**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN BERRIS,<br><br>        *Plaintiff,*<br><br>v.<br><br>SUNG-FUNG CHOI (a/k/a NORMAN CHOI), DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC, HIN WENG LUI (a/k/a SAMUEL LUI), GENESIS UNICORN CAPITAL CORP.,<br><br>        *Defendants.* | No.: _____<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

Plaintiff Ryan Berris for his Complaint against Defendants Sung-Fung "Norman" Choi ("Choi"), De Tomaso Automobili Holdings N.A. LLC ("De Tomaso" or "the company") (together "De Tomaso Defendants"), Hin Weng "Samuel" Lui, and Genesis Unicorn Capital Corp. ("Genesis") (collectively and together with certain affiliates, "Defendants"), and through his undersigned attorneys, alleges upon personal knowledge and upon information and belief, as follows:

## NATURE OF THE CASE

1.      The revival of De Tomaso as a world-class luxury automobile manufacturer is one of the most remarkable stories of the past decade in the elite sports car industry.  The once legendary brand, whose iconic vehicles include the Pantera and the Mangusta, fell into disrepair for decades before being revived by Ryan Berris and Norman Choi.  Berris is a highly regarded figure in elite automobile manufacturing circles.  He cut his teeth helping develop the now famous Scuderia Cameron Glickenhaus ("SCG") brand and brought with him industry expertise and an extensive

network of artisans, designers, engineers, machinists, creatives, and connoisseurs, all of whom were essential to relaunching De Tomaso. Choi was purportedly a Hong Kong financier who, along with another Hong Kong-based partner, had dabbled in elite car manufacturing by purchasing the defunct De Tomaso and, separately, the Gumpert brand (which was later renamed Apollo). Choi's problem was that while he was able to step into the water of elite motor cars, he had no idea how to swim and found himself unable to successfully relaunch the brands.

2.      That all changed in 2014 when Choi was introduced to Berris and then later asked Berris to help him manage and develop the Apollo brand. Over the course of a few years, Berris turned Apollo from a money losing venture into a viable company that was ultimately purchased for approximately $153 million in 2020. Then, while Apollo was being sold, Choi agreed to partner with Berris to develop De Tomaso, with Berris running the company, overseeing the design and production of its automobiles, and serving as a 10% equity holder. In addition to his equity stake, the company agreed to pay Berris a relatively modest salary and industry-customary commissions on sales. Choi also agreed to no longer permit his business partner from Apollo to be involved in De Tomaso.



*Berris and Choi with a De Tomaso P72 Inside the Toyota Formula One Wind Tunnel.*

3.      Thereafter, Berris devoted his life to De Tomaso. As both CEO and Chief Marketing

Officer, Berris routinely worked over 80 hours per week for years, travelled for most of the time away from his family, and almost single-handedly oversaw the successful development of the company and revival of the brand.  Among other things, he leveraged his connections with world-class engineers and manufacturers to recruit them into the development process.  He secured high-profile strategic hires, including professional racing celebrities.  And he oversaw the marketing of De Tomaso to potential purchasers, who are typically a select group of high-end automobile aficionados, many of whom already respected and trusted Berris.

4.      As Berris kept himself fully immersed in the development of De Tomaso, he assumed that Choi was his loyal partner and had the best interests of the company at heart.  To Berris's mind, he and Choi were friends and enjoyed a good working relationship.  Indeed, Berris was close enough to Choi to agree to sponsor Choi for a United States O-1 visa.

5.      But, just as remarkable as the resurgence of the De Tomaso brand was the complete betrayal of De Tomaso's founding ideals by Choi and his cynical efforts to claim Berris's work as his own.  Choi became obsessed not with making the perfect automobile to resurrect De Tomaso and to serve the company's discerning clients, but instead with trying to take the company public through a bogus SPAC process involving Defendant Genesis and its nominal President and CFO, Defendant Samuel Lui.  In doing so, Choi began to cut corners behind Berris's back, conjure false financial statements, and mislead the discerning customers who were already putting down their sizeable deposits for De Tomaso's vehicles.

6.      As Berris gradually learned of Choi's chicanery, he confronted him and made clear that Choi was destroying the hard work Berris put into De Tomaso.  Worse, Choi was deceiving the company's clients, creating a product that did not comply with the terms marketed to customers, and appeared to be committing fraud.  Rather than address those concerns, Choi and Lui worked

in concert to fire Berris.  Choi then threatened Berris with potential physical harm if he ever disclosed what he knew and set about defaming Berris to De Tomaso's development partners, clients, and employees, as well as others in the industry.

7.      In doing all of this, Choi claimed to repossess, without any legal authority, the 10% equity stake Berris had in De Tomaso.  And, in astounding fashion, Choi declined to pay Berris his salary (which Berris had deferred, among other things, to help the company maintain liquidity), his commissions, or even his out-of-pocket expenses, which included the salary and expenses of De Tomaso employees necessary for the company to operate.

## THE PARTIES

8.      Plaintiff Ryan Berris is a citizen of New York who resides in New York.

9.      Defendant De Tomaso Automobili Holdings N.A., LLC, is a Delaware limited liability company with its address at 200 Glastonbury Boulevard, Suite 102 in Glastonbury, CT 06033. The sole member of De Tomaso Automobili Holdings N.A., LLC is De Tomaso Automobili Holdings Limited, a Marshall Islands corporation. Upon information and belief, De Tomaso Automobili Holdings Limited is wholly owned by Norman Choi.

10.     Defendant Sung-Fung "Norman" Choi is a citizen of Hong Kong S.A.R. who resides at 35 Hudson Yards in Manhattan, New York City.  Defendant has an O-1 visa to work and live in the United States.

11.     Defendant Genesis Unicorn Capital Corporation ("Genesis") is a Delaware corporation with its principal executive offices and place of business at 281 Witherspoon Street, Suite 120, Princeton, NJ 08540.  Genesis shares are publicly traded under the ticker GENQU on the NASDAQ stock exchange, which is based in New York, and it made material statements to investors who purchased its shares on that exchange.

12.     Defendant Hin Weng "Samuel" Lui is a citizen of Singapore.

## JURISDICTION

13.     This court has subject matter jurisdiction over Berris's claims under 28 U.S.C. § 1332(a).

14.     The matter in controversy exceeds $75,000, exclusive of interest and costs.

15.     The parties are completely diverse.  Defendant Genesis is a citizen of Delaware, where it is incorporated, and New Jersey, where it maintains its principal executive offices.  Defendants Choi and Lui are foreign nationals who have not been admitted for permanent residency in the United States.  Defendant De Tomaso is a limited liability corporation which is solely owned by a Marshall Islands corporation solely owned and controlled by Defendant Choi.

## FACTUAL BACKGROUND

### A.  Berris Builds a Reputation for Excellence in High-End Automobiles

16.     Prior to his involvement with Defendants, Berris held multiple positions in the high-end automobile industry.  In this extremely competitive and insular industry, which involves the development and sale of limited edition, exclusive, multi-million-dollar automobiles, reputation is everything.  Berris spent years acquiring the knowledge and skill to become one of the leaders of a younger generation of developers in the industry.  He accomplished this through serving in multiple roles and developing a deep network of international connections and clients.  In the industry, many purchasers are repeat buyers who are deeply knowledgeable in the space.  Berris was a trusted voice to many of these potential purchasers and collectors in the rarified world of bespoke luxury automotive.

17.     Berris was born and raised in Brooklyn, Connecticut and came from humble beginnings. He was largely reared by his grandmother, who operated a foster home and was awarded Connecticut citizen of the year for her work.  Berris went to public school and eventually graduated

from the University of Connecticut with a degree in economics.  After graduation, Berris worked as an investment advisor starting in 2007.  He worked full-time in that capacity until in or about 2012, when he co-founded a financial technology startup related to crowdfunding.  After that he became involved in the car industry.

18.     When Berris was a young child, he admired high-performance and limited-edition cars. He routinely went to car shows and other events and religiously collected automotive publications. Following that passion, he built project vehicles of his own, participated in motorsport events, and developed skills in automotive videography.  At UConn, he participated in founding the Uconn Car Club, which included an annual show in which sponsors such as EA Sports and RedBull, brought their Formula One cars to the area for viewing.

19.     In or around 2012, Berris began working for Scuderia Cameron Glickenhaus ("SCG"), an American automotive company that manufactures high-performance racing and road cars. Founded in 2004, and based in Westchester County, New York, SCG's purpose was to develop limited supply high-performance racing cars that would compete in the legendary "24 Hours of Nürburgring" races.  Over the years, SCG was able to produce multiple high-performance cars and win international awards.  In 2012, SCG's P4/5 Competizione Modificata was one of the first hybrid vehicles to complete a 24-hour endurance race at the Nürburgring and, as a result, it won a Federation of International Automobiles ("FIA") Alternative Energies Cup.   FIA is the international organization that oversees sanctioned international motorsports.  They later became the first American manufacturer in over fifty years to a take an overall podium position at Le Mans in the 24-hour race in 2022 with their SCG007 hyper-car.

20.     Berris was a key contributor and strategic advisor to the development of the standalone SCG brand.  Berris aided the development, sales, marketing, and press for SCG's first clean-sheet

car offering, the SCG003.  Berris identified, curated, and onboarded SCG's first clients and helped create and launch the brand's successful international client racing program. In parallel, he helped introduce the SCG brand to an extensive network of bespoke automotive enthusiasts, collectors, and influencers. These included senior Wall Street bankers, royalty from Middle East, and other ultra-high worth clientele.  One of Berris's responsibilities was to interface with potential buyers and keep them updated on the progress of the development of SCG's new models.  These connections were essential for the company.  Indeed, one of the founders has said that they would not have a car company if not for Berris.  A two-volume book on the founding of SCG documents Berris's substantial involvement in the success of SCG.

21.     Choi reached out to Berris in or about 2014 saying that he was an admirer of SCG. Thereafter, Berris and Choi met at a racetrack in Spain where they discussed various aspects of SCG's automobiles. As they continued to communicate, Choi confessed that he and his business partner at the time, Koon-Ming "Michael" Choi (no relation to Norman), had acquired two automotive brands, Gumpert (later rebranded Apollo) and De Tomaso, but had been unable to develop the brands and had a number of false starts.  He asked Berris for advice about how he would advance Apollo and De Tomaso.

22.     In October 2016, SCG, at Berris's urging, partnered with Apollo to develop the Apollo Arrow, which then became the Apollo Intensa Emozione ("IE").

### B.  Norman Choi Crafts an Image as a Successful and Wealthy Entrepreneur

23.     Norman Choi was born into an affluent Hong Kong family.  He was educated in the United Kingdom and the United States.  He began his career in 1995 with Merrill Lynch (Asia) in the equity derivative group.

24.     In or about 1999, Choi began working for his family's business.  Among other things, at

that time, his family owned or controlled four companies listed on the Hong Kong stock exchange. Building upon his family's reputation and success, Choi became—at least on the surface—a successful entrepreneur who engaged in business transactions throughout the world.  In particular, he was focused on debt restructuring in his various merger and acquisition activities.  However, as described in more detail below, Choi was also involved in various apparent "pump and dump" schemes and has left a trail of failed deals in his wake.

25.     In or about 2020, Choi sought to obtain an O-1 visa, which permits foreign nationals with unique skills or talents to live and work in the United States along with their families.  In doing so, he requested that Berris serve as a sponsor.  Berris agreed and also assisted Choi in obtaining a number of reference letters in support of Choi's application, which letters detailed how Choi worked alongside Berris to develop De Tomaso.

26.     As detailed in a press release issued by his U.S. immigration attorneys upon the successful approval of Choi's petition for an O-1 visa, Choi has relied on his purported entrepreneurial skill in seeking his visa: "Mr. Choi has been credited with the comeback of legendary companies Apollo and De Tomaso, among others.  Mr. Choi's groundbreaking work has been profiled in major automotive publications including Robb Report, Automobile Magazine, Road and Track, The Drive, Top Gear, Car Buzz, Hypebeast, and Autoweek. Choi is widely regarding as a debt restructuring and branding genius, having masterminded and successfully closed some of the most significant mergers and acquisitions transactions in automotive history."

27.     Choi sought Berris's assistance to obtain an O-1 visa in part because he was critical of the Chinese Communist Party and its severe policy shift in Hong Kong and wanted to move his family and assets abroad to what he perceived as the protection of foreign jurisdictions away from the CCP's reach.  Choi's concern about the Chinese government were one of the factors that drove

him to ask Berris help him to get an O-1 visa.

28.     Choi regularly travels around the world, but he owns property in (at least) Hong Kong and New York City.

**C.**  **Impressed by Berris's Work, Choi Befriends Berris and the Two Begin a Long and Close Working Relationship**

29.     In 2014, Norman Choi and his business partner "Michael" Koon-Ming Choi acquired German supercar company Gumpert out of bankruptcy.  After purchasing Gumpert, Norman and Michael Choi attempted to rebrand it as "Apollo Automobil", and they commissioned two prototype show-vehicles that debuted in March 2016 at the Geneva motor-show.  Later, Norman Choi informed Berris that "Clement" Shui Tong Mak, another shadowy Hong Kong financier, held an undisclosed interest in Apollo.  However, their initial efforts with Apollo failed to gain much traction or sales in the auto world.

30.     Around this time, Choi met Berris and they had numerous conversations about the automobile industry.  Over time, they developed a cordial relationship and Choi began to suggest that Berris come and work alongside him.  At the time, Berris was a key contributor to SCG's growing success and this appeared to impress Choi.

31.     In or about 2016, Choi formally offered Berris a job managing Apollo as General Manager and Chief Marketing Officer of the company.  The initial idea, as discussed above, was to partner with SCG—where Berris was leaving on good terms—to develop Apollo's brand.  Ultimately, Apollo did not continue its partnership with SCG and instead opted to utilize the same Italian design house, Manifattura Automobili Torino, that Berris also helped develop while at SCG. Choi designated Berris to revamp the company and salvage its image and brand.

32.     Under Berris's leadership, Apollo designed the Apollo Intensa Emozione, which was widely praised as reinventing the ultra-luxury "supercar" market. A feature piece in the *Robb*

*Report* lifestyle magazine described how Berris worked alongside Choi to build the Apollo brand. During an interview with Berris and Choi, Berris noted that "I've been involved with the Apollo program since the inception of the IE, as Norman has been my friend for many years. I had been working with Scuderia Cameron Glickenhaus (SCG) when Norman and I started talking about resurrecting the Apollo nameplate." *See* "Q&A:  Apollo IE's Dynamic Duo on Why Their Creation Could Be Supercar Salvation," https://www.yahoo.com/lifestyle/q-apollo-ie-dynamic-duo-230009443.html.



*Apollo Intensa Emozione.*

33.    In March 2017, a Hong Kong company called CCT Land Holdings Limited (HK: 261) ("CCT Land") expressed interest in purchasing a majority stake in Apollo.  Choi showed an eagerness to complete the deal and it was on track to close later that year.  However, in late 2017, the *Financial Times* began to ask questions about the nature of the transaction.  Choi became agitated in learning about the inquiry and quickly set about shutting the deal down.

34.    Berris later learned that CCT Land was a company in which Choi had a substantial interest

and the deal would have allowed Choi to exit Apollo with a considerable premium before delivering any vehicles.  It was also during this period that Berris became aware that Apollo's CFO, Diana Majcher, also managed the finances of various other Choi companies.  Over time, Berris would see that Majcher would subordinate her fiduciary duties to Apollo, and later De Tomaso, to advance Choi's personal interests.

35.     CCT Land was controlled by Clement Mak, whom Choi told Berris also had an undisclosed interest in Apollo.  Berris was concerned by the events related to CCT Land and Choi's reaction to public scrutiny of the deal such that he began to look into Choi's business associates.  Concerned by what appeared to be interested self-dealing transactions by persons with ownership interests in Apollo, Berris confronted Choi and demanded an explanation.  Choi disclosed that the proposed self-dealing transaction was motivated by his business partner, Michael Choi.  It was at this time that Berris stated his discomfort and told Choi that if Berris was going to stay to help build the company, Choi would need to buy out Michael and be the only beneficial owner of Apollo and De Tomaso.  Choi agreed.

36.     In January 2018, Berris entered into a formal consultancy agreement with Apollo.  The terms of that agreement were that Berris would receive a salary of $200,000 and a one-percent commission on the sale of the Apollo IE or the Apollo Arrow.

37.     At that same time, even though he was distracted by the events relating to CCT Land, Berris continued to work to develop the Apollo brand and vehicles.  Among other things, Berris began to leverage his contacts to build demand for the new Apollo cars and awareness of the brand.  In addition, Berris helped secure a technical partnership with the founder of Mercedes-AMG, Hans Werner Aufrecht, and his new company HWA, to co-develop the final Apollo vehicle.  Mr. Aufrecht is a legend in the automotive industry and one of the founders of AMG.

HWA has been responsible for all of Mercedes's non-Formula One motorsport development and production. These were crucial achievements in the advancement of Apollo because, by Berris bringing in highly respected industry professionals, he established Apollo's legitimacy as a new brand.

38.     Berris also played a central role in the marketing and branding of Apollo. Among other things, before and after securing the assistance of HWA, Berris fronted Apollo and its model the Intensa Emozione (the "IE") at major industry functions. The development of the IE was initially announced in October of 2017 with a price in excess of $2.6 million. In June 2018, and as referenced above, it was announced that HWA would complete the development of the vehicle. A prototype of the car was shown at the Goodwood Speed Festival, where it received the Festival's "Showstopper" Award. Berris was Apollo's frontperson at the festival, touted the car on behalf of Apollo, and received the Showstopper Award on behalf of Apollo:



*Apollo Intensa Emozione at Goodwood Festival of Speed 2018.*

39.     As a direct result of Berris's leadership, Apollo Automobil was acquired in March 2020

for $153 million by We Solutions Ltd., which rebranded its holding company as the Apollo Future Mobility Group (HK: 860).  This buyout was a direct result of Berris's business development, management, and branding contributions for Apollo.  Berris received no compensation for the buyout, nor any sort of bonus.  Rather, Choi pocketed the funds from the buyout.  Earlier in Berris's tenure at Apollo, Choi offered to provide Berris with equity options in Apollo.  Berris would have been able to exercise those options and cash them out in connection with the merger, but Berris instead requested that Choi roll whatever Apollo equity he was going to be granted into De Tomaso, which was expressly excluded from the purchase. Choi also agreed to use the full proceeds from the Apollo sale to fund De Tomaso's operations.  (As discussed below, Choi never carried out this promise.)

40.     During their years working together at Apollo, Berris and Choi developed a close friendship as they traveled the world together to promote the new brand.  They were in constant communication including by email, WhatsApp, and telephone calls, and they considered one another to be extended family.

### D. De Tomaso Hires Berris To Return the Brand To Its Glory Days As a Leading Luxury Automotive Brand

41.     De Tomaso was founded in Italy in 1959, and at one point was majority owned by Ford. At its peak, the company owned Maserati and was a competitor to Ferrari and Lamborghini. During its glory days, De Tomaso cars were the envy of car collectors around the world, with owners including Elvis Presley.

42.     After the founder of De Tomaso, Alejandro de Tomaso passed away in 2003, his wife Isabelle closed the company down in 2004.  In 2009, a group of former FIAT executives

attempted to revive the brand, but De Tomaso went into liquidation in 2012, with its rights and

trademarks thereafter held by the Italian Government.



*1970 De Tomaso Pantera*



*De Tomaso is also known for its Mangusta, featured in Quentin Tarantino's Kill Bill: Vol. 2.*

43.     In 2014, Norman Choi and Michael Choi acquired the De Tomaso Automobili rights and trademarks from the Italian Government.  The rights originally lay dormant while Choi pursued the Apollo development.

44.     Initially, Norman and Michael Choi planned to revive the De Tomaso brand by making replica kit cars of the iconic De Tomaso Pantera.  They commissioned a kit-car manufacturer in South Africa to do the development and named Tom Kim as CEO of De Tomaso.  While Tom Kim was CEO of De Tomaso, the company planned to do a reverse merger with New Generation Consumer Group (OTC: NGCG), a shell company associated with Norman Choi, Michael Choi, and Tom Kim, which had at one point been the subject of an apparent pump-and-dump scheme. Lacking credibility within the insular world of ultra-luxury cars, this initial revival attempt appeared poised to fail.



*Choi and Kim's original De Tomaso facility in Los Angeles.*

45.     Desperate to avoid failure, Norman Choi pleaded with Berris to take over the company and create a world-class, credible revival of the famed De Tomaso brand. Berris agreed on the

condition that Norman Choi purchase Michael Choi's stake in the company, as Norman Choi explained to Berris that the earlier, failed revival plan was driven by Michael Choi and Tom Kim, who was Michael's close friend.

46.     Berris acted as both CEO and Chief Marketing Officer for De Tomaso, working around the clock to redevelop De Tomaso as a world-class brand.  Berris designed and executed a business plan and strategic roadmap that involved strategic technical partnerships, establishing a global dealer network, and designing one-of-a-kind marketing campaigns.  Overhead costs, including office space, were not covered by the company.  Berris, with the approval of Choi, regularly traveled to client meetings, auto shows, and development facilities using his own money.  Those expenses were to be reimbursed by the company, but a substantial amount of the expenses were never reimbursed.

47.     Berris developed the brand concept brief for the P72, the company's first offering as part of its revival.  The P72's brand concept paid homage to the original 1965 De Tomaso P70.  Berris also worked closely with Jowyn Wong, lead designer on the P72.  Although Norman would later denigrate Jowyn Wong as an "illustrator" who played little substantive role in the development of the vehicle, Wong was integral to the P72's design.

48.     Because Norman Choi wanted to keep capital expenditures to a minimum, Berris effectively ran De Tomaso as a one-person operation, managing the entire business, clients, dealers, engineering operations, marketing, and press up until June 2021 when he made his first hire.

49.     On July 4, 2019, at the Goodwood Festival of Speed, De Tomaso debuted the P72, its first offering as part of its revival, in celebration of the brand's sixtieth anniversary.  Here too, and as described in more detail below, Berris led the vehicle's development and branding.



*Berris presenting the De Tomaso P72 at the 2019 Goodwood Festival*

50.     The P72 and De Tomaso revival were internationally acclaimed.  Within a few days of the debut, De Tomaso received more legitimate purchase inquiries than the limited 72-unit supply of the P72, which had a base price of one million USD.



*Source:* https://uk.motor1.com/news/358133/de-tomaso-p72-revealed/amp.



*Source:* https://www.topgear.com/car-news/first-look/de-tomaso-back-meet-p72-supercar.



*Source:* https://carbuzz.com/news/de-tomaso-reborn-with-the-delicious-p72.



*Source:* https://www.topspeed.com/cars/car-news/the-de-tomaso-p72-represents-brand-revival-done-right.

51.     While working at De Tomaso, and building on his earlier work in the industry, Berris curated a group of high-net-worth clients who trusted and respected his vision, leadership, and character. By the spring of 2022, De Tomaso had received approximately $36 million in nonrefundable deposits.  This was vastly more successful than what had occurred with Apollo.  Indeed, the demand for the P72 far exceeded the supply.  Berris had to insert a "no resale" provision in the sales contract that allowed De Tomaso to repurchase the cars back within two years because, even at this early juncture, it was clear that the P72 could command multiples of its list price on the secondary market.  This measure preserved the exclusivity and value of the product for the company's discerning customers.

52.     After the successful launch of the P72, Berris spearheaded an effort to position De Tomaso as an exclusive, international luxury brand with tie-ins to the fashion and lifestyle sectors. These were crucial in developing De Tomaso as a sustainable brand. As part of these efforts,

Berris negotiated several high-profile media profiles of De Tomaso with top television and film studios.  Berris was also working to develop and finalize partnerships with high-end European fashion brands.

53.     To execute his vision and strategic plan, Berris made high-quality and high-profile strategic hires of top professionals to build the De Tomaso brand.  Berris's first hire, Hugo de Sadeleer, joined De Tomaso in July 2021.  De Sadeleer is a noted professional racing driver who participated in some of the most prestigious competitions in Europe.  He served as a development driver for the company.  As recently as last year, De Sadeleer was making demonstration drives for the P72 and helping to promote the vehicle.



*Berris with De Sadeleer in a De Tomaso P72.*

54.     In September 2021, Berris was able to convince Carmen Jorda, an accomplished and high-profile female racing driver (who was only the 11th woman ever in Formula One) to serve as a developer and driver.  Berris brought Jorda to De Tomaso to work on many company initiatives designed to take De Tomaso's brand to the next level.  This endorsement gained considerable international press attention, further promoting and establishing the brand.



*Jorda was prominent in the brand's marketing materials and at promotional events.*

55.     Jorda was paid a base of €250,000 a year, plus €100,000 in image rights, on a three-year guarantee.  As part of that relationship, Berris co-created a series of short films featuring the P72 to launch the "Meet Isabelle" campaign, in homage to Isabelle de Tomaso, one of the co-founders of the original company.  The films received rave reviews in the automotive press, with one publication noting: "[t]here is no doubt that her appointment will help boost the image of De Tomaso Automobili as the carmaker continues to reposition itself within the automobile industry."  Berris paid out of pocket for numerous expenses related to the Meet Isabelle campaign, including $25,000 for a press event at Cipriani Wall Street attended by Choi.

56.     As recently as March 2023, Choi was taking credit for Berris's Meet Isabelle marketing campaign at an invitation-only event in Toronto.

57.     Also in September 2021, Berris onboarded Ash Thorp, a renowned digital artist and designer who has contributed to the direction and concepts for X-Men: First Class, The Amazing Spider-Man 2, and many other feature films.  Thorp famously designed the Batmobile used in the 2022 movie *The Batman*.  At De Tomaso, Thorp was to be responsible for designing the

company's various digital endeavors.  Berris also brought Thorp on to consult on vehicle design.

The hire garnered significant press attention, which featured Berris as the spokesperson for the

brand.



*Source:* https://www.forbes.com/sites/nargessbanks/2021/12/23/de-tomaso-collaborates-with-batmobile-digital-artist-ash-thorp-on-new-digital-initiative

### E.  De Tomaso and Choi Agree To Compensate Berris For His Work As De Tomas's CEO and CMO

58.     In the summer of 2020, after De Tomaso's revival had attained a firm foundation, Berris

and Norman Choi agreed to compensate Berris with a base salary of $400,000 a year, a two

percent commission on all sales, and a De Tomaso P72 vehicle (chassis number 60).  In the

interest of not straining the financials of the company, Berris agreed to defer his compensation as

a capital contribution.  As a partner in the company's success, Berris fronted many of the

company's operating expenses, including salaries for later hires, as a further capital contribution.

59.     In February 2022, Berris was asked to issue an invoice for one monthly installment of his base salary, amounting to approximately $33,000.  De Tomaso made that single salary payment to Berris.

60.     Also in February 2022, in addition to the compensation De Tomaso agreed to provide Berris back in September 2020, De Tomaso awarded Berris a new Porsche 911 GT3 as a bonus in recognition of his stellar performance running De Tomaso.  The Porsche was never delivered.

61.     During his time running De Tomaso, Berris was responsible for over $100 million in De Tomaso sales agreements and he personally executed each of the purchase and sale agreements on behalf of De Tomaso.



*Berris's signature on sale agreements for the De Tomaso P72.*

**F.  De Tomaso Grants Berris a Ten Percent Equity Stake in Order To Keep Him Running the Company**

62.     After the sale of Apollo, Choi began to withhold payments that De Tomaso owed to various of its technical partners.  Instead, Choi began looking to see if various aspects of the P72's development could be outsourced to Apollo.  Dealer-partners and technical partners were requesting assurances of De Tomaso's financial stability and proof of manufacturing capacity before they would release customer deposits from escrow.  To provide that stability, De Tomaso entered into a licensing agreement whereby Apollo would fund the development of a vehicle platform for De Tomaso.  The dealer-partners agreed to release the funds based on the financial support of Apollo, but the money never arrived from Apollo.  Choi continued to act as CEO of Apollo Automobil during this period. Choi's incompetence as CEO and that of his immediate leadership team caused serious delays, and the agreement between Apollo and De Tomaso was terminated.

63.     In mid-2020, Berris and Choi engaged counsel on behalf of De Tomaso to formalize its corporate structure.  As part of that process, the company sought to establish a United States-based holding company.

64.     In the summer and fall of 2020, Berris was fully in charge of De Tomaso's operations and branding.  He also played a significant role in its finances and was a primary or co-signatory on all the company's accounts of which he was aware, with the exception of its Hong Kong Citibank account.  He also managed and executed key corporate filings, including the formation of De Tomaso's domestic LLCs.

65.     In or about November 2019, Berris began to have serious reservations about continuing to work with Choi.  In connection with the delivery of an Apollo IE to a client/friend of Berris, Choi withheld significant production delays from Berris even as that client was scheduled to

travel from the United States to Germany to receive the Apollo IE. The client in fact traveled to Germany and, only upon the client's arrival, did Berris learn that the vehicle was not ready. This was extremely damaging to Berris's relationship with the client and left Berris blindsided and embarrassed.

66.     Thereafter, as Apollo was being sold and the deal closed in March 2020 (and as the COVID-19 pandemic was beginning to sweep the world), Berris had additional concerns, described above, relating to Choi's business practices. As a result of these, and other concerns, Berris began looking to keep his options open and potentially cease working with Choi. However, Choi—and his wife—made repeated assurances to Berris that he should remain with De Tomaso and that he would have substantial control over the company. Choi assured Berris that he would be a partner in the company and have a 10% ownership stake. These promises were made, among other things, to retain Berris at De Tomaso.

67.     In or about late August and early September 2020, Berris's compensation was formalized over a series of phone calls with Choi as Berris took on leadership of De Tomaso. Berris was promised a 10% equity stake in De Tomaso to stay at the company. In addition, Berris was promised a salary of $400,000 a year starting in September 2020 and a 2% commission on vehicle sales. Based on representations by Choi that De Tomaso needed the liquidity, Berris deferred his salary. Berris received only one month's salary between September 2020 and his termination in May 2022.

68.     In this same time period, Choi proposed that De Tomaso purchase or rent corporate apartments for both him and Berris in the Hudson Yards development in New York City or in Miami. Thereafter, Choi's real estate broker—who was a friend of Choi's wife—sent Berris multiple listings from the development at 35 Hudson Yards. Berris declined these offers and

expressly told Choi that company funds should not be used for such a purpose. Choi at one point also proposed the purchase of a corporate yacht.

69.     Choi ultimately purchased a $10+ million apartment at 35 Hudson Yards through "Too Slow LLC," an entity whose name was based on a joke he shared with Berris.



*City of New York recording form for Choi's 35 Hudson Yards apartment.*

70.     In October 2021, De Tomaso established a banking relationship with UBS Private Wealth Management, whereby Berris and Norman Choi were appointed the only two authorized signatories on the account.

### G. By 2020, Berris Developed De Tomaso Into a Company Worth Hundreds of Millions

71.     With the obvious demand for the P72, it was clear that De Tomaso would need additional capital to develop the car and expand the brand. Accordingly, beginning in January 2021, De Tomaso began to work on raising funds. Berris spearheaded those efforts and personally prepared the materials to present to potential investors, including creating a 140+ slide presentation as well

as financial models and forecasts for De Tomaso.  These forecasts and models were later manipulated by Norman Choi, Diana Majcher, and Samuel Lui.

72.    It did not take long to find interested potential investors.  Berris was approached by numerous company clients, with whom Berris had longstanding relationships, who expressed interest in purchasing majority stakes in the company with Berris remaining in his role.  In connection with this first outside fundraising round, De Tomaso was valued at approximately $200 million.  Numerous other potential investors emerged over the course of 2021.  The minimum investment that De Tomaso was seeking was $20 million.

73.    A second, third-party valuation was conducted on July 31, 2020, as the brand continued to grow.  That valuation found the company to be worth approximately $400 million.



*July 2020 valuation prepared by GCA Professional Service Ltd.*

74.    However, Norman Choi was keen to do a US SPAC to take the company public.  While Berris preferred to keep the company private, he had Choi agree that if they did take De Tomaso public that the business plan would remain intact and the additional capital would go towards potential mergers and acquisitions identified by Berris.

75.    In November 2021, De Tomaso entered into an engagement agreement with ARC Group for financial advisory services relating to a potential SPAC.

76.    By fall of 2021, under Berris's leadership, De Tomaso had quickly become a self-sustaining business, with world-class partnerships, an oversubscribed order book with approximately $36 million in non-refundable deposits.  The company had a cash-flow positive business structure with a reliable customer base of ultra-high net-worth individuals who trusted in Berris's vision for De Tomaso.

77.    Reflecting the growth and stability that Berris's work had brought to De Tomaso, a third-party valuation prepared to support Choi's efforts to take the company public via a SPAC valued the company between $1 billion and $1.5 billion.  Berris' recruitment of driver sponsors and the fact that the company was receiving tens of millions of dollars in non-refundable customer deposits were major drivers of the increase.



*Valuation report prepared by ARC Group in March 2022.*

### H. Choi Launders Money from Chinese Entities To Mislead Potential De Tomaso Investors

78.     In or about October 2020, Choi was working to raise capital to fund De Tomaso.  At that time, the company, under the direction of CFO Diana Majcher, was purportedly keeping books and records that were to be shown to potential investors to demonstrate the financial condition of the company.  During this time period, Choi claimed to have deposited $3.1 million in personal funds as a capital contribution to the company.  After those funds were contributed, they were reflected in the company's financial statements that were shown to potential investors—and later to a SPAC.

79.     However, those funds did *not* come from Choi.  Rather, they appear to have come from a shell company that has been associated with an ongoing fraud, money laundering, and pump-and-dump scheme to which Choi—and his business partner, Michael Choi—have been linked.  That shell company is a Hong Kong listed entity called Sino Vision Worldwide Holdings Limited (HK: 8086) (formerly "DX.com Holdings Limited").  Sino Vision has been linked by investigative journalists in Hong Kong, including David Webb, a former director of the Hong Kong Exchange, to a network of companies engaged in financial misconduct.



*Graphic from* David Webb, *The Enigma Network: 50 Stocks Not to Own*, Webb-Site Reports (May 15, 2017), https://webb-site.com/articles/enigma.asp.

80.    This was not just some conspiracy theory.  Rather, major financial papers recognized that the "Enigma Network" investigation was credible:



Jennifer Hughes, *Traders seek source of Hong Kong's 'Enigma' market crash*, Financial Times (June 28, 2017), https://www.ft.com/content/e1db0afc-5bab-11e7-b553-e2df1b0c3220.



Don Weiland & Nicolle Liu, *Hong Kong corruption probe targets 'enigma network'*, Financial Times (May, 16 2019), https://www.ft.com/content/6b1750c4-77bf-11e9-bbad-7c18c0ea0201.

81.    In preparing financial statements, Choi (and Majcher) claimed that the $3.1 million was from Choi himself:



*2020 De Tomaso Financial Statement Prepared by Majcher and Choi.*

82.     However, Choi made perfectly clear in text messages that the $3.1M was from Sino Vision, and not Choi himself.

```
[2/2/21, 4:39:51 AM] Norman Choi: notes in the email, let me know if they are clear
[2/2/21, 4:39:51 AM] Norman Choi: in total reflects close to $30m with the accrued interest
[2/2/21, 4:39:51 AM] Norman Choi: and this is not including the $2.4m from sino vision because that actually came in Oct
[2/2/21, 4:41:23 AM] Norman Choi: Actually another $700k on top of $2.4m for a total of $3.1m

Which will be reflected in Dec/ Jan management account
```

*February 2021 WhatsApp messages from Norman Choi reflecting Sino Vision cash infusion.*

83.     Accordingly, the company—at the direction of Choi—was laundering money through its financial statements and misleading potential investors as to the source of the funds available to the company to further expand and develop its business.

**I.    Norman Choi Seeks to Push De Tomaso into a SPAC Transaction with Genesis**

84.     Both Choi and Berris knew that continuing to grow De Tomaso would depend in part on their ability to obtain new money to expand its operations.  By late 2020 or early 2021, Choi was looking at the prospect of eventually going public via a SPAC transaction. A SPAC—or "Special Purpose Acquisition Company"—is a publicly traded company that raises capital to identify and acquire a target company.  Because a SPAC has due diligence and reporting obligations once it has selected a target and because the SPAC initial public offering represents to investors that the SPAC has not yet selected a target, a key requirement of a SPAC is that it have not selected a target company when it is formed and makes an initial public offering.

85.     In 2021, Choi began to press for selling a stake of De Tomaso to Genesis Unicorn Capital Corporation (NASDAQ: GENQ), a SPAC.  Genesis filed its Form S-1 Registration Statement with the SEC on July 1, 2021.  That Registration Statement represented that the Chief Executive Officer and interim Chief Financial Officer of the SPAC was Juan Fernandez and that the company "intend[ed] to focus our search on the intersection of the healthcare and technology industries, specifically within the biotechnology and pharmaceutical sectors."

86.     Choi enlisted ARC Capital to find potential SPACs to acquire a stake in De Tomaso. ARC Capital, a Shanghai based firm that has been active in US SPAC markets, has faced substantial scrutiny for its activities. ARC-backed companies have been the subject of enforcement action by the SEC for material misstatements and omissions, *see* Go EZ Corporation, Arc Lifestyle Group Inc., and Nova Smart Solutions, Inc., Securities Act Release No. Release No. 10400 (Aug. 14, 2017), https://www.sec.gov/Archives/edgar/data/1649801/999999999717009894/filename1. pdf, suspension orders by the SEC, *see* Exchange Act Release No. Release No. 34-82204 (Dec. 4, 2017) (the same company later had its registration revoked), and lawsuits for securities fraud in the US and foreign countries, *see* Douglas Macmillan & Jonathan O'Connell, *Trump's Newest Business Partner: A Chinese Firm with a History of SEC Investigations*, Washington Post (Dec. 23, 2021 11:25 AM), https://www.washingtonpost.com/business/2021/12/23/trump-spac-deal-sec.

87.     Based on the information available to him at the time, Berris had concerns about bringing in ARC Group and about the statements that Choi was separately making to potential investors, but he remained nearly exclusively focused on the company's operations, product development, and sales.   Unbeknownst to Berris, Choi himself was a key investor in Genesis and it was predetermined that Genesis would acquire a stake in De Tomaso.

88.     On August 25, 2021, Choi sent a WhatsApp message to Berris with a link to Genesis's July 1, 2021, S-1 Registration Statement stating: "Samuel's latest SPAC" and "Tell u more later when we meet."  "Samuel" was Defendant Samuel Lui, an associate of Choi's from the Hong Kong financial arena.  Samuel Lui would not appear in any public filing by Genesis until it filed an amendment to its S-1 on November 24, 2021, disclosing that Lui was its President and Chief Financial Officer. Thereafter, Choi forwarded regular texts from Lui updating Choi about the

development of the SPAC.  The reason for this was that Choi and Lui had already agreed that the purpose of the SPAC was to acquire a stake in De Tomaso.



*WhatsApp message from Norman Choi on August 25, 2021 regarding Samuel Lui's SPAC.*

89.   In fact, Choi had been in discussions with Lui since at least May 2021 regarding possible investment in the company.  During fall 2021, Choi worked with Lui to coordinate the relationship with ARC.

90.   For example, on or about December 15, 2021, Choi forwarded Berris an email titled "Genesis Unicorn Capital Corp Form S-1A SEC STATUS" which updates Choi on the status of the filing of Genesis's Registration Statement so that it can be listed on a stock exchange.



*Forwarded texts from Choi regarding Genesis SEC filings.*

91.     Knowing that their conduct to that point was likely illegal, Choi and his associates sought to establish a sham paper-trail. On or about February 25, 2022, ARC sent a fabricated email to Choi and Berris pretending to introduce Genesis to De Tomaso for the first time. This was obviously bogus because, as detailed above, they knew each other well and had multiple discussions beforehand.

92.     Indeed, as described above, Choi and Berris had multiple conversations with individuals who would later be principals of Genesis about buying a stake in De Tomaso *before Genesis was even formed*. The purpose of the "cover" email was to deceive potential regulators, including the United States Securities and Exchange Commission, that the proposed transaction complied with the applicable regulations for SPACs.

**From:** Sergio Camarero <sergio.camarero@arc-group.com>
**Sent:** Friday, 25 February 2022 1:41 pm
**To:** samuel.lui@genesisunicorn.com; Norman Choi <norman.choi@detomaso-automobili.com>
**Cc:** Ryan Berris <ryan.berris@detomaso-automobili.com>; 'Niel Starksen' <niel.starksen@genesisunicorn.com>; juan.fernandez@genesisunicorn.com; adeoye.olukotun@genesisunicorn.com
**Subject:** SPAC target intro DT

Dear Samuel and Norman,
I hope this email finds you well.
As discussed individually with both of you, let me make a short intro.
Normal, Samuel, Oye and Juan are the management team of Genesis Unicorn Acquisition Corp. a 86.25M USD SPAC recently listed in Nasdaq.
Samuel, Norman and Ryan are the management team of

*Sham introduction email from ARC Group to De Tomaso and Genesis.*

93.  In April 2022, on a trip through Mexico, Choi confessed to Berris that he was an investor in Genesis.  This had been concealed throughout this entire period from Berris.  Indeed, it appeared that the entire purpose of the SPAC transaction was to artificially inflate the value of De Tomaso by having Choi, in an undisclosed role, invest in De Tomaso at an inflated price to increase the valuation and subsequently utilize the billion-dollar plus valuation in the future.

**J.  Norman Choi and His Business Associates Had a Record of Stock Schemes and Manipulation**

94.  Choi and his associates have been associated with stock manipulation schemes and associated misconduct on United States and foreign markets.  During his time at Apollo and then De Tomaso, Berris conveyed his discomfort with Choi's business associates to him, and Berris further explored their patterns of prior misconduct after his departure from the company, described below.

95.  In 2017, numerous companies owned or controlled by Norman Choi or Michael Choi were implicated in the "Enigma Network" of small-cap Hong Kong stocks that had opaque and interconnected structures of ownership and fraudulent disclosures intended to drive high

valuations among retail investors. *See* David Webb, *The Enigma Network: 50 Stocks Not to Own*, Webb-site Reports (May 15, 2017), https://webb-site.com/articles/enigma.asp.

96.     For instance, Michael Choi's family company, Sunwah Kingsway (HK: 188), has acted as placing agent—directly marketing securities to investors—for entities like Town Health International Medical Group (HK: 3886), part of the Enigma Network, *see* Sheridan Prasso and Benjamin Robertson, *The Spectacular Implosion of Dr. Cho's 'Nefarious Network'*, Bloomberg (May 14, 2019 5:00PM), https://www.bloomberg.com/news/features/2019-05-14/a-hong-kong-doctor-s-nefarious-network-sparks-market-inquiry; Wealth Glory Holdings Limited (HK: 8573), part of the Enigma Network; and GBA Holdings Limited (BM), formerly CCT Land, the entity with which Norman Choi abandoned a potential transaction after press attention.

97.     Likewise, Norman Choi's associates Michael Choi and Tom Kim have also been active in schemes involving US OTC stock markets.  Michael Choi and Tom Kim are associated with New Generation Consumer Group, Inc. (OTC: NGCG), which was part of Norman's and Michael's original De Tomaso revival plans.  In 2017, De Tomaso's predecessor entity, then controlled by Kim and both Michael Choi and Norman Choi, loaned funds to NGCG—a transaction without legitimate business purpose. New Generation Consumer Group has been plagued by fraudulent debt issuances and allegations of pump-and-dump tactics.   New Generation's officers during the time that Tom Kim was associated with it have been subject to civil complaints by the SEC, *see* Complaint, *SEC v. Osegueda*, No. 2:19-cv-04348 (C.D. Cal. May 20, 2019) (civil enforcement complaint against Calvin Ross, who Tom Kim bought out of his position in NGCG).



*Michael Choi and Tom Kim together with a yacht named Apollo in Hong Kong.*

98.    Tom Kim and others used various aliases to engage in stock promotion for NGCG, which was working with the fledgling De Tomaso back in 2016.

99.    Michael Choi and Norman Choi were also associated with SPAC and other securities misconduct on US and foreign markets.  For instance, they and their associates controlled 8i Acquisition Corporation (NASDAQ: JFK), a SPAC that merged with crypto exchange Diginex Limited, a Hong Kong company to become Eqonex Limited (NASDAQ: EQONEX).

100.    Madison Holdings Limited (HK: 8057) (formerly Madison Wine), a Hong Kong company associated with Michael Choi and his associates that had formerly been putatively in the alcohol business, purchased a controlling share in Diginex and placed sham orders to increase trading volume (and therefore value) prior to the acquisition to deceive both investors and the SEC. *See, e.g.*, Diginex Limited Form 6-K (June 24, 2021),        https://www.sec.gov/Archives/edgar/data/1790515/000149315221015158/form6-k.htm.

101.    Trading of EQONEX shares on the NASDAQ was suspended in November 2022 and the company was delisted in March 2023.

102.    Norman Choi openly confirmed to Berris Michael Choi's role in the EQONEX/DIGINEX stock shenanigans:

```
[3/11/21, 8:40:29 AM] Ryan Berris: Btw, what's the ticker for Michael's SPAC?
[3/11/21, 8:40:56 AM] Norman Choi: Hold on
[3/11/21, 8:47:44 AM] Norman Choi: https://www.coindesk.com/diginex-raises-20m-ahead-of-spac-listing-on-nasdaq
[3/11/21, 8:47:50 AM] Ryan Berris: image omitted
```

*March 2021 WhatsApp message from Norman Choi stating Michael Choi's interest in Diginex.*

### K.  Norman Choi Schemes to Force Berris Out of De Tomaso

103.    In September 2021, after years of a close, friendly working relationship, Choi and Berris had their first substantive disagreement about De Tomaso's business operations, with Choi pushing the company to work with a technical partner that Berris did not fully trust, and which ultimately failed to timely deliver.

104.    The next month, Choi refused to join design calls with Ash Thorp.  In November 2021, Choi informed Berris that he had secretly created a new design that he wanted to use rather than the designs Berris had been working on with Thorp.  Despite pushback from Berris and test driver Hugo De Sadeleer, Choi persisted in this decision and Thorp resigned from the company in early 2022.

105.    As Choi became laser-focused on taking the company public via a SPAC, he began increasing his control over business and financial decisions, leading to material delays in De Tomaso's development program along with alienation of employees, technical partners, and dealers.  Choi began to silo-off Berris from material conversations, status updates, and notifications of delays from Capricorn and other related technical parties to whom Choi delegated responsibilities.

106.     When Berris and technical partners such as ROUSH Industries and APPLUS+ IDIADA would inquire for updates, Choi would dissemble and indicate that production was on-track if not ahead of schedule.  This was false.

107.     During Spring 2022 and in connection with Choi asserting greater control over the management of De Tomaso, Samuel Lui, then President and CFO of Genesis, began to take an active management role in the affairs of De Tomaso, explicitly directing Berris to undertake certain actions related to the company's management, including altering financial models and terminating or modifying external agreements. No deal with Genesis had been done, and Lui had no role at De Tomaso.

108.     In April 2022, Choi announced the hire of two designers without Berris's consent or approval.  During a business trip to Mexico City with Choi, Berris told Choi that his former business associates at SCG were asking him to come back but that Berris desired to remain at De Tomaso and that he deserved to be treated better by Choi.

109.     Around this time, Choi refused to authorize payments owed to Carmen Jorda, and instead wanted Berris to terminate her agreement.  Berris had previously paid for Jorda's salary and expenses from his own personal funds.

110.     Choi's complaints about Jorda were entirely pretextual.  During a September 3, 2021 text message exchange between Choi and Berris, Choi expressly authorized the hiring of Jorda, noting that she would join Berris and Choi as a "trio."  On January 19, 2022, Choi expressly authorized a wire transfer from De Tomaso's UBS bank account to Jorda in the amount of €83,333.

111.     By April 2022, it was becoming clear to Berris that what had earlier been yellow flags in his working relationship with Choi were becoming large red flags.  Berris started to convey concerns about Choi's false, material statements, as detailed herein, to customers, potential

investors, and partners. Berris also raised concerns about corner-cutting and the incompetence of Capricorn, whose role Choi had expanded beyond its areas of core expertise, and other technical partners.

112.    During this period, Choi began to make material changes to the specifications of De Tomaso vehicles for which customers had already placed deposits.  In the high-end super-car industry, the value of a car depends heavily on uniqueness and exclusivity; changing the specifications of a vehicle or the number of vehicles produced can damage the trust of this elite clientele.  Berris was concerned that these changes would endanger De Tomaso's relationships with its customers and its dealer-partners and raised these concerns with Choi.

113.    During this time period, Choi also began making material false statements to potential investors and customers.  As part of presentations to potential investors and/or purchasers of De Tomaso vehicles, Choi made various statements regarding the timeline on which the P72 would be rolled out to customers.  In addition, he made various statements about the development of the P72 using only premier industry technical partners.  Those statements were intended to induce investors to invest in De Tomaso and for potential buyers to purchase the company.  However, those statements were false.

114.    Over the past months, Berris was repeatedly at odds with Choi because Choi was not paying technical partners or other suppliers for their work.  This was causing those partners to cease development of the vehicles and drastically delaying the production timeline.  Berris told Choi that the timeline was unrealistic.  The valuations described above were dependent on that timeline in calculating the value of the company.  This only compounded the materiality of Choi's false statements to the investors.

115.    Choi intentionally and repeatedly refused to pay De Tomaso's technical partners, causing

delays.   He then substituted second-rate partners to cut costs.   This was contrary to the representations that were being made to customers and investors about the quality and make-up of the P72.

116.    As early as fall 2021, even though Genesis had not done a deal with De Tomaso and he had no formal role with De Tomaso, Samuel Lui (using a personal email address) was coordinating with Diana Majcher, De Tomaso's CFO, and Choi to change certain elements of the company's financial modeling to increase its value for potential investors and/or valuation experts.

117.    In addition, recognizing that deadlines would be missed, Choi hatched a plot whereby he would claim the final six pre-series P72 development prototypes were final production vehicles that had been delivered to actual customers and were compliant with corresponding emission and safety regulations.   That was, of course, not the case.   The purpose of concocting this plan was to deliberately mislead investors into believing that De Tomaso was on track—as set forth in the various solicitation materials presented to them—when it plainly was not.   Choi then planned to later resell those vehicles on the open market, in violation of representations to clients and dealer partners that the P72 would be limited to 72 vehicles; these additional vehicles would increase the number of P72s to 78.

118.    Berris, recognizing that part of the brand's value was its exclusivity, worked to vet potential customers carefully. This brought him into conflict with Choi, who preferred to realize immediate sales to inflate the company's financials.   As Choi became more committed to taking the company public via a SPAC, he submitted twelve orders for future De Tomaso vehicles via a shell company he controlled, Pachmar Limited.   These purchases lacked a legitimate business purpose and were intended to artificially inflate the value of the company in representations to

potential investors.

119.    On May 3, 2022, desperate to get rid of Berris in order to allow the fraudulent SPAC to proceed, Samuel Lui, using a personal email address, sent Berris a form letter for his resignation from the De Tomaso Board telling him to "get it signed by tonight and email to me and/or directly to Norman."



**From:** Tack Fat <tackisfat@gmail.com>
**Date:** 5/3/22, 5:49 PM
**To:** ryan.berris@detomaso-automobili.com

Resignation as Director – get it signed by tonight and email to me and/or directly to Norman
Novation of agreement with Carmen – suggest you tell Norman that you will get the agreement cancelled or novated

also, strongly suggest that you provide the access/username & passwords to the following (which Norman said he has requested from you multiple times already):
– email server
– website
– social media accounts (for eg IG, FB, youtube, twitter, etc)
In any case, as we discussed before, we will need to outsource all the IT function to a third party professional firm so that we can meet the standards required of a listed entity (ie Sarbanes Oxley Act)

Lastly, he mentioned about the lack of activity on the social media accounts and as discussed the easy fix will be to outsource this function to a third party professional firm so that we can have a more active social media presence which is what Norman wants.

Attachments:

De Tomaso – Resignation letter – Ryan Berris (20220503).doc          55.0 KB
De Tomaso – Deed of Novation (20220503).doc                                      56.0 KB

*Email from Lui's personal email with pre-prepared resignation letter.*

120.    The draft resignation letter included language stating: "I confirm that I have no claim against the Company whatsoever whether in respect of fees, remuneration, benefits or compensation in relation to my resignation from the Company." Because of the falsity of that statement, Berris refused to sign the drafted statement prepared for him. Also included in the email was a document that purported to be a deed of novation that would shift liability for the company's agreement with Carmen Jorda—who had been doing substantial marketing for the company—directly to Berris and his personal consulting company, Aprivy LLC.  Berris did not sign this document either.

121.    Later that day, under extreme pressure and duress, Berris resigned from the De Tomaso Board.

122.    On May 19, 2022, Joshua King from ROUSH Industries, a key technical partner for De Tomaso, emailed and called Berris, expressly stating concerns that they had about Choi's decisions, and that it would not be feasible to meet planned development timelines.  This was only a part of an overwhelming record that Choi's selection of second-rate technical partners was causing tremendous delays in the production of the P72.  This, in turn, was making Choi and Lui's representation to potential investors and customers regarding vehicle timelines plainly false.



*Email from Joshua King illustrating the likely production timeline.*

123.    Only hours after receiving the troubling email from ROUSH, Berris was locked out of his company email account and systems without notice and an attorney purporting to represent De Tomaso wrote to Berris, informing him that as of the date of his resignation from the Board, he was terminated from his position at De Tomaso, and threatening that "As of this date, you are no longer authorized to contact De Tomaso or Mr. Choi by phone, message, email or any other communication method."

124.    In April and May 2022, Berris had several discussions with Samuel Lui.  Lui told Berris that Choi and he would make false reports to the Securities and Exchange Commission to harm Berris's reputation.  As part of this threat, Lui demanded that Berris make no further claim to having any interest in the company and void any claims he might have in De Tomaso.  Lui also intimated that, in addition to making false reports, Berris's personal safety was at risk and that "things would not end well" for Berris.

125.    After his termination, Berris began to conduct further research into Choi and his prior business dealings.  What he uncovered was unnerving.  Berris discovered more about the connections and past conduct described in this complaint.  Choi and his associates appeared to have been laying the groundwork for a classic "pump and dump" scheme from the start.

**L.  Choi Defames Berris to Customers, Partners, and Others in the Automotive Industry**

126.    Following Berris's resignation from De Tomaso's board and termination from his position, Choi began to spread false and defamatory statements about him to De Tomaso customers, partners, and others in the automotive industry and the general business community.

127.    Following Berris's departure from the company under duress, Choi attended industry events on behalf of De Tomaso, including at Villa d'Este in Italy and the Nurburgring in Germany.  At those events, Choi falsely stated to numerous individuals in the high-end luxury

car industry that Berris had been fired for incompetence, had mismanaged the company, and was primarily responsible for blown production and delivery deadlines on the P72.

128.     Apart from his statements at those events, Choi told De Tomaso clients and others in the industry that Ryan had led the company into financial shambles and had blown budgets and timelines for production of ordered vehicles.

129.     On information and belief, Choi and De Tomaso have disseminated multiple other false statements about Berris to De Tomaso customers, partners, and others in the automotive industry and the general business community.

130.     These false statements about Berris's competence and the circumstances of his departure from the company harmed Berris's reputation in the small and highly reputation-dependent community of high-end luxury automobile manufacturers, technical partners, and owners.

### M. De Tomaso Owes Berris Substantial Backpay for Unpaid Salary and Unreimbursed Corporate Expenses

131.     As of the date of this filing, the *only* compensation Berris received during his years serving as CEO and Chief Marketing Officer of De Tomaso was one salary payment of approximately $33,000 dollars.

### FIRST CAUSE OF ACTION
Breach of Contract
(Against De Tomaso Defendants)

132.     Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

133.     Berris entered into a binding agreement with the De Tomaso Defendants by accepting their offer to provide services to the company, including acting as CEO and Chief Marketing Officer of De Tomaso in exchange for an annual salary of $400,000, payable monthly, a 2 percent commission on all sales, and a 10 percent equity stake in the company (the "Agreement").

134.     Berris performed under the contract, effectively managing the day-to-day of the company as CEO and CMO and securing over $100 million in pre-sales of De Tomaso vehicles, including $36 million in non-refundable deposits.

135.     De Tomaso Defendants acknowledged and ratified the agreement at numerous times, including by paying Berris one month's salary and acknowledging the terms of the compensation agreements in multiple communications both internally and with the company's outside counsel.

136.     Berris voluntarily deferred receiving compensation to conserve the company's working capital and at no time waived his claims to the full amount of his salary, commissions, or his 10 percent equity stake in the company.

137.     De Tomaso Defendants breached the agreement by failing to pay Berris as agreed, for his services or sales, up to the time of Berris's departure, to reimburse Berris for approved company expenses, or to render to Berris his 10 percent equity stake.

138.     Berris was injured by De Tomaso Defendants' breach of the agreement in their refusal to pay compensation owed and is entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
(Against De Tomaso Defendants & Samuel Lui)

139.     Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

140.     The agreement between Berris and the De Tomaso Defendants included an implied covenant of good faith and fair dealing.

141.     Berris had a reasonable expectation that he would receive the agreed-upon compensation in return for his performance.

142.    De Tomaso Defendants and Samuel Lui acted to force Berris out of the company on false pretenses and deprive him of the compensation to which he was entitled.

143.    De Tomaso Defendants and Samuel Lui acted in bad faith to deprive Berris the compensation and other benefits which he was due under the contract, including improperly accusing Berris of financial impropriety, accusing Berris of acting without authorization in approving an agreement with a test driver whose employment had been expressly authorized, and attempting to coerce him to sign a release of all claims against De Tomaso prior to his departure.

144.    Samuel Lui and De Tomaso Defendants' conduct was calculated to avoid paying Berris the compensation to which he was entitled.

145.    Berris was injured by De Tomaso Defendants' breach of the agreement in its refusal to pay compensation owed and is entitled to damages in an amount to be determined at trial. Berris is additionally entitled to punitive damages for Defendants' bad-faith conduct.

**THIRD CAUSE OF ACTION**
Promissory Estoppel
(Against De Tomaso Defendants)

146.    Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

147.    Berris pleads this count in the alternative to Counts I and II.

148.    De Tomaso Defendants made a clear and definite promise to Berris that he would be compensated for his services to the company, including by an annual salary of $400,000, to be paid monthly, a 2 percent commission on all sales, and a 10 percent equity stake in the company. De Tomaso Defendants also made clear and definite promises to Berris that he would be reimbursed for certain expenses incurred personally to operate the company.

149.     Berris reasonably relied on these promises in continuing to perform services for the company and in incurring reasonable, authorized expenses on behalf of the company. Additionally, Berris forewent alternative employment opportunities in reliance upon Defendant's promise that he would be compensated for this work for the company.

150.     De Tomaso Defendants' promise that Berris would be compensated for services and contributions to the company reasonably induced reliance by Berris in the performance of his duties under the contract and his incurring certain business expenses.

151.     Enforcement of De Tomaso Defendants' clear and definite promise to compensate Berris is necessary to avoid injustice, and Berris is entitled to damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
Unjust Enrichment
(Against De Tomaso Defendants)

152.     Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

153.     Berris pleads this count in the alternative to Counts I, II, III, and V.

154.     To the extent that De Tomaso Defendants contend that the compensation agreement and the equity agreement are not valid and that no contracts exist between the parties, Berris is without an adequate remedy under the contract.

155.     Berris directly conferred non-gratuitous benefits upon De Tomaso Defendants, including by acting as day-to-day manager, CMO, and CEO of the company, marketing the product and securing over $100 million in pre-sales of De Tomaso vehicles, securing the employment of skilled technical and marketing staff, paying certain expenses of the company out of pocket, and

performing other acts that materially contributed to the viability of the company and its product and materially enhanced its valuation.

156.    De Tomaso Defendants knowingly accepted the benefits conferred by Berris, and Defendants appreciated or knew of the non-gratuitous benefits conferred by Berris.

157.    De Tomaso Defendants accepted and retained the non-gratuitous benefits conferred by Berris, with full knowledge that it would be unjust and inequitable to retain such benefits without fair compensation of defendant.

158.    Berris received one $33,000 payment for his services to De Tomaso Defendants over the course of his employment from in or around September 2020 through in or around May 2022 and was not otherwise compensated for his services. The benefits conferred by Berris's services to Defendants substantially exceed this amount.

159.    Due to De Tomaso Defendants' unjust and inequitable actions, Berris is entitled to an equitable accounting and to restitution, in an amount to be determined at trial, for the benefits that his services conferred upon De Tomaso Defendants.

### FIFTH CAUSE OF ACTION
Quantum Meruit
(Against De Tomaso Defendants)

160.    Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

161.    Berris pleads this count in the alternative to Counts I, II, III, and IV.

162.    To the extent that De Tomaso Defendants contend that the compensation agreement and the equity agreement are not valid and that no contracts exist between the parties, Berris is without an adequate remedy under the contract.

163.    Berris directly conferred non-gratuitous benefits upon De Tomaso Defendants, including by acting as day-to-day manager, CMO, and CEO of the company, marketing the product and securing over $100 million in pre-sales of De Tomaso vehicles, securing the employment of skilled technical and marketing staff, paying certain expenses of the company out of pocket, and performing other acts that materially contributed to the viability of the company and its product and materially enhanced its valuation.

164.    De Tomaso Defendants represented to Berris that he would be compensated for his services at a future time.

165.    Berris deferred payment of compensation to reduce expenses for the company as it got off the ground and in reliance on De Tomaso Defendants' representations that Berris would be compensated for his services through a salary and ten-percent equity grant.  Berris also deferred seeking reimbursement for certain out-of-pocket business expenses based upon Defendants' representations that he would be reimbursed at a later date.

166.    De Tomaso Defendants knowingly accepted the benefits conferred by Berris, and Defendants appreciated or knew of the non-gratuitous benefits conferred by Berris.

167.    De Tomaso Defendants accepted and retained the non-gratuitous benefits conferred by Berris, with full knowledge that it would be unjust and inequitable to retain such benefits without fair compensation of Berris.

168.    Berris received one $33,000 payment for his services to De Tomaso Defendants over the course of his employment and was not otherwise compensated for his services. The benefits conferred by Berris's services to Defendants substantially exceed this amount.

169.    Due to De Tomaso Defendants' unjust and inequitable actions, Berris is entitled to an equitable accounting and restitution, in an amount to be determined at trial, for the value of the

services that he rendered to Defendants and the value of the out-of-pocket expenses paid on behalf of De Tomaso.

### SIXTH CAUSE OF ACTION
Common-Law Wrongful Discharge (Connecticut Law)
(Against De Tomaso Defendants and Samuel Lui)

170.    Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

171.    Berris was, prior to his discharge, and at all relevant times, an employee of De Tomaso.

172.    Berris reported violations or potential violations of important public policy, including but not limited to concerns about potential fraudulent conduct by Choi and others, self-dealing and misappropriation of company funds by Choi, and safety and quality concerns related to staffing, supplier, and design decisions made by Choi, to Choi and others at De Tomaso.

173.    Samuel Lui, acting on behalf of Norman Choi, De Tomaso, and Genesis Unicorn Capital Corp., effectuated Berris's discharge.  This act was undertaken, in part, to conceal the concerns that Berris raised and/or had knowledge of about mismanagement and potential fraud or other malfeasance during Genesis Unicorn's due diligence process.

174.    Berris was discharged, or, in the alternative, constructively discharged by hostile environment, diminishment of duties, and otherwise, from his employment with De Tomaso.

175.    Berris was discharged, or, in the alternative, constructively discharged by hostile environment, diminishment of duties, and otherwise, in retaliation for his reporting of the aforementioned concerns implicating important public policy. Because Berris was discharged in retaliation for reporting violations or potential violations of public policy, Berris's discharge violated important public policy.

176.     Berris pleads this Count in the alternative to other counts to the extent that his discharge in violation of public policy would go unredressed and leave valuable and important social policy unvindicated.

177.     Berris was injured by his wrongful discharge in retaliation for reporting violations or potential violations of important public policy and is entitled to an award of damages and punitive damages in an amount to be determined at trial.

**SEVENTHTH CAUSE OF ACTION**
Corporate Waste
(Against Choi)

178.     Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

179.     Berris is entitled to at least 10 percent of De Tomaso by virtue of the equity grant that was part of his compensation and the rollover of his equity interest from Apollo.

180.     While Berris was still employed by De Tomaso, Choi proposed to use company funds to purchase apartments in the luxury development of 35 Hudson Yards in Manhattan, New York City.

181.     Berris informed Choi that this was not a legitimate use of company funds and that the purchase of an apartment, let alone one in a luxury development such as Hudson Yards, was not permissible.

182.     Choi relented until Berris was forced out of the company and had resigned as a member of the Board.  After Berris's departure from the company, Choi used company funds to purchase at least one apartment in the Hudson Yards development.  The purchase did not receive substantial review from any independent members of De Tomaso's Board.

183.   Choi currently resides in the apartment.  It is his primary current personal residence and it is not used for any substantial legitimate business purpose.

184.   The company has not received any substantial consideration for the use of its funds to purchase the apartment.  Because the company has received no consideration, no businessperson of ordinary, sound judgment could conclude that the company received adequate consideration.

185.   De Tomaso was injured by this improper expenditure of corporate funds.  Additionally, this improper expenditure, if it became known, would do substantial harm to the company's reputation and valuation.

186.   A demand upon De Tomaso's Board to rescind the transaction, seek payment from Choi, or otherwise protect the interests of De Tomaso would be futile because Choi is the majority shareholder and, if not the only member of the Board at present, controls its members.

187.   Berris seeks, on behalf of the company, an order directing Choi to return the value of the apartment to the company and/or an award of damages sufficient to compensate the company for Choi's wasteful conduct.

### EIGHTH CAUSE OF ACTION
Defamation
(Against Choi)

188.   Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

189.   Defendant Choi made false and defamatory statements of fact identifying Berris, including that Berris was fired from De Tomaso for incompetence, that Berris's incompetence was the primary reason for production and delivery delays with the P72, and that Berris had mismanaged the company. A reasonable person would not understand these to be statements of

opinion. These statements were defamatory, having a tendency to harm the reputation of a person in the estimation of the community or to deter others from associating or dealing with him.

190.    Defendant Choi made these false and defamatory statements to third parties, including De Tomaso customers, dealer partners, and executives at other automobile companies.

191.    In the small, insular world of high-end automobiles, statements like these to customers, partners, and other members of the industry will damage a person's reputation within the industry and negatively impact their ability to work, partner, or sell in the future.

192.    As a result of Defendant Choi's false and defamatory statements to third parties, Berris has suffered injuries to his reputation and had been impaired in his ability to continue to work in the high-end automobile industry, in which he has worked for most of the past decade.

193.    Defendant Choi has continued to make these statements and has worked to attempt to erase Berris's contributions to De Tomaso.

194.    Berris seeks an order enjoining Defendant Choi from continuing to make false and defamatory statements regarding Berris.  Berris is also entitled to damages in an amount to be determined at trial sufficient to compensate him for the injury to his reputation caused by Defendant Choi's false and defamatory statements.

### NINTH CAUSE OF ACTION
Tortious Interference with Contract
(Against all Defendants)

195.    Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

196.    Berris had a contract for employment with Defendant De Tomaso, including a promised compensation for salary deferred and promised compensation in the form of an award of 10 percent equity.

197.    Defendants Samuel Lui and Genesis were aware of this contractual agreement.

198.    Acting on behalf of Choi and of Genesis, Lui acted to terminate Berris from his position at De Tomaso, in part to frustrate his efforts to obtain the compensation which he was due.  Lui transmitted a form resignation letter to Berris and attempted to coerce him to sign it as well as a release of all claims against the company.

199.    This action was improper, malicious, and without justification. Lui had no role at De Tomaso.  Rather, Lui was the CFO of a SPAC purportedly conducting due diligence of De Tomaso as a possible target, which was supposed to be an arms' length transaction.  As detailed above, it was not. Lui's email attempted to defraud or otherwise coerce Berris by indicating that he should sign a release of all claims against the company.  Further, Lui subsequently threatened Berris should he attempt to take his experience public, threatening to defame him, draw illegitimate law enforcement scrutiny on him, and otherwise harm him.  Among other things, Lui told Berris "things will not go well for you" if he resisted being forced out or sought the compensation he was due.

200.    Lui was acting as an agent of Genesis in terminating Berris. Genesis was aware of and endorsed this conduct, as evidenced by the nearly six months of coordination between Lui, ARC Group, Genesis, and Choi.

201.    Defendants Choi, De Tomaso, Lui, and Genesis conspired with each other and acted in concert in tortiously interfering with Berris's contract with De Tomaso.

202.    Berris was harmed by Lui's and Genesis's conduct, including, principally, being deprived of the compensation that he was contractually due.

203.    Berris seeks an award of damages in an amount to be determined at trial for the damage caused by Defendants' misconduct.

## TENTH CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage
### (Against all Defendants)

204.     Berris repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

205.     Berris had a business relationship with Defendant De Tomaso, which included an expectancy of compensation for services rendered, including conveyance of an at least 10 percent equity stake in the company.

206.     Defendants Samuel Lui and Genesis were aware of this business relationship.

207.     Acting on behalf of Choi and of Genesis, Lui acted to interfere with Berris's business relationship with De Tomaso, in part to frustrate his entitlement to compensation for services including equity in the company.  Lui transmitted a form letter for resignation from the De Tomaso board to Berris and attempted to coerce him to sign it as well as a release of all claims against the company.

208.     This action was improper and without justification. Lui had no role at De Tomaso.  Rather, Lui was the CFO of a SPAC purportedly conducting due diligence of De Tomaso as a possible target, which was supposed to be an arms' length transaction.  As detailed above, it was not. Lui's email attempted to defraud or otherwise coerce Berris by indicating that he should sign a release of all claims against the company.  Further, Lui subsequently threatened Berris should he attempt to take his experience public, threatening to defame him, draw illegitimate law enforcement scrutiny on him, and otherwise harm him.  Among other things, Lui told Berris "things will not go well for you" if he resisted being forced out or sought the compensation he was due.

209.    Lui was acting as an agent of Genesis in terminating Berris.  Genesis was aware of and endorsed this conduct, as evidenced by the nearly six months of coordination between Lui, ARC Group, Genesis, and Choi.

210.     Defendants Choi, De Tomaso, Lui, and Genesis conspired with each other and acted in concert in tortiously interfering with Berris's business expectancies with relation to De Tomaso.

211.    Berris was harmed by Lui's and Genesis's conduct, including, principally, being deprived of compensation and an equity share to which he was entitled.

212.    Berris seeks an award of damages in an amount to be determined at trial for the damage caused Defendants' misconduct.

## <u>DEMAND FOR RELIEF</u>

Berris demand judgment as follows:

A.   Awarding Berris general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

B.   Awarding Berris punitive damages;

C.   Ordering Defendants to produce books and records and conduct an accounting;

D.   Enjoining De Tomaso Defendants from continuing to make false and defamatory statements about Berris as to prevent the ongoing harm being suffered by Berris as a result of De Tomaso Defendants' ongoing actions;

E.   Ordering Choi to reimburse the company for any and all company funds used in the purchase of his apartment at 35 Hudson Yards;

F.   Awarding Berris pre-judgment and post-judgment interest at the maximum rate allowable by law;

G.   Awarding Berris the cost of suit as incurred in this action and attorneys' fees; and

H.  All other relief that the Court deems warranted.

Dated:  May 24, 2023

Respectfully submitted,

*/s/ John T. Zach*

John T. Zach
David L. Simons
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: 212 446 2300
jzach@bsfllp.com
dsimons@bsfllp.com

A. Izaak Earnhardt*
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW
Washington, DC 20005
Telephone: 202 274 1129
iearnhardt@bsfllp.com

*Attorneys for Plaintiff Ryan Berris*

*\*Petition for admission forthcoming.*