# EXHIBIT 1

Page 1

1              RYAN C. BERRIS VOLUME I
2        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
3          CASE NO. 1:23-cv-04305 (AS)
4     RYAN BERRIS,                    :
            Plaintiff,                :
5                                     :
               v.                     :
6                                     :
      SUNG-FUNG CHOI (a/k/a    :
7     NORMAN CHOI), DE TOMASO :
      AUTOMOBILI HOLDINGS,      :
8     N.A. LLC, HIN WENG LUI   :
      (A/k/a SAMUEL LUI),       :
9     GENESIS UNICORN CAPITAL :
      CORP.,                         :
10          Defendants.            :
      ---------------------- :
11
12            VIDEOTAPE DEPOSITION OF:
13           RYAN C. BERRIS VOLUME I
14             NEW YORK, NEW YORK
15         THURSDAY, SEPTEMBER 5, 2024
16
17
18
19
20
21
22
23
24    REPORTED BY:
      SILVIA P. WAGE, CCR, CRR, RPR
25    JOB NO. 6791518

Page 2

1          RYAN C. BERRIS VOLUME I

2

3

                        September 9, 2024
4                       10:16 a.m.

5      VOLUME I of the videotape deposition of

6      RYAN C. BERRIS, held at the offices of

7      Sheppard Mullin, LLP, 30 Rockefeller

8      Plaza, 39th Floor, New York, New York,

9      pursuant to agreement  before SILVIA P.

10     WAGE, a Certified Shorthand Reporter,

11     Certified Realtime Reporter, Registered

12     Professional Reporter, and Notary

13     Public for the States of New Jersey,

14     New York and Pennsylvania.

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1              RYAN C. BERRIS VOLUME I
 2      A P P E A R A N C E S:
 3
        BOIES SCHILLER FLEXNER LLP
 4      Attorneys for Plaintiffs
        55 Hudson Yards, 20th Floor
 5      New York, New York  10001
        (212) 303-3648
 6      Jzach@BSFLLP.com
        Dsimon@BSFLLP.com
 7      Kwaldo@BSFLLP.com
        BY:  JOHN T. ZACH, ESQ.
 8      BY:  DAVID SIMON, ESQ.
        BY:  KELLY WALDO, ESQ.
 9
10      SHEPPARD MULLIN, LLP
        Attorneys for Defendants
11      30 Rockefeller Plaza, 39th Floor
        New York, New York 10112
12      (212) 653-8700
        Pwerner@sheppardmullin.com
13      Hwigger@sheppardmullin.com
        Abustamante@sheppardmullin.com
14      BY:  PAUL A. WERNER, ESQ.
        BY:  HANNAH WIGGER, ESQ.
15      BY:  ALEXANDRA BUSTAMANTE, ESQ.
16
17      A L S O    P R E S E N T:
18
        NORMAN CHOI
19      CORPORATE REPRESENTATIVE
20      DIANA MAJCHER
        CORPORATE REPRESENTATIVE
21
22      TOM DEVINE
        VIDEOGRAPHER
23
24
25
```

Page 4

1                   RYAN C. BERRIS VOLUME I
2                         I N D E X
3                                               PAGE
     WITNESS:  RYAN C. BERRIS
4
     EXAMINATION BY MR. WERNER                   15
5
6                      E X H I B I T S
7     NO.              DESCRIPTION               PAGE
8     Exhibit Berris 1  Notice of                 20
                        Deposition of
9                       Ryan Berris
      Exhibit Berris 2  Notice of                 21
10                      Subpoena for
                        Rule 30(b)(6)
11                      Deposition of
                        Aprivy LLC
12    Exhibit Berris 3  screen capture            27
                        of Ryan Berris'
13                      website
      Exhibit Berris 4  printout of               52
14                      LinkedIn profile
                        for Ryan Berris
15    Exhibit Berris 5  Amended                   66
                        Complaint
16    Exhibit Berris 6  WhatsApp text            133
                        thread between
17                      Ryan Berris and
                        Carmen Jorda
18                      BERRIS-000202764
                        to
19                      BERRIS-000202787
                        marked
20                      Confidential
      Exhibit Berris 7  WhatsApp text            139
21                      thread between
                        Ryan Berris and
22                      Hugo de Sadeleer
                        BERRIS-000186297
23                      to
                        BERRIS-000186301
24                      marked
                        Confidential
25

```
                                                         Page 5
 1              RYAN C. BERRIS VOLUME I
 2                E X H I B I T S
 3      NO.            DESCRIPTION              PAGE
 4    Exhibit Berris 8   WhatsApp text           144
                         thread between
 5                       Ryan Berris and
                         Carmen Jorda
 6                       BERRIS-000200043
                         to
 7                       BERRIS-000200050
                         marked
 8                       Confidential
      Exhibit Berris 9   e-mail thread           148
 9                       DT0000016492 to
                         DT0000016494
10                       marked
                         Confidential
11    Exhibit Berris 10  5/24/21 e-mail          152
                         DT0000018017 &
12                       DT0000018018
                         marked
13                       Confidential
      Exhibit Berris 11  WhatsApp text           154
14                       thread between
                         Ryan Berris and
15                       Carmen Jorda
                         BERRIS-000201787
16                       to
                         BERRIS-000201803
17                       marked
                         Confidential
18    Exhibit Berris 12  e-mail thread           167
                         and attachment
19                       DT0000023400 to
                         DT0000023419
20                       marked
                         Confidential
21    Exhibit Berris 13  11/1/21 e-mail          183
                         from John Maatta
22                       to Ryan Berris
                         and attachment
23                       DT0000025711 to
                         DT0000025731
24                       marked
                         Confidential
25
```

```
 1              RYAN C. BERRIS VOLUME I
 2                 E X H I B I T S
 3      NO.            DESCRIPTION          PAGE
 4      Exhibit Berris 14 e-mail thread      178
                          BERRIS-000217695
 5                        &
                          BERRIS-000217696
 6                        marked
                          Confidential
 7      Exhibit Berris 15 e-mail thread      190
                          and attachment
 8                        DT0000028355 to
                          DT0000028377
 9                        marked
                          Confidential
10      Exhibit Berris 16 e-mail thread      202
                          DT0000023770 to
11                        DT0000023772
                          marked
12                        Confidential
        Exhibit Berris 17 WhatsApp text      205
13                        thread between
                          Ryan Berris and
14                        Carmen Jorda
                          BERRIS-000201003
15                        to
                          BERRIS-000201012
16                        marked
                          Confidential
17      Exhibit Berris 18 e-mail thread      212
                          marked
18                        DT0000032181 &
                          DT0000032182
19                        Confidential
        Exhibit Berris 19 e-mail thread      218
20                        DT0000035690 to
                          DT0000035690
21                        marked
                          Confidential
22
23
24
25
```

```
 1          RYAN C. BERRIS VOLUME I
 2              E X H I B I T S
 3    NO.           DESCRIPTION          PAGE
 4    Exhibit Berris 20 WhatsApp text       247
                        thread between
 5                      Ryan Berris and
                        Samuel Lui
 6                      BERRIS-000158881
                        to
 7                      BERRIS-000158884
                        marked
 8                      Confidential
      Exhibit Berris 21 WhatsApp text       257
 9                      thread between
                        Ryan Berris and
10                      Samuel Lui
                        BERRIS-000158889
11                      &
                        BERRIS-000158890
12                      marked
                        Confidential
13    Exhibit Berris 22 Chapter 23,         266
                        "Threesome"
14                      DT00175695
                        to DT00175706
15                      marked
                        Confidential
16    Exhibit Berris 23 Chapter 8,          269
                        "Friends with
17                      Benefits,"
                        DT00175594 to
18                      DT00175601
                        marked
19                      Confidential
      Exhibit Berris 24 Chapter 21,         271
20                      "Tunnel Vision,"
                        DT00175888 to
21                      DT00175895
                        marked
22                      Confidential
      Exhibit Berris 25 Consulting          274
23                      Services
                        Agreement
24                      DT0000000100 to
                        DT0000000112
25                      marked
                        Confidential
```

```
 1            RYAN C. BERRIS VOLUME I
 2              E X H I B I T S
 3     NO.           DESCRIPTION          PAGE
 4     Exhibit Berris 26 Limited Liability  327
                         Company Agreement
 5                       for De Tomaso
                         Automobili
 6                       Holdings N.A.
                         LLC DT0000000073
 7                       to DT0000000082
       Exhibit Berris 27 4/27/21 Invoice    330
 8                       DT0000000221
                         marked
 9                       Confidential
       Exhibit Berris 28 2/7/22 UBS wire    335
10                       transfer
                         Confirmation
11                       DT0000000227 &
                         DT0000000228
12                       marked
                         Confidential
13     Exhibit Berris 29 11/2/21 e-mail     339
                         from Ryan Berris
14                       to Norman Choi
                         and attachment
15                       Berris-000083652
                         to
16                       Berris-000083662
                         marked
17                       Confidential
       Exhibit Berris 30 Bank of America    341
18                       Statement 9/1/21
                         to 9/30/21
19                       Berris-000083295
                         to
20                       Berris-000083300
                         marked
21                       Confidential
       Exhibit Berris 31 3/24/22 e-mail     350
22                       from Diana
                         Majcher to Ryan
23                       Berris
                         BERRIS-000091077
24                       &
                         BERRIS-000091078
25                       marked
                         Confidential
```

Page 9

```
 1              RYAN C. BERRIS VOLUME I
 2                 E X H I B I T S
 3      NO.             DESCRIPTION              PAGE
 4      Exhibit Berris 32 e-mail thread          351
                          DT0000076100 to
 5                        DT0000076102
                          marked
 6                        Confidential
        Exhibit Berris 33 5/3/22 e-mail          366
 7                        forward
                          DT00110061 &
 8                        DT00110062
                          marked
 9                        Confidential
        Exhibit Berris 34 e-mail string          369
10                        DT0000077009 to
                          DT0000077015
11                        marked
                          Confidential
12      Exhibit Berris 35 WhatsApp text          372
                          thread between
13                        Ryan Berris and
                          Norman Choi
14                        DT00157731 to
                          DT00157736
15                        marked
                          Confidential
16      Exhibit Berris 36 WhatsApp text          388
                          from Ryan Berris
17                        to Norman Choi
                          with no response
18                        DT00157941
                          marked
19                        Confidential
        Exhibit Berris 37 WhatsApp text          401
20                        thread between
                          Norman Choi and
21                        Sugar DT00110200
                          to DT00110205
22                        marked
                          Confidential
23
24
25
```

Page 10

```
 1              RYAN C. BERRIS VOLUME I
 2                  E X H I B I T S
 3      NO.              DESCRIPTION           PAGE
 4    Exhibit Berris 38 WhatsApp text      406
                        thread between
 5                      Norman Choi and
                        Ryan Berris
 6                      DT00157965
                        marked
 7                      Confidential
      Exhibit Berris 39 WhatsApp text      411
 8                      thread between
                        Norman Choi and
 9                      Ryan Berris
                        DT00158019 &
10                      DT00158020
                        marked
11                      Confidential
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 11

```
 1              RYAN C. BERRIS VOLUME I
 2                    -   -   -
 3           DEPOSITION SUPPORT INDEX
 4                    -   -   -
 5
 6      Direction to Witness Not to Answer
        Page Line
 7

        237    19
 8      237    24
        239    20
 9
        Request for Production of Documents
10      Page Line
11       44     7
         62    24
12       82     8
        438    21
13
        Stipulations
14      Page Line
15
16      Question Marked
        Page Line
17
18
        Reservation
19      Page Line
20       465     8
21      Motion to Strike
        Page Line
22
        255    16
23      296    16
24
25
```

Page 12

1          RYAN C. BERRIS VOLUME I

2              THE VIDEOGRAPHER:  Good

3      morning.  We're going on the record

4      at, approximately, 10:16 a.m. on

5      September 5TH, 2024.

6              Please note that the

7      microphones are sensitive and may

8      pick up private conversations.

9              Please mute your phones at

10     this time.

11             Audio and video recording will

12     continue to take place unless all

13     parties agree to go off the record.

14             This is Media Unit 1 of the

15     video recorded deposition of Ryan

16     Berris in the matter of Ryan Berris

17     v. Sung-Fung Choi, et al., filed

18     in the United States District Court

19     for the Southern District of New

20     York, Civil Action No.

21     1:23-cv-04305 (AS).

22             The location of this

23     deposition is at the offices of

24     Sheppard Mullin LLP located at 30

25     Rockefeller Plaza, 39th floor,

Page 13

```
 1          RYAN C. BERRIS VOLUME I
 2       New York, New York.
 3            My name is Tom Devine
 4       representing Veritext Mid-Atlantic
 5       and I am the Videographer.
 6            The Court Reporter is Silvia
 7       Wage, also, with Veritext
 8       Mid-Atlantic.
 9            I am not authorized to
10       administer an oath.  I am not
11       related to any party in this
12       action.  Nor am I financially
13       interested in the outcome.
14            If there are any objections
15       to proceeding, please state them
16       at the time of your appearance.
17            I'd ask Counsel and all else
18       present to please state their
19       appearances and affiliations for
20       the record beginning with the
21       noticing attorney.
22            MR. WERNER:  Sure.  Good
23       morning.  Paul Werner, Sheppard
24       Mullin for the Defendants.
25            MS. WIGGER:  Hannah Wigger,
```

Page 14

1            RYAN C. BERRIS VOLUME I
2        Sheppard Mullin for Defendants.
3            MS BUSTAMANTE:  Alexandra
4        Bustamante for the Defendants.
5            MR. ZACH:  John Zach for the
6        Plaintiff.
7            MR. SIMONS:  David Simons for
8        the Plaintiff.
9            MS. WALDO:  Kelly Waldo for
10        the Plaintiff.
11            MR. SIMONS:  I think there's a
12        couple of other people here.  I'm
13        not sure if they'd like to identify
14        themselves.
15            MS. WIGGER:  We have with us
16        our clients as well, Norman Choi
17        for De Tomaso and Diana Majcher
18        for De Tomaso.
19            THE VIDEOGRAPHER:  Thank you.
20            Silvia, would you please
21        swear in the witness.  After
22        which we may proceed.
23            THE STENOGRAPHER:  Sir, if
24        you can please raise your right
25        hand --

Page 15

```
1              RYAN C. BERRIS VOLUME I
2                 THE WITNESS:  Yes.
3                 THE STENOGRAPHER:  -- so I
4          administer the oath.
5      RYAN C. BERRIS,
6          15 Hudson Yards, New York, New York
7          10001, after having been duly
8          sworn, was examined and testified
9          as follows:
10                THE STENOGRAPHER:  Thank you.
11                You may proceed.
12     EXAMINATION BY MR. WERNER:
13         Q.    Alright.  Good morning.
14         Could you please state your full
15     name for the record?
16         A.    Yes, Ryan Christopher Berris.
17         Q.    Okay.  Mr. Berris, nice to
18     meet you.
19         My name is Paul Werner, as you
20     heard me introduce myself for the record.
21     I represent the Defendants, who you sued.
22         And I'm here to take some questions
23     -- ask some questions of you today, okay?
24         A.    That's okay.
25         Q.    Have you ever had your
```

1          RYAN C. BERRIS VOLUME I

2     deposition taken before?

3          A.    No, this is my first time.

4          Q.    Okay.  Alright.

5          Well, we'll go over some ground

6     rules in just a second.

7          Mr. Berris, I think, I heard you

8     say this off the record, but just to

9     confirm.

10          Is your residence and place of

11     domicile at 1500 Hudson Yards?

12          A.    Yes.

13          Q.    And how long have you lived

14     there?

15          A.    At that address, I've lived

16     there since last December.  Before I was

17     in a previous New York address.

18          Q.    Okay.  And what was the

19     "previous New York address"?

20          A.    I'm trying to recall

21     correctly.  I think it's -- it was 455

22     Tenth Avenue.

23          Q.    Okay.

24          A.    The building was called The

25     Set.

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  And that was a

3    residence as well?

4          A.    Yes.

5          Q.    And how long did you live

6    there?

7          A.    I think since beginning of

8    May 2023.

9          Q.    Okay.  Alright.  Let's go

10   over some ground rules.

11         Okay.  You understand that you're

12   under oath, right?

13         A.    Yes.

14         Q.    Okay.  And I'm going to ask

15   you some questions.

16         If you don't understand my question,

17   will you please let me know?

18         A.    Yes.

19         Q.    Okay.  If you don't say that

20   you don't understand my question, I'm

21   going to assume that you do, okay?

22         A.    Understood.

23         Q.    Okay.  We have a Court

24   Reporter, who is transcribing this.  You

25   can see her fingers are typing feverishly.

1          RYAN C. BERRIS VOLUME I
2     So that means a few things.  One, we need
3     to try to moderate the speed at which we
4     speak, okay?
5          A.    Okay.
6          Q.    It, also, means that responses
7     need to be verbal.  Yes, no and so on,
8     not uh-huh or head shakes.
9          A.    Understood.
10          Q.    Alright.  I will let you
11     finish your answers, if you let me finish
12     my questions, okay?
13          A.    Okay.
14          Q.    Again, it's just important
15     that we don't talk over each other for
16     the sanity of our Court Reporter, okay?
17          A.    Yes.
18          Q.    Your Counsel may object to
19     some of my questions.
20          Do you understand that those are
21     just for the record and that unless your
22     Counsel instructs you otherwise, you
23     still need to answer the questions?
24          A.    Yes, I do.
25          Q.    Okay.  Alright.

Page 19

1          RYAN C. BERRIS VOLUME I

2          We'll take some breaks.

3          Do you have any special needs for

4     breaks today?

5          A.    Nothing out of the ordinary;

6     bathroom break or for some food.

7          Q.    If you need to take a

8     bathroom break, if you need to get a

9     smack, whatever, just let me know and

10    we'll take a break.

11         A.    Okay.

12         Q.    We tend to take breaks every

13    hour or so otherwise, okay?

14         A.    That's fair.

15         Q.    The only thing I ask is if

16    there is a question pending, please go

17    ahead and answer the question before we

18    take a break, okay?

19         A.    Okay.

20         Q.    Alright.  Any reason you

21    can't testify truthfully today?

22         A.    There is not.

23         Q.    Okay.  Are you on any

24    medications of any kind that would impede

25    your ability to focus and answer

1          RYAN C. BERRIS VOLUME I
2    questions truthfully?
3          A.    I am on no medications.
4          Q.    Alright.  Have you ever been
5    convicted of any crimes?
6          A.    I have not.
7          Q.    Okay.  Have you ever been the
8    subject of any kind of investigation by a
9    regulatory body or a government agency?
10         A.    Not to my knowledge.
11         Q.    Okay.  Have you ever been
12   sanctioned or penalized by any court,
13   regulatory body or administrative agency?
14         A.    I have not.
15         Q.    Okay.  Alright.
16   I'm going to show you what's going
17   to be the first of many documents we're
18   going to look at today.
19              MR. WERNER:  We're going to
20         mark this, which is Notice of
21         Deposition of Ryan Berris, as
22         Exhibit 1.
23              (Deposition Exhibit Berris 1,
24         Notice of Deposition of Ryan Berris,
25         was marked for identification.)

Page 21

1          RYAN C. BERRIS VOLUME I
2          Q.    And I'm going hand that to
3      you.  We'll provide copies to your
4      Counsel.
5                MR. WERNER:  Thanks.
6          Q.    Have you seen this document
7      before, Mr. Berris?
8          A.    I don't believe I have.  I
9      think this went directly to my Counsel.
10         Q.    Okay.  You understand that
11     your deposition is taken -- is being
12     taken today pursuant to this notice?
13               MR. SIMONS:  Sorry.  Is there
14         anymore copies to share?
15               MR. WERNER:  Here.
16         A.    Yes.
17         Q.    Okay.  Alright.
18         And I'm going to show you another
19     exhibit, which we're going to mark as
20     No. 2.
21               (Deposition Exhibit Berris 2,
22         Notice of Subpoena for Rule 30(b)(6)
23         Deposition of Aprivy LLC, was
24         marked for identification.)
25               MR. WERNER:  By the way,

Page 22

1          RYAN C. BERRIS VOLUME I
2          Counsel, I assume you're good with
3          me just kicking off with No. 1,
4          since this is the first.
5                   MR. ZACH:   Totally fine.
6          Q.    Okay.   Alright.
7          I'm going to show you Exhibit No. 2,
8    which is the Notice of Deposition of
9    Aprivy LLC.
10         And I'm going to ask you, Mr.
11   Berris, if you've seen that document
12   before?
13         A.    I don't believe I have.   I
14   think this went directly to my Counsel.
15         Q.    Okay.   Do you understand that
16   you're being deposed today in your
17   personal capacity, as well as a corporate
18   representative of Aprivy LLC?
19         A.    Yes.
20         Q.    And, by the way, am I saying
21   that right?
22         A.    That is correct.
23         Q.    And if you turn -- and what I
24   just identified and marked for the record
25   as Exhibit 2, if you turn to what is

Page 23

1          RYAN C. BERRIS VOLUME I
2     Exhibit A, which is Page 4, I believe, of
3     the document, you'll see beginning on
4     Page 6 there are deposition topics listed
5     for the Aprivy LLC deposition.
6          A.    (The witness reviews the
7     exhibit.)
8          Yes.
9          Q.    Okay.  And you understand
10    that you are here to testify on behalf of
11    Aprivy with respect to each of those
12    topics?
13         A.    Yes.
14         Q.    Okay.  What, if anything, did
15    you do to prepare to testify today on
16    those topics?
17         A.    "On those topics"?  I read --
18    I read the Complaint and nothing further.
19    I mean, I had general meetings with my
20    lawyers.
21         Q.    Okay.  I'm not asking you to
22    go into your conversations with your
23    Counsel.
24         A.    Sure.
25         Q.    But just in connection with

```
 1              RYAN C. BERRIS VOLUME I
 2      corporate deposition of Aprivy, did you
 3      review any --
 4              A.    For this deposition?
 5              Q.    Yes.  For this deposition,
 6      did you review any business records?
 7              A.    I did not outside of some
 8      that were sent for production but nothing
 9      in particular.
10              Q.    Okay.  Aside from meetings
11      with Counsel, did you have communications
12      with anyone else in connection with
13      preparing yourself for your deposition on
14      these topics today?
15              A.    No.
16              Q.    Okay.  Alright.
17              And just in general, did you do
18      anything -- you mentioned that you met
19      with your Counsel.
20              Did you do anything other than meet
21      with Counsel to prepare to provide
22      deposition testimony today?
23              A.    No.
24              Q.    Did you review any documents
25      to prepare for your depositions today?
```

Page 25

1          RYAN C. BERRIS VOLUME I
2          A.    I just re-read the Complaint.
3          Q.    Okay.
4          A.    And to be specific re-read
5     our Complaint, not the Amended Complaint
6     and the responses regarding counterclaims.
7          Q.    You read the original
8     Complaint that you filed?
9          A.    Yes.
10         Q.    Okay.  You mentioned that you
11    met with your Counsel.
12         Without going into the substance of
13    your conversations with Counsel, when did
14    you meet with your Counsel?
15         A.    I met with them -- what is
16    today Thursday?
17         I met with them on Tuesday.
18         Q.    Okay.  Just on Tuesday?
19         A.    On Tuesday and Wednesday.
20         Q.    Okay.  On Tuesday, how long
21    did you meet with them for?
22         A.    I'm not certain, but I would
23    say maybe two, two to three hours.
24         Q.    Okay.  And then on Wednesday,
25    how long did you meet with them for?

Page 26

1          RYAN C. BERRIS VOLUME I
2          A.    I think that may have been an
3    hour max, something along those lines.
4          Q.    Okay.  During those meetings,
5    did you review any documents other than
6    the Complaint that you mentioned?
7          A.    I did not.
8          Q.    Okay.  Aside from the two
9    meetings that you mentioned with your
10   Counsel, did you have any conversations
11   with anyone else in preparation for
12   today's deposition?
13         A.    No.
14         Q.    Okay.  And aside from
15   reviewing the original Complaint, am I
16   correct in understanding that you did not
17   review any other documents of any kind?
18         A.    Yes.
19         Q.    Okay.  Alright.
20         Mr. Berris, are you currently
21   employed?
22         A.    No.
23         Q.    Okay.
24              MR. WERNER:  Can I have the
25         next...

1          RYAN C. BERRIS VOLUME I

2                (There is a discussion off

3          the record.)

4                (Deposition Exhibit Berris 3,

5          screen capture of Ryan Berris'

6          website, was marked for

7          identification.)

8          Q.    Mr. Berris, I'm going to hand

9     you another document, which I'm marking

10    as Exhibit 3.

11          And I'll represent to you that this

12    is a capture that we pulled down from

13    your website, business website.

14          A.    Okay.

15                MR. WERNER:  We'll hand you

16          one.

17                MR. ZACH:  I got one.

18                MR. WERNER:  Oh, you got a

19          copy, okay.

20          Q.    Mr. Berris, do you recognize

21    this as what you have on your website?

22          A.    Yes.

23          Q.    Okay.  And it says there

24    you're an "investor" and "entrepreneur"?

25          A.    Correct.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  What does that mean?
3          A.    That is a broad, I guess,
4     summary of what I do professionally.
5          Q.    Okay.
6          A.    Let's say have done
7     professionally.
8          Q.    Okay.  Are you doing that
9     now, are you an "investor" and
10    "entrepreneur" of any kind?
11         A.    I have certain financial
12    investments, but nothing that is active.
13         Q.    Okay.
14         A.    I am -- my -- I have no
15    professional activities currently.  Nor
16    have I had any professional activities
17    following my departure from the
18    Defendants.
19         Q.    Okay.  The investments that
20    you mentioned, are those investments
21    related to your personal funds or the
22    funds of third parties?
23         A.    Personal funds.
24         Q.    Okay.  So am I correct then
25    in understanding that aside from

Page 29

1           RYAN C. BERRIS VOLUME I
2      investing of your personal investments
3      related to your personal funds, you're
4      not investing money on behalf of others
5      in any companies, correct?
6           A.    Correct.
7           Q.    And you haven't formed any
8      other companies or startups or other
9      kinds of ventures; is that correct?
10          A.    Could you rephrase the
11     question?  Pertaining to which period?
12          Q.    Yeah, sure.  Just since you
13     left -- I'm just trying to get a handle
14     on what you've done --
15          A.    Sure.
16          Q.    -- since you left De Tomaso
17     Automobili.
18          And if I understand your testimony
19     so far correctly, you have not done
20     anything other than manage your own
21     personal investments; is that correct?
22          A.    I haven't even managed my own
23     personal investments.  I really just been
24     dedicated to the case.
25          Q.    Okay.  So, since leaving De

1              RYAN C. BERRIS VOLUME I

2    Tomaso, other than being "dedicated" to I

3    assume "the case," meaning, this

4    litigation --

5         A.    Correct.

6         Q.    -- you have not had any other

7    professional pursuits of any kind; is

8    that fair?

9         A.    I have not had any active

10   pursuits.  It's -- I have attempted, but

11   I have had difficulties.

12        Q.    Okay.  We'll get into that.

13        A.    Yes.

14        Q.    But I just want to make sure

15   I understand the scope of what you have

16   done since you left De Tomaso.

17             And when you said -- you were

18   drawing a distinction between active and

19   passive.

20             Passive, as I understand, it

21   related to the investments that you had

22   made at some point in the past; is that

23   correct?

24        A.    Yes, prior to my departure

25   from De Tomaso.

1              RYAN C. BERRIS VOLUME I

2          Q.     Okay.  So, other than

3     passively managing investments and being

4     "dedicated" to this litigation, you have

5     not had any other work or professional

6     affiliations of any kind; is that right?

7          A.     Correct.

8          Q.     Okay.  Alright.

9          Let's talk about your educational

10    background beginning with college.

11         Do you have any college degrees?

12         A.     I do.

13         Q.     Okay.  Where from?

14         A.     The University of Connecticut.

15         Q.     Okay.  And what degree did

16    you obtain from the University of

17    Connecticut?

18         A.     Economics.

19         Q.     Okay.  And when was that?

20         A.     It was from 2003 to 2007.

21         Q.     Alright.  Did you attend the

22    University of Connecticut following high

23    school?

24         A.     I'm sorry, I didn't hear the

25    question.

1          RYAN C. BERRIS VOLUME I

2          Q.     Yeah, sure.

3          A.     Sorry.

4          Q.     Did you attend the University

5     of Connecticut following graduation from

6     high school?

7          A.     Correct, yes.

8          Q.     Okay.  Alright.

9          And then following your graduation,

10    let's turn to your work history following

11    your graduation from the University of

12    Connecticut in 2007.

13         A.     Uh-huh.

14         Q.     What did you do when you

15    graduated from the University of

16    Connecticut?

17         A.     I went to work for my father

18    full time at his company Buell Securities.

19         Q.     Okay.  And what is "Buell

20    Securities"?

21         A.     "Buell Securities" is a

22    broker/dealer and registered investment

23    advisor.

24         Q.     Okay.  And what did you do

25    for your dad?

1          RYAN C. BERRIS VOLUME I

2          A.    My father gave me a cubicle.

3     He gave me no salary and he gave me --

4     the company, basically, sponsored my

5     financial license, which I had a Series 7

6     and Series 63.

7          And thereafter I worked, after

8     passing those exams.  I prospected and I

9     built my own book of business.

10          So I never over the course of my

11     employment with my father had any salary

12     from him.  It was, basically, an office

13     and they had sponsored me for the

14     licenses.

15          Q.    Okay.  But, just so I

16     understand, did you draw any salary or

17     obtain compensation from Buell Securities?

18          A.    I did.  But the compensation

19     was based off of my production, based on

20     my book of business.

21          Q.    Okay.  Other than the degree

22     -- I assume it was a Bachelor of Arts

23     degree in economics; is that correct?

24          A.    That is correct.

25          Q.    Okay.  Did you have any other

1              RYAN C. BERRIS VOLUME I
2      certifications or postgraduate degrees of
3      any kind?
4              A.    No further postgraduate
5      degrees.  As far as other certifications,
6      to the best of my recollection, I have a
7      Series 7, Series 63.  But there may have
8      been some other licenses that I obtained
9      regarding my employment at the time of
10     Buell Securities, but I can't recall,
11     specifically, if there was, what the
12     nomenclature would be.
13             Q.    Okay.  So, your time at Buell
14     Securities you were operating as a
15     broker/dealer, is that how you would
16     describe what you were doing there?
17             A.    Well, I was working for a
18     broker/dealer.
19             Q.    Okay.
20             A.    And I was basically an
21     investment advisor.
22             Q.    Okay.  The license you
23     obtained, Series 7 and, I think, you said
24     Series 63, what do those permit you to
25     do?

Page 35

1        RYAN C. BERRIS VOLUME I

2        A.    I don't recall, specifically,

3    to be fair.  But Series 7, from what I

4    can remember, is a general securities

5    license in order to allow to, I think,

6    provide professional investment advice

7    and/or manage client assets, something

8    along those lines.  But, again, I can't

9    recall, specifically.

10        And, to the best of my recollection,

11    a Series 63, I think, pertained to

12    something with regards to jurisdiction in

13    which you would be licensed to practice.

14        Q.    Okay.  Do you maintain active

15    licenses under Series 7 and 63 today?

16        A.    That is something I cannot

17    answer, yeah.

18        Q.    Okay.  Alright.

19        Since leaving -- how long were you

20    there at Buell Securities?

21        A.    Well, I started working there,

22    I believe, in -- to the best I can recall

23    -- in December 2007.  I may have been

24    there a bit previously or in parallel

25    studying for the exams, but it may not.

```
 1            RYAN C. BERRIS VOLUME I
 2     It may have happened in 2008.
 3          Q.    Okay.  And when did your
 4     employment end at Buell Securities?
 5          A.    To be honest, I don't recall,
 6     specifically.  And the reason I don't
 7     recall, specifically, is because I,
 8     basically, forwent my investment practice
 9     and my work with Buell Securities to
10     pursue the endeavors in automotive.
11          Q.    Okay.
12          A.    I did however maintain a, I
13     think, employment status there by some
14     means for -- the only purpose was that I
15     needed health insurance.  And I stayed,
16     from what I can recall, on the company's
17     health insurance plan.  But, I believe, I
18     continued to and still pay for those
19     costs out of pocket.
20          Q.    That was a really long answer
21     to a question I didn't ask you.  And this
22     is going to be a very long day, if that's
23     how you're going to answer my questions.
24          The question I asked you was really
25     simple.
```

1          RYAN C. BERRIS VOLUME I
2       When did you stop working at Buell
3    Securities?  Do you know?
4          A.    I can't recall, specifically.
5          Q.    Okay.
6          A.    But it was on or around the
7    time that I began working fully for the
8    Defendants and, also --
9          Q.    Would February of 2022 make
10   sense?
11         A.    I can see you're saying
12   February of 2022 and that pertains to
13   perhaps my LinkedIn.
14         But my LinkedIn is something that I
15   rarely update.  And I can tell you that I
16   do recall change -- or, let's say,
17   putting the end date of February 2022
18   just because of a personal issue I had
19   with my father.
20         Q.    Okay.  And what was that
21   "issue"?
22         A.    My father always dreamt that
23   I would take over his business and that
24   was one opportunity that I had available
25   to me.  And I let Mr. Choi be aware of

1              RYAN C. BERRIS VOLUME I

2      this, because I needed to make an

3      important life decision.  And I chose to

4      go on the path with Mr. Choi.

5           And my father -- ever since that

6      point, the relationship with my father --

7      we still love each other -- had become

8      quite quite strained.

9           Q.    When was the last time you

10     updated your LinkedIn?

11           A.    I don't recall.

12           Q.    Was it this year?

13                 MR. ZACH:  Asked and answered.

14           Q.    You don't know?

15           A.    I don't recall.

16           Q.    Okay.  So getting back to my

17     question, which is when your employment

18     ended with Buell Securities.  I think, I

19     understood you to say to answer that you

20     don't know.

21           A.    I'm not sure, specifically.

22     And the reason being is because I had

23     stayed on in some capacity solely to have

24     personal health insurance.

25           Q.    Okay.  Alright.

1          RYAN C. BERRIS VOLUME I
2          So this is -- after you worked for
3     Buell Securities, where did you work next?
4          A.    With Mr. Choi.
5          Q.    Okay.  Did you ever work with
6     Scuderia Cameron Glickenhaus?
7          A.    I did prior to my time with
8     Mr. Choi.  However, the contracting --
9     okay, yeah I did, yes.
10         Q.    Okay.  When?
11         A.    My time at SEG, if I can
12    recall correctly, is, roughly -- because
13    the relationship grew over time, because
14    the business was just an idea before it
15    became a business.
16         So my relationship, as far as
17    considering starting a business with
18    them, began in 2011.  But from what I can
19    remember professionally I think, it
20    started on or around 2014.
21         But I think we've produced the
22    contracts that relate to any employment
23    with SEG to you.
24         Q.    Okay.  What I asked you was,
25    what was your tenure of employment with

1          RYAN C. BERRIS VOLUME I

2     SEG.

3          Do you know what that was?

4          A.    To the best of my

5     recollection, I had been assisting SEG

6     and the businesses that were related to

7     that from around -- again, it's -- the

8     question -- if you were pertaining to

9     contractually or are you asking with

10    regards to some type of casual, you know,

11    relationship of consulting beforehand

12    when there is no monetary exchange?

13         Q.    Give me both answers.

14         A.    So I had known the Glickenhaus

15    family since 2008.

16         Q.    Okay.

17         A.    And then in 2000 and -- I

18    believe around 2010, 2011, I began to

19    have discussions with them and become

20    more intimate, as far as the relationship.

21    And this pertained to their P4/5C

22    Competizione, bespoke car and a racing

23    program in Europe.

24         Q.    Okay.  I'll ask you one more

25    time.

Page 41

1          RYAN C. BERRIS VOLUME I
2          However you want to define it, when
3     you were employed?  And I'm looking for
4     dates.  When you were employed by SEG in
5     any capacity?
6          A.    So.
7          Q.    I'm not asking about when you
8     were friends with them, when you got to
9     know them, when you became personal.
10          I'm asking you when you, Ryan
11     Berris, believed you were employed by
12     them.
13          A.    Not having the documents,
14     meaning, business contracts in front of
15     me, I believe, the first one may have
16     been executed in 2014 with the caveat
17     that there was no actual entity for SEG,
18     to my knowledge, at that time.  So the
19     Glickenhaus family had, basically,
20     subcontracted the exclusive right for the
21     SEG program and its related activities to
22     a Swiss company called GPE.
23          So, therefore, the contracts in
24     relation to SEG were between myself
25     and/or Aprivy and GPE.

1          RYAN C. BERRIS VOLUME I

2          Q.    So, Mr. Berris, your testimony

3     is you had an employment contract with

4     SEG?

5          A.    No.  My response was that SEG

6     granted exclusive rights for their

7     programs to GPE and my contracts related

8     to assisting professionally with monetary

9     exchange for SEG were with GPE.

10          Q.    Okay.  So you didn't have an

11     employment contract directly with SEG; is

12     that right?

13          A.    From what I understood, there

14     were no one that had an employment

15     contract with SEG.

16          Jim Glickenhaus granted the full

17     program and then the ability to

18     subcontract work out through his company

19     GPE.  That's to the best of my knowledge.

20          I don't know the specifics of what

21     Mr. Garella and Mr. Glickenhaus came to.

22          Q.    My question was, do you, Ryan

23     Berris, or your company have a contract

24     -- had a contract at anytime with SEG,

25     yes or no?

Page 43

1          RYAN C. BERRIS VOLUME I
2          A.     Through GPE.
3          Q.     What do you mean "through
4     GPE"?
5          A.     From what I can recall, SEG
6     was not an actual entity at the time, or
7     if it was, it was just a personal asset
8     of the Glickenhaus family.
9          When Jim and Jesse decided to turn
10    it into a business, they then -- from
11    what I understood and can recall --
12    granted the exclusive rights to Paolo
13    Garella and his company GPE.  And then it
14    was Paolo's responsibility to then
15    operate the programs related to SEG
16    including commissioning technical
17    partners and/or contractors or employees.
18         Q.     That was like a massive word
19    salad.
20         Did you provide a copy of this
21    contract you referenced to your lawyers?
22              MR. ZACH:  Object to the form.
23              But you can answer.
24         A.     I provided every contract
25    that I had in relation to SEG.

Page 44

```
 1            RYAN C. BERRIS VOLUME I
 2       Q.    So that's yes?
 3            MR. ZACH:  Object to the form.
 4       Q.    Yes, you provided those
 5  contracts to your lawyers?
 6       A.    Yes.
 7            MR. WERNER:  Okay.  [REQUEST]
 8       We haven't seen them.  Please
 9       produce them.
10       Q.    What was your title?  Again,
11  put the word salad aside, however you
12  worked for, through, on behalf of SEG.
13       What title did you have?
14            MR. ZACH:  Object to form.
15       A.    I don't recall, not having
16  the documents in front of me.  But it
17  was -- I think, the language may have
18  been somewhere along the lines of a
19  marketing consultant but -- the
20  contractual agreements with GPE.
21       But there was no -- it was --
22  again, it was -- there was no real formal
23  titles so-to-speak at that time.  The
24  business was at its infancy.
25       Q.    Okay.  What did you understand
```

1            RYAN C. BERRIS VOLUME I
2      your roles and responsibilities to be
3      under the arrangement you had?
4            A.    Quite broad.  So I was
5      advising, to the best of my recollection,
6      on prospective customers, aiding sales
7      for vehicles, looking for sponsors for
8      racing programs, seeking potential outside
9      investors.
10            I was assisting and advising them
11      on marketing and brand and business
12      strategy to keep their response at a high
13      level.
14            Q.    How were you compensated for
15      your involvement in those things?
16            A.    Without having the agreements
17      in front of me, what I can recall that I
18      was compensated on a commission basis.
19            Q.    And your commissions were
20      tied to what?
21            A.    Sales of vehicles.
22            Q.    Okay.  And what commission
23      percentage did you receive?
24            A.    Initially, Jim and I agreed
25      -- we had an oral agreement that we were

1              RYAN C. BERRIS VOLUME I

2       going to -- 5 percent would be fair.  It

3       was standard in the industry.

4            But as the business was progressing,

5       when we went to formalize the agreements,

6       we had a re-discussion and I believe

7       without having that agreement in front of

8       me the commission was 3 percent.

9            Q.    Okay.  And that 3 percent was

10      in writing, the 5 percent was not; is

11      that right?

12           A.    From what I can recall.

13           Q.    Okay.  And how many vehicles

14      were you compensated for at a 5 percent

15      commission?

16           A.    At a 5 percent compensation?

17           Q.    Yeah.

18      How much were you paid?

19           A.    Well, without having the

20      agreements and documents in front of me,

21      I don't believe I invoiced for any

22      commission on a 5 percent rate.

23           Q.    Okay.  How much did you

24      invoice for at the 3 percent rate?

25           A.    Without having the documents

Page 47

1              RYAN C. BERRIS VOLUME I
2       in front of me, I can't speak,
3       specifically.
4              But it was -- I provided all of the
5       invoices including contracts to my
6       lawyers.
7              Q.    Well, we've never seen them.
8       So I need your help today, okay?
9              Were you paid more than $0?
10             A.    Yes.
11             Q.    How much more than $0 were
12      you paid by anyone in connection with the
13      commission in your agreement?
14             A.    I'm unable to answer that
15      question, because I don't have the
16      documents.  That occurred some time ago.
17      I had provided all the documents
18      including bank records to my lawyers
19      regarding that.  So perhaps I can answer
20      your question -- I don't want to
21      speculate.
22             Q.    Okay.  So you're involved in a
23      startup business for high performance
24      vehicles, something that you're passionate
25      about, right?

Page 48

1              RYAN C. BERRIS VOLUME I
2         A.     Yes.
3         Q.     And this is your first job in
4    this world, right?
5         A.     Formally, yes.
6         Q.     Okay.  First time someone is
7    going to pay you for anything related to
8    high performance vehicles, right?
9         A.     I believe so, yes.
10        Q.     Okay.  And so sitting here
11   today your testimony is that you don't
12   remember how many vehicles you sold for
13   that company?
14        A.     Well, if I recall, your
15   question was not asking me the amount of
16   vehicles I sold.  It was asking me how
17   much I was compensated for and --
18        Q.     And the commission was on a
19   per vehicle basis, right?
20        A.     Correct.  However, from what
21   I can recall, the commission is based
22   upon a vehicle price, but there were
23   other cost that related to those vehicles
24   whether they could be options or whether
25   there could be additional monies paid by

1           RYAN C. BERRIS VOLUME I
2     the client for racing programs that I'm
3     not certain without having the documents
4     in front of me if that commission based
5     upon the base price of the car was
6     greater as --
7           Q.    Mr. Berris, how many vehicles
8     did you sell?
9           A.    From what I can recall, it
10    was two.
11          Q.    Okay.
12          A.    Two race vehicles and a full
13    race program.
14          Q.    So, if I go and look at these
15    invoices that you supposedly provided to
16    your lawyer, which I currently don't
17    have, I'm going to see invoices from you
18    to some entity for commissions for two
19    vehicles; is that right?
20          A.    Related to SEG, yes.
21          Q.    Okay.  And how much did you
22    invoice SEG for those two vehicles?
23                MR. ZACH:  Asked and answered.
24          A.    Yeah, I don't recall,
25    specifically, but --

```
 1           RYAN C. BERRIS VOLUME I
 2      Q.    Okay.
 3      A.    -- my lawyers have the
 4   documents and I was unaware that they
 5   were not provided.  But they're more than
 6   happy to provide them to you.
 7      Q.    Alright.  Were you paid?
 8      A.    Yes.
 9      Q.    How much?
10      A.    I --
11           MR. ZACH:  Objection, asked
12      and answered.
13      A.    Again, I would be speculating.
14   I don't recall.
15      Q.    Okay.  Well, we'll look
16   forward to having your lawyers produce
17   the documents, since you just said they
18   could produce them for you.
19      Okay.  So your time with SGC,
20   again, that was your first kind of foray
21   into this world of high performance high
22   end vehicles, right?
23      A.    If you wouldn't mind
24   rephrasing that question.
25      Q.    What's confusing about it?
```

1              RYAN C. BERRIS VOLUME I
2         A.    Well, my interpretation could
3    mean two things.  It could mean
4    professionally, meaning, that it was in
5    exchange for money or my foray into high
6    performance vehicles, which is something
7    that I had been very infatuated, since I
8    was very very young child.
9         Q.    Okay.  I'm happy to stipulate
10   that I don't care about your hobbies.
11   I'm interested in your professional
12   engagements, okay.
13        And, as I understand it, SGC was
14   your first professional engagement in the
15   high performance vehicle industry?
16              MR. ZACH:  Object to form.
17              Answer.
18        A.    Yeah, SEG.
19        Q.    I'm sorry, SEG.
20        So why isn't that listed on your
21   LinkedIn page?
22        A.    I rarely visit my LinkedIn
23   page and there's many activities that I
24   have not put there, as far as my bio,
25   because I prefer to be a private person

Page 52

1              RYAN C. BERRIS VOLUME I
2      and that's the only reason.
3          Q.    Well, that's not true, is it,
4      Mr. Berris, because it was listed on your
5      LinkedIn page, wasn't it?
6          A.    SEG?
7          Q.    Yeah.
8          A.    Not that I can recall.
9          Q.    You didn't do anything to take
10     it off of your LinkedIn page recently?
11         A.    Not that I can recall.
12         Q.    Okay.  Let me show you
13     another document.
14              (Deposition Exhibit Berris 4,
15         printout of LinkedIn profile for
16         Ryan Berris, was marked for
17         identification.)
18              MR. WERNER:  I've marked this
19         as Exhibit 4.
20         Q.    And Mr. Berris, I'm going to
21     hand you what is -- I'll represent to you
22     is a printout of your current LinkedIn
23     page.
24         And tell me if that looks accurate
25     to you.

Page 53

1            RYAN C. BERRIS VOLUME I
2            A.    (The witness reviews the
3       exhibit.)
4            It looks accurate.  I have not
5       viewed my page in a while, but I believe
6       this looks correct.
7            Q.    Well, let me ask you this.
8            You've been looking for a job in the
9       high performance vehicle world, haven't
10      you?
11           A.    One, one, yes.
12           Q.    "One" what?
13           A.    I had discussed a potential
14      engagement with, let's say, to be specific
15      -- because even one is very minute --
16      would be two parties.  One would be the
17      Glickenhauses and the other -- recently,
18      I had spoken with Paolo Garella, who had
19      sent me a message, you know, that he
20      wanted to potentially do business
21      together.
22           Q.    Okay.  Well, as someone who
23      is looking for a job in the auto world,
24      don't you think it would be important to
25      have an updated LinkedIn that reflects

Page 54

1           RYAN C. BERRIS VOLUME I
2      your experience in that industry?
3           A.    That could be one person's
4      view, but it's not mine.
5           Q.    It's not your view?
6           A.    No, because I --
7           Q.    I didn't ask you.  I didn't
8      ask you.
9           A.    No.
10          Q.    Let me just ask the questions,
11     okay?  It will go a lot smoother.
12          A.    Okay.
13          Q.    And it will be a lot smoother,
14     if you just answer my questions.
15          So your view is that it's not
16     important to have a LinkedIn page that
17     reflects accurately your employment
18     history in the industry in which you are
19     seeking employment, correct?
20               MR. ZACH:  Object to the form.
21          A.    At this point in time, no.
22          Q.    At any point in time.
23          A.    For me personally, no.
24          Q.    Okay.  So it's not important
25     to you, in your view, in looking for work

Page 55

1           RYAN C. BERRIS VOLUME I

2    in a very limited high performance auto

3    world to show the world that you,

4    actually, have worked in that world for

5    others aside from De Tomaso?

6              MR. ZACH:  Object to the form.

7         A.    I mean, LinkedIn is one

8    service.  But I had built a very strong

9    reputation that has now been tarnished by

10   the Defendants.

11        Q.    Do you have a résumé?

12        A.    I have never had a résumé.

13        Q.    Okay.  So, when you're out

14   looking for work in the high performance

15   auto world, do you tell people that you

16   also work for SEG?

17        A.    To be clear, I have not had

18   any discussion with any party outside of

19   entering into a professional arrangement

20   with the exception of the Glickenhauses.

21        Q.    Okay.

22        A.    Since my departure from S --

23   from the Defendant.

24        Q.    Okay.  So you didn't send out

25   résumés or solicit or cold call or seek

Page 56

1           RYAN C. BERRIS VOLUME I
2      employment with any auto manufacturer out
3      there?
4           A.    No, I did not.
5           Q.    Okay.  And you haven't done
6      that at all since you separated from De
7      Tomaso?
8           A.    I was -- no, I have not.
9           Q.    Okay.  Alright.
10          Your time with SEG -- again, don't
11     have the contract, I don't know what it
12     says -- were you operating as a CEO of
13     any business unit?
14          A.    No.
15          Q.    Okay.  Were you operating --
16     again, putting titles aside substantively
17     -- were you in charge of sales?
18          A.    Yes.
19          Q.    Okay.  Were you in charge of
20     marketing?
21          A.    I would have to go back to
22     the specifics of the contract.  But, to
23     the best of my recollection, it was,
24     basically, Jim and I that were discussing
25     the strategies and the decisions together

Page 57

1              RYAN C. BERRIS VOLUME I
2        daily.
3              Q.     Okay.  Were you in charge of
4        seeking outside investors for --
5              A.     I wouldn't.
6              Q.     -- SEG?
7              A.     I would not say in charge of,
8        because there -- without my knowledge,
9        there may have been other parties that
10       were prospecting that I cannot speak to.
11       But that was one aspect that we had
12       explored.
13             Q.     Did you secure any investors
14       for SEG?
15             A.     Investors in which manner,
16       meaning, equity or one that was putting
17       in sufficient funds to support the
18       business activities and racing programs?
19             Q.     In any manner, however you
20       define it.
21             A.     So I would -- to be fair, I
22       would say my friend Chris Ruud, who came
23       on board as the first client, who ended
24       up purchasing two vehicles.  I don't have
25       the specific numbers of what he had

1          RYAN C. BERRIS VOLUME I
2      contributed to the business over the
3      course of the relationship, because it's
4      still ongoing.
5          But if I were to estimate, I would
6      think it would have been in excess of 10
7      million euro.
8          And I had been told from Jim
9      Glickenhaus that the funds coming from
10     Chris Ruud was helping subsidize his --
11     even his personal racing cost to allow
12     that aspect of the business to grow.
13          Q.    What was that dude's name?
14          A.    Chris Ruud.
15          Q.    Alright.  Chris Ruud, he is a
16     friend of yours?
17          A.    I haven't spoken to Chris in
18     some years, but we were quite close.
19          Q.    "Some years" ago?
20          A.    Yes.
21          Q.    You said he purchased two
22     vehicles?
23          A.    Yes.
24          Q.    Were those the two vehicles
25     on which you obtained commissions?

Page 59

1          RYAN C. BERRIS VOLUME I
2          A.    Yes.
3          Q.    Okay.  And your testimony is
4    that in some manner you, Ryan Berris,
5    were responsible for him investing
6    upwards of 10 million euros in SEG?
7          A.    I want to be careful with the
8    definition of "investing."
9          But I -- from -- without -- if I
10   were to estimate -- and I'd be
11   speculating partly -- I believe, he may
12   have put in over 10 million euro into SEG
13   as part of his vehicle purchases, as well
14   as his payment for further vehicle
15   development and his racing programs.
16         Q.    Yeah, I'm sure your lawyers
17   told you not to speculate and I am not
18   really interested in speculation.
19         What I'm interested in is facts
20   from you and information from you in
21   responses to my questions.  And I asked
22   you a very simple question, okay.
23         As I understood your earlier
24   testimony, one of the things you did for
25   SEG, whether it was through SEG or some

Page 60

1              RYAN C. BERRIS VOLUME I
2      other business vehicle, was to solicit
3      outside investors.
4           And my question to you, based on
5      that testimony from you is, whether you
6      were successful in soliciting any outside
7      investors, however the investments came
8      in to SEG; yes or no?
9                   MR. ZACH:  Object to the form.
10          A.    Again, Chris Ruud, if I were
11     to estimate, put in perhaps north of 10
12     million euro.
13          If you're asking me if he became an
14     equity holder of the business, he did
15     not.
16          Q.    What I'm asking you if you
17     were responsible, Ryan Berris was
18     responsible for him for making the
19     investment that you just mentioned in SEG?
20          A.    Yes.
21          Q.    Okay.  Were you responsible
22     for obtaining any sponsors for SEG?
23          A.    Without having the agreements
24     in front of me, which we will produce for
25     you, I can't recall the specific language.

1              RYAN C. BERRIS VOLUME I
2      But partnership or sponsorship was part
3      of it and Chris Ruud, also, had his
4      personal companies, from what I can
5      recall, sponsor the vehicles.
6          Q.    What's the name of his --
7      what are the names of those companies?
8          A.    I can recall one.  There may
9      be others.  It was the Light Speed Racing
10     and Aviation, I believe, is the proper
11     name.
12         Q.    Okay.  And you were
13     responsible for obtaining that
14     sponsorship?
15         A.    Well, it came as a result of
16     the relationship with Chris Ruud, as that
17     was his personal and/or family business.
18         Q.    So yes or no?
19         A.    Yes.
20               MR. ZACH:  Asked and answered.
21         Q.    Okay.  Customers, let's talk
22     about customers.
23         Which customers did you bring to
24     SEG?
25         A.    I just want to make sure I'm

1              RYAN C. BERRIS VOLUME I
2      understanding the question correctly.
3           Is your question asking me which
4      customers who actually bought cars
5      including which customers who were true
6      prospects?
7           Q.    Yeah, I guess, what I'm
8      asking you is -- I think you're going to
9      tell me Chris Ruud?
10          I'm wondering is Chris Ruud one of
11     the customers you brought to the company
12     or no?
13          A.    Yes.
14          Q.    Aside from Chris Ruud, did you
15     bring any other customers to the company?
16          A.    I brought many prospective
17     clients to SEG.  The discussions of their
18     potential engagement with them ranged, as
19     far as the maturity.
20          But I have handed overall of my
21     e-mails regarding to my time at SEG to my
22     Counsel, as well as all agreements.
23              MR. WERNER:  We have none of
24          those and [REQUEST] we'd ask that
25          they be produced.

1          RYAN C. BERRIS VOLUME I

2          Q.     But, in terms of the customers

3     that you brought to the company, there

4     were only two cars for which you sought

5     payment of commissions and those were

6     vehicles that were purchased by Chris

7     Ruud, correct?

8          A.     Correct.

9          Q.     Okay.  Alright.

10          Alright.  So, after your time with

11     SEG, whenever that was, what did you do

12     after that?

13          A.     I was building a relationship

14     with Mr. Choi and during that period when

15     Mr. Choi and I began to strike up our

16     relationship, I had a consultancy

17     agreement with Paolo Garella.  I believe

18     it was my existing contract and then

19     there was a supplemental contract to that

20     to be a marketing consultant and/or

21     intermediary, I think, something along

22     those lines was the language.

23          But I provided all of these

24     documents to my lawyers for production.

25          Q.     Okay.  So you met Mr. Choi in

Page 64

1              RYAN C. BERRIS VOLUME I
2       2015; is that right?
3              A.    I believe the first time we
4       met in person was 2015.  I can't recall,
5       specifically, if -- our communications, I
6       believe, may have gone back into sometime
7       into 2014.
8              Q.    Would you agree with me that
9       at that time you represented that you
10      were employed by SEG between February 2015
11      and August 2016?
12             A.    That sounds like that is
13      accurate.
14             Q.    Okay.  Aside from the
15      commissions that you mentioned with SEG,
16      did you -- were you compensated in any
17      other way?
18             A.    From -- for SEG?
19             Q.    Yeah.
20             A.    I was -- from what I can
21      recall -- but this will all be reflected
22      in the productions for you.  I was
23      reimbursed for my expenses.
24             Jim Glickenhaus did offer, you know,
25      if I needed additional funds, to carry

Page 65

1              RYAN C. BERRIS VOLUME I
2       me, because selling these cars as a new
3       company are difficult.  And as a sign of
4       good faith, I chose not to and just work
5       off of commission.
6            Q.     Okay.  So the answer to my
7       question is, no, you weren't compensated
8       in any other way aside from commissions?
9                 MR. ZACH:  Object to form.
10           A.     To the best of my knowledge.
11           But the documents that I've given
12      to my lawyers will give you all the
13      clarity.
14           Q.     Well, that's to be determined.
15           Alright.  Mr. Berris, you allege
16      that you were responsible for "senior
17      Wall Street bankers that you
18      "identified," "curated" and "on boarded"
19      as SEG's first clients.
20           Who were those people?
21           A.     Where is this language coming
22      from?
23           Q.     Your Complaint.
24           A.     Could I see a copy of the
25      Complaint?

Page 66

1          RYAN C. BERRIS VOLUME I

2          Q.    Sure.

3               (There is a discussion off

4          the record.)

5               (Deposition Exhibit Berris 5,

6          Amended Complaint, was marked for

7          identification.)

8               MR. WERNER:  I'll mark this

9          as Exhibit 5.

10         Q.    And, Mr. Berris, I'm going to

11    hand you what I've just marked as

12    Exhibit 5, which is your Amended Complaint

13    against all of the Defendants, okay?

14         A.    Okay.

15         Q.    And if you would, why don't

16    you turn to Paragraph 21.

17         A.    Okay.

18         Q.    Are you with me?

19         A.    Yes, I'm just reading it now.

20         Q.    Okay.  Well, let me know when

21    you're done.

22         A.    Okay, I've completed

23    Paragraph 21.

24         Q.    Perfect, okay.

25               If you look at the third sentence

Page 67

```
 1              RYAN C. BERRIS VOLUME I
 2      you allege, "Berris identified and
 3      curated and on boarded SEG's first
 4      clients," right?
 5              A.    Yes.
 6              Q.    Tell me who those were.
 7              A.    It was Chris -- from what I
 8      can recall -- again, I don't have the
 9      documents in front of me.
10          But when Chris Ruud came on board,
11      it was a family initiative with he and
12      his father and another friend.  They had
13      a series of different entities.  And then
14      they ended up purchasing the two vehicles
15      and a full multiyear racing program.
16          So, from my understanding, there was
17      an economic relationship between Chris
18      and his father Alan Ruud and, I think,
19      another one of their friends in business
20      associates named Ted.  But not having
21      access to records I cannot comment to.
22              Q.    Okay.  And those were SEG's
23      first clients?
24              A.    Correct.
25              Q.    Okay.  And then if you go
```

1          RYAN C. BERRIS VOLUME I
2    down a couple of sentences, you mention
3    "bespoke automotive enthusiasts,
4    collectors and influencers."  And then
5    the next sentence says, "These included
6    senior Wall Street bankers, royals from
7    Middle East and other ultra high worth
8    clientele."
9          A.    Yes.
10         Q.    Do you see that?
11         Okay.  Who were the "senior Wall
12    Street bankers"?
13         A.    I don't recall, specifically.
14    But I have given all of my records from
15    SEG to my Counsel for production.
16         Q.    Okay.
17         A.    That can speak to that.
18         Q.    So sitting here today, okay,
19    you can't tell me who these people are
20    who you introduced?
21         A.    I could -- I could recall a
22    few certain names, if needed.
23         Q.    That's what I asked you, sir.
24    I asked you for names.
25         A.    Okay.  So Peter Kalikow.

Page 69

1              RYAN C. BERRIS VOLUME I

2         Q.    And who is he?

3         A.    Peter Kalikow is a very

4    prominent figure in New York real estate.

5         Robert Herjavec, who was a host on

6    Shark Tank.  I don't know if he still is.

7    I don't watch the show.

8              MR. ZACH:  Not to interrupt,

9         but should we spell these for her?

10             MR. WERNER:  We can do them

11        during a break.

12        Q.    Who else?

13        A.    Roger Beit, who is a very

14   large car collector from my town where I

15   at the time was residing in Glastonbury,

16   Connecticut.

17        Q.    Who else?

18        A.    Joe Capasso.

19        Q.    Who is Joe?

20        A.    Joe Capasso is another close

21   friend and big car collector from

22   Glastonbury, Connecticut.

23        Q.    Okay.  These were all Wall

24   Street bankers?

25        A.    I'm just talking specific

1          RYAN C. BERRIS VOLUME I
2    names.  So I don't know -- I can't
3    recall, specifically, what their titles
4    were.
5         But if you're just asking if people
6    regarding -- pertaining to the financial
7    industry...
8         Q.    I'm literally asking you
9    based on what you have alleged against my
10   clients.
11        A.    Uh-huh.
12        Q.    These are your words.  I mean,
13   they're your lawyers words, but supposedly
14   they came to you.
15        You said it included "Wall Street
16   bankers."  I want you to identify by name
17   who those Wall Street bankers were.
18        A.    "Wall Street," again, that's
19   a general term as far as the financial
20   industry.  So --
21        Q.    I just want to names.
22        A.    So one would be Gerard Lopez.
23        Q.    Anyone else?
24        A.    There are many others, but I
25   can't recall the names offhand.  But I

Page 71

1              RYAN C. BERRIS VOLUME I
2      can say that they should be included in
3      the documents that will be produced.
4          Q.    What document would those
5      names be included in?  So I know when I
6      get it, I'll know where to find it.
7          A.    Sure.  I believe you could --
8      it would likely be in my e-mail
9      communications.
10         Q.    Okay.  These are clients who
11     you were prospecting or trying to solicit
12     sales from?
13         A.    Yeah, it was a mix of.  So
14     some I was prospecting.  Some I was
15     bringing based on personal relationships.
16     But those would all be reflected in the
17     e-mail communications.
18         Q.    Okay.  Alright.
19         The royalty from the Middle East --
20         A.    Yes.
21         Q.    -- who is that?
22         A.    I believe it was -- I can't
23     recall the name, specifically.  But,
24     again, they will be in my e-mail
25     communications.

1          RYAN C. BERRIS VOLUME I

2          I believe it was perhaps someone

3      from the region, Saudi and perhaps

4      Bahrain.  And, also, there may have been

5      one party from -- I don't recall if he

6      was in Dubai or Abu Dhabi, but his name

7      was Tani Hannna, if I can recall

8      correctly.

9          Q.    And who's Tani Hanna?

10         A.    Tani Hanna was a -- if I can

11     recall correctly, he's a member of

12     Ferrari's course at Clancy program.  He

13     had a relationship with Chris Ruud, yeah.

14         Q.    Anyone else from the Middle

15     East, royalty?

16         A.    Nothing I can remember

17     offhand, but this -- these should be

18     reflected in the productions.

19         Q.    Mr. Hanna, he's a royalist of

20     some sort from the Middle East?

21         A.    I can't recall.  I don't know

22     if he was a royal, but that's one name I

23     can recall from the Middle East region

24     that I had discussions with about him

25     potentially becoming involved with SEG.

Page 73

1          RYAN C. BERRIS VOLUME I
2          Q.    Do you know anyone from the
3      Middle East who was a royal that you know
4      sitting here today?
5          A.    I believe we had discussions
6      and I can't recall the names,
7      specifically, but I think it was someone
8      from Bahrain and that party I think --
9      yeah.
10          Q.    "Someone from Bahrain"?
11          A.    Yes.
12          Q.    What was their title?
13          A.    I --
14          Q.    Sheik or a prince or a --
15                MR. ZACH:  Don't talk over
16          each other.
17          Q.    -- warlord?  What was their
18      title?
19                MR. ZACH:  Object to the form.
20          A.    I cannot recall.  It was too
21      many years ago.
22          Q.    Okay.
23          Okay.  You, also, mentioned high
24      worth -- "ultra high worth clientele."
25          Can you give me some names -- well,

Page 74

1           RYAN C. BERRIS VOLUME I
2       all of the names that you can, who you're
3       referencing here?
4           A.    So, just to make sure I
5       understand the question correctly, what
6       would you define as "ultra high net
7       worth"?
8           Q.    This is literally your
9       allegation.
10          A.    Okay, okay.
11          Q.    I'm trying to understand.
12          A.    Sure.
13          Q.    If you have different
14      definitions for what that means or the
15      definition your lawyers supplied you,
16      tell me what it is.  I'm trying to
17      understand what you've alleged against my
18      clients.
19          A.    Understood.
20          So some names that I can recall
21      offhand would be Roger Beit, Joe Capasso,
22      Benjamin Sloss, Andrew -- or Alexander
23      West, Stanley Cohen, Peter Kalikow, Chris
24      Ruud, Gerard Lopez, Robert Herjavec.
25          Q.    Alright.  So all of the names

1              RYAN C. BERRIS VOLUME I
2      that you just mentioned, am I correct in
3      understanding that aside from Chris Ruud,
4      you were not responsible for, actually,
5      consummating any sales transactions with
6      them for vehicles at SEG, right?
7              A.    That is correct.
8              Q.    Okay.  Now, for everything
9      that you did while you were at SEG, were
10     you fully compensated according to
11     whatever arrangement you had with
12     whoever?
13                   MR. ZACH:  Object to form.
14             A.    From what I can recall, yes.
15             Q.    Okay.  So you didn't have any
16     disagreement with SEG about the
17     compensation you received for your work
18     on its behalf?
19             A.    That's not true.
20             Q.    Okay.  Did you have a
21     disagreement with SCG about your
22     compensation for your work on its behalf?
23             A.    I did.  I had a dispute with
24     Jim Glickenhaus with regards to the
25     second car that Christopher Ruud

Page 76

1          RYAN C. BERRIS VOLUME I
2     purchased.
3          Jim by his definition was saying
4     that it was not a car.  And I'm speaking
5     very simply.  And I viewed that it was a
6     car, because the car was racing alongside
7     his cars at the Never Green.  And this is
8     something that Jim took a hard position
9     for.
10         His son who was, also, intimately
11    involved in the business, Jesse
12    Glickenhaus, was upset with his father
13    for taking this position and had a heated
14    exchange with his family.
15         However, to keep things short, what
16    I can say is that I was, ultimately, paid
17    for that car based upon the terms of my
18    condition from Paolo Garella.
19         Q.    Okay.  So Mr. Glickenhaus
20    didn't pay you, Paolo Garella paid you?
21         A.    Yeah, any compensation that I
22    received during my time aiding SEG always
23    came from Paolo Garella's company GPE,
24    because Jim had given him those exclusive
25    rights.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  So, just to summarize
3     that story you just told me, you had a
4     disagreement, but you were, ultimately,
5     compensated for everything that you
6     believed you were entitled to for your
7     efforts on SEG's behalf?
8          A.    Yes.
9          Q.    Okay.  Alright.
10          You're familiar with a luxury
11     vehicle maker called Apollo, right?
12          A.    Yes.
13          Q.    Okay.  And around 2016 Apollo
14     was working to build Apollo IE prototypes,
15     right?
16          A.    Yes.
17          Q.    Okay.  And you understand and
18     would agree with me that when Apollo
19     first started to build those prototypes,
20     the IE prototypes, the initial idea was
21     to license the chassis fro SGC, right?
22     SEG, I'm sorry.
23          A.    That is correct.
24          Q.    Okay.  And so you understood
25     that SEG would oversee the build?

1          RYAN C. BERRIS VOLUME I

2          A.    SEG would not oversee the

3    builds, because SEG -- to keep it simple,

4    SEG was a brand.  And it was GPE, Paolo's

5    company, and his sub-company, MAT, who

6    was the one that in a sense was doing the

7    technical work and the construction of

8    the vehicles.

9          Q.    Alright.  So MAT -- I'm going

10   to slaughter this -- but that stands for

11   Manifattura Automobili Torino, right?

12         A.    You got it good, yeah.

13         And sorry to -- is it possible to

14   get some water?

15         Q.    Oh, sure.

16         You know, why don't we take --

17   let's take a break.

18         A.    Okay.

19              MR. ZACH:  Okay.

20              THE VIDEOGRAPHER:  Thank you.

21         The time is 11:16 a.m.  We're going

22         off the record.  This is the end

23         of Media 1.

24              (Recess taken 11:17 to

25         a.m.)

Page 79

1          RYAN C. BERRIS VOLUME I
2              THE VIDEOGRAPHER:  And the
3          time is, approximately, 11:28.
4          We're back on the record.  This
5          is the start of Media 1.
6          Q.    Alright.  Mr. Berris, before
7     we took a break, we were talking about
8     Apollo.
9          Am I correct in understanding
10    around the time call it 2015/2016, when
11    Apollo was starting to build its
12    prototypes, is when you started to form a
13    relationship with Mr. Choi; is that fair?
14         A.    Yes.
15         Q.    Okay.  And similar to what
16    you described with Mr. Glickenhaus, you
17    were forming your relationship with Mr.
18    Choi in hopes of becoming associated with
19    potentially working for Apollo, right?
20         A.    Well, that wasn't the initial
21    intent.
22         The initial intent was trying to
23    create a synergy between Apollo and SEG
24    and then the relationship with Mr. Choi
25    just continued to grow organically.

Page 80

1           RYAN C. BERRIS VOLUME I
2           Q.    Okay.  And -- but, eventually,
3      the understanding or your intention,
4      ultimately, was to align yourself with
5      Apollo, right?
6           A.    No.
7           Q.    Okay.
8           A.    It was, actually -- that
9      notion was first proposed from Mr. Choi.
10          Q.    Okay.  As we were discussing
11     before, there was a deal where SEG was
12     going to be building the chassises and
13     that fell through, right?
14          A.    To clarify -- so SEG was,
15     basically, going to license their existing
16     chassis to Apollo and, yes, that deal --
17     I think, initially, it was aligned, but
18     then when it went to contractual terms,
19     from what I can recall, did not end up
20     proceeding.
21          Q.    It didn't proceed and fell
22     through, because Glickenhaus demanded a
23     license fee of $500,000 per car, right?
24          A.    That is correct.  Jim wanted
25     me to find a way to have Norman agree to

```
 1            RYAN C. BERRIS VOLUME I
 2      this.
 3            And I told him that I did not think
 4      it was right.  And then this is when the
 5      -- basically, that deal fell apart and
 6      the relationship then became between
 7      Apollo and MAT.
 8            Q.    Okay.  And at that same time
 9      or thereabouts, you, also, had a side
10      agreement with MAT or GPE where you'd be
11      paid a commission for each of the first
12      two Apollo IE prototypes that were
13      developed, right?
14            A.    Well, I wouldn't call it a
15      "side agreement."
16            I had -- so, initially, I had an
17      agreement with GPE for SEG.  So, if the
18      deal then came to fruition with SEG and
19      Apollo, there would have been some type
20      of compensation for my work.  That did
21      not come through.
22            And then thereafter, I believe,
23      there was a new agreement that was
24      created between myself and I believe it
25      was GPE, the best I can remember.  But
```

1              RYAN C. BERRIS VOLUME I

2      these documents have been produced.

3          Q.    You're sure they've "been

4      produced"?

5          A.    I would re-clarify.  I've

6      given them to my Counsel.

7          Q.    Yeah, okay.

8              MR. WERNER:  [REQUEST] Well,

9          to the extent that they haven't

10         been produced, we're going to ask

11         that they be produced.

12         Q.    The arrangement with MAT or

13     GPE, the commissions, that wasn't

14     something that was known to Norman at the

15     time, was it?

16             MR. ZACH:  Object to the form.

17         A.    Not specifically, no.

18         Q.    Right.

19             And, actually, at one point in

20     time, you begged Norman to forgive you

21     for misleading him around your deal with

22     MAT or GPE, right?

23             MR. ZACH:  Object to the form.

24         A.    I don't recall "begging" "for

25     misleading."  I recall Mr. Choi and I

1              RYAN C. BERRIS VOLUME I

2      having a conversation pertaining to that

3      agreement.

4          Q.    You don't remember crying and

5      asking Mr. Choi for forgiveness?

6          A.    I do not recall.

7          Q.    Okay.  Alright.

8          You've got them in the Complaint in

9      front of you, which I believe we've

10     marked as Exhibit 5.

11         Take a look at Paragraph 2.  You

12     allege there, "Over the course of a few

13     years, Berris turned Apollo from a money

14     losing venture into a viable company."

15         Let me know when you have read that.

16         A.    Uh-huh.

17         I've completed it.

18         Q.    Okay.  What did you do to do

19     that?  And I'm asking you, as in Ryan

20     Berris, what did you do?

21         A.    Just to be clear, because

22     there is a lot of topics covered in this

23     paragraph.

24         Q.    I'm asking you about the

25     sentence I just read.

RYAN C. BERRIS VOLUME I

1

2      A.      Would you mind just repeating

3      the...

4      Q.      Okay.   "Over the course of a

5      few years, Berris" -- i.e., you -- "turned

6      Apollo from a money losing venture into a

7      viable company."

8      And what I'm asking you is, again,

9      you, Mr. Berris, what did you do to do

10     that?

11     A.      At a high level sales,

12     marketing and general business

13     development.

14     Q.      Okay.   What did you do with

15     respect to "sales" to turn the company

16     "from a money losing venture into a

17     viable company"?

18     A.      To successfully close sales

19     of the Apollo IE, for which ten would be

20     produced.

21     Q.      How many vehicles did you

22     sell?

23     A.      I assisted on -- from what I

24     can recall, all of the sales of the cars.

25     Q.      "Assisted" who?

Page 85

1              RYAN C. BERRIS VOLUME I
2         A.    The business.
3         Q.    Were there other people
4    involved?
5         A.    In the sales process?
6         Q.    Yes.
7         A.    I think that's a vague
8    question for me.
9         I mean, I was, basically,
10   responsible for leading those.
11        It would be speculating for me to
12   say if there were other people involved
13   in this, because it's too broad.
14        I mean, of course, there were other
15   internal people at Apollo that were
16   assisting with forming of agreements or
17   facilitating payments.
18        Q.    Yeah.  I asked you a vague
19   question, because you gave me a vague
20   answer.
21        You used the word "assist."  You
22   "assisted" in the sales.
23        I'm asking what you did mean when
24   you said you "assisted" in the sales?
25        A.    I built relationship with the

Page 86

1              RYAN C. BERRIS VOLUME I
2      clients, made them comfortable, which
3      leading to the closing of the sales, most
4      specifically, with the first customer for
5      the brand Barry Skolnick.
6              Q.    Did you close that sale
7      transaction yourself?
8              A.    I was leading that whole
9      process with Barry.  I personally did not
10     countersign his agreement, because for
11     Apollo, I was a contractor and I was not
12     signatory.
13             But I was responsible for the
14     closing and building of the relationship
15     with Mr. Skolnick and that took a very
16     very long time to make him comfortable.
17             Q.    So you were responsible for
18     that sale, that's your testimony?
19             A.    In large part, yes.
20             Q.    What do you mean by "in large
21     part"?
22             A.    Meaning, that there's other
23     aspects and contributions that led to
24     Mr. Skolnick becoming interested in the
25     brand, becoming formally on boarded.  But

1                RYAN C. BERRIS VOLUME I
2     the majority of that work and relationship
3     was built between Mr. Skolnick and I.
4          Q.     Okay.  So you would agree
5     with me, you, Ryan Berris, were not
6     solely responsible for closing the deal
7     with that customer?
8          A.     I would say that would be
9     fair.
10         Q.     Okay.  Aside from that sale,
11    what other sales did you, Ryan Berris,
12    close?
13         A.     I had assisted with most all
14    of the sales of the vehicles.
15         Q.     There were ten of them, right?
16         A.     Yes.
17         Q.     List them to me.
18         A.     In which way, the clients?
19         Q.     Yes.
20         A.     So there was Barry Skolnick,
21    Michael Loke, Carlos Peralta, Mr. Yoko
22    Yama San, I believe, if I'm saying his
23    name correctly.
24             I'm trying to recall the others,
25    but I can't remember offhand.

1          RYAN C. BERRIS VOLUME I

2          I can say another one, which was

3     Patch Bar Limited.  That was a company

4     that Mr. Choi told me that was his own

5     and that Apollo was for himself.

6          I, also, do remember other clients

7     including Bill Pepe of Miller Motorcars.

8     But, from what I understand, he did not

9     end up taking delivery and that was

10    something that I was working on until my

11    departure from De Tomaso.

12         Q.    Okay.  And is it fair to say

13    with respect to the sales that you just

14    referenced and the others ones that you

15    can't currently remember, you assisted in

16    those but were not solely responsible for

17    them?

18         A.    I would say that's fair.

19         Q.    Okay.  Alright.

20         You mentioned that you were, also,

21    involved in "marketing" during your time

22    with Apollo.

23         And how so?

24         A.    I was, basically, leading

25    most of the marketing initiatives from

1          RYAN C. BERRIS VOLUME I
2     press releases, to events, to social
3     media, to working with potential
4     distribution partners for future sales.
5          Q.    Anything else?
6          A.    Marketing campaigns with
7     technical partners.
8          Q.    The things that you just
9     mentioned, did you assist with those or
10     were you solely responsible for them?
11          A.    Well, there is many -- to be
12     fair, there's -- I listed many
13     categories.  And there's many moving
14     parts to each one of those categories.
15          Q.    Okay.
16          A.    So I would need to have more
17     granular question to respond accurately.
18          Q.    Sure.
19          You mentioned a variety of things
20     that you did in connection with your role
21     in marketing for Apollo.
22          Were any of those things for which
23     you were solely responsible?
24          A.    I was in charge of, yes, but
25     there were other people that would assist.

Page 90

```
 1           RYAN C. BERRIS VOLUME I
 2     Whether they were -- could be internal
 3     but it could, also, be contracting a
 4     video production company to make a video
 5     for a marketing campaign.
 6           Q.    I said this before and I'm
 7     going to say it again and I hope I don't
 8     have to.
 9           This is going to take all day and
10     probably tomorrow, if you don't answer my
11     questions.
12           I didn't ask you what you were "in
13     charge of."
14           I asked you -- you listed a bunch
15     of things for which you were involved in
16     for Apollo in connection with marketing.
17           What I asked you, is there anything
18     within the things that you mentioned or
19     anything that you didn't mention for
20     which you, Ryan Berris, were solely
21     responsible?
22                 MR. ZACH:  Object to the form.
23           A.    I would say -- I would say,
24     yes, there were.
25           Q.    What were they?
```

1          RYAN C. BERRIS VOLUME I
2          A.    One in particular I could say
3     I had introduced the brand to Miller
4     Motorcars.
5          Q.    What else?
6          A.    I was, also, the one who was
7     responsible for the -- working to import
8     the vehicles into the US, specifically,
9     with regards to Mr. Skolnick and then,
10    also, future Apollo deliveries such as
11    home built.  But I was unable to complete
12    those duties, because they had been
13    occurring over the process leading up to
14    my departure from De Tomaso.
15         Q.    Okay.  So you were solely
16    responsible for making an introduction to
17    Miller Motorcars and solely responsible
18    for importing vehicles, right?
19         A.    Meaning, I'm not the company
20    who does the paperwork for the importing
21    so-to-speak.  So I want to be very
22    specific.  But I was the one who was in
23    charge of those.
24         Q.    Okay.  I'm not asking if you
25    were "in charge."

1          RYAN C. BERRIS VOLUME I
2          I'm asking you whether -- again, I
3     understand that you don't work for other
4     companies involved in these issues.
5          I'm asking what you did at your
6     time at Apollo and whether these are the
7     things for which you, Ryan Berris, were
8     solely responsible for handling for the
9     company.
10               MR. ZACH:  Just object to the
11          form.  I don't -- when you use the
12          nomenclature of "solely responsible"
13          and "in charge," maybe there's a
14          distinction in there but...
15               MR. WERNER:  Well, if there
16          is, he can tell me what it is.
17               I asked the questions.  He's
18          not telling me he doesn't understand
19          the questions.  He's just refusing
20          to answer the questions.
21               And as I advised him and I'll
22          advise you, I've got a lot of
23          questions to ask and I'm going to
24          get answers to them one way or the
25          other.

1          RYAN C. BERRIS VOLUME I
2      Q.    And if you just keep refusing
3   to answer the questions, we'll go to the
4   Court.  We'll get more time.  And this
5   will take as long as it has to, to get
6   answers --
7              MR. ZACH:  Hold on.  Stop.
8              Just before you answer...
9              I don't think the record
10         reflects that.  I think your
11         questions have -- there's ambiguity
12         in them and then there's some
13         quibbling over here over semantics.
14         But let's move forward.
15              MR. WERNER:  I'd love to.
16      Q.    My sense of things is that
17   you contributed to these matters while at
18   the company, but these weren't things
19   that you necessarily handled all on your
20   own; is that fair?
21      A.    I was in charge of but did
22   not handle all on my own.
23      Q.    Okay.  Let's move on.
24         You would agree with me that -- we
25   discussed this a minute ago, but just to

1          RYAN C. BERRIS VOLUME I
2     be clear -- there, ultimately, was never
3     any contractual partnership between
4     Apollo and SCG related to the vehicles,
5     right?
6          A.    That I cannot recall.
7          Q.    Okay.
8          A.    I don't remember if there was
9     an agreement that was executed and then
10    void or not.
11         Q.    Okay.  So answer you don't
12    know, right?
13         A.    Yes.
14         Q.    Okay.  Now, do you know who
15    Michael Koon-Ming Choi is?
16         A.    Yes.
17         Q.    Do you know whether or not he
18    was a shareholder or a director of Apollo?
19         A.    I was told that he was by Mr.
20    Choi, but I have never seen the company
21    registers.
22         Q.    So, aside from someone telling
23    you that, you don't have any independent
24    knowledge one way or the other; is that
25    fair?

1              RYAN C. BERRIS VOLUME I

2          A.    I have what was communicated

3     to me by Norman Choi and, also, my

4     experiences with Michael Choi when he was

5     traveling with Michael relating to

6     businesses -- business matters with

7     Apollo and MAT.

8          Q.    Okay.  So do you know whether

9     Mr. Michael Koon-Ming Choi was ever a

10    shareholder or director of Apollo?

11         A.    Outside of what Mr. Choi told

12    me, I cannot answer definitively.

13         Q.    So you, Ryan Berris, do not

14    know, right?

15         A.    I only know what Mr. Choi had

16    told me, meaning, Norman Choi.

17         Q.    Okay.  Aside from what

18    someone told you, which in the legal

19    business we call "hearsay," you have no

20    independent firsthand knowledge of the --

21    one way or the other whether he was a

22    shareholder or a director, right?

23              MR. ZACH:  Object to the form

24         but...

25         A.    I believe there are

Page 96

1           RYAN C. BERRIS VOLUME I
2    productions that speak to Michael Choi
3    being so.
4         Q.    What "productions" are you
5    talking about?
6         A.    I can't recall the Bates
7    Number, specifically, but I flagged them
8    for my lawyer.
9              MR. ZACH:  Don't say what
10         you said to your lawyer.  Don't
11         talk about that.
12         Q.    Yeah.  I'm not interested in
13    that.
14         What I want to know is whether you,
15    Ryan Berris, has any firsthand knowledge
16    one way or the other, yes or no, whether
17    Michael Koon-Ming Choi was a shareholder
18    or director of Apollo?
19         A.    Outside of what was told to
20    me, no.
21         Q.    Okay.  Alright.
22         Let's talk about your time at De
23    Tomaso.
24         So, as I understood it, between
25    your time working with the Glickenhauses

1           RYAN C. BERRIS VOLUME I
2     and SEG, you didn't work for any other
3     vehicle company, other than Apollo and
4     then De Tomaso; is that fair?
5           A.    I believe what would be
6     correct is saying that I had -- prior to
7     my time at Apollo/De Tomaso, I had worked
8     with three formally, which would be SEG,
9     GPE, MAT.
10          Q.    Okay.  What does "GPE" stand
11    for?
12          A.    From what I can recall, it's
13    Global -- Global something Enterprises.
14    But it's reflected on my consulting
15    agreements with the company.
16          Q.    Why isn't your work with GPE
17    or MAT listed on your LinkedIn page?
18          A.    Because I don't really -- I'm
19    not active on social media.  I don't
20    really update my LinkedIn as well.
21          Q.    Okay.  Alright.
22          Let's talk about your time at De
23    Tomaso.
24          You were the Chief Marketing
25    Officer of De Tomaso, right?

1           RYAN C. BERRIS VOLUME I
2           A.    Amongst other titles, yes.
3           Q.    Okay.  We're going to go
4      through those.  Let's start with one.
5           A.    Yes.
6           Q.    Well, let me back up.
7           "Amongst other titles," what other
8      titles did you have?
9           A.    So, originally, it was
10     General Manager and Chief Marketing
11     Officer.
12          Q.    Uh-huh.
13          A.    And later I became the CEO
14     and Chief Marketing Officer.
15          Q.    Okay.  Alright.
16          Let's start with your role as CMO.
17          What did you understand that job to
18     entail?
19          A.    I understood the job to
20     entail developing the -- I would say --
21     so, specifically, marketing, developing
22     marketing strategies, including press
23     releases, events, social media presence.
24          Q.    Anything else?
25          A.    It could include other matters

1          RYAN C. BERRIS VOLUME I
2     such as -- based on someone's definition
3     of marketing, you could, also, say
4     prospecting with clients and sales or
5     something of that sort.  So I just want
6     to make sure that I'm speaking that the
7     marketing was kind of as a holistic
8     approach.
9          Q.    Yeah, just to be clear, I
10    don't care about somebody else's
11    deposition -- I, mean somebody else's
12    definition.
13         What I care about is what you
14    understood your job under that title to
15    be.  And, I think, you've answered that
16    question.
17         Did it, in your mind, include sales
18    functions as well?
19         A.    Yes.
20         Q.    Okay.  Alright.
21         With respect to your role as the
22    Chief Marketing Officer and carrying out
23    the responsibilities and performing the
24    roles and job functions you just
25    mentioned, what experience did you bring

Page 100

```
 1           RYAN C. BERRIS VOLUME I
 2      to that job?
 3           A.    I think a very unique
 4      experience, because SEG -- I was involved
 5      in the development of a new hyper car and
 6      sports car brand that was akin to the
 7      likes of Pagani or a Koenigsegg.  And it
 8      been quite some time before there was a
 9      new reputable serious effort and entry
10      into the market.
11           So I had a unique experience and
12      knowledge that came -- that allowed me to
13      be -- that was advantageous to Mr. Choi
14      and Apollo and De Tomaso.
15           Q.    Okay.  Aside from what you
16      just said, any other experience that you
17      brought to the role of Chief Marketing
18      Officer of De Tomaso?
19           A.    I find the question quite
20      vague.  I have -- I brought my life
21      experience to it.
22           Q.    Okay.  I'm asking you -- okay.
23           So, aside from "life experience,"
24      anything else, any other experience?
25           A.    I find the question too broad
```

1          RYAN C. BERRIS VOLUME I
2     to understand.
3          Q.    Okay.  Alright.
4          Your job as Chief Marketing Officer
5     of De Tomaso and the functions that you
6     just described to me, how did you go
7     about executing the job duties you just
8     described?
9          A.    I -- I took different
10    approaches depending upon the activity or
11    goal that I was working towards.  But I
12    dedicated most of my waking hours to De
13    Tomaso.
14         Q.    What does that mean,
15    "dedicated" your "waking hours to De
16    Tomaso"?
17         A.    I was working around the
18    clock seven days a week.
19         Q.    Okay.  As Chief Marketing
20    Officer, did you take an assessment of
21    how the company was marketing itself
22    currently in the marketplace?
23         A.    Prior to my being involved in
24    taking the title; is this a correct
25    interpretation of your question?

Page 102

1          RYAN C. BERRIS VOLUME I

2          Q.    No.  I asked -- okay.

3          You understand I'm talking about

4    when you worked for De Tomaso, right?

5          A.    Yes.

6          Q.    You came on board and your

7    title was Chief Marketing Officer.

8          And I'm asking you, as Chief

9    Marketing Officer, did you undertake any

10   analysis of what the company was doing at

11   the time that you were hired for that job

12   in the marketplace to market its

13   forthcoming automobile?

14         A.    I did.  I did a lot, yes.

15         Q.    Okay.  Did you prepare any

16   reports?

17         A.    I believe, to the best of my

18   knowledge, I prepared a lot of documents

19   and communications with Mr. Choi and

20   others.  A lot of that pertained to Mr.

21   Choi's original plan to -- that was

22   openly communicated to the market with

23   Tom Kim about doing the Pantera, you

24   know, kit car program.

25         Q.    Okay.  And what was your

```
 1              RYAN C. BERRIS VOLUME I
 2      assessment of how it was marketing itself
 3      at the time that you came on board and
 4      what it needed to do more or differently?
 5           A.    So I had discussed, actually,
 6      you know, my views on how it was currently
 7      viewed and how I viewed it and in the
 8      market.
 9           Prior to coming on board with Mr.
10      Choi, I told him that in short, you have
11      one chance to do it right, in my
12      experience, and I believe that the work
13      that Mr. Kim was doing was -- would not
14      be taken seriously and it could be done
15      in a better fashion.
16           Q.    So your view of De Tomaso's
17      business opportunity with respect to
18      marketing is it had "one chance" to get
19      it right and so it was imperative that it
20      get its marketing correct, right?
21           A.    To be clear, it wasn't just
22      the marketing.  It was the entire
23      business strategy, in general.
24           Q.    Okay.  So it had to have the
25      right -- it had one shot to get the
```

1              RYAN C. BERRIS VOLUME I

2        business strategy right, right?

3            A.    I felt that it was important

4        to -- when introducing the brand to the

5        market, that it's important to make sure

6        it was a very thorough sound approach and

7        I -- my personal view was that what he

8        was planning with Mr. Kim would not be

9        taken -- would not be received well.

10           Q.    Okay.  But now you're in the

11       role, you're calling the shots.

12           What did you do to make sure that

13       the business took its one shot, its one

14       opportunity "to get it right"?

15           A.    Well, I did a lot of research

16       into what had already been communicated

17       to the market, based on what Mr. Kim had

18       been planning, which that covered things

19       in the press on web forums amongst other

20       areas, investor boards.

21           And I worked to create some

22       potential strategic scenarios that Mr.

23       Choi and I then discussed intimately

24       together.

25           Q.    Okay.  Anything else?

1          RYAN C. BERRIS VOLUME I

2          A.    I think at a high level

3     that's...

4          Q.    Okay.  Let's -- I want to

5     talk to you about the role of CEO and

6     General Manager.

7          Maybe we just -- is there anything

8     separate and apart from what we just

9     discussed with respect to your roles of

10    Chief Marketing Officer that you did or

11    were responsible for with respect to your

12    role as General Manager at the time when

13    you held that title?

14         A.    If you wouldn't mind, just

15    say the question one more time.

16         Q.    I want to ask you a bunch of

17    questions if I don't need to.  And so we

18    were just talking about your role as

19    Chief Marketing Officer.

20         As I understood it, at some point

21    your role transitioned from General

22    Manager/Chief Marketing Officer to

23    CEO/Chief Marketing Officer; is that fair?

24         A.    Yes.

25         Q.    Okay.  So have we covered, in

1          RYAN C. BERRIS VOLUME I
2      terms of what your roles,
3      responsibilities, experience and
4      execution with respect to the time you
5      served as General Manager and Chief
6      Marketing Officer?
7              MR. ZACH:  Object to the form.
8          A.    Yeah.  But "have we covered"
9      what, in particular?
10         Q.    I'm asking you, is there
11     anything else that you did as General
12     Manager that we haven't discussed that
13     you did as Chief Marketing Officer?
14         A.    Many, many activities.
15         Q.    Okay.  What did you understand
16     your role as General Manager -- apart
17     from Chief Marketing Officer -- to be?
18         A.    Basically, it was Mr. Choi
19     and I at the business.  And I was
20     responsible and did create the business
21     strategy, the business plan, consulted
22     Mr. Choi about potential technical
23     partners, helping create those agreements
24     and commercial terms.
25         I put together the distribution

1          RYAN C. BERRIS VOLUME I

2     network, notably, from Miller Motorcars

3     and allowed them an exclusive; helped

4     create the -- outside of the marketing

5     campaigns -- the initial sales process

6     that we would use, in order to, let's

7     say, have a registration of interest

8     process and then going into having an ROI

9     agreement, which allowed serious buyers

10    after we vetted them to put 100,000€

11    deposit to be held in escrow wherever

12    they were, so they felt comfortable.

13          So there was a lot of interim steps

14    that were taken in order to ensure that

15    we were able to do our -- make our best

16    effort to succeed but, also, to put

17    ourselves in the client or the dealer's

18    shoes what would be palatable in their

19    experience and, also, to allow us to have

20    a solid indicator of whether interest in

21    the vehicles was tangible or not.

22          Q.    Were you responsible for

23    overseeing contracts?

24          A.    Most but not all.

25          Q.    Were you responsible for

1          RYAN C. BERRIS VOLUME I
2     overseeing relationships with vendors?
3          A.    I would say generally, yes,
4     not all.
5          Q.    Okay.  Were you responsible
6     for making sure that vendors got paid?
7          A.    I would say, to the best of
8     my efforts, but it was ultimately up to
9     Mr. Choi to make the -- process the
10    payment.  So, prior to having a U.S.
11    Banking relationship, the funds were
12    coming from overseas entities whereby I
13    was not a signatory, so I could not
14    initiate the payments myself.
15         Q.    Okay.  Again, it would be
16    great, if you just answer my questions.
17         You're using your best efforts with
18    vendors.
19         Did that include regular
20    communications with vendors?
21         A.    Yes.
22         Q.    Okay.  Managing those
23    relationships with vendors?
24         A.    I think that's fair, yes.
25         Q.    Okay.  To the extent you

Page 109

```
 1            RYAN C. BERRIS VOLUME I
 2     could, making sure that vendors got paid?
 3            A.    Yes.
 4            Q.    Okay.  And with respect to
 5     contracts, did you understand it to be
 6     your role that you were responsible for
 7     making sure that De Tomaso performed its
 8     contractual obligations?
 9            A.    To the best of my abilities,
10     yes.
11            Q.    Okay, alright.
12            So I want to transition to talking
13     about your role as the CEO.
14            Did anything change in your roles
15     and responsibility from General Manager
16     to CEO, you know, other than what we just
17     talked about what you did as GM, did the
18     role change?
19            A.    Outside of the title itself --
20            Q.    Yeah.
21            A.    -- to me, no.
22            Q.    Okay.  Was it your
23     understanding that as CEO, if things went
24     wrong or poorly, you were, ultimately, to
25     blame?
```

1          RYAN C. BERRIS VOLUME I
2          A.    I guess, it could be viewed
3     that way.
4          Q.    Well, have you heard the
5     expression, "the buck stops with you"?
6          A.    Yes.
7          In a sense, though, it was -- Mr.
8     Choi and I were for a long period the
9     only people doing the heavy lifting at
10    the company.
11         Q.    Yeah.
12         My question was, as CEO, did the
13    buck stop with you?
14         A.    I guess, it's subjective.
15    But I was taking responsibility, yes.
16         Q.    Okay.  Had you ever served as
17    CEO before?
18         A.    I guess -- I mean, I could
19    say I was CEO of my own personal
20    companies.  But as far as an outside
21    party, no, this would be my first time.
22         Q.    You were CEO of Aprivy?
23         A.    I'm the sole proprietor so...
24         Q.    Do you have any other
25    businesses?

```
 1              RYAN C. BERRIS VOLUME I
 2         A.    I had an investment practice,
 3    but that was just working under the -- my
 4    father's company.
 5         Q.    Okay.  Aside from being CEO
 6    of your LLC and CEO of your broker/dealer
 7    practice, have you ever run any other
 8    business?
 9         A.    I had a startup before with
10    some friends called Efunder.
11         Q.    What was that?
12         A.    It was a fintech startup
13    based on crowd funding.
14         Q.    Okay.  Any other companies
15    you've run?
16         A.    I think that covers it.
17         Q.    Okay.  So am I correct that
18    you've never been CEO of a car company
19    before?
20         A.    Correct.
21         Q.    Okay.  And you've never been
22    General Manager of a car company before?
23         A.    Not until working with Mr.
24    Choi.
25         Q.    Right.
```

1          RYAN C. BERRIS VOLUME I
2          And until you worked with Mr. Choi
3     and De Tomaso, you never held the role of
4     Chief Marketing Officer before, right?
5          A.    Perhaps based on what
6     language is written in an agreement,
7     right, because I just want to be careful
8     at my time at SEG.
9          I don't have my consulting
10    agreement in front of me.  So I can't
11    recall what the title that was given.
12         Q.    We don't have it front of us
13    either.  So, I guess, we're at a mutual
14    disadvantage there.
15         So, as CEO or General Manager, what
16    experience did you bring aside from the
17    experience you referenced earlier?
18         A.    "What experience" did I bring
19    to?
20         Q.    To executing those roles.
21         A.    So, prior to my time at
22    working at SEG and assisting GPE and MAT,
23    I brought my lessons and experience that
24    I learned from my past business
25    activities and, also, my car knowledge

1          RYAN C. BERRIS VOLUME I

2     and infatuation with brands, since I was

3     a young child had.

4          I would always study and analyze

5     the market and brands, you know.

6          Q.    So you brought your love of

7     cars, your experience in the broker/dealer

8     world, your experience in the startup

9     with your friends and running your

10    personal LLC; is that right?

11         A.    I can't recall.  But, also,

12    if it wasn't included, my time at working

13    with SEG, GPE, MAT.

14         Q.    I'm sorry, I left that out.

15    Anything else?

16         A.    From what I can recall,

17    that's everything.

18         Q.    Okay.  Mr. Berris, you'd agree

19    with me that it is customary for an

20    executive in the high performance vehicle

21    manufacturing industry to respond promptly

22    to customer inquiries and outreach?

23         A.    Yes.

24         Q.    Okay.  And you'd agree with

25    me that it is, also, customary for an

1              RYAN C. BERRIS VOLUME I
2      executive in that industry to respond
3      promptly to outreach from fellow
4      executives and employees and vendors and
5      contractors and board members, right?
6           A.    I think, that's fair, yes.
7           Q.    Okay.  And you'd agree with
8      me that as an executive for a vehicle
9      company like that, it's required to act
10     in the best interest of the company for
11     which one is an officer, right?
12          A.    Yes.
13          Q.    Okay.  And that you'd agree
14     with me that that means putting the
15     business interest ahead of personal
16     interest, right?
17          A.    Yes.
18          Q.    Okay.  And you would agree
19     with me that an executive needs to use
20     and manage company funds for the benefit
21     of the company, right?
22          A.    Yes.
23          Q.    Okay.  So that means not using
24     company funds for personal uses, right?
25          A.    Outside of those that are

RYAN C. BERRIS VOLUME I

1          RYAN C. BERRIS VOLUME I
2     responsible for conducting the business,
3     yes.
4          Q.    Okay.  Do you think that there
5     are personal expenses that are necessary
6     for conducting business?
7          A.    No, I just find it -- well,
8     personal expenses could be -- it can be
9     vague.
10         I mean, my waking -- my entire life
11    was dedicated Apollo/De Tomaso.  So it's
12    -- I was always just solely focused on
13    the business.
14         Q.    So, during your time at De
15    Tomaso, every expense you incurred was a
16    business expense; is that what you're
17    saying?
18         A.    I would say everyone that I
19    had invoiced, yes.  But there are many
20    un-invoiced expenses that I contributed
21    to the company and did not seek
22    reimbursement.
23         Q.    Okay.  You'd agree with me
24    that it's part of the job responsibility
25    of an executive for a car company to

1              RYAN C. BERRIS VOLUME I
2       disclose the use of funds to fellow
3       executives and board members, right?
4            A.    Yes.
5            Q.    Okay.  And you'd agree with
6       me that such an executive is obligated to
7       protect and hold in confidence company
8       information from third parties, right?
9            A.    Correct.
10            Q.    Okay.  And that information,
11       confidential company information, should
12       only be used to benefit the company,
13       right?
14            A.    Yes.
15            Q.    Alright.  And you'd agree
16       with me that it's customary for an
17       executive to inform the Board of the
18       company about actions the executive
19       intends to take that may impact the
20       company, right?
21                 MR. ZACH:  Object to the form.
22            A.    Perhaps in general it's
23       customary.  But Mr. Choi and I, our
24       course of dealing, was more casual.
25       There would be things that we would be

1          RYAN C. BERRIS VOLUME I
2     fully --
3          Q.    I'm asking you in general.
4     I'm not asking you specifically.
5          A.    "In general," yes.
6          Q.    Okay.  And you would agree
7     with me that it's customary to inform the
8     board of the company and fellow officers
9     and directors about substantial
10    contractual commitments that may impact
11    the company, right?
12         A.    Yes.
13         Q.    Okay.  And you'd agree with
14    me that it's customary for executives to
15    respond promptly to vendors to address
16    payment issues, right?
17         A.    Yes.
18         Q.    And you'd agree that it's
19    customary to actually pay vendors
20    promptly, right?
21         A.    Yes.
22         Q.    And you'd agree that when
23    submitting an invoice to a company for
24    reimbursement, the executive needs to
25    support the invoice being submitted,

1            RYAN C. BERRIS VOLUME I
2    right?
3            A.    Yes.
4            Q.    Okay.  And it needs to --
5    that support needs to show that the
6    invoice for reimbursement relates to
7    business activities, not personal
8    activities, right?
9            A.    Yes.
10               MR. ZACH:  Objection, form.
11            Q.    Okay.  And you'd agree with
12    me that it's customary for an executive
13    to maintain appropriate and professional
14    relationships with company personnel,
15    right?
16            A.    Yes.
17            Q.    Okay.  And to maintain
18    professionalism and communications with
19    company personnel, right?
20            A.    Yes.
21            Q.    Okay.  So you'd agree with me
22    that executives shouldn't sext or send
23    inappropriate text messages to company
24    personnel, right?
25            A.    Yes.

1              RYAN C. BERRIS VOLUME I
2         Q.    Okay.  And you'd agree with
3    me that it's not appropriate for
4    executives to engage in romantic pursuits
5    with contractors or vendors or business
6    partners, right?
7         A.    Yes.
8         Q.    Okay.  And so, as CEO of De
9    Tomaso, one of the things that you did
10   was identify business opportunities,
11   right?
12        A.    Yes.
13        Q.    And you identified potential
14   business partners, right?
15        A.    Yes.
16        Q.    And you negotiated the sale
17   of De Tomaso cars, right?
18        A.    Yes.
19        Q.    Okay.  I'm going to direct
20   you back to your Amended Complaint.
21   It's, actually, the first paragraph of
22   that document.
23        And it's -- I'm going to direct you
24   -- you can read the whole paragraph.  But
25   I'm directing you, specifically, to the

1              RYAN C. BERRIS VOLUME I
2       last sentence that carries over from
3       Page 2 to Page 3, okay?
4              A.    Uh-huh.
5              Q.    And you can go ahead and read
6       it, if you want.
7              A.    (The witness reviews the
8       exhibit.)
9                   MR. ZACH:  Is it the one,
10              "he cut his teeth"?
11                  MR. WERNER:  Yeah.  I'll
12              just go ahead and I'll just...
13              Q.    What I'm directing you to,
14       specifically, is where you say you
15       brought with him, meaning you, "industry
16       expertise and then extensive network of
17       artisans, designers, engineers,
18       machinists, creatives and connoisseurs,
19       all of whom were essential to relaunching
20       De Tomaso."
21              A.    I finished reading it.
22              Q.    Alright.  You'd agree with me
23       that you're not an artisan, right?
24              A.    I guess, everyone's
25       definition of "artisan" can be, you know,

```
 1              RYAN C. BERRIS VOLUME I
 2       subjective.
 3              Q.    Okay.
 4              A.    I would say I -- a lot of the
 5       work that I've done -- and my skill set
 6       is quite creative.
 7              Q.    Okay.  So you're an artisan?
 8              MR. ZACH:  Do you make
 9       pottery?
10              Q.    Do you make pottery?
11              A.    I do not.
12              Q.    Okay.  Alright.
13       Are you a designer?
14              A.    No.
15              Q.    Are you an engineer?
16              A.    No.
17              Q.    Alright.  You're a machinist
18       -- you're not a machinist, right?
19              A.    No.
20              Q.    Okay.  And neither -- just to
21       be clear, these were folks who you had
22       connections to, these weren't roles that
23       you, Ryan Berris, were going to be
24       performing for De Tomaso, right?
25              A.    I would say, yes, with the
```

1           RYAN C. BERRIS VOLUME I
2    exception of perhaps creatives.
3           Q.    Okay.  You would consider
4    yourself a creative?
5           A.    By my definition, yes.
6           Q.    Okay.  Alright.
7           Who were the artisans that you were
8    bringing with you?
9           A.    I mean, in general terms?
10          Q.    No, I want names.
11          A.    So, by "artisan," are you
12    referring to someone who is crafting a
13    product or...
14              MR. ZACH:  What he means in
15          here.
16          Q.    Let's get something straight.
17          A.    Sure.
18          Q.    These are your allegations,
19    okay.  So I'm asking you about your
20    allegations.
21          A.    Yeah.
22          Q.    I want to know what you meant.
23          A.    Sure.
24          Q.    Okay.  And I understand you
25    didn't draft this.  Your lawyers did.

Page 123

1          RYAN C. BERRIS VOLUME I
2     But I'm asking you the factual basis
3     underlying these allegations.
4          So, when you say you bring an
5     "extensive network of artisans," I want
6     to know who the "artisans" were.
7          A.     Sure.
8          I would say Paolo Garella, Lowie
9     Vermeersch, Barton and Lies Lenaerts.
10    There's many people, but those are key
11    names that I can remember offhand.
12         Q.     Who are the "designers"?
13         A.     Well, there's different type
14    of designers.  So there's those that are
15    engineering design and then there are
16    those that are doing more of the esthetic
17    design.
18         So Lowie Vermeersch is a designer
19    from formerly Pininfarina at Granstudio.
20    He had submitted proposals for De Tomaso.
21         Paolo Garella is a designer and
22    many of the people who were working for
23    him at his company MAT.
24         Q.     Who were the "engineers"?
25         A.     There were too many to recall.

Page 124

1          RYAN C. BERRIS VOLUME I
2      But I can give you two -- or, let's say,
3      three specifically.
4          One is Paolo Garella.
5          One is Ugo Galloni.
6          And the other would be Luca
7      Cicchetti, if I'm pronouncing his name
8      correctly.
9          Q.    Who were the "machinists"?
10         A.    It would be either parties
11     who were working for MAT and/or Podium
12     Advance Technologies.  I can't recall
13     their names, specifically, but they were
14     employed or a contractor of.
15         Q.    Who were the "creatives,"
16     aside from you?
17         A.    The "creatives"?
18         I would say Bart and Lies Lenaerts,
19     who were be the book writers for SEG, who
20     later did work, you know, for De Tomaso.
21         Q.    Who were the "connoisseurs"?
22         A.    Some of the clients who had
23     -- we had covered in a previous
24     discussion, as well as marketing social
25     context, one including Tim Burton.  He

1          RYAN C. BERRIS VOLUME I

2     goes under the public name as Shmee150.

3          Q.    Anyone else?

4          A.    There's -- there's -- there's

5     -- I want to be respectful of your time.

6     There is too many to list.  I would defer

7     back to the names that I had said...

8          Q.    Tell me the names.  If you've

9     gotten more names, give them to me.  Lay

10    it on me.

11         A.    I would say all of those that

12    I had communicated with in my time at

13    SEG, I then brought to the table amongst

14    other personal friends and contacts such

15    as Joe Capasso, Roger Biet, Stanley Cohen.

16         Q.    Anyone else?

17         A.    That's all that I can recall

18    at the moment.

19         Q.    Okay.  Going back to list of

20    artisans that you referenced, did any of

21    those folks take on employment with De

22    Tomaso?

23         A.    No.  But we had contracted

24    some of them for work.

25         Q.    The designers that you

1          RYAN C. BERRIS VOLUME I
2     referenced, did any of those take on
3     employment with De Tomaso?
4          A.    They did not.
5          Q.    Okay.  The engineers that you
6     referenced, did any of those take on
7     employment with De Tomaso?
8          A.    With De Tomaso, no, but they
9     were the ones who were responsible for
10    development of the Apollo.
11         Q.    Okay.  The machinists that
12    you referenced, did any of those take on
13    work with De Tomaso?
14         A.    Again, they had worked on the
15    Apollo project, but they did not come on
16    board for De Tomaso.
17         Q.    The creatives that you
18    mentioned, did any of those take on
19    employment for De Tomaso?
20         A.    Yes.
21         Q.    Which ones?
22         A.    So, indirectly, to name one,
23    would be Waft, which is Bart and Lies
24    Lenaerts, who are the book writers.
25         Others that I would mention would

1          RYAN C. BERRIS VOLUME I
2     be the company the Automobilist.  We had
3     done a lot of work with them commissioning
4     them to do certain creative and marketing
5     work for De Tomaso.
6          And then one of the employees at
7     Automobilist then became a, I believe, an
8     employee of De Tomaso --
9          Q.    Okay.
10         A.    -- on or around the beginning
11    of 2022.
12         Q.    Any other?
13         A.    The founder of the
14    Automobilist, Jan Rambousek, if I'm
15    recalling his name correctly.  I had been
16    in discussions with him to formally come
17    on board as well.
18         Q.    Did he?
19         A.    That is something that I'm
20    not aware of, because this was over the
21    course of the first half of 2022 leading
22    up to my departure from the company.
23         Q.    So you don't know?
24         A.    I'm not sure.
25         Q.    Okay.  The connoisseurs that

1              RYAN C. BERRIS VOLUME I
2      you reference, did any of them close
3      sales transactions with De Tomaso?
4           A.    Yes.
5           Q.    Which ones?
6           A.    One, specifically, I can
7      recall offhand was Stanley Cohen.
8           Q.    Okay.  Any others?
9           A.    Without having the list of
10     clients and names in front of me, I can't
11     recall all of them.
12          Q.    Okay.  At one point in time,
13     you gave an interview to a podcast called
14     "Monocle."
15          Do you recall that?
16          A.    Yes.
17          Q.    Do you recall stating during
18     that interview that you were an owner in
19     Ideal Team Ventures?
20          A.    I -- without having the
21     transcript of that, I don't recall
22     utilizing that specific language.  It's
23     possible that I could have.
24          Q.    You'd agree with me that
25     you're not an owner of Ideal Team

1              RYAN C. BERRIS VOLUME I
2        Ventures, right?
3              A.    No.
4              Q.    You are?
5              A.    No.  So I am not.
6              Q.    Okay.
7              A.    I am not, yes.
8              Q.    Thank you.
9              You'd agree with me that you did
10       not have a hand in acquiring the De
11       Tomaso brand, right?
12             A.    I did not, but the language
13       that was used in that podcast was a
14       narrative that Mr. Choi and I had
15       discussed in order to clean up what I had
16       done with Tom Kim.
17             Q.    Okay.  You came on board with
18       Apollo in 2018, right?
19             A.    January 2018.
20             Q.    Okay.  And when was the De
21       Tomaso brand acquired?
22             A.    In -- I don't recall,
23       specifically; somewhere in 2014, 2015.
24             Q.    So many years before you came
25       on board with Apollo, right?

```
 1            RYAN C. BERRIS VOLUME I
 2       A.     Yes.
 3       Q.     Okay.  Alright.
 4              (There is a discussion off
 5       the record.)
 6       Q.     Are you good?
 7       A.     I'm okay.
 8       Q.     Alright.
 9              MR. WERNER:  Everybody else
10       good?
11              MR. ZACH:  Good.
12       Q.     Alright.  Why don't we switch
13   gears and talk a bit about your work for
14   De Tomaso.
15       And I want to start with Carmen
16   Jorda.
17       You know who Carmen Jorda is, right?
18       A.     Yes.
19       Q.     She is an Instagram
20   personality/aspiring race car driver; is
21   that fair?
22       A.     I would say she was an actual
23   female racing driver.
24       Q.     "Was," right?
25       A.     I'm not sure what she's
```

```
 1            RYAN C. BERRIS VOLUME I
 2     currently doing.
 3          Q.    Okay.  She's a controversial
 4     figure in the racing world, right?
 5          A.    Somewhat.
 6          Q.    Like she ran over her hair
 7     dresser a couple of times?
 8          A.    I saw that in your
 9     counterclaims, but I was unaware of this.
10          Q.    Okay.  Were you aware that --
11     again, in our counterclaims maybe this is
12     when you became aware of it -- about
13     statements she said about female racers?
14     Were you aware of those?
15          A.    Yes, I was aware.
16          Q.    Okay.  It was your idea to
17     bring Jorda into the De Tomaso family
18     so-to-speak, right?
19          A.    Yes.
20          Q.    Okay.  When did you first
21     come up with the idea to bring Jorda on
22     board?
23          A.    To the best I can recall, I
24     think it began in early 2021.
25          Q.    Okay.  And it was your idea
```

Page 132

1              RYAN C. BERRIS VOLUME I

2      to have her work with De Tomaso in

3      different capacities, right?

4              A.    Yes.

5              Q.    Okay.  Now, at the time that

6      you were considering bringing her on

7      board, you were, also, personally

8      infatuated with Ms. Jorda, right?

9              A.    I would disagree with that.

10             Q.    Okay.  So you would disagree

11     then that in bringing her on board, it

12     was your plan and intent to mix business

13     with pleasure and use your role at De

14     Tomaso and the prospect of business

15     opportunities and flush expense account

16     to woo her romantically?

17             A.    No.

18             MR. ZACH:  Object to the form.

19             Q.    Let's starts looking at some

20     documents.

21             (There is a discussion off

22         the record.)

23             Q.    Alright.  Mr. Berris, I'm

24     going to hand you what I'm marking as

25     Exhibit No. 6.

Page 133

1          RYAN C. BERRIS VOLUME I
2               (Deposition Exhibit Berris 6,
3          WhatsApp text thread between Ryan
4          Berris and Carmen Jorda
5          BERRIS-000202764 to BERRIS-000202787
6          marked Confidential, was marked
7          for identification.)
8          Q.    And this is a production of
9    various text messages between you and Ms.
10   Jorda that were produced by your Counsel.
11   And I'll direct -- you can, you know,
12   take a look at them.  But I'll direct you
13   to them.
14        A.    Okay.  For the spirit of
15   efficiency, I'll wait for you to direct
16   me and then I'll review.
17        Q.    Alright.  I mean, do you --
18   just generally speaking -- do you
19   remember your text conversations with Ms.
20   Jorda?
21        A.    Give me one moment.
22        In -- at a high level.  I don't
23   remember all of them, specifically,
24   because, I think, there would have been
25   quite some.

Page 134

```
1              RYAN C. BERRIS VOLUME I
2         Q.    Okay.  Alright.
3         Let's -- I mean, that's fair.  I
4    just -- I don't want to have you --
5         A.    I understand.
6         Q.    -- waste a bunch of time, if
7    we don't have to, okay?
8         If you look at what I just handed
9    you as Exhibit 6, which is marked as
10    BERRIS 202764 through 87, this is a
11    conversation between you and Ms. Jorda,
12    right?
13        A.    It appears so, yes.
14        Q.    And the conversation is dated
15    January 25, 2022, right?
16        A.    Yes.
17        Q.    Okay.  And, you know, you
18    say, "Good morning, Ms. Carmen.  Hope you
19    slept well."
20        She says, "Good morning, Mr. Ryan."
21        You say you "could do this every
22    day," right?
23        Is that normal chatter with
24    business partners?
25                  MR. ZACH:  Object to the form.
```

```
 1              RYAN C. BERRIS VOLUME I
 2        A.    To be fair, I called all of
 3    my team members Mr. Hugo, Mr. Jiri,
 4    Mr. Ash.  Yeah, so that was how I
 5    communicated to the team.
 6        Q.    Okay.  So let's go to Page 6
 7    and you tell Ms. Jorda, "I wish you were
 8    here to see what I'm seeing now."
 9        A.    What page?
10              MR. ZACH:  What's the Bates?
11        Q.    000202769.
12              MR. ZACH:  Got it.
13        A.    769.
14        "Wish you were here to see what I'm
15    seeing now."
16        Yes, I see that.
17        Q.    Alright.  And then she asks
18    you to show her and you reply, "come here
19    if you want," right?
20        A.    Yes.
21        Q.    And that's you inviting her
22    to your personal hotel room, right?
23        A.    No.
24        Q.    Where are you inviting her?
25        A.    I don't recall, but Ms. Jorda
```

```
 1            RYAN C. BERRIS VOLUME I
 2      never came to my hotel room.
 3            Q.    That's not what I'm asking
 4      you.
 5            I asked you if you were inviting
 6      her to your hotel room.
 7            A.    No.
 8            Q.    Okay.  Where were you then?
 9            A.    I don't know, but I'm sure my
10      records can pinpoint that.
11            Q.    What "records"?
12            A.    My credit card expenses, for
13      one example.
14            Q.    They would pinpoint that you
15      weren't in your hotel room when you sent
16      this text message?
17            A.    I think that they could speak
18      to maybe I was at a Whole Foods or some
19      other establishment.
20            Q.    Okay.  So, when you say,
21      "come here if you want," where were you
22      inviting her?
23            A.    Again, I don't recall.
24            Q.    Okay.  Let's go to the next
25      page, which is 000202770.
```

1            RYAN C. BERRIS VOLUME I
2        A.    Uh-huh.
3        Q.    Do you see the picture that
4    she sent you?
5        A.    I do.
6        Q.    That's her in the bathtub,
7    right?
8        A.    Correct.
9        Q.    Okay.  Is that normal back
10   and forth among business partners?
11       A.    I would say, no.  And she had
12   sent me those unsolicited and I never
13   sent any such message to her.
14       Q.    Did you write back and say,
15   well, that's really inappropriate, please
16   don't send me anymore naked pictures of
17   you?
18            MR. ZACH:  Object to the form.
19        I mean, the picture, just so the
20        record is clear, shows looks like
21        a knee or a leg.
22       A.    I was laughing, because she
23   had -- her favorite thing to do, from
24   what I can recall, was take a bath.
25       Q.    Okay.  You'd agree with me

1          RYAN C. BERRIS VOLUME I
2     that it's not customary for business
3     executives to exchange photos like this,
4     right?
5          A.    I would say, yes, and I did
6     not send the photo.
7          Q.    Okay.  Did you understand her
8     to be inviting you to join her in the
9     bathtub?
10          A.    No.
11          Q.    Okay.  Did you ever get the
12     sense that Ms. Jorda was using her
13     sexuality to take advantage of you and
14     take advantage of De Tomaso?
15          A.    I would say, to be very fair,
16     I think, there were multiple occasions
17     whereby she gave me the impression that
18     she wanted to be romantically involved,
19     but I never entertained those.
20          Q.    Yeah.  And -- okay.
21          So am I correct in understanding
22     there, that you never had any romantic
23     intentions towards Ms. Jorda?
24          A.    Me personally?
25          Q.    Yes, you personally.

```
 1           RYAN C. BERRIS VOLUME I
 2      A.    No.
 3      Q.    And you never told anybody at
 4  De Tomaso that you were attracted to Ms.
 5  Jorda?
 6      A.    That I did.  I had
 7  communicated that, I think, to Mr. Choi
 8  on multiple occasions.
 9      Q.    Okay.  Did you tell others at
10  De Tomaso that you wanted to have a
11  romantic relationship with Ms. Jorda?
12      A.    I do not believe so.
13      Q.    Okay.  Did you ever have any
14  romantic relationship with Ms. Jorda?
15      A.    Never.
16      Q.    Okay.  Let's go to the next
17  -- let me show you the next document,
18  which is Tab 22.
19               (Deposition Exhibit Berris 7,
20          WhatsApp text thread between Ryan
21          Berris and Hugo de Sadeleer
22          BERRIS-000186297 to BERRIS-000186301
23          marked Confidential, was marked
24          for identification.)
25      A.    Are we done with this one for
```

1              RYAN C. BERRIS VOLUME I
2      now or...
3           Q.    For now.
4           A.    Okay.
5           Q.    Here you go.
6           A.    Thanks.
7           Q.    I just handed you what has
8      been marked as Exhibit 7.  And it's
9      another text exchange.  It's dated
10     January 29, 2021.
11           And it's WhatsApp conversation
12     between you and Hugo de Sadeleer, right?
13           A.    Okay.
14           Q.    Okay.  And Hugo is a driver
15     for De Tomaso, right?
16           A.    Yes.
17           Q.    Is he a friend of yours?
18           A.    Yes.
19           Q.    Okay.  And if you go to the
20     fourth page of that document --
21           A.    Would you mind just saying
22     the Bates Number?
23                 MR. ZACH:  Just the last two,
24          just the last two.
25           Q.    Yeah, I will.  If I can find

1                RYAN C. BERRIS VOLUME I

2      it myself.  Yeah, it's -- 300 is the

3      last.

4           Are you with me?

5           A.    Yes.

6           Q.    That's a picture of Carmen

7      Jorda working out, right?

8           A.    Yes.

9           Q.    And then you write,

10     "potentially mi amor," right?

11          A.    Yes.

12          Q.    Which translates to

13     "potentially my love," right?

14          A.    Yes.

15          Q.    And then Hugo writes, "should

16     be a quick fix," right?

17          A.    Yes.

18          Q.    Alright.  And then you send

19     another picture of [sic] Hugo of Carmen

20     posing with a coat and rain boots right?

21          A.    Yes.

22          Q.    And you write, "mi still low,

23     right, which means my style right?

24          A.    That's correct.

25          Q.    And what you're referencing

```
 1              RYAN C. BERRIS VOLUME I
 2      there is Ms. Jorda being your type right?
 3          A.    From what I can recall going
 4      back to this, my style was referring to
 5      the style for how I conduct myself and
 6      the style that we were doing for the
 7      culture of the brand.
 8          Q.    Do you expect anyone to
 9      believe that?
10              MR. ZACH:  Object to the form.
11          Q.    You sent a picture of Ms.
12      Jorda working out and Mr. Sad letter is
13      supposed to interpret that as a
14      communication about how you conduct
15      business?
16              MR. ZACH:  Object to the form.
17          A.    You're referring to the thing
18      where I said my style or "mi estilo."
19          Q.    Do you, generally, conduct
20      business with people in gyms?
21          A.    I mean, sometimes I would be
22      traveling.
23          Q.    Alright.  So --
24          A.    But, to be clear, I was not
25      in a gym taking a photo of her there.  It
```

1          RYAN C. BERRIS VOLUME I

2     looks like a screen shot of a social

3     media post.

4          Q.    Okay.  You would agree with

5     me that this text exchange with Hugo is

6     you expressing to him your romantic

7     intentions towards Ms. Jorda?

8          A.    I don't view it that way.  I

9     think it's a common term to say -- to

10    someone, in general, you know.

11         Q.    "It's a common term," in

12    general, to refer to somebody as

13    potentially your love?

14         A.    I said it jokingly.

15         Q.    Okay.  So, when -- when Hugo

16    writes back, "Should be a quick fix,"

17    what did you understand him to understand

18    you communicating to him?

19              MR. ZACH:  Object to the form.

20         A.    I don't recall, specifically,

21    the context of the conversation.  But

22    this could have been around the time when

23    I was planning for the Meet Isabelle

24    campaign and because it was Hugo who

25    provided the introduction to her manager.

Page 144

1          RYAN C. BERRIS VOLUME I

2          Q.    Right.

3          So you say Carmen Jorda's

4     potentially my love.

5          He writes back, it's going to be a

6     "quick fix."

7          And you didn't think that he

8     understood you to be saying that you were

9     angling to hook up with Ms. Jorda?

10         A.    I can't say what Mr. de

11    Sadeleer would say, but that was not my

12    intent.

13         Q.    Did that communication back

14    from him signal at all that he thought

15    you were joking?

16         A.    Again, I can't speak to what

17    Hugo meant by sending that to me.

18         Q.    Okay.  Alright.

19         Let's go on.  Let's take a look at

20    the next document.

21              (Deposition Exhibit Berris 8,

22         WhatsApp text thread between Ryan

23         Berris and Carmen Jorda

24         BERRIS-000200043 to BERRIS-000200050

25         marked Confidential, was marked

Page 145

```
 1              RYAN C. BERRIS VOLUME I
 2          for identification.)
 3              MR. WERNER:  I'll mark the
 4          next document as Exhibit 8, which
 5          is another text message thread.
 6          Q.    Again, I'll direct you to it.
 7          This is What's App conversation
 8     between you and Ms. Jorda, right?
 9          A.    Yes.
10          Q.    And it's dated June 8, 2021,
11     right?
12          A.    Yes.
13          Q.    And, in this conversation,
14     you're discussing an upcoming shoot that
15     Jorda is going to do for De Tomaso,
16     right?
17          A.    Allow me a moment to
18     familiarize myself.
19          Q.    Sure, take a look.
20          By the way, Tani Hanna, you
21     mentioned this person earlier.
22          They're a driver for Ferrari,
23     right?  They're not some kind of like
24     sheik or something?
25          A.    Well, I mentioned that he
```

1             RYAN C. BERRIS VOLUME I
2     wasn't a sheik, but he's someone I can
3     recall from the region.
4          Q.    Somebody from the Middle East?
5          A.    I believe so.
6          Q.    Yeah, okay.
7          Anyway, are you oriented with this
8     text thread here?
9          A.    I've perused the first two
10    pages, yes.
11         Q.    Okay.  So the conversation
12    here is about what Jorda is going to wear
13    for the shoot, right?
14         A.    Yes.
15         Q.    Okay.  And if you go to
16    Page 7, which ends -- the Bates range
17    ends in 49, you tell her that you like
18    her style, right?
19         A.    Yes.
20         Q.    Alright.  And you, actually,
21    proceed to tell her that you find her
22    style "sexy yet classy," right?
23         A.    Yes.
24         Q.    Alright.  Do you tell people
25    at De Tomaso that they're "sexy" all the

```
 1            RYAN C. BERRIS VOLUME I
 2     time?
 3          A.    It was playful and there's
 4     further context to that, because we put
 5     together a mood board for the look that
 6     the Meet Isabelle Campaign video should
 7     have and her stylist is working from
 8     that.
 9          And it drew parallels to the nature
10     of the P72.  It's a classy car, but a
11     piece of it too is quite seductive, which
12     is how we in part marketed vehicle.
13          Q.    Okay.  So, if you go back to
14     my question, which I think buried in
15     there you answered was that, no, you
16     don't generally refer to people you work
17     with as "sexy"?
18               MR. ZACH:  Object to the form.
19          A.    Maybe, I think, in joking
20     terms, but I can't recall all my
21     communications.
22          Q.    Alright.
23               THE WITNESS:  John, can you
24          pass me the water?
25               MR. ZACH:  Oh, yeah, sure.
```

Page 148

1           RYAN C. BERRIS VOLUME I

2                THE WITNESS:  Thank you.

3                MR. ZACH:  Pass me your glass.

4           Q.    Let's take a look at another

5      document.

6                (Deposition Exhibit Berris 9,

7           e-mail thread DT0000016492 to

8           DT0000016494 marked Confidential,

9           was marked for identification.)

10          Q.    Alright.  I'm going to hand

11     you what I'm marking as Exhibit 9, okay,

12     which is an e-mail thread involving

13     outreach to Ms Jorda's PR team.

14          If you would take a look at that.

15          A.    (The witness reviews the

16     exhibit.)

17          Q.    Are you with me on this one?

18     It's an e-mail between you and Hugo dated

19     April 30th.

20          A.    Yes.

21          Q.    Okay.  Alright; April 30,

22     2021.

23          Mr. Choi is not on this e-mail,

24     right?

25          A.    Correct.

1          RYAN C. BERRIS VOLUME I

2          Q.    Why not?

3          A.    We didn't always CC each

4     other on every communication, especially

5     if it was a more minor -- minor matter.

6          Q.    So this was just accidental

7     or you just didn't feel the need to copy

8     him on this?

9          A.    It was common for us.  We

10    didn't need to CC each other on every

11    communication.

12         Q.    Okay.  And in the e-mail

13    here, you describe that you want Ms.

14    Jorda to join De Tomaso "on a much

15    grander scale," right?

16         A.    Uh-huh.

17         Q.    What did you mean by that?

18         A.    So my philosophy behind

19    anyone who I brought on board to the

20    company is that I wanted them to become

21    part of the family.

22         And so it was focusing on quality

23    over quantity and people who had unique

24    skill sets that could help give further

25    credibility to the brand, to allow it --

1              RYAN C. BERRIS VOLUME I
2      cause it wasn't easy to get clients to
3      become interested and to sign contracts,
4      et cetera.
5           So my intent -- discussion with her
6      was the same with my discussions that I
7      would have with other employees or
8      contractors such as Ash Thorp.
9           Q.    Okay.  And then you say you
10     wish to keep things more macro, right?
11          A.    Uh-huh.
12          Q.    What did you mean by that?
13          A.    What I meant by is that I was
14     not interested in just hiring the talent
15     to play a role in a few videos.  I had
16     done -- I had contracted racing drivers
17     in the past, at SEG, et cetera.  And if
18     you're building a long-term brand, you
19     know, a lot of times if you're going to
20     just have them available for one
21     campaign, they may delay discussions.
22     But, most importantly, they seek many
23     other opportunities.  And for us -- for
24     me it was very important that if someone
25     was involved with De Tomaso their

1            RYAN C. BERRIS VOLUME I

2     representing the brand and that they are

3     focused to that within the scope of let's

4     say automobile in this case.

5          Q.    Okay.  And is it fair to say

6     that you weren't concerned about her

7     being kind of controversial in this

8     racing high end car world as someone who

9     is going to be the brand ambassador for

10    De Tomaso?

11         A.    So, to be clear, the only

12    controversial issue that I was aware of

13    with her was her comments about female

14    drivers, which there was a lot of

15    criticism for.  But I think there's

16    strong arguments on both sides.  It's

17    coming down to the physiology of a human

18    being and it's more difficult for a

19    female to manage the high loads in the

20    vehicles.  So it was controversial, but

21    it -- obviously, you know, she had quite

22    a high profile internationally.

23         Q.    What was her view, exactly?

24         A.    I don't recall, specifically.

25    So I would need to see a document to

Page 152

1              RYAN C. BERRIS VOLUME I
2       speak to that.
3              Q.    Alright.  Her view was,
4       basically, that women physically can't be
5       as good as drivers as men, right?
6                   MR. ZACH:  Object to the form.
7              Like race car driving?
8              A.    Yeah, I think she was
9       referring to the fact that it was more
10      difficult for a female based on -- with
11      their body, to handle the excessive
12      forces that a racing driver would
13      experience behind the wheel of a car
14      notably like in Form A1.  And so I think
15      that's what that was pertaining to.
16             Q.    And she caught a lot of heat
17      from that?
18             A.    From what I can recall, yes.
19             Q.    Okay.  Alright.
20             Let's take another look at another
21      document.
22                  (Deposition Exhibit Berris 10,
23             5/24/21 e-mail DT0000018017 &
24             DT0000018018 marked Confidential,
25             was marked for identification.)

1              RYAN C. BERRIS VOLUME I
2                   MR. WERNER:  Okay.  We're
3          going to mark this as Exhibit 10.
4              Q.    And this is an e-mail from
5      you to Guzman at Crown Creators dated
6      5/24/2021.
7              A.    Okay.
8                   MR. ZACH:  Sorry.  Is that
9          ten?
10                  MR. WERNER:  Yes.
11                  MR. ZACH:  Okay.
12             Q.    And this is an e-mail from
13     you to Carmen Jorda's PR team, right?
14             A.    I believe he was like her
15     business manager or something of that
16     likes, yes.
17             Q.    And here you discuss an
18     interest in conducting a photo shoot with
19     Carmen Jorda in California, right?
20             A.    Yes.
21             Q.    And you discuss an interest
22     in developing a long-term formal agreement
23     between De Tomaso and Ms. Jorda, right?
24             A.    Yes.
25             Q.    And you'd agree with me that

Page 154

```
 1            RYAN C. BERRIS VOLUME I
 2      there is no one else from De Tomaso on
 3      this e-mail, right?
 4           A.    On this e-mail, yes.
 5           Q.    Okay.  Let's take a look at
 6      another document.
 7                 (Deposition Exhibit Berris 11,
 8                 WhatsApp text thread between Ryan
 9                 Berris and Carmen Jorda
10                 BERRIS-000201787 to BERRIS-000201803
11                 marked Confidential, was marked
12                 for identification.)
13                 MR. WERNER:  This is going
14                 to be Exhibit 11.
15           Q.    Here you go.
16      And this is another text thread
17      between you and Ms. Jorda.
18      Okay.  And if you go really to the
19      last page, that's what I'm directing you
20      to.  It ends 98.
21      And this is a discussion that
22      you're having with Ms. Jorda about
23      joining De Tomaso on a long-term basis,
24      right?
25           A.    Sorry.  To be clear, it's
```

                    RYAN C. BERRIS VOLUME I

 1      201798?

 2           Q.    Yes.

 3           A.    Okay.  Allow me just to

 4      review the document.

 5           Okay.

 6           Q.    Alright.  And you reference

 7      that De Tomaso has no bureaucracy, right?

 8           A.    Yes.

 9           Q.    Why did you tell her that?

10           A.    Well, we're still getting to

11      know each other and she had told me in a

12      lot of her commercial agreements, from

13      what I can recall in the past, were with

14      larger brands and it was a bit, you know,

15      I guess, stuffy you would call it or

16      things of that nature or perhaps

17      artificial, you know, more from a

18      corporate standpoint.

19           And we, essentially, were a startup

20      and in startup you have usually a unique

21      energetic light culture.

22           Q.    Right.

23           So you say, "you'll begin to love

24      our lack of bureaucracy," right?

1          RYAN C. BERRIS VOLUME I

2          A.    Yes.

3          Q.    And then you say, "We are

4    self-sustaining and choose to do what we

5    want, how we want, with whom we want,

6    when we want.  It's as simple as that,"

7    right?

8          A.    Yes.

9          Q.    And so your testimony is that

10   that's an effort to get her comfortable

11   with working with De Tomaso in light of

12   her experience with other brands?

13         A.    Yeah.  I mean, this is a

14   dialogue that Mr. Choi and I would use

15   very often.  You know, we were in a very

16   fortunate position whereby, you know, we

17   were doing things from what we both

18   viewed in a very authentic genuine way

19   that I think we both would say that it's

20   quite rare in that field and even outside

21   of automotive.

22         So this is a discussion that I

23   would have similar discussions on many

24   occasions with other potential partners

25   or contractors and the like, so they can

1              RYAN C. BERRIS VOLUME I
2      understand the ethos of what we were
3      building.  Because it's important that if
4      we're going to enter into some type of
5      relationship with another party, that
6      it's clear, you know, what the spirit is.
7      So then that they can do whatever they're
8      being contracted to deliver upon.
9          Q.    So the answer to my question
10     that I asked you is, yes, right?
11         A.    Yes.
12         Q.    Okay.  You'd agree with me
13     that before there is any actual working
14     relationship with Ms. Jorda, you flew her
15     to multiple locations around the world?
16         A.    Before there was a working
17     relationship?  I would not agree with
18     that.
19         Q.    Okay.  Would you agree with
20     me that you flew her from Madrid to LA on
21     June 18, 2021?
22         A.    On June 18, 2021?  June 18,
23     2021, I believe --
24              MR. ZACH:  Don't speculate.
25              THE WITNESS:  Okay.

```
 1              RYAN C. BERRIS VOLUME I
 2         A.    I'm not sure of the date.
 3    But I believe she flew from Madrid to LA
 4    sometime in the summer of 2021.
 5         Q.    I mean, I can show you the
 6    documents.  I'm not trying to hide the
 7    ball.  I'm just trying to short-circuit
 8    wasting time.
 9              MR. ZACH:  That's fine.
10         You're just representing a document
11         that's says that.  That's fine.
12              THE WITNESS:  Okay.
13         A.    Okay, yes.
14         Q.    Like, subject to check --
15         A.    Yeah, okay.
16         Q.    -- you paid to fly her from
17    Madrid to LA on June 18th, right, 2021?
18         A.    On or about, yes.
19         Q.    Okay.  And then you also paid
20    to fly her from LA to Aspen on June 27,
21    2021, right?
22         A.    It sounds about right.
23         Q.    Okay.  And then you also paid
24    for a roundtrip from Aspen to Madrid on
25    June 29, 2021 to August 3, 2021, right?
```

Page 159

1          RYAN C. BERRIS VOLUME I

2          A.    Yeah.

3          Q.    Subject to check?

4          A.    Yeah.

5          Q.    I mean, does that sound about

6    right?

7          A.    Subject to check, it sounds,

8    yeah, about right.

9          Q.    Okay.  And then there was

10   another round trip that you funded for

11   her from Madrid to Miami on December 3rd,

12   2021 to December 14, 2021, right?

13         A.    That sounds about right

14   subject to check.

15         Q.    Okay.  And then you, also,

16   flew her to the US on December 5th, 2021

17   right?

18         A.    Subject to check, it sounds

19   right.

20         Q.    Okay.  Who paid for all the

21   flights?

22         A.    That's something I don't

23   recall offhand.  I think it was a mix of

24   De Tomaso and then there were other

25   expenses of hers that I covered

1           RYAN C. BERRIS VOLUME I
2      personally.
3           Q.    Okay.  So some of them were
4      submitted for reimbursement to De Tomaso,
5      some of them you paid out of your own
6      pocket?
7           A.    Yes.
8           Q.    Okay.  Why would you pay for
9      them out of your own pocket?
10          A.    I covered many expenses, not
11     only relating to Carmen but relating to
12     corporate expenses, relating to other
13     employees such as Hugo de Sadeleer,
14     because I knew -- like, we were building
15     a startup and it's stuff and you don't
16     always have all of the resources
17     available and sometimes I wanted to treat
18     them.
19          And I knew that the funds were
20     limited in the company and I wanted to
21     take -- put that on my shoulders, as a
22     partner in the business.
23          Q.    Did you run these trips
24     passed Norman or get his signoff for De
25     Tomaso to fund any of them?

Page 161

1          RYAN C. BERRIS VOLUME I
2          A.    To the best of my recall, we
3    had discussed some but not all.
4          Q.    Which ones did you discuss?
5          A.    I can't -- I don't want to
6    speculate.
7          Q.    Alright.  What was the
8    purpose of these trips?
9          A.    Business.
10          Q.    How so?
11          A.    I would have to go back and
12    review my documents to be specific.
13    Because there's multiple occasions and it
14    was quite some time ago.
15          But they would cover, roughly,
16    filming for the "Me Isabelle" videos, her
17    trip to Miami.  This is when she was
18    going to close the deal for say
19    relationship with Moncler.
20          Q.    On behalf of De Tomaso?
21          A.    Yes.  Because the owner of
22    Moncler is a very very close friend of
23    hers.
24          Q.    And did that deal get closed?
25          A.    She told me it did, yes, and

```
 1              RYAN C. BERRIS VOLUME I
 2      then there were subsequent communications
 3      between -- in my e-mails between myself
 4      and the responsible parties at Moncler,
 5      based upon the inputs they were asking.
 6           Q.    So, yes, no, I don't know?
 7      Which was the answer?
 8           A.    She told me, yes.
 9           Q.    Okay.  So you -- I'm not
10      asking what she told you.
11           I'm asking do you know.
12           Yes, no, I don't know, did the deal
13      get closed?
14                 MR. ZACH:  Well --
15           A.    She told me it did.
16           Q.    Okay.
17           A.    And then she connected me
18      with the people at Moncler to start the
19      process.  And she also introduced me to
20      recommend Remo Ruffini, I think, during a
21      trip in early 2022.
22           Q.    So your testimony is that
23      there was a deal closed between De Tomaso
24      and Moncler that was facilitated by Ms.
25      Jorda?
```

```
 1              RYAN C. BERRIS VOLUME I
 2        A.    She told me there was a deal
 3    orchestrated.  This was a verbal
 4    communication she gave to me.
 5        Did I see a formal agreement with a
 6    commercial terms?
 7        From what I can recall, they were
 8    working on a proposal for us.
 9        Q.    Did you see a contract ever?
10        A.    I don't recall, no.
11        Q.    Did you share a contract with
12    anybody at De Tomaso?
13             MR. ZACH:  Objection, asked
14        -- if he doesn't recall if he saw
15        a contract.
16        A.    Yeah, I don't recall.
17        Q.    Okay.  So then you don't know
18    whether you would have shared a copy of
19    the contract with anyone else at De
20    Tomaso, right?
21        A.    Right after Carmen told me
22    that Remo Ruffini approved it, I believe,
23    I called Mr. Choi, because he was waiting
24    to see, and I told him that she said it
25    was a done deal.
```

1              RYAN C. BERRIS VOLUME I
2         Q.    Okay.  But you don't know
3    whether you've seen a contract, right?
4         A.    I cannot recall.
5         Q.    Okay.
6         A.    I don't believe that there
7    was -- if I were to speculate, which I
8    don't want to --
9              MR. ZACH:  Don't speculate.
10             THE WITNESS:  Yeah.
11        Q.    So your understanding is that
12   it was an oral deal?
13        A.    She told me that she closed
14   the deal with Remo.  Remo and her are
15   incredibly close.  And so I took her at
16   her word.
17        Q.    Why at this point was Ms.
18   Jorda representing De Tomaso, if she
19   didn't have any contract with the company
20   then, did she?
21        A.    She did.
22        Q.    Really?
23        A.    Yes.
24        Q.    At what time?
25        A.    Well, there was the California

```
 1              RYAN C. BERRIS VOLUME I
 2    shoot agreement and then there was a
 3    separate agreement that was entered into,
 4    I believe, sometime during the first week
 5    of September, 2021.
 6         Q.    Okay.  What year?
 7         A.    Of 2021.
 8         Q.    Oh, okay.  Okay.
 9         A.    I believe so.
10         Q.    We'll get into all of that.
11         So the Aspen trip, what was that
12    for?
13         A.    I can't recall.
14         Q.    Okay.  Alright.
15         Let's talk about -- well, let's
16    see.
17              MR. WERNER:  What time is
18         it?  Is lunch here?
19              Lunch is here.
20              Can we just take a 30-minute
21         lunch break?
22              MR. ZACH:  Yeah.
23              MR. WERNER:  Let's do that.
24              THE VIDEOGRAPHER:  Thank you.
25         The time is 12:49.  We're going
```

Page 166

1          RYAN C. BERRIS VOLUME I

2          off the record.

3               (Lunch recess taken

4          to 1:30 p.m.)

5               THE VIDEOGRAPHER:  And the

6          time is 1:30 p.m.  we're back on

7          the record.  This is the beginning

8          of Media 3.

9          Q.    Alright.  Mr. Berris, before

10   we left off for our lunch break, we were

11   talking about the relationship between De

12   Tomaso and Carmen Jorda --

13          A.    Uh-huh.

14          Q.    -- okay?

15          And I want to reorient you to that

16   discussion.  And I want to pick up sort

17   of where we left off, which is the

18   discussion between you and Ms. Jorda had

19   regarding a more formal relationship,

20   okay?

21          A.    Okay.

22          Q.    Okay.  And you recall, of

23   course, there was a time when you

24   discussed with Ms. Jorda having a formal

25   contractual arrangement between De Tomaso

1               RYAN C. BERRIS VOLUME I
2       and her, right?
3               A.    Yes.
4               Q.    Okay.  And, as I understand
5       it, the first time that you and Ms. Jorda
6       ever discussed a more formal employment
7       contract was in August of 2021; is that
8       right?
9               A.    No, I think that the basis of
10      it started at the first communications
11      with her manager.
12              Q.    And when was that?
13              A.    It's one of these exhibits.
14      Should I go through them and pull out?
15              Q.    No.
16              Just tell me, if it's not in
17      August, when was the time?
18                    MR. ZACH:  If you recall.
19              A.    If I recall, I think, it was
20      in, roughly, May 2021 timeline.
21              Q.    Okay.  Let's take a look at
22      another exhibit.
23                    (Deposition Exhibit Berris 12,
24          e-mail thread and attachment
25          DT0000023400 to DT0000023419

Page 168

```
 1              RYAN C. BERRIS VOLUME I
 2          marked Confidential, was marked
 3          for identification.)
 4          Q.    Alright.  I'm going to hand
 5     you what's been marked as Berris Exhibit
 6     13, which is an e-mail from you to --
 7              THE STENOGRAPHER:  Twelve.
 8          Q.    Berris 12, sorry, from you to
 9     Ms. Jorda on September 5 of 2021, okay?
10          A.    Okay.
11          Q.    And, again, I'm going to ask
12     you some questions about this.  If you
13     want to orient yourself to it or just be
14     directed by me, happy to do it either
15     way.
16          A.    Let me just browse this
17     briefly.
18          Q.    Okay.
19          A.    (The witness reviews the
20     exhibit.)
21          Okay, yes.
22          Q.    Alright.  Now, let me ask you
23     this.
24          In negotiating an arrangement with
25     Ms. Jorda, you did not on behalf of De
```

Page 169

1              RYAN C. BERRIS VOLUME I
2      Tomaso engage legal Counsel, did you?
3           A.    I cannot recall.
4           Q.    Okay.  In any event, these
5      e-mails are between you and Ms. Jorda
6      regarding a confidential draft agreement,
7      right?
8           A.    Correct.
9           Q.    Okay.  And you'd agree with
10     me that there isn't anyone else on this
11     e-mail thread from De Tomaso, right?
12          A.    That is correct.
13          Q.    Okay.  So let's turn to the
14     very last page of the e-mail, which ends
15     in 03.
16          A.    (The witness complies.)
17          Q.    Are you there?
18          A.    Yes.
19          Q.    Okay.  And in the e-mail you
20     state here that you are attaching a first
21     draft of the employment agreement for
22     Carmen to get familiar with the structure
23     first, right?
24          A.    Yes.
25          Q.    And that is on August 16th of

1          RYAN C. BERRIS VOLUME I

2     2021, right?

3          A.    Yes.

4          Q.    Okay.  So you'd agree with me

5     that the first time that you on behalf of

6     De Tomaso put any kind of agreement to

7     Ms. Jorda to look at was in August 16,

8     right?

9          A.    No, the first agreement with

10    her was for the California shoot.

11         Q.    Okay.

12         A.    Yeah, which I think it was

13    finalized in -- it started to be

14    discussed, I think, roughly, around

15    May 2021.  It may have been finalized in

16    May or may have been finalized, roughly,

17    in June 2021.

18         Q.    Okay.  Well, with respect to

19    broader employment agreement, this is the

20    first time you've sent her an agreement

21    along these lines, right?

22         A.    I believe so.  I believe so.

23         Q.    Okay.  Alright.

24         And who drafted this agreement?

25         A.    I did.

1          RYAN C. BERRIS VOLUME I
2          Q.     Okay.  Did you base it on
3     anything?
4          A.     Yeah, I based it on the
5     template that I used for most other
6     agreements for the company.
7          Q.     Where did that template come
8     from?
9          A.     That was a template that I
10    had used in my previous days at SEG, that
11    I had used to modify.  So the language is
12    very familiar.
13         Q.     Okay.  So you drafted the
14    agreement?
15         A.     Yes.
16         Q.     Okay.  And then you state
17    here that you two can discuss numbers,
18    any comments or questions, right?
19         A.     Is that on 03 page?
20         Q.     Uh-huh.  It's the same
21    sentence where --
22         A.     Yes.
23         Q.     Okay.  And then after that,
24    there's some responses back and forth
25    between Carmen and yourself regarding

1                RYAN C. BERRIS VOLUME I

2      comments and revisions of her employment

3      contract, right?

4            A.    Yes.

5            Q.    Okay.  And you respond,

6      ultimately, with a revised agreement on

7      September 1st, right?

8            A.    Yes.

9            Q.    Okay.  And then she responds

10     and attaches revised language on

11     September 3rd, right?

12           A.    Yes.

13           Q.    Okay.  And she says she had a

14     friend look at it and return a copy with

15     comments to you, right?

16           A.    Yes.

17           Q.    Okay.  And then there's back

18     and forth between you two up through

19     September 5th, right?

20           A.    Well, I see on the top, this

21     says sent on the 5th, yes, so -- and then

22     it's forwarded from the 3rd.

23           Q.    Yeah.

24                 And on the 5th, you send her a new

25     agreement, right?

1              RYAN C. BERRIS VOLUME I
2         A.    To be clear, it's not entirely
3    clear to me, because I see on the 5th,
4    it's showing sent, but then I don't see
5    anything in the body.  I see the
6    attachment.  So...
7         Q.    Okay.  Do you have any reason
8    to think that you didn't send her a
9    revised agreement on the 5th?
10        A.    I do not.  I just want to
11   make sure I'm speaking clearly.
12        Q.    Okay.  And you'd agree with
13   me that if you look on Page 16 of this
14   that -- the draft agreement that you sent
15   is not signed, right?
16        A.    Correct.
17        Q.    Right.
18        At this point in time, as of the
19   5th, you're still negotiating an
20   agreement with Ms. Jorda, right?
21        A.    As per this e-mail.  But, if
22   I recall, Ms. Jorda was already in New
23   York or was coming to New York on or
24   around this date and we ended up signing
25   the agreement in person in New York.

1          RYAN C. BERRIS VOLUME I
2          Q.     On what date?
3          A.     I don't have the document in
4     front of me.  I don't recall.
5          Q.     Is there a document?
6          A.     There is.
7          Q.     Where is it?
8          A.     I -- it was a hardcopy.  I
9     can't speak to where it is now.  But
10    whether this was in my e-mail or not, I'm
11    unsure.
12         But we signed the agreement either
13    September -- roughly, on September 5th or
14    6th.
15         Q.     Where?
16         A.     At the -- her hotel.  It was
17    the Mercer Hotel.
18         Q.     And at what time?
19         A.     I don't recall.  Sometime I
20    think during the evening.
21         Q.     Oh, so...
22         So your testimony is that you
23    signed the agreement on the either the
24    5th or the 6th?
25         A.     I'm trying to recall.  I

1           RYAN C. BERRIS VOLUME I
2     think on or around that date.
3          Q.    Okay.  Alright.
4          Let's take another look at a
5     different document.
6          You both signed it at the same time?
7          A.    Yes.
8          Q.    You signed it together?
9          A.    Yes.
10         Q.    At her hotel?
11         A.    In the lobby, yes.
12         Q.    Okay.  Do you remember what
13    color pen you used?
14         A.    I do not.
15         Q.    And you have -- do you have a
16    hard copy of the document that you
17    signed?
18         A.    I would have to check my
19    records.  I don't recall.  I do know
20    there was a document.  I believe it was
21    in my car that was being stored
22    afterwards at Miller Motorcars, because I
23    was traveling.
24         I have not gone through all the
25    contents that were in there.  So I don't

Page 176

RYAN C. BERRIS VOLUME I

1    know if it's -- yeah, if I have it.

2        Q.    So the original agreement that

3    you and Ms. Jorda signed in the lobby of

4    her hotel around the 5th or the 6th, you

5    do not know where that is?

6        A.    At this very moment, I can't

7    recall.  But I could, certainly, go after

8    this and try to locate the document.

9        Q.    Weren't you asked to go look

10   for documents by your lawyers in

11   connection with this case and produce

12   responsive documents, which would have

13   necessarily included the original of that

14   contract?

15           MR. ZACH:  Objection.  It

16        calls for privilege.

17           I will state as the

18        representative that, of course.

19        Q.    So didn't you do that?

20        A.    Yes.  And from what I could

21   recall, that document was in my SUV that

22   was being stored at Miller Motorcars'

23   facility in Stamford, Connecticut.

24           I then did not go back to that

1          RYAN C. BERRIS VOLUME I

2     vehicle at that location.  In fact, it

3     was my parent's who collected the

4     vehicle.

5          And when the vehicle went back to

6     my parent's and I finally went through

7     the documents that were there, I don't

8     recall.

9          But from my recollection, I don't

10    think that the -- that hard document was

11    there.  So I can't speak to if someone

12    had gone inside my car there but --

13          Q.    Someone went inside your car?

14          A.    I am not saying that.

15          But I'm saying I had a lot of

16    personal belongings including corporate

17    documents that were in my vehicle, that

18    were stored in Miller Motorcars.

19          Q.    That's why people don't store

20    documents in their cars, right?

21                MR. ZACH:  Object to the form.

22                Can we...

23                MR. WERNER:  Can we do what?

24                Oh, okay.

25          Q.    You'd agree with me that it's

1                RYAN C. BERRIS VOLUME I
2      not a good practice to store corporate
3      records in your car, right, Mr. Berris?
4           A.    I would say so.  But the
5      context is I did not have a home and I
6      did not have an office that was nearby
7      outside of my personal one in
8      Glastonbury.
9           Q.    So you signed this agreement
10     on the 5th or the 6th and then you did
11     not send a copy of that executed
12     agreement around that time to anyone else
13     at De Tomaso, did you?
14          A.    I don't recall.
15          Q.    Okay.
16               (Deposition Exhibit Berris 14,
17          e-mail thread BERRIS-000217695 &
18          BERRIS-000217696 marked
19          Confidential, was marked for
20          identification.)
21          Q.    Okay.  Let's take a look at
22     another document here, which I've marked
23     as Berris 14, which is an e-mail from
24     John Maatta to you dated October 27,
25     2021.

1             RYAN C. BERRIS VOLUME I
2         Do you know who John Maatta is?
3         A.    Yes.
4         Q.    He's Ms. Jorda's lawyer,
5    right?
6         A.    Correct.
7         Q.    I can direct you to stuff or
8    you can take a look at it and stuff.
9    It's short.
10        A.    It's short, so I'm okay.
11        Q.    Alright.  This is an e-mail
12   between you and Mr. Maatta, who is Ms.
13   Jorda's lawyer, right?
14        A.    Yes.
15        Q.    And Mr. Maatta is representing
16   Ms. Jorda's interest in connection with a
17   negotiation of the employment agreement
18   with De Tomaso, right?
19        A.    Yes.
20        Q.    Right.  And she's using a
21   lawyer and the company is not, right?
22        A.    Yes.
23        Q.    Alright.  Did you ever think
24   to yourself that in order to protect De
25   Tomaso's best interests, it would be good

1              RYAN C. BERRIS VOLUME I

2      to get a lawyer to negotiate on behalf of

3      De Tomaso opposite of Ms. Jorda's lawyer?

4            A.    The understanding -- so I'm

5      very clear, so you have the background.

6            Q.    I don't want "background."  I

7      want the answer to my question.

8            A.    I felt comfortable in

9      negotiating those terms.

10           Q.    Okay.  You're not a lawyer,

11     but you felt comfortable negotiating with

12     the lawyer?

13           A.    Yes.  Because I had been the

14     one who had negotiated most of all the

15     employment contracts with our employees

16     at that time and/or that were being on

17     boarded in parallel.

18           Q.    Okay.  So you'd agree with me

19     that this e-mail is dated October 20,

20     right?

21           A.    The original one, yes.

22           Q.    Right.

23           And Mr. Maatta wants to schedule a

24     call with you to discuss the draft

25     agreement, right?

Page 181

1              RYAN C. BERRIS VOLUME I

2         A.    I see that here.  I don't

3    know if there was attachments

4    corresponding to what he's referring to.

5         Q.    Well, he wants to discuss the

6    agreement that you sent to Ms. Jorda on

7    the 5th, right?

8         A.    No, I believe not.

9         Q.    Well, which agreement does he

10   want to discuss with you?

11        A.    So, when Ms. Jorda and I

12   entered into her agreement on or around

13   September 5th in person, she -- as

14   English is not her first language -- she

15   was saying, you know, she still wanted

16   someone from her side to be able to

17   review, which I said is fair.

18        However, shortly after that time

19   period, she was in New York whereby we

20   were going to be announcing her joining

21   the company and launching the Meet

22   Isabelle Campaign.

23        And she said, basically, the

24   agreement that we had together upon

25   signing is that she'll sign because I

```
 1              RYAN C. BERRIS VOLUME I
 2      told her I did not want to launch a
 3      campaign, unless we had specific terms on
 4      which she was bound to by the company.
 5           And so this communication from John
 6      Maatta was along those lines whereby I
 7      agreed, I gave her my word that we could
 8      revisit certain terms to ensure that she
 9      was comfortable with everything going
10      forward thereafter.
11           Q.    So you had a signed agreement
12      with talent.  Her lawyer says, I want to
13      negotiate more.
14           And you don't write back and tell
15      him, we have a signed deal, what are you
16      talking about?
17                 MR. ZACH:  Object to the form.
18           A.    No.  Because I'm a man of my
19      word and that's what I agreed to her
20      with.
21           Q.    And you don't write to him at
22      all and say, yes, I understand that we
23      have a signed deal, but we're happy to
24      reopen it?
25           And, in fact, he doesn't say that
```

Page 183

1              RYAN C. BERRIS VOLUME I
2      to you either, does he?
3           A.    Not in this communication.
4      But there were multiple communications
5      that were had with him either in an
6      e-mail or on the phone.
7           Q.    Okay.  You would agree with
8      me though that Mr. Maatta here is
9      e-mailing you about the agreement that
10     was transmitted to Jorda on the 5th,
11     right?
12          A.    On or on the date, yes.
13          Q.    Alright.  Okay.
14          And the purpose of his reaching out
15     to you is to continue negotiate that
16     agreement, right?
17          A.    To negotiate what I had
18     agreed upon with Ms. Jorda, yes.
19          Q.    Okay.
20          Okay.  Let's take a look at another
21     exhibit here.
22                (Deposition Exhibit Berris 13,
23            11/1/21 e-mail from John Maatta
24            to Ryan Berris and attachment
25            DT0000025711 to DT0000025731

1          RYAN C. BERRIS VOLUME I

2          marked Confidential, was marked

3          for identification.)

4               (There is a discussion off

5          the record.)

6               MR. WERNER:  This is going

7          to be 13.  And I'm sorry.

8               MR. ZACH:  So.

9               MR. WERNER:  In the low light,

10         I can't read.

11              MR. ZACH:  The last one is

12         14.  I see.

13         Q.    Alright.  So, Mr. Berris, I

14    just handed you Exhibit 13, okay, which

15    is another e-mail communication from John

16    Maatta to you, right?

17         A.    Yes.

18         Q.    And this one is dated

19    November 1st, 2021, right?

20         A.    That is correct.

21         Q.    Okay.  And in the e-mail, Mr.

22    Maatta mentions a phone call you two had

23    in October, right?

24         A.    He didn't say October

25    explicitly, but I assume that's what he

Page 185

1              RYAN C. BERRIS VOLUME I
2       was referring to.
3              Q.    Right.
4              And he says, as I mentioned, "the
5       proposed agreement," right?
6              A.    Uh-huh.
7              Q.    You understood that he's
8       saying that there is no executed final
9       agreement, there is a "proposed
10      agreement," right?
11             A.    No, that's not my
12      understanding.
13             Q.    Okay.  Did you write back and
14      correct him on that?
15             A.    I'm unsure, because I don't
16      have the responses that may have been
17      sent on my behalf at this moment.
18             Q.    Okay.  Well, I'll represent
19      to you that subject to check that, no,
20      you didn't, okay?
21             And he says here, "the proposed
22      agreement was not one that was drafted by
23      a lawyer," right?
24             A.    Those are his words, yes.
25             Q.    Right.  Which is -- I mean,

Page 186

1                 RYAN C. BERRIS VOLUME I
2         it's true.
3                 A.    Uh-huh.
4                 Q.    The agreement was drafted by
5         you, you're not a lawyer, right?
6                 A.    Correct.
7                 Q.    Okay.  In the e-mail he says,
8         "I need to reserve the right to make
9         other and further comment until such time
10        as the agreement is executed," right?
11                A.    Yes.
12                Q.    So his understanding, as of
13        November 1, 2021, is that the agreement
14        had not been executed, right?
15                A.    No, that's not correct.
16                Q.    Okay.  Did you write back to
17        him and say, wait a minute, what are you
18        talking about, we have an executed
19        agreement, I just agreed to accept
20        further negotiation and revisions to it
21        after it had been executed?
22                A.    So I can't speculate, because
23        I don't have the records of my responses.
24                And, also, it was not a contentious
25        back and forth.  It was discussions in

1              RYAN C. BERRIS VOLUME I
2      good faith.
3              Q.    Okay.  So he's saying there
4      was no agreement.  Your belief was that
5      there was.  You didn't bother to call out
6      to him, Ms. Jorda's lawyer, that you
7      thought the company had an executed
8      agreement already?
9              A.    He was aware of the original
10     agreement.
11             Q.    What are you basing that on?
12             A.    Ms. Jorda and I executed the
13     agreement.  I can't recall if she had
14     took a copy of that from the hotel and
15     gave it to John Maatta.
16             Q.    Okay.
17             A.    But that was the then the
18     basis and then John was discussing
19     supplemental terms for a revised
20     agreement.
21             Q.    That's not what he says.
22             He doesn't say anything about
23     "supplemental terms," does he?
24             A.    Not in this e-mail
25     communication.

1              RYAN C. BERRIS VOLUME I
2         Q.    No.
3         Okay.  Alright.
4         So, if you look at the attachment,
5    which is, you know, a markup of...
6         The redlines that he sends you, the
7    markup is dated in September, right?
8         You see the title of the agreement
9    it says, "September 3, 2021"?
10        A.    I see that's what he's citing
11   and then this document is dated, what,
12   October 30th, yes.
13        Q.    Right.
14        So he's marking up an agreement
15   that was transmitted or prepared around
16   the 3rd of September, right?
17        A.    That appears correct.
18        Q.    Okay.  The signed agreement
19   that you said was signed by hand in ink,
20   did Mr. Maatta have a copy of that?
21        A.    I can't speak to that.
22        I would assume that Carmen would
23   have provided him with a copy.
24        Q.    Well, when it was signed, how
25   many copies were signed?

Page 189

1                RYAN C. BERRIS VOLUME I
2          A.    I don't recall, but if I were
3     -- yeah, I don't recall.
4          Q.    Who provided the copies that
5     you and Ms. Jorda executed?
6          A.    I believe they probably would
7     have been printed at the business center
8     at the hotel.
9          Q.    By whom?
10         A.    By some of the hotel staff.
11         Q.    How many copies were printed?
12         A.    I don't recall.
13         Q.    Was it more than one?
14         A.    It could possibly be.
15         Q.    What kind of pen did you sign
16    it with?
17              MR. ZACH:  Asked and answered.
18         A.    I don't recall.
19         Q.    Was it in ink?
20         A.    I believe it would be a
21    normal pen.
22         Q.    Why do you "believe" that?
23         A.    Well, typically, agreements
24    are signed in ink.
25              I don't recall, specifically.

Page 190

1              RYAN C. BERRIS VOLUME I
2          Q.    Okay.  Now, all these back
3      and forth communications you had with Mr.
4      Maatta, Mr. Choi is not copied on them,
5      is he?
6          A.    Correct.
7          Q.    Okay.  Let's take a look at
8      another document.
9                (Deposition Exhibit Berris 15,
10             e-mail thread and attachment
11             DT0000028355 to DT0000028377
12             marked Confidential, was marked
13             for identification.)
14         Q.    Okay.  Now we're going to
15     Exhibit 15, alright?
16         Exhibit 15 is going to be another
17     e-mail chain between you and Mr. Maatta
18     December 27, 2021, okay?
19         And I want to direct your attention
20     to Page 5, the Page ending in 59.  It's
21     really part of the thread we were looking
22     at before.  But I want to talk to you
23     about this one.
24         A.    You said ending in 5-9?
25         Q.    Yes, sir.

1            RYAN C. BERRIS VOLUME I

2        A.    (The witness reviews the

3    exhibit.)

4        Q.    And you'd agree with me this

5    is an e-mail from you November 10, 2021

6    in response to an e-mail from Mr. Maatta

7    sending the redlines that we just looked

8    at and you say, you're going to "revert

9    soon," right?

10       A.    Yes.

11       Q.    Okay.  And by that, I gather

12   that you met that you'd take a look at

13   the redlines and comments and then get

14   back to Mr. Maatta with your views on

15   those, right?

16       A.    That sounds about right, yes.

17       Q.    Okay.  And Mr. Maatta responds

18   to you.  "As a matter of good practice,

19   my opinion is that we should conclude and

20   execute the agreement before Carmen

21   provides any additional services and

22   public on the company's behalf."

23       Do you see that?

24       A.    I do.

25       Q.    Okay.  Now, did you write

Page 192

1           RYAN C. BERRIS VOLUME I
2      back to him and say, oh, no, nothing
3      worry about because we've already got an
4      executed agreement?
5           A.    I did not.  I said, "Thank
6      you."  We'll "revert soon."
7           Q.    You would agree with me that,
8      clearly, his understanding is that there
9      is no executed agreement and that's why
10     he doesn't want his client to continue to
11     work for free, right?
12               MR. ZACH:  Objection to form.
13          A.    I disagree.
14          Q.    Okay.  What did you take him
15     to mean with these words?
16          A.    I took him to mean that Ms.
17     Jorda and I entered into an agreement on
18     or around September 5th or 6th.  The
19     agreement was signed.  It was signed with
20     the understanding that she would have the
21     ability to check with her lawyer and, in
22     good faith, we would discuss any type of
23     modifications that were reasonable
24     thereafter.
25               So that's my interpretation of what

1          RYAN C. BERRIS VOLUME I
2    John is referring to here.
3          Q.    Really?
4          By when he says, "We should
5    conclude and execute the agreement before
6    Carmen provides any additional services,"
7    you took that to mean that he understands
8    there really is some other agreement, but
9    we're going to continue to work in good
10   faith to negotiate a new one?
11         A.    This was part of the
12   conversations I had with him.  I had
13   conversations with him outside of e-mail
14   including, I think, there would be
15   records of this in my De Tomaso e-mail --
16         Q.    Really?
17         A.    -- whether Zoom or something
18   of this sorts.
19         Q.    So let me ask you this.
20         You're the point man calling the
21   shots on this deal that you're
22   negotiating for the company opposite a
23   lawyer and you're someone who has no
24   legal training and you don't think it
25   would be appropriate or necessary in

Page 194

1          RYAN C. BERRIS VOLUME I

2     protecting De Tomaso's interests to tell

3     the lawyer that you already have a signed

4     agreement with his client?

5               MR. ZACH:  Objection, form.

6          A.   I, certainly, could have

7     taken a hard line, but that was not the

8     right approach.

9          I was building a team.  I wanted

10    everyone to feel comfortable.  Otherwise,

11    there was no point in having a

12    relationship.

13         Q.   So please answer the question

14    I asked you, instead of giving me this,

15    like, word salad that I have to, like,

16    try to sort through.

17         You, Mr. Berris, calling the shot

18    as the CEO of De Tomaso didn't think it

19    was necessary or appropriate to put in

20    writing the company's understanding that

21    it already had a signed, sealed,

22    delivered contract with this lawyer's

23    client?

24         A.   No, because when Jorda and I

25    executed the September agreement, it was

Page 195

1                RYAN C. BERRIS VOLUME I
2       done under that verbal understanding, that
3       she would have the ability to revisit the
4       topics and we would discuss in good faith.
5            Q.    Did you ever do that with any
6       other vendors or employees of De Tomaso?
7            A.    I can't recall, specifically.
8       But this is, typically, how I conducted
9       myself.
10           Q.    Really?  You sign up deals
11      and then negotiate them some more?
12           A.    No.  I would -- meaning, that
13      I would discuss -- I would bring on board
14      individuals, if we had a good spirit and
15      dynamic, because we were building a team
16      for the long-term.  This was always the
17      intent.
18           Q.    Like people you're
19      romantically interested in you mean?
20                MR. ZACH:  Objection.
21           A.    No.
22           Q.    Okay.  Tell me one other deal
23      that you signed and then turned around
24      and continue to negotiate it.
25           A.    I can't recall offhand.

1           RYAN C. BERRIS VOLUME I
2           Q.    Yeah, I didn't think so.
3           Looking at that e-mail, you would
4      agree with me the edits, the comments
5      with her lawyer, go back and forth
6      through October, November and December,
7      right?
8           A.    (The witness reviews the
9      exhibit.)
10          I only see what you can point to me
11     -- oh, I do see here, yeah.
12          Q.    So, ultimately, you send back
13     the latest version from our side, right?
14     That's in December?
15          A.    That is correct.
16          Q.    And at that time, you know,
17     what you're sending isn't a signed
18     agreement, right?
19          A.    I don't believe so.
20          Q.    Okay.  So let me ask you
21     this.  Let's just accept this hypothesis
22     here that you signed an agreement and
23     signed it some more.
24          Did you on behalf of De Tomaso
25     reopen any terms, I mean, to renegotiate?

1          RYAN C. BERRIS VOLUME I

2          A.    Yes.

3          Q.    Which ones?

4          A.    We had renegotiated terms

5     with regards to a fee for image rights,

6     as well as other items, which I think are

7     referenced in an attachment that I'm sure

8     you'll provide me shortly.

9          Q.    Okay.

10         A.    Yup.

11         Q.    Okay.  So you're continuing

12    to negotiate for the company as well?

13         A.    Yes.

14         Q.    Okay.  Alright.

15         And aside from you, you would agree

16    with me that no one else was involved in

17    these negotiations for De Tomaso, right?

18         A.    I handled this matter, yes.

19         Q.    Okay.  And with respect to

20    this agreement that you're negotiating,

21    the discussions continued into January,

22    right?

23         A.    Yes, I believe so.

24         Q.    Okay.  And you'd agree with

25    me that the agreement was -- this

1              RYAN C. BERRIS VOLUME I
2      agreement was actually signed in
3      January 22nd of '22?
4           A.    I would say a revised
5      agreement was signed sometime in January
6      of 2022.
7           Q.    Where were you when you
8      signed it?
9           A.    I was in Düsseldorf, Germany.
10          Q.    Okay.  Was Carmen there too?
11          A.    Yes, she was.
12          Q.    Okay.  Where did you sign it?
13          A.    In the restaurant at the
14     hotel that we would stay at quite often.
15     I think it's the Park something, you know.
16          Q.    Where did the copies of the
17     agreement come from?
18          A.    We signed in person and then
19     I -- if I recall, I believe, they may have
20     been faxed or something of the nature.
21          Q.    "Faxed" where to whom?
22          A.    I don't recall.  But, I
23     believe, Carmen was the one.  She
24     transmitted to John.  But, again, I'm
25     trying to recall something that was quite

1           RYAN C. BERRIS VOLUME I
2      a while ago.
3           Q.    So, at the time of that
4      signing, she transmitted an electronic
5      copy to her lawyer of the signed
6      agreement?
7           A.    I'm not positive.
8           Q.    Okay.  Did you transmit a
9      signed copy of the agreement to anyone at
10     De Tomaso?
11          A.    I don't recall.
12          Q.    Do you remember whether there
13     was one or two or more copies of the
14     contract when it was being signed?
15          A.    "When it was being signed"?
16          Q.    Yeah.
17          A.    Yes, there was more than one.
18          Q.    Do you know where the
19     original copies of that contract are?
20     Are they in your car?
21          A.    I do not recall where the
22     original version is.
23          Q.    Okay.  Now, you'd agree with
24     me that January 22 of '22 was just a few
25     days before the bathtub exchange with Ms.

```
 1            RYAN C. BERRIS VOLUME I
 2     Jorda that we looked at earlier, right?
 3          A.    It sounds about it was on or
 4     around the same time.
 5          Q.    So you weren't in the United
 6     States when that bathtub photo was taken,
 7     were you?
 8          A.    No.  I think that was sent in
 9     -- I don't know if that was either in
10     Germany or Switzerland.
11          Q.    Switzerland, right?
12          A.    It could have been.  Because
13     after Germany, we then went to Switzerland
14     to meet with Bernie Ecclestone.
15          Q.    There is are no Whole Foods,
16     are there?
17          A.    I'm sorry?
18          Q.    There are no Whole Foods in
19     Switzerland?
20          A.    Sadly, no, to my knowledge.
21          Q.    Alright.  Okay.
22          Now, the contract that was signed
23     in January that wasn't approved by Mr.
24     Choi, was it?
25          A.    It's something that I handled,
```

1          RYAN C. BERRIS VOLUME I
2    but I had authorization to do so.
3          Q.    How did you have
4    "authorization to do so"?
5          A.    Mr. Choi and I on some
6    occasions would review terms and specifics
7    of documents and long-term contracts with
8    the likes of major technical partners.
9    But we would, also, under our own power
10   negotiate the terms of employment
11   contracts without the other being
12   knowledge.
13         Q.    You never sent him a copy of
14   this agreement, did you?
15         A.    I don't recall.
16         Q.    Yeah, okay.
17         Okay.  You recall that you signed
18   off on large purchases for Ms. Jorda,
19   right?
20         A.    Could you be specific?
21         Q.    Yeah.  I will, absolutely.
22         Do you recall approving a
23   significant publicity budget for an
24   agency to handle De Tomaso's marketing
25   around September 15 of 2021?

Page 202

1          RYAN C. BERRIS VOLUME I
2          A.    September 15th?  Which party
3     would this be?
4          Q.    With -- well, I'll show you
5     document.
6          A.    Sure.
7          Q.    I'm just trying to keep this
8     moving.
9               (Deposition Exhibit Berris 16,
10          e-mail thread DT0000023770 to
11          DT0000023772 marked Confidential,
12          was marked for identification.)
13          Q.    Exhibit 16, Mr. Berris.
14          A.    Thank you.
15          Q.    Okay.  This e-mail thread is
16     between you and Ms. Jorda, right?  Dated
17     September 15, 2021, right?
18          A.    That is correct.
19          Q.    Are you fluent in Spanish?
20          A.    I am not.
21          Q.    Okay.  So did you understand
22     what you were approving here?
23          A.    I mean, easily, put in Google
24     translate, yes.
25          Q.    That wasn't my question.

Page 203

1          RYAN C. BERRIS VOLUME I
2          Did you understand what you approved
3     here?
4          A.     So I cannot recall,
5     specifically, if there was an attachment
6     and/or I cannot recall the language here,
7     because I'm not fluent in Spanish.
8          Q.     Right.
9          A.     But when I had these
10    communications, naturally, I would have
11    put it in a document such as -- or
12    service such as Google Translate so that
13    I could be familiar.
14               (There is a discussion off
15          the record.)
16          Q.     Okay.  So your testimony is
17    that you ran this through Google
18    Translate?
19          A.     I'm speculating but --
20          Q.     Don't.  I mean, your lawyers
21    told you not to speculate.  I told you
22    not to speculate.  No one in this room
23    wants you to speculate.
24          A.     So -- so, in that case, I
25    don't recall.

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  So you don't know, but

3    you approved it.

4          You got it around it looks like

5    around 8:00 a.m. and you approved it

6    around noon; is that right?

7          A.    That matches the time here.

8          Q.    Okay.  So four hours after

9    getting it, you approve it lock, stock,

10   barrel, no changes, right?

11         A.    That appears to be.

12         Q.    Okay.  Let's take a look at

13   another document here.

14         Well, let me ask you this, do you

15   recall a Chanel suit that Carmen wore for

16   one of the suits --

17         A.    Yes.

18         Q.    -- shoots?

19         A.    Yes.

20         Q.    Okay.  And then did you

21   approve of that being expensed to the

22   company?

23         A.    No.  In fact, I paid for that

24   in my personal funds and never sought

25   reimbursement.

Page 205

1            RYAN C. BERRIS VOLUME I
2        Q.    Okay.  Alright.
3        So you recall some back and forth
4    you had with Carmen -- well, I'll just
5    show you the document.  We'll get it into
6    here.
7                (Deposition Exhibit Berris 17,
8            WhatsApp text thread between Ryan
9            Berris and Carmen Jorda
10           BERRIS-000201003 to BERRIS-000201012
11           marked Confidential, was marked
12           for identification.)
13       Q.    Alright.  I'm going to hand
14   you Exhibit 17, which is another text
15   thread between you and Ms. Jorda.
16       Alright.  So you recognize this?
17       This is a text thread between you
18   and Ms. Jorda, right?
19       A.    (The witness reviews the
20   exhibit.)
21       Yes.
22       Q.    Alright.  And this is dated
23   September 11, 2021 right?
24       A.    Yes.
25       Q.    And she tells you that she

```
 1              RYAN C. BERRIS VOLUME I
 2      should wear Chanel, a Chanel suit, for De
 3      Tomaso event, right?
 4           A.    Would you mind just pointing
 5      me to the Bates Page?
 6           Q.    Yes.  It's the page that ends
 7      08.  The one right next to the photo of
 8      the Chanel suit.
 9           A.    Yes, I see that.
10           Q.    Yeah, alright.
11           And so she says, I want to wear
12      Chanel for this De Tomaso event.
13           And then you write, "pics?"
14           And she writes, "now."
15           And then you say, "Carmen, my heart
16      can't take anymore teasing," right?
17           A.    Could you just let me know
18      the Bates Number where that is?
19           Q.    It's on the same page.  It's
20      right down towards the bottom, right next
21      to the last "RB."
22                 MR. ZACH:  It's the fourth
23           from the bottom.
24           A.    Oh, okay, okay, on the other
25      side.  Got it.
```

```
 1              RYAN C. BERRIS VOLUME I
 2         Yes, I see that.
 3         Q.    Right.
 4         Is it your normal practice to tell
 5    your business partners that you can't
 6    take any -- your heart can't take anymore
 7    of their "teasing"?
 8         A.    Well, I think, she was
 9    referring to the Chanel suit, which she
10    then sent the photo of, yeah.
11         Q.    Oh, so you're talking about
12    your heart can't take anymore teasing
13    about the Chanel clothing?
14         A.    Yeah, what she had envisioned
15    for the look.
16         Q.    Right.
17         So this, in your opinion, isn't a
18    reflection of your romantic interest in
19    Ms. Jorda?
20         A.    Absolutely not.
21         Q.    Okay, alright.
22         So, just so we're completely clear
23    on this.
24         A.    Uh-huh.
25         Q.    So, when I ask you this at
```

1                   RYAN C. BERRIS VOLUME I
2          trial, we're going to be very clear on
3          it.
4               It's your testimony under oath that
5          you never had any romantic interest in
6          Ms. Carmen Jorda, right?
7               A.     I found her attractive, but I
8          was never romantic.  Nor did I ever
9          pursue.
10              Q.     Okay.  And you paid for this
11         out of your personal budget, right?
12              A.     That's correct.
13              Q.     Okay.  Why did you do that?
14              A.     Because I was a partner in
15         the business.  I felt that, of course, it
16         was expensive and it's, obviously,
17         something that I don't think Mr. Choi and
18         I would see eye to eye on it.
19              So, as a partner in the business, I
20         chose to do it and this is in my view as
21         investing in the relationship, because I
22         wanted to grow the value of the brand.
23              Q.     How much was it?
24              A.     I don't recall, specifically,
25         but I think it could have been around

1              RYAN C. BERRIS VOLUME I

2       20,000.

3           Q.    So you spent 20,000 of your

4       own dollars on a suit for Ms. Jorda,

5       right?

6           A.    Yes.

7           Q.    Okay.  And you, actually,

8       didn't even raise with the business

9       whether that is something that would make

10      sense to spend company funds on or not,

11      right?

12          A.    It was not company funds.  It

13      was my personal.

14          Q.    I'm asking.  I understand

15      your testimony is you spent your own

16      money.

17              What I'm saying is, before you

18      spent your own money on it, you didn't go

19      to Norman or anyone else at the business

20      and say, hey, my creative vision for

21      Carmen attending this event is that she

22      shows up wearing Chanel, would it be okay

23      if that were submitted as an expense

24      through the business?

25          A.    I just -- I planned to take

```
 1            RYAN C. BERRIS VOLUME I
 2      care of it personally.
 3            Q.    Okay.  Did you buy clothes
 4      for any other vendors that the company
 5      did business with?
 6            A.    You mean any other employees
 7      or...
 8            Q.    Anyone.
 9            A.    Mr. Choi.
10            Q.    Okay.  Anybody else?
11            A.    Not that I can recall,
12      specifically, but it's certainly possible.
13            Q.    Okay.  So, when you write
14      here, "Powerful."  "Whatever you like my
15      dear," that's just you communicating with
16      a business partner about how best to
17      advance De Tomaso's business interests?
18            A.    Well, she was not a business
19      partner.  The only partners in the
20      business were Mr. Choi and I.
21            And I was being playful and I was
22      trying to have a good energy, because
23      this is a big moment, you know, she
24      coming on board but, also, for me having
25      worked for years tirelessly to develop
```

1              RYAN C. BERRIS VOLUME I
2      the business and the brand and to get
3      traction.  I viewed this as a big
4      milestone, because she would open up a
5      lot of doors that I would be unable to or
6      it would be difficult for me to.
7           Q.    Well, you'd agree with me that
8      there came a time when your relationship
9      with Ms. Jorda soured, right?
10           A.    Yes.
11           Q.    And that's when the company
12      stopped processing her expense
13      reimbursements, right?
14           A.    I don't recall, specifically,
15      but it could have been with regard to
16      that or payment for her base compensation.
17           Q.    And under the agreement, Ms.
18      Jorda was to submit her expenses directly
19      to you, right?
20           A.    I don't have the document in
21      front of me, but it, certainly, could be.
22      And most agreements with independent
23      contractors or vendors, I was usually the
24      contact person.
25           Q.    Why would they go to you

1              RYAN C. BERRIS VOLUME I

2      rather than to the company's CFO or

3      another part of the business?

4              A.    I don't believe we had a CFO

5      at that time.

6              Q.    Okay.  Let's take a look at

7      another document.

8                    (Deposition Exhibit Berris 18,

9              e-mail thread marked DT0000032181

10             & DT0000032182 Confidential, was

11             marked for identification.)

12             Q.    Alright.  Mr. Berris, I'm

13     handing you Exhibit 18.

14             Okay.  This is an e-mail from Ms.

15     Jorda to you March 29, 2022, right?

16             A.    Yes.

17             Q.    And she's complaining that

18     she's not getting her expenses reimbursed,

19     right?

20             A.    I don't see where she refers

21     to "expenses."  I just see it referring

22     to the attached "invoice."

23             Q.    Okay.  Well, you see where

24     she says, "We are almost in April and I

25     have not been paid for the last three

1          RYAN C. BERRIS VOLUME I
2     months"?
3          A.    I see that.  But that's -- I
4     don't think that is accurate.
5          Q.    Okay.  From her you're
6     saying?
7          A.    Yeah, I don't -- I don't
8     believe that's accurate because if I
9     recall correctly, I had been personally
10    paying her, I think, up through end of
11    February or maybe sometime into March.
12    I'm not sure without having the records
13    in front of me.
14          Q.    You had personally been
15    paying for her?
16          A.    Yes.
17          Q.    Did you personally pay for
18    any other vendors or contractors or
19    employees for De Tomaso?
20          A.    I took care of many expenses
21    for corporate items, right, so their
22    travel, computers for the designers,
23    software for the company.
24          Q.    Those were paid for by your
25    personal funds?

1              RYAN C. BERRIS VOLUME I

2          A.    Yes, amongst many many others.

3          Q.    And you didn't submit those

4     for reimbursement?

5          A.    I did not.

6          Q.    Okay.  So is she referring to

7     amounts that are due under her employment

8     agreement, or is she referring to

9     expenses?

10         A.    No, from what I recall --

11    but, again, it's tough to speak without

12    having the documents in front of me -- I

13    think almost all her expenses I had

14    covered personally.

15         I don't recall, specifically, her

16    invoicing for expenses.  It could be

17    possible.

18         Q.    I mean, the document's right

19    here.  Just turn the page.

20         A.    (The witness complies.)

21         Q.    It's an invoice.

22         A.    Okay.

23         Q.    Right.

24         Monthly payment, right?

25         A.    Yes.

1          RYAN C. BERRIS VOLUME I
2          Q.    So that's contract payments,
3     right?
4          A.    Correct.  I believe that's
5     what I would be referring to.
6          Q.    Okay.  Are there any other
7     vendors or contractors or employees whose
8     contractual payments you paid out of your
9     own pocket?
10         A.    Many of their expenses, yes.
11         Q.    That's not what I'm asking
12    you, okay?
13         Ms. Jorda had a contract with De
14    Tomaso, right, not you, right?
15         A.    Correct.
16         Q.    Okay.  Are there any other
17    contract arrangements out there where it
18    would -- De Tomaso was obligated to pay
19    monies to someone where you stepped in,
20    opened your wallet and paid with your
21    personal funds?
22         A.    There were -- without having
23    the documents in front of me, but I
24    believe that there were a few including a
25    marketing company for shoots for the car

```
1              RYAN C. BERRIS VOLUME I
2    in Switzerland.  I believe there was one
3    for a photo shoot in LA.  But I would
4    have to go back and check the records to
5    be more precise.
6         Q.    Which "records" would you
7    check?
8         A.    I would check a spreadsheet
9    that I put together, as well the
10   supporting receipts.
11        Q.    Okay.  Where she writes,
12   "This is not what we discussed in
13   Switzerland and I am very concerned,"
14   what did you discuss with her in
15   Switzerland?
16        A.    I, honestly, don't recall.
17        Q.    Okay.  Was there anyone else
18   present for that conversation?
19        A.    Not that I can recall.
20        Q.    Do you know when the
21   conversation took place?
22        A.    I can only say that it would
23   have taken -- occurred over the period
24   that we were in Switzerland.  I don't
25   recall the dates offhand.
```

1          RYAN C. BERRIS VOLUME I

2          Q.    Do you know where it took

3     place?

4          A.    It could have been multiple

5     places.  We had been traveling around for

6     meetings with Bernie Ecclestone.  So I

7     don't know what she's referring to and,

8     therefore, I don't know the date, time or

9     location.

10          Q.    Was it around the time that

11     she signed and you signed the agreement?

12          A.    I would be speculating.  I

13     don't know.

14          Q.    Okay.  And you'd agree with

15     me that there came a time with respect to

16     Jorda where you communicated with De

17     Tomaso's CFO that you would like the

18     outstanding payment for Carmen to be

19     deducted from your personal compensation,

20     right?

21          A.    Yes.  But just to be clear --

22     so who was the CFO at the time listed?

23          Q.    I'll show you the document.

24          A.    Sure.

25               (Deposition Exhibit Berris 19,

Page 218

1              RYAN C. BERRIS VOLUME I
2         e-mail thread DT0000035690 to
3         DT0000035690 marked Confidential,
4         was marked for identification.)
5         Q.    Alright.  Mr. Berris, I'm
6    going to hand you Exhibit 19.
7         It's e-mail thread between you and
8    Ms. Majcher with a copy to Mr. Choi,
9    okay?
10         A.    Okay.
11         Q.    And, again, my question is
12    May 18, 2022 you're communicating with
13    Diana and Norman about outstanding
14    payments for Carmen being deducted from
15    your personal compensation, right?
16         A.    Yes.
17         Q.    Okay.  And why is it that you
18    were having payments to her deducted from
19    your personal compensation?
20         A.    For many reasons.  One being
21    that I was low on funds, as I had been
22    deferring my compensation from the
23    company that I had not been invoicing for
24    my expenses for a very long period and,
25    also, because of certain instructions and

1          RYAN C. BERRIS VOLUME I
2     threats that were coming from Mr. Lui to
3     me with regards to the way that I need to
4     conduct matters with Ms. Carmen Jorda;
5     otherwise, there would be implications.
6          Q.    Alright.  So May 18th, you
7     write and say, you want the payments to
8     come from your personal compensation and
9     you said first because you were low on
10    funds.  I don't understand what you mean
11    by that.
12          A.    Well, I had been deferring my
13    De Tomaso compensation for years with the
14    exception of, I believe, one salary
15    payment.
16          I had not been invoicing for my
17    expenses, which is far in the six
18    figures.  I was covering many company
19    expenses, which I, actually, still
20    continue to this day.
21          Q.    Okay.  I asked you why you
22    paid for her expenses or her compensation
23    out of your personal funds and you
24    telling me it's because you are low on
25    funds does not make sense to me.

1              RYAN C. BERRIS VOLUME I
2         So I'm trying to understand why you
3    not having money would be a reason for
4    you to pay out of your personal money
5    Carmen's.
6         A.    Understood.
7         So the reason I was taking that --
8    putting that weight on my shoulder, as a
9    partner of the business, is because De
10   Tomaso was in arrears --
11        Q.    Okay.
12        A.    -- for various technical
13   partners that were core to the business.
14        Q.    Okay.  And so -- and then you
15   mentioned "threats."
16        A.    Yes.
17        Q.    Okay.  Were any of those in
18   writing?
19        A.    Naturally not.
20        Q.    Alright.  And when were those
21   threats made to you?
22        A.    There were multiple over the
23   course of the months of April and
24   May 2022.
25        Q.    Okay.  When in April, exactly?

Page 221

1              RYAN C. BERRIS VOLUME I
2         A.    I have put together a
3    document.  There were many meetings that
4    I had.
5              MR. ZACH:  Don't -- don't.
6         Q.    We haven't seen the document.
7              MR. ZACH:  Don't talk about
8         things you prepared --
9              THE WITNESS:  Okay.
10             MR. ZACH:  -- in preparation
11        for the suit.
12        Q.    I want to know specific days,
13   dates, times, places, people.
14        Are you prepared to testify to
15   that?
16             MR. ZACH:  To the extent that
17        you can recall.
18        A.    Okay.  So, to the extent that
19   I can recall, I believe, the first one is
20   coming from Samuel was on or around
21   April 27th.  That's when Samuel was
22   telling me that Mr. Choi was very upset,
23   that he never authorized Carmen coming on
24   board to the company, which I told him is
25   not true.

```
 1              RYAN C. BERRIS VOLUME I
 2         And he had said, well, that's what
 3    Norman is saying.
 4         And I told him I even -- to
 5    understand why this was such a big deal,
 6    I had been covering a large portion of
 7    her compensation and personal expenses
 8    and was not invoicing.
 9         Samuel was then just giving me
10    instructions on how I needed to handle
11    the matter.
12         And after this meeting, if I recall
13    correctly, I then met with Mr. Choi in
14    person whereby Samuel had given me
15    certain instructions on what to say to
16    Mr. Choi.
17         I was very emotional during that
18    period.  I followed Samuel's instructions
19    including the ones thereafter.
20         Q.    The meeting with Mr. Choi,
21    when did that take place?
22         A.    I believe it was somewhere
23    around April 27th or April 28th.
24         Q.    Okay.
25         A.    But I cannot recall,
```

1              RYAN C. BERRIS VOLUME I
2      specifically.
3              Q.    Okay.  And you mentioned --
4      were there any other meetings with Mr.
5      Lui where he threatened you?
6              A.    Many.
7              Q.    Tell me the dates and the
8      times and the places.
9              A.    So it was almost daily
10     thereafter that I was meeting or
11     discussing with Samuel.  There may have
12     been periods whereby -- there were
13     certain days whereby we weren't meeting.
14          But the second -- or, let's say,
15     the following meeting to the one with
16     Samuel where I met with Mr. Choi, Samuel
17     was saying that it was very -- the
18     situation was very serious, he was
19     incredibly upset, meaning, Norman.
20          Samuel claimed that he was doing
21     whatever he could to make the situation
22     better because he knew -- I told Samuel
23     that I was, basically, the whole company.
24          And he said, I know, I know, but I
25     don't know if this is just coming from

1              RYAN C. BERRIS VOLUME I
2      Norman or maybe it's coming from his wife
3      Sophia.  But it's important and I hope we
4      can put this behind us.
5           And then Samuel told me that it was
6      important that I follow his instructions
7      going forward, as I would not be able to
8      meet with Choi again during this period.
9           And Samuel then told me that if I
10     did not follow his instructions, that
11     they would make a disclosure to, I
12     believe, the SEC as part of this back
13     process that I had -- was conducting
14     myself in an unauthorized manner.
15          Q.    Okay.  I asked you for dates.
16          What are the dates of all of these
17     meetings that you supposedly had?
18          And I assume these were all
19     in-person meetings that you had?
20          A.    Yes.
21          Q.    Okay.  I want to know the
22     dates.
23          A.    So I can't recall the dates,
24     specifically.
25          Q.    Okay.

1          RYAN C. BERRIS VOLUME I
2          A.    But what I can tell you is
3     that they occurred, roughly, between
4     April 27th and May 7th of 2022.
5          Q.    April 27th and May 7th, you
6     had a series of in-person meetings with
7     Mr. Lui?
8          A.    Correct.
9          Q.    Okay.  Now, I want to make
10    sure I understand all of the "threats"
11    that he made.
12          You mentioned the SEC disclosure.
13          What, specifically, did he say he
14    was going to disclose about you?
15          A.    He said that he and Mr. Choi
16    would make a disclosure or a filing.  I'm
17    not familiar with the typical language,
18    as that's not my field of expertise.
19    That I had conducted myself in an
20    unauthorized manner, unauthorized activity
21    and he said -- I wouldn't want that to
22    happen because that would harm my
23    reputation.
24          Q.    Was that in reference to the
25    Jorda contract?

Page 226

1              RYAN C. BERRIS VOLUME I
2         A.    Yes.
3         Q.    Okay.  And the Jorda contract
4    was, in fact, not authorized, right?
5         A.    That's not true.
6         Q.    Oh, it was?
7         A.    I had full --
8              MR. ZACH:  Objection.  That's
9         not a question.
10        Q.    Mr. Choi signed off on that
11   contract?
12        A.    Mr. Choi did not need to sign
13   off on the contract.
14        Q.    That wasn't my question, okay?
15   Mr. Choi did not sign off on that
16   contract, right?
17        A.    Correct.
18        Q.    Okay.  Now, so the disclosure
19   that he said he was going to make to the
20   SEC was about "unauthorized activity" by
21   you, right?
22        A.    Yes.
23        Q.    Okay.  What other "threats"
24   did he make to you?
25        A.    Samuel?

1          RYAN C. BERRIS VOLUME I

2          So Samuel was -- kept relaying to

3     me how serious the situation was.  I was,

4     also, in parallel so busy with the

5     business that I do recall, I believe, it

6     was, roughly, from April 30th to May 2nd

7     that I turned my phone off, because I was

8     focusing on the La Motte Classic Event,

9     which was coming up amongst other

10    business matters.

11         On May 3rd or May 4th, Samuel then

12    sent me a draft resignation letter and he

13    told me that I needed to get this signed

14    by tonight and send back to him or

15    Norman.

16         When I received that document, I

17    was not comfortable with the language.  I

18    then relayed this to Samuel, I believe,

19    on the phone.

20         And he told me, make any adjustments

21    that you need to, just make sure you get

22    it signed by tonight.

23         I then removed a clause that I was

24    not comfortable with.  I signed the

25    agreement to resign as a Director from

1                RYAN C. BERRIS VOLUME I
2       the Board or a member of the Board.  I
3       can't recall the specific language.  And
4       I transmitted it I don't recall if both
5       to Samuel and Norman or either or.
6            Q.    Okay.  My question to you,
7       sir, was what were the "threats" made to
8       you?  I want to understand --
9            A.    Sure.
10           Q.    -- specifically, what
11      "threats" were being made to you.
12           Can you please just identify,
13      specifically, the threats?
14           A.    Yes.  So there was the SEC
15      disclosure.  There was the fact that my
16      future at the company was hanging in the
17      balance, my life's work.
18           I had -- on multiple occasions,
19      Samuel and I met after Mr. Choi would no
20      longer communicate or speak with me and
21      that one meeting Samuel asked me about my
22      agreements with the company.
23           And as part of that discussion, I
24      was letting Samuel know.
25           And Samuel then asked me if I had

1              RYAN C. BERRIS VOLUME I
2      any stock in De Tomaso.
3              And I said, yes, I own 10 percent
4      of the company.
5              And Samuel acted very surprised and
6      he said, well, this is news to me.  And
7      then he continued to say, do you trust
8      Norman?
9              And I said, yes.  Norman is like
10     family to me.
11             And he said then in response to
12     that, well, I would get it in writing, if
13     I were you.
14                 MR. ZACH:  Guys, can I just
15          ask for a favor?  Can I step out
16          like for one minute while you --
17                 MR. WERNER:  Can you what?
18                 MR. ZACH:  Step out to go
19          to the bathroom?
20                 MR. WERNER:  Oh, yeah, sure.
21                 THE VIDEOGRAPHER:  Are we
22          going off the record?
23                 MR. ZACH:  Yeah, you can
24          stay on the record.
25                 MR. WERNER:  Stay on the

1              RYAN C. BERRIS VOLUME I
2         record.  Just...
3              MR. ZACH:  I'll be really
4         fast.
5              MR. WERNER:  Alright.  We
6         good?
7              MR. ZACH:  Thank you.
8    BY MR. WERNER:
9         Q.    Okay.  Mr. Berris, what I
10   gathered from what you just said, in
11   terms of the "threats" being made at you,
12   were three things.  That the company was
13   going to report something about you to
14   the SEC, that your future with the
15   company was hanging in the balance and
16   that Mr. Choi didn't want to talk to you
17   anymore, right?
18        A.    That's what I've stated thus
19   far, but there are others.
20        Q.    Well, I asked you.  I asked
21   you to tell me, specifically, all of the
22   "threats" that anyone made against you.
23        A.    Yes.  And the only reason I
24   stopped is because my lawyer had to step
25   out.

Page 231

1          RYAN C. BERRIS VOLUME I
2          Q.      Alright.
3                  MR. ZACH:  It's a strategic --
4                  MR. WERNER:  Blame it on the
5          lawyer.  It's always our fault.
6          A.      So, after signing the draft
7     -- the resignation template that they
8     sent me that I then modified, Samuel then
9     -- his next communication with me was him
10    hysterically crying.  He was having he
11    said a nervous breakdown.  He missed his
12    family and he wanted to go home.
13         So this was right after -- shortly
14    or after me sending the revised
15    resignation template to Mr. Choi and Mr.
16    Lui.
17         I then had subsequent meetings with
18    Samuel whereby he was relaying
19    instructions and feedback to me from Mr.
20    Choi and advising me on actions to take.
21         Samuel was telling me that it was
22    -- the situation was critical.  It was
23    super important that I follow everything
24    that he said.  And the language was very
25    important.

```
 1              RYAN C. BERRIS VOLUME I
 2         Samuel then on those meetings would
 3    take my phone, would type draft messages
 4    for me to send to Norman and telling me
 5    that if I follow these steps, then
 6    everything will be fine, everything will
 7    be fine.
 8              MR. ZACH:  His question is to
 9         you -- trying to list the "threats."
10              THE WITNESS:  Understood.
11              MR. ZACH:  Just answer his
12         question.
13              THE WITNESS:  Understood.
14         A.    Okay.  So Samuel then
15    informed me that Mr. Choi had hired
16    Counsel against me, after I had sent
17    these communications to him at Samuel's
18    request.
19         And then the other notable threat
20    that was made to me that came from Samuel
21    occurred on or around May 19, 2022,
22    whereby no one was communicating with me
23    anymore at the company.  I was not
24    getting responses to calls or e-mails.  I
25    had been locked out of my e-mail account
```

Page 233

1                RYAN C. BERRIS VOLUME I
2        to my surprise.
3             Samuel -- I then reached out to him.
4        I was able to get him on the phone.
5        Samuel then told me that I needed to sign
6        the novation agreement to take
7        responsibility for Ms. Jorda's contract
8        personally and that I need to send it
9        immediately.
10            And I said, I'm not comfortable
11       with doing that.  However, if that's what
12       it's going to take to make this situation
13       better, that I was willing to do so.
14            And I said, I'm willing to do so,
15       under the condition that my employment
16       and the terms that I had agreed upon with
17       Mr. Choi were guaranteed.
18            And Samuel told me, that's not in
19       the cards for you.  But if you don't sign
20       the novation agreement, things will not
21       end well for you.
22            I then told Samuel that I could not
23       do so from a financial capacity, because
24       I would not have the income to satisfy
25       the agreements for Carmen's terms with De

Page 234

1              RYAN C. BERRIS VOLUME I
2     Tomaso if I did not have my income coming
3     from De Tomaso.
4          And that's, again, when Samuel told
5     me, if I don't sign the novation
6     agreement, things won't end well for you.
7          I then, you know, received the
8     termination notice from Frank Caruso and
9     that was the last communication that I
10    had.
11         Q.    Okay.  You resigned on
12    May 3rd, right?
13         A.    From the Board, yes.
14         Q.    Mr. Lui told you things would
15    not end well for you, did he elaborate on
16    that statement?
17         A.    He did not.  But I --
18         Q.    No, just please...
19         A.    He did not.
20         Q.    Okay.  What did you understand
21    him to be telling you, specifically?
22         A.    What I understood him to
23    mean, specifically, was that they were
24    going to come at me with all that they
25    had and I didn't know what the limits of

1              RYAN C. BERRIS VOLUME I
2       that would be.
3              Over this period recollections of
4       past events and things that had been
5       communicated to me were coming back to
6       mind, including Diana's husband who was
7       involved in the intelligence community,
8       spying and money laundering.
9              I had people in the past telling me
10      that Mr. Choi had been involved in
11      organized crimes, in triads with Michael
12      Choi and Clement Mack amongst other
13      members of the Enigma network.
14             So I took that as a very serious
15      threat, because he had told me that
16      after, you know, letting me know that I
17      had -- was no longer had employment with
18      the company.
19             Q.    Alright.  A "threat" of what
20      exactly did you take that as?
21                  MR. ZACH:   Asked and answered.
22             A.    Yes.
23             Q.    That they were going to come
24      at you "with all [that] they had," what
25      do you mean by that?

1              RYAN C. BERRIS VOLUME I

2                  MR. ZACH:  Asked and answered.

3          Q.    You still have to answer my

4     questions, even if he objects.  Sorry.

5          A.    So I -- I didn't know what it

6     to mean at the that time.  But I took it

7     as a threat to my personal safety.

8          Q.    Okay.  And so you were so

9     concerned about your personal safety that

10    you moved right next door to the

11    Defendant?

12                 MR. ZACH:  Objection.

13         Q.    Answer the question.

14         A.     I felt more comfort after I

15    became public with my lawsuit.

16         Q.    Okay.  So, in fact, nobody

17    came after you?

18         You came after the company, right?

19                 MR. ZACH:  Objection.

20         A.     That's not true.

21         Q.    Okay.  Alright.

22         Other than the information you

23    provided about the threats that were made

24    to you, were there any other threats?

25         A.     That was the last

1              RYAN C. BERRIS VOLUME I
2       communication I had with any of the
3       Defendants.
4             Q.    Alright.
5             A.    With the exception of the
6       other termination notice that came from
7       Diana.
8             Q.    When did you engage Boies
9       Schiller?
10            A.    I don't recall, specifically.
11      But I think perhaps somewhere around
12      November of 2022.
13            Q.    Did you engage them
14      personally?
15            A.    Yes.
16            Q.    How did you identify Boies
17      Schiller to represent you?
18            A.    I...
19                  MR. ZACH:  [INSTRUCTION] if it
20            Involves discussions with other
21            Counsel that represented you, don't
22            get into.
23                  If it doesn't, you can answer.
24            A.    Then I can't answer.
25            Q.    Okay.  You can't answer

```
 1              RYAN C. BERRIS VOLUME I
 2      because they were -- Boies Schiller was
 3      identified to you by other lawyers with
 4      whom you had privileged communications?
 5              A.    Correct.
 6              Q.    Okay.  How many other lawyers
 7      did you have privileged communications
 8      with about your lawsuit against De Tomaso?
 9                  MR. ZACH:  Just -- not to
10              interrupt, but I can ask him
11              questions.
12                  I don't know that he's
13              sophisticated enough to know if
14              it's privileged or not.
15                  If you want me to step out and
16              just ask him about those other
17              discussions, I --
18                  MR. WERNER:  No, I don't --
19              I don't --
20                  MR. ZACH:  You know, he's
21              not a lawyer, but I'm happy if
22              this is important to you to --
23                  MR. WERNER:  No, that's fine.
24              Q.    I just want to know, like,
25      how many law firms did you talk to about
```

```
 1              RYAN C. BERRIS VOLUME I
 2     sewing De Tomaso.
 3          Again, I don't want the substance,
 4     I want a number.
 5               MR. ZACH:  Okay.
 6          A.    Okay.  I believe it was,
 7     approximately, five.
 8          Q.    Okay.  Alright.
 9          Are you responsible for your fees
10     to Boies Schiller?
11               MR. ZACH:  Objection.
12               Are you -- let me ask.  Are
13          you trying to get in our
14          engagement letter?
15               MR. WERNER:  Yeah, I want to
16          know who is paying the fees.
17               MR. ZACH:  I do not know
18          sitting here whether that's
19          privileged or not.
20               [INSTRUCTION] So I'm going
21          to instruct him not to answer.
22               But if this is information
23          that you care about, we can -- we
24          can provide that information to
25          you as Counsel.
```

```
 1            RYAN C. BERRIS VOLUME I
 2              I just -- I will -- I just
 3         don't know whether or not -- I
 4         think in different districts,
 5         there are different rules about
 6         whether the engagement letter is
 7         privileged or not.
 8              MR. WERNER:  Yeah, that's
 9         fine.  I don't really want to get
10         into any of privileged information.
11              Ultimately, what I would like
12         to know is whether he is paying his
13         fees or whether someone else is
14         paying his fees.
15              And I'd like to know the
16         scope of the engagement letter,
17         to the extent that it's not
18         privileged so...
19              MR. ZACH:  I can represent
20         to you that no one else is paying
21         his fees.
22              MR. WERNER:  Alright.
23              MR. ZACH:  In terms of the
24         actual terms of our engagement
25         letter, we can take that up on the
```

1          RYAN C. BERRIS VOLUME I
2          side, because it's an engagement
3          letter.
4               MR. WERNER:  That's fine.
5               MR. ZACH:  So we can figure
6          that out.
7               MR. WERNER:  Okay.  We can
8          deal with that separately.
9     BY MR. WERNER:
10         Q.   Okay.  Let me ask you this
11    again.  I don't -- don't tell me about
12    the conversations you had with any law
13    firm.
14         But you may have said this, but I
15    want to make sure it's clear on the
16    record.
17         When did you start contacting law
18    firms about a potential lawsuit against
19    De Tomaso?
20         A.   If I recall correctly, I
21    think, it was around October of 2022.
22         Q.   Okay.  I want to go back to
23    the -- your interactions with Sam Lui and
24    the threats and so on and just lock down
25    a few things.

Page 242

1              RYAN C. BERRIS VOLUME I
2          The meetings, as I understood it,
3      took place in person, correct?
4          A.    Yes.
5          Q.    Okay.  You mentioned one on
6      the 27th, right?
7          A.    On or around there, yes.
8          Q.    Where did it take place?
9          A.    So I don't recall,
10     specifically, all the locations by date.
11     But I can list out the locations that we
12     met over the course of April 27th through
13     May 7th, if that's helpful.
14         Q.    That's helpful.
15         And can you just give me the
16     location and the time?
17         A.    The time would be tough,
18     because we met, I think, over six times.
19         Q.    Okay.
20         A.    So it's tough for me to be
21     specific, but I can tell you the locations
22     that I can recall, to the best of my
23     knowledge, where we would meet.
24         Q.    Okay.  Tell me.
25         A.    So we met at the hotel that I

1          RYAN C. BERRIS VOLUME I
2     was staying at in New York at that time,
3     which is the Intercontinental Barclay
4     Hotel.  Sometimes we would meet there in
5     the lobby or the restaurant there.
6          Other times we would meet in the --
7     if I'm pronouncing it correctly -- the
8     Ole and Steen Cafe, which is within the
9     same building.
10         Other times we had met at Whole
11    Foods.
12         We had met at Bryant Park.
13         We had met at Le Pain Quotidien, if
14    I'm saying or pronouncing it correctly.
15    I perhaps not.
16         Q.    I wouldn't know.
17         A.    Le Pain Quotidien or the
18    coffee bakery style, yup.  We met there.
19         We, also, met -- I believe the
20    restaurant is called the Le Botaniste.
21    It's like a vegan place, if I remember
22    correctly.
23         Q.    Alright.  Anywhere else that
24    you can recall?
25         A.    We had gone to a Chipotle

```
 1              RYAN C. BERRIS VOLUME I
 2    once, but that was nearby the meeting
 3    that we had at Bryant Park.  But, to the
 4    best of my recollection, I think, those
 5    are the ones that I can recall.
 6         Q.    Okay.  Fair to say these were
 7    all public places, right?
 8         A.    Yes.
 9         Q.    Lots people around and --
10    right?
11         A.    Yes.
12         Q.    Okay.  And you'd agree with
13    me just, again, based on your recitation
14    of your sense of the "threats" and what
15    you took them to mean, am I correct in
16    understanding that no one actually
17    expressly made any threats of physical
18    harm against you?
19              MR. ZACH:  Object to the form.
20              But you can answer.
21         A.    I would disagree.  I would --
22    I interpreted the threat that came on or
23    around May 19th to be that, which I was
24    in Italy at the time.
25         Q.    "Which" was what?
```

Page 245

                    RYAN C. BERRIS VOLUME I

 1          A.    Which I was in Italy at the

 2     time.

 3          Q.    You were in Italy with Mr.

 4     Lui?

 5          A.    No.  That threat came from

 6     Samuel via phone.  I was in a hotel at

 7     the Malpensa Airport when it happened.

 8          Q.    Okay.  I understood all these

 9     "threats" were do be made in-person

10     meetings.

11          Were there phone calls, too?

12          A.    Yes.

13          Q.    How many?

14          A.    How many phone calls where

15     threats were conveyed?

16          Q.    Yes.

17          A.    I don't recall, specifically.

18     There were many communications via phone

19     that Samuel and I had over the course of

20     that period that I mentioned to you,

21     roughly, April 27th through May 7th.

22          But the threat where I interpreted

23     one of my personal safety came via phone

24     from Samuel.  I did not know where Samuel

```
 1            RYAN C. BERRIS VOLUME I
 2     was at that point in time.
 3           Q.    And what exactly -- I want to
 4     know his exact words to you that made you
 5     feel physically threatened over the
 6     phone.
 7           A.    Yes.  He told me that if I
 8     did not sign the novation agreement,
 9     after letting me know that I was being
10     terminated, that things would not end
11     well for me.
12           Q.    Okay.  And going back to the
13     question that I was, actually, asking you
14     is really this.
15           I understand that you interpreted
16     that to mean a threat of physical harm,
17     what I'm asking you, did Mr. Lui or
18     anyone else with their expressed words
19     threaten to harm you, if you didn't do
20     something they wanted?
21           Do you understand the difference?
22           A.    Yes.
23           But I -- my interpretation of that
24     would include the SEC and --
25           Q.    I'm not asking -- I'm not
```

```
 1              RYAN C. BERRIS VOLUME I
 2     asking for your interpretation.
 3          I'm asking you did Mr. Lui or
 4     anyone else expressly threaten you with
 5     physical harm?
 6              MR. ZACH:  Object to the form.
 7              I think -- I think the
 8          question is were the words to the
 9          effect of, like, I'll kick your
10          butt or I'll hit you or, you
11          know, there's expressed words --
12              MR. WERNER:  No, the question
13          is exactly as I've asked it, okay?
14              And I'll try it again.
15          Q.    Okay.  Did Mr. Lui or anyone
16     else at De Tomaso expressly in words tell
17     you they or someone else was going to
18     hurt you physically?
19          A.    Not in those expressed words.
20          Q.    Okay.  Thank you.
21              MR. WERNER:  Alright.  So
22          let's take a look at another
23          exhibit.
24              (Deposition Exhibit Berris 20,
25          WhatsApp text thread between Ryan
```

```
 1              RYAN C. BERRIS VOLUME I
 2         Berris and Samuel Lui
 3         BERRIS-000158881 to BERRIS-000158884
 4         marked Confidential, was marked
 5         for identification.)
 6         Q.    Alright.  Mr. Berris, I'm
 7    handing you Exhibit 20, okay?
 8         Exhibit 20 is a text thread between
 9    you and Mr. Lui.
10         A.    Yes.
11         Q.    Okay.  So do you agree with
12    me that this, sir, is a text thread
13    between you and Mr. Lui on May 6 of 2022,
14    right?
15         A.    Yes.
16         Q.    Okay.  And you'd agree with
17    me that this is two days after you
18    resigned from De Tomaso, right?
19         A.    From the Board, yes.
20         Q.    Alright.  And this is ten
21    days or so after Mr. Lui threatened you,
22    right?
23         A.    With regards to SEC?
24         Q.    Yes.
25         A.    Yes.
```

Page 249

1          RYAN C. BERRIS VOLUME I

2          Q.     Yeah, okay.

3          So he's asking you to chat.

4          You say, can you connect in the

5     morning, right?

6          A.     Yes.

7          Q.     And just to be precise about

8     this...

9          And you tell him May 6 to "sleep

10    well," right?

11         A.     Would you mind just pointing

12    me to -- oh, okay.  Yes, I see that.

13         Q.     In the middle.

14         A.     Yes.

15         Q.     You tell him to "sleep well."

16         And then you take his burrito

17    order, right?

18         A.     Yes.

19         Q.     Okay.  And then you also --

20    you -- turning the page there.

21         You send him drafts of e-mails that

22    you're going to send to Norman, right?

23         A.     Yeah, I believe those were

24    drafts for What's App, but I can't

25    recall, specifically.

1          RYAN C. BERRIS VOLUME I
2          Q.    But these are things that you
3     prepared, right?
4          A.    No.   Those are -- that is
5     language that Mr. -- that Samuel would
6     draft on my phone, when we were meeting
7     in person.   And then, again, he was
8     telling me that I needed to be very
9     specific with my language and thereby ask
10    me -- hence this example, to send it to
11    him for his review before I sent anything
12    to Norman.
13         Q.    Okay.   Let's take a look at
14    this that's actually on the page.
15         Your testimony is that Mr. Lui
16    drafted this, not you?
17         A.    This -- the language of this
18    was instructed to me by Samuel, yes.
19         Q.    How so?
20         A.    In person.
21         Q.    Okay.   So you took down
22    verbatim in a text thread with him what
23    he said to send as a draft?
24         A.    Not in a -- not in a text
25    thread.

1          RYAN C. BERRIS VOLUME I
2          Samuel would take my phone.  He
3     would draft the note that I was supposed
4     to send to Norman.
5          And this is one instance.  There
6     were others whereby he was reviewing the
7     language that he asked me to send to
8     Norman to make sure that it was right.
9          Q.    Okay.  This e-mail here where
10    you write "draft" and then provide text,
11    did you draft this or did Mr. Lui?
12               MR. ZACH:  Object to the form.
13               It's not an e-mail.
14         A.    These -- all these messages
15    that were sent to Norman were done at the
16    instruction of Samuel.  Samuel's the one
17    that was informing me the precise language
18    to use.
19         Q.    Okay.  I'm asking you a very,
20    like, easy question, okay?
21         This is a text thread you're having
22    with him when you're not together, right?
23         A.    Yes.
24         Q.    Okay.  And so, to the extent
25    that there are words being entered into

Page 252

1          RYAN C. BERRIS VOLUME I
2     your phone, right --
3          A.    Uh-huh.
4          Q.    -- they're being entered by
5     you, right?
6          A.    No.  Samuel would take my
7     phone at some of these meetings, draft
8     the language.
9          On certain occasions, I would tell
10    him that I would like to make it -- revise
11    a bit and make it bit more in the nature
12    which Norman and I had communicated in
13    the past.  Hence, why I would send him a
14    draft for him to review.
15         Q.    Okay.  So are you saying that
16    this draft, this e-mail -- this text that
17    you sent right here was not written by
18    you, it was written by Mr. Lui?
19         A.    It was written my me when it
20    was sent here, but it was done at the
21    instruction of Samuel.
22         Q.    Right.
23         This draft in your text from your
24    phone was typed by your fingers, right?
25         A.    Not necessarily.  Samuel may

1          RYAN C. BERRIS VOLUME I
2     have used my notes app when we were
3     together in person whereby I copied and
4     pasted and revised some language.
5          Q.    Were you together in person
6     when you sent this text?
7          A.    When I sent this to Samuel?
8          Q.    Uh-huh.
9          A.    I don't recall.
10          Q.    Okay.  So you think that
11     you're taking his burrito order, since
12     you two are sitting together?
13          A.    Yeah.  But there is, like, a
14     two-hour gap, right, between 4:59 p.m. to
15     when I sent the drafts to him for his
16     review at 7:09 p.m.
17          Q.    Okay.  So your testimony today
18     sitting here is that you don't know when
19     you drafted this whether you were,
20     actually, physically present with Mr. Lui
21     at this time?
22          A.    Yes.
23          Q.    Okay.  Alright.
24          Nevertheless, you'll agree with me
25     that in this text thread, you're wishing

1           RYAN C. BERRIS VOLUME I
2      someone a good night sleep and taking
3      their burrito orders, who supposedly just
4      days before threatened with physical harm?
5               MR. ZACH:  Object to the form.
6           A.    I disagree with that whereby
7      the threat that I view as my physical
8      harm occurred weeks later.
9           I will say, yes, of course, the
10     dialogue here with Samuel was friendly.
11     But that's because my life's work and
12     everything I had put into De Tomaso was
13     on the line and no one would communicate
14     with me.
15          And Samuel was the one that was
16     relaying -- basically, the intermediary
17     and he claimed he was just trying to help
18     the situation.
19          But now in -- yeah, it's come to be
20     clear that that was not the case.
21          Q.    Okay.  Alright.
22          Again, so Mr. Lui's threatening
23     you.  You don't mention anything about
24     the threats, but you take his burrito
25     order, right?

1              RYAN C. BERRIS VOLUME I
2                  MR. ZACH:  Object to the form.
3         A.      That's speculating.
4         Q.      Really?
5              It's right here.  You're taking his
6     burrito order.
7         A.      On every occasion Samuel
8     would --
9         Q.      "Sour cream [or on the side]
10    on the side?"
11             "You got it."
12             "Cauliflower rice," right, you got
13    it, right?
14             Let's take a look at another
15    document.
16                 MR. ZACH:  [MOTION] I move
17         to strike.  That wasn't a question.
18                 MR. WERNER:  Okay.
19         Q.      Then I'll ask the question
20    again and maybe you can give me an actual
21    truthful answer for a change.
22         A.      This ---
23                 MR. ZACH:  Objection.
24                 Hold on, hold on, hold on.
25                 Let's keep it civil.  Ask the

Page 256

1           RYAN C. BERRIS VOLUME I
2        questions.
3                MR. WERNER:  Alright.
4        Q.    In this e-mail, in this text
5     thread with Mr. Lui, you were taking a
6     burrito order from him, right?
7        A.    Yes.
8        Q.    Okay.
9        A.    Or he was taking from me.  I
10    don't want to waste time but, yeah.
11       Q.    Well, if you look at the top
12    of the page, right?  I mean...
13       A.    Okay, I see.  I see it.
14       Q.    I mean...
15    The guy threatens you.  You're
16    buying him a burrito, right?
17                MR. ZACH:  Objection, asked
18        and answered.
19                You can answer.
20       A.    Mr. -- Samuel did not threaten
21    me on every occasion.  On some occasions
22    including this one he was giving me
23    explicit instructions on how to handle
24    certain matters that he said were coming
25    from Mr. Choi.

```
 1              RYAN C. BERRIS VOLUME I
 2        Q.    You understand that in this
 3    actual text thread, he's only giving you
 4    explicit instructions on is how to place
 5    his burrito order, right?
 6              MR. ZACH:  Objection.  The
 7         document speaks for itself.
 8        A.    I think he'd probably be
 9    afraid to put what he was doing to me in
10    writing.
11              MR. ZACH:  Don't speculate.
12         The document speaks for
13         itself.
14        Q.    Okay.  Alright.
15              (Deposition Exhibit Berris 21,
16         WhatsApp text thread between Ryan
17         Berris and Samuel Lui
18         BERRIS-000158889 & BERRIS-000158890
19         marked Confidential, was marked
20         for identification.)
21        Q.    I'm going to show you
22    Exhibit 21, okay?
23         This is another text thread between
24    you and Mr. Lui.
25         This is you'd agree with me a text
```

Page 258

1              RYAN C. BERRIS VOLUME I
2     thread with Mr. Lui on May 8, right?
3          A.    Yes.
4          Q.    Okay.  And this is, again,
5     after you resigned, right?
6          A.    Yes.
7          Q.    And it's after Mr. Lui
8     threatened you, right?
9          A.    The -- not all of the threats
10    but some, yes.
11         Q.    He had by this point,
12    according to your testimony, threatened
13    you, right, yes?
14         A.    That he and Mr. Choi would go
15    to the SEC, yes.
16         Q.    He threatened you with
17    reporting you to the SEC, right?
18         A.    Yes.
19         Q.    Okay.  Alright.
20         A.    But Mr. Lui, to be very clear
21    -- okay.
22              MR. ZACH:  Just wait until
23         the next question.
24         Q.    No, go ahead, answer.  I want
25    to hear what you have to say.

1          RYAN C. BERRIS VOLUME I
2          A.    Samuel was telling me in
3    person, one, I was the only real point of
4    contact with the company.  It was coming
5    from him.  And he was telling me claiming
6    that he was just trying to help the
7    situation.
8          Q.    Right.
9          A.    And that he was then meeting
10   with Norman in between these meetings
11   that we would have together and then
12   relaying what I was supposed -- the
13   orders that I was supposed to follow.
14         Q.    Okay.  So over a period of
15   between, as I understood, it April 27
16   through May 7, Mr. Lui was making various
17   threats to you, which at one point caused
18   you to fear for your physical safety,
19   right?
20         A.    No.
21         The fear for my physical safety did
22   not occur during that period.  That
23   occurred on or around May 19th.
24         Q.    Okay.  Okay.  That's fine.
25         You didn't document any of these

1              RYAN C. BERRIS VOLUME I

2      "threats" in writing, did you?

3           A.    I --

4                MR. ZACH:  Object to the form.

5           A.    I recall them vividly.  I

6      mean, this --

7           Q.    That wasn't my question.

8           You, Ryan Berris, did not make any

9      contemporaneous notes, records of any

10     threats being made to you by anyone at De

11     Tomaso, right?

12          A.    Yes.

13          Q.    You did not?

14               MR. ZACH:  You have double

15          negative.

16               MR. WERNER:  Yeah, sorry.

17               MR. ZACH:  Okay.

18               MR. WERNER:  Double negatives.

19               Let me go back to my question.

20          Q.    Yeah.

21          So my question just, again, to try

22     to clear this up...

23          It's true, isn't it, that you did

24     not make any contemporaneous notes or

25     records of any threats being made to you

1          RYAN C. BERRIS VOLUME I

2     by anyone at De Tomaso, right?

3          A.    Yes.

4          Q.    Okay.  Alright.

5          Let's take a look at tab -- the

6     Exhibit 21 here.  We started to talking

7     about this.

8          This is another threat between you

9     and Mr. Lui, right?

10          A.    Yes.

11          Q.    Okay.  And, you know, here

12     you write, "Dear Samuel.  It's been a

13     pleasure to finally meet in person and

14     spend quality time together."

15          A.    Yes.

16          Q.    Why would you write that to

17     somebody who had threatened you?

18          A.    Because that was my only real

19     point of communication with the company

20     that I put my life into, one.

21          Two, Samuel had relayed to me during

22     the meetings, again, that he was acting

23     as an intermediary and his orders were

24     coming from Mr. Choi.

25          Q.    Okay.  And so, again, here

Page 262

```
 1           RYAN C. BERRIS VOLUME I
 2    you are.  You write to somebody who at
 3    this point has threatened you.  "It's
 4    clear we align professionally and
 5    personally and a good start to the future
 6    relationship."
 7           Why would you write that?
 8           A.    I wrote that because there
 9    was only downside if I took a negative
10    approach how I viewed at the time.
11           It was clear that, you know, Samuel
12    was getting orders from Norman, one, and
13    it was, also, clear that they were
14    self-dealing with the SPAK.
15           Q.    And then you write, "Looking
16    forward to seeing you again soon, meeting
17    your family and the exciting journey
18    ahead.  Safe travels and speak soon."
19           Why would you write that to someone
20    who had threatened you?
21           A.    Well, again, Samuel was
22    relaying communications from Mr. Choi
23    and, also, Samuel appeared to me, to be
24    honest, at that time, to be trying to
25    help the situation.
```

Page 263

1          RYAN C. BERRIS VOLUME I
2          Samuel, also, appeared to have not
3     done his duties from what I gathered when
4     I did not sign the right language for the
5     resignation letter, which is why Samuel
6     contacted me hysterically crying and said
7     he were having a nervous breakdown and he
8     wanted to go home early to meet his
9     family.
10          Q.    I'm not asking you what
11     Samuel is relaying to you.
12          I'm asking why you're responding
13     the way you are to someone who is
14     threatening you.
15          A.    Because I was trying to
16     salvage a situation that was unexpected
17     and everything I worked for was on the
18     line.
19          Q.    Okay.  I mean, the reality
20     is, Mr. Berris, that at this point in
21     time you had resigned.  Clearly, the
22     company was not happy with you.  And
23     you're engaging with Mr. Lui in hopes to
24     enlist his help getting back into the
25     company's good graces and having your

Page 264

1              RYAN C. BERRIS VOLUME I

2       various misdeeds forgiven, right?

3                    MR. ZACH:  Object to the form.

4              A.    I do not agree.

5              Q.    Okay.

6                    MR. WERNER:  Why don't we

7              take a short break.

8                    MR. ZACH:  Sure.

9                    THE VIDEOGRAPHER:  Thank you.

10             The time is, approximately,

11             p.m.  We're going off the record.

12             This is end of Media 3.

13                   (Recess taken 3:04 to

14             p.m.)

15                   THE VIDEOGRAPHER:  And the

16             time is 3:21.  We're back on the

17             record.  This is the beginning of

18             Media 4.

19             Q.    Alright.  Mr. Berris, I'm

20      going to switch gears and talk to you

21      about something different.

22             You mentioned earlier on in your

23      testimony that Bart Lenaerts is one of

24      the creatives kind of in your network,

25      right?

Page 265

1           RYAN C. BERRIS VOLUME I

2           A.    Yes.

3           Q.    Okay.  And you commissioned a

4     book to be written by Mr. Lenaerts about

5     De Tomaso, right?

6           A.    Yes.

7           Q.    Okay.  And that there were

8     going to be two parts to that book, right?

9           A.    Yes.

10          Q.    And the first one was

11    published by Waft Publishing?

12          A.    Yes.

13          Q.    Okay.  And then the second

14    one was never published, right?

15          A.    To my knowledge, no.

16          Q.    Okay.  Did you have any hand

17    in drafting any of that second book?

18          A.    No.

19          Q.    Have you seen parts of that

20    book?

21          A.    Only now through the

22    production but nothing beforehand, from

23    what I can recall.

24          Q.    Okay.  What do you recall

25    about what you've seen in the production

Page 266

1              RYAN C. BERRIS VOLUME I
2      about parts of that book, if anything?
3                   MR. ZACH:   Objection.
4           A.    You're asking, again, what do
5      I recall about it?
6           Q.    Yeah.
7           A.    It was nice to finally see
8      some of the work that Bart and his wife
9      had done over the years in documenting.
10          Q.    Alright.  "Documenting" what?
11          A.    The revival process of De
12     Tomaso.
13          Q.    Okay.
14               (Deposition Exhibit Berris 22,
15          Chapter 23, "Threesome" DT00175695
16          to DT00175706 marked Confidential,
17          was marked for identification.)
18          Q.    I'm going to hand you what
19     I've just marked as Berris Exhibit 22.
20          Mr. Berris, have you seen this
21     before?
22          A.    I believe I've seen the --
23     actually, I can't recall, specifically.
24     I've seen certain productions with regard
25     to the book.  But I have not personally

1                RYAN C. BERRIS VOLUME I
2      reviewed them all.
3           Q.    Okay.  Do you recall reviewing
4      this part?
5           A.    I do not.
6           Q.    Do you know who wrote this?
7           A.    I'm assuming Bart Lenaerts,
8      but I can't be specific.
9           Q.    I'm not asking you to
10     "assume."
11          A.    I do not.
12          Q.    Okay.  Did you write this?
13          A.    No.
14          Q.    Okay.  So this is a section
15     titled, "Threesome," right?
16          A.    Yes.
17          Q.    Okay.  And if you go down to
18     the bottom of the first page, last
19     paragraph, there is a section that reads,
20     "Ryan recognizes he's experiencing a
21     unique adventure from the first row while
22     his best buds from high school are
23     settling down, tying the knock with cute
24     Connecticut-girls, procreating,
25     establishing lucrative lawyers or Wall

Page 268

1              RYAN C. BERRIS VOLUME I
2      Street careers, Ryan is the one that got
3      away.  He'll have quite the story to
4      amaze his grandchildren with -- enough to
5      fill heroic books."
6              Have you seen that before?
7          A.    I am now seeing it now.
8          Q.    For the first time?
9          A.    Yes.
10          Q.    Okay.  This isn't about De
11      Tomaso; is it?
12              MR. ZACH:  Objection.
13          A.    Yes.
14          I mean, I believe, this is part of
15      Bart's style and the narrative of telling
16      how he portrays a -- the story for his
17      books.
18          Q.    Okay.  This is about you,
19      right?
20          A.    Correct.
21          Q.    Okay.  Was the second half of
22      the book to be about you and your
23      exploits?
24          A.    No.  The second half of the
25      book was about -- I believe, the working

1              RYAN C. BERRIS VOLUME I

2      title was "Resurrection" about the

3      revival of De Tomaso.

4              Q.    Okay.

5              Okay.  Let's take a look at another

6      exhibit.

7                   (Deposition Exhibit Berris 23,

8              Chapter 8, "Friends with Benefits,"

9              DT00175594 to DT00175601 marked

10             Confidential, was marked for

11             identification.)

12             Q.    I'm going to hand you another

13     exhibit, which I'm marking as Exhibit 23.

14     This chapter is called, "Friends With

15     Benefits."

16             A.    I see that.

17             Q.    And then if you look at the

18     bottom, there's a section that says,

19     "Sipping another hellish black coffee,

20     grabbing some refresh breakfast fruit,

21     watching a spindly dear nibbling on an

22     overripe apple in the orchard.  Norman is

23     enjoying his new life to the fullest and

24     despite the five star service, it's not

25     exactly the hotel's merit.  In fact, not

Page 270

```
 1            RYAN C. BERRIS VOLUME I
 2     even the Apollo's mighty thrills make him
 3     feel alive in each pore of his toned
 4     body."
 5            Do you know who wrote this chapter?
 6        A.    I do not.
 7        Q.    Okay.  Do you know what the
 8     point of these two chapters is?
 9               MR. ZACH:  Objection.
10        A.    I can't speak on behalf of
11     the author.
12        Q.    You're overseeing this
13     project, right?
14        A.    No.  So the -- Waft was
15     commissioned by De Tomaso.  But Waft had
16     discretion.  It was to be a Waft book on
17     their revival of De Tomaso, not a De
18     Tomaso explicit book whereby we would
19     give them orders and what to write.  That
20     was not the case.
21        Q.    Okay.  Do you think that these
22     two chapters cast De Tomaso in a favorable
23     light?
24               MR. ZACH:  Objection.
25               He hasn't -- I mean, if you
```

                    RYAN C. BERRIS VOLUME I

1

2          want to read the chapters, he could.

3          But, I mean...

4          A.    Yeah I would have to read

5     both documents to comment.

6          Q.    Yeah.  So these chapters were

7     provided to De Tomaso.

8          Did you not look at them when they

9     were provided?

10         A.    To my knowledge, these were

11    never provided during my time there.

12         Q.    Okay.  Let's take a look at

13    another one, Exhibit 24.

14               (Deposition Exhibit Berris 24,

15         Chapter 21, "Tunnel Vision,"

16         DT00175888 to DT00175895 marked

17         Confidential, was marked for

18         identification.)

19         Q.    Alright.  Mr. Berris, I'm

20    handing you Exhibit 24.

21               MR. ZACH:  Do you mind if I

22         staple these?

23               MR. WERNER:  Go for it.

24         Q.    This one is Chapter 21,

25    "Tunnel Vision."

Page 272

1              RYAN C. BERRIS VOLUME I
2          Have you seen this before?
3          A.    I have not.
4          Q.    Okay.  Go down to the middle
5      of the page.  I'm going to read something
6      to you.  It says, "Wind tunnels are like
7      working girls.  They come in all sorts
8      sizes, ages and stages of willingness.
9      There is only one common ground.  They're
10     either repulsively or revoltingly
11     expensive.  Wind tunnels are a bit like
12     French presidents as well," and it goes
13     on.
14          You've never seen that before,
15     right?
16          A.    Correct.
17          Q.    Okay.  Do you think these
18     chapters are appropriate for a book about
19     the "resurrection" of De Tomaso?
20               MR. ZACH:  Objection.  Same
21          objection.
22               He hasn't read these.  He
23          said --
24          A.    Yeah, I can't comment without
25     reading them in their entirety.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  So sitting here today
3     you don't know whether this would be
4     appropriate or not; is that your
5     testimony?
6               MR. ZACH:  Objection.
7          A.    I can't comment without
8     reading the documents.
9          Q.    Okay.  Can you understand why
10    maybe De Tomaso wouldn't want a book like
11    this published about it?
12              MR. ZACH:  Objection.  Same
13         objection.
14         A.    I can't comment without
15    reading.
16         Q.    Okay.  Well the good news for
17    you is that you're going to have a copy
18    of thee exhibits and you can read them at
19    your leisure.
20         A.    Okay.
21         Q.    Alright.
22              THE WITNESS:  Do you mind
23         stapling this?
24              MR. ZACH:  Yeah.
25         Q.    Okay.  Mr. Berris, I'm going

Page 274

1            RYAN C. BERRIS VOLUME I
2       to switch gears again and show you
3       another document.
4                (There is a discussion off
5            the record.)
6                (Deposition Exhibit Berris 25,
7            Consulting Services Agreement
8            DT0000000100 to DT0000000112
9            marked Confidential, was marked
10           for identification.)
11           Q.    Mr. Berris, I'm going to hand
12      you what's being marked as Deposition
13      Exhibit 25.  And this is a Consulting
14      Services Agreement made the 27th of
15      January 2018 by and between Apollo and
16      Aprivy LLC.
17           Tell me if you recognize that.
18           A.    (The witness reviews the
19      exhibit.)
20           Q.    You're familiar with this,
21      right?
22           A.    Just allow me a few more.
23           Q.    Take your time.
24           A.    Yes.
25           Q.    Alright.  This is a consulting

1                RYAN C. BERRIS VOLUME I

2       agreement between Aprivy LLC and Apollo,

3       right?

4            A.    That is correct.

5            Q.    Okay.  And Aprivy LLC is your

6       personal LLC, right?

7            A.    Yes.

8            Q.    You're the sole member of

9       that entity, right?

10           A.    Yes.

11           Q.    Okay.  And it was signed

12      January of 2018, right?

13           A.    Yes.

14           Q.    And it was signed by you and

15      Mr. Choi, right?

16           A.    That's what it's showing here.

17           Q.    Okay.  And under or pursuant

18      to the consulting agreement, you were to

19      perform certain services for both Apollo

20      and De Tomaso, right?

21           A.    At this time, yes.

22           Q.    What do you mean, "at this

23      time"?

24           A.    So, at the time of this

25      agreement, the reason that there's a

1              RYAN C. BERRIS VOLUME I
2      mention of De Tomaso is because at this
3      time Norman was the owner of Apollo/De
4      Tomaso.  And De Tomaso, the revival plan
5      that we ended up executing had not been
6      discussed or devised.  Therefore, it was
7      not possible to come to a mutually
8      agreeable financial terms for De Tomaso,
9      which is why it mentioned we would
10     discuss those in good faith at a later
11     date.
12          Q.    Okay.  When was this
13     agreement terminated?
14          A.    I'm sure you have it in your
15     record.  But I believe I received a
16     termination notice from Diana sometime in
17     May of 2022.
18          Q.    Okay.  Was that before or
19     after your resignation?
20          A.    This was received --
21          Q.    No.  I'm sorry.  You said --
22          A.    Oh, the termination.
23     The termination notice for the
24     Apollo agreement from Diana was received
25     after my resignation from the Board of De

Page 277

1              RYAN C. BERRIS VOLUME I
2       Tomaso.
3            Q.    Which was May 3rd?
4            A.    Yes.
5            Q.    Okay.  And pursuant to this
6       agreement, you were to be paid $200,000 a
7       year, right?
8            A.    Yes.
9            Q.    And you had the option of
10      earning a performance fee, based on
11      sales, right?
12           A.    Yes.
13           Q.    Okay.  And if you look at
14      Paragraph 2B, you were to seek approval
15      from De Tomaso prior to incurring any
16      expense more than $500, right?
17           A.    Well, this is referring to
18      Apollo.
19           Q.    Okay.  So you were to seek
20      approval from Apollo?
21           A.    Yes.
22           Q.    Okay.  Before incurring any
23      expense above $500, right?
24           A.    Yes.
25           Q.    Okay.  And you'd agree with

1                RYAN C. BERRIS VOLUME I

2      me that there is no equity piece of this

3      agreement, right?

4            A.    Not for Apollo.

5            Q.    Okay.  Is there a part of

6      this agreement that awards you equity at

7      all?

8            A.    In Apollo, no.

9            Q.    Is there a part of this

10     agreement that awards you equity in

11     anything?

12           A.    No.

13           Q.    Okay.  You keep saying

14     "Apollo."

15           A.    I just want to be specific,

16     so it's not confusing.

17           Q.    This agreement relates to

18     services between Apollo and De Tomaso,

19     correct?

20           A.    At a high level but it does

21     not go into the specific financial terms

22     for De Tomaso, which we agreed upon to

23     cover at a later date.

24           Q.    The answer to my question is,

25     yes, right?

Page 279

1               RYAN C. BERRIS VOLUME I

2                    MR. ZACH:   Objection.

3          A.    (No response.)

4          Q.    Can you answer my question?

5          A.    Would you mind just restating

6      the question?

7          Q.    The services that you're to

8      perform under this agreement are for

9      Apollo and De Tomaso, correct?

10         A.    Yes.

11         Q.    And if you want, if you turn

12     to "duties, specifications and

13     compensation," on Exhibit A, which is DT

14     110, there is actually a definition

15     related to services.

16         And it says, "The services will be

17     performed for both Apollo and De Tomaso,"

18     right?

19         A.    Yes.

20         Q.    Okay.  Alright.

21         Now, under this agreement -- and

22     I'm only talking about this agreement,

23     this consulting agreement between your

24     company and Apollo.

25         There is nothing in "this agreement"

Page 280

1              RYAN C. BERRIS VOLUME I
2      that says anything about any equity
3      whatsoever, right?
4              A.    Yes.
5              Q.    Okay.  Alright.
6              And the way that the compensation
7      flowed for the services performed under
8      this agreement is that the compensation
9      would be provided to your LLC Aprivy,
10     right?
11             A.    Yes.
12             Q.    Does Aprivy mean anything,
13     like --
14             A.    For me personally?
15             Q.    Where does the name come from?
16             A.    It's just a name that I
17     thought of back when I established a
18     company, roughly, in 2014.
19             Q.    Is it just like a made-up
20     word?
21             A.    Yeah.  I just had created it
22     with something that I found fitting.
23             Q.    Like you liked the word?
24             A.    I mean, at the time, I did
25     and that's why I used it for the LLC.

1          RYAN C. BERRIS VOLUME I
2          Q.    I'm not -- it isn't a trick
3     question.
4          A.    Yeah.
5          Q.    I'm just asking you.  I don't
6     know that word.
7          A.    It was --
8          Q.    Is it in the dictionary?  I
9     don't know.
10         A.    I don't believe so, no.
11         Q.    Alright.  It's a made-up word
12    that you labeled your company and it has
13    some meaning to you?
14         A.    I believe so, yes.
15         Q.    Okay.  That's -- Apollo was
16    sold in March of 2020, right?
17         A.    Yes.
18         Q.    And even after March of 2020,
19    your company continued to receive
20    compensation under this agreement, right?
21         A.    For my work for Apollo, yes.
22         Q.    Okay.  The services you
23    performed under this agreement related to
24    Apollo and De Tomaso, right?
25              We just looked at that.

```
 1           RYAN C. BERRIS VOLUME I
 2           A.    Yeah.  Up to the point when
 3     De Tomaso -- when Apollo was sold and De
 4     Tomaso completely became its own
 5     independent entity, yeah.
 6           Q.    My question was after Apollo
 7     was sold, you continued to be paid for
 8     your company under this agreement, right?
 9           A.    Yes, I continued to do work
10     concurrently both for Apollo and De
11     Tomaso.
12           Q.    Okay.  Okay.
13           Let's take a look at another -- we
14     don't need to.
15           Let me ask you the question.
16           Would you agree with me subject to
17     check that after March of 2020 Aprivy LLC
18     received more than $360,000 from De
19     Tomaso?
20           A.    I would -- subject to check,
21     that could be realistic.
22           Q.    That sounds right to you,
23     just at a high level?
24           A.    Well, I -- it's -- what comes
25     to mind is what was put in your
```

1            RYAN C. BERRIS VOLUME I
2      counterclaims.  And I think that a lot of
3      that related to in full or in part to
4      expenses.
5            Q.    Alright.  So would you agree
6      with me, again, subject to check that
7      after March of 2020, Aprivy LLC received
8      more than a half million dollars from
9      Apollo?
10            A.    Would you mind just saying
11      the date again?
12            Q.    March of 2020, basically,
13      after Apollo was sold.
14            A.    Subject to check my records,
15      that could be possible, yes.
16            Q.    Okay.  Now, I think you're
17      going to disagree with me on this because
18      you've tagged this onto some of your
19      answers.
20            But after Apollo was sold, you
21      weren't doing work for Apollo, right?
22            A.    I disagree.
23            Q.    Okay.  What did you do?
24            A.    The -- what I was told from
25      Mr. Choi and what I continued to do for

1              RYAN C. BERRIS VOLUME I
2    Apollo was oversee the client management,
3    some of the marketing and, also, the
4    remaining closing of delivery of Apollo's
5    to the clients, which I continued to do
6    concurrently with my work at De Tomaso
7    and I was still working on towards in May
8    of 2022 and then I'm still incurring
9    expenses for.
10          Q.    Okay.  Let me ask you this.
11          After Apollo was sold, did you
12    participate in any marketing or corporate
13    events for Apollo?
14          A.    Subject to checking records,
15    yes.
16          Q.    Did you go to Hong Kong or
17    China for Apollo?
18          A.    After Apollo was sold?  I do
19    not believe so.
20          Q.    Okay.  Did you participate in
21    any corporate planning for Apollo after
22    it was sold?
23          A.    Subject to check my records,
24    I believe so.
25          Q.    What did you do?

Page 285

1          RYAN C. BERRIS VOLUME I
2          A.    Again, I would need to check
3    my records, but I was managing all the
4    existing clients for Apollo.  I was doing
5    driver training with them.  I was
6    handling customer service, requests that
7    they had, management of the relationships.
8    And, also, I was working amongst other
9    things in assisting in handling the
10   import of two forthcoming Apollo
11   E-deliveries whereby I established two
12   LLCs where the principals are -- one is
13   Evan Zeigler and one is -- I believe, his
14   name is George or Jorge Santiago.  They
15   are both employees at Miller Motorcars.
16        And those were established in order
17   to aid the forthcoming home built process
18   for two Apollo E-deliveries.
19        However, I wasn't able to fulfill
20   those duties, because I was working on
21   this through May and, in fact, I am still
22   paying for those two LLCs.
23        Q.    Early on in that answer, you
24   referenced checking your records.
25        Which records would you need to

Page 286

1          RYAN C. BERRIS VOLUME I
2     check?
3          A.    Files in my computer.
4          Q.    Which computer?
5          A.    The computer that has been
6     given to -- I don't know the right term
7     for the vendor but Haystack.
8          Q.    Okay.  To be clear, these are
9     records on a computer that you provided
10    to your Counsel as part of this discovery
11    process?
12         A.    Correct.
13         Q.    Okay.  And so, presumably,
14    the records you reference have been
15    produced in this litigation?
16         A.    I would assume so, yes.
17         Q.    Okay.  You mentioned some
18    clients that you were still working for
19    after Apollo was sold.
20         Which clients were those?
21         A.    Most of the Apollo clients
22    including Michael Loke, Barry Skolnick,
23    Carlos Peralta, Bill Pepe, Yoko Yama San
24    and his office, because I don't think he
25    spoke English.  So there was always, you

Page 287

1          RYAN C. BERRIS VOLUME I
2     know, intermediary who was working on his
3     behalf.
4          Q.    Any others?
5          A.    Not that I can recall at the
6     moment.
7          Q.    Okay.
8          A.    Oh, yes, Benn Godenzi, who is
9     an Apollo-E owner.
10         And then at the moment, I can't
11    recall any others.
12         Q.    Okay.  Now, aside from this
13    Consulting Services Agreement that we are
14    been looking at, which has been marked as
15    Exhibit 25, you would agree with me that
16    you don't have any -- you or Aprivy don't
17    have any other written employment
18    agreement with De Tomaso, right?
19              MR. ZACH:  Object to the form.
20              But go ahead and answer.
21         A.    "Written," meaning, both
22    parties countersign, no.
23         Q.    Written --
24         A.    Well, I want to be specific,
25    though.

1          RYAN C. BERRIS VOLUME I
2          So you're regarding an employment
3     contractual relation and not, let's say,
4     corporate statutory documents for De
5     Tomaso entities?
6          Q.    What I'm referring -- yes.  I
7     am not referring to -- and we can talk
8     about the LLC agreement.  Let's just put
9     that aside for now.
10          A.    Sure.
11          Q.    What I'm asking is, aside
12     from this Consulting Service Agreement at
13     Exhibit 25, there is no other employment
14     or consulting agreement between you and
15     Apollo or De Tomaso that is in writing,
16     signed, executed?
17          A.    Yes.
18          Q.    Okay.  Alright.
19          Now, I understand from your
20     Complaint that you allege that you
21     entered a binding agreement with De
22     Tomaso by accepting an offer to provide
23     services to the company in exchange for
24     an annual salary of $400,000, payable
25     monthly, a 2 percent commission on all

1           RYAN C. BERRIS VOLUME I

2      sales and a 10 percent stake in the

3      company.

4           Do I have that right?

5           A.    Yes.

6           Q.    Okay.  And you, also, allege

7      that you are entitled to a Porsche GT of

8      some sort, right?

9           A.    It was a Porsche GT3 and

10      Chassis 60 for the P72, which is

11      something that we discussed.

12           Q.    So two cars?

13           A.    Yes.

14           Q.    Okay.  When was this offer

15      communicated?

16           A.    The initial offer?  So Mr.

17      Choi had -- and I had ongoing discussions

18      about a financial arrangement for me for

19      De Tomaso in order to retain me.  These

20      became somewhat granular going back to

21      Fall Q3/Q4 of 2019 because it was on

22      around the time when we were delivering

23      two Apollo IEs, one to Barry Skolnick and

24      one to Michael Loke, whereby certain

25      things were not making me comfortable.

1          RYAN C. BERRIS VOLUME I
2          In Japan, I had a sit down meeting
3     with Norman Choi and the designer Joe
4     Wong and, basically, telling them that I
5     didn't know if I wanted to keep doing
6     this anymore.
7          And they both were saying that they
8     would do whatever they could do in order
9     to retain me in the company and that, you
10    know, basically, if I agree that De
11    Tomaso could be mine to handle as I wish.
12         Q.    Did you understand my
13    question was, actually -- I was asking
14    you about a temporal frame, as in when
15    was this offer communicated to you?
16         A.    Yes.  So --
17         Q.    Can you tell me when this
18    offer was communicated to you?  And by
19    "when," I want a date and a time.
20         A.    Sure.
21         So Mr. Choi and I got into the
22    specifics of my De Tomaso financial
23    package after the closing of the Apollo
24    deal, which from what I can recall
25    occurred in March of 2020.

1          RYAN C. BERRIS VOLUME I
2          Norman then said, you know, he --
3     I'm working to answer your question
4     because there were a series of
5     discussions that we had --
6          Q.    You're not working to answer
7     my question.
8          My question was very specific.  I
9     asked you dates and times.
10          A.    So Norman told me that he
11     would work on a financial proposal for me
12     and he would come back.
13          Q.    When did he tell you that?
14          A.    In -- in the first half of
15     2020 -- 2020, yes.
16          Q.    That's a six-month period.
17          Can you give my more specifics on
18     that?
19          A.    It was between the closing of
20     the Apollo deal and the end of June.
21          Q.    So sometime between March and
22     June of 2020, Mr. Choi communicated the
23     offer that we just discussed to you?
24          A.    Yes.  The first specific
25     offer that he presented to me was the

1             RYAN C. BERRIS VOLUME I

2     10 percent equity.  And he asked me if I

3     was comfortable with that, when I said,

4     yes, and I accepted it.

5          The remaining terms such as salary

6     occurred over subsequent discussions.

7          Q.    Okay.  Again, I'm just going

8     to come back to my question, which is

9     when -- let's talk about the 10 percent

10    equity.

11         When did Mr. Choi communicate that

12    to you?

13         A.    Sometime between the closing

14    of the Apollo deal.  If I were to try to

15    pinpoint a definitive range, it was over

16    the months of April and May of 2020.

17         Q.    Okay.  Where did he

18    communicate this to you?  Where were you?

19         A.    So the first definitive thing

20    we had discussed, which was the equity, I

21    believe I was in my office in Connecticut

22    or some other location in Connecticut, if

23    I can recall correctly.

24         Q.    And this offer was

25    communicated to you by Mr. Choi?

1          RYAN C. BERRIS VOLUME I

2          A.    Yes.

3          Q.    Okay.  And when was that

4     offer to take effect?

5          A.    It was to take effect

6     immediately.

7          Shortly after presenting this to

8     me, Mr. Choi and I then had discussions

9     with various Counsels which included Loeb

10    & Loeb.  It, also, included Linda Rhodes

11    at Mayer Brown.

12         Q.    Okay.  So you understood that

13    this arrangement was going to be an

14    agreement that would be put in writing?

15         A.    Yes, that that was the spirit.

16         Q.    Right.

17         That's why lawyers were involved?

18         A.    Yes.  But, initially, when we

19    were discussing with Counsel, with Loeb &

20    Loeb and with Mayer Brown, there were a

21    couple of different matters that were in

22    relation to this, which took priority.

23         And that was because on or around

24    this time, Mr. Choi and his family had

25    intent to move to the US and have a

```
 1              RYAN C. BERRIS VOLUME I
 2     residence here.  And as is shown in the
 3     communications with Counsel, who was
 4     advising us on this, was that there could
 5     be potential tax implications for me when
 6     I took possession of the stock.
 7          And when I was speaking with
 8     Norman, he had let me know and I believe
 9     this is supported in the communications
10     with Counsel that it was Mr. Choi's wish
11     to have a stepped up basis for his shares
12     to potentially limit the tax liabilities
13     that he would have as part of his
14     relocation to the US.
15          During this period in parallel
16     there was a --
17          Q.    I mean, you can go on and on.
18              MR. ZACH:  Don't interrupt
19          the witness.  Let him finish his
20          answer and then --
21              MR. WERNER:  He's not
22          answering the question.  He goes
23          on every time --
24              MR. ZACH:  It's against the
25          rules to interrupt the witness.
```

Page 295

1           RYAN C. BERRIS VOLUME I

2               Continue.

3        Q.    Go ahead and answer and then

4     we'll -- go ahead --

5        A.    So --

6        Q.    -- finish your answer, please.

7        A.    So, during this period in

8     parallel, Mr. Choi had a third-party

9     evaluation report made for De Tomaso,

10    which valued the company at, roughly, 400

11    million US dollar.  And that then would

12    become upon me coming possession of the

13    equity, 10 percent, it was being advised

14    and communicated to me that as a US

15    citizen, I could be responsible for a tax

16    liability on 40 million in ordinary

17    income, which could be in excess of

18    $20 million.  And those are funds that I

19    did not have in order to go ahead and

20    take possession.

21          So under that -- those terms, you

22    know, Norman had -- we were very close

23    and he told me, are you okay with this?

24          I said, I'm fine.

25          And he told me that in doing so, in

1          RYAN C. BERRIS VOLUME I
2     me assisting him in becoming a US citizen
3     or having a residence here and relocating
4     some of his assets, that he would hold my
5     shares for me and this was something that
6     he told me he had done in previous deals,
7     notably, his deal with Remock where Mr.
8     Choi told me he was never a listed
9     shareholder and that his friend was
10    holding the shares for him.
11         I trusted Mr. Choi and which is why
12    I did not take possession of the stock at
13    that time.
14         Q.    Are you done?
15         A.    Yes.
16         Q.    Okay.  [MOTION] I'm going to
17    move to strike all of that as utterly
18    nonresponsive to a very simple question I
19    asked you.
20         And if you want to continue in on
21    this vein, that's fine.  But we're going
22    to be here a long long time, okay?
23         I asked you a very simple question.
24    And I'll ask it again, because somewhere
25    in that word salad, you answered it,

RYAN C. BERRIS VOLUME I

1
2    which was...
3        Lawyers were involved, right,
4    because the idea was that it would be --
5    this deal would be subject to a written
6    instrument, right?
7                MR. ZACH:  Object to the form.
8        A.    No, the discussion with
9    Counsel was with regards to how, one,
10   structure a new US entity for De Tomaso,
11   which then coincided with how the equity
12   would be structured, the domicile of
13   those entities and then associated tax
14   impacts for Mr. Choi and myself.
15       Q.    Yeah, the point of having
16   lawyers involved is so that they can
17   write this all down and have the parties
18   execute agreements around it, right?
19               MR. ZACH:  Object to the form.
20       A.    In some cases, yes.
21       Q.    What do you mean, "in some
22   cases, yes"?  What does that even mean?
23       A.    We were just not discussing,
24   you know, papering our agreement with
25   attorneys.

1                RYAN C. BERRIS VOLUME I

2          What was taking priority was that

3      Mr. Choi wanted to ensure that he was

4      doing what he could to aid his move to

5      the US, because he was uncomfortable with

6      what was going on in Hong Kong at the

7      time.

8          Q.    I didn't ask you anything

9      about Mr. Choi's comfort level with the

10     geopolitical state of the world including

11     in Hong Kong or what he was doing to

12     protect his business interest.

13          I'm asking you, Mr. Berris, about

14     the supposed offer that you received and

15     whether because lawyers were involved, it

16     was going to be subject to a written

17     document or not.

18               MR. ZACH:   Object to the form.

19          A.    Speaking directly to that

20     point, in -- I believe, in May of 2021,

21     we had -- Mr. Choi, myself and Linda

22     Rhodes from Mayer Brown had specific

23     discussions pertaining to any type of

24     conditions that were tied to the equity

25     that was given to me by Mr. Choi and on

Page 299

1            RYAN C. BERRIS VOLUME I
2       that -- in those discussions that Linda
3       -- Linda Rhodes explicitly asked Mr. Choi
4       if there was any performance clauses or
5       conditions tied to this for a vesting
6       period.
7            And Mr. Choi said, no, this is
8       sweat equity.  Mr. Berris earned it.
9            And thereafter the Counsel,
10      including Mayer Brown and also Loeb &
11      Loeb, was advising that if I were to take
12      position as a US citizen, I could incur a
13      substantial tax liability.
14           Q.    Was your compensation
15      agreement going to be put in writing, yes
16      or no?
17           A.    At a later date, yes.
18           Q.    Okay.  And it was going to be
19      put in writing at a later date because of
20      other things happening at the company; is
21      that right?
22           A.    No, it's actually at my
23      discretion.
24           Q.    Okay.  It was going to be put
25      in writing at a later date at your

```
 1            RYAN C. BERRIS VOLUME I
 2     discretion?
 3            A.    Not "at a later date."  I
 4     could have taken possession at the time
 5     Mr. Choi first offered me and I accepted.
 6            And, also, I could have chosen to
 7     move into a formal agreement at that
 8     time.
 9            However, I was incredibly busy.
10     This was not an urgent matter.
11            What was urgent to me was helping
12     my friend, who was family, assist his
13     relocation to the US and any impacts on
14     his personal assets.
15            Q.    How long was it expected that
16     Mr. Choi would hold your shares?
17            A.    It was up until the point
18     when I wanted to take possession and what
19     was comfortable for me because I was
20     deferring my compensation from the
21     company would be upon a liquidity event
22     whereby we had outside investors come in
23     De Tomaso and, therefore, and I could
24     afford to sell a portion of the stock in
25     order to cover the tax liability.
```

Page 301

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  My question was "how
3     long."
4          Would that be years?
5               MR. ZACH:  Asked and answered.
6          Q.    Would it be years?
7          A.    Would you mind just stating
8     the question again?
9          Q.    I'm trying to make sense of
10     the verbal hash that you're dishing out,
11     okay.
12          And so what I'm asking you is --
13               MR. ZACH:  Well, enough.
14          You're not going to -- you're not
15          going to characterize --
16               MR. WERNER:  No, no.
17               MR. ZACH:  Stop.
18               You're not going to
19          characterize the witness as --
20               MR. WERNER:  Calm down.
21               MR. ZACH:  -- "verbal hash."
22          You're not -- enough of the rude
23          commentary.  You can ask your
24          questions in a professional manner.
25               MR. WERNER:  Sure.  I'm

Page 302

1    RYAN C. BERRIS VOLUME I
2    asking them in a professional manner
3    and I'm describing accurately.
4         And you don't need to get
5    upset.  I can --
6         MR. ZACH:  I'm getting upset
7    because you said, "word salad"
8    and --
9         MR. WERNER:  I can understand
10    why you would be frustrated with
11    your client's testimony.
12         MR. ZACH:  Look it --
13         MR. WERNER:  I mean it's
14    utter nonsense.
15         MR. ZACH:  -- you're more
16    experienced and you're a better
17    lawyer than that.
18         MR. WERNER:  Let me just
19    ask the questions, okay?
20    Q.    I'm asking you -- you said
21    the deal could be done at your discretion
22    and you mentioned a liquidity event,
23    okay?
24         What was the anticipated timing of
25    the liquidity event?  Was with it weeks,

1              RYAN C. BERRIS VOLUME I
2      was it days, was it months, was it years?
3           A.    There was no anticipated
4      timing.
5           Q.    So you had no idea?
6              MR. ZACH:  Object to the form.
7           A.    Your -- I -- I would be
8      speculating.
9           Q.    Okay.
10          A.    It was at my discretion and
11     Mr. Choi -- our discussions were always
12     that upon the time when we would find an
13     investor, we would ideally, if we could,
14     try to find the right individual who
15     would allow the company to grow in a more
16     organic way versus something that is, you
17     know, more tied to aggressive private
18     equity of venture capital.
19          Q.    And what was your sense of
20     timing around all of that?
21          A.    "Timing" with regards to me
22     taking possession of the stock?
23          Q.    No, how long would that take,
24     what you just described.
25              How long would that take?

Page 304

1              RYAN C. BERRIS VOLUME I
2         A.    Of bringing on board
3    investors?
4         Q.    Yeah.
5         A.    That's -- I would be
6    speculating.  There's too many unknown
7    variables.
8         Q.    Right.
9         Have you ever been awarded any kind
10   of equity in any business previously?
11        A.    Outside of my own companies,
12   no.
13        Q.    Okay.  Did you hire a lawyer
14   to represent you in connection with this
15   equity transaction that you've described?
16        A.    I did not.
17        Q.    Okay.  And so the lawyers
18   that you described who were involved in
19   this, those were lawyers for the company,
20   right?
21        A.    Yes, those are lawyers that
22   Mr. Choi and I engaged on behalf of the
23   companies.
24        Q.    And you understand that those
25   lawyers did not represent your interest

1               RYAN C. BERRIS VOLUME I
2       Mr. Berris, right?
3                  MR. ZACH:  Object to the form.
4           But...
5           A.    On a personal capacity, I
6       guess, it could be viewed that way.
7           Q.    Okay.  Did you view this
8       transaction was significant and impacting
9       your personal interest?
10          A.    I viewed this -- this was one
11      of the most material events in my life
12      and I was closer with Mr. Choi than most
13      everyone in my family and I trusted him.
14          Q.    Okay.  And, just to be clear,
15      you did not retain Counsel to represent
16      your interests, right?
17          A.    Correct, because I felt it
18      was not necessary.
19          Q.    Okay.  Alright.
20          Okay.  Let's talk about the
21      different pieces of that, right?
22          There was a Porsche that you were
23      supposed to get, right?
24          A.    Yes.
25          Q.    Did you ever get it?

Page 306

1          RYAN C. BERRIS VOLUME I

2          A.    No.

3          Q.    Did you ever ask, hey, Mr.

4     Choi, where is my Porsche?

5          A.    An order -- specification

6     order was submitted to Robertino Will,

7     who had a strong relationship with

8     Porsche.  I believe this is recorded in

9     my WhatsApp's.

10         Q.    You submitted the request?

11         Who submitted this specification?

12         A.    Robertino asked me and said

13    that he could get an allocation for the

14    car before what someone normally in the

15    market would be able to because the car

16    had a waiting list.  And so Robertino

17    said he would handle this matter.

18         And I sent him, from what I can

19    recall, a specification for the GT3

20    sometime in I recall in 2022.

21         Q.    And no car was provided to

22    you at any point, right?

23         A.    No.  I mean, even though

24    Robertino had a strong relationship,

25    there is still a waiting period for that

1           RYAN C. BERRIS VOLUME I
2     exclusive vehicle.
3           Q.    Okay.  So, to answer my
4     question, no car was ever provided to
5     you, right?
6           A.    Correct.
7           Q.    And to get back to the
8     question I asked you a couple of
9     questions ago, to answer my question, you
10    did not complain or raise an issue with
11    anyone at De Tomaso about not getting the
12    Porsche?
13          A.    No, because it's common that
14    the waiting list for those cars to be
15    specifically built can be months, if not
16    years.
17          Q.    Okay.  The employment
18    agreement that was on the table that you
19    say orally, how long was that supposed to
20    last?
21          A.    Indefinitely.  Mr. Choi and I
22    were the partners.  We were only people
23    in the company together.
24          Q.    Okay.  So more than a year?
25          A.    Yes.

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  Under the new oral

3     discussions that you had around an

4     employment agreement, were there any new

5     employment obligations that you were

6     taking on beyond those that you were

7     performing under the Consulting Services

8     Agreement executed between Apollo and

9     Aprivy?

10         A.    So, just to make sure I'm

11    understanding correctly, you're asking if

12    I engaged other professional contractual

13    obligations with other parties outside of

14    Apollo/De Tomaso?

15         Q.    No, that's not what I'm

16    asking.

17         What I'm asking is the -- when you

18    talk about the employment arrangement,

19    right, you talk about the things -- the

20    benefits that are flowing to you, right?

21         A.    Uh-huh.

22         Q.    What I'm asking to you is,

23    were there any additional obligations

24    that you took on beyond the ones that

25    were outlined in Exhibit A of the

Page 309

1          RYAN C. BERRIS VOLUME I
2     Consulting Services Agreement that has
3     been marked as Exhibit 25?
4          A.    So I just want to understand
5     the question.
6          So what do you mean by
7     "obligations"?
8          Q.    You don't know what the word
9     "obligations" mean?
10          A.    I do.  But it could be quite
11     general.  So I just want to make sure I'm
12     being specific.
13          Q.    Do you understand that under
14     the Consulting Services Agreement, Aprivy
15     undertook certain obligations?
16          A.    For performance or services,
17     yes.
18          Q.    Okay.  So what I'm asking you
19     is, in discussing this new arrangement,
20     were there other obligations that you or
21     your company were taking on beyond those
22     that are identified in the Consulting
23     Services Agreement identified at
24     Exhibit 25?
25          A.    I don't understand the

1          RYAN C. BERRIS VOLUME I
2     question, honestly.  It's too vague.
3          Q.    You can't answer the question?
4          A.    If you could rephrase it.
5          Q.    You can't answer it, as it's
6     framed; is that right?
7          A.    I don't feel comfortable, yes.
8          Q.    Okay.  Alright.
9          Let's take a look at 25, okay?  And
10    go to DT110.
11         A.    (The witness complies.)
12         Q.    You see the section titled,
13    "Duties"?
14         A.    Yes.
15         Q.    Okay.  Did you understand
16    that those were things that your company
17    and you were going to be providing to
18    Apollo and De Tomaso?
19         A.    As far as the separate
20    agreement, yes.
21         Q.    I'm talking about this
22    agreement, Mr. Berris.
23         A.    You're talking about this
24    agreement, the Apollo agreement?
25         Q.    Yeah.  I'm talking -- I'm

1          RYAN C. BERRIS VOLUME I
2      just asking you, you understand that
3      Exhibit A outlines certain duties for you
4      and services you are to provide, right?
5              A.    Yes.
6              Q.    So let's talk about this
7      other oral arrangement and discussions.
8              What I'm asking you is, what other
9      obligations, duties, services were you to
10     be performing under that oral arrangement
11     beyond what's identified here at Exhibit
12     A?
13             A.    It was, basically, agreeing
14     with Mr. Choi that we would be partners.
15     I would forego any future opportunities,
16     as I did, including inheriting my father's
17     business.  And thereby I dedicated my
18     life and I was working countless hours
19     and I had no social life.  I dedicated
20     everything, everything.
21             Q.    So the obligations under the
22     oral agreement were for you to give up
23     "inheriting your father's business,"
24     "dedicating your life" to De Tomaso,
25     giving "countless hours" and having "no

```
 1              RYAN C. BERRIS VOLUME I
 2      social life"?
 3              A.    This is the understanding
 4      that we had together.
 5              Q.    Okay.  Alright.
 6              A.    But, to be specific, it's not
 7      saying that Mr. Choi was telling me I
 8      could have no social life.
 9              It was that as really a two-man
10      operation at that time, I -- I was unable
11      to have any type of extracurricular life
12      or social network outside of every one
13      that was involved in the company or the
14      clients, which then became my friends and
15      my family.
16              Q.    Yeah, okay.  That's fine.
17              You would agree with me that there
18      are no written documents of any kind,
19      e-mails, so on, that actually document
20      the terms of any new employment agreement
21      for you, right?
22                  MR. ZACH:  Object to the form.
23              A.    I don't agree.
24              Q.    Okay.  Which documents are
25      there?
```

Page 313

1          RYAN C. BERRIS VOLUME I

2          A.    I can't recall, specifically,

3      the Bates Numbers.

4          But what I can say is I invoiced De

5      Tomaso in February of 2022, if I recall

6      correctly, at the insistence of Mr. Choi

7      and Diana.

8          In the previous years, Mr. Choi was

9      telling me that I could draw a salary, if

10     I wanted to, but I didn't want to.  I was

11     putting everything that I could,

12     contributing as much as I could.

13         But.  There is that invoice.  There

14     was a direct payment, which matched the

15     $400,000 a year, as part of the terms of

16     the agreement that Mr. Choi and I had.

17         Q.    Okay.  So there is an invoice

18     and you were paid some money.

19         Anything else, like, documenting,

20     like, here is what I'm going to receive

21     and here's what I'm going to give to the

22     company?

23              MR. ZACH:  Object to the form.

24              But...

25         A.    Yeah.  And it's -- there was

Page 314

1              RYAN C. BERRIS VOLUME I
2       a lot of communications with regards to
3       my equity and my package with, again,
4       Counsel, Loeb & Loeb, Mayer Brown, some
5       investment banks that we'd be in
6       discussions with such as Citibank, J.P.
7       Morgan, Deutsche Bank.  There may be some
8       others.  But those are all that I can
9       recall offhand.
10          Q.    Okay.  What I'm getting at is
11      did De Tomaso ever provide you a written
12      offer that aligns with the things that
13      you're saying you were to receive under
14      this agreement?
15          A.    They never did, because it
16      was at my discretion.  I was the one that
17      was creating the agreements for the
18      employees and I was the one that would
19      create the agreements for -- even in this
20      case -- myself that I would then review
21      with Mr. Choi.
22          Q.    So you were going to draft up
23      your own employment agreement for the
24      company?
25          A.    Just like I did for the

```
 1            RYAN C. BERRIS VOLUME I
 2      Apollo agreement.
 3           Q.    Did you do that?
 4           A.    I created a draft agreement,
 5      but I never transmitted it to Mr. Choi.
 6           Q.    Okay.  And did you ever in
 7      writing say, hey, I accept your offer as
 8      follows?
 9                 MR. ZACH:  Object to the form.
10           A.    I cannot recall, subject to
11      reviewing documents.  But there are many
12      instances that infer that between myself
13      and Mr. Choi and others.
14           Q.    Okay.  The answer to my
15      question is, no, you didn't write
16      something, specifically, that said, I
17      hereby accept the offer as follows X, Y,
18      Z, blah, blah, blah, right?
19                 MR. ZACH:  Object to the form.
20                 Go ahead.
21           A.    Not in that specific language.
22           Q.    Did you do it in any language?
23           A.    There are -- without subject
24      to reviewing documents, there are many
25      communications with Mr. Choi and I and
```

Page 316

1          RYAN C. BERRIS VOLUME I
2     other parties that help substantiate this.
3          Q.    Okay.  Did you say, this is
4     to confirm that you promised to give me
5     10 percent equity for my continued
6     employment on the following terms?
7          A.    Nothing with that specific
8     language that I can recall.
9          Q.    Did you write to anyone at De
10    Tomaso and say, this confirms my continued
11    employment in exchange for a Porsche GT3?
12         A.    I did not outside of sending
13    the order to Robertino.  There may be
14    other communications relating to that,
15    but I cannot recall offhand.
16         Q.    Did you ever send anyone to
17    De Tomaso and say, this confirms my
18    entitlement to 2 percent commission on
19    the sale of De Tomaso vehicles?
20         A.    Not that I can recall offhand.
21         Q.    Did you ever confirm in
22    writing to anyone at De Tomaso that this
23    is confirming my new salary of $400,000 a
24    year?
25         A.    I believe it was to Diana

1          RYAN C. BERRIS VOLUME I
2    when I was invoicing.
3          Q.    Did you send an invoice for
4    $400,000?
5          A.    No, it was prorated for that
6    monthly amount.
7          Q.    Then please just focus on my
8    question, which was, did you write to
9    anybody and say, this confirms my annual
10    salary of $400,000?
11               MR. ZACH:  Object -- object to
12         the form.
13          A.    I did not, but Mr. Choi
14    confirmed it in his productions to us.
15          Q.    Okay.  So the answer to my
16    question is, no, you didn't do anything,
17    right?
18               MR. ZACH:  Object to the form.
19          A.    Well, what does it mean
20    "anything"?
21          Q.    You didn't send the type of
22    communication that I just described, you,
23    Ryan Berris?
24               MR. ZACH:  Object to form.
25          A.    Not explicitly.  It was

1           RYAN C. BERRIS VOLUME I

2    unneeded.  It was implied.  Hence why --

3           Q.    That wasn't my question.

4           A.    -- I invoiced for that amount.

5           Q.    It wasn't my question, okay.

6           My question was, did you, Mr.

7    Berris, ever confirm your entitlement to

8    a $400,000 salary from De Tomaso to

9    anyone at De Tomaso?

10          A.    To Norman and Diana.

11          Q.    Okay.  And when you say, "to

12   Norman and Diana," you're referencing the

13   invoice, right?

14          A.    Yes.

15          Q.    And that invoice was for how

16   much?

17          A.    I don't recall offhand.  But

18   it was in line with being prorated for

19   400,000 over 12 months.

20          But then I believe Diana came back

21   to me and said, Norman didn't want me to

22   include January.  So then it was reduced

23   to 11 months, something along those

24   lines.

25          Q.    So, the answer to my

1          RYAN C. BERRIS VOLUME I
2     question, aside from the invoice you just
3     referenced, you didn't actually expressly
4     communicate your acceptance of $400,000
5     salary, right?
6               MR. ZACH:  Objection.
7          A.    I disagree.
8          Q.    Okay.  And you disagree
9     because of the invoice, right?
10         A.    That but I had many verbal
11    communications with Defendants pertaining
12    to this.
13         Q.    I'm asking you about written
14    communications.
15         A.    That I -- subject to
16    reviewing the documents, the best one I
17    can bring up at the moment was the
18    invoice that was sent to Diana and
19    Norman.
20         Q.    Okay.  We'll try it one more
21    time.
22         I'm asking you, did you, Ryan
23    Berris, confirm in writing to anyone at
24    De Tomaso your entitlement to a $400,000
25    salary?

1             RYAN C. BERRIS VOLUME I
2               MR. ZACH:  Objection, asked
3          and answered.
4               MR. WERNER:  It has not been.
5          It's been asked lots and lots of
6          time but not answered.
7          A.    In my view, yes.
8          Q.    Okay.  And, "in your view,
9      yes," you're answering that based on the
10     invoice, right?
11         A.    Yes, subject to reviewing
12     other documents.
13         Q.    What do you mean "subject to
14     reviewing other documents"?
15         A.    The relationship with Mr.
16     Choi and I expanded many years and there
17     are many documents and I cannot recall
18     all of them offhand.
19         Q.    Right.
20         But you -- this litigation is like
21     your full-time job right now, right?
22         A.    Yes.
23         Q.    Okay.  And you've reviewed
24     all of the documents, right?
25         A.    I --

Page 321

1              RYAN C. BERRIS VOLUME I
2                    MR. ZACH:  Object to the form.
3                    But...
4         A.    Yeah.  I don't know if
5    there's been subsequent productions, but
6    I've reviewed all of the productions from
7    the Defendants thus far.
8         Q.    Right.
9         So when I ask you and you say,
10   "subject to check," you've gone through
11   all the documents, right?
12        A.    Yes.
13        Q.    That's like as a full-time
14   job?
15        A.    Yes.
16        Q.    Like, you're not even seeking
17   any other employment, you're focused on
18   this as a time job, right?
19                    MR. ZACH:  Objection.
20        Objection.
21        Q.    This litigation is your job,
22   correct?
23        A.    I am choosing to dedicate my
24   time in seeking justice.
25            And in your production from your

Page 322

1              RYAN C. BERRIS VOLUME I
2      clients, Mr. Choi in writing confirms the
3      400,000.
4          Q.    Okay.  Surely, you understand
5      that's not the question I've asked you a
6      lot of times.  So I'm going to move on
7      and go with the answers that you have not
8      really given and we'll just leave it at
9      that.  But that's fine.
10         The 2 percent commission, did you
11     ever receive a 2 percent commission from
12     De Tomaso?
13         A.    I never received any
14     commissions from De Tomaso, as I never
15     invoiced for commissions.
16         Q.    Okay.  Did you ever raise in
17     writing the fact that you never received
18     a 10 percent grant of equity?
19              MR. ZACH:  Objection to form.
20         A.    I -- as it was at my
21     discretion when to take possession, there
22     was no need.
23         Q.    Okay.  Were you obligated to
24     make any capital contribution to the
25     company in exchange for the equity?

Page 323

1                RYAN C. BERRIS VOLUME I
2          A.    No.
3          Q.    Okay.  So the 10 percent
4    equity that you say that you were
5    entitled to, is it your understanding
6    that you could -- had you discretion when
7    to cash that out?
8          A.    I had discretion when to take
9    possession.
10         Q.    Okay.  But then my question
11   is about liquidating the interest.
12         Were there any restrictions around
13   how or when you could liquidate the
14   equity interest?
15         A.    There were no restrictions
16   that were discussed.
17         Q.    So you could just sell it
18   whenever?
19         A.    In theory, yes, but it's not
20   something that I would do because Mr.
21   Choi and I were partners and we were
22   committed to this for the long run.
23         Q.    You keep saying you were
24   partners.
25         Did you have a partnership

Page 324

1          RYAN C. BERRIS VOLUME I

2     agreement with Mr. Choi?

3              MR. ZACH:  Objection to form.

4          A.    Yeah, I can't recall offhand

5     all the documents that were executed on

6     behalf of the company.

7          Q.    So you don't recall whether

8     or not you executed a partnership

9     agreement with Mr. Choi?

10         A.    We had our oral agreement and

11    then there was many discussions with

12    Counsel whereby how to do an appropriate

13    structure for the company that would be

14    palatable for outside investors but also

15    to aid Mr. Choi's relocation and perhaps

16    some of his assets being moved into the

17    US.

18         Some of those included discussions

19    of a partnership structure and this was

20    something that Mr. Choi and I would then

21    discuss after the Counsel was giving

22    advice.

23         Q.    Okay.  My question was, you

24    don't recall whether or not you executed

25    a partnership agreement with Mr. Choi?

1              RYAN C. BERRIS VOLUME I

2         A.    Being very clear, as I'm not

3    a legal expert, I don't know if there's

4    multiple meanings for that.  So I just

5    want to be accurate in what I'm

6    responding.

7         So subject to reviewing documents

8    to familiarize myself more with that

9    language, because I don't know if it can

10   have more than one meaning, from a legal

11   standpoint, yes, I can't recall offhand.

12        Q.    How many agreements are you

13   aware of that you've executed related to

14   De Tomaso?  And I'm talking about written

15   agreements.

16        A.    In general --

17             MR. ZACH:  Including like

18        vendors and stuff?

19        Q.    No, between -- I'm sorry,

20   between you and De Tomaso, on your behalf.

21        How many agreements in writing did

22   you, actually, sign on the dotted line?

23        A.    So I signed multiple

24   documents in regards to, I believe, the

25   structuring of new entities.

1          RYAN C. BERRIS VOLUME I
2          But with regards to my employment
3     terms with Mr. Choi, again, we never
4     papered the agreement.  It was an oral
5     agreement that I accepted.
6          Q.    Okay.  Let's talk about the
7     LLC agreement.
8          You're familiar with that, right?
9          A.    I've become familiar with it
10    after reviewing the productions.
11         Q.    You weren't familiar with it
12    before?
13         A.    I was familiar with the fact
14    that it exists and we had both executed
15    it, but I was not familiar with all of
16    the specifics.
17         Q.    Did you read it before you
18    executed it?
19         A.    To -- from what I can recall,
20    I scanned briefly but did not read it in
21    its entirety but signed, because this was
22    a document that had long been prepared
23    amongst others with Counsel and, I
24    believe, Mr. Choi had already said he
25    approved.

1          RYAN C. BERRIS VOLUME I
2          So, if he approved, then I just
3     went along and co-signed.
4          Q.    Did you understand that it
5     required certain things of you?
6          A.    I -- after now familiarized
7     myself with all the details, following my
8     time at De Tomaso, I am familiar with
9     that language.
10         Q.    Okay.  But you signed it
11    without knowing that and you didn't know
12    it while you were employed at De Tomaso;
13    is that fair?
14         Why are you looking at your
15    lawyers.
16              MR. ZACH:  I was going to
17         object and then I choked it down.
18         A.    That's fair.
19         Q.    Okay.  Let's take a look at
20    this agreement.
21              (Deposition Exhibit Berris 26,
22         Limited Liability Company Agreement
23         for De Tomaso Automobili Holdings
24         N.A. LLC DT0000000073 to
25         DT0000000082, was marked for

Page 328

```
 1          RYAN C. BERRIS VOLUME I
 2      identification.)
 3              MR. WERNER:  Alright.  We're
 4      going to mark this as Exhibit 26.
 5          Q.    Okay.  Mr. Berris, I'm handing
 6      you what I'm marking as Exhibit 26.
 7          This is Limited Liability Company
 8      Agreement for De Tomaso Automobili
 9      Holdings N.A., LLC dated September 3rd,
10      2020.
11          You're familiar with this, as a
12      result of the lawsuit; is that right?
13          A.    Yes.
14          Q.    Okay.  And this is a document
15      that names you as CEO of the company,
16      right?
17          A.    In the spirit of time, if you
18      want to just point me to the time.
19          Q.    Yeah.  It's 81 of the Bates
20      Numbers.
21          A.    Yes.
22          Q.    Okay.  And it, also, names
23      you and Norman Choi to the Board of
24      Managers.  That's at 82.
25          A.    Yes.
```

1          RYAN C. BERRIS VOLUME I
2          Q.    And if you look at 75,
3     Section 5.1(1), it made you a Director of
4     the company, right?
5               MR. ZACH:    Sorry.  What was
6          that again?
7               MR. WERNER:    Just 5.1 makes
8          him a Director.
9          A.    Yes.
10         Q.    Okay.  And you looked at
11    this, I guess, more closely since your
12    time at De Tomaso and since you've
13    initiated this lawsuit.
14         But if you look at 5.1 Romanette
15    (iii) -- not Romanette (iii).  I guess
16    Subsection (3) it says, "no director had
17    authority to act for or bind the company
18    without the requisite consent of the
19    Board."
20         Do you see that?
21         A.    You're saying 5.1(3)?
22         Q.    Yes.
23         A.    Allow me to read.
24    Yes.
25         Q.    Okay.  And is it fair to say

Page 330

1          RYAN C. BERRIS VOLUME I
2      you really didn't understand that at the
3      time you signed this or your time,
4      actually, working at De Tomaso?
5          A.    I did not.  I was not
6      familiar with that language.
7          Q.    Okay.  And, again, just to be
8      clear, when you entered this document,
9      this isn't something that you sought or
10     obtained legal Counsel around?
11         A.    For me personally?
12         Q.    Yeah.
13         A.    No.
14         Q.    Okay.  Alright.
15         Mr. Berris, I'm going to switch
16     gears and talk to you a bit about the
17     expenses you submitted for De Tomaso.
18              (Deposition Exhibit Berris
19              27, 4/27/21 Invoice DT0000000221
20              marked Confidential, was marked
21              for identification.)
22         Q.    Mr. Berris, I'm going to hand
23     you what I'm marking as Deposition
24     Exhibit 27.
25         This document reflects a payment

1          RYAN C. BERRIS VOLUME I

2     from De Tomaso to Aprivy in the amount of

3     $110,000; is that right?

4          A.    Yes.

5          Q.    Okay.  What was this payment

6     for?

7          A.    This payment was because at

8     the time I was still without residence

9     and I was looking to have an apartment in

10    Connecticut.  And due to the fact that I

11    was deferring my income for De Tomaso, it

12    would not be possible for me to be

13    approved for a mortgage without, you

14    know, meeting additional conditions,

15    hired on payment of the sorts.

16          So I had open dialogue with Mr.

17    Choi about this and he agreed and offered

18    that, you know, that he would do whatever

19    he could to help me make it happen.  That

20    was, roughly, along the lines of the

21    communication.

22          And he asked me how much I would

23    need.  And from what I can recall at the

24    time, I would need, roughly, another

25    110,000.  And I was, also, getting, you

```
 1            RYAN C. BERRIS VOLUME I
 2     know, advance on my commissions early for
 3     Apollo, if I can remember correctly.
 4          So, with that, it would have allowed
 5     me to pay for the apartment that I was
 6     looking for.  However --
 7          Q.    Go ahead, sorry.
 8          A.    So I was starting to say,
 9     however, at the end of the approval
10     process, I ended up not being approved
11     and, therefore, did not proceed with the
12     purchase.
13          Q.    Okay.  Was this a loan from
14     the company to you?
15          A.    It was never expressly
16     determined what it would be.
17          I, basically, told Norman in the
18     end, like, whatever he would need for his
19     accounting purposes or et cetera, I would
20     be comfortable with the language.
21          Upon reviewing documentation, I do
22     recall that I had issued, I think, an
23     invoice.
24          And I don't recall, specifically,
25     but if you have it, it would be helpful,
```

1          RYAN C. BERRIS VOLUME I
2     the language that was used in that
3     invoice pertaining to the 110,000.
4          Q.    You issued an invoice to the
5     company around the 110,000?
6          A.    Yes.  At the request of, I
7     think, Norman and Diana.
8          Q.    Okay.  And you don't
9     understand whether in that invoice one
10    way or the other it was intended to be a
11    loan?
12         A.    No.  Subject to reviewing the
13    specific document, for what I recall was
14    accurate, it was a covering a consulting
15    fee for De Tomaso.
16         But I had told Norman that if they
17    needed me to re-paper it, whatever it
18    was, I was really just doing whatever I
19    could to help the business.
20         Q.    Okay.  In any event, this
21    isn't money that you repaid to the
22    company; is that fair?
23         A.    It's money -- basically, all
24    the money that I ended up receiving from
25    this 110,000 and then the other monies

1                RYAN C. BERRIS VOLUME I
2       that were coming from Apollo I had ended
3       up putting back into De Tomaso and, in
4       fact, the un-reimbursed or un-invoiced
5       expenses capital that I committed to the
6       company outside of my salary and
7       commission was in excess of 500,000 US.
8            Q.    Do you recall how much you
9       received in expense reimbursements?
10           A.    I do not recall, specifically.
11           Q.    Would you agree that it was
12      over $700,000?
13           A.    In expense reimbursements?
14           Q.    Yes.
15           A.    I -- subject to reviewing, I
16      don't think that sounds accurate.
17           Q.    What "sounds accurate" then?
18           A.    I believe, unless I can have
19      time to review the counterclaims, correct
20      me if I'm wrong, I think there's a number
21      stating something around 300,000 and
22      change for expenses.
23           Q.    Okay.
24                MR. WERNER:  Let's take a look
25           at another document.

Page 335

```
 1            RYAN C. BERRIS VOLUME I
 2                (Deposition Exhibit Berris 28,
 3          2/7/22 UBS wire transfer
 4          Confirmation DT0000000227 &
 5          DT0000000228 marked Confidential,
 6          was marked for identification.)
 7          Q.    Alright.  We're going to
 8     label this one Exhibit 28.
 9          Okay.  This is another bank record.
10          And this records a wire transfer
11     from De Tomaso to Aprivy, right?
12          A.    Yes.
13          Q.    And this one is for $50,000?
14          A.    Yes.
15          Q.    Okay.  What was this money
16     for?
17          A.    That's because I was too busy
18     to get around to invoicing for some of my
19     expenses that I had a conversation with
20     Norman and told him, you know, I needed
21     some money because my funds were running
22     low and he said, okay, no problem, how
23     much.
24          And then I said, 50,000, and then
25     he agreed, hence this wire.
```

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  Was this money used to

3     pay Carmen Jorda's invoices?

4          A.    This money I used for many

5     business expenses, nothing in particular.

6          Q.    Okay.  "Many business

7     expenses, nothing in particular."

8          Did that include anything related

9     to Carmen Jorda?

10         A.    I would say over the course

11    of 2022, I had many expenses and fees

12    that I was paying that included Ms. Jorda

13    but, also, that included for Hugo de

14    Sadeleer, for Jiri Kubik, for the

15    company, in general, for Mr. Choi amongst

16    other parties.

17         Q.    When you answer a question

18    with -- by starting with, "I would say,"

19    is that you speculating?

20         A.    No, it's not "speculating."

21         Q.    Okay.

22         A.    I have all of the documents

23    to substantiate this, which, I believe,

24    has been produced.

25         Q.    Okay.  So my question then to

1          RYAN C. BERRIS VOLUME I
2     you was whether any of those $50,000 was
3     used for payments or invoices or expenses
4     for Carmen Jorda or not.
5          A.    To the point whereby this
6     allowed me to have additional funds that
7     I would then use for various business
8     purposes, part of that would include Ms.
9     Jorda.
10         But this 50,000 was not requested
11    solely for monies due or paid to her.
12         Q.    Okay.  I hear what you're
13    saying, but I really would like you to
14    just answer my question.
15         And I understand that you're saying
16    that you didn't request this money,
17    specifically, so you could turn around
18    and give it to Carmen Jorda.
19         My question, though, is whether you
20    took this money and used it to reimburse
21    her or to pay her invoices?
22         A.    I use used this for various
23    business expenses that I had, which
24    included expenses and compensation for
25    her, amongst other items.

1            RYAN C. BERRIS VOLUME I
2         Q.    So the answer to my question
3     is, yes, right?
4         A.    In general yes.
5         Q.    What do you mean by "in
6     general"?
7         A.    I was covering many company
8     expenses.  I had not invoice for any of
9     my expenses for 2022.  And as I had
10    stated before, the number of those
11    expenses that I never invoiced the
12    company was over 500,000 US.
13         Part of that includes monies that I
14    had paid to her.  But this 50,000 became
15    part of capital that was available that I
16    was paying for various parties.
17         Q.    Okay.  So this 15 [sic]
18    capital that, like, became available to
19    you from a wire transfer from De Tomaso
20    was, in fact, used, at least, in part to
21    pay Carmen Jorda?
22         A.    Yes.
23         Q.    Okay.
24              MR. WERNER:  Let's look at
25         the next one.

Page 339

1           RYAN C. BERRIS VOLUME I
2                (Deposition Exhibit Berris 29,
3           11/2/21 e-mail from Ryan Berris to
4           Norman Choi and attachment
5           Berris-000083652 to Berris-000083662
6           marked Confidential, was marked
7           for identification.)
8           Q.    Alright.  I'm going to hand
9      you what's being marked as Deposition
10     Exhibit 29.
11          This is another bank record.  This
12     one is from Bank of America and it
13     records a $25,000 payment to Aprivy,
14     right?
15          A.    Are you referring to 655?
16          Q.    Yeah.
17          A.    Yes.
18          Q.    655 there is an online
19     banking transfer confirmation to Aprivy.
20          A.    Yes.
21          Q.    Okay.  And was this payment
22     to cover expenses?
23          A.    Yes.
24          Q.    Which ones?
25          A.    A multiple but at the time I

1            RYAN C. BERRIS VOLUME I
2      had been so busy that I was -- I did not
3      have time to getting around to preparing
4      an expense report.
5           So I then had Hugo de Sadeleer
6      assist with preparing those documents.
7      Because, I think, at this point in time,
8      I had not invoiced for expenses going
9      back to, roughly, December of 2020
10     leading up to, you know, the middle --
11     the middle or end of August.
12          Q.    If you look up above that on
13     8/26, there is a cash withdrawal.
14          A.    For 1,000 US?
15          Q.    Yeah.
16          A.    Yes.
17          Q.    Was that made by you?
18          A.    It was made by me on behalf
19     -- at the request of Mr. Choi and all
20     those funds went to Mr. Choi.
21          Q.    Okay.  Do you know what it
22     was for?
23          A.    I'd be speculating, but I
24     believe he needed some cash for operation
25     in US or maybe for his daughter or his

1              RYAN C. BERRIS VOLUME I
2    wife.
3         Q.    Okay.  We'll look at another
4    document here.
5              (Deposition Exhibit Berris 30,
6         Bank of America Statement 9/1/21
7         to 9/30/21 Berris-000083295 to
8         Berris-000083300 marked
9         Confidential, was marked for
10        identification.)
11        Q.    Alright.  Mr. Berris, I'm
12   handing you Exhibit 30.  And, again, it's
13   another bank record that reflects
14   payments from De Tomaso to various
15   entities.
16        And I'll direct you to 83655, which
17   shows payments to Aprivy.
18        A.    Would you mind saying the
19   Bates Number again?
20        Q.    Yeah.  I think if you look at
21   97 -- yeah, 97 there's some payments
22   there.
23        A.    Yes.
24        Q.    Okay.  And do you see the
25   entry there for 110,000 and change?

Page 342

1              RYAN C. BERRIS VOLUME I
2         A.     Yes.
3         Q.     And the description is
4     "reimbursement NT for expenses"?
5         A.     Yes.
6         Q.     What expenses did that
7     payment cover?
8         A.     Subject to reviewing the
9     documents, I believe, this referred to
10    the first expense report that Hugo had
11    prepared for me.  But, I believe, if I
12    recall correctly, it covered, roughly,
13    December 2020 through middle of August
14    2021.
15        Q.     Okay.  And then if you look
16    right under that, there is another
17    expense for $21,906 and change.
18        A.     Yes.
19        Q.     Okay.  And that, again, is
20    from De Tomaso to Aprivy?
21        A.     Yes.
22        Q.     And what was that payment for?
23        A.     Subject to reviewing the
24    documents, I do not recall, specifically,
25    offhand.  But it was for corporate-related

Page 343

1          RYAN C. BERRIS VOLUME I
2     expenses.
3          Q.    Okay.  When you say,
4     "documents," what are you referring to?
5          A.    I have prepared -- from my
6     understanding, I've given to my Counsel
7     all of my financial statements showing
8     the extent --
9               MR. ZACH:  Don't talk about
10          what you gave to us, but answer his
11          questions, if you can, independent
12          of things you said to us.
13          A.    Okay.  Would you jut mind
14     saying the question again.
15          Q.    I'm -- you referenced -- in
16     both answers to my question, you
17     referenced the need to review documents.
18          I'm just asking which documents you
19     would need to review to understand what
20     these expenses were for?
21          A.    Probably my expense reports
22     that were submitted to the company.  Or
23     my Bank of America bank statements
24     whereby it was paying for certain things
25     from my personal bank and then seeking

1          RYAN C. BERRIS VOLUME I
2     reimbursement from the company.
3          Q.    Okay.  So sitting here today,
4     you can't tell me when I ask you about
5     amounts, how they tie out with expense
6     reimbursement requests from you?
7          A.    I cannot -- without having
8     documents, I can't recall, specifically.
9          Q.    Okay.
10         A.    But I can say definitively
11    that whatever was invoiced and reimbursed
12    was less than the monies that I was
13    incurring on behalf of the company.
14         Q.    I'm not asking you that.
15         Okay.  You understand that you're
16    testifying today in part as a corporate
17    representative for your personal LLC
18    Aprivy LLC, right?
19         A.    Yes.
20         Q.    Okay.  And you understand
21    that to answer my questions on behalf of
22    the company, you are actually obligated
23    to prepare yourself, right?
24              MR. ZACH:  If we're going
25         to -- are you going to answer the

1              RYAN C. BERRIS VOLUME I
2         question.
3              MR. WERNER:  Let me just
4         ask some questions.
5         Q.    Do you understand that?
6         A.    Yes.
7              MR. ZACH:  Just to pause,
8         sorry.
9              I asked -- I don't mind --
10        you're totally entitled to go into
11        that.  But we need to, like, make
12        a clear demarcation from when
13        you're asking him in his personal
14        capacity versus as the 30(b)(6).
15             MR. WERNER:  That's fine.  And
16        so really all I want is answers to
17        my questions.
18        Q.    We looked at this earlier.
19   And there is a corporate rep notice to
20   you, notice to Aprivy and we talked about
21   the different topics, right?
22        Do you remember that way back when
23   in the beginning of this deposition?
24        A.    Yes.
25        Q.    I think it was Exhibit 2.

1          RYAN C. BERRIS VOLUME I

2          A.    Yes.

3          Q.    Okay.  Well, one of those

4     categories was transactions, invoices and

5     payments between Aprivy and Choi/De

6     Tomaso or Apollo between January 1, 2014

7     and December 31, 2022.

8          Do you recall that?

9          A.    That sounds about right.

10          Q.    Okay.  Did you do anything to

11     prepare to provide testimony today on

12     that topic?

13          A.    I had familiarized myself

14     with the documents previously when

15     preparing for production, upon receiving

16     the subpoena.

17          But there -- in preparation for

18     today, there's too many documents to

19     review to be able to speak, specifically.

20          Q.    Okay.  So, when I ask you

21     about specific payments to your company,

22     you are not able today to tell me how

23     they tie out to certain expenses for

24     which you sought reimbursement; is that

25     fair?

1          RYAN C. BERRIS VOLUME I
2              MR. ZACH:  Object to the form.
3          A.    I would say not offhand.  But
4      I believe that we've produced all
5      financial records that would substantiate.
6          Q.    I'm not -- I mean, offhand is
7      all we got, right.  I can only depose you.
8              MR. ZACH:  Well, I don't think
9          the 30(b)(6) requires someone to
10         memorize, like, years worth of
11         expenses.
12             MR. WERNER:  I'm not -- I'm
13         not -- I don't care to debate you
14         about this.  I'm just asking him
15         whether he's prepared to tell me
16         how expense payments to him tie out
17         to expense request.
18             I understand he's not
19         prepared to do that today.
20         Q.    If I want to know how to go
21     figure out how payments tie out, you've
22     referenced several times documents that I
23     need to look at.
24         What documents, specifically, would
25     I need to go look at?

1            RYAN C. BERRIS VOLUME I

2            A.    So I believe the documents

3      that would be most beneficial to you

4      would be the expense reports that were

5      prepared by Hugo de Sadeleer on my

6      behalf, which I think were transmitted to

7      the Defendants, also, the bank account

8      records for both Aprivy and my personal

9      bank account, which cover some other

10     related expenses.

11            Q.    Okay.  Now, what if I were to

12     tell you we tried to do that and they

13     don't tie out and we can't match up the

14     payments to you and your submitted

15     request?

16            Is there anything that you can help

17     us with in being able to sort that out?

18            Are there other documents that we

19     can look at?

20            A.    So it's difficult for me to

21     know what, specifically, has been

22     produced from my Counsel for you and,

23     also, what's been reviewed.  But I'm more

24     than happy to revisit those documents and

25     incite them.  But I can't recall those

Page 349

1           RYAN C. BERRIS VOLUME I
2      offhand.  But I can tell you that I
3      provided all of the relevant documentation
4      that would substantiate your question for
5      production.
6           Q.    Okay.  Do you understand that
7      the time for you to provide information
8      on these things is today, right?
9           And you're the corporate rep here
10     to testify on behalf of the company on a,
11     specifically, identified set of
12     transactions and invoices and payments.
13     And so telling me that we can revisit it
14     at some other time is inconsistent with
15     what you were obligated to do to come
16     testify today.
17          Do you understand that?
18               MR. ZACH:  Objection to the
19               form.
20               He was responding to a
21               question, which you said you've
22               done an analysis and not shared
23               with us and then you asked how
24               can he help you with your analysis.
25               If you want to provide him

1           RYAN C. BERRIS VOLUME I
2        that analysis and show it to him
3        and then question him about that,
4        we'll see if he can answer.
5              (There is a discussion off
6        the record.)
7        Q.    We'll show you another
8  document.
9              (Deposition Exhibit Berris 31,
10        3/24/22 e-mail from Diana Majcher
11        to Ryan Berris BERRIS-000091077 &
12        BERRIS-000091078 marked
13        Confidential, was marked for
14        identification.)
15              MR. WERNER:  We're going to
16        mark this deposition Exhibit 31.
17        Q.    This is an e-mail thread
18  between Diana and you, copy to Norman
19  about audit-related outstanding items,
20  okay?
21        A.    Okay.
22        Q.    Do your remember this
23  document or this e-mail exchange?
24        A.    Please allow me to read
25  through.

```
 1            RYAN C. BERRIS VOLUME I
 2        Q.    Go ahead.
 3        Do you recall this e-mail?
 4        A.    Yes, I do.
 5        Q.    And do you recall the request
 6    being made of you to help sort this out?
 7        A.    Yes.
 8        Q.    Okay.  And am I correct in
 9    understanding that you never responded to
10    this e-mail?
11        A.    I don't think that's correct.
12    I believe that I had responded.
13        Q.    When?
14        A.    I can't recall, specifically,
15    offhand without access to the documents.
16        Q.    Did you do it in writing?
17        A.    Respond to this e-mail?
18        Q.    Yes.
19        A.    Without documents in front of
20    me, I can't recall.
21        Q.    Okay.
22            MR. WERNER:  Let's take a
23        look at the next document, please.
24            (Deposition Exhibit Berris
25        32, e-mail thread DT0000076100 to
```

Page 352

1              RYAN C. BERRIS VOLUME I
2          DT0000076102 marked Confidential,
3          was marked for identification.)
4          Q.    Okay.  Mr. Berris, Exhibit 32.
5    Okay.  It's another e-mail between you
6    and Diana and Norman.
7          Again, the issue being discussed in
8    this e-mail thread is challenges tying
9    together amounts paid to you with proper
10   expense reimbursement requests.
11         Do you understand that?
12         A.    Yes.
13         Q.    Okay.  And if you go up to
14   the last e-mail in the chain, it's dated
15   4/11/22.  And so there had been several
16   requests for you to provide information
17   on this.  And in the middle of the page,
18   you say you're going to provide them at
19   the end of the day tomorrow.
20         Basically, a week goes, but you
21   don't do that.  Diana follows up.
22         Did you ever provide any updated
23   information on what was being requested
24   of you here?
25              MR. ZACH:  Object to the form.

1          RYAN C. BERRIS VOLUME I
2               You can answer.
3     A.    Yeah, without having all the
4     records in front of me, I believe, as
5     cited here, I mentioned to Diana that
6     Hugo was assisting with this.
7          I believe I gave him having he
8     needed and without future communications,
9     I don't recall offhand what was
10    submitted.
11         But after the filing of the lawsuit
12    and going through the productions, I see
13    that there were many expenses that I did
14    not -- or invoices or receipts I did not
15    provide due to just being busy that would
16    substantiate any deviation.
17    Q.    Yeah, I guess the question at
18    the end of the day is, the e-mail from
19    Diana on April 11th, did you respond to
20    that in writing?
21    A.    I don't know.
22    Q.    Okay.  Alright.
23         You would agree with me that
24    generally it's just -- in business, one
25    needs to provide sufficient details to

Page 354

1           RYAN C. BERRIS VOLUME I
2     support expenses that have been submitted
3     for reimbursement, right?
4           A.    I think that's fair, yes.
5           Q.    Yeah.
6           And the reason for that is to make
7     sure that the expenses are appropriate
8     and business related, right?
9           A.    Yes.
10          Q.    And that they're not personal
11    expenses being asked of the company to
12    reimburse, right?
13          A.    Yes.
14          Q.    Okay.
15          Okay.  If you look at Exhibit 32
16    that we were just looking at and go to
17    the document Bates ending 02.
18          A.    Yes.
19          Q.    Alright.  And if you go to
20    the top of the page, there is a No. 2 and
21    then you go down to the second paragraph,
22    okay?
23          A.    Uh-huh.
24          Q.    You see that Diana is
25    inquiring about more than $730,000 in

1                RYAN C. BERRIS VOLUME I
2      unexplained expenses that have been paid
3      to Aprivy?
4            A.    I see that she said this
5      there.  I'm not familiar with how she
6      calculated that number.
7                  MR. ZACH:  I don't want to
8            interfere, but, I think, Berris 31
9            has it broken out.
10                 THE WITNESS:  Okay.  Yup.
11           A.    So, yes, I do see her
12     relaying this.
13           Q.    Okay.  So does that change
14     your testimony around how much Aprivy had
15     been reimbursed from De Tomaso?
16           A.    No, because I don't know what
17     she was using to calculate these.
18           Q.    Okay.
19                 MR. ZACH:  Just to note for
20           the record, it says, "expenses
21           incurred to."  So it's not clear
22           what was paid or what was potential
23           liability on the books.
24                 MR. WERNER:  Uh-huh.
25           Q.    Did you ever write back and

1              RYAN C. BERRIS VOLUME I
2      challenge any of the numbers here or say,
3      this isn't right or here this is how it
4      all fits together in writing?
5              A.    I don't recall, specifically,
6      in writing with the exception of the
7      following.
8              So I don't know if it was on this
9      date or a later date, you know.  Diana
10     had provided me with some documents to
11     sign supposedly from the auditors
12     claiming -- and when I read the language,
13     I wasn't quite comfortable with it.  It
14     was claiming that these are monies due
15     from Aprivy to De Tomaso.  So I recall
16     calling Diana and discussing this on the
17     phone and said, you know, I'm more than
18     happy in trying to aid the process,
19     right, for the audit or the SPAK.
20     However I was not comfortable with the
21     language.
22             And Diana then told me on the
23     phone, don't sign anything you're not
24     comfortable with.
25             And I then responded in e-mail, I

1          RYAN C. BERRIS VOLUME I
2    believe to Norman and Diana referring to
3    what Diana had told me on the phone, that
4    I want to help get the process completed,
5    but I'm not comfortable with the
6    language.  Because Diana had told me -- I
7    don't know if this was in writing or in
8    that phone call with her that it's just
9    necessary for the audit and just sign it.
10   It's not going to be due from you.
11        But as the relationship with Mr.
12   Choi and others in the company were at an
13   odd period, this further raised suspicion
14   for me.
15        Q.    You didn't put anything in
16   that writing in these e-mails, did you?
17        A.    Not in the ones that are
18   here.  But there is a communication that
19   is sent to Mr. Choi and Ms. Majcher in my
20   De Tomaso e-mails, again, re-affirming
21   what she had said to me on the phone that
22   don't sign anything that you're not
23   comfortable with.
24        Q.    So we've looked a lot of
25   fairly significant things that haven't

1              RYAN C. BERRIS VOLUME I
2    been documented in writing.
3          Is it generally your practice not
4    to document substantial important things
5    in writing?
6          A.    No.
7          Q.    Okay.  So let's go through
8    the list.  The agreement subject to
9    negotiation with Ms. Jorda, no writing
10   from you documenting that, right?
11              MR. ZACH:  Objection.
12         A.    I don't -- I don't feel
13   comfortable responding to that, because I
14   don't know -- can't recall offhand all
15   the documentation that's been produced.
16         Q.    Just tell me what you do
17   remember.  So we've got the Carmen Jorda
18   agreement.  We've got "threats" being
19   made to you.  We've got expenses now and
20   we've got a very significant compensation
21   package and none of those things have one
22   document confirming them from you.
23              MR. ZACH:  Objection to form.
24         Q.    Right?
25              MR. ZACH:  Argumentive.

1           RYAN C. BERRIS VOLUME I

2           A.    I don't agree that there is

3     no document supporting them.

4           Q.    Alright.  In any event, okay,

5     this e-mail that we were looking at where

6     you're being asked to supply information

7     to the auditors, right, you tell Diana

8     that you're going to work to revert on

9     this shortly and then you don't, right?

10          A.    I would need to review

11    documents to see what subsequent

12    communications there were.  But I was

13    busy with many items related to the

14    business.

15          Q.    Okay.  I'm going to bring you

16    back to the deposition notice you

17    received, okay?

18          And you were, specifically, asked

19    to come ready to testify about

20    transactions invoices and payments

21    between Aprivy and Choi and De Tomaso and

22    others, okay?

23          So, when you sit here and you tell

24    me you have to check documents, that's

25    something that you were supposed to do to

Page 360

1              RYAN C. BERRIS VOLUME I
2         prepare yourself to testify.
3              Do you understand that?
4              A.    I do understand.  But due to
5         the volume of documents it's not feasible
6         to recall everything offhand.
7              Q.    But you haven't recalled
8         anything offhand.
9              A.    I disagree.
10             Q.    I've asked you, specifically,
11        about a series of expenses.  You haven't
12        been able to tell me what a single one
13        was for.
14             A.    I've pointed you to the
15        documents that have been produced, which
16        support all of this.
17             Q.    Okay.  Well, let's do this.
18        Let's look at 32.  And there's a
19        reference to $736,000, okay?
20             Can you walk me through your
21        expenses that make that amount up?
22                  MR. ZACH:  Objection.
23                  So wait.
24                  Are we going into the 30(b)(6)
25             now?

1             RYAN C. BERRIS VOLUME I
2                 MR. WERNER:  Sure.  I mean,
3            it's been 30(b)(6).
4                 MR. ZACH:  Well, you got to
5            like -- it's -- I understand it's
6            a subtle distinction but --
7                 MR. WERNER:  I mean, we have
8            been doing our best to make this
9            as efficient as possible by
10           combining these two depositions.
11                MR. ZACH:  It's not a timing
12           issue.  I don't have a timing
13           issue.  My issue is --
14                MR. WERNER:  I mean, look --
15                MR. ZACH:  -- one, he's a
16           fact witness.
17                MR. WERNER:  -- we all know
18           what the answer to this question is.
19           He's not prepared to do this and
20           that's fine.
21                MR. ZACH:  Well, if your
22           question to him right now is if
23           he's sitting here in a deposition
24           and you've shown him an e-mail
25           that says there are 700 written

1              RYAN C. BERRIS VOLUME I

2         by an employee for the Defendant

3         saying there was $736,986.94 and

4         you're asking him to use his memory

5         to explain what that is, I don't

6         think that's -- I think that's

7         not appropriate 30(b)(6).

8              MR. WERNER:  I'm not asking

9         him to use his memory.  In fact,

10        we gave him lots and lots of notice

11        on Topic 8 to come prepared to do

12        that.

13             He could have brought a

14        summary document.  He could have

15        pieced this together.

16             He, certainly, knew for many

17        many months, actually, years that

18        this was an issue that was

19        outstanding and low and behold

20        he's not prepared to do it today.

21             We'll leave the deposition

22        open.

23        Q.   So maybe we'll have that

24   opportunity to revisit this when you are

25   prepared to break these down and,

Page 363

1          RYAN C. BERRIS VOLUME I
2     actually, help us tie out the amounts
3     that you were paid for expenses.
4          But I understand that's not going
5     to happen today, so we'll move on.
6               MR. ZACH:  For the record, I
7          disagree.
8               But we're moving on and we
9          can discuss it later.  That's fine.
10              MR. WERNER:  I mean, look,
11         if he can tie it out today, let's
12         do it.  I don't think he can.
13              MR. ZACH:  It's not his
14         document.  This is a number that
15         was created by Ms. Majcher and
16         you're asking him to sort of opine
17         on the document.
18              But let's just -- we can move
19         on.
20              MR. WERNER:  That's fine.
21              I mean, this is his own --
22         this is something he produced, 31
23         was.
24              MR. ZACH:  I mean, let's be
25         serious.  It's a De Tomaso e-mail.

```
 1              RYAN C. BERRIS VOLUME I
 2         So it's from your client's e-mail
 3         server and we have a copy.  Both
 4         sides have it.  And it's an
 5         e-mail from your client to him.
 6              MR. WERNER:  The bottom line
 7         is one of the things that we,
 8         specifically, forecast, we were
 9         interested in in our deposition
10         notice was being able to walk
11         through these transactions.
12              The witness is not, in fact,
13         prepared to do that today.  We
14         can talk about it offline.  But
15         I'm just noting that that is a
16         pretty clearly identified topic
17         and we're not getting answers to
18         our questions.
19              MR. ZACH:  I guess, I would
20         say, just so the record is clear,
21         maybe you can mark the documents
22         that you want to ask him about.
23              So you don't have to show
24         them to him.  Just mark them, so
25         we know what you want to ask him
```

```
1           RYAN C. BERRIS VOLUME I
2       about.
3               MR. WERNER:  That's fine.
4               MR. ZACH:  Because I do think
5       you're treating it as a memory
6       test.  It's not.  It's not
7       appropriate under the rules.
8               But let's just -- we can
9       mark the set so I can -- we, at
10      least, have a record of what you
11      wanted to ask him about.
12              MR. WERNER:  That's fine.
13      It's the two exhibits that we've
14      already introduced, Exhibits 31
15      and 32.
16              MR. ZACH:  Okay.  And so
17      you were hoping he could break out
18      these numbers from what Ms. Majcher
19      said?
20              MR. WERNER:  Well, okay.
21      To be clear, we've walked through
22      a number of documents related to
23      the expenses.  I don't think he
24      has provided clear testimony
25      around what the expenses were for.
```

Page 366

1              RYAN C. BERRIS VOLUME I
2                   So I'll tell you what.  We
3          can take this.  We don't need to
4          waste deposition time on this.
5          We can talk to you offline --
6                   MR ZACH:  Sure.
7                   MR. WERNER:  -- about sorting
8          this out.
9                   MR. ZACH:  That's fine.
10    BY MR. WERNER:
11         Q.    Mr. Berris, we talked about
12    this before.
13         You resigned on May 3rd, right, of
14    2022?
15         A.    From the Board.
16         Q.    Okay.
17                   (Deposition Exhibit Berris 33,
18          5/3/22 e-mail forward DT00110061
19          & DT00110062 marked Confidential,
20          was marked for identification.)
21                   MR. WERNER:  Let's take a
22          break.
23                   THE VIDEOGRAPHER:  Thank you.
24                   The time is 4:59.  We're going
25          off the record.

1              RYAN C. BERRIS VOLUME I
2                  (Recess taken 4:59 to
3          p.m.)
4                  THE VIDEOGRAPHER:  And the
5          time is 5:23.  We're back on the
6          record.
7          Q.    Alright.  Mr. Berris, before
8    we left for the break, I had handed you
9    deposition Exhibit 33.
10         Have you had a chance to look at
11   that?
12         A.    Yes.
13         Q.    Okay.  And that's your
14   resignation as a Director of De Tomaso,
15   right?
16         A.    Correct.
17         Q.    Okay.  And that was as of
18   May 3rd, right?
19         A.    Yes.
20         Q.    Okay.  Where were you when
21   you submitted that e-mail to Mr. Choi?
22         A.    I was in my hotel room in the
23   -- if I recall correctly --
24   Intercontinental Barclay.
25         Q.    Is that New York City?

1              RYAN C. BERRIS VOLUME I
2         A.    Yes.  It's simply in Midtown.
3         Q.    And was anyone with you when
4    you submitted that?
5         A.    I was by myself in my hotel
6    room.
7         Q.    Okay.  And just -- I think you
8    said this in a response to a different
9    question.
10         Were you living at the hotel
11    because you didn't have a residence at
12    that time?
13         A.    I was not living at the
14    hotel.  I was staying there sometimes for
15    long periods.  But I gave up my personal
16    residence in -- if I recall correctly --
17    in 2017 to pursue this full time, also,
18    to have less financial strain on myself.
19         And, yeah, so I was always on the
20    move and staying in hotels.
21         Q.    The residence -- sorry, go
22    ahead.  I didn't mean to interrupt.
23         A.    Sure.  When I wasn't
24    traveling around and staying in hotels, I
25    would quite often sleep in my office in

1          RYAN C. BERRIS VOLUME I
2     Glastonbury, Connecticut or in my car.
3          Q.    Okay.  The residence that you
4     referenced that you gave up, was that in
5     Connecticut or New York?
6          A.    In Connecticut.
7          Q.    Okay.  After you resigned do
8     you recall that the folks at De Tomaso
9     had to work with you to try to get
10    company passwords that you maintain?  Do
11    you recall that?
12         A.    I don't recall if the request
13    to have access to the social media
14    accounts occurred before or after this
15    just to be specific.  I do recall the
16    request, but I don't remember when that
17    was originally dated.
18         Q.    Okay.
19              (There is a discussion off
20         the record.)
21              (Deposition Exhibit Berris 34,
22         e-mail string DT0000077009 to
23         DT0000077015 marked Confidential,
24         was marked for identification.)
25         Q.    Alright.  So I'll hand you

1          RYAN C. BERRIS VOLUME I
2     another exhibit.
3          This is going to be Exhibit 34.
4          And you can go through this, but
5     there were, you're right, there were
6     requests for different passwords related
7     to social media and so on that began, at
8     least, in April and then ran through
9     after your resignation.
10         Do you recall that?
11         A.   Please allow me time to
12    browse the document.
13         Q.   Yeah take a look.
14         A.   Yes.
15         Q.   "Yes," in response to my
16    question or was it just, "yes," you're --
17         A.   Yes, I'm ready to address
18    your question.
19         Q.   Yes.
20         So my question is, folks at De
21    Tomaso had been asking you for passwords
22    to certain social media accounts for, at
23    least, a month prior to your resignation,
24    right?
25         A.   Yes, that seems accurate.

1           RYAN C. BERRIS VOLUME I
2           Q.    Okay.  And then even two days
3      after your resignation, you had still not
4      provided access to those accounts, right?
5           A.    From what I'm seeing in this
6      document, there were still some minor
7      open items with Diana that I worked to
8      address, yes.
9           Q.    And when did you address
10     those?
11          A.    I believe there may be other
12     communications in relation to this.  But,
13     if I recall, one of the issues that was
14     happening was that this the social media
15     accounts that I had created from scratch
16     and some of them notably, if I recall
17     correctly, such as the Facebook account
18     was linked to my personal Facebook.
19          So I could grant her as much access
20     as I could, but from what I recall, based
21     on Facebook's rules and procedures, that
22     I was unable to make her, like, a full
23     administrator of the likes because that
24     would then be hanging over, if I recall
25     correctly, my personal Facebook profile.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  I'm sorry.  That was a
3     really long answer to a question I didn't
4     ask you.
5          The question I asked you was, as of
6     your last e-mail here, May 6th, right,
7     there were still issues that had not been
8     resolved around access to the social
9     media accounts, right?
10          A.    Yes.
11          Q.    Okay.  And then I asked you
12     when, because I thought in answer to one
13     of my earlier questions you said they
14     were resolved.
15          When -- as in time, date -- when
16     were those issues resolved by you?
17          A.    I cannot recall, specifically,
18     without documents, the ultimate date.
19          Q.    That's fine.
20          Okay.  Let's go to another document.
21               (Deposition Exhibit Berris 35,
22          WhatsApp text thread between Ryan
23          Berris and Norman Choi DT00157731
24          to DT00157736 marked Confidential,
25          was marked for identification.)

1           RYAN C. BERRIS VOLUME I

2           Q.      I'm handing you Exhibit 35

3    which is a chat between you and Mr. Choi.

4    Take a look, let me know when you're

5    ready to discuss.

6           A.      (The witness reviews the

7    exhibit.)

8           I'm finished reviewing.

9           Q.      Okay.  Do you recall this

10   exchange with Mr. Choi?

11          A.      I do.

12          Q.      Okay.  Where were you

13   physically when you wrote these text

14   messages to Mr. Choi?

15          A.      I don't recall where I was,

16   specifically.  But I can say that I was

17   in New York City.

18          Q.      Okay.  Were you alone when

19   you wrote these?

20          A.      I would be speculating if I

21   tried to answer that.

22          Q.      Okay.  So the answer to my

23   question is you don't recall; is that

24   fair?

25          A.      Yes.

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  And you say down at

3    the bottom on the first page ending in 31

4    that, "I love you and I'm sorry" right?

5          A.    Yes.

6          Q.    What are you saying you're

7    "sorry" for here?

8          A.    I was saying "sorry" based

9    upon the information nature of what Mr.

10   Choi was relaying to Samuel that he was

11   relaying to me, that he had a different

12   understanding than I with regards to Ms.

13   Jorda.

14          And Norman was my best friend.  He

15   was my brother, my honestly family.  And

16   so I sent him multiple communications

17   just trying to talk with each other

18   because I felt that this misalignment was

19   a true misunderstanding and that we owed

20   it to each other to sit down and go into

21   things at length.

22          Q.    Okay.  I'm not sure I

23   understand your answer here.

24          You're saying you're sorry for

25   something here.  I'm just wondering

Page 375

1          RYAN C. BERRIS VOLUME I
2    specifically what it is that you are
3    saying you are sorry for.
4          A.    One of the many things that
5    Samuel told me to relay to Norman was
6    even if I did not agree, admit that
7    certain actions that I had taken were
8    mistakes and just tell him that I'm
9    sorry, which I did.
10         Q.    Okay.  So someone told you to
11   say that you're sorry and to say that
12   certain things were mistakes.
13         A.    Samuel Lui.
14         Q.    Okay.  What were those
15   misstates that you were saying that you
16   were sorry for?
17         A.    Samuel had given me a list,
18   which from the best I can recall included
19   Carmen Jorda, Ash Thorp, those are the
20   only two that I can recall, specifically,
21   offhand.
22         Q.    Okay.  Mr. Lui -- I'm sorry
23   I've been saying it wrong up until this
24   point -- he gave you a list?
25         A.    He instructed me the specific

```
 1            RYAN C. BERRIS VOLUME I
 2     items to admit -- to say Norman and he
 3     told me -- cause I told him on some of
 4     those that I did not agree.
 5          And he told me he's just trying to
 6     make the situation better, to just tell
 7     Norman what he wants to hear and,
 8     hopefully, this makes things better.
 9          Q.    You said Samuel gave you a
10     list, right?
11          A.    Yes.
12          Q.    Was that list in writing?
13          A.    I know definitively that, of
14     course, it was verbally.
15          With regards to in writing, subject
16     to me reviewing documents, I cannot
17     recall offhand all of the exchanges
18     between he and I.
19          Q.    Okay.  So sitting here today
20     your testimony is that Mr. Lui gave you a
21     list and you don't remember whether that
22     list was in writing or not?
23          A.    At the moment I cannot
24     recall.
25          Q.    Okay.  And in terms of the
```

1          RYAN C. BERRIS VOLUME I
2     mistakes, it was Carmen Jorda and Ash
3     Thorp is what you were told were mistakes
4     that you needed to cop to; is that right?
5          A.    To the best of my
6     recollection, yes.
7          Q.    Okay.  And then if you turn
8     the page on this text thread, you say,
9     "You and De Tomaso are my life my family
10    and my everything.  And while things
11    could have been handled better in
12    retrospect," and then you go on.
13          Do you see that?
14          A.    Yes.
15          Q.    Okay.  And you say -- what,
16    specifically, are you referencing here
17    where you say, "things could have been
18    handled better in retrospect"?
19          A.    This means many things, which
20    go back to Q3/Q4 of 2021 leading up to
21    this point.
22          You know, there were a lot of
23    changes to the business, with new
24    parties, new tactical partners coming in
25    such as Robertino Wills.

1              RYAN C. BERRIS VOLUME I

2         And I could sense my dynamic

3    between Mr. Choi and I changing when

4    Robertino came in.  I was always a bit

5    sceptical of Robertino with regards to

6    his true intentions, which had been

7    documented.  Also, the fact of, you know,

8    it wasn't that I was trying to do any

9    harm to Mr. Choi.

10         It's that I was incredibly busy.  I

11   was responsible for the roles that

12   normally multiple people do.  And I was

13   putting everything that I could do create

14   value for the company.  And if there were

15   perhaps unspoken words then Norman Choi

16   felt a certain way, which was being

17   relayed to me through other parties, such

18   as Hugo de Sadeleer, Jiri Kubik and Jan

19   Rambousek, if I'm saying his name

20   correctly, as well as Samuel Lui that

21   there was something off and I wanted to

22   address this and clear the air

23   so-to-speak.

24         Q.    Okay.  You reference things

25   that "could have been handled better in

```
 1            RYAN C. BERRIS VOLUME I
 2      retrospect.
 3            And my question is really could you
 4      please identify what those specific
 5      things are that you believe could have
 6      been handled better in retrospect?
 7            A.    I feel that Mr. Choi and I
 8      could have been more transparent with
 9      each other, because there were certain
10      agreements and parties that he had on
11      boarded and were paying without my
12      knowledge, which I would have been okay
13      with, if we had a discussion about it,
14      one.
15            And then, two, another instance
16      that I in retrospect could have handled
17      better would have been with regards to
18      the West Port lease.
19            Q.    Okay.  So the reference to
20      the on boarding and paying people, you're
21      saying that that's something that Mr.
22      Choi could have done better telling you
23      about it?
24            A.    (The witness reviews the
25      exhibit.)
```

1          RYAN C. BERRIS VOLUME I
2          So can you just point me to the
3    specific Bates Number that you want me to
4    respond to?
5          Q.    Well, I'm just trying to
6    understand the testimony that you're
7    providing.  I wasn't asking you about a
8    document.
9          What I'm, ultimately, trying to
10   understand is the text message that you
11   sent to Mr. Choi that we're looking at
12   here on the Bates Page ending in 32 and
13   the things that could have been handled
14   better in retrospect.
15         I'm trying to understand,
16   specifically, you are identifying as
17   things that could have been handled
18   better in retrospect.
19         And your testimony just a minute,
20   ago, referenced the parties that he had
21   -- Mr. Choi had on boarded and were
22   paying without your knowledge.
23         And so I'm asking if that's one of
24   those things that could have been handled
25   better in retrospect by Mr. Choi not you.

1           RYAN C. BERRIS VOLUME I
2           A.    Yes.
3           Q.    Okay.  So one of the things
4      for which you are apologizing is
5      something that was done by Mr. Choi?
6           A.    No, that was not my intention
7      in my response.
8           Q.    Okay.  Alright.
9           And then you reference now the West
10     Port lease and that is something that
11     could have been handled better in
12     retrospect?
13          A.    Yes.
14          Q.    Okay.  And what was the issue
15     with the lease?  Or let me help you out.
16     Let me help you out.
17          A.    Sure.
18          Q.    You didn't pay the lease,
19     right?
20          A.    I don't think that's
21     accurate.  I believe Diana, from what I
22     can recall, had initiated the initial
23     deposit for the lease.
24          Q.    Okay.  Alright.  Well, we'll
25     get into that.

1           RYAN C. BERRIS VOLUME I
2           But go ahead tell me what you think
3       about the lease could have been handled
4       better by you, if anything.
5           A.    There were times whereby
6       there would be communications to the
7       parties regarding the lease or to Mr.
8       Choi about the status and I was delayed
9       in my response to some of those, because
10      I found myself in an uncomfortable
11      situation whereby we were in arrears in
12      payments to our key technical partners.
13          And I also, you know, wanted the
14      lease to go through, but the assets for
15      the company were limited.  But, again, in
16      retrospect, it's a matter that I feel I
17      could have handled better.
18          Q.    Okay.  Among the things that
19      could have been handled better -- let me
20      ask you this.
21          When you write things could have
22      been handled better in retrospect are you
23      in fact referring to things that you had
24      mishandled?
25          A.    I'm just mention one specific

1          RYAN C. BERRIS VOLUME I
2     instance which would have been the lease,
3     yes.
4          Q.    That's true you mentioned
5     one.  And you used the word things which
6     is plural.
7          Are there other things that you
8     mishandled that you're referencing here?
9          A.    Yeah I just want to be -- I
10    want to think through.
11         I would say, in general, if Mr.
12    Choi and I were radically transparent
13    with each other, that would be one matter
14    that, I think, we both could have done
15    better in retrospect.
16         Q.    Okay.  That's one thing.
17         Are there any others?
18         A.    I had mentioned that and I
19    had mentioned the West Port lease.
20         Q.    I'm sorry.  So one of the
21    things that you mishandled was not being
22    radically transparent?
23         A.    One of the things that I feel
24    in retrospect could have been done better
25    both on my behalf and Mr. Choi is radical

Page 384

```
 1              RYAN C. BERRIS VOLUME I
 2      transparency, even down to the most
 3      trivial matters, because after reviewing
 4      many productions, it's -- I became aware
 5      of certain engagements that I was unaware
 6      of at the time by Mr. Choi.
 7          Q.    Okay.  So your reference to
 8      things that could have been handled
 9      better are things that you could have
10      handled better and also things that Mr.
11      Choi could have handled better?
12          A.    Yes.
13          Q.    Okay.  And in terms of
14      radical transparency, would that have
15      been included telling Mr. Choi about the
16      arrangement with Carmen Jorda?
17          A.    Okay.  I think it could have
18      included going through all of these
19      specific fine details of that, as well as
20      the agreements that Mr. Choi entered into
21      with various parties and employees
22      without my knowledge.
23          Q.    Okay.  Would that have, also,
24      included the company's relationship with
25      Ash Thorp and his resignation?
```

1              RYAN C. BERRIS VOLUME I

2         A.    You're referring to the

3    radical transparency?

4         I don't believe so, because I had

5    been working -- Norman and I for a long

6    time to explore a potential on-boarding

7    in a relationship with Ash Thorp.  We

8    then came to final terms whereby he was

9    formally on boarded.

10        However, prior to announcing to the

11   public that Ash was joining the team, Mr.

12   Choi without my knowledge had engaged the

13   old designers from Apollo, Joe Wong and

14   SGLIEFRJTS to develop a new car which was

15   supposed to be a task that Ash was

16   working on.

17        Q.    Okay.  Mr. Berris I'm

18   literally just trying to understand the

19   words that you wrote to Mr. Choi.  And so

20   you write him a text in which you're

21   saying that you are sorry and you're

22   saying that there are things that could

23   have been handled better in retrospect.

24        And so what I'm trying to

25   understand from you is when you wrote

1          RYAN C. BERRIS VOLUME I
2    that to Mr. Choi, what are the things for
3    which you are sorry that you believe
4    could have been handled better by you?
5          A.    So, as I had mentioned, I
6    feel that both Mr. Choi and I could have
7    been more transparent with each other.
8    However if Mr. Lui and I don't know if
9    I'm pronouncing his last name correctly
10   was not giving me solicit orders, then my
11   communications both verbally and via text
12   to Mr. Choi would have been different.
13         Q.    So are you telling me that
14   this e-mail or this text message that you
15   sent was actually something that had been
16   prepared for you by someone else?
17         A.    It had not been drafted and
18   prepared.  It had been -- I was
19   instructed by Samuel on -- to tell Norman
20   what he wanted to hear.  This is what he
21   was telling me.
22         Q.    Okay.  So this isn't like a
23   sincere communication form you about you
24   being sorry for anything?  This is just
25   you telling Norman what Mr. Lui told you

1              RYAN C. BERRIS VOLUME I

2     he wants to hear?

3          A.    This specific text, yes, that

4     was the origin of it.

5          Q.    Okay.  I mean -- okay.  That's

6     fine.

7          Did Mr. Lui tell you to send

8     pictures of you and Mr. Choi together as

9     well?

10         A.    I don't recall.  That may

11    have been something that I just decided

12    to do myself.

13         Q.    Okay.

14              (There is a discussion off

15         the record.)

16         Q.    I'm going to show you another

17    document.

18         Are you, generally, someone who

19    does what other people tell you to do?

20         A.    No.

21         Q.    Okay.  Did you ever think to

22    write to Mr. Choi and tell him that I've

23    been having all of these conversations

24    with Mr. Lui, they're making me

25    uncomfortable I feel threatened I would

Page 388

1                RYAN C. BERRIS VOLUME I
2      really like to talk to you about that?
3            A.    I did not because it was -- I
4      did not.
5            Q.    Okay.
6                  (Deposition Exhibit Berris 36,
7            WhatsApp text from Ryan Berris to
8            Norman Choi with no response
9            DT00157941 marked Confidential,
10           was marked for identification.)
11           Q.    Alright.  I'm going to hand
12     you Exhibit 36 which is another chat that
13     you had initiated with Mr. Choi.  Take a
14     minute let me know when you're ready.
15           A.    The witness reviews the
16     exhibit.)
17           Okay I've reviewed it.
18           Q.    Okay.  Now, this is on
19     May 4th, which is actually after you
20     resigned as a Director from De Tomaso,
21     right?
22           A.    Correct.
23           Q.    Okay.  And here you write,
24     "Dear, Norman.  I'm sorry.  I admit that
25     I have made mistakes in the past, E.G.,

1             RYAN C. BERRIS VOLUME I
2     Ash Carmen.  I will work to get it
3     terminated, et cetera," right?
4          Where were you when you sent this
5     text?
6          A.    I don't recall, specifically,
7     but I know it was in New York City.
8          Q.    Okay.  Were you alone?
9          A.    I do not recall specifically.
10         Q.    Okay.  Is this another text
11    that you sent at Mr. Lui's behest?
12         A.    Yes.
13         Q.    Okay.  And so when you say
14    that you're sorry, that's not a sincere
15    statement of apology for you?
16         A.    I was relaying to Norman what
17    Samuel was telling me I need to
18    communicate to Mr. Choi to make the
19    situation better.
20         Q.    So, at the time you wrote
21    this, there wasn't anything that you were
22    sorry for?
23         A.    I think there may have been
24    personal things that we had perhaps
25    needed to address.

1          RYAN C. BERRIS VOLUME I
2          But, specifically, to these, I felt
3     strongly and on boarding them and I don't
4     blame Ash for resigning and he never knew
5     the full truth because I had covered for
6     Norman, based on he had hired the
7     designers without my knowledge.
8          Q.    So.  When you say, I admit I
9     made mistakes in the past," and you go on
10    to identify mistakes, you wrote something
11    that you didn't believe was true?
12         A.    At the explicit instruction
13    from Samuel.
14         Q.    Okay.  Can you please answer
15    my question?
16         Is the answer to my question, yes?
17         A.    Yes.
18         Q.    Okay.  So, with respect to
19    Ash and Carmen it's your view that you
20    did not make mistakes?
21         A.    Yes.
22         Q.    Okay.  And when you say,
23    "e.g.," are there other -- that means for
24    example, right?
25         A.    Yes.

Page 391

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  Are there other things
3     that you, at least, were trying to
4     reference here?
5          A.    I believe this was language
6     that I was instructed by Samuel to relay
7     to Mr. Choi.
8          Q.    How were you instructed by
9     Mr. Lui to write this?
10          A.    I don't recall where I was
11     during this specific communication.  But
12     I was receiving instructions by Samuel on
13     -- either on the phone or in person, as
14     well as some WhatsApp's where -- while he
15     was making some revisions to what he had
16     drafted on my phone previously.
17          Q.    So you sent Mr. Lui a draft
18     of this?
19          A.    "Of this"?
20          Q.    Yeah.
21          A.    I don't recall.  I would have
22     to look review documents.  But it's my
23     testimony that this was sent at the
24     instruction of Samuel.
25          Q.    Okay.  The text thread that

1           RYAN C. BERRIS VOLUME I
2     we looked at before, where you also
3     offered a fake apology, was that
4     something that you sent to Mr. Lui a
5     draft of?
6           A.    Which after -- you're talking
7     about the one that begins with Bates --
8     or ends with 731?
9           Q.    I'm talking about, I believe,
10    it's Exhibit 35.
11          A.    Oh, so the photos.
12          In general, I was sorry that this
13    misunderstanding in this dynamic between
14    Mr. Choi and I had unfolded.  He was my
15    life.  He was literally my best friend.
16    And it was breaking my heart that I was
17    being put in this situation.
18          Q.    What are you talking about?
19    You're offering fake apologies.  How is
20    that breaking your heart?
21          A.    It's the specific terminology
22    that was used, meaning, examples of
23    mistakes that I had made were at the
24    instruction of Samuel.
25          When I told Norman that, "I love

1              RYAN C. BERRIS VOLUME I
2      you," it's true.
3              Q.    Okay.  When you say -- I
4      literally just asked you this.
5              I said, was this sincere that you
6      were sorry and you said no you weren't
7      sorry, right?
8              A.    I was not sorry for the
9      specific instances listed.  But, in
10     general, I was sorry that we a had
11     misunderstanding and that the dynamic
12     between us as best friends and partners
13     was deteriorating.
14             Q.    Right.
15             And so, when you say you're
16     admitting mistakes, right, that's a
17     disingenuous thing that you're saying to
18     Mr. Choi, right?
19             A.    At that point in time, Mr.
20     Choi and I were not communicating.  And
21     on multiple occasions, Samuel was telling
22     me that he met with Norman and this is
23     what Norman wants, please abide by these.
24     I can't tell you how serious the
25     situation is.  And I listened to Samuel's

Page 394

1          RYAN C. BERRIS VOLUME I
2      instruction is because I was trying to
3      resolve the ongoing issue.
4          Q.    So you were trying to resolve
5      the situation by telling Mr. Choi things
6      that you didn't believe to be true?
7          A.    At the instruction of Samuel,
8      yes.
9          Q.    Okay.  So you just tell
10     people what they want to hear to get what
11     you want from them, right?
12         A.    In this case, I was abiding
13     by the instruction that Samuel was giving
14     to me.
15         Q.    So yes, right?
16         A.    Not in every scenario.  In
17     this scenario, yes.
18         Q.    Okay.  When you reference
19     here, "Carmen:  I will work to get it
20     terminated," you're referencing the
21     agreement with Carmen, right?
22         A.    Yes.
23         Q.    And so, when you say you're
24     going to work to get it terminated, is
25     that just another thing that you're

1          RYAN C. BERRIS VOLUME I

2     telling Norman in thinking that's what

3     he wants to hear, but not something that

4     you're actually going to do or need to

5     do?

6          A.    That was something that I was

7     telling Norman at the instruction of

8     Samuel and, also, something that Samuel

9     communicated to me that if I was able to

10    do this, that it would make the situation

11    better.  And I took every response to

12    that request and instruction from Samuel

13    to achieve that within the time period

14    that I still remained at the company.

15         Q.    Achieve what?

16         A.    To find a way to have

17    Carmen's agreement terminated.

18         Q.    Okay.  You didn't achieve

19    that, did you?

20         A.    I wasn't able to due to time

21    constraints.

22         Q.    What did you to do achieve

23    it?

24         A.    Without recalling everything,

25    specifically, I do know that I flew to

1              RYAN C. BERRIS VOLUME I
2       Miami.
3            Outside of e-mail communications
4       with, I believe, Ms. Jorda and John
5       Maatta, I also flew to Miami at the
6       instruction, I believe, of Samuel to meet
7       with Carmen in-person, cause he asked me
8       to see if I could find a way to have the
9       agreement go away without having her
10      attorneys involved.
11           Q.    Okay.  Did you meet with her
12      in person?
13           A.    Yes.
14           Q.    Okay.  Did you talk to her on
15      the phone?
16           A.    After this point, after May
17      4th?
18           Q.    Yeah, let's just -- what I'm
19      asking you is, you told me in the time
20      permitted, you sought to have the
21      agreement terminated.  And I'm asking you
22      more, specifically, what you did to
23      accomplish that and you rattled off some
24      things.  And I'm just trying to understand
25      what you told me.

1          RYAN C. BERRIS VOLUME I
2          A.    Okay.
3          Q.    So hang on.  Let me ask again.
4          Okay.  So you referenced an
5     in-person meeting with Carmen Jorda in
6     Miami, right?
7          A.    Yes.
8          Q.    Okay.  You referenced e-mail
9     communications with her and her Counsel,
10    right?
11         A.    Yes from what I can recall.
12         Q.    And so, in your e-mail
13    communications with her and her Counsel,
14    what did you say?
15         A.    I don't recall.
16         Q.    Okay.  Did you have any phone
17    calls with Ms. Jorda or her Counsel about
18    getting the agreement terminated?
19         A.    I believe so.  But I would
20    need to check my records to be more
21    precise.
22         Q.    What records would you need
23    to check?
24         A.    I would need to check e-mails
25    and/or text messages that could be

1          RYAN C. BERRIS VOLUME I
2     relating to that.
3          Q.    Okay.  The in-person meeting
4     with Carmen Jorda that you had in Miami,
5     what day was that?
6          A.    I don't recall, specifically.
7     But I -- there's a -- I believe there is
8     some documents that have been produced
9     that evidence this.
10          Q.    Do you know, generally, when
11     it was?
12          A.    I can just say it occurred
13     sometime in May of 2022.  So, naturally,
14     it occurred sometime between -- in the
15     first three weeks, I would say, of
16     May 2022, because I receive the
17     termination notice on or around May 19th?
18          Q.    Does May 7th sound right?
19          A.    I don't recall.
20          Q.    Subject to check?
21          A.    Subject to check.  It could
22     be or it could be some days thereafter.
23          Q.    Were any e-mails and phone
24     calls around that same period, May of
25     2022?

1          RYAN C. BERRIS VOLUME I

2          A.    To the best of my

3     recollection, there certainly could have

4     been.

5          Q.    Okay.  What in substance did

6     you discuss with Ms. Jorda during your

7     in-person meeting with her?

8          A.    We had discussed finding ways

9     to find amicable ways to end her

10    agreement.  I had let her know that this

11    was not my decision and I felt bad but I

12    wanted to do whatever we could to have

13    something that was palatable for both

14    sides.

15         Q.    Did you offer to pay her

16    bills personally?

17         A.    At that meeting?  No.

18         Q.    What was her response?

19         A.    To the discussion?

20         Q.    Yes.

21         A.    To the best of my

22    recollection, she was, I think, upset

23    during that period, because I think

24    without speaking on her behalf, I felt

25    that, you know, her heart was broken as

Page 400

1              RYAN C. BERRIS VOLUME I
2     well.  She had opened up her connections
3     and was doing what she could do to add
4     value to the company.
5          And, also, just to be very
6     transparent, I was supposed to be meeting
7     with her one on one without her Counsel
8     present.  However, she was insistent that
9     John Maatta be -- listen into the
10    discussion, which he did via telephone.
11         Q.    Did she tell you that De
12    Tomaso was in breach in contract?
13              (Stenographer clarification.)
14         Q.    Did she tell you that De
15    Tomaso was in breach of contract?
16         A.    I cannot recall, specifically,
17    but I think she had may have said that or
18    her Counsel may have said that.
19         Q.    And so, before the meeting
20    happened, she told you that she was going
21    to her business manager, as well as her
22    legal team on speaker phone, right?
23         A.    I think that sounds about
24    correct.
25         Q.    Okay.  Was any legal action

Page 401

1                RYAN C. BERRIS VOLUME I

2      against De Tomaso discussed at that

3      meeting?

4            A.    Not to my knowledge, no.

5            Q.    How did it leave off then?

6            A.    I cannot recall, specifically.

7      I do know that Ms. Jorda was upset after

8      the meeting.  I said something along the

9      lines of, I'm sorry, this is not my

10      decision or out of my control.  And I

11      don't recall any subsequent discussions

12      with her thereafter.  But there may have

13      been some e-mail or text messages with

14      her or with John Maatta.

15            Q.    Okay.  Let's look at another

16      document.

17                  (Deposition Exhibit Berris 37,

18            WhatsApp text thread between

19            Norman Choi and Sugar DT00110200

20            to DT00110205 marked Confidential,

21            was marked for identification.)

22            Q.    Now, just so we're all clear

23      on this, all of this -- all these efforts

24      with Carmen Jorda you didn't think you

25      had made any mistakes with respect to De

1          RYAN C. BERRIS VOLUME I
2      Tomaso dealing with her, right?
3          A.    With regards to her value to
4      the company and the decision to on board
5      her, no, I don't feel that was a mistake.
6          Do I feel that, as I had mentioned
7      earlier, in general, Mr. Choi and I could
8      have been more transparent with each
9      other?
10         I think, absolutely, on both sides.
11         Q.    Okay.  So you don't think it
12     was not a mistake not to share the
13     agreement with Mr. Choi, for instance?
14         A.    I was -- again, we could have
15     been more transparent.  I was busy with
16     many many items and it was not something
17     that I was purposefully trying to
18     withhold.  But it was something that I
19     was taking responsibility for any type of
20     financial deviation from her September
21     agreement, because the company De Tomaso
22     at the time was in arrears to many
23     ethical partners.
24         Q.    How was Mr. Choi to be more
25     transparent with you about a contract he

Page 403

1              RYAN C. BERRIS VOLUME I
2     didn't know existed?
3          A.    I think Mr. Choi had entered
4     into multiple agreements going back to
5     2021 without my knowledge.  And so, as I
6     had mentioned earlier, our relationship
7     had began to deteriorate starting in the
8     second half of 2021 leading up until my
9     departure from the company.
10          Q.    So he was supposed to be more
11    transparent with you about the Jorda
12    relationship by telling you about other
13    agreements going back to 2021 that he had
14    entered without your knowledge?
15          A.    I think without speaking for
16    Mr. Choi, I feel that we both, in
17    retrospect, could have been more
18    transparent with each other on various
19    matters.
20          Q.    Okay.  My question to you
21    was, how was it that Mr. Choi was supposed
22    to be more transparent with you about the
23    Jorda arrangement?
24          A.    I feel that he could have
25    chosen to just meet with me directly and

1           RYAN C. BERRIS VOLUME I
2    not sending Samuel Lui, as an
3    intermediary, who has given me explicit
4    instruction, for which I always wished
5    that I could just have heart to hearts
6    with Mr. Choi.
7           Q.    Okay.  So he could have met
8    with you after the fact to discuss his
9    issues with the Jorda contract?
10          A.    I feel that Mr. Choi and I
11   should have handled this matter directly
12   instead of having Samuel as an
13   intermediary.
14          Q.    Didn't Mr. Choi and others at
15   De Tomaso tell you they had an issue with
16   the Jorda arrangement, specifically?
17          A.    In which context?
18          Q.    In any context.
19          A.    There had been certain
20   comments, you know, or points raised to
21   me or Mr. Choi.  I can only speak to the
22   ones I was aware of.  But those may have
23   come from Hugo de Sadeleer and then, you
24   know, Mr. Choi had mentioned something to
25   me on one occasion.

1       RYAN C. BERRIS VOLUME I

2       Q.    Yeah.

3       Mr. Choi told you directly and

4    explicitly that he had a real problem

5    with the Carmen Jorda arrangement, right?

6       A.    He told me that he was not

7    seeing her value.  This, I think, was on

8    or around February of 2022.

9       But I feel that Mr. Choi was

10   unaware of most of the activities that I

11   had been working on with her in order to

12   create value and open doors for the

13   company.

14            (There is a discussion off

15       the record.)

16       Q.    Alright.  Let's talk about

17   what I marked as Exhibit 37, which is

18   another text thread with you and Mr.

19   Choi, right?

20       A.    No, I believe this is with

21   Mr. Choi and his wife.  It says, "Norman

22   Choi and Sugar."

23       Q.    Okay.

24       A.    I'm assuming that's his wife.

25       Q.    Down here below where it

1              RYAN C. BERRIS VOLUME I
2      says, "unknown," that's not you?
3           A.    Well, at the top, it shows
4      that I was not part of this conversation.
5      Maybe this is -- I'm not certain, but
6      maybe this was a message that Mr. Choi
7      had forwarded to his wife.
8           Q.    Okay.  You can set that one
9      down.
10               (There is a discussion off
11          the record.)
12          Q.    I'm going to show you another
13     document, okay?
14          A.    Okay.
15               (Deposition Exhibit Berris 38,
16          WhatsApp text thread between
17          Norman Choi and Ryan Berris
18          DT00157965 marked Confidential,
19          was marked for identification.)
20          Q.    Alright.  I'm going to mark
21     this Exhibit 38 here.
22          Okay.  This is a short text exchange
23     between you and Norman Choi, right?
24          A.    Yes.
25          Q.    Okay.  And this is May 8th of

1            RYAN C. BERRIS VOLUME I
2       2022, right?
3            A.    Okay.
4            Q.    And here you again say you're
5       sorry, right?
6            A.    Yes.
7            Q.    Okay.  But you didn't mean
8       that, right?
9            A.    This message was sent at the
10      instruction of Samuel Lui.
11           Q.    My question was you didn't
12      mean it, right?
13           A.    I meant I'm sorry in a -- to
14      the extent whereby I was sad that our
15      relationship was tense.  But I was not
16      apologizing for the things that Mr. Lui
17      was asking me to.
18           Q.    Okay.  Did you say that in
19      this text message?
20           A.    I did not.
21           Q.    Okay.
22           A.    Samuel had told me that the
23      situation was very serious.  And, also,
24      at this point in time, Samuel had
25      informed me that Mr. Choi had hired legal

1           RYAN C. BERRIS VOLUME I
2     Counsel against me and that it was very
3     important that I use specific words.
4           Q.    Okay.  Again, so when you say
5     you're sorry, it's not sorry -- you're
6     not sorry for anything that you did,
7     right?
8           A.    With regards to this, I was
9     sorry in general.  As I said, I felt at
10    that point and in retrospect now that we
11    could have been more transparent with one
12    another.  However, the reason for this
13    specific message and the language was at
14    the instruction of Samuel.
15          Q.    Where were you when you sent
16    this?
17          A.    I don't recall.  I would have
18    to review the documents.
19          Q.    Was anybody there with you?
20          A.    I don't recall.
21          Q.    Okay.  And so, when you write
22    up above, "Please note that I am taking
23    responsibility to get this matter
24    sorted," that's a reference to the Carmen
25    Jorda situation?

1          RYAN C. BERRIS VOLUME I

2          A.     Yes.

3          Q.     And the response that you

4     took to get it sorted was what we

5     discussed earlier, the phone call, the

6     potential phone calls e-mails and the

7     in-person meeting with Ms. Jorda?

8          A.     Yes.

9          Q.     Okay.

10               (There is a discussion off

11          the record.)

12          Q.     Here you write that you're

13    open to the notion of the "potential cost

14    of her agreement being deducted from the

15    salary of my to-be-signed employment

16    contract," right?

17          A.     Yes.

18          Q.     And so the "to-be-signed

19    employment contract" was the one that we

20    discussed earlier with the $400,000

21    salary and the 2 percent commission and

22    the Porsche and the De Tomaso vehicle and

23    the equity, right?

24          A.     The paper agreement, yes.

25    But the oral agreement that we came upon

```
 1              RYAN C. BERRIS VOLUME I
 2      back in 2020 was, specifically, with
 3      regards to the 10 percent and the
 4      400,000.
 5          Q.    I'm asking you when you wrote
 6      this, were you referring here to the
 7      "to-be-signed employment contract," that
 8      was a written document reflecting the
 9      terms I just identified, right?
10              MR. ZACH:  When is this
11          dated, sir?  I'm sorry?
12              MR. WERNER:  It's May.
13              MR. ZACH:  Oh, I see.  Sorry,
14          sorry.
15          A.    I think that's fair.
16          Q.    I mean, these are your words.
17      I'm asking you what you meant when you
18      wrote them?
19          A.    Yeah, I mean -- I meant what
20      I said.  And, also, this is why I sent
21      the e-mail, I think, days previously
22      asking Diana and Norman to pay her
23      because this would help me find a more
24      efficient way to terminate our agreement,
25      which is what I was informed Mr. Choi
```

Page 411

1        RYAN C. BERRIS VOLUME I
2    wanted.
3        Q.    Yeah.  I asked you about the
4    to be signed employment contract, right?
5        You write, "my to-be-signed
6    employment contract."
7        And what I'm asking you is, those
8    are your words, right?
9        A.    Yes.
10        Q.    Okay.  And you are referring
11    to the employment agreement that includes
12    the terms that I had just identified and
13    we discussed for quite a bit earlier?
14        A.    Yes.
15        Q.    Right?
16        Okay.  Did Mr. Lui instruct you to
17    reference a "to-be-signed employment
18    agreement" [sic] in this text?
19        A.    I can't recall.
20        Q.    Okay.  I'm going to show you
21    another document.
22             (Deposition Exhibit Berris 39,
23        WhatsApp text thread between
24        Norman Choi and Ryan Berris
25        DT00158019 & DT00158020 marked

```
 1              RYAN C. BERRIS VOLUME I
 2          Confidential, was marked for
 3          identification.)
 4          Q.    I'm going to mark this one
 5      Exhibit 39.
 6          Alright.  This is more text threads
 7      between you and Mr. Choi.
 8          This one is dated the 16th of May,
 9      2022, right?
10          A.    Yes.
11          Q.    Alright.  And, again, here
12      you write that you're sorry, right?
13          A.    Please allow me just to
14      review the document.
15          (The witness reviews the exhibit.)
16          Yes.
17          Q.    Right.
18          Where were you when you sent this?
19          A.    I do not recall at this
20      moment.  But I feel like there is
21      document likely that will answer that
22      question.
23          Q.    What do you mean you feel
24      there are documents that might answer
25      that question?
```

                    RYAN C. BERRIS VOLUME I

1          A.    I feel that in the documents
2    that we have produced, it would be
3    reflected on my credit card transactions
4    and also where I was staying at the time.
5          Q.    How would your location when
6    you sent these text messages be reflected
7    in your credit card transactions?
8          A.    Meaning, like the general
9    occasion.  So I feel that it would show
10   if I was in New York City or if I was in,
11   for example, Italy or Germany at the
12   time.
13         Q.    Okay.  Were you in Italy or
14   Germany at the time?
15         A.    I don't recall at this
16   moment.
17         Q.    Okay.  So this is like a
18   fairly intense and traumatic experience
19   in your life, right?
20         A.    The most by far.
21         Q.    Yeah.
22         And De Tomaso was your life, right?
23         A.    Perhaps an understatement
24   but, yes.

1          RYAN C. BERRIS VOLUME I
2          Q.    I'm sorry?
3          A.    I said, I perhaps would even
4     view this as an understatement.  But,
5     yes, it was my everything.
6          Q.    That's you're "everything."
7          It's your "everything," right?
8          A.    Yeah.
9          Q.    So, when you're writing these
10     e-mails or text messages, you don't know
11     where you were?
12          A.    Well, this covers -- the
13     topics we're covering today are such a
14     long period.
15          At this moment, I cannot recall,
16     specifically, where I was when I sent
17     this communication.
18          Q.    Okay.
19          A.    But I'm confident it would be
20     reflected in the documents that have been
21     produced.
22          Q.    Okay.  Is this another text
23     that Mr. Lui instructed you to send?
24          A.    No, this one -- I drafted
25     these myself.  That was from the heart.

```
 1              RYAN C. BERRIS VOLUME I
 2         Q.    Oh, this was from the heart?
 3         A.    Yes.
 4         Q.    Okay.  So the phone calls you
 5    made to Mr. Choi, were those from the
 6    heart to?
 7         A.    Well he never answered my
 8    calls.
 9         Q.    You placed them, right?
10         A.    Yes.
11         Q.    Okay.  And so those phone
12    calls to Mr. Choi were not something that
13    you instructed by anyone to do?
14         A.    From what I can recall for
15    these, no.
16         Q.    Okay.  And this e-mail, this
17    text message that you wrote here that
18    says -- you know, starts, "dear Norman,
19    this is something that you were not
20    instructed to send by anybody?
21         A.    From what I can recall, I
22    sent this under my own willpower and from
23    the heart.  I was trying to have direct
24    communication with Mr. Choi instead of
25    going through Samuel.
```

1                RYAN C. BERRIS VOLUME I

2          Q.    Okay.  And here you say, "I'm

3     sorry," right?

4          A.    Yes.

5          Q.    What were you "sorry" for?

6          A.    For whatever may have been on

7     his mind that was creating this tension

8     and lack of communication.  I cannot

9     speak to everything that Mr. Choi was

10    thinking or ways he interpreted matters

11    at the time.

12          I can only speak to what I felt

13    and, also, what was being relayed to me

14    by Samuel regarding Norman's state of

15    mind and his wishes.

16          Q.    Okay.  So you're not sorry

17    for anything -- you're not saying you're

18    sorry for anything you did.  You're sorry

19    for the way Mr. Choi feels?

20          A.    I am -- I believe what I was

21    saying here is that, in general, as a

22    best friend, as family, I was saying, I'm

23    sorry.  I really wanted to rekindle the

24    relationship.  And it broke my heart that

25    things had deteriorated to this manner.

1              RYAN C. BERRIS VOLUME I
2          And as I had said in an earlier
3     response that, in retrospect, I think, if
4     Mr. Choi and I were both more transparent
5     with each other, perhaps, you know, these
6     issues could have been addressed in a
7     different way.
8          Q.    Well, I'm asking you what
9     you're saying you're "sorry" for.
10          What is it?  What is it that you're
11     telling Mr. Choi you're "sorry" for here?
12          A.    I can't recall, specifically.
13     But I was saying -- it was general.  So I
14     was saying, I'm sorry based upon the
15     things that Samuel is relaying to me and,
16     also, just in general that we owed it to
17     each other to speak directly.
18          Q.    Are you saying you're sorry
19     for anything you did during your tenure
20     at De Tomaso?
21          A.    In this message?
22          Q.    Yes.
23          A.    I would be speculating.
24          Q.    I mean, you understand these
25     are your words, right?

Page 418

1          RYAN C. BERRIS VOLUME I
2          A.    Yes.
3          Q.    So you're speculating about
4     what you wrote here?
5          A.    Well, I can't recall,
6     specifically, what I was thinking through
7     at the time.  There was a lot of
8     emotions.
9          But what I can say is that, in
10     general, I was telling Norman, as I had
11     relayed I think to him and Diana in a
12     previous e-mail where I said, it was my
13     everything, my sacrifices.
14          And that e-mail, which I think was
15     dated, roughly, May 6th I never received
16     a response to.  And only feedback was
17     coming from Samuel, who told me that
18     communication and outpouring, my emotions
19     to Mr. Choi was not well received and in
20     effect Mr. Choi had hired Counsel against
21     me.
22          Q.    Okay.  I'll give you one more
23     shot.
24          When you say that you're sorry,
25     were you actually saying you were sorry

1          RYAN C. BERRIS VOLUME I

2     for anything that you did while you were

3     at the company?

4          A.     In part, yes.

5          Q.     Okay.  What?

6               MR. ZACH:  Asked and answered.

7               But go ahead.

8          A.     Yeah, if I were to use

9     specifics, I would say that I --

10          Q.     That's what I'm asking.

11          A.     -- I could have handled the

12     West Port lease better.  We could have

13     been in general more transparent with

14     each other, which I think would have

15     perhaps prevented some of these issues.

16          Q.     Alright.  Mr. Berris, what

17     you're sorry for is that you're not

18     working for De Tomaso anymore; isn't that

19     like fair?

20          You're sorry that your relationship

21     with De Tomaso is over at this point,

22     right?

23          A.     No.  Because I had only

24     resigned from the Board at this point in

25     time.

1          RYAN C. BERRIS VOLUME I
2          I did not receive a termination
3      notice until some days thereafter.
4          Q.    Okay.  Were you an at will
5      employee for the company after you
6      resigned from the Board?
7          A.    What do you -- what's --
8          Q.    Well, did you have, like --
9      you told me earlier that you had a
10      contract that lasted -- an employment
11      agreement that lasted more than a year;
12      is that right?
13          A.    Yes.
14          Q.    Okay.  When you write here,
15      "we shouldn't hurt each other," how were
16      you hurting Norman?
17          A.    At the time, I did not know.
18      I only was -- the only knowledge I had at
19      that moment in time -- based on what
20      Norman was on his mind but, again, I
21      can't speak to it -- was what Samuel was
22      relaying to me in in-person meetings and
23      on the phone after his meetings with Mr.
24      Choi in New York, which were then being
25      relayed to me giving me instructions on

1          RYAN C. BERRIS VOLUME I
2     what to do.
3          Q.    Alright.  So, when you say,
4     "we shouldn't hurt each other," this
5     isn't saying that you have hurt Norman in
6     any way, right?  Is that what you're
7     saying?
8          A.    I can't speak to whether I
9     had hurt Norman.  I could -- was clear
10    that Norman was upset, but we were not
11    communicating directly.
12         Q.    I'm asking you about the
13    contents of your own words that you are
14    communicating to Mr. Choi.  And I'm
15    trying to real hard to understand what in
16    the world it is you were trying to
17    communicate.
18         And when you write, "we shouldn't
19    hurt each other," are you communicating
20    any information that you are acknowledging
21    that you have hurt Mr. Choi?
22         A.    I am -- I can't say specifics
23    to what may or may not have hurt Mr.
24    Choi.
25         But what I can say is in these

1           RYAN C. BERRIS VOLUME I
2       messages, I am pouring my heart out
3       because De Tomaso was my life, Mr. Choi
4       was my life.
5           Q.    Okay.  So, in these messages,
6       you're saying sorry when you're not,
7       right?
8           A.    That's not true.
9           Q.    And you're saying that you're
10      taking responsibility for things that, in
11      fact, you don't believe you erred about
12      or mishandled at all, right?
13          A.    I'm saying, in general, that
14      I was outpouring my love to Norman, but
15      also saying that I'm sorry relating to
16      the fact that we should -- that we owed
17      it to each other to be more transparent
18      and that, therefore, I was trying to sit
19      face to face with him or to communicate,
20      because I was tired of going through
21      Samuel, as an intermediary.
22          I did not know, specifically, what
23      Samuel was relaying to Mr. Choi and I
24      only knew what Samuel was relaying to me
25      that he claimed was coming from Mr. Choi.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  So, you know, it's
3     interesting.
4          You don't say anything about
5     transparency in any of your text messages
6     to Mr. Choi, do you?
7          A.    I can't speak to that without
8     reviewing the documents.
9          Q.    And you don't say anything
10    about the fact that you believe your
11    ability to communicate with Mr. Choi is
12    being impeded by Mr. Lui serving as an
13    intermediary, right?
14         A.    In these specific messages,
15    no.
16         Q.    Yes.
17         And so, when you say you shouldn't
18    hurt one another, what you're really
19    referring to is Mr. Choi hurting you,
20    right?
21         A.    That's how I felt at the
22    moment.
23         Q.    Okay.  So let's go back down
24    to the next page of this, which is DT
25    ending in 20.

Page 424

```
1              RYAN C. BERRIS VOLUME I
2         A.    Okay.
3         Q.    The last line there, this is
4    you writing, "I'm only human and make
5    mistakes.  We all do.  I'm taking
6    ownership of the situation and will only
7    grow to be better in the future."
8         Do you see that?
9         A.    Yes.
10        Q.    Okay.  What are you saying
11   there?
12        A.    I was doing the best I could
13   to try to reconnect with Mr. Choi and I
14   was referencing many items with regards
15   to mistakes.  They included those that
16   Samuel had told me to relay to Mr. Choi
17   to tell him what he wanted to hear.
18        But then separate to that, you
19   know, I was trying to put myself in
20   Norman's shoes.  And I do say here that,
21   in retrospect, I could have handled, for
22   instance, the West Port lease better.
23        So, as an aggregate, I think,
24   that's, roughly, along the lines of what
25   I was trying to relay.
```

1          RYAN C. BERRIS VOLUME I

2          Q.    Okay.  You say here that

3     you've made "mistakes," right?

4          A.    Yes.

5          Q.    Did you believe when you sent

6     this text message that you had made

7     mistakes?

8          A.    Yes.

9          Q.    Which ones?

10         A.    I feel that we could have

11    both been more transparent with each

12    other, which, I think, in my view, is a

13    mistake on both parts.

14         I feel I could have handled the

15    West Port lease situation better.  So,

16    again, I admit I view that, in

17    retrospect, as a mistake.

18         And, also, in general because there

19    were so many moving parts, the fact that

20    we both let our relationship deteriorate

21    over the course of the second half of

22    2021 to 2022, because there were so many

23    new parties coming into the mix and it

24    was -- I was devastated.  My heart was

25    broken.

1          RYAN C. BERRIS VOLUME I
2          Q.    Okay.  Any other mistakes for
3      which you are taking ownership of here?
4          A.    At the moment, not that I can
5      recall, specifically.
6          Q.    Okay.  After these text
7      messages, there came a time where you were
8      out of touch with your family, right?
9          A.    Yes.
10          Q.    To the point where they filed
11      a missing persons report about you?
12          A.    Yes.
13          Q.    Where did you go?
14          A.    So the day after receiving
15      the termination letter, I had gone to the
16      Airbnb that I had originally booked for
17      the De Tomaso team for them to stay for
18      the Villa d'Este Lake Como event, which
19      is -- I was in Italy to meet Mr. Choi in
20      person.
21          And the main reason that I went to
22      the Airbnb the following day is because I
23      was receiving frantic calls from the
24      Airbnb host, who was an elderly woman,
25      and no one was responding or not showing

Page 427

1          RYAN C. BERRIS VOLUME I
2    up.
3          So, I believe, I spoke with Hugo de
4    Sadeleer on or around that period and
5    Hugo, from what I can recall correctly,
6    he was telling me -- I could hear
7    background noise.  He was telling me that
8    he couldn't really talk.  The environment
9    where he was very nasty.
10         So I went to the Airbnb.  I stayed
11   there through the time that I had booked
12   it for and personally paid and then I
13   went to the airport and flew back to New
14   York.
15         Q.    Okay.  How long were you in
16   Italy then?
17         A.    I don't recall, specifically.
18   I would have to go back and look at the
19   records.  But whenever the end of the
20   Airbnb was booked for, I then flew that
21   day from Milan Airport back to JFK.
22         Q.    Well, was it days?  Was it
23   weeks?  Like, can you give any sense of
24   the timeframe?
25         A.    I don't want to speculate.

1              RYAN C. BERRIS VOLUME I
2     But I feel that it was not weeks.  I
3     think it was just a matter of days.
4          Q.    Okay.  And when you got back,
5     did you get back in touch with your
6     family?
7          A.    No.  From what I recall, on
8     -- as I don't have the communication
9     showing the precise date of termination.
10    I believe it was, roughly, May 19th.
11    After getting in touch with the Airbnb
12    host, I recall turning my electronics off
13    and I kept my electronics off, meaning,
14    my phone.  I believe the first time I put
15    my phone back on was in October of 2022.
16         Q.    So you turned your phone off
17    in May and didn't turn it back on until
18    October?
19         A.    Yes.
20         Q.    Was turning off your phone or
21    other electronics like that something
22    that you did on a regular basis?
23         A.    Not to that period, no.
24         Q.    To what period then did you
25    do it regularly?

Page 429

1          RYAN C. BERRIS VOLUME I
2          A.    Well, I never did that
3     regularly.
4          But if I had an immense amounts of
5     work on my plate that had specific
6     deadlines or other variables, that I
7     would at times turn my phone off to be
8     fully focused on what needed to be
9     achieved and then naturally and long-range
10    flights, my phone would be off.
11         Q.    So did you get back in touch
12    with your family back in October then?
13         A.    I got back in touch with my
14    family when the police approached me, who
15    were sent to try to find me in, if I
16    recall, June of 2022.
17         They told me that they were trying
18    to locate me to see if I was okay and
19    that my family was incredibly concerned
20    and the -- I don't know if there were
21    officers at the time told me they're just
22    doing what they were sent to do, but it
23    was at my discretion if I wanted to reach
24    out to my family at the time.
25         And I was not ready to do so at

1          RYAN C. BERRIS VOLUME I
2     that point for numerous reasons.
3          So, from what I can recall, I did
4     not reach out to my family until, I
5     believe, sometime towards the end of June
6     when I ended up taking a car service I
7     was able to book online to their home.
8          Q.    Okay.  Did the reasons that
9     you didn't get back in touch with your
10    family have anything to do with what had
11    happened at De Tomaso?
12          A.    That was the direct result.
13          Q.    Okay.  And so is it fair to
14    say that you didn't want to tell them
15    what had happened at De Tomaso?
16          A.    I -- from now looking at
17    communications that were sent thereafter,
18    my family was made aware because, I
19    believe, there was a paper notice sent to
20    at the time De Tomaso's HQ address, which
21    was my father's personal office in
22    Glastonbury.
23          So, after meeting with my family,
24    you know, I think, roughly, in late June,
25    they had let me know that they had

1         RYAN C. BERRIS VOLUME I
2    received the notice and they didn't know
3    what was going on and my father and my
4    family, my friends were doing everything
5    they could to try to locate me to make
6    sure that I was okay.
7         Q.    Yeah, I'm just trying to
8    understand why it is that you didn't want
9    to communicate with your family about
10   what was going on with your relationship
11   with De Tomaso.
12        A.    It was a moment that was
13   incredibly traumatic for me.  I needed
14   time to process and then, also, I was
15   incredibly concerned after what Samuel
16   had told me on the phone that things
17   would not end well and my interpretation
18   of that is that my personal safety could
19   be at risk.
20        Q.    So you're going through a
21   "traumatic" experience and one in which
22   that you thought your "personal safety
23   could be at risk" and that's why you
24   didn't want to get in touch with your
25   family?

1                RYAN C. BERRIS VOLUME I
2          A.    In part, because I did not
3     want to put anyone else in harm's way.
4          Q.    Oh, so you believed you were
5     at risk and as a means of protecting your
6     family, your response was not to tell
7     them that they might be at risk too?
8          A.    My response is that I turned
9     off my communications to avoid trying to
10    be located via a -- certain services or
11    people that may be trying to potentially
12    do harm to me.
13         Q.    Okay.
14         A.    I was processing everything
15    that unfolded to me and then I began to
16    conduct a private investigation.
17         Q.    You began "to conduct a
18    private investigation"?
19         A.    Yes.
20         Q.    Okay.  And how did you do
21    that?
22         A.    I did that based upon
23    reviewing -- I had my laptop with me.  So
24    my phone was off -- reviewing certain
25    documents in the past and then, also,

1           RYAN C. BERRIS VOLUME I
2    conducting extensive search through
3    various online resources and putting
4    together, trying to make sense of what,
5    actually, happened and because everything
6    was very very odd and off-putting.
7           Q.    Okay.  So what documents did
8    you review?
9           A.    There would be hundreds,
10   hundreds of documents.
11          Q.    Tell me one of them.
12          A.    Some of the financial past
13   dealings by Mr. Choi and Mr. Michael Choi
14   and, also, Bill Majcher, if I'm saying
15   that correctly, on the Hong Kong Exchange.
16          Q.    So these were documents that
17   were De Tomaso's documents?
18          A.    No.  They are readily
19   available on the Hong Kong Exchange
20   website database.
21          Q.    Okay.  In your answer to a
22   question that I didn't ask you, you told
23   me that you reviewed documents and that
24   you "conducted extensive searching."  I
25   want to talk about those separately.

1              RYAN C. BERRIS VOLUME I

2         A.    Okay.

3         Q.    Okay.  When you reference

4    "documents," were those documents that

5    you had received from De Tomaso?

6         A.    I reviewed documents during

7    the period from my departure from the

8    company up until and after when I turned

9    my phone on in October of 2022 pertaining    to

10   De Tomaso but also going back through old

11   documents from Apollo.

12        Q.    My question is, were those De

13   Tomaso records?

14        A.    They were documents that had

15   on file in my computer from my time at De

16   Tomaso.  So some of them would be.

17        Q.    Okay.  And some of them were

18   Apollo records?

19        A.    Yes.

20        Q.    Okay.  And then the online

21   searching that you did, tell me about

22   that.

23        A.    It was quite extensive.  But,

24   as I mentioned, I had been doing as much

25   due diligence as I could to make sense of

Page 435

1          RYAN C. BERRIS VOLUME I
2     what was happening to me and why certain
3     individuals that I had trusted for many
4     years were acting in a certain way, which
5     I found not normal.
6          So I then began reviewing public
7     documents on the Hong Kong Exchange,
8     also, offshore leak databases from some
9     regulatory authorities and, also,
10    non-profits.
11         I had been reviewing a website from
12    David Webb, who has an extensive site
13    with articles tying to public filings on
14    the Hong Kong Exchange.
15         Q.    Okay.  So tell me what
16    findings and conclusions did you reach
17    based on your "extensive" review of
18    documents and research during this period
19    after you had severed ties with the
20    company and had turned off your phone and
21    been in incommunicado with your family.
22         A.    Many items, which consist of
23    pass dealings of Norman Choi, Michael
24    Choi, Bill Majcher, if I'm pronouncing
25    the name correctly, other associates that

1          RYAN C. BERRIS VOLUME I

2     had been involved in their course of

3     self-dealings in the past, Michael Choi

4     and other members of the David Webb's

5     reported Enigma network and, also, the

6     other networks that he had identified

7     such as -- and whether I'm pronouncing

8     this correctly, the -- Huarong network,

9     the Baron network, amongst other public

10    reports that were put together on David

11    Webb's website.

12         Q.    Okay.  So these were all

13    things that you uncovered during this

14    period that you had turned off your

15    phone, right?

16         A.    Correct.

17         Q.    So this was June of 2022?

18         A.    I don't recall the specific

19    date.  But it really began after my

20    departure from the company, when I was

21    trying to understand and then the

22    extensiveness of my research increased

23    with thoroughness and in cadence in the

24    subsequent months.

25         Q.    Did anybody help you with

Page 437

1          RYAN C. BERRIS VOLUME I
2     this investigation you were launching?
3          A.    Not prior to meeting with
4     Counsel.
5          Q.    Okay.  And I'm not asking you
6     about your meetings with Counsel.
7          And so going back, I had asked you
8     a question that I really do want an
9     answer to.
10         Your investigation, what findings
11    and conclusions did you, Ryan Berris,
12    reach as a result of your investigation?
13         A.    Substantive evidence that Mr.
14    Choi and his associates were involved in
15    some of the reported Enigma network and
16    other self-dealings and connected
17    transactions on the Hong Kong Exchange
18    and, also, into the US markets.
19         Q.    Anything else?
20         A.    There is very extensive list.
21    I --
22         Q.    I want to know -- that's what
23    I'm asking.
24         A.    Sure.
25         Q.    I want the list.

1          RYAN C. BERRIS VOLUME I
2               MR. ZACH:   To the best of
3          your recollection.
4          A.     Yeah.  So, to the best of my
5     recollection --
6          Q.     Well, let me ask you this.
7     Let me ask you this.
8          This investigation that you did,
9     did you prepare notes or a report of any
10    kind in writing?
11         A.     Yes.
12         Q.     Where is that?
13         A.     They're on my computer
14    amongst other sources.  I can't recall
15    everything off of that.
16         Q.     Did you provide that
17    information to your Counsel?
18         A.     I don't know if I provided
19    everything to them.  I may have.  But we
20    had many meetings regarding this.
21               MR. WERNER:  [REQUEST] We want
22          all of those documents produced to
23          us immediately.
24         Q.     I want the -- I want to see
25    the documents and, likely, we'll be

1          RYAN C. BERRIS VOLUME I
2     visiting on that document or documents,
3     whatever it is that you prepared again.
4          But walk me through.  Give me the
5     full list of all of your findings and all
6     of your conclusions, based on your
7     research after you separated from De
8     Tomaso.
9          A.    So, due to the extensive
10    nature, I'm not able to recall all of the
11    instances.  But I can speak to some
12    specific.
13         Q.    I want to know what you can
14    tell me sitting here today were your
15    findings and conclusions from the
16    investigation that you said you undertook
17    after you left the company.  I want every
18    one that you can remember.
19         A.    So off or and -- and I'm
20    speaking at a high level.
21         Q.    I don't want "at a high
22    level."
23         I want the information that you
24    have sitting here today that's in your
25    head; specifics.

1              RYAN C. BERRIS VOLUME I
2         A.    So what I'm able to speak to,
3    from what I can recall offhand, is --
4         Q.    Well, let me ask you this.
5    Let me ask you this.
6         Is the list all the stuff that you
7    allege in the Complaint?
8         A.    Not "all."
9         Q.    Okay.  The things that you
10   reference in the Complaint, do those all
11   stem from your investigation?
12              MR. ZACH:  He's only asking
13        you about things you might have
14        learned independent of any
15        discussions with us.
16        A.    Pertaining to the specific
17   sections of the Complaint that reference
18   these topics.
19        Q.    I don't know what that means.
20        A.    Okay.  Would you mind just
21   rephrasing the question?
22        Q.    Yeah.  I'm trying to help you
23   by making this a little bit easier, okay?
24        A.    Okay.
25        Q.    I asked you, specifically,

Page 441

1          RYAN C. BERRIS VOLUME I
2    about what your findings and conclusions
3    are.
4          You lay out a number of allegations
5    related to dealings around De Tomaso and
6    players involved and so on and so forth.
7          Really what I'm asking you is, if I
8    want to know what conclusions and
9    findings you came to as a result of your
10   investigation, are they the ones that you
11   set forth in your Complaint?
12          A.    Yes.
13          Q.    Okay.
14          MR. ZACH:   Okay.
15          A.    But there are others, yes.
16          Q.    Okay.   And the others are in
17   your notes and documents that we haven't
18   seen; is that fair?
19          A.    I'm not sure if you haven't
20   seen.   I believe some of them may have
21   been produced.   But I can't speak to
22   whether all of them have.
23          Q.    Okay.   Well, can you -- to
24   the best of your recollection, sitting
25   here today tell me the ones -- your

Page 442

RYAN C. BERRIS VOLUME I

1

2    findings and conclusions -- that aren't

3    reflected in the Complaint.

4         A.    Mr. Choi's dealings, as well

5    as Bill Majcher with many Enigma network

6    entitles and Huarong network entities, in

7    connected transactions, in self-dealing

8    including my time prior to becoming

9    involved in Apollo.

10        I learned that an entity that Mr.

11   Choi had informed me was his, notably,

12   Pachmayr Limited was not, in fact, his.

13   It was a longtime associate Mr. Choi had

14   used for many self-dealing transactions.

15        Q.    What else?

16        A.    I became aware of the

17   connected nature to Norman Choi, the

18   Enigma network entities and other entities

19   and networks cited on David Webb's site

20   tying in Michael Choi and other parties,

21   which showed a trail of what appeared to

22   be financial misdealings and fraud over

23   the course of many years.

24        Q.    Okay.  So, just to be

25   clear -- you've said this, but I want to

1              RYAN C. BERRIS VOLUME I
2      make sure the record is absolutely clear.
3          All of the findings that found
4      their way into the Complaint, as well as
5      things that didn't relate it to
6      self-dealing, improper transactions,
7      stock manipulation, Enigma network,
8      Huarong network and so on, these were all
9      things that you came to learn after you
10     separated from De Tomaso, right?
11         A.    With the exception of the
12     instances that I had referenced in the
13     Complaint pertaining to Michael Choi
14     pertaining to Clement Mack.
15         Q.    To what?
16         A.    Pertaining to -- in the
17     Complaint, there were specific instances
18     relating to a proposed transaction
19     between Apollo and CCT Land.  Clement
20     Mack was the, I think, the ultimate
21     owner/controller of CCT Land and, also,
22     ties to Michael Choi and his SPAK on the
23     US exchange, ties with Michael Choi,
24     Norman Choi and Tom Kim on the
25     over-the-counter markets in the US with

Page 444

1          RYAN C. BERRIS VOLUME I

2     Next Generation Consumer Group.

3          Q.    What specific wrongdoing by

4     Mr. Choi or De Tomaso or any of these

5     entities that you referenced did you

6     become aware of during your employment

7     tenure with De Tomaso?

8          A.    One is cited in the Complaint

9     was the proposed CCT Land transaction

10    that occurred from what I can recall and

11    had documents to support over the course

12    mostly of 2017.

13         I remember vividly my first time in

14    Hong Kong.  I was at SPS Automotive, I

15    believe, on their second floor and we

16    were doing some work to prepare to Apollo

17    the related matters and that's when the

18    Financial Times showed up for an

19    interview regarding the transaction with

20    CCT Land and Mr. Choi's entities.

21         And during that time Mr. Choi

22    became startled and he said, uh-oh, this

23    is not good, and he told Diana, from what

24    I can recall, to make this go away.

25         Q.    Your employment with Apollo

Page 445

1            RYAN C. BERRIS VOLUME I
2      started in January of 2018, right?
3            A.    Yes.
4            Q.    Okay.  So you didn't work for
5      Apollo or De Tomaso in 2017, correct?
6            A.    I was assisting, but I was
7      not being financially rewarded.
8            Q.    You didn't have any employment
9      arrangement with Apollo or De Tomaso in
10      2017, did you?
11            A.    I did not.
12            Q.    Okay.  Alright.  Thank you.
13            Now, just -- with respect to the
14      CCT Land transaction, please tell me in
15      specific words what was the wrongdoing
16      that was involved in that.
17            If you don't know, just say, I
18      don't know, and we can move on.
19            A.    I can't recall, specifically,
20      at this time.  But I'm confident we can
21      provide documents to support.
22            Q.    Okay.  Which "documents"?
23            A.    These are documents that I
24      cannot refer to, specifically, because
25      there's too many.

```
 1            RYAN C. BERRIS VOLUME I
 2       Q.    Okay.  You reference that
 3  one, the CCT Land transaction as one
 4  cited in the Complaint.
 5       Is there anything else cited in the
 6  Complaint detailing wrongdoing during
 7  your employment tenure with De Tomaso?
 8            MR. ZACH:  Objection.
 9            I guess he can review the
10  Complaint.
11       A.    Yeah, I'd like to review it.
12       Q.    Alright.  Knock yourself out.
13       I mean, I asked you -- it's been a
14  while.  But I asked you a bit ago and
15  your testimony was that the things
16  detailed in your Complaint were things
17  that you learned as a result of your
18  investigation; is that true?
19       A.    Not in full, in part.
20       Q.    Okay.  How is it not true?
21  Tell me how it is not true then.
22       A.    Because a lot of the items in
23  the Complaint related to my time at both
24  Apollo and De Tomaso.
25       Q.    Okay.  So I'm trying to
```

Page 447

1              RYAN C. BERRIS VOLUME I
2      simplify this.
3            What I want to know from you is to
4      the extent that you are aware of
5      wrongdoing while you were employed by the
6      company, what, specifically, was that
7      wrongdoing?
8            If you need to look at the Amended
9      Complaint, look at it.  But that's what
10     I'm asking you.
11                 MR. ZACH:  Can I make a
12           suggestion?
13                 Maybe we can take a
14           five-minute break.  You can read
15           -- well instead --
16                 MR. WERNER:  Sure.
17                 MR. ZACH:  Well, you don't
18           have to do that.  That's just --
19           it's your examination.
20           Q.    Well, let me just ask you
21     this.
22           Is there anything else while
23     sitting here today that you can tell me
24     without looking at the Complaint?
25           A.    With relate to my concerns of

1              RYAN C. BERRIS VOLUME I
2       the hedge fund misdealings?
3                   MR. ZACH:  I think the
4              question -- the question is -- I
5              think his -- I don't mean to --
6              the question is, while you were
7              working at Apollo and De Tomaso,
8              what wrongdoing did you learn of?
9              This is while you're working
10             there, not afterwards.
11                  THE WITNESS:  Uh-huh.
12             Q.    Take a look -- just -- we'll
13      stay on the record.
14             We'll take -- take a look at the
15      Amended Complaint --
16             A.    Okay.
17             Q.    -- and you tell me.
18                  MR. ZACH:  I mean, I think,
19             the relevant sections -- I don't
20             think you need to read from the
21             beginning.
22                  Why don't you go to like a
23             section -- yeah.  It starts at
24             Page 30.
25                  MR. WERNER:  Alright.  Let's

Page 449

1             RYAN C. BERRIS VOLUME I

2          go off the record for a minute.

3          Q.    But I want you to stay here

4     and look at this, okay?

5                 THE VIDEOGRAPHER:  Thank you.

6          The time is 6:53.  We're going

7          off the record.

8                 (Recess taken 6:53 to

9          p.m.)

10                THE VIDEOGRAPHER:  The time

11         is 7:05 p.m.  We're back on the

12         record.  It's the beginning of

13         Media 6.

14         Q.    Okay.  Mr. Berris, when we

15    left off, I was asking you about specific

16    wrongdoing that you learned of during

17    your tenure at De Tomaso that is

18    identified in your Complaint.

19         Are you prepared to tell me about

20    that?

21         A.    Yes.

22         Q.    Okay.

23         A.    So I was aware of the CCT

24    Land transaction and the Financial Times

25    article that came out.  However, the

Page 450

1          RYAN C. BERRIS VOLUME I

2    interview for the article or background,

3    it was different than their report as

4    original reproach from my recollection.

5          He was asking about why a land

6    company would want to acquire a stake in

7    an automobile company.  So I was aware of

8    that.

9          To be clear, I was not aware of

10   David Webb's Enigma network at that time.

11   I became aware of that after my departure

12   from De Tomaso and Apollo.

13        During my time at Apollo/De Tomaso,

14   I was aware of the NGCG, New Generation

15   Consumer Group, which is referenced in

16   the complaint.

17        I was aware of the transfer of

18   funds that Norman said from SinoVision,

19   but I did not know what that meant and/or

20   if that potentially had ties to anything

21   else until after my departure from De

22   Tomaso/Apollo.

23        And I became aware of during my

24   timing at Apollo/De Tomaso of Michael

25   Choi's SPAK that Norman had informed me

```
 1              RYAN C. BERRIS VOLUME I
 2     of that is referenced in the Complaint.
 3         I, also, during my time at
 4     Apollo/De Tomaso, also, became aware of
 5     the parent self-dealing in the SPAK
 6     between Genesis and the other Defendants.
 7         Q.    Anything else?
 8         A.    I was aware of the yacht from
 9     Apollo.  Norman had sent me photos of
10     that before.
11         Q.    The what?
12         A.    The Apollo yacht that's
13     referenced in the Complaint.
14         Q.    Okay.  I just -- I want to --
15     I don't want to interrupt you.
16         But my question is really targeted
17     towards specific wrongdoing, not, you
18     know -- I don't need to know every fact
19     that you knew while you were at De
20     Tomaso.
21         What I want to know is the specific
22     wrongdoing that you were aware of while
23     you were at the company.
24         And so I'm going to walk through
25     the list that you just provided.
```

1          RYAN C. BERRIS VOLUME I
2          But are there other things in your
3     Complaint that you are alleging was
4     specific wrongdoing that you became aware
5     of while you were at the company?
6          A.    Yes.   Pertaining, notably, to
7     the SPAK process, the projections and
8     timelines that were being prepared,
9     because I was not being well-informed by
10    Mr. Choi or certain tactical partners
11    such as Capricorn of the true status of
12    prototype development and production.
13         And I was receiving concerns from
14    Roush and Idiada, amongst others, because
15    they were having a clear picture and the
16    technical program is part of a Master
17    plan where everything is quite
18    intermingled.
19         Q.    What else?
20         A.    As mentioned in the Complaint
21    when Mr. Choi told me that he was an
22    investor in Genesis.
23         Q.    Anything else?
24         A.    That's the best I can recall
25    offhand at the moment.

Page 453

1          RYAN C. BERRIS VOLUME I
2          Q.    Well, it's not "the best you
3     can recall offhand."
4          We just took a break so you could
5     go through the Amended Complaint, which
6     is consistent of all your allegations
7     against the company.
8          Did you take time and care in
9     reviewing the Amended Complaint?
10         A.    I have.
11         If you want me to revisit, to give
12    a more thorough answer, I can.  But I
13    don't know if I will recall anything else,
14    specifically, at this time.
15         Q.    Well, I -- we just -- your
16    Counsel -- at your Counsel's direction,
17    you were invited to go look at your own
18    allegations and come back and tell us
19    what wrongdoing you are aware of at the
20    company.
21         Did you do that?
22         A.    That's what I'm attempting to
23    do so now.
24              MR. ZACH:  It's a different
25         question.

Page 454

1          RYAN C. BERRIS VOLUME I

2               In the break, did you do that?

3      A.     In the break, I was --

4  outside of going to the bathroom, I was

5  reviewing the Amended Complaint as well.

6      Q.     Okay.  So, other than the

7  list that you just provided, is there

8  anything else?

9      A.     Yeah.  I became aware of

10 certain dealings and issues between We

11 Solutions, which became Apollo Future

12 Mobility Group, and Mr. Choi.

13      To be specific, Mr. Choi had raised

14 to me on a telephone phone call together

15 when he was in Hong Kong that the Board

16 of We Solutions had cornered him and

17 accused him of many things and Mr. Choi

18 told me they called him a criminal.

19      I did not have anything more

20 specifically during my time.  So that is

21 something that I was mindful of.

22      I trusted Mr. Choi.  I did not

23 believe that that would be the truth

24 during that period.

25      Q.     Is there anything else?

Page 455

1          RYAN C. BERRIS VOLUME I

2          A.    About potential use of

3     corporate funds for personal purchases

4     such as an apartment in Hudson Yards.

5          Q.    You learned about the

6     "potential use" of personal funds for "an

7     apartment in Hudson Yards"?

8          A.    That's something that, again,

9     in the course of my discussion with Mr.

10    Choi, we had had discussions whereby the

11    company could potentially secure

12    residences for us.

13         Q.    Okay.  You understand that

14    it's after 7 o'clock, right?

15         A.    Yes.

16         Q.    Okay.  I asked you to tell me

17    what specific wrongdoing you identified

18    while you were at the company, okay?

19         A.    Yes.

20         Q.    Okay.  What was the wrongdoing

21    around the potential apartments that you

22    learned of at the company?

23         A.    Well, at the time at the

24    company, I found it unusual that Mr. Choi

25    was doing a purchase for an apartment in

Page 456

1              RYAN C. BERRIS VOLUME I
2        Hudson Yards, which was --
3              Q.    Let me stop you.  It's after
4        7 o'clock.
5              I want to go through all of these
6        and what I want you to do is tell me in
7        your own words what, specifically, was
8        the "wrongdoing" that you learned of.
9              A.    Okay.  So --
10                   MR. ZACH:  Well, hold on.
11                   You interrupted him.  I
12             understand everyone's [sic] late.
13             Everyone is tired.
14                   So ask the question.
15                   Answer his question.
16             Q.    Let me ask you this.
17             Aside from the things that you just
18        mentioned, were you aware of any other,
19        quote, unquote, "wrongdoing" by anyone at
20        De Tomaso?
21             Meaning.  I want to make sure that
22        I've exhausted your memory of things that
23        you believe involved "wrongdoing."
24             Is there anything else that you
25        haven't said?

Page 457

1          RYAN C. BERRIS VOLUME I

2          A.    Yes.  There was a series of

3     communications between people at De

4     Tomaso, Arc Group, other SPAKs and Samuel

5     Lui utilizing private e-mails pertaining

6     to proposed self-dealing and/or

7     manipulations of documents in order to

8     support a desired valuation and facilitate

9     a rapid closure of the merger between De

10    Tomaso and Genesis.

11         Q.    Anything else?

12         A.    Nothing I can recall at this

13    moment.

14         Q.    Great.

15         Let's start with (INAUDIBLE)

16    communications with the Arc Group.

17         What were the "wrongdoing" that you

18    learned of while you were at De Tomaso

19    that related to that?

20         A.    Well, I found it odd during

21    my time.

22         Q.    No, no, I'm not finding what

23    you found "odd."

24              MR. ZACH:  Don't -- let him

25         answer the question and then you

Page 458

1           RYAN C. BERRIS VOLUME I
2           can --
3                    MR. WERNER:   Okay.
4           A.     So I'm not a securities
5     enforcement expert.  But what I had found
6     that was unusual was the text messages
7     that Mr. Choi had forwarded me regarding
8     a potential SPAK, which was Genesis
9     Unicorn, that was then had initial target,
10    I think, somewhere in the healthcare
11    sector and then later to find out that,
12    you know, Samuel was appointed as the
13    head of SPAK, as well as other individuals
14    that were familiar to me in name based
15    upon former -- past dealings with Samuel
16    Lui, Norman Choi and Gabriel Fung, who is
17    Ernest Fung's brother, from what I
18    recall.
19          Samuel Lui was also -- after taking
20    his position at Genesis was utilizing his
21    private e-mail.  Norman was instructing
22    Arc Group to include Samuel in all future
23    communications.
24          And when I was in discussion with
25    other potential SPAKs, Samuel was joining

```
 1                RYAN C. BERRIS VOLUME I
 2        some of those calls under -- anonymously
 3        utilizing, you know, I think the name
 4        "iPad."
 5                    MR. WERNER:  John, I got to
 6            tell you, I think, we're going to
 7            have to go to the court on this.
 8            This is just ridiculous and,
 9            frankly, really improper.
10            Q.    Do you understand what
11        "wrongdoing" is?
12                    MR. ZACH:  I'd advise -- let
13            me just -- I disagree with that.
14                    But look, guys, it's 7:15.
15            If you want to keep going, you
16            can.
17                    But what I would suggest is
18            let's call it a day.  Everyone is
19            tired.
20                    MR. WERNER:  No, not this,
21            because this is -- we're going to
22            go through this while he's on the
23            record.
24                    And, as I say, we're likely
25            going to the go to the court on
```

Page 460

1          RYAN C. BERRIS VOLUME I
2          this.
3                    MR. ZACH:   It's fine.  It's
4          your right to do what you want.
5          Q.    The acquisition of an
6     apartment in New York, what was the
7     wrongdoing involved in that?
8          A.    It was the timing.  Because
9     Mr. Choi made that discretionary purpose
10    at a time when I knew definitively De
11    Tomaso was in arrears to many of its core
12    ethical partners.
13         Q.    Okay.  The dealings and issues
14    with We Solutions and board accusations,
15    what was the wrongdoing that you learned
16    of related to that?
17         A.    I wouldn't say it was
18    specific wrongdoing.  It's something that
19    had been relayed to me during my time at
20    De Tomaso that I then gained further
21    clarity on after my departure of the
22    company.
23         Q.    The investors -- the
24    investment in Genesis, what was
25    specifically, of the wrongdoing that you

Page 461

1                    RYAN C. BERRIS VOLUME I
2         learned of while you were at De Tomaso?
3              A.     I believe it's illegal to
4         know the target for a SPAK beforehand
5         and, also, for the target in a sense to
6         have undisclosed investment funds from
7         the company in which its seeking to enter
8         into a business merger agreement with.
9              Q.     Okay.   You reference the SPAK
10        process.
11             Was that related, also, to the
12        investment in Genesis or is there some
13        other wrongdoing related to the SPAK
14        process that you learned of while you
15        were at De Tomaso?
16                    MR. ZACH:  Object to the form.
17                    But you can answer, if you
18             understand it.
19             A.     Would you mind clarifying?
20             Q.     You said there was wrongdoing
21        in the SPAK process.
22             I'm just asking you, what was the
23        wrongdoing that you learned of?
24                    MR. ZACH:  Asked and answered.
25             He just answered it.

Page 462

1                RYAN C. BERRIS VOLUME I

2          Q.     I asked you about investment

3     in Genesis.  You told me about a SPAK

4     process.

5          So I tried to help you out by

6     asking you if that's what you were

7     talking about.

8          Is it?

9               MR. ZACH:  Listen to his

10          question.

11               Let's take a break.

12               MR. WERNER:  No, I don't

13          want to take a break.  I want to

14          get through this, okay?

15          Q.     Let me ask you about the

16     Apollo yacht.

17          What was the wrongdoing around the

18     Apollo yacht that you learned of while at

19     De Tomaso?

20          A.     I'm not saying that it was

21     "wrongdoing."

22          I'm referencing certain items that

23     were brought to my attention that could

24     be viewed as maybe misappropriation of

25     funds.  But these were things that, you

Page 463

1           RYAN C. BERRIS VOLUME I
2      know, were investigated after my
3      departure.
4           Q.    The parent and self --
5      Genesis self-dealing, what was the
6      wrongdoing that you learned of related to
7      that?
8               MR. ZACH:  I think asked and
9           answered.  I think he's answered
10          that.
11          Q.    Okay, is that the SPAK
12     process that you talked about?
13          A.    Yes, I felt that they were
14     not meeting securities protocols and
15     regulation and, also, the fact that Mr.
16     Choi was an undisclosed investor, from
17     what he told me.
18          Q.    Okay.  And then you referenced
19     Mr. Choi in connection with the SPAK
20     process.
21          Is that something you've already
22     spoken to at this point as well?
23          A.    I believe so, yes.
24          Q.    The transfer of funds to
25     SinoVision, what was the wrongdoing that

Page 464

1              RYAN C. BERRIS VOLUME I
2      you uncovered related to that?
3              A.     During my time at the company?
4              Q.     Yes.
5              A.     I was unaware of that at the
6      time.
7              Q.     Okay, great.
8              The NCOC Consumer Group, what was
9      the wrongdoing that you learned of
10     related to that entity while you were at
11     De Tomaso?
12             A.     So just because -- NCGC.
13             Q.     NC --
14             A.     Or NGCG, New Generation
15     Consumer Group.
16             So what I had learned during my
17     time at De Tomaso and Apollo was what was
18     publically disclosed on the Internet such
19     as web forums, perhaps investor forums as
20     well, which clearly was following and
21     documenting the relationship between Tom
22     Kim, Michael Choi, Norman Choi and NC --
23     NCGC and the relation to Apollo and De
24     Tomaso and, also, it was being
25     communicated to the public from Tom Kim

Page 465

1              RYAN C. BERRIS VOLUME I
2     that it was that over-the-counter stock
3     intention to do a relation with De
4     Tomaso.
5              MR. WERNER:  Okay.  We're
6         going to stop there and we're going
7         to leave this deposition open.
8              [RESERVATION] And I'm going
9         to reserve the right to come back
10        to these items, as well as the
11        other documents that haven't been
12        provided to us, which we've
13        requested during the course of
14        the deposition, as well as the
15        many additional questions that we
16        have not had a chance to get to
17        today.
18        Q.    So we'll work with Counsel to
19     identify a new time, hopefully, as soon as
20     possible to get you back under oath and
21     ask you the rest of our questions, okay?
22        A.    Okay.
23        Q.    Alright.
24              MR. ZACH:  Thank you.
25              THE VIDEOGRAPHER:  May I close

1                RYAN C. BERRIS VOLUME I

2          out the deposition for today?

3                    MR. WERNER:  Yes.

4                    MR. ZACH:  Yes.

5                    THE VIDEOGRAPHER:  Thank you.

6                    We are off the record at

7          7:21 p.m. and this concludes

8          today's testimony given by Ryan

9          Berris.

10                    The total number of media

11         used was six and will be retained

12         by Veritext Mid-Atlantic.

13                    (Time noted:  7:21 p.m.)

14                    (Time noted on the video

15         record 7 hours 21 minutes per the

16         Videographer.)

17                    (Mr. Zach's order is

18         recorded on the Stenographer's

19         software.)

20                    (Ms. Wigger's order is

21         recorded on the stenographer's

22         software.)

23

24

25

Page 467

1          RYAN C. BERRIS VOLUME I
2          CERTIFICATE OF REPORTER
3      I, SILVIA P. WAGE, CSR, CRR, RPR,
4    herby certify that the witness in the
5    foregoing deposition was by me duly sworn
6    to tell the whole truth, nothing but the
7    truth; said deposition was taken down in
8    shorthand by me, a disinterested person,
9    at the time and place therein stated.  The
10   testimony of said witness was thereafter
11   reduced to typewriting by computer under
12   my direction and supervision.  Before
13   completion of the deposition, review of
14   the transcript [X] was [ ] was not
15   requested.  If requested, any changes
16   made by the deponent (and provided to
17   the reporter) during the period allowed
18   are appended hereto.
19      I further certify that I am not of
20   counsel or attorney for either or any
21   of the parties to the said deposition,
22   nor in any way interested in the event
23   of this cause, and that I am not
24                                    ies thereto.
25

Page 468

1    John T. Zach, Esquire

2    jzach@bsfllp.com

3                    September 16, 2024

4    RE:    Berris, Ryan v. Choi, Sung-Fung Et Al

5        9/5/2024, Ryan Berris

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-midatlantic@veritext.com

16     Return completed errata within 30 days from

17    receipt of testimony.

18     If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 469

1    Berris, Ryan v. Choi, Sung-Fung Et Al

2    Ryan Berris as Aprivy LLC Corp Rep RULE 30(b)(6) (#6791518)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Ryan Berris                          Date

25

Page 470

1    Berris, Ryan v. Choi, Sung-Fung Et Al

2    Ryan Berris as Aprivy LLC Corp Rep RULE 30(b)(6) (#6791518)

3                   ACKNOWLEDGEMENT OF DEPONENT

4        I, Ryan Berris, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Ryan Berris as Aprivy                      Date

13    *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

**[& - 18]** Page 1

| & | 0 | 000186301 4:23 139:22 | 1 | 12 5:18 167:23 |
|---|---|---|---|---|

**&** 5:11 6:5,18
7:11 8:11,24
9:7 10:9
152:23 178:17
212:10 257:18
293:10,19
299:10 314:4
335:4 350:11
366:19 411:25

**0**

**0** 47:9,11
**000083295** 8:19
341:7
**000083300** 8:20
341:8
**000083652** 8:15
339:5
**000083662** 8:16
339:5
**000091077** 8:23
350:11
**000091078** 8:24
350:12
**000158881** 7:6
248:3
**000158884** 7:7
248:3
**000158889** 7:10
257:18
**000158890** 7:11
257:18
**000186297** 4:22
139:22

**000186301** 4:23
139:22
**000200043** 5:6
144:24
**000200050** 5:7
144:24
**000201003** 6:14
205:10
**000201012** 6:15
205:10
**000201787** 5:15
154:10
**000201803** 5:16
154:10
**000202764** 4:18
133:5
**000202769**
135:11
**000202770**
136:25
**000202787** 4:19
133:5
**000217695** 6:4
178:17
**000217696** 6:5
178:18
**02** 354:17
**03** 169:15
171:19
**04305** 1:3
12:21
**08** 206:7

**1**

**1** 4:8 12:14
20:22,23 22:3
78:23 79:5
186:13 329:3
346:6
**1,000** 340:14
**10** 5:11 58:6
59:6,12 60:11
152:22 153:3
191:5 229:3
289:2 292:2,9
295:13 316:5
322:18 323:3
410:3
**100,000** 107:10
**10001** 3:5 15:7
**10112** 3:11
**10:16** 2:4 12:4
**11** 5:13 154:7
154:14 205:23
318:23
**11/1/21** 5:21
183:23
**11/2/21** 8:13
339:3
**110** 279:14
**110,000** 331:3
331:25 333:3,5
333:25 341:25
**11:16** 78:21
**11:17** 78:24
**11:28** 79:3
**11th** 353:19

**12** 5:18 167:23
168:8 318:19
**12:49** 165:25
**13** 5:21 168:6
183:22 184:7
184:14
**133** 4:16
**139** 4:20
**14** 6:4 159:12
178:16,23
184:12
**144** 5:4
**148** 5:8
**15** 4:4 6:7 15:6
190:9,15,16
201:25 202:17
338:17
**1500** 16:11
**152** 5:11
**154** 5:13
**15th** 202:2
**16** 6:10 11:22
11:23 170:7
173:13 202:9
202:13 468:3
**167** 5:18
**16th** 169:25
412:8
**17** 6:12 205:7
205:14
**178** 6:4
**18** 6:17 157:21
157:22,22
212:8,13
218:12

[183 - 27]                                                                    Page 2

**183** 5:21
**18th** 158:17
  219:6
**19** 6:19 11:7
  217:25 218:6
  232:21
**190** 6:7
**19th** 244:23
  259:23 398:17
  428:10
**1:23** 1:3 12:21
**1:30** 166:4,6
**1st** 172:7
  184:19

**2**

**2** 4:9 21:20,21
  22:7,25 83:11
  120:3 288:25
  316:18 322:10
  322:11 345:25
  354:20 409:21
**2/7/22** 8:9
  335:3
**20** 4:8 7:4 11:8
  180:19 247:24
  248:7,8 295:18
  423:25 470:15
**20,000** 209:2,3
**200,000** 277:6
**2000** 40:17
**2003** 31:20
**2007** 31:20
  32:12 35:23
**2008** 36:2
  40:15

**2010** 40:18
**2011** 39:18
  40:18
**2014** 39:20
  41:16 64:7
  129:23 280:18
  346:6
**2015** 64:2,4,10
  129:23
**2015/2016**
  79:10
**2016** 64:11
  77:13
**2017** 368:17
  444:12 445:5
  445:10
**201798** 155:2
**2018** 129:18,19
  274:15 275:12
  445:2
**2019** 289:21
**202** 6:10
**2020** 281:16,18
  282:17 283:7
  283:12 290:25
  291:15,15,22
  292:16 328:10
  340:9 342:13
  410:2
**2021** 131:24
  140:10 145:10
  148:22 157:21
  157:22,23
  158:4,17,21,25
  158:25 159:12

159:12,16
165:5,7 167:7
167:20 168:9
170:2,15,17
178:25 184:19
186:13 188:9
190:18 191:5
201:25 202:17
205:23 298:20
342:14 377:20
403:5,8,13
425:22
**2022** 37:9,12,17
127:11,21
134:15 162:21
198:6 212:15
218:12 220:24
225:4 232:21
237:12 241:21
248:13 276:17
284:8 306:20
313:5 336:11
338:9 346:7
366:14 398:13
398:16,25
405:8 407:2
412:9 425:22
428:15 429:16
434:9 436:17
**2023** 17:8
**2024** 1:15 2:3
12:5 468:3
**202764** 134:10
**205** 6:12

**20th** 3:4
**21** 4:9 7:8,19
  11:12 66:16,23
  257:15,22
  261:6 271:15
  271:24 466:15
**21,906** 342:17
**212** 3:5,12 6:17
**218** 6:19
**22** 7:13 139:18
  198:3 199:24
  199:24 266:14
  266:19
**22nd** 198:3
**23** 7:13,16
  266:15 269:7
  269:13
**237** 11:7,8
**239** 11:8
**24** 7:19 11:8,11
  271:13,14,20
**247** 7:4
**25** 7:22 134:15
  274:6,13
  287:15 288:13
  309:3,24 310:9
**25,000** 339:13
**255** 11:22
**257** 7:8
**26** 8:4 327:21
  328:4,6
**266** 7:13
**269** 7:16
**27** 4:12 8:7
  158:20 178:24

**[27 - 5th]**                                                                 Page 3

190:18 259:15
330:19,24
**271**   7:19
**274**   7:22
**27th**   221:21
222:23 225:4,5
242:6,12
245:22 274:14
**28**   8:9 335:2,8
**28th**   222:23
**29**   8:13 140:10
158:25 212:15
339:2,10
**296**   11:23
**2b**   277:14
**2nd**   227:6

**3**

**3**   4:12 27:4,10
46:8,9,24
120:3 158:25
166:8 188:9
264:12 329:16
329:21
**3/24/22**   8:21
350:10
**30**   2:7 3:11
4:10 8:17
12:24 21:22
148:21 165:20
341:5,12
345:14 347:9
360:24 361:3
362:7 448:24
468:16 469:2
470:2

**300**   141:2
**300,000**   334:21
**303-3648**   3:5
**30th**   148:19
188:12 227:6
**31**   8:21 346:7
350:9,16 355:8
363:22 365:14
374:3
**32**   9:4 351:25
352:4 354:15
360:18 365:15
380:12
**327**   8:4
**33**   9:6 366:17
367:9
**330**   8:7
**335**   8:9
**339**   8:13
**34**   9:9 369:21
370:3
**341**   8:17
**35**   9:12 372:21
373:2 392:10
**350**   8:21
**351**   9:4
**36**   9:16 388:6
388:12
**360,000**   282:18
**366**   9:6
**369**   9:9
**37**   9:19 401:17
405:17
**372**   9:12

**38**   10:4 406:15
406:21
**388**   9:16
**39**   10:7 411:22
412:5
**39th**   2:8 3:11
12:25
**3:04**   264:13
**3:21**   264:16
**3rd**   159:11
172:11,22
188:16 227:11
234:12 277:3
328:9 366:13
367:18

**4**

**4**   4:13 23:2
52:14,19
264:18
**4/11/22**   352:15
**4/27/21**   8:7
330:19
**40**   295:16
**400**   295:10
**400,000**   288:24
313:15 316:23
317:4,10 318:8
318:19 319:4
319:24 322:3
409:20 410:4
**401**   9:19
**406**   10:4
**411**   10:7
**438**   11:12

**44**   11:11
**455**   16:21
**465**   11:20
**49**   146:17
**4:59**   253:14
366:24 367:2
**4th**   227:11
388:19 396:17

**5**

**5**   1:15 4:15
46:2,10,14,16
46:22 66:5,9
66:12 83:10
168:9 190:20
**5-9**   190:24
**5.1**   329:3,7,14
329:21
**5/24/2021**
153:6
**5/24/21**   5:11
152:23
**5/3/22**   9:6
366:18
**50,000**   335:13
335:24 337:2
337:10 338:14
**500**   277:16,23
**500,000**   80:23
334:7 338:12
**52**   4:13
**55**   3:4
**59**   190:20
**5:23**   367:5
**5th**   12:5 159:16
172:19,21,24

173:3,9,19
174:13,24
176:5 178:10
181:7,13
183:10 192:18

**6**

**6**   4:10,16 21:22
23:4 132:25
133:2 134:9
135:6 248:13
249:9 345:14
347:9 360:24
361:3 362:7
449:13 469:2
470:2
**60**   289:10
**62**   11:11
**63**   33:6 34:7,24
35:11,15
**653-8700**   3:12
**655**   339:15,18
**66**   4:15
**6791518**   1:25
469:2 470:2
**6:53**   449:6,8
**6th**   174:14,24
176:5 178:10
192:18 372:6
418:15

**7**

**7**   4:20 11:11
33:5 34:7,23
35:3,15 139:19
140:8 146:16

259:16 455:14
456:4 466:15
**700**   361:25
**700,000**   334:12
**730,000**   354:25
**731**   392:8
**736,000**   360:19
**736,986.94**
362:3
**75**   329:2
**769**   135:13
**7:05**   449:11
**7:09**   253:16
**7:15**   459:14
**7:21**   466:7,13
**7th**   225:4,5
242:13 245:22
398:18

**8**

**8**   5:4 7:16
11:12,20
144:21 145:4
145:10 258:2
269:8 362:11
**8/26**   340:13
**81**   328:19
**82**   11:12
328:24
**83655**   341:16
**87**   134:10
**8:00**   204:5
**8th**   406:25

**9**

**9**   2:3 5:8 148:6
148:11
**9/1/21**   8:18
341:6
**9/30/21**   8:18
341:7
**9/5/2024**   468:5
**97**   341:21,21
**98**   154:20
**9932**   467:25

**a**

**a.m.**   2:4 12:4
78:21,25 204:5
**a1**   152:14
**abide**   393:23
**abiding**   394:12
**abilities**   109:9
**ability**   19:25
42:17 192:21
195:3 423:11
**able**   107:15
181:16 224:7
233:4 285:19
306:15 346:19
346:22 348:17
360:12 364:10
395:9,20 430:7
439:10 440:2
**above**   277:23
340:12 408:22
468:6 470:7
**absolutely**
201:21 207:20
402:10 443:2

**abu**   72:6
**abustamante**
3:13
**accept**   186:19
196:21 315:7
315:17
**acceptance**
319:4
**accepted**   292:4
300:5 326:5
**accepting**
288:22
**access**   67:21
351:15 369:13
371:4,19 372:8
**accidental**
149:6
**accomplish**
396:23
**account**   132:15
232:25 348:7,9
371:17
**accounting**
332:19
**accounts**
369:14 370:22
371:4,15 372:9
**accuracy**   468:9
**accurate**   52:24
53:4 64:13
213:4,8 325:5
333:14 334:16
334:17 370:25
381:21

[accurately - agree]    Page 5

**accurately**
54:17 89:17
302:3
**accusations**
460:14
**accused**  454:17
**achieve**  395:13
395:15,18,22
**achieved**  429:9
**acknowledge...**
470:3
**acknowledging**
421:20
**acknowledg...**
468:12
**acquire**  450:6
**acquired**
129:21
**acquiring**
129:10
**acquisition**
460:5
**act**  114:9
329:17
**acted**  229:5
**acting**  261:22
435:4
**action**  12:20
13:12 400:25
**actions**  116:18
231:20 375:7
**active**  28:12
30:9,18 35:14
97:19

**activities**  28:15
28:16 41:21
51:23 57:18
106:14 112:25
118:7,8 405:10
**activity**  101:10
225:20 226:20
**actual**  41:17
43:6 130:22
157:13 240:24
255:20 257:3
**actually**  55:4
62:4 75:4 80:8
82:19 103:5
117:19 119:21
146:20 198:2
209:7 219:19
244:16 246:13
250:14 253:20
266:23 279:14
290:13 299:22
312:19 319:3
325:22 330:4
344:22 362:17
363:2 386:15
388:19 395:4
418:25 433:5
**add**  400:3
**additional**
48:25 64:25
191:21 193:6
308:23 331:14
337:6 465:15
**additions**  470:6

**address**  16:15
16:17,19
117:15 370:17
371:8,9 378:22
389:25 430:20
**addressed**
417:6
**adjustments**
227:20
**administer**
13:10 15:4
**administrative**
20:13
**administrator**
371:23
**admit**  375:6
376:2 388:24
390:8 425:16
**admitting**
393:16
**advance**  124:12
210:17 332:2
**advantage**
138:13,14
**advantageous**
100:13
**adventure**
267:21
**advice**  35:6
324:22
**advise**  92:22
459:12
**advised**  92:21
295:13

**advising**  45:5
45:10 231:20
294:4 299:11
**advisor**  32:23
34:21
**affiliations**
13:19 31:6
**affirming**
357:20
**afford**  300:24
**afraid**  257:9
**agency**  20:9,13
201:24
**ages**  272:8
**aggregate**
424:23
**aggressive**
303:17
**ago**  47:16
58:19 73:21
93:25 161:14
199:2 307:9
380:20 446:14
**agree**  12:13
64:8 77:18
80:25 87:4
93:24 113:18
113:24 114:7
114:13,18
115:23 116:5
116:15 117:6
117:13,18,22
118:11,21
119:2 120:22
128:24 129:9

**[agree - align]** Page 6

137:25 143:4
153:25 157:12
157:17,19
169:9 170:4
173:12 177:25
180:18 183:7
191:4 192:7
196:4 197:15
197:24 199:23
211:7 217:14
244:12 248:11
248:16 253:24
257:25 264:4
277:25 282:16
283:5 287:15
290:10 312:17
312:23 334:11
353:23 359:2
375:6 376:4
**agreeable**
276:8
**agreed** 45:24
182:7,19
183:18 186:19
233:16 278:22
331:17 335:25
**agreeing**
311:13
**agreement** 2:9
7:23 8:4 45:25
46:7 47:13
63:17 81:10,15
81:17,23 83:3
86:10 94:9
107:9 112:6,10

153:22 163:5
165:2,3 169:6
169:21 170:6,9
170:19,20,24
171:14 172:6
172:25 173:9
173:14,20,25
174:12,23
176:3 178:9,12
179:17 180:25
181:6,9,12,24
182:11 183:9
183:16 185:5,9
185:10,22
186:4,10,13,19
187:4,8,10,13
187:20 188:8
188:14,18
191:20 192:4,9
192:17,19
193:5,8 194:4
194:25 196:18
196:22 197:20
197:25 198:2,5
198:17 199:6,9
201:14 211:17
214:8 217:11
227:25 233:6
233:20 234:6
246:8 274:7,14
275:2,18,25
276:13,24
277:6 278:3,6
278:10,17
279:8,21,22,23

279:25 280:8
281:20,23
282:8 287:13
287:18 288:8
288:12,14,21
293:14 297:24
299:15 300:7
307:18 308:4,8
309:2,14,23
310:20,22,24
310:24 311:22
312:20 313:16
314:14,23
315:2,4 324:2
324:9,10,25
326:4,5,7
327:20,22
328:8 358:8,18
394:21 395:17
396:9,21
397:18 399:10
402:13,21
409:14,24,25
410:24 411:11
411:18 420:11
461:8
**agreements**
44:20 45:16
46:5,20 60:23
62:22 85:16
97:15 106:23
155:13 171:6
189:23 211:22
228:22 233:25
297:18 314:17

314:19 325:12
325:15,21
379:10 384:20
403:4,13
**ahead** 19:17
114:15 120:5
120:12 258:24
262:18 287:20
295:3,4,19
315:20 332:7
351:2 368:22
382:2 419:7
**aid** 285:17
298:4 324:15
356:18
**aiding** 45:6
76:22
**air** 378:22
**airbnb** 426:16
426:22,24
427:10,20
428:11
**airport** 245:8
427:13,21
**akin** 100:6
**al** 12:17 468:4
469:1 470:1
**alan** 67:18
**alexander**
74:22
**alexandra** 3:15
14:3
**align** 80:4
262:4

aligned 80:17
aligns 314:12
alive 270:3
allegation 74:9
allegations
  122:18,20
  123:3 441:4
  453:6,18
allege 65:15
  67:2 83:12
  288:20 289:6
  440:7
alleged 70:9
  74:17
alleging 452:3
allocation
  306:13
allotted 468:19
allow 35:5
  58:11 107:19
  145:17 149:25
  155:4 274:22
  303:15 329:23
  350:24 370:11
  412:13
allowed 100:12
  107:3,9 332:4
  337:6 467:17
alongside 76:6
alright 15:13
  16:4 17:9
  18:10,25 19:20
  20:4,15 21:17
  22:6 24:16
  26:19 31:8,21

32:8 35:18
38:25 50:7
56:9 58:15
63:9,10 65:15
71:18 74:25
77:9 78:9 79:6
83:7 88:19
96:21 97:21
98:15 99:20
101:3 109:11
116:15 120:22
121:12,17
122:6 130:3,8
130:12 132:23
133:17 134:2
135:17 141:18
142:23 144:18
146:20,24
147:22 148:10
148:21 152:3
152:19 155:7
161:7 165:14
166:9 168:4,22
170:23 175:3
179:11,23
183:13 184:13
188:3 190:15
197:14 200:21
205:2,13,16,22
206:10 207:21
212:12 218:5
219:6 220:20
230:5 231:2
235:19 236:21
237:4 239:8

240:22 243:23
247:21 248:6
248:20 253:23
254:21 256:3
257:14 258:19
261:4 264:19
266:10 271:19
273:21 274:25
279:20 280:5
281:11 283:5
288:18 305:19
310:8 312:5
328:3 330:14
335:7 339:8
341:11 353:22
354:19 359:4
367:7 369:25
381:8,24
388:11 405:16
406:20 412:6
412:11 419:16
421:3 445:12
446:12 448:25
465:23
amaze 268:4
ambassador
  151:9
ambiguity
  93:11
amended 4:15
  25:5 66:6,12
  119:20 447:8
  448:15 453:5,9
  454:5

america 8:17
  339:12 341:6
  343:23
amicable 399:9
amor 141:10
amount 48:15
  317:6 318:4
  331:2 360:21
amounts 214:7
  344:5 352:9
  363:2 429:4
analysis 102:10
  349:22,24
  350:2
analyze 113:4
andrew 74:22
angling 144:9
announcing
  181:20 385:10
annual 288:24
  317:9
anonymously
  459:2
answer 11:6
  18:23 19:17,25
  35:17 36:20,23
  38:19 43:23
  47:14,19 51:17
  54:14 65:6
  85:20 90:10
  92:20 93:3,8
  94:11 95:12
  108:16 157:9
  162:7 180:7
  194:13 232:11

236:3,13
237:23,24,25
239:21 244:20
255:21 256:19
258:24 278:24
279:4 285:23
287:20 291:3,6
294:20 295:3,6
307:3,9 310:3
310:5 315:14
317:15 318:25
336:17 337:14
338:2 343:10
344:21,25
350:4 353:2
361:18 372:3
372:12 373:21
373:22 374:23
390:14,16
412:21,24
433:21 437:9
453:12 456:15
457:25 461:17
**answered**
38:13 49:23
50:12 61:20
99:15 147:15
189:17 235:21
236:2 256:18
296:25 301:5
320:3,6 415:7
419:6 461:24
461:25 463:9,9
**answering**
294:22 320:9

**answers**  18:11
40:13 92:24
93:6 283:19
322:7 343:16
345:16 364:17
**anticipated**
302:24 303:3
**anybody**  139:3
163:12 210:10
317:9 408:19
415:20 436:25
**anymore**  21:14
137:16 206:16
207:6,12
230:17 232:23
290:6 419:18
**anytime**  42:24
**anyway**  146:7
**apart**  81:5
105:8 106:16
**apartment**
331:9 332:5
455:4,7,25
460:6
**apartments**
455:21
**apollo**  77:11,13
77:14,18 79:8
79:11,19,23
80:5,16 81:7
81:12,19 83:13
84:6,19 85:15
86:11 88:5,22
89:21 90:16
91:10 92:6

94:4,18 95:7
95:10 96:18
97:3,7 100:14
115:11 126:10
126:15 129:18
129:25 274:15
275:2,19 276:3
276:24 277:18
277:20 278:4,8
278:14,18
279:9,17,24
281:15,21,24
282:3,6,10
283:9,13,20,21
284:2,11,13,17
284:18,21
285:4,10,18
286:19,21
287:9 288:15
289:23 290:23
291:20 292:14
308:8,14
310:18,24
315:2 332:3
334:2 346:6
385:13 434:11
434:18 442:9
443:19 444:16
444:25 445:5,9
446:24 448:7
450:12,13,22
450:24 451:4,9
451:12 454:11
462:16,18
464:17,23

**apollo's**  270:2
284:4
**apologies**
392:19
**apologizing**
381:4 407:16
**apology**  389:15
392:3
**app**  145:7
249:24 253:2
**appearance**
13:16
**appearances**
13:19
**appeared**
262:23 263:2
442:21
**appears**  134:13
188:17 204:11
**appended**
467:18 470:7
**apple**  269:22
**applicable**
468:8
**appointed**
458:12
**approach**  99:8
104:6 194:8
262:10
**approached**
429:14
**approaches**
101:10
**appropriate**
118:13 119:3

193:25 194:19
272:18 273:4
324:12 354:7
362:7 365:7
**approval**
277:14,20
332:9
**approve**  204:9
204:21
**approved**
163:22 200:23
203:2 204:3,5
326:25 327:2
331:13 332:10
**approving**
201:22 202:22
**approximately**
12:4 79:3
239:7 264:10
**april**  148:19,21
212:24 220:23
220:25 221:21
222:23,23
225:4,5 227:6
242:12 245:22
259:15 292:16
353:19 370:8
**aprivy**  4:11
21:23 22:9,18
23:5,11 24:2
41:25 110:22
274:16 275:2,5
280:9,12
282:17 283:7
287:16 308:9

309:14 331:2
335:11 339:13
339:19 341:17
342:20 344:18
345:20 346:5
348:8 355:3,14
356:15 359:21
469:2 470:2,12
**arc**  457:4,16
458:22
**areas**  104:20
**argumentive**
358:25
**arguments**
151:16
**arrangement**
45:3 55:19
75:11 82:12
166:25 168:24
289:18 293:13
308:18 309:19
311:7,10
384:16 403:23
404:16 405:5
445:9
**arrangements**
215:17
**arrears**  220:10
382:11 402:22
460:11
**article**  449:25
450:2
**articles**  435:13
**artificial**
155:18

**artisan**  120:23
120:25 121:7
122:11
**artisans**  120:17
122:7 123:5,6
125:20
**arts**  33:22
**ash**  135:4 150:8
375:19 377:2
384:25 385:7
385:11,15
389:2 390:4,19
**aside**  24:10
26:8,14 28:25
44:11 55:5
56:16 62:14
64:14 65:8
75:3 87:10
94:22 95:17
100:15,23
111:5 112:16
124:16 197:15
287:12 288:9
288:11 319:2
456:17
**asked**  36:24
38:13 39:24
49:23 50:11
59:21 61:20
68:23,24 85:18
90:14,17 92:17
102:2 136:5
157:10 163:13
176:10 189:17
194:14 219:21

224:15 228:21
228:25 230:20
230:20 235:21
236:2 247:13
251:7 256:17
291:9 292:2
296:19,23
299:3 301:5
306:12 307:8
320:2,5 322:5
331:22 345:9
349:23 354:11
359:6,18
360:10 372:5
372:11 393:4
396:7 411:3
419:6 437:7
440:25 446:13
446:14 455:16
461:24 462:2
463:8
**asking**  23:21
40:9 41:7,10
48:15,16 60:13
60:16 62:3,8
70:5,8 83:5,19
83:24 84:8
85:23 91:24
92:2,5 100:22
102:8 106:10
117:3,4 122:19
123:2 136:3
162:5,10,11
209:14 215:11
246:13,17,25

**[asking - available]** Page 10

247:2,3 249:3
251:19 263:10
263:12 266:4
267:9 281:5
288:11 290:13
298:13 301:12
302:2,20
308:11,16,17
308:22 309:18
311:2,8 319:13
319:22 343:18
344:14 345:13
347:14 362:4,8
363:16 370:21
380:7,23
396:19,21
407:17 410:5
410:17,22
411:7 417:8
419:10 421:12
437:5,23
440:12 441:7
447:10 449:15
450:5 461:22
462:6
**asks** 135:17
**aspect** 57:11
58:12
**aspects** 86:23
**aspen** 158:20
158:24 165:11
**aspiring** 130:20
**assessment**
101:20 103:2

**asset** 43:7
**assets** 35:7
296:4 300:14
324:16 382:14
**assist** 85:21
89:9,25 300:12
340:6
**assisted** 84:23
84:25 85:22,24
87:13 88:15
**assisting** 40:5
42:8 45:10
85:16 112:22
285:9 296:2
353:6 445:6
**associate**
442:13
**associated**
79:18 297:13
**associates**
67:20 435:25
437:14
**assume** 17:21
22:2 30:3
33:22 184:25
188:22 224:18
267:10 286:16
**assuming** 267:7
405:24
**atlantic** 13:4,8
466:12
**attached**
212:22 468:11
**attaches** 172:10

**attaching**
169:20
**attachment**
5:18,22 6:7
8:14 167:24
173:6 183:24
188:4 190:10
197:7 203:5
339:4
**attachments**
181:3
**attempted**
30:10
**attempting**
453:22
**attend** 31:21
32:4
**attending**
209:21
**attention**
190:19 462:23
**attorney** 13:21
467:20 468:13
**attorneys** 3:4
3:10 297:25
396:10
**attracted** 139:4
**attractive**
208:7
**audio** 12:11
**audit** 350:19
356:19 357:9
**auditors**
356:11 359:7

**august** 64:11
158:25 167:7
167:17 169:25
170:7 340:11
342:13
**authentic**
156:18
**author** 270:11
**authorities**
435:9
**authority**
329:17
**authorization**
201:2,4
**authorized**
13:9 221:23
226:4
**auto** 53:23 55:2
55:15 56:2
**automobile**
102:13 151:4
450:7
**automobili** 1:7
8:5 29:17
78:11 327:23
328:8
**automobilist**
127:2,7,14
**automotive**
36:10 68:3
156:21 444:14
**available** 37:24
150:20 160:17
338:15,18
433:19 468:6

**[avenue - bates]**

**avenue** 16:22
**aviation** 61:10
**avoid** 432:9
**awarded** 304:9
**awards** 278:6
  278:10
**aware** 37:25
  127:20 131:10
  131:12,14,15
  151:12 187:9
  325:13 384:4
  404:22 430:18
  442:16 444:6
  447:4 449:23
  450:7,9,11,14
  450:17,23
  451:4,8,22
  452:4 453:19
  454:9 456:18

**b**

**b** 4:6,10 5:2 6:2
  7:2 8:2 9:2
  10:2 21:22
  345:14 347:9
  360:24 361:3
  362:7 469:2
  470:2
**bachelor** 33:22
**back** 38:16
  56:21 64:6
  79:4 98:6
  119:20 125:7
  125:19 137:9
  137:14 142:4
  143:16 144:5

144:13 147:13
161:11 166:6
171:24 172:17
176:25 177:5
182:14 185:13
186:16,25
190:2 191:14
192:2 196:5,12
205:3 216:4
224:12 227:14
235:5 241:22
246:12 260:19
263:24 264:16
280:17 289:20
291:12 292:8
307:7 318:20
334:3 340:9
345:22 355:25
359:16 367:5
377:20 403:4
403:13 410:2
423:23 427:13
427:18,21
428:4,5,15,17
429:11,12,13
430:9 434:10
437:7 449:11
453:18 465:9
465:20
**background**
  31:10 180:5,6
  427:7 450:2
**bad** 399:11
**bahrain** 72:4
  73:8,10

**bakery** 243:18
**balance** 228:17
  230:15
**ball** 158:7
**bank** 8:17
  47:18 314:7
  335:9 339:11
  339:12 341:6
  341:13 343:23
  343:23,25
  348:7,9
**bankers** 65:17
  68:6,12 69:24
  70:16,17
**banking** 108:11
  339:19
**banks** 314:5
**bar** 88:3
**barclay** 243:3
  367:24
**baron** 436:9
**barrel** 204:10
**barry** 86:5,9
  87:20 286:22
  289:23
**bart** 124:18
  126:23 264:23
  266:8 267:7
**bart's** 268:15
**barton** 123:9
**base** 49:5 171:2
  211:16
**based** 33:19,19
  48:21 49:4
  60:4 70:9

71:15 76:17
99:2 104:17
111:13 112:5
152:10 162:5
171:4 244:13
277:10 320:9
371:20 374:8
390:6 417:14
420:19 432:22
435:17 439:6
458:14
**basically** 33:4
  33:12 34:20
  36:8 41:19
  56:24 80:15
  81:5 85:9
  88:24 106:18
  152:4 181:23
  223:23 254:16
  283:12 290:4
  290:10 311:13
  332:17 333:23
  352:20
**basing** 187:11
**basis** 45:18
  48:19 123:2
  154:23 167:9
  187:18 294:11
  428:22
**bates** 96:6
  135:10 140:22
  146:16 206:5
  206:18 313:3
  328:19 341:19
  354:17 380:3

**[bates - berris]** Page 12

380:12 392:7
**bath** 137:24
**bathroom** 19:6
19:8 229:19
454:4
**bathtub** 137:6
138:9 199:25
200:6
**becoming**
72:25 79:18
86:24,25 296:2
442:8
**began** 37:7
39:18 40:18
63:15 131:24
370:7 403:7
432:15,17
435:6 436:19
**begged** 82:20
**begging** 82:24
**beginning**
13:20 17:7
23:3 31:10
127:10 166:7
264:17 345:23
448:21 449:12
**begins** 392:7
**behalf** 23:10
29:4 44:12
75:18,22 77:7
161:20 168:25
170:5 180:2
185:17 191:22
196:24 270:10
287:3 304:22

324:6 325:20
340:18 344:13
344:21 348:6
349:10 383:25
399:24
**behest** 389:11
**behold** 362:19
**beit** 69:13
74:21
**belief** 187:4
**believe** 21:8
22:13 23:2
35:22 36:17
40:18 41:15
46:6,21 48:9
53:5 59:11
61:10 63:17
64:3,6 71:7,22
72:2 73:5
81:22,24 83:9
87:22 95:25
97:5 102:17
103:12 127:7
139:12 142:9
146:5 153:14
157:23 158:3
163:22 164:6
165:4,9 170:22
170:22 175:20
181:8 189:6,20
189:22 196:19
197:23 198:19
198:23 212:4
213:8 215:4,24
216:2 219:14

221:19 222:22
224:12 227:5
227:18 239:6
243:19 249:23
266:22 268:14
268:25 276:15
281:10,14
284:19,24
285:13 292:21
294:8 298:20
306:8 316:25
318:20 325:24
326:24 334:18
336:23 340:24
342:9,11 347:4
348:2 351:12
353:4,7 357:2
371:11 379:5
381:21 385:4
386:3 390:11
391:5 392:9
394:6 396:4,6
397:19 398:7
405:20 416:20
422:11 423:10
425:5 427:3
428:10,14
430:5,19
441:20 444:15
454:23 456:23
461:3 463:23
**believed** 41:11
77:6 432:4
**belongings**
177:16

**beneficial**
348:3
**benefit** 114:20
116:12
**benefits** 7:17
269:8,15
308:20
**benjamin**
74:22
**benn** 287:8
**bernie** 200:14
217:6
**berris** 1:1,4,13
2:1,6 3:1 4:1,3
4:8,9,9,12,12
4:13,14,15,16
4:17,18,19,20
4:21,22,23 5:1
5:4,5,6,7,8,11
5:13,14,15,16
5:18,21,22 6:1
6:4,4,5,7,10,12
6:13,14,15,17
6:19 7:1,4,5,6,7
7:8,9,10,11,13
7:16,19,22 8:1
8:4,7,9,13,13
8:15,16,17,19
8:20,21,23,23
8:24 9:1,4,6,9
9:12,13,16,16
9:19 10:1,4,5,7
10:9 11:1 12:1
12:16,16 13:1
14:1 15:1,5,16

**[berris - berris]**                                                    Page 13

| | | | |
|---|---|---|---|
| 15:17 16:1,7 | 92:1,7 93:1 | 155:1 156:1 | 217:1,25 218:1 |
| 17:1 18:1 19:1 | 94:1 95:1,13 | 157:1 158:1 | 218:5 219:1 |
| 20:1,21,23,24 | 96:1,15 97:1 | 159:1 160:1 | 220:1 221:1 |
| 21:1,7,21 22:1 | 98:1 99:1 | 161:1 162:1 | 222:1 223:1 |
| 22:11 23:1 | 100:1 101:1 | 163:1 164:1 | 224:1 225:1 |
| 24:1 25:1 26:1 | 102:1 103:1 | 165:1 166:1,9 | 226:1 227:1 |
| 26:20 27:1,4,5 | 104:1 105:1 | 167:1,23 168:1 | 228:1 229:1 |
| 27:8,20 28:1 | 106:1 107:1 | 168:5,8 169:1 | 230:1,9 231:1 |
| 29:1 30:1 31:1 | 108:1 109:1 | 170:1 171:1 | 232:1 233:1 |
| 32:1 33:1 34:1 | 110:1 111:1 | 172:1 173:1 | 234:1 235:1 |
| 35:1 36:1 37:1 | 112:1 113:1,18 | 174:1 175:1 | 236:1 237:1 |
| 38:1 39:1 40:1 | 114:1 115:1 | 176:1 177:1 | 238:1 239:1 |
| 41:1,11 42:1,2 | 116:1 117:1 | 178:1,3,16,17 | 240:1 241:1 |
| 42:23 43:1 | 118:1 119:1 | 178:18,23 | 242:1 243:1 |
| 44:1 45:1 46:1 | 120:1 121:1,23 | 179:1 180:1 | 244:1 245:1 |
| 47:1 48:1 49:1 | 122:1 123:1 | 181:1 182:1 | 246:1 247:1,24 |
| 49:7 50:1 51:1 | 124:1 125:1 | 183:1,22,24 | 248:1,2,3,3,6 |
| 52:1,4,14,16,20 | 126:1 127:1 | 184:1,13 185:1 | 249:1 250:1 |
| 53:1 54:1 55:1 | 128:1 129:1 | 186:1 187:1 | 251:1 252:1 |
| 56:1 57:1 58:1 | 130:1 131:1 | 188:1 189:1 | 253:1 254:1 |
| 59:1,4 60:1,17 | 132:1,23 133:1 | 190:1,9 191:1 | 255:1 256:1 |
| 61:1 62:1 63:1 | 133:2,4,5,5 | 192:1 193:1 | 257:1,15,17,18 |
| 64:1 65:1,15 | 134:1,10 135:1 | 194:1,17 195:1 | 257:18 258:1 |
| 66:1,5,10 67:1 | 136:1 137:1 | 196:1 197:1 | 259:1 260:1,8 |
| 67:2 68:1 69:1 | 138:1 139:1,19 | 198:1 199:1 | 261:1 262:1 |
| 70:1 71:1 72:1 | 139:21,22,22 | 200:1 201:1 | 263:1,20 264:1 |
| 73:1 74:1 75:1 | 140:1 141:1 | 202:1,9,13 | 264:19 265:1 |
| 76:1 77:1 78:1 | 142:1 143:1 | 203:1 204:1 | 266:1,14,19,20 |
| 79:1,6 80:1 | 144:1,21,23,24 | 205:1,7,9,10,10 | 267:1 268:1 |
| 81:1 82:1 83:1 | 144:24 145:1 | 206:1 207:1 | 269:1,7 270:1 |
| 83:13,20 84:1 | 146:1 147:1 | 208:1 209:1 | 271:1,14,19 |
| 84:5,9 85:1 | 148:1,6 149:1 | 210:1 211:1 | 272:1 273:1,25 |
| 86:1 87:1,5,11 | 150:1 151:1 | 212:1,8,12 | 274:1,6,11 |
| 88:1 89:1 90:1 | 152:1,22 153:1 | 213:1 214:1 | 275:1 276:1 |
| 90:20 91:1 | 154:1,7,9,10,10 | 215:1 216:1 | 277:1 278:1 |

**[berris - better]** Page 14

| | | | |
|---|---|---|---|
| 279:1 280:1 | 344:1 345:1 | 407:1 408:1 | **bespoke** 40:22 |
| 281:1 282:1 | 346:1 347:1 | 409:1 410:1 | 68:3 |
| 283:1 284:1 | 348:1 349:1 | 411:1,22,24 | **best** 34:6 35:10 |
| 285:1 286:1 | 350:1,9,11,11 | 412:1 413:1 | 35:22 40:4 |
| 287:1 288:1 | 350:12 351:1 | 414:1 415:1 | 42:19 45:5 |
| 289:1 290:1 | 351:24 352:1,4 | 416:1 417:1 | 56:23 65:10 |
| 291:1 292:1 | 353:1 354:1 | 418:1 419:1,16 | 81:25 102:17 |
| 293:1 294:1 | 355:1,8 356:1 | 420:1 421:1 | 107:15 108:7 |
| 295:1 296:1 | 357:1 358:1 | 422:1 423:1 | 108:17 109:9 |
| 297:1 298:1,13 | 359:1 360:1 | 424:1 425:1 | 114:10 131:23 |
| 299:1,8 300:1 | 361:1 362:1 | 426:1 427:1 | 161:2 179:25 |
| 301:1 302:1 | 363:1 364:1 | 428:1 429:1 | 210:16 242:22 |
| 303:1 304:1 | 365:1 366:1,11 | 430:1 431:1 | 244:4 267:22 |
| 305:1,2 306:1 | 366:17 367:1,7 | 432:1 433:1 | 319:16 361:8 |
| 307:1 308:1 | 368:1 369:1,21 | 434:1 435:1 | 374:14 375:18 |
| 309:1 310:1,22 | 370:1 371:1 | 436:1 437:1,11 | 377:5 392:15 |
| 311:1 312:1 | 372:1,21,23 | 438:1 439:1 | 393:12 399:2 |
| 313:1 314:1 | 373:1 374:1 | 440:1 441:1 | 399:21 416:22 |
| 315:1 316:1 | 375:1 376:1 | 442:1 443:1 | 424:12 438:2,4 |
| 317:1,23 318:1 | 377:1 378:1 | 444:1 445:1 | 441:24 452:24 |
| 318:7 319:1,23 | 379:1 380:1 | 446:1 447:1 | 453:2 |
| 320:1 321:1 | 381:1 382:1 | 448:1 449:1,14 | **better** 103:15 |
| 322:1 323:1 | 383:1 384:1 | 450:1 451:1 | 223:22 233:13 |
| 324:1 325:1 | 385:1,17 386:1 | 452:1 453:1 | 302:16 376:6,8 |
| 326:1 327:1,21 | 387:1 388:1,6 | 454:1 455:1 | 377:11,18 |
| 328:1,5 329:1 | 388:7 389:1 | 456:1 457:1 | 378:25 379:6 |
| 330:1,15,18,22 | 390:1 391:1 | 458:1 459:1 | 379:17,22 |
| 331:1 332:1 | 392:1 393:1 | 460:1 461:1 | 380:14,18,25 |
| 333:1 334:1 | 394:1 395:1 | 462:1 463:1 | 381:11 382:4 |
| 335:1,2 336:1 | 396:1 397:1 | 464:1 465:1 | 382:17,19,22 |
| 337:1 338:1 | 398:1 399:1 | 466:1,9 467:1 | 383:15,24 |
| 339:1,2,3,5,5 | 400:1 401:1,17 | 468:4,5 469:1 | 384:9,10,11 |
| 340:1 341:1,5 | 402:1 403:1 | 469:2,24 470:1 | 385:23 386:4 |
| 341:7,8,11 | 404:1 405:1 | 470:2,4,12 | 389:19 395:11 |
| 342:1 343:1 | 406:1,15,17 | | 419:12 424:7 |

**[better - brought]**                                           Page 15

424:22 425:15
**beyond** 308:6
308:24 309:21
311:11
**biet** 125:15
**big** 69:21
210:23 211:3
222:5
**bill** 88:7 286:23
433:14 435:24
442:5
**bills** 399:16
**bind** 329:17
**binding** 288:21
**bio** 51:24
**bit** 35:24
130:13 155:15
252:11,11
272:11 330:16
378:4 411:13
440:23 446:14
**black** 269:19
**blah** 315:18,18
315:18
**blame** 109:25
231:4 390:4
**board** 57:23
67:10 102:6
103:3,9 114:5
116:3,17 117:8
126:16 127:17
129:17,25
131:22 132:7
132:11 147:5
149:19 195:13

210:24 221:24
228:2,2 234:13
248:19 276:25
304:2 328:23
329:19 366:15
402:4 419:24
420:6 454:15
460:14
**boarded** 65:18
67:3 86:25
180:17 379:11
380:21 385:9
**boarding**
379:20 385:6
390:3
**boards** 104:20
**body** 20:9,13
152:11 173:5
270:4
**boies** 3:3 237:8
237:16 238:2
239:10
**book** 33:9,20
124:19 126:24
265:4,8,17,20
266:2,25
268:22,25
270:16,18
272:18 273:10
430:7
**booked** 426:16
427:11,20
**books** 268:5,17
355:23

**boots** 141:20
**botaniste**
243:20
**bother** 187:5
**bottom** 206:20
206:23 267:18
269:18 364:6
374:3
**bought** 62:4
**bound** 182:4
**brand** 45:11
78:4 86:5,25
91:3 100:6
104:4 129:11
129:21 142:7
149:25 150:18
151:2,9 208:22
211:2
**brands** 113:2,5
155:15 156:12
**breach** 400:12
400:15
**break** 19:6,8,10
19:18 69:11
78:17 79:7
165:21 166:10
264:7 362:25
365:17 366:22
367:8 447:14
453:4 454:2,3
462:11,13
**breakdown**
231:11 263:7
**breakfast**
269:20

**breaking**
392:16,20
**breaks** 19:2,4
19:12
**briefly** 168:17
326:20
**bring** 61:23
62:15 99:25
112:16,18
123:4 131:17
131:21 195:13
319:17 359:15
**bringing** 71:15
122:8 132:6,11
304:2
**broad** 28:3
45:4 85:13
100:25
**broader** 170:19
**broke** 416:24
**broken** 355:9
399:25 425:25
**broker** 32:22
34:15,18 111:6
113:7
**brother** 374:15
458:17
**brought** 62:11
62:16 63:3
100:17,20
112:23 113:6
120:15 125:13
149:19 362:13
462:23

| | | | |
|---|---|---|---|
| **brown** 293:11 | **buried** 147:14 | 210:5,16,17,18 | 30:1 31:1 32:1 |
| 293:20 298:22 | **burrito** 249:16 | 210:20 211:2 | 33:1 34:1 35:1 |
| 299:10 314:4 | 253:11 254:3 | 212:3 220:9,13 | 36:1 37:1 38:1 |
| **browse** 168:16 | 254:24 255:6 | 227:5,10 | 39:1 40:1 41:1 |
| 370:12 | 256:6,16 257:5 | 298:12 304:10 | 42:1 43:1 44:1 |
| **bryant** 243:12 | **burton** 124:25 | 311:17,23 | 45:1 46:1 47:1 |
| 244:3 | **business** 24:6 | 333:19 336:5,6 | 48:1 49:1 50:1 |
| **bsfllp.com** 3:6 | 27:13 33:9,20 | 337:7,23 | 51:1 52:1 53:1 |
| 3:6,7 468:2 | 37:23 39:14,15 | 353:24 354:8 | 54:1 55:1 56:1 |
| **buck** 110:5,13 | 39:17 41:14 | 359:14 377:23 | 57:1 58:1 59:1 |
| **budget** 201:23 | 43:10 44:24 | 400:21 461:8 | 60:1 61:1 62:1 |
| 208:11 | 45:11 46:4 | **businesses** 40:6 | 63:1 64:1 65:1 |
| **buds** 267:22 | 47:23 53:20 | 95:6 110:25 | 66:1 67:1 68:1 |
| **buell** 32:18,19 | 56:13 57:18 | **bustamante** | 69:1 70:1 71:1 |
| 32:21 33:17 | 58:2,12 60:2 | 3:15 14:3,4 | 72:1 73:1 74:1 |
| 34:10,13 35:20 | 60:14 61:17 | **busy** 227:4 | 75:1 76:1 77:1 |
| 36:4,9 37:2 | 67:19 76:11 | 300:9 335:17 | 78:1 79:1 80:1 |
| 38:18 39:3 | 84:12 85:2 | 340:2 353:15 | 81:1 82:1 83:1 |
| **build** 77:14,19 | 95:6,19 103:17 | 359:13 378:10 | 84:1 85:1 86:1 |
| 77:25 79:11 | 103:23 104:2 | 402:15 | 87:1 88:1 89:1 |
| **building** 16:24 | 104:13 106:19 | **butt** 247:10 | 90:1 91:1 92:1 |
| 63:13 80:12 | 106:20,21 | **buy** 210:3 | 93:1 94:1 95:1 |
| 86:14 150:18 | 111:8 112:24 | **buyers** 107:9 | 96:1 97:1 98:1 |
| 157:3 160:14 | 114:15 115:2,6 | **buying** 256:16 | 99:1 100:1 |
| 194:9 195:15 | 115:13,16 | | 101:1 102:1 |
| 243:9 | 118:7 119:5,10 | **c** | 103:1 104:1 |
| **builds** 78:3 | 119:14 132:12 | **c** 1:1,13 2:1,6 | 105:1 106:1 |
| **built** 33:9 55:8 | 132:14 134:24 | 3:1,2 4:1,3 5:1 | 107:1 108:1 |
| 85:25 87:3 | 137:10 138:2 | 6:1 7:1 8:1 9:1 | 109:1 110:1 |
| 91:11 285:17 | 142:15,20 | 10:1 11:1 12:1 | 111:1 112:1 |
| 307:15 | 153:15 160:22 | 13:1 14:1 15:1 | 113:1 114:1 |
| **bunch** 90:14 | 161:9 189:7 | 15:5 16:1 17:1 | 115:1 116:1 |
| 105:16 134:6 | 207:5 208:15 | 18:1 19:1 20:1 | 117:1 118:1 |
| **bureaucracy** | 208:19 209:8 | 21:1 22:1 23:1 | 119:1 120:1 |
| 155:8,25 | 209:19,24 | 24:1 25:1 26:1 | 121:1 122:1 |
| | | 27:1 28:1 29:1 | |

| | | | |
|---|---|---|---|
| 123:1 124:1 | 193:1 194:1 | 263:1 264:1 | 333:1 334:1 |
| 125:1 126:1 | 195:1 196:1 | 265:1 266:1 | 335:1 336:1 |
| 127:1 128:1 | 197:1 198:1 | 267:1 268:1 | 337:1 338:1 |
| 129:1 130:1 | 199:1 200:1 | 269:1 270:1 | 339:1 340:1 |
| 131:1 132:1 | 201:1 202:1 | 271:1 272:1 | 341:1 342:1 |
| 133:1 134:1 | 203:1 204:1 | 273:1 274:1 | 343:1 344:1 |
| 135:1 136:1 | 205:1 206:1 | 275:1 276:1 | 345:1 346:1 |
| 137:1 138:1 | 207:1 208:1 | 277:1 278:1 | 347:1 348:1 |
| 139:1 140:1 | 209:1 210:1 | 279:1 280:1 | 349:1 350:1 |
| 141:1 142:1 | 211:1 212:1 | 281:1 282:1 | 351:1 352:1 |
| 143:1 144:1 | 213:1 214:1 | 283:1 284:1 | 353:1 354:1 |
| 145:1 146:1 | 215:1 216:1 | 285:1 286:1 | 355:1 356:1 |
| 147:1 148:1 | 217:1 218:1 | 287:1 288:1 | 357:1 358:1 |
| 149:1 150:1 | 219:1 220:1 | 289:1 290:1 | 359:1 360:1 |
| 151:1 152:1 | 221:1 222:1 | 291:1 292:1 | 361:1 362:1 |
| 153:1 154:1 | 223:1 224:1 | 293:1 294:1 | 363:1 364:1 |
| 155:1 156:1 | 225:1 226:1 | 295:1 296:1 | 365:1 366:1 |
| 157:1 158:1 | 227:1 228:1 | 297:1 298:1 | 367:1 368:1 |
| 159:1 160:1 | 229:1 230:1 | 299:1 300:1 | 369:1 370:1 |
| 161:1 162:1 | 231:1 232:1 | 301:1 302:1 | 371:1 372:1 |
| 163:1 164:1 | 233:1 234:1 | 303:1 304:1 | 373:1 374:1 |
| 165:1 166:1 | 235:1 236:1 | 305:1 306:1 | 375:1 376:1 |
| 167:1 168:1 | 237:1 238:1 | 307:1 308:1 | 377:1 378:1 |
| 169:1 170:1 | 239:1 240:1 | 309:1 310:1 | 379:1 380:1 |
| 171:1 172:1 | 241:1 242:1 | 311:1 312:1 | 381:1 382:1 |
| 173:1 174:1 | 243:1 244:1 | 313:1 314:1 | 383:1 384:1 |
| 175:1 176:1 | 245:1 246:1 | 315:1 316:1 | 385:1 386:1 |
| 177:1 178:1 | 247:1 248:1 | 317:1 318:1 | 387:1 388:1 |
| 179:1 180:1 | 249:1 250:1 | 319:1 320:1 | 389:1 390:1 |
| 181:1 182:1 | 251:1 252:1 | 321:1 322:1 | 391:1 392:1 |
| 183:1 184:1 | 253:1 254:1 | 323:1 324:1 | 393:1 394:1 |
| 185:1 186:1 | 255:1 256:1 | 325:1 326:1 | 395:1 396:1 |
| 187:1 188:1 | 257:1 258:1 | 327:1 328:1 | 397:1 398:1 |
| 189:1 190:1 | 259:1 260:1 | 329:1 330:1 | 399:1 400:1 |
| 191:1 192:1 | 261:1 262:1 | 331:1 332:1 | 401:1 402:1 |

| | | | |
|---|---|---|---|
| 403:1 404:1 | **cafe** 243:8 | 182:3 | **card** 136:12 |
| 405:1 406:1 | **calculate** | **campaigns** | 413:4,8 |
| 407:1 408:1 | 355:17 | 89:6 107:5 | **cards** 233:19 |
| 409:1 410:1 | **calculated** | **capacities** | **care** 51:10 |
| 411:1 412:1 | 355:6 | 132:3 | 99:10,13 210:2 |
| 413:1 414:1 | **california** | **capacity** 22:17 | 213:20 239:23 |
| 415:1 416:1 | 153:19 164:25 | 38:23 41:5 | 347:13 453:8 |
| 417:1 418:1 | 170:10 | 233:23 305:5 | **careers** 268:2 |
| 419:1 420:1 | **call** 55:25 | 345:14 | **careful** 59:7 |
| 421:1 422:1 | 79:10 81:14 | **capasso** 69:18 | 112:7 |
| 423:1 424:1 | 95:19 155:16 | 69:20 74:21 | **carlos** 87:21 |
| 425:1 426:1 | 180:24 184:22 | 125:15 | 286:23 |
| 427:1 428:1 | 187:5 357:8 | **capital** 1:9 | **carmen** 4:17 |
| 429:1 430:1 | 409:5 454:14 | 303:18 322:24 | 5:5,15 6:14 |
| 431:1 432:1 | 459:18 | 334:5 338:15 | 130:15,17 |
| 433:1 434:1 | **called** 16:24 | 338:18 | 133:4 134:18 |
| 435:1 436:1 | 41:22 77:11 | **capricorn** | 141:6,19 144:3 |
| 437:1 438:1 | 111:10 128:13 | 452:11 | 144:23 153:13 |
| 439:1 440:1 | 135:2 163:23 | **capture** 4:12 | 153:19 154:9 |
| 441:1 442:1 | 243:20 269:14 | 27:5,12 | 160:11 163:21 |
| 443:1 444:1 | 454:18 | **car** 40:22 49:5 | 166:12 169:22 |
| 445:1 446:1 | **calling** 104:11 | 69:14,21 75:25 | 171:25 188:22 |
| 447:1 448:1 | 193:20 194:17 | 76:4,6,6,17 | 191:20 193:6 |
| 449:1 450:1 | 356:16 | 80:23 100:5,6 | 198:10,23 |
| 451:1 452:1 | **calls** 176:17 | 102:24 111:18 | 204:15 205:4,9 |
| 453:1 454:1 | 232:24 245:12 | 111:22 112:25 | 206:15 208:6 |
| 455:1 456:1 | 245:15 397:17 | 115:25 130:20 | 209:21 217:18 |
| 457:1 458:1 | 398:24 409:6 | 147:10 151:8 | 218:14 219:4 |
| 459:1 460:1 | 415:4,8,12 | 152:7,13 | 221:23 336:3,9 |
| 461:1 462:1 | 426:23 459:2 | 175:21 177:12 | 337:4,18 |
| 463:1 464:1 | **calm** 301:20 | 177:13 178:3 | 338:21 358:17 |
| 465:1 466:1 | **cameron** 39:6 | 199:20 215:25 | 375:19 377:2 |
| 467:1 | **campaign** 90:5 | 306:14,15,21 | 384:16 389:2 |
| **cadence** 436:23 | 143:24 147:6 | 307:4 369:2 | 390:19 394:19 |
| | 150:21 181:22 | 385:14 430:6 | 394:21 396:7 |

397:5 398:4
401:24 405:5
408:24
**carmen's** 220:5
233:25 395:17
**carries** 120:2
**carry** 64:25
**carrying** 99:22
**cars** 62:4 63:4
65:2 76:7
84:24 113:7
119:17 177:20
289:12 307:14
**caruso** 234:8
**case** 1:3 29:24
30:3 151:4
176:12 203:24
254:20 270:20
314:20 394:12
**cases** 297:20,22
**cash** 323:7
340:13,24
**cast** 270:22
**casual** 40:10
116:24
**categories**
89:13,14 346:4
**caught** 152:16
**cauliflower**
255:12
**cause** 150:2
376:3 396:7
467:23
**caused** 259:17

**caveat** 41:16
**cc** 149:3,10
**ccr** 1:24
**cct** 443:19,21
444:9,20
445:14 446:3
449:23
**center** 189:7
**ceo** 56:12 98:13
105:5,23
109:13,16,23
110:12,17,19
110:22 111:5,6
111:18 112:15
119:8 194:18
328:15
**certain** 25:22
28:11 49:3
68:22 127:4
182:8 218:25
222:15 223:13
252:9 256:24
266:24 275:19
289:24 309:15
311:3 327:5
343:24 346:23
370:22 375:7
375:12 378:16
379:9 384:5
404:19 406:5
432:10,24
435:2,4 452:10
454:10 462:22
**certainly** 176:8
194:6 210:12

211:21 362:16
399:3
**certificate**
467:2
**certifications**
34:2,5
**certified** 2:10
2:11
**certify** 467:4,19
**cetera** 150:4,17
332:19 389:3
**cfo** 212:2,4
217:17,22
**chain** 190:17
352:14
**challenge** 356:2
**challenges**
352:8
**chance** 103:11
103:18 367:10
465:16
**chanel** 204:15
206:2,2,8,12
207:9,13
209:22
**change** 37:16
109:14,18
255:21 334:22
341:25 342:17
355:13 469:4,7
469:10,13,16
469:19
**changes** 204:10
377:23 467:15
468:10 470:6

**changing** 378:3
**chapter** 7:13,16
7:19 266:15
269:8,14 270:5
271:15,24
**chapters** 270:8
270:22 271:2,6
272:18
**characterize**
301:15,19
**charge** 56:17
56:19 57:3,7
89:24 90:13
91:23,25 92:13
93:21
**chassis** 77:21
80:16 289:10
**chassises** 80:12
**chat** 249:3
373:3 388:12
**chatter** 134:23
**check** 158:14
159:3,7,14,18
175:18 185:19
192:21 216:4,7
216:8 282:17
282:20 283:6
283:14 284:23
285:2 286:2
321:10 359:24
397:20,23,24
398:20,21
**checking**
284:14 285:24

**[chief - christopher]**

| | | | |
|---|---|---|---|
| **chief** 97:24 | 221:22 222:13 | 357:19 359:21 | 435:24 436:3 |
| 98:10,14 99:22 | 222:16,20 | 367:21 372:23 | 437:14 442:11 |
| 100:17 101:4 | 223:16 224:8 | 373:3,10,14 | 442:13,17,20 |
| 101:19 102:7,8 | 225:15 226:10 | 374:10 378:3,9 | 443:13,22,23 |
| 105:10,19,22 | 226:12,15 | 378:15 379:7 | 443:24 444:4 |
| 105:23 106:5 | 228:19 230:16 | 379:22 380:11 | 444:21 452:10 |
| 106:13,17 | 231:15,20 | 380:21,25 | 452:21 454:12 |
| 112:4 | 232:15 233:17 | 381:5 382:8 | 454:13,17,22 |
| **child** 51:8 | 235:10,12 | 383:12,25 | 455:10,24 |
| 113:3 | 256:25 258:14 | 384:6,11,15,20 | 458:7,16 460:9 |
| **china** 284:17 | 261:24 262:22 | 385:12,19 | 463:16,19 |
| **chipotle** 243:25 | 275:15 283:25 | 386:2,6,12 | 464:22,22 |
| **choi** 1:6,7 3:18 | 289:17 290:3 | 387:8,22 388:8 | 468:4 469:1 |
| 8:14 9:13,17 | 290:21 291:22 | 388:13 389:18 | 470:1 |
| 9:20 10:5,8 | 292:11,25 | 391:7 392:14 | **choi's** 102:21 |
| 12:17 14:16 | 293:8,24 295:8 | 393:18,20 | 294:10 298:9 |
| 37:25 38:4 | 296:8,11 | 394:5 401:19 | 324:15 442:4 |
| 39:4,8 63:14 | 297:14 298:3 | 402:7,13,24 | 444:20 450:25 |
| 63:15,25 79:13 | 298:21,25 | 403:3,16,21 | **choked** 327:17 |
| 79:18,24 80:9 | 299:3,7 300:5 | 404:6,10,14,21 | **choose** 156:4 |
| 82:25 83:5 | 300:16 303:11 | 404:24 405:3,9 | **choosing** |
| 88:4 94:15,20 | 304:22 305:12 | 405:19,21,22 | 321:23 |
| 95:3,4,9,11,15 | 306:4 307:21 | 406:6,17,23 | **chose** 38:3 65:4 |
| 95:16 96:2,17 | 311:14 312:7 | 407:25 410:25 | 208:20 |
| 100:13 102:19 | 313:6,8,16 | 411:24 412:7 | **chosen** 300:6 |
| 103:10 104:23 | 314:21 315:5 | 415:5,12,24 | 403:25 |
| 106:18,22 | 315:13,25 | 416:9,19 417:4 | **chris** 57:22 |
| 108:9 110:8 | 317:13 320:16 | 417:11 418:19 | 58:10,14,15,17 |
| 111:24 112:2 | 322:2 323:21 | 418:20 420:24 | 60:10 61:3,16 |
| 116:23 129:14 | 324:2,9,20,25 | 421:14,21,24 | 62:9,10,14 |
| 139:7 148:23 | 326:3,24 | 422:3,23,25 | 63:6 67:7,10 |
| 156:14 163:23 | 328:23 331:17 | 423:6,11,19 | 67:17 72:13 |
| 190:4 200:24 | 336:15 339:4 | 424:13,16 | 74:23 75:3 |
| 201:5 208:17 | 340:19,20 | 426:19 433:13 | **christopher** |
| 210:9,20 218:8 | 346:5 357:12 | 433:13 435:23 | 15:16 75:25 |

**cicchetti** 124:7
**circuit** 158:7
**cited** 353:5
  442:19 444:8
  446:4,5
**citibank** 314:6
**citing** 188:10
**citizen** 295:15
  296:2 299:12
**city** 367:25
  373:17 389:7
  413:11
**civil** 12:20
  255:25
**claimed** 223:20
  254:17 422:25
**claiming** 259:5
  356:12,14
**clancy** 72:12
**clarification**
  400:13
**clarify** 80:14
  82:5
**clarifying**
  461:19
**clarity** 65:13
  460:21
**classic** 227:8
**classy** 146:22
  147:10
**clause** 227:23
**clauses** 299:4
**clean** 129:15
**clear** 55:17
  83:21 94:2

99:9 103:21
121:21 137:20
142:24 151:11
154:25 157:6
173:2,3 180:5
207:22 208:2
217:21 241:15
254:20 258:20
260:22 262:4
262:11,13
286:8 305:14
325:2 330:8
345:12 355:21
364:20 365:21
365:24 378:22
401:22 421:9
442:25 443:2
450:9 452:15
**clearly** 173:11
192:8 263:21
364:16 464:20
**clement** 235:12
443:14,19
**client** 35:7 49:2
57:23 107:17
192:10 194:4
194:23 284:2
364:5
**client's** 302:11
364:2
**clientele** 68:8
73:24
**clients** 14:16
62:17 65:19
67:4,23 70:10

71:10 74:18
86:2 87:18
88:6 99:4
124:22 128:10
150:2 284:5
285:4 286:18
286:20,21
312:14 322:2
**clock** 101:18
**close** 58:18
69:20 84:18
86:6 87:12
128:2 161:18
161:22 164:15
295:22 465:25
**closed** 161:24
162:13,23
164:13
**closely** 329:11
**closer** 305:12
**closing** 86:3,14
87:6 284:4
290:23 291:19
292:13
**closure** 457:9
**clothes** 210:3
**clothing** 207:13
**cmo** 98:16
**coat** 141:20
**coffee** 243:18
269:19
**cohen** 74:23
125:15 128:7
**coincided**
297:11

**cold** 55:25
**collected** 177:3
**collector** 69:14
  69:21
**collectors** 68:4
**college** 31:10
  31:11
**color** 175:13
**combining**
  361:10
**come** 81:21
  126:15 127:16
  131:21 135:18
  136:21 171:7
  198:17 219:8
  234:24 235:23
  254:19 272:7
  276:7 280:15
  291:12 292:8
  300:22 349:15
  359:19 362:11
  404:23 453:18
  465:9
**comes** 282:24
**comfort** 236:14
  298:9
**comfortable**
  86:2,16 107:12
  156:10 180:8
  180:11 182:9
  194:10 227:17
  227:24 233:10
  289:25 292:3
  300:19 310:7
  332:20 356:13

**[comfortable - company]**                                    Page 22

| | | | |
|---|---|---|---|
| 356:20,24 | 288:25 316:18 | 464:25 | 430:17 432:9 |
| 357:5,23 | 322:10,11 | **communicating** | 457:3,16 |
| 358:13 | 334:7 409:21 | 143:18 210:15 | 458:23 |
| **coming** 58:9 | **commissioned** | 218:12 232:22 | **community** |
| 65:21 103:9 | 265:3 270:15 | 393:20 421:11 | 235:7 |
| 108:12 151:17 | **commissioning** | 421:14,19 | **como** 426:18 |
| 173:23 210:24 | 43:16 127:3 | **communication** | **companies** 29:5 |
| 219:2 221:20 | **commissions** | 142:14 144:13 | 29:8 61:4,7 |
| 221:23 223:25 | 45:19 49:18 | 149:4,11 163:4 | 92:4 110:20 |
| 224:2 227:9 | 58:25 63:5 | 182:5 183:3 | 111:14 304:11 |
| 234:2 235:5 | 64:15 65:8 | 184:15 187:25 | 304:23 |
| 256:24 259:4 | 82:13 322:14 | 231:9 234:9 | **company** 8:4 |
| 261:24 295:12 | 322:15 332:2 | 237:2 261:19 | 32:18 33:4 |
| 334:2 377:24 | **commitments** | 317:22 331:21 | 41:22 42:18,23 |
| 418:17 422:25 | 117:10 | 357:18 386:23 | 43:13 48:13 |
| 425:23 | **committed** | 391:11 414:17 | 62:11,15 63:3 |
| **comment** 67:21 | 323:22 334:5 | 415:24 416:8 | 65:3 76:23 |
| 186:9 271:5 | **common** 143:9 | 418:18 428:8 | 78:5,5 83:14 |
| 272:24 273:7 | 143:11 149:9 | **communicati...** | 84:7,15,17 |
| 273:14 | 272:9 307:13 | 24:11 64:5 | 88:3 90:4 |
| **commentary** | **communicate** | 71:9,17,25 | 91:19 92:9 |
| 301:23 | 228:20 254:13 | 102:19 108:20 | 93:18 94:20 |
| **comments** | 292:11,18 | 118:18 147:21 | 97:3,15 101:21 |
| 151:13 171:18 | 319:4 389:18 | 162:2 167:10 | 102:10 110:10 |
| 172:2,15 | 421:17 422:19 | 183:4 190:3 | 111:4,18,22 |
| 191:13 196:4 | 423:11 431:9 | 203:10 232:17 | 114:9,10,20,21 |
| 404:20 | **communicated** | 238:4,7 245:19 | 114:24 115:21 |
| **commercial** | 95:2 102:22 | 262:22 294:3,9 | 115:25 116:7 |
| 106:24 155:13 | 104:16 125:12 | 314:2 315:25 | 116:11,12,18 |
| 163:6 | 135:5 139:7 | 316:14 319:11 | 116:20 117:8 |
| **commission** | 217:16 235:5 | 319:14 353:8 | 117:11,23 |
| 45:18,22 46:8 | 252:12 289:15 | 359:12 371:12 | 118:14,19,23 |
| 46:15,22 47:13 | 290:15,18 | 374:16 382:6 | 123:23 127:2 |
| 48:18,21 49:4 | 291:22 292:25 | 386:11 396:3 | 127:22 149:20 |
| 65:5 81:11 | 295:14 395:9 | 397:9,13 | 160:20 164:19 |

171:6 179:21
181:21 182:4
187:7 193:22
197:12 204:22
209:10,12
210:4 211:11
213:23 215:25
218:23 219:18
221:24 223:23
228:16,22
229:4 230:12
230:15 232:23
235:18 236:18
259:4 261:19
263:22 279:24
280:18 281:12
281:19 282:8
288:23 289:3
290:9 295:10
299:20 300:21
303:15 304:19
307:23 309:21
310:16 312:13
313:22 314:24
322:25 324:6
324:13 327:22
328:7,15 329:4
329:17 332:14
333:5,22 334:6
336:15 338:7
338:12 343:22
344:2,13,22
346:21 349:10
354:11 357:12
369:10 378:14

382:15 395:14
400:4 402:4,21
403:9 405:13
419:3 420:5
434:8 435:20
436:20 439:17
447:6 450:6,7
451:23 452:5
453:7,20
455:11,18,22
455:24 460:22
461:7 464:3
**company's**
36:16 191:22
194:20 212:2
263:25 384:24
**compensated**
45:14,18 46:14
48:17 64:16
65:7 75:10
77:5
**compensation**
33:17,18 46:16
75:17,22 76:21
81:20 211:16
217:19 218:15
218:19,22
219:8,13,22
222:7 279:13
280:6,8 281:20
299:14 300:20
337:24 358:20
**competizione**
40:22

**complain**
307:10
**complaining**
212:17
**complaint** 4:15
23:18 25:2,5,5
25:8 26:6,15
65:23,25 66:6
66:12 83:8
119:20 288:20
440:7,10,17
441:11 442:3
443:4,13,17
444:8 446:4,6
446:10,16,23
447:9,24
448:15 449:18
450:16 451:2
451:13 452:3
452:20 453:5,9
454:5
**complete** 91:11
470:8
**completed**
66:22 83:17
357:4 468:16
**completely**
207:22 282:4
**completion**
467:13
**complies**
169:16 214:20
310:11
**computer**
286:3,4,5,9

434:15 438:13
467:11
**computers**
213:22
**concerned**
151:6 216:13
236:9 429:19
431:15
**concerns**
447:25 452:13
**conclude**
191:19 193:5
**concludes**
466:7
**conclusions**
435:16 437:11
439:6,15 441:2
441:8 442:2
**concurrently**
282:10 284:6
**condition** 76:18
233:15
**conditions**
298:24 299:5
331:14
**conduct** 142:5
142:14,19
219:4 432:16
432:17
**conducted**
195:8 225:19
433:24
**conducting**
115:2,6 153:18
224:13 433:2

**[confidence - contract]**

**confidence**
  116:7
**confident**
  414:19 445:20
**confidential**
  4:20,24 5:8,10
  5:13,17,20,24
  6:6,9,12,16,19
  6:21 7:8,12,15
  7:19,22,25 8:9
  8:12,17,21,25
  9:6,9,11,15,19
  9:22 10:7,11
  116:11 133:6
  139:23 144:25
  148:8 152:24
  154:11 168:2
  169:6 178:19
  184:2 190:12
  202:11 205:11
  212:10 218:3
  248:4 257:19
  266:16 269:10
  271:17 274:9
  330:20 335:5
  339:6 341:9
  350:13 352:2
  366:19 369:23
  372:24 388:9
  401:20 406:18
  412:2
**confirm**   16:9
  316:4,21 318:7
  319:23

**confirmation**
  8:10 335:4
  339:19
**confirmed**
  317:14
**confirming**
  316:23 358:22
**confirms**
  316:10,17
  317:9 322:2
**confusing**
  50:25 278:16
**connect**   249:4
**connected**
  162:17 437:16
  442:7,17
**connecticut**
  31:14,17,22
  32:5,12,16
  69:16,22
  176:24 267:24
  292:21,22
  331:10 369:2,5
  369:6
**connection**
  23:25 24:12
  47:12 89:20
  90:16 176:12
  179:16 304:14
  463:19
**connections**
  121:22 400:2
**connoisseurs**
  120:18 124:21
  127:25

**consent**   329:18
**consider**   122:3
**considering**
  39:17 132:6
**consist**   435:22
**consistent**
  453:6
**constraints**
  395:21
**construction**
  78:7
**consultancy**
  63:16
**consultant**
  44:19 63:20
**consulted**
  106:21
**consulting**   7:22
  40:11 97:14
  112:9 274:7,13
  274:25 275:18
  279:23 287:13
  288:12,14
  308:7 309:2,14
  309:22 333:14
**consumer**
  444:2 450:15
  464:8,15
**consummating**
  75:5
**contact**   211:24
  259:4
**contacted**
  263:6

**contacting**
  241:17
**contacts**   125:14
**contemporan...**
  260:9,24
**contentious**
  186:24
**contents**
  175:25 421:13
**context**   124:25
  143:21 147:4
  178:5 404:17
  404:18
**continue**   12:12
  183:15 192:10
  193:9 195:24
  219:20 295:2
  296:20
**continued**
  36:18 79:25
  197:21 229:7
  281:19 282:7,9
  283:25 284:5
  316:5,10
**continuing**
  197:11
**contract**   42:3
  42:11,15,23,24
  43:21,24 56:11
  56:22 63:18,19
  163:9,11,15,19
  164:3,19 167:7
  172:3 176:15
  194:22 199:14
  199:19 200:22

215:2,13,17
225:25 226:3
226:11,13,16
233:7 400:12
400:15 402:25
404:9 409:16
409:19 410:7
411:4,6 420:10
**contracted**
125:23 150:16
157:8
**contracting**
39:8 90:3
**contractor**
86:11 124:14
**contractors**
43:17 114:5
119:5 150:8
156:25 211:23
213:18 215:7
**contracts** 39:22
41:14,23 42:7
44:5 47:5
107:23 109:5
150:3 180:15
201:7,11
**contractual**
44:20 80:18
94:3 109:8
117:10 166:25
215:8 288:3
308:12
**contractually**
40:9

**contributed**
58:2 93:17
115:20
**contributing**
313:12
**contribution**
322:24
**contributions**
86:23
**control** 401:10
**controller**
443:21
**controversial**
131:3 151:7,12
151:20
**conversation**
83:2 134:11,14
140:11 143:21
145:7,13
146:11 216:18
216:21 335:19
406:4
**conversations**
12:8 23:22
25:13 26:10
133:19 193:12
193:13 241:12
387:23
**conveyed**
245:16
**convicted** 20:5
**cop** 377:4
**copied** 190:4
253:3

**copies** 21:3,14
188:25 189:4
189:11 198:16
199:13,19
468:14
**copy** 27:19
43:20 65:24
149:7 163:18
172:14 175:16
178:11 187:14
188:20,23
199:5,9 201:13
218:8 273:17
350:18 364:3
**core** 220:13
460:11
**cornered**
454:16
**corp** 1:9 469:2
470:2
**corporate** 3:19
3:20 22:17
24:2 155:19
160:12 177:16
178:2 213:21
284:12,21
288:4 342:25
344:16 345:19
349:9 455:3
**correct** 22:22
26:16 27:25
28:24 29:5,6,9
29:21 30:5,23
31:7 32:7
33:23,24 48:20

53:6 54:19
63:7,8 67:24
75:2,7 77:23
79:9 80:24
97:6 101:24
103:20 111:17
111:20 116:9
137:8 138:21
141:24 148:25
169:8,12
173:16 179:6
184:20 185:14
186:6,15
188:17 190:6
196:15 202:18
208:12 215:4
215:15 225:8
226:17 238:5
242:3 244:15
268:20 272:16
275:4 278:19
279:9 286:12
305:17 307:6
321:22 334:19
351:8,11
367:16 388:22
400:24 436:16
445:5 470:8
**corrections**
470:6
**correctly** 16:21
29:19 39:12
62:2 72:8,11
74:5 87:23
124:8 127:15

213:9 222:13
241:20 243:7
243:14,22
292:23 308:11
313:6 332:3
342:12 367:23
368:16 371:17
371:25 378:20
386:9 427:5
433:15 435:25
436:8
**corresponding**
181:4
**cost** 48:23
58:11 409:13
**costs** 36:19
**counsel** 13:17
18:18,22 21:4
21:9 22:2,14
23:23 24:11,19
24:21 25:11,13
25:14 26:10
62:22 68:15
82:6 133:10
169:2 232:16
237:21 239:25
286:10 293:19
294:3,10 297:9
299:9 305:15
314:4 324:12
324:21 326:23
330:10 343:6
348:22 397:9
397:13,17
400:7,18 408:2

418:20 437:4,6
438:17 453:16
465:18 467:20
468:14
**counsel's**
453:16
**counsels** 293:9
**counter** 443:25
465:2
**counterclaims**
25:6 131:9,11
283:2 334:19
**countersign**
86:10 287:22
**countless**
311:18,25
**couple** 14:12
68:2 131:7
293:21 307:8
**course** 33:10
58:3 72:12
83:12 84:4
85:14 116:24
127:21 166:23
176:19 208:15
220:23 242:12
245:20 254:9
336:10 376:14
425:21 436:2
442:23 444:11
455:9 465:13
**court** 1:2 12:18
13:6 17:23
18:16 20:12
93:4 459:7,25

**cover** 161:15
278:23 300:25
339:22 342:7
348:9
**covered** 83:22
104:18 105:25
106:8 124:23
159:25 160:10
214:14 342:12
390:5
**covering**
219:18 222:6
333:14 338:7
414:13
**covers** 111:16
414:12
**crafting** 122:12
**cream** 255:9
**create** 79:23
104:21 106:20
106:23 107:4
314:19 378:13
405:12
**created** 81:24
280:21 315:4
363:15 371:15
**creating** 314:17
416:7
**creative** 121:6
122:4 127:4
209:20
**creatives**
120:18 122:2
124:15,17
126:17 264:24

**creators** 153:5
**credibility**
149:25
**credit** 136:12
413:4,8
**crimes** 20:5
235:11
**criminal**
454:18
**critical** 231:22
**criticism**
151:15
**crowd** 111:13
**crown** 153:5
**crr** 1:24 467:3
**crying** 83:4
231:10 263:6
**cs** 468:15
**csr** 467:3
**cubicle** 33:2
**culture** 142:7
155:22
**curated** 65:18
67:3
**current** 52:22
**currently** 26:20
28:15 49:16
88:15 101:22
103:6 131:2
**customary**
113:19,25
116:16,23
117:7,14,19
118:12 138:2

**customer** 86:4
87:7 113:22
285:6
**customers** 45:6
61:21,22,23
62:4,5,11,15
63:2
**cut** 120:10
**cute** 267:23
**cv** 1:3 12:21

**d**

**d** 4:2
**d'este** 426:18
**dad** 32:25
**daily** 57:2
223:9
**database**
433:20
**databases**
435:8
**date** 37:17
158:2 173:24
174:2 175:2
183:12 217:8
242:10 276:11
278:23 283:11
290:19 299:17
299:19,25
300:3 356:9,9
372:15,18
428:9 436:19
469:24 470:12
**dated** 134:14
140:9 145:10
148:18 153:5

178:24 180:19
184:18 188:7
188:11 202:16
205:22 328:9
352:14 369:17
410:11 412:8
418:15
**dates** 41:4
216:25 221:13
223:7 224:15
224:16,22,23
291:9
**daughter**
340:25
**david** 3:8 14:7
435:12 436:4
436:10 442:19
450:10
**day** 36:22 90:9
134:22 219:20
352:19 353:18
398:5 426:14
426:22 427:21
459:18 470:15
**days** 101:18
171:10 199:25
221:12 223:13
248:17,21
254:4 303:2
371:2 398:22
410:21 420:3
427:22 428:3
468:16
**de** 1:7 4:22 8:5
14:17,18 29:16

29:25 30:16,25
55:5 56:6
88:11 91:14
96:22 97:4,7
97:22,25
100:14,18
101:5,12,15
102:4 103:16
109:7 112:3
115:11,14
119:8,17
120:20 121:24
123:20 124:20
125:21 126:3,7
126:8,13,16,19
127:5,8 128:3
129:10,20
130:14 131:17
132:2,13
138:14 139:4
139:10,21
140:12,15
144:10 145:15
146:25 149:14
150:25 151:10
153:23 154:2
154:23 155:8
156:11 159:24
160:4,13,24
161:20 162:23
163:12,19
164:18 166:11
166:25 168:25
169:11 170:6
178:13 179:18

179:24 180:3
193:15 194:2
194:18 195:6
196:24 197:17
199:10 201:24
206:2,12
210:17 213:19
215:13,18
217:16 219:13
220:9 229:2
233:25 234:3
238:8 239:2
241:19 247:16
248:18 254:12
260:10 261:2
265:5 266:11
268:10 269:3
270:15,17,17
270:22 271:7
272:19 273:10
275:20 276:2,3
276:4,8,25
277:15 278:18
278:22 279:9
279:17 281:24
282:3,3,10,18
284:6 287:18
288:4,15,21
289:19 290:10
290:22 295:9
297:10 300:23
307:11 308:14
310:18 311:24
313:4 314:11
316:9,17,19,22

318:8,9 319:24
322:12,14
325:14,20
327:8,12,23
328:8 329:12
330:4,17 331:2
331:11 333:15
334:3 335:11
336:13 338:19
340:5 341:14
342:20 346:5
348:5 355:15
356:15 357:20
359:21 363:25
367:14 369:8
370:20 377:9
378:18 388:20
400:11,14
401:2,25
402:21 404:15
404:23 409:22
413:23 417:20
419:18,21
422:3 426:17
427:3 430:11
430:15,20
431:11 433:17
434:5,10,12,15
439:7 441:5
443:10 444:4,7
445:5,9 446:7
446:24 448:7
449:17 450:12
450:13,21,24
451:4,19

456:20 457:3,9
457:18 460:10
460:20 461:2
461:15 462:19
464:11,17,23
465:3
**deadlines** 429:6
**deal** 80:11,16
81:5,18 82:21
87:6 161:18,24
162:12,23
163:2,25
164:12,14
182:15,23
193:21 195:22
222:5 241:8
290:24 291:20
292:14 296:7
297:5 302:21
**dealer** 32:22
34:15,18 111:6
113:7
**dealer's** 107:17
**dealing** 116:24
262:14 402:2
442:7,14 443:6
451:5 457:6
463:5
**dealings** 433:13
435:23 436:3
437:16 441:5
442:4 454:10
458:15 460:13
**deals** 195:10
296:6

**dear** 210:15
261:12 269:21
388:24 415:18
**debate** 347:13
**december**
16:16 35:23
159:11,12,16
190:18 196:6
196:14 340:9
342:13 346:7
**decided** 43:9
387:11
**decision** 38:3
399:11 401:10
402:4
**decisions** 56:25
**declare** 470:4
**dedicate**
321:23
**dedicated**
29:24 30:2
31:4 101:12,15
115:11 311:17
311:19
**dedicating**
311:24
**deducted**
217:19 218:14
218:18 409:14
**deemed** 470:6
**defendant**
55:23 236:11
362:2
**defendants**
1:10 3:10

13:24 14:2,4
15:21 28:18
37:8 55:10
66:13 237:3
319:11 321:7
348:7 451:6
**defer** 125:6
**deferring**
218:22 219:12
300:20 331:11
**define** 41:2
57:20 74:6
**definition** 59:8
74:15 76:3
99:2,12 120:25
122:5 279:14
**definitions**
74:14
**definitive**
292:15,19
**definitively**
95:12 344:10
376:13 460:10
**degree** 31:15
33:21,23
**degrees** 31:11
34:2,5
**delay** 150:21
**delayed** 382:8
**deliver** 157:8
**delivered**
194:22
**deliveries**
91:10 285:11
285:18

**delivering**
  289:22
**delivery** 88:9
  284:4
**demanded**
  80:22
**demarcation**
  345:12
**departure**
  28:17 30:24
  55:22 88:11
  91:14 127:22
  403:9 434:7
  436:20 450:11
  450:21 460:21
  463:3
**depending**
  101:10
**deponent**
  467:16 468:13
  470:3
**depose** 347:7
**deposed** 22:16
**deposing**
  468:13
**deposit** 107:11
  381:23
**deposition** 1:12
  2:5 4:8,11 11:3
  12:15,23 16:2
  20:21,23,24
  21:11,21,23
  22:8 23:4,5
  24:2,4,5,13,22
  26:12 27:4

52:14 66:5
99:11 133:2
139:19 144:21
148:6 152:22
154:7 167:23
178:16 183:22
190:9 202:9
205:7 212:8
217:25 247:24
257:15 266:14
269:7 271:14
274:6,12
327:21 330:18
330:23 335:2
339:2,9 341:5
345:23 350:9
350:16 351:24
359:16 361:23
362:21 364:9
366:4,17 367:9
369:21 372:21
388:6 401:17
406:15 411:22
465:7,14 466:2
467:5,7,13,21
**depositions**
  24:25 361:10
**describe** 34:16
  149:13
**described**
  79:16 101:6,8
  303:24 304:15
  304:18 317:22
**describing**
  302:3

**description** 4:7
  5:3 6:3 7:3 8:3
  9:3 10:3 342:3
**design** 123:15
  123:17
**designer**
  121:13 123:18
  123:21 290:3
**designers**
  120:17 123:12
  123:14 125:25
  213:22 385:13
  390:7
**desired** 457:8
**despite** 269:24
**detailed** 446:16
**detailing** 446:6
**details** 327:7
  353:25 384:19
**deteriorate**
  403:7 425:20
**deteriorated**
  416:25
**deteriorating**
  393:13
**determined**
  65:14 332:16
**deutsche** 314:7
**devastated**
  425:24
**develop** 210:25
  385:14
**developed**
  81:13

**developing**
  98:20,21
  153:22
**development**
  59:15 84:13
  100:5 126:10
  452:12
**deviation**
  353:16 402:20
**devine** 3:22
  13:3
**devised** 276:6
**dhabi** 72:6
**dialogue**
  156:14 254:10
  331:16
**diana** 3:20 8:22
  14:17 218:13
  237:7 276:16
  276:24 313:7
  316:25 318:10
  318:12,20
  319:18 333:7
  350:10,18
  352:6,21 353:5
  353:19 354:24
  356:9,16,22
  357:2,3,6
  359:7 371:7
  381:21 410:22
  418:11 444:23
**diana's** 235:6
**dictionary**
  281:8

**difference**
246:21
**different** 67:13
74:13 101:9
123:13 132:3
175:5 240:4,5
264:21 293:21
305:21 345:21
368:8 370:6
374:11 386:12
417:7 450:3
453:24
**differently**
103:4
**difficult** 65:3
151:18 152:10
211:6 348:20
**difficulties**
30:11
**diligence**
434:25
**direct** 119:19
119:23 133:11
133:12,15
145:6 179:7
190:19 313:14
341:16 415:23
430:12
**directed** 168:14
**directing**
119:25 120:13
154:19
**direction** 11:6
453:16 467:12

**directly** 21:9
22:14 42:11
211:18 298:19
403:25 404:11
405:3 417:17
421:11
**director** 94:18
95:10,22 96:18
227:25 329:3,8
329:16 367:14
388:20
**directors** 117:9
**disadvantage**
112:14
**disagree** 132:9
132:10 192:13
244:21 254:6
283:17,22
319:7,8 360:9
363:7 459:13
**disagreement**
75:16,21 77:4
**disclose** 116:2
225:14
**disclosed**
464:18
**disclosure**
224:11 225:12
225:16 226:18
228:15
**discovery**
286:10
**discretion**
270:16 299:23
300:2 302:21

303:10 314:16
322:21 323:6,8
429:23
**discretionary**
460:9
**discuss** 153:17
153:21 161:4
171:17 180:24
181:5,10
192:22 195:4
195:13 216:14
276:10 324:21
363:9 373:5
399:6 404:8
**discussed** 53:13
93:25 103:5
104:23 105:9
106:12 129:15
161:3 166:24
167:6 170:14
216:12 276:6
289:11 291:23
292:20 323:16
352:7 399:8
401:2 409:5,20
411:13
**discussing**
56:24 80:10
145:14 187:18
223:11 293:19
297:23 309:19
356:16
**discussion** 27:2
46:6 55:18
66:3 124:24

130:4 132:21
150:5 154:21
156:22 166:16
166:18 184:4
203:14 228:23
274:4 297:8
350:5 369:19
379:13 387:14
399:19 400:10
405:14 406:10
409:10 455:9
458:24
**discussions**
40:19 62:17
72:24 73:5
127:16 150:6
150:21 156:23
186:25 197:21
237:20 238:17
289:17 291:5
292:6 293:8
298:23 299:2
303:11 308:3
311:7 314:6
324:11,18
401:11 440:15
455:10
**dishing** 301:10
**disingenuous**
393:17
**disinterested**
467:8
**dispute** 75:23
**distinction**
30:18 92:14

**[distinction - drafted]**     Page 31

361:6
**distribution**
89:4 106:25
**district**   1:2,2
12:18,19
**districts**   240:4
**document**   21:6
22:11 23:3
27:9 52:13
71:4 119:22
139:17 140:20
144:20 145:4
148:5 151:25
152:21 154:6
155:5 158:10
174:3,5 175:5
175:16,20
176:9,22
177:10 178:22
188:11 190:8
202:5 203:11
204:13 205:5
211:20 212:7
217:23 221:3,6
227:16 255:15
257:7,12
259:25 274:3
298:17 312:19
326:22 328:14
330:8,25
333:13 334:25
341:4 350:8,23
351:23 354:17
358:4,22 359:3
362:14 363:14

363:17 370:12
371:6 372:20
380:8 387:17
401:16 406:13
410:8 411:21
412:14,21
439:2
**document's**
214:18
**documentation**
332:21 349:3
358:15
**documented**
358:2 378:7
**documenting**
266:9,10
313:19 358:10
464:21
**documents**
11:9 20:17
24:24 26:5,17
41:13 44:16
46:20,25 47:16
47:17 49:3
50:4,17 63:24
65:11 67:9
71:3 82:2
102:18 132:20
158:6 161:12
176:11,13
177:7,17,20
201:7 214:12
215:23 271:5
273:8 288:4
312:18,24

315:11,24
319:16 320:12
320:14,17,24
321:11 324:5
325:7,24
336:22 340:6
342:9,24 343:4
343:17,18
344:8 346:14
346:18 347:22
347:24 348:2
348:18,24
351:15,19
356:10 359:11
359:24 360:5
360:15 364:21
365:22 372:18
376:16 391:22
398:8 408:18
412:24 413:2
414:20 423:8
432:25 433:7
433:10,16,17
433:23 434:4,4
434:6,11,14
435:7,18
438:22,25
439:2 441:17
444:11 445:21
445:22,23
457:7 465:11
**doing**   28:8
34:16 78:6
102:10,23
103:13 110:9

123:16 131:2
142:6 156:17
223:20 233:11
257:9 283:21
285:4 290:5
295:25 298:4
298:11 333:18
361:8 400:3
424:12 429:22
431:4 434:24
444:16 455:25
**dollar**   295:11
**dollars**   209:4
283:8
**domicile**   16:11
297:12
**door**   236:10
**doors**   211:5
405:12
**dotted**   325:22
**double**   260:14
260:18
**downside**   262:9
**draft**   122:25
169:6,21
173:14 180:24
227:12 231:6
232:3 250:6,23
251:3,10,11
252:7,14,16,23
314:22 315:4
391:17 392:5
**drafted**   170:24
171:13 185:22
186:4 250:16

253:19 386:17
391:16 414:24
**drafting**   265:17
**drafts**   249:21
249:24 253:15
**draw**   33:16
313:9
**drawing**   30:18
**dreamt**   37:22
**dresser**   131:7
**drew**   147:9
**driver**   130:20
130:23 140:14
145:22 152:12
285:5
**drivers**   150:16
151:14 152:5
**driving**   152:7
**dsimon**   3:6
**dt**   279:13
423:24
**dt0000000073**
8:6 327:24
**dt0000000082**
8:7 327:25
**dt0000000100**
7:24 274:8
**dt0000000112**
7:24 274:8
**dt0000000221**
8:8 330:19
**dt0000000227**
8:11 335:4
**dt0000000228**
8:11 335:5

**dt0000016492**
5:9 148:7
**dt0000016494**
5:9 148:8
**dt0000018017**
5:11 152:23
**dt0000018018**
5:12 152:24
**dt0000023400**
5:19 167:25
**dt0000023419**
5:19 167:25
**dt0000023770**
6:10 202:10
**dt0000023772**
6:11 202:11
**dt0000025711**
5:23 183:25
**dt0000025731**
5:23 183:25
**dt0000028355**
6:8 190:11
**dt0000028377**
6:8 190:11
**dt0000032181**
6:18 212:9
**dt0000032182**
6:18 212:10
**dt0000035690**
6:20,20 218:2
218:3
**dt0000076100**
9:4 351:25
**dt0000076102**
9:5 352:2

**dt0000077009**
9:10 369:22
**dt0000077015**
9:10 369:23
**dt00110061**   9:7
366:18
**dt00110062**   9:8
366:19
**dt00110200**
9:21 401:19
**dt00110205**
9:21 401:20
**dt00157731**
9:14 372:23
**dt00157736**
9:14 372:24
**dt00157941**
9:18 388:9
**dt00157965**
10:6 406:18
**dt00158019**
10:9 411:25
**dt00158020**
10:10 411:25
**dt00175594**
7:17 269:9
**dt00175601**
7:18 269:9
**dt00175695**
7:14 266:15
**dt00175706**
7:14 266:16
**dt00175888**
7:20 271:16

**dt00175895**
7:21 271:16
**dt110**   310:10
**dubai**   72:6
**dude's**   58:13
**due**   214:7
331:10 337:11
353:15 356:14
357:10 360:4
395:20 434:25
439:9
**duly**   15:7 467:5
**duties**   91:12
101:7 263:3
279:12 285:20
310:13 311:3,9
**dynamic**
195:15 378:2
392:13 393:11
**düsseldorf**
198:9

|  e  |
|---|

**e**   3:2,2,17,17
4:2,6 5:2,8,11
5:18,21 6:2,4,7
6:10,17,19 7:2
8:2,13,21 9:2,4
9:6,9 10:2
62:21 71:8,17
71:24 148:7,12
148:18,23
149:12 152:23
153:4,12 154:3
154:4 162:3
167:24 168:6

169:5,11,14,19
173:21 174:10
178:17,23
179:11 180:19
183:6,9,23
184:15,21
186:7 187:24
190:10,17
191:5,6 193:13
193:15 196:3
202:10,15
212:9,14 218:2
218:7 232:24
232:25 249:21
251:9,13
252:16 256:4
285:11,18
287:9 312:19
339:3 350:10
350:17,23
351:3,10,17,25
352:5,8,14
353:18 356:25
357:16,20
359:5 361:24
363:25 364:2,5
366:18 367:21
369:22 372:6
386:14 396:3
397:8,12,24
398:23 401:13
409:6 410:21
414:10 415:16
418:12,14
457:5 458:21

469:3,3,3
**e.g.** 388:25
390:23
**earlier** 59:23
112:17 145:21
200:2 264:22
345:18 372:13
402:7 403:6
409:5,20
411:13 417:2
420:9
**early** 131:24
162:21 263:8
285:23 332:2
**earned** 299:8
**earning** 277:10
**easier** 440:23
**easily** 202:23
**east** 68:7 71:19
72:15,20,23
73:3 146:4
**easy** 150:2
251:20
**ecclestone**
200:14 217:6
**economic** 67:17
**economics**
31:18 33:23
**edits** 196:4
**educational**
31:9
**effect** 247:9
293:4,5 418:20
**efficiency**
133:15

**efficient** 361:9
410:24
**effort** 100:9
107:16 156:10
**efforts** 77:7
108:8,17
401:23
**efunder** 111:10
**either** 112:13
124:10 168:14
174:12,23
183:2,5 200:9
228:5 272:10
391:13 467:20
**elaborate**
234:15
**elderly** 426:24
**electronic**
199:4
**electronics**
428:12,13,21
**else's** 99:10,11
**emotional**
222:17
**emotions** 418:8
418:18
**employed**
26:21 41:3,4
41:11 64:10
124:14 327:12
447:5
**employee** 127:8
362:2 420:5
**employees**
43:17 114:4

127:6 150:7
160:13 180:15
195:6 210:6
213:19 215:7
285:15 314:18
384:21
**employment**
33:11 34:9
36:4,13 38:17
39:22,25 42:3
42:11,14 54:17
54:19 56:2
125:21 126:3,7
126:19 167:6
169:21 170:19
172:2 179:17
180:15 201:10
214:7 233:15
235:17 287:17
288:2,13
307:17 308:4,5
308:18 312:20
314:23 316:6
316:11 321:17
326:2 409:15
409:19 410:7
411:4,6,11,17
420:10 444:6
444:25 445:8
446:7
**endeavors**
36:10
**ended** 38:18
57:23 67:14
173:24 276:5

**[ended - evaluation]**

332:10 333:24
334:2 430:6
**ends** 146:16,17
154:20 169:14
206:6 392:8
**energetic**
155:22
**energy** 210:22
**enforcement**
458:5
**engage** 119:4
169:2 237:8,13
**engaged** 304:22
308:12 385:12
**engagement**
51:14 53:14
62:18 239:14
240:6,16,24
241:2
**engagements**
51:12 384:5
**engaging**
263:23
**engineer**
121:15
**engineering**
123:15
**engineers**
120:17 123:24
126:5
**english** 181:14
286:25
**enigma** 235:13
436:5 437:15
442:5,18 443:7

450:10
**enjoying**
269:23
**enlist** 263:24
**ensure** 107:14
182:8 298:3
**entail** 98:18,20
**enter** 157:4
461:7
**entered** 165:3
181:12 192:17
251:25 252:4
288:21 330:8
384:20 403:3
403:14
**entering** 55:19
**enterprises**
97:13
**entertained**
138:19
**enthusiasts**
68:3
**entire** 103:22
115:10
**entirely** 173:2
**entirety** 272:25
326:21
**entities** 67:13
108:12 288:5
297:13 325:25
341:15 442:6
442:18,18
444:5,20
**entitled** 77:6
289:7 323:5

345:10
**entitlement**
316:18 318:7
319:24
**entitles** 442:6
**entity** 41:17
43:6 49:18
275:9 282:5
297:10 442:10
464:10
**entrepreneur**
27:24 28:10
**entry** 100:9
341:25
**environment**
427:8
**envisioned**
207:14
**equity** 57:16
60:14 278:2,6
278:10 280:2
292:2,10,20
295:13 297:11
298:24 299:8
303:18 304:10
304:15 314:3
316:5 322:18
322:25 323:4
323:14 409:23
**ernest** 458:17
**errata** 468:11
468:13,16
**erred** 422:11
**escrow** 107:11

**especially**
149:4
**esq** 3:7,8,8,14
3:14,15
**esquire** 468:1
**essential**
120:19
**essentially**
155:20
**established**
280:17 285:11
285:16
**establishing**
267:25
**establishment**
136:19
**estate** 69:4
**esthetic** 123:16
**estilo** 142:18
**estimate** 58:5
59:10 60:11
**et** 12:17 150:4
150:17 332:19
389:3 468:4
469:1 470:1
**ethical** 402:23
460:12
**ethos** 157:2
**euro** 58:7 59:12
60:12
**europe** 40:23
**euros** 59:6
**evaluation**
295:9

**evan** 285:13

**evening** 174:20

**event** 169:4
206:3,12
209:21 227:8
300:21 302:22
302:25 333:20
359:4 426:18
467:22

**events** 89:2
98:23 235:4
284:13 305:11

**eventually** 80:2

**everybody**
130:9

**everyone's**
120:24 456:12

**evidence** 398:9
437:13

**exact** 246:4

**exactly** 151:23
220:25 235:20
246:3 247:13
269:25

**examination**
4:4 15:12
447:19

**examined** 15:8

**example**
136:13 250:10
390:24 413:12

**examples**
392:22

**exams** 33:8
35:25

**exception**
55:20 122:2
219:14 237:5
356:6 443:11

**excess** 58:6
295:17 334:7

**excessive**
152:11

**exchange** 40:12
42:9 51:5
76:14 138:3
140:9 143:5
199:25 288:23
316:11 322:25
350:23 373:10
406:22 433:15
433:19 435:7
435:14 437:17
443:23

**exchanges**
376:17

**exciting** 262:17

**exclusive** 41:20
42:6 43:12
76:24 107:3
307:2

**execute** 191:20
193:5 297:18

**executed** 41:16
94:9 178:11
185:8 186:10
186:14,18,21
187:7,12 189:5
192:4,9 194:25
288:16 308:8

324:5,8,24
325:13 326:14
326:18

**executing**
101:7 112:20
276:5

**execution**
106:4

**executive**
113:20 114:2,8
114:19 115:25
116:6,17,18
117:24 118:12

**executives**
114:4 116:3
117:14 118:22
119:4 138:3

**exhausted**
456:22

**exhibit** 4:8,9,12
4:13,15,16,20
5:4,8,11,13,18
5:21 6:4,7,10
6:12,17,19 7:4
7:8,13,16,19,22
8:4,7,9,13,17
8:21 9:4,6,9,12
9:16,19 10:4,7
20:22,23 21:19
21:21 22:7,25
23:2,7 27:4,10
52:14,19 53:3
66:5,9,12
83:10 120:8
132:25 133:2

134:9 139:19
140:8 144:21
145:4 148:6,11
148:16 152:22
153:3 154:7,14
167:22,23
168:5,20
178:16 183:21
183:22 184:14
190:9,15,16
191:3 196:9
202:9,13 205:7
205:14,20
212:8,13
217:25 218:6
247:23,24
248:7,8 257:15
257:22 261:6
266:14,19
269:6,7,13,13
271:13,14,20
274:6,13,19
279:13 287:15
288:13 308:25
309:3,24 311:3
311:11 327:21
328:4,6 330:18
330:24 335:2,8
339:2,10 341:5
341:12 345:25
350:9,16
351:24 352:4
354:15 366:17
367:9 369:21
370:2,3 372:21

**[exhibit - fact]** Page 36

373:2,7 379:25
388:6,12,16
392:10 401:17
405:17 406:15
406:21 411:22
412:5,15
**exhibits** 167:13
273:18 365:13
365:14
**existed** 403:2
**existing** 63:18
80:15 285:4
**exists** 326:14
**expanded**
320:16
**expect** 142:8
**expected**
300:15
**expense** 115:15
115:16 132:15
209:23 211:12
277:16,23
334:9,13 340:4
342:10,17
343:21 344:5
347:16,17
348:4 352:10
**expensed**
204:21
**expenses** 64:23
115:5,8,20
136:12 159:25
160:10,12
211:18 212:18
212:21 213:20

214:9,13,16
215:10 218:24
219:17,19,22
222:7 283:4
284:9 330:17
334:5,22
335:19 336:5,7
336:11 337:3
337:23,24
338:8,9,11
339:22 340:8
342:4,6 343:2
343:20 346:23
347:11 348:10
353:13 354:2,7
354:11 355:2
355:20 358:19
360:11,21
363:3 365:23
365:25
**expensive**
208:16 272:11
**experience** 54:2
99:25 100:4,11
100:16,21,23
100:24 103:12
106:3 107:19
112:16,17,18
112:23 113:7,8
152:13 156:12
413:19 431:21
**experienced**
302:16
**experiences**
95:4

**experiencing**
267:20
**expert** 325:3
458:5
**expertise**
120:16 225:18
**explain** 362:5
**explicit** 256:23
257:4 270:18
390:12 404:3
**explicitly**
184:25 299:3
317:25 405:4
**exploits** 268:23
**explore** 385:6
**explored** 57:12
**expressed**
246:18 247:11
247:19
**expressing**
143:6
**expression**
110:5
**expressly**
244:17 247:4
247:16 319:3
332:15
**extensive**
120:16 123:5
433:2,24
434:23 435:12
435:17 437:20
439:9
**extensiveness**
436:22

**extent** 82:9
108:25 221:16
221:18 240:17
251:24 343:8
407:14 447:4
**extracurricular**
312:11
**eye** 208:18,18

**f**

**face** 422:19,19
**facebook**
371:17,18,25
**facebook's**
371:21
**facilitate** 457:8
**facilitated**
162:24
**facilitating**
85:17
**facility** 176:24
**fact** 152:9
177:2 182:25
204:23 226:4
228:15 236:16
269:25 285:21
322:17 326:13
331:10 334:4
338:20 361:16
362:9 364:12
378:7 382:23
404:8 422:11
422:16 423:10
425:19 442:12
451:18 463:15

**facts** 59:19
**factual** 123:2
**fails** 468:18
**fair** 19:14 30:8
35:3 46:2
57:21 79:13
87:9 88:12,18
89:12 93:20
94:25 97:4
105:23 108:24
114:6 130:21
134:3 135:2
138:15 151:5
181:17 244:6
327:13,18
329:25 333:22
346:25 354:4
373:24 410:15
419:19 430:13
441:18
**fairly** 357:25
413:19
**faith** 65:4
187:2 192:22
193:10 195:4
276:10
**fake** 392:3,19
**fall** 289:21
**familiar** 77:10
169:22 171:12
203:13 225:17
274:20 326:8,9
326:11,13,15
327:8 328:11
330:6 355:5

458:14
**familiarize**
145:18 325:8
**familiarized**
327:6 346:13
**family** 40:15
41:19 43:8
61:17 67:11
76:14 131:17
149:21 229:10
231:12 262:17
263:9 293:24
300:12 305:13
312:15 374:15
377:9 416:22
426:8 428:6
429:12,14,19
429:24 430:4
430:10,18,23
431:4,9,25
432:6 435:21
**far** 29:19 34:5
39:16 40:20
51:24 62:19
70:19 110:20
219:17 230:19
310:19 321:7
413:21
**fashion** 103:15
**fast** 230:4
**father** 32:17
33:2,11 37:19
37:22 38:5,6
67:12,18 76:12
431:3

**father's** 111:4
311:16,23
430:21
**fault** 231:5
**favor** 229:15
**favorable**
270:22
**favorite** 137:23
**faxed** 198:20
198:21
**fear** 259:18,21
**feasible** 360:5
**february** 37:9
37:12,17 64:10
213:11 313:5
405:8
**fee** 80:23 197:5
277:10 333:15
**feedback**
231:19 418:16
**feel** 149:7
194:10 246:5
270:3 310:7
358:12 379:7
382:16 383:23
386:6 387:25
402:5,6 403:16
403:24 404:10
405:9 412:20
412:23 413:2
413:10 425:10
425:14 428:2
**feels** 416:19
**fees** 239:9,16
240:13,14,21

336:11
**fell** 80:13,21
81:5
**fellow** 114:3
116:2 117:8
**felt** 104:3
107:12 180:8
180:11 208:15
236:14 305:17
374:18 378:16
390:2 399:11
399:24 408:9
416:12 423:21
463:13
**female** 130:23
131:13 151:13
151:19 152:10
**ferrari** 145:22
**ferrari's** 72:12
**feverishly**
17:25
**field** 156:20
225:18
**figure** 69:4
131:4 241:5
347:21
**figures** 219:18
**file** 434:15
**filed** 12:17 25:8
426:10
**files** 286:3
**filing** 225:16
353:11
**filings** 435:13

**[fill - forgiveness]**                                              Page 38

fill  268:5
filming  161:16
final  185:8
  385:8
finalized
  170:13,15,16
finally  177:6
  261:13 266:7
financial  28:11
  33:5 70:6,19
  233:23 276:8
  278:21 289:18
  290:22 291:11
  343:7 347:5
  368:18 402:20
  433:12 442:22
  444:18 449:24
financially
  13:12 445:7
find  71:6 80:25
  100:19,25
  115:7 140:25
  146:21 303:12
  303:14 395:16
  396:8 399:9
  410:23 429:15
  458:11
finding  399:8
  457:22
findings  435:16
  437:10 439:5
  439:15 441:2,9
  442:2 443:3
fine  22:5 158:9
  158:11 232:6,7

238:23 240:9
241:4 259:24
295:24 296:21
312:16 322:9
345:15 361:20
363:9,20 365:3
365:12 366:9
372:19 384:19
387:6 460:3
fingers  17:25
  252:24
finish  18:11,11
  294:19 295:6
finished  120:21
  373:8
fintech  111:12
firm  241:13
firms  238:25
  241:18
first  16:3 20:17
  22:4 41:15
  48:3,6 50:20
  51:14 57:23
  64:3 65:19
  67:3,23 77:19
  80:9 81:11
  86:4 110:21
  119:21 127:21
  131:20 146:9
  165:4 167:5,10
  169:20,23
  170:5,9,20
  181:14 219:9
  221:19 265:10
  267:18,21

268:8 291:14
291:24 292:19
300:5 342:10
374:3 398:15
428:14 444:13
firsthand  95:20
  96:15
fits  356:4
fitting  280:22
five  239:7
  269:24 447:14
fix  141:16
  143:16 144:6
flagged  96:7
flew  157:14,20
  158:3 159:16
  395:25 396:5
  427:13,20
flexner  3:3
flights  159:21
  429:10
floor  2:8 3:4,11
  12:25 444:15
flowed  280:7
flowing  308:20
fluent  202:19
  203:7
flush  132:15
fly  158:16,20
focus  19:25
  317:7
focused  115:12
  151:3 321:17
  429:8

focusing
  149:22 227:8
folks  121:21
  125:21 369:8
  370:20
follow  224:6,10
  231:23 232:5
  259:13
followed
  222:18
following  28:17
  31:22 32:5,9
  32:10 223:15
  316:6 327:7
  356:7 426:22
  464:20
follows  15:9
  315:8,17
  352:21
food  19:6
foods  136:18
  200:15,18
  243:11
foray  50:20
  51:5
forces  152:12
forecast  364:8
forego  311:15
foregoing
  467:5 470:5
forgive  82:20
forgiven  264:2
forgiveness
  83:5

**[form - funds]**    Page 39

**form** 43:22
44:3,14 51:16
54:20 55:6
60:9 65:9
73:19 75:13
79:12 82:16,23
90:22 92:11
95:23 106:7
116:21 118:10
132:18 134:25
137:18 142:10
142:16 143:19
147:18 152:6
152:14 177:21
182:17 192:12
194:5 244:19
247:6 251:12
254:5 255:2
260:4 264:3
287:19 297:7
297:19 298:18
303:6 305:3
312:22 313:23
315:9,19
317:12,18,24
321:2 322:19
324:3 347:2
349:19 352:25
358:23 386:23
461:16
**formal** 44:22
153:22 163:5
166:19,24
167:6 300:7

**formalize** 46:5
**formally** 48:5
86:25 97:8
127:16 385:9
**formed** 29:7
**former** 458:15
**formerly**
123:19
**forming** 79:17
85:16
**forth** 137:10
171:24 172:18
186:25 190:3
196:5 205:3
441:6,11
**forthcoming**
102:13 285:10
285:17
**fortunate**
156:16
**forums** 104:19
464:19,19
**forward** 9:7
50:16 93:14
182:10 224:7
262:16 366:18
**forwarded**
172:22 406:7
458:7
**forwent** 36:8
**found** 208:7
280:22 382:10
435:5 443:3
455:24 457:20
457:23 458:5

**founder** 127:13
**four** 204:8
**fourth** 140:20
206:22
**frame** 290:14
**framed** 310:6
**frank** 234:8
**frankly** 459:9
**frantic** 426:23
**fraud** 442:22
**free** 192:11
**french** 272:12
**friend** 57:22
58:16 67:12
69:21 140:17
161:22 172:14
296:9 300:12
374:14 392:15
416:22
**friendly** 254:10
**friends** 7:16
41:8 67:19
111:10 113:9
125:14 269:8
269:14 312:14
393:12 431:4
**fro** 77:21
**front** 41:14
44:16 45:17
46:7,20 47:2
49:4 60:24
67:9 83:9
112:10,12
128:10 174:4
211:21 213:13

214:12 215:23
351:19 353:4
**fruit** 269:20
**fruition** 81:18
**frustrated**
302:10
**fulfill** 285:19
**full** 15:14 32:18
42:16 49:12
67:15 226:7
283:3 320:21
321:13 368:17
371:22 390:5
439:5 446:19
**fullest** 269:23
**fully** 37:7 75:10
117:2 429:8
**functions** 99:18
99:24 101:5
**fund** 160:25
448:2
**funded** 159:10
**funding** 111:13
**funds** 28:21,22
28:23 29:3
57:17 58:9
64:25 108:11
114:20,24
116:2 160:19
204:24 209:10
209:12 213:25
215:21 218:21
219:10,23,25
295:18 335:21
337:6 340:20

450:18 455:3,6
461:6 462:25
463:24
**fung** 1:6 12:17
458:16 468:4
469:1 470:1
**fung's** 458:17
**further** 23:18
34:4 59:14
147:4 149:24
186:9,20
357:13 460:20
467:19
**future** 89:4
91:10 228:16
230:14 262:5
311:15 353:8
424:7 454:11
458:22

**g**

**gabriel** 458:16
**gained** 460:20
**galloni** 124:5
**gap** 253:14
**garella** 42:21
43:13 53:18
63:17 76:18,20
123:8,21 124:4
**garella's** 76:23
**gather** 191:11
**gathered**
230:10 263:3
**gears** 130:13
264:20 274:2
330:16

**general** 23:19
24:17 35:4
70:19 84:12
98:10 103:23
105:6,12,21
106:5,11,16
109:15 111:22
112:15 116:22
117:3,5 122:9
143:10,12
309:11 325:16
336:15 338:4,6
383:11 392:12
393:10 402:7
408:9 413:9
416:21 417:13
417:16 418:10
419:13 422:13
425:18
**generally** 108:3
133:18 142:19
147:16 353:24
358:3 387:18
398:10
**generation**
444:2 450:14
464:14
**genesis** 1:9
451:6 452:22
457:10 458:8
458:20 460:24
461:12 462:3
463:5
**genuine** 156:18

**geopolitical**
298:10
**george** 285:14
**gerard** 70:22
74:24
**germany** 198:9
200:10,13
413:12,15
**getting** 38:16
155:11 204:9
212:18 232:24
262:12 263:24
302:6 307:11
314:10 331:25
340:3 364:17
397:18 428:11
**girls** 267:24
272:7
**give** 40:13
65:12 73:25
124:2 125:9
133:21 149:24
242:15 255:20
270:19 291:17
311:22 313:21
316:4 337:18
418:22 427:23
439:4 453:11
**given** 65:11
68:14 76:24
82:6 112:11
222:14 286:6
298:25 322:8
343:6 375:17
404:3 466:8

470:9
**giving** 194:14
222:9 256:22
257:3 311:25
324:21 386:10
394:13 420:25
**glass** 148:3
**glastonbury**
69:15,22 178:8
369:2 430:22
**glickenhaus**
39:6 40:14
41:19 42:16,21
43:8 58:9
64:24 75:24
76:12,19 79:16
80:22
**glickenhauses**
53:17 55:20
96:25
**global** 97:13,13
**gm** 109:17
**go** 12:13 16:5
17:9 19:16
23:22 38:4
49:14 54:11
56:21 67:25
93:3 98:3
101:6 120:5,12
135:6 136:24
139:16 140:5
140:19 144:19
146:15 147:13
154:15,18
161:11 167:14

**[go - grandchildren]** Page 41

| | | | |
|---|---|---|---|
| 176:8,10,25 | 20:16,18,19 | 273:17,25 | 22:2 65:4 |
| 196:5 209:18 | 21:2,18,19 | 274:11 283:17 | 78:12 130:6,10 |
| 211:25 216:4 | 22:7,10 25:12 | 289:20 292:7 | 130:11 134:18 |
| 229:18 231:12 | 27:8 36:22,23 | 293:13 296:16 | 134:20 152:5 |
| 241:22 258:14 | 46:2 48:7 | 296:21 298:6 | 178:2 179:25 |
| 258:24 260:19 | 49:17 52:20 | 298:16 299:15 | 187:2 191:18 |
| 263:8 267:17 | 62:8 66:10 | 299:18,24 | 192:22 193:9 |
| 271:23 272:4 | 78:9,21 80:12 | 301:14,15,18 | 195:4,14 |
| 278:21 284:16 | 80:15 82:10 | 310:17 313:20 | 210:22 230:6 |
| 287:20 294:17 | 90:7,9 92:23 | 313:21 314:22 | 254:2 262:5 |
| 295:3,4,19 | 98:3 107:8 | 322:6 327:16 | 263:25 273:16 |
| 310:10 315:20 | 119:19,23 | 328:4 330:15 | 276:10 444:23 |
| 322:7 332:7 | 121:23 125:19 | 330:22 335:7 | **google** 202:23 |
| 345:10 347:20 | 132:24 142:3 | 339:8 340:8 | 203:12,17 |
| 347:25 351:2 | 144:5 145:15 | 344:24,25 | **gotten** 125:9 |
| 352:13 354:16 | 146:12 148:10 | 350:15 352:18 | **government** |
| 354:19,21 | 150:19 151:9 | 353:12 357:10 | 20:9 |
| 358:7 368:21 | 153:3 154:13 | 359:8,15 | **gpe** 41:22,25 |
| 370:4 372:20 | 157:4 161:18 | 360:24 363:4 | 42:7,9,19 43:2 |
| 374:20 377:12 | 165:25 168:4 | 366:24 370:3 | 43:4,13 44:20 |
| 377:20 382:2 | 168:11 181:20 | 384:18 387:16 | 76:23 78:4 |
| 382:14 390:9 | 182:9 184:6 | 388:11 394:24 | 81:10,17,25 |
| 396:9 419:7 | 190:14,16 | 395:4 400:20 | 82:13,22 97:9 |
| 423:23 426:13 | 191:8 193:9 | 403:4,13 | 97:10,16 |
| 427:18 444:24 | 205:13 208:2 | 406:12,20 | 112:22 113:13 |
| 448:22 449:2 | 218:6 224:7 | 411:20 412:4 | **grabbing** |
| 453:5,17 456:5 | 225:14 226:19 | 415:25 422:20 | 269:20 |
| 459:7,22,25 | 229:22 230:13 | 431:3,10,20 | **graces** 263:25 |
| **goal** 101:11 | 233:12 234:24 | 434:10 437:7 | **graduated** |
| **godenzi** 287:8 | 235:23 239:20 | 449:6 451:24 | 32:15 |
| **goes** 125:2 | 246:12 247:17 | 454:4 459:6,15 | **graduation** |
| 272:12 294:22 | 249:22 257:21 | 459:21,25 | 32:5,9,11 |
| 352:20 | 264:11,20 | 465:6,6,8 | **grandchildren** |
| **going** 12:3 | 265:8 266:18 | **good** 12:2 | 268:4 |
| 17:14,21 20:16 | 269:12 272:5 | 13:22 15:13 | |

**grander** 149:15

**granstudio** 123:19

**grant** 322:18 371:19

**granted** 42:6 42:16 43:12

**granular** 89:17 289:20

**great** 108:16 457:14 464:7

**greater** 49:6

**green** 76:7

**grew** 39:13

**ground** 16:5 17:10 272:9

**group** 444:2 450:15 454:12 457:4,16 458:22 464:8 464:15

**grow** 58:12 79:25 208:22 303:15 424:7

**gt** 289:7

**gt3** 289:9 306:19 316:11

**guaranteed** 233:17

**guess** 28:3 62:7 110:2,14,18 112:13 120:24 155:16 305:6 329:11,15 353:17 364:19

446:9

**guy** 256:15

**guys** 229:14 459:14

**guzman** 153:5

**gym** 142:25

**gyms** 142:20

**h**

**h** 4:6 5:2 6:2 7:2 8:2 9:2 10:2 469:3

**hair** 131:6

**half** 127:21 268:21,24 283:8 291:14 403:8 425:21

**hand** 14:25 21:2 27:8,15 52:21 66:11 129:10 132:24 148:10 168:4 188:19 205:13 218:6 265:16 266:18 269:12 274:11 330:22 339:8 369:25 388:11

**handed** 62:20 134:8 140:7 184:14 367:8

**handing** 212:13 248:7 271:20 328:5 341:12 373:2

**handle** 29:13 93:22 152:11 201:24 222:10 256:23 290:11 306:17

**handled** 93:19 197:18 200:25 377:11,18 378:25 379:6 379:16 380:13 380:17,24 381:11 382:3 382:17,19,22 384:8,10,11 385:23 386:4 404:11 419:11 424:21 425:14

**handling** 92:8 285:6,9

**hang** 397:3

**hanging** 228:16 230:15 371:24

**hanna** 72:9,10 72:19 145:20

**hannah** 3:14 13:25

**hannna** 72:7

**happen** 225:22 331:19 363:5

**happened** 36:2 245:8 400:20 430:11,15 433:5

**happening** 299:20 371:14

435:2

**happy** 50:6 51:9 168:14 182:23 238:21 263:22 348:24 356:18

**hard** 76:8 175:16 177:10 194:7 421:15

**hardcopy** 174:8

**harm** 225:22 244:18 246:16 246:19 247:5 254:4,8 378:9 432:12

**harm's** 432:3

**hash** 301:10,21

**haystack** 286:7

**he'll** 268:3

**head** 18:8 439:25 458:13

**health** 36:15,17 38:24

**healthcare** 458:10

**hear** 31:24 258:25 337:12 376:7 386:20 387:2 394:10 395:3 424:17 427:6

**heard** 15:20 16:7 110:4

**hearsay** 95:19
**heart** 206:15
  207:6,12
  392:16,20
  399:25 404:5
  414:25 415:2,6
  415:23 416:24
  422:2 425:24
**hearts** 404:5
**heat** 152:16
**heated** 76:13
**heavy** 110:9
**hedge** 448:2
**held** 2:6 105:13
  107:11 112:3
**hellish** 269:19
**help** 47:8
  149:24 254:17
  259:6 262:25
  263:24 316:2
  331:19 333:19
  348:16 349:24
  351:6 357:4
  363:2 381:15
  381:16 410:23
  436:25 440:22
  462:5
**helped** 107:3
**helpful** 242:13
  242:14 332:25
**helping** 58:10
  106:23 300:11
**herby** 467:4
**hereto** 467:18
  470:7

**herjavec** 69:5
  74:24
**heroic** 268:5
**hey** 209:20
  306:3 315:7
**hide** 158:6
**high** 31:22 32:6
  45:12 47:23
  48:8 50:21,21
  51:5,15 53:9
  55:2,14 68:7
  73:23,24 74:6
  84:11 105:2
  113:20 133:22
  151:8,19,22
  267:22 278:20
  282:23 439:20
  439:21
**hin** 1:8
**hire** 304:13
**hired** 102:11
  232:15 331:15
  390:6 407:25
  418:20
**hiring** 150:14
**history** 32:10
  54:18
**hit** 247:10
**hobbies** 51:10
**hold** 93:7 116:7
  255:24,24,24
  296:4 300:16
  456:10
**holder** 60:14

**holding** 296:10
**holdings** 1:7
  8:6 327:23
  328:9
**holistic** 99:7
**home** 91:11
  178:5 231:12
  263:8 285:17
  430:7
**honest** 36:5
  262:24
**honestly**
  216:16 310:2
  374:15
**hong** 284:16
  298:6,11
  433:15,19
  435:7,14
  437:17 444:14
  454:15
**hook** 144:9
**hope** 90:7
  134:18 224:3
**hopefully** 376:8
  465:19
**hopes** 79:18
  263:23
**hoping** 365:17
**host** 69:5
  426:24 428:12
**hotel** 135:22
  136:2,6,15
  174:16,17
  175:10 176:5
  187:14 189:8

189:10 198:14
  242:25 243:4
  245:7 367:22
  368:5,10,14
**hotel's** 269:25
**hotels** 368:20
  368:24
**hour** 19:13
  26:3 253:14
**hours** 25:23
  101:12,15
  204:8 311:18
  311:25 466:15
**hq** 430:20
**huarong** 436:8
  442:6 443:8
**hudson** 3:4
  15:6 16:11
  455:4,7 456:2
**hugo** 4:22
  135:3 139:21
  140:12,14
  141:15,19
  143:5,15,24
  144:17 148:18
  160:13 336:13
  340:5 342:10
  348:5 353:6
  378:18 404:23
  427:3,5
**huh** 18:8 32:13
  70:11 83:16
  98:12 120:4
  137:2 149:16
  150:11 166:13

[huh - including]                                                      Page 44

171:20 185:6
186:3 207:24
252:3 253:8
308:21 354:23
355:24 448:11
**human** 151:17
424:4
**hundreds**
433:9,10
**hurt** 247:18
420:15 421:4,5
421:9,19,21,23
423:18
**hurting** 420:16
423:19
**husband** 235:6
**hwigger** 3:13
**hyper** 100:5
**hypothesis**
196:21
**hysterically**
231:10 263:6

**i**

**i.e.** 84:5
**idea** 39:14
77:20 131:16
131:21,25
297:4 303:5
**ideal** 128:19,25
**ideally** 303:13
**identification**
20:25 21:24
27:7 52:17
66:7 133:7
139:24 145:2

148:9 152:25
154:12 168:3
178:20 184:3
190:13 202:12
205:12 212:11
218:4 248:5
257:20 266:17
269:11 271:18
274:10 328:2
330:21 335:6
339:7 341:10
350:14 352:3
366:20 369:24
372:25 388:10
401:21 406:19
412:3
**identified**
22:24 65:18
67:2 119:13
238:3 309:22
309:23 311:11
349:11 364:16
410:9 411:12
436:6 449:18
455:17
**identify** 14:13
70:16 119:10
228:12 237:16
379:4 390:10
465:19
**identifying**
380:16
**idiada** 452:14
**ies** 289:23

**iii** 329:15,15
**illegal** 461:3
**image** 197:5
**immediately**
233:9 293:6
438:23
**immense** 429:4
**impact** 116:19
117:10
**impacting**
305:8
**impacts** 297:14
300:13
**impede** 19:24
**impeded**
423:12
**imperative**
103:19
**implications**
219:5 294:5
**implied** 318:2
**import** 91:7
285:10
**important**
18:14 38:3
53:24 54:16,24
104:3,5 150:24
157:3 224:3,6
231:23,25
238:22 358:4
408:3
**importantly**
150:22
**importing**
91:18,20

**impression**
138:17
**improper** 443:6
459:9
**inappropriate**
118:23 137:15
**inaudible**
457:15
**incite** 348:25
**include** 98:25
99:17 108:19
246:24 318:22
336:8 337:8
458:22
**included** 68:5
70:15 71:2,5
113:12 176:14
293:9,10
324:18 336:12
336:13 337:24
375:18 384:15
384:18,24
424:15
**includes** 338:13
411:11
**including** 43:16
47:5,18 62:5
88:7 98:22
124:25 177:16
193:14 215:24
222:19 235:6
256:22 286:22
298:10 299:10
311:16 325:17
442:8

[income - intense]                                                          Page 45

income   233:24
  234:2 295:17
  331:11
incommunica...
  435:21
inconsistent
  349:14
increased
  436:22
incredibly
  164:15 223:19
  300:9 378:10
  429:19 431:13
  431:15
incur   299:12
incurred
  115:15 355:21
incurring
  277:15,22
  284:8 344:13
indefinitely
  307:21
independent
  94:23 95:20
  211:22 282:5
  343:11 440:14
index   11:3
indicator
  107:20
indirectly
  126:22
individual
  303:14
individuals
  195:14 435:3

458:13
industry   46:3
  51:15 54:2,18
  70:7,20 113:21
  114:2 120:15
infancy   44:24
infatuated   51:7
  132:8
infatuation
  113:2
infer   315:12
influencers
  68:4
inform   116:17
  117:7
information
  59:20 116:8,10
  116:11 236:22
  239:22,24
  240:10 349:7
  352:16,23
  359:6 374:9
  421:20 438:17
  439:23
informed
  232:15 407:25
  410:25 442:11
  450:25 452:9
informing
  251:17
inheriting
  311:16,23
initial   77:20
  79:20,22 107:5
  289:16 381:22

458:9
initially   45:24
  80:17 81:16
  293:18
initiate   108:14
initiated
  329:13 381:22
  388:13
initiative   67:11
initiatives
  88:25
ink   188:19
  189:19,24
inputs   162:5
inquiries
  113:22
inquiring
  354:25
inside   177:12
  177:13
insistence
  313:6
insistent   400:8
instagram
  130:19
instance   251:5
  379:15 383:2
  402:13 424:22
instances
  315:12 393:9
  439:11 443:12
  443:17
instruct   239:21
  411:16

instructed
  250:18 375:25
  386:19 391:6,8
  414:23 415:13
  415:20
instructing
  458:21
instruction
  237:19 239:20
  251:16 252:21
  390:12 391:24
  392:24 394:2,7
  394:13 395:7
  395:12 396:6
  404:4 407:10
  408:14
instructions
  218:25 222:10
  222:15,18
  224:6,10
  231:19 256:23
  257:4 391:12
  420:25
instructs   18:22
instrument
  297:6
insurance
  36:15,17 38:24
intelligence
  235:7
intended
  333:10
intends   116:19
intense   413:19

**intent** 79:21,22
132:12 144:12
150:5 195:17
293:25
**intention** 80:3
381:6 465:3
**intentions**
138:23 143:7
378:6
**interactions**
241:23
**intercontinen...**
243:3 367:24
**interest** 107:7
107:20 114:10
114:15,16
153:18,21
179:16 207:18
208:5 298:12
304:25 305:9
323:11,14
**interested**
13:13 51:11
59:18,19 86:24
96:12 150:3,14
195:19 364:9
467:22
**interesting**
423:3
**interests**
179:25 194:2
210:17 305:16
**interfere** 355:8
**interim** 107:13

**intermediary**
63:21 254:16
261:23 287:2
404:3,13
422:21 423:13
**intermingled**
452:18
**internal** 85:15
90:2
**internationally**
151:22
**internet** 464:18
**interpret**
142:13
**interpretation**
51:2 101:25
192:25 246:23
247:2 431:17
**interpreted**
244:22 245:23
246:15 416:10
**interrupt** 69:8
238:10 294:18
294:25 368:22
451:15
**interrupted**
456:11
**interview**
128:13,18
444:19 450:2
**intimate** 40:20
**intimately**
76:10 104:23
**introduce**
15:20

**introduced**
68:20 91:3
162:19 365:14
**introducing**
104:4
**introduction**
91:16 143:25
**investigated**
463:2
**investigation**
20:8 432:16,18
437:2,10,12
438:8 439:16
440:11 441:10
446:18
**investing** 29:2
29:4 59:5,8
208:21
**investment**
32:22 34:21
35:6 36:8
60:19 111:2
314:5 460:24
461:6,12 462:2
**investments**
28:12,19,20
29:2,21,23
30:21 31:3
60:7
**investor** 27:24
28:9 104:20
303:13 452:22
463:16 464:19
**investors** 45:9
57:4,13,15

60:3,7 300:22
304:3 324:14
460:23
**invited** 453:17
**inviting** 135:21
135:24 136:5
136:22 138:8
**invoice** 8:7
46:24 49:22
117:23,25
118:6 212:22
214:21 313:13
313:17 317:3
318:13,15
319:2,9,18
320:10 330:19
332:23 333:3,4
333:9 338:8
**invoiced** 46:21
115:19,20
313:4 318:4
322:15 334:4
338:11 340:8
344:11
**invoices** 47:5
49:15,17 336:3
337:3,21 346:4
349:12 353:14
359:20
**invoicing**
214:16 218:23
219:16 222:8
317:2 335:18
**involved** 47:22
72:25 76:11

85:4,12 88:21
90:15 92:4
100:4 101:23
138:18 150:25
197:16 235:7
235:10 293:17
297:3,16
298:15 304:18
312:13 396:10
436:2 437:14
441:6 442:9
445:16 456:23
460:7
**involvement**
45:15
**involves**   237:20
**involving**
148:12
**ipad**   459:4
**isabelle**   143:23
147:6 161:16
181:22
**issue**   37:18,21
151:12 307:10
352:7 361:12
361:13,13
362:18 381:14
394:3 404:15
**issued**   332:22
333:4
**issues**   92:4
117:16 371:13
372:7,16 404:9
417:6 419:15
454:10 460:13

**italy**   244:24
245:2,4 413:12
413:14 426:19
427:16
**items**   197:6
213:21 337:25
350:19 359:13
371:7 376:2
402:16 424:14
435:22 446:22
462:22 465:10

**j**

**j.p.**   314:6
**jan**   127:14
378:18
**january**   129:19
134:15 140:10
197:21 198:3,5
199:24 200:23
274:15 275:12
318:22 346:6
445:2
**japan**   290:2
**jersey**   2:13
**jesse**   43:9 76:11
**jfk**   427:21
**jim**   42:16 43:9
45:24 56:24
58:8 64:24
75:24 76:3,8
76:24 80:24
**jiri**   135:3
336:14 378:18
**job**   1:25 48:3
53:8,23 98:17

98:19 99:14,24
100:2 101:4,7
102:11 115:24
320:21 321:14
321:18,21
**joe**   69:18,19,20
74:21 125:15
290:3 385:13
**john**   3:7 5:21
14:5 147:23
178:24 179:2
182:5 183:23
184:15 187:15
187:18 193:2
198:24 396:4
400:9 401:14
459:5 468:1
**join**   138:8
149:14
**joining**   154:23
181:20 385:11
458:25
**joking**   144:15
147:19
**jokingly**   143:14
**jorda**   4:17 5:5
5:15 6:14
130:16,17
131:17,21
132:8 133:4,10
133:20 134:11
135:7,25
138:12,23
139:5,11,14
141:7 142:2,12

143:7 144:9,23
145:8,15
146:12 149:14
153:19,23
154:9,17,22
157:14 162:25
164:18 166:12
166:18,24
167:5 168:9,25
169:5 170:7
173:20,22
176:4 181:6,11
183:10,18
187:12 189:5
192:17 194:24
200:2 201:18
202:16 205:9
205:15,18
207:19 208:6
209:4 211:9,18
212:15 215:13
217:16 219:4
225:25 226:3
336:9,12 337:4
337:9,18
338:21 358:9
358:17 374:13
375:19 377:2
384:16 396:4
397:5,17 398:4
399:6 401:7,24
403:11,23
404:9,16 405:5
408:25 409:7

**[jorda's - know]**

| | | | |
|---|---|---|---|
| **jorda's**  144:3 | **kick**  247:9 | 95:8,14,15 | 270:5,7 273:3 |
| 148:13 153:13 | **kicking**  22:3 | 96:14 102:24 | 281:6,9 286:6 |
| 179:4,13,16 | **kim**  102:23 | 103:6 109:16 | 287:2 290:5,10 |
| 180:3 187:6 | 103:13 104:8 | 113:5 120:25 | 291:2 294:8 |
| 233:7 336:3 | 104:17 129:16 | 122:22 123:6 | 295:22 297:24 |
| **jorge**  285:14 | 443:24 464:22 | 124:20 127:23 | 303:17 309:8 |
| **journey**  262:17 | 464:25 | 130:17 133:11 | 321:4 325:3,9 |
| **june**  145:10 | **kind**  19:24 20:8 | 134:17 136:9 | 327:11 331:14 |
| 157:21,22,22 | 26:17 28:10 | 143:10 150:19 | 331:18 332:2 |
| 158:17,20,25 | 30:7 31:6 34:3 | 151:21 155:12 | 335:20 340:10 |
| 170:17 291:20 | 50:20 99:7 | 155:15,18 | 340:21 347:20 |
| 291:22 429:16 | 145:23 151:7 | 156:15,16 | 348:21 353:21 |
| 430:5,24 | 170:6 189:15 | 157:6 162:6,11 | 355:16 356:8,9 |
| 436:17 | 264:24 304:9 | 162:12 163:17 | 356:17 357:7 |
| **jurisdiction** | 312:18 438:10 | 164:2 175:19 | 358:14 361:17 |
| 35:12 | **kinds**  29:9 | 176:2,6 179:2 | 364:25 373:4 |
| **justice**  321:24 | **kit**  102:24 | 181:3,15 188:5 | 376:13 377:22 |
| **jut**  343:13 | **knee**  137:21 | 196:16 198:15 | 378:7 382:13 |
| **jzach**  3:6 468:2 | **knew**  160:14,19 | 199:18 200:9 | 386:8 388:14 |
| **k** | 223:22 362:16 | 204:2 206:17 | 389:7 395:25 |
| **k**  1:6,8 | 390:4 422:24 | 210:23 216:20 | 398:10 399:10 |
| **kalikow**  68:25 | 451:19 460:10 | 217:2,7,8,13 | 399:25 401:7 |
| 69:3 74:23 | **knock**  267:23 | 221:12 223:24 | 403:2 404:20 |
| **keep**  45:12 | 446:12 | 223:24,25 | 404:24 414:10 |
| 76:15 78:3 | **know**  17:17 | 224:21 228:24 | 415:18 417:5 |
| 93:2 150:10 | 19:9 37:3 | 234:7,25 | 420:17 422:22 |
| 202:7 255:25 | 38:14,20 40:3 | 235:16,16 | 423:2 424:19 |
| 278:13 290:5 | 40:10 41:9 | 236:5 238:12 | 429:20 430:24 |
| 323:23 459:15 | 42:20 53:19 | 238:13,20,24 | 430:25 431:2 |
| **kelly**  3:8 14:9 | 56:11 64:24 | 239:16,17 | 437:22 438:18 |
| **kept**  227:2 | 66:20 69:6 | 240:3,12,15 | 439:13 440:19 |
| 428:13 | 70:2 71:5,6 | 243:16 245:25 | 441:8 445:17 |
| **key**  123:10 | 72:21 73:2,3 | 246:4,9 247:11 | 445:18 447:3 |
| 382:12 | 78:16 83:15 | 253:18 261:11 | 450:19 451:18 |
| | 94:12,14,17 | 262:11 267:6 | 451:18,21 |

453:13 458:12
459:3 461:4
463:2
**knowing**
327:11
**knowledge**
20:10 41:18
42:19 57:8
65:10 94:24
95:20 96:15
100:12 102:18
112:25 200:20
201:12 242:23
265:15 271:10
379:12 380:22
384:22 385:12
390:7 401:4
403:5,14
420:18
**known** 40:14
82:14
**koenigsegg**
100:7
**kong** 284:16
298:6,11
433:15,19
435:7,14
437:17 444:14
454:15
**koon** 94:15
95:9 96:17
**kubik** 336:14
378:18
**kwaldo** 3:7

**l**

**l** 3:17
**la** 157:20 158:3
158:17,20
216:3 227:8
**label** 335:8
**labeled** 281:12
**lack** 155:25
416:8
**lake** 426:18
**land** 443:19,21
444:9,20
445:14 446:3
449:24 450:5
**language** 44:17
60:25 63:22
65:21 112:6
128:22 129:12
171:11 172:10
181:14 203:6
225:17 227:17
228:3 231:24
250:5,9,17
251:7,17 252:8
253:4 263:4
315:21,22
316:8 325:9
327:9 330:6
332:20 333:2
356:12,21
357:6 391:5
408:13
**laptop** 432:23
**large** 69:14
86:19,20

201:18 222:6
**larger** 155:15
**lasted** 420:10
420:11
**late** 430:24
456:12
**latest** 196:13
**laughing**
137:22
**launch** 182:2
**launching**
181:21 437:2
**laundering**
235:8
**law** 238:25
241:12,17
**lawsuit** 236:15
238:8 241:18
328:12 329:13
353:11
**lawyer** 49:16
96:8,10 179:4
179:13,21
180:2,3,10,12
182:12 185:23
186:5 187:6
192:21 193:23
194:3 196:5
199:5 230:24
231:5 238:21
302:17 304:13
**lawyer's**
194:22
**lawyers** 23:20
43:21 44:5

47:6,18 50:3
50:16 59:16
63:24 65:12
70:13 74:15
122:25 176:11
203:20 238:3,6
267:25 293:17
297:3,16
298:15 304:17
304:19,21,25
327:15
**lay** 125:9 441:4
**le** 243:13,17,20
**leading** 85:10
86:3,8 88:24
91:13 127:21
340:10 377:20
403:8
**leak** 435:8
**learn** 443:9
448:8
**learned** 112:24
440:14 442:10
446:17 449:16
455:5,22 456:8
457:18 460:15
461:2,14,23
462:18 463:6
464:9,16
**lease** 379:18
381:10,15,18
381:23 382:3,7
382:14 383:2
383:19 419:12
424:22 425:15

**[leave - llc]**

Page 50

| | | | |
|---|---|---|---|
| **leave** 322:8 | 282:23 298:9 | **likes** 100:7 | **liquidity** |
| 362:21 401:5 | 439:20,22 | 153:16 201:8 | 300:21 302:22 |
| 465:7 | **liabilities** | 371:23 | 302:25 |
| **leaving** 29:25 | 294:12 | **limit** 294:12 | **list** 87:17 125:6 |
| 35:19 | **liability** 8:4 | **limited** 8:4 55:2 | 125:19 128:9 |
| **led** 86:23 | 295:16 299:13 | 88:3 160:20 | 232:9 242:11 |
| **left** 29:13,16 | 300:25 327:22 | 327:22 328:7 | 306:16 307:14 |
| 30:16 113:14 | 328:7 355:23 | 382:15 442:12 | 358:8 375:17 |
| 166:10,17 | **license** 33:5 | **limits** 234:25 | 375:24 376:10 |
| 367:8 439:17 | 34:22 35:5 | **linda** 293:10 | 376:12,21,22 |
| 449:15 | 77:21 80:15,23 | 298:21 299:2,3 | 437:20,25 |
| **leg** 137:21 | **licensed** 35:13 | **line** 11:6,10,14 | 439:5 440:6 |
| **legal** 95:18 | **licenses** 33:14 | 11:16,19,21 | 451:25 454:7 |
| 169:2 193:24 | 34:8 35:15 | 194:7 254:13 | **listed** 23:4 |
| 325:3,10 | **lies** 123:9 | 263:18 318:18 | 51:20 52:4 |
| 330:10 400:22 | 124:18 126:23 | 325:22 364:6 | 89:12 90:14 |
| 400:25 407:25 | **life** 38:3 100:20 | 424:3 469:4,7 | 97:17 217:22 |
| 468:23 | 100:23 115:10 | 469:10,13,16 | 296:8 393:9 |
| **leisure** 273:19 | 261:20 269:23 | 469:19 | **listen** 400:9 |
| **lenaerts** 123:9 | 305:11 311:18 | **lines** 26:3 35:8 | 462:9 |
| 124:18 126:24 | 311:19,24 | 44:18 63:22 | **listened** 393:25 |
| 264:23 265:4 | 312:2,8,11 | 170:21 182:6 | **literally** 70:8 |
| 267:7 | 377:9 392:15 | 318:24 331:20 | 74:8 385:18 |
| **length** 374:21 | 413:20,23 | 401:9 424:24 | 392:15 393:4 |
| **lessons** 112:23 | 422:3,4 | **linked** 371:18 | **litigation** 30:4 |
| **letter** 142:12 | **life's** 228:17 | **linkedin** 4:14 | 31:4 286:15 |
| 227:12 239:14 | 254:11 | 37:13,14 38:10 | 320:20 321:21 |
| 240:6,16,25 | **lifting** 110:9 | 51:21,22 52:5 | **little** 440:23 |
| 241:3 263:5 | **light** 61:9 | 52:10,15,22 | **live** 17:5 |
| 426:15 | 155:22 156:11 | 53:25 54:16 | **lived** 16:13,15 |
| **letting** 228:24 | 184:9 270:23 | 55:7 97:17,20 | **living** 368:10 |
| 235:16 246:9 | **liked** 280:23 | **liquidate** | 368:13 |
| **level** 45:13 | **likely** 71:8 | 323:13 | **llc** 1:8 4:11 8:6 |
| 84:11 105:2 | 412:21 438:25 | **liquidating** | 21:23 22:9,18 |
| 133:22 278:20 | 459:24 | 323:11 | 23:5 111:6 |

113:10 274:16
275:2,5,6
280:9,25
282:17 283:7
288:8 326:7
327:24 328:9
344:17,18
469:2 470:2
**llcs** 285:12,22
**llp** 2:7 3:3,10
12:24
**loads** 151:19
**loan** 332:13
333:11
**lobby** 175:11
176:4 243:5
**locate** 176:9
429:18 431:5
**located** 12:24
432:10
**location** 12:22
177:2 217:9
242:16 292:22
413:6
**locations**
157:15 242:10
242:11,21
**lock** 204:9
241:24
**locked** 232:25
**loeb** 293:9,10
293:19,20
299:10,11
314:4,4

**loke** 87:21
286:22 289:24
**long** 16:13 17:5
25:20,25 35:19
36:20,22 86:16
93:5 110:8
150:18 153:22
154:23 195:16
201:7 218:24
296:22,22
300:15 301:3
303:23,25
307:19 323:22
326:22 368:15
372:3 385:5
414:14 427:15
429:9
**longer** 228:20
235:17
**longtime**
442:13
**look** 20:18
49:14 50:15
66:25 83:11
133:12 134:8
144:19 145:19
147:5 148:4,14
152:20 154:5
167:21 170:7
172:14 173:13
175:4 176:10
178:21 179:8
183:20 188:4
190:7 191:12
204:12 207:15

212:6 247:22
250:13 255:14
256:11 261:5
269:5,17 271:8
271:12 277:13
282:13 302:12
310:9 327:19
329:2,14
334:24 338:24
340:12 341:3
341:20 342:15
347:23,25
348:19 351:23
354:15 360:18
361:14 363:10
367:10 370:13
373:4 391:22
401:15 427:18
447:8,9 448:12
448:14 449:4
453:17 459:14
**looked** 191:7
200:2 281:25
329:10 345:18
357:24 392:2
**looking** 41:3
45:7 53:8,23
54:25 55:14
132:19 190:21
196:3 262:15
287:14 327:14
331:9 332:6
354:16 359:5
380:11 430:16
447:24

**looks** 52:24
53:4,6 137:20
143:2 204:4
**lopez** 70:22
74:24
**losing** 83:14
84:6,16
**lot** 54:11,13
83:22 92:22
102:14,18,20
104:15 107:13
121:4 127:3
150:19 151:14
152:16 155:13
177:15 211:5
283:2 314:2
322:6 357:24
377:22 418:7
446:22
**lots** 244:9
320:5,5 362:10
362:10
**love** 38:7 93:15
113:6 141:13
143:13 144:4
155:24 374:4
392:25 422:14
**low** 141:22
184:9 218:21
219:9,24
335:22 362:19
**lowie** 123:8,18
**luca** 124:6
**lucrative**
267:25

**lui** 1:8,8 7:5,10
219:2 223:5
225:7 231:16
234:14 241:23
245:5 246:17
247:3,15 248:2
248:9,13,21
250:15 251:11
252:18 253:20
256:5 257:17
257:24 258:2,7
258:20 259:16
261:9 263:23
375:13,22
376:20 378:20
386:8,25 387:7
387:24 391:9
391:17 392:4
404:2 407:10
407:16 411:16
414:23 423:12
457:5 458:16
458:19
**lui's** 254:22
389:11
**lunch** 165:18
165:19,21
166:3,10
**luxury** 77:10

**m**

**maatta** 5:21
178:24 179:2
179:12,15
180:23 182:6
183:8,23

184:16,22
187:15 188:20
190:4,17 191:6
191:14,17
396:5 400:9
401:14
**machinist**
121:17,18
**machinists**
120:18 124:9
126:11
**mack** 235:12
443:14,20
**macro** 150:10
**made** 30:22
86:2 220:21
225:11 228:7
228:11 230:11
230:22 232:20
236:23 244:17
245:10 246:4
260:10,25
274:14 280:19
281:11 295:9
329:3 340:17
340:18 351:6
358:19 388:25
390:9 392:23
401:25 415:5
425:3,6 430:18
460:9 467:16
470:5
**madrid** 157:20
158:3,17,24
159:11

**mail** 5:8,11,18
5:21 6:4,7,10
6:17,19 8:13
8:21 9:4,6,9
71:8,17,24
148:7,12,18,23
149:12 152:23
153:4,12 154:3
154:4 167:24
168:6 169:11
169:14,19
173:21 174:10
178:17,23
179:11 180:19
183:6,23
184:15,21
186:7 187:24
190:10,17
191:5,6 193:13
193:15 196:3
202:10,15
212:9,14 218:2
218:7 232:25
251:9,13
252:16 256:4
339:3 350:10
350:17,23
351:3,10,17,25
352:5,8,14
353:18 356:25
359:5 361:24
363:25 364:2,5
366:18 367:21
369:22 372:6
386:14 396:3

397:8,12
401:13 410:21
415:16 418:12
418:14 458:21
**mailing** 183:9
**mails** 62:21
162:3 169:5
232:24 249:21
312:19 357:16
357:20 397:24
398:23 409:6
414:10 457:5
**main** 426:21
**maintain** 35:14
36:12 118:13
118:17 369:10
**majcher** 3:20
8:22 14:17
218:8 350:10
357:19 363:15
365:18 433:14
435:24 442:5
**major** 201:8
**majority** 87:2
**make** 30:14
37:9 38:2
61:25 74:4
86:16 90:4
99:6 104:5,12
107:15 108:9
121:8,10
173:11 186:8
209:9 219:25
223:21 224:11
225:9,16

226:19,24
227:20,21
233:12 241:15
251:8 252:10
252:11 260:8
260:24 270:2
301:9 308:10
309:11 322:24
331:19 345:11
354:6 360:21
361:8 371:22
376:6 389:18
390:20 395:10
424:4 431:5
433:4 434:25
443:2 444:24
447:11 456:21
**maker** 77:11
**makes** 329:7
376:8
**making** 60:18
91:16 108:6
109:2,7 259:16
289:25 387:24
391:15 440:23
**malpensa**
245:8
**man** 182:18
193:20 312:9
**manage** 29:20
35:7 114:20
151:19
**managed** 29:22
**management**
284:2 285:7

**manager** 98:10
105:6,12,22
106:5,12,16
109:15 111:22
112:15 143:25
153:15 167:11
400:21
**managers**
328:24
**managing** 31:3
108:22 285:3
**manifattura**
78:11
**manipulation**
443:7
**manipulations**
457:7
**manner** 57:15
57:19 59:4
224:14 225:20
301:24 302:2
416:25
**manufacturer**
56:2
**manufacturing**
113:21
**march** 212:15
213:11 281:16
281:18 282:17
283:7,12
290:25 291:21
**mark** 20:20
21:19 66:8
145:3 153:3
328:4 350:16

364:21,24
365:9 406:20
412:4
**marked** 4:19
4:24 5:7,10,12
5:17,20,24 6:6
6:9,11,16,17,21
7:7,12,15,18,21
7:25 8:8,12,16
8:20,25 9:5,8
9:11,15,18,22
10:6,10 11:16
20:25 21:24
22:24 27:6
52:16,18 66:6
66:11 83:10
133:6,6 134:9
139:23,23
140:8 144:25
144:25 148:8,9
152:24,25
154:11,11
168:2,2,5
178:18,19,22
184:2,2 190:12
190:12 202:11
202:12 205:11
205:11 212:9
212:11 218:3,4
248:4,4 257:19
257:19 266:16
266:17,19
269:9,10
271:16,17
274:9,9,12

287:14 309:3
327:25 330:20
330:20 335:5,6
339:6,6,9
341:8,9 350:12
350:13 352:2,3
366:19,20
369:23,24
372:24,25
388:9,10
401:20,21
405:17 406:18
406:19 411:25
412:2
**market** 100:10
102:12,22
103:8 104:5,17
113:5 306:15
**marketed**
147:12
**marketing**
44:19 45:11
56:20 63:20
84:12 88:21,25
89:6,21 90:5
90:16 97:24
98:10,14,21,22
99:3,7,22
100:17 101:4
101:19,21
102:7,9 103:2
103:18,20,22
105:10,19,22
105:23 106:6
106:13,17

107:4 112:4
124:24 127:4
201:24 215:25
284:3,12
**marketplace**
101:22 102:12
**markets** 437:18
443:25
**marking** 27:9
132:24 148:11
188:14 269:13
328:6 330:23
**markup** 188:5
188:7
**massive** 43:18
**master** 452:16
**mat** 78:5,9 81:7
81:10 82:12,22
95:7 97:9,17
112:22 113:13
123:23 124:11
**match** 348:13
**matched**
313:14
**matches** 204:7
**material**
305:11
**matter** 12:16
149:5 191:18
197:18 222:11
300:10 306:17
382:16 383:13
404:11 408:23
428:3

**matters** 93:17
95:6 98:25
219:4 227:10
256:24 293:21
384:3 403:19
416:10 444:17
**maturity** 62:19
**max** 26:3
**mayer** 293:11
293:20 298:22
299:10 314:4
**mean** 23:19
28:2 43:3 51:3
51:3 55:7
70:12 85:9,14
85:23 86:20
99:11 101:14
110:18 115:10
122:9 133:17
134:3 137:19
142:21 149:17
150:12 156:13
158:5 159:5
185:25 192:15
192:16 193:7
195:19 196:25
202:23 203:20
210:6 214:18
219:10 234:23
235:25 236:6
244:15 246:16
256:12,14
260:6 263:19
268:14 270:25
271:3 275:22

280:12,24
294:17 297:21
297:22 302:13
306:23 309:6,9
317:19 320:13
338:5 347:6
361:2,7,14
363:10,21,24
368:22 387:5
407:7,12
410:16,19
412:23 417:24
446:13 448:5
448:18
**meaning** 30:3
41:14 51:4
57:16 86:22
91:19 95:16
120:15 195:12
223:19 281:13
287:21 325:10
392:22 413:9
428:13 456:21
**meanings**
325:4
**means** 18:2,6
36:14 74:14
114:14,23
122:14 141:23
377:19 390:23
432:5 440:19
**meant** 122:22
144:17 150:13
407:13 410:17
410:19 450:19

**media** 12:14
78:23 79:5
89:3 97:19
98:23 143:3
166:8 264:12
264:18 369:13
370:7,22
371:14 372:9
449:13 466:10
**medications**
19:24 20:3
**meet** 15:18
24:20 25:14,21
25:25 143:23
147:6 181:21
200:14 224:8
242:23 243:4,6
261:13 263:8
396:6,11
403:25 426:19
**meeting** 222:12
222:20 223:10
223:13,15
228:21 244:2
250:6 259:9
262:16 290:2
331:14 397:5
398:3 399:7,17
400:6,19 401:3
401:8 409:7
430:23 437:3
463:14
**meetings** 23:19
24:10 26:4,9
217:6 221:3

**[meetings - misappropriation]**    Page 55

223:4 224:17
224:19 225:6
231:17 232:2
242:2 245:11
252:7 259:10
261:22 420:22
420:23 437:6
438:20
**member** 72:11
228:2 275:8
**members** 114:5
116:3 135:3
235:13 436:4
**memorize**
347:10
**memory** 362:4
362:9 365:5
456:22
**men** 152:5
**mention** 68:2
90:19 126:25
254:23 276:2
382:25
**mentioned**
24:18 25:10
26:6,9 28:20
60:19 64:15
73:23 75:2
88:20 89:9,19
90:18 99:25
126:18 145:21
145:25 185:4
220:15 223:3
225:12 242:5
245:21 264:22

276:9 286:17
302:22 353:5
383:4,18,19
386:5 402:6
403:6 404:24
434:24 452:20
456:18
**mentions**
184:22
**mercer** 174:17
**merger** 457:9
461:8
**merit** 269:25
**message** 53:19
136:16 137:13
145:5 380:10
386:14 406:6
407:9,19
408:13 415:17
417:21 425:6
**messages**
118:23 133:9
232:3 251:14
373:14 397:25
401:13 413:7
414:10 422:2,5
423:5,14 426:7
458:6
**met** 24:18
25:11,15,17
63:25 64:4
191:12 222:13
223:16 228:19
242:12,18,25
243:10,12,13

243:18,19
393:22 404:7
**mi** 141:10,22
142:18
**miami** 159:11
161:17 396:2,5
397:6 398:4
**michael** 87:21
94:15 95:4,5,9
96:2,17 235:11
286:22 289:24
433:13 435:23
436:3 442:20
443:13,22,23
450:24 464:22
**microphones**
12:7
**mid** 13:4,8
466:12
**midatlantic**
468:15
**middle** 68:7
71:19 72:14,20
72:23 73:3
146:4 249:13
272:4 340:10
340:11 342:13
352:17
**midtown** 368:2
**mighty** 270:2
**milan** 427:21
**milestone**
211:4
**miller** 88:7
91:3,17 107:2

175:22 176:23
177:18 285:15
**million** 58:7
59:6,12 60:12
283:8 295:11
295:16,18
**mind** 50:23
84:2 99:17
105:14 140:21
206:4 235:6
249:11 271:21
273:22 279:5
282:25 283:10
301:7 341:18
343:13 345:9
416:7,15
420:20 440:20
461:19
**mindful** 454:21
**mine** 54:4
290:11
**ming** 94:15
95:9 96:17
**minor** 149:5,5
371:6
**minute** 53:15
93:25 165:20
186:17 229:16
380:19 388:14
447:14 449:2
**minutes** 466:15
**misalignment**
374:18
**misappropria...**
462:24

**[misdealings - named]**

**misdealings**
442:22 448:2
**misdeeds** 264:2
**mishandled**
382:24 383:8
383:21 422:12
**misleading**
82:21,25
**missed** 231:11
**missing** 426:11
**misstates**
375:15
**mistake** 402:5
402:12 425:13
425:17
**mistakes** 375:8
375:12 377:2,3
388:25 390:9
390:10,20
392:23 393:16
401:25 424:5
424:15 425:3,7
426:2
**misunderstan...**
374:19 392:13
393:11
**mix** 71:13
132:12 159:23
425:23
**mobility**
454:12
**moderate** 18:3
**modifications**
192:23

**modified** 231:8
**modify** 171:11
**moment** 125:18
133:21 145:17
176:7 185:17
210:23 287:6
287:10 319:17
376:23 412:20
413:17 414:15
420:19 423:22
426:4 431:12
452:25 457:13
**moncler** 161:19
161:22 162:4
162:18,24
**monetary**
40:12 42:8
**money** 29:4
51:5 83:13
84:6,16 209:16
209:18 220:3,4
235:8 313:18
333:21,23,24
335:15,21
336:2,4 337:16
337:20
**monies** 48:25
215:19 333:25
337:11 338:13
344:12 356:14
**monocle**
128:14
**month** 291:16
370:23

**monthly**
214:24 288:25
317:6
**months** 213:2
220:23 292:16
303:2 307:15
318:19,23
362:17 436:24
**mood** 147:5
**morgan** 314:7
**morning** 12:3
13:23 15:13
134:18,20
249:5
**mortgage**
331:13
**motion** 11:21
255:16 296:16
**motorcars** 88:7
91:4,17 107:2
175:22 176:23
177:18 285:15
**motte** 227:8
**move** 93:14,23
255:16 293:25
296:17 298:4
300:7 322:6
363:5,18
368:20 445:18
**moved** 236:10
324:16
**moving** 89:13
202:8 363:8
425:19

**mullin** 2:7 3:10
12:24 13:24
14:2
**multiple**
138:16 139:8
157:15 161:13
183:4 217:4
220:22 228:18
325:4,23
339:25 374:16
378:12 393:21
403:4
**multiyear**
67:15
**mute** 12:9
**mutual** 112:13
**mutually** 276:7

**n**

**n** 3:2,17 4:2
**n.a.** 1:8 8:6
327:24 328:9
**naked** 137:16
**name** 13:3
15:15,19 58:13
61:6,11 70:16
71:23 72:6,22
87:23 124:7
125:2 126:22
127:15 280:15
280:16 285:14
378:19 386:9
435:25 458:14
459:3
**named** 67:20

**names**  61:7
68:22,24 70:2
70:21,25 71:5
73:6,25 74:2
74:20,25
122:10 123:11
124:13 125:7,8
125:9 128:10
328:15,22
**narrative**
129:14 268:15
**nasty**  427:9
**naturally**
203:10 220:19
398:13 429:9
**nature**  147:9
155:17 198:20
252:11 374:9
439:10 442:17
**nc**  464:13,22
**ncgc**  464:12,23
**ncoc**  464:8
**nearby**  178:6
244:2
**necessarily**
93:19 176:14
252:25
**necessary**
115:5 193:25
194:19 305:18
357:9 470:6
**need**  18:2,7,23
19:7,8 47:8
89:16 105:17
149:7,10

151:25 186:8
219:3 226:12
227:21 233:8
282:14 285:2
285:25 302:4
322:22 331:23
331:24 332:18
343:17,19
345:11 347:23
347:25 359:10
366:3 389:17
395:4 397:20
397:22,24
447:8 448:20
451:18
**needed**  36:15
38:2 64:25
68:22 103:4
222:10 227:13
233:5 250:8
333:17 335:20
340:24 353:8
377:4 389:25
429:8 431:13
**needs**  19:3
114:19 117:24
118:4,5 353:25
**negative**
260:15 262:9
**negatives**
260:18
**negotiate**  180:2
182:13 183:15
183:17 193:10
195:11,24

197:12 201:10
**negotiated**
119:16 180:14
**negotiating**
168:24 173:19
180:9,11
193:22 197:20
**negotiation**
179:17 186:20
358:9
**negotiations**
197:17
**neither**  121:20
**nervous**  231:11
263:7
**net**  74:6
**network**  107:2
120:16 123:5
235:13 264:24
312:12 436:5,8
436:9 437:15
442:5,6,18
443:7,8 450:10
**networks**  436:6
442:19
**never**  33:10
47:7 55:12
76:7 94:2,20
111:18,21
112:3 136:2
137:12 138:19
138:22 139:3
139:15 201:13
204:24 208:5,8
221:23 265:14

271:11 272:14
296:8 314:15
315:5 322:13
322:14,17
326:3 332:15
338:11 351:9
390:4 415:7
418:15 429:2
**nevertheless**
253:24
**new**  1:2,14,14
2:8,8,13,14 3:5
3:5,11,11
12:19 13:2,2
15:6,6 16:17
16:19 65:2
69:4 81:23
100:5,9 172:24
173:22,23,25
181:19 193:10
243:2 269:23
297:10 308:2,4
309:19 312:20
316:23 325:25
367:25 369:5
373:17 377:23
377:24 385:14
389:7 413:11
420:24 425:23
427:13 450:14
460:6 464:14
465:19
**news**  229:6
273:16

**ngcg** 450:14 464:14

**nibbling** 269:21

**nice** 15:17 266:7

**night** 254:2

**noise** 427:7

**nomenclature** 34:12 92:12

**non** 435:10

**nonresponsive** 296:18

**nonsense** 302:14

**noon** 204:6

**normal** 134:23 137:9 189:21 207:4 435:5

**normally** 306:14 378:12

**norman** 1:7 3:18 8:14 9:13 9:17,20 10:5,8 14:16 80:25 82:14,20 95:3 95:16 160:24 209:19 218:13 222:3 223:19 224:2 227:15 228:5 229:8,9 232:4 249:22 250:12 251:4,8 251:15 252:12 259:10 262:12

269:22 276:3 290:3 291:2,10 294:8 295:22 318:10,12,21 319:19 328:23 332:17 333:7 333:16 335:20 339:4 350:18 352:6 357:2 372:23 374:14 375:5 376:2,7 378:15 385:5 386:19,25 388:8,24 389:16 390:6 392:25 393:22 393:23 395:2,7 401:19 405:21 406:17,23 410:22 411:24 415:18 418:10 420:16,20 421:5,9,10 422:14 435:23 442:17 443:24 450:18,25 451:9 458:16 458:21 464:22

**norman's** 416:14 424:20

**north** 60:11

**notable** 232:19

**notably** 107:2 152:14 296:7 371:16 442:11

452:6

**notary** 2:12 470:13,19

**note** 12:6 251:3 355:19 408:22 468:10

**noted** 466:13 466:14 470:7

**notes** 253:2 260:9,24 438:9 441:17

**notice** 4:8,9 20:20,24 21:12 21:22 22:8 234:8 237:6 276:16,23 345:19,20 359:16 362:10 364:10 398:17 420:3 430:19 431:2

**noticing** 13:21

**noting** 364:15

**notion** 80:9 409:13

**novation** 233:6 233:20 234:5 246:8

**november** 184:19 186:13 191:5 196:6 237:12

**nt** 342:4

**number** 96:7 140:22 206:18

239:4 334:20 338:10 341:19 355:6 363:14 365:22 380:3 441:4 466:10

**numbers** 57:25 171:17 313:3 328:20 356:2 365:18

**numerous** 430:2

**o**

**o** 3:17

**o'clock** 455:14 456:4

**oath** 13:10 15:4 17:12 208:4 465:20

**object** 18:18 43:22 44:3,14 51:16 54:20 55:6 60:9 65:9 73:19 75:13 82:16,23 90:22 92:10 95:23 106:7 116:21 132:18 134:25 137:18 142:10 142:16 143:19 147:18 152:6 177:21 182:17 244:19 247:6 251:12 254:5 255:2 260:4 264:3 287:19

**[object - okay]**

Page 59

297:7,19
298:18 303:6
305:3 312:22
313:23 315:9
315:19 317:11
317:11,18,24
321:2 327:17
347:2 352:25
461:16
**objection** 50:11
118:10 163:13
176:16 192:12
194:5 195:20
226:8 236:12
236:19 239:11
255:23 256:17
257:6 266:3
268:12 270:9
270:24 272:20
272:21 273:6
273:12,13
279:2 319:6
320:2 321:19
321:20 322:19
324:3 349:18
358:11,23
360:22 446:8
**objections**
13:14
**objects** 236:4
**obligated** 116:6
215:18 322:23
344:22 349:15
**obligations**
109:8 308:5,13

308:23 309:7,9
309:15,20
311:9,21
**obtain** 31:16
33:17
**obtained** 34:8
34:23 58:25
330:10
**obtaining**
60:22 61:13
**obviously**
151:21 208:16
**occasion** 255:7
256:21 404:25
413:10
**occasions**
138:16 139:8
156:24 161:13
201:6 228:18
252:9 256:21
393:21
**occur** 259:22
**occurred** 47:16
216:23 225:3
232:21 254:8
259:23 290:25
292:6 369:14
398:12,14
444:10
**occurring**
91:13
**october** 178:24
180:19 184:23
184:24 188:12
196:6 241:21

428:15,18
429:12 434:9
**odd** 357:13
433:6 457:20
457:23
**offer** 64:24
288:22 289:14
289:16 290:15
290:18 291:23
291:25 292:24
293:4 298:14
314:12 315:7
315:17 399:15
**offered** 300:5
331:17 392:3
**offering** 392:19
**offhand** 70:25
72:17 74:21
87:25 123:11
128:7 159:23
195:25 216:25
314:9 316:15
316:20 318:17
320:18 324:4
325:11 342:25
347:3,6 349:2
351:15 353:9
358:14 360:6,8
375:21 376:17
440:3 452:25
453:3
**office** 33:12
178:6 286:24
292:21 368:25
430:21

**officer** 97:25
98:11,14 99:22
100:18 101:4
101:20 102:7,9
105:10,19,22
105:23 106:6
106:13,17
112:4 114:11
**officers** 117:8
429:21
**offices** 2:6
12:23
**offline** 364:14
366:5
**offshore** 435:8
**oh** 27:18 78:15
147:25 165:8
174:21 177:24
192:2 196:11
206:24 207:11
226:6 229:20
249:12 276:22
287:8 392:11
410:13 415:2
432:4 444:22
**okay** 15:17,23
15:24 16:4,18
16:23 17:2,9
17:11,14,19,21
17:23 18:4,5
18:12,13,16,25
19:11,13,18,19
19:23 20:7,11
20:15 21:10,17
22:6,15 23:9

**[okay - okay]**

| | | | |
|---|---|---|---|
| 23:14,21 24:10 | 73:22,23 74:10 | 126:11 127:9 | 168:10,18,21 |
| 24:16 25:3,10 | 74:10 75:8,15 | 127:25 128:8 | 169:4,9,13,19 |
| 25:18,20,24 | 75:20 76:19 | 128:12 129:6 | 170:4,11,18,23 |
| 26:4,8,14,19,23 | 77:2,9,13,17,24 | 129:17,20 | 171:2,13,16,23 |
| 27:14,19,23 | 78:18,19 79:15 | 130:3,7 131:3 | 172:5,9,13,17 |
| 28:2,5,8,13,19 | 80:2,7,10 81:8 | 131:10,16,20 | 173:7,12 175:3 |
| 28:24 29:25 | 82:7 83:7,18 | 131:25 132:5 | 175:12 177:24 |
| 30:12 31:2,8 | 84:4,14 87:4 | 132:10 133:14 | 178:15,21 |
| 31:13,15,19 | 87:10 88:12,19 | 134:2,7,17 | 179:10 180:10 |
| 32:8,19,24 | 89:15 91:15,24 | 135:6 136:8,20 | 180:18 183:7 |
| 33:15,21,25 | 93:23 94:7,11 | 136:24 137:9 | 183:13,19,20 |
| 34:13,19,22 | 94:14 95:8,17 | 137:25 138:7 | 184:14,21 |
| 35:14,18 36:3 | 96:21 97:10,21 | 138:11,20 | 185:13,18,20 |
| 36:11 37:5,20 | 98:3,15 99:20 | 139:9,13,16 | 186:7,16 187:3 |
| 38:16,25 39:5 | 100:15,22,22 | 140:4,13,14,19 | 187:16 188:3 |
| 39:9,10,24 | 101:3,19 102:2 | 143:4,15 | 188:18 190:2,7 |
| 40:16,24 42:10 | 102:15,25 | 144:18 146:6 | 190:14,18 |
| 44:7,25 45:22 | 103:24 104:10 | 146:11,15 | 191:11,17,25 |
| 46:9,13,23 | 104:25 105:4 | 147:13 148:11 | 192:14 195:22 |
| 47:8,22 48:6 | 105:25 106:15 | 148:21 149:12 | 196:20 197:9 |
| 48:10 49:11,21 | 108:5,15,22,25 | 150:9 151:5 | 197:11,14,19 |
| 50:2,15,19 | 109:4,11,22 | 152:19 153:2,7 | 197:24 198:10 |
| 51:9,12 52:12 | 110:16 111:5 | 153:11 154:5 | 198:12 199:8 |
| 53:22 54:11,12 | 111:14,17,21 | 154:18 155:4,6 | 199:23 200:21 |
| 54:24 55:13,21 | 113:18,24 | 157:12,19,25 | 201:16,17 |
| 55:24 56:5,9 | 114:7,13,18,23 | 158:12,13,15 | 202:15,21 |
| 56:15,19 57:3 | 115:4,23 116:5 | 158:19,23 | 203:16 204:2,8 |
| 59:3,22 60:21 | 116:10 117:6 | 159:9,15,20 | 204:12,20 |
| 61:12,21 63:9 | 117:13 118:4 | 160:3,8 162:9 | 205:2 206:24 |
| 63:25 64:14 | 118:11,17,21 | 162:16 163:17 | 206:24 207:21 |
| 65:6 66:13,14 | 119:2,8,19 | 164:2,5 165:6 | 208:10,13 |
| 66:17,20,22,24 | 120:3 121:3,7 | 165:8,8,14 | 209:7,22 210:3 |
| 67:22,25 68:11 | 121:12,20 | 166:14,20,21 | 210:10,13 |
| 68:16,18,25 | 122:3,6,19,24 | 166:22 167:4 | 212:6,14,23 |
| 69:23 71:10,18 | 125:19 126:5 | 167:21 168:9 | 213:5 214:6,22 |

**[okay - okay]**                                                Page 61

| | | | |
|---|---|---|---|
| 215:6,12,16 | 263:19 264:5 | 312:5,16,24 | 360:17,19 |
| 216:11,17 | 265:3,7,13,16 | 313:17 314:10 | 365:16,20 |
| 217:14 218:9 | 265:24 266:13 | 315:6,14 316:3 | 366:16 367:13 |
| 218:10,17 | 267:3,12,14,17 | 317:15 318:5 | 367:17,20 |
| 219:21 220:11 | 268:10,18,21 | 318:11 319:8 | 368:7 369:3,7 |
| 220:14,17,25 | 269:4,5 270:7 | 319:20 320:8 | 369:18 371:2 |
| 221:9,18 | 270:21 271:12 | 320:23 322:4 | 372:2,11,20 |
| 222:24 223:3 | 272:4,17 273:2 | 322:16,23 | 373:9,12,18,22 |
| 224:15,21,25 | 273:9,16,20,25 | 323:3,10 | 374:2,22 |
| 225:9 226:3,14 | 275:5,11,17 | 324:23 326:6 | 375:10,14,22 |
| 226:18,23 | 276:12,18 | 327:10,19 | 376:19,25 |
| 228:6 230:9 | 277:5,13,19,22 | 328:5,14,22 | 377:7,15 |
| 232:14 234:11 | 277:25 278:5 | 329:10,25 | 378:24 379:12 |
| 234:20 236:8 | 278:13 279:20 | 330:7,14 331:5 | 379:19 381:3,8 |
| 236:16,21 | 280:5 281:15 | 332:13 333:8 | 381:14,24 |
| 237:25 238:6 | 281:22 282:12 | 333:20 334:23 | 382:18 383:16 |
| 239:5,6,8 | 282:12 283:16 | 335:9,15,22 | 384:7,13,17,23 |
| 241:7,10,22 | 283:23 284:10 | 336:2,6,21,25 | 385:17 386:22 |
| 242:5,19,24 | 284:20 286:8 | 337:12 338:17 | 387:5,5,13,21 |
| 244:6,12 245:9 | 286:13,17 | 338:23 339:21 | 388:5,17,18,23 |
| 246:12 247:13 | 287:7,12 | 340:21 341:3 | 389:8,10,13 |
| 247:15,20 | 288:18 289:6 | 341:24 342:15 | 390:14,18,22 |
| 248:7,11,16 | 289:14 292:7 | 342:19 343:3 | 391:2,25 393:3 |
| 249:2,12,19 | 292:17 293:3 | 343:13 344:3,9 | 394:9,18 |
| 250:13,21 | 293:12 295:23 | 344:15,20 | 395:18 396:11 |
| 251:9,19,20,24 | 296:16,22 | 346:3,10,20 | 396:14 397:2,4 |
| 252:15 253:10 | 299:18,24 | 348:11 349:6 | 397:8,16 398:3 |
| 253:17,23 | 301:2,11 | 350:20,21 | 399:5 400:25 |
| 254:21 255:18 | 302:19,23 | 351:8,21 352:4 | 401:15 402:11 |
| 256:8,13 | 303:9 304:13 | 352:5,13 | 403:20 404:7 |
| 257:14,22 | 304:17 305:7 | 353:22 354:14 | 405:23 406:8 |
| 258:4,19,21 | 305:14,19,20 | 354:15,22 | 406:13,14,22 |
| 259:14,24,24 | 307:3,17,24 | 355:10,13,18 | 406:25 407:3,7 |
| 260:17 261:4 | 308:2 309:18 | 358:7 359:4,15 | 407:18,21 |
| 261:11,25 | 310:8,9,15 | 359:17,22 | 408:4,21 409:9 |

**[okay - outstanding]**

411:10,16,20
413:14,18
414:18,22
415:4,11,16
416:2,16
418:22 419:5
420:4,14 422:5
423:2,23 424:2
424:10 425:2
426:2,6 427:15
428:4 429:18
430:8,13 431:6
432:13,20
433:7,21 434:2
434:3,17,20
435:15 436:12
437:5 440:9,20
440:23,24
441:13,14,16
441:23 442:24
445:4,12,22
446:2,20,25
448:16 449:4
449:14,22
451:14 454:6
455:13,16,18
455:20 456:9
458:3 460:13
461:9 462:14
463:11,18
464:7 465:5,21
465:22
**old**  385:13
434:10

**ole**  243:8
**once**  244:2
**ones**  88:14
   126:9,21 128:5
   161:4 197:3
   222:19 244:5
   308:24 339:24
   357:17 404:22
   425:9 441:10
   441:25
**ongoing**  58:4
   289:17 394:3
**online**  339:18
   430:7 433:3
   434:20
**open**  211:4
   331:16 362:22
   371:7 405:12
   409:13 465:7
**opened**  215:20
   400:2
**openly**  102:22
**operate**  43:15
**operating**
   34:14 56:12,15
**operation**
   312:10 340:24
**opine**  363:16
**opinion**  191:19
   207:17
**opportunities**
   119:10 132:15
   150:23 311:15
**opportunity**
   37:24 103:17

104:14 362:24
**opposite**  180:3
   193:22
**option**  277:9
**options**  48:24
**oral**  45:25
   164:12 308:2
   311:7,10,22
   324:10 326:4
   409:25
**orally**  307:19
**orchard**  269:22
**orchestrated**
   163:3
**order**  35:5
   107:6,14
   129:15 179:24
   249:17 253:11
   254:25 255:6
   256:6 257:5
   285:16 289:19
   290:8 295:19
   300:25 306:5,6
   316:13 405:11
   457:7 466:17
   466:20
**orders**  254:3
   259:13 261:23
   262:12 270:19
   386:10
**ordinary**  19:5
   295:16
**organic**  303:16
**organically**
   79:25

**organized**
   235:11
**orient**  168:13
**oriented**  146:7
**origin**  387:4
**original**  25:7
   26:15 102:21
   176:3,14
   180:21 187:9
   199:19,22
   450:4
**originally**  98:9
   369:17 426:16
**outcome**  13:13
**outlined**  308:25
**outlines**  311:3
**outpouring**
   418:18 422:14
**outreach**
   113:22 114:3
   148:13
**outside**  24:7
   45:8 55:18
   57:4 60:3,6
   95:11 96:19
   107:4 109:19
   110:20 114:25
   156:20 178:7
   193:13 300:22
   304:11 308:13
   312:12 316:12
   324:14 334:6
   396:3 454:4
**outstanding**
   217:18 218:13

350:19 362:19
**overall** 62:20
**overripe**
  269:22
**overseas**
  108:12
**oversee** 77:25
  78:2 284:2
**overseeing**
  107:23 108:2
  270:12
**owed** 374:19
  417:16 422:16
**own** 29:20,22
  33:9 88:4
  93:20,22
  110:19 160:5,9
  201:9 209:4,15
  209:18 215:9
  229:3 282:4
  304:11 314:23
  363:21 415:22
  421:13 453:17
  456:7
**owner** 128:18
  128:25 161:21
  276:3 287:9
  443:21
**ownership**
  424:6 426:3

**p**

**p** 1:24 2:9 3:2,2
  3:17 467:3
**p.m.** 166:4,6
  253:14,16

264:11,14
  367:3 449:9,11
  466:7,13
**p4/5c** 40:21
**p72** 147:10
  289:10
**pachmayr**
  442:12
**package** 290:23
  314:3 358:21
**pagani** 100:7
**page** 4:3,7 5:3
  6:3 7:3 8:3 9:3
  10:3 11:6,10
  11:14,16,19,21
  23:2,4 51:21
  51:23 52:5,10
  52:23 53:5
  54:16 97:17
  120:3,3 135:6
  135:9 136:25
  140:20 146:16
  154:19 169:14
  171:19 173:13
  190:20,20
  206:5,6,19
  214:19 249:20
  250:14 256:12
  267:18 272:5
  352:17 354:20
  374:3 377:8
  380:12 423:24
  448:24 469:4,7
  469:10,13,16
  469:19

**pages** 146:10
**paid** 46:18 47:9
  47:12 48:25
  50:7 76:16,20
  81:11 108:6
  109:2 158:16
  158:19,23
  159:20 160:5
  204:23 208:10
  212:25 213:24
  215:8,20
  219:22 277:6
  282:7 313:18
  337:11 338:14
  352:9 355:2,22
  363:3 427:12
**pain** 243:13,17
**palatable**
  107:18 324:14
  399:13
**pantera** 102:23
**paolo** 43:12
  53:18 63:17
  76:18,20,23
  123:8,21 124:4
**paolo's** 43:14
  78:4
**paper** 333:17
  409:24 430:19
**papered** 326:4
**papering**
  297:24
**paperwork**
  91:20

**paragraph**
  66:16,23 83:11
  83:23 119:21
  119:24 267:19
  277:14 354:21
**parallel** 35:24
  180:17 227:4
  294:15 295:8
**parallels** 147:9
**parent** 451:5
  463:4
**parent's** 177:3
  177:6
**park** 198:15
  243:12 244:3
**part** 59:13 61:2
  86:19,21
  115:24 147:12
  149:21 190:21
  193:11 212:3
  224:12 228:23
  267:4 268:14
  278:5,9 283:3
  286:10 294:13
  313:15 337:8
  338:13,15,20
  344:16 406:4
  419:4 432:2
  446:19 452:16
**participate**
  284:12,20
**particular** 24:9
  91:2 106:9
  336:5,7

**[parties - perfect]** Page 64

parties 12:13
28:22 53:16
57:9 116:8
124:10 162:4
287:22 297:17
308:13 316:2
336:16 338:16
377:24 378:17
379:10 380:20
382:7 384:21
425:23 442:20
467:21,24
partly 59:11
partner 160:22
208:14,19
210:16,19
220:9
partners 43:17
89:4,7 106:23
119:6,14
134:24 137:10
156:24 201:8
207:5 210:19
220:13 307:22
311:14 323:21
323:24 377:24
382:12 393:12
402:23 452:10
460:12
partnership
61:2 94:3
323:25 324:8
324:19,25
parts 89:14
265:8,19 266:2

425:13,19
party 13:11
55:18 72:5
73:8 110:21
157:5 202:2
295:8
pass 147:24
148:3 435:23
passed 160:24
passing 33:8
passionate
47:24
passive 30:19
30:20
passively 31:3
passwords
369:10 370:6
370:21
past 30:22
112:24 150:17
155:14 235:4,9
252:13 388:25
390:9 432:25
433:12 436:3
458:15
pasted 253:4
patch 88:3
path 38:4
paul 3:14 13:23
15:19
pause 345:7
pay 36:18 48:7
76:20 117:19
160:8 213:17
215:18 220:4

332:5 336:3
337:21 338:21
381:18 399:15
410:22
payable 288:24
paying 213:10
213:15 239:16
240:12,14,20
285:22 336:12
338:16 343:24
379:11,20
380:22
payment 59:14
63:5 108:10
117:16 211:16
214:24 217:18
219:15 313:14
330:25 331:5,7
331:15 339:13
339:21 342:7
342:22
payments
85:17 108:14
215:2,8 218:14
218:18 219:7
337:3 341:14
341:17,21
346:5,21
347:16,21
348:14 349:12
359:20 382:12
pen 175:13
189:15,21
penalized
20:12

pending 19:16
pennsylvania
2:14
people 14:12
55:15 65:20
68:19 70:5
85:3,12,15
89:25 110:9
123:10,22
142:20 146:24
147:16 149:23
162:18 177:19
195:18 221:13
235:9 244:9
307:22 378:12
379:20 387:19
394:10 432:11
457:3
pepe 88:7
286:23
peralta 87:21
286:23
percent 46:2,8
46:9,10,14,16
46:22,24 229:3
288:25 289:2
292:2,9 295:13
316:5,18
322:10,11,18
323:3 409:21
410:3
percentage
45:23
perfect 66:24

**perform** 275:19
279:8
**performance**
47:23 48:8
50:21 51:6,15
53:9 55:2,14
113:20 277:10
299:4 309:16
**performed**
109:7 279:17
280:7 281:23
**performing**
99:23 121:24
308:7 311:10
**period** 29:11
63:14 110:8
181:19 216:23
218:24 222:18
224:8 235:3
245:21 259:14
259:22 291:16
294:15 295:7
299:6 306:25
357:13 395:13
398:24 399:23
414:14 427:4
428:23,24
434:7 435:18
436:14 454:24
467:17
**periods** 223:12
368:15
**permit** 34:24
**permitted**
396:20

**person** 51:25
64:4 145:21
173:25 181:13
198:18 211:24
222:14 224:19
225:6 242:3
245:10 250:7
250:20 253:3,5
259:3 261:13
391:13 396:7
396:12 397:5
398:3 399:7
409:7 420:22
426:20 467:8
**person's** 54:3
**personal** 22:17
28:21,23 29:2
29:3,21,23
37:18 38:24
41:9 43:7
58:11 61:4,17
71:15 104:7
110:19 113:10
114:15,24
115:5,8 118:7
125:14 135:22
177:16 178:7
204:24 208:11
209:13 213:25
215:21 217:19
218:15,19
219:8,23 220:4
222:7 236:7,9
245:24 275:6
300:14 305:5,9

343:25 344:17
345:13 348:8
354:10 368:15
371:18,25
389:24 430:21
431:18,22
455:3,6
**personality**
130:20
**personally**
54:23 86:9
132:7 138:24
138:25 160:2
210:2 213:9,14
213:17 214:14
233:8 237:14
262:5 266:25
280:14 330:11
399:16 427:12
**personnel**
118:14,19,24
**persons** 426:11
**pertained**
35:11 40:21
102:20
**pertaining**
29:11 40:8
70:6 83:2
152:15 298:23
319:11 333:3
434:9 440:16
443:13,14,16
452:6 457:5
**pertains** 37:12

**perused** 146:9
**peter** 68:25
69:3 74:23
**philosophy**
149:18
**phone** 183:6
184:22 227:7
227:19 232:3
233:4 245:7,12
245:15,19,24
246:6 250:6
251:2 252:2,7
252:24 356:17
356:23 357:3,8
357:21 391:13
391:16 396:15
397:16 398:23
400:22 409:5,6
415:4,11
420:23 428:14
428:15,16,20
429:7,10
431:16 432:24
434:9 435:20
436:15 454:14
**phones** 12:9
**photo** 138:6
142:25 153:18
200:6 206:7
207:10 216:3
**photos** 138:3
392:11 451:9
**physical** 244:17
246:16 247:5
254:4,7 259:18

259:21
**physically**
152:4 246:5
247:18 253:20
373:13
**physiology**
151:17
**pick** 12:8
166:16
**pics** 206:13
**picture** 137:3
137:19 141:6
141:19 142:11
452:15
**pictures** 137:16
387:8
**piece** 147:11
278:2
**pieced** 362:15
**pieces** 305:21
**pininfarina**
123:19
**pinpoint**
136:10,14
292:15
**place** 12:12
16:10 216:21
217:3 222:21
242:3,8 243:21
257:4 467:9
**placed** 415:9
**places** 217:5
221:13 223:8
244:7

**plaintiff** 1:4
14:6,8,10
**plaintiffs** 3:4
**plan** 36:17
102:21 106:21
132:12 276:4
452:17
**planned** 209:25
**planning** 104:8
104:18 143:23
284:21
**plate** 429:5
**play** 150:15
**players** 441:6
**playful** 147:3
210:21
**plaza** 2:8 3:11
12:25
**please** 12:6,9
13:15,18 14:20
14:24 15:14
17:17 19:16
44:8 137:15
194:13 228:12
234:18 295:6
317:7 350:24
351:23 370:11
379:4 390:14
393:23 408:22
412:13 445:14
**pleasure**
132:13 261:13
**plural** 383:6
**pocket** 36:19
160:6,9 215:9

**podcast** 128:13
129:13
**podium** 124:11
**point** 30:22
38:6 54:21,22
82:19 105:20
128:12 164:17
173:18 193:20
194:11 196:10
246:2 258:11
259:3,17
261:19 262:3
263:20 270:8
282:2 297:15
298:20 300:17
306:22 328:18
337:5 340:7
375:24 377:21
380:2 393:19
396:16 407:24
408:10 419:21
419:24 426:10
430:2 463:22
**pointed** 360:14
**pointing** 206:4
249:11
**points** 404:20
**police** 429:14
**poorly** 109:24
**pore** 270:3
**porsche** 289:7
289:9 305:22
306:4,8 307:12
316:11 409:22

**port** 379:18
381:10 383:19
419:12 424:22
425:15
**portion** 222:6
300:24
**portrays**
268:16
**posing** 141:20
**position** 76:8
76:13 156:16
299:12 458:20
**positive** 199:7
**possession**
294:6 295:12
295:20 296:12
300:4,18
303:22 322:21
323:9
**possible** 78:13
128:23 210:12
214:17 276:7
283:15 331:12
361:9 465:20
**possibly** 189:14
**post** 143:3
**postgraduate**
34:2,4
**potential** 45:8
53:13 62:18
89:3 104:22
106:22 119:13
156:24 241:18
294:5 355:22
385:6 409:6,13

**[potential - produced]**

455:2,6,21
458:8,25
**potentially**
53:20 72:25
79:19 141:10
141:13 143:13
144:4 294:12
432:11 450:20
455:11
**pottery** 121:9
121:10
**pouring** 422:2
**power** 201:9
**powerful**
210:14
**pr** 148:13
153:13
**practice** 35:13
36:8 111:2,7
178:2 191:18
207:4 358:3
**precise** 216:5
249:7 251:17
397:21 428:9
**prefer** 51:25
**preparation**
26:11 221:10
346:17
**prepare** 23:15
24:21,25
102:15 344:23
346:11 360:2
438:9 444:16
**prepared**
102:18 188:15

221:8,14 250:3
326:22 342:11
343:5 347:15
347:19 348:5
361:19 362:11
362:20,25
364:13 386:16
386:18 439:3
449:19 452:8
**preparing**
24:13 340:3,6
346:15
**presence** 98:23
**present** 13:18
216:18 253:20
400:8
**presented**
291:25
**presenting**
293:7
**presidents**
272:12
**press** 89:2
98:22 104:19
**presumably**
286:13
**pretty** 364:16
**prevented**
419:15
**previous** 16:17
16:19 124:23
171:10 296:6
313:8 418:12
**previously**
35:24 304:10

346:14 391:16
410:21
**price** 48:22
49:5
**prince** 73:14
**principals**
285:12
**printed** 189:7
189:11
**printout** 4:13
52:15,22
**prior** 30:24
39:7 97:6
101:23 103:9
108:10 112:21
277:15 370:23
385:10 437:3
442:8
**priority** 293:22
298:2
**private** 12:8
51:25 303:17
432:16,18
457:5 458:21
**privilege**
176:17
**privileged**
238:4,7,14
239:19 240:7
240:10,18
**probably** 90:10
189:6 257:8
343:21
**problem**
335:22 405:4

**procedures**
371:21
**proceed** 14:22
15:11 80:21
146:21 332:11
**proceeding**
13:15 80:20
**process** 85:5
86:9 91:13
107:5,8 108:9
162:19 224:13
266:11 285:17
286:11 332:10
356:18 357:4
431:14 452:7
461:10,14,21
462:4 463:12
463:20
**processing**
211:12 432:14
**procreating**
267:24
**produce** 44:9
50:16,18 60:24
176:12
**produced**
39:21 62:25
71:3 82:2,4,10
82:11 84:20
133:10 286:15
336:24 347:4
348:22 358:15
360:15 363:22
398:8 413:3
414:21 438:22

**[produced - purchased]** Page 68

441:21

**product** 122:13

**production**
11:9 24:8
33:19 63:24
68:15 90:4
133:8 265:22
265:25 321:25
346:15 349:5
452:12

**productions**
64:22 72:18
96:2,4 266:24
317:14 321:5,6
326:10 353:12
384:4

**professional**
2:12 28:15,16
30:7 31:5 35:6
51:11,14 55:19
118:13 301:24
302:2 308:12

**professionali...**
118:18

**professionally**
28:4,7 39:19
42:8 51:4
262:4

**profile** 4:14
52:15 151:22
371:25

**profits** 435:10

**program** 40:23
41:21 42:17
49:13 67:15

72:12 102:24
452:16

**programs** 42:7
43:15 45:8
49:2 57:18
59:15

**progressing**
46:4

**project** 126:15
270:13

**projections**
452:7

**prominent** 69:4

**promised** 316:4

**promptly**
113:21 114:3
117:15,20

**pronouncing**
124:7 243:7,14
386:9 435:24
436:7

**proper** 61:10
352:9

**proposal** 163:8
291:11

**proposals**
123:20

**proposed** 80:9
185:5,9,21
443:18 444:9
457:6

**proprietor**
110:23

**prorated** 317:5
318:18

**prospect**
132:14

**prospected**
33:8

**prospecting**
57:10 71:11,14
99:4

**prospective**
45:6 62:16

**prospects** 62:6

**protect** 116:7
179:24 298:12

**protecting**
194:2 432:5

**protocols**
463:14

**prototype**
452:12

**prototypes**
77:14,19,20
79:12 81:12

**provide** 21:3
24:21 35:6
43:20 50:6
197:8 239:24
251:10 288:22
311:4 314:11
346:11 349:7
349:25 352:16
352:18,22
353:15,25
438:16 445:21

**provided** 43:24
44:4 47:4,17
49:15 50:5

63:23 143:25
188:23 189:4
236:23 271:7,9
271:11 280:9
286:9 306:21
307:4 349:3
356:10 365:24
371:4 438:18
451:25 454:7
465:12 467:16

**provides**
191:21 193:6

**providing**
310:17 380:7

**public** 2:13
125:2 191:22
236:15 244:7
385:11 435:6
435:13 436:9
464:25 470:19

**publically**
464:18

**publicity**
201:23

**published**
265:11,14
273:11

**publishing**
265:11

**pull** 167:14

**pulled** 27:12

**purchase**
332:12 455:25

**purchased**
58:21 63:6

**[purchased - quotidien]**                                        Page 69

| | | | |
|---|---|---|---|
| 76:2 | **putting** 37:17 | 247:8,12 | 462:10 |
| **purchases** | 56:16 57:16 | 251:20 255:17 | **questions** 15:22 |
| 59:13 201:18 | 114:14 220:8 | 255:19 258:23 | 15:23 17:15 |
| 455:3 | 313:11 334:3 | 260:7,19,21 | 18:12,19,23 |
| **purchasing** | 378:13 433:3,6 | 278:24 279:4,6 | 20:2 36:23 |
| 57:24 67:14 | **pwerner** 3:12 | 281:3 282:6,15 | 54:10,14 59:21 |
| **purpose** 36:14 | | 290:13 291:3,7 | 90:11 92:17,19 |
| 161:8 183:14 | **q** | 291:8 292:8 | 92:20,23 93:3 |
| 460:9 | | 294:22 296:18 | 93:11 105:17 |
| **purposefully** | **q3** 289:21 | 296:23 301:2,8 | 108:16 168:12 |
| 402:17 | 377:20 | 307:4,8,9 | 171:18 236:4 |
| **purposes** | **q4** 289:21 | 309:5 310:2,3 | 238:11 256:2 |
| 332:19 337:8 | 377:20 | 315:15 317:8 | 301:24 302:19 |
| **pursuant** 2:9 | **quality** 149:22 | 317:16 318:3,5 | 307:9 343:11 |
| 21:12 275:17 | 261:14 | 318:6 319:2 | 344:21 345:4 |
| 277:5 | **quantity** | 322:5 323:10 | 345:17 364:18 |
| **pursue** 36:10 | 149:23 | 324:23 336:17 | 372:13 465:15 |
| 208:9 368:17 | **question** 11:16 | 336:25 337:14 | 465:21 |
| **pursuits** 30:7 | 17:16,20 19:16 | 337:19 338:2 | **quibbling** |
| 30:10 119:4 | 19:17 29:11 | 343:14,16 | 93:13 |
| **put** 44:11 51:24 | 31:25 36:21,24 | 345:2 349:4,21 | **quick** 141:16 |
| 59:12 60:11 | 38:17 40:8 | 350:3 353:17 | 143:16 144:6 |
| 106:25 107:10 | 42:22 47:15,20 | 361:18,22 | **quite** 38:8,8 |
| 107:16 147:4 | 48:15 50:24 | 368:9 370:16 | 45:4 58:18 |
| 160:21 170:6 | 59:22 60:4 | 370:18,20 | 100:8,19 121:6 |
| 194:19 202:23 | 62:2,3 65:7 | 372:3,5 373:23 | 133:25 147:11 |
| 203:11 216:9 | 74:5 85:8,19 | 379:3 390:15 | 151:21 156:20 |
| 221:2 224:4 | 89:17 99:16 | 390:16 403:20 | 161:14 198:14 |
| 254:12 257:9 | 100:19,25 | 407:11 412:22 | 198:25 268:3 |
| 261:20 282:25 | 101:25 105:15 | 412:25 433:22 | 309:10 356:13 |
| 288:8 293:14 | 110:12 147:14 | 434:12 437:8 | 368:25 411:13 |
| 299:15,19,24 | 157:9 180:7 | 440:21 448:4,4 | 434:23 452:17 |
| 357:15 392:17 | 194:13 202:25 | 448:6 451:16 | **quote** 456:19 |
| 424:19 428:14 | 218:11 226:9 | 453:25 456:14 | **quotidien** |
| 432:3 436:10 | 226:14 228:6 | 456:15 457:25 | 243:13,17 |
| | 232:8,12 | | |
| | 236:13 246:13 | | |

| r | | | |
|---|---|---|---|
| **r** 3:2,17 469:3,3 | **rate** 46:22,24 | **really** 29:23 | 38:11,15 39:12 |
| **race** 49:12,13 | **rather** 212:2 | 36:20,24 59:18 | 43:5,11 44:15 |
| 130:20 152:7 | **rattled** 396:23 | 97:18,20 | 45:17 46:12 |
| **racers** 131:13 | **rb** 206:21 | 137:15 154:18 | 48:14,21 49:9 |
| **racing** 40:22 | **reach** 429:23 | 164:22 190:21 | 49:24 50:14 |
| 45:8 49:2 | 430:4 435:16 | 193:3,8,16 | 52:8,11 60:25 |
| 57:18 58:11 | 437:12 | 195:10 230:3 | 61:5,8 64:4,21 |
| 59:15 61:9 | **reached** 233:3 | 240:9 246:14 | 67:8 68:13,21 |
| 67:15 76:6 | **reaching** | 255:4 312:9 | 70:3,25 71:23 |
| 130:23 131:4 | 183:14 | 322:8 330:2 | 72:5,7,11,21,23 |
| 150:16 151:8 | **read** 23:17,18 | 333:18 337:13 | 73:6,20 74:20 |
| 152:12 | 25:2,4,7 83:15 | 345:16 372:3 | 75:14 80:19 |
| **radical** 383:25 | 83:25 119:24 | 379:3 388:2 | 82:24,25 83:6 |
| 384:14 385:3 | 120:5 184:10 | 416:23 423:18 | 84:24 87:24 |
| **radically** | 271:2,4 272:5 | 427:8 436:19 | 94:6 96:6 |
| 383:12,22 | 272:22 273:18 | 437:8 441:7 | 97:12 112:11 |
| **rain** 141:20 | 326:17,20 | 451:16 459:9 | 113:11,16 |
| **raise** 14:24 | 329:23 350:24 | **realtime** 2:11 | 123:25 124:12 |
| 209:8 307:10 | 356:12 447:14 | **reason** 19:20 | 125:17 128:7 |
| 322:16 | 448:20 468:9 | 36:6 38:22 | 128:11,15,17 |
| **raised** 357:13 | 470:5 | 52:2 173:7 | 128:21 129:22 |
| 404:20 454:13 | **readily** 433:18 | 220:3,7 230:23 | 131:23 135:25 |
| **rambousek** | **reading** 66:19 | 275:25 354:6 | 136:23 137:24 |
| 127:14 378:19 | 120:21 272:25 | 408:12 426:21 | 142:3 143:20 |
| **ran** 131:6 | 273:8,15 | 468:11 469:6,9 | 146:3 147:20 |
| 203:17 370:8 | **reads** 267:19 | 469:12,15,18 | 151:24 152:18 |
| **range** 146:16 | **ready** 359:19 | 469:21 | 155:14 159:23 |
| 292:15 429:9 | 370:17 373:5 | **reasonable** | 161:2 163:7,10 |
| **ranged** 62:18 | 388:14 429:25 | 192:23 | 163:14,16 |
| **rapid** 457:9 | **real** 44:22 69:4 | **reasons** 218:20 | 164:4 165:13 |
| **rare** 156:20 | 259:3 261:18 | 430:2,8 | 166:22 167:18 |
| **rarely** 37:15 | 405:4 421:15 | **recall** 16:20 | 167:19 169:3 |
| 51:22 | **realistic** 282:21 | 34:10 35:2,9 | 173:22 174:4 |
| | **reality** 263:19 | 35:22 36:5,7 | 174:19,25 |
| | | 36:16 37:4,16 | 175:19 176:8 |

176:22 177:8
178:14 187:13
189:2,3,12,18
189:25 195:7
195:25 198:19
198:22,25
199:11,21
201:15,17,22
203:4,6,25
204:15 205:3
208:24 210:11
211:14 213:9
214:10,15
216:16,19,25
221:17,19
222:12,25
224:23 227:5
228:3,4 237:10
241:20 242:9
242:22 243:24
244:5 245:18
249:25 253:9
260:5 265:23
265:24 266:5
266:23 267:3
287:5,11
290:24 292:23
306:19,20
313:2,5 314:9
315:10 316:8
316:15,20
318:17 320:17
324:4,7,24
325:11 326:19
331:23 332:22

332:24 333:13
334:8,10
342:12,24
344:8 346:8
348:25 351:3,5
351:14,20
353:9 356:5,15
358:14 360:6
367:23 368:16
369:8,11,12,15
370:10 371:13
371:16,20,24
372:17 373:9
373:15,23
375:18,20
376:17,24
381:22 387:10
389:6,9 391:10
391:21 397:11
397:15 398:6
398:19 400:16
401:6,11
408:17,20
411:19 412:19
413:16 414:15
415:14,21
417:12 418:5
426:5 427:5,17
428:7,12
429:16 430:3
436:18 438:14
439:10 440:3
444:10,24
445:19 452:24
453:3,13

457:12 458:18
**recalled** 360:7
**recalling**
127:15 395:24
**receipt** 468:17
**receipts** 216:10
353:14
**receive** 45:23
281:19 313:20
314:13 322:11
398:16 420:2
**received** 75:17
76:22 104:9
227:16 234:7
276:15,20,24
282:18 283:7
298:14 322:13
322:17 334:9
359:17 418:15
418:19 431:2
434:5
**receiving**
333:24 346:15
391:12 426:14
426:23 452:13
**recently** 52:10
53:17
**recess** 78:24
166:3 264:13
367:2 449:8
**recitation**
244:13
**recognize**
27:20 205:16
274:17

**recognizes**
267:20
**recollection**
34:6 35:10
40:5 45:5
56:23 177:9
244:4 377:6
399:3,22 438:3
438:5 441:24
450:4
**recollections**
235:3
**recommend**
162:20
**reconnect**
424:13
**record** 12:3,13
13:20 15:15,20
16:8 18:21
22:24 27:3
66:4 78:22
79:4 93:9
130:5 132:22
137:20 166:2,7
184:5 203:15
229:22,24
230:2 241:16
264:11,17
274:5 276:15
335:9 339:11
341:13 350:6
355:20 363:6
364:20 365:10
366:25 367:6
369:20 387:15

405:15 406:11
409:11 443:2
448:13 449:2,7
449:12 459:23
466:6,15
**recorded** 12:15
306:8 466:18
466:21
**recording**
12:11
**records** 24:6
47:18 67:21
68:14 136:10
136:11 175:19
178:3 186:23
193:15 213:12
216:4,6 260:9
260:25 283:14
284:14,23
285:3,24,25
286:9,14
335:10 339:13
347:5 348:8
353:4 397:20
397:22 427:19
434:13,18
**redlines** 188:6
191:7,13
**reduced** 318:22
467:11
**refer** 143:12
147:16 445:24
**reference** 128:2
155:7 225:24
286:14 360:19

378:24 379:19
381:9 384:7
391:4 394:18
408:24 411:17
434:3 440:10
440:17 446:2
461:9
**referenced**
43:21 88:14
112:17 125:20
126:2,6,12
197:7 285:24
319:3 343:15
343:17 347:22
369:4 380:20
397:4,8 443:12
444:5 450:15
451:2,13
463:18 468:6
**referencing**
74:3 141:25
318:12 377:16
383:8 394:20
424:14 462:22
**referred** 342:9
**referring**
122:12 142:4
142:17 152:9
181:4 185:2
193:2 207:9
212:21 214:6,8
215:5 217:7
277:17 288:6,7
339:15 343:4
357:2 382:23

385:2 410:6
411:10 423:19
**refers** 212:20
**reflected** 64:21
71:16 72:18
97:14 413:4,7
414:20 442:3
**reflecting**
410:8
**reflection**
207:18
**reflects** 53:25
54:17 93:10
330:25 341:13
**refresh** 269:20
**refusing** 92:19
93:2
**regard** 211:15
266:24
**regarding** 25:6
34:9 47:19
62:21 70:6
166:19 169:6
171:25 288:2
382:7 416:14
438:20 444:19
458:7
**regards** 35:12
40:10 75:24
91:9 197:5
219:3 248:23
297:9 303:21
314:2 325:24
326:2 374:12
376:15 378:5

379:17 402:3
408:8 410:3
424:14
**region** 72:3,23
146:3
**registered** 2:11
32:22
**registers** 94:21
**registration**
107:7
**regular** 108:19
428:22
**regularly**
428:25 429:3
**regulation**
463:15
**regulatory** 20:9
20:13 435:9
**reimburse**
337:20 354:12
**reimbursed**
64:23 212:18
334:4 344:11
355:15
**reimbursement**
115:22 117:24
118:6 160:4
204:25 214:4
342:4 344:2,6
346:24 352:10
354:3
**reimburseme...**
211:13 334:9
334:13

**rekindle**
    416:23
**relate**   39:22
    443:5 447:25
**related**   13:11
    28:21 29:3
    30:21 40:6
    41:21 42:7
    43:15 48:7,23
    49:20 94:4
    279:15 281:23
    283:3 325:13
    336:8 342:25
    348:10 350:19
    354:8 359:13
    365:22 370:6
    441:5 444:17
    446:23 457:19
    460:16 461:11
    461:13 463:6
    464:2,10
    467:24
**relates**   118:6
    278:17
**relating**   95:5
    160:11,11,12
    316:14 398:2
    422:15 443:18
**relation**   41:24
    43:25 288:3
    293:22 371:12
    464:23 465:3
**relationship**
    38:6 39:13,16
    40:11,20 58:3

61:16 63:13,16
67:17 72:13
79:13,17,24
81:6 85:25
86:14 87:2
108:11 139:11
139:14 157:5
157:14,17
161:19 166:11
166:19 194:12
208:21 211:8
262:6 306:7,24
320:15 357:11
384:24 385:7
403:6,12
407:15 416:24
419:20 425:20
431:10 464:21
**relationships**
    71:15 108:2,23
    118:14 285:7
**relaunching**
    120:19
**relay**   375:5
    391:6 424:16
    424:25
**relayed**   227:18
    261:21 378:17
    416:13 418:11
    420:25 460:19
**relaying**   227:2
    231:18 254:16
    259:12 262:22
    263:11 355:12
    374:10,11

389:16 417:15
420:22 422:23
422:24
**releases**   89:2
    98:23
**relevant**   349:3
    448:19
**relocating**
    296:3
**relocation**
    294:14 300:13
    324:15
**remained**
    395:14
**remaining**
    284:4 292:5
**remember**   35:4
    39:19 48:12
    72:16 81:25
    83:4 87:25
    88:6,15 94:8
    123:11 133:19
    133:23 175:12
    199:12 243:21
    332:3 345:22
    350:22 358:17
    369:16 376:21
    439:18 444:13
**remo**   162:20
    163:22 164:14
    164:14
**remock**   296:7
**removed**
    227:23

**renegotiate**
    196:25
**renegotiated**
    197:4
**reopen**   182:24
    196:25
**reorient**   166:15
**rep**   345:19
    349:9 469:2
    470:2
**repaid**   333:21
**repeating**   84:2
**rephrase**   29:10
    310:4
**rephrasing**
    50:24 440:21
**reply**   135:18
**report**   230:13
    295:9 340:4
    342:10 426:11
    438:9 450:3
**reported**   1:24
    436:5 437:15
**reporter**   2:10
    2:11,12 13:6
    17:24 18:16
    467:2,17
**reporting**
    258:17
**reports**   102:16
    343:21 348:4
    436:10
**represent**
    15:21 27:11
    52:21 185:18

237:17 240:19
304:14,25
305:15
**representative**
3:19,20 22:18
176:19 344:17
**represented**
64:9 237:21
**representing**
13:4 151:2
158:10 164:18
179:15
**reproach** 450:4
**repulsively**
272:10
**reputable**
100:9
**reputation** 55:9
225:23
**request** 11:9
44:7 62:24
82:8 232:18
306:10 333:6
337:16 340:19
347:17 348:15
351:5 369:12
369:16 395:12
438:21
**requested**
337:10 352:23
465:13 467:15
467:15
**requests** 285:6
344:6 352:10
352:16 370:6

**required** 114:9
327:5 470:13
**requires** 347:9
**requisite**
329:18
**research**
104:15 435:18
436:22 439:7
**reservation**
11:18 465:8
**reserve** 186:8
465:9
**residence** 16:10
17:3 294:2
296:3 331:8
368:11,16,21
369:3
**residences**
455:12
**residing** 69:15
**resign** 227:25
**resignation**
227:12 231:7
231:15 263:5
276:19,25
367:14 370:9
370:23 371:3
384:25
**resigned**
234:11 248:18
258:5 263:21
366:13 369:7
388:20 419:24
420:6

**resigning** 390:4
**resolve** 394:3,4
**resolved** 372:8
372:14,16
**resources**
160:16 433:3
**respect** 23:11
84:15 88:13
99:21 103:17
105:9,11 106:4
109:4 170:18
197:19 217:15
390:18 401:25
445:13
**respectful**
125:5
**respond** 89:17
113:21 114:2
117:15 172:5
351:17 353:19
380:4
**responded**
351:9,12
356:25
**responding**
263:12 325:6
349:20 358:13
426:25
**responds** 172:9
191:17
**response** 9:17
42:5 45:12
191:6 229:11
279:3 368:8
370:15 381:7

382:9 388:8
395:11 399:18
409:3 417:3
418:16 432:6,8
**responses** 18:6
25:6 59:21
171:24 185:16
186:23 232:24
**responsibilities**
45:2 99:23
106:3
**responsibility**
43:14 109:15
110:15 115:24
233:7 402:19
408:23 422:10
**responsible**
59:5 60:17,18
60:21 61:13
65:16 75:4
85:10 86:13,17
87:6 88:16
89:10,23 90:21
91:7,16,17
92:8,12 105:11
106:20 107:22
107:25 108:5
109:6 115:2
126:9 162:4
239:9 295:15
378:11
**responsive**
176:13
**rest** 465:21

**restating** 279:5
**restaurant**
  198:13 243:5
  243:20
**restrictions**
  323:12,15
**result** 61:15
  328:12 430:12
  437:12 441:9
  446:17
**resurrection**
  269:2 272:19
**retain** 289:19
  290:9 305:15
**retained**
  466:11
**retrospect**
  377:12,18
  379:2,6,16
  380:14,18,25
  381:12 382:16
  382:22 383:15
  383:24 385:23
  403:17 408:10
  417:3 424:21
  425:17
**return** 172:14
  468:13,16
**revert** 191:8
  192:6 359:8
**review** 24:3,6
  24:24 26:5,17
  133:16 155:5
  161:12 181:17
  201:6 250:11

252:14 253:16
314:20 334:19
343:17,19
346:19 359:10
391:22 408:18
412:14 433:8
435:17 446:9
446:11 467:13
468:7
**reviewed** 267:2
320:23 321:6
348:23 388:17
433:23 434:6
**reviewing**
26:15 251:6
267:3 315:11
315:24 319:16
320:11,14
325:7 326:10
332:21 333:12
334:15 342:8
342:23 373:8
376:16 384:3
423:8 432:23
432:24 435:6
435:11 453:9
454:5
**reviews** 23:6
53:2 120:7
148:15 168:19
191:2 196:8
205:19 274:18
373:6 379:24
388:15 412:15

**revise** 252:10
**revised** 172:6
  172:10 173:9
  187:19 198:4
  231:14 253:4
**revisions** 172:2
  186:20 391:15
**revisit** 182:8
  195:3 348:24
  349:13 362:24
  453:11
**revival** 266:11
  269:3 270:17
  276:4
**revoltingly**
  272:10
**rewarded**
  445:7
**rhodes** 293:10
  298:22 299:3
**rice** 255:12
**ridiculous**
  459:8
**right** 14:24
  17:12 22:21
  31:6 41:20
  42:12 46:11
  47:25 48:4,8
  48:19 49:19
  50:22 64:2
  67:4 75:6
  77:11,15,21
  78:11 79:19
  80:5,13,23
  81:4,13 82:18

82:22 87:15
91:18 94:5,12
95:14,22 97:25
102:4 103:11
103:19,20,25
104:2,2,14
111:25 112:4,7
113:10 114:5
114:11,16,21
114:24 116:3,8
116:13,20
117:11,16,20
118:2,8,15,19
118:24 119:6
119:11,14,17
120:23 121:18
121:24 129:2
129:11,18,25
130:17,24
131:4,18 132:3
132:8 134:12
134:15,22
135:19,22
137:7 138:4
140:12,15
141:7,10,13,16
141:20,23,23
142:2 144:2
145:8,11,16,23
146:13,18,22
148:24 149:15
150:10 152:5
153:13,19,23
154:3,24 155:8
155:23,25

| | | | |
|---|---|---|---|
| 156:7 157:10 | 207:16 208:6 | 280:10 281:16 | 381:19 388:21 |
| 158:17,21,22 | 208:11 209:5 | 281:20,24 | 389:3 390:24 |
| 158:25 159:6,8 | 209:11 211:9 | 282:8,22 | 393:7,14,16,18 |
| 159:12,13,17 | 211:13,19 | 283:21 286:6 | 394:11,15,21 |
| 159:19 163:20 | 212:15,19 | 287:18 289:4,8 | 397:6,10 |
| 163:21 164:3 | 213:21 214:18 | 293:16 297:3,6 | 398:18 400:22 |
| 167:2,8 169:7 | 214:23,24 | 297:18 299:21 | 402:2 405:5,19 |
| 169:11,23 | 215:3,14,14 | 303:14 304:8 | 406:23 407:2,5 |
| 170:2,8,21 | 217:20 218:15 | 304:20 305:2 | 407:8,12 408:7 |
| 171:18 172:3,7 | 226:4,16,21 | 305:16,21,23 | 409:16,23 |
| 172:11,15,19 | 230:17 231:13 | 306:22 307:5 | 410:9 411:4,8 |
| 172:25 173:15 | 234:12 236:10 | 308:19,20 | 411:15 412:9 |
| 173:17,20 | 236:18 242:6 | 310:6 311:4 | 412:12,17 |
| 177:20 178:3 | 244:7,10 | 312:21 315:18 | 413:20,23 |
| 179:5,13,18,20 | 248:14,18,22 | 317:17 318:13 | 414:7 415:9 |
| 179:21 180:20 | 249:5,10,17,22 | 319:5,9 320:10 | 416:3 417:25 |
| 180:22,25 | 250:3 251:8,22 | 320:19,21,21 | 419:22 420:12 |
| 181:7 183:11 | 252:2,5,17,22 | 320:24 321:8 | 421:6 422:7,12 |
| 183:16 184:16 | 252:24 253:14 | 321:11,18 | 423:13,20 |
| 184:19,23 | 254:25 255:5 | 326:8 328:12 | 425:3 426:8 |
| 185:3,5,10,23 | 255:12,13 | 328:16 329:4 | 436:15 443:10 |
| 185:25 186:5,8 | 256:6,12,16 | 331:3 335:11 | 445:2 455:14 |
| 186:10,14 | 257:5 258:2,5 | 338:3 339:14 | 460:4 465:9 |
| 188:7,13,16 | 258:8,13,17 | 342:16 344:18 | **rights** 42:6 |
| 191:9,15,16 | 259:8,19 | 344:23 345:21 | 43:12 76:25 |
| 192:11 194:8 | 260:11 261:2,9 | 346:9 347:7 | 197:5 |
| 196:7,13,18 | 263:4 264:2,25 | 349:8 354:3,8 | **risk** 431:19,23 |
| 197:17,22 | 265:5,8,14 | 354:12 356:3 | 432:5,7 |
| 200:2,11 | 267:15 268:19 | 356:19 358:10 | **robert** 69:5 |
| 201:19 202:16 | 270:13 272:15 | 358:24 359:7,9 | 74:24 |
| 202:17 203:8 | 274:21 275:3,6 | 361:22 366:13 | **robertino** |
| 204:6,10 | 275:9,12,15,20 | 367:15,18 | 306:6,12,16,24 |
| 205:18,23 | 277:7,11,16,23 | 370:5,24 371:4 | 316:13 377:25 |
| 206:3,7,16,20 | 278:3,25 | 372:6,9 374:4 | 378:4,5 |
| 206:20 207:3 | 279:18 280:3 | 376:10 377:4 | |

| | | | |
|---|---|---|---|
| **rockefeller** 2:7 | 227:6 245:22 | 63:7 67:10,18 | 73:1 74:1 75:1 |
| 3:11 12:25 | 280:18 295:10 | 72:13 74:24 | 76:1 77:1 78:1 |
| **roger** 69:13 | 331:20,24 | 75:3,25 | 79:1 80:1 81:1 |
| 74:21 125:15 | 340:9 342:12 | **ryan** 1:1,4,13 | 82:1 83:1,19 |
| **roi** 107:8 | 418:15 424:24 | 2:1,6 3:1 4:1,3 | 84:1 85:1 86:1 |
| **role** 89:20 | 428:10 430:24 | 4:9,12,14,17,21 | 87:1,5,11 88:1 |
| 98:16 99:21 | **round** 159:10 | 5:1,5,14,22 6:1 | 89:1 90:1,20 |
| 100:17 104:11 | **roundtrip** | 6:13 7:1,5,9 | 91:1 92:1,7 |
| 105:5,12,18,21 | 158:24 | 8:1,13,22 9:1 | 93:1 94:1 95:1 |
| 106:16 109:6 | **roush** 452:14 | 9:13,16 10:1,5 | 95:13 96:1,15 |
| 109:13,18 | **row** 267:21 | 10:9 11:1 12:1 | 97:1 98:1 99:1 |
| 112:3 132:13 | **royal** 72:22 | 12:15,16 13:1 | 100:1 101:1 |
| 150:15 | 73:3 | 14:1 15:1,5,16 | 102:1 103:1 |
| **roles** 45:2 | **royalist** 72:19 | 16:1 17:1 18:1 | 104:1 105:1 |
| 99:24 105:9 | **royals** 68:6 | 19:1 20:1,21 | 106:1 107:1 |
| 106:2 109:14 | **royalty** 71:19 | 20:24 21:1 | 108:1 109:1 |
| 112:20 121:22 | 72:15 | 22:1 23:1 24:1 | 110:1 111:1 |
| 378:11 | **rpr** 1:24 467:3 | 25:1 26:1 27:1 | 112:1 113:1 |
| **romanette** | **rude** 301:22 | 27:5 28:1 29:1 | 114:1 115:1 |
| 329:14,15 | **ruffini** 162:20 | 30:1 31:1 32:1 | 116:1 117:1 |
| **romantic** 119:4 | 163:22 | 33:1 34:1 35:1 | 118:1 119:1 |
| 138:22 139:11 | **rule** 4:10 21:22 | 36:1 37:1 38:1 | 120:1 121:1,23 |
| 139:14 143:6 | 469:2 470:2 | 39:1 40:1 41:1 | 122:1 123:1 |
| 207:18 208:5,8 | **rules** 16:6 | 41:10 42:1,22 | 124:1 125:1 |
| **romantically** | 17:10 240:5 | 43:1 44:1 45:1 | 126:1 127:1 |
| 132:16 138:18 | 294:25 365:7 | 46:1 47:1 48:1 | 128:1 129:1 |
| 195:19 | 371:21 | 49:1 50:1 51:1 | 130:1 131:1 |
| **room** 135:22 | **run** 111:7,15 | 52:1,16 53:1 | 132:1 133:1,3 |
| 136:2,6,15 | 160:23 323:22 | 54:1 55:1 56:1 | 134:1,20 135:1 |
| 203:22 367:22 | **running** 113:9 | 57:1 58:1 59:1 | 136:1 137:1 |
| 368:6 | 335:21 | 59:4 60:1,17 | 138:1 139:1,20 |
| **roughly** 39:12 | **ruud** 57:22 | 61:1 62:1 63:1 | 140:1 141:1 |
| 161:15 167:20 | 58:10,14,15 | 64:1 65:1 66:1 | 142:1 143:1 |
| 170:14,16 | 60:10 61:3,16 | 67:1 68:1 69:1 | 144:1,22 145:1 |
| 174:13 225:3 | 62:9,10,14 | 70:1 71:1 72:1 | 146:1 147:1 |

**[ryan - ryan]**                                                    Page 78

| | | | |
|---|---|---|---|
| 148:1 149:1 | 218:1 219:1 | 288:1 289:1 | 358:1 359:1 |
| 150:1 151:1 | 220:1 221:1 | 290:1 291:1 | 360:1 361:1 |
| 152:1 153:1 | 222:1 223:1 | 292:1 293:1 | 362:1 363:1 |
| 154:1,8 155:1 | 224:1 225:1 | 294:1 295:1 | 364:1 365:1 |
| 156:1 157:1 | 226:1 227:1 | 296:1 297:1 | 366:1 367:1 |
| 158:1 159:1 | 228:1 229:1 | 298:1 299:1 | 368:1 369:1 |
| 160:1 161:1 | 230:1 231:1 | 300:1 301:1 | 370:1 371:1 |
| 162:1 163:1 | 232:1 233:1 | 302:1 303:1 | 372:1,22 373:1 |
| 164:1 165:1 | 234:1 235:1 | 304:1 305:1 | 374:1 375:1 |
| 166:1 167:1 | 236:1 237:1 | 306:1 307:1 | 376:1 377:1 |
| 168:1 169:1 | 238:1 239:1 | 308:1 309:1 | 378:1 379:1 |
| 170:1 171:1 | 240:1 241:1 | 310:1 311:1 | 380:1 381:1 |
| 172:1 173:1 | 242:1 243:1 | 312:1 313:1 | 382:1 383:1 |
| 174:1 175:1 | 244:1 245:1 | 314:1 315:1 | 384:1 385:1 |
| 176:1 177:1 | 246:1 247:1,25 | 316:1 317:1,23 | 386:1 387:1 |
| 178:1 179:1 | 248:1 249:1 | 318:1 319:1,22 | 388:1,7 389:1 |
| 180:1 181:1 | 250:1 251:1 | 320:1 321:1 | 390:1 391:1 |
| 182:1 183:1,24 | 252:1 253:1 | 322:1 323:1 | 392:1 393:1 |
| 184:1 185:1 | 254:1 255:1 | 324:1 325:1 | 394:1 395:1 |
| 186:1 187:1 | 256:1 257:1,16 | 326:1 327:1 | 396:1 397:1 |
| 188:1 189:1 | 258:1 259:1 | 328:1 329:1 | 398:1 399:1 |
| 190:1 191:1 | 260:1,8 261:1 | 330:1 331:1 | 400:1 401:1 |
| 192:1 193:1 | 262:1 263:1 | 332:1 333:1 | 402:1 403:1 |
| 194:1 195:1 | 264:1 265:1 | 334:1 335:1 | 404:1 405:1 |
| 196:1 197:1 | 266:1 267:1,20 | 336:1 337:1 | 406:1,17 407:1 |
| 198:1 199:1 | 268:1,2 269:1 | 338:1 339:1,3 | 408:1 409:1 |
| 200:1 201:1 | 270:1 271:1 | 340:1 341:1 | 410:1 411:1,24 |
| 202:1 203:1 | 272:1 273:1 | 342:1 343:1 | 412:1 413:1 |
| 204:1 205:1,8 | 274:1 275:1 | 344:1 345:1 | 414:1 415:1 |
| 206:1 207:1 | 276:1 277:1 | 346:1 347:1 | 416:1 417:1 |
| 208:1 209:1 | 278:1 279:1 | 348:1 349:1 | 418:1 419:1 |
| 210:1 211:1 | 280:1 281:1 | 350:1,11 351:1 | 420:1 421:1 |
| 212:1 213:1 | 282:1 283:1 | 352:1 353:1 | 422:1 423:1 |
| 214:1 215:1 | 284:1 285:1 | 354:1 355:1 | 424:1 425:1 |
| 216:1 217:1 | 286:1 287:1 | 356:1 357:1 | 426:1 427:1 |

| | | | |
|---|---|---|---|
| 428:1 429:1 | **sadeleer** 4:22 | **salvage** 263:16 | 404:2,12 |
| 430:1 431:1 | 139:21 140:12 | **sam** 241:23 | 407:10,22,24 |
| 432:1 433:1 | 144:11 160:13 | **samuel** 1:8 7:5 | 408:14 415:25 |
| 434:1 435:1 | 336:14 340:5 | 7:10 221:20,21 | 416:14 417:15 |
| 436:1 437:1,11 | 348:5 378:18 | 222:9,14 | 418:17 420:21 |
| 438:1 439:1 | 404:23 427:4 | 223:11,16,16 | 422:21,23,24 |
| 440:1 441:1 | **sadly** 200:20 | 223:20,22 | 424:16 431:15 |
| 442:1 443:1 | **safe** 262:18 | 224:5,9 226:25 | 457:4 458:12 |
| 444:1 445:1 | **safety** 236:7,9 | 227:2,11,18 | 458:15,19,22 |
| 446:1 447:1 | 245:24 259:18 | 228:5,19,21,24 | 458:25 |
| 448:1 449:1 | 259:21 431:18 | 228:25 229:5 | **samuel's** |
| 450:1 451:1 | 431:22 | 231:8,18,21 | 222:18 232:17 |
| 452:1 453:1 | **salad** 43:19 | 232:2,14,20 | 251:16 393:25 |
| 454:1 455:1 | 44:11 194:15 | 233:3,5,18,22 | **san** 87:22 |
| 456:1 457:1 | 296:25 302:7 | 234:4 245:7,20 | 286:23 |
| 458:1 459:1 | **salary** 33:3,11 | 245:25,25 | **sanctioned** |
| 460:1 461:1 | 33:16 219:14 | 248:2 250:5,18 | 20:12 |
| 462:1 463:1 | 288:24 292:5 | 251:2,16 252:6 | **sanity** 18:16 |
| 464:1 465:1 | 313:9 316:23 | 252:21,25 | **santiago** |
| 466:1,8 467:1 | 317:10 318:8 | 253:7 254:10 | 285:14 |
| 468:4,5 469:1 | 319:5,25 334:6 | 254:15 255:7 | **satisfy** 233:24 |
| 469:2,24 470:1 | 409:15,21 | 256:20 257:17 | **saudi** 72:3 |
| 470:2,4,12 | **sale** 86:6,18 | 259:2 261:12 | **saw** 131:8 |
| **résumé** 55:11 | 87:10 119:16 | 261:21 262:11 | 163:14 |
| 55:12 | 316:19 | 262:21,23 | **saying** 22:20 |
| **résumés** 55:25 | **sales** 45:6,21 | 263:2,5,11 | 37:11 76:3 |
| **s** | 56:17 71:12 | 374:10 375:5 | 87:22 97:6 |
| **s** 3:2,17,17 4:6 | 75:5 84:11,15 | 375:13,17 | 115:17 140:21 |
| 5:2 6:2 7:2 8:2 | 84:18,24 85:5 | 376:9 378:20 | 144:8 177:14 |
| 9:2 10:2 55:22 | 85:22,24 86:3 | 386:19 389:17 | 177:15 181:15 |
| 469:3 | 87:11,14 88:13 | 390:13 391:6 | 185:8 187:3 |
| **sacrifices** | 89:4 99:4,17 | 391:12,24 | 209:17 213:6 |
| 418:13 | 107:5 128:3 | 392:24 393:21 | 222:3 223:17 |
| **sad** 142:12 | 277:11 289:2 | 394:7,13 395:8 | 243:14 252:15 |
| 407:14 | | 395:8,12 396:6 | 278:13 283:10 |

290:7 312:7
314:13 323:23
329:21 337:13
337:15 341:18
343:14 362:3
374:6,8,24
375:3,15,23
378:19 379:21
385:21,22
393:17 416:17
416:21,22
417:9,13,14,18
418:25 421:5,7
422:6,9,13,15
424:10 433:14
462:20
**says** 27:23
56:12 68:5
134:20 158:11
172:13,21
182:12 185:4
185:21 186:7
187:21 188:9
193:4 206:11
212:24 269:18
272:6 279:16
280:2 329:16
355:20 361:25
405:21 406:2
415:18
**scale** 149:15
**scanned** 326:20
**scenario**
394:16,17

**scenarios**
104:22
**sceptical** 378:5
**scg** 75:21 94:4
**schedule**
180:23
**schiller** 3:3
237:9,17 238:2
239:10
**school** 31:23
32:6 267:22
**scope** 30:15
151:3 240:16
**scratch** 371:15
**screen** 4:12
27:5 143:2
**scuderia** 39:6
**sealed** 194:21
**search** 433:2
**searching**
433:24 434:21
**sec** 224:12
225:12 226:20
228:14 230:14
246:24 248:23
258:15,17
**second** 16:6
75:25 223:14
265:13,17
268:21,24
354:21 403:8
425:21 444:15
**section** 267:14
267:19 269:18
310:12 329:3

448:23
**sections** 440:17
448:19
**sector** 458:11
**secure** 57:13
455:11
**securities** 32:18
32:20,21 33:17
34:10,14 35:4
35:20 36:4,9
37:3 38:18
39:3 458:4
463:14
**seductive**
147:11
**see** 17:25 23:3
37:11 49:17
65:24 68:10
135:8,14,16
137:3 151:25
163:5,9,24
165:16 172:20
173:3,4,5
181:2 184:12
188:8,10
191:23 196:10
196:11 206:9
207:2 208:18
212:20,21,23
213:3 249:12
256:13,13
266:7 269:16
310:12 329:20
341:24 350:4
353:12 354:24

355:4,11
359:11 377:13
396:8 410:13
424:8 429:18
438:24
**seeing** 135:8,15
262:16 268:7
371:5 405:7
**seek** 55:25
115:21 150:22
277:14,19
**seeking** 45:8
54:19 57:4
321:16,24
343:25 461:7
**seems** 370:25
**seen** 21:6 22:11
44:8 47:7
94:20 164:3
221:6 265:19
265:25 266:20
266:22,24
268:6 272:2,14
441:18,20
**seg** 39:11,23
40:2,5 41:4,17
41:21,24 42:4
42:5,9,11,15,24
43:5,15,25
44:12 49:20,22
51:18,19 52:6
55:16 56:10
57:6,14 59:6
59:12,25,25
60:8,19,22

61:24 62:17,21
63:11 64:10,15
64:18 68:15
72:25 75:6,9
75:16 76:22
77:22,25 78:2
78:3,4 79:23
80:11,14 81:17
81:18 97:2,8
100:4 112:8,22
113:13 124:19
125:13 150:17
171:10
**seg's** 65:19
67:3,22 77:7
**self** 156:4
262:14 436:3
437:16 442:7
442:14 443:6
451:5 457:6
463:4,5
**sell** 49:8 84:22
300:24 323:17
**selling** 65:2
**semantics**
93:13
**send** 55:24
118:22 137:16
138:6 141:18
172:24 173:8
178:11 196:12
227:14 232:4
233:8 249:21
249:22 250:10
250:23 251:4,7

252:13 316:16
317:3,21 387:7
414:23 415:20
**sending** 144:17
191:7 196:17
231:14 316:12
404:2
**sends** 188:6
**senior** 65:16
68:6,11
**sense** 37:10
78:6 93:16
110:7 138:12
209:10 219:25
244:14 301:9
303:19 378:2
427:23 433:4
434:25 461:5
**sensitive** 12:7
**sent** 24:8 53:19
136:15 137:4
137:12,13
142:11 170:20
172:21 173:4
173:14 181:6
185:17 200:8
201:13 207:10
227:12 231:8
232:16 250:11
251:15 252:17
252:20 253:6,7
253:15 306:18
319:18 357:19
374:16 380:11
386:15 389:4

389:11 391:17
391:23 392:4
407:9 408:15
410:20 412:18
413:7 414:16
415:22 425:5
429:15,22
430:17,19
451:9 468:14
**sentence** 66:25
68:5 83:25
120:2 171:21
**sentences** 68:2
**separate** 105:8
165:3 310:19
424:18
**separated** 56:6
439:7 443:10
**separately**
241:8 433:25
**september** 1:15
2:3 12:5 165:5
168:9 172:7,11
172:19 174:13
174:13 181:13
188:7,9,16
192:18 194:25
201:25 202:2
202:17 205:23
328:9 402:20
468:3
**series** 33:5,6
34:7,7,23,24
35:3,11,15
67:13 225:6

291:4 360:11
457:2
**serious** 100:9
107:9 223:18
227:3 235:14
363:25 393:24
407:23
**seriously**
103:14
**served** 106:5
110:16
**server** 364:3
**service** 55:8
203:12 269:24
285:6 288:12
430:6
**services** 7:23
191:21 193:6
274:7,14
275:19 278:18
279:7,15,16
280:7 281:22
287:13 288:23
308:7 309:2,14
309:16,23
311:4,9 432:10
**serving** 423:12
**set** 16:25 121:5
349:11 365:9
406:8 441:11
**sets** 149:24
**settling** 267:23
**seven** 101:18
**several** 347:22
352:15

**severed** 435:19

**sewing** 239:2

**sext** 118:22

**sexuality** 138:13

**sexy** 146:22,25 147:17

**sgc** 50:19 51:13 77:21

**sgliefrjts** 385:14

**shakes** 18:8

**share** 21:14 163:11 402:12

**shared** 163:18 349:22

**shareholder** 94:18 95:10,22 96:17 296:9

**shares** 294:11 296:5,10 300:16

**shark** 69:6

**she'll** 181:25

**sheet** 468:11

**sheik** 73:14 145:24 146:2

**sheppard** 2:7 3:10 12:24 13:23 14:2

**sheppardmull...** 3:12,13,13

**shmee150** 125:2

**shoes** 107:18 424:20

**shoot** 145:14 146:13 153:18 165:2 170:10 216:3

**shoots** 204:18 215:25

**short** 76:15 103:10 158:7 179:9,10 264:7 406:22

**shorthand** 2:10 467:8

**shortly** 181:18 197:8 231:13 293:7 359:9

**shot** 103:25 104:13 143:2 194:17 418:23

**shots** 104:11 193:21

**shoulder** 220:8

**shoulders** 160:21

**show** 20:16 21:18 22:7 52:12 55:3 69:7 118:5 135:18 139:17 158:5 202:4 205:5 217:23 257:21 274:2 350:2,7 364:23 387:16 406:12

411:20 413:10

**showed** 442:21 444:18

**showing** 173:4 275:16 343:7 426:25 428:9

**shown** 294:2 361:24

**shows** 137:20 209:22 341:17 406:3

**sic** 141:19 338:17 411:18 456:12

**side** 81:9,15 181:16 196:13 206:25 241:2 255:9,10

**sides** 151:16 364:4 399:14 402:10

**sign** 65:3 150:3 181:25 189:15 195:10 198:12 226:12,15 233:5,19 234:5 246:8 263:4 325:22 356:11 356:23 357:9 357:22 468:12

**signal** 144:14

**signatory** 86:12 108:13

**signature** 467:25

**signed** 173:15 174:12,23 175:6,8,17 176:4 178:9 182:11,15,23 188:18,19,24 188:25 189:24 192:19,19 194:3,21 195:23 196:17 196:22,23 198:2,5,8,18 199:5,9,14,15 200:22 201:17 217:11,11 226:10 227:13 227:22,24 275:11,14 288:16 325:23 326:21 327:3 327:10 330:3 409:15,18 410:7 411:4,5 411:17 468:19

**significant** 201:23 305:8 357:25 358:20

**signing** 173:24 181:25 199:4 231:6

**signoff** 160:24

**silvia** 1:24 2:9 13:6 14:20 467:3

**[similar - sort]**                                             Page 83

| | | | |
|---|---|---|---|
| **similar** 79:15 | **situation** | 371:14 372:8 | 262:18 465:19 |
| 156:23 | 223:18,21 | **software** | **sophia** 224:3 |
| **simon** 3:8 | 227:3 231:22 | 213:23 466:19 | **sophisticated** |
| **simons** 14:7,7 | 233:12 254:18 | 466:22 | 238:13 |
| 14:11 21:13 | 259:7 262:25 | **sold** 48:12,16 | **sorry** 21:13 |
| **simple** 36:25 | 263:16 376:6 | 281:16 282:3,7 | 31:24 32:3 |
| 59:22 78:3 | 382:11 389:19 | 283:13,20 | 51:19 77:22 |
| 156:6 296:18 | 392:17 393:25 | 284:11,18,22 | 78:13 113:14 |
| 296:23 | 394:5 395:10 | 286:19 | 153:8 154:25 |
| **simplify** 447:2 | 407:23 408:25 | **sole** 110:23 | 168:8 184:7 |
| **simply** 76:5 | 424:6 425:15 | 275:8 | 200:17 236:4 |
| 368:2 | **six** 219:17 | **solely** 38:23 | 260:16 276:21 |
| **sincere** 386:23 | 242:18 291:16 | 87:6 88:16 | 325:19 329:5 |
| 389:14 393:5 | 466:11 | 89:10,23 90:20 | 332:7 345:8 |
| **single** 360:12 | **sizes** 272:8 | 91:15,17 92:8 | 368:21 372:2 |
| **sinovision** | **skill** 121:5 | 92:12 115:12 | 374:4,7,8,24 |
| 450:18 463:25 | 149:24 | 337:11 | 375:3,9,11,16 |
| **sipping** 269:19 | **skolnick** 86:5 | **solicit** 55:25 | 375:22 383:20 |
| **sir** 14:23 68:23 | 86:15,24 87:3 | 60:2 71:11 | 385:21 386:3 |
| 190:25 228:7 | 87:20 91:9 | 386:10 | 386:24 388:24 |
| 248:12 410:11 | 286:22 289:23 | **soliciting** 60:6 | 389:14,22 |
| **sit** 290:2 | **slaughter** 78:10 | **solid** 107:20 | 392:12 393:6,7 |
| 359:23 374:20 | **sleep** 249:9,15 | **solutions** | 393:8,10 401:9 |
| 422:18 | 254:2 368:25 | 454:11,16 | 407:5,13 408:5 |
| **site** 435:12 | **slept** 134:19 | 460:14 468:23 | 408:5,6,9 |
| 442:19 | **sloss** 74:22 | **somebody** | 410:11,13,14 |
| **sitting** 48:10 | **smack** 19:9 | 99:10,11 | 412:12 414:2 |
| 68:18 73:4 | **smoother** 54:11 | 143:12 146:4 | 416:3,5,16,18 |
| 239:18 253:12 | 54:13 | 261:17 262:2 | 416:18,23 |
| 253:18 273:2 | **social** 89:2 | **someone's** 99:2 | 417:9,11,14,18 |
| 344:3 361:23 | 97:19 98:23 | **somewhat** | 418:24,25 |
| 376:19 439:14 | 124:24 143:2 | 131:5 289:20 | 419:17,20 |
| 439:24 441:24 | 311:19 312:2,8 | **son** 76:10 | 422:6,15 |
| 447:23 | 312:12 369:13 | **soon** 191:9 | **sort** 72:20 99:5 |
| | 370:7,22 | 192:6 262:16 | 166:16 194:16 |

| | | | |
|---|---|---|---|
| 289:8 348:17 | **speak** 18:4 | 291:24 298:22 | 214:15 223:2 |
| 351:6 363:16 | 44:23 47:2 | 309:12 312:6 | 224:24 225:13 |
| **sorted** 408:24 | 57:10 68:17 | 315:21 316:7 | 228:10,13 |
| 409:4 | 91:21 96:2 | 333:13 346:21 | 230:21 234:21 |
| **sorting** 366:7 | 131:18 136:17 | 369:15 375:25 | 234:23 237:10 |
| **sorts** 193:18 | 144:16 152:2 | 379:4 380:3 | 242:10 245:18 |
| 272:7 331:15 | 174:9 177:11 | 382:25 384:19 | 249:25 266:23 |
| **sought** 63:4 | 188:21 214:11 | 387:3 391:11 | 307:15 313:2 |
| 204:24 330:9 | 228:20 262:18 | 392:21 393:9 | 315:16 332:24 |
| 346:24 396:20 | 270:10 346:19 | 408:3,13 | 334:10 337:17 |
| **sound** 104:6 | 378:23 404:21 | 423:14 429:5 | 342:24 344:8 |
| 159:5 398:18 | 416:9,12 | 436:18 439:12 | 346:19 347:24 |
| **sounds** 64:12 | 417:17 420:21 | 440:16 443:17 | 348:21 349:11 |
| 158:22 159:7 | 421:8 423:7 | 444:3 445:15 | 351:14 356:5 |
| 159:13,18 | 439:11 440:2 | 449:15 451:17 | 359:18 360:10 |
| 191:16 200:3 | 441:21 | 451:21 452:4 | 364:8 372:17 |
| 282:22 334:16 | **speaker** 400:22 | 454:13 455:17 | 373:16 375:2 |
| 334:17 346:9 | **speaking** 76:4 | 460:18 | 375:20 377:16 |
| 400:23 | 99:6 133:18 | **specifically** | 380:16 389:6,9 |
| **sour** 255:9 | 173:11 294:7 | 34:11 35:2,9 | 390:2 395:25 |
| **sources** 438:14 | 298:19 399:24 | 36:6,7 37:4 | 396:22 398:6 |
| **soured** 211:9 | 403:15 439:20 | 38:21 47:3 | 400:16 401:6 |
| **southern** 1:2 | **speaks** 257:7 | 49:25 64:5 | 404:16 410:2 |
| 12:19 | 257:12 | 68:13 70:3 | 414:16 417:12 |
| **spak** 262:14 | **special** 19:3 | 71:23 73:7 | 418:6 422:22 |
| 356:19 443:22 | **specific** 25:4 | 82:17 86:4 | 426:5 427:17 |
| 450:25 451:5 | 53:14 57:25 | 91:8 96:7 | 440:25 445:19 |
| 452:7 458:8,13 | 60:25 69:25 | 98:21 117:4 | 445:24 447:6 |
| 461:4,9,13,21 | 91:22 128:22 | 119:25 120:14 | 453:14 454:20 |
| 462:3 463:11 | 161:12 182:3 | 124:3,13 128:6 | 456:7 460:25 |
| 463:19 | 201:20 221:12 | 129:23 133:23 | **specification** |
| **spaks** 457:4 | 228:3 242:21 | 143:20 151:24 | 306:5,11,19 |
| 458:25 | 250:9 267:8 | 189:25 195:7 | **specifications** |
| **spanish** 202:19 | 278:15,21 | 203:5 208:24 | 279:12 |
| 203:7 | 287:24 291:8 | 210:12 211:14 | |

**[specifics - store]**                                             Page 85

specifics  42:20
  56:22 201:6
  290:22 291:17
  326:16 419:9
  421:22 439:25
speculate  47:21
  59:17 157:24
  161:6 164:7,9
  186:22 203:21
  203:22,23
  257:11 427:25
speculating
  50:13 59:11
  85:11 203:19
  217:12 255:3
  303:8 304:6
  336:19,20
  340:23 373:20
  417:23 418:3
speculation
  59:18
speed  18:3 61:9
spell  69:9
spend  209:10
  261:14
spent  209:3,15
  209:18
spindly  269:21
spirit  133:14
  157:6 195:14
  293:15 328:17
spoke  286:25
  427:3
spoken  53:18
  58:17 463:22

sponsor  61:5
sponsored  33:4
  33:13
sponsors  45:7
  60:22
sponsorship
  61:2,14
sports  100:6
spreadsheet
  216:8
sps  444:14
spying  235:8
staff  189:10
stages  272:8
stake  289:2
  450:6
stamford
  176:24
stand  97:10
standard  46:3
standpoint
  155:19 325:11
stands  78:10
stanley  74:23
  125:15 128:7
staple  271:22
stapling  273:23
star  269:24
start  79:5 98:4
  98:16 130:15
  162:18 241:17
  262:5 457:15
started  35:21
  39:20 77:19
  79:12 167:10

170:13 261:6
  445:2
starting  39:17
  79:11 332:8
  336:18 403:7
startled  444:22
starts  132:19
  415:18 448:23
startup  47:23
  111:9,12 113:8
  155:20,21
  160:15
startups  29:8
state  13:15,18
  15:14 169:20
  171:16 176:18
  298:10 416:14
stated  230:18
  338:10 467:9
statement  8:18
  234:16 341:6
  389:15
statements
  131:13 343:7
  343:23
states  1:2 2:13
  12:18 200:6
stating  128:17
  301:7 334:21
status  36:13
  382:8 452:11
statutory  288:4
stay  198:14
  229:24,25
  426:17 448:13

449:3
stayed  36:15
  38:23 427:10
staying  243:2
  368:14,20,24
  413:5
steen  243:8
stem  440:11
stenographer
  14:23 15:3,10
  168:7 400:13
stenographer's
  466:18,21
step  229:15,18
  230:24 238:15
stepped  215:19
  294:11
steps  107:13
  232:5
stipulate  51:9
stipulations
  11:13
stock  204:9
  229:2 294:6
  296:12 300:24
  303:22 443:7
  465:2
stop  37:2 93:7
  110:13 301:17
  456:3 465:6
stopped  211:12
  230:24
stops  110:5
store  177:19
  178:2

stored  175:21
  176:23 177:18
story  77:3
  268:3,16
straight  122:16
strain  368:18
strained  38:8
strategic
  104:22 231:3
strategies
  56:25 98:22
strategy  45:12
  103:23 104:2
  106:21
street  65:17
  68:6,12 69:24
  70:15,17,18
  268:2
strike  11:21
  63:15 255:17
  296:17
string  9:9
  369:22
strong  55:8
  151:16 306:7
  306:24
strongly  390:3
structure
  169:22 297:10
  324:13,19
structured
  297:12
structuring
  325:25

study  113:4
studying  35:25
stuff  160:15
  179:7,8 325:18
  440:6
stuffy  155:16
style  141:23
  142:4,5,6,18
  146:18,22
  243:18 268:15
stylist  147:7
sub  78:5
subcontract
  42:18
subcontracted
  41:20
subject  20:8
  158:14 159:3,7
  159:14,18
  185:19 282:16
  282:20 283:6
  283:14 284:14
  284:23 297:5
  298:16 315:10
  315:23 319:15
  320:11,13
  321:10 325:7
  333:12 334:15
  342:8,23 358:8
  376:15 398:20
  398:21
subjective
  110:14 121:2
submit  211:18
  214:3

submitted
  117:25 123:20
  160:4 209:23
  306:6,10,11
  330:17 343:22
  348:14 353:10
  354:2 367:21
  368:4
submitting
  117:23
subpoena  4:10
  21:22 346:16
subscribed
  470:14
subsection
  329:16
subsequent
  162:2 231:17
  292:6 321:5
  359:11 401:11
  436:24
subsidize  58:10
substance
  25:12 239:3
  399:5
substantial
  117:9 299:13
  358:4
substantiate
  316:2 336:23
  347:5 349:4
  353:16
substantive
  437:13

substantively
  56:16
subtle  361:6
succeed  107:16
successful  60:6
successfully
  84:18
sued  15:21
sufficient  57:17
  353:25
sugar  9:21
  401:19 405:22
suggest  459:17
suggestion
  447:12
suit  204:15
  206:2,8 207:9
  209:4 221:11
suits  204:16
summarize
  77:2
summary  28:4
  362:14
summer  158:4
sung  1:6 12:17
  468:4 469:1
  470:1
super  231:23
supervision
  467:12
supplemental
  63:19 187:19
  187:23
supplied  74:15

supply   359:6
support   11:3
  57:17 117:25
  118:5 354:2
  360:16 444:11
  445:21 457:8
supported
  294:9
supporting
  216:10 359:3
supposed
  142:13 251:3
  259:12,13
  298:14 305:23
  307:19 359:25
  385:15 400:6
  403:10,21
supposedly
  49:15 70:13
  224:17 254:3
  356:11
sure   13:22
  14:13 23:24
  29:12,15 30:14
  32:2 38:21
  59:16 61:25
  66:2 71:7 74:4
  74:12 78:15
  82:3 89:18
  99:6 104:5,12
  108:6 109:2,7
  122:17,23
  123:7 127:24
  130:25 136:9
  145:19 147:25

158:2 173:11
197:7 202:6
213:12 217:24
225:10 227:21
228:9 229:20
241:15 251:8
264:8 276:14
288:10 290:20
301:25 308:10
309:11 354:7
361:2 366:6
368:23 374:22
381:17 431:6
437:24 441:19
443:2 447:16
456:21
surely   322:4
surprise   233:2
surprised
  229:5
suspicion
  357:13
sustaining
  156:4
suv   176:22
swear   14:21
sweat   299:8
swiss   41:22
switch   130:12
  264:20 274:2
  330:15
switzerland
  200:10,11,13
  200:19 216:2
  216:13,15,24

sworn   15:8
  467:5 470:14
synergy   79:23

**t**

t   3:7,17 4:6 5:2
  6:2 7:2 8:2 9:2
  10:2 468:1
  469:3,3
tab   139:18
  261:5
table   125:13
  307:18
tactical   377:24
  452:10
tagged   283:18
take   12:12
  15:22 19:2,7
  19:10,12,18
  37:23 52:9
  78:16,17 83:11
  90:9 93:5
  101:20 116:19
  125:21 126:2,6
  126:12,18
  133:12 137:24
  138:13,14
  144:19 145:19
  148:4,14
  152:20 154:5
  160:21 165:20
  167:21 175:4
  178:21 179:8
  183:20 190:7
  191:12 192:14
  204:12 206:16

207:6,6,12
209:25 212:6
222:21 231:20
232:3 233:6,12
235:20 240:25
242:8 247:22
249:16 250:13
251:2 252:6
254:24 255:14
261:5 264:7
269:5 271:12
274:23 282:13
293:4,5 295:20
296:12 299:11
300:18 303:23
303:25 310:9
322:21 323:8
327:19 334:24
351:22 366:3
366:21 370:13
373:4 388:13
447:13 448:12
448:14,14
453:8 462:11
462:13
taken   16:2
  21:11,12 78:24
  103:14 104:9
  107:14 166:3
  194:7 200:6
  216:23 264:13
  300:4 367:2
  375:7 449:8
  467:7

talent  150:14 182:12

talk  18:15 31:9 61:21 73:15 96:11,22 97:22 105:5 130:13 165:15 190:22 221:7 230:16 238:25 264:20 288:7 292:9 305:20 308:18 308:19 311:6 326:6 330:16 343:9 364:14 366:5 374:17 388:2 396:14 405:16 427:8 433:25

talked  109:17 345:20 366:11 463:12

talking  69:25 79:7 96:5 102:3 105:18 109:12 166:11 182:16 186:18 207:11 261:6 279:22 310:21 310:23,25 325:14 392:6,9 392:18 462:7

tangible  107:21

tani  72:7,9,10 145:20

tank  69:6

target  458:9 461:4,5

targeted  451:16

tarnished  55:9

task  385:15

tax  294:5,12 295:15 297:13 299:13 300:25

team  128:19,25 135:3,5 148:13 153:13 194:9 195:15 385:11 400:22 426:17

teasing  206:16 207:7,12

technical  43:16 78:7 89:7 106:22 201:8 220:12 382:12 452:16

technologies  124:12

ted  67:20

teeth  120:10

telephone  400:10 454:14

tell  37:15 52:24 55:15 62:9 67:6 68:19 74:16 92:16 125:8 135:7 139:9 146:17 146:21,24

155:10 167:16 182:14 194:2 195:22 207:4 223:7 225:2 230:21 241:11 242:21,24 247:16 249:9 249:15 252:9 274:17 290:17 291:13 344:4 346:22 347:15 348:12 349:2 358:16 359:7 359:23 360:12 366:2 375:8 376:6 382:2 386:19 387:7 387:19,22 393:24 394:9 400:11,14 404:15 424:17 430:14 432:6 433:11 434:21 435:15 439:14 441:25 445:14 446:21 447:23 448:17 449:19 453:18 455:16 456:6 459:6 467:6

telling  92:18 94:22 219:24 221:22 231:21 232:4 234:21 235:9 250:8

259:2,5 268:15 290:4 312:7 313:9 349:13 379:22 384:15 386:13,21,25 389:17 393:21 394:5 395:2,7 403:12 417:11 418:10 427:6,7

tells  205:25

template  171:5 171:7,9 231:7 231:15

temporal  290:14

ten  84:19 87:15 153:9 248:20

tend  19:12

tense  407:15

tension  416:7

tenth  16:22

tenure  39:25 417:19 444:7 446:7 449:17

term  70:19 143:9,11 150:18 153:22 154:23 195:16 201:7 286:6

terminate  410:24

terminated  246:10 276:13 389:3 394:20 394:24 395:17

396:21 397:18
**termination**
  234:8 237:6
  276:16,22,23
  398:17 420:2
  426:15 428:9
**terminology**
  392:21
**terms** 63:2
  76:17 80:18
  106:2,24 122:9
  147:20 163:6
  180:9 182:3,8
  187:19,23
  196:25 197:4
  201:6,10
  230:11 233:16
  233:25 240:23
  240:24 276:8
  278:21 292:5
  295:21 312:20
  313:15 316:6
  326:3 376:25
  384:13 385:8
  410:9 411:12
**test** 365:6
**testified** 15:8
**testify** 19:21
  23:10,15
  221:14 349:10
  349:16 359:19
  360:2
**testifying**
  344:16

**testimony**
  24:22 29:18
  42:2 48:11
  59:3,24 60:5
  86:18 156:9
  162:22 174:22
  203:16 208:4
  209:15 250:15
  253:17 258:12
  264:23 273:5
  302:11 346:11
  355:14 365:24
  376:20 380:6
  380:19 391:23
  446:15 466:8
  467:10 468:9
  468:17 470:8
**text** 4:16,20 5:4
  5:13 6:12 7:4,8
  9:12,16,19
  10:4,7 118:23
  133:3,9,19
  136:16 139:20
  140:9 143:5
  144:22 145:5
  146:8 154:8,16
  205:8,14,17
  247:25 248:8
  248:12 250:22
  250:24 251:10
  251:21 252:16
  252:23 253:6
  253:25 256:4
  257:3,16,23,25
  372:22 373:13

377:8 380:10
  385:20 386:11
  386:14 387:3
  388:7 389:5,10
  391:25 397:25
  401:13,18
  405:18 406:16
  406:22 407:19
  411:18,23
  412:6 413:7
  414:10,22
  415:17 423:5
  425:6 426:6
  458:6
**thank** 14:19
  15:10 78:20
  129:8 148:2
  165:24 192:5
  202:14 230:7
  247:20 264:9
  366:23 445:12
  449:5 465:24
  466:5
**thanks** 21:5
  140:6
**thee** 273:18
**theory** 323:19
**thereabouts**
  81:9
**thereto** 467:24
**thing** 19:15
  137:23 142:17
  292:19 383:16
  393:17 394:25

**things** 18:2
  45:15 51:3
  59:24 76:15
  89:8,19,22
  90:15,18 92:7
  93:16,18
  104:18 109:23
  116:25 119:9
  150:10 155:17
  156:17 221:8
  230:12 233:20
  234:6,14 235:4
  241:25 246:10
  250:2 285:9
  289:25 299:20
  308:19 310:16
  314:12 327:5
  343:12,24
  349:8 357:25
  358:4,21 364:7
  374:21 375:4
  375:12 376:8
  377:10,17,19
  378:24 379:5
  380:13,17,24
  381:3 382:18
  382:21,23
  383:5,7,21,23
  384:8,9,10
  385:22 386:2
  389:24 391:2
  394:5 396:24
  407:16 416:25
  417:15 422:10
  431:16 436:13

**[things - threats]**                                                    Page 90

| | | | |
|---|---|---|---|
| 440:9,13 443:5 | 200:8 207:8 | **thinking** 395:2 | 351:25 352:8 |
| 443:9 446:15 | 208:17,25 | 416:10 418:6 | 372:22 377:8 |
| 446:16 452:2 | 213:4,10 | **third** 28:22 | 391:25 401:18 |
| 454:17 456:17 | 214:13 237:11 | 66:25 116:8 | 405:18 406:16 |
| 456:22 462:25 | 240:4 241:21 | 295:8 | 411:23 |
| **think** 14:11 | 242:18 244:4 | **thorough** 104:6 | **threads** 412:6 |
| 16:7,21 17:7 | 247:7,7 253:10 | 453:12 | **threat** 232:19 |
| 21:9 22:14 | 257:8 270:21 | **thoroughness** | 235:15,19 |
| 26:2 34:23 | 272:17 283:2 | 436:23 | 236:7 244:22 |
| 35:5,11 36:13 | 283:16 286:24 | **thorp** 150:8 | 245:6,23 |
| 38:18 39:19,21 | 332:22 333:7 | 375:19 377:3 | 246:16 254:7 |
| 44:17 53:24 | 334:16,20 | 384:25 385:7 | 261:8 |
| 58:6 62:8 | 340:7 341:20 | **thought** 144:14 | **threaten** |
| 63:21 67:18 | 345:25 347:8 | 187:7 280:17 | 246:19 247:4 |
| 73:7,8 80:17 | 348:6 351:11 | 372:12 431:22 | 256:20 |
| 81:3 85:7 93:9 | 354:4 355:8 | **thread** 4:16,21 | **threatened** |
| 93:10 99:15 | 362:6,6 363:12 | 5:4,8,14,18 6:4 | 223:5 246:5 |
| 100:3 105:2 | 365:4,23 368:7 | 6:7,10,13,17,19 | 248:21 254:4 |
| 108:24 111:16 | 381:20 382:2 | 7:4,9 9:4,12,20 | 258:8,12,16 |
| 114:6 115:4 | 383:10,14 | 10:4,8 133:3 | 261:17 262:3 |
| 131:24 133:24 | 384:17 387:21 | 139:20 144:22 | 262:20 387:25 |
| 136:17 138:16 | 389:23 399:22 | 145:5 146:8 | **threatening** |
| 139:7 143:9 | 399:23 400:17 | 148:7,12 154:8 | 254:22 263:14 |
| 144:7 147:14 | 400:23 401:24 | 154:16 167:24 | **threatens** |
| 147:19 151:15 | 402:10,11 | 169:11 178:17 | 256:15 |
| 152:8,14 | 403:3,15 405:7 | 190:10,21 | **threats** 219:2 |
| 156:19 159:23 | 410:15,21 | 202:10,15 | 220:15,21 |
| 162:20 167:9 | 417:3 418:11 | 205:8,15,17 | 225:10 226:23 |
| 167:19 170:12 | 418:14 419:14 | 212:9 218:2,7 | 228:7,11,13 |
| 170:14 173:8 | 424:23 425:12 | 247:25 248:8 | 230:11,22 |
| 174:20 175:2 | 428:3 430:24 | 248:12 250:22 | 232:9 236:23 |
| 177:10 179:23 | 443:20 448:3,5 | 250:25 251:21 | 236:24 241:24 |
| 193:14,24 | 448:18,20 | 253:25 256:5 | 244:14,17 |
| 194:18 196:2 | 458:10 459:3,6 | 257:3,16,23 | 245:10,16 |
| 197:6 198:15 | 463:8,9 | 258:2 350:17 | 254:24 258:9 |

| | | | |
|---|---|---|---|
| 259:17 260:2 | 79:3,10 81:8 | 275:21,23,24 | 450:10,13 |
| 260:10,25 | 82:15,20 86:16 | 276:3 280:24 | 451:3 453:8,14 |
| 358:18 | 88:21 92:6 | 289:22 290:19 | 454:20 455:23 |
| **three**   25:23 | 93:4 96:22,25 | 293:24 294:23 | 457:21 460:10 |
| 97:8 124:3 | 97:7,22 100:8 | 296:13,22 | 460:19 464:3,6 |
| 212:25 230:12 | 102:11 103:3 | 298:7 300:4,8 | 464:17 465:19 |
| 398:15 | 105:12,15 | 303:12 312:10 | 466:13,14 |
| **threesome**   7:13 | 106:4 110:21 | 319:21 320:6 | 467:9 468:18 |
| 266:15 267:15 | 112:8,21 | 320:21 321:13 | **timeframe** |
| **thrills**   270:2 | 113:12 115:14 | 321:18,24 | 427:24 468:8 |
| **thursday**   1:15 | 125:5,12 | 327:8 328:17 | **timeline**   167:20 |
| 25:16 | 128:12 132:5 | 328:18 329:12 | **timelines**   452:8 |
| **tie**   344:5 | 134:6 143:22 | 330:3,3 331:8 | **times**   131:7 |
| 346:23 347:16 | 147:2 158:8 | 331:24 334:19 | 150:19 221:13 |
| 347:21 348:13 | 161:14 164:24 | 339:25 340:3,7 | 223:8 242:18 |
| 363:2,11 | 165:17,25 | 349:7,14 366:4 | 243:6,10 291:9 |
| **tied**   45:20 | 166:6,23 167:5 | 366:24 367:5 | 322:6 347:22 |
| 298:24 299:5 | 167:17 170:5 | 368:12,17 | 382:5 429:7 |
| 303:17 | 170:20 173:18 | 370:11 372:15 | 444:18 449:24 |
| **ties**   435:19 | 174:18 175:6 | 384:6 385:6 | **timing**   302:24 |
| 443:22,23 | 178:12 180:16 | 389:20 393:19 | 303:4,20,21 |
| 450:20 | 181:18 186:9 | 395:13,20 | 361:11,12 |
| **tim**   124:25 | 196:16 199:3 | 396:19 402:22 | 450:24 460:8 |
| **time**   12:10 | 200:4 204:7 | 407:24 413:5 | **tired**   422:20 |
| 13:16 16:3 | 211:8 212:5 | 413:13,15 | 456:13 459:19 |
| 32:18 34:9,13 | 217:8,10,15,22 | 416:11 418:7 | **tirelessly** |
| 37:7 38:9 39:7 | 236:6 242:16 | 419:25 420:17 | 210:25 |
| 39:11,13 40:25 | 242:17 243:2 | 420:19 426:7 | **title**   44:10,13 |
| 41:18 43:6 | 244:24 245:3 | 427:11 428:14 | 73:12,18 99:14 |
| 44:23 47:16 | 246:2 253:21 | 429:21,24 | 101:24 102:7 |
| 48:6 50:19 | 256:10 261:14 | 430:20 431:14 | 105:13 109:19 |
| 54:21,22 56:10 | 262:10,24 | 434:15 442:8 | 112:11 188:8 |
| 62:21 63:10 | 263:21 264:10 | 444:13,21 | 269:2 |
| 64:3,9 69:15 | 264:16 268:8 | 445:20 446:23 | **titled**   267:15 |
| 76:22 78:21 | 271:11 274:23 | 449:6,10 | 310:12 |

**[titles - tomaso]** Page 92

| | | | |
|---|---|---|---|
| **titles** 44:23 | **told** 58:8 59:17 | 443:24 464:21 | 169:11 170:6 |
| 56:16 70:3 | 77:3 81:3 88:4 | 464:25 | 178:13 179:18 |
| 98:2,7,8 | 94:19 95:11,16 | **tomaso** 1:7 8:5 | 180:3 193:15 |
| **today** 15:23 | 95:18 96:19 | 14:17,18 29:16 | 194:18 195:6 |
| 19:4,21 20:18 | 103:10 139:3 | 30:2,16,25 | 196:24 197:17 |
| 21:12 22:16 | 155:12 161:25 | 55:5 56:7 | 199:10 206:3 |
| 23:15 24:14,22 | 162:8,10,15 | 88:11 91:14 | 206:12 213:19 |
| 24:25 25:16 | 163:2,21,24 | 96:23 97:4,7 | 215:14,18 |
| 35:15 47:8 | 164:13 182:2 | 97:23,25 | 219:13 220:10 |
| 48:11 68:18 | 203:21,21 | 100:14,18 | 229:2 234:2,3 |
| 73:4 253:17 | 221:24 222:4 | 101:5,13,16 | 238:8 239:2 |
| 273:2 344:3,16 | 223:22 224:5,9 | 102:4 109:7 | 241:19 247:16 |
| 346:11,18,22 | 227:13,20 | 112:3 115:11 | 248:18 254:12 |
| 347:19 349:8 | 233:5,18,22 | 115:15 119:9 | 260:11 261:2 |
| 349:16 362:20 | 234:4,14 | 119:17 120:20 | 265:5 266:12 |
| 363:5,11 | 235:15 246:7 | 121:24 123:20 | 268:11 269:3 |
| 364:13 376:19 | 283:24 291:10 | 124:20 125:22 | 270:15,17,18 |
| 414:13 439:14 | 295:23,25 | 126:3,7,8,13,16 | 270:22 271:7 |
| 439:24 441:25 | 296:6,8 332:17 | 126:19 127:5,8 | 272:19 273:10 |
| 447:23 465:17 | 333:16 335:20 | 128:3 129:11 | 275:20 276:2,4 |
| 466:2 | 356:22 357:3,6 | 129:21 130:14 | 276:4,8 277:2 |
| **today's** 26:12 | 375:5,10 376:3 | 131:17 132:2 | 277:15 278:18 |
| 466:8 | 376:3,5 377:3 | 132:14 138:14 | 278:22 279:9 |
| **together** 53:21 | 386:25 392:25 | 139:4,10 | 279:17 281:24 |
| 56:25 104:24 | 396:19,25 | 140:15 145:15 | 282:3,4,11,19 |
| 106:25 147:5 | 400:20 405:3,6 | 146:25 149:14 | 284:6 287:18 |
| 175:8 181:24 | 407:22 418:17 | 150:25 151:10 | 288:5,15,22 |
| 216:9 221:2 | 420:9 424:16 | 153:23 154:2 | 289:19 290:11 |
| 251:22 253:3,5 | 429:17,21 | 154:23 155:8 | 290:22 295:9 |
| 253:12 259:11 | 431:16 433:22 | 156:11 159:24 | 297:10 300:23 |
| 261:14 307:23 | 444:23 452:21 | 160:4,25 | 307:11 308:14 |
| 312:4 352:9 | 454:18 462:3 | 161:20 162:23 | 310:18 311:24 |
| 356:4 362:15 | 463:17 | 163:12,20 | 313:5 314:11 |
| 387:8 433:4 | **tom** 3:22 13:3 | 164:18 166:12 | 316:10,17,19 |
| 436:10 454:14 | 102:23 129:16 | 166:25 169:2 | 316:22 318:8,9 |

**[tomaso - transparent]** Page 93

319:24 322:12
322:14 325:14
325:20 327:8
327:12,23
328:8 329:12
330:4,17 331:2
331:11 333:15
334:3 335:11
338:19 341:14
342:20 346:6
355:15 356:15
357:20 359:21
363:25 367:14
369:8 370:21
377:9 388:20
400:12,15
401:2 402:2,21
404:15 409:22
413:23 417:20
419:18,21
422:3 426:17
430:11,15
431:11 434:5
434:10,13,16
439:8 441:5
443:10 444:4,7
445:5,9 446:7
446:24 448:7
449:17 450:12
450:13,22,24
451:4,20
456:20 457:4
457:10,18
460:11,20
461:2,15

462:19 464:11
464:17,24
465:4
**tomaso's**
103:16 179:25
194:2 201:24
210:17 217:17
430:20 433:17
**tomorrow**
90:10 352:19
**toned** 270:3
**tonight** 227:14
227:22
**took** 76:8 79:7
86:15 101:9
104:13 164:15
187:14 192:16
193:7 213:20
216:21 217:2
235:14 236:6
242:3 244:15
250:21 262:9
293:22 294:6
308:24 337:20
395:11 409:4
453:4
**top** 172:20
256:11 354:20
406:3
**topic** 346:12
362:11 364:16
**topics** 23:4,12
23:16,17 24:14
83:22 195:4
345:21 414:13

440:18
**torino** 78:11
**total** 466:10
**totally** 22:5
345:10
**touch** 426:8
428:5,11
429:11,13
430:9 431:24
**tough** 214:11
242:17,20
**towards** 101:11
138:23 143:7
206:20 284:7
430:5 451:17
**town** 69:14
**traction** 211:3
**trail** 442:21
**training** 193:24
285:5
**transaction**
86:7 304:15
305:8 443:18
444:9,19
445:14 446:3
449:24
**transactions**
75:5 128:3
346:4 349:12
359:20 364:11
413:4,8 437:17
442:7,14 443:6
**transcribing**
17:24

**transcript**
128:21 467:14
468:6,19 470:5
470:8
**transfer** 8:10
335:3,10
338:19 339:19
450:17 463:24
**transition**
109:12
**transitioned**
105:21
**translate**
202:24 203:12
203:18
**translates**
141:12
**transmit** 199:8
**transmitted**
183:10 188:15
198:24 199:4
228:4 315:5
348:6
**transparency**
384:2,14 385:3
423:5
**transparent**
379:8 383:12
383:22 386:7
400:6 402:8,15
402:25 403:11
403:18,22
408:11 417:4
419:13 422:17
425:11

**traumatic**
413:19 431:13
431:21
**travel** 213:22
**traveling** 95:5
142:22 175:23
217:5 368:24
**travels** 262:18
**treat** 160:17
**treating** 365:5
**triads** 235:11
**trial** 208:2
**trick** 281:2
**tried** 348:12
373:21 462:5
**trip** 159:10
161:17 162:21
165:11
**trips** 160:23
161:8
**trivial** 384:3
**true** 52:3 62:5
75:19 186:2
221:25 226:5
236:20 260:23
374:19 378:6
383:4 390:11
393:2 394:6
422:8 446:18
446:20,21
452:11 470:8
**trust** 229:7
**trusted** 296:11
305:13 435:3
454:22

**truth** 390:5
454:23 467:6,7
**truthful** 255:21
**truthfully**
19:21 20:2
**try** 18:3 176:9
194:16 247:14
260:21 292:14
303:14 319:20
369:9 424:13
429:15 431:5
**trying** 16:20
29:13 71:11
74:11,16 79:22
87:24 158:6,7
174:25 198:25
202:7 210:22
220:2 232:9
239:13 254:17
259:6 262:24
263:15 301:9
356:18 374:17
376:5 378:8
380:5,9,15
385:18,24
391:3 394:2,4
396:24 402:17
415:23 421:15
421:16 422:18
424:19,25
429:17 431:7
432:9,11 433:4
436:21 440:22
446:25

**tuesday** 25:17
25:18,19,20
**tunnel** 7:20
271:15,25
**tunnels** 272:6
272:11
**turn** 22:23,25
32:10 43:9
66:16 84:15
169:13 214:19
279:11 337:17
377:7 428:17
429:7
**turned** 83:13
84:5 195:23
227:7 428:16
432:8 434:8
435:20 436:14
**turning** 249:20
428:12,20
**twelve** 168:7
**two** 25:23,23
26:8 49:10,12
49:18,22 51:3
53:16 57:24
58:21,24 63:4
67:14 81:12
124:2 140:23
140:24 146:9
171:17 172:18
184:22 199:13
248:17 253:12
253:14 261:21
265:8 270:8,22
285:10,11,18

285:22 289:12
289:23 312:9
361:10 365:13
371:2 375:20
379:15
**tying** 267:23
352:8 435:13
442:20
**type** 40:10
81:19 123:13
142:2 157:4
192:22 232:3
298:23 312:11
317:21 402:19
**typed** 252:24
**typewriting**
467:11
**typical** 225:17
**typically**
189:23 195:8
**typing** 17:25

**u**

**u.s.** 108:10
**ubs** 8:9 335:3
**ugo** 124:5
**uh** 18:8 32:13
70:11 83:16
98:12 120:4
137:2 149:16
150:11 166:13
171:20 185:6
186:3 207:24
252:3 253:8
308:21 354:23
355:24 444:22

448:11
**ultimate**
372:18 443:20
**ultimately**
76:16 77:4
80:4 94:2
108:8 109:24
172:6 196:12
240:11 380:9
**ultra** 68:7
73:24 74:6
**un** 115:20
334:4,4
**unable** 47:14
91:11 211:5
312:10 371:22
**unauthorized**
224:14 225:20
225:20 226:20
**unaware** 50:4
131:9 384:5
405:10 464:5
**uncomfortable**
298:5 382:10
387:25
**uncovered**
436:13 464:2
**under** 17:12
35:15 45:3
99:14 111:3
125:2 195:2
201:9 208:4
211:17 214:7
233:15 275:17
279:8,21 280:7

281:20,23
282:8 295:21
308:2,7 309:13
311:10,21
314:13 342:16
365:7 415:22
459:2 465:20
467:11
**underlying**
123:3
**understand**
17:11,16,20
18:20 21:10
22:15 23:9
29:18 30:15,20
33:16 44:25
51:13 74:5,11
74:17 77:17
88:8 92:3,18
98:17 101:2
102:3 106:15
109:5 122:24
134:5 138:7
143:17,17
157:2 167:4
182:22 202:21
203:2 209:14
219:10 220:2
222:5 225:10
228:8 234:20
246:15,21
257:2 273:9
288:19 290:12
302:9 304:24
309:4,13,25

310:15 311:2
322:4 327:4
330:2 333:9
337:15 343:19
344:15,20
345:5 347:18
349:6,17
352:11 360:3,4
361:5 363:4
374:23 380:6
380:10,15
385:18,25
396:24 417:24
421:15 431:8
436:21 455:13
456:12 459:10
461:18
**understanding**
26:16 28:25
62:2 67:16
75:3 79:9 80:3
109:23 138:21
164:11 180:4
185:12 186:12
192:8,20
194:20 195:2
244:16 308:11
312:3 323:5
343:6 351:9
374:12
**understands**
193:7
**understatement**
413:24 414:4

**understood**
17:22 18:9
38:19 42:13
43:11 59:23
74:19 77:24
96:24 98:19
99:14 105:20
144:8 185:7
220:6 232:10
232:13 234:22
242:2 245:9
259:15 293:12
**undertake**
102:9
**undertook**
309:15 439:16
**undisclosed**
461:6 463:16
**unexpected**
263:16
**unexplained**
355:2
**unfolded**
392:14 432:15
**unicorn** 1:9
458:9
**unique** 100:3
100:11 149:23
155:21 267:21
**unit** 12:14
56:13
**united** 1:2
12:18 200:5
**university**
31:14,16,22

32:4,11,15
**unknown** 304:6
  406:2
**unneeded**
  318:2
**unquote** 456:19
**unsolicited**
  137:12
**unspoken**
  378:15
**unsure** 174:11
  185:15
**unusual** 455:24
  458:6
**upcoming**
  145:14
**update** 37:15
  97:20
**updated** 38:10
  53:25 352:22
**upset** 76:12
  221:22 223:19
  302:5,6 399:22
  401:7 421:10
**upwards** 59:6
**urgent** 300:10
  300:11
**use** 92:11 107:6
  114:19 116:2
  132:13 156:14
  251:18 337:7
  337:22 362:4,9
  408:3 419:8
  455:2,6

**used** 85:21
  116:12 129:13
  171:5,10,11
  175:13 253:2
  280:25 333:2
  336:2,4 337:3
  337:20,22
  338:20 383:5
  392:22 442:14
  466:11 468:19
**uses** 114:24
**using** 108:17
  114:23 138:12
  179:20 355:17
**usually** 155:21
  211:23
**utilizing** 128:22
  457:5 458:20
  459:3
**utter** 302:14
**utterly** 296:17

**v**

**v** 1:5 12:17
  468:4 469:1
  470:1
**vague** 85:7,18
  85:19 100:20
  115:9 310:2
**valuation** 457:8
**value** 208:22
  378:14 400:4
  402:3 405:7,12
**valued** 295:10
**variables** 304:7
  429:6

**variety** 89:19
**various** 133:9
  220:12 259:16
  264:2 293:9
  337:7,22
  338:16 341:14
  384:21 403:18
  433:3
**vegan** 243:21
**vehicle** 48:19
  48:22 51:15
  53:9 59:13,14
  60:2 77:11
  97:3 113:20
  114:8 147:12
  177:2,4,5,17
  307:2 409:22
**vehicles** 45:7
  45:21 46:13
  47:24 48:8,12
  48:16,23 49:7
  49:12,19,22
  50:22 51:6
  57:24 58:22,24
  61:5 63:6
  67:14 75:6
  78:8 84:21
  87:14 91:8,18
  94:4 107:21
  151:20 316:19
**vein** 296:21
**vendor** 286:7
**vendors** 108:2
  108:6,18,20,23
  109:2 114:4

117:15,19
  119:5 195:6
  210:4 211:23
  213:18 215:7
  325:18
**venture** 83:14
  84:6,16 303:18
**ventures** 29:9
  128:19 129:2
**verbal** 18:7
  163:3 195:2
  301:10,21
  319:10
**verbally** 376:14
  386:11
**verbatim**
  250:22
**verify** 468:9
**veritext** 13:4,7
  466:12 468:14
  468:23
**veritext.com**
  468:15
**vermeersch**
  123:9,18
**version** 196:13
  199:22
**versus** 303:16
  345:14
**vesting** 299:5
**vetted** 107:10
**viable** 83:14
  84:7,17
**video** 12:11,15
  90:4,4 147:6

| | | | |
|---|---|---|---|
| 466:14 | **visit** 51:22 | 90:1 91:1 92:1 | 163:1 164:1 |
| **videographer** | **visiting** 439:2 | 93:1 94:1 95:1 | 165:1 166:1 |
| 3:22 12:2 13:5 | **vividly** 260:5 | 96:1 97:1 98:1 | 167:1 168:1 |
| 14:19 78:20 | 444:13 | 99:1 100:1 | 169:1 170:1 |
| 79:2 165:24 | **void** 94:10 | 101:1 102:1 | 171:1 172:1 |
| 166:5 229:21 | **volume** 1:1,13 | 103:1 104:1 | 173:1 174:1 |
| 264:9,15 | 2:1,5 3:1 4:1 | 105:1 106:1 | 175:1 176:1 |
| 366:23 367:4 | 5:1 6:1 7:1 8:1 | 107:1 108:1 | 177:1 178:1 |
| 449:5,10 | 9:1 10:1 11:1 | 109:1 110:1 | 179:1 180:1 |
| 465:25 466:5 | 12:1 13:1 14:1 | 111:1 112:1 | 181:1 182:1 |
| 466:16 | 15:1 16:1 17:1 | 113:1 114:1 | 183:1 184:1 |
| **videos** 150:15 | 18:1 19:1 20:1 | 115:1 116:1 | 185:1 186:1 |
| 161:16 | 21:1 22:1 23:1 | 117:1 118:1 | 187:1 188:1 |
| **videotape** 1:12 | 24:1 25:1 26:1 | 119:1 120:1 | 189:1 190:1 |
| 2:5 | 27:1 28:1 29:1 | 121:1 122:1 | 191:1 192:1 |
| **view** 54:4,5,15 | 30:1 31:1 32:1 | 123:1 124:1 | 193:1 194:1 |
| 54:25 103:16 | 33:1 34:1 35:1 | 125:1 126:1 | 195:1 196:1 |
| 104:7 143:8 | 36:1 37:1 38:1 | 127:1 128:1 | 197:1 198:1 |
| 151:23 152:3 | 39:1 40:1 41:1 | 129:1 130:1 | 199:1 200:1 |
| 208:20 254:7 | 42:1 43:1 44:1 | 131:1 132:1 | 201:1 202:1 |
| 305:7 320:7,8 | 45:1 46:1 47:1 | 133:1 134:1 | 203:1 204:1 |
| 390:19 414:4 | 48:1 49:1 50:1 | 135:1 136:1 | 205:1 206:1 |
| 425:12,16 | 51:1 52:1 53:1 | 137:1 138:1 | 207:1 208:1 |
| **viewed** 53:5 | 54:1 55:1 56:1 | 139:1 140:1 | 209:1 210:1 |
| 76:5 103:7,7 | 57:1 58:1 59:1 | 141:1 142:1 | 211:1 212:1 |
| 110:2 156:18 | 60:1 61:1 62:1 | 143:1 144:1 | 213:1 214:1 |
| 211:3 262:10 | 63:1 64:1 65:1 | 145:1 146:1 | 215:1 216:1 |
| 305:6,10 | 66:1 67:1 68:1 | 147:1 148:1 | 217:1 218:1 |
| 462:24 | 69:1 70:1 71:1 | 149:1 150:1 | 219:1 220:1 |
| **views** 103:6 | 72:1 73:1 74:1 | 151:1 152:1 | 221:1 222:1 |
| 191:14 | 75:1 76:1 77:1 | 153:1 154:1 | 223:1 224:1 |
| **villa** 426:18 | 78:1 79:1 80:1 | 155:1 156:1 | 225:1 226:1 |
| **vision** 7:20 | 81:1 82:1 83:1 | 157:1 158:1 | 227:1 228:1 |
| 209:20 271:15 | 84:1 85:1 86:1 | 159:1 160:1 | 229:1 230:1 |
| 271:25 | 87:1 88:1 89:1 | 161:1 162:1 | 231:1 232:1 |

| 233:1 234:1 | 303:1 304:1 | 373:1 374:1 | 443:1 444:1 |
| 235:1 236:1 | 305:1 306:1 | 375:1 376:1 | 445:1 446:1 |
| 237:1 238:1 | 307:1 308:1 | 377:1 378:1 | 447:1 448:1 |
| 239:1 240:1 | 309:1 310:1 | 379:1 380:1 | 449:1 450:1 |
| 241:1 242:1 | 311:1 312:1 | 381:1 382:1 | 451:1 452:1 |
| 243:1 244:1 | 313:1 314:1 | 383:1 384:1 | 453:1 454:1 |
| 245:1 246:1 | 315:1 316:1 | 385:1 386:1 | 455:1 456:1 |
| 247:1 248:1 | 317:1 318:1 | 387:1 388:1 | 457:1 458:1 |
| 249:1 250:1 | 319:1 320:1 | 389:1 390:1 | 459:1 460:1 |
| 251:1 252:1 | 321:1 322:1 | 391:1 392:1 | 461:1 462:1 |
| 253:1 254:1 | 323:1 324:1 | 393:1 394:1 | 463:1 464:1 |
| 255:1 256:1 | 325:1 326:1 | 395:1 396:1 | 465:1 466:1 |
| 257:1 258:1 | 327:1 328:1 | 397:1 398:1 | 467:1 |

**w**

**waft** 126:23 265:11 270:14 270:15,16

**wage** 1:24 2:10 13:7 467:3

**wait** 133:15 186:17 258:22 360:23

**waiting** 163:23 306:16,25 307:14

**waking** 101:12 101:15 115:10

**waldo** 3:8 14:9 14:9

**walk** 360:20 364:10 439:4 451:24

**walked** 365:21

**wall** 65:17 68:6 68:11 69:23

| 259:1 260:1 | 329:1 330:1 | 399:1 400:1 |
| 261:1 262:1 | 331:1 332:1 | 401:1 402:1 |
| 263:1 264:1 | 333:1 334:1 | 403:1 404:1 |
| 265:1 266:1 | 335:1 336:1 | 405:1 406:1 |
| 267:1 268:1 | 337:1 338:1 | 407:1 408:1 |
| 269:1 270:1 | 339:1 340:1 | 409:1 410:1 |
| 271:1 272:1 | 341:1 342:1 | 411:1 412:1 |
| 273:1 274:1 | 343:1 344:1 | 413:1 414:1 |
| 275:1 276:1 | 345:1 346:1 | 415:1 416:1 |
| 277:1 278:1 | 347:1 348:1 | 417:1 418:1 |
| 279:1 280:1 | 349:1 350:1 | 419:1 420:1 |
| 281:1 282:1 | 351:1 352:1 | 421:1 422:1 |
| 283:1 284:1 | 353:1 354:1 | 423:1 424:1 |
| 285:1 286:1 | 355:1 356:1 | 425:1 426:1 |
| 287:1 288:1 | 357:1 358:1 | 427:1 428:1 |
| 289:1 290:1 | 359:1 360:1,5 | 429:1 430:1 |
| 291:1 292:1 | 361:1 362:1 | 431:1 432:1 |
| 293:1 294:1 | 363:1 364:1 | 433:1 434:1 |
| 295:1 296:1 | 365:1 366:1 | 435:1 436:1 |
| 297:1 298:1 | 367:1 368:1 | 437:1 438:1 |
| 299:1 300:1 | 369:1 370:1 | 439:1 440:1 |
| 301:1 302:1 | 371:1 372:1 | 441:1 442:1 |

70:15,17,18
267:25
**wallet** 215:20
**want** 30:14
41:2 47:20
59:7 61:25
70:16,21 91:21
96:14 99:5
105:4,16
109:12 112:7
120:6 122:10
122:22 123:5
125:5 130:15
134:4 135:19
136:21 149:13
156:5,5,5,6
161:5 164:8
166:15,16
168:13 173:10
180:6,7 181:10
182:2,12
190:19,22
192:10 206:11
219:7 221:12
224:21 225:9
225:21 228:8
230:16 238:15
238:24 239:3,4
239:15 240:9
241:15,22
246:3 256:10
258:24 271:2
273:10 278:15
279:11 287:24
290:19 296:20

309:4,11
313:10 318:21
325:5 328:18
345:16 347:20
349:25 355:7
357:4 364:22
364:25 380:3
383:9,10
394:10,11
427:25 430:14
431:8,24 432:3
433:25 437:8
437:22,25
438:21,24,24
439:13,17,21
439:23 441:8
442:25 447:3
449:3 450:6
451:14,15,21
453:11 456:5,6
456:21 459:15
460:4 462:13
462:13
**wanted** 53:20
80:24 138:18
139:10 149:20
160:17,20
181:15 194:9
208:22 231:12
246:20 263:8
290:5 298:3
300:18 313:10
365:11 378:21
382:13 386:20
399:12 411:2

416:23 424:17
429:23
**wants** 180:23
181:5 203:23
376:7 387:2
393:23 395:3
**warlord** 73:17
**waste** 134:6
256:10 366:4
**wasting** 158:8
**watch** 69:7
**watching**
269:21
**water** 78:14
147:24
**way** 21:25
22:20 64:17
65:8 80:25
87:18 92:24
94:24 95:21
96:16 110:3
143:8 145:20
156:18 168:15
219:3 263:13
280:6 303:16
305:6 333:10
345:22 378:16
395:16 396:8
410:24 416:19
417:7 421:6
432:3 435:4
443:4 467:22
**ways** 399:8,9
416:10

**we've** 39:21
47:7 83:9
192:3 347:4
357:24 358:17
358:18,19,20
365:13,21
465:12
**wear** 146:12
206:2,11
**wearing** 209:22
**web** 104:19
464:19
**webb** 435:12
**webb's** 436:4
436:11 442:19
450:10
**website** 4:13
27:6,13,13,21
433:20 435:11
436:11
**wednesday**
25:19,24
**week** 101:18
165:4 352:20
**weeks** 254:8
302:25 398:15
427:23 428:2
**weight** 220:8
**weng** 1:8
**went** 21:9
22:14 32:17
46:5 80:18
109:23 177:5,6
177:13 200:13
327:3 340:20

**[went - work]**

426:21 427:10
427:13
**werner** 3:14
4:4 13:22,23
15:12,19 20:19
21:5,15,25
26:24 27:15,18
44:7 52:18
62:23 66:8
69:10 82:8
92:15 93:15
120:11 130:9
145:3 153:2,10
154:13 165:17
165:23 177:23
184:6,9 229:17
229:20,25
230:5,8 231:4
238:18,23
239:15 240:8
240:22 241:4,7
241:9 247:12
247:21 255:18
256:3 260:16
260:18 264:6
271:23 294:21
301:16,20,25
302:9,13,18
320:4 328:3
329:7 334:24
338:24 345:3
345:15 347:12
350:15 351:22
355:24 361:2,7
361:14,17

362:8 363:10
363:20 364:6
365:3,12,20
366:7,10,21
410:12 438:21
447:16 448:25
458:3 459:5,20
462:12 465:5
466:3
**west** 74:23
379:18 381:9
383:19 419:12
424:22 425:15
**whatsapp** 4:16
4:20 5:4,13
6:12 7:4,8 9:12
9:16,19 10:4,7
133:3 139:20
140:11 144:22
154:8 205:8
247:25 257:16
372:22 388:7
401:18 406:16
411:23
**whatsapp's**
306:9 391:14
**whatsoever**
280:3
**wheel** 152:13
**wife** 224:2
266:8 341:2
405:21,24
406:7
**wigger** 3:14
13:25,25 14:15

**wigger's**
466:20
**willing** 233:13
233:14
**willingness**
272:8
**willpower**
415:22
**wills** 377:25
**wind** 272:6,11
**wire** 8:9 335:3
335:10,25
338:19
**wish** 135:7,14
150:10 290:11
294:10
**wished** 404:4
**wishes** 416:15
**wishing** 253:25
**withdrawal**
340:13
**withhold**
402:18
**witness** 4:3
11:6 14:21
15:2 23:6 53:2
120:7 147:23
148:2,15
157:25 158:12
164:10 168:19
169:16 191:2
196:8 205:19
214:20 221:9
232:10,13
273:22 274:18

294:19,25
301:19 310:11
355:10 361:16
364:12 373:6
379:24 388:15
412:15 448:11
467:4,10 468:8
468:10,12,18
**woman** 426:24
**women** 152:4
**wondering**
62:10 374:25
**wong** 290:4
385:13
**woo** 132:16
**word** 43:18
44:11 85:21
164:16 182:7
182:19 194:15
280:20,23
281:6,11
296:25 302:7
309:8 383:5
**words** 70:12,13
185:24 192:15
246:4,18 247:8
247:11,16,19
251:25 378:15
385:19 408:3
410:16 411:8
417:25 421:13
445:15 456:7
**wore** 204:15
**work** 31:5
32:10,17 36:9

39:3,5 42:18
54:25 55:14,16
65:4 75:17,22
78:7 81:20
87:2 92:3 97:2
97:16 103:12
121:5 124:20
125:24 126:13
127:3,5 130:13
132:2 147:16
192:11 193:9
228:17 254:11
266:8 281:21
282:9 283:21
284:6 291:11
359:8 369:9
389:2 394:19
394:24 429:5
444:16 445:4
465:18
**worked** 33:7
39:2 44:12
55:4 97:7
102:4 104:21
112:2 126:14
210:25 263:17
371:7
**working** 34:17
35:21 37:2,7
77:14 79:19
88:10 89:3
91:7 96:25
101:11,17
111:3,23
112:22 113:12

123:22 124:11
141:7 142:12
147:7 156:11
157:13,16
163:8 268:25
272:7 284:7
285:8,20
286:18 287:2
291:3,6 311:18
330:4 385:5,16
405:11 419:18
448:7,9
**world** 48:4
50:21 53:9,23
55:3,3,4,15
113:8 131:4
151:8 157:15
298:10 421:16
**worry** 192:3
**worth** 68:7
73:24,24 74:7
347:10
**write** 137:14
141:9,22
182:14,21
185:13 186:16
191:25 206:13
210:13 219:7
251:10 261:12
261:16 262:2,7
262:15,19
267:12 270:19
297:17 315:15
316:9 317:8
355:25 382:21

385:20 387:22
388:23 391:9
408:21 409:12
411:5 412:12
420:14 421:18
**writers** 124:19
126:24
**writes** 141:15
143:16 144:5
206:14 216:11
**writing** 46:10
194:20 220:18
229:12 257:10
260:2 288:15
293:14 299:15
299:19,25
315:7 316:22
319:23 322:2
322:17 325:21
351:16 353:20
356:4,6 357:7
357:16 358:2,5
358:9 376:12
376:15,22
414:9 424:4
438:10
**written** 112:6
252:17,18,19
265:4 287:17
287:21,23
297:5 298:16
312:18 314:11
319:13 325:14
361:25 410:8

**wrong** 109:24
334:20 375:23
**wrongdoing**
444:3 445:15
446:6 447:5,7
448:8 449:16
451:17,22
452:4 453:19
455:17,20
456:8,19,23
457:17 459:11
460:7,15,18,25
461:13,20,23
462:17,21
463:6,25 464:9
**wrote** 262:8
267:6 270:5
373:13,19
385:19,25
389:20 390:10
410:5,18
415:17 418:4

**x**

**x** 4:2,6 5:2 6:2
7:2 8:2 9:2
10:2 315:17
467:14

**y**

**y** 315:17
**yacht** 451:8,12
462:16,18
**yama** 87:22
286:23

**yards**  3:4 15:6
16:11 455:4,7
456:2
**yeah**  29:12
32:2 35:17
39:9 46:17
49:24 51:18
52:7 59:16
62:7 64:19
71:13 72:13
73:9 76:21
78:12 82:7
85:18 96:12
99:9 106:8
109:20 110:11
120:11 122:21
135:4 138:20
140:25 141:2
146:6 147:25
152:8 156:13
158:15 159:2,4
159:8 163:16
164:10 165:22
170:12 171:4
172:23 176:2
189:3 196:2,11
199:16 201:16
201:21 206:10
207:10,14
213:7 229:20
229:23 239:15
240:8 249:2,23
253:13 254:19
256:10 260:16
260:20 266:6

271:4,6 272:24
273:24 280:21
281:4 282:2,5
297:15 304:4
310:25 312:16
313:25 321:4
324:4 328:19
330:12 339:16
340:15 341:20
341:21 353:3
353:17 354:5
368:19 370:13
383:9 391:20
396:18 405:2
410:19 411:3
413:22 414:8
419:8 431:7
438:4 440:22
446:11 448:23
454:9
**year**  38:12
165:6 277:7
307:24 313:15
316:24 420:11
**years**  58:18,19
73:21 83:13
84:5 129:24
210:25 219:13
266:9 301:4,6
303:2 307:16
313:8 320:16
347:10 362:17
435:4 442:23
**yoko**  87:21
286:23

**york**  1:2,14,14
2:8,8,14 3:5,5
3:11,11 12:20
13:2,2 15:6,6
16:17,19 69:4
173:23,23,25
181:19 243:2
367:25 369:5
373:17 389:7
413:11 420:24
427:14 460:6
**young**  51:8
113:3
**yup**  197:10
243:18 355:10

**z**

**z**  315:18
**zach**  3:7 14:5,5
22:5 27:17
38:13 43:22
44:3,14 49:23
50:11 51:16
54:20 55:6
60:9 61:20
65:9 69:8
73:15,19 75:13
78:19 82:16,23
90:22 92:10
93:7 95:23
96:9 106:7
116:21 118:10
120:9 121:8
122:14 130:11
132:18 134:25
135:10,12

137:18 140:23
142:10,16
143:19 147:18
147:25 148:3
152:6 153:8,11
157:24 158:9
162:14 163:13
164:9 165:22
167:18 176:16
177:21 182:17
184:8,11
189:17 192:12
194:5 195:20
206:22 221:5,7
221:10,16
226:8 229:14
229:18,23
230:3,7 231:3
232:8,11
235:21 236:2
236:12,19
237:19 238:9
238:20 239:5
239:11,17
240:19,23
241:5 244:19
247:6 251:12
254:5 255:2,16
255:23 256:17
257:6,11
258:22 260:4
260:14,17
264:3,8 266:3
268:12 270:9
270:24 271:21

**[zach - zoom]**                                          Page 103

272:20 273:6                461:16,24
273:12,24                   462:9 463:8
279:2 287:19                465:24 466:4
294:18,24                   468:1
297:7,19                    **zach's**  466:17
298:18 301:5                **zeigler**  285:13
301:13,17,21                **zoom**  193:17
302:6,12,15
303:6 305:3
312:22 313:23
315:9,19
317:11,18,24
319:6 320:2
321:2,19
322:19 324:3
325:17 327:16
329:5 343:9
344:24 345:7
347:2,8 349:18
352:25 355:7
355:19 358:11
358:23,25
360:22 361:4
361:11,15,21
363:6,13,24
364:19 365:4
365:16 366:6,9
410:10,13
419:6 438:2
440:12 441:14
446:8 447:11
447:17 448:3
448:18 453:24
456:10 457:24
459:12 460:3

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 471

```
1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
2     Case No. 23-cv-4305(AS)
      - - - - - - - - - - - - - - - - - -x
3     RYAN BERRIS,                        :
                                          :
4                        Plaintiff, :
                                          :
5             - vs -                      :
                                          :
6     SUNG-FUN CHOI, et al,               :
                                          :
7                        Defendants. :
      - - - - - - - - - - - - - - - - - -x
8
9                             September 23, 2024
                              1:20 p.m.
10                            30 Rockefeller Plaza
                              New York, NY
11
12
13
14
15                   ***VOLUME II***
16
17
18
19
20          CONTINUED VIDEOTAPED DEPOSITION UPON
21    ORAL EXAMINATION OF RYAN BERRIS, held at the
22    above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25
```

R. Berris

Page 472

```
 1    APPEARANCES:
 2               BOIES SCHILLER FLEXNER, LLP
               Attorneys for Plaintiff
 3
               55 Hudson Yards, 20th Floor
 4             New York, New York 10001
 5             BY:  DAVID SIMONS, ESQ.
                   SOPHIE ROYTBLAT, ESQ.
 6
 7
               SHEPPARD MULLIN LLP
 8             Attorneys for Defendants
 9             2099 Pennsylvania Ave. NW
               Suite 100
10             Washington, D.C. 2006
11             BY:  PAUL A. WERNER, ESQ.
                   HANNAH WIGGER, ESQ.
12                 ALEXANDRA BUSTAMANTE, ESQ.
13                      * * *
14
15
16
17
18
19
20    ALSO PRESENT:
21               Bob Rudis - Videographer
               Norman Choi
22             Diana Majcher
23
24
25
```

R. Berris

Page 473

1              STIPULATIONS

2              IT IS HEREBY STIPULATED AND AGREED, by

3     and among counsel for the respective parties

4     hereto, that the filing, sealing and

5     certification of the within deposition shall be

6     and the same are hereby waived;

7              IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to form of the

9     question, shall be reserved to the time of the

10    trial;

11             IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be signed before

13    any Notary Public with the same force and effect

14    as if signed and sworn to before the Court.

15                         *  *  *

16

17

18

19

20

21

22

23

24

25

R. Berris

Page 474

```
 1              MR. VIDEOGRAPHER:  Good morning.
 2      We are going on the record at 13:20,
 3      September 23rd, 2024.  Please note the
 4      microphones are sensitive and may pick up
 5      whispering and private conversations.
 6      Please mute your mobile phones at this time.
 7      Audio and video recording will continue to
 8      take place unless all parties agree to go
 9      off the record.  This is Media Unit 1 of the
10      video-recorded deposition of Ryan Berris
11      taken by counsel for defendants in the
12      matter of Ryan Berris versus Sung-Fung Choi,
13      et al, filed in the United States District
14      Court, Southern District of New York, Case
15      No. 23-cv-4305(AS).  The location of the
16      deposition is Sheppard Mullin, LLP, 30
17      Rockefeller Plaza, New York, New York.
18              My name is Robert Rudis.  I'm the
19      videographer.  The court reporter is Randi
20      Friedman, and we represent the firm,
21      Veritext Legal Solutions.  I'm not related
22      to any party in this action, nor am I
23      financially interested in the outcome.
24              If there are any objections to
25      proceeding, please state them at the time of
```

R. Berris

                                              Page 475

1       your appearance.  Counsel and all present

2       will now please state their appearances and

3       affiliations for the record, beginning with

4       the noticing attorney.

5                    MR. WERNER:  Paul Werner for the

6       defendants.

7                    MS. WIGGER:  Hannah Wigger for

8       defendants.

9                    MS. BUSTAMANTE:  Alexandra

10      Bustamante for defendants.

11                   MS. WIGGER:  We are joined by our

12      client representatives, Norman Choi and

13      Diana Majcher.

14                   MR. SIMONS:  David Simons on

15      behalf of the plaintiff, Ryan Berris.  I'm

16      joined by my colleague, Sophie Roytblat.

17                   MR. VIDEOGRAPHER:  Would the court

18      reporter please swear in the witness and

19      then counsel may proceed.

20                           * * *

21                   RYAN BERRIS, the witness herein,

22      after first having been duly sworn, was

23      examined and testified as follows:

24                           * * *

25

R. Berris

1                    CONTINUED EXAMINATION

2      BY MR. WERNER:

3          Q      Welcome back, Mr. Berris.

4          A      Thank you.

5          Q      Did you do anything to prepare for

6      today's deposition?

7          A      Yes.  I reviewed the, I think, the

8      subpoena for the 30(b) if that's right, 30(b)(6)

9      or something along those lines, yes.  And then

10     reread the Amended Complaint.

11         Q      Who's "we"?

12         A      I said I reread.  Not "we."

13         Q      You reread.

14         A      I reread.  Sorry.

15         Q      Okay.  Anything else?

16         A      In preparation, I met with my

17     attorneys briefly.  Nothing else.

18         Q      Okay.  When did you meet with your

19     attorneys?

20         A      I met with them yesterday.

21         Q      For how long?

22         A      In preparation I would say for this,

23     no more than an hour.

24         Q      Okay.  Other than meeting with your

25     lawyers, and I don't want you to go into the

R. Berris

Page 477

1    substance of your communications with your

2    lawyers, did you discuss your prior deposition

3    testimony with anyone else?

4         A    I did not.

5         Q    Did you discuss the deposition

6    testimony of any other witness?

7         A    I did not.

8         Q    Okay.  So that would mean that you did

9    not talk to your sister about her deposition?

10        A    I did not talk to my sister about

11   anything of the substance of her deposition, no.

12        Q    Did you talk to her about your

13   deposition?

14        A    I did not, no.

15        Q    Okay.  You said you reread your

16   Amended Complaint; is that right?

17        A    Correct.

18        Q    And why did you do that?

19        A    Just to be as prepared as I could for

20   today.

21        Q    Okay.  So do you recall in your

22   Amended Complaint that you allege that Tom Kim

23   was CEO of De Tomaso?

24        A    Yes.

25        Q    Okay.  What is the factual basis for

R. Berris

Page 478

1    that statement?

2                    MR. SIMONS:  Objection to form.

3    BY MR. WERNER:

4         Q    That allegation?

5         A    Mr. Choi provided me his business

6    cards showing Tom Kim as CEO.  And also there

7    were a lot of public publications when Tom Kim

8    was operating as CEO to De Tomaso Pantera.

9                    THE WITNESS:  I can spell it if

10        you need to.

11                   MR. SIMONS:  Maybe just try to

12        slow down a little bit --

13                   THE WITNESS:  Sure.

14                   MR. SIMONS:  -- so the court

15        reporter can keep up.

16   BY MR. WERNER:

17        Q    Did you finish your answer?

18        A    Yes.

19        Q    Okay.  To the best of your

20   recollection, did you ever see an organization

21   chart with Tom Kim reflected as CEO?

22        A    I did not.

23        Q    And you would agree with me, we looked

24   at the LLC Agreement earlier.

25                   You would agree with me that he's not

R. Berris

Page 479

1    reflected in the LLC Agreement; is he?

2                    MR. SIMONS:  Objection to form.

3          Please just make sure you wait so I can get

4          the objections.  Objection to form.

5                    THE WITNESS:  It's not possible

6          that he could be reflected then, because the

7          entity was formed after.

8    BY MR. WERNER:

9          Q    Okay.  Do you recall in your Amended

10   Complaint alleging that Diana Majcher managed the

11   finances of various other Choi companies?

12         A    Yes.

13         Q    Which companies?

14         A    From what I was informed by Mr. Choi,

15   Diana was acting as like a private

16   financial/operational consultant for Mr. Choi

17   related to Apollo, De Tomaso and other

18   Choi-related businesses.

19         Q    I asked you specifically which

20   companies.

21              Can you please provide me the list of

22   which companies?

23         A    So the only ones that I would know

24   offhand that I was aware of by name would be

25   Apollo Automobil and De Tomaso Automobili.  Ideal

R. Berris

Page 480

1    Team Ventures.  And I assumed at the time that

2    Diana was doing this for Pachmar Limited, because

3    during my time at Apollo De Tomaso, I was

4    informed by Mr. Choi that that was his entity.

5         Q    Okay.  So that was an assumption that

6    you made, is that fair, based on what you just

7    testified?

8                   MR. SIMONS:  Objection to form.

9                   THE WITNESS:  I'm just --

10                   MR. WERNER:  What's the basis of

11         your objection?

12                   MR. SIMONS:  Sorry?

13                   MR. WERNER:  What's the basis of

14         your objection?

15                   MR. SIMONS:  Just the use of the

16         word "assumption" is a vague term.

17                   MR. WERNER:  It's the term that he

18         used in his testimony.

19                   MR. SIMONS:  I'm allowed to state

20         objections for the record.

21                   MR. WERNER:  You can.  I want to

22         know what they are so I can correct my

23         question if there's an issue.

24                   MR. SIMONS:  Understood.

25                   MR. WERNER:  If you want to make

R. Berris

Page 481

1    bogus objections and waste my time, that's

2    fine.

3  BY MR. WERNER:

4    Q    Going back to your use of the word

5  "assumption," did you make an assumption that Ms.

6  Majcher was involved in the -- managing the

7  various finances of Pachmar?

8                MR. SIMONS:  Objection to form.

9                THE WITNESS:  I said that because

10        I was aware of multiple payments that were

11        processed for Pachmar, and Diana was usually

12        the one that was processing those payments

13        on behalf of Mr. Choi.

14  BY MR. WERNER:

15    Q    Which payments?

16    A    So Pachmar, to the best of my

17  recollection during my time at Apollo/De Tomaso

18  was used to purchase engines from a friend of

19  mine in Florida for the Apollo.  It was used to

20  purchase an Apollo IE.

21    Q    Anything else?

22    A    That's all I can recall offhand.

23    Q    With respect to the companies that you

24  mentioned, Apollo, De Tomaso, Ideal Team Ventures

25  and Pachmar, what is the factual basis for your

R. Berris

Page 482

1      understanding that Ms. Majcher managed the

2      finances of those companies?

3           A      From what I can recall, is that Diana

4      used to work for Sunwah Kings Way.

5                     THE WITNESS:  I can spell it if

6           you need me to.  S-U-N-W-A-H.  And then the

7           second word is Kings, K-I-N-G-S, W-A-Y.  And

8           then Norman told me that Diana had left

9           Sunwah Kings Way to work for him in a

10          personal capacity.

11     BY MR. WERNER:

12          Q      Okay.  So other than what Norman told

13     you, are there any other factual bases for your

14     allegations?

15          A      Pertaining to that she was controlling

16     the finances?

17          Q      Yes.

18          A      Just from what I experienced at my

19     time, that Diana was typically the one that

20     processed payments.

21          Q      Okay.  You also allege that "Over

22     time, Berris would see that Majcher would

23     subordinate her fiduciary duties to Apollo and

24     later De Tomaso to advance Choi's personal

25     interests"; do you recall that allegation?

R. Berris

Page 483

1          A     Yes.

2          Q     What interests specifically were

3     subordinated?  I'm sorry.  I'm sorry.

4                Which personal interests of Choi's are

5     you referencing in your allegation?

6          A     So this would be after the sale of

7     Apollo to We Solutions, W-E, and then second

8     word, Solutions.  So after the sale of Apollo to

9     We Solutions, Diana was working for the

10    newly-formed company AFMG, which stands for the

11    Apollo Future Mobility Group.  And after the

12    acquisition was completed, there was a discussion

13    between Apollo and De Tomaso about a Licensing

14    Agreement, whereby Apollo would agree to fund the

15    development of a homologated rolling chassis for

16    future road cars, and that De Tomaso would be the

17    licensee and pay Apollo a fee based on those.

18                And what I witnessed at the time is

19    that Diana was basing on both sides of the deal

20    terms, and the final deal terms for the Licensing

21    Agreement were far in favor of De Tomaso than it

22    was for the Apollo.

23         Q     Mr. Berris, I didn't ask you what you

24    witnessed.  I asked you what interests; okay?

25    We're in Day 2 of your deposition, largely in

R. Berris

Page 484

1    part because you refuse to answer questions.

2    This is going to be a very, very long day.  I'm

3    doing my best to get us out of here in an

4    efficient way, and I would appreciate it if you

5    please just answer my questions.

6                    MR. SIMONS:  Paul --

7                    MR. WERNER:  Let me try this

8        again.

9    BY MR. WERNER:

10       Q     The only interest that you mentioned

11   in your prior answer was AFMG.

12             Are there any other specific interests

13   that you were referencing there in your

14   allegation?

15                   MR. SIMONS:  Objection to form.

16                   THE WITNESS:  Mr. Choi's interest

17       in having favorable terms for De Tomaso at

18       the time that Ms. Majcher was an executive

19       officer for AFMG.

20   BY MR. WERNER:

21       Q     Okay.  And how did Ms. Majcher

22   subordinate her financial duties to Apollo to

23   advance Choi's interest exactly?

24       A     She was the one that was drafting, and

25   then was the signator on both Apollo's side, from

R. Berris

Page 485

1    what I can recall, and on De Tomaso's side.

2        Q    Anything else?

3        A    At the time, I was not aware of

4    anything else.  I became aware further after my

5    departure.

6        Q    What did you become aware of after?

7        A    Certain orders that were placed using

8    Pachmar Limited to satisfy the acquisition by

9    Resolutions of Apollo.

10       Q    When you say you became aware of these

11   later, is that as a result of discovery in this

12   case?

13       A    I was aware that Pachmar was a client

14   of Apollo that was listed, but Mr. Choi told me

15   that that was his entity.  I did not find out

16   that that was not his entity until this lawsuit.

17       Q    Okay.  In terms of the subordination

18   of financial duties by Ms. Majcher, whether with

19   respect to Apollo or De Tomaso, did you discuss

20   that issue with anyone at De Tomaso?

21       A    The only people at De Tomaso at that

22   time were Mr. Choi and myself.

23       Q    Do you understand that didn't answer

24   my question?

25               MR. SIMONS:  Ryan, just take a

R. Berris

Page 486

```
1          beat.  Try to listen to the question and
2          just try to answer it.  But if you're able
3          to answer it yes or no, please just try to
4          do that.
5                    THE WITNESS:  Okay.  Would you
6          mind just restating the question?
7                    MR. WERNER:  Can you read it back,
8          please?  I can do it.  That's fine.  I can
9          do it.
10   BY MR. WERNER:
11        Q    The question was, with respect to your
12   allegation about Ms. Majcher subordinating her
13   financial duties to Apollo and De Tomaso, did you
14   ever discuss that with anyone at De Tomaso?
15        A    It would only be Mr. Choi.
16        Q    So, yes, you did?
17        A    Yes.
18        Q    And what did you discuss with
19   Mr. Choi?
20        A    From what I can recall at that time,
21   asking if Diana was actually able to continue to
22   assist De Tomaso under her new role as an officer
23   of AMFG, which was publicly-traded entity.
24        Q    And when was that discussion?
25        A    I do not recall specifically, but this
```

R. Berris

Page 487

1    would have occurred over the time when De Tomaso

2    and Apollo were going back and forth in

3    discussions for the Licensing Agreement.

4         Q    And when was that?

5         A    I don't recall specifically, but if I

6    were to estimate, I think it would have occurred

7    some time over 2021.

8         Q    Okay.  That's a whole year.  Can you

9    do any better than a whole year?

10                   MR. SIMONS:  Objection to form.

11                   THE WITNESS:  I do not recall

12        offhand when the Licensing Agreement was

13        executed.

14   BY MR. WERNER:

15        Q    Do you recall having any discussions

16   with anyone about that issue, the subordination

17   of Ms. Majcher's financial duties to De Tomaso or

18   Apollo in writing?

19        A    No.

20        Q    Okay.  Do you recall your allegation

21   in your Amended Complaint that you were

22   approached by numerous company clients who

23   expressed interest in purchasing majority stakes

24   in the company with Berris remaining in this

25   role?

R. Berris

Page 488

1        A      I had discussions with various

2    clients, yes.

3                    MR. SIMONS:  Ryan, just listen to

4           the question and try to answer it as --

5                    THE WITNESS:  Yes.

6    BY MR. WERNER:

7        Q      Okay.

8        A      Just so you know, I'm doing my best.

9    I was here, like, two weeks ago and that was my

10   first time, so I'll try to keep things succinct

11   as possible.

12       Q      Yeah, I think it just would be great

13   if you could just answer the question.

14                   So you remember that allegation?

15       A      Yes.

16       Q      So who were the numerous company

17   clients that expressed an interest in purchasing

18   majority stakes in the company with you remaining

19   in your role?

20       A      I recall -- I guess I can list off the

21   clients that I had discussions with or potential

22   clients.  It would be Barry Skolnick.  Carlos

23   Peralta.  I also was discussing with Bernie

24   Eckelstone, who was planning to become a P72

25   client as well.

R. Berris

Page 489

1        Q     You listed three names.  I just want

2    to take them one-by-one.

3              Barry Skolnick, when did he approach

4    you about preparing a majority stake?

5        A     I had discussions with him.  This was

6    something that was proposed from our side.  And I

7    believe there was multiple discussions with Barry

8    going back to maybe as early as 2019.  And there

9    may have been subsequent discussions, but it was

10   in a casual setting.

11       Q     And with respect to Eckelstone, when

12   did he approach you?

13       A     This was at a meeting that I was with

14   him in Switzerland, and he did this on two

15   occasions.  This was in -- I believe one was

16   January of 2022, and there was another one in

17   March of 2022.

18       Q     Okay.  And how about with respect to

19   Peralta, when did he approach you?

20       A     I approached him --

21       Q     Okay.

22       A     -- on a trip in Mexico City.

23       Q     Okay.  So just to recap, Barry

24   Skolnick, you approached him.  And Peralta, you

25   approached him; is that right?

R. Berris

Page 490

1           A       Yes.

2           Q       Okay.  Are any of these approaches,

3   whether from you or from them, are they in

4   writing?

5           A       I wouldn't say the totality of the

6   discussions, but there would certainly be some

7   type of paper trail, I would imagine.

8           Q       Would that paper trail involve

9   communications with you?

10          A       I believe so, yes.

11          Q       Now these conversations, I don't want

12  to characterize this incorrectly, but I want to

13  go back to your answer to an earlier question,

14  were these fairly, like, informal types of

15  conversations?

16          A       I guess the -- they were friendly.  I

17  mean, casual.  The relationship with -- that I

18  had with our clients was very intimate, you know,

19  as if we were very close friends or perhaps

20  extended family.

21          Q       Okay.  So is it fair to say these were

22  casual conversations?

23          A       Yes.

24          Q       Why are you looking at your counsel?

25                  MR. SIMONS:  I think he's waiting

R. Berris

1          to see if I'm planning to object.  That's

2          all.  Keep looking at Mr. Werner.  I'll

3          object if I feel the need.

4                    MR. WERNER:  Okay.

5     BY MR. WERNER:

6          Q     Do you recall your allegation in your

7     Complaint that "Companies owned or controlled by

8     Norman Choi were implicated in the Enigma

9     Network?

10         A     Yes.

11         Q     Which companies?

12         A     I would not be able to list them all

13    offhand, but I can name a few.

14         Q     Mr. Berris, I'll reask my question.

15    Which companies?

16                    MR. SIMONS:  Objection to form.

17         Asked and answered.

18                    MR. WERNER:  He did not answer the

19         question.

20                    MR. SIMONS:  All he's able to do

21         is answer to the best of his ability.  He's

22         not required to have a photographic memory.

23                    MR. WERNER:  I don't want to argue

24         with you, but he didn't answer the question

25         to the best of his abilities.  I asked for

R. Berris

Page 492

1    which companies and he listed zero.

2  BY MR. WERNER:

3    Q    So if zero is the best of your

4  abilities, that's fine.  I asked you -- I'm going

5  to ask you again, which companies?

6              MR. SIMONS:  Objection to form.

7              THE WITNESS:  Yes.  So to the best

8         of my ability at this time, there would be

9         Sung Zhan Limited.  Do you need that

10        spelling?  S-U-N-G, Z-H-A-N, Limited.  There

11        would be Pachmar Limited, P-A-C-H-M-A-R,

12        Ltd.  There would be Sino Partner Global

13        Limited, s-i-n-o.  There would be Double Joy

14        Limited.  There would be Ideal Team Ventures

15        Limited.  There would be Ideal Master

16        Limited.

17              There would be -- you're talking,

18        just to be clear with respect, just private

19        entities associated with Mr. Choi and not

20        publicly-traded companies; correct?

21  BY MR. WERNER:

22    Q    No.  What I'm asking about is your

23  allegation, which was that companies owned or

24  controlled by Norman Choi were implicated in the

25  Enigma Network.  So I'm asking you to identify

R. Berris

Page 493

1   for us which companies you were referring to in

2   your allegation.

3          A     Sure.  So there is Greater China

4   Appraiser Limited.  There is M Dream Inworld

5   Limited.  There is Get, G-E-T, Holdings Limited.

6   There is Lerado, L-E-R-A-D-O, Limited.  There

7   is -- I believe the name is China New Economy

8   Fund Limited.  There is Town Health Limited.  And

9   that's all I can recall offhand at the moment.

10         Q     Okay.  You just listed 12 companies.

11         A     And I can supplement with another, if

12   that's helpful.  It would be Wealth Glory

13   Company.

14                MR. SIMONS:  There's no question

15         pending.

16   BY MR. WERNER:

17         Q     Wealth what?

18         A     Wealth Glory Limited.

19         Q     So that's more than a dozen companies

20   that you just recalled.

21                And you're alleging that those are all

22   owned or controlled by Mr. Choi?

23         A     And his associates, yes.

24         Q     I didn't ask you about the associates.

25   They're owned and controlled by Mr. Choi?

R. Berris

Page 494

1          A       Some in whole and some in part.

2          Q       Okay.  Now you said that they are

3     implicated in the Enigma Network, and we can go

4     through them one-by-one, but I would like to know

5     how they're implicated in the Enigma network.  So

6     let's start with Sung Zhan.

7                  How is it implicated in the Enigma

8     Network?

9          A       In publicly-traded documents or

10    publicly available documents from the Hong Kong

11    Exchange, Sung Zhan Limited has been an investor

12    in certain connected transactions in the Enigma

13    Network entities alongside Town Health Limited

14    and also Kingsway Lion Spur.  All one word.

15         Q       Pachmar, how is it implicated in the

16    Enigma Network?

17         A       Pachmar, from what I found, was used

18    to take substantial stakes in these general

19    listed entities in order to manipulate the market

20    price, and also as part of certain connected

21    transactions.

22         Q       And the Sino Partners Global, how is

23    it implicated in the Enigma Network?

24         A       Multiple instances of self-dealing

25    transactions involved with entities that are part

R. Berris

Page 495

1      of the Enigma Network.

2          Q     Okay.  And Double Joy Limited, how is

3      it implicated in the Enigma Network?

4          A     The same answer as before.

5          Q     Oh.  Well let me ask you this just to

6      try to short-circuit this.

7          A     Sure.  Sure.

8          Q     Is the answer you that gave with

9      respect to Sino Partners Global applicable to the

10     whole list?

11         A     Yeah.  It's -- out of respect to keep

12     things succinct, I can't recall offhand.  I can

13     give you another direct instance whereby Wealth

14     Glory Holdings was used to enter into sham

15     Distribution Agreements with Apollo in order to

16     facilitate the proposed CCT Land transaction.

17         Q     Okay.  But just -- again, I'm not

18     trying -- just tell me if I have this wrong.  I'm

19     just trying to short-circuit going through each

20     one of these.

21         A     Okay.

22         Q     Is your basic allegation of how

23     they're implicated in the Enigma Network their

24     involvement in interested transactions, or is it

25     something else?

R. Berris

Page 496

1       A       Again, I'm trying to be -- again, to

2    summarize as efficiently as possible.  But it was

3    stated in Bloomberg and Financial Times articles,

4    the Enigma network.  It is an intermingled web

5    of -- in a certain number of public companies and

6    a group of private entities and shareholders that

7    all have connected dealings as part of all of

8    these entities connected together over a series

9    of years.

10      Q       Okay.  So your information about these

11   companies and their involvement, are these from

12   publicly-reported sources?

13      A       Yes.  So to be very clear, I first

14   became aware of the Enigma Network via online

15   press articles on Bloomberg and the Financial

16   Times.

17      Q       Okay.  And that was after your

18   employment and association with De Tomaso ended;

19   is that correct?

20      A       That is correct.

21      Q       So is it fair to say, then, that in

22   terms of your allegations about the Enigma

23   Network, you did not discuss those with anyone at

24   De Tomaso?

25      A       No.  That's true.  I did not know

R. Berris

Page 497

1   about it at that time.

2       Q    Okay.  Do I have it correctly that you

3   allege that Norman Choi used De Tomaso funds to

4   purchase an apartment at 35 Hudson Yards through

5   Too Slow LLC?

6       A    Would you mind just restating that

7   question one more time?  I want to answer very

8   directly.

9       Q    Is it your allegation that Norman Choi

10  used De Tomaso funds to purchase an apartment at

11  35 Hudson Yards through Too Slow LLC?

12      A    Yes.  This was and continues to be a

13  concern of mine.

14      Q    I just -- is that your allegation?

15      A    Yes.  Yes.

16      Q    Okay.  Fine.  What's your factual

17  basis for that allegation?

18      A    At the time when I was at De Tomaso, I

19  found it odd that Mr. Choi was making such a

20  large discretionary purchase when I knew that we

21  were in arrears to our key technical partners.

22  And then -- so that's during my time at De

23  Tomaso.  And then after my time at De Tomaso

24  through the discovery process, I noticed certain

25  large sums of payments under the title of

1    repayment of a loan to Norman around the same

2    time when Mr. Choi was closing on his Hudson

3    Yards apartment.

4         Q    Okay.  Did you ever discuss your

5    allegation with anyone at De Tomaso?

6         A    No.

7         Q    Now you also allege that Mr. Choi is a

8    key investor in Genesis; right?

9         A    Yes.

10        Q    What is the factual basis for that

11   allegation?

12        A    Mr. Choi told me that he was.

13        Q    Okay.  Other than that, do you have

14   any other factual basis?

15        A    I do not.

16        Q    You also allege that it was

17   predetermined that genesis would acquire a stake

18   in De Tomaso; correct?

19        A    Yes.

20        Q    How was this predetermined?

21        A    So -- you're asking based on my

22   knowledge at the time I was at De Tomaso or now?

23        Q    Well why don't you give me both.

24        A    Okay.  So during my time at De Tomaso,

25   I found it odd that Norman had forwarded me the

R. Berris

Page 499

1    message from -- in August 2021 with the SEC

2    filing for Genesis saying Samuel made a SPAC,

3    because when I reviewed the SEC prospectus at

4    that time, Samuel was not listed.  I then found

5    it odd that Samuel was joining confidential

6    discussions with De Tomaso and Art Group, who was

7    De Tomaso's sponsor for the potential U.S. SPAC

8    anonymously coming in as iPad.  And then later

9    when Genesis filed its revised S1 in

10   November 24th, if I recall correctly, it then

11   listed Samuel and certain other of his associates

12   joining the Genesis SPAC.

13        Q    Okay.  I may have confused us.

14             Was all of that learned while you were

15   at De Tomaso, or was some of that learned after?

16        A    Sure.  Sure.  So my response to you

17   now is just telling you what I was aware of

18   during my time at De Tomaso.

19        Q    Okay.  And to the extent you learned

20   information after your time at De Tomaso, that

21   was learned in the context of this litigation; is

22   that right?

23        A    I think that's fair to say, yes.

24        Q    Okay.  And so to the extent you're

25   alleging that it was predetermined that Genesis

R. Berris

Page 500

1    would acquire a stake in De Tomaso, who was it

2    predetermined by?

3         A    Mr. Choi and Mr. Lui.

4         Q    Okay.  Now you would agree with me

5    that Genesis never, in fact, acquired any stake

6    in De Tomaso; right?

7         A    To my knowledge, yes.

8         Q    Now you allege in your Amended

9    Complaint that Mr. Choi has been associated with

10   stock manipulation schemes in association with

11   misconduct on U.S. and foreign markets; do you

12   recall that allegation?

13        A    Yes.

14        Q    What's the factual basis for your

15   allegation that Norman Choi has been associated

16   with stock manipulation schemes in the U.S. or

17   elsewhere?

18        A    This was -- became part -- so I

19   learned this after my departure from De Tomaso,

20   to be clear.  I first began to learn of this

21   after reading Bloomberg and the Financial Times

22   and learning about the Enigma Network.  Me

23   conducting my own research into this, and then

24   after I brought on my current counsel --

25             MR. SIMONS:  Yeah, you are not to

R. Berris

Page 501

1          talk about --

2                    THE WITNESS:  Then that's

3          attorney/client work product.

4      BY MR. WERNER:

5          Q     Okay.  So you learned about it

6      initially from public reporting sources; is that

7      fair?

8          A     And publicly -- public databases on

9      the exchanges.

10         Q     Okay.  What exactly were the schemes

11     that Mr. Choi was involved in?

12         A     Market manipulation schemes which goes

13     at the core of what the Enigma Network was

14     orchestrated and it did conduct over a series of

15     years.

16         Q     Yeah, I'm asking you which specific

17     schemes.

18         A     To kind of keep things very, very

19     succinct.  Market manipulation.  Self-dealing.

20     Overinflation of share prices.  Connected

21     transactions.  Shareholder loans to certain

22     nominees.

23         Q     I'm actually asking you for the

24     specifics.  You allege that Mr. Choi was

25     associated with stock manipulation schemes.  I'd

R. Berris

Page 502

1    like for you to identify, to the extent you can,

2    what those schemes were with specificity.

3          A     Okay.  So to the best of -- I can

4    recall offhand, I'll give you some concrete

5    examples.  So after my departure from De Tomaso,

6    I began to investigate these entities, and then I

7    became aware that Mr. Choi had entered into

8    multiple dealings which are publicly disclosed

9    with some of the Enigma Network entities.  One in

10   particular is Wealth Glory Holdings, where there

11   is multiple Distribution Agreements between

12   Apollo and Wealth Glory Holdings to be

13   distributors for future Apollo vehicles.  And if

14   I can recall correctly, I think there was roughly

15   four such agreements that were entered into

16   between Apollo, Wealth Glory Holdings and its

17   subsidiaries.

18         Q     Were those stock manipulation schemes?

19         A     I'm not a securities expert, but what

20   it appeared to be is that these so-called

21   Distribution Agreements were entered into in

22   order to facilitate a higher valuation for the

23   CCT Land acquisition of Apollo, because I also

24   became aware of over the course of, let's say,

25   2014 leading up to, let's say, 2017, Mr. Choi was

R. Berris

Page 503

1    selling minority stakes in the holding company

2    for Apollo at that time, which was Sino Partner

3    Global Limited to various entities that were also

4    involved in this self-dealing, marketing

5    manipulation network.

6         Q    Was it a stock manipulation scheme?

7                   MR. SIMONS:  Objection to form.

8                   THE WITNESS:  I'm not a securities

9         expert.  Based on my knowledge, it appeared

10        to be, yes.

11   BY MR. WERNER:

12        Q    Which stock was being manipulated?

13        A    Okay.  So for instance --

14        Q    It's a very simple question.

15        A    To keep it simple, so Wealth Glory,

16   when it was entering into Fiduciary Agreements.

17   I don't have the charts in front of me, but I

18   recall based upon certain announcements of these

19   agreements that the share price of, let's say,

20   Wealth Glory that was publicly-traded, would

21   spike.  And there were concentrations of

22   ownership in Wealth Glory and other entities that

23   entered into either agreements with Apollo or

24   were acquisition entities who took minority

25   stakes in Mr. Choi's holding companies, Sino

R. Berris

Page 504

1    Partner Global.  So based on that, yes, that is

2    market manipulation.

3         Q    Okay.  So your allegation is that

4    Mr. Choi was involved in the manipulation of

5    Wealth Glory stock?

6         A    It appeared to be, yes.

7         Q    Okay.  Any other stocks in which

8    Mr. Choi was involved with stock manipulation

9    concerning?

10        A    There were others, but to be fair, I

11   cannot recall the names offhand.

12        Q    You also allege that Mr. Choi was

13   engaged in associated misconduct.

14             What associated misconduct are you

15   referring to?

16        A    Would you mind, just to be fair,

17   saying the full context of -- in the Complaint

18   where it says "associated misconduct"?

19        Q    Okay.  Sure.  You allege Mr. Choi has

20   been associated with stock manipulation schemes

21   and associated misconduct on U.S. and foreign

22   markets.  I'm asking you what is the associated

23   misconduct to which you are referring?

24        A    Okay.  That's helpful.  So I'm

25   referring to -- I'll give you some concrete

R. Berris

Page 505

1    examples and keep it very succinct.  I learned

2    that Mr. Choi had invested money through Tom Kim

3    into an over-the-counter stock on the U.S.

4    markets called New -- I think it's New Generation

5    Consumer Group, NGCG, which there is a lot of

6    records online that that original plan was to do

7    a reverse merger with De Tomaso into NGCG.

8         Q      What is the misconduct?

9         A      The misconduct?

10        Q      Yes.

11        A      Again, I'm not a securities expert,

12   but Mr. Choi, his original plans appeared that he

13   was planning to do a reverse merger with a pink

14   sheet -- a penny stock on the U.S. exchange.

15        Q      Okay.  You understand whether you are

16   a securities expert or not, these are your

17   allegations that you're making, and so I'm just

18   trying to understand the factual basis.

19        A      Sure.

20        Q      So when I ask you, Mr. Berris, a

21   non-securities expert, when you are alleging

22   associated misconduct, I want to know what you,

23   Mr. Berris, thinks is the misconduct.

24                    MR. SIMONS:  Objection to the

25        form.

R. Berris

Page 506

1    BY MR. WERNER:

2         Q    So can you tell me what specifically

3    the associated misconduct you're alleging

4    Mr. Choi was involved in?

5                   MR. SIMONS:  Objection to the

6         form.

7                   THE WITNESS:  Okay.  There is also

8         an SEC enforcement action that was taken

9         against a U.S. listed company involving

10        Pachmar Limited.

11   BY MR. WERNER:

12        Q    Okay.  Anything else?

13        A    Mr. Choi told me that he was involved

14   with Michael Choi's U.S. SPAC which originally

15   went under the ticker symbol JFK, and if I recall

16   correctly, the name of that SPAC was A -- no, 8I

17   Acquisition Corp.  And that SPAC was connected to

18   lots of marketing manipulation on U.S. Exchanges

19   involving Enigma Network entities in the Hong

20   Kong Exchange and connected dealings and sham

21   orders that were placed in order to inflate the

22   value of the merger and also the price once it

23   was on De-SPAC.

24        Q    We'll try this one more time.

25             What was the misconduct that Mr. Choi

R. Berris

Page 507

1      engaged?

2          A      Mr. Choi told me he was involved with

3      Michael Choi.

4          Q      Anything else?

5          A      That's all I can recall offhand.

6          Q      Thank you.  Now, again, it's fair to

7      say that to the extent that you allege that

8      Mr. Choi was involved in stock manipulations or

9      misconduct, those are allegations that you did

10     not raise while you were at De Tomaso; correct?

11         A      Correct.  These are items that I

12     became aware of after my departure.

13         Q      Right.  Okay.  Now you also allege

14     that Mr. Choi began to make material changes to

15     the specifications of De Tomaso vehicles; do you

16     recall that?

17         A      Yes.

18         Q      And what were the changes?

19         A      It occurred when Capricorn came on

20     board, and a lot of the existing suppliers and

21     technical work was reassigned.  And to give you a

22     hard example would be the technical partner for

23     the ABS.  So the braking and traction control

24     system was given to a company called FEV, and in

25     the reports that I was seeing from FEV, it was

R. Berris

Page 508

1    clearly stating in their own language that they

2    were not capable of producing a system that was

3    road legal.  So I raised this concern to

4    Mr. Choi.  And also Rausch raised this concern.

5    And prior to my departure from De Tomaso, it went

6    unaddressed.

7         Q    Let's go back to my question.  You

8    allege that Mr. Choi began to make material

9    changes to the specifications of De Tomaso

10   vehicles.

11            What were the material changes to the

12   specifications that you are alleging Mr. Choi

13   made?

14        A    Changes in key suppliers which

15   correlated to the vehicles' regulatory

16   compliance.  And two hard examples would be the

17   braking and traction control systems, and also

18   the emissions systems and exhaust.

19        Q    So there were changes to the brake

20   system; is that what you're saying?

21        A    Braking system and traction control

22   system, and also the -- for the emissions and

23   exhaust.

24        Q    You've really just got to try to

25   answer the question.  I'm trying to put it into

R. Berris

Page 509

1     bite-size pieces to make it really easy for you.

2              So if I understand what you're saying

3     is, your allegation around changes that are

4     material to the specifications referenced changes

5     to brakes, traction, emissions?

6     A     Brakes, traction control and

7     emissions, yes.

8     Q     Is it in your experience common in the

9     industry to make changes to specifications to

10    vehicles during the design process?

11    A     It is certainly normal to do so.

12    However, it's important that the parties that are

13    taking responsibility are able to meet the

14    regulatory compliance.

15    Q     Okay.  Were the changes to the

16    specifications aimed towards making the vehicles

17    more valuable or less valuable?

18              MR. SIMONS:  Objection.  Objection

19         to form.

20    BY MR. WERNER:

21    Q     If you know.

22    A     Those particular changes would just

23    lead to the vehicles not being compliant for road

24    use.

25    Q     Where?

R. Berris

Page 510

1          A       Notably in the U.S. market.

2          Q       Okay.  Would you consider yourself an

3      expert on compliance with U.S. regulations for

4      vehicles?

5          A       I would not, which is why we brought

6      on board the season partners who are well tuned

7      with this.

8          Q       Okay.  With respect to those changes,

9      did you ever object to those changes?

10         A       Yes.

11         Q       Did you do so in writing?

12         A       Yes.

13         Q       Okay.  When?

14         A       So with regards to the ABS -- so the

15     braking and traction control, that would have

16     been in March of 2022, and then at additional

17     times thereafter.

18         Q       And who did you make your objections

19     known to?

20         A       Directly to Mr. Choi.

21         Q       Okay.  Do you know if your issues

22     around those matters were addressed?

23         A       They -- prior to my departure, they

24     were not addressed.

25         Q       And so can I take that to mean, then,

R. Berris

Page 511

1    sitting here today, you don't know if they were

2    ever addressed?

3         A     I'm assuming now that there's a change

4    of partners after the -- Mr. Choi and De Tomaso

5    decided to part ways with Capricorn.

6         Q     You further allege that Mr. Choi began

7    making material false statements to potential

8    investors and customers.

9               Do you recall that allegation?

10        A     Yes.

11        Q     Which investors are you referring to?

12        A     Investors as part of the SPAC.

13        Q     And which customers are you referring

14   to?

15        A     I think clients in general, because we

16   were responsible for giving routine status

17   updates to our deal partners on the development

18   milestones and production timelines for the P72.

19        Q     Your allegation is false statements to

20   customers.  I'd like to know which customers

21   false statements were made to.

22        A     Stanley Cohen.

23        Q     Okay.  Who else?

24        A     I would say likely most all the

25   clients in the U.S., and likely in Europe as

R. Berris

Page 512

1    well.

2         Q    Okay.  You're saying "likely."

3              Is that because you don't know one way

4    or the other?

5                   MR. SIMONS:  Objection to the

6              form.

7                   THE WITNESS:  That's because the

8              distribution network that was set up was

9              that we had Miller Motorcars for North

10             America, and we had Louwman Exclusive.  So

11             L-O-U-W-M-A-N, Exclusive in Europe, just for

12             example.  And their responsibility was not

13             only to take care of the clients and the

14             region, but also we would give the head of

15             those partners updates, and then they were

16             using that as touchpoints that they could

17             then interact with their clients who were

18             P72 owners.

19   BY MR. WERNER:

20        Q    Okay.  So you refer to information

21   provided to the dealer network that may have been

22   shared with customers.

23             My question to you is, do you know

24   factually under oath sitting here today, whether

25   the dealers shared any of the alleged false

R. Berris

Page 513

1    statements with any specific customer?

2        A    I do, because some of those customers

3    were planning to come to Hamal Classic(sic.)

4    They were asking, you know, what development

5    milestones we were going to be showing during

6    that event.

7        Q    Which customers?

8        A    I can't recall offhand, but I can name

9    a few.  So that would have been Stanley Cohen.

10   Barry Skolnick.  Carson Chen.  The Young family.

11   His first name was Michael.  Mark Katzman.

12   Richard Valdez.  That's all I can recall offhand

13   for the moment.

14       Q    Let's go back now.  You referenced

15   false statements made to the SPAC.

16            What was the false statements that

17   were made to the SPAC?

18       A    So to keep it very simple, there were

19   altered financial statements with forecasts and

20   production timelines that could not be met; one.

21   There was vehicle noncompliance because of the

22   change of key technical partners, again,

23   corresponding to the braking and traction control

24   systems as well as emissions.

25       Q    When were those statements made?

R. Berris

Page 514

1       A     To potential investors?

2       Q     No.

3       A     Sure.

4       Q     I'm trying to go through the list that

5    you gave me.  You referenced the SPAC on one hand

6    and customers on the other.  I want to talk about

7    the SPAC right now --

8       A     Okay.

9       Q     -- okay?  When were statements to the

10   SPAC made?

11              MR. SIMONS:  Objection to form.

12              THE WITNESS:  It would have

13        occurred over, I would say, from end of

14        February, beginning of March, to all the way

15        after my departure from De Tomaso.

16   BY MR. WERNER:

17       Q     Now to the extent that there were

18   false -- you're alleging there were false

19   statements made to the SPAC, did you discuss that

20   with anyone at De Tomaso?

21       A     I did with Mr. Choi.

22       Q     Did you do that in writing?

23       A     I believe I communicated with him

24   about concerns with Capricorn and asking for

25   status updates both verbally and in writing.

R. Berris

Page 515

1      Q      If you did that in writing, when did

2   you do that?

3      A      If I were, I would say it would have

4   occurred some time in the spring of 2022.

5      Q      Okay.  Now I want to switch your

6   attention to the customer list that you just gave

7   me; okay?  I want to walk through that, but of

8   course, if you can answer the same for all of

9   them, please just let me know that.  Let's start

10   with Stanley Cohen.

11             What specifically were the false

12   statements that were made to Stanley Cohen?

13      A      With regards to the timing for

14   delivery and the availability of the final

15   development prototypes for the P72.

16      Q      Okay.  Who made those statements?

17      A      So I would say that I had communicated

18   with clients, as well as Mr. Choi.  I could only

19   relay to the clients what Mr. Choi was relaying

20   to me because I was not getting status updates

21   from Capricorn, even though I was trying via

22   email, via text on numerous occasions.  And I was

23   just told that there were -- six prototypes were

24   going to be ready by Hamal Classic, which it

25   turns out not one was ready.

R. Berris

Page 516

1      Q      So were you making false statements to

2      clients?

3      A      Not knowingly.

4      Q      And when with respect to statements to

5      Mr. Cohen, when were those made?

6      A      I'm sure there were numerous.  Stanley

7      was a long-time friend of mine for, you know, 15

8      plus years, so we communicated quite often.

9      Q      He was a good friend of yours?

10     A      Yes.

11     Q      Why didn't you go to his funeral?

12            MR. SIMONS:  Objection.

13            THE WITNESS:  Because of this

14     litigation.

15     BY MR. WERNER:

16     Q      Okay.  You referenced a number of

17     other -- well, let me ask you this:

18            The false statements that were made to

19     Mr. Cohen, were those made in writing?

20     A      I don't recall specifically at that

21     time, but I can say definitively reading the

22     discovery productions, yes.

23     Q      Now the statements that were made to

24     the other customers, Barry Skolnick, Carson Chen,

25     the Young family, Katzman and Valdez, were you

R. Berris

Page 517

1    making communications to them that were false?

2                    MR. SIMONS:  Objection to form.

3                    THE WITNESS:  Not knowingly.  I

4         was communicating the status updates that

5         Mr. Choi was giving me from Capricorn

6         because I was not getting any information

7         with regards to them directly.

8    BY MR. WERNER:

9         Q    So, yes, you were making false

10   statements to them?

11        A    Not knowingly.

12                   MR. SIMONS:  Objection.  Wait.

13   BY MR. WERNER:

14        Q    That was not my question.  I'm not

15   asking you if you did it knowingly or not, no.

16   I'm asking if you were making false statements to

17   the customers.

18                   MR. SIMONS:  You know, the witness

19        needs to wait for my objection so the

20        record's clear and so that the court

21        reporter does not murder us all.  So the way

22        things will work is, Mr. Werner will ask you

23        a question.  You pause.  Allow me to object

24        and then you answer, unless I instruct you

25        not to.

R. Berris

Page 518

```
1                   THE WITNESS:  That's fair.
2                   MR. SIMONS:  It will be easier
3          that way.
4                   MR. WERNER:  Why don't you just
5          keep it to non-speaking objections going
6          forward.  I would appreciate that because
7          you're wasting our time.
8                   MR. SIMONS:  I have been keeping
9          it to non-speaking objections.  I'm just
10         trying to make sure that the back and forth
11         is clear and to try to save the court
12         reporter a lot of grief.  The record will
13         reflect that she's smiling at me and she's
14         very appreciative of that.  Objection to
15         form.
16    BY MR. WERNER:
17         Q    So, yes, you were making false
18    statements to customers?
19                   MR. SIMONS:  Objection to form.
20                   THE WITNESS:  I was speaking what
21         was known as truth to me at the time.
22    BY MR. WERNER:
23         Q    And what you were speaking as truth
24    was, in fact, false?
25                   MR. SIMONS:  Objection to form.
```

R. Berris

Page 519

```
 1                   THE WITNESS:  Later to find out.
 2     BY MR. WERNER:
 3         Q     So you were making false statements to
 4     the SPAC, and you were making false statements to
 5     De Tomaso's customers; right?
 6                   MR. SIMONS:  Objection to the
 7           form.
 8                   THE WITNESS:  No.  Sorry.  No.
 9     BY MR. WERNER:
10         Q     With respect to the customers and the
11     statements that you made that you have said are
12     false, what exactly were they?
13         A     To be clear, I did not say they were
14     false.
15         Q     Okay.  So your testimony is then you
16     were not making false statements to customers?
17                   MR. SIMONS:  Objection to the form
18           of the question.
19                   THE WITNESS:  To be clear, I said
20           that I was speaking to them is what I knew
21           as truth at the time.  Later to find out
22           that that was not true, because I was being
23           siloed off from updates from Capricorn.
24     BY MR. WERNER:
25         Q     So you were saying things to customers
```

R. Berris

Page 520

1    that were not true; right?

2        A    I was communicating to them what was

3    told to me from Mr. Choi.

4        Q    So you were communicating things to

5    customers that were not true; right?

6        A    Not knowingly.

7        Q    So you were communicating things to

8    customers that were not true; right?

9        A    Not knowingly.

10        Q    So you were communicating things to

11    customers that were not true.  It's a yes or no

12    question.

13                MR. SIMONS:  You can answer it to

14        the best of your ability.

15                THE WITNESS:  To the best of my

16        abilities, no.

17    BY MR. WERNER:

18        Q    So the things you were communicating

19    to customers were true then?

20        A    Based on the knowledge available to me

21    at the time, yes.

22        Q    The statements to the list of

23    customers you mentioned other than you, who

24    communicated with those customers with respect to

25    your allegation around false statements?

R. Berris

Page 521

1          A      I think it would be the key

2    responsibles at our dealer partners, such as Evan

3    Cygler at Miller Motorcars.  C-Y-G-L-E-R.  Miller

4    Motorcars.  And then also Thomas Middledorp.

5    I'll try my best on his last name.

6    M-I-D-D-L-E-D-O-R-P, I believe.

7          Q      All right.  So there were you and

8    dealers making these statements; right?

9          A      The dealers were providing status

10   updates as well.

11         Q      And were those updates in writing?

12         A      I would believe that they were likely

13   in writing.

14         Q      I didn't ask you what you believe.  I

15   asked you what you know.

16                Were they in writing?

17         A      I'm not sure.

18         Q      So you don't know?

19         A      I'm not sure how they communicated to

20   their clients.

21         Q      So you don't know?

22                MR. SIMONS:  Objection; asked and

23         answered.

24                THE WITNESS:  I don't know.

25

R. Berris

Page 522

1    BY MR. WERNER:

2         Q     So if I ask you when those statements

3    were made, the answer is you don't know; right?

4                   MR. SIMONS:  Objection.

5                   THE WITNESS:  To the best of my

6         recollection, they would have occurred some

7         time over the spring of 2022.

8    BY MR. WERNER:

9         Q     Okay.  Do you know for a fact when

10   those statements were made?

11                  MR. SIMONS:  Objection.

12                  THE WITNESS:  I cannot narrow it

13        any further than the spring of 2022.

14   BY MR. WERNER:

15        Q     Okay.  Do you know whether those

16   statements were in writing or not?

17        A     I do not know.

18        Q     You allege that -- well let me ask you

19   this:

20              With respect to material false

21   statements, did you raise that issue or concern

22   with anyone at De Tomaso during your employment

23   there?

24        A     I raised concerns to Mr. Choi, and

25   then also I had been venting my frustrations to

R. Berris

Page 523

1    Hugo de Sadeleer, and told him on numerous

2    occasions that I was not feeling comfortable and

3    was planning on leaving the company.

4        Q    Oh, you were planning on leaving the

5    company?

6        A    I was thinking about it.

7        Q    And when was that?

8        A    In early 2022.

9        Q    Okay.  And why were you planning on

10   leaving the company?

11       A    Because I was becoming frustrated with

12   some of the decisions that Mr. Choi was taking

13   with Capricorn.

14       Q    And how were you planning to leave the

15   company?  Were you planning to resign?

16       A    Any normal procedure if someone's

17   going to leave their employer.

18       Q    What was the procedure for you?

19           MR. SIMONS:  Objection.

20           THE WITNESS:  I didn't think

21       through to --

22   BY MR. WERNER:

23       Q    So you were contemplating leaving the

24   company; right?

25       A    At times I became uncomfortable, yes.

R. Berris

Page 524

1        Q       And I'm asking you how were you

2    planning to leave the company.

3        A       I didn't think through the specifics.

4        Q       Did you think you were going to be

5    resigning from the company?

6        A       I did not think through the specifics.

7        Q       So when you say you were thinking

8    about leaving the company, what do you mean?

9        A       That verbatim.  I was thinking about

10   potentially leaving De Tomaso.

11       Q       And doing what?

12       A       I wasn't sure at the time.

13       Q       The frustrations that you vented to

14   Hugo and I guess Mr. Choi, were those in writing?

15       A       To Hugo, I know definitively it was

16   verbally.  I can't recall offhand if there was

17   anything in writing.  I can say he concurred and

18   was saying that he would follow me if I were to

19   leave.  And then my frustrations to Mr. Choi,

20   sometimes these were communicated verbally.

21   Other times they were communicated either through

22   Mr. Lui or via WhatsApp with Mr. Choi.

23       Q       You were communicating with Mr. Lui?

24       A       At the time when Mr. Choi was not

25   communicating with me, and my only person that I

R. Berris

Page 525

1    could speak to at -- and he wasn't even at De

2    Tomaso, was Mr. Lui.

3         Q    Okay.  And the communications with

4    Hugo, when were those?

5         A    I would say over the course of the

6    first months of -- leading up to my departure.

7    So from roughly -- it may have been into the tail

8    end of 2021 up until May of 2022.

9         Q    Okay.  And then the communications

10   with Mr. Choi or Mr. Lui, when were those?

11        A    Regarding concerns?

12        Q    Yes.

13        A    What I can recall offhand at the

14   moment is to Mr. Choi definitively in March of

15   2022.  And then to Mr. Lui, this would have

16   occurred after I -- Mr. Choi was refusing to

17   speak with me, so that would have occurred some

18   time in the final week or so of April into May.

19        Q    Okay.  Now with respect to my

20   questions about these communications, you

21   understand that I'm asking you specifically when

22   and who you discussed Mr. Choi making false

23   statements to potential investors and customers.

24   Not other generalized frustrations you might have

25   had; right?

R. Berris

Page 526

1              MR. SIMONS:  Objection to form.

2              THE WITNESS:  I understand.

3    BY MR. WERNER:

4        Q    Okay.  All right.  You recall that De

5    Tomaso had a Bank of America bank account for De

6    Tomaso Automobili North America LLC; right?

7        A    Yes.

8        Q    You created that bank account; right?

9        A    I created that bank account and also

10   the entity.  I was the sole member.

11       Q    Okay.  And am I correct in

12   understanding that with respect to that bank

13   account, you were the only one who had a password

14   to it?

15       A    No.  I was the only authorized user,

16   because you needed to be a U.S. person, but

17   Mr. Choi had e-login details for that account.

18       Q    Is it fair to say he had view only

19   access?

20       A    I don't recall.  He had the full

21   access that they could give a, I guess, non-U.S.

22   person.

23       Q    Okay.  You recall attending a meeting

24   with Hermes on behalf of De Tomaso?

25       A    Yes.

R. Berris

Page 527

1        Q      When was that?

2        A      That was in April, I believe.  In the

3    middle of the first two weeks of April 2022.

4        Q      And who set that meeting up?

5        A      Hugo de Sadeleer and his parents.

6        Q      And who was the meeting with?

7        A      The meeting was with responsibles at

8    Hermes and their bespoke department, which is

9    called, if I recall correctly, Hermes Horizons.

10       Q      What were their names?

11       A      I can only recall one offhand.  If I

12   recall correctly, it's Timothy Wachs, W-A-C-H-S.

13       Q      Okay.  How many were there?

14       A      People from Hermes?

15       Q      Yes.

16       A      At our specific meeting, 'cause we

17   were going to multiple locations at the campus, I

18   would say roughly three at the sitdown kind of

19   formal arrangement.  And then they were giving us

20   tours through the divisions where we met numerous

21   other Hermes employees.

22       Q      Okay.  So this was at the Hermes

23   campus?

24       A      Correct.

25       Q      And where is the Hermes campus?

R. Berris

Page 528

```
1          A      It's in Paris.

2          Q      Where in Paris?

3          A      I don't recall the address offhand.  I

4    believe it's somewhere on the outskirts of the

5    city or something like that.

6          Q      Okay.  Do you remember which -- I

7    don't want to mess this up, Arond Dusmont(sic)?

8          A      I will not attempt French.  I do not.

9    Hugo was with me with his family.  They are very

10   familiar with the area, so they were the tour

11   guides.

12         Q      Okay.  And you referenced a meeting

13   with some responsibles.  There were apparently

14   three of them.

15                What did you discuss with them?

16         A      We were discussing -- it was almost

17   like the next formal step in what we had been

18   discussing in the subsequent months, whereby they

19   were going to do a bespoke P72 for Hugo's mother.

20   Her name is Isabelle.  And at the specific

21   meeting, I had given kind of like a brand

22   presentation to the responsibles at Hermes.  And

23   then they started going into details of what the

24   journey would look like for De Tomaso and for

25   Hugo's mom for this process, as far as potential
```

R. Berris

Page 529

1    high-level milestones where we needed to deliver

2    them, let's say -- some data for the vehicle so

3    they could start the design process, and then

4    rough, I think, timelines from what I can recall

5    for when -- how long the process would go up

6    until the point whereby they could potentially

7    hand over the delivery to her.

8        Q    So the discussion was around doing a

9    bespoke P72 for Hugo's mother?

10       A    Yes.

11       Q    And your testimony is that that was

12   then subsequently discussed over ensuing months?

13       A    Yeah.  To be very clear, we had been

14   discussing with them I think as early as October,

15   November of 2021, where we had some meetings with

16   Timothy Wachs and maybe one of his colleagues in

17   Belgium, and this specific date was the first

18   time that we were having, like, this very formal

19   meeting where the responsibles at Hermes were

20   present.  I was present.  Hugo de Sadeleer was

21   present, and his parents as well.

22       Q    Okay.  As I understood your testimony,

23   that meeting was in April 2022, and I thought you

24   referenced the discussion of the Isabelle

25   Hermes/De Tomaso during subsequent months after

R. Berris

Page 530

1    the meeting.

2        A    Yeah.  So following the meeting from

3    what I can recall, they were asking, you know, we

4    were following up with what they had requested

5    from us, I think.  How we're going to share

6    certain data for the vehicle.  Something along

7    those lines.

8        Q    And when you say "us," was that you?

9        A    "Us" meaning De Tomaso, and then also

10   additional next steps from what I can recall for

11   Hugo's family as part of that process.

12       Q    But what I'm asking is in terms of the

13   followup during the subsequent months on the De

14   Tomaso side, who were the people who were

15   involved in that?

16       A    I would say it would have been myself

17   and Hugo de Sadeleer.

18       Q    And what ultimately happened with that

19   project?

20       A    I can't speak to it because I departed

21   the company shortly thereafter.

22                MR. WERNER:  Why don't we take a

23         five-minute break.

24                MR. SIMONS:  Sure.

25                MR. VIDEOGRAPHER:  Off the record

R. Berris

Page 531

1          at 14:27 marking the end of Media Unit

2          No. 1.

3                    (Whereupon there was a brief

4          recess.)

5                    MR. VIDEOGRAPHER:  On the record

6          at 14:38.  Marking the beginning of Media

7          Unit No. 2.

8     BY MR. WERNER:

9          Q     Mr. Berris, in your Amended Complaint,

10    you allege various forms of wrongdoing by the

11    defendants; right?

12         A     Yes.

13         Q     Have you reported any of that

14    wrongdoing to any regulatory or law enforcement

15    agency?

16                    MR. SIMONS:  Mr. Berris, I'll just

17         instruct you to the extent that any of this

18         involved discussion with lawyers, don't get

19         into that, but if you can answer the

20         question sort of directly, feel free.

21                    THE WITNESS:  Yes.

22    BY MR. WERNER:

23         Q     Which body?

24         A     The SEC, Securities and Exchange

25    Commission.

R. Berris

Page 532

1      Q      Any others?

2      A      Not at this time.

3      Q      What does that mean?

4      A      This goes to a privileged conversation

5    with my counsel.

6              MR. SIMONS:  Yeah.  He doesn't

7         want to hear any of that.  He's just asking

8         have you reported to any authorities.

9              THE WITNESS:  Yes, SEC.

10   BY MR. WERNER:

11     Q    Are you planning to report it to other

12   agencies or law enforcement outfits in the

13   future?

14              MR. SIMONS:  If that

15         decision-making implicates privileged

16         conversations with counsel, I instruct you

17         not to answer.

18              THE WITNESS:  On the advice of

19         counsel, I cannot answer.

20   BY MR. WERNER:

21     Q    So you have reported something to the

22   SEC.  When did you do that?

23     A      This was in 2022 and 2023.

24     Q    So that was after your employment with

25   De Tomaso?

R. Berris

Page 533

1        A     Yes.

2        Q     And what did you report?

3        A     That was something that was done

4    through my attorneys.

5        Q     So --

6              MR. SIMONS:  To the extent that he

7         his only understanding of what was reported

8         was through his attorneys, I'll instruct you

9         not to answer.  If you have any

10        independent --

11             MR. WERNER:  No.  No.  No.  No.

12        Hang on.  Hang on.

13   BY MR. WERNER:

14        Q     You testified that something was

15   reported to the SEC; okay.  What I'm asking you

16   is what was reported to the SEC?

17             MR. SIMONS:  And, Mr. Berris, you

18        can testify only to your independent

19        understanding of what was reported, and not

20        to any understanding you may have based on

21        discussions with counsel.

22             THE WITNESS:  My independent

23        understanding is that my counsel are

24        familiar with the SEC and the protocols, and

25        made the appropriate, I guess, submissions

R. Berris

Page 534

1              to the SEC.

2         BY MR. WERNER:

3              Q    Well did you look at those submissions

4         before they were filed?

5              A    I signed paperwork and reviewed

6         information at a high level, but this was all

7         prepared by my counsel.

8              Q    So did you look at the submissions

9         before they were filed?

10             A    Yes.

11             Q    Okay.  Did you read them?

12             A    Yes.

13             Q    What did they say?

14                  MR. SIMONS:  Once again, to the

15             extent these were submissions that were

16             created and authored by counsel, I'm going

17             to instruct him not to answer.

18                  MR. WERNER:  They're not

19             privileged.  They were filed allegedly with

20             the SEC; okay.

21        BY MR. WERNER:

22             Q    So they were filed.  What did they

23        say?

24                  MR. SIMONS:  If you can recall,

25             you can testify.

R. Berris

Page 535

1              MR. WERNER:  You know what; you've

2         got to quit with the speaking objections and

3         instructing the witness.  The witness is

4         looking at you for answers and you're

5         providing him substantive testimony.  You

6         need to stop that immediately or we're going

7         to call it and we're going to get the Court

8         on the phone if you do that again.

9              MR. SIMONS:  To be very clear, I'm

10        not looking at all at the witness.  I don't

11        know what the witness is doing, but your

12        job, Mr. Berris, is certainly to answer

13        Mr. Werner's questions to the best of your

14        ability.

15              THE WITNESS:  Sure.  I cannot

16        recall.

17   BY MR. WERNER:

18        Q    You read them.  You signed them.  You

19   don't know what they said?

20        A    I cannot recall at this time.

21        Q    Do you know which branch of the SEC

22   they were filed with?

23        A    I do not recall.

24        Q    Do you know what, if anything, has

25   come of those filings?

R. Berris

Page 536

1          MR. SIMONS:  Once again, if your
2      understanding of that comes from counsel,
3      don't answer.
4          THE WITNESS:  I am unaware, as
5      this is a matter my counsel is directly
6      dealing with.
7  BY MR. WERNER:
8      Q    Okay.  And just to be clear, those
9  filings were made by your present counsel at
10 Boies Schiller?
11     A    Yes.
12     Q    Okay.  Do you know who the filings
13 were directed to?
14     A    I do not.
15     Q    Were they directed to De Tomaso?
16         MR. SIMONS:  Objection to form.
17 BY MR. WERNER:
18     Q    Just if you know.
19     A    I do not know.
20     Q    Do you know if they were directed to
21 Apollo?
22     A    I do not know.
23     Q    Do you know if they were directed to
24 Mr. Choi?
25     A    I do not know.

R. Berris

Page 537

1          Q       Do you know if they were directed to

2     Samuel Lui?

3          A       I do not know.

4          Q       So you don't know who or what entity

5     they were directed to?

6          A       I cannot recall at this time.

7          Q       Okay.  You know who Scott Sherwood is;

8     right?

9          A       Only after this lawsuit was filed.

10         Q       You didn't meet Scott Sherwood in

11    2014?

12         A       I believe I -- I never met him in

13    person.  I had entered into an NDA with him on

14    behalf of SCG, but since then I had no

15    communication with him whatsoever, especially

16    with regards to De Tomaso.

17         Q       My question was just, do you know who

18    he is.

19         A       Yes.

20         Q       Right.  You do.  And you met him as

21    early as 2014; right?

22         A       Only electronically.

23         Q       And he was a potential client at SCG;

24    right?

25         A       Yes.

R. Berris

Page 538

1        Q      And you corresponded with him during

2    your time with SCG; right?

3        A      Yes.

4        Q      And you had him sign an NDA with SCG;

5    right?

6        A      Yes.

7        Q      Okay.  Let's take a look at an

8    exhibit.  We're going to mark this as Exhibit 40.

9                (Berris Exhibit 40 was marked.)

10   BY MR. WERNER:

11       Q      Exhibit 40, right, this is the NDA

12   with Scott Sherwood; right?

13       A      Yes.

14       Q      I'll show you another document.  This

15   is going to be 41.

16               (Berris Exhibit 41 was marked.)

17       Q      Mr. Berris, what I'm handing you is an

18   article titled, "The Twisted Saga of the De

19   Tomaso P72"; right?

20       A      Yes.

21       Q      And you've seen this before; right?

22       A      I'm aware of this article, yes.

23       Q      And it's written by Scott Sherwood;

24   correct?

25       A      I know it's on his website.  I don't

R. Berris

Page 539

1    know who authored it.
2        Q    Okay.  Do you recall speaking to
3    Mr. Sherwood prior to publishing the article?
4        A    No.
5        Q    You did not do that?
6        A    I did not.
7        Q    Aren't you listed as one of the
8    sources for this article?
9            MR. SIMONS:  Objection to form.
10           THE WITNESS:  Not to my knowledge.
11   BY MR. WERNER:
12       Q    So you deny that you were one of the
13   sources for this article?
14       A    Yes, I deny.
15       Q    Okay.  I'm going to show you another
16   exhibit.  Mr. Berris, I'm handing you Exhibit 42.
17           (Berris Exhibit 42 was marked.)
18           And this is an Engagement Letter with
19   a law firm called Finch McCranie, LLP; right?
20           MR. SIMONS:  To the extent this
21           was produced, I think it was produced
22           inadvertently.  I think generally these
23           letters are considered privileged, so I
24           think I want to set this aside and initiate
25           a clawback under the Protective Order.

R. Berris

Page 540

```
1              MR. WERNER:  I don't think there's
2         anything privileged about this, but that's
3         fine.  I'm going to ask the questions
4         anyway, and you can object or instruct him
5         not to answer if you wish.
6    BY MR. WERNER:
7         Q    Do you recall engaging a law firm
8    called Finch McCranie?
9         A    I don't recall if I engaged them.  I
10   recall having a conversation with them.
11        Q    Okay.  You just don't recall whether,
12   in fact, you engaged them or not?
13        A    I do not recall.
14        Q    Okay.  Did you work with this law firm
15   to make any filings to the SEC?
16              MR. SIMONS:  Objection.  To the
17         extent you were working with them as
18         attorneys, that would be privileged
19         information.
20              THE WITNESS:  Yeah, I don't
21         recall.
22   BY MR. WERNER:
23        Q    Okay.  Did you engage this law firm to
24   make any filings with the SEC or any other
25   regulatory or law enforcement agencies?
```

R. Berris

Page 541

1          A     I don't recall.

2          Q     Okay.  And so you don't know whether

3     they did or not on your behalf; right?

4          A     I don't recall.

5          Q     Okay.  Did you enter any engagement

6     other than the one that's reflected in Exhibit 42

7     with this law firm?

8          A     I don't recall.

9          Q     Okay.  All right.  Mr. Berris, you

10    know you made a defamation claim against the

11    defendants; correct?

12         A     Yes.

13         Q     All right.  And you allege that

14    Mr. Choi made false and defamatory statements of

15    fact with reference to you, including that you

16    were fired from De Tomaso for incompetence;

17    right?

18         A     Amongst other items, yes.

19         Q     Well that's the one I'm focusing you

20    on now; okay?

21         A     Okay.

22         Q     So let's just focus on that specific

23    allegation.  It's at 193 of your Amended

24    Complaint if you would like to see it.

25         A     I take you at your word.

R. Berris

Page 542

1      Q      So what I'd like for you to do is tell
2   me the specific content of the statements that
3   you are referencing in Paragraph 193.
4      A      Yeah.  So at a -- and to keep it very
5   succinct for you, I was told from numerous
6   parties that Mr. Choi had approached them and was
7   tarnishing my name.  And with regards to the
8   incompetence, was telling them that all of the
9   delays and decisions with Capricorn, amongst
10   others, was my fault.  And these individuals, to
11   name two specifically, who relayed this to me --
12   if you didn't ask for the individuals, I can stop
13   answering.
14              MR. SIMONS:  He asked you a
15         question.  You're answering it to the best
16         of your ability.
17              MR. WERNER:  No, no, no.  He's not
18         answering my question.
19   BY MR. WERNER:
20      Q      You're not answering my question.
21              MR. SIMONS:  I think the record
22         will speak for itself.
23   BY MR. WERNER:
24      Q      That's fine.  If you would like to
25   continue, go ahead.

R. Berris

Page 543

1       A     If you feel that I'm not answering

2    your question, would you kindly just restate the

3    question so I can make sure that I'm being very

4    pointed?

5       Q     Sure.  Well, let me do this for you;

6    okay?

7       A     Uh-huh.

8       Q     I want to talk about this allegation;

9    okay.  And I'd like to know the specific contents

10   of Mr. Choi's statements.  Then I'm going to ask

11   you when he made them.  Then I'm going to ask you

12   to whom he made them.

13      A     Okay.

14      Q     Let's start with this.  I want to know

15   the specific content of the defamatory statements

16   that you allege Mr. Choi made about you.

17                  MR. SIMONS:  Objection to form.

18                  THE WITNESS:  Just to be clear,

19          you're only asking about incompetence and

20          not the other items listed on the Amended

21          Complaint?

22   BY MR. WERNER:

23      Q     I'm asking you specifically about your

24   allegation of incompetence at Paragraph 193 of

25   your Amended Complaint.

R. Berris

Page 544

```
 1        A      Okay.  Just so I can be very clear, do
 2    you mind if I see the Amended Complaint just so I
 3    can familiarize myself with that paragraph?
 4        Q      Sure.  I referenced Paragraph 193;
 5    okay?
 6        A      Okay.  Yes.
 7        Q      Okay.  What specifically did Mr. Choi
 8    say?
 9        A      Mr. Choi said that the -- to the best
10    I can recall, that the budgets were blown; the
11    program was massively delayed, and he put all the
12    blame on me.
13        Q      Okay.  Now who did he say those
14    statements to?
15        A      Jim Glickenhaus.  Gerald Ng(sic).
16        Q      Okay.
17        A      And those -- to be clear, those are
18    the only two individuals that I spoke with
19    directly, but then I have received many messages
20    that this has been communicated to others and
21    spread across the network.
22        Q      Okay.  You referenced Jim Glickenhaus
23    and Gerald Ng.
24               When were the statements made by
25    Norman Choi to Jim Glickenhaus?
```

R. Berris

Page 545

1          A       They were -- from what Jim told me,

2     they occurred in May of 2022, and June and July

3     of 2022, from what I can recall.

4          Q       Okay.  And Gerald Ng, when were the

5     statements made?

6          A       Gerald, I'm not entirely sure, because

7     I did not speak with Gerald until I first turned

8     my phone back on in October of 2022.  Gerald is

9     based in Singapore, and I became aware that there

10    was an international group of friends who were

11    trying to locate me, and as part of that, Gerald

12    told me when I called him, that he had reached

13    out through a friend of his in Hong Kong who

14    happened to know Mr. Choi, and demanded to speak

15    with Mr. Choi.

16              And Gerald told me that there was a

17    conversation had, and that Mr. Choi was

18    completely tarnishing my name and putting all

19    blame for supposed issues with the P72

20    development and delays on me personally.

21         Q       Okay.  I just asked you when that

22    conversation was, and I believe you testified

23    that you don't know.

24         A       I spoke to Gerald in October 2022.  I

25    don't know when he held a discussion with

R. Berris

Page 546

1    Mr. Choi.

2         Q      Right.  Okay.  And then you referenced

3    others and a network.

4             When were statements made to others

5    and the network?

6         A      So from what I was told, right after

7    Mr. Choi said these statements to Jim

8    Glickenhaus, Jim Glickenhaus then relayed this to

9    his son, Jesse Glickenhaus, who then communicated

10   these to a group chat with other contacts in New

11   York, U.S., and also in Europe and Asia.

12        Q      Okay.  So those weren't statements by

13   Mr. Choi.  Those were statements by others?

14        A      Based on what Mr. Choi told

15   Mr. Glickenhaus.

16        Q      Those were statements by other people;

17   not Mr. Choi; correct?

18        A      In that instance, yes.

19        Q      Okay.  And in terms of dates when that

20   was done, when was that done?

21        A      As I had not spoken to anyone prior to

22   October 2022, it must have occurred some time

23   after my departure in May up until October.

24        Q      Okay.  So you don't know when it was

25   done then?

R. Berris

Page 547

1         A      I don't know specific dates.

2         Q      Okay.  And if I ask you the same

3    question with respect to Mr. Glickenhaus in terms

4    of a specific date, am I correct that you don't

5    know that either?

6                MR. SIMONS:  Objection to form,

7         just which Glickenhaus we're referring to.

8    BY MR. WERNER:

9         Q      Jim Glickenhaus?

10        A      So Jim had told me that he had spoken

11   to Norman at an event in Italy called Villa

12   D'Este.

13        Q      And what was the date of that?

14        A      That would have occurred I think some

15   time in the third week of May 2022.  And then Jim

16   informed me that Norman had approached him on

17   subsequent occasions in the months of what I can

18   recall, I think, in June and July of 2022.

19        Q      Okay.  Now same paragraph, if you want

20   to keep looking at it, it's fine.

21               You allege that Mr. Choi made false

22   and defamatory statements that your incompetence

23   was the primary reason for production and

24   delivery delays with the P72; do you recall that?

25        A      Yes.

R. Berris

Page 548

1       Q    Now I have basically all of the same

2    questions.

3       A    Okay.

4       Q    But if they're the same, just tell me

5    that they're the same.

6       A    Understood.  So, no, there's different

7    parties.

8       Q    Okay.  So let's talk specifically then

9    about allegations of incompetence related to

10   production and delivery delays.

11         What exactly did Mr. Choi say?

12       A    So I will say the content of what was

13   relayed based on that is the same as the previous

14   answers, but I will just say there's new

15   individuals that pertain to Paragraph 194.

16       Q    It's still --

17         MR. SIMONS:  It's still 193.

18   BY MR. WERNER:

19       Q    It's still 193.

20       A    Okay.  Sorry.  Sorry.  I thought we

21   were on 194.

22       Q    No.  Well does your testimony change

23   if we're still talking about Paragraph 193?

24       A    Just because I'm trying to be as

25   efficient as possible.  So if you want me to name

R. Berris

Page 549

1    other individuals that pertain to what is covered

2    in 193, 194, because it appears to be quite --

3    like if you're asking for incompetence, it

4    appears to be, like, the same topic but just for

5    different parties; you know what I mean?  Am I

6    interpreting it the same way as you?

7         Q    What I'm asking you specifically is we

8    talked earlier about you being fired for

9    incompetence, which is also in 193.  And then

10   there's a reference that your incompetence was

11   the primary reason for production and delivery

12   delays.

13              And so my question initially was what

14   exactly did Mr. Choi say with respect to that

15   specific allegation around defamatory statements.

16        A    Okay.  So I was informed that Mr. Choi

17   had said the same things that were related to the

18   Glickenhauses and Gerald to other parties, and I

19   can provide some names.

20        Q    Okay.  Well let's start with this.

21        A    Sure.

22        Q    You said you were told that.  By whom?

23        A    By the individuals.

24        Q    Okay.  And who were those individuals?

25        A    So one would be Florian Kamelger.

R. Berris

Page 550

1          Q      Okay.

2          A      I can try -- I think I remember the

3    name -- the spelling right, but it's Florian.

4    And then the last name is K-A-M-E-L-G-E-R, from

5    what I can recall.  And his business partner,

6    Andreas Baenziger.  I'll spare you the last name.

7    I think it's more along the lines of how it

8    sounds.

9          Q      Anyone else?

10         A      Yes.  Stanley Cohen.  Bart Lennartz.

11         Q      Okay.  What else -- who else?

12         A      That's all I can recall offhand at the

13   moment.

14         Q      Okay.  That's fine.  Let's go down the

15   list.

16                In terms of when the statements from

17   Mr. Choi were made, when did he make the

18   statements with respect to Florian?

19         A      So I do not know the specific

20   timeline.  All I can tell you is that the first

21   time I spoke -- okay.

22         Q      What I'm asking you is for the

23   timeline.

24         A      Sorry.  I do not know the specific

25   timing.

R. Berris

Page 551

1       Q     What's the specific timing for Andreas

2    Baenziger?

3       A     It would have been the same time for

4    Florian.

5       Q     And your answer to that was you don't

6    know?

7       A     I do not know because my phone was off

8    at that time, and I did not speak with him until

9    2023 for the first time.

10      Q     And so with respect to Stanley Cohen

11   and Bart Lennartz, is it also the case that your

12   phone was off, so you don't know exactly when

13   those statements were made?

14      A     For Bart, I know that it was October

15   of 2022, 'cause I spoke to him on the same

16   evening that I spoke to Gerald Ng.

17      Q     Okay.  But I'm not asking when you

18   spoke to them.  I'm asking when Mr. Choi made the

19   allegedly defamatory statements about you to

20   these individuals.

21      A     Understood.  Sorry.  I'm not sure.

22      Q     And that goes for Mr. Cohen as well;

23   right?

24      A     Yes.

25      Q     All right.  Now sticking with 193, you

R. Berris

Page 552

1    further allege that Mr. Choi made a false and

2    defamatory statement that you had mismanaged the

3    company; do you see that?

4        A    Yes.

5        Q    What exactly did Mr. Choi say?

6        A    So I had received -- I spoke to

7    various parties, and some instances were Mr. Choi

8    had told clients that I had conducted

9    unauthorized activity.  That I had apparently

10   misappropriated company funds.

11       Q    Okay.  So with respect to those

12   statements, who did he make those statements to?

13       A    So I had spoken to Barry Skolnick, who

14   relayed this to me on the phone shortly before I

15   filed my Complaint.

16       Q    Okay.  That wasn't my question.  My

17   question was -- well let me make sure we're on

18   the same page.

19       A    Sure.

20       Q    I'm asking you who Mr. Choi made the

21   statements to.

22            Is it your testimony that he made them

23   to Barry Skolnick?

24       A    Sorry, sorry, sorry.  So I was

25   informed that these communications, these

R. Berris

Page 553

1    statements, were made to many De Tomaso clients

2    and dealer partners.

3         Q    And I'm asking you specifically

4    people, companies, what have you, who did

5    Mr. Choi make the statements to?

6         A    So from what was relayed to me, the

7    only person that I spoke to prior to filing of

8    the lawsuit was Barry Skolnick.

9         Q    Okay.  I understand your testimony

10   that Barry Skolnick was the one who told you that

11   Mr. Choi had made these statements; right?  What

12   I'm asking you specifically is who is it that

13   Mr. Choi actually made these statements to.

14        A    So Barry told me Mr. Choi made these

15   statements to him directly.

16        Q    Okay.

17        A    And then after filing the lawsuit

18   going through discovery, I have become aware that

19   Mr. Choi had similar discussions with many other

20   key clients.

21        Q    And who are those clients?

22        A    Carlos Peralta.  Stanley Cohen.  Evan

23   Cygler.

24             THE WITNESS:  Do you need that

25        one?  Okay.  Richard Koppelman.  Bailey

R. Berris

Page 554

1          Vanneck.  Thomas Middledorp.  Parties at
2          Rausch Industries.  Sorry, you just want
3          names.  Joshua King.  And Matthew Hepburn.
4     BY MR. WERNER:
5          Q     Okay.  Any others?
6          A     Yes.  Michael Bozzuto.  And that's all
7     I can recall offhand at the moment.
8          Q     Okay.  Now your conversation with
9     Mr. Skolnick, when was that?
10         A     In May of 2023.
11         Q     Can you be more specific?
12         A     I can say that it was before the
13    filing of this lawsuit, which I believe was
14    May 24th.
15         Q     That was the Amended Complaint.
16              MR. SIMONS:  That's the Amended
17         Complaint.
18              THE WITNESS:  Sorry.
19    BY MR. WERNER:
20         Q     It's not going to help you.
21         A     I think May 23rd or 24th, so prior to
22    that.
23         Q     Okay.  So Carlos, when did Mr. Choi
24    make statements to him?
25         A     In May of 2022.

R. Berris

Page 555

1       Q      Okay.  Can you be more specific?

2       A      Of the day?

3       Q      Yeah.

4       A      I cannot offhand.

5       Q      How about with respect to Stanley

6    Cohen; when did Mr. Choi make the alleged

7    statements?

8       A      Beginning of May of 2022, and

9    continued thereafter.

10      Q      Okay.  Let me ask you this:

11             For the other people that you

12   mentioned on the list, is May of 2022 going to be

13   the answer for all of those?

14      A      Or shortly thereafter, yes.

15      Q      Okay.  All right.  If you look at

16   Paragraph 194, you allege there that "Defendant

17   Choi made these false and defamatory statements

18   to third parties, including De Tomaso customers,

19   dealer partners and executives at other

20   automobile companies"; do you see that?

21      A      Yes.

22      Q      Okay.  Are the customers being

23   referenced there the ones that we have discussed

24   with respect to the allegations of 193?

25      A      Subject to check, yeah, that's a good

R. Berris

Page 556

1    response, yes.

2        Q    Okay.  And the same question really

3    with respect to dealer partners, are they the

4    ones referenced with respect to our conversation

5    around Paragraph 193?

6        A    Yes.

7        Q    Okay.  And the executives that you

8    referenced, who are they?

9        A    That would be Jim Glickenhaus, and

10   then also Florian and his business partner,

11   Andreas, who are heading Cosworth.

12       Q    And basically all I'm trying to get at

13   is the different categories of folks listed in

14   194.

15            Are they basically the folks that we

16   discussed in the context of 193?

17       A    Subject to check, I think that's fair,

18   yes.

19       Q    Okay.  All right.  Go to 196 of your

20   Amended Complaint.  You allege there, "As a

21   result of Defendant Choi's false and defamatory

22   statements to third parties, Berris has suffered

23   injuries to his reputation and had been impaired

24   in his ability to continue to work in the

25   high-end automobile industry in which he has

R. Berris

Page 557

1    worked for most of the past decade"; do you see

2    that?

3         A    Yes.

4         Q    Okay.  Can you please tell me

5    specifically how Mr. Choi's statements have

6    harmed you?

7         A    They have destroyed my reputation

8    amongst clients, partners, the insular world.

9    It's a very exclusive insular world, where

10   there's a handful of manufacturers and a small

11   group of clients, and this -- the false

12   statements that have been stated by Mr. Choi have

13   reverberated and been relayed to me, and it's

14   utterly devastating.

15        Q    Mr. Berris, has anyone told you that

16   they wouldn't hire you because of what Mr. Choi

17   said about you?

18        A    Yes.

19        Q    Who?

20        A    SCG.

21        Q    Is that Mr. Glickenhaus?

22        A    Yes.

23        Q    Anyone else?

24        A    I've -- that's the only one, to be

25   fair, that I have approached, because from what

R. Berris

Page 558

1    I've been informed from many parties

2    internationally, is that Mr. Choi has destroyed

3    my reputation.  So; therefore, I am maintaining

4    my focus on this lawsuit and a pursuit of

5    justice.

6         Q    What exactly did Mr. Glickenhaus say

7    to you?

8         A    He told me what Norman had relayed to

9    him, that -- that everything that was wrong with

10   the P72 program and delays were all as a result

11   of my doing.

12        Q    Yeah.  I guess what I'm getting at is

13   when I ask you has anyone told you that they

14   wouldn't hire you because of what Mr. Choi has

15   said about you, you referenced SCG and

16   Mr. Glickenhaus.

17             And what I'm asking you is what

18   specifically did Mr. Glickenhaus say about him

19   not hiring you?

20        A    They were not comfortable with what

21   Mr. Choi had told him about me, and with the

22   lawsuit pending, you know, they said that they

23   were not comfortable doing anything with me at

24   this time.

25        Q    Because the lawsuit was pending?

R. Berris

Page 559

1        A       Because what Mr. Choi had said about

2    me, and they are awaiting the outcome of this

3    legal dispute.

4        Q       They're waiting the outcome of the

5    legal dispute that you filed?

6        A       Yes.

7        Q       Okay.  Now I believe you testified to

8    this earlier, but just to be clear on this, you

9    haven't applied for employment with any company

10   in the insular world that you referenced since

11   your separation from De Tomaso; right?

12       A       I tried with SCG, and I viewed that as

13   my closest path, because I helped start that

14   company and they're my dear friends.  And when I

15   received the response from them, it further broke

16   my heart, and I knew that if they weren't willing

17   to work with me, then that was going to create an

18   issue for me going elsewhere.

19       Q       Okay.  So the answer to my question

20   was that you haven't applied for employment

21   elsewhere; right?

22       A       No.

23       Q       Okay.  So your conversation with

24   Mr. Glickenhaus, what role with SCG did you seek?

25       A       It was no -- it was casual discussions

R. Berris

Page 560

1    that we were having.  There was no, like,
2    specific title that I was seeking.  It was
3    exploring if there was a path, whereby we could
4    potentially work together --
5         Q    And when --
6         A    -- in some capacity.
7         Q    Yeah, and I'm asking you more
8    specifically, what capacity was discussed?
9         A    I was asking to see if there was any
10   capacity.
11        Q    And what did Mr. Glickenhaus say?
12        A    He said that they did not feel
13   comfortable doing anything at this time.
14        Q    Okay.  So were you discussing
15   specifically any employment with his company or
16   just opportunities more generally?
17        A    With his company.
18        Q    But in terms of what that employment
19   opportunity was, there was nothing specific
20   discussed; is that right?
21        A    I was open to various options.
22        Q    And my question was, were there any
23   specific options discussed?
24        A    No.  No.
25        Q    Okay.  Thank you.  But in terms of

R. Berris

Page 561

1    sending your resume out, you didn't send your
2    resume out to look for work; did you?
3        A    I never had a resume in my life.  My
4    resume has been my reputation, which Mr. Choi has
5    destroyed.
6        Q    Okay.  So the question that I asked
7    you was, did you send a resume out.  And your
8    answer is, you do not have a resume; right?
9        A    Correct.
10        Q    Okay.  And did you make any phone
11    calls to look for work other than your
12    conversation casually with Mr. Glickenhaus?
13        A    I tested the waters, and I was given
14    the same feedback from key individuals in my
15    network.
16        Q    And who were those key individuals in
17    your network?
18        A    So Florian Kamelger.
19        Q    Who else?
20        A    It was really just he and the
21    Glickenhauses.
22        Q    So what did you discuss with
23    Mr. Florian?
24        A    So what I discussed with Florian is
25    that he told me that he and Andreas had been

R. Berris

Page 562

1   trying to reach out to me since my departure.
2   They were concerned.  They relayed what Norman
3   had told them to harm my reputation.  And they --
4   I'll be very honest with you, they told me that
5   the only reason that they supported the De Tomaso
6   project or had interest in it was because of me.
7   And they were surprised that I would ever
8   associate myself with someone like Mr. Choi.  And
9   that they were hopeful that I am successful in my
10  pursuit of justice, and also that they were
11  willing to put together an investor group to buy
12  De Tomaso under the sole condition that Mr. Choi
13  was no longer involved.
14        Q    Okay.  So you had a conversation with
15  Florian, and he basically told you that he didn't
16  believe the things that Mr. Choi was saying about
17  you; right?
18        A    Florian personally told me this, yes.
19        Q    And so my question going back was,
20  what were the -- what, if any, job opportunities
21  did you pursue with Florian?
22        A    I have not.
23        Q    Okay.  So he discussed putting
24  together an investor group to buy De Tomaso and
25  have you lead it?

R. Berris

Page 563

1          A      Yes.

2          Q      And that obviously hasn't happened;

3     right?

4          A      Because I haven't further explored

5     that path with him.

6          Q      Okay.  Really what I was trying to get

7     at was whether you discussed with him any

8     concrete employment opportunities.

9          A      I did not.

10         Q      Okay.  All right.  And aside from

11    Mr. Glickenhaus and Florian, you didn't have

12    employment-related conversations with any other

13    person or company; is that right?

14         A      Yes.

15         Q      Okay.  So am I correct, then, that

16    since your separation from De Tomaso, you have

17    been unemployed?

18         A      Yes.

19         Q      Now you allege at Paragraph 179 that

20    "Defendant Choi has continued to make these

21    statements and has worked to attempt to erase

22    Berris' contributions to De Tomaso"; do you see

23    that?

24         A      Were you saying 179?

25         Q      I'm sorry.  197.

R. Berris

Page 564

1          A     Yes.

2          Q     Okay.  The statements that are

3     continuing to be made, what are those?  Are they

4     the same ones that we've discussed?

5          A     Yes.  Yes.

6          Q     Okay.  And to the extent that Mr. Choi

7     has continued to make them, who has he made them

8     to?

9          A     To De Tomaso clients and others in the

10     industry.

11          Q     Okay.  Others in the industry --

12          A     I guess I -- sure.  Specific.

13          Q     Well we've discussed a range of

14     customers, dealers, executives, the group that

15     you listed in 193 and 194.

16               So I'm asking you to the extent that

17     Mr. Choi has allegedly continued to make these

18     statements, are they to other people other than

19     the ones we've discussed?

20          A     There are others, but I cannot recall

21     all of them offhand at the moment.

22          Q     Can you recall any of them offhand at

23     the moment?

24          A     I refer back to the earlier list that

25     I provided to you.

R. Berris

Page 565

```
 1        Q     Okay.  And so you allege that they
 2   were continuing to be made, so when were those
 3   statements continuing to be made?  And I'm
 4   looking for timeframes different from the
 5   timeframes you gave me previously.
 6        A     I would say starting May 2022, and
 7   then they continued after the filing of my
 8   lawsuit.
 9        Q     Okay.  And I'm asking you
10   specifically, when were they made?
11        A     As I would not be present at the times
12   that they occurred, I cannot speak to precisely
13   when they were.
14        Q     Well you don't know when they were
15   made; right?
16        A     Not specifically.
17        Q     And you don't even know if they were
18   made; right?
19        A     I believe that the people that are
20   relaying this to me would be -- not be
21   fabricating.
22        Q     I'm not asking you what you believe.
23   I'm asking you what you know, sir.
24              And you don't know whether or not they
25   were made; correct?
```

R. Berris

Page 566

```
 1                    MR. SIMONS:  Objection to form.
 2                    THE WITNESS:  I do through
 3         discovery now via email.
 4    BY MR. WERNER:
 5         Q    Okay.  And, again, putting aside what
 6    we've already discussed, the continued
 7    statements, what exactly were they?
 8         A    There are a few that I can recall
 9    offhand, but meeting my long-term friend,
10    Mr. Cohen, who I knew far before I ever met
11    Mr. Choi.
12         Q    The guy whose funeral you didn't
13    attend?
14                    MR. SIMONS:  Paul, that is
15         inappropriate and out of line and you know
16         that.  Really.
17                    MR. WERNER:  It's perfectly
18         appropriate.
19    BY MR. WERNER:
20         Q    Answer the question.
21                    MR. SIMONS:  Mr. -- you can answer
22         the question.
23                    THE WITNESS:  Leading Mr. Cohen
24         who was a long-time friend of mine, dear
25         friend, stating to Mr. Choi and others in an
```

Page 567

1           email that, I never thought that Ryan would

2           be the Bernie Madoff of New England.

3     BY MR. WERNER:

4           Q     Okay.  Let's talk about that

5     statement.

6                 That statement was made by Mr. Cohen;

7     right?

8           A     In response to information that was

9     provided by Mr. Choi.

10          Q     You don't know that.

11                MR. SIMONS:  Objection.  There's

12          no question pending.

13    BY MR. WERNER:

14          Q     You don't know what that statement was

15    made in response to; do you?

16          A     You have provided us email threads

17    which show information and false accusations that

18    were provided to De Tomaso through privates and

19    investigations that were then forwarded from

20    Mr. Choi to Stanley Cohen.

21          Q     So your testimony around the

22    statements that were made to and by Mr. Cohen

23    came from your review during discovery of text or

24    email communications between Mr. Norman and --

25    Mr. Choi and Mr. Cohen; right?

R. Berris

Page 568

1          A      In part.

2          Q      What else did they come from?

3          A      Communications with Barry Skolnick on

4     the phone.

5          Q      Okay.  You learned about

6     communications between Mr. Choi and Mr. Cohen

7     from Mr. Skolnick?

8          A      Not Mr. Cohen.  Just from Mr. Choi.

9     So just to be clear, so you're only asking me in

10    relation to Mr. Cohen?

11         Q      I'm just trying to -- first, you

12    mentioned Mr. Cohen, so I'm trying to understand

13    what your knowledge is.  What your actual factual

14    basis is for your allegation there; okay?  And

15    you referenced an email or text.

16                What I'm asking is, is your

17    understanding from any other source of knowledge?

18         A      Outside of emails that were produced?

19    For Mr. Cohen, none outside of the emails that

20    were produced, because I did not speak to him

21    after filing the lawsuit or before.

22         Q      Okay.  That's all I wanted to know.

23    Thank you.

24         A      Okay.

25         Q      Now aside from Mr. Cohen, after your

R. Berris

Page 569

```
 1      Complaint was filed, who else did Mr. Choi make
 2      statements to?
 3                    MR. SIMONS:  Objection to form.
 4      BY MR. WERNER:
 5          Q    Do you understand what I'm asking?
 6          A    Yes.
 7          Q    Okay.
 8          A    I cannot recall offhand.
 9          Q    Okay.  All right.  So since you can't
10      recall that offhand, if I ask exactly what was
11      said, you also wouldn't be able to recall that
12      offhand; true?  Right?
13                    MR. SIMONS:  Objection to form.
14                    THE WITNESS:  I would state
15          basically what was -- what I became aware of
16          was the statements Mr. Choi was saying were
17          pretty much uniform across parties.
18      BY MR. WERNER:
19          Q    Okay.  I was really asking you
20      specifically who those parties were, and I
21      thought you told me you can't recall who they
22      were offhand.
23          A    Outside of -- yeah, I stand by my
24      original answer.
25          Q    Okay.  So you can't recall who they
```

R. Berris

Page 570

1    are?

2         A    Your question was after the lawsuit

3    was filed.  At this time, I cannot recall

4    offhand.

5         Q    All right.  So then am I correct in

6    further understanding that with respect to what

7    specifically was said and when it was said to

8    those parties who you cannot recall, you would

9    not be able to tell me that either?

10         A    Would you mind just restating the

11    question?  It was a long one.

12         Q    Sure.  It's just I asked you who the

13    parties were.  You said you couldn't recall.

14              So if I want to know more about what

15    was said to those parties or when it was said, am

16    I correct that you can't tell me those things

17    today either?

18         A    I cannot recall that information

19    offhand.

20         Q    That's fine.  Okay.

21              MR. WERNER:  Can we take a real

22         short break?

23              MR. SIMONS:  Sure.

24              MR. VIDEOGRAPHER:  Off the record

25         at 15:26, marking the end of Media Unit No.

R. Berris

Page 571

```
 1        2.
 2                    (Whereupon there was a brief
 3        recess.)
 4                    MR. VIDEOGRAPHER:  On the record
 5        at 15:38, beginning Media Unit No. 3.
 6   BY MR. WERNER:
 7        Q     Mr. Berris, you testified earlier
 8   around some threats made to you by Mr. Lui; do
 9   you recall that testimony?
10        A     Yes.
11        Q     And specifically you testified that
12   Mr. Lui threatened you on or around May 19th; do
13   you recall that?
14        A     Yes.
15        Q     Now that specific threat, was that
16   made over WhatsApp?
17        A     That was on the phone.
18        Q     It was on the phone.
19              So how often was it on WhatsApp, phone
20   or something else?
21        A     I don't recall.  Likely.  Likely,
22   yeah.
23        Q     Did you talk to him other than on
24   WhatsApp phone?
25        A     I don't recall.
```

R. Berris

Page 572

1          Q      And, again, I'm using "WhatsApp phone"
2     like for lack of a better --
3          A      Sure.
4          Q      -- term.
5          A      That's fair.
6          Q      So WhatsApp is a messaging platform on
7     which you can send essentially text messages;
8     right?
9          A      Texts or phone calls, yeah.
10         Q      You've got to let me just --
11         A      Sorry.
12         Q      Just answer the question I'm asking;
13    okay?
14                So you can send basically just text
15    messages over WhatsApp; right?
16         A      Yes.
17         Q      And you can also make telephone calls
18    over WhatsApp?
19         A      Yes.
20         Q      Okay.  So your communications making
21    phone calls, right, with Mr. Lui, were those over
22    the WhatsApp platform?
23         A      On some occasion.  I don't know if I
24    could speak for all of them.
25         Q      If it weren't over WhatsApp, how were

R. Berris

Page 573

1    you having phone conversations with Mr. Lui?

2         A      It would be via either regular phone

3    call or maybe another messaging app, such as

4    maybe Signal or Telegram or something like that.

5         Q      Did you have communications with Mr.

6    Lui using another messenger app?

7         A      Not that I can recall.

8         Q      Okay.  So, no, you did not?

9                     MR. SIMONS:  Objection to form.

10                    THE WITNESS:  Subject to check, I

11           don't believe so.

12   BY MR. WERNER:

13        Q      We haven't seen any of those kinds of

14   communications in your document production, so

15   that's why I'm asking to try to understand

16   whether, in fact, you had those communications.

17              So do you recall whether or not you

18   had communications with Mr. Lui over any kind of

19   messaging platform other than WhatsApp?

20        A      I do not recall.

21        Q      Did you have landline phone calls with

22   Mr. Lui?

23        A      I do not recall.

24        Q      You and Mr. Lui were in different

25   countries and on different continents when you

R. Berris

Page 574

1    had telephone calls; right?

2              MR. SIMONS:  Objection to form.

3              THE WITNESS:  Not always.

4    BY MR. WERNER:

5         Q    Okay.  Do you recall where you were on

6    May 19th?

7         A    I was in Italy.

8         Q    Okay.  Do you recall where Mr. Lui

9    was?

10        A    I didn't know his location.

11        Q    Okay.  Would you have made a regular

12   landline phone call to Mr. Lui from Italy?

13        A    Typically, no.

14        Q    Okay.  I mean, the truth is, to the

15   extent that you talked to Mr. Lui live

16   synchronously, it was over WhatsApp telephone;

17   right?

18        A    Usually, yes.

19        Q    Well not usually.  Only; right?

20        A    I can't speak.  There may have been

21   occasions where I called on a regular phone.  I

22   just can't recall specifically.

23        Q    You couldn't tell me sitting here

24   today a single occasion that you had a telephone

25   call with Mr. Lui that it wasn't over WhatsApp;

R. Berris

Page 575

1    right?

2         A    I could not say definitively.

3         Q    All right.  Mr. Lui -- Mr. Berris --

4    Mr. Lui.

5         A    That's okay.

6         Q    Mr. Berris, in your earlier testimony

7    do you recall you testified around chassis

8    allocations for De Tomaso vehicles?

9         A    Yes.

10        Q    I want to show you a document that

11   we're going to identify as Exhibit 43.

12             (Berris Exhibit 43 was marked.)

13             Mr. Berris, I'm handing you Exhibit

14   43.  The first question is, do you recognize this

15   document?

16        A    Let me look at it.

17        Q    Of course.

18        A    Yes.

19        Q    And I'm correct, aren't I, that this

20   is an email from you to Mr. Choi dated May 17,

21   2021; right?

22        A    Yes.

23        Q    And the attachment which is

24   referenced, "De Tomaso P72, Global Chassis

25   Allocations, Internal Use Only," is a document

R. Berris

Page 576

1    that you created; right?

2         A    I believe so, yes.

3         Q    You can put that aside.

4              During our last session together, we

5    had some discussions around expenses; do you

6    recall that?

7         A    Yes.

8         Q    Okay.  And you mentioned at one point,

9    that every expense that you invoiced to De Tomaso

10   was a business expense; right?

11        A    I believe so, yes.

12        Q    Okay.  And you mentioned as well that

13   at some point, you gave up your personal

14   residence to have less of a financial strain on

15   yourself and you started staying at hotels; do

16   you remember that?

17        A    Yes.

18        Q    So at that time, you weren't paying

19   any personal rent for any residence; right?

20        A    Correct.

21        Q    And you weren't paying any mortgage

22   for a personal residence; right?

23        A    Correct.

24        Q    And am I correct that when you were

25   not traveling for De Tomaso, you worked for the

R. Berris

Page 577

1    company from an office in New York; right?

2         A    When I was not traveling for work, it

3    would typically be my office in -- I didn't have

4    an office in New York.  So I had hotel rooms in

5    New York.  I had an office in Glastonbury,

6    Connecticut, where I spent a lot of time.

7         Q    Okay.  And the office in Glastonbury,

8    was that a De Tomaso office?

9         A    It was a space that I provided to De

10   Tomaso at no cost, but it was my father's

11   personal office.

12        Q    Right.  So it wasn't space that you

13   provided.  It was space that your father

14   provided?

15        A    At my request, yes.

16        Q    Okay.  And so when you were not

17   traveling outside of the U.S. and you were

18   working locally here, you would work in

19   Connecticut?

20        A    If I wasn't -- didn't have to be in

21   New York, then -- I wouldn't need to travel, I

22   was typically working from that office in

23   Glastonbury, Connecticut, yes.

24        Q    So after you gave up your residence,

25   which I think I recall was in Connecticut; right?

R. Berris

Page 578

1          A     Correct.

2          Q     You were staying at hotels when you

3     were in New York; right?

4          A     When I was in New York, yes.

5          Q     Okay.  So when you weren't traveling

6     for De Tomaso outside of the city, you would stay

7     at hotels in the city; right?

8          A     No.

9          Q     Where would you stay?

10         A     When I wasn't -- didn't have to travel

11    for work, many times I would sleep in my office

12    in Glastonbury, Connecticut or sleep in my car.

13         Q     Okay.  So when was it that you were

14    staying in hotels in New York City?  Were you

15    doing that for the company, you're saying?

16         A     Yeah.  When I was in New York, it was

17    for the company.  I really took no personal time.

18         Q     That was my question.

19               So when you were in New York City, you

20    were staying in hotels; right?

21         A     Yes.

22         Q     Okay.

23         A     With the exception of there was a few

24    occasions that I would stay at my sister's

25    apartment on her couch when she was living in New

R. Berris

Page 579

 1    York, but then she moved to Chicago, so that was

 2    no longer an option.

 3         Q      When you were in New York, you stayed

 4    at your sister's apartment how many nights?

 5         A      I don't recall offhand.

 6         Q      Okay.  How many nights did you stay at

 7    hotels?

 8         A      I don't recall offhand.

 9         Q      To the extent that you stayed in

10    hotels, you would submit those stays for

11    reimbursement to De Tomaso; right?

12         A      On most occasions, yes.

13         Q      Okay.  And you also submitted

14    restaurant bills to De Tomaso for reimbursement

15    when you were in New York as well; right?

16         A      Some, yes.

17         Q      Would you consider entertainment to be

18    a business expense?

19         A      Yes.

20         Q      How about clothing purchases?

21         A      If it had a business purpose, such as

22    dress shirts for the team or something along

23    those lines, yes.

24         Q      How about dress shirts for you; would

25    those be a business expense?

R. Berris

Page 580

1          A      The only dress shirts that I used were
2      the same ones that I bought for Mr. Choi.  And we
3      had De Tomaso embroidered, and that was basically
4      what I wore almost every day.
5          Q      That wasn't my question.
6                 To the extent that you purchased
7      shirts, just dress shirts, were those personal or
8      business expenses?
9          A      Are you referring to ones I would
10     expense to the company?
11         Q      Uh-huh.
12         A      They would be for business.
13         Q      How about haircuts; is that a personal
14     expense or a business expense?
15         A      I don't recall those expenses.
16         Q      Is a haircut a business expense or a
17     personal expense, to your mind?
18         A      I think maybe if I was going to get
19     prepared for an event or meet with clients, to
20     look professional, it could be considered a
21     business expense.  I'm not an expense expert and
22     there was no formal expense policy.
23         Q      How about medicine; is that a personal
24     expense or a business expense?
25         A      Medicine?  I would imagine that would

R. Berris

Page 581

1    be personal, unless I was buying it for someone

2    on the team.  I just can't recall without further

3    context.

4        Q    How about skin care products; are

5    those personal or business expenses, to your

6    mind?

7                MR. SIMONS:  Objection to the

8        form.

9                THE WITNESS:  I would imagine that

10       would be personal.

11   BY MR. WERNER:

12       Q    How about groceries; would those be

13   business expenses or personal expenses?

14       A    I would never buy groceries, as I did

15   not have a home, so I would always just go out to

16   Whole Foods with team members where I was, so we

17   would have our meals as I was working during my

18   waking hours.

19       Q    So daily meals at Whole Foods would be

20   a business expense; is that what you're saying?

21       A    I think it would be construed as,

22   like, a per diem, something along those lines,

23   but there was no formal policy.  This is -- my

24   expenses followed the same protocols and

25   procedures that I did starting at the beginning

R. Berris

Page 582

1    of my relationship with Apollo De Tomaso and

2    never changed.

3        Q      That really wasn't what I asked you.

4    That's okay.  Let's take a look at a document

5    there, which we're going to label as Exhibit 44.

6            Okay.  I'm going to hand you what has

7    been previously marked as Exhibit 30, which

8    you've seen before, but you can see anew now.

9        A      Okay.

10       Q      If you turn to Page 3 of 6, which is

11   Berris ending in 297 --

12       A      Yes.

13       Q      -- you see an entry there for 27,000

14   and some change?

15       A      Yes.

16       Q      And the expense is designated as De

17   Tomaso Event 25 Cipriani?

18       A      Yes.

19       Q      So you would agree with me that that

20   Cipriani event was paid for out of the De Tomaso

21   account?

22       A      At this time, and then -- at this

23   time, yes.

24       Q      Well, what do you mean by "at this

25   time"?

R. Berris

Page 583

```
1        A      It was a later -- later when my
2    expense report was issued for, I believe, roughly
3    the range of August 16th to December 31st
4    prepared by Hugo, Diana was coming back to me and
5    asking me to deduct the cost of the Cipriani
6    event from expenses that were due to me.  And I
7    agreed, so that ended up being deducted from
8    amounts that were due as part of my expenses.
9        Q      Where is that reflected?  And by
10   "where," I mean in a document of any kind.
11       A      That would be reflected in the zip
12   file that I sent to Ms. Majcher on multiple
13   occasions leading all the way up to, I think, May
14   19th or right around there of 2022.
15       Q      Can you tell me what press attended
16   this Cipriani event?
17       A      I don't recall all the attendees
18   offhand.
19       Q      I'm not asking you to recall all the
20   attendees offhand.  I'm asking you to recall
21   which press attended the event.
22              Can you tell me any press that
23   attended the event?
24       A      So the spirit of the event was to --
25       Q      I'm not asking you about the spirit of
```

R. Berris

Page 584

1      the event.  I'm asking you a very, very, very

2      simple question, so please just focus on the

3      question.

4            A      Sure.

5            Q      What press attended the event?

6            A      It was not meant to be a press event.

7            Q      Okay.  So am I to take it from that

8      answer that there was no press that attended the

9      event?

10           A      I wouldn't say that.  There was press

11     there who had a relationship with the press, but

12     they were not there to coverage it from a press

13     standpoint.  They were there to video the event

14     for future use.

15           Q      We'll try this one more time.

16                  What names or organizations associated

17     with the press attended the Cipriani event?

18           A      From what I can recall offhand, I

19     would say J.F. Musial.  John Francis Musial.

20           Q      And J.F. Musial is what or who?

21           A      So J.F. is very well known in the

22     automotive industry.  We worked with him and his

23     company on many videos in the past years.  And

24     J.F. was also the founder of a website called

25     thedrive.com, which is one of the most

R. Berris

Page 585

1    heavily-trafficked automotive websites.

2        Q    Okay.  And you're saying that he

3    attended the event, but not in his capacity as a

4    member of the press?

5        A    Correct.  He was there to film the

6    event.

7        Q    Oh, he was there to film the event?

8        A    Yes.

9        Q    For De Tomaso?

10        A    Yes.

11        Q    Not for press?

12        A    For future use after editing for

13    marketing purposes.

14        Q    We're going to go look at another

15    document which has been previously marked as, I

16    believe, 31.  And, Mr. Berris, we looked at this

17    email before.  It's an email from Diana to you

18    dated March 24, 2022; right?

19        A    Yes.

20        Q    Okay.  And I'm correct in

21    understanding that you did not respond in writing

22    to this email; right?

23        A    I believe that I did, but I would have

24    to go back and check the records.

25        Q    So sitting here today, you can't tell

R. Berris

Page 586

1    me whether or not, in fact, you responded to this

2    email in writing?

3        A    What I can recall is that there were

4    multiple communications with Ms. Majcher.  I

5    responded on numerous occasions.  The numbers

6    that were there I worked with her to check, and

7    then any further substantiation that she needed,

8    I worked to provide and send to her, leading up

9    until I think maybe the day of my departure from

10   the company or maybe a couple days before.

11       Q    Mr. Berris, that wasn't my question,

12   so I'm going to reask it.

13            My question was sitting here today, do

14   you recall whether or not you responded in

15   writing to this email?

16       A    Without seeing the thread of this

17   email, I cannot say definitively.

18       Q    So sitting here today, you do not know

19   whether or not you responded to this email;

20   correct?

21       A    I believe that I did, but I would need

22   to check.

23       Q    I'm not asking you what you believe.

24   I'm just asking you what you know sitting here

25   factually, and I'm correct that right now, you

R. Berris

Page 587

1    cannot tell us whether or not you, in fact,

2    responded to this email in writing.

3          A      I cannot say definitively.

4          Q      Right.  That's -- okay.  Let's take a

5    look at another email here.  Mr. Berris, I'm

6    handing you what was previously marked as Exhibit

7    32.  Again, you've seen this before.

8                 This is emails back and forth between

9    you and Diana; right?

10         A      Yes.

11         Q      Okay.  And you recall -- we talked

12   about this a bit before, but just to reorient

13   you, this is Diana telling you auditors are

14   asking De Tomaso to justify certain transfers

15   made to Aprivy; right?

16         A      Just let me peruse the document

17   quickly.

18         Q      Sure.

19         A      Okay.  I'm ready.

20         Q      Can you answer my question?

21         A      Would you just mind restating it?

22         Q      Sure.

23         A      Sure.

24         Q      This is -- in this email, Diana's

25   telling you that auditors are asking De Tomaso to

R. Berris

Page 588

1    justify certain transfers made to Aprivy; right?

2        A    Yes.

3        Q    And Aprivy, we previously discussed,

4    is your company; right?

5        A    Correct.

6        Q    And what Diana is saying is that there

7    are certain transfers here that are over

8    $730,000.00 that are not supported; right?

9        A    This is what she's stating here, yes.

10       Q    Right.  And you would agree with me

11   that she is following up repeatedly asking for

12   you to provide documentation to support those

13   expenses; right?

14               MR. SIMONS:  Objection to form.

15               THE WITNESS:  It appears so, yes.

16   BY MR. WERNER:

17       Q    Okay.  And you would agree with me

18   that you did not, in fact, provide documentation

19   to her in response to her inquiries.

20       A    No.  I did.

21       Q    Okay.  When did you do that?

22       A    I do not recall specifically, but I

23   believe I sent her many communications throughout

24   the course of following this email, all the way

25   up until my departure to the company.

R. Berris

Page 589

1        Q      So your testimony is that after

2    April 11, 2022, you responded to her in writing

3    with documentation around the expenses?

4        A      Yes.

5        Q      Okay.  What email did you use, or was

6    it over email?

7        A      My De Tomaso email.

8        Q      Oh, okay.  Let me ask you this:

9               Do you recall submitting credit card

10   expenses?

11       A      I recall submitting credit card

12   statements to help match up expenses, yes.

13       Q      Okay.  Did you -- beyond providing

14   credit card statements, did you provide anything

15   detailing the business purpose for specific

16   expenses listed in your credit card bills?

17       A      Yes.  I believe I sent a zip file that

18   had hundreds, if not, thousands of documents that

19   I never received a response from.

20       Q      And what were those documents?

21       A      A detailed Excel spreadsheet.

22   Receipts and other documentation to support any

23   expenses.

24       Q      Okay.  So you submitted credit card

25   bills and you submitted receipts?

R. Berris

Page 590

1          A     Yes.

2          Q     Did you submit anything that tied

3    together expenses and receipts and provide

4    information around why the receipts were proper

5    business expenses?

6          A     I provided, from what I believe,

7    everything that Ms. Majcher asked for.  And then

8    I even in that emails -- in those emails told her

9    that I was on standby to provide any further

10   assistance, but I received no responses.

11         Q     Okay.  That wasn't my question.

12               My question was in addition to the

13   credit card bill or bills and the receipt that

14   you provided in a zip file, did you provide any

15   narrative linking together the bills, the

16   receipts and any narrative around why or how the

17   receipts were business expenses for De Tomaso?

18                    MR. SIMONS:  Objection to form.

19                    THE WITNESS:  I cannot recall

20          everything that I provided in that zip file,

21          but I believe it was quite comprehensive,

22          and I said to Diana that if there were any

23          further questions, I was more than happy to

24          help.

25

R. Berris

Page 591

1    BY MR. WERNER:

2         Q    I'm sorry.  I didn't ask if it was

3    comprehensive.  I asked you whether you provided

4    specific information.  And if I'm parsing through

5    your testimony, my understanding of what you just

6    said is that, no, you did not provide a narrative

7    linking together credit card entries, receipts

8    and business purposes; right?

9              MR. SIMONS:  Objection to form.

10             THE WITNESS:  I don't recall ever

11        being asked for that, and I also don't

12        recall all of the information that I

13        provided, because I believe at least it was

14        hundreds of documents, if not, thousands.

15   BY MR. WERNER:

16        Q    I did not ask you what you were asked

17   to provide.  I asked you what you provided.  And

18   if I'm understanding your testimony, sitting here

19   today, you cannot recall one way or the other

20   whether you provided the information that I was

21   asking about; right?

22             MR. SIMONS:  Objection to form.

23             THE WITNESS:  Correct, yes.

24   BY MR. WERNER:

25        Q    All right.  Mr. Berris, I'm going to

R. Berris

Page 592

1    hand you what we, in fact, are going to mark as

2    Exhibit 44; okay?

3                    (Berris Exhibit 44 was marked.)

4            Have a look at that one; okay?

5                    MR. SIMONS:  Is this a produced

6        document?

7                    MS. WIGGER:  Yes, it is

8        DT0000033304.

9                    MR. SIMONS:  33304.

10   BY MR. WERNER:

11       Q    Have you had a look at this one?

12       A    I've -- I've skimmed it.

13       Q    Okay.  You recognize this; right?

14       A    Yes.

15       Q    These are your Apple card

16   transactions; right?

17       A    That's what it says, yes.

18       Q    And this is information that you

19   provided to Diana when asked to submit your

20   expenses; right?

21       A    I don't recall.  I mean, to be very

22   clear, I -- Hugo was tasked with preparing these

23   for me, and I gave him requested information.

24       Q    Was Hugo your assistant?

25       A    I mean, he assisted with many things.

R. Berris

Page 593

1    He wore many hats.

2           Q    Was he your assistant?

3           A    If I were to have one, I would say

4    yes.

5           Q    Did you have one?

6           A    Not formally.

7           Q    So was he your assistant?

8           A    That wasn't his official title, but he

9    was assisting on many matters that I needed help

10   with because I had an extreme workload on my

11   plate.

12          Q    Was Hugo your assistant; yes or no?

13          A    I don't know how you would define.  I

14   mean, in writing, no, but he assisted me with

15   many matters, yes.

16          Q    So was he your assistant -- putting

17   aside titles, job descriptions, did he function

18   within the company as your assistant?

19          A    Hugo had many roles.

20          Q    Hugo is a professional driver for De

21   Tomaso; right?

22          A    Amongst other responsibilities.

23          Q    Was one of his responsibilities being

24   your assistant?

25          A    He assisted me with many activities,

R. Berris

Page 594

1    including helping me with the preparation for my

2    expenses for -- as part of the audit process with

3    Ms. Majcher.

4         Q    Was it one of Hugo's job

5    responsibilities to prepare your expense

6    submissions?

7         A    In this case it was, because I was too

8    busy, and he offered to lend his hand.

9         Q    So one of the things that Hugo was

10   paid for was to perform the task of submitting

11   your expenses because you were too busy?

12                   MR. SIMONS:  Objection to form.

13                   THE WITNESS:  In this instance, he

14        offered to help, and yes.

15   BY MR. WERNER:

16        Q    So he was performing this as part of

17   his job duties for De Tomaso?

18        A    Yes.

19        Q    Okay.  Exhibit 44, that's an Excel

20   sheet that you provided to submit -- to support

21   your expenses to the auditors; right?

22        A    To be fair, I don't recall all the

23   documents that were in that file.

24        Q    Did you put all the documents in the

25   file?

Page 595

1          A     I gave documents to Hugo.  Hugo
2     prepared the spreadsheet with the expenses
3     listed, and then all corresponding documentation.
4          Q     Who put the documents in the file?
5                MR. SIMONS:  Objection to form.
6                THE WITNESS:  In the file that was
7          zipped to Ms. Majcher?
8     BY MR. WERNER:
9          Q     Yes.
10         A     These were documents that I believe I
11    gave information to Hugo.  Hugo then prepared and
12    sent to me, and I believe I then sent to Ms.
13    Majcher, if I recall correctly.
14         Q     Who put the documents in the file?
15         A     I would say it would likely be Hugo
16    and I.
17         Q     Do you know?
18         A     I don't recall.
19         Q     In any event, these are your expenses
20    from September 2021; right?
21         A     I don't know if these were listed as
22    expenses.  This looks like a spreadsheet of
23    credit card charges.
24         Q     Okay.  Look at the transaction for
25    September 1, 2021.  There's an expense for

R. Berris

Page 596

1     Bloomingdale's for $215.49.

2          A     Would you say the date again?

3     September 15th?

4          Q     September 1st.

5          A     September 1st.

6                MR. SIMONS:  It's the fifth up

7          from the bottom on the third page.

8                THE WITNESS:  Okay.  I do see

9          this, yes.

10    BY MR. WERNER:

11         Q     Bloomingdale's is a department store;

12    right?

13         A     Yes.

14         Q     What did you purchase at

15    Bloomingdale's on that day that was a business

16    expense for De Tomaso?

17         A     Yeah.  So I see here this says Newport

18    Beach, California.  And what I recall is I

19    believe Hugo and Mr. Choi and I were together.

20    We were on business in the area and we needed to

21    have additional luggage to ship back some

22    additional items that we incurred on that trip,

23    and we went to Bloomingdale's together.  And I

24    think we purchased, like, a cheap suitcase or

25    something like this.

R. Berris

Page 597

1      Q    So the expense for Bloomingdale's was
2  a suitcase?
3      A    To the best of my knowledge, I believe
4  that's what it was, yes.
5      Q    Okay.  If you look at -- how would Ms.
6  Majcher or De Tomaso's auditors be able to
7  discern from this document that that expense was
8  for a suitcase to carry back De Tomaso stuff?
9                MR. SIMONS:  Objection to form.
10                THE WITNESS:  I don't believe I
11      was ever asked about that specific instance.
12  BY MR. WERNER:
13      Q    You really just need to answer the
14  question that I asked.
15      A    Okay.
16      Q    Not one that you want to answer; okay.
17                Using this document or anything else
18  you submitted, how would the auditors know what
19  that expense was for?
20      A    I believe if it raised an issue for
21  them, they could ask.  To my knowledge, they
22  never asked me.
23      Q    Again, not my question.
24                How is it that the auditors would use
25  the information that you provided to understand

R. Berris

Page 598

1    that that expense was for luggage for the

2    company?

3                    MR. SIMONS:  Objection to form.

4                    THE WITNESS:  I don't know.

5    BY MR. WERNER:

6        Q     Okay.  Thank you.  There's an entry on

7    September 5th, 2021 for $112.00 at Charles

8    Tyrwhitt; right?

9        A     Yes.

10       Q     And if you look at September 11, 2021,

11   there's another expense from the same merchant

12   for $244.00?

13       A     Yes.

14       Q     Okay.  Charles Tyrwhitt's a menswear

15   company; right?

16       A     Yeah, that's where Mr. Choi and I, we

17   used to buy our favorite shirts.

18       Q     What did you purchase on the 5th and

19   the 11th?

20       A     Subject to check, I believe it would

21   just be the dress shirts that we would always

22   buy, and then have embroidered for De Tomaso that

23   we would wear almost every day.

24       Q     Do you recall having those shirts

25   embroidered?

R. Berris

Page 599

1          A      Yes.

2          Q      And going back to an earlier question

3     with respect to Bloomingdale's, again, if you're

4     De Tomaso's auditors, you wouldn't be able to

5     know that from this information here; right?

6          A      That seems fair.

7          Q      Okay.  Now on the 17th, if you look,

8     there's an expense for Blue Ribbon Brasserie for

9     $875.05.

10         A      Yes.

11         Q      That's a restaurant; right?

12         A      Correct.

13         Q      Okay.  Who dined at the restaurant on

14    the 17th?

15         A      I believe -- I'm trying to recall.  I

16    believe I was there.  Ms. Jorda was there.  Some

17    of her key contacts in the press was there.

18    Rihanna's business manager was there.  Amongst a

19    few others who attended the Me Isabelle event,

20    but I can't recall everyone specifically.  And I

21    also don't recall if this was ever formally

22    expensed.

23         Q      This is listed in the information that

24    you provided to Diana; right?

25         A      Yes, but that doesn't necessarily mean

R. Berris

Page 600

1    that everything on the list is put as an expense.

2         Q    Subject to check, would you just agree

3    with me that your cover email says that

4    everything in here was properly expensed?

5                   MR. SIMONS:  Objection to form.

6    BY MR. WERNER:

7         Q    So you don't know whether that was a

8    proper expense or not?

9         A    I don't know if that was ever expensed

10   at all.

11        Q    And going back to my earlier question,

12   you don't know how the auditors would be able to

13   piece together whether this was a proper expense

14   or not based on the information submitted?

15        A    I can't speak to their process, so,

16   no.

17        Q    The Hermes campus meetings in Paris,

18   was Carmen Jorda present for that?

19        A    She was not.

20        Q    If you look at Exhibit 44, there are a

21   number of entries for Whole Foods.

22        A    Yes.

23        Q    What were those expenses for?

24        A    Typically, Mr. Choi or Mr. de Sadeleer

25   and I or all of us would -- and also at this time

R. Berris

Page 601

1    in September, we had other De Tomaso employees

2    visiting, such as Asdorp and some of his other

3    film friends to assist with activities, so we

4    would have team meals there; yeah.

5          Q    And, again, same question, you

6    wouldn't know how the auditors would be able to

7    figure out that these expenses were business

8    expenses; right?

9          A    I can't speak to their process, so,

10   no.

11         Q    Okay.  You see expenses related to

12   CVS?

13         A    Yes.

14         Q    What were those for?

15         A    I can't recall.

16         Q    Okay.  There are a number of entries

17   related to hotel rooms in New York; right?

18                   MR. SIMONS:  Objection to form.

19                   THE WITNESS:  Yes.

20   BY MR. WERNER:

21         Q    Okay.  There are entries related to

22   the Intercon Barclay Hotel; right?

23         A    Yes.

24         Q    And there are entries related to the

25   Mercer Hotel; right?

R. Berris

Page 602

1      A      Yes.

2      Q      And these were hotels that you stayed

3   at; right?

4      A      No.  I stayed at the Intercontinental.

5   I did not say stay at the Mercer.

6      Q      Okay.  Do you know what the entries

7   related to the Mercer Hotel was for?

8      A      Yes.  That was the hotel that was

9   booked for Carmen Jorda.

10      Q      Okay.  So these were expenses related

11   to Carmen Jorda?

12      A      Yes.  That was related to the Me

13   Isabelle campaign.

14      Q      Let's take a look at another exhibit.

15          So you stayed at the Intercontinental

16   Barclay; right?

17              MR. SIMONS:  Objection to form.

18              THE WITNESS:  Yes, and I believe

19      Hugo de Sadeleer was there at times as well.

20   BY MR. WERNER:

21      Q      Didn't ask you about someone else.

22   Just asked about you.

23      A      Okay.  Yes.

24      Q      And you stayed there at that hotel

25   when you were here in New York not traveling

R. Berris

Page 603

1    elsewhere for De Tomaso; right?

2        A    To be clear, the only reason I would

3    be in New York would be for a business purpose,

4    yes.

5        Q    Well at this time, you had no

6    residence; right?

7        A    Correct.

8        Q    Let's take a look at what I'm going to

9    mark as Exhibit 45.  It's another spreadsheet.

10                (Berris Exhibit 45 was marked.)

11            This is another document you provided

12    to Diana; right?

13                MR. SIMONS:  Objection to the

14        form.

15                THE WITNESS:  I cannot speak -- it

16        could possibly be, but I cannot speak to.

17    BY MR. WERNER:

18        Q    You don't recognize it?

19        A    Well I recognize it as being an Apple

20    card statement for October 2021, but I can't

21    recall offhand all of the documentation that was

22    provided to Ms. Majcher, but I imagine that this

23    could quite possibly have been one of them.

24        Q    Okay.  Do you recognize this as being

25    your Apple card transaction statement for

R. Berris

Page 604

1   October 2021?

2        A     Yes.

3        Q     You just don't know whether this was

4   actually provided to Diana or not?

5        A     Correct.  If I were to guess, I would

6   say yes, but I can't say definitively.

7        Q     Right.  This is a list of submitted

8   expenses for the month of October 2021; right?

9             MR. SIMONS:  Objection to form.

10        Misstates the document.

11             THE WITNESS:  Yeah, I can't say

12        that.  I can't state that all of these were

13        viewed as expenses.  These seem to be all of

14        my Apple card charges for the month of

15        October.

16   BY MR. WERNER:

17        Q     These were all of your charges?

18        A     Yes.

19        Q     Not necessarily just business

20   expenses; right?

21        A     I don't recall definitively.  I'd have

22   to check the export of my Apple card to see.

23        Q     So if this were submitted to De

24   Tomaso, how would it or its auditors know which

25   of these were business expenses and which of

R. Berris

Page 605

1     these were personal expenses?

2                    MR. SIMONS:  Objection to form.

3                    THE WITNESS:  So to be clear, I

4         don't know if this is the full statement of

5         my Apple card from that time.  And when this

6         was provided, there would be receipts, such

7         as for hotels, etc., to justify.  But,

8         again, as per my earlier responses, I can't

9         speak to what process the auditor was using,

10        but in the event they had more -- requested

11        more information, I was happy to comply.

12    BY MR. WERNER:

13        Q    So you would agree with me that just

14    looking at this wouldn't tell auditors or De

15    Tomaso which of these you were submitting as

16    business expenses or not; right?

17                   MR. SIMONS:  Objection to form.

18                   THE WITNESS:  This would be a

19        supplementary document for the spreadsheet

20        that would list out and categorize each

21        invoice expense.

22    BY MR. WERNER:

23        Q    Are you able to answer my question?

24        A    Would you mind just stating it one

25    more time?

R. Berris

Page 606

1        Q      Do I have to?

2        A      It would be helpful.

3        Q      Did you not understand my question?

4        A      I'm just trying to recall what you

5     said specifically.

6        Q      But I'm asking, did you not understand

7     the question I've asked you?

8        A      I thought that I did, but maybe I

9     misinterpreted it, so it would be helpful if you

10    could just restate.

11       Q      Okay.  Looking at what we have

12    identified as Exhibit 45, okay, would you agree

13    with me that just looking at this, no one could

14    tell what is a business expense or what is a

15    personal expense; right?

16                    MR. SIMONS:  Objection to form.

17                    THE WITNESS:  If they were solely

18         just given this piece of paper, I would say

19         yes.

20    BY MR. WERNER:

21       Q      Do you see there's an expense there,

22    October 5, 2021, for CT Self-Storage, Glastonbury

23    for $282.81?

24       A      Yes.

25       Q      Was this a business expense or a

R. Berris

Page 607

1    personal expense?

2         A     Business.

3         Q     And what was it?

4         A     It's a storage facility that I was

5    paying for on behalf of De Tomaso.

6         Q     What was in it?

7         A     Many De Tomaso goods that I ran out of

8    space at my father's office to store.

9         Q     Okay.  Were you storing any personal

10   items there?

11        A     No.

12        Q     You would agree with me that no one at

13   De Tomaso asked you to give up your personal

14   residence in Connecticut; right?

15        A     Yes.

16        Q     Okay.

17               MR. WERNER:  Yeah, why don't we

18        take a break.  I think we can probably wrap

19        up.

20               MR. VIDEOGRAPHER:  The time is

21        16:20.  This is the end of Media Unit No. 3.

22               (Whereupon there was a brief

23        recess.)

24               MR. VIDEOGRAPHER:  On the record

25        at 16:30.  Beginning of Media Unit No. 4.

R. Berris

Page 608

1    BY MR. WERNER:

2         Q    Mr. Berris, we were talking earlier

3    about Hugo de Sadeleer; right?

4         A    Yes.

5         Q    Do you consider him a friend?

6         A    I don't know about now, but I

7    considered him one of my closest friends at the

8    time.

9         Q    Why don't you know whether you

10   consider him a friend?

11        A    I have not communicated with Hugo

12   since my departure from De Tomaso.

13        Q    Okay.  That seems to suggest you're

14   answering whether he considers you a friend.  I'm

15   asking you whether you consider him a friend.

16                  MR. SIMONS:  Objection to form.

17                  THE WITNESS:  I don't know how I

18        feel at the moment.

19   BY MR. WERNER:

20        Q    You don't know how what?

21        A    I don't know how I feel at the moment.

22        Q    You don't know how you feel; okay.

23             When was the last time you

24   communicated with Hugo?

25        A    It either would have been May 19th or

R. Berris

Page 609

1    May 20th, somewhere around that time, 2022.

2        Q    So fair to say you haven't

3    communicated with him since initiating this

4    lawsuit?

5        A    Yes.

6        Q    Okay.  Do you know whether your

7    lawyers have communicated with him?

8        A    I do not.

9        Q    Do you know whether anyone has

10   communicated with him on your behalf?

11               MR. SIMONS:  Objection to form.

12               THE WITNESS:  I do not.

13   BY MR. WERNER:

14       Q    And so did you communicate with him at

15   all after separating from De Tomaso?

16       A    The last message or time I

17   communicated with him was either on May 19th or

18   May 20th, 2022, if I recall.

19       Q    Okay.  Now we discussed in your

20   earlier testimony that there was a period that

21   you had your electronic communications turned

22   off; right?

23       A    Yes.

24       Q    Okay.  And how long was that time

25   period?  Was it May to October?

R. Berris

Page 610

1        A     It was roughly, you know, the third
2   week of May, 2022, all the way up 'til some time
3   in October of 2022.
4        Q     Do you remember when in October of
5   2022?
6        A     When?
7        Q     When you came back online.
8        A     Yeah.  I don't recall the specific
9   day.
10       Q     Was it toward the end of October?
11       A     I don't recall specifically.
12       Q     Okay.  Mr. Berris, you were De
13  Tomaso's chief marketing officer for a time;
14  right?
15       A     Yes.
16       Q     Okay.  And I'm correct to understand
17  that that was the first time that you had served
18  in that capacity professionally; right?
19       A     No.
20       Q     Okay.  When did you serve in that
21  capacity professionally otherwise?
22       A     At Apollo.
23       Q     Okay.  Putting aside Apollo and De
24  Tomaso, had you served as the chief marketing
25  officer of any other company?

R. Berris

Page 611

1        A     Well I did not necessarily have -- at

2    SCG, we did not necessarily have formal titles,

3    but I was taking upon that role during my time

4    there.

5        Q     So you were the chief marketing

6    officer of SCG?

7        A     There was -- from what I can recall,

8    there was no specific title for that position at

9    SCG.  It was just one of the responsibilities

10   that Jim and Jesse wanted me to assist with.

11       Q     What I'm asking you is putting aside

12   formal title, informal title, was it your job

13   function to serve as a chief marketing officer of

14   SCG?

15       A     I wouldn't feel comfortable saying

16   that official title, but that was -- marketing

17   was one of my roles.

18       Q     All right.  You really just need to

19   answer the question that I'm asking; okay?

20             Whether it was a title or not, did you

21   operate at SCG in the capacity as a chief

22   marketing officer; yes or no?

23       A     I don't recall.

24       Q     So when I asked you whether you had

25   served as a chief marketing officer of any

R. Berris

Page 612

```
 1    company aside from Apollo and De Tomaso, you
 2    answered yes; do you recall that?
 3                   MR. SIMONS:  Objection to form.
 4                   THE WITNESS:  Yes.
 5    BY MR. WERNER:
 6        Q    Then I asked you which company had you
 7    operated as chief marketing officer; okay.  I'm
 8    going to come back to that question.
 9        A    Okay.
10        Q    Putting aside De Tomaso and Apollo,
11    please identify for me the company or companies
12    where you operated as the chief marketing
13    officer.
14        A    I did not hold that formal title at
15    any company prior to Apollo De Tomaso.
16        Q    So when I asked you whether you had
17    operated as a chief marketing officer for any
18    company other than Apollo and De Tomaso and you
19    said yes, your testimony was not correct; right?
20                   MR. SIMONS:  Objection to form.
21                   THE WITNESS:  It's because I don't
22         recall specifically the terminology in my
23         agreement for SCG.
24    BY MR. WERNER:
25        Q    I asked you -- the transcript's going
```

R. Berris

Page 613

1    to be really clear on this.

2              I said putting aside title, I asked

3    you whether you operated for SCG as their chief

4    marketing officer; yes or no?

5                    MR. SIMONS:  Objection to form.

6                    THE WITNESS:  I don't believe

7         there was any formal role at the company for

8         that, so I would have to say no.

9    BY MR. WERNER:

10        Q    So when I asked you whether you had

11   served as a chief marketing officer for a company

12   other than Apollo and De Tomaso and you said yes,

13   your testimony was false; right?

14                   MR. SIMONS:  Objection to form.

15                   THE WITNESS:  With regards to that

16        specific language of a title, yes.

17   BY MR. WERNER:

18        Q    Okay.  The record is going to be very

19   clear that I was asking you putting aside the

20   title.  I don't care about title.  It's fine.

21   I'll move on.

22                   MR. SIMONS:  There's no question

23        pending.

24   BY MR. WERNER:

25        Q    I'll move on.  Your testimony is what

Page 614

1    it is on that.

2         A    Okay.

3         Q    One of the things that you were to do

4    in your role as chief marketing officer, one of

5    the things you had kind of oversight or

6    responsibility for was social media; right?

7         A    Yes.

8         Q    And one of the metrics for measuring

9    social media is the number of followers that a

10   social media presence has; right?

11        A    Depending upon how it's being

12   analyzed, yes.

13        Q    So you would agree with me just

14   generally, having more followers is better than

15   having fewer followers on social media; right?

16        A    No.

17        Q    And why is that?

18        A    I think it's important to have quality

19   over quantity.

20        Q    So fewer followers is good, as long as

21   they're the right followers; is that what you're

22   saying?

23        A    Yeah, those that understand the brands

24   and are in our target demographic.

25        Q    Okay.  So growth of followers just in

R. Berris

Page 615

1    general is not an important metric to you?

2          A     No.

3          Q     Do you know whether that is an

4    important metric to De Tomaso?

5                    MR. SIMONS:  Objection to form.

6                    THE WITNESS:  It was important

7           that we increased visibility for the brand,

8           but that was never the key objective behind

9           our marketing strategy to obtain a certain

10          number of followers.

11   BY MR. WERNER:

12         Q     Is one way of increasing visibility in

13   the social media space to increase followers?

14         A     Yes.

15                   MR. SIMONS:  Objection.

16   BY MR. WERNER:

17         Q     And in terms of social media, what was

18   De Tomaso's target demographic for its followers?

19         A     I would say our clients, our

20   prospective clients, are those who regularly

21   consume in the luxury and ultra luxury and quiet

22   luxury spaces.

23         Q     So Instagram, for example, when people

24   followed the company, De Tomaso on Instagram,

25   would you when you were serving as chief

R. Berris

Page 616

1    marketing officer, make an assessment of whether

2    they were allowed to follow the company or not?

3         A    Not that I can recall.

4         Q    Okay.  Like, did you screen customers

5    whether they met your targeted demographics or

6    not?

7         A    Referring to screen followers?

8         Q    Yeah, followers.

9         A    No.

10        Q    Okay.  Did you do anything to analyze

11   De Tomaso's follower growth while you were

12   serving as chief marketing officer at De Tomaso?

13        A    I would keep an eye on what the

14   numbers were from time to time.

15        Q    So when you say -- I had asked you

16   whether you analyzed the followers, and you said

17   keep an eye on it.  But what do you mean by keep

18   an eye on it?

19        A    I would just look at the high level

20   numbers for a number of followers from time to

21   time, but it was never a strong objective in my

22   mind to obtain a maximum number of followers.

23        Q    Okay.  So my question, then, was

24   whether you did anything to analyze the followers

25   beyond just keeping an eye on it based on what

R. Berris

Page 617

1    you just described.

2                Is it true, then, that you did not

3    analyze De Tomaso's followers?

4        A    I cannot recall.

5        Q    Okay.  Do you know whether or not De

6    Tomaso's followers increased, decreased or stayed

7    the same while you served as chief marketing

8    officer?

9        A    I do.

10       Q    And what was it?

11       A    They could only increase, 'cause I

12   created all the accounts from scratch.

13       Q    Okay.  So they -- you started the

14   account; is what you're saying?

15       A    Yes.

16       Q    Okay.  And you're saying that whatever

17   growth happened during -- after you started the

18   account was growth?

19       A    Yeah, it was above zero.

20       Q    Do you remember what number it reached

21   during your tenure?

22       A    I do not recall.

23       Q    Did you have a process for screening

24   customers at De Tomaso, or potential customers?

25       A    Yes.

R. Berris

Page 618

1       Q      And what was that?

2       A      So we had an internal track list of

3   clients who were submitting inquiries based upon

4   their relative region.  I would then forward the

5   information to the relevant dealer partner for

6   that region.  And the dealer partner would then

7   conduct the research and due diligence and inform

8   us.  We would have conversations back and forth

9   to see if we felt that that individual could

10  potentially be a right fit for a P72 and the

11  brand.

12      Q      When you say "right fit," what do you

13  mean?

14      A      We always strive to find P72

15  custodians who understood what we were doing,

16  appreciated the history, and hopefully would

17  become repeat buyers for future models.

18      Q      So were there potential customers that

19  you identified as not being good fits or not

20  being worthy of owning a De Tomaso vehicle?

21      A      If I recall, there may certainly have

22  been some instances where we felt or I felt, and

23  perhaps based on feedback from dealers that

24  certain individuals may not have been in the best

25  interest of the brand.

R. Berris

Page 619

1          Q      Okay.  What did you do to -- how did
2     you communicate that to those customers?
3          A      I don't recall offhand.
4          Q      Okay.  Did you communicate proactively
5     that you didn't think that they were suitable for
6     being De Tomaso custodians?
7                      MR. SIMONS:  Objection to form.
8                      THE WITNESS:  I don't recall.
9     BY MR. WERNER:
10         Q      Do you recall whether you just didn't
11    respond to them?
12         A      I don't recall.
13         Q      Were there times when you just didn't
14    respond to prospective customers?
15         A      I don't recall.
16         Q      Were you always consistently
17    responsive to De Tomaso customers and prospective
18    customers in your communications?
19         A      I always tried to be.
20         Q      Okay.  Thank you, Mr. Berris, for your
21    testimony today.  I have no further questions.
22         A      Thank you so much.
23                      MR. SIMONS:  I just have a couple
24         questions and we'll get you out of here.
25

R. Berris

Page 620

```
 1                    EXAMINATION
 2    BY MR. SIMONS:
 3         Q    Mr. Berris, do you recall testifying
 4    earlier, and I think by "earlier," I now mean a
 5    couple weeks ago, about the terms of your
 6    Employment Agreement with De Tomaso?
 7         A    Yes.
 8         Q    And do you recall testifying that you
 9    understood your Employment Agreement with De
10    Tomaso would last for "more than a year"?
11         A    Yes.
12         Q    And what did you mean by "more than a
13    year"?
14                    MR. WERNER:  Object to the form.
15         Calls for a legal conclusion.
16                    THE WITNESS:  I meant that there
17         was no specific time period to it.  It was
18         more or less indefinite.  And it was the
19         hope for myself and Mr. Choi that we would
20         work together forever.  In the event we
21         decided to part ways, then we had the
22         ability to do so.
23    BY MR. SIMONS:
24         Q    Did you generally understand that you
25    would be an at-will employee of De Tomaso under
```

R. Berris

Page 621

1    your Employment Agreement?

2                    MR. WERNER:  Object to the form.

3           Calls for a legal conclusion.  He also

4           testified he didn't know what that meant

5           last time.

6                    MR. SIMONS:  Well I think we now

7           know who has the most speaking objections

8           here, but continue.

9                    THE WITNESS:  Yes.

10   BY MR. SIMONS:

11        Q    In fact, there did come a time when De

12   Tomaso terminated your employment; right?

13        A    Yes.

14                   MR. WERNER:  Objection.  Calls for

15          a legal conclusion.

16   BY MR. SIMONS:

17        Q    Did you ever reach any agreement with

18   Mr. Choi about when you could take possession of

19   the equity that he and De Tomaso gave you?

20        A    Yes.

21                   MR. WERNER:  Objection.

22   BY MR. SIMONS:

23        Q    And when was that?

24        A    I was able to take possession of it

25   immediately after he gave it to me.

R. Berris

Page 622

1           MR. SIMONS:  No further questions.

2      Thank you.

3           MR. WERNER:  I've got a followup.

4           FURTHER EXAMINATION

5  BY MR. WERNER:

6      Q    With respect to the -- your testimony

7  just now about how long your tenure was going to

8  be under your supposed Employment Agreement, when

9  did you feel the need to clarify your testimony

10 around that?

11          MR. SIMONS:  Objection to form.

12          THE WITNESS:  I'm not sure I

13     understand the question.

14 BY MR. WERNER:

15     Q    Did you feel a need to clarify your

16 testimony on that point?

17          MR. SIMONS:  Objection to form.

18          THE WITNESS:  I followed the --

19          MR. SIMONS:  We don't want to

20     hear --

21          THE WITNESS:  I can't speak based

22     on discussions with counsel.

23 BY MR. WERNER:

24     Q    Will you follow the advice of your

25 counsel?  Right.  Okay.

R. Berris

Page 623

```
 1                    MR. SIMONS:  There's no question
 2          pending.
 3                    MR. WERNER:  That's fine.  We can
 4          go off the record.
 5                    MR. SIMONS:  Thank you, Mr.
 6          Berris.
 7                    MR. VIDEOGRAPHER:  This concludes
 8          today's testimony given by Ryan Berris as
 9          stipulated by all parties.  The total number
10          of media units used was four and will be
11          retained by Veritext Legal Solutions.  Off
12          the record at 16:46.
13                              * * *
14
15
16
17
18
19          -------------------------------
            RYAN BERRIS
20
            SUBSCRIBED AND SWORN TO
21          BEFORE ME THIS ____ DAY
            OF _____, 2024.
22
23          -----------------------
            NOTARY PUBLIC
24          MY COMMISSION EXPIRES_____
25
```

R. Berris

Page 624

```
 1                 INDEX TO TESTIMONY
 2                  EXAMINATION OF
 3     RYAN BERRIS                              PAGE
 4     BY:  Mr. Werner                     476, 622
 5     BY:  Mr. Simons                          620
 6                     * * *
 7                  E X H I B I T S
 8

       Berris
 9     Number       Description                 Page
       Exhibit 40   Non-Disclosure Agreement      538
10                  (BERRIS 223111)
11     Exhibit 41   "The Twisted Saga of the De   538
                    Tomaso P72" (DT 52143)
12
       Exhibit 42   Letter:  10-31-22             539
13                  (BERRIS 221999)
14     Exhibit 43   Email & Spreadsheet (DT 44118) 575
15     Exhibit 44   Apple Transactions            592
                    September 2021 (DT 33304)
16
       Exhibit 45   Apple Transactions            603
17                  October 2021 (DT 33318)
18          (Exhibits were retained by reporter.)
19                     * * *
20
21
22
23
24
25
```

R. Berris

Page 625

```
 1                C E R T I F I C A T I O N
 2              I, Randi Friedman, Registered
 3      Professional Reporter and Notary Public of the
 4      State of New York, do hereby certify:
 5          THAT, the witness whose testimony is herein
 6      before set forth, was duly sworn by me, and
 7      THAT, the within transcript is a true record of
 8      the testimony given by said witness.
 9          I further certify that I am not related
10      either by blood or marriage to any of the parties
11      to this action; and that I am in no way
12      interested in the outcome of this matter.
13          IN WITNESS WHEREOF, I have hereunto set my
14      hand this day, October 2, 2024.
15

16
17
18      Randi Friedman, RPR
19
20
21
22
23
24
25      *     *     *     *     *     *     *     *     *
```

Page 626

1    David Simons, Esquire

2    dsimons@bsfllp.com

3                          October 7, 2024

4    RE:    Berris, Ryan v. Choi, Sung-Fung Et Al

5         9/23/2024, Ryan Berris, Vol 2(#6931031)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-midatlantic@veritext.com.

16     Return completed errata within 30 days from

17    receipt of testimony.

18      If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                            Page 627

1    Berris, Ryan v. Choi, Sung-Fung Et Al

2    Ryan Berris - Vol 2 (#6931031)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Ryan Berris                         Date

25
```

Page 628

1    Berris, Ryan v. Choi, Sung-Fung Et Al

2    Ryan Berris - Vol 2 (#6931031)

3                 ACKNOWLEDGEMENT OF DEPONENT

4        I, Ryan Berris, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Ryan Berris                          Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**&**

**&** 624:14

**1**

**1** 474:9 531:2
595:25
**10-31-22**
624:12
**100** 472:9
**10001** 472:4
**11** 589:2
598:10
**112.00** 598:7
**11th** 598:19
**12** 493:10
**13:20** 474:2
**14:27** 531:1
**14:38** 531:6
**15** 516:7
**15:26** 570:25
**15:38** 571:5
**15th** 596:3
**16:20** 607:21
**16:30** 607:25
**16:46** 623:12
**16th** 583:3
**17** 575:20
**179** 563:19,24
**17th** 599:7,14
**193** 541:23
542:3 543:24
544:4 548:17
548:19,23
549:2,9 551:25
555:24 556:5
556:16 564:15

**194** 548:15,21
549:2 555:16
556:14 564:15
**196** 556:19
**197** 563:25
**19th** 571:12
574:6 583:14
608:25 609:17
**1:20** 471:9
**1st** 596:4,5

**2**

**2** 483:25 531:7
571:1 625:14
626:5 627:2
628:2
**20** 628:15
**2006** 472:10
**2014** 502:25
537:11,21
**2017** 502:25
**2019** 489:8
**2021** 487:7
499:1 525:8
529:15 575:21
595:20,25
598:7,10
603:20 604:1,8
606:22 624:15
624:17
**2022** 489:16,17
510:16 515:4
522:7,13 523:8
525:8,15 527:3
529:23 532:23
545:2,3,8,24

546:22 547:15
547:18 551:15
554:25 555:8
555:12 565:6
583:14 585:18
589:2 609:1,18
610:2,3,5
**2023** 532:23
551:9 554:10
**2024** 471:9
474:3 623:21
625:14 626:3
**2099** 472:9
**20th** 472:3
609:1,18
**215.49.** 596:1
**221999** 624:13
**223111** 624:10
**23** 471:2,9
474:15
**23rd** 474:3
554:21
**24** 585:18
**244.00** 598:12
**24th** 499:10
554:14,21
**25** 582:17
**27,000** 582:13
**282.81** 606:23
**297** 582:11

**3**

**3** 571:5 582:10
607:21
**30** 471:10
474:16 476:8,8

582:7 626:16
**31** 585:16
**31st** 583:3
**32** 587:7
**33304** 592:9
624:15
**33318** 624:17
**35** 497:4,11
**3886** 625:17

**4**

**4** 607:25
**40** 538:8,9,11
624:9
**41** 538:15,16
624:11
**42** 539:16,17
541:6 624:12
**43** 575:11,12,14
624:14
**4305** 471:2
474:15
**44** 582:5 592:2
592:3 594:19
600:20 624:15
**44118** 624:14
**45** 603:9,10
606:12 624:16
**476** 624:4

**5**

**5** 606:22
**52143** 624:11
**538** 624:9,11
**539** 624:12

**55**  472:3
**575**  624:14
**592**  624:15
**5th**  598:7,18

**6**

**6**  476:8 582:10
**603**  624:16
**620**  624:5
**622**  624:4
**6931031**  626:5
627:2 628:2

**7**

**7**  626:3
**730,000.00**
588:8

**8**

**875.05.**  599:9
**8i**  506:16

**9**

**9/23/2024**
626:5

**a**

**abilities**  491:25
492:4 520:16
**ability**  491:21
492:8 520:14
535:14 542:16
556:24 620:22
**able**  486:2,21
491:12,20
509:13 569:11
570:9 597:6
599:4 600:12

601:6 605:23
621:24
**above**  471:22
617:19 626:6
628:7
**abs**  507:23
510:14
**access**  526:19
526:21
**account**  526:5
526:8,9,13,17
582:21 617:14
617:18
**accounts**
617:12
**accuracy**  626:9
**accusations**
567:17
**acknowledge...**
628:3
**acknowledg...**
626:12
**acquire**  498:17
500:1
**acquired**  500:5
**acquisition**
483:12 485:8
502:23 503:24
506:17
**acting**  479:15
**action**  474:22
506:8 625:11
**activities**
593:25 601:3

**activity**  552:9
**actual**  568:13
**actually**  486:21
501:23 553:13
604:4
**addition**
590:12
**additional**
510:16 530:10
596:21,22
**additions**  628:6
**address**  528:3
**addressed**
510:22,24
511:2
**advance**  482:24
484:23
**advice**  532:18
622:24
**affiliations**
475:3
**afmg**  483:10
484:11,19
**agencies**
532:12 540:25
**agency**  531:15
**ago**  488:9
620:5
**agree**  474:8
478:23,25
483:14 500:4
582:19 588:10
588:17 600:2
605:13 606:12
607:12 614:13

**agreed**  473:2,7
473:11 583:7
**agreement**
478:24 479:1
483:14,21
487:3,12
612:23 620:6,9
621:1,17 622:8
624:9
**agreements**
495:15 502:11
502:15,21
503:16,19,23
**ahead**  542:25
**aimed**  509:16
**al**  471:6 474:13
626:4 627:1
628:1
**alexandra**
472:12 475:9
**allegation**
478:4 482:25
483:5 484:14
486:12 487:20
488:14 491:6
492:23 493:2
495:22 497:9
497:14,17
498:5,11
500:12,15
504:3 509:3
511:9,19
520:25 541:23
543:8,24
549:15 568:14

**allegations**
482:14 496:22
505:17 507:9
548:9 555:24
**allege** 477:22
482:21 497:3
498:7,16 500:8
501:24 504:12
504:19 507:7
507:13 508:8
511:6 522:18
531:10 541:13
543:16 547:21
552:1 555:16
556:20 563:19
565:1
**alleged** 512:25
555:6
**allegedly**
534:19 551:19
564:17
**alleging** 479:10
493:21 499:25
505:21 506:3
508:12 514:18
**allocations**
575:8,25
**allotted** 626:19
**allow** 517:23
**allowed** 480:19
616:2
**alongside**
494:13
**altered** 513:19

**amended**
476:10 477:16
477:22 479:9
487:21 500:8
531:9 541:23
543:20,25
544:2 554:15
554:16 556:20
**america** 512:10
526:5,6
**amfg** 486:23
**amounts** 583:8
**analyze** 616:10
616:24 617:3
**analyzed**
614:12 616:16
**andreas** 550:6
551:1 556:11
561:25
**anew** 582:8
**announcements**
503:18
**anonymously**
499:8
**answer** 478:17
484:1,5,11
485:23 486:2,3
488:4,13
490:13 491:18
491:21,24
495:4,8 497:7
508:25 515:8
517:24 520:13
522:3 531:19
532:17,19

533:9 534:17
535:12 536:3
540:5 551:5
555:13 559:19
561:8 566:20
566:21 569:24
572:12 584:8
587:20 597:13
597:16 605:23
611:19
**answered**
491:17 521:23
612:2
**answering**
542:13,15,18
542:20 543:1
608:14
**answers** 535:4
548:14
**anyway** 540:4
**apartment**
497:4,10 498:3
578:25 579:4
**apollo** 479:17
479:25 480:3
481:17,19,20
481:24 482:23
483:7,8,11,13
483:14,17,22
484:22 485:9
485:14,19
486:13 487:2
487:18 495:15
502:12,13,16
502:23 503:2

503:23 536:21
582:1 610:22
610:23 612:1
612:10,15,18
613:12
**apollo's** 484:25
**app** 573:3,6
**apparently**
528:13 552:9
**appearance**
475:1
**appearances**
472:1 475:2
**appeared**
502:20 503:9
504:6 505:12
**appears** 549:2
549:4 588:15
**appended**
628:7
**apple** 592:15
603:19,25
604:14,22
605:5 624:15
624:16
**applicable**
495:9 626:8
**applied** 559:9
559:20
**appraiser**
493:4
**appreciate**
484:4 518:6
**appreciated**
618:16

**appreciative**
518:14
**approach**
489:3,12,19
**approached**
487:22 489:20
489:24,25
542:6 547:16
557:25
**approaches**
490:2
**appropriate**
533:25 566:18
**april** 525:18
527:2,3 529:23
589:2
**aprivy** 587:15
588:1,3
**area** 528:10
596:20
**argue** 491:23
**arond** 528:7
**arrangement**
527:19
**arrears** 497:21
**art** 499:6
**article** 538:18
538:22 539:3,8
539:13
**articles** 496:3
496:15
**asdorp** 601:2
**asia** 546:11
**aside** 539:24
563:10 566:5

568:25 576:3
593:17 610:23
611:11 612:1
612:10 613:2
613:19
**asked** 479:19
483:24 491:17
491:25 492:4
521:15,22
542:14 545:21
561:6 570:12
582:3 590:7
591:3,11,16,17
592:19 597:11
597:14,22
602:22 606:7
607:13 611:24
612:6,16,25
613:2,10
616:15
**asking** 486:21
492:22,25
498:21 501:16
501:23 504:22
513:4 514:24
517:15,16
524:1 525:21
530:3,12 532:7
533:15 543:19
543:23 549:3,7
550:22 551:17
551:18 552:20
553:3,12
558:17 560:7,9
564:16 565:9

565:22,23
568:9,16 569:5
569:19 572:12
573:15 583:5
583:19,20,25
584:1 586:23
586:24 587:14
587:25 588:11
591:21 606:6
608:15 611:11
611:19 613:19
**assessment**
616:1
**assist** 486:22
601:3 611:10
**assistance**
590:10
**assistant**
592:24 593:2,7
593:12,16,18
593:24
**assisted** 592:25
593:14,25
**assisting** 593:9
**associate** 562:8
**associated**
492:19 500:9
500:15 501:25
504:13,14,18
504:20,21,22
505:22 506:3
584:16
**associates**
493:23,24
499:11

**association**
496:18 500:10
**assumed** 480:1
**assuming** 511:3
**assumption**
480:5,16 481:5
481:5
**attached**
626:11
**attachment**
575:23
**attempt** 528:8
563:21
**attend** 566:13
**attended**
583:15,21,23
584:5,8,17
585:3 599:19
**attendees**
583:17,20
**attending**
526:23
**attention** 515:6
**attorney** 475:4
501:3 626:13
**attorneys** 472:2
472:8 476:17
476:19 533:4,8
540:18
**audio** 474:7
**audit** 594:2
**auditor** 605:9
**auditors**
587:13,25
594:21 597:6

**b**

597:18,24
599:4 600:12
601:6 604:24
605:14
**august**  499:1
583:3
**authored**
534:16 539:1
**authorities**
532:8
**authorized**
526:15
**automobil**
479:25
**automobile**
555:20 556:25
**automobili**
479:25 526:6
**automotive**
584:22 585:1
**availability**
515:14
**available**
494:10 520:20
626:6
**ave**  472:9
**awaiting**  559:2
**aware**  479:24
481:10 485:3,4
485:6,10,13
496:14 499:17
502:7,24
507:12 538:22
545:9 553:18
569:15

**b**  476:8,8 624:7
**back**  476:3
481:4 486:7
487:2 489:8
490:13 508:7
513:14 518:10
545:8 562:19
564:24 583:4
585:24 587:8
596:21 597:8
599:2 600:11
610:7 612:8
618:8
**baenziger**
550:6 551:2
**bailey**  553:25
**bank**  526:5,5,8
526:9,12
**barclay**  601:22
602:16
**barry**  488:22
489:3,7,23
513:10 516:24
552:13,23
553:8,10,14
568:3
**bart**  550:10
551:11,14
**based**  480:6
483:17 498:21
503:9,18 504:1
520:20 533:20
545:9 546:14
548:13 600:14

616:25 618:3
618:23 622:21
**bases**  482:13
**basic**  495:22
**basically**  548:1
556:12,15
562:15 569:15
572:14 580:3
**basing**  483:19
**basis**  477:25
480:10,13
481:25 497:17
498:10,14
500:14 505:18
568:14
**beach**  596:18
**beat**  486:1
**becoming**
523:11
**began**  500:20
502:6 507:14
508:8 511:6
**beginning**
475:3 514:14
531:6 555:8
571:5 581:25
607:25
**behalf**  475:15
481:13 526:24
537:14 541:3
607:5 609:10
**belgium**  529:17
**believe**  489:7
489:15 490:10
493:7 514:23

521:6,12,14
527:2 528:4
537:12 545:22
554:13 559:7
562:16 565:19
565:22 573:11
576:2,11 583:2
585:16,23
586:21,23
588:23 589:17
590:6,21
591:13 595:10
595:12 596:19
597:3,10,20
598:20 599:15
599:16 602:18
613:6
**bernie**  488:23
567:2
**berris**  471:3,21
474:10,12
475:15,21
476:3 482:22
483:23 487:24
491:14 505:20
505:23 531:9
531:16 533:17
535:12 538:9
538:16,17
539:16,17
541:9 556:22
557:15 563:22
571:7 575:3,6
575:12,13
582:11 585:16

586:11 587:5
591:25 592:3
603:10 608:2
610:12 619:20
620:3 623:6,8
623:19 624:3,8
624:10,13
626:4,5 627:1
627:2,24 628:1
628:2,4,12
**bespoke**  527:8
528:19 529:9
**best**  478:19
481:16 484:3
488:8 491:21
491:25 492:3,7
502:3 520:14
520:15 521:5
522:5 535:13
542:15 544:9
597:3 618:24
**better**  487:9
572:2 614:14
**beyond**  589:13
616:25
**bill**  590:13
**bills**  579:14
589:16,25
590:13,15
**bit**  478:12
587:12
**bite**  509:1
**blame**  544:12
545:19

**blood**  625:10
**bloomberg**
496:3,15
500:21
**bloomingdale's**
596:1,11,15,23
597:1 599:3
**blown**  544:10
**blue**  599:8
**board**  507:20
510:6
**bob**  472:21
**body**  531:23
**bogus**  481:1
**boies**  472:2
536:10
**booked**  602:9
**bottom**  596:7
**bought**  580:2
**bozzuto**  554:6
**brake**  508:19
**brakes**  509:5,6
**braking**  507:23
508:17,21
510:15 513:23
**branch**  535:21
**brand**  528:21
615:7 618:11
618:25
**brands**  614:23
**brasserie**  599:8
**break**  530:23
570:22 607:18
**brief**  531:3
571:2 607:22

**briefly**  476:17
**broke**  559:15
**brought**  500:24
510:5
**bsfllp.com**
626:2
**budgets**  544:10
**business**  478:5
550:5 556:10
576:10 579:18
579:21,25
580:8,12,14,16
580:21,24
581:5,13,20
589:15 590:5
590:17 591:8
596:15,20
599:18 601:7
603:3 604:19
604:25 605:16
606:14,25
607:2
**businesses**
479:18
**bustamante**
472:12 475:9
475:10
**busy**  594:8,11
**buy**  562:11,24
581:14 598:17
598:22
**buyers**  618:17
**buying**  581:1

**c**

**c**  492:11 521:3
527:12 625:1,1
**california**
596:18
**call**  535:7
573:3 574:12
574:25
**called**  502:20
505:4 507:24
527:9 539:19
540:8 545:12
547:11 574:21
584:24
**calls**  561:11
572:9,17,21
573:21 574:1
620:15 621:3
621:14
**campaign**
602:13
**campus**  527:17
527:23,25
600:17
**capable**  508:2
**capacity**
482:10 560:6,8
560:10 585:3
610:18,21
611:21
**capricorn**
507:19 511:5
514:24 515:21
517:5 519:23
523:13 542:9

**car** 578:12
**card** 589:9,11
  589:14,16,24
  590:13 591:7
  592:15 595:23
  603:20,25
  604:14,22
  605:5
**cards** 478:6
**care** 512:13
  581:4 613:20
**carlos** 488:22
  553:22 554:23
**carmen** 600:18
  602:9,11
**carry** 597:8
**cars** 483:16
**carson** 513:10
  516:24
**case** 471:2
  474:14 485:12
  551:11 594:7
**casual** 489:10
  490:17,22
  559:25
**casually** 561:12
**categories**
  556:13
**categorize**
  605:20
**cause** 527:16
  551:15 617:11
**cct** 495:16
  502:23

**ceo** 477:23
  478:6,8,21
**certain** 485:7
  494:12,20
  496:5 497:24
  499:11 501:21
  503:18 530:6
  587:14 588:1,7
  615:9 618:24
**certainly** 490:6
  509:11 535:12
  618:21
**certification**
  473:5
**certify** 625:4,9
**change** 511:3
  513:22 548:22
  582:14 627:4,7
  627:10,13,16
  627:19
**changed** 582:2
**changes** 507:14
  507:18 508:9
  508:11,14,19
  509:3,4,9,15,22
  510:8,9 626:10
  628:6
**characterize**
  490:12
**charges** 595:23
  604:14,17
**charles** 598:7
  598:14
**chart** 478:21

**charts** 503:17
**chassis** 483:15
  575:7,24
**chat** 546:10
**cheap** 596:24
**check** 555:25
  556:17 573:10
  585:24 586:6
  586:22 598:20
  600:2 604:22
**chen** 513:10
  516:24
**chicago** 579:1
**chief** 610:13,24
  611:5,13,21,25
  612:7,12,17
  613:3,11 614:4
  615:25 616:12
  617:7
**china** 493:3,7
**choi** 471:6
  472:21 474:12
  475:12 478:5
  479:11,14,16
  479:18 480:4
  481:13 485:14
  485:22 486:15
  486:19 491:8
  492:19,24
  493:22,25
  497:3,9,19
  498:2,7,12
  500:3,9,15
  501:11,24
  502:7,25 504:4

504:8,12,19
505:2,12 506:4
506:13,25
507:2,3,8,14
508:4,8,12
510:20 511:4,6
514:21 515:18
515:19 517:5
520:3 522:24
523:12 524:14
524:19,22,24
525:10,14,16
525:22 526:17
536:24 541:14
542:6 543:16
544:7,9,25
545:14,15,17
546:1,7,13,14
546:17 547:21
548:11 549:14
549:16 550:17
551:18 552:1,5
552:7,20 553:5
553:11,13,14
553:19 554:23
555:6,17
557:12,16
558:2,14,21
559:1 561:4
562:8,12,16
563:20 564:6
564:17 566:11
566:25 567:9
567:20,25
568:6,8 569:1

569:16 575:20
580:2 596:19
598:16 600:24
620:19 621:18
626:4 627:1
628:1
**choi's**   482:24
483:4 484:16
484:23 503:25
506:14 543:10
556:21 557:5
**cipriani**   582:17
582:20 583:5
583:16 584:17
**circuit**   495:6,19
**city**   489:22
528:5 578:6,7
578:14,19
**claim**   541:10
**clarify**   622:9,15
**classic**   513:3
515:24
**clawback**
539:25
**clear**   492:18
496:13 500:20
517:20 518:11
519:13,19
529:13 535:9
536:8 543:18
544:1,17 559:8
568:9 592:22
603:2 605:3
613:1,19

**clearly**   508:1
**client**   475:12
485:13 488:25
501:3 537:23
**clients**   487:22
488:2,17,21,22
490:18 511:15
511:25 512:13
512:17 515:18
515:19 516:2
521:20 552:8
553:1,20,21
557:8,11 564:9
580:19 615:19
615:20 618:3
**close**   490:19
**closest**   559:13
608:7
**closing**   498:2
**clothing**   579:20
**cohen**   511:22
513:9 515:10
515:12 516:5
516:19 550:10
551:10,22
553:22 555:6
566:10,23
567:6,20,22,25
568:6,8,10,12
568:19,25
**colleague**
475:16
**colleagues**
529:16

**come**   513:3
535:25 568:2
612:8 621:11
**comes**   536:2
**comfortable**
523:2 558:20
558:23 560:13
611:15
**coming**   499:8
583:4
**commission**
531:25 623:24
**common**   509:8
**communicate**
609:14 619:2,4
**communicated**
514:23 515:17
516:8 520:24
521:19 524:20
524:21 544:20
546:9 608:11
608:24 609:3,7
609:10,17
**communicating**
517:4 520:2,4
520:7,10,18
524:23,25
**communication**
537:15
**communicati...**
477:1 490:9
517:1 525:3,9
525:20 552:25
567:24 568:3,6
572:20 573:5

573:14,16,18
586:4 588:23
609:21 619:18
**companies**
479:11,13,20
479:22 481:23
482:2 491:7,11
491:15 492:1,5
492:20,23
493:1,10,19
496:5,11
503:25 553:4
555:20 612:11
**company**
483:10 487:22
487:24 488:16
488:18 493:13
503:1 506:9
507:24 523:3,5
523:10,15,24
524:2,5,8
530:21 552:3
552:10 559:9
559:14 560:15
560:17 563:13
577:1 578:15
578:17 580:10
584:23 586:10
588:4,25
593:18 598:2
598:15 610:25
612:1,6,11,15
612:18 613:7
613:11 615:24
616:2

**complaint**
476:10 477:16
477:22 479:10
487:21 491:7
500:9 504:17
531:9 541:24
543:21,25
544:2 552:15
554:15,17
556:20 569:1
**complete** 628:8
**completed**
483:12 626:16
**completely**
545:18
**compliance**
508:16 509:14
510:3
**compliant**
509:23
**comply** 605:11
**comprehensive**
590:21 591:3
**concentrations**
503:21
**concern** 497:13
508:3,4 522:21
**concerned**
562:2
**concerning**
504:9
**concerns**
514:24 522:24
525:11

**concludes**
623:7
**conclusion**
620:15 621:3
621:15
**concrete** 502:4
504:25 563:8
**concurred**
524:17
**condition**
562:12
**conduct** 501:14
618:7
**conducted**
552:8
**conducting**
500:23
**confidential**
499:5
**confused**
499:13
**connected**
494:12,20
496:7,8 501:20
506:17,20
**connecticut**
577:6,19,23,25
578:12 607:14
**consider** 510:2
579:17 608:5
608:10,15
**considered**
539:23 580:20
608:7

**considers**
608:14
**consistently**
619:16
**construed**
581:21
**consultant**
479:16
**consume**
615:21
**consumer**
505:5
**contacts** 546:10
599:17
**contemplating**
523:23
**content** 542:2
543:15 548:12
**contents** 543:9
**context** 499:21
504:17 556:16
581:3
**continents**
573:25
**continue** 474:7
486:21 542:25
556:24 621:8
**continued**
471:20 476:1
555:9 563:20
564:7,17 565:7
566:6
**continues**
497:12

**continuing**
564:3 565:2,3
**contributions**
563:22
**control** 507:23
508:17,21
509:6 510:15
513:23
**controlled**
491:7 492:24
493:22,25
**controlling**
482:15
**conversation**
532:4 540:10
545:17,22
554:8 556:4
559:23 561:12
562:14
**conversations**
474:5 490:11
490:15,22
532:16 563:12
573:1 618:8
**copies** 626:14
**core** 501:13
**corp** 506:17
**correct** 477:17
480:22 492:20
496:19,20
498:18 507:10
507:11 526:11
527:24 538:24
541:11 546:17
547:4 561:9

563:15 565:25
570:5,16
575:19 576:20
576:23,24
578:1 585:5,20
586:20,25
588:5 591:23
599:12 603:7
604:5 610:16
612:19 628:8
**corrections**
628:6
**correctly** 497:2
499:10 502:14
506:16 527:9
527:12 595:13
**correlated**
508:15
**corresponded**
538:1
**corresponding**
513:23 595:3
**cost** 577:10
583:5
**cosworth**
556:11
**couch** 578:25
**counsel** 473:3
474:11 475:1
475:19 490:24
500:24 532:5
532:16,19
533:21,23
534:7,16 536:2
536:5,9 622:22

622:25 626:14
**counter** 505:3
**countries**
573:25
**couple** 586:10
619:23 620:5
**course** 502:24
515:8 525:5
575:17 588:24
**court** 471:1
473:14 474:14
474:19 475:17
478:14 517:20
518:11 535:7
**cover** 600:3
**coverage**
584:12
**covered** 549:1
**create** 559:17
**created** 526:8,9
534:16 576:1
617:12
**credit** 589:9,11
589:14,16,24
590:13 591:7
595:23
**cs** 626:15
**ct** 606:22
**current** 500:24
**custodians**
618:15 619:6
**customer** 513:1
515:6
**customers**
511:8,13,20,20

512:22 513:2,7
514:6 516:24
517:17 518:18
519:5,10,16,25
520:5,8,11,19
520:23,24
525:23 555:18
555:22 564:14
616:4 617:24
617:24 618:18
619:2,14,17,18
**cv** 471:2 474:15
**cvs** 601:12
**cygler** 521:3
553:23

**d**

**d** 493:6 521:6,6
521:6
**d'este** 547:12
**d.c.** 472:10
**daily** 581:19
**data** 529:2
530:6
**databases**
501:8
**date** 529:17
547:4,13 596:2
627:24 628:12
**dated** 575:20
585:18
**dates** 546:19
547:1
**david** 472:5
475:14 626:1

**day** 483:25
484:2 555:2
580:4 586:9
596:15 598:23
610:9 623:21
625:14 628:15
**days** 586:10
626:16
**de** 477:23
478:8 479:17
479:25 480:3
481:17,24
482:24 483:13
483:16,21
484:17 485:1
485:19,20,21
486:13,14,22
487:1,17
496:18,24
497:3,10,18,22
497:23 498:5
498:18,22,24
499:6,7,15,18
499:20 500:1,6
500:19 502:5
505:7 506:23
507:10,15
508:5,9 511:4
514:15,20
519:5 522:22
523:1 524:10
525:1 526:4,5
526:24 527:5
528:24 529:20
529:25 530:9

530:13,17
532:25 536:15
537:16 538:18
541:16 553:1
555:18 559:11
562:5,12,24
563:16,22
564:9 567:18
575:8,24 576:9
576:25 577:8,9
578:6 579:11
579:14 580:3
582:1,16,20
585:9 587:14
587:25 589:7
590:17 593:20
594:17 596:16
597:6,8 598:22
599:4 600:24
601:1 602:19
603:1 604:23
605:14 607:5,7
607:13 608:3
608:12 609:15
610:12,23
612:1,10,15,18
613:12 615:4
615:18,24
616:11,12
617:3,5,24
618:20 619:6
619:17 620:6,9
620:25 621:11
621:19 624:11

**deal** 483:19,20
511:17
**dealer** 512:21
521:2 553:2
555:19 556:3
618:5,6
**dealers** 512:25
521:8,9 564:14
618:23
**dealing** 494:24
501:19 503:4
536:6
**dealings** 496:7
502:8 506:20
**dear** 559:14
566:24
**decade** 557:1
**december**
583:3
**decided** 511:5
620:21
**decision** 532:15
**decisions**
523:12 542:9
**declare** 628:4
**decreased**
617:6
**deduct** 583:5
**deducted** 583:7
**deemed** 628:6
**defamation**
541:10
**defamatory**
541:14 543:15
547:22 549:15

551:19 552:2
555:17 556:21
**defendant**
555:16 556:21
563:20
**defendants**
471:7 472:8
474:11 475:6,8
475:10 531:11
541:11
**define** 593:13
**definitively**
516:21 524:15
525:14 575:2
586:17 587:3
604:6,21
**delayed** 544:11
**delays** 542:9
545:20 547:24
548:10 549:12
558:10
**deliver** 529:1
**delivery** 515:14
529:7 547:24
548:10 549:11
**demanded**
545:14
**demographic**
614:24 615:18
**demographics**
616:5
**deny** 539:12,14
**departed**
530:20

**department**
527:8 596:11
**departure**
485:5 500:19
502:5 507:12
508:5 510:23
514:15 525:6
546:23 562:1
586:9 588:25
608:12
**depending**
614:11
**deponent**
626:13 628:3
**deposing**
626:13
**deposition**
471:20 473:5
473:12 474:10
474:16 476:6
477:2,5,9,11,13
483:25
**described**
617:1
**description**
624:9
**descriptions**
593:17
**design** 509:10
529:3
**designated**
582:16
**destroyed**
557:7 558:2
561:5

**detailed** 589:21
**detailing** 589:15
**details** 526:17 528:23
**devastating** 557:14
**development** 483:15 511:17 513:4 515:15 545:20
**diana** 472:22 475:13 479:10 479:15 480:2 481:11 482:3,8 482:19 483:9 483:19 486:21 583:4 585:17 587:9,13 588:6 590:22 592:19 599:24 603:12 604:4
**diana's** 587:24
**diem** 581:22
**different** 548:6 549:5 556:13 565:4 573:24 573:25
**diligence** 618:7
**dined** 599:13
**direct** 495:13
**directed** 536:13 536:15,20,23 537:1,5

**directly** 497:8 510:20 517:7 531:20 536:5 544:19 553:15
**discern** 597:7
**disclosed** 502:8
**disclosure** 624:9
**discovery** 485:11 497:24 516:22 553:18 566:3 567:23
**discretionary** 497:20
**discuss** 477:2,5 485:19 486:14 486:18 496:23 498:4 514:19 528:15 561:22
**discussed** 525:22 529:12 555:23 556:16 560:8,20,23 561:24 562:23 563:7 564:4,13 564:19 566:6 588:3 609:19
**discussing** 488:23 528:16 528:18 529:14 560:14
**discussion** 483:12 486:24 529:8,24 531:18 545:25

**discussions** 487:3,15 488:1 488:21 489:5,7 489:9 490:6 499:6 533:21 553:19 559:25 576:5 622:22
**dispute** 559:3,5
**distribution** 495:15 502:11 502:21 512:8
**distributors** 502:13
**district** 471:1,1 474:13,14
**divisions** 527:20
**document** 538:14 573:14 575:10,15,25 582:4 583:10 585:15 587:16 592:6 597:7,17 603:11 604:10 605:19
**documentation** 588:12,18 589:3,22 595:3 603:21
**documents** 494:9,10 589:18,20 591:14 594:23 594:24 595:1,4 595:10,14

**doing** 480:2 484:3 488:8 524:11 529:8 535:11 558:11 558:23 560:13 578:15 618:15
**double** 492:13 495:2
**dozen** 493:19
**drafting** 484:24
**dream** 493:4
**dress** 579:22,24 580:1,7 598:21
**driver** 593:20
**dsimons** 626:2
**dt** 624:11,14,15 624:17
**dt0000033304** 592:8
**due** 583:6,8 618:7
**duly** 475:22 625:6
**dusmont** 528:7
**duties** 482:23 484:22 485:18 486:13 487:17 594:17

|  e  |
|-----|

**e** 483:7 493:5,6 521:3,6 526:17 550:4,4 624:7 625:1 627:3,3 627:3

**earlier** 478:24 490:13 549:8 559:8 564:24 571:7 575:6 599:2 600:11 605:8 608:2 609:20 620:4,4
**early** 489:8 523:8 529:14 537:21
**easier** 518:2
**easy** 509:1
**eckelstone** 488:24 489:11
**economy** 493:7
**editing** 585:12
**effect** 473:13
**efficient** 484:4 548:25
**efficiently** 496:2
**either** 503:23 524:21 547:5 570:9,17 573:2 608:25 609:17 625:10
**electronic** 609:21
**electronically** 537:22
**email** 515:22 566:3 567:1,16 567:24 568:15 575:20 585:17 585:17,22

586:2,15,17,19 587:2,5,24 588:24 589:5,6 589:7 600:3 624:14
**emails** 568:18 568:19 587:8 590:8,8
**embroidered** 580:3 598:22 598:25
**emissions** 508:18,22 509:5,7 513:24
**employee** 620:25
**employees** 527:21 601:1
**employer** 523:17
**employment** 496:18 522:22 532:24 559:9 559:20 560:15 560:18 563:8 563:12 620:6,9 621:1,12 622:8
**ended** 496:18 583:7
**enforcement** 506:8 531:14 532:12 540:25
**engage** 540:23
**engaged** 504:13 507:1 540:9,12

**engagement** 539:18 541:5
**engaging** 540:7
**engines** 481:18
**england** 567:2
**enigma** 491:8 492:25 494:3,5 494:7,12,16,23 495:1,3,23 496:4,14,22 500:22 501:13 502:9 506:19
**ensuing** 529:12
**enter** 495:14 541:5
**entered** 502:7 502:15,21 503:23 537:13
**entering** 503:16
**entertainment** 579:17
**entirely** 545:6
**entities** 492:19 494:13,19,25 496:6,8 502:6 502:9 503:3,22 503:24 506:19
**entity** 479:7 480:4 485:15 485:16 486:23 526:10 537:4
**entries** 591:7 600:21 601:16 601:21,24

602:6
**entry** 582:13 598:6
**equity** 621:19
**erase** 563:21
**errata** 626:11 626:13,16
**especially** 537:15
**esq** 472:5,5,11 472:11,12
**esquire** 626:1
**essentially** 572:7
**estimate** 487:6
**et** 471:6 474:13 626:4 627:1 628:1
**europe** 511:25 512:11 546:11
**evan** 521:2 553:22
**evening** 551:16
**event** 513:6 547:11 580:19 582:17,20 583:6,16,21,23 583:24 584:1,5 584:6,9,13,17 585:3,6,7 595:19 599:19 605:10 620:20
**exactly** 484:23 501:10 519:12 548:11 549:14

551:12 552:5
558:6 566:7
569:10
**examination**
471:21 476:1
620:1 622:4
624:2
**examined**
475:23
**example**
507:22 512:12
615:23
**examples** 502:5
505:1 508:16
**excel** 589:21
594:19
**except** 473:8
**exception**
578:23
**exchange**
494:11 505:14
506:20 531:24
**exchanges**
501:9 506:18
**exclusive**
512:10,11
557:9
**executed**
487:13
**executive**
484:18
**executives**
555:19 556:7
564:14

**exhaust** 508:18
508:23
**exhibit** 538:8,8
538:9,11,16
539:16,16,17
541:6 575:11
575:12,13
582:5,7 587:6
592:2,3 594:19
600:20 602:14
603:9,10
606:12 624:9
624:11,12,14
624:15,16
**exhibits** 624:18
**existing** 507:20
**expense** 576:9
576:10 579:18
579:25 580:10
580:14,14,16
580:17,21,21
580:22,24,24
581:20 582:16
583:2 594:5
595:25 596:16
597:1,7,19
598:1,11 599:8
600:1,8,13
605:21 606:14
606:15,21,25
607:1
**expensed**
599:22 600:4,9
**expenses** 576:5
580:8,15 581:5

581:13,13,24
583:6,8 588:13
589:3,10,12,16
589:23 590:3,5
590:17 592:20
594:2,11,21
595:2,19,22
600:23 601:7,8
601:11 602:10
604:8,13,20,25
605:1,16
**experience**
509:8
**experienced**
482:18
**expert** 502:19
503:9 505:11
505:16,21
510:3 580:21
**expires** 623:24
**explored** 563:4
**exploring**
560:3
**export** 604:22
**expressed**
487:23 488:17
**extended**
490:20
**extent** 499:19
499:24 502:1
507:7 514:17
531:17 533:6
534:15 539:20
540:17 564:6
564:16 574:15

579:9 580:6
**extreme** 593:10
**eye** 616:13,17
616:18,25

**f**

**f** 625:1
**fabricating**
565:21
**facilitate**
495:16 502:22
**facility** 607:4
**fact** 500:5
518:24 522:9
540:12 541:15
573:16 586:1
587:1 588:18
592:1 621:11
**factual** 477:25
481:25 482:13
497:16 498:10
498:14 500:14
505:18 568:13
**factually**
512:24 586:25
**fails** 626:18
**fair** 480:6
490:21 496:21
499:23 501:7
504:10,16
507:6 518:1
526:18 556:17
557:25 572:5
594:22 599:6
609:2

**[fairly - followers]**

**fairly** 490:14
**false** 511:7,19
  511:21 512:25
  513:15,16
  514:18,18
  515:11 516:1
  516:18 517:1,9
  517:16 518:17
  518:24 519:3,4
  519:12,14,16
  520:25 522:20
  525:22 541:14
  547:21 552:1
  555:17 556:21
  557:11 567:17
  613:13
**familiar** 528:10
  533:24
**familiarize**
  544:3
**family** 490:20
  513:10 516:25
  528:9 530:11
**far** 483:21
  528:25 566:10
**father** 577:13
**father's** 577:10
  607:8
**fault** 542:10
**favor** 483:21
**favorable**
  484:17
**favorite** 598:17
**february**
  514:14

**fee** 483:17
**feedback**
  561:14 618:23
**feel** 491:3
  531:20 543:1
  560:12 608:18
  608:21,22
  611:15 622:9
  622:15
**feeling** 523:2
**felt** 618:9,22,22
**fev** 507:24,25
**fewer** 614:15
  614:20
**fiduciary**
  482:23 503:16
**fifth** 596:6
**figure** 601:7
**file** 583:12
  589:17 590:14
  590:20 594:23
  594:25 595:4,6
  595:14
**filed** 474:13
  499:9 534:4,9
  534:19,22
  535:22 537:9
  552:15 559:5
  569:1 570:3
**filing** 473:4
  499:2 553:7,17
  554:13 565:7
  568:21
**filings** 535:25
  536:9,12

540:15,24
**film** 585:5,7
  601:3
**final** 483:20
  515:14 525:18
**finances** 479:11
  481:7 482:2,16
**financial**
  479:16 484:22
  485:18 486:13
  487:17 496:3
  496:15 500:21
  513:19 576:14
**financially**
  474:23
**finch** 539:19
  540:8
**find** 485:15
  519:1,21
  618:14
**fine** 481:2
  486:8 492:4
  497:16 540:3
  542:24 547:20
  550:14 570:20
  613:20 623:3
**finish** 478:17
**fired** 541:16
  549:8
**firm** 474:20
  539:19 540:7
  540:14,23
  541:7
**first** 475:22
  488:10 496:13

500:20 513:11
  525:6 527:3
  529:17 545:7
  550:20 551:9
  568:11 575:14
  610:17
**fit** 618:10,12
**fits** 618:19
**five** 530:23
**flexner** 472:2
**floor** 472:3
**florian** 549:25
  550:3,18 551:4
  556:10 561:18
  561:23,24
  562:15,18,21
  563:11
**florida** 481:19
**focus** 541:22
  558:4 584:2
**focusing**
  541:19
**folks** 556:13,15
**follow** 524:18
  616:2 622:24
**followed**
  581:24 615:24
  622:18
**follower** 616:11
**followers** 614:9
  614:14,15,20
  614:21,25
  615:10,13,18
  616:7,8,16,20
  616:22,24

617:3,6
**following** 530:2
530:4 588:11
588:24
**follows** 475:23
**followup**
530:13 622:3
**foods** 581:16
581:19 600:21
**force** 473:13
**forecasts**
513:19
**foregoing**
628:5
**foreign** 500:11
504:21
**forever** 620:20
**form** 473:8
478:2 479:2,4
480:8 481:8
484:15 487:10
491:16 492:6
503:7 505:25
506:6 509:19
512:6 514:11
517:2 518:15
518:19,25
519:7,17 526:1
536:16 539:9
543:17 547:6
566:1 569:3,13
573:9 574:2
581:8 588:14
590:18 591:9
591:22 594:12

595:5 597:9
598:3 600:5
601:18 602:17
603:14 604:9
605:2,17
606:16 608:16
609:11 612:3
612:20 613:5
613:14 615:5
619:7 620:14
621:2 622:11
622:17
**formal** 527:19
528:17 529:18
580:22 581:23
611:2,12
612:14 613:7
**formally** 593:6
599:21
**formed** 479:7
483:10
**forms** 531:10
**forth** 487:2
518:10 587:8
618:8 625:6
**forward** 518:6
618:4
**forwarded**
498:25 567:19
**found** 494:17
497:19 498:25
499:4
**founder** 584:24
**four** 502:15
623:10

**francis** 584:19
**free** 531:20
**french** 528:8
**friedman**
471:23 474:20
625:2,18
**friend** 481:18
516:7,9 545:13
566:9,24,25
608:5,10,14,15
**friendly** 490:16
**friends** 490:19
545:10 559:14
601:3 608:7
**front** 503:17
**frustrated**
523:11
**frustrations**
522:25 524:13
524:19 525:24
**full** 504:17
526:20 605:4
**fun** 471:6
**function**
593:17 611:13
**fund** 483:14
493:8
**funds** 497:3,10
552:10
**funeral** 516:11
566:12
**fung** 474:12
626:4 627:1
628:1

**further** 473:7
473:11 485:4
511:6 522:13
552:1 559:15
563:4 570:6
581:2 586:7
590:9,23
619:21 622:1,4
625:9
**future** 483:11
483:16 502:13
532:13 584:14
585:12 618:17

**g**

**g** 482:7 492:10
493:5 521:3
550:4
**general** 494:18
511:15 615:1
**generalized**
525:24
**generally**
539:22 560:16
614:14 620:24
**generation**
505:4
**genesis** 498:8
498:17 499:2,9
499:12,25
500:5
**gerald** 544:15
544:23 545:4,6
545:7,8,11,16
545:24 549:18
551:16

**getting** 515:20
517:6 558:12
**give** 495:13
498:23 502:4
504:25 507:21
512:14 526:21
607:13
**given** 507:24
528:21 561:13
606:18 623:8
625:8 628:9
**giving** 511:16
517:5 527:19
**glastonbury**
577:5,7,23
578:12 606:22
**glickenhaus**
544:15,22,25
546:8,8,9,15
547:3,7,9
556:9 557:21
558:6,16,18
559:24 560:11
561:12 563:11
**glickenhauses**
549:18 561:21
**global** 492:12
494:22 495:9
503:3 504:1
575:24
**glory** 493:12,18
495:14 502:10
502:12,16
503:15,20,22
504:5

**go** 474:8
476:25 490:13
494:3 508:7
513:14 514:4
516:11 529:5
542:25 550:14
556:19 581:15
585:14,24
623:4
**goes** 501:12
532:4 551:22
**going** 474:2
481:4 484:2
487:2 489:8
492:4 495:19
513:5 515:24
518:5 523:17
524:4 527:17
528:19,23
530:5 534:16
535:6,7 538:8
538:15 539:15
540:3 543:10
543:11 553:18
554:20 555:12
559:17,18
562:19 575:11
580:18 582:5,6
585:14 586:12
591:25 592:1
599:2 600:11
603:8 612:8,25
613:18 622:7
**good** 474:1
516:9 555:25

614:20 618:19
**goods** 607:7
**great** 488:12
**greater** 493:3
**grief** 518:12
**groceries**
581:12,14
**group** 483:11
496:6 499:6
505:5 545:10
546:10 557:11
562:11,24
564:14
**growth** 614:25
616:11 617:17
617:18
**guess** 488:20
490:16 524:14
526:21 533:25
558:12 564:12
604:5
**guides** 528:11
**guy** 566:12

**h**

**h** 482:6 492:10
492:11 527:12
624:7 627:3
**haircut** 580:16
**haircuts** 580:13
**hamal** 513:3
515:24
**hand** 514:5
529:7 582:6
592:1 594:8
625:14

**handful** 557:10
**handing** 538:17
539:16 575:13
587:6
**hang** 533:12,12
**hannah** 472:11
475:7
**happened**
530:18 545:14
563:2 617:17
**happy** 590:23
605:11
**hard** 507:22
508:16
**harm** 562:3
**harmed** 557:6
**hats** 593:1
**head** 512:14
**heading** 556:11
**health** 493:8
494:13
**hear** 532:7
622:20
**heart** 559:16
**heavily** 585:1
**held** 471:21
545:25
**help** 554:20
589:12 590:24
593:9 594:14
**helped** 559:13
**helpful** 493:12
504:24 606:2,9
**helping** 594:1

hepburn 554:3
hereto 473:4
  628:7
hereunto
  625:13
hermes 526:24
  527:8,9,14,21
  527:22,25
  528:22 529:19
  529:25 600:17
high 529:1
  534:6 556:25
  616:19
higher 502:22
hire 557:16
  558:14
hiring 558:19
history 618:16
hold 612:14
holding 503:1
  503:25
holdings 493:5
  495:14 502:10
  502:12,16
home 581:15
homologated
  483:15
honest 562:4
hong 494:10
  506:19 545:13
hope 620:19
hopeful 562:9
hopefully
  618:16

horizons 527:9
hotel 577:4
  601:17,22,25
  602:7,8,24
hotels 576:15
  578:2,7,14,20
  579:7,10 602:2
  605:7
hour 476:23
hours 581:18
hudson 472:3
  497:4,11 498:2
hugo 523:1
  524:14,15
  525:4 527:5
  528:9 529:20
  530:17 583:4
  592:22,24
  593:12,19,20
  594:9 595:1,1
  595:11,11,15
  596:19 602:19
  608:3,11,24
hugo's 528:19
  528:25 529:9
  530:11 594:4
huh 543:7
  580:11
hundreds
  589:18 591:14

i

ideal 479:25
  481:24 492:14
  492:15

identified
  606:12 618:19
identify 492:25
  502:1 575:11
  612:11
ii 471:15
imagine 490:7
  580:25 581:9
  603:22
immediately
  535:6 621:25
impaired
  556:23
implicated
  491:8 492:24
  494:3,5,7,15,23
  495:3,23
implicates
  532:15
important
  509:12 614:18
  615:1,4,6
inadvertently
  539:22
inappropriate
  566:15
including
  541:15 555:18
  594:1
incompetence
  541:16 542:8
  543:19,24
  547:22 548:9
  549:3,9,10

incorrectly
  490:12
increase 615:13
  617:11
increased
  615:7 617:6
increasing
  615:12
incurred
  596:22
indefinite
  620:18
independent
  533:10,18,22
index 624:1
individual
  618:9
individuals
  542:10,12
  544:18 548:15
  549:1,23,24
  551:20 561:14
  561:16 618:24
industries
  554:2
industry 509:9
  556:25 564:10
  564:11 584:22
inflate 506:21
inform 618:7
informal
  490:14 611:12
information
  496:10 499:20
  512:20 517:6

534:6 540:19 567:8,17 570:18 590:4 591:4,12,20 592:18,23 595:11 597:25 599:5,23 600:14 605:11 618:5

**informed** 479:14 480:4 547:16 549:16 552:25 558:1

**initially** 501:6 549:13

**initiate** 539:24

**initiating** 609:3

**injuries** 556:23

**inquiries** 588:19 618:3

**instagram** 615:23,24

**instance** 495:13 503:13 546:18 594:13 597:11

**instances** 494:24 552:7 618:22

**instruct** 517:24 531:17 532:16 533:8 534:17 540:4

**instructing** 535:3

**insular** 557:8,9 559:10

**interact** 512:17

**intercon** 601:22

**intercontinen...** 602:4,15

**interest** 484:10 484:16,23 487:23 488:17 562:6 618:25

**interested** 474:23 495:24 625:12

**interests** 482:25 483:2,4 483:24 484:12

**intermingled** 496:4

**internal** 575:25 618:2

**international** 545:10

**internationally** 558:2

**interpreting** 549:6

**intimate** 490:18

**invested** 505:2

**investigate** 502:6

**investigations** 567:19

**investor** 494:11 498:8 562:11 562:24

**investors** 511:8 511:11,12 514:1 525:23

**invoice** 605:21

**invoiced** 576:9

**involve** 490:8

**involved** 481:6 494:25 501:11 503:4 504:4,8 506:4,13 507:2 507:8 530:15 531:18 562:13

**involvement** 495:24 496:11

**involving** 506:9 506:19

**inworld** 493:4

**ipad** 499:8

**isabelle** 528:20 529:24 599:19 602:13

**issue** 480:23 485:20 487:16 522:21 559:18 597:20

**issued** 583:2

**issues** 510:21 545:19

**italy** 547:11 574:7,12

**items** 507:11 541:18 543:20

596:22 607:10

**j**

**j.f.** 584:19,20 584:21,24

**january** 489:16

**jesse** 546:9 611:10

**jfk** 506:15

**jim** 544:15,22 544:25 545:1 546:7,8 547:9 547:10,15 556:9 611:10

**job** 535:12 562:20 593:17 594:4,17 611:12

**john** 584:19

**joined** 475:11 475:16

**joining** 499:5 499:12

**jorda** 599:16 600:18 602:9 602:11

**joshua** 554:3

**journey** 528:24

**joy** 492:13 495:2

**july** 545:2 547:18

**june** 545:2 547:18

**justice** 558:5 562:10

**justify** 587:14
588:1 605:7

**k**

**k** 482:7 550:4
**kamelger**
549:25 561:18
**katzman**
513:11 516:25
**keep** 478:15
488:10 491:2
495:11 501:18
503:15 505:1
513:18 518:5
542:4 547:20
616:13,17,17
**keeping** 518:8
616:25
**key** 497:21
498:8 508:14
513:22 521:1
553:20 561:14
561:16 599:17
615:8
**kim** 477:22
478:6,7,21
505:2
**kind** 501:18
527:18 528:21
573:18 583:10
614:5
**kindly** 543:2
**kinds** 573:13
**king** 554:3
**kings** 482:4,7,9

**kingsway**
494:14
**knew** 497:20
519:20 559:16
566:10
**know** 479:23
480:22 488:8
490:18 494:4
496:25 505:22
509:21 510:21
511:1,20 512:3
512:23 513:4
515:9 516:7
517:18 521:15
521:18,21,24
522:3,9,15,17
524:15 530:3
535:1,11,19,21
535:24 536:12
536:18,19,20
536:22,23,25
537:1,3,4,7,17
538:25 539:1
541:2,10 543:9
543:14 545:14
545:23,25
546:24 547:1,5
549:5 550:19
550:24 551:6,7
551:12,14
558:22 565:14
565:17,23,24
566:15 567:10
567:14 568:22
570:14 572:23

574:10 586:18
586:24 593:13
595:17,21
597:18 598:4
599:5 600:7,9
600:12 601:6
602:6 604:3,24
605:4 608:6,9
608:17,20,21
608:22 609:6,9
610:1 615:3
617:5 621:4,7
**knowingly**
516:3 517:3,11
517:15 520:6,9
**knowledge**
498:22 500:7
503:9 520:20
539:10 568:13
568:17 597:3
597:21
**known** 510:19
518:21 584:21
**kong** 494:10
506:20 545:13
**koppelman**
553:25

**l**

**l** 493:6 512:11
521:3,6 550:4
**label** 582:5
**lack** 572:2
**land** 495:16
502:23

**landline** 573:21
574:12
**language** 508:1
613:16
**large** 497:20,25
**largely** 483:25
**law** 531:14
532:12 539:19
540:7,14,23,25
541:7
**lawsuit** 485:16
537:9 553:8,17
554:13 558:4
558:22,25
565:8 568:21
570:2 609:4
**lawyers** 476:25
477:2 531:18
609:7
**lead** 509:23
562:25
**leading** 502:25
525:6 566:23
583:13 586:8
**learn** 500:20
**learned** 499:14
499:15,19,21
500:19 501:5
505:1 568:5
**learning**
500:22
**leave** 523:14,17
524:2,19
**leaving** 523:3,4
523:10,23

524:8,10
**left** 482:8
**legal** 474:21
508:3 559:3,5
620:15 621:3
621:15 623:11
626:23
**lend** 594:8
**lennartz**
550:10 551:11
**lerado** 493:6
**letter** 539:18
624:12
**letters** 539:23
**level** 529:1
534:6 616:19
**licensee** 483:17
**licensing**
483:13,20
487:3,12
**life** 561:3
**likely** 511:24
511:25 512:2
521:12 571:21
571:21 595:15
**limited** 480:2
485:8 492:9,10
492:11,13,14
492:15,16
493:4,5,5,6,8,8
493:18 494:11
494:13 495:2
503:3 506:10
**line** 566:15
627:4,7,10,13

627:16,19
**lines** 476:9
530:7 550:7
579:23 581:22
**linking** 590:15
591:7
**lion** 494:14
**list** 479:21
488:20 491:12
495:10 514:4
515:6 520:22
550:15 555:12
564:24 600:1
604:7 605:20
618:2
**listed** 485:14
489:1 492:1
493:10 494:19
499:4,11 506:9
539:7 543:20
556:13 564:15
589:16 595:3
595:21 599:23
**listen** 486:1
488:3
**litigation**
499:21 516:14
**little** 478:12
**live** 574:15
**living** 578:25
**llc** 478:24
479:1 497:5,11
526:6
**llp** 472:2,7
474:16 539:19

**loan** 498:1
**loans** 501:21
**locally** 577:18
**locate** 545:11
**location** 474:15
574:10
**locations**
527:17
**login** 526:17
**long** 476:21
484:2 516:7
529:5 566:9,24
570:11 609:24
614:20 622:7
**longer** 562:13
579:2
**look** 528:24
534:3,8 538:7
555:15 561:2
561:11 575:16
580:20 582:4
585:14 587:5
592:4,11
595:24 597:5
598:10 599:7
600:20 602:14
603:8 616:19
**looked** 478:23
585:16
**looking** 490:24
491:2 535:4,10
547:20 565:4
605:14 606:11
606:13

**looks** 595:22
**lot** 478:7 505:5
507:20 518:12
577:6
**lots** 506:18
**louwman**
512:10
**luggage** 596:21
598:1
**lui** 500:3
524:22,23
525:2,10,15
537:2 571:8,12
572:21 573:1,6
573:18,22,24
574:8,12,15,25
575:3,4
**luxury** 615:21
615:21,22

**m**

**m** 492:11 493:4
512:11 521:6
550:4
**made** 480:6
499:2 508:13
511:21 513:15
513:17,25
514:10,19
515:12,16
516:5,18,19,23
519:11 522:3
522:10 533:25
536:9 541:10
541:14 543:11
543:12,16

544:24 545:5
546:4 547:21
550:17 551:13
551:18 552:1
552:20,22
553:1,11,13,14
555:17 564:3,7
565:2,3,10,15
565:18,25
567:6,15,22
571:8,16
574:11 587:15
588:1 628:5
**madoff** 567:2
**maintaining**
558:3
**majcher** 472:22
475:13 479:10
481:6 482:1,22
484:18,21
485:18 486:12
583:12 586:4
590:7 594:3
595:7,13 597:6
603:22
**majcher's**
487:17
**majority**
487:23 488:18
489:4
**make** 479:3
480:25 481:5
507:14 508:8
509:1,9 510:18
518:10 540:15

540:24 543:3
550:17 552:12
552:17 553:5
554:24 555:6
561:10 563:20
564:7,17 569:1
572:17 616:1
**making** 497:19
505:17 509:16
511:7 516:1
517:1,9,16
518:17 519:3,4
519:16 521:8
525:22 532:15
572:20
**managed**
479:10 482:1
**manager**
599:18
**managing**
481:6
**manipulate**
494:19
**manipulated**
503:12
**manipulation**
500:10,16
501:12,19,25
502:18 503:5,6
504:2,4,8,20
506:18
**manipulations**
507:8
**manufacturers**
557:10

**march** 489:17
510:16 514:14
525:14 585:18
**mark** 513:11
538:8 592:1
603:9
**marked** 538:9
538:16 539:17
575:12 582:7
585:15 587:6
592:3 603:10
**market** 494:19
501:12,19
504:2 510:1
**marketing**
503:4 506:18
585:13 610:13
610:24 611:5
611:13,16,22
611:25 612:7
612:12,17
613:4,11 614:4
615:9 616:1,12
617:7
**markets** 500:11
504:22 505:4
**marking** 531:1
531:6 570:25
**marriage**
625:10
**massively**
544:11
**master** 492:15
**match** 589:12

**material**
507:14 508:8
508:11 509:4
511:7 522:20
**matter** 474:12
536:5 625:12
**matters** 510:22
593:9,15
**matthew** 554:3
**maximum**
616:22
**mccranie**
539:19 540:8
**meals** 581:17
581:19 601:4
**mean** 477:8
490:17 510:25
524:8 532:3
549:5 574:14
582:24 583:10
592:21,25
593:14 599:25
616:17 618:13
620:4,12
**meaning** 530:9
**meant** 584:6
620:16 621:4
**measuring**
614:8
**media** 474:9
531:1,6 570:25
571:5 607:21
607:25 614:6,9
614:10,15
615:13,17

623:10
**medicine**
580:23,25
**meet** 476:18
509:13 537:10
580:19
**meeting** 476:24
489:13 526:23
527:4,6,7,16
528:12,21
529:19,23
530:1,2 566:9
**meetings**
529:15 600:17
**member** 526:10
585:4
**members**
581:16
**memory** 491:22
**menswear**
598:14
**mentioned**
471:22 481:24
484:10 520:23
555:12 568:12
576:8,12
**mercer** 601:25
602:5,7
**merchant**
598:11
**merger** 505:7
505:13 506:22
**mess** 528:7
**message** 499:1
609:16

**messages**
544:19 572:7
572:15
**messaging**
572:6 573:3,19
**messenger**
573:6
**met** 476:16,20
513:20 527:20
537:12,20
566:10 616:5
**metric** 615:1,4
**metrics** 614:8
**mexico** 489:22
**michael** 506:14
507:3 513:11
554:6
**microphones**
474:4
**midatlantic**
626:15
**middle** 527:3
**middledorp**
521:4 554:1
**milestones**
511:18 513:5
529:1
**miller** 512:9
521:3,3
**mind** 486:6
497:6 504:16
544:2 570:10
580:17 581:6
587:21 605:24
616:22

**mine** 481:19
497:13 516:7
566:24
**minority** 503:1
503:24
**minute** 530:23
**misappropria...**
552:10
**misconduct**
500:11 504:13
504:14,18,21
504:23 505:8,9
505:22,23
506:3,25 507:9
**misinterpreted**
606:9
**mismanaged**
552:2
**misstates**
604:10
**mobile** 474:6
**mobility**
483:11
**models** 618:17
**mom** 528:25
**moment** 493:9
513:13 525:14
550:13 554:7
564:21,23
608:18,21
**money** 505:2
**month** 604:8,14
**months** 525:6
528:18 529:12
529:25 530:13

547:17
**morning** 474:1
**mortgage**
576:21
**mother** 528:19
529:9
**motorcars**
512:9 521:3,4
**move** 613:21,25
**moved** 579:1
**mullin** 472:7
474:16
**multiple**
481:10 489:7
494:24 502:8
502:11 527:17
583:12 586:4
**murder** 517:21
**musial** 584:19
584:19,20
**mute** 474:6

| **n** |

**n** 482:6,7
492:10,10,13
512:11 625:1
**name** 474:18
479:24 491:13
493:7 506:16
513:8,11 521:5
528:20 542:7
542:11 545:18
548:25 550:3,4
550:6
**names** 489:1
504:11 527:10

549:19 554:3
584:16
**narrative**
590:15,16
591:6
**narrow**  522:12
**nda**  537:13
538:4,11
**necessarily**
599:25 604:19
611:1,2
**necessary**
628:6
**need**  478:10
482:6 491:3
492:9 535:6
553:24 577:21
586:21 597:13
611:18 622:9
622:15
**needed**  526:16
529:1 586:7
593:9 596:20
**needs**  517:19
**network**  491:9
492:25 494:3,5
494:8,13,16,23
495:1,3,23
496:4,14,23
500:22 501:13
502:9 503:5
506:19 512:8
512:21 544:21
546:3,5 561:15
561:17

**never**  500:5
537:12 561:3
567:1 581:14
582:2 589:19
597:22 615:8
616:21
**new**  471:1,10
471:24 472:4,4
474:14,17,17
486:22 493:7
505:4,4 546:10
548:14 567:2
577:1,4,5,21
578:3,4,14,16
578:19,25
579:3,15
601:17 602:25
603:3 625:4
**newly**  483:10
**newport**
596:17
**ng**  544:15,23
545:4 551:16
**ngcg**  505:5,7
**nights**  579:4,6
**nominees**
501:22
**non**  505:21
518:5,9 526:21
624:9
**noncompliance**
513:21
**normal**  509:11
523:16

**norman**  472:21
475:12 482:8
482:12 491:8
492:24 497:3,9
498:1,25
500:15 544:25
547:11,16
558:8 562:2
567:24
**north**  512:9
526:6
**notably**  510:1
**notary**  473:13
623:23 625:3
628:13,19
**note**  474:3
626:10
**noted**  628:7
**noticed**  497:24
**noticing**  475:4
**november**
499:10 529:15
**number**  496:5
516:16 600:21
601:16 614:9
615:10 616:20
616:22 617:20
623:9 624:9
**numbers**  586:5
616:14,20
**numerous**
487:22 488:16
515:22 516:6
523:1 527:20
542:5 586:5

**nw**  472:9
**ny**  471:10

**o**

**o**  492:13 493:6
512:11 521:6
625:1
**oath**  512:24
**object**  491:1,3
510:9 517:23
540:4 620:14
621:2
**objection**  478:2
479:2,4 480:8
480:11,14
481:8 484:15
487:10 491:16
492:6 503:7
505:24 506:5
509:18,18
512:5 514:11
516:12 517:2
517:12,19
518:14,19,25
519:6,17
521:22 522:4
522:11 523:19
526:1 536:16
539:9 540:16
543:17 547:6
566:1 567:11
569:3,13 573:9
574:2 581:7
588:14 590:18
591:9,22
594:12 595:5

597:9 598:3
600:5 601:18
602:17 603:13
604:9 605:2,17
606:16 608:16
609:11 612:3
612:20 613:5
613:14 615:5
615:15 619:7
621:14,21
622:11,17
**objections**
473:8 474:24
479:4 480:20
481:1 510:18
518:5,9 535:2
621:7
**objective** 615:8
616:21
**obtain** 615:9
616:22
**obviously**
563:2
**occasion**
572:23 574:24
**occasions**
489:15 515:22
523:2 547:17
574:21 578:24
579:12 583:13
586:5
**occurred** 487:1
487:6 507:19
514:13 515:4
522:6 525:16

525:17 545:2
546:22 547:14
565:12
**october** 529:14
545:8,24
546:22,23
551:14 603:20
604:1,8,15
606:22 609:25
610:3,4,10
624:17 625:14
626:3
**odd** 497:19
498:25 499:5
**offered** 594:8
594:14
**offhand** 479:24
481:22 487:12
491:13 493:9
495:12 502:4
504:11 507:5
513:8,12
524:16 525:13
527:11 528:3
550:12 554:7
555:4 564:21
564:22 566:9
569:8,10,12,22
570:4,19 579:5
579:8 583:18
583:20 584:18
603:21 619:3
**office** 577:1,3,4
577:5,7,8,11,22
578:11 607:8

**officer** 484:19
486:22 610:13
610:25 611:6
611:13,22,25
612:7,13,17
613:4,11 614:4
616:1,12 617:8
**official** 593:8
611:16
**oh** 495:5 523:4
585:7 589:8
**okay** 476:15,18
476:24 477:8
477:15,21,25
478:19 479:9
480:5 482:12
482:21 483:24
484:21 485:17
486:5 487:8,20
488:7 489:18
489:21,23
490:2,21 491:4
493:10 494:2
495:2,17,21
496:10,17
497:2,16 498:4
498:13,24
499:13,19,24
500:4 501:5,10
502:3 503:13
504:3,7,19,24
505:15 506:7
506:12 507:13
509:15 510:2,8
510:13,21

511:23 512:2
512:20 514:8,9
515:5,7,16
516:16 519:15
522:9,15 523:9
525:3,9,19
526:4,11,23
527:13,22
528:6,12
529:22 533:15
534:11,20
536:8,12 537:7
538:7 539:2,15
540:11,14,23
541:2,5,9,20,21
543:6,9,13
544:1,5,6,7,13
544:16,22
545:4,21 546:2
546:12,19,24
547:2,19 548:3
548:8,20
549:16,20,24
550:1,11,14,21
551:17 552:11
552:16 553:9
553:16,25
554:5,8,23
555:1,10,15,22
556:2,7,19
557:4 559:7,19
559:23 560:14
560:25 561:6
561:10 562:14
562:23 563:6

563:10,15
564:2,6,11
565:1,9 566:5
567:4 568:5,14
568:22,24
569:7,9,19,25
570:20 572:13
572:20 573:8
574:5,8,11,14
575:5 576:8,12
577:7,16 578:5
578:13,22
579:6,13 582:4
582:6,9 584:7
585:2,20 587:4
587:11,19
588:17,21
589:5,8,13,24
590:11 592:2,4
592:13 594:19
595:24 596:8
597:5,15,16
598:6,14 599:7
599:13 601:11
601:16,21
602:6,10,23
603:24 606:11
606:12 607:9
607:16 608:13
608:22 609:6
609:19,24
610:12,16,20
610:23 611:19
612:7,9 613:18
614:2,25 616:4

616:10,23
617:5,13,16
619:1,4,20
622:25
**once** 506:22
534:14 536:1
**ones** 479:23
555:23 556:4
564:4,19 580:2
580:9
**online** 496:14
505:6 610:7
**open** 560:21
**operate** 611:21
**operated** 612:7
612:12,17
613:3
**operating**
478:8
**operational**
479:16
**opportunities**
560:16 562:20
563:8
**opportunity**
560:19
**option** 579:2
**options** 560:21
560:23
**oral** 471:21
**orchestrated**
501:14
**order** 494:19
495:15 502:22
506:21 539:25

**orders** 485:7
506:21
**organization**
478:20
**organizations**
584:16
**original** 505:6
505:12 569:24
**originally**
506:14
**outcome**
474:23 559:2,4
625:12
**outfits** 532:12
**outside** 568:18
568:19 569:23
577:17 578:6
**outskirts** 528:4
**overinflation**
501:20
**oversight** 614:5
**own** 500:23
508:1
**owned** 491:7
492:23 493:22
493:25
**owners** 512:18
**ownership**
503:22
**owning** 618:20

**p**

**p** 492:11 521:6
**p.m.** 471:9
**p72** 488:24
511:18 512:18

515:15 528:19
529:9 538:19
545:19 547:24
558:10 575:24
618:10,14
624:11
**pachmar** 480:2
481:7,11,16,25
485:8,13
492:11 494:15
494:17 506:10
**page** 552:18
582:10 596:7
624:3,9 627:4
627:7,10,13,16
627:19
**paid** 582:20
594:10
**pantera** 478:8
**paper** 490:7,8
606:18
**paperwork**
534:5
**paragraph**
542:3 543:24
544:3,4 547:19
548:15,23
555:16 556:5
563:19
**parents** 527:5
529:21
**paris** 528:1,2
600:17
**parsing** 591:4

part  484:1
  494:1,20,25
  496:7 500:18
  511:5,12
  530:11 545:11
  568:1 583:8
  594:2,16
  620:21
particular
  502:10 509:22
parties  473:3
  474:8 509:12
  542:6 548:7
  549:5,18 552:7
  554:1 555:18
  556:22 558:1
  569:17,20
  570:8,13,15
  623:9 625:10
partner  492:12
  503:2 504:1
  507:22 550:5
  556:10 618:5,6
partners
  494:22 495:9
  497:21 510:6
  511:4,17
  512:15 513:22
  521:2 553:2
  555:19 556:3
  557:8
party  474:22
password
  526:13

past  557:1
  584:23
path  559:13
  560:3 563:5
paul  472:11
  475:5 484:6
  566:14
pause  517:23
pay  483:17
paying  576:18
  576:21 607:5
payments
  481:10,12,15
  482:20 497:25
pending  493:15
  558:22,25
  567:12 613:23
  623:2
pennsylvania
  472:9
penny  505:14
people  485:21
  527:14 530:14
  546:16 553:4
  555:11 564:18
  565:19 615:23
peralta  488:23
  489:19,24
  553:22
perfectly
  566:17
perform  594:10
performing
  594:16

period  609:20
  609:25 620:17
person  524:25
  526:16,22
  537:13 553:7
  563:13
personal
  482:10,24
  483:4 576:13
  576:19,22
  577:11 578:17
  580:7,13,17,23
  581:1,5,10,13
  605:1 606:15
  607:1,9,13
personally
  545:20 562:18
pertain  548:15
  549:1
pertaining
  482:15
peruse  587:16
phone  535:8
  545:8 551:7,12
  552:14 561:10
  568:4 571:17
  571:18,19,24
  572:1,9,21
  573:1,2,21
  574:12,21
phones  474:6
photographic
  491:22
pick  474:4

piece  600:13
  606:18
pieces  509:1
pink  505:13
place  471:22
  474:8
placed  485:7
  506:21
plaintiff  471:4
  472:2 475:15
plan  505:6
planning
  488:24 491:1
  505:13 513:3
  523:3,4,9,14,15
  524:2 532:11
plans  505:12
plate  593:11
platform  572:6
  572:22 573:19
plaza  471:10
  474:17
please  474:3,6
  474:25 475:2
  475:18 479:3
  479:21 484:5
  486:3,8 515:9
  557:4 584:2
  612:11
plus  516:8
point  529:6
  576:8,13
  622:16
pointed  543:4

policy  580:22
581:23
position  611:8
possession
621:18,24
possible  479:5
488:11 496:2
548:25
possibly  603:16
603:23
potential
488:21 499:7
511:7 514:1
525:23 528:25
537:23 617:24
618:18
potentially
524:10 529:6
560:4 618:10
precisely
565:12
predetermined
498:17,20
499:25 500:2
preparation
476:16,22
594:1
prepare  476:5
594:5
prepared
477:19 534:7
580:19 583:4
595:2,11
preparing
489:4 592:22

presence
614:10
present  472:20
475:1 529:20
529:20,21
536:9 565:11
600:18
presentation
528:22
press  496:15
583:15,21,22
584:5,6,8,10,11
584:12,17
585:4,11
599:17
pretty  569:17
previous
548:13
previously
565:5 582:7
585:15 587:6
588:3
price  494:20
503:19 506:22
prices  501:20
primary
547:23 549:11
prior  477:2
484:11 508:5
510:23 539:3
546:21 553:7
554:21 612:15
private  474:5
479:15 492:18
496:6

privates  567:18
privileged
532:4,15
534:19 539:23
540:2,18
proactively
619:4
probably
607:18
procedure
523:16,18
procedures
581:25
proceed  475:19
proceeding
474:25
process  497:24
509:10 528:25
529:3,5 530:11
594:2 600:15
601:9 605:9
617:23
processed
481:11 482:20
processing
481:12
produced
539:21,21
568:18,20
592:5
producing
508:2
product  501:3
production
511:18 513:20

547:23 548:10
549:11 573:14
productions
516:22
products  581:4
professional
471:23 580:20
593:20 625:3
professionally
610:18,21
program
544:11 558:10
project  530:19
562:6
proper  590:4
600:8,13
properly  600:4
proposed  489:6
495:16
prospective
615:20 619:14
619:17
prospectus
499:3
protective
539:25
protocols
533:24 581:24
prototypes
515:15,23
provide  479:21
549:19 586:8
588:12,18
589:14 590:3,9
590:14 591:6

591:17
**provided** 478:5
  512:21 564:25
  567:9,16,18
  577:9,13,14
  590:6,14,20
  591:3,13,17,20
  592:19 594:20
  597:25 599:24
  603:11,22
  604:4 605:6
**providing**
  521:9 535:5
  589:13
**public** 473:13
  478:7 496:5
  501:6,8 623:23
  625:3 628:19
**publications**
  478:7
**publicly** 486:23
  492:20 494:9
  494:10 496:12
  501:8 502:8
  503:20
**publishing**
  539:3
**purchase**
  481:18,20
  497:4,10,20
  596:14 598:18
**purchased**
  580:6 596:24
**purchases**
  579:20

**purchasing**
  487:23 488:17
**purpose** 579:21
  589:15 603:3
**purposes**
  585:13 591:8
**pursue** 562:21
**pursuit** 558:4
  562:10
**put** 508:25
  544:11 562:11
  576:3 594:24
  595:4,14 600:1
**putting** 545:18
  562:23 566:5
  593:16 610:23
  611:11 612:10
  613:2,19

**q**

**quality** 614:18
**quantity**
  614:19
**question** 473:9
  480:23 485:24
  486:1,6,11
  488:4,13
  490:13 491:14
  491:19,24
  493:14 497:7
  503:14 508:7
  508:25 512:23
  517:14,23
  519:18 520:12
  531:20 537:17
  542:15,18,20

543:2,3 547:3
  549:13 552:16
  552:17 556:2
  559:19 560:22
  561:6 562:19
  566:20,22
  567:12 570:2
  570:11 572:12
  575:14 578:18
  580:5 584:2,3
  586:11,13
  587:20 590:11
  590:12 597:14
  597:23 599:2
  600:11 601:5
  605:23 606:3,7
  611:19 612:8
  613:22 616:23
  622:13 623:1
**questions** 484:1
  484:5 525:20
  535:13 540:3
  548:2 590:23
  619:21,24
  622:1
**quickly** 587:17
**quiet** 615:21
**quit** 535:2
**quite** 516:8
  549:2 590:21
  603:23

**r**

**r** 492:11 493:6
  521:3,6 550:4
  625:1 627:3,3

**raise** 507:10
  522:21
**raised** 508:3,4
  522:24 597:20
**ran** 607:7
**randi** 471:22
  474:19 625:2
  625:18
**range** 564:13
  583:3
**rausch** 508:4
  554:2
**reach** 562:1
  621:17
**reached** 545:12
  617:20
**read** 486:7
  534:11 535:18
  626:9 628:5
**reading** 500:21
  516:21
**ready** 515:24
  515:25 587:19
**real** 570:21
**really** 508:24
  509:1 556:2
  561:20 563:6
  566:16 569:19
  578:17 582:3
  597:13 611:18
  613:1
**reask** 491:14
  586:12
**reason** 547:23
  549:11 562:5

603:2 626:11
627:6,9,12,15
627:18,21
**reassigned**
507:21
**recall**  477:21
479:9 481:22
482:3,25 485:1
486:20,25
487:5,11,15,20
488:20 491:6
493:9 495:12
499:10 500:12
502:4,14
503:18 504:11
506:15 507:5
507:16 511:9
513:8,12
516:20 524:16
525:13 526:4
526:20,23
527:9,11,12
528:3 529:4
530:3,10
534:24 535:16
535:20,23
537:6 539:2
540:7,9,10,11
540:13,21
541:1,4,8
544:10 545:3
547:18,24
550:5,12 554:7
564:20,22
566:8 569:8,10

569:11,21,25
570:3,8,13,18
571:9,13,21,25
573:7,17,20,23
574:5,8,22
575:7 576:6
577:25 579:5,8
580:15 581:2
583:17,19,20
584:18 586:3
586:14 587:11
588:22 589:9
589:11 590:19
591:10,12,19
592:21 594:22
595:13,18
596:18 598:24
599:15,20,21
601:15 603:21
604:21 606:4
609:18 610:8
610:11 611:7
611:23 612:2
612:22 616:3
617:4,22
618:21 619:3,8
619:10,12,15
620:3,8
**recalled**  493:20
**recap**  489:23
**receipt**  590:13
626:17
**receipts**  589:22
589:25 590:3,4
590:16,17

591:7 605:6
**received**
544:19 552:6
559:15 589:19
590:10
**recess**  531:4
571:3 607:23
**recognize**
575:14 592:13
603:18,19,24
**recollection**
478:20 481:17
522:6
**record**  474:2,9
475:3 480:20
518:12 530:25
531:5 542:21
570:24 571:4
607:24 613:18
623:4,12 625:7
**record's**  517:20
**recorded**
474:10
**recording**
474:7
**records**  505:6
585:24
**refer**  512:20
564:24
**reference**
541:15 549:10
**referenced**
509:4 513:14
514:5 516:16
528:12 529:24

544:4,22 546:2
555:23 556:4,8
558:15 559:10
568:15 575:24
626:6
**referencing**
483:5 484:13
542:3
**referring**  493:1
504:15,23,25
511:11,13
547:7 580:9
616:7
**reflect**  518:13
**reflected**
478:21 479:1,6
541:6 583:9,11
**refuse**  484:1
**refusing**  525:16
**regarding**
525:11
**regards**  510:14
515:13 517:7
537:16 542:7
613:15
**region**  512:14
618:4,6
**registered**
471:23 625:2
**regular**  573:2
574:11,21
**regularly**
615:20
**regulations**
510:3

**regulatory**
508:15 509:14
531:14 540:25
**reimbursement**
579:11,14
**related** 474:21
479:17,18
548:9 549:17
563:12 601:11
601:17,21,24
602:7,10,12
625:9
**relation** 568:10
**relationship**
490:17 582:1
584:11
**relative** 618:4
**relay** 515:19
**relayed** 542:11
546:8 548:13
552:14 553:6
557:13 558:8
562:2
**relaying** 515:19
565:20
**relevant** 618:5
**remaining**
487:24 488:18
**remember**
488:14 528:6
550:2 576:16
610:4 617:20
**rent** 576:19
**reorient** 587:12

**repayment**
498:1
**repeat** 618:17
**repeatedly**
588:11
**report** 532:11
533:2 583:2
**reported**
496:12 531:13
532:8,21 533:7
533:15,16,19
**reporter**
471:23 474:19
475:18 478:15
517:21 518:12
624:18 625:3
**reporting**
501:6
**reports** 507:25
**represent**
474:20
**representatives**
475:12
**reputation**
556:23 557:7
558:3 561:4
562:3
**request** 577:15
**requested**
530:4 592:23
605:10
**required**
491:22 628:13
**reread** 476:10
476:12,13,14

477:15
**research**
500:23 618:7
**reserved** 473:9
**residence**
576:14,19,22
577:24 603:6
607:14
**resign** 523:15
**resigning** 524:5
**resolutions**
485:9
**respect** 481:23
485:19 486:11
489:11,18
492:18 495:9
495:11 510:8
516:4 519:10
520:24 522:20
525:19 526:12
547:3 549:14
550:18 551:10
552:11 555:5
555:24 556:3,4
570:6 599:3
622:6
**respective**
473:3
**respond** 585:21
619:11,14
**responded**
586:1,5,14,19
587:2 589:2
**response**
499:16 556:1

559:15 567:8
567:15 588:19
589:19
**responses**
590:10 605:8
**responsibilities**
593:22,23
594:5 611:9
**responsibility**
509:13 512:12
614:6
**responsible**
511:16
**responsibles**
521:2 527:7
528:13,22
529:19
**responsive**
619:17
**restate** 543:2
606:10
**restating** 486:6
497:6 570:10
587:21
**restaurant**
579:14 599:11
599:13
**result** 485:11
556:21 558:10
**resume** 561:1,2
561:3,4,7,8
**retained**
623:11 624:18
**return** 626:13
626:16

**[reverberated - schemes]** Page 32

**reverberated**
  557:13
**reverse** 505:7
  505:13
**review** 567:23
  626:7
**reviewed** 476:7
  499:3 534:5
**revised** 499:9
**ribbon** 599:8
**richard** 513:12
  553:25
**right** 476:8
  477:16 489:25
  498:8 499:22
  500:6 507:13
  514:7 519:5
  520:1,5,8
  521:7,8 522:3
  523:24 525:25
  526:4,6,8
  531:11 537:8
  537:20,21,24
  538:2,5,11,12
  538:19,21
  539:19 541:3,9
  541:13,17
  546:2,6 550:3
  551:23,25
  553:11 555:15
  556:19 559:11
  559:21 560:20
  561:8 562:17
  563:3,10,13
  565:15,18

  567:7,25 569:9
  569:12 570:5
  572:8,15,21
  574:1,17,19
  575:1,3,21
  576:1,10,19,22
  577:1,12,25
  578:3,7,20
  579:11,15
  583:14 585:18
  585:22 586:25
  587:4,9,15
  588:1,4,8,10,13
  591:8,21,25
  592:13,16,20
  593:21 594:21
  595:20 596:12
  598:8,15 599:5
  599:11,24
  601:8,17,22,25
  602:3,16 603:1
  603:6,12 604:7
  604:8,20
  605:16 606:15
  607:14 608:3
  609:22 610:14
  610:18 611:18
  612:19 613:13
  614:6,10,15,21
  618:10,12
  621:12 622:25
**rihanna's**
  599:18
**road** 483:16
  508:3 509:23

**robert** 474:18
**rockefeller**
  471:10 474:17
**role** 486:22
  487:25 488:19
  559:24 611:3
  613:7 614:4
**roles** 593:19
  611:17
**rolling** 483:15
**rooms** 577:4
  601:17
**rough** 529:4
**roughly** 502:14
  525:7 527:18
  583:2 610:1
**routine** 511:16
**roytblat** 472:5
  475:16
**rpr** 625:18
**rudis** 472:21
  474:18
**ryan** 471:3,21
  474:10,12
  475:15,21
  485:25 488:3
  567:1 623:8,19
  624:3 626:4,5
  627:1,2,24
  628:1,2,4,12

**s**

**s** 482:6,7
  492:10,13
  527:12 624:7
  627:3

**s1** 499:9
**sadeleer** 523:1
  527:5 529:20
  530:17 600:24
  602:19 608:3
**saga** 538:18
  624:11
**sale** 483:6,8
**samuel** 499:2,4
  499:5,11 537:2
**satisfy** 485:8
**save** 518:11
**saying** 499:2
  504:17 508:20
  509:2 512:2
  519:25 524:18
  562:16 563:24
  569:16 578:15
  581:20 585:2
  588:6 611:15
  614:22 617:14
  617:16
**says** 504:18
  592:17 596:17
  600:3
**scg** 537:14,23
  538:2,4 557:20
  558:15 559:12
  559:24 611:2,6
  611:9,14,21
  612:23 613:3
**scheme** 503:6
**schemes** 500:10
  500:16 501:10
  501:12,17,25

502:2,18
504:20
**schiller** 472:2
536:10
**scott** 537:7,10
538:12,23
**scratch** 617:12
**screen** 616:4,7
**screening**
617:23
**sealing** 473:4
**season** 510:6
**sec** 499:1,3
506:8 531:24
532:9,22
533:15,16,24
534:1,20
535:21 540:15
540:24
**second** 482:7
483:7
**securities**
502:19 503:8
505:11,16,21
531:24
**see** 478:20
482:22 491:1
541:24 544:2
552:3 555:20
557:1 560:9
563:22 582:8
582:13 596:8
596:17 601:11
604:22 606:21
618:9

**seeing** 507:25
586:16
**seek** 559:24
**seeking** 560:2
**seem** 604:13
**seems** 599:6
608:13
**seen** 538:21
573:13 582:8
587:7
**self** 494:24
501:19 503:4
606:22
**selling** 503:1
**send** 561:1,7
572:7,14 586:8
**sending** 561:1
**sensitive** 474:4
**sent** 583:12
588:23 589:17
595:12,12
626:14
**separating**
609:15
**separation**
559:11 563:16
**september**
471:9 474:3
595:20,25
596:3,4,5
598:7,10 601:1
624:15
**series** 496:8
501:14

**serve** 610:20
611:13
**served** 610:17
610:24 611:25
613:11 617:7
**serving** 615:25
616:12
**session** 576:4
**set** 512:8 527:4
539:24 625:6
625:13
**setting** 489:10
**sham** 495:14
506:20
**share** 501:20
503:19 530:5
**shared** 512:22
512:25
**shareholder**
501:21
**shareholders**
496:6
**sheet** 505:14
594:20 626:11
**sheppard** 472:7
474:16
**sherwood**
537:7,10
538:12,23
539:3
**ship** 596:21
**shirts** 579:22
579:24 580:1,7
580:7 598:17
598:21,24

**short** 495:6,19
570:22
**shortly** 530:21
552:14 555:14
**show** 538:14
539:15 567:17
575:10
**showing** 478:6
513:5
**sic** 513:3 528:7
544:15
**side** 484:25
485:1 489:6
530:14
**sides** 483:19
**sign** 538:4
626:12
**signal** 573:4
**signator** 484:25
**signature**
625:17
**signed** 473:12
473:14 534:5
535:18 626:19
**siloed** 519:23
**similar** 553:19
**simons** 472:5
475:14,14
478:2,11,14
479:2 480:8,12
480:15,19,24
481:8 484:6,15
485:25 487:10
488:3 490:25
491:16,20

**[simons - specific]**                                      Page 34

492:6 493:14
500:25 503:7
505:24 506:5
509:18 512:5
514:11 516:12
517:2,12,18
518:2,8,19,25
519:6,17
520:13 521:22
522:4,11
523:19 526:1
530:24 531:16
532:6,14 533:6
533:17 534:14
534:24 535:9
536:1,16 539:9
539:20 540:16
542:14,21
543:17 547:6
548:17 554:16
566:1,14,21
567:11 569:3
569:13 570:23
573:9 574:2
581:7 588:14
590:18 591:9
591:22 592:5,9
594:12 595:5
596:6 597:9
598:3 600:5
601:18 602:17
603:13 604:9
605:2,17
606:16 608:16
609:11 612:3

612:20 613:5
613:14,22
615:5,15 619:7
619:23 620:2
620:23 621:6
621:10,16,22
622:1,11,17,19
623:1,5 624:5
626:1
**simple** 503:14
503:15 513:18
584:2
**singapore**
545:9
**single** 574:24
**sino** 492:12
494:22 495:9
503:2,25
**sir** 565:23
**sister** 477:9,10
**sister's** 578:24
579:4
**sitdown** 527:18
**sitting** 511:1
512:24 574:23
585:25 586:13
586:18,24
591:18
**six** 515:23
**size** 509:1
**skimmed**
592:12
**skin** 581:4
**skolnick**
488:22 489:3

489:24 513:10
516:24 552:13
552:23 553:8
553:10 554:9
568:3,7
**sleep** 578:11,12
**slow** 478:12
497:5,11
**small** 557:10
**smiling** 518:13
**social** 614:6,9
614:10,15
615:13,17
**sole** 526:10
562:12
**solely** 606:17
**solutions**
474:21 483:7,8
483:9 623:11
626:23
**someone's**
523:16
**son** 546:9
**sophie** 472:5
475:16
**sorry** 476:14
480:12 483:3,3
519:8 548:20
548:20 550:24
551:21 552:24
552:24,24
554:2,18
563:25 572:11
591:2

**sort** 531:20
**sounds** 550:8
**source** 568:17
**sources** 496:12
501:6 539:8,13
**southern** 471:1
474:14
**spac** 499:2,7,12
506:14,16,17
506:23 511:12
513:15,17
514:5,7,10,19
519:4
**space** 577:9,12
577:13 607:8
615:13
**spaces** 615:22
**spare** 550:6
**speak** 525:1,17
530:20 542:22
545:7,14 551:8
565:12 568:20
572:24 574:20
600:15 601:9
603:15,16
605:9 622:21
**speaking** 518:5
518:9,20,23
519:20 535:2
539:2 621:7
**specific** 484:12
501:16 513:1
527:16 528:20
529:17 541:22
542:2 543:9,15

547:1,4 549:15
550:19,24
551:1 554:11
555:1 560:2,19
560:23 564:12
571:15 589:15
591:4 597:11
610:8 611:8
613:16 620:17
**specifically**
479:19 483:2
486:25 487:5
506:2 515:11
516:20 525:21
542:11 543:23
544:7 548:8
549:7 553:3,12
557:5 558:18
560:8,15
565:10,16
569:20 570:7
571:11 574:22
588:22 599:20
606:5 610:11
612:22
**specifications**
507:15 508:9
508:12 509:4,9
509:16
**specificity**
502:2
**specifics**
501:24 524:3,6
**spell**  478:9
482:5

**spelling**  492:10
550:3
**spent**  577:6
**spike**  503:21
**spirit**  583:24
583:25
**spoke**  544:18
545:24 550:21
551:15,16,18
552:6 553:7
**spoken**  546:21
547:10 552:13
**sponsor**  499:7
**spread**  544:21
**spreadsheet**
589:21 595:2
595:22 603:9
605:19 624:14
**spring**  515:4
522:7,13
**spur**  494:14
**stake**  489:4
498:17 500:1,5
**stakes**  487:23
488:18 494:18
503:1,25
**stand**  569:23
**standby**  590:9
**standpoint**
584:13
**stands**  483:10
**stanley**  511:22
513:9 515:10
515:12 516:6
550:10 551:10

553:22 555:5
567:20
**start**  494:6
515:9 529:3
543:14 549:20
559:13
**started**  528:23
576:15 617:13
617:17
**starting**  565:6
581:25
**state**  471:24
474:25 475:2
480:19 569:14
604:12 625:4
**stated**  496:3
557:12
**statement**
478:1 552:2
567:5,6,14
603:20,25
605:4
**statements**
511:7,19,21
513:1,15,16,19
513:25 514:9
514:19 515:12
515:16 516:1,4
516:18,23
517:10,16
518:18 519:3,4
519:11,16
520:22,25
521:8 522:2,10
522:16,21

525:23 541:14
542:2 543:10
543:15 544:14
544:24 545:5
546:4,7,12,13
546:16 547:22
549:15 550:16
550:18 551:13
551:19 552:12
552:12,21
553:1,5,11,13
553:15 554:24
555:7,17
556:22 557:5
557:12 563:21
564:2,18 565:3
566:7 567:22
569:2,16
589:12,14
**states**  471:1
474:13
**stating**  508:1
566:25 588:9
605:24
**status**  511:16
514:25 515:20
517:4 521:9
**stay**  578:6,9,24
579:6 602:5
**stayed**  579:3,9
602:2,4,15,24
617:6
**staying**  576:15
578:2,14,20

stays  579:10
step  528:17
steps  530:10
sticking  551:25
stipulated
   473:2,7,11
   623:9
stipulations
   473:1
stock  500:10,16
   501:25 502:18
   503:6,12 504:5
   504:8,20 505:3
   505:14 507:8
stocks  504:7
stop  535:6
   542:12
storage  606:22
   607:4
store  596:11
   607:8
storing  607:9
strain  576:14
strategy  615:9
strive  618:14
strong  616:21
stuff  597:8
subject  555:25
   556:17 573:10
   598:20 600:2
submissions
   533:25 534:3,8
   534:15 594:6
submit  579:10
   590:2 592:19

594:20
submitted
   579:13 589:24
   589:25 597:18
   600:14 604:7
   604:23
submitting
   589:9,11
   594:10 605:15
   618:3
subordinate
   482:23 484:22
subordinated
   483:3
subordinating
   486:12
subordination
   485:17 487:16
subpoena
   476:8
subscribed
   623:20 628:14
subsequent
   489:9 528:18
   529:25 530:13
   547:17
subsequently
   529:12
subsidiaries
   502:17
substance
   477:1,11
substantial
   494:18

substantiation
   586:7
substantive
   535:5
successful
   562:9
succinct  488:10
   495:12 501:19
   505:1 542:5
suffered  556:22
suggest  608:13
suitable  619:5
suitcase  596:24
   597:2,8
suite  472:9
summarize
   496:2
sums  497:25
sung  471:6
   474:12 492:9
   494:6,11 626:4
   627:1 628:1
sunwah  482:4
   482:9
supplement
   493:11
supplementary
   605:19
suppliers
   507:20 508:14
support  588:12
   589:22 594:20
supported
   562:5 588:8

supposed
   545:19 622:8
sure  478:13
   479:3 493:3
   495:7,7 499:16
   499:16 504:19
   505:19 514:3
   516:6 518:10
   521:17,19
   524:12 530:24
   535:15 543:3,5
   544:4 545:6
   549:21 551:21
   552:17,19
   564:12 570:12
   570:23 572:3
   584:4 587:18
   587:22,23
   622:12
surprised
   562:7
swear  475:18
switch  515:5
switzerland
   489:14
sworn  473:14
   475:22 623:20
   625:6 628:14
symbol  506:15
synchronously
   574:16
system  507:24
   508:2,20,21,22
systems  508:17
   508:18 513:24

| t | | | |
|---|---|---|---|
| **t**  493:5 624:7 | 579:22 581:2 | **tested**  561:13 | **things**  488:10 |
| 625:1,1 627:3 | 581:16 601:4 | **testified**  475:23 | 495:12 501:18 |
| 627:3 | **technical** | 480:7 533:14 | 517:22 519:25 |
| **tail**  525:7 | 497:21 507:21 | 545:22 559:7 | 520:4,7,10,18 |
| **take**  474:8 | 507:22 513:22 | 571:7,11 575:7 | 549:17 562:16 |
| 485:25 489:2 | **telegram**  573:4 | 621:4 | 570:16 592:25 |
| 494:18 510:25 | **telephone** | **testify**  533:18 | 594:9 614:3,5 |
| 512:13 530:22 | 572:17 574:1 | 534:25 | **think**  476:7 |
| 538:7 541:25 | 574:16,24 | **testifying**  620:3 | 487:6 488:12 |
| 570:21 582:4 | **tell**  495:18 | 620:8 | 490:25 499:23 |
| 584:7 587:4 | 506:2 542:1 | **testimony** | 502:14 505:4 |
| 602:14 603:8 | 548:4 550:20 | 477:3,6 480:18 | 511:15 521:1 |
| 607:18 621:18 | 557:4 570:9,16 | 519:15 529:11 | 523:20 524:3,4 |
| 621:24 | 574:23 583:15 | 529:22 535:5 | 524:6 529:4,14 |
| **taken**  474:11 | 583:22 585:25 | 548:22 552:22 | 530:5 539:21 |
| 506:8 | 587:1 605:14 | 553:9 567:21 | 539:22,24 |
| **talk**  477:9,10 | 606:14 | 571:9 575:6 | 540:1 542:21 |
| 477:12 501:1 | **telling**  499:17 | 589:1 591:5,18 | 547:14,18 |
| 514:6 543:8 | 542:8 587:13 | 609:20 612:19 | 550:2,7 554:21 |
| 548:8 567:4 | 587:25 | 613:13,25 | 556:17 577:25 |
| 571:23 | **tenure**  617:21 | 619:21 622:6,9 | 580:18 581:21 |
| **talked**  549:8 | 622:7 | 622:16 623:8 | 583:13 586:9 |
| 574:15 587:11 | **term**  480:16,17 | 624:1 625:5,8 | 596:24 607:18 |
| **talking**  492:17 | 566:9 572:4 | 626:9,17 628:8 | 614:18 619:5 |
| 548:23 608:2 | **terminated** | **text**  515:22 | 620:4 621:6 |
| **target**  614:24 | 621:12 | 567:23 568:15 | **thinking**  523:6 |
| 615:18 | **terminology** | 572:7,14 | 524:7,9 |
| **targeted**  616:5 | 612:22 | **texts**  572:9 | **thinks**  505:23 |
| **tarnishing** | **terms**  483:20 | **thank**  476:4 | **third**  547:15 |
| 542:7 545:18 | 483:20 484:17 | 507:6 560:25 | 555:18 556:22 |
| **task**  594:10 | 485:17 496:22 | 568:23 598:6 | 596:7 610:1 |
| **tasked**  592:22 | 530:12 546:19 | 619:20,22 | **thomas**  521:4 |
| **team**  480:1 | 547:3 550:16 | 622:2 623:5 | 554:1 |
| 481:24 492:14 | 560:18,25 | **thedrive.com** | **thought**  529:23 |
| | 615:17 620:5 | 584:25 | 548:20 567:1 |

569:21 606:8
**thousands**
589:18 591:14
**thread** 586:16
**threads** 567:16
**threat** 571:15
**threatened**
571:12
**threats** 571:8
**three** 489:1
527:18 528:14
**ticker** 506:15
**tied** 590:2
**time** 471:22
473:9 474:6,25
480:1,3 481:1
481:17 482:19
482:22 483:18
484:18 485:3
485:22 486:20
487:1,7 488:10
492:8 497:1,7
497:18,22,23
498:2,22,24
499:4,18,20
503:2 506:24
515:4 516:7,21
518:7,21
519:21 520:21
522:7 524:12
524:24 525:18
529:18 532:2
535:20 537:6
538:2 546:22
547:15 550:21

551:3,8,9
558:24 560:13
566:24 570:3
576:18 577:6
578:17 582:22
582:23,25
584:15 600:25
603:5 605:5,25
607:20 608:8
608:23 609:1
609:16,24
610:2,13,17
611:3 616:14
616:14,20,21
620:17 621:5
621:11 626:18
**timeframe**
626:8
**timeframes**
565:4,5
**timeline** 550:20
550:23
**timelines**
511:18 513:20
529:4
**times** 496:3,16
500:21 510:17
523:25 524:21
565:11 578:11
602:19 619:13
**timing** 515:13
550:25 551:1
**timothy** 527:12
529:16

**title** 497:25
560:2 593:8
611:8,12,12,16
611:20 612:14
613:2,16,20,20
**titled** 538:18
**titles** 593:17
611:2
**today** 477:20
511:1 512:24
570:17 574:24
585:25 586:13
586:18 591:19
619:21
**today's** 476:6
623:8
**together** 496:8
560:4 562:11
562:24 576:4
590:3,15 591:7
596:19,23
600:13 620:20
**told** 482:8,12
485:14 498:12
506:13 507:2
515:23 520:3
523:1 542:5
545:1,12,16
546:6,14
547:10 549:22
552:8 553:10
553:14 557:15
558:8,13,21
561:25 562:3,4
562:15,18

569:21 590:8
**tom** 477:22
478:6,7,21
505:2
**tomaso** 477:23
478:8 479:17
479:25 480:3
481:17,24
482:24 483:13
483:16,21
484:17 485:19
485:20,21
486:13,14,22
487:1,17
496:18,24
497:3,10,18,23
497:23 498:5
498:18,22,24
499:6,15,18,20
500:1,6,19
502:5 505:7
507:10,15
508:5,9 511:4
514:15,20
522:22 524:10
525:2 526:5,6
526:24 528:24
529:25 530:9
530:14 532:25
536:15 537:16
538:19 541:16
553:1 555:18
559:11 562:5
562:12,24
563:16,22

564:9 567:18
575:8,24 576:9
576:25 577:8
577:10 578:6
579:11,14
580:3 582:1,17
582:20 585:9
587:14,25
589:7 590:17
593:21 594:17
596:16 597:8
598:22 601:1
603:1 604:24
605:15 607:5,7
607:13 608:12
609:15 610:24
612:1,10,15,18
613:12 615:4
615:24 616:12
617:24 618:20
619:6,17 620:6
620:10,25
621:12,19
624:11
**tomaso's** 485:1
499:7 519:5
597:6 599:4
610:13 615:18
616:11 617:3,6
**took** 503:24
578:17
**topic** 549:4
**total** 623:9
**totality** 490:5

**touchpoints**
512:16
**tour** 528:10
**tours** 527:20
**toward** 610:10
**towards** 509:16
**town** 493:8
494:13
**track** 618:2
**traction** 507:23
508:17,21
509:5,6 510:15
513:23
**traded** 486:23
492:20 494:9
503:20
**trafficked**
585:1
**trail** 490:7,8
**transaction**
495:16 595:24
603:25
**transactions**
494:12,21,25
495:24 501:21
592:16 624:15
624:16
**transcript**
625:7 626:6,19
628:5,8
**transcript's**
612:25
**transfers**
587:14 588:1,7

**travel** 577:21
578:10
**traveling**
576:25 577:2
577:17 578:5
602:25
**trial** 473:10
**tried** 559:12
619:19
**trip** 489:22
596:22
**true** 496:25
519:22 520:1,5
520:8,11,19
569:12 617:2
625:7 628:8
**truth** 518:21,23
519:21 574:14
**try** 478:11
484:7 486:1,2
486:3 488:4,10
495:6 506:24
508:24 518:11
521:5 550:2
573:15 584:15
**trying** 495:18
495:19 496:1
505:18 508:25
514:4 515:21
518:10 545:11
548:24 556:12
562:1 563:6
568:11,12
599:15 606:4

**tuned** 510:6
**turn** 582:10
**turned** 545:7
609:21
**turns** 515:25
**twisted** 538:18
624:11
**two** 488:9
489:14 508:16
527:3 542:11
544:18
**type** 490:7
**types** 490:14
**typically**
482:19 574:13
577:3,22
600:24
**tyrwhitt** 598:8
**tyrwhitt's**
598:14

**u**

**u** 482:6 492:10
512:11
**u.s.** 499:7
500:11,16
504:21 505:3
505:14 506:9
506:14,18
510:1,3 511:25
526:16,21
546:11 577:17
**uh** 543:7
580:11
**ultimately**
530:18

**ultra**  615:21
**unaddressed**
  508:6
**unauthorized**
  552:9
**unaware**  536:4
**uncomfortable**
  523:25
**under**  486:22
  497:25 506:15
  512:24 539:25
  562:12 620:25
  622:8
**understand**
  485:23 505:15
  505:18 509:2
  525:21 526:2
  553:9 568:12
  569:5 573:15
  597:25 606:3,6
  610:16 614:23
  620:24 622:13
**understanding**
  482:1 526:12
  533:7,19,20,23
  536:2 568:17
  570:6 585:21
  591:5,18
**understood**
  480:24 529:22
  548:6 551:21
  618:15 620:9
**unemployed**
  563:17

**uniform**  569:17
**unit**  474:9
  531:1,7 570:25
  571:5 607:21
  607:25
**united**  471:1
  474:13
**units**  623:10
**updates**  511:17
  512:15 514:25
  515:20 517:4
  519:23 521:10
  521:11
**use**  480:15
  481:4 509:24
  575:25 584:14
  585:12 589:5
  597:24
**used**  480:18
  481:18,19
  482:4 494:17
  495:14 497:3
  497:10 580:1
  598:17 623:10
  626:19
**user**  526:15
**using**  485:7
  512:16 572:1
  573:6 597:17
  605:9
**usually**  481:11
  574:18,19
**utterly**  557:14

**v**

**v**  626:4 627:1
  628:1
**vague**  480:16
**valdez**  513:12
  516:25
**valuable**
  509:17,17
**valuation**
  502:22
**value**  506:22
**vanneck**  554:1
**various**  479:11
  481:7 488:1
  503:3 531:10
  552:7 560:21
**vehicle**  513:21
  529:2 530:6
  618:20
**vehicles**  502:13
  507:15 508:10
  508:15 509:10
  509:16,23
  510:4 575:8
**vented**  524:13
**venting**  522:25
**ventures**  480:1
  481:24 492:14
**verbally**  514:25
  524:16,20
**verbatim**  524:9
**verify**  626:9
**veritext**  474:21
  623:11 626:14
  626:23

**veritext.com.**
  626:15
**versus**  474:12
**video**  474:7,10
  584:13
**videographer**
  472:21 474:1
  474:19 475:17
  530:25 531:5
  570:24 571:4
  607:20,24
  623:7
**videos**  584:23
**videotaped**
  471:20
**view**  526:18
**viewed**  559:12
  604:13
**villa**  547:11
**visibility**  615:7
  615:12
**visiting**  601:2
**vol**  626:5 627:2
  628:2
**volume**  471:15
**vs**  471:5

**w**

**w**  482:6,7 483:7
  512:11 527:12
**wachs**  527:12
  529:16
**wait**  479:3
  517:12,19
**waiting**  490:25
  559:4

| | | | |
|---|---|---|---|
| **waived** 473:6 | 495:13 502:10 | 519:2,9,24 | 619:9 620:14 |
| **waking** 581:18 | 502:12,16 | 520:17 522:1,8 | 621:2,14,21 |
| **walk** 515:7 | 503:15,20,22 | 522:14 523:22 | 622:3,5,14,23 |
| **want** 476:25 | 504:5 | 526:3 530:22 | 623:3 624:4 |
| 480:21,25 | **wear** 598:23 | 531:8,22 | **werner's** |
| 489:1 490:11 | **web** 496:4 | 532:10,20 | 535:13 |
| 490:12 491:23 | **website** 538:25 | 533:11,13 | **whatsapp** |
| 497:7 505:22 | 584:24 | 534:2,18,21 | 524:22 571:16 |
| 514:6 515:5,7 | **websites** 585:1 | 535:1,17 536:7 | 571:19,24 |
| 528:7 532:7 | **week** 525:18 | 536:17 538:10 | 572:1,6,15,18 |
| 539:24 543:8 | 547:15 610:2 | 539:11 540:1,6 | 572:22,25 |
| 543:14 547:19 | **weeks** 488:9 | 540:22 542:17 | 573:19 574:16 |
| 548:25 554:2 | 527:3 620:5 | 542:19,23 | 574:25 |
| 570:14 575:10 | **welcome** 476:3 | 543:22 547:8 | **whatsoever** |
| 597:16 622:19 | **went** 506:15 | 548:18 554:4 | 537:15 |
| **wanted** 568:22 | 508:5 596:23 | 554:19 566:4 | **whereof** 625:13 |
| 611:10 | **werner** 472:11 | 566:17,19 | **whispering** |
| **washington** | 475:5,5 476:2 | 567:3,13 569:4 | 474:5 |
| 472:10 | 478:3,16 479:8 | 569:18 570:21 | **wigger** 472:11 |
| **waste** 481:1 | 480:10,13,17 | 571:6 573:12 | 475:7,7,11 |
| **wasting** 518:7 | 480:21,25 | 574:4 581:11 | 592:7 |
| **waters** 561:13 | 481:3,14 | 588:16 591:1 | **willing** 559:16 |
| **way** 482:4,9 | 482:11 484:7,9 | 591:15,24 | 562:11 |
| 484:4 512:3 | 484:20 486:7 | 592:10 594:15 | **wish** 540:5 |
| 514:14 517:21 | 486:10 487:14 | 595:8 596:10 | **witness** 475:18 |
| 518:3 549:6 | 488:6 491:2,4 | 597:12 598:5 | 475:21 477:6 |
| 583:13 588:24 | 491:5,18,23 | 600:6 601:20 | 478:9,13 479:5 |
| 591:19 610:2 | 492:2,21 | 602:20 603:17 | 480:9 481:9 |
| 615:12 625:11 | 493:16 501:4 | 604:16 605:12 | 482:5 484:16 |
| **ways** 511:5 | 503:11 506:1 | 605:22 606:20 | 486:5 487:11 |
| 620:21 | 506:11 509:20 | 607:17 608:1 | 488:5 492:7 |
| **we've** 564:4,13 | 512:19 514:16 | 608:19 609:13 | 501:2 503:8 |
| 564:19 566:6 | 516:15 517:8 | 612:5,24 613:9 | 506:7 512:7 |
| **wealth** 493:12 | 517:13,22 | 613:17,24 | 514:12 516:13 |
| 493:17,18 | 518:4,16,22 | 615:11,16 | 517:3,18 518:1 |

518:20 519:1,8
519:19 520:15
521:24 522:5
522:12 523:20
526:2 531:21
532:9,18
533:22 535:3,3
535:10,11,15
536:4 539:10
540:20 543:18
553:24 554:18
566:2,23
569:14 573:10
574:3 581:9
588:15 590:19
591:10,23
594:13 595:6
596:8 597:10
598:4 601:19
602:18 603:15
604:11 605:3
605:18 606:17
608:17 609:12
612:4,21 613:6
613:15 615:6
619:8 620:16
621:9 622:12
622:18,21
625:5,8,13
626:8,10,12,18
**witnessed**
483:18,24
**word** 480:16
481:4 482:7
483:8 494:14

541:25
**wore** 580:4
593:1
**work** 482:4,9
501:3 507:21
517:22 540:14
556:24 559:17
560:4 561:2,11
577:2,18
578:11 620:20
**worked** 557:1
563:21 576:25
584:22 586:6,8
**working** 483:9
540:17 577:18
577:22 581:17
**workload**
593:10
**world** 557:8,9
559:10
**worthy** 618:20
**wrap** 607:18
**writing** 487:18
490:4 510:11
514:22,25
515:1 516:19
521:11,13,16
522:16 524:14
524:17 585:21
586:2,15 587:2
589:2 593:14
**written** 538:23
**wrong** 495:18
558:9

**wrongdoing**
531:10,14

| **x** |
|---|

**x** 471:2,7 624:7

| **y** |
|---|

**y** 482:7 521:3
**yards** 472:3
497:4,11 498:3
**yeah** 488:12
495:11 500:25
501:16 529:13
530:2 532:6
540:20 542:4
555:3,25
558:12 560:7
569:23 571:22
572:9 578:16
596:17 598:16
601:4 604:11
607:17 610:8
614:23 616:8
617:19
**year** 487:8,9
620:10,13
**years** 496:9
501:15 516:8
584:23
**yesterday**
476:20
**york** 471:1,10
471:24 472:4,4
474:14,17,17
546:11 577:1,4
577:5,21 578:3

578:4,14,16,19
579:1,3,15
601:17 602:25
603:3 625:4
**young** 513:10
516:25

| **z** |
|---|

**z** 492:10
**zero** 492:1,3
617:19
**zhan** 492:9
494:6,11
**zip** 583:11
589:17 590:14
590:20
**zipped** 595:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.