# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
RYAN BERRIS,

       Plaintiff,

                    Case No.:

   -against-          1:23-cv-04305(AS)

SUNG-FUNG CHOI (a/k/a NORMAN CHOI),
DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC,
HIN WENG LUI (a/k/a SAMUEL LUI),
GENESIS UNICORN CAPITAL CORP.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - x


       Videotaped deposition of DIANA
MAJCHER, taken pursuant to notice, was
held at the law offices of BOIES
SCHILLER & FLEXNER LLP, 55 Hudson Yards,
New York, New York, commencing September
17, 2024, 10:17 a.m., on the above date,
before Leslie Fagin, a Court Reporter
and Notary Public in the State of New
York.

               - - -


MAGNA LEGAL SERVICES - (866) 624-6221



Page 2

```
 1
 2   APPEARANCES:
 3
     BOIES SCHILLER & FLEXNER LLP
 4   Attorneys for Plaintiff
                 55 Hudson Yards
 5               New York, New York 10001
     BY:         SOPHIE ROYTBLAT, ESQUIRE
 6               JOHN ZACH, ESQUIRE
                 DAVID SIMONS, ESQUIRE
 7
 8   SHEPPARD MULLIN RICHTER & HAMPTON LLP
     Attorneys for Defendants
 9               2099 Pennsylvania Avenue, NW
                 Suite 100
10               Washington, D.C. 20006-6801
     BY:         ALEXANDRA BUSTAMANTE, ESQUIRE
11               HANNAH WIGGER, ESQUIRE
12
     ALSO PRESENT:
13
     NORMAN CHOI
14
     RYAN BERRIS
15
     JEREMY KOVACS, Videographer
16     Magna Legal Services
17
18
19
20
21
22
23
24
25
```



1

2          THE VIDEOGRAPHER:  Good morning.
3     We are now on the record.
4          This begins videotape No. 1 in the
5     deposition of 30(b)(6) Diana Majcher/De
6     Tomaso in the matter of versus Ryan
7     Berris v. Sung-Fung Choi, et al.
8          Today is Tuesday, September 17,
9     2024 and the time is 10:17 a.m.
10          This deposition is being taken at
11     Boies Schiller Flexner LLP, 55 Hudson
12     Yards, New York, New York 10001 at the
13     request of Boies Schiller Flexner.
14          The videographer is Jeremy Kovacs
15     of Magna Legal Services and the court
16     reporter is Leslie Fagin of Magna Legal
17     Services.
18          Will counsel and all parties
19     present state their appearances and whom
20     they represent?
21          MR. SIMONS:  I just want to clarify
22     one thing for the record, this
23     deposition is actually of Ms. Majcher in
24     her personal capacity, so we will change
25     course altogether when we switch to the



Page 4

```
 1              D. Majcher
 2         30(b)(6) corporate representative, but
 3         all the questioning until I say
 4         otherwise will be of Ms. Majcher in her
 5         personal capacity.
 6              And with that, my name is David
 7         Simons from Boies Schiller.  I'm here
 8         with my colleagues, John Zach and Sophie
 9         Roytblat.  We represent Ryan Berris who
10         is present as well.
11              MS. WIGGER:  Good morning.  My name
12         is Hannah Wigger for De Tomaso.  I'm
13         with my colleague Ali Bustamante and
14         party representative, Norman Choi.
15  D I A N A   M A J C H E R,  called as a
16         witness, having been duly sworn by a
17         Notary Public, was examined and testified
18         as follows:
19  EXAMINATION BY
20  MR. SIMONS:
21         Q.    Good morning.
22         A.    Good morning.
23         Q.    Ms. Majcher, you've attended both
24  the Ryan Berris' deposition and also Mr.
25  Choi's deposition yesterday, right?
```



1                    D. Majcher

2        A.    Yes.

3        Q.    So you have a general sense
4   hopefully of the sort of ground rules that we
5   try to follow in these depositions, right?

6        A.    Yes.

7        Q.    So I won't go back over them with
8   you, but, of course, if you need a break at
9   any time, let me know.  I just ask if there
10   is a question pending, that you get your
11   answer out and then we can take a break,
12   okay?

13        A.    Okay.

14        Q.    Where do you currently reside?

15        A.    In Hong Kong.

16        Q.    Do you have a residence in Canada
17   at all?

18        A.    No.

19        Q.    What is your highest educational
20   degree?

21        A.    I have a university degree,
22   bachelor degree.

23        Q.    Bachelor's degree from what
24   university?

25        A.    British Columbia.



```
 1                    D. Majcher
 2        Q.    What was your degree in?
 3        A.    Bachelor of commerce.
 4        Q.    What year was that?
 5        A.    Graduated in 2004.
 6        Q.    Besides your lawyers, did you speak
 7  to anyone else about today's deposition?
 8        A.    I spoke to Mr. Choi.
 9        Q.    What did you talk about with Mr.
10  Choi?
11        A.    General timeline of things.
12        Q.    General timeline of what happened
13  in this case you mean?
14        A.    Yes, allegations.
15        Q.    Can you be anymore specific about
16  anything that Mr. Choi told you about your
17  deposition today?
18             MS. WIGGER:  Object to form.
19        A.    He didn't tell me about anything
20  about my deposition today.  We discussed
21  about the case.
22        Q.    What did you discuss about the
23  case?
24        A.    A lot of things that we discussed.
25  If you have any specific topic that...
```



```
 1                    D. Majcher
 2        Q.    When did these discussions happen?
 3        A.    It happened through actually many
 4   months, since the complaint was filed.
 5        Q.    How about let's limit it to
 6   following his deposition yesterday.  Did you
 7   have any discussions with Mr. Choi about this
 8   case outside the presence of counsel?
 9        A.    Not really, no.
10        Q.    You said not really?
11        A.    We had a debrief yesterday about
12   his deposition.
13        Q.    That was with your lawyers present?
14        A.    Yes.
15        Q.    Besides Mr. Choi, did you speak
16   about today's deposition with anybody else at
17   De Tomaso?
18        A.    No.  I told people I would be
19   coming to a deposition.
20        Q.    But nothing about the substance of
21   the deposition?
22        A.    No.
23        Q.    Did you review any documents in
24   preparation for your deposition?
25        A.    Yes.
```



Page 8

1                    D. Majcher

2        Q.    Did you review anything that

3    refreshed your recollection for your

4    testimony today?

5        A.    What do you mean by that?

6        Q.    Did you review anything where you

7    said, oh, right now, I remember that's what

8    happened on such and such date?

9        A.    I saw a lot of things yesterday.

10       Q.    So were there some documents

11   yesterday that refreshed your recollection?

12       A.    Yeah, maybe first time seeing or

13   that I don't remember existed.

14       Q.    What email address do you use

15   professionally?

16       A.    The De Tomaso address.

17       Q.    Do you have any other professional

18   email addresses that you use?

19       A.    I have an Apollo email address.

20       Q.    What is that email address?

21       A.    Diana.majcher@apollo.automobile

22   .com.

23       Q.    That's an active email account?

24       A.    Yes.

25       Q.    You use WhatsApp, correct?



```
 1                    D. Majcher
 2        A.   I use WhatsApp.
 3        Q.   Do you use that from your personal
 4   phone?
 5        A.   I only have one phone.
 6        Q.   Do you pay for that phone or is
 7   that paid for by a corporate entity?
 8        A.   I pay for the phone.
 9        Q.   Do you use any other phone numbers?
10        A.   No.
11        Q.   Do you ever use We Chat?
12        A.   Sometimes, very rarely.
13        Q.   Do you ever use We Chat to
14   correspond with people at Apollo or De
15   Tomaso?
16        A.   Apollo, yes.  De Tomaso, not
17   really.
18        Q.   Who at Apollo would you correspond
19   with using We Chat?
20        A.   It's usually related to --
21   actually, I can't recall anyone in
22   particular.  I remember using We Chat to
23   correspond with Eric Ho who was the chairman
24   at AFMG and whenever the need arises, dealing
25   with people in China, for example.
```



```
 1                    D. Majcher
 2      Q.   Do you ever use Signal?
 3      A.   No.
 4      Q.   Do you ever use Telegram?
 5      A.   I have a Telegram account.  I can't
 6 say I use it.
 7      Q.   So you've never used your Telegram
 8 account?
 9      A.   I have used it, maybe a couple of
10 messages.
11      Q.   Have you ever used it to correspond
12 with anyone at Apollo or De Tomaso?
13      A.   I think I got some messages from
14 Jowyn Wong, because the files are large, so
15 they use Telegram to send, but not really.
16      Q.   Just to be clear, Jowyn Wong has
17 corresponded with you over Telegram about
18 work related to Apollo or De Tomaso?
19           MS. WIGGER:  Object to form.
20      A.   From my recollection, we
21 corresponded on Telegram.  I can't remember
22 exactly what for.
23      Q.   Fair enough.  Do you ever use
24 iMessage?
25      A.   Yes.
```



Page 11

```
 1                    D. Majcher
 2      Q.    Do you correspond with people at De
 3 Tomaso or Apollo using iMessage?
 4      A.    I can't say for sure, but I do use
 5 it, but it's not a usual form of
 6 communication that I would use.
 7      Q.    So you can't say one way or the
 8 other whether you have or have not used
 9 iMessage to correspond with people from
10 Apollo or De Tomaso?
11      A.    I cannot.
12      Q.    In connection with this case, did
13 you check to see whether you had any
14 iMessages with people from Apollo or De
15 Tomaso?
16           MS. WIGGER:  Object to form.
17      A.    I did not check.
18      Q.    You did not check.
19           Did you ever use SMS text
20 messaging?
21      A.    When you say use, you mean me
22 sending?
23      Q.    Or receiving.
24      A.    I receive a lot of spam through
25 SMS.
```



```
 1                   D. Majcher
 2        Q.   Don't we all.
 3        A.   But I don't use it.
 4        Q.   It's fair to say that you don't use
 5   SMS text messaging to correspond with people
 6   relating to your work at Apollo or De Tomaso?
 7        A.   It's fair to say.  Again, unless
 8   the need arises because I can't get ahold of
 9   someone because they don't use WhatsApp or
10   any of those platforms and I may have sent an
11   SMS to try to communicate.
12        Q.   Understood.  Did you check to see,
13   in connection with this case, whether you
14   have any SMS messages that relate to the
15   allegations or the counterclaims in this
16   case?
17        A.   I did not.
18        Q.   Do you use any other kind of
19   messaging app?
20        A.   Email.
21        Q.   I mean besides email.  I don't know
22   which ones there are, Snapchat?
23        A.   There is line.
24        Q.   Do you use that?
25        A.   That's only with family.
```



Page 13

1                          D. Majcher

2          Q.    You mentioned email.  You said you

3    have a corporate email address at De Tomaso

4    and one at Apollo Future Mobility Group.

5               Do you also have a personal email

6    address?

7          A.    I do.

8          Q.    What is that?

9          A.    That's diana.majcher@gmail.com.

10         Q.    Do you have any other personal

11   email addresses that you use?

12         A.    No.

13         Q.    Do you ever delete emails?

14              MS. WIGGER:  Object to form.

15         A.    I think everyone does from time to

16   time, I delete emails.

17         Q.    How do you decide which ones to

18   delete?

19              MS. WIGGER:  Object to form.

20              Are you asking about a specific

21        account?  Are you talking about spam?

22              MR. SIMONS:  I'm asking generally,

23        how do she decide which emails to

24        delete.

25         A.    They are irrelevant, they RE



Page 14

```
 1                    D. Majcher
 2   outdated, they are spam, if I receive
 3   somebody's, you know, acceptance or rejection
 4   of a calendar invitation, those are
 5   unimportant so I delete them.
 6        Q.   Do you ever delete emails related
 7   to your work?
 8             MS. WIGGER:  Object to form.
 9        A.   Like I said, if it's a reply for a
10   calendar invitation, that would be deleted
11   and that's related to work, yes.
12        Q.   Do you ever delete text messages?
13             MS. WIGGER:  Object to form.
14        A.   Spam, yes.
15        Q.   Do you ever delete any text
16   messages other than spam?
17             MS. WIGGER:  Object to form.
18        A.   What type?
19        Q.   I'm just asking, you said you
20   deleted spam text messages and I'm asking,
21   have you ever deleted any text messages that
22   are not spam?
23             MS. WIGGER:  Same objection.
24             MR. SIMONS:  Just to clarify, what
25        is the problem with the question as
```


MAGNA
LEGAL SERVICES

```
 1                    D. Majcher
 2       phrased?
 3            MS. WIGGER:  It's incredibly vague
 4       and lacks foundation.
 5            You are asking if she ever deletes
 6       any text messages ever from any account
 7       at any time related to any topic.  I
 8       don't see how it's relevant or how she
 9       could know it or how there is any
10       foundation to ask that.
11            MR. SIMONS:  The foundation is I'm
12       trying to understand what her practices
13       are.
14            MS. WIGGER:  You are not limiting
15       it to an account or time period or this
16       case, but it's your deposition.
17       Q.   Have you ever deleted any text
18   messages that are not spam?
19       A.   Have I ever?  I suppose, yes.
20       Q.   How do you decide which text
21   messages you are going to delete that are not
22   spam?
23            MS. WIGGER:  Object to form.
24       A.   Unimportant ones that I don't know.
25       Q.   Do you ever delete any text
```



Page 16

```
 1                    D. Majcher
 2   messages that you consider might be
 3   important?
 4        A.    Perhaps by error.
 5        Q.    Have you ever deleted any De Tomaso
 6   related emails or text messages in 2024?
 7             MS. WIGGER:  Object to form.
 8        A.    I cannot -- any, in any form, any
 9   content?
10        Q.    Correct, any.
11        A.    I suppose the answer would be yes.
12        Q.    Which De Tomaso emails or text
13   messages have you deleted in 2024?
14             MS. WIGGER:  Object to form.
15        A.    I cannot recall.
16        Q.    Have you ever deleted any De Tomaso
17   related emails or text messages in 2023?
18             MS. WIGGER:  Object to form.
19        A.    I cannot recall, but I would expect
20   yes.
21        Q.    You would expect yes?
22        A.    Yes.
23        Q.    Has Mr. Choi ever asked you to
24   delete any of your text messages?
25        A.    Any of my text messages, I don't
```



1                     D. Majcher

2    recall, no.

3         Q.    You don't recall him ever asking

4    you to delete any of your text messages?

5         A.    I don't recall, no.

6         Q.    Has Mr. Choi ever asked you to

7    delete any of your emails?

8         A.    As I saw in the deposition

9    yesterday, I guess he did, yes.

10         Q.    Do you recall, did you delete those

11    emails?

12         A.    I don't recall at the time, but I

13    did check yesterday.

14         Q.    What did you find out?

15         A.    I found that I did not delete them.

16         Q.    Let's put a document in front of

17    you so we can have the record be clear about

18    what we are talking about.

19              MR. SIMONS:  If I can get tab 1 and

20         we will mark this as Majcher Exhibit 1.

21              (Majcher Exhibit 1, February 5,

22         2021 chat between Diana Majcher and

23         Norman Choi, marked for identification.)

24         Q.    Ms. Majcher, I've hand you a

25    document that's been marked as Majcher



Page 18

```
 1                    D. Majcher
 2    Exhibit 1.  I will give copies to counsel
 3    right now.
 4            Is this the document you are
 5    referring to that Mr. Choi was asked about
 6    yesterday?
 7            MS. WIGGER:  Object to form.
 8            Can you represent that it is?
 9            MR. SIMONS:  I can, in fact, that
10        it is.
11        Q.   And I ask you a couple of questions
12    and --
13            MS. WIGGER:  I think the document
14        yesterday was one page and this is many,
15        so it's not the same.
16            Can you direct us to a page?
17        Q.   Ms. Majcher, this is identified as
18    a chat between you and Norman Choi on the 5th
19    of February 2021, is that right?
20        A.   Yes.
21        Q.   And I will direct you to the page
22    ending in Bates No. 126 at the bottom, so
23    it's quite a few pages in.  It's quite a
24    lengthy chat.
25        A.   Yes.
```



```
                        D. Majcher
 1
 2        Q.    Actually, I think this might
 3   actually be a slightly different message than
 4   what we saw yesterday, so I do apologize, but
 5   do you see it says 5131 is the time stamp?
 6   That's a message from you and you say,
 7   Realistically, do you need me to stay and
 8   help with the Apollo stuff.
 9             I need to think about what to do
10   for myself.  There is just too much BS going
11   on here.
12             Do you see that?
13        A.    I do, yes.
14        Q.    Do you recall what you were talking
15   about at the time?
16        A.    Can I read through this?
17        Q.    You can flip through it a little
18   bit, but just offhand, do you have a
19   recollection?
20             MS. WIGGER:  You can read it if you
21        need to.  Take the time you need to.
22        A.    Okay.
23        Q.    Do you recall what you were talking
24   about here?
25        A.    Yeah, I think I do.
```



Page 20

1                    D. Majcher

2        Q.    What were you talking about?

3        A.    I think I was talking about my time

4    with Apollo/AFMG.

5        Q.    You were expressing some

6    frustration with your time at Apollo/AFMG?

7        A.    Yes.

8        Q.    You still work at AFMG, correct?

9        A.    Right now?

10       Q.    Yes.

11       A.    I have a consulting arrangement

12   with them, yes.

13       Q.    Now, if you go to the next message

14   in response to your message that's at 5137,

15   it says Norman Choi is the sender and he

16   writes, Perhaps in your WhatsApp, delete all

17   the sensitive messages just to be safe.

18            Do you see that?

19       A.    I do.

20       Q.    Do you recall what he was talking

21   about when he was asking you to delete all

22   the sensitive messages just to be safe?

23            MS. WIGGER:  Object to form.

24       A.    I don't recall.  I can see the

25   message here.



```
 1                      D. Majcher
 2        Q.    Do you recall whether you did
 3   delete any WhatsApp messages following this
 4   instruction from Mr. Choi to delete all the
 5   sensitive messages just to be safe?
 6        A.    I don't recall.
 7             MR. SIMONS:  Can I get tab 2?  I
 8        think this is actually the document from
 9        yesterday.  We are going to mark it
10        again.
11             We will mark this as Majcher 2.
12             (Majcher Exhibit 2, February 10,
13        2022 WhatsApp chat between Diana Majcher
14        and Norman Choi, marked for
15        identification.)
16             MS. WIGGER:  I don't think this is
17        a document from yesterday.
18        Q.    So, Ms. Majcher, this is a WhatsApp
19   chat between you and Norman Choi from the
20   10th of February 2022, is that correct?
21        A.    Yes.
22        Q.    And you see it starts out at
23   1:55:22, there are a couple of messages sent
24   simultaneously, but I will start with the
25   second one.
```



Page 22

```
 1                  D. Majcher
 2          I guess, first of all, just to
 3    question, do you know why in your WhatsApp
 4    chats, things tend to repeat twice, some of
 5    the chats.  I don't know if you noticed that.
 6          A.   I don't.  It seems like it's only
 7    in the production that it's in this way
 8    because in the chat, it doesn't.
 9          Q.   I was just curious.
10          So it says at 1:55:22, it's a
11    message from Norman Choi to you, it says,
12    Please delete all emails you have with
13    Samuel.
14          Do you see that?
15          A.   I do.
16          Q.   Then he writes, As well, the
17    previous message.
18          Do you see that?
19          A.   Yes.
20          Q.   And you write, Okay?
21          A.   Yes.
22          Q.   Then if you go to the next page, at
23    1:58:05, Mr. Choi writes, His SPAC is ready.
24          Do you see that?
25          A.   I do.
```



Page 23

                        D. Majcher

1

2      Q.    Who is the Samuel Mr. Choi was

3   referring to here?

4            MS. WIGGER:   Object to form.

5      A.    I believe it's Samuel Lui.

6      Q.    Why do you believe it's Samuel Lui?

7      A.    I don't know any other Samuel.

8      Q.    If you don't know any other Samuel,

9   that helps narrow the universe.

10           In fact, Mr. Lui, as you understood

11  at the time, had a SPAC as well that he was

12  working on?

13     A.    He did.

14     Q.    You understood that Mr. Choi was

15  asking you to delete those emails because De

16  Tomaso was working on a process to enter into

17  a SPAC deal with Mr. Lui's SPAC, right?

18           MS. WIGGER:   Object to form.

19     A.    No, I don't know what I understood.

20  I can see he asked me to delete emails.

21     Q.    Did you ask him why he was asking

22  you to delete emails?

23     A.    I guess I did not.

24     Q.    Is it normal for Mr. Choi to ask

25  you to delete emails?



Page 24

                    D. Majcher

1

2        A.    I can't recall any other instances

3   when he did.

4        Q.    So if it's sort of an abnormal

5   occurrence, you didn't bother to ask him why

6   are you asking me to delete emails?

7             MS. WIGGER:  Object to form, asked

8        and answered.

9        A.    I didn't.

10       Q.    Did you understand that Mr. Choi

11  didn't want a paper trail of your earlier

12  communications with Mr. Lui?

13            MS. WIGGER:  Object to form.

14       A.    I don't think that that's what I

15  understood at the time.

16            I did not ask him why and I did not

17  delete any of the emails.

18       Q.    You mentioned that's not what you

19  understood at the time.

20            Sitting here today, do you now

21  understand that that's what he meant?

22            MS. WIGGER:  Object to form.

23       A.    No, I don't know why he asked me.

24  I can't speak to why.

25       Q.    After you saw this email or this



Page 25

```
 1                    D. Majcher
 2    text exchange yesterday, did you ask Mr. Choi
 3    what he meant by please delete all emails you
 4    have with Samuel?
 5         A.   I did not.
 6         Q.   Are you curious what he meant by
 7    please delete all emails you had with Samuel?
 8              MS. WIGGER:  Object to form.
 9         A.   I didn't think of that.
10         Q.   When did you first meet Mr. Choi?
11              You can put that aside.
12         A.   I believe it was around 2011.
13         Q.   How did you first meet him?
14         A.   I was working at a financial
15    services firm at the time which was Sunwah
16    Kingsway and Michael Choi was the CEO at the
17    time and I believe there was an introduction
18    by Michael.
19         Q.   You believe you first met Mr.
20    Norman Choi in 2011 through an introduction
21    by Michael Choi?
22         A.   Yes.
23         Q.   And you were working at Michael
24    Choi's company, Sunwah Kingsway, in 2011?
25         A.   Yes.
```



Page 26

1                    D. Majcher
2       Q.   Did Mr. Norman Choi have any
3  involvement in Sunwah Kingsway?
4            MS. WIGGER:  Object to form.
5       A.   I wouldn't know.  I don't know.
6            MS. WIGGER:  Try to give a pause
7       before you answer.
8       Q.   Did you start working with Mr. Choi
9  in and around -- sorry, Mr. Norman Choi, in
10  or around 2011, after you first met him?
11      A.   No.
12      Q.   When did you first start working
13  for Norman Choi?
14      A.   I think it was the beginning of
15  2015 thereabouts.
16      Q.   Had you been working at Sunwah
17  Kingsway up until that point?
18      A.   I took a little break from
19  Kingsway.  I can't remember precisely from
20  when, but it was maybe 2014 thereabouts for
21  about nine months and I went to do something
22  else and then I came back.
23      Q.   Did you have any discussions with
24  Michael Choi about the fact that you were
25  going to go start working for Norman Choi?



Page 27

```
 1                   D. Majcher
 2        A.    I don't think so, no.  He was the
 3   CEO of the company, but I was not working,
 4   like, directly with him.
 5        Q.    Understood.  Like I often do not
 6   work with the high, high, high boss here at
 7   Boies Schiller, although sometimes he does
 8   wander the hauls which is a little scary.
 9              What did you understand the
10   relationship was in 2011 between Michael Choi
11   and Norman Choi?
12              MS. WIGGER:  Object to form.
13        A.    I understood them to be friends.
14        Q.    And so you said you know Norman
15   Choi since 2011, so roughly 13 years?
16        A.    Yeah.
17        Q.    You worked for him not quite --
18   about nine years.  I won't make you do math
19   on the spot.
20        A.    Yeah.
21        Q.    You know Mr. Norman Choi pretty
22   well by this point?
23        A.    Pretty well as in?
24        Q.    Just like you feel like you worked
25   with him at two different companies over nine
```



Page 28

```
 1                 D. Majcher
 2  years, right?
 3      A.    Two different -- Apollo and De
 4  Tomaso, yes.
 5      Q.    And there has actually been days
 6  where you chatted over WhatsApp with Mr. Choi
 7  hundreds of times a day?
 8      A.    Perhaps, yeah.
 9      Q.    Is it fair to say that he trusts
10  your judgment?
11            MS. WIGGER:  Object to form.
12      A.    I hope so.
13      Q.    Is it fair to say that he relies on
14  you as an advisor?
15            MS. WIGGER:  Object to form.
16      A.    As an advisor, I'm his employee, I
17  think, yeah, he relies on me to do my job.
18      Q.    Since 2015, do you have a ballpark
19  idea of how much money Norman Choi or
20  companies controlled by him have paid to you
21  personally or any entities controlled by you?
22            MS. WIGGER:  Object to form.
23      A.    No, I haven't done the math.
24      Q.    Would it be more or less than 1
25  million U.S. dollars since 2015?
```



```
 1                    D. Majcher
 2        A.    I don't know.
 3        Q.    So it could be more than a million
 4   dollars, you just don't know?
 5        A.    I just didn't tally up the numbers.
 6        Q.    That's totally fine.
 7              Do you have an understanding of
 8   what a Ponzi scheme is?
 9              MS. WIGGER:  Object to form.
10        A.    In a general sense, yeah.
11        Q.    What is your general understanding
12   of what a Ponzi scheme was?
13        A.    I guess that's what Bernie Madoff
14   had done.
15        Q.    So you are familiar --
16        A.    I understand it's some fraud.
17        Q.    Have you ever told anyone you
18   thought Mr. Choi runs his businesses like a
19   Ponzi scheme?
20              MS. WIGGER:  Object to form.
21        A.    I don't recall having said exactly
22   those words.
23        Q.    Would it surprise you if you had
24   told someone in exactly those words that Mr.
25   Choi runs his businesses like a Ponzi scheme?
```



```
 1                    D. Majcher
 2           MS. WIGGER:  Object to form.
 3      A.    Again, I don't recall saying that.
 4      Q.    I understand you don't recall.  I'm
 5  asking a slightly separate question is
 6  whether it would surprise you sitting here
 7  today if someone were to tell you actually
 8  that you did make that statement to them?
 9           MS. WIGGER:  Object to form, asked
10      and answered.
11      A.    I say a lot of things to different
12  people, offhand comments, so would I be
13  surprised, I don't know, maybe, maybe not.
14      Q.    Why would you have said that Mr.
15  Choi runs his businesses like a Ponzi scheme?
16           MS. WIGGER:  Object to form, lack
17      of foundation.
18      A.    Are you saying I did?
19      Q.    If you were to say that to
20  somebody, what would you have meant by that?
21           MS. WIGGER:  Object to form, lack
22      of foundation.
23      A.    You are asking me to assume that I
24  have said that and make the assumption of why
25  I said that.
```



Page 31

```
 1                    D. Majcher
 2      Q.    Has Mr. Choi ever asked you to do
 3  anything that made you uncomfortable?
 4            MS. WIGGER:  Object to form.
 5      A.    Anything?
 6      Q.    Anything.
 7      A.    That made me feel uncomfortable.  I
 8  can't recall offhand.
 9      Q.    Has he ever asked you to do
10  anything that you thought might be illegal?
11            MS. WIGGER:  Object to form.
12      A.    No.
13      Q.    Has he ever asked you to do
14  anything that you thought might be unethical?
15            MS. WIGGER:  Object to form.
16      A.    I don't know.
17      Q.    Has Mr. Choi ever asked you to lie
18  to anybody?
19      A.    No.
20      Q.    Has Mr. Choi ever asked you to
21  conceal information from other people?
22      A.    Conceal information as in hide?
23      Q.    To hide information from someone.
24            MS. WIGGER:  Object to form.
25      A.    I don't recall.
```



Page 32

1                        D. Majcher

2        Q.    Has Mr. Choi ever asked you to hack

3    into someone's emails?

4        A.    To hack into someone's emails?

5        Q.    Yes.

6        A.    No.

7        Q.    Has Mr. Choi ever asked you to send

8    him emails that belonged to someone else

9    without that person's knowledge?

10       A.    I don't recall.

11       Q.    Has Mr. Choi ever asked you to hire

12   someone to conduct physical surveillance of

13   another individual?

14       A.    I believe we discuss.

15       Q.    And what were the circumstances by

16   which you were discussing conducting physical

17   surveillance of another individual?

18       A.    To gain information.

19       Q.    Who was that individual?

20       A.    I believe it was Mr. Berris.

21       Q.    So you discussed hiring someone to

22   physically surveil Mr. Berris?

23            MS. WIGGER:  Object to form.

24       A.    Yes.

25       Q.    Did you end up hiring someone to



Page 33

                        D. Majcher
 1
 2   conduct physical surveillance of Mr. Berris?
 3        A.   I think we did.
 4        Q.   When was that?
 5        A.   It was after his departure from De
 6   Tomaso, I believe.
 7        Q.   So was it roughly in May of 2022?
 8        A.   I can't recall exactly.  It could
 9   be.
10        Q.   Who did you hire to conduct
11   physical surveillance of Mr. Berris?
12        A.   We spoke to a firm called -- I
13   can't remember the exact name, but, you know,
14   through our attorney.
15        Q.   I don't want to hear --
16             MS. WIGGER:  To the extent this
17        relates to conversations that included
18        counsel, don't answer this.  If counsel
19        were involved in the conversations,
20        don't answer.
21        Q.   I'm just asking for the name.  It
22   sounds like you don't recall the specific
23   name of the person that you hired for the
24   firm that you hired.
25        A.   The firm was Gaffney,



Page 34

```
 1                  D. Majcher
 2  G-A-F-F-N-E-Y.
 3      Q.   Do you know where that firm is
 4  located?
 5      A.   In Florida.
 6      Q.   In Florida.
 7           What kind of physical surveillance
 8  did that firm conduct of Mr. Berris?
 9           MS. WIGGER:  Object to form.
10           And, again, if this relates to
11      conversations with counsel, don't
12      answer.
13      Q.   To be clear, I'm not asking about
14  any conversations with counsel.  I just
15  really want to know what the surveillance was
16  that this firm did.
17      A.   I can't remember, but I think at
18  the time, we were just trying to locate him.
19      Q.   So you don't remember what this
20  person was doing in terms of their
21  surveillance work of Mr. Berris?
22      A.   I suppose in general, surveillance,
23  meaning, to watch someone.
24      Q.   Correct.
25      A.   They would be trying to watch him
```



Page 35

```
 1                D. Majcher
 2  from somewhere.
 3      Q.   Did this individual that you hired
 4  to conduct physical surveillance of Mr.
 5  Berris provide reports to you on what he was
 6  finding about Mr. Berris?
 7      A.   I vaguely remember having some
 8  report.
 9      Q.   Would a copy of that report be in
10  De Tomaso's files somewhere?
11      A.   I don't know.
12           MR. SIMONS:  I don't believe we
13      received a copy of such reports, so we
14      certainly request it be produced, but we
15      can take that up.
16           MS. WIGGER:  It may be privileged,
17      but we can take it up after the
18      deposition.
19           MR. SIMONS:  That's fine.
20      Q.   Do you recall how long you had
21  someone conducting physical surveillance of
22  Mr. Berris?
23      A.   No.
24      Q.   Do you recall what the ultimate
25  findings were of that physical surveillance
```



Page 36

```
 1                    D. Majcher
 2    of Mr. Berris?
 3         A.    I believe we couldn't locate him.
 4         Q.    I just want to change gears for a
 5    second.  Just to sort of go back to your work
 6    history.
 7               You mentioned that before working
 8    at De Tomaso, you worked for Mr. Choi at a
 9    company called Apollo, is that right?
10         A.    Yes.
11         Q.    You had started working for Apollo
12    you said in 2015?
13         A.    Thereabouts, yeah.
14         Q.    Then Apollo was sold in 2020?
15         A.    Correct.
16         Q.    Then you worked for the publicly
17    listed Hong Kong company that bought it,
18    right?
19         A.    Yes.
20         Q.    That was first WE Solutions, but
21    then Apollo Future Mobility Group?
22         A.    Yes.
23         Q.    We can also call that AFMG, is that
24    right?
25         A.    Yes.
```



Page 37

                        D. Majcher
1
2        Q.    You said you still work as a
3    consultant for AFMG?
4        A.    Yes.
5        Q.    Let me sort of breakdown the
6    chronology of each of those.
7              You start working at Apollo in
8    2015.  Roughly what month, do you recall?
9        A.    No.
10       Q.    Did you have an employment
11   agreement with Apollo?
12       A.    Yes.
13       Q.    When was that executed?
14       A.    I don't remember.
15       Q.    Was it a written agreement or an
16   oral agreement?
17       A.    Written agreement.
18       Q.    What did that written agreement say
19   about the role or the title that you would
20   have at Apollo?
21       A.    I believe the title was COO.
22       Q.    Do you recall what your salary was
23   under that agreement?
24       A.    I don't.
25       Q.    Did that agreement provide for a



Page 38

1                     D. Majcher

2    set salary?

3        A.    Yes.

4        Q.    Do you recall roughly what your

5    salary was on an annual basis when you worked

6    at Apollo?

7              MS. WIGGER:    Object to form, asked

8        and answered.

9        A.    I think -- that was a long time

10   ago, but at the end of that agreement, I

11   believe the salary was anywhere between 80 to

12   a hundred thousand Hong Kong dollars per

13   month.

14       Q.    Eighty to 100,000 Hong Kong dollars

15   a month.  Roughly, the exchange is roughly

16   like 7 or 8 Hong Kong dollars to 1 U.S.

17   dollar?

18       A.    Yes.

19       Q.    So then when Apollo was bought by

20   AFMG, were you continuing to work at AFMG

21   under that existing Apollo agreement?

22       A.    No.

23       Q.    So you signed a new employment

24   agreement with AFMG?

25       A.    Correct.



Page 39

```
  1                    D. Majcher
  2        Q.    When did you sign that agreement?
  3        A.    Around the time when the sale of
  4   Apollo completed.
  5        Q.    Was that roughly March of 2020 --
  6        A.    Yeah.
  7        Q.    -- or sometime thereafter?
  8              Who were the parties to that
  9   agreement?  It was you on one side and AFMG
 10   on the other side?
 11        A.    Correct.
 12        Q.    Do you recall who executed it on
 13   behalf of AFMG?
 14        A.    Like who actually signed it?
 15        Q.    Yeah.
 16        A.    No.
 17        Q.    What was your salary under that
 18   agreement?
 19        A.    I remember getting a little bump
 20   up, so 120.  I can't remember.
 21        Q.    So maybe roughly around 120,000
 22   Hong Kong dollars per month?
 23        A.    Yes.
 24        Q.    And under that agreement, what was
 25   your title or role at AFMG?
```



```
 1                    D. Majcher
 2        A.    I became the COO of AFMG.
 3        Q.    So you became the COO of the
 4   publicly listed entity AFMG?
 5        A.    Yes.
 6        Q.    Did that employment agreement have
 7   a number of hours that you were supposed to
 8   work as part of your agreement with AFMG?
 9        A.    I don't recall specifically, like
10   it doesn't say you have to work 40 hours a
11   week.
12        Q.    But setting aside what it said, do
13   you recall roughly how many hours you worked
14   per week for AFMG?
15             MS. WIGGER:  Object to form.
16        A.    Do I recall now or --
17        Q.    When you were working at -- you are
18   still a consultant at AFMG, right?
19        A.    Now I am, yes.
20        Q.    When you started working at AFMG,
21   as we said, in March of 2020, roughly how
22   many hours were you working a week, 30, 40,
23   50?
24        A.    It was a full-time job so I think
25   the minimum expectation would be 40.  There
```



Page 41

1                    D. Majcher

2    could be more hours when it calls for it so,

3    you know.

4        Q.    Did you work from an office at

5    AFMG?

6        A.    Yes.

7        Q.    Where was that office located?

8        A.    In the beginning, it was located in

9    Science Park in Hong Kong and then they later

10   moved the office back to central.

11       Q.    Did you go into the office

12   regularly?

13       A.    Yes.

14       Q.    When did you transition from your

15   agreement at AFMG where you were the COO to

16   this consultancy agreement that you are under

17   today?

18       A.    I believe it was June of 2022.

19       Q.    Why did you make that transition?

20       A.    That was when I basically came on

21   sort of full-time with De Tomaso.

22       Q.    So you were not working full-time

23   at De Tomaso prior to June of 2022?

24       A.    Well, I was working on both

25   companies, so I basically -- it was at a



Page 42

1                    D. Majcher
2    crossroad where I had to choose.  I just
3    couldn't spend the time on both sides
4    anymore, so then I switched over to spend
5    more time -- to spend most of my time on De
6    Tomaso and I continued to do a little bit of
7    consulting work for AFMG.
8         Q.   So just to go back to the question
9    that I asked, I think you largely answered
10   it, but it's fair to say then that you were
11   not working full-time at De Tomaso prior to
12   June of 2022, is that correct?
13        A.   I should qualify that.  It was like
14   I was working two full-time jobs.
15        Q.   That sounds tough, one full-time
16   job is enough.
17             Under this consultancy agreement
18   you currently have with AFMG, how much are
19   they paying you?
20        A.   They are paying me 50,000 Hong Kong
21   dollars a month.
22        Q.   Approximately how many hours do you
23   work a month under that consultancy
24   agreement?
25        A.   I don't keep regular hours.  It's



Page 43

1                        D. Majcher

2    more like if things need to get done, then I

3    attend to them.

4        Q.    When did you begin working for De

5    Tomaso?

6        A.    Basically as soon as I started

7    working with Mr. Choi.

8        Q.    So roughly in 2015?

9        A.    Yeah.

10       Q.    What was your role or your title

11   when you started at De Tomaso in 2015?

12       A.    I'm not sure I had -- necessarily

13   had a title.

14       Q.    Were you working as a consultant

15   effectively for De Tomaso?

16       A.    I look at my job at both Apollo and

17   De Tomaso to be pretty much the same.  Again,

18   it's like the same job, but at two different

19   companies and they're all owned by the same

20   individual and I work with the same people

21   who also take the same jobs in both

22   companies.

23       Q.    Let me just unpack that a little

24   bit.  You said it's like the same job at two

25   different companies and they are owned by the



Page 44

```
 1                    D. Majcher
 2    same individual.
 3              Was that true after Apollo was sold
 4    to WE Solutions in March of 2020?
 5         A.   No.
 6         Q.   So at that point, that was a
 7    company that was not owned by Mr. Choi
 8    anymore, correct?
 9         A.   Correct.
10         Q.   As you said, you were working
11    full-time at Apollo starting in what year --
12    you were working full-time at AFMG starting
13    in 2020?
14         A.   2020.
15         Q.   When you started working at De
16    Tomaso, say, in like 2016, were you the CFO
17    of De Tomaso in 2016?
18         A.   I did not officially carry the
19    title, but I did take care of a lot of
20    financial responsibilities.
21         Q.   So you were not appointed as the
22    CFO of De Tomaso in 2016?
23         A.   No.
24         Q.   Were you the COO or chief operating
25    officer of De Tomaso in 2016?
```



Page 45

D. Majcher

1

2    A.    I believe I may have been using the
3    title for like email signatures or business
4    cards.

5    Q.    Who told you that you could use the
6    title of COO of De Tomaso in 2016?

7    A.    I don't remember.

8    Q.    Did you have any discussions where
9    Mr. Choi told you that you were the COO or
10   CFO of De Tomaso in 2016?

11   A.    He could have.  I can't recall.

12   Q.    Once Mr. Berris became involved
13   with De Tomaso, was he aware that you
14   believed you were the COO of De Tomaso?

15         MS. WIGGER:  Object to form.

16   A.    I can't speak to whether he was
17   aware or not.

18   Q.    I just want to make sure I fully
19   understand the progression.

20         You started working sort of as a
21   consultant or advisory role at De Tomaso, you
22   were not the CFO of De Tomaso.  You were
23   doing some of the duties of what you believe
24   of the COO of De Tomaso.

25         Did you ever formally take on any



Page 46

1                    D. Majcher
2    title or officer role at De Tomaso?
3              MS. WIGGER:  Object to form.
4         A.    Formally take on?
5         Q.    Were you ever appointed by the
6    board of De Tomaso as an officer of the
7    company?
8         A.    The board of De Tomaso as in which
9    De Tomaso company are you referring to?
10        Q.    De Tomaso Automobili NA LLC?
11        A.    I don't recall any formal board
12   appointment, no.
13        Q.    Did Mr. Berris ever authorize your
14   appointment as the COO or CFO of De Tomaso?
15             MS. WIGGER:  Object to form.
16        A.    Did Mr. Berris authorize?
17        Q.    Yes.
18        A.    Not that I am aware of.
19        Q.    Did Mr. Berris ever authorize De
20   Tomaso to pay you for your work at De Tomaso?
21             MS. WIGGER:  Object to form.
22        A.    I am not aware of such
23   authorization, nor am I aware that it needs
24   his authorization.
25        Q.    Do you have an employment contract



Page 47

```
 1                     D. Majcher
 2   with De Tomaso?
 3        A.    Not an employment contract, no.
 4        Q.    Do you have any written piece of
 5   paper that memorializes your employment
 6   relationship with De Tomaso?
 7        A.    Yes.
 8              MS. WIGGER:  Object to form.
 9        Q.    What would you refer to that
10   document as?
11        A.    I would refer that as a consultancy
12   agreement.
13        Q.    When was that contract executed?
14        A.    I believe it was July 2022.
15        Q.    Did you have a contract with De
16   Tomaso in any form prior to July of 2022?
17        A.    No.
18        Q.    Did you have an agreement relating
19   to your employment at De Tomaso at any point
20   prior to July of 2022?
21              MS. WIGGER:  Object to form.
22        A.    Like a written contract?
23        Q.    Written or oral.
24              MS. WIGGER:  Same objection.
25        A.    No.
```



1                    D. Majcher

2        Q.    Did you have an understanding with

3   Mr. Choi that you were going to be doing work

4   for De Tomaso and he was going to compensate

5   you for that work?

6        A.    My understanding was my work done

7   at De Tomaso would be compensated under my

8   Apollo contract.

9        Q.    Did De Tomaso ever pay you

10  directly, separate and apart from Apollo?

11            MS. WIGGER:  Object to form.

12       A.    Not until the consulting agreement

13  was signed.

14       Q.    So it's your testimony that De

15  Tomaso never paid you until sometime after

16  this agreement was signed in -- you claim was

17  signed in 2022?

18            MS. WIGGER:  Object to form.

19       A.    I don't believe De Tomaso has ever

20  paid me as compensation prior to the

21  consultancy agreement being signed.

22            There might have been expense

23  reimbursement, I can't say for sure.  I did

24  not receive like a single dollar.

25       Q.    Understood.  Separate and apart



Page 49

```
 1                    D. Majcher
 2  from expense reimbursements, your
 3  recollection is that De Tomaso never paid you
 4  as compensation prior to what you say was
 5  2022?
 6       A.   I believe so, yes.
 7       Q.   If De Tomaso had paid you for
 8  compensation, what would that compensation
 9  have been for?
10            MS. WIGGER:  Object to form,
11       foundation.
12       A.   For work I've done I guess.
13       Q.   Work you did for De Tomaso?
14       A.   For De Tomaso, yes.
15       Q.   So that would have been De Tomaso
16  paying you separately for work you did for De
17  Tomaso, separate and apart from your work at
18  Apollo, right?
19            MS. WIGGER:  Object to form and
20       foundation.
21       A.   Yes.
22       Q.   When you started working at De
23  Tomaso, did you have discussions with Mr.
24  Choi about the type of work that you would be
25  doing?
```



1                    D. Majcher

2       A.    When would this be?

3       Q.    At any point when you started

4   working at De Tomaso, how did you know what

5   you were supposed to be doing at the company?

6       A.    It was kind of a learning process.

7   We were a small business, we were a startup

8   so you kind of learn as you go.

9       Q.    And who else were you working with

10  at De Tomaso at that point in time?

11      A.    There was Jowyn Wong, there was

12  Jakub Jodlowski, obviously, Mr. Choi and at

13  some point, Mr. Berris, Stefan Burger.  Those

14  were the main individuals I worked with.

15      Q.    It was a small company at the

16  beginning?

17      A.    Yes.

18      Q.    It was run relatively informally it

19  sounds like?

20          MS. WIGGER:  Object to form.

21      A.    It was run leanly.

22      Q.    I'm going to show you a document,

23  tab 3.

24          MR. SIMONS:  We will mark this as

25      Majcher 3.



Page 51

```
 1                    D. Majcher
 2              (Majcher Exhibit 3, consultancy
 3         agreement dated July of 2022, marked for
 4         identification.)
 5         Q.    Ms. Majcher, is this the
 6    consultancy agreement you were referring to?
 7    Feel free to page through it.
 8         A.    Yes.
 9         Q.    So it is the consultancy agreement?
10         A.    Yes.
11         Q.    On the front page, it's dated July
12    of 2022?
13         A.    Yes.
14         Q.    You said that's your recollection
15    of when this agreement was executed?
16         A.    Yes.
17         Q.    If you flip to the second page, or
18    I guess the first real page of text with the
19    Bates number ending in 792, it says it's an
20    agreement between Jubilant Dragon Limited.
21              Do you see that?
22         A.    Yes.
23         Q.    What is Jubilant Dragon Limited?
24         A.    It's a BVI company solely owned by
25    my husband.  I'm a director of that company.
```



Page 52

```
 1                   D. Majcher
 2        Q.    Why did you contract for Jubilant
 3   Dragon Limited?
 4        A.    For personal taxes purposes.
 5        Q.    Understood.  No one wants to pay
 6   more taxes than they have to.
 7             If go to the whereas clauses, the
 8   third one.  The contractor shall carry out
 9   the services under this agreement and Ms.
10   Diana Majcher shall carry the corporate title
11   of, quote, chief operating officer of the
12   company.
13             Do you see that?
14        A.    I do.
15        Q.    Was this the first time you were
16   formally designated as the chief operating
17   officer of De Tomaso?
18             MS. WIGGER:  Object to form.
19        A.    Formally designated as in?
20        Q.    That there was an official piece of
21   paper, an agreement, a board vote that said
22   Ms. Diana Majcher is the chief operating
23   officer of De Tomaso?
24             MS. WIGGER:  Same objection.
25        A.    I don't know.  I don't recall if
```



Page 53

1                     D. Majcher
2    there was any other pieces of paper or
3    communication so I can't be sure.
4         Q.   If you go to the next page, you see
5    clause D says, Exclusivity, it says, Upon
6    execution of this agreement, the contractor
7    agrees to work exclusively for the company.
8              Do you see that?
9         A.   I do.
10        Q.   Then later on, it says, With the
11   exception of Apollo Automobile Limited and
12   their associated and related companies for
13   the duration of this agreement.
14             Do you see that?
15        A.   I do.
16        Q.   Why did you need to have that
17   language in this agreement?
18             MS. WIGGER:  Object to form.
19        Q.   The language related to the
20   exception for Apollo Automobile specifically?
21             MS. WIGGER:  Same objection.
22        A.   Because I was still working with
23   them.
24        Q.   It's not meant as a trick question.
25             You were still working for Apollo


MAGNA
LEGAL SERVICES

Page 54

1                    D. Majcher
2    Automobile so you didn't want to run afoul of
3    the exclusivity clause in here so you wanted
4    De Tomaso to understand that you were also
5    going to be doing work for Apollo Automobile,
6    correct?
7        A.    Correct.
8        Q.    When you worked at AFMG, did they
9    have a similar exclusivity clause language in
10   their contract?
11       A.    I believe there was something, yes.
12       Q.    And did it say that you were
13   allowed to work for De Tomaso while you were
14   working at AFMG?
15       A.    I don't remember if it specifically
16   named De Tomaso.
17       Q.    Do you recall whether you had
18   authorization from AFMG to work for De Tomaso
19   while you were working full-time as the group
20   COO of AFMG?
21            MS. WIGGER:  Object to form.
22       A.    I believe so.
23       Q.    If you go to the page ending in
24   799, do you see where it says Compensation
25   and in part A, it says, The company shall pay



Page 55

```
 1                    D. Majcher
 2    the contractor U.S. $300,000 per year (the
 3    quotation fee) to be paid in 12 monthly
 4    installments at the end of each calendar
 5    month?
 6            Do you see that?
 7        A.   I do.
 8        Q.   Was that, in fact, the compensation
 9    that you still receive from De Tomaso?
10        A.   Yes.
11        Q.   Who drafted this consultancy
12    agreement?
13        A.   I believe this was the same form of
14    contract that Mr. Berris has been using.
15        Q.   This is the template that Mr.
16    Berris created for De Tomaso's employment
17    contracts?
18            MS. WIGGER:  Object to form.
19        A.   I believe so, yes.
20        Q.   You thought it was appropriate to
21    use for your own employment contract?
22        A.   This was used for everyone.
23        Q.   Who put in the specific terms
24    relating to chief operating officer and your
25    compensation?  Were you the ones that put the
```



Page 56

                         D. Majcher
 1
 2   terms in this sort of template?
 3        A.    I was the one drafting it, yes.
 4        Q.    So you drafted your own employment
 5   contract?
 6             MS. WIGGER:  Object to form.
 7        A.    Yes.
 8        Q.    Did Mr. Choi negotiate any of the
 9   terms in here with you?
10             MS. WIGGER:  Object to form.
11        A.    Can you qualify by negotiate?
12        Q.    Did he ever say, I want to pay you
13   less than $300,000 or I want to lock you down
14   for five years instead of three years?
15        A.    We discussed the terms before the
16   contract was drafted and that's why the terms
17   were put into the contract.
18        Q.    Was this contract subject to any
19   kind of outside legal review?  And I don't
20   want to hear any of the substance of it, just
21   whether a lawyer ever looked at this
22   contract.
23        A.    I don't believe, no.
24        Q.    You can put that aside.
25             MR. SIMONS:  Let's go to tab 4.  I



Page 57

                    D. Majcher

 1      will mark this as Majcher 4.

 2              (Majcher Exhibit 4, June 17, 2021

 3      WhatsApp exchange between Ms. Majcher

 4      and Mr. Choi, marked for

 5      identification.)

 6      Q.   You have Majcher 4 in front of you,

 7   Ms. Majcher?

 8      A.   Yes.

 9      Q.   This is a WhatsApp exchange between

10   you and Mr. Choi from June 17, 2021?

11      A.   Yes.

12      Q.   I'm just going to ask you about two

13   messages on the bottom of the page ending in

14   682, so quite a bit into this.

15           Do you see there is -- it's a short

16   message so I will just read it out loud.  At

17   3:48:15, there is a message from you that

18   says, I processed three payments-cars-lease

19   deposit-Jubilant Dragon (Bill's BVI company)

20   dated June 30th.

21           Do you see that?

22      A.   I do.

23      Q.   Then if you go to the next page, at

24   3:48:47, you wrote to Mr. Choi, You can



Page 58

```
 1                    D. Majcher
 2    approve when you have time.
 3              Do you see that?
 4         A.   I do.
 5         Q.   What did you mean when you wrote, I
 6    process three payments, including one to
 7    Jubilant Dragon Bill's BVI company dated June
 8    30th?
 9         A.   Process payment means that the
10    payments were entered into the banking
11    system.
12         Q.   Whose banking system?
13         A.   De Tomaso's I believe.  I think
14    this is what we are talking about.
15         Q.   This is dated, once again, June
16    17th of 2021, correct?
17         A.   Yes.
18         Q.   So what payment was De Tomaso
19    processing to Jubilant Dragon in June of
20    2021?
21         A.   I can't recall.
22         Q.   Would you have processed your
23    expense reimbursements to Jubilant Dragon in
24    June of 2021?
25         A.   Possible, but I can't remember.
```



Page 59

```
 1                    D. Majcher
 2       Q.    Is it possible that this was
 3  payment for your consultancy services for De
 4  Tomaso?
 5       A.    Again, anything is possible, but I
 6  don't remember.
 7       Q.    You can put that aside.
 8            MR. SIMONS:   We will mark now tab 5
 9       as Majcher 5.
10            (Majcher Exhibit 5, July 14, 2023
11       text exchange between Ms. Majcher and
12       Mr. Choi, marked for identification.)
13       Q.    You see here, this is text exchange
14  between you and Mr. Choi dated July 14th of
15  2023.
16            Do you see that?
17       A.    Yes.
18       Q.    If you go to the bottom of the
19  first page, it shows you are sending to Mr.
20  Choi, an attachment that's labeled
21  Confidential De Tomaso Automobili-Jubilant
22  Dragon.
23            Do you see that?
24       A.    I do.
25       Q.    Then if you go to the next page, at
```



Page 60

                    D. Majcher

1

2    6:00, you write, Standard contract exclusive

3    except for Apollo, 90 days notice to

4    terminate, U.S. 300-K per year, no image

5    right, no business class travel, no five star

6    hotel stays.

7            Do you see that?

8    A.    Yes.

9    Q.    Then you write, If okay, I will

10   execute and upload.

11           Do you see that?

12   A.    Yes.

13   Q.    Then Mr. Choi responds at 6:02 with

14   what appears to be a thumbs up emoji.

15           Do you see that?

16   A.    Yes.

17   Q.    So Ms. Majcher, does this refresh

18   your recollection that your contract wasn't

19   actually executed until July of 2023?

20           MS. WIGGER:  Object to form.

21   A.    I can't -- no, I can't tell by this

22   when the contract was executed.

23   Q.    Well, let go through what these

24   messages are showing.

25           On the first page you are attaching



Page 61

1                         D. Majcher
2    a document that refers to confidential De
3    Tomaso Automobile Jubilant Dragon.  That's
4    your consultancy, right?
5              MS. WIGGER:  Object to form.
6         A.   I take your word for it that it is.
7         Q.   It is your consultancy, correct?
8              MS. WIGGER:  Object to form.  The
9         document is not here.
10        Q.   Subject to check, I can represent
11   to you that if you will pull up that
12   attachment, it shows a copy of your
13   consultancy agreement.  Subject to check, I
14   can represent it was your consultancy
15   agreement.
16             If you go on the next page, what
17   you write here are basically the key terms of
18   that consultancy agreement, correct?
19             MS. WIGGER:  Object to form.
20        A.   Correct.
21        Q.   Then you write, If okay, I will
22   execute and upload, right?
23        A.   Yes.
24        Q.   And what you meant by that was that
25   if Mr. Choi approved the terms of your



Page 62

```
 1                    D. Majcher
 2   consultancy contract, you were going to
 3   execute it on that day, July 14, 2023?
 4   That's what you meant when you wrote that,
 5   right?
 6        A.    It appears that way, yes.
 7        Q.    So do you know why the contract is
 8   dated 2022?
 9        A.    The contract was dated 2022 because
10   the consultancy arrangement started in 2022.
11        Q.    The consultancy arrangement started
12   in 2022.
13              Was there a written document that
14   memorialized that consultancy arrangement
15   when it started in 2022?
16        A.    We just saw that.
17        Q.    But that document appears to have
18   been executed in 2023, right?
19              MS. WIGGER:  Object to form.
20        A.    It appears to be, yes.
21        Q.    So if you had a consultancy
22   arrangement without a contract that wasn't
23   executed until 2023, what were the terms that
24   you agreed with Mr. Choi in 2022?
25        A.    I expect it would be the same terms
```



Page 63

```
 1                    D. Majcher
 2   we are seeing here.
 3        Q.    You had a discussion with Mr. Choi
 4   and you agreed on those terms at that time in
 5   2022?
 6        A.    Yeah, well I started getting paid
 7   in 2022.
 8        Q.    You reached an agreement with Mr.
 9   Choi that that's what he would pay you in
10   2022?
11        A.    Correct.
12        Q.    You didn't have anything in writing
13   because you trusted Mr. Choi would pay you
14   consistent with that?
15             MS. WIGGER:  Object to form.
16        A.    I don't know if we had anything --
17   we just saw there was an agreement.
18        Q.    We saw there was an agreement that
19   appears to have been executed in July of
20   2023?
21             MS. WIGGER:  Object to form.
22        A.    That's what you say.
23        Q.    The document speaks for itself.
24             MS. WIGGER:  There is no document.
25             MR. SIMONS:  I'm referring to
```



Page 64

```
 1                    D. Majcher
 2       Majcher 5.
 3       Q.    Sitting here today, you don't have
 4  any recollection why -- strike that.
 5            While you were working at De
 6  Tomaso, you were also getting paid your
 7  full-time salary from AFMG until you switched
 8  over to the consultancy agreement, is that
 9  right?
10       A.    Well, I was -- my full-time
11  employment contract with AFMG ended in June
12  of 2022.
13       Q.    During that period, say, from when
14  AFMG came into existence around March of 2020
15  through June 2022, you were still getting
16  your full-time salary from AFMG?
17       A.    Correct.
18       Q.    Ms. Majcher, I want to show you now
19  something that we are going to mark as
20  Majcher 6.
21            (Majcher Exhibit 6, copy of Diana
22            Majcher's LinkedIn profile, marked for
23            identification.)
24       Q.    Ms. Majcher, is this a copy of your
25  LinkedIn profile?
```



Page 65

                        D. Majcher
1
2       A.    It appears to be, yes.
3       Q.    You were there at Mr. Berris'
4    deposition where he was asked some questions
5    about his LinkedIn profile.
6             Do you recall that?
7       A.    I do.
8       Q.    Do you regularly update your
9    LinkedIn profile?
10      A.    As a matter of fact, I do not.
11      Q.    Do you recall when you last updated
12   this?
13      A.    No.
14      Q.    Do you recall if you updated it in
15   2022?
16      A.    I may have.
17      Q.    Why do you think you may have
18   updated it in 2022?
19      A.    Because I see that under
20   experience, De Tomaso started -- it says
21   here, De Tomaso, chief operating officer,
22   June 2022.
23      Q.    So presumably that's -- you updated
24   it sometime after you started taking on that
25   role?



Page 66

1                    D. Majcher

2       A.    Yes.

3       Q.    I just want to look briefly through

4   this.

5             You mentioned you went to the

6   University of British Columbia.  You have

7   this on page 3 under education.

8       A.    Yes.

9       Q.    Then it says you worked at Baron

10  Global Financial Canada Limited from

11  September 2007 to April 2009.

12            Do you see that?

13      A.    Yes.

14      Q.    Is that accurate?

15      A.    That is --

16      Q.    Those dates?

17      A.    Yes, those are accurate, yes.

18      Q.    Above that, it says you worked at

19  Sambo as assistant to director from December

20  2009 to January 2011.

21            Do you see that?

22      A.    Yes.

23      Q.    Is that accurate?

24      A.    I don't think that's accurate

25  actually.



Page 67

```
 1                   D. Majcher
 2      Q.   Do you recall what the exact dates
 3  were?
 4      A.   I mean, I stopped working at Sambo
 5  before going to the next job, so I don't
 6  think that's accurate.
 7      Q.   If you go to the page 2, it says
 8  you worked at Sunwah International Limited
 9  from December 2010 to June 2014, is that
10  accurate?
11      A.   That sounds accurate, yes.
12      Q.   Then it says you worked at Hudson
13  as a consultant financial services from July
14  2014 to April 2015, is that accurate?
15      A.   Yeah that sounds accurate.
16      Q.   Sunwah Kingsway from May 2015 to
17  December 2017.  Does that sound accurate?
18      A.   That sounds, yeah.
19      Q.   Then it says Apollo Automobile,
20  COO, November 2015 to July of 2022, is that
21  accurate?
22      A.   Yeah.
23      Q.   Then it says Apollo Future Mobility
24  Group, AFMG group COO, April 2020 to July
25  2022.
```



Page 68

```
 1                    D. Majcher
 2            Do you see that?
 3       A.   Yes.
 4       Q.   Is that accurate?
 5       A.   Yes.
 6       Q.   Then above that, it says De Tomaso
 7  Automobili, chief operating officer, June
 8  2022 to present, is that accurate?
 9       A.   That's what it says here.  As to
10  its accuracy, I mean, I started working for
11  De Tomaso a long time ago.  It's just not
12  represented here.
13       Q.   Why is it not represented here?
14       A.   I think I just wanted to present a
15  cleaner timeline of my work experience.
16       Q.   So you wanted to present a cleaner
17  timeline of your work experience by omitting
18  certain time periods that you worked at De
19  Tomaso?
20            MS. WIGGER:  Object to form.
21       A.   It's not by omitting the time.  It
22  just gives a clearcut as to when one job or
23  one position stopped and the other position
24  started.
25       Q.   So the clearcut was that your job
```



Page 69

1                       D. Majcher

2    at AFMG Future Mobility Group stopped in July

3    2022 and your position at De Tomaso in 2022

4    started in June 2022?

5          A.    But as we know, I'm still

6    affiliated by AFMG and I'm not representing

7    that here either.

8          Q.    Is there a reason you did not say

9    you were working for both De Tomaso and AFMG

10   at the same time?

11         A.    They are two separate companies and

12   especially now, they are two separate

13   companies by different shareholders and run

14   by different management.  I just don't want

15   to create that confusion.

16         Q.    Did you have any concern that AFMG

17   would not allow you to be working for De

18   Tomaso at the same time that you were working

19   for AFMG?

20         A.    No.

21         Q.    You never had that concern?

22         A.    It was understood that I would be

23   working for both companies.

24         Q.    Understood by whom?

25               MS. WIGGER:  Object to form.



Page 70

                              D. Majcher
1
2        A.    It was understood by Mr. Choi, it
3   was understood by the management at AFMG.
4        Q.    Who are you referring to when you
5   say the management at AFMG?
6        A.    I suppose specifically it would be
7   Richard Sung and Eric Ho and later on, when
8   they brought in the new director, Joseph Lee.
9        Q.    So did you ever take any steps to
10  hide the work you were doing at De Tomaso
11  from anyone at AFMG?
12       A.    Take any steps to hide?  Not
13  deliberately hiding, but I don't think they
14  necessarily needed to know what I was doing.
15       Q.    So you didn't openly talk to them
16  about your work at De Tomaso?
17            MS. WIGGER:  Object to form.
18       A.    No, I did not.
19       Q.    You can put that one aside.
20            Now I want to show you tab 7.
21            MR. SIMONS:  We will mark this as
22       Majcher 7.
23            (Majcher Exhibit 7, declaration
24       filed by Diana Majcher on September 19,
25       2023, marked for identification.)



Page 71

                         D. Majcher

1

2        Q.    Ms. Majcher, what I'm showing you

3    is a declaration that you filed in this case

4    on the 19th of September 2023.

5            Does this document look familiar to

6    you?

7        A.    Yeah.

8        Q.    Do you see on the third page, is

9    that your signature there?

10       A.    Yes.

11       Q.    Did you, in fact, sign this

12   document?

13       A.    I believe so.

14       Q.    On the bottom of page 2, it says.

15   I declare under penalty of perjury, under the

16   laws of the United States of America, that

17   the foregoing is true and correct.

18           Do you see that?

19       A.    I do.

20       Q.    If you go up to the first page, it

21   says, I, and is that pronounced Enti, Diana

22   Majcher, declare under penalty of perjury,

23   under the laws of the United States of

24   America, pursuant to 28 USC Section 1746 and

25   then it says, I am the chief operating



Page 72

```
 1                    D. Majcher
 2   officer and chief financial officer of De
 3   Tomaso Automobili Holdings NA LLC (quotation
 4   De Tomaso).  I have served in that role since
 5   2016.
 6            Do you see that?
 7       A.   I do.
 8       Q.   Ms. Majcher, is that statement
 9   accurate?
10            MS. WIGGER:  Object to form.
11       A.   That statement's accurate.
12       Q.   Is it a truthful statement that you
13   were the chief -- that you served as COO and
14   CFO of De Tomaso Automobili Holdings NA LLC
15   since 2016?
16       A.   I served those functions, yes.
17       Q.   Did you serve in the role of chief
18   operating officer and chief financial officer
19   of De Tomaso Automobili Holdings NA LLC since
20   2016?
21            MS. WIGGER:  Object to form, asked
22        and answered.
23       A.   The company was not even formed
24   until 2020, so I suppose technically, this is
25   not accurate, but I have served in those
```



Page 73

                    D. Majcher

1

2   capacities for the entire group since 2016.

3       Q.    What do you mean by I served in

4   those capacities for the entire group since

5   2016?

6       A.    I think you have a corporate chart

7   of the De Tomaso group so you know that there

8   are a number of companies in this entire

9   group.

10      Q.    Was there a single piece of paper

11  appointing you as chief operating officer,

12  chief financial officer of De Tomaso since

13  2016?

14          MS. WIGGER:  Object to form.

15      A.    There may be.  I don't know.

16      Q.    Did you draft this paragraph here?

17      A.    I did not, no.

18      Q.    When you reviewed it, did you

19  express any concern that it wasn't accurate

20  because, like you said, De Tomaso Automobili

21  Holdings NA LLC didn't even exist until 2020?

22          MS. WIGGER:  Object to form.

23          This sounds privileged, so the to

24      extent it touches on conversations with

25      counsel, don't answer it.



Page 74

1                      D. Majcher

2        Q.    I don't want to hear about your

3    conversations.

4              Did you speak to anyone else?  Did

5    you say Mr. Choi, wait a second, I didn't

6    actually have that role since 2016?

7              MS. WIGGER:  Object to form.

8              You can answer what you told Mr.

9        Choi.

10       A.    I did not speak to Mr. Choi about

11   this document.  This was drafted by our

12   lawyers.

13             MS. WIGGER:  Stop.  Nothing

14       related --

15       Q.    You reviewed it before signing it,

16   right?

17       A.    I did, yeah.

18       Q.    The lawyers, I believe this was

19   drafted and Hannah, correct me if I'm wrong,

20   but lawyers before the current group of

21   lawyers that represent you today?

22             MS. WIGGER:  We are not talking

23       about anything lawyers did.

24             MR. SIMONS:  I'm just going for

25       chronology here.  Was Sheppard Mullin



Page 75

```
 1                    D. Majcher
 2      counsel at this time?
 3           MS. WIGGER:  I'm not under oath.
 4           MR. SIMONS:  Fair enough.  Let me
 5      ask a different question.
 6      Q.   Ms. Majcher, the lawyers
 7 representing you today are also the same ones
 8 that represent Mr. Choi, right?
 9           MS. WIGGER:  By you, this is a
10      deposition in her personal capacity, you
11      mean De Tomaso, not you.
12      Q.   Do you have any lawyers here today
13 representing your interest?
14           MS. WIGGER:  Yes, we represent her
15      interest.  I just want to clarify, we
16      are still in the personal deposition?
17           MR. SIMONS:  Yeah, we are still in
18      the personal deposition?
19      Q.   I'm asking you in your personal
20 capacity, the lawyers that represent you, Ms.
21 Diana Majcher, are still the same lovely
22 people across the table from me who also
23 represent Norman Choi, right?
24      A.   Yes.
25      Q.   Are you aware that they also
```



Page 76

```
 1                    D. Majcher
 2  represent Samuel Lui?
 3       A.   I am aware.
 4       Q.   Are you also aware they represent
 5  Genesis Unicorn?
 6       A.   I am.
 7       Q.   Are you aware they also represent
 8  De Tomaso?
 9       A.   I am.
10       Q.   Have you ever considered hiring
11  your own lawyer to represent your interests
12  in this case?  And I don't want to hear any
13  privileged conversations.  Just anything in
14  your head.
15            Have you ever had discussions with
16  anyone not a lawyer about representing your
17  own interests?
18       A.   No.
19            MS. WIGGER:  Object to form.
20       Q.   Have you ever had discussions with
21  Mr. Choi about whether you should get your
22  own lawyer?
23            MS. WIGGER:  Object to form.  This
24       seems to touch on privileged information
25       anyway.
```



Page 77

```
 1                D. Majcher
 2           MR. SIMONS:  Conversations with Mr.
 3      Choi are not privileged?
 4           MS. WIGGER:  They are if they
 5      relate to privileged matters.  I don't
 6      see how this is relevant remotely.
 7           MR. SIMONS:  Are you going to
 8      instruct her not to answer?
 9      Q.   Absent an instruction not to answer
10  you have to answer the question.
11           MS. WIGGER:  No, if you are asking
12      her about her litigation strategy,
13      conversations internally about
14      litigation strategy are privileged.
15           MR. SIMONS:  The substance of those
16      conversations may be.  I'm just going
17      for a yes or no.
18      Q.   So as long as we limit it to a yes
19  or no, if you had ever had any discussions,
20  and I don't want to hear the substance of
21  those, with Mr. Norman Choi about whether you
22  should get your own lawyer, yes or no?
23           MS. WIGGER:  No.  Don't answer
24      that.  The substance is in your
25      question, so, yes, I'm instructing her
```



Page 78

```
 1                   D. Majcher
 2       not to answer.
 3       Q.   Do you think you do need your own
 4  lawyer, Ms. Majcher?
 5       A.   Do you?
 6            MS. WIGGER:  Same objection.
 7            Don't answer.
 8       Q.   I can't give you that kind of
 9  advice?
10            MR. SIMONS:  We've been going a bit
11       over an hour so why don't we take a
12       break.
13            THE VIDEOGRAPHER:  We are going off
14       the record.  The time is 11:14 a.m.
15            (Recess.)
16            THE VIDEOGRAPHER:  We are back on
17       the record.  The time is 11:31 a.m.
18       Q.   Welcome back, Ms. Majcher.  I'm
19  going to show you what has been marked as
20  Majcher 8.
21            (Majcher Exhibit 8, De Tomaso BVI
22       Company's general ledger, marked for
23       identification.)
24       Q.   You will see there is a cover page
25  that says DT and the Bates stamp ends in
```



Page 79

```
 1                    D. Majcher
 2    75506.  It says, document produced in native
 3    form which means this was an Excel file, so
 4    apologies, but to have this printed out, I
 5    think it maybe cuts off some of the columns
 6    all the way on the side, but for our
 7    purposes, I will just ask you questions
 8    hopefully based on what you just see here on
 9    the paper.
10           If you look on the first page,
11    first real page, it says general journal and
12    above that, it says De Tomaso Automobili
13    Limited BVI.
14           Do you see that?
15       A.   Yes.
16       Q.   Just what is this document?
17       A.   It looks to be what it says, it's
18    the De Tomaso BVI Company's, I would say,
19    general ledger.
20       Q.   And by ledger, you mean it
21    basically shows payments in and payments out
22    to the company?
23       A.   It shows all of the transactions,
24    whether they are payments or not.
25       Q.   If you go down about four entries
```



                         D. Majcher

1              down, do you see one dated, and I don't know

3      how -- I think it's January 6th because I

4      think you do it with the date and then the

5      month first, right?

6          A.    Yes.

7          Q.    I think we can tell that because

8      later down, there are some 22s and there are

9      no 22 months in that order, so I think that

10     says January 6, 2021 and then the entry next

11     to it, it says, Diana consultancy.

12              Do you see that?

13         A.    I do.

14         Q.    Then it looks like there was a

15     debit from the De Tomaso account in the

16     amount of Hong Kong dollars, $232,509.

17              Do you see that?

18         A.    I do.

19         Q.    Is that roughly about 30,000 U.S.

20     dollars?

21         A.    Thereabouts.

22         Q.    So what this is showing is that De

23     Tomaso paid you for your consultancy work for

24     the company on January 6, 2021 roughly in the

25     amount of 30,000 U.S. dollars?



Page 81

1                    D. Majcher

2             MS. WIGGER:  Object to form.

3        A.    It appears to be, yes.

4        Q.    Do you recall what work you did for

5    De Tomaso to earn this 30,000 U.S. dollar

6    payment?

7        A.    I have done a lot of work, but, no,

8    I don't recall specifically.

9        Q.    Do you recall if you submitted an

10   invoice relating to this payment?

11       A.    I don't recall.

12       Q.    I think earlier you said in your

13   testimony that largely, your work for De

14   Tomaso was covered by your existing work for

15   Apollo.

16             Do you recall that testimony?

17             MS. WIGGER:  Object to form.

18       A.    If that's what I said.

19       Q.    I'm just asking if you remember

20   generally that we sort of talked about that?

21       A.    Sure.

22       Q.    You said you were getting paid from

23   Apollo so that you didn't feel the need to

24   get paid from De Tomaso?

25             MS. WIGGER:  Object to form.



Page 82

                        D. Majcher

1

2       A.    I don't think I said I didn't feel

3   the need.

4       Q.    Fair enough.

5       A.    Always happy to be paid more.

6       Q.    This is an example of De Tomaso

7   paying you for your work associated with De

8   Tomaso, is that fair?

9             MS. WIGGER:  Object to form.

10      A.    It looks that way, yes.

11      Q.    Do you remember if there were other

12  payments like this?  Was this maybe a monthly

13  consulting payment you got from De Tomaso in

14  2021?

15      A.    I don't believe it was monthly, but

16  it could be one time payment or -- I don't

17  remember.

18      Q.    Do you recall how you agreed on the

19  amount that you were going to be paid for

20  this consultancy payment?

21            MS. WIGGER:  Object to form.

22      A.    I don't.

23      Q.    Is there a piece of paper in

24  writing where you reached written agreement

25  about you getting paid $30,000 for the work



Page 83

```
 1                    D. Majcher
 2    you were doing at De Tomaso?
 3         A.    I don't recall.
 4         Q.    Do you think you maybe had that
 5    discussion with Mr. Choi where you said can
 6    you pay me $30,000 or thereabouts for your
 7    work?
 8              MS. WIGGER:  Object to form.
 9         A.    I'm sure there was a discussion,
10    otherwise, the payment wouldn't have been
11    made.
12         Q.    Right.  So you talked to Mr. Choi
13    and he agreed to pay you $30,000 is your best
14    recollection?
15              MS. WIGGER:  Object to form.
16         A.    I believe that's what happened.
17         Q.    And De Tomaso then did pay you
18    $30,000?
19         A.    Yes.
20         Q.    And you just don't remember, there
21    might have been other payments like this, but
22    you just don't recall?
23         A.    I don't recall.
24         Q.    You can put that aside.
25              MR. SIMONS:  I'm going to show you
```



Page 84

```
 1                    D. Majcher
 2        what I guess is Majcher 9.
 3             (Majcher Exhibit 9, WhatsApp
 4        exchange between Ms. Majcher and Mr.
 5        Choi dated February 1, 2021, marked for
 6        identification.)
 7        Q.   Ms. Majcher, what's been marked as
 8   Exhibit 9 is a WhatsApp exchange between you
 9   and Mr. Choi dated February 1, 2021, is that
10   right?
11        A.   Yes.
12        Q.   If you go to the page ending in
13   914, a few pages in, you see Mr. Choi sends
14   you a message at 3:38.
15             Do you see that?
16        A.   I do.
17        Q.   He writes, If this is going to be a
18   clean cutoff, I think it will be better and
19   fair for you at least on the official level
20   (in the eyes of AFMG) that you are not
21   involved with DT.  To be safe, perhaps if you
22   can remove all DT emails/materials from your
23   office desktop.
24             Do you see that?
25        A.   I do.
```



Page 85

```
 1                    D. Majcher
 2        Q.    Do you recall what Mr. Choi was
 3   talking about in this message?
 4              MS. WIGGER:  Object to form.
 5        A.    No, I don't recall.
 6        Q.    Do you recall that there was some
 7   discussion at the time about whether you
 8   could continue to work for both AFMG and De
 9   Tomaso at the same time?
10        A.    I don't think -- I recall us having
11   discussions about balancing what was
12   happening at De Tomaso and at Apollo at the
13   time, yes.
14        Q.    Mr. Choi says, To be safe, perhaps
15   if you can remove all DT emails/materials
16   from your office desktop.
17              Did you follow that instruction
18   from Mr. Choi?
19              MS. WIGGER:  Object to form.
20        A.    I don't remember.
21        Q.    Do you know why he would have asked
22   you to be removing all DT emails, materials
23   from your office desktop?
24              MS. WIGGER:  Object to form.
25        A.    I can't speculate.
```



Page 86

                    D. Majcher

1
2       Q.    I don't want you to speculate.
3             If you go to the next page ending
4    in 915, Mr. Choi says, Are you comfortable
5    with this idea?  And then you write, If it's
6    going to be clean cut, they might request
7    that I stop working on DT stuff, but I think
8    realistically, to ask for a transitional
9    period is also reasonable.
10            Do you see that?
11      A.    I do.
12      Q.    Then Mr. Choi writes, I think they
13   will request, so better to be prepared.
14            Do you see that?
15      A.    I do.
16      Q.    Does this refresh your recollection
17   that there was some discussions about whether
18   Apollo Future Mobility Group was going to
19   remember that you stop working on De Tomaso
20   stuff at the same time you were working as
21   the COO of their publicly listed company?
22            MS. WIGGER:  Object to form.
23      A.    If you read the conversation, it
24   looks like that's what we are talking about.
25   Whether it's carried through, I don't



Page 87

```
  1                   D. Majcher
  2  remember.
  3       Q.   If you go to page 917, ending in
  4  917, at the top of that page, you write,
  5  That's okay, I'm prepared.  Everything is set
  6  up to be accessed from anywhere anyway so I
  7  don't need to have any DT stuff here at the
  8  office.  There also isn't too many physical
  9  files.
 10            Do you see that?
 11       A.   I do.
 12       Q.   Then if you go to the top of the
 13  next page, Mr. Choi writes, I think they will
 14  be very insistent, given this is how I have
 15  been feeling and as per what you also said,
 16  keeping me off.
 17            Do you see that?
 18       A.   I do.
 19       Q.   Do you know what he was referring
 20  to there?
 21            MS. WIGGER:  Object to form.
 22       A.   I cannot speculate.
 23       Q.   I don't want you to.  That's fine.
 24            If you go to the page ending in
 25  919.  At the top there, you write, I can
```



Page 88

                              D. Majcher
1
2    still handle the DT stuff until a more
3    permanent solution is formulated and they
4    don't need to know about it either.
5              Do you see that?
6         A.    I do.
7         Q.    Who is the they that you are
8    referring to there?
9         A.    Give me a second.
10        Q.    Sure.
11        A.    You don't want me to speculate.
12        Q.    I don't want you to speculate.  I
13   will ask you a direct question.
14             Do you recall if the they you are
15   referring to there was individuals associated
16   with AFMG?
17             MS. WIGGER:  Object to form.
18        A.    It would appear to be.
19        Q.    If you go to the next page ending
20   in 920, Mr. Choi writes to you, Just want to
21   also make sure any materials are left/shown
22   on the company's server, and then it looks
23   like he is indicating he made a typo because
24   then he says, are not.
25             Did you understand this was him



Page 89

```
 1                    D. Majcher
 2   saying he wants to make sure that any
 3   materials relating to De Tomaso are not left
 4   on the AFMG servers?
 5            MS. WIGGER:  Object to form.
 6        A.   It appears to be that way, yes.
 7        Q.   Did you do anything to make sure
 8   there were no De Tomaso materials left on the
 9   AFMG servers?
10        A.   I don't believe there was any De
11   Tomaso material on the AFMG server.
12        Q.   Just a couple of quick questions on
13   this document.  We are going to look at some
14   photos.
15            If you flip to the next page ending
16   in 921, there is a photo of what looks to be
17   a Range Rover with a license plate SSN or
18   SNS.
19            Do you know whose car that was at
20   the time?
21        A.   That was the car that belonged to
22   Apollo.
23        Q.   Who actually drove that car?
24        A.   We are at what time?  February
25   2021?  I believe Mr. Choi was the primary
```



Page 90

```
 1                    D. Majcher
 2  driver of that car.
 3       Q.    That was a car that was purchased
 4  by Apollo?
 5       A.    Correct.
 6       Q.    If you go to the page ending in
 7  923.
 8       A.    Yes.
 9       Q.    I'm not a car person.  I believe
10  this is a Lamborghini?
11       A.    It is.
12       Q.    All right.  I learned.  Ryan is so
13  proud of me right now.
14             Was this also a car that Mr. Choi
15  had Apollo purchase?
16             MS. WIGGER:  Object to form.
17       A.    No, it was not.
18       Q.    Who purchased this car?
19       A.    This was a car traded in by a
20  customer.
21       Q.    Who drove this car?
22       A.    No one drove this car.
23       Q.    It just sat in the parking lot?
24       A.    As far as I am aware, yes.
25             MS. WIGGER:  Sad.
```



Page 91

1            D. Majcher

2            MR. SIMONS:  Sad, exactly.  I'm a

3        true New Yorker.  I don't even own a

4        car.

5        Q.    I want to go back to what was

6    marked as Majcher 1 just for a second to ask

7    something on this topic, so if you can dig

8    that out.

9            Let me know when you've got it.

10        A.    I've got it.

11        Q.    If you go to and just to set the

12    scene again, this is a WhatsApp exchange

13    between you and Mr. Choi from the 5th of

14    February 2021, right?

15        A.    Yes.

16        Q.    If you go to the page ending in

17    127, Mr. Choi writes to you, Let me have a

18    think and come back with a viable plan, and

19    then he writes, One idea is to set up your

20    own consultancy firm and DT engages your firm

21    for certain work relating to almost the same

22    stuff you've been doing.  Then he writes,

23    Majcher & Co.

24            Do you see that?

25        A.    I do.



Page 92

```
 1                    D. Majcher
 2      Q.    Did you end up setting up your own
 3  consultancy firm to do work for De Tomaso?
 4      A.    No, I did not.
 5      Q.    Well, at some point, I think you
 6  did, did you not testify that you set up or
 7  -- there was -- you do have a consultancy
 8  arrangement currently with De Tomaso?
 9      A.    I do.
10      Q.    That's through Jubilant Dragon?
11      A.    Correct.
12      Q.    But you never set up an entity
13  called Majcher & Co.?
14      A.    No.
15      Q.    I'm going to show you another
16  exhibit.  We've killed a lot of trees.  I
17  feel really bad.  I should make a carbon
18  offset donation of some sort.
19             (Majcher Exhibit 10, November 6,
20             2021 WhatsApp exchange between Ms.
21             Majcher and Mr. Choi, marked for
22             identification.)
23      Q.    This is marked as Majcher 10.  This
24  is a WhatsApp exchange between you and Mr.
25  Choi on November 6th of 2021.
```



Page 93

1                    D. Majcher

2          Do you see that?

3     A.    I do.

4     Q.    If you go to the page ending in

5 386, Mr. Choi writes to you, Another topic,

6 can I engage you to assist on the SPAC

7 listing process?

8          Do you see that?

9     A.    I do.

10    Q.    Then you write, Of course, I would

11 be happy to help.

12          Do you see that?

13    A.    Yes.

14    Q.    But will need to work out what that

15 means, re:  Apollo and AFMG in terms of time

16 needed.  I would prefer to do things right

17 instead of, and I apologize, particularly

18 because my husband is Chinese, but can you

19 maybe state for the record what those Chinese

20 characters say?

21    A.    It says (speaking Chinese).

22    Q.    Roughly in English.

23    A.    I thought you wanted me to read

24 out.

25    Q.    No, no, no.



Page 94

                      D. Majcher
1
2        A.    It means like -- it's like there
3    are shorelines on both sides and you can't
4    reach either side.   That's a literal
5    translation.
6        Q.    That's helpful.   Thank you.
7              Then on the next page, you write,
8    Of course, I would be happy to help.   I guess
9    that's the exact same message again, sorry,
10   but if you go further down the page, Mr. Choi
11   writes to you, For compensation, I suggest
12   U.S., dollar sign, 50-K, once successfully
13   listed, another dollars sign, 50-K, plus
14   potential bonus.   Let me know if that's
15   acceptable.
16             Do you see that?
17       A.    I do.
18       Q.    What was Mr. Choi talking about
19   here to your understanding?
20             MS. WIGGER:   Object to form.
21       A.    Referencing to this thread of text
22   messages, it seems like he is asking me to
23   help with the SPAC listing process.
24       Q.    The SPAC listing process for De
25   Tomaso?



Page 95

1                      D. Majcher

2              MS. WIGGER:  Object to form.

3         A.    I believe so.

4         Q.    And he is offering to pay you

5    roughly 50,000 or 100,000 U.S. dollars to

6    help with that work for De Tomaso?

7              MS. WIGGER:  Object to form.

8         A.    It appears to be, yes.

9         Q.    Did you end up entering into that

10   agreement with Mr. Choi to get that payment

11   for assisting the De Tomaso SPAC?

12        A.    I don't remember entering into a

13   particular agreement.

14        Q.    So you don't remember entering into

15   a written agreement?

16        A.    I don't.

17        Q.    But do you remember if Mr. Choi or

18   De Tomaso did provide you extra compensation

19   for your help working on the De Tomaso SPAC

20   process?

21        A.    I don't.  It's possible that he

22   did.

23        Q.    I want to change gears for a little

24   bit.

25              Mr. Berris started doing work for



Page 96

```
 1                    D. Majcher
 2  Apollo in roughly 2016, is that right?
 3       A.   No, that's not how I remember.
 4       Q.   When do you recall that he first
 5  started doing any activities relating to
 6  Apollo?
 7       A.   My recollection will be sometime in
 8  2017.
 9       Q.   Do you recall roughly when in 2017?
10       A.   No, but definitely by the time we
11  were about to do the preview of the Apollo IE
12  which would have been July 2017 I think.
13       Q.   And do you recall that he has a
14  consultancy agreement or through a company
15  called Aprivy that was with Apollo starting
16  in about 2018?
17       A.   I do.
18       Q.   Mr. Berris was the general manager
19  of Apollo, right?
20            MS. WIGGER:  Object to form.
21       A.   According to the contract, that's
22  the title that he was given.
23       Q.   And he was generally in charge of
24  Apollo's marketing and sales efforts, right?
25            MS. WIGGER:  Object to form.
```



Page 97

                    D. Majcher
1
2        A.    Generally, that would fall under
3    his responsibilities, I would say yes.
4        Q.    That's actually what he did day to
5    day at Apollo, right?
6            MS. WIGGER:  Object to form.
7        A.    I can't actually say I know or knew
8    what he was doing day to day, but I
9    understood that to be part of his
10    responsibilities, yes.
11        Q.    During this period, you were
12    working in Hong Kong and he was largely based
13    in the States, right?
14        A.    Yes.
15        Q.    So it's not like you were sharing
16    an office on a day to day basis?
17        A.    No.
18        Q.    And after Apollo was purchased and
19    became AFMG, that consultancy deal or
20    contract that he had with Apollo, that was
21    assigned to AFMG, right?
22            MS. WIGGER:  Object to form.
23        A.    It was not.
24        Q.    Apollo ceased to exist at that
25    point, right?



Page 98

```
 1                    D. Majcher
 2            MS. WIGGER:  Object to form.
 3      A.    Incorrect.
 4      Q.    Did the entity, Apollo Automobili,
 5  exist after it was purchased by AFMG and was
 6  renamed?
 7      A.    Yes and it exists to this day.
 8            MS. WIGGER:  Object to form.  Try
 9      to do one pause so I can get my two
10      cents in.
11      Q.    Mr. Berris' consultancy contract,
12  the payments he received came from Apollo
13  Future Mobility Group, isn't that right, Ms.
14  Majcher?
15            MS. WIGGER:  Object to form.
16      A.    No, not as far as I know.
17      Q.    Do you have any direct knowledge as
18  to whether -- strike that.
19            Would you be surprised that the
20  payments that Mr. Berris received were paid
21  directly from Apollo Future Mobility Group?
22            MS. WIGGER:  Object to form.
23      A.    Indeed, I would be, yes.
24      Q.    Why?
25      A.    Because as far as I understand, all
```



Page 99

```
 1                    D. Majcher
 2  of his payments were done by Apollo
 3  Automobile Limited which is the company --
 4  which is the counterpart of that Aprivy
 5  consultancy agreement.
 6      Q.   You don't have any direct knowledge
 7  as to who was making those payments, do you?
 8      A.   I do.
 9      Q.   Do you have a piece of paper that
10  you have shown your counsel that shows that
11  those payments came from Apollo Limited as
12  opposed to Apollo Future Mobility Group?
13            MS. WIGGER:  Object to form.
14            And don't answer to the extent that
15       you talked to us.
16      Q.   I don't want to hear any
17  discussions with counsel, but your testimony
18  today is that you believe if someone were to
19  look at the records, it would show those
20  payments came from an entity called Apollo
21  Automobili Limited?
22      A.   Yes.
23      Q.   Was that still a functioning
24  corporate entity at the time it was purchased
25  and turned into Apollo Future Mobility Group?
```



Page 100

```
 1                    D. Majcher
 2              MS. WIGGER:  Object to form.
 3         A.    When we said that AFMG purchased
 4    Apollo.
 5         Q.    Yes.
 6         A.    Yeah, it purchased the holding
 7    company that owns Apollo.
 8         Q.    Yes.
 9         A.    It purchased 86 percent.
10         Q.    Yes.
11         A.    Of the shares of the holding
12    company.
13         Q.    Yes.
14         A.    And the holding company and all of
15    the rest -- all of the subsidiary operating
16    company continue to exist until this day.
17         Q.    Who owned them at that point?
18              MS. WIGGER:  Object to form.
19         Q.    The subsidiaries.
20         A.    Who owned them?
21         Q.    The subsidiaries were owned by the
22    holding company, right?
23         A.    The subsidiaries were still owned
24    by the holding company.
25         Q.    And the holding company was owned
```



Page 101

```
 1                    D. Majcher
 2  by AFMG?
 3      A.    Correct, but none of the agreements
 4  were assigned to AFMG because each operating
 5  company still exists, they're still operating
 6  their own business.
 7      Q.    But Apollo Automobile Limited at
 8  the time was owned by AFMG?
 9            MS. WIGGER:  Object to form.
10      A.    Indirectly, yes.
11      Q.    Let me show you another document.
12            MR. SIMONS:  We will mark this as
13         Majcher 11.
14            (Majcher Exhibit 11, January 19,
15         2021 WhatsApp exchange between Ms.
16         Majcher and Mr. Choi, marked for
17         identification.)
18      Q.    This document has been marked as
19  Majcher 11, is a WhatsApp exchange between
20  you and Mr. Choi on January 19, 2021, is that
21  right?
22      A.    Yes.
23      Q.    If we go to the page ending in --
24  let me set the scene.  It looks like in the
25  first couple of pages, you are talking about
```



MAGNA
LEGAL SERVICES

Page 102

```
 1                    D. Majcher
 2   work related to Apollo or AFMG, is that fair?
 3            MS. WIGGER:  Object to form.  Take
 4        your time to review this.
 5        A.    Yeah, it appears to be, yes.
 6        Q.    Then on the page ending in 190, Mr.
 7   Choi writes to you, As for Aprivy, Ryan needs
 8   to stick around a bit longer to serve IE
 9   clients.
10            Do you see that?
11        A.    Yes.
12        Q.    That was Mr. Choi indicating that
13   AFMG still needed Mr. Berris to perform work
14   servicing the existing IE clients, right?
15            MS. WIGGER:  Object to form.
16        A.    I don't know if it was AFMG or Mr.
17   Choi or whoever, but I see he says Ryan needs
18   to stick around a little longer.
19        Q.    You can put that aside -- sorry.  I
20   have another question about that, my bad.
21            If you turn to the page ending in
22   196, you write, Maybe going forward, can
23   split Joyce's time and have her continue to
24   work on the DT book as an admin, not that
25   easy to find someone part-time line this.
```



Page 103

```
 1                  D. Majcher
 2          Do you see that?
 3     A.    I do.
 4     Q.    Then Mr. Choi writes, To be fair,
 5  let me think clearly if the CFO should be in
 6  the U.S. or HK.
 7          Do you see that?
 8     A.    Yes.
 9     Q.    This discussion is about hiring a
10  CFO for De Tomaso, right?
11          MS. WIGGER:  Object to form.
12     A.    This discussion looks like -- I
13  don't know if we are talking about hiring a
14  CFO, but he is thinking about having a CFO.
15     Q.    He is thinking about having a CFO
16  for De Tomaso at this point in -- what is the
17  date is this, January of 2021, the day before
18  my birth?
19          MS. WIGGER:  Object to form.
20          MR. SIMONS:  As to my birthday.
21     You can strike the remark about my
22     birthday.
23     Q.    Now I will show you what we will
24  mark as Majcher 12.
25          (Majcher Exhibit 12, February 4,
```



Page 104

```
 1                    D. Majcher
 2        2021 WhatsApp chat between Ms. Majcher
 3        and Mr. Choi, marked for
 4        identification.)
 5        Q.   Ms. Majcher, this is a WhatsApp
 6   chat between you and Mr. Choi on February 4,
 7   2021, is that right?
 8        A.   Yes.
 9        Q.   I'm just going to ask you about two
10   chats on the page ending in 072.
11        A.   072?
12        Q.   Correct.  Just the bottom two ones
13   there.
14        A.   Okay.  I'm there.
15        Q.   So Mr. Choi writes to you, Based on
16   the group chart, I will propose to act as
17   advisor to Apollo once the termination of
18   contract is confirmed.  Stefan can continue
19   to be the CEO under Marco and his guidance.
20             Do you see that?
21        A.   I do.
22        Q.   And you writer, But Apollo Germany
23   is only a production center.  The business
24   needs sales and marketing which Germany
25   cannot do.
```



Page 105

```
 1                    D. Majcher
 2           Do you see that?
 3      A.   I do.
 4      Q.   Then Mr. Choi responds on the next
 5  page, Ryan will continue to help out.
 6           Do you see that?
 7      A.   I do.
 8      Q.   Then he writes, But for now,
 9  limited to and until the final delivery of
10  IEs.
11           Do you see that?
12      A.   I do.
13      Q.   Do you recall when the final
14  delivery of the Apollo IEs was made?
15      A.   Like the very last car?
16      Q.   Yes.  Correct.
17      A.   The very last Apollo IE was
18  delivered sometime this year.
19      Q.   Sometime in 2024?
20      A.   Yeah.
21      Q.   You can put that aside.
22           Mr. Berris started doing work for
23  De Tomaso sometime in 2016, 2017, is that
24  right?
25           MS. WIGGER:  Object to form.
```



Page 106

                        D. Majcher

1

2       A.    I was not aware.  I can't pinpoint

3  what time he started doing work.

4       Q.    Fair enough.

5            But from when he started doing work

6  -- at some point in time, you became aware

7  that Mr. Berris was doing work related to De

8  Tomaso, is that a fair statement?

9       A.    That's fair.

10       Q.    Initially, you two got along pretty

11  well?

12       A.    Define pretty well.

13       Q.    Just like in casual terms, you

14  weren't screaming at each other?

15       A.    Cordial, friendly.

16       Q.    You had a good working

17  relationship?

18       A.    Okay.

19       Q.    I'm asking you.  Initially, when

20  you were working together --

21       A.    It was cordial and professional,

22  but it was limited to work only.

23       Q.    And Mr. Berris, in your view, did

24  some good work when he was at De Tomaso,

25  right?



1              D. Majcher

2          MS. WIGGER:  Object to form.

3      A.   Can you qualify, did some good

4   work?

5      Q.   Did you find that the work that he

6   did for De Tomaso was up to certain standards

7   in your subjective opinion?

8          MS. WIGGER:  Object to form.

9      A.   I'm not a marketer.  I'm not a

10  creative person so, you know, to the extent

11  that Mr. Berris created some campaigns or

12  supervised photoshoots and whatnot, I found

13  him to be way better than what I could have

14  done.

15     Q.   Fair enough.

16          He had a certain skill set that was

17  different from your skill set, is that a fair

18  statement?

19     A.   That's fair.

20     Q.   And you found him to carry himself

21  very professionally, right?

22          MS. WIGGER:  Object to form.

23     A.   I found him to carry himself in a

24  very presentable manner.  He is a reasonably

25  good looking guy, fit, he speaks well,



Page 108

```
 1                    D. Majcher
 2  eloquently, he is a good presenter.
 3       Q.   You found him to be well-spoken,
 4  you found that --
 5       A.   Yeah.
 6       Q.   You found him to conduct himself
 7  professionally when he was dealing with
 8  clients of De Tomaso?
 9            MS. WIGGER:  Object to form.
10       A.   Professionally in a sense that --
11  yeah, it's just very businesslike, not overly
12  friendly.
13       Q.   Businesslike professional?
14       A.   Sure.
15       Q.   You observed that he became close
16  to Mr. Norman Choi and Mr. Choi's family,
17  right?
18            MS. WIGGER:  Object to form.
19       A.   I observed that he was spending a
20  lot of time with them, yes.
21       Q.   They would travel a lot together?
22            MS. WIGGER:  Object to form.
23       A.   They did, yes.
24       Q.   They would speak to each other
25  almost every day?
```



Page 109

```
 1                    D. Majcher
 2              MS. WIGGER:  Object to form.
 3         A.    I don't know the frequency, I don't
 4    know.
 5         Q.    Fair enough.  But from your
 6    understanding, they were very close?
 7         A.    It would appear that way, yes.
 8         Q.    At the time that Mr. Berris started
 9    doing work for De Tomaso, did it have any
10    full-time employees?
11              MS. WIGGER:  Object to form.
12         A.    At the time, no, I would say no.
13         Q.    So did De Tomaso have any full-time
14    employees in 2017?
15         A.    No.
16         Q.    Did De Tomaso have any full-time
17    employees in 2018?
18         A.    No.
19         Q.    Did De Tomaso have any full-time
20    employees in 2019?
21         A.    No.
22         Q.    So besides you and Mr. Choi, Mr.
23    Berris was largely the other person that was
24    doing work for De Tomaso in that period,
25    right?
```



Page 110

1                    D. Majcher

2              MS. WIGGER:  Object to form.

3         A.    In that period, like 2017 to 2019?

4         Q.    Yes.

5         A.    Yes -- let me qualify that.  Again,

6    there is Jowyn Wong and Jakub Jodlowski and I

7    would say Stefan Burger as well.

8         Q.    Over that period, 2017, '18 and

9    '19, the primary people doing the day to day

10   work at De Tomaso was Mr. Choi, yourself and

11   Mr. Berris?

12             MS. WIGGER:  Object to form.

13        A.    Can you define day to day work?

14        Q.    The majority of the work of the

15   company.

16             MS. WIGGER:  Object to form.

17        A.    I mean, we are a car company, we

18   market cars, so the majority of the work

19   could be the design of the car because

20   without the car, there is no company.

21        Q.    Let me try this another way.

22             Do you recall in 2018 or 2019,

23   whether anyone besides you, Mr. Choi and Mr.

24   Berris had a De Tomaso email address?

25        A.    No, I can't go that far back.  I



Page 111

```
 1                    D. Majcher
 2   can't remember when the email addresses were
 3   created.
 4        Q.    During the time that you worked at
 5   Apollo or De Tomaso, do you recall Mr. Berris
 6   ever taking a vacation?
 7             MS. WIGGER:  Object to form.
 8        A.    Do I recall?
 9        Q.    Yes.  Do you have a specific
10   recollection?
11        A.    I don't recall, no.
12        Q.    Do you recall him ever talking
13   about any nonbusiness social obligations of
14   any kind?
15             MS. WIGGER:  Object to form.
16        A.    Mr. Berris very rarely spoke about
17   his personal life, so to answer your
18   question, I do not recall.
19        Q.    De Tomaso's first full-time
20   employee was someone named Hugo De Sadeleer,
21   it's D-E and then the second word is
22   S-A-D-E-L-E-E-R?
23             MS. WIGGER:  Object to form.
24        A.    Hugo is an independent contractor,
25   just like myself.
```



Page 112

                    D. Majcher
1
2        Q.    So he was not an employee of --
3    fair enough.
4            But he was the first person that
5    you recall that signed -- is it fair to say
6    he is the first person that signed a written
7    employment contract with De Tomaso?
8            MS. WIGGER:  Object to form.
9        Q.    Or a written contract with De
10   Tomaso to do work?
11       A.    With the De Tomaso entity, yes.
12       Q.    And roughly when did that occur?
13       A.    I think it's 2020.  Actually, I
14   can't remember.
15       Q.    I think that's right too.  I don't
16   have a note here to myself, but that sounds
17   about right.
18            Mr. De Sadeleer was introduced to
19   De Tomaso through Mr. Berris, is that right?
20            MS. WIGGER:  Object to form.
21       A.    I don't know, but I knew Hugo when
22   we were doing the Apollo stuff, he was
23   already involved in some of our events so I
24   don't know if it's fair to say that he was
25   introduced to De Tomaso through Mr. Berris or



Page 113

1                          D. Majcher

2   we already knew him, I don't know.

3        Q.    Whose idea was it to have him join

4   the company as a consultant?

5        A.    To join the company?

6        Q.    To join De Tomaso.

7              MS. WIGGER:  Object to form.

8        A.    I don't know.

9        Q.    Does Mr. De Sadeleer still work for

10  De Tomaso?

11       A.    He does.

12       Q.    What work does he do for De Tomaso?

13       A.    He is our development driver, so he

14  would help us test the cars, but he also

15  helped us manage events and because of his

16  racing background, he has a large network

17  within this industry so he helps out on the

18  event management side a lot these days.

19       Q.    And has he had the same employment

20  status as a contractor throughout his time

21  being associated with De Tomaso?

22       A.    Yes.

23       Q.    Mr. Berris brought an individual

24  named Jiri Kubik, I'm not sure how to spell

25  the last name, maybe you do, to De Tomaso, is



Page 114

1                    D. Majcher

2    that right?

3              MS. WIGGER:  Object to form.

4         A.    I believe so, yes.

5         Q.    How do you spell his last name, if

6    you know?

7         A.    It's K-U-B-I-K.

8         Q.    Does Mr. -- is it pronounced Kubik?

9         A.    Kubik.

10        Q.    Does Mr. Kubik still work for De

11   Tomaso?

12        A.    He does.

13        Q.    What is his title at De Tomaso?

14        A.    If I remember correctly, his title

15   is digital artist.

16        Q.    Mr. Berris was in charge, when he

17   was working at the company, I should say, Mr.

18   Berris was in charge of De Tomaso's marketing

19   efforts, right?

20        A.    I would say that's one of his

21   responsibilities, yes.

22        Q.    He ran De Tomaso's social media

23   accounts, right?

24        A.    He did.

25        Q.    He was also in charge of managing



Page 115

```
 1                      D. Majcher
 2    the registrations of interest for the P72?
 3         A.    He was, yes.
 4         Q.    He helped interface with clients?
 5         A.    He did.
 6         Q.    He worked on marketing campaigns?
 7         A.    Yes.
 8         Q.    He designed the De Tomaso website?
 9         A.    Yes.
10         Q.    He created, as you noted, some of
11    the draft employment template contracts?
12         A.    Yes.
13         Q.    What else did Mr. Berris do besides
14    what we described just now?
15              MS. WIGGER:  Object to form.
16         A.    He organized certain events.  You
17    already mentioned campaign, website, client
18    interface, registration of interest.
19              I'm sorry, what else did you
20    mention?
21         Q.    It's okay.  It's not a memory test.
22              Did he also work on soliciting
23    clients to purchase the P72s?
24              MS. WIGGER:  Object to form.
25         A.    I believe that was part of his
```



Page 116

```
 1                    D. Majcher
 2    agreement, yes.
 3         Q.   He was often the person that
 4    executed the sales contracts for the P72s, is
 5    that right?
 6              MS. WIGGER:  Object to form.
 7         A.   When you say execute, you mean just
 8    putting his name on it?
 9         Q.   He signed on behalf of De Tomaso,
10    many of those sale contracts?
11         A.   I believe some of them, yes.
12         Q.   Do you recall if he was already in
13    charge of coordinating with dealer partners
14    such as Miller Motor Cars?
15              MS. WIGGER:  Object to form.
16         A.   I believe he interfaced with them,
17    yes.
18         Q.   I want to show you a document.
19              MR. SIMONS:  We will mark this as
20         Majcher 13.
21              (Majcher Exhibit 13, May 27, 2021
22         WhatsApp message exchange between Ms.
23         Majcher and Mr. Berris, marked for
24         identification.)
25         Q.   Ms. Majcher, Majcher 13 is a
```



Page 117

1                    D. Majcher
2   message exchange, it appears to be WhatsApp
3   between you and Mr. Berris dated May 27,
4   2021, is that right?
5        A.   Yes.
6        Q.   I will pretty much go through this
7   whole thing.
8             At the beginning, you sent him what
9   appears to be a link to a YouTube video.
10            Do you see that?
11       A.   Yes.
12       Q.   It says start at 11:13.
13            Do you see that?
14       A.   Yes.
15       Q.   Then you write, Apollo IE, F9,
16  right?
17       A.   Yes.
18       Q.   Then he responds with a heart
19  emoji, right?
20       A.   Yes.
21       Q.   Then you write, For IE or RB.  And
22  then you put, I don't know how to describe
23  this emoji, the winky tongue out emoji?
24       A.   I'm not going to do that on camera.
25       Q.   I'm not asking you to do that.



Page 118

1                   D. Majcher

2           But is that a fair summary of that

3    emoji?

4        A.   Yes.

5        Q.   He writes back, IE, yes.  You write

6    to him, This was ages ago, and then Mr.

7    Berris says, Hard to believe I haven't seen

8    you in ages.  Then you write back, I just saw

9    you on YouTube.  I think that's the screaming

10   emoji, maybe, it's a bit blurry.

11       A.    Maybe.

12       Q.   And then he writes, I hope these

13   past 1.5 years have treated me well,

14   otherwise, you might now, I think that's a

15   typo, I think he meant to write not,

16   recognize me.

17           Do you see that?

18       A.   Yes.

19       Q.   Then he puts a laughing emoji I

20   believe.

21           Do you see that?

22       A.   Yes.

23       Q.   Then you write back, I guess I will

24   have to see you in person to find out.

25           Do you see that?



Page 119

```
 1                    D. Majcher
 2       A.    Yes.
 3       Q.    Would you describe this as a very
 4   friendly exchange between coworkers, is that
 5   right?
 6             MS. WIGGER:  Object to form.
 7       A.    Yes.
 8       Q.    You can put that aside.  I will
 9   show you another text exchange that we will
10   mark as Majcher 14.
11             (Majcher Exhibit 14, March 2, 2018
12       WhatsApp chat between Diana Majcher and
13       Bill Majcher, marked for
14       identification.)
15       Q.    So Majcher 14 is a WhatsApp chat
16   between you and an individual named Bill
17   Majcher from March 2, 2018, is that right?
18       A.    I don't know how to tell that.
19       Q.    That it's you?  I can represent,
20   subject to check, that this identifies you as
21   the custodian of this document.
22       A.    Okay.
23       Q.    This was produced from -- your
24   attorneys did produce this document to us.
25             Bill Majcher is your husband,
```



Page 120

```
 1                    D. Majcher
 2  right?
 3       A.   Yes.
 4       Q.   I guess, do you recognize that
 5  phone number?  Is that your phone number,
 6  plus 8 (526) 891-7919?
 7       A.   That's his phone number.
 8       Q.   Is your phone number -- I guess
 9  there is not a second phone number on here,
10  but here it says, Ryan does our sales and
11  marketing.  He is the naive American guy you
12  and Frank spoke to at our event.
13            Do you see that?
14       A.   I do.
15       Q.   Do you recall why you describe Mr.
16  Berris as the naive American guy?
17            MS. WIGGER:  Object to foundation.
18       I don't think we established she wrote
19       that.
20       A.   If I look at this, this message is
21  from 2018.
22       Q.   Correct.
23       A.   And thinking back, this event that
24  we were talking about was the Apollo event in
25  December of 2017.
```



Page 121

1                      D. Majcher

2        Q.    Okay.

3        A.    That would have been the time when

4    my husband and Frank, who we are referring to

5    here, would have met Mr. Berris.

6        Q.    What you are saying here is Ryan

7    does our sales and marketing, right?

8        A.    Yes.  Go ahead.

9        Q.    You are referring to, by our, were

10   you referring there to Apollo?

11       A.    Apollo.

12       Q.    You can put that aside.  I will

13   show you another document.

14            (Majcher Exhibit 15, July 10, 2019

15        WhatsApp message exchange between Diana

16        Majcher and Bill Majcher, marked for

17        identification.)

18       Q.    This we will mark as Majcher 15 and

19   this once again, appears to be WhatsApp

20   message exchange between you and your husband

21   Bill Majcher from the date is July 10, 2019.

22            Do you see that?

23            MS. WIGGER:  Object to form and

24        foundation.

25       A.    July 10, 2019, yes.



Page 122

1                    D. Majcher

2        Q.    The body of the text says, Ryan

3    apologized, but said couldn't get vehicle

4    down and I advised no worries and thanks for

5    consideration as he is pretty generous and

6    genuine.

7            Do you see that?

8        A.    I do.

9        Q.    Do you recall what your husband was

10   saying in this text message?

11           MS. WIGGER:   Object to form.

12       A.    This is one line literally five

13   years ago.

14       Q.    Do you recall your husband ever

15   describing Mr. Berris as generous and

16   genuine?

17       A.    No, I don't recall having a lot of

18   discussions with him about Ryan.  It would be

19   a little strange so, no.

20       Q.    Fair enough.  You try to keep your

21   work life and personal life separate.  Put

22   that aside.

23           Changing gears a little bit.

24           Since you have been, as you said,

25   you worked at De Tomaso or done work for De



Page 123

```
 1                    D. Majcher
 2    Tomaso for a number of years, right?
 3         A.   Yes.
 4         Q.   During that period of time, at
 5    points, you found Mr. Choi to be difficult to
 6    work for, right?
 7              MS. WIGGER:  Object to form.
 8         A.   Difficult to work for?  I guess
 9    it's normal for anyone who has a boss to feel
10    that way about their boss from time to time.
11         Q.   From time to time.
12              You haven't always agreed with his
13    decisions?
14              MS. WIGGER:  Object to form.
15         A.   Agreed, as in -- perhaps not, yeah.
16         Q.   Do you recall any decisions that
17    Mr. Choi made relating to De Tomaso that you
18    disagreed with?
19              MS. WIGGER:  Object to form.
20         A.   When you say I disagreed with,
21    meaning what?
22         Q.   You thought it was the wrong
23    decision.
24              MS. WIGGER:  Object to form.
25         A.   Wrong decision, there might have
```



Page 124

```
 1                    D. Majcher
 2   been things I would have done differently
 3   perhaps.
 4       Q.    I guess to be a little more
 5   specific.  There were times when you felt Mr.
 6   Choi was being cheap in how he went about
 7   running De Tomaso?
 8             MS. WIGGER:  Object to form.
 9       A.    Being cheap?  Can you qualify cheap
10   or define cheap?
11       Q.    Just in your every day
12   understanding of being cheap, I guess -- I
13   will be a little bit more specific.
14             There were times that you thought
15   he wasn't devoting adequate resources to
16   certain parts of the company's operations?
17             MS. WIGGER:  Object to form.
18       A.    I think that there were times when
19   I thought that the company needed more
20   resources, whether it was because we were a
21   startup and we were just short of funding.  I
22   don't think -- I don't think that I ever
23   believed that Mr. Choi was intentionally
24   withholding resources or funding so that the
25   business cannot be successful.  I understand
```



1                    D. Majcher

2    there were difficulties, yes.

3        Q.    You did think that sometimes with

4    respect to maybe events, that he would nickel

5    and dime things?

6            MS. WIGGER:  Object to form.

7        A.    Nickel and dime?  Again, I said it

8    earlier, we run the business in a very lean

9    way because we have to, we had to and we

10   still have to so, yeah, we went about doing

11   things with the least amount of money

12   possible.

13       Q.    But specifically, there were times

14   that you thought Mr. Choi would nickel and

15   dime on the operations of De Tomaso?

16           MS. WIGGER:  Object to form.

17       A.    Nickel and dime, meaning?

18       Q.    How you understand the expression.

19           MS. WIGGER:  Object to form.

20       A.    Like counting every penny that we

21   spend?

22       Q.    Not devoting adequate resources to

23   funding events, for instance.

24       A.    No, nickel and diming, meaning, you

25   count your money and resources very



Page 126

```
 1                    D. Majcher
 2    carefully.
 3         Q.   In July 2022, you thought that De
 4    Tomaso, under Mr. Choi's leadership, was
 5    doing everything spontaneously, right?
 6              MS. WIGGER:  Object to form.
 7         A.   Did I, I can't recall, no.
 8         Q.   Do you recall that you thought in
 9    July 2022, that De Tomaso, under Mr. Choi's
10    leadership, was doing everything with zero
11    planning whatsoever?
12              MS. WIGGER:  Object to form.
13         A.   I don't recall.
14         Q.   Let me show you a document.
15              MR. SIMONS:  We will mark this as
16         Majcher 16.
17              (Majcher Exhibit 16, July 6, 2022
18         chat between Diana Majcher and Jowyn
19         Wong, marked for identification.)
20         Q.   This is a July 6, 2022 chat between
21    you and Joe Wong.
22              Is this Joe the same Jowyn Wong
23    that you referred to earlier in your
24    testimony?
25         A.   Yes.
```



Page 127

```
                      D. Majcher
 1
 2        Q.    Does he work at De Tomaso?
 3        A.    He does.
 4        Q.    What is his job title?
 5        A.    He is the chief designer.
 6        Q.    How long has he worked at De
 7   Tomaso?
 8        A.    You mean just like a general
 9   working arrangement?
10        Q.    How long has he had -- are you
11   aware of whether he has a signed contract
12   with De Tomaso?
13        A.    He does.
14        Q.    Do you know when that was executed?
15        A.    The contract was executed in I
16   believe April '22.
17        Q.    But your understanding is that he
18   may have been doing work for De Tomaso before
19   he signed that contract?
20        A.    I know he has been doing work
21   before that.
22        Q.    Do you know if De Tomaso paid him
23   any money for his work before he signed that
24   contract?
25        A.    I don't recall.
```



Page 128

```
 1                    D. Majcher
 2       Q.    Do you know if Mr. Berris was in
 3  favor of hiring Mr. Wong to work at De
 4  Tomaso?
 5            MS. WIGGER:  Object to form.
 6       A.    I do not -- I can't speculate.
 7       Q.    Do you know if the two of them got
 8  along?
 9            MS. WIGGER:  Object to form.
10       A.    I can only tell you from what Mr.
11  Wong has told me.
12       Q.    What did Mr. Wong say?
13       A.    From time to time, maybe not.
14       Q.    Do you recall if it was Mr. Choi's
15  idea to execute this formal agreement with
16  Mr. Wong in 2022?
17            MS. WIGGER:  Object to form.
18       A.    Mr. Choi's idea, yeah, yes.
19       Q.    If you go to the page ending in
20  140, Mr. Wong at the top says, Do we have
21  requirements from SPAC for, and then in
22  quotations, proper team?  And then you write,
23  Forget about the SPAC.  We need to be a
24  proper team to run a proper business.
25            Do you see that?
```



Page 129

1                    D. Majcher
2        A.    Yes.
3        Q.    Then Mr. Wong replies, No, of
4    course, I get that, but Norman won't care.
5              Do you see that?
6        A.    I do.
7        Q.    Then Mr. Wong says, He is always,
8    like, quotation, yeah, I can do it myself, I
9    don't sleep, I only sleep four/five hours,
10   end quote.  I'm like, dude, it's not about
11   you, it's about your team and company.
12             Do you see that?
13       A.    I do.
14       Q.    Then later on, you write, It's not
15   about the amount of sleep anyway, you get it.
16             Do you see that?
17       A.    I do.
18       Q.    Then on the next page, you write,
19   It's not even about taking a rest.  We just
20   can't do everything spontaneously with zero
21   planning whatsoever.
22             Do you see that?
23       A.    I do.
24       Q.    Then you write, And This goes
25   beyond events.  Even in making cars, we are



Page 130

1                    D. Majcher
2    doing it this way.
3            Do you see that?
4        A.   I do.
5        Q.   Do you recall what this discussion
6    was about?
7        A.   Sitting here right now, I cannot
8    recall, no.
9        Q.   You can put that aside.
10           You mentioned that Mr. Wong is
11   still employed at De Tomaso as, I believe you
12   said, chief designer, is that right?
13       A.   Yes.
14       Q.   But there has been a period of time
15   over the last couple of years where he has
16   been largely absent from the company, right?
17           MS. WIGGER:  Object to form.
18       A.   What do you mean by absent from the
19   company?
20       Q.   There has been a period of time
21   over the last couple of years that he has not
22   been doing much day to day work for the
23   company, is that fair?
24           MS. WIGGER:  Object to form.
25       A.   Day to day work?  I believe he



Page 131

```
 1                    D. Majcher
 2  carried out what he needs to do as the
 3  designer, his responsibilities.
 4        Q.    Let me show you a document.
 5              (Majcher Exhibit 17, March 14, 2024
 6        WhatsApp exchange between Diana Majcher
 7        and Jakub Jodlowski, marked for
 8        identification.)
 9        Q.    This is Majcher 17.  Ms. Majcher,
10  this is a WhatsApp exchange between you and
11  someone identified as Jakub from March 14,
12  2024.
13              Do you see that?
14        A.    Yes.
15        Q.    Who is Jakub?
16        A.    Jakub Jodlowski, our designer.
17        Q.    So he works at De Tomaso?
18        A.    He does.
19        Q.    How long has he worked at De
20  Tomaso?
21        A.    Since '17, '18, long time.
22        Q.    How long has he had an executed
23  written contract with De Tomaso?
24              MS. WIGGER:  Object to form.
25        A.    Since the contract was executed in
```



Page 132

```
 1                 D. Majcher
 2  April of '22.
 3       Q.   Has Jakub worked very closely with
 4  Jowyn Wong over the course of his career?
 5       A.   Yes.
 6       Q.   I want to ask you about some
 7  specific texts in here.
 8            If you go to the page ending in
 9  157.  Jakub writes to you, I apologize, I'm
10  not going to use his last name, because I
11  don't want to mispronounce it.  He says, we
12  are still short on that at DT, dot, dot, dot,
13  big time short on get shit done people.
14            Do you see that?
15       A.   Yes.
16       Q.   Then you respond with some type of
17  emoji which I can't tell what it is.  I don't
18  know if you can tell what it is.
19       A.   No.
20       Q.   Then you wrote, I spoke to Jowyn
21  today, right?
22       A.   Yes.
23       Q.   Then Jakub sends you a few
24  messages.  I think there -- I will represent
25  that a couple of them are GIFS.
```



Page 133

```
 1                    D. Majcher
 2           Does that sound possible, that he
 3   would send you a GIF?
 4       A.    It's possible.
 5       Q.    Then if you go to 159, Jakub
 6   writes, Oh, maaan, with a bunch of As in it,
 7   right?
 8       A.    Yes.
 9       Q.    Then you write, He is almost ready
10   to come back, right?
11       A.    Yes.
12       Q.    The he you are referring to there
13   is Jowyn, right?
14       A.    I think so.
15       Q.    Then you write, I think, right?
16       A.    Yes.
17       Q.    Then you write, Norman is almost at
18   his limit I think, correct?
19       A.    Yes.
20       Q.    Then Jakub writes, With Jowyn, dot,
21   dot, dot, and then you respond, Yes, is that
22   right?
23       A.    Yes.
24       Q.    Then he sends you some more, I
25   believe GIFs and I think also an audio file
```



Page 134

```
 1                    D. Majcher
 2   and then if then you go to 163, you write,
 3   You know his grandma passed away.
 4            Do you see that?
 5       A.   Yes.
 6       Q.   Are you referring there to Jowyn
 7   Wong?
 8       A.   Yes.
 9       Q.   Then you write, But yeah, he is a
10   hard nut to crack, and Jakub writes, Yes, I
11   heard, frowny face, and then Jakub writes, I
12   don't know.  He starts the call, like I will
13   join, dot, dot, dot and finishes on, all
14   caps, fuck, no, I need to do something on my
15   own.
16            Do you see that?
17       A.   Yes.
18       Q.   Then you write, He has issues that
19   need to be dealt with properly.
20            Do you see that?
21       A.   Uh-huh.  Yes.
22       Q.   You are referring there to Jowyn
23   Wong, right?
24       A.   Yes.
25       Q.   The chief designer of De Tomaso,
```



Page 135

```
 1                    D. Majcher
 2  right?
 3        A.    Yes.
 4        Q.    Then Jakub writes, And he listens
 5  to no one.
 6              Do you see that?
 7        A.    Yes.
 8        Q.    We told him that straight two years
 9  ago, and then he writes, Is two years now
10  that he is not working?  And then later on,
11  you write, It's coming on two years for sure.
12              And there you are referring to Mr.
13  Wong not working for the last two years,
14  right?
15        A.    I don't think I was specifically
16  referring to that.
17        Q.    Do you recall who you could have
18  been referring to other than Mr. Wong?
19              MS. WIGGER:  Object to form.
20        A.    I'm not saying I'm not referring to
21  Mr. -- the he being Mr. Wong.
22              I'm just saying that I'm not
23  necessarily agreeing to the whole he is not
24  working phrase.
25        Q.    Then you say, It's coming on two
```



Page 136

                          D. Majcher
1
2    years for sure.  I think he stopped around
3    the end of 2022.
4              Do you see that?
5         A.   I do.
6         Q.   What do you mean by he stopped?
7    You meant he stopped working around the end
8    of 2022?
9         A.   I think he stopped participating in
10   some of the, like you said, day to day work,
11   calls, meetings, but my understanding is that
12   he was in touch with Mr. Choi, he was giving
13   his input on the designs and he was carrying
14   out, in some form, his responsibilities.
15        Q.   He was carrying out, in some form,
16   his responsibilities, even though you said I
17   think he stopped around the end of 2022?
18             MS. WIGGER:  Object to form.
19        A.   I did not say he stopped doing what
20   there.
21        Q.   Then Jakub writes, Yeah, sounds
22   right.  After our Dutch trip, when he was
23   playing his Anime games and I think he meant
24   to write, driving us around, ha-ha.
25             Do you see that?



Page 137

```
 1               D. Majcher
 2      A.   Yes.
 3      Q.   Then Jakub writes, When are you
 4  next in Europea?  And you say, At least he
 5  drove.  And then you write, I don't know.  No
 6  order from our supreme leader yet.
 7           Who are you referring to by our
 8  supreme leader?
 9      A.   I think that would be Mr. Choi.
10           MR. SIMONS:  So I want to do
11           something I have never done at a
12           deposition before which is play an audio
13           file which is one of the things Jakub
14           attaches to this message, so Sophie is
15           going to play it.
16           MS. WIGGER:  Is the file part of
17           the text?  Do you want to mark it?
18           MR. SIMONS:  There is a Bates
19           associated with it.  The Bates -- we can
20           mark it as DT 000139172, it's just 30
21           seconds.
22           MS. WIGGER:  This will be M 18.
23           (Majcher Exhibit 10, audio file
24           bearing Bates stamp No. DT 000139172,
25           marked for identification.)
```



Page 138

```
 1                   D. Majcher
 2            (Tape played.)
 3            MR. SIMONS:  That's the end of the
 4       audio message.
 5            I think it's a good time to take
 6       our lunch break, unless you want to keep
 7       going.
 8            MS. WIGGER:  Do you not have
 9       questions on the audio file?
10            MR. SIMONS:  It speaks for itself.
11            MS. WIGGER:  Lunch.
12            THE VIDEOGRAPHER:  We are going off
13       the record.  The time is 12:30 p.m.
14            (Luncheon recess taken at 12:30
15       p.m.)
16
17
18
19
20
21
22
23
24
25
```



Page 139

```
 1                    D. Majcher
 2           A F T E R N O O N   S E S S I O N
 3              (Time noted:  1:18 p.m.)
 4  D I A N A   M A J C H E R,    resumed and
 5     testified as follows:
 6              THE VIDEOGRAPHER:  We are back on
 7        the record.  The time is 1:18 p.m.
 8  EXAMINATION BY (Cont'd.)
 9  MR. SIMONS:
10        Q.   Welcome back, Ms. Majcher.
11             Before the lunch break, I played
12  you an audio file that we marked as Majcher
13  Exhibit 18.
14             Do you remember that?
15        A.   Yes.
16        Q.   That audio file was an audio
17  message from that gentleman, Jakub?
18        A.   Yes.
19        Q.   In that message, he was talking
20  about Jowyn Wong, correct?
21             MS. WIGGER:  Object to form.
22        A.   I believe so, yes.
23        Q.   I want to show you a document.
24             MR. SIMONS:  I guess we will mark
25        this as Majcher 19.
```



Page 140

1                    D. Majcher
2              (Majcher Exhibit 19, March 2, 2021
3        WhatsApp exchange between Ms. Majcher
4        and Mr. Choi, marked for
5        identification.)
6        Q.    So Majcher 19 is a WhatsApp
7    exchange between you and Mr. Choi dated March
8    2, 2021, correct?
9              MS. WIGGER:   I believe it's 6/8 on
10       my copy.
11             MS. ROYTBLAT:   I gave you the wrong
12       copy, sorry.
13             THE WITNESS:   It says June 8.
14             MR. SIMONS:   Wrong copy.
15             (Off the record).
16             MR. SIMONS:   This is Majcher 19 and
17       so the record is clear, it's the Bates
18       ending in 130496.
19       Q.    And that's why, Ms. Majcher, I was
20   asking about March 2, 2021.   This is a text
21   exchange between you and Norman Choi from
22   that date, right?
23       A.    Yes.
24       Q.    I will ask you some questions.   If
25   you go to the page ending in 497.



Page 141

```
 1                    D. Majcher
 2        A.    497?
 3        Q.    The second page.
 4             Mr. Choi is writing to you at 1:01
 5   and he says, I think he is mentally a bit
 6   imbalanced, knowing and seeing MC doing very
 7   well and all of his cars (worth something
 8   like U.S. 15M) on display, plus all the
 9   listco deals and started to compare his own
10   accomplishments.
11             Do you see that?
12        A.    I do.
13        Q.    Who is the MC that Mr. Choi is
14   referring to there?
15             MS. WIGGER:  Object to form.
16        A.    I believe that's Michael Choi.
17        Q.    And Michael Choi, like you said
18   earlier, is a longtime friend of Mr. Norman
19   Choi's, right?
20             MS. WIGGER:  Object to form.
21        A.    I believe that to be true, yes.
22        Q.    If we can go to the page ending in
23   499.  Towards the bottom of the page, Mr.
24   Choi writes to you, 8071 was MC's shell and
25   Richard was CEO.  And then you respond, Ooh.
```



Page 142

```
 1                    D. Majcher
 2            Do you see that?
 3       A.   Yes.
 4       Q.   Do you know what 8071 is?
 5            MS. WIGGER:  Object to form.
 6       A.   I believe that's a stock code in
 7  Hong Kong.
 8       Q.   So it would be a stock code for
 9  like a publicly-traded company in Hong Kong?
10       A.   Correct.
11       Q.   And is it your understanding that
12  the MC referred to here was Michael Choi yet
13  again?
14            MS. WIGGER:  Object to form.
15       A.   I believe so.
16       Q.   What was your understanding of what
17  Mr. Choi meant when he said 8071, a publicly
18  traded Hong Kong company was MC's show?
19            MS. WIGGER:  Object to form.
20       A.   At the time, I understood that to
21  be that Michael Choi had something to do with
22  this 8071 company.
23       Q.   When you say that you understood it
24  to mean that Michael Choi had something to do
25  with this 8071 company, did you understand
```



Page 143

                    D. Majcher
 1
 2    that to be that he was publicly associated
 3    with it or that he was trying to hide his
 4    involvement with 8071?
 5              MS. WIGGER:  Object to form.
 6         A.    I just know that he was -- because
 7    it was sent to me.  Literally, it says 8071
 8    was MC's show, so I took it to mean that he
 9    was involved in some shape or form.
10         Q.    What did you understand a shell
11    company to be?
12         A.    It's a listed company in Hong Kong
13    that may not be carrying on an operating
14    business.
15         Q.    If you turn now to page -- the page
16    ending in 503.  In the middle of the page,
17    Mr. Choi writes to you, You busy now?  I will
18    send you an article.  Would like your
19    feedback.  And then you write, Sure.  And
20    then he sends you a link to a website that
21    says, SPACs, How Does It Work.  And then I
22    think that link is repeated on the next
23    couple of pages.
24              And then at 231, Mr. Choi writes to
25    you, Keep it separate, and then he corrects



Page 144

1                    D. Majcher
2    his own typo and no need to share with any of
3    them in the office.
4              Do you see that?
5         A.    I do.
6         Q.    Then on the next page, you write, I
7    don't share any of our discussions with
8    anyone at the office.
9              Do you see that?
10        A.    Yes.
11        Q.    What you were referring to when you
12   say, I don't share any of our discussions
13   with anyone at the office?
14        A.    I don't share with anything to do
15   with De Tomaso at the Apollo office.
16        Q.    Why not?
17        A.    Why should I?
18        Q.    I thought you said that Apollo and
19   De Tomaso were largely the same company?
20        A.    That's not what I said.
21        Q.    They are two separate companies?
22        A.    They have always been two separate
23   companies and if you look at the time of this
24   message exchange, this was after Apollo was
25   sold, they were under separate ownership,



Page 145

```
 1                    D. Majcher
 2    under separate management.
 3            There is no reason that anyone from
 4    the Apollo office should know about the De
 5    Tomaso business.
 6        Q.    Then you write, What kind of
 7    feedback are you looking for?
 8            Do you see that?
 9        A.    Yes.
10        Q.    Then Mr. Choi writes, In theory, I
11    can form my own SPAC.  One question is
12    whether I can acquire my own business.  Then
13    you write to him on the next page,
14    Technically speaking, you are not supposed to
15    have already identified an acquisition target
16    when you form the SPAC because it is supposed
17    to be a blind pool that you are raising for
18    the IPO.
19            Do you see that?
20        A.    Yes.
21        Q.    What did you mean by that?
22            MS. WIGGER:  Object to form.
23        A.    I mean exactly what I wrote there.
24        Q.    That it was your understanding that
25    you are not supposed to have already
```



Page 146

```
 1                    D. Majcher
 2   identified an acquisition target when you
 3   formed the SPAC, correct?
 4        A.    That was my understanding, yes.
 5        Q.    Because it's supposed to be a blind
 6   pool you are raising from the IPO?
 7        A.    From my understanding, yes.
 8        Q.    Then you write -- then Mr. Choi
 9   writes, Confidentially, I met Suen, S-U-E-N,
10   and he is highly interested.
11              Do you see that?
12        A.    I do.
13        Q.    Who is Suen?
14        A.    I do not know this individual.
15        Q.    Then you write, The answer to this
16   is definitely no.  The transaction needs to
17   be arm's length, but, dot, dot, dot.
18              Do you see that?
19        A.    I do.
20        Q.    What did you mean when you said,
21   the transaction needs to be arm's length?
22              MS. WIGGER:  Object to form.
23        A.    Arm's length means it was a
24   business terminology, means that the
25   transaction needs to be arms length.  I'm not
```



Page 147

```
 1                    D. Majcher
 2   sure I know how to define it in a technical
 3   way, but it means that everything needs to be
 4   above board.
 5             It's like two unrelated entities
 6   entering into a business transaction.
 7        Q.   Then if we go to, at 5:11, you
 8   write, Just need to find some presentable
 9   Gwailos, G-W-A-I-L-O-S, to face institutional
10   investors and regulators, right?
11        A.   Yes.
12        Q.   Gwailos is sort of a term which
13   means like a white westerner, right?
14        A.   Yes.
15        Q.   What did you mean by that?
16        A.   Exactly that.
17        Q.   You meant that you needed to find a
18   presentable white westerner to be the public
19   face of the SPAC?
20        A.   To the SPAC, yes.
21        Q.   Then on the next page, Mr. Choi
22   writes, Bill.
23             Do you see that?
24        A.   I do.
25        Q.   That was a reference, or you
```



Page 148

```
 1                    D. Majcher
 2  understood that be to a reference to your
 3  husband, Bill Majcher, right?
 4       A.   Yes.
 5       Q.   Had you ever discussed with Mr.
 6  Choi any other person named Bill being
 7  involved in the De Tomaso SPAC?
 8       A.   Not that I can recall.
 9       Q.   Then if you go forward a few pages,
10  on 514, Mr. Choi writes, When we raise
11  through the SPAC.  And then you write, You
12  mean this as the IPO side, question mark.
13  And then Mr. Choi writes, Yes, and we value
14  DT at say 1-BM.
15            Do you see that?
16       A.   I do.
17       Q.   Did you understand him to mean that
18  the valuation of De Tomaso he was proposing
19  was 1 billion U.S. dollars?
20            MS. WIGGER:  Object to form.
21       A.   Yes, possibly, yeah.
22       Q.   Then if you go to the page ending
23  in 516, Mr. Choi continues, So perhaps the
24  idea is have Bill front the SPAC (as his
25  public profile seems reasonable and seen as
```



Page 149

```
 1                   D. Majcher
 2    proper).
 3            Do you see that?
 4        A.    Yes.
 5        Q.    Once again, the Bill here you
 6    understood to be your husband, Bill Majcher?
 7        A.    Yes.
 8        Q.    You did have discussions with Mr.
 9    Choi outside of just this document about
10    having your husband be involved as the public
11    face of the SPAC for De Tomaso, right?
12            MS. WIGGER:  Object to form.
13        A.    You mean outside of this thread?
14        Q.    Outside of this thread, you had
15    other discussions besides just this one?
16        A.    I can't recall.
17        Q.    Just a quick question about this
18    specific message that I asked you about where
19    Mr. Choi says, Perhaps the idea is have Bill
20    front the SPAC.
21            Do you have any idea why that
22    message would not be available in the chat
23    history that Mr. Choi has from this same date
24    with you?
25            MS. WIGGER:  Object to form,
```



Page 150

1                    D. Majcher

2         foundation.

3         A.    I'm sorry, can you...

4         Q.    I will clarify the question.

5               So this document, I will represent

6    to you, because we see it has that weird

7    quirk where everything is produced twice, all

8    the messages are produced twice, came from an

9    image of your phone, a history of your chat

10   with Norman Choi on one specific date, March

11   2, 2021.

12              So our understanding in looking at

13   this document is that this is every chat that

14   you had with Mr. Choi on that date.  All

15   right?

16        A.    Okay.

17        Q.    Mr. Choi also produced certain

18   documents, including chats with you from that

19   same date of March 2, 2021 and so what I'm

20   asking you is if that message that I just

21   mentioned to you, Perhaps the idea is have

22   Bill front the SPAC, was not included in that

23   chat history, do you have any idea why that

24   would be?

25              MS. WIGGER:  Object to form and



Page 151

1                    D. Majcher

2        foundation.

3        A.    No, I don't have any idea why that

4   would be.

5        Q.    Do you know if Mr. Choi

6   specifically deleted text messages or

7   WhatsApp message related to the SPAC

8   transaction?

9              MS. WIGGER:  Object to form and

10        foundation.

11        A.    I wouldn't know.

12        Q.    Have you ever asked him?

13        A.    No, no reason for me to ask.

14        Q.    We continue on.  If you go to the

15   page ending in 518, you write, Then need to

16   make sure the acquisition strategy on the

17   prospectus is written in a way, what, maybe

18   you meant that, it says what, will fit DT's

19   profile without giving it a way.

20              Do you see that?

21        A.    I do.

22        Q.    What were you referring to when you

23   said the prospectus?

24        A.    The prospectus is the public

25   document that you submit when a company goes



Page 152

1                         D. Majcher

2    IPO.

3         Q.   So, for instance, in the U.S., it

4    would be the public document that you submit

5    to the Securities and Exchange Commission

6    when a company is going IPO?

7         A.   Whoever you submit it to.

8         Q.   What you are saying here is that we

9    need to, quote, make sure the acquisition

10   strategy on that document being submitted

11   with the regulators is written in a way that

12   would fit DT's profile without giving it

13   away.

14              Is that a fair summation?

15        A.   Sure.

16        Q.   Wouldn't that be some form of

17   securities fraud?

18              MS. WIGGER:   Object to form, legal

19        conclusion.

20        A.   What would be the fraud?

21        Q.   Well, you are suggesting

22   essentially that, we discussed earlier that

23   you said a SPAC transaction is supposed to be

24   arm's length, correct?

25        A.   Correct.



Page 153

                    D. Majcher
1
2        Q.    We discussed earlier that for a
3    SPAC transaction, there is not supposed to be
4    a pre-identified target.
5            MS. WIGGER:  Object to form.  Take
6        a pause.
7        A.    Yes.
8        Q.    What you are discussing here is
9    having a prospectus here filed with public
10   regulators that would essentially be
11   pre-targeting De Tomaso, quote, without
12   giving it away, right?
13           MS. WIGGER:  Object to form,
14       foundation, legal conclusion.
15       A.    That's not what I'm saying here.  I
16   at no point said the prospectus -- actually,
17   at no point I said that De Tomaso would be
18   the pre-identified target.
19       Q.    If you go now to page ending in
20   534, Mr. Choi writes you a message and says,
21   Do you have Bill's CV?  If not, can you ask
22   him to prepare one?  Then you write, I do.
23           That, again, is referring to your
24   husband, Bill Majcher, right?
25           MS. WIGGER:  Object to form.



Page 154

```
 1                    D. Majcher
 2         A.    I believe so, yes.
 3         Q.    Then if we go a little bit later,
 4    on the Bates ending in 537, it looks like you
 5    attached into the chat a copy of a document
 6    that's named Bill Majcher CV 2020.
 7               Do you see that?
 8         A.    I do.
 9         Q.    Do you recall actually sending a
10    copy of your husband's CV to Mr. Choi?
11         A.    To be honest, I don't, but if it's
12    appearing here, then I -- clearly, I did.
13         Q.    Fair enough.
14               Then on the page ending in 39, you
15    send something that is labeled Brief Bio on
16    Inspector Bill Majcher.doc.
17               Do you see that?
18         A.    I do.
19         Q.    Do you recall if that's like a Word
20    document sort of providing a biography of
21    your husband?
22         A.    It seems to be, yes.
23         Q.    Then on the page ending in 540, you
24    write, What do you envision his role to be?
25               Do you see that?
```



Page 155

```
 1                    D. Majcher
 2        A.   Yes.
 3        Q.   By that, you are referring to your
 4   husband, Bill Majcher, what his role would
 5   be?
 6        A.   Yes, I think so.
 7        Q.   Then on page 541, the top, Mr. Choi
 8   writes, I'm proud of myself knowing this
 9   national treasure.  Sounds like a good,
10   perfect candidate to be at least a board
11   member, if not CEO for the SPAC before the
12   merger.  I think realistically, if done, a
13   great profile for Bill as well.
14             Do you see that?
15        A.   I do.
16        Q.   Here again, Mr. Choi is talking
17   about your husband, Bill Majcher, right?
18             MS. WIGGER:  Object to form.
19        A.   I believe so.
20        Q.   Did you understand that he was
21   suggesting that your husband could be
22   potentially a board member, if not the CEO of
23   the SPAC before the merger?
24             MS. WIGGER:  Object to form.
25        A.   It appears to be, yeah, the message
```



Page 156

```
 1                 D. Majcher
 2   appears to mean that.
 3        Q.    On the next page, Mr. Choi writes,
 4   He is a good man and I like him a lot.
 5             Do you see that?
 6        A.    Yes.
 7        Q.    Then you write, For the SPAC board,
 8   his profile is very helpful.  He has a lot of
 9   public market experience.  He used to monitor
10   and police one in North America.  He is your
11   perfect governance guy on the board.
12             Do you see that?
13        A.    I do.
14        Q.    You can put that aside.  I will
15   show you another document.
16             (Majcher Exhibit 20, March 3, 2021
17        WhatsApp exchange between Ms. Majcher
18        and Mr. Choi, marked for
19        identification.)
20        Q.    This is Majcher 20.  Once again,
21   this is a copy of a WhatsApp exchange between
22   you and Mr. Choi on the 3rd of March of 2021
23   and I can represent to you that this document
24   comes from your custodial files, means it was
25   downloaded basically from your phone.
```



Page 157

                         D. Majcher

1                        You see that it is a chat with you
2    and Mr. Choi on the 3rd of March, right?
3         A.   I do.
4         Q.   Do you have any idea why Mr. Choi
5    wouldn't have a copy of his chat on his phone
6    or in his electronic files?
7              MS. WIGGER:  Object to form and
8              foundation.
9         A.   No, I don't have any idea why.
10        Q.   Mr. Choi writes, Morning.  In sum,
11   we have three routes; one, engage
12   banker/sponsor the traditional way,
13   matchmaking process; two, start a new SPAC;
14   three, acquire an existing SPAC, and then he
15   writes on the next page, Bill can be involved
16   in any of the three above.
17             Do you see that?
18        A.   Yes.
19        Q.   Once again, you understood this
20   reference to Bill was a reference to your
21   husband, Bill Majcher?
22             MS. WIGGER:  Object to form.
23        A.   Looking back, yes, I believe so,
24   yes.



Page 158

1                    D. Majcher

2        Q.    You can put that document aside.  I

3    will show you another document.

4              (Majcher Exhibit 21, November 9,

5        2021 chat between Ms. Majcher and Mr.

6        Choi, marked for identification.)

7        Q.    This is Majcher 21 and this is a

8    chat between you and Mr. Choi on November 9,

9    2021.

10             Do you see that?

11       A.    Yes.

12       Q.    If we go to page ending in 402, Mr.

13   Choi writes to you, We are signing the

14   revised engagement letter with Arc today and

15   soon will be more, will be full speed from

16   now.  Let me know your thoughts on supporting

17   us in this journey.

18             Do you see that?

19       A.    Yes.

20       Q.    Then you write on the next page, I

21   am honored to have been on this journey and

22   to continue on it.  I hope I will able, I

23   think you meant be able, to provide the

24   support that's necessary.  I assume my role

25   will be to assist in the audit with Moore,


MAGNA
LEGAL SERVICES

Page 159

```
 1                    D. Majcher
 2    the financial aspect of the DD process,
 3    forecast/valuation related matters, certain
 4    legal/structuring issues and being a sounding
 5    board for you to stop you from doing anything
 6    you might regret.  Anything else, question
 7    mark.
 8              Do you see that?
 9         A.   Yes.
10         Q.   Then Mr. Choi responds, Perfect, I
11    think it's a typo, it's spelled
12    P-R-E-F-E-C-T, understanding with three
13    different emojis that I will not ask you to
14    try to figure out what those mean.
15              Do you recall what this discussion
16    was about?
17         A.   I mean, reading through the
18    messages now, it appears to be Mr. Choi
19    asking me to help out with the potential
20    fundraise and SPAC.  I should say de-SPAC
21    process for which we engaged Arc to assist.
22         Q.   Did you, in fact, assist with that
23    process?
24         A.   I believe I did.
25         Q.   Did you assist in, as it's
```



Page 160

```
 1                    D. Majcher
 2  described here, the audit with Moore?
 3       A.   Yes.
 4       Q.   Did you assist with the financial
 5  aspects of the DD process?
 6            Does that mean due diligence?
 7       A.   Yes.
 8       Q.   Did you assist with the forecast
 9  and valuation related matters?
10       A.   Yes.
11       Q.   Did you assist with certain
12  legal/structuring issues?
13       A.   Yes.
14       Q.   Did De Tomaso pay you any
15  compensation for your assistance dealing with
16  those matters?
17            MS. WIGGER:  Object to form.
18       A.   I think we went over sort of this
19  topic earlier and I can't remember.
20       Q.   Going through a little bit more of
21  this document.  If you go to the bottom of
22  406, Mr. Choi writes to you, And possible
23  having Bill as the director of the SPAC for
24  his experience.
25            Do you see that?
```



Page 161

```
 1                    D. Majcher
 2      A.    Sorry, 406?
 3      Q.    Yes, 406, on the bottom, the very
 4  bottom, yeah.
 5            Do you see that?  He writes to you,
 6  And possible having Bill as a director of the
 7  SPAC for his experience.
 8      A.    I see that, yes.
 9      Q.    That's a reference, you understood
10  it again to be a reference to your husband,
11  Bill Majcher, right?
12      A.    Yes.
13      Q.    Then you write, Is there a, on the
14  next page, Is there a business plan you can
15  share with me?  And Mr. Choi responds, Yes, I
16  will ask Ryan to send you a data room link by
17  tomorrow.
18            Do you see that?
19      A.    I do.
20      Q.    And the Ryan he is referring to
21  there, you understood to be Mr. Berris?
22      A.    Yes.
23      Q.    Then you write, Maybe I should
24  catch up with Ryan to get more details,
25  right?
```



Page 162

1                    D. Majcher

2         A.    Yes.

3         Q.    And that's still Mr. Berris, right?

4         A.    Yes.

5         Q.    Then Mr. Choi writes, Sure, but he

6    is scratching his head now, getting the

7    latest newsletter out to clients.

8              Do you see that?

9         A.    Yes.

10         Q.    Then he writes, Due to technical

11    issues, right?

12         A.    Yes.

13         Q.    Then at the bottom of the page, Mr.

14    Choi says to you, I will send you the emails

15    now, re:  Capricorn.

16              Do you see that?

17         A.    Yes.

18         Q.    What is Capricorn?

19         A.    Capricorn was a supplier we were

20    using at the time.

21         Q.    A supplier that was meant to do

22    what?

23         A.    Their engagement evolved throughout

24    time.  At the time, they were engaged to

25    complete the development of the P72 and



Page 163

```
 1                    D. Majcher
 2  produce six prototypes.
 3       Q.   If you go to 410, you write, I
 4  remember one payment had already been made,
 5  right?  And Mr. Choi responds, We paid total
 6  Eur, E-U-R, 1-M.
 7            Do you see that?
 8       A.   Yes.
 9       Q.   You understood that to mean that
10  Mr. Choi was talking about that De Tomaso had
11  paid Capricorn a total of 1 million Euros by
12  this point, right?
13            MS. WIGGER:  Object to form.
14       Q.   You can feel free to flip back.
15       A.   I understand he was paying someone
16  1 million Euros.
17       Q.   Just to the best of your
18  recollection.
19            MS. WIGGER:  Take your time look
20       through it.
21       A.   Going by these messages, I would
22  say yes.
23       Q.   Yes, that's a reference to a
24  payment to Capricorn?
25            MS. WIGGER:  Object to form.
```



Page 164

```
 1                  D. Majcher
 2       A.    Yes.
 3       Q.    Then after, Mr. Choi writes, We
 4  paid total Eur 1-M, he then writes 500-K from
 5  DTCT.
 6             Do you see that?
 7       A.    Yes.
 8       Q.    Then you write on the top of the
 9  next page, An agreement was never signed,
10  question mark, and then Mr. Choi responds,
11  Not signed yet, but we will get it done.
12             Do you see that?
13       A.    Yes.
14       Q.    This is a reference to the fact
15  that at the time that this 1 million Euro
16  payment was made to Capricorn, there was not
17  yet a signed agreement between De Tomaso and
18  Capricorn, right?
19             MS. WIGGER:  Object to form.
20       A.    It appears that way.
21       Q.    Is that consistent with your
22  recollection?
23       A.    This was November, yes, I believe
24  that's correct.
25       Q.    Who at De Tomaso authorized paying
```



Page 165

```
 1                    D. Majcher
 2   Capricorn 1 million Euros without a written
 3   agreement or a signed agreement?
 4            MS. WIGGER:  Object to form.
 5        A.   Payments are typically only
 6   authorized by Mr. Choi, but I also see from
 7   here that it says 500-K from DTCT and that
 8   bank account was operated by Mr. Berris only.
 9        Q.   Do you have a specific recollection
10   as to whether it was Mr. Choi that authorized
11   this 1 million Euro payment to Capricorn?
12            MS. WIGGER:  Object to form, asked
13        and answered.
14        A.   No, not specific recollection.
15        Q.   Then further down on the page, you
16   write, Do you have a CFO candidate in mind?
17            Do you see that?
18        A.   I do.
19        Q.   What were you asking by asking, do
20   you have a CFO candidate in mind?
21        A.   I can't remember at this point.
22        Q.   Were you referring to a CFO
23   candidate for De Tomaso?
24        A.   I believe so.
25        Q.   Because there wasn't technically a
```



Page 166

1                    D. Majcher

2    CFO at De Tomaso at that time, right?

3              MS. WIGGER:  Object to form.

4        A.    Not anyone sort of holding the

5    title there, correct.

6        Q.    Then Mr. Choi writes, Samuel is

7    asking for it, but I was waiting to

8    see/assess, but he writes access,

9    A-C-C-E-S-S, the situation.

10             Do you see that?

11       A.    I do.

12       Q.    Then you write, You need one,

13   right?

14       A.    Yes.

15       Q.    Then Mr. Choi writes, Asking to

16   become the CFO, he is correcting his typo.

17             Do you see that?

18       A.    Yes.

19       Q.    Who did you understand the Samuel

20   that Mr. Choi was referring to there to be?

21             MS. WIGGER:  Object to form.

22       A.    Like I said earlier, I only know

23   one Samuel.

24       Q.    That does help things.

25       A.    Samuel Lui.



1                    D. Majcher

2       Q.    Your recollection is it was Samuel

3  Lui?

4             MS. WIGGER:  Object to form.

5       Q.    This is Mr. Choi asking -- saying

6  that Samuel was asking to be the CFO of De

7  Tomaso, right?

8       A.    Yes.

9       Q.    You wrote, You need one, meaning, a

10  CFO, right?

11       A.    Yes.

12       Q.    Because you thought the company

13  needed a CFO?

14       A.    Yes.

15       Q.    Then Norman Choi wrote at the

16  bottom of the page, I think 412, Let's do

17  this assignment first and see how you feel,

18  then decide.

19             Do you see that?

20       A.    I do.

21       Q.    What did you understand him to mean

22  by that?

23             MS. WIGGER:  Object to form.

24       Q.    If it's helpful, we can go through

25  the next text as well where it says, Oh, I



Page 168

```
 1                    D. Majcher
 2   didn't mean -- you write, Oh, I didn't mean
 3   it should be me necessarily, just pointing
 4   out it's important to have one.  Will save
 5   you a lot of headache to have a good CFO.
 6             Do you see that?
 7        A.   Yes.
 8        Q.   Mr. Choi writes, No doubt.  Also
 9   depends on if you feel comfortable.
10             Do you see that?
11        A.   Yes.
12        Q.   So basically, what you are talking
13   about here is who Mr. Choi should pick to be
14   the CFO of De Tomaso, right?
15             MS. WIGGER:  Object to form.
16        A.   No, I don't think we were
17   discussing who should become the CFO.  I
18   think we are just discussing having a CFO.
19        Q.   You can put that aside.  I will
20   show you another document.
21             (Majcher Exhibit 22, November 14,
22             2021 WhatsApp exchange between Ms.
23             Majcher and Mr. Choi, marked for
24             identification.)
25        Q.   This is Majcher 22 and this is a
```



Page 169

                    D. Majcher

1                   D. Majcher

2   WhatsApp exchange between you and Mr. Choi

3   dated November 14, 2021, correct?

4        A.    Correct.

5        Q.    Do you see here at the top, Mr.

6   Choi says, I asked Neil to review Gemini's

7   agreement and email.  He will revert later

8   today.  Then he writes, Samuel and his

9   partner has a SPAC about to get listed early

10  December.  He asked if I was interested to be

11  one of the funders, total 4 million risk

12  capital.

13            Do you see that?

14       A.    I do.

15       Q.    Then he writes, With that, DD

16  valuation and timing would be much easier to

17  control.  Arc would carry on the same role as

18  now.  His SPAC is proposed to raise 75-M with

19  over allotment of 15 percent.  I asked him to

20  prepare another set of dilution table,

21  assuming I or friends take up one fourth of

22  the risk capital.

23            Then you write, And use the SPAC

24  for DT, question mark, and then Mr. Choi

25  writes, Yes.



Page 170

```
 1                     D. Majcher
 2          Do you see that?
 3     A.    I do.
 4     Q.    As we established earlier, the
 5  Samuel that you understand Mr. Choi to be
 6  referring to is Samuel Lui, right?
 7          MS. WIGGER:  Object to form.
 8     A.    Yes.
 9     Q.    So what Mr. Choi is talking about
10  is that Sam Lui and a partner of his, in
11  November of 2021, have a SPAC that they
12  expect is about to get listed in early
13  December, right?
14          MS. WIGGER:  Object to form.
15     A.    It reads that way, yes.
16     Q.    And Mr. Choi says Mr. Lui asked if
17  he was interested in being one of the funders
18  of that SPAC, right?
19          MS. WIGGER:  Object to form.
20     A.    That's what the message reads, yes.
21     Q.    Then Mr. Choi says, With that DD.
22          To your understanding, that means
23  due diligence?
24     A.    Typically, that's what it stands
25  for.
```



Page 171

 1                        D. Majcher

 2          Q.    Valuation and timing would be much

 3    easier to control.

 4                Do you see that?

 5          A.    Yes.

 6          Q.    What did you understand Mr. Choi to

 7    mean by that?

 8          A.    Are you asking me to remember back

 9    in time?

10          Q.    When you read the words on the page

11    then or now, what was your understanding of

12    what he meant by that?

13                MS. WIGGER:  Object to form.

14          A.    What it says there.

15          Q.    I understand you are saying

16    basically it says what it says on the piece

17    of paper.  You understand him meaning to say

18    that if he was interested -- if he was one of

19    the funders of the SPAC, that the due

20    diligence process and the valuation process

21    and the timing would be easier to control?

22                MS. WIGGER:  Object to form.  The

23          document speaks for itself.

24          A.    Yes, that's what it says.

25          Q.    And that's what you understood it



Page 172

```
 1                    D. Majcher
 2    to mean?
 3              MS. WIGGER:  Object to form.
 4         A.   I believe at the time, yes.
 5         Q.   And when he says, and use the SPAC
 6    for -- when you say, And use the SPAC for DT
 7    and he says yes, what you are asking is that
 8    this SPAC would then acquire De Tomaso,
 9    right?
10              MS. WIGGER:  Object to form.
11         A.   Use the SPAC for DT, potentially,
12    this would be SPAC that we would use to raise
13    money.
14         Q.   To essentially acquire De Tomaso,
15    correct?
16              MS. WIGGER:  Object to form.
17         A.   However the transaction would be
18    structured, yes.
19         Q.   But setting aside however the
20    specifics of the transaction would be
21    structured, what he is talking about is
22    working with Mr. Lui who he clearly knew to
23    pre-identify De Tomaso as a target for a
24    SPAC, right?
25              MS. WIGGER:  Object to form,
```



Page 173

```
 1                    D. Majcher
 2        foundation, mischaracterizes the
 3        document.
 4        A.    I mean, it says -- this is an idea
 5   to work on a SPAC, what I take it to be.
 6        Q.    The specific idea was
 7   potentially -- I understand it never came to
 8   fruition, but potentially that Mr. Lui and
 9   his SPAC and maybe Mr. Choi as a funder of
10   that SPAC would use that SPAC to acquire De
11   Tomaso?
12             MS. WIGGER:  Object to form,
13        foundation.
14        A.    Potentially to acquire De Tomaso,
15   but -- yes.
16        Q.    Did you understand that to be
17   consistent with the regulations surrounding
18   SPACs?
19             MS. WIGGER:  Object to form,
20        foundation.
21        A.    I don't understand what you mean by
22   that.
23        Q.    Earlier we went through a document
24   where you said that it was not permissible
25   for a SPAC to have a pre-identified target,
```



Page 174

```
 1                  D. Majcher
 2   right?
 3           MS. WIGGER:  Object to form.
 4       A.   That's how I understand it to be,
 5   yes.
 6       Q.   You would agree with me that what
 7   is being described here is the potential
 8   situation where there is a pre-identified
 9   target of a SPAC, right?
10           MS. WIGGER:  Object to form.
11       A.   I don't know, I disagree.  Just
12   because a SPAC or its principals may have
13   known a company preexisting to the SPAC
14   doesn't necessarily mean the target has been
15   pre-identified, right?
16           I mean, when you form a SPAC, you
17   know that you are going to go out and acquire
18   certain companies because the prospectus
19   would require you to at least narrow down the
20   industries that you are going to seek
21   targets.
22           So does that mean that you have
23   pre-identified every company that will fit
24   into the industry, I think that's a stretch
25   so, no.
```



Page 175

```
 1                    D. Majcher
 2        Q.   But are you aware of whether it's
 3  permissible for someone who has an ownership
 4  interest or contributes to the risk capital
 5  of a SPAC to then go out and acquire their
 6  own company that they own themselves?
 7             MS. WIGGER:  Object to form, legal
 8        conclusion.
 9        A.   I'm not a financial expert.  I
10  don't know.
11        Q.   Did you ever express any concerns
12  to Mr. Choi about this scenario whereby he
13  would be an investor in the SPAC and also
14  purchasing his own company?
15             MS. WIGGER:  Object to form,
16        foundation.
17        A.   I can't recall.  I don't think I
18  did here, but I don't recall.
19        Q.   Do you know if Mr. Choi was one of
20  the funders of the risk capital for Samuel's
21  SPAC?
22             MS. WIGGER:  Object to form.
23        A.   I don't know.
24        Q.   Have you ever asked him?
25             MS. WIGGER:  Object to form.
```



Page 176

```
 1                    D. Majcher
 2       A.    I believe I have.
 3       Q.    What did he say?
 4       A.    He said no.
 5       Q.    Did you believe him?
 6       A.    I have no reason to not believe
 7  him.
 8       Q.    You can put that document aside.
 9             Now, during this period of time,
10  you started -- I guess I should back up.
11             When did you first meet an
12  individual named Samuel Lui?
13       A.    I actually can't remember the
14  specific time.
15       Q.    Roughly like a year, was it 2021?
16       A.    It seems like it would be before
17  this because that's the only Samuel I know,
18  so probably fair to say sometime in '21, but
19  it's fuzzy.
20       Q.    When did you first meet him or do
21  you recall the circumstances under which you
22  first met him?
23       A.    I think he was introduced to me by
24  Mr. Choi as someone who could assist in
25  putting our forecast numbers in a more
```



Page 177

```
 1                    D. Majcher
 2  professional -- more presentable way.
 3        Q.   Did you understand who Mr. Lui
 4  worked for at the time?
 5        A.   I don't think I asked.
 6        Q.   Did you know just what he did as an
 7  occupation?
 8        A.   At the time?
 9        Q.   Yeah.
10        A.   I don't think so.
11        Q.   Have you subsequently learned what
12  his occupation is or background is?
13        A.   Yeah, I learned he was a trained
14  accountant by background.  He worked for a
15  number of prominent investment banks and as I
16  recall, I understood him to be doing a lot of
17  advisory work for different companies.
18        Q.   When you say I think he was
19  introduced to me by Mr. Choi as someone who
20  could assist in putting our forecast numbers
21  in a more professional, presentable way, are
22  you referring to doing that in the context of
23  a SPAC or just generally?
24        A.   I think just generally.
25        Q.   Did Mr. Lui help do that?
```



Page 178

```
 1                    D. Majcher
 2        A.   Yeah, I remember having some
 3   discussions with Samuel on how to do the
 4   spreadsheet and his Excel skills are a lot
 5   more proficient than mine.
 6        Q.   I'm sure they're much more
 7   proficient than mine as well.
 8             So during this period of time, he
 9   was assisting De Tomaso in working with some
10   of its financial modeling?
11        A.   That's fair to say, yes.
12        Q.   Was he employed by De Tomaso at
13   this time in a formal capacity?
14        A.   No.
15        Q.   So why was he doing work for De
16   Tomaso?
17             MS. WIGGER:  Object to form.
18        A.   I shouldn't assume.
19        Q.   Don't assume.  Do you know why he
20   was doing work for De Tomaso at this period
21   of time?
22        A.   If I can't assume, then no.
23        Q.   If you don't know, you don't know.
24   That's totally fine.
25             Did you ever ask Mr. Choi why Mr.
```



Page 179

                        D. Majcher
1
2    Lui was now helping out with some of the
3    financial modeling at De Tomaso?
4         A.   I don't know if I ever asked him
5    that.
6         Q.   Do you know if Mr. Lui was paid by
7    Mr. Choi or De Tomaso for this work that he
8    was doing?
9         A.   Not by De Tomaso that I know.  I
10   don't know if he had any arrangements with
11   Mr. Choi.
12        Q.   Do you know why he would have been
13   doing this work for free?  Can you imagine
14   that he would have with been doing this work
15   for free?
16             MS. WIGGER:  Object to form.
17        A.   I mean, that would be assuming that
18   he did it for free, but I don't know, no.
19        Q.   Do you know a lot of people that
20   like to do financial modeling without getting
21   paid for it?
22             MS. WIGGER:  Object to form.
23        A.   I don't know anyone in particular.
24        Q.   Me either.
25             You said you met Mr. Lui through



Page 180

```
 1                    D. Majcher
 2   Mr. Choi initially.
 3              Was that in person or like over
 4   email?
 5        A.   I don't think it was in person.
 6        Q.   So was it then over email or a
 7   phone call?
 8        A.   Yeah, it could be a phone call.
 9        Q.   Do you recall anything about that
10   first conversation?
11              MS. WIGGER:  Object to form.
12        A.   No, not specific content of the
13   phone call.
14        Q.   There did come a time when you were
15   involved in email correspondence with Mr.
16   Lui, right?
17        A.   I believe so, yeah.
18        Q.   Do you remember roughly when that
19   was?
20        A.   No.
21        Q.   Was it, say, sometime in 2021?
22              MS. WIGGER:  Object to form.
23        A.   It could be.
24        Q.   We will get to the document.  It's
25   not a memory test.  I probably wouldn't
```



Page 181

```
 1                    D. Majcher
 2    necessarily remember either.
 3              We will show you a document.
 4              (Majcher Exhibit 23, email from
 5         normansfchoi@gmail.com to Ms. Majcher
 6         and Mr. Berris on November 14, 2021,
 7         marked for identification.)
 8         Q.    This is Majcher 23.  Ms. Majcher,
 9    Majcher 23 is an email that Norman Choi, from
10    his normansfchoi@gmail.com account, sent to
11    you and to Mr. Berris on the 14th of November
12    2021.
13              Do you see that?
14         A.    I do.
15         Q.    He is forwarding you a message from
16    an individual with an email address
17    H-I-N-W-E-N-G at Gmail.com.
18              Do you see that?
19         A.    I do.
20         Q.    That message was sent I guess
21    earlier that same day to Norman Choi at that
22    same Gmail address.
23              Do you see that?
24         A.    Yes.
25         Q.    Do you know who uses that email
```



Page 182

1                  D. Majcher
2    address hinweng@gmail.com?
3         A.   I do now.
4         Q.   Who is that?
5         A.   Samuel.
6         Q.   In this email, Samuel writes,
7    Latest dilution table with the following
8    assumptions changed from the previous
9    version.  A, warrants a bit amended from half
10   in previous version to three quarters in this
11   version to be consistent with the expected
12   terms of our SPAC.
13              Do you see that?
14        A.   I do.
15        Q.   Then B, he says, SPAC size is
16   changed to, dollar sign, 75-M, again, to be
17   consistent with the expected terms of our
18   SPAC.
19              Do you see that?
20        A.   Yes.
21        Q.   Then he writes, Assuming, dollar
22   sign, 1 VLN, I'm assuming that means
23   valuation, your shares till, I think he might
24   have meant will, be diluted to 84.3 percent.
25              Do you see that?



Page 183

```
 1                    D. Majcher
 2        A.    Yes.
 3        Q.    Then he writes, For, dollar sign,
 4   75-M SPAC, the total risk capital for our
 5   SPAC will be, dollar sign, 4 million.
 6              Do you see that?
 7        A.    Yes.
 8        Q.    That's consistent with the earlier
 9   message you saw from Mr. Choi talking about
10   Samuel asking him to invest in the risk
11   capital of the SPAC where the total list
12   capital was $4 million, right?
13              MS. WIGGER:  Object to form.
14        A.    That message refers to risk capital
15   4 million and here, there is the same
16   reference.  Whether they are talking about
17   the same SPAC, I don't know.  This message
18   was not sent to me.
19        Q.    It wasn't sent to you originally,
20   but then Mr. Choi did forward it to you later
21   that day, right?
22        A.    But it was not written to me.  I
23   was not in that discussion.
24        Q.    Do you know why Mr. Choi was
25   forwarding you this email?
```



Page 184

1                    D. Majcher

2            MS. WIGGER:  Object to form.

3       A.    I don't know.  He forwards me a lot

4  of emails and sitting here today, I actually

5  don't know if I read this email when it came

6  to me, but to answer your question, no, I

7  don't know why he forwarded it to me.

8       Q.    I appreciate that.  We get too many

9  emails.

10           Do you know -- I'm going to show

11  you another document.

12           (Majcher Exhibit 24, November 15,

13           2021 WhatsApp exchange between Ms.

14           Majcher and Mr. Choi, marked for

15           identification.)

16       Q.    This is Majcher 24.  Ms. Majcher,

17  this is a WhatsApp exchange between you and

18  Mr. Choi on the 17th of November 2021, right?

19       A.    Yes.

20       Q.    So this is coming three days after

21  that email exchange we just looked at in the

22  previous exhibit, right?

23       A.    Yes.

24       Q.    And you see that in the second

25  message, Mr. Choi inserts or sends you what



Page 185

```
 1                    D. Majcher
 2    appears to be a document called Genesis
 3    Unicorn Capital Management Team.
 4            Do you see that?
 5    A.    Yes.
 6    Q.    Then there is a link to an SEC
 7    filing and then there is a message that says,
 8    This was the last public filing before we
 9    took it over.  We are targeting to refile by
10    this week with details of the new MGT, I
11    think that means management team, and board
12    members.
13            Do you see that?
14    A.    Yes.
15    Q.    Did you have an understanding of
16    what Genesis Unicorn was at the time?
17            MS. WIGGER:  Object to form.
18    A.    At the time, probably not, and I
19    don't even know if I clicked on the link.
20    Q.    Do you know why Mr. Choi would have
21    been sending you the public filings for
22    Genesis Unicorn on November 17, 2021?
23            MS. WIGGER:  Object to form.
24    A.    I can't speculate.
25    Q.    Did you ever ask why he was sending
```



Page 186

```
 1                    D. Majcher
 2   you the public filings for Genesis Unicorn in
 3   November 2021?
 4         A.    Did I?
 5         Q.    Yes.
 6         A.    I don't recall.
 7         Q.    Fair enough.  You can page through.
 8         A.    It doesn't look like I asked him.
 9         Q.    Did you have an understanding that
10   Genesis Unicorn was associated with Samuel
11   Lui at this point in time?
12              MS. WIGGER:  Object to form.
13         A.    I can't recall.
14         Q.    Did there come a time when you
15   realized that Mr. Lui was associated with
16   Genesis Unicorn?
17         A.    I believe eventually, yes.
18         Q.    Roughly when did you learn that?
19         A.    I cannot recall.
20         Q.    Was it before Genesis Unicorn
21   started doing the due diligence process for a
22   potential SPAC with De Tomaso?
23         A.    It could be, but I don't remember.
24         Q.    Mr. Lui was actually, at one point,
25   the president of Genesis Unicorn, right?
```



Page 187

```
 1                    D. Majcher
 2        A.    I believe so.
 3        Q.    And at a later point in time, he
 4   started corresponding with you and others at
 5   De Tomaso using his Genesis Unicorn email
 6   address, right?
 7        A.    Yes.
 8        Q.    So is it fair to say that by that
 9   point, you knew he was associated with
10   Genesis Unicorn?
11        A.    Yeah, definitely.
12        Q.    Put that aside.  Let me show you
13   another document.
14             (Majcher Exhibit 25, email from
15             tackisfat@gmail.com to
16             diana.majcher@gmail.com with a copy to
17             Norman Choi at normansfchoi@gmail.com
18             dated March 11, 2022, marked for
19             identification.)
20        Q.    This is Majcher 25.  Ms. Majcher,
21   this is an email from an email address that
22   says tackisfat@gmail.com to
23   diana.majcher@gmail.com with a copy to Norman
24   Choi at the email address
25   normansfchoi@gmail.com dated March 11, 2022.
```


MAGNA
LEGAL SERVICES

Page 188

```
 1                    D. Majcher
 2           Do you see that?
 3      A.   Yes.
 4      Q.   Who controls the
 5  tackisfat@gmail.com email address?
 6           MS. WIGGER:  Object to form.
 7      A.   I don't know who controls it.
 8      Q.   Who sends emails from that account,
 9  to your understanding?
10      A.   To my understanding, this would
11  have come from Samuel.
12      Q.   And Samuel, meaning, Samuel Lui?
13      A.   Correct.
14      Q.   He wrote to you and to Mr. Choi, I
15  don't have Ryan's personal email so I did not
16  cc him into this email.
17           Do you see that?
18      A.   Yes.
19      Q.   Do you have any understanding of
20  why he wouldn't have copied Ryan into the
21  email because he didn't have his personal
22  email?
23           MS. WIGGER:  Object to form.
24      A.   I didn't send this email.
25      Q.   I understand that, but --
```



Page 189

                    D. Majcher
1
2       A.    No, I don't know.
3       Q.    You never asked Mr. Lui why are you
4    sending this to my personal email not to my
5    De Tomaso email?
6       A.    I don't recall if we had this
7    conversation.
8       Q.    Did you notice a pattern that Mr.
9    Lui would email you only from his Gmail email
10   to your Gmail email?
11           MS. WIGGER:  Object to form.
12      A.    What do you mean by pattern?
13      Q.    It would happen on more than one
14   occasion.
15           MS. WIGGER:  Object to form.
16      A.    So you meant that is the question
17   that he has sent emails to my personal email
18   from this email address, from tackisfat@gmail
19   more than once?
20      Q.    Or any other Gmail personal email
21   account more than once.
22      A.    I believe I received more than one
23   email, yes.
24      Q.    You have no understanding of why he
25   was sending things to your personal Gmail



Page 190

```
 1                    D. Majcher
 2   account rather than your work account?
 3             MS. WIGGER:  Object to form.
 4        A.   I have no understanding.  I mean,
 5   is the understanding just from my own
 6   understanding or that I discussed with him
 7   why he was doing it?
 8        Q.   Yeah, either.  I mean, do you have
 9   an understanding based on a discussion with
10   him or otherwise?
11        A.   I understand it to be him taking
12   this -- helping us clean up the financial
13   forecast in his personal capacity, so that's
14   why he is using personal email addresses to
15   conduct the correspondence.
16        Q.   So he may have been doing this in
17   what you referred to in his personal
18   capacity, but he was doing the work for De
19   Tomaso in its corporate capacity, right?
20             MS. WIGGER:  Object to form.
21        A.   I don't know if he is doing this
22   for De Tomaso in its corporate capacity or he
23   may be helping Mr. Choi out because he is a
24   friend so I cannot speak to that.
25        Q.   Do you often get work-related
```



Page 191

```
 1                    D. Majcher
 2   emails sent to your Gmail account?
 3        A.    Not often.
 4        Q.    Because most people don't like
 5   getting work-related emails sent to their
 6   Gmail account, right?
 7             Did you of ask Mr. Lui to make sure
 8   he sends you these emails to your work
 9   account?
10        A.    I don't recall.
11        Q.    Did you forward the emails that you
12   received to Gmail account to your work email
13   account just to make sure you had them in
14   your work email?
15        A.    I don't recall.
16        Q.    Is it possible that Mr. Lui told
17   you that you should always use Gmail account
18   because there was a concern about the
19   pre-identification of the target of the SPAC?
20             MS. WIGGER:   Object to form and
21        foundation.
22        A.    I don't recall.
23        Q.    You have no recollection one way or
24   the other about Mr. Lui saying, let's make
25   sure we keep this on personal emails because
```



Page 192

1                    D. Majcher
2    I don't want there to be like a corporate
3    paper trail of this?
4             MS. WIGGER:  Object to form and
5         foundation, asked and answered.
6         A.    Not in those words, no.
7         Q.    Do you recall him saying that in
8    some other type of words?
9             MS. WIGGER:  Object to form.
10        A.    No, I don't recall.
11        Q.    You don't recall, but that doesn't
12   mean he didn't say it to you, right?
13            MS. WIGGER:  Object to form, asked
14        and answered.
15        A.    You are trying to get me to guess
16   words that people had said that I don't
17   remember.
18        Q.    I don't want you to guess words.
19        A.    But anything is possible, but if I
20   don't remember, then I can't guess what he
21   had said or he had not said.
22        Q.    Anything is possible, but we are
23   talking about email from about two years ago
24   and a situation where if someone told me, you
25   know, let's make sure to keep this on



Page 193

```
 1                    D. Majcher
 2    personal email, I would have a recollection
 3    of that kind of conversation, but your
 4    recollection is you don't have a conversation
 5    one way or another about having that
 6    conversation with Mr. Lui?
 7              MS. WIGGER:  Object to form,
 8         mischaracterizes testimony.
 9         A.   No.
10         Q.   I will show you another document.
11              (Majcher Exhibit 26, June 9, 2022
12         email to Ms. Majcher copying Mr. Choi
13         from tackisfat@gmail, marked for
14         identification.)
15         Q.   This is Majcher 26 and Majcher 26
16    is a June 9, 2022 email to you at your Gmail
17    account copying Mr. Choi at his Gmail account
18    from that same Tack Is Fat Gmail address.
19              Do you see that?
20         A.   I do.
21         Q.   Once again, this is an email from
22    Mr. Samuel Lui, right?
23         A.   I believe so, yes.
24         Q.   In June of 2022, he is still
25    emailing you and Mr. Choi at your personal
```



Page 194

```
 1                    D. Majcher
 2   emails, right?
 3        A.    That's what it shows here, yes.
 4        Q.    At this point in time, De Tomaso
 5   had already -- there was already a due
 6   diligence process underway between De Tomaso
 7   and Genesis Unicorn, the SPAC of which Mr.
 8   Lui was the president, right?
 9        A.    To my recollection, yes.
10        Q.    So why was he emailing you to your
11   personal emails and not to your De Tomaso
12   emails?
13             MS. WIGGER:  Object to form.
14        A.    I don't know, he sends it, so I
15   don't know.
16        Q.    Were you surprised to receive an
17   email once again to your personal email when
18   you have been interacting with him in his
19   professional capacity through his Genesis
20   Unicorn email?
21             I'm just trying to get to the
22   bottom of why would he be sending something
23   to you when he has been working at Genesis
24   Unicorn, sending you emails to your De Tomaso
25   email in that capacity, but here, he is only
```



Page 195

```
 1                   D. Majcher
 2   sending you emails through his Gmail.
 3            Do you have any understanding why
 4   that would be?
 5            MS. WIGGER:  Object to form.
 6            You can answer if you know.
 7       A.   I don't know, but as I said
 8   earlier, my understanding is he is helping us
 9   with the financial model in a personal
10   capacity so that may be why he is sending it
11   from his personal email.
12       Q.   You mentioned earlier that your
13   understanding of what a SPAC transaction is
14   supposed to be is that it's an arm's length
15   transaction, right?
16       A.   Yes.
17       Q.   So not between any sort of related
18   parties, right?
19       A.   Right.
20       Q.   Is it consistent with your
21   definition of an arm's length transaction for
22   the president of the SPAC to be providing
23   help to the target of the SPAC in his, quote,
24   personal capacity?
25            MS. WIGGER:  Object to form.
```



Page 196

                    D. Majcher

1

2      A.    I don't know enough about the rules

3   and the regulations so I can't speak to that.

4      Q.    But just using sort of common

5   sense, does that ring any bells to you?

6          MS. WIGGER:  Object to form, asked

7       and answered.

8      A.    I don't think that there is

9   anything wrong with him helping out when,

10  ultimately, the decision of the SPAC will be

11  made by the shareholders and the board of

12  directors, so...

13     Q.    Do you know if Mr. Lui was one of

14  the shareholders in Genesis Unicorn?

15     A.    I don't know one way or another.

16     Q.    Going forward, if you were to work

17  on another SPAC deal, would you feel

18  comfortable interacting with someone who

19  worked for that SPAC in their personal

20  capacity advising you on the terms of the

21  SPAC?

22         MS. WIGGER:  Object to form,

23      foundation.

24     A.    Sorry, can you repeat that question

25  again?



Page 197

D. Majcher

1
2    Q.    Based on your past experience
3    interacting with Mr. Lui and Genesis Unicorn
4    where he was both the president of Genesis
5    Unicorn and also providing apparently
6    assistance to De Tomaso in his personal
7    capacity, would you feel comfortable engaging
8    in that type of relationship again?
9              MS. WIGGER:  Object to form,
10          misstates testimony.
11   A.    In that type of relationship again?
12   Q.    Yes.  Where there is somebody
13   basically working both sides, where they are
14   both representing the SPAC, but also helping
15   out you guys as the target company.
16             MS. WIGGER:  Object to form,
17          foundation, misstates testimony.
18             You can answer again.
19   A.    I think after this saga that we are
20   experiencing right now, I would say no.
21   Q.    You can put that aside.
22             Did the SPAC or de-SPAC transaction
23   or proposed transaction between Genesis and
24   De Tomaso ever close?
25   A.    Can you just repeat the question?



Page 198

1                      D. Majcher

2        Q.    Did the transaction, the SPAC or

3   de-SPAC, however you want to refer to it,

4   transaction between De Tomaso and Genesis

5   Unicorn ever close?

6        A.    No.

7        Q.    Why not?

8              MS. WIGGER:  Object to form.

9        A.    Because we didn't proceed.

10       Q.    Why didn't you proceed?

11             MS. WIGGER:  Object to form.

12       A.    Why didn't --

13       Q.    Why didn't De Tomaso -- was it that

14   De Tomaso backed out of the deal or that

15   Genesis Unicorn backed out of the deal?

16             I'm trying to understand, if you

17   can walk me through what happened that the

18   deal fell apart.

19             MS. WIGGER:  Object to form.

20             You can answer in your personal

21        capacity if you know.

22       Q.    In your personal capacity.

23       A.    My understanding is that Mr. Choi

24   didn't feel comfortable with the market

25   conditions at the time and he did not want to



```
 1                    D. Majcher
 2  proceed.
 3       Q.    You were still going through the
 4  diligence process of the SPAC at the time
 5  that Mr. Berris left De Tomaso, is that
 6  right?
 7       A.    I think so.
 8       Q.    Because I think we saw this email
 9  from June of 2022 that's after Mr. Berris had
10  left the company, right?
11       A.    Yes.
12       Q.    Did anyone from Genesis raise any
13  concerns about the departure of the De Tomaso
14  CEO in the middle of the SPAC process?
15            MS. WIGGER:   Object to form.
16       A.    Not to me -- not to my knowledge.
17       Q.    So you were not involved in any
18  discussions with anyone from Genesis about
19  what happened to Mr. Berris, your CEO?
20       A.    No.
21       Q.    You were involved generally in the
22  due diligence discussions, right?
23       A.    Yes.
24       Q.    And those happened pretty regularly
25  throughout that period, right?
```



Page 200

1                     D. Majcher
2        A.    Yeah, like -- yeah.
3        Q.    To your recollection, not during
4   none of those discussions did it ever come up
5   that the De Tomaso's CEO had left the
6   company?
7        A.    To the best of my recollection, no.
8        Q.    So you don't recall having any
9   discussions where you told the folks at
10  Genesis Unicorn that the CEO had left the
11  company?
12       A.    I think a lot of the discussions
13  between Genesis and De Tomaso was handled by
14  Mr. Choi.  I was on more the granular,
15  hands-on stuff.
16       Q.    Fair enough.
17             Your understanding is that the
18  direct discussions between Genesis Unicorn
19  the SPAC and De Tomaso, the company, were
20  handled by Mr. Norman Choi?
21       A.    Yes.
22       Q.    I want to show you another
23  document.
24             (Majcher Exhibit 27, chat between
25       Mr. Samuel Lee and Norman Choi dated



Page 201

```
 1                    D. Majcher
 2          July 31, 2023, marked for
 3          identification.)
 4          Q.    This is Majcher 27.  Ms. Majcher,
 5     you are not copied on this document and I
 6     acknowledge that.
 7               I will ask you if you have seen
 8     this before?
 9               It's a chat between Mr. Samuel Lui
10     and Norman Choi dated July 31, 2023.
11               Do you see that?
12          A.    Yes.
13          Q.    Feel free to just read through the
14     whole message.
15          A.    Okay.
16          Q.    Have you ever seen this document
17     before?
18          A.    I saw it yesterday.
19          Q.    Did you?  That's helpful.  That
20     helps short circuit some of the questioning.
21               The message from Mr. Lui to Mr.
22     Choi at the top says, Norman, Can I trouble
23     you to get Diana to settle these two invoices
24     by today or tomorrow please?  I need the cash
25     in order to settle some of the SPAC closing
```



Page 202

1                    D. Majcher

2    fees.  Thanks.

3             Do you see that?

4        A.   Yes.

5        Q.   Then Mr. Lui attaches an invoice,

6    then it says something, something, U.S.

7    $75,000.PDF.

8             Do you see that?

9        A.   Yes.

10       Q.   Then about -- this is at 5:36 and

11   at 6:23, so less than an hour later, Mr. Choi

12   writes, Processed.

13            Do you see that?

14       A.   Yes.

15       Q.   Then Mr. Lui writes, Thanks.

16            Do you recall processing these

17   invoices for Samuel Lui?

18       A.   Specifically recall processing

19   them, no.

20       Q.   But you have no reason to doubt

21   that you did process these invoices for Mr.

22   Lui, right?

23            MS. WIGGER:  Object to form.

24       A.   No, no reason to doubt.

25       Q.   Do you recall that Mr. Lui did



Page 203

```
 1                    D. Majcher
 2  submit invoices to De Tomaso in order to,
 3  quote, settle some of the SPAC closing fees?
 4            MS. WIGGER:  Object to form.
 5       A.   No, and I don't believe that these
 6  invoices -- there are two invoices here
 7  actually.  There is one for 45,000 and one
 8  for 75.
 9       Q.   Yes, that's right.  That's fair,
10  yes.
11       A.   So these invoices -- I think his
12  message is that he needs cash to settle some
13  of the SPAC closing fees, whatever that
14  means.  His invoices to us are not for the
15  SPAC closing fees.
16       Q.   What were his invoices to you for?
17            MS. WIGGER:  Object to form.
18       A.   The invoices are for him helping us
19  raise capital.
20       Q.   In what capacity?
21       A.   In an advisory capacity.
22       Q.   When did Mr. Lui start working for
23  De Tomaso in an advisory capacity?
24       A.   His official employment contract
25  was signed sometime in September of 2023, but
```



Page 204

```
 1                    D. Majcher
 2  -- yeah.
 3        Q.    This was in July of 2023, right?
 4        A.    Yes, and he had a standalone
 5  advisory.  I can't remember what the contract
 6  was actually called, but it was essentially a
 7  finder's fee arrangement where he would get a
 8  finder's fee for helping the company raise
 9  money.
10        Q.    He had a written finder's fee
11  arrangement with De Tomaso?
12        A.    His company did, yes.
13            MR. SIMONS:  I don't believe that
14        document has been produced so that's
15        certainly responsive to our request.
16            MS. WIGGER:  We will look into
17        that.
18        Q.    Do you recall when that document
19  was executed?
20        A.    No.
21        Q.    Do you recall if it was before the
22  date of this WhatsApp message of July 31,
23  2023?
24        A.    I believe it was, but I don't
25  remember.
```



Page 205

1                    D. Majcher

2        Q.    Do you recall what the terms of

3    that purported finder's fee arrangement were?

4        A.    I just remember it would be 3

5    percent finder's fee on any money that -- on

6    money that investors he brought in -- on

7    money that he raised.

8        Q.    What money did Mr. Lui raise for De

9    Tomaso?

10       A.    In total?

11       Q.    Yes.

12       A.    He brought in investors that

13   invested to date $25 million.

14       Q.    Who was that investor?

15       A.    F-Tech.

16       Q.    What is F-Tech?

17       A.    My understanding is that they are a

18   financial services and asset management

19   company based in Singapore.

20       Q.    How did Mr. Lui know the people at

21   F-Tech?

22            MS. WIGGER:   Object to form.

23       A.    I don't know.

24       Q.    Does F-Tech have any equity

25   interests currently in De Tomaso?



Page 206

1                    D. Majcher

2        A.    No.

3        Q.    So why did they invest $25 million

4   in the company?

5             MS. WIGGER:  Object to form.

6        A.    The form of their investment is a

7   convertible redeemable, preferred shares.

8        Q.    What are the terms of those

9   convertible redeemable preferred shares?

10            MS. WIGGER:  Object to form.

11       A.    In broad terms?

12       Q.    In broad terms.  I don't have a

13  copy of them.  I'm not sure --

14            MS. WIGGER:  You do have that.

15            MR. SIMONS:  We have the

16            subscription agreement, but in broad

17            terms.

18            MS. WIGGER:  You have what exists

19            on that.

20       A.    I'm sorry, broad terms, what terms

21  as in, like...

22       Q.    What were they getting in exchange

23  for their $25 million?  Economically

24  speaking, what was the upside for F-Tech

25  putting $25 million in to De Tomaso?



Page 207

1                    D. Majcher

2              MS. WIGGER:  Object to form.

3         A.    The preferred shares could be

4    converted into common shares at some point in

5    time.  I can't remember the exact timing now

6    and if they are never converted, then I

7    believe they have, like a -- there is a built

8    in return that they could have at the end of

9    the -- I think it was three years, three-year

10   period.

11        Q.    Has De Tomaso received all of that

12   $25 million investment?

13        A.    We received $25 million today, yes.

14        Q.    What were the uses that De Tomaso

15   has used the $25 million for?

16             MS. WIGGER:  Object to form.

17        A.    I'm sorry?

18        Q.    How did De Tomaso use that $25

19   million?

20             MS. WIGGER:  Same objection.

21        A.    General working capital,

22   development of the cars.

23        Q.    Did any of it go to repay any of

24   the loans that Mr. Choi purports to have made

25   to the company?



Page 208

```
 1                    D. Majcher
 2            MS. WIGGER:  Object to form.
 3       A.   I don't know how to answer that
 4  question.
 5            The 25 million that we got from
 6  F-Tech was not the only money that ever came
 7  in, right, throughout this period.  We also
 8  have customer deposits and so we have
 9  multiple streams of inflow so I can't say
10  that it's only the F-Tech money that came in
11  that went out to repay Mr. Choi's loans or
12  was it.
13       Q.   You are saying money is fungible,
14  right?
15       A.   Fungible.
16       Q.   Like one pot -- a dollar is a
17  dollar, so if money comes in from F-Tech or
18  money comes in from other sources, you can't
19  sort of differentiate between the money that
20  came in from F-Tech versus the money that
21  came in from other sources?
22       A.   Yeah.
23       Q.   But your understanding is that
24  since the money has come in from F-Tech,
25  there has been some repayment to Mr. Choi of
```


MAGNA
LEGAL SERVICES

Page 209

                    D. Majcher
1
2    loans that purports to have made to the
3    company?
4         A.    Without seeing the --
5         Q.    From -- if you recall offhand.
6         A.    It's possible, yeah.
7         Q.    Do you know if Mr. Choi has any
8    interest or relationship with F-Tech?
9         A.    Interest as in --
10        Q.    Whether he has any ownership
11   interest or an investor in F-Tech or
12   associated with any of the people that work
13   at F-Tech?
14        A.    Not to my knowledge.
15        Q.    Have you ever asked him?
16        A.    No, I don't believe I asked him.
17        Q.    I'm going to show you a couple of
18   more document and then we will take a break
19   if that works.
20             Let me ask you a prefatory
21   question.  After Mr. Berris left De Tomaso,
22   as you mentioned, De Tomaso then hired Samuel
23   Lui to work at the company in an official
24   capacity, right?
25             MS. WIGGER:  Object to form.



Page 210

1                    D. Majcher

2         A.    Correct.

3         Q.    In fact, they hired him to work as

4    De Tomaso's vice-president and CFO, right?

5         A.    The employment contract says he is

6    an advisor.

7         Q.    But his functional duties are as

8    vice-president and CFO, right?

9         A.    I wouldn't really characterize it

10   like that, no.

11        Q.    What would you say that he does on

12   a daily basis at the company?

13        A.    He advises the company on some

14   financial matters, but largely I would say he

15   was focused on fundraising.

16        Q.    Is that a full-time job?  Does he

17   work 40 hours a week for De Tomaso?

18             MS. WIGGER:  Object to form.

19        A.    I don't know.  I don't ask him to

20   keep a timesheet so I don't know.

21        Q.    I will show you this other

22   document.

23             (Majcher Exhibit 28, September 14,

24        2023 chat between Ms. Majcher and other

25        individuals, marked for identification.)



Page 211

1                    D. Majcher

2        Q.    Majcher 28.  So Ms. Majcher, the

3    document that's been marked as Majcher 28 is

4    a chat between you and a few other

5    individuals on the 14th of September 2023.

6    You are listed on here, Mr. Choi is listed on

7    here, Samuel Lui is listed on here and then

8    there is someone named Phil and someone named

9    Sam.

10             Who is Phil and who is Sam?

11       A.    They are people from F-Tech.

12       Q.    What are their roles at F-Tech?

13       A.    I can't say I know specifically,

14   but they are the people from F-Tech we've

15   been dealing with.  I don't want to

16   speculate.  That's all I know.

17       Q.    Do you know if they have a personal

18   relationship with Mr. Lui?

19             MS. WIGGER:  Object to form.

20       A.    Personal as?

21       Q.    Are they friends with Mr. Lui?

22             MS. WIGGER:  Object to form.

23       A.    I don't know.

24       Q.    If you look at this document, Mr.

25   Lui writes, Gentlemen, as I have briefed the



Page 212

```
 1                    D. Majcher
 2    both of you separately, I have agreed to
 3    terms of employment to join De Tomaso
 4    officially as vice-president and CFO.
 5            Do you see that?
 6        A.   I do.
 7        Q.   Does that refresh your recollection
 8    that Mr. Lui was hired to be De Tomaso's
 9    official vice-president and CFO?
10        A.   No.
11        Q.   Do you know why he would have said,
12    I have agreed to terms of employment to join
13    De Tomaso officially as vice-president and
14    CFO if that is not the case?
15            MS. WIGGER:  Object to form.
16        A.   I don't know why he would have said
17    that.  The contract we signed with him, my
18    recollection was we signed that after this
19    date, the date of the message.  We signed it
20    actually specifically in Germany when Mr. Lui
21    had brought Phil and Sam and a number of
22    other people to visit our production partner
23    in Germany.  They are on the due diligence
24    trip, so to speak.
25            And at the time of the signing, his
```



Page 213

1                    D. Majcher
2    title under the employment contract was
3    advisor.
4        Q.    Do you know if Mr. Lui had an
5    informal agreement with Mr. Choi that he
6    could refer to himself as the vice-president
7    and CFO of De Tomaso?
8            MS. WIGGER:  Object to form.
9        A.    I do not know.
10        Q.    If you continue on, he says, Due to
11    the ongoing lawsuit with Ryan, Norman's
12    lawyers are saying that Ryan's lawyers may
13    say that Norman may be using money to, quote,
14    bribe me.  Nonetheless, Norman is prepared to
15    take the risk and go ahead to appoint me
16    officially.  He wants the both of you to be
17    aware of this risk.  If you are both okay,
18    then he will proceed to finalize my
19    employment contract ASAP.  This text is to
20    confirm that the both of you acknowledge this
21    risk and agree to push ahead as well.
22    Thanks.
23            And then Phil writes, Yes.
24    Congratulations, bro.  Phil writes, Bro, I
25    think you are an amazing asset for De Tomaso



Page 214

1                    D. Majcher

2    and us and with Norman leadership and Samuel

3    capabilities I know we will have the best

4    hyper car company in the world with three

5    thumbs up emojis, and then he writes,

6    Congratulations, bro.

7              Do you see that?

8         A.   Yes.

9         Q.   Is there anywhere in here that Sam

10    responds to this announcement about Mr. Lui

11    being hired as the vice-president and CFO of

12    De Tomaso?

13              MS. WIGGER:  Object to form.

14         A.   Sorry?

15         Q.   Is there anywhere in here that Sam,

16    meaning, not Samuel Lui, but the Sam from

17    F-Tech acknowledges the, quote, risk, and

18    agrees to push ahead with the hiring of Mr.

19    Lui as vice-president and CFO of De Tomaso?

20              MS. WIGGER:  Object to form.

21         A.   In this thread, not that I can see.

22         Q.   Do you know if Sam ever did provide

23    his acknowledge of the risk of hiring Mr. Lui

24    as vice-president and CFO of De Tomaso?

25              MS. WIGGER:  Object to form and



Page 215

```
 1                    D. Majcher
 2        foundation.
 3        A.    Sorry, can you say that one again?
 4        Q.    Sitting here today, did Sam ever
 5   convey to you or anyone -- I guess to you,
 6   are you aware whether Sam said, I'm fine with
 7   you guys bringing in Samuel Lui to work at De
 8   Tomaso?
 9             MS. WIGGER:  Object to form.
10        A.    He was physically present when the
11   agreement was signed in Germany.
12        Q.    Seems like a fair inference then,
13   he was at the agreement signing.  That's
14   helpful context.
15             Do you have an understanding of
16   what Mr. Lui meant when he said that, Due to
17   the ongoing lawsuit with Ryan, Norman's
18   lawyers are saying that Ryan's lawyers may
19   say that Norman may be using money to bribe
20   me?
21             MS. WIGGER:  Object to form.
22        A.    Does this get into conversations
23   with counsel?
24        Q.    I definitely don't want
25   conversations with counsel.
```



Page 216

```
 1                   D. Majcher
 2           MS. WIGGER:  Someone's lawyers said
 3       someone's lawyers said -- don't repeat
 4       anything lawyers said.
 5       Q.   Don't repeat anything lawyers said,
 6   but do you have an independent understanding
 7   of why Samuel Lui might be saying that being
 8   hired by De Tomaso may be construed as a
 9   bribe to him?
10           MS. WIGGER:  Object to form,
11       speculation.
12           You can answer if you have an
13       independent understanding.
14       A.   I can't say that I have an
15   understanding of his thoughts.
16       Q.   Did you ever have a discussion with
17   Mr. Lui about a concern that his hiring by De
18   Tomaso could be construed as a bribe and
19   setting aside any conversations with counsel?
20       A.   No, but we did have discussions
21   about how optically, it just may send the
22   wrong signal.
23       Q.   Let's talk about those discussions.
24           MS. WIGGER:  Just again, nothing
25       that you discussed with the counsel.
```



Page 217

```
 1                  D. Majcher
 2             MR. SIMONS:  That goes, hopefully,
 3        without saying, but it's obviously
 4        counsel's job to make sure she says it.
 5             MS. WIGGER:  Just a reminder.
 6        Q.   Do you recall when you had those
 7   discussions with Mr. Lui?
 8             MS. WIGGER:  Object to form.
 9        A.   I don't recall specifically at the
10   time.
11        Q.   Was it sometime on or around before
12   this message was sent in September of 2023?
13        A.   I think that would be fair to say.
14        Q.   What do you remember him saying to
15   you or you saying to him?
16             MS. WIGGER:  Object to form and
17        foundation.
18        A.   I think it was general discussion
19   of trying to formalize a working arrangement
20   with Mr. Lui.
21        Q.   What I'm trying to understand is
22   you said that there was a general discussion
23   about how optically it just may send the
24   wrong signal.
25             What was the nature of that
```



Page 218

1                     D. Majcher

2    discussion, how would it optically send the

3    wrong signal?

4              MS. WIGGER:   Object to form.

5         A.   So this is at a time where we were

6    actively trying to raise money for De Tomaso,

7    with this lawsuit already overhanging, right,

8    so that was -- it was very difficult to try

9    to accomplish what we were trying to do,

10   right.

11             The first thing any investor would

12   ask when we sit down is what is this lawsuit,

13   what is this about, and Samuel was -- is

14   still a named defendant on that lawsuit and

15   with the allegations, however unsupported

16   they are, it's easy for people to think or --

17   they will make connections however they like.

18        Q.   Like you said, you were concerned

19   that how other people would perceive Mr. Lui

20   joining the company in light of Mr. Berris'

21   allegations?

22        A.   Yes.

23             MR. SIMONS:   We can put that

24        document aside.

25             I think now is a good time to take



Page 219

```
 1                    D. Majcher
 2        a break.
 3              MS. WIGGER:  Fantastic.
 4              THE VIDEOGRAPHER:  We are going off
 5        the record.  The time is 2:37 p.m.
 6              (Recess.)
 7              THE VIDEOGRAPHER:  We are back on
 8        the record.  The time is 2:55 p.m.
 9        Q.   Ms. Majcher, I want to follow-up on
10   some of your earlier testimony about the
11   relationship between Mr. Choi and Mr. Berris,
12   okay?
13        A.   Okay.
14        Q.   So you spoke about earlier how in
15   the early years of De Tomaso, you observed
16   that they had a pretty close relationship,
17   right?
18        A.   Yes.
19        Q.   And from what you could observe
20   during the early years that they worked
21   together at De Tomaso, they were on good
22   terms as colleagues, right?
23              MS. WIGGER:  Object to form.
24        A.   Yes.
25        Q.   At some point in late 2021, is it
```



Page 220

```
 1                   D. Majcher
 2   fair to say they started to have some
 3   disagreements about their respective visions
 4   for the future of the company?
 5              MS. WIGGER:  Object to form.
 6        A.   Late 2021, I recall there was some
 7   difference, yeah.
 8        Q.   One of those differences was that
 9   they disagreed over the planned design for
10   the P900, right?
11              MS. WIGGER:  Object to form.
12        A.   Yes.  After the fact, I knew that
13   to be one of the disagreements.
14        Q.   They also had some disagreements
15   over De Tomaso's hiring of Carmen Jord?,
16   right?
17              MS. WIGGER:  Object to form.
18        A.   Of her involvement with the
19   company, yes.
20        Q.   By March of 2022, Mr. Choi actually
21   told you that he was thinking about taking
22   over as CEO.
23              Do you remember that?
24              MS. WIGGER:  Object to form.
25        A.   Not specifically.
```



Page 221

                        D. Majcher

1

2      Q.   Do you remember it generally?

3      A.   I think, yeah, he might have

4  brought it up at some point.

5      Q.   Do you remember that he was

6  thinking about moving Ryan to be the chief

7  marketing officer of the company?

8           MS. WIGGER:  Object to form.

9      A.   Vaguely.

10     Q.   Let's show you some documents so we

11 can get into some specifics.

12          (Majcher Exhibit 29, March 21, 2022

13      chat between Ms. Majcher and Mr. Choi,

14      marked for identification.)

15     Q.   This is Majcher 29.  This is a chat

16 between you and Mr. Choi dated March 21,

17 2022, is that right?

18     A.   Yes.

19     Q.   At the top, Mr. Choi writes, And

20 Joe will also be appointed at chief designer

21 responsible for leading the product design

22 team.

23          Did you understand that the Joe

24 there was Jowyn Wong?

25     A.   Yes.



Page 222

                    D. Majcher

1

2      Q.    And then he writes, Ash will be

3   assigned under CMO.  His skill set, from what

4   I have seen, belong to that space and so does

5   Carmen.

6            Do you see that?

7      A.    Yes.

8      Q.    And who did you understand Ash to

9   be?

10     A.    Ash Thorpe.

11     Q.    What was Ash Thorpe's role at De

12  Tomaso?

13            MS. WIGGER:  Object to form.

14     A.    I believe he was hired to be

15  actually -- sorry, I can't remember what he

16  was hired to be.  He was -- I actually don't

17  know because I was not involved with his

18  hiring.  I didn't have any interaction with

19  him.

20     Q.    Did you understand what Mr. Choi

21  was talking about here was that Ash -- let me

22  back up.

23            Who did you understand Mr. Choi to

24  be referring to when he references Carmen?

25  Is that Ms. Jord??



Page 223

1                      D. Majcher

2              MS. WIGGER:  Object to form.

3        A.    I think so.

4        Q.    So you understood that Mr. Choi was

5   saying that Ash Thorpe and Carmen Jord? would

6   be assigned under the CMO, meaning, chief

7   marketing officer, is that what you

8   understand this to mean?

9              MS. WIGGER:  Object to form,

10             misstates the document.

11       A.    I understand CMO to be chief

12   marketing officer, yes.

13       Q.    So this is basically Mr. Choi

14   proposing that Mr. Thorpe and Carmen Jord?

15   would be assigned, sort of in an org chart of

16   the company, under someone in the CMO role,

17   right?

18             MS. WIGGER:  Object to form,

19             misstates the document.

20       A.    I take it to be that they would be

21   reporting to the CMO.

22       Q.    Reporting to the CMO.  Do you have

23   a recollection that this was, in fact, a

24   proposal that Mr. Choi made to you roughly

25   around this time in March of 2022?



Page 224

```
 1                    D. Majcher
 2           MS. WIGGER:  Object to form.
 3      A.   No, I don't remember.
 4      Q.   If you go to the next page ending
 5  in 941, Mr. Choi says later, I intend to have
 6  the CMO be responsible for any expenses
 7  relating to Ash, Carmen, Jiri, J-I-R-I, plus,
 8  plus under his belt.
 9           Do you see that?
10      A.   I do.
11      Q.   Who did you understand him to be
12  referring to when he was talking about the
13  CMO in this message?
14           MS. WIGGER:  Object to form.
15      A.   I think he is just speaking in
16  general terms.
17      Q.   You didn't understand him to have
18  specific person to be the CMO at this point
19  in March of 2022?
20      A.   I can't recall if I did or did not.
21      Q.   If you go to 948, page ending in
22  941.  At the top of the page, Mr. Choi
23  writes, Ryan's behaviors have changed
24  dramatically.  I will be the CEO/president.
25  And you write, In what way?  And he writes a
```



Page 225

```
 1                  D. Majcher
 2   long list.
 3            Do you see that?
 4       A.   Yes.
 5       Q.   If you go to the next page, you
 6   write, Did something happen?  Is this
 7   anything of concern, question mark.  And the
 8   reason you ask that question is because up
 9   until this point, you weren't really aware of
10   any serious concerns relating to Mr. Berris,
11   were you?
12            MS. WIGGER:  Object to form.
13       A.   I can't recall at this moment.
14       Q.   So you can't recall one way or the
15   other whether you had any serious concerns
16   about Mr. Berris' work at De Tomaso as of the
17   time of this text exchange?
18            MS. WIGGER:  Object to form.
19       A.   Yeah, I cannot recall.
20       Q.   Mr. Choi then writes at the bottom,
21   He hired Ash hoping to replace Joe.  He hired
22   Jiri, J-I-R-I, hoping to replace Jakub.  He
23   hired Carmen because he is after her.
24            Do you see that?
25       A.   I do.
```



Page 226

1                     D. Majcher

2         Q.    The Jiri he is referring to there

3    is Jiri Kubik, right?

4         A.    Yes.

5         Q.    Jiri Kubik is still an employee of

6    De Tomaso, right?

7         A.    He is.

8         Q.    In your opinion, he does good work

9    for De Tomaso?

10              MS. WIGGER:   Object to form.

11        A.    In my opinion, yes.

12        Q.    He was hired by Mr. Berris, right?

13        A.    He was hired -- yes.

14        Q.    If I turn your attention to the

15   next page, 50, you write, If you have decided

16   to implement the above structure, then should

17   do it quickly before further press releases

18   go out with his CEO title.  Also will be

19   confusing for clients, dealers, service

20   providers, et cetera.

21              Do you see that?

22        A.    Yes.

23        Q.    What did you mean when you wrote,

24   it will be confusing for clients, dealers,

25   service providers, et cetera?



Page 227

                    D. Majcher

1

2       A.    It would be confusing if you have

3   two people claiming to be CEO of the company.

4       Q.    That's because the clients,

5   dealers, service providers at De Tomaso were

6   interacting with Mr. Berris as the CEO of the

7   company at that time?

8            MS. WIGGER:  Object to form.

9       A.    That was the title he was carrying

10  at the time, yes.

11      Q.    A few seconds later, at the bottom,

12  you wrote, Maybe he just needs a break.

13           Do you see that?

14      A.    Yes.

15      Q.    What you are referring to there was

16  that maybe Mr. Berris was just working too

17  hard and needed a vacation essentially?

18           MS. WIGGER:  Object to form.

19      A.    I don't know.  I don't know exactly

20  what I meant by -- I can't remember what I

21  meant at the time needing a break.

22      Q.    Usually when you write someone

23  needs a break, does that mean that they need

24  some time off from work?

25      A.    I was giving -- the stress.



Page 228

```
 1                      D. Majcher
 2        Q.    We all need a break from time to
 3    time, I think it's fair to say.
 4              Were you aware if Mr. Berris was
 5    taking time off for himself around this
 6    period of time?
 7              MS. WIGGER:  Object to form.
 8        A.    I was not aware, no.
 9        Q.    If you go now to the next page
10    ending in 952, you write -- Mr. Choi writes,
11    I understand his insecurities so I put him
12    back to the spot he is most comfortable with,
13    CMO.
14              Do you see that?
15        A.    Yes.
16        Q.    And did you understand that he was
17    referring to reassigning Mr. Berris from
18    being CEO to CMO of the company?
19              MS. WIGGER:  Object to form, the
20         document speaks for itself.
21        A.    I understand that to mean that Mr.
22    Berris will be taking on the role of the CMO.
23        Q.    CMO, you understand to be chief
24    marketing officer?
25        A.    Yes.
```



Page 229

```
 1                    D. Majcher
 2        Q.   In March of 2022, Mr. Choi is
 3   proposing that Berris take on the role of
 4   chief marketing officer of De Tomaso, right?
 5             MS. WIGGER:   Object to form,
 6        misstates the document.
 7        A.   He was already the CMO at the time.
 8        Q.   So essentially, he is saying that
 9   he should continue on as the CMO of the
10   company?
11             MS. WIGGER:   Same objection.
12        A.   He is saying that he should be the
13   CMO, yeah.
14        Q.   If you go a few pages later, ending
15   in 957, Mr. Choi says, I thought about it a
16   bit more of your positioning.  You will act
17   as an external consultant.  I plan to
18   compensate you 100-K, with a dollar sign, up
19   until we do de-SPAC.  Let me know if this is
20   acceptable.
21             Do you see that?
22        A.   I do.
23        Q.   That's Mr. Choi proposing to you
24   that he will compensate you $100,000 for your
25   work at De Tomaso relating to the de-SPAC
```



Page 230

                        D. Majcher

1    process, right?

2        A.    I think so.

3        Q.    Did that, in fact, happen?  Did he

4    provide you compensation related to the

5    de-SPAC process?

6        A.    I don't remember.

7        Q.    Then you write on the next page,

8    And after de-SPAC?  And Mr. Choi responds,

9    Have not thought out just yet.  Has now need

10   to put all the chief in place.

11            Do you see that?

12       A.    Yes.

13       Q.    If you go a few more pages in to

14   964.  The top of the page, you write, You

15   have independent candidates in mind?  And he

16   writes, Maybe Bill.

17            What did you mean when you wrote,

18   You have independent candidate in mind,

19   question mark?

20       A.    I need to read through.

21       Q.    You can flip back.

22            Do you recall if what you were

23   referring to is having independent candidates

24   in mind for a board of a publicly-traded



Page 231

```
 1                    D. Majcher
 2   company?
 3            MS. WIGGER:  Object to form.
 4       A.   Or it seems we are talking about
 5   board of directors.
 6       Q.   Board of directors for De Tomaso?
 7            MS. WIGGER:  Object to form.
 8       A.   I think so.
 9       Q.   And Mr. Choi, when he writes, Maybe
10   Bill, was, again, referring or you understood
11   him to be referring to your husband, Bill
12   Majcher, right?
13       A.   Yes.
14       Q.   If you go a few more pages, at the
15   bottom of 971, Mr. Choi sends you a text
16   message that appears to be attaching an
17   exhibit and it's in very small print and we
18   can get to that in a second.
19            Without looking at the document, do
20   you remember what he was sending you at the
21   time?
22       A.   So we talked about the attachment
23   on 972?
24       Q.   Yes.
25       A.   No.
```



Page 232

```
 1                    D. Majcher
 2        Q.    Let's pull it up.
 3              (Majcher Exhibit 30, agreement
 4        between Wyn Design, Jowyn Wong and De
 5        Tomaso dated March 2022, marked for
 6        identification.)
 7        Q.    Can you see this appears to be the
 8   full attachment and I can represent to you
 9   this is, in fact, the attachment that was
10   embedded into the WhatsApp chat here with the
11   Bates number ending in 134003.
12              If you want to take a second to
13   look over the document.
14        A.    Okay.
15        Q.    This document purports to be an
16   agreement between Wyn, W-Y-N, Design and
17   Jowyn Wong and De Tomaso, right?
18        A.    Yes.
19        Q.    And it's dated March 2022.
20              Do you see that?
21        A.    Yes.
22        Q.    And it appears to be signed by
23   Jowyn Wong on behalf of Wyn Design, right?
24        A.    Yes.
25        Q.    And what this agreement purports to
```



Page 233

                    D. Majcher

1
2    do is to establish, quote, an exclusive
3    partnership and commitment for at least 10
4    years.
5              Do you see that?
6         A.   I do.
7         Q.   Then it says, quote, Jowyn Wong to
8    assign as board member of De Tomaso with
9    shares equal to 4-M USD subject to listing
10   with addition to annual bonuses are expected.
11             Do you see that?
12        A.   Yes.
13        Q.   At the bottom, it says, A
14   guaranteed amount of 500,000 pounds per year
15   for a minimum of 10 years is agreed to be
16   made payable in monthly installments to Wyn
17   Design.
18             Do you see that?
19        A.   Yes.
20        Q.   The first installment of 41,666
21   pounds to be made payable in April 2022.
22             Do you see that?
23        A.   I do.
24        Q.   Was this document ever executed by
25   De Tomaso?



                       D. Majcher
1
2        A.    Not to my knowledge, no.
3        Q.    Do you know why Mr. Choi was
4    sending you this document?
5              MS. WIGGER:  Object to form.
6        A.    I don't know.  He sends me a lot of
7    stuff.
8        Q.    Like any boss.
9              You mentioned earlier that Jowyn
10   Wong does have an agreement with De Tomaso in
11   his capacity as chief designer.
12             Do you recall if it guarantees him
13   payment of 500,000 pounds per year?
14       A.    No, I'm pretty sure that's not the
15   compensation agreement.
16       Q.    Do you recall what the compensation
17   agreement is?
18       A.    It's not a precise number so I
19   don't want to say.
20       Q.    Do you recall if it was an
21   agreement that was designed to last a term of
22   at least 10 years?
23       A.    I don't think it says at least 10
24   years.  I think it's 10 years.
25       Q.    The agreement, your recollection of



Page 235

```
 1                   D. Majcher
 2   the terms of that agreement is that it lasts
 3   10 years?
 4        A.    Yes.
 5        Q.    And is it typical for De Tomaso to
 6   enter into agreements that are for a 10-year
 7   period?
 8              MS. WIGGER:  Object to form.
 9        A.    Typical, it would depend on the
10   contract.
11        Q.    Are there other contracts that De
12   Tomaso has entered into that have a term of
13   10 years?
14              MS. WIGGER:  Object to form.
15        A.    Yes.
16        Q.    What are those other contracts?
17        A.    That's the contract with Jakub
18   Jodlowski.
19        Q.    So De Tomaso has entered into a
20   contract with Jowyn Wong for a period of 10
21   years and also for Jakub Jodlowski for a
22   10-year period?
23        A.    Yes.
24        Q.    Did you have a concerns about De
25   Tomaso entering into 10-year contracts with
```



Page 236

```
 1                    D. Majcher
 2   these individuals?
 3        A.    The concerns would be?
 4        Q.    It's a very large financial
 5   commitment, isn't it?
 6        A.    That would depend on what you are
 7   getting in return.
 8        Q.    Setting aside what you are getting
 9   in return, it's fair to say 10 years of some
10   monetary amount can add up to a fair amount
11   of money?
12             MS. WIGGER:  Object to form.
13        A.    It can.
14        Q.    Did you ever express any concerns
15   to Mr. Choi about entering into these 10-year
16   contracts with these two individuals?
17             MS. WIGGER:  Object to form.
18        A.    I can't recall.
19        Q.    Do you recall if De Tomaso has made
20   -- starting making payments to Jowyn Wong
21   prior to April of 2022?
22        A.    I don't recall.
23        Q.    Would it surprise you to learn that
24   De Tomaso started paying Jowyn Wong
25   approximately 50,000 pounds starting in
```



Page 237

```
 1                    D. Majcher
 2    October of 2021?
 3              MS. WIGGER:  Object to form.
 4         A.    Surprise?  If we did, we did, but I
 5    don't recall.
 6         Q.    But if you had paid him 50,000
 7    British pounds starting in October 2021, that
 8    would not have been pursuant to any type of
 9    written contract at the time, right?
10              MS. WIGGER:  Object to form.
11         A.    If there wasn't any written
12    contract, then no.
13         Q.    If he doesn't have a written
14    contract, then you are not paying him
15    pursuant to a written contract?
16         A.    Correct.
17         Q.    We can put that aside.
18              MS. WIGGER:  Is that document --
19         that was 30?
20              MR. SIMONS:  Yes.
21              this will be Majcher 31.
22              (Majcher Exhibit 31, WhatsApp chat
23         between Ms. Majcher and Mr. Choi dated
24         March 23, 2022, marked for
25         identification.)
```



Page 238

1                     D. Majcher

2          Q.    Ms. Majcher, this is a WhatsApp

3    chat between you and Mr. Choi dated March 23,

4    2022, right?

5          A.    Yes.

6          Q.    The first message Mr. Choi says,

7    Does Bill have any contacts looking into this

8    type of case.  And then you respond, You

9    really think this is necessary?

10              Do you recall what you were

11   discussing there?

12         A.    No.  This is no context here.

13         Q.    Then he writes, For my own peace of

14   mind.  And then you write, I think it is very

15   unlikely that the supplier invoices were

16   altered because money was paid directly to

17   the suppliers.  If he inflated the invoices,

18   he would have to work with the suppliers to

19   get the money back.

20              Do you see that?

21         A.    Yes.

22         Q.    Does that refresh your recollection

23   about what you and Mr. Choi were discussing?

24         A.    Yeah, I think we were talking about

25   some kind of forensic accounting or just some



Page 239

```
 1                    D. Majcher
 2   kind of investigations into Mr. Berris'
 3   submitted invoices or expense --
 4   reimbursements.
 5        Q.   Was Mr. Choi or did you have any
 6   discussions with Mr. Choi at this time that
 7   he was concerned that Mr. Berris might have
 8   somehow been altering supplier invoices?
 9             MS. WIGGER:  Object to form.
10        A.   I think we had discussions, yes.
11        Q.   Did you look into whether Mr.
12   Berris was, in fact, altering supplier
13   invoices?
14        A.   Look into?
15        Q.   Was there any type of investigation
16   or any other work the company did to see
17   whether, in fact, he was altering supplier
18   invoices?
19        A.   I don't think so.
20        Q.   Did you ever find any evidence to
21   indicate that he was ever altering supplier
22   invoices?
23             MS. WIGGER:  Object to form.
24        A.   Not that I am aware of, no.
25        Q.   Then if you go a little bit later
```



Page 240

```
 1                  D. Majcher
 2   to 503, you see a text message from Mr. Choi
 3   where he says he told JJ he has received
 4   nothing and only doing it because of his
 5   passion.  He gave up his life and his career
 6   and his father's business to do what he is
 7   doing.
 8           Do you see that?
 9       A.  Yes.
10       Q.  Were you referring by he there to
11   Mr. Berris?
12           MS. WIGGER:  Object to form.  Is
13       that --
14       Q.  I apologize.  Was it your
15   understanding the he that Mr. Choi was
16   referring to there was Mr. Berris?
17           MS. WIGGER:  Object to form.
18       A.  Yes.
19       Q.  Who is JJ?
20       A.  Jowyn and Jakub.
21       Q.  You can put that aside.  I will
22   show you another document.
23           (Majcher Exhibit 32, March 22, 2022
24       chat between Ms. Majcher and Mr. Choi,
25       marked for identification.)
```



Page 241

1                    D. Majcher

2        Q.    Majcher 32, Ms. Majcher is a chat

3   between you and Mr. Choi on the 22nd of March

4   2022, is that right?

5        A.    Yes.

6        Q.    It starts off, you are chatting,

7   you say, If the intention is to lock up JJ,

8   there is no need to acquire Wyn because there

9   is no asset within Wyn that DT needs, there

10  are many ways to grant shares to them.  We

11  just need to find the most tax efficient one.

12  You can even give them your shares or have

13  them become shareholders of the Marshall

14  Islands Company.

15            Do you see that?

16       A.    Yes.

17       Q.    And again, the JJ you are referring

18  to here is Jowyn Wong?

19       A.    Yes.

20       Q.    What were you telling Mr. Choi in

21  this text message?

22       A.    Sorry, JJ is Jowyn Wong and Jakub.

23       Q.    The J and J, you refer to them

24  together?

25       A.    Yes.



Page 242

                        D. Majcher

1

2        Q.    What you were telling Mr. Choi in

3    this message?

4        A.    I think we were discussing ideas of

5    perhaps giving some equity to JJ.

6        Q.    So in this conversation in March of

7    2022, you were discussing ideas for giving

8    equity to either Mr. -- either or and both

9    Jowyn Wong and Jakub, is that fair?

10        A.    Yes.

11        Q.    Did that ever happen?

12        A.    Not to my knowledge, no.

13        Q.    If you go a couple of pages in to

14    the one ending in Bates 074.  Mr. Choi says,

15    I'm very likely going to remove his

16    directorship, as I have discovered many

17    irregularities.  I will not allow that to

18    happen going into the future.  And then you

19    write, I don't think so.  There are many

20    small items, you know, like Whole Foods,

21    Uber, travel, that are clearly stated in the

22    credit card or account, but then there are

23    details.

24            Do you see that?

25        A.    Yes.



                        D. Majcher

1

2        Q.    Here, you are discussing Mr.

3   Berris' company expenses, right?

4        A.    Yes.

5        Q.    Mr. Choi is expressing some

6   displeasure, fair to say, about Mr. Berris'

7   company expenses, right?

8              MS. WIGGER:   Object to form.

9        A.    Yeah, he was questioning his

10  expenses.

11       Q.    If you go now to the top of 076,

12  you reply to Mr. Choi, I also need to remind

13  you, maybe your agitation towards him

14  recently stemmed from you not having enough

15  sleep, so every little thing becomes a

16  trigger point.  Not trying to defend him,

17  just something for you to consider.

18             Do you see that?

19       A.    Yes.

20       Q.    There, you are talking about Mr.

21  Choi's agitation towards Mr. Berris, right?

22       A.    Yes.

23       Q.    Then in the next chat from you, you

24  say, He has his flaws, and there, you are

25  still referring to Mr. Berris, right?



Page 244

1                    D. Majcher

2        A.    Yes.

3        Q.    Then you continue, which I think

4   largely come or came from his insecurity and

5   desire of wanting to be, quote, your only

6   man, end quote, the only one you trust and

7   rely on.  He is not a cheat.  Definitely made

8   some mistakes along the way and let his ego

9   get in the way, but you can attest to his

10  character.

11            Do you see that?

12       A.    Yes.

13       Q.    What were you trying to convey to

14  Mr. Choi through this message?

15            MS. WIGGER:  Object to form.

16       A.    I think I was trying to convey to

17  him that perhaps he should give Mr. Berris

18  another chance to explain himself and to

19  investigate further as to whether he was

20  misappropriating company funds or, you know,

21  some of the suspicions that Mr. Choi had.

22       Q.    When you write, but you can attest

23  to his character, what did you mean by that

24  specifically?

25       A.    I mean, I think they were close



Page 245

                    D. Majcher

1

2  enough, so it's for Mr. Choi to judge for

3  himself.

4     Q.   So you are saying that they've had

5  a long relationship prior to this, so Mr.

6  Choi already knew Mr. Berris' character very

7  well by this point?

8          MS. WIGGER:  Object to form.

9     A.   They have been working together for

10  a number of years so he should have an idea

11  for himself.

12    Q.   If you go to the next page, ending

13  in 077, you write -- sorry, Mr. Choi writes,

14  Despite no receipts, auditors are still okay

15  with them.

16          Do you see that?

17    A.   Yes.

18    Q.   Then there is Mr. Choi sending some

19  excerpts from the LLC agreements, and he

20  writes, Literally from the LLC agreements,

21  but then you respond to his earlier question

22  and say, They didn't raise any questions.

23          Do you see that?

24    A.   Yes.

25    Q.   What you are doing there is saying



Page 246

```
 1                     D. Majcher
 2   that the auditors that they are working with
 3   De Tomaso at this point, didn't raise any
 4   questions about Mr. Berris' expenses, right?
 5           MS. WIGGER:  Object to form.
 6       A.   Yes.
 7       Q.   And during this time, who was the
 8   auditor that you were working with?
 9       A.   MSBC.
10       Q.   If you go a couple of pages in
11   further from this document.  Actually, let's
12   just go to the next page, 80.  Mr. Choi
13   writes, So I need to serve him a notice and
14   you write, Gum, G-U-M, he needs to know, Ga.
15           Is that sort of conversational
16   speak?
17       A.   Yeah, it's mixing Chinese with
18   English.
19       Q.   Understood.  Then you wrote, Do you
20   think if you talk to him, he will resign,
21   question mark, right?
22       A.   Yes.
23       Q.   And then Mr. Choi says, I will talk
24   to him next week, and then there is some
25   discussion in these chats about updating the
```



Page 247

```
 1                 D. Majcher
 2   membership of the LLC, right?
 3        A.   Yeah.
 4        Q.   If you go to page 82, at the
 5   bottom, Mr. Choi writes, Members are Ryan and
 6   I.
 7             Do you see that?
 8        A.   Yes.
 9        Q.   Then you write on the next page,
10   083, Even if he is a member, he is minority,
11   can't vote you.  I think you mean can't vote
12   you out?
13        A.   It says can't outvote you.
14        Q.   Can't outvote you, there you go.
15             You wrote, Even if he is a member,
16   he is a minority, can't outvote you, right?
17        A.   Yes.
18        Q.   What you meant by that was that Mr.
19   Berris was a minority shareholder in De
20   Tomaso, right?
21             MS. WIGGER:  Object to form,
22        misstates document.
23        A.   No.
24        Q.   What other type of minority was he
25   with respect to the company?
```



Page 248

1                    D. Majcher

2            MS. WIGGER:  Object to form.

3        A.    You are taking this one sentence

4    out of context.  So in the previous page, Mr.

5    Choi said members are Ryan and I and I reply

6    to him on the record, members are only DT

7    Marshall Islands.

8        Q.    Then you say, even if he is a

9    member, he is a minority, can't outvote you?

10       A.    In the case that if he was ever a

11   member.

12       Q.    What did you mean by saying he was

13   a minority member of the company?

14           MS. WIGGER:  Objection, misstates

15       the document, asked and answered.

16       A.    I'm sorry, I didn't mean that he is

17   a minority.

18       Q.    What did you mean, he is a minority

19   of what?  I'm trying to understand, when you

20   say he is a minority, a minority what?  A

21   minority of the directorship, a minority of

22   the equity ownership of the company?

23           MS. WIGGER:  Object to form,

24       misstates the document.  It says, even

25       if he is a member, not that he is a



Page 249

                    D. Majcher

1

2      member.

3      A.    Right.

4      Q.    I'm asking, what do you mean?

5      A.    Even if he is a member, he is

6  minority and the minority will refer to the

7  member.

8      Q.    What did you mean by minority?

9  Minority of what?

10          MS. WIGGER:  Object to form, asked

11      and answered twice now.

12      Q.    You mean minority member, is that

13  what you mean?

14      A.    I literally just said that.

15      Q.    I just want to have a clear record.

16          So when you say minority, you mean

17  a minority member of the company, is that

18  what you mean?

19          MS. WIGGER:  Object to form.

20      A.    I was referring to even if he is a

21  member, he is minority, so the minority

22  refers to him being a member.

23      Q.    I'm not sure I fully understand

24  that.  I was referring to even if he is a

25  member, he is a minority, so the minority



Page 250

```
 1                D. Majcher
 2   refers to him being a member.
 3            A minority of what, like he and Mr.
 4   Choi, even if he is a member, he is only the
 5   minority member.  Is that what you are trying
 6   to say?
 7            MS. WIGGER:  Object to form, asked
 8       and answered three times now.
 9            MR. SIMONS:  I still don't think
10       I've gotten an answer.
11            MS. WIGGER:  You didn't get the
12       answer you want.
13            MR. SIMONS:  No, no, I don't think
14       that's true.
15            MS. WIGGER:  You can repeat your
16       answer again if you like.
17       A.   I'm not sure how you are not
18   understanding my answer.
19       Q.   Maybe we are speaking past each
20   other which is fine.
21            I will show you then, turning to a
22   couple of pages down, you try to clarify and
23   you say, member equals shareholder on the
24   bottom of 085?
25       A.   Yes.
```



Page 251

                        D. Majcher

1

2       Q.    When you say, even if he is a

3   member, he is a minority, can't outvote you

4   and later on, you say member equal

5   shareholder, what you are saying is even if

6   he is a shareholder, he is a minority, can't

7   outvote you?

8            MS. WIGGER:  Object to form.

9       Q.    That's what you are trying to say

10  here, right?

11      A.    You put those words together, yes.

12      Q.    That's what you were trying to say?

13           MS. WIGGER:  Object to form.

14      A.    Yes.

15      Q.    Then if you go I think to the very

16  last page of this document, Mr. Choi writes

17  to you --

18      A.    The very last page, 118?

19      Q.    Exactly, 118.

20           Mr. Choi writes to you, I want to

21  conduct a forensic investigation into the

22  invoices, receipts prepared by Ryan.  I hope

23  I won't find anything.

24           Do you see that?

25      A.    Yes.


MAGNA
LEGAL SERVICES

Page 252

1                    D. Majcher

2      Q.    Did De Tomaso ever conduct a

3  forensic investigation into the invoices or

4  receipts prepared by Mr. Berris?

5      A.    I don't think so.

6      Q.    You can put that aside.

7            Now, you mentioned that you were

8  working in this time period, say, March,

9  April 2022 with Moore as the auditor for the

10  company?

11      A.    Yeah, Moore was the firm on the

12  ground in Hong Kong doing the work.

13      Q.    You were also doing a lot of work,

14  as I have seen in the documents, you were

15  very involved in that audit process, right?

16      A.    Yes.  Sure.

17      Q.    And, in fact, the auditor was often

18  taking direction from you, right?

19      A.    No, the auditor -- we work with the

20  auditors, they are independent.

21      Q.    But there were occasions where you

22  would sort of ask them to do something and

23  they would do it, right?

24            MS. WIGGER:  Object to form.

25      A.    What occasions?



Page 253

```
 1                    D. Majcher
 2        Q.    Do you recall any occasions --
 3        A.    Do what?
 4        Q.    Anything.  Is there ever an
 5   occasion where you ask the auditor to do
 6   something during the process and they agreed
 7   to comply?
 8             MS. WIGGER:  Object to form.
 9             You can answer if you remember.
10        A.    I don't remember.
11        Q.    I'm going to show you a document.
12             (Majcher Exhibit 33, April 8, 2022
13        WhatsApp chat between Ms. Majcher and
14        Mr. Choi, marked for identification.)
15        Q.    We marked this as Majcher 33.
16             Ms. Majcher, this is another
17   WhatsApp chat between you and Mr. Choi on
18   April 8 of 2022, is that right?
19        A.    Yes.
20        Q.    If you go to the page ending in
21   097, you write, I told the auditor I need to
22   hold off on the audit because of this issue.
23   Then you write, and they are willing to play
24   ball with us.
25             What did you mean by that?
```



Page 254

```
 1                D. Majcher
 2           MS. WIGGER:  Object to foundation.
 3      A.   I need to read this.
 4      Q.   That's fine.  You can flip through
 5  it.
 6           Were you referring, when you say,
 7  this issue, to the purported issue related to
 8  Mr. Berris' expenses?
 9           MS. WIGGER:  Hold on.  Let us
10      finish reviewing it.
11      Q.   That's fine.  Go for it.
12      A.   To be honest, even after reading
13  through this whole chat, there are so many
14  different things going on, I can't tell what
15  this is referring to.
16      Q.   Let's go through some of the
17  additional messages.
18           After you write, I told the auditor
19  I need to hold off on the audit because of
20  this issue and they're willing to play ball
21  with you, Mr. Choi responds, At the same
22  time, we want to complete the audit, but we
23  will have Aprivy held responsible for the
24  unjustified expenses, right?
25           And then you write, That's what I
```



Page 255

1                    D. Majcher

2    mean.  Auditor is ready and prepared to do

3    that if that's what we want.  We just need to

4    tell them.

5           Do you see that?

6      A.   Yes.

7      Q.   So what you are talking about here

8    is that the auditor was willing to

9    essentially hold Mr. Berris accountable for

10   certain expenses if that's what you guys told

11   the auditor to do, right?

12          MS. WIGGER:  Object to form,

13       misstates the document?

14      A.   The auditors don't have any

15   authority to hold Mr. Berris accountable to

16   anything that happened with the company so

17   no, that's not what I meant.

18      Q.   What did you mean when you said

19   auditor is ready and prepared to do that if

20   that's what we want?

21      A.   Do that, as in agreeing with us how

22   to treat these unjustified expenses, how they

23   are booked on to the company's accounts.

24      Q.   We looked at a document earlier,

25   Ms. Majcher, right, where Mr. Choi asked you



Page 256

                    D. Majcher
1
2   whether the auditors raised any concerns
3   about Mr. Berris' invoices.
4           Do you remember that?
5       A.   Yes.
6       Q.   At the time, you said they hadn't,
7   right?
8       A.   Right.
9       Q.   It was actually you and Mr. Choi to
10  actually focus on this issue, right?
11          MS. WIGGER:  Object to form.
12      A.   No.  Again, I did not ask the
13  auditors to focus on this issue.
14      Q.   What did you mean when you said
15  they are willing to play ball with us?
16      A.   Okay.  Let's get into a little bit
17  of technicality when it comes to audit.
18      Q.   Okay.
19      A.   Typically, auditors will not raise
20  any issues of amounts that they call -- they
21  consider to be immaterial, materiality.
22          Are you familiar with that?
23      Q.   Yes, yes, absolutely.
24      A.   So from the auditor's perspective,
25  if the company is willing to accept those as



Page 257

```
 1                    D. Majcher
 2   proper business expenses without seeing
 3   proper receipts, supporting documents, as
 4   long as the company is willing to sign off,
 5   then they will be happy to sign off.
 6        Q.   They will do that if, in their
 7   view, the expenses are immaterial to the
 8   company's balance sheet or operations?
 9        A.   Yes.  And what I'm referring to
10   here are I discuss with the auditors I have
11   this issue with unsubstantiated expenses from
12   Mr. Berris and that I was unwilling to book
13   them on to the company's books as proper
14   company expenses.
15        Q.   Right.  So you, Diana Majcher, or
16   Mr. Norman Choi, were unwilling, on behalf of
17   De Tomaso, to book these as proper company
18   expenses and that's what you conveyed to the
19   auditor?
20        A.   Yes, because from our point of
21   view, they were unjustified and unsupported.
22        Q.   This is not an issue that the
23   auditor raised first, you raised this issue
24   with the auditor yourself?
25        A.   Yes.
```



Page 258

                         D. Majcher

1

2        Q.    Did De Tomaso have a corporate

3    expense policy at this point?

4        A.    Not a written one.

5        Q.    Did it have an unwritten corporate

6    expense policy?

7        A.    I would say it's like -- goes

8    without saying.

9        Q.    What did you mean by that?

10       A.    There is a common understanding of

11   the fact that you should treat the company

12   expenses as they're -- like you are running

13   your own company.  You don't spend other

14   people's money if that's not how you would

15   spend your own money.

16       Q.    There was nothing conveyed to

17   people that worked for De Tomaso that

18   memorialized this understanding about what

19   the expense policy was?

20       A.    There was no written agreement, no,

21   or document.

22       Q.    Was there ever an oral discussion

23   with De Tomaso employees about what their

24   expense policy was?

25            MS. WIGGER:  Object to form.



Page 259

                              D. Majcher
1
2        A.    I believe there were discussions,
3    yes.
4        Q.    What was the nature of those
5    discussions?  Let's talk about Mr. Berris
6    specifically.
7              In 2020 or 2021, did you ever have
8    any discussions with him where you said this
9    is our corporate expense policy regarding
10   what are appropriate business expenses?
11       A.    I don't recall having that
12   discussion.
13       Q.    Do you recall if anyone else had a
14   discussion with Mr. Berris about what were
15   appropriate business expenses at that time?
16             MS. WIGGER:  Object to form.
17       A.    I wouldn't know.
18       Q.    Fair enough.  I will show you
19   another document.
20             (Majcher Exhibit 34, April 22, 2022
21        WhatsApp exchange between Ms. Majcher
22        and Mr. Choi, marked for
23        identification.)
24       Q.    Ms. Majcher, this is another
25   WhatsApp exchange between you and Mr. Choi



Page 260

1                    D. Majcher

2    dated April 22, 2022.

3            Do you see that?

4        A.    Yes.

5        Q.    I want to ask you about a couple of

6    messages on the page ending in Bates 974.

7        A.    Yes.

8        Q.    Like the third page.  The bottom,

9    it says, it's a message from you.  You wrote,

10   Ryan told me yesterday that he gave up his

11   home and belongings to, quote, do this.

12   Probably why he needs to live in hotel rooms

13   every night and that shouldn't be DT's

14   problem if he chose to do that.

15           Do you see that?

16       A.    Yes.

17       Q.    Then you write at the top of the

18   next page, He sounded a bit defeated

19   yesterday when we spoke.  He is usually not

20   like that.

21           Do you see that?

22       A.    Yes.

23       Q.    Then towards the bottom of the

24   page, Mr. Choi writes, We need to have a

25   corporate policy giving everyone a guideline.



Page 261

1              D. Majcher

2          Do you see that?

3     A.   Yes.

4     Q.   So what Mr. Choi is conveying there

5  is there was not, at this point in time, a

6  corporate policy giving De Tomaso affiliated

7  individuals a guideline on appropriate

8  business expenses?

9          MS. WIGGER:  Object to form,

10         misstates the document.

11    A.   I answered one of your questions

12  earlier.  I also said we didn't have a

13  written policy at the time, yes.

14    Q.   And in your message at the bottom

15  of 974, you say that Ryan had to live in

16  hotel rooms because he basically gave up his

17  home and his belongings to work for De

18  Tomaso, right?

19         MS. WIGGER:  Object to form,

20         misstates the document.  It says Ryan

21         told me.

22    Q.   He told you that?

23    A.   Yes.

24    Q.   Did you have an understanding that

25  he had, in fact, given up his home to work



Page 262

1                    D. Majcher

2    for De Tomaso?

3        A.    I did not verify.

4        Q.    Had he told you that previous to

5    this discussion?

6        A.    I'm sorry?

7        Q.    Had he told you that previous to

8    this discussion referenced here?

9        A.    I don't recall.

10        Q.    Do you recall Ryan ever talking

11    about the apartment that he lived in in 2022?

12        A.    Actually, I don't recall him ever

13    telling me of where he was living at all.

14        Q.    Did you ever ask?

15        A.    I don't know.

16        Q.    You can put that aside.  Let me

17    show you another document.

18              (Majcher Exhibit 35, April 26, 2022

19        WhatsApp exchange between Ms. Majcher

20        and Mr. Choi, marked for

21        identification.)

22        Q.    Showing you a document marked as

23    Majcher 35, this is another WhatsApp exchange

24    between you and Mr. Choi as dated 26th of

25    April 2022.



Page 263

 1                    D. Majcher

 2            Do you see that?

 3       A.   Yes.

 4       Q.   Then you write at the beginning,

 5  Who prepared this?  Is Genesis ready to sign

 6  the benchmark?  How is their progress on DD?

 7  Anything I need to do?

 8            Do you see that?

 9       A.   Yes.

10       Q.   What you are talking about here is

11  the due diligence process related to the

12  contemplated SPAC or de-SPAC with Genesis

13  Unicorn, right?

14       A.   Yes.

15       Q.   If you go to the page ending in

16  525, in the middle of the page, Mr. Choi

17  writes to you, Please prepare your CV and use

18  anonymous identity for now, and you write,

19  Meaning, my name, company names, question

20  mark, and then Mr. Choi responds, Both.

21            Do you see that?

22       A.   Yes.

23       Q.   What did you understand he was

24  referring to when he asked you to prepare a

25  CV with an anonymous identity?



Page 264

1                    D. Majcher

2        A.    I took that to mean just as a CV

3    without your name or identifying the

4    companies I worked for.

5        Q.    Who was that CV supposed to be

6    provided to?

7              MS. WIGGER:    Object to form.

8        A.    I wouldn't know.

9        Q.    Did you ask him why he wanted you

10   to prepare an anonymous CV?

11       A.    I guess I didn't.

12       Q.    Has anyone ever asked you to

13   prepare an anonymous CV before?

14       A.    I can't recall.

15       Q.    Then if you go a few pages down to

16   533, Mr. Choi writes to you, Meantime, can

17   you help prepare an org chart.  Joe as chief

18   designer; Jakub, chief CAD designer; Steve as

19   CPO; Rodney, chief compliance officer; Jake,

20   special client; Ryan, VP (Jiri and Hugo under

21   him), you being the anonymous CFO for now.

22             Do you see that?

23       A.    Yes.

24       Q.    The Joe there, did you understand

25   him to be referring to Jowyn Wong?



Page 265

1                    D. Majcher

2        A.    Yes.

3        Q.    And Jakub is the same Jakub we

4   discussed?

5        A.    Yes.

6        Q.    Ryan, did you understand him to

7   mean Ryan Berris?

8        A.    Yes.

9        Q.    Who is the Steve referred to there?

10            MS. WIGGER:  Object to form.

11        Q.    To your understanding?

12        A.    Steve Pegg, P-E-G-G.

13        Q.    Who is Steve Pegg?

14        A.    My understanding is that he was an

15   engineer working in the automotive industry.

16        Q.    And does he work for De Tomaso?

17        A.    He does not.

18        Q.    Who is the Rodney that was referred

19   to here to your understanding?

20        A.    That would be Rodney Au, A-U.

21        Q.    And does he work for De Tomaso or

22   has he ever worked for De Tomaso?

23        A.    He does now.

24        Q.    When did he start working for De

25   Tomaso?



Page 266

1                        D. Majcher

2        A.    Towards the end of 2023, last year.

3        Q.    What is his title?

4        A.    He is risk and compliance.

5        Q.    Did De Tomaso have a risk and

6   compliance employee or contractor prior to

7   Rodney joining De Tomaso?

8        A.    No.

9        Q.    Below this, you write, CPO equals

10  chief product production officer or product,

11  question mark.  May I suggest putting Ryan as

12  CMO in this case.  He can be at the VP level

13  from a grading perspective, but carry the CMO

14  title.

15             Do you see that?

16       A.    Yes.

17       Q.    What you are suggesting here is

18  that Mr. Berris should be titled as the chief

19  marketing officer for the company at this

20  point in April of 2022, right?

21       A.    I would suggest saying to put that

22  into the org chart so that it looks more

23  uniform as you have, you know, there is a CPO

24  and there is a CMO and there is CFO, so those

25  would be like same level so I was



Page 267

```
 1                    D. Majcher
 2   specifically referring to his request of
 3   preparing an org chart.
 4        Q.   And going back to Mr. Choi's
 5   comment about you being the anonymous CFO for
 6   now, do you have any understanding of why you
 7   were supposed to be the anonymous CFO in this
 8   org chart?
 9             MS. WIGGER:  Object to form.
10        A.   I don't know why.
11        Q.   You can put that document aside.
12             If we go now to -- I will show you
13   another.
14             (Majcher Exhibit 36, May 19, 2022
15        email from Ms. Majcher to Mr. Choi,
16        marked for identification.)
17        Q.   This is Majcher 36.  Majcher 36 is
18   an email at the top that you sent on the 19th
19   of May 2022 from your De Tomaso email to Mr.
20   Choi, right?
21        A.   Yes.
22        Q.   You are forwarding him an email
23   from Mr. Berris, right?
24        A.   Yes.
25        Q.   And the email from Mr. Berris is on
```



Page 268

```
 1                D. Majcher
 2   the 20th of May 2022, right?
 3        A.   Yes.
 4        Q.   And he writes to you, Dear Diana, I
 5   hope this message find you well.  Following
 6   our discussions regarding this matter, I have
 7   spent time reviewing, preparing missing
 8   receipts and revising Excel documents.
 9   Kindly find attached to this email the
10   corresponding expense reports, receipts and
11   other relevant documentation.  As I am not an
12   accounting expert, please let me know if
13   there are any outstanding invoices that need
14   to be issued in order to match the expense
15   reports.  As always, I remain on standby to
16   provide any further clarification and/or
17   assistance to help satisfy the requirements.
18   Best, Ryan.
19             Do you see that?
20        A.   Yes.
21        Q.   Did you ever respond to this email?
22        A.   I don't know.  I can't recall.
23        Q.   Do you recall when Mr. Berris was
24   terminated from De Tomaso?
25             MS. WIGGER:  Object to form.
```



Page 269

                    D. Majcher

1

2          A.    My understanding is that Mr. Berris

3    was not terminated, he resigned.

4          Q.    It was your understanding that Mr.

5    Berris was never terminated from De Tomaso?

6          A.    He resigned from De Tomaso.

7          Q.    He resigned from the board of De

8    Tomaso.  He was still an employee at the time

9    that he resigned from the board of De Tomaso,

10   is that correct?

11               MS. WIGGER:  Object to form.

12         A.    I don't think he was ever an

13   employee of De Tomaso.

14         Q.    Do you recall that he resigned from

15   the board on or around May 3rd of 2022?  Does

16   that sound about right?

17         A.    That sounds about right, yeah.

18         Q.    Do you recall that he was still

19   working and doing work for De Tomaso after

20   that point?

21               MS. WIGGER:  Object to form.

22         A.    I cannot speak to whether he was

23   doing work, no.

24         Q.    Do you recall that on or around May

25   19th, De Tomaso sent him a letter from a



Page 270

1                    D. Majcher
2    lawyer named Frank Caruso to inform him that
3    he was being terminated from De Tomaso?
4              Does that refresh your
5    recollection?
6              MS. WIGGER:  Object to form.
7        A.   I think that letter was to
8    terminate the relationship he had with De
9    Tomaso, but it was not a termination letter.
10       Q.   I'm not sure I understand the
11   distinction, but the documents speak for
12   themselves.
13             You will see in this document that
14   there is a ZIP file referenced that was
15   attached from Mr. Berris that he sent to you.
16             Did you look through the contents
17   of that ZIP file?
18       A.   I can't remember.  I may have, but
19   I can't remember.
20       Q.   You can't remember.
21             But Mr. Berris, there was a
22   concern, as you said, at the time from Mr.
23   Choi and maybe even yourself that Mr.
24   Berris' expenses were unsubstantiated, right?
25       A.   Yes.



Page 271

```
 1                    D. Majcher
 2        Q.    And what he is trying to do here is
 3   send you the substantiation for those
 4   expenses, correct?
 5              MS. WIGGER:  Object to form.
 6        A.    He sent me something here, yes.
 7        Q.    He says he sends you corresponding
 8   expense reports, receipts and other relevant
 9   documentation, right?
10        A.    That's what he says, yes.
11        Q.    But you can't remember if you ever
12   looked at that document, right?
13        A.    Sitting here, I cannot.
14        Q.    Okay.  You can put that aside.
15              I will show you one more document
16   and then we can maybe take a break if you
17   want.
18              (Majcher Exhibit 37, April 5, 2022
19              email from Ms. Majcher to Mr. Berris
20              copying Mr. Choi, marked for
21              identification.)
22        Q.    We will mark this as Majcher 37
23   and, Ms. Majcher, this is an email from you
24   to Mr. Berris copying Mr. Choi dated April
25   52022, right?
```



Page 272

```
 1                    D. Majcher
 2        A.    Yes.
 3        Q.    It says De Tomaso internal control
 4   requirements.
 5              Do you see that?
 6        A.    Yes.
 7        Q.    You write, Dear Ryan, I hope this
 8   email find you well.  As you are aware, the
 9   auditors also completed internal control
10   review as part of the audit engagement.  They
11   have brought out a few points that require
12   our action.
13              Do you see that?
14        A.    Yes.
15        Q.    And then you say later on, To that
16   point, please share with Norman and me the
17   following, and then you list login details
18   for various De Tomaso accounts.
19              Do you see that?
20        A.    Yes.
21        Q.    Ms. Majcher, isn't it true that
22   this request for Mr. Berris to share these
23   login details to the social media accounts
24   came from Mr. Choi and not from the auditors?
25              MS. WIGGER:  Object to form.
```



Page 273

                    D. Majcher

1

2       A.   It was something that we had

3  discussed.  We used the same audit firm to do

4  the audit and do an internal control review.

5  There are two teams and so it was a concern

6  of both the internal control people and the

7  company that only one person at De Tomaso had

8  the login to all of these -- had the details

9  to all of these logins.

10      Q.   And do you recall whether it was

11 you or Mr. Choi that articulated that concern

12 or whether it was the internal control team

13 that articulated that concern first?

14          MS. WIGGER:  Object to form.

15      A.   I do not recall.

16          MR. SIMONS:  You can put this aside

17      and let's take a break.

18          THE VIDEOGRAPHER:  We are going off

19      the record.  The time is 3:53 p.m.

20          (Recess.)

21          THE VIDEOGRAPHER:  We are back on

22      the record.  The time is 4:11 p.m.

23      Q.   Ms. Majcher, before Mr. Berris

24 separated from De Tomaso, is it fair to say

25 that Mr. Choi became paranoid that he was



Page 274

```
 1                    D. Majcher
 2   somehow stealing money from the company?
 3            MS. WIGGER:  Object to form.
 4       A.    I don't think I would characterize
 5   it that way.
 6       Q.    How would you characterize it?
 7       A.    I think he had suspicions that Mr.
 8   Berris might have been using the money
 9   inappropriately.
10       Q.    Did you ever hire a private
11   investigator to determine whether Mr. Berris
12   was misappropriating funds from De Tomaso?
13            MS. WIGGER:  Object to form.
14       A.    I think we did hire a private
15   investigator.  I can't recall if -- the
16   second part of your question, investigating
17   the misappropriation of funds was part of the
18   scope of work.
19       Q.    When did you hire this private
20   investigator?
21       A.    I don't remember.
22       Q.    Was it shortly around the time that
23   Mr. Berris left De Tomaso?
24       A.    I can't remember if it was before
25   or after actually.
```



1                    D. Majcher

2      Q.   What was the name of the private

3  investigator?

4      A.   I think we talked about it earlier,

5  Gaffney.

6      Q.   So this is the same firm that was

7  tasked with conducting physical surveillance

8  of Mr. Berris?

9      A.   Yes, I believe we only ever hired

10  one private investigation firm, yes.

11      Q.   Besides the physical surveillance

12  of Mr. Berris, what other work did they do

13  with respect to looking into his background

14  or otherwise?

15          MS. WIGGER:  Object to form.  I

16      don't know if this gets into question,

17      but, again, anything with counsel would

18      be privileged.

19      Q.   I don't want to hear anything with

20  counsel.

21      A.   So they were hired through counsel.

22      Q.   But what did they actually -- what

23  were they asked to do?  What did the company

24  ask them to do?

25      A.   To provide a background check of



Page 276

```
 1                    D. Majcher
 2   Mr. Berris.
 3        Q.    Why did the company conduct a
 4   background check for Mr. Berris?
 5              MS. WIGGER:  Object to form.
 6              To the extent this was on advice of
 7         counsel, don't answer.
 8        A.    Okay.  We felt that we didn't know
 9   Mr. -- we felt that we didn't know who Mr.
10   Berris really was.
11        Q.    Partly because, as you testified
12   earlier, he is a relatively reserved person,
13   right?
14              MS. WIGGER:  Object to form.
15        A.    I don't think I used that word, but
16   I would agree with the use of the term, yes.
17        Q.    He doesn't talk about his personal
18   life that much?
19        A.    No.
20        Q.    And what did the -- did the
21   investigator ever produce a report or summary
22   of their findings about Mr. Berris?
23        A.    Yes.
24        Q.    What were the takeaways from that
25   report?
```



Page 277

```
 1               D. Majcher
 2          MS. WIGGER:  Object.  I need to
 3     talk to my witness about privilege for
 4     two seconds.
 5          Can we go off the record please?
 6          THE VIDEOGRAPHER:  We are going off
 7     the record.  The time is 4:14 p.m.
 8          (Off the record.)
 9          THE VIDEOGRAPHER:  We are back on
10     the record.  The time is 4:18 p.m.
11          MS. WIGGER:  This is work product
12     in anticipation of litigation made at
13     the direction of counsel so I will
14     instruct the witness not to answer.
15          MR. SIMONS:  Your position is that
16     a factual background investigation
17     conducted of Mr. Berris is
18     attorney-client -- sorry, is work
19     product?  That's fine.
20          MS. WIGGER:  We can talk about it.
21     The person was actually retained by
22     counsel, so it's privileged and I'm
23     instructing her not to answer.
24          MR. SIMONS:  Are you also going to
25     instruct her not to answer about any
```


MAGNA
LEGAL SERVICES

Page 278

```
 1                  D. Majcher
 2      information the company learned from
 3      that report factually?
 4            MS. WIGGER:  Yes, the report would
 5      be work product in anticipation of
 6      litigation, so, yeah.
 7            MR. SIMONS:  I understand your
 8      instruction.  We can take this up later.
 9      Q.    Did the investigator you hired, the
10 company hired to look into Mr. Berris ever
11 find any evidence that he was
12 misappropriating funds from De Tomaso?
13            MS. WIGGER:  I'm going to instruct
14      her not to answer to this investigation
15      for the same reason.
16      Q.    Are you going to accept that
17 instruction from your attorney?
18      A.    I think I should, yes.
19      Q.    I think you should too.  That's
20 generally a good point.
21            MS. WIGGER:  Take it up with me,
22      not her.
23      Q.    Sitting here today, are you aware
24 of any evidence, setting aside anything you
25 may have learned from this investigative
```



Page 279

```
 1                    D. Majcher
 2   report, supporting the view that Mr. Berris
 3   misappropriated funds from De Tomaso?
 4            MS. WIGGER:  Object to form.
 5        A.   Can you define misappropriate?
 6        Q.   That he took funds to personally
 7   enrich himself.
 8            MS. WIGGER:  Same objection, but
 9        you can answer to the extent you know.
10        A.   From my personal opinion, I would
11   say yes.
12        Q.   What is that evidence?
13        A.   We've seen money going out from the
14   account, from the company account into Mr.
15   Berris' private account.
16        Q.   But Mr. Berris provided invoices
17   and documentation to support those expenses,
18   did he not?
19            MS. WIGGER:  Object to form.
20        A.   He did not.
21        Q.   I just want to direct you back to
22   Majcher 36.  If you can pull that back up
23   again.
24            That document, as we discussed, is
25   an email from Mr. Berris to you saying, I've
```



Page 280

                         D. Majcher
1
2   spent time reviewing, preparing missing
3   receipt and revising Excel documents.  Please
4   find attached to this email the corresponding
5   expense reports, receipts and other relevant
6   documentation.
7             Do you recall this document?
8       A.   I think we went through this
9   earlier and my answer is I did not.  I do not
10  -- I see it now, but I don't recall this
11  document necessarily.
12      Q.   And your testimony is, correct me
13  if I'm wrong, was that you are not sure you
14  ever looked at this documentation that Mr.
15  Berris provided to support and justify those
16  business expenses?
17            MS. WIGGER:  Object to form.
18      A.   Without actually opening this
19  attachment and seeing what it is, I cannot
20  confirm.
21      Q.   Do you know if anyone else at the
22  company ever looked at the documentation that
23  Mr. Berris provided to justify his business
24  expenses?
25            MS. WIGGER:  Object to form.



Page 281

1                    D. Majcher

2        A.    I don't know.  I can't answer that.

3        Q.    But it's fair to say that without

4    looking or without knowing what this

5    documentation says, you can't offer an

6    opinion one way or the other about whether

7    the expenses are justified or are not

8    justified, that depends on the documentation,

9    right?

10            MS. WIGGER:   Object to form,

11         mischaracterizes testimony.

12        A.    I can say from my previous

13    experience with Mr. Berris and the way that

14    he submitted his expenses that it was often

15    not substantiated and not properly

16    categorized or supported.

17        Q.    What do you mean by not properly

18    categorized?

19        A.    Maybe that's not -- not properly

20    documented or supported.

21        Q.    And were there times that you would

22    ask him for additional documentation?

23        A.    I think that's what I did here.

24        Q.    He would provide you that

25    additional documentation, right?



Page 282

                              D. Majcher
1
2         A.    But it would often still not be
3    what I actually wanted to see or were after.
4         Q.    Did you convey that to Mr. Berris
5    at the time?
6         A.    Yeah.
7         Q.    Did he then provide you additional
8    documentation responding to your request for
9    additional support?
10        A.    Not always, no.
11        Q.    In this situation though, he did,
12   correct?
13              MS. WIGGER:   Object to form.
14        A.    We see there is an attachment.
15        Q.    You don't recall whether you ever
16   looked at it?
17        A.    We can look at it now if you have
18   it.
19              MS. WIGGER:   I think she is saying
20        without seeing what the document is.
21        Q.    I understand.   I can represent
22   having looked, I think it's a ZIP file, it's
23   several hundred pages or several hundred
24   files of receipts, invoices and supporting
25   documentation that we are not going to take



Page 283

```
 1                D. Majcher
 2  the time to go through it now.
 3       A.   But, again, having receipts doesn't
 4  mean those receipts are for business
 5  purposes.
 6       Q.   The only way for you to know would
 7  be to look at the receipts, correct?
 8       A.   Yeah, but it will be for him to
 9  properly present those receipts as to say I
10  took an Uber from this place to that place at
11  this time to meet so and so or to conduct
12  whatever business.
13       Q.   Based under what policy?
14       A.   Based under common sense.
15       Q.   Is common sense the same thing as a
16  corporate expense policy?
17            MS. WIGGER:  Object to form,
18            argumentative.
19       A.   No.
20       Q.   Ms. Majcher, did the investigator
21  that you hired ever look through Mr. Berris'
22  emails?
23            MS. WIGGER:  Object to form.
24            Again.  We are not talking about what
25            the investigator did.
```



Page 284

```
 1                  D. Majcher
 2           MR. SIMONS:  You are going to
 3      instruct the witness not to answer a
 4      factual question about whether the
 5      investigator ever looked through Mr.
 6      Berris' emails?
 7           MS. WIGGER:  Yes.
 8           MR. SIMONS:  On the basis of what?
 9           MS. WIGGER:  Privilege.  This
10      investigator was hired by counsel and
11      I'm saying that his investigation is
12      privileged.
13           MR. SIMONS:  The acts of what he
14      did -- what is the communication that is
15      being provided to counsel for purposes
16      of seeking or receiving legal advice?
17           MS. WIGGER:  Maybe I misunderstood
18      your question.  Your question was, did
19      the investigator -- I guess if you ask
20      her --
21           MR. SIMONS:  I'm asking a yes or no
22      question.
23           MS. WIGGER:  Are you asking if she
24      provided it to him?
25           I guess what I'm saying is because
```



Page 285

                    D. Majcher
1
2      you asked what the investigator did
3      without first establishing if she had
4      any clue what he did, that can only come
5      through counsel and so...
6           MR. SIMONS:  It could come through
7      counsel or it could come through Ms.
8      Majcher or Mr. Choi, so let's just short
9      circuit it by showing you a document.
10          (Majcher Exhibit 38, May 19, 2022
11     WhatsApp chat between Ms. Majcher and
12     Mr. Choi, marked for identification.)
13     Q.   Ms. Majcher, this is a WhatsApp
14  chat between you and Mr. Choi dated May 19,
15  2022, right?
16     A.   Yes.
17     Q.   If you go to the second page ending
18  in 433, you write at the bottom, The
19  investigators want to get access to his DT
20  email and go through.
21          Do you see that?
22     A.   Yes.
23     Q.   Then you say, I told them to wait
24  until we officially give him the termination
25  notice.



Page 286

1                    D. Majcher

2          Do you see that?

3     A.    Yes.

4     Q.    Then if we go to I believe the page

5     ending in 449, you write, Are you okay if I

6     give access of his mailbox and Google Drive

7     to the investigators and then Mr. --

8     A.    Sorry, sorry, sorry, 449?

9     Q.    449, yes.

10          Towards the bottom, you say, Are

11    you okay if I give access of his mailbox and

12    Google Drive to the investigators and you

13    write -- sorry, and Mr. Choi responds, Yes

14    please.

15          Do you recall giving access to the

16    investigators -- giving the investigators

17    access to Mr. Berris' mailbox and Google

18    Drive?

19    A.    I don't recall specifically.

20    Q.    But based on this document, do you

21    have any reason to doubt that you did, in

22    fact, give the investigators access to Mr.

23    Berris' mailbox and Google Drive?

24          MS. WIGGER:  Object to form.

25    A.    I asked Mr. Choi if it's okay and



Page 287

```
 1                    D. Majcher
 2   he said yes, but I can't tell from that
 3   whether I did or did not and I cannot
 4   remember.
 5       Q.   Why did you want investigators to
 6   go through Mr. Berris' emails or Google
 7   Drive?
 8            MS. WIGGER:  Object to form.
 9            Don't repeat any conversations with
10       counsel.
11       Q.   Setting that aside.
12            MS. WIGGER:  If it was based on
13       conversations with counsel, it's
14       privileged.
15       A.   Yeah, no, I can't answer.
16       Q.   So your only conversations about
17   having an investigator look into Mr. Berris'
18   emails and Google Drive were with counsel?
19       A.   Well, I would -- I had a discussion
20   with Mr. Choi here.
21       Q.   Did you have a discussion with Mr.
22   Choi outside of this chat about going into
23   and looking into Mr. Berris' emails and
24   Google Drive?
25       A.   I can't recall now.
```



Page 288

                         D. Majcher
1
2        Q.    I will show you another document.
3              (Majcher Exhibit 39, Truth Finder
4        Background Report, Ryan C. Berris,
5        report created May 17, 2022, marked for
6        identification.)
7        Q.    This is Majcher 39.  So, Ms.
8    Majcher, this says Truth Finder Background
9    Report, Ryan C. Berris, report created May
10   17, 2022.
11             Do you see that?
12       A.    I do, yes.
13             MR. SIMONS:  And, counsel, I'm
14       assuming this is not the investigator --
15       I'll ask it.
16       Q.    This is not the investigative
17   report that you are referring to.  This looks
18   like it was something that was basically you
19   fill out on the website, Truth Finder,
20   someone's individual, and they pile a bunch
21   of publicly accessible information about that
22   person.
23             Is that a fair summary of this
24   document from you, Ms. Majcher, looking
25   through it?



Page 289

1                    D. Majcher
2            MS. WIGGER:  Object to form.
3       A.    I can only confirm this is not the
4   report created by the investigators.
5       Q.    Do you recall the circumstances
6   behind the creation of this report?
7       A.    No.
8       Q.    Have you ever seen this report
9   before?
10      A.    I think I have.
11      Q.    Do you recall if there was anything
12  in this report that raised any reg flags
13  about Mr. Berris or his background?
14           MS. WIGGER:  Object to form.
15      A.    I don't remember.
16      Q.    Do you remember if there was
17  anything in this report that suggested that
18  Mr. Berris had ever represented --
19  misrepresented anything about his personal
20  background?
21           MS. WIGGER:  Object to form.
22      A.    Sorry, can you say that again?
23      Q.    Do you remember if there was
24  anything in this report that suggested that
25  Mr. Berris had ever misrepresented anything



Page 290

```
 1                    D. Majcher
 2   about his background?
 3        A.    I don't remember now.
 4        Q.    I just want to go back to the
 5   previous exhibit for a second if you don't
 6   mind.  Back to Majcher 38.
 7              I have a couple of questions on an
 8   unrelated point.  If you go to the Bates
 9   ending in 437.  You write, Will Mike be
10   making his payments soon?  And then Mr. Choi
11   responds, Miller has 31 contracts signed and
12   received payments from 29 clients.  I can
13   move Pachmar, dollar sign, 3-M, to fill up
14   the remaining five.
15              Do you see that?
16        A.    I do.
17        Q.    And then you respond, Stefan is
18   chasing me for money.  Will Pachmar make the
19   balance payment soon?
20              Do you see that?
21        A.    Yes.
22        Q.    What is Pachmar?
23        A.    We learned yesterday it is a
24   company that has purchased several cars from
25   both De Tomaso and Apollo.
```



Page 291

                    D. Majcher

1

2      Q.   Setting aside the testimony from

3  yesterday, did you have independent

4  understanding, separate and apart from what

5  Mr. Choi testified to, about what Pachmar

6  was?

7      A.   Yeah, it's a company that had made

8  purchases from both De Tomaso and Apollo.

9      Q.   What did you understand Mr. Choi to

10 mean when he said, I can move Pachmar and it

11 looks like $3 million to fill up the

12 remaining five?

13          MS. WIGGER:  Object to form.

14     A.   I'm not sure it means anything at

15 that time.

16     Q.   You said, Will Pachmar make the

17 balance payments, right?

18     A.   Yes.

19     Q.   What did you mean by that?

20     A.   I was referring to the balance

21 payment outstanding from the Apollo vehicle

22 that's owed to Apollo.

23     Q.   Do you know what Mr. Choi's

24 connection is with Pachmar?

25          MS. WIGGER:  Object to form.



Page 292

```
 1                    D. Majcher
 2      A.    Again, I know now from yesterday's
 3  testimony.
 4      Q.    You didn't know anything before
 5  about what Pachmar was?
 6      A.    I knew that it's a company that he
 7  -- he knew the owner of the company.
 8      Q.    Did you ever ask your husband for a
 9  recommendation for someone that could
10  potentially hack into Mr. Berris' emails?
11           MS. WIGGER:  Object to form.
12      A.    Can you repeat?
13      Q.    Did you ever ask your husband for a
14  recommendation for someone that could
15  potentially hack into Mr. Berris' emails?
16      A.    Hack?  We may have discussed, yes.
17      Q.    What was the nature of that
18  discussion?
19           MS. WIGGER:  Object to form.
20      A.    We would like to see what Mr.
21  Berris was up to.
22      Q.    So what you talked about with your
23  husband was hiring someone to basically break
24  into his personal emails and see what Mr.
25  Berris was up to?
```



Page 293

                    D. Majcher
1
2       A.    I don't know what they would do.
3   We just wanted to know what was happening.
4       Q.    Let me show you another document.
5            (Majcher Exhibit 40, email from
6        Stanley Cohen, fastferrari@aol.com to
7        Mr. Choi, marked for identification.)
8       Q.    We will mark this as Majcher 40,
9   which may or may not be my true age.  I will
10  not confirm or deny that fact.
11           Majcher 40 is an email from an
12  individual named Stanley Cohen with the email
13  address fastferrari@aol.com to Mr. Choi and
14  I'm not going to ask about Mr. Cohen's
15  exchange because you are not on it and you
16  probably have never seen it before, but if
17  you go down to the next page ending in
18  111230, there is an exchange between you and
19  someone named Frank Caruso and if you go, I
20  think the initial email in this thread starts
21  on page ending in 231.  It looks like on the
22  17th of May 2022, you wrote the following
23  email, right?
24           Do you see that?
25      A.    Yes.



Page 294

```
 1                    D. Majcher
 2      Q.    You wrote, Hi, Frank, Pursuant to
 3  our call, please find attached; one, Carmen
 4  Jord?'s invoice.  This invoice was paid on
 5  January 20, 2022.  Two, Ryan's resignation
 6  letter.  And then you write, Here is the
 7  background and the investigative suggestions
 8  I gave to Ross for your reference.  Target,
 9  Ryan Christopher Berris, DOB 1985, and I'm
10  not sure if that's June or July --
11            MR. SIMONS:  Ryan, what's your
12      birthday?
13      Q.    It says 1985/06/07.
14            Do you see that?
15      A.    Yes.
16      Q.    Then you write, We first met Ryan
17  in 2016 through a mutual contact.  He later
18  came onboard to work with us on sales and
19  marketing of two companies, Apollo Automobile
20  and; two, De Tomaso Automobile.
21            Do you see that?
22      A.    Yes.
23      Q.    That's an accurate statement?
24      A.    Yes.
25      Q.    Just as background, you were
```



Page 295

```
 1                    D. Majcher
 2   providing this information you said in this
 3   email, to sort of give the investigator some
 4   context for who Mr. Berris was, right?
 5             MS. WIGGER:  Object to form.
 6        A.   Yes, I think that's what it was.
 7        Q.   So you were trying to be pretty
 8   thorough in describing Mr. Berris'
 9   background, his personality and his work for
10   the company, right?
11             MS. WIGGER:  Object to form.
12        A.   Yeah, that's what it says here.
13        Q.   You then write, He has always
14   carried himself well, appeared to be reserved
15   and conservative.  He ingratiated himself
16   with the owner of the two companies, Norman
17   Choi and his family quite quickly.
18             And that, again, was an accurate
19   statement at the time that you wrote it,
20   right?
21        A.   Yes.
22        Q.   Then you wrote, Over the years, he
23   has produced some good work, but over the
24   past six months or so, we have been noticing
25   irregularities in his behavior that are
```



Page 296

```
 1              D. Majcher
 2   causing concern.
 3              That was also a true statement at
 4   the time that you wrote it, right?
 5       A.   Yes.
 6       Q.   Then below that, you write, Based
 7   on the above, we have reasons to believe that
 8   he may be defrauding the company.  In recent
 9   weeks, we asked him to hand over some
10   proprietary company information such as login
11   details to social media accounts, email
12   servers, etc., and were met with a lot of
13   resistance.
14              Was that an accurate statement?
15              MS. WIGGER:  Object to form.  You
16         skipped quite a lot of text.
17              MR. SIMONS:  I understand.
18              MS. WIGGER:  So based on the above,
19         that is not the record.
20       Q.   Is that an accurate reading of this
21   bullet point here, Ms. Majcher?
22       A.   Yes, you read what is written.
23       Q.   That's good.  Please correct me if
24   I don't.
25              Then you write, We believe the
```



MAGNA
LEGAL SERVICES

Page 297

```
 1                      D. Majcher
 2  working relationship with Ryan needs to end,
 3  but we need to find a way that will cause the
 4  least amount of damage to the company.  We
 5  want to do a thorough background check of
 6  Ryan and his related companies and we would
 7  like to do some forensic work on the invoices
 8  that he submitted to determine whether we
 9  have been defrauded.
10           Do you see that?
11      A.   Yes.
12      Q.   And that, again, is an accurate
13  statement at the time, right?
14      A.   Yes.
15      Q.   And I know we covered this a little
16  bit earlier, but to your recollection, the
17  company never did do any forensic work on the
18  invoices, did it?
19      A.   I don't think so.
20      Q.   Then later on, you write, The
21  outcome of the investigation -- let me start
22  with the sentence before that.  He is close
23  to a number of our clients.  His departure
24  will need to be dealt with carefully.
25           That was an accurate statement at
```



Page 298

```
 1                    D. Majcher
 2   the time that you wrote it, right?
 3             MS. WIGGER:  Again, object to form,
 4        to the extent you are skipping sentences
 5        here.
 6        A.   Yes.
 7        Q.   Then you wrote, The outcome of the
 8   investigation may be used in our negotiation
 9   with Ryan.
10             Do you see that?
11        A.   Yes.
12        Q.   And what did you mean by our
13   negotiation with Ryan?
14        A.   It would appear to be the
15   negotiation about him leaving the company.
16        Q.   If you go to the next bullet point,
17   you write, We suspect that Ryan may be
18   delinquent in his tax filings.  We suspect
19   that it may be the same case for his private
20   company, Aprivy LLC.
21             Do you see that?
22        A.   Yes.
23        Q.   Did you ever confirm or find out
24   that he was or was not delinquent in his tax
25   filing?
```



Page 299

                         D. Majcher
1
2        A.    I don't recall ever getting any
3    results.
4        Q.    Then at bullet point 2, you write,
5    Ryan uses one single address for multiple
6    businesses.  Can we find out what this
7    address actually is?
8              Do you see that?
9        A.    Yes.
10       Q.    Did you find out what this address
11   actually is?
12       A.    I think we actually -- we always
13   knew this to be his father's -- the address
14   for his father's business.
15       Q.    Point 3, you say, Ryan incorporated
16   a Connecticut company, De Tomaso Automobili
17   North America LLC that is wholly owned by
18   him.  This company has a bank account with
19   Bank of America and for a period of six
20   months or so, we actually used this account
21   as our nominee account because we had not
22   been able to open a U.S. based bank account.
23   We would like to know if this company was/is
24   being used to conduct any other business.
25              And did you find out the answer to



Page 300

```
 1                    D. Majcher
 2   that question?
 3        A.    I don't recall.
 4        Q.    Do you recall finding out whether
 5   -- to the best of your recollection, do you
 6   know whether that company was being used for
 7   any business beyond the De Tomaso business?
 8             MS. WIGGER:  Object to form.
 9        A.    I don't know.
10        Q.    Point 6 says, His behavior has
11   taken a sharp turn since Ms. Carmen Jord?
12   came into the picture, and then you describe
13   a little bit about issues with Ms. Jord? and
14   you write, It would be very helpful to find
15   out the exact relationship between Ms. Jord?
16   and Ryan.  Here is a profile.
17             Do you see that?
18        A.    Yes.
19        Q.    Did you find out anything about the
20   exact relationship between Ms. Jord? and
21   Ryan?
22             MS. WIGGER:  Object to form.
23        A.    I don't recall that we did.
24        Q.    Then you wrote, We want to do deep
25   dive into Ryan's background.
```



Page 301

```
 1                    D. Majcher
 2          Did you, in fact, do a deep dive
 3   into Ryan's background?
 4       A.   We conducted the background check
 5   that we talked about earlier.
 6       Q.   Point B says, His previous
 7   employment history.  We know that at one
 8   point, he worked for the Jim Glickenhaus, and
 9   then after another sentence, it says, In
10   front of us, he always made it sound like he
11   contributed a lot to Jim's then venture and
12   he left because he found Jim to be unethical.
13   In public, he does not speak about his
14   history with Jim at all.  We believe he was
15   fired by Jim and things did not end amicably.
16   We would like to know the circumstances
17   surrounding his departure if possible.
18          Did you, in fact, find out the
19   circumstances surrounding his departure from
20   Jim Glickenhaus' company?
21          MS. WIGGER:  Object to form.
22       A.   Not that I recall.
23       Q.   Did you ever find any evidence or
24   information to suggest he was, in fact, fired
25   by Jim Glickenhaus?
```



Page 302

```
 1                D. Majcher
 2           MS. WIGGER:  Object to form.
 3      A.    Not to my recollection.
 4      Q.    Any evidence or anything to support
 5  the claim that things did not end amicably
 6  with Jim Glickenhaus?
 7           MS. WIGGER:  Objection to form.
 8      A.    We didn't find anything at all to
 9  my recollection.
10      Q.    Despite hiring an investigator to
11  look into, I believe the words here was a
12  deep dive into Ryan's background, you didn't
13  find much of anything at all, is that your
14  testimony?
15           MS. WIGGER:  Object to form.
16      A.    I don't remember, no.
17      Q.    Then you wrote, Does he have any
18  criminal records, question mark.
19           Did you find out whether he did, in
20  fact, have any type of criminal record?
21      A.    I don't think he did.
22      Q.    Then you wrote, As far as we know,
23  he has no close friends or intimate
24  relationships.  We would like to know if that
25  is true and if there could be any reason why.
```



Page 303

```
 1                    D. Majcher
 2             Do you see that?
 3        A.    Yes.
 4        Q.    Did you, in fact, find out if it
 5   was true that Mr. Berris had no close friends
 6   or intimate relationships?
 7             MS. WIGGER:  Object to form.
 8        A.    I don't recall having any findings.
 9        Q.    Okay.  You can set that aside.
10             I'm going to show you another
11   document.
12             (Majcher Exhibit 41, May 18, 2022
13        WhatsApp exchange between Ms. Majcher
14        and Hugo De Sadeleer, marked for
15        identification.)
16        Q.    This is Majcher 41.  Ms. Majcher,
17   this is a WhatsApp exchange between you and
18   Hugo De Sadeleer from May 18, 2022, is that
19   right?
20        A.    Yes.
21        Q.    As we discussed earlier, Mr. De
22   Sadeleer was hired to work at De Tomaso in
23   roughly 2020.
24             Is that your recollection?
25        A.    Yes.
```



Page 304

                         D. Majcher

1

2        Q.    And you said he continues to work

3    at De Tomaso?

4        A.    Yes.

5        Q.    If you go to the page ending in

6    760, Mr. De Sadeleer writes, Personally, I

7    think it would be necessary for Norman to

8    talk to him, but whatever works best.  Do not

9    have him blow up the company.  And then you

10   write back, Sigh, dot, dot, dot.

11            Do you recall what this is

12   referring to?

13       A.    At the time, Mr. Choi was not

14   speaking to Mr. Berris.

15       Q.    So Mr. Berris would try to speak to

16   Mr. Choi, but Mr. Choi was refusing to speak

17   to Mr. Berris, is that your understanding?

18            MS. WIGGER:  Object to form.

19       A.    My understanding is they were not

20   speaking.

21       Q.    Do you know whether Mr. Berris was

22   trying to contact Mr. Choi?

23       A.    I believe he was.

24       Q.    Do you know if Mr. Choi was trying

25   to contact Mr. Berris?



Page 305

```
 1                    D. Majcher
 2        A.    I don't think he was.
 3        Q.    So it's fair to say then that Mr.
 4   Choi was the one not responding to Mr.
 5   Berris' outreach, right?
 6              MS. WIGGER:  Object to form.
 7        A.    I think it's fair.
 8        Q.    Did you have an understanding of
 9   what Mr. De Sadeleer meant about Mr. Berris,
10   quote, blowing -- sorry, blow up the company?
11              MS. WIGGER:   Object to form.
12        A.    Those are his words so I just think
13   he means there might be some negative impact
14   to the company.
15        Q.    Why would there be negative impact
16   from Mr. Berris leaving the company?
17              MS. WIGGER:  Object to form and
18        foundation.
19        A.    Any time when you have some kind of
20   human resource changes in the firm and in the
21   company, and especially for a company like
22   our size, it's small, we are a small team, it
23   has an impact.
24        Q.    If you go to the next page ending
25   in 761, Hugo writes to you, You have to
```



Page 306

```
 1                   D. Majcher
 2   acknowledge that generally speaking, he has
 3   done amazing things for DT.
 4           Do you see that?
 5       A.   Yes.
 6       Q.   And then he writes, However, these
 7   issues that have arisen are completely
 8   unacceptable.  He has become a dear friend
 9   for me -- sorry, a dear friend, so, for me, I
10   want to stay out of all of this, but I remain
11   very objective about it all.  I said to
12   Norman, emotion removed, there is no chance I
13   would ever keep someone associated based on
14   these facts.
15           Do you see that?
16       A.   Yes.
17       Q.   Do you have an understanding what
18   these facts were that Mr. De Sadeleer is
19   referring to?
20           MS. WIGGER:  Object to form.
21       A.   I don't want to speculate to
22   exactly what facts he is referring to.
23       Q.   Then in the next message, Hugo De
24   Sadeleer writes, It's really heartbreaking,
25   dot, dot, dot.  You wrote, I totally agree
```



Page 307

```
 1                    D. Majcher
 2   with you.
 3            Do you see that?
 4        A.   Yes.
 5        Q.   Why did you agree with Mr. De
 6   Sadeleer that it was heartbreaking?
 7            MS. WIGGER:  Object to form.
 8        A.   I'm not sure I'm agreeing it's
 9   really heartbreaking or the previous message.
10        Q.   Fair enough.  And I don't want you
11   to speculate.
12            In the next message, you say, I
13   would have taken a different approach to deal
14   with the issue.
15            Do you see that?
16        A.   Yes.
17        Q.   What did you mean by that?
18        A.   I think I mean or I meant the
19   approach of not speaking to Mr. Berris.
20        Q.   So what you are saying is you
21   didn't agree with Mr. Choi's approach of not
22   speaking to Mr. Berris?
23            MS. WIGGER:  Object to form.
24        A.   No, I just said I would take a
25   different approach.
```



Page 308

1                    D. Majcher

2        Q.    Mr. De Sadeleer then writes, I

3    don't see how Norman can work from the

4    environment he lives in either, he needs

5    stability, a real base.

6            Do you see that?

7        A.    Yes.

8        Q.    Then you write, Bottom line is, he

9    made some errors that are unacceptable, but

10   communication is a two-way street and at the

11   very minimum, he deserves to know why he is

12   getting handed the sentence he is getting,

13   whether he is going to accept it, and I think

14   you meant or not, right?

15       A.    Yeah.

16       Q.    Here, you are talking about, the he

17   you are referring to here is Mr. Berris?

18       A.    I think so.

19       Q.    When you say, communication is a

20   two-way street, you are talking about

21   communication between Mr. Berris and Mr.

22   Choi, right?

23       A.    Communication in general, so, yeah.

24       Q.    Then Mr. -- the next thing you

25   write here, I think it is following up on Mr.



Page 309

                    D. Majcher
1
2    De Sadeleer saying, I don't see how Norman
3    can work from the environment he lives in
4    either.  The top of the page, you write, I
5    don't want to get into his domestic affairs,
6    ha, ha.
7            Do you see that?
8        A.   Yes.
9        Q.   What did you mean by that?
10       A.   Exactly that.  I didn't want to get
11   into his --
12       Q.   His home life, essentially right?
13       A.   Yes.
14       Q.   And then Hugo sends an emoji,
15   right, and then he writes, Doesn't help to
16   make clear-minded decisions.
17           Do you see that?
18       A.   Yes.
19       Q.   Then Hugo writes, That's why he
20   keeps getting shafted by the romance of the
21   German engineering companies, smiley face.
22           Do you see that?
23       A.   Yes.
24       Q.   What Mr. De Sadeleer is referring
25   to was essentially Mr. Choi getting shafted



Page 310

1                    D. Majcher

2   by the romance of Capricorn?

3            MS. WIGGER:  Object to form.

4        A.   I can't speculate to what he is

5   referring to here.

6        Q.   Did you have an understanding at

7   the time about what he was referring to?

8            MS. WIGGER:  Object to form.

9        A.   I don't know.

10       Q.   How many German engineering

11  companies were you working with at the time

12  of this text exchange in May of 2022?

13       A.   Probably -- we had more than one

14  partner so...

15       Q.   Were there issues at the time?  Did

16  you have concerns at this time about a

17  particular German engineering company?

18       A.   At this time, I think we had some

19  doubts about Capricorn, sure.

20       Q.   Then if you go to the next page,

21  Hugo writes, 100, underscore, and then it

22  needs to be done amicably and the good work

23  that has been done needs to be acknowledged

24  and praised.

25            Do you see that?



Page 311

1                      D. Majcher
2          A.    Yes.
3          Q.    Do you understand that he was
4    referring to the good work that was done by
5    Mr. Berris?
6                MS. WIGGER:  Object to form, lack
7          of foundation.
8          A.    He could be.
9          Q.    Who else could he have been
10   referring to in terms of good work that needs
11   to be acknowledged and praised?
12               MS. WIGGER:  Object to form and
13         speculation.
14         A.    I don't know.
15         Q.    You can put that aside.
16               (Majcher Exhibit 42, May 19, 2022
17         text exchange between Ms. Majcher and
18         Mr. De Sadeleer, marked for
19         identification.)
20         Q.    Ms. Majcher, this is another text
21   exchange between you and Mr. De Sadeleer on
22   the following day, the 19th of May 2022, is
23   that right?
24         A.    Yes.
25         Q.    If you go to the page ending in



Page 312

```
 1                    D. Majcher
 2  874, Mr. De Sadeleer writes to you.
 3            Let me know when you are there.
 4       A.   Yes.
 5       Q.   This event is of material value to
 6  the brand.  It has to be done right, and you
 7  write, Definitely needs to be done right, no
 8  argument there, right?
 9       A.   Yes.
10       Q.   What event were you describing?
11       A.   I believe this was the LeMans
12  Classics.
13       Q.   Then if you go to the next page
14  ending in 875, at the bottom, Mr. De Sadeleer
15  writes, We want to spend millions to design a
16  V12 engine that won't exist for 40 months and
17  we are hustling for 50-K here.  We are
18  redesigning a whole rear clamshell when we
19  don't even have a prototype out.  Diligence
20  is one thing that is definitely necessary, I
21  agree, but cutting for the client experience
22  is not the right approach.
23            Do you see that?
24       A.   Yes.
25       Q.   Then he continues, We need some
```



Page 313

```
 1                    D. Majcher
 2   perspective please.  This is an event of
 3   material value for the brand.  It will be the
 4   foundation for all future events.  It is
 5   about environment and establishing ourselves
 6   with our clients.
 7            Do you see that?
 8       A.   Yes.
 9       Q.   Then if you go to the page ending
10   in 877, you respond to Mr. De Sadeleer and
11   you say, It's a common trait for people like
12   Norman to burn through, dollar sign, 1-M
13   without blinking, but nickel and diming over
14   $10, and then there is some type of emoji, is
15   that right?
16       A.   Yes.
17       Q.   Do you agree that Mr. Choi
18   sometimes is happy to burn through a million
19   dollars, but then nickels and dimes over $10?
20            MS. WIGGER:  Object to form.
21       A.   I think that was an off the cuff
22   comment.
23       Q.   But what was the basis for the
24   comment?
25            MS. WIGGER:  Object to form.
```



Page 314

                    D. Majcher
1
2        A.    That we would spend a lot of money
3    doing certain things, but when it comes down
4    to running the business, we still need to
5    fight over every dollar.
6        Q.    If you go, I guess to the last page
7    of this chat, Mr. De Sadeleer says, I also
8    think that this Ryan situation is being
9    dealt, then he writes, this wrong.  Ryan can
10   blow up the whole company.  Need to be a
11   sit-down, a clear explanation for all the
12   work that he has done and a clear explanation
13   of why he is being let go.  And then you
14   respond, That is, unfortunately, not my call.
15            Do you see that?
16       A.    Yes.
17            MS. WIGGER:  Object to form.  I
18       think you meant a clear appreciation.
19       Q.    It should have been a clear
20   appreciation, which I think the record has.
21            You responded, That is,
22   unfortunately, not my call, right?
23       A.    Yes.
24       Q.    What did you mean when you said, it
25   is, unfortunately, not your call?



Page 315

                         D. Majcher
 1
 2        A.    It was not my decision on how to
 3    deal with, to quote Mr. De Sadeleer, this
 4    Ryan situation.
 5        Q.    Why was it unfortunate that you
 6    weren't able to make the decision?
 7             MS. WIGGER:   Object to form.
 8        A.    This was just a figure of speech.
 9    I'm letting him know it's not my call.
10        Q.    You can put that document aside.
11             Changing gears a little bit, we
12    discussed earlier that you had some
13    discussions with Mr. Choi about your husband,
14    Bill Majcher, potentially serving on the
15    board or in some capacity with the De Tomaso
16    affiliated SPAC?
17             MS. WIGGER:   Object to form.
18        A.    Can you repeat what you said?
19        Q.    I said, we had some discussions
20    earlier -- we discussed earlier that you had
21    some discussions with Mr. Choi about your
22    husband, Bill Majcher, potentially serving on
23    the board or in some capacity with a De
24    Tomaso affiliated SPAC.
25             Do you recall those discussions?



Page 316

```
 1                    D. Majcher
 2            MS. WIGGER:  Same objection.
 3       A.    I think we were floating ideas back
 4  and forth of him being potentially on the
 5  board of directors of a company, could be a
 6  SPAC.
 7       Q.    Any idea if that company was going
 8  to be affiliated in some respect with De
 9  Tomaso?
10       A.    I don't know.
11       Q.    What other company would you have
12  been discussing besides De Tomaso in that
13  correspondence?
14       A.    I mean --
15            MS. WIGGER:  Object to form.
16            Go ahead.
17       A.    A SPAC is a standalone company so
18  it wouldn't be associated with any company.
19       Q.    Why would you be having discussions
20  with Mr. Choi about a company that had
21  nothing to do with De Tomaso?
22            MS. WIGGER:  Object to form.
23       A.    Mr. Choi is a businessman, he can
24  be investing in many different businesses.
25       Q.    Besides these discussions you had
```



```
 1                    D. Majcher
 2   with Mr. Choi, there were other discussions
 3   that your husband was involved in regarding
 4   to a sort of crypto related project relating
 5   to De Tomaso.
 6            Do you recall that?
 7            MS. WIGGER:  Object to form.
 8       A.   Yeah, I think at one point, we were
 9   looking into something like that, yes.
10       Q.   What do you remember about that?
11            MS. WIGGER:  Object to form.
12       A.   I actually don't remember too much.
13       Q.   Let me show you a document and see
14   if you can remember something.
15            (Majcher Exhibit 43, April 21, 2021
16         WhatsApp exchange between Adam, Bill
17         Majcher, Diana Majcher, Norman Choi and
18         Ryan Berris, marked for identification.)
19       Q.   This is Majcher 43 and this appears
20   to be a WhatsApp exchange on April 21, 2021
21   and the participants are listed as someone
22   named Adam, Bill Majcher, yourself, Diana
23   Majcher, Norman Choi and Ryan Berris.
24            Do you see that?
25       A.   Yes.
```



Page 318

                    D. Majcher

1

2       Q.    If you go to the first page of the

3   chat, sort of the second entry down there, it

4   says, Bill Majcher created group called Car

5   Crypto.

6             Do you see that?

7       A.    Yes.

8       Q.    So your husband, Bill Majcher,

9   created this WhatsApp group called Car

10  Crypto, is that a fair statement?

11      A.    Yeah, that's what it shows here.

12      Q.    He included you, Mr. Choi, Mr.

13  Berris, himself and someone named Adam in

14  that group, right?

15      A.    Yes.

16      Q.    Who is Adam?

17      A.    Adam is his business partner.

18      Q.    His business partner in what?

19      A.    In a cyber security business.

20      Q.    What is the name of that business?

21      A.    It's called -- sorry, it's changed

22  a couple of times.  I will say EMIDR,

23  E-M-I-D-R.

24      Q.    What is Adam's last name?

25      A.    Clark, C-L-A-R-K.



Page 319

1                    D. Majcher

2        Q.    Is he based in Hong Kong or

3    somewhere else?

4        A.    No, to my knowledge, he lives in

5    Thailand.

6        Q.    Then in this exchange, it looks

7    like Adam is sending a link, I think this is

8    the message at 10:20 with some information

9    about potentially Bitcoin.  He says, As you

10   can see, four exchanges account for 90

11   percent of the trading in Bitcoin.

12            Do you see that?

13       A.    Yes.

14       Q.    And then Norman writes, Thanks for

15   sharing, Adam.

16            Do you see that?

17       A.    Yes.

18       Q.    And Adam responds and Norman says,

19   If you find it appropriate, shall we have

20   another call Friday, 10:00 a.m. HKT.

21            Do you see that?

22       A.    Yes.

23       Q.    Adam says, Sounds good.  Speak

24   then.  Bill says, Same group chat, Norman?

25   Norman says, Yes, please, and Bill puts a



Page 320

```
 1                    D. Majcher
 2   thumbs up emoji.
 3            Do you see that?
 4       A.   Yes.
 5       Q.   Does this refresh your recollection
 6   that there were discussions involving your
 7   husband regarding to a car crypto project?
 8       A.   Yeah, I think we talked about or
 9   were exploring the possibility of what they
10   call -- there was a term they used that's
11   basically fractionize an asset like a piece
12   of art.
13       Q.   Right, an NFT, a nonfungible token
14   or...
15       A.   Something like that, but I think
16   this was before the NFT, but it's a similar
17   concept to NFT, so in a digital phase people
18   can become...
19       Q.   Did anything ever come out of those
20   discussions to your knowledge?
21       A.   I don't think so.
22       Q.   How did your husband get involved
23   in those discussions?
24            MS. WIGGER:  Object to form.
25       A.   He was a partner in the business
```



Page 321

```
 1                    D. Majcher
 2   that's in that space.
 3        Q.   How did then he and his business
 4   partner get connected with you, Mr. Choi and
 5   Mr. Berris?
 6             MS. WIGGER:  Object to form.
 7        A.   He is my husband.
 8        Q.   Fair enough.  Again, not a trick
 9   question.  Just need it for the record.
10             So your husband used to work in law
11   enforcement, right?
12        A.   He did.
13        Q.   And during that time, he worked in
14   law enforcement in Canada, right?
15        A.   Yes.
16        Q.   And during that time, he actually
17   interacted with a number of very dangerous
18   individuals, right?
19        A.   I think so, yes.
20        Q.   For a time, he worked actually in
21   deep undercover, right?
22        A.   To my understanding, yes.
23        Q.   He worked undercover infiltrating
24   organized crime, is that a fair statement?
25        A.   Yes.
```



MAGNA
LEGAL SERVICES

Page 322

1                    D. Majcher

2        Q.    He works deep undercover

3   infiltrating a drug cartel, is that your

4   understanding?

5        A.    Yes.

6        Q.    Let me show you a document.

7              (Majcher Exhibit 44, document

8              titled Brief Bio on Inspector Bill

9              Majcher, marked for identification.)

10       Q.    This is Majcher 44.  This document

11   is titled Brief Bio on Inspector Bill

12   Majcher.

13             Do you see that?

14       A.    Yes.

15       Q.    I don't know if you looked at a lot

16   of documents, but maybe you recall earlier

17   that we saw a situation where Mr. Choi was

18   asking you for his CV, you sent him a copy of

19   his CV, you also sent him a copy of a Word

20   document labeled Brief Bio.

21             Does this sound fair that this is

22   the same document you probably sent to Mr.

23   Choi?

24       A.    Yes.

25       Q.    In this bio of your husband, it



Page 323

```
 1                  D. Majcher
 2   says, Bill has -- in the third paragraph, has
 3   been almost murdered on at least two
 4   occasions and now receives two medical
 5   disabilities.
 6            Do you see that?
 7       A.   Yes.
 8       Q.   Is that accurate to your knowledge?
 9       A.   To my knowledge, yes.
10       Q.   In the next paragraph, it says,
11   Despite these brutal assaults, Bill
12   endeavored to have a highly stressful, but
13   adventurous career working with the RCMP and
14   other foreign agencies in a covert capacity.
15   Bill worked what was considered the longest
16   and most complex deep cover investigation of
17   its type in Canada.  He later worked for a
18   number of U.S. agencies and on a, quotation,
19   cold approach, end quotation, infiltrated the
20   Medell?n cocaine cartel who at the time was
21   considered the world's richest and most
22   violent criminal organization.  The lead U.S.
23   investigators advised that at the time when
24   Bill worked undercover into the cartel, the
25   Medell?n cartel had a standing U.S. dollar
```



Page 324

```
 1                    D. Majcher
 2  sign $100,000, quote, hit on any undercover
 3  personnel who infiltrated the organization.
 4            Then it says, Inspector Majcher and
 5  INSP Majcher worked his way up to the point
 6  over several years where he would ask to be
 7  the front man for all legitimate transactions
 8  for the Medell?n cartel (in North America).
 9  It was unprecedented infiltration of the
10  Colombian cartels at such a senior level.
11            Do you see that?
12       A.   Yes.
13       Q.   That's accurate to the best of your
14  knowledge?
15       A.   To the best of my knowledge, yes.
16       Q.   Then it says, Bill is sometimes
17  working two to three undercover operations
18  simultaneously and has been away from home
19  for years at a time, thus, sacrificing
20  personal relationships and economic
21  advantages (real estate market-opportunities
22  missed).
23            Then it says, Bill on a, quote,
24  cold approach, end quote, entered into
25  another three-year undercover investigation
```



Page 325

```
 1                    D. Majcher
 2   working with the FBI in Miami and the result
 3   was an 88 percent conviction rate of 60
 4   suspects in what has been reported on as the
 5   largest and most successful money laundering
 6   and securities sting in North American
 7   history.
 8            Do you see that?
 9        A.   Yes.
10        Q.   That's consistent with your
11   understanding as well?
12        A.   Yes.
13        Q.   If you go to the next page, the
14   first full paragraph, it says, Aside from
15   having been almost murdered, having a
16   standing $100,000 contract on his life if his
17   identity was discovered, Inspector Majcher
18   also had to go into hiding outside of Canada
19   at the time of one operation as it was
20   learned one of the primary suspects Inspector
21   Majcher would be testifying against was
22   reaching out to a contract killer ostensibly
23   to stop Inspector Majcher or some other
24   co-accused from testifying.
25            Do you see that?
```



Page 326

                    D. Majcher
 1
 2      A.    Yes.
 3      Q.    That's also accurate to the best of
 4  your knowledge?
 5      A.    From what I was told, yes.
 6            MS. WIGGER:  Object to form and
 7      relevance in reading this, as much as
 8      I'm enjoying it.
 9      Q.    I want to show you another
10  document.  You can put that one aside.
11            MR. SIMONS:  We will mark this as
12      Majcher 45.
13            (Majcher Exhibit 45, copy of Bill
14      Majcher's CV, marked for
15      identification.)
16      Q.    Ms. Majcher, Majcher 45 is a copy
17  of your husband's CV, is that fair?
18      A.    Yeah, it looks to be.
19      Q.    If you go to the second page, there
20  is a line item that says, Directorships and
21  board advisory roles.
22            Do you see that?  That's the third
23  page?
24      A.    Yes.
25      Q.    And the third one down says, CCT



Page 327

```
 1                  D. Majcher
 2    Land Holdings Limited.
 3            Do you see that?
 4        A.    Yes.
 5        Q.    And it says next to it, HKEX 261.
 6            Do you see that?
 7        A.    Yes.
 8        Q.    And do you understand that to be
 9    the abbreviation, the numeric abbreviation
10    for the listing on the Hong Kong Stock
11    Exchange of CCT Land Holdings Limited?
12        A.    I take it to mean what it is, yeah.
13        Q.    It's correct, your husband was, in
14    fact, a director of CCT Land Holdings
15    Limited, right?
16            MS. WIGGER:  Object to form.
17        A.    He was for a short period of time
18    to my understanding.
19        Q.    You can put that aside.
20            (Majcher Exhibit 46, September 22,
21            2020 WhatsApp exchange between Ms.
22            Majcher and Mr. Choi, marked for
23            identification.)
24        Q.    We are marking this as Majcher 46.
25    Ms. Majcher, this is a WhatsApp exchange
```



Page 328

```
 1                    D. Majcher
 2   between you and Mr. Choi from September 22nd
 3   of 2020.
 4           Do you see that?
 5      A.   Yes.
 6      Q.   Then the first chat that you say
 7   is, You own 81 percent of this company, then
 8   you write, 261 used to own 19 percent, then
 9   they transferred the interest to some private
10   company.  Then the next text you wrote, I
11   mean ITV owns 81 percent.
12           Do you see that?
13      A.   Yes.
14      Q.   When you were talking about you own
15   81 percent of this company in September 2020,
16   you were referring to Apollo, right?
17           MS. WIGGER:  Object to form.
18           Go ahead.
19      A.   I don't know.  There is no context.
20      Q.   Do you recall any other company
21   that Mr. Choi owned or -- sorry, ITV owned an
22   81 percent interest in?
23           MS. WIGGER:  Object to form.
24      A.   No, but Mr. Choi also doesn't --
25   Mr. Choi or Ideal Team never owned 81 percent
```



Page 329

```
 1                D. Majcher
 2   of Apollo.
 3       Q.    The reference here in 261 is to CCT
 4   Land, right?
 5            MS. WIGGER:  Object to form.
 6       A.    It could be.
 7       Q.    Do you have any recollection of
 8   another company that the numbers 261 could be
 9   referring to?
10            MS. WIGGER:  Object to form.
11       A.    No, no recollection.
12       Q.    So to the best of your
13   recollection, 261 is referring to CCT Land,
14   right?
15            MS. WIGGER:  Object to form, asked
16       and answered.
17       A.    Possibly.
18       Q.    And when you say, 261 used to own
19   19 percent, then they transferred the
20   interest to some private company.  You are
21   saying that CCT Land used to own 19 percent,
22   then they transferred the interest to some
23   private company, right?
24            MS. WIGGER:  Object to form.
25       A.    Yes.
```



Page 330

1                    D. Majcher

2      Q.    So you are talking here about some

3   company that Ideal Team Ventures owned 81

4   percent of and that CCT Land owns 19 percent

5   of, right?

6            MS. WIGGER:  Object to form.

7      A.    Based on this message, yes.

8      Q.    You do, in fact, recall that CCT

9   Land did own some percentage of Apollo at

10  some point in time, right?

11           MS. WIGGER:  Object to form.

12     A.    I don't know if it was CCT Land or

13  one of their -- so no, I can't recall the

14  actual structure or the holder of the shares.

15     Q.    But you recall there was either CCT

16  Land or some entity associated with CCT Land

17  that owned a 19 percent interest in Apollo at

18  some point?

19           MS. WIGGER:  Object to form.

20     A.    I don't remember the ownership

21  percentage and I still don't know exactly

22  which company we are talking about here.

23     Q.    Do you recall that at some point,

24  there was a proposed deal for CCT Land to

25  purchase Apollo, right?



Page 331

```
 1                    D. Majcher
 2        A.   There was a proposed deal to do
 3   something with CCT, purchase, there was a
 4   proposed transaction, yes.
 5        Q.   But that deal never transpired,
 6   right?
 7        A.   No.
 8        Q.   And that happened after Mr. Choi
 9   had a Financial Times interview relating to
10   that proposed transaction, right?
11             MS. WIGGER:  Object to form.
12        A.   Sorry, what happened after the
13   Financial Times interview?
14        Q.   That was a bad question on my part.
15             Prior to the proposed deal with CCT
16   Land falling apart, Mr. Choi had an interview
17   with the financial times, right, do you
18   recall that?
19             MS. WIGGER:  Object to form.
20        A.   This deal falling apart is
21   referring to, when you say, fall apart, what
22   does that mean?
23        Q.   I'm referring to the fact that
24   there was never -- there was, at one point --
25   let me look at your testimony.
```



Page 332

```
 1                    D. Majcher
 2           You said there was a proposed deal
 3   for CCT Land to purchase Apollo and that
 4   never transpired, right?
 5      A.   I said there was a proposed
 6   transaction with Apollo.  I can't remember
 7   the exact structure and that did not
 8   transpire, yes.
 9      Q.   And prior to that deal not
10   transpiring, Mr. Choi sat for an interview
11   with a reporter from the Financial Times.  Do
12   you recall that?
13           MS. WIGGER:  Object to form.
14      A.   I recall there was an interview,
15   but I don't recall the exact timing.
16      Q.   Do you recall that Mr. Choi was
17   asked questions relating to this proposed
18   deal relating to Apollo and CCT Land during
19   that interview?
20           MS. WIGGER:  Object to form.
21      A.   I don't recall, no.
22      Q.   Do you recall Mr. Choi asked you
23   after that interview to, quote, make the
24   issue go away?
25      A.   I don't recall.
```



Page 333

```
 1                    D. Majcher
 2      Q.    Clement Mak at one point was also
 3  an investor in Apollo, right?
 4            MS. WIGGER:  Object to form.
 5      A.    Not to my knowledge.
 6      Q.    But it's possible that one of his
 7  entities that he owns or controls was an
 8  investor in Apollo, right?
 9            MS. WIGGER:  Object to form.
10      A.    Again, I don't know his entities,
11  controlling, so I can't speak to that.
12      Q.    But you do know that he was the
13  controlling shareholder of CCT Land at one
14  point, right?
15            MS. WIGGER:  Object to form.
16      A.    Actually, I do not know.  I know he
17  is somehow associated with CCT Land.
18      Q.    CCT Land, once again, was the
19  company your husband served on the board for
20  at one point?
21            MS. WIGGER:  Object to form.
22      A.    Yes.
23      Q.    You can put that aside.
24            Ms. Majcher, your husband has been
25  indicted by Canada under criminal espionage
```



Page 334

```
 1                   D. Majcher
 2  charges, right, and I understand they are
 3  just charges?
 4          MS. WIGGER:  Why is this remotely
 5      relevant to this case?
 6          MR. SIMONS:  Are you instructing
 7      her not to answer?
 8          MS. WIGGER:  I am real close on the
 9      basis of harassing.  You can ask this
10      one question, but this better not be
11      a...
12          MR. SIMONS:  I don't know what the
13      basis is.  I don't mean to be harassing.
14      I know it's a tough time, but I do just
15      want to create some background for the
16      record.  There was a line of questions
17      asking Mr. Choi about this.  There was
18      no objection raised at the time.
19      Q.   So, Ms. Majcher, I'm sure this is a
20  tough topic to talk about, but in July of
21  2023, your husband was charged, allegedly, by
22  Canada, for being involved in foreign
23  interference, right?
24          MS. WIGGER:  Objection to form and
25      relevance.
```



Page 335

```
 1                    D. Majcher
 2        A.    That's not the wording of the exact
 3   charge, but...
 4        Q.    The general nature of the
 5   allegations, and I'm just -- I'm going to ask
 6   two more questions on it.
 7              The general nature of the
 8   allegations is that he is alleged to have
 9   assisted in the Chinese government's efforts
10   to identify and intimidate an individual
11   outside the scope of Canadian law, is that a
12   fair summary?
13              MS. WIGGER:  Object to form and
14         relevance.  This is close to harassing
15         and you need to move on.
16        A.    In large part, yeah.
17        Q.    Last question on that.  This arrest
18   came following a two-year investigation into
19   your husband, is that your understanding?
20              MS. WIGGER:  Objection.  She cannot
21         possibly know how long the investigation
22         was.
23        Q.    Are you aware that there was public
24   reporting that your husband had been under
25   investigation for two years?
```



Page 336

```
 1                   D. Majcher
 2      A.    After the arrest, yes.
 3      Q.    This is not about the nature of the
 4   criminal investigation.  I'm going to
 5   follow-up on a question about Mr. Choi's
 6   testimony yesterday.
 7            You were here yesterday when he
 8   said he was not aware of the details of the
 9   criminal prosecution of your husband.
10            Do you recall that testimony from
11   Mr. Choi yesterday?
12            MS. WIGGER:  Object to form and
13        relevance.
14      A.    I recall this topic came up.  I
15   don't recall exactly what he said.
16      Q.    Have you ever discussed the details
17   of the prosecution of your husband with Mr.
18   Choi?
19            MS. WIGGER:  Object to form and
20        relevance.
21      A.    I keep him up to speed on what is
22   happening because this is a big deal on my
23   personal life and I want to keep him abreast.
24      Q.    It's your understanding that he is
25   generally aware of the nature of the
```



Page 337

```
 1                    D. Majcher
 2   allegations against your husband, right?
 3             MS. WIGGER:  Object to form.  She
 4        can't know what Mr. Choi knows.  This is
 5        harassing and irrelevant.
 6        A.   Again, I told him what I told him.
 7   Whether he is aware, he really understood, I
 8   don't know.
 9        Q.   What did you tell him?  That's my
10   last question, I promise.
11             MS. WIGGER:  Object to form.
12        A.   Really, I forwarded him some
13   articles that talked about the case.  I told
14   him the general situation and status, what's
15   happening.
16        Q.   Have you ever been contacted by any
17   law enforcement officials regarding your work
18   at Apollo?
19        A.   Me?
20        Q.   You, yes.
21        A.   Law enforcement?
22        Q.   Yes.
23        A.   When you said contacted, you mean
24   having interactions or them contacting me,
25   like they initiating?
```



Page 338

                    D. Majcher

1

2       Q.    Yes, them initiating contact with

3   you.

4       A.    Them initiating, I don't think so.

5       Q.    Have you ever had interactions with

6   law enforcement relating to your work at

7   Apollo, separate from them initiating

8   interactions with you?

9       A.    Yes.

10      Q.    What was the nature of those

11   interactions?

12      A.    There was one time where AFMG was

13   basically defrauded, that email scam,

14   somebody saying they are the CEO, wire this

15   money, so that actually happened and we

16   contacted the Hong Kong police.

17      Q.    Have you ever been contacted, and I

18   mean now, just limited to someone initiating

19   and reaching out to you specifically, by any

20   regulatory authorities regarding your work at

21   Apollo?

22      A.    Not that I can recall.

23      Q.    Have you ever been contacted by any

24   law enforcement authorities about your work

25   at De Tomaso?



Page 339

```
 1                   D. Majcher
 2        A.    Not that I can recall.
 3        Q.    Have you ever been contacted by any
 4   regulatory authorities relating to your work
 5   at De Tomaso?
 6        A.    Have I ever been contacted, again,
 7   is it their --
 8        Q.    They're reaching out to you.
 9        A.    Not that I can recall.
10        Q.    Have you ever been contacted by any
11   investigative journalists regarding your work
12   at Apollo?
13        A.    Not that I can recall.
14        Q.    Have you ever been contacted by any
15   investigative journalists regarding your work
16   at De Tomaso?
17        A.    Not that I can recall.
18        Q.    Would it surprise you that other
19   people who have worked at Apollo or De Tomaso
20   have been contacted by these types of
21   journalists asking about you personally?
22             MS. WIGGER:  Object to form.
23        A.    I would be.
24             MR. SIMONS:  Maybe now is a good
25        time to take a break.
```



Page 340

```
 1                  D. Majcher
 2            Off the record.
 3            THE VIDEOGRAPHER:  We are going off
 4       the record.  The time is 5:19 p.m.
 5            (Recess.)
 6            THE VIDEOGRAPHER:  We are back on
 7       the record.  The time is 5:39 p.m.
 8       Q.   Welcome back, Ms. Majcher.
 9            During the time that you worked at
10  De Tomaso, on at least one occasion, you
11  mentioned to Mr. Choi or you asked Mr. Choi
12  about whether De Tomaso should put something
13  in writing about Mr. Berris' agreement with
14  De Tomaso, right?
15            MS. WIGGER:  Object to form.
16       A.   I don't recall.  Did I?  I don't
17  recall.
18       Q.   Let me show you.
19            (Majcher Exhibit 47, March 3, 2022
20       chat between Ms. Majcher and Mr. Choi,
21       marked for identification.)
22       Q.   This has been marked as Majcher 47.
23  This is a chat between you and Mr. Choi on
24  March 3rd of 2022, correct?
25       A.   Yes.
```



Page 341

1                    D. Majcher

2       Q.    I'm going to ask you a few

3  questions about a couple of specific portions

4  because I know it's a very lengthy chat with

5  screenshots.

6            If you go to the page ending in

7  608, you write towards the bottom, it says,

8  At 12:46, Ryan sent me his invoice for

9  February.  $36,333.  Okay to process.

10           Do you see that?

11      A.    Yes.

12      Q.    Then you write, No way Ryan can

13 handle all of this on his own.  He needs a

14 lot of help.  I'm happy to help with whatever

15 he is willing to part with.  Maybe what makes

16 most sense for now is the SPAC-related stuff.

17           And then Mr. Choi responds, Let me

18 have a look at his invoice please, and then

19 he writes, Yes, SPAC-related only.  We will

20 need a CRM and some sort of accounting system

21 as well.  Right now, too many loose pieces.

22           And then you write, It's just a

23 simple invoice that says February consulting.

24 He said the formal contract is coming, but

25 you agreed to this prorated fee, and Mr. Choi



Page 342

1                    D. Majcher

2    wrote, Should be 400-K per year so that works

3    out to be 33,333.

4              Do you see that?

5        A.   Yes.

6        Q.   So what you are talking about,

7    going back to that first message on 608, is

8    that Mr. Berris sent De Tomaso an invoice for

9    the work he was doing for the company for the

10   month of February of 2022, right?

11             MS. WIGGER:  Object to form.

12       A.    He sent me an invoice, yes.

13       Q.    That invoice was for the work he

14   did for De Tomaso?

15             MS. WIGGER:  Object to form.

16       A.    I presume it to be.

17       Q.    That invoice was in the amount of

18   $36,363, right?

19             MS. WIGGER:  Object to form.

20       A.    He did send me an invoice for that

21   amount to my knowledge, yes.

22       Q.    You are asking Mr. Choi if it's

23   okay to process that invoice, right?

24       A.    Yes.

25       Q.    In the next message, what did you



Page 343

1                    D. Majcher
2    mean when you said, No way Ryan can handle
3    all of this on his own?
4        A.    I actually don't know.  There is no
5    context to what this comment was referred to.
6        Q.    Do you have an independent
7    recollection outside of this document as to
8    what you were talking about at this time as
9    to why Ryan won't be able to handle
10   everything on his own?
11            MS. WIGGER:  Object to form and
12       foundation.
13       A.    No.  Again, I can't -- like you
14   said, I haven't found anything relevant to
15   that comment so I don't know.
16       Q.    You said, Maybe what makes the most
17   sense for now is the SPAC-related stuff, and
18   you were offering to Mr. Choi, right, to help
19   out with the SPAC and take that off Ryan's
20   plate, is that fair?
21       A.    I think it's a fair assessment.
22       Q.    And Mr. Choi agreed with you, he
23   said yes, SPAC-related only, right?
24       A.    Yes.
25       Q.    Then if you go to the next page,



Page 344

1                    D. Majcher
2   you say, It's just a simple invoice that says
3   February consulting fee and that's referring
4   to the invoice that Mr. Berris had sent you
5   for $36,333, right?
6        A.    Yes.
7        Q.    When you write, he said the formal
8   contract is coming, but you've agreed to this
9   prorated fee, that was a true statement, that
10  is what Mr. Berris told you at the time?
11       A.    I believe it would be, otherwise, I
12  wouldn't have said that.
13       Q.    Mr. Choi wrote, Should be 400-K per
14  year, that works out to be 33,333?
15       A.    That's what he said, yes.
16       Q.    So what you understood him to mean
17  is that the agreement to pay Mr. Berris for
18  De Tomaso was for $400,000 per year, right?
19            MS. WIGGER:  Object to form.
20            Go ahead.
21       A.    No.
22       Q.    That's not what you understand him
23  to mean?
24       A.    He wrote what he wrote, but I
25  didn't understand that to mean that Mr.



Page 345

```
 1                  D. Majcher
 2   Berris was getting paid $400,000 a year.
 3        Q.   What did you understand him to
 4   mean, should be 400-K per year, so that works
 5   out to be 33,333?
 6             MS. WIGGER:  Object to form.
 7        A.   I'm not sure that I understood
 8   anything about that.
 9        Q.   You were talking about above this
10   message, you say, it's just a simple invoice
11   that says February consulting fee.  He said
12   the formal contract is coming, but you have
13   agreed to this pro rated fee, right?
14             Do you see that?
15        A.   Yeah.
16        Q.   Pro rated fee means like a monthly
17   fee based on an annual contract, right?
18             MS. WIGGER:  Object to form.
19        A.   That's what pro rated means.
20        Q.   That's what you meant here, right?
21        A.   No -- my message was to relay what
22   Mr. Berris had told me.  He said that the
23   formal contract is coming, but you agreed to
24   this pro rated fee.  I was quoting Mr.
25   Berris.
```



Page 346

1                        D. Majcher

2          Q.    What did you understand prorated

3    fee to mean?

4                MS. WIGGER:   Object to form.

5          A.    I'm not sure.   There were other

6    instances where Mr. Choi had asked me to

7    process payment to Mr. Berris without giving

8    me any contact or me receiving any invoices

9    from Mr. Berris.

10               So I understand it to be that they

11   had some kind of discussion and that I was to

12   process -- and that Mr. Berris then sends me

13   an invoice and asked me to process.

14         Q.    And Mr. Choi agreed with you

15   processing that invoice that Mr. Berris had

16   submitted, right?

17               MS. WIGGER:   Object to form.

18         A.    I don't see that he agreed to my

19   question of okay to process.

20         Q.    What did he say to you instead?   He

21   said, should be 400-K per year, that works

22   out to be 33,333, right?

23         A.    That's what he said.   It's not a

24   yes.

25         Q.    So what you understood him to mean



Page 347

```
 1                    D. Majcher
 2  was actually that invoice that you sent for
 3  36,333, wait a second, actually, it should be
 4  33,333 instead, that's what he was trying to
 5  say to you, right?
 6            MS. WIGGER:  Object to form.  I
 7       also think you meant 33, not 36.
 8       Q.   There is one 36 and there is one
 9  33.  The invoice he sent you was in the
10  amount 36,333, right?
11       A.   Yes.
12       Q.   And here, Mr. Choi is saying should
13  be 400-K per year, so that works out to be
14  33,333.
15            Do you see that?
16       A.   I do.
17       Q.   And 400-K, not to put you on the
18  spot, but 33,333 is 1/12 of 400, roughly?
19            MS. WIGGER:  Object to form.
20       A.   I will take your word for it.
21       Q.   It's roughly one month's payment
22  under an annual salary of 400-K per year,
23  right?
24            MS. WIGGER:  Object to form.
25       A.   If you assume there is annual
```



```
 1                    D. Majcher
 2   salary of 400,000, then can you fit the
 3   $33,333 as a one-month payment, yes.
 4        Q.    That's all the math I'm going to
 5   make you do today at least.  You can put this
 6   aside.
 7             There came a point in time where
 8   you were aware of discussions about granting
 9   Mr. Berris an equity interest in De Tomaso,
10   right?
11             MS. WIGGER:  Object to form.
12        A.    Sorry, can you maybe -- actually,
13   ask me again.
14        Q.    I'm happy to ask you again.
15             There came a point in time where
16   you were aware of discussions about granting
17   Mr. Berris an equity interest in De Tomaso,
18   right?
19             MS. WIGGER:  Object to form.
20        A.    I'm not aware of granting Mr.
21   Berris any equity interest.
22        Q.    There was a discussion about Mr.
23   Choi saying he was going to give Mr. Berris
24   an equity interest in the company, right?
25             MS. WIGGER:  Object to form.
```



Page 349

1                        D. Majcher

2        A.    I think there was a discussion

3   about -- I think -- I understood it to be him

4   considering this as a possibility.

5        Q.    So your testimony is that there was

6   a time where Mr. Choi was considering

7   granting Mr. Berris an equity interest in the

8   company?

9              MS. WIGGER:  Object to form.

10       A.    To the best of my recollection.

11       Q.    I want to show you a document.

12             (Majcher Exhibit 48, October 7,

13             2020 WhatsApp communication between Ms.

14             Majcher and Mr. Choi, marked for

15             identification.)

16       Q.    This is Majcher 48.  Ms. Majcher,

17   this is a WhatsApp communication between you

18   and -- from October 7, 2020 between you and

19   Mr. Choi, right?

20       A.    Yes.

21       Q.    Looking through this, if you go on

22   the second page, Mr. Choi says, I intend to

23   have AFMG exercise the option ASAP and an

24   evaluation TBD will likely higher than 200-M.

25             Do you see that?



Page 350

```
 1                    D. Majcher
 2         A.    Yes.
 3         Q.    Do you have an understanding of
 4    what he was talking about there?
 5         A.    Yeah, I think so.
 6         Q.    What is that?
 7         A.    At the time, AFMG held an option to
 8    participate -- to purchase an equity stake in
 9    De Tomaso.
10         Q.    And what Mr. Choi is proposing here
11    is having AFMG exercise that option, right?
12         A.    Yes, it reads that way.
13         Q.    He is saying he wants that done at
14    a valuation likely higher than 200-M.
15               Do you see that?
16               MS. WIGGER:  Object to form.
17         A.    That's what it reads.
18         Q.    You understand 200-M to be 200
19    million?
20         A.    Yes.
21         Q.    Then you write, There is already an
22    option now to, quote, buy back the
23    development program per the licensing
24    agreement.  And then you write, One, they
25    don't have the money right now; two, the
```



Page 351

```
 1                    D. Majcher
 2   option is exercisable at the time DT conducts
 3   an equity raise; three, without determining
 4   the valuation, we cannot determine the
 5   exercise price/ownership percentage.
 6           Do you see that?
 7       A.   Yes.
 8       Q.   Then a little bit later in this
 9   message, you say, the top of page 781, You
10   need to let them know about Ryan's ownership
11   percentage though.
12           Do you see that?
13       A.   781?
14       Q.   At the top.
15       A.   Yes.
16       Q.   So you wrote to Mr. Choi on October
17   7, 2020, You need to let them know about
18   Ryan's ownership percentage though, right?
19       A.   Yes.
20       Q.   This was in the context of talking
21   about AFMG exercising its option to take a
22   stake in De Tomaso, right?
23       A.   I think so.
24       Q.   What you were saying is if AFMG is
25   going to exercise its option, they need to be
```



Page 352

1                    D. Majcher

2   aware about the percentage that Ryan owns in

3   the company, right?

4              MS. WIGGER:  Object to form.

5       A.   Yes.

6       Q.   You can put this document aside.

7              MR. SIMONS:  Mark this as Majcher

8        49.

9              (Majcher Exhibit 49, email

10        exchange, marked for identification.)

11       Q.   This is an email exchange, the top

12   email is Mr. Berris sending an email to you

13   and Mr. Choi on May 16, 2022, right?

14       A.   Yes.

15       Q.   The bottom of this email, I guess

16   he is following up to an earlier email that

17   he had sent you on the 13th of May 2022.

18              Does that look right?

19       A.   Yes.

20       Q.   He writes, Thank you for your

21   updates and hard work.  Below is a long note

22   that we can go into further detail on during

23   our next call.  As soon as you are available

24   and hopefully within the next 12 hours, as I

25   am here to assist/complete the process.



Page 353

```
 1              D. Majcher
 2         Do you see that?
 3    A.    Yes.
 4    Q.    Mr. Berris says to you, As we
 5  discussed on our call last evening, for years
 6  I have done everything I can to bring value
 7  to the company.  I have dedicated my life
 8  personally and professionally to Norman and
 9  have remained by his side through thick and
10  thin.  I have nothing to hide and want to
11  assist in any way I can to help you complete
12  this process, but the language in the
13  documents you have provided me does not make
14  me comfortable.  As you concurred and
15  understood during our discussion, to my
16  knowledge there has never been any formal
17  internal protocols and procedures clearly
18  communicated and explained to me regarding
19  this process and other processes in general
20  and if there were/are, I am more than happy
21  to adhere 100 percent going forward.  For the
22  past years, I'm sure you know there had been
23  times whereby I have been able to keep track
24  and issue monthly invoices in a timely manner
25  and other times/periods when invoices may
```



Page 354

                        D. Majcher

1

2    constitute a period of months due to extreme

3    workloads on my plate.  Perhaps it a fault of

4    my own (as I need to learn to delegate work

5    better), but I literally have been doing the

6    work of multiple people for years (24/7/365)

7    and, quite honestly, I many times do not even

8    have time to eat, sleep, see my family, let

9    alone efficiently keep track of all of my

10   expenses.  I've done this out of my undying

11   loyalty and respect for Norman, knowing the

12   great sacrifices he has made for many years

13   and trying to reduce the burden on his

14   shoulders as much as I possibly can given my

15   limited resources.

16           MS. WIGGER:  Are we just reading

17       this on to the record or...

18           MR. SIMONS:  I will ask questions

19       about it.

20       Q.    Then he writes, the next paragraph,

21   There are many expenses that have occurred --

22   I have incurred on my side that I have never

23   proposed, nor sought reimbursement for, as I

24   am, from the bottom of my heart,

25   wholeheartedly dedicated to Norman, the team



Page 355

                          D. Majcher
 1
 2    and the company.  Although I have been
 3    working for De Tomaso for many years, I only
 4    accepted my first paycheck this February at
 5    the kind request of Norman and have yet to
 6    invoice for subsequent months.
 7              Do you see that?
 8         A.   I do.
 9         Q.   Ms. Majcher, did you ever respond
10    to this email?
11         A.   I don't recall if I did or I
12    didn't.
13         Q.   You have no recollection of
14    responding to this email one way or the
15    other?
16         A.   No.
17         Q.   Do you recall if you ever spoke to
18    Mr. Berris at any point following the receipt
19    of this email on May 13, 2022?
20         A.   I don't recall.
21         Q.   You can put that aside.
22              There came a point where De Tomaso
23    commissioned a two-part book that was
24    supposed to track the history and development
25    of the De Tomaso brand, right?



Page 356

1                    D. Majcher
2         A.    In general terms, yes.
3         Q.    That book was going to be authored
4    by a husband and wife team, Bart and Lies
5    Waft, right?
6         A.    Yes.  Sorry, their company is Waft.
7         Q.    Their last name is Lenaerts and
8    their company is Waft?
9         A.    Yes.
10        Q.    And De Tomaso received the first
11   part of that book, right?
12        A.    The first book was published.
13        Q.    It was published and De Tomaso gave
14   copies of that book to its clients, its
15   customers, right?
16        A.    Yes.
17        Q.    So it's fair to say that De Tomaso
18   was pleased with the quality of the book that
19   it gave to its clients and customers, right?
20             MS. WIGGER:  Object to form.
21             You can answer in a personal
22        capacity.
23        A.    From my opinion, I think we
24   accepted the quality of the book and we
25   deemed it good enough to distribute.



1                        D. Majcher

2        Q.    The first book was just limited to

3    a sort of historical lookback at the De

4    Tomaso brand prior to Mr. Choi and Mr. Berris

5    being involved with De Tomaso, is that fair?

6        A.    I think so.  I haven't read the

7    book myself, but, yes, I think so.

8        Q.    Haven't you?  You don't have a

9    coffee table copy?

10              But you also, but not you

11   personally, but you are aware that De Tomaso

12   also commissioned a second book that would

13   focus more on the revival of De Tomaso once

14   Mr. Choi and Mr. Berris got into the picture,

15   right?

16       A.    I think the original work scope was

17   always two books.

18       Q.    The second book was going to focus

19   on the modern history of De Tomaso starting

20   from when Mr. Choi purchased the brand,

21   right?

22       A.    Yeah, largely focusing on the brand

23   of the P72.

24       Q.    Did you ever read the draft

25   chapters for that book?



Page 358

                    D. Majcher
1
2       A.    Not until Mr. Berris' deposition.
3       Q.    Have you, prior to that, you had
4  never read any of the draft chapters of the
5  book?
6       A.    I mean, I was aware that there were
7  drafts and as we went through a settlement
8  process with Waft to so-called decommission
9  the project, I believe they sent overdrafts.
10      Q.    Did you look at the drafts that
11 they sent over?
12      A.    I think I just very quickly sort of
13 skimmed through them.
14      Q.    Did anyone else at De Tomaso look
15 through those drafts?
16      A.    I believe so, yes.
17      Q.    Who looked at those drafts?
18      A.    To my knowledge, I believe Jake
19 Hamilton did.
20      Q.    Did Jake Hamilton actually produce
21 a summary summarizing the contents of those
22 drafts?
23           MS. WIGGER:  Object to form.
24      A.    I don't know.
25      Q.    Do you recall reviewing a summary



Page 359

```
 1                   D. Majcher
 2   that Jake produced that covered the contents
 3   of those two weeks?
 4              MS. WIGGER:  Object to form and
 5         foundation.
 6         A.    I actually cannot recall.
 7         Q.    Do you recall having concerns that
 8   the drafts in book 2 painted Mr. Berris in an
 9   overly positive light?
10              MS. WIGGER:  Object to form.
11         A.    Can you say again.
12         Q.    Do you recall having concerns that
13   the drafts of book 2 painted Mr. Berris in an
14   overly positive light?
15              MS. WIGGER:  Object to form.
16         A.    No, because I didn't read the
17   drafts so I couldn't have had that concern.
18         Q.    You mentioned that the book was
19   decommissioned.
20              What do you mean by that?
21         A.    We didn't go through with the
22   project.
23         Q.    When you say, we didn't go through
24   with the project, do you mean the authors
25   hadn't drafted the book or De Tomaso didn't
```



Page 360

```
 1                   D. Majcher
 2   want the book to be published?
 3        A.   De Tomaso didn't want the book to
 4   be published.
 5        Q.   Why not?
 6             MS. WIGGER:  Object to form.
 7             You can answer in your personal
 8        capacity.
 9        A.   My understanding is we didn't think
10   the book would put the company in a favorable
11   light and it didn't represent -- didn't
12   represent the company in -- it didn't
13   represent De Tomaso, so we didn't want it to
14   be published.
15        Q.   In what respects did you think the
16   book wouldn't put the company in a favorable
17   light?
18             MS. WIGGER:  Object to form and
19        foundation.
20        A.   Like I said, I didn't read it, this
21   is just to my knowledge of what the company
22   had decided to do.
23        Q.   Who made the decision to, in your
24   words, decommission the book?
25        A.   I believe it was Mr. Choi.
```



Page 361

```
 1                    D. Majcher
 2        Q.    Are you aware of if Mr. Choi had
 3   read the draft chapters for the book?
 4             MS. WIGGER:  Object to form.
 5        A.    I can't answer that.  I don't know.
 6        Q.    Do you think he would have agreed
 7   to decommission the book if he hadn't ever
 8   seen the drafts of the book?
 9             MS. WIGGER:  Object to form.
10        A.    I can't imagine why he would if he
11   hasn't seen it.
12        Q.    Exactly.  Let me show you.
13             (Majcher Exhibit 50, August 24,
14        2023 email from Bart Lenaerts at Waft to
15        Ms. Majcher, marked for identification.)
16        Q.    Ms. Majcher, this is an email from
17   Bart at Waft to you dated August 24, 2023; is
18   that right?
19        A.    Yes.
20        Q.    It looks like he is sending you
21   those draft chapters of the second book that
22   you referred to, is that fair?
23             MS. WIGGER:  Object to form.
24        A.    It looks that way, yes.
25        Q.    And do you recall if you then
```



Page 362

```
 1              D. Majcher
 2   provided those draft chapters to Mr. Hamilton
 3   to look over?
 4        A.    I don't recall.
 5        Q.    You can put that aside.
 6              MR. SIMONS:  This is Majcher 51.
 7              (Majcher Exhibit 51, October 10,
 8        2023 email from Ms. Majcher to Bart
 9        Lenaerts at Waft, marked for
10        identification.)
11        Q.    This is an email that you sent to
12   Bart at Waft on October 10, 2023.
13              Do you see that?
14        A.    Yes.
15        Q.    And you wrote, in part, Your
16   approach below works for us.  Thank you.  The
17   signed agreement that you returned to me
18   still had dates missing and on the signature
19   page, the witness should be a different
20   person from the person signing on behalf of
21   Waft.  I have attached a dated version of the
22   agreement that is signed by Norman and
23   witnessed by me.  I would appreciate if you
24   could execute this version instead.
25              Do you see that?
```



Page 363

1                   D. Majcher

2       A.    Yes.

3       Q.    Then you write, I'm also attaching

4   a confirmation for you to please sign and

5   return to me once the last Dropbox folder has

6   been downloaded for me and deleted so we can

7   close the first half of this settlement

8   agreement.

9             Do you see that?

10      A.    Yes.

11      Q.    What was your reference to

12  confirmation for them to sign and return once

13  the last Dropbox folder has been downloaded

14  by me and deleted?  What did you mean by

15  that?

16            MS. WIGGER:  Object to form.

17      A.    I think as part of the settlement

18  agreement, we had asked them to return all

19  materials, whether in hardcopy or softcopy to

20  us, and there is language in there that they

21  have to sign a confirmation that they did, in

22  fact, had given us everything and that they

23  were not keeping any copies anymore.

24      Q.    De Tomaso wanted assurances that

25  they had no files left over whatsoever from



Page 364

```
 1                    D. Majcher
 2   their work researching and writing this book,
 3   right?
 4        A.   Yeah, we wanted to make sure that
 5   they were not keeping any of the files.
 6        Q.   In fact, De Tomaso paid Waft
 7   100,000 Euros in connection with what you
 8   referred to as the decommissioning of this
 9   book, right?
10             MS. WIGGER:  Object to form.
11        A.   To the terms of the settlement
12   agreement, yes.
13        Q.   The purpose of that settlement
14   agreement was to ensure that that book was
15   never published, right?
16             MS. WIGGER:  Object to form.
17        A.   The purpose of the agreement was we
18   did not want that book to be published.
19        Q.   Just looking at the date of this,
20   in October 10th of 2023, this was sometime
21   after Mr. Berris had filed his lawsuit
22   against De Tomaso, is that right?
23        A.   This was, yeah.
24        Q.   You recall executing the agreement
25   that you attached to this document, right?
```



Page 365

                    D. Majcher
1
2        A.    Yeah.
3        Q.    You can put that aside.
4              MR. SIMONS:  We will mark this as
5        Majcher 52.
6              (Majcher Exhibit 52, copy of the
7        settlement agreement entered into on the
8        10th of October of 2023, marked for
9        identification.)
10       Q.    Ms. Majcher, is this a copy of the
11   settlement agreement entered into on the 10th
12   of October of 2023?
13       A.    Yeah, it appears to be.
14       Q.    The page ending at 708, that bears
15   your signature on it, right?
16       A.    708, yes.
17       Q.    Just briefly looking at some of the
18   terms of this agreement, on the first full
19   page ending in 705, it says at part C, the
20   third whereas clause, Subject to the terms
21   and conditions set out herein, the parties,
22   by mutual concessions, agree to terminate the
23   book publishing agreement.
24             Do you see that?
25       A.    Yes.



Page 366

```
 1                     D. Majcher
 2         Q.    Then if you go down to termination,
 3    part 1.12, it says, For book 2, Waft shall
 4    not print or publish any copies of book 2 and
 5    in the event there are any printed copies of
 6    book 2, Waft shall deliver all such copies to
 7    Ideal Team.
 8              Do you see that?
 9         A.    Yes.
10         Q.    That was the purpose of this
11    agreement essentially, right?
12         A.    Essentially, yes.
13         Q.    It says, The parties agree that
14    Ideal Team shall pay one off amount of
15    100,000 Euros, the payment to Waft by way of
16    a wire transfer to the bank account
17    designated by Waft.
18              Do you see that?
19         A.    Yes.
20         Q.    Did Ideal Team pay Waft $100,000
21    not to publish this book?
22              MS. WIGGER:  Object to form.
23         A.    The 100,000 Euros?
24         Q.    100,000 Euros.
25         A.    Was paid.
```



Page 367

                         D. Majcher

1

2       Q.    When you go to part 2, return of

3   company properties, it says, Upon the signing

4   of this agreement, Waft shall immediately

5   return to Ideal Team all information and

6   documentation of Ideal Team and De Tomaso,

7   including, but not limited to, files,

8   documents and photographs and all copies and

9   duplicates of such items, whether in physical

10  or electronic form.

11          Do you see that?

12      A.    Yes.

13      Q.    And did Waft, in fact, do that?

14      A.    To the best of my knowledge, yes,

15  they did.

16          MR. SIMONS:   We will mark this as

17      Majcher 53.

18          (Majcher Exhibit 53, October 9,

19      2023 email from Bart Lenaerts at Waft to

20      Ms. Majcher, marked for identification.)

21      Q.    This is an email from Bart at Waft

22  to you on October 9, 2023.

23          Do you see that?

24      A.    Yes.

25      Q.    He writes to you, Did you get our



Page 368

```
 1                    D. Majcher
 2    email from last week with the signed
 3    contract?  For your information, there still
 4    existed a Dropbox file with us, Ryan, Jowyn
 5    and Jakub as members.  We have deleted this
 6    file.
 7              Do you see that?
 8         A.   Yes.
 9         Q.   Did you have -- then it says, We
10    also removed all references to the new DT
11    from our Instagram page.
12              Do you see that?
13         A.   Yes.
14         Q.   Then it stays, We prepared another
15    Dropbox file with all the digital information
16    we have about the new DT, including all
17    pictures, all texts and all films.  As soon
18    as the contract is signed and the first
19    payment is done, we will add you as access
20    member.  After you have downloaded all the
21    files, we will delete that Dropbox file.
22              Do you see that?
23         A.   Yes.
24         Q.   Do you recall, in fact, they did
25    prepare a Dropbox file with all this as
```



Page 369

1                    D. Majcher
2  provided?
3          MS. WIGGER:  Object to form.
4      A.   I don't recall specifically, but I
5  don't have reason to doubt that that did not
6  happen and I think, in fact, we looked at one
7  of the previous texts, that's exactly what I
8  had told him, right?
9      Q.   Yes.  It sounds like they prepared
10 a Dropbox file with all the digital
11 information and they said that they were
12 going to delete that once you downloaded all
13 the files, that's what he writes here, right?
14     A.   Yes.
15     Q.   He also refers to another Dropbox
16 file with us, Ryan, Jowyn and Jakub as
17 members and he says, We deleted this file.
18          Do you see that?
19     A.   Yes.
20     Q.   Did you ever get access to the
21 contents of that file?
22          MS. WIGGER:  Object to form.
23     A.   No, I didn't.
24     Q.   Now, at the time that you entered
25 into this agreement, you had already been



Page 370

1                    D. Majcher
2    sued by Mr. Berris, right?
3         A.   Yes.
4              MS. WIGGER:  Object to form.
5         Q.   Without getting into any specifics
6    or discussions with counsel, you were aware
7    of your obligations as a company to preserve
8    any information relevant to the allegations
9    of the counterclaims of this case, right?
10        A.   Yes.
11        Q.   Do you think -- did you have any
12   concerns that entering into this agreement
13   could run afoul of your obligation to
14   preserve relevant information relating to the
15   allegations and counterclaims in this case?
16             MS. WIGGER:  Object to form.
17        A.   It did not cross my mind.
18        Q.   So it did not cross your mind that
19   you were under an obligation to preserve
20   information, but Mr. Bart here says, we
21   deleted this file with us, Ryan, Jowyn and
22   Jakub?
23             MS. WIGGER:  Object to form,
24        mischaracterizes testimony and the
25        document.



1                    D. Majcher

2        A.    I have never been sued so,

3    naturally, it wouldn't cross my mind to be

4    watching every move that I make to make sure

5    I don't violate, you know, protocol, whatever

6    it is related to a lawsuit, so, no, it did

7    not cross my mind.

8        Q.    You can put that document aside.

9             Changing gears a little bit, we

10   talked a bit about Jowyn Wong and his work

11   over the years for Apollo and De Tomaso,

12   right?

13       A.    Yes.

14       Q.    And I believe you were here

15   yesterday when Mr. Choi testified that you,

16   Diana Majcher, and Jowyn are two of the

17   people with whom he worked the longest in

18   terms of Apollo and De Tomaso, he has had the

19   longest working relationship with you and

20   Jowyn?

21             MS. WIGGER:   Object to form.

22       A.    We're two of the --

23       Q.    Two of the longest.

24       A.    -- a number of people, yes.

25       Q.    So it's fair to say that you and



Page 372

                    D. Majcher

1
2    Jowyn know Mr. Choi very well, right?

3         A.    I would say I know him fairly well.

4         Q.    At least in a professional

5    capacity?

6         A.    Sure.

7         Q.    So you and Mr. Jowyn Wong would be

8    two of the people best qualified to sort of

9    offer an opinion about Mr. Choi's strengths

10   and weaknesses as a boss?

11             MS. WIGGER:  Object to form.

12        A.    I don't know if we will be the best

13   people to.  Certainly we will have our

14   opinions.

15        Q.    You have worked with him for a long

16   time, as you said, right?

17        A.    I have.

18             MR. SIMONS:  We will mark this as

19        Majcher 54.

20             (Majcher Exhibit 54, April 6, 2020

21        WhatsApp exchange between Diana Majcher

22        and Jowyn Wong, marked for

23        identification.)

24        Q.    Majcher 54 is a WhatsApp exchange

25   between you and Jowyn Wong on April 6, 2020,



Page 373

```
 1                    D. Majcher
 2   is that right?
 3        A.    Yes.
 4        Q.    I want to go through some of your
 5   messages with Mr. Wong in here.
 6              At the top of the page ending in
 7   518, Mr. Wong says --
 8        A.    Sorry, 518?
 9        Q.    Yes.
10        A.    Yes.
11        Q.    Mr. Wong says to you, Putting
12   pressure on Norman, though he is starting to
13   change, and you write, he is a bit different,
14   I can tell.  Then Jowyn writes, He will
15   consider us a lot more in a more personal
16   level this year.  And then Mr. Wong says on
17   the next page, I spoke to him about those
18   issues -- these issues last year, so it's
19   only just sunk in.  He need time to process
20   all of these things thoroughly, but he never
21   forgets.
22              Do you see that?
23        A.    Yes.
24        Q.    Then you write on the next page,
25   You are right, he -- the bottom of that page,
```



Page 374

                    D. Majcher
1
2   you write, You are right, he doesn't forget.
3   And then you write, And he sometime comes
4   back to the thing that you told him about two
5   weeks later as if he just discovered it on
6   his own.
7           Do you see that?
8       A.   Yes.
9       Q.   Then you write to Mr. Wong in
10  response to his earlier remarks, What do you
11  mean?  And he responds, As in, I told him
12  people have families to feed and they are all
13  human beings -- sorry, human working, all
14  caps, for you, they are not tools and all
15  have feelings and emotions.
16          Do you see that?
17      A.   Yes.
18      Q.   And that's Mr. Wong talking about a
19  conversation he had with Mr. Choi, right?
20          MS. WIGGER:  Object to form.
21      A.   I take it to be that, yeah.
22      Q.   And what Mr. Wong is saying that he
23  told Mr. Choi is that the people working for
24  you are humans, they're not tools, right?
25          MS. WIGGER:  Object to form.  The



Page 375

D. Majcher

1

2      document speaks for itself.

3      A.    That's how it reads.

4      Q.    We will keep going through this.

5   On the page ending in 522, Mr. Wong writes,

6   Hopefully, it will all change.  I need to

7   somehow sneak some things into Sophia's mind

8   too.

9          Do you see that?

10      A.    Yes.

11      Q.    Sophia is Mr. Choi's wife, right?

12          MS. WIGGER:  Object to form as to

13      who Mr. Wong was referring to.

14      Q.    Do you have an understanding of who

15   the Sophia is that he is referring to here?

16          MS. WIGGER:  Same objection.

17      A.    I understand Mr. Choi's wife's name

18   to be Sophia.

19      Q.    Do you and Mr. Jowyn Wong ever

20   interact with someone else named Sophia on a

21   regular basis?

22          MS. WIGGER:  Object to form.

23      A.    No.

24      Q.    In your next message, you write, He

25   has been pretty detached though in that he



Page 376

```
 1                    D. Majcher
 2   keeps private about his private life, so
 3   maybe that's why he doesn't ask too much
 4   about other people's lives, so he doesn't
 5   need to open up.
 6            Do you see that?
 7       A.   Yes.
 8       Q.   You are speaking there about Mr.
 9   Choi, right?
10       A.   I think so.
11       Q.   Then Jowyn says, It's always
12   mysterious.  I think he spent a lot of time
13   with family these couple of months.  And then
14   you write, Like you can't just shoot the shit
15   with him.
16            Do you see that?
17       A.   Yes.
18       Q.   That's referring to Mr. Choi again,
19   right?
20       A.   Yes.
21       Q.   And Mr. Wong says, That's also
22   true, ha, ha, ha.  What happened in Miami was
23   good for him, and you wrote, What happened?
24   And then he wrote, The WAS falling part in
25   front of him and some people.
```



Page 377

```
 1                    D. Majcher
 2           Do you see that?
 3      A.   Yes.
 4      Q.   Do you know what that was referring
 5  to?
 6           MS. WIGGER:  Object to form.
 7      A.   No actually.
 8      Q.   Then you write, Oh, that part, ha,
 9  ha, ha.
10           Do you see that?
11      A.   Yes.
12      Q.   Then Jowyn writes, He rang to say
13  how embarrassed he was and that big changes
14  are necessary so this cannot happen, and then
15  Mr. Wong corrects himself to say happen.
16           Do you see that?
17      A.   Yes.
18      Q.   You can put this document aside.
19           (Majcher Exhibit 55, August 17,
20           2020 WhatsApp exchange between Diana
21           Majcher and Jowyn Wong, marked for
22           identification.)
23      Q.   We will mark this as Majcher 55.
24  This is another WhatsApp exchange between you
25  and Jowyn Wong on August 17th of 2020, is
```



Page 378

```
 1                D. Majcher
 2   that right?
 3        A.    Yes.
 4        Q.    And on the bottom of the page
 5   ending in 555, you wrote, Makes me feel good
 6   that I'm doing something you guys need.   I
 7   hope Norman can understand that.
 8             Do you see that?
 9        A.    Yes.
10        Q.    And then Mr. Wong replies, Norman
11   will always have his own priorities and
12   beliefs.  He is a master of finance, though
13   still a student of business.
14             Do you see that?
15        A.    Yes.
16        Q.    What did you understand Mr. Wong to
17   say that -- what did you understand him to
18   mean by saying that Mr. Choi was, quote,
19   still a student of business?
20             MS. WIGGER:  Object to form.
21        A.    I don't know, I don't know.
22        Q.    If you go to the page ending in
23   564.
24        A.    Yes.
25        Q.    At the bottom, you write, Like you
```



Page 379
```
 1                    D. Majcher
 2    said, Norman has his own agenda and I feel he
 3    is not even trying to work at integrating
 4    into the group.
 5            Do you see that?
 6        A.   Yes.
 7        Q.   What did you mean by that?
 8        A.   I can't recall what exactly I
 9    meant.
10        Q.   Mr. Wong then says, This is the
11    Achilles' heel I am afraid.  You wrote, He is
12    still just doing his thing on his own, but
13    now with someone else's money.
14            Do you see that?
15        A.   Yes.
16        Q.   And that's not going to be
17    sustainable you wrote.
18            And the he you are referring to
19    there is Mr. Choi?
20        A.   I think so.
21        Q.   What did you mean when you wrote
22    that he is still just doing his thing on his
23    own, but now with someone else's money?
24            MS. WIGGER:  Object to form.
25        A.   I can't recall what this
```



Page 380

```
 1                    D. Majcher
 2    conversation was about.
 3        Q.   If you look at the timing of this
 4    chat, it was August 17th of 2020, right?
 5        A.   Okay.
 6        Q.   And that was only a couple of
 7    months after Apollo had been purchased by
 8    AFMG, right?
 9        A.   Five months later.
10        Q.   You were talking here about the
11    fact that now, Mr. Choi was still trying to
12    do his own thing, but with AFMG's money?
13             MS. WIGGER:  Object to form.
14        A.   I can't recall if that's what I was
15    referring to.
16        Q.   Okay.  You can put this aside.
17             MR. SIMONS:  We will mark this as
18        Majcher 56.
19             (Majcher Exhibit 56, January 7,
20        2021 WhatsApp exchange between Diana
21        Majcher and Jowyn Wong, marked for
22        identification.)
23        Q.   Majcher 56 is a WhatsApp exchange
24    between you and Jowyn Wong on January 7,
25    2021.
```



Page 381

1              D. Majcher
2          Do you see that?
3     A.    Yes.
4     Q.    There is a message from you on the
5  page ending in 547 where it says, Somehow I
6  have the reputation of being, quote, Norman's
7  spy around here.
8          Do you see that?
9     A.    Yes.
10    Q.    What did you mean that you had the
11 reputation of being Norman's spy?
12         MS. WIGGER:  Object to form.
13    A.    This was when?
14    Q.    In January of 2021.
15         MS. WIGGER:  Take your time to read
16    the context of this.
17    Q.    If you don't recall, that's fine.
18    A.    I'm not sure that I recall.
19    Q.    If you go to the page ending in
20 555, you write -- I should give you a second.
21    A.    Yes.
22    Q.    I know those documents better than
23 you probably, so I apologize.
24         It says, I'm stuck in this
25 situation until at least the end of 2021,


MAGNA
LEGAL SERVICES

Page 382

1                    D. Majcher
2  when Norman's deal can materialize, dot, dot
3  dot.  Until then, there is no way for me to
4  abandon Apollo and all of the legacy shit.
5           Do you see that?
6      A.   Yes.
7      Q.   What did you mean by that?
8           MS. WIGGER:  Object to form.
9      A.   I think I was referring to the sale
10  of Apollo and being at the time, we were
11  speaking about the -- my work or involvement
12  with AFMG.
13      Q.   What did you mean when you said you
14  are stuck in this situation?
15      A.   I take it to mean that I wasn't
16  very happy in that situation.
17      Q.   Fair enough.  You say, until at
18  least the end of 2021, when Norman's deal can
19  materialize.
20           What did you mean by when Norman's
21  deal can materialize?
22      A.   It was part of the sales and
23  purchase agreement that he would -- there is
24  the piece attached to the agreement where,
25  based on the performance of Apollo, that he



Page 383

```
 1                    D. Majcher
 2  would have -- part of the consideration would
 3  be paid in shares of AFMG.
 4       Q.   Do you know if that consideration
 5  was ever paid to Mr. Choi?
 6       A.   To my knowledge, yes.
 7       Q.   Do you have a rough sense of what
 8  the value in U.S. dollars of that
 9  consideration was?
10            MS. WIGGER:  Object to form.  I
11       assume you mean in 2021?
12       A.   I actually don't.
13       Q.   Do you recall if the value of the
14  consideration was more or less than $50
15  million?
16            MS. WIGGER:  Object to form.
17       A.   I don't.
18       Q.   If you go to the page ending in
19  560.  Mr. Wong is messaging you at 4:38 and
20  he writes, Richard realized the deal wasn't
21  as cut and dry and basically a lot things
22  developed for DT is not really transferrable,
23  nor in the best interest of the Apollo brand
24  and where it's now heading, so he will not
25  fund anymore.  He is tired of not knowing
```



Page 384

```
 1                    D. Majcher
 2   where the money is being spent and just tired
 3   of the whole ordeal, how Norman doesn't
 4   cooperate, he doesn't integrate and just
 5   criticizes everyone's effort.
 6            Do you see that?
 7       A.   I do.
 8       Q.   Who is the Richard referred to
 9   there to your knowledge?
10            MS. WIGGER:  Object to form.
11       A.   To my knowledge, that would be
12   Richard Sung.
13       Q.   And Richard Sung's role at AFMG was
14   what?
15       A.   He was the CEO of the company.
16       Q.   Do you have an understanding of
17   what the concern was that's being articulated
18   here?
19            MS. WIGGER:  Object to form, as to
20       what Joe said Richard thought.
21       A.   Whatever was said there.
22       Q.   Do you recall that there was a
23   concern amongst folks at AFMG that there was
24   a lot of material developed by Apollo that
25   was going to essentially be appropriated by
```



Page 385

```
 1                    D. Majcher
 2   the De Tomaso brand?
 3             MS. WIGGER:  Object to form.
 4        A.   I think there were some questions
 5   around those, but eventually, those were
 6   cleared up and Mr. Choi continued to serve as
 7   CEO of Apollo until August of 2023.
 8        Q.   What were the questions that people
 9   had?
10             MS. WIGGER:  Object to form.
11        A.   They were -- since he had
12   involvement in both Apollo and De Tomaso, I
13   think, naturally, they just wanted to make
14   sure everything was done properly.
15        Q.   If you go to the top of the page
16   ending in 563, Mr. Wong said, He said he
17   does, but Norman doesn't really say anything
18   that's useful.  He complains that all -- all
19   Norman ever does, I -- I ask for money.
20             That's what it says, right?
21        A.   Okay, yeah.
22        Q.   And then you write, I can tell you
23   that no money has been misappropriated,
24   right?
25        A.   Yes.
```



Page 386

```
 1                    D. Majcher
 2      Q.    What you were referring to there?
 3            MS. WIGGER:  Object to form and
 4      foundation.
 5      A.    Sorry, I'm just reading this.
 6            MS. WIGGER:  Take your time.
 7      A.    Okay.  I think I was telling him no
 8  money has been misappropriated in Apollo.
 9      Q.    You were telling him that because
10  there had been concerns raised that Mr. Choi
11  had, in fact, misappropriated money from
12  Apollo, right?
13            MS. WIGGER:  Object to form and
14      foundation.
15      A.    I don't know why I told him that.
16  I can't recall.
17      Q.    You don't recall why you had said
18  there had not been money misappropriated?
19            MS. WIGGER:  Same objection, asked
20      and answered.
21      A.    No.
22      Q.    If you go to the page ending in
23  577, at the top there, Mr. Wong writes, Ah,
24  God, it's just Norman, ha, ha, and you write,
25  Naturally, I just want everyone to get along
```



```
 1                    D. Majcher
 2    and Mr. Wong writes, Same, me too.  The way I
 3    talk shit about Norman isn't shit, it's just
 4    facts, but it sounds like shit.
 5             Do you see that?
 6        A.   Yes.
 7        Q.   You can put that aside.
 8             MR. SIMONS:  We will mark this as
 9        Majcher 57.
10             (Majcher Exhibit 57, October 27,
11             2020 WhatsApp exchange between Ms.
12             Majcher and Mr. Wong, marked for
13             identification.)
14        Q.   Majcher 57 is another WhatsApp
15    exchange between you and Mr. Wong dated
16    October 27, 2020, right?
17        A.   Yes.
18        Q.   And if you go to the page ending in
19    945, Mr. Wong asks you how much time --
20        A.   Sorry, just --
21        Q.   That's my bad.
22             Mr. Wong asks you how much time do
23    you spend in the office environment.  And
24    then you write, I'm there every day, and he
25    asks how many hours and you write, regularly
```



Page 388

```
 1                    D. Majcher
 2    seven to eight hours.
 3               Do you see that?
 4        A.   Yes.
 5        Q.   That's a reference to you regularly
 6    going into the AFMG offices seven to eight
 7    hours a day, right?
 8               MS. WIGGER:  Object to form,
 9          foundation.
10        A.   Looking at the date, yes.
11        Q.   Was there any other office you were
12    going into regularly for seven to eight
13    hours?
14        A.   No, referencing to the date, that
15    was the time I was working at the AFMG
16    office, so, yes.
17        Q.   Is it fair to say that you did, in
18    fact, go into the AFMG office regularly for
19    seven to eight hours a day?
20        A.   I did, yes.
21        Q.   If you go to the page ending in
22    958.
23               Are you there?
24        A.   Yes.
25        Q.   Mr. Wong writes in the middle of
```



Page 389

1                      D. Majcher
2     the page, Did you see the press release from
3     De Tomaso?  And then you write, TBH, I
4     haven't read through it, with an emoji.  And
5     then you wrote, It's so long.  And then Mr.
6     Wong wrote, It's interesting, to say the
7     least, although I'm happy that Ryan can take
8     control of it as much as he desired.
9              Do you see that?
10        A.   Yes.
11              MS. WIGGER:  As so much he desired.
12              MR. SIMONS:  As so much he desired,
13        yes, that's correct.
14        Q.   Then at the top of page 906, you
15     write, It will not be an easy path.
16              What were you referring to when you
17     wrote, It will not be an easy path?
18              MS. WIGGER:  Object to form and
19        foundation.  I think you skipped some
20        messages.
21        A.   I don't know.
22        Q.   You don't recall whether you were
23     referring to De Tomaso here?
24        A.   No.
25        Q.   Mr. Wong then writes, No.  Hence, I



Page 390

```
 1                    D. Majcher
 2  decided I have no desire to join.
 3            Do you see that?
 4       A.   Yes.
 5       Q.   Then you write, Now I need to read
 6  it to find out what message it conveyed.  Mr.
 7  Wong wrote, It's a bold statement, a lot to
 8  live up to.
 9            Do you see that?
10       A.   Yes.
11       Q.   Is that referring to the De Tomaso
12  press release that Mr. Wong sent to you
13  earlier?
14            MS. WIGGER:  Object to form.
15       A.   I don't know.
16       Q.   Do you recall reading the De Tomaso
17  press release that was issued around this
18  time in 2020?
19       A.   No, I don't remember what press
20  release was issued and, hence, I can't
21  remember if I read it.
22       Q.   Then you write, It's okay to make
23  bold statements, but you need to have plans
24  to back them up.  They want to go out to
25  raise money based on 300 to 400 million
```



Page 391

1                      D. Majcher

2    valuations when they don't even know where

3    they will be based, dot, dot, dot, a company

4    run by two guys.

5              Does that refresh your recollection

6    that you are talking about De Tomaso?

7              MS. WIGGER:  Object to form.

8         A.   It appears to be.

9         Q.   The two guys that run the company

10   you are referring to there are Mr. Choi and

11   Mr. Berris, right?

12        A.   I think so.

13        Q.   And then Joe Wong writes, You are

14   correct, yes.  And then you write, With

15   everything outsourced.  And then you write, I

16   came from an investment banking background.

17   My very job making analysis on whether to

18   invest in a company.  And then Joe Wong

19   writes, It's difficult to swallow.  I know

20   there are financial incentives with that

21   approach, but working on shoestring budgets

22   again and repeating the same mistakes is just

23   hard to swallow.  And you write, I don't see

24   the investability of this at all, right?

25        A.   Yes.



Page 392

                    D. Majcher

1

2       Q.    You are referring to the

3   investability of De Tomaso, right?

4             MS. WIGGER:  Object to form.

5       A.    It appears to be that's what we are

6   discussing.

7       Q.    You write, It all sounds very

8   exciting to some car nut and it all looks

9   very fancy.  And then you write, But people

10  don't part with their money so easily and Joe

11  Wong wrote back, Likewise, I wholeheartedly

12  agree with you.  And then you write, I am no

13  visionary and definitely no dreamer.  Some

14  say I am pessimistic and then Joe writes back

15  to you, I have seen enough and learned enough

16  over the past decade of my career.  It's not

17  something I would venture on.  And you write,

18  But that's the real world, and Mr. Wong

19  writes back, But you are right.  Then he

20  writes, It's not just that either, it's the

21  secrets, the lying and BSing that I really

22  had enough.  And then you write, Bill hates

23  this part of me, ha, ha.

24            Do you see that?

25      A.    Yes.



Page 393

1                    D. Majcher
2        Q.    Then Joe writes, One day, Diana, I
3    will stand on stage and be absolutely
4    thrilled at what we have created.  He writes,
5    No lies, no BS, maybe just a sprinkle, but
6    it's going to be a very proud moment I am
7    envisioning for all of us, ha, ha.  Then you
8    write, There is always BS and exaggerations,
9    but it needs to be within reason.
10            Do you see that?
11        A.    Yes.
12        Q.    Then Mr. Wong writes to you, But
13    not the entire thing, let's say, with an
14    emoji, and you wrote, Ha, ha, you are right.
15            And then Mr. Wong write to you, I
16    had strong talks with Norman at one point
17    saying I am not going, I think that might be
18    a typo for doing, this anymore, LOL.
19            Do you see that?
20        A.    Yes.
21        Q.    And then you write, How is your
22    relationship with Norman now?  And Mr. Wong
23    follows up his earlier comment where he says,
24    I had strong talks with Norman at one point
25    saying I'm not doing this anymore, saying the


MAGNA
LEGAL SERVICES

Page 394

                    D. Majcher

1
2    lying part.  He said other brands do it.  My
3    reply was the other guys have the cars you
4    can drive and prove what they are saying.
5          Do you see that?
6    A.    Yes.
7    Q.    Your understanding there is that
8    Mr. Wong said that he confronted Mr. Choi
9    that he didn't like lying about the car
10   brand, right?
11         MS. WIGGER:  Objection to form.
12         The document says what it says.  We are
13         happy to stipulate to that if it will
14         move this along.
15         MR. SIMONS:  I'm asking for her
16         independent understanding or
17         recollection.
18         MS. WIGGER:  You asked what Mr.
19         Wong meant.
20         MR. SIMONS:  I'm asking if she
21         understood what Mr. Wong meant.  The
22         document cannot testify to that.
23   Q.    What did you understand him to mean
24   by this?
25   A.    This is quite sometime ago.  I



Page 395

```
 1                    D. Majcher
 2  don't remember what I understood at the time.
 3       Q.   If you go to the page ending in
 4  970, you write at the top, Norman gets very
 5  fixated on some ideas and he convinces
 6  himself so deeply, he can't come out of it.
 7  And Mr. Wong replies, Yes, very much so.
 8  Then you write, I'm in a very awkward
 9  position.  And Jowyn Wong writes, How come?
10  And you write, I know a lot, but I don't know
11  enough and I don't know what kind of exposure
12  I actually have.
13            Do you see that?
14       A.   Yes.
15       Q.   Then Jowyn says, what do you mean?
16  And your response is, I know what Apollo is
17  not, but in front of AFMG, there are some
18  things I can't say.
19            Do you see that?
20       A.   Yes.
21       Q.   What did you mean when you wrote, I
22  know what Apollo is not, but in front of
23  AFMG, there are some things I can't say?
24            MS. WIGGER:  Object to form.
25       A.   I can't recall what that was
```



MAGNA

LEGAL SERVICES

Page 396

1                    D. Majcher
2   referring to.
3        Q.   You have no recollection at all
4   when you say that in front of AFMG, there are
5   some things I can't say?
6             MS. WIGGER:  Object to form.
7        That's what she testified to.
8        A.   I don't.
9        Q.   Do you have any recollection of
10  what you said meant when you said, I don't
11  know what kind of exposure I actually have?
12            MS. WIGGER:  Object to form.
13       A.   I don't.
14       Q.   Were you referring to criminal or
15  regulatory exposure?
16            MS. WIGGER:  Object to form.  She
17       just said she doesn't know.
18       A.   I don't.
19       Q.   It continues on -- you don't recall
20  what you were saying or you -- sorry.
21       A.   Your question was if I recall.  I
22  don't recall.
23       Q.   After you say, I know what Apollo
24  is not, but in front of AFMG, there are some
25  things I can't say, you wrote, Some of



Page 397

```
 1                    D. Majcher
 2   Norman's trust, I can't betray.
 3            What did you mean by saying that
 4   there was some of Norman's trust that you
 5   couldn't betray?
 6            MS. WIGGER:  Object to form.
 7       A.    I think exactly what it says.
 8       Q.    What was it that you couldn't
 9   betray of Norman's trust?  What information
10   had he given you that you felt you couldn't
11   betray his trust regarding?
12            MS. WIGGER:  Object to form and
13       foundation.
14       A.    I don't recall.
15       Q.    Jowyn Wong then says, Oh, I know
16   what you mean, yeah.  Then at the top of the
17   next page, you write, I'm knee deep in this
18   financial mess.
19            Do you see that?
20       A.    Yes.
21       Q.    What did you mean by that?
22       A.    I don't recall.
23       Q.    You have no recollection of what
24   you meant at the time when you said you were
25   knee deep in this financial mess?
```



Page 398

```
 1                  D. Majcher
 2           MS. WIGGER:  Object to form.
 3      A.   No.
 4      Q.   Was it something relating to AFMG?
 5           MS. WIGGER:  Object to form.  She
 6      just said she doesn't recall.
 7      A.   I don't recall.
 8      Q.   Jowyn writes, Hard to juggle.  It's
 9  obvious now.  And then you write, But I am
10  now an employee of AFMG and some things just
11  can't be ignored or hidden from sight
12  anymore.
13           Do you see that?
14      A.   Yes.
15      Q.   And what did you mean by that?
16      A.   I don't remember.
17      Q.   You have no recollection of the
18  things that were being ignored or hidden from
19  sight at that time?
20           MS. WIGGER:  Object to form,
21      mischaracterizes testimony and document
22      I guess.
23      A.   I don't.
24      Q.   Were you referring to the fact that
25  now that you were an employee of AFMG, there
```



Page 399

1                    D. Majcher
2    was certain information that you knew through
3    your relationship with Mr. Choi that could
4    not be ignored or hidden from sight anymore?
5              MS. WIGGER:  Object to form.
6         A.   I can't recall what this was
7    referring to.
8         Q.   Next page, you write, How are we
9    going to deliver six cars next year?
10             Do you see that?
11        A.   Yes.
12        Q.   If you go to the page ending in
13   983, you write, If Norman one day just
14   decides, fuck it, I'm getting the hell out,
15   then it will be very difficult for me to try
16   to say I didn't know about all this.
17             Do you see that?
18        A.   Yes.
19        Q.   What were you referring to there?
20             MS. WIGGER:  Object to form and
21        foundation.
22        A.   I don't know.
23        Q.   You have no recollection whatsoever
24   about a situation where you were concerned
25   that it would be very difficult for you to



Page 400

```
 1                    D. Majcher
 2    try to say you didn't know anything about
 3    this?
 4              MS. WIGGER:  To be clear, you are
 5         skipping like huge number of pages and
 6         asking random questions about one off
 7         things.
 8              MR. SIMONS:  They are not random
 9         questions.
10         Q.   I think the document in the context
11    shows you are talking about your time at
12    AFMG, right?
13              MS. WIGGER:  Object to form.
14         A.   I don't know looking at this.  I
15    don't recall what we were talking about.
16         Q.   You have no recollection about what
17    you meant when you said, If Norman one day
18    just decides, fuck it, I'm getting the hell
19    out, it would be very difficult for me to say
20    I didn't know about all this?  That's your
21    testimony today?
22              MS. WIGGER:  Object to form and
23         foundation.  She already said that and
24         there is no jury in this room.  Can we
25         not keep asking questions twice.
```



Page 401

```
 1                    D. Majcher
 2        A.    No, I don't.
 3             MR. SIMONS:  Maybe we can take a
 4        break at this point.
 5             THE VIDEOGRAPHER:  We are going off
 6        the record.  The time is 6:43 p.m.
 7             (Recess.)
 8             THE VIDEOGRAPHER:  We are back on
 9        the record.  The time is 6:58 p.m.
10        Q.    Ms. Majcher, if you will actually
11   pull back Majcher Exhibit 57, I have a couple
12   more questions about that, and if you can
13   turn to the page with the Bates number ending
14   019.
15        A.    Okay.
16        Q.    Do you see that?
17        A.    Yes.
18        Q.    And that's a message that you wrote
19   to Mr. Wong saying, Clearly, Norman sold them
20   the idea of using Roush to build a
21   homologated platform that will be owned by
22   Apollo (because it's paid for by AFMG), but
23   he always had it in his -- but he always had
24   it in mind that the platform will be used by
25   P72.
```



Page 402

```
 1                  D. Majcher
 2          Do you see that?
 3      A.   Yes.
 4      Q.   And then Mr. Wong says, Yes, of
 5  course, that limits his initial investment so
 6  he can just license it with a smaller fee at
 7  a later stage.
 8          Do you see that?
 9      A.   Yes.
10      Q.   If you turn now a couple of pages
11  down to the Bates ending in 023, you write at
12  the top there, He is moving to the U.S.
13          Do you recall who you were
14  referring to by that statement?
15          MS. WIGGER:  Object to form.
16      A.   The only person who I know who
17  moved to the U.S. in that timeframe would be
18  Mr. Choi.
19      Q.   Mr. Wong write, Makes sense.
20  Norman doesn't want to spend on anything
21  heavy initially and if someone else can spend
22  it, of course, he would rather that, in this
23  case, AFMG.
24          And then you reply, He's, I think
25  you meant his, heart not there, and then Mr.
```



Page 403

```
 1                    D. Majcher
 2   Wong asks you, Talking about Ryan or Norman?
 3   And then it's a little hard to follow because
 4   there is another text where you say, Sure,
 5   and then we need to make sure the platform is
 6   actually useful to AFMG, right?  And then
 7   your next text, you write, Norman.
 8              So you are referring to Mr. Choi's
 9   heart not being there, right?
10              MS. WIGGER:  Object to form.
11         Skipping a lot of things in there, but
12         you can answer if you understand.
13         A.   I think so.
14         Q.   You wrote, He lives five minutes
15   from me and I haven't seen him in two months
16   at least.
17              Do you see that?
18         A.   Yes.
19         Q.   Are you referring to Mr. Choi
20   there?
21         A.   Yes.
22         Q.   If you go to the next page ending
23   in 026, Mr. Wong writes, That's what I don't
24   like, to be honest.  We have left a trail of
25   just bad relationships with suppliers.  It's
```



Page 404

```
 1                    D. Majcher
 2   really not acceptable.  And then you respond,
 3   For the costs of production, et cetera, no
 4   homework has been done at all.  And then you
 5   write, There is one thing in common with all
 6   the suppliers and that's Norman.
 7            Do you see that?
 8   A.   Yes.
 9   Q.   You can put that document aside.
10            MS. WIGGER:  Again, we are happy to
11        stipulate the documents say what they
12        say if that will move it along.
13            MR. SIMONS:  Thankfully for
14        everyone, I don't have much time.
15            We will mark this as Majcher 58.
16            (Majcher Exhibit 58, October 29,
17        2020 WhatsApp exchange between Diana
18        Majcher and Jowyn Wong, marked for
19        identification.)
20   Q.   Ms. Majcher, this is another
21   WhatsApp exchange between you and Jowyn Wong
22   on October 29, 2020, correct?
23   A.   Yes.
24   Q.   If you go to the Bates page ending
25   in 09 or maybe that's a typo on my part.  I
```



Page 405

```
 1                    D. Majcher
 2   think it's the one ending in 82.
 3            MS. WIGGER:  082.
 4            MR. SIMONS:  Yes, 082.
 5       A.   129082?
 6       Q.   Correct.
 7            Are you there?
 8       A.   Yes.
 9       Q.   You write, I always trusted Norman
10   in the sense that he would watch my back in
11   any situation, but now I'm not so sure about
12   that.  And then you wrote, Yes, he is like a
13   baby, the Chinese Stefan.  I know Norman
14   doesn't have the drive to actually build
15   something or the determination.
16            Do you see that?
17       A.   Yes.
18       Q.   What did you mean by that?
19            MS. WIGGER:  Object to form.
20       A.   I'm not sure I recall at this
21   moment.
22       Q.   You have no recollection about what
23   you meant when you wrote, I know Norman
24   doesn't have the drive to actually build
25   something or the determination?
```



Page 406

```
 1                  D. Majcher
 2           MS. WIGGER:  Object to form.  She
 3      just answered that question.
 4      Q.    Then Jowyn Wong writes, I've had a
 5  difficult time for a long time with Norman,
 6  not in terms of our friends relationship, but
 7  the constant erosion of the efforts we have
 8  all put in.
 9           Do you see that?
10      A.    Yes.
11      Q.    Then he writes, For me, the real
12  loss is all of you.  And then you write, He
13  came from the stock trading world and he
14  can't shake that mindset of getting something
15  for nothing and always just trying to play
16  the market.
17           Do you see that?
18      A.    Yes.
19      Q.    The he you are referring to there
20  is Mr. Choi, right?
21           MS. WIGGER:  Object to form.
22      A.    I am not sure.
23      Q.    You are not sure the he you are
24  referring to there is Mr. Choi?
25           MS. WIGGER:  Object to form, asked
```



Page 407

```
 1                    D. Majcher
 2        and answered.
 3        A.    I'm not sure.
 4        Q.    Do you work with somebody else that
 5   came from the stock trading world regularly?
 6        A.    As a matter of fact, I do.
 7        Q.    You are responding to a message
 8   right before there from Mr. Wong that says,
 9   I've had difficult time for a long time with
10   Norman, not in terms of a friends
11   relationship, but a constant erosion of the
12   efforts we have all put in.  For me, the real
13   loss is all of you.
14             When you say he there, the only
15   other person you were talking to up to this
16   point -- talking about up until this point is
17   Norman Choi, right?
18             MS. WIGGER:  Object to form.  There
19        are 40 pages of texts that we have gone
20        through.
21        Q.    Understood.  In the prior several
22   messages, the only person you were talking
23   about was Norman Choi, right?
24             MS. WIGGER:  Object to form.
25        A.    Less than two minutes ago, there is
```



Page 408

                    D. Majcher

1

2  Eric, there is Richard in this message.  This

3  is a very long message so, no, I don't know.

4       Q.    But if you go to the previous page,

5  you mention about Norman Choi.  If you go to

6  the page before that, you talk about Norman

7  Choi.

8            So here, you don't have any

9  recollection that the he that you are

10 referring to is Norman Choi?

11           MS. WIGGER:  Object to form.

12      A.    No, because in the text message

13 it's not like you're always referring or

14 replying to the message that is immediate

15 prior, so, no.

16      Q.    Then you write, Can't build a

17 business like that.  And then Mr. Wong

18 writes, Yes, you are very right.  Norman

19 approaches business like stocks.  And you

20 respond, All just becomes a big Ponzi scheme.

21 And Mr. Wong writes, Yeah.  You write, I want

22 nothing, and I want nothing to do with that.

23           Do you see that?

24      A.    Yes.

25      Q.    Does that refresh your recollection



Page 409

```
 1                  D. Majcher
 2   you are talking about Mr. Choi here?
 3             MS. WIGGER:  Object to form,
 4        mischaracterizes testimony and the
 5        document.
 6        A.   No.
 7        Q.   Who else could you be talking about
 8   here, Ms. Majcher?
 9             MS. WIGGER:  Object to form.
10        A.   It could be anyone.  I don't recall
11   so I don't know.
12             MS. WIGGER:  Again, there are 40
13        pages that she can go through if you
14        want her to go through them.
15        Q.   Let's just look at what is
16   happening here on the page.  Mr. Wong writes
17   to you, Norman approaches business like
18   stocks and you respond, All just becomes a
19   big Ponzi scheme.
20             Was that message sent to what Mr.
21   Wong said to you right before then?
22             MS. WIGGER:  Object to form, asked
23        and answered.
24        A.   I don't know.
25        Q.   If we go now, a little further into
```



Page 410

```
 1                    D. Majcher
 2   this exchange, on the page ending in 098 --
 3   let's go to the page before that actually.
 4   The one ending in 097.  Jowyn writes, This,
 5   I've always said to Jakub, Norman doesn't
 6   seem to know what it's like to be an
 7   employee.
 8            Do you see that?
 9       A.   Yes.
10       Q.   Then you write, He takes the
11   attitude from my observation that it's okay
12   to take advantage of the platform we are on
13   and let everyone make money, as long as at
14   the end of the day, we can still be
15   accountable to the shareholders who hired us.
16            Do you see that?
17       A.   Yes.
18       Q.   Then you write, Norman, on the
19   other hand, doesn't give a shit because he
20   doesn't have to.
21            Do you see that?
22       A.   Yes.
23       Q.   Then Mr. Wong writes, His character
24   is also quite bizarre and in no offensive
25   way, it's just awkward when we are with
```



Page 411

```
 1                    D. Majcher
 2   people and stuff, but personally, it's fine.
 3   And then he writes, Accountability is an
 4   immeasurable responsibility.  And you write,
 5   And he always thinks and still thinks that if
 6   he can pay us a sum that we ask for or make
 7   sure that we are paid that sum, then we
 8   should just be happy, no questions asked.
 9            Do you see that?
10       A.   Yes.
11       Q.   Mr. Wong writes, It's an innate
12   skill that defines a character to me and you
13   write, Why are we bothering with all this
14   other shit?  Norman's antisocial for sure.
15            And there, you are referring to
16   Norman Choi, right?
17            MS. WIGGER:  Object to form.  I
18       assume you just mean the last message?
19            MR. SIMONS:  Yes.
20       Q.   That message, Norman is antisocial
21   for sure refers to Norman Choi, right?
22       A.   Yes.
23       Q.   Mr. Wong says, I am aligned with
24   everything you are saying.  Then you write on
25   the next page, Norman has never had to worry
```



Page 412

```
 1                    D. Majcher
 2   about anyone or thing else other than himself
 3   and his family.
 4             Do you see that?
 5        A.   Yes.
 6        Q.   The Norman you are referring to
 7   there is Mr. Choi?
 8        A.   The one and only, yes.
 9        Q.   The one and only.  Then he says,
10   then you write, He doesn't understand why we
11   are not happy.
12             And there, again, you are referring
13   to Mr. Choi, right?
14             MS. WIGGER:  Object to form.
15        A.   I think so.
16        Q.   Then Jowyn writes, You are right.
17   You can't pay your way out of it.  It just
18   inevitably sucks.  Then you write, Why Stefan
19   gets upset that he trusts Ryan more.
20             Do you see that?
21        A.   Yes.
22        Q.   Then Jowyn writes down there,
23   That's one, I think it's a typo for
24   psychological thing.  I can't blame him
25   personally, but from our point of view,
```



Page 413

```
 1                    D. Majcher
 2   Norman isn't fit for this purpose and the
 3   ship is sinking.
 4             Do you see that?
 5        A.   Yes.
 6        Q.   Your understanding there is that
 7   Mr. Wong was referring to Norman Choi, right?
 8             MS. WIGGER:  Object to form.
 9        A.   So the Norman, I suppose yes.
10        Q.   Then Jowyn writes, This is going to
11   be difficult.  I don't want to hurt Norman,
12   but I want the best for Apollo and to me,
13   that's more important.  Then you write, I
14   genuinely believe Norman is one of the nicest
15   and most decent human beings out there, but
16   he is very difficult to work with or work
17   for.
18             Do you see that?
19        A.   Yes.
20        Q.   Then Jowyn writes, I just cannot
21   imagine another five years or something
22   working with Ryan and Norman any longer.  As
23   friends, it's no problem, but the quality in
24   which we conduct ourselves is just abysmal.
25             Do you see that?
```



Page 414

```
 1                  D. Majcher
 2        A.    Yes.
 3        Q.    Then you write, The way they do
 4   things will not get anywhere.
 5              Do you see that?
 6        A.    Yes.
 7        Q.    Then further down, you write, And
 8   maybe they don't need to care or worry about
 9   it because they are sitting on money, but I
10   can't afford that.
11              MS. WIGGER:  Object to form, to the
12        extent we also didn't read the message
13        you just skipped.
14        Q.    Do you see that?
15        A.    Yes.
16        Q.    Then Mr. Wong writes, It's just a
17   load of facade.  I don't want to lie to
18   customers' faces in the entire world anymore.
19   Ha, ha.  It's so demoralizing.
20              Do you see that?
21        A.    Yes.
22        Q.    Do you have an understanding about
23   what Mr. Wong wrote when he said, I don't
24   want to lie to customers' faces in the entire
25   world anymore?
```



Page 415

                    D. Majcher
1
2            MS. WIGGER:  Object to form, calls
3       for speculation.
4       A.   I don't.
5       Q.   Mr. Wong then wrote, Not even about
6  the money for me.  I notice Norman and Ryan
7  both do not have friends.  I do not want to
8  end up like them.  It's completely against my
9  nature.  And then you wrote, Maybe they
10  really do believe in their own BS.
11           Do you see that?
12       A.   Yes.
13       Q.   By they there, you are referring to
14  Mr. Choi and Mr. Berris, right?
15       A.   Possibly.
16       Q.   Then you write, Yes, that's very
17  true and very sad, triple exclamation mark.
18  They only have each other.
19           And there, again, you are referring
20  to Mr. Choi and Mr. Berris, right?
21       A.   Possibly, yes.
22       Q.   Then Mr. Wong writes, That's fine
23  if they do, but consider the world is full of
24  human beings.  And then you write, I used to
25  wonder if Ryan is gay, now I just wonder if



Page 416

```
 1                  D. Majcher
 2   he is asexual.
 3           You are referring to Ryan Berris
 4   there, right?
 5      A.   Yes.
 6      Q.   Mr. Wong writes, I don't even know
 7   what he is.  I just come to understand he has
 8   rooted problems.  Both Ryan and Norman do and
 9   they have not faced it unfortunately.
10           Do you see that?
11      A.   Yes.
12      Q.   Then he writes --
13           MS. WIGGER:  Object to form.  Is
14       there a point to just reading this
15       document into the record?
16      Q.   Then he says, Ryan is on a mission
17   to prove something to his family.  Norman's
18   case, he can't trust anyone, especially the
19   Chinese.  He is so against whatever China
20   politician and whoever is doing, he is
21   completely absorbed himself into it.
22           Do you see that?
23      A.   Yes.
24      Q.   Then you write, Yes, he is so
25   obsessed by it.
```



Page 417

1                    D. Majcher

2           Do you see that?

3      A.    Yes.

4      Q.    It's crazy.  Then you write,

5  They're both socially awkward.

6           Do you see that?

7      A.    Yes.

8      Q.    And the they you are referring to

9  there are Norman Choi and Ryan Berris?

10     A.    I think so.

11     Q.    Then you write, Norman hides it

12 better, right?

13     A.    Yes.

14     Q.    A little bit further in here -- I

15 will ask the question without the document.

16           Did there come a time you remember

17 Mr. Wong telling you that Mr. Choi's wife was

18 jealous of you?

19           MS. WIGGER:  Object to form and any

20      possible relevance.

21     A.    I don't remember him using those

22 words.

23     Q.    What do you remember him saying in

24 sum or substance, just generally speaking?

25           MS. WIGGER:  Object to form.  About



Page 418

```
 1                  D. Majcher
 2      what?
 3      Q.    About Mr. Choi's wife's feelings
 4  towards you.
 5            MS. WIGGER:  Object to form.
 6      A.    Again, this is what was told to me,
 7  that perhaps there is some insecurity.
 8      Q.    Insecurity in what sense?
 9      A.    I don't know.
10      Q.    Let's look through the document
11  real quick.  If you go to the one ending in
12  121.  The top of the page there, Jowyn writes
13  to you, The reason Norman is distant from you
14  is deliberate, it's because of Sophia.
15            Do you see that?
16      A.    Yes.
17      Q.    And Sophia is Mr. Choi's wife,
18  right?
19      A.    Yes.
20      Q.    And you write, No --
21            MS. WIGGER:  I object.  This is
22            harassing.  What is the point of this?
23            MR. SIMONS:  Are you going to
24            instruct the witness not to answer?
25            MS. WIGGER:  No, but I would like
```



Page 419

```
 1                D. Majcher
 2      you to stop harassing her by reading
 3      these text messages with no question or
 4      content.
 5           MR. SIMONS:  We are entering it
 6      into this record so that we can play it
 7      in front of the jury.
 8           MS. WIGGER:  The document is in the
 9      record.  I mean, you are not going to
10      play...
11           MR. SIMONS:  I understand your
12      objection.  If you are not going to
13      instruct her, which, obviously, would be
14      an invalid instruction, then we will
15      keep on with the questions.
16           MS. WIGGER:  This is not how
17      deposition transcripts are used at
18      actual trials.
19      Q.   If you go to the bottom of the page
20  ending in 123, Jowyn said, Sophia made huge
21  fusses about it with him to the point where
22  she didn't want you to be working with him.
23  I had to convince Norman that he cannot
24  fucking do that because your wife is insecure
25  because this is the reason for his actions
```



Page 420

```
 1                    D. Majcher
 2   and his compromise to Sophia.
 3              Do you see that?
 4        A.   Yes.
 5        Q.   You can put that document aside.
 6              Ms.  Majcher, you had concerns
 7   about Capricorn's ability to deliver the
 8   prototypes that De Tomaso wanted them to
 9   build, right?
10              MS. WIGGER:  Object to form.
11        A.   I think I had concerns at some
12   point in time, yes.  I raised my concerns.
13        Q.   Do you recall if you expressed
14   those concerns to Mr. Choi in March of 2022?
15        A.   I don't recall exactly when.
16        Q.   Do you recall if anyone else at De
17   Tomaso had concerns about Capricorn's ability
18   to deliver?
19              MS. WIGGER:  Object to form.
20        A.   No, I don't know.
21        Q.   When you raised those concerns to
22   Mr. Choi, what did he say to you?
23              MS. WIGGER:  Object to form.  She
24         just said no.
25        A.   That's a different question.
```



Page 421

1                    D. Majcher

2        Q.    That's a different question?

3        A.    I don't remember exactly what his

4   reply was.

5        Q.    But he continued to work with

6   Capricorn, right?

7        A.    Yeah, we continued to work with

8   Capricorn.

9        Q.    Approximately how much money had De

10  Tomaso paid Capricorn?

11       A.    Roughly 20 million Euros I think.

12             MR. SIMONS:   We will mark this as

13        Majcher 59.

14             (Majcher Exhibit 59, March 28,

15        2022, WhatsApp exchange between Diana

16        Majcher and Jowyn Wong, marked for

17        identification.)

18       Q.    Ms. Majcher, this is a WhatsApp

19  exchange between you and Jowyn Wong on March

20  28th of 2022, is that right?

21       A.    Yes.

22       Q.    I want to direct you to the

23  correspondence with Mr. Wong starting on the

24  top of page 72.  All right?

25       A.    Seventy-two?



Page 422

```
 1                    D. Majcher
 2         Q.   Yes.
 3              MS. WIGGER:  Mine starts at 79.
 4         Q.   Did you get the wrong document?
 5         A.   Or is it 372?
 6         Q.   It's 372, it's the one ending in
 7    372.
 8              MS. WIGGER:  This is a document
 9         that's 134279?
10              MR. SIMONS:  Yes, Correct.
11              MS. WIGGER:  Then you are going to
12         the ending 372?
13              MR. SIMONS:  Correct.  These are
14         very lengthy chats.
15         Q.   Are you there, Ms. Majcher?
16         A.   Yes.
17         Q.   Mr. Wong writes to you, Capricorns
18    have not shown proper detail in terms of
19    scope of work and deliverables outlining
20    their requirements.  It's all kind, like,
21    trust we know what we are doing sort of vibe.
22              Do you see that?
23         A.   Yes.
24         Q.   Then if you go to the page ending
25    in 374, Jowyn says, I will tell him straight
```



Page 423

```
 1                    D. Majcher
 2   actually when I meet him again.  I will say
 3   if he doesn't take the advice seriously, we
 4   cannot commit to this.  It will just be
 5   repeated again and we cannot be bothered with
 6   it.
 7             Do you see that?
 8        A.   Yes.
 9        Q.   And he writes, Yeah, good luck with
10   that.  Asking milling factories to make an
11   engine.
12             Do you see that?
13        A.   Yes.
14        Q.   Did you understand him to be
15   referring to Capricorn as the milling
16   factory?
17             MS. WIGGER:  Object to form.
18        A.   I don't know.
19        Q.   Your next message to him, you
20   write, I mean maybe it's not as bad as we
21   think.  I'm definitely not close enough to
22   judge, but then you can't ignore all the red
23   flags.
24             Do you see that?
25        A.   Yes.
```



Page 424

```
 1                    D. Majcher
 2      Q.    Jowyn says, By now, we can just
 3  tell.  And you write, We can't leave
 4  ourselves so exposed.  He writes, Neil
 5  reviewed the agreement and he just thought
 6  Norman went crazy, and then you insert a few
 7  emojis.
 8            What you are referring to here is
 9  the proposed agreement between De Tomaso and
10  Capricorn, right?
11            MS. WIGGER:  Object to form.
12      A.    I think so.
13      Q.    Then Jowyn sends you a message and
14  you write, He couldn't believe we kept paying
15  them without having seen or received
16  anything.  And then Jowyn writes, It's
17  insanity.
18            Do you see that?
19      A.    Yes.
20            MS. WIGGER:  Object to form, to the
21      extent you skipped some.
22      Q.    Now, if you go, it looks like Mr.
23  Wong sends you maybe some images and then you
24  say, At one point, I asked Norman, how can we
25  sure that they will do what they say?
```



Page 425

1                    D. Majcher

2      A.    Where are you?

3            MS. WIGGER:   Where are you?

4            MR. SIMONS:   Oh, sorry, the top of

5       378.

6      Q.    Mr. Wong writes, It's insanity.

7  There are a couple of blank messages, then

8  you write, At one point, I asked Norman how

9  we can be sure they will do what they say.

10           Do you see that?

11     A.    Yes.

12     Q.    And he said, He just said, trust.

13  And then you write, I was seriously, like,

14  and you insert a sticker of some kind, I'm

15  not sure that we have.

16           And what you are referring to here

17  is that you were skeptical about the fact

18  that Mr. Choi was trusting in Capricorn's

19  promises to deliver, right?

20           MS. WIGGER:   Object to form,

21       misstates the document.

22     A.    To the extent we were talking about

23  Capricorn, that would be a fair statement.

24     Q.    You thought it was a mistake for

25  Mr. Choi to trust what Capricorn was telling



Page 426

```
 1                  D. Majcher
 2  him?
 3           MS. WIGGER:  Object to form.
 4       A.   I think it's a mistake in general
 5  in business to put everything only in trust
 6  and not see deliverables or contracts.
 7       Q.   In this particular instance, you
 8  were talking about a lack of deliverables or
 9  contracts with respect to Capricorn, right?
10           MS. WIGGER:  Object to form, asked
11       and answered.
12       A.   I think so.
13       Q.   Then on the next page -- on 379,
14  Mr. Wong writes to you and then on 308, you
15  respond, How many times have you been taken
16  for a ride in the past, right?
17       A.   Yes.
18       Q.   And are you referring to Mr. Choi
19  there?
20           MS. WIGGER:  Object to form,
21       foundation.
22       A.   I don't recall.
23       Q.   Then Mr. Wong says, Oh, AFMG.  You
24  write, OMG.  Then he writes, Robertino,
25  LOOOL.  Then you write, He really is a magnet
```



Page 427

1                    D. Majcher

2    for these people.

3              Was the he you were referring to

4    there Mr. Choi?

5         A.   Possibly.

6         Q.   Then Jowyn Wong writes, Ummm, maybe

7    that's his lesson.  And then you respond, How

8    can he still not have learned it?

9              Do you see that?

10        A.   I do.

11        Q.   Then Jowyn writes, I'm so baffled.

12   And then you wrote, We developed the IE like

13   three times.  And then Jowyn writes, I mean,

14   it's not like we are asking much, right?

15   Just want some evidence of the work done so

16   far.

17             Do you see that?

18        A.   Yes.

19        Q.   And he is referring there to

20   Capricorn again, right?

21             MS. WIGGER:  Object to form.

22        A.   Again, assuming that this string is

23   talking about Capricorn, then, yes.

24        Q.   Then you write, Exactly, or has the

25   work been delivered and we just don't know



Page 428

                        D. Majcher

 1

 2    it, question mark.  Maybe Norman has seen it.

 3              Do you see that?

 4        A.    Yes.

 5        Q.    Then Jowyn writes, I'm asking for

 6    them to send all those amazing things they

 7    fixed over to us.  Then you wrote, Does

 8    Norman have those?  And he wrote, All this

 9    amazing, mind-blowing work they have done

10    that Norman keeps praising.  He is supposed

11    to send them over to us soon, but so far,

12    nada.

13              Do you see that?

14        A.    I do.

15        Q.    And, again, this is -- it's best of

16    your best recollection or discussion about

17    Mr. Choi's faith in Capricorn, right?

18              MS. WIGGER:  Object to form and

19         lack of foundation.

20        A.    I think we are just talking about

21    Capricorn.

22        Q.    Then on the bottom of 85, you say,

23    That's why I think you and Steve should go

24    and visit them, sit with their team to go

25    over the work that's been done so far.  And



Page 429

```
 1                    D. Majcher
 2   then you wrote, Ryan keeps telling me the
 3   data room is not updated or the work is not
 4   what it's supposed to be.
 5            Do you see that?
 6       A.   Yes.
 7       Q.   And the Ryan that's referred to
 8   there is Mr. Berris?
 9            MS. WIGGER:  Object to form.
10       A.   Yes.
11       Q.   And what you recall -- do you
12   recall that Mr. Berris was telling you that
13   the data room that Capricorn was supposed to
14   be provided, was supposed to be providing
15   information in, was either, quote, not
16   updated or the work is not what it's supposed
17   to be?
18       A.   I don't recall specifically.
19       Q.   If you go to the page ending in
20   389, Mr. Wong writes at the top, Even with
21   this lighting proposal, there is no scope of
22   work for what will be delivered after 300-K.
23   Just small details like these puts enormous
24   risk and liability to DT and I can imagine
25   every proposal is the same, and you write,
```



Page 430

```
 1                    D. Majcher
 2    Your imagination is correct.  And then you
 3    write, They can't define their own scope of
 4    work in an agreement where we are going to
 5    pay them 10 million Euros, exclamation point,
 6    right?
 7              MS. WIGGER:  Object to form.
 8        A.   Yes.
 9        Q.   And here again, you are referring
10    to the -- the they you are referring to there
11    is Capricorn, right?
12        A.   I think so.
13        Q.   Then Mr. Wong writes, Ha, ha.
14    Well, we will understand these to be honey
15    traps, especially when you did this all
16    without any technical advisors on board to
17    review properly, right?
18        A.   That's what he wrote.
19        Q.   Then you wrote --
20              MS. WIGGER:  All right.  I think we
21         are at seven hours and 27 minutes on my
22         clock.
23              Are we at seven hours?
24              THE VIDEOGRAPHER:  Yes.
25              MR. SIMONS:  I just want to -- one
```



Page 431

1              D. Majcher

2      last question.

3           MS. WIGGER:  I think we are done.

4      We are at seven hours.

5           MR. SIMONS:  All right.  That's

6      fine.

7           Thank you, Ms. Majcher, for your

8      time.

9           MS. WIGGER:  I have no questions

10      for Ms. Majcher.

11           THE VIDEOGRAPHER:  This concludes

12      today's deposition.  The time is 7:25

13      p.m.

14           (Time noted:  7:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25



Page 432

1

2                      - - -

3                I  N  D  E  X

4                      - - -

5

6    DIANA MAJCHER                          PAGE

7        By Mr. Simons                      4

8

9                      - - -

10               E  X  H  I  B  I  T

11                     - - -

12   MAJCHER EXHIBIT                        PAGE

13   Exhibit 1 February 5, 2021 chat        17

14        between Diana Majcher and

15        Norman Choi

16   Exhibit 2 February 10, 2022            21

17        WhatsApp chat between Diana

18        Majcher and Norman Choi

19   Exhibit 3 Consultancy agreement        50

20        dated July of 2022

21   Exhibit 4 June 17, 2021 WhatsApp       56

22        exchange between Ms. Majcher

23        and Mr. Choi

24

25



Page 433

- - -

E X H I B I T

- - -

MAJCHER EXHIBIT                              PAGE

Exhibit 5 July 14, 2023 text                59
    exchange between Ms. Majcher
    and Mr. Choi

Exhibit 6 Copy of Diana Majcher's           64
    LinkedIn profile

Exhibit 7 Declaration filed by Diana        70
    Majcher on September 19, 2023

Exhibit 8 De Tomaso BVI Company's           78
    general ledger

Exhibit 9 WhatsApp exchange between         83
    Ms. Majcher and Mr. Choi dated
    February 1, 2021

Exhibit 10 November 6, 2021 WhatsApp        92
    exchange between Ms. Majcher
    and Mr. Choi

Exhibit 11 January 19, 2021 WhatsApp        101
    exchange between Ms. Majcher
    and Mr. Choi



Page 434

- - -

E X H I B I T

- - -

MAJCHER EXHIBIT                                    PAGE

Exhibit 12 February 4, 2021 WhatsApp    103
    Chat between Ms. Majcher and
    Mr. Choi

Exhibit 13 May 27, 2021 WhatsApp       116
    message exchange between Ms.
    Majcher and Mr. Berris

Exhibit 14 March 2, 2018 WhatsApp      119
    chat between Diana Majcher
    and Bill Majcher

Exhibit 15 July 10, 2019 WhatsApp      121
    message exchange between Diana
    Majcher and Bill Majcher

Exhibit 17 March 14, 2024 WhatsApp     131
    exchange between Diana Majcher
    and Jakub Jodlowski

Exhibit 10 Audio file bearing Bates    137
    Stamp No. DT 000139172

Exhibit 19 March 2, 2021 WhatsApp      140
    exchange between Ms. Majcher
    and Mr. Choi



Page 435

1

2                        - - -

3                  E X H I B I T

4                        - - -

5  MAJCHER EXHIBIT                          PAGE

6  Exhibit 20 March 3, 2021 WhatsApp       156

7      exchange between Ms. Majcher

8      and Mr. Choi

9  Exhibit 21 November 9, 2021 chat        157

10     between Ms. Majcher and Mr. Choi

11  Exhibit 23 Email from                   180

12     normansfchoi@gmail.com to Ms.

13     Majcher and Mr. Berris on

14     November 14, 2021

15  Exhibit 24 November 15, 2021 WhatsApp   184

16     exchange between Ms. Majcher and

17     Mr. Choi

18  Exhibit 25 Email from                   187

19     tackisfat@gmail.com to

20     diana.majcher@gmail.com with

21     a copy to Norman Choi at

22     normansfchoi@gmail.com dated

23     March 11, 2022

24

25



Page 436

1
2                          - - -
3                    E X H I B I T
4                          - - -
5   MAJCHER EXHIBIT                          PAGE
6   Exhibit 26 June 9, 2022 email to Ms.    193
7        Majcher copying Mr. Choi from
8        tackisfat@gmail
9   Exhibit 27 Chat between Mr. Samuel       200
10       Lee and Norman Choi dated July
11       31, 2023
12  Exhibit 28 September 14, 2023 chat       210
13       between Ms. Majcher and other
14       individuals
15  Exhibit 29 March 21, 2022 chat           221
16       between Ms. Majcher and Mr. Choi
17  Exhibit 30 Agreement between Wyn         231
18       Design, Jowyn Wong and De Tomaso
19       dated March 2022
20  Exhibit 31 WhatsApp chat between         237
21       Ms. Majcher and Mr. Choi dated
22       March 23, 2022
23  Exhibit 32 March 22, 2022 chat           240
24       between Ms. Majcher and Mr. Choi
25



Page 437

1

2                    - - -

3                E X H I B I T

4                    - - -

5  MAJCHER EXHIBIT                     PAGE

6  Exhibit 33 April 8, 2022 WhatsApp    253

7      chat between Ms. Majcher and

8      Mr. Choi

9  Exhibit 34 April 22, 2022 WhatsApp   259

10     exchange between Ms. Majcher

11     and Mr. Choi

12 Exhibit 35 April 26, 2022 WhatsApp   262

13     exchange between Ms. Majcher

14     and Mr. Choi

15 Exhibit 36 May 19, 2022 email from   267

16     Ms. Majcher to Mr. Choi

17 Exhibit 37 April 5, 2022 email from  271

18     Ms. Majcher to Mr. Berris

19     copying Mr. Choi

20 Exhibit 38 May 19, 2022 WhatsApp     285

21     chat between Ms. Majcher and

22     Mr. Choi

23 Exhibit 39 Truth Finder Background   287

24     Report, Ryan C. Berris, report

25     created May 17, 2022



Page 438

1

2                         - - -

3                    E X H I B I T

4                         - - -

5    MAJCHER EXHIBIT                              PAGE

6    Exhibit 40 Email from Stanley Cohen      292

7        fastferrari@aol.com to Mr. Choi

8    Exhibit 41 May 18, 2022 WhatsApp         303

9        exchange between Ms. Majcher

10       and Hugo De Sadeleer

11   Exhibit 42 May 19, 2022 text             311

12       exchange between Ms. Majcher

13       and Mr. De Sadeleer

14   Exhibit 43 April 21, 2021 WhatsApp       317

15       exchange between Adam, Bill

16       Majcher, Diana Majcher, Norman

17       Choi and Ryan Berris

18   Exhibit 44 Document titled Brief         321

19       Bio on Inspector Bill Majcher

20   Exhibit 45 Copy of Bill Majcher's CV     326

21   Exhibit 46 September 22, 2020            327

22       WhatsApp exchange between Ms.

23       Majcher and Mr. Choi

24   Exhibit 47 March 3, 2022 chat between    340

25       Ms. Majcher and Mr. Choi



Page 439

1
2                     - - -
3                  E X H I B I T
4                     - - -
5   MAJCHER EXHIBIT                        PAGE
6   Exhibit 48 October 7, 2020 WhatsApp    349
7       communication between Ms.
8       Majcher and Mr. Choi
9   Exhibit 49 Email exchange              351
10  Exhibit 50 August 24, 2023 email       361
11      from Bart Lenaerts at Waft to
12      Ms. Majcher
13  Exhibit 51 October 10, 2023 email      361
14      from Ms. Majcher to Bart
15      Lenaerts at Waft
16  Exhibit 52 Copy of the settlement      364
17      agreement entered into on the
18      10th of October of 2023
19  Exhibit 53 October 9, 2023 email       367
20      from Bart Lenaerts at Waft to
21      Ms. Majcher
22  Exhibit 54 April 6, 2020 WhatsApp      372
23      exchange between Diana Majcher
24      and Jowyn Wong
25



Page 440

```
 1
 2                     - - -
 3                E X H I B I T
 4                     - - -
 5   MAJCHER EXHIBIT                      PAGE
 6   Exhibit 55 August 17, 2020 WhatsApp    377
 7       exchange between Diana Majcher
 8       and Jowyn Wong
 9   Exhibit 56 January 7, 2021 WhatsApp    380
10       exchange between Diana Majcher
11       and Jowyn Wong
12   Exhibit 57 October 27, 2020 WhatsApp   386
13       exchange between Ms. Majcher
14       and Mr. Wong
15   Exhibit 58 October 29, 2020 WhatsApp   404
16       exchange between Diana Majcher
17       and Jowyn Wong
18   Exhibit 59 March 28, 2022, WhatsApp    421
19       exchange between Diana Majcher
20       and Jowyn Wong
21
22
23
24
25
```



Page 441

```
 1
 2                        - - -
 3            DEPOSITION SUPPORT INDEX
 4                        - - -
 5   Request for Production of Documents
     Page  Line        Page  Line    Page   Line
 6   None
 7                        - - -
 8   Stipulations
     Page  Line        Page  Line    Page   Line
 9   None
                         - - -
10
     Questions Marked
11   Page  Line        Page  Line    Page   Line
     None
12                       - - -
13   To Be Filled In
     Page  Line        Page  Line    Page   Line
14   None
                         - - -
15
16
17
18
19
20
21
22
23
24
25
```



Page 442

```
 1
 2                    CERTIFICATE
 3
            I HEREBY CERTIFY that the witness,
 4    DIANA MAJCHER, was duly sworn by me and that
      the deposition is a true record of the
 5    testimony given by the witness.
 6    _____
      Leslie Fagin,
 7    Registered Professional Reporter
      Dated: September 17, 2024
 8
 9
10
            (The foregoing certification of
11    this transcript does not apply to any
      reproduction of the same by any means, unless
12    under the direct control and/or supervision
      of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 443

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3          I,                        , do hereby
    certify that I have read the foregoing pages,
 4  and that the same is a correct transcription
    of the answers given by me to the questions
 5  therein propounded, except for the
    corrections or changes in form or substance,
 6  if any, noted in the attached Errata Sheet.
 7
 8
    DIANA MAJCHER                    DATE
 9
10
    Subscribed and sworn
11  to before me this
            day of                   , 2024.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



Page 444

```
 1
 2                   - - - - - -
                    E  R  R  A  T  A
 3                   - - - - - -
   PAGE   LINE   CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



## A

**A-C-C-E-S-S**
166:9
**A-U**
265:20
**a.m**
1:16 3:9 78:14,17
319:20
**a/k/a**
1:8,9
**abandon**
382:4
**abbreviation**
327:9,9
**ability**
420:7,17
**able**
158:22,23 299:22
315:6 343:9 353:23
**abnormal**
24:4
**abreast**
336:23
**absent**
77:9 130:16,18
**absolutely**
256:23 393:3
**absorbed**
416:21
**abysmal**
413:24
**accept**
256:25 278:16
308:13
**acceptable**
94:15 229:20 404:2
**acceptance**
14:3
**accepted**
355:4 356:24
**access**
166:8 285:19 286:6
286:11,15,17,22
368:19 369:20
**accessed**

87:6
**accessible**
288:21
**accomplish**
218:9
**accomplishments**
141:10
**account**
8:23 10:5,8 13:21
15:6,15 80:15 165:8
181:10 188:8
189:21 190:2,2
191:2,6,9,12,13,17
193:17,17 242:22
279:14,14,15
299:18,20,21,22
319:10 366:16
**Accountability**
411:3
**accountable**
255:9,15 410:15
**accountant**
177:14
**accounting**
238:25 268:12
341:20
**accounts**
114:23 255:23
272:18,23 296:11
**accuracy**
68:10
**accurate**
66:14,17,23,24 67:6
67:10,11,14,15,17
67:21 68:4,8 72:9
72:11,25 73:19
294:23 295:18
296:14,20 297:12
297:25 323:8
324:13 326:3
**Achilles'**
379:11
**acknowledge**
201:6 213:20 214:23
306:2
**acknowledged**

310:23 311:11
**acknowledges**
214:17
**ACKNOWLEDG...**
443:2
**acquire**
145:12 157:15 172:8
172:14 173:10,14
174:17 175:5 241:8
**acquisition**
145:15 146:2 151:16
152:9
**act**
104:16 229:16
**action**
272:12
**actions**
419:25
**active**
8:23
**actively**
218:6
**activities**
96:5
**acts**
284:13
**actual**
330:14 419:18
**Adam**
317:16,22 318:13,16
318:17 319:7,15,18
319:23 438:15
**Adam's**
318:24
**add**
236:10 368:19
**addition**
233:10
**additional**
254:17 281:22,25
282:7,9
**address**
8:14,16,19,20 13:3,6
110:24 181:16,22
182:2 187:6,21,24
188:5 189:18

193:18 293:13
299:5,7,10,13
**addresses**
8:18 13:11 111:2
190:14
**adequate**
124:15 125:22
**adhere**
353:21
**admin**
102:24
**advantage**
410:12
**advantages**
324:21
**adventurous**
323:13
**advice**
78:9 276:6 284:16
423:3
**advised**
122:4 323:23
**advises**
210:13
**advising**
196:20
**advisor**
28:14,16 104:17
210:6 213:3
**advisors**
430:16
**advisory**
45:21 177:17 203:21
203:23 204:5
326:21
**affairs**
309:5
**affiliated**
69:6 261:6 315:16,24
316:8
**afford**
414:10
**AFMG**
9:24 20:8 36:23 37:3
38:20,20,24 39:9,13
39:25 40:2,4,8,14



40:18,20 41:5,15
42:7,18 44:12 54:8
54:14,18,20 64:7,11
64:14,16 67:24 69:2
69:6,9,16,19 70:3,5
70:11 84:20 85:8
88:16 89:4,9,11
93:15 97:19,21 98:5
100:3 101:2,4,8
102:2,13,16 338:12
349:23 350:7,11
351:21,24 380:8
382:12 383:3
384:13,23 388:6,15
388:18 395:17,23
396:4,24 398:4,10
398:25 400:12
401:22 402:23
403:6 426:23
**AFMG's**
380:12
**afoul**
54:2 370:13
**afraid**
379:11
**against-**
1:7
**age**
293:9
**agencies**
323:14,18
**agenda**
379:2
**ages**
118:6,8
**agitation**
243:13,21
**ago**
38:10 68:11 118:6
122:13 135:9
192:23 394:25
407:25
**agree**
174:6 213:21 276:16
306:25 307:5,21
312:21 313:17

365:22 366:13
392:12
**agreed**
62:24 63:4 82:18
83:13 123:12,15
212:2,12 233:15
253:6 341:25
343:22 344:8
345:13,23 346:14
346:18 361:6
**agreeing**
135:23 255:21 307:8
**agreement**
37:11,15,16,17,18,23
37:25 38:10,21,24
39:2,9,18,24 40:6,8
41:15,16 42:17,24
47:12,18 48:12,16
48:21 51:3,6,9,15
51:20 52:9,21 53:6
53:13,17 55:12
61:13,15,18 63:8,17
63:18 64:8 82:24
95:10,13,15 96:14
99:5 116:2 128:15
164:9,17 165:3,3
169:7 206:16 213:5
215:11,13 232:3,16
232:25 234:10,15
234:17,21,25 235:2
258:20 340:13
344:17 350:24
362:17,22 363:8,18
364:12,14,17,24
365:7,11,18,23
366:11 367:4
369:25 370:12
382:23,24 424:5,9
430:4 432:19
436:17 439:17
**agreements**
101:3 235:6 245:19
245:20
**agrees**
53:7 214:18
**Ah**

386:23
**ahead**
121:8 213:15,21
214:18 316:16
328:18 344:20
**ahold**
12:8
**al**
3:7
**ALEXANDRA**
2:10
**Ali**
4:13
**aligned**
411:23
**allegations**
6:14 12:15 218:15,21
335:5,8 337:2 370:8
370:15
**alleged**
335:8
**allegedly**
334:21
**allotment**
169:19
**allow**
69:17 242:17
**allowed**
54:13
**altered**
238:16
**altering**
239:8,12,17,21
**altogether**
3:25
**amazing**
213:25 306:3 428:6,9
**amended**
182:9
**America**
71:16,24 156:10
299:17,19 324:8
**American**
120:11,16 325:6
**amicably**
301:15 302:5 310:22

**amount**
80:16,25 82:19
125:11 129:15
233:14 236:10,10
297:4 342:17,21
347:10 366:14
**amounts**
256:20
**analysis**
391:17
**and/or**
268:16 442:12
**Anime**
136:23
**announcement**
214:10
**annual**
38:5 233:10 345:17
347:22,25
**anonymous**
263:18,25 264:10,13
264:21 267:5,7
**answer**
5:11 16:11 26:7
33:18,20 34:12
73:25 74:8 77:8,9
77:10,23 78:2,7
99:14 111:17
146:15 184:6 195:6
197:18 198:20
208:3 216:12
250:10,12,16,18
253:9 276:7 277:14
277:23,25 278:14
279:9 280:9 281:2
284:3 287:15
299:25 334:7
356:21 360:7 361:5
403:12 418:24
**answered**
24:8 30:10 38:8 42:9
72:22 165:13 192:5
192:14 196:7
248:15 249:11
250:8 261:11
329:16 386:20



406:3 407:2 409:23
426:11
**answers**
443:4
**anticipation**
277:12 278:5
**antisocial**
411:14,20
**anybody**
7:16 31:18
**anymore**
6:15 42:4 44:8
363:23 383:25
393:18,25 398:12
399:4 414:18,25
**anyway**
76:25 87:6 129:15
**apart**
48:10,25 49:17
198:18 291:4
331:16,20,21
**apartment**
262:11
**Apollo**
8:19 9:14,16,18
10:12,18 11:3,10,14
12:6 13:4 19:8 28:3
36:9,11,14,21 37:7
37:11,20 38:6,19,21
39:4 43:16 44:3,11
48:8,10 49:18 53:11
53:20,25 54:5 60:3
67:19,23 81:15,23
85:12 86:18 89:22
90:4,15 93:15 96:2
96:6,11,15,19 97:5
97:18,20,24 98:4,12
98:21 99:2,11,12,20
99:25 100:4,7 101:7
102:2 104:17,22
105:14,17 111:5
112:22 117:15
120:24 121:10,11
144:15,18,24 145:4
290:25 291:8,21,22
294:19 328:16

329:2 330:9,17,25
332:3,6,18 333:3,8
337:18 338:7,21
339:12,19 371:11
371:18 380:7 382:4
382:10,25 383:23
384:24 385:7,12
386:8,12 395:16,22
396:23 401:22
413:12
**Apollo's**
96:24
**Apollo/AFMG**
20:4,6
**apologies**
79:4
**apologize**
19:4 93:17 132:9
240:14 381:23
**apologized**
122:3
**app**
12:19
**apparently**
197:5
**appear**
88:18 109:7 298:14
**appearances**
2:2 3:19
**appeared**
295:14
**appearing**
154:12
**appears**
60:14 62:6,17,20
63:19 65:2 81:3
89:6 95:8 102:5
117:2,9 121:19
155:25 156:2
159:18 164:20
185:2 231:16 232:7
232:22 317:19
365:13 391:8 392:5
**apply**
442:11
**appoint**

213:15
**appointed**
44:21 46:5 221:20
**appointing**
73:11
**appointment**
46:12,14
**appreciate**
184:8 362:23
**appreciation**
314:18,20
**approach**
307:13,19,21,25
312:22 323:19
324:24 362:16
391:21
**approaches**
408:19 409:17
**appropriate**
55:20 259:10,15
261:7 319:19
**appropriated**
384:25
**approve**
58:2
**approved**
61:25
**approximately**
42:22 236:25 421:9
**April**
66:11 67:14,24
127:16 132:2
233:21 236:21
252:9 253:12,18
259:20 260:2
262:18,25 266:20
271:18,24 317:15
317:20 372:20,25
437:6,9,12,17
438:14 439:22
**Aprivy**
96:15 99:4 102:7
254:23 298:20
**Arc**
158:14 159:21
169:17

**argument**
312:8
**argumentative**
283:18
**arisen**
306:7
**arises**
9:24 12:8
**arm's**
146:17,21,23 152:24
195:14,21
**arms**
146:25
**arrangement**
20:11 62:10,11,14,22
92:8 127:9 204:7,11
205:3 217:19
**arrangements**
179:10
**arrest**
335:17 336:2
**art**
320:12
**article**
143:18
**articles**
337:13
**articulated**
273:11,13 384:17
**artist**
114:15
**ASAP**
213:19 349:23
**asexual**
416:2
**Ash**
222:2,8,10,11,21
223:5 224:7 225:21
**aside**
25:11 40:12 56:24
59:7 70:19 83:24
102:19 105:21
119:8 121:12
122:22 130:9
156:14 158:2
168:19 172:19



176:8 187:12
197:21 216:19
218:24 236:8
237:17 240:21
252:6 262:16
267:11 271:14
273:16 278:24
287:11 291:2 303:9
311:15 315:10
325:14 326:10
327:19 333:23
348:6 352:6 355:21
362:5 365:3 371:8
377:18 380:16
387:7 404:9 420:5
**asked**
16:23 17:6 18:5
23:20 24:7,23 30:9
31:2,9,13,17,20
32:2,7,11 38:7 42:9
65:4 72:21 85:21
149:18 151:12
165:12 169:6,10,19
170:16 175:24
177:5 179:4 186:8
189:3 192:5,13
196:6 209:15,16
248:15 249:10
250:7 255:25
263:24 264:12
275:23 285:2
286:25 296:9
329:15 332:17,22
340:11 346:6,13
363:18 386:19
394:18 406:25
409:22 411:8
424:24 425:8
426:10
**asking**
13:20,22 14:19,20
15:5 17:3 20:21
23:15,21 24:6 30:5
30:23 33:21 34:13
75:19 77:11 81:19
94:22 106:19

117:25 140:20
150:20 159:19
165:19,19 166:7,15
167:5,6 171:8 172:7
183:10 249:4
284:21,23 322:18
334:17 339:21
342:22 394:15,20
400:6,25 423:10
427:14 428:5
**asks**
387:19,22,25 403:2
**aspect**
159:2
**aspects**
160:5
**assaults**
323:11
**assessment**
343:21
**asset**
205:18 213:25 241:9
320:11
**assign**
233:8
**assigned**
97:21 101:4 222:3
223:6,15
**assignment**
167:17
**assist**
93:6 158:25 159:21
159:22,25 160:4,8
160:11 176:24
177:20 353:11
**assist/complete**
352:25
**assistance**
160:15 197:6 268:17
**assistant**
66:19
**assisted**
335:9
**assisting**
95:11 178:9
**associated**

53:12 82:7 88:15
113:21 137:19
143:2 186:10,15
187:9 209:12
306:13 316:18
330:16 333:17
**assume**
30:23 158:24 178:18
178:19,22 347:25
383:11 411:18
**assuming**
169:21 179:17
182:21,22 288:14
427:22
**assumption**
30:24
**assumptions**
182:8
**assurances**
363:24
**attached**
154:5 268:9 270:15
280:4 294:3 362:21
364:25 382:24
443:6
**attaches**
137:14 202:5
**attaching**
60:25 231:16 363:3
**attachment**
59:20 61:12 231:22
232:8,9 280:19
282:14
**attend**
43:3
**attended**
4:23
**attention**
226:14
**attest**
244:9,22
**attitude**
410:11
**attorney**
33:14 278:17
**attorney-client**

277:18
**attorneys**
2:4,8 119:24
**Au**
265:20
**audio**
133:25 137:12,23
138:4,9 139:12,16
139:16 434:21
**audit**
158:25 160:2 252:15
253:22 254:19,22
256:17 272:10
273:3,4
**auditor**
246:8 252:9,17,19
253:5,21 254:18
255:2,8,11,19
257:19,23,24
**auditor's**
256:24
**auditors**
245:14 246:2 252:20
255:14 256:2,13,19
257:10 272:9,24
**August**
361:13,17 377:19,25
380:4 385:7 439:10
440:6
**authored**
356:3
**authorities**
338:20,24 339:4
**authority**
255:15
**authorization**
46:23,24 54:18
**authorize**
46:13,16,19
**authorized**
164:25 165:6,10
**authors**
359:24
**Automobile**
53:11,20 54:2,5 61:3
67:19 99:3 101:7



294:19,20
**Automobili**
1:8 46:10 68:7 72:3
72:14,19 73:20
79:12 98:4 99:21
299:16
**Automobili-Jubilant**
59:21
**automotive**
265:15
**available**
149:22 352:23
**Avenue**
2:9
**aware**
45:13,17 46:18,22,23
75:25 76:3,4,7
90:24 106:2,6
127:11 175:2
213:17 215:6 225:9
228:4,8 239:24
272:8 278:23
335:23 336:8,25
337:7 348:8,16,20
352:2 357:11 358:6
361:2 370:6
**awkward**
395:8 410:25 417:5

**B**

**B**
182:15 301:6 432:10
433:3 434:3 435:3
436:3 437:3 438:3
439:3 440:3
**baby**
405:13
**bachelor**
5:22 6:3
**Bachelor's**
5:23
**back**
5:7 26:22 36:5 41:10
42:8 78:16,18 91:5
91:18 110:25 118:5
118:8,23 120:23

133:10 139:6,10
157:24 163:14
171:8 176:10 219:7
222:22 228:12
230:22 238:19
267:4 273:21 277:9
279:21,22 290:4,6
304:10 316:3 340:6
340:8 342:7 350:22
374:4 390:24
392:11,14,19 401:8
401:11 405:10
**backed**
198:14,15
**background**
113:16 177:12,14
275:13,25 276:4
277:16 288:4,8
289:13,20 290:2
294:7,25 295:9
297:5 300:25 301:3
301:4 302:12
334:15 391:16
437:23
**bad**
92:17 102:20 331:14
387:21 403:25
423:20
**baffled**
427:11
**balance**
257:8 290:19 291:17
291:20
**balancing**
85:11
**ball**
253:24 254:20
256:15
**ballpark**
28:18
**bank**
165:8 299:18,19,22
366:16
**banker/sponsor**
157:13
**banking**

58:10,12 391:16
**banks**
177:15
**Baron**
66:9
**Bart**
356:4 361:14,17
362:8,12 367:19,21
370:20 439:11,14
439:20
**base**
308:5
**based**
79:8 97:12 104:15
190:9 197:2 205:19
283:13,14 286:20
287:12 296:6,18
299:22 306:13
319:2 330:7 345:17
382:25 390:25
391:3
**basically**
41:20,25 43:6 61:17
79:21 156:25
168:12 171:16
197:13 223:13
261:16 288:18
292:23 320:11
338:13 383:21
**basis**
38:5 97:16 210:12
284:8 313:23 334:9
334:13 375:21
**Bates**
18:22 51:19 78:25
137:18,19,24
140:17 154:4
232:11 242:14
260:6 290:8 401:13
402:11 404:24
434:21
**bearing**
137:24 434:21
**bears**
365:14
**beginning**

26:14 41:8 50:16
117:8 263:4
**begins**
3:4
**behalf**
39:13 116:9 232:23
257:16 362:20
**behavior**
295:25 300:10
**behaviors**
224:23
**beings**
374:13 413:15
415:24
**beliefs**
378:12
**believe**
23:5,6 25:12,17,19
32:14,20 33:6 35:12
36:3 37:21 38:11
41:18 45:2,23 47:14
48:19 49:6 54:11,22
55:13,19 56:23
58:13 71:13 74:18
82:15 83:16 89:10
89:25 90:9 95:3
99:18 114:4 115:25
116:11,16 118:7,20
127:16 130:11,25
133:25 139:22
140:9 141:16,21
142:6,15 154:2
155:19 157:24
159:24 164:23
165:24 172:4 176:2
176:5,6 180:17
186:17 187:2
189:22 193:23
203:5 204:13,24
207:7 209:16
222:14 259:2 275:9
286:4 296:7,25
301:14 302:11
304:23 312:11
344:11 358:9,16,18
360:25 371:14



413:14 415:10
424:14
**believed**
45:14 124:23
**bells**
196:5
**belong**
222:4
**belonged**
32:8 89:21
**belongings**
260:11 261:17
**belt**
224:8
**benchmark**
263:6
**Bernie**
29:13
**Berris**
1:5 2:14 3:7 4:9
32:20,22 33:2,11
34:8,21 35:5,6,22
36:2 45:12 46:13,16
46:19 50:13 55:14
55:16 95:25 96:18
98:20 102:13
105:22 106:7,23
107:11 109:8,23
110:11,24 111:5,16
112:19,25 113:23
114:16,18 115:13
116:23 117:3 118:7
120:16 121:5
122:15 128:2
161:21 162:3 165:8
181:6,11 199:5,9,19
209:21 219:11
225:10 226:12
227:6,16 228:4,17
228:22 229:3 239:7
239:12 240:11,16
243:21,25 244:17
247:19 252:4 255:9
255:15 257:12
259:5,14 265:7
266:18 267:23,25

268:23 269:2,5
270:15,21 271:19
271:24 272:22
273:23 274:8,11,23
275:8,12 276:2,4,10
276:22 277:17
278:10 279:2,16,25
280:15,23 281:13
282:4 288:4,9
289:13,18,25
292:21,25 294:9
295:4 303:5 304:14
304:15,17,21,25
305:9,16 307:19,22
308:17,21 311:5
317:18,23 318:13
321:5 342:8 344:4
344:10,17 345:2,22
345:25 346:7,9,12
346:15 348:9,17,21
348:23 349:7
352:12 353:4
355:18 357:4,14
359:8,13 364:21
370:2 391:11
415:14,20 416:3
417:9 429:8,12
434:11 435:13
437:18,24 438:17
**Berris'**
4:24 65:3 98:11
218:20 225:16
239:2 243:3,6 245:6
246:4 254:8 256:3
270:24 279:15
283:21 284:6
286:17,23 287:6,17
287:23 292:10,15
295:8 305:5 340:13
358:2
**best**
83:13 163:17 200:7
214:3 268:18 300:5
304:8 324:13,15
326:3 329:12
349:10 367:14

372:8,12 383:23
413:12 428:15,16
**betray**
397:2,5,9,11
**better**
84:18 86:13 107:13
334:10 354:5
381:22 417:12
**beyond**
129:25 300:7
**big**
132:13 336:22
377:13 408:20
409:19
**Bill**
119:13,16,25 121:16
121:21 147:22
148:3,6,24 149:5,6
149:19 150:22
153:24 154:6,16
155:4,13,17 157:16
157:21,22 160:23
161:6,11 230:17
231:10,11 238:7
315:14,22 317:16
317:22 318:4,8
319:24,25 322:8,11
323:2,11,15,24
324:16,23 326:13
392:22 434:14,17
438:15,19,20
**Bill's**
57:20 58:7 153:21
**billion**
148:19
**bio**
154:15 322:8,11,20
322:25 438:19
**biography**
154:20
**birth**
103:18
**birthday**
103:20,22 294:12
**bit**
19:18 42:6 43:24

57:15 78:10 95:24
102:8 118:10
122:23 124:13
141:5 154:3 160:20
182:9 229:16
239:25 256:16
260:18 297:16
300:13 315:11
351:8 371:9,10
373:13 417:14
**Bitcoin**
319:9,11
**bizarre**
410:24
**blame**
412:24
**blank**
425:7
**blind**
145:17 146:5
**blinking**
313:13
**blow**
304:9 305:10 314:10
**blowing**
305:10
**blurry**
118:10
**board**
46:6,8,11 52:21
147:4 155:10,22
156:7,11 159:5
185:11 196:11
230:25 231:5,6
233:8 269:7,9,15
315:15,23 316:5
326:21 333:19
430:16
**body**
122:2
**Boies**
1:15 2:3 3:11,13 4:7
27:7
**bold**
390:7,23
**bonus**



94:14
**bonuses**
233:10
**book**
102:24 257:12,17
355:23 356:3,11,12
356:14,18,24 357:2
357:7,12,18,25
358:5 359:8,13,18
359:25 360:2,3,10
360:16,24 361:3,7,8
361:21 364:2,9,14
364:18 365:23
366:3,4,6,21
**booked**
255:23
**books**
257:13 357:17
**boss**
27:6 123:9,10 234:8
372:10
**bother**
24:5
**bothered**
423:5
**bothering**
411:13
**bottom**
18:22 57:14 59:18
71:14 104:12
141:23 160:21
161:3,4 162:13
167:16 194:22
225:20 227:11
231:15 233:13
247:5 250:24 260:8
260:23 261:14
285:18 286:10
308:8 312:14 341:7
352:15 354:24
373:25 378:4,25
419:19 428:22
**bought**
36:17 38:19
**brand**
312:6 313:3 355:25

357:4,20,22 383:23
385:2 394:10
**brands**
394:2
**break**
5:8,11 26:18 78:12
138:6 139:11
209:18 219:2
227:12,21,23 228:2
271:16 273:17
292:23 339:25
401:4
**breakdown**
37:5
**bribe**
213:14 215:19 216:9
216:18
**Brief**
154:15 322:8,11,20
438:18
**briefed**
211:25
**briefly**
66:3 365:17
**bring**
353:6
**bringing**
215:7
**British**
5:25 66:6 237:7
**bro**
213:24,24 214:6
**broad**
206:11,12,16,20
**brought**
70:8 113:23 205:6,12
212:21 221:4
272:11
**brutal**
323:11
**BS**
19:10 393:5,8 415:10
**BSing**
392:21
**budgets**
391:21

**build**
401:20 405:14,24
408:16 420:9
**built**
207:7
**bullet**
296:21 298:16 299:4
**bump**
39:19
**bunch**
133:6 288:20
**burden**
354:13
**Burger**
50:13 110:7
**burn**
313:12,18
**business**
45:3 50:7 60:5 101:6
104:23 124:25
125:8 128:24
143:14 145:5,12
146:24 147:6
161:14 240:6 257:2
259:10,15 261:8
280:16,23 283:4,12
299:14,24 300:7,7
314:4 318:17,18,19
318:20 320:25
321:3 378:13,19
408:17,19 409:17
426:5
**businesses**
29:18,25 30:15 299:6
316:24
**businesslike**
108:11,13
**businessman**
316:23
**Bustamante**
2:10 4:13
**busy**
143:17
**buy**
350:22
**BVI**

51:24 57:20 58:7
78:21 79:13,18
433:13

---

**C**

**C**
4:15 139:4 288:4,9
365:19 437:24
**C-L-A-R-K**
318:25
**CAD**
264:18
**calendar**
14:4,10 55:4
**call**
36:23 134:12 180:7,8
180:13 256:20
294:3 314:14,22,25
315:9 319:20
320:10 352:23
353:5
**called**
4:15 33:12 36:9
92:13 96:15 99:20
185:2 204:6 318:4,9
318:21
**calls**
41:2 136:11 415:2
**camera**
117:24
**campaign**
115:17
**campaigns**
107:11 115:6
**Canada**
5:16 66:10 321:14
323:17 325:18
333:25 334:22
**Canadian**
335:11
**candidate**
155:10 165:16,20,23
230:19
**candidates**
230:16,24
**capabilities**



**214:3**
**capacities**
73:2,4
**capacity**
3:24 4:5 75:10,20
178:13 190:13,18
190:19,22 194:19
194:25 195:10,24
196:20 197:7
198:21,22 203:20
203:21,23 209:24
234:11 315:15,23
323:14 356:22
360:8 372:5
**capital**
1:9 169:12,22 175:4
175:20 183:4,11,12
183:14 185:3
203:19 207:21
**Capricorn**
162:15,18,19 163:11
163:24 164:16,18
165:2,11 310:2,19
421:6,8,10 423:15
424:10 425:23,25
426:9 427:20,23
428:17,21 429:13
430:11
**Capricorn's**
420:7,17 425:18
**Capricorns**
422:17
**caps**
134:14 374:14
**car**
89:19,21,23 90:2,3,9
90:14,18,19,21,22
91:4 105:15 110:17
110:19,20 214:4
318:4,9 320:7 392:8
394:9
**carbon**
92:17
**card**
242:22
**cards**

45:4
**care**
44:19 129:4 414:8
**career**
132:4 240:5 323:13
392:16
**carefully**
126:2 297:24
**Carmen**
220:15 222:5,24
223:5,14 224:7
225:23 294:3
300:11
**carried**
86:25 131:2 295:14
**carry**
44:18 52:8,10 107:20
107:23 169:17
266:13
**carrying**
136:13,15 143:13
227:9
**cars**
110:18 113:14
116:14 129:25
141:7 207:22
290:24 394:3 399:9
**cartel**
322:3 323:20,24,25
324:8
**cartels**
324:10
**Caruso**
270:2 293:19
**case**
1:6 6:13,21,23 7:8
11:12 12:13,16
15:16 71:3 76:12
212:14 238:8
248:10 266:12
298:19 334:5
337:13 370:9,15
402:23 416:18
**cash**
201:24 203:12
**casual**

106:13
**catch**
161:24
**categorized**
281:16,18
**cause**
297:3
**causing**
296:2
**cc**
188:16
**CCT**
326:25 327:11,14
329:3,13,21 330:4,8
330:12,15,16,24
331:3,15 332:3,18
333:13,17,18
**ceased**
97:24
**center**
104:23
**central**
41:10
**cents**
98:10
**CEO**
25:16 27:3 104:19
141:25 155:11,22
199:14,19 200:5,10
220:22 226:18
227:3,6 228:18
338:14 384:15
385:7
**CEO/president**
224:24
**certain**
68:18 91:21 107:6,16
115:16 124:16
150:17 159:3
160:11 174:18
255:10 314:3 399:2
**certainly**
35:14 204:15 372:13
**CERTIFICATE**
442:1
**certification**

442:10
**certify**
442:3 443:3
**certifying**
442:12
**cetera**
226:20,25 404:3
**CFO**
44:16,22 45:10,22
46:14 72:14 103:5
103:10,14,14,15
165:16,20,22 166:2
166:16 167:6,10,13
168:5,14,17,18
210:4,8 212:4,9,14
213:7 214:11,19,24
264:21 266:24
267:5,7
**chairman**
9:23
**chance**
244:18 306:12
**change**
3:24 36:4 95:23
373:13 375:6 444:3
**changed**
182:8,16 224:23
318:21
**changes**
305:20 377:13 443:5
**Changing**
122:23 315:11 371:9
**chapters**
357:25 358:4 361:3
361:21 362:2
**character**
244:10,23 245:6
410:23 411:12
**characterize**
210:9 274:4,6
**characters**
93:20
**charge**
96:23 114:16,18,25
116:13 335:3
**charged**



334:21
**charges**
334:2,3
**chart**
73:6 104:16 223:15
264:17 266:22
267:3,8
**chasing**
290:18
**chat**
9:11,13,19,22 17:22
18:18,24 21:13,19
22:8 104:2,6 119:12
119:15 126:18,20
149:22 150:9,13,23
154:5 157:2,6 158:5
158:8 200:24 201:9
210:24 211:4
221:13,15 232:10
237:22 238:3
240:24 241:2
243:23 253:13,17
254:13 285:11,14
287:22 314:7 318:3
319:24 328:6
340:20,23 341:4
380:4 432:13,17
434:7,13 435:9
436:9,12,15,20,23
437:7,21 438:24
**chats**
22:4,5 104:10 150:18
246:25 422:14
**chatted**
28:6
**chatting**
241:6
**cheap**
124:6,9,9,10,12
**cheat**
244:7
**check**
11:13,17,18 12:12
17:13 61:10,13
119:20 275:25
276:4 297:5 301:4

**chief**
44:24 52:11,16,22
55:24 65:21 68:7
71:25 72:2,13,17,18
73:11,12 127:5
130:12 134:25
221:6,20 223:6,11
228:23 229:4
230:11 234:11
264:17,18,19
266:10,18
**China**
9:25 416:19
**Chinese**
93:18,19,21 246:17
335:9 405:13
416:19
**Choi**
1:8,8 2:13 3:7 4:14
6:8,10,16 7:7,15
16:23 17:6,23 18:5
18:18 20:15 21:4,14
21:19 22:11,23 23:2
23:14,24 24:10 25:2
25:10,16,20,21 26:2
26:8,9,13,24,25
27:10,11,15,21 28:6
28:19 29:18,25
30:15 31:2,17,20
32:2,7,11 36:8 43:7
44:7 45:9 48:3
49:24 50:12 56:8
57:5,11,25 59:12,14
59:20 60:13 61:25
62:24 63:3,9,13
70:2 74:5,9,10 75:8
75:23 76:21 77:3,21
83:5,12 84:5,9,13
85:2,14,18 86:4,12
87:13 88:20 89:25
90:14 91:13,17
92:21,25 93:5 94:10
94:18 95:10,17
101:16,20 102:7,12
102:17 103:4 104:3
104:6,15 105:4

108:16 109:22
110:10,23 123:5,17
124:6,23 125:14
136:12 137:9 140:4
140:7,21 141:4,13
141:16,17,24
142:12,17,21,24
143:17,24 145:10
146:8 147:21 148:6
148:10,13,23 149:9
149:19,23 150:10
150:14,17 151:5
153:20 154:10
155:7,16 156:3,18
156:22 157:3,5,11
158:6,8,13 159:10
159:18 160:22
161:15 162:5,14
163:5,10 164:3,10
165:6,10 166:6,15
166:20 167:5,15
168:8,13,23 169:2,6
169:24 170:5,9,16
170:21 171:6 173:9
175:12,19 176:24
177:19 178:25
179:7,11 180:2
181:9,21 183:9,20
183:24 184:14,18
184:25 185:20
187:17,24 188:14
190:23 193:12,17
193:25 198:23
200:14,20,25
201:10,22 202:11
207:24 208:25
209:7 211:6 213:5
219:11 220:20
221:13,16,19
222:20,23 223:4,13
223:24 224:5,22
225:20 228:10
229:2,15,23 230:9
231:9,15 234:3
236:15 237:23
238:3,6,23 239:5,6

240:2,15,24 241:3
241:20 242:2,14
243:5,12 244:14,21
245:2,6,13,18
246:12,23 247:5
248:5 250:4 251:16
251:20 253:14,17
254:21 255:25
256:9 257:16
259:22,25 260:24
261:4 262:20,24
263:16,20 264:16
267:15,20 270:23
271:20,24 272:24
273:11,25 285:8,12
285:14 286:13,25
287:20,22 290:10
291:5,9 293:7,13
295:17 304:13,16
304:16,22,24 305:4
308:22 309:25
313:17 315:13,21
316:20,23 317:2,17
317:23 318:12
321:4 322:17,23
327:22 328:2,21,24
328:25 331:8,16
332:10,16,22
334:17 336:11,18
337:4 340:11,11,20
340:23 341:17,25
342:22 343:18,22
344:13 346:6,14
347:12 348:23
349:6,14,19,22
350:10 351:16
352:13 357:4,14,20
360:25 361:2
371:15 372:2
374:19,23 376:9,18
378:18 379:19
380:11 383:5 385:6
386:10 391:10
394:8 399:3 402:18
403:19 406:20,24
407:17,23 408:5,7



408:10 409:2
411:16,21 412:7,13
413:7 415:14,20
417:9 420:14,22
425:18,25 426:18
427:4 432:15,18,23
433:8,16,20,23
434:8,25 435:8,10
435:17,21 436:7,10
436:16,21,24 437:8
437:11,14,16,19,22
438:7,17,23,25
439:8
**Choi's**
4:25 25:24 108:16
126:4,9 128:14,18
141:19 208:11
243:21 267:4
291:23 307:21
336:5 372:9 375:11
375:17 403:8
417:17 418:3,17
428:17
**choose**
42:2
**chose**
260:14
**Christopher**
294:9
**chronology**
37:6 74:25
**circuit**
201:20 285:9
**circumstances**
32:15 176:21 289:5
301:16,19
**claim**
48:16 302:5
**claiming**
227:3
**clamshell**
312:18
**clarification**
268:16
**clarify**
3:21 14:24 75:15

150:4 250:22
**Clark**
318:25
**class**
60:5
**Classics**
312:12
**clause**
53:5 54:3,9 365:20
**clauses**
52:7
**clean**
84:18 86:6 190:12
**cleaner**
68:15,16
**clear**
10:16 17:17 34:13
140:17 249:15
314:11,12,18,19
400:4
**clear-minded**
309:16
**clearcut**
68:22,25
**cleared**
385:6
**clearly**
103:5 154:12 172:22
242:21 353:17
401:19
**Clement**
333:2
**clicked**
185:19
**client**
115:17 264:20
312:21
**clients**
102:9,14 108:8 115:4
115:23 162:7
226:19,24 227:4
290:12 297:23
313:6 356:14,19
**clock**
430:22
**close**

108:15 109:6 197:24
198:5 219:16
244:25 297:22
302:23 303:5 334:8
335:14 363:7
423:21
**closely**
132:3
**closing**
201:25 203:3,13,15
**clue**
285:4
**CMO**
222:3 223:6,11,16,21
223:22 224:6,13,18
228:13,18,22,23
229:7,9,13 266:12
266:13,24
**co-accused**
325:24
**cocaine**
323:20
**code**
142:6,8
**coffee**
357:9
**Cohen**
293:6,12 438:6
**Cohen's**
293:14
**cold**
323:19 324:24
**colleague**
4:13
**colleagues**
4:8 219:22
**Colombian**
324:10
**Columbia**
5:25 66:6
**columns**
79:5
**com**
8:22
**come**
91:18 133:10 180:14

186:14 188:11
200:4 208:24 244:4
285:4,6,7 320:19
395:6,9 416:7
417:16
**comes**
156:24 208:17,18
256:17 314:3 374:3
**comfortable**
86:4 168:9 196:18
197:7 198:24
228:12 353:14
**coming**
7:19 135:11,25
184:20 341:24
344:8 345:12,23
**commencing**
1:16
**comment**
267:5 313:22,24
343:5,15 393:23
**comments**
30:12
**commerce**
6:3
**commission**
152:5 443:12
**commissioned**
355:23 357:12
**commit**
423:4
**commitment**
233:3 236:5
**common**
196:4 207:4 258:10
283:14,15 313:11
404:5
**communicate**
12:11
**communicated**
353:18
**communication**
11:6 53:3 284:14
308:10,19,21,23
349:13,17 439:7
**communications**



24:12
**companies**
27:25 28:20 41:25
43:19,22,25 53:12
69:11,13,23 73:8
144:21,23 174:18
177:17 264:4
294:19 295:16
297:6 309:21
310:11
**company**
25:24 27:3 36:9,17
44:7 46:7,9 50:5,15
51:24,25 52:12 53:7
54:25 57:20 58:7
72:23 79:22 80:24
86:21 96:14 99:3
100:7,12,14,16,22
100:24,25 101:5
110:15,17,20 113:4
113:5 114:17
124:19 129:11
130:16,19,23 142:9
142:18,22,25
143:11,12 144:19
151:25 152:6
167:12 174:13,23
175:6,14 197:15
199:10 200:6,11,19
204:8,12 205:19
206:4 207:25 209:3
209:23 210:12,13
214:4 218:20 220:4
220:19 221:7
223:16 227:3,7
228:18 229:10
231:2 239:16
241:14 243:3,7
244:20 247:25
248:13,22 249:17
252:10 255:16
256:25 257:4,14,17
258:11,13 263:19
266:19 273:7 274:2
275:23 276:3 278:2
278:10 279:14

280:22 290:24
291:7 292:6,7
295:10 296:8,10
297:4,17 298:15,20
299:16,18,23 300:6
301:20 304:9
305:10,14,16,21,21
310:17 314:10
316:5,7,11,17,18,20
328:7,10,15,20
329:8,20,23 330:3
330:22 333:19
342:9 348:24 349:8
352:3 353:7 355:2
356:6,8 360:10,12
360:16,21 367:3
370:7 384:15 391:3
391:9,18
**company's**
78:2 79:18 88:22
124:16 255:23
257:8,13 433:13
**compare**
141:9
**compensate**
48:4 229:18,24
**compensated**
48:7
**compensation**
48:20 49:4,8,8 54:24
55:8,25 94:11 95:18
160:15 230:5
234:15,16
**complains**
385:18
**complaint**
7:4
**complete**
162:25 254:22
353:11
**completed**
39:4 272:9
**completely**
306:7 415:8 416:21
**complex**
323:16

**compliance**
264:19 266:4,6
**comply**
253:7
**compromise**
420:2
**conceal**
31:21,22
**concept**
320:17
**concern**
69:16,21 73:19
191:18 216:17
225:7 270:22 273:5
273:11,13 296:2
359:17 384:17,23
**concerned**
218:18 239:7 399:24
**concerns**
175:11 199:13
225:10,15 235:24
236:3,14 256:2
310:16 359:7,12
370:12 386:10
420:6,11,12,14,17
420:21
**concessions**
365:22
**concludes**
431:11
**conclusion**
152:19 153:14 175:8
**concurred**
353:14
**conditions**
198:25 365:21
**conduct**
32:12 33:2,10 34:8
35:4 108:6 190:15
251:21 252:2 276:3
283:11 299:24
413:24
**conducted**
277:17 301:4
**conducting**
32:16 35:21 275:7

**conducts**
351:2
**confidential**
59:21 61:2
**Confidentially**
146:9
**confirm**
213:20 280:20 289:3
293:10 298:23
**confirmation**
363:4,12,21
**confirmed**
104:18
**confronted**
394:8
**confusing**
226:19,24 227:2
**confusion**
69:15
**Congratulations**
213:24 214:6
**connected**
321:4
**Connecticut**
299:16
**connection**
11:12 12:13 291:24
364:7
**connections**
218:17
**conservative**
295:15
**consider**
16:2 243:17 256:21
373:15 415:23
**consideration**
122:5 383:2,4,9,14
**considered**
76:10 323:15,21
**considering**
349:4,6
**consistent**
63:14 164:21 173:17
182:11,17 183:8
195:20 325:10
**constant**


MAGNA
LEGAL SERVICES

406:7 407:11
**constitute**
354:2
**construed**
216:8,18
**consultancy**
41:16 42:17,23 47:11
48:21 51:2,6,9
55:11 59:3 61:4,7
61:13,14,18 62:2,10
62:11,14,21 64:8
80:11,23 82:20
91:20 92:3,7 96:14
97:19 98:11 99:5
432:19
**consultant**
37:3 40:18 43:14
45:21 67:13 113:4
229:17
**consulting**
20:11 42:7 48:12
82:13 341:23 344:3
345:11
**Cont'd**
139:8
**contact**
294:17 304:22,25
338:2 346:8
**contacted**
337:16,23 338:16,17
338:23 339:3,6,10
339:14,20
**contacting**
337:24
**contacts**
238:7
**contemplated**
263:12
**content**
16:9 180:12 419:4
**contents**
270:16 358:21 359:2
369:21
**context**
177:22 215:14
238:12 248:4 295:4

328:19 343:5
351:20 381:16
400:10
**continue**
85:8 100:16 102:23
104:18 105:5
151:14 158:22
213:10 229:9 244:3
**continued**
42:6 385:6 421:5,7
**continues**
148:23 304:2 312:25
396:19
**continuing**
38:20
**contract**
46:25 47:3,13,15,22
48:8 52:2 54:10
55:14,21 56:5,16,17
56:18,22 60:2,18,22
62:2,7,9,22 64:11
96:21 97:20 98:11
104:18 112:7,9
127:11,15,19,24
131:23,25 203:24
204:5 210:5 212:17
213:2,19 235:10,17
235:20 237:9,12,14
237:15 325:16,22
341:24 344:8
345:12,17,23 368:3
368:18
**contractor**
52:8 53:6 55:2
111:24 113:20
266:6
**contracts**
55:17 115:11 116:4
116:10 235:11,16
235:25 236:16
290:11 426:6,9
**contributed**
301:11
**contributes**
175:4
**control**

169:17 171:3,21
272:3,9 273:4,6,12
389:8 442:12
**controlled**
28:20,21
**controlling**
333:11,13
**controls**
188:4,7 333:7
**conversation**
86:23 180:10 189:7
193:3,4,6 242:6
374:19 380:2
**conversational**
246:15
**conversations**
33:17,19 34:11,14
73:24 74:3 76:13
77:2,13,16 215:22
215:25 216:19
287:9,13,16
**converted**
207:4,6
**convertible**
206:7,9
**convey**
215:5 244:13,16
282:4
**conveyed**
257:18 258:16 390:6
**conveying**
261:4
**conviction**
325:3
**convince**
419:23
**convinces**
395:5
**COO**
37:21 40:2,3 41:15
44:24 45:6,9,14,24
46:14 54:20 67:20
67:24 72:13 86:21
**cooperate**
384:4
**coordinating**

116:13
**copied**
188:20 201:5
**copies**
18:2 356:14 363:23
366:4,5,6 367:8
**copy**
35:9,13 61:12 64:21
64:24 140:10,12,14
154:5,10 156:21
157:6 187:16,23
206:13 322:18,19
326:13,16 357:9
365:6,10 433:9
435:21 438:20
439:16
**copying**
193:12,17 271:20,24
436:7 437:19
**cordial**
106:15,21
**CORP**
1:9
**corporate**
4:2 9:7 13:3 52:10
73:6 99:24 190:19
190:22 192:2 258:2
258:5 259:9 260:25
261:6 283:16
**correct**
8:25 16:10 20:8
21:20 34:24 36:15
38:25 39:11 42:12
44:8,9 54:6,7 58:16
61:7,18,20 63:11
64:17 71:17 74:19
90:5 92:11 101:3
104:12 105:16
120:22 133:18
139:20 140:8
142:10 146:3
152:24,25 164:24
166:5 169:3,4
172:15 188:13
210:2 237:16
269:10 271:4



280:12 282:12
283:7 296:23
327:13 340:24
389:13 391:14
404:22 405:6
422:10,13 430:2
443:4
**correcting**
166:16
**corrections**
443:5
**correctly**
114:14
**corrects**
143:25 377:15
**correspond**
9:14,18,23 10:11
11:2,9 12:5
**corresponded**
10:17,21
**correspondence**
180:15 190:15
316:13 421:23
**corresponding**
187:4 268:10 271:7
280:4
**costs**
404:3
**counsel**
3:18 7:8 18:2 33:18
33:18 34:11,14
73:25 75:2 99:10,17
215:23,25 216:19
216:25 275:17,20
275:21 276:7
277:13,22 284:10
284:15 285:5,7
287:10,13,18
288:13 370:6
**counsel's**
217:4
**count**
125:25
**counterclaims**
12:15 370:9,15
**counterpart**

99:4
**counting**
125:20
**couple**
10:9 18:11 21:23
89:12 101:25
130:15,21 132:25
143:23 209:17
242:13 246:10
250:22 260:5 290:7
318:22 341:3
376:13 380:6
401:11 402:10
425:7
**course**
3:25 5:8 93:10 94:8
129:4 132:4 402:5
402:22
**court**
1:2,17 3:15
**cover**
78:24 323:16
**covered**
81:14 297:15 359:2
**covert**
323:14
**coworkers**
119:4
**CPO**
264:19 266:9,23
**crack**
134:10
**crazy**
417:4 424:6
**create**
69:15 334:15
**created**
55:16 107:11 111:3
115:10 288:5,9
289:4 318:4,9 393:4
437:25
**creation**
289:6
**creative**
107:10
**credit**

242:22
**crime**
321:24
**criminal**
302:18,20 323:22
333:25 336:4,9
396:14
**criticizes**
384:5
**CRM**
341:20
**cross**
370:17,18 371:3,7
**crossroad**
42:2
**crypto**
317:4 318:5,10 320:7
**cuff**
313:21
**curious**
22:9 25:6
**current**
74:20
**currently**
5:14 42:18 92:8
205:25
**custodial**
156:24
**custodian**
119:21
**customer**
90:20 208:8
**customers**
356:15,19
**customers'**
414:18,24
**cut**
86:6 383:21
**cutoff**
84:18
**cuts**
79:5
**cutting**
312:21
**CV**
153:21 154:6,10

263:17,25 264:2,5
264:10,13 322:18
322:19 326:14,17
438:20
**cyber**
318:19

---

**D**

**D**
4:1,15 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1,5 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1



139:1,4 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1

277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1
340:1 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1
349:1 350:1 351:1
352:1 353:1 354:1
355:1 356:1 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1 372:1
373:1 374:1 375:1
376:1 377:1 378:1
379:1 380:1 381:1
382:1 383:1 384:1
385:1 386:1 387:1
388:1 389:1 390:1
391:1 392:1 393:1
394:1 395:1 396:1
397:1 398:1 399:1
400:1 401:1 402:1
403:1 404:1 405:1
406:1 407:1 408:1
409:1 410:1 411:1
412:1 413:1 414:1

415:1 416:1 417:1
418:1 419:1 420:1
421:1 422:1 423:1
424:1 425:1 426:1
427:1 428:1 429:1
430:1 431:1 432:3
**D-E**
111:21
**D.C**
2:10
**daily**
210:12
**damage**
297:4
**dangerous**
321:17
**data**
161:16 429:3,13
**date**
1:16 8:8 80:4 103:17
    121:21 140:22
    149:23 150:10,14
    150:19 204:22
    205:13 212:19,19
    364:19 388:10,14
    443:8
**dated**
51:3,11 57:21 58:7
    58:15 59:14 62:8,9
    80:2 84:5,9 117:3
    140:7 169:3 187:18
    187:25 200:25
    201:10 221:16
    232:5,19 237:23
    238:3 260:2 262:24
    271:24 285:14
    361:17 362:21
    387:15 432:20
    433:16 435:22
    436:10,19,21 442:7
**dates**
66:16 67:2 362:18
**David**
2:6 4:6
**day**
28:7 62:3 97:4,5,8,8

97:16,16 98:7
100:16 103:17
108:25 110:9,9,13
110:13 124:11
130:22,22,25,25
136:10,10 181:21
183:21 311:22
387:24 388:7,19
393:2 399:13
400:17 410:14
443:11
**days**
28:5 60:3 113:18
    184:20
**DD**
159:2 160:5 169:15
    170:21 263:6
**De**
1:8 4:12 7:17 8:16
    9:14,16 10:12,18
    11:2,10,14 12:6
    13:3 16:5,12,16
    23:15 28:3 33:5
    35:10 36:8 41:21,23
    42:5,11 43:4,11,15
    43:17 44:15,17,22
    44:25 45:6,10,13,14
    45:21,22,24 46:2,6
    46:8,9,10,14,19,20
    47:2,6,15,19 48:4,7
    48:9,14,19 49:3,7
    49:13,14,15,16,22
    50:4,10 52:17,23
    54:4,13,16,18 55:9
    55:16 58:13,18 59:3
    59:21 61:2 64:5
    65:20,21 68:6,11,18
    69:3,9,17 70:10,16
    72:2,4,14,19 73:7
    73:12,20 75:11 76:8
    78:21 79:12,18
    80:15,22 81:5,13,24
    82:6,7,13 83:2,17
    85:8,12 86:19 89:3
    89:8,10 92:3,8
    94:24 95:6,11,18,19



103:10,16 105:23
106:7,24 107:6
108:8 109:9,13,16
109:19,24 110:10
110:24 111:5,19,20
112:7,9,11,18,19,25
113:6,9,10,12,21,25
114:10,13,18,22
115:8 116:9 122:25
122:25 123:17
124:7 125:15 126:3
126:9 127:2,6,12,18
127:22 128:3
130:11 131:17,19
131:23 134:25
144:15,19 145:4
148:7,18 149:11
153:11,17 160:14
163:10 164:17,25
165:23 166:2 167:6
168:14 172:8,14,23
173:10,14 178:9,12
178:15,20 179:3,7,9
186:22 187:5 189:5
190:18,22 194:4,6
194:11,24 197:6,24
198:4,13,14 199:5
199:13 200:5,13,19
203:2,23 204:11
205:8,25 206:25
207:11,14,18
209:21,22 210:4,17
212:3,8,13 213:7,25
214:12,19,24 215:7
216:8,17 218:6
219:15,21 220:15
222:11 225:16
226:6,9 227:5 229:4
229:25 231:6 232:4
232:17 233:8,25
234:10 235:5,11,19
235:24 236:19,24
246:3 247:19 252:2
257:17 258:2,17,23
261:6,17 262:2
265:16,21,22,24

266:5,7 267:19
268:24 269:5,6,7,9
269:13,19,25 270:3
270:8 272:3,18
273:7,24 274:12,23
278:12 279:3
290:25 291:8
294:20 299:16
300:7 303:14,18,21
303:22 304:3,6
305:9 306:18,23
307:5 308:2 309:2
309:24 311:18,21
312:2,14 313:10
314:7 315:3,15,23
316:8,12,21 317:5
338:25 339:5,16,19
340:10,12,14 342:8
342:14 344:18
348:9,17 350:9
351:22 355:3,22,25
356:10,13,17 357:3
357:5,11,13,19
358:14 359:25
360:3,13 363:24
364:6,22 367:6
371:11,18 385:2,12
389:3,23 390:11,16
391:6 392:3 420:8
420:16 421:9 424:9
433:13 436:18
438:10,13
**de-SPAC**
159:20 197:22 198:3
229:19,25 230:6,9
263:12
**deal**
23:17 97:19 196:17
198:14,15,18
307:13 315:3
330:24 331:2,5,15
331:20 332:2,9,18
336:22 382:2,18,21
383:20
**dealer**
116:13

**dealers**
226:19,24 227:5
**dealing**
9:24 108:7 160:15
211:15
**deals**
141:9
**dealt**
134:19 297:24 314:9
**dear**
268:4 272:7 306:8,9
**debit**
80:15
**debrief**
7:11
**decade**
392:16
**December**
66:19 67:9,17 120:25
169:10 170:13
**decent**
413:15
**decide**
13:17,23 15:20
167:18
**decided**
226:15 360:22 390:2
**decides**
399:14 400:18
**decision**
123:23,25 196:10
315:2,6 360:23
**decisions**
123:13,16 309:16
**declaration**
70:23 71:3 433:11
**declare**
71:15,22
**decommission**
358:8 360:24 361:7
**decommissioned**
359:19
**decommissioning**
364:8
**dedicated**
353:7 354:25

**deemed**
356:25
**deep**
300:24 301:2 302:12
321:21 322:2
323:16 397:17,25
**deeply**
395:6
**defeated**
260:18
**defend**
243:16
**defendant**
218:14
**Defendants**
1:10 2:8
**define**
106:12 110:13
124:10 147:2 279:5
430:3
**defines**
411:12
**definitely**
96:10 146:16 187:11
215:24 244:7 312:7
312:20 392:13
423:21
**definition**
195:21
**defrauded**
297:9 338:13
**defrauding**
296:8
**degree**
5:20,21,22,23 6:2
**delegate**
354:4
**delete**
13:13,16,18,24 14:5
14:6,12,15 15:21,25
16:24 17:4,7,10,15
20:16,21 21:3,4
22:12 23:15,20,22
23:25 24:6,17 25:3
25:7 368:21 369:12
**deleted**



14:10,20,21 15:17
16:5,13,16 151:6
363:6,14 368:5
369:17 370:21
**deletes**
15:5
**deliberate**
418:14
**deliberately**
70:13
**delinquent**
298:18,24
**deliver**
366:6 399:9 420:7,18
425:19
**deliverables**
422:19 426:6,8
**delivered**
105:18 427:25
429:22
**delivery**
105:9,14
**demoralizing**
414:19
**deny**
293:10
**departure**
33:5 199:13 297:23
301:17,19
**depend**
235:9 236:6
**depends**
168:9 281:8
**DEPONENT**
443:2
**deposit-Jubilant**
57:20
**deposition**
1:14 3:5,10,23 4:24
4:25 6:7,17,20 7:6
7:12,16,19,21,24
15:16 17:8 35:18
65:4 75:10,16,18
137:12 358:2
419:17 431:12
441:3 442:4

**depositions**
5:5
**deposits**
208:8
**describe**
117:22 119:3 120:15
300:12
**described**
115:14 160:2 174:7
**describing**
122:15 295:8 312:10
**deserves**
308:11
**design**
110:19 220:9 221:21
232:4,16,23 233:17
312:15 436:18
**designated**
52:16,19 366:17
**designed**
115:8 234:21
**designer**
127:5 130:12 131:3
131:16 134:25
221:20 234:11
264:18,18
**designs**
136:13
**desire**
244:5 390:2
**desired**
389:8,11,12
**desktop**
84:23 85:16,23
**Despite**
245:14 302:10
323:11
**detached**
375:25
**detail**
352:22 422:18
**details**
161:24 185:10
242:23 272:17,23
273:8 296:11 336:8
336:16 429:23

**determination**
405:15,25
**determine**
274:11 297:8 351:4
**determining**
351:3
**developed**
383:22 384:24
427:12
**development**
113:13 162:25
207:22 350:23
355:24
**devoting**
124:15 125:22
**Diana**
1:14 3:5 17:22 21:13
52:10,22 64:21
70:24 71:21 75:21
80:11 119:12
121:15 126:18
131:6 201:23
257:15 268:4
317:17,22 371:16
372:21 377:20
380:20 393:2
404:17 421:15
432:6,14,17 433:9
433:11 434:13,16
434:19 438:16
439:23 440:7,10,16
440:19 442:4 443:8
**Diana.majcher@a...**
8:21
**diana.majcher@g...**
13:9 187:16,23
435:20
**difference**
220:7
**differences**
220:8
**different**
19:3 27:25 28:3
30:11 43:18,25
69:13,14 75:5
107:17 159:13

177:17 254:14
307:13,25 316:24
362:19 373:13
420:25 421:2
**differentiate**
208:19
**differently**
124:2
**difficult**
123:5,8 218:8 391:19
399:15,25 400:19
406:5 407:9 413:11
413:16
**difficulties**
125:2
**dig**
91:7
**digital**
114:15 320:17
368:15 369:10
**diligence**
160:6 170:23 171:20
186:21 194:6 199:4
199:22 212:23
263:11 312:19
**diluted**
182:24
**dilution**
169:20 182:7
**dime**
125:5,7,15,17
**dimes**
313:19
**diming**
125:24 313:13
**direct**
18:16,21 88:13 98:17
99:6 200:18 279:21
421:22 442:12
**direction**
252:18 277:13
**directly**
27:4 48:10 98:21
238:16
**director**
51:25 66:19 70:8



160:23 161:6
327:14
**directors**
196:12 231:5,6 316:5
**directorship**
242:16 248:21
**Directorships**
326:20
**disabilities**
323:5
**disagree**
174:11
**disagreed**
123:18,20 220:9
**disagreements**
220:3,13,14
**discovered**
242:16 325:17 374:5
**discuss**
6:22 32:14 257:10
**discussed**
6:20,24 32:21 56:15
    148:5 152:22 153:2
    190:6 216:25 265:4
    273:3 279:24
    292:16 303:21
    315:12,20 336:16
    353:5
**discussing**
32:16 153:8 168:17
    168:18 238:11,23
    242:4,7 243:2
    316:12 392:6
**discussion**
63:3 83:5,9 85:7
    103:9,12 130:5
    159:15 183:23
    190:9 216:16
    217:18,22 218:2
    246:25 258:22
    259:12,14 262:5,8
    287:19,21 292:18
    346:11 348:22
    349:2 353:15
    428:16
**discussions**

7:2,7 26:23 45:8
49:23 76:15,20
77:19 85:11 86:17
99:17 122:18 144:7
144:12 149:8,15
178:3 199:18,22
200:4,9,12,18
216:20,23 217:7
239:6,10 259:2,5,8
268:6 315:13,19,21
315:25 316:19,25
317:2 320:6,20,23
348:8,16 370:6
**display**
141:8
**displeasure**
243:6
**distant**
418:13
**distinction**
270:11
**distribute**
356:25
**DISTRICT**
1:2,3
**dive**
300:25 301:2 302:12
**DOB**
294:9
**document**
17:16,25 18:4,13
21:8,17 47:10 50:22
61:2,9 62:13,17
63:23,24 71:5,12
74:11 79:2,16 89:13
101:11,18 116:18
119:21,24 121:13
126:14 131:4
139:23 149:9 150:5
150:13 151:25
152:4,10 154:5,20
156:15,23 158:2,3
160:21 168:20
171:23 173:3,23
176:8 180:24 181:3
184:11 185:2

187:13 193:10
200:23 201:5,16
204:14,18 209:18
210:22 211:3,24
218:24 223:10,19
228:20 229:6
231:19 232:13,15
233:24 234:4
237:18 240:22
246:11 247:22
248:15,24 251:16
253:11 255:13,24
258:21 259:19
261:10,20 262:17
262:22 267:11
270:13 271:12,15
279:24 280:7,11
282:20 285:9
286:20 288:2,24
293:4 303:11
315:10 317:13
322:6,7,10,20,22
326:10 343:7
349:11 352:6
364:25 370:25
371:8 375:2 377:18
394:12,22 398:21
400:10 404:9 409:5
416:15 417:15
418:10 419:8 420:5
422:4,8 425:21
438:18
**documentation**
268:11 271:9 279:17
    280:6,14,22 281:5,8
    281:22,25 282:8,25
    367:6
**documented**
281:20
**documents**
7:23 8:10 150:18
221:10 252:14
257:3 268:8 270:11
280:3 322:16
353:13 367:8
381:22 404:11

441:5
**doing**
34:20 45:23 48:3
49:25 50:5 54:5
70:10,14 83:2 91:22
95:25 96:5 97:8
105:22 106:3,5,7
109:9,24 110:9
112:22 125:10
126:5,10 127:18,20
130:2,22 136:19
141:6 159:5 177:16
177:22 178:15,20
179:8,13,14 186:21
190:7,16,18,21
240:4,7 245:25
252:12,13 269:19
269:23 314:3 342:9
354:5 378:6 379:12
379:22 393:18,25
416:20 422:21
**dollar**
38:17 48:24 81:5
94:12 182:16,21
183:3,5 208:16,17
229:18 290:13
313:12 314:5
323:25
**dollars**
28:25 29:4 38:12,14
38:16 39:22 42:21
80:16,20,25 94:13
95:5 148:19 313:19
383:8
**domestic**
309:5
**donation**
92:18
**dot**
132:12,12,12 133:20
133:21,21 134:13
134:13,13 146:17
146:17,17 304:10
304:10,10 306:25
306:25,25 382:2,2,3
391:3,3,3



doubt
168:8 202:20,24
286:21 369:5
doubts
310:19
downloaded
156:25 363:6,13
368:20 369:12
draft
73:16 115:11 357:24
358:4 361:3,21
362:2
drafted
55:11 56:4,16 74:11
74:19 359:25
drafting
56:3
drafts
358:7,10,15,17,22
359:8,13,17 361:8
Dragon
51:20,23 52:3 57:20
58:7,19,23 59:22
61:3 92:10
dramatically
224:24
dreamer
392:13
drive
286:6,12,18,23 287:7
287:18,24 394:4
405:14,24
driver
90:2 113:13
driving
136:24
Dropbox
363:5,13 368:4,15,21
368:25 369:10,15
drove
89:23 90:21,22 137:5
drug
322:3
dry
383:21
DT

78:25 84:21,22 85:15
85:22 86:7 87:7
88:2 91:20 102:24
132:12 137:20,24
148:14 169:24
172:6,11 241:9
248:6 285:19 306:3
351:2 368:10,16
383:22 429:24
434:22
DT's
151:18 152:12
260:13
DTCT
164:5 165:7
dude
129:10
due
160:6 162:10 170:23
171:19 186:21
194:5 199:22
212:23 213:10
215:16 263:11
354:2
duly
4:16 442:4
duplicates
367:9
duration
53:13
Dutch
136:22
duties
45:23 210:7

—————————
E
E
4:15 139:2,2,4 432:3
432:10 433:3 434:3
435:3 436:3 437:3
438:3 439:3 440:3
444:2
E-M-I-D-R
318:23
E-U-R
163:6

earlier
24:11 81:12 125:8
126:23 141:18
152:22 153:2
160:19 166:22
170:4 173:23
181:21 183:8 195:8
195:12 219:10,14
234:9 245:21
255:24 261:12
275:4 276:12 280:9
297:16 301:5
303:21 315:12,20
315:20 322:16
352:16 374:10
390:13 393:23
early
169:9 170:12 219:15
219:20
earn
81:5
easier
169:16 171:3,21
easily
392:10
easy
102:25 218:16
389:15,17
eat
354:8
economic
324:20
Economically
206:23
education
66:7
educational
5:19
effectively
43:15
efficient
241:11
efficiently
354:9
effort
384:5

efforts
96:24 114:19 335:9
406:7 407:12
ego
244:8
eight
388:2,6,12,19
Eighty
38:14
either
69:7 88:4 94:4
179:24 181:2 190:8
242:8,8 308:4 309:4
330:15 392:20
429:15
electronic
157:7 367:10
eloquently
108:2
else's
379:13,23
email
8:14,18,19,20,23
12:20,21 13:2,3,5
13:11 24:25 45:3
110:24 111:2 169:7
180:4,6,15 181:4,9
181:16,25 182:6
183:25 184:5,21
187:5,14,21,21,24
188:5,15,16,21,22
188:24 189:4,5,9,9
189:10,17,18,20,23
190:14 191:12,14
192:23 193:2,12,16
193:21 194:17,17
194:20,25 195:11
199:8 267:15,18,19
267:22,25 268:9,21
271:19,23 272:8
279:25 280:4
285:20 293:5,11,12
293:20,23 295:3
296:11 338:13
352:9,11,12,12,15
352:16 355:10,14


MAGNA
LEGAL SERVICES

355:19 361:14,16
362:8,11 367:19,21
368:2 435:11,18
436:6 437:15,17
438:6 439:9,10,13
439:19
**emailing**
193:25 194:10
**emails**
13:13,16,23 14:6
16:6,12,17 17:7,11
22:12 23:15,20,22
23:25 24:6,17 25:3
25:7 32:3,4,8 85:22
162:14 184:4,9
188:8 189:17 191:2
191:5,8,11,25 194:2
194:11,12,24 195:2
283:22 284:6 287:6
287:18,23 292:10
292:15,24
**emails/materials**
84:22 85:15
**embarrassed**
377:13
**embedded**
232:10
**EMIDR**
318:22
**emoji**
60:14 117:19,23,23
118:3,10,19 132:17
309:14 313:14
320:2 389:4 393:14
**emojis**
159:13 214:5 424:7
**emotion**
306:12
**emotions**
374:15
**employed**
130:11 178:12
**employee**
28:16 111:20 112:2
226:5 266:6 269:8
269:13 398:10,25

410:7
**employees**
109:10,14,17,20
258:23
**employment**
37:10 38:23 40:6
46:25 47:3,5,19
55:16,21 56:4 64:11
112:7 113:19
115:11 203:24
210:5 212:3,12
213:2,19 301:7
**endeavored**
323:12
**ended**
64:11
**ends**
78:25
**enforcement**
321:11,14 337:17,21
338:6,24
**engage**
93:6 157:12
**engaged**
159:21 162:24
**engagement**
158:14 162:23
272:10
**engages**
91:20
**engaging**
197:7
**engine**
312:16 423:11
**engineer**
265:15
**engineering**
309:21 310:10,17
**English**
93:22 246:18
**enjoying**
326:8
**enormous**
429:23
**enrich**
279:7

**ensure**
364:14
**enter**
23:16 235:6
**entered**
58:10 235:12,19
324:24 365:7,11
369:24 439:17
**entering**
95:9,12,14 147:6
235:25 236:15
370:12 419:5
**Enti**
71:21
**entire**
73:2,4,8 393:13
414:18,24
**entities**
28:21 147:5 333:7,10
**entity**
9:7 40:4 92:12 98:4
99:20,24 112:11
330:16
**entries**
79:25
**entry**
80:10 318:3
**environment**
308:4 309:3 313:5
387:23
**envision**
154:24
**envisioning**
393:7
**equal**
233:9 251:4
**equals**
250:23 266:9
**equity**
205:24 242:5,8
248:22 348:9,17,21
348:24 349:7 350:8
351:3
**Eric**
9:23 70:7 408:2
**erosion**

406:7 407:11
**Errata**
443:6
**error**
16:4
**errors**
308:9
**especially**
69:12 305:21 416:18
430:15
**espionage**
333:25
**ESQUIRE**
2:5,6,6,10,11
**essentially**
152:22 153:10
172:14 204:6
227:17 229:8 255:9
309:12,25 366:11
366:12 384:25
**establish**
233:2
**established**
120:18 170:4
**establishing**
285:3 313:5
**estate**
324:21
**et**
3:7 226:20,25 404:3
**Eur**
163:6 164:4
**Euro**
164:15 165:11
**Europea**
137:4
**Euros**
163:11,16 165:2
364:7 366:15,23,24
421:11 430:5
**evaluation**
349:24
**evening**
353:5
**event**
113:18 120:12,23,24



312:5,10 313:2
366:5
**events**
112:23 113:15
115:16 125:4,23
129:25 313:4
**eventually**
186:17 385:5
**everyone's**
384:5
**evidence**
239:20 278:11,24
279:12 301:23
302:4 427:15
**evolved**
162:23
**exact**
33:13 67:2 94:9
207:5 300:15,20
332:7,15 335:2
**exactly**
10:22 29:21,24 33:8
91:2 145:23 147:16
227:19 251:19
306:22 309:10
330:21 336:15
361:12 369:7 379:8
397:7 420:15 421:3
427:24
**exaggerations**
393:8
**EXAMINATION**
4:19 139:8
**examined**
4:17
**example**
9:25 82:6
**Excel**
79:3 178:4 268:8
280:3
**exception**
53:11,20
**excerpts**
245:19
**exchange**
25:2 38:15 57:4,10

59:11,13 84:4,8
91:12 92:20,24
101:15,19 116:22
117:2 119:4,9
121:15,20 131:6,10
140:3,7,21 144:24
152:5 156:17,21
168:22 169:2
184:13,17,21
206:22 225:17
259:21,25 262:19
262:23 293:15,18
303:13,17 310:12
311:17,21 317:16
317:20 319:6
327:11,21,25
352:10,11 372:21
372:24 377:20,24
380:20,23 387:11
387:15 404:17,21
410:2 421:15,19
432:22 433:7,15,19
433:22 434:10,16
434:19,24 435:7,16
437:10,13 438:9,12
438:15,22 439:9,23
440:7,10,13,16,19
**exchanges**
319:10
**exciting**
392:8
**exclamation**
415:17 430:5
**exclusive**
60:2 233:2
**exclusively**
53:7
**exclusivity**
53:5 54:3,9
**execute**
60:10 61:22 62:3
116:7 128:15
362:24
**executed**
37:13 39:12 47:13
51:15 60:19,22

62:18,23 63:19
116:4 127:14,15
131:22,25 204:19
233:24
**executing**
364:24
**execution**
53:6
**exercisable**
351:2
**exercise**
349:23 350:11 351:5
351:25
**exercising**
351:21
**exhibit**
17:20,21 18:2 21:12
51:2 57:3 59:10
64:21 70:23 78:21
84:3,8 92:16,19
101:14 103:25
116:21 119:11
121:14 126:17
131:5 137:23
139:13 140:2
156:16 158:4
168:21 181:4
184:12,22 187:14
193:11 200:24
210:23 221:12
231:17 232:3
237:22 240:23
253:12 259:20
262:18 267:14
271:18 285:10
288:3 290:5 293:5
303:12 311:16
317:15 322:7
326:13 327:20
340:19 349:12
352:9 361:13 362:7
365:6 367:18
372:20 377:19
380:19 387:10
401:11 404:16
421:14 432:12,13

432:16,19,21 433:5
433:6,9,11,13,15,18
433:21 434:5,6,9,12
434:15,18,21,23
435:5,6,9,11,15,18
436:5,6,9,12,15,17
436:20,23 437:5,6,9
437:12,15,17,20,23
438:5,6,8,11,14,18
438:20,21,24 439:5
439:6,9,10,13,16,19
439:22 440:5,6,9,12
440:15,18
**exist**
73:21 97:24 98:5
100:16 312:16
**existed**
8:13 368:4
**existence**
64:14
**existing**
38:21 81:14 102:14
157:15
**exists**
98:7 101:5 206:18
**expect**
16:19,21 62:25
170:12
**expectation**
40:25
**expected**
182:11,17 233:10
**expense**
48:22 49:2 58:23
239:3 258:3,6,19,24
259:9 268:10,14
271:8 280:5 283:16
**expenses**
224:6 243:3,7,10
246:4 254:8,24
255:10,22 257:2,7
257:11,14,18
258:12 259:10,15
261:8 270:24 271:4
279:17 280:16,24
281:7,14 354:10,21



**experience**
65:20 68:15,17 156:9
  160:24 161:7 197:2
  281:13 312:21
**experiencing**
197:20
**expert**
175:9 268:12
**expires**
443:12
**explain**
244:18
**explained**
353:18
**explanation**
314:11,12
**exploring**
320:9
**exposed**
424:4
**exposure**
395:11 396:11,15
**express**
73:19 175:11 236:14
**expressed**
420:13
**expressing**
20:5 243:5
**expression**
125:18
**extent**
33:16 73:24 99:14
  107:10 276:6 279:9
  298:4 414:12
  424:21 425:22
**external**
229:17
**extra**
95:18
**extreme**
354:2
**eyes**
84:20

———————
**F**
**F**

139:2
**F-Tech**
205:15,16,21,24
  206:24 208:6,10,17
  208:20,24 209:8,11
  209:13 211:11,12
  211:14 214:17
**F9**
117:15
**facade**
414:17
**face**
134:11 147:9,19
  149:11 309:21
**faced**
416:9
**faces**
414:18,24
**fact**
18:9 23:10 26:24
  55:8 65:10 71:11
  159:22 164:14
  210:3 220:12
  223:23 230:4 232:9
  239:12,17 252:17
  258:11 261:25
  286:22 293:10
  301:2,18,24 302:20
  303:4 327:14 330:8
  331:23 363:22
  364:6 367:13
  368:24 369:6
  380:11 386:11
  388:18 398:24
  407:6 425:17
**factories**
423:10
**factory**
423:16
**facts**
306:14,18,22 387:4
**factual**
277:16 284:4
**factually**
278:3
**Fagin**

1:17 3:16 442:6
**fair**
10:23 12:4,7 28:9,13
  42:10 75:4 82:4,8
  84:19 102:2 103:4
  106:4,8,9 107:15,17
  107:19 109:5 112:3
  112:5,24 118:2
  122:20 130:23
  152:14 154:13
  176:18 178:11
  186:7 187:8 200:16
  203:9 215:12
  217:13 220:2 228:3
  236:9,10 242:9
  243:6 259:18
  273:24 281:3
  288:23 305:3,7
  307:10 318:10
  321:8,24 322:21
  326:17 335:12
  343:20,21 356:17
  357:5 361:22
  371:25 382:17
  388:17 425:23
**fairly**
372:3
**faith**
428:17
**fall**
97:2 331:21
**falling**
331:16,20 376:24
**familiar**
29:15 71:5 256:22
**families**
374:12
**family**
12:25 108:16 295:17
  354:8 376:13 412:3
  416:17
**fancy**
392:9
**Fantastic**
219:3
**far**

90:24 98:16,25
  110:25 302:22
  427:16 428:11,25
**fastferrari@aol.com**
293:6,13 438:7
**Fat**
193:18
**father's**
240:6 299:13,14
**fault**
354:3
**favor**
128:3
**favorable**
360:10,16
**FBI**
325:2
**February**
17:21 18:19 21:12,20
  84:5,9 89:24 91:14
  103:25 104:6 341:9
  341:23 342:10
  344:3 345:11 355:4
  432:13,16 433:17
  434:6
**fee**
55:3 204:7,8,10
  205:3,5 341:25
  344:3,9 345:11,13
  345:16,17,24 346:3
  402:6
**feed**
374:12
**feedback**
143:19 145:7
**feel**
27:24 31:7 51:7
  81:23 82:2 92:17
  123:9 163:14
  167:17 168:9
  196:17 197:7
  198:24 201:13
  378:5 379:2
**feeling**
87:15
**feelings**



MAGNA ►
LEGAL SERVICES

374:15 418:3
**fees**
202:2 203:3,13,15
**fell**
198:18
**felt**
124:5 276:8,9 397:10
**fight**
314:5
**figure**
159:14 315:8
**file**
79:3 133:25 137:13
137:16,23 138:9
139:12,16 270:14
270:17 282:22
368:4,6,15,21,25
369:10,16,17,21
370:21 434:21
**filed**
7:4 70:24 71:3 153:9
364:21 433:11
**files**
10:14 35:10 87:9
156:24 157:7
282:24 363:25
364:5 367:7 368:21
369:13
**filing**
185:7,8 298:25
**filings**
185:21 186:2 298:18
**fill**
288:19 290:13
291:11
**Filled**
441:13
**films**
368:17
**final**
105:9,13
**finalize**
213:18
**finance**
378:12
**financial**

25:14 44:20 66:10
67:13 72:2,18 73:12
159:2 160:4 175:9
178:10 179:3,20
190:12 195:9
205:18 210:14
236:4 331:9,13,17
332:11 391:20
397:18,25
**find**
17:14 102:25 107:5
118:24 147:8,17
239:20 241:11
251:23 268:5,9
272:8 278:11 280:4
294:3 297:3 298:23
299:6,10,25 300:14
300:19 301:18,23
302:8,13,19 303:4
319:19 390:6
**Finder**
288:3,8,19 437:23
**finder's**
204:7,8,10 205:3,5
**finding**
35:6 300:4
**findings**
35:25 276:22 303:8
**fine**
29:6 35:19 87:23
178:24 215:6
250:20 254:4,11
277:19 381:17
411:2 415:22 431:6
**finish**
254:10
**finishes**
134:13
**fired**
301:15,24
**firm**
25:15 33:12,24,25
34:3,8,16 91:20,20
92:3 252:11 273:3
275:6,10 305:20
**first**

8:12 22:2 25:10,13
25:19 26:10,12
36:20 51:18 52:15
59:19 60:25 71:20
79:10,11 80:5 96:4
101:25 111:19
112:4,6 167:17
176:11,20,22
180:10 218:11
233:20 238:6
257:23 273:13
285:3 294:16 318:2
325:14 328:6 342:7
355:4 356:10,12
357:2 363:7 365:18
368:18
**fit**
107:25 151:18
152:12 174:23
348:2 413:2
**five**
56:14 60:5 122:12
290:14 291:12
380:9 403:14
413:21
**fixated**
395:5
**fixed**
428:7
**flags**
289:12 423:23
**flaws**
243:24
**Flexner**
1:15 2:3 3:11,13
**flip**
19:17 51:17 89:15
163:14 230:22
254:4
**floating**
316:3
**Florida**
34:5,6
**focus**
256:10,13 357:13,18
**focused**

210:15
**focusing**
357:22
**folder**
363:5,13
**folks**
200:9 384:23
**follow**
5:5 85:17 403:3
**follow-up**
219:9 336:5
**following**
7:6 21:3 182:7 268:5
272:17 293:22
308:25 311:22
335:18 352:16
355:18
**follows**
4:18 139:5 393:23
**Foods**
242:20
**forecast**
160:8 176:25 177:20
190:13
**forecast/valuation**
159:3
**foregoing**
71:17 442:10 443:3
**foreign**
323:14 334:22
**forensic**
238:25 251:21 252:3
297:7,17
**forget**
128:23 374:2
**forgets**
373:21
**form**
6:18 10:19 11:5,16
13:14,19 14:8,13,17
15:23 16:7,8,14,18
18:7 20:23 23:4,18
24:7,13,22 25:8
26:4 27:12 28:11,15
28:22 29:9,20 30:2
30:9,16,21 31:4,11



31:15,24 32:23 34:9
38:7 40:15 45:15
46:3,15,21 47:8,16
47:21 48:11,18
49:10,19 50:20
52:18 53:18 54:21
55:13,18 56:6,10
60:20 61:5,8,19
62:19 63:15,21
68:20 69:25 70:17
72:10,21 73:14,22
74:7 76:19,23 79:3
81:2,17,25 82:9,21
83:8,15 85:4,19,24
86:22 87:21 88:17
89:5 90:16 94:20
95:2,7 96:20,25
97:6,22 98:2,8,15
98:22 99:13 100:2
100:18 101:9 102:3
102:15 103:11,19
105:25 107:2,8,22
108:9,18,22 109:2
109:11 110:2,12,16
111:7,15,23 112:8
112:20 113:7 114:3
115:15,24 116:6,15
119:6 121:23
122:11 123:7,14,19
123:24 124:8,17
125:6,16,19 126:6
126:12 128:5,9,17
130:17,24 131:24
135:19 136:14,15
136:18 139:21
141:15,20 142:5,14
142:19 143:5,9
145:11,16,22
146:22 148:20
149:12,25 150:25
151:9 152:16,18
153:5,13,25 155:18
155:24 157:8,23
160:17 163:13,25
164:19 165:4,12
166:3,21 167:4,23

168:15 170:7,14,19
171:13,22 172:3,10
172:16,25 173:12
173:19 174:3,10,16
175:7,15,22,25
178:17 179:16,22
180:11,22 183:13
184:2 185:17,23
186:12 188:6,23
189:11,15 190:3,20
191:20 192:4,9,13
193:7 194:13 195:5
195:25 196:6,22
197:9,16 198:8,11
198:19 199:15
202:23 203:4,17
205:22 206:5,6,10
207:2,16 208:2
209:25 210:18
211:19,22 212:15
213:8 214:13,20,25
215:9,21 216:10
217:8,16 218:4
219:23 220:5,11,17
220:24 221:8
222:13 223:2,9,18
224:2,14 225:12,18
226:10 227:8,18
228:7,19 229:5
231:3,7 234:5 235:8
235:14 236:12,17
237:3,10 239:9,23
240:12,17 243:8
244:15 245:8 246:5
247:21 248:2,23
249:10,19 250:7
251:8,13 252:24
253:8 255:12
256:11 258:25
259:16 261:9,19
264:7 265:10 267:9
268:25 269:11,21
270:6 271:5 272:25
273:14 274:3,13
275:15 276:5,14
279:4,19 280:17,25

281:10 282:13
283:17,23 286:24
287:8 289:2,14,21
291:13,25 292:11
292:19 295:5,11
296:15 298:3 300:8
300:22 301:21
302:2,7,15 303:7
304:18 305:6,11,17
306:20 307:7,23
310:3,8 311:6,12
313:20,25 314:17
315:7,17 316:15,22
317:7,11 320:24
321:6 326:6 327:16
328:17,23 329:5,10
329:15,24 330:6,11
330:19 331:11,19
332:13,20 333:4,9
333:15,21 334:24
335:13 336:12,19
337:3,11 339:22
340:15 342:11,15
342:19 343:11
344:19 345:6,18
346:4,17 347:6,19
347:24 348:11,19
348:25 349:9
350:16 352:4
356:20 358:23
359:4,10,15 360:6
360:18 361:4,9,23
363:16 364:10,16
366:22 367:10
369:3,22 370:4,16
370:23 371:21
372:11 374:20,25
375:12,22 377:6
378:20 379:24
380:13 381:12
382:8 383:10,16
384:10,19 385:3,10
386:3,13 388:8
389:18 390:14
391:7 392:4 394:11
395:24 396:6,12,16

397:6,12 398:2,5,20
399:5,20 400:13,22
402:15 403:10
405:19 406:2,21,25
407:18,24 408:11
409:3,9,22 411:17
412:14 413:8
414:11 415:2
416:13 417:19,25
418:5 420:10,19,23
423:17 424:11,20
425:20 426:3,10,20
427:21 428:18
429:9 430:7 443:5
**formal**
46:11 128:15 178:13
341:24 344:7
345:12,23 353:16
**formalize**
217:19
**formally**
45:25 46:4 52:16,19
**formed**
72:23 146:3
**formulated**
88:3
**forth**
316:4
**forward**
102:22 148:9 183:20
191:11 196:16
353:21
**forwarded**
184:7 337:12
**forwarding**
181:15 183:25
267:22
**forwards**
184:3
**found**
17:15 107:12,20,23
108:3,4,6 123:5
301:12 343:14
**foundation**
15:4,10,11 30:17,22
49:11,20 120:17



121:24 150:2 151:2
151:10 153:14
157:9 173:2,13,20
175:16 191:21
192:5 196:23
197:17 215:2
217:17 254:2
305:18 311:7 313:4
343:12 359:5
360:19 386:4,14
388:9 389:19
397:13 399:21
400:23 426:21
428:19
**four**
79:25 319:10
**four/five**
129:9
**fourth**
169:21
**fractionize**
320:11
**Frank**
120:12 121:4 270:2
293:19 294:2
**fraud**
29:16 152:17,20
**free**
51:7 163:14 179:13
179:15,18 201:13
**frequency**
109:3
**Friday**
319:20
**friend**
141:18 190:24 306:8
306:9
**friendly**
106:15 108:12 119:4
**friends**
27:13 169:21 211:21
302:23 303:5 406:6
407:10 413:23
415:7
**front**
17:16 51:11 57:7

148:24 149:20
150:22 301:10
324:7 376:25
395:17,22 396:4,24
419:7
**frowny**
134:11
**fruition**
173:8
**frustration**
20:6
**fuck**
134:14 399:14
400:18
**fucking**
419:24
**full**
158:15 232:8 325:14
365:18 415:23
**full-time**
40:24 41:21,22 42:11
42:14,15 44:11,12
54:19 64:7,10,16
109:10,13,16,19
111:19 210:16
**fully**
45:18 249:23
**functional**
210:7
**functioning**
99:23
**functions**
72:16
**fund**
383:25
**funder**
173:9
**funders**
169:11 170:17
171:19 175:20
**funding**
124:21,24 125:23
**fundraise**
159:20
**fundraising**
210:15

**funds**
244:20 274:12,17
278:12 279:3,6
**fungible**
208:13,15
**further**
94:10 165:15 226:17
244:19 246:11
268:16 352:22
409:25 414:7
417:14
**fusses**
419:21
**future**
13:4 36:21 67:23
69:2 86:18 98:13,21
99:12,25 220:4
242:18 313:4
**fuzzy**
176:19

---

### G

**G-A-F-F-N-E-Y**
34:2
**G-U-M**
246:14
**G-W-A-I-L-O-S**
147:9
**Ga**
246:14
**Gaffney**
33:25 275:5
**gain**
32:18
**games**
136:23
**gay**
415:25
**gears**
36:4 95:23 122:23
315:11 371:9
**Gemini's**
169:6
**general**
5:3 6:11,12 29:10,11
34:22 78:22 79:11

79:19 96:18 127:8
207:21 217:18,22
224:16 308:23
335:4,7 337:14
353:19 356:2 426:4
433:14
**generally**
13:22 81:20 96:23
97:2 177:23,24
199:21 221:2
278:20 306:2
336:25 417:24
**generous**
122:5,15
**Genesis**
1:9 76:5 185:2,16,22
186:2,10,16,20,25
187:5,10 194:7,19
194:23 196:14
197:3,4,23 198:4,15
199:12,18 200:10
200:13,18 263:5,12
**gentleman**
139:17
**Gentlemen**
211:25
**genuine**
122:6,16
**genuinely**
413:14
**German**
309:21 310:10,17
**Germany**
104:22,24 212:20,23
215:11
**getting**
39:19 63:6 64:6,15
81:22 82:25 162:6
179:20 191:5
206:22 236:7,8
299:2 308:12,12
309:20,25 345:2
370:5 399:14
400:18 406:14
**GIF**
133:3



**GIFs**
132:25 133:25
**give**
18:2 26:6 78:8 88:9
241:12 244:17
285:24 286:6,11,22
295:3 348:23
381:20 410:19
**given**
87:14 96:22 261:25
354:14 363:22
397:10 442:5 443:4
**gives**
68:22
**giving**
136:12 151:19
152:12 153:12
227:25 242:5,7
260:25 261:6
286:15,16 346:7
**Glickenhaus**
301:8,25 302:6
**Glickenhaus'**
301:20
**Global**
66:10
**Gmail**
181:22 189:9,10,20
189:25 191:2,6,12
191:17 193:16,17
193:18 195:2
**Gmail.com**
181:17
**go**
5:7 20:13 22:22
26:25 36:5 41:11
42:8 50:8 52:7 53:4
54:23 56:25 57:24
59:18,25 60:23
61:16 67:7 71:20
79:25 84:12 86:3
87:3,12,24 88:19
90:6 91:5,11,16
93:4 94:10 101:23
110:25 117:6 121:8
128:19 132:8 133:5

134:2 140:25
141:22 147:7 148:9
148:22 151:14
153:19 154:3
158:12 160:21
163:3 167:24
174:17 175:5
207:23 213:15
224:4,21 225:5
226:18 228:9
229:14 230:14
231:14 239:25
242:13 243:11
245:12 246:10,12
247:4,14 251:15
253:20 254:11,16
263:15 264:15
267:12 277:5 283:2
285:17,20 286:4
287:6 290:4,8
293:17,19 298:16
304:5 305:24
310:20 311:25
312:13 313:9 314:6
314:13 316:16
318:2 325:13,18
326:19 328:18
332:24 341:6
343:25 344:20
349:21 352:22
359:21,23 366:2
367:2 373:4 378:22
381:19 383:18
385:15 386:22
387:18 388:18,21
390:24 395:3
399:12 403:22
404:24 408:4,5
409:13,14,25 410:3
418:11 419:19
422:24 424:22
428:23,24 429:19
**God**
386:24
**goes**
129:24 151:25 217:2

258:7
**going**
15:21 19:10 21:9
26:25 48:3,4 50:22
54:5 57:13 62:2
64:19 67:5 74:24
77:7,16 78:10,13,19
82:19 83:25 84:17
86:6,18 89:13 92:15
102:22 104:9
117:24 132:10
137:15 138:7,12
152:6 160:20
163:21 174:17,20
184:10 196:16
199:3 209:17 219:4
242:15,18 253:11
254:14 267:4
273:18 277:6,24
278:13,16 279:13
282:25 284:2
287:22 293:14
303:10 308:13
316:7 335:5 336:4
340:3 341:2 342:7
348:4,23 351:25
353:21 356:3
357:18 369:12
375:4 379:16
384:25 388:6,12
393:6,17 399:9
401:5 413:10
418:23 419:9,12
422:11 430:4
**good**
3:2 4:11,21,22
106:16,24 107:3,25
108:2 138:5 155:9
156:4 168:5 218:25
219:21 226:8
278:20 295:23
296:23 310:22
311:4,10 319:23
339:24 356:25
376:23 378:5 423:9
**Google**

286:6,12,17,23 287:6
287:18,24
**gotten**
250:10
**governance**
156:11
**government's**
335:9
**grading**
266:13
**Graduated**
6:5
**grandma**
134:3
**grant**
241:10
**granting**
348:8,16,20 349:7
**granular**
200:14
**great**
155:13 354:12
**ground**
5:4 252:12
**group**
13:4 36:21 54:19
67:24,24 69:2 73:2
73:4,7,9 74:20
86:18 98:13,21
99:12,25 104:16
318:4,9,14 319:24
379:4
**guaranteed**
233:14
**guarantees**
234:12
**guess**
17:9 22:2 23:23
29:13 49:12 51:18
84:2 94:8 118:23
120:4,8 123:8 124:4
124:12 139:24
176:10 181:20
192:15,18,20 215:5
264:11 284:19,25
314:6 352:15



398:22
**guidance**
104:19
**guideline**
260:25 261:7
**Gum**
246:14
**guy**
107:25 120:11,16
156:11
**guys**
197:15 215:7 255:10
378:6 391:4,9 394:3
**Gwailos**
147:9,12

**H**

**H**
4:15 139:4 432:10
433:3 434:3 435:3
436:3 437:3 438:3
439:3 440:3
**H-I-N-W-E-N-G**
181:17
**ha**
309:6,6 376:22,22,22
377:8,9,9 386:24,24
392:23,23 393:7,7
393:14,14 414:19
414:19 430:13,13
**ha-ha**
136:24
**hack**
32:2,4 292:10,15,16
**half**
182:9 363:7
**Hamilton**
358:19,20 362:2
**HAMPTON**
2:8
**hand**
17:24 296:9 410:19
**handed**
308:12
**handle**
88:2 341:13 343:2,9

**handled**
200:13,20
**hands-on**
200:15
**Hannah**
2:11 4:12 74:19
**happen**
7:2 189:13 225:6
230:4 242:11,18
369:6 377:14,15
**happened**
6:12 7:3 8:8 83:16
198:17 199:19,24
255:16 331:8,12
338:15 376:22,23
**happening**
85:12 293:3 336:22
337:15 409:16
**happy**
82:5 93:11 94:8
257:5 313:18
341:14 348:14
353:20 382:16
389:7 394:13
404:10 411:8
412:11
**harassing**
334:9,13 335:14
337:5 418:22 419:2
**hard**
118:7 134:10 227:17
352:21 391:23
398:8 403:3
**hardcopy**
363:19
**hates**
392:22
**hauls**
27:8
**head**
76:14 162:6
**headache**
168:5
**heading**
383:24
**hear**

33:15 56:20 74:2
76:12 77:20 99:16
275:19
**heard**
134:11
**heart**
117:18 354:24
402:25 403:9
**heartbreaking**
306:24 307:6,9
**heavy**
402:21
**heel**
379:11
**held**
1:15 254:23 350:7
**hell**
399:14 400:18
**help**
19:8 93:11 94:8,23
95:6,19 105:5
113:14 159:19
166:24 177:25
195:23 264:17
268:17 309:15
341:14,14 343:18
353:11
**helped**
113:15 115:4
**helpful**
94:6 156:8 167:24
201:19 215:14
300:14
**helping**
179:2 190:12,23
195:8 196:9 197:14
203:18 204:8
**helps**
23:9 113:17 201:20
**Hi**
294:2
**hidden**
398:11,18 399:4
**hide**
31:22,23 70:10,12
143:3 353:10

**hides**
417:11
**hiding**
70:13 325:18
**high**
27:6,6,6
**higher**
349:24 350:14
**highest**
5:19
**highly**
146:10 323:12
**HIN**
1:9
**hinweng@gmail.co...**
182:2
**hire**
32:11 33:10 274:10
274:14,19
**hired**
33:23,24 35:3 209:22
210:3 212:8 214:11
216:8 222:14,16
225:21,21,23
226:12,13 275:9,21
278:9,10 283:21
284:10 303:22
410:15
**hiring**
32:21,25 76:10 103:9
103:13 128:3
214:18,23 216:17
220:15 222:18
292:23 302:10
**historical**
357:3
**history**
36:6 149:23 150:9,23
301:7,14 325:7
355:24 357:19
**hit**
324:2
**HK**
103:6
**HKEX**
327:5



**HKT**
319:20
**Ho**
9:23 70:7
**hold**
253:22 254:9,19
  255:9,15
**holder**
330:14
**holding**
100:6,11,14,22,24,25
  166:4
**Holdings**
1:8 72:3,14,19 73:21
  327:2,11,14
**home**
260:11 261:17,25
  309:12 324:18
**homework**
404:4
**homologated**
401:21
**honest**
154:11 254:12
  403:24
**honestly**
354:7
**honey**
430:14
**Hong**
5:15 36:17 38:12,14
  38:16 39:22 41:9
  42:20 80:16 97:12
  142:7,9,18 143:12
  252:12 319:2
  327:10 338:16
**honored**
158:21
**hope**
28:12 118:12 158:22
  251:22 268:5 272:7
  378:7
**hopefully**
5:4 79:8 217:2
  352:24 375:6
**hoping**

225:21,22
**hotel**
60:6 260:12 261:16
**hour**
78:11 202:11
**hours**
40:7,10,13,22 41:2
  42:22,25 129:9
  210:17 352:24
  387:25 388:2,7,13
  388:19 430:21,23
  431:4
**Hudson**
1:15 2:4 3:11 67:12
**huge**
400:5 419:20
**Hugo**
111:20,24 112:21
  264:20 303:14,18
  305:25 306:23
  309:14,19 310:21
  438:10
**human**
305:20 374:13,13
  413:15 415:24
**humans**
374:24
**hundred**
38:12 282:23,23
**hundreds**
28:7
**hurt**
413:11
**husband**
51:25 93:18 119:25
  121:4,20 122:9,14
  148:3 149:6,10
  153:24 154:21
  155:4,17,21 157:22
  161:10 231:11
  292:8,13,23 315:13
  315:22 317:3 318:8
  320:7,22 321:7,10
  322:25 327:13
  333:19,24 334:21
  335:19,24 336:9,17

337:2 356:4
**husband's**
154:10 326:17
**hustling**
312:17
**hyper**
214:4

---

### I

**idea**
28:19 86:5 91:19
  113:3 128:15,18
  148:24 149:19,21
  150:21,23 151:3
  157:5,10 173:4,6
  245:10 316:7
  401:20
**Ideal**
328:25 330:3 366:7
  366:14,20 367:5,6
**ideas**
242:4,7 316:3 395:5
**identification**
17:23 21:15 51:4
  57:6 59:12 64:23
  70:25 78:23 84:6
  92:22 101:17 104:4
  116:24 119:14
  121:17 126:19
  131:8 137:25 140:5
  156:19 158:6
  168:24 181:7
  184:15 187:19
  193:14 201:3
  210:25 221:14
  232:6 237:25
  240:25 253:14
  259:23 262:21
  267:16 271:21
  285:12 288:6 293:7
  303:15 311:19
  317:18 322:9
  326:15 327:23
  340:21 349:15
  352:10 361:15
  362:10 365:9

367:20 372:23
  377:22 380:22
  387:13 404:19
  421:17
**identified**
18:17 131:11 145:15
  146:2
**identifies**
119:20
**identify**
335:10
**identifying**
264:3
**identity**
263:18,25 325:17
**IEs**
105:10,14
**ignore**
423:22
**ignored**
398:11,18 399:4
**illegal**
31:10
**image**
60:4 150:9
**images**
424:23
**imagination**
430:2
**imagine**
179:13 361:10
  413:21 429:24
**imbalanced**
141:6
**iMessage**
10:24 11:3,9
**iMessages**
11:14
**immaterial**
256:21 257:7
**immeasurable**
411:4
**immediate**
408:14
**immediately**
367:4



impact
305:13,15,23
implement
226:16
important
16:3 168:4 413:13
inappropriately
274:9
incentives
391:20
included
33:17 150:22 318:12
including
58:6 150:18 367:7
368:16
incorporated
299:15
Incorrect
98:3
incredibly
15:3
incurred
354:22
independent
111:24 216:6,13
230:16,19,24
252:20 291:3 343:6
394:16
INDEX
441:3
indicate
239:21
indicating
88:23 102:12
indicted
333:25
Indirectly
101:10
individual
32:13,17,19 35:3
43:20 44:2 113:23
119:16 146:14
176:12 181:16
288:20 293:12
335:10
individuals

50:14 88:15 210:25
211:5 236:2,16
261:7 321:18
436:14
industries
174:20
industry
113:17 174:24
265:15
inevitably
412:18
inference
215:12
infiltrated
323:19 324:3
infiltrating
321:23 322:3
infiltration
324:9
inflated
238:17
inflow
208:9
inform
270:2
informal
213:5
informally
50:18
information
31:21,22,23 32:18
76:24 278:2 288:21
295:2 296:10
301:24 319:8 367:5
368:3,15 369:11
370:8,14,20 397:9
399:2 429:15
ingratiated
295:15
initial
293:20 402:5
initially
106:10,19 180:2
402:21
initiating
337:25 338:2,4,7,18

innate
411:11
input
136:13
insanity
424:17 425:6
insecure
419:24
insecurities
228:11
insecurity
244:4 418:7,8
insert
424:6 425:14
inserts
184:25
insistent
87:14
INSP
324:5
Inspector
154:16 322:8,11
324:4 325:17,20,23
438:19
Instagram
368:11
installment
233:20
installments
55:4 233:16
instance
125:23 152:3 426:7
instances
24:2 346:6
institutional
147:9
instruct
77:8 277:14,25
278:13 284:3
418:24 419:13
instructing
77:25 277:23 334:6
instruction
21:4 77:9 85:17
278:8,17 419:14
integrate

384:4
integrating
379:3
intend
224:5 349:22
intention
241:7
intentionally
124:23
interact
375:20
interacted
321:17
interacting
194:18 196:18 197:3
227:6
interaction
222:18
interactions
337:24 338:5,8,11
interest
75:13,15 115:2,18
175:4 209:8,9,11
328:9,22 329:20,22
330:17 348:9,17,21
348:24 349:7
383:23
interested
146:10 169:10
170:17 171:18
interesting
389:6
interests
76:11,17 205:25
interface
115:4,18
interfaced
116:16
interference
334:23
internal
272:3,9 273:4,6,12
353:17
internally
77:13
International



67:8
**interview**
331:9,13,16 332:10
332:14,19,23
**intimate**
302:23 303:6
**intimidate**
335:10
**introduced**
112:18,25 176:23
177:19
**introduction**
25:17,20
**invalid**
419:14
**invest**
183:10 206:3 391:18
**investability**
391:24 392:3
**invested**
205:13
**investigate**
244:19
**investigating**
274:16
**investigation**
239:15 251:21 252:3
275:10 277:16
278:14 284:11
297:21 298:8
323:16 324:25
335:18,21,25 336:4
**investigations**
239:2
**investigative**
278:25 288:16 294:7
339:11,15
**investigator**
274:11,15,20 275:3
276:21 278:9
283:20,25 284:5,10
284:19 285:2
287:17 288:14
295:3 302:10
**investigators**
285:19 286:7,12,16

286:16,22 287:5
289:4 323:23
**investing**
316:24
**investment**
177:15 206:6 207:12
391:16 402:5
**investor**
175:13 205:14
209:11 218:11
333:3,8
**investors**
147:10 205:6,12
**invitation**
14:4,10
**invoice**
81:10 202:5 294:4,4
341:8,18,23 342:8
342:12,13,17,20,23
344:2,4 345:10
346:13,15 347:2,9
355:6
**invoices**
201:23 202:17,21
203:2,6,6,11,14,16
203:18 238:15,17
239:3,8,13,18,22
251:22 252:3 256:3
268:13 279:16
282:24 297:7,18
346:8 353:24,25
**involved**
33:19 45:12 84:21
112:23 143:9 148:7
149:10 157:16
180:15 199:17,21
222:17 252:15
317:3 320:22
334:22 357:5
**involvement**
26:3 143:4 220:18
382:11 385:12
**involving**
320:6
**IPO**
145:18 146:6 148:12

152:2,6
**irregularities**
242:17 295:25
**irrelevant**
13:25 337:5
**Islands**
241:14 248:7
**issue**
253:22 254:7,7,20
256:10,13 257:11
257:22,23 307:14
332:24 353:24
**issued**
268:14 390:17,20
**issues**
134:18 159:4 160:12
162:11 256:20
300:13 306:7
310:15 373:18,18
**item**
326:20
**items**
242:20 367:9
**ITV**
328:11,21

---

**J**

**J**
4:15 139:4 241:23,23
**J-I-R-I**
224:7 225:22
**Jake**
264:19 358:18,20
359:2
**Jakub**
50:12 110:6 131:7,11
131:15,16 132:3,9
132:23 133:5,20
134:10,11 135:4
136:21 137:3,13
139:17 225:22
235:17,21 240:20
241:22 242:9
264:18 265:3,3
368:5 369:16
370:22 410:5

434:20
**January**
66:20 80:3,10,24
101:14,20 103:17
294:5 380:19,24
381:14 433:21
440:9
**jealous**
417:18
**Jeremy**
2:15 3:14
**Jim**
301:8,12,14,15,20,25
302:6
**Jim's**
301:11
**Jiri**
113:24 224:7 225:22
226:2,3,5 264:20
**JJ**
240:3,19 241:7,17,22
242:5
**job**
28:17 40:24 42:16
43:16,18,24 67:5
68:22,25 127:4
210:16 217:4
391:17
**jobs**
42:14 43:21
**Jodlowski**
50:12 110:6 131:7,16
235:18,21 434:20
**Joe**
126:21,22 221:20,23
225:21 264:17,24
384:20 391:13,18
392:10,14 393:2
**John**
2:6 4:8
**join**
113:3,5,6 134:13
212:3,12 390:2
**joining**
218:20 266:7
**Jord**



220:15 222:25
223:5,14 300:11,13
300:15,20
**Jord?'s**
294:4
**Joseph**
70:8
**journal**
79:11
**journalists**
339:11,15,21
**journey**
158:17,21
**Jowyn**
10:14,16 50:11 110:6
126:18,22 132:4,20
133:13,20 134:6,22
139:20 221:24
232:4,17,23 233:7
234:9 235:20
236:20,24 240:20
241:18,22 242:9
264:25 368:4
369:16 370:21
371:10,16,20 372:2
372:7,22,25 373:14
375:19 376:11
377:12,21,25
380:21,24 395:9,15
397:15 398:8
404:18,21 406:4
410:4 412:16,22
413:10,20 418:12
419:20 421:16,19
422:25 424:2,13,16
427:6,11,13 428:5
436:18 439:24
440:8,11,17,20
**Joyce's**
102:23
**Jubilant**
51:20,23 52:2 58:7
58:19,23 61:3 92:10
**judge**
245:2 423:22
**judgment**

28:10
**juggle**
398:8
**July**
47:14,16,20 51:3,11
59:10,14 60:19 62:3
63:19 67:13,20,24
69:2 96:12 121:14
121:21,25 126:3,9
126:17,20 201:2,10
204:3,22 294:10
334:20 432:20
433:6 434:15
436:10
**June**
41:18,23 42:12 57:3
57:11,21 58:7,15,19
58:24 64:11,15
65:22 67:9 68:7
69:4 140:13 193:11
193:16,24 199:9
294:10 432:21
436:6
**jury**
400:24 419:7
**justified**
281:7,8
**justify**
280:15,23

———————————
**K**
———————————
**K-U-B-I-K**
114:7
**keep**
42:25 122:20 138:6
143:25 191:25
192:25 210:20
306:13 336:21,23
353:23 354:9 375:4
400:25 419:15
**keeping**
87:16 363:23 364:5
**keeps**
309:20 376:2 428:10
429:2
**kept**

424:14
**key**
61:17
**killed**
92:16
**killer**
325:22
**kind**
12:18 34:7 50:6,8
56:19 78:8 111:14
145:6 193:3 238:25
239:2 305:19
346:11 355:5
395:11 396:11
422:20 425:14
**Kindly**
268:9
**Kingsway**
25:16,24 26:3,17,19
67:16
**knee**
397:17,25
**knew**
97:7 112:21 113:2
172:22 187:9
220:12 245:6 292:6
292:7 299:13 399:2
**know**
5:9 12:21 14:3 15:9
15:24 22:3,5 23:7,8
23:19 24:23 26:5,5
27:14,21 29:2,4
30:13 31:16 33:13
34:3,15 35:11 41:3
50:4 52:25 62:7
63:16 69:5 70:14
73:7,15 80:2 85:21
87:19 88:4 89:19
91:9 94:14 97:7
98:16 102:16
103:13 107:10
109:3,4 112:21,24
113:2,8 114:6
117:22 119:18
127:14,20,22 128:2
128:7 132:18 134:3

134:12 137:5 142:4
143:6 145:4 146:14
147:2 151:5,11
158:16 166:22
174:11,17 175:10
175:19,23 176:17
177:6 178:19,23,23
179:4,6,9,10,12,18
179:19,23 181:25
183:17,24 184:3,5,7
184:10 185:19,20
188:7 189:2 190:21
192:25 194:14,15
195:6,7 196:2,13,15
198:21 205:20,23
208:3 209:7 210:19
210:20 211:13,16
211:17,23 212:11
212:16 213:4,9
214:3,22 222:17
227:19,19 229:19
234:3,6 242:20
244:20 246:14
259:17 262:15
264:8 266:23
267:10 268:12,22
275:16 276:8,9
279:9 280:21 281:2
283:6 291:23 292:2
292:4 293:2,3
297:15 299:23
300:6,9 301:7,16
302:22,24 304:21
304:24 308:11
310:9 311:14 312:3
315:9 316:10
322:15 328:19
330:12,21 333:10
333:12,16,16
334:12,14 335:21
337:4,8 341:4 343:4
343:15 351:10,17
353:22 358:24
361:5 371:5 372:2,3
372:12 377:4
378:21,21 381:22


MAGNA
LEGAL SERVICES

383:4 386:15
389:21 390:15
391:2,19 395:10,10
395:11,16,22
396:11,17,23
397:15 399:16,22
400:2,14,20 402:16
405:13,23 408:3
409:11,24 410:6
416:6 418:9 420:20
422:21 423:18
427:25
**knowing**
141:6 155:8 281:4
354:11 383:25
**knowledge**
32:9 98:17 99:6
199:16 209:14
234:2 242:12 319:4
320:20 323:8,9
324:14,15 326:4
333:5 342:21
353:16 358:18
360:21 367:14
383:6 384:9,11
**known**
174:13
**knows**
337:4
**Kong**
5:15 36:17 38:12,14
38:16 39:22 41:9
42:20 80:16 97:12
142:7,9,18 143:12
252:12 319:2
327:10 338:16
**Kovacs**
2:15 3:14
**Kubik**
113:24 114:8,9,10
226:3,5

— — — — — —
**L**
**labeled**
59:20 154:15 322:20
**lack**

30:16,21 311:6 426:8
428:19
**lacks**
15:4
**Lamborghini**
90:10
**Land**
327:2,11,14 329:4,13
329:21 330:4,9,12
330:16,16,24
331:16 332:3,18
333:13,17,18
**language**
53:17,19 54:9 353:12
363:20
**large**
10:14 113:16 236:4
335:16
**largely**
42:9 81:13 97:12
109:23 130:16
144:19 210:14
244:4 357:22
**largest**
325:5
**lasts**
235:2
**late**
219:25 220:6
**latest**
162:7 182:7
**laughing**
118:19
**laundering**
325:5
**law**
1:15 321:10,14
335:11 337:17,21
338:6,24
**laws**
71:16,23
**lawsuit**
213:11 215:17 218:7
218:12,14 364:21
371:6
**lawyer**

56:21 76:11,16,22
77:22 78:4 270:2
**lawyers**
6:6 7:13 74:12,18,20
74:21,23 75:6,12,20
213:12,12 215:18
215:18 216:2,3,4,5
**lead**
323:22
**leader**
137:6,8
**leadership**
126:4,10 214:2
**leading**
221:21
**lean**
125:8
**leanly**
50:21
**learn**
50:8 186:18 236:23
354:4
**learned**
90:12 177:11,13
278:2,25 290:23
325:20 392:15
427:8
**learning**
50:6
**leave**
424:3
**leaving**
298:15 305:16
**ledger**
78:22 79:19,20
433:14
**Lee**
70:8 200:25 436:10
**left**
89:3,8 199:5,10
200:5,10 209:21
274:23 301:12
363:25 403:24
**left/shown**
88:21
**legacy**

382:4
**legal**
1:25 2:16 3:15,16
56:19 152:18
153:14 175:7
284:16
**legal/structuring**
159:4 160:12
**legitimate**
324:7
**LeMans**
312:11
**Lenaerts**
356:7 361:14 362:9
367:19 439:11,15
439:20
**length**
146:17,21,23,25
152:24 195:14,21
**lengthy**
18:24 341:4 422:14
**Leslie**
1:17 3:16 442:6
**lesson**
427:7
**let's**
7:5 17:16 56:25
167:16 191:24
192:25 216:23
221:10 232:2
246:11 254:16
256:16 259:5
273:17 285:8
393:13 409:15
410:3 418:10
**letter**
158:14 269:25 270:7
270:9 294:6
**letting**
315:9
**level**
84:19 266:12,25
324:10 373:16
**liability**
429:24
**license**



89:17 402:6
**licensing**
350:23
**lie**
31:17 414:17,24
**lies**
356:4 393:5
**life**
111:17 122:21,21
240:5 276:18
309:12 325:16
336:23 353:7 376:2
**light**
218:20 359:9,14
360:11,17
**lighting**
429:21
**Likewise**
392:11
**limit**
7:5 77:18 133:18
**limited**
51:20,23 52:3 53:11
66:10 67:8 79:13
99:3,11,21 101:7
105:9 106:22 327:2
327:11,15 338:18
354:15 357:2 367:7
**limiting**
15:14
**limits**
402:5
**line**
12:23 102:25 122:12
308:8 326:20
334:16 441:5,5,5,8
441:8,8,11,11,11,13
441:13,13 444:3
**link**
117:9 143:20,22
161:16 185:6,19
319:7
**LinkedIn**
64:22,25 65:5,9
433:10
**list**

183:11 225:2 272:17
**listco**
141:9
**listed**
36:17 40:4 86:21
94:13 143:12 169:9
170:12 211:6,6,7
317:21
**listens**
135:4
**listing**
93:7 94:23,24 233:9
327:10
**literal**
94:4
**literally**
122:12 143:7 245:20
249:14 354:5
**litigation**
77:12,14 277:12
278:6
**little**
19:17 26:18 27:8
39:19 42:6 43:23
95:23 102:18
122:19,23 124:4,13
154:3 160:20
239:25 243:15
256:16 297:15
300:13 315:11
351:8 371:9 403:3
409:25 417:14
**live**
260:12 261:15 390:8
**lived**
262:11
**lives**
308:4 309:3 319:4
376:4 403:14
**living**
262:13
**LLC**
1:8 46:10 72:3,14,19
73:21 245:19,20
247:2 298:20
299:17

**LLP**
1:15 2:3,8 3:11
**load**
414:17
**loans**
207:24 208:11 209:2
**locate**
34:18 36:3
**located**
34:4 41:7,8
**lock**
56:13 241:7
**login**
272:17,23 273:8
296:10
**logins**
273:9
**LOL**
393:18
**long**
35:20 38:9 68:11
77:18 127:6,10
131:19,21,22 225:2
245:5 257:4 335:21
352:21 372:15
389:5 406:5 407:9
408:3 410:13
**longer**
102:8,18 413:22
**longest**
323:15 371:17,19,23
**longtime**
141:18
**look**
43:16 66:3 71:5
79:10 89:13 99:19
120:20 144:23
163:19 186:8
204:16 211:24
232:13 239:11,14
270:16 278:10
282:17 283:7,21
287:17 302:11
331:25 341:8
352:18 358:10,14
362:3 380:3 409:15

418:10
**lookback**
357:3
**looked**
56:21 184:21 255:24
271:12 280:14,22
282:16,22 284:5
322:15 358:17
369:6
**looking**
107:25 145:7 150:12
157:24 231:19
238:7 275:13 281:4
287:23 288:24
317:9 349:21
364:19 365:17
388:10 400:14
**looks**
79:17 80:14 82:10
86:24 88:22 89:16
101:24 103:12
154:4 266:22
288:17 291:11
293:21 319:6
326:18 361:20,24
392:8 424:22
**LOOOL**
426:25
**loose**
341:21
**loss**
406:12 407:13
**lot**
6:24 8:9 11:24 30:11
44:19 81:7 90:23
92:16 108:20,21
113:18 122:17
156:4,8 168:5
177:16 178:4
179:19 184:3
200:12 234:6
252:13 296:12,16
301:11 314:2
322:15 341:14
373:15 376:12
383:21 384:24



390:7 395:10
403:11
**loud**
57:17
**lovely**
75:21
**loyalty**
354:11
**luck**
423:9
**Lui**
1:9,9 23:5,6,10 24:12
76:2 166:25 167:3
170:6,10,16 172:22
173:8 176:12 177:3
177:25 179:2,6,25
180:16 186:11,15
186:24 188:12
189:3,9 191:7,16,24
193:6,22 194:8
196:13 197:3 201:9
201:21 202:5,15,17
202:22,25 203:22
205:8,20 209:23
211:7,18,21,25
212:8,20 213:4
214:10,16,19,23
215:7,16 216:7,17
217:7,20 218:19
**Lui's**
23:17
**lunch**
138:6,11 139:11
**Luncheon**
138:14
**lying**
392:21 394:2,9

**M**

**M**
4:15 137:22 139:4
**maaan**
133:6
**Madoff**
29:13
**Magna**

1:25 2:16 3:15,16
**magnet**
426:25
**mailbox**
286:6,11,17,23
**main**
50:14
**Majcher**
1:14 3:23 4:1,4,23
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
17:20,21,22,24,25
18:1,17 19:1 20:1
21:1,11,12,13,18
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1,25 51:1,2,5
52:1,10,22 53:1
54:1 55:1 56:1 57:1
57:2,3,4,7,8 58:1
59:1,9,10,11 60:1
60:17 61:1 62:1
63:1 64:1,2,18,20
64:21,24 65:1 66:1
67:1 68:1 69:1 70:1
70:22,23,24 71:1,2
71:22 72:1,8 73:1
74:1 75:1,6,21 76:1
77:1 78:1,4,18,20
78:21 79:1 80:1
81:1 82:1 83:1 84:1
84:2,3,4,7 85:1 86:1
87:1 88:1 89:1 90:1
91:1,6,23 92:1,13
92:19,21,23 93:1
94:1 95:1 96:1 97:1
98:1,14 99:1 100:1
101:1,13,14,16,19
102:1 103:1,24,25
104:1,2,5 105:1

106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1,20,21
116:23,25,25 117:1
118:1 119:1,10,11
119:12,13,15,17,25
120:1 121:1,14,16
121:16,18,21 122:1
123:1 124:1 125:1
126:1,16,17,18
127:1 128:1 129:1
130:1 131:1,5,6,9,9
132:1 133:1 134:1
135:1 136:1 137:1
137:23 138:1 139:1
139:10,12,25 140:1
140:2,3,6,16,19
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1,3 149:1
149:6 150:1 151:1
152:1 153:1,24
154:1,6 155:1,4,17
156:1,16,17,20
157:1,22 158:1,4,5
158:7 159:1 160:1
161:1,11 162:1
163:1 164:1 165:1
166:1 167:1 168:1
168:21,23,25 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1,4
181:5,8,8,9 182:1
183:1 184:1,12,14
184:16,16 185:1
186:1 187:1,14,20
187:20 188:1 189:1
190:1 191:1 192:1
193:1,11,12,15,15
194:1 195:1 196:1
197:1 198:1 199:1
200:1,24 201:1,4,4
202:1 203:1 204:1

205:1 206:1 207:1
208:1 209:1 210:1
210:23,24 211:1,2,2
211:3 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1,9
220:1 221:1,12,13
221:15 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1,12
232:1,3 233:1 234:1
235:1 236:1 237:1
237:21,22,23 238:1
238:2 239:1 240:1
240:23,24 241:1,2,2
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
253:12,13,15,16
254:1 255:1,25
256:1 257:1,15
258:1 259:1,20,21
259:24 260:1 261:1
262:1,18,19,23
263:1 264:1 265:1
266:1 267:1,14,15
267:17,17 268:1
269:1 270:1 271:1
271:18,19,22,23
272:1,21 273:1,23
274:1 275:1 276:1
277:1 278:1 279:1
279:22 280:1 281:1
282:1 283:1,20
284:1 285:1,8,10,11
285:13 286:1 287:1
288:1,3,7,8,24
289:1 290:1,6 291:1
292:1 293:1,5,8,11
294:1 295:1 296:1
296:21 297:1 298:1
299:1 300:1 301:1
302:1 303:1,12,13
303:16,16 304:1



305:1 306:1 307:1
308:1 309:1 310:1
311:1,16,17,20
312:1 313:1 314:1
315:1,14,22 316:1
317:1,15,17,17,19
317:22,23 318:1,4,8
319:1 320:1 321:1
322:1,7,9,10,12
323:1 324:1,4,5
325:1,17,21,23
326:1,12,13,16,16
327:1,20,22,24,25
328:1 329:1 330:1
331:1 332:1 333:1
333:24 334:1,19
335:1 336:1 337:1
338:1 339:1 340:1,8
340:19,20,22 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1,12,14
349:16,16 350:1
351:1 352:1,7,9
353:1 354:1 355:1,9
356:1 357:1 358:1
359:1 360:1 361:1
361:13,15,16 362:1
362:6,7,8 363:1
364:1 365:1,5,6,10
366:1 367:1,17,18
367:20 368:1 369:1
370:1 371:1,16
372:1,19,20,21,24
373:1 374:1 375:1
376:1 377:1,19,21
377:23 378:1 379:1
380:1,18,19,21,23
381:1 382:1 383:1
384:1 385:1 386:1
387:1,9,10,12,14
388:1 389:1 390:1
391:1 392:1 393:1
394:1 395:1 396:1
397:1 398:1 399:1
400:1 401:1,10,11

402:1 403:1 404:1
404:15,16,18,20
405:1 406:1 407:1
408:1 409:1,8 410:1
411:1 412:1 413:1
414:1 415:1 416:1
417:1 418:1 419:1
420:1,6 421:1,13,14
421:16,18 422:1,15
423:1 424:1 425:1
426:1 427:1 428:1
429:1 430:1 431:1,7
431:10 432:6,12,14
432:18,22 433:5,7
433:12,16,19,22
434:5,7,11,13,14,17
434:17,19,24 435:5
435:7,10,13,16
436:5,7,13,16,21,24
437:5,7,10,13,16,18
437:21 438:5,9,12
438:16,16,19,23,25
439:5,8,12,14,21,23
440:5,7,10,13,16,19
442:4 443:8
**Majcher's**
64:22 326:14 433:9
438:20
**Majcher.doc**
154:16
**Majcher/De**
3:5
**majority**
110:14,18
**Mak**
333:2
**making**
99:7 129:25 236:20
290:10 391:17
**man**
156:4 244:6 324:7
**manage**
113:15
**management**
69:14 70:3,5 113:18
145:2 185:3,11

205:18
**manager**
96:18
**managing**
114:25
**manner**
107:24 353:24
**March**
39:5 40:21 44:4
64:14 119:11,17
131:5,11 140:2,7,20
150:10,19 156:16
156:22 157:3
187:18,25 220:20
221:12,16 223:25
224:19 229:2 232:5
232:19 237:24
238:3 240:23 241:3
242:6 252:8 340:19
340:24 420:14
421:14,19 434:12
434:18,23 435:6,23
436:15,19,22,23
438:24 440:18
**Marco**
104:19
**mark**
17:20 21:9,11 50:24
57:2 59:8 64:19
70:21 101:12
103:24 116:19
119:10 121:18
126:15 137:17,20
139:24 148:12
159:7 164:10
169:24 225:7
230:20 246:21
263:20 266:11
271:22 293:8
302:18 326:11
352:7 365:4 367:16
372:18 377:23
380:17 387:8
404:15 415:17
421:12 428:2
**marked**



17:23,25 21:14 51:3
57:5 59:12 64:22
70:25 78:19,22 84:5
84:7 91:6 92:21,23
101:16,18 104:3
116:23 119:13
121:16 126:19
131:7 137:25
139:12 140:4
156:18 158:6
168:23 181:7
184:14 187:18
193:13 201:2
210:25 211:3
221:14 232:5
237:24 240:25
253:14,15 259:22
262:20,22 267:16
271:20 285:12
288:5 293:7 303:14
311:18 317:18
322:9 326:14
327:22 340:21,22
349:14 352:10
361:15 362:9 365:8
367:20 372:22
377:21 380:21
387:12 404:18
421:16 441:10
**market**
110:18 156:9 198:24
406:16
**market-opportunit...**
324:21
**marketer**
107:9
**marketing**
96:24 104:24 114:18
115:6 120:11 121:7
221:7 223:7,12
228:24 229:4
266:19 294:19
**marking**
327:24
**Marshall**
241:13 248:7



**master**
378:12
**match**
268:14
**matchmaking**
157:14
**material**
89:11 312:5 313:3
384:24
**materiality**
256:21
**materialize**
382:2,19,21
**materials**
85:22 88:21 89:3,8
363:19
**math**
27:18 28:23 348:4
**matter**
3:6 65:10 268:6
407:6
**matters**
77:5 159:3 160:9,16
210:14
**MC**
141:6,13 142:12
**MC's**
141:24 142:18 143:8
**mean**
6:13 8:5 11:21 12:21
58:5 67:4 68:10
73:3 75:11 79:20
110:17 116:7 127:8
130:18 136:6
142:24 143:8
145:21,23 146:20
147:15 148:12,17
149:13 156:2
159:14,17 160:6
163:9 167:21 168:2
168:2 171:7 172:2
173:4,21 174:14,16
174:22 179:17
189:12 190:4,8
192:12 223:8
226:23 227:23

228:21 230:18
244:23,25 247:11
248:12,16,18 249:4
249:8,12,13,16,18
253:25 255:2,18
256:14 258:9 264:2
265:7 281:17 283:4
291:10,19 298:12
307:17,18 309:9
314:24 316:14
327:12 328:11
331:22 334:13
337:23 338:18
343:2 344:16,23,25
345:4 346:3,25
358:6 359:20,24
363:14 374:11
378:18 379:7,21
381:10 382:7,13,15
382:20 383:11
394:23 395:15,21
397:3,16,21 398:15
405:18 411:18
419:9 423:20
427:13
**meaning**
34:23 123:21 125:17
125:24 167:9
171:17 188:12
214:16 223:6
263:19
**means**
58:9 79:3 93:15 94:2
146:23,24 147:3,13
156:24 170:22
182:22 185:11
203:14 291:14
305:13 345:16,19
442:11
**meant**
24:21 25:3,6 30:20
53:24 61:24 62:4
118:15 136:7,23
142:17 147:17
151:18 158:23
162:21 171:12

182:24 189:16
215:16 227:20,21
247:18 255:17
305:9 307:18
308:14 314:18
345:20 347:7 379:9
394:19,21 396:10
397:24 400:17
402:25 405:23
**Medell?n**
323:20,25 324:8
**media**
114:22 272:23
296:11
**medical**
323:4
**meet**
25:10,13 176:11,20
283:11 423:2
**meetings**
136:11
**member**
155:11,22 233:8
247:10,15 248:9,11
248:13,25 249:2,5,7
249:12,17,21,22,25
250:2,4,5,23 251:3
251:4 368:20
**members**
185:12 247:5 248:5,6
368:5 369:17
**membership**
247:2
**memorialized**
62:14 258:18
**memorializes**
47:5
**memory**
115:21 180:25
**mentally**
141:5
**mention**
115:20 408:5
**mentioned**
13:2 24:18 36:7 66:5
115:17 130:10

150:21 195:12
209:22 234:9 252:7
340:11 359:18
**merger**
155:12,23
**mess**
397:18,25
**message**
19:3,6 20:13,14,25
22:11,17 57:17,18
84:14 85:3 94:9
116:22 117:2
120:20 121:15,20
122:10 137:14
138:4 139:17,19
144:24 149:18,22
150:20 151:7
153:20 155:25
170:20 181:15,20
183:9,14,17 184:25
185:7 201:14,21
203:12 204:22
212:19 217:12
224:13 231:16
238:6 240:2 241:21
242:3 244:14 260:9
261:14 268:5
306:23 307:9,12
319:8 330:7 342:7
342:25 345:10,21
351:9 375:24 381:4
390:6 401:18 407:7
408:2,3,12,14
409:20 411:18,20
414:12 423:19
424:13 434:10,16
**messages**
10:10,13 12:14 14:12
14:16,20,21 15:6,18
15:21 16:2,6,13,17
16:24,25 17:4 20:17
20:22 21:3,5,23
57:14 60:24 94:22
132:24 150:8 151:6
159:18 163:21
254:17 260:6 373:5



389:20 407:22
419:3 425:7
**messaging**
11:20 12:5,19 383:19
**met**
25:19 26:10 121:5
146:9 176:22
179:25 294:16
296:12
**MGT**
185:10
**Miami**
325:2 376:22
**Michael**
25:16,18,21,23 26:24
27:10 141:16,17
142:12,21,24
**middle**
143:16 199:14
263:16 388:25
**Mike**
290:9
**Miller**
116:14 290:11
**milling**
423:10,15
**million**
28:25 29:3 163:11,16
164:15 165:2,11
169:11 183:5,12,15
205:13 206:3,23,25
207:12,13,15,19
208:5 291:11
313:18 350:19
383:15 390:25
421:11 430:5
**millions**
312:15
**mind**
165:16,20 230:16,19
230:25 238:14
290:6 370:17,18
371:3,7 375:7
401:24
**mind-blowing**
428:9

**mindset**
406:14
**mine**
178:5,7 422:3
**minimum**
40:25 233:15 308:11
**minority**
247:10,16,19,24
248:9,13,17,18,20
248:20,21,21 249:6
249:6,8,9,12,16,17
249:21,21,25,25
250:3,5 251:3,6
**minutes**
403:14 407:25
430:21
**misappropriate**
279:5
**misappropriated**
279:3 385:23 386:8
386:11,18
**misappropriating**
244:20 274:12
278:12
**misappropriation**
274:17
**mischaracterizes**
173:2 193:8 281:11
370:24 398:21
409:4
**mispronounce**
132:11
**misrepresented**
289:19,25
**missed**
324:22
**missing**
268:7 280:2 362:18
**mission**
416:16
**misstates**
197:10,17 223:10,19
229:6 247:22
248:14,24 255:13
261:10,20 425:21
**mistake**

425:24 426:4
**mistakes**
244:8 391:22
**misunderstood**
284:17
**mixing**
246:17
**Mobility**
13:4 36:21 67:23
69:2 86:18 98:13,21
99:12,25
**model**
195:9
**modeling**
178:10 179:3,20
**modern**
357:19
**moment**
225:13 393:6 405:21
**monetary**
236:10
**money**
28:19 125:11,25
127:23 172:13
204:9 205:5,6,7,8
208:6,10,13,17,18
208:19,20,24
213:13 215:19
218:6 236:11
238:16,19 258:14
258:15 274:2,8
279:13 290:18
314:2 325:5 338:15
350:25 379:13,23
380:12 384:2
385:19,23 386:8,11
386:18 390:25
392:10 410:13
414:9 415:6 421:9
**monitor**
156:9
**month**
37:8 38:13,15 39:22
42:21,23 55:5 80:5
342:10
**month's**

347:21
**monthly**
55:3 82:12,15 233:16
345:16 353:24
**months**
7:4 26:21 80:9
295:24 299:20
312:16 354:2 355:6
376:13 380:7,9
403:15
**Moore**
158:25 160:2 252:9
252:11
**morning**
3:2 4:11,21,22
157:11
**Motor**
116:14
**move**
290:13 291:10
335:15 371:4
394:14 404:12
**moved**
41:10 402:17
**moving**
221:6 402:12
**MSBC**
246:9
**Mullin**
2:8 74:25
**multiple**
208:9 299:5 354:6
**murdered**
323:3 325:15
**mutual**
294:17 365:22
**mysterious**
376:12

_____
**N**
_____
**N**
4:15 139:2,2,2,4
432:3
**N.A**
1:8
**nada**



428:12

**naive**
120:11,16

**name**
4:6,11 33:13,21,23
113:25 114:5 116:8
132:10 263:19
264:3 275:2 318:20
318:24 356:7
375:17

**named**
54:16 111:20 113:24
119:16 148:6 154:6
176:12 211:8,8
218:14 270:2
293:12,19 317:22
318:13 375:20

**names**
263:19

**narrow**
23:9 174:19

**national**
155:9

**native**
79:2

**naturally**
371:3 385:13 386:25

**nature**
217:25 259:4 292:17
335:4,7 336:3,25
338:10 415:9

**necessarily**
43:12 70:14 135:23
168:3 174:14 181:2
280:11

**necessary**
158:24 238:9 304:7
312:20 377:14

**need**
5:8 9:24 12:8 19:7,9
19:21,21 43:2 53:16
78:3 81:23 82:3
87:7 88:4 93:14
128:23 134:14,19
144:2 147:8 151:15
152:9 166:12 167:9

201:24 227:23
228:2 230:10,21
241:8,11 243:12
246:13 253:21
254:3,19 255:3
260:24 263:7
268:13 277:2 297:3
297:24 312:25
314:4,10 321:9
335:15 341:20
351:10,17,25 354:4
373:19 375:6 376:5
378:6 390:5,23
403:5 414:8

**needed**
70:14 93:16 102:13
124:19 147:17
167:13 227:17

**needing**
227:21

**needs**
46:23 102:7,17
104:24 131:2
146:16,21,25 147:3
203:12 227:12,23
241:9 246:14
260:12 297:2 308:4
310:22,23 311:10
312:7 341:13 393:9

**negative**
305:13,15

**negotiate**
56:8,11

**negotiation**
298:8,13,15

**Neil**
169:6 424:4

**network**
113:16

**never**
10:7 48:15 49:3
69:21 92:12 137:11
164:9 173:7 189:3
207:6 269:5 293:16
297:17 328:25
331:5,24 332:4

353:16 354:22
358:4 364:15 371:2
373:20 411:25

**new**
1:3,16,16,17 2:5,5
3:12,12 38:23 70:8
91:3 157:14 185:10
368:10,16

**newsletter**
162:7

**NFT**
320:13,16,17

**nicest**
413:14

**nickel**
125:4,7,14,17,24
313:13

**nickels**
313:19

**night**
260:13

**nine**
26:21 27:18,25

**nominee**
299:21

**nonbusiness**
111:13

**nonfungible**
320:13

**normal**
23:24 123:9

**Norman**
1:8 2:13 4:14 17:23
18:18 20:15 21:14
21:19 22:11 25:20
26:2,9,13,25 27:11
27:14,21 28:19
75:23 77:21 108:16
129:4 133:17
140:21 141:18
150:10 167:15
181:9,21 187:17,23
200:20,25 201:10
201:22 213:13,14
214:2 215:19
257:16 272:16

295:16 304:7
306:12 308:3 309:2
313:12 317:17,23
319:14,18,24,25
353:8 354:11,25
355:5 362:22
373:12 378:7,10
379:2 384:3 385:17
385:19 386:24
387:3 393:16,22,24
395:4 399:13
400:17 401:19
402:20 403:2,7
404:6 405:9,13,23
406:5 407:10,17,23
408:5,6,10,18
409:17 410:5,18
411:16,20,21,25
412:6 413:2,7,9,11
413:14,22 415:6
416:8 417:9,11
418:13 419:23
424:6,24 425:8
428:2,8,10 432:15
432:18 435:21
436:10 438:16

**Norman's**
213:11 215:17 381:6
381:11 382:2,18,20
397:2,4,9 411:14
416:17

**normansfchoi@g...**
181:5,10 187:17,25
435:12,22

**North**
156:10 299:17 324:8
325:6

**Notary**
1:17 4:17 443:14

**note**
112:16 352:21

**noted**
115:10 139:3 431:14
443:6

**notice**
1:14 60:3 189:8



246:13 285:25
415:6
**noticed**
22:5
**noticing**
295:24
**November**
67:20 92:19,25 158:4
  158:8 164:23
  168:21 169:3
  170:11 181:6,11
  184:12,18 185:22
  186:3 433:18 435:9
  435:14,15
**number**
40:7 51:19 73:8
  120:5,5,7,8,9 123:2
  177:15 212:21
  232:11 234:18
  245:10 297:23
  321:17 323:18
  371:24 400:5
  401:13
**numbers**
9:9 29:5 176:25
  177:20 329:8
**numeric**
327:9
**nut**
134:10 392:8
**NW**
2:9

---

**O**

**O**
139:2,2,2
**oath**
75:3
**object**
6:18 10:19 11:16
  13:14,19 14:8,13,17
  15:23 16:7,14,18
  18:7 20:23 23:4,18
  24:7,13,22 25:8
  26:4 27:12 28:11,15
  28:22 29:9,20 30:2

30:9,16,21 31:4,11
31:15,24 32:23 34:9
38:7 40:15 45:15
46:3,15,21 47:8,21
48:11,18 49:10,19
50:20 52:18 53:18
54:21 55:18 56:6,10
60:20 61:5,8,19
62:19 63:15,21
68:20 69:25 70:17
72:10,21 73:14,22
74:7 76:19,23 81:2
81:17,25 82:9,21
83:8,15 85:4,19,24
86:22 87:21 88:17
89:5 90:16 94:20
95:2,7 96:20,25
97:6,22 98:2,8,15
98:22 99:13 100:2
100:18 101:9 102:3
102:15 103:11,19
105:25 107:2,8,22
108:9,18,22 109:2
109:11 110:2,12,16
111:7,15,23 112:8
112:20 113:7 114:3
115:15,24 116:6,15
119:6 120:17
121:23 122:11
123:7,14,19,24
124:8,17 125:6,16
125:19 126:6,12
128:5,9,17 130:17
130:24 131:24
135:19 136:18
139:21 141:15,20
142:5,14,19 143:5
145:22 146:22
148:20 149:12,25
150:25 151:9
152:18 153:5,13,25
155:18,24 157:8,23
160:17 163:13,25
164:19 165:4,12
166:3,21 167:4,23
168:15 170:7,14,19

171:13,22 172:3,10
172:16,25 173:12
173:19 174:3,10
175:7,15,22,25
178:17 179:16,22
180:11,22 183:13
184:2 185:17,23
186:12 188:6,23
189:11,15 190:3,20
191:20 192:4,9,13
193:7 194:13 195:5
195:25 196:6,22
197:9,16 198:8,11
198:19 199:15
202:23 203:4,17
205:22 206:5,10
207:2,16 208:2
209:25 210:18
211:19,22 212:15
213:8 214:13,20,25
215:9,21 216:10
217:8,16 218:4
219:23 220:5,11,17
220:24 221:8
222:13 223:2,9,18
224:2,14 225:12,18
226:10 227:8,18
228:7,19 229:5
231:3,7 234:5 235:8
235:14 236:12,17
237:3,10 239:9,23
240:12,17 243:8
244:15 245:8 246:5
247:21 248:2,23
249:10,19 250:7
251:8,13 252:24
253:8 254:2 255:12
256:11 258:25
259:16 261:9,19
264:7 265:10 267:9
268:25 269:11,21
270:6 271:5 272:25
273:14 274:3,13
275:15 276:5,14
277:2 279:4,19
280:17,25 281:10

282:13 283:17,23
286:24 287:8 289:2
289:14,21 291:13
291:25 292:11,19
295:5,11 296:15
298:3 300:8,22
301:21 302:2,15
303:7 304:18 305:6
305:11,17 306:20
307:7,23 310:3,8
311:6,12 313:20,25
314:17 315:7,17
316:15,22 317:7,11
320:24 321:6 326:6
327:16 328:17,23
329:5,10,15,24
330:6,11,19 331:11
331:19 332:13,20
333:4,9,15,21
335:13 336:12,19
337:3,11 339:22
340:15 342:11,15
342:19 343:11
344:19 345:6,18
346:4,17 347:6,19
347:24 348:11,19
348:25 349:9
350:16 352:4
356:20 358:23
359:4,10,15 360:6
360:18 361:4,9,23
363:16 364:10,16
366:22 369:3,22
370:4,16,23 371:21
372:11 374:20,25
375:12,22 377:6
378:20 379:24
380:13 381:12
382:8 383:10,16
384:10,19 385:3,10
386:3,13 388:8
389:18 390:14
391:7 392:4 395:24
396:6,12,16 397:6
397:12 398:2,5,20
399:5,20 400:13,22



402:15 403:10
405:19 406:2,21,25
407:18,24 408:11
409:3,9,22 411:17
412:14 413:8
414:11 415:2
416:13 417:19,25
418:5,21 420:10,19
420:23 423:17
424:11,20 425:20
426:3,10,20 427:21
428:18 429:9 430:7
**objection**
14:23 47:24 52:24
53:21 78:6 207:20
229:11 248:14
279:8 302:7 316:2
334:18,24 335:20
375:16 386:19
394:11 419:12
**objective**
306:11
**obligation**
370:13,19
**obligations**
111:13 370:7
**observation**
410:11
**observe**
219:19
**observed**
108:15,19 219:15
**obsessed**
416:25
**obvious**
398:9
**obviously**
50:12 217:3 419:13
**occasion**
189:14 253:5 340:10
**occasions**
252:21,25 253:2
323:4
**occupation**
177:7,12
**occur**

112:12
**occurred**
354:21
**occurrence**
24:5
**October**
237:2,7 349:12,18
351:16 362:7,12
364:20 365:8,12
367:18,22 387:10
387:16 404:16,22
439:6,13,18,19
440:12,15
**offensive**
410:24
**offer**
281:5 372:9
**offering**
95:4 343:18
**offhand**
19:18 30:12 31:8
209:5
**office**
41:4,7,10,11 84:23
85:16,23 87:8 97:16
144:3,8,13,15 145:4
387:23 388:11,16
388:18
**officer**
44:25 46:2,6 52:11
52:17,23 55:24
65:21 68:7 72:2,2
72:18,18 73:11,12
221:7 223:7,12
228:24 229:4
264:19 266:10,19
**offices**
1:15 388:6
**official**
52:20 84:19 203:24
209:23 212:9
**officially**
44:18 212:4,13
213:16 285:24
**officials**
337:17

**offset**
92:18
**oh**
8:7 133:6 167:25
168:2 377:8 397:15
425:4 426:23
**okay**
5:12,13 19:22 22:20
60:9 61:21 87:5
104:14 106:18
115:21 119:22
121:2 150:16
201:15 213:17
219:12,13 232:14
245:14 256:16,18
271:14 276:8 286:5
286:11,25 303:9
341:9 342:23
346:19 380:5,16
385:21 386:7
390:22 401:15
410:11
**OMG**
426:24
**omitting**
68:17,21
**onboard**
294:18
**once**
45:12 58:15 94:12
104:17 121:19
149:5 156:20
157:20 189:19,21
193:21 194:17
333:18 357:13
363:5,12 369:12
**one-month**
348:3
**ones**
12:22 13:17 15:24
55:25 75:7 104:12
**ongoing**
213:11 215:17
**Ooh**
141:25
**open**

299:22 376:5
**opening**
280:18
**openly**
70:15
**operated**
165:8
**operating**
44:24 52:11,16,22
55:24 65:21 68:7
71:25 72:18 73:11
100:15 101:4,5
143:13
**operation**
325:19
**operations**
124:16 125:15 257:8
324:17
**opinion**
107:7 226:8,11
279:10 281:6
356:23 372:9
**opinions**
372:14
**opposed**
99:12
**optically**
216:21 217:23 218:2
**option**
349:23 350:7,11,22
351:2,21,25
**oral**
37:16 47:23 258:22
**ordeal**
384:3
**order**
80:9 137:6 201:25
203:2 268:14
**org**
223:15 264:17
266:22 267:3,8
**organization**
323:22 324:3
**organized**
115:16 321:24
**original**



357:16
**originally**
183:19
**ostensibly**
325:22
**outcome**
297:21 298:7
**outdated**
14:2
**outlining**
422:19
**outreach**
305:5
**outside**
7:8 56:19 149:9,13
149:14 287:22
325:18 335:11
343:7
**outsourced**
391:15
**outstanding**
268:13 291:21
**outvote**
247:13,14,16 248:9
251:3,7
**overdrafts**
358:9
**overhanging**
218:7
**overly**
108:11 359:9,14
**owed**
291:22
**owned**
43:19,25 44:7 51:24
100:17,20,21,23,25
101:8 299:17
328:21,21,25 330:3
330:17 401:21
**owner**
292:7 295:16
**ownership**
144:25 175:3 209:10
248:22 330:20
351:10,18
**owns**

100:7 328:11 330:4
333:7 352:2

---

**P**

**P-E-G-G**
265:12
**P-R-E-F-E-C-T**
159:12
**p.m**
138:13,15 139:3,7
219:5,8 273:19,22
277:7,10 340:4,7
401:6,9 431:13,14
**P72**
115:2 162:25 357:23
401:25
**P72s**
115:23 116:4
**P900**
220:10
**Pachman**
290:13,18,22 291:5
291:10,16,24 292:5
**page**
18:14,16,21 22:22
51:7,11,17,18 53:4
54:23 57:14,24
59:19,25 60:25
61:16 66:7 67:7
71:8,14,20 78:24
79:10,11 84:12 86:3
87:3,4,13,24 88:19
89:15 90:6 91:16
93:4 94:7,10 101:23
102:6,21 104:10
105:5 128:19
129:18 132:8
140:25 141:3,22,23
143:15,15,16 144:6
145:13 147:21
148:22 151:15
153:19 154:14,23
155:7 156:3 157:16
158:12,20 161:14
162:13 164:9
165:15 167:16

171:10 186:7 224:4
224:21,22 225:5
226:15 228:9 230:8
230:15 245:12
246:12 247:4,9
248:4 251:16,18
253:20 260:6,8,18
260:24 263:15,16
285:17 286:4
293:17,21 304:5
305:24 309:4
310:20 311:25
312:13 313:9 314:6
318:2 325:13
326:19,23 341:6
343:25 349:22
351:9 362:19
365:14,19 368:11
373:6,17,24,25
375:5 378:4,22
381:5,19 383:18
385:15 386:22
387:18 388:21
389:2,14 395:3
397:17 399:8,12
401:13 403:22
404:24 408:4,6
409:16 410:2,3
411:25 418:12
419:19 421:24
422:24 426:13
429:19 432:6,12
433:5 434:5 435:5
436:5 437:5 438:5
439:5 440:5 441:5,5
441:5,8,8,11,11
441:11,13,13,13
444:3
**pages**
18:23 84:13 101:25
143:23 148:9
229:14 230:14
231:14 242:13
246:10 250:22
264:15 282:23
400:5 402:10

407:19 409:13
443:3
**paid**
9:7 28:20 48:15,20
49:3,7 55:3 63:6
64:6 80:23 81:22,24
82:5,19,25 98:20
127:22 163:5,11
164:4 179:6,21
237:6 238:16 294:4
345:2 364:6 366:25
383:3,5 401:22
411:7 421:10
**painted**
359:8,13
**paper**
24:11 47:5 52:21
53:2 73:10 79:9
82:23 99:9 171:17
192:3
**paragraph**
73:16 323:2,10
325:14 354:20
**paranoid**
273:25
**Park**
41:9
**parking**
90:23
**part**
40:8 54:25 97:9
115:25 137:16
272:10 274:16,17
331:14 335:16
341:15 356:11
362:15 363:17
365:19 366:3 367:2
376:24 377:8
382:22 383:2
392:10,23 394:2
404:25
**part-time**
102:25
**participants**
317:21
**participate**



350:8
**participating**
136:9
**particular**
9:22 95:13 179:23
310:17 426:7
**particularly**
93:17
**parties**
3:18 39:8 195:18
365:21 366:13
**Partly**
276:11
**partner**
169:9 170:10 212:22
310:14 318:17,18
320:25 321:4
**partners**
116:13
**partnership**
233:3
**parts**
124:16
**party**
4:14
**passed**
134:3
**passion**
240:5
**path**
389:15,17
**pattern**
189:8,12
**pause**
26:6 98:9 153:6
**pay**
9:6,8 46:20 48:9 52:5
54:25 56:12 63:9,13
83:6,13,17 95:4
160:14 344:17
366:14,20 411:6
412:17 430:5
**payable**
233:16,21
**paycheck**
355:4

**paying**
42:19,20 49:16 82:7
163:15 164:25
236:24 237:14
424:14
**payment**
58:9,18 59:3 81:6,10
82:13,16,20 83:10
95:10 163:4,24
164:16 165:11
234:13 290:19
291:21 346:7
347:21 348:3
366:15 368:19
**payments**
58:6,10 79:21,21,24
82:12 83:21 98:12
98:20 99:2,7,11,20
165:5 236:20
290:10,12 291:17
**payments-cars-lease**
57:19
**peace**
238:13
**Pegg**
265:12,13
**penalty**
71:15,22
**pending**
5:10
**Pennsylvania**
2:9
**penny**
125:20
**people**
7:18 9:14,25 11:2,9
11:14 12:5 30:12
31:21 43:20 75:22
110:9 132:13
179:19 191:4
192:16 205:20
209:12 211:11,14
212:22 218:16,19
227:3 258:17 273:6
313:11 320:17
339:19 354:6

371:17,24 372:8,13
374:12,23 376:25
385:8 392:9 411:2
427:2
**people's**
258:14 376:4
**perceive**
218:19
**percent**
100:9 169:19 182:24
205:5 319:11 325:3
328:7,8,11,15,22,25
329:19,21 330:4,4
330:17 353:21
**percentage**
330:9,21 351:5,11,18
352:2
**perfect**
155:10 156:11
159:10
**perform**
102:13
**performance**
382:25
**period**
15:15 64:13 86:9
97:11 109:24 110:3
110:8 123:4 130:14
130:20 176:9 178:8
178:20 199:25
207:10 208:7 228:6
235:7,20,22 252:8
299:19 327:17
354:2
**periods**
68:18
**perjury**
71:15,22
**permanent**
88:3
**permissible**
173:24 175:3
**person**
33:23 34:20 90:9
107:10 109:23
112:4,6 116:3

118:24 148:6 180:3
180:5 224:18 273:7
276:12 277:21
288:22 362:20,20
402:16 407:15,22
**person's**
32:9
**personal**
3:24 4:5 9:3 13:5,10
52:4 75:10,16,18,19
111:17 122:21
188:15,21 189:4,17
189:20,25 190:13
190:14,17 191:25
193:2,25 194:11,17
195:9,11,24 196:19
197:6 198:20,22
211:17,20 276:17
279:10 289:19
292:24 324:20
336:23 356:21
360:7 373:15
**personality**
295:9
**personally**
28:21 279:6 304:6
339:21 353:8
357:11 411:2
412:25
**personnel**
324:3
**perspective**
256:24 266:13 313:2
**pessimistic**
392:14
**phase**
320:17
**Phil**
211:8,10 212:21
213:23,24
**phone**
9:4,5,6,8,9 120:5,5,7
120:8,9 150:9
156:25 157:6 180:7
180:8,13
**photo**



89:16
**photographs**
367:8
**photos**
89:14
**photoshoots**
107:12
**phrase**
135:24
**phrased**
15:2
**physical**
32:12,16 33:2,11
34:7 35:4,21,25
87:8 275:7,11 367:9
**physically**
32:22 215:10
**pick**
168:13
**picture**
300:12 357:14
**pictures**
368:17
**piece**
47:4 52:20 73:10
82:23 99:9 171:16
320:11 382:24
**pieces**
53:2 341:21
**pile**
288:20
**pinpoint**
106:2
**place**
230:11 283:10,10
**Plaintiff**
1:6 2:4
**plan**
91:18 161:14 229:17
**planned**
220:9
**planning**
126:11 129:21
**plans**
390:23
**plate**

89:17 343:20 354:3
**platform**
401:21,24 403:5
410:12
**platforms**
12:10
**play**
137:12,15 253:23
254:20 256:15
406:15 419:6,10
**played**
138:2 139:11
**playing**
136:23
**please**
22:12 25:3,7 201:24
263:17 268:12
272:16 277:5 280:3
286:14 294:3
296:23 313:2
319:25 341:18
363:4
**pleased**
356:18
**plus**
94:13 120:6 141:8
224:7,8
**point**
26:17 27:22 44:6
47:19 50:3,10,13
92:5 97:25 100:17
103:16 106:6
153:16,17 163:12
165:21 186:11,24
187:3,9 194:4 207:4
219:25 221:4
224:18 225:9
243:16 245:7 246:3
257:20 258:3 261:5
266:20 269:20
272:16 278:20
290:8 296:21
298:16 299:4,15
300:10 301:6,8
317:8 324:5 330:10
330:18,23 331:24

333:2,14,20 348:7
348:15 355:18,22
393:16,24 401:4
407:16,16 412:25
416:14 418:22
419:21 420:12
424:24 425:8 430:5
**pointing**
168:3
**points**
123:5 272:11
**police**
156:10 338:16
**policy**
258:3,6,19,24 259:9
260:25 261:6,13
283:13,16
**politician**
416:20
**Ponzi**
29:8,12,19,25 30:15
408:20 409:19
**pool**
145:17 146:6
**portions**
341:3
**position**
68:23,23 69:3 277:15
395:9
**positioning**
229:16
**positive**
359:9,14
**possibility**
320:9 349:4
**possible**
58:25 59:2,5 95:21
125:12 133:2,4
160:22 161:6
191:16 192:19,22
209:6 301:17 333:6
417:20
**possibly**
148:21 329:17
335:21 354:14
415:15,21 427:5

**pot**
208:16
**potential**
94:14 159:19 174:7
186:22
**potentially**
155:22 172:11 173:7
173:8,14 292:10,15
315:14,22 316:4
319:9
**pounds**
233:14,21 234:13
236:25 237:7
**practices**
15:12
**praised**
310:24 311:11
**praising**
428:10
**pre-identification**
191:19
**pre-identified**
153:4,18 173:25
174:8,15,23
**pre-identify**
172:23
**pre-targeting**
153:11
**precise**
234:18
**precisely**
26:19
**preexisting**
174:13
**prefatory**
209:20
**prefer**
93:16
**preferred**
206:7,9 207:3
**preparation**
7:24
**prepare**
153:22 169:20
263:17,24 264:10
264:13,17 368:25



**prepared**
86:13 87:5 213:14
   251:22 252:4 255:2
   255:19 263:5
   368:14 369:9
**preparing**
267:3 268:7 280:2
**presence**
7:8
**present**
2:12 3:19 4:10 7:13
   68:8,14,16 215:10
   283:9
**presentable**
107:24 147:8,18
   177:2,21
**presenter**
108:2
**preserve**
370:7,14,19
**president**
186:25 194:8 195:22
   197:4
**press**
226:17 389:2 390:12
   390:17,19
**pressure**
373:12
**presumably**
65:23
**presume**
342:16
**pretty**
27:21,23 43:17
   106:10,12 117:6
   122:5 199:24
   219:16 234:14
   295:7 375:25
**preview**
96:11
**previous**
22:17 182:8,10
   184:22 248:4 262:4
   262:7 281:12 290:5
   301:6 307:9 369:7
   408:4

**price/ownership**
351:5
**primary**
89:25 110:9 325:20
**principals**
174:12
**print**
231:17 366:4
**printed**
79:4 366:5
**prior**
41:23 42:11 47:16,20
   48:20 49:4 236:21
   245:5 266:6 331:15
   332:9 357:4 358:3
   407:21 408:15
**priorities**
378:11
**private**
274:10,14,19 275:2
   275:10 279:15
   298:19 328:9
   329:20,23 376:2,2
**privilege**
277:3 284:9
**privileged**
35:16 73:23 76:13,24
   77:3,5,14 275:18
   277:22 284:12
   287:14
**pro**
345:13,16,19,24
**probably**
176:18 180:25
   185:18 260:12
   293:16 310:13
   322:22 381:23
**problem**
14:25 260:14 413:23
**problems**
416:8
**procedures**
353:17
**proceed**
198:9,10 199:2
   213:18

**process**
23:16 50:6 58:6,9
   93:7 94:23,24 95:20
   157:14 159:2,21,23
   160:5 171:20,20
   186:21 194:6 199:4
   199:14 202:21
   230:2,6 252:15
   253:6 263:11 341:9
   342:23 346:7,12,13
   346:19 352:25
   353:12,19 358:8
   373:19
**processed**
57:19 58:22 202:12
**processes**
353:19
**processing**
58:19 202:16,18
   346:15
**produce**
119:24 163:2 276:21
   358:20
**produced**
35:14 79:2 119:23
   150:7,8,17 204:14
   295:23 359:2
**product**
221:21 266:10,10
   277:11,19 278:5
**production**
22:7 104:23 212:22
   266:10 404:3 441:5
**professional**
8:17 106:21 108:13
   177:2,21 194:19
   372:4 442:7
**professionally**
8:15 107:21 108:7,10
   353:8
**proficient**
178:5,7
**profile**
64:22,25 65:5,9
   148:25 151:19
   152:12 155:13

**prorated**

156:8 300:16
   433:10
**program**
350:23
**progress**
263:6
**progression**
45:19
**project**
317:4 320:7 358:9
   359:22,24
**prominent**
177:15
**promise**
337:10
**promises**
425:19
**pronounced**
71:21 114:8
**proper**
128:22,24,24 149:2
   257:2,3,13,17
   422:18
**properly**
134:19 281:15,17,19
   283:9 385:14
   430:17
**properties**
367:3
**proposal**
223:24 429:21,25
**propose**
104:16
**proposed**
169:18 197:23
   330:24 331:2,4,10
   331:15 332:2,5,17
   354:23 424:9
**proposing**
148:18 223:14 229:3
   229:23 350:10
**propounded**
443:5
**proprietary**
296:10
**prorated**



341:25 344:9 346:2
**prosecution**
336:9,17
**prospectus**
151:17,23,24 153:9
153:16 174:18
**protocol**
371:5
**protocols**
353:17
**prototype**
312:19
**prototypes**
163:2 420:8
**proud**
90:13 155:8 393:6
**prove**
394:4 416:17
**provide**
35:5 37:25 95:18
158:23 214:22
230:5 268:16
275:25 281:24
282:7
**provided**
264:6 279:16 280:15
280:23 284:15,24
353:13 362:2 369:2
429:14
**providers**
226:20,25 227:5
**providing**
154:20 195:22 197:5
295:2 429:14
**psychological**
412:24
**public**
1:17 4:17 147:18
148:25 149:10
151:24 152:4 153:9
156:9 185:8,21
186:2 301:13
335:23 443:14
**publicly**
36:16 40:4 86:21
142:17 143:2

**288:21**
**publicly-traded**
142:9 230:25
**publish**
366:4,21
**published**
356:12,13 360:2,4,14
364:15,18
**publishing**
365:23
**pull**
61:11 232:2 279:22
401:11
**purchase**
90:15 115:23 330:25
331:3 332:3 350:8
382:23
**purchased**
90:3,18 97:18 98:5
99:24 100:3,6,9
290:24 357:20
380:7
**purchases**
291:8
**purchasing**
175:14
**purported**
205:3 254:7
**purports**
207:24 209:2 232:15
232:25
**purpose**
364:13,17 366:10
413:2
**purposes**
52:4 79:7 283:5
284:15
**pursuant**
1:14 71:24 237:8,15
294:2
**push**
213:21 214:18
**put**
17:16 25:11 55:23,25
56:17,24 59:7 70:19
83:24 102:19

105:21 117:22
119:8 121:12
122:21 130:9
156:14 158:2
168:19 176:8
187:12 197:21
218:23 228:11
230:11 237:17
240:21 251:11
252:6 262:16
266:21 267:11
271:14 273:16
311:15 315:10
326:10 327:19
333:23 340:12
347:17 348:5 352:6
355:21 360:10,16
362:5 365:3 371:8
377:18 380:16
387:7 404:9 406:8
407:12 420:5 426:5
**puts**
118:19 319:25
429:23
**putting**
116:8 176:25 177:20
206:25 266:11
373:11

––––––––––––––––
**Q**
––––––––––––––––
**qualified**
372:8
**qualify**
42:13 56:11 107:3
110:5 124:9
**quality**
356:18,24 413:23
**quarters**
182:10
**question**
5:10 14:25 22:3 30:5
42:8 53:24 75:5
77:10,25 88:13
102:20 111:18
145:11 148:12
149:17 150:4 159:6

164:10 169:24
184:6 189:16
196:24 197:25
208:4 209:21 225:7
225:8 230:20
245:21 246:21
263:19 266:11
274:16 275:16
284:4,18,18,22
300:2 302:18 321:9
331:14 334:10
335:17 336:5
337:10 346:19
396:21 406:3
417:15 419:3
420:25 421:2 428:2
431:2
**questioning**
4:3 201:20 243:9
**questions**
18:11 65:4 79:7
89:12 138:9 140:24
245:22 246:4
261:11 290:7
332:17 334:16
335:6 341:3 354:18
385:4,8 400:6,9,25
401:12 411:8
419:15 431:9
441:10 443:4
**quick**
89:12 149:17 418:11
**quickly**
226:17 295:17
358:12
**quirk**
150:7
**quite**
18:23,23 27:17 57:15
295:17 296:16
354:7 394:25
410:24
**quotation**
55:3 72:3 129:8
323:18,19
**quotations**



128:22
**quote**
52:11 129:10 152:9
153:11 195:23
203:3 213:13
214:17 233:2,7
244:5,6 260:11
305:10 315:3 324:2
324:23,24 332:23
350:22 378:18
381:6 429:15
**quoting**
345:24

**R**

**R**
4:15 139:2,4 444:2,2
**racing**
113:16
**raise**
148:10 169:18
172:12 199:12
203:19 204:8 205:8
218:6 245:22 246:3
256:19 351:3
390:25
**raised**
205:7 256:2 257:23
257:23 289:12
334:18 386:10
420:12,21
**raising**
145:17 146:6
**ran**
114:22
**random**
400:6,8
**rang**
377:12
**Range**
89:17
**rarely**
9:12 111:16
**rate**
325:3
**rated**

345:13,16,19,24
**RB**
117:21
**RCMP**
323:13
**reach**
94:4
**reached**
63:8 82:24
**reaching**
325:22 338:19 339:8
**read**
19:16,20 57:17 86:23
93:23 171:10 184:5
201:13 230:21
254:3 296:22 357:6
357:24 358:4
359:16 360:20
361:3 381:15 389:4
390:5,21 414:12
443:3
**reading**
159:17 254:12
296:20 326:7
354:16 386:5
390:16 416:14
419:2
**reads**
170:15,20 350:12,17
375:3
**ready**
22:23 133:9 255:2,19
263:5
**real**
51:18 79:11 308:5
324:21 334:8
392:18 406:11
407:12 418:11
**realistically**
19:7 86:8 155:12
**realized**
186:15 383:20
**really**
7:9,10 9:17 10:15
34:15 92:17 210:9
225:9 238:9 276:10

306:24 307:9 337:7
337:12 383:22
385:17 392:21
404:2 415:10
426:25
**rear**
312:18
**reason**
69:8 145:3 151:13
176:6 202:20,24
225:8 278:15
286:21 302:25
369:5 393:9 418:13
419:25
**reasonable**
86:9 148:25
**reasonably**
107:24
**reasons**
296:7
**reassigning**
228:17
**recall**
9:21 16:15,19 17:2,3
17:5,10,12 19:14,23
20:20,24 21:2,6
24:2 29:21 30:3,4
31:8,25 32:10 33:8
33:22 35:20,24 37:8
37:22 38:4 39:12
40:9,13,16 45:11
46:11 52:25 54:17
58:21 65:6,11,14
67:2 81:4,8,9,11,16
82:18 83:3,22,23
85:2,5,6,10 88:14
96:4,9,13 105:13
110:22 111:5,8,11
111:12,18 112:5
116:12 120:15
122:9,14,17 123:16
126:7,8,13 127:25
128:14 130:5,8
135:17 148:8
149:16 154:9,19
159:15 175:17,18

176:21 177:16
180:9 186:6,13,19
189:6 191:10,15,22
192:7,10,11 200:8
202:16,18,25
204:18,21 205:2
209:5 217:6,9 220:6
224:20 225:13,14
225:19 230:23
234:12,16,20
236:18,19,22 237:5
238:10 253:2
259:11,13 262:9,10
262:12 264:14
268:22,23 269:14
269:18,24 273:10
273:15 274:15
280:7,10 282:15
286:15,19 287:25
289:5,11 299:2
300:3,4,23 301:22
303:8 304:11
315:25 317:6
322:16 328:20
330:8,13,15,23
331:18 332:12,14
332:15,16,21,22,25
336:10,14,15
338:22 339:2,9,13
339:17 340:16,17
355:11,17,20
358:25 359:6,7,12
361:25 362:4
364:24 368:24
369:4 379:8,25
380:14 381:17,18
383:13 384:22
386:16,17 389:22
390:16 395:25
396:19,21,22
397:14,22 398:6,7
399:6 400:15
402:13 405:20
409:10 420:13,15
420:16 426:22
429:11,12,18



receipt
280:3 355:18
receipts
245:14 251:22 252:4
257:3 268:8,10
271:8 280:5 282:24
283:3,4,7,9
receive
11:24 14:2 48:24
55:9 194:16
received
35:13 98:12,20
189:22 191:12
207:11,13 240:3
290:12 356:10
424:15
receives
323:4
receiving
11:23 284:16 346:8
recess
78:15 138:14 219:6
273:20 340:5 401:7
recognize
118:16 120:4
recollection
8:3,11 10:20 19:19
49:3 51:14 60:18
64:4 83:14 86:16
96:7 111:10 163:18
164:22 165:9,14
167:2 191:23 193:2
193:4 194:9 200:3,7
212:7,18 223:23
234:25 238:22
270:5 297:16 300:5
302:3,9 303:24
320:5 329:7,11,13
343:7 349:10
355:13 391:5
394:17 396:3,9
397:23 398:17
399:23 400:16
405:22 408:9,25
428:16
recommendation

292:9,14
record
3:3,22 17:17 78:14
78:17 93:19 138:13
139:7 140:15,17
219:5,8 248:6
249:15 273:19,22
277:5,7,8,10 296:19
302:20 314:20
321:9 334:16 340:2
340:4,7 354:17
401:6,9 416:15
419:6,9 442:4
records
99:19 302:18
red
423:22
redeemable
206:7,9
redesigning
312:18
reduce
354:13
refer
47:9,11 198:3 213:6
241:23 249:6
reference
147:25 148:2 157:21
157:21 161:9,10
163:23 164:14
183:16 294:8 329:3
363:11 388:5
referenced
262:8 270:14
references
222:24 368:10
referencing
94:21 388:14
referred
126:23 142:12
190:17 265:9,18
343:5 361:22 364:8
384:8 429:7
referring
18:5 23:3 46:9 51:6
63:25 70:4 87:19

88:8,15 121:4,9,10
133:12 134:6,22
135:12,16,18,20
137:7 141:14
144:11 151:22
153:23 155:3
161:20 165:22
166:20 170:6
177:22 222:24
224:12 226:2
227:15 228:17
230:24 231:10,11
240:10,16 241:17
243:25 249:20,24
254:6,15 257:9
263:24 264:25
267:2 288:17
291:20 304:12
306:19,22 308:17
309:24 310:5,7
311:4,10 328:16
329:9,13 331:21,23
344:3 375:13,15
376:18 377:4
379:18 380:15
382:9 386:2 389:16
389:23 390:11
391:10 392:2 396:2
396:14 398:24
399:7,19 402:14
403:8,19 406:19,24
408:10,13 411:15
412:6,12 413:7
415:13,19 416:3
417:8 423:15 424:8
425:16 426:18
427:3,19 430:9,10
refers
61:2 183:14 249:22
250:2 369:15
411:21
refile
185:9
refresh
60:17 86:16 212:7
238:22 270:4 320:5

391:5 408:25
refreshed
8:3,11
refusing
304:16
reg
289:12
regarding
259:9 268:6 317:3
320:7 337:17
338:20 339:11,15
353:18 397:11
Registered
442:7
registration
115:18
registrations
115:2
regret
159:6
regular
42:25 375:21
regularly
41:12 65:8 199:24
387:25 388:5,12,18
407:5
regulations
173:17 196:3
regulators
147:10 152:11
153:10
regulatory
338:20 339:4 396:15
reimbursement
48:23 354:23
reimbursements
49:2 58:23 239:4
rejection
14:3
relate
12:14 77:5
related
9:20 10:18 14:6,11
15:7 16:6,17 53:12
53:19 74:14 102:2
106:7 151:7 159:3



160:9 195:17 230:5
254:7 263:11 297:6
317:4 371:6
**relates**
33:17 34:10
**relating**
12:6 47:18 55:24
81:10 89:3 91:21
96:5 123:17 224:7
225:10 229:25
317:4 331:9 332:17
332:18 338:6 339:4
370:14 398:4
**relationship**
27:10 47:6 106:17
197:8,11 209:8
211:18 219:11,16
245:5 270:8 297:2
300:15,20 371:19
393:22 399:3 406:6
407:11
**relationships**
302:24 303:6 324:20
403:25
**relatively**
50:18 276:12
**relay**
345:21
**release**
389:2 390:12,17,20
**releases**
226:17
**relevance**
326:7 334:25 335:14
336:13,20 417:20
**relevant**
15:8 77:6 268:11
271:8 280:5 334:5
343:14 370:8,14
**relies**
28:13,17
**rely**
244:7
**remain**
268:15 306:10
**remained**

353:9
**remaining**
290:14 291:12
**remark**
103:21
**remarks**
374:10
**remember**
8:7,13 9:22 10:21
26:19 33:13 34:17
34:19 35:7 37:14
39:19,20 45:7 54:15
58:25 59:6 81:19
82:11,17 83:20
85:20 86:19 87:2
95:12,14,17 96:3
111:2 112:14
114:14 139:14
160:19 163:4
165:21 171:8
176:13 178:2
180:18 181:2
186:23 192:17,20
204:5,25 205:4
207:5 217:14
220:23 221:2,5
222:15 224:3
227:20 230:7
231:20 253:9,10
256:4 270:18,19,20
271:11 274:21,24
287:4 289:15,16,23
290:3 302:16
317:10,12,14
330:20 332:6
390:19,21 395:2
398:16 417:16,21
417:23 421:3
**remind**
243:12
**reminder**
217:5
**remotely**
77:6 334:4
**remove**
84:22 85:15 242:15

**removed**
306:12 368:10
**removing**
85:22
**renamed**
98:6
**repay**
207:23 208:11
**repayment**
208:25
**repeat**
22:4 196:24 197:25
216:3,5 250:15
287:9 292:12
315:18
**repeated**
143:22 423:5
**repeating**
391:22
**replace**
225:21,22
**replies**
129:3 378:10 395:7
**reply**
14:9 243:12 248:5
394:3 402:24 421:4
**replying**
408:14
**report**
35:8,9 276:21,25
278:3,4 279:2 288:4
288:5,9,9,17 289:4
289:6,8,12,17,24
437:24,24
**reported**
325:4
**reporter**
1:17 3:16 332:11
442:7,12
**reporting**
223:21,22 335:24
**reports**
35:5,13 268:10,15
271:8 280:5
**represent**
3:20 4:9 18:8 61:10

61:14 74:21 75:8,14
75:20,23 76:2,4,7
76:11 119:19
132:24 150:5
156:23 232:8
282:21 360:11,12
360:13
**representative**
4:2,14
**represented**
68:12,13 289:18
**representing**
69:6 75:7,13 76:16
197:14
**reproduction**
442:11
**reputation**
381:6,11
**request**
3:13 35:14 86:6,13
204:15 267:2
272:22 282:8 355:5
441:5
**require**
174:19 272:11
**requirements**
128:21 268:17 272:4
422:20
**researching**
364:2
**reserved**
276:12 295:14
**reside**
5:14
**residence**
5:16
**resign**
246:20
**resignation**
294:5
**resigned**
269:3,6,7,9,14
**resistance**
296:13
**resource**
305:20



**resources**
124:15,20,24 125:22
  125:25 354:15
**respect**
125:4 247:25 275:13
  316:8 354:11 426:9
**respective**
220:3
**respects**
360:15
**respond**
132:16 133:21
  141:25 238:8
  245:21 268:21
  290:17 313:10
  314:14 355:9 404:2
  408:20 409:18
  426:15 427:7
**responded**
314:21
**responding**
282:8 305:4 355:14
  407:7
**responds**
60:13 105:4 117:18
  159:10 161:15
  163:5 164:10
  214:10 230:9
  254:21 263:20
  286:13 290:11
  319:18 341:17
  374:11
**response**
20:14 374:10 395:16
**responsibilities**
44:20 97:3,10 114:21
  131:3 136:14,16
**responsibility**
411:4
**responsible**
221:21 224:6 254:23
**responsive**
204:15
**rest**
100:15 129:19
**result**

325:2
**results**
299:3
**resumed**
139:4
**retained**
277:21
**return**
207:8 236:7,9 363:5
  363:12,18 367:2,5
**returned**
362:17
**revert**
169:7
**review**
7:23 8:2,6 56:19
  102:4 169:6 272:10
  273:4 430:17
**reviewed**
73:18 74:15 424:5
**reviewing**
254:10 268:7 280:2
  358:25
**revised**
158:14
**revising**
268:8 280:3
**revival**
357:13
**Richard**
70:7 141:25 383:20
  384:8,12,13,20
  408:2
**richest**
323:21
**RICHTER**
2:8
**ride**
426:16
**right**
4:25 5:5 8:7 18:3,19
  20:9 23:17 28:2
  36:9,18,24 40:18
  49:18 60:5 61:4,22
  62:5,18 64:9 74:16
  75:8,23 80:5 83:12

84:10 90:12,13
91:14 93:16 96:2,19
96:24 97:5,13,21,25
98:13 100:22
101:21 102:14
103:10 104:7
105:24 106:25
107:21 108:17
109:25 112:15,17
112:19 114:2,19,23
116:5 117:4,16,19
119:5,17 120:2
121:7 123:2,6 126:5
130:7,12,16 132:21
133:7,10,13,15,22
134:23 135:2,14
136:22 140:22
141:19 147:10,13
148:3 149:11
150:15 153:12,24
155:17 157:3
161:11,25 162:3,11
163:5,12 164:18
166:2,13 167:7,10
168:14 170:6,13,18
172:9,24 174:2,9,15
180:16 183:12,21
184:18,22 186:25
187:6 190:19 191:6
192:12 193:22
194:2,8 195:15,18
195:19 197:20
199:6,10,22,25
202:22 203:9 204:3
208:7,14 209:24
210:4,8 218:7,10
219:17,22 220:10
220:16 221:17
223:17 226:3,6,12
229:4 230:2 231:12
232:17,23 237:9
238:4 241:4 243:3,7
243:21,25 246:4,21
247:2,16,20 249:3
251:10 252:15,18
252:23 253:18

254:24 255:11,25
256:7,8,10 257:15
261:18 263:13
266:20 267:20,23
268:2 269:16,17
270:24 271:9,12,25
276:13 281:9,25
285:15 291:17
293:23 295:4,10,20
296:4 297:13 298:2
303:19 305:5
308:14,22 309:12
309:15 311:23
312:6,7,8,22 313:15
314:22 318:14
320:13 321:11,14
321:18,21 327:15
328:16 329:4,14,23
330:5,10,25 331:6
331:10,17 332:4
333:3,8,14 334:2,23
337:2 340:14
341:21 342:10,18
342:23 343:18,23
344:5,18 345:13,17
345:20 346:16,22
347:5,10,23 348:10
348:18,24 349:19
350:11,25 351:18
351:22 352:3,13,18
355:25 356:5,11,15
356:19 357:15,21
361:18 364:3,9,15
364:22,25 365:15
366:11 369:8,13
370:2,9 371:12
372:2,16 373:2,25
374:2,19,24 375:11
376:9,19 378:2
380:4,8 385:20,24
386:12 387:16
388:7 391:11,24
392:3,19 393:14
394:10 400:12
403:6,9 406:20
407:8,17,23 408:18



409:21 411:16,21
412:13,16 413:7
415:14,20 416:4
417:12 418:18
420:9 421:6,20,24
424:10 425:19
426:9,16 427:14,20
428:17 430:6,11,17
430:20 431:5
**ring**
196:5
**risk**
169:11,22 175:4,20
183:4,10,14 213:15
213:17,21 214:17
214:23 266:4,5
429:24
**Robertino**
426:24
**Rodney**
264:19 265:18,20
266:7
**role**
37:19 39:25 43:10
45:21 46:2 65:25
72:4,17 74:6 154:24
155:4 158:24
169:17 222:11
223:16 228:22
229:3 384:13
**roles**
211:12 326:21
**romance**
309:20 310:2
**room**
161:16 400:24 429:3
429:13
**rooms**
260:12 261:16
**rooted**
416:8
**Ross**
294:8
**rough**
383:7
**roughly**

27:15 33:7 37:8 38:4
38:15,15 39:5,21
40:13,21 43:8 80:19
80:24 93:22 95:5
96:2,9 112:12
176:15 180:18
186:18 223:24
303:23 347:18,21
421:11
**Roush**
401:20
**routes**
157:12
**Rover**
89:17
**Roytblat**
2:5 4:9 140:11
**rules**
5:4 196:2
**run**
50:18,21 54:2 69:13
125:8 128:24
370:13 391:4,9
**running**
124:7 258:12 314:4
**runs**
29:18,25 30:15
**Ryan**
1:5 2:14 3:6 4:9,24
90:12 102:7,17
105:5 120:10 121:6
122:2,18 161:16,20
161:24 188:20
213:11 215:17
221:6 247:5 248:5
251:22 260:10
261:15,20 262:10
264:20 265:6,7
266:11 268:18
272:7 288:4,9 294:9
294:11,16 297:2,6
298:9,13,17 299:5
299:15 300:16,21
314:8,9 315:4
317:18,23 341:8,12
343:2,9 352:2 368:4

369:16 370:21
389:7 403:2 412:19
413:22 415:6,25
416:3,8,16 417:9
429:2,7 437:24
438:17
**Ryan's**
188:15 213:12
215:18 224:23
294:5 300:25 301:3
302:12 343:19
351:10,18

——————————
S
——————————
**S**
139:2,2,2
**S-A-D-E-L-E-E-R**
111:22
**S-U-E-N**
146:9
**sacrifices**
354:12
**sacrificing**
324:19
**sad**
90:25 91:2 415:17
**Sadeleer**
111:20 112:18 113:9
303:14,18,22 304:6
305:9 306:18,24
307:6 308:2 309:2
309:24 311:18,21
312:2,14 313:10
314:7 315:3 438:10
438:13
**safe**
20:17,22 21:5 84:21
85:14
**saga**
197:19
**salary**
37:22 38:2,5,11
39:17 64:7,16
347:22 348:2
**sale**
39:3 116:10 382:9

**sales**
96:24 104:24 116:4
120:10 121:7
294:18 382:22
**Sam**
170:10 211:9,10
212:21 214:9,15,16
214:22 215:4,6
**Sambo**
66:19 67:4
**Samuel**
1:9 22:13 23:2,5,6,7
23:8 25:4,7 76:2
166:6,19,23,25
167:2,6 169:8 170:5
170:6 176:12,17
178:3 182:5,6
183:10 186:10
188:11,12,12
193:22 200:25
201:9 202:17
209:22 211:7 214:2
214:16 215:7 216:7
218:13 436:9
**Samuel's**
175:20
**sat**
90:23 332:10
**satisfy**
268:17
**save**
168:4
**saw**
8:9 17:8 19:4 24:25
62:16 63:17,18
118:8 183:9 199:8
201:18 322:17
**saying**
30:3,18 89:2 121:6
122:10 135:20,22
152:8 153:15 167:5
171:15 191:24
192:7 208:13
213:12 215:18
216:7 217:3,14,15
223:5 229:8,12



245:4,25 248:12
251:5 258:8 266:21
279:25 282:19
284:11,25 307:20
309:2 329:21
338:14 347:12
348:23 350:13
351:24 374:22
378:18 393:17,25
393:25 394:4
396:20 397:3
401:19 411:24
417:23
**says**
19:5 20:15 22:10,11
51:19 53:5,5,10
54:24,25 57:19
65:20 66:9,18 67:7
67:12,19,23 68:6,9
71:14,21,25 78:25
79:2,11,12,17 80:10
80:11 85:14 86:4
88:24 93:21 102:17
117:12 118:7
120:10 122:2
128:20 129:7
132:11 140:13
141:5 143:7,21
149:19 151:18
153:20 162:14
165:7 167:25 169:6
170:16,21 171:14
171:16,16,24 172:5
172:7 173:4 182:15
185:7 187:22
201:22 202:6 210:5
213:10 217:4 224:5
229:15 233:7,13
234:23 238:6 240:3
242:14 246:23
247:13 248:24
260:9 261:20 271:7
271:10 272:3 281:5
288:8 294:13
295:12 300:10
301:6,9 314:7 318:4

319:9,18,23,24,25
323:2,10 324:4,16
324:23 325:14
326:20,25 327:5
341:7,23 344:2
345:11 349:22
353:4 365:19 366:3
366:13 367:3 368:9
369:17 370:20
373:7,11,16 376:11
376:21 379:10
381:5,24 385:20
393:23 394:12,12
395:15 397:7,15
402:4 407:8 411:23
412:9 416:16
422:25 424:2
426:23
**scam**
338:13
**scary**
27:8
**scenario**
175:12
**scene**
91:12 101:24
**scheme**
29:8,12,19,25 30:15
408:20 409:19
**Schiller**
1:15 2:3 3:11,13 4:7
27:7
**Science**
41:9
**scope**
274:18 335:11
357:16 422:19
429:21 430:3
**scratching**
162:6
**screaming**
106:14 118:9
**screenshots**
341:5
**SEC**
185:6

**second**
21:25 36:5 51:17
74:5 88:9 91:6
111:21 120:9 141:3
184:24 231:18
232:12 274:16
285:17 290:5 318:3
326:19 347:3
349:22 357:12,18
361:21 381:20
**seconds**
137:21 227:11 277:4
**secrets**
392:21
**Section**
71:24
**securities**
152:5,17 325:6
**security**
318:19
**see**
11:13 12:12 15:8
19:5,12 20:18,24
21:22 22:14,18,24
23:20 51:21 52:13
53:4,8,14 54:24
55:6 57:16,22 58:3
59:13,16,23 60:7,11
60:15 65:19 66:12
66:21 68:2 71:8,18
72:6 77:6 78:24
79:8,14 80:2,12,17
84:13,15,24 86:10
86:14 87:10,17 88:5
91:24 93:2,8,12
94:16 102:10,17
103:2,7 104:20
105:2,6,11 117:10
117:13 118:17,21
118:24,25 120:13
121:22 122:7
128:25 129:5,12,16
129:22 130:3
131:13 132:14
134:4,16,20 135:6
136:4,25 141:11

142:2 144:4,9 145:8
145:19 146:11,18
147:23 148:15
149:3 150:6 151:20
154:7,17,25 155:14
156:5,12 157:2,18
158:10,18 159:8
160:25 161:5,8,18
162:8,16 163:7
164:6,12 165:6,17
166:10,17 167:17
167:19 168:6,10
169:5,13 170:2
171:4 181:13,18,23
182:13,19,25 183:6
184:24 185:4,13
188:2,17 193:19
201:11 202:3,8,13
212:5 214:7,21
222:6 224:9 225:3
225:24 226:21
227:13 228:14
229:21 230:12
232:7,20 233:5,11
233:18,22 238:20
239:16 240:2,8
241:15 242:24
243:18 244:11
245:16,23 247:7
251:24 255:5 260:3
260:15,21 261:2
263:2,8,21 264:22
266:15 268:19
270:13 272:5,13,19
280:10 282:3,14
285:21 286:2
288:11 290:15,20
292:20,24 293:24
294:14,21 297:10
298:10,21 299:8
300:17 303:2 306:4
306:15 307:3,15
308:3,6 309:2,7,17
309:22 310:25
312:23 313:7
314:15 317:13,24



318:6 319:10,12,16
319:21 320:3
322:13 323:6
324:11 325:8,25
326:22 327:3,6
328:4,12 341:10
342:4 345:14
346:18 347:15
349:25 350:15
351:6,12 353:2
354:8 355:7 362:13
362:25 363:9
365:24 366:8,18
367:11,23 368:7,12
368:22 369:18
373:22 374:7,16
375:9 376:6,16
377:2,10,16 378:8
378:14 379:5,14
381:2,8 382:5 384:6
387:5 388:3 389:2,9
390:3,9 391:23
392:24 393:10,19
394:5 395:13,19
397:19 398:13
399:10,17 401:16
402:2,8 403:17
404:7 405:16 406:9
406:17 408:23
410:8,16,21 411:9
412:4,20 413:4,18
413:25 414:5,14,20
415:11 416:10,22
417:2,6 418:15
420:3 422:22 423:7
423:12,24 424:18
425:10 426:6 427:9
427:17 428:3,13
429:5
**see/assess**
166:8
**seeing**
8:12 63:2 141:6
209:4 257:2 280:19
282:20
**seek**

174:20
**seeking**
284:16
**seen**
118:7 148:25 201:7
201:16 222:4
252:14 279:13
289:8 293:16 361:8
361:11 392:15
403:15 424:15
428:2
**send**
10:15 32:7 133:3
143:18 154:15
161:16 162:14
188:24 216:21
217:23 218:2 271:3
342:20 428:6,11
**sender**
20:15
**sending**
11:22 59:19 154:9
185:21,25 189:4,25
194:22,24 195:2,10
231:20 234:4
245:18 319:7
352:12 361:20
**sends**
84:13 132:23 133:24
143:20 184:25
188:8 191:8 194:14
231:15 234:6 271:7
309:14 346:12
424:13,23
**senior**
324:10
**sense**
5:3 29:10 108:10
196:5 283:14,15
341:16 343:17
383:7 402:19
405:10 418:8
**sensitive**
20:17,22 21:5
**sent**
12:10 21:23 117:8

143:7 181:10,20
183:18,19 189:17
191:2,5 217:12
267:18 269:25
270:15 271:6
322:18,19,22 341:8
342:8,12 344:4
347:2,9 352:17
358:9,11 362:11
390:12 409:20
**sentence**
248:3 297:22 301:9
308:12
**sentences**
298:4
**separate**
30:5 48:10,25 49:17
69:11,12 122:21
143:25 144:21,22
144:25 145:2 291:4
338:7
**separated**
273:24
**separately**
49:16 212:2
**September**
1:16 3:8 66:11 70:24
71:4 203:25 210:23
211:5 217:12
327:20 328:2,15
433:12 436:12
438:21 442:7
**serious**
225:10,15
**seriously**
423:3 425:13
**serve**
72:17 102:8 246:13
385:6
**served**
72:4,13,16,25 73:3
333:19
**server**
88:22 89:11
**servers**
89:4,9 296:12

**service**
226:19,25 227:5
**services**
1:25 2:16 3:15,17
25:15 52:9 59:3
67:13 205:18
**servicing**
102:14
**serving**
315:14,22
**set**
38:2 87:5 91:11,19
92:6,12 101:24
107:16,17 169:20
222:3 303:9 365:21
**setting**
40:12 92:2 172:19
216:19 236:8
278:24 287:11
291:2
**settle**
201:23,25 203:3,12
**settlement**
358:7 363:7,17
364:11,13 365:7,11
439:16
**seven**
388:2,6,12,19 430:21
430:23 431:4
**Seventy-two**
421:25
**shafted**
309:20,25
**shake**
406:14
**shape**
143:9
**share**
144:2,7,12,14 161:15
272:16,22
**shareholder**
247:19 250:23 251:5
251:6 333:13
**shareholders**
69:13 196:11,14
241:13 410:15



**shares**
100:11 182:23 206:7
206:9 207:3,4 233:9
241:10,12 330:14
383:3
**sharing**
97:15 319:15
**sharp**
300:11
**sheet**
257:8 443:6
**shell**
141:24 143:10
**Sheppard**
2:8 74:25
**ship**
413:3
**shit**
132:13 376:14 382:4
387:3,3,4 410:19
411:14
**shoestring**
391:21
**shoot**
376:14
**shorelines**
94:3
**short**
57:16 124:21 132:12
132:13 201:20
285:8 327:17
**shortly**
274:22
**shoulders**
354:14
**show**
50:22 64:18 70:20
78:19 83:25 92:15
99:19 101:11
103:23 116:18
119:9 121:13
126:14 131:4
139:23 142:18
143:8 156:15 158:3
168:20 181:3
184:10 187:12

193:10 200:22
209:17 210:21
221:10 240:22
250:21 253:11
259:18 262:17
267:12 271:15
288:2 293:4 303:10
317:13 322:6 326:9
340:18 349:11
361:12
**showing**
60:24 71:2 80:22
262:22 285:9
**shown**
99:10 422:18
**shows**
59:19 61:12 79:21,23
99:10 194:3 318:11
400:11
**side**
39:9,10 79:6 94:4
113:18 148:12
353:9 354:22
**sides**
42:3 94:3 197:13
**Sigh**
304:10
**sight**
398:11,19 399:4
**sign**
39:2 71:11 94:12,13
182:16,22 183:3,5
229:18 257:4,5
263:5 290:13
313:12 324:2 363:4
363:12,21
**signal**
10:2 216:22 217:24
218:3
**signature**
71:9 362:18 365:15
**signatures**
45:3
**signed**
38:23 39:14 48:13,16
48:17,21 112:5,6

116:9 127:11,19,23
164:9,11,17 165:3
203:25 212:17,18
212:19 215:11
232:22 290:11
362:17,22 368:2,18
**signing**
74:15 158:13 212:25
215:13 362:20
367:3
**similar**
54:9 320:16
**Simons**
2:6 3:21 4:7,20 13:22
14:24 15:11 17:19
18:9 21:7 35:12,19
50:24 56:25 59:8
63:25 70:21 74:24
75:4,17 77:2,7,15
78:10 83:25 91:2
101:12 103:20
116:19 126:15
137:10,18 138:3,10
139:9,24 140:14,16
204:13 206:15
217:2 218:23
237:20 250:9,13
273:16 277:15,24
278:7 284:2,8,13,21
285:6 288:13
294:11 296:17
326:11 334:6,12
339:24 352:7
354:18 362:6 365:4
367:16 372:18
380:17 387:8
389:12 394:15,20
400:8 401:3 404:13
405:4 411:19
418:23 419:5,11
421:12 422:10,13
425:4 430:25 431:5
432:7
**simple**
341:23 344:2 345:10
**simultaneously**

21:24 324:18
**Singapore**
205:19
**single**
48:24 73:10 299:5
**sinking**
413:3
**sit**
218:12 428:24
**sit-down**
314:11
**sitting**
24:20 30:6 64:3
130:7 184:4 215:4
271:13 278:23
414:9
**situation**
166:9 174:8 192:24
282:11 314:8 315:4
322:17 337:14
381:25 382:14,16
399:24 405:11
**six**
163:2 295:24 299:19
399:9
**size**
182:15 305:22
**skeptical**
425:17
**skill**
107:16,17 222:3
411:12
**skills**
178:4
**skimmed**
358:13
**skipped**
296:16 389:19
414:13 424:21
**skipping**
298:4 400:5 403:11
**sleep**
129:9,9,15 243:15
354:8
**slightly**
19:3 30:5



**small**
50:7,15 231:17
  242:20 305:22,22
  429:23
**smaller**
402:6
**smiley**
309:21
**SMS**
11:19,25 12:5,11,14
**Snapchat**
12:22
**sneak**
375:7
**SNS**
89:18
**so-called**
358:8
**social**
111:13 114:22
  272:23 296:11
**socially**
417:5
**softcopy**
363:19
**sold**
36:14 44:3 144:25
  401:19
**solely**
51:24
**soliciting**
115:22
**solution**
88:3
**Solutions**
36:20 44:4
**somebody**
30:20 197:12 338:14
  407:4
**somebody's**
14:3
**someone's**
32:3,4 216:2,3
  288:20
**soon**
43:6 158:15 290:10

290:19 352:23
368:17 428:11
**Sophia**
375:11,15,18,20
  418:14,17 419:20
  420:2
**Sophia's**
375:7
**Sophie**
2:5 4:8 137:14
**sorry**
26:9 94:9 102:19
  115:19 140:12
  150:3 161:2 196:24
  206:20 207:17
  214:14 215:3
  222:15 241:22
  245:13 248:16
  262:6 277:18 286:8
  286:8,8,13 289:22
  305:10 306:9
  318:21 328:21
  331:12 348:12
  356:6 373:8 374:13
  386:5 387:20
  396:20 425:4
**sort**
5:4 24:4 36:5 37:5
  41:21 45:20 56:2
  81:20 92:18 147:12
  154:20 160:18
  166:4 195:17 196:4
  208:19 223:15
  246:15 252:22
  295:3 317:4 318:3
  341:20 357:3
  358:12 372:8
  422:21
**sought**
354:23
**sound**
67:17 133:2 269:16
  301:10 322:21
**sounded**
260:18
**sounding**

159:4
**sounds**
33:22 42:15 50:19
  67:11,15,18 73:23
  112:16 136:21
  155:9 269:17
  319:23 369:9 387:4
  392:7
**sources**
208:18,21
**SOUTHERN**
1:3
**SPAC**
22:23 23:11,17,17
  93:6 94:23,24 95:11
  95:19 128:21,23
  145:11,16 146:3
  147:19,20 148:7,11
  148:24 149:11,20
  150:22 151:7
  152:23 153:3
  155:11,23 156:7
  157:14,15 159:20
  160:23 161:7 169:9
  169:18,23 170:11
  170:18 171:19
  172:5,6,8,11,12,24
  173:5,9,10,10,25
  174:9,12,13,16
  175:5,13,21 177:23
  182:12,15,18 183:4
  183:5,11,17 186:22
  191:19 194:7
  195:13,22,23
  196:10,17,19,21
  197:14,22 198:2
  199:4,14 200:19
  201:25 203:3,13,15
  263:12 315:16,24
  316:6,17 343:19
**SPAC-related**
341:16,19 343:17,23
**space**
222:4 321:2
**SPACs**
143:21 173:18

**spam**
11:24 13:21 14:2,14
  14:16,20,22 15:18
  15:22
**speak**
6:6 7:15 24:24 45:16
  74:4,10 108:24
  190:24 196:3
  212:24 246:16
  269:22 270:11
  301:13 304:15,16
  319:23 333:11
**speaking**
93:21 145:14 206:24
  224:15 250:19
  304:14,20 306:2
  307:19,22 376:8
  382:11 417:24
**speaks**
63:23 107:25 138:10
  171:23 228:20
  375:2
**special**
264:20
**specific**
6:15,25 13:20 33:22
  55:23 111:9 124:5
  124:13 132:7
  149:18 150:10
  165:9,14 173:6
  176:14 180:12
  224:18 341:3
**specifically**
40:9 53:20 54:15
  70:6 81:8 125:13
  135:15 151:6
  202:18 211:13
  212:20 217:9
  220:25 244:24
  259:6 267:2 286:19
  338:19 369:4
  429:18
**specifics**
172:20 221:11 370:5
**speculate**
85:25 86:2 87:22



88:11,12 128:6
185:24 211:16
306:21 307:11
310:4
**speculation**
216:11 311:13 415:3
**speech**
315:8
**speed**
158:15 336:21
**spell**
113:24 114:5
**spelled**
159:11
**spend**
42:3,4,5 125:21
258:13,15 312:15
314:2 387:23
402:20,21
**spending**
108:19
**spent**
268:7 280:2 376:12
384:2
**split**
102:23
**spoke**
6:8 33:12 111:16
120:12 132:20
219:14 260:19
355:17 373:17
**spontaneously**
126:5 129:20
**spot**
27:19 228:12 347:18
**spreadsheet**
178:4
**sprinkle**
393:5
**spy**
381:7,11
**SSN**
89:17
**stability**
308:5
**stage**

393:3 402:7
**stake**
350:8 351:22
**stamp**
19:5 78:25 137:24
434:22
**stand**
393:3
**standalone**
204:4 316:17
**Standard**
60:2
**standards**
107:6
**standby**
268:15
**standing**
323:25 325:16
**stands**
170:24
**Stanley**
293:6,12 438:6
**star**
60:5
**start**
21:24 26:8,12,25
37:7 117:12 157:14
203:22 265:24
297:21
**started**
36:11 40:20 43:6,11
44:15 45:20 49:22
50:3 62:10,11,15
63:6 65:20,24 68:10
68:24 69:4 95:25
96:5 105:22 106:3,5
109:8 141:9 176:10
186:21 187:4 220:2
236:24
**starting**
44:11,12 96:15
236:20,25 237:7
357:19 373:12
421:23
**starts**
21:22 134:12 241:6

293:20 422:3
**startup**
50:7 124:21
**state**
1:17 3:19 93:19
**stated**
242:21
**statement**
30:8 72:8,12 106:8
107:18 294:23
295:19 296:3,14
297:13,25 318:10
321:24 344:9 390:7
402:14 425:23
**statement's**
72:11
**statements**
390:23
**States**
1:2 71:16,23 97:13
**status**
113:20 337:14
**stay**
19:7 306:10
**stays**
60:6 368:14
**stealing**
274:2
**Stefan**
50:13 104:18 110:7
290:17 405:13
412:18
**stemmed**
243:14
**steps**
70:9,12
**Steve**
264:18 265:9,12,13
428:23
**stick**
102:8,18
**sticker**
425:14
**sting**
325:6
**stipulate**

394:13 404:11
**Stipulations**
441:8
**stock**
142:6,8 327:10
406:13 407:5
**stocks**
408:19 409:18
**stop**
74:13 86:7,19 159:5
325:23 419:2
**stopped**
67:4 68:23 69:2
136:2,6,7,9,17,19
**straight**
135:8 422:25
**strange**
122:19
**strategy**
77:12,14 151:16
152:10
**streams**
208:9
**street**
308:10,20
**strengths**
372:9
**stress**
227:25
**stressful**
323:12
**stretch**
174:24
**strike**
64:4 98:18 103:21
**string**
427:22
**strong**
393:16,24
**structure**
226:16 330:14 332:7
**structured**
172:18,21
**stuck**
381:24 382:14
**student**



378:13,19
**stuff**
19:8 86:7,20 87:7
88:2 91:22 112:22
200:15 234:7
341:16 343:17
411:2
**subject**
56:18 61:10,13
119:20 233:9
365:20
**subjective**
107:7
**submit**
151:25 152:4,7 203:2
**submitted**
81:9 152:10 239:3
281:14 297:8
346:16
**Subscribed**
443:10
**subscription**
206:16
**subsequent**
355:6
**subsequently**
177:11
**subsidiaries**
100:19,21,23
**subsidiary**
100:15
**substance**
7:20 56:20 77:15,20
77:24 417:24 443:5
**substantiated**
281:15
**substantiation**
271:3
**successful**
124:25 325:5
**successfully**
94:12
**sucks**
412:18
**sued**
370:2 371:2

**Suen**
146:9,13
**suggest**
94:11 266:11,21
301:24
**suggested**
289:17,24
**suggesting**
152:21 155:21
266:17
**suggestions**
294:7
**Suite**
2:9
**sum**
157:11 411:6,7
417:24
**summarizing**
358:21
**summary**
118:2 276:21 288:23
335:12 358:21,25
**summation**
152:14
**Sung**
70:7 384:12
**Sung's**
384:13
**Sung-Fung**
1:8 3:7
**sunk**
373:19
**Sunwah**
25:15,24 26:3,16
67:8,16
**supervised**
107:12
**supervision**
442:12
**supplier**
162:19,21 238:15
239:8,12,17,21
**suppliers**
238:17,18 403:25
404:6
**support**

158:24 279:17
280:15 282:9 302:4
441:3
**supported**
281:16,20
**supporting**
158:16 257:3 279:2
282:24
**suppose**
15:19 16:11 34:22
70:6 72:24 413:9
**supposed**
40:7 50:5 145:14,16
145:25 146:5
152:23 153:3
195:14 264:5 267:7
355:24 428:10
429:4,13,14,16
**supreme**
137:6,8
**sure**
11:4 43:12 45:18
48:23 53:3 81:21
83:9 88:10,21 89:2
89:7 108:14 113:24
135:11 136:2
143:19 147:2
151:16 152:9,15
162:5 178:6 191:7
191:13,25 192:25
206:13 217:4
234:14 249:23
250:17 252:16
270:10 280:13
291:14 294:10
307:8 310:19
334:19 345:7 346:5
353:22 364:4 371:4
372:6 381:18
385:14 403:4,5
405:11,20 406:22
406:23 407:3 411:7
411:14,21 424:25
425:9,15
**surprise**
29:23 30:6 236:23

237:4 339:18
**surprised**
30:13 98:19 194:16
**surrounding**
173:17 301:17,19
**surveil**
32:22
**surveillance**
32:12,17 33:2,11
34:7,15,21,22 35:4
35:21,25 275:7,11
**suspect**
298:17,18
**suspects**
325:4,20
**suspicions**
244:21 274:7
**sustainable**
379:17
**swallow**
391:19,23
**switch**
3:25
**switched**
42:4 64:7
**sworn**
4:16 442:4 443:10
**system**
58:11,12 341:20

---

**T**

**T**
139:2 432:10 433:3
434:3 435:3 436:3
437:3 438:3 439:3
440:3 444:2
**tab**
17:19 21:7 50:23
56:25 59:8 70:20
**table**
75:22 169:20 182:7
357:9
**Tack**
193:18
**tackisfat@gmail**
189:18 193:13 436:8



tackisfat@gmail.c...
187:15,22 188:5
435:19
**take**
5:11 19:21 35:15,17
43:21 44:19 45:25
46:4 61:6 70:9,12
78:11 102:3 138:5
153:5 163:19
169:21 173:5
209:18 213:15
218:25 223:20
229:3 232:12
271:16 273:17
278:8,21 282:25
307:24 327:12
339:25 343:19
347:20 351:21
374:21 381:15
382:15 386:6 389:7
401:3 410:12 423:3
**takeaways**
276:24
**taken**
1:14 3:10 138:14
300:11 307:13
426:15
**takes**
410:10
**talk**
6:9 70:15 216:23
246:20,23 259:5
276:17 277:3,20
304:8 334:20 387:3
408:6
**talked**
81:20 83:12 99:15
231:22 275:4
292:22 301:5 320:8
337:13 371:10
**talking**
13:21 17:18 19:14,23
20:2,3,20 58:14
74:22 85:3 86:24
94:18 101:25
103:13 111:12

120:24 139:19
155:16 163:10
168:12 170:9
172:21 183:9,16
192:23 222:21
224:12 231:4
238:24 243:20
255:7 262:10
263:10 283:24
308:16,20 328:14
330:2,22 342:6
343:8 345:9 350:4
351:20 374:18
380:10 391:6
400:11,15 403:2
407:15,16,22 409:2
409:7 425:22 426:8
427:23 428:20
**talks**
393:16,24
**tally**
29:5
**Tape**
138:2
**target**
145:15 146:2 153:4
153:18 172:23
173:25 174:9,14
191:19 195:23
197:15 294:8
**targeting**
185:9
**targets**
174:21
**tasked**
275:7
**tax**
241:11 298:18,24
**taxes**
52:4,6
**TBD**
349:24
**TBH**
389:3
**team**
128:22,24 129:11

185:3,11 221:22
273:12 305:22
328:25 330:3
354:25 356:4 366:7
366:14,20 367:5,6
428:24
**teams**
273:5
**technical**
147:2 162:10 430:16
**technicality**
256:17
**technically**
72:24 145:14 165:25
**Telegram**
10:4,5,7,15,17,21
**tell**
6:19 30:7 60:21 80:7
119:18 128:10
132:17,18 254:14
255:4 287:2 337:9
373:14 385:22
422:25 424:3
**telling**
241:20 242:2 262:13
386:7,9 417:17
425:25 429:2,12
**template**
55:15 56:2 115:11
**tend**
22:4
**term**
147:12 234:21
235:12 276:16
320:10
**terminate**
60:4 270:8 365:22
**terminated**
268:24 269:3,5 270:3
**termination**
104:17 270:9 285:24
366:2
**terminology**
146:24
**terms**
34:20 55:23 56:2,9

56:15,16 61:17,25
62:23,25 63:4 93:15
106:13 182:12,17
196:20 205:2 206:8
206:11,12,17,20,20
212:3,12 219:22
224:16 235:2
311:10 356:2
364:11 365:18,20
371:18 406:6
407:10 422:18
**test**
113:14 115:21
180:25
**testified**
4:17 139:5 276:11
291:5 371:15 396:7
**testify**
92:6 394:22
**testifying**
325:21,24
**testimony**
8:4 48:14 81:13,16
99:17 126:24 193:8
197:10,17 219:10
280:12 281:11
291:2 292:3 302:14
331:25 336:6,10
349:5 370:24
398:21 400:21
409:4 442:5
**text**
11:19 12:5 14:12,15
14:20,21 15:6,17,20
15:25 16:6,12,17,24
16:25 17:4 25:2
51:18 59:11,13
94:21 119:9 122:2
122:10 137:17
140:20 151:6
167:25 213:19
225:17 231:15
240:2 241:21
296:16 310:12
311:17,20 328:10
403:4,7 408:12



419:3 433:6 438:11
**texts**
132:7 368:17 369:7
407:19
**Thailand**
319:5
**Thank**
94:6 352:20 362:16
431:7
**Thankfully**
404:13
**thanks**
122:4 202:2,15
213:22 319:14
**theory**
145:10
**thereabouts**
26:15,20 36:13 80:21
83:6
**thick**
353:9
**thin**
353:10
**thing**
3:22 117:7 218:11
243:15 283:15
308:24 312:20
374:4 379:12,22
380:12 393:13
404:5 412:2,24
**things**
6:11,24 8:9 22:4
30:11 43:2 93:16
124:2 125:5,11
137:13 166:24
189:25 254:14
301:15 302:5 306:3
314:3 373:20 375:7
383:21 395:18,23
396:5,25 398:10,18
400:7 403:11 414:4
428:6
**think**
10:13 13:15 18:13
19:2,9,25 20:3 21:8
21:16 24:14 25:9

26:14 27:2 28:17
33:3 34:17 38:9
40:24 42:9 58:13
65:17 66:24 67:6
68:14 70:13 73:6
78:3 79:5 80:3,4,7,9
81:12 82:2 83:4
84:18 85:10 86:7,12
87:13 91:18 92:5
96:12 103:5 112:13
112:15 118:9,14,15
120:18 124:18,22
124:22 125:3
132:24 133:14,15
133:18,25 135:15
136:2,9,17,23 137:9
138:5 141:5 143:22
155:6,12 158:23
159:11 160:18
167:16 168:16,18
174:24 175:17
176:23 177:5,10,18
177:24 180:5
182:23 185:11
196:8 197:19 199:7
199:8 200:12
203:11 207:9
213:25 217:13,18
218:16,25 221:3
223:3 224:15 228:3
230:3 231:8 234:23
234:24 238:9,14,24
239:10,19 242:4,19
244:3,16,25 246:20
247:11 250:9,13
251:15 252:5
269:12 270:7 274:4
274:7,14 275:4
276:15 278:18,19
280:8 281:23
282:19,22 289:10
293:20 295:6
297:19 299:12
302:21 304:7 305:2
305:7,12 307:18
308:13,18,25

310:18 313:21
314:8,18,20 316:3
317:8 319:7 320:8
320:15,21 321:19
338:4 343:21 347:7
349:2,3 350:5
351:23 356:23
357:6,7,16 358:12
360:9,15 361:6
363:17 369:6
370:11 376:10,12
379:20 382:9 385:4
385:13 386:7
389:19 391:12
393:17 397:7
400:10 402:24
403:13 405:2
412:15,23 417:10
420:11 421:11
423:21 424:12
426:4,12 428:20,23
430:12,20 431:3
**thinking**
103:14,15 120:23
220:21 221:6
**thinks**
411:5,5
**third**
52:8 71:8 260:8
323:2 326:22,25
365:20
**thorough**
295:8 297:5
**thoroughly**
373:20
**Thorpe**
222:10 223:5,14
**Thorpe's**
222:11
**thought**
29:18 31:10,14 55:20
93:23 123:22
124:14,19 125:14
126:3,8 144:18
167:12 229:15
230:10 384:20

424:5 425:24
**thoughts**
158:16 216:15
**thousand**
38:12
**thread**
94:21 149:13,14
214:21 293:20
**three**
56:14 57:19 58:6
157:12,15,17
159:12 182:10
184:20 207:9 214:4
250:8 324:17 351:3
427:13
**three-year**
207:9 324:25
**thrilled**
393:4
**thumbs**
60:14 214:5 320:2
**till**
182:23
**time**
3:9 5:9 8:12 13:15,16
15:7,15 17:12 19:5
19:15,21 20:3,6
23:11 24:15,19
25:15,17 34:18 38:9
39:3 42:3,5,5 50:10
52:15 58:2 63:4
68:11,18,21 69:10
69:18 75:2 78:14,17
82:16 85:7,9,13
86:20 89:20,24
93:15 96:10 99:24
101:8 102:4,23
106:3,6 108:20
109:8,12 111:4
113:20 121:3 123:4
123:10,10,11,11
128:13,13 130:14
130:20 131:21
132:13 138:5,13
139:3,7 142:20
144:23 162:20,24



162:24 163:19
164:15 166:2 171:9
172:4 176:9,14
177:4,8 178:8,13,21
180:14 185:16,18
186:11,14 187:3
194:4 198:25 199:4
207:5 212:25
217:10 218:5,25
219:5,8 223:25
225:17 227:7,10,21
227:24 228:2,3,5,6
229:7 231:21 237:9
239:6 246:7 252:8
254:22 256:6
259:15 261:5,13
268:7 269:8 270:22
273:19,22 274:22
277:7,10 280:2
282:5 283:2,11
291:15 295:19
296:4 297:13 298:2
304:13 305:19
310:7,11,15,16,18
321:13,16,20
323:20,23 324:19
325:19 327:17
330:10 334:14,18
338:12 339:25
340:4,7,9 343:8
344:10 348:7,15
349:6 350:7 351:2
354:8 369:24
372:16 373:19
376:12 381:15
382:10 386:6
387:19,22 388:15
390:18 395:2
397:24 398:19
400:11 401:6,9
404:14 406:5,5
407:9,9 417:16
420:12 431:8,12,14
**timeframe**
402:17
**timeline**

6:11,12 68:15,17
**timely**
353:24
**times**
28:7 124:5,14,18
  125:13 250:8
  281:21 318:22
  331:9,13,17 332:11
  353:23 354:7
  426:15 427:13
**times/periods**
353:25
**timesheet**
210:20
**timing**
169:16 171:2,21
  207:5 332:15 380:3
**tired**
383:25 384:2
**title**
37:19,21 39:25 43:10
  43:13 44:19 45:3,6
  46:2 52:10 96:22
  114:13,14 127:4
  166:5 213:2 226:18
  227:9 266:3,14
**titled**
266:18 322:8,11
  438:18
**today**
3:8 6:17,20 8:4 24:20
  30:7 41:17 64:3
  74:21 75:7,12 99:18
  132:21 158:14
  169:8 184:4 201:24
  207:13 215:4
  278:23 348:5
  400:21
**today's**
6:7 7:16 431:12
**token**
320:13
**told**
6:16 7:18 29:17,24
  45:5,9 74:8 128:11
  135:8 191:16

192:24 200:9
220:21 240:3
253:21 254:18
255:10 260:10
261:21,22 262:4,7
285:23 326:5 337:6
337:6,13 344:10
345:22 369:8 374:4
374:11,23 386:15
418:6
**Tomaso**
1:8 3:6 4:12 7:17
  8:16 9:15,16 10:12
  10:18 11:3,10,15
  12:6 13:3 16:5,12
  16:16 23:16 28:4
  33:6 36:8 41:21,23
  42:6,11 43:5,11,15
  43:17 44:16,17,22
  44:25 45:6,10,13,14
  45:21,22,24 46:2,6
  46:8,9,10,14,20,20
  47:2,6,16,19 48:4,7
  48:9,15,19 49:3,7
  49:13,14,15,17,23
  50:4,10 52:17,23
  54:4,13,16,18 55:9
  58:18 59:4,21 61:3
  64:6 65:20,21 68:6
  68:11,19 69:3,9,18
  70:10,16 72:3,4,14
  72:19 73:7,12,20
  75:11 76:8 78:21
  79:12,18 80:15,23
  81:5,14,24 82:6,8
  82:13 83:2,17 85:9
  85:12 86:19 89:3,8
  89:11 92:3,8 94:25
  95:6,11,18,19
  103:10,16 105:23
  106:8,24 107:6
  108:8 109:9,13,16
  109:19,24 110:10
  110:24 111:5 112:7
  112:10,11,19,25
  113:6,10,12,21,25

114:11,13 115:8
116:9 122:25 123:2
123:17 124:7
125:15 126:4,9
127:2,7,12,18,22
128:4 130:11
131:17,20,23
134:25 144:15,19
145:5 148:7,18
149:11 153:11,17
160:14 163:10
164:17,25 165:23
166:2 167:7 168:14
172:8,14,23 173:11
173:14 178:9,12,16
178:20 179:3,7,9
186:22 187:5 189:5
190:19,22 194:4,6
194:11,24 197:6,24
198:4,13,14 199:5
199:13 200:13,19
203:2,23 204:11
205:9,25 206:25
207:11,14,18
209:21,22 210:17
212:3,13 213:7,25
214:12,19,24 215:8
216:8,18 218:6
219:15,21 222:12
225:16 226:6,9
227:5 229:4,25
231:6 232:5,17
233:8,25 234:10
235:5,12,19,25
236:19,24 246:3
247:20 252:2
257:17 258:2,17,23
261:6,18 262:2
265:16,21,22,25
266:5,7 267:19
268:24 269:5,6,8,9
269:13,19,25 270:3
270:9 272:3,18
273:7,24 274:12,23
278:12 279:3
290:25 291:8



294:20 299:16
300:7 303:22 304:3
315:15,24 316:9,12
316:21 317:5
338:25 339:5,16,19
340:10,12,14 342:8
342:14 344:18
348:9,17 350:9
351:22 355:3,22,25
356:10,13,17 357:4
357:5,11,13,19
358:14 359:25
360:3,13 363:24
364:6,22 367:6
371:11,18 385:2,12
389:3,23 390:11,16
391:6 392:3 420:8
420:17 421:10
424:9 433:13
436:18
**Tomaso's**
35:10 55:16 58:13
111:19 114:18,22
200:5 210:4 212:8
220:15
**tomorrow**
161:17 201:24
**tongue**
117:23
**tools**
374:14,24
**top**
87:4,12,25 128:20
155:7 164:8 169:5
201:22 221:19
224:22 230:15
243:11 260:17
267:18 309:4 351:9
351:14 352:11
373:6 385:15
386:23 389:14
395:4 397:16
402:12 418:12
421:24 425:4
429:20
**topic**

6:25 15:7 91:7 93:5
160:19 334:20
336:14
**total**
163:5,11 164:4
169:11 183:4,11
205:10
**totally**
29:6 178:24 306:25
**touch**
76:24 136:12
**touches**
73:24
**tough**
42:15 334:14,20
**track**
353:23 354:9 355:24
**traded**
90:19 142:18
**trading**
319:11 406:13 407:5
**traditional**
157:13
**trail**
24:11 192:3 403:24
**trained**
177:13
**trait**
313:11
**transaction**
146:16,21,25 147:6
151:8 152:23 153:3
172:17,20 195:13
195:15,21 197:22
197:23 198:2,4
331:4,10 332:6
**transactions**
79:23 324:7
**transcript**
442:11
**transcription**
443:4
**transcripts**
419:17
**transfer**
366:16

**transferrable**
383:22
**transferred**
328:9 329:19,22
**transition**
41:14,19
**transitional**
86:8
**translation**
94:5
**transpire**
332:8
**transpired**
331:5 332:4
**transpiring**
332:10
**traps**
430:15
**travel**
60:5 108:21 242:21
**treasure**
155:9
**treat**
255:22 258:11
**treated**
118:13
**trees**
92:16
**trials**
419:18
**trick**
53:24 321:8
**trigger**
243:16
**trip**
136:22 212:24
**triple**
415:17
**trouble**
201:22
**true**
44:3 71:17 91:3
141:21 250:14
272:21 293:9 296:3
302:25 303:5 344:9
376:22 415:17

442:4
**trust**
244:6 397:2,4,9,11
416:18 422:21
425:12,25 426:5
**trusted**
63:13 405:9
**trusting**
425:18
**trusts**
28:9 412:19
**Truth**
288:3,8,19 437:23
**truthful**
72:12
**try**
5:5 12:11 26:6 98:8
110:21 122:20
159:14 218:8
250:22 304:15
399:15 400:2
**trying**
15:12 34:18,25 143:3
192:15 194:21
198:16 217:19,21
218:6,9 243:16
244:13,16 248:19
250:5 251:9,12
271:2 295:7 304:22
304:24 347:4
354:13 379:3
380:11 406:15
**Tuesday**
3:8
**turn**
102:21 143:15
226:14 300:11
401:13 402:10
**turned**
99:25
**turning**
250:21
**twice**
22:4 150:7,8 249:11
400:25
**two**



27:25 28:3 42:14
43:18,24 57:13
69:11,12 98:9 104:9
104:12 106:10
128:7 135:8,9,11,13
135:25 144:21,22
147:5 157:14
192:23 201:23
203:6 227:3 236:16
273:5 277:4 294:5
294:19,20 295:16
323:3,4 324:17
335:6,25 350:25
357:17 359:3
371:16,22,23 372:8
374:4 391:4,9
403:15 407:25
**two-part**
355:23
**two-way**
308:10,20
**two-year**
335:18
**type**
14:18 49:24 132:16
192:8 197:8,11
237:8 238:8 239:15
247:24 302:20
313:14 323:17
**types**
339:20
**typical**
235:5,9
**typically**
165:5 170:24 256:19
**typo**
88:23 118:15 144:2
159:11 166:16
393:18 404:25
412:23

———————
**U**
**U.S**
28:25 38:16 55:2
60:4 80:19,25 81:5
94:12 95:5 103:6

141:8 148:19 152:3
202:6 299:22
323:18,22,25 383:8
402:12,17
**Uber**
242:21 283:10
**Uh-huh**
134:21
**ultimate**
35:24
**ultimately**
196:10
**Ummm**
427:6
**unacceptable**
306:8 308:9
**uncomfortable**
31:3,7
**undercover**
321:21,23 322:2
323:24 324:2,17,25
**underscore**
310:21
**understand**
15:12 24:10,21 27:9
29:16 30:4 45:19
54:4 88:25 98:25
124:25 125:18
142:25 143:10
148:17 155:20
163:15 166:19
167:21 170:5 171:6
171:15,17 173:7,16
173:21 174:4 177:3
188:25 190:11
198:16 217:21
221:23 222:8,20,23
223:8,11 224:11,17
228:11,16,21,23
248:19 249:23
263:23 264:24
265:6 270:10 278:7
282:21 291:9
296:17 311:3 327:8
334:2 344:22,25
345:3 346:2,10

350:18 375:17
378:7,16,17 394:23
403:12 412:10
416:7 419:11
423:14 430:14
**understanding**
29:7,11 48:2,6 94:19
109:6 124:12
127:17 136:11
142:11,16 145:24
146:4,7 150:12
159:12 170:22
171:11 185:15
186:9 188:9,10,19
189:24 190:4,5,6,9
195:3,8,13 198:23
200:17 205:17
208:23 215:15
216:6,13,15 240:15
250:18 258:10,18
261:24 265:11,14
265:19 267:6 269:2
269:4 291:4 304:17
304:19 305:8
306:17 310:6
321:22 322:4
325:11 327:18
335:19 336:24
350:3 360:9 375:14
384:16 394:7,16
413:6 414:22
**understood**
12:12 23:10,14,19
24:15,19 27:5,13
48:25 52:5 69:22,24
70:2,3 97:9 142:20
142:23 148:2 149:6
157:20 161:9,21
163:9 171:25
177:16 223:4
231:10 246:19
337:7 344:16 345:7
346:25 349:3
353:15 394:21
395:2 407:21
**underway**

194:6
**undying**
354:10
**unethical**
31:14 301:12
**unfortunate**
315:5
**unfortunately**
314:14,22,25 416:9
**Unicorn**
1:9 76:5 185:3,16,22
186:2,10,16,20,25
187:5,10 194:7,20
194:24 196:14
197:3,5 198:5,15
200:10,18 263:13
**uniform**
266:23
**unimportant**
14:5 15:24
**United**
1:2 71:16,23
**universe**
23:9
**university**
5:21,24 66:6
**unjustified**
254:24 255:22
257:21
**unpack**
43:23
**unprecedented**
324:9
**unrelated**
147:5 290:8
**unsubstantiated**
257:11 270:24
**unsupported**
218:15 257:21
**unwilling**
257:12,16
**unwritten**
258:5
**update**
65:8
**updated**



MAGNA
LEGAL SERVICES

65:11,14,18,23
429:3,16
**updates**
352:21
**updating**
246:25
**upload**
60:10 61:22
**upset**
412:19
**upside**
206:24
**USC**
71:24
**USD**
233:9
**use**
8:14,18,25 9:2,3,9,11
9:13 10:2,4,6,15,23
11:4,6,19,21 12:3,4
12:9,18,24 13:11
45:5 55:21 132:10
169:23 172:5,6,11
172:12 173:10
191:17 207:18
263:17 276:16
**useful**
385:18 403:6
**uses**
181:25 207:14 299:5
**usual**
11:5
**usually**
9:20 227:22 260:19

### V

**v**
3:7
**V12**
312:16
**vacation**
111:6 227:17
**vague**
15:3
**vaguely**
35:7 221:9

**valuation**
148:18 160:9 169:16
171:2,20 182:23
350:14 351:4
**valuations**
391:2
**value**
148:13 312:5 313:3
353:6 383:8,13
**various**
272:18
**vehicle**
122:3 291:21
**venture**
301:11 392:17
**Ventures**
330:3
**verify**
262:3
**version**
182:9,10,11 362:21
362:24
**versus**
3:6 208:20
**viable**
91:18
**vibe**
422:21
**vice-president**
210:4,8 212:4,9,13
213:6 214:11,19,24
**video**
117:9
**videographer**
2:15 3:2,14 78:13,16
138:12 139:6 219:4
219:7 273:18,21
277:6,9 340:3,6
401:5,8 430:24
431:11
**videotape**
3:4
**Videotaped**
1:14
**view**
106:23 257:7,21

279:2 412:25
**violate**
371:5
**violent**
323:22
**visionary**
392:13
**visions**
220:3
**visit**
212:22 428:24
**VLN**
182:22
**vote**
52:21 247:11,11
**VP**
264:20 266:12

### W

**W-Y-N**
232:16
**Waft**
356:5,6,8 358:8
361:14,17 362:9,12
362:21 364:6 366:3
366:6,15,17,20
367:4,13,19,21
439:11,15,20
**wait**
74:5 285:23 347:3
**waiting**
166:7
**walk**
198:17
**wander**
27:8
**want**
3:21 24:11 33:15
34:15 36:4 45:18
54:2 56:12,13,20
64:18 66:3 69:14
70:20 74:2 75:15
76:12 77:20 86:2
87:23 88:11,12,20
91:5 95:23 99:16
116:18 132:6,11

137:10,17 138:6
139:23 192:2,18
198:3,25 200:22
211:15 215:24
219:9 232:12
234:19 249:15
250:12 251:20
254:22 255:3,20
260:5 271:17
275:19 279:21
285:19 287:5 290:4
297:5 300:24
306:10,21 307:10
309:5,10 312:15
326:9 334:15
336:23 349:11
353:10 360:2,3,13
364:18 373:4
386:25 390:24
402:20 408:21,22
409:14 413:11,12
414:17,24 415:7
419:22 421:22
427:15 430:25
**wanted**
54:3 68:14,16 93:23
264:9 282:3 293:3
363:24 364:4
385:13 420:8
**wanting**
244:5
**wants**
52:5 89:2 213:16
350:13
**warrants**
182:9
**was/is**
299:23
**Washington**
2:10
**wasn't**
60:18 62:22 73:19
124:15 165:25
183:19 237:11
382:15 383:20
**watch**



34:23,25 405:10
**watching**
371:4
**way**
11:7 22:7 62:6 79:6
82:10 89:6 107:13
109:7 110:21
123:10 125:9 130:2
147:3 151:17,19
152:11 157:13
164:20 170:15
177:2,21 191:23
193:5 196:15
224:25 225:14
244:8,9 274:5 281:6
281:13 283:6 297:3
324:5 341:12 343:2
350:12 353:11
355:14 361:24
366:15 382:3 387:2
410:25 412:17
414:3
**ways**
241:10
**We're**
371:22
**we've**
78:10 92:16 211:14
279:13
**weaknesses**
372:10
**website**
115:8,17 143:20
288:19
**week**
40:11,14,22 185:10
210:17 246:24
368:2
**weeks**
296:9 359:3 374:5
**weird**
150:6
**Welcome**
78:18 139:10 340:8
**well-spoken**
108:3

**WENG**
1:9
**went**
26:21 66:5 124:6
125:10 160:18
173:23 208:11
280:8 358:7 424:6
**were/are**
353:20
**weren't**
106:14 225:9 315:6
**westerner**
147:13,18
**whatnot**
107:12
**WhatsApp**
8:25 9:2 12:9 20:16
21:3,13,18 22:3
28:6 57:4,10 84:3,8
91:12 92:20,24
101:15,19 104:2,5
116:22 117:2
119:12,15 121:15
121:19 131:6,10
140:3,6 151:7
156:17,21 168:22
169:2 184:13,17
204:22 232:10
237:22 238:2
253:13,17 259:21
259:25 262:19,23
285:11,13 303:13
303:17 317:16,20
318:9 327:21,25
349:13,17 372:21
372:24 377:20,24
380:20,23 387:11
387:14 404:17,21
421:15,18 432:17
432:21 433:15,18
433:21 434:6,9,12
434:15,18,23 435:6
435:15 436:20
437:6,9,12,20 438:8
438:14,22 439:6,22
440:6,9,12,15,18

**whatsoever**
126:11 129:21
363:25 399:23
**white**
147:13,18
**wholeheartedly**
354:25 392:11
**wholly**
299:17
**wife**
356:4 375:11 417:17
418:17 419:24
**wife's**
375:17 418:3
**Wigger**
2:11 4:11,12 6:18
10:19 11:16 13:14
13:19 14:8,13,17,23
15:3,14,23 16:7,14
16:18 18:7,13 19:20
20:23 21:16 23:4,18
24:7,13,22 25:8
26:4,6 27:12 28:11
28:15,22 29:9,20
30:2,9,16,21 31:4
31:11,15,24 32:23
33:16 34:9 35:16
38:7 40:15 45:15
46:3,15,21 47:8,21
47:24 48:11,18
49:10,19 50:20
52:18,24 53:18,21
54:21 55:18 56:6,10
60:20 61:5,8,19
62:19 63:15,21,24
68:20 69:25 70:17
72:10,21 73:14,22
74:7,13,22 75:3,9
75:14 76:19,23 77:4
77:11,23 78:6 81:2
81:17,25 82:9,21
83:8,15 85:4,19,24
86:22 87:21 88:17
89:5 90:16,25 94:20
95:2,7 96:20,25
97:6,22 98:2,8,15

98:22 99:13 100:2
100:18 101:9 102:3
102:15 103:11,19
105:25 107:2,8,22
108:9,18,22 109:2
109:11 110:2,12,16
111:7,15,23 112:8
112:20 113:7 114:3
115:15,24 116:6,15
119:6 120:17
121:23 122:11
123:7,14,19,24
124:8,17 125:6,16
125:19 126:6,12
128:5,9,17 130:17
130:24 131:24
135:19 136:18
137:16,22 138:8,11
139:21 140:9
141:15,20 142:5,14
142:19 143:5
145:22 146:22
148:20 149:12,25
150:25 151:9
152:18 153:5,13,25
155:18,24 157:8,23
160:17 163:13,19
163:25 164:19
165:4,12 166:3,21
167:4,23 168:15
170:7,14,19 171:13
171:22 172:3,10,16
172:25 173:12,19
174:3,10 175:7,15
175:22,25 178:17
179:16,22 180:11
180:22 183:13
184:2 185:17,23
186:12 188:6,23
189:11,15 190:3,20
191:20 192:4,9,13
193:7 194:13 195:5
195:25 196:6,22
197:9,16 198:8,11
198:19 199:15
202:23 203:4,17



204:16 205:22
206:5,10,14,18
207:2,16,20 208:2
209:25 210:18
211:19,22 212:15
213:8 214:13,20,25
215:9,21 216:2,10
216:24 217:5,8,16
218:4 219:3,23
220:5,11,17,24
221:8 222:13 223:2
223:9,18 224:2,14
225:12,18 226:10
227:8,18 228:7,19
229:5,11 231:3,7
234:5 235:8,14
236:12,17 237:3,10
237:18 239:9,23
240:12,17 243:8
244:15 245:8 246:5
247:21 248:2,14,23
249:10,19 250:7,11
250:15 251:8,13
252:24 253:8 254:2
254:9 255:12
256:11 258:25
259:16 261:9,19
264:7 265:10 267:9
268:25 269:11,21
270:6 271:5 272:25
273:14 274:3,13
275:15 276:5,14
277:2,11,20 278:4
278:13,21 279:4,8
279:19 280:17,25
281:10 282:13,19
283:17,23 284:7,9
284:17,23 286:24
287:8,12 289:2,14
289:21 291:13,25
292:11,19 295:5,11
296:15,18 298:3
300:8,22 301:21
302:2,7,15 303:7
304:18 305:6,11,17
306:20 307:7,23

310:3,8 311:6,12
313:20,25 314:17
315:7,17 316:2,15
316:22 317:7,11
320:24 321:6 326:6
327:16 328:17,23
329:5,10,15,24
330:6,11,19 331:11
331:19 332:13,20
333:4,9,15,21 334:4
334:8,24 335:13,20
336:12,19 337:3,11
339:22 340:15
342:11,15,19
343:11 344:19
345:6,18 346:4,17
347:6,19,24 348:11
348:19,25 349:9
350:16 352:4
354:16 356:20
358:23 359:4,10,15
360:6,18 361:4,9,23
363:16 364:10,16
366:22 369:3,22
370:4,16,23 371:21
372:11 374:20,25
375:12,16,22 377:6
378:20 379:24
380:13 381:12,15
382:8 383:10,16
384:10,19 385:3,10
386:3,6,13,19 388:8
389:11,18 390:14
391:7 392:4 394:11
394:18 395:24
396:6,12,16 397:6
397:12 398:2,5,20
399:5,20 400:4,13
400:22 402:15
403:10 404:10
405:3,19 406:2,21
406:25 407:18,24
408:11 409:3,9,12
409:22 411:17
412:14 413:8
414:11 415:2

416:13 417:19,25
418:5,21,25 419:8
419:16 420:10,19
420:23 422:3,8,11
423:17 424:11,20
425:3,20 426:3,10
426:20 427:21
428:18 429:9 430:7
430:20 431:3,9
**willing**
253:23 254:20 255:8
256:15,25 257:4
341:15
**winky**
117:23
**wire**
338:14 366:16
**withholding**
124:24
**witness**
4:16 140:13 277:3,14
284:3 362:19
418:24 442:3,5
**witnessed**
362:23
**wonder**
415:25,25
**Wong**
10:14,16 50:11 110:6
126:19,21,22 128:3
128:11,12,16,20
129:3,7 130:10
132:4 134:7,23
135:13,18,21
139:20 221:24
232:4,17,23 233:7
234:10 235:20
236:20,24 241:18
241:22 242:9
264:25 371:10
372:7,22,25 373:5,7
373:11,16 374:9,18
374:22 375:5,13,19
376:21 377:15,21
377:25 378:10,16
379:10 380:21,24

383:19 385:16
386:23 387:2,12,15
387:19,22 388:25
389:6,25 390:7,12
391:13,18 392:11
392:18 393:12,15
393:22 394:8,19,21
395:7,9 397:15
401:19 402:4,19
403:2,23 404:18,21
406:4 407:8 408:17
408:21 409:16,21
410:23 411:11,23
413:7 414:16,23
415:5,22 416:6
417:17 421:16,19
421:23 422:17
424:23 425:6
426:14,23 427:6
429:20 430:13
436:18 439:24
440:8,11,14,17,20
**word**
61:6 111:21 154:19
276:15 322:19
347:20
**wording**
335:2
**words**
29:22,24 171:10
192:6,8,16,18
251:11 302:11
305:12 360:24
417:22
**work**
10:18 12:6 14:7,11
20:8 27:6 34:21
36:5 37:2 38:20
40:8,10 41:4 42:7
42:23 43:20 46:20
48:3,5,6 49:12,13
49:16,17,24 53:7
54:5,13,18 68:15,17
70:10,16 80:23 81:4
81:7,13,14 82:7,25
83:7 85:8 91:21



92:3 93:14 95:6,25
102:2,13,24 105:22
106:3,5,7,22,24
107:4,5 109:9,24
110:10,13,14,18
112:10 113:9,12
114:10 115:22
122:21,25 123:6,8
127:2,18,20,23
128:3 130:22,25
136:10 143:21
173:5 177:17
178:15,20 179:7,13
179:14 190:2,18
191:8,12,14 196:16
209:12,23 210:3,17
215:7 225:16 226:8
227:24 229:25
238:18 239:16
252:12,13,19
261:17,25 265:16
265:21 269:19,23
274:18 275:12
277:11,18 278:5
294:18 295:9,23
297:7,17 303:22
304:2 308:3 309:3
310:22 311:4,10
314:12 321:10
337:17 338:6,20,24
339:4,11,15 342:9
342:13 352:21
354:4,6 357:16
364:2 371:10 379:3
382:11 407:4
413:16,16 421:5,7
422:19 427:15,25
428:9,25 429:3,16
429:22 430:4
**work-related**
190:25 191:5
**worked**
27:17,24 36:8,16
  38:5 40:13 50:14
  54:8 66:9,18 67:8
  67:12 68:18 111:4

115:6 122:25 127:6
131:19 132:3 177:4
177:14 196:19
219:20 258:17
264:4 265:22 301:8
321:13,20,23
323:15,17,24 324:5
339:19 340:9
371:17 372:15
**working**
23:12,16 25:14,23
  26:8,12,16,25 27:3
  36:7,11 37:7 40:17
  40:20,22 41:22,24
  42:11,14 43:4,7,14
  44:10,12,15 45:20
  49:22 50:4,9 53:22
  53:25 54:14,19 64:5
  67:4 68:10 69:9,17
  69:18,23 86:7,19,20
  95:19 97:12 106:16
  106:20 114:17
  127:9 135:10,13,24
  136:7 172:22 178:9
  194:23 197:13
  203:22 207:21
  217:19 227:16
  245:9 246:2,8 252:8
  265:15,24 269:19
  297:2 310:11
  323:13 324:17
  325:2 355:3 371:19
  374:13,23 388:15
  391:21 413:22
  419:22
**workloads**
354:3
**works**
131:17 209:19 304:8
  322:2 342:2 344:14
  345:4 346:21
  347:13 362:16
**world**
214:4 392:18 406:13
  407:5 414:18,25
  415:23

**world's**
323:21
**worries**
122:4
**worry**
411:25 414:8
**worth**
141:7
**wouldn't**
26:5 83:10 151:11
  152:16 157:6
  180:25 188:20
  210:9 259:17 264:8
  316:18 344:12
  360:16 371:3
**write**
22:20 60:2,9 61:17
  61:21 86:5 87:4,25
  93:10 94:7 102:22
  117:15,21 118:5,8
  118:15,23 128:22
  129:14,18,24 133:9
  133:15,17 134:2,9
  134:18 135:11
  136:24 137:5
  143:19 144:6 145:6
  145:13 146:8,15
  147:8 148:11
  151:15 153:22
  154:24 156:7
  158:20 161:13,23
  163:3 164:8 165:16
  166:12 168:2
  169:23 224:25
  225:6 226:15
  227:22 228:10
  230:8,15 238:14
  242:19 244:22
  245:13 246:14
  247:9 253:21,23
  254:18,25 260:17
  263:4,18 266:9
  272:7 285:18 286:5
  286:13 290:9 294:6
  294:16 295:13
  296:6,25 297:20

298:17 299:4
300:14 304:10
308:8,25 309:4
312:7 328:8 341:7
341:12,22 344:7
350:21,24 363:3
373:13,24 374:2,3,9
375:24 376:14
377:8 378:25
381:20 385:22
386:24 387:24,25
389:3,15 390:5,22
391:14,15,23 392:7
392:9,12,17,22
393:8,15,21 395:4,8
395:10 397:17
398:9 399:8,13
402:11,19 403:7
404:5 405:9 406:12
408:16,21 410:10
410:18 411:4,13,24
412:10,18 413:13
414:3,7 415:16,24
416:24 417:4,11
418:20 423:20
424:3,14 425:8,13
426:24,25 427:24
429:25 430:3
**writer**
104:22
**writes**
20:16 22:16,23 84:17
  86:12 87:13 88:20
  91:17,19,22 93:5
  94:11 102:7 103:4
  104:15 105:8 118:5
  118:12 132:9 133:6
  133:20 134:10,11
  135:4,9 136:21
  137:3 141:24
  143:17,24 145:10
  146:9 147:22
  148:10,13 153:20
  155:8 156:3 157:11
  157:16 158:13
  160:22 161:5 162:5



162:10 164:3,4
166:6,8,15 168:8
169:8,15,25 182:6
182:21 183:3
202:12,15 211:25
213:23,24 214:5
221:19 222:2
224:23,25 225:20
228:10 230:17
231:9 238:13
245:13,20 246:13
247:5 251:16,20
260:24 263:17
264:16 268:4 304:6
305:25 306:6,24
308:2 309:15,19
310:21 312:2,15
314:9 319:14
341:19 352:20
354:20 367:25
369:13 373:14
375:5 377:12
383:20 386:23
387:2 388:25
389:25 391:13,19
392:14,19,20 393:2
393:4,12 395:9
398:8 403:23 406:4
406:11 408:18,21
409:16 410:4,23
411:3,11 412:16,22
413:10,20 414:16
415:22 416:6,12
418:12 422:17
423:9 424:4,16
425:6 426:14,24
427:6,11,13 428:5
429:20 430:13

**writing**
63:12 82:24 141:4
340:13 364:2

**written**
37:15,17,18 47:4,22
47:23 62:13 82:24
95:15 112:6,9
131:23 151:17

152:11 165:2
183:22 204:10
237:9,11,13,15
258:4,20 261:13
296:22

**wrong**
74:19 123:22,25
140:11,14 196:9
216:22 217:24
218:3 280:13 314:9
422:4

**wrote**
57:25 58:5 62:4
120:18 132:20
145:23 167:9,15
188:14 226:23
227:12 230:18
246:19 247:15
260:9 293:22 294:2
295:19,22 296:4
298:2,7 300:24
302:17,22 306:25
328:10 342:2
344:13,24,24
351:16 362:15
376:23,24 378:5
379:11,17,21 389:5
389:6,17 390:7
392:11 393:14
395:21 396:25
401:18 403:14
405:12,23 414:23
415:5,9 427:12
428:7,8 429:2
430:18,19

**Wyn**
232:4,16,23 233:16
241:8,9 436:17

---
## X
---

**x**
1:4,11 432:3,10
433:3 434:3 435:3
436:3 437:3 438:3
439:3 440:3

---
## Y
---

**Yards**
1:15 2:4 3:12

**yeah**
8:12 19:25 27:16,20
28:8,17 29:10 36:13
39:6,15 43:9 63:6
67:15,18,22 71:7
74:17 75:17 100:6
102:5 105:20 108:5
108:11 123:15
125:10 128:18
129:8 134:9 136:21
148:21 155:25
161:4 177:9,13
178:2 180:8,17
187:11 190:8 200:2
200:2 204:2 208:22
209:6 220:7 221:3
225:19 229:13
238:24 243:9
246:17 247:3
252:11 269:17
278:6 282:6 283:8
287:15 291:7
295:12 308:15,23
317:8 318:11 320:8
326:18 327:12
335:16 345:15
350:5 357:22 364:4
364:23 365:2,13
374:21 385:21
397:16 408:21
421:7 423:9

**year**
6:4 44:11 55:2 60:4
105:18 176:15
233:14 234:13
266:2 342:2 344:14
344:18 345:2,4
346:21 347:13,22
373:16,18 399:9

**years**
27:15,18 28:2 56:14
56:14 118:13

122:13 123:2
130:15,21 135:8,9
135:11,13 136:2
192:23 207:9
219:15,20 233:4,15
234:22,24,24 235:3
235:13,21 236:9
245:10 295:22
324:6,19 335:25
353:5,22 354:6,12
355:3 371:11
413:21

**yesterday**
4:25 7:6,11 8:9,11
17:9,13 18:6,14
19:4 21:9,17 25:2
201:18 260:10,19
290:23 291:3 336:6
336:7,11 371:15

**yesterday's**
292:2

**York**
1:3,16,16,18 2:5,5
3:12,12

**Yorker**
91:3

**YouTube**
117:9 118:9

---
## Z
---

**Zach**
2:6 4:8

**zero**
126:10 129:20

**ZIP**
270:14,17 282:22

---
## 0
---

**000139172**
137:20,24 434:22

**019**
401:14

**023**
402:11

**026**
403:23



**072**
104:10,11
**074**
242:14
**076**
243:11
**077**
245:13
**082**
405:3,4
**083**
247:10
**085**
250:24
**09**
404:25
**097**
253:21 410:4
**098**
410:2

---

**1**

**1**
3:4 17:19,20,21 18:2
   28:24 38:16 84:5,9
   91:6 148:19 163:11
   163:16 164:15
   165:2,11 182:22
   432:13 433:17
**1-BM**
148:14
**1-M**
163:6 164:4 313:12
**1.12**
366:3
**1.5**
118:13
**1/12**
347:18
**1:01**
141:4
**1:18**
139:3,7
**1:23-cv-04305(AS)**
1:7
**1:55:22**

21:23 22:10
**1:58:05**
22:23
**10**
21:12 92:19,23
   121:14,21,25
   137:23 233:3,15
   234:22,23,24 235:3
   235:13,20 236:9
   313:14,19 362:7,12
   430:5 432:16
   433:18 434:15,21
   439:13
**10-year**
235:6,22,25 236:15
**10:00**
319:20
**10:17**
1:16 3:9
**10:20**
319:8
**100**
2:9 310:21 353:21
**100-K**
229:18
**100,000**
38:14 95:5 229:24
   324:2 325:16 364:7
   366:15,20,23,24
**10001**
2:5 3:12
**101**
433:21
**103**
434:6
**10th**
21:20 364:20 365:8
   365:11 439:18
**11**
101:13,14,19 187:18
   187:25 433:21
   435:23
**11:13**
117:12
**11:14**
78:14

**11:31**
78:17
**111230**
293:18
**116**
434:9
**118**
251:18,19
**119**
434:12
**12**
55:3 103:24,25
   352:24 434:6
**12:30**
138:13,14
**12:46**
341:8
**120**
39:20
**120,000**
39:21
**121**
418:12 434:15
**123**
419:20
**126**
18:22
**127**
91:17
**129082**
405:5
**13**
27:15 116:20,21,25
   355:19 434:9
**130496**
140:18
**131**
434:18
**134003**
232:11
**134279**
422:9
**137**
434:21
**13th**
352:17

**14**
59:10 62:3 119:10,11
   119:15 131:5,11
   168:21 169:3 181:6
   210:23 433:6
   434:12,18 435:14
   436:12
**140**
128:20 434:23
**14th**
59:14 181:11 211:5
**15**
121:14,18 169:19
   184:12 434:15
   435:15
**156**
435:6
**157**
132:9 435:9
**159**
133:5
**15M**
141:8
**16**
126:16,17 352:13
**163**
134:2
**17**
1:16 3:8 57:3,11
   131:5,9,21 185:22
   288:5,10 377:19
   432:13,21 434:18
   437:25 440:6 442:7
**1746**
71:24
**17th**
58:16 184:18 293:22
   377:25 380:4
**18**
110:8 131:21 137:22
   139:13 303:12,18
   438:8
**180**
435:11
**184**
435:15



**187**
435:18
**19**
70:24 101:14,20
  110:9 139:25 140:2
  140:6,16 267:14
  285:10,14 311:16
  328:8 329:19,21
  330:4,17 433:12,21
  434:23 437:15,20
  438:11
**190**
102:6
**193**
436:6
**196**
102:22
**1985**
294:9
**1985/06/07**
294:13
**19th**
71:4 267:18 269:25
  311:22

---
**2**
---

**2**
21:7,11,12 67:7
  71:14 119:11,17
  140:2,8,20 150:11
  150:19 299:4 359:8
  359:13 366:3,4,6
  367:2 432:16
  434:12,23
**2:37**
219:5
**2:55**
219:8
**20**
156:16,20 294:5
  421:11 435:6
**200**
350:18 436:9
**200-M**
349:24 350:14,18
**20006-6801**

2:10
**2004**
6:5
**2007**
66:11
**2009**
66:11,20
**2010**
67:9
**2011**
25:12,20,24 26:10
  27:10,15 66:20
**2014**
26:20 67:9,14
**2015**
26:15 28:18,25 36:12
  37:8 43:8,11 67:14
  67:16,20
**2016**
44:16,17,22,25 45:6
  45:10 72:5,15,20
  73:2,5,13 74:6 96:2
  105:23 294:17
**2017**
67:17 96:8,9,12
  105:23 109:14
  110:3,8 120:25
**2018**
96:16 109:17 110:22
  119:11,17 120:21
  434:12
**2019**
109:20 110:3,22
  121:14,21,25
  434:15
**2020**
36:14 39:5 40:21
  44:4,13,14 64:14
  67:24 72:24 73:21
  112:13 154:6 259:7
  303:23 327:21
  328:3,15 349:13,18
  351:17 372:20,25
  377:20,25 380:4
  387:11,16 390:18
  404:17,22 438:21

439:6,22 440:6,12
  440:15
**2021**
17:22 18:19 57:3,11
  58:16,20,24 80:10
  80:24 82:14 84:5,9
  89:25 91:14 92:20
  92:25 101:15,20
  103:17 104:2,7
  116:21 117:4 140:2
  140:8,20 150:11,19
  156:16,22 158:5,9
  168:22 169:3
  170:11 176:15
  180:21 181:6,12
  184:13,18 185:22
  186:3 219:25 220:6
  237:2,7 259:7
  317:15,20 380:20
  380:25 381:14,25
  382:18 383:11
  432:13,21 433:17
  433:18,21 434:6,9
  434:23 435:6,9,14
  435:15 438:14
  440:9
**2022**
21:13,20 33:7 41:18
  41:23 42:12 47:14
  47:16,20 48:17 49:5
  51:3,12 62:8,9,10
  62:12,15,24 63:5,7
  63:10 64:12,15
  65:15,18,22 67:20
  67:25 68:8 69:3,3,4
  126:3,9,17,20
  128:16 136:3,8,17
  187:18,25 193:11
  193:16,24 199:9
  220:20 221:12,17
  223:25 224:19
  229:2 232:5,19
  233:21 236:21
  237:24 238:4
  240:23 241:4 242:7
  252:9 253:12,18

259:20 260:2
  262:11,18,25
  266:20 267:14,19
  268:2 269:15
  271:18 285:10,15
  288:5,10 293:22
  294:5 303:12,18
  310:12 311:16,22
  340:19,24 342:10
  352:13,17 355:19
  420:14 421:15,20
  432:16,20 435:23
  436:6,15,19,22,23
  437:6,9,12,15,17,20
  437:25 438:8,11,24
  440:18
**2023**
16:17 59:10,15 60:19
  62:3,18,23 63:20
  70:25 71:4 201:2,10
  203:25 204:3,23
  210:24 211:5
  217:12 266:2
  334:21 361:14,17
  362:8,12 364:20
  365:8,12 367:19,22
  385:7 433:6,12
  436:11,12 439:10
  439:13,18,19
**2024**
1:16 3:9 16:6,13
  105:19 131:5,12
  434:18 442:7
  443:11
**2099**
2:9
**20th**
268:2
**21**
158:4,7 176:18
  221:12,16 317:15
  317:20 432:16
  435:9 436:15
  438:14
**210**
436:12



**22**
80:9 127:16 132:2
    168:21,25 240:23
    259:20 260:2
    327:20 436:23
    437:9 438:21
**221**
436:15
**22nd**
241:3 328:2
**22s**
80:8
**23**
181:4,8,9 237:24
    238:3 435:11
    436:22
**231**
143:24 293:21
    436:17
**232,509**
80:16
**237**
436:20
**24**
184:12,16 361:13,17
    435:15 439:10
**24/7/365**
354:6
**240**
436:23
**25**
187:14,20 205:13
    206:3,23,25 207:12
    207:13,15,18 208:5
    435:18
**253**
437:6
**259**
437:9
**26**
193:11,15,15 262:18
    436:6 437:12
**261**
327:5 328:8 329:3,8
    329:13,18
**262**

437:12
**267**
437:15
**26th**
262:24
**27**
116:21 117:3 200:24
    201:4 387:10,16
    430:21 434:9 436:9
    440:12
**271**
437:17
**28**
71:24 210:23 211:2,3
    421:14 436:12
    440:18
**285**
437:20
**287**
437:23
**28th**
421:20
**29**
221:12,15 290:12
    404:16,22 436:15
    440:15
**292**
438:6

_____
                  **3**
_____
**3**
50:23,25 51:2 66:7
    156:16 205:4
    291:11 299:15
    340:19 432:19
    435:6 438:24
**3-M**
290:13
**3:38**
84:14
**3:48:15**
57:18
**3:48:47**
57:25
**3:53**
273:19

**30**
40:22 137:20 232:3
    237:19 436:17
**30(b)(6)**
3:5 4:2
**30,000**
80:19,25 81:5 82:25
    83:6,13,18
**300**
390:25
**300-K**
60:4 429:22
**300,000**
55:2 56:13
**303**
438:8
**308**
426:14
**30th**
57:21 58:8
**31**
201:2,10 204:22
    237:21,22 290:11
    436:11,20
**311**
438:11
**317**
438:14
**32**
240:23 241:2 436:23
**321**
438:18
**326**
438:20
**327**
438:21
**33**
253:12,15 347:7,9
    437:6
**33,333**
342:3 344:14 345:5
    346:22 347:4,14,18
    348:3
**34**
259:20 437:9
**340**

438:24
**349**
439:6
**35**
262:18,23 437:12
**351**
439:9
**36**
267:14,17,17 279:22
    347:7,8 437:15
**36,333**
341:9 344:5 347:3,10
**36,363**
342:18
**361**
439:10,13
**364**
439:16
**367**
439:19
**37**
271:18,22 437:17
**372**
422:5,6,7,12 439:22
**374**
422:25
**377**
440:6
**378**
425:5
**379**
426:13
**38**
285:10 290:6 437:20
**380**
440:9
**386**
93:5 440:12
**389**
429:20
**39**
154:14 288:3,7
    437:23
**3rd**
156:22 157:3 269:15
    340:24



**4**

**4**
56:25 57:2,3,7
103:25 104:6
169:11 183:5,12,15
432:7,21 434:6
**4-M**
233:9
**4:11**
273:22
**4:14**
277:7
**4:18**
277:10
**4:38**
383:19
**40**
40:10,22,25 210:17
293:5,8,11 312:16
407:19 409:12
438:6
**400**
347:18 390:25
**400-K**
342:2 344:13 345:4
346:21 347:13,17
347:22
**400,000**
344:18 345:2 348:2
**402**
158:12
**404**
440:15
**406**
160:22 161:2,3
**41**
303:12,16 438:8
**41,666**
233:20
**410**
163:3
**412**
167:16
**42**
311:16 438:11

**421**
440:18
**43**
317:15,19 438:14
**433**
285:18
**437**
290:9
**44**
322:7,10 438:18
**449**
286:5,8,9
**45**
326:12,13,16 438:20
**45,000**
203:7
**46**
327:20,24 438:21
**47**
340:19,22 438:24
**48**
349:12,16 439:6
**49**
352:8,9 439:9
**497**
140:25 141:2
**499**
141:23

**5**

**5**
17:21 59:8,9,10 64:2
271:18 432:13
433:6 437:17
**5:11**
147:7
**5:19**
340:4
**5:36**
202:10
**5:39**
340:7
**50**
40:23 226:15 361:13
383:14 432:19
439:10

**50-K**
94:12,13 312:17
**50,000**
42:20 95:5 236:25
237:6
**500-K**
164:4 165:7
**500,000**
233:14 234:13
**503**
143:16 240:2
**51**
362:6,7 439:13
**5131**
19:5
**5137**
20:14
**514**
148:10
**516**
148:23
**518**
151:15 373:7,8
**52**
365:5,6 439:16
**52022**
271:25
**522**
375:5
**525**
263:16
**526**
120:6
**53**
367:17,18 439:19
**533**
264:16
**534**
153:20
**537**
154:4
**54**
372:19,20,24 439:22
**540**
154:23
**541**

155:7
**547**
381:5
**55**
1:15 2:4 3:11 377:19
377:23 440:6
**555**
378:5 381:20
**56**
380:18,19,23 432:21
440:9
**560**
383:19
**563**
385:16
**564**
378:23
**57**
387:9,10,14 401:11
440:12
**577**
386:23
**58**
404:15,16 440:15
**59**
421:13,14 433:6
440:18
**5th**
18:18 91:13

**6**

**6**
64:20,21 80:10,24
92:19 126:17,20
300:10 372:20,25
433:9,18 439:22
**6/8**
140:9
**6:00**
60:2
**6:02**
60:13
**6:23**
202:11
**6:43**
401:6



**6:58**
401:9
**60**
325:3
**608**
341:7 342:7
**624-6221**
1:25
**64**
433:9
**682**
57:15
**6th**
80:3 92:25

─────── **7** ───────
**7**
38:16 70:20,22,23
349:12,18 351:17
380:19,24 433:11
439:6 440:9
**7:25**
431:12,14
**70**
433:11
**705**
365:19
**708**
365:14,16
**72**
421:24
**75**
203:8
**75-M**
169:18 182:16 183:4
**75,000.PDF**
202:7
**75506**
79:2
**760**
304:6
**761**
305:25
**78**
433:13
**781**

351:9,13
**79**
422:3
**792**
51:19
**799**
54:24

─────── **8** ───────
**8**
38:16 78:20,21 120:6
140:13 253:12,18
433:13 437:6
**80**
38:11 246:12
**8071**
141:24 142:4,17,22
142:25 143:4,7
**81**
328:7,11,15,22,25
330:3
**82**
247:4 405:2
**83**
433:15
**84.3**
182:24
**85**
428:22
**86**
100:9
**866**
1:25
**874**
312:2
**875**
312:14
**877**
313:10
**88**
325:3
**891-7919**
120:6

─────── **9** ───────
**9**

84:2,3,8 158:4,8
193:11,16 367:18
367:22 433:15
435:9 436:6 439:19
**90**
60:3 319:10
**906**
389:14
**914**
84:13
**915**
86:4
**917**
87:3,4
**919**
87:25
**92**
433:18
**920**
88:20
**921**
89:16
**923**
90:7
**941**
224:5,22
**945**
387:19
**948**
224:21
**952**
228:10
**957**
229:15
**958**
388:22
**964**
230:15
**970**
395:4
**971**
231:15
**972**
231:23
**974**
260:6 261:15

**983**
399:13

