# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
RYAN BERRIS,
            Plaintiff,
                        Case No.:
    -against-            1:23-cv-04305(AS)
SUNG-FUNG CHOI (a/k/a NORMAN CHOI),
DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC,
HIN WENG LUI (a/k/a SAMUEL LUI),
GENESIS UNICORN CAPITAL CORP.,

            Defendants.

- - - - - - - - - - - - - - - - - - - x


          Videotaped deposition of NORMAN
    CHOI, taken pursuant to notice, was held
    at the law offices of BOIES SCHILLER &
    FLEXNER LLP, 55 Hudson Yards, New York,
    New York, commencing September 16, 2024,
    10:11 a.m., on the above date, before
    Leslie Fagin, a Court Reporter and
    Notary Public in the State of New York.

                    - - -


    MAGNA LEGAL SERVICES - (866) 624-6221
              www.MagnaLS.com



Page 2

```
 1
 2   APPEARANCES:
 3
     BOIES SCHILLER & FLEXNER LLP
 4   Attorneys for Plaintiff
                 55 Hudson Yards
 5               New York, New York 10001
     BY:         JOHN ZACH, ESQUIRE
 6               KELLY WALDO, ESQUIRE
                 DAVID SIMONS, ESQUIRE
 7
 8   SHEPPARD MULLIN RICHTER & HAMPTON LLP
     Attorneys for Defendants
 9               2099 Pennsylvania Avenue, NW
                 Suite 100
10               Washington, D.C. 20006-6801
     BY:         PAUL A. WERNER, ESQUIRE
11               ALEXANDRA BUSTAMANTE, ESQUIRE
                 HANNAH WIGGER, ESQUIRE
12
13   ALSO PRESENT:
14   DIANA MAJCHER, De Tomaso
15   RYAN BERRIS
16   JEREMY KOVACS, Videographer
       Magna Legal Services
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2          THE VIDEOGRAPHER:  Good morning.
 3     We are now on the record.
 4          This begins videotape No. 1 in the
 5     deposition of Norman Choi in the matter
 6     of Ryan Berris versus Sung-Fung Choi, et
 7     al.
 8          Today is Monday, September 16, 2024
 9     and the time is 10:11 a.m.
10          This deposition is being taken at
11     Boies Schiller Flexner LLP, 55 Hudson
12     Yards, New York, New York 1001 at the
13     request of Boies Schiller Flexner LLP.
14          The videographer is Jeremy Kovacs
15     of Magna Legal Services and the court
16     reporter is Leslie Fagin of Magna Legal
17     Services.
18          Will counsel and all party present
19     state their appearances including who
20     they represent?
21          MR. ZACH:  Starting with the
22     noticing party, John Zach, Kelly Waldo,
23     David Simons for the plaintiff, Ryan
24     Berris, and Mr. Berris is also here.
25          MR. WERNER:  Paul Werner, Sheppard
```



Page 4

                    N. Choi

1
2          Mullin for the defendants with Hannah
3          Wigger, Alex Bustamante and the client
4          representative, Diana Majcher.
5    N O R M A N   C H O I,   called as a
6          witness, having been duly sworn by a
7          Notary Public, was examined and testified
8          as follows:
9    EXAMINATION BY
10   MR. ZACH:
11         Q.   Good morning, Mr. Choi.
12         A.   Good morning.
13         Q.   Have you ever been deposed before?
14         A.   No.
15         Q.   You attended Mr. Berris'
16   deposition, right?
17         A.   Correct.
18         Q.   So the same rules apply.  If you
19   want a break, want a water, just let me know,
20   okay?
21              So what's your current address?
22         A.   I am a resident of Hong Kong.
23         Q.   What is your address in Hong Kong?
24         A.   35A Phase 2, Tower 1.
25         Q.   Where did you grow up?



Page 5

```
 1                    N. Choi
 2         A.    Hong Kong.
 3         Q.    And how far did you go in school
 4    growing up?
 5         A.    University.
 6         Q.    What university did you graduate
 7    from?
 8         A.    University of San Diego.
 9         Q.    What year did you graduate from the
10    University of San Diego?
11         A.    '94.
12         Q.    What was your degree in?
13         A.    In business administration.
14         Q.    After you graduated from University
15    of San Diego, did you pursue any additional
16    degrees?
17         A.    No.
18         Q.    What was your first job after
19    graduating from the University of San Diego?
20         A.    I worked briefly for my father and
21    I started working for Merrill Lynch.
22         Q.    What year did you start working for
23    Merrill Lynch in?
24         A.    '95.
25         Q.    Did you work for them here or in
```



Page 6

```
 1                   N. Choi
 2  Hong Kong?
 3       A.   Hong Kong.
 4       Q.   Your father was a prominent
 5  businessperson in Hong Kong, right?
 6       A.   Define prominent.  I think he did
 7  okay.
 8       Q.   And he was -- he owned numerous
 9  businesses?
10            MR. WERNER:  Object to the form.
11       A.   He owns some businesses.
12       Q.   What sorts of businesses did your
13  father own?
14       A.   The main business is a cold storage
15  warehouse.
16       Q.   If you had to roughly estimate your
17  father's net worth, what would that be?
18            MR. WERNER:  Object to the form.
19       A.   Actually, I don't understand this
20  question.
21       Q.   Do you understand what net worth
22  means?
23       A.   In what value?  I mean, in today's
24  value?  In previous year's value?  I don't
25  want to -- really want to give you a
```



1                    N. Choi

2    straightforward answer.

3        Q.    How about in today's value?

4        A.    I don't have an answer to that.

5        Q.    Would it be fair to say, talking in

6    terms of U.S. dollars, your father was a

7    millionaire?

8              MR. WERNER:  Object to the form.

9        A.    Yes.

10       Q.    Would it be fair to say in U.S.

11   dollars that your dad had more than $15

12   million?

13             MR. WERNER:  Object to the form.

14       A.    Possibly -- I don't -- yeah.

15       Q.    As you sit here today, you can't

16   estimate that?

17       A.    No, I cannot.

18       Q.    When you went to work for your dad,

19   what sorts of job did you do?

20       A.    I was learning.

21       Q.    What was he teaching you?

22       A.    Operation of the business.

23       Q.    Was this the cold storage business?

24       A.    Yes.

25       Q.    I don't know what cold storage is.



Page 8

1                     N. Choi
2              Can you, in layman's terms,
3    describe what that would be?
4              MR. WERNER:  Object to the form.
5         A.    Like a landlord.
6         Q.    What sort of properties did your
7    father own?
8              MR. WERNER:  Object to the form.
9         A.    Real estates.
10        Q.    Was it commercial real estate or
11   residential real estate?
12        A.    Both.
13        Q.    Approximately how many buildings
14   did your father own in Hong Kong?
15             MR. WERNER:  Object to the form.
16        A.    As far as cold storage, at one
17   point, I think over 2.3 million square feet.
18             MR. ZACH:  I'm sorry, I want to
19        make sure, it's being transcribed as
20        code storage or is it cold, as in cold?
21             MR. WERNER:  C-O-L-D.
22             MR. ZACH:  That's what I thought.
23        Q.    Is that for sort of storing
24   perishable items and things?
25        A.    Yeah.



```
 1                    N. Choi
 2       Q.   So your father was a landlord that
 3  held commercial properties that could store
 4  perishable items because it was refrigerated
 5  or what have you?
 6       A.   Yes, correct.
 7       Q.   Setting that aside, he also owned
 8  residential real estate that he rented out?
 9       A.   Yes.
10       Q.   Did that include apartment
11  buildings?
12       A.   Yes.
13       Q.   Approximately how many apartment
14  buildings did your dad own?
15       A.   I don't recall.
16       Q.   At some point, your father was
17  arrested by the Hong Kong authorities, wasn't
18  he?
19            MR. WERNER:  Object to the form.
20       A.   He was invited for interviews.
21       Q.   But there was never any criminal
22  prosecution of him?
23       A.   No.
24       Q.   Did he pay any fines?
25       A.   No, he did not.
```



```
 1                    N. Choi
 2       Q.    Is your dad still alive?
 3       A.    Yes, he is.
 4       Q.    So in 1994, you go to work for
 5  Merrill Lynch.  What sort of work --
 6       A.    '95.
 7       Q.    In 1995, you go to work for Merrill
 8  Lynch.  What are you doing?
 9       A.    Equity derivative.
10       Q.    How long did you work at Merrill
11  Lynch for?
12       A.    Until '99.
13       Q.    Then in 1999, where did you work
14  next?
15       A.    My father's.
16       Q.    How long did you continue working
17  for your father for?
18       A.    A few years.
19       Q.    If you had to estimate when you
20  stopped working for your father, what year
21  would that be?
22       A.    Right around late '99 to 2000,
23  around there.
24       Q.    It was a pretty short period of
25  time that you went to work for your dad?
```



1                    N. Choi

2        A.    Yes.

3        Q.    Same thing, sort of learning the

4    business from him?

5        A.    Yes.

6        Q.    Other than working in your dad's

7    real estate holdings, did you work in any

8    other types of business with him?

9        A.    No.

10        Q.    Where did you go to work after

11    2000, after you left your dad?

12        A.    I never left my dad.

13        Q.    I thought you worked from 1999 to

14    2000?

15        A.    You asked me when I started with my

16    father.

17        Q.    I will ask a better question.

18              What year, starting in 2000, did

19    you work for your dad?

20              MR. WERNER:  Object to the form.

21              I think you might want to try that

22        one again.

23        Q.    What years did you work for your

24    dad?

25        A.    Work, meaning, like, working and



```
 1                    N. Choi
 2  getting paid or what do you mean, working?
 3        Q.    How do you define the term work?
 4        A.    I would say until we finished the
 5  restructuring of the company.
 6        Q.    When was that?
 7        A.    Around '03, '04.
 8        Q.    Where did you go to work after
 9  that?
10        A.    I was -- I spent a long time in
11  Indonesia.
12        Q.    What were you doing in Indonesia?
13        A.    Again, learning from my family.
14              Just so you know, part of my family
15  is from Indonesia.
16        Q.    Was it your mom's side or dad's
17  side that was from Indonesia?
18        A.    Both side.
19        Q.    What sort of business were you
20  learning in Indonesia?
21        A.    Commodity.
22        Q.    Commodity trading or --
23        A.    Actual business, trading is part of
24  it.
25        Q.    Did your family own farms or other
```



```
 1                    N. Choi
 2  sort of commodity creating entities?
 3       A.    We have.
 4       Q.    What sorts of properties did your
 5  family own in Indonesia?
 6       A.    Plantations, mines.
 7       Q.    What sorts of plantations?  What
 8  was growing on them?
 9       A.    Rubber and timber as well.
10       Q.    What would you say would be the
11  yearly revenue from the plantations your
12  family owned?
13            MR. WERNER:  Object to the form.
14       A.    I didn't really look into it.
15       Q.    Were they large commercial farms?
16            MR. WERNER:  Object to the form.
17       A.    I would say sizable.
18       Q.    How many people worked on the farms
19  that were owned by your families?
20            MR. WERNER:  Object to the form.
21       A.    Probably in the hundreds.
22       Q.    They were growing timber and, I
23  don't know how rubber is made, but the sap
24  that makes the rubber?
25       A.    Uh-huh.
```



```
 1                    N. Choi
 2        Q.   In terms of mining, what sorts of
 3   minerals were being mined at your family's
 4   mines?
 5        A.   Coal mining.
 6        Q.   How many coal mines did your family
 7   own?
 8             MR. WERNER:  Object to the form.
 9        A.   I don't recall.
10        Q.   More than one?
11        A.   More than one.
12        Q.   More than five?
13             MR. WERNER:  Object to the form.
14        A.   I mean, they usually go by the term
15   concession.  A few concessions.
16        Q.   How long did you work with your
17   family in these commodity businesses in
18   Indonesia?
19        A.   I learned until '09, around there.
20        Q.   Starting in 2009, what did you do
21   next with your career?
22        A.   I started to look into various
23   investment opportunities.
24        Q.   Were you doing this on your own or
25   were you partnering up with somebody?
```



1                    N. Choi

2        A.    Mostly on my own.

3        Q.    What sort of investment

4   opportunities were you looking to invest in?

5        A.    All sorts.

6        Q.    Was it securities or commodities or

7   did you have an area that you wanted to focus

8   on?

9              MR. WERNER:  Object to the form.

10       A.    Yeah, exactly what you said,

11  commodities, equities.

12       Q.    Did you, in fact, make investments?

13       A.    I have.

14       Q.    Where did you get the money to make

15  those investments from?

16       A.    My family.

17       Q.    So you were investing your family's

18  money?

19       A.    I did.

20       Q.    Approximately how much did your

21  family permit you to invest of their money?

22       A.    There wasn't a specific amount.

23       Q.    When you first started, about how

24  much did you invest?

25       A.    I don't exactly recall the amount.



Page 16

```
 1                    N. Choi
 2      Q.   Was it more than a million U.S.
 3  dollars?
 4      A.   Yes.
 5      Q.   Was it more than 10 million U.S.
 6  dollars?
 7      A.   I cannot say.  I don't recall on
 8  this one.
 9      Q.   Did you have full discretion to
10  invest or did you have to report to your
11  father?
12           MR. WERNER:  Object to the form.
13      A.   You know, it's families, so it's
14  not specifically my father.
15      Q.   Would you have to consult with your
16  family before you made an investment?
17      A.   From time to time.
18      Q.   How long did you invest your
19  family's money for?
20           MR. WERNER:  Objection to form.
21      A.   I did not count the years.
22      Q.   Are you still investing your
23  family's money today?
24      A.   I would say no.
25      Q.   You paused.  Is there something
```



```
 1                 N. Choi
 2  that -- is there some caveat?  Are you
 3  indirectly investing your family's money
 4  today?
 5             MR. WERNER:  Object to the form.
 6      A.   No, I just wanted to answer with a
 7  clear, basically a clear answer so I thought
 8  about this and took a pause and think.
 9      Q.   When did you stop investing your
10  family's money?
11      A.   There wasn't a date on this one.
12      Q.   Can you roughly estimate in time
13  when you stopped investing your family's
14  money?
15      A.   I mean -- I don't have a
16  recollection or any specific -- I don't
17  recall any specific date as to what you are
18  referring to.
19      Q.   What was the last investment that
20  you invested in that included your family's
21  money?
22             MR. WERNER:  Object to the form.
23      A.   That wasn't a clear definition on
24  what's last.
25      Q.   I'm talking about in time.
```



Page 18

1                          N. Choi

2        A.    I don't have a time for you.

3        Q.    You can't estimate?

4        A.    No.

5        Q.    But at some point, you stopped

6    investing your family's money?

7        A.    I wouldn't say characterize as in

8    stop at some point, so maybe it's sometime in

9    the future, I need something, I can ask.

10       Q.    That's fine, I get that, but right

11   now, as we are sitting here today, you are

12   not investing your family's money anymore?

13       A.    No.

14       Q.    So between when you stopped

15   investing your family's money and today, what

16   were you doing?

17       A.    Do you have a specific time?

18       Q.    You don't know when you stopped

19   investing your family's money -- let me break

20   it down.

21            At some point after you stopped

22   investing your family's money, did you start

23   doing other activities on your own to earn

24   money?

25            MR. WERNER:  Object to the form.



Page 19

1                    N. Choi

2        A.    Like I said, I mean, if any time I
3    need help, I would ask.

4        Q.    So what would you describe --
5    before you were involved with Apollo, what
6    were you doing?

7        A.    I was investing.

8        Q.    You were investing your family's
9    money?

10       A.    Yes.

11       Q.    You went from investing your
12    family's money to working in the car
13    business?

14       A.    Yes.

15       Q.    How did you get interested in the
16    car business?

17       A.    Always like cars.

18       Q.    Did you have cars growing up?

19       A.    Starting with my grandfather.

20       Q.    How did you make the decision to
21    start working in the car business?

22       A.    It was an opportunity that
23    presented to me.

24       Q.    What was the opportunity that was
25    presented to you?



Page 20

1                    N. Choi

2        A.    A company, a very well-known

3   company went into liquidations.

4        Q.    What was the name of the company?

5        A.    G-U-M-P-E-R-T.

6        Q.    When you saw that Gumpert had gone

7   into liquidation, you decided to invest in it

8   or to take it out of liquidation?

9             MR. WERNER:  Objection to form.

10        A.    I looked into it, yes.

11        Q.    What did you ultimately decide to

12   do with Gumpert?

13             MR. WERNER:  Object to the form.

14        A.    Ultimately decide?

15        Q.    Yes.

16        A.    You mean in terms of restructuring

17   it?

18        Q.    Did you decide to buy it or decide

19   to take action with it after you saw it was

20   in liquidation?

21             MR. WERNER:  Object to the form.

22        A.    Yes.

23        Q.    What did you do?

24        A.    First of all, you have to negotiate

25   and work with the liquidator and see what



Page 21

```
 1                    N. Choi
 2   kind of ultimate price.
 3       Q.    How much did you ultimately pay for
 4   Gumpert?
 5            MR. WERNER:  Object to the form.
 6       A.    Approximately 2 million, something
 7   like this, 2 to 2-1/2.
 8       Q.    And the currencies are changed in
 9   some of the documents so would that be U.S.
10   dollars or Hong Kong?
11       A.    U.S. dollars.
12       Q.    Was that money your own or were
13   there other people that went in to buy with
14   you?
15            MR. WERNER:  Objection to form.
16       A.    My own.
17       Q.    What did you do with Gumpert after
18   you bought it?
19       A.    We relaunched the brand and changed
20   the name.
21       Q.    What did you change the name to?
22       A.    To Apollo.
23       Q.    Who did you do that with?
24            MR. WERNER:  Object to the form.
25       A.    Myself.
```



```
 1                    N. Choi
 2        Q.    Do you know an individual named
 3   Michael Choi?
 4        A.    I do.
 5        Q.    Who is Michael Choi?
 6        A.    A friend of mine.
 7        Q.    Where is he a friend of yours from?
 8        A.    Hong Kong.
 9        Q.    What is Michael Choi's profession
10   as you understand it?
11             MR. WERNER:  Object to the form.
12        A.    He was a prominent family in Hong
13   Kong.
14        Q.    You would agree that you were born
15   into a prominent family as well, right?
16             MR. WERNER:  Object to the form.
17        A.    In my -- sure.
18        Q.    Did you know Michael Choi growing
19   up?
20        A.    I've known him for about 30 years.
21        Q.    I didn't ask, what year were you
22   born?
23        A.    '72.
24        Q.    So you've known him since you
25   were -- I'm trying to do the math.
```



Page 23

1               N. Choi

2          MR. WERNER:  That's always a

3      problem for lawyers.

4          MR. ZACH:  I know.

5     Q.    Your early 20s?

6     A.    Yeah.

7     Q.    Where did you meet him?

8     A.    Hong Kong.

9     Q.    Have you ever partnered with

10  Michael Choi in business activities?

11    A.    Some.

12    Q.    What business activities have you

13  partnered with Michael Choi in?

14    A.    I remember I co-invest in

15  properties, both commercial and real estate

16  -- excuse me, and residential and also with

17  his family in restaurants.

18    Q.    Was that in Hong Kong or elsewhere?

19    A.    Hong Kong.

20    Q.    Other than investments in Hong Kong

21  in property and restaurants, did you have any

22  other business dealings with Michael Choi?

23    A.    Any particular dealings that you

24  are talking about?

25    Q.    I'm asking you, I don't know, I'm



Page 24

```
 1                    N. Choi
 2   trying to make sure I understand -- what I'm
 3   trying to do is exhaust all of the business
 4   activities that you have done with Michael
 5   Choi.
 6        A.    Uh-huh.
 7        Q.    So I guess what I'm asking you is
 8   other than those that you've listed, did you
 9   have any other business activities with Mr.
10   Choi?
11            MR. WERNER:  Objection to form.
12        A.    Those are the major ones.
13        Q.    Did you ever work with Michael Choi
14   to decide where to invest your family's
15   money?
16        A.    We talk about it sometimes.
17        Q.    Did you ever decide to jointly
18   invest in the same stock or other asset?
19            MR. WERNER:  Object to the form.
20        A.    Like I mentioned, properties,
21   restaurants, those are the main ones.
22        Q.    That's fair.
23            Did you ever invest in securities
24   or other non-real estate properties?
25            MR. WERNER:  Object to the form.
```



1                    N. Choi
2        A.   You mean jointly?
3        Q.   Yes.
4        A.   No.
5        Q.   When did you first meet Ryan
6    Berris?
7        A.   2015 February.
8        Q.   Was Michael Choi an investor in
9    Apollo?
10       A.   He is not.
11       Q.   Was he ever an investor in Apollo?
12       A.   He was not.
13       Q.   Was he ever an investor in De
14   Tomaso?
15       A.   He is not.
16       Q.   I'm handing you what I have marked
17   as Choi 1.
18            (Choi Exhibit 1, email from Tom Kim
19       to Michael Choi, marked for
20       identification.)
21       Q.   Mr. Choi, I'm showing you a
22   document that was produced to us in this
23   discovery.
24            You see it's an email from Tom Kim
25   to Michael Choi?



Page 26

1                        N. Choi

2          A.    Uh-huh.

3          Q.    Who is Tom Kim?

4          A.    A high school friend of Michael.

5          Q.    Are you acquainted with Mr. Kim?

6          A.    Acquainted, meaning?

7          Q.    Do you know him?

8          A.    I know of him.

9          Q.    Are you friends with Tom Kim?

10         A.    At one point, I consider that he

11    would be acquaintance/friends, although not

12    very close.

13         Q.    You see this document appears to be

14    a photograph that was taken of a computer

15    screen?

16         A.    Yes.

17         Q.    Did you take this photograph?

18         A.    I did not.

19         Q.    Do you know who took this

20    photograph?

21         A.    I don't know.

22         Q.    You see here that Tom Kim is saying

23    to Michael Choi that you wired $800,000 from

24    Hong Kong and 40,000 from NGCG which equals

25    $840,000.



Page 27

 1                    N. Choi

 2          Do you know what NGCG is?

 3     A.    It was Tom Kim's company.

 4     Q.    What was Tom Kim's company involved

 5 in?

 6     A.    I don't know on this one.

 7     Q.    As regards to the build of cars,

 8 Ford equals 100,000; Roush equals 75,000 and

 9 Gemini equals 65,000.

10          Do you see that?

11     A.    Uh-huh.

12     Q.    You see the subject to this title

13 is De Tomaso, correct?

14     A.    Right.

15     Q.    Does this suggest to you that Mr.

16 Choi had any financial involvement in De

17 Tomaso?

18          MR. WERNER:  Object to the form.

19     A.    Which Mr. Choi?

20     Q.    Sorry, fair enough.

21          That Michael Choi, who we've been

22 talking about.

23     A.    Uh-huh.  No.

24     Q.    So you've always been the owner of

25 Apollo, right, since --



Page 28

                          N. Choi

1

2      A.    Are we talking about Apollo or De

3  Tomaso now?

4      Q.    Talking about Apollo.

5            Since you bought Gumpert out of

6  liquidation and renamed it Apollo, you have

7  been the CEO since the time until you sold

8  it?

9      A.    Yeah, I'm the owner.

10     Q.    You would have been the owner in

11 2017 when this email is dated, right?

12     A.    The subject is De Tomaso, but you

13 asked me about Apollo.

14     Q.    At some point, you also bought the

15 rights to De Tomaso, right?

16     A.    Correct.

17     Q.    You can put that aside.

18           I would like to show you another

19 document which I will mark as Choi 2.

20           (Choi Exhibit 2, list of

21           shareholders of Apollo, marked for

22           identification.)

23     Q.    Do you recognize this document?

24     A.    Where is this document from?

25     Q.    You produced it.  I don't know.



1                   N. Choi
2        A.    I produce it?
3        Q.    You see in the bottom right, it
4   says DT?  That's a Bates number and that
5   means that it was produced by you and your
6   lawyers, not you, but by De Tomaso.
7        A.    Okay.
8        Q.    Do you recognize this document?
9        A.    I don't recall seeing this, but
10  okay, you can ask me questions.
11       Q.    Just one second.
12             If you turn to the second page
13  which says DT, it ends in 49, there is a list
14  of shareholders?
15       A.    Uh-huh.
16       Q.    Those shareholders -- do those
17  strike you as the shareholders of Gumpert and
18  Apollo?
19       A.    Yes, I guess this is from a public
20  document.  I just want to make sure we are
21  aligned.
22       Q.    I don't know because it says draft
23  on it.
24       A.    Yeah.
25       Q.    It was produced to your team by us



Page 30

```
 1                    N. Choi
 2  so I didn't make this document, but it looks
 3  like...
 4            MR. WERNER:  Just to be clear, it
 5       looks like there is an additional 48.
 6       It's an exhibit that you introduced as
 7       four pages and I think you just want the
 8       -- I assume you just want three or it
 9       doesn't -- whatever you want, but it
10       looks like you have the first page
11       twice, at least in what you handed me.
12            MR. ZACH:  That's just a bad
13       photocopy.
14            MR. WERNER:  It should be 48
15       through 50 right.
16            MR. ZACH:  Yes, sir, that's right.
17       Q.    This looks like a list of
18  shareholders for Apollo, right?
19       A.    Yes, it appears.
20       Q.    You see one of the entities that's
21  listed there is Ideal Team.
22            That's an entity you own, right?
23       A.    Correct.
24       Q.    Then if you look at that list, you
25  see there is an entity called Best Advisory
```



Page 31

```
 1                  N. Choi
 2  Investments Limited, it's the fourth down?
 3       A.    Are we talking about the third
 4  page?
 5       Q.    I'm on the second page, the list of
 6  shareholders.  The fourth down says Best
 7  Advisory Investments Limited.
 8             Do you see that?
 9       A.    Uh-huh.
10       Q.    So that was one of the investors in
11  Apollo, along with you, was Best Advisory
12  Investments Limited, right?
13       A.    Uh-huh.
14       Q.    If we turn to the note, it
15  references a note on page 3.  It says, To the
16  best of the knowledge, information and belief
17  of the directors, after having made
18  reasonable inquiries, Best Advisory
19  Investments Limited is a subsidiary of Sunwah
20  Kingsway Capital Holdings Limited, a company
21  listed on the Stock Exchange.
22             Do you see that?
23       A.    Yes.
24       Q.    Isn't it true, sir, that Michael
25  Choi is -- operates the Kingsway Capital
```



Page 32

```
1              N. Choi
2  Holdings Limited?
3          MR. WERNER:  Object to the form.
4      A.   He is a CEO, yeah, of the company,
5  yes.
6      Q.   So you would agree with me that at
7  least through the entity of Best Advisory
8  Investments, Michael Choi was investing in
9  Apollo, correct?
10          MR. WERNER:  Object to the form.
11      A.   That's not really correct because
12  Kingsway is a listed company in Hong Kong and
13  it's owned by another holding company listed
14  in Canada.
15      Q.   I understand it's listed, but you
16  would admit that Michael Choi is the CEO of
17  Kingsway Capital Holdings, right?
18          MR. WERNER:  Object to the form.
19      A.   Yes.
20      Q.   And that Kingsway, one of Kingsway
21  Capital Holdings subsidiaries is Best
22  Advisory Investments, at least to the best of
23  your knowledge?
24          MR. WERNER:  Object to the form.
25      A.   Yes.
```



Page 33

```
 1                    N. Choi
 2       Q.    And that Best Advisory Investments
 3   Limited is, in fact, invested in Apollo,
 4   correct?
 5            MR. WERNER:  Object to the form.
 6       A.    Yes.
 7       Q.    Are you aware of any other entities
 8   of which Michael Choi is an officer or
 9   director that you have done investment work
10   with?
11            MR. WERNER:  Object to the form.
12       A.    In particular to what?
13       Q.    Generally, if you invested in
14   companies where Michael Choi was involved as
15   an officer or director of another legally
16   recognized entity.
17            MR. WERNER:  Object to the form.
18       A.    No.
19       Q.    You can put that aside.
20            Now, so did Michael Choi play any
21   role in helping build out Apollo?
22            MR. WERNER:  Object to the form.
23       A.    We did talk about the design.
24       Q.    Aside from talking about the
25   design, did he play any other role in
```



Page 34

```
 1                    N. Choi
 2  developing Apollo?
 3            MR. WERNER:  Object to the form.
 4       A.   We had professionals working on the
 5  development of the actual car itself.
 6       Q.   I guess just broader, was Michael
 7  Choi helping you develop Apollo as a general
 8  matter?
 9            MR. WERNER:  Object to the form.
10       A.   As a friend.
11       Q.   So he was doing it as a friend, but
12  he had no particular designated role, is that
13  right?
14            MR. WERNER:  Object to the form.
15       A.   No.
16       Q.   How many hours do you think he
17  helped you as a friend developing Apollo?
18            MR. WERNER:  Object to the form.
19       A.   From the start to now, I have only
20  been -- I have been the only director of the
21  company.
22       Q.   It's your testimony that other than
23  offering friendly advice, Michael Choi played
24  no other role in developing Apollo?
25       A.   No.
```



Page 35

1                    N. Choi

2        Q.    I think we have a double negative.

3    I will ask it again so just listen to my

4    question.  Sometimes we can do double

5    negatives.

6              My question to you was, it's your

7    testimony, right, that other than offering

8    friendly advice, Michael Choi played no other

9    role in developing Apollo?

10       A.    Yes, that's my understanding, yeah.

11       Q.    So just --

12       A.    Sometimes your questions are kind

13   of like --

14       Q.    Long?

15       A.    Just not very clear.

16       Q.    Fair enough.  I will do my best.

17   That was my fault.  Double negatives is the

18   question's fault.

19              When did you first meet Ryan

20   Berris?

21       A.    February 2015.

22       Q.    How did you meet -- how did you

23   learn of Ryan?

24              MR. WERNER:  Object to the form.

25       A.    Michael send me an email and Ryan



Page 36

```
 1                    N. Choi
 2   had been prospecting.
 3        Q.    Michael, you mean Michael Choi?
 4        A.    Yes.
 5        Q.    Where did you first meet Ryan
 6   Berris?
 7              MR. WERNER:  Object to the form.
 8        A.    In Spain.
 9        Q.    What were you doing in Spain at the
10   time?
11        A.    Family vacation.
12        Q.    Around what year was this?
13        A.    2015.
14        Q.    Do you remember where in Spain you
15   were?
16        A.    On a track.
17        Q.    A track, like a hiking thing?
18        A.    As in circuit.
19        Q.    A racing track.  Fair enough.
20              Were you there on behalf of Apollo?
21        A.    No.  So what happened was he send
22   -- Ryan I mean, send an email and said that
23   his then employer was testing, at the time,
24   the STG, the vehicles, so he invited us to go
25   over and have a look.
```



```
 1                    N. Choi
 2      Q.    Were you familiar with STG?
 3      A.    I think he is famous, iconic racing
 4   hero, as in the owner of the company.
 5      Q.    Who is the owner of the company?
 6      A.    Jim Glickenhaus,
 7   G-L-I-C-K-E-N-H-A-U-S.
 8      Q.    Would it be fair to say that after
 9   first meeting Ryan, you developed a
10   friendship with him?
11           MR. WERNER:  Object to the form.
12      A.    Yeah, we spoke, yeah.
13      Q.    Just generally between 2015 and
14   let's say the end of 2021, would you agree
15   with me that you and Ryan had a very friendly
16   relationship?
17           MR. WERNER:  Object to the form.
18      A.    I would say so, yeah, more than
19   anything.
20      Q.    Would you agree with me that during
21   that time period, you were close to one
22   another and shared -- strike that.
23           You would agree with me that during
24   that time period that you were close friends?
25           MR. WERNER:  Object to the form.
```



Page 38

```
 1                    N. Choi
 2      A.    Yeah, he came to many of my family
 3  vacations.
 4      Q.    He met your wife and your children,
 5  right?
 6            MR. WERNER:  Object to the form.
 7      A.    Many many times.
 8      Q.    You would talk about personal
 9  information and business information too?
10            MR. WERNER:  Object to the form.
11      A.    At least I tried.  I don't know
12  about him.
13      Q.    You met Ryan's sister, right,
14  Chelsea Berris?
15      A.    A few times.
16      Q.    Would you agree with me that during
17  that time period from 2015 to the end of 2021
18  you had a got working relationship with one
19  another?
20            MR. WERNER:  Object to the form.
21      A.    In some way.
22      Q.    Now, when did -- how would you
23  describe Mr. Berris' role in Apollo?
24            MR. WERNER:  Object to the form.
25      A.    I think to be definitive, we would
```



Page 39

```
 1                    N. Choi
 2   look at the scope of work under the
 3   consultancy agreement I had with him.
 4        Q.   We can look at that in a second.
 5             As you sit here today, if you had
 6   to describe the contributions you believe
 7   that Ryan made to the Apollo, what, if any,
 8   would you say they were?
 9             MR. WERNER:  Object to the form.
10        A.   I would say, again, I refer to the
11   consultancy agreement and it's clearly stated
12   exactly the wordings.
13        Q.   So you feel like he carried out
14   what's set forth in the consultancy agreement
15   throughout the duration of his time at
16   Apollo?
17        A.   To some parts, yes.
18        Q.   I will show it to you later.  I
19   only have one copy.  That's my mistake.
20             Let me just mark it, I think
21   everybody knows this well enough.  I won't
22   ask you any real questions about it.
23             I marked as Choi 3, and I will
24   distribute copies to others, is the
25   consultancy agreement.
```



Page 40

                         N. Choi
 1
 2          Do you see that?
 3          (Choi Exhibit 3, consultancy
 4      agreement, marked for identification.)
 5      A.    I have.
 6      Q.    When you referred to a consultancy
 7  agreement, that's an Apollo and Ryan, that's
 8  what you are talking about, right?
 9      A.    Yes.
10      Q.    What value did you think Ryan would
11  bring to Apollo?
12          MR. WERNER:  Object to the form.
13      A.    Any specific period of time you are
14  referring to?
15      Q.    When you hired him.
16      A.    I think it was a trial in the
17  beginning, at least -- I think maybe you
18  should deserve to know about the background
19  of this, how it came about.
20      Q.    We can talk about that, but just
21  answer my question first which is, when you
22  hired him, what contributions did you think
23  he would make to Apollo?
24          MR. WERNER:  Object to the form.
25      A.    Actually, not just Apollo, also De



Page 41

```
 1                    N. Choi
 2   Tomaso, so exactly what is stated in the
 3   scope of services, so the exact wording here
 4   is corporate planning, strategy, general
 5   management, marketing, public relation and
 6   sales aspect.
 7        Q.   So when you hired him, you thought
 8   those were all components of his future work
 9   that you thought he could make contributions
10   to?
11             MR. WERNER:  Object to the form.
12        A.   This is also an agreement drafted
13   by him, so yes.
14        Q.   Even setting aside the agreement,
15   did you believe Mr. Berris could actually do
16   those things to help you?
17             MR. WERNER:  Object to the form.
18        A.   Again, like I said, it was a
19   beginning of a relationship, yeah.
20        Q.   You said, I think either way you
21   phrased it before, it was a test at the
22   beginning?
23        A.   A trial.
24        Q.   A trial, fair enough.  But he
25   stayed on for a number of years after this
```



Page 42

```
 1                  N. Choi
 2   agreement was signed, right?
 3       A.    Yes.
 4       Q.    So you would agree with me that
 5   whatever trial period you were imposing, he
 6   passed the trial, right?
 7             MR. WERNER:  Object to the form.
 8       A.    Depending on what level.  On a
 9   personal level, as a friend, I supported him.
10   On a professional level, I choose to overlook
11   a lot of topics.
12       Q.    This is during the Apollo time
13   period?
14             MR. WERNER:  Object to the form.
15       A.    You asked during the period, yeah.
16       Q.    While he was working at Apollo,
17   say, from 2017 to 2020, what aspects of
18   Ryan's work did you have to overlook because
19   you thought they were not adequate?
20             MR. WERNER:  Object to the form.
21       A.    I think the promises is when he
22   came on board, he said he could bring a long
23   list of clients and, of course, I found out
24   in a way, that it never happened.
25       Q.    That's for Apollo, right?
```



Page 43

N. Choi

1

2          MR. WERNER:  Object to the form.

3      Q.    I want to make sure we are framed

4  -- now, we are just talking about Apollo from

5  2017 to 2020?

6      A.    Yes.

7      Q.    So your criticism of Ryan is that

8  he didn't bring the number of clients that

9  you expected during that time period?

10         MR. WERNER:  Object to the form.

11     A.    That's one of them.

12     Q.    What are the other ones?

13     A.    I think in general, it's the way

14  how he wasn't really able to integrate with

15  the rest of the team.

16     Q.    Who was the rest of the team for

17  Apollo during the time period 2017 to 2020?

18     A.    In general, the designers.  In

19  general, the staff on the ground building the

20  cars and also suppliers.

21     Q.    Who specifically were the

22  designers?

23     A.    Jowyn Wong, J-O-W-Y-N, Wong,

24  W-O-N-G, and Jakub, J-A-K-U-B.

25     Q.    For Jowyn Wong, he was a designer



Page 44

```
 1                    N. Choi
 2   that you respected, right?
 3            MR. WERNER:  Object to the form.
 4        A.   I'm sorry, can you repeat your
 5   question?
 6        Q.   For Jowyn Wong, he was a designer
 7   you respected, right?
 8        A.   Yes, but of course we have
 9   differences.
10        Q.   But as a general matter, you
11   respected his opinion, right?
12            MR. WERNER:  Object to the form.
13        A.   Yeah, I'm always a person who is
14   open to listen to opinions.
15        Q.   You mentioned suppliers.  Who were
16   the suppliers?
17        A.   HWA.
18        Q.   Who were the people on the ground?
19        A.   We have Uli, Uli Fritz, U-L-I, and
20   then F-R-I-T-Z, and then we have Stefan
21   Burger, S-T-E-F-A-N, Burger.
22        Q.   Was Ms. Majcher, who is here, was
23   she with Apollo during that time period?
24        A.   She was.
25            MR. ZACH:  Did I pronounce your
```



Page 45

```
 1                    N. Choi
 2       name right?
 3            MS. MAJCHER:  Majcher.
 4       Q.   What was Ms. Majcher's role?
 5       A.   I would say COO type of role.
 6       Q.   So the record is clear, that would
 7  be like a chief operating officer?
 8       A.   Correct.
 9       Q.   Over time, did Ms. Majcher also
10  work on the finance side of Apollo and De
11  Tomaso?
12       A.   Yes.
13            MR. WERNER:  Object to the form.
14       Q.   Would you agree that she ultimately
15  served as something akin to a CFO for both
16  Apollo and De Tomaso?
17            MR. WERNER:  Object to the form.
18       A.   Yeah.
19       Q.   I take it that you deeply trust the
20  opinions that Ms. Majcher has?
21            MR. WERNER:  Object to the form.
22       Q.   Relating to the companies that she
23  worked on for you?
24            MR. WERNER:  Object to the form.
25       A.   I'm a pretty trusting people --
```



Page 46

```
 1                    N. Choi
 2  person.
 3       Q.    You would agree with me that in
 4  your view, Ms. Majcher is an excellent CFO?
 5             MR. WERNER:  Object to the form.
 6       A.    I would consider not only that, on
 7  a personal level, also a very, very, very
 8  nice human.
 9       Q.    When Ms. Majcher expresses an
10  opinion, you respect that opinion, right?
11       A.    I respect everyone's opinion.
12       Q.    Can you think of times in which you
13  -- strike that.
14             You know Ms. Majcher to always tell
15  the truth, right?
16             MR. WERNER:  Object to the form.
17       A.    I don't have any belief that she
18  wouldn't be telling the truth.
19       Q.    I take it you view Ms. Majcher as
20  being loyal to Apollo and De Tomaso and their
21  mission of creating cars?
22             MR. WERNER:  Object to the form.
23       A.    I don't see the reason why she is
24  not -- is not disloyal -- I mean, is
25  disloyal.
```



Page 47

1                          N. Choi
2          Q.    You take it you also view Ms.
3     Majcher as being loyal to you personally, as
4     a friend?
5                MR. WERNER:  Object to the form.
6          A.    I don't know what she thinks.
7          Q.    I'm asking you.
8          A.    I'm hoping so.
9          Q.    You view her as being loyal, right?
10         A.    Yeah.  I don't have, otherwise, any
11    reason not to believe.
12         Q.    So what specifically did Ryan do
13    that made him not integrate well with Jowyn
14    Wong during 2017 to 2020?
15         A.    Actually, it's not just Jowyn Wong,
16    it's the whole team.
17         Q.    Understood.  You gave a list, I'm
18    starting with the first name.
19               So with respect to Jowyn Wong, what
20    specifically did he do to not integrate with
21    him at Apollo during 2017 to 2020?
22         A.    I can't speak for Jowyn.
23         Q.    But you said you had observed
24    behavior that you had to overlook because
25    Ryan was not properly integrating with Mr.



Page 48

                        N. Choi

 1

 2  Wong.

 3          My question to you is, what

 4  specifically did you observe?

 5      A.    Many topics.

 6      Q.    Give me one.

 7      A.    It would be from design, from the

 8  positioning and also overall, the strategies.

 9      Q.    So you thought that Ryan's views on

10  the design were wrong?

11      A.    Ryan has his own opinion in terms

12  of design, he call himself artisan in his

13  deposition.

14      Q.    What specifically about the design

15  did he disagree with Jowyn about at Apollo?

16      A.    I think Jowyn can speak to that

17  when it comes to the time.

18      Q.    I'm asking what did you disagree

19  with?

20      A.    What did I disagree with what?

21      Q.    You said Ryan didn't integrate well

22  in relation to the design of the Apollo.

23          What specifically about the design

24  did he not integrate about?

25          MR. WERNER:  Object to the form.



Page 49

```
 1                    N. Choi
 2       A.    Have you seen the Apollo itself?
 3       Q.    Yes.
 4       A.    It's outlandish, very extreme
 5   design.
 6       Q.    You don't like that?
 7       A.    I love it, I love the design, but
 8   Ryan has his own opinion about what the
 9   design should be.
10       Q.    What was the difference of opinion
11   between the two of you?
12       A.    It could be design of the front
13   fender, it could be design of the interior,
14   it could be a number of things, specifically
15   I don't recall, but anyway, there were some
16   debates talked about the design.
17       Q.    I take it you had debates with many
18   people about how to create the Apollo IE,
19   right?
20             MR. WERNER:  Object to the form.
21       A.    It's been a process, yes.
22       Q.    Would you agree that the creation
23   of the Apollo IE was a collaborative process
24   among a number of people?
25             MR. WERNER:  Object to the form.
```



Page 50

```
 1                    N. Choi
 2       A.   Of course, there are many
 3  individuals involved.
 4       Q.   In connection with that
 5  collaboration, there were various opinions
 6  expressed by stakeholders, right?
 7            MR. WERNER:  Object to the form.
 8       A.   Stakeholder as in myself or who?
 9       Q.   Fair enough.  As in people that
10  were contributing to the design and the
11  ideas?
12            MR. WERNER:  Object to the form.
13       A.   I think as, again, the design was
14  all about Jowyn's idea and then, of course, I
15  worked with him in terms of what I actually
16  foresee.
17       Q.   Between 2017 and 2020, what would
18  you describe Ryan's duties at Apollo to be?
19            MR. WERNER:  Object to the form.
20       A.   I think we answered that.
21       Q.   Did he -- did Ryan report directly
22  to you during that time period?
23       A.   He did.
24       Q.   Were you his manager?
25       A.   I would say I'm the employer of his
```



Page 51

1              N. Choi

2    company.

3        Q.    When did you first buy the rights

4    to De Tomaso?

5        A.    The completion took place in 2015,

6    March.

7        Q.    How did you learn about the rights

8    being available?

9        A.    A friend from Hong Kong.

10       Q.    What friend from Hong Kong?

11       A.    Simon.

12       Q.    Does Simon have a last name?

13       A.    Simon Wu, W-U.

14       Q.    What did Simon tell you about the

15   rights being available?

16       A.    It was being put on public auction.

17       Q.    Had you heard of De Tomaso before?

18       A.    Of course.

19       Q.    And you went and bid on the rights,

20   right?

21            MR. WERNER:  Object to the form.

22       A.    I did.

23       Q.    You obtained the rights, right?

24            MR. WERNER:  Objection to form.

25       A.    I eventually.



Page 52

```
 1                    N. Choi
 2        Q.    When you eventually obtained the
 3   rights, were you doing that on your own or
 4   did you have someone else that was going in
 5   on the investment with you?
 6        A.    On my own.
 7        Q.    What was your plan initially for De
 8   Tomaso?
 9        A.    There were many plans, many ideas.
10        Q.    Was one of those plans to build a
11   kit car?
12             MR. WERNER:  Object to the form.
13        A.    We were exploring many different
14   opportunities.
15        Q.    Is that one of the opportunities
16   you explored?
17        A.    One of them.
18        Q.    Can you explain what a kit car is?
19        A.    Well, I wouldn't necessarily call
20   it a kit car, but you name it as kit car.
21   Maybe you can also define to me what you
22   understand kit car to be.
23        Q.    Are you familiar with the term kit
24   car?
25             MR. WERNER:  Object to the form.
```



1                    N. Choi

2        A.    I just want to make sure we have

3    the right definition.

4        Q.    I'm asking, do you understand what

5    that term is?

6        A.    It's a replica you are talking

7    about.

8        Q.    Let me ask the question.  I'm the

9    examiner so I have to ask the questions, you

10   have to answer them.  It's fine.

11       A.    It's just definitions.  Let's just

12   say a car, let's say mass market, a larger

13   market.

14       Q.    So you've heard the term kit car

15   before, right?

16       A.    Some would refer as kit car.

17       Q.    When you've heard the term kit car,

18   what did you understand it to mean?

19       A.    A replica.

20       Q.    By replica, you mean there is some

21   model from the past that you sort of recreate

22   now in modern times, is that fair?

23       A.    In recent days, people have now

24   called it as a restomod, R-E-S-T-O-M-O-D.

25       Q.    That's a better way of referring to



Page 54

```
 1                    N. Choi
 2   it.  So a restomod --
 3        A.    Kit car doesn't sound too premium.
 4        Q.    So, for example, there was a, De
 5   Tomaso was driven by Bill in Kill Bill
 6   movies, right?
 7               MR. WERNER:  Object to the form.
 8        A.    I think beyond that, Kill Bill is
 9   one little chapter.
10        Q.    Listen to my question.
11               You've seen the movie Kill Bill?
12        A.    It was many years ago, so I don't
13   really remember movie theme.
14        Q.    Do you remember in the movie, Bill,
15   the character, drove a De Tomaso, right?
16               MR. WERNER:  Object to the form.
17        A.    As in Kill Bill and other movies
18   too.
19        Q.    I'm trying to get to what a resto
20   car is, okay, and I think that was a car from
21   maybe the 1970s, right?
22               MR. WERNER:  Object to the form.
23        A.    Right around that period.
24        Q.    Would it be fair to say that a
25   restomod would be to take that design and
```



Page 55

```
 1                    N. Choi
 2   recreate it in 2017 or 2018?
 3        A.    Yeah, or even now.
 4        Q.    Right, that's the idea, is you are
 5   taking sort of a classic model and recreating
 6   it for future buyers?
 7        A.    Yeah.
 8        Q.    That was one of the ideas you had
 9   for De Tomaso, right?
10        A.    Uh-huh.
11        Q.    In fact, De Tomaso hired a company
12   to try to do that, right?
13              MR. WERNER:  Object to the form.
14        A.    I think not just a company, we had
15   a few companies.
16        Q.    When did you first discuss selling
17   your stake in Apollo?
18              MR. WERNER:  Object to the form.
19        A.    Selling my stake as in, what do you
20   mean selling my stake?
21        Q.    Apollo was eventually sold to an
22   outside company, right?
23        A.    To what company?
24        Q.    To an outside company.
25        A.    So I just want to make sure your
```



Page 56

```
 1                    N. Choi
 2  definition is aligned with mine.  Selling
 3  stake, meaning to raise money or to sell the
 4  company?
 5      Q.   At some point, you sold a large
 6  part of your interest in the company, right?
 7      A.   I think you have to be quite clear
 8  on actually what selling means.  Any specific
 9  period you are talking about?
10      Q.   In 2020, you sold a large stake of
11  your company, right?
12      A.   I sold my entire stake, yeah.
13      Q.   That's what I was referring to.
14           Who did you sell that stake to?
15      A.   To a Hong Kong listed company.
16      Q.   And when you say a Hong Kong listed
17  company, are you referring to a company
18  that's listed on a Hong Kong Exchange?
19      A.   Correct.
20      Q.   Another way of saying it is it's a
21  publicly-traded company, but it trades on the
22  Hong Kong Exchange?
23      A.   Uh-huh.
24      Q.   It's regulated by Hong Kong
25  authorities, right?
```



Page 57

                              N. Choi

 1

 2        A.    Hong Kong Stock Exchange.

 3        Q.    What was the name of the company

 4   that you sold your entire stake to?

 5        A.    It's called WE Solutions, W-E, and

 6   then Solutions.

 7        Q.    Who were the owners of WE

 8   Solutions?

 9        A.    There were many.

10        Q.    Who was the CEO of WE Solutions?

11              MR. WERNER:  Object to the form.

12        A.    At the time?

13        Q.    Yes.

14        A.    It was Richard.

15        Q.    What is Richard's last name?

16        A.    Sung, S-U-N-G.

17        Q.    After you sold your stake in

18   Apollo, you stayed on to help with the

19   company still, right?

20        A.    Yes, I have.

21        Q.    Are you still doing work for

22   Apollo?

23        A.    I ended my contract with them

24   sometime fourth quarter '23, so I stayed on

25   for over three and a half years.



Page 58

```
 1                    N. Choi
 2      Q.   And Ms. Majcher also stayed on at
 3  Apollo to do work, right?
 4      A.   She has.
 5      Q.   Ms. Majcher was the CEO of Apollo,
 6  right -- excuse me, that was wrong.
 7           Ms. Majcher was the CFO of Apollo,
 8  right?
 9      A.   I don't actually recall her title.
10      Q.   Do you know how long Ms. Majcher
11  continued to work at Apollo for?
12      A.   I believe she -- you can ask her.
13      Q.   How much work -- isn't it true,
14  sir, that you had a number of disputes with
15  the board of Apollo?
16           MR. WERNER:  Object to the form.
17      A.   I don't recall having actual
18  dispute.
19      Q.   As you sit here today, you don't
20  know that you've had problems with Richard
21  Sung relating to your use of funds that were
22  owed to Apollo?
23           MR. WERNER:  Object to the form.
24      A.   With what particular dispute?
25      Q.   As you sit here today, do you
```



Page 59

```
 1                     N. Choi
 2    recall ever having a dispute with Richard
 3    Sung about your conduct at Apollo?
 4              MR. WERNER:  Object to the form.
 5       A.   I would like to know what exact
 6    conduct you are referring to.
 7       Q.   I'm not referring to anything.  I'm
 8    asking, as you sit here today, do you recall
 9    having a dispute with anyone at Apollo
10    relating to your conduct at that company?
11              MR. WERNER:  Object to the form.
12       A.   I don't recall.
13       Q.   You would agree that if someone
14    made serious accusations to you about your
15    conduct at Apollo, you would remember that,
16    right?
17              MR. WERNER:  Object to the form.
18       A.   I don't remember that.
19              MR. ZACH:  We've been going for
20         about an hour.  Can we take a
21         five-minute break?
22              THE VIDEOGRAPHER:  We are going off
23         the record.  The time is 11:09 a.m.
24         (Recess.)
25              THE VIDEOGRAPHER:  We are back on
```



Page 60

1                    N. Choi

2        the record.  The time is 11:22 a.m.

3        Q.    I'm handing you what's been marked

4    as Choi 4.

5             (Choi Exhibit 4, March 25, 2021

6        text exchange between Ms. Majcher and

7        Mr. Choi, marked for identification.)

8        Q.    You can see that looking at the

9    first page of this document, it's a text

10   exchange between Ms. Majcher and yourself.

11            Do you see that?

12       A.    Okay.

13       Q.    It's from March 25, 2021.

14            Do you see that?

15       A.    Yes.

16       Q.    You can read any part of this

17   document, but I would like to sort of direct

18   your attention to the exchange that occurs on

19   the part ending in Bates 196.

20            Are you at 196?

21       A.    Yes.

22       Q.    Starting -- the way this works is

23   you can look at this for yourself, but Ms.

24   Majcher is the light-colored text and sort of

25   the shaded is your text?



Page 61

```
 1                  N. Choi
 2        A.    Uh-huh.
 3        Q.    At 7:04, you say, Thing is from
 4   even before day one.  I have expressly
 5   mentioned the roadmap with Roush/Idiada, the
 6   plan and etc.  Then Eric Richard and
 7   Matthew/Jackie just cornered me in a meeting
 8   room and threatened me.
 9              Do you see that?
10        A.    Yes.
11        Q.    Richard is Richard Sung?
12        A.    Yes.
13        Q.    Who is Eric?
14        A.    Eric was the chairman.
15        Q.    Of Apollo?
16        A.    Of the Hong Kong listed company.
17        Q.    That had just purchased Apollo?
18        A.    This is dated when?
19        Q.    It's dated March 25, 2021.
20        A.    Over a year after.
21        Q.    At this point, you sold out your
22   shares, but you are still working for the
23   company, right?
24        A.    Yes, I was the CEO.
25        Q.    Then Ms. Majcher says, Didn't know
```



Page 62

1                     N. Choi

2    what, then you respond, First they said they

3    received a red flag from auditor.

4              Do you see that?

5         A.    Uh-huh.

6         Q.    Second, they said they consulted

7    their lawyer friends and mentioned it was a

8    fraud.

9              Do you see that?

10        A.    Uh-huh.

11        Q.    Third, the board was made aware of

12   the situation and had asked Julian to write a

13   technical report.

14             Do you see that?

15        A.    Uh-huh.

16        Q.    Fourth, Julian then supposedly

17   consulted Stefan/Mirko.

18             Do you see that?

19        A.    Uh huh.

20        Q.    Fifth, you kind of do dot, dot,

21   dot.  Then again in one person meetings, they

22   asked for two thirds of my shares.

23             Do you see that?

24        A.    Uh-huh.

25        Q.    Do you recall being confronted by



Page 63

```
 1                    N. Choi
 2  Mr. Sung and other management in this manner?
 3            MR. WERNER:  Object to the form.
 4       A.    I don't recall specifically on this
 5  one.
 6       Q.    You don't recall them telling her
 7  that they had concerns about the auditors of
 8  the company?
 9            MR. WERNER:  Object to the form.
10       A.    I don't remember this one.
11       Q.    You have no memory of -- you were
12  the CEO of the company at the time, correct?
13       A.    Uh-huh.
14       Q.    This was approximately a little
15  over three years ago, right?
16       A.    Correct.
17       Q.    I assume you took your CEO
18  responsibilities seriously at Apollo?
19       A.    I have.
20       Q.    And you don't have any recollection
21  of being, in your words, threatened by the
22  management of the company because there had
23  been a red flag relating to fraud?
24            MR. WERNER:  Object to the form.
25       A.    I don't exactly remember this.
```



Page 64

                    N. Choi

1

2          MR. WERNER:  That's not what the

3     text message says either.

4     Q.    Let me be clear.  You don't recall

5  that Apollo received a red flag from their

6  auditors?

7          MR. WERNER:  Object to the form.

8     A.    I don't.

9     Q.    You don't recall that the company's

10  management said that -- consulted their

11  lawyer friends and mentioned it was a fraud?

12          MR. WERNER:  Object to the form.

13     A.    No.

14     Q.    Were you ever accused of fraud or

15  misconduct by management of the company?

16     A.    I don't recollect.

17     Q.    You would recollect that, right?

18     A.    If there was.

19     Q.    You can set that document aside.

20          MR. ZACH:  I'm marking as Choi 5.

21          (Choi Exhibit 5, text message,

22     marked for identification.)

23     Q.    This is another text message that

24  was produced by DT.

25          You see -- you can read all of it,



Page 65

```
 1                    N. Choi
 2  but you can see here at 12:13, you write,
 3  Again, is just to make sure Richard and Eric
 4  don't continue to use the word of Norman
 5  misappropriate funds to enrich himself DT.
 6            Do you see that?
 7      A.   Uh-huh.
 8      Q.   Isn't it a fact that the management
 9  of the company accused you of
10  misappropriating Apollo's funds to enrich
11  yourself and DT?
12            MR. WERNER:  Object to the form.
13      A.   No.
14      Q.   So you don't -- what do you think
15  you were referring to here then?
16            MR. WERNER:  Object to the form.
17      A.   My recollection at the time they
18  had wanted to potentially invest into De
19  Tomaso.
20      Q.   Why did you use the word
21  misappropriate funds?
22            MR. WERNER:  Object to the form.
23      A.   I think this is not my language, it
24  is their language, so that's why I said don't
25  continue to use the word of Norman
```



Page 66

                        N. Choi

1

2    misappropriate fund because I didn't think it

3    was appropriate for them to say that.

4        Q.    You didn't think it was appropriate

5    for them to say to you that you were

6    misappropriating funds?

7        A.    Yeah, I didn't think it was

8    appropriate for them to say misappropriate.

9        Q.    In relation to you, right?

10       A.    Yeah, exactly.  I think this is

11   what is stated right here.

12       Q.    You would agree with me that these

13   individuals are accusing you of

14   misappropriating funds, right?

15            MR. WERNER:  Object to the form.

16       A.    There was discussion.

17       Q.    The discussion was that you were

18   misappropriating funds from Apollo, right?

19            MR. WERNER:  Object to the form.

20       A.    Well, I think it's pretty clear

21   what it says here, so I don't want to repeat,

22   rephrase exactly what is written.

23       Q.    What do you think it says there?

24       A.    What I see is don't continue to use

25   the word of Norman misappropriate fund.



Page 67

             N. Choi

1

2    Q.    You wanted them to stop saying you

3    were misappropriating funds, right?

4    A.    From what it states here, yes.

5    Q.    Did you, in fact, misappropriate

6    funds from De Tomaso?

7         MR. WERNER:  Object to the form.

8    A.    From De Tomaso?

9    Q.    Excuse me.  Did you, in fact,

10   misappropriate funds from --

11   A.    I have not.  If I have, there would

12   have been many actions.

13   Q.    Would it surprise you if Richard

14   Sung had stated in other contexts that you

15   stole millions of Euros from Apollo?

16        MR. WERNER:  Object to the form.

17   A.    I will not agree to that.

18   Q.    Would you deny that?

19   A.    I absolutely deny.

20   Q.    Let's go very quickly back to the

21   agreement now that we all have it.

22        This is the consulting agreement

23   that we talked about earlier between Aprivy,

24   Ryan and Apollo, right?

25        Do you see that?



Page 68

                    N. Choi

1

2    A.    The title, yes.

3    Q.    You see it's dated January 27,

4    2018?

5    A.    Yes.

6    Q.    You are aware, sir, that at the

7    beginning of this case, at an earlier phase,

8    before your new counsel appeared, that it was

9    the defendant's contention that this

10   agreement controlled Ryan Berris' employment

11   with De Tomaso from 2020 until he was

12   terminated in 2022?  Are you aware of that?

13          MR. WERNER:  Object to the form.

14   Calls for a legal conclusion.

15   A.    So I just want to make clear when

16   my counsel said calls for a -- what did you

17   say?

18          MR. WERNER:  You are not here to

19          offer legal testimony.

20          MR. ZACH:  He is making a record.

21   A.    All I know is I always oblige with

22   what is written here, so I don't want to be

23   ambiguous so what I follow is what is stated

24   here in the agreement.

25   Q.    My question is different.



Page 69

                    N. Choi
1
2               After you sold your shares in
3    Apollo and the Hong Kong listed company took
4    it over, you continued to do work for Apollo
5    as its CEO, right?
6         A.    Correct.
7         Q.    And Ms. Majcher continued to do
8    work as Apollo's CFO, right?
9         A.    Again, I don't recall exactly her
10   title.
11        Q.    Ryan Berris --
12        A.    I don't think it's CFO either.
13        Q.    She maintained some role there?
14        A.    Yeah.
15        Q.    Fair enough.  Ryan Berris also
16   continued to do work for Apollo, right?
17             MR. WERNER:  Object to the form.
18        A.    It's subjective.
19        Q.    What's subjective, did he or did he
20   not do work for Apollo?
21        A.    Minimal.
22        Q.    So you acknowledge that he did
23   work, but your view is he didn't do enough?
24             MR. WERNER:  Object to the form.
25        A.    It's not my view, it's actually



Page 70

1                    N. Choi
2    what was performed.
3        Q.    What is it that he did perform --
4    what work do you believe that Ryan Berris
5    performed for Apollo after you sold your
6    shares of the company to the Hong Kong listed
7    company?
8        A.    Let's say, he did not go to Hong
9    Kong or China to participate in any of the
10   subsequent exhibitions or road shows.
11       Q.    And in your view, he was expected
12   to do that?
13       A.    Well, it's not in my view, I go
14   with the agreement, what is stated here.
15       Q.    You were the CEO of Apollo, right?
16       A.    Uh-huh.
17       Q.    You were the CEO even after you
18   sold your stake, right?
19       A.    Uh-huh.
20       Q.    When did you actually get rid of
21   the title CEO?
22             MR. WERNER:  Object to the form.
23       A.    The day I resigned.
24       Q.    What day did you resign?
25       A.    Fourth quarter '23.



Page 71

1                    N. Choi

2        Q.    Why did you resign?

3        A.    My time was up.

4        Q.    It wasn't because you were accused

5    of misconduct by Mr. Sung?

6        A.    I think if you refer back to that

7    accusation is -- can you remind me what date

8    that is, '21?

9        Q.    Say again.

10       A.    When you -- I think it's 2021.

11       Q.    It was March of 2021.

12       A.    So I stayed on until fourth quarter

13   '23 and I believe Richard had resigned maybe

14   in '22, in '21, so I stayed on, he left.

15       Q.    Now, you said that part of your

16   disagreement with Mr. Berris was that he did

17   not appear at various road shows or travel to

18   Hong Kong?

19             MR. WERNER:  Object to the form.

20       A.    I did not say it was a

21   disagreement.

22       Q.    What did you say?  I don't want to

23   mischaracterize your testimony.

24       A.    I said that he performed minimal

25   work, that's what I said.



Page 72

```
 1                    N. Choi
 2       Q.    As part of minimal work, you
 3  testified that he did not, quote, give me one
 4  second.  You said, quote, your answer was, He
 5  did not go to Hong Kong or China to
 6  participate in any of the subsequent
 7  exhibitions or road shows.
 8            Do you recall that testimony?
 9       A.    That's what I said.
10       Q.    That's one of the things that you
11  said that you thought Mr. Berris should have
12  done with his ongoing employment with Apollo,
13  right?
14            MR. WERNER:  Object to the form.
15       A.    Again, as defined in the agreement.
16       Q.    And we are talking about the period
17  after you sold your shares?
18       A.    Regardless.
19       Q.    We are talking, specifically in
20  time, my question to you is after you sold
21  your shares in Apollo?
22       A.    Uh-huh.
23       Q.    But continued on as CEO, Mr. Berris
24  also continued to do work for Apollo, right?
25            MR. WERNER:  Object to the form.
```



Page 73

```
  1                    N. Choi
  2        A.    Like I said, very minimal.
  3        Q.    And during that time period, one of
  4   the things that you criticized was his
  5   failure to travel to road shows and Hong Kong
  6   and China, right?
  7        A.    I didn't say criticize.  I said
  8   he --
  9        Q.    He didn't do it, right?
 10        A.    Yeah.
 11        Q.    Isn't it true that beginning in
 12   March 2020, China was in lockdown because of
 13   Covid?
 14              MR. WERNER:  Object to the form.
 15        A.    It was.
 16        Q.    So you would agree that it would
 17   have been impossible for Mr. Berris to travel
 18   to China during the lockdown, right?
 19        A.    You still allowed to travel to Hong
 20   Kong.  I did.
 21        Q.    So you thought he should have
 22   traveled to Hong Kong despite a worldwide
 23   lockdown?
 24              MR. WERNER:  Object to the form.
 25        A.    There are certain lockdown rules
```



Page 74

                         N. Choi
1
2    that you can be in a quarantine hotel for
3    seven days, then you are free to move.
4        Q.    Your view, it was your expectation
5    that he would have sort of traveled during
6    that time period?
7            MR. WERNER:    Object to the form.
8        A.    Yes.
9        Q.    Now, at the same time, after you
10   sold your shares in Apollo to the Hong Kong
11   listed company, you maintained control of the
12   De Tomaso brand, right?
13       A.    I have always been.
14           MR. WERNER:    Object to the form.
15       Q.    You set De Tomaso up as a separate
16   company, right?
17       A.    It is a separate company.
18       Q.    So to go back to my initial
19   question with you, is it your position as CEO
20   of Apollo and CEO of De Tomaso that this
21   agreement controlled Mr. Berris' rights for
22   the work he did in connection with De Tomaso?
23           MR. WERNER:    Object to the form.
24   Calls for a legal conclusion.
25       Q.    From 2020 to 2022.



Page 75

                              N. Choi

1

2    A.    I think the agreement speaks for

3    itself.

4    Q.    I'm saying, did you -- you are a

5    CEO, right?

6    A.    Yeah.

7          MR. WERNER:  Of which company?

8    When?

9    Q.    You served in the position of CEO

10   of multiple companies, right?

11   A.    Just these two.

12   Q.    You understand that, as a

13   sophisticated financial person, that various

14   agreements are entered into with employees or

15   third parties, right?

16   A.    That's why we have lawyers.

17   Q.    So if, let's say, you had an

18   agreement with a supplier, right, and the

19   supplier didn't give you the goods that they

20   wanted.

21         Are you still with me?

22   A.    I am with you.

23   Q.    Would you go look at the contract

24   to determine what the supplier owed you?

25         MR. WERNER:  Object to the form.



Page 76

                        N. Choi

1

2      A.    I think having the proper contract

3  drafted by professional lawyers is essential.

4      Q.    So what I'm asking you then is, did

5  you view this contract as the operative

6  contract for Ryan's work with De Tomaso?

7      A.    It's always been the case.

8      Q.    What?

9      A.    It's always been the case.

10     Q.    So that's a yes?

11     A.    Yes.

12     Q.    Let's look at this contract for a

13  second.

14         So you are denying that you ever

15  entered into a separate agreement with Ryan

16  to pay him in connection with his work at De

17  Tomaso?

18         MR. WERNER:  Object to the form.

19     A.    Again, I will go with this

20  agreement as it is.  This is the only written

21  form of agreement.

22     Q.    You are saying this is the only

23  agreement you have with Ryan Berris?

24     A.    Yes.

25     Q.    You are saying you made no other



Page 77

```
 1                    N. Choi
 2   agreements with him, oral or written?
 3        A.   Correct.
 4        Q.   You've never made an oral agreement
 5   with him?
 6        A.   No.
 7        Q.   So whatever is in this contract,
 8   you view as your responsibilities to Ryan?
 9             MR. WERNER:  Object to the form.
10        A.   Again, in the spirit of the
11   contract, it's signed by both parties, not
12   just my spirit.
13        Q.   You think this applies to the work
14   he did -- strike that.
15             You view this agreement as
16   controlling any work that he did for De
17   Tomaso?
18             MR. WERNER:  Object to the form.
19        A.   Exactly as I repeated a number of
20   times.  It's clearly stated in the scope of
21   work in Exhibit A.
22        Q.   So let's look at the contract for a
23   second.  Just give me a second.
24             So let's turn to Exhibit A.  You
25   are there now?
```



Page 78

```
 1                    N. Choi
 2       A.    Yes.
 3       Q.    The last page, just so we are
 4    clear, it's signed by both you and Mr.
 5    Berris, right?
 6       A.    And also -- actually, this one is
 7    signed by Diana, in my capacity.
 8       Q.    It says Norman Choi, but that's not
 9    your signature?
10       A.    It's Diana's signature.
11       Q.    You authorized Ms. Majcher to sign
12    on your behalf?
13       A.    Yes.
14       Q.    The front of the page, it says --
15    the very first thing, the agreement is made
16    this 27th of January 2018 by and between
17    Apollo Automobile Limited, the company, a
18    corporation organized and existing under the
19    laws of the Hong Kong Special Administrative
20    Region and Aprivy, the consultant, a limited
21    liability company located in Glastonbury,
22    Connecticut, United States.
23            Do you see that?
24       A.    I do.
25       Q.    You understand Aprivy was an entity
```



Page 79

```
 1                    N. Choi
 2  owned by Ryan, right?
 3       A.   At the time, that is what I was
 4  told, and, of course, I haven't done thorough
 5  due diligence of who owns it.
 6       Q.   Fair enough.  I'm just asking for
 7  your understanding.
 8       A.   That was the understanding.
 9       Q.   And then turning to where we just
10  were, Exhibit A, it sets out compensation,
11  right?
12       A.   Uh-huh.
13       Q.   It says, As compensation for the
14  services rendered under this agreement, the
15  company shall pay the consultant fee of
16  $200,000, U.S. dollars per year which is
17  defined as the base fee to be paid in 12
18  monthly installments at the end of each
19  calendar month.
20            Do you see that?
21       A.   Yes, I see that.
22       Q.   I take it that is your view of the
23  salary that was owed for any work Ryan
24  performed on behalf of De Tomaso or Apollo?
25            MR. WERNER:  Object to the form.
```



Page 80

1                         N. Choi

2         A.   Again, I don't want to give legal

3    opinion, but that's what is stated here very

4    clearly.

5         Q.   I'm not asking you for a legal

6    opinion, but as a sophisticated

7    businessperson, you read contracts all the

8    time, right?

9              MR. WERNER:  Object to the form.

10        A.   I ultimately rely on lawyers.

11        Q.   You have an understanding of what

12   is set forth in a contract, right?

13             MR. WERNER:  Object to the form.

14        A.   I have a general understanding.

15        Q.   Because when you are working with

16   your lawyers to, let's say, draft a contract,

17   you will participate in what terms are

18   necessary, what you need out of the contract,

19   right, from a business perspective?

20             MR. WERNER:  Object to the form.

21        A.   Uh-huh.

22        Q.   Now, the contract also says in C,

23   In addition to the base fee, the consultant

24   is to be rewarded a performance fee

25   predicated as a percentage of sales.



Page 81

```
 1                    N. Choi
 2            Do you see that?
 3            MR. WERNER:  Object to the form.
 4       A.   I do see it.
 5       Q.   It says, One, a 1 percent fee on
 6  sales of the Apollo Intensa Emozione, if I
 7  said that right, and the future Apollo Arrow.
 8            Do you see that?
 9       A.   Uh-huh.
10       Q.   Two, it says, Per sales of lower
11  end models such as Apollo N and/or De Tomaso
12  Pantera continuation project, the consultant
13  and the company can mutually agree on a fair
14  and reasonable compensation at an applicable
15  time.
16            Do you see that?
17       A.   Uh-huh.
18       Q.   The models listed there are the IE,
19  the Apollo Arrow, Apollo N and the De Tomaso
20  Pantera continuation, right?
21       A.   Uh-huh.
22       Q.   Is De Tomaso Pantera continuation
23  referred to as the heritage model?
24            MR. WERNER:  Object to the form.
25       A.   It could be.
```



Page 82

1                    N. Choi

2       Q.    That's an older version of De

3   Tomaso, right?

4       A.    Uh-huh.

5       Q.    For future models, Apollo or De

6   Tomaso, the consultant or company will, in

7   good faith, come to terms on a mutually

8   agreeable compensation on those products at

9   the time and they are defined and planned for

10  production.

11          Do you see that?

12      A.    I do.

13      Q.    You agree that that's one of the

14  terms of this contract, right?

15          MR. WERNER:  Object to the form.

16      A.    Again, it is what is stated here in

17  black and white.

18      Q.    Just so we are very, very clear,

19  you are saying you've never made any other

20  oral agreement with Ryan either as CEO of

21  Apollo or as the controlling shareholder and

22  CEO of De Tomaso?

23          MR. WERNER:  Object to the form,

24      asked and answered multiple times.

25      A.    Yeah, I was just listening to my



Page 83

1                    N. Choi

2   counsel.

3       Q.   So you understand, sir, that in

4   connection with this lawsuit, plaintiffs have

5   made the assertion that you entered into an

6   oral agreement to, among other things, pay

7   Mr. Berris $400,000 a year for his work on De

8   Tomaso?  You understand that?

9       A.   I understand his complaint.

10      Q.   Is it your testimony, sir, that you

11  never agreed to pay Mr. Berris $400,000 a

12  year for his work with De Tomaso?

13      A.   Correct.

14      Q.   You deny ever making any such oral

15  agreement?

16      A.   Yes.

17      Q.   I would like to show you --

18           MR. WERNER:  Are we putting this

19      one down?

20           MR. ZACH:  We are going to move to

21      Choi 6.

22           (Choi Exhibit 6, document bearing

23      Bates stamp No. DT 108254, marked for

24      identification.)

25           MS. BUSTAMANTE:  What's the Bates?



Page 84

```
 1                    N. Choi
 2           MR. ZACH:   DT 108254.
 3      Q.   Mr. Choi, this is a chat between
 4  Ms. Majcher and yourself on March 3, 2022.
 5           Do you see that?
 6      A.   Yeah.
 7      Q.   So I would like to turn your
 8  attention to the Bates ending 262.
 9      A.   Just to be clear, am I in this?
10      Q.   Yes, you are.
11      A.   Okay.
12      Q.   Your chats are the lighter ones
13  that are kind of like in here with the --
14  they look like the font is a little bit
15  lighter than Ms. Majcher's.
16           I would like to direct your
17  attention to the chat at 12:46.  It's from
18  Ms. Majcher.  She says, Ryan sent me his
19  invoice --
20      A.   12:46?
21      Q.   Do you see that?
22      A.   Yes.
23      Q.   Ms. Majcher writes, Ryan sent me
24  his invoice for February, $36,363, okay to
25  process.
```



Page 85

                    N. Choi

 1

 2          Do you see that, Mr. Choi?

 3     A.    Yes, I do.

 4     Q.    You then answer, Let me have a look

 5  at his invoice please, right?

 6     A.    That's what I wrote, yes.

 7     Q.    Ms. Majcher says, It's just a

 8  simple invoice that says February consulting

 9  fee.  He says the formal contract is coming,

10  but you have agreed to this pro rated fee.

11          Do you see that?

12     A.    Yes.

13     Q.    You answer, turn to the next page,

14  Should be 400,000 per year so that works out

15  to be 33,333.

16          Do you see that, the very top, sir?

17     A.    Okay.

18     Q.    So when you testified a moment ago

19  that you had made no other agreement with

20  Ryan relating to his compensation at Apollo,

21  you were wrong, right?

22          MR. WERNER:  Object to the form.

23     A.    Actually, to begin with, I don't

24  recall seeing that particular invoice.

25     Q.    We can look -- if you look at the



Page 86

```
 1                    N. Choi
 2    text, right, sir, Ms. Majcher says that you
 3    have -- you have agreed to this prorated fee.
 4              Do you see her say that on the
 5    prior page, sir?
 6              MR. WERNER:  Object to the form.
 7         A.   Yes, I do.
 8         Q.   And you respond, Should be 400,000
 9    per year so that works out to be 33,333.
10              You see that, sir?
11         A.   Yes, that's what is written there.
12         Q.   Do you want to change your
13    testimony now, sir, that you, in fact, agreed
14    to pay Mr. Berris $400,000 for his work at De
15    Tomaso?
16              MR. WERNER:  Object to the form.
17         A.   I think from what I recall, in
18    around that time, Ryan had came to me to talk
19    about his situation with the family.  He was
20    at a crossroad with his father and he was low
21    on fund and he needed money.
22              So if you take a look at what I had
23    done in the past, Ryan had come to me various
24    times to ask for money, so it is one of those
25    wire that I just agreed to send him.
```



Page 87

```
 1                    N. Choi
 2      Q.   So you agreed to give him
 3  essentially $33,000, plus some more just as a
 4  favor?
 5      A.   As I have done in the past.
 6      Q.   Then, sir, why did you say it
 7  should be 400,000 per year?
 8           MR. WERNER:  Object to the form.
 9      A.   I don't recall why I actually wrote
10  that.
11      Q.   You think you just made up the
12  number, 400,000?
13           MR. WERNER:  Object to the form.
14      A.   I don't recall specific.  I only
15  remember the incident when we met, the
16  incident, where we met in Düsseldorf.
17      Q.   Just so it's very clear, it is your
18  testimony that when you say, should be
19  $400,000 per year, that has nothing to do
20  with an oral agreement you made to pay him
21  $400,000 a year for his work at De Tomaso?
22           MR. WERNER:  Object to the form.
23      A.   Yes.
24           MR. ZACH:  I would like to mark now
25      Choi 7.
```



Page 88

1                     N. Choi

2              (Choi Exhibit 7, document bearing

3         Bates stamp No. DT 133796, marked for

4         identification.)

5              MR. ZACH:  It's DT 133796.

6         Q.   You see this is another chat

7    between yourself and Ms. Majcher?

8         A.   Yes.

9         Q.   I just want to direct your

10   attention to the first page.

11             Ms. Majcher says, Should we process

12   Ryan's invoice and you say yes.

13             Do you see that?

14        A.   Yes.

15        Q.   Does that refresh your recollection

16   that you, in fact, saw the invoice?

17             MR. WERNER:  Object to the form.

18        A.   No, I don't recall seeing invoice.

19        Q.   You can set that aside.

20             Now, De Tomaso maintains internal

21   corporate records, right?

22             MR. WERNER:  Object to the form.

23        A.   Yes.

24        Q.   For example, you keep a general

25   ledger, you keep other financial information,



Page 89

```
 1                    N. Choi
 2   right?
 3        A.   We have professional audit
 4   accounting firm.
 5        Q.   I take it you do your best as CEO
 6   of the company to ensure that any materials
 7   or financial numbers are accurate?
 8             MR. WERNER:  Object to the form.
 9        A.   That's why we have auditors.
10        Q.   I'm make marking as Choi 8, this is
11   an excerpt from a larger document that was
12   produced to us by your team of internal De
13   Tomaso records.  This document is from around
14   June 2021, okay?
15        A.   Uh-huh.
16             (Choi Exhibit 8, document bearing
17        Bates stamp No. DT 00134817, marked for
18        identification.)
19             MS. WIGGER:  What is the Bates of
20        the document?
21             MR. ZACH:  We can get it for you.
22             MR. WERNER:  This was printed from
23        an Excel file.
24             MR. ZACH:  There are a series of
25        tabs on the file.  One is called
```



Page 90

```
 1                    N. Choi
 2      headcount and we can get you the Bates
 3      number.
 4            MS. WIGGER:  Thanks.
 5      Q.    Now, I don't need you to look at
 6  all of this document, sir, but feel free to
 7  flip around wherever you want.
 8            But you see here -- just to be
 9  clear, in 2021, you would agree with me that
10  the two individuals most responsible for
11  building out De Tomaso were you and Mr.
12  Berris, right?
13            MR. WERNER:  Object to the form.
14      A.    I don't agree with that.
15      Q.    Who would you add to that?
16            MR. WERNER:  Object to the form.
17      A.    There are multiple people.
18      Q.    Do you see on this document that
19  there is a list of people that work for De
20  Tomaso, right, and a list of their monthly
21  payments?
22            Do you see that?
23      A.    Uh-huh.
24      Q.    Do you see there is a CFO?
25      A.    I do.
```



Page 91

```
 1                    N. Choi
 2        Q.    That CFO would be who?
 3        A.    At the time, I don't want to
 4   speculate, but it could have been Diana.
 5        Q.    You see there is also an MD, right?
 6        A.    Yes, that's what it says there.
 7        Q.    And that's -- you see that the MD
 8   is being paid $33,333 a month.
 9              Do you see that, sir?
10              MR. WERNER:  Object to the form.
11        A.    That's what it says there, yes.
12        Q.    The MD is Ryan Berris, right, sir?
13        A.    It could be me.
14        Q.    You were being paid $333,000 a
15   year?
16        A.    I said it could be me.  It didn't
17   state the name.
18        Q.    You think that could be you, sir?
19              MR. WERNER:  Object to the form.
20        A.    Why not?
21        Q.    Do you have an employment contract
22   with De Tomaso?
23              MR. WERNER:  Object to the form.
24        A.    I don't recall.
25        Q.    You were the CEO of De Tomaso,
```



Page 92

```
 1                    N. Choi
 2   right?
 3        A.    Uh-huh, the owner.
 4        Q.    And the owner?
 5        A.    Yeah.
 6        Q.    Your testimony to the jury is you
 7   don't recall whether or you have an
 8   employment contract?
 9             MR. WERNER:  Object to the form.
10        A.    It wasn't for me.
11        Q.    It wasn't important for you to have
12   an agreement with the company?
13        A.    I'm the sole investor in the
14   company, so my interest is to build out the
15   company.
16        Q.    So is it your view that you can
17   take whatever action you want with respect to
18   the company?
19             MR. WERNER:  Object to the form.
20        A.    Under the rule of laws.
21        Q.    Your testimony is that you disagree
22   with me, you disagree with me that this
23   $33,333 reflects Mr. Berris'?
24        A.    I would disagree with you.
25             MR. WERNER:  Object to the form.
```



Page 93

                    N. Choi

1

2       Q.    You think that might actually be

3    your salary?

4            MR. WERNER:  Object to the form.

5       A.    It could be.

6       Q.    How much was your salary then, sir?

7            MR. WERNER:  Object to the form.

8       A.    My salary, I have not been made

9    myself.

10      Q.    Why would you list 333,000?

11           MR. WERNER:  Object to the form.

12      Q.    Why would you list 33,000?

13      A.    As a projection, I would assume --

14   it states it very clearly on the first line,

15   it's assumptions, so as a business, you do a

16   lot of different assumptions.

17      Q.    You can set that document aside.

18           Now, as one of -- again, as part of

19   this litigation, you understand that one of

20   our -- the plaintiff's assertions is that he

21   was promised a model P72 as part of his

22   employment, right?

23           MR. WERNER:  Object to the form.

24      A.    No.

25      Q.    You don't understand that or you



Page 94

```
 1                  N. Choi
 2  deny that --
 3       A.   I deny that.
 4       Q.   Just there are two separate
 5  questions so I will go slower.
 6            My first question is, you
 7  understand that as part of this litigation,
 8  one of the allegations that the plaintiffs
 9  are making against De Tomaso is that you
10  orally promised Mr. Berris a P72 De Tomaso
11  car?  You understand that?
12       A.   I understand.
13       Q.   The second question is, did you, in
14  fact, sir, make an oral promise to Mr. Berris
15  to give him a P72 model?
16            MR. WERNER:  Object to the form.
17       A.   I did not.
18       Q.   Did you, in fact -- strike that.
19            Isn't it true, sir, that, in fact,
20  there was a specific chassis number, No. 60
21  that was promised to Mr. Berris?
22            MR. WERNER:  Object to the form.
23       A.   I did not.
24            MR. ZACH:  Let me mark exhibit Choi
25       9.
```



Page 95

```
 1                  N. Choi
 2              (Choi Exhibit 9, document entitled
 3         De Tomaso P72 Global Chassis
 4         Allocations, marked for identification.)
 5         Q.   This is another document, you can
 6    see below, that was produced to us by you.
 7              Do you see that, Mr. Choi?
 8         A.   Okay.
 9         Q.   We can stay on the first page.
10    This is a document entitled De Tomaso P72
11    Global Chassis Allocations?
12         A.   I do see it.
13         Q.   If you look four down, it says
14    chassis No. 60.
15              Do you see that?
16         A.   Uh-huh.
17         Q.   You see that it says RB flex to it,
18    right?
19         A.   Uh-huh.
20         Q.   That's Ryan Berris, right, sir?
21              MR. WERNER:  Object to the form.
22         A.   First of all, who input this?
23         Q.   You produced this document to me,
24    sir?
25              MR. WERNER:  Object to the form.
```



Page 96

1                    N. Choi
2        His lawyers did.
3        Q.    Your lawyers produced this to me so
4    I don't know.
5        A.    I don't know either who input this.
6        Q.    You are saying -- my question is
7    narrow.  You see it's RB.
8              RB stands for Ryan Berris, right?
9              MR. WERNER:  Object to the form.  I
10          don't think you asked him if he has seen
11          this document or knows what this
12          document is.  I don't think there is any
13          foundation.
14       Q.    Do you understand --
15       A.    I understand very clearly.
16       Q.    So you understand, sir, this is a
17   list, it's a document held by De Tomaso
18   titled Global Chassis Allocations?
19       A.    Uh-huh.
20       Q.    What is a chassis?
21       A.    It's a specific number that is
22   assigned to a vehicle.
23       Q.    Each P72 has it's own specific
24   chassis, right, sir?
25       A.    Uh-huh.



Page 97

```
 1                    N. Choi
 2        Q.    Let's start with chassis 72, the
 3   next one down.
 4              Do you see that?
 5        A.    Uh-huh.
 6        Q.    Next to that, it says NC, right?
 7        A.    Uh-huh.
 8        Q.    What does NC stand for?
 9        A.    My name.
10        Q.    Did you receive chassis No. 72, is
11   that yours?
12              MR. WERNER:  Object to the form.
13        A.    I did not.
14        Q.    You did not receive it.
15              You see chassis No. 60, right?
16        A.    I do.
17        Q.    Next to it, it says RB, right?
18        A.    I'm seeing it.
19        Q.    Would you disagree with me that the
20   RB stands for Ryan Berris?
21              MR. WERNER:  Object to the form.
22        A.    I don't want to speculate.
23              MR. WERNER:  You are not here to
24        speculate.
25        Q.    You agree with me that RB appears
```



Page 98

```
 1                    N. Choi
 2    to mean Ryan Berris?
 3            MR. WERNER:  Object to the form.
 4        A.    It could be Richard Branson.
 5        Q.    Did Richard Branson purchase a P72,
 6    sir?
 7        A.    He did not.
 8        Q.    Can you name other client that
 9    bought a P72, sir, that had the initials RB?
10        A.    This is not input by me, so I have
11    no idea who inputted this.
12        Q.    As the CEO, you are saying you
13    don't know who input this data?
14            MR. WERNER:  Object to the form.
15        You didn't ask that question.
16        A.    There have been multiple people
17    that have the ability to input, so one of
18    them could potentially be Ryan, so maybe you
19    should ask if he input it.
20        Q.    To be very clear, you never orally
21    promised chassis No. 60 to Ryan Berris?
22        A.    No.
23        Q.    Now, switching topics slightly.
24            You attended Mr. Berris' deposition
25    last week, right?
```



Page 99

                      N. Choi

1

2        A.    I have.

3        Q.    And one of the -- do you agree with

4    me that one of your allegations against Mr.

5    Berris is that his business expenses were too

6    high?

7              MR. WERNER:  Object to the form.

8        A.    I think the document speaks for

9    itself.

10       Q.    I'm asking, is that one of your

11   allegations, that you believe that he had

12   business expenses that were too high or

13   otherwise inappropriate?

14             MR. WERNER:  Object to the form.

15       A.    I think as a business, we need to

16   have invoices that are supported.

17       Q.    Did De Tomaso have a formal expense

18   policy that was in place?

19       A.    Formal as in what?

20       Q.    Did you have a written policy for

21   managing business expenses?

22       A.    We have a general understanding, so

23   everybody has an obligations, you know, prior

24   to them spending money, at least have some

25   sort of approval, maybe not written, but at



Page 100

                         N. Choi
1    least an understanding.
2
3        Q.    So I will start with the first
4    piece.
5              You did not, in fact, have a
6    written expense policy at De Tomaso, right?
7        A.    Are you referring to anything
8    specifically because if you are talking about
9    as in a case with Aprivy, within the
10   agreement, it does have an expense policy.
11       Q.    I'm talking, was there a general
12   business expense policy that was implemented
13   by De Tomaso?
14             MR. WERNER:  Object to the form.
15       A.    Again, I would go with the Aprivy
16   agreement in which it's stated explicitly in
17   terms of the reimbursement policy.
18       Q.    When you worked at Merrill Lynch,
19   did you ever incur any business expenses?
20       A.    Very minimal.
21       Q.    But when you worked at Merrill
22   Lynch, you understood the company had a
23   formal document that governed business
24   expenses, right?
25             MR. WERNER:  Object to the form.



Page 101

1                    N. Choi

2          A.   You are talking about 30 years ago.

3     I don't exactly remember.

4          Q.   As you sit here today as a CEO of

5     two companies, do you have an understanding

6     that many companies, in fact, have a formal

7     business expense policy that's in place?

8               MR. WERNER:  Object to the form.

9          A.   Okay.  Yeah.

10         Q.   You agree with that, right?

11         A.   Yeah.

12         Q.   Isn't it a fact that Ms. Majcher

13    repeatedly told you that you should get a

14    policy in place?

15              MR. WERNER:  Object to the form.

16         A.   Repeatedly in what?  Do you have a

17    specific time?  Repeatedly?  What are you

18    referring to?

19         Q.   Did Ms. Majcher ever tell you that

20    you should institute a formal expense policy

21    with regard to De Tomaso?

22              MR. WERNER:  Object to the form.

23         A.   In the past.

24         Q.   She did, right?

25         A.   Uh-huh.



Page 102

```
 1                    N. Choi
 2      Q.   You never actually produced a
 3  written version, did you?
 4           MR. WERNER:  Object to the form.
 5      A.   We working on it and I think we
 6  should already have one in place.
 7      Q.   In 2024?
 8      A.   I don't exactly remember the date,
 9  but yes.
10      Q.   But you didn't have one back in
11  2022 and earlier, right?
12           MR. WERNER:  Object to the form.
13      A.   I don't remember exactly the date,
14  whether I have it or not.
15      Q.   You think there might have been a
16  written expense policy in 2022?
17      A.   I don't recall that.
18      Q.   You would agree with me, whatever
19  policies or understanding applied to you as
20  well as to anyone else, right?
21           MR. WERNER:  Object to the form.
22      A.   Again, I'm the owner.
23      Q.   So --
24      A.   So depending on what kind of
25  expenses you are talking about.
```



Page 103

```
 1                    N. Choi
 2        Q.    We are talking about business
 3   expenses.
 4              You would agree with me that --
 5   strike that.
 6              You testified that while you didn't
 7   have a written expense policy at De Tomaso,
 8   there was an understanding?
 9        A.    Uh-huh.
10        Q.    What was that understanding?
11        A.    That you have to, you know, as a
12   fiduciary duty to the company, you need to
13   have a sense of how you are spending the
14   money, so that's what I would say in general.
15        Q.    You would agree that you -- even as
16   CEO, you had a fiduciary duty to the company
17   to only charge appropriate business expenses
18   to the company, right?
19              MR. WERNER:  Object to the form.
20        A.    Yes.
21              MR. ZACH:  I apologize, I need two
22        minutes to make copies.  Let's just take
23        five.
24              THE VIDEOGRAPHER:  We are going off
25        the record.  The time is 12:07 p.m.
```



Page 104

```
 1                 N. Choi
 2           (Recess.)
 3           THE VIDEOGRAPHER:  We are back on
 4      the record.  The time is 12:19 p.m.
 5      Q.   Mr. Choi, I'm handing you Choi 10.
 6           MS. WIGGER:  Do you know the Bates
 7      for Choi 8?
 8           MR. ZACH:  Kelly will get it.
 9      Q.   Mr. Choi, do you see this is a text
10 exchange between you and Ms. Majcher?
11           (Choi Exhibit 10, April 20, 2022
12      text exchange between Mr. Choi and Ms.
13      Majcher, marked for identification.)
14      A.   Are you referring to any specific
15 page?
16      Q.   The front.  Do you see it's between
17 you and Ms. -- I'm setting the table.
18           Do you see that you and Ms.
19 Majcher, April 20, 2022?
20      A.   Uh-huh.
21      Q.   And then can I turn your attention
22 to the ending Bates 306?
23           MR. WERNER:  Can we be clear, Choi
24      10 is 157299 through 157325?  Since it's
25      not stapled, I just want to be clear.
```



Page 105

                              N. Choi

1

2          MR. ZACH:  Correct.

3          MR. WERNER:  These are not double

4     sided, if you are only going to talk

5     about odd numbers.

6          MS. MAJCHER:  Two copies here, but

7     they are all odd numbered.

8          MR. WERNER:  Let's go off the

9     record.

10          THE VIDEOGRAPHER:  We are going off

11     the record at 12:20 p.m.

12          (Off the record.)

13          THE VIDEOGRAPHER:  We are back on

14     the record.  The time is 12:21 p.m.

15     Q.    I'm showing you what's now been

16  marked as Choi 11.  We will come back to Choi

17  10.

18          Do you see this is another text

19  exchange between Ms. Majcher and yourself

20  dated April 16, 2022?

21     A.    Yes.

22          (Choi Exhibit 11, April 16, 2022

23     text exchange between Ms. Majcher and

24     Mr. Choi, marked for identification.)

25     Q.    I would like to turn your page to



Page 106

```
 1                    N. Choi
 2   the next page ending 56.
 3        A.    Uh-huh.
 4        Q.    And you guys are talking about Mr.
 5   Berris' business expenses.
 6              Do you see that?
 7        A.    Which particular line?
 8        Q.    The line says, Hotel stay.  If it's
 9   for business travel, then, okay, but it can't
10   be every day.
11              Do you see that?
12        A.    I do see it.
13        Q.    Ms. Majcher says, Can you justify
14   that every day of the last year was for
15   business travel?
16              Do you see that?
17        A.    I do.
18        Q.    You say, I'm just getting fed up
19   with all these, and then you talk about Ash
20   and Carmen and Digital Paradigm.
21              Do you see that?
22        A.    I do see it.
23        Q.    Then Ms. Majcher says, It should
24   just be part of the expense policy.
25              Do you see that?
```



Page 107

```
 1                   N. Choi
 2       A.    I do see it.
 3       Q.    That's -- what she is saying there
 4  is that you need to implement a formal
 5  expense policy to help deal with these
 6  things, is that right?
 7       A.    That's what it appears to be.
 8       Q.    At the time, there was no formal
 9  expense policy for Mr. Berris, yourself or
10  any other employee, right?
11             MR. WERNER:  Object to the form.
12       Calls for a legal conclusion.
13       A.    I don't charge the company.
14       Q.    What?
15       A.    I don't charge the company on my
16  expenses.
17       Q.    You don't charge the company on any
18  of your expenses?
19       A.    No.
20       Q.    You would agree with me that it's
21  important to maintain formality between your
22  corporate records and your personal records,
23  right, sir?
24             MR. WERNER:  Object to the form.
25       A.    I think we came to a point when
```



```
 1                    N. Choi
 2    Ryan submitted his expenses, it's just a list
 3    of items from his credit card.  Those list of
 4    items include something like coffee, haircut,
 5    many items that are not explained for.
 6              So to me, it was crossing the line
 7    and whether at that time we had already
 8    initiated this policy or not, I cannot speak
 9    for that, but it's clear as far as what I
10    mentioned earlier is within the consultancy
11    agreement, it states explicitly the expense
12    policy, so that is my reply to you.
13              MR. ZACH:  I'm going to move to
14         strike as nonresponsive.
15              MR. WERNER:  I think he answered
16         the question, but you can try it again.
17         Q.   I will ask you the question.  You
18    would agree with me, Mr. Choi, that for you,
19    as the CEO, it's important for you to
20    maintain separation between your personal
21    finances and the finances of the company,
22    right?
23              MR. WERNER:  Object to the form.
24         A.   Personal finance and finance of the
25    company in relation to expense policy?
```



Page 109

```
 1                    N. Choi
 2       Q.    For yourself.
 3       A.    You are talking about expense
 4  policy?
 5       Q.    Yes, sir.
 6       A.    I think as far as the consultancy
 7  agreement is concerned, it states, again,
 8  clearly, the reimbursement policy.
 9       Q.    I'm asking you about you, not Mr.
10  Berris.
11            You would agree with me, sir, that
12  as CEO of the company, to maintain corporate
13  formalities --
14       A.    We do have proper corporate
15  formality.
16            Again, like I say we have proper
17  professionals in place, a good one, to look
18  out -- actually, to conduct audit and proper
19  accounting work.
20       Q.    As part of that, you would agree
21  with me, sir, that as CEO of the company,
22  that you, Norman Choi, need to maintain
23  separation between the corporate finances of
24  De Tomaso and your personal finances as
25  Norman Choi?
```



Page 110

1                N. Choi

2          MR. WERNER:  Object to the form.

3     A.    Like I said, that's why we have

4  professionals in place, to make sure

5  everything is in proper order.

6     Q.    To make sure you are maintaining

7  that separation, right?

8     A.    It's simple.  It's exactly how I

9  practice.

10     Q.    You mean you practice diligently to

11  make sure you are making sure your personal

12  expenses aren't being charged to the company,

13  right, sir?

14          MR. WERNER:  Object to the form.

15     A.    Again, like I said, and I will

16  repeat it again, and that's why we have

17  proper auditor firm, accounting firm and

18  legal firm to perform for us.

19     Q.    So your expectation would be if

20  they identify you, Norman Choi, billing

21  personal expenses to the company, they should

22  flag that for you, right?

23          MR. WERNER:  Object to the form.

24     A.    Like I said, if auditor see it as

25  an issue, I will have to deal with it one way



Page 111

```
 1                   N. Choi
 2    or the other.
 3        Q.    But you, personally do not charge
 4    your personal expenses to the company, right,
 5    sir?
 6        A.    No, I don't.
 7        Q.    You've never done that throughout
 8    your tenure as the CEO of Apollo, right, sir?
 9            MR. WERNER:  Object to the form.
10        A.    I don't have a recollections, but I
11    don't think I have.
12        Q.    You can put that document aside.
13            MR. ZACH:  I'm going to now mark
14        Choi 10 which is not stapled, but it's
15        also single sided and it's DT 168425
16        through DT 168434.
17            (Choi Exhibit 12, documents bearing
18        Bates stamp No. DT 168425 through DT
19        168434, marked for identification.)
20        Q.    Here is another text exchange
21    between Ms. Majcher and yourself dated
22    February 11, 2022.
23            Do you see that, sir?
24        A.    Yes.
25        Q.    I would like to focus your
```



Page 112

```
  1                    N. Choi
  2   attention on the Bates ending 429.
  3             Would you agree with me, sir,
  4   around this time period, in February of 2022,
  5   you were beginning to grow disillusioned with
  6   Mr. Berris, right, sir?
  7             MR. WERNER:  Object to the form.
  8        A.   What do you mean by, what is that
  9   word?
 10        Q.   That's fair.  Let me rephrase it.
 11             You would agree with me, sir, that
 12   in the February 2022 time period, you were
 13   questioning Mr. Berris' conduct in connection
 14   with his work at De Tomaso?
 15        A.   His work -- are you referring
 16   specifically to this?  I mean, is that
 17   relevant to?
 18        Q.   In the big picture.
 19        A.    In the big picture, I have begun
 20   that, let's say question mark in my head,
 21   since I would say even early 2000.
 22        Q.   Okay.
 23        A.   If you want me to go into details,
 24   I can.
 25        Q.   Your testimony is that you first
```



Page 113

1                  N. Choi

2 started to have concerns in early 2000,

3 right?

4       A.    Yeah.

5       Q.    But you would agree with me that in

6 February 2022, you had growing concerns with

7 Mr. Berris, is that fair?

8       A.    I mean, it's accumulations of many

9 experiences that I have gone through since

10 the early concern raised in 2000 -- 2020.

11       Q.    Turning to 429.

12       A.    Uh-huh.

13       Q.    Here, again, we are talking -- you

14 guys are talking about various expenses,

15 right, sir?

16       A.    Which particular line?

17       Q.    Starting with -- turn to the prior,

18 page 28.  It says, I asked for invoices again

19 earlier this week, but no reply.

20            Do you see that?

21       A.    Who is it directed?

22       Q.    It's from Diana saying that in the

23 middle of the page at 11:55.

24       A.    Yes, I see it.

25       Q.    Then you see, if you jump down to



Page 114

```
 1                    N. Choi
 2   the last text on the page, Can't have
 3   unchecked expenses?
 4        A.   I would assume, are you referring
 5   to Ryan expenses?
 6        Q.   You're just talking about expenses
 7   generally.  I'm not sure who in particular.
 8        A.   If you look into -- I think even
 9   earlier in the previous pages, it does
10   mention actually the subject of concern is
11   Ryan.
12        Q.   That's fine.
13             My question is, you guys are
14   discussing expenses that have been billed to
15   De Tomaso, right?
16        A.   Expenses related to Ryan, yes.
17        Q.   Then you see at the bottom, on page
18   429, Ms. Majcher says, I will ask the
19   internal control review team to note that we
20   need to have a clear expense policy, then
21   Ryan will need to get in line.
22             Do you see that?
23        A.   I think it's pretty clear.
24        Q.   Once again, then at this point,
25   when you are discussing these expenses, you
```



Page 115

                          N. Choi
1
2    would agree there was not a clear expense
3    policy in place, right, sir?
4            MR. WERNER:  Object to the form.
5        A.    Again, I would refer to the
6    agreement that we had in the consultancy
7    agreement specifically state that there
8    should be a reimbursement process and
9    procedures.
10        Q.    So why don't you flip through the
11   rest of this and tell me whether or not you
12   reply to Ms. Majcher that, actually just look
13   at the consultancy agreement?  Do you say
14   that in response to her statement that we
15   need to have a clear expense policy?
16           MR. WERNER:  Object to the form.
17       A.    I'm not sure if I even replied.
18       Q.    Turn to the next page.
19           You say, Yes.  Thank you.
20           Do you see that, sir?
21       A.    I do.  I wrote it.
22       Q.    So you did reply, right?
23       A.    I have in this case.
24       Q.    You agree that nowhere in this
25   document do you refer Ms. Majcher to the



Page 116

```
 1                  N. Choi
 2  consultancy agreement as the formal expense
 3  policy, right, sir?
 4            MR. WERNER:  Object to the form.
 5      A.   I disagree to this.
 6      Q.   Show me where you make that
 7  reference in this text?
 8      A.   You keep going back.  I repeat the
 9  same thing, right, so I really specifically
10  already told you that we are referring to,
11  and this is also a known fact, that Ryan has
12  been on consultancy role with the company
13  since 2018 so it's something that is already
14  known.
15      Q.   So Mr. Choi, please listen to my
16  question.
17            Your CFO tells you on 429, I will
18  ask the internal control review team to note
19  that we need to have a clear expense policy,
20  then Ryan will have to get in line.
21            Do you see that?
22      A.   I do see that.
23      Q.   Then you respond on the next page,
24  Yes.  Thank you.
25            Do you see that?
```



Page 117

```
 1                   N. Choi
 2        A.   It's a very brief answer.
 3        Q.   Your testimony has been that there
 4   was a written policy and that was in the
 5   consultancy agreement, right, you said that
 6   to me multiple times, right, sir?
 7        A.   Right, and you asked me multiple
 8   times too.
 9        Q.   You are not listening to my
10   question.  My question is narrower.
11             Where do you respond in this text
12   exchange to Ms. Majcher saying, well, we need
13   to have a clear expense policy, we already
14   have one?
15             Do you say that?
16             MR. WERNER:  Object to the form.
17        A.   I can't travel back in time exactly
18   in what circumstances, how I reply, but yes,
19   I did reply, yes, thank you.
20        Q.   You make no reference to the
21   consultancy agreement in this text exchange,
22   right, sir?
23        A.   You can pick and choose.  Like I
24   said, I wrote a very simple, yes, thank you,
25   so in the grand scheme of things, there could
```



Page 118

1                    N. Choi

2    be multiple things that were going on at the

3    time, but if you want to pinpoint, I did

4    write down, yes, thank you.

5        Q.   You are saying, yes, thank you, to

6    her statement that I will ask the internal

7    control review team to note that we need to

8    have a clear expense policy, right, sir?

9             MR. WERNER:  Object to the form.

10       A.   Like I said, I don't want to repeat

11   myself, so my answer is very clear.  At that

12   moment in time, the context could be a number

13   of things, but I did reply, yes, thank you.

14            MR. WERNER:  That's not even true,

15        John, in terms of what you just

16        recommended the text exchange is.

17            So the document speaks for itself

18        at the end of the day, but I don't think

19        you have accurately stated what the text

20        says.

21       Q.   You can set that one aside.

22            Let's go back to, here is 10 --

23   would you mind lifting up 10?  I want to make

24   sure it's right?

25            MR. ZACH:  I will mark this as Choi



Page 119

                         N. Choi
 1
 2      13 just in case.
 3           MR. WERNER:  We took his 10.
 4           MS. WIGGER:  So 10 is withdrawn.
 5           MR. ZACH:  Withdrawn.
 6           (Choi Exhibit 13, April 20, 2022
 7      text exchange between Ms. Majcher and
 8      Mr. Choi, marked for identification.)
 9      Q.   You can see at the top, this is
10  another text exchange between Ms. Majcher and
11  yourself on April 20, 2022.
12           Do you see that?
13      A.   Uh-huh.
14      Q.   You can look at what you want, but
15  I want to direct your attention to 306.
16           Here again, you are talking about
17  Ryan's expenses and this is right before you
18  are about to terminate Mr. Berris, right,
19  sir, April 20, 2022?
20      A.   I see it here, yeah.
21      Q.   That's shortly before you fired
22  him, right?
23           MR. WERNER:  Object to the form.
24      A.   Actually, he resigned.
25      Q.   But it's right before the time


MAGNA
LEGAL SERVICES

Page 120

1                    N. Choi
2    period in which he left the employment at De
3    Tomaso?
4              MR. WERNER:   Object to the form.
5         A.   I can say he resigned in the
6    beginning of May.
7         Q.   You would agree that April 20th and
8    beginning of May are fairly close in time,
9    right?
10        A.   Yes.
11        Q.   You are discussing expenses and Ms.
12   Majcher says to you, going on to 307, Well,
13   if the expenses are justifiable company
14   expenses, then why give up so easily?  Do we
15   need to paper up Ryan's engagement?
16             Do you see that?
17        A.   I do.
18        Q.   By paper up Ryan's engagement, you
19   understood Ms. Majcher to be saying we need
20   to formalize the expense policy, right, sir?
21        A.   I cannot speculate what she
22   actually meant.
23             Did I reply?
24        Q.   You do reply.  We do.
25             And you can read your own reply on



Page 121

1                    N. Choi
2    the next page.
3         A.    Which reply will that be?
4         Q.    On 308.  You are the darker ones.
5    So you are talking about you need a more
6    formal writing with respect to Mr. Berris,
7    right?
8               MR. WERNER:  Object to the form.
9         A.    Again, do you mind pointing me out?
10        Q.    Sure.  Where Ms. Majcher says, Do
11   we need to paper up Ryan's engagement?  After
12   you were complaining about the expenses and
13   before that, she says, Well, if the expenses
14   are justifiable company expenses, then why
15   give up so easily?
16        A.    Yes.  In relation to expenses,
17   right.
18        Q.    So, again, you would agree, you had
19   no formal written expense policy, right?
20              MR. WERNER:  Object to the form.
21        A.    Like imagine you asked me multiple
22   times, I will ask you -- I will answer you
23   the same answer.
24        Q.    Despite the text we are looking at,
25   that does not change your testimony at all?



Page 122

                          N. Choi

1

2              MR. WERNER:  Object to the form.

3         A.   I, again, repeatedly going back to

4    the consultancy agreement.

5         Q.   We can put that aside.

6              MR. ZACH:  Now, I would like to

7         mark -- these are excerpts from

8         spreadsheets that were produced to us by

9         De Tomaso.  I'm marking as Choi 14.

10             (Choi Exhibit 14, document bearing

11        Bates stamp No. DT 00176285, marked for

12        identification.)

13        Q.   This is from the year 2021.

14             MS. WIGGER:  Do we have the Bates?

15             MR. ZACH:  I can get them for you.

16        Q.   You see, sir, at the top of this

17   document, it says, De Tomaso Automobile

18   Limited BVI?

19        A.   Yes.

20        Q.   Then it says funding advancements

21   from shareholder, right, sir?

22        A.   I see it here.

23        Q.   Does the shareholder refer to you?

24        A.   Yes.

25        Q.   I would like to look at a couple of



Page 123

1                    N. Choi
2    the expenses.
3            Can you look down at the fourth
4    from the bottom, Edith Chan Yang, 10,000 U.S.
5    dollars.
6            Do you see that?
7        A.    Uh-huh.
8        Q.    That's a payment to a real estate
9    broker?
10       A.    Yes.
11       Q.    Edith Chan Yang is the real estate
12   broker who assisted you in purchasing your
13   home here in Hudson Yards, right, sir?
14           MR. WERNER:  Object to the form.
15       A.    Yes.
16       Q.    What is your address here?
17           MR. WERNER:  Object to the form.
18       A.    35 Hudson Yards.
19       Q.    How much did you pay for that
20   apartment?
21       A.    Approximate 9.2 million.
22       Q.    You still reside there from time to
23   time?
24       A.    From time to time.
25       Q.    Are so this is a payment to real



Page 124

```
 1                  N. Choi
 2  estate broker from De Tomaso, right, sir?
 3            MR. WERNER:  Object to the form.
 4      A.    I think you can see it.
 5      Q.    That's right.
 6            Let's go to the next page.  You see
 7  the middle block says Norman Choi?
 8      A.    Uh-huh.
 9      Q.    I would like to go down to March
10  31st of 2022.
11            Do you see that?  It's a loan
12  repayment, Canaan Dance.
13      A.    Uh-huh.
14      Q.    And that is a dance school that
15  your daughter goes to, right, sir?
16            MR. WERNER:  Object to the form.
17      A.    She attended.
18      Q.    And that's -- the entry below that,
19  repayment of loan to Wong Sum Yee.
20            That's your wife, sir, right?
21      A.    Correct.
22      Q.    And going further down to
23  8/16/2023, there is an payment to the Ellison
24  Ballet Foundation.
25            Do you see that?
```



Page 125

```
 1                   N. Choi
 2        A.    Uh-huh.
 3        Q.    And that's a ballet foundation that
 4   you --
 5        A.    Uh-huh.
 6        Q.    That your daughter is interested
 7   in, right, sir, related to your daughter?
 8             MR. WERNER:  Object to the form.
 9        A.    Uh-huh.
10        Q.    Here, De Tomaso is making a payment
11   of over $10,000 to a ballet foundation,
12   right, sir?
13             MR. WERNER:  Object to the form.
14             You keep saying De Tomaso.  Just to
15        be clear, this is De Tomaso BVI.
16             MR. ZACH:  When I say De Tomaso, I
17        mean the record should be clear, it's De
18        Tomaso BVI.  That's a fair point.
19        A.    So this is a subject, as a
20   defendant?
21             MR. WERNER:  No.
22        Q.    So you are making personal payments
23   related no your daughter's dance out of the
24   De Tomaso BVI account?
25        A.    You don't need to muddle this.
```



Page 126

```
 1                    N. Choi
 2   It's a repayment of loan to myself, so I just
 3   have the company repay in the form as I
 4   directed.
 5       Q.    What loan to yourself, sir?
 6       A.    I loan company -- I loan money to
 7   the company.
 8       Q.    So the company is directly paying a
 9   ballet bill?
10       A.    My personal repayment.
11       Q.    It's going directly from the
12   company to the ballet, right?
13       A.    In this case, yes.
14       Q.    There are multiple examples of that
15   happening, right, sir?
16       A.    It's a repayment of loan.
17       Q.    Sir, would you agree that -- strike
18   that.
19       A.    Again, this is on a BVI level.
20       Q.    BVI is part of the corporate
21   structure of De Tomaso, correct, sir?
22            MR. WERNER:  Object to the form.
23       A.    Yes, it is part of the structure.
24       Q.    You can set that aside.
25            MR. ZACH:  I'm marking as Choi 15,
```



Page 127

```
 1                    N. Choi
 2        more of the general ledger from De
 3        Tomaso BVI.  This is for the year 2022.
 4        This is an excerpt.
 5             (Choi Exhibit 15, document bearing
 6        Bates stamp No. DT 000036656, marked for
 7        identification.)
 8             MS. WIGGER:  We will need the Bates
 9        for this one too.
10        Q.   Do you see this, sir?  It says De
11   Tomaso Automobile Limited BVI General
12   Journal?
13        A.   Uh-huh.
14        Q.   It's for the year 2022, right?
15        A.   Yes.
16        Q.   You see on the first page here,
17   you've got a loan repayment to Dream Maker
18   International LTD?
19        A.   Yes.
20        Q.   For $15 million?
21        A.   For what?
22        Q.   For $15 million.
23        A.   I don't see 15 -- that's Hong Kong
24   dollars.
25        Q.   Okay.  That's Hong Kong dollars?
```



Page 128

                        N. Choi
1
2        A.    Okay.
3        Q.    To be clear, actually go back to
4    the one we just looked at.
5              Were those sums, to your mind, in
6    Hong Kong dollars or U.S. dollars, just so
7    it's clear?
8        A.    Which sum particularly?
9        Q.    Any of the denominations.
10       A.    There is Euro and there is U.S.
11   dollars.
12       Q.    So it distinguishes.  I just want
13   to make sure.
14             My question is, what is Dream Maker
15   International?
16       A.    It's a company -- it's a subsidiary
17   of a company that I own.
18       Q.    What's the company that you own?
19   What's a company that it's a subsidiary of?
20       A.    Able Path.
21       Q.    What does Able Path do?
22       A.    It's investment holding company.
23       Q.    Who is the ultimate beneficial
24   owner of Able Path?
25       A.    I am.



Page 129

```
 1                    N. Choi
 2      Q.   Are the funds that are used for
 3  that investment company your family funds?
 4           MR. WERNER:  Object to the form.
 5      A.   It's my fund.
 6      Q.   So it's not mixed in with your
 7  family funds, it's just Norman Choi?
 8      A.   Yeah.
 9      Q.   You see the next one down, there is
10  a loan repayment, Canaan Dance, right, sir?
11           That's your daughter's dance
12  lessons, right?
13      A.   Yes, I think it would be the same
14  one as a previous entry.
15      Q.   Now we are 2022.  That was 2021.
16           MR. ZACH:  I don't mind being
17      corrected.
18           MR. WERNER:  They're 2022.
19      A.   I just want to get the dates
20  correct.
21      Q.   You have the other document in
22  front of you.  That's for 2021.  I think the
23  amounts are different.
24           MR. WERNER:  The other document is
25      2024.
```



Page 130

                    N. Choi
 1
 2          MR. ZACH:  We will send you the
 3      Bates, but it's for the year 2021.
 4          MR. WERNER:  It's '22, '23, '24.
 5          MR. ZACH:  The document speaks for
 6      itself.
 7      Q.    Going back to this, you would
 8  agree, sir, that on Choi 15, it reflects a
 9  payment on March 31st, I think you might be
10  right, 2022, of money to Canaan Dance, right,
11  sir?
12          MR. WERNER:  Object to the form.
13      Are we looking at 15?
14          MR. ZACH:  Fifteen, first page.
15      A.    Excuse me, this page?
16      Q.    Yes.  Then turning to the second
17  page, you see there is -- it lists a payment
18  to your wife, right, on April 14, 2022?
19      A.    Which page?
20      Q.    The second page of the last entry
21  while it's still gray.
22      A.    Uh-huh.
23      Q.    Did your wife work for De Tomaso?
24      A.    No, she does not.
25      Q.    Does your wife have any role



Page 131

```
 1                    N. Choi
 2    whatsoever in De Tomaso?
 3              MR. WERNER:  Object to the form.
 4         A.    I want to be clear, even on the
 5    entry, it does say repayment of loan.
 6         Q.    Is the repayment of loan to who?
 7         A.    I directed it to my wife.
 8         Q.    So you are --
 9         A.    The loan I extended to the company,
10    just to be clear.
11         Q.    So let me understand your
12    testimony.
13              You are saying that you made a loan
14    to De Tomaso, right?
15         A.    Yes.
16         Q.    What was that loan in particular
17    for?
18         A.    General working capital for the
19    company.
20         Q.    So this is the working capital that
21    you put into the company, right?
22         A.    I have.
23         Q.    You are taking money out of the
24    working capital to pay your wife directly,
25    right?
```



Page 132

                        N. Choi
1

2                MR. WERNER:  Object to the form.

3        A.    The way you put it, it sounds like

4   -- does not reflect the proper situation.

5   It's a repayment of loan and I directed the

6   company to send money to my wife.

7        Q.    I agree.  Do you know why --

8        A.    You are making it sound like very

9   funny.

10               I mean, I would prefer you ask me a

11  question professionally.

12       Q.    Do you think -- is this how Merrill

13  Lynch repaid your business expenses?

14               MR. WERNER:  Object to the form of

15       the question.

16       Q.    Did Merrill Lynch ever directly pay

17  your wife or your family for your business

18  expenses?

19               MR. WERNER:  Object to the form.

20       A.    I want to clearly mention, this is

21  on a BVI level, so if you have any questions

22  and auditor have any questions, they would

23  raise a flag to me, so everything that we

24  have done on the general level, conducted by

25  our accounting firm, it's all in proper



Page 133

1                    N. Choi

2    order.

3        Q.    Your accountants think it's -- who

4    are your accountants?

5        A.    MSPC.

6        Q.    Let's go to the next page.

7              You see at the bottom, there is a

8    July 21, 2022 payment to Edith Chan.

9              Do you see that?

10       A.    I think it's the same one that you

11   referred to.

12       Q.    Do you see that?  This one is for

13   $78,000.  I think that's Hong Kong which

14   would be about 10,000, right?

15       A.    I think we should get it cleared up

16   and not mix it up together.  It sounds like,

17   you know -- I mean, let's just have a proper,

18   like presentation on documentation.

19       Q.    My question to you sir, is --

20       A.    I don't want to confuse anyone.

21       Q.    Does this refer to a loan

22   repayment?

23       A.    Yes, it does.

24       Q.    Where does it say that?

25       A.    In the eventual accounting record.



Page 134

N. Choi

1

2      Q.    Let's go to the page 5.  Page 5,

3    October 15, 2022, you are, again, paying

4    Edith Chan Yang.

5            Do you see that?

6      A.    Same thing.  You are going over and

7    over again.

8      Q.    This has a different date, doesn't

9    it, sir?  The last one was dated July 21st.

10   This one is dated --

11     A.    Again, if you look at the headline,

12   repayment Norman.

13     Q.    But again, so I understand the

14   structure again, you are taking from working

15   capital of the company --

16     A.    It's a loan, so it's a repayment

17   terms, so you repay when the capital is

18   available.

19     Q.    So where is that specific term set

20   forth?

21     A.    We have a loan agreement.

22     Q.    You have a loan agreement and the

23   terms of the loan let's you have the loan be

24   repaid --

25     A.    When it's appropriate.



Page 135

1                     N. Choi
2       Q.   Who determines when it's
3  appropriate?
4       A.   I'm the owner of the company so
5  when I deem it is appropriate and it is.
6       Q.   This loan that was made, was that
7  cash you put into the company?
8       A.   Can you repeat again.
9       Q.   The loan that you made to the
10 company, was it in cash?
11      A.   In cash.
12      Q.   It was in cash?
13      A.   Yes.
14      Q.   How much in cash was it?
15      A.   I need to look at the overall, but
16 in the tens of millions.
17      Q.   Did you make any other type of loan
18 to the company that was not in cash?
19           MR. WERNER:  Object to the form.
20      A.   I want to answer very carefully.
21 So if it is a loan, it is, in fact, a cash
22 injection into the company.
23      Q.   I'm asking you, when we were
24 talking about these loan repayments, I'm
25 trying to understand what the loan was.



Page 136

                        N. Choi

1
2          So the loan that you made to the
3    company was in cash, right?
4          A.    Yes.
5          Q.    Did you make any other loans that
6    did not involve cash to the company?
7          A.    No, just cash.
8          Q.    So anything that you are -- so any
9    of these withdrawals designated as repayments
10   to Norman are repayments for the cash you put
11   into the company for working capital?
12         A.    Uh-huh.
13         Q.    You can put that one aside.
14              MR. ZACH:  I'm going to mark as
15        Choi 16.
16              (Choi Exhibit 16, document bearing
17        Bates stamp No. DT 00167101, marked for
18        identification.)
19         Q.    This is, again, the general ledger,
20   general journal, excuse me, of De Tomaso
21   Automobile Limited Hong Kong.
22              This is a different entity, is that
23   correct, sir?
24         A.    That's correct.
25         Q.    And within here, I would like to



Page 137

```
 1                    N. Choi
 2   point you to a couple of -- if you turn to
 3   page 30.
 4        A.    Uh-huh.
 5        Q.    Do you see there is expenses there
 6   dated -- these are the ones that are kind of
 7   shaded a bit and they're dated August 9, 2023
 8   and it says to Wong Sum Yee.
 9              That's your wife, right?
10        A.    That's correct.
11        Q.    And it's a reimbursement for the
12   Villa L'Oleandra.
13              Do you see that?
14        A.    Uh-huh.
15        Q.    That's property in Italy, right?
16        A.    Somewhere in Europe, I'm not sure
17   if it's Italy or France.
18        Q.    Do you know who owns that property?
19        A.    I do not know.
20        Q.    Why are you reimbursing your wife
21   for that?
22              MR. WERNER:  Object to the form.
23        A.    Just from a recollection, so
24   probably my wife has paid for certain venues
25   -- this is '23, we had a company retreat and
```



Page 138

```
 1                    N. Choi
 2    then she went and booked it through Airbnb.
 3         Q.   Who attended the company retreat?
 4         A.   Diana and also our number of
 5    colleagues, including Stefan, including Jake,
 6    Abby and Jakub and his wife and Stefan's
 7    wife.
 8         Q.   Do you know whether or not this
 9    property is owned by a movie actor?
10         A.   I do not.  Is it?
11         Q.   Okay.  You can set that aside.
12              MR. ZACH:  I would like to mark as
13         Choi 17.
14              (Choi Exhibit 17, sales contract
15         for Apollo Arrow IE prototype, marked
16         for identification.)
17         Q.   Do you recognize this document,
18    sir?
19         A.   I do.
20         Q.   What is it?
21         A.   It's a sales contract.
22         Q.   For what?
23         A.   It states right there, Apollo Arrow
24    IE prototype.
25         Q.   It says 1 of 2, right?
```



Page 139

1                          N. Choi

2          A.    Yes.

3          Q.    There are two Apollo Arrow IE

4    prototypes made?

5          A.    Correct.

6          Q.    This is being sold by Apollo to an

7    entity called Pachmar.

8                Do you see that?

9          A.    Correct.

10         Q.    What is Pachmar Limited?

11         A.    It is an investment company.

12         Q.    Is it your investment company?

13         A.    It's my uncle's.

14         Q.    What is your uncle's name?

15         A.    Eddie Winata, W-I-N-A-T-A.

16         Q.    What does Mr. Winata do?

17         A.    He is a businessperson.

18         Q.    What kind of business is he in?

19         A.    Mining.

20         Q.    Is he in Indonesia or Hong Kong?

21         A.    Indonesia.

22         Q.    Did you deliver this car to

23    Indonesia?

24                MR. WERNER:  Object to the form.

25         A.    No, we did not.



Page 140

```
 1                    N. Choi
 2      Q.    It was never delivered.
 3            MR. ZACH:  I would like to mark the
 4      next item as Choi 18.
 5            (Choi Exhibit 18, sales contract
 6      for the second Apollo Arrow IE
 7      prototype, marked for identification.)
 8      Q.    Looking at Choi 18, do you
 9  recognize this document?
10      A.    It's the same document.
11      Q.    No, it's not.
12      A.    Except for this is 2 of 2.
13      Q.    If you look at them side by side,
14  Choi 17, if you look at balance payment, it
15  says it's due no later than the 30th of June
16  2017.
17            Do you see that?
18      A.    Uh-huh.
19      Q.    If you look at Choi 18 for the
20  second prototype, it's the 31st of July 2017.
21            Do you see that?
22      A.    Uh-huh.
23      Q.    This is the sale of the second
24  Apollo Arrow IE prototype, right?
25      A.    Yes.
```



Page 141

                        N. Choi

1
2       Q.    And this is to your uncle's
3    company?
4       A.    Uh-huh.
5       Q.    Do you have any financial interest
6    whatsoever in your uncle's company?
7       A.    They are customers, the IE as well
8    as De Tomaso.
9       Q.    They are customers of De Tomaso?
10      A.    Uh-huh.
11      Q.    Did you deliver the second
12   prototype to your uncle in Indonesia?
13      A.    Not to Indonesia.
14      Q.    Where did you deliver it to?
15      A.    Germany.
16      Q.    Your uncle took possession of both
17   prototypes?
18      A.    According to the contract.
19      Q.    I'm not talking about the
20   contracts.
21            Did your uncle physically take
22   possession of the two protocol types?
23            MR. WERNER:  Object to the form.
24      A.    What do you mean physically?
25      Q.    When you go to a car dealership,



Page 142

```
 1                   N. Choi
 2   you buy a car, you drive it off the lot so
 3   you can drive it.
 4           Did your uncle get the car
 5   delivered to him in Germany and did he drive
 6   it around?
 7           MR. WERNER:  Object to the form.
 8       A.   The question is according to
 9   contract, he performed what is asked for.
10       Q.   I'm not asking about the contract.
11       A.   He signed off the contract.
12       Q.   Did he ever receive the physical
13   car, sir?
14       A.   As far as the contract is
15   concerned, yes.
16       Q.   Sir, I understand.
17           Do you understand that the contract
18   requires performance, right?
19       A.   Uh-huh.
20       Q.   He paid you money, he paid Apollo
21   money and in return for paying money, he
22   should get a car, right?
23       A.   I don't see any point that he
24   didn't get a car.
25       Q.   How many other prototypes were
```



Page 143

```
 1                    N. Choi
 2    there?
 3         A.    Another one.
 4         Q.    There are the two, right?
 5         A.    There are three.
 6         Q.    Where were those cars physically
 7    built?
 8         A.    Germany -- this one is built in
 9    Italy originally.
10         Q.    Both prototypes were built in
11    Italy?
12         A.    Yes.  By, in fact, Ryan ex-company.
13         Q.    And, sir, did Pachmar take delivery
14    of a physical automobile?
15         A.    As far as the contract is
16    concerned, yes.
17         Q.    You -- setting aside the contract,
18    after they signed the contract, after they
19    paid the money, was a car given to them?
20              MR. WERNER:  Object to the form.
21         A.    Yes.
22         Q.    How was it given to them?
23         A.    It's a car, presented in a factory.
24         Q.    So was it taken from the factory
25    and given to your uncle?
```



Page 144

```
 1                    N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.    I don't know what your question is
 4  trying to drive at.
 5       Q.    Is anybody driving this car?
 6            MR. WERNER:  Object to the form.
 7       A.    It's a prototype.
 8       Q.    What does that mean, it's a
 9  prototype?
10       A.    Prototype is a car that you do
11  prior to the actual preproduction prototypes,
12  prior to production, so it can be a display,
13  it could be a collection, it could be a
14  number of things.
15       Q.    Did Pachmar ever take possession of
16  either of the two prototypes?
17       A.    I answered that question, yes.
18       Q.    Where did they take possession?
19       A.    I already said, in Germany.
20       Q.    Who from Apollo handed over the car
21  to them?
22       A.    I did.
23       Q.    So you handed the keys to your
24  uncle?
25       A.    It doesn't have a key.  It's a
```



MAGNA
LEGAL SERVICES

Page 145

```
 1                    N. Choi
 2  prototype.
 3       Q.    Where did you give it to him?
 4       A.    In Germany.
 5       Q.    Where in determine any?
 6       A.    Denkerdorf, D-E-N-K-E-R-D-O-R-F.
 7       Q.    Is it a city?
 8       A.    It's a small town.
 9       Q.    Where did you meet with your uncle?
10       A.    Again, they took possession.  So
11  whatever you are trying to get at, so
12  everything was followed according to the
13  spirit of the contract, everything has been
14  executed according to proper order.
15       Q.    I still don't think you answered my
16  question, sir.
17       A.    I answered your question already.
18       Q.    Did your uncle -- did you meet
19  personally with your uncle to give him the
20  car so he could display it somewhere?
21            MR. WERNER:  Object to the form.
22            You didn't ask that question.
23       A.    As far as Apollo is concerned, as
24  far as Pachmar concerned, transaction has
25  completed and possession has taken.
```



Page 146

1                        N. Choi

2        Q.    I understand what you are saying

3    legally.

4              I'm asking you, Pachmar bought a

5    car?

6        A.    Uh-huh.

7        Q.    Most people, when they buy a car,

8    get the car so they could drive it around.

9              You would agree with me with that,

10   right?

11       A.    This is not a common car.  It's a

12   very special car.

13       Q.    I know it's a very special car, but

14   even people that buy special cars, they pay

15   money so they can display it, they can drive

16   it, they can do what they have.

17       A.    It's a prototype.  It's not meant

18   to be driven.

19       Q.    Is it meant to be displayed?

20       A.    Yes.  That could be one

21   possibility.

22       Q.    Where did your uncle display the

23   car then?

24              MR. WERNER:  Object to the form.

25       A.    Again, as far as the spirit of the



Page 147

```
 1                   N. Choi
 2   contract is concerned, it is taken possession
 3   and it has been completed.
 4        Q.   You would agree with me, sir, that
 5   you never actually handed over the car to
 6   your uncle, did you?
 7             MR. WERNER:  Object to the form.
 8        A.   I completely disagree.
 9        Q.   Where did you hand over the car to
10   your uncle?
11             MR. WERNER:  Object to the form.
12        A.   I repeat three times, in Germany.
13        Q.   Where did you meet with him to hand
14   over the car?
15             MR. WERNER:  Object to the form,
16        asked and answered.
17        A.   You want me to repeat again.
18        Q.   I want --
19        A.   As far as the contract is
20   concerned, it is executed and it is -- it has
21   taken possessions in Germany.
22        Q.   So where is it today, the
23   prototype?  Where was it in 2017?  Where was
24   it sitting?
25        A.   In, like I said, in Germany.
```



Page 148

```
 1                     N. Choi
 2      Q.   It was in a warehouse in Germany,
 3  right?
 4      A.   It was in the factory in Germany.
 5      Q.   Did the prototype every leave the
 6  factory to your knowledge?
 7      A.   To my knowledge, yes.
 8      Q.   Where did it go?
 9      A.   It later became De Tomaso
10  prototypes.
11      Q.   Where did it have to travel from,
12  the factory to where to become a De Tomaso
13  prototype?
14           MR. WERNER:  Object to the form.
15      A.   In Germany.
16      Q.   Was it the same factory or a
17  different factory?
18      A.   Different factory.
19      Q.   So it was moved from one factory to
20  another correct?
21      A.   Correct.
22      Q.   In between, did your uncle actually
23  take physical possession of the car?
24           MR. WERNER:  Object to the form.
25      A.   I look after the car for him.
```



Page 149

```
 1                    N. Choi
 2        Q.    You looked after the car for him,
 3   right?
 4        A.    Uh-huh.
 5        Q.    You could have -- I understand
 6   that.
 7              After this contract was signed, you
 8   maintained possession of the car for him?
 9        A.    You could say that.
10        Q.    Did he ever sell it back to you?
11              MR. WERNER:  Object to the form.
12        A.    Eventually, De Tomaso purchased it.
13              MR. ZACH:  Let me mark as Choi 19.
14              (Choi Exhibit 19, sales contract
15        for Apollo IE prototypes, marked for
16        identification.)
17        Q.    Do you recognize Choi 19, sir?
18        A.    I do.
19        Q.    What is it?
20        A.    It's a sales contract.
21        Q.    What is being sold?
22        A.    The Apollo IE prototypes.
23        Q.    This is one of cars we just
24   discussed, right?
25        A.    Correct.
```



Page 150

```
 1                    N. Choi
 2        Q.   Who is selling it?
 3        A.   In this case, seller is Norman
 4   Choi.
 5        Q.   That's you, right?
 6        A.   Yes.
 7        Q.   It's not Pachmar?
 8        A.   Not in this case.
 9        Q.   It's not your uncle, right?
10        A.   No.
11        Q.   So you are now selling the car to
12   De Tomaso, right, sir?
13        A.   Correct.
14        Q.   The prior contracts that we looked
15   at were from 2017, right, sir?
16        A.   Uh-huh.
17        Q.   At that time, you -- going back to
18   the Pachmar contracts, Choi 17 and Choi 18,
19   at that time, you were CEO of Apollo,
20   correct?
21        A.   Correct.
22        Q.   When you sold them to your uncle,
23   you sold these cars for 900,000 Euro, right,
24   sir?
25        A.   Uh-huh.
```



Page 151

1                    N. Choi

2        Q.    Then you watched over the cars for

3    your uncle, right?

4        A.    Uh-huh.

5        Q.    Now, in March 1st of 2019, you are

6    selling that same car to De Tomaso for 3.5

7    million Euro, right?

8        A.    Uh-huh.

9        Q.    You have to say yes or no?

10       A.    That's what it says here.

11       Q.    That is an increase of 2.6 million

12   Euro, right?

13       A.    Yes.

14       Q.    Did your uncle sell you the car,

15   sir?

16       A.    He did.

17       Q.    How much did he sell it to you for?

18       A.    I don't recall.

19       Q.    Do you have any documentation of

20   him selling it to you, sir?

21       A.    I need to look.

22       Q.    You were served with multiple

23   document requests actually asking about

24   Pachmar and Mr. Winata and we were told there

25   is no relevance to that.



Page 152

```
 1                    N. Choi
 2            Is it your testimony today that you
 3    have a written agreement with your uncle to
 4    sell this car back to you?
 5            MR. WERNER:  Object to the form.
 6       A.    I don't recall.
 7       Q.    You don't recall how much he sold
 8    it to you for?
 9       A.    No.
10       Q.    I will show you another document.
11            MR. ZACH:  This is Choi 20.
12            (Choi Exhibit 20, sales contract
13        for the second prototype to De Tomaso,
14        marked for identification.)
15       Q.    Do you recognize Choi 20, sir?
16       A.    I see it.
17       Q.    It's very similar to Choi 19,
18    right?
19       A.    Uh-huh.
20       Q.    This is the sales contract for the
21    second prototype, right?
22       A.    Uh-huh.
23       Q.    And who is the seller?
24       A.    Myself.
25       Q.    Who are you selling it to?
```



Page 153

                    N. Choi
1
2        A.    To De Tomaso which also, for the
3    record, also myself.
4        Q.    Exactly.  So to follow this
5    prototype, Apollo first sold it to your
6    uncle's company, right, back in 2017?
7        A.    Correct.
8        Q.    And it sold it at a substantial
9    discount, right, sir?
10            MR. WERNER:  Object to the form.
11        A.    I don't want to characterize it as
12    in the form of a discount.
13        Q.    So you don't --
14        A.    There was a time period of a year
15    and a half, two years.
16        Q.    So you don't think 900,000 Euro was
17    a discounted price to sell the prototype to
18    your uncle?
19            MR. WERNER:  Object to the form.
20        A.    I don't recall how it was valued at
21    the time.
22        Q.    But you are not disputing that it
23    was 900,000 Euros?
24        A.    That is stated there.
25        Q.    Do you have any control over



Page 154

```
 1                    N. Choi
 2   Pachmar's books and records?
 3        A.   I don't.
 4        Q.   Do you have any control over
 5   Pachmar's bank accounts?
 6        A.   I don't.
 7        Q.   Do you receive information relating
 8   to Pachmar -- do you have access to like
 9   Pachmar's bank statements, where they're
10   mailed?
11             MR. WERNER:  Object to the form.
12        A.   I don't recall having them.
13        Q.   Have you ever had any ability to
14   look at internal Pachmar documents?
15        A.   I don't recall.
16        Q.   So you have -- your sworn testimony
17   is you have no involvement whatsoever with
18   Pachmar?
19        A.   Like I said, I don't recall.
20        Q.   That's different.
21             What leads you from -- what makes
22   you question whether or not you may have had
23   involvement with Pachmar?
24             MR. WERNER:  Object to the form.
25        A.   Like I said, I don't recall.
```



Page 155

                        N. Choi

1

2       Q.    So is there anything that resides

3   in your mind now that makes you think you

4   might have had some involvement with Pachmar?

5       A.    Should I?

6       Q.    I'm asking you, sir.

7       A.    I don't know.  I mean, I said three

8   times, I don't recall.

9       Q.    It's not your company, right, sir?

10      A.    It's not.

11      Q.    You have no involvement with it,

12  right, sir?

13            MR. WERNER:  Object to the form.

14      A.    Involvement as in what?

15      Q.    As in its operation, its finances,

16  its internal operations.

17            MR. WERNER:  Object to the form,

18        asked and answered.

19      Q.    Right?

20      A.    Like I said, I already answered.

21      Q.    In any event, you sell both of

22  these -- going back, did you authorize the

23  sale of the Apollo IE prototypes to your

24  uncle back when they happened back in 2017?

25      A.    I would be the one, yes.



Page 156

                         N. Choi

1

2    Q.    Then at some point, it's your

3    testimony that your uncle sold both of these

4    prototypes back to you?

5    A.    Yes.

6    Q.    As you sit here today, you haven't

7    produced any sort of documentary evidence

8    showing that, right?

9          MR. WERNER:  Object to the form.

10   A.    I'm not sure.

11   Q.    Do know what the price was for

12   either of the two Apollo IEs when your uncle

13   sold them back to you?

14         MR. WERNER:  Object to the form.

15   A.    I don't recall.

16   Q.    Now, you then sell these cars back

17   to De Tomaso for $3.5 million each right --

18   Euros?

19   A.    Uh-huh.

20   Q.    What was the business purpose in --

21   strike that.

22         MR. ZACH:  I'm going to mark for

23         you Choi 21.

24         (Choi Exhibit 21, March 11, 2020

25         text exchange between Mr. Choi and Ms.



Page 157

```
 1                N. Choi
 2        Majcher, marked for identification.)
 3        Q.   Mr. Choi, this is a text exchange
 4   between you and Ms. Majcher from March 11,
 5   2020.
 6             Do you see that?
 7        A.   Yes, I do.
 8        Q.   We can see that the last sales
 9   contract from yourself to De Tomaso was on
10   March 1, 2019, right?
11        A.   Sorry, are you referring to the
12   WhatsApp messages?
13        Q.   Sorry.  That was a bad question.
14   I'm trying to frame this in time.
15             MR. WERNER:  The last contract was
16        February 2020.
17        Q.   One is in March 2019 and Paul is
18   right, the second one is February 2020,
19   right?
20        A.   Uh-huh.
21        Q.   So this is a little over a month
22   after the sale of the second prototype to De
23   Tomaso, right?
24        A.   Which one?  I'm looking at February
25   3rd and then March 1st.
```



Page 158

```
 1                   N. Choi
 2        Q.    I'm talking about the February 3rd.
 3        A.    Uh-huh.
 4        Q.    You can look at whatever you want,
 5   but I ask we sort of focus on page starting
 6   at 133.
 7        A.    Okay.
 8        Q.    Tell me when you are there.
 9        A.    Okay.
10        Q.    So you see you are saying at the
11   bottom of 133 to Ms. Majcher, We will be
12   making the same arrangements for prototype IE
13   owned by Pachmar to transfer to DT, hence,
14   same value as first one which was 3.5 million
15   Euro.  Please check.
16              Do you see that?
17        A.    Uh-huh.
18        Q.    So you are referring to Pachmar
19   there, not to -- you don't mention what you
20   just testified to, that your uncle sold it
21   back to you, right?
22              MR. WERNER:  Object to the form.
23        A.    You cannot pick one line out of
24   10,000 messages, so I don't recall exactly
25   what may have said on the phone, so, but if
```


MAGNA
LEGAL SERVICES

Page 159

                        N. Choi

1    you -- I mean, it's as simple as this.  It's

2    what I stated here, owned by Pachmar, that's

3    what I wrote.

4        Q.   We just looked at Choi 20 and Choi

5    19, right?

6        A.   Uh-huh.

7        Q.   And just so the record is very

8    clear, in Choi 19, it references a sale by

9    you, Norman Choi, not Pachmar, to De Tomaso

10   on March 1, 2019, right?

11           MR. WERNER:  Object to the form.

12       A.   Right.

13       Q.   Then on February 3, 2020, Norman

14   Choi, not Pachmar, sold for 3.5 million Euro

15   to De Tomaso the second prototype, right,

16   sir?

17           MR. WERNER:  Object to the form.

18       A.   Okay.

19       Q.   Now, here, in March 11, 2020, you

20   are writing Ms. Majcher saying that you want

21   to make the same arrangement for the

22   prototype IE owned by Pachmar to transfer to

23   DT.

24           Do you see that?



Page 160

                    N. Choi
 1
 2       A.    I do.
 3       Q.    So this is after the sale actually
 4  happened, right, sir?
 5             MR. WERNER:  Object to the form.
 6       A.    The sale of?
 7       Q.    What we see in Choi 19 and Choi 20.
 8       A.    Okay.
 9       Q.    Did you backdate these contracts,
10  Choi 20 and Choi 19?
11             MR. WERNER:  Object to the form.
12       A.    Backdate which contract?
13       Q.    Pull out Choi 19 please.
14       A.    However you want to frame me on the
15  back date.  Again, we have a professional
16  auditor that does audit and you can probably
17  refer back to the audit report for the
18  purpose.
19             So I wouldn't use the word, I'm
20  correcting you, you shouldn't be using the
21  word backdated.
22       Q.    Let me ask you this.  Did you sign
23  Choi 19, sir, at the time, on or about March
24  1, 2019?
25       A.    I think you are getting it mixed



Page 161

                        N. Choi

1  up.  Which contract?  This particular

2  contract?

3       Q.    Choi 19, there is a sticker on it.

4       A.    I signed this, yes.

5       Q.    Did you sign that?  So you signed

6  it on page 2, right, sir?

7       A.    Yes.

8       Q.    Do you see that the contract is

9  dated March 1, 2019?  Do you see that, sir?

10      A.    Uh-huh.

11      Q.    Did you sign this contract on or

12 about March 1st of 2019?

13      A.    It appears to be, yes.

14      Q.    I'm not saying does it appear to.

15            Do you recall signing it?

16      A.    You are asking --

17      Q.    Around March 1, 2019?

18      A.    You are asking me to travel back

19 over five years ago.

20            My answer is, it's probably me, I

21 signed it.

22      Q.    You are frustrated that I used the

23 word backdating.  Backdating means you sign a

24 contract after the fact.



Page 162

                    N. Choi

1
2              Did you sign this contract after
3      the fact or at the time it actually occurred?
4              MR. WERNER:  Object to the form.
5          A.    Like I said, the agreement states
6      it here, it states 2019 and that is when I
7      signed it and if you have any objectable
8      doubt, you can refer back to any audit report
9      that we have produced by professionals.
10         Q.    You are the CEO of the company,
11     right?
12         A.    I am the CEO.  I was the CEO, yes.
13         Q.    You've been around auditors your
14     entire career, right, sir?
15             MR. WERNER:  Object to the form.
16         A.    Some part of my career, yes.
17         Q.    You understand that auditors
18     receive documents from the company, right,
19     sir?
20         A.    Yeah, in the natural course of
21     business.
22         Q.    You understand that as the CEO,
23     it's your responsibility to supply truthful
24     information to your auditors?
25             MR. WERNER:  Object to the form.



Page 163

                         N. Choi
1
2       A.    That is supposed to be, yeah.
3       Q.    Let's keep going with this
4  document.  Let's turn to page 135 of the
5  texts.  Ms. Majcher says, You mean transfer
6  the purple IE to DT?  How to justify $3.5
7  million when Pachmar bought it for 950-K.
8             Do you see that?
9       A.    Uh-huh.
10      Q.    You say, We paid MAT Euro plus 7
11 million for the two IE.
12            Do you see that?
13      A.    Uh-huh.
14      Q.    What does, we paid MAT Euro plus 7
15 million for the two IE mean to you?
16      A.    As far as I remember, the
17 consideration that were paid to Ryan's
18 ex-employer was over Euro 7 million, it could
19 have been eight, I don't remember exactly the
20 number, but it was a lot of money.
21      Q.    So if you paid them, then you would
22 agree with me that when you sold it initially
23 to your uncle, that it was sold at a
24 discount?
25            MR. WERNER:  Object to the form.



Page 164

```
 1                    N. Choi
 2        A.    I wouldn't say it was a discount.
 3   It was prototypes that had been used.
 4        Q.    Now, it says, We did, but we sold
 5   it to Pachmar at a loss because it's a
 6   prototype and now we are buying it back after
 7   it being used for so long at 3X what we sold
 8   for.  Just need to have a good story that
 9   makes commercial sense.
10           Do you see that?
11        A.    Uh-huh.
12        Q.    So you are telling -- and at this
13   time, Ms. Majcher was your CFO, right?
14        A.    At the time, either the title --
15           MR. WERNER:  Object to the form.
16        A.    I don't remember exactly the title.
17        Q.    This is you telling your CFO that
18   you just need to have a good story that makes
19   commercial sense, right?
20           MR. WERNER:  Object to the form.
21        A.    I don't know if I wrote that.  You
22   said I wrote.
23        Q.    This is Ms. Majcher saying that.
24   You're right.  That's fair enough.
25           Ms. Majcher is saying, We need to
```



Page 165

```
 1                    N. Choi
 2  have a good story that makes commercial
 3  sense.
 4           Do you see that?
 5      A.   Uh-huh.
 6      Q.   Nowhere in here do you reference
 7  how much you purportedly paid your uncle to
 8  get the car back, right?
 9           MR. WERNER:  Object to the form.
10      A.   It's not explicitly stated here.
11      Q.   Can you produce for us a bank
12  transfer or financial information that shows
13  how much you paid your uncle for this car?
14           MR. WERNER:  Object to the form.
15      A.   I'm not sure if I can.
16      Q.   Do you have bank accounts going
17  back to 2019 or 2020?
18           MR. WERNER:  Object to the form.
19      A.   I am not sure.
20      Q.   Does De Tomaso maintain general
21  ledgers and corporate records that go back to
22  this time period?
23           MR. WERNER:  Object to the form.
24      A.   I would assume so.  I would have to
25  check.
```



Page 166

```
 1                    N. Choi
 2       Q.   Does Apollo keep bank records that
 3  go back to that time?
 4            MR. WERNER:  Object to the form.
 5       A.   I would assume so.
 6       Q.   Have you seen anywhere in your
 7  preparation for -- setting aside anything
 8  your counsel told you, have you seen any
 9  evidence anywhere in the record to date that
10  shows the amount that you purportedly paid
11  your uncle to get these cars back?
12            MR. WERNER:  Object to the form.
13       A.   Again, I'm not sure.
14       Q.   You can put that document away.
15            MR. WERNER:  Is it time for a
16       break?
17            MR. ZACH:  Give me a little bit.
18            MR. WERNER:  If you are wrapping
19       up.
20            MR. ZACH:  I can't commit to that,
21       so let's take a break.
22            THE VIDEOGRAPHER:  We are going off
23       the record.  The time is 1:23 p.m.
24            (Luncheon recess taken at 1:23
25       p.m.)
```



Page 167

1                    N. Choi

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 168

```
 1                    N. Choi
 2            A F T E R N O O N    S E S S I O N
 3            (Time noted:  2:05 p.m.)
 4  N O R M A N    C H O I,  resumed and testified
 5     as follows:
 6            THE VIDEOGRAPHER:  We are back on
 7       the record.  The time is 2:05 p.m.
 8            MR. ZACH:  We are back from lunch.
 9       I want to stick with these prototypes.
10            I'm going to mark as Choi 22, a
11       motor vehicle bill of sale.
12            (Choi Exhibit 22, motor vehicle
13       bill of sale dated May 11, 2021, marked
14       for identification.)
15  EXAMINATION BY (Cont'd.)
16  MR. ZACH:
17       Q.   Do you recognize this document sir?
18       A.   I'm looking, yes, actually, it's --
19  okay.  All right.
20       Q.   So this document is a motor vehicle
21  bill of sale, right?
22       A.   Yes.
23       Q.   And it's dated May 11, 2021?
24       A.   Yes.
25       Q.   And this is after the documents
```



Page 169

```
 1                    N. Choi
 2   that we were just looking at in which you,
 3   Norman Choi, sold the two Apollo IE
 4   prototypes to De Tomaso, right?
 5        A.   Yes.
 6        Q.   You see here, this document says
 7   that one of the prototypes is going to be
 8   sold again to De Tomaso.
 9             Do you see that?
10        A.   To De Tomaso NA LLC, right.
11        Q.   Who does this document indicate is
12   selling that document -- that car to De
13   Tomaso Automobile NA Holdings LLC?
14        A.   You mean the seller?
15        Q.   Yes.
16        A.   It says Ideal Team Ventures.
17        Q.   Ideal Team Ventures is a company
18   owned by you, right?
19        A.   Correct.
20        Q.   When did the car get sold from De
21   Tomaso to Ideal Team Ventures?
22             MR. WERNER:  Object to the form.
23        A.   I don't think it was official
24   record to that, so because if you look at the
25   previous purchase agreement, it's in my name,
```



Page 170

                    N. Choi
1
2   so I just have it categorized and I do Team
3   Ventures in this case.
4        Q.   Can you tell which of the two
5   prototypes this is from this document?
6        A.   It says 01.
7        Q.   So let's --
8        A.   The No. 1.
9        Q.   So let's go to, back to Choi 19 and
10  20 don't distinguish between the two
11  prototypes, do they?
12       A.   They usually have a chassis number.
13  Okay.
14       Q.   So when we last left off, I'm just
15  going to take the later one, the February
16  2020.
17            In February 2020, you, Norman Choi,
18  sold prototype to De Tomaso Automobile
19  Limited, right?
20       A.   Yes.
21       Q.   Then approximately a little over a
22  year later, we have that same car being sold
23  by Ideal Team Ventures to De Tomaso
24  Automobile NA Holdings, right?
25       A.   Uh-huh.



Page 171

                          N. Choi

1

2      Q.    Between when you sold the car to De

3   Tomaso in 2020 and to this document in May

4   2021 in which Ideal Team Ventures sells it

5   again to De Tomaso, was there a transfer from

6   De Tomaso to Ideal Team Ventures?

7           MR. WERNER:  Object to the form.

8      A.    I think I stated, I don't exactly

9   remember if there is a document reflecting

10  that.

11     Q.    But what happened?  Tell me what

12  happened.

13     A.    I mentioned to you the purchase

14  agreement, the one that you presented was to

15  myself and then Ideal Team also is actually

16  100 percent ownership by Norman Choi.

17     Q.    I see.  So your view of it is

18  essentially that since you are the owner of

19  these companies, it doesn't really matter

20  which one is --

21     A.    It does.  I mean, I'm sure it

22  reflects we have some sort of record and, for

23  that matter, maybe you can check in with

24  Diana tomorrow when she does the corporate

25  testimony.



Page 172

1                     N. Choi

2      Q.    It's not fair to give it to Diana

3  for tomorrow, so...

4      A.    I think it's a proper record.  I

5  don't remember everything.

6      Q.    Can you think of a business purpose

7  why -- strike that.

8            Can you think of a commercial

9  purpose for De Tomaso to sell the car to

10  Ideal Team Ventures?

11           MR. WERNER:  Object to the form.

12      A.    Hold on.  This is a bill of sale

13  agreement from De Tomaso to the buyer in this

14  case, so buyer is De Tomaso and seller is

15  Ideal Team and in this case, the sale

16  purchase price was 500,000, so one thing that

17  I remember why we had 500,000 stated there

18  was for the importations to the U.S. so that

19  somehow we would reduce the import tax to the

20  U.S., but to a larger extent, I think, again,

21  as Diana is going to do the deposition

22  tomorrow, she can give you a clear answer to

23  that.

24      Q.    Let me ask you about that.

25           Looking back at Choi 20 -- excuse



Page 173

```
 1                    N. Choi
 2   me -- Choi 20, the February 2020 sales
 3   contract.
 4              At that point, you, Norman Choi,
 5   sold the Apollo IE prototype to De Tomaso for
 6   3.5 million Euro, right?
 7        A.   Uh-huh.
 8        Q.   I don't want to go back over it.
 9              You saw the texts about Ms. Majcher
10   and you discussing commercial purpose for
11   that increase of sale from when it was
12   initially sold to Pachmar a few years
13   earlier, right?
14              Do you remember that?
15        A.   Going back to this, are you saying
16   that Ideal Team is not selling at substantial
17   price to De Tomaso --
18        Q.   Let me ask the question.  I'm
19   asking, looking at Choi 20, you are selling a
20   car, a prototype from yourself to De Tomaso
21   which you own, right?
22        A.   Uh-huh.
23        Q.   You have to say yes or no for the
24   court reporter.
25        A.   Yes.
```



Page 174

```
 1                    N. Choi
 2         Q.    You are doing that, the price for
 3    that is 3.5 million Euro, right?
 4         A.    Yes.
 5         Q.    Now, I believe your testimony was
 6    that looking at Choi 22, the motor vehicle
 7    bill of sale, this was a document that was
 8    necessary to address various tax issues with
 9    importing the car to the United States,
10    right?
11         A.    Yes.
12         Q.    And for purposes of importing this
13    into the United States, you are valuing the
14    car at half a million Euros, right?
15         A.    From what it says, yes.
16         Q.    Which is 3 million Euros less than
17    the sales contract for that same car from
18    2020, right?
19              MR. WERNER:  Object to the form.
20         A.    Again, I don't exactly recall how
21    we recorded, so, again, I'm not a corporate
22    representative so you can get a clear answer
23    tomorrow.
24         Q.    I want you to answer the question.
25         A.    My answer is I don't exactly
```



Page 175

```
 1                    N. Choi
 2   recall.
 3        Q.   You just testified that your
 4   understanding of this document was to import
 5   the car into the United States, right, sir?
 6        A.   Yeah, because you asked me about
 7   this bill of sales and I just mentioned to
 8   you, but I don't exactly remember the exact,
 9   let's say, treatment in terms of the
10   execution of this two agreements.
11        Q.   Do you recall earlier I asked you
12   when you sold the car in 2017 to your uncle
13   for 900,000, whether or not that was a
14   discount and you said it was not?
15             Do you recall that?
16             MR. WERNER:  Object to the form.
17        A.   Perhaps.
18        Q.   Your testimony will speak for
19   itself.
20             Here, when you are worried about
21   U.S. tax liability, you are now valuing the
22   car at half a million Euros, right?
23             MR. WERNER:  Object to the form.
24        A.   Again, I can only tell you what I
25   remember.  So it was likely due to the tax
```



Page 176

```
 1                   N. Choi
 2   importunities.
 3        Q.   You would agree with me, sir, that
 4   you are undervaluing the car for purposes of
 5   the motor vehicle bill of sale right?
 6             MR. WERNER:  Object to the form.
 7        A.   Me as CEO?
 8        Q.   Yes.
 9        A.   Of which company.
10        Q.   Are you the CEO of both Ideal Team
11   Ventures and De Tomaso?
12             MR. WERNER:  Object to the form.
13        A.   At the time, I think it's stated
14   here, if you can look at it, it says Ryan.
15        Q.   Ryan is -- fair enough, but for the
16   seller, which is Ideal Team Ventures, you are
17   Norman Choi on behalf of Ideal Team Ventures,
18   right?
19        A.   Yes.
20        Q.   It's been your testimony throughout
21   I believe this case, you consider yourself
22   the 100 percent owner of De Tomaso and its
23   various entities, right?
24        A.   Yes.
25        Q.   So you are selling this car for the
```



```
 1                    N. Choi
 2  third time from yourself to yourself, but
 3  ascribing only half a million Euros in value
 4  to the car, right?
 5           MR. WERNER:  Object to the form.
 6       A.    Like I said, I don't recall exactly
 7  the arrangement, how it is made.
 8             And also, you said from myself to
 9  myself.  Again, for the third time, I don't
10  think that's the case.  We already stated in
11  the beginning that it was sold to Pachmar and
12  then -- anyway, I don't want to repeat
13  myself.  We state it a couple of times
14  already.
15             But in terms of this particular, I
16  will just say I don't exactly recall.
17       Q.    You would agree with me that it
18  would be illegal to intentionally undervalue
19  a car for importation tax purposes?
20           MR. WERNER:  Object to the form.
21       Asks for a legal conclusion.
22       A.    I have not seeked legal advice on
23  this.
24       Q.    As CEO of the company, do you think
25  it's important to appropriately value assets
```


MAGNA
LEGAL SERVICES

Page 178

```
 1                    N. Choi
 2   for tax purposes in the United States?
 3             MR. WERNER:  Objection to the form.
 4        The CEO on this document is Ryan Berris.
 5        You keep asking him as CEO.
 6             MR. ZACH:  That's a fair cause for
 7        objection.
 8        Q.   As the purported owner of De Tomaso
 9   and as the chairman of Ideal Team Ventures,
10   would you agree with me that it is important
11   to appropriately value assets for U.S.
12   importation tax purposes in relation to
13   transactions that you are involved in?
14             MR. WERNER:  Object to the form.
15        A.   At the end of the day, depends on
16   the custom, the U.S. custom to decide.
17        Q.   You mean it's for -- did you --
18   when you signed this, you understood that
19   this was going to be submitted to the United
20   States custom authorities, right?
21             MR. WERNER:  Object to the form.
22        A.   I did not perform the importation
23   work.
24        Q.   But you authorized this document,
25   right?
```



Page 179

```
 1                    N. Choi
 2              MR. WERNER:  Object to the form.
 3         A.   I signed.  The seller signature,
 4    that was me.
 5         Q.   You understood that the vehicle was
 6    going to be imported into the United States,
 7    right, sir?
 8              MR. WERNER:  Object to the form.
 9         A.   Yeah, that's what it stated here.
10         Q.   Then you understood that despite
11    having valued this car at 3.5 million Euros
12    about a year before, you are now valuing it
13    at about half a million Euros?
14              MR. WERNER:  Object to the form.
15         A.   It is two different matter.  It is
16    how it is being recorded and how it is being
17    imported.
18         Q.   Explain that distinction for me,
19    sir.
20         A.   You asked me how it is recorded on
21    the book and how it is being imported, so I
22    already said for further details, you can get
23    an answer tomorrow because as I remember --
24    as I said earlier, I don't recall exactly,
25    right?
```



Page 180

```
 1                       N. Choi
 2         Q.    You can put that document aside.
 3               I asked you some questions earlier
 4    about Pachmar.  Do you remember that?
 5               Is it your testimony, sir, that to
 6    be clear, Pachmar had no interest in Apollo,
 7    correct?
 8               MR. WERNER:  Object to the form.
 9         A.    At what time?
10         Q.    Ever.
11         A.    In what form?
12         Q.    Did it ever invest in Apollo?
13               MR. WERNER:  Object to the form.
14         A.    I don't really recall.
15               During when?
16         Q.    To your recollection, at any point
17    in time, did Pachmar invest in the company?
18         A.    I don't exactly recall the details.
19         Q.    You testified previously that you
20    have no -- your testimony stands for itself.
21               Let me show you what we will mark
22    as -- this is -- it's a longer document.
23    This is only the first six pages.
24               I just want to direct you to one
25    page, but feel free to look the full document
```



Page 181

```
 1                    N. Choi
 2   if you need it.
 3            MR. ZACH:  This is Choi 25.
 4            (Choi Exhibit 25, Deloitte document
 5        dated 12 April 2019, marked for
 6        identification.)
 7        Q.  Mr. Choi, looking at this document,
 8   you see it's from Deloitte, from Deloitte is
 9   an accounting firm, right?
10            MR. WERNER:  This is Deloitte 23.
11            MR. ZACH:  I picked the wrong
12        sticker.  This is Deloitte 25.
13        Q.  This is a document that has
14   Deloitte written on it and it's dated 12
15   April 2019.
16            Do you see that?
17        A.  Uh-huh.
18        Q.  It says that -- draft financial and
19   tax due diligence report.
20            Do you see that?
21        A.  Yes.
22        Q.  Then if you turn to -- if you turn
23   very briefly to page ending 558.  It says
24   from Deloitte, Dear Sirs, We enclose our
25   draft financial and tax due diligence report
```



Page 182

```
 1                      N. Choi
 2   prepared in connection with a proposed
 3   investment in Sino Partner Global Limited and
 4   its subsidiaries the target in accordance
 5   with the terms of our engagement agreement.
 6             Do you see that?
 7        A.    Uh-huh.
 8        Q.    Then if you turn to page 560, it
 9   says, Transaction.  We understand that WE
10   Solutions Limited is contemplated to
11   investment in Sino Partner Global Limited and
12   its subsidiaries.
13             Do you see that?
14        A.    Yes.
15        Q.    Sino Partner Global Limited is one
16   of your entities, right?
17        A.    Yes.
18        Q.    And WE Solutions is the Hong Kong
19   listed company we were talking about earlier
20   that ultimately purchased your stake in
21   Apollo, right?
22        A.    Correct.
23        Q.    So this is sort of a due diligence
24   document that's being prepared by
25   accountants, independent auditors in advance
```



Page 183

                    N. Choi
 1
 2   of that potential transaction?
 3             MR. WERNER:  Object to the form.
 4        A.   Yes.  I have not seen this
 5   document, but yes.
 6        Q.   If we turn to the next page, 561,
 7   this shows the group structure as of 18 March
 8   2019.
 9             Do you see that?
10        A.   Yes.
11        Q.   I just want to spend one moment
12   looking at this.  Ideal Team Ventures.  Look
13   at the top left.
14             That's one of your entities, right?
15        A.   Yes.
16        Q.   What is Benefit Favor Limited?
17        A.   One of the shareholder.
18        Q.   Who is that shareholder?
19        A.   One of the shareholder.
20             You are talking about identity?
21        Q.   Yes.
22        A.   It's Benefit Favor Limited.
23        Q.   Who is the ultimate beneficial
24   owner of Benefit Favor Limited?
25             MR. WERNER:  Object to the form.



Page 184

                        N. Choi

1

2          You can answer if you know.

3     A.    I don't recall.

4     Q.    In 2019, you owned 86 percent of

5 Sino Partner Global Limited, right?

6     A.    Uh-huh.

7     Q.    And did you have any partners or

8 other shareholders in connection with your

9 ownership of that entity?

10    A.    No, just myself.

11    Q.    So you were the only owner of Sino

12 Partner Global Limited BVI?

13         MR. WERNER:  Object to the form.

14    A.    From what I recall.

15    Q.    We know that Ideal Team Ventures is

16 one of your entities, right?

17    A.    Yes.

18    Q.    Is it your testimony today that

19 Benefit Favor Limited, you don't know who

20 actually was in control of that entity?

21         MR. WERNER:  Object to the form.

22    A.    I don't recall looking at this

23 today.

24    Q.    Was Clement Mak one of the

25 investors in Sino Partner Global Limited?



Page 185

```
 1                    N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.    I don't recall.
 4       Q.    Have you ever done business with
 5  Clement Mak?
 6       A.    We tried to.
 7       Q.    So you don't know whether or not
 8  Clement Mak was the ultimate beneficial owner
 9  of Benefit Favor Limited?
10            MR. WERNER:  Object to the form.
11       A.    I don't recall at that time.
12       Q.    Do you know who owned -- who
13  controlled -- strike that.
14            Do you know who controlled Splendid
15  Best International Limited?
16       A.    I don't want to speculate.
17       Q.    Do you have an understanding as you
18  sit here today?
19       A.    Sitting here today, I'm saying that
20  I don't want to speculate.
21            MR. WERNER:  Object to the form.
22       Q.    So you have no understanding
23  whatsoever who owned Splendid Best
24  International?
25            MR. WERNER:  Objection.
```



Page 186

```
 1                    N. Choi
 2        A.    I don't want to speculate.
 3        Q.    What is -- who is your
 4   understanding of who controlled China U-Ton
 5   International Holding Limited?
 6              MR. WERNER:  Objection to the form.
 7        A.    I don't want to speculate.
 8        Q.    You would agree that all these
 9   people are or at least this purports to have
10   interest in Sino Partner Global Limited?
11              MR. WERNER:  Object to the form.
12        They're not people.
13        Q.    These entities all appear to have
14   stakes Sino Partner Global Limited?
15        A.    Uh-huh.
16        Q.    You were the owner and CEO of Sino
17   Partner Global Limited, right?
18        A.    Yes.
19        Q.    So as you sit here today, you are
20   telling us that you cannot identify who were
21   your other shareholders for that entity that
22   you controlled?
23        A.    So you see all the list here, so
24   these are the names that I can identify with,
25   but I don't remember exactly who are the
```



Page 187

```
 1                    N. Choi
 2    ultimate shareholders.
 3         Q.    Those entities would have directors
 4    and officers, right?
 5              MR. WERNER:  Object to the form.
 6         A.    They may, they may not.  I don't
 7    handle them.
 8         Q.    As you are sit here today, you are
 9    telling us you can't identify any of the
10    officers or directors of the other entities
11    that were invested in your company?
12              MR. WERNER:  Object to the form.
13         A.    No, I don't.
14         Q.    If you look at this, to the right,
15    the business overview, there is a number of
16    bullet points.
17         A.    Uh-huh.
18         Q.    I want to direct your attention to
19    the second bullet point which says that
20    during fiscal year '17, FY 17, target sold
21    two prototype Apollo IEs to Pachmar Limited,
22    a company owned by Mr. Henry Winata.
23    Management advised that Pachmar is a third
24    party not related to the target.
25              Do you see that?
```



Page 188

```
 1                    N. Choi
 2        A.    Uh-huh.
 3        Q.    But as we just testified, Mr.
 4   Winata was your uncle, right?
 5        A.    Actually, I said Eddie, Eddie
 6   Winata.
 7        Q.    So do they have his name wrong
 8   here?
 9        A.    I don't know.  I cannot say.
10        Q.    Do you think that -- do you know
11   Henry Winata?
12        A.    That's his son.
13        Q.    Do you have an understanding of
14   whether or not Henry Winata, his son, was the
15   -- owned Pachmar Limited?
16        A.    Possibly.
17        Q.    But so I guess that would be your
18   cousin, right?
19        A.    Uncle can be a definition of
20   different things.
21        Q.    Let me step back.
22              Is Eddie Winata your uncle by blood
23   or a term of endearment?
24        A.    As you call it, term of endearment?
25        Q.    Yes.
```



Page 189

```
 1                    N. Choi
 2        A.    Yeah.
 3        Q.    So what is -- what does it mean to
 4    you then to use that term uncle in connection
 5    with Eddie Winata?
 6        A.    Well, my daughter call Ryan, Uncle
 7    Ryan, so we are not related.
 8        Q.    It just means you have a close
 9    relationship with him?
10        A.    Yeah.
11        Q.    And despite that close
12    relationship, did you still feel comfortable
13    representing to the auditors that Pachmar is
14    a third party not related to the target?
15            MR. WERNER:  Objection to the form.
16        A.    Again, if there was any concern, it
17    would have been raised.
18        Q.    By who?
19        A.    Whoever is looking at this.
20        Q.    If they didn't know about that
21    relationship, how would it be raised?
22            MR. WERNER:  Object to the form.
23        A.    Again, what I look at it, an
24    independent third party.
25        Q.    If the independent third party
```



Page 190

```
 1                    N. Choi
 2   doesn't know about this close relationship
 3   between the two of you, how are they supposed
 4   to raise that?
 5            MR. WERNER:  Object to the form.
 6       A.   I don't want to speculate.  It's up
 7   to them to interpret.
 8       Q.   Did you advise the auditors that
 9   you had the relationship were the Winatas?
10       A.   I don't recall.
11       Q.   Do you think you should have told
12   the auditor that you did have that
13   relationship with the Winatas?
14            MR. WERNER:  Object to form.
15       A.   I don't recall a question they ask.
16       Q.   If they didn't ask you, was it your
17   intention not to tell them?
18            MR. WERNER:  Object to the form.
19       A.   I don't want to speculate.
20            MR. ZACH:  I would like to mark
21       now -- sorry, I'm going to go back to
22       23.
23            This is Choi 23.
24            (Choi Exhibit 23, March 27, 2017
25       email from Michael Yip to Ms. Majcher,
```



Page 191

```
 1                    N. Choi
 2        Mr. Choi and others, marked for
 3        identification.)
 4        Q.    Let me know when you had a moment
 5   to look at this, Mr. Choi.
 6        A.    Uh-huh.
 7        Q.    You see this is an email from March
 8   27, 2017 from someone named Michael Yip to
 9   Ms. Majcher and yourself?
10        A.    Uh-huh.
11        Q.    And others.
12              And if you look at this, it says,
13   Hi, Diana, After our meeting and discussion
14   held this morning, attached, please find the
15   latest version as of today for your perusal.
16   In this version, the below charges were made.
17   It says, expenses, legal costs and designer
18   fee for years 2014 and 2015 paid by Pachmar
19   and Ideal Team were booked a total of Hong
20   Kong 870,000 and the inventory of cars in
21   Winner Advance and Shine Billion were put
22   back a total of 9 million Hong Kong.
23              Do you see that?
24        A.    Uh-huh.
25        Q.    Then it says, As a result, together
```



Page 192

1                      N. Choi

2    with directors, Pachmar and Ideal Team,

3    collectively known as due to ultimate

4    shareholder at consolidation level, the

5    current account balance now is a credit of

6    Hong Kong 7.66 million, including Hong Kong

7    .28 from director current account, Hong Kong

8    1.3 million from Ideal Team and Hong Kong 5.9

9    from Pachmar, all in credit balances.

10              Do you see that?

11        A.    Uh-huh.

12        Q.    Doesn't this reflect, sir, that

13   Pachmar was paying legal costs, expenses and

14   the designer fees in connection with the

15   Apollo build out?

16              MR. WERNER:  Objection to the form.

17        A.    I don't actually recall because

18   this is something, traveling back to 2014,

19   2015, nine years ago, so I cannot comment.

20        Q.    Did you ever work -- did your

21   entity, Ideal Team, ever work with Pachmar to

22   invest in designing automobiles or working in

23   any other business together?

24              MR. WERNER:  Object to the form.

25        A.    I don't recall.



Page 193

                    N. Choi

1
2      Q.    You don't recall whether you worked

3  with your close uncle?

4           MR. WERNER:  Object to the form.  I

5      think we defined now that uncle means

6      friend.

7      Q.    Your close friend?

8      A.    I don't recall.

9      Q.    Put that aside.

10          MR. ZACH:  I would like to mark the

11     next document as Choi 24.

12          (Choi Exhibit 24, October 3, 2017

13     text exchange between Ms. Majcher and

14     Mr. Choi, marked for identification.)

15     Q.    So Choi 24 is, you can see, another

16  text exchange between police Ms. Majcher and

17  yourself dated October 3, 2017.

18          Do you see that?

19     A.    Uh-huh.

20     Q.    I would like to direct your

21  attention to page 122 if we can.

22          Do you see here, Ms. Majcher says,

23  VMS close account and transferred the

24  remaining balance to Sungzhan Limited,

25  Sungzhan account and receive cashier's order


MAGNA
LEGAL SERVICES

Page 194

```
 1                  N. Choi
 2   for remaining balance.  Pachmar closed
 3   account and transferred the remaining balance
 4   to Sungzhan Limited.
 5            Do you see that?
 6       A.   Uh-huh.
 7       Q.   Is this right?
 8            Do you see that?
 9       A.   Yes.
10       Q.   You answered, VMS account already
11   closed for the rest.  Yes, thank you, right?
12       A.   Uh-huh.
13       Q.   What is Sungzhan Limited, sir?
14       A.   It was my company.
15       Q.   So here you are, going to close the
16   Pachmar account and transfer the balance from
17   the Pachmar account to your own entity,
18   right?
19            MR. WERNER:  Object to the form.
20       A.   From what it appears.
21       Q.   So does this change your testimony
22   as to whether or not you had access to
23   Pachmar's bank accounts and other --
24       A.   It's tough for me to recollect.
25   This is dated back 2017.
```



Page 195

```
 1                    N. Choi
 2        Q.    So do you still stand by your
 3   testimony that you had no --
 4        A.    I still stand by.
 5        Q.    With Pachmar?
 6        A.    I don't recollect.
 7              MR. ZACH:  I would like to mark for
 8        you, this is a blowup, I'm marking as
 9        Choi 26.
10              I'm trying to find a spot on here
11        where you are not blocking something,
12        I'm blocking the 22.
13              (Choi Exhibit 26, document bearing
14        Bates stamp No. DT 0000082687, marked
15        for identification.)
16        Q.    This is a document that's entitled
17   De Tomaso P72 Global Chassis Allocations.
18              Do you see that?
19        A.    Uh-huh.
20        Q.    Do you see here that there are six
21   that are designated for Pachmar?
22        A.    Yes.
23        Q.    Who negotiated those deals with
24   Pachmar?
25              MR. WERNER:  Object to the form.
```



Page 196

```
 1                    N. Choi
 2        A.   How do you mean, negotiate?
 3        Q.   Who sold those cars to Pachmar?
 4             MR. WERNER:  Object to the form.
 5        A.   I did.
 6        Q.   Go ahead.
 7        A.   Go ahead.
 8        Q.   Did you ever deliver -- who did you
 9   negotiate with Pachmar to sell those cars?
10   Who was the representative of Pachmar?
11        A.   My uncle.
12        Q.   This was your friend, Eddie Winata?
13        A.   Uh-huh.
14        Q.   He decided to buy six of those
15   P72s?
16        A.   Yes.
17        Q.   Did you ever deliver any of those
18   P72s to him?
19        A.   It's not produced yet.
20        Q.   Do you intend to deliver six of
21   these to Pachmar?
22        A.   Likely, yeah.
23             MS. WIGGER:  What is the Bates for
24        Choi 26?
25             MR. ZACH:  I'm going to mark as
```



Page 197

```
 1                    N. Choi
 2        Choi 27, another text exchange.
 3             (Choi Exhibit 27, October 6, 2020
 4        text exchange between Mr. Choi and Ms.
 5        Majcher, marked for identification.)
 6        A.    No. 60, you no longer have.  Do you
 7   remember?
 8        Q.    Huh-huh.  Mr. Choi, this is another
 9   text exchange between you and Ms. Majcher,
10   October 6, 2020.
11             Do you see that?
12        A.    Uh-huh.
13        Q.    I would like to direct your
14   attention to pages 770, going into 771, okay.
15             So you say here, the middle, the
16   first text from you on this page says, From
17   my point of view, I like to use only partial
18   debt into equity and not the entire amount so
19   to keep some liquidity for myself down the
20   road.
21             Do you see that?
22        A.    Uh-huh.
23        Q.    Ms. Majcher says, What they were
24   saying is that IRS may deem all of the
25   existing loans to be equity and never debt to
```



Page 198

```
 1                    N. Choi
 2   begin with and we definitely don't want that
 3   because that means you don't even have the
 4   right to convert.
 5             Do you see that?
 6        A.   Uh-huh.
 7        Q.   Then you respond, Definitely need
 8   to avoid or, otherwise, we keep Pachmar as
 9   the creditor, perhaps even include the last
10   latest 2.4 million in funding.
11             Do you see that?
12        A.   Uh-huh.
13        Q.   Then Ms. Majcher says, Always
14   better to be in your name.  Let me reach out
15   to Lawrence.
16             Do you see that?
17        A.   Uh-huh.
18        Q.   Where it says, We keep Pachmar as
19   the creditor, perhaps even include the latest
20   $2.4 million in funding, that's referring to
21   funds that Pachmar itself has invested into
22   Apollo, isn't it, sir?
23             MR. WERNER:  Object to the form.
24        A.   Are you talking which amount?
25        Q.   The $2.4 million?
```



Page 199

```
 1                    N. Choi
 2        A.   I don't think so.
 3        Q.   What are you referring to when you
 4   say you want to keep Pachmar as the creditor?
 5             MR. WERNER:  Object to the form.
 6        A.   I don't exactly recall on this one.
 7        Q.   But in terms of funding for Apollo,
 8   what possible involvement, to your
 9   recollection, could Pachmar have?
10             MR. WERNER:  Object to the form.
11        A.   Again, I don't recall exactly.
12        Q.   So your testimony still remains the
13   same, that you had no involvement with
14   Pachmar's internal operations?
15             MR. WERNER:  Object to the form.
16        A.   No.
17        Q.   What was the latest $2.4 million in
18   funding that you are referring to there?
19             MR. WERNER:  Object to the form.
20        A.   I don't want to speculate.
21        Q.   Well, how many outside investors
22   gave you over a million dollars to help with
23   Apollo?
24             MR. WERNER:  Object to the form.
25        A.   With the Apollo?
```



Page 200

```
 1                  N. Choi
 2       Q.   Yes.
 3       A.   I don't recall.
 4       Q.   You don't recall how many of your
 5  investors gave you over a million dollars?
 6       A.   I don't recall exactly.
 7       Q.   Can you name a single investor that
 8  gave over a million dollars to Apollo?
 9       A.   To Apollo, right?
10       Q.   Yes.
11       A.   Maybe if we refer back to the audit
12  -- excuse me, the report that you have shown
13  in 25.  Is it 25?
14       Q.   The white one?
15            MR. WERNER:  That's 23.
16       A.    I think for the record, I think you
17  refer back to 23 or 25.
18       Q.   Let's just call it the delay
19  report.
20       A.   So those would be the ones.
21  Exactly what amount, I don't recall.
22       Q.   But Pachmar was never one that
23  invested money with you?
24       A.   It's not this way.  It doesn't
25  show.
```



Page 201

```
 1                    N. Choi
 2        Q.    I'm not saying this way.
 3   Independent of what is written there.
 4        A.    I don't recall.
 5        Q.    To be clear, you can't name, as you
 6   sit here today, any of the officers or
 7   directors of any of those other entities, can
 8   you, sir?
 9             MR. WERNER:  Object to the form,
10        asked and answered.
11        A.    I really don't recall.
12             MR. ZACH:  I would like to mark as
13        Choi 28.
14             (Choi Exhibit 28, agreement dated
15        April 2016 between Ideal Team Ventures,
16        Acedes Holdings and AC Cars Europe
17        Limited, marked for identification.)
18        Q.    Do you have Choi 28 in front of
19   you, sir?
20        A.    Yes, I do.
21        Q.    This is an agreement dated April
22   2016.
23             Do you see that?
24        A.    Uh-huh.
25        Q.    It's between Ideal Team Ventures
```



Page 202

```
 1                    N. Choi
 2   and I'm probably going to mispronounce this,
 3   Acedes Holdings and AC Cars Europe Limited.
 4            And if you turn to the first page
 5   which is ending in Bates 83, this is an
 6   agreement to develop, I forget your term, you
 7   had a better term, not a kit car, but the
 8   other term?
 9        A.    Restomod.
10        Q.    This was an agreement to build a
11   restomod?
12        A.    Uh-huh.
13        Q.    To do that, Ideal Team Ventures,
14   your entity, was going to pay 1.25 million
15   Great British pounds, right?
16        A.    Uh-huh.
17        Q.    For the development of that, right?
18        A.    Uh-huh.
19        Q.    If you look at this agreement and
20   you turn to page 7 of the agreement which
21   would be Bates ending 89.
22        A.    Which page?
23        Q.    Page 7 of the agreement, but if you
24   want to use the little mini numbers, it's 89.
25   There is 14 says entire agreement.
```



Page 203

                    N. Choi
1
2              Do you see that?
3              And then 14.1, and it says -- you
4    can read the whole thing, but the last
5    sentence says that Notwithstanding the above,
6    the manager acknowledges the receipt of
7    4.8900 -- 489,000 Great British pounds paid
8    to De Tomaso Automobile since entering into
9    this agreement.
10             Do you see that?
11   A.    Yes.
12   Q.    At the time of the signing of this
13   agreement, 489,000 pounds of the 1.25 million
14   pounds that had already been paid by De
15   Tomaso, right?
16             MR. WERNER:  Object to the form.
17        This agreement is not fully signed.
18   A.    Not signed by me, but also, at the
19   same time, I'm not sure which De Tomaso
20   Automobile it is referring to.
21   Q.    Do you recall this agreement?
22             MR. WERNER:  Object to the form.
23   A.    In general, yes.
24   Q.    Do you recall hiring these folks to
25   try to build out restomod?



Page 204

```
 1                  N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.   Yes.
 4       Q.   What happened with trying to build
 5  out the restomod?
 6            MR. WERNER:  Object to the form.
 7       A.   You are talking about --
 8       Q.   After they went to work?
 9       A.   They had completely redesigned the
10  car.
11       Q.   At the beginning of your work with
12  De Tomaso, one of the ideas you had was to
13  try to build a restomod of the De Tomaso
14  Automobiles, right?
15       A.   Yes.
16       Q.   Ultimately decided to go a
17  different direction?
18       A.   Not really, because we have many
19  different scenarios how to build the company.
20       Q.   But the one that you ultimately
21  settled on was to create the P72, right?
22       A.   Who knows?  Maybe we will go into
23  that afterward.
24       Q.   But for now, after -- this
25  agreement is from 2016, right?
```



Page 205

```
 1                    N. Choi
 2        A.   Uh-huh.
 3        Q.   After you signed this agreement,
 4   you didn't ultimately create more restomods,
 5   right?
 6             MR. WERNER:  Object to the form.
 7        A.   Not yet.
 8        Q.   Fair enough.  But between 2016 and
 9   as we sit here in September of 2024, you
10   haven't built anymore restomods, right?
11             MR. WERNER:  Object to the form.
12        A.   Again, not yet.
13        Q.   Do you have any firm plans to build
14   new rest models now?
15             MR. WERNER:  Object to the form.
16        A.   At some point.
17        Q.   Do you have a firm plan now to
18   build a restomod?
19             MR. WERNER:  Object to the form.
20        A.   I guess our plan is now to deal
21   with your lawsuit.
22        Q.   Setting aside our lawsuit, do you
23   have any plans to build a restomod?
24        A.   At the time, it's taking a long
25   time to do with this lawsuit.
```



Page 206

```
 1                      N. Choi
 2        Q.    I don't want to ask the question
 3   one more time.
 4              As you sit here today, do you have
 5   any firm plans to create a restomod?
 6              MR. WERNER:  Object to the form.
 7        A.    I have a very good idea, but it
 8   hasn't been executed yet.
 9        Q.    To be clear, you haven't hired any
10   suppliers?
11              MR. WERNER:  Object to the form.
12        Q.    For a specific restomod, right?
13        A.    We have a number of suppliers that
14   we can refer to.
15        Q.    You can refer to, but you haven't
16   instructed them to begin work, right?
17        A.    Now, the focus is building a P72.
18        Q.    There is a subsequent car -- what
19   is after the P72, what is the next model you
20   created at De Tomaso?
21              MR. WERNER:  Object to the form.
22        A.    It's confidential.  We haven't
23   talked about it yet.
24        Q.    You can answer the question.  We
25   can mark it as confidential.
```



Page 207

```
 1                    N. Choi
 2       A.   We haven't announced.  Build P900.
 3       Q.   How far along are you in the P900?
 4       A.   Pretty far along.
 5       Q.   Let's set that aside.
 6            MR. ZACH:  Now, I am going to mark
 7       Choi 29.
 8            (Choi Exhibit 29, documents
 9       beginning with Bates stamp No. DT
10       169678, marked for identification.)
11       Q.   We are looking at a document
12   beginning Bates DT 169678.
13            Do you see that?
14       A.   Uh-huh.
15       Q.   It's an agreement dated the 1st day
16   of November 2019 between Ideal Team Ventures
17   and De Tomaso, right?
18       A.   Uh-huh.
19       Q.   And this is for the Pantera
20   intangible assets agreement.
21            Do you see that?
22       A.   Uh-huh.
23       Q.   When you say uh-huh, you mean yes,
24   but --
25       A.   Yes.
```



Page 208

1                        N. Choi

2          Q.    So if you look on page 4 of the

3    agreement ending Bates 81, they describe the

4    sale and purchase of assets and they are

5    talking about the Heritage Pantera, right?

6          A.    Uh-huh.

7          Q.    That's what we were just talking

8    about in the prior agreement, right?

9          A.    Yes.

10         Q.    If you look at 2.2.

11         A.    Yes.

12         Q.    You are selling the intangible

13   assets for 12 million Euro to De Tomaso,

14   right?

15         A.    Yes.

16         Q.    By you, I mean Ideal Team Ventures,

17   right?

18         A.    Yes.

19         Q.    And that is the same work that you

20   had paid back in 2016, the 1.25 British

21   pounds for, right?

22         A.    Yes.

23              MR. WERNER:  Object to the form.

24         Q.    So now you are selling that to De

25   Tomaso for 12 million Euros, right?



Page 209

```
 1                    N. Choi
 2              MR. WERNER:  Object to the form.
 3         A.    Yes.
 4         Q.    You would agree that's
 5    substantially more than the 1.25 pounds that
 6    you paid, right?
 7              MR. WERNER:  Objection.
 8         A.    Depending how you measure.
 9         Q.    Depending what you put in, in terms
10    of cash?
11         A.    There are differences.
12         Q.    You think those assets depreciated
13    from 1.25 billion pounds to 12 million Euros
14    as of the time this agreement was signed?
15              MR. WERNER:  Object to the form.
16         A.    I didn't get your question.  Can
17    you repeat again?
18         Q.    Is it your testimony that you
19    believe that the assets that you paid 1.25
20    million British pounds for in 2016 had
21    depreciated to 12 million Euros as of
22    November 2019?
23              MR. WERNER:  Object to the form.
24         A.    You are asking for my opinion?
25         Q.    Yes.
```



Page 210

                        N. Choi

1

2      A.    I mean, when you first invested in

3   the project, there is risk.  You need to take

4   it.  Certain risk.  Whatever the value at the

5   time, I believe we may have even conducted

6   some sort of valuation based on that

7   consideration.

8      Q.    How long did it take you to go from

9   deciding to build the P72 to delivering the

10  first car?

11          MR. WERNER:  Object to the form.

12     A.    Subject to the manufacturers.

13     Q.    Now, as we sit here today, how long

14  has it taken from when you decided to build

15  the P72 to when you delivered the first car?

16          MR. WERNER:  Object to the form.

17     A.    It's a long answer.

18     Q.    I'm asking time, like years,

19  months, days.  Do you know how long it's

20  taken?

21     A.    From the date when we announce

22  until today?

23     Q.    No.  From when you decided that you

24  wanted to proceed with the P72 as an idea,

25  until you delivered the first model.



Page 211

```
 1                    N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.    Again, it's a long and short
 4  answer.
 5            The long answer is we took the
 6  wrong path.  I took the advice from Ryan.  If
 7  you want me to go on, I can.
 8       Q.   Answer my question.  How long did
 9  it take?
10       A.    It could have been a lot sooner.
11       Q.   Fair enough.  But how long did it
12  take?
13            MR. WERNER:  Object to the form.
14       A.    From the practical point of view,
15  as far as the eye is concerned, we started in
16  '17 and we start delivery in '19, so two
17  years.  That should have been the case.  If I
18  had not taken the advice from him.
19            If you would like a longer form, I
20  can tell you.
21       Q.   I asked, my question to you was a
22  timeline.  You will have the opportunity,
23  your lawyer will be able to ask you questions
24  and you can explain the reasons why.
25            MR. ZACH:  Let me show you.  This
```



Page 212

```
 1                    N. Choi
 2      is Choi 30.
 3              (Choi Exhibit 30, statement
 4        prepared by MSPC, marked for
 5        identification.)
 6        Q.    Sir, do you recognize what's been
 7   marked as Choi 30?
 8        A.    It's a statement prepared by MSPC.
 9        Q.    Who is MSPC?
10        A.    It's an accounting -- certified
11   public accounting and advisors.
12        Q.    Is it someone that you've utilized
13   for De Tomaso?
14        A.    For accounting work, yes.
15        Q.    If you look at page -- we have
16   different places, so why don't we just look
17   at page 4141.
18              Do you see this is the consolidated
19   statement of financial position as of
20   December 31, 2022, December 31, 2021 and
21   January 1, 2021?
22        A.    Uh-huh.
23        Q.    They have different columns for
24   each, but this basically was prepared at the
25   end of 2022, right?
```



Page 213

1                    N. Choi

2        A.    Is that a question?

3        Q.    Yes.

4        A.    Yes.

5        Q.    Then I would like to turn to page

6    154 if we can.

7             Do you remember earlier, you

8    testified about loans you had made to De

9    Tomaso?

10       A.    Yes.

11       Q.    If we look at note 4, promissory

12   notes related party.

13            Do you see that?

14       A.    Note 4.

15       Q.    Note 4 at the top of page 17?

16       A.    Uh-huh.

17       Q.    If you look at that, you can see

18   that according to these statements that at

19   the end of 2022, there was about $27.6

20   million in loans from you to the company.

21            Do you see that?

22       A.    Yes.

23       Q.    We talked earlier about -- what

24   interest do you charge on the loans that

25   you've been making?



Page 214

```
 1                 N. Choi
 2      A.    I believe 10 percent.
 3      Q.    How did you come up with 10
 4  percent?
 5            MR. WERNER:  Object to the form.
 6      A.    How did I come up?  Depending on
 7  various measurements.
 8      Q.    What measurement did you utilize?
 9      A.    Different indexes.
10      Q.    Did you do that work or did someone
11  else do that work?
12            MR. WERNER:  Object to the form.
13      A.    I don't exactly recall.
14      Q.    For a while, I think as I
15  understood from your past history, you spent
16  significant time in high finance, right?
17            MR. WERNER:  Object to the form.
18      A.    In derivatives, but it's not
19  interest rate.
20      Q.    You consider yourself sophisticated
21  in financial matters, right?
22            MR. WERNER:  Object to the form.
23      A.    That is subject to one's opinion.
24      Q.    I'm asking how you view yourself?
25            MR. WERNER:  Object to the form.
```



Page 215

1                   N. Choi

2        A.    I feel okay about myself.

3        Q.    I'm asking how you feel about your

4   capabilities with respect to financial

5   matters?

6             MR. WERNER:  Object to the form.

7        A.    Again, it's the same.  I think I'm

8   okay, not an expert.

9        Q.    Do you recall what specific indices

10   you looked at in coming up with that 10

11   percent?

12        A.    It could be various measures,

13   lending rate, Federal rate, amongst many

14   other rates.

15        Q.    Did you seek any outside guidance

16   from professionals about what an appropriate

17   interest rate would be?

18             MR. WERNER:  Object to the form.

19        A.    I mean, you can look at Bloomberg.

20   What are the available rates, so you can

21   refer to that and then you can check out

22   commercial banks, lending banks, whatever

23   they charge to small businesses.

24        Q.    Did you, in fact, do that?

25        A.    Yeah, I have had a look.



Page 216

```
 1                   N. Choi
 2        Q.   In your view, do you think a
 3   related party loan should be analyzed the
 4   same way as an arm's length transaction
 5   between a bank and a lendee?
 6             MR. WERNER:  Object to the form.
 7        A.   I think it's about disclosure.
 8   It's not something -- it's not written.
 9        Q.   Does $27 million, is that the
10   amount of cash that you put into the
11   business?
12        A.   Possibly at that time.
13        Q.   Does that seem around the right
14   amount of money that you put into, in terms
15   of cash into the business?
16        A.   Probably more by now.
17        Q.   But as of 2022, you think this is
18   $27 million in cash that you put into the
19   company?
20        A.   That could be accurate.
21        Q.   You can put that aside.
22             MR. ZACH:  I would like to mark as
23        Choi 31.
24             (Choi Exhibit 31, email chain,
25        marked for identification.)
```



Page 217

N. Choi

1

2      Q.    Do you see this is an email chain

3  with a lot of people, but the top email is

4  February 3, 2021 between you and Mr. Berris?

5           MR. WERNER:   Hang on a second,

6           Exhibit 31, which we are seeing now

7           during the deposition, appears to be a

8           privileged document.   So on that basis,

9           I'm objecting to the use of this

10          document.

11              I'm also insisting that all such

12          documents be clawed back to us.   It's a

13          deeply concerning to me that this has

14          been used to prepare for deposing this

15          witness and certainly the witness is not

16          going to be answering questions about

17          privileged documents.

18              This is a communication with Loeb &

19          Loeb who we all know are lawyers and

20          company personnel.

21          MR. ZACH:   It's forwarded to Mr.

22          Berris.

23          MR. WERNER:   Mr. Berris is at the

24          company.

25          MR. ZACH:   I was only going to



Page 218

```
 1                    N. Choi
 2        actually ask about the top email to Mr.
 3        Berris.
 4             MR. WERNER:  Again --
 5             MR. ZACH:  That's fine.  You guys
 6        can take it back.  That's a fair
 7        objection.
 8             MR. WERNER:  It's concerning
 9        because --
10             MR. ZACH:  It was produced to you.
11             MS. WIGGER:  We sent an email to
12        Isaac on July 12, 2024 informing him we
13        weren't waiving privilege just because
14        Berris was copied on emails and all such
15        emails need to be returned to us, so
16        it's very concerning they weren't and
17        now they are being used at deposition.
18             MR. ZACH:  I'm happy not asking
19        about this.
20             MR. WERNER:  We can take this up
21        off line.  We don't need to waste
22        deposition time.
23             Our objections are noted and
24        concerns are noted and we can take it up
25        off the record.
```



Page 219

```
 1              N. Choi
 2         MR. ZACH:  Sorry, this is not
 3     stapled, so I will read -- I will mark
 4     this -- for the record, you guys are
 5     clawing back.
 6         That was 31?
 7         MR. WERNER:  Yes.
 8         MR. ZACH:  This is 32, Bates DT 942
 9     to 949.
10         (Choi Exhibit 32, documents bearing
11     Bates stamp No. DT 942 through DT 949,
12     marked for identification.)
13     Q.   So, Mr. Choi, this is another text
14 exchange between yourself and Ms. Majcher
15 from December 3, 2020.
16         Do you see that?
17     A.   Yes.
18         MR. WERNER:  Just to be clear
19     again, since my version is not stapled,
20     this is DT document ending 942 through
21     949 that we are marking as Exhibit 32.
22         MR. ZACH:  That's correct.
23     Q.   So this document, let's start on
24 page 943.
25     A.   Uh-huh.
```



Page 220

1                     N. Choi

2      Q.    You were talking with Ms. Majcher

3   about a possible valuation for De Tomaso.

4            Do you see that at the bottom?

5      A.    Uh-huh.

6      Q.    And Ms. Majcher says, DT valuation

7   at 400 million, okay.  I will ask GCA to just

8   use DCF and not the IP approach and issue

9   draft report first not signed.

10           Do you see that?

11     A.    Uh-huh.

12     Q.    GCA were your auditors/financial

13  advisors, is that fair?

14     A.    GCA, as I recall, is an appraisal

15  firm.

16     Q.    So they were finance advisors or

17  appraisal firm.

18           Then you ask on the next page, what

19  is the discount rate?  Is it 15 percent?  And

20  then Ms. Majcher says, Of course not.  At

21  22.36 percent.

22           Do you see that?

23     A.    Uh-huh.

24     Q.    Then at the bottom, Ms. Majcher

25  asks, Do you want to accrue any interest on



Page 221

                    N. Choi
1
2    the DT loans?  We can work those in the
3    financials now.
4          Do you see that?
5    A.    Uh-huh.
6    Q.    You respond, Sure, 10 percent,
7    interest charged won't be counted towards
8    Apollo edit, correct?
9          Do you see that?
10   A.    Uh-huh.
11   Q.    So in terms of your loans to De
12   Tomaso at this point, you had not actually
13   established what percentage you were going to
14   charge, right?
15   A.    I don't want to speculate.  I don't
16   recall.
17   Q.    Hold on.  Your CFO is asking you a
18   question, Do you want to accrue any interest
19   on the DT loans?
20         Do you see that?
21   A.    I see.
22   Q.    Did you point her towards any loan
23   agreements that you had for the money you put
24   in?
25   A.    I don't want to speculate so I



Page 222

```
 1                    N. Choi
 2   cannot give you an answer.
 3       Q.    Your answer, Sure, 10 percent makes
 4   no reference to any analysis you are doing,
 5   right?
 6            MR. WERNER:  Object to the form.
 7       A.    I actually don't recall, again.
 8       Q.    Isn't this the case, sir, that you
 9   just picked 10 percent out of thin air
10   because it's how much you wanted to make?
11            MR. WERNER:  Object to the form.
12       A.    It's not how much I wanted to make.
13       Q.    Do you think a 10 percent loan by a
14   related party is commercially reasonable?
15            MR. WERNER:  Object to the form.
16       A.    I don't have any comment on this.
17       Q.    You don't have any comment because
18   -- you can't say no comment.
19            The question is, do you believe
20   that 10 percent interest by a related party
21   is commercially reasonable?
22            MR. WERNER:  Object to the form.
23       A.    I don't think it's unfair.
24       Q.    Okay.  Set that aside.  Let us move
25   on to --
```



Page 223

                    N. Choi

1

2          MR. ZACH:  Do you want to take a

3     break?

4          MR. WERNER:  If you are changing

5     topics.

6          THE VIDEOGRAPHER:  We are going off

7     the record.  The time is 3:06 p.m.

8          (Recess.)

9          THE VIDEOGRAPHER:  We are back on

10    the record.  The time is 3:19 p.m.

11    Q.    I want to change topics.

12          One of the points of contention in

13  this lawsuit is Carmen Jordá.

14          You would agree with that?

15    A.    Amongst others.

16    Q.    Who is Carmen Jordá?

17    A.    Ryan knows best.

18    Q.    I'm asking you.  Who is Carmen

19  Jordá?

20    A.    She is a female from Spain.

21    Q.    Besides being a female from Spain,

22  what did she do as a professional?

23          MR. WERNER:  Object to the form.

24    A.    I'm not sure what her profession

25  is.



Page 224

```
 1                     N. Choi
 2       Q.    Isn't it correct that she is a race
 3   car driver?
 4             MR. WERNER:  Object to the form.
 5       A.    Maybe at some point.
 6       Q.    So you don't have a recollection
 7   one way or the other whether Ms. Jordá was a
 8   race car driver?
 9             MR. WERNER:  Object to the form.
10       A.    She was known to be a race car
11   driver.
12       Q.    At some point, she worked on
13   advertising campaign for De Tomaso, right?
14       A.    Yes.
15       Q.    When did you first meet Carmen
16   Jordá?
17             MR. WERNER:  Object to the form.
18       A.    Meet, as in person?
19       Q.    Did you ever meet her in person --
20       A.    Or text.
21       Q.    Both.  When did you have any
22   communication with her?
23       A.    I heard about her from Ryan back in
24   2017.
25       Q.    When did you first meet her in
```



Page 225

```
 1                    N. Choi
 2   person?
 3        A.    I believe it was 21, September.
 4        Q.    And you understand that she did an
 5   ad campaign called Meet Isabelle?
 6        A.    That was the shoot in May 2021.
 7        Q.    Did you participate in any way in
 8   helping put together the video and the ad
 9   campaign?
10        A.    Participate as in part of the
11   actor?
12        Q.    No, sorry, fair.
13              You understood that the ad campaign
14   was being made, the Meet Isabelle campaign
15   was being made?
16        A.    Yes, I do.
17        Q.    It involved a number of things, but
18   included, like, a video?
19        A.    Yes.
20        Q.    So my question is, did you have any
21   input in the look or the feel or whatever
22   have you of the campaign?
23              MR. WERNER:  Object to the form.
24        A.    Input as in money maybe, because we
25   end up paying towards it.
```



MAGNA LEGAL SERVICES

Page 226

```
 1                    N. Choi
 2        Q.    How much did you pay Ms. Jordá
 3   total?
 4        A.    Too much.
 5        Q.    Do you have a sense of how much in
 6   terms of actual dollars you paid?
 7        A.    It's counting.
 8        Q.    Now, I would like to show you,
 9   let's mark these documents -- did you like
10   the Meet Isabelle campaign aesthetically?
11             MR. WERNER:  Object to the form.
12        A.    Let's say I don't dislike it.  I
13   like it better when there is no lawsuit.
14        Q.    But you thought the looks of it
15   were cool, right?
16             MR. WERNER:  Object to the form.
17        A.    Like I said, I don't dislike it,
18   although I have become not liking it when
19   there was a lawsuit being filed.
20        Q.    The company entered into a series
21   of contracts with Ms. Jordá, right?
22             MR. WERNER:  Object to the form.
23        A.    The company or Ryan?
24        Q.    The company.
25             MR. WERNER:  Object to the form.
```



Page 227

```
 1                    N. Choi
 2      A.   The lawsuit is based around that.
 3      Q.   Well, Ryan was the CEO, right?
 4      A.   He was titled as the CEO.
 5      Q.   And you knew that when Carmen was
 6  brought into the Meet Isabelle campaign, she
 7  was being paid for that, right?
 8           MR. WERNER:  Object to the form.
 9      A.   At the beginning, it was a one-time
10  campaign fee.
11      Q.   But you understood she was being
12  paid, right?
13           MR. WERNER:  Object to the form.
14      A.   First of all, I don't recall
15  exactly when any invoice was submitted and at
16  what point the payment was made.
17      Q.   Did you understand that she was
18  helping to promote De Tomaso in ways other
19  than simply making a video?
20           MR. WERNER:  Object to the form.
21      A.   That's very subjective.  What
22  people pitch and what could actually be
23  delivered is two different measurement.
24      Q.   What did you understand the pitch
25  was for Ms. Jordá to De Tomaso?
```



Page 228

```
 1                    N. Choi
 2              MR. WERNER:  Object to the form.
 3        A.    Whatever Ryan was telling me.
 4        Q.    What is your recollection of what
 5   Ryan was telling you?
 6        A.    Everything.  She brings the whole
 7   world to you.
 8        Q.    What did you understand the whole
 9   world to mean?
10        A.    Everything to him.
11        Q.    Did you understand that she would
12   -- you agree she was going to make the Meet
13   Isabelle campaign, right?
14        A.    She was the actress or the model.
15        Q.    And that in connection with that
16   video, there was an event at Cipriani, right?
17        A.    Which Ryan stated in a complaint
18   that he paid for.
19        Q.    My question to you is, do you know
20   whether or not there was an event at
21   Cipriani?
22              MR. WERNER:  Objection to form.
23        A.    Again, it's a long answer to that.
24        Q.    Let me make it simpler.  Did you
25   attend the event at Cipriani?
```



Page 229

```
 1                    N. Choi
 2        A.   Yes, I attended.
 3        Q.   When you attended, was Carmen Jordá
 4   there?
 5        A.   She was there.
 6        Q.   Was Cipriani sort of decked out
 7   with De Tomaso branding?
 8             MR. WERNER:  Object to the form.
 9        A.   Yes, but not many people were
10   there.
11        Q.   Was it another aspect of Ms. Jordá
12   that you understood she may be able to make
13   introductions to potential clients?
14             MR. WERNER:  Object to the form.
15        A.   From what it appeals at the time by
16   Ryan.
17        Q.   What do you mean by, from what it
18   appeals at the time by Ryan?
19        A.   Everything I was told by Ryan.
20        Q.   So you understood from Ryan that
21   she would be able to make introductions to
22   potential clients, is that fair?
23        A.   Potential people.  I don't know if
24   they would become clients.
25        Q.   Did you understand that Ms. Jordá
```



Page 230

1                    N. Choi

2   would be able to make introductions to

3   prominent people in the racing world for De

4   Tomaso?

5            MR. WERNER:  Object to the form.

6       A.   That's what Ryan said.

7       Q.   Did you understand that Ms. Jordá

8   would also wear De Tomaso branding at various

9   racing functions?

10           MR. WERNER:  Object to the form.

11      A.   Various racing functions as in what

12  racing function?

13      Q.   Sitting at racing functions in

14  general, sir.

15      A.   It wasn't my mandate.

16      Q.   Did you have an understanding that

17  one of the things that Ms. Jordá would

18  provide in terms of promotion for De Tomaso

19  was that she would wear De Tomaso branding at

20  various racing events?

21      A.   I know Ryan made a suit for her and

22  a helmet.

23      Q.   I'm asking, did you understand she

24  would be wearing those at public functions?

25      A.   I knew it afterward.



Page 231

```
 1                    N. Choi
 2      Q.   When you were first -- when the
 3  idea of the Meet Isabelle campaign was first
 4  proposed, did you object to that campaign?
 5           MR. WERNER:  Object to the form.
 6      A.   Let's say I did not not accept it.
 7      Q.   What do you mean by you did not not
 8  accept that?
 9      A.   You have to understand the
10  background, a lot of things that Ryan had
11  proposed previously, prior to the campaign, I
12  went along with it and maybe -- it's just a
13  little bit two-minutes explanation --
14           MR. WERNER:  Hang on.  Let's just
15       answer the question and I think the
16       question just was, what do you mean by
17       did not not accept it, so let's go back
18       to that.
19      A.   Let's say I did not oppose.
20      Q.   You knew that the shoot was
21  happening and the promotional was happening,
22  right?
23      A.   Yes.
24      Q.   And I take it you wanted De Tomaso
25  to be a successful brand out in the
```



Page 232

```
 1                    N. Choi
 2   marketplace, right?
 3              MR. WERNER:  Object to the form.
 4        A.    I mean, of course, that's how we
 5   try to build the business.
 6        Q.    And you would agree that, you know,
 7   one -- would you agree that racing is a
 8   sport?
 9        A.    That is not really our intention.
10   We are far away from that.
11        Q.    I'm just asking, do you think of
12   racing as a sport?
13        A.    Racing is racing.  I don't know if
14   you can call it a sport, but it's racing.
15        Q.    Was the De Tomaso meant to appear,
16   the P72, was it meant to appear in part as
17   like a race car?
18        A.    It really is not because we are
19   taking a different approach in terms of how
20   we build and identify our car.
21        Q.    Do you think someone that drove a
22   P72 would be upset if I passed them in my
23   2014 green Jeep Grand Cherokee on the
24   Audubon?
25        A.    No, I think in general, customers
```



Page 233

                    N. Choi

1

2    are very educated, so I don't think they

3    would judge people by how they look or what

4    they drive.

5        Q.    But you are trying to appeal to car

6    aficionados?

7            MR. WERNER:   Object to the form.

8        A.    My perspective is always go back to

9    the fundamental of the design of the

10   vehicles.

11       Q.    What about the design in particular

12   do you think it goes back to?

13       A.    I think similar to what we have

14   achieved with the Apollo, we first launched

15   the car back in 2017 and today, if you bring

16   it to any car shows, it's still the talk of

17   the show.

18            Just like the fact that we want to

19   instill the same for the P72.  It's really

20   about the making of P72 in terms of

21   craftsmanships, in terms of engineering and

22   the overall beauty, perpetual beauty of the

23   car.

24       Q.    I asked you earlier whether or not

25   you understood that one of the things that



Page 234

                    N. Choi
1
2   Ms. Jordá brought to the table was an ability
3   to make introductions to prominent
4   individuals in the racing world?
5       A.    I can't be certain.  Like I
6   mentioned, I talked to her.  I have seen her
7   a handful of times.  Ryan spent the most
8   amount of time with her.
9       Q.    Did you, in your opinion, was Ms.
10  Jordá successful in making any introductions
11  to prominent folks in the racing world?
12          MR. WERNER:  Object to the form.
13      A.    I mean, it doesn't concern me at
14  all, let's just put it this way.  At the
15  bottom line, no one came on board because of
16  Carmen Jordá.
17      Q.    Is it your view, sir, that Ms.
18  Jordá successfully gained publicity for the
19  De Tomaso brand?
20          MR. WERNER:  Object to the form.
21      A.    What do you mean, publicity?
22      Q.    Did she appear at events that got
23  news hits?
24      A.    Let's just say nobody came to the
25  event just because of Carmen Jordá being



Page 235

1                    N. Choi

2    there.

3         Q.    I would like to mark -- do you know

4    who Bernie Ecclestone is?

5         A.    I do.

6         Q.    Who is Bernie Ecclestone?

7         A.    The father of F One.

8         Q.    When you say, the father of F One?

9         A.    He is the founder.

10        Q.    Would you agree with me that he is

11   very famous in the racing world?

12        A.    He is.

13        Q.    Is he someone that the De Tomaso

14   brand would like to be associated with?

15        A.    Depends.  He has had his issues

16   publicly in terms of being involved in a

17   tax-related matter that got him into a lot of

18   trouble.

19             MR. ZACH:  I'm marking for you

20        what's been marked as Choi 33.

21             (Choi Exhibit 33, Daily Mail

22        article, marked for identification.)

23        Q.    Do you recognize this Daily Mail

24   article?

25        A.    I believe it's one of the gossip



Page 236

```
 1                    N. Choi
 2  U.K. outlet.
 3            Would that be correct?
 4       Q.   You tell me.  I don't read -- do
 5  you read the Daily Mail, sir?
 6       A.   I went to school in U.K. so I'm
 7  aware it's more like, what do you call it,
 8  the Esquire or something in the U.S.
 9       Q.   The Enquirer?
10       A.   Enquirer, whatever.
11       Q.   You know the Daily Mail, but you
12  look down on it a little bit?
13            MR. WERNER:  Object to the form.
14       A.   I don't look down.
15       Q.   Do you read the New York Post?
16       A.   I do subscribe to them.  Excuse me,
17  I read The New York Times, not the New York
18  Post.
19       Q.   You don't read the New York Post?
20       A.   No, I don't.
21       Q.   Do you think the New York Post is a
22  lowly rag like the Daily Mail?
23            MR. WERNER:  Object to the form.
24       A.   I don't have opinion.  I never read
25  it.
```



Page 237

                         N. Choi

1

2      Q.    But in any event, flipping through

3  this, this is a De Tomaso promotional event,

4  right, sir?

5      A.    I wouldn't call it an event.  It

6  was an occasion that Ryan drove a car

7  together with Carmen to see Bernie.

8      Q.    And if you turn to page 3, there

9  are no Bates numbers, if you turn to page 3

10  of 27 --

11          MR. WERNER:  There are no Bates

12      numbers because it wasn't produced to

13      us.

14          MR. ZACH:  It's a publicly

15      available document.  You guys can find

16      news articles.

17      Q.    That is Mr. Ecclestone?

18      A.    He looks stylish and outing in a

19  light blue-brown jacket.

20      Q.    If we turn to page 5.

21          Do you see that?

22      A.    It talks about his clothing.

23      Q.    P72, do you see?

24      A.    Vroom, the group stop to look at

25  the lavish car.



Page 238

```
 1                    N. Choi
 2        Q.    It's Mr. Ecclestone looking at the
 3   car, right?
 4        A.    While out for a walk, yes.
 5        Q.    There is another individual there
 6   named Christian Horner, right?
 7        A.    Yeah, he is holding a bag for
 8   Bernie I suppose.
 9        Q.    He is there with his wife, Geri,
10   right?
11        A.    I don't know that it's his wife.
12        Q.    Are you a fan of the Spice Girls,
13   sir?
14              MR. WERNER:  Object to the form.
15        A.    I am not, a lot of people are, a
16   lot of men are.
17        Q.    The Spice Girls are a famous band,
18   right?
19        A.    I mean --
20              MR. WERNER:  Object to the form.
21        A.    Twenty, 30 years ago perhaps, yeah.
22        Q.    So at this event, there is Ms.
23   Jordá, a spice girl and Bernie Ecclestone,
24   right?
25        A.    Yeah.  From what the picture
```



Page 239

```
 1                    N. Choi
 2    depicts here, yes, correct.
 3         Q.    And if you turn to page --
 4         A.    Again, I just -- Looking chic, he
 5    wore a white polo neck top beneath his coat
 6    and had a pair of dark sunglasses.
 7               Let's go to the next page.
 8         Q.    Page 14 and 15.
 9               Do you see those?
10         A.    Which one, 14 and 15?
11         Q.    It's really small on the bottom,
12    this page.
13               Do you see her there are multiple
14    pictures of the P72 with these folks around
15    it?
16         A.    Yeah, as stated, they are out for a
17    walk.
18         Q.    So in your view, this is not useful
19    publicity for De Tomaso?
20         A.    What I see is a result which I
21    don't see.
22         Q.    What is the result you are speaking
23    of, sir?
24         A.    Generating nothing.
25         Q.    What do you mean generating
```



```
 1                    N. Choi
 2   nothing?
 3        A.    Nothing at all.  I mean, what do
 4   you expect after you see this?  I mean, do
 5   you expect increase viewerships?  Someone out
 6   of this material that will come now,
 7   subscribe for a car?  If you are talking
 8   about that, I don't see.
 9        Q.    So it's your view that having the
10   car featured in multiple photographs in a
11   national British newspaper is not useful
12   publicity for De Tomaso?
13              MR. WERNER:  Object to the form.
14        A.    In my opinion, it achieve nothing.
15        Q.    When did this occur?
16        A.    You have to ask Ryan.
17        Q.    We will look at the front.  There
18   is a newspaper article.
19              MR. WERNER:  Object to the form.
20        If he doesn't know, he doesn't know.
21        Q.    When is this article dated?
22              MR. WERNER:  The article is dated
23        when it's dated.
24        A.    You are asking me?
25        Q.    Yes.  The front page.
```



Page 241

```
 1                    N. Choi
 2       A.   You are the one producing.
 3            MR. WERNER:  No one produced it.
 4            MR. ZACH:  It's on the internet.
 5       A.   Does it say a date?
 6       Q.   February 21, 2022.
 7       A.   February 1 -- February 21, 2022.
 8            MR. WERNER:  It says as updated
 9       February '22.  The article is what it
10       is.
11            MR. ZACH:  It says published
12       February 21st.  It's updated the next
13       day too.
14       Q.   You can set that aside.
15            MR. ZACH:  We will mark a
16       photograph 34.
17            (Choi Exhibit 34, photograph,
18       marked for identification.)
19       Q.   Do you recognize the person in this
20  photograph?
21       A.   Yes.
22       Q.   Is that Ms. Jordá?
23       A.   Yeah, but she looks a bit bigger
24  here in this photo.
25       Q.   What do you mean by she looks
```



Page 242

```
 1                  N. Choi
 2   bigger in this photograph?
 3        A.   She seems more slim in person, but
 4   it looks to be.
 5        Q.   She is wearing professional racing
 6   gear, isn't she sir?
 7             MR. WERNER:  Object to the form.
 8        A.   I don't know professional, but it
 9   is a racing suit, but whether this qualified
10   as professional -- anyway, I don't want to
11   argue.
12        Q.   If you look on the top right, she
13   is wearing the De Tomaso logo on her racing
14   outfit, right?
15        A.   Yes, I see it.
16        Q.   Her colors match the De Tomaso
17   coloring, right?
18        A.   I think she is still using it until
19   today.
20        Q.   Even today, she is still promoting
21   De Tomaso, right?
22             MR. WERNER:  Object to the form.
23        A.   No, absolutely not.
24             MR. WERNER:  Is there a Bates
25        number for this?
```



Page 243

```
 1                    N. Choi
 2            MR. ZACH:  I just blew it up.  I
 3       can give you the Bates number.
 4            MR. WERNER:  It was a produced
 5       document.
 6       Q.    Did Ms. Jordá assist in making any
 7  introductions that you are aware of to
 8  potential clients?
 9       A.    I never met anyone myself.
10       Q.    That's not my question.
11            Are you aware of Ms. Jordá
12  introducing De Tomaso to other potential
13  clients?
14            MR. WERNER:  Object to the form.
15       A.    I am not aware.
16       Q.    So your testimony is that you are
17  not aware of any instance in which Ms. Jordá
18  made introductions to potential clients?
19       A.    Yes.
20       Q.    Would that change your view of Ms.
21  Jordá if you became aware of introductions
22  she made?
23            MR. WERNER:  Object to the form.
24       A.    I don't want to speculate.  I have
25  not seen any result.
```



Page 244

```
 1                    N. Choi
 2        Q.   How do you define result, sir?
 3             MR. WERNER:  Object to the form.
 4        A.   As he just categorized.
 5        Q.   Sorry, can you restate?
 6        A.   You said introducing clients.
 7        Q.   Your measure of result is making an
 8   introduction to clients?
 9        A.   Possibly.
10        Q.   Are there any other metrics that
11   you have for which you think would be
12   successful?
13        A.   It was never defined.  I never got
14   to speak to Carmen with any respect to this.
15        Q.   But you would talk about Carmen off
16   line with other individuals, right?
17             MR. WERNER:  Object to the form.
18        A.   That's a very broad question.
19        Q.   You would, from time to time, joke
20   with Ryan about Carmen, right?
21        A.   You know, Ryan has been on his own
22   for a very long time.  I am concerned about
23   his well-being, so I'm happy that as a
24   female, that he has an interest in, let's put
25   it that way.
```



Page 245

```
 1                    N. Choi
 2       Q.   Are you trying to imply that --
 3  well, strike that.
 4            What do you mean by that?
 5       A.   I want him to be happy.
 6       Q.   What does that have to do with
 7  Carmen Jordá?
 8       A.   Finally, a female come into his
 9  life.
10       Q.   So is it your view that you
11  believed that Ryan and Ms. Jordá had a
12  romantic relationship?
13       A.   I don't know what to believe in.
14  You just look at the facts.
15       Q.   Isn't it true, sir, that you texted
16  Mr. Berris and told him that you thought he
17  should marry Ms. Jordá?
18       A.   Perhaps at one point.
19       Q.   That wouldn't surprise you if you
20  had made a text like that?
21       A.   No, I wouldn't be surprised.  I
22  would be very happy for that to happen, if
23  they could afford it.
24       Q.   You and Hugo would, at times, talk
25  about Ms. Jordá, right?
```



Page 246

                         N. Choi

1

2              MR. WERNER:  Object to the form.

3         A.    I don't want to speculate.  If you

4    have some exhibit to show me, maybe it would

5    be better.

6         Q.    As you sit here today, do you

7    recall communicating with Hugo at all about

8    Ms. Jordá?

9         A.    I communicated with Hugo all the

10   time.

11             MR. ZACH:  I'm marking Choi 35.

12             (Choi Exhibit 35, February 22, 2022

13        text exchange, marked for

14        identification.)

15        Q.    A text exchange from February 22,

16   2022, right?

17        A.    Uh-huh.

18        Q.    And this is actually -- this is

19   around the same time of the article we just

20   looked at, right?

21        A.    I assume, yeah.  I think the

22   article was 21, 21st, is it?

23        Q.    Yes, the 21st.

24        A.    This is the updated version so the

25   original version, I don't know.



Page 247

                          N. Choi

1

2        Q.    It says to the left of it.

3        A.    It says published, oh, right, okay.

4   So 21st and then updated on 22nd.

5        Q.    This is you and Hugo.  Does this

6   refresh your recollection that you and Hugo

7   are talking about the article here?

8              MR. WERNER:  Object to the form.

9        A.    I can't speculate.  It's a very

10  broad message.

11       Q.    Hugo says, Poor Carmen, no mention,

12  and then you say, Or what she was wearing.

13             What did you mean by, or what she

14  was wearing?

15       A.    Tough to speculate.

16       Q.    As you sit here today, you have no

17  recollection of what you meant in that text?

18       A.    I mean, it's obvious I was asking

19  what was she wearing, so I don't have a

20  broader reference as to what I was talking

21  about.

22       Q.    Then Hugo gives you an emoji.

23             Do you know what that emoji

24  signifies?

25       A.    I don't.  Do you?  I can't even see



Page 248

```
 1                    N. Choi
 2   it.  It looks like a fish.
 3        Q.   I had the same problem.
 4             We were talking a bit about the
 5   success of -- strike that.
 6             Earlier, you were saying that you
 7   believed the timeline for the P72 rollout
 8   took too long, is that right?
 9        A.   Uh-huh.
10        Q.   I take it that part of that is you
11   attribute at least some or maybe all of it to
12   Mr. Berris, is that right?
13             MR. WERNER:  Object to the form.
14        A.   There are various facts, so you
15   want me to continue?
16        Q.   Let me ask, if you could -- do you
17   think that Mr. Berris is -- do you blame him
18   primarily for what you perceive as delays in
19   the rollout of the P72?
20        A.   I think it's a long form question
21   worth hours of discussion, right?
22        Q.   If you just had to --
23        A.   If I can travel back in time, I
24   would stick with the same strategy how we
25   built the Apollo, keeping Germany and price
```



Page 249

```
 1                    N. Choi
 2    it accordingly.
 3             So coming to America was a big
 4    defeat, no dealer, no clients, even the press
 5    talk poorly about us.  Nobody want a million
 6    dollar car to be produced in Detroit and we
 7    made all this news media in the public.  That
 8    was very, very difficult to overcome.
 9        Q.   That's what you view as at least a
10    component of the problems, at least from your
11    perspective, that De Tomaso faced?
12        A.   Not just one, there are a number.
13        Q.   At some point, sir, isn't it true
14    that you decided to bring in a company called
15    Capricorn to build out the P72?
16             MR. WERNER:  Object to the form.
17        A.   Not just me, we did it as a team.
18    We have comparables where we would pick
19    several candidates for the production.
20        Q.   You would agree with me, sir, that
21    Mr. Berris was opposed to bringing in
22    Capricorn, right?
23        A.   I disagree with that.  He did a
24    comparison table, we have a field for us to
25    pick from.
```



Page 250

                        N. Choi

1

2      Q.    So your view as you sit here today

3   is Mr. Berris wanted Capricorn to come and

4   build out the car?

5      A.    He did not disagree.

6      Q.    As you sit here today, you are sure

7   he never disagreed any disagreement about

8   bringing in Capricorn?

9      A.    We have disagreement all the time

10  about everyone.

11     Q.    De Tomaso has been sued by

12  Capricorn?

13     A.    They have not sued us.  We are

14  suing them.

15     Q.    What is the nature of that lawsuit?

16     A.    For nondeliverables.

17     Q.    How much money have you paid to

18  Capricorn for their work as of today?

19     A.    In terms of dollar amount, close to

20  22 million U.S. dollar and on top of that,

21  our other assets, including cars, prototypes,

22  parts, toolings.

23     Q.    Let me break that down.  De Tomaso

24  has paid Capricorn $22 million to develop the

25  P72, right?



Page 251

```
 1                     N. Choi
 2         A.    Correct.
 3         Q.    As of today, they haven't delivered
 4    a P72 to you, have they?
 5         A.    They have not.
 6         Q.    In addition to you paying them $22
 7    million, they are still in possession of
 8    various assets that you believe belong to De
 9    Tomaso, right?
10         A.    I know they belong to De Tomaso.
11         Q.    How much total as of today have you
12    paid to Carmen Jordá?
13              MR. WERNER:  Object to the form.
14         A.    I think we list it out, so overall,
15    including, are you talking about including
16    all the legal fees?
17         Q.    No, just pursuant to the contracts
18    that you have complained about in your
19    complaint.
20              MR. WERNER:  Object to the form.
21         A.    It's a long list of items that
22    would surround Carmen Jordá.
23         Q.    What was her salary supposed to be?
24              MR. WERNER:  Object to the form.
25         A.    What was her salary supposed to be?
```



MAGNA
LEGAL SERVICES

Page 252

1                    N. Choi

2  I believe in the beginning, it was 20,000.

3        Q.    What did it go up to?

4        A.    From what I was told in the alleged

5  contract is what is stated in there, so three

6  years nonterminable contract of 1.05.

7        Q.    A year or total?

8        A.    It's three years nonterminable

9  contact, a total of 1.05 plus additional perk

10 options or perks.

11       Q.    So the contract that you were

12 frustrated with Mr. Berris of amounted to, at

13 least in terms of direct payments, a little

14 over a million dollars to Ms. Jordá, right?

15            MR. WERNER:   Object to the form.

16       A.    I think it's more than that.

17       Q.    You understood for that, that she

18 would promote De Tomaso exclusively?

19       A.    I don't know what I understood

20 because I never seen the contract.

21       Q.    Sticking with Capricorn, I would

22 like to show you -- the first I want to show

23 you is Choi 36.

24            (Choi Exhibit 36, March 2022 email

25       from Ryan Berris to Mr. Choi copying Ms.



Page 253

```
 1                    N. Choi
 2        Majcher, marked for identification.)
 3        Q.    This is an email from March 2022.
 4              Do you see that?
 5        A.    Uh-huh.
 6        Q.    It's from Ryan to you copying Ms.
 7   Majcher and it says Roush Production
 8   Documentation.
 9              Do you see that?
10        A.    Uh-huh.
11        Q.    Who is Roush?
12        A.    Roush is an engine suppliers.
13        Q.    That was one of the suppliers that
14   Ryan was supporting, right?
15              MR. WERNER:  Object to the form.
16        A.    Yes.  Again, if you wanted me to
17   travel back in time, I would have done it
18   differently.
19        Q.    We say here, Mr. Choi, the second
20   paragraph says, I will send over my comments,
21   re:  Capricorn agreement soon, but feel it is
22   best that we limit the scope of the first
23   agreement for specified for prototype
24   development production and leave the P72
25   production agreement separate, as there are
```



Page 254

```
 1                    N. Choi
 2    many open items that require input and
 3    diligence.
 4            Do you see that?
 5        A.   Yes.
 6        Q.   Isn't it true, sir, what you
 7    understood Mr. Berris to be saying is that he
 8    was suggesting that you limit Capricorn to
 9    just developing a prototype first before
10    giving them a wider mandate?
11            MR. WERNER:  Object to the form.
12        A.   I agree, and we have not entered
13    into production agreement with them.
14        Q.   Let me show you marking Choi 37.
15            (Choi Exhibit 37, March 11, 2022
16        text message between Mr. Choi and Ms.
17        Majcher, marked for identification.)
18        Q.   Mr. Choi, this is a text message
19    between you and Ms. Majcher from March 11,
20    2022.
21            Do you see that?
22        A.   Uh-huh.
23        Q.   And if you turn to page 769, at the
24    bottom, you see that Ms. Majcher is saying,
25    Ryan seems quite concerned with Capricorn's
```



Page 255

1                    N. Choi
2    ability to deliver.
3            Do you see that?
4        A.    Yes, it's probably referring to the
5    production agreement.
6        Q.    So you would agree with me that at
7    various times, Mr. Berris conveyed to you and
8    others at De Tomaso that Capricorn may not
9    have the ability to actually accomplish what
10   they promised?
11           MR. WERNER:    Object to the form.
12       A.    Like I said, that's why we did not
13   enter into a production agreement with them
14   until we see the prototypes being built.
15       Q.    Here you would agree that Mr.
16   Berris was repeatedly critical of Capricorn's
17   abilities?
18           MR. WERNER:    Object to the form.
19       A.    Like I mentioned, we also, myself,
20   would need to see a prototype being built and
21   satisfied to our parameters.
22       Q.    Isn't it the case, sir, that it was
23   you that decided over Mr. Berris' objection
24   to go with Capricorn?
25       A.    He said concern, but he did not --



Page 256

```
 1                    N. Choi
 2   I mean, by the way, this is written by Diana,
 3   so do you have any documents that suggest
 4   otherwise, what Ryan's so-called concern or
 5   disagreement to that?
 6       Q.    Sir, my question to you is a
 7   factual question.  You were there, you saw,
 8   you heard.
 9            Do you recall, sir, that Mr. Berris
10   repeatedly objected to the use of Capricorn?
11            MR. WERNER:  Object to the form.
12       A.    I disagree.
13       Q.    So you don't believe that Mr.
14   Berris was opposed to the use of Capricorn?
15            MR. WERNER:  Object to the form.
16       A.    We picked Capricorn together, so
17   again, like I mentioned, we have a table of
18   different comparables that we looked at and
19   Capricorn at the time also committed to a new
20   facilities for us specifically and branded De
21   Tomaso of which Ryan Berris did the whole
22   promotional campaign for that and had the
23   press release being issued.
24       Q.    Isn't it true that in comparing
25   Capricorn with other potential outside
```



Page 257

1                     N. Choi
2    vendors, that it was Capricorn alone that had
3    never fully developed a car all the way
4    through?
5              MR. WERNER:  Object to the form.
6         A.    I don't believe so.
7         Q.    You don't believe it was the case
8    that Capricorn, that you knew that Capricorn
9    had never, from beginning to end, developed a
10   car of the type?
11             MR. WERNER:  Objection, asked and
12        answered.
13        A.    I believe they have.
14        Q.    I'm going to show you what's been
15   marked as Choi 38.
16             (Choi Exhibit 38, December 24, 2021
17        email forwarded from Mr. Choi to Mr.
18        Berris, marked for identification.)
19        Q.    This is an email from -- dated
20   December 24th, '21 that you forwarded to
21   Ryan.
22             Do you see that at the top?
23        A.    Uh-huh.
24        Q.    Below it is -- you are forwarding
25   an email?



Page 258

                    N. Choi

1

2      A.    Do you mind, I want to say, this is

3   coming from a lawyer, Mishcon.

4           MR. WERNER:  Where did this

5           document come from?  It's not produced

6           either.

7      A.    Mishcon was a lawyer.

8      Q.    Let's set this one aside then.

9           MR. WERNER:  Again, this is the

10          subject of our prior issues and we can

11          take it up after the deposition.

12          MR. ZACH:  Let's make it clear for

13          the record.

14          What was that, 38?

15          MR. WERNER:  That was 38.

16     Q.    Let me give you a different

17   document which is Choi 39.

18          (Choi Exhibit 39, email from Mr.

19          Choi to Mr. Burger and Diana Majcher,

20          marked for identification.)

21     Q.    Sir, what has been marked as Choi

22   39 is an email from you to Mr. Burger and

23   Diana Majcher.

24          Do you see that?

25     A.    Yes.



Page 259

1                          N. Choi

2          Q.    It is forwarding to you an email

3     that Robertino Wild wrote on June 30th of

4     2021, right?

5          A.    Uh-huh.

6          Q.    In the email that Mr. Robertino is

7     forwarding to you, there are various

8     discussions of Capricorn's plan to build out

9     the P72.

10              Do you see that?

11              You can flip through it, but just

12    as a general matter.

13         A.    Uh-huh.

14         Q.    Who is Robertino?

15         A.    I actually don't know.  He is

16    wearing a mask when he was speaking to us,

17    so, in short, he is the owner of Capricorn,

18    at least from what I was told.

19         Q.    When you say he was wearing a mask,

20    was he trying to conceal his identity in any

21    way?

22         A.    I don't know what to believe given

23    the current situation.

24         Q.    When you were speaking to your

25    principal supplier who was wearing a mask,



Page 260

1                    N. Choi

2    you were concerned that he might be hiding

3    his identity?

4         A.    I don't know what he is.  According

5    to the contract, you see what he wrote and,

6    again, Ryan and I went there, we spoke to

7    him, we tried to understand what he could

8    offer and we had committed.

9         Q.    It says here, you write to -- the

10   top email, Below is going back to the

11   beginning when Robertino began to tell me how

12   brilliant Capricorn is.  Of course, it was a

13   fantasy story and the simple fact is

14   Capricorn had never built a complete car ever

15   in their history.

16            Do you see that?

17        A.    I see that.

18        Q.    Do you now recall that of the

19   vendors you were looking at, Capricorn was

20   the one that had never built a complete car?

21            MR. WERNER:  Object to the form.

22        A.    What I had looked at when we were

23   doing due diligence, I also looked at

24   credibility of what a company is.  He was the

25   main supplier to Porsche.  Ryan stated that



Page 261

```
 1                    N. Choi
 2  he had a relationship with Porsche for a very
 3  long time, so throughout the period,
 4  Robertino showed me the check report in terms
 5  of satisfactory, let's say a checkbook from
 6  Porsche and Capricorn, check all the boxes.
 7       Q.   Do you take any personal
 8  responsibility for the decision to use
 9  Capricorn and not other suppliers that were
10  available to De Tomaso?
11            MR. WERNER:  Object to the form.
12       A.   I think it was a consensus decision
13  at the time.
14       Q.   So you don't think that you -- you
15  were the -- you claim to be the ultimate
16  owner of De Tomaso, right?
17       A.   I am going to be?
18       Q.   You claim to be the sole owner of
19  De Tomaso, right?
20       A.   Yes.
21       Q.   As the sole owner of De Tomaso, do
22  you take responsibility for hiring Capricorn?
23       A.   Yeah, of course.
24            MR. ZACH:  I would like to mark
25       Choi 40.
```



Page 262

1                     N. Choi

2                (Choi Exhibit 40, March 26, 2021

3          text exchange between Mr. Choi and Jowyn

4          Wong, marked for identification.)

5                MR. ZACH:   There are marks on this

6          document which I assume someone like me

7          clumsily made.   They are not part of the

8          real document.

9          Q.   So this is a text exchange between

10   yourself and Jowyn Wong on March 26, 2021.

11              Do you see that?

12         A.   Yes.

13         Q.   In this, you begin by saying, I'm

14   going to fire Ash.

15              Do you see that?

16         A.   First page?

17         Q.   Yes.

18         A.   Yes.

19         Q.   Who is Ash?

20         A.   A person, a digital artist.

21         Q.   What was his role?

22         A.   He was supposed to become a digital

23   artist for De Tomaso and aspire car designer.

24         Q.   And why did you want to fire him?

25         A.   For not meeting what I requested.



Page 263

```
 1                    N. Choi
 2       Q.    What had you requested?
 3       A.    To design a car that I believe
 4  would be suitable.
 5       Q.    So did he actually present you with
 6  designs of the car?
 7       A.    He presented sketches.
 8       Q.    And you were dissatisfied with
 9  those sketches?
10       A.    Not just me, clients.  So we
11  presented drawings, both from Ash as well as
12  Jowyn in front of the clients.
13       Q.    So Jowyn had a competing version of
14  the car that he was presenting?
15       A.    Just to give you a bit of
16  background, Jowyn has joined me since 2014 so
17  he has consistently delivered.
18            The original Arrow, the original IE
19  and presented to and are all designed by him.
20       Q.    What did you understand Mr. Ash's
21  background to have been?
22       A.    Digital artist.
23       Q.    What sorts of projects had he
24  worked on?
25       A.    I think Ryan can tell you more.
```



Page 264

```
 1                    N. Choi
 2        Q.   I'm not asking Ryan.
 3             Do you have any recollection of the
 4   projects?
 5        A.   He did digital design on cars.
 6        Q.   So turning the page to the next
 7   page, you see Jowyn Wong says to you, I am
 8   sure Robertino is an amazing person, but
 9   we're talking real world now.  It is really
10   appalling at this point, but I would prefer
11   to save them face and reduce the stress at
12   this point.
13             Do you see that?
14        A.   I do.
15        Q.   If you turn to the next page, and
16   Jowyn Wong continues, But please consider
17   what I'm saying very seriously.  This isn't
18   something we have come across before.  They
19   really have no idea what is going on and are
20   always avoiding calls and emails.
21             Do you see that?
22        A.   Uh-huh.
23        Q.   Then if you turn to page 67, he
24   goes on.  The middle of the page, at 313,
25   Jowyn Wong says, Okay.  Let's do this.  We
```



Page 265

```
 1                    N. Choi
 2  all want to get P72 done properly with the
 3  right people who are focused.  Currently, the
 4  engineering, communication and discussion is
 5  absolutely not acceptable by any means and at
 6  this stage of the project, DT cannot afford
 7  this level of rubbish work, right?
 8       A.   Uh-huh.
 9       Q.   You would agree with me that Jowyn
10  Wong is being highly critical of Capricorn,
11  right?
12       A.   Yes.
13       Q.   If you go to the next page and
14  Jowyn Wong says, Even Ryan thinks it smells
15  funny, and you respond, Ryan never liked
16  Robertino.
17            Do you see that?
18       A.   Uh-huh.
19       Q.   Again, you understood that Mr.
20  Berris did not want to proceed with
21  Capricorn, but instead, recommended
22  proceeding with other vendors, right?
23            MR. WERNER:  Object to the form.
24       A.   I would disagree to that statement.
25       Q.   Isn't it true, sir, that Mr. Berris
```



Page 266

1                    N. Choi

2    recommended continuing with Roush, among

3    others, to finish the P72?

4              MR. WERNER:  Object to the form.

5         A.   Roush was not capable to finish the

6    P72.

7         Q.   I understand you would have to use

8    multiple vendors sometimes, right, to finish

9    it, right?

10             MR. WERNER:  Object to the form.

11        A.   If I had a choice to travel back in

12   time, I would have stick with our original

13   supplier, contractor HWA to finish the job.

14        Q.   You can set that aside.

15             MR. ZACH:  I'm going to mark Choi

16        41.  This is very briefly.

17             (Choi Exhibit 41, document bearing

18        Bates stamp No. Berris 000034737, marked

19        for identification.)

20        Q.   Very briefly, we talked earlier

21   about you and Mr. Berris joking about Carmen,

22   right?

23        A.   Uh-huh.

24        Q.   Here on the first page, you can

25   see, Our hard work and loyalty shall prevail.



Page 267

                        N. Choi
1
2   You say, Marry Carmen ASAP, heart sign,
3   right?  Then you say, Privatize her.
4           What did you mean by privatize her?
5       A.   Marry her.
6       Q.   He says, Working on it, right?  So
7   you guys were joking about Carmen?
8       A.   It's a long time coming for him.
9       Q.   What do you mean by that?  Are you
10  trying to imply that Mr. Berris had a hard
11  time getting a girlfriend?
12          MR. WERNER:  Object to the form.
13      A.   I don't want to suggest anything.
14  I haven't seen him with any girl.
15      Q.   Isn't it true, sir, in other
16  emails, you and your colleagues make fun of
17  Mr. Berris?  Do you think he is gay?
18          MR. WERNER:  Object to the form.
19      A.   Who said?
20      Q.   You did.
21      A.   I'm asking you, did I?
22      Q.   I'm asking did you --
23          MR. WERNER:  Object to the form.
24  Show the documents.
25      A.   It would be nice if you had



Page 268

```
 1                    N. Choi
 2  something to point me to.
 3       Q.   Listen to my question.  Isn't it
 4  true, sir, that at times, you texted others
 5  at De Tomaso suggesting that Ryan might be
 6  gay?
 7            MR. WERNER:  Object to the form.
 8       A.   I would love to see it.
 9            MS. WIGGER:  What is the Bates
10       number for 41?
11            MR. ZACH:  We can give it to you.
12       Q.   When you say you want to see the
13  document, that's because that's something you
14  would never do?
15            MR. WERNER:  Object to the form.
16       A.   I don't want to speculate.  Pleases
17  if you present me.
18       Q.   I'm asking, without seeing a
19  document, is that something you would or
20  would not do?
21            MR. WERNER:  Object to the form.
22       A.   People call me gay too.  I don't
23  want to characterize anyone with this, but if
24  I wrote it, I wrote it.
25            Let's have a look at the context.
```



Page 269

                    N. Choi

1
2      Q.    Briefly, we discussed this entity

3  Sino Vision.

4            Is that one of your companies?

5      A.    It is.

6            MR. ZACH:  I would like to mark as

7       Choi 42.

8            (Choi Exhibit 42, document from

9       O-Bank, marked for identification.)

10     Q.    This is a document from O-Bank in

11  Taiwan.

12           Do you see that?

13     A.    Yes.

14     Q.    And it is payment, an order of Sino

15  Vision.

16           That's your company, right?

17     A.    Correct.

18     Q.    It's wiring just short of 2.4

19  million U.S. dollars to De Tomaso, right?

20     A.    Correct.

21     Q.    In October 9, 2020?

22     A.    Uh-huh.

23     Q.    How does Sino Vision fit into the

24  corporate structure of De Tomaso?

25           MR. WERNER:  Object to the form.



Page 270

                              N. Choi
1
2        A.    It doesn't.
3        Q.    Why is Sino Vision wiring $2.4
4    million to De Tomaso?
5        A.    I instructed the wiring.
6        Q.    On what basis did you issue that
7    instruction?
8              MR. WERNER:  Object to the form.
9        A.    What do you mean, what basis?
10       Q.    What's the purpose in having a
11   corporate entity, Sino Vision?
12       A.    It's my company.
13       Q.    Did Sino Vision have any business
14   relationship with De Tomaso?
15             MR. WERNER:  Object to the form.
16       A.    I have the relationship with De
17   Tomaso.  I instructed Sino Vision to wire the
18   money to De Tomaso.
19       Q.    Did Sino Vision receive a
20   promissory note or something in consideration
21   for the wiring of that money?
22       A.    We have a general facilities under
23   my -- let's say -- we do have, let's say,
24   loan facilities, so a general working capital
25   facilities.



Page 271

1                        N. Choi

2        Q.    Is that a written agreement?

3        A.    It is a written agreement.

4        Q.    We haven't seen that.  Would you

5   please produce that?

6        A.    It is a general agreement that's in

7   my name with the company.

8        Q.    But as part of that written

9   agreement, Sino Vision wired $2.4 million to

10  De Tomaso, right?

11       A.    Uh-huh.

12       Q.    Was this a loan or how would you

13  characterize this?

14       A.    It's a loan.

15       Q.    It's a loan by Sino Vision to --

16       A.    Actually, by me.

17       Q.    Is there documentation of this

18  loan?

19       A.    I think Diana will be able to

20  provide it.

21       Q.    How many companies of yours are

22  part of this general agreement to share money

23  amongst themselves?

24            MR. WERNER:  Object to the form.

25       A.    I don't recall exactly.



Page 272

```
 1                    N. Choi
 2       Q.   How many companies do you have
 3  control of or of which you are an officer or
 4  director?
 5            MR. WERNER:  Object to the form.
 6       A.   I don't recall the number.
 7       Q.   Being an officer of a company is an
 8  important role, right?
 9            MR. WERNER:  Object to the form.
10       A.   It depends on what jurisdiction.
11       Q.   What jurisdiction is it not
12  important for an officer -- strike that.
13            In what jurisdictions is it not
14  important for someone to be an officer of a
15  company?
16            MR. WERNER:  Object to the form.
17       A.   I'm confused about your question,
18  but I know I was the sole shareholder and
19  director of Sino Vision.
20       Q.   How many other companies were you
21  the sole shareholder of?
22       A.   Pretty much all.
23       Q.   Can you list for me the companies
24  that you are the sole shareholder of?
25       A.    In relation to De Tomaso?
```



Page 273

```
 1                    N. Choi
 2        Q.    Just in general.
 3        A.    Able Path, then we have Ideal Teams
 4   and then also in this case, De Tomaso.
 5        Q.    Do you have significant equity
 6   interest in other companies?
 7              MR. WERNER:  Object to the form.
 8              Are you asking like his 401(k) or
 9        something like that?
10        Q.    I don't want your 401(k).
11        A.    I don't have a 401(k).
12        Q.    Fair enough.
13              Do you have -- are you an officer
14   and director of any other corporate entity?
15        A.    Right now, my only focus is De
16   Tomaso.
17        Q.    I understand.  But as you sit here
18   today, are you, as set forth in formal
19   corporate documents, an officer or director
20   of any other company?
21        A.    Other than what I just mentioned.
22        Q.    So the answer is no, except for the
23   ones you mentioned?
24        A.    Yes.
25              MR. ZACH:  I'm going to mark as
```



Page 274

```
 1              N. Choi
 2       Choi 43.
 3              (Choi Exhibit 43, February 20, 2021
 4       text message between Mr. Choi and Mr.
 5       Berris, marked for identification.)
 6       Q.    This is a text message between you
 7  and Mr. Berris from February 20, 2021.
 8              Do you see that?
 9       A.    Uh-huh.
10       Q.    Going to the second page which is
11  ending in 63.
12       A.    Uh-huh.
13       Q.    You say, Thank you, Mr. Berris.
14  Notes in the email.  Let me know if they are
15  clear, and this is not including my 2.4
16  million from Sino Vision because that
17  actually came in October.  In total reflects
18  close to 30 million with the accrued
19  interest.
20              Do you see that?
21       A.    Uh-huh.
22       Q.    This is relating to what, sir?
23       A.    What did you mean, which part?
24       Q.    Do you know what the 2.4 million
25  that we just looked at on the bank statement
```



Page 275

```
 1                  N. Choi

 2   --

 3        A.   Sino Vision.

 4             MR. WERNER:  Object to the form.  I

 5        also object to this document.  It's 248

 6        to 263, it's incomplete.

 7             MR. ZACH:  Fair enough.  I only --

 8        that's fair enough.  I will confirm at

 9        the break.  I believe this is a longer

10        stack.

11             MR. WERNER:  I'm sure it is.

12             MR. ZACH:  The first, they come by

13        day, so in order to have the first date,

14        you've got to have that first page, so

15        it's just to supplement.

16             I'm going to mark Choi 44.  I think

17        this is another one where it starts with

18        138 and then proceeds out of sequence to

19        148, so it has a cover page to indicate

20        the date.

21             (Choi Exhibit 44, July 5, 2021 text

22        message between Mr. Choi and Mr. Berris,

23        marked for identification.)

24        Q.   This, again, is a conversation

25   between yourself and Ms. Majcher on July 5,
```



Page 276

```
 1                    N. Choi
 2   2021.
 3           Do you see that?
 4       A.   Yes.
 5       Q.   I just want to direct your
 6   attention to page 150.  And here, Ms. Majcher
 7   says, At 8:45, the option was repurchased by
 8   DT using around $11 million of cash that came
 9   from Sino Vision, part of the U.S. 3 million,
10   the rest were you taking up amounts
11   originally due to you from Apollo.  Those can
12   be credited to your account.
13           Do you see that?
14       A.   Yeah, sure.
15       Q.   The option Ms. Majcher is talking
16   about is an option that was provided to the
17   purchaser of your stake in Apollo, right?
18           MR. WERNER:  Object to the form.
19       A.   No, that's not correct.
20       Q.   Again, what is the name of the
21   company that purchased your stake in Apollo
22   again?
23       A.   WE Solutions.
24       Q.   WE Solutions.
25       A.   It was later renamed as Apollo and
```



Page 277

```
 1                  N. Choi
 2  then Future Mobility Group, the short name
 3  AFMG.
 4       Q.   Isn't it a fact, sir, that AFMG was
 5  given the option to purchase shares in De
 6  Tomaso?
 7            MR. WERNER:  Object to the form.
 8       A.   It was an option, not purchased
 9  outright to De Tomaso, only a percentage.
10       Q.   They never exercised that option?
11       A.   Never.
12       Q.   You purchased that option back from
13  them, right?
14       A.   Yes, I did.
15            And just for clarification, the 11
16  million here, I believe it's Hong Kong
17  dollar.
18       Q.   Fair enough.
19       A.   That translate to maybe 1.2, 1.3,
20  something like that.
21       Q.   How much did you purchase those
22  options back for?
23       A.   Same price as they pay.
24       Q.   Do you recall what they paid?
25       A.   I don't recall.
```



Page 278

1                    N. Choi

2        Q.    The money you used to purchase

3   those back came from Sino Vision?

4             MR. WERNER:  Object to the form.

5        A.    I don't recall exactly how much was

6   transferred and how much.

7             MR. ZACH:  I would like to now mark

8        as Choi 45.

9             (Choi Exhibit 45, document bearing

10       Bates stamp No. Berris 000253831, marked

11       for identification.)

12       Q.    We will give you the Bates number.

13       A.    So small.

14       Q.    I apologize, my eyes aren't good

15   either.  I will read it out.  These are

16   management accounts and financial statements

17   for De Tomaso.

18             Do you see that?

19       A.    Uh-huh.

20       Q.    They are from 2020?

21       A.    Uh-huh.

22       Q.    If you look at important

23   disclosures, No. 1, it says, the De Tomaso?

24       A.    Which page?

25       Q.    The front page, this thing right



Page 279

```
 1                    N. Choi
 2   here, I will try to read it.
 3            The De Tomaso management accounts
 4   reflected in this document do not include
 5   additional capital contributions of the 3.1
 6   million U.S. dollars to De Tomaso by Norman
 7   Choi which occurred during the fourth quarter
 8   of 2020.  These individuals will be
 9   accurately reflected on the December/January
10   management account statements which are
11   currently being prepared.
12            Do you see that?
13       A.   Uh-huh.
14       Q.   Here, would you agree with me that
15   you did not personally wire the money, the
16   $3.1 million, that, instead, came from Sino
17   Vision, right?
18            MR. WERNER:  Object to the form.
19       A.   I just said to you I was the sole
20   director.
21       Q.   I understand.  But would you agree
22   with me that corporate formality is important
23   or is it not?
24            MR. WERNER:  Object to the form.
25       A.   To begin with, this is a statement
```



Page 280

```
 1                    N. Choi
 2   prepared by Ryan, so I don't know what --
 3   actually how it went out and just looking at
 4   how this whole thing is being prepared, you
 5   know, with the logo and with the choice of
 6   the font, it's not prepared by me, so how he
 7   wrote, I mean, it's...
 8       Q.    At times, sir, you would agree that
 9   you asked Mr. Berris to assist in preparing
10   presentations for potential investors and the
11   like, right?
12       A.    Yeah, I did, yeah.
13       Q.    And at times, he would prepare them
14   and you would review them?
15       A.    Not all the time.
16       Q.    Was it your practice to review
17   things that he made?
18       A.    Yeah, if he send it to me, yes.
19       Q.    Isn't it true that Ms. Majcher
20   participated in the creation of these
21   management account and financial statements?
22             MR. WERNER:  Object to the form.
23       A.    I think amongst other
24   professionals.
25       Q.    It would be your expectation that
```



Page 281

                    N. Choi
1   Ms. Majcher would have participated in this,
2   right?
3              MR. WERNER:   Object to the form.
4        A.   I don't want to speculate exactly
5   who was involved.
6        Q.   But you would agree with me that it
7   was, in fact, the entity Sino Vision that
8   sent out $3.1 million to De Tomaso?
9        A.   Actually, I'm glad you brought this
10  up because this is actually one of the big
11  allegations that you have made in your
12  complaint, saying how we are tied up with the
13  so-called network, so thank you for that, but
14  as far as this is concerned, I am not 100
15  percent sure, but I have a high suspicion
16  this is being prepared by Ryan in this case
17  so I don't know if I have verified this, but
18  perhaps -- my short answer is I don't recall
19  who prepared it.
20       Q.   My question to you is, you would
21  agree that the $3.1 million that was sent to
22  De Tomaso was not from you, Norman Choi, but
23  instead, came through the corporate entity --
24       A.   It's the same thing how I do with

Page 282

                        N. Choi
1
2    Ideal Team and Dream Makers, I would, again,
3    fund the company if needed.
4          Q.    I'm asking as a factual matter, the
5    money came from Sino Vision, right?
6                MR. WERNER:  Object to the form.
7          A.    I mentioned to you, I have a
8    facility letter that are ready to support the
9    company.
10         Q.    You will produce that to us?
11         A.    I think you may already have it.
12               MR. ZACH:  Last document on this
13         topic.  Choi 46.
14               (Choi Exhibit 46, March 22, 2024
15         WhatsApp between Mr. Choi and Ms.
16         Majcher, marked for identification.)
17         Q.    This is a WhatsApp between yourself
18    and Ms. Majcher.
19               Do you see that?
20         A.    Uh-huh.
21         Q.    It's dated March 22, 2024, right?
22         A.    Uh-huh.
23         Q.    And in this -- if you turn to the
24    last page, you are referring to how you are
25    going to respond to our interrogatories?



Page 283

```
 1                    N. Choi
 2        A.   Which particular?
 3        Q.   Go to page 16.
 4        A.   Uh-huh.
 5        Q.   This is for the interrogatories we
 6   can discuss on Monday --
 7             MR. WERNER:  This is privileged
 8        too, this is work product.  This is work
 9        being done at the direction of counsel.
10        We object to it, so I'm instructing the
11        witness not to answer any questions on
12        this document.  There is a reference to
13        counsel in here, again.
14             MR. ZACH:  All right.  That's fine.
15        Let's go.  Do you want to take a break?
16             MR. WERNER:  Why don't we take a
17        short break.
18             THE VIDEOGRAPHER:  We are going off
19        the record.  The time is 4:23 p.m.
20             (Recess.)
21             THE VIDEOGRAPHER:  We are back on
22        the record.  The time is 4:36 p.m.
23        Q.   Mr. Choi, I want to return to a
24   discussion we had earlier about Mr. Berris'
25   compensation at De Tomaso.
```



Page 284

N. Choi

1

2          To be clear, you deny in addition
3    to the other things you denied in the
4    deposition, you denied that you ever
5    conferred equity upon Mr. Berris in De
6    Tomaso, right?

7          A.    Yes.

8          Q.    What is your -- what do you recall
9    telling Mr. Berris with respect to equity in
10   De Tomaso?

11          MR. WERNER:  Object to the form,
12       lack of foundation, assumes facts not in
13       evidence.

14          Q.    Did you ever raise -- did you ever
15   propose giving equity to Mr. Berris?

16          MR. WERNER:  Object to the form.

17          A.    Equity in what form?

18          Q.    In De Tomaso.

19          A.    I don't recall specifically any
20   time I mentioned about that.

21          Q.    So as you sit here, you do not
22   recall -- strike that.

23          I just want to make sure I
24   understand.  Is it your testimony, sir, that
25   you never indicated to Mr. Berris that you



Page 285

```
 1                    N. Choi
 2  would provide him with equity in De Tomaso?
 3            MR. WERNER:  Object to the form.
 4       A.   I mean, in the larger scheme, you
 5  know, we could have talked about the
 6  employment shareholder scheme -- employee
 7  share scheme.  That would be a custom to at a
 8  point when it's appropriate.
 9       Q.   But as he worked at De Tomaso from
10  2020 to 2022, you never told him that you
11  would provide him with equity, independent of
12  any potential share -- option share program?
13       A.   I would, again --
14            MR. WERNER:  Hang on.  Do you want
15       to start over?
16       Q.   Let me reask the question.
17            Is it your testimony, sir, that
18  between 2020 and 2022, you never advised Mr.
19  Berris that you would provide him with equity
20  in De Tomaso?
21            MR. WERNER:  Object to the form.
22       A.   I think I would, again, refer back
23  to the original consultancy agreement that we
24  have entered into as a base.
25       Q.   So your position remains that it is
```



Page 286

```
 1                    N. Choi
 2   that Apollo consultancy agreement that
 3   governs all of Berris' rights with respect to
 4   De Tomaso?
 5        A.   That's the principle.
 6             MR. ZACH:  I would like to mark for
 7        you Choi 47.
 8             (Choi Exhibit 47, discussion
 9        between Ms. Majcher and Mr. Choi, marked
10        for identification.)
11        Q.   This is a discussion between Ms.
12   Majcher and yourself.
13             Do you see that?
14        A.   Uh-huh.
15        Q.   And as part of this, turning to the
16   page 776, you discuss AFMG's option at 341.
17             Do you see that?
18        A.   Yes.
19        Q.   That's the option that we were just
20   talking about, right?
21             And then if you turn to page -- as
22   part of this, you are doing a valuation of De
23   Tomaso, right?
24        A.   I don't know which valuation you
25   are talking about.
```



Page 287

1                    N. Choi

2        Q.   As part of selling the -- as part

3   of -- strike that.

4             Let me just point you to something

5   in the document.  You see back at page 76, it

6   says, I intend to have AFMG exercise the

7   option ASAP and have a valuation to be

8   determined, but likely higher than $20

9   million.

10            Do you see that?

11       A.   341 again?

12       Q.   At 776, I apologize.

13            MR. WERNER:  I think it's 200

14       million too.

15       Q.   Two hundred, what did I say, 20

16   million.

17            So that's the option that we were

18   just discussing earlier, right?

19            MR. WERNER:  Object to the form.

20       A.   It looks to be.

21       Q.   And then if you turn to 781, you

22   see Ms. Majcher say, You need to let them

23   know about Ryan's ownership percentage

24   though.

25            Do you see that?



Page 288

```
 1                    N. Choi
 2       A.    Okay.  I see it.  Yeah, she wrote
 3  it here.
 4       Q.    And that ownership percentage is
 5  the equity that you've conferred upon Mr.
 6  Berris in connection with De Tomaso, isn't
 7  it?
 8            MR. WERNER:  Object to the form.
 9       His testimony has been exactly the
10       opposite of that.
11       Q.    What was your understanding of the
12  ownership percentage that Ms. Majcher was
13  referring to there?
14            MR. WERNER:  Object to the form.
15       A.    I can't speculate.
16       Q.    Do you recall saying, I have no
17  idea what you are talking about when she
18  referred to Ryan's ownership percentage?
19            MR. WERNER:  Object to the form.
20       A.    I don't seem to have a reply so I
21  don't know.
22       Q.    As you sit here today, you can't
23  testify for the jury what your understanding
24  of what Ms. Majcher was referring to there,
25  right?
```



Page 289

```
 1                    N. Choi
 2           MR. WERNER:  Object to the form.
 3      A.    Right.
 4           MR. ZACH:  I would like to show you
 5      -- mark what is exhibit Choi 48.
 6           (Choi Exhibit 48, December 31, 2020
 7      text chain between Mr. Choi and Mr.
 8      Berris, marked for identification.)
 9      Q.    This is a text chain between you
10  and Mr. Berris on December 31, 2020.
11           Do you see that?
12      A.    Uh-huh.
13      Q.    You see your text is in tan.
14           At 2:14, you say, Morning.  One
15  question regarding the percentage I promised
16  to give Ryan.  At the end, what's the best
17  way to structure and proceed with Ryan not
18  having to deal with all the capital gain gift
19  income tax issue?
20           Do you see that?
21      A.    Yes, I do.
22      Q.    What you are saying to Mr. Berris
23  here is, you are referring to the percentage
24  of equity that you promised Ryan, right?
25           MR. WERNER:  Object to the form.
```



Page 290

```
 1                    N. Choi
 2        A.    I would say this.  At that time, we
 3   do have a number of counsels giving us
 4   advises and --
 5              MR. WERNER:  You are not allowed to
 6         go into the discussions with counsel.
 7         You can talk about nonprivileged
 8         communication, but don't go into your
 9         communications with your lawyers please.
10        A.    In short, I think we have thousands
11   of emails going into the discussion how the
12   structure should be set up, so the conclusion
13   is prior to going into all this new setup of
14   the U.S. entity, I was the sole shareholder
15   and after restructuring, I was still the sole
16   shareholder.
17        Q.    But you write here, One question
18   regarding the percentage I promised to give
19   Ryan.
20              What did you promise to give Ryan,
21   sir?
22              MR. WERNER:  Object to the form.
23        A.    I don't recall.
24        Q.    What do you think the percentage
25   that you've included there refers to?
```



Page 291

                        N. Choi

1

2    A.   I cannot refer back to what I wrote

3    three, four years ago.

4    Q.   But you have a general

5    understanding of what percentage means,

6    right?

7    A.   I do, but it's not defined.

8    Q.   And you have a general

9    understanding of what the term promise means,

10   right?

11   A.   It could have been reflected in

12   other form, like I mentioned, the employee

13   share option scheme.

14   Q.   So here, your testimony is that

15   when you say, One question regarding the

16   percent I promised to give Ryan, that is not

17   referring to any equity that you promised to

18   Mr. Berris?

19        MR. WERNER:   Object to the form,

20        asked and answered.

21   A.   Like I said, I was in many

22   discussions with different counsels in

23   relation to this matter.

24   Q.   Did you have any discussions with

25   Mr. Berris promising him equity in the



Page 292

```
 1                    N. Choi
 2   company?
 3        A.    At the end of the day, subject to
 4   the final outcome or conclusion given by the
 5   counsel.
 6        Q.    That's not what I asked.
 7              I asked, did you ever make a
 8   promise to Ryan that you would give him
 9   equity in De Tomaso?
10              MR. WERNER:  Object to the form,
11         asked and answered.
12        A.    One possible way is through the
13   employee share option scheme.
14        Q.    I don't think you answered my
15   question.
16              Did you promise equity of any sort
17   to Ryan Berris?
18        A.    Share option scheme, like I said
19   for the third time, that's what I mentioned.
20        Q.    That's the only time you --
21        A.    There are many different structures
22   that were mentioned during the discussion
23   with the lawyers.
24        Q.    At the time -- do you know who
25   Rudolph James was?  Do you know someone named
```



Page 293

```
 1                  N. Choi
 2   Rudolph James?
 3        A.    If you can show me the email, let
 4   me have a look.
 5        Q.    Did you know -- I'm not trying to
 6   hide the ball.  You are not on this email.
 7              Did you know someone named James
 8   Rudolph from Citibank?
 9        A.    I never talked to him.
10        Q.    I would like to show you another
11   text message.  This is another text exchange
12   between you and Mr. Berris which I will mark
13   as Choi 49.
14              (Choi Exhibit 49, January 5, 2021
15        text exchange between Mr. Choi and Mr.
16        Berris, marked for identification.)
17        Q.    This is a text exchange on January
18   5, 2021.
19              Do you see that?
20        A.    Uh-huh.
21        Q.    That's between you and Mr. Berris
22   and I would like to turn to page 681.
23              Here, you are texting to Mr. Berris
24   saying, Let me look into it with Jamie in
25   January.  There shouldn't be a gift tax, but
```



Page 294

```
 1                    N. Choi
 2   Ryan will have to include income and gain as
 3   the structure will be a partnership for tax
 4   purposes until SPAC.
 5            Do you see that?
 6       A.   Uh-huh.
 7       Q.   And the next, you include in this
 8   message to Ryan, Hi, Lawrence, Please let me
 9   know once you speak to Jamie.  FYI, I will
10   proceed with the fundraise and want to make
11   sure Ryan's interest is well taken care of
12   prior to the completion of the raise.
13            Do you see that?
14       A.   Uh-huh.
15       Q.   What are you referring to when you
16   say you want to make sure Ryan's interest is
17   well taken care of?
18       A.   I take care of all his interests
19   all the time, but I need to oblige to the
20   advice given by my counsel.
21       Q.   Isn't it a fact that your reference
22   to Ryan's interest here is the equity stake
23   you promised him?
24            MR. WERNER:  Object to the form.
25       A.   I don't want to speculate what I
```



Page 295

```
 1                 N. Choi
 2   was referring to, but again, in the grand
 3   scheme of things, we need to refer to
 4   counsel's advice.
 5            And Jamie also, if I remember
 6   correctly, is a lawyer from Loeb & Loeb, so
 7   just so you know and --
 8        Q.   Don't tell me what you said to your
 9   lawyers?
10        A.   What?  This is a privilege
11   conversation?
12        Q.   This isn't privileged.  This is
13   between you and Mr. Berris.
14        A.   Just so you know, Jamie is a lawyer
15   from Loeb & Loeb.
16        Q.   So you tell Ryan, Let me look into
17   it with Jamie in January.  There shouldn't be
18   a gift tax, but Ryan will have to include
19   income and gains as the structure will be a
20   partnership for tax purposes until the SPAC.
21            Do you see that?
22        A.   Yeah.  Like I mentioned --
23        Q.   You would agree with me that an
24   equity grant could trigger income and gains
25   tax, right, in a partnership?
```



Page 296

```
 1                    N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.    I need to refer back to what Loeb
 4    wrote --
 5       Q.    Don't, don't, don't --
 6            MR. WERNER:  Don't go into your
 7       conversations with counsel.
 8       Q.    You have equity in numerous
 9    companies, right?
10       A.    Myself in numerous companies,
11    correct.
12       Q.    You understand that a grant of
13    equity can create tax implications, right?
14       A.    I never granted or have any options
15    issued to anyone.  I've always been 100
16    percent shareholder of all the companies that
17    I own.
18            So with respect to this, we were
19    just coming to America, we were new and
20    that's why we engage, again, professional
21    firms to evaluate the situation for us.
22       Q.    When you say, on the next page,
23    when you will proceed with the fundraise, you
24    are talking about working through a potential
25    SPAC, right?
```



Page 297

```
 1                    N. Choi
 2             MR. WERNER:  Object to the form.
 3        A.    I cannot recall whether SPAC or
 4   other measurements of fundraise.
 5        Q.    To be clear, generally, a SPAC were
 6   to purchase De Tomaso, they would be buying
 7   out some portion of the equity of the
 8   company, right?
 9        A.    It could be many forms.  I don't
10   want to speculate because we never got to
11   that stage.
12        Q.    You have a general understanding of
13   how SPACs work?
14        A.    In general.  I've never done one.
15        Q.    You spent a lot of time, we will
16   get to, working on a potential SPAC
17   transaction, right?
18             MR. WERNER:  Object to the form.
19        A.    You can continue.
20        Q.    You understand a SPAC is a legal
21   entity that is created that has shareholders
22   that are then looking to find a target
23   company to purchase, to make public through
24   the SPAC.
25             Is that a fair summary?
```



Page 298

                    N. Choi

1

2        A.    In general, that's a principle.

3        Q.    In general, the SPAC entity will

4    purchase the target entity, right?

5              MR. WERNER:  Object to the form.

6        A.    In general, that's the principle.

7        Q.    What else would the SPAC do if it

8    wasn't buying the company?

9              MR. WERNER:  Object to the form.

10       A.    I'm not an expert in U.S. security.

11       Q.    If a SPAC were to buy De Tomaso, it

12   would be buying out equity from the company,

13   right, sir?

14             MR. WERNER:  Object to the form.

15       A.    Maybe.

16       Q.    So here, where you just discussed a

17   SPAC in the prior text, you are referring to,

18   quote, make sure Ryan's interest is well

19   taken care of prior to the completion of the

20   raise.

21             Do you see that?

22       A.    That's what I wrote.

23       Q.    You would agree with me that what

24   you are referring to is to make sure you are

25   protecting Ryan's equity stake so that when



Page 299

```
 1                    N. Choi
 2  someone buys it out, it's protected, right?
 3           MR. WERNER:  Object to the form.
 4      A.   Again, there could be many forms,
 5  so at the end, I will refer back to the
 6  discussion that I had with the counsels.
 7      Q.   We can't refer to that, but okay.
 8           But one of the forms it could take
 9  is what I just described, which was buying
10  out the interest, the equity interest that
11  you conferred upon Mr. Berris, right?
12           MR. WERNER:  Object to the form.
13      A.   Again, this is a matter that I
14  would refer to the conversation that we have
15  had with different counsels.
16      Q.   You are saying you can't answer
17  that question because it would implicate
18  privilege?
19      A.   I'm not trying to say anything at
20  all.  I'm just telling you the true picture.
21  Anything I do, I try to be careful.
22           MR. ZACH:  I will mark this.  This
23      is going to be Choi 50.
24           (Choi Exhibit 50, document bearing
25      Bates stamp No. DT 0000040939, marked
```



Page 300

```
 1                    N. Choi
 2        for identification.)
 3        Q.    This is another text exchange
 4   between you and Mr. Berris relating to -- as
 5   of January 20, 2021.
 6              Do you see that?
 7        A.    Uh-huh.  Yes.
 8        Q.    And in this, you are -- you make
 9   reference on the second page to forwarding
10   email from Loeb & Loeb.
11              Do you see that, to Mr. Berris?
12        A.    Uh-huh.
13        Q.    Then below that, you say, By the
14   way, once you read it, the 10 percent is for
15   the big guy.
16              Do you see that?
17        A.    Yes.
18        Q.    What you are referring to is that
19   you had promised Mr. Berris 10 percent in
20   equity, right?
21              MR. WERNER:  Object to the form.
22        A.    Actually not.  It was meant to be
23   an inside joke.
24        Q.    You guys joke routinely about, I
25   take it this is like Hunter Biden's emails
```



Page 301

```
 1                    N. Choi
 2  about the big guy, right?
 3        A.   Yes.
 4        Q.   So what you were doing here is you
 5  were saying I set aside 10 percent and you
 6  are joking with him calling Mr. Berris the
 7  big guy, right?
 8             MR. WERNER:  Object to the form.
 9        A.   I don't agree with that.
10        Q.   At some point, sir, isn't it true
11  that you did, in fact, set aside 10 percent
12  of the equity for Mr. Berris?
13             MR. WERNER:  Object to the form.
14        A.   I did not.
15        Q.   Did you ever set aside 10 percent
16  of any entity?
17             MR. WERNER:  Object to the form.
18        A.   I did not.
19        Q.   Did you ever consider setting aside
20  10 percent of equity?
21             MR. WERNER:  Object to the form.
22        A.   Like I mentioned, we met with a
23  couple of counsels.
24        Q.   Don't tell me what you said to
25  counsel.
```



Page 302

```
 1                    N. Choi
 2       A.   We have hundreds, if not thousands
 3   of emails.  There have been many various
 4   different advices, different structures being
 5   proposed.
 6            When I walk in there with the
 7   counsels, I was 100 percent shareholder, and
 8   when I walk out the counsel's office, I am
 9   still the 100 percent shareholder.
10            MR. WERNER:  Is this a produced
11        document?  It's not labeled in any way.
12            MR. ZACH:  We will get you the
13        Bates number.
14            I would like to mark Choi 51.
15            (Choi Exhibit 51, March 20, 2022
16        text exchange between Mr. Choi and Mr.
17        Berris, marked for identification.)
18       Q.   This is another text exchange
19   between you and Mr. Berris from March 20,
20   2022.
21            Do you see that?
22       A.   Uh-huh.
23       Q.   It starts off with you saying, Good
24   morning.  I just want to check in.  According
25   to the latest numbers in the global JC
```



Page 303

1                    N. Choi

2    allocation, we have a total of 47 paid

3    clients, 29 from Miller.

4            Do you see that?

5        A.    Uh-huh.

6        Q.    That's 29 of the chassis that had

7    been allocated, are through an entity called

8    Miller Motor Cars, right?

9        A.    Uh-huh.

10        Q.    You agree with me that Mr. Berris

11    made the introduction of De Tomaso to Miller

12    Motor Cars, right?

13            MR. WERNER:  Object to the form.

14        A.    I disagree.

15        Q.    You disagree?

16        A.    The relationship started with

17    Apollo and the relationship grew.

18        Q.    Would you say you were the one

19    responsible for the introduction of Miller

20    Motor Cars to De Tomaso?

21        A.    I think it was my conversation

22    because we did invite them to come to Germany

23    to look at our initial prototypes.

24        Q.    Who did you interact with at Miller

25    Motor Parts?



Page 304

                         N. Choi

1

2       A.   I interact with all three of them,

3   including Richard Baily.

4       Q.   How often did you interact with

5   him?

6       A.   When it's necessary.  I don't count

7   on the exact day, time.

8       Q.   Were you aware that Mr. Berris was

9   also interacting with Miller Motor Cars?

10      A.   Of course.

11      Q.   Did you expect for him to maintain

12  a good relationship with Miller Motor Cars as

13  a distributor of De Tomaso cars --

14           MR. WERNER:  Object to the form.

15      A.   I expect him to perform according

16  to the consultancy agreement which is to

17  assist the sales aspect of the vehicles.

18      Q.   Then if you look at the bottom, you

19  say, As we are planning out for SPAC, I need

20  to know clearly your preference, how you want

21  to go about dealing with your share options.

22  Your compensation will likely have to be

23  directly under your name as well.

24           Do you see that?

25      A.   I think that's one thing.  We talk



Page 305

```
 1                    N. Choi
 2  about options in the previous answer that I
 3  gave, granting of employee share options.
 4       Q.   You are talking about share options
 5  that you have already given him?
 6            MR. WERNER:  Object to the form
 7       misstates testimony.
 8       A.   I was referring back to the
 9  employee share option scheme.
10       Q.   Have you established an employee
11  share option scheme at this point?
12       A.   Not yet.
13       Q.   When you refer to how are you going
14  to deal with your share options, what
15  specific options were you referring to?
16            MR. WERNER:  Object to the form.
17       A.   The one to be formalized in terms
18  of the employee share option scheme.
19            MR. ZACH:  I would like to mark now
20       a chat.  I would like to mark now Choi
21       52.
22            (Choi Exhibit 52, February 23, 2023
23       chat between Mr. Choi and Ms. Majcher,
24       marked for identification.)
25       Q.   This is a chat between yourself and
```



Page 306

```
 1                N. Choi
 2  Ms. Majcher in February 23, 2023.
 3           Do you see that?
 4      A.   Uh-huh.
 5      Q.   If you turn to page 966, Ms.
 6  Majcher asks you, Most importantly, have you
 7  ever promised granting Ryan the shares
 8  verbally or in writing?
 9           Do you see that?
10      A.   Yes.
11      Q.   Then she says, If my memory serves
12  me right, the discussion was about
13  potentially giving him 3 to 5 percent of the
14  LLC.
15           Do you see that?
16      A.   Yes, that's all she wrote.
17      Q.   Then she says, At the time, because
18  of potential tax issues, we didn't do
19  anything, but I will find the email chain.
20           Do you see that?
21      A.   Yes.
22      Q.   So do you recall promising Mr.
23  Berris equity in the LLC?
24           MR. WERNER:  Objection.
25      A.   I think it's, again, pretty clear
```



Page 307

```
 1                    N. Choi
 2   and I will repeat it again.  We were having
 3   many conversations with counsels.  I went in
 4   there as the hundred percent shareholder of
 5   the company.  I walk out of the counsel's
 6   office still owning hundred percent shares of
 7   the company.
 8        Q.   But then if you turn to the next
 9   page on 68, you say to her what you just
10   said, In all the Loeb email exchanges,
11   everything stated was always Norman Choi 100
12   percent in all the chart structures, et
13   cetera.
14             Do you see that?
15        A.   Yes.
16        Q.   Then Ms. -- Diana answers, Yes,
17   that's correct, but we did discuss the
18   potential grant to Ryan with Loeb.
19             Do you see that?
20        A.   I see it.
21        Q.   So you would agree that -- you
22   would admit then so that you did have
23   discussions about granting equity to Mr.
24   Berris with representatives of De Tomaso?
25             MR. WERNER:  Object to the form.
```



Page 308

1                    N. Choi

2        A.    Again, we have had many different

3   proposal coming from the lawyers.

4        Q.    I don't want to know what the

5   proposal from the lawyers are, but you, in

6   fact, discussed, you at least had a

7   discussion with Ms. Majcher about conveying

8   equity to Mr. Berris, right?

9              MR. WERNER:   Object to the form.

10       A.    Again, it's pretty clear what you

11  saw here.   There is no conclusive.

12       Q.    Would you agree with me, sir, that

13  from 2020 to 2022, you viewed Mr. Berris as

14  your partner in building out De Tomaso?

15             MR. WERNER:   Object to the form.

16       A.    Again, I would refer back to the

17  consultancy agreement.   As in there, it's

18  stated very clearly the scope of work and

19  over time, I observe his performance and I

20  would do according to what is correct as far

21  as the overall scheme of suggestions from the

22  counsel.

23       Q.    If you had to rank, who did the

24  most work for De Tomaso?

25       A.    I would say the whole team.



Page 309

                    N. Choi
1
2       Q.    Who do you think did the most work?
3             MR. WERNER:  Object to the form.
4       A.    How do you quantify?
5       Q.    Who do you think put in the most
6    hours at De Tomaso?
7             MR. WERNER:  Object to the form.
8       A.    It's hard to say.  I heard him
9    talking about the countless hours.  I don't
10   actually clock in terms of what kind of hours
11   you are working so I'm looking at
12   deliverables, that's the end result.  If you
13   can finish the job, you can be done in 30
14   minutes, good, get the day off.
15      Q.    So other than the one payment that
16   we looked at earlier of around $33,000 from
17   De Tomaso to Mr. Berris, did De Tomaso, the
18   entity, pay him anymore salary?
19            MR. WERNER:  Object to the form.
20      A.    Excuse me, are you referring to any
21   specific documents?
22      Q.    No, I'm asking you a question, sir.
23   I'm asking you, setting aside Apollo, did De
24   Tomaso, the entity, other than the $33,000
25   that we looked at earlier, did De Tomaso pay



Page 310

                        N. Choi
1
2    Mr. Berris any additional salary?
3            MR. WERNER:  Object to the form.
4        A.    I think it's pretty clear that we
5    wired him 110,000, 50,000, 25,000 and
6    depending on how you look at it.
7        Q.    Did you view that as salary?
8            MR. WERNER:  I don't think he was
9            finished with his answer.
10       A.    In general, my principle is very
11   simple.  I would say that at all times, I try
12   to really look after Ryan.  Whatever is
13   needed, I will try my best to accommodate,
14   right.
15           So I don't think you find -- I
16   don't think you find senior partner who will
17   grant you a certain amount of money just
18   because you need something to support your
19   family or whatever purchases.  When he said
20   it, I just do what I can to accommodate.  So
21   however he want to title that, whether it is
22   expense, whether -- whatever, I -- by the
23   way, I don't think I would say something in
24   an email, but in any case, that's my general
25   principle.



Page 311

```
                           N. Choi
 1
 2         Q.    You understand that as part of this
 3    lawsuit, the plaintiffs are asserting that in
 4    addition to the other things we talked about,
 5    that you also agreed to pay Mr. Berris 2
 6    percent commission on the De Tomaso cars that
 7    he sold.
 8             Do you deny that you ever made that
 9    agreement?
10             MR. WERNER:  Object to the form.
11             Also, I think there is just one
12        plaintiff or are we adding plaintiffs?
13        Q.    Just to make the record very clear,
14    it's your testimony, sir, that you never
15    agreed with Mr. Berris that he would receive
16    a 2 percent commission for --
17        A.    Yes.
18        Q.    Let me finish my question.  She is
19    really nice, but she is going to kill
20    everybody.
21             Is it your testimony, sir, that you
22    never agreed that De Tomaso would pay Mr.
23    Berris a 2 percent commission for De Tomaso
24    automobiles, including the P72s that were
25    sold?
```



Page 312

1                    N. Choi

2        A.    Never.

3        Q.    There was no agreement in place for

4    any commission relating to P72s for Mr.

5    Berris, is that your testimony?

6        A.    No.

7        Q.    This logically follows, but it's

8    true that De Tomaso, in fact, never did pay

9    any commissions to Mr. Berris, right?

10            MR. WERNER:  Object to the form.

11       Q.    I was trying to get the logical end

12   here.

13            So in connection with P72s that

14   were sold by De Tomaso, isn't it a fact that

15   there was never any commission paid for them

16   to Mr. Berris?

17       A.    No.

18       Q.    We did the double negative.  Let me

19   ask it again.

20            Isn't it true, sir, that in

21   connection with the P72s that were sold by De

22   Tomaso, De Tomaso did not pay Mr. Berris any

23   commission?

24       A.    No.

25       Q.    Let me try it one more time.  There



Page 313

1                    N. Choi
2    is a negative in it.  I'm saying you did not
3    pay, so let me ask one more time.
4        A.    I did not pay.
5        Q.    I have to make the question clear.
6              Isn't it true, sir, in connection
7    with the P72s that were sold by De Tomaso, De
8    Tomaso did not pay Mr. Berris any commission?
9              MR. WERNER:  Object to the form.
10       A.    Well, I did not.
11             MR. ZACH:  I would like to, briefly
12        going back, I would like to mark Choi
13        53, another text exchange.
14             (Choi Exhibit 53, May 3, 2022 text
15        exchange between Mr. Choi and Ms.
16        Majcher, marked for identification.)
17       Q.    Let's talk about this very briefly.
18   There is no need to dwell on it.
19             This is a text exchange in May 3,
20   2022 between you and Ms. Majcher, right?
21       A.    Yes.
22       Q.    Turning to page 744, you write,
23   Sophia is not suspecting Ryan is actually
24   gay.
25             Do you see that?



Page 314

1                    N. Choi

2         A.    744?

3         Q.    Yeah.

4         A.    Who wrote that?

5         Q.    You did.

6         A.    Was it me?

7         Q.    Yes.

8         A.    Uh-huh.

9         Q.    Sophia is your wife, right?

10        A.    Yes.

11        Q.    We can put that aside.

12              MR. ZACH:  Can we go off the record

13        for one second?

14              THE VIDEOGRAPHER:  Going off the

15        record.  The time is 5:12 p.m.

16              (Off the record.)

17              THE VIDEOGRAPHER:  We are back on

18        the record.  The time is 5:23 p.m.

19        Q.    Mr. Choi, when did you first meet

20    Samuel Lui?  I don't know how to pronounce

21    his last name.

22        A.    Around 2021, April May.

23        Q.    How do you pronounce Samuel's last

24    name?

25        A.    Lui.



Page 315

                        N. Choi

1

2      Q.    In what context did you meet Mr.

3   Lui?

4      A.    Through a luncheon.

5      Q.    What kind of luncheon was it?

6      A.    It was a luncheon with my other

7   friend, Carl Gabriel.

8      Q.    Where did this luncheon occur?

9      A.    In Hong Kong.

10     Q.    What did you understand Mr. Lui's

11  profession to be?

12     A.    I understood that he worked at

13  Merrill Lynch previously.

14     Q.    What did you understand him to be

15  doing currently in 2021?

16     A.    At the time, he was -- I guess in

17  various different investments.

18     Q.    And is this when you also were

19  introduced to Genesis?

20     A.    No.

21     Q.    When were you introduced to

22  Genesis?

23           MR. WERNER:  Object to the form.

24     A.    I don't recall the date.  Probably

25  in late '21 or early '22.



Page 316

                         N. Choi

1

2    Q.    What was Mr. Lui's relationship, if

3    any, to Genesis?

4         MR. WERNER:  Object to the form.

5    A.    I believe he carried a title.

6    Q.    He carried a title you said?

7    A.    Carried a title, yeah.

8    Q.    Do you know what the title was?

9    A.    I believe some sort of director.

10   Q.    Did you understand Mr. Lui to be

11   working in the SPAC space, so to speak?

12        MR. WERNER:  Object to the form.

13   A.    Hard for me to speculate, as I have

14   just gotten to know him.

15   Q.    We talked about this earlier, but

16   what is a SPAC briefly?

17   A.    Special purpose acquisition

18   company, if I say it correctly.

19   Q.    And Mr. Lui would keep you apprised

20   of, after you met him, of various financial

21   opportunities that he could provide, is that

22   fair?

23        MR. WERNER:  Object to the form.

24   A.    I would say in general, many

25   people.



```
 1                    N. Choi
 2      Q.   Many people did, but Mr. Lui was
 3  one of the many people you would talk to
 4  about potential financial dealings, is that
 5  fair?
 6      A.   Dealings is a broad terms, but, you
 7  know, let's say opportunities.
 8      Q.   You weren't talking to him about
 9  golf?
10      A.   I talked to him about golf.
11           MR. WERNER:  Object to the form.
12      Q.   What did you guys say about golf?
13           MR. WERNER:  Object to the form.
14      A.   We played golf.
15      Q.   What is your handicap?
16           MR. WERNER:  Object to the form.
17      A.   Now or previously?
18      Q.   Previously.
19      A.   I was as low as I think 2.7.
20      Q.   That's a very good golfer.  I will
21  remember not to play golf with you.
22      A.   Now, it's like 37.
23      Q.   I'm sure you are still better than
24  me.
25           MR. ZACH:  Let me just mark Choi
```



Page 318

```
 1                    N. Choi
 2        54.   This is an excerpt and we will give
 3        you the Bates number.
 4               (Choi Exhibit 54, document bearing
 5        Bates stamp No. Berris 000035815, marked
 6        for identification.)
 7        Q.    This is a text exchange between you
 8   and Mr. Berris.  I just want to direct your
 9   attention to the third page at the 3:10 p.m.
10   on August 25th.
11        A.    Uh-huh.
12        Q.    You see here, you forward an SEC
13   press release?
14        A.    Yeah.
15        Q.    Where I guess it's an SEC document
16   and you say to Mr. Berris, Samuel's latest
17   SPAC.
18               Do you see that?
19        A.    Uh-huh.
20        Q.    This was a SPAC that Mr. Lui was
21   working on in connection with Genesis, is
22   that fair?
23        A.    Actually, to be fair, I don't know
24   what this particular link is related to and
25   if you have a documents, I would like to
```



Page 319

```
 1                    N. Choi
 2  clarify.
 3       Q.    My question is, is it fair to say
 4  that Mr. Lui would advise you about SPACs
 5  that he was working on?
 6            MR. WERNER:   Object to the form.
 7       A.    I think even before I met, that he
 8  was working on some initiatives.
 9       Q.    But he would tell you about the
10  calls for SPACs he was working on, right?
11       A.    Yeah, I mean also Gabriel as well.
12            MR. ZACH:   Now, I would like to
13        mark as Choi 55, another chat exchange.
14            (Choi Exhibit 55, March 2, 2021
15        chat exchange between Mr. Choi and Ms.
16        Majcher, marked for identification.)
17       Q.    This is a chat exchange between you
18  and Ms. Majcher on March 2, 2021.
19            I would like to direct your
20  attention first to page 497.
21            You say, I think he is mentally a
22  bit imbalanced knowing and seeing MC doing
23  very well in all his cars for something like
24  U.S. 50 million on display and all the listco
25  deals and started to compare his own
```



Page 320

```
 1                    N. Choi
 2   accomplishments.  He, once again, needs to
 3   get out of his own way, be humble, listen and
 4   then methodically analyze and decide the best
 5   course of action.
 6           Do you see that?
 7           Is MC Michael Choi?
 8      A.   I cannot define.  I cannot recall.
 9      Q.   So --
10      A.   This is a 2021 --
11      Q.   And here, it's you that's making
12   references to MC.
13           Do you recall who MC is?
14           MR. WERNER:  Object to the form.
15      A.   I actually don't.
16      Q.   Turning to 499, you say, 8071 was
17   MC shell and Richard was CEO.
18           Do you see that?
19      A.   What time?
20      Q.   It's at 1:13.
21      A.   That's the next page, okay.
22      Q.   Again, does that refresh your
23   recollection of who MC was?
24      A.   Actually, not really.
25      Q.   Who was Richard?
```



Page 321

```
 1                    N. Choi
 2      A.    Richard Sung was the CEO of AFMG.
 3      Q.    You know Richard is referring to
 4  the CEO of AFMG, but you don't know who MC
 5  is?
 6      A.    I cannot be certain.
 7      Q.    Now, let's turn to page 506.
 8            And you can see that before it says
 9  SPACs, how does it work, SPAC consultants.
10            Do you see that?
11      A.    Yeah.  Okay.  It's an external
12  link.
13      Q.    Then you say, Keep it separate AVS.
14  No need to share with any of them in the
15  office.
16            Do you recall what you were
17  referring to there?
18      A.    I don't.  I think it's probably a
19  typo.
20      Q.    It's probably keep it separate and
21  no need to...
22      A.    Uh-huh.
23      Q.    At this time, were you
24  contemplating taking De Tomaso public via
25  SPAC?
```



Page 322

                    N. Choi

1

2          MR. WERNER:  Object to the form.

3       A.    I think as a company, we look at

4   many different options of financing.

5       Q.    Fair enough.  But was one of the

6   opportunities you looked at a SPAC?

7       A.    Yes.

8       Q.    If you turn to page 508, at 2:41,

9   you write to Ms. Majcher, In theory, I can

10  form my own SPAC.  One question is whether I

11  can acquire my own business.

12          Do you see that?

13      A.    Yes.

14      Q.    And her response is, Technically

15  speaking, you are not supposed to have

16  already identified an acquisition target when

17  you form the SPAC because it is supposed to

18  be a blind pool you are raising from the IPO.

19          Do you see that?

20      A.    Yes.

21      Q.    You understand, sir, that an

22  essential component of a SPAC is that the

23  SPAC not pre-identify its target?

24          MR. WERNER:  Object to the form.

25      A.    Yes.



```
 1                    N. Choi
 2        Q.   You understand --
 3        A.   I was learning, just to be clear.
 4        Q.   Sorry?
 5        A.   I was learning, that's why I'm
 6   asking questions.
 7        Q.   Totally right.  Here, you were
 8   asking and you received the answer that you
 9   can't pre-identify the target, right?
10             MR. WERNER:  Object to the form.
11        A.   Yes.  Now, I understood.
12        Q.   Now, you had more experience in
13   SPAC, you understand that's an important SEC
14   regulation, right?
15             MR. WERNER:  Object to the form,
16        calls for a legal conclusion.
17        A.   Again, I would then -- exactly what
18   I mention earlier when we are going into a
19   new territory, new jurisdiction.
20             I need to give myself an ability to
21   understand what the landscape is.  I think
22   it's fair to understand that.
23        Q.   Now, you continue to sort of talk
24   with Ms. Majcher just generally about SPACs
25   and when we get to page 516 at 2:51, you
```



Page 324

```
 1                    N. Choi
 2    write, So perhaps the idea is to have Bill
 3    front the SPAC as his public profile seems
 4    reasonable and seen as proper.
 5            Do you see that?
 6       A.    Uh-huh.
 7       Q.    Is the Bill you are referring to
 8    Mr. Bill Majcher?
 9       A.    Could be.
10       Q.    What other Bill could she be
11    referring to?
12       A.    Is this message from me or from
13    Diana?
14       Q.    It says Norman Choi.
15            MR. WERNER:  Your question says
16       she.
17       Q.    So here, you write, So perhaps the
18    idea is have Bill front the SPAC as his
19    public profile seems reasonable and seen as
20    proper.
21            Do you see that?
22       A.    Bill is a common name.
23       Q.    So you have a doubt in your mind
24    that the Bill you are referring to there is
25    not Bill Majcher?
```



Page 325

```
 1                  N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.   Again, if I am allowed to look
 4  through.
 5       Q.   Sure.  You are allowed to look
 6  through, of course.
 7       A.   So is there any further reference
 8  to Bill in this case?
 9       Q.   If you turn to page 519, the last
10  one, at 2:57, you say, Maybe a time to ask
11  Bill to prepare a CV, and you are writing
12  that to Ms. Majcher?
13       A.   Yeah, I see a Bill Parker.
14       Q.   She says, Change his name to Bill
15  Parker, right?
16       A.   Yeah.
17       Q.   So can we agree now that the Bill
18  you are talking about is Bill Majcher?
19            MR. WERNER:  Object to the form.
20       A.   I think it says Parker.
21       Q.   So your testimony is that the Bill
22  is a reference to Bill Parker?
23            MR. WERNER:  Object to the form.
24       A.   I said it could be a number of
25  different Bills, so I cannot conclusively
```



Page 326

                        N. Choi
1
2   tell you which Bill we are talking about.
3        Q.    Let me ask a different question.
4              Did you ever contemplate having
5   Bill Majcher be the front for the SPAC?
6              MR. WERNER:  Object to the form.
7        A.    I think you know this is a very
8   initial stage whereby I was learning, so I
9   don't recall exactly what I talk about when I
10  say front.
11       Q.    Let's turn to page 534.  You then
12  write to Ms. Majcher at 4:31, Do you have
13  Bill's CV?  If not, can you ask him to
14  prepare one?
15             Do you see that?
16       A.    You are talking about the time
17  4:31, yeah, I see it.
18       Q.    Then she says, I do.
19             Does that refresh your recollection
20  that you are talking about Bill Majcher at
21  this early stage?
22       A.    Is there a CV that was then
23  prepared?
24       Q.    I wasn't the one texting so I don't
25  know.



Page 327

```
 1                    N. Choi
 2       A.   I think it would be helpful.
 3       Q.   So your testimony is you are still
 4  unsure if the Bill you are referring to in
 5  this exchange is Bill Majcher?
 6            MR. WERNER:  Object to the form.
 7       A.   Again, I don't want to speculate
 8  unless I have...
 9       Q.   Have you ever met Bill Majcher?
10       A.   Bill, yes, I met him.
11       Q.   What was his role in connection
12  with De Tomaso?
13       A.   He has no role with --
14            MR. WERNER:  Object to the form.
15       Q.   Did you ever make any payments to
16  Bill Majcher from De Tomaso?
17       A.   I don't recall specifically to his
18  name.
19       Q.   Do you know if there were any
20  entities associated with Bill Majcher that
21  you have made payments to?
22            MR. WERNER:  Object to the form.
23       A.   I'm not sure.
24       Q.   How often did you interact with Mr.
25  Majcher?
```



Page 328

                        N. Choi

1

2        A.     Not very often.

3        Q.     Mr. Majcher is former Canadian law

4    enforcement?

5        A.     That's what I believe.

6        Q.     He had done substantial undercover

7    work throughout his career, right?

8               MR. WERNER:  Object to the form.

9        A.     I would assume so.

10       Q.     And you understand now it's in the

11   papers that Mr. Majcher is under criminal

12   prosecution in Canada, right?

13       A.     I am not sure what stage that

14   prosecution is.

15       Q.     You understand that the charges

16   which are only charges are for espionage on

17   behalf of China, right?

18              MR. WERNER:  Object to the form.

19       A.     I did not go into details.

20       Q.     You have not read articles about

21   that?

22       A.     No.

23       Q.     We can put this document away.

24              Hold on.  Turning to page 54 -- I

25   don't have that page here -- turning to page



Page 329

```
 1                    N. Choi
 2   542.  You see that.
 3            MR. ZACH:  I would like to mark now
 4       what is Choi 56.
 5            (Choi Exhibit 56, March 3, 2021
 6       chat between Mr. Choi and Ms. Majcher,
 7       marked for identification.)
 8       Q.   This is another chat between you
 9   and Ms. Majcher.  This is dated March 3,
10   2021.  You start out saying, Morning.  In
11   sum, we have three routes; one, engage bank
12   sponsor the traditional way, matchmaking
13   process; two, start a new SPAC; three,
14   acquire existing SPAC.
15            Do you see that?
16       A.   Uh-huh.
17       Q.   These are ideas that you are
18   contemplating for selling De Tomaso to or
19   receiving additional financing, right?
20       A.   I wouldn't say the word or use the
21   word selling.
22       Q.   You are trying to raise additional
23   capital for De Tomaso, is that fair?
24       A.   Yes.
25       Q.   These are paths in which you can
```



Page 330

                         N. Choi
1
2    raise additional financing for the company,
3    is that right?
4              MR. WERNER:  Object to the form.
5         A.    Some of the paths, it's not
6    inclusive, okay.
7         Q.    Then if you turn to the next page
8    at 0057, you write, Bill can be involved in
9    any of the three above.  There are pros and
10   cons to each of them and I know how Sue Ann
11   and friends functions.  We can further
12   identify which is the most achievable,
13   sensible route as things unfold.
14             Do you see that?
15        A.    Uh-huh.
16        Q.    Again, the Bill there you are
17   referring to is Bill Majcher, right?
18        A.    I, again, it could be.
19        Q.    It could be.
20             Is there some other Bill that you
21   think, that you are good friends with that
22   you might be referring to here?
23        A.    Bill, it could be a short name for
24   William, it could be a few, so I'm not saying
25   it could not be Bill Majcher, it could be.



Page 331

```
 1                  N. Choi
 2       Q.   Then if you look at page 588, Ms.
 3  Majcher writes to you at the top, Bill is
 4  always happy to be involved in things, but
 5  you know his pros and cons.
 6            Do you see that?
 7       A.   What time?
 8       Q.   It's Bates 588, the time is 2:33 at
 9  the top left here.
10       A.   Yeah.  Yeah.
11       Q.   So she is referring to Bill too and
12  her husband's name is Bill?
13       A.   So in this case, maybe it's very
14  likely.
15       Q.   That's all I was trying to get at.
16            You are discussing different ways
17  that Mr. Majcher could participate in any
18  potential -- any of the three proposals you
19  had listed on the first page, right?
20            MR. WERNER:  Object to the form.
21       A.   Like I mentioned, amongst many
22  other potential options.
23       Q.   Put that one aside.
24            MR. ZACH:  This is Choi 57.
25            (Choi Exhibit 57, November 14, 2021
```



Page 332

                         N. Choi
1
2         chat between Mr. Choi and Ms. Majcher,
3         marked for identification.)
4         Q.    Again, another chat between
5    yourself and Ms. Majcher this time November
6    14, 2021.
7              Do you see that?
8         A.    Uh-huh.
9         Q.    So you see on the first page ending
10   501 at 7:41:50, you see Samuel and his
11   partner have a SPAC that's about to get
12   listed in early December?
13        A.    Uh-huh.
14        Q.    He asked if I was interested to be
15   one of the funders of total of 4 million in
16   risk capital.
17             Do you see that?
18        A.    Uh-huh.
19        Q.    Isn't it a fact that Mr. Lui
20   advised you that he was about to launch a new
21   SPAC in early December?
22        A.    It says here he is about to get
23   listed.
24        Q.    And the initial part of the SPAC is
25   to list a corporate entity on a stock



```
 1                    N. Choi
 2   exchange and invite investors to invest,
 3   right?
 4             MR. WERNER:  Object to the form.
 5        A.   To be fair, I wasn't really exactly
 6   sure at what stage it was other than what is
 7   stated here.
 8             So, again, the SPAC process, I
 9   don't know, somehow the company would have
10   been able to raise a certain fund of which I
11   am not sure if, at that time, that SPAC has
12   already raised a certain money, so maybe, you
13   know, you can verify that for me.
14        Q.   If you turn the page, you then
15   write with that, DD valuation of timing would
16   be much easier to control.
17             Do you see that first part?
18        A.   Yes.
19        Q.   What you are saying is with respect
20   to the SPAC, that the due diligence and the
21   valuation of De Tomaso, should it be acquired
22   by the SPAC, would be easier to control?
23             MR. WERNER:  Object to the form.
24        A.   I don't think it says De Tomaso in
25   there.
```



Page 334

                    N. Choi

1
2       Q.    The next thing you say is Arc would
3    carry on the same role as now.
4             Do you see that?
5       A.    Yeah, Arc, at the time we engaged
6    the -- A-R-C.
7       Q.    What was Arc's role, sir?
8       A.    Our financial advisor.
9       Q.    They were advising, they were
10   advising you different ways to obtain
11   financing for De Tomaso, right?
12            MR. WERNER:  Object to the form.
13      A.    Well, they have proposed a few ways
14   for raising funds.
15      Q.    Your testimony is here that with
16   respect to the due diligence and valuation
17   that you referred to, that that does not
18   refer to De Tomaso?
19      A.    For which one?
20      Q.    The stock part.  It says, with that
21   DD, due diligence, valuation and timing would
22   be much easier to control.
23            Do you see that?
24      A.    I don't exactly recall my chain of
25   thought at the time so I cannot say for sure.



Page 335

                         N. Choi

1

2      Q.    The facts that you are referring to

3   is the SPAC buying De Tomaso, isn't it?

4            MR. WERNER:  Object to the form.

5      A.    I'm not sure if I actually wrote De

6   Tomaso.

7      Q.    Let's look down on the same page we

8   are on.  Ms. Majcher says, And use the SPAC

9   for DT?  And you answer, Yes.

10           Do you see that?

11     A.    I don't exactly know which

12  particular SPAC.

13     Q.    You see earlier, the page before,

14  you say that Samuel and his partner have a

15  new SPAC.

16           Do you see that?

17     A.    It could be a number of other

18  things, either online or offline.

19     Q.    Your testimony is here that the --

20  when Ms. Majcher says, use this SPAC for DT,

21  that she may not necessarily be referring to

22  Samuel's SPAC that you had been discussing

23  running up to this point?

24           MR. WERNER:  Object to the form.

25     A.    To be fair, as far as Arc was



Page 336

```
 1                    N. Choi
 2    concerned, I think maybe by that time, they
 3    have posed a few SPACs for us to consider.
 4         Q.   But here, you would agree with me
 5    that you are referring to Samuel's SPAC,
 6    right?
 7              MR. WERNER:  Object to the form.
 8         A.   I am not 100 percent sure.
 9         Q.   Do you know whether or not --
10    strike that.
11              You can set that aside.
12              Isn't it true, sir, at this time,
13    you were starting to actively negotiate with
14    Mr. Lui about having SPAC acquire De Tomaso?
15              MR. WERNER:  Object to the form.
16         A.   Is there a specific period?
17         Q.   The last document we were looking
18    at was the November 2021 time period.
19         A.   Like I mentioned, you know, we
20    started to get to know each other sometime in
21    April/May.
22              MR. ZACH:  Let me show you Choi 58.
23              (Choi Exhibit 58, email that Mr.
24         Choi forwards to Ms. Majcher and Mr.
25         Berris on November 14, 2021, marked for
```



Page 337

```
 1                    N. Choi
 2        identification.)
 3        Q.    This is an email that you forward
 4   to Ms. Majcher and Mr. Berris on November 14,
 5   2021?
 6        A.    Uh-huh.
 7        Q.    The email you are forwarding is
 8   from hinweng@gmail.com, right?
 9        A.    Uh-huh.
10        Q.    That's an address that Samuel Lui
11   utilized, isn't it?
12        A.    Yes.
13        Q.    So this is an email from Mr. Lui to
14   yourself, right?
15        A.    It appears that way.
16        Q.    He references on B that the SPAC
17   size has changed to 75 million, again, to be
18   consistent with the expected terms of our
19   SPAC.
20              Do you see that?
21        A.    Yes, that appears that way.
22        Q.    So Mr. Lui is providing you with
23   material terms about a SPAC that he is about
24   to launch, right?
25        A.    That's all he gave me, it appears
```



Page 338

                        N. Choi

1                       N. Choi

2    that way.

3         Q.    He also references on two that an

4    Australian company is willing to pay a

5    million dollars in exchange for a hundred

6    thousand shares.

7               Do you see that?

8         A.    Uh-huh.

9         Q.    This is all information about a

10   SPAC that Mr. Lui himself or his company are

11   putting together, right?

12              MR. WERNER:   Object to the form.

13        A.    It appears that way, yeah.

14        Q.    This is prior to, to your

15   knowledge, to any sort of public filing about

16   the SPAC, right?

17        A.    Actually, I'm not aware of that,

18   whether the public filing was filed.

19        Q.    You can set that one aside.

20              I would like to show you another

21   document.  This is Choi 59.

22              (Choi Exhibit 59, email from

23              tackisfat@gmail.com to Ms. Majcher and

24              Mr. Choi, marked for identification.)

25        Q.    This is an email from



Page 339

                    N. Choi
1
2    tackisfat@gmail.com to Ms. Majcher and to
3    yourself.
4          Do you see that?
5    A.    Uh-huh.
6    Q.    It's titled Hyper Financial
7    Forecasts, right?
8          Tack Is Fat it another email
9    address that Mr. Lui used, right?
10   A.    I am not 100 percent sure, but
11   let's assume.
12   Q.    Did you ever ask Mr. Lui why he is
13   using different Gmail addresses that don't
14   include his name?
15         MR. WERNER:  Object to the form.
16   A.    Actually, I don't.
17   Q.    In the email we just previously
18   looked at where he used the hinweng@gmail and
19   forwarding you material information about
20   SPAC, he didn't use his real name, did he?
21         MR. WERNER:  Object to the form.
22   A.    Hin Weng, that's his name.
23   Q.    Is he sending that to you from a
24   Gmail account or an official corporate
25   account?



Page 340

                         N. Choi

1

2          MR. WERNER:  Object to the form.

3     A.    It looks to be his Gmail.

4     Q.    Do you know why he used the Tack Is

5 Fat Gmail?

6          MR. WERNER:  Object to the form.

7     A.    I never ask.

8     Q.    Here he says, I didn't have Ryan's

9 personal email so I didn't cc him into this

10 email.

11          Do you see that?

12     A.    Uh-huh.

13     Q.    Why weren't you being emailed at

14 your De Tomaso email address in connection

15 with these communications?

16          MR. WERNER:  Object to the form.

17          You can answer if you know.

18     A.    Just more convenient for me.

19     Q.    At this time, you were

20 contemplating doing a SPAC transaction with

21 Mr. Lui, right?

22          MR. WERNER:  Object to the form.

23     A.    I cannot recall exactly when would

24 be the time.

25     Q.    But there was a time in which you



Page 341

                     N. Choi
1
2   were contemplating doing a SPAC transaction
3   with Mr. Lui, right?
4        A.    I think not just Mr. Lui, we look
5   at many opportunities.
6        Q.    But one of the SPACs you were
7   looking at was one that Mr. Lui was
8   associated with, right, sir?
9        A.    I cannot definitively tell you
10  exactly when the process engaged.
11       Q.    But you will agree with me that
12  there was a process in which De Tomaso was
13  looking to do a SPAC deal with an entity that
14  Mr. Lui was associated with?
15       A.    I guess the conclusion at the end
16  of the day, we have to have the right
17  structuring and we have to have the right
18  professionals.  I always go back to having
19  professional advisors.
20       Q.    Sir, the SPAC that Mr. Lui was
21  putting together was going to be traded on
22  the NASDAQ, right?
23            MR. WERNER:  Object to the form.
24       Which SPAC?
25            MR. ZACH:  The Genesis SPAC.



Page 342

1                      N. Choi

2       A.    I think eventually, it did.

3       Q.    The NASDAQ is a securities exchange

4  in the United States, right?

5       A.    I think that's a common known fact.

6       Q.    So when you were interacting with

7  Mr. Lui, you understood that the SPAC

8  transaction potentially involved investors

9  that would be purchasing shares on a U.S.

10 exchange, right?

11            MR. WERNER:  Object to the form.

12      A.    Like I said, I was learning.

13      Q.    Look at the information that you

14 are talking about here that's being

15 referenced to.

16            Mr. Lui as Tack Fat says to you,

17 Revised model, as per our discussion a few

18 hours ago, to do list.  Diana to update the

19 2020 P&L figures as well as the cash flow

20 items for 2020 and 2021.

21            Do you see that?

22      A.    Uh-huh.

23      Q.    Those are figures relating to De

24 Tomaso, right?

25      A.    It appears that way.



Page 343

```
 1                    N. Choi
 2       Q.    And Norman to review the
 3  development cost.
 4             Do you see that?
 5       A.    Uh-huh.
 6       Q.    And Ryan and Diana to review and
 7  update the G&A and headcount expenses.
 8             Do you see that?
 9       A.    Uh-huh.
10       Q.    So what you are talking about is
11  presenting financial figures relating to De
12  Tomaso for a potential SPAC transaction,
13  right?
14       A.    Not necessarily.
15       Q.    What else would you be talking
16  about?
17       A.    First of all, if I recall
18  correctly, this financial forecast has been
19  around for a number of years and if I
20  remember correctly, that we continuously
21  revise the spreadsheets, so at some point in
22  time, again, as we are learning, there are
23  possibly some requirements to ensure the
24  forecasts is robust enough.  This is
25  something I can tell you.
```



Page 344

```
 1                    N. Choi
 2      Q.   So would it surprise you to learn
 3 that the Genesis was first listed on the
 4 NASDAQ in July of 2021?
 5           MR. WERNER:  Object to the form.
 6      A.   I do not follow.
 7      Q.   You understood that you were
 8 potentially doing a business transaction with
 9 Genesis, didn't you?
10           MR. WERNER:  Object to the form.
11      A.   Again, I was looking at various
12 different opportunities.
13      Q.   But one of the opportunities you
14 were looking at was with Genesis, right, sir?
15      A.   I did not look into the date you
16 mentioned.
17      Q.   But you did know that you were
18 potentially thinking about doing a deal with
19 Genesis, right?
20           MR. WERNER:  Object to the form.
21      A.   At one point, we did.
22      Q.   You can put that aside.
23           But you are doing these
24 communications, all of you, using Gmails,
25 right?
```



Page 345

```
 1                  N. Choi
 2           MR. WERNER:  Object to the form.
 3      A.   I mean, I use Gmail all the time.
 4      Q.   But you have a De Tomaso email
 5  address, right?
 6      A.   I do.
 7      Q.   And Ms. Majcher has a Gmail
 8  address, right?
 9      A.   Yeah.
10      Q.   Ms. Majcher has a De Tomaso
11  address, right?
12      A.   Uh-huh, yes.
13      Q.   And here, he specifically points
14  out that I don't have Ryan's personal email.
15           Do you see that?
16      A.   Yes.
17      Q.   And Ryan had a De Tomaso email
18  address too, right?
19      A.   He does.
20      Q.   Isn't it true, sir, that you were
21  emailing on your personal account so that
22  these emails could not be tracked?
23           MR. WERNER:  Object to the form.
24      A.   Absolutely not.  All my emails, I
25  always use Gmail previously.
```



Page 346

                          N. Choi
1
2       Q.    As a corporate officer for De
3    Tomaso, is it important for you to preserve
4    email communications relating to De Tomaso
5    business?
6              MR. WERNER:  Object to the form.
7       A.    I mean, it's for convenience.
8       Q.    Do you understand, sir, that
9    companies typically have books and records
10   requirements?
11             MR. WERNER:  Object to the form.
12      A.    I'm open to -- I don't have any
13   problem having my Gmail.
14      Q.    Do you regularly delete your text
15   messages?
16             MR. WERNER:  Object to the form.
17      A.    I don't, not really.
18      Q.    Do you delete -- to your
19   recollection, have you deleted any text
20   messages relating to De Tomaso business
21   between you and Ms. Majcher?
22      A.    I don't recall.
23      Q.    You don't recall.  Does that mean
24   you don't think you did or you don't know one
25   way or the other?



Page 347

```
 1                    N. Choi
 2              MR. WERNER:  Object to the form.
 3         A.   I don't recall.
 4         Q.   Do you think it would be
 5    appropriate for you to be deleting email
 6    texts between you and Ms. Majcher?
 7              MR. WERNER:  Object to the form.
 8         A.   I don't think anything.
 9         Q.   You don't think it would be
10    appropriate one way or the other?
11              MR. WERNER:  Object to the form.
12         A.   Yes.
13         Q.   Have you ever instructed employees
14    of any company that you worked with to delete
15    emails?
16              MR. WERNER:  Object to the form.
17         A.   I don't recall.
18         Q.   Does that seem like something that
19    you would do, to order people to delete
20    emails?
21              MR. WERNER:  Object to the form.
22         A.   No, it doesn't seem like it.
23         Q.   Do you think that that would be a
24    bad practice for a CEO to order his
25    subordinates to delete their emails?
```



Page 348

                    N. Choi
 1
 2              MR. WERNER:  Object to the form.
 3         A.   Naturally, yes.
 4              MR. ZACH:  I would like to mark
 5         here Choi 60.
 6              (Choi Exhibit 60, email from Tack
 7         Is Fat to Mr. Choi and Ms. Majcher,
 8         marked for identification.)
 9         Q.   Sir, this is an email, again, from
10    Tack Is Fat to you and to Ms. Majcher, right?
11         A.   Uh-huh.
12         Q.   Again, Samuel is using a Gmail
13    account that doesn't have his name, right?
14         A.   It appears that way.
15         Q.   And emails are to you and Ms.
16    Majcher at your Gmail accounts, right?
17         A.   Uh-huh.
18         Q.   Again, once again, you are talking
19    about financial forecasts relating to De
20    Tomaso, right?
21         A.   Yeah, he was helping -- yeah.
22         Q.   As part of the potential deal,
23    there are code names often given to maintain
24    the confidentiality of information, right?
25         A.   Uh-huh.


MAGNA
LEGAL SERVICES

Page 349

1                        N. Choi

2          Q.    So here, you guys are actually

3    using Project Hyper to make it -- to not

4    disclose the fact you are talking about De

5    Tomaso, right?

6          A.    Uh-huh.

7          Q.    At this point, I take it Samuel is

8    not employed by De Tomaso, is he?

9          A.    He was not.

10         Q.    He was still working for Genesis,

11   to your understanding, right?

12         A.    To my understanding, he has

13   multiple roles in many things.

14         Q.    What role was he emailing you in

15   connection with here?

16               MR. WERNER:  Object to the form.

17         A.    Like I mentioned, to help us

18   improve the spreadsheets.

19         Q.    In connection with a potential SPAC

20   transaction with Genesis, right, sir?

21               MR. WERNER:  Object to the form.

22         A.    I don't think specifically for that

23   because, again, at the time, we do have a few

24   other SPACs.

25         Q.    Let's set that one aside.



Page 350

```
 1                   N. Choi
 2            MR. ZACH:  I would like to mark
 3       this as Choi 61.
 4            (Choi Exhibit 61, July 31, 2023
 5       text message between Mr. Choi and Mr.
 6       Lui, marked for identification.)
 7       Q.    This is a text message on July 31,
 8  2023 between you and Mr. Lui, right?
 9       A.    Uh-huh.
10       Q.    Was Mr. Lui employed by De Tomaso
11  in July of 2023?
12       A.    I don't exactly remember the date.
13       Q.    Here, he is asking you to get Diana
14  to settle invoices related to a SPAC.
15            Do you see that, SPAC closing fees,
16  right?
17       A.    Yes, that's what is wrote.
18       Q.    Is that relating to potential
19  closing fees relating to De Tomaso selling
20  itself to Genesis?
21            MR. WERNER:  Object to the form.
22       A.    I don't want to speculate.
23       Q.    What other SPAC closing fees do you
24  think De Tomaso could have potentially have
25  been liable for?
```



Page 351

                        N. Choi
1
2       A.    I don't want to think of anything,
3    so if there is an attachment, an actual
4    attachment.
5       Q.    Was De Tomaso close to settling a
6    SPAC with any other entity in the July 2023
7    time period?
8             MR. WERNER:  Object to the form.
9       A.    Actually, we drop every initiatives
10   I think by that time.
11      Q.    So you have no understanding of
12   what the cash was needed to in order to pay
13   for the SPAC closing fees?
14            MR. WERNER:  Object to the form.
15      A.    I don't want to speculate.
16      Q.    After -- at some point, Mr. Lui was
17   hired by De Tomaso, right?
18      A.    Correct.
19      Q.    And that was subsequent to Mr.
20   Berris leaving the company, right?
21      A.    Yes, subsequent.
22      Q.    What is Mr. Lui's role with the
23   company now?
24      A.    Advisor.
25      Q.    What was his role when you first



Page 352

```
 1                    N. Choi
 2   hired him?
 3            MR. WERNER:  Object to the form.
 4       A.   I don't recall the exact title, but
 5   it would be likely advisor.
 6       Q.   I would like to mark now for you
 7   Choi 62.
 8            (Choi Exhibit 62, February 10, 2022
 9       text message between Mr. Choi and Ms.
10       Majcher, marked for identification.)
11       Q.   This is a text message between you
12   and Ms. Majcher dated February 10, 2022.
13            Do you see that?
14       A.   Uh-huh.
15       Q.   Here, you say at 1:55, Please
16   delete all emails you have with Samuel as
17   well as previous messages.
18            Do you see that?
19       A.   Yes.
20       Q.   So here, you are instructing your
21   CFO to delete emails with Samuel, right?
22            MR. WERNER:  Object to the form.
23       A.   Uh-huh.
24       Q.   That would include the emails we
25   just looked at on various Gmail accounts,
```



Page 353

 1                    N. Choi
 2  right?
 3          MR. WERNER:  Object to the form.
 4      A.   I don't recall.
 5      Q.   You would agree with me, sir, that
 6  here, you are ordering your subordinates to
 7  delete emails?
 8          MR. WERNER:  Object to the form.
 9      A.   I don't specifically remember what
10  emails.
11      Q.   It says, Please delete all emails
12  you have with Samuel, right?
13          MR. WERNER:  Object to the form.
14      A.   Yes, I cannot recall.
15      Q.   You were doing that because you
16  understood that those emails on Gmail were
17  illegal in the SPAC context, didn't you?
18          MR. WERNER:  Object to the form.
19      A.   I don't know what's legal or
20  illegal.
21      Q.   You were trying to just delete
22  those emails because you understood that it
23  was illegal to have had Genesis pre-identify
24  De Tomaso as a target, right?
25          MR. WERNER:  Object to the form.



Page 354

                              N. Choi
1
2        A.    Like I said, we have had many other
3    different SPACs that we were looking at.
4        Q.    Did you order the deletion of
5    emails in connection with any of the other
6    SPACs you were involved with?
7              MR. WERNER:  Object to the form.
8        A.    I don't recall.
9        Q.    You potentially could have ordered
10   other emails deleted in connection to other
11   SPACs, right?
12             MR. WERNER:  Object to the form.
13       A.    I don't recall.
14       Q.    After you -- let me ask you this.
15   As part of your tax returns, you disclose how
16   many days you typically spend in the United
17   States, right?
18       A.    Yes.
19       Q.    So the tax returns that you
20   produced in this action that reflect dates
21   that you spent in the United States, would
22   you agree that they are fair and accurate?
23             MR. WERNER:  Object to the form.
24       A.    In order to be accurate, I usually
25   leave it to my counsel to do the accounting.



Page 355

1                    N. Choi

2        Q.    I'm asking about, how is it that

3    you tabulate the dates that you spend in the

4    United States?

5        A.    According to my counsel's

6    discretion.

7        Q.    I don't want to ask about counsel.

8             I want to understand, how is it

9    that you calculate -- how did you keep track

10   of the days you spend in the U.S.?

11       A.    I believe you have a system in the

12   U.S. whereby you can track the in and out.

13       Q.    So you don't individually keep a

14   calendar and keep note of the number of days

15   you spend in the United States?

16       A.    I don't want to miss a day or two.

17       Q.    So you ask -- is it your

18   understanding that the information on your

19   tax returns which would be prepared by an

20   accountant is based on permitting them to

21   access U.S. travel databases?

22             MR. WERNER:   Object to the form.

23       A.    I pass that information to Loeb &

24   Loeb.

25       Q.    But you don't individually keep a



Page 356

```
 1                     N. Choi
 2   calendar of where you are on a given day?
 3             MR. WERNER:  Object to the form.
 4        A.   On any given day, like to a daily
 5   log where I am?
 6        Q.   No.  Just like when you are in New
 7   York and when you are in Hong Kong.
 8        A.   I travel around a lot, so I don't
 9   really keep a log.
10        Q.   Do you keep a personal calendar?
11        A.   No, not exactly.
12        Q.   What do you keep to track your
13   meetings?
14        A.   I'm sorry?
15        Q.   What do you do to keep track of
16   meetings?
17        A.   I'm not a very good organizer.
18        Q.   Clearly, I'm not either, but I keep
19   a calendar.
20             You don't keep a calendar on your
21   phone?
22        A.   Sometimes.
23        Q.   Where, and this is -- we will mark
24   this confidential.  I'm just trying to figure
25   out -- where does your daughter -- where does
```



Page 357

```
 1                    N. Choi
 2   she go to school?
 3           MR. WERNER:  Object to the form.
 4           What relevance does this have?
 5       This has no relevance.
 6           MR. ZACH:  Where he lives, it has
 7       relevance.
 8           MR. WERNER:  No it doesn't.  If you
 9       want to talk about his family, we will
10       take a break and have a conversation.
11       If you want to ask him about where he
12       lives, ask him a question.
13           MR. ZACH:  Paul, you subpoenaed Mr.
14       Berris' sister.
15           MR. WERNER:  She was involved and
16       working in the company.  You want
17       information where his daughter --
18       Q.   Does your daughter attend school in
19   the United States or some other location?
20       A.   Regular school online.
21       Q.   Does your family principally reside
22   in the United States or someplace else?
23       A.   Principally Hong Kong.  All our
24   family is in Hong Kong and Indonesia.
25       Q.   As we sit here today, it's the
```



Page 358

                        N. Choi

1
2    school year, is your family in New York or in
3    Hong Kong?
4         A.    Currently now, here.
5         Q.    How long do you expect to stay here
6    for?
7              MR. WERNER:  Object to the form.
8         A.    You mean for future?
9         Q.    Do you have a plane ticket to go
10   back to Hong Kong?
11        A.    Hong Kong is always home.
12        Q.    Do you have plans right now to --
13   do you have prepaid tickets to go back to
14   Hong Kong right now?
15             MR. WERNER:  Object to the form.
16        A.    This is a topic that you want to
17   know my personal plan, where I want to be?
18        Q.    I'm trying to figure out the times
19   that, as you know from court, like one of the
20   issues is, like what days you are in New York
21   and what days you are not.
22        A.    If it requires me to be here, then
23   I be here.
24        Q.    That was not what I was asking.
25             Let me show you a document that I



Page 359

```
 1                    N. Choi
 2    have marked Choi 63.
 3              (Choi Exhibit 63, letter from Mr.
 4         Choi to people within De Tomaso relating
 5         to Mr. Berris leaving the company,
 6         marked for identification.)
 7         Q.   Do you recognize this document?
 8         A.   Yes, I do.
 9         Q.   This is an email -- this is a
10    letter that you sent out to people within the
11    company within De Tomaso and certain
12    suppliers relating to Mr. Berris leaving the
13    company, isn't it?
14         A.   To internals, yes.  To suppliers, I
15    am unsure.
16         Q.   Who drafted this letter?
17         A.   I think one of our counsel.
18         Q.   You see here that the letter
19    begins, This email constitutes a formal
20    notice of Ryan Berris' immediate suspicion of
21    all activities in the company and the group
22    due to misconduct.
23              Do you see that?
24         A.   Yes, I see.
25         Q.   Whoever received this letter, you
```



Page 360

                    N. Choi
1
2   are accusing Mr. Berris of committing
3   misconduct, aren't you?
4           MR. WERNER:  Object to the form.
5       A.   So, again, I will refer that to the
6   counsel because that is the understanding
7   that I have.
8       Q.   This letter is signed Norman,
9   right?
10      A.   Correct.
11      Q.   And regardless of who drafted it,
12  you authorized this being disseminated,
13  right?
14          MR. WERNER:  Object to the form.
15      A.   Like I said, we consulted counsel.
16          MR. WERNER:  Don't go into your
17          conversation with counsel.
18      Q.   Did you disagree with any of the
19  language in this letter before you permitted
20  your name to be on it?
21      A.   I think it's concise.
22      Q.   But you understand that in this
23  letter, you are accusing Mr. Berris of
24  misconduct, right?
25          MR. WERNER:  Object to the form.



Page 361

```
 1                    N. Choi
 2      A.    I don't understand what you mean by
 3  accuse.
 4      Q.    You characterized -- fair enough.
 5            You would agree with me, sir, that
 6  in this letter, you characterize Mr. Berris'
 7  being immediately suspended and the reason
 8  for that is due to his misconduct?
 9      A.    That's what I say here.
10      Q.    When I say accuse, we obviously
11  deny any misconduct, but you are accusing him
12  of wrongdoing, right?
13            MR. WERNER:  Object to the form.
14      A.    I think at the end of the day, you
15  would know that we received legal claim or
16  letter from John Matta, M-A-T-T-A.
17      Q.    So just to be really clear, the
18  email constitutes a formal notice of Ryan
19  Berris' immediate suspension from all current
20  activities in the company and the group due
21  to misconduct.
22            You see that, right?
23      A.    Yeah, yeah.
24      Q.    You approved that coming out,
25  right?
```



Page 362

```
 1                    N. Choi
 2            MR. WERNER:  Object to the form.
 3       A.    Like I mentioned, we consulted
 4  counsel and this is what the counsel
 5  suggested --
 6            MR. WERNER:  Don't go into your
 7       conversations with counsel.
 8       Q.    My question is, you approved this
 9  letter being sent out, didn't you?
10            MR. WERNER:  Object to the form.
11       A.    My name is there.
12       Q.    That's all I'm asking.
13            What is your recollection of who
14  this went to?
15            MR. WERNER:  Object to the form.
16       A.    Internal colleagues.
17       Q.    And without getting into the
18  substance of anything your attorneys advised
19  you of, it's a very narrow question, what law
20  firm advised you on this?
21       A.    We had multiple.
22       Q.    What multiple law firms advised you
23  on this?
24       A.    You mean the name?
25       Q.    Just the name of the law firm that
```



Page 363

```
 1                    N. Choi
 2   advised you on this letter.
 3        A.   One of them, I believe it was
 4   Mishcon.
 5        Q.   Were there any other law firms that
 6   advised you on this?
 7        A.   Possibly Frank Caruso, CNA
 8   Advisory, and perhaps another --
 9             MR. WERNER:  Don't speculate or
10        guess, if you know.
11        A.   I don't want to speculate.  I have
12   a few.
13        Q.   I would like to show you -- these
14   are two documents that go together, but I
15   will mark them separately.  One is an email,
16   one is an attachment.
17             MR. ZACH:  First we will mark, the
18        email will be Choi 64, the attachment
19        will be Choi 65.
20             (Choi Exhibit 64, email bearing
21        Bates stamp No. DT 50454, marked for
22        identification.)
23             (Choi Exhibit 65, attachment
24        bearing Bates stamp No. DT 50469, marked
25        for identification.)
```



Page 364

1                      N. Choi

2        Q.    It's DT 50454 and the attachment is

3    50469.  The cover email is from Evan Cygler,

4    right, who is at Miller Motor Cars, dated

5    5/31/ 2022 and you see you are copied on

6    this, right?

7        A.    Yes.

8        Q.    Is it your understanding that this

9    email was sent by Miller Motor Cars to the

10   potential clients of De Tomaso?

11            MR. WERNER:  Object to the form.

12            You can answer to the extent you

13        know.

14       A.    I wasn't sure exactly who he would

15   be sending the email to.

16       Q.    But it would be fair to say that

17   you provided -- you see the attachment that's

18   65?  That's something that was drafted by De

19   Tomaso, right?

20       A.    Uh-huh.

21       Q.    It was drafted by De Tomaso and it

22   was shared with Miller Motor Cars, right?

23       A.    Yes.

24       Q.    At the last page, 474, it says,

25   Team departures and references, Ryan Berris.



Page 365

```
 1                    N. Choi
 2          Do you see that?
 3     A.    Are you talking about -- I'm trying
 4  to locate.
 5     Q.    The very last page.  You see here
 6  that there is language referring to Mr.
 7  Berris, his departure and it states -- I can
 8  read the whole thing, but the second sentence
 9  says, It is with great regret we inform you
10  of Mr. Berris' departure from his position
11  due to personal circumstances.  We wish Ryan
12  all the best in his future endeavors.
13          Do you see that?
14     A.    Uh-huh.
15     Q.    You approved this language that
16  said the departure from this position was due
17  to personal circumstances?
18     A.    Yes.
19     Q.    You can put that aside.
20          MR. WERNER:  Hang on one second.
21          -- it's not clear that what you are
22          saying is Exhibit 65 was actually the
23          attachment referenced in what you marked
24          as 64 and I don't think that it is so --
25          MR. ZACH:  Fair enough.  That's a
```



Page 366

                    N. Choi
1        fair objection.
2             MR. WERNER:  We object to these
3        being characterized as related.
4             MR. ZACH:  We should be able to
5        figure that out, but...
6             MR. WERNER:  I think we can
7        definitively say they are not.  We can
8        move on.
9        Q.    Let's go to, I would like to show
10  you Choi 66.
11            MR. ZACH:  This is Choi 66.
12            (Choi Exhibit 66, document bearing
13       Bates stamp No. Bates 111229, marked for
14       identification.)
15       Q.    This is Bates 111229.  This is an
16  email from the top email is from Stanley
17  Cohen to Norman Choi?
18       A.    Yes.
19       Q.    You understand that Stanley Cohen
20  was a -- you were introduced to Stanley Cohen
21  by Ryan Berris, right?
22       A.    By Miller Motor Cars.
23       Q.    By Miller Motor Cars.
24            So you were not introduced to --



Page 367

N. Choi

1

2       A.    I believe Stanley has been with

3   them or Miller has been serving them for

4   decades.

5       Q.    Do you have an understanding of

6   whether or not Mr. Berris had a personal

7   relationship with Mr. Cohen?

8             MR. WERNER:  Object to the form.

9       A.    I cannot definitively say they are

10  a present relationship or not.  I know that

11  he was not present at his funeral which I

12  was.

13      Q.    Now, if you look below, you see

14  sort of the first email in the chain, right?

15      A.    The first page or second page?

16      Q.    All the way back.  They go in

17  reverse chronological order, 1231.

18            You see here an email from, it

19  looks like Ms. Majcher to Frank Caruso and it

20  says, Here is the background and the

21  investigative suggestions I gave to Ross for

22  your reference.

23            Do you see that?

24      A.    Uh-huh.

25      Q.    I'm not going to go over it all,



Page 368

```
 1                    N. Choi
 2   but there is a bunch of information relating
 3   to Mr. Berris here, right?
 4        A.   Uh-huh.
 5        Q.   This information is then forwarded
 6   by -- on page 230, to -- from Ms. Majcher to
 7   you at 12:33 a.m. and then you proceed to
 8   forward that information on to Stanley Cohen,
 9   right?
10        A.   Uh-huh.
11        Q.   And Stanley Cohen was a client of
12   De Tomaso, right?
13        A.   And also, I would call him a
14   friend.
15        Q.   Then after he receives this
16   information at the top email and he has read
17   what has been forwarded to him.  Mr. Cohen
18   says, Finally, I am very disappointed in
19   Ryan.  I would never have suspected that he
20   would be the Bernie Madoff of New England.
21             Do you see that?
22        A.   Yes.
23        Q.   Would you agree with me that Bernie
24   Madoff is one of the most notorious criminals
25   in U.S. history?
```



Page 369

```
 1                  N. Choi
 2            MR. WERNER:  Object to the form.
 3       Q.   Do you know who Bernie Madoff is?
 4       A.   I don't know -- I've heard of his
 5  name.
 6       Q.   What do you know about Bernie
 7  Madoff?
 8       A.   Not a lot.
 9       Q.   He is a bad guy, right?
10            MR. WERNER:  Object to the form.
11       A.   I'm not sure.
12       Q.   Do you think Bernie Madoff is a
13  good guy?
14            MR. WERNER:  Object to the form.
15       He said he doesn't know him.
16       A.   I don't know.
17       Q.   Seriously, you have no idea who
18  Bernie Madoff is?
19       A.   I know Harvey Weinstein.
20            MR. WERNER:  Object to the form.
21       A.   I don't know.
22       Q.   You can set that aside.
23            Do you know who Barry Skolnick is?
24       A.   Yes.
25       Q.   Who is Barry Skolnick?
```



Page 370

                        N. Choi

1

2          A.    He is our customer and I also

3     consider him a friend.

4          Q.    I'm going to show you Choi 67.

5               (Choi Exhibit 67, May 24, 2022 text

6          exchanges between Mr. Choi and Mr.

7          Skolnick, marked for identification.)

8          Q.    Do you see this is May 24, 2022.

9     It's a text exchanges between yourself and

10    Mr. Skolnick and he says, Good morning, Norm,

11    I have not gotten a response from Ryan yet.

12    Just to note, my Apollo is at the museum in

13    California as you know, and then he talks

14    about some other things.

15               You respond, Good afternoon, Barry,

16    I don't think he will reach out for the time

17    being.  I can manage the return of your IE

18    any time soon.  Then you say, I can go over

19    the details myself so we can align.  Are you

20    available for a call?

21               Do you see that?

22         A.    Uh-huh.

23         Q.    Mr. Skolnick says, In 30, and you

24    say, Will call you then.

25               Do you see that?



Page 371

```
 1                    N. Choi
 2        A.    Uh-huh.
 3        Q.    Did you subsequently have a call
 4   with Mr. Skolnick?
 5        A.    I probably have.
 6        Q.    Did you explain to Mr. Skolnick,
 7   did you discuss Mr. Berris with Mr. Skolnick
 8   in any way?
 9             MR. WERNER:  Object to the form.
10        A.    It's hard for me to recall what I
11   exactly said at the time.
12        Q.    Would you agree with me that you've
13   told multiple people that Mr. Berris, in your
14   view, committed misconduct while at De
15   Tomaso?
16             MR. WERNER:  Object to the form.
17        A.    I wouldn't exactly use that word
18   misconduct.
19        Q.    What word would you use?
20        A.    I don't want to speculate.
21        Q.    How many people do you think you
22   talked about Mr. --
23        A.    At the end of the day, I have
24   always been trying to protect Ryan.  I wanted
25   him to go his own way, every message, every
```



Page 372

```
 1                    N. Choi
 2    one of the names that he had accused that I
 3    had said something to them.  Go back to the
 4    record.  Never one of them that was negative.
 5         Q.   So you said you never said a
 6    negative thing about Mr. Berris?
 7         A.   Not unless it is true.
 8         Q.   After you -- Mr. Berris left the
 9    company, did you talk to other customers
10    about him leaving De Tomaso?
11              MR. WERNER:  Object to the form.
12         A.   I don't recall specifically, but
13    customers mostly care about their P72.
14         Q.   You agree that most of the
15    customers interacted with Mr. Berris in
16    connection with their P72?
17              MR. WERNER:  Object to the form.
18         A.   Which jurisdiction are you talking
19    about?
20         Q.   Generally, some of the people that
21    had P72s were dealing with Mr. Berris and not
22    you, right?
23              MR. WERNER:  Object to the form.
24         A.   I think in general, you would
25    understand that we have official dealers in
```



Page 373

```
 1                    N. Choi
 2   different jurisdictions around the world.
 3        Q.   Did any customers reach out to you
 4   and ask about Mr. Berris's whereabouts?
 5             MR. WERNER:  Object to the form.
 6        A.   I don't recall.
 7             MR. ZACH:  This is Choi 68.
 8             (Choi Exhibit 68, May 27, 2022 text
 9        between Mr. Choi and Carlos Peralta,
10        marked for identification.)
11        Q.   This is a text between yourself and
12   Carlos dated May 27, 2022?
13        A.   Uh-huh.
14        Q.   Who is Carlos?
15        A.   Carlos, one of our customers.
16        Q.   What is Carlos' last name?
17        A.   Peralta.
18        Q.   Where does he reside?
19        A.   Mexico City.
20        Q.   He is a very wealthy man right?
21             MR. WERNER:  Object to the form.
22        A.   According to Bob Marley, wealthy
23   has different definitions.
24        Q.   Fair enough.  But he is wealthy
25   enough to buy a P72, right?
```



Page 374

                    N. Choi
1
2       A.    Yeah, not only that, also the
3    Apollo.
4       Q.    Mr. Peralta has enough money to buy
5    cars that are worth over a million dollars,
6    right?
7       A.    I think so.
8       Q.    And in your view, you would agree
9    that that's a wealthy person, right?
10           MR. WERNER:  Object to the form.
11      A.    In terms of monetary, yes.
12      Q.    Here you write, Dear Carlos, I
13   would like to inform you that Ryan is no
14   longer working for De Tomaso.
15           Do you see that?
16           And you say that because Mr. Berris
17   had been dealing directly with Mr. Peralta,
18   hadn't he?
19           MR. WERNER:  Object to the form.
20      A.    Not necessarily, because I was
21   always in constant contact as well.
22      Q.    In fact, the two of you had
23   recently visited Mr. Peralta in 2022, right?
24      A.    I don't remember the exact date.
25      Q.    But there was a point in time which



Page 375

                      N. Choi
1
2    you and Mr. Berris both traveled to Mexico to
3    meet with him, right?
4         A.    Let's put it this way, I traveled
5    with Ryan around the world a lot.
6         Q.    Do you have any specific
7    recollection of traveling to meet Mr.
8    Peralta?
9         A.    Yeah, I do.  I don't remember the
10   exact date, but yes.
11        Q.    You go on to say, It's not an easy
12   decision, but one I have to make in order to
13   maintain the corporate integrity.
14             Do you see that?
15        A.    I do.
16        Q.    So you are saying here that you had
17   to fire Mr. Berris because he did not
18   maintain corporate integrity, right?
19             MR. WERNER:  Object to the form.
20        A.    It's speculative for me to say, but
21   it is what it is.  That's what I wrote, so I
22   don't exactly recall what was conversed
23   during the conversation.
24        Q.    We can put that one aside.
25             At some point, you hired a company



Page 376

```
 1                  N. Choi
 2   called Waft to create books about De Tomaso,
 3   right?
 4        A.    I did not.   It was Ryan's
 5   engagement.
 6        Q.    Waft, in fact, ended up creating a
 7   book relating to De Tomaso, right?
 8             MR. WERNER:   Object to the form.
 9        A.    Including other outlets such as
10   STG.
11        Q.    But they, in fact, they published a
12   first book on De Tomaso, right?
13             MR. WERNER:   Object to the form.
14        A.    First book under Waft?
15        Q.    Yes.   And that book was given out
16   by you and others to customers, clients and
17   friends, right?
18        A.    Uh-huh.
19        Q.    There was a second book that was
20   being published, a follow-up book being
21   published as to De Tomaso, right?
22        A.    Uh-huh.
23        Q.    And it was your view after seeing
24   excerpts of that book that it was -- that it
25   painted Mr. Berris in an overly positive
```



Page 377

                               N. Choi
 1
 2    light, right?
 3              MR. WERNER:  Object to the form.
 4         A.   No.
 5              MR. ZACH:  Let me mark as Choi 69.
 6              (Choi Exhibit 69, document bearing
 7         Bates stamp No. DT 61290, marked for
 8         identification.)
 9         Q.   This is a document that was
10    produced to us, DT 61290.
11              Do you see that?
12         A.   Yes.
13         Q.   You see it says, Summary, Book 2 is
14    structured in a way which paints Ryan in an
15    overly positive light.  Scenarios are often
16    exaggerated and lead the reader to believe
17    Ryan was making the majority of the
18    decisions.  Norman and team seem to be a
19    counterpart to the story.
20              Do you see that?
21         A.   First of all, this is in what
22    context?  Who actually wrote this?
23         Q.   You produced it to me, sir, I don't
24    know.
25



```
 1                      N. Choi
 2        A.    Can you give some reference?
 3        Q.    Do you agree or disagree with what
 4   is written in the summary there?
 5             MR. WERNER:  Object to the form.
 6        A.    Again, I don't think I've seen
 7   this.
 8        Q.    Just read the words and tell me if
 9   you agree or disagree?
10        A.    I don't want to make comment on
11   this because this is first time and I don't
12   know who wrote it.
13        Q.    Did you review -- have you reviewed
14   the book?
15             MR. WERNER:  Object to the form.
16        A.    Not particularly.
17        Q.    Is it your understanding that -- is
18   it your view that the book painted Ryan in
19   too positive a light?
20             MR. WERNER:  Object to the form.
21        A.    Again, I don't want to make
22   judgment.
23        Q.    I'm asking you as a person, do you,
24   Norman Choi, of what you know of book 2, did
25   it paint Ryan in an overly positive light?
```



Page 379

N. Choi

1
2         MR. WERNER:  Objection.  He said he
3     hasn't reviewed the book.
4     Q.    You have reviewed the book?
5         MR. WERNER:  He answered the
6     question.  He said not particularly.
7     Q.    Isn't it true, sir, that De Tomaso
8  entered into a settlement agreement with Waft
9  to not have the book published?
10    A.    I think in the overall picture, the
11 evidence, and the writer is called Bart,
12 B-A-R-T, and then Lies, his wife, so she has
13 had some health issues.
14    Q.    That's the writer's wife?
15    A.    Yes.
16    Q.    But sir, you --
17        MR. ZACH:  I will mark Choi 70.
18        (Choi Exhibit 70, document, marked
19     for identification.)
20    Q.    Ideal Team Ventures is your
21 company?
22    A.    Yes.
23    Q.    Ideal Team Ventures entered into a
24 settlement agreement with Waft, right?
25    A.    Uh-huh.



Page 380

                        N. Choi

1

2       Q.    As part of that settlement

3    agreement, you paid Waft a fee of 50,000

4    Euros, right?

5             MR. WERNER:  This is an unexecuted

6         agreement as far as I can tell.

7             MR. ZACH:  This is what I have.

8       Q.    Did this agreement, to your

9    understanding, get executed?

10            I misspoke because I was going too

11   quickly.

12            If you go to 1.2, it says, The

13   parties agree to, and it says, Ideal Team

14   shall pay a one off amount of 100,000 Euros

15   to Waft?

16      A.    Uh-huh.

17      Q.    Has De Tomaso paid a hundred

18   thousand Euros to Waft?

19      A.    I actually don't recall.

20      Q.    Do you see, if you continue to go,

21   that as part of that agreement, there are

22   various confidentiality and continuing

23   obligations in which the interviews, the

24   rights and the books had to be returned to De

25   Tomaso.



Page 381

```
 1                   N. Choi
 2           Do you see that?
 3           MR. WERNER:  Object to the form.
 4           Again, the agreement says draft on
 5      it.
 6      Q.    Let me ask you this, sir.  Did De
 7   Tomaso or any entity controlled by you enter
 8   into a settlement agreement with Waft for the
 9   return of book 2 and its attentive
10   information?
11           MR. WERNER:  Object to the form.
12      A.    I can't answer that definitively.
13      Q.    Why can't you answer definitively?
14      A.    Because I actually don't really
15   remember.
16      Q.    You understand that there are
17   various video clips of you being interviewed
18   by the people from Waft, right?
19      A.    I never watched it.
20      Q.    As you sit here today as the owner
21   of De Tomaso and the CEO of De Tomaso, you
22   cannot tell me whether or not there was a
23   settlement agreement with Waft to return book
24   2?
25           MR. WERNER:  Object to the form.
```



MAGNA
LEGAL SERVICES

Page 382

                              N. Choi
1
2        A.    I don't want to make a guess, but
3    possibly.
4        Q.    So it wasn't important to you one
5    way or the other whether the book was
6    returned?
7              MR. WERNER:  Object to the form.
8        A.    No.  Again, I don't have a
9    recollection of the exact sequence of events.
10       Q.    But do you -- so you -- okay.
11   Fine.
12             So you don't know whether or not
13   the Waft book and materials has been returned
14   to De Tomaso?
15             MR. WERNER:  Object to the form.
16       A.    I am not 100 percent certain.
17       Q.    Who would you ask about that?
18       A.    I think it's drafted by one of the
19   counsel.  I think it's pretty comprehensive.
20   It's drafted by one of our counsel, so this
21   is beyond me in terms of the legal language
22   so I'm sure.  Maybe we can find some more
23   materials if you want to wish to find out who
24   exactly drafted this was.
25       Q.    Well, I don't care who drafted it.



Page 383

                           N. Choi

1

2            I want to know whether or not there

3    was a hundred thousand Euros that was being

4    paid to Waft?

5            MR. WERNER:  Objection, asked and

6        answered.

7        A.   I don't want to really speculate,

8    but I'm sure somehow, something.

9            MR. ZACH:  Just so the record is

10       complete, here is 71.

11           (Choi Exhibit 71, document executed

12       and signed by Bart Lenaerts, marked for

13       identification.)

14       Q.   This is executed and signed by Bart

15    Lenaerts.

16           Do you see that?

17       A.   Yes.

18       Q.   Mr. Lenaerts was one of the people

19    that participated in trying to create book 2,

20    right?

21       A.   I'm sorry, can you repeat that

22    question?

23       Q.   Mr. Lenaerts was one of the people

24    involved in the Waft project, right?

25       A.   I believe he is one of the writer.



Page 384

```
 1                    N. Choi
 2          MR. ZACH:  Let's take a quick,
 3      five-minute break.  I probably have 10
 4      minutes.
 5          MS. WIGGER:  You don't necessarily
 6      need to be here for this, but I want to
 7      read the Bates numbers on the record of
 8      the other documents.
 9          THE VIDEOGRAPHER:  We are going off
10      the record.  The time is 6:36 p.m.
11          (Recess.)
12          THE VIDEOGRAPHER:  We are back on
13      the record.  The time is 6:44 p.m.
14      Q.   Mr. Choi, have you ever had any
15  dealings with an individual named Roy Cho?
16      A.   Roy.
17      Q.   This goes back to the what you were
18  talking about earlier.  We won't spend a lot
19  of time, but this is Choi 72.
20          (Choi Exhibit 72, Bloomberg
21      article, marked for identification.)
22      Q.   This is an article that refers to
23  Mr. Cho, a Bloomberg article.
24          Looking at that individual, Roy
25  Cho, Kwai-Che, spelled K-W-A-I, dash, C-H-E.
```



Page 385

                        N. Choi
1
2            Have you ever had any business
3    dealings with him?
4        A.    No.
5        Q.    Has he ever been an investor in any
6    of your companies?
7        A.    No.
8        Q.    Have you ever met him in person?
9        A.    No.
10       Q.    So none of the companies you've
11   owned ever had any investment from him?
12       A.    No.
13       Q.    Are you certain of that?
14       A.    I don't remember.  I don't recall
15   who he is.
16       Q.    You never heard of this individual?
17            MR. WERNER:  Objection, asked and
18       answered.
19       Q.    Outside of anything you discussed
20   with counsel, have you ever heard of this
21   individual?
22       A.    Okay.  Now, I recall.  Yeah, I know
23   who he is.
24       Q.    But it's not -- you never met him?
25       A.    I don't think I have.



Page 386

                              N. Choi

 1

 2       Q.   You never had any business dealings

 3    with him?

 4       A.   No.

 5       Q.   I'm just going to ask you if you

 6    have any association or investment with any

 7    of these companies.

 8            Do you have any involvement with an

 9    entity known as M Dream?

10       A.   No.

11       Q.   How about M Dream In World Limited?

12       A.   Enron.

13       Q.   No, not Enron, no.  M Dream In

14    World Limited.

15       A.   No.

16       Q.   So your entity, Sungzhan, never

17    engaged in any business transactions with an

18    M Dream In World Limited?

19       A.   I don't recall.

20       Q.   Do you have any involvement with an

21    entity called Sino Vision Worldwide?

22       A.   No.

23       Q.   What about Greater China Services

24    Limited?

25       A.   No.



Page 387

```
 1                     N. Choi
 2       Q.    What about Wealth Glory?
 3       A.    I don't recall.
 4       Q.    You don't recall whether or not
 5  Apollo had a distribution agreement with an
 6  entity called Wealth Glory Holdings?
 7             MR. WERNER:  Object to the form.
 8       A.    If would you like to send me the
 9  exhibit, I would like to take a look at it.
10       Q.    My question is, does this refresh
11  your recollection?
12       A.    Uh-huh.
13             MR. ZACH:  This is Choi 73.
14             (Choi Exhibit 73, public filing by
15       Wealth Glory Holdings, marked for
16       identification.)
17       Q.    This is a public filing by an
18  entity called Wealth Glory Holdings and it
19  discusses a distribution agreement with
20  Gumpert Apollo.
21             Do you see that?
22       A.    I see it also dated 10 years ago.
23       Q.    Does that refresh your
24  recollection?
25       A.    Yes.
```



Page 388

```
 1                    N. Choi
 2        Q.    So you've had some business
 3   interactions with an entity called Wealth
 4   Glory Limited, right?
 5             MR. WERNER:  Object to the form.
 6        A.    Yes, disclosed here, yes.
 7        Q.    Have you ever had any investment or
 8   other financial interest in an entity called
 9   Town Health?
10        A.    I don't recall.
11        Q.    Have you ever had any investment or
12   financial interest in an entity called Convoy
13   Global Holdings LTD?
14             MR. WERNER:  Object to the form.
15        A.    I don't recall.
16        Q.    Have you ever had an investment or
17   other financial interest in WLS Holdings?
18        A.    I don't recall.
19        Q.    How about same question as to China
20   New Economy Fund LTD?
21        A.    I don't recall.
22        Q.    Are you aware that Michael Choi is
23   a director of China New Economy Fund LTD?
24             MR. WERNER:  Object to the form.
25        A.    I don't recall.
```



Page 389

                         N. Choi

1

2       Q.    The last one is same question.

3  Have you had any financial interest in Sun

4  Corp. Technologies?

5            MR. WERNER:  Object to the form.

6       A.    I don't recall.

7            MR. ZACH:  Thank you, Mr. Choi.  I

8       appreciate your time.

9            THE WITNESS:  That's it?

10            MR. WERNER:  I have a few questions

11       for you, Mr. Choi.

12  EXAMINATION BY

13  MR. WERNER:

14       Q.    Mr. Choi, you recall Mr. Zach quite

15  a while ago asked you a few questions about

16  purported gift of equity from you to the

17  plaintiff, Ryan Berris?  Do you recall that

18  conversation?

19       A.    You mean when he asked me about

20  this?

21       Q.    Yes.

22       A.    Yes.

23       Q.    Was Mr. Berris the first employee

24  of Apollo?

25       A.    No.



Page 390

```
 1                    N. Choi
 2      Q.    Was he the first employee of De
 3 Tomaso?
 4      A.    No.
 5      Q.    Are there employees who have been
 6 employed for -- by Apollo and De Tomaso
 7 longer than Ryan Berris' tenure with Apollo
 8 and De Tomaso?
 9      A.    Ryan was never with us for 10
10 years.
11      Q.    My question is, were there
12 employees or are there currently employees
13 who worked for Apollo and or De Tomaso longer
14 than Mr. Berris worked for those companies?
15      A.    Yes.
16      Q.    Can you name some of them?
17      A.    Yes, I would say Stefan Burger,
18 Jowyn Wong, Jakub Jodlowski and also Diana.
19      Q.    How long have those employees
20 worked for Apollo and or De Tomaso?
21      A.    Since 2014.
22      Q.    So approximately 10 years plus?
23      A.    Ten years plus.
24      Q.    How long did Mr. Berris work for
25 Apollo/De Tomaso?
```



Page 391

```
 1                    N. Choi
 2      A.    2018, January 27th.
 3      Q.    So how long did he work there
 4  total?
 5      A.    Approximately until his departure
 6  in May 2022, so just a little less than four
 7  years.
 8      Q.    Less than four years.
 9            With respect to the employees who
10  you just referenced whose tenure with the
11  companies is longer than Mr. Berris, do any
12  of them have equity in Apollo or De Tomaso?
13      A.    None of them.
14      Q.    Now, as you know, Mr. Berris
15  alleges that you awarded him some equity in
16  the company and I want to ask you some
17  questions about that.
18            Did you ever tell Mr. Berris or
19  promise him a specific percentage ownership,
20  equity ownership in any company that you own?
21      A.    No.
22      Q.    With respect to Mr. Berris'
23  allegations that you awarded him equity in
24  some venture the two of you were involved in,
25  did you ever tell him specifically what
```



Page 392

                    N. Choi
1
2   company he was getting an equity stake in?
3        A.   No.
4        Q.   Did you ever discuss with Mr.
5   Berris the share price or the number of
6   shares of equity that he supposedly was being
7   awarded?
8        A.   No.
9        Q.   Did you ever discuss with him any
10  vesting period for any equity that he
11  supposedly was being awarded?
12       A.   No.
13       Q.   Did you discuss with him when or
14  when not Mr. Berris could exercise his right
15  as to any equity he supposedly held in any
16  company related to De Tomaso?
17       A.   No.
18       Q.   Or Apollo?
19       A.   No.
20       Q.   Did you tell him whether his
21  supposed equity interest would vest
22  immediately or over time?
23       A.   No.
24       Q.   Did you tell him anything he would
25  have to do actually to obtain the supposed



Page 393

```
 1                    N. Choi
 2    equity interest in De Tomaso?
 3         A.    No.
 4         Q.    Did you tell him how long he would
 5    have to work for De Tomaso before he could
 6    obtain any equity in the company?
 7         A.    No.
 8         Q.    Did you discuss or did you make any
 9    promises to Mr. Berris around any dilution of
10    his supposed equity and whether there would
11    be any antidilution protection of his
12    supposed equity interest in De Tomaso?
13         A.    No.
14         Q.    With respect to the various things
15    that I just discussed, share price vesting
16    period, timing of exercising options, vesting
17    periods, obligations to obtain equity,
18    antidilution, did Berris ever -- or
19    percentage ownership and ownership in a
20    particular company, did Berris ever accept
21    you, whether verbally or in writing or in any
22    other way, any offer from you related to any
23    of the equity terms that we just discussed?
24              MR. ZACH:  Object to the form.
25              You can answer.
```



Page 394

                    N. Choi

1

2        A.   No.

3        Q.   As part of your conversation with

4   Mr. Zach, you discussed the structuring of De

5   Tomaso's U.S. operations.

6             Do you recall that?

7        A.   Yes.

8        Q.   I believe that you testified that,

9   and correct me if I am wrong, that as part of

10  considering different structuring options, it

11  was discussed whether there would be a

12  component of employee options or employee

13  equity in the company.

14            Do you recall that testimony?

15       A.   Yes.

16       Q.   Now, it did come to pass that De

17  Tomaso did set up U.S. operations, right?

18       A.   Yes.

19       Q.   I don't want to talk about what you

20  discussed with the lawyers and the advice you

21  received and so on, but as a result of

22  setting up U.S. operations for De Tomaso, did

23  the company create any employee stock

24  ownership program?

25       A.   No.



Page 395

```
 1                    N. Choi
 2      Q.   Did the company award any employees
 3  or anyone else other than you equity in De
 4  Tomaso?
 5      A.   No.
 6      Q.   De Tomaso U.S. and also De Tomaso
 7  in any form?
 8      A.   No.
 9           MR. WERNER:  No further questions.
10           MS. WIGGER:  I want to read the
11      Bates numbers for these exhibits.
12           Exhibit 8 is DT 00134817; Exhibit
13      14 is DT 00176285; Choi 15 is DT
14      000036656; Choi 16 is DT 00167101; Choi
15      26 is DT 0000082687; Choi 34 has never
16      been produced; Choi 45 is Berris
17      000253831; Choi 41 is Berris 000034737;
18      Choi 50 is DT 0000040939; and Choi 54 is
19      Berris 000035815.
20           THE VIDEOGRAPHER:  This concludes
21      today's deposition of Norman Choi.  The
22      time is 6:57 p.m.
23           (Time noted:  6:57 p.m.)
24
25
```



Page 396

```
 1
 2                    - - -
 3               I N D E X
 4                    - - -
 5
 6   NORMAN CHOI                          PAGE
 7        By Mr. Zach                     4
 8        Mr. Mr. Werner                  389
 9
10                    - - -
11              E X H I B I T
12                    - - -
13   CHOI EXHIBIT                         PAGE
14   Exhibit 1 Email from Tom Kim to      25
15        Michael Choi
16   Exhibit 2 List of shareholders of    28
17        Apollo
18   Exhibit 3 Consultancy agreement      40
19   Exhibit 4 March 25, 2021 text        60
20        exchange between Ms. Majcher
21        and Mr. Choi
22   Exhibit 5 Text message               64
23   Exhibit 6 Document bearing Bates     83
24        Stamp No. DT 108254
25
```



Page 397

 1
 2                       - - -
 3                   E X H I B I T
 4                       - - -
 5  CHOI EXHIBIT                              PAGE
 6  Exhibit 7 Document bearing Bates          87
 7       Stamp No. DT 133796
 8  Exhibit 8 Document bearing Bates          89
 9       Stamp No. DT 00134817
10  Exhibit 9 Document entitled De            94
11       Tomaso P72 Global Chassis
12       Allocations
13  Exhibit 10 April 20, 2022 text           104
14       exchange between Mr. Choi and
15       Ms. Majcher
16  Exhibit 11 April 16, 2022 text           105
17       exchange between Ms. Majcher
18       And Mr. Choi
19  Exhibit 12 Documents bearing Bates       111
20       Stamp No. DT 168425 through
21       DT 168434
22  Exhibit 13 April 20, 2022 text           119
23       exchange between Ms. Majcher
24       and Mr. Choi
25                       - - -



Page 398

1

2                    E X H I B I T

3                       - - -

4    CHOI EXHIBIT                          PAGE

5    Exhibit 14 Document bearing Bates     122

6         Stamp No. DT 00176285

7    Exhibit 15 Document bearing Bates     127

8         Stamp No. DT 000036656

9    Exhibit 16 Document bearing Bates     136

10        Stamp No. DT 00167101

11   Exhibit 17 Sales contract for Apollo  138

12        Arrow IE prototype

13   Exhibit 18 Sales contract for the     140

14        second Apollo Arrow IE prototype

15   Exhibit 19 Sales contract for Apollo  149

16        IE prototypes

17   Exhibit 20 Sales contract for the     152

18        second prototype to De Tomaso

19   Exhibit 21 March 11, 2020 text        156

20        exchange between Mr. Choi and

21        Ms. Majcher

22   Exhibit 22 Motor vehicle bill of      167

23        sale dated May 11, 2021

24

25                       - - -



Page 399

2                E X H I B I T

3                   - - -

4   CHOI EXHIBIT                          PAGE

5   Exhibit 25 Deloitte document dated    180

6       12 April 2019

7   Exhibit 23 March 27, 2017 email       189

8       from Michael Yip to

9       Ms. Majcher, Mr. Choi and other

10  Exhibit 24 October 3, 2017 text       192

11      exchange between Ms. Majcher

12      and Mr. Choi

13  Exhibit 26 Document bearing Bates     194

14      Stamp No. DT 0000082687

15  Exhibit 27 October 6, 2020 text       196

16      exchange between Mr. Choi and

17      Ms. Majcher

18  Exhibit 28 Agreement dated April      200

19      2016 between Ideal Team Ventures,

20      Acedes Holdings and AC Cars

21      Europe Limited

22  Exhibit 29 Documents beginning with   206

23      Bates stamp No. DT 169678

24  Exhibit 30 Statement prepared by MSPC 211

25                   - - -



Page 400

1

2                        E X H I B I T

3                          - - -

4    CHOI EXHIBIT                               PAGE

5    Exhibit 31 Email chain                     215

6    Exhibit 32 Documents bearing Bates         218

7         Stamp No. DT 942 through DT 949

8    Exhibit 33 Daily Mail article              234

9    Exhibit 34 Photograph                      240

10   Exhibit 35 February 22, 2022 text          245

11        exchange

12   Exhibit 36 March 2022 email from           251

13        Ryan Berris to Mr. Choi copying

14        Ms. Majcher

15   Exhibit 37 March 11, 2022 text             253

16        message between Mr. Choi and Ms.

17        Majcher

18   Exhibit 38 December 24, 2021 email         256

19        forwarded from Mr. Choi to Mr.

20        Berris

21   Exhibit 39 Email from Mr. Choi to          257

22        Mr. Burger and Diana Majcher

23

24

25                          - - -



Page 401

```
 1
 2                    E X H I B I T
 3                        - - -
 4   CHOI EXHIBIT                            PAGE
 5   Exhibit 40 March 26, 2021 text          260
 6       exchange between Mr. Choi and
 7       Jowyn Wong
 8   Exhibit 41 Document bearing Bates       265
 9       Stamp No. Berris 000034737
10   Exhibit 42 Document from O-Bank         268
11   Exhibit 43 February 20, 2021 text       272
12       message between Mr. Choi and
13       Mr. Berris
14   Exhibit 44 July 5, 2021 text message    274
15       between Mr. Choi and Mr. Berris
16   Exhibit 45 Document bearing Bates       277
17       Stamp No. Berris 000253831
18   Exhibit 46 March 22, 2024 WhatsApp      281
19       between Mr. Choi and Ms. Majcher
20   Exhibit 47 Discussion between Ms.       285
21       Majcher and Mr. Choi
22   Exhibit 48 December 31, 2020 text       288
23       chain between Mr. Choi and Mr.
24       Berris
25                        - - -
```



MAGNA
LEGAL SERVICES

Page 402

1

2                    E X H I B I T

3                        - - -

4  CHOI EXHIBIT                              PAGE

5  Exhibit 49 January 5, 2021 text          292

6      exchange between Mr. Choi and

7      Mr. Berris

8  Exhibit 50 Document bearing Bates        298

9      Stamp No. DT 0000040939

10  Exhibit 51 March 20, 2022 text           301

11      exchange between Mr. Choi and

12      Mr. Berris

13  Exhibit 52 February 23, 2023 chat        304

14      between Mr. Choi and Ms. Majcher

15  Exhibit 53 May 3, 2022 text exchange     312

16      between Mr. Choi and Ms. Majcher

17  Exhibit 54 Document bearing Bates        316

18      Stamp No. Berris 000035815

19  Exhibit 55 March 2, 2021 chat            318

20      exchange between Mr. Choi and

21      Ms. Majcher

22  Exhibit 56 March 3, 2021 chat            327

23      between Mr. Choi and Ms. Majcher

24

25                        - - -



Page 403

1
2                    E X H I B I T
3                        - - -
4    CHOI EXHIBIT                              PAGE
5    Exhibit 57 November 14, 2021 chat        330
6         between Mr. Choi and Ms. Majcher
7    Exhibit 58 Email that Mr. Choi           335
8         forwards to Ms. Majcher and Mr.
9         Berris on November 14, 2021
10   Exhibit 59 Email from                    337
11        Tackisfat@gmail.com to Ms.
12        Majcher and Mr. Choi
13   Exhibit 60 Email from Tack Is Fat        346
14        to Mr. Choi and Ms. Majcher
15   Exhibit 61 July 31, 2023 text message    348
16        between Mr. Choi and Mr. Lui
17   Exhibit 62 February 10, 2022 text        351
18        message between Mr. Choi and
19        Ms. Majcher
20   Exhibit 63 Letter from Mr. Choi to       357
21        people within De Tomaso relating
22        to Mr. Berris leaving the company
23   Exhibit 64 Email bearing Bates stamp     362
24        No. DT 50454
25                        - - -



Page 404

1

2                    E X H I B I T

3                        - - -

4    CHOI EXHIBIT                              PAGE

5    Exhibit 65 Attachment bearing Bates      362

6        Stamp No. DT 50469

7    Exhibit 66 Document bearing Bates        365

8        Stamp No. Bates 111229

9    Exhibit 67 May 24, 2022 text             368

10       exchanges between Mr. Choi and

11       Mr. Skolnick

12   Exhibit 68 May 27, 2022 text between     371

13       Mr. Choi and Carlos Peralta

14   Exhibit 69 Document bearing Bates        375

15       Stamp No. DT 61290

16   Exhibit 70 Document                      378

17   Exhibit 71 Document executed and         382

18       signed by Bart Lenaerts

19   Exhibit 72 Bloomberg article             383

20   Exhibit 73 Public filing by Wealth       386

21       Glory Holdings

22

23

24

25



Page 405

```
 1
 2                         - - -
 3              DEPOSITION SUPPORT INDEX
 4                         - - -
 5  Request for Production of Documents
    Page  Line        Page  Line    Page  Line
 6  None
 7                         - - -
 8  Stipulations
    Page  Line        Page  Line    Page  Line
 9  None
                           - - -
10
    Questions Marked
11  Page  Line        Page  Line    Page  Line
    None
12                         - - -
13  To Be Filled In
    Page  Line        Page  Line    Page  Line
14  None
                           - - -
15
16
17
18
19
20
21
22
23
24
25
```



Page 406

```
 1
 2                      CERTIFICATE
 3
            I HEREBY CERTIFY that the witness,
 4    NORMAN CHOI, was duly sworn by me and that
      the deposition is a true record of the
 5    testimony given by the witness.
 6            Leslie Fagin
      _____
      Leslie Fagin,
 7    Registered Professional Reporter
      Dated: September 16, 2024
 8
 9
10
            (The foregoing certification of
11    this transcript does not apply to any
      reproduction of the same by any means, unless
12    under the direct control and/or supervision
      of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 407

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3          I,                    , do hereby
    certify that I have read the foregoing pages,
 4  and that the same is a correct transcription
    of the answers given by me to the questions
 5  therein propounded, except for the
    corrections or changes in form or substance,
 6  if any, noted in the attached Errata Sheet.
 7
 8
    NORMAN CHOI                    DATE
 9
10
    Subscribed and sworn
11  to before me this
          day of                 , 2024.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



Page 408

1

2                    - - - - - -

                 E  R  R  A  T  A

3                    - - - - - -

    PAGE   LINE   CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**A-R-C**
334:6
**a.m**
1:16 3:9 59:23 60:2
    368:7
**a/k/a**
1:8,9
**Abby**
138:6
**abilities**
255:17
**ability**
98:17 154:13 234:2
    255:2,9 323:20
**able**
43:14 128:20,21,24
    211:23 229:12,21
    230:2 271:19 273:3
    333:10 366:5
**absolutely**
67:19 242:23 265:5
    345:24
**AC**
201:16 202:3 399:20
**accept**
231:6,8,17 393:20
**acceptable**
265:5
**access**
154:8 194:22 355:21
**accommodate**
310:13,20
**accomplish**
255:9
**accomplishments**
320:2
**account**
125:24 192:5,7
    193:23,25 194:3,10
    194:16,17 276:12
    279:10 280:21
    339:24,25 345:21
    348:13
**accountant**

355:20
**accountants**
133:3,4 182:25
**accounting**
89:4 109:19 110:17
    132:25 133:25
    181:9 212:10,11,14
    354:25
**accounts**
154:5 165:16 194:23
    278:16 279:3
    348:16 352:25
**accrue**
220:25 221:18
**accrued**
274:18
**accumulations**
113:8
**accurate**
89:7 216:20 354:22
    354:24
**accurately**
118:19 279:9
**accusation**
71:7
**accusations**
59:14
**accuse**
361:3,10
**accused**
64:14 65:9 71:4
    372:2
**accusing**
66:13 360:2,23
    361:11
**Acedes**
201:16 202:3 399:20
**achievable**
330:12
**achieve**
240:14
**achieved**
233:14
**acknowledge**
69:22
**acknowledges**

203:6
**ACKNOWLEDG...**
407:2
**acquaintance/frien...**
26:11
**acquainted**
26:5,6
**acquire**
322:11 329:14
    336:14
**acquired**
333:21
**acquisition**
316:17 322:16
**action**
20:19 92:17 320:5
    354:20
**actions**
67:12
**actively**
336:13
**activities**
18:23 23:10,12 24:4
    24:9 359:21 361:20
**actor**
138:9 225:11
**actress**
228:14
**actual**
12:23 34:5 58:17
    144:11 226:6 351:3
**ad**
225:5,8,13
**add**
90:15
**adding**
311:12
**addition**
80:23 251:6 284:2
    311:4
**additional**
5:15 30:5 252:9
    279:5 310:2 329:19
    329:22 330:2
**address**
4:21,23 123:16 174:8

337:10 339:9
    340:14 345:5,8,11
    345:18
**addresses**
339:13
**adequate**
42:19
**administration**
5:13
**Administrative**
78:19
**admit**
32:16 307:22
**advance**
182:25 191:21
**advancements**
122:20
**advertising**
224:13
**advice**
34:23 35:8 177:22
    211:6,18 294:20
    295:4 394:20
**advices**
302:4
**advise**
190:8 319:4
**advised**
187:23 285:18
    332:20 362:18,20
    362:22 363:2,6
**advises**
290:4
**advising**
334:9,10
**advisor**
334:8 351:24 352:5
**advisors**
212:11 220:13,16
    341:19
**Advisory**
30:25 31:7,11,18
    32:7,22 33:2 363:8
**aesthetically**
226:10
**afford**



245:23 265:6
**aficionados**
233:6
**AFMG**
277:3,4 287:6 321:2
321:4
**AFMG's**
286:16
**afternoon**
370:15
**afterward**
204:23 230:25
**against-**
1:7
**ago**
54:12 63:15 85:18
101:2 161:20
192:19 238:21
291:3 342:18
387:22 389:15
**agree**
22:14 32:6 37:14,20
37:23 38:16 42:4
45:14 46:3 49:22
59:13 66:12 67:17
73:16 81:13 82:13
90:9,14 97:25 99:3
101:10 102:18
103:4,15 107:20
108:18 109:11,20
112:3,11 113:5
115:2,24 120:7
121:18 126:17
130:8 132:7 146:9
147:4 163:22 176:3
177:17 178:10
186:8 209:4 223:14
228:12 232:6,7
235:10 249:20
254:12 255:6,15
265:9 279:14,21
280:8 281:7,22
295:23 298:23
301:9 303:10
307:21 308:12
325:17 336:4

341:11 353:5
354:22 361:5
368:23 371:12
372:14 374:8 378:3
378:9 380:13
**agreeable**
82:8
**agreed**
83:11 85:10 86:3,13
86:25 87:2 311:5,15
311:22
**agreement**
39:3,11,14,25 40:4,7
41:12,14 42:2 67:21
67:22 68:10,24
70:14 72:15 74:21
75:2,18 76:15,20,21
76:23 77:4,15 78:15
79:14 82:20 83:6,15
85:19 87:20 92:12
100:10,16 108:11
109:7 115:6,7,13
116:2 117:5,21
122:4 134:21,22
152:3 162:5 169:25
171:14 172:13
182:5 201:14,21
202:6,10,19,20,23
202:25 203:9,13,17
203:21 204:25
205:3 207:15,20
208:3,8 209:14
253:21,23,25
254:13 255:5,13
271:2,3,6,9,22
285:23 286:2
304:16 308:17
311:9 312:3 379:8
379:24 380:3,6,8,21
381:4,8,23 387:5,19
396:18 399:18
**agreements**
75:14 77:2 175:10
221:23
**ahead**
196:6,7

**air**
222:9
**Airbnb**
138:2
**akin**
45:15
**al**
3:7
**Alex**
4:3
**ALEXANDRA**
2:11
**align**
370:19
**aligned**
29:21 56:2
**alive**
10:2
**allegations**
94:8 99:4,11 281:12
391:23
**alleged**
252:4
**alleges**
391:15
**allocated**
303:7
**allocation**
303:2
**Allocations**
95:4,11 96:18 195:17
397:12
**allowed**
73:19 290:5 325:3,5
**amazing**
264:8
**ambiguous**
68:23
**America**
249:3 296:19
**amount**
15:22,25 166:10
197:18 198:24
200:21 216:10,14
234:8 250:19
310:17 380:14

**amounted**
252:12
**amounts**
129:23 276:10
**analysis**
222:4
**analyze**
320:4
**analyzed**
216:3
**and/or**
81:11 406:12
**Ann**
330:10
**announce**
210:21
**announced**
207:2
**answer**
7:2,4 17:6,7 40:21
53:10 72:4 85:4,13
117:2 118:11
121:22,23 135:20
161:21 172:22
174:22,24,25
179:23 184:2
206:24 210:17
211:4,5,8 222:2,3
228:23 231:15
273:22 281:19
283:11 299:16
305:2 310:9 323:8
335:9 340:17
364:12 381:12,13
393:25
**answered**
50:20 82:24 108:15
144:17 145:15,17
147:16 155:18,20
194:10 201:10
257:12 291:20
292:11,14 379:5
383:6 385:18
**answering**
217:16
**answers**



307:16 407:4
**antidilution**
393:11,18
**anybody**
144:5
**anymore**
18:12 205:10 309:18
**anyway**
49:15 177:12 242:10
**apartment**
9:10,13 123:20
**Apollo**
19:5 21:22 25:9,11
27:25 28:2,4,6,13
28:21 29:18 30:18
31:11 32:9 33:3,21
34:2,7,17,24 35:9
36:20 38:23 39:7,16
40:7,11,23,25 42:12
42:16,25 43:4,17
44:23 45:10,16
46:20 47:21 48:15
48:22 49:2,18,23
50:18 55:17,21
57:18,22 58:3,5,7
58:11,15,22 59:3,9
59:15 61:15,17
63:18 64:5 66:18
67:15,24 69:3,4,16
69:20 70:5,15 72:12
72:21,24 74:10,20
78:17 79:24 81:6,7
81:11,19,19 82:5,21
85:20 111:8 138:15
138:23 139:3,6
140:6,24 142:20
144:20 145:23
149:15,22 150:19
153:5 155:23
156:12 166:2 169:3
173:5 180:6,12
182:21 187:21
192:15 198:22
199:7,23,25 200:8,9
221:8 233:14
248:25 276:11,17

276:21,25 286:2
303:17 309:23
370:12 374:3 387:5
387:20 389:24
390:6,7,13,20
391:12 392:18
396:17 398:11,14
398:15
**Apollo's**
65:10 69:8
**Apollo/De**
390:25
**apologize**
103:21 278:14
287:12
**appalling**
264:10
**appeal**
233:5
**appeals**
229:15,18
**appear**
71:17 161:15 186:13
232:15,16 234:22
**appearances**
2:2 3:19
**appeared**
68:8
**appears**
26:13 30:19 97:25
107:7 161:14
194:20 217:7
337:15,21,25
338:13 342:25
348:14
**applicable**
81:14
**applied**
102:19
**applies**
77:13
**apply**
4:18 406:11
**appraisal**
220:14,17
**appreciate**

389:8
**apprised**
316:19
**approach**
220:8 232:19
**appropriate**
66:3,4,8 103:17
134:25 135:3,5
215:16 285:8 347:5
347:10
**appropriately**
177:25 178:11
**approval**
99:25
**approved**
361:24 362:8 365:15
**Approximate**
123:21
**approximately**
8:13 9:13 15:20 21:6
63:14 170:21
390:22 391:5
**April**
104:11,19 105:20,22
119:6,11,19 120:7
130:18 181:5,15
201:15,21 314:22
397:13,16,22 399:6
399:18
**April/May**
336:21
**Aprivy**
67:23 78:20,25 100:9
100:15
**Arc**
334:2,5 335:25
**Arc's**
334:7
**area**
15:7
**argue**
242:11
**arm's**
216:4
**arrangement**
159:22 177:7

**arrangements**
158:12
**arrested**
9:17
**Arrow**
81:7,19 138:15,23
139:3 140:6,24
263:18 398:12,14
**article**
235:22,24 240:18,21
240:22 241:9
246:19,22 247:7
384:21,22,23 400:8
404:19
**articles**
237:16 328:20
**artisan**
48:12
**artist**
262:20,23 263:22
**ASAP**
267:2 287:7
**ascribing**
177:3
**Ash**
106:19 262:14,19
263:11
**Ash's**
263:20
**aside**
9:7 28:17 33:19,24
41:14 64:19 88:19
93:17 111:12
118:21 122:5
126:24 136:13
138:11 143:17
166:7 180:2 193:9
205:22 207:5
216:21 222:24
241:14 258:8
266:14 301:5,11,15
301:19 309:23
314:11 331:23
336:11 338:19
344:22 349:25
365:19 369:22



375:24
**asked**
11:15 28:13 42:15
62:12,22 82:24
96:10 113:18 117:7
121:21 142:9
147:16 155:18
175:6,11 179:20
180:3 201:10
211:21 233:24
257:11 280:9
291:20 292:6,7,11
332:14 383:5
385:17 389:15,19
**asking**
23:25 24:7 47:7
48:18 53:4 59:8
76:4 79:6 80:5
99:10 109:9 135:23
142:10 146:4
151:23 155:6
161:17,19 173:19
178:5 209:24
210:18 214:24
215:3 218:18
221:17 223:18
230:23 232:11
240:24 247:18
264:2 267:21,22
268:18 273:8 282:4
309:22,23 323:6,8
350:13 355:2
358:24 362:12
378:23
**asks**
177:21 220:25 306:6
**aspect**
41:6 229:11 304:17
**aspects**
42:17
**aspire**
262:23
**asserting**
311:3
**assertion**
83:5

**assertions**
93:20
**asset**
24:18
**assets**
177:25 178:11
207:20 208:4,13
209:12,19 250:21
251:8
**assigned**
96:22
**assist**
243:6 280:9 304:17
**assisted**
123:12
**associated**
235:14 327:20 341:8
341:14
**association**
386:6
**assume**
30:8 63:17 93:13
114:4 165:24 166:5
246:21 262:6 328:9
339:11
**assumes**
284:12
**assumptions**
93:15,16
**attached**
191:14 407:6
**attachment**
351:3,4 363:16,18,23
364:2,17 365:23
404:5
**attend**
228:25 357:18
**attended**
4:15 98:24 124:17
138:3 229:2,3
**attention**
60:18 84:8,17 88:10
104:21 112:2
119:15 187:18
193:21 197:14
276:6 318:9 319:20

**attentive**
381:9
**attorneys**
2:4,8 362:18
**attribute**
248:11
**auction**
51:16
**audit**
89:3 109:18 160:16
160:17 162:8
200:11
**auditor**
62:3 110:17,24
132:22 160:16
190:12
**auditors**
63:7 64:6 89:9
162:13,17,24
182:25 189:13
190:8
**auditors/financial**
220:12
**Audubon**
232:24
**August**
137:7 318:10
**Australian**
338:4
**authorities**
9:17 56:25 178:20
**authorize**
155:22
**authorized**
78:11 178:24 360:12
**automobile**
78:17 122:17 127:11
136:21 143:14
169:13 170:18,24
203:8,20
**automobiles**
192:22 204:14
311:24
**AUTOMOBILI**
1:8
**available**

51:8,15 134:18
215:20 237:15
261:10 370:20
**Avenue**
2:9
**avoid**
198:8
**avoiding**
264:20
**AVS**
321:13
**award**
395:2
**awarded**
391:15,23 392:7,11
**aware**
33:7 62:11 68:6,12
236:7 243:7,11,15
243:17,21 304:8
338:17 388:22

**B**

**B**
337:16 396:11 397:3
398:2 399:2 400:2
401:2 402:2 403:2
404:2
**B-A-R-T**
379:12
**back**
59:25 67:20 71:6
74:18 102:10 104:3
105:13,16 116:8
117:17 118:22
122:3 128:3 130:7
149:10 150:17
152:4 153:6 155:22
155:24,24 156:4,13
156:16 158:21
160:15,17 161:19
162:8 164:6 165:8
165:17,21 166:3,11
168:6,8 170:9
172:25 173:8,15
188:21 190:21
191:22 192:18



194:25 200:11,17
208:20 217:12
218:6 219:5 223:9
224:23 231:17
233:8,12,15 248:23
253:17 260:10
266:11 277:12,22
278:3 283:21
285:22 287:5 291:2
296:3 299:5 305:8
308:16 313:12
314:17 341:18
358:10,13 367:16
372:3 384:12,17
**backdate**
160:9,12
**backdated**
160:21
**backdating**
161:24,24
**background**
40:18 231:10 263:16
263:21 367:20
**bad**
30:12 157:13 347:24
369:9
**bag**
238:7
**Baily**
304:3
**balance**
140:14 192:5 193:24
194:2,3,16
**balances**
192:9
**ball**
293:6
**ballet**
124:24 125:3,11
126:9,12
**band**
238:17
**bank**
154:5,9 165:11,16
166:2 194:23 216:5
274:25 329:11

**banks**
215:22,22
**Barry**
369:23,25 370:15
**Bart**
379:11 383:12,14
404:18
**base**
79:17 80:23 285:24
**based**
210:6 227:2 355:20
**basically**
17:7 212:24
**basis**
217:8 270:6,9
**Bates**
29:4 60:19 83:23,25
84:8 88:3 89:17,19
90:2 104:6,22
111:18 112:2
122:11,14 127:6,8
130:3 136:17
195:14 196:23
202:5,21 207:9,12
208:3 219:8,11
237:9,11 242:24
243:3 266:18 268:9
278:10,12 299:25
302:13 318:3,5
331:8 363:21,24
366:14,14,16 377:7
384:7 395:11
396:23 397:6,8,19
398:5,7,9 399:13,23
400:6 401:8,16
402:8,17 403:23
404:5,7,8,14
**bearing**
83:22 88:2 89:16
111:17 122:10
127:5 136:16
195:13 219:10
266:17 278:9
299:24 318:4
363:20,24 366:13
377:6 396:23 397:6

397:8,19 398:5,7,9
399:13 400:6 401:8
401:16 402:8,17
403:23 404:5,7,14
**beauty**
233:22,22
**began**
260:11
**beginning**
40:17 41:19,22 68:7
73:11 112:5 120:6,8
177:11 204:11
207:9,12 227:9
252:2 257:9 260:11
399:22
**begins**
3:4 359:19
**begun**
112:19
**behalf**
36:20 78:12 79:24
176:17 328:17
**behavior**
47:24
**belief**
31:16 46:17
**believe**
39:6 41:15 47:11
58:12 70:4 71:13
99:11 174:5 176:21
209:19 210:5 214:2
222:19 225:3
235:25 245:13
251:8 252:2 256:13
257:6,7,13 259:22
263:3 275:9 277:16
316:5,9 328:5
355:11 363:3 367:2
377:16 383:25
394:8
**believed**
245:11 248:7
**belong**
251:8,10
**beneath**
239:5

**beneficial**
128:23 183:23 185:8
**Benefit**
183:16,22,24 184:19
185:9
**Bernie**
235:4,6 237:7 238:8
238:23 368:20,23
369:3,6,12,18
**Berris**
1:5 2:15 3:6,24,24
25:6 35:20 36:6
38:14 41:15 69:11
69:15 70:4 71:16
72:11,23 73:17
76:23 78:5 83:7,11
86:14 90:12 91:12
94:10,14,21 95:20
96:8 97:20 98:2,21
99:5 107:9 109:10
112:6 113:7 119:18
121:6 178:4 217:4
217:22,23 218:3,14
245:16 248:12,17
249:21 250:3
252:12,25 254:7
255:7,16 256:9,14
256:21 257:18
265:20,25 266:18
266:21 267:10,17
274:5,7,13 275:22
278:10 280:9 284:5
284:9,15,25 285:19
288:6 289:8,10,22
291:18,25 292:17
293:12,16,21,23
295:13 299:11
300:4,11,19 301:6
301:12 302:17,19
303:10 304:8
306:23 307:24
308:8,13 309:17
310:2 311:5,15,23
312:5,9,16,22 313:8
318:5,8,16 336:25
337:4 351:20 359:5



359:12 360:2,23
364:25 365:7
366:22 367:6 368:3
371:7,13 372:6,8,15
372:21 374:16
375:2,17 376:25
389:17,23 390:14
390:24 391:11,14
391:18 392:5,14
393:9,18,20 395:16
395:17,19 400:13
400:20 401:9,13,15
401:17,24 402:7,12
402:18 403:9,22
**Berris'**
4:15 38:23 68:10
74:21 92:23 98:24
106:5 112:13
255:23 283:24
286:3 357:14
359:20 361:6,19
365:10 390:7
391:22
**Berris's**
373:4
**best**
30:25 31:6,11,16,18
32:7,21,22 33:2
35:16 89:5 185:15
185:23 223:17
253:22 289:16
310:13 320:4
365:12
**better**
11:17 53:25 198:14
202:7 226:13 246:5
317:23
**beyond**
54:8 382:21
**bid**
51:19
**Biden's**
300:25
**big**
112:18,19 249:3
281:11 300:15

301:2,7
**bigger**
241:23 242:2
**bill**
54:5,5,8,11,14,17
126:9 168:11,13,21
172:12 174:7 175:7
176:5 324:2,7,8,10
324:18,22,24,25
325:8,11,13,14,17
325:18,21,22 326:2
326:5,20 327:4,5,9
327:10,16,20 330:8
330:16,17,20,23,25
331:3,11,12 398:22
**Bill's**
326:13
**billed**
114:14
**billing**
110:20
**billion**
191:21 209:13
**Bills**
325:25
**bit**
84:14 137:7 166:17
231:13 236:12
241:23 248:4
263:15 319:22
**black**
82:17
**blame**
248:17
**blew**
243:2
**blind**
322:18
**block**
124:7
**blocking**
195:11,12
**blood**
188:22
**Bloomberg**
215:19 384:20,23

404:19
**blowup**
195:8
**blue-brown**
237:19
**board**
42:22 58:15 62:11
234:15
**Bob**
373:22
**Boies**
1:15 2:3 3:11,13
**book**
179:21 376:7,12,14
376:15,19,20,24
377:13 378:14,18
378:24 379:3,4,9
381:9,23 382:5,13
383:19
**booked**
138:2 191:19
**books**
154:2 346:9 376:2
380:24
**born**
22:14,22
**bottom**
29:3 114:17 123:4
133:7 158:11 220:4
220:24 234:15
239:11 254:24
304:18
**bought**
21:18 28:5,14 98:9
146:4 163:7
**boxes**
261:6
**brand**
21:19 74:12 231:25
234:19 235:14
**branded**
256:20
**branding**
229:7 230:8,19
**Branson**
98:4,5

**break**
4:19 18:19 59:21
166:16,21 223:3
250:23 275:9
283:15,17 357:10
384:3
**brief**
117:2
**briefly**
5:20 181:23 266:16
266:20 269:2
313:11,17 316:16
**brilliant**
260:12
**bring**
40:11 42:22 43:8
233:15 249:14
**bringing**
249:21 250:8
**brings**
228:6
**British**
202:15 203:7 208:20
209:20 240:11
**broad**
244:18 247:10 317:6
**broader**
34:6 247:20
**broker**
123:9,12 124:2
**brought**
227:6 234:2 281:10
**build**
27:7 33:21 52:10
92:14 192:15
202:10 203:25
204:4,13,19 205:13
205:18,23 207:2
210:9,14 232:5,20
249:15 250:4 259:8
**building**
43:19 90:11 206:17
308:14
**buildings**
8:13 9:11,14
**built**



143:7,8,10 205:10
248:25 255:14,20
260:14,20
**bullet**
187:16,19
**bunch**
368:2
**Burger**
44:21,21 258:19,22
390:17 400:22
**business**
5:13 6:14 7:22,23
11:4,8 12:19,23
19:13,16,21 23:10
23:12,22 24:3,9
38:9 80:19 93:15
99:5,12,15,21
100:12,19,23 101:7
103:2,17 106:5,9,15
132:13,17 139:18
156:20 162:21
172:6 185:4 187:15
192:23 216:11,15
232:5 270:13
322:11 344:8 346:5
346:20 385:2 386:2
386:17 388:2
**businesses**
6:9,11,12 14:17
215:23
**businessperson**
6:5 80:7 139:17
**Bustamante**
2:11 4:3 83:25
**buy**
20:18 21:13 51:3
142:2 146:7,14
196:14 298:11
373:25 374:4
**buyer**
172:13,14
**buyers**
55:6
**buying**
164:6 297:6 298:8,12
299:9 335:3

**buys**
299:2
**BVI**
122:18 125:15,18,24
126:19,20 127:3,11
132:21 184:12

———————

**C**

**C**
4:5 80:22 168:4
**C-H-E**
384:25
**C-O-L-D**
8:21
**calculate**
355:9
**calendar**
79:19 355:14 356:2
356:10,19,20
**California**
370:13
**call**
48:12 52:19 188:24
189:6 200:18
232:14 236:7 237:5
268:22 368:13
370:20,24 371:3
**called**
4:5 30:25 53:24 57:5
89:25 139:7 225:5
249:14 303:7 376:2
379:11 386:21
387:6,18 388:3,8,12
**calling**
301:6
**calls**
68:14,16 74:24
107:12 264:20
319:10 323:16
**campaign**
224:13 225:5,9,13,14
225:22 226:10
227:6,10 228:13
231:3,4,11 256:22
**Canaan**
124:12 129:10

130:10
**Canada**
32:14 328:12
**Canadian**
328:3
**candidates**
249:19
**capabilities**
215:4
**capable**
266:5
**capacity**
78:7
**capital**
1:9 31:20,25 32:17
32:21 131:18,20,24
134:15,17 136:11
270:24 279:5
289:18 329:23
332:16
**Capricorn**
249:15,22 250:3,8,12
250:18,24 252:21
253:21 254:8 255:8
255:24 256:10,14
256:16,19,25 257:2
257:8,8 259:17
260:12,14,19 261:6
261:9,22 265:10,21
**Capricorn's**
254:25 255:16 259:8
**car**
19:12,16,21 34:5
52:11,18,20,20,22
52:24 53:12,14,16
53:17 54:3,20,20
94:11 139:22
141:25 142:2,4,13
142:22,24 143:19
143:23 144:5,10,20
145:20 146:5,7,8,11
146:12,13,23 147:5
147:9,14 148:23,25
149:2,8 150:11
151:6,14 152:4
165:8,13 169:12,20

170:22 171:2 172:9
173:20 174:9,14,17
175:5,12,22 176:4
176:25 177:4,19
179:11 202:7
204:10 206:18
210:10,15 224:3,8
224:10 232:17,20
233:5,15,16,23
237:6,25 238:3
240:7,10 249:6
250:4 257:3,10
260:14,20 262:23
263:3,6,14
**card**
108:3
**care**
294:11,17,18 298:19
372:13 382:25
**career**
14:21 162:14,16
328:7
**careful**
299:21
**carefully**
135:20
**Carl**
315:7
**Carlos**
373:9,12,14,15
374:12 404:13
**Carlos'**
373:16
**Carmen**
106:20 223:13,16,18
224:15 227:5 229:3
234:16,25 237:7
244:14,15,20 245:7
247:11 251:12,22
266:21 267:2,7
**carried**
39:13 316:5,6,7
**carry**
334:3
**cars**
19:17,18 27:7 43:20



46:21 143:6 146:14
149:23 150:23
151:2 156:16
166:11 191:20
196:3,9 201:16
202:3 250:21 264:5
303:8,12,20 304:9
304:12,13 311:6
319:23 364:4,9,22
366:23,24 374:5
399:20
**Caruso**
363:7 367:19
**case**
1:6 68:7 76:7,9 100:9
115:23 119:2
126:13 150:3,8
170:3 172:14,15
176:21 177:10
211:17 222:8
255:22 257:7 273:4
281:17 310:24
325:8 331:13
**cash**
135:7,10,11,12,14,18
135:21 136:3,6,7,10
209:10 216:10,15
216:18 276:8
342:19 351:12
**cashier's**
193:25
**categorized**
170:2 244:4
**cause**
178:6
**caveat**
17:2
**cc**
340:9
**CEO**
28:7 32:4,16 57:10
58:5 61:24 63:12,17
69:5 70:15,17,21
72:23 74:19,20 75:5
75:9 82:20,22 89:5
91:25 98:12 101:4

103:16 108:19
109:12,21 111:8
150:19 162:10,12
162:12,22 176:7,10
177:24 178:4,5
186:16 227:3,4
320:17 321:2,4
347:24 381:21
**certain**
73:25 137:24 210:4
234:5 310:17 321:6
333:10,12 359:11
382:16 385:13
**certainly**
217:15
**CERTIFICATE**
406:2
**certification**
406:10
**certified**
212:10
**certify**
406:3 407:3
**certifying**
406:12
**cetera**
307:13
**CFO**
45:15 46:4 58:7 69:8
69:12 90:24 91:2
116:17 164:13,17
221:17 352:21
**chain**
216:24 217:2 289:7,9
306:19 334:24
367:14 400:5
401:23
**chairman**
61:14 178:9
**Chan**
123:4,11 133:8 134:4
**change**
21:21 86:12 121:25
194:21 223:11
243:20 325:14
408:3

**changed**
21:8,19 337:17
**changes**
407:5
**changing**
223:4
**chapter**
54:9
**character**
54:15
**characterize**
18:7 153:11 268:23
271:13 361:6
**characterized**
361:4 366:4
**charge**
103:17 107:13,15,17
111:3 213:24
215:23 221:14
**charged**
110:12 221:7
**charges**
191:16 328:15,16
**chart**
307:12
**chassis**
94:20 95:3,11,14
96:18,20,24 97:2,10
97:15 98:21 170:12
195:17 303:6
397:11
**chat**
84:3,17 88:6 305:20
305:23,25 319:13
319:15,17 329:6,8
332:2,4 402:13,19
402:22 403:5
**chats**
84:12
**check**
158:15 165:25
171:23 215:21
261:4,6 302:24
**checkbook**
261:5
**Chelsea**

38:14
**Cherokee**
232:23
**chic**
239:4
**chief**
45:7
**children**
38:4
**China**
70:9 72:5 73:6,12,18
186:4 328:17
386:23 388:19,23
**Cho**
384:15,23,25
**Choi**
1:8,8,14 3:5,6 4:1,11
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1,3,5,18 23:1,10
23:13,22 24:1,5,10
24:13 25:1,8,17,18
25:19,21,25 26:1,23
27:1,16,19,21 28:1
28:19,20 29:1 30:1
31:1,25 32:1,8,16
33:1,8,14,20 34:1,7
34:23 35:1,8 36:1,3
37:1 38:1 39:1,23
40:1,3 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1,4,5,7 61:1
62:1 63:1 64:1,20
64:21 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
78:8 79:1 80:1 81:1
82:1 83:1,21,22
84:1,3 85:1,2 86:1
87:1,25 88:1,2 89:1



89:10,16 90:1 91:1
92:1 93:1 94:1,24
95:1,2,7 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1,5,5,7,9,11,12
104:23 105:1,16,16
105:22,24 106:1
107:1 108:1,18
109:1,22,25 110:1
110:20 111:1,14,17
112:1 113:1 114:1
115:1 116:1,15
117:1 118:1,25
119:1,6,8 120:1
121:1 122:1,9,10
123:1 124:1,7 125:1
126:1,25 127:1,5
128:1 129:1,7 130:1
130:8 131:1 132:1
133:1 134:1 135:1
136:1,15,16 137:1
138:1,13,14 139:1
140:1,4,5,8,14,19
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
149:13,14,17 150:1
150:4,18,18 151:1
152:1,11,12,15,17
153:1 154:1 155:1
156:1,23,24,25
157:1,3 158:1 159:1
159:5,5,9,10,15
160:1,7,7,10,10,13
160:23 161:1,4
162:1 163:1 164:1
165:1 166:1 167:1
168:1,10,12 169:1,3
170:1,9,17 171:1,16
172:1,25 173:1,2,4
173:19 174:1,6
175:1 176:1,17
177:1 178:1 179:1
180:1 181:1,3,4,7
182:1 183:1 184:1

185:1 186:1 187:1
188:1 189:1 190:1
190:23,24 191:1,2,5
192:1 193:1,11,12
193:14,15 194:1
195:1,9,13 196:1,24
197:1,2,3,4,8 198:1
199:1 200:1 201:1
201:13,14,18 202:1
203:1 204:1 205:1
206:1 207:1,7,8
208:1 209:1 210:1
211:1 212:1,2,3,7
213:1 214:1 215:1
216:1,23,24 217:1
218:1 219:1,10,13
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1,20,21 236:1
237:1 238:1 239:1
240:1 241:1,17
242:1 243:1 244:1
245:1 246:1,11,12
247:1 248:1 249:1
250:1 251:1 252:1
252:23,24,25 253:1
253:19 254:1,14,15
254:16,18 255:1
256:1 257:1,15,16
257:17 258:1,17,18
258:19,21 259:1
260:1 261:1,25
262:1,2,3 263:1
264:1 265:1 266:1
266:15,17 267:1
268:1 269:1,7,8
270:1 271:1 272:1
273:1 274:1,2,3,4
275:1,16,21,22
276:1 277:1 278:1,8
278:9 279:1,7 280:1
281:1,23 282:1,13
282:14,15 283:1,23

284:1 285:1 286:1,7
286:8,9 287:1 288:1
289:1,5,6,7 290:1
291:1 292:1 293:1
293:13,14,15 294:1
295:1 296:1 297:1
298:1 299:1,23,24
300:1 301:1 302:1
302:14,15,16 303:1
304:1 305:1,20,22
305:23 306:1 307:1
307:11 308:1 309:1
310:1 311:1 312:1
313:1,12,14,15
314:1,19 315:1
316:1 317:1,25
318:1,4 319:1,13,14
319:15 320:1,7
321:1 322:1 323:1
324:1,14 325:1
326:1 327:1 328:1
329:1,4,5,6 330:1
331:1,24,25 332:1,2
333:1 334:1 335:1
336:1,22,23,24
337:1 338:1,21,22
338:24 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1,5,6,7
349:1 350:1,3,4,5
351:1 352:1,7,8,9
353:1 354:1 355:1
356:1 357:1 358:1
359:1,2,3,4 360:1
361:1 362:1 363:1
363:18,19,20,23
364:1 365:1 366:1
366:11,12,13,18
367:1 368:1 369:1
370:1,4,5,6 371:1
372:1 373:1,7,8,9
374:1 375:1 376:1
377:1,5,6 378:1,24
379:1,17,18 380:1
381:1 382:1 383:1

383:11 384:1,14,19
384:20 385:1 386:1
387:1,13,14 388:1
388:22 389:1,7,11
389:14 390:1 391:1
392:1 393:1 394:1
395:1,13,14,14,15
395:16,17,18,18,21
396:6,13,15,21
397:5,14,18,24
398:4,20 399:4,9,12
399:16 400:4,13,16
400:19,21 401:4,6
401:12,15,19,21,23
402:4,6,11,14,16,20
402:23 403:4,6,7,12
403:14,16,18,20
404:4,10,13 406:4
407:8
**Choi's**
22:9
**choice**
266:11 280:5
**choose**
42:10 117:23
**Christian**
238:6
**chronological**
367:17
**Cipriani**
228:16,21,25 229:6
**circuit**
36:18
**circumstances**
117:18 365:11,17
**Citibank**
293:8
**city**
145:7 373:19
**claim**
261:15,18 361:15
**clarification**
277:15
**clarify**
319:2
**classic**



55:5
**clawed**
217:12
**clawing**
219:5
**clear**
17:7,7,23 30:4 35:15
45:6 56:7 64:4
66:20 68:15 78:4
82:18 84:9 87:17
90:9 98:20 104:23
104:25 108:9
114:20,23 115:2,15
116:19 117:13
118:8,11 125:15,17
128:3,7 131:4,10
159:9 172:22
174:22 180:6 201:5
206:9 219:18
258:12 274:15
284:2 297:5 306:25
308:10 310:4
311:13 313:5 323:3
361:17 365:21
**cleared**
133:15
**clearly**
39:11 77:20 80:4
93:14 96:15 109:8
132:20 304:20
308:18 356:18
**Clement**
184:24 185:5,8
**client**
4:3 98:8 368:11
**clients**
42:23 43:8 229:13,22
229:24 243:8,13,18
244:6,8 249:4
263:10,12 303:3
364:10 376:16
**clips**
381:17
**clock**
309:10
**close**

26:12 37:21,24 120:8
189:8,11 190:2
193:3,7,23 194:15
250:19 274:18
351:5
**closed**
194:2,11
**closing**
350:15,19,23 351:13
**clothing**
237:22
**clumsily**
262:7
**CNA**
363:7
**co-invest**
23:14
**coal**
14:5,6
**coat**
239:5
**code**
8:20 348:23
**coffee**
108:4
**Cohen**
366:18,20,21 367:7
368:8,11,17
**cold**
6:14 7:23,25 8:16,20
8:20
**collaboration**
50:5
**collaborative**
49:23
**colleagues**
138:5 267:16 362:16
**collection**
144:13
**collectively**
192:3
**coloring**
242:17
**colors**
242:16
**columns**

212:23
**come**
82:7 86:23 105:16
214:3,6 240:6 245:8
250:3 258:5 264:18
275:12 303:22
394:16
**comes**
48:17
**comfortable**
189:12
**coming**
85:9 215:10 249:3
258:3 267:8 296:19
308:3 361:24
**commencing**
1:16
**comment**
192:19 222:16,17,18
378:10
**comments**
253:20
**commercial**
8:10 9:3 13:15 23:15
164:9,19 165:2
172:8 173:10
215:22
**commercially**
222:14,21
**commission**
311:6,16,23 312:4,15
312:23 313:8
407:12
**commissions**
312:9
**commit**
166:20
**committed**
256:19 260:8 371:14
**committing**
360:2
**commodities**
15:6,11
**commodity**
12:21,22 13:2 14:17
**common**

146:11 324:22 342:5
**communicated**
246:9
**communicating**
246:7
**communication**
217:18 224:22 265:4
290:8
**communications**
290:9 340:15 344:24
346:4
**companies**
33:14 45:22 55:15
75:10 101:5,6
171:19 269:4
271:21 272:2,20,23
273:6 296:9,10,16
346:9 385:6,10
386:7 390:14
391:11
**company**
12:5 20:2,3,4 27:3,4
31:20 32:4,12,13
34:21 37:4,5 51:2
55:11,14,22,23,24
56:4,6,11,15,17,17
56:21 57:3,19 59:10
61:16,23 63:8,12,22
64:15 65:9 69:3
70:6,7 74:11,16,17
75:7 78:17,21 79:15
81:13 82:6 89:6
92:12,14,15,18
100:22 103:12,16
103:18 107:13,15
107:17 108:21,25
109:12,21 110:12
110:21 111:4
116:12 120:13
121:14 126:3,6,7,8
126:12 128:16,17
128:18,19,22 129:3
131:9,19,21 132:6
134:15 135:4,7,10
135:18,22 136:3,6
136:11 137:25



138:3 139:11,12
141:3,6 153:6 155:9
162:10,18 169:17
176:9 177:24
180:17 182:19
187:11,22 194:14
204:19 213:20
216:19 217:20,24
226:20,23,24
249:14 260:24
269:16 270:12
271:7 272:7,15
273:20 276:21
282:3,9 292:2 297:8
297:23 298:8,12
307:5,7 316:18
322:3 330:2 333:9
338:4,10 347:14
351:20,23 357:16
359:5,11,13,21
361:20 372:9
375:25 379:21
391:16,20 392:2,16
393:6,20 394:13,23
395:2 403:22
**company's**
64:9
**comparables**
249:18 256:18
**compare**
319:25
**comparing**
256:24
**comparison**
249:24
**compensation**
79:10,13 81:14 82:8
85:20 283:25
304:22
**competing**
263:13
**complained**
251:18
**complaining**
121:12
**complaint**

83:9 228:17 251:19
281:13
**complete**
260:14,20 383:10
**completed**
145:25 147:3
**completely**
147:8 204:9
**completion**
51:5 294:12 298:19
**component**
249:10 322:22
394:12
**components**
41:8
**comprehensive**
382:19
**computer**
26:14
**conceal**
259:20
**concern**
113:10 114:10
189:16 234:13
255:25 256:4
**concerned**
109:7 142:15 143:16
145:23,24 147:2,20
211:15 244:22
254:25 260:2
281:15 336:2
**concerning**
217:13 218:8,16
**concerns**
63:7 113:2,6 218:24
**concession**
14:15
**concessions**
14:15
**concise**
360:21
**concludes**
395:20
**conclusion**
68:14 74:24 107:12
177:21 290:12

292:4 323:16
341:15
**conclusive**
308:11
**conclusively**
325:25
**conduct**
59:3,6,10,15 109:18
112:13
**conducted**
132:24 210:5
**conferred**
284:5 288:5 299:11
**confidential**
206:22,25 356:24
**confidentiality**
348:24 380:22
**confirm**
275:8
**confronted**
62:25
**confuse**
133:20
**confused**
272:17
**Connecticut**
78:22
**connection**
50:4 74:22 76:16
83:4 112:13 182:2
184:8 189:4 192:14
228:15 288:6
312:13,21 313:6
318:21 327:11
340:14 349:15,19
354:5,10 372:16
**cons**
330:10 331:5
**consensus**
261:12
**consider**
26:10 46:6 176:21
214:20 264:16
301:19 336:3 370:3
**consideration**
163:17 210:7 270:20

**considering**
394:10
**consistent**
337:18
**consistently**
263:17
**consolidated**
212:18
**consolidation**
192:4
**constant**
374:21
**constitutes**
359:19 361:18
**consult**
16:15
**consultancy**
39:3,11,14,25 40:3,6
108:10 109:6 115:6
115:13 116:2,12
117:5,21 122:4
285:23 286:2
304:16 308:17
396:18
**consultant**
78:20 79:15 80:23
81:12 82:6
**consultants**
321:9
**consulted**
62:6,17 64:10 360:15
362:3
**consulting**
67:22 85:8
**Cont'd**
168:15
**contact**
252:9 374:21
**contemplate**
326:4
**contemplated**
182:10
**contemplating**
321:24 329:18
340:20 341:2
**contention**



68:9 223:12
**context**
118:12 268:25 315:2
353:17 377:22
**contexts**
67:14
**continuation**
81:12,20,22
**continue**
10:16 65:4,25 66:24
248:15 297:19
323:23 380:20
**continued**
58:11 69:4,7,16
72:23,24
**continues**
264:16
**continuing**
266:2 380:22
**continuously**
343:20
**contract**
57:23 75:23 76:2,5,6
76:12 77:7,11,22
80:12,16,18,22
82:14 85:9 91:21
92:8 138:14,21
140:5 141:18 142:9
142:10,11,14,17
143:15,17,18
145:13 147:2,19
149:7,14,20 152:12
152:20 157:9,15
160:12 161:2,3,9,12
161:25 162:2 173:3
174:17 252:5,6,11
252:20 260:5
398:11,13,15,17
**contractor**
266:13
**contracts**
80:7 141:20 150:14
150:18 160:9
226:21 251:17
**contributing**
50:10

**contributions**
39:6 40:22 41:9
279:5
**control**
74:11 114:19 116:18
118:7 153:25 154:4
184:20 272:3
333:16,22 334:22
406:12
**controlled**
68:10 74:21 185:13
185:14 186:4,22
381:7
**controlling**
77:16 82:21
**convenience**
346:7
**convenient**
340:18
**conversation**
275:24 295:11
299:14 303:21
357:10 360:17
375:23 389:18
394:3
**conversations**
296:7 307:3 362:7
**conversed**
375:22
**convert**
198:4
**conveyed**
255:7
**conveying**
308:7
**Convoy**
388:12
**COO**
45:5
**cool**
226:15
**copied**
218:14 364:5
**copies**
39:24 103:22 105:6
**copy**

39:19
**copying**
252:25 253:6 400:13
**cornered**
61:7
**Corp**
1:9 389:4
**corporate**
41:4 88:21 107:22
109:12,14,23
126:20 165:21
171:24 174:21
269:24 270:11
273:14,19 279:22
281:24 332:25
339:24 346:2
375:13,18
**corporation**
78:18
**correct**
4:17 9:6 27:13 28:16
30:23 32:9,11 33:4
45:8 56:19 63:12,16
69:6 77:3 83:13
105:2 124:21
126:21 129:20
136:23,24 137:10
139:5,9 148:20,21
149:25 150:13,20
150:21 153:7
169:19 180:7
182:22 219:22
221:8 224:2 236:3
239:2 251:2 269:17
269:20 276:19
296:11 307:17
308:20 351:18
360:10 394:9 407:4
**corrected**
129:17
**correcting**
160:20
**corrections**
407:5
**correctly**
295:6 316:18 343:18

343:20
**cost**
343:3
**costs**
191:17 192:13
**counsel**
3:18 68:8,16 83:2
166:8 283:9,13
290:6 292:5 294:20
296:7 301:25
308:22 354:25
355:7 359:17 360:6
360:15,17 362:4,4,7
382:19,20 385:20
**counsel's**
295:4 302:8 307:5
355:5
**counsels**
290:3 291:22 299:6
299:15 301:23
302:7 307:3
**count**
16:21 304:6
**counted**
221:7
**counterpart**
377:19
**counting**
226:7
**countless**
309:9
**couple**
122:25 137:2 177:13
301:23
**course**
42:23 44:8 50:2,14
51:18 79:4 162:20
220:20 232:4
260:12 261:23
304:10 320:5 325:6
**court**
1:2,17 3:15 173:24
358:19
**cousin**
188:18
**cover**



cover
275:19 364:3
Covid
73:13
craftsmanships
233:21
create
49:18 204:21 205:4
206:5 296:13 376:2
383:19 394:23
created
206:20 297:21
creating
13:2 46:21 376:6
creation
49:22 280:20
credibility
260:24
credit
108:3 192:5,9
credited
276:12
creditor
198:9,19 199:4
criminal
9:21 328:11
criminals
368:24
critical
255:16 265:10
criticism
43:7
criticize
73:7
criticized
73:4
crossing
108:6
crossroad
86:20
currencies
21:8
current
4:21 192:5,7 259:23
361:19
currently

265:3 279:11 315:15
358:4 390:12
custom
178:16,16,20 285:7
customer
370:2
customers
141:7,9 232:25 372:9
372:13,15 373:3,15
376:16
CV
325:11 326:13,22
Cygler
364:3

D

D
396:3
D-E-N-K-E-R-D-O...
145:6
D.C
2:10
dad
7:11,18 9:14 10:2,25
11:11,12,19,24
dad's
11:6 12:16
daily
235:21,23 236:5,11
236:22 356:4 400:8
dance
124:12,14 125:23
129:10,11 130:10
dark
239:6
darker
121:4
dash
384:25
data
98:13
databases
355:21
date
1:16 17:11,17 71:7
102:8,13 134:8

160:15 166:9
210:21 241:5
275:13,20 315:24
344:15 350:12
374:24 375:10
407:8
dated
28:11 61:18,19 68:3
105:20 111:21
134:9,10 137:6,7
161:10 168:13,23
181:5,14 193:17
194:25 201:14,21
207:15 240:21,22
240:23 257:19
282:21 329:9
352:12 364:4
373:12 387:22
398:23 399:5,18
406:7
dates
129:19 354:20 355:3
daughter
124:15 125:6,7 189:6
356:25 357:17,18
daughter's
125:23 129:11
David
2:6 3:23
day
61:4 70:23,24 106:10
106:14 118:18
178:15 207:15
241:13 275:13
292:3 304:7 309:14
341:16 355:16
356:2,4 361:14
371:23 407:11
days
53:23 74:3 210:19
354:16 355:10,14
358:20,21
DCF
220:8
DD
333:15 334:21

De
1:8 2:14 25:13 27:13
27:16 28:2,12,15
29:6 40:25 45:10,16
46:20 51:4,17 52:7
54:4,15 55:9,11
65:18 67:6,8 68:11
74:12,15,20,22 76:6
76:16 77:16 79:24
81:11,19,22 82:2,5
82:22 83:7,12 86:14
87:21 88:20 89:12
90:11,19 91:22,25
94:9,10 95:3,10
96:17 99:17 100:6
100:13 101:21
103:7 109:24
112:14 114:15
120:2 122:9,17
124:2 125:10,14,15
125:16,17,24
126:21 127:2,10
130:23 131:2,14
136:20 141:8,9
148:9,12 149:12
150:12 151:6
152:13 153:2
156:17 157:9,22
159:10,16 165:20
169:4,8,10,12,20
170:18,23 171:2,5,6
172:9,13,14 173:5
173:17,20 176:11
176:22 178:8
195:17 203:8,14,19
204:12,13 206:20
207:17 208:13,24
212:13 213:8 220:3
221:11 224:13
227:18,25 229:7
230:3,8,18,19
231:24 232:15
234:19 235:13
237:3 239:19
240:12 242:13,16
242:21 243:12



249:11 250:11,23
251:8,10 252:18
255:8 256:20
261:10,16,19,21
262:23 268:5
269:19,24 270:4,14
270:16,18 271:10
272:25 273:4,15
277:5,9 278:17,23
279:3,6 281:9,23
283:25 284:5,10,18
285:2,9,20 286:4,22
288:6 292:9 297:6
298:11 303:11,20
304:13 307:24
308:14,24 309:6,17
309:17,23,25 311:6
311:22,23 312:8,14
312:21,22 313:7,7
321:24 327:12,16
329:18,23 333:21
333:24 334:11,18
335:3,5 336:14
340:14 341:12
342:23 343:11
345:4,10,17 346:2,4
346:20 348:19
349:4,8 350:10,19
350:24 351:5,17
353:24 359:4,11
364:10,18,21
368:12 371:14
372:10 374:14
376:2,7,12,21 379:7
380:17,24 381:6,21
381:21 382:14
390:2,6,8,13,20
391:12 392:16
393:2,5,12 394:4,16
394:22 395:3,6,6
397:10 398:18
403:21
**deal**
107:5 110:25 205:20
289:18 305:14
341:13 344:18

348:22
**dealer**
249:4
**dealers**
372:25
**dealership**
141:25
**dealing**
304:21 372:21
374:17
**dealings**
23:22,23 317:4,6
384:15 385:3 386:2
**deals**
195:23 319:25
**Dear**
181:24 374:12
**debates**
49:16,17
**debt**
197:18,25
**decades**
367:4
**December**
212:20,20 219:15
257:16,20 289:6,10
332:12,21 400:18
401:22
**December/January**
279:9
**decide**
20:11,14,18,18 24:14
24:17 178:16 320:4
**decided**
20:7 196:14 204:16
210:14,23 249:14
255:23
**deciding**
210:9
**decision**
19:20 261:8,12
375:12
**decisions**
377:18
**decked**
229:6

**deem**
135:5 197:24
**deeply**
45:19 217:13
**defeat**
249:4
**defendant**
125:20
**defendant's**
68:9
**defendants**
1:10 2:8 4:2
**define**
6:6 12:3 52:21 244:2
320:8
**defined**
72:15 79:17 82:9
193:5 244:13 291:7
**definitely**
198:2,7
**definition**
17:23 53:3 56:2
188:19
**definitions**
53:11 373:23
**definitive**
38:25
**definitively**
341:9 366:8 367:9
381:12,13
**degree**
5:12
**degrees**
5:16
**delay**
200:18
**delays**
248:18
**delete**
346:14,18 347:14,19
347:25 352:16,21
353:7,11,21
**deleted**
346:19 354:10
**deleting**
347:5

**deletion**
354:4
**deliver**
139:22 141:11,14
196:8,17,20 255:2
**deliverables**
309:12
**delivered**
140:2 142:5 210:15
210:25 227:23
251:3 263:17
**delivering**
210:9
**delivery**
143:13 211:16
**Deloitte**
181:4,8,8,10,12,14
181:24 399:5
**denied**
284:3,4
**Denkerdorf**
145:6
**denominations**
128:9
**deny**
67:18,19 83:14 94:2
94:3 284:2 311:8
361:11
**denying**
76:14
**departure**
365:7,10,16 391:5
**departures**
364:25
**depending**
42:8 102:24 209:8,9
214:6 310:6
**depends**
178:15 235:15
272:10
**depicts**
239:2
**DEPONENT**
407:2
**deposed**
4:13



deposing
217:14
deposition
1:14 3:5,10 4:16
   48:13 98:24 172:21
   217:7 218:17,22
   258:11 284:4
   395:21 405:3 406:4
depreciated
209:12,21
derivative
10:9
derivatives
214:18
describe
8:3 19:4 38:23 39:6
   50:18 208:3
described
299:9
deserve
40:18
design
33:23,25 48:7,10,12
   48:14,22,23 49:5,7
   49:9,12,13,16 50:10
   50:13 54:25 233:9
   233:11 263:3 264:5
designated
34:12 136:9 195:21
designed
263:19
designer
43:25 44:6 191:17
   192:14 262:23
designers
43:18,22
designing
192:22
designs
263:6
despite
73:22 121:24 179:10
   189:11
details
112:23 179:22
   180:18 328:19

370:19
determine
75:24 145:5
determined
287:8
determines
135:2
Detroit
249:6
develop
34:7 202:6 250:24
developed
37:9 257:3,9
developing
34:2,17,24 35:9
   254:9
development
34:5 202:17 253:24
   343:3
Diana
2:14 4:4 78:7 91:4
   113:22 138:4
   171:24 172:2,21
   191:13 256:2
   258:19,23 271:19
   307:16 324:13
   342:18 343:6
   350:13 390:18
   400:22
Diana's
78:10
Diego
5:8,10,15,19
difference
49:10
differences
44:9 209:11
different
52:13 68:25 93:16
   129:23 134:8
   136:22 148:17,18
   154:20 179:15
   188:20 204:17,19
   212:16,23 214:9
   227:23 232:19
   256:18 258:16

291:22 292:21
299:15 302:4,4
308:2 315:17 322:4
325:25 326:3
331:16 334:10
339:13 344:12
354:3 373:2,23
394:10
differently
253:18
difficult
249:8
digital
106:20 262:20,22
   263:22 264:5
diligence
79:5 181:19,25
   182:23 254:3
   260:23 333:20
   334:16,21
diligently
110:10
dilution
393:9
direct
60:17 84:16 88:9
   119:15 180:24
   187:18 193:20
   197:13 252:13
   276:5 318:8 319:19
   406:12
directed
113:21 126:4 131:7
   132:5
direction
204:17 283:9
directly
50:21 126:8,11
   131:24 132:16
   304:23 374:17
director
33:9,15 34:20 192:7
   272:4,19 273:14,19
   279:20 316:9
   388:23
directors

31:17 187:3,10 192:2
   201:7
disagree
48:15,18,20 92:21,22
   92:24 97:19 116:5
   147:8 249:23 250:5
   256:12 265:24
   303:14,15 360:18
   378:3,9
disagreed
250:7
disagreement
71:16,21 250:7,9
   256:5
disappointed
368:18
disclose
349:4 354:15
disclosed
388:6
disclosure
216:7
disclosures
278:23
discount
153:9,12 163:24
   164:2 175:14
   220:19
discounted
153:17
discovery
25:23
discretion
16:9 355:6
discuss
55:16 283:6 286:16
   307:17 371:7 392:4
   392:9,13 393:8
discussed
149:24 269:2 298:16
   308:6 385:19
   393:15,23 394:4,11
   394:20
discusses
387:19
discussing



114:14,25 120:11
173:10 287:18
331:16 335:22
**discussion**
66:16,17 191:13
248:21 265:4
283:24 286:8,11
290:11 292:22
299:6 306:12 308:7
342:17 401:20
**discussions**
259:8 290:6 291:22
291:24 307:23
**disillusioned**
112:5
**dislike**
226:12,17
**disloyal**
46:24,25
**display**
144:12 145:20
146:15,22 319:24
**displayed**
146:19
**dispute**
58:18,24 59:2,9
**disputes**
58:14
**disputing**
153:22
**dissatisfied**
263:8
**disseminated**
360:12
**distinction**
179:18
**distinguish**
170:10
**distinguishes**
128:12
**distribute**
39:24
**distribution**
387:5,19
**distributor**
304:13

**DISTRICT**
1:2,3
**document**
25:22 26:13 28:19,23
28:24 29:8,20 30:2
60:9,17 64:19 83:22
88:2 89:11,13,16,20
90:6,18 93:17 95:2
95:5,10,23 96:11,12
96:17 99:8 100:23
111:12 115:25
118:17 122:10,17
127:5 129:21,24
130:5 136:16
138:17 140:9,10
151:23 152:10
163:4 166:14
168:17,20 169:6,11
169:12 170:5 171:3
171:9 174:7 175:4
178:4,24 180:2,22
180:25 181:4,7,13
182:24 183:5
193:11 195:13,16
207:11 217:8,10
219:20,23 237:15
243:5 258:5,17
262:6,8 266:17
268:13,19 269:8,10
275:5 278:9 279:4
282:12 283:12
287:5 299:24
302:11 318:4,15
328:23 336:17
338:21 358:25
359:7 366:13 377:6
377:9 379:18
383:11 396:23
397:6,8,10 398:5,7
398:9 399:5,13
401:8,10,16 402:8
402:17 404:7,14,16
404:17
**documentary**
156:7
**documentation**

133:18 151:19 253:8
271:17
**documents**
21:9 111:17 154:14
162:18 168:25
207:8 217:12,17
219:10 226:9 256:3
267:24 273:19
309:21 318:25
363:14 384:8
397:19 399:22
400:6 405:5
**doing**
10:8 12:12 14:24
18:16,23 19:6 34:11
36:9 52:3 57:21
174:2 222:4 260:23
286:22 301:4
315:15 319:22
340:20 341:2 344:8
344:18,23 353:15
**dollar**
249:6 250:19,20
277:17
**dollars**
7:6,11 16:3,6 21:10
21:11 79:16 123:5
127:24,25 128:6,6
128:11 199:22
200:5,8 226:6
252:14 269:19
279:6 338:5 374:5
**dot**
62:20,20,21
**double**
35:2,4,17 105:3
312:18
**doubt**
162:8 324:23
**draft**
29:22 80:16 181:18
181:25 220:9 381:4
**drafted**
41:12 76:3 359:16
360:11 364:18,21
382:18,20,24,25

**drawings**
263:11
**Dream**
127:17 128:14 282:2
386:9,11,13,18
**drive**
142:2,3,5 144:4
146:8,15 233:4
**driven**
54:5 146:18
**driver**
224:3,8,11
**driving**
144:5
**drop**
351:9
**drove**
54:15 232:21 237:6
**DT**
29:4,13 64:24 65:5
65:11 83:23 84:2
88:3,5 89:17 111:15
111:16,18,18
122:11 127:6
136:17 158:13
159:24 163:6
195:14 207:9,12
219:8,11,11,20
220:6 221:2,19
265:6 276:8 299:25
335:9,20 363:21,24
364:2 377:7,10
395:12,13,13,14,15
395:18 396:24
397:7,9,20,21 398:6
398:8,10 399:14,23
400:7,7 402:9
403:24 404:6,15
**due**
79:5 140:15 175:25
181:19,25 182:23
192:3 260:23
276:11 333:20
334:16,21 359:22
361:8,20 365:11,16
**duly**



4:6 406:4
**duration**
39:15
**Düsseldorf**
87:16
**duties**
50:18
**duty**
103:12,16
**dwell**
313:18

—————————
**E**
**E**
168:2,2 396:3,11
397:3 398:2 399:2
400:2 401:2 402:2
403:2 404:2 408:2
**earlier**
67:23 68:7 102:11
108:10 113:19
114:9 173:13
175:11 179:24
180:3 182:19 213:7
213:23 233:24
248:6 266:20
283:24 287:18
309:16,25 316:15
323:18 335:13
384:18
**early**
23:5 112:21 113:2,10
315:25 326:21
332:12,21
**earn**
18:23
**easier**
333:16,22 334:22
**easily**
120:14 121:15
**easy**
375:11
**Ecclestone**
235:4,6 237:17 238:2
238:23
**Economy**

388:20,23
**Eddie**
139:15 188:5,5,22
189:5 196:12
**edit**
221:8
**Edith**
123:4,11 133:8 134:4
**educated**
233:2
**eight**
163:19
**either**
41:20 64:3 69:12
82:20 96:5 144:16
156:12 164:14
258:6 278:15
335:18 356:18
**Ellison**
124:23
**email**
25:18,24 28:11 35:25
36:22 190:25 191:7
216:24 217:2,3
218:2,11 252:24
253:3 257:17,19,25
258:18,22 259:2,6
260:10 274:14
293:3,6 300:10
306:19 307:10
310:24 336:23
337:3,7,13 338:22
338:25 339:8,17
340:9,10,14 345:4
345:14,17 346:4
347:5 348:6,9 359:9
359:19 361:18
363:15,18,20 364:3
364:9,15 366:17,17
367:14,18 368:16
396:14 399:7 400:5
400:12,18,21 403:7
403:10,13,23
**emailed**
340:13
**emailing**

345:21 349:14
**emails**
218:14,15 264:20
267:16 290:11
300:25 302:3
345:22,24 347:15
347:20,25 348:15
352:16,21,24 353:7
353:10,11,16,22
354:5,10
**emoji**
247:22,23
**Emozione**
81:6
**employed**
349:8 350:10 390:6
**employee**
107:10 285:6 291:12
292:13 305:3,9,10
305:18 389:23
390:2 394:12,12,23
**employees**
75:14 347:13 390:5
390:12,12,19 391:9
395:2
**employer**
36:23 50:25
**employment**
68:10 72:12 91:21
92:8 93:22 120:2
285:6
**enclose**
181:24
**endearment**
188:23,24
**endeavors**
365:12
**ended**
57:23 376:6
**ends**
29:13
**enforcement**
328:4
**engage**
296:20 329:11
**engaged**

334:5 341:10 386:17
**engagement**
120:15,18 121:11
182:5 376:5
**engine**
253:12
**engineering**
233:21 265:4
**England**
368:20
**Enquirer**
236:9,10
**enrich**
65:5,10
**Enron**
386:12,13
**ensure**
89:6 343:23
**enter**
255:13 381:7
**entered**
75:14 76:15 83:5
226:20 254:12
285:24 379:8,23
**entering**
203:8
**entire**
56:12 57:4 162:14
197:18 202:25
**entities**
13:2 30:20 33:7
176:23 182:16
183:14 184:16
186:13 187:3,10
201:7 327:20
**entitled**
95:2,10 195:16
397:10
**entity**
30:22,25 32:7 33:16
78:25 136:22 139:7
184:9,20 186:21
192:21 194:17
202:14 269:2
270:11 273:14
281:8,24 290:14



297:21 298:3,4
301:16 303:7
309:18,24 332:25
341:13 351:6 381:7
386:9,16,21 387:6
387:18 388:3,8,12
**entry**
124:18 129:14
130:20 131:5
**equals**
26:24 27:8,8,9
**equities**
15:11
**equity**
10:9 197:18,25 273:5
284:5,9,15,17 285:2
285:11,19 288:5
289:24 291:17,25
292:9,16 294:22
295:24 296:8,13
297:7 298:12,25
299:10 300:20
301:12,20 306:23
307:23 308:8
389:16 391:12,15
391:20,23 392:2,6
392:10,15,21 393:2
393:6,10,12,17,23
394:13 395:3
**Eric**
61:6,13,14 65:3
**Errata**
407:6
**espionage**
328:16
**Esquire**
2:5,6,6,10,11,11
236:8
**essential**
76:3 322:22
**essentially**
87:3 171:18
**established**
221:13 305:10
**estate**
8:10,11 9:8 11:7

23:15 24:24 123:8
123:11 124:2
**estates**
8:9
**estimate**
6:16 7:16 10:19
17:12 18:3
**et**
3:6 307:12
**Euro**
128:10 150:23 151:7
151:12 153:16
158:15 159:15
163:10,14,18 173:6
174:3 208:13
**Europe**
137:16 201:16 202:3
399:21
**Euros**
67:15 153:23 156:18
174:14,16 175:22
177:3 179:11,13
208:25 209:13,21
380:4,14,18 383:3
**evaluate**
296:21
**Evan**
364:3
**event**
155:21 228:16,20,25
234:25 237:2,3,5
238:22
**events**
230:20 234:22 382:9
**eventual**
133:25
**eventually**
51:25 52:2 55:21
149:12 342:2
**everybody**
39:21 99:23 311:20
**everyone's**
46:11
**evidence**
156:7 166:9 284:13
379:11

**ex-company**
143:12
**ex-employer**
163:18
**exact**
41:3 59:5 175:8
304:7 352:4 374:24
375:10 382:9
**exactly**
15:10,25 39:12 41:2
63:25 66:10,22 69:9
77:19 101:3 102:8
102:13 110:8
117:17 153:4
158:24 163:19
164:16 171:8
174:20,25 175:8
177:6,16 179:24
180:18 186:25
199:6,11 200:6,21
214:13 227:15
271:25 278:5 281:5
288:9 323:17 326:9
333:5 334:24
335:11 340:23
341:10 350:12
356:11 364:14
371:11,17 375:22
382:24
**exaggerated**
377:16
**EXAMINATION**
4:9 168:15 389:12
**examined**
4:7
**examiner**
53:9
**example**
54:4 88:24
**examples**
126:14
**Excel**
89:23
**excellent**
46:4
**excerpt**

89:11 127:4 318:2
**excerpts**
122:7 376:24
**exchange**
31:21 56:18,22 57:2
60:6,10,18 104:10
104:12 105:19,23
111:20 117:12,21
118:16 119:7,10
156:25 157:3
193:13,16 197:2,4,9
219:14 246:13,15
262:3,9 293:11,15
293:17 300:3
302:16,18 313:13
313:15,19 318:7
319:13,15,17 327:5
333:2 338:5 342:3
342:10 396:20
397:14,17,23
398:20 399:11,16
400:11 401:6 402:6
402:11,15,20
**exchanges**
307:10 370:6,9
404:10
**exclusively**
252:18
**excuse**
23:16 58:6 67:9
130:15 136:20
172:25 200:12
236:16 309:20
**executed**
145:14 147:20 206:8
380:9 383:11,14
404:17
**execution**
175:10
**exercise**
287:6 392:14
**exercised**
277:10
**exercising**
393:16
**exhaust**



24:3
**exhibit**
25:18 28:20 30:6
40:3 60:5 64:21
77:21,24 79:10
83:22 88:2 89:16
94:24 95:2 104:11
105:22 111:17
119:6 122:10 127:5
136:16 138:14
140:5 149:14
152:12 156:24
168:12 181:4
190:24 193:12
195:13 197:3
201:14 207:8 212:3
216:24 217:6
219:10,21 235:21
241:17 246:4,12
252:24 254:15
257:16 258:18
262:2 266:17 269:8
274:3 275:21 278:9
282:14 286:8 289:5
289:6 293:14
299:24 302:15
305:22 313:14
318:4 319:14 329:5
331:25 336:23
338:22 348:6 350:4
352:8 359:3 363:20
363:23 365:22
366:13 370:5 373:8
377:6 379:18
383:11 384:20
387:9,14 395:12,12
396:13,14,16,18,19
396:22,23 397:5,6,8
397:10,13,16,19,22
398:4,5,7,9,11,13
398:15,17,19,22
399:4,5,7,10,13,15
399:18,22,24 400:4
400:5,6,8,9,10,12
400:15,18,21 401:4
401:5,8,10,11,14,16

401:18,20,22 402:4
402:5,8,10,13,15,17
402:19,22 403:4,5,7
403:10,13,15,17,20
403:23 404:4,5,7,9
404:12,14,16,17,19
404:20
**exhibitions**
70:10 72:7
**exhibits**
395:11
**existing**
78:18 197:25 329:14
**expect**
240:4,5 304:11,15
358:5
**expectation**
74:4 110:19 280:25
**expected**
43:9 70:11 337:18
**expense**
99:17 100:6,10,12
101:7,20 102:16
103:7 106:24 107:5
107:9 108:11,25
109:3 114:20 115:2
115:15 116:2,19
117:13 118:8
120:20 121:19
310:22
**expenses**
99:5,12,21 100:19,24
102:25 103:3,17
106:5 107:16,18
108:2 110:12,21
111:4 113:14 114:3
114:5,6,14,16,25
119:17 120:11,13
120:14 121:12,13
121:14,16 123:2
132:13,18 137:5
191:17 192:13
343:7
**experience**
323:12
**experiences**

113:9
**expert**
215:8 298:10
**expires**
407:12
**explain**
52:18 179:18 211:24
371:6
**explained**
108:5
**explanation**
231:13
**explicitly**
100:16 108:11
165:10
**explored**
52:16
**exploring**
52:13
**expressed**
50:6
**expresses**
46:9
**expressly**
61:4
**extended**
131:9
**extent**
172:20 364:12
**external**
321:11
**extreme**
49:4
**eye**
211:15
**eyes**
278:14

_____
**F**
_____
**F**
168:2 235:7,8
**F-R-I-T-Z**
44:20
**face**
264:11
**faced**

249:11
**facilities**
256:20 270:22,24,25
**facility**
282:8
**fact**
15:12 33:3 55:11
65:8 67:5,9 86:13
88:16 94:14,18,19
100:5 101:6,12
116:11 135:21
143:12 161:25
162:3 215:24
233:18 260:13
277:4 281:8 294:21
301:11 308:6 312:8
312:14 332:19
342:5 349:4 374:22
376:6,11
**factory**
143:23,24 148:4,6,12
148:16,17,18,19
**facts**
245:14 248:14
284:12 335:2
**factual**
256:7 282:4
**Fagin**
1:17 3:16 406:6
**failure**
73:5
**fair**
7:5,10 24:22 27:20
35:16 36:19 37:8
41:24 50:9 53:22
54:24 69:15 79:6
81:13 112:10 113:7
125:18 164:24
172:2 176:15 178:6
205:8 211:11 218:6
220:13 225:12
229:22 273:12
275:7,8 277:18
297:25 316:22
317:5 318:22,23
319:3 322:5 323:22



329:23 333:5
335:25 354:22
361:4 364:16
365:25 366:2
373:24
**fairly**
120:8
**faith**
82:7
**familiar**
37:2 52:23
**families**
13:19 16:13
**family**
12:13,14,25 13:5,12
14:6,17 15:16,21
16:16 22:12,15
23:17 36:11 38:2
86:19 129:3,7
132:17 310:19
357:9,21,24 358:2
**family's**
14:3 15:17 16:19,23
17:3,10,13,20 18:6
18:12,15,19,22 19:8
19:12 24:14
**famous**
37:3 235:11 238:17
**fan**
238:12
**fantasy**
260:13
**far**
5:3 8:16 108:9 109:6
142:14 143:15
145:23,24 146:25
147:19 163:16
207:3,4 211:15
232:10 281:15
308:20 335:25
380:6
**farms**
12:25 13:15,18
**Fat**
339:8 340:5 342:16
348:7,10 403:13

**father**
5:20 6:4,13 7:6 8:7
8:14 9:2,16 10:17
10:20 11:16 16:11
16:14 86:20 235:7,8
**father's**
6:17 10:15
**fault**
35:17,18
**favor**
87:4 183:16,22,24
184:19 185:9
**featured**
240:10
**February**
25:7 35:21 84:24
85:8 111:22 112:4
112:12 113:6
157:16,18,24 158:2
159:14 170:15,17
173:2 217:4 241:6,7
241:7,9,12 246:12
246:15 274:3,7
305:22 306:2 352:8
352:12 400:10
401:11 402:13
403:17
**fed**
106:18
**Federal**
215:13
**fee**
79:15,17 80:23,24
81:5 85:9,10 86:3
191:18 227:10
380:3
**feel**
39:13 90:6 180:25
189:12 215:2,3
225:21 253:21
**fees**
192:14 251:16
350:15,19,23
351:13
**feet**
8:17

**female**
223:20,21 244:24
245:8
**fender**
49:13
**fiduciary**
103:12,16
**field**
249:24
**Fifteen**
130:14
**Fifth**
62:20
**figure**
356:24 358:18 366:6
**figures**
342:19,23 343:11
**file**
89:23,25
**filed**
226:19 338:18
**filing**
338:15,18 387:14,17
404:20
**Filled**
405:13
**final**
292:4
**Finally**
245:8 368:18
**finance**
45:10 108:24,24
214:16 220:16
**finances**
108:21,21 109:23,24
155:15
**financial**
27:16 75:13 88:25
89:7 141:5 165:12
181:18,25 212:19
214:21 215:4
278:16 280:21
316:20 317:4 334:8
339:6 343:11,18
348:19 388:8,12,17
389:3

**financials**
221:3
**financing**
322:4 329:19 330:2
334:11
**find**
191:14 195:10
237:15 297:22
306:19 310:15,16
382:22,23
**fine**
18:10 53:10 114:12
218:5 283:14
382:11
**fines**
9:24
**finish**
266:3,5,8,13 309:13
311:18
**finished**
12:4 310:9
**fire**
262:14,24 375:17
**fired**
119:21
**firm**
89:4 110:17,17,18
132:25 181:9
205:13,17 206:5
220:15,17 362:20
362:25
**firms**
296:21 362:22 363:5
**first**
5:18 15:23 20:24
25:5 30:10 35:19
36:5 37:9 40:21
47:18 51:3 55:16
60:9 62:2 78:15
88:10 93:14 94:6
95:9,22 100:3
112:25 127:16
130:14 153:5
158:14 180:23
197:16 202:4 210:2
210:10,15,25 220:9



224:15,25 227:14
231:2,3 233:14
252:22 253:22
254:9 262:16
266:24 275:12,13
275:14 314:19
319:20 331:19
332:9 333:17
343:17 344:3
351:25 363:17
367:14,15 376:12
376:14 377:21
378:11 389:23
390:2
**fiscal**
187:20
**fish**
248:2
**fit**
269:23
**five**
14:12 103:23 161:20
**five-minute**
59:21 384:3
**flag**
62:3 63:23 64:5
110:22 132:23
**flex**
95:17
**Flexner**
1:15 2:3 3:11,13
**flip**
90:7 115:10 259:11
**flipping**
237:2
**flow**
342:19
**focus**
15:7 111:25 158:5
206:17 273:15
**focused**
265:3
**folks**
203:24 234:11
239:14
**follow**

68:23 153:4 344:6
**follow-up**
376:20
**followed**
145:12
**follows**
4:8 168:5 312:7
**font**
84:14 280:6
**Ford**
27:8
**forecast**
343:18
**forecasts**
339:7 343:24 348:19
**foregoing**
406:10 407:3
**foresee**
50:16
**forget**
202:6
**form**
6:10,18 7:8,13 8:4,8
8:15 9:19 11:20
13:13,16,20 14:8,13
15:9 16:12,20 17:5
17:22 18:25 20:9,13
20:21 21:5,15,24
22:11,16 24:11,19
24:25 27:18 32:3,10
32:18,24 33:5,11,17
33:22 34:3,9,14,18
35:24 36:7 37:11,17
37:25 38:6,10,20,24
39:9 40:12,24 41:11
41:17 42:7,14,20
43:2,10 44:3,12
45:13,17,21,24 46:5
46:16,22 47:5 48:25
49:20,25 50:7,12,19
51:21,24 52:12,25
54:7,16,22 55:13,18
57:11 58:16,23 59:4
59:11,17 63:3,9,24
64:7,12 65:12,16,22
66:15,19 67:7,16

68:13 69:17,24
70:22 71:19 72:14
72:25 73:14,24 74:7
74:14,23 75:25
76:18,21 77:9,18
79:25 80:9,13,20
81:3,24 82:15,23
85:22 86:6,16 87:8
87:13,22 88:17,22
89:8 90:13,16 91:10
91:19,23 92:9,19,25
93:4,7,11,23 94:16
94:22 95:21,25 96:9
97:12,21 98:3,14
99:7,14 100:14,25
101:8,15,22 102:4
102:12,21 103:19
107:11,24 108:23
110:2,14,23 111:9
112:7 115:4,16
116:4 117:16 118:9
119:23 120:4 121:8
121:20 122:2
123:14,17 124:3,16
125:8,13 126:3,22
129:4 130:12 131:3
132:2,14,19 135:19
137:22 139:24
141:23 142:7
143:20 144:2,6
145:21 146:24
147:7,11,15 148:14
148:24 149:11
152:5 153:10,12,19
154:11,24 155:13
155:17 156:9,14
158:22 159:12,18
160:5,11 162:4,15
162:25 163:25
164:15,20 165:9,14
165:18,23 166:4,12
169:22 171:7
172:11 174:19
175:16,23 176:6,12
177:5,20 178:3,14
178:21 179:2,8,14

180:8,11,13 183:3
183:25 184:13,21
185:2,10,21 186:6
186:11 187:5,12
189:15,22 190:5,14
190:18 192:16,24
193:4 194:19
195:25 196:4
198:23 199:5,10,15
199:19,24 201:9
203:16,22 204:2,6
205:6,11,15,19
206:6,11,21 208:23
209:2,15,23 210:11
210:16 211:2,13,19
214:5,12,17,22,25
215:6,18 216:6
222:6,11,15,22
223:23 224:4,9,17
225:23 226:11,16
226:22,25 227:8,13
227:20 228:2,22
229:8,14 230:5,10
231:5 232:3 233:7
234:12,20 236:13
236:23 238:14,20
240:13,19 242:7,22
243:14,23 244:3,17
246:2 247:8 248:13
248:20 249:16
251:13,20,24
252:15 253:15
254:11 255:11,18
256:11,15 257:5
260:21 261:11
265:23 266:4,10
267:12,18,23 268:7
268:15,21 269:25
270:8,15 271:24
272:5,9,16 273:7
275:4 276:18 277:7
278:4 279:18,24
280:22 281:4 282:6
284:11,16,17 285:3
285:21 287:19
288:8,14,19 289:2



289:25 290:22
291:12,19 292:10
294:24 296:2 297:2
297:18 298:5,9,14
299:3,12 300:21
301:8,13,17,21
303:13 304:14
305:6,16 307:25
308:9,15 309:3,7,19
310:3 311:10
312:10 313:9
315:23 316:4,12,23
317:11,13,16 319:6
320:14 322:2,10,17
322:24 323:10,15
325:2,19,23 326:6
327:6,14,22 328:8
328:18 330:4
331:20 333:4,23
334:12 335:4,24
336:7,15 338:12
339:15,21 340:2,6
340:16,22 341:23
342:11 344:5,10,20
345:2,23 346:6,11
346:16 347:2,7,11
347:16,21 348:2
349:16,21 350:21
351:8,14 352:3,22
353:3,8,13,18,25
354:7,12,23 355:22
356:3 357:3 358:7
358:15 360:4,14,25
361:13 362:2,10,15
364:11 367:8 369:2
369:10,14,20 371:9
371:16 372:11,17
372:23 373:5,21
374:10,19 375:19
376:8,13 377:3
378:5,15,20 381:3
381:11,25 382:7,15
387:7 388:5,14,24
389:5 393:24 395:7
407:5
**formal**

85:9 99:17,19 100:23
101:6,20 107:4,8
116:2 121:6,19
273:18 359:19
361:18
**formalities**
109:13
**formality**
107:21 109:15
279:22
**formalize**
120:20
**formalized**
305:17
**former**
328:3
**forms**
297:9 299:4,8
**forth**
39:14 80:12 134:20
273:18
**forward**
318:12 337:3 368:8
**forwarded**
217:21 257:17,20
368:5,17 400:19
**forwarding**
257:24 259:2,7 300:9
337:7 339:19
**forwards**
336:24 403:8
**found**
42:23
**foundation**
96:13 124:24 125:3
125:11 284:12
**founder**
235:9
**four**
30:7 95:13 291:3
391:6,8
**fourth**
31:2,6 57:24 62:16
70:25 71:12 123:3
279:7
**frame**

157:14 160:14
**framed**
43:3
**France**
137:17
**Frank**
363:7 367:19
**fraud**
62:8 63:23 64:11,14
**free**
74:3 90:6 180:25
**friend**
22:6,7 26:4 34:10,11
34:17 42:9 47:4
51:9,10 193:6,7
196:12 315:7
368:14 370:3
**friendly**
34:23 35:8 37:15
**friends**
26:9 37:24 62:7
64:11 330:11,21
376:17
**friendship**
37:10
**Fritz**
44:19
**front**
49:12 78:14 104:16
129:22 201:18
240:17,25 263:12
278:25 324:3,18
326:5,10
**frustrated**
161:23 252:12
**full**
16:9 180:25
**fully**
203:17 257:3
**fun**
267:16
**function**
230:12
**functions**
230:9,11,13,24
330:11

**fund**
66:2,25 86:21 129:5
282:3 333:10
388:20,23
**fundamental**
233:9
**funders**
332:15
**funding**
122:20 198:10,20
199:7,18
**fundraise**
294:10 296:23 297:4
**funds**
58:21 65:5,10,21
66:6,14,18 67:3,6
67:10 129:2,3,7
198:21 334:14
**funeral**
367:11
**funny**
132:9 265:15
**further**
124:22 179:22 325:7
330:11 395:9
**future**
18:9 41:8 55:6 81:7
82:5 277:2 358:8
365:12
**FY**
187:20
**FYI**
294:9

---

**G**

**G-L-I-C-K-E-N-H...**
37:7
**G-U-M-P-E-R-T**
20:5
**G&A**
343:7
**Gabriel**
315:7 319:11
**gain**
289:18 294:2
**gained**



**234:18**

**gains**
295:19,24

**gay**
267:17 268:6,22
313:24

**GCA**
220:7,12,14

**gear**
242:6

**Gemini**
27:9

**general**
34:7 41:4 43:13,18
43:19 44:10 80:14
88:24 99:22 100:11
103:14 127:2,11
131:18 132:24
136:19,20 165:20
203:23 230:14
232:25 259:12
270:22,24 271:6,22
273:2 291:4,8
297:12,14 298:2,3,6
310:10,24 316:24
372:24

**generally**
33:13 37:13 114:7
297:5 323:24
372:20

**generating**
239:24,25

**Genesis**
1:9 315:19,22 316:3
318:21 341:25
344:3,9,14,19
349:10,20 350:20
353:23

**Geri**
238:9

**Germany**
141:15 142:5 143:8
144:19 145:4
147:12,21,25 148:2
148:4,15 248:25
303:22

**getting**
12:2 106:18 160:25
267:11 362:17
392:2

**gift**
289:18 293:25
295:18 389:16

**girl**
238:23 267:14

**girlfriend**
267:11

**Girls**
238:12,17

**give**
6:25 48:6 72:3 75:19
77:23 80:2 87:2
94:15 120:14
121:15 145:3,19
166:17 172:2,22
222:2 243:3 258:16
263:15 268:11
278:12 289:16
290:18,20 291:16
292:8 318:2 323:20
378:2

**given**
143:19,22,25 259:22
277:5 292:4 294:20
305:5 348:23 356:2
356:4 376:15 406:5
407:4

**gives**
247:22

**giving**
254:10 284:15 290:3
306:13

**glad**
281:10

**Glastonbury**
78:21

**Glickenhaus**
37:6

**global**
95:3,11 96:18 182:3
182:11,15 184:5,12
184:25 186:10,14

**186:17 195:17**
302:25 388:13
397:11

**Glory**
387:2,6,15,18 388:4
404:21

**Gmail**
339:13,24 340:3,5
345:3,7,25 346:13
348:12,16 352:25
353:16

**Gmails**
344:24

**go**
5:3 10:4,7 11:10 12:8
14:14 36:24 67:20
70:8,13 72:5 74:18
75:23 76:19 94:5
100:15 105:8
112:23 118:22
124:6,9 128:3 133:6
134:2 141:25 148:8
165:21 166:3 170:9
173:8 190:21 196:6
196:7 204:16,22
210:8 211:7 231:17
233:8 239:7 252:3
255:24 265:13
283:3,15 290:6,8
296:6 304:21
314:12 328:19
341:18 357:2 358:9
358:13 360:16
362:6 363:14
366:10 367:16,25
370:18 371:25
372:3 375:11
380:12,20

**goes**
124:15 233:12
264:24 384:17

**going**
52:4 59:19,22 83:20
103:24 105:4,10
108:13 111:13
116:8 118:2 120:12

**122:3 124:22**
126:11 130:7 134:6
136:14 150:17
155:22 156:22
163:3 165:16
166:22 168:10
169:7 170:15
172:21 173:15
178:19 179:6
190:21 194:15
196:25 197:14
202:2,14 207:6
217:16,25 221:13
223:6 228:12
257:14 260:10
261:17 262:14
264:19 266:15
273:25 274:10
275:16 282:25
283:18 290:11,13
299:23 305:13
311:19 313:12
314:14 323:18
341:21 367:25
370:4 380:10 384:9
386:5

**golf**
317:9,10,12,14,21

**golfer**
317:20

**good**
3:2 4:11,12 82:7
109:17 164:8,18
165:2 206:7 278:14
302:23 304:12
309:14 317:20
330:21 356:17
369:13 370:10,15

**goods**
75:19

**gossip**
235:25

**gotten**
316:14 370:11

**governed**
100:23



governs
286:3
graduate
5:6,9
graduated
5:14
graduating
5:19
grand
117:25 232:23 295:2
grandfather
19:19
grant
295:24 296:12
307:18 310:17
granted
296:14
granting
305:3 306:7 307:23
gray
130:21
great
202:15 203:7 365:9
Greater
386:23
green
232:23
grew
303:17
ground
43:19 44:18
group
183:7 237:24 277:2
359:21 361:20
grow
4:25 112:5
growing
5:4 13:8,22 19:18
22:18 113:6
guess
24:7 29:19 34:6
188:17 205:20
315:16 318:15
341:15 363:10
382:2
guidance

215:15
Gumpert
20:6,12 21:4,17 28:5
29:17 387:20
guy
300:15 301:2,7 369:9
369:13
guys
106:4 113:14 114:13
218:5 219:4 237:15
267:7 300:24
317:12 349:2

_____ H _____

H
4:5 168:4 396:11
397:3 398:2 399:2
400:2 401:2 402:2
403:2 404:2
haircut
108:4
half
57:25 153:15 174:14
175:22 177:3
179:13
HAMPTON
2:8
hand
147:9,13
handed
30:11 144:20,23
147:5
handful
234:7
handicap
317:15
handing
25:16 60:3 104:5
handle
187:7
Hang
217:5 231:14 285:14
365:20
Hannah
2:11 4:2
happen

245:22
happened
36:21 42:24 155:24
160:4 171:11,12
204:4
happening
126:15 231:21,21
happy
218:18 244:23 245:5
245:22 331:4
hard
266:25 267:10 309:8
316:13 371:10
Harvey
369:19
head
112:20
headcount
90:2 343:7
headline
134:11
health
379:13 388:9
heard
51:17 53:14,17
224:23 256:8 309:8
369:4 385:16,20
heart
267:2
held
1:14 9:3 96:17
191:14 392:15
helmet
230:22
help
19:3 41:16 57:18
107:5 199:22
349:17
helped
34:17
helpful
327:2
helping
33:21 34:7 225:8
227:18 348:21
Henry

187:22 188:11,14
heritage
81:23 208:5
hero
37:4
Hi
191:13 294:8
hide
293:6
hiding
260:2
high
26:4 99:6,12 214:16
281:16
higher
287:8
highly
265:10
hiking
36:17
Hin
1:9 339:22
hinweng@gmail
339:18
hinweng@gmail.co...
337:8
hired
40:15,22 41:7 55:11
206:9 351:17 352:2
375:25
hiring
203:24 261:22
history
214:15 260:15
368:25
hits
234:23
Hold
172:12 221:17
328:24
holding
32:13 128:22 186:5
238:7
holdings
1:8 11:7 31:20 32:2
32:17,21 169:13


MAGNA
LEGAL SERVICES

170:24 201:16
202:3 387:6,15,18
388:13,17 399:20
404:21
**home**
123:13 358:11
**Hong**
4:22,23 5:2 6:2,3,5
8:14 9:17 21:10
22:8,12 23:8,18,19
23:20 26:24 32:12
51:9,10 56:15,16,18
56:22,24 57:2 61:16
69:3 70:6,8 71:18
72:5 73:5,19,22
74:10 78:19 127:23
127:25 128:6
133:13 136:21
139:20 182:18
191:19,22 192:6,6,7
192:8 277:16 315:9
356:7 357:23,24
358:3,10,11,14
**hoping**
47:8
**Horner**
238:6
**hotel**
74:2 106:8
**hour**
59:20
**hours**
34:16 248:21 309:6,9
309:10 342:18
**Hudson**
1:15 2:4 3:11 123:13
123:18
**Hugo**
245:24 246:7,9 247:5
247:6,11,22
**huh**
62:19
**Huh-huh**
197:8
**human**
46:8

**humble**
320:3
**hundred**
287:15 307:4,6 338:5
380:17 383:3
**hundreds**
13:21 302:2
**Hunter**
300:25
**husband's**
331:12
**HWA**
44:17 266:13
**Hyper**
339:6 349:3

---

## I

**iconic**
37:3
**idea**
50:14 55:4 98:11
206:7 210:24 231:3
264:19 288:17
324:2,18 369:17
**Ideal**
30:21 169:16,17,21
170:23 171:4,6,15
172:10,15 173:16
176:10,16,17 178:9
183:12 184:15
191:19 192:2,8,21
201:15,25 202:13
207:16 208:16
273:3 282:2 379:20
379:23 380:13
399:19
**ideas**
50:11 52:9 55:8
204:12 329:17
**identification**
25:20 28:22 40:4
60:7 64:22 83:24
88:4 89:18 95:4
104:13 105:24
111:19 119:8
122:12 127:7

136:18 138:16
140:7 149:16
152:14 157:2
168:14 181:6 191:3
193:14 195:15
197:5 201:17
207:10 212:5
216:25 219:12
235:22 241:18
246:14 253:2
254:17 257:18
258:20 262:4
266:19 269:9 274:5
275:23 278:11
282:16 286:10
289:8 293:16 300:2
302:17 305:24
313:16 318:6
319:16 329:7 332:3
337:2 338:24 348:8
350:6 352:10 359:6
363:22,25 366:15
370:7 373:10 377:8
379:19 383:13
384:21 387:16
**identified**
322:16
**identify**
110:20 186:20,24
187:9 232:20
330:12
**identity**
183:20 259:20 260:3
**IEs**
156:12 187:21
**illegal**
177:18 353:17,20,23
**imagine**
121:21
**imbalanced**
319:22
**immediate**
359:20 361:19
**immediately**
361:7 392:22
**implement**

107:4
**implemented**
100:12
**implicate**
299:17
**implications**
296:13
**imply**
245:2 267:10
**import**
172:19 175:4
**important**
92:11 107:21 108:19
177:25 178:10
272:8,12,14 278:22
279:22 323:13
346:3 382:4
**importantly**
306:6
**importation**
177:19 178:12,22
**importations**
172:18
**imported**
179:6,17,21
**importing**
174:9,12
**importunities**
176:2
**imposing**
42:5
**impossible**
73:17
**improve**
349:18
**inappropriate**
99:13
**incident**
87:15,16
**include**
9:10 108:4 198:9,19
279:4 294:2,7
295:18 339:14
352:24
**included**
17:20 225:18 290:25


MAGNA
LEGAL SERVICES

**including**
3:19 138:5,5 192:6
250:21 251:15,15
274:15 304:3
311:24 376:9
**inclusive**
330:6
**income**
289:19 294:2 295:19
295:24
**incomplete**
275:6
**increase**
151:11 173:11 240:5
**incur**
100:19
**independent**
182:25 189:24,25
201:3 285:11
**INDEX**
405:3
**indexes**
214:9
**indicate**
169:11 275:19
**indicated**
284:25
**indices**
215:9
**indirectly**
17:3
**individual**
22:2 238:5 384:15,24
385:16,21
**individually**
355:13,25
**individuals**
50:3 66:13 90:10
234:4 244:16 279:8
**Indonesia**
12:11,12,15,17,20
13:5 14:18 139:20
139:21,23 141:12
141:13 357:24
**inform**
365:9 374:13

**information**
31:16 38:9,9 88:25
154:7 162:24
165:12 338:9
339:19 342:13
348:24 355:18,23
357:17 368:2,5,8,16
381:10
**informing**
218:12
**initial**
74:18 303:23 326:8
332:24
**initially**
52:7 163:22 173:12
**initials**
98:9
**initiated**
108:8
**initiatives**
319:8 351:9
**injection**
135:22
**input**
95:22 96:5 98:10,13
98:17,19 225:21,24
254:2
**inputted**
98:11
**inquiries**
31:18
**inside**
300:23
**insisting**
217:11
**installments**
79:18
**instance**
243:17
**instill**
233:19
**institute**
101:20
**instructed**
206:16 270:5,17
347:13

**instructing**
283:10 352:20
**instruction**
270:7
**intangible**
207:20 208:12
**integrate**
43:14 47:13,20 48:21
48:24
**integrating**
47:25
**integrity**
375:13,18
**intend**
196:20 287:6
**Intensa**
81:6
**intention**
190:17 232:9
**intentionally**
177:18
**interact**
303:24 304:2,4
327:24
**interacted**
372:15
**interacting**
304:9 342:6
**interactions**
388:3
**interest**
56:6 92:14 141:5
180:6 186:10
213:24 214:19
215:17 220:25
221:7,18 222:20
244:24 273:6
274:19 294:11,16
294:22 298:18
299:10,10 388:8,12
388:17 389:3
392:21 393:2,12
**interested**
19:15 125:6 332:14
**interests**
294:18

**interior**
49:13
**internal**
88:20 89:12 114:19
116:18 118:6
154:14 155:16
199:14 362:16
**internals**
359:14
**International**
127:18 128:15
185:15,24 186:5
**internet**
241:4
**interpret**
190:7
**interrogatories**
282:25 283:5
**interviewed**
381:17
**interviews**
9:20 380:23
**introduced**
30:6 315:19,21
366:21,25
**introducing**
243:12 244:6
**introduction**
244:8 303:11,19
**introductions**
229:13,21 230:2
234:3,10 243:7,18
243:21
**inventory**
191:20
**invest**
15:4,21,24 16:10,18
20:7 24:14,18,23
65:18 180:12,17
192:22 333:2
**invested**
17:20 33:3,13 187:11
198:21 200:23
210:2
**investigative**
367:21



**investing**
15:17 16:22 17:3,9
  17:13 18:6,12,15,19
  18:22 19:7,8,11
  32:8
**investment**
14:23 15:3 16:16
  17:19 33:9 52:5
  128:22 129:3
  139:11,12 182:3,11
  385:11 386:6 388:7
  388:11,16
**investments**
15:12,15 23:20 31:2
  31:7,12,19 32:8,22
  33:2 315:17
**investor**
25:8,11,13 92:13
  200:7 385:5
**investors**
31:10 184:25 199:21
  200:5 280:10 333:2
  342:8
**invite**
303:22 333:2
**invited**
9:20 36:24
**invoice**
84:19,24 85:5,8,24
  88:12,16,18 227:15
**invoices**
99:16 113:18 350:14
**involve**
136:6
**involved**
19:5 27:4 33:14 50:3
  178:13 225:17
  235:16 281:6 330:8
  331:4 342:8 354:6
  357:15 383:24
  391:24
**involvement**
27:16 154:17,23
  155:4,11,14 199:8
  199:13 386:8,20
**IP**

220:8
**IPO**
322:18
**IRS**
197:24
**Isaac**
218:12
**Isabelle**
225:5,14 226:10
  227:6 228:13 231:3
**issue**
110:25 220:8 270:6
  289:19
**issued**
256:23 296:15
**issues**
174:8 235:15 258:10
  306:18 358:20
  379:13
**Italy**
137:15,17 143:9,11
**item**
140:4
**items**
8:24 9:4 108:3,4,5
  251:21 254:2
  342:20

---

**J**

**J-A-K-U-B**
43:24
**J-O-W-Y-N**
43:23
**jacket**
237:19
**Jake**
138:5
**Jakub**
43:24 138:6 390:18
**James**
292:25 293:2,7
**Jamie**
293:24 294:9 295:5
  295:14,17
**January**
68:3 78:16 212:21

293:14,17,25
  295:17 300:5 391:2
  402:5
**JC**
302:25
**Jeep**
232:23
**Jeremy**
2:16 3:14
**Jim**
37:6
**job**
5:18 7:19 266:13
  309:13
**Jodlowski**
390:18
**John**
2:5 3:22 118:15
  361:16
**joined**
263:16
**jointly**
24:17 25:2
**joke**
244:19 300:23,24
**joking**
266:21 267:7 301:6
**Jordá**
223:13,16,19 224:7
  224:16 226:2,21
  227:25 229:3,11,25
  230:7,17 234:2,10
  234:16,18,25
  238:23 241:22
  243:6,11,17,21
  245:7,11,17,25
  246:8 251:12,22
  252:14
**journal**
127:12 136:20
**Jowyn**
43:23,25 44:6 47:13
  47:15,19,22 48:15
  48:16 262:3,10
  263:12,13,16 264:7
  264:16,25 265:9,14

390:18 401:7
**Jowyn's**
50:14
**judge**
233:3
**judgment**
378:22
**Julian**
62:12,16
**July**
133:8 134:9 140:20
  218:12 275:21,25
  344:4 350:4,7,11
  351:6 401:14
  403:15
**jump**
113:25
**June**
89:14 140:15 259:3
**jurisdiction**
272:10,11 323:19
  372:18
**jurisdictions**
272:13 373:2
**jury**
92:6 288:23
**justifiable**
120:13 121:14
**justify**
106:13 163:6

---

**K**

**K-W-A-I**
384:25
**keep**
88:24,25 116:8
  125:14 163:3 166:2
  178:5 197:19 198:8
  198:18 199:4
  316:19 321:13,20
  355:9,13,14,25
  356:9,10,12,15,18
  356:20
**keeping**
248:25
**Kelly**



2:6 3:22 104:8
**key**
144:25
**keys**
144:23
**kill**
54:5,8,11,17 311:19
**Kim**
25:18,24 26:3,5,9,22
396:14
**Kim's**
27:3,4
**kind**
21:2 35:12 62:20
84:13 102:24 137:6
139:18 309:10
315:5
**Kingsway**
31:20,25 32:12,17,20
32:20
**kit**
52:11,18,20,20,22,23
53:14,16,17 54:3
202:7
**knew**
227:5 230:25 231:20
257:8
**know**
4:19 7:25 12:14
13:23 16:13 18:18
22:2,18 23:4,25
26:7,8,19,21 27:2,6
28:25 29:22 38:11
40:18 46:14 47:6
58:10,20 59:5 61:25
68:21 96:4,5 98:13
99:23 103:11 104:6
132:7 133:17
137:18,19 138:8
144:3 146:13 155:7
156:11 164:21
184:2,15,19 185:7
185:12,14 188:9,10
189:20 190:2 191:4
210:19 217:19
228:19 229:23

230:21 232:6,13
235:3 236:11
238:11 240:20,20
242:8 244:21
245:13 246:25
247:23 251:10
252:19 259:15,22
260:4 272:18
274:14,24 280:2,5
281:18 285:5
286:24 287:23
288:21 292:24,25
293:5,7 294:9 295:7
295:14 304:20
308:4 314:20 316:8
316:14 317:7
318:23 321:3,4
326:7,25 327:19
330:10 331:5 333:9
333:13 335:11
336:9,19,20 340:4
340:17 344:17
346:24 353:19
358:17,19 361:15
363:10 364:13
367:10 369:3,4,6,15
369:16,19,21,23
370:13 377:24
378:12,24 382:12
383:2 385:22
391:14
**knowing**
319:22
**knowledge**
31:16 32:23 148:6,7
338:15
**known**
22:20,24 116:11,14
192:3 224:10 342:5
386:9
**knows**
39:21 96:11 204:22
223:17
**Kong**
4:22,23 5:2 6:2,3,5
8:14 9:17 21:10

22:8,13 23:8,18,19
23:20 26:24 32:12
51:9,10 56:15,16,18
56:22,24 57:2 61:16
69:3 70:6,9 71:18
72:5 73:5,20,22
74:10 78:19 127:23
127:25 128:6
133:13 136:21
139:20 182:18
191:20,22 192:6,6,7
192:8 277:16 315:9
356:7 357:23,24
358:3,10,11,14
**Kovacs**
2:16 3:14
**Kwai-Che**
384:25

---

**L**

**L'Oleandra**
137:12
**labeled**
302:11
**lack**
284:12
**landlord**
8:5 9:2
**landscape**
323:21
**language**
65:23,24 360:19
365:6,15 382:21
**large**
13:15 56:5,10
**larger**
53:12 89:11 172:20
285:4
**late**
10:22 315:25
**latest**
191:15 198:10,19
199:17 302:25
318:16
**launch**
332:20 337:24

**launched**
233:14
**lavish**
237:25
**law**
1:15 328:3 362:19,22
362:25 363:5
**Lawrence**
198:15 294:8
**laws**
78:19 92:20
**lawsuit**
83:4 205:21,22,25
223:13 226:13,19
227:2 250:15 311:3
**lawyer**
62:7 64:11 211:23
258:3,7 295:6,14
**lawyers**
23:3 29:6 75:16 76:3
80:10,16 96:2,3
217:19 290:9
292:23 295:9 308:3
308:5 394:20
**layman's**
8:2
**lead**
377:16
**leads**
154:21
**learn**
35:23 51:7 344:2
**learned**
14:19
**learning**
7:20 11:3 12:13,20
323:3,5 326:8
342:12 343:22
**leave**
148:5 253:24 354:25
**leaving**
351:20 359:5,12
372:10 403:22
**ledger**
88:25 127:2 136:19
**ledgers**



165:21
**left**
11:11,12 71:14 120:2
170:14 183:13
247:2 331:9 372:8
**legal**
1:24 2:16 3:15,16
68:14,19 74:24 80:2
80:5 107:12 110:18
177:21,22 191:17
192:13 251:16
297:20 323:16
353:19 361:15
382:21
**legally**
33:15 146:3
**Lenaerts**
383:12,15,18,23
404:18
**lendee**
216:5
**lending**
215:13,22
**length**
216:4
**Leslie**
1:17 3:16 406:6
**lessons**
129:12
**let's**
37:14 53:11,12 67:20
70:8 75:17 76:12
77:22,24 80:16 97:2
103:22 105:8
112:20 118:22
124:6 133:6,17
134:2,23 163:3,4
166:21 170:7,9
175:9 200:18 207:5
219:23 226:9,12
231:6,14,17,19
234:14,24 239:7
244:24 258:8,12
261:5 264:25
268:25 270:23,23
283:15 313:17

317:7 321:7 326:11
335:7 339:11
349:25 366:10
375:4 384:2
**letter**
282:8 359:3,10,16,18
359:25 360:8,19,23
361:6,16 362:9
363:2 403:20
**level**
42:8,9,10 46:7
126:19 132:21,24
192:4 265:7
**liability**
78:21 175:21
**liable**
350:25
**Lies**
379:12
**life**
245:9
**lifting**
118:23
**light**
237:19 377:2,15
378:19,25
**light-colored**
60:24
**lighter**
84:12,15
**liked**
265:15
**liking**
226:18
**limit**
253:22 254:8
**limited**
31:2,7,12,19,20 32:2
33:3 78:17,20
122:18 127:11
136:21 139:10
170:19 182:3,10,11
182:15 183:16,22
183:24 184:5,12,19
184:25 185:9,15
186:5,10,14,17

187:21 188:15
193:24 194:4,13
201:17 202:3
386:11,14,18,24
388:4 399:21
**line**
93:14 106:7,8 108:6
113:16 114:21
116:20 158:23
218:21 234:15
244:16 405:5,5,5,8
405:8,8,11,11,11,13
405:13,13 408:3
**link**
318:24 321:12
**liquidation**
20:7,8,20 28:6
**liquidations**
20:3
**liquidator**
20:25
**liquidity**
197:19
**list**
28:20 29:13 30:17,24
31:5 42:23 47:17
90:19,20 93:10,12
96:17 108:2,3
186:23 251:14,21
272:23 332:25
342:18 396:16
**listco**
319:24
**listed**
24:8 30:21 31:21
32:12,13,15 56:15
56:16,18 61:16 69:3
70:6 74:11 81:18
182:19 331:19
332:12,23 344:3
**listen**
35:3 44:14 54:10
116:15 268:3 320:3
**listening**
82:25 117:9
**lists**

130:17
**litigation**
93:19 94:7
**little**
54:9 63:14 84:14
157:21 166:17
170:21 202:24
231:13 236:12
252:13 391:6
**lives**
357:6,12
**LLC**
1:8 169:10,13 306:14
306:23
**LLP**
1:15 2:3,8 3:11,13
**loan**
124:11,19 126:2,5,6
126:6,16 127:17
129:10 131:5,6,9,13
131:16 132:5
133:21 134:16,21
134:22,23,23 135:6
135:9,17,21,24,25
136:2 216:3 221:22
222:13 270:24
271:12,14,15,18
**loans**
136:5 197:25 213:8
213:20,24 221:2,11
221:19
**locate**
365:4
**located**
78:21
**location**
357:19
**lockdown**
73:12,18,23,25
**Loeb**
217:18,19 295:6,6,15
295:15 296:3
300:10,10 307:10
307:18 355:23,24
**log**
356:5,9



356:5,9
**logical**
312:11
**logically**
312:7
**logo**
242:13 280:5
**long**
10:10,16 12:10 14:16
16:18 35:14 42:22
58:10 164:7 205:24
210:8,13,17,19
211:3,5,8,11 228:23
244:22 248:8,20
251:21 261:3 267:8
358:5 390:19,24
391:3 393:4
**longer**
180:22 197:6 211:19
275:9 374:14 390:7
390:13 391:11
**look**
13:14 14:22 30:24
36:25 39:2,4 60:23
75:23 76:12 77:22
84:14 85:4,25,25
86:22 90:5 95:13
109:17 114:8
115:12 119:14
122:25 123:3
134:11 135:15
140:13,14,19
148:25 151:21
154:14 158:4
169:24 176:14
180:25 183:12
187:14 189:23
191:5,12 202:19
208:2,10 212:15,16
213:11,17 215:19
215:25 225:21
233:3 236:12,14
237:24 240:17
242:12 245:14
268:25 278:22
293:4,24 295:16

303:23 304:18
310:6,12 322:3
325:3,5 331:2 335:7
341:4 342:13
344:15 367:13
387:9
**looked**
20:10 128:4 149:2
150:14 159:5
215:10 246:20
256:18 260:22,23
274:25 309:16,25
322:6 339:18
352:25
**looking**
15:4 60:8 121:24
130:13 140:8
157:24 168:18
169:2 172:25
173:19 174:6 181:7
183:12 184:22
189:19 207:11
238:2 239:4 260:19
280:3 297:22
309:11 336:17
341:7,13 344:11,14
354:3 384:24
**looks**
30:2,5,10,17 226:14
237:18 241:23,25
242:4 248:2 287:20
340:3 367:19
**loss**
164:5
**lot**
42:11 93:16 142:2
163:20 211:10
217:3 231:10
235:17 238:15,16
297:15 356:8 369:8
375:5 384:18
**love**
49:7,7 268:8
**low**
86:20 317:19
**lower**

81:10
**lowly**
236:22
**loyal**
46:20 47:3,9
**loyalty**
266:25
**Lui**
1:9,9 314:20,25
315:3 316:10,19
317:2 318:20 319:4
332:19 336:14
337:10,13,22
338:10 339:9,12
340:21 341:3,4,7,14
341:20 342:7,16
350:6,8,10 351:16
403:16
**Lui's**
315:10 316:2 351:22
**lunch**
168:8
**luncheon**
166:24 315:4,5,6,8
**Lynch**
5:21,23 10:5,8,11
100:18,22 132:13
132:16 315:13

---

## M

**M**
4:5 168:4 386:9,11
386:13,18
**M-A-T-T-A**
361:16
**Madoff**
368:20,24 369:3,7,12
369:18
**Magna**
1:24 2:16 3:15,16
**Mail**
235:21,23 236:5,11
236:22 400:8
**mailed**
154:10
**main**

6:14 24:21 260:25
**maintain**
107:21 108:20
109:12,22 165:20
304:11 348:23
375:13,18
**maintained**
69:13 74:11 149:8
**maintaining**
110:6
**maintains**
88:20
**Majcher**
2:14 4:4 44:22 45:3,3
45:9,20 46:4,9,14
46:19 47:3 58:2,5,7
58:10 60:6,10,24
61:25 69:7 78:11
84:4,18,23 85:7
86:2 88:7,11 101:12
101:19 104:10,13
104:19 105:6,19,23
106:13,23 111:21
114:18 115:12,25
117:12 119:7,10
120:12,19 121:10
157:2,4 158:11
159:21 163:5
164:13,23,25 173:9
190:25 191:9
193:13,16,22 197:5
197:9,23 198:13
219:14 220:2,6,20
220:24 253:2,7
254:17,19,24
258:19,23 275:25
276:6,15 280:19
281:2 282:16,18
286:9,12 287:22
288:12,24 305:23
306:2,6 308:7
313:16,20 319:16
319:18 322:9
323:24 324:8,25
325:12,18 326:5,12
326:20 327:5,9,16



327:20,25 328:3,11
329:6,9 330:17,25
331:3,17 332:2,5
335:8,20 336:24
337:4 338:23 339:2
345:7,10 346:21
347:6 348:7,10,16
352:10,12 367:19
368:6 396:20
397:15,17,23
398:21 399:9,11,17
400:14,17,22
401:19,21 402:14
402:16,21,23 403:6
403:8,12,14,19
**Majcher's**
45:4 84:15
**major**
24:12
**majority**
377:17
**Mak**
184:24 185:5,8
**Maker**
127:17 128:14
**Makers**
282:2
**making**
68:20 83:14 94:9
110:11 125:10,22
132:8 158:12
213:25 227:19
233:20 234:10
243:6 244:7 320:11
377:17
**man**
373:20
**manage**
370:17
**management**
41:5 63:2,22 64:10
64:15 65:8 187:23
278:16 279:3,10
280:21
**manager**
50:24 203:6

**managing**
99:21
**mandate**
230:15 254:10
**manner**
63:2
**manufacturers**
210:12
**March**
51:6 60:5,13 61:19
71:11 73:12 84:4
124:9 130:9 151:5
156:24 157:4,10,17
157:25 159:11,20
160:23 161:10,13
161:18 183:7
190:24 191:7
252:24 253:3
254:15,19 262:2,10
282:14,21 302:15
302:19 319:14,18
329:5,9 396:19
398:19 399:7
400:12,15 401:5,18
402:10,19,22
**mark**
28:19 39:20 87:24
94:24 111:13
112:20 118:25
122:7 136:14
138:12 140:3
149:13 156:22
168:10 180:21
190:20 193:10
195:7 196:25
201:12 206:25
207:6 216:22 219:3
226:9 235:3 241:15
261:24 266:15
269:6 273:25
275:16 278:7 286:6
289:5 293:12
299:22 302:14
305:19,20 313:12
317:25 319:13
329:3 348:4 350:2

352:6 356:23
363:15,17 377:5
379:17
**marked**
25:16,19 28:21 39:23
40:4 60:3,7 64:22
83:23 88:3 89:17
95:4 104:13 105:16
105:24 111:19
119:8 122:11 127:6
136:17 138:15
140:7 149:15
152:14 157:2
168:13 181:5 191:2
193:14 195:14
197:5 201:17
207:10 212:4,7
216:25 219:12
235:20,22 241:18
246:13 253:2
254:17 257:15,18
258:20,21 262:4
266:18 269:9 274:5
275:23 278:10
282:16 286:9 289:8
293:16 299:25
302:17 305:24
313:16 318:5
319:16 329:7 332:3
336:25 338:24
348:8 350:6 352:10
359:2,6 363:21,24
365:23 366:14
370:7 373:10 377:7
379:18 383:12
384:21 387:15
405:10
**market**
53:12,13
**marketing**
41:5
**marketplace**
232:2
**marking**
64:20 89:10 122:9
126:25 195:8

219:21 235:19
246:11 254:14
**marks**
262:5
**Marley**
373:22
**marry**
245:17 267:2,5
**mask**
259:16,19,25
**mass**
53:12
**MAT**
163:10,14
**match**
242:16
**matchmaking**
329:12
**material**
240:6 337:23 339:19
**materials**
89:6 382:13,23
**math**
22:25
**Matta**
361:16
**matter**
3:5 34:8 44:10
171:19,23 179:15
235:17 259:12
282:4 291:23
299:13
**matters**
214:21 215:5
**Matthew/Jackie**
61:7
**MC**
319:22 320:7,12,13
320:17,23 321:4
**MD**
91:5,7,12
**mean**
6:23 12:2 14:14
17:15 19:2 20:16
25:2 36:3,22 46:24
53:18,20 55:20 98:2



110:10 112:8,16
113:8 125:17
132:10 133:17
141:24 144:8 155:7
159:2 163:5,15
169:14 171:21
178:17 189:3 196:2
207:23 208:16
210:2 215:19 228:9
229:17 231:7,16
232:4 234:13,21
238:19 239:25
240:3,4 241:25
245:4 247:13,18
256:2 267:4,9 270:9
274:23 280:7 285:4
319:11 345:3 346:7
346:23 358:8 361:2
362:24 389:19
**meaning**
11:25 26:6 56:3
**means**
6:22 29:5 56:8
161:24 189:8 193:5
198:3 265:5 291:5,9
406:11
**meant**
120:22 146:17,19
232:15,16 247:17
300:22
**measure**
209:8 244:7
**measurement**
214:8 227:23
**measurements**
214:7 297:4
**measures**
215:12
**media**
249:7
**meet**
23:7 25:5 35:19,22
36:5 145:9,18
147:13 224:15,18
224:19,25 225:5,14
226:10 227:6

228:12 231:3
314:19 315:2 375:3
375:7
**meeting**
37:9 61:7 191:13
262:25
**meetings**
62:21 356:13,16
**memory**
63:11 306:11
**men**
238:16
**mentally**
319:21
**mention**
114:10 132:20
158:19 247:11
323:18
**mentioned**
24:20 44:15 61:5
62:7 64:11 108:10
171:13 175:7 234:6
255:19 256:17
273:21,23 282:7
284:20 291:12
292:19,22 295:22
301:22 331:21
336:19 344:16
349:17 362:3
**Merrill**
5:21,23 10:5,7,10
100:18,21 132:12
132:16 315:13
**message**
64:3,21,23 247:10
254:16,18 274:4,6
275:22 293:11
294:8 324:12 350:5
350:7 352:9,11
371:25 396:22
400:16 401:12,14
403:15,18
**messages**
157:12 158:24
346:15,20 352:17
**met**

38:4,13 87:15,16
243:9 301:22
316:20 319:7 327:9
327:10 385:8,24
**methodically**
320:4
**metrics**
244:10
**Mexico**
373:19 375:2
**Michael**
22:3,5,9,18 23:10,13
23:22 24:4,13 25:8
25:19,25 26:4,23
27:21 31:24 32:8,16
33:8,14,20 34:6,23
35:8,25 36:3,3
190:25 191:8 320:7
388:22 396:15
399:8
**middle**
113:23 124:7 197:15
264:24
**Miller**
303:3,8,11,19,24
304:9,12 364:4,9,22
366:23,24 367:3
**million**
7:12 8:17 16:2,5 21:6
123:21 127:20,22
151:7,11 156:17
158:14 159:15
163:7,11,15,18
173:6 174:3,14,16
175:22 177:3
179:11,13 191:22
192:6,8 198:10,20
198:25 199:17,22
200:5,8 202:14
203:13 208:13,25
209:13,20,21
213:20 216:9,18
220:7 249:5 250:20
250:24 251:7
252:14 269:19
270:4 271:9 274:16

274:18,24 276:8,9
277:16 279:6,16
281:9,22 287:9,14
287:16 319:24
332:15 337:17
338:5 374:5
**millionaire**
7:7
**millions**
67:15 135:16
**mind**
118:23 121:9 128:5
129:16 155:3 258:2
324:23
**mine**
22:6 56:2
**mined**
14:3
**minerals**
14:3
**mines**
13:6 14:4,6
**mini**
202:24
**minimal**
69:21 71:24 72:2
73:2 100:20
**mining**
14:2,5 139:19
**minutes**
103:22 309:14 384:4
**misappropriate**
65:5,21 66:2,8,25
67:5,10
**misappropriating**
65:10 66:6,14,18
67:3
**mischaracterize**
71:23
**misconduct**
64:15 71:5 359:22
360:3,24 361:8,11
361:21 371:14,18
**Mishcon**
258:3,7 363:4
**mispronounce**



202:2
**mission**
46:21
**misspoke**
380:10
**misstates**
305:7
**mistake**
39:19
**mix**
133:16
**mixed**
129:6 160:25
**Mobility**
277:2
**model**
53:21 55:5 81:23
93:21 94:15 206:19
210:25 228:14
342:17
**models**
81:11,18 82:5 205:14
**modern**
53:22
**mom's**
12:16
**moment**
85:18 118:12 183:11
191:4
**Monday**
3:8 283:6
**monetary**
374:11
**money**
15:14,18,21 16:19,23
17:3,10,14,21 18:6
18:12,15,19,22,24
19:9,12 21:12 24:15
56:3 86:21,24 99:24
103:14 126:6
130:10 131:23
132:6 142:20,21,21
143:19 146:15
163:20 200:23
216:14 221:23
225:24 250:17

270:18,21 271:22
278:2 279:15 282:5
310:17 333:12
374:4
**month**
79:19 91:8 157:21
**monthly**
79:18 90:20
**months**
210:19
**morning**
3:2 4:11,12 191:14
289:14 302:24
329:10 370:10
**motor**
168:11,12,20 174:6
176:5 303:8,12,20
303:25 304:9,12
364:4,9,22 366:23
366:24 398:22
**move**
74:3 83:20 108:13
222:24 366:9
**moved**
148:19
**movie**
54:11,13,14 138:9
**movies**
54:6,17
**MSPC**
133:5 212:4,8,9
399:24
**muddle**
125:25
**Mullin**
2:8 4:2
**multiple**
75:10 82:24 90:17
98:16 117:6,7 118:2
121:21 126:14
151:22 239:13
240:10 266:8
349:13 362:21,22
371:13
**museum**
370:12

**mutually**
81:13 82:7

---

**N**

---

**N**
4:1,5,5 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1,11,19
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1

149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1,2,2,2,4
168:4 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1



285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1
396:3
**N.A**
1:8
**name**
20:4 21:20,21 45:2
47:18 51:12 52:20
57:3,15 91:17 97:9
98:8 139:14 169:25
188:7 198:14 200:7

201:5 271:7 276:20
277:2 304:23
314:21,24 324:22
325:14 327:18
330:23 331:12
339:14,20,22
348:13 360:20
362:11,24,25 369:5
373:16 390:16
**named**
22:2 191:8 238:6
292:25 293:7
384:15
**names**
186:24 348:23 372:2
**narrow**
96:7 362:19
**narrower**
117:10
**NASDAQ**
341:22 342:3 344:4
**national**
240:11
**natural**
162:20
**Naturally**
348:3
**nature**
250:15
**NC**
97:6,8
**necessarily**
52:19 335:21 343:14
374:20 384:5
**necessary**
80:18 174:8 304:6
**neck**
239:5
**need**
18:9 19:3 80:18 90:5
99:15 103:12,21
107:4 109:22
114:20,21 115:15
116:19 117:12
118:7 120:15,19
121:5,11 125:25

127:8 135:15
151:21 164:8,18,25
181:2 198:7 210:3
218:15,21 255:20
287:22 294:19
295:3 296:3 304:19
310:18 313:18
321:14,21 323:20
384:6
**needed**
86:21 282:3 310:13
351:12
**needs**
320:2
**negative**
35:2 312:18 313:2
372:4,6
**negatives**
35:5,17
**negotiate**
20:24 196:2,9 336:13
**negotiated**
195:23
**net**
6:17,21
**network**
281:14
**never**
9:21 11:12 42:24
77:4 82:19 83:11
98:20 102:2 111:7
140:2 147:5 197:25
200:22 236:24
243:9 244:13,13
250:7 252:20 257:3
257:9 260:14,20
265:15 268:14
277:10,11 284:25
285:10,18 293:9
296:14 297:10,14
311:14,22 312:2,8
312:15 340:7
368:19 372:4,5
381:19 385:16,24
386:2,16 390:9
395:15

**new**
1:3,15,16,17 2:5,5
3:12,12 68:8 205:14
236:15,17,17,19,21
256:19 290:13
296:19 323:19,19
329:13 332:20
335:15 356:6 358:2
358:20 368:20
388:20,23
**news**
234:23 237:16 249:7
**newspaper**
240:11,18
**NGCG**
26:24 27:2
**nice**
46:8 267:25 311:19
**nine**
192:19
**non-real**
24:24
**nondeliverables**
250:16
**nonprivileged**
290:7
**nonresponsive**
108:14
**nonterminable**
252:6,8
**Norm**
370:10
**Norman**
1:8,14 3:5 65:4,25
66:25 78:8 109:22
109:25 110:20
124:7 129:7 134:12
136:10 150:3
159:10,14 169:3
170:17 171:16
173:4 176:17 279:6
281:23 307:11
324:14 343:2 360:8
366:18 377:18
378:24 395:21
396:6 406:4 407:8



**Notary**
1:17 4:7 407:14
**note**
31:14,15 114:19
  116:18 118:7
  213:11,14,15
  270:20 355:14
  370:12
**noted**
168:3 218:23,24
  395:23 407:6
**notes**
213:12 274:14
**notice**
1:14 359:20 361:18
**noticing**
3:22
**notorious**
368:24
**Notwithstanding**
203:5
**November**
207:16 209:22
  331:25 332:5
  336:18,25 337:4
  403:5,9
**number**
29:4 41:25 43:8
  49:14,24 58:14
  77:19 87:12 90:3
  94:20 96:21 118:12
  138:4 144:14
  163:20 170:12
  187:15 206:13
  225:17 242:25
  243:3 249:12
  268:10 272:6
  278:12 290:3
  302:13 318:3
  325:24 335:17
  343:19 355:14
  392:5
**numbered**
105:7
**numbers**
89:7 105:5 202:24

237:9,12 302:25
  384:7 395:11
**numerous**
6:8 296:8,10
**NW**
2:9

───────────────
**O**
───────────────

**O**
4:5,5 168:2,2,2,4,4
**O-Bank**
269:9,10 401:10
**object**
6:10,18 7:8,13 8:4,8
  8:15 9:19 11:20
  13:13,16,20 14:8,13
  15:9 16:12 17:5,22
  18:25 20:13,21 21:5
  21:24 22:11,16
  24:19,25 27:18 32:3
  32:10,18,24 33:5,11
  33:17,22 34:3,9,14
  34:18 35:24 36:7
  37:11,17,25 38:6,10
  38:20,24 39:9 40:12
  40:24 41:11,17 42:7
  42:14,20 43:2,10
  44:3,12 45:13,17,21
  45:24 46:5,16,22
  47:5 48:25 49:20,25
  50:7,12,19 51:21
  52:12,25 54:7,16,22
  55:13,18 57:11
  58:16,23 59:4,11,17
  63:3,9,24 64:7,12
  65:12,16,22 66:15
  66:19 67:7,16 68:13
  69:17,24 70:22
  71:19 72:14,25
  73:14,24 74:7,14,23
  75:25 76:18 77:9,18
  79:25 80:9,13,20
  81:3,24 82:15,23
  85:22 86:6,16 87:8
  87:13,22 88:17,22
  89:8 90:13,16 91:10

91:19,23 92:9,19,25
  93:4,7,11,23 94:16
  94:22 95:21,25 96:9
  97:12,21 98:3,14
  99:7,14 100:14,25
  101:8,15,22 102:4
  102:12,21 103:19
  107:11,24 108:23
  110:2,14,23 111:9
  112:7 115:4,16
  116:4 117:16 118:9
  119:23 120:4 121:8
  121:20 122:2
  123:14,17 124:3,16
  125:8,13 126:22
  129:4 130:12 131:3
  132:2,14,19 135:19
  137:22 139:24
  141:23 142:7
  143:20 144:2,6
  145:21 146:24
  147:7,11,15 148:14
  148:24 149:11
  152:5 153:10,19
  154:11,24 155:13
  155:17 156:9,14
  158:22 159:12,18
  160:5,11 162:4,15
  162:25 163:25
  164:15,20 165:9,14
  165:18,23 166:4,12
  169:22 171:7
  172:11 174:19
  175:16,23 176:6,12
  177:5,20 178:14,21
  179:2,8,14 180:8,13
  183:3,25 184:13,21
  185:2,10,21 186:11
  187:5,12 189:22
  190:5,14,18 192:24
  193:4 194:19
  195:25 196:4
  198:23 199:5,10,15
  199:19,24 201:9
  203:16,22 204:2,6
  205:6,11,15,19

206:6,11,21 208:23
  209:2,15,23 210:11
  210:16 211:2,13
  214:5,12,17,22,25
  215:6,18 216:6
  222:6,11,15,22
  223:23 224:4,9,17
  225:23 226:11,16
  226:22,25 227:8,13
  227:20 228:2 229:8
  229:14 230:5,10
  231:4,5 232:3 233:7
  234:12,20 236:13
  236:23 238:14,20
  240:13,19 242:7,22
  243:14,23 244:3,17
  246:2 247:8 248:13
  249:16 251:13,20
  251:24 252:15
  253:15 254:11
  255:11,18 256:11
  256:15 257:5
  260:21 261:11
  265:23 266:4,10
  267:12,18,23 268:7
  268:15,21 269:25
  270:8,15 271:24
  272:5,9,16 273:7
  275:4,5 276:18
  277:7 278:4 279:18
  279:24 280:22
  281:4 282:6 283:10
  284:11,16 285:3,21
  287:19 288:8,14,19
  289:2,25 290:22
  291:19 292:10
  294:24 296:2 297:2
  297:18 298:5,9,14
  299:3,12 300:21
  301:8,13,17,21
  303:13 304:14
  305:6,16 307:25
  308:9,15 309:3,7,19
  310:3 311:10
  312:10 313:9
  315:23 316:4,12,23



317:11,13,16 319:6
320:14 322:2,24
323:10,15 325:2,19
325:23 326:6 327:6
327:14,22 328:8,18
330:4 331:20 333:4
333:23 334:12
335:4,24 336:7,15
338:12 339:15,21
340:2,6,16,22
341:23 342:11
344:5,10,20 345:2
345:23 346:6,11,16
347:2,7,11,16,21
348:2 349:16,21
350:21 351:8,14
352:3,22 353:3,8,13
353:18,25 354:7,12
354:23 355:22
356:3 357:3 358:7
358:15 360:4,14,25
361:13 362:2,10,15
364:11 366:3 367:8
369:2,10,14,20
371:9,16 372:11,17
372:23 373:5,21
374:10,19 375:19
376:8,13 377:3
378:5,15,20 381:3
381:11,25 382:7,15
387:7 388:5,14,24
389:5 393:24
**objectable**
162:7
**objected**
256:10
**objecting**
217:9
**objection**
16:20 20:9 21:15
24:11 51:24 178:3,7
185:25 186:6
189:15 192:16
209:7 218:7 228:22
255:23 257:11
306:24 366:2 379:2

383:5 385:17
**objections**
218:23
**obligations**
99:23 380:23 393:17
**oblige**
68:21 294:19
**observe**
48:4 308:19
**observed**
47:23
**obtain**
334:10 392:25 393:6
393:17
**obtained**
51:23 52:2
**obvious**
247:18
**obviously**
361:10
**occasion**
237:6
**occur**
240:15 315:8
**occurred**
162:3 279:7
**occurs**
60:18
**October**
134:3 193:12,17
197:3,10 269:21
274:17 399:10,15
**odd**
105:5,7
**offer**
68:19 260:8 393:22
**offering**
34:23 35:7
**office**
302:8 307:6 321:15
**officer**
33:8,15 45:7 272:3,7
272:12,14 273:13
273:19 346:2
**officers**
187:4,10 201:6

**offices**
1:15
**official**
169:23 339:24
372:25
**offline**
335:18
**oh**
247:3
**okay**
4:20 6:7 29:7,10
54:20 60:12 84:11
84:24 85:17 89:14
95:8 101:9 106:9
112:22 127:25
128:2 138:11 158:7
158:9 159:19 160:8
168:19 170:13
197:14 215:2,8
220:7 222:24 247:3
264:25 288:2 299:7
320:21 321:11
330:6 382:10
385:22
**older**
82:2
**once**
114:24 294:9 300:14
320:2 348:18
**one's**
214:23
**one-time**
227:9
**ones**
24:12,21 43:12 84:12
121:4 137:6 200:20
273:23
**ongoing**
72:12
**online**
335:18 357:20
**open**
44:14 254:2 346:12
**operates**
31:25
**operating**

45:7
**operation**
7:22 155:15
**operations**
155:16 199:14 394:5
394:17,22
**operative**
76:5
**opinion**
44:11 46:10,10,11
48:11 49:8,10 80:3
80:6 209:24 214:23
234:9 236:24
240:14
**opinions**
44:14 45:20 50:5
**opportunities**
14:23 15:4 52:14,15
316:21 317:7 322:6
341:5 344:12,13
**opportunity**
19:22,24 211:22
**oppose**
231:19
**opposed**
249:21 256:14
**opposite**
288:10
**option**
276:7,15,16 277:5,8
277:10,12 285:12
286:16,19 287:7,17
291:13 292:13,18
305:9,11,18
**options**
252:10 277:22
296:14 304:21
305:2,3,4,14,15
322:4 331:22
393:16 394:10,12
**oral**
77:2,4 82:20 83:6,14
87:20 94:14
**orally**
94:10 98:20
**order**



110:5 133:2 145:14
193:25 269:14
275:13 347:19,24
351:12 354:4,24
367:17 375:12
**ordered**
354:9
**ordering**
353:6
**organized**
78:18
**organizer**
356:17
**original**
246:25 263:18,18
266:12 285:23
**originally**
143:9 276:11
**outcome**
292:4
**outfit**
242:14
**outing**
237:18
**outlandish**
49:4
**outlet**
236:2
**outlets**
376:9
**outright**
277:9
**outside**
55:22,24 199:21
215:15 256:25
385:19
**overall**
48:8 135:15 233:22
251:14 308:21
379:10
**overcome**
249:8
**overlook**
42:10,18 47:24
**overly**
376:25 377:15

378:25
**overview**
187:15
**owed**
58:22 75:24 79:23
**owned**
6:8 9:7 13:12,19
32:13 79:2 138:9
158:13 159:3,23
169:18 184:4
185:12,23 187:22
188:15 385:11
**owner**
27:24 28:9,10 37:4,5
92:3,4 102:22
128:24 135:4
171:18 176:22
178:8 183:24
184:11 185:8
186:16 259:17
261:16,18,21
381:20
**owners**
57:7
**ownership**
171:16 184:9 287:23
288:4,12,18 391:19
391:20 393:19,19
394:24
**owning**
307:6
**owns**
6:11 79:5 137:18

———————————
**P**
———————————
**P&L**
342:19
**p.m**
103:25 104:4 105:11
105:14 166:23,25
168:3,7 223:7,10
283:19,22 314:15
314:18 318:9
384:10,13 395:22
395:23
**P72**

93:21 94:10,15 95:3
95:10 96:23 98:5,9
195:17 204:21
206:17,19 210:9,15
210:24 232:16,22
233:19,20 237:23
239:14 248:7,19
249:15 250:25
251:4 253:24 259:9
265:2 266:3,6
372:13,16 373:25
397:11
**P72s**
196:15,18 311:24
312:4,13,21 313:7
372:21
**P900**
207:2,3
**Pachmar**
139:7,10 143:13
144:15 145:24
146:4 150:7,18
151:24 154:8,14,18
154:23 155:4
158:13,18 159:3,10
159:15,23 163:7
164:5 173:12
177:11 180:4,6,17
187:21,23 188:15
189:13 191:18
192:2,9,13,21 194:2
194:16,17 195:5,21
195:24 196:3,9,10
196:21 198:8,18,21
199:4,9 200:22
**Pachmar's**
154:2,5,9 194:23
199:14
**page**
29:12 30:10 31:4,5
31:15 60:9 78:3,14
85:13 86:5 88:10
95:9 104:15 105:25
106:2 113:18,23
114:2,17 115:18
116:23 121:2 124:6

127:16 130:14,15
130:17,19,20 133:6
134:2,2 137:3 158:5
161:7 163:4 180:25
181:23 182:8 183:6
193:21 197:16
202:4,20,22,23
208:2 212:15,17
213:5,15 219:24
220:18 237:8,9,20
239:3,7,8,12 240:25
254:23 262:16
264:6,7,15,23,24
265:13 266:24
274:10 275:14,19
276:6 278:24,25
282:24 283:3
286:16,21 287:5
293:22 296:22
300:9 306:5 307:9
313:22 318:9
319:20 320:21
321:7 322:8 323:25
325:9 326:11
328:24,25,25 330:7
331:2,19 332:9
333:14 335:7,13
364:24 365:5
367:15,15 368:6
396:6,13 397:5
398:4 399:4 400:4
401:4 402:4 403:4
404:4 405:5,5,5,8,8
405:8,11,11,11,13
405:13,13 408:3
**pages**
30:7 114:9 180:23
197:14 407:3
**paid**
12:2 79:17 91:8,14
137:24 142:20,20
143:19 163:10,14
163:17,21 165:7,13
166:10 191:18
203:7,14 208:20
209:6,19 226:6



MAGNA
LEGAL SERVICES

227:7,12 228:18
250:17,24 251:12
277:24 303:2
312:15 380:3,17
383:4
**paint**
378:25
**painted**
376:25 378:18
**paints**
377:14
**pair**
239:6
**Pantera**
81:12,20,22 207:19
208:5
**paper**
120:15,18 121:11
**papers**
328:11
**Paradigm**
106:20
**paragraph**
253:20
**parameters**
255:21
**Parker**
325:13,15,20,22
**part**
12:14,23 56:6 60:16
60:19 71:15 72:2
93:18,21 94:7
106:24 109:20
126:20,23 162:16
225:10 232:16
248:10 262:7 271:8
271:22 274:23
276:9 286:15,22
287:2,2 311:2
332:24 333:17
334:20 348:22
354:15 380:2,21
394:3,9
**partial**
197:17
**participate**

70:9 72:6 80:17
225:7,10 331:17
**participated**
280:20 281:2 383:19
**particular**
23:23 33:12 34:12
58:24 85:24 106:7
113:16 114:7
131:16 161:2
177:15 233:11
283:2 318:24
335:12 393:20
**particularly**
128:8 378:16 379:6
**parties**
75:15 77:11 380:13
**partner**
182:3,11,15 184:5,12
184:25 186:10,14
186:17 308:14
310:16 332:11
335:14
**partnered**
23:9,13
**partnering**
14:25
**partners**
184:7
**partnership**
294:3 295:20,25
**parts**
39:17 250:22 303:25
**party**
3:18,22 187:24
189:14,24,25
213:12 216:3
222:14,20
**pass**
355:23 394:16
**passed**
42:6 232:22
**path**
128:20,21,24 211:6
273:3
**paths**
329:25 330:5

**Paul**
2:10 3:25 157:17
357:13
**pause**
17:8
**paused**
16:25
**pay**
9:24 21:3 76:16
79:15 83:6,11 86:14
87:20 123:19
131:24 132:16
146:14 202:14
226:2 277:23
309:18,25 311:5,22
312:8,22 313:3,4,8
338:4 351:12
380:14
**paying**
126:8 134:3 142:21
192:13 225:25
251:6
**payment**
123:8,25 124:23
125:10 130:9,17
133:8 140:14
227:16 269:14
309:15
**payments**
90:21 125:22 252:13
327:15,21
**Pennsylvania**
2:9
**people**
13:18 21:13 44:18
45:25 49:18,24 50:9
53:23 90:17,19
98:16 146:7,14
186:9,12 217:3
227:22 229:9,23
230:3 233:3 238:15
265:3 268:22
316:25 317:2,3
347:19 359:4,10
371:13,21 372:20
381:18 383:18,23

403:21
**Peralta**
373:9,17 374:4,17,23
375:8 404:13
**perceive**
248:18
**percent**
81:5 171:16 176:22
184:4 214:2,4
215:11 220:19,21
221:6 222:3,9,13,20
281:16 291:16
296:16 300:14,19
301:5,11,15,20
302:7,9 306:13
307:4,6,12 311:6,16
311:23 336:8
339:10 382:16
**percentage**
80:25 221:13 277:9
287:23 288:4,12,18
289:15,23 290:18
290:24 291:5
391:19 393:19
**perform**
70:3 110:18 178:22
304:15
**performance**
80:24 142:18 308:19
**performed**
70:2,5 71:24 79:24
142:9
**period**
10:24 37:21,24 38:17
40:13 42:5,13,15
43:9,17 44:23 50:22
54:23 56:9 72:16
73:3 74:6 112:4,12
120:2 153:14
165:22 261:3
336:16,18 351:7
392:10 393:16
**periods**
393:17
**perishable**
8:24 9:4



**perk**
252:9
**perks**
252:10
**permit**
15:21
**permitted**
360:19
**permitting**
355:20
**perpetual**
233:22
**person**
44:13 46:2 62:21
  75:13 224:18,19
  225:2 241:19 242:3
  262:20 264:8 374:9
  378:23 385:8
**personal**
38:8 42:9 46:7
  107:22 108:20,24
  109:24 110:11,21
  111:4 125:22
  126:10 261:7 340:9
  345:14,21 356:10
  358:17 365:11,17
  367:6
**personally**
47:3 111:3 145:19
  279:15
**personnel**
217:20
**perspective**
80:19 233:8 249:11
**perusal**
191:15
**phase**
4:24 68:7
**phone**
158:25 356:21
**photo**
241:24
**photocopy**
30:13
**photograph**
26:14,17,20 241:16

241:17,20 242:2
  400:9
**photographs**
240:10
**phrased**
41:21
**physical**
142:12 143:14
  148:23
**physically**
141:21,24 143:6
**pick**
117:23 158:23
  249:18,25
**picked**
181:11 222:9 256:16
**picture**
112:18,19 238:25
  299:20 379:10
**pictures**
239:14
**piece**
100:4
**pinpoint**
118:3
**pitch**
227:22,24
**place**
51:5 99:18 101:7,14
  102:6 109:17 110:4
  115:3 312:3
**places**
212:16
**plaintiff**
1:6 2:4 3:23 311:12
  389:17
**plaintiff's**
93:20
**plaintiffs**
83:4 94:8 311:3,12
**plan**
52:7 61:6 205:17,20
  259:8 358:17
**plane**
358:9
**planned**

82:9
**planning**
41:4 304:19
**plans**
52:9,10 205:13,23
  206:5 358:12
**plantations**
13:6,7,11
**play**
33:20,25 317:21
**played**
34:23 35:8 317:14
**please**
85:5 116:15 158:15
  160:13 191:14
  264:16 271:5 290:9
  294:8 352:15
  353:11
**Pleases**
268:16
**plus**
87:3 163:10,14 252:9
  390:22,23
**point**
8:17 9:16 18:5,8,21
  26:10 28:14 56:5
  61:21 107:25
  114:24 125:18
  137:2 142:23 156:2
  173:4 180:16
  187:19 197:17
  205:16 211:14
  221:12,22 224:5,12
  227:16 245:18
  249:13 264:10,12
  268:2 285:8 287:4
  301:10 305:11
  335:23 343:21
  344:21 349:7
  351:16 374:25
  375:25
**pointing**
121:9
**points**
187:16 223:12
  345:13

**police**
193:16
**policies**
102:19
**policy**
99:18,20 100:6,10,12
  100:17 101:7,14,20
  102:16 103:7
  106:24 107:5,9
  108:8,12,25 109:4,8
  114:20 115:3,15
  116:3,19 117:4,13
  118:8 120:20
  121:19
**polo**
239:5
**pool**
322:18
**Poor**
247:11
**poorly**
249:5
**Porsche**
260:25 261:2,6
**portion**
297:7
**posed**
336:3
**position**
74:19 75:9 212:19
  285:25 365:10,16
**positioning**
48:8
**positive**
376:25 377:15
  378:19,25
**possession**
141:16,22 144:15,18
  145:10,25 147:2
  148:23 149:8 251:7
**possessions**
147:21
**possibility**
146:21
**possible**
199:8 220:3 292:12



possibly
7:14 188:16 216:12
244:9 343:23 363:7
382:3
Post
236:15,18,19,21
potential
183:2 229:13,22,23
243:8,12,18 256:25
280:10 285:12
296:24 297:16
306:18 307:18
317:4 331:18,22
343:12 348:22
349:19 350:18
364:10
potentially
65:18 98:18 306:13
342:8 344:8,18
350:24 354:9
pounds
202:15 203:7,13,14
208:21 209:5,13,20
practical
211:14
practice
110:9,10 280:16
347:24
pre-identify
322:23 323:9 353:23
predicated
80:25
prefer
132:10 264:10
preference
304:20
premium
54:3
prepaid
358:13
preparation
166:7
prepare
217:14 280:13
325:11 326:14
prepared

182:2,24 212:4,8,24
279:11 280:2,4,6
281:17,20 326:23
355:19 399:24
preparing
280:9
preproduction
144:11
present
2:13 3:18 263:5
268:17 367:10,11
presentation
133:18
presentations
280:10
presented
19:23,25 143:23
171:14 263:7,11,19
presenting
263:14 343:11
preserve
346:3
press
249:4 256:23 318:13
pretty
10:24 45:25 66:20
114:23 207:4
272:22 306:25
308:10 310:4
382:19
prevail
266:25
previous
6:24 114:9 129:14
169:25 305:2
352:17
previously
180:19 231:11
315:13 317:17,18
339:17 345:25
price
21:2 153:17 156:11
172:16 173:17
174:2 248:25
277:23 392:5
393:15

primarily
248:18
principal
259:25
principally
357:21,23
principle
286:5 298:2,6 310:10
310:25
printed
89:22
prior
86:5 99:23 113:17
144:11,12 150:14
208:8 231:11
258:10 290:13
294:12 298:17,19
338:14
privatize
267:3,4
privilege
218:13 295:10
299:18
privileged
217:8,17 283:7
295:12
pro
85:10
probably
13:21 137:24 160:16
161:21 202:2
216:16 255:4
315:24 321:18,20
371:5 384:3
problem
23:3 248:3 346:13
problems
58:20 249:10
procedures
115:9
proceed
210:24 265:20
289:17 294:10
296:23 368:7
proceeding
265:22

proceeds
275:18
process
49:21,23 84:25 88:11
115:8 329:13 333:8
341:10,12
produce
29:2 165:11 271:5
282:10
produced
25:22 28:25 29:5,25
64:24 89:12 95:6,23
96:3 102:2 122:8
156:7 162:9 196:19
218:10 237:12
241:3 243:4 249:6
258:5 302:10
354:20 377:10,23
395:16
producing
241:2
product
283:8
production
82:10 144:12 249:19
253:7,24,25 254:13
255:5,13 405:5
products
82:8
profession
22:9 223:24 315:11
professional
42:10 76:3 89:3
160:15 223:22
242:5,8,10 296:20
341:19 406:7
professionally
132:11
professionals
34:4 109:17 110:4
162:9 215:16
280:24 341:18
profile
324:3,19
program
285:12 394:24



**project**
81:12 210:3 265:6
349:3 383:24
**projection**
93:13
**projects**
263:23 264:4
**prominent**
6:4,6 22:12,15 230:3
234:3,11
**promise**
94:14 290:20 291:9
292:8,16 391:19
**promised**
93:21 94:10,21 98:21
255:10 289:15,24
290:18 291:16,17
294:23 300:19
306:7
**promises**
42:21 393:9
**promising**
291:25 306:22
**promissory**
213:11 270:20
**promote**
227:18 252:18
**promoting**
242:20
**promotion**
230:18
**promotional**
231:21 237:3 256:22
**pronounce**
44:25 314:20,23
**proper**
76:2 109:14,16,18
110:5,17 132:4,25
133:17 145:14
172:4 324:4,20
**properly**
47:25 265:2
**properties**
8:6 9:3 13:4 23:15
24:20,24
**property**

23:21 137:15,18
138:9
**proposal**
308:3,5
**proposals**
331:18
**propose**
284:15
**proposed**
182:2 231:4,11 302:5
334:13
**propounded**
407:5
**prorated**
86:3
**pros**
330:9 331:5
**prosecution**
9:22 328:12,14
**prospecting**
36:2
**protect**
371:24
**protected**
299:2
**protecting**
298:25
**protection**
393:11
**protocol**
141:22
**prototype**
138:15,24 140:7,20
140:24 141:12
144:7,9,10 145:2
146:17 147:23
148:5,13 152:13,21
153:5,17 157:22
158:12 159:16,23
164:6 170:18 173:5
173:20 187:21
253:23 254:9
255:20 398:12,14
398:18
**prototypes**
139:4 141:17 142:25

143:10 144:11,16
148:10 149:15,22
155:23 156:4 164:3
168:9 169:4,7 170:5
170:11 250:21
255:14 303:23
398:16
**provide**
230:18 271:20 285:2
285:11,19 316:21
**provided**
276:16 364:17
**providing**
337:22
**public**
1:17 4:7 29:19 41:5
51:16 212:11
230:24 249:7
297:23 321:24
324:3,19 338:15,18
387:14,17 404:20
407:14
**publicity**
234:18,21 239:19
240:12
**publicly**
235:16 237:14
**publicly-traded**
56:21
**published**
241:11 247:3 376:11
376:20,21 379:9
**Pull**
160:13
**purchase**
98:5 169:25 171:13
172:16 208:4 277:5
277:21 278:2 297:6
297:23 298:4
**purchased**
61:17 149:12 182:20
276:21 277:8,12
**purchaser**
276:17
**purchases**
310:19

**purchasing**
123:12 342:9
**purple**
163:6
**purported**
178:8 389:16
**purportedly**
165:7 166:10
**purports**
186:9
**purpose**
156:20 160:18 172:6
172:9 173:10
270:10 316:17
**purposes**
174:12 176:4 177:19
178:2,12 294:4
295:20
**pursuant**
1:14 251:17
**pursue**
5:15
**put**
28:17 33:19 51:16
111:12 122:5
131:21 132:3 135:7
136:10,13 166:14
180:2 191:21 193:9
209:9 216:10,14,18
216:21 221:23
225:8 234:14
244:24 309:5
314:11 328:23
331:23 344:22
365:19 375:4,24
**putting**
83:18 338:11 341:21

**Q**

**qualified**
242:9
**quantify**
309:4
**quarantine**
74:2
**quarter**



57:24 70:25 71:12
279:7
**question**
6:20 11:17 35:4,6
40:21 44:5 48:3
53:8 54:10 68:25
72:20 74:19 94:6,13
96:6 98:15 108:16
108:17 112:20
114:13 116:16
117:10,10 128:14
132:11,15 133:19
142:8 144:3,17
145:16,17,22
154:22 157:13
173:18 174:24
190:15 206:2,24
209:16 211:8,21
213:2 221:18
222:19 225:20
228:19 231:15,16
243:10 244:18
248:20 256:6,7
268:3 272:17
281:21 285:16
289:15 290:17
291:15 292:15
299:17 309:22
311:18 313:5 319:3
322:10 324:15
326:3 357:12 362:8
362:19 379:6
383:22 387:10
388:19 389:2
390:11
**question's**
35:18
**questioning**
112:13
**questions**
29:10 35:12 39:22
53:9 94:5 132:21,22
180:3 211:23
217:16 283:11
323:6 389:10,15
391:17 395:9

405:10 407:4
**quick**
384:2
**quickly**
67:20 380:11
**quite**
56:7 254:25 389:14
**quote**
72:3,4 298:18

---
**R**

**R**
4:5 168:2,4 408:2,2
**R-E-S-T-O-M-O-D**
53:24
**race**
224:2,8,10 232:17
**racing**
36:19 37:3 230:3,9
230:11,12,13,20
232:7,12,13,13,14
234:4,11 235:11
242:5,9,13
**rag**
236:22
**raise**
56:3 132:23 190:4
284:14 294:12
298:20 329:22
330:2 333:10
**raised**
113:10 189:17,21
333:12
**raising**
322:18 334:14
**rank**
308:23
**rate**
214:19 215:13,13,17
220:19
**rated**
85:10
**rates**
215:14,20
**RB**
95:17 96:7,8 97:17

97:20,25 98:9
**reach**
198:14 370:16 373:3
**read**
60:16 64:25 80:7
120:25 203:4 219:3
236:4,5,15,17,19,24
278:15 279:2
300:14 328:20
365:8 368:16 378:8
384:7 395:10 407:3
**reader**
377:16
**ready**
282:8
**real**
8:9,10,11 9:8 11:7
23:15 39:22 123:8
123:11,25 262:8
264:9 339:20
**really**
6:25 13:14 32:11
43:14 54:13 116:9
171:19 180:14
201:11 204:18
232:9,18 233:19
239:11 264:9,19
310:12 311:19
320:24 333:5
346:17 356:9
361:17 381:14
383:7
**reask**
285:16
**reason**
46:23 47:11 361:7
**reasonable**
31:18 81:14 222:14
222:21 324:4,19
**reasons**
211:24
**recall**
9:15 14:9 15:25 16:7
17:17 29:9 49:15
58:9,17 59:2,8,12
62:25 63:4,6 64:4,9

69:9 72:8 85:24
86:17 87:9,14 88:18
91:24 92:7 102:17
151:18 152:6,7
153:20 154:12,15
154:19,25 155:8
156:15 158:24
161:16 174:20
175:2,11,15 177:6
177:16 179:24
180:14,18 184:3,14
184:22 185:3,11
190:10,15 192:17
192:25 193:2,8
199:6,11 200:3,4,6
200:21 201:4,11
203:21,24 214:13
215:9 220:14
221:16 222:7
227:14 246:7 256:9
260:18 271:25
272:6 277:24,25
278:5 281:19 284:8
284:19,22 288:16
290:23 297:3
306:22 315:24
320:8,13 321:16
326:9 327:17
334:24 340:23
343:17 346:22,23
347:3,17 352:4
353:4,14 354:8,13
371:10 372:12
373:6 375:22
380:19 385:14,22
386:19 387:3,4
388:10,15,18,21,25
389:6,14,17 394:6
394:14
**receipt**
203:6
**receive**
97:10,14 142:12
154:7 162:18
193:25 270:19
311:15



**received**
62:3 64:5 323:8
  359:25 361:15
  394:21
**receives**
368:15
**receiving**
329:19
**recess**
59:24 104:2 166:24
  223:8 283:20
  384:11
**recognize**
28:23 29:8 138:17
  140:9 149:17
  152:15 168:17
  212:6 235:23
  241:19 359:7
**recognized**
33:16
**recollect**
64:16,17 194:24
  195:6
**recollection**
17:16 63:20 65:17
  88:15 137:23
  180:16 199:9 224:6
  228:4 247:6,17
  264:3 320:23
  326:19 346:19
  362:13 375:7 382:9
  387:11,24
**recollections**
111:10
**recommended**
118:16 265:21 266:2
**record**
3:3 45:6 59:23 60:2
  68:20 103:25 104:4
  105:9,11,12,14
  125:17 133:25
  153:3 159:8 166:9
  166:23 168:7
  169:24 171:22
  172:4 200:16
  218:25 219:4 223:7

223:10 258:13
  283:19,22 311:13
  314:12,15,16,18
  372:4 383:9 384:7
  384:10,13 406:4
**recorded**
174:21 179:16,20
**records**
88:21 89:13 107:22
  107:22 154:2
  165:21 166:2 346:9
**recreate**
53:21 55:2
**recreating**
55:5
**red**
62:3 63:23 64:5
**redesigned**
204:9
**reduce**
172:19 264:11
**refer**
39:10 53:16 71:6
  115:5,25 122:23
  133:21 160:17
  162:8 200:11,17
  206:14,15 215:21
  285:22 291:2 295:3
  296:3 299:5,7,14
  305:13 308:16
  334:18 360:5
**reference**
116:7 117:20 165:6
  222:4 247:20
  283:12 294:21
  300:9 325:7,22
  367:22 378:2
**referenced**
342:15 365:23
  391:10
**references**
31:15 159:9 320:12
  337:16 338:3
  364:25
**referred**
40:6 81:23 133:11

288:18 334:17
**referring**
17:18 40:14 53:25
  56:13,17 59:6,7
  65:15 100:7 101:18
  104:14 112:15
  114:4 116:10
  157:11 158:18
  198:20 199:3,18
  203:20 255:4
  282:24 288:13,24
  289:23 291:17
  294:15 295:2
  298:17,24 300:18
  305:8,15 309:20
  321:3,17 324:7,11
  324:24 327:4
  330:17,22 331:11
  335:2,21 336:5
  365:6
**refers**
290:25 384:22
**reflect**
132:4 192:12 354:20
**reflected**
279:4,9 291:11
**reflecting**
171:9
**reflects**
92:23 130:8 171:22
  274:17
**refresh**
88:15 247:6 320:22
  326:19 387:10,23
**refrigerated**
9:4
**regard**
101:21
**regarding**
289:15 290:18
  291:15
**regardless**
72:18 360:11
**regards**
27:7
**Region**
543

78:20
**Registered**
406:7
**regret**
365:9
**Regular**
357:20
**regularly**
346:14
**regulated**
56:24
**regulation**
323:14
**reimbursement**
100:17 109:8 115:8
  137:11
**reimbursing**
137:20
**related**
114:16 125:7,23
  187:24 189:7,14
  213:12 216:3
  222:14,20 318:24
  350:14 366:4
  392:16 393:22
**relating**
45:22 58:21 59:10
  63:23 85:20 154:7
  274:22 300:4 312:4
  342:23 343:11
  346:4,20 348:19
  350:18,19 359:4,12
  368:2 376:7 403:21
**relation**
41:5 48:22 66:9
  108:25 121:16
  178:12 272:25
  291:23
**relationship**
37:16 38:18 41:19
  189:9,12,21 190:2,9
  190:13 245:12
  261:2 270:14,16
  303:16,17 304:12
  316:2 367:7,10
**relaunched**



21:19
**release**
256:23 318:13
**relevance**
151:25 357:4,5,7
**relevant**
112:17
**rely**
80:10
**remaining**
193:24 194:2,3
**remains**
199:12 285:25
**remember**
23:14 36:14 54:13,14
  59:15,18 63:10,25
  87:15 101:3 102:8
  102:13 163:16,19
  164:16 171:9 172:5
  172:17 173:14
  175:8,25 179:23
  180:4 186:25 197:7
  213:7 295:5 317:21
  343:20 350:12
  353:9 374:24 375:9
  381:15 385:14
**remind**
71:7
**renamed**
28:6 276:25
**rendered**
79:14
**rented**
9:8
**repaid**
132:13 134:24
**repay**
126:3 134:17
**repayment**
124:12,19 126:2,10
  126:16 127:17
  129:10 131:5,6
  132:5 133:22
  134:12,16
**repayments**
135:24 136:9,10

**repeat**
44:4 66:21 110:16
  116:8 118:10 135:8
  147:12,17 177:12
  209:17 307:2
  383:21
**repeated**
77:19
**repeatedly**
101:13,16,17 122:3
  255:16 256:10
**rephrase**
66:22 112:10
**replica**
53:6,19,20
**replied**
115:17
**reply**
108:12 113:19
  115:12,22 117:18
  117:19 118:13
  120:23,24,25 121:3
  288:20
**report**
16:10 50:21 62:13
  160:17 162:8
  181:19,25 200:12
  200:19 220:9 261:4
**reporter**
1:17 3:16 173:24
  406:7,12
**represent**
3:20
**representative**
4:4 174:22 196:10
**representatives**
307:24
**representing**
189:13
**reproduction**
406:11
**repurchased**
276:7
**request**
3:13 405:5
**requested**

262:25 263:2
**requests**
151:23
**require**
254:2
**requirements**
343:23 346:10
**requires**
142:18 358:22
**reside**
123:22 357:21
  373:18
**resident**
4:22
**residential**
8:11 9:8 23:16
**resides**
155:2
**resign**
70:24 71:2
**resigned**
70:23 71:13 119:24
  120:5
**respect**
46:10,11 47:19 92:17
  121:6 215:4 244:14
  284:9 286:3 296:18
  333:19 334:16
  391:9,22 393:14
**respected**
44:2,7,11
**respond**
62:2 86:8 116:23
  117:11 198:7 221:6
  265:15 282:25
  370:15
**response**
115:14 322:14
  370:11
**responsibilities**
63:18 77:8
**responsibility**
162:23 261:8,22
**responsible**
90:10 303:19
**rest**

43:15,16 115:11
  194:11 205:14
  276:10
**restate**
244:5
**restaurants**
23:17,21 24:21
**resto**
54:19
**restomod**
53:24 54:2,25 202:9
  202:11 203:25
  204:5,13 205:18,23
  206:5,12
**restomods**
205:4,10
**restructuring**
12:5 20:16 290:15
**result**
191:25 239:20,22
  243:25 244:2,7
  309:12 394:21
**resumed**
168:4
**retreat**
137:25 138:3
**return**
142:21 283:23
  370:17 381:9,23
**returned**
218:15 380:24 382:6
  382:13
**returns**
354:15,19 355:19
**revenue**
13:11
**reverse**
367:17
**review**
114:19 116:18 118:7
  280:14,16 343:2,6
  378:13
**reviewed**
378:13 379:3,4
**revise**
343:21



**Revised**
342:17
**rewarded**
80:24
**Richard**
57:14 58:20 59:2
61:6,11,11 65:3
67:13 71:13 98:4,5
304:3 320:17,25
321:2,3
**Richard's**
57:15
**RICHTER**
2:8
**rid**
70:20
**right**
4:16 6:5 10:22 18:10
22:15 27:14,25
28:11,15 29:3 30:15
30:16,18,22 31:12
32:17 34:13 35:7
38:5,13 40:8 42:2,6
42:25 44:2,7,11
45:2 46:10,15 47:9
49:19 50:6 51:20,23
53:3,15 54:6,15,21
54:23 55:4,9,12,22
56:6,11,25 57:19
58:3,6,8 59:16
61:23 63:15 64:17
66:9,11,14,18 67:3
67:24 69:5,8,16
70:15,18 72:13,24
73:6,9,18 74:12,16
75:5,10,15,18 78:5
79:2,11 80:8,12,19
81:7,20 82:3,14
85:5,21 86:2 88:21
89:2 90:12,20 91:5
91:12 92:2 93:22
95:18,20 96:8,24
97:6,15,17 98:25
100:6,24 101:10,24
102:11,20 103:18
107:6,10,23 108:22

110:7,13,22 111:4,8
112:6 113:3,15
114:15 115:3,22
116:3,9 117:5,6,7
117:22 118:8,24
119:17,18,22,25
120:9,20 121:7,17
121:19 122:21
123:13 124:2,5,15
124:20 125:7,12
126:12,15 127:14
129:10,12 130:10
130:10,18 131:14
131:21,25 133:14
136:3 137:9,15
138:23,25 140:24
142:18,22 143:4
146:10 148:3 149:3
149:24 150:5,9,12
150:15,23 151:3,7
151:12 152:18,21
153:6,9 155:9,12,19
156:8,17 157:10,18
157:19,23 158:21
159:6,11,13,16
160:4 161:7 162:11
162:14,18 164:13
164:19,24 165:8
168:19,21 169:4,10
169:18 170:19,24
173:6,13,21 174:3
174:10,14,18 175:5
175:22 176:5,18,23
177:4 178:20,25
179:7,25 181:9
182:16,21 183:14
184:5,16 186:17
187:4,14 188:4,18
194:7,11,18 198:4
200:9 202:15,17
203:15 204:14,21
204:25 205:5,10
206:12,16 207:17
208:5,8,14,17,21,25
209:6 212:25
214:16,21 216:13

221:14 222:5
224:13 226:15,21
227:3,7,12 228:13
228:16 231:22
232:2 237:4 238:3,6
238:10,18,24
242:12,14,17,21
244:16,20 245:25
246:16,20 247:3
248:8,12,21 249:22
250:25 251:9
252:14 253:14
259:4 261:16,19
265:3,7,11,22 266:8
266:9,22 267:3,6
269:16,19 271:10
272:8 273:15
276:17 277:13
278:25 279:17
280:11 281:3 282:5
282:21 283:14
284:6 286:20,23
287:18 288:25
289:3,24 291:6,10
295:25 296:9,13,25
297:8,17 298:4,13
299:2,11 300:20
301:2,7 303:8,12
306:12 308:8
310:14 312:9
313:20 314:9
319:10 323:7,9,14
325:15 328:7,12,17
329:19 330:3,17
331:19 333:3
334:11 336:6 337:8
337:14,24 338:11
338:16 339:7,9
340:21 341:3,8,16
341:17,22 342:4,10
342:24 343:13
344:14,19,25 345:5
345:8,11,18 348:10
348:13,16,20,24
349:5,11,20 350:8
350:16 351:17,20

352:21 353:2,12,24
354:11,17 358:12
358:14 360:9,13,24
361:12,22,25 364:4
364:6,19,22 366:22
367:14 368:3,9,12
369:9 372:22
373:20,25 374:6,9
374:23 375:3,18
376:3,7,12,17,21
377:2 379:24 380:4
381:18 383:20,24
388:4 392:14
394:17
**rights**
28:15 51:3,7,15,19
51:23 52:3 74:21
286:3 380:24
**risk**
210:3,4 332:16
**road**
70:10 71:17 72:7
73:5 197:20
**roadmap**
61:5
**Robertino**
259:3,6,14 260:11
261:4 264:8 265:16
**robust**
343:24
**role**
33:21,25 34:12,24
35:9 38:23 45:4,5
69:13 116:12
130:25 262:21
272:8 327:11,13
334:3,7 349:14
351:22,25
**roles**
349:13
**rollout**
248:7,19
**romantic**
245:12
**room**
61:8



**Ross**
367:21
**roughly**
6:16 17:12
**Roush**
27:8 253:7,11,12
266:2,5
**Roush/Idiada**
61:5
**route**
330:13
**routes**
329:11
**routinely**
300:24
**Roy**
384:15,16,24
**rubber**
13:9,23,24
**rubbish**
265:7
**Rudolph**
292:25 293:2,8
**rule**
92:20
**rules**
4:18 73:25
**running**
335:23
**Ryan**
1:5 2:15 3:6,23 25:5
35:19,23,25 36:5,22
37:9,15 39:7 40:7
40:10 43:7 47:12,25
48:11,21 49:8 50:21
67:24 68:10 69:11
69:15 70:4 76:15,23
77:8 79:2,23 82:20
84:18,23 85:20
86:18,23 91:12
95:20 96:8 97:20
98:2,18,21 108:2
114:5,11,16,21
116:11,20 143:12
176:14,15 178:4
189:6,7 211:6

223:17 224:23
226:23 227:3 228:3
228:5,17 229:16,18
229:19,20 230:6,21
231:10 234:7 237:6
240:16 244:20,21
245:11 252:25
253:6,14 254:25
256:21 257:21
260:6,25 263:25
264:2 265:14,15
268:5 280:2 281:17
289:16,17,24
290:19,20 291:16
292:8,17 294:2,8
295:16,18 306:7
307:18 310:12
313:23 343:6
345:17 359:20
361:18 364:25
365:11 366:22
368:19 370:11
371:24 374:13
375:5 377:14,17
378:18,25 389:17
390:7,9 400:13
**Ryan's**
38:13 42:18 48:9
50:18 76:6 88:12
119:17 120:15,18
121:11 163:17
256:4 287:23
288:18 294:11,16
294:22 298:18,25
340:8 345:14 376:4

---

**S**

**S**
168:2,2,2
**S-T-E-F-A-N**
44:21
**S-U-N-G**
57:16
**salary**
79:23 93:3,6,8
251:23,25 309:18

310:2,7
**sale**
140:23 155:23
157:22 159:9 160:3
160:6 168:11,13,21
172:12,15 173:11
174:7 176:5 208:4
398:23
**sales**
41:6 80:25 81:6,10
138:14,21 140:5
149:14,20 152:12
152:20 157:8 173:2
174:17 175:7
304:17 398:11,13
398:15,17
**Samuel**
1:9 314:20 332:10
335:14 337:10
348:12 349:7
352:16,21 353:12
**Samuel's**
314:23 318:16
335:22 336:5
**San**
5:8,10,15,19
**sap**
13:23
**satisfactory**
261:5
**satisfied**
255:21
**save**
264:11
**saw**
20:6,19 88:16 173:9
256:7 308:11
**saying**
26:22 56:20 67:2
75:4 76:22,25 82:19
96:6 98:12 107:3
113:22 117:12
118:5 120:19
125:14 131:13
146:2 158:10
159:21 161:15

164:23,25 173:15
185:19 197:24
201:2 248:6 254:7
254:24 262:13
264:17 281:13
288:16 289:22
293:24 299:16
301:5 302:23 313:2
329:10 330:24
333:19 365:22
375:16
**says**
29:4,13,22 31:6,15
61:25 64:3 66:21,23
78:8,14 79:13 80:22
81:5,10 84:18 85:7
85:8,9 86:2 88:11
91:6,11 95:13,17
97:6,17 106:8,13,23
113:18 114:18
118:20 120:12
121:10,13 122:17
122:20 124:7
127:10 137:8
138:25 140:15
151:10 163:5 164:4
169:6,16 170:6
174:15 176:14
181:18,23 182:9
187:19 191:12,17
191:25 193:22
197:16,23 198:13
198:18 202:25
203:3,5 220:6,20
241:8,11 247:2,3,11
253:7,20 260:9
264:7,25 265:14
267:6 276:7 278:23
287:6 306:11,17
321:8 324:14,15
325:14,20 326:18
332:22 333:24
334:20 335:8,20
340:8 342:16
353:11 364:24
365:9 367:20



368:18 370:10,23
377:13 380:12,13
381:4
**scenarios**
204:19 377:15
**scheme**
117:25 285:4,6,7
291:13 292:13,18
295:3 305:9,11,18
308:21
**Schiller**
1:15 2:3 3:11,13
**school**
5:3 26:4 124:14
236:6 357:2,18,20
358:2
**scope**
39:2 41:3 77:20
253:22 308:18
**screen**
26:15
**SEC**
318:12,15 323:13
**second**
29:11,12 31:5 39:4
62:6 72:4 76:13
77:23,23 94:13
130:16,20 140:6,20
140:23 141:11
152:13,21 157:18
157:22 159:16
187:19 217:5
253:19 274:10
300:9 314:13 365:8
365:20 367:15
376:19 398:14,18
**securities**
15:6 24:23 342:3
**security**
298:10
**see**
20:25 25:24 26:13,22
27:10,12 29:3 30:20
30:25 31:8,22 40:2
46:23 60:8,11,14
61:9 62:4,9,14,18

62:23 64:25 65:2,6
66:24 67:25 68:3
78:23 79:20,21 81:2
81:4,8,16 82:11
84:5,21 85:2,11,16
86:4,10 88:6,13
90:8,18,22,24 91:5
91:7,9 95:6,7,12,15
95:17 96:7 97:4,15
104:9,16,18 105:18
106:6,11,12,16,21
106:22,25 107:2
110:24 111:23
113:20,24,25
114:17,22 115:20
116:21,22,25 119:9
119:12,20 120:16
122:16,22 123:6
124:4,6,11,25
127:10,16,23 129:9
130:17 133:7,9,12
134:5 137:5,13
139:8 140:17,21
142:23 152:16
157:6,8 158:10,16
159:25 160:7 161:9
161:10 163:8,12
164:10 165:4 169:6
169:9 171:17 181:8
181:16,20 182:6,13
183:9 186:23
187:25 191:7,23
192:10 193:15,18
193:22 194:5,8
195:18,20 197:11
197:21 198:5,11,16
201:23 203:2,10
207:13,21 212:18
213:13,17,21 217:2
219:16 220:4,10,22
221:4,9,20,21 237:7
237:21,23 239:9,13
239:20,21 240:4,8
242:15 247:25
253:4,9 254:4,21,24
255:3,14,20 257:22

258:24 259:10
260:5,16,17 262:11
262:15 264:7,13,21
265:17 266:25
268:8,12 269:12
274:8,20 276:3,13
278:18 279:12
282:19 286:13,17
287:5,10,22,25
288:2 289:11,13,20
293:19 294:5,13
295:21 298:21
300:6,11,16 302:21
303:4 304:24 306:3
306:9,15,20 307:14
307:19,20 313:25
318:12,18 320:6,18
321:8,10 322:12,19
324:5,21 325:13
326:15,17 329:2,15
330:14 331:6 332:7
332:9,10,17 333:17
334:4,23 335:10,13
335:16 337:20
338:7 339:4 340:11
342:21 343:4,8
345:15 350:15
352:13,18 359:18
359:23,24 361:22
364:5,17 365:2,5,13
367:13,18,23
368:21 370:8,21,25
374:15 375:14
377:11,13,20
380:20 381:2
383:16 387:21,22
**seeing**
29:9 85:24 88:18
97:18 217:6 268:18
319:22 376:23
**seek**
215:15
**seeked**
177:22
**seen**
49:2 54:11 96:10

166:6,8 183:4 234:6
243:25 252:20
267:14 271:4 324:4
324:19 378:6
**sell**
56:3,14 149:10
151:14,17 152:4
153:17 155:21
156:16 172:9 196:9
**seller**
150:3 152:23 169:14
172:14 176:16
179:3
**selling**
55:16,19,20 56:2,8
150:2,11 151:6,20
152:25 169:12
173:16,19 176:25
208:12,24 287:2
329:18,21 350:19
**sells**
171:4
**send**
35:25 36:21,22 86:25
130:2 132:6 253:20
280:18 387:8
**sending**
339:23 364:15
**senior**
310:16
**sense**
103:13 164:9,19
165:3 226:5
**sensible**
330:13
**sent**
84:18,23 218:11
281:9,22 359:10
362:9 364:9
**sentence**
203:5 365:8
**separate**
74:15,17 76:15 94:4
253:25 321:13,20
**separately**
363:15



**separation**
108:20 109:23 110:7
**September**
1:16 3:8 205:9 225:3
406:7
**sequence**
275:18 382:9
**series**
89:24 226:20
**serious**
59:14
**seriously**
63:18 264:17 369:17
**served**
45:15 75:9 151:22
**serves**
306:11
**services**
1:24 2:16 3:15,17
41:3 79:14 386:23
**serving**
367:3
**set**
39:14 64:19 74:15
80:12 88:19 93:17
118:21 126:24
134:19 138:11
207:5 222:24
241:14 258:8
266:14 273:18
290:12 301:5,11,15
336:11 338:19
349:25 369:22
394:17
**sets**
79:10
**setting**
9:7 41:14 104:17
143:17 166:7
205:22 301:19
309:23 394:22
**settle**
350:14
**settled**
204:21
**settlement**

379:8,24 380:2 381:8
381:23
**settling**
351:5
**setup**
290:13
**seven**
74:3
**shaded**
60:25 137:7
**share**
271:22 285:7,12,12
291:13 292:13,18
304:21 305:3,4,9,11
305:14,18 321:14
392:5 393:15
**shared**
37:22 364:22
**shareholder**
82:21 122:21,23
183:17,18,19 192:4
272:18,21,24 285:6
290:14,16 296:16
302:7,9 307:4
**shareholders**
28:21 29:14,16,17
30:18 31:6 184:8
186:21 187:2
297:21 396:16
**shares**
61:22 62:22 69:2
70:6 72:17,21 74:10
277:5 306:7 307:6
338:6 342:9 392:6
**Sheet**
407:6
**shell**
320:17
**Sheppard**
2:8 3:25
**Shine**
191:21
**shoot**
225:6 231:20
**short**
10:24 211:3 259:17

269:18 277:2
281:19 283:17
290:10 330:23
**shortly**
119:21
**show**
28:18 39:18 83:17
116:6 152:10
180:21 200:25
211:25 226:8
233:17 246:4
252:22,22 254:14
257:14 267:24
289:4 293:3,10
336:22 338:20
358:25 363:13
366:10 370:4
**showed**
261:4
**showing**
25:21 105:15 156:8
**shown**
200:12
**shows**
70:10 71:17 72:7
73:5 165:12 166:10
183:7 233:16
**side**
12:16,17,18 45:10
140:13,13
**sided**
105:4 111:15
**sign**
78:11 160:22 161:6
161:12,24 162:2
267:2
**signature**
78:9,10 179:3
**signed**
42:2 77:11 78:4,7
142:11 143:18
149:7 161:5,6,22
162:7 178:18 179:3
203:17,18 205:3
209:14 220:9 360:8
383:12,14 404:18

**significant**
214:16 273:5
**signifies**
247:24
**signing**
161:16 203:12
**similar**
152:17 233:13
**Simon**
51:11,12,13,14
**Simons**
2:6 3:23
**simple**
85:8 110:8 117:24
159:2 260:13
310:11
**simpler**
228:24
**simply**
227:19
**single**
111:15 200:7
**Sino**
182:3,11,15 184:5,11
184:25 186:10,14
186:16 269:3,14,23
270:3,11,13,17,19
271:9,15 272:19
274:16 275:3 276:9
278:3 279:16 281:8
282:5 386:21
**sir**
30:16 31:24 58:14
68:6 83:3,10 85:16
86:2,5,10,13 87:6
90:6 91:9,12,18
93:6 94:14,19 95:20
95:24 96:16,24 98:6
98:9 107:23 109:5
109:11,21 110:13
111:5,8,23 112:3,6
112:11 113:15
115:3,20 116:3
117:6,22 118:8
119:19 120:20
122:16,21 123:13



124:2,15,20 125:7
125:12 126:5,15,17
126:21 127:10
129:10 130:8,11
133:19 134:9
136:23 138:18
142:13,16 143:13
145:16 147:4
149:17 150:12,15
150:24 151:15,20
152:15 153:9 155:6
155:9,12 159:17
160:4,23 161:7,10
162:14,19 168:17
175:5 176:3 179:7
179:19 180:5
192:12 194:13
198:22 201:8,19
212:6 222:8 230:14
234:17 236:5 237:4
238:13 239:23
242:6 244:2 245:15
249:13,20 254:6
255:22 256:6,9
258:21 265:25
267:15 268:4
274:22 277:4 280:8
284:24 285:17
290:21 298:13
301:10 308:12
309:22 311:14,21
312:20 313:6
322:21 334:7
336:12 341:8,20
344:14 345:20
346:8 348:9 349:20
353:5 361:5 377:23
379:7,16 381:6
**Sirs**
181:24
**sister**
38:13 357:14
**sit**
7:15 39:5 58:19,25
59:8 101:4 156:6
185:18 186:19

187:8 201:6 205:9
206:4 210:13 246:6
247:16 250:2,6
273:17 284:21
288:22 357:25
381:20
**sitting**
18:11 147:24 185:19
230:13
**situation**
62:12 86:19 132:4
259:23 296:21
**six**
180:23 195:20
196:14,20
**sizable**
13:17
**size**
337:17
**sketches**
263:7,9
**Skolnick**
369:23,25 370:7,10
370:23 371:4,6,7
404:11
**slightly**
98:23
**slim**
242:3
**slower**
94:5
**small**
145:8 215:23 239:11
278:13
**smells**
265:14
**so-called**
256:4 281:14
**sold**
28:7 55:21 56:5,10
56:12 57:4,17 61:21
69:2 70:5,18 72:17
72:20 74:10 139:6
149:21 150:22,23
152:7 153:5,8 156:3
156:13 158:20

159:15 163:22,23
164:4,7 169:3,8,20
170:18,22 171:2
173:5,12 175:12
177:11 187:20
196:3 311:7,25
312:14,21 313:7
**sole**
92:13 261:18,21
272:18,21,24
279:19 290:14,15
**Solutions**
57:5,6,8,10 182:10
182:18 276:23,24
**somebody**
14:25
**someplace**
357:22
**son**
188:12,14
**soon**
253:21 370:18
**sooner**
211:10
**Sophia**
313:23 314:9
**sophisticated**
75:13 80:6 214:20
**sorry**
8:18 27:20 44:4
157:11,13 190:21
219:2 225:12 244:5
323:4 356:14
383:21
**sort**
8:6,23 10:5 11:3
12:19 13:2 15:3
53:21 55:5 60:17,24
74:5 99:25 156:7
158:5 171:22
182:23 210:6 229:6
292:16 316:9
323:23 338:15
367:14
**sorts**
6:12 7:19 13:4,7 14:2

15:5 263:23
**sound**
54:3 132:8
**sounds**
132:3 133:16
**SOUTHERN**
1:3
**SPAC**
294:4 295:20 296:25
297:3,5,16,20,24
298:3,7,11,17
304:19 316:11,16
318:17,20 321:9,25
322:6,10,17,22,23
323:13 324:3,18
326:5 329:13,14
332:11,21,24 333:8
333:11,20,22 335:3
335:8,12,15,20,22
336:5,14 337:16,19
337:23 338:10,16
339:20 340:20
341:2,13,20,24,25
342:7 343:12
349:19 350:14,15
350:23 351:6,13
353:17
**space**
316:11
**SPACs**
297:13 319:4,10
321:9 323:24 336:3
341:6 349:24 354:3
354:6,11
**Spain**
36:8,9,14 223:20,21
**speak**
47:22 48:16 108:8
175:18 244:14
294:9 316:11
**speaking**
239:22 259:16,24
322:15
**speaks**
75:2 99:8 118:17
130:5



**special**
78:19 146:12,13,14
   316:17
**specific**
15:22 17:16,17 18:17
   40:13 56:8 87:14
   94:20 96:21,23
   101:17 104:14
   134:19 206:12
   215:9 305:15
   309:21 336:16
   375:6 391:19
**specifically**
16:14 43:21 47:12,20
   48:4,14,23 49:14
   63:4 72:19 100:8
   112:16 115:7 116:9
   256:20 284:19
   327:17 345:13
   349:22 353:9
   372:12 391:25
**specified**
253:23
**speculate**
91:4 97:22,24 120:21
   185:16,20 186:2,7
   190:6,19 199:20
   221:15,25 243:24
   246:3 247:9,15
   268:16 281:5
   288:15 294:25
   297:10 316:13
   327:7 350:22
   351:15 363:9,11
   371:20 383:7
**speculative**
375:20
**spelled**
384:25
**spend**
183:11 354:16 355:3
   355:10,15 384:18
**spending**
99:24 103:13
**spent**
12:10 214:15 234:7

297:15 354:21
**spice**
238:12,17,23
**spirit**
77:10,12 145:13
   146:25
**Splendid**
185:14,23
**spoke**
37:12 260:6
**sponsor**
329:12
**sport**
232:8,12,14
**spot**
195:10
**spreadsheets**
122:8 343:21 349:18
**square**
8:17
**stack**
275:10
**staff**
43:19
**stage**
265:6 297:11 326:8
   326:21 328:13
   333:6
**stake**
55:17,19,20 56:3,10
   56:12,14 57:4,17
   70:18 182:20
   276:17,21 294:22
   298:25 392:2
**Stakeholder**
50:8
**stakeholders**
50:6
**stakes**
186:14
**stamp**
83:23 88:3 89:17
   111:18 122:11
   127:6 136:17
   195:14 207:9
   219:11 266:18

278:10 299:25
   318:5 363:21,24
   366:14 377:7
   396:24 397:7,9,20
   398:6,8,10 399:14
   399:23 400:7 401:9
   401:17 402:9,18
   403:23 404:6,8,15
**stand**
97:8 195:2,4
**stands**
96:8 97:20 180:20
**Stanley**
366:17,20,21 367:2
   368:8,11
**stapled**
104:25 111:14 219:3
   219:19
**start**
5:22 18:22 19:21
   34:19 97:2 100:3
   211:16 219:23
   285:15 329:10,13
**started**
5:21 11:15 14:22
   15:23 113:2 211:15
   303:16 319:25
   336:20
**starting**
3:21 11:18 14:20
   19:19 47:18 60:22
   113:17 158:5
   336:13
**starts**
275:17 302:23
**state**
1:17 3:19 91:17
   115:7 177:13
**stated**
39:11 41:2 66:11
   67:14 68:23 70:14
   77:20 80:3 82:16
   100:16 118:19
   153:24 159:3
   165:10 171:8
   172:17 176:13

177:10 179:9
   228:17 239:16
   252:5 260:25
   307:11 308:18
   333:7
**statement**
115:14 118:6 212:3,8
   212:19 265:24
   274:25 279:25
   399:24
**statements**
154:9 213:18 278:16
   279:10 280:21
**states**
1:2 67:4 78:22 93:14
   108:11 109:7
   138:23 162:5,6
   174:9,13 175:5
   178:2,20 179:6
   342:4 354:17,21
   355:4,15 357:19,22
   365:7
**stay**
95:9 106:8 358:5
**stayed**
41:25 57:18,24 58:2
   71:12,14
**Stefan**
44:20 138:5 390:17
**Stefan's**
138:6
**Stefan/Mirko**
62:17
**step**
188:21
**STG**
36:24 37:2 376:10
**stick**
168:9 248:24 266:12
**sticker**
161:4 181:12
**Sticking**
252:21
**Stipulations**
405:8
**stock**



24:18 31:21 57:2
332:25 334:20
394:23
**stole**
67:15
**stop**
17:9 18:8 67:2
237:24
**stopped**
10:20 17:13 18:5,14
18:18,21
**storage**
6:14 7:23,25 8:16,20
**store**
9:3
**storing**
8:23
**story**
164:8,18 165:2
260:13 377:19
**straightforward**
7:2
**strategies**
48:8
**strategy**
41:4 248:24
**stress**
264:11
**strike**
29:17 37:22 46:13
77:14 94:18 103:5
108:14 126:17
156:21 172:7
185:13 245:3 248:5
272:12 284:22
287:3 336:10
**structure**
126:21,23 134:14
183:7 269:24
289:17 290:12
294:3 295:19
**structured**
377:14
**structures**
292:21 302:4 307:12
**structuring**

341:17 394:4,10
**stylish**
237:18
**subject**
27:12 28:12 114:10
125:19 210:12
214:23 258:10
292:3
**subjective**
69:18,19 227:21
**submitted**
108:2 178:19 227:15
**subordinates**
347:25 353:6
**subpoenaed**
357:13
**subscribe**
236:16 240:7
**Subscribed**
407:10
**subsequent**
70:10 72:6 206:18
351:19,21
**subsequently**
371:3
**subsidiaries**
32:21 182:4,12
**subsidiary**
31:19 128:16,19
**substance**
362:18 407:5
**substantial**
153:8 173:16 328:6
**substantially**
209:5
**success**
248:5
**successful**
231:25 234:10
244:12
**successfully**
234:18
**Sue**
330:10
**sued**
250:11,13

**suggest**
27:15 256:3 267:13
**suggested**
362:5
**suggesting**
254:8 268:5
**suggestions**
308:21 367:21
**suing**
250:14
**suit**
230:21 242:9
**suitable**
263:4
**Suite**
2:9
**sum**
124:19 128:8 137:8
329:11
**summary**
297:25 377:13 378:4
**sums**
128:5
**Sun**
389:3
**Sung**
57:16 58:21 59:3
61:11 63:2 67:14
71:5 321:2
**Sung-Fung**
1:8 3:6
**sunglasses**
239:6
**Sungzhan**
193:24,25 194:4,13
386:16
**Sunwah**
31:19
**supervision**
406:12
**supplement**
275:15
**supplier**
75:18,19,24 259:25
260:25 266:13
**suppliers**

43:20 44:15,16
206:10,13 253:12
253:13 261:9
359:12,14
**supply**
162:23
**support**
282:8 310:18 405:3
**supported**
42:9 99:16
**supporting**
253:14
**suppose**
238:8
**supposed**
163:2 190:3 251:23
251:25 262:22
322:15,17 392:21
392:25 393:10,12
**supposedly**
62:16 392:6,11,15
**sure**
8:19 22:17 24:2
29:20 43:3 53:2
55:25 65:3 110:4,6
110:11,11 114:7
115:17 118:24
121:10 128:13
137:16 156:10
165:15,19 166:13
171:21 203:19
221:6 222:3 223:24
250:6 264:8 275:11
276:14 281:16
284:23 294:11,16
298:18,24 317:23
325:5 327:23
328:13 333:6,11
334:25 335:5 336:8
339:10 364:14
369:11 382:22
383:8
**surprise**
67:13 245:19 344:2
**surprised**
245:21



**surround**
251:22
**suspected**
368:19
**suspecting**
313:23
**suspended**
361:7
**suspension**
361:19
**suspicion**
281:16 359:20
**switching**
98:23
**sworn**
4:6 154:16 406:4
    407:10
**system**
355:11

**T**

**T**
    168:2 396:11 397:3
    398:2 399:2 400:2
    401:2 402:2 403:2
    404:2 408:2
**table**
    104:17 234:2 249:24
    256:17
**tabs**
89:25
**tabulate**
355:3
**Tack**
339:8 340:4 342:16
    348:6,10 403:13
**tackisfat@gmail.c...**
338:23 339:2 403:11
**Taiwan**
269:11
**take**
    20:8,19 26:17 45:19
    46:19 47:2 49:17
    54:25 59:20 79:22
    86:22 89:5 92:17
    103:22 141:21

143:13 144:15,18
148:23 166:21
170:15 210:3,8
211:9,12 218:6,20
218:24 223:2
231:24 248:10
258:11 261:7,22
283:15,16 294:18
299:8 300:25 349:7
357:10 384:2 387:9
**taken**
1:14 3:10 26:14
143:24 145:25
147:2,21 166:24
210:14,20 211:18
294:11,17 298:19
**talk**
24:16 33:23 38:8
40:20 86:18 105:4
106:19 233:16
244:15 245:24
249:5 290:7 304:25
313:17 317:3
323:23 326:9 357:9
372:9 394:19
**talked**
49:16 67:23 206:23
213:23 234:6
266:20 285:5 293:9
311:4 316:15
317:10 371:22
**talking**
7:5 17:25 23:24
27:22 28:2,4 31:3
33:24 40:8 43:4
53:6 56:9 72:16,19
100:8,11 101:2
102:25 103:2 106:4
109:3 113:13,14
114:6 119:16 121:5
135:24 141:19
158:2 182:19
183:20 198:24
204:7 208:5,7 220:2
240:7 247:7,20
248:4 251:15 264:9

276:15 286:20,25
288:17 296:24
305:4 309:9 317:8
325:18 326:2,16,20
342:14 343:10,15
348:18 349:4 365:3
372:18 384:18
**talks**
237:22 370:13
**tan**
289:13
**target**
182:4 187:20,24
189:14 297:22
298:4 322:16,23
323:9 353:24
**tax**
172:19 174:8 175:21
175:25 177:19
178:2,12 181:19,25
289:19 293:25
294:3 295:18,20,25
296:13 306:18
354:15,19 355:19
**tax-related**
235:17
**teaching**
7:21
**team**
29:25 30:21 43:15,16
47:16 89:12 114:19
116:18 118:7
169:16,17,21 170:2
170:23 171:4,6,15
172:10,15 173:16
176:10,16,17 178:9
183:12 184:15
191:19 192:2,8,21
201:15,25 202:13
207:16 208:16
249:17 282:2
308:25 364:25
377:18 379:20,23
380:13 399:19
**Teams**
273:3

**technical**
62:13
**Technically**
322:14
**Technologies**
389:4
**tell**
46:14 51:14 101:19
115:11 158:8 170:4
171:11 175:24
190:17 211:20
236:4 260:11
263:25 295:8,16
301:24 319:9 326:2
341:9 343:25 378:8
380:6 381:22
391:18,25 392:20
392:24 393:4
**telling**
46:18 63:6 164:12,17
186:20 187:9 228:3
228:5 284:9 299:20
**tells**
116:17
**Ten**
390:23
**tens**
135:16
**tenure**
111:8 390:7 391:10
**term**
12:3 14:14 52:23
53:5,14,17 134:19
188:23,24 189:4
202:6,7,8 291:9
**terminate**
119:18
**terminated**
68:12
**terms**
7:6 8:2 14:2 20:16
48:11 50:15 80:17
82:7,14 100:17
118:15 134:17,23
175:9 177:15 182:5
199:7 209:9 216:14



221:11 226:6
230:18 232:19
233:20,21 235:16
250:19 252:13
261:4 305:17
309:10 317:6
337:18,23 374:11
382:21 393:23
**territory**
323:19
**test**
41:21
**testified**
4:7 72:3 85:18 103:6
158:20 168:4 175:3
180:19 188:3 213:8
394:8
**testify**
288:23
**testimony**
34:22 35:7 68:19
71:23 72:8 83:10
86:13 87:18 92:6,21
112:25 117:3
121:25 131:12
152:2 154:16 156:3
171:25 174:5
175:18 176:20
180:5,20 184:18
194:21 195:3
199:12 209:18
243:16 284:24
285:17 288:9
291:14 305:7
311:14,21 312:5
325:21 327:3
334:15 335:19
394:14 406:5
**testing**
36:23
**text**
60:6,9,24,25 64:3,21
64:23 86:2 104:9,12
105:18,23 111:20
114:2 116:7 117:11
117:21 118:16,19

119:7,10 121:24
156:25 157:3
193:13,16 197:2,4,9
197:16 219:13
224:20 245:20
246:13,15 247:17
254:16,18 262:3,9
274:4,6 275:21
289:7,9,13 293:11
293:11,15,17
298:17 300:3
302:16,18 313:13
313:14,19 318:7
346:14,19 350:5,7
352:9,11 370:5,9
373:8,11 396:19,22
397:13,16,22
398:19 399:10,15
400:10,15 401:5,11
401:14,22 402:5,10
402:15 403:15,17
404:9,12
**texted**
245:15 268:4
**texting**
293:23 326:24
**texts**
163:5 173:9 347:6
**thank**
115:19 116:24
117:19,24 118:4,5
118:13 194:11
274:13 281:14
389:7
**Thanks**
90:4
**theme**
54:13
**theory**
322:9
**thin**
222:9
**thing**
11:3 36:17 61:3
78:15 116:9 134:6
172:16 203:4

278:25 280:4
281:25 304:25
334:2 365:8 372:6
**things**
8:24 41:16 49:14
72:10 73:4 83:6
107:6 117:25 118:2
118:13 144:14
188:20 225:17
230:17 231:10
233:25 280:17
284:3 295:3 311:4
330:13 331:4
335:18 349:13
370:14 393:14
**think**
6:6 8:17 11:21 17:8
30:7 34:16 35:2
37:3 38:25 39:20
40:10,16,17,22
41:20 42:21 43:13
46:12 48:16 50:13
50:20 54:8,20 55:14
56:7 65:14,23 66:2
66:4,7,10,20,23
69:12 71:6,10 75:2
76:2 77:13 86:17
87:11 91:18 93:2
96:10,12 99:8,15
102:5,15 107:25
108:15 109:6
111:11 114:8,23
118:18 124:4
129:13,22 130:9
132:12 133:3,10,13
133:15 145:15
153:16 155:3
160:25 169:23
171:8 172:4,6,8,20
176:13 177:10,24
188:10 190:11
193:5 199:2 200:16
200:16 209:12
214:14 215:7 216:2
216:7,17 222:13,23
231:15 232:11,21

232:25 233:2,12,13
236:21 242:18
244:11 246:21
248:17,20 251:14
252:16 261:12,14
263:25 267:17
271:19 275:16
280:23 282:11
285:22 287:13
290:10,24 292:14
303:21 304:25
306:25 309:2,5
310:4,8,15,16,23
311:11 317:19
319:7,21 321:18
322:3 323:21
325:20 326:7 327:2
330:21 333:24
336:2 341:4 342:2,5
346:24 347:4,8,9,23
349:22 350:24
351:2,10 359:17
360:21 361:14
365:24 366:7
369:12 370:16
371:21 372:24
374:7 378:6 379:10
382:18,19 385:25
**thinking**
344:18
**thinks**
47:6 265:14
**third**
31:3 62:11 75:15
177:2,9 187:23
189:14,24,25
292:19 318:9
**thirds**
62:22
**thorough**
79:4
**thought**
8:22 11:13 17:7 41:7
41:9 42:19 48:9
72:11 73:21 226:14
245:16 334:25



**thousand**
338:6 380:18 383:3
**thousands**
290:10 302:2
**threatened**
61:8 63:21
**three**
30:8 57:25 63:15
143:5 147:12 155:7
252:5,8 291:3 304:2
329:11,13 330:9
331:18
**ticket**
358:9
**tickets**
358:13
**tied**
281:13
**timber**
13:9,22
**time**
3:9 10:25 12:10
16:17,17 17:12,25
18:2,17 19:2 28:7
36:10,23 37:21,24
38:17 39:15 40:13
42:12 43:9,17 44:23
45:9 48:17 50:22
57:12 59:23 60:2
63:12 65:17 71:3
72:20 73:3 74:6,9
79:3 80:8 81:15
82:9 86:18 91:3
101:17 103:25
104:4 105:14 107:8
108:7 112:4,12
117:17 118:3,12
119:25 120:8
123:22,23,24,24
150:17,19 153:14
153:21 157:14
160:23 162:3
164:13,14 165:22
166:3,15,23 168:3,7
176:13 177:2,9
180:9,17 185:11

203:12,19 205:24
205:25 206:3
209:14 210:5,18
214:16 216:12
218:22 223:7,10
229:15,18 234:8
244:19,19,22
246:10,19 248:23
250:9 253:17
256:19 261:3,13
266:12 267:8,11
280:15 283:19,22
284:20 290:2
292:19,20,24
294:19 297:15
304:7 306:17
308:19 312:25
313:3 314:15,18
315:16 320:19
321:23 325:10
326:16 331:7,8
332:5 333:11 334:5
334:25 336:2,12,18
340:19,24,25
343:22 345:3
349:23 351:7,10
370:16,18 371:11
374:25 378:11
384:10,13,19 389:8
392:22 395:22,23
**timeline**
211:22 248:7
**times**
38:7,15 46:12 53:22
77:20 82:24 86:24
117:6,8 121:22
147:12 155:8
177:13 234:7
236:17 245:24
255:7 268:4 280:8
280:13 310:11
358:18
**timing**
333:15 334:21
393:16
**title**

27:12 58:9 68:2
69:10 70:21 164:14
164:16 310:21
316:5,6,7,8 352:4
**titled**
96:18 227:4 339:6
**today**
3:8 7:15 16:23 17:4
18:11,15 39:5 58:19
58:25 59:8 101:4
147:22 152:2 156:6
184:18,23 185:18
185:19 186:19
187:8 191:15 201:6
206:4 210:13,22
233:15 242:19,20
246:6 247:16 250:2
250:6,18 251:3,11
273:18 288:22
357:25 381:20
**today's**
6:23 7:3 395:21
**told**
79:4 101:13 116:10
151:24 166:8
190:11 229:19
245:16 252:4
259:18 285:10
371:13
**Tom**
25:18,24 26:3,9,22
27:3,4 396:14
**Tomaso**
1:8 2:14 25:14 27:13
27:17 28:3,12,15
29:6 41:2 45:11,16
46:20 51:4,17 52:8
54:5,15 55:9,11
65:19 67:6,8 68:11
74:12,15,20,22 76:6
76:17 77:17 79:24
81:11,19,22 82:3,6
82:22 83:8,12 86:15
87:21 88:20 89:13
90:11,20 91:22,25
94:9,10 95:3,10

96:17 99:17 100:6
100:13 101:21
103:7 109:24
112:14 114:15
120:3 122:9,17
124:2 125:10,14,15
125:16,18,24
126:21 127:3,11
130:23 131:2,14
136:20 141:8,9
148:9,12 149:12
150:12 151:6
152:13 153:2
156:17 157:9,23
159:10,16 165:20
169:4,8,10,13,21
170:18,23 171:3,5,6
172:9,13,14 173:5
173:17,20 176:11
176:22 178:8
195:17 203:8,15,19
204:12,13 206:20
207:17 208:13,25
212:13 213:9 220:3
221:12 224:13
227:18,25 229:7
230:4,8,18,19
231:24 232:15
234:19 235:13
237:3 239:19
240:12 242:13,16
242:21 243:12
249:11 250:11,23
251:9,10 252:18
255:8 256:21
261:10,16,19,21
262:23 268:5
269:19,24 270:4,14
270:17,18 271:10
272:25 273:4,16
277:6,9 278:17,23
279:3,6 281:9,23
283:25 284:6,10,18
285:2,9,20 286:4,23
288:6 292:9 297:6
298:11 303:11,20



304:13 307:24
308:14,24 309:6,17
309:17,24,25 311:6
311:22,23 312:8,14
312:22,22 313:7,8
321:24 327:12,16
329:18,23 333:21
333:24 334:11,18
335:3,6 336:14
340:14 341:12
342:24 343:12
345:4,10,17 346:3,4
346:20 348:20
349:5,8 350:10,19
350:24 351:5,17
353:24 359:4,11
364:10,19,21
368:12 371:15
372:10 374:14
376:2,7,12,21 379:7
380:17,25 381:7,21
381:21 382:14
390:3,6,8,13,20,25
391:12 392:16
393:2,5,12 394:17
394:22 395:4,6,6
397:11 398:18
403:21
**Tomaso's**
394:5
**tomorrow**
171:24 172:3,22
174:23 179:23
**toolings**
250:22
**top**
85:16 119:9 122:16
183:13 213:15
217:3 218:2 239:5
242:12 250:20
257:22 260:10
331:3,9 366:17
368:16
**topic**
282:13 358:16
**topics**

42:11 48:5 98:23
223:5,11
**total**
191:19,22 226:3
251:11 252:7,9
274:17 303:2
332:15 391:4
**Totally**
323:7
**tough**
194:24 247:15
**Tower**
4:24
**town**
145:8 388:9
**track**
36:16,17,19 355:9,12
356:12,15
**tracked**
345:22
**traded**
341:21
**trades**
56:21
**trading**
12:22,23
**traditional**
329:12
**transaction**
145:24 182:9 183:2
216:4 297:17
340:20 341:2 342:8
343:12 344:8
349:20
**transactions**
178:13 386:17
**transcribed**
8:19
**transcript**
406:11
**transcription**
407:4
**transfer**
158:13 159:23 163:5
165:12 171:5
194:16

**transferred**
193:23 194:3 278:6
**translate**
277:19
**travel**
71:17 73:5,17,19
106:9,15 117:17
148:11 161:19
248:23 253:17
266:11 355:21
356:8
**traveled**
73:22 74:5 375:2,4
**traveling**
192:18 375:7
**treatment**
175:9
**trial**
40:16 41:23,24 42:5
42:6
**tried**
38:11 185:6 260:7
**trigger**
295:24
**trouble**
235:18
**true**
31:24 58:13 73:11
94:19 118:14
245:15 249:13
254:6 256:24
265:25 267:15
268:4 280:19
299:20 301:10
312:8,20 313:6
336:12 345:20
372:7 379:7 406:4
**trust**
45:19
**trusting**
45:25
**truth**
46:15,18
**truthful**
162:23
**try**

11:21 55:12 108:16
203:25 204:13
232:5 279:2 299:21
310:11,13 312:25
**trying**
22:25 24:2,3 54:19
135:25 144:4
145:11 157:14
195:10 204:4 233:5
245:2 259:20
267:10 293:5
299:19 312:11
329:22 331:15
353:21 356:24
358:18 365:3
371:24 383:19
**turn**
29:12 31:14 77:24
84:7 85:13 104:21
105:25 113:17
115:18 137:2 163:4
181:22,22 182:8
183:6 202:4,20
213:5 237:8,9,20
239:3 254:23
264:15,23 282:23
286:21 287:21
293:22 306:5 307:8
321:7 322:8 325:9
326:11 330:7
333:14
**turning**
79:9 113:11 130:16
264:6 286:15
313:22 320:16
328:24,25
**Twenty**
238:21
**twice**
30:11
**two**
49:11 62:22 75:11
81:10 90:10 94:4
101:5 103:21 105:6
139:3 141:22 143:4
144:16 153:15



156:12 163:11,15
169:3 170:4,10
175:10 179:15
187:21 190:3
211:16 227:23
287:15 329:13
338:3 355:16
363:14 374:22
391:24
**two-minutes**
231:13
**type**
45:5 135:17 257:10
**types**
11:8 141:22
**typically**
346:9 354:16
**typo**
321:19

———————

**U**

**U-L-I**
44:19
**U-Ton**
186:4
**U.K**
236:2,6
**U.S**
7:6,10 16:2,5 21:9,11
79:16 123:4 128:6
128:10 172:18,20
175:21 178:11,16
236:8 250:20
269:19 276:9 279:6
290:14 298:10
319:24 342:9
355:10,12,21
368:25 394:5,17,22
395:6
**Uh**
62:19
**uh-huh**
13:25 24:6 26:2
27:11,23 29:15 31:9
31:13 55:10 56:23
61:2 62:5,10,15,24

63:13 65:7 70:16,19
72:22 79:12 80:21
81:9,17,21 82:4
89:15 90:23 92:3
95:16,19 96:19,25
97:5,7 101:25 103:9
104:20 106:3
113:12 119:13
123:7 124:8,13
125:2,5,9 127:13
130:22 136:12
137:4,14 140:18,22
141:4,10 142:19
146:6 149:4 150:16
150:25 151:4,8
152:19,22 156:19
157:20 158:3,17
159:7 161:11 163:9
163:13 164:11
165:5 170:25 173:7
173:22 181:17
182:7 184:6 186:15
187:17 188:2 191:6
191:10,24 192:11
193:19 194:6,12
195:19 196:13
197:12,22 198:6,12
198:17 201:24
202:12,16,18 205:2
207:14,18,22,23
208:6 212:22
213:16 219:25
220:5,11,23 221:5
221:10 246:17
248:9 253:5,10
254:22 257:23
259:5,13 264:22
265:8,18 266:23
269:22 271:11
274:9,12,21 278:19
278:21 279:13
282:20,22 283:4
286:14 289:12
293:20 294:6,14
300:7,12 302:22
303:5,9 306:4 314:8

318:11,19 321:22
324:6 329:16
330:15 332:8,13,18
337:6,9 338:8 339:5
340:12 342:22
343:5,9 345:12
348:11,17,25 349:6
350:9 352:14,23
364:20 365:14
367:24 368:4,10
370:22 371:2
373:13 376:18,22
379:25 380:16
387:12
**Uli**
44:19,19
**ultimate**
21:2 128:23 183:23
185:8 187:2 192:3
261:15
**ultimately**
20:11,14 21:3 45:14
80:10 182:20
204:16,20 205:4
**unchecked**
114:3
**uncle**
141:12,16,21 142:4
143:25 144:24
145:9,18,19 146:22
147:6,10 148:22
150:9,22 151:3,14
152:3 153:18
155:24 156:3,12
158:20 163:23
165:7,13 166:11
175:12 188:4,19,22
189:4,6 193:3,5
196:11
**uncle's**
139:13,14 141:2,6
153:6
**undercover**
328:6
**understand**
6:19,21 22:10 24:2

32:15 52:22 53:4,18
75:12 78:25 83:3,8
83:9 93:19,25 94:7
94:11,12 96:14,15
96:16 131:11
134:13 135:25
142:16,17 146:2
149:5 162:17,22
182:9 225:4 227:17
227:24 228:8,11
229:25 230:7,23
231:9 260:7 263:20
266:7 273:17
279:21 284:24
296:12 297:20
311:2 315:10,14
316:10 322:21
323:2,13,21,22
328:10,15 346:8
355:8 360:22 361:2
366:20 372:25
381:16
**understanding**
35:10 79:7,8 80:11
80:14 99:22 100:2
101:5 102:19 103:8
103:10 175:4
185:17,22 186:4
188:13 230:16
288:11,23 291:5,9
297:12 349:11,12
351:11 355:18
360:6 364:8 367:5
378:17 380:9
**understood**
47:17 100:22 120:19
178:18 179:5,10
214:15 225:13
227:11 229:12,20
233:25 252:17,19
254:7 265:19
315:12 323:11
342:7 344:7 353:16
353:22
**undervalue**
177:18



**undervaluing**
176:4
**unexecuted**
380:5
**unfair**
222:23
**unfold**
330:13
**UNICORN**
1:9
**United**
1:2 78:22 174:9,13
175:5 178:2,19
179:6 342:4 354:16
354:21 355:4,15
357:19,22
**university**
5:5,6,8,10,14,19
**unsure**
327:4 359:15
**update**
342:18 343:7
**updated**
241:8,12 246:24
247:4
**upset**
232:22
**use**
58:21 65:4,20,25
66:24 160:19 189:4
197:17 202:24
217:9 220:8 256:10
256:14 261:8 266:7
329:20 335:8,20
339:20 345:3,25
371:17,19
**useful**
239:18 240:11
**usually**
14:14 170:12 354:24
**utilize**
214:8
**utilized**
212:12 337:11

— V —

**vacation**
36:11
**vacations**
38:3
**valuation**
210:6 220:3,6 286:22
286:24 287:7
333:15,21 334:16
334:21
**value**
6:23,24,24 7:3 40:10
158:14 177:3,25
178:11 210:4
**valued**
153:20 179:11
**valuing**
174:13 175:21
179:12
**various**
14:22 50:5 71:17
75:13 86:23 113:14
174:8 176:23 214:7
215:12 230:8,11,20
248:14 251:8 255:7
259:7 302:3 315:17
316:20 344:11
352:25 380:22
381:17 393:14
**vehicle**
96:22 168:11,12,20
174:6 176:5 179:5
398:22
**vehicles**
36:24 233:10 304:17
**vendors**
257:2 260:19 265:22
266:8
**venture**
391:24
**Ventures**
169:16,17,21 170:3
170:23 171:4,6
172:10 176:11,16
176:17 178:9
183:12 184:15
201:15,25 202:13

207:16 208:16
379:20,23 399:19
**venues**
137:24
**verbally**
306:8 393:21
**verified**
281:18
**verify**
333:13
**version**
82:2 102:3 191:15,16
219:19 246:24,25
263:13
**versus**
3:6
**vest**
392:21
**vesting**
392:10 393:15,16
**video**
225:8,18 227:19
228:16 381:17
**videographer**
2:16 3:2,14 59:22,25
103:24 104:3
105:10,13 166:22
168:6 223:6,9
283:18,21 314:14
314:17 384:9,12
395:20
**videotape**
3:4
**Videotaped**
1:14
**view**
46:4,19 47:2,9 69:23
69:25 70:11,13 74:4
76:5 77:8,15 79:22
92:16 171:17
197:17 211:14
214:24 216:2
234:17 239:18
240:9 243:20
245:10 249:9 250:2
310:7 371:14 374:8

376:23 378:18
**viewed**
308:13
**viewerships**
240:5
**views**
48:9
**Villa**
137:12
**Vision**
269:3,15,23 270:3,11
270:13,17,19 271:9
271:15 272:19
274:16 275:3 276:9
278:3 279:17 281:8
282:5 386:21
**visited**
374:23
**VMS**
193:23 194:10
**Vroom**
237:24

— W —

**W-E**
57:5
**W-I-N-A-T-A**
139:15
**W-O-N-G**
43:24
**W-U**
51:13
**Waft**
376:2,6,14 379:8,24
380:3,15,18 381:8
381:18,23 382:13
383:4,24
**waiving**
218:13
**Waldo**
2:6 3:22
**walk**
238:4 239:17 302:6,8
307:5
**want**
4:19,19 6:25,25 8:18



11:21 29:20 30:7,8
30:9 43:3 53:2
55:25 66:21 68:15
68:22 71:22 80:2
86:12 88:9 90:7
91:3 92:17 97:22
104:25 112:23
118:3,10,23 119:14
119:15 128:12
129:19 131:4
132:20 133:20
135:20 147:17,18
153:11 158:4
159:21 160:14
168:9 173:8 174:24
177:12 180:24
183:11 185:16,20
186:2,7 187:18
190:6,19 198:2
199:4,20 202:24
206:2 211:7 220:25
221:15,18,25 223:2
223:11 233:18
242:10 243:24
245:5 246:3 248:15
249:5 252:22 258:2
262:24 265:2,20
267:13 268:12,16
268:23 273:10
276:5 281:5 283:15
283:23 284:23
285:14 294:10,16
294:25 297:10
302:24 304:20
308:4 310:21 318:8
327:7 350:22 351:2
351:15 355:7,8,16
357:9,11,16 358:16
358:17 363:11
371:20 378:10,21
382:2,23 383:2,7
384:6 391:16
394:19 395:10
**wanted**
15:7 17:6 65:18 67:2
75:20 210:24

222:10,12 231:24
250:3 253:16
371:24
**warehouse**
6:15 148:2
**Washington**
2:10
**wasn't**
9:17 15:22 17:11,23
43:14 71:4 92:10,11
230:15 237:12
298:8 326:24 333:5
364:14 382:4
**waste**
218:21
**watched**
151:2 381:19
**water**
4:19
**way**
38:21 41:20 42:24
43:13 53:25 56:20
60:22 110:25 132:3
200:24 201:2 216:4
224:7 225:7 234:14
244:25 256:2 257:3
259:21 289:17
292:12 300:14
302:11 310:23
320:3 329:12
337:15,21 338:2,13
342:25 346:25
347:10 348:14
367:16 371:8,25
375:4 377:14 382:5
393:22
**ways**
227:18 331:16
334:10,13
**we're**
264:9
**we've**
27:21 59:19
**Wealth**
387:2,6,15,18 388:3
404:20

**wealthy**
373:20,22,24 374:9
**wear**
230:8,19
**wearing**
230:24 242:5,13
247:12,14,19
259:16,19,25
**week**
98:25 113:19
**Weinstein**
369:19
**well-being**
244:23
**well-known**
20:2
**Weng**
1:9 339:22
**went**
7:18 10:25 19:11
20:3 21:13 51:19
138:2 204:8 231:12
236:6 260:6 280:3
307:3 362:14
**weren't**
218:13,16 317:8
340:13
**Werner**
2:10 3:25,25 6:10,18
7:8,13 8:4,8,15,21
9:19 11:20 13:13,16
13:20 14:8,13 15:9
16:12,20 17:5,22
18:25 20:9,13,21
21:5,15,24 22:11,16
23:2 24:11,19,25
27:18 30:4,14 32:3
32:10,18,24 33:5,11
33:17,22 34:3,9,14
34:18 35:24 36:7
37:11,17,25 38:6,10
38:20,24 39:9 40:12
40:24 41:11,17 42:7
42:14,20 43:2,10
44:3,12 45:13,17,21
45:24 46:5,16,22

47:5 48:25 49:20,25
50:7,12,19 51:21,24
52:12,25 54:7,16,22
55:13,18 57:11
58:16,23 59:4,11,17
63:3,9,24 64:2,7,12
65:12,16,22 66:15
66:19 67:7,16 68:13
68:18 69:17,24
70:22 71:19 72:14
72:25 73:14,24 74:7
74:14,23 75:7,25
76:18 77:9,18 79:25
80:9,13,20 81:3,24
82:15,23 83:18
85:22 86:6,16 87:8
87:13,22 88:17,22
89:8,22 90:13,16
91:10,19,23 92:9,19
92:25 93:4,7,11,23
94:16,22 95:21,25
96:9 97:12,21,23
98:3,14 99:7,14
100:14,25 101:8,15
101:22 102:4,12,21
103:19 104:23
105:3,8 107:11,24
108:15,23 110:2,14
110:23 111:9 112:7
115:4,16 116:4
117:16 118:9,14
119:3,23 120:4
121:8,20 122:2
123:14,17 124:3,16
125:8,13,21 126:22
129:4,18,24 130:4
130:12 131:3 132:2
132:14,19 135:19
137:22 139:24
141:23 142:7
143:20 144:2,6
145:21 146:24
147:7,11,15 148:14
148:24 149:11
152:5 153:10,19
154:11,24 155:13



155:17 156:9,14
157:15 158:22
159:12,18 160:5,11
162:4,15,25 163:25
164:15,20 165:9,14
165:18,23 166:4,12
166:15,18 169:22
171:7 172:11
174:19 175:16,23
176:6,12 177:5,20
178:3,14,21 179:2,8
179:14 180:8,13
181:10 183:3,25
184:13,21 185:2,10
185:21,25 186:6,11
187:5,12 189:15,22
190:5,14,18 192:16
192:24 193:4
194:19 195:25
196:4 198:23 199:5
199:10,15,19,24
200:15 201:9
203:16,22 204:2,6
205:6,11,15,19
206:6,11,21 208:23
209:2,7,15,23
210:11,16 211:2,13
214:5,12,17,22,25
215:6,18 216:6
217:5,23 218:4,8,20
219:7,18 222:6,11
222:15,22 223:4,23
224:4,9,17 225:23
226:11,16,22,25
227:8,13,20 228:2
228:22 229:8,14
230:5,10 231:5,14
232:3 233:7 234:12
234:20 236:13,23
237:11 238:14,20
240:13,19,22 241:3
241:8 242:7,22,24
243:4,14,23 244:3
244:17 246:2 247:8
248:13 249:16
251:13,20,24

252:15 253:15
254:11 255:11,18
256:11,15 257:5,11
258:4,9,15 260:21
261:11 265:23
266:4,10 267:12,18
267:23 268:7,15,21
269:25 270:8,15
271:24 272:5,9,16
273:7 275:4,11
276:18 277:7 278:4
279:18,24 280:22
281:4 282:6 283:7
283:16 284:11,16
285:3,14,21 287:13
287:19 288:8,14,19
289:2,25 290:5,22
291:19 292:10
294:24 296:2,6
297:2,18 298:5,9,14
299:3,12 300:21
301:8,13,17,21
302:10 303:13
304:14 305:6,16
306:24 307:25
308:9,15 309:3,7,19
310:3,8 311:10
312:10 313:9
315:23 316:4,12,23
317:11,13,16 319:6
320:14 322:2,24
323:10,15 324:15
325:2,19,23 326:6
327:6,14,22 328:8
328:18 330:4
331:20 333:4,23
334:12 335:4,24
336:7,15 338:12
339:15,21 340:2,6
340:16,22 341:23
342:11 344:5,10,20
345:2,23 346:6,11
346:16 347:2,7,11
347:16,21 348:2
349:16,21 350:21
351:8,14 352:3,22

353:3,8,13,18,25
354:7,12,23 355:22
356:3 357:3,8,15
358:7,15 360:4,14
360:16,25 361:13
362:2,6,10,15 363:9
364:11 365:20
366:3,7 367:8 369:2
369:10,14,20 371:9
371:16 372:11,17
372:23 373:5,21
374:10,19 375:19
376:8,13 377:3
378:5,15,20 379:2,5
380:5 381:3,11,25
382:7,15 383:5
385:17 387:7 388:5
388:14,24 389:5,10
389:13 395:9 396:8
**WhatsApp**
157:12 282:15,17
401:18
**whatsoever**
131:2 141:6 154:17
185:23
**whereabouts**
373:4
**white**
82:17 200:14 239:5
**wider**
254:10
**wife**
38:4 124:20 130:18
130:23,25 131:7,24
132:6,17 137:9,20
137:24 138:6,7
238:9,11 314:9
379:12,14
**Wigger**
2:11 4:3 89:19 90:4
104:6 119:4 122:14
127:8 196:23
218:11 268:9 384:5
395:10
**Wild**
259:3

**William**
330:24
**willing**
338:4
**Winata**
139:15,16 151:24
187:22 188:4,6,11
188:14,22 189:5
196:12
**Winatas**
190:9,13
**Winner**
191:21
**wire**
86:25 270:17 279:15
**wired**
26:23 271:9 310:5
**wiring**
269:18 270:3,5,21
**wish**
365:11 382:23
**withdrawals**
136:9
**withdrawn**
119:4,5
**witness**
4:6 217:15,15 283:11
389:9 406:3,5
**WLS**
388:17
**Wong**
43:23,23,25 44:6
47:14,15,19 48:2
124:19 137:8 262:4
262:10 264:7,16,25
265:10,14 390:18
401:7
**word**
65:4,20,25 66:25
112:9 160:19,21
161:24 329:20,21
371:17,19
**wording**
41:3
**wordings**
39:12



**words**
63:21 378:8
**wore**
239:5
**work**
5:25 7:18 10:4,5,7,10
    10:13,25 11:7,10,19
    11:23,25 12:3,8
    14:16 20:25 24:13
    33:9 39:2 41:8
    42:18 45:10 57:21
    58:3,11,13 69:4,8
    69:16,20,23 70:4
    71:25 72:2,24 74:22
    76:6,16 77:13,16,21
    79:23 83:7,12 86:14
    87:21 90:19 109:19
    112:14,15 130:23
    178:23 192:20,21
    204:8,11 206:16
    208:19 212:14
    214:10,11 221:2
    250:18 265:7
    266:25 283:8,8
    297:13 308:18,24
    309:2 321:9 328:7
    390:24 391:3 393:5
**worked**
5:20 11:13 13:18
    45:23 50:15 100:18
    100:21 193:2
    224:12 263:24
    285:9 315:12
    347:14 390:13,14
    390:20
**working**
5:21,22 10:16,20
    11:6,25 12:2 19:12
    19:21 34:4 38:18
    42:16 61:22 80:15
    102:5 131:18,20,24
    134:14 136:11
    192:22 267:6
    270:24 296:24
    297:16 309:11
    316:11 318:21

319:5,8,10 349:10
    357:16 374:14
**works**
60:22 85:14 86:9
**world**
228:7,9 230:3 234:4
    234:11 235:11
    264:9 373:2 375:5
    386:11,14,18
**worldwide**
73:22 386:21
**worried**
175:20
**worth**
6:17,21 248:21 374:5
**wouldn't**
18:7 46:18 52:19
    160:19 164:2 237:5
    245:19,21 329:20
    371:17
**wrapping**
166:18
**write**
62:12 65:2 118:4
    260:9 290:17
    313:22 322:9 324:2
    324:17 326:12
    330:8 333:15
    374:12
**writer**
379:11 383:25
**writer's**
379:14
**writes**
84:23 331:3
**writing**
121:6 159:21 306:8
    325:11 393:21
**written**
66:22 68:22 76:20
    77:2 86:11 99:20,25
    100:6 102:3,16
    103:7 117:4 121:19
    152:3 181:14 201:3
    216:8 256:2 271:2,3
    271:8 378:4

**wrong**
48:10 58:6 85:21
    181:11 188:7 211:6
    394:9
**wrongdoing**
361:12
**wrote**
85:6 87:9 115:21
    117:24 159:4
    164:21,22 259:3
    260:5 268:24,24
    280:7 288:2 291:2
    296:4 298:22
    306:16 314:4 335:5
    350:17 375:21
    377:22 378:12
**Wu**
51:13
**www.MagnaLS.com**
1:25

---

## X

**x**
1:4,11 396:3,11
    397:3 398:2 399:2
    400:2 401:2 402:2
    403:2 404:2

---

## Y

**Yang**
123:4,11 134:4
**Yards**
1:15 2:4 3:12 123:13
    123:18
**yeah**
7:14 8:25 15:10 23:6
    28:9 29:24 32:4
    35:10 37:12,12,18
    38:2 41:19 42:15
    44:13 45:18 47:10
    55:3,7 56:12 66:7
    66:10 69:14 73:10
    75:6 82:25 84:6
    92:5 101:9,11 113:4
    119:20 129:8
    162:20 163:2 175:6

179:9 189:2,10
    196:22 215:25
    238:7,21,25 239:16
    241:23 246:21
    261:23 276:14
    280:12,12,18 288:2
    295:22 314:3 316:7
    318:14 319:11
    321:11 325:13,16
    326:17 331:10,10
    334:5 338:13 345:9
    348:21,21 361:23
    361:23 374:2 375:9
    385:22
**year**
5:9,22 10:20 11:18
    22:21 36:12 61:20
    79:16 83:7,12 85:14
    86:9 87:7,19,21
    91:15 106:14
    122:13 127:3,14
    130:3 153:14
    170:22 179:12
    187:20 252:7 358:2
**year's**
6:24
**yearly**
13:11
**years**
10:18 11:23 16:21
    22:20 41:25 54:12
    57:25 63:15 101:2
    153:15 161:20
    173:12 191:18
    192:19 210:18
    211:17 238:21
    252:6,8 291:3
    343:19 387:22
    390:10,22,23 391:7
    391:8
**Yee**
124:19 137:8
**Yip**
190:25 191:8 399:8
**York**
1:3,15,16,17 2:5,5



3:12,12 236:15,17
236:17,19,21 356:7
358:2,20

## Z

**Zach**
2:5 3:21,22 4:10 8:18
8:22 23:4 30:12,16
44:25 59:19 64:20
68:20 83:20 84:2
87:24 88:5 89:21,24
94:24 103:21 104:8
105:2 108:13
111:13 118:25
119:5 122:6,15
125:16 126:25
129:16 130:2,5,14
136:14 138:12
140:3 149:13
152:11 156:22
166:17,20 168:8,16
178:6 181:3,11
190:20 193:10
195:7 196:25
201:12 207:6
211:25 216:22
217:21,25 218:5,10
218:18 219:2,8,22
223:2 235:19
237:14 241:4,11,15
243:2 246:11
258:12 261:24
262:5 266:15
268:11 269:6
273:25 275:7,12
278:7 282:12
283:14 286:6 289:4
299:22 302:12
305:19 313:11
314:12 317:25
319:12 329:3
331:24 336:22
341:25 348:4 350:2
357:6,13 363:17
365:25 366:5,12
373:7 377:5 379:17

380:7 383:9 384:2
387:13 389:7,14
393:24 394:4 396:7

## 0

**0000040939**
299:25 395:18 402:9
**0000082687**
195:14 395:15
399:14
**000034737**
266:18 395:17 401:9
**000035815**
318:5 395:19 402:18
**000036656**
127:6 395:14 398:8
**000253831**
278:10 395:17
401:17
**00134817**
89:17 395:12 397:9
**00167101**
136:17 395:14
398:10
**00176285**
122:11 395:13 398:6
**0057**
330:8
**01**
170:6
**03**
12:7
**04**
12:7
**09**
14:19

## 1

**1**
3:4 4:24 25:17,18
81:5 138:25 157:10
159:11 160:24
161:10,18 170:8
212:21 241:7
278:23 396:14
**1.05**

252:6,9
**1.2**
277:19 380:12
**1.25**
202:14 203:13
208:20 209:5,13,19
**1.3**
192:8 277:19
**1:13**
320:20
**1:23**
166:23,24
**1:23-cv-04305(AS)**
1:7
**1:55**
352:15
**10**
16:5 104:5,11,24
105:17 111:14
118:22,23 119:3,4
214:2,3 215:10
221:6 222:3,9,13,20
300:14,19 301:5,11
301:15,20 352:8,12
384:3 387:22 390:9
390:22 397:13
403:17
**10,000**
123:4 125:11 133:14
158:24
**10:11**
1:16 3:9
**100**
2:9 171:16 176:22
281:15 296:15
302:7,9 307:11
336:8 339:10
382:16
**100,000**
27:8 380:14
**10001**
2:5
**1001**
3:12
**104**
397:13

**105**
397:16
**108254**
83:23 84:2 396:24
**11**
105:16,22 111:22
156:24 157:4
159:20 168:13,23
254:15,19 276:8
277:15 397:16
398:19,23 400:15
**11:09**
59:23
**11:22**
60:2
**11:55**
113:23
**110,000**
310:5
**111**
397:19
**111229**
366:14,16 404:8
**119**
397:22
**12**
79:17 111:17 181:5
181:14 208:13,25
209:13,21 218:12
397:19 399:6
**12:07**
103:25
**12:13**
65:2
**12:19**
104:4
**12:20**
105:11
**12:21**
105:14
**12:33**
368:7
**12:46**
84:17,20
**122**
193:21 398:5



**1231**
367:17
**127**
398:7
**13**
119:2,6 397:22
**133**
158:6,11
**133796**
88:3,5 397:7
**135**
163:4
**136**
398:9
**138**
275:18 398:11
**14**
122:9,10 130:18
  202:25 239:8,10
  331:25 332:6
  336:25 337:4
  395:13 398:5 403:5
  403:9
**14.1**
203:3
**140**
398:13
**148**
275:19
**149**
398:15
**15**
7:11 126:25 127:5,20
  127:22,23 130:8,13
  134:3 220:19 239:8
  239:10 395:13
  398:7
**150**
276:6
**152**
398:17
**154**
213:6
**156**
398:19
**157299**

104:24
**157325**
104:24
**16**
1:16 3:8 105:20,22
  136:15,16 283:3
  395:14 397:16
  398:9 406:7
**167**
398:22
**168425**
111:15,18 397:20
**168434**
111:16,19 397:21
**169678**
207:10,12 399:23
**17**
138:13,14 140:14
  150:18 187:20,20
  211:16 213:15
  398:11
**18**
140:4,5,8,19 150:18
  183:7 398:13
**180**
399:5
**189**
399:7
**19**
149:13,14,17 152:17
  159:6,9 160:7,10,13
  160:23 161:4 170:9
  211:16 398:15
**192**
399:10
**194**
399:13
**196**
60:19,20 399:15
**1970s**
54:21
**1994**
10:4
**1995**
10:7
**1999**

10:13 11:13
**1st**
151:5 157:25 161:13
  207:15

————————
2
————————
**2**
4:24 21:6,7 28:19,20
  138:25 140:12,12
  161:7 311:5,16,23
  319:14,18 377:13
  378:24 381:9,24
  383:19 396:16
  402:19
**2-1/2**
21:7
**2.2**
208:10
**2.3**
8:17
**2.4**
198:10,20,25 199:17
  269:18 270:3 271:9
  274:15,24
**2.6**
151:11
**2.7**
317:19
**2:05**
168:3,7
**2:14**
289:14
**2:33**
331:8
**2:41**
322:8
**2:51**
323:25
**2:57**
325:10
**20**
104:11,19 119:6,11
  119:19 152:11,12
  152:15 159:5 160:7
  160:10 170:10
  172:25 173:2,19

274:3,7 287:8,15
  300:5 302:15,19
  397:13,22 398:17
  401:11 402:10
**20,000**
252:2
**200**
287:13 399:18
**200,000**
79:16
**2000**
10:22 11:11,14,18
  112:21 113:2,10
**20006-6801**
2:10
**2009**
14:20
**2014**
191:18 192:18
  232:23 263:16
  390:21
**2015**
25:7 35:21 36:13
  37:13 38:17 51:5
  191:18 192:19
**2016**
201:15,22 204:25
  205:8 208:20
  209:20 399:19
**2017**
28:11 42:17 43:5,17
  47:14,21 50:17 55:2
  140:16,20 147:23
  150:15 153:6
  155:24 175:12
  190:24 191:8
  193:12,17 194:25
  224:24 233:15
  399:7,10
**2018**
55:2 68:4 78:16
  116:13 391:2
**2019**
151:5 157:10,17
  159:11 160:24
  161:10,13,18 162:6



165:17 181:5,15
183:8 184:4 207:16
209:22 399:6
**2020**
42:17 43:5,17 47:14
47:21 50:17 56:10
68:11 73:12 74:25
113:10 156:24
157:5,16,18 159:14
159:20 165:17
170:16,17 171:3
173:2 174:18 197:3
197:10 219:15
269:21 278:20
279:8 285:10,18
289:6,10 308:13
342:19,20 398:19
399:15 401:22
**2021**
37:14 38:17 60:5,13
61:19 71:10,11
89:14 90:9 122:13
129:15,22 130:3
168:13,23 171:4
212:20,21 217:4
225:6 257:16 259:4
262:2,10 274:3,7
275:21 276:2
293:14,18 300:5
314:22 315:15
319:14,18 320:10
329:5,10 331:25
332:6 336:18,25
337:5 342:20 344:4
396:19 398:23
400:18 401:5,11,14
402:5,19,22 403:5,9
**2022**
68:12 74:25 84:4
102:11,16 104:11
104:19 105:20,22
111:22 112:4,12
113:6 119:6,11,19
124:10 127:3,14
129:15,18 130:10
130:18 133:8 134:3

212:20,25 213:19
216:17 241:6,7
246:12,16 252:24
253:3 254:15,20
285:10,18 302:15
302:20 308:13
313:14,20 352:8,12
364:5 370:5,8 373:8
373:12 374:23
391:6 397:13,16,22
400:10,12,15
402:10,15 403:17
404:9,12
**2023**
137:7 305:22 306:2
350:4,8,11 351:6
402:13 403:15
**2024**
1:16 3:8 102:7
129:25 205:9
218:12 282:14,21
401:18 406:7
407:11
**206**
399:22
**2099**
2:9
**20s**
23:5
**20th**
120:7
**21**
71:8,14 133:8 156:23
156:24 225:3 241:6
241:7 246:22
257:20 315:25
398:19
**211**
399:24
**215**
400:5
**218**
400:6
**21st**
134:9 241:12 246:22
246:23 247:4

**22**
71:14 130:4 168:10
168:12 174:6
195:12 241:9
246:12,15 250:20
250:24 251:6
282:14,21 315:25
398:22 400:10
401:18
**22.36**
220:21
**22nd**
247:4
**23**
57:24 70:25 71:13
130:4 137:25
181:10 190:22,23
190:24 200:15,17
305:22 306:2 399:7
402:13
**230**
368:6
**234**
400:8
**24**
130:4 193:11,12,15
257:16 370:5,8
399:10 400:18
404:9
**240**
400:9
**245**
400:10
**248**
275:5
**24th**
257:20
**25**
60:5,13 61:19 181:3
181:4,12 200:13,13
200:17 396:14,19
399:5
**25,000**
310:5
**251**
400:12

**253**
400:15
**256**
400:18
**257**
400:21
**25th**
318:10
**26**
195:9,13 196:24
262:2,10 395:15
399:13 401:5
**260**
401:5
**262**
84:8
**263**
275:6
**265**
401:8
**268**
401:10
**27**
68:3 190:24 191:8
197:2,3 216:9,18
237:10 373:8,12
399:7,15 404:12
**27.6**
213:19
**272**
401:11
**274**
401:14
**277**
401:16
**27th**
78:16 391:2
**28**
113:18 192:7 201:13
201:14,18 396:16
399:18
**281**
401:18
**285**
401:20
**288**



401:22
**29**
207:7,8 303:3,6
399:22
**292**
402:5
**298**
402:8

---

**3**

**3**
31:15 39:23 40:3
84:4 159:14 174:16
193:12,17 217:4
219:15 237:8,9
276:9 306:13
313:14,19 329:5,9
396:18 399:10
402:15,22
**3.1**
279:5,16 281:9,22
**3.5**
151:6 156:17 158:14
159:15 163:6 173:6
174:3 179:11
**3:06**
223:7
**3:10**
318:9
**3:19**
223:10
**30**
22:20 101:2 137:3
212:2,3,7 238:21
274:18 309:13
370:23 399:24
**301**
402:10
**304**
402:13
**306**
104:22 119:15
**307**
120:12
**308**
121:4

**30th**
140:15 259:3
**31**
212:20,20 216:23,24
217:6 219:6 289:6
289:10 350:4,7
400:5 401:22
403:15
**312**
402:15
**313**
264:24
**316**
402:17
**318**
402:19
**31st**
124:10 130:9 140:20
**32**
219:8,10,21 400:6
**327**
402:22
**33**
235:20,21 400:8
**33,000**
87:3 93:12 309:16,24
**33,333**
85:15 86:9 91:8
92:23
**330**
403:5
**333,000**
91:14 93:10
**335**
403:7
**337**
403:10
**34**
241:16,17 395:15
400:9
**341**
286:16 287:11
**346**
403:13
**348**
403:15

**35**
123:18 246:11,12
400:10
**351**
403:17
**357**
403:20
**35A**
4:24
**36**
252:23,24 400:12
**36,363**
84:24
**362**
403:23 404:5
**365**
404:7
**368**
404:9
**37**
254:14,15 317:22
400:15
**371**
404:12
**375**
404:14
**378**
404:16
**38**
257:15,16 258:14,15
400:18
**382**
404:17
**383**
404:19
**386**
404:20
**389**
396:8
**39**
258:17,18,22 400:21
**3rd**
157:25 158:2
**3X**
164:7

---

**4**

**4**
60:4,5 208:2 213:11
213:14,15 332:15
396:7,19
**4.8900**
203:7
**4:23**
283:19
**4:31**
326:12,17
**4:36**
283:22
**40**
261:25 262:2 396:18
401:5
**40,000**
26:24
**400**
220:7
**400,000**
83:7,11 85:14 86:8
86:14 87:7,12,19,21
**401(k)**
273:8,10,11
**41**
266:16,17 268:10
395:17 401:8
**4141**
212:17
**42**
269:7,8 401:10
**429**
112:2 113:11 114:18
116:17
**43**
274:2,3 401:11
**44**
275:16,21 401:14
**45**
278:8,9 395:16
401:16
**46**
282:13,14 401:18
**47**



286:7,8 303:2
401:20
**474**
364:24
**48**
30:5,14 289:5,6
401:22
**489,000**
203:7,13
**49**
29:13 293:13,14
402:5
**497**
319:20
**499**
320:16

---
**5**

**5**
64:20,21 134:2,2
237:20 275:21,25
293:14,18 306:13
396:22 401:14
402:5
**5.9**
192:8
**5/31/**
364:5
**5:12**
314:15
**5:23**
314:18
**50**
30:15 299:23,24
319:24 395:18
402:8
**50,000**
310:5 380:3
**500,000**
172:16,17
**501**
332:10
**50454**
363:21 364:2 403:24
**50469**
363:24 364:3 404:6

**506**
321:7
**508**
322:8
**51**
302:14,15 402:10
**516**
323:25
**519**
325:9
**52**
305:21,22 402:13
**53**
313:13,14 402:15
**534**
326:11
**54**
318:2,4 328:24
395:18 402:17
**542**
329:2
**55**
1:15 2:4 3:11 319:13
319:14 402:19
**558**
181:23
**56**
106:2 329:4,5 402:22
**560**
182:8
**561**
183:6
**57**
331:24,25 403:5
**58**
336:22,23 403:7
**588**
331:2,8
**59**
338:21,22 403:10

---
**6**

**6**
83:21,22 197:3,10
396:23 399:15
**6:36**

384:10
**6:44**
384:13
**6:57**
395:22,23
**60**
94:20 95:14 97:15
98:21 197:6 348:5,6
396:19 403:13
**61**
350:3,4 403:15
**61290**
377:7,10 404:15
**62**
352:7,8 403:17
**624-6221**
1:24
**63**
274:11 359:2,3
403:20
**64**
363:18,20 365:24
396:22 403:23
**65**
363:19,23 364:18
365:22 404:5
**65,000**
27:9
**66**
366:11,12,13 404:7
**67**
264:23 370:4,5 404:9
**68**
307:9 373:7,8 404:12
**681**
293:22
**69**
377:5,6 404:14

---
**7**

**7**
87:25 88:2 163:10,14
163:18 202:20,23
397:6
**7.66**
192:6

**7:04**
61:3
**7:41:50**
332:10
**70**
379:17,18 404:16
**71**
383:10,11 404:17
**72**
22:23 97:2,10 384:19
384:20 404:19
**73**
387:13,14 404:20
**744**
313:22 314:2
**75**
337:17
**75,000**
27:8
**76**
287:5
**769**
254:23
**770**
197:14
**771**
197:14
**776**
286:16 287:12
**78,000**
133:13
**781**
287:21

---
**8**

**8**
89:10,16 104:7
395:12 397:8
**8/16/2023**
124:23
**8:45**
276:7
**800,000**
26:23
**8071**
320:16



208:3
**83**
202:5 396:23
**840,000**
26:25
**86**
184:4
**866**
1:24
**87**
397:6
**870,000**
191:20
**89**
202:21,24 397:8

---

**9**

**9**
94:25 95:2 137:7
191:22 269:21
397:10
**9.2**
123:21
**900,000**
150:23 153:16,23
175:13
**94**
5:11 397:10
**942**
219:8,11,20 400:7
**943**
219:24
**949**
219:9,11,21 400:7
**95**
5:24 10:6
**950-K**
163:7
**966**
306:5
**99**
10:12,22

