# EXHIBIT 4

Page 1

D. Majcher

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

RYAN BERRIS,

           Plaintiff,        Case No.

                          1:2023cv04305

      vs.

SUNG-FUNG CHOI, HIN WENG LUI, NORMAN CHOI, DE TOMASO

AUTOMOBILI HOLDINGS N.A. LLC, SAMUEL LUI and GENESIS

UNICORN CAPITAL CORP.,

          Defendants.

--------------------------------------------------------x

CONTINUED VIDEOTAPED DEPOSITION OF

DIANA MAJCHER

New York, New York

September 18, 2024

Reported by:

THOMAS A. FERNICOLA, RPR

JOB NO. 1200212



Page 2

1                    D. Majcher

2

3

4

5              September 18, 2024

6                 9:00 a.m.

7

8

9          CONTINUED VIDEOTAPED DEPOSITION of DIANA

10    MAJCHER, at the Offices of Boies Schiller Flexner LLP,

11    55 Hudson Yards, New York, New York, before

12    Thomas A. Fernicola, a Registered Professional Reporter

13    and Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

1                    D. Majcher

2  A P P E A R A N C E S:

3

4          BOIES SCHILLER FLEXNER LLP

5          Attorneys for the Plaintiff(s)

6              55 Hudson Yards

7              New York, New York 10001

8          BY:  JOHN ZACH, ESQ.

9              SOPHIE ROYTBLAT, ESQ.

10             DAVID SIMONS, ESQ.

11

12

13         SHEPPARD MULLIN

14         Attorneys for the Defendants

15             30 Rockefeller Plaza

16             New York, New York 10112

17         BY:  HANNAH WIGGER, ESQ.

18             ALEXANDRA BUSTAMANTE, ESQ.

19

20

21

22  ALSO PRESENT:

23         DANNY ORTEGA, Videographer

24         RYAN BERRIS

25         NORMAN CHOI.



Page 4

1                          D. Majcher

2

3

4    STENOGRAPHER'S NOTE:

5

          All quotations from exhibits are reflected in

6

    the manner in which they were read into the record and

7

    do not necessarily indicate an exact quote from a

8

    document.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 5

```
 1                    D. Majcher
 2             THE VIDEOGRAPHER:  We are now
 3       on the record.
 4             My name is Danny Ortega, and I
 5       am the legal videographer for Magna
 6       Legal Services.
 7             Today's date is September 18,
 8       2024, and the time is 9:55 a.m.
 9             This video deposition is being
10       held at 55 Hudson Yards, New York,
11       New York, in the matter of
12       Ryan Berris versus Sung-Fung Choi, et
13       al.
14             The deponent today is
15       Diana Majcher.
16             All counsel will be noted on
17       the stenographic record.
18             The court reporter today is
19       Tom Fernicola, who will now swear in
20       the witness.
21
22
23
24
25
```



```
                                          Page 6
 1                   D. Majcher
 2   DIANA MAJCHER,
 3   called as a witness, having been duly sworn by a
 4   Notary Public, was examined and testified as follows:
 5   BY THE REPORTER:
 6        Q    Please state your full name and
 7     address for the record.
 8        A    Diana Majcher.
 9   BY MR. ZACH:
10        Q    Good morning, Ms. Majcher.
11        A    Good morning.
12        Q    I understand that you have been
13     designated by De Tomaso to be what's
14     known as their 30(b)(6) witness; is that
15     right?
16        A    Yes.
17             MR. ZACH:  The first exhibit
18        I'm going to mark is DT 1, which is a
19        copy of the notice, the 30(b)(6)
20        notice.
21             MS. WIGGER:  We'll just take
22        one for the purposes of saving paper.
23
24
25
```



```
 1                    D. Majcher
 2             (DT's Exhibit 1, Copy of
 3        30(b)(6) Notice, was marked for
 4        identification, as of this date.)
 5   BY MR. ZACH:
 6        Q     Ms. Majcher, are you familiar
 7   with this document?
 8        A     Yes.
 9        Q     Do you understand that attached
10   to this document are a series of
11   deposition topics numbered 1 through 23
12   that De Tomaso has been asked to prepare
13   a witness to discuss?
14        A     Yes.
15        Q     I don't want to go into any
16   discussions with your counsel, but can
17   you just at a high level just describe
18   sort of the steps you took to educate
19   yourself on these topics?
20        A     I've reviewed this document.
21   I've spoken to counsel.  I've spoken to
22   Mr. Choi, and I have reviewed certain
23   documents.
24        Q     In terms of not setting --
25   setting aside your lawyers, other than
```



```
                         D. Majcher
 1
 2   Mr. Choi, did you talk to any other
 3   employees or contractors or others
 4   associated with De Tomaso to help you
 5   prepare for today's deposition?
 6        A     I don't think so, no.
 7        Q     And you gave a deposition in
 8   your personal capacity yesterday.
 9              Do you recall that?
10        A     Yes.
11        Q     And during that deposition, you
12   went over your personal background and
13   history.
14              Do you recall that?
15        A     Yes.
16        Q     Do you want to change anything
17   from that, or can I just accept that as
18   your background so we can skip over that
19   part?
20        A     Nothing new or earthshattering
21   took place yesterday.  So, no, we can
22   stick with that.
23        Q     That's good to know.
24              So with that being done, why
25   don't we turn to the list of deposition
```



```
 1                    D. Majcher
 2    topics, which looks like you're already
 3    there.
 4         A    Yes.
 5         Q    And the first one that I'd like
 6    to go over with you is number 2, which is
 7    the acquisition of the De Tomaso brand
 8    and assets by Mr. Choi and his related
 9    entities, including the terms and
10    conditions and sources of funding for the
11    transaction.
12              Do you see that?
13         A    I do.
14         Q    What is -- how did -- from
15    De Tomaso's perspective, how was it
16    acquired by Mr. Choi or Mr. Choi's
17    entities?
18              MS. WIGGER:  I don't want to
19         say this each time, so I'll say it
20         once for the record:
21              These are, of course, subject
22         to the objections that we served to
23         the topics.
24              If it becomes relevant, we'll
25         discuss it, but, otherwise, I'm not
```



Page 10

```
 1                    D. Majcher
 2       going to interrupt you each time for
 3       that.
 4       A      Okay.  So I just want to be
 5    technically accurate, right?
 6            The original acquisition was
 7    not of De Tomaso, the defendant company.
 8    It was of the brand.
 9       Q      Exactly.
10       A      Yes, okay.
11       Q      It's a little weird because
12    you're, in theory, the company sitting
13    there.
14       A      Yes.
15       Q      So I'm basically asking, how
16    did you get acquired by Mr. Choi?
17       A      Yes, but I'm just saying, going
18    back to history, the company itself was
19    not acquired.  It was created much later
20    on, right?  But we're talking about
21    historically.
22            The De Tomaso brand and
23    original assets acquired by Mr. Choi were
24    done through a public auction held by the
25    Italian government back in 2014 and 2015.
```



1                    D. Majcher

2        Q      For what amount of money were

3    those assets acquired by Mr. Choi or any

4    of his related entities?

5        A      Ultimately, it was Euros one

6    million -- 1.05, so I guess 1,050,000.

7        Q      You said, just for the record,

8    that was in Euros?

9        A      In Euros.

10       Q      And what entity acquired those

11   assets at that time?

12       A      It was an entity called Ideal

13   Team Ventures Limited.  It was a U.K.

14   company.

15       Q      Who was the owner of

16   Ideal Teams?

17              MS. WIGGER:  I object to form.

18       A      You mean the shareholder?

19       Q      Yes.

20       A      It was another company called

21   Ideal Team Ventures Limited, which is a

22   BVI company.

23       Q      Who is the ultimate beneficial

24   owner of that entity?

25       A      Of the BVI entity?


MAGNA
LEGAL SERVICES

Page 12

1                        D. Majcher

2           Q      Yes.

3           A      Mr. Choi.

4           Q      Were there any other investors

5     that participated with the acquiring

6     entities other than Mr. Choi?

7                  MS. WIGGER:  I object to form.

8           A      Not to De Tomaso's knowledge.

9           Q      I'd like to show you a couple

10    of documents on this topic.

11                 Are you familiar with an

12    individual named Michael Choi?

13          A      I am.

14          Q      Was Michael Choi one of the

15    investors that participated in the

16    acquisition of the De Tomaso rights in

17    connection with Mr. Choi?

18                 MS. WIGGER:  I object to form.

19          A      Not to De Tomaso's knowledge.

20                 MR. ZACH:  So I'm marking what

21          will be DT 2.

22                 (DT's Exhibit 2, Document dated

23          from August 31, 2017, was marked for

24          identification, as of this date.)

25



```
 1                    D. Majcher
 2   BY MR. ZACH
 3        Q     DT 2 is conversations between
 4     Mr. Choi and Mr. Berris.
 5             Do you see that?
 6        A     I do.
 7        Q     And the chat is dated from
 8     August 31, 2017.
 9             Do you see that?
10        A     Yes.
11        Q     If you turn to the first page,
12     it says -- Mr. Choi says:
13             "Discussion with Michael re:
14          DT went well.  Just need to work
15          out the numbers."
16             Then Mr. Berris responds:
17             "Glad to hear."
18             Do you see that?
19        A     Yes.
20        Q     Does that change De Tomaso's
21     recollection of whether Michael Choi was
22     one of the initial investors that
23     purchased the De Tomaso assets?
24        A     No, it doesn't.
25        Q     You can set that aside.
```



Page 14

```
 1                    D. Majcher
 2            MR. ZACH:  I'd like to mark as
 3       DT 3 another email exchange.
 4            (DT's Exhibit 3, Email dated
 5       September 15, 2015, was marked for
 6       identification, as of this date.)
 7  BY MR. ZACH:
 8       Q    This is from earlier.  It's
 9    from September 15, 2015.
10            Do you see that up at the top?
11       A    I do.
12       Q    This is an email from
13    Mr. Norman Choi to Ryan Berris.
14            Do you see that?
15       A    Yes.
16       Q    And copied on this email is
17    Michael Choi.
18            Do you see that?
19       A    Yes.
20       Q    What is De Tomaso's
21    understanding of Michael Choi's
22    professional background?
23            MS. WIGGER:  Objection.  I
24       don't think that's related to any of
25       these topics.
```



```
                        D. Majcher
 1
 2               MR. ZACH:  I think it's related
 3        to the -- well, I mean, it's related
 4        to the acquisition of the funds.
 5               MS. WIGGER:  I don't think it
 6        is, because she said he's not related
 7        to the acquisition of the funds.
 8               MR. ZACH:  Well, we can test
 9        that.
10               MS. WIGGER:  We'll allow
11        limited questions on this.
12   BY MR. ZACH:
13        Q    I'll step back.
14               Let me ask you this:
15               Is De Tomaso familiar with an
16     entity known as Sunwah Kingsway?
17        A    I don't know how to answer that
18     question.
19        Q    Are you familiar?
20        A    I am.
21        Q    What is Sunwah Kingsway?
22        A    It is a financial services firm
23     in Hong Kong.  It's also a
24     publicly-traded company in Hong Kong.
25        Q    And it's controlled by
```



```
 1                    D. Majcher
 2     Michael Choi, right?
 3          A     I can't speak to who controls
 4     it.  I understand Michael Choi to be the
 5     CEO of this company.
 6          Q     Fair enough.
 7                And if you look at -- I'm going
 8     to direct you to the first, the top part
 9     of this email.
10          A     Okay.
11          Q     Mr. Norman Choi with
12     Michael Choi cc'd writes to Mr. Berris:
13                "Since we last met, we managed
14            to venture into the automotive
15            business ourselves in the past
16            year.
17                "We have acquired two European
18            brands, one being the
19            Gumpert Apollo, which we have now
20            renamed it into simply Apollo, and
21            the other is De Tomaso."
22                Do you see that?
23          A     I do.
24          Q     And then Mr. Norman Choi
25     writes:
```



Page 17

```
 1                    D. Majcher
 2           "Michael will be in LA next
 3       week, and I will be in Germany" --
 4       I'm not going to try and say what
 5       the slash is -- "myself."
 6           Do you see that?
 7   A     Yes.
 8   Q     Does the content of this email
 9  change De Tomaso's opinion or testimony
10  that Michael Choi was not an investor in
11  the assets that were purchased by
12  Norman Choi?
13   A     It does not.
14   Q     You can set that aside.
15           MR. ZACH:  I'm going to mark
16       what is to be DT 4.
17           (DT's Exhibit 4, Screenshot of
18       an email dated September 13, 2017,
19       was marked for identification, as of
20       this date.)
21           MS. WIGGER:  Is this the
22       complete document?
23           MR. ZACH:  Yes.
24  BY MR. ZACH:
25   Q     I'm showing you what's been
```



Page 18

```
 1                      D. Majcher
 2    marked as DT 4, which was produced by
 3    De Tomaso.
 4             You can see that on the bottom
 5    right.
 6             Do you see that?
 7       A    I do.
 8       Q    And this appears to be like a
 9    photograph of a computer screen.
10             Do you see that?
11       A    Yes.
12       Q    On it, there is an email dated
13    September 13, 2017.
14             Do you see that?
15       A    Yes.
16       Q    And what is the subject heading
17    of this email?
18       A    It says "De Tomaso."
19       Q    It's from Tom Kim to Michael
20    Choi.
21             Do you see that?
22       A    Yes.
23       Q    Do you have an understanding of
24    who Tom Kim is?
25       A    Yes.
```



Page 19

                    D. Majcher

1

2      Q      Who is Tom Kim?

3      A      I understand him to be

4   Michael Choi's friend.

5      Q      Does Tom Kim have any

6   connection to De Tomaso?

7            MS. WIGGER:  I object to form.

8      A      He does not.  Now he does not,

9   no.

10     Q      At any point, is De Tomaso

11  aware of Mr. Tom Kim having any

12  association with the company?

13           MS. WIGGER:  I object to form.

14     A      At some point in time, yes.

15     Q      What was that association?

16     A      In, I think, around 2017,

17  Mr. Choi had enlisted -- well, Mr. Kim

18  was trying to help us relaunch the

19  Pantera Heritage line of vehicles in

20  America back around this time, I think.

21     Q      So when you made reference to

22  Mr. Choi, you mean Norman Choi, right?

23     A      Yes.

24     Q      Michael and Norman have the

25  same last name.



Page 20

```
 1                    D. Majcher
 2              Now, you were at the other
 3    deposition.  Norman Choi used a better
 4    term than I did.
 5              Do you recall what that term
 6    was for the Heritage brand?
 7              MS. WIGGER:  I object to form.
 8        A    "Restomod."
 9        Q    And so would it be fair to say
10    that Tom Kim was helping with the
11    restomod Pantera work?
12        A    He was.
13        Q    And that was around the same
14    time period as this email around 2017, to
15    your recollection?
16        A    To the best of my recollection,
17    yes.
18        Q    And you see in this email to
19    Michael Choi, it says Subject: De Tomaso.
20              And Tom Kim writes:
21              "You were wired $800,000 U.S.
22         from Hong Kong and $40,000 from
23         NGCG," which equals $840,000.
24              Even I can do that math.
25              Do you see that?
```



MAGNA
LEGAL SERVICES

Page 21

1                         D. Majcher

2          A      Yes.

3          Q      "Not included is 85TR."

4                 Do you see that?

5          A      Yes.

6          Q      Do you have any understanding

7      of what "85TR" would be?

8          A      I think it's a vehicle.

9          Q      What vehicle?

10         A      I don't know.  It's one of the

11     Heritage cars, I think.

12         Q      So, to the best of your

13     recollection, this is one of the restomod

14     cars that could have been being worked

15     on?

16         A      I can't be sure.

17         Q      And then Tom Kim goes on to

18     write:

19                "If you wire $260,000, that

20            will make $1.1 million, which will

21            pay off balance of construction,"

22            and there's more numbers.

23                Do you see that?

24         A      Yes.

25         Q      And then it goes:



Page 22

```
 1                    D. Majcher
 2              "Regards to the build of cars,
 3          Ford equals $100,000 deposit, and
 4          a Roush equals $75,000 deposit,
 5          and a Gemini Trans equals
 6          $60,000."
 7              Do you see that?
 8      A     Yes.
 9      Q     "The rest should go to SA."
10              Do you see that?
11      A     Yes.
12      Q     Do you have any understanding
13   of what "SA" means?
14      A     No, I don't.
15      Q     Did Roush have any involvement
16   with De Tomaso around 2017?
17              MS. WIGGER:  I object to form.
18      A     I don't think so.
19      Q     What about Ford?
20              MS. WIGGER:  Same objection.
21      A     No, I don't think so either.
22      Q     Do you know what Gemini Trans
23   is?
24      A     It's a company that works on
25   transmissions.
```



Page 23

1                         D. Majcher

2       Q      To your understanding, did

3    Gemini Trans have any -- was it doing any

4    work for De Tomaso around this time

5    period?

6       A      No, I don't think so.

7       Q      Does this email change

8    De Tomaso's testimony that

9    Mr. Michael Choi was not an investor in

10   the company?

11      A      It does not.

12      Q      You can set that aside.

13             I want to skip to topic No. 9.

14             Just so you know, I know you're

15   on a time schedule.  I'm actually not

16   going to cover all the topics.

17             I might go back and forth a

18   bit, but I tried to streamline it.

19             (DT's Exhibit 5, Operating

20         Agreement, was marked for

21         identification, as of this date.)

22   BY MR. ZACH:

23      Q      Are you familiar with this

24   document?

25      A      I am.



Page 24

1                       D. Majcher

2       Q     Could you please tell me what

3    this is?

4       A     Tell you?

5       Q     What are we looking at here?

6       A     This is the operating agreement

7    for the De Tomaso company.

8       Q     It was effective, at least as

9    of the first page, September 3, 2020,

10   right?

11      A     Yes.

12      Q     This is essentially the

13   document by which the Delaware limited

14   liability entity operated, right?

15      A     Yes.

16      Q     And if you turn to the very --

17   and this sets up the corporate structure

18   for De Tomaso?

19            MS. WIGGER:  I object to form.

20      A     I'm sorry?

21      Q     That's a bad question.

22            Let me withdraw it.

23            Does this document governs the

24   Delaware LLC, right?

25            A     Yes, like the articles of



Page 25

```
 1                        D. Majcher
 2    association.
 3         Q      Exactly.
 4         A      Yes.
 5         Q      And so if you turn to the last
 6    page, it says that the board of -- it
 7    lists the board of managers.
 8                Do you see that?
 9         A      Yes.
10         Q      As of September 3, 2020, who
11    sat on the board of managers of
12    De Tomaso?
13         A      According to this agreement, it
14    would be Mr. Norman Choi and
15    Mr. Ryan Berris.
16         Q      Are you aware of any amendments
17    to this agreement?
18         A      Yes.
19         Q      When did those amendments
20    occur?
21         A      It occurred after Mr. Berris
22    resigned.
23         Q      So between when this document
24    was executed and when Mr. Berris left the
25    company, there were no amendments to
```



Page 26

                        D. Majcher
 1
 2      this, right?
 3           A       Not to my knowledge.
 4           Q       I want to look at a couple of
 5      things in here.
 6                   Give me one second.
 7                   If you go back -- I'm sorry, go
 8      back one page from the -- the
 9      second-to-last page.
10           A       Yes.
11           Q       Do you see that Mr. Berris
12      signs the agreement?
13           A       I do.
14           Q       And his title is CEO.
15                   Do you see that?
16           A       Yes.
17           Q       So Mr. Berris was on the board
18      of managers, correct?
19           A       Correct.
20           Q       And he was the CEO of the
21      company, right?
22           A       As it shows here.
23           Q       And as you've testified, there
24      were, at least to De Tomaso's
25      recollection, no changes in this document



Page 27

                                D. Majcher
1
2    between when it was executed, and when it
3    was that Mr. Berris departed the company,
4    right?
5         A     Yes.
6         Q     So let's turn to page 3 of the
7    agreement, if we can.
8         A     Okay.
9         Q     If you look at 5.1, management,
10   it says under 5.1(1):
11               "The member has established
12          the company as a manager's managed
13          limited liability company and has
14          agreed to designate the board of
15          managers (The Board) initially
16          comprised of two individuals to
17          serve as managers and manage the
18          company and its business affairs."
19               Do you see that?
20        A     I do.
21        Q     At any time between when this
22   agreement was executed, which was
23   September -- or it was effective
24   September 3, 2020, and when Mr. Berris
25   departed the company, were there other



Page 28

```
 1                    D. Majcher
 2    board members added?
 3        A     No.
 4        Q     So for that time, the only
 5    board members were Mr. Berris and
 6    Mr. Choi, right?
 7        A     Correct.
 8        Q     Now, this section goes on to
 9    say that:
10             "Each of the individuals
11          appointed to the board is referred
12          to herein as a director, and the
13          director shall be designated by
14          written consent of the member."
15             Do you see that?
16        A     I do.
17        Q     So in addition to being CEO and
18    on the board of managers, Mr. Berris also
19    held the title director, right?
20        A     Yes, according to the agreement
21    here.
22        Q     Between September 3, 2020, and
23    when Mr. Berris left the company, were
24    there any other directors added to
25    De Tomaso?
```



Page 29

1                          D. Majcher

2          A      No.

3          Q      So for that time, again, it was

4    Mr. Berris and Mr. Norman Choi that were

5    the directors of De Tomaso, right?

6          A      Yes.

7          Q      I'd like to go down to 5.13.

8          A      Okay.

9          Q      Just take a moment and read it.

10                I'm not going to read the whole

11   thing.

12         A      Okay.

13         Q      You see that part of what this

14   agreement says is that it lays out some

15   of the things that directors and board

16   members are able to do, right?

17                MS. WIGGER:  Objection to form.

18         Q      Just generally?

19         A      Yes.

20         Q      And you see at the last sort of

21   clause, it says -- well, let's just start

22   with this.

23                So A says:

24                "The board will have the sole

25          right to manage the business of



Page 30

```
                        D. Majcher
 1
 2        the company and will have all
 3        powers and rights necessary,
 4        appropriate, or advisable to
 5        effectuate and carry out the
 6        purposes of the business of the
 7        company."
 8            Do you see that?
 9    A     I do.
10    Q     So that means the board, again,
11 is referring to Mr. Choi and Mr. Berris,
12 right?
13    A     Yes.
14    Q     Then B says:
15            "Each director shall process
16        and may enjoy and exercise all the
17        rights and powers of a manager as
18        provided in and under the Act."
19            Do you see that?
20    A     I do.
21    Q     Again, that's referring to the
22 rights and powers that Mr. Norman Choi
23 and Ryan Berris would have to carry out
24 the work for De Tomaso, right?
25    A     Yes.
```



1                     D. Majcher

2       Q     And then C says:

3             "Each director shall be a

4         manager for the purposes of the

5         Act."

6             Do you see that?

7       A     I do.

8       Q     So both Mr. Norman Choi and

9     Ryan Berris were both managers for the

10    purposes of the Act, right?

11      A     Yes.

12      Q     When it says:

13            "Provided, however, that no

14        individual director shall have the

15        authority to act for or bind the

16        company without the requisite

17        consent of the board."

18            Do you see that?

19      A     I do.

20      Q     And that says that in order to

21    bind the company, the board would have to

22    approve, right?

23            MS. WIGGER:  Objection to form.

24      A     Yes.

25      Q     And the board consists of



Page 32

1                    D. Majcher
2    Mr. Berris and Mr. Choi, right?
3        A    Yes.
4        Q    So if Mr. Choi were to act
5    unilaterally without the consent of the
6    board, he would be in violation of this
7    agreement, right?
8            MS. WIGGER:  Objection to form.
9        A    So you want me to answer a
10   hypothetical question?
11       Q    No.
12            I'm just saying, so, for
13   example, if one of the accusations
14   De Tomaso is making in this case is that
15   Mr. Berris exceeded his authority in
16   entering into certain contracts.
17            Right?
18            MS. WIGGER:  Objection to form.
19       A    It's one of our counterclaims,
20   yes.
21       Q    And as part of that
22   counterclaim, isn't it the fact that
23   De Tomaso is asserting that Mr. Berris
24   bound the company without receiving
25   consent of the board?


MAGNA
LEGAL SERVICES

Page 33

```
 1                    D. Majcher
 2              MS. WIGGER:  Objection to form.
 3       A      Sorry, I'm just thinking
 4    through.
 5       Q      Take your time.
 6       A      What you just said, I think the
 7    counterclaim was that Mr. Berris had no
 8    authority to bind the company to certain
 9    contractual commitments.
10       Q      When you say "didn't have
11    authority," the source of any authority
12    to bind the company would come from this
13    agreement, right?
14              MS. WIGGER:  Objection to form.
15       A      The source of the authority,
16    yes.
17       Q      And so, I think part of what
18    you're saying -- I'm not trying to say
19    it's all of it, but part of what
20    De Tomaso is saying is that by entering
21    into a contract with Carmen Jorda,
22    Mr. Berris did so without the consent of
23    the board, right?
24       A      That's one part of it.
25       Q      Now, you would agree with me
```



Page 34

```
 1                    D. Majcher
 2    that, under this provision, if
 3    Mr. Norman Choi were to enter into a
 4    contract on his own with a third party on
 5    behalf of De Tomaso without consent of
 6    the board, he, too, would be in
 7    violation, right?
 8              MS. WIGGER:  Objection to form.
 9        A    Any one director who does that
10    would be in violation.
11        Q    Because according to this, you
12    would need to have both Mr. Norman Choi
13    and Mr. Ryan Berris, who were the board
14    members, to approve it, right?
15              MS. WIGGER:  Objection to form.
16        A    Yes.
17        Q    You can put that away.
18              MR. ZACH:  I apologize.  Can we
19    take a two-minute break?
20              MS. WIGGER:  Yes.
21              THE VIDEOGRAPHER:  The time is
22    10:22 a.m.
23              We're off the record.
24              (Recess taken from 10:22 a.m.
25    to 10:25 p.m.)
```



Page 35

1                    D. Majcher

2              THE VIDEOGRAPHER:  The time is

3      10:25 a.m.

4              We're back on the record.

5  BY MR. ZACH:

6      Q    I'd like to stay with DT 5 for

7  just a couple more questions.  Can we go

8  to page 5?

9              If you go back to 4, section 6,

10 Voting Board Meetings, is, like,

11 section 6 of the agreement.

12     A    Yes.

13     Q    And 6.2 says "Annual and

14 Special Meetings."

15             Do you see that?

16     A    I do.

17     Q    Where did De Tomaso hold annual

18 board meetings?

19     A    Not regularly.

20     Q    Were there formally scheduled

21 board meetings at the company?

22     A    No.

23     Q    As part of meetings with the

24 board, were any records recorded, like

25 minutes of the board meetings?


MAGNA
LEGAL SERVICES

Page 36

```
 1                    D. Majcher
 2        A     No.
 3        Q     So it was not De Tomaso's
 4   practice to regularly maintain board
 5   minutes?
 6        A     We don't have any board
 7   minutes, no.
 8        Q     As far as you're aware, were
 9   there any board meetings specifically
10   scheduled between 2020 and the end of
11   2022?
12        A     Board meetings scheduled, no.
13        Q     If you go down to seven, it
14   says "Accounting Records and Reports."
15              Do you see that?
16        A     I do.
17        Q     For 7.3, there's a revision
18   called "Books and Records."
19              Do you see that?
20        A     Yes.
21        Q     That provision says:
22              "The company shall keep books
23          and records that reflect all
24          material transactions are
25          appropriate and adequate for the
```



```
 1                    D. Majcher
 2          company's business."
 3               Do you see that?
 4      A     I do.
 5      Q     Was there any formal
 6   documentation kept in a centralized place
 7   that reflected the major decisions that
 8   were made by the company?
 9               MS. WIGGER:  I object to form.
10      Q     I'll break it down.
11      A     Yes, please.
12      Q     Is there a repository within
13   De Tomaso in which its standard books and
14   records are kept?
15               MS. WIGGER:  I object to form.
16      A     You mean like a filing cabinet?
17               MR. ZACH:  Strike that.
18               Let me ask a different
19   question.
20   BY MR. ZACH:
21      Q     Was there a secretary or other
22   position at De Tomaso for someone to keep
23   track of the books and records of the
24   company?
25      A     Yes.
```



Page 38

```
 1                      D. Majcher
 2              By books and records, you mean
 3   both documents that are signed,
 4   accounting records, is that what you
 5   mean?
 6        Q    Exactly, yes.
 7        A    That would be me, yes.
 8        Q    Who was that person?
 9        A    Primarily, that would be me.
10        Q    When I said "secretary," I
11   meant with, like, a capital S.
12              Like, you know how a
13   corporation has like a --
14        A    A company secretary.
15        Q    Exactly, right.
16              So what was your position
17   during that time period?
18        A    During this time period?
19        Q    Yes, when you were maintaining
20   those books and records.
21        A    I am the COO of the company.
22        Q    Where did you maintain those
23   records within the company?
24              MS. WIGGER:  I object to form.
25        A    Physical files would be in the
```



Page 39

```
 1                    D. Majcher
 2     office in Hong Kong.  And we, obviously,
 3     have digital files.
 4         Q      Would it be fair to say that
 5     you were the one that was principally
 6     tasked with keeping those organized and
 7     preserved?
 8         A      Yes.
 9         Q      We can set that aside.
10                I'd like to turn to -- I'm
11     turning to a different topic now.
12                Basically, some of these topics
13     have overlap.
14                So we're in the Topic 10 and 11
15     area right now, which is:
16                "The compensation arrangements
17          for any and all De Tomaso
18          employees, officers, or
19          contractors and the contracts
20          related to the same."
21                MS. WIGGER:  This is one
22     subject to objections and some
23     negotiations.
24                MR. ZACH:  I'd like to mark
25     this as De Tomaso 6.
```



Page 40

```
 1                        D. Majcher
 2              (DT's Exhibit 6, Independent
 3         Contractor Agreement entered into on
 4         April 2022, was marked for
 5         identification, as of this date.)
 6    BY MR. ZACH:
 7         Q      Looking at De Tomaso 6, are you
 8    familiar with this document?
 9         A      Yes.
10         Q      This is an independent
11    contractor agreement entered into on
12    April 2022, right?
13         A      Yes.
14         Q      April 2022 is still prior to
15    Mr. Berris' departure from the company,
16    right?
17         A      Yes.
18         Q      So at this time, Mr. Berris and
19    Mr. Choi were the only board members of
20    the company, right?
21         A      Yes.
22         Q      And they were the only
23    directors of the company, right?
24         A      Yes.
25         Q      This is an agreement that was
```



Page 41

1                       D. Majcher

2    entered into between De Tomaso and

3    Nguyen Design LTD, right?

4         A     Yes.

5         Q     And if you turn to the last

6    page, there is like an Exhibit A, which

7    is like the last two pages.

8         A     Yes.

9         Q     You see that's signed by

10   Jowyn Wong and Norman Choi.

11               Do you see that?

12        A     I do.

13        Q     And then you see here that

14   there's another agreement signed.

15               The agreement itself is on

16   2/12, which is signed by Jowyn Wong and

17   Norman Choi.

18               Do you see that?

19        A     I do.

20        Q     What were the duties of

21   Jowyn Wong with respect to De Tomaso?

22               What was he doing?

23        A     He's the chief designer.  He

24   designs all the cars.

25        Q     And this agreement, if you look



Page 42

                          D. Majcher
1
2    at the terms of this agreement, what is
3    the term of this agreement?
4              MS. WIGGER:  I object to form.
5    A    I'm sorry, term as in length?
6    Q    Let me just direct you to the
7    spot.  I'm sorry.
8              Go to page 3 of 10.
9    A    Okay.
10   Q    So it says here that this
11   agreement will become -- under 2, Term:
12            "This agreement will become
13        effective for a minimum term of
14        ten years."
15            Do you see that?
16   A    I do.
17   Q    In general, it goes on to say:
18            "Unless it is terminated
19        earlier in accordance with other
20        provisions in the agreement."
21            Right?
22   A    Yes.
23   Q    And the terms of which it could
24   be terminated are set forth in 2(d).
25            Do you see that?



Page 43

```
 1                    D. Majcher
 2        A     Yes.
 3        Q     And those include that if
 4   either party is in material breach of any
 5   provision of the agreement, right?
 6        A     Yes.
 7        Q     "By the company immediately at
 8   any time without prior notice if the
 9   contractor is convicted of a crime or
10   offense."
11              Right?
12        A     Yes.
13        Q     Or if there is bankruptcy or
14   dissolution of the contractor or his
15   death?
16        A     Yes.
17              MS. WIGGER:  I object to form.
18              There's a couple more.
19   BY MR. ZACH:
20        Q     That's the gist of it, right?
21              And so other than whatever is
22   in part D, this is a 10-year agreement
23   with Mr. Jowyn Wong, right?
24        A     Yes.
25        Q     And if you turn to -- if you
```



Page 44

                    D. Majcher
1    turn to 9 of 10, which is Exhibit A,
2    which sets forth the duties,
3    specifications, and compensation.
4        A    Yes.
5        Q    Do you see under 3 -- let's
6    start with 3(b):
7              "The contractor shall be
8         compensated for services rendered
9         beginning from April 1, 2022."
10             Do you see that?
11       A    Yes.
12       Q    And then it goes on to say
13   that:
14             "As compensation for the
15        services under this agreement, the
16        company shall pay the contractor
17        250,000 Great British pounds a
18        year."
19             Do you see that?
20       A    I do.
21       Q    So absent one of the
22   termination provisions that we just
23   looked at being triggered, this contract
24   binds De Tomaso to pay Jowyn Wong 2 1/2



Page 45

```
 1                     D. Majcher
 2     million Great British pounds over
 3     10 years, right?
 4              MS. WIGGER:  I object to form.
 5         A     It binds the company to pay
 6     Nguyen Design.
 7         Q     Fair enough.
 8         A     But, yes, a 10-year contract at
 9     250,000 pounds per year.
10         Q     Do the books and records of
11     De Tomaso reflect a board meeting in
12     which this engagement was approved at?
13              MS. WIGGER:  Objection to form.
14         A     No.
15         Q     And this compensation for
16     Jowyn Wong, via his entity, commences on
17     April 1, 2022, right?
18         A     Yes.
19         Q     You can set that aside.
20              With respect to DT 6, was
21     De Tomaso aware of any approval given by
22     Mr. Berris to authorize that contract?
23              MS. WIGGER:  Objection to form.
24         A     We're not aware of any
25     objection by Mr. Berris.
```



MAGNA
LEGAL SERVICES

Page 46

```
 1                    D. Majcher
 2      Q     Are you aware of this contract
 3  being shown to Mr. Berris prior to it
 4  being extended to Mr. Jowyn Wong and his
 5  entity?
 6      A     I can't speak to whether
 7  Mr. Berris had seen the contract, but I
 8  don't want to choose the word.
 9            I can't say I know, but
10  Mr. Berris was aware of Mr. Jowyn Wong
11  coming on board.
12      Q     But you agree that there was
13  never a board meeting in which this was
14  approved?
15      A     There was no record to show
16  that.
17      Q     Was there any formal approval
18  by the board, including Mr. Berris, to
19  authorize this agreement for those
20  amounts?
21            MS. WIGGER:  I object to form.
22      A     There is no formal approval by
23  Mr. Choi or Mr. Berris in records.
24            MR. ZACH:  So I'm going to show
25      you DT 7.
```



Page 47

```
 1                    D. Majcher
 2              (DT's Exhibit 7, Agreement
 3         between De Tomaso and R27 LTD, was
 4         marked for identification, as of this
 5         date.)
 6    BY MR. ZACH:
 7         Q     Please take a moment and look
 8    through that.
 9              Are you familiar with this
10    agreement?
11         A     I am.
12         Q     This is an agreement between
13    De Tomaso and an entity called R27,
14    right?
15         A     Yes.
16         Q     And R27 is an entity that is
17    controlled by an individual named
18    Jacob Jodlowski.
19              MR. ZACH:  I'll show the court
20         reporter how to spell that.
21         A     Oh, sorry.
22              To be accurate, I don't know
23    who controls the entity, but this is an
24    entity that we entered into the contract
25    with that governs Mr. Jodlowski's
```



Page 48

```
 1                    D. Majcher
 2    services.
 3        Q      Fair enough.
 4               So maybe a better way for me to
 5    phrase the question is that De Tomaso
 6    understands that R27 LTD is an entity
 7    associated with Jacob Jodlowski?
 8        A      Yes.
 9        Q      What, to De Tomaso's mind, was
10    the role that Mr. Jodlowski was to play
11    as an independent contractor for
12    De Tomaso?
13        A      As it states here in the
14    contract, he is the chief CAD designer.
15        Q      What does that mean?
16        A      So in very simple terms, he
17    turns a to-be design into CAD drawings
18    that the engineers can work with.
19        Q      If you turn to the first page,
20    this agreement is dated 26 April 2022,
21    right?
22        A      Yes.
23        Q      Here, too, on the next page,
24    the term of this agreement is also
25    10 years, right?
```



Page 49

                                  D. Majcher

1

2          A      Yes.

3          Q      It's very similar to the prior

4    agreement in that that 10-year term is

5    subject to termination provisions that

6    are set forth in 2(d).

7                 Do you see those?

8                 MS. WIGGER:  I object to form.

9          A      Yes.

10         Q      Just reviewing them briefly,

11   you would agree that those are

12   essentially the same as the termination

13   provisions we just looked at?

14         A      Yes.

15         Q      In terms of compensation for

16   R27, it was to be paid 250,000

17   Great British pounds a year, right?

18         A      Yes.

19         Q      So, as with the other contract,

20   like, absent the triggering of one of the

21   termination provisions, this agreement

22   would bind De Tomaso to pay R27

23   2.5 million British pounds over the next

24   10 years, right?

25                MS. WIGGER:  I object to form.



Page 50

                    D. Majcher

1

2       A       Subject to the agreement not

3   being terminated, yes.

4       Q       And this involved compensation

5   beginning on April 1, 2022, right, if you

6   look at B?

7       A       Yes, the contract is effective

8   April 1, 2022.

9       Q       And so is De Tomaso aware of

10  the board specifically approving this

11  contract?

12          MS. WIGGER:  I object to form.

13      A       No.

14      Q       Are you aware of any specific

15  authorization from Ryan Berris agreeing

16  to the company entering into this

17  contract?

18          MS. WIGGER:  I object to form.

19      A       No.  No, there was objections.

20      Q       You can set that aside.

21              Isn't it the case that, with

22  respect to Jowyn Wong, that De Tomaso

23  began making payments to him in or around

24  October 2021?

25          MS. WIGGER:  I object to form.



Page 51

```
                        D. Majcher
 1
 2        A      I don't think so.
 3        Q      What was De Tomaso's
 4   recollection, as you sit here today, of
 5   when the first payments were made to
 6   Jowyn Wong?
 7              If you don't know, this isn't a
 8   memory test.
 9        A      Again, under the contract, the
10   payments were made to Nguyen Design.
11              If you're saying that we had
12   made payments directly to Jowyn Wong, and
13   if you could show me, then I can, you
14   know, tell you what you need to know.
15        Q      Fair enough.  I understand that
16   you're not omniscient.
17        A      Yes, I can't remember.
18        Q      Let's move on.
19              MS. WIGGER:  John, can we take
20         a five-minute break when you come to
21         a good --
22              MR. ZACH:  This is a good time.
23              MS. WIGGER:  Since you're
24         moving on, I thought maybe I'd ask
25         now for a short break.
```



Page 52

                         D. Majcher
1
2                MR. ZACH:  We can go off the
3        record.
4                THE VIDEOGRAPHER:  The time
5        right now is 10:45 a.m.
6                We are off the record.
7                (Recess taken from 10:45 a.m.
8        to 10:56 a.m.)
9                THE VIDEOGRAPHER:  The time is
10        10:56 a.m.
11                We are back on the record.
12   BY MR. ZACH:
13        Q     Referring back to the LLC
14   agreement, is it the case that De Tomaso
15   does not have any minutes that reflect
16   any meetings or decisions by the board?
17                MS. WIGGER:  I object to form.
18        A     Like, at all times?
19        Q     Well, between the date of its
20   execution and the departure of
21   Mr. Berris.
22        A     There is not.
23        Q     And it was not the -- strike
24   that.
25                During that time period,



Page 53

```
 1                    D. Majcher
 2    De Tomaso did not hold any board
 3    meetings?
 4         A      They did not.
 5         Q      Switching topics to expenses,
 6    expense policy, isn't it the case that
 7    De Tomaso did not have a written expense
 8    policy that was put in place for its
 9    employees and contractors?
10              MS. WIGGER:  I object to form.
11         A      Sorry, your question is, isn't
12    it the case?
13         Q      Yes.
14         A      That is the case.
15         Q      So I'm guilty of double
16    negatives sometimes myself.
17              So there was no formal expense
18    policy in place at De Tomaso, right?
19         A      No written policy, yes.
20         Q      And from time to time, the COO,
21    you, made suggestions to Norman Choi that
22    such a policy should be -- such a formal
23    written policy should be put in place,
24    right?
25         A      I think I might have.
```



Page 54

1                          D. Majcher

2          Q      You were here for Mr. Choi's

3      deposition.

4                  So, just to cut through it, you

5      were able to observe a number of text

6      messages in which you suggested that a

7      formal written policy should be put in

8      place, right?

9                  MS. WIGGER:   I object to form.

10         A      I was doing my job, yes.

11         Q      And De Tomaso would agree that,

12     you know, many companies actually --

13     there are advantages to putting in place

14     a formal written expense policy, right?

15                 MS. WIGGER:   I object to form.

16         A      Yes, it's prudent.

17         Q      One of the advantages of having

18     a formal written expense policy is that

19     it would, to a certain extent, alleviate

20     ambiguity as to what's a business versus

21     a personal expense, right?

22         A      Yes.

23         Q      Now, was there a -- did

24     De Tomaso have any written form for

25     submitting reimbursement for business



Page 55

```
 1                    D. Majcher
 2    expenses?
 3              MS. WIGGER:  I object to form.
 4       A     I'm not sure I understood the
 5    question.
 6       Q     Was there sort of a form that
 7    was maintained by the company by which
 8    a -- a written form that was maintained
 9    by the company by which employees or
10    contractors or others could submit
11    business expenses?
12              MS. WIGGER:  I object to form.
13       A     And by "form," do you mean a
14    literal form, like a piece of paper that
15    they fill in?
16       Q     Exactly, exactly, exactly.
17       A     Actually, I believe so, yes.
18       Q     Who created that form?
19       A     I think I did.
20       Q     When did you create that form?
21       A     I cannot recall, but it would
22    be as early as the first expenses would
23    have been, you know, submitted.
24       Q     Now, De Tomaso would agree
25    that, with respect to business versus
```



Page 56

```
 1                    D. Majcher
 2   personal expenses, both Mr. Choi and
 3   Mr. Berris would have been subject to the
 4   same policy, right?
 5        A      Everyone would be.
 6        Q      Because the expense policy
 7   would be uniform for the company to
 8   ensure that expenses that are being
 9   charged to the company itself are deemed
10   appropriate by the company?
11        A      Yes.
12        Q      So there's no difference,
13   whether it be Mr. Berris or Mr. Choi,
14   with respect to what would constitute a
15   business or a personal expense, right?
16        A      It should not.
17             MR. ZACH:  I'm going to mark a
18        number of documents here.
19             I'm going to mark these all at
20        once.
21             Just give me a second, because
22        I'm going to try and mark them in
23        chronological order, and I don't know
24        that I have them that way.
25             I'm going to mark as -- just
```



Page 57

```
 1                    D. Majcher
 2          one second.  I'm going to pause
 3          because I want to make sure I've got
 4          this.
 5               I'm marking this as DT 8.
 6               (DT's Exhibit 8, General
 7          Journal from January 1, 2022, to
 8          December 31, 2022, was marked for
 9          identification, as of this date.)
10  BY MR. ZACH:
11          Q     DT 8 is a general journal from
12      January 1, 2022, to December 31, 2022.
13               Do you see that?
14          A     I do.
15          Q     Is this a document that was
16      maintained in the ordinary course of
17      business at De Tomaso?
18          A     Yes.
19          Q     What was the purpose of the
20      general journal?
21          A     It's for bookkeeping and
22      accounting purposes.
23          Q     Did someone within De Tomaso
24      have oversight over maintaining this
25      document?
```



Page 58

```
 1                         D. Majcher
 2        A      Oversight as in?
 3        Q      Well, strike that.
 4               Did someone sort of -- who sort
 5     of kept the general journal to make sure
 6     that it was updated on a regular basis,
 7     is my question?
 8        A      Our bookkeeper.
 9        Q      Who is your bookkeeper?
10        A      Joyce Au, A-U.
11               MR. ZACH:  I'm going to mark as
12        9 another journal that was produced
13        to us.
14               (DT's Exhibit 9, Journal
15        Entries, was marked for
16        identification, as of this date.)
17        A      Do you want to give me this
18     copy that's tabbed?
19        Q      You've been around me too much.
20               Let me take this.
21               Thank you.
22               There's 9.  This is 9.
23               MR. ZACH:  This will be 10.
24
25
```



Page 59

```
 1                    D. Majcher
 2              (DT's Exhibit 10, Journal
 3         Entries, was marked for
 4         identification, as of this date.)
 5              MR. ZACH:  Least, but not last,
 6         this is number 11.
 7              (DT's Exhibit 11, Journal
 8         Entries, was marked for
 9         identification, as of this date.)
10    BY MR. ZACH:
11         Q     How is the general journal
12    maintained?  Is it a database or a
13    spreadsheet, just in terms of how the
14    information is input?
15         A     Well, the documents that we're
16    looking at right now are in Excel format,
17    but these are generated from the
18    accounting software, which is MYOB.
19         Q     MYOB is the name of the
20    accounting software?
21         A     Yes.
22         Q     Other than sort of maintaining
23    the general journal, what else does it
24    do?
25              MR. ZACH:  Strike that.
```



Page 60

```
1                    D. Majcher
2              MS. WIGGER:  I object to form.
3              MR. ZACH:  That's a good
4         objection, actually.
5    BY MR. ZACH:
6         Q     Other than maintaining the
7    general journal, what does De Tomaso use
8    that accounting software for?
9         A     What do we use the accounting
10   software for?  It's to record the
11   transactions and to maintain the books
12   and records.
13        Q     So to the extent that there was
14   a question about sort of the financial
15   information relating to the company,
16   meaning money coming in and money coming
17   out, that would be located in that
18   software, right?
19             MS. WIGGER:  I object to form.
20        A     Yes, it tracks all the
21   transactions, whether actual cash was
22   involved or not.
23        Q     Let's start with -- give me one
24   second.
25             Let's start with 8.
```



Page 61

                    D. Majcher
1                   In terms of the currency that
2   the general journal is in, it's in Hong
3   Kong dollars; is that right?
4        A     It depends on the company.
5        Q     With respect to looking at
6   this, 8, what is the denomination that's
7   reflected here with the dollar sign?
8        A     On DT 8?
9        Q     Yes.
10       A     So this is for De Tomaso
11  Automobili NA, LLC.  So this will be in
12  U.S. dollars.
13       Q     So the numbers that are here
14  are in U.S. dollars?
15       A     Yes.
16       Q     And if you look at the second
17  page, there is a payment the fourth from
18  the bottom to yourself --
19       A     Yes.
20       Q     -- on April 2, 2022.
21             Do you see that?
22       A     I do.
23       Q     And that's a payment for
24  $30,000?



Page 62

1                         D. Majcher

2        A       Yes.

3        Q       What was that payment for?

4        A       It says "consulting fee."

5        Q       But you were the COO of the

6    company at the time, right?

7        A       I was.

8        Q       And so while it's labeled as a

9    consulting fee, would De Tomaso agree

10   this was made to you as payment for your

11   work at De Tomaso?

12              MS. WIGGER:  I object to form.

13       A       It would be for payment --

14   sorry, it would be payment for work done

15   for De Tomaso, obviously, but I don't

16   think this is a recurring fee.  It's one

17   time.  It's not like a salary.

18       Q       In terms of how -- and I'm

19   talking about you in your capacity as

20   COO, were you an employee of De Tomaso or

21   were you an independent contractor?

22       A       I'm not an employee of

23   De Tomaso.

24       Q       So even though you served as

25   COO and did other sort of work for



Page 63

```
 1                    D. Majcher
 2     De Tomaso, that was done not as a direct
 3     employee of De Tomaso?
 4          A     That's correct.
 5          Q     Turning to page 5, do you see
 6     there is a payment there, five from the
 7     bottom --
 8          A     Yes.
 9          Q     -- for Nguyen Design?
10          A     Yes.
11          Q     That's an entity that is
12     associated with Jowyn, right?
13          A     Yes.
14          Q     And there's a payment there on
15     April 26 for $27,070.83, right?
16          A     Yes.
17          Q     Do you know what the purpose of
18     that payment was for?
19          A     That should be for the service
20     fee, the consulting fee, for the month of
21     April.
22          Q     If you turn to the next page
23     six down from the top, there's a payment
24     on May 4, 2022, also to Nguyen Design?
25          A     Yes.
```



Page 64

                              D. Majcher
1
2        Q     This time, it's for just a
3    little bit under $80,000.
4              Do you see that?
5        A     Yes.
6        Q     And it looks like that -- I
7    mean, do you see how, I think with both
8    of these payments, that under the --
9    where it says Nguyen Design, it says
10   "GBP"?
11             Is that British pounds?
12       A     Yes.
13       Q     Did the software itself do the
14   currency conversion, or how did you
15   reconcile the currency conversions in
16   your accounting records?
17       A     It would be -- so we would
18   receive -- we don't maintain a British
19   pounds bank account.  So money would be
20   going out in U.S. dollars or Hong Kong
21   dollars depending on the account, right?
22             So we normally will note down
23   the original currency of the invoice,
24   like here now.
25             And the 79,669 will be the



Page 65

                    D. Majcher
1
2    actual amounts that went out from the
3    bank.
4        Q      Thank you.  That's helpful.
5               Let's go to page 8, if we can.
6               Do you see, five from the
7    bottom, on June 17, 2022, there's a
8    payment to Jubilant Dragon.
9               Do you see that?
10       A      Yes.
11       Q      Just so that it's clear, the
12   dates in the general journal, they're
13   done in the -- I'll just call it the
14   European style?
15       A      The British way.
16       Q      The British way.
17              It's the date, then the month,
18   then the year, right?
19       A      Yes.
20       Q      And this is for a consulting
21   fee, right?
22       A      Yes.
23       Q      And Jubilant Dragon is an
24   entity that's controlled by your husband,
25   right?



Page 66

1                        D. Majcher
2          A     Yes.
3          Q     So this is being paid as a
4    consulting fee, right?
5          A     Yes.
6          Q     This is for work that was
7    performed by you, though, right?
8          A     Yes.
9          Q     But you would, from time to
10   time, use Jubilant Dragon as a place to
11   receive payments that were owed to you,
12   right?
13         A     Yes.
14         Q     And this, again, was for your
15   work at De Tomaso, I take it?
16         A     Yes.
17         Q     If we turn to page 10, July 29,
18   third from the bottom, there's another
19   payment to Jubilant Dragon, right?
20         A     Yes.
21         Q     For $25,000?
22         A     Yes.
23         Q     Again, that's payment to you
24   for your work at De Tomaso, right?
25         A     Yes.



Page 67

```
 1                    D. Majcher
 2              By this time, we've entered
 3    into a formal consulting agreement,
 4    written, so this should be for the
 5    monthly fee of July.
 6       Q     So I'm not going to go
 7    through -- I mean, there are other
 8    payments to Jubilant Dragon.
 9              But is it fair to say, to the
10    extent there is a payment by De Tomaso to
11    Jubilant Dragon, that's going to be for
12    work that was performed by you in
13    connection with De Tomaso, right?
14       A     Yes.
15       Q     Even though it's your husband's
16    company, were any of the payments for
17    work that he did for the company?
18       A     He never did any work for the
19    company.
20       Q     You can put 8 aside.
21              I'd like to look at 9.
22              MS. WIGGER:  Which deposition
23    topic does this relate to?
24              MR. ZACH:  Expenses.
25              MS. WIGGER:  Expenses?
```



Page 68

```
 1                    D. Majcher
 2           So this is not the defendant
 3      company No. 9.  This is a different
 4      company.
 5           We objected on this basis, and,
 6      in fact, conferred and clarified
 7      again that our objection was to
 8      unnamed entities other than the
 9      defendant.
10           And your colleague responded,
11      as long as our objections are limited
12      to that, okay.
13           So the corporate representative
14      is not necessarily prepared to
15      testify as to other entities that are
16      not the defendant company.
17           MR. ZACH:  These are all
18      subsidiaries.
19           I mean, we can go look at the
20      consolidated financial statements,
21      but let me ask a question.
22           MS. WIGGER:  Well, we
23      specifically objected to this and
24      discussed it with your colleague, so
25      I don't know why we're asking about
```



Page 69

                    D. Majcher

1
2    it now.
3    BY MR. ZACH:
4        Q    Does De Tomaso, for its
5    financial statements, consolidate all of
6    its related entities into one set of
7    financial statements?
8            MS. WIGGER:  I object to form.
9        This is one specifically for a Hong
10       Kong entity.
11   BY MR. ZACH:
12       Q    Does De Tomaso maintain
13   consolidated financial statements?
14       A    When you say "De Tomaso," you
15   mean the defendant company?
16       Q    Yes.
17       A    Does it now?
18       Q    Well, I have the consolidated
19   statements.
20       A    Yes.  So the structure is not
21   the same anymore.
22            So those -- yes, we did have
23   consolidated statements.  And we continue
24   to have consolidated statements, but it's
25   just depends on which is the holding



Page 70

```
 1                    D. Majcher
 2   company.
 3        Q     Fair enough.
 4              But for all the entities, the
 5   various expenses and costs are all sort
 6   of rolled up into a single set of
 7   financial statements, right?
 8              MS. WIGGER:  Objection to form.
 9        A     That's not true.  Each company
10   maintains their own financial statements,
11   right?  But when we do a group audit, we
12   only do the group audit as a consolidated
13   basis.
14        Q     Right.
15              And so when you do that, like
16   all of the expenses and income, and what
17   have you, is all rolled up into a single
18   set of consolidated financial statements?
19        A     It's presented to be one group.
20        Q     Exactly, okay.
21              So...
22              MS. WIGGER:  Well, no, that
23        doesn't resolve my objection.
24              She said they only maintain
25        their own financial records --
```



Page 71

```
 1                    D. Majcher
 2          MR. ZACH:  Look, if you're
 3      going to instruct her not to answer,
 4      we'll go to the court.  It's your
 5      choice.
 6          MS. WIGGER:  It's not a proper
 7      30(b)(6) topic, because your 30(b)(6)
 8      deposition is limited to the topics
 9      you noticed.
10          We objected to this.  We
11      conferred.  Your colleague said --
12      and I can read it.  I have the email
13      here, he said okay.
14          So now I'm confused why this is
15      coming up.
16          MR. SIMONS:  You're
17      misrepresenting what was agreed to.
18          MS. WIGGER:  I'm happy to read
19      the entire thing right here.
20          MR. ZACH:  Do we want to go off
21      the record?
22          MR. SIMONS:  Yes, let's go off
23      the record.
24          MS. WIGGER:  Let me
25      understand --
```



Page 72

```
 1                    D. Majcher
 2            THE VIDEOGRAPHER:  We're still
 3       on the record.
 4            MS. WIGGER:  That's okay.  Just
 5       stay on the record.
 6            Are you -- I mean, maybe you
 7       can ask a question, we'll see.
 8            Are you asking specifically
 9       about expenses to the defendant
10       company?
11            MR. ZACH:  I'm asking about
12       expenses that are ultimately rolled
13       up into their consolidated financial
14       statements which they used to solicit
15       investors.
16            MS. WIGGER:  I don't understand
17       what any of that means.
18            If you are going to ask
19       questions about the defendant
20       company, that's fine.
21            But if you're asking questions
22       about a Hong Kong company that kept
23       separate books and records, that is
24       an entirely different issue.
25            And maybe it would be a good
```



Page 73

```
 1                    D. Majcher
 2      time for a personal deposition, but
 3      not a 30(b)(6).
 4            MR. ZACH:  If you want to
 5      assert an answer, so be it.  She can
 6      come back, but I think we have a
 7      basis.
 8            It's covered by the topics.
 9            If you want, I'm happy to have
10      a longer discussion about this.  I
11      don't have the email in front of me,
12      but I don't think your objection has
13      a basis.
14            MS. WIGGER:  I'm happy to
15      listen to your question, I mean, if
16      you're representing this is related
17      to the topic related to expenses...
18            MR. ZACH:  Look, as you know,
19      many of these topics have overlap.
20            MS. WIGGER:  I'm just asking
21      about the topics so I can understand
22      how this is tied to your 30(b)(6)
23      notice.
24            You said it's tied to expenses.
25            If you're going to ask about
```



Page 74

                         D. Majcher
1
2       expenses to the defendant company --
3       of your question.
4            If you're asking about other
5       things, I might remain and discuss
6       this.
7            MR. ZACH:  I mean, I can sit
8       here and list the topics, if you'd
9       like:
10           "The financial performance and
11         projections of De Tomaso's,
12         including the revenue, expenses,
13         assets, liabilities, and equities
14         of the company and its related
15         entities."
16           MS. WIGGER:  So that's a topic
17      I discussed with your colleague, I'd
18      be happy to read it onto the record,
19      where I thought we had come to an
20      understanding that we were talking
21      about the defendant company, not a
22      Hong Kong entity.
23           MR. SIMONS:  We did not come to
24      any such understanding.
25           MS. WIGGER:  Let me, just for



Page 75

```
 1                        D. Majcher
 2          the record, read this onto the
 3          record.
 4                  So in topic 6, we said:
 5                  "We do not understand your
 6             response.
 7                     "As stated in our objections,
 8             we will produce a witness to
 9             testify regarding De Tomaso's
10             financial performances and
11             projections.
12                  "Our objections limit the
13             testimony in terms of:  1,
14             privilege; 2, the recitation of
15             numbers or data from memory; 3,
16             unnamed entities other than
17             De Tomaso which are not party to
18             the suit.
19                  "These are objections are
20             appropriate.
21                  "Response," in red:
22                  "As long as your objections
23             are limiting the notice topic
24             testimony only with respect to the
25             three you've enumerated, that is
```



Page 76

```
 1                    D. Majcher
 2       okay.
 3          "Based on your response, we
 4       expect that the witness will be
 5       prepared to testify regarding De
 6       Tomaso's financial performance and
 7       projections, including its assets
 8       and liabilities.  Otherwise,
 9       please advise."
10          So she's prepared to testify as
11       to the defendant company --
12          MR. SIMONS:  There was never
13       any discussion limiting it to
14       excluding it from subsidiaries.
15          My understanding, when we're
16       referring to De Tomaso, to be very
17       clear, was that, of course, it would
18       include all of its subsidiaries,
19       which, as we've established through
20       the record, are consolidated into its
21       balance sheet.
22          MS. WIGGER:  So we haven't
23       established that.
24          Again, I said other entities
25       other than De Tomaso are not party to
```



Page 77

```
 1                    D. Majcher
 2      this suit.
 3           There is one entity party to
 4      the suit.
 5           MR. SIMONS:  And they are
 6      De Tomaso entities.
 7           MS. WIGGER:  They're not party
 8      to the suit.
 9           You understand you haven't sued
10      this Hong Kong entity, right?
11           MR. ZACH:  I mean, we also have
12      piercing the corporate veil
13      allegations.
14           Look, by the way -- let me just
15      finish.
16           The questions I think I've
17      asked are also related to
18      compensation arrangements by
19      employees.
20           MS. WIGGER:  Maybe I should
21      hear your question if it's related to
22      expenses to the defendant company,
23      which, again, is what you
24      represented.
25
```



```
 1                    D. Majcher
 2  BY MR. ZACH:
 3      Q     So turning to page 4, you see
 4  there's a payment on the second down --
 5  it's really the first entry.  There is a
 6  hangover entry.
 7            You see there is a loaner
 8  payment from Dream Maker on March 14,
 9  2022.
10            Do you see that?
11      A     Yes.
12      Q     And that is a payment of
13  $15.6 million?
14      A     Hong Kong dollars.
15      Q     Those are Hong Kong dollars?
16      A     Yes.
17            MS. WIGGER:  Again, not to the
18       defendant company.
19  BY MR. ZACH:
20      Q     Now, what is your understanding
21  of what Dream Maker is?
22      A     So I can answer?
23      Q     Yes.
24            MS. WIGGER:  I object to the
25       form.
```



Page 79

```
 1                    D. Majcher
 2            You can answer.
 3            Again, we've used all the
 4       personal deposition time.  I'm sure
 5       this relates to a topic, but I'll
 6       give you some leeway.
 7       A     I'm answering as De Tomaso or
 8  as myself?
 9       Q     It's mixed, right?  You know,
10  it's impossible.
11            So what is your understanding
12  of what --
13       A     Dream Maker is a company that's
14  ultimately controlled by Mr. Choi.
15            Sorry.
16            And who has loaned money to the
17  company.
18       Q     Can I ask a question?
19            You said that is Hong Kong
20  dollars.  So this --
21       A     Yes, it's Hong Kong dollars.
22       Q     Can you explain?
23       A     So you can see, right, loan
24  repayment, Dream Maker.
25            And then you see U.S.D. 2M.  So
```



Page 80

```
 1                    D. Majcher
 2    that's the U.S. dollar amount.
 3            But the Hong Kong company
 4    maintains its books in the Hong Kong
 5    currency.
 6       Q    I see.
 7            So this journal is because of
 8    the Hong Kong entity.  Now we're not in
 9    dollars.  Now we're in Hong Kong dollars?
10       A    Correct.
11       Q    Understood, okay.
12            And this general journal, the
13    expenses within it, are when you submit
14    your consolidated financial statements,
15    this information is rolled up into those
16    statements, right?
17            MS. WIGGER:  Objection to form.
18       A    Rolled up, yes.  All the
19    different companies get consolidated.
20            You know, intercompany
21    transactions get canceled out and all the
22    revenues get added together.  All the
23    expenses get added together.
24            MR. ZACH:  I'm going to mark
25         this statement so we can have at
```



Page 81

```
 1                    D. Majcher
 2        least a point of the reference.
 3                So I'm going to mark as
 4        DT 12...
 5                (DT's Exhibit 12, Document
 6        entitled Index to Consolidated
 7        Financial Statements, was marked for
 8        identification, as of this date.)
 9   BY MR. ZACH:
10        Q     Are you familiar with this
11   document?
12        A     Yes.
13        Q     This is entitled "Index to
14   Consolidated Financial Statements."
15                Do you see that?
16        A     Yes.
17        Q     This is a document that's
18   prepared by Moore Global Network Limited;
19   is that right?
20        A     MSPC, as we know it, yes.
21        Q     Those are the accountants and
22   advisors for the company, right?
23        A     Those are the auditors, yes.
24        Q     If you see on page -- the next
25   page over ending 140, there's a signature
```



Page 82

```
 1                    D. Majcher
 2   of MSPC.
 3            Do you see that?
 4       A    Yes.
 5       Q    And its signed in New York, New
 6   York, on August 2023?
 7       A    Yes.
 8       Q    And it says:
 9            "We've served as the company's
10         auditor since 2021."
11       A    Yes.
12       Q    So for the information
13   that's -- we were looking at, in DT 9,
14   these transactions as reflected in the
15   general journal are ultimately rolled up
16   into the financial information that the
17   company keeps as set forth in DT 12,
18   right?
19            MS. WIGGER:  Objection to form.
20       A    They would make up part of --
21   yes, they would be -- no, all of those
22   numbers will be included in this
23   statement, yes.
24       Q    That's what consolidated
25   financial statements are, right?
```



Page 83

```
 1                     D. Majcher
 2         A     Yes.
 3         Q     And, in fact, if you go to
 4    page 8 of your consolidated financial
 5    statements, you can see that under notice
 6    one, there is a description of the
 7    organization and the nature of the
 8    operations, right?
 9         A     Yes.
10         Q     And this says that the
11    consolidated financial statements
12    include -- I'm not going to read this
13    into the record, but it basically lists
14    all of the De Tomaso related entities,
15    right?
16              MS. WIGGER:   Objection to form.
17         A     It lists a number of entities,
18    yes.
19         Q     And including the Hong Kong
20    entity?
21         A     Yes.
22         Q     We were going to go to this
23    document later, but I just want to make
24    the record clear about it.
25              So with this case -- put 9
```



Page 84

1                        D. Majcher
2      away.
3                I'm sorry, did we just put 9
4      away?
5          A    Yes.
6          Q    Okay.
7                Let's look at 10.
8                Same just general question,
9      which is:
10               This is the general journal for
11     the Hong Kong entity, right?
12         A    Yes.
13         Q    And as we just looked at DT --
14         A    12.
15         Q    Thank you, 12.
16               This information is also rolled
17     up into your consolidated financial
18     statements, right?
19               MS. WIGGER:  I object to form.
20               Not in DT 12, though, right,
21          because it's different years, just to
22          make sure it's clear?
23               THE WITNESS:  Yes.
24               MR. ZACH:  So I think, just to
25          be clear -- well, you may be right.



Page 85

```
 1                    D. Majcher
 2           Yes, she's right.
 3    BY MR. ZACH:
 4        Q     As a general matter, has
 5    De Tomaso produced to
 6    Mr. Berris -- strike that.
 7              Let me ask a different
 8    question:
 9              Have your accountants prepared
10    consolidated financial statements for
11    2023?
12        A     They have not been finalized,
13    not signed off.
14        Q     So those are still in the
15    process of being finalized?
16        A     Correct.
17        Q     Is there a deadline by which,
18    for tax purposes or other reporting
19    purposes -- that those consolidated
20    financial statements need to be finalized
21    by?
22              MS. WIGGER:  Objection to form.
23        A     No.
24        Q     But when your 2023 consolidated
25    financial statements are complete, this
```



Page 86

1                           D. Majcher
2      information would be rolled up into them,
3      right?
4           A      They should.
5           Q      Give me one second.
6                  I take it that De Tomaso does
7      its best to maintain the accuracy of its
8      books and records?
9           A      Yes.
10          Q      Just turning to page 29.
11          A      29?
12          Q      Yes, please.
13                 You see six down --
14          A      Yes.
15          Q      -- there is a payment to Waft.
16                 Do you see that?
17          A      Yes.
18          Q      You've been here over the last
19      few days of depositions, but Waft was the
20      entity that was hired by De Tomaso to
21      create a book, right?
22          A      Yes.
23          Q      And De Tomaso eventually
24      entered into a settlement agreement with
25      Waft, right?



Page 87

1                    D. Majcher

2        A    Yes.

3        Q    Whereby De Tomaso acquired back

4   all the materials relating to the book,

5   right?

6             MS. WIGGER:  Objection to form.

7        A    As part of the settlement, we

8   received the materials, yes.

9        Q    As part of the settlement,

10  there was also confidentiality provisions

11  that restricted Waft from discussing

12  De Tomaso, right?

13            MS. WIGGER:  Objection to form.

14       A    Correct.

15       Q    What we see here is at least

16  one of the payments made by De Tomaso to

17  Waft in connection with that settlement

18  agreement, right?

19       A    Yes.

20       Q    You can put 10 aside.

21            Let's look at 11.

22            This is also a general journal,

23  but this is for De Tomaso Automobile

24  Limited BVI, right?

25       A    Yes.



Page 88

                    D. Majcher

1

2       Q     BVI is another one of the

3    De Tomaso entities that is listed on your

4    consolidated financial statements, right?

5       A     Yes.

6       Q     Not to be repetitive, but to

7    the extent when you do issue your 2023

8    consolidated financial statements,

9    information from here will be rolled up

10   into those statements, right?

11      A     Yes.

12      Q     How does De Tomaso decide which

13   of its entities payments will be made for

14   ongoing expenses by the company?

15      A     I'm sorry, I don't understand

16   the question.

17      Q     I'll break it down.

18            So sometimes -- when we looked

19   at -- you've got a general journal for

20   the BVI entity, right?

21      A     Sorry, say again.

22      Q     We see the general journal for

23   the BVI entity, right?

24      A     Yes.

25      Q     We've seen the general journal



Page 89

```
 1                    D. Majcher
 2    for the Hong Kong entity, right?
 3         A    Yes.
 4         Q    And they're making -- and we've
 5    seen a general journal for the U.S.
 6    based, right?
 7         A    Yes.
 8         Q    And De Tomaso is -- the
 9    principal purpose of De Tomaso is the
10    creation of the P72 and now the P900,
11    right?
12         A    Correct.
13         Q    So other than developing and
14    selling those cars -- well, sorry.
15              You'd agree with me that the
16    development of those two cars are by far
17    the principal business purpose of the
18    company?
19         A    Yes.
20         Q    And that the vast majority of
21    expenses that are being paid out are in
22    furtherance of the development of those
23    cars, right?
24         A    Yes.
25         Q    How does the company decide, as
```



Page 90

1                    D. Majcher

2     those expenses come due, which of the

3     various entities makes those payments?

4              MS. WIGGER:  I object to form.

5        A      Which of the entities makes

6     those payments?

7        Q      Yes.

8              So let's just assume, like --

9     it's a little bit of a hypothetical, but

10    let's say an expense comes in from

11    Capricorn.

12             What is the process by which

13    the company determines that invoice

14    should be paid either from BVI or

15    Hong Kong or one of the other entities?

16       A      As a practical matter, it

17    depends on where the cash is sitting, in

18    which bank account.

19       Q      So for each of the entities,

20    they maintain their own bank accounts?

21       A      Not all the entities have bank

22    accounts.

23       Q      Which of the entities have bank

24    accounts?

25             MS. WIGGER:  I object to form.



Page 91

1                    D. Majcher

2        A     At the moment, it's the

3    Hong Kong entity.

4        Q     So other than the Hong Kong

5    entity, De Tomaso does not maintain any

6    other bank accounts?

7        A     Not at this very moment.

8        Q     So if an expense is -- and I

9    take it that the Hong Kong bank account

10   holds De Tomaso's money in Hong Kong

11   dollars?

12       A     We have different currency.

13   So, they're, yes, multi-currency

14   accounts.

15       Q     So the bank account in

16   Hong Kong is --

17       A     We have USD, HKD, Euro.

18       Q     Got it.

19             So as expenses -- as we sit

20   here today, as expenses come due,

21   everything is paid out of that bank

22   account?

23             MS. WIGGER:  I object to form.

24       A     Yes.

25       Q     I mean, is it the case that,



Page 92

1                          D. Majcher
2        let's say, some invoices in Euros, you'll
3        just pay out of the Euro subaccount that
4        you have there?
5             A     Just so that we don't lose out
6        on foreign exchange, yes.
7             Q     So regardless of what entity
8        is -- as we sit here today, regardless of
9        what -- strike that.
10                  As we sit here today,
11       regardless of which entity's general
12       journal records the expense, those
13       expenses are all paid out of the
14       Hong Kong based bank account, right?
15                  MS. WIGGER:  I object to form.
16            A     You're talking specifically
17       about the cash going out?
18            Q     Yes.
19            A     Yes.
20            Q     So even if the expense is
21       listed on the BVI entity, it's still
22       being paid on the bank account that's
23       controlled by the Hong Kong entity?
24            A     Yes.  And then on the journal
25       of the Hong Kong company, we record that



Page 93

                              D. Majcher

1
2       as a payment that's made on behalf of the
3       BVI company.  And then the BVI company
4       will record that expense item and record
5       that now it owes the money to Hong Kong.
6              Do you understand?
7       Q     Yes.
8       A     Yes, okay.
9       Q     What is the business purpose
10      for De Tomaso on maintaining the BVI
11      entity?
12             MS. WIGGER:  I object to form.
13      A      It was originally the holding
14      company of the De Tomaso Group.
15      Q     What is the business purpose of
16      the United Kingdom entity?
17             MS. WIGGER:  I object to form.
18      A      That entity holds all of the
19      trademarks and design rights.
20      Q     And what is the business
21      purpose of the Hong Kong entity?
22             MS. WIGGER:  I object to form.
23      Asked and answered.
24             Oh, sorry.
25      A      The Hong Kong entity is the



Page 94

```
 1                    D. Majcher
 2    primary operating entity.
 3        Q     What was the prior name of the
 4    holding company?
 5              MS. WIGGER:  I object to form.
 6        A     I'm sorry, which holding
 7    company?
 8        Q     As we sit here today, what is
 9    the overarching holding company for the
10    various entities?
11        A     The overarching holding -- so
12    when I use the term the holding company
13    for the group, I mean that if a new
14    investor were to come in, that's where
15    they would invest into.
16        Q     Where is that based?
17        A     Today?
18        Q     Yes.
19        A     Cayman Islands.
20        Q     Where was it before?
21              MS. WIGGER:  I object to form.
22        A     Which time period?
23        Q     Let's say between 2020 and
24    2022.
25        A     So I guess the best way is if
```



Page 95

1                       D. Majcher
2    we look at the consolidated financial
3    statements up until the end of 2022,
4    De Tomaso North America, LLC, was that
5    holding company.
6         Q     So you have 11 before you now,
7    right?
8         A     I do.
9         Q     I'm just making sure I've got
10   nothing else with 11.
11               I don't.
12               You can put 11 aside.
13               MR. ZACH:  I'm going to mark as
14          13, DT 13...
15               (DT's Exhibit 13, Journal entry
16          for the BVI entity, was marked for
17          identification, as of this date.)
18   BY MR. ZACH:
19         Q     So here is a general journal
20    for the BVI entity.
21               Do you see that?
22         A     Yes.
23         Q     And, again, this is something
24    that would be rolled up into -- this
25    actually would be rolled up into DT 12,



Page 96

```
 1                    D. Majcher
 2     the consolidated statements going back.
 3          A     Yes.
 4          Q     If you look at the first page
 5     of it --
 6          A     Yes.
 7          Q     -- there is a payment that
 8     says, "Diana Consultancy Fee, U.S.
 9     $30,000."
10               Do you see that?
11          A     Yes.
12          Q     That was made on January 6,
13     2021, right?
14          A     Yes.
15          Q     That is a payment that's being
16     made to you as compensation for your work
17     at De Tomaso, right?
18          A     Yes.
19          Q     Without getting into looking at
20     the documents, we'll just short-circuit
21     things a bit.
22               You were here during Mr. Choi's
23     deposition, right?
24          A     Yes.
25          Q     During that deposition, we
```



```
 1                         D. Majcher
 2    walked through a number of expenses that
 3    were paid out of various De Tomaso
 4    entities that went directly to his real
 5    estate broker for dance lessons.
 6              Do you recall those payments?
 7              MS. WIGGER:  I object to form.
 8        A    I recall us walking through
 9    these, yes.
10        Q    So as a general matter, is it
11    De Tomaso's practice to make payments
12    directly from its bank accounts to pay
13    for personal expenses for Mr. Choi?
14              MS. WIGGER:  I object to form.
15        A    No.  And those are not for
16    personal expenses.  Those are not payment
17    for personal expenses.
18        Q    Let me make it clear, because I
19    think I see a disconnect.
20              So you would agree with me that
21    payments for Mr. Choi's daughter's dance
22    lessons would be a personal expense in
23    general?
24              MS. WIGGER:  I object to form.
25        A    Yes.
```



Page 98

                        D. Majcher

1

2      Q      And as I understand it from

3   Mr. Choi's testimony, the payments that

4   are going directly from the company to

5   pay for what otherwise would be a

6   personal expense, that's warranted

7   because that's money owed to Mr. Choi by

8   the company, right?

9              MS. WIGGER:  I object to form.

10     A      So I think -- and perhaps

11  there's a disconnect.

12             The document, if I recall

13  correctly, that you showed during

14  Mr. Choi's deposition is a list of money

15  in from him and money out for him on his

16  behalf.

17             That's a document that we

18  created to keep track of, you know, the

19  money that's the total amount of money

20  that's owed to Mr. Choi at any one time.

21             If you actually look into the

22  journal, then you will see wherever the

23  money went out to, it's properly recorded

24  into his -- we call it the current

25  account.



Page 99

                    D. Majcher
 1
 2            Like, think of it as like a
 3    running tab.  So it's his current
 4    account.
 5            In the loan agreement with
 6    Mr. Choi, if I recall correctly, it's
 7    stated that the lender can direct the
 8    company to pay to whichever bank account
 9    it wishes at the time of repayment.
10            So that's what happened.
11    Q     Now, for the company's
12    accounting purposes, where there is a
13    payment directly from the company to pay
14    for what would otherwise be a personal
15    expense for Mr. Choi, how is that
16    recorded for purposes of reporting
17    Mr. Choi's income to relative tax
18    authorities?
19            MS. WIGGER:  I object to form.
20    A     That is not our -- the company
21    does nothing to report -- I mean, okay,
22    the company has not done anything that's
23    related to Mr. Choi's personal income.
24    Q     So does the company provide
25    Mr. Choi with his overall income or



Page 100

```
 1                    D. Majcher
 2    payments by the -- or a record of his
 3    overall income and payments for purposes
 4    of his reporting taxes?
 5              MS. WIGGER:  I object to form.
 6        A    No.
 7        Q    The books and records reflect
 8    various reported loans from Mr. Choi to
 9    the company that earn 10 percent
10    interest.
11              The company is aware of that,
12    right?
13        A    Yes.
14        Q    The company actually keeps
15    track of the interest that's earned by
16    Mr. Choi, right?
17        A    Correct.
18        Q    Does the company report that
19    earned interest to Mr. Choi in a format
20    that he can supply it to his accountants
21    or relevant tax authorities?
22              MS. WIGGER:  I object to form.
23        A    No.  And today, the company has
24    not made any interest payments.
25        Q    So the interest payments are
```



Page 101

```
 1                    D. Majcher
 2   recorded on the books as owed to
 3   Mr. Choi, but it's made no payment?
 4        A     Correct.
 5        Q     In terms of the loans that the
 6   various entities have -- strike that.
 7              In terms of the loans that
 8   entities controlled by Mr. Choi have made
 9   to the company, how are those loans
10   documented?
11              MS. WIGGER:  I object to form.
12        A     Are you talking about when the
13   money comes in?
14        Q     Yes, exactly.
15        A     It would be recorded into the
16   general ledger.
17        Q     Like, for example, the entity
18   Ideal Team Ventures has made a number
19   of -- well, let me go to the document.
20              I think I know the document
21   that you're talking about, so let me just
22   actually mark that document so we can
23   talk about it.
24        A     Sure.
25              MR. ZACH:  So I'm marking this
```



Page 102

```
 1                    D. Majcher
 2        as DT 14.
 3             (DT's Exhibit 14, Two-page
 4        Document, was marked for
 5        identification, as of this date.)
 6   BY MR. ZACH:
 7        Q     When you were pointing me to an
 8     earlier document that we were discussing,
 9     is that what you were talking about?
10        A     Yes.
11             MS. WIGGER:  I think it is, but
12        this is the entire document, right?
13             MR. ZACH:  Yes, it's two pages.
14             MS. WIGGER:  Okay, yes.
15   BY MR. ZACH:
16        Q     So to maybe be more precise,
17     let's just -- looking at the top of this
18     document, you see it says "Dream Maker,"
19     right?
20        A     Yes.
21        Q     And Dream Maker is one of the
22     entities that Mr. Choi controls, right?
23        A     Yes.
24        Q     And you see, just taking the
25     first two entries by way of example, in
```



MAGNA
LEGAL SERVICES

Page 103

```
 1                      D. Majcher
 2      March of 2021, Dream Maker made a
 3      $3 million advance to De Tomaso, right?
 4           A      Correct.
 5           Q      And then in July of 2021, there
 6      was another $3 million advance made,
 7      right?
 8           A      Yes.
 9           Q      Is Dream Maker earning
10      10 percent on those advances to the
11      extent they haven't been repaid?
12           A      Yes.
13           Q      So my question is:
14                  Is there a formal written loan
15      agreement between De Tomaso and
16      Dream Maker that reflects the amount of
17      this loan and the interest terms?
18           A      No.  We have two loan
19      agreements:  One is with Ideal Team, and
20      one is with Mr. Choi in his personal
21      capacity.
22                  Those are both made with this
23      entity here, the BVI entity.
24                  The money that's coming in from
25      Dream Maker, for our purposes, they are
```



Page 104

```
 1                     D. Majcher
 2    recorded as coming in from Ideal Team.
 3    So we view them as one.
 4        Q     So regardless of which of
 5    Mr. Choi's entities is making the
 6    payment, the company just treats it as if
 7    it's coming from Ideal Team; is that
 8    right?
 9        A     That's fair to say.
10        Q     I mean, even if it's just
11    Mr. Choi, personally, making the payment,
12    that would still be viewed at least by
13    the company as coming through Ideal Team?
14             MS. WIGGER:  I object to form.
15        A     Actually, no, because we
16    actually have an agreement in place with
17    Mr. Choi in his personal name, so money
18    coming in directly from him will be
19    treated under that agreement.
20        Q     Got it.
21             So if you just flip it over,
22    this page starts with -- like, it says
23    Norman Choi, and there's a series of
24    payments.
25             Those are the ones that are
```



MAGNA
LEGAL SERVICES

Page 105

```
 1                     D. Majcher
 2    coming directly from him?
 3        A      Correct.
 4        Q      So those would be under the
 5    agreement that the company has personally
 6    with Mr. Choi?
 7        A      Yes.
 8        Q      And that's a written agreement?
 9        A      Yes.
10        Q      And whether it's
11    Ideal Team Ventures or Mr. Choi,
12    personally, under that agreement, both of
13    those agreements are for 10 percent
14    interest, right?
15        A      Yes.
16        Q      Has De Tomaso produced those
17    agreements?
18              They may have.  I just don't
19    know the answer.
20              MS. WIGGER:  Yes, we checked
21        them after David's discussion.
22    BY MR. ZACH:
23        Q      Now, how did the company
24    negotiate with Mr. Choi to arrive at a
25    10 percent interest rate?
```



Page 106

```
 1                    D. Majcher
 2              MS. WIGGER:  I object to form.
 3      A     By mutual agreement.
 4      Q     Well, did the company -- when
 5   the loan was initially proposed, did the
 6   company request a lower interest rate?
 7              MS. WIGGER:  I object to form.
 8      A     The company, as in the company
 9   borrowing the money, I guess?
10      Q     Sorry?
11      A     The company, as in the borrower
12   here, not the defendant?
13      Q     Right, the borrower, yes.
14      A     I'm not aware.
15              Just to put things into
16   perspective, as a startup business
17   without having generated any revenue,
18   it's not possible for the company to go
19   and borrow money from any bank.
20              So, you know, even if we wanted
21   to pay 15 percent interest, there's no
22   possibility to borrow that money.
23              So 10 percent is not an
24   unreasonable interest rate from the
25   company's point of view.
```



```
 1                    D. Majcher
 2        Q     Well, Mr. Choi was the
 3    principal shareholder of the company,
 4    right?
 5        A     Yes.
 6        Q     And you would agree with me
 7    that -- the company would agree that
 8    Mr. Choi is a very wealthy man, right?
 9              MS. WIGGER:  I object to form.
10        A     I can't speak to how wealthy
11    Mr. Choi is.  He's a wealthy man.
12        Q     And the company is aware that,
13    at times in startup companies, principal
14    shareholders can make personal guarantees
15    with loans, right?
16              MS. WIGGER:  I object to form.
17        A     Yes.
18        Q     And if there is some outside
19    personal guarantee, the company
20    understands that that could -- a bank
21    could provide a reduced interest rate,
22    because it's taking on less risk given
23    the guarantee, right?
24              MS. WIGGER:  I object to form.
25        A     I can't speak to the
```



Page 108

```
 1                    D. Majcher
 2   hypothetical situation.  I can only speak
 3   to us having gone to banks, and that was
 4   not the situation that happened.
 5             We could not get any financing
 6   from banks.
 7       Q    Did Mr. Choi ever offer the
 8   company to provide some sort of personal
 9   guarantee to help it find financing from
10   banks?
11       A    Not to my knowledge.
12       Q    Sort of sticking with -- let's
13   go back to De Tomaso 12, the consolidated
14   financial statements.
15             Can we go back to 13 before we
16   go to 12?
17             Sorry.
18             Going to page 7, if you look at
19   the top of page 7, on October 18, 2021,
20   there was a payment to Jowyn Wong for
21   543,000 Hong Kong dollars.
22             Do you see that?
23       A    I do.
24       Q    So you had asked me earlier to
25   show an earlier payment to Mr. Wong.
```



Page 109

                              D. Majcher
 1
 2              So does that refresh your
 3      recollection that the company was making
 4      payments to him as early as October of
 5      2021?
 6              MS. WIGGER:  I object to form.
 7      A       I see that there's a payment
 8      made to Jowyn Wong, but I also see that
 9      it's booked as a repayment to director,
10      which would have been Mr. Choi.
11              So it appears to me that the
12      money went to Jowyn Wong, but it's on
13      behalf of Mr. Choi.
14      Q       When you say it's on behalf of
15      Mr. Choi, so this would be another
16      instance where Mr. Choi is directing the
17      company to pay someone directly, and then
18      sort of debit the outstanding amounts
19      that were owed to Mr. Choi by the
20      company?
21              MS. WIGGER:  I object to form.
22      A       Mr. Choi has directed the
23      company to repay his loan by paying
24      Mr. Jowyn Wong.
25      Q       And then you see three below



MAGNA
LEGAL SERVICES

Page 110

                              D. Majcher
1                       that, there's a payment to
2     Edith Chan Yang?
3        A     Yes.
4        Q     Do you know who Edith Chan Yang
5     is?
6        A     I do now since the deposition.
7        Q     So this also reflects a payment
8     on December 8, 2021, to her from the BVI
9     entity, right?
10       A     Actually, if you look at the
11    journal, then it means the money had gone
12    out from the Hong Kong bank account.  And
13    then the director's account, which is
14    Mr. Choi's loan account, was debited.
15       Q     I see.  I see.  Okay, thank
16    you.
17             So going back to -- now we go
18    to 12.
19             Give me a second to find my
20    place.
21             If you turn to page 17, note
22    five.
23       A     Note five, yes.
24       Q     The motor vehicle?



Page 111

1                      D. Majcher

2          A      Yes.

3          Q      So at some point, the company

4     purchased a car, right, a motor vehicle?

5          A      Yes.

6              MR. ZACH:  And that I'm going

7          to mark as Plaintiff's Exhibit 15,

8          DT 15...

9              (DT's Exhibit 15, Invoice, was

10         marked for identification, as of this

11         date.)

12    BY MR. ZACH:

13         Q      Do you see DT 15 is an invoice

14    from PAG Greenwich M-1?

15         A      Yes.

16         Q      And this is for the purchase of

17    a 2021 Mercedes light truck G30.

18              Do you see that?

19         A      Yes.

20         Q      And going back to 17 -- excuse

21    me, page 17 of DT 12, do you see that

22    there is -- it reflects about $195,000

23    for the company buying a car?

24         A      Yes.

25         Q      It's the same car, right?



Page 112

```
 1                    D. Majcher
 2        A     I believe so.
 3        Q     What was the business purpose
 4   of this car?
 5        A     It's to drive it.
 6        Q     Who was meant to drive it?
 7        A     I think both Mr. Choi and
 8   Mr. Berris drove it.
 9              And, in fact, Mr. Berris still
10   holds title to this car.
11        Q     Mr. Berris is actually still
12   paying taxes on the car, right?
13              MS. WIGGER:  I object to form.
14        A     We have not seen anything.
15        Q     But, in fact, the company
16   actually has possession of the car,
17   doesn't it?
18              MS. WIGGER:  Objection to form.
19        A     We do not.
20              Well, it's parked at Miller
21   Motors.  We have access to it.
22        Q     When there was access to it,
23   did the company permit Mr. Choi to
24   utilize it when he was in New York?
25              MS. WIGGER:  Objection to form.
```



Page 113

                        D. Majcher

 1

 2      A      Mr. Choi had access to the car

 3   when he was in New York, yes.

 4      Q      One of the business purposes

 5   was for Mr. Choi to travel around

 6   New York when he was here doing business,

 7   right?

 8      A      Yes.

 9      Q      Now, we talked about -- during

10   Mr. Choi's deposition, he made reference

11   to a company retreat at a villa in Italy,

12   right?

13      A      Yes.

14      Q      I take it that was paid for by

15   the company, right?

16      A      Yes.

17      Q      And who from the company

18   attended that?

19      A      I did.

20      Q      Did others attend?

21      A      Yes.

22             Do you want me to list the

23   names of everyone?

24      Q      Sure.

25      A      I was there.



Page 114

```
 1                    D. Majcher
 2             Hugo was there with his
 3      girlfriend.
 4             Stephan Berger was there with
 5      his wife.
 6             Jacob Jodlowski was there with
 7      his wife.
 8             Jake Hamilton was there.
 9             And Abby Gilbey-Dunning is her
10      last name.
11             And these are all of our
12      colleagues.
13             And Mr. Choi and his family
14      were there.
15      Q     Who authorized the corporate
16      retreat taking place there?
17             MS. WIGGER:  Objection to form.
18      A     It would be Mr. Choi.
19      Q     Marked as DT 16, just an
20      Internet article.
21             Looking at that, that's where
22      you guys went, right?
23
24
25
```



Page 115

                          D. Majcher

1                      (DT's Exhibit 16, Article, was

2               marked for identification, as of this

3               date.)

4        A      I don't know.  That doesn't

5    look like the place that we were -- no,

6    this is definitely not the place.

7        Q      That's not it?

8        A      Well, I mean, I see that it

9    says this is George Clooney's mansion at

10   Lake Como.

11                 Right?

12                 And our retreat did not take

13   place at Lake Como.

14       Q      Where did it take place?

15       A      I don't actually remember the

16   name of the village, but it's outside of

17   Verona.

18       Q      Was it on the water?

19       A      No.

20       Q      Was it out in the hills?

21       A      I don't remember seeing hills.

22   Like farmland, vineyards.

23       Q      When you were you at that

24   corporate retreat, were there -- how many



Page 116

```
 1                    D. Majcher
 2    business meetings occurred?
 3            Like, was there a formal
 4    sitdown -- strike that.
 5            During the retreat, did anyone
 6    make a presentation about the business?
 7            MS. WIGGER:  I object to form.
 8       A    Presentation, as in, like,
 9    internal presentations?
10       Q    Yes, like a slide show or, you
11    know...
12            MS. WIGGER:  I object to form.
13       A    I may have.  I mean, we were
14    basically talking about business day and
15    night, formally or informally.  Whether a
16    slideshow was shown, I don't know.
17       Q    What sort of formal business
18    events occurred at the retreat?
19       A    Formal business?
20       Q    So you're talking about
21    formally or informally?
22       A    Like we had sitdown meetings
23    where, okay, certain either everyone or
24    certain people will talk about a specific
25    topic, or there will be sort of breakouts
```



```
 1                    D. Majcher
 2    when you are sitting around drinking
 3    coffee.
 4              You just talk about business
 5    anyways, so that will be informal to me.
 6       Q     And when those meetings were
 7    occurring, what were -- were all of the
 8    guests present for these business
 9    discussions?
10              MS. WIGGER:  I object to form.
11       A     Again, it depends on the topic.
12       Q     For some of those business
13    discussions, were all of the guests
14    present?
15              MS. WIGGER:  I object to form.
16       A     I think so.
17              When you say "all," you mean
18    including people who were not part of
19    De Tomaso?
20       Q     Yes, exactly.  The invited
21    guests.
22       A     I don't think so.  I don't see
23    any reason why they would be interested
24    in participating.
25              I mean, the spouses, for
```



Page 118

```
 1                    D. Majcher
 2    example, I don't think so.
 3         Q      But during sort of -- I take it
 4    there was informal -- you had dinners
 5    while you were there, right?
 6         A      Yes.
 7         Q      I take it during those dinner
 8    times, there were informal discussions
 9    amongst the group?
10         A      Sure.
11         Q      So of those related to the
12    development of the P790, right?
13                MS. WIGGER:  I object to form.
14         Q      Or the P --
15         A      The P72?
16         Q      The P72, sorry.
17                MS. WIGGER:  Same objection.
18         A      Yes.
19         Q      Some of those discussions
20    related to the development of the P900 or
21    the -- do I have that right?
22         A      I would assume so, yes.
23         Q      And some of those discussions
24    were amongst the entire group of all the
25    marketing in how to position the company,
```



Page 119

```
 1                      D. Majcher
 2    right?
 3              MS. WIGGER:  I object to form.
 4       A      I think so.
 5       Q      At some point, Mr. Choi
 6    purchased a home right near us, right?
 7       A      Yes.
 8       Q      Did the company pay for that
 9    home?
10       A      No.
11       Q      Funds were transferred from the
12    company to various individuals involved
13    in the purchase of that company, right?
14              MS. WIGGER:  Objection.
15    BY MR. ZACH:
16       Q      His real estate agent, and what
17    have you, right?
18              MS. WIGGER:  I object to form.
19       A      I have not verified the real
20    estate agent that you have mentioned.
21              I understand her to also be a
22    personal friend to Mr. Choi's wife.
23              So to the extent that you're
24    saying she's the real estate agent
25    involved in the purchase of his home
```



Page 120

                              D. Majcher
1       here, then the record shows money has
2       been transferred to her, yes.
3           Q      But to be clear, so it is the
4       company's testimony that it did not
5       pay -- itself pay for the home, right?
6           A      It is the company's testimony
7       that it did not pay for the home that
8       Mr. Choi purchased in New York, no.
9           Q      Did the company ever offer to
10      provide homes for Mr. Choi or Mr. Berris?
11          A      No.
12          Q      The company never extended an
13      offer to potentially purchase apartments
14      for either of the two directors?
15          A      No.
16              MR. ZACH:  Why don't we take a
17          break.
18              THE VIDEOGRAPHER:  The time now
19          is 12:05 p.m.
20              We're off the record.
21              (Recess taken from 12:05 p.m.
22          to 12:44 p.m.)
23
24
25



Page 121

                            D. Majcher
 1
 2              A F T E R N O O N   S E S S I O N
 3                  (Time noted:  12:44 p.m.)
 4
 5              THE VIDEOGRAPHER:  The time is
 6       12:44 p.m.
 7              We're back on the record.
 8              MR. ZACH:  We're back from
 9       lunch.  I have a couple more
10       documents I'd like to mark.
11              This will be DT 17.  These are
12       more general ledgers.
13              (DT's Exhibit 17, General
14       Ledger Entries, was marked for
15       identification, as of this date.)
16              MS. WIGGER:  What did you say,
17       DT?
18              MR. ZACH:  17.
19              Let me just mark them all.
20       This will be DT 18.
21              Give me one second.  I'm going
22       to take 18 back.
23              I've already marked 18.
24              Rather than be confusing, just
25       ignore 18, but I'll keep the 18



Page 122

```
 1                    D. Majcher
 2        sticker.  And I'll mark the next
 3        document 18.
 4
 5   DIANA MAJCHER,
 6        resumed and testified as follows:
 7   BY MR. ZACH:
 8        Q     So just looking at -- very
 9     briefly looking at DT 17, this is another
10     general journal.
11             Do you see that?
12        A     Yes.
13        Q     And it is one that, as we
14     discussed earlier, rolls up into the
15     consolidated financial statements for the
16     company, right?
17        A     Not the one that we've seen.
18        Q     Right.
19             But it is what otherwise --
20     well, did some of this roll up?  It's
21     from 2020.
22        A     The balance sheet items would,
23     depending on the item, but not the profit
24     and loss.
25        Q     Okay, got you.
```



Page 123

```
 1                     D. Majcher
 2               And to your point --
 3       A      DT 12 is...
 4       Q      It doesn't go back.  It only
 5   goes back to 2021?
 6       A      Yes.
 7       Q      To the extent that there was a
 8   consolidated set of financial statements
 9   for De Tomaso for the year 2020, this
10   would have rolled up into it?
11       A      Yes.
12       Q      Turning to the last page of
13   this on 11, we had talked earlier about
14   interest being paid on loans and
15   promissory notes that Mr. Choi had made
16   to the company?
17       A      We spoke about interest being
18   accrued, but not paid.
19       Q      Just taking the last entry,
20   when it says, "Accrue interest of
21   promissory note," does this essentially
22   show it -- what does this show with
23   respect to the interest?
24       A      It shows the amount of interest
25   that's been accrued on this particular
```



Page 124

```
 1                     D. Majcher
 2    promissory note.
 3              I mean, I don't know if there's
 4    other entries related to interest in
 5    this, but it looks like it would be the
 6    whole year.
 7         Q    Does this reflect a transfer of
 8    that interest?
 9         A    I don't believe so, no.
10         Q    The debit?
11              So it's the --
12         A    So I see the interest.
13              The debit is the interest
14    expense, and then the credit is the
15    promissory note.
16              So we're adding the interest
17    amount to the total outstanding of the
18    promissory notes.
19         Q    Got it.
20              So this reflects sort of the
21    accrual on the books and records, but not
22    a disbursement of payments to Mr. Choi?
23         A    Correct.
24         Q    You can set that aside.
25              I'm going to move on to a
```



Page 125

```
 1                    D. Majcher
 2    different topic, Topic 5, which is the
 3    development of the P72.
 4            Does De Tomaso agree that
 5    Mr. Berris worked to select various
 6    suppliers and independent contractors to
 7    assist with the development and launch of
 8    the P72?
 9            MS. WIGGER:  I object to form.
10    A    Sorry, it's a long question.
11            Can you repeat?
12    Q    Sure, sure.
13            Does De Tomaso agree that
14    Mr. Berris helped select and recommend
15    suppliers and independent contractors to
16    assist with the development and launch of
17    the P72?
18            MS. WIGGER:  Same objection.
19    A    I think Mr. Berris participated
20    in the selection on some of these, yes.
21    Q    And De Tomaso would agree that
22    Mr. Berris made a number of
23    recommendations of who should be hired to
24    assist in that work, right?
25            MS. WIGGER:  Objection to form.
```



Page 126

```
 1                     D. Majcher
 2      A     Assist in?
 3      Q     Assist in developing and
 4   launching the P72.
 5      A     I mean, developing and
 6   launching the P72 is very broad.
 7            But to the extent that these
 8   are suppliers of De Tomaso related to the
 9   business, yes.
10      Q     One of those suppliers -- let
11   me mark this.
12            MR. ZACH:  I'm marking as
13         DT 18, an email.
14            (DT's Exhibit 18, Email from
15         Ms. Majcher to Moritz Ley, was marked
16         for identification, as of this date.)
17   BY MR. ZACH:
18      Q     Do you see here this is an
19   email from yourself to Moritz Ley at
20   Capricorn?
21      A     Yes.
22      Q     And that Mr. Choi and Robertino
23   Wild are copied on, right?
24      A     Yes.
25      Q     And if you read the email from
```



Page 127

1                          D. Majcher
2      you, it says:
3                "Dear Moritz" -- who works at
4           Capricorn -- "thank you for
5           sending over the settlement
6           agreement.
7                "We are glad to finally put
8           CTA behind us.
9                "Can you also send over a
10          spreadsheet that was mentioned in
11          the settlement agreement?"
12               Do you see that?
13     A     Yes.
14     Q     And CTE was an independent
15     entity that was assisting with working on
16     the exhaust systems for the P72; is that
17     right?
18     A     Yes.
19     Q     And De Tomaso would agree that
20     the exhaust system of the type of car as
21     a P72 is a complicated function, right?
22     A     I would agree, yes.  Everything
23     is pretty complicated, yes.
24     Q     And De Tomaso would agree also
25     that Mr. Berris had recommended CTE to it



Page 128

```
 1                    D. Majcher
 2   to actually do the exhaust work for
 3   De Tomaso?
 4        A     I am not aware.
 5        Q     But at some point when the work
 6   transferred to Capricorn, CTE
 7   was -- strike that.
 8              So this email is in September
 9   of 2022, right?
10        A     Yes.
11        Q     At this point, De Tomaso has
12   made the decision to get rid of CTE to
13   help that with the exhaust work, right?
14              MS. WIGGER:  Objection to form.
15        A     I believe this was based on
16   Capricorn's recommendation.
17        Q     Capricorn told De Tomaso that
18   they shouldn't use CTE but go a different
19   direction for the exhaust system, right?
20              MS. WIGGER:  Objection to form.
21        A     Yes.
22        Q     And this is after Mr. Berris
23   had departed from the company, right?
24        A     Correct.
25        Q     And, in fact, De Tomaso got rid
```



Page 129

1                        D. Majcher
2    of CTE, right?
3              MS. WIGGER:  I object to form.
4        A     We stopped working with them at
5    this point in time, yes.
6        Q     There's a reference here made
7    to a settlement agreement.
8              What was the settlement
9    agreement?
10       A     It was to settle the work that
11   they had already done so far to hand over
12   everything to Capricorn so Capricorn
13   could take over from that time.
14       Q     So, basically, Capricorn would
15   be doing the work in place of CTE, right?
16       A     Yes.
17       Q     You can put that aside.
18             And from other depositions,
19   De Tomaso ultimately had a bad experience
20   with Capricorn, right?
21             MS. WIGGER:  I object to form.
22       A     We stopped working with them.
23       Q     Because Capricorn failed to
24   deliver on multiple obligations to
25   De Tomaso, right?



Page 130

                        D. Majcher

1

2      A      They failed to perform under

3   the contracts we signed with them.

4      Q      So I'd like to mark as --

5      A      That was 18, right?

6             That was 18.

7             MR. ZACH:  We'll mark as

8         DT 19...

9             (DT's Exhibit 19, Email from

10        Stephan Berger to De Tomaso, July of

11        2023, was marked for identification,

12        as of this date.)

13   BY MR. ZACH:

14     Q      This is an email from July of

15   2023, right?

16     A      Yes.

17     Q      And it's from Stephan Berger at

18   De Tomaso, right?

19     A      Yes.

20     Q      And it's to Jayson Perry at

21   Roush?

22     A      Yes.

23     Q      And you're copy on it, right?

24     A      Yes.

25     Q      What was Mr. Berger's role at



Page 131

```
 1                     D. Majcher
 2    De Tomaso?
 3         A      He's the CEO of our German
 4    subsidiary.
 5         Q      And what is Mr. Perry's role?
 6                Sorry, excuse me.  That's fine.
 7                You see in the email, it says:
 8                "Hi, Jayson.
 9                "Had a chat with Norman about
10         CTE.
11                "You mentioned that there is
12         32,000 Great British pounds needed
13         to be settled before CTE restarts
14         the project."
15                Do you see that?
16         A      Yes.
17         Q      So at least by this point in
18    July of 2023, De Tomaso made the decision
19    to go back and work with CTE again,
20    right?
21         A      Yes.
22         Q      And this was subsequent -- and
23    they had been working with CTE earlier on
24    in the development of the P72, right?
25         A      De Tomaso has, yes.
```



```
                          D. Majcher
 1
 2       Q      And now after Capricorn had
 3    failed to deliver on its commitments to
 4    the company, De Tomaso is returning to
 5    CTE to complete the exhaust work, right?
 6       A      Yes.  Because they already
 7    worked on the project previously, it
 8    would be faster for them to just pick up
 9    the work again.
10       Q      But CTE then had to restart the
11    work because they had stopped, you know,
12    about a year earlier, right?
13             MS. WIGGER:  I object to form.
14       A      Yes, stopped for however long
15    the period was, yes.
16       Q      You can put that aside.
17             MR. ZACH:  I'm going to mark as
18       DT 20 another email.
19  BY MR. ZACH:
20       Q      As I hand this to you, I'm
21    going to say and spell a word and see if
22    you know what it means, because I just
23    want to know what it means.
24
25
```



```
 1                    D. Majcher
 2              (DT's Exhibit 20, Email dated
 3         March 11, 2022, was marked for
 4         identification, as of this date.)
 5   BY MR. ZACH:
 6         Q      Do you know what "homologation"
 7    means?
 8         A      Yes.
 9         Q      And that's spelled
10    h-o-m-o-l-o-g-a-t-i-o-n, right?
11         A      Yes.
12         Q      Am I saying that word right,
13    "homologation"?
14         A      Homologation, yes.
15         Q      What is homologation?
16         A      In very simple terms, it's to
17    ensure that the vehicle complies to
18    safety standards and rules imposed by
19    the -- in the U.S., it will be NHTSA, for
20    example.
21         Q      So maybe let me break it down a
22    bit.
23              The P72 is sold in different
24    countries around the world, right?
25         A      Yes.
```



Page 134

1                    D. Majcher
2      Q      In order for a car to be driven
3   on the street, most countries have sort
4   of safety regulations that are imposed on
5   automobile manufacturers that have to be
6   complied with, right?
7               MS. WIGGER:  I object to form.
8      A      Yes.
9      Q      And homologation is essentially
10  the work that's done to make sure that
11  the car the automaker is selling is in
12  compliance with whatever local
13  regulations are in place where the car is
14  going to be driven?
15     A      Correct.
16     Q      And in connection with -- and
17  this email is dated March 11, 2022,
18  right?
19     A      Yes.
20     Q      And at that point, De Tomaso is
21  using an individual named Lance Tunick in
22  connection with its homologation work,
23  right?
24     A      No.
25     Q      Who is Lance Tunick?



Page 135

```
 1                    D. Majcher
 2      A    Lance Tunick, he's an
 3    independent consultant.  As I understand,
 4    he's a lawyer by background.
 5              He helps us with the
 6    importation of the cars into the U.S.
 7              In connection with that, you
 8    know, he's familiar with the homologation
 9    rules, but he's not the person working on
10    the homologation.
11      Q    Fair enough.  I get the
12    distinction.
13              So Mr. Tunick is sort of
14    providing professional advice about how
15    to comply with different nations
16    restrictions to make the cars legally
17    importable?
18              MS. WIGGER:  I object to form.
19      A    Only in the U.S.
20      Q    And Mr. Tunick was someone that
21    Mr. Berris brought in to assist
22    De Tomaso, right?
23              MS. WIGGER:  I object to form.
24      A    Not to De Tomaso's knowledge.
25      Q    But subsequently, De Tomaso,
```



Page 136

```
 1                    D. Majcher
 2    for a time, got rid of Mr. Tunick and was
 3    not using him for advice, right?
 4         A      I disagree.
 5         Q      So there was never a point at
 6    which Mr. Tunick ceased to offer advice
 7    to De Tomaso?
 8              MS. WIGGER:  I object to form.
 9         A      The engagement or the
10    arrangement with Mr. Tunick is not like
11    he will be working every day or every
12    month.
13              It was when the need arises, we
14    will consult him.  So, I mean, there will
15    be periods of times where he's not doing
16    anything for us.
17         Q      But at some point, Capricorn
18    took over the homologation work, right?
19              MS. WIGGER:  I object to form.
20         A      You have to be more specific.
21    What do you mean by "took over
22    homologation work"?
23         Q      So when Capricorn was brought
24    in, it became its responsibility to
25    assist with the necessary work to make
```



Page 137

                        D. Majcher
1
2    sure that the cars would be sufficiently
3    in compliance with various nations'
4    regulations so that they could be sold in
5    those nations?
6              MS. WIGGER:  I object to form.
7        A      There came a time where
8    Capricorn offered to do some of the
9    homologation work, but it's the actual
10   work that's going to go onto the car.
11   It's not to advise us what this
12   particular jurisdiction requires the car
13   to be.
14       Q      They were given
15   instructions -- sorry, strike that.
16             Capricorn was given
17   instructions about how to technically
18   execute the physical work, let's call it,
19   on the car to make sure that it was going
20   to be in compliance?
21             MS. WIGGER:  I object to form.
22       A      I mean, I don't know what you
23   mean by "taking instructions."
24             But, like, whatever would be
25   the advice on making the car or to



Page 138

                          D. Majcher
1
2    homologate the car coming from whichever
3    expert consultant or ultimately coming
4    from De Tomaso, Capricorn would be the
5    one to execute it, so to speak.
6        Q     And who was -- during 2022, who
7    was De Tomaso taking advice from in terms
8    of the advice as opposed to the
9    execution, taking the advice from, to
10   understand what was necessary to
11   homologate the car?
12             MS. WIGGER:  I object to form.
13       A     So for the U.S. market,
14   definitely we were working with
15   Mr. Tunick.
16             For worldwide and more general
17   sense, it would be IDIADA.
18       Q     It's a fact that Capricorn
19   failed on a number of aspects in properly
20   homologating the car, right?
21             MS. WIGGER:  I object to form.
22       A     I don't think we even got that
23   far with Capricorn.  I mean, the cars
24   were never built, so we never even got to
25   homologation.



Page 139

                    D. Majcher

1

2       Q      So Capricorn did such a poor

3    job that you never actually were

4    sufficiently far along in the development

5    to even address some of these

6    homologation issues?

7       A      They failed to deliver the six

8    prototypes that were, you know, part of

9    the contract.

10      Q      As we sit here today, has

11   Capricorn delivered any of the

12   prototypes?

13      A      No.

14      Q      In De Tomaso's view, what are

15   the things that Capricorn did incorrectly

16   in executing the tasks for De Tomaso in

17   developing the P72?

18            MS. WIGGER:  I object to form.

19      A      Incorrectly?

20      Q      Let me rephrase.  I'll ask it

21   more simply:

22            What are the things that

23   De Tomaso believes Capricorn did wrong in

24   its work with the P72 --

25            MS. WIGGER:  I object to form.



1                    D. Majcher
2        Q      -- at a high level?
3        A      They failed to deliver
4    according to the timeline, the schedule.
5        Q      What was the initial deadline
6    that Capricorn was given to develop these
7    prototypes by?
8        A      Going by memory --
9        Q      Don't speculate, but if you can
10   give, like, a summary.  You know, it can
11   be as general as you're comfortable with.
12       A      Yes.  I believe the first
13   prototype was to be delivered in the
14   spring of 2022.
15       Q      Obviously, that never occurred,
16   right?
17       A      It did not.
18       Q      And when did De Tomaso
19   ultimately terminate its relationship
20   with Capricorn?
21              MS. WIGGER:  I object to form.
22       A      We terminated the contract that
23   governed the delivery of the six
24   prototypes in February -- I'm sorry, no,
25   the contract was actually terminated in



Page 141

                              D. Majcher

 1

 2    March of 2023.

 3        Q      And it was terminated because

 4    De Tomaso concluded that Capricorn had

 5    failed to meet its obligations, amongst

 6    other things?

 7              MS. WIGGER:  I object to form.

 8        A      We initiated termination, yes.

 9        Q      You can set that aside.

10              I'm going to show you DT 21.

11              (DT's Exhibit 21, Document,

12         Bates No. DT165332, was marked for

13         identification, as of this date.)

14              MR. ZACH:  This is an excerpt,

15         but I will read the Bates number for

16         you guys.

17              It's DT165322.

18    BY MR. ZACH:

19        Q      So looking at this document,

20    does this reflect payments that were made

21    by De Tomaso to Capricorn?

22        A      I believe that's what this

23    document is trying to do.  I can't speak

24    to the accuracy, but, yes.

25        Q      You know, it was produced by



Page 142

```
 1                    D. Majcher
 2     De Tomaso.
 3              And then subject to your caveat
 4     that you haven't confirmed these
 5     numbers -- and, in fairness, it is an
 6     excerpt, you would agree with me that
 7     this does appear to reflect the various
 8     payments that were made by De Tomaso to
 9     Capricorn?
10              MS. WIGGER:  I object to form.
11     A     Yes.
12     Q     And if you look at the -- you
13     see it's in Euros, and there's a series
14     of totals at the bottom.
15              Do you see that?
16     A     I do.
17     Q     And with respect to Euros, the
18     number there is 19,730,968 and 47 cents?
19     A     Cents, yes.
20     Q     Does that roughly comport with
21     your understanding of the amount of
22     payments that were made to Capricorn?
23     A     Yes.
24     Q     The company is involved in an
25     active dispute with Capricorn; is that
```



MAGNA
LEGAL SERVICES

Page 143

```
 1                    D. Majcher
 2    right?
 3        A     We are involved in one dispute
 4    with them at the moment.
 5        Q     How much is De Tomaso claiming
 6    that Capricorn owes it money back?
 7              MS. WIGGER:  I object to form.
 8        A     That's one of the claims, yes.
 9        Q     How much does De Tomaso believe
10    it lost -- strike that.
11              How much does De Tomaso believe
12    Capricorn harmed De Tomaso financially?
13              MS. WIGGER:  I object to form.
14        A     I don't think that's a question
15    that I would be qualified to answer.
16              We're talking about damages,
17    basically, and we haven't filed lawsuits
18    to go after them for damages.
19        Q     But you'd agree that De Tomaso
20    spent approximately 20 million Euro on
21    Capricorn?
22        A     We've paid Capricorn, yes,
23    roughly 20 million.
24        Q     And that Capricorn never
25    delivered any of the prototypes that they
```



Page 144

```
 1                    D. Majcher
 2    were expected to?
 3         A     They did not.
 4         Q     You can put that aside.
 5               MR. ZACH:  I'm marking DT 22.
 6               Do not worry.  We are not going
 7         to spend a lot of time on this.  I'm
 8         just going to ask a couple of
 9         questions.
10               (DT's Exhibit 22, Spreadsheet,
11         Bates No. DT 159753, was marked for
12         identification, as of this date.)
13               MR. ZACH:  Do we have a Bates
14         for this?
15               MS. WIGGER:  Yes.
16               MR. ZACH:  We'll get you the
17         Bates for this.
18               MS. WIGGER:  Is this the
19         complete spreadsheet?
20               MR. ZACH:  I believe it is, but
21         we can confirm that for you.
22    BY MR. ZACH:
23         Q     Is De Tomaso a fan of the Green
24    Bay Packers?
25         A     I'm sorry?
```



Page 145

```
 1                    D. Majcher
 2       Q      The colors.  My family is from
 3   Wisconsin, and these colors mean
 4   something.
 5               Okay, the Bates number is
 6   DT 159753.
 7       A      Am I allowed to ask where this
 8   document came from?  What is it part of?
 9       Q      Sure.  It was produced by
10   De Tomaso, and it looks like it's an
11   Excel.
12       A      Yes, I can see it's an Excel.
13   But, like, was it part of an email?
14               MS. WIGGER:  It was attached to
15           an email.
16               MR. ZACH:  Which I'm fine for
17           you guys if you want to state what
18           you know for the record.
19               Even though it's my deposition,
20           if that's helpful for her, I don't
21           have an objection to that.
22               MS. WIGGER:  It appears to be
23           from Stephan Berger to
24           Hugo de Sadeleer and no text, just an
25           attached spreadsheet.
```



Page 146

```
 1                    D. Majcher
 2              It says:
 3              "Spreadsheet shared with you,
 4          P72 live."
 5              MR. ZACH:  What's the date on
 6         the email?
 7              MS. WIGGER:  On April 23, 2023.
 8    BY MR. ZACH:
 9         Q     So my question is a little bit
10    simpler, which is, you know, just
11    flipping through this, De Tomaso kept
12    track of the technical developments of
13    the P72 as development went along, right?
14         A     Yes.
15              MS. WIGGER:  I object to form.
16    BY MR. ZACH:
17         Q     So just looking at -- just
18    flipping through this document quickly,
19    you can see that it refers to a number of
20    sort of technical issues like A/C system
21    or side mirror or buttons and knobs; is
22    that right?
23         A     Yes.
24         Q     So De Tomaso itself tracked
25    developmental issues over time as the P72
```



Page 147

```
 1                    D. Majcher
 2    was being developed, right?
 3              MS. WIGGER:  I object to form.
 4        A     In general, but I don't -- so I
 5    think I know exactly what this document
 6    is.
 7        Q     Sure.  Tell me what you think
 8    it is.
 9        A     This is a document that was put
10    together after we stopped working with
11    Capricorn when we started to reengage the
12    current supplier, HWA.
13              This is a document that was put
14    together by multiple parties, including
15    HWA, De Tomaso, IDIADA, who will all be
16    working together to continue the
17    development project.
18              So this is a list of all the
19    topics or the things that need to be done
20    to complete the vehicle.
21              And I think you can see, you
22    know, who will be responsible for what.
23              So this is what the document is
24    about.
25        Q     So this is a document that was
```



Page 148

```
 1                    D. Majcher
 2     created, in part, by De Tomaso to
 3     determine sort of the current status as
 4     of --
 5                 MR. ZACH:  Sorry, what was the
 6         date?
 7                 MS. WIGGER:  April 23, 2023.
 8   BY MR. ZACH:
 9         Q     So let me rephrase that.
10               So it's De Tomaso's
11     recollection that in or about April 2023,
12     this document reflects work by De Tomaso
13     and some of its contractors to evaluate,
14     among other things, the current status of
15     the P72's development, right?
16         A     Yes.
17         Q     And also to reflect steps going
18     forward on how to continue to develop it,
19     right?
20         A     Yes.
21         Q     I mean, was this a document
22     that was updated from time to time?
23               MS. WIGGER:  I object to form.
24         A     I believe there are more than
25     one iteration of this document.
```



Page 149

                        D. Majcher

 1

 2      Q      So this is a document that was,

 3    you know, kept by De Tomaso in the

 4    ordinary course of business and updated

 5    from time to time, right?

 6      A      I don't know who the owner of

 7    the document is, but De Tomaso would have

 8    participated in the updating of the

 9    document, yes.

10      Q      And the purpose of it was to

11    keep an ongoing record of the status of

12    the development of the P72?

13            MS. WIGGER:  I object to form.

14      A      Among other things.

15      Q      Right.

16            Not just the status.  It's

17    also, like, kind of a to-do list as well,

18    right?

19      A      Yes, who to do what by when.

20      Q      Fair enough.

21            You can put that aside.

22            I just want to briefly go back

23    to some of the financial statements.

24            MR. ZACH:  I'm going to mark

25            for you -- this is DT 23.



Page 150

```
 1                    D. Majcher
 2              (DT's Exhibit 23, Consolidated
 3         Financial Statements for BVI Year
 4         Ending December 31, 2020, was marked
 5         for identification, as of this date.)
 6              MR. ZACH:  And then I'll give
 7         you another document.
 8              I'll mark this as DT 24.
 9              (DT's Exhibit 24, Consolidated
10         Financial Statements for De Tomaso
11         Automobile Holdings NA, LLC, for 2020
12         and 2021, was marked for
13         identification, as of this date.)
14    BY MR. ZACH:
15         Q     My questions to you is:
16              Looking at DT 23, this is,
17      again, consolidated financial statements,
18      but for the year ended December 31, 2020,
19      right?
20              MS. WIGGER:  I object to form.
21         A     Yes.
22              MR. ZACH:  You're right.  I
23         said the wrong year.
24              Did I?
25              MS. WIGGER:  Did you say DT 23
```



MAGNA
LEGAL SERVICES

Page 151

1                         D. Majcher
2          or 24?
3                  MR. ZACH:  I did say 23.
4                  MS. WIGGER:  I'm sorry, I think
5          I just misheard.
6                  MR. ZACH:  You convinced me.
7                  Let's make sure the record is
8          clear.
9      BY MR. ZACH:
10          Q     So DT 23 is the consolidated
11      financial statements for De Tomaso for
12      the year ending 31 December 2020, right?
13          A     Yes.
14          Q     Did DT change accountants at
15      some point, or are these the same guys?
16          A     No, they're not the same
17      people.
18          Q     Looking at DT 24, this is the
19      consolidated financial statements for
20      De Tomaso for the year ending
21      December 31, 2021, right?
22          A     Yes.
23          Q     Does De Tomaso know why it
24      changed accountants between 2020 and
25      2021?



Page 152

```
 1                    D. Majcher
 2            MS. WIGGER:  Objection to form.
 3       A    So, first of all, these two
 4   statements are referring to different
 5   companies.
 6            DT 23 is the consolidated
 7   financial statements for the BVI company
 8   ending December 31, 2020.
 9            DT 24 is the consolidated
10   financial statements for the De Tomaso
11   Automobile Holdings NA, LLC, for 2020 and
12   2021.
13       Q    That's helpful.
14            So sticking with
15   DT 23 -- strike that.
16            I'm going to ask a simpler,
17   like nonscientific question.
18            So DT 24, it looks a lot like
19   DT 12 that we looked at earlier, right?
20       A    Yes.
21       Q    That's the consolidated
22   statements for all the entities rolled up
23   into one, right?
24            MS. WIGGER:  I object to form.
25       A    Yes.
```



MAGNA
LEGAL SERVICES

Page 153

                          D. Majcher
1
2        Q     Is DT 23 different?
3              I'm just trying to understand.
4    It's consolidated.
5              But is this exclusive only to
6    the BVI, or does this also include the
7    then existing subsidiaries?
8              MS. WIGGER:  I object to form.
9              Go ahead.
10       A     No, it's the same.  But this
11   DT 23 was done a lot earlier, right?
12             So DT 24 would have been done,
13   obviously, after December of 2021.  And
14   DT 23 will be done sometime during the
15   year of 2021.
16             And the De Tomaso NA, LLC,
17   entity was not incorporated until towards
18   the end of 2020.
19             So I think at the time we did
20   DT 23, even though the LLC was
21   incorporated, it was not active, like
22   nothing -- no transaction actually took
23   place.
24             And it could have been an
25   oversight.  We just went ahead from BVI,



```
 1                    D. Majcher
 2     Hong Kong, Germany, and there's the U.K.
 3     company, and then that was it.
 4          Q     I guess, generally speaking,
 5     between when DT 23 was issued, and when
 6     DT 24 was issued, the company sort of
 7     reorganized itself a little bit?
 8          A     Correct.
 9          Q     The organization stayed the
10     same between DT 24 and DT 12?
11                You can go back and look.
12          A     Yes.
13          Q     I think you testified earlier
14     that the structure subsequently changed
15     again?
16          A     Correct.
17          Q     Just reiterate, again,
18     generally how the structure changed?
19                MS. WIGGER:  I object to form.
20          A     You want to know how it
21     changed, or what it is now?
22          Q     Fair.
23                What it is now after -- well,
24     let me do this:
25                How did it change from DT 12 to
```



Page 155

```
 1                      D. Majcher
 2    what it is now?
 3             MS. WIGGER:  I object to form.
 4        A      Again, like, the changes
 5    actually made?
 6        Q      Yes, generally.
 7        A      I'm trying to do it in my head.
 8    It's difficult, right?
 9             So...
10             MS. WIGGER:  Are you asking for
11         the structure now or for each step of
12         the reorganization?
13    BY MR. ZACH:
14        Q      Were there multiple steps along
15    the way?
16        A      Yes.
17        Q      I'm going to say -- this is not
18    a question.  I'm going to say what I'm
19    trying to get at.
20             I'm just trying to see -- let
21    me ask a different question.
22             So between -- when did the
23    change in organizational structure
24    between DT 23 and DT 24 get finalized?
25             MS. WIGGER:  Objection to form.
```



Page 156

                        D. Majcher
1
2       A       Between DT 23 and DT 24.
3               So, again, at the time that
4       DT 23 was produced, the structure was
5       already there.  It's just not reflected
6       in the financial statement.
7               So at DT 23, it was the
8       defendant company, the De Tomaso NA, LLC.
9       And then it goes this BVI company,
10      Hong Kong, Germany.
11              And then on the side, owned by
12      the LLC was the U.K. company.
13              And so instead of doing the
14      consolidated statements at the level of
15      the LLC, this reflects the level at the
16      BVI.
17      Q       And then afterwards, then you
18      started doing the consolidation at the
19      LLC level?
20      A       At the LLC level, because that
21      was the holding company.
22      Q       How long did the LLC continue
23      as the holding company?  Until what date,
24      approximately?
25              MS. WIGGER:  I object to form.



Page 157

1                          D. Majcher

2          A       Until sometime in early 2023.

3          Q       You can put those aside.

4                   But I do want to go back to

5     DT 12.

6          A       Okay.

7          Q       The first thing I'd like to do

8     on DT 12 is to go to page 8.

9                   And now I realize I could have

10    just asked you this, so I apologize.  I

11    could have made this a lot easier for us.

12                  There's a reorganization that's

13    listed here on DT 12, right?

14         A       Yes.

15         Q       Just reviewing it quickly, does

16    that accurately reflect to De Tomaso the

17    change in the reorganizational changes

18    that occurred up to the date of this

19    document?

20         A       I mean, I can't remember all of

21    the dates, but I have no reason to doubt

22    that this wouldn't be accurate.

23         Q       I take it De Tomaso would agree

24    that its consolidated financial

25    statements are very important financial



Page 158

```
 1                    D. Majcher
 2    documents to maintain accurately, right?
 3         A     Yes.
 4         Q     So you have no reason to
 5    believe that any of this was incorrect,
 6    right?
 7         A     Yes.
 8         Q     Looking at September 9, 2020.
 9               Do you see that?
10         A     Sorry.  September 9, yes.
11         Q     It says:
12               "On September 9, 2020, the
13           shares in DT BVI were transferred
14           from Ideal Team Ventures Limited
15           to Norman Choi at a consideration
16           of $10,000."
17               Do you see that?
18         A     Yes.
19         Q     Then it says:
20               "On December 31, 2020,
21           Norman Choi transferred all the
22           shares in DT BVI to De Tomaso
23           Automobili Holdings Limited, which
24           was incorporated in the Marshall
25           Islands, at a consideration of
```



Page 159

                    D. Majcher

1

2       10,000."

3            Do you see that?

4    A    Yes.

5    Q    Then it says:

6            "At the same date, the DT

7         Marshall Islands transferred all

8         its shares in DT BVI to DT U.S. at

9         a consideration of $10,000."

10           Right?

11   A    Yes.

12   Q    And other than the shares that

13   are stated here, isn't it a fact that

14   there were no other classes of shares

15   that existed at this time?

16           MS. WIGGER:  I object to form.

17   A    Of which company?

18   Q    So this describes -- so the

19   shares represent the ownership -- the

20   overall ownership interest in the

21   company, right?

22           MS. WIGGER:  I object to form.

23   A    Yes.

24   Q    And at this time, there was

25   only one kind of share, right?



Page 160

                         D. Majcher
1
2                 MS. WIGGER:  I object to form.
3       A       But the shares of which company
4    are you referring to?
5       Q       Well, the shares that are
6    referred to here, right?
7       A       So if I read this, then the
8    shares are referring to the shares in DT
9    BVI.
10      Q       And the shares represent,
11   essentially, the ownership interest in
12   De Tomaso, the De Tomaso company at
13   large, right?
14                MS. WIGGER:  I object to form.
15      A       Okay, this paragraph
16   specifically is only talking about the
17   transfer of shares in DT BVI.
18      Q       But would De Tomaso agree that
19   the shares discussed here at this time
20   are, ultimately, the overall ownership
21   interest in De Tomaso's various entities?
22                MS. WIGGER:  Objection to form.
23      A       No, because this company was no
24   longer the holding company.
25      Q       No, I'm saying...



Page 161

```
 1                    D. Majcher
 2              So the holding company changed
 3    from time to time, right?
 4       A     Yes.
 5       Q     And when the holding company
 6    changed, the shares moved with it, right?
 7              MS. WIGGER:  I object to form.
 8       A     When the holding company
 9    changes, the shares move with it?
10              I'm not sure I understand the
11    question.
12       Q     Let me ask it differently.
13              So if one were trying to
14    determine who the ultimate owner is of
15    De Tomaso -- and I'm defining De Tomaso
16    as any of the De Tomaso entities listed
17    here.
18              Okay?
19       A     Sure.
20       Q     -- one would look to see who
21    the holder of the shares were.
22              You would agree with that,
23    right?
24              MS. WIGGER:  I object to form.
25       A     Yes.
```



Page 162

```
 1                    D. Majcher
 2      Q     The shares represent the
 3   ultimate interest in the company, right?
 4            MS. WIGGER:  I object to form.
 5      A     Typically, yes.
 6      Q     And not just typically.
 7            But for De Tomaso, the shares
 8   that are described here are the actual
 9   ownership interests for all of the
10   consolidated companies reflected in the
11   consolidated financial statements, right?
12            MS. WIGGER:  Objection to form.
13      A     I'm still not really
14   understanding -- because I'm reading it.
15            This is very specific.
16            This talks about the
17   transference of shares in the DT BVI
18   company.
19            And it talks about how it came
20   to be that DT BVI became -- how it come
21   to be that DT U.S., as it says here,
22   which is the LLC, became the shareholder
23   of DT BVI.
24      Q     Fair enough.
25            And that's because, ultimately,
```



Page 163

```
 1                    D. Majcher
 2    the shares that are tracked here
 3    ultimately ended up in DT U.S., right?
 4              MS. WIGGER:  I object to form.
 5       A    DT U.S. ultimately became the
 6    holding company?
 7       Q    Right.
 8       A    Yes.
 9       Q    And the holding company is the
10    company that -- basically everything
11    under the holding company -- the holding
12    company controls all the subsidiaries
13    underneath it, right?
14              MS. WIGGER:  I object to form.
15       A    The holding company owns
16    100 percent of the shares of...
17              Okay, the holding company owns
18    100 percent of the shares of DT BVI and
19    indirectly also owns 100 percent of the
20    rest of the subsidiaries.
21       Q    Exactly.
22       A    Yes.
23       Q    And those shares are -- there's
24    only one class of shares in DT BVI that
25    controls all those other ones, right?
```



Page 164

```
 1                    D. Majcher
 2              MS. WIGGER:  Objection to form.
 3      A       BVI or LLC?
 4      Q       Which of these companies had
 5   shares?  Which of the entities had
 6   specific shares?
 7              MS. WIGGER:  I object to form.
 8      A       They all have shares.
 9      Q       They all have shares.
10              How many shares do they have?
11              MS. WIGGER:  I object to form.
12      A       Like, the exact number of
13   outstanding shares?
14      Q       Yes.
15      A       I don't -- I cannot tell you
16   right now.
17      Q       Mr. Choi -- according to
18   De Tomaso now, Mr. Choi is the
19   100 percent owner of all the De Tomaso
20   entities, right?
21              MS. WIGGER:  I object to form.
22      A       He's an indirect 100 percent
23   owner, right, of the holding company,
24   whichever one it is now, which, in turn,
25   owns 100 percent of the rest of the
```


MAGNA
LEGAL SERVICES

Page 165

```
 1                      D. Majcher
 2      companies.
 3          Q     Okay.
 4          A     Each company issues current
 5      shares to its parent company.
 6                So, like here, if we're looking
 7      at the paragraph that we were just
 8      talking about, DT BVI would have
 9      issued -- as you know, the shares of DT
10      BVI would have been transferred to DT
11      U.S., right?
12                And then DT BVI holds shares of
13      DT H.K.
14                For example, like each company
15      has a share register, and it shows who
16      the shareholder is.
17          Q     But, at this point, the
18      ultimate equity in the company is owned
19      by Mr. Choi, right?
20          A     Yes.
21          Q     How would you describe how that
22      equity exists?  Like, in what form does
23      the equity exist?
24                MS. WIGGER:  I object to form.
25          A     In what form?  I don't
```



Page 166

```
 1                    D. Majcher
 2    understand.
 3       Q      So let me ask you this:
 4              So you entered into a
 5    transaction with FTAG, right?
 6       A      Yes.
 7       Q      And how is the FTAG transaction
 8    structured?
 9       A      It's structured as a -- you
10    mean the instrument where the investment
11    came in?
12       Q      Well, did FTAG take an interest
13    in the company?
14              MS. WIGGER:  Objection to form.
15       A      Take an interest in the
16    company...
17              So they were investing in
18    convertible, redeemable preferred shares
19    of the company, of the Cayman Islands
20    company.
21       Q      Before this time, were there
22    any preferred shares -- before the FTAG
23    transaction, were there any preferred
24    shares in the company, or was that the
25    first time they were ever created?
```



Page 167

```
 1                    D. Majcher
 2              MS. WIGGER:  I object to form.
 3       A     Prior to FTAG, there were no
 4    preferred shares.
 5       Q     They were just normal shares?
 6       A     Common shares.
 7       Q     So all the shares for any of
 8    the DT entities were all common shares,
 9    right?
10       A     Correct.
11       Q     And as you sit here today,
12    Mr. Choi is 100 percent owner of the
13    common shares, right?
14              MS. WIGGER:  Objection to form.
15       A     Yes, indirectly, ultimately,
16    yes.
17       Q     Okay, fair enough.
18       A     If I could just put on the
19    record that the restructuring that it
20    refers to in this particular paragraph,
21    that it's so complicated, because it was
22    done for tax returns.
23       Q     Well, we see a number of
24    documents.
25              Can you just explain DT's --
```



Page 168

```
 1                    D. Majcher
 2     De Tomaso's understanding of how this was
 3     structured to gain a tax advantage?
 4              MS. WIGGER:  Objection to form.
 5              Do not divulge advice of
 6         counsel.
 7              MR. ZACH:  Right, but from a
 8         tax -- just understanding from a tax
 9         basis is not legal advice.
10     BY MR. ZACH:
11         Q    Just from a tax perspective,
12     what did the structure gain as a tax
13     benefit by doing the structure?
14              MS. WIGGER:  I object to form.
15         A    First of all, I'm not a tax
16     lawyer.
17         Q    Fair enough.
18         A    But I can say that this was
19     done for Mr. Choi's personal tax planning
20     purposes.
21         Q    What was De Tomaso's
22     understanding of the goal of Mr. Choi's
23     tax planning purposes in conducting this
24     reorganization?
25              MS. WIGGER:  Objection to form.
```



Page 169

                        D. Majcher

1

2        A      I'm not sure that the company

3    necessarily understood the purpose or

4    intention.  But, typically, tax planning

5    is to be tax efficient.

6        Q      Was one of the tax planning

7    purpose of the structure related to the

8    fact that Mr. Choi was going to relocate

9    to the U.S.?

10              MS. WIGGER:  I object to form.

11       A      I believe he was going to spend

12    more time in the United States so he

13    wanted to be careful.

14       Q      So by spending more time in the

15    United States, there's U.S. tax

16    implications, right?

17              MS. WIGGER:  I object to form.

18       A      Yes.

19       Q      One of the purposes in doing

20    the restructuring was to restructure his

21    shares in the company so that the

22    underlying basis of them would be higher

23    so he could avoid capital gains liability

24    in the United States?

25              MS. WIGGER:  I object to form.



Page 170

                    D. Majcher

 1
 2      A      I think that might touch upon
 3   what counsel...
 4      Q      I'm not asking what counsel
 5   said.
 6             You're the CEO, right, of the
 7   company?
 8      A      I'm not.
 9             MS. WIGGER:  I object to form.
10   BY MR. ZACH:
11      Q      I said "COO."
12      A      Yes.
13      Q      You also have, essentially,
14   responsibility over the finances of the
15   company, right?
16      A      Essentially, yes.
17      Q      And then you have an under --
18   you know, you have an understanding of
19   how taxes work, right?
20             MS. WIGGER:  I object to form.
21      A      I pay them.
22      Q      We all do.
23             So one of the issues that's
24   commonly associated with shares is that
25   when you sell them at an increase, you



Page 171

```
 1                    D. Majcher
 2   could pay capital gains tax, right?
 3            MS. WIGGER:  I object to form.
 4       A     Correct.
 5       Q     So does the company understand
 6   that one of the purposes in the company
 7   itself doing this restructuring was to
 8   increase the basis of the shares owned by
 9   Mr. Choi to reduce his potential capital
10   gains liability in the United States?
11            MS. WIGGER:  I object to form.
12       Asked and answered.
13       A     Actually, the company's
14   understanding of this restructuring was
15   because Mr. Berris had recommended that
16   we relocate our operations to the U.S.,
17   and that's why a U.S. LLC was
18   incorporated and became the holding
19   company.
20       Q     As part of that, the company
21   had to contemplate tax implications for
22   its executives, right?
23            MS. WIGGER:  I object to form.
24       A     Not to my knowledge, that this
25   was contemplated by the company for its
```



Page 172

```
 1                    D. Majcher
 2    executives.
 3        Q     But as part of that relocation,
 4    there were new tax issues presented to
 5    the company, right?
 6        A     That relocation of the company
 7    created potential tax -- I don't want to
 8    use the word "issues."
 9              There were implications for
10    Mr. Choi, yes.
11        Q     To go back to it again, one of
12    those implications was, it would be
13    beneficial to Mr. Choi, from a capital
14    gains perspective, to have a higher base,
15    a higher value for his shares?
16              MS. WIGGER:  I object to form.
17        A     I mean --
18        Q     Not that there's anything wrong
19    with that.
20        A     To the extent that that's how,
21    you know, capital gains tax works, then
22    yes.
23              But whether or not the company
24    relocates, there will be a capital gains
25    tax implication for Mr. Choi whenever he
```



Page 173

```
 1                    D. Majcher
 2   eventually sells the company.
 3       Q     I 100 percent agree with that.
 4             But I'm just -- so just to make
 5   my question really narrow, because I want
 6   to make sure I get it so I don't want to
 7   overstate it.
 8             My question is simply:  One,
 9   one among a number of considerations in
10   the relocation, was to increase the basis
11   of Mr. Choi's shares to limit potential
12   capital gains liability going forward in
13   the United States?
14             MS. WIGGER:  I object to form.
15       A     When you say "consideration,"
16   do you mean that was, like, thought
17   about?
18       Q     Yes.
19       A     Right.
20       Q     Yes, part of the planning
21   involved that.
22       A     Yes.
23       Q     Fair enough.
24             And that plan was eventually
25   executed?
```



Page 174

```
 1                    D. Majcher
 2            MS. WIGGER:  I object to form.
 3      A     Which plan?
 4      Q     The relocation to the
 5   United States, as reflected here.
 6      A     It literally does exist.
 7      Q     Okay, one second.
 8            I had another question that
 9   popped in my head, but then I forgot when
10   we were going back and forth.
11            So, you know, we've looked at a
12   number of consulting contracts between
13   De Tomaso and a number of third parties
14   that came to do work for them.
15            Right?
16      A     Yes.
17      Q     My understanding is that
18   De Tomaso did not -- in those consulting
19   agreements did not utilize a lawyer to
20   draft those agreements.
21            Is that fair?
22            MS. WIGGER:  I object to form.
23      A     That's fair.
24      Q     Who did draft -- so, like, with
25   Jowyn Wong, who was principally
```



                        D. Majcher

1    responsible for drafting those

2    agreements?

3         A     I believe it was myself.

4         Q     Now, you're not a lawyer, but

5    you're commercially sophisticated enough

6    that you understand how to draft a

7    contract, right?

8              MS. WIGGER:  I object to form.

9         A     I hope so.

10        Q     They look pretty good to me.

11             In terms of when you were

12   drafting that contract, did you provide a

13   draft of that contract to the other party

14   who was going to sign, like, the

15   consultant that was going to come on

16   board?

17        A     Yes, naturally.  He signed it.

18        Q     Right.

19             Was there any back-and-forth in

20   negotiating the terms of the contract?

21        A     With me?

22        Q     No, let's say with Jowyn Wong.

23             Like, when you were drafting

24   his agreement, did you exchange drafts



Page 176

```
 1                     D. Majcher
 2    back and forth?
 3        A     No, I don't believe so.
 4        Q     Did Mr. Wong give you any input
 5    as to what he believed should be
 6    appropriately in his contract?
 7              MS. WIGGER:  I object to form.
 8        A     I believe Mr. Choi had spoken
 9    to me about the terms of the contract
10    that he had negotiated with Mr. Wong.
11    And I was just papering it up, so to
12    speak.
13        Q     Now, looking at DT 12 a little
14    bit more, I just want to ask -- I want to
15    go to page 4.
16              This is as of December 31,
17    2022.  It also reflects as of
18    December 31, 2021, and of January 1,
19    2021.
20              Do you see that?
21        A     Yes.
22        Q     Looking at the current
23    liabilities, I just want to make sure
24    that I understand what those are.
25              So you see under "Current
```



MAGNA
LEGAL SERVICES

Page 177

```
 1                    D. Majcher
 2    Liabilities," the second one down, there
 3    is "Accrued Interest Related Parties."
 4              Do you see that?
 5         A    Yes.
 6         Q    And as of 2022, that was like
 7    around $7.3 million.
 8              Do you see that?
 9         A    Yes.
10         Q    Is that essentially the
11    10 percent interest that we've been
12    talking about that was being recorded on
13    behalf of Mr. Choi and his entities for
14    monies that he provided to the company?
15              MS. WIGGER:  I object to form.
16         A    So there should be a note.
17         Q    There is.  There is.  We can go
18    to that.
19         A    Yes, so I just want to make
20    sure before I answer.
21              It's not broken down in a very
22    clear way to tell right away.  But, I
23    mean, subject to verifying everything, I
24    would say that that should be what it is.
25         Q    But also it says a loan from a
```



Page 178

```
 1                    D. Majcher
 2    director.
 3            Do you see that?
 4       A     Yes.
 5       Q     Is that also a loan from
 6    Mr. Choi?
 7       A     The director will be referring
 8    to Mr. Choi, yes.
 9       Q     So, I mean, at least to your
10    knowledge subject to check, the accrued
11    interest is related to Mr. Choi, and the
12    loan from a director is also related to
13    Mr. Choi, right?
14       A     Yes.
15       Q     And then if you look a little
16    bit further down, there is an entry for
17    "Promissory Notes, Related Parties"?
18       A     Yes.
19       Q     And that's over 20 million.
20            Do you see that?
21       A     Yes.
22       Q     And that relates to the
23    intangible assets that the company
24    entered in agreements with Mr. Choi
25    about, right?
```



Page 179

```
 1                    D. Majcher
 2            MS. WIGGER:  I object to form.
 3      A     That relates to the three
 4   promissory notes that the company, you
 5   know, owes to Mr. Choi.
 6      Q     Why don't we go back to kind of
 7   where you were looking on note 4.
 8      A     Yes.
 9      Q     In note 4 on note 1, it says:
10            "The company has two
11         outstanding promissory notes and
12         accrued interest payable to
13         Norman Choi.
14            "These outstanding promissory
15         notes are unsecured, bear interest
16         at 10 percent per annum, and are
17         repayable in 2028 and 2029,
18         respectively."
19      A     Yes.
20      Q     And that relates to -- you can
21   see there, it says Norman Choi.  And at
22   least as of 2022, there's about
23   $7.4 million in principal?
24      A     Yes.
25      Q     Do those promissory notes
```



Page 180

1                          D. Majcher
2     relate to the Apollo prototypes that we
3     were discussing during Mr. Choi's
4     deposition?
5              MS. WIGGER:  I object to form.
6         A     They relate to, yes, the Apollo
7     IE prototypes that were ultimately used
8     to be turned into the De Tomaso
9     prototypes, yes.
10         Q     And then you see for the Ideal
11    Team Ventures Limited, that note?
12         A     Yes.
13         Q     Does that relate to the
14    Heritage -- I wrote it down, and now I'm
15    going to say it again.
16         A     The Pantera Heritage.
17         Q     Yes, the Pantera Heritage,
18    right.
19              So note 1 is the Apollo, and
20    Note 2 is the Heritage?
21         A     Yes.
22         Q     Fair enough.
23              You can set that aside.
24              From time to time, the company
25    sought independent valuations of itself,



Page 181

```
 1                         D. Majcher
 2      right?
 3                 MS. WIGGER:  I object to form.
 4           A      Yes.
 5                 MR. ZACH:  I am marking as
 6           DT 25...
 7                 (DT's Exhibit 25, Report
 8           Prepared by GCA Professional Service
 9           Limited, was marked for
10           identification, as of this date.)
11                 MR. ZACH:  And I'm going to
12           show you DT 26.
13                 (DT's Exhibit 26, Report
14           Prepared by GCA Professional Service
15           Limited, was marked for
16           identification, as of this date.)
17      BY MR. ZACH:
18           Q      Let's start with DT 25.
19                 So if you'd lay DT 25 and DT 26
20      sort of side by side, we'll kind of just
21      talk about them together a little bit.
22           A      Okay.
23           Q      So these are both valuation
24      reports that were prepared by GCA
25      Professional Services Limited, right?
```



Page 182

```
 1                    D. Majcher
 2            MS. WIGGER:  I object to form.
 3      A     Yes.
 4      Q     And what was GCA Professional
 5  Services Limited?
 6      A     They are a professional
 7  valuation firm.
 8      Q     Where are they based?
 9      A     In Hong Kong.
10      Q     Has De Tomaso used them for
11  sort of other business purposes?
12      A     No.
13      Q     Why did De Tomaso commission
14  these valuation reports in July of 2020?
15            MS. WIGGER:  I object to form.
16      A     Just, again, to be technically
17  accurate, De Tomaso itself did not
18  because the company didn't exist at the
19  time.
20      Q     Fair enough.
21            What was the purpose of these
22  valuations, as you understand it, in the
23  July 2020 time period?
24      A     It was to value certain assets.
25      Q     Those assets would be -- first,
```



Page 183

1                         D. Majcher
2       one of them is the technology know-how in
3       De Tomaso, right?
4            A      For 25, yes.
5            Q      And for 26, it would be valuing
6       the equity stake, right?
7            A      Yes.
8            Q      Just very briefly, who at the
9       company was involved, if at all, in
10      working on preparing these valuations?
11                  MS. WIGGER:   I object to form.
12           A      The valuations were prepared by
13      GCA, you know, with the company providing
14      certain information to them.
15           Q      Was the purpose of
16      this -- well, strike that.
17                  What was the reason for valuing
18      the two different ways between the
19      100 percent equity and the technological
20      know-how?
21           A      I think the technological or
22      the technology know-how specifically
23      refers to the Pantera Heritage project.
24           Q      I want you to look at --
25      actually, I know what you're talking



Page 184

```
 1                    D. Majcher
 2    about, but this is slightly different.
 3              Why don't you turn to page --
 4    why don't we go to --
 5              MS. WIGGER:  Are you on 25
 6       right now?
 7              MR. ZACH:  Yes, we're on 25.
 8              Give me one second.
 9       A     This is an unsigned report.
10       Q     Yes, this is what was produced
11    to us.
12              I mean, it also has, like, if
13    you look, it's got a bracket there, too.
14       A     Right.
15       Q     So I agree with you.  It does
16    appear to be something in a draft.
17              Do you know whether or not this
18    was ever finalized?
19       A     I mean, now that I'm looking at
20    this, no, I don't think so.
21       Q     So if you look at page 3 of 18
22    on the actual document, it says "Company
23    Overview."
24       A     Yes.
25       Q     And it says, "The know-how
```



Page 185

```
 1                    D. Majcher
 2   related to," again, in parentheses, I
 3   agree with you, suggesting that it could
 4   be a draft.
 5        A     Yes.
 6        Q     It talks about the P72.
 7        A     Yes.
 8        Q     There is another valuation
 9   report about Pantera.
10              I think your memory is right,
11   but I just was trying to clear that up so
12   you didn't --
13        A     So this is not that one.
14        Q     This is not that, at least as
15   far as I know.
16              If you turn to page 16 of 18,
17   we'll call it, like, the draft, you know.
18              The draft conclusion of the
19   market value of the know-how relating to
20   the P72 was estimated at about
21   $344 million.
22              Do you see that?
23              MS. WIGGER:  I object to form.
24        A     Yes.
25        Q     Do you know whether -- does
```



Page 186

```
 1                     D. Majcher
 2    De Tomaso know whether this document was
 3    used for any purpose or shown to anyone?
 4              MS. WIGGER:  I object to form.
 5         A    I don't believe so, especially
 6    when it's an unsigned document.
 7         Q    Fair enough.
 8              If you look around the same
 9    date, we can go to 26.
10              This is another report that was
11    prepared by GCA.
12              Do you see that?
13         A    Yes.
14         Q    But this one looks at
15    100 percent of the equity, right?
16         A    Yes.
17         Q    Did you have any involvement
18    with the preparation of this?
19              MS. WIGGER:  I object to form.
20         A    Not in the preparation of this,
21    but in providing information to them as
22    the company, sure.
23         Q    And you would agree that the
24    purpose of this was to calculate the
25    value of the equity, the common shares
```



Page 187

                         D. Majcher
1
2    that Mr. Choi held, right?
3              MS. WIGGER:  I object to form.
4         A    Yes.
5         Q    And, ultimately, if you turn to
6    page 16 of 18, it concludes that the
7    value of the equity interest in
8    Mr. Choi's common shares was just under
9    $400 million as of July 31, 2020, right?
10             MS. WIGGER:  I object to form.
11        A    Yes.
12        Q    And at the time, did you think
13   that was an accurate valuation of the --
14   well, at the time, did De Tomaso believe
15   that was an accurate valuation of its
16   equity interest?
17             MS. WIGGER:  I object to form.
18        A    De Tomaso is not qualified to
19   give an opinion on this.  We go with what
20   the professionals say.
21        Q    Did De Tomaso have any reason
22   to believe that this was an inaccurate
23   valuation of the equity interest as
24   reflected in Mr. Choi's common shares?
25             MS. WIGGER:  I object to form.



Page 188

                          D. Majcher

1

2      A      Based on the approach that's

3   used in the report the way that they --

4   you know, however they do their work to

5   come up with a value, then, yes.

6      Q      Right.

7              Because, I mean, you're a

8   financially sophisticated person.

9   There's different models for valuing an

10  asset, right?

11     A      Correct.

12     Q      There's, like, something called

13  a market approach, right?

14     A      Yes.

15     Q      There's something called the

16  income approach, right?

17     A      Yes, comparable assets, costs,

18  you name it.

19     Q      Right.

20             So there's different ways of

21  valuing it.

22             But to De Tomaso's view, this

23  evaluation, at least as of July 31, 2020,

24  appeared accurate to it?

25             MS. WIGGER:  I object to form.



Page 189

```
 1                    D. Majcher
 2       A    Based on the work that's been
 3   put into the report, yes.  But, again,
 4   this report is unsigned.
 5       Q    Fair enough.
 6            I mean, did you -- as
 7   De Tomaso, does it have anything it would
 8   disagree with in this report?
 9            MS. WIGGER:  I object to form.
10       A    I'm not sure I understand.
11       Q    I guess that's not a fair
12   question because you didn't have time to
13   read it, so I'm going to withdraw it.
14            I'm going to show you another
15   document.
16            MR. ZACH:  Sorry, this one is
17       stapled kind of weird.
18            (DT's Exhibit 27, Report
19       Prepared by the Ark Group, was marked
20       for identification, as of this date.)
21   BY MR. ZACH:
22       Q    What is Ark Group?
23       A    I'm sorry?
24       Q    What is Ark Group?
25       A    They are a financial services
```



Page 190

```
 1                    D. Majcher
 2    group, financial advisory.
 3         Q      Who is it that -- did De Tomaso
 4    retain Ark Group, or did someone else do
 5    that?
 6                MS. WIGGER:  I object to form.
 7         A      They were our financial advisor
 8    for a time.
 9         Q      For what time period was Ark
10    the financial advisor for -- was
11    De Tomaso's financial advisor?
12         A      I think the engagement started
13    in 2021.
14         Q      For what purpose was Ark
15    providing financial advice to De Tomaso?
16         A      Primarily to help with
17    fundraising.
18         Q      During the 2021 and 2022 time
19    period, what avenues of fundraising was
20    De Tomaso exploring?
21         A      Every possible avenue.
22         Q      Can you list some examples?
23         A      Like equity, debt, preferred
24    shares.
25                Are you talking about, like,
```



Page 191

```
 1                      D. Majcher
 2    potential investors or...
 3         Q     What means was De Tomaso
 4    exploring to raise financing during the
 5    2021 and 2022 time period?
 6                MS. WIGGER:  I object to form.
 7         A     What means?
 8                So, I mean --
 9         Q     So one of the avenues for
10    raising capital for the company was
11    exploring being involved in a SPAC
12    transaction, right?
13         A     That was one consideration.
14         Q     And De Tomaso, in fact, engaged
15    with a number of potential SPAC
16    transactions in the 2021 and 2022 time
17    period, right?
18         A     Yes, we spoke to a number of
19    SPACs.
20         Q     And De Tomaso understood -- and
21    one of the SPACs that De Tomaso spoke to
22    as Genesis, right?
23         A     Yes.
24         Q     What was De Tomaso's
25    understanding of the Genesis SPAC?
```



Page 192

```
 1                    D. Majcher
 2            MS. WIGGER:  I object to form.
 3            MR. ZACH:  That's a bad
 4      question.
 5  BY MR. ZACH:
 6      Q    Who did De Tomaso understand to
 7  control Genesis?
 8            MS. WIGGER:  I object to form.
 9      A    Its shareholders, but no
10  particular individual.
11      Q    Was this Ark Group valuation
12  used in connection with trying to obtain
13  financing for De Tomaso?
14            MS. WIGGER:  Objection to form.
15      A    I don't think I would consider
16  this to be a valuation.  This seems to be
17  a presentation of some sort.
18            It suggests a valuation.  And
19  if you look at it, it seems to be
20  benchmarking the valuation against other
21  companies in the industry.
22      Q    So why don't we turn to
23  page 18.
24            This page is labeled
25  "Illustrative Value Perspective."
```



Page 193

1                          D. Majcher
2               Do you see that?
3      A      Yes.
4      Q      In here, the Ark Group
5      concludes that a preliminary valuation of
6      De Tomaso is somewhere between $1 and
7      $1.5 billion.
8               Do you see that?
9               MS. WIGGER:  Objection to form.
10     A      I see that it says "preliminary
11     valuation."  And there's 1.5B and 1.0B,
12     yes.
13     Q      Did De Tomaso have any role in
14     preparing this preliminary valuation with
15     Ark?
16              MS. WIGGER:  I object to form.
17     A      No.  And, again, I don't think
18     this -- I don't consider this to be a
19     valuation report.
20              I think it's listing two
21     numbers, potential valuation numbers, and
22     trying to compare this -- or, not
23     compare, trying to put multiples into
24     perspective.
25     Q      Who at De Tomaso -- okay.



Page 194

                              D. Majcher
1
2                  Did De Tomaso have anyone that
3      was speaking with -- strike that.
4                  Who at De Tomaso was
5      preliminarily responsible for interfacing
6      with the Ark Group?
7          A     I believe it was Mr. Berris.
8          Q     Do you know how -- does
9      De Tomaso know how this document was used
10     in connection with any of the raising of
11     financing that was occurring at that
12     time?
13                 MS. WIGGER:  I object to form.
14         A     It does not.
15         Q     Does De Tomaso view this
16     preliminary valuation of one billion to
17     1.5 billion to be reasonable?
18                 MS. WIGGER:  I object to form.
19         A     Again, De Tomaso is not
20     qualified to provide that opinion.
21         Q     Why is De Tomaso -- oh, because
22     it didn't -- that's because De Tomaso
23     didn't conduct the underlying analysis?
24         A     Yes.  This is not the number
25     that we put together.



Page 195

                         D. Majcher

1

2      Q      I'm going to show you -- you

3   can put that aside.

4            MR. ZACH:  I'm marking -- we

5       stapled this one, again, a little

6       weirdly -- DT 28.

7            (DT's Exhibit 28, Report, was

8       marked for identification, as of this

9       date.)

10  BY MR. ZACH:

11     Q      Are you familiar with DT 28?

12     A      I can't say I'm very familiar

13   with it, but I think I know what it is.

14     Q      What do you think DT 28 is?

15     A      It's a report made by Altus

16   after having done financial due

17   diligence.

18     Q      Who retained Altus for the

19   purpose of valuing De Tomaso?

20     A      For this report on this date, I

21   believe it was FTAG.

22     Q      And just for the record, what

23   is FTAG?

24     A      They are a financial group with

25   asset management and asset banking



Page 196

```
 1                    D. Majcher
 2   licenses based in Singapore.
 3        Q     Who at FTAG was principally
 4   interacting with De Tomaso in connection
 5   with this financial due diligence?
 6        A     So they engaged Altus to
 7   perform the financial due diligence.
 8        Q     Fair enough.
 9              Who was De Tomaso -- the reason
10   that FTAG was conducting the financial
11   due diligence was, to De Tomaso's
12   understanding, because FTAG was
13   considering making an investment in
14   De Tomaso, right?
15              MS. WIGGER:  I object to form.
16        A     Yes.
17        Q     Prior to making any such
18   investment, FTAG wanted to conduct its
19   own financial due diligence, right?
20              MS. WIGGER:  I object to form.
21        A     Yes.
22        Q     I take it that De Tomaso
23   assisted Altus by supplying it
24   information as required so that they
25   could conduct their due diligence and
```


MAGNA
LEGAL SERVICES

Page 197

```
 1                    D. Majcher
 2    valuation?
 3        A       Yes.
 4        Q       Did you help them with that,
 5    you, personally?
 6        A       You bet, yes.
 7        Q       Was it a lot of work?
 8        A       It was.
 9        Q       How long did you have to work
10    with Altus to supply them with the
11    information that was required?
12        A       I can't give you a time, but it
13    was quite intense.
14        Q       From De Tomaso's perspective,
15    did Altus seem to be competent and
16    professional in conducting their due
17    diligence and valuation work?
18               MS. WIGGER:  Objection to form.
19        A       They were very detail oriented.
20    We went through every transaction for
21    every document, every agreement.
22        Q       We don't have to flip through
23    all of this.
24               But, you know, you could see
25    that it sets forth information about the
```



Page 198

```
 1                    D. Majcher
 2    sales and revenue of De Tomaso, right?
 3        A    Yes.
 4        Q    And it looks at sort of
 5    development costs and other information
 6    and major R&D that needs to occur for the
 7    continued development of the De Tomaso
 8    prototypes, right?
 9             MS. WIGGER:  I object to form.
10        A    Yes.
11        Q    And it ultimately has a
12    valuation of De Tomaso, right?
13             MS. WIGGER:  I object to form.
14        A    It ultimately...
15        Q    You go to the last page, if you
16    want.
17        A    The last page, 43, or the last
18    line?
19        Q    The very, very last page.
20        A    Yes.
21        Q    You see there that Altus
22    eventually concluded with a valuation
23    range, right?
24        A    Yes.
25        Q    It says that:
```



Page 199

```
                          D. Majcher
 1
 2              "Under the following
 3         assumptions, any discount rate of
 4         11.12 percent, the implied equity
 5         value range is from $680 million
 6         to $750 million."
 7              Do you see that?
 8     A     Yes.
 9     Q     Do you think that that is a --
10  does De Tomaso believe that that is an
11  accurate valuation of itself as of
12  August 2023?
13              MS. WIGGER:  I object to form.
14     A     Go back to my same answer, that
15  De Tomaso is not qualified to answer.
16              But this is a report that was
17  used by FTAG to make its investment into
18  De Tomaso.
19              And, ultimately, the investment
20  that they made into De Tomaso was valued
21  at $100 million, just right what it says
22  here.
23     Q     It could be that De Tomaso
24  doesn't think it's worth that much money
25  now?
```



Page 200

```
 1                    D. Majcher
 2              MS. WIGGER:  I object to form.
 3       A      No, I'm not going to say that.
 4    I'm just not qualified to answer.
 5       Q      So let me show you, then, this
 6    next document, which is, I think, what
 7    you're referring to.
 8              MR. ZACH:  So marking 29.
 9              (DT's Exhibit 29, Letter, was
10         marked for identification, as of this
11         date.)
12    BY MR. ZACH:
13       Q      Are you familiar with this
14    agreement?
15       A      Yes.
16       Q      This is a valuation letter,
17    right?
18       A      Yes.
19       Q      I think what you said is that
20    after this report was prepared, that FTAG
21    ultimately decided to make an investment
22    at a different valuation, right?
23              MS. WIGGER:  I object to form.
24       A      Correct.
25       Q      So if you look at paragraph 3,
```



Page 201

```
 1                    D. Majcher
 2    there are two separate valuations on
 3    which FTAG agreed to invest?
 4        A      83, if you read the whole
 5    paragraph.
 6        Q      Sure, that's fine.
 7                So if you see for A, there's:
 8                "The first tranche valuation
 9            shall refer to a pre-money
10            valuation of $175 million."
11                Do you see that?
12        A      Yes.
13        Q      So that means for the first
14    part of FTAG's investment, they are
15    valuing the company at $175 million,
16    right?
17                MS. WIGGER:  I object to form.
18        A      So the first tranche valuation
19    definition comes from the subscription
20    agreement.  That's not shown.
21        Q      I have that.
22        A      I know.  But I just want to put
23    on the record, that it's more complicated
24    than just that, because that is a
25    conversion value when they ultimately
```



Page 202

```
 1                      D. Majcher
 2     decide to convert their preferred shares
 3     into common shares of the company.
 4          Q     Okay.
 5                So why don't you explain?
 6                Explain, to the best of your
 7     knowledge, what you mean by that.
 8          A     What I meant?
 9                MS. WIGGER:  I object to form.
10                MR. ZACH:  Fair enough.
11     BY MR. ZACH:
12          Q     Can you make that a little
13     bit -- can you boil that down a little
14     bit more for me?
15                MS. WIGGER:  I object to form.
16          A     So they have invested money
17     into De Tomaso in the form of preferred
18     shares.
19                These shares under certain
20     conditions can be converted into common
21     shares.  Then they would actually become,
22     as you put earlier, owners of the
23     company.
24                And this valuation letter is --
25     this valuation letter, I guess, governs
```



Page 203

```
 1                    D. Majcher
 2    what the values of the company at the
 3    various conversion...
 4              Actually, no.
 5              Sorry, no.
 6              This valuation letters governs
 7    the valuation of each tranche of
 8    investment at the time of conversion.
 9              MR. ZACH:  I'm going to mark
10         what is 30.
11              (DT's Exhibit 30, Agreement,
12         was marked for identification, as of
13         this date.)
14              MR. ZACH:  I have another one,
15         too.
16              And DT 31.
17              (DT's Exhibit 31, Agreement
18         between De Tomaso, FTAG, and Mr.
19         Choi, was marked for identification,
20         as of this date.)
21              MR. ZACH:  31 is the one with
22         FTAG.
23    BY MR. ZACH:
24         Q    So I think it sounds like we
25    want to go to 31, right?
```



Page 204

                          D. Majcher

1

2        A      If you do.

3        Q      Looking at DT 31, this is an

4   agreement between De Tomaso, FTAG, and

5   Mr. Choi, right?

6        A      Yes.

7        Q      And as part of this at Section,

8   I think it's 5, it's a description of the

9   first tranche of preferred shares, and

10  the second tranche of preferred shares.

11              Right?

12       A      5.4?

13              5.4, yes.

14       Q      And I think you testified to

15  this earlier, but this is only in

16  connection with the FTAG transaction that

17  De Tomaso -- a De Tomaso entity creates

18  preferred shares, right?

19              MS. WIGGER:  I object to form.

20  BY MR. ZACH:

21       Q      Prior to this, there were no

22  preferred shares for any De Tomaso...

23       A      Correct.

24       Q      These preferred shares

25  translated to common stock, right?



Page 205

```
 1                        D. Majcher
 2              MS. WIGGER:  I object to form.
 3        A      They can be, yes.
 4        Q      That is the common stock that
 5   is wholly-owned by Mr. Choi, right?
 6        A      Correct.
 7        Q      Maybe you can tell me, what
 8   conditions -- for the first tranche, what
 9   conditions arise that permit FTAG to
10   convert its preferred shares?
11              MS. WIGGER:  I object to form.
12        A      So I'm quite familiar with the
13   agreement.
14              But, you know, there are lots
15   of different paragraphs here.
16              Subject to really reading
17   everything --
18        Q      Fair enough.
19        A      -- I believe that the
20   conversion is not at -- the conversion is
21   not the option of FTAG.  Okay, there will
22   be a forced conversion.
23              They will be forced to convert
24   when a conversion event happens, which,
25   if you look at Schedule 1.1, which is
```



Page 206

```
 1                     D. Majcher
 2    Bates No. 692 -- sorry, 962 --
 3         Q     I'm there, got it.
 4         A     -- the very bottom, conversion
 5    event means a future fund-raising, a
 6    qualifying IPO, or a trade sale.
 7               So if one of those events
 8    occurs, then automatically, FTAG's
 9    preferred shares would be converted into
10    common shares.
11         Q     As we sit here today, how much
12    money has FTAG provided to De Tomaso?
13         A     $25 million.
14         Q     Does De Tomaso anticipate a
15    second payment from FTAG?
16               MS. WIGGER:  I object to form.
17         A     It's been multiple payments.
18         Q     Are you anticipating further
19    payments from FTAG as part of this
20    agreement?
21               MS. WIGGER:  I object to form.
22         A     It's possible.
23               So you can see that there are
24    two tranches of investment.  The first
25    tranche is closed.  The second tranche is
```



Page 207

D. Majcher

2    not closed.

3        Q      If the second tranche is fully

4    filled, how much would that mean is paid

5    to De Tomaso?

6        A      A total of 30.  So there's

7    5 million more.

8        Q      So you've got 25 now, and

9    another 5 will make 30, right?

10       A      Correct.

11       Q      Are there any restrictions on

12   the use of the 30 million -- it's

13   dollars, right?

14       A      Yes.

15       Q      Is there any restrictions on

16   the use of the $30 million by De Tomaso?

17              MS. WIGGER:  I object to form.

18       A      In general terms, no.  But I

19   think it has some restrictions to do with

20   not using the proceeds to pay for damages

21   in Mr. Berris' lawsuit or Ms. Jorda's

22   lawsuit.

23       Q      Has Mr. Choi made any sort of

24   guarantee to back that provision?

25              MS. WIGGER:  Objection to form.



Page 208

                         D. Majcher

1

2       A     I think it might have been

3    mentioned in here.

4       Q     It says what it says?

5       A     Yes.

6       Q     Fair enough.

7              As part of this, we had looked

8    earlier on DT 12 relating to promissory

9    notes by Mr. Choi to the company, right?

10      A     Yes.

11      Q     Some of those promissory notes

12   were -- involved the two Apollo IEs and

13   the Heritage Pantera.

14              Do you recall that?

15      A     Yes.

16      Q     As part of this deal with FTAG,

17   isn't it a fact that at least $35 million

18   of that debt -- strike that.

19              In connection with that

20   prior -- strike that.

21              In connection with the FTAG

22   deal, isn't it a fact that Mr. Choi was

23   required to convert approximately

24   $35 million of that debt into what was

25   essentially a gift card for future



MAGNA
LEGAL SERVICES

Page 209

                      D. Majcher

 1

 2    De Tomaso automobiles?

 3           MS. WIGGER:  I object to form.

 4      A     I think it gets into 30 now, so

 5    I'll just need to ensure that I'm telling

 6    you the right numbers.

 7      Q     Which is fair.

 8           I should be doing the same.  I

 9    was doing it by memory.

10           I actually think it's a

11    different agreement.  It's a different

12    agreement.

13           MR. ZACH:  Maybe this is a good

14       time to take a quick break.

15           Let's take a 15-minute break.

16       I'm getting close to being done.

17           THE VIDEOGRAPHER:  The time

18       right now is 2:15 p.m.

19           We're off the record.

20           (Recess taken from 2:15 p.m. to

21       2:39 p.m.)

22           THE VIDEOGRAPHER:  The time is

23       2:39 p.m.

24           We're back on the record.

25           MR. ZACH:  Prior to the break,



Page 210

```
 1                    D. Majcher
 2          we were referring to a document I
 3          have marked as DT 32.
 4                  (DT's Exhibit 32, Deed of
 5          settlement dated August 31, 2023, was
 6          marked for identification, as of this
 7          date.)
 8  BY MR. ZACH:
 9          Q      This is a document dated the
10      31st of August, 2023, and it's titled
11      "Deed of Settlement."
12                  Do you see that?
13          A      Yes.
14          Q      It's between De Tomaso and
15      Ideal Team Ventures.
16                  Do you see that?
17          A      Yes.
18          Q      If you turn to page 2, it says,
19      "Settlement of the outstanding amounts."
20          A      Yes.
21          Q      And if you look at 4.1(b), it
22      says there:
23              "$35 million U.S. shall be
24               satisfied by the issuance of a
25               gift card with a face amount of
```



Page 211

```
 1                    D. Majcher
 2          $35 million by the company, such
 3          gift card to be used solely to
 4          offset any payments for future
 5          automotives to be built and sold
 6          by the company to Choi or anyone
 7          nominated by him."
 8          Do you see that?
 9      A   Yes.
10      Q   We were talking earlier about
11  the conversion of certain promissory
12  notes that were reflected on the
13  consolidated financial statements that
14  were issued from entities controlled by
15  Mr. Choi to the company.
16          Does this relate to those?
17          MS. WIGGER:  I object to form.
18      A   That was very long.
19      Q   That was a lot.
20          Let me break that down.
21          The consolidated -- and we
22  looked at DT 12, and some of the notes
23  reflected promissory notes relating to
24  two Apollo IEs and the Heritage Pantera
25  intangible assets?
```



Page 212

1                    D. Majcher

2          Do you recall those?

3     A     Yes.

4     Q     And those were kept on the

5  consolidated financial statements as

6  outstanding commitments the company owed

7  to Mr. Choi, right?

8     A     Yes.

9     Q     And the function of this

10 agreement, in part, was to convert

11 $35 million of those into a gift card for

12 Mr. Choi to use to buy future De Tomaso

13 cars for himself or people that he

14 nominates, right?

15          MS. WIGGER:  I object to form.

16    A     I think this settlement deed

17 includes all of the outstanding amounts

18 owed to Mr. Choi, so, naturally, those

19 three promissory notes that you mentioned

20 would be part of that.

21    Q     And so now, instead of a loan,

22 this is sort of a credit for future

23 purchases by Mr. Choi or someone he

24 nominates, right?

25          MS. WIGGER:  I object to form.



Page 213

```
 1                    D. Majcher
 2       A      The gift card would be, yes.
 3       Q      And put another way, at some
 4   point, the company understands that
 5   Mr. Choi was contemplating using his
 6   outstanding loans and promissory notes to
 7   increase his capital contributions to the
 8   business, right?
 9            MS. WIGGER:  I object to form.
10       A      I'm not sure I understand the
11   question.
12       Q      What is De Tomaso's
13   understanding of why this $35 million was
14   converted into a gift card?
15       A      This is one of the conditions
16   imposed by the investors, by FTAG.
17       Q      What is De Tomaso's
18   understanding of why FTAG imposed this
19   condition before entering into the
20   transaction?
21            MS. WIGGER:  I object to form.
22       A      I believe it's to -- so if you
23   look at a settlement deed, there are
24   three parts, right?  The $35 million gift
25   card is only one portion of it.
```



Page 214

```
 1                    D. Majcher
 2              Another portion is to have
 3    Mr. Choi subscribe to preferred shares
 4    under the same terms as FTAG in the
 5    amount of 20 million.
 6              So this whole arrangement is so
 7    that Mr. Choi has a couple of things.
 8              First of all, Mr. Choi will
 9    have more skin in the game, so to speak.
10              Also, in anticipation for
11    potential future fundraisings, the
12    company doesn't carry all this liability
13    on its balance sheet and also having this
14    obligation to repay in cash.
15              Because once it's converted
16    into the gift card, the gift card could
17    only be used as payments for future cars
18    that he purchases, right?
19              So the company is not obligated
20    to pay cash to settle the loans.
21        Q    The company understands that by
22    creating these preferred shares for
23    purposes of the FTAG transaction, that
24    the conversion of those preferred shares
25    into common stock would dilute Mr. Choi's
```



Page 215

```
 1                    D. Majcher
 2    ownership in the company, right?
 3         A    Yes.
 4         Q    It eventually increases the
 5    number of shares available, and FTAG
 6    would own a chunk of shares, and then
 7    Mr. Choi would own the remaining.
 8              And, therefore, he would -- you
 9    know, his percentage would go from 100 to
10    whatever it goes to according to the
11    agreement, right?
12         A    Correct.
13         Q    By executing the settlement
14    with respect to 20 million of outstanding
15    liabilities on the books to Mr. Choi or
16    his entities, he will be issued similar
17    preferred shares as those that have been
18    provided to FTAG, right?
19              MS. WIGGER:  I object to form.
20         A    The same class of preferred
21    shares, yes.
22         Q    So at this point, there's only
23    two classes of shares:  There's the
24    preferred shares and the common shares,
25    right?
```



Page 216

```
 1                    D. Majcher
 2       A     Yes.
 3       Q     And the preferred shares can be
 4   converted into common shares, right?
 5             MS. WIGGER:  I object to form.
 6       A     Yes.
 7       Q     But for $35 million of those
 8   outstanding obligations on the books of
 9   the company relating to Mr. Choi, those
10   aren't going to be treated as preferred
11   shares, but rather as the gift card that
12   we've just discussed.
13             Right?
14       A     Correct, yes.
15       Q     You can set that aside.
16       A     Everything?  29, 30, 31, and
17   32?
18       Q     Yes.
19             Well, you can keep them there,
20   but I'm not going to be asking you
21   anymore about them.
22             MR. ZACH:  I'm marking another
23        document which is stapled, again,
24        weirdly.
25             This is DT 33.
```



Page 217

```
 1                     D. Majcher
 2              (DT's Exhibit 33, Document
 3         Entitled Titled Management Responses
 4         on the Operation of the Business, was
 5         marked for identification, as of this
 6         date.)
 7    BY MR. ZACH:
 8         Q     This is a document that was
 9      produced by De Tomaso in this litigation,
10      and it's titled "Management Responses on
11      the Operation of the Business."
12              Do you see that?
13         A     Yes.
14         Q     Please flip through this if you
15      want, but isn't it the case -- strike
16      that.
17              Is it the case that this
18      document was prepared to anticipate
19      questions posed by FTAG in connection
20      with other potential investments?
21         A     If you could give me some
22      context as to where this came from, then
23      I can...
24              MS. WIGGER:  I'm going to
25         object to the extent this is not a
```



Page 218

```
                        D. Majcher
 1
 2       complete family.
 3              MR. ZACH:  Sure.  It may very
 4       well be an excerpt.
 5              MS. WIGGER:  It looks like it's
 6       attached to an email which is too
 7       long for me to read onto the record
 8       this time.
 9              MR. ZACH:  What's the date of
10       the email?
11              MS. BUSTAMANTE:  October 27,
12       2023, sent by --
13              MS. WIGGER:  That's, like, the
14       end of the chain.
15              MS. BUSTAMANTE:  Yes, and then
16       it's the attachment.
17              MS. WIGGER:  The end of the
18       chain is October 27, 2023.
19              MS. BUSTAMANTE:  And the chain
20       starts October 5, 2023.
21   BY MR. ZACH:
22       Q     So in that time period, was
23   De Tomaso involved in negotiations with
24   FTAG?
25       A     No, I don't think there's any
```



Page 219

```
 1                    D. Majcher
 2    more negotiation.
 3             The subscription agreement was
 4    signed at the end of August, so...
 5        Q     Fair enough.
 6             Turning to the last page, there
 7    is a question, you know, a draft
 8    question, right, which says:
 9             "How will the fund make
10          returns on investors' money?"
11             Do you see that?
12        A     Yes.
13        Q     And you see it says for FTAG
14    fund to reply, there's a suggested
15    answer.
16             Do you see that?
17        A     Yes.
18        Q     And it says that:
19             "The target is to list
20          De Tomaso on the main board of the
21          Hong Kong Exchange within the next
22          two years at a valuation of no
23          less than $1.5 billion, at which
24          time De Tomaso would have already
25          delivered the P72/P900 cars, plus
```



Page 220

```
 1                    D. Majcher
 2          potentially already launched
 3          fully-sold newer models like the
 4          P72 Roadster."
 5          Do you see that?
 6      A     Yes.
 7      Q     Is it De Tomaso's intention to
 8  try to list itself on the Hong Kong
 9  Exchange within the next two years?
10          MS. WIGGER:  I object to form.
11          Do you mean two years from
12      today or from the email?
13          MR. ZACH:  Fair enough.
14          I would say that would be from
15      2013.
16          MS. WIGGER:  '23?
17          MR. ZACH:  2023.
18      A     I think it was one of the many
19  possibilities that we looked at.  I
20  wouldn't consider that the intention.
21      Q     Was this one of the
22  possibilities that De Tomaso discussed
23  with FTAG in connection with FTAG's
24  investment in the company?
25      A     In relation to FTAG's
```



Page 221

```
 1                    D. Majcher
 2    investment in the company?  I believe
 3    this topic came up, yes.
 4        Q      Did De Tomaso advise FTAG that
 5    it was working to list itself on the
 6    Hong Kong Exchange in the near future?
 7        A      No.
 8        Q      Is it De Tomaso's intention to
 9    list itself on the Hong Kong Exchange in
10    the next couple of years?
11              MS. WIGGER:  I object to form.
12        A      Right at this moment, there is
13    no plan to do that.
14        Q      Should De Tomaso deliver the
15    P72 and P900 cars and perhaps even launch
16    the P72 Roadster, does De Tomaso believe
17    that a fair valuation of the company
18    would be $1.5 billion?
19              MS. WIGGER:  I object to form.
20        A      I can't speak to that.  At the
21    moment, we -- I don't want to sound bad,
22    but at the moment, we don't even know if
23    we're going to make money on these cars.
24    So I don't know what the value will be
25    once the cars are delivered.
```



Page 222

                          D. Majcher
 1
 2        Q      Did De Tomaso make a document,
 3   you know, similar to this in connection
 4   with its negotiations with FTAG?
 5              MS. WIGGER:  I object to form.
 6        A      What do you mean by "similar to
 7   this"?
 8        Q      Were you involved in sort of
 9   the back-and-forth with FTAG as they were
10   considering their investment?
11        A      Yes, yes.
12        Q      In connection with that, do you
13   recall ever having sort of like a Q&A
14   document to prepare for those
15   discussions?
16              MS. WIGGER:  I object to form.
17        A      I believe so.
18        Q      You see here that what we just
19   looked at says "for FTAG fund to reply,"
20   right?
21        A      Yes.
22        Q      So you would agree with me
23   that, at least according to this
24   document, this was one of the answers
25   that De Tomaso was anticipating



```
 1                    D. Majcher
 2    delivering to FTAG should FTAG ask how
 3    will the fund make returns on investors'
 4    money?
 5              MS. WIGGER:  I object to form,
 6         especially without the email context.
 7         A    If I only look at this one box,
 8    and the question is how will the fund
 9    make returns on investors' money, I
10    believe this is for FTAG, which is the
11    fund invested into De Tomaso, to tell
12    their investors how FTAG is to make money
13    from this deal.
14              So this is for them to -- and,
15    literally, it says for FTAG fund to
16    reply.
17         Q    I see what you're saying.
18              So FTAG is itself a fund with
19    outside investors, right?
20         A    I believe the entity that
21    invested into De Tomaso, it's a fund with
22    other investor money, yes.
23         Q    So at least your present
24    reading of this document, with whatever
25    context has been provided, is that this
```



Page 224

                        D. Majcher
1
2    would be a communication sort of agreed
3    upon between FTAG and De Tomaso to tell
4    FTAG's potential investors as to why
5    FTAG's investment in De Tomaso makes
6    sense for FTAG?
7              MS. WIGGER:  I object to form.
8        A    Okay.  Again, without reading
9    the emails and everything else, I read
10   this document to be De Tomaso's response
11   to...
12             Okay, I read this as FTAG
13   needed to answer some questions from
14   their investors.  And so they came to
15   De Tomaso and asked questions on
16   operations, because they obviously can't
17   do that.
18             So then we answer all the
19   questions related to the business, the
20   development, the cars, and the last
21   question about how to make returns on
22   investors' money was left for FTAG to
23   answer.
24             So how they ultimately
25   communicated with their investors, I



Page 225

```
 1                    D. Majcher
 2    cannot say.
 3        Q      So just to be clear, when you
 4    say "we," you're saying that, you know,
 5    De Tomaso sort of participated in filling
 6    in some of these responses and compiling
 7    the document?
 8        A      Correct, yes.
 9        Q      You can set that aside.
10               So with respect to the P72s
11    that are being produced right now by
12    De Tomaso, how many of those have been
13    purchased by customers?
14        A      All of them.
15        Q      All 72 have been?
16        A      Yes.
17        Q      And the way that De Tomaso
18    handles production is that they initially
19    take a customer deposit from the
20    purchaser, right?
21        A      Yes.
22        Q      What is sort of the standard
23    customer deposit for the P72 that a
24    customer has to pay to receive a car?
25        A      Over the years, the terms of
```



Page 226

```
 1                    D. Majcher
 2      the sales agreement have changed.
 3                I would say for the large part,
 4      most of the customers will have to make
 5      four installments under their purchase
 6      agreement.
 7                So the first deposit will be
 8      25 percent of the base price, followed by
 9      another 25 percent.
10                And then the third payment will
11      be another 25 percent of the base price
12      plus the options, prices for the options,
13      which is typically due six months prior
14      to production.
15                Then the last payment, which is
16      the remaining 25 percent, is due before
17      the car is delivered.
18           Q    So just to break that down,
19      what is the list price of a standard,
20      no-option P72?
21           A    We started at $1 million, and
22      over the years, the price of the car has
23      gone up.
24                At this moment, the base price
25      of the car is 1.6 million Euros.
```



Page 227

```
 1                    D. Majcher
 2        Q     Do you know how many -- have
 3   you sold any cars at 1.6 million Euros?
 4        A     Yes.
 5        Q     So I'm just going to use the
 6   1 million number because it makes the
 7   math easier.
 8        A     It's easier, yes.
 9        Q     So, as I understand it, the
10   customer first puts down, say, 250 Euro?
11        A     U.S. dollars.
12              So the $1 million price tag was
13   priced in U.S.
14        Q     So a customer comes in, they
15   want a P72, and they put down $250,000
16   U.S.?
17        A     Correct.
18        Q     Just generally, when is that
19   next installment payment due of the next
20   $250,000?
21        A     It would depend on when the
22   customer came in.
23              So, generally, it could be nine
24   months later.  It could be a year later.
25   It depends on when we were at or where
```


MAGNA
LEGAL SERVICES

Page 228

1                         D. Majcher
2       the program was at at the time the sales
3       contract was executed.
4            Q      But it's sometime considerably
5       before delivery, right?
6            A      Yes.
7            Q      And then there's a third
8       $250,000 payment, plus whatever options?
9            A      Yes.
10           Q      And that also happens
11      considerably prior to delivery of the
12      car, right?
13           A      According to the contract
14      terms, it would be due six months prior
15      to the start of production.
16           Q      So the first three payments,
17      plus the options, have to all be due at
18      the latest by six months prior to the
19      beginning of production, right?
20           A      Correct.
21           Q      So that would mean -- using our
22      million-dollar fixed point, that would
23      mean that $750,000 U.S., plus options,
24      would have to be provided to De Tomaso
25      six months prior to production?



Page 229

1                          D. Majcher

2          A      Yes.

3          Q      Does De Tomaso hold those

4    customer deposits in escrow?

5          A      No.

6          Q      So does De Tomaso possess

7    any -- does De Tomaso have an escrow

8    account for customer deposits?

9          A      No.

10         Q      Are those customer deposits set

11   aside in any way to ensure that they're

12   only going to be used for the production

13   of the car?

14         A      No.

15         Q      Does De Tomaso view itself as

16   being able to take in those deposits and

17   spend them on whatever business purpose

18   it deems fit?

19                MS. WIGGER:  I object to form.

20         A      We take the position that we

21   spend the money to ultimately achieve the

22   goal of delivering the cars.

23         Q      Have De Tomaso ever used

24   customer deposits to repay any loan

25   obligations owed by Mr. Choi or his



Page 230

```
 1                    D. Majcher
 2    entities?
 3              MS. WIGGER:  I object to form.
 4        A     That is the question that is
 5    not -- that's impossible to answer,
 6    almost.
 7              I think we touched on this
 8    yesterday in my own deposition, that a
 9    dollar coming in, it could be from
10    customers.  It could be from Mr. Choi.
11    It could be from FTAG, and it's not
12    possible to differentiate the money going
13    to repay Mr. Choi.
14              It's from this pot, that pot,
15    you know, the other pot.
16        Q     So, I mean, let me put it a
17    different way.
18              So all of the incoming funds to
19    De Tomaso are pooled together?
20        A     Yes.
21        Q     Not sort of segregated out for
22    any specific purpose.
23              Is that fair?
24        A     That's fair.
25        Q     Therefore, when you're paying
```



Page 231

```
 1                      D. Majcher
 2      for any incoming liability, whether it be
 3      for a third-party contractor or to repay
 4      a loan to Mr. Choi, those payments are
 5      coming out of that some pool of money?
 6          A    Correct.
 7          Q    Isn't it a fact that during
 8      2022, De Tomaso fell behind in paying a
 9      number of its contractors their invoices?
10              MS. WIGGER:  Objection to form.
11          A    What do you mean by "fell
12      behind"?
13          Q    Meaning that, you know, a
14      number of third-party service providers
15      or manufacturers invoiced De Tomaso for
16      work that it had done, and De Tomaso was
17      late in paying those invoices?
18              MS. WIGGER:  I object to form.
19          A    Late, as in not paying on the
20      exact due date of the invoice, yes.
21          Q    What is the longest that
22      De Tomaso can recall that it went between
23      when an invoice was due, the due date
24      being defined, I guess, by the third
25      party, and actual payment?
```



Page 232

```
 1                    D. Majcher
 2           MS. WIGGER:  I object to form.
 3      A      Two, three months.
 4      Q      You don't recall sort of having
 5  past due bills of more than two or three
 6  months to any of your service providers?
 7           MS. WIGGER:  I object to form.
 8      A      I mean, subject to looking at
 9  the documents, no.
10      Q      I know you're here as a
11  30(b)(6) witness.
12           But as we discussed, you're
13  closely intertwined with the finances of
14  the company, right?
15      A      Yes.
16      Q      And so even setting aside sort
17  of your education, like, you would be the
18  one that would probably be closest to
19  whether or not a bill is late or not
20  amongst the De Tomaso employees, right?
21           MS. WIGGER:  I object to form.
22      Q      You're not an employee, but due
23  to the De Tomaso -- the folks working at
24  De Tomaso?
25           MS. WIGGER:  The object is also
```



Page 233

1                    D. Majcher

2         to, like, which bill in time.

3              I mean...

4  BY MR. ZACH:

5         Q      If you understand.

6              Do you understand the question?

7         A      You're asking me if I'm the

8    person who knows best about bills in the

9    company?

10        Q      Exactly.

11        A      To the extent that the bills

12   were presented to me, then, yes.

13        Q      Is it your expectation -- is it

14   the expectation of the company that

15   incoming bills should be presented to you

16   personally?

17        A      Yes.

18        Q      So as you sit here recalling

19   the longest you feel -- you recall a bill

20   going past due is in the two- to

21   three-month range?

22        A      Yes.

23        Q      De Tomaso would agree that its

24   customers make substantial payments to

25   De Tomaso in advance of actually



Page 234

```
 1                    D. Majcher
 2    receiving their car in return, right?
 3         A    Yes.
 4         Q    You would agree that, you know,
 5    De Tomaso's customers are, you know,
 6    placing faith in De Tomaso that they will
 7    ultimately deliver a car as they place
 8    deposits of $750,000 before production,
 9    right?
10              MS. WIGGER:  I object to form.
11         A    Yes.  And we feel honored by
12    their faith.
13         Q    And De Tomaso would agree that
14    it's extremely important to be truthful
15    with its customers about the technical
16    aspects of the car that will ultimately
17    be produced, right?
18              MS. WIGGER:  I object to form.
19         A    Yes.
20         Q    And De Tomaso would agree that
21    it's extremely important that it be
22    truthful to customers about the realistic
23    delivery schedule of the P72 cars that
24    the customers have put deposits on?
25              MS. WIGGER:  I object to form.
```



Page 235

1                    D. Majcher
2        A      Yes.
3        Q      And De Tomaso would agree that
4    it should not omit important information,
5    even if it's bad information relating to
6    the production of the P72, from, you
7    know, customers that are placing these
8    large deposits for those cars.
9            Right?
10            MS. WIGGER:  I object to form.
11       A      I mean, the customers are
12   not -- we, obviously, don't tell
13   customers everything, right?
14            I mean, they don't need to get
15   an email update every day about where we
16   are.
17       Q      That's not what I'm saying.
18            I'm saying, as a general
19   matter, it's important, though, to be
20   truthful about conveying -- strike that.
21            You would agree with me that it
22   is important that De Tomaso convey to
23   customers making deposits its own
24   realistic understanding of the timeline
25   of the delivery of the cars?



Page 236

```
 1                      D. Majcher
 2            MS. WIGGER:  I object to form.
 3       A    Yes.
 4       Q    Similarly, De Tomaso would
 5    agree that it's important that it be
 6    honest with the dealers that are helping
 7    sell De Tomaso's cars --
 8            MS. WIGGER:  Objection.
 9       Q    -- along the same lines that...
10            Strike that.
11            You would also agree that
12    De Tomaso should be honest with the
13    dealers about the realistic delivery
14    dates known to De Tomaso for the cars
15    that it's producing, right?
16            MS. WIGGER:  I object to form.
17       A    Yes.
18            MR. ZACH:  I'd like to mark 34.
19       This is DT 34.
20            (DT's Exhibit 34, Documents
21       dated March 17, 2023, was marked for
22       identification, as of this date.)
23    BY MR. ZACH:
24       Q    This is a chat from March 17,
25    2023, between yourself and Mr. Choi.
```



Page 237

```
 1                    D. Majcher
 2              Do you see that?
 3       A      Yes.
 4       Q      And I'd like you to turn, if
 5    you can, to page ending 61.
 6              You see at the top, you're,
 7    again -- we know this is you because
 8    you're the culprit with the double texts
 9    right.
10              It always shows up twice.
11       A      Okay.
12       Q      You're the darker text, right?
13       A      Okay.
14       Q      You write:
15              "This is what he wants now and
16         it's what Jake is reluctant to
17         change."
18              So my question is:  Do you know
19    who Jake Hamilton is?
20       A      Yes.
21       Q      Who is Jake Hamilton?
22       A      Jake Hamilton is the head of
23    sales and marketing for us right now.
24       Q      When you say "head of sales and
25    marketing," that's the person that goes
```



Page 238

```
 1                        D. Majcher
 2    out and tries to obtain customers to
 3    purchase De Tomaso automobiles, right?
 4         A      One of his responsibilities.
 5         Q      He's also responsible for
 6    marketing, which is like working on the
 7    advertising and branding issues as well.
 8                Is that fair?
 9         A      Among other things, yes.
10         Q      If you look at the bottom part
11    of the chat, you're reporting to
12    Mr. Choi:
13                "Jake's reluctance comes from
14           two things:  1, he thinks we
15           should stop 'selling' completely
16           until we can clearly communicate
17           to clients what is going on.
18                "And, 2, he is concerned that
19           the prices quoted may not be
20           profitable for us and that he will
21           be held accountable."
22                Do you see that?
23         A      Yes.
24                MS. WIGGER:  Just for the
25           record, "selling" is in quotes.
```



Page 239

```
 1                    D. Majcher
 2            MR. ZACH:  Selling is in
 3      quotes.
 4            Fair enough.
 5  BY MR. ZACH:
 6      Q    And then if you turn to the
 7   next text, the next page, you continue on
 8   saying:
 9            "I agree with him that we
10         should slow down.  We need to be
11         very careful as to not let anyone
12         come back to us in the future to
13         say that we misled them into
14         paying us, but we need to take the
15         balanced approach to continue to
16         run the business.
17            "So you need to speak to Jake
18         to calm him down."
19            Do you see that?
20      A    Yes.
21      Q    Isn't it the case that
22   De Tomaso sometimes tries to strike a
23   balance between telling potential
24   customers bad news about De Tomaso's
25   ability to deliver a car in a timely
```



Page 240

```
 1                    D. Majcher
 2    fashion with its need to bring in
 3    customer deposits to fund the business?
 4              MS. WIGGER:  I object to form.
 5       A     Sorry, can you repeat that?
 6       Q     Sure.
 7              Isn't it true that De Tomaso
 8    sometimes tries to strike a balance
 9    between telling potential customers bad
10    news about De Tomaso's ability to deliver
11    its automobiles so that it can continue
12    to bring in customer deposits to fund its
13    business?
14              MS. WIGGER:  Same objection.
15       A     No.  As a business, De Tomaso
16    is always trying to strike a balance in
17    just managing the business, in general.
18    But that does not mean that we hide bad
19    news from customers to intentionally
20    mislead them into paying us.
21       Q     And then if you look further,
22    it says -- this is Mr. Choi, who's in
23    charge of De Tomaso.
24              "The reality is it takes ages
25         for us to collect deposits, Wild
```



Page 241

```
 1                    D. Majcher
 2         and SPS the same.  Been now over
 3         four months.  The process must
 4         continue."
 5              Do you see that?
 6      A     Yes.
 7      Q     Isn't it a fact that De Tomaso
 8  has struggled to bring in sufficient
 9  customer deposits to continue the
10  production of its automobiles?
11              MS. WIGGER:  I object to form.
12      A     No, that's not how I would
13  categorize it.
14              I think it takes longer for us
15  to receive the deposits from customers,
16  right?
17              We discussed the payment
18  schedules of the sales contracts earlier.
19              So despite what the contract
20  actually says, not every customer always
21  adheres to the payment schedule.
22              So they will be late often, and
23  we don't necessarily take action to go
24  after them.
25      Q     Turning to the next page of 63,
```



Page 242

1                        D. Majcher

2     you write sort in the top shaded box:

3              "I agree the process must

4         continue, but the communication

5         needs to be clear, open, and

6         honest.

7              "For them to pay a deposit

8         now, there will be certain

9         expectations and need to ensure we

10        will be able to meet those

11        expectations.

12             "Because, to be fair, so far,

13        we have not been able to meet any

14        in terms of development and

15        production timelines, and we can't

16        expect too many more second

17        chances."

18             Do you see that?

19        A    I do.

20        Q    Isn't it a fact that, within

21    De Tomaso, there has been tension between

22    its management, Mr. Choi, and the rest of

23    the staff to be more candid with

24    customers about the realistic

25    expectations of the production delivery



Page 243

```
 1                    D. Majcher
 2     of the P72s because Mr. Choi has been
 3     pressuring those within the company to
 4     obtain deposits despite bad news?
 5                MS. WIGGER:  Objection to form.
 6        A      No.  I think to put things into
 7     context, this is maybe two weeks after we
 8     terminated the agreement with Capricorn.
 9     So this was a time when a lot of changes
10     were taking place.
11                We were working on securing a
12     new supplier to take over what Capricorn
13     was doing.  We were contemplating how to
14     communicate to the market, to the
15     customers on the changes.
16                So, no, I wouldn't say that.
17                And, again, in every company,
18     there would often be disagreements among
19     people.  But I wouldn't say that it's
20     because Mr. Choi was pressuring anyone to
21     solicit more deposits.
22        Q      In addition to the production
23     timeline of the P72 being important for
24     customers, that information would also be
25     important to potential financial
```



Page 244

```
 1                    D. Majcher
 2    investors in the company, right?
 3              MS. WIGGER:  I object to form.
 4       A     Yes.  That's important to us,
 5    too.
 6       Q     Right.
 7              You'd agree that actually -- I
 8    mean, that's a fair point, that, in fact,
 9    the timeline for the production is one of
10    the core risks to the company.
11              It needs to build cars to make
12    money, right?
13       A     Yes.
14       Q     And so you would agree that a
15    realistic assessment of the production
16    timeline is a material term in terms of
17    representations that the company would be
18    making to potential outside investors?
19              MS. WIGGER:  Objection to form.
20       A     Sorry, please repeat.
21       Q     Sure.
22              You would agree that providing
23    a realistic assessment of the production
24    timeline is a material term that needs to
25    be shared with any potential investors in
```



Page 245

```
 1                    D. Majcher
 2    the company, right?
 3              MS. WIGGER:  I object to form.
 4        A     Yes.
 5        Q     Because, as you just said, it
 6    goes to the core of the business, right?
 7        A     Yes.
 8        Q     You can put that away.
 9              MR. ZACH:  I'm going to mark
10         DT 35.
11              (DT's Exhibit 35, Document
12         dated June 13, 2023, was marked for
13         identification, as of this date.)
14    BY MR. ZACH:
15        Q     DT 35 is dated June 13, 2023.
16              Do you see that?
17        A     Yes.
18        Q     And it's on stationery or
19    it's -- I guess no one uses stationery
20    anymore.
21              The header of this features the
22    Roush logo, right?
23        A     Yes.
24        Q     Who is Roush?
25        A     Roush is a supplier that is
```



Page 246

```
 1                      D. Majcher
 2    responsible for the P72 powertrain
 3    system.
 4        Q     For folks like me, what is the
 5    powertrain system?
 6        A     The engine.
 7        Q     You can flip through this as
 8    you want, but...
 9              Well, strike that.
10              Let me just orient you some
11    more.
12              It says, "Subject:  De Tomaso
13    Powertrain Integration."
14              Do you see that?
15        A     Yes.
16        Q     And this is essentially -- do
17    you know what this document is?
18        A     I believe it's a quotation from
19    Roush to us for the work that they would
20    be doing at least in 2023.
21        Q     Had the company worked with
22    Roush before?
23        A     Yes.
24        Q     Did it stop working with Roush
25    at a certain time?
```



Page 247

                              D. Majcher
1
2          A      No.
3          Q      If you look at page 12 of 14,
4     it says "Risks"?
5          A      Yes.
6          Q      And the first one says "Program
7     Timing"?
8          A      Yes.
9          Q      Again, just to orient us, we
10    are in the June 2023 timeline?
11         A      Yes.
12         Q      And with respect to program
13    timing, Roush notes:
14                "The requested timing for
15             production start does not align
16             with the required timing to
17             complete full vehicle emissions
18             calibration and OBD development
19             for the U.S. market."
20                Do you see that?
21         A      Yes.
22         Q      What is OBD development?
23         A      I'm not sure of the actual
24    acronym.
25         Q      That's fine.



Page 248

```
 1                    D. Majcher
 2              And then he goes on to say:
 3              "This does not mean that
 4         De Tomaso can't begin building
 5         cars prior to testing being
 6         complete, but sales will be held
 7         until car/EPA certifications are
 8         completed."
 9              Do you see that?
10    A    Yes.
11    Q    So we get to go back to
12    homologation, right?
13    A    Part of homologation.
14    Q    And so what Roush is noting
15    here is that, you know, there are
16    substantial production risks, because
17    while the car is being completed, no
18    sales can happen until that homologation
19    sort of work is concluded, right?
20              MS. WIGGER:  I object to form.
21    A    I think what they're saying
22    here is the sales, I think, refers to
23    delivery.
24              They're saying that until these
25    tests or the car EPA certifications are
```



Page 249

                    D. Majcher
1
2    completed, the delivery into the U.S.
3    market should be held.
4        Q    In reference to EPA?
5        A    I'm sorry?
6        Q    Because of the reference to the
7    EPA?
8        A    Yes.
9             So Roush is doing the engine,
10   the calibration, the ECU, but part of
11   that is also to make sure that these
12   engines passed emissions tests,
13   homologation requirements, for the U.S.
14   market.
15            That's what they do.
16            So what they're saying is
17   until -- and the U.S. market has the most
18   stringent requirements.
19            So they're saying until that's
20   all done, the cars should not be sold, as
21   in delivered, into the U.S. market,
22   because then you won't be legal to drive
23   them.
24       Q    Have you ever seen the movie
25   Rain Man?



Page 250

1                    D. Majcher

2         A      No.

3         Q      There's an emissions issue that

4     starts in that movie.

5                All right.

6                So the second is Emissions

7     Compliance below there?

8         A      Yes.

9         Q      Or, excuse me, the third says

10    Emissions Compliance?

11        A      Yes.

12        Q      There it says:

13                "The current emissions

14           standards are defined through

15           2026.  New standards are planned

16           for 2027 phasing through 2032.

17                "This could pose a risk to

18           program assumptions depending on

19           the overall timing planned for

20           vehicles."

21                Do you see that?

22        A      Yes.

23        Q      So would De Tomaso agree with

24    me that in the -- well, strike that.

25                The June 2023 time period, as



Page 251

```
 1                    D. Majcher
 2    sort of, I think, you had mentioned, is
 3    shortly after you had terminated your
 4    work with Capricorn, right?
 5        A    Yes.
 6        Q    So you would agree, or would
 7    De Tomaso agree with me, that, at least
 8    as of this time, June 2023, the company
 9    was far behind where it wanted to be in
10    terms of the production of the cars?
11            MS. WIGGER:  I object to form.
12        A    It's behind -- wait, compared
13    to what we were expecting to accomplish
14    with Capricorn, yes, we're behind.
15        Q    And that that was having a
16    substantially adverse impact on
17    De Tomaso's financial condition at that
18    time in June 2023, right?
19            MS. WIGGER:  I object to form.
20        A    Yes.
21            And not to mention, this was,
22    like, days after Mr. Berris' lawsuit was
23    filed.  So, yes.
24        Q    You can set that aside.
25            MR. ZACH:  Just very briefly on
```



Page 252

                    D. Majcher

 1

 2        this document, I'm marking DT 36.

 3              (DT's Exhibit 36, Document, was

 4        marked for identification, as of this

 5        date.)

 6   BY MR. ZACH:

 7        Q      This is produced in native

 8   format, which means that it's probably

 9   like an Excel spreadsheet.

10              So the front page is the Bates

11   reference.

12        A      Yes.

13        Q      But if you turn the page, it

14   says this is a De Tomaso Automobili

15   Limited Proforma Balance Sheet.

16        A      Okay.

17        Q      And it's as of the 31st of

18   March, 2020.

19              Do you see that?

20        A      Yes.

21              MS. WIGGER:  This is the whole

22        document?

23              MR. ZACH:  I believe this is

24        just an excerpt.

25



Page 253

```
 1                    D. Majcher
 2    BY MR. ZACH:
 3        Q    If you look kind of in the
 4    middle, like, grouping of six that
 5    starts, "Due to Ideal Team," do you see
 6    that?
 7        A    Yes.
 8        Q    If you go four down, it says:
 9             "Due to Pachmar, 95,000 Euro."
10             Do you see that?
11        A    Yes.
12        Q    What was due to Pachmar?
13             MS. WIGGER:  I object to form,
14        especially to the extent this
15        document is incomplete.
16        A    I mean, if I just read the
17    line, then it would imply that it's an
18    amount that's due to this Pachmar.
19        Q    You mean an amount that's owed
20    to Pachmar?
21        A    Yes.
22             MS. WIGGER:  I object to form.
23        Again, this document is incomplete.
24        A    But I don't know where this
25    came from, if it's an attachment.
```



Page 254

```
 1                     D. Majcher
 2      Q      Fair enough.
 3             This was a document produced by
 4   you, but, I mean, without further
 5   context, you would interpret "due to
 6   Pachmar" as meaning it's an obligation
 7   owed to Pachmar by De Tomaso?
 8             MS. WIGGER:  I object to form
 9        and foundation.
10      A      Yes.
11      Q      So let's just shift gears here.
12             MR. ZACH:  I'm going to mark as
13        DT 37 your answer to the first
14        amended complaint and your
15        counterclaims.
16             (DT's Exhibit 37, Answers to
17        First Amended Complaint and
18        Counterclaims, was marked for
19        identification, as of this date.)
20   BY MR. ZACH:
21      Q      One of the topics here relates
22   to, you know, claims against Mr. Berris,
23   so I wanted to just ask you a few
24   questions about those.
25             The counterclaims begin on
```



Page 255

```
 1                    D. Majcher
 2     page 72, and there are allegations that
 3     Mr. Berris in your counterclaims breached
 4     his fiduciary duties, right?
 5          A     One of them, yes.
 6          Q     In connection with the alleged
 7     breach of his fiduciary duties, what is
 8     it that De Tomaso is claiming that he
 9     did?
10               MS. WIGGER:  I object to form
11          and legal conclusion.
12               The document speaks for itself.
13     BY MR. ZACH:
14          Q     In sum.
15               You know, obviously I think
16     your counsel is right, and it's fine to
17     refer to the counterclaims.
18               But at a high level, what does
19     De Tomaso think that Mr. Berris did that
20     breached his fiduciary duties as a board
21     member of the company?
22               MS. WIGGER:  Same objection.
23               At least point her to, like,
24          paragraph 221.
25               MR. ZACH:  That's fine.  I
```



Page 256

```
 1                        D. Majcher
 2        mean, it's not a memory test.
 3               MS. WIGGER:  Are you asking her
 4        what's written in the document?
 5   BY MR. ZACH:
 6        Q     Well, I'm just asking at a high
 7   level, what do you think he did?
 8        A     To put it very simply, the
 9   company thinks that Mr. Berris put his
10   self-interests before the company's
11   interests, and he misused company
12   resources to advance his own interests.
13        Q     What personal interests did he
14   put ahead of the company's interests?
15               MS. WIGGER:  I object to form
16        and legal conclusion.
17        A     His pursuit of
18   Ms. Carmen Jorda, for one, and the
19   undocumented and unsupported personal
20   expenses, and also moving money from the
21   company's account into his own personal
22   account.
23        Q     So to take those one at a time,
24   it's the company's view, at least in
25   bringing claims against Mr. Berris, that
```



Page 257

```
 1                    D. Majcher
 2    it believes that Mr. Berris was
 3    romantically pursuing Ms. Jorda.
 4              Is that sort of the gist of the
 5    claim?
 6         A    Yes.
 7         Q    And with respect to the
 8    undocumented expenses, we've gone over
 9    this in some detail, but it's essentially
10    that various expenses that he incurred
11    and sought reimbursement for, the company
12    views as being inappropriate?
13              MS. WIGGER:  I object to form.
14         A    Sought reimbursement for and
15    expenses that he already incurred using
16    the company's money that cannot be
17    substantiated.
18         Q    I'm not going to make you --
19    I'm just going to ask you, generally,
20    what were the types of expenses that he
21    incurred that the company can't sort of
22    unwind that you're referring to?
23              MS. WIGGER:  I object to form.
24         A    That the company can't unwind?
25         Q    Well, what I thought I heard
```



Page 258

                              D. Majcher

1                              D. Majcher
2       you say is that it's not just that he
3       submitted expenses that were wrong, or
4       that the company viewed as wrong, but
5       that he had sort of -- you had already
6       paid him money or he'd already made
7       commitments that the company couldn't
8       undo.
9            A      Correct.
10           Q      And so for that second
11      category, can you list some of those
12      expenses?
13                  MS. WIGGER:  I object to form.
14           A      That could be travel, airfare,
15      hotels, Uber, various things, just
16      that's -- you know, Expedia.com, but with
17      no details.
18           Q      There was testimony that the
19      company hired external auditors to review
20      some of his expenses.
21                  Is that fair?
22           A      I think the auditors were hired
23      to put together the consolidated
24      financial statements.
25           Q      To the company's knowledge, did



Page 259

```
 1                    D. Majcher
 2    those auditors ever actually review the
 3    various expenses that were, in fact,
 4    submitted by Mr. Berris?
 5        A     To the extent that they were
 6    submitted.
 7        Q     Just one second.
 8              You had a third point.  I was
 9    just trying see what the third point was.
10        A     That he had moved money from
11    the company's account.
12        Q     With respect to moving money
13    from the company's account to his own,
14    what, generally, is the company's
15    understanding of what they believe
16    occurred there?
17              MS. WIGGER:  I object to form.
18        A     I'm sorry, what is the --
19        Q     What is the company's
20    understanding of what occurred there at
21    sort of a general level?
22        A     That the money left the account
23    and went to his account.
24        Q     How much money has the company
25    identified as having been moved in that
```



Page 260

1                      D. Majcher
2    manner?
3         A      I would have to -- I mean, I
4    think it's listed in our counterclaims.
5         Q      Prior to Mr. Berris' departure
6    from the company in May 2022, the company
7    is aware that Mr. Berris submitted
8    documentation for some of the expenses
9    that he was asked to submit to the
10   company, right?
11             MS. WIGGER:  I object to form.
12        A      He had submitted certain
13   documents, yes.
14        Q      Did any of the company's
15   auditors review those expenses that he
16   had submitted?
17             MS. WIGGER:  I object to form.
18        A      To the extent that the audit
19   was still ongoing at the time, and they
20   were working on it, I believe so, yes.
21        Q      Did anyone from De Tomaso,
22   including its auditors or agents or
23   whoever, review those expenses to make a
24   determination of whether they were
25   appropriate business expenses or not?



Page 261

```
 1                    D. Majcher
 2              MS. WIGGER:  I object to form.
 3        A      I think we tried, but we were
 4   not able to come to that conclusion
 5   because the information provided was
 6   either nonexistent or incomplete.
 7        Q      Who at De Tomaso attempted to
 8   identify that information?
 9        A      That would be either myself or
10   our bookkeeper, Joyce.
11        Q      When you say it's incomplete,
12   you're saying there was insufficient
13   information to determine one way or
14   another whether it was an appropriate
15   business expense?
16              MS. WIGGER:  I object to form.
17        A      That's fair to say.
18        Q      As part of your counterclaims,
19   De Tomaso is seeking damages from
20   Mr. Berris, right?
21        A      Yes.
22        Q      One of the damages, if you look
23   at paragraph 225, it says:
24              "Between his fraudulently" --
25        that is your allegation.
```



Page 262

```
 1                    D. Majcher
 2              "Between his fraudulently
 3         reimbursed expenses and
 4         unauthorized wire transfers,
 5         Berris has directly caused
 6         De Tomaso to suffer financial loss
 7         in excess of $400,000."
 8              Do you see that?
 9         A    Yes.
10         Q    Is that, as of today, the
11    company's best estimate of the damages it
12    incurred in connection with what you just
13    described as the transfer of money and
14    the unauthorized expenses?
15              MS. WIGGER:  I object to form
16         and legal conclusion.
17         A    I'm not sure if we have --
18    well, I guess we didn't update this
19    counterclaim.
20              But I believe in one of our
21    responses to the interrogatories, we've
22    listed the amount.  So, I mean, whatever
23    it...
24         Q    So whatever is in that
25    interrogatory response represents your
```



Page 263

```
 1                    D. Majcher
 2    present claim for damages in connection
 3    with those allegations?
 4              MS. WIGGER:  I object to form
 5         and legal conclusion.
 6              I don't believe she knows the
 7         title of all the documents.
 8              MR. ZACH:  Fair enough.
 9    BY MR. ZACH:
10         Q    But it's your understanding
11    that, through counsel, you've provided
12    sort of written documentation of those
13    types of damages that you're seeking?
14         A    Yes.
15         Q    What other types of damages
16    is -- strike that.
17              Is De Tomaso also seeking
18    damages in connection with Carmen Jorda?
19              MS. WIGGER:  I object to form
20         and legal conclusion.
21         A    I believe so.  I think it's
22    listed.
23         Q    I'm just asking you.
24         A    Yes, I believe so.
25         Q    Is De Tomaso seeking any other
```



Page 264

```
 1                    D. Majcher
 2     damages with respect to any alleged harm
 3     to the business?
 4              MS. WIGGER:  I object to form
 5         and legal conclusion.
 6         A    I think the damages that we're
 7     seeking are all sort of laid out in the
 8     documents.  So, yes.
 9         Q    I'm going to shift gears.
10              Well, one second.  Let me just
11     consult with my colleagues.
12              I think we've gone over some of
13     this, but I just want to -- you can put
14     that aside.
15              We discussed about this, I
16     think, with DT 12.
17              But as of May 2022, De Tomaso's
18     ownership structure was sort of as
19     reflected in the consolidated financial
20     statements, right?
21         A    DT 12?
22         Q    Yes.
23         A    Yes.
24         Q    As of May 2022, what was
25     De Tomaso's business model in connection
```



Page 265

```
 1                     D. Majcher
 2    with how it wanted to sell the cars?
 3              MS. WIGGER:  I object to form.
 4    BY MR. ZACH:
 5         Q     I'll break that down.
 6              In May 2022, was it the case
 7    that most of the sales were -- all the
 8    sales are preorder sales, right?
 9         A     All the sales are --
10         Q     All the sales are preorder
11    sales, right?
12         A     Yes.
13         Q     Just by the way it works,
14    you've got to go through that deposit
15    process that we talked about earlier?
16         A     Yes.
17         Q     Did De Tomaso utilize
18    dealerships to try and promote and sell
19    the De Tomaso cars?
20         A     I wouldn't necessarily call
21    them dealerships, but they are dealer
22    partners, yes.
23         Q     Okay.
24         A     But it's not like you walk in
25    the dealership and you can pick up a car.
```



Page 266

1                          D. Majcher

2          Q      Because there weren't any cars,

3      right?

4          A      Yes.

5          Q      But in the United States,

6      De Tomaso utilized Miller Motorcars,

7      right?

8          A      Yes.

9          Q      And that's located nearby but

10     up in Greenwich, right?

11         A      Yes.

12         Q      Did De Tomaso use any other

13     dealerships elsewhere in the world?

14         A      Yes.

15         Q      What were those dealerships?

16         A      We have Louwman Exclusive in

17     the Netherlands.  We also have a

18     partnership with BI Partners in

19     Switzerland.  We have SPS Motors in

20     Hong Kong.

21         Q      In terms of the P72s that have

22     been sold, I don't need a precise number,

23     but roughly how many of those have been

24     in the United States, Europe, and Asia

25     just, like, percentage-wise?



Page 267

1                     D. Majcher

2              You can estimate.

3       A       I would say roughly 50 percent

4    in the U.S., and maybe 15 percent in

5    Asia, and then the rest in Europe.

6       Q       When you're referring to Asia,

7    you're including the Middle East in Asia

8    as well?

9              MS. WIGGER:  I object to form.

10      A       We only have one car in the

11   Middle East.

12      Q       Would it be fair to say that

13   De Tomaso's business model was trying to

14   adopt what I'll call, like, an

15   asset-light structure, meaning that you

16   don't have sort of the infrastructure

17   that a Ford or a GM would have?

18             MS. WIGGER:  I object to form.

19      A       Yes.

20      Q       Maybe put another way, would it

21   be fair to say that part of De Tomaso's

22   business model was to sort of outsource

23   to partners the actual production of the

24   car?

25      A       Yes.



Page 268

                        D. Majcher

1

2      Q      And we touched on this before,

3    but customer deposits were meant to be

4    used to fund the production of the car,

5    right?

6      A      The customer deposit is used to

7    fund the general business, including

8    producing the cars, yes.

9      Q      Does De Tomaso, comparing it to

10   your -- well, forget that.

11            How would De Tomaso describe

12   its sort of market positioning relative

13   to someone like Ferrari?

14            MS. WIGGER:  I object to form.

15     A      Market position as to, like,

16   appeal to the end customers?

17     Q      Yes.

18            How are you trying to

19   distinguish yourself from someone like

20   Ferrari?

21     A      I think we're a lot more

22   exclusive than Ferrari.

23            We make a lot fewer cars than

24   Ferrari.  We're higher priced and

25   certainly better quality, I hope the end



Page 269

```
 1                    D. Majcher
 2   product to be.  So we are quite
 3   different.
 4       Q     And the same question but as to
 5   Bugatti.
 6             MS. WIGGER:  I object to form.
 7       A     Bugatti is someone, like,
 8   really high up and farther.  So perhaps
 9   not quite comparable, but closer to
10   Bugatti than to Ferrari.
11       Q     For both your answers for
12   Ferrari and Bugatti, you felt the same
13   way around May 2022, right?
14             MS. WIGGER:  I object to form.
15       A     I believe so.
16       Q     And the last one I'll ask you
17   about, how would you -- the same
18   question, but as to Pagani.
19       A     Pagani?
20             MS. WIGGER:  I object to form.
21       A     Pagani is someone that we see
22   ourselves to be quite comparable to.
23       Q     What sort of strategies was
24   De Tomaso employing to sort of
25   differentiate themselves from those
```



Page 270

1                          D. Majcher
2      brands like Ferrari, Bugatti, and Pagani?
3                    MS. WIGGER:  I object to form.
4          A      I think the product speaks for
5      itself.  It's very different from Ferrari
6      and Bugatti.
7                    But De Tomaso, at least for the
8      P72, it was, you know, going back to the
9      1960s, '70s era, but with a modern
10     design, but still trying to bring the
11     drivers back to that nostalgic era.
12         Q      Setting aside sort of the ad
13     campaigns involving Carmen Jorda, what
14     specific strategies did De Tomaso employ
15     to differentiate itself brand-wise from
16     those other companies I just referenced?
17                   MS. WIGGER:  I object to form.
18         A      At what time period?
19         Q      Let's just say in 2022.
20         A      I'm not sure we employed any
21     real strategy.  I think we were just
22     letting the product speak for itself.
23         Q      But how were you letting the
24     world learn about the product?
25                   MS. WIGGER:  I object to form.



Page 271

                    D. Majcher

1

2      A      There will be campaigns, social

3    media campaign.

4             We would take the cars to

5    different events and shows.

6      Q      At those shows, would your

7    competitors also be at those shows?

8      A      Some of them, depending on the

9    show.  But, yes, sometimes.

10     Q      What were the main challenges

11   that De Tomaso faced in trying to break

12   into this ultra luxury market in terms of

13   brand identification?

14            MS. WIGGER:  I object to form.

15     A      It's not as well known as, say,

16   Ferrari or Pagani, even though the brand

17   has been around for a very long time.

18            But I think, you know, in the

19   past maybe 20 years or so, it was

20   inactive.  And so in 2019, we revived the

21   brand.

22            So some of the challenges would

23   come from the fact that the brand is not

24   as well known, and, of course, then once

25   we come back, it's viewed as a newcomer,



Page 272

```
 1                    D. Majcher
 2    right?
 3              We haven't shown a track
 4    record, so to speak.
 5        Q      And when the brand was first
 6    purchased by Mr. Choi, there was
 7    contemplation of doing a Heritage, sort
 8    of ret --
 9        A      Restromod.
10        Q      Restromod, thank you.
11              That De Tomaso did not go in
12    that direction.  Instead, it decided to
13    create the P72, right?
14        A      Yes.  That was one of the
15    things that the business considered and
16    ultimately put aside.
17        Q      I think we talked about this
18    with Mr. Choi.
19              But as it currently stands
20    today, as we sit here in September 2024,
21    there is no current plan that's starting
22    to create a restomod model, right?
23        A      As it stands today, yes.
24        Q      Are there any definitive plans
25    to create that type of car, you know, in
```



Page 273

```
 1                    D. Majcher
 2    the next year or two?
 3         A      No definitive, no.
 4         Q      Has De Tomaso's business model
 5    evolved in any way since May 2022?
 6         A      When you say "business model,"
 7    what are you referring to?
 8         Q      Limit its approach to becoming
 9    financially successful.
10              MS. WIGGER:  I object to form.
11         A      Financially successful?
12         Q      This isn't a question, but I'm
13    going to give an illustrative example.
14              So, you know, take the P72.
15              Instead of creating, you know,
16    72 expensive, exclusive cars, has there
17    been any change to, say, create 2,000
18    cheaper cars, or something like that?
19         A      Okay.  Then, no.
20         Q      It's roughly the same as it's
21    been since the company decided to proceed
22    with the P72?
23         A      Correct.
24         Q      What were the key milestones in
25    De Tomaso's product development around
```



Page 274

```
 1                    D. Majcher
 2    the time that Mr. Berris departed the
 3    company?
 4              MS. WIGGER:  I object to form.
 5       A      Product milestones?
 6              MR. ZACH:  Strike that.
 7    BY MR. ZACH:
 8       Q      As we sit here, do you recall
 9    what the expected timeline at the time of
10    Mr. Berris' departure from the company
11    was for delivery of the P72s?
12       A      No.
13       Q      How would you characterize
14    De Tomaso's financial health today?
15              MS. WIGGER:  I object to form.
16       A      Financial health as in?
17              I'm trying to understand how I
18    should answer the question.
19       Q      How does De Tomaso risk --
20    calculate its risk of continuing as a
21    going concern, as you sit here today?
22              MS. WIGGER:  I object to form.
23       A      I consider us -- a going
24    concern?
25       Q      Uh-huh.
```



Page 275

```
 1                    D. Majcher
 2        A     So far largely with Mr. Choi's
 3   financial support, still ongoing.
 4        Q     And De Tomaso still intends to
 5   deliver the P72s that it's been working
 6   to produce?
 7        A     Yes, absolutely.
 8        Q     Is there an estimated date for
 9   when you hope to begin delivery of those
10   vehicles?
11        A     Yes.  We're in 2024, so in
12   2025.
13        Q     Has the company's financial
14   position changed significantly from when
15   Mr. Berris departed the company in
16   May 2022 and today?
17             MS. WIGGER:  I object to form.
18        A     Financial position changing
19   significantly...
20             The company still has no
21   recorded revenue.
22             The company has incurred more
23   losses since Mr. Berris has been there.
24             And, I mean, if you just look
25   at the financial -- and Mr. Choi has put
```



Page 276

```
 1                    D. Majcher
 2    in considerably more money since then.
 3         Q     If you had to estimate how much
 4    money Mr. Choi has put in since
 5    Mr. Berris' departure, how much would
 6    that be?
 7                 MS. WIGGER:  I object to form.
 8         A     Sitting here, I can't just tell
 9    you that number.
10         Q     Can you just sort of give a
11    ballpark estimate?
12                 MS. WIGGER:  I object to form.
13                 Asked and answered.
14         A     Since his departure to today,
15    no.
16         Q     Would it be more than
17    $10 million, do you think?
18         A     I think so, yes.
19         Q     Would it be more than $20
20    million, do you think?
21                 MS. WIGGER:  I object to form.
22         A     I can't say.
23         Q     But that would be reflected in
24    the company's books and records, right?
25         A     Yes.
```



Page 277

                        D. Majcher
1
2       Q      Was the FTAG investment the
3    first time that De Tomaso has been able
4    to obtain outside capital other than
5    Mr. Choi?
6       A      Yes.
7       Q      For what reason did De Tomaso
8    not proceed with the Genesis SPAC?
9              MS. WIGGER:  I object to form.
10      A      To De Tomaso's knowledge,
11   Mr. Choi had felt uncomfortable with the
12   then-current market conditions with --
13   the general, you know, U.S. markets,
14   economy, and the SPAC market.  And so he
15   decided to withdraw from the transaction.
16      Q      How far had De Tomaso gone in
17   the SPAC process with Genesis before
18   Mr. Choi elected to opt out of that
19   process?
20             MS. WIGGER:  I object to form.
21      A      We had signed an LOI with them.
22   They had begun due diligence.  And I
23   believe a sales and purchase agreement
24   was being worked on by their lawyers but
25   being drafted.



Page 278

1                          D. Majcher
2        Q      To the best of your
3    recollection.
4        A      Yes.
5        Q      When was it that De Tomaso
6    ceased pursuing the Genesis SPAC option?
7               MS. WIGGER:  I object to form.
8        Q      Again, I'm just asking you to
9    estimate.
10       A      I believe it was the beginning
11   of July 2022.
12       Q      Other than pursuing a SPAC and
13   sort of outside funds like FTAG, what
14   other efforts did De Tomaso make to raise
15   capital from -- subsequent to Mr. Berris'
16   departure from the company?
17              MS. WIGGER:  I object to form.
18       A      We had engaged with a few
19   financial services firms, or you can call
20   them advisors, to help us with
21   fund-raising.
22              We have met with certain
23   potential investors and investment banks.
24       Q      But none of those ultimately
25   resulted in outside investment coming in?



Page 279

```
 1                    D. Majcher
 2       A     No, not except FTAG.
 3       Q     Did De Tomaso have any
 4   strategic partnerships or collaborations
 5   with other brands as of May 2022?
 6             MS. WIGGER:  I object to form.
 7       A     As of May 2022?
 8       Q     Yes.
 9       A     Not to De Tomaso's knowledge.
10       Q     Subsequent to May 2022, did
11   De Tomaso enter into any strategic
12   partnerships or collaborations with other
13   brands?
14             MS. WIGGER:  I object to form.
15       A     No.
16       Q     How did -- has De Tomaso faced
17   any regulatory challenges entering or
18   operating in sort of specific nations in
19   2022?
20             MS. WIGGER:  I object to form.
21       A     No.
22       Q     Other than we talked about the
23   homologation issues, but setting that
24   aside, were there other sort of factors
25   that made it hard for the business to
```



Page 280

                    D. Majcher
1
2   develop?
3       A     Sorry, you asked about
4   reporting?
5       Q     Sorry.
6             Fair enough.
7             I was thinking other than
8   trying to comply with the homologation
9   issues that we've discussed, and we don't
10  need to go over it again, were there
11  other sort of regulatory issues that
12  De Tomaso had to deal with going into
13  May 2022?
14            MS. WIGGER:  I object to form.
15      A     No.
16      Q     If you know, what is the sort
17  of the average price point now for the
18  preorders of the De Tomaso cars?
19            It's gone from like a million
20  dollars to -- there's a higher amount in
21  Euros that we're talking about.
22            Do you have a sense of how
23  those averaged out?
24            MS. WIGGER:  I object to form.
25      A     Okay.  So you mean, like, we



Page 281

1                           D. Majcher
2       sold 72 cars, some of them have sold at
3       this price or that price to average out?
4            Q     Yes.
5            A     Just a base price?
6            Q     Yes.
7            A     It maybe averages out to be --
8       largely, they were sold at the $1 million
9       price.  So maybe $1.2, $1.3 million U.S.,
10      I would say.
11           Q     In terms of profitability to
12      the company, does De Tomaso make a larger
13      profit on the options and add-ons than it
14      does on just the base price?
15                 MS. WIGGER:  I object to form.
16           A     We're hoping that's going to be
17      the case.  It remains to be seen.
18           Q     Part of the business plan, the
19      add-on options increase the overall
20      profitability of the sale of the car.
21                 Is that fair?
22           A     That's fair.
23           Q     I think we sort of covered this
24      a bit before.
25                 But going back to the 2021



Page 282

```
 1                    D. Majcher
 2    audited financial statements, it lists
 3    for the year 2021 and 2020, a loss of
 4    $31 million for the company, I believe.
 5              MS. WIGGER:  I object to form.
 6  BY MR. ZACH:
 7       Q     There are also substantial
 8    loans on the books at the same time.
 9              I just want to make sure, part
10    of that is that the loans that are on the
11    books, the company views as money paid in
12    by Mr. Choi, right?
13       A     Yes.
14       Q     So those loans, to the extent
15    that they're cash as opposed to the IP
16    rights, are viewed by the company as sort
17    of funding by Mr. Choi or his entities to
18    assist the business?
19              MS. WIGGER:  I object to form.
20       A     That's what they are, yes.
21       Q     The valuation reports that we
22    looked at from 2020, do you remember
23    those, the draft ones?
24       A     Yes.
25       Q     Did the company view the
```



Page 283

```
 1                    D. Majcher
 2    financial projections that were supplied
 3    to the outside valuers as being
 4    reasonable at the time?
 5              MS. WIGGER:  I object to form.
 6       A      At the time, yes.
 7       Q      I guess, more broadly, to the
 8    extent that De Tomaso is participating in
 9    a valuation, the projections that you
10    supplied to do some of the modeling, you
11    intended to be as accurate as possible,
12    right?
13              MS. WIGGER:  I object to form.
14       A      Yes.
15              But I think you will see, if
16    you look at the actual underlying
17    projections, the business plan probably
18    has changed from that point in time.
19              MR. ZACH:  Give me one second.
20              Let's take a quick break.  I'm
21       going to organize my last set of
22       questions.
23              We'll plow through, and then we
24       can wrap up.
25              So let's just come back at
```



Page 284

```
 1                    D. Majcher
 2        4:05.
 3             THE VIDEOGRAPHER:  The time is
 4        3:54 p.m.
 5             We're off the record.
 6             (Recess taken from 3:54 p.m. to
 7        4:09 p.m.)
 8             THE VIDEOGRAPHER:  The time is
 9        4:09 p.m.
10             We're back on the record.
11             MR. ZACH:  I'm going to show
12        you an email and an attachment.
13             So this is DT 38.
14             (DT's Exhibit 38, Email, was
15        marked for identification, as of this
16        date.)
17             MR. ZACH:  And this is DT 39.
18             (DT's Exhibit 39, Email, was
19        marked for identification, as of this
20        date.)
21             MR. ZACH:  That's the
22        attachment.
23             MS. WIGGER:  That's the full
24        family?
25             MS. BUSTAMANTE:  No, that's one
```



Page 285

```
 1                    D. Majcher
 2        attachment of several.
 3              MS. WIGGER:  Which one is this
 4        one?
 5  BY MR. ZACH:
 6        Q     So looking at 38 --
 7              MS. WIGGER:  Can you tell me
 8        what the title of this attachment is?
 9        There's like four listed.
10              Which one is this?
11              MR. ZACH:  So this is a May 6,
12        2022, email from Mr. Lui to various
13        people about the De Tomaso slides.
14              And it attaches -- one of the
15        attachments has 39, which is some
16        financial numbers related to
17        De Tomaso.
18  BY MR. ZACH:
19        Q     Do you see 39?
20        A     Yes.
21        Q     Did you participate at all in
22     coming up with this valuation in
23     connection with the work with Genesis for
24     the SPAC?
25              MS. WIGGER:  I object to form.
```



Page 286

```
 1                    D. Majcher
 2        A     Did I as in me, or did
 3   De Tomaso?
 4        Q     Fair enough.
 5              Let me ask you first:  Are you
 6   familiar with this?
 7        A     It's the first time I'm seeing
 8   this.
 9        Q     So I take it, then, from your
10   perspective, you haven't seen it?
11        A     No.
12        Q     But you would agree that
13   De Tomaso engaged in substantial due
14   diligence with Genesis in connection with
15   the proposed SPAC?
16        A     Genesis was conducting the due
17   diligence.
18        Q     Right.  I should have phrased
19   it better.
20              There was a substantial due
21   diligence process conducted by Genesis in
22   connection with the SPAC, right?
23        A     Yes.
24        Q     In fact, you know, hundreds, if
25   not thousands, of documents were
```


MAGNA
LEGAL SERVICES

Page 287

                    D. Majcher
1
2   exchanged or provided by De Tomaso to
3   Genesis, right?
4        A    Lots of them, yes.
5        Q    As part of that process Genesis
6   created valuations of the company, right?
7             MS. WIGGER:  I object to form.
8        A    I can't speak to what Genesis
9   did.
10       Q    Let me put it this way:
11            As part of the Genesis SPAC
12  process, there were discussions between
13  De Tomaso and Genesis about the potential
14  value of De Tomaso, right?
15            MS. WIGGER:  I object to form.
16       A    Yes.
17       Q    Because the whole point of the
18  SPAC is the SPAC will be purchasing an
19  interest in De Tomaso, right?
20       A    Yes.
21       Q    And looking at 39, you would
22  agree, at least as reflected in this
23  document, that this iteration of the
24  valuation had an enterprise value for
25  De Tomaso of a little over $1 billion?



Page 288

```
 1                     D. Majcher
 2              MS. WIGGER:  I object to form.
 3    BY MR. ZACH:
 4        Q     So there's like the two boxes.
 5    And then there's like a little middle
 6    thing.  It's the middle thing.
 7        A     The middle thing?
 8              MS. WIGGER:  I object to form.
 9        A     Where it says "enterprise
10    value"?
11        Q     Yes, exactly.
12        A     Okay.
13        Q     I'll reask the question.
14              So at least according to this
15    document, as it was being circulated by
16    De Tomaso around May 26, 2022, this
17    valuation of De Tomaso, in terms of
18    enterprise value, was a little over a
19    billion dollars, right?
20              MS. WIGGER:  I object to form.
21         Misstates the document.
22              This was circulated by Genesis.
23              MR. ZACH:  Oh, by Genesis.
24              Sorry, correction noted.
25        A     I see this as an ownership
```



Page 289

```
 1                    D. Majcher
 2     table.
 3              I mean, even the file name says
 4     Proforma Ownership Table.  I don't see
 5     this as a valuation that's done.
 6              It even says, if you read
 7     note 3:
 8              "Assumes pretransaction
 9           valuation of target company at
10           $1 billion."
11        Q    Fair enough.
12              What do you understand an
13     ownership table to be?
14              MS. WIGGER:  I object to form.
15        A    Exactly what it is.  It's a
16     table showing who the shareholders are.
17        Q    Okay, got you.
18              You can set that aside.
19              Going back, you know the Altus
20     due diligence, the big report we looked
21     at?
22              Can you just pull that out very
23     quickly?  It's way back, but it's one of
24     the thicker ones.
25        A    Okay, I got it.  It's 28.
```



Page 290

                    D. Majcher

1

2      Q      This was done as of August 14,

3   2023, right?

4      A      The draft was dated that, yes.

5      Q      But the forecasts that were

6   utilized in this report were prepared

7   back in May of 2022, right?

8           MS. WIGGER:  I object to form

9      and foundation.

10     A      Do you have a forecast in here?

11     Q      Yes.  Let me direct you to a

12   page.

13          If you go to page 43.

14     A      43, okay.

15     Q      And there are a -- it lists,

16   essentially, forecasts for the cash flow

17   assumptions.

18          Do you see that?

19          MS. WIGGER:  I object to form.

20     A      Yes.

21     Q      And those look at historical

22   2022 going backwards, right?

23     A      Yes.

24     Q      Just to be clear, these would

25   have been supplied to Altus by De Tomaso,



Page 291

                              D. Majcher
1
2      right?
3          A      Yes.
4          Q      When you're supplying the
5      forecasts, you're giving your best
6      credible assessment of what you
7      anticipate actually happening with the
8      company, right?
9                 MS. WIGGER:   I object to form.
10         A      At the time the information was
11     prepared, yes.  But going back to your
12     earlier question, this was not prepared
13     in May of 2022.  I think you had said
14     that.
15         Q      No, I was saying that the
16     forecasts were from 2022.
17         A      No, because there's already a
18     column that says "Historical."  So 2022
19     is already over.
20         Q      So you think that these would
21     have been from sometime later in time?
22         A      No, definitely.  This draft was
23     August 2023.
24                Typically, no investor will be
25     looking at forecasts.  Like, they want it



Page 292

                    D. Majcher
1
2    to be updated.  It's only recent.
3        Q    So you would want your -- you
4    know, when you're dealing with these
5    valuations, typically, the people doing
6    the valuation would want the most recent
7    forecasts available?
8        A    Yes.
9        Q    How often does De Tomaso update
10   its forecasts?
11            MS. WIGGER:  I object to form.
12       A    As often as is necessary.
13       Q    When is the last time you
14   recall De Tomaso updating its forecasts?
15       A    We're at September.  June,
16   maybe.
17       Q    June of 2024?
18       A    Yes.
19       Q    Do you recall for what purpose
20   those forecasts were made?
21       A    Both for internal cash flow
22   projection/planning purposes and
23   potential fundraising efforts.
24       Q    You can set that aside.
25            Did De Tomaso make an



Page 293

1                          D. Majcher
2       investment in a company associated with
3       Jowyn Wong called Helix?
4                  MS. WIGGER:  I object to form.
5            A      Yes.
6            Q      How much was that investment
7       for?
8            A      I think in our financial
9       records it will show.  Offhand, I don't
10      recall.
11           Q      Again, I totally respect that.
12                  But if you had to sort of
13      ballpark it, what do you think it would
14      have been?
15                  MS. WIGGER:  I object to form.
16           A      $100,000, $150,000.
17           Q      U.S. dollars?
18           A      Yes.
19           Q      What was your understanding of
20      the -- what was De Tomaso's understanding
21      of the purpose of making that investment?
22           A      The purpose of making that
23      investment is to hopefully make a return.
24           Q      Was the investment in
25      connection with any developmental benefit



Page 294

```
 1                  D. Majcher
 2    to De Tomaso, meaning De Tomaso getting
 3    the P72 or other cars produced?
 4        A      Not in that sense, no.
 5        Q      So it was your understanding
 6    that the investment was purely hoping to
 7    make a return on another company?
 8              MS. WIGGER:  I object to form.
 9        A      Well, no.  So the De Tomaso
10    main -- like, the P72, these luxury
11    hypercars business is very exclusive.
12              If you look at the car market,
13    it's a very extreme spectrum.
14              Helix's business model is to
15    produce these electric urban vehicles
16    that will...
17              These are small vehicles,
18    electric, but very, for lack of a better
19    term, cheap, affordable, and that
20    companies can potentially use as
21    commercial fleets, like the last-mile
22    delivery, for example, right?
23              So this is a completely
24    different market but still in this
25    mobility industry.
```



Page 295

                        D. Majcher

1                       So this is a slight

2        diversification, so to speak.

3           Q       Understood.

4                       So it wasn't the hope of

5        De Tomaso that it was going to obtain

6        some sort of technological information

7        that would help build out a De Tomaso

8        car.  It was purely an investment in a

9        different company?

10          A       That's not an impossibility,

11       but the original intention was not for

12       the Helix investment to benefit the

13       development of P72.

14          Q       It was just to make a return on

15       the investment if Mr. Wong's company was

16       successful?

17          A       It's not Mr. Wong's.  Well, he

18       was one of the people involved in the

19       company.

20          Q       Did De Tomaso also invest in a

21       project developed by Mr. Choi relating to

22       a Mazda RX7?

23                  MS. WIGGER:  I object to form.

24          A       I don't believe so.



Page 296

                    D. Majcher

1

2      Q      Are you aware of Mr. Choi

3   having any sort of independent project

4   relating to a Mazda RX7?

5            MS. WIGGER:  I object to form.

6      A      I don't know what you're

7   referring to.

8      Q      What do you understand that to

9   mean?

10     A      It's a restoration of a

11  Mazda RX7.

12     Q      Was that being conducted by

13  Mr. Choi?

14     A      No.  It was worked on by

15  someone else.

16     Q      I mean, sorry, is it

17  De Tomaso's understanding that the car

18  was ultimately for Mr. Choi?

19     A      I don't know who the car would

20  be -- no, I don't know who it ultimately

21  would be for.

22            But the payments made on -- the

23  payments that related to the RX7

24  restoration project was made on behalf of

25  Mr. Choi as repayment to him.



Page 297

                        D. Majcher
1
2       Q      So it's similar to, like, the
3   deposit to the Hudson Yards broker deal,
4   like, where -- it's that type of a
5   payment we've talked about over and over
6   again?
7               MS. WIGGER:  I object to form.
8       A      Just to clarify, I don't know
9   who the Hudson Yard broker is.
10              We made a payment to someone
11  who's a real estate agent.  I don't know
12  what that payment was for.
13      Q      That's fair enough.
14              But it's that type of -- it's a
15  personal expense of Mr. Choi's that's
16  being reimbursed directly by the company,
17  because it's repayment for an outstanding
18  obligation the company, De Tomaso, has to
19  Mr. Choi?
20              MS. WIGGER:  I object to form.
21      A      That's a fair statement, yes.
22      Q      Shifting gears, in 2022, what
23  official role did Sammy Lui have with
24  respect to De Tomaso?
25      A      De Tomaso?



Page 298

```
 1                    D. Majcher
 2        Q     Yes.
 3        A     None.
 4        Q     So up to the time of
 5   Mr. Berris' departure from the company,
 6   is it fair to say that Mr. Lui was not a
 7   representative or agent of De Tomaso?
 8              MS. WIGGER:  I object to form.
 9        A     Fair to say, yes.
10        Q     Now, I'm going to mark...
11              During that time period, what
12   did De Tomaso -- who did De Tomaso
13   understand Mr. Lui to work for?
14              MS. WIGGER:  I object to form.
15        A     Mr. Lui was a representative of
16   Genesis.
17              MR. ZACH:  I'm showing you
18        DT 40.
19              (DT's Exhibit 40, Text
20        Messages, was marked for
21        identification, as of this date.)
22   BY MR. ZACH:
23        Q     This is a series of text
24   messages between Mr. -- everyone says his
25   name different ways.
```



Page 299

```
 1                    D. Majcher
 2           Is it "Lui" or is it "Lou"?
 3      A    I say it "Lui."
 4      Q    "Lui."
 5           Okay, I'll do my best.  I'll
 6    try my best.
 7           These are text messages between
 8    Mr. Lui and Mr. Choi from April of 2022.
 9           Do you see that?
10      A    Yes.
11      Q    This is right around the
12    time -- this is very close in time to
13    Mr. Berris departing the company,
14    correct?
15      A    Yes.
16      Q    If you turn to the second page,
17    you will see Sammy forwarding, it looks
18    to be, another text.
19           This is at 5:18.
20           It says:
21           "According to Diana, under the
22        articles for the De Tomaso LLC
23        entity, no single director can
24        enter into binding contracts on
25        behalf of the company.
```



Page 300

```
 1                    D. Majcher
 2             "Having said that, the company
 3          made a payment of" -- and he goes
 4          on about that.
 5             Do you see that?
 6       A    Yes.
 7       Q    What is the company's
 8  understanding of why Mr. Lui is
 9  interpreting the LLC provisions relating
10  to Mr. Berris' employment when he has no
11  official position at the company?
12             MS. WIGGER:  I object to form.
13       A    I believe at the time, Mr. Lui
14  was communicating with Mr. Berris.
15       Q    At the time, De Tomaso would
16  agree that Mr. Lui appears to have been
17  communicating with Mr. Berris at the
18  direction of Mr. Choi, right?
19             MS. WIGGER:  I object to form.
20       A    De Tomaso does not have the
21  knowledge to say whose direction he's
22  under to speak, but he was speaking to
23  Mr. Berris.
24       Q    But Mr. Lui had no authority to
25  act on behalf of De Tomaso at this time,
```


MAGNA
LEGAL SERVICES

Page 301

```
 1                        D. Majcher
 2    right?
 3               MS. WIGGER:  I object to form.
 4        A     No.
 5        Q     And Mr. Lui was never --
 6    De Tomaso would never consider Mr. Lui to
 7    be its agent.
 8               Is that fair?
 9               MS. WIGGER:  I object to form.
10        A     That's fair.
11        Q     And if you look at the text
12    message below, Mr. Lui writes:
13               "Norman would like you to
14          draft a reply with the following
15          main points:
16               "State the fact that Norman is
17          the sole owner of De Tomaso, and
18          that he had no prior knowledge of
19          the final terms of this contract."
20               And you see there's a number of
21    other provisions after that.
22               Do you see that?
23        A     Yes.
24        Q     Does De Tomaso think it's
25    appropriate for someone who has no
```



Page 302

```
 1                    D. Majcher
 2    association with the company to be
 3    instructing one of De Tomaso's board
 4    members in this manner?
 5              MS. WIGGER:  I object to form.
 6         A    Again, I can't tell by this
 7    text message to see.
 8              This is the message that
 9    Mr. Lui sent to Mr. Choi.  So who is he
10    directing to -- who is he giving
11    direction to?  He's not giving direction
12    to Mr. Choi.
13         Q    No, he's giving the direction
14    to...
15              I can represent this is giving
16    direction to Mr. Berris, essentially.
17    This is a forwarding of a text that
18    Mr. Lui is sending to Mr. Berris.
19              MS. WIGGER:  I object to form
20         and foundation.
21         A    So, okay.
22              MR. ZACH:  One second.
23              Okay, I'll withdraw that.  I
24         misstated it.
25              For the record, I apologize.
```


MAGNA
LEGAL SERVICES

Page 303

                        D. Majcher
1
2    BY MR. ZACH:
3        Q      Does De Tomaso think it's
4    appropriate for Mr. Choi and Mr. Lui to
5    be discussing how to frame the
6    termination of Mr. Berris?
7                MS. WIGGER:  I object to form
8        and foundation.
9        A      How to frame the termination of
10   Mr. Berris?
11       Q      Or to establish terms to be
12   conveyed by Mr. Lui to Mr. Berris with
13   respect to his employment at De Tomaso?
14                MS. WIGGER:  Same objection.
15       A      Mr. Choi, being the ultimate
16   member of the company, has the authority
17   to remove directors at his wish.
18       Q      Why would the company -- why
19   would De Tomaso need to utilize Mr. Lui,
20   who is at the time working with the SPAC
21   that was about to acquire De Tomaso --
22   why was it necessary to have Mr. Lui
23   having these direct communications with
24   Mr. Berris?
25                MS. WIGGER:  I object to form



Page 304

1                        D. Majcher
2          and foundation.
3          A     De Tomaso was not utilizing
4     Mr. Lui to do what you just said.
5                Mr. Choi could have been
6     speaking to Mr. Lui, but De Tomaso did
7     not instruct Mr. Lui to do any of this.
8          Q     Would De Tomaso agree that, to
9     the extent that Mr. Choi was
10    communicating with his fellow board
11    member, Mr. Choi would have been doing
12    that in his capacity as shareholder,
13    director, board member of De Tomaso?
14                MS. WIGGER:  I object to form.
15         Legal conclusion.
16         A     Sorry, that was, again, very
17    long.
18         Q     That's fine.  I'll withdraw it.
19                We can put that aside.
20                After this litigation began,
21    what steps did De Tomaso bring...
22                Sorry, can we go back to that
23    document one more time?
24                I apologize.
25                If you go to 7355, you see at



Page 305

```
 1                    D. Majcher
 2     2044 --
 3         A     Yes.
 4         Q     -- Mr. Choi says:
 5               "Thinking of insisting on Ryan
 6           signing Mark's original
 7           resignation letter format."
 8               Do you see that?
 9         A     Yes.
10         Q     And then another message was
11     deleted.
12               Do you see that?
13         A     Yes.
14         Q     Does De Tomaso think it was
15     appropriate for Mr. Choi to be sharing
16     communications relating to how to frame
17     correspondence terminating Mr. Berris
18     with an agent of the SPAC that they were
19     about to do a transaction with?
20               MS. WIGGER:  I object to form
21           and foundation.
22         A     No.  Again, I don't think I'm
23     understanding the question.
24         Q     It's okay.  You can set it
25     aside.
```



Page 306

                          D. Majcher

1                         So after Mr. Berris gave notice

2    of his potential dispute and ultimate

3    litigation with De Tomaso, what steps did

4    the company take to preserve documents

5    that would be relevant to this lawsuit?

6         A     To the extent that counsel had

7    instructed us to do anything --

8         Q     Don't go into what --

9         A     I understand.

10                        We would have followed the

11   instructions.

12        Q     Without going into what your

13   attorneys told you to do, I'm just asking

14   what specific efforts were made to ensure

15   that, you know, electronic information

16   wasn't sort of lost or deleted?

17                        MS. WIGGER:  I object to form.

18        A     I mean, quite early on,

19   Mr. Choi and my devices were copied by a

20   vendor recommended by counsel at the

21   time.  And, in general, the records were

22   just kept.  I mean, nothing was touched,

23   so to speak.

24        Q     But in terms of conducting --



Page 307

                        D. Majcher
1
2    so this is a process that could -- what
3    you're saying is, like, having your phone
4    mirrored or copied sort of preserves the
5    information?
6        A    Yes.
7        Q    With respect to the stuff that
8    would -- information that would have been
9    sort of on the De Tomaso's computers,
10   like, you know, laptops, computers, paper
11   files, how was that collected?
12              MS. WIGGER:  I object to form.
13       A    How was that collected for the
14   discovery process?
15       Q    Yes, exactly.
16       A    Again, at the instruction of
17   counsel, they told us to...
18       Q    Did you personally sort of
19   collect documents?
20              MS. WIGGER:  I object to form.
21       A    Personally collect documents?
22       Q    Sorry, I'm getting tired so I'm
23   asking bad questions.
24              So you're based in Hong Kong,
25   right?



Page 308

```
 1                    D. Majcher
 2        A      Yes.
 3        Q      De Tomaso maintains an office
 4   in Hong Kong, correct?
 5        A      Yes.
 6        Q      I take it there are paper files
 7   in Hong Kong, right?
 8        A      There are some, yes.
 9        Q      Did you sort of search those
10   paper files in connection with this
11   litigation?
12             MS. WIGGER:  I object to form.
13        A      When the need arises, yes.
14        Q      In general, does De Tomaso have
15   any document preservation policies in
16   place in the ordinary course of its
17   business?
18             MS. WIGGER:  I object to form.
19        A      Nothing written.
20        Q      Is there any informal policies
21   that are shared amongst your colleagues
22   at De Tomaso --
23             MS. WIGGER:  I object to form.
24        Q      -- on how to preserve
25   information in the ordinary course?
```



Page 309

                         D. Majcher
1
2              MS. WIGGER:  Sorry, I was
3         early.
4              I object to form.
5         A     No.
6         Q     So after Mr. Berris departed
7    the company, there were a series of --
8    did De Tomaso make communications to
9    dealer partners relating to his
10   departure?
11        A     Not specifically, but we sent
12   out an email telling everybody that
13   Mr. Berris left.
14             MR. ZACH:  I'm going to mark as
15        DT 41 and 42...
16             (DT's Exhibit 41, Document, was
17        marked for identification, as of this
18        date.)
19             MS. WIGGER:  I assume 42 is the
20        attachment.
21             (DT's Exhibit 42, Newsletter,
22        was marked for identification, as of
23        this date.)
24             MR. ZACH:  It is the
25        attachment, and we confirmed that it



Page 310

```
 1                    D. Majcher
 2          is.  I think there was some debate
 3          last time.
 4     BY MR. ZACH:
 5          Q     So if we look at what is 41,
 6       this is from Evan Cygler at Miller
 7       Motorcars, right?
 8          A     Yes.
 9          Q     And the attachment, which is
10       42, is a -- it looks like a letter or a
11       pamphlet, or what have you.
12                It's got some pictures and
13       writing, right?
14          A     Newsletter.
15          Q     This newsletter would be
16       prepared by De Tomaso, right?
17          A     Yes.
18          Q     Who at De Tomaso prepared this
19       newsletter?
20          A     It would be Jake Hamilton.
21          Q     And you see at the last page
22       that there is reference made to
23       Mr. Berris?
24          A     Yes.
25          Q     So who does this newsletter go
```



Page 311

1                        D. Majcher

2    out to?

3            MS. WIGGER:  I object to form.

4        A      It would go out to our

5    custodians and dealers.

6        Q      When you say "custodians," are

7    those folks that have purchased cars?

8        A      Customers.

9        Q      The dealers would be the

10   various dealers that you had mentioned

11   earlier in your deposition today?

12       A      Yes.

13       Q      Was it De Tomaso's

14   understanding that the dealers may

15   further disseminate them to customers or

16   potential customers?

17       A      Yes.

18       Q      You can set that aside.

19            MR. ZACH:  I'm marking 43,

20       DT 43.

21            (DT's Exhibit 43, Email, was

22       marked for identification, as of this

23       date.)

24   BY MR. ZACH:

25       Q      This is an email sent by



Page 312

```
 1                    D. Majcher
 2    Mr. Choi.
 3            It says:
 4            "Dear Colleagues:  This email
 5        constitutes formal notice of Ryan
 6        Berris' immediate suspension from
 7        all current activities in the
 8        company and the group due to
 9        misconduct."
10            Do you see that?
11    A      Yes.
12    Q      What does "the group" refer to?
13    A      The De Tomaso Group.
14    Q      So is it De Tomaso's
15    understanding that this email was
16    distributed to -- what is De Tomaso's
17    understanding of who this email was
18    distributed to?
19    A      To the then-current employees
20    or people working for De Tomaso, the
21    consultants.
22    Q      So that would include technical
23    partners, consultants, and the like,
24    right?
25            MS. WIGGER:  I object to form.
```



Page 313

1                          D. Majcher

2         A     I don't think so.  I think it's

3     just for the contractors who were working

4     with us.

5         Q     So people like yourself who may

6     not be sort of a technical employee but

7     have some sort of agreement?

8         A     Yes.

9         Q     I'd like to show you 44.

10              This is an email from -- you're

11    on it.  It's an email chain, but what I

12    really want to focus on is on page 226.

13              Do you see that?

14        A     Yes.

15              (DT's Exhibit 44, Email, was

16        marked for identification, as of this

17        date.)

18    BY MR. ZACH:

19        Q     The email that starts at the

20    beginning of the page, middle of the

21    page, says, "Hi, Frank," and goes on from

22    there.

23              Do you see that?

24        A     Yes.

25        Q     It says, "Best Regards, Diana,"



Page 314

```
 1                    D. Majcher
 2    at the end?
 3         A     At the very end, yes.
 4         Q     Did you draft this email?
 5         A     Yes.
 6         Q     This includes a series of
 7    assertions about Mr. Berris, right?
 8               MS. WIGGER:  I object to form.
 9         A     Assertions?
10               These are --
11         Q     I'll say this:  Statements
12    about Mr. Berris, right?
13         A     Sure, yes.
14         Q     And this was then forwarded,
15    ultimately, to an individual named
16    Stanley Cohen.
17               Do you see that?
18         A     Yes.
19         Q     Who else did De Tomaso share
20    this information with?
21               MS. WIGGER:  I object to form.
22         A     Counsel.  This email was
23    originally sent to counsel.
24         Q     And then counsel forwarded --
25    then Mr. Choi forwarded it to Mr. Cohen,
```



Page 315

```
 1                    D. Majcher
 2    right?
 3         A     Yes.
 4         Q     At the time of Mr. Berris'
 5    departure, did De Tomaso call any of its
 6    customers to inform them of his
 7    departure?
 8         A     Did De Tomaso call?  I believe
 9    Mr. Choi may have called a couple of the
10    closer -- Mr. Choi may have called some
11    customers who Mr. Berris had a
12    relationship with.
13         Q     What is De Tomaso's
14    recollection of who those customers were?
15         A     Like physically call or...?
16         Q     No, the individuals.
17               MS. WIGGER:  I object to form.
18         A     Sorry, the individuals who were
19    called or just like notified?
20         Q     Called by Mr. Choi.
21         A     By phone call?
22         Q     Yes.
23         A     To the best of De Tomaso's
24    knowledge, it would be Mr. Barry
25    Skolnick.
```



Page 316

1                          D. Majcher

2        Q     At various events that

3    De Tomaso attended, like car shows and

4    the like, did it have discussions with

5    customers and others at those locations

6    discussing Mr. Berris' departure?

7                    MS. WIGGER:  I object to form.

8        A     I believe we would have told

9    people that Mr. Berris was no longer with

10   the company.

11       Q     When the company -- when

12   De Tomaso told customers and technical

13   partners that Mr. Berris was no longer

14   with the company, isn't it a fact that

15   De Tomaso advised them that he was

16   dismissed for misconduct?

17                    MS. WIGGER:  I object to form.

18       A     No, I don't believe so.

19       Q     So no employees of De Tomaso,

20   to your recollection, told customers,

21   clients, or technical partners that

22   Mr. Berris departed because of his

23   misconduct?

24                    MS. WIGGER:  I object to form.

25       A     Okay.  I mean, I think in our



Page 317

```
 1                    D. Majcher
 2    responses to the interrogatories, we had
 3    mentioned the names of certain
 4    individuals outside of the company who we
 5    discussed Mr. Berris' misconducts with,
 6    yes.
 7         Q    So you're referring to whatever
 8    responses you supplied to your attorney?
 9         A    Yes.
10              MR. ZACH:  One second.
11              THE VIDEOGRAPHER:  The time is
12         4:41 p.m.
13              We're off the record.
14              (Recess taken from 4:41 p.m. to
15         4:42 p.m.)
16              THE VIDEOGRAPHER:  The time is
17         4:42 p.m.
18              We are back on the record.
19              MR. ZACH:  Thank you,
20         Ms. Majcher.
21              No further questions.
22              Save travels.
23              MS. WIGGER:  We have no
24         questions for Ms. Majcher either.
25              Thank you.
```



Page 318

```
 1                    D. Majcher
 2            THE VIDEOGRAPHER:  The time
 3      right now is 4:42 p.m.
 4            We're off the record.
 5            (The Deposition Concluded at
 6      4:42 p.m.)
 7            (The Exhibits were retained by
 8      the Court Reporter.)
 9                    oOo
10
11
12
13
14
15
16
17
18                      _____
19                      DIANA MAJCHER
20
21      Subscribed and sworn to before me
22      this    day of            2024.
23
24      _____
25
```



Page 319

```
 1                      D. Majcher

 2                   CERTIFICATE

 3    STATE OF NEW YORK  )

                        :  ss

 4    COUNTY OF NEW YORK )

 5

 6            I, THOMAS A. FERNICOLA, a Registered

 7    Professional Reporter and Notary Public within and for

 8    the State of New York, do hereby certify:

 9            That DIANA MAJCHER, the witness whose

10    deposition is herein before set forth, was duly sworn by

11    me, and that such deposition is a true record of the

12    testimony given by such witness on September 18, 2024.

13            I further certify that I am not related to any

14    of the parties to this action by blood or marriage, and

15    that I am in no way interested in the outcome of this

16    matter.

17            IN WITNESS WHEREOF, I have hereunto set my

18    hand this 19th day of September 2024.

19

20

21              THOMAS A. FERNICOLA
                _____

22                THOMAS A. FERNICOLA, RPR

23

24

25
```



Page 320

```
 1                      D. Majcher

 2                 INDEX OF EXAMINATION

 3   WITNESS:  DIANA MAJCHER                    PAGE

 4   By Mr. Zach                                   6

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 321

```
 1                        D. Majcher
 2              INDEX TO EXHIBITS
 3   DT'S          DESCRIPTION                        PAGE
 4   Exhibit 1 Copy of 30(b)(6) Notice                  6
 5   Exhibit 2 Document dated from August 31, 2017      12
 6   Exhibit 3 Email dated September 15, 2015           14
 7   Exhibit 4 Screenshot of an email dated             17
                   September 13, 2017
 8
     Exhibit 5 Operating Agreement                      23
 9
     Exhibit 6 Independent Contractor Agreement         40
10                   entered into on April 2022
11   Exhibit 7 Agreement between De Tomaso and R27      47
                   LTD
12
     Exhibit 8 General Journal from January 1, 2022,    57
13                   to December 31, 2022
14   Exhibit 9 Journal Entries                          58
15   Exhibit 10 Journal Entries                         58
16   Exhibit 11 Journal Entries                         59
17   Exhibit 12 Document entitled Index to              81
                   Consolidated Financial Statements
18
     Exhibit 13 Journal entry for the BVI entity        95
19
     Exhibit 14 Two-page Document                       102
20
     Exhibit 15 Invoice                                 111
21
     Exhibit 16 Article                                 114
22
     Exhibit 17 General Ledger Entries                  121
23
     Exhibit 18 Email from Ms. Majcher to Moritz Ley    126
24
25
```



Page 322

1                          D. Majcher
2                   INDEX TO EXHIBITS (Cont'd)
3      DT'S         DESCRIPTION                              PAGE

4      Exhibit 19 Email from Stephan Berger to De            130
                  Tomaso, July of 2023
5
       Exhibit 20 Email dated March 11, 2022                 132
6
       Exhibit 21 Document, Bates No. DT165332               141
7
       Exhibit 22 Spreadsheet, Bates No. DT 159753           144
8
       Exhibit 23 Consolidated Financial Statements for      150
9                 BVI Year Ending December 31, 2020
10     Exhibit 24 Consolidated Financial Statements for      150
                  De Tomaso Automobile Holdings NA,
11                LLC, for 2020 and 2021
12     Exhibit 25 Report Prepared by GCA Professional         181
                  Service Limited
13
       Exhibit 26 Report Prepared by GCA Professional         181
14                Service Limited
15     Exhibit 27 Report Prepared by the Ark Group            189
16     Exhibit 28 Report                                      195
17     Exhibit 29 Letter                                      200
18     Exhibit 30 Agreement                                   203
19     Exhibit 31 Agreement between De Tomaso, FTAG,          203
                  and Mr. Choi
20
       Exhibit 32 Deed of settlement dated August 31,        210
21                2023
22     Exhibit 33 Document Entitled Titled Management         217
                  Responses on the Operation of the
23                Business
24     Exhibit 34 Documents dated March 17, 2023             236
25



Page 323

1                          D. Majcher

2                   INDEX TO EXHIBITS (Cont'd)

3    DT'S           DESCRIPTION                        PAGE

4    Exhibit 35 Document dated June 13, 2023           245

5    Exhibit 36 Document                               252

6    Exhibit 37 Answers to First Amended Complaint     254
               and Counterclaims
7

     Exhibit 38 Email                                  284
8

     Exhibit 39 Email                                  284
9

     Exhibit 40 Text Messages                          298
10

     Exhibit 41 Document                               309
11

     Exhibit 42 Newsletter                             309
12

     Exhibit 43 Email                                  311
13

     Exhibit 44 Email                                  313

14

15

16

17

18

19

20

21

22

23

24

25



Page 324

```
 1                      D. Majcher

 2                    ERRATA SHEET

 3   Case Name:

 4   Deposition Date:

 5   Deponent:

 6   Page Line   Now Reads        Should Read      Reason

 7   ____ ____  _____  _____  _____

 8   ____ ____  _____  _____  _____

 9   ____ ____  _____  _____  _____

10   ____ ____  _____  _____  _____

11   ____ ____  _____  _____  _____

12   ____ ____  _____  _____  _____

13   ____ ____  _____  _____  _____

14   ____ ____  _____  _____  _____

15   ____ ____  _____  _____  _____

16   ____ ____  _____  _____  _____

17   ____ ____  _____  _____  _____

18   ____ ____  _____  _____  _____

19   ____ ____  _____  _____  _____

20

21                                 _____

22                                 Signature of Deponent

23   SUBSCRIBED AND SWORN TO BEFORE ME

24   THIS _____ DAY OF _____, 2024.

25   (Notary Public) MY COMMISSION EXPIRES:_____
```



# Magna
## Key Contacts

### Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

### Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

### General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

### Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

### Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

### Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

### National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

### Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

### Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

| A |
| --- |

**A-U**
58:10
**a.m**
2:6 5:8 34:22,24 35:3
  52:5,7,8,10
**A/C**
146:20
**Abby**
114:9
**ability**
239:25 240:10
**able**
29:16 54:5 229:16
  242:10,13 261:4
  277:3
**absent**
44:22 49:20
**absolutely**
275:7
**accept**
8:17
**access**
112:21,22 113:2
**accomplish**
251:13
**account**
64:19,21 90:18 91:9
  91:15,22 92:14,22
  98:25 99:4,8 110:13
  110:14,15 229:8
  256:21,22 259:11
  259:13,22,23
**accountable**
238:21
**accountants**
81:21 85:9 100:20
  151:14,24
**accounting**
36:14 38:4 57:22
  59:18,20 60:8,9
  64:16 99:12
**accounts**
90:20,22,24 91:6,14
  97:12

**accrual**
124:21
**Accrue**
123:20
**accrued**
123:18,25 177:3
  178:10 179:12
**accuracy**
86:7 141:24
**accurate**
10:5 47:22 157:22
  182:17 187:13,15
  188:24 199:11
  283:11
**accurately**
157:16 158:2
**accusations**
32:13
**achieve**
229:21
**acquire**
303:21
**acquired**
9:16 10:16,19,23
  11:3,10 16:17 87:3
**acquiring**
12:5
**acquisition**
9:7 10:6 12:16 15:4,7
**acronym**
247:24
**act**
30:18 31:5,10,15
  32:4 300:25
**action**
241:23 319:14
**active**
142:25 153:21
**activities**
312:7
**actual**
60:21 65:2 137:9
  162:8 184:22
  231:25 247:23
  267:23 283:16
**ad**

270:12
**add-on**
281:19
**add-ons**
281:13
**added**
28:2,24 80:22,23
**adding**
124:16
**addition**
28:17 243:22
**address**
6:7 139:5
**adequate**
36:25
**adheres**
241:21
**adopt**
267:14
**advance**
103:3,6 233:25
  256:12
**advances**
103:10
**advantage**
168:3
**advantages**
54:13,17
**adverse**
251:16
**advertising**
238:7
**advice**
135:14 136:3,6
  137:25 138:7,8,9
  168:5,9 190:15
**advisable**
30:4
**advise**
76:9 137:11 221:4
**advised**
316:15
**advisor**
190:7,10,11
**advisors**
81:22 278:20

**advisory**
190:2
**affairs**
27:18
**affordable**
294:19
**agent**
119:16,20,24 297:11
  298:7 301:7 305:18
**agents**
260:22
**ages**
240:24
**agree**
33:25 46:12 49:11
  54:11 55:24 62:9
  89:15 97:20 107:6,7
  125:4,13,21 127:19
  127:22,24 142:6
  143:19 157:23
  160:18 161:22
  173:3 184:15 185:3
  186:23 222:22
  233:23 234:4,13,20
  235:3,21 236:5,11
  239:9 242:3 244:7
  244:14,22 250:23
  251:6,7 286:12
  287:22 300:16
  304:8
**agreed**
27:14 71:17 201:3
  224:2
**agreeing**
50:15
**agreement**
23:20 24:6 25:13,17
  26:12 27:7,22 28:20
  29:14 32:7 33:13
  35:11 40:3,11,25
  41:14,15,25 42:2,3
  42:11,12,20 43:5,22
  44:16 46:19 47:2,10
  47:12 48:20,24 49:4
  49:21 50:2 52:14
  67:3 86:24 87:18



99:5 103:15 104:16
104:19 105:5,8,12
106:3 127:6,11
129:7,9 175:25
197:21 200:14
201:20 203:11,17
204:4 205:13
206:20 209:11,12
212:10 215:11
219:3 226:2,6 243:8
277:23 313:7 321:8
321:9,11 322:18,19
**agreements**
103:19 105:13,17
174:19,20 175:3
178:24
**ahead**
153:9,25 256:14
**airfare**
258:14
**al**
5:13
**ALEXANDRA**
3:18
**align**
247:15
**allegation**
261:25
**allegations**
77:13 255:2 263:3
**alleged**
255:6 264:2
**alleviate**
54:19
**allow**
15:10
**allowed**
145:7
**Altus**
195:15,18 196:6,23
197:10,15 198:21
289:19 290:25
**ambiguity**
54:20
**amended**
254:14,17 323:6

**amendments**
25:16,19,25
**America**
19:20 95:4
**amount**
11:2 80:2 98:19
103:16 123:24
124:17 142:21
210:25 214:5
253:18,19 262:22
280:20
**amounts**
46:20 65:2 109:18
210:19 212:17
**analysis**
194:23
**annual**
35:13,17
**annum**
179:16
**answer**
15:17 32:9 71:3 73:5
78:22 79:2 105:19
143:15 177:20
199:14,15 200:4
219:15 224:13,18
224:23 230:5
254:13 274:18
**answered**
93:23 171:12 276:13
**answering**
79:7
**answers**
222:24 254:16
269:11 323:6
**anticipate**
206:14 217:18 291:7
**anticipating**
206:18 222:25
**anticipation**
214:10
**anymore**
69:21 216:21 245:20
**anyways**
117:5
**apartments**

120:14
**Apollo**
16:19,20 180:2,6,19
208:12 211:24
**apologize**
34:18 157:10 302:25
304:24
**appeal**
268:16
**appear**
142:7 184:16
**appeared**
188:24
**appears**
18:8 109:11 145:22
300:16
**appointed**
28:11
**approach**
188:2,13,16 239:15
273:8
**appropriate**
30:4 36:25 56:10
75:20 260:25
261:14 301:25
303:4 305:15
**appropriately**
176:6
**approval**
45:21 46:17,22
**approve**
31:22 34:14
**approved**
45:12 46:14
**approving**
50:10
**approximately**
143:20 156:24
208:23
**April**
40:4,12,14 44:10
45:17 48:20 50:5,8
61:21 63:15,21
146:7 148:7,11
299:8 321:10
**area**

39:15
**arises**
136:13 308:13
**Ark**
189:19,22,24 190:4,9
190:14 192:11
193:4,15 194:6
322:15
**arrangement**
136:10 214:6
**arrangements**
39:16 77:18
**arrive**
105:24
**article**
114:20 115:2 321:21
**articles**
24:25 299:22
**Asia**
266:24 267:5,6,7
**aside**
7:25 13:25 17:14
23:12 39:9 45:19
50:20 67:20 87:20
95:12 124:24
129:17 132:16
141:9 144:4 149:21
157:3 180:23 195:3
216:15 225:9
229:11 232:16
251:24 264:14
270:12 272:16
279:24 289:18
292:24 304:19
305:25 311:18
**asked**
7:12 77:17 93:23
108:24 157:10
171:12 224:15
260:9 276:13 280:3
**asking**
10:15 68:25 72:8,11
72:21 73:20 74:4
155:10 170:4
216:20 233:7 256:3
256:6 263:23 278:8



306:14 307:23
**aspects**
138:19 234:16
**assert**
73:5
**asserting**
32:23
**assertions**
314:7,9
**assessment**
244:15,23 291:6
**asset**
188:10 195:25,25
**asset-light**
267:15
**assets**
9:8 10:23 11:3,11
   13:23 17:11 74:13
   76:7 178:23 182:24
   182:25 188:17
   211:25
**assist**
125:7,16,24 126:2,3
   135:21 136:25
   282:18
**assisted**
196:23
**assisting**
127:15
**associated**
8:4 48:7 63:12
   170:24 293:2
**association**
19:12,15 25:2 302:2
**assume**
90:8 118:22 309:19
**Assumes**
289:8
**assumptions**
199:3 250:18 290:17
**attached**
7:9 145:14,25 218:6
**attaches**
285:14
**attachment**
218:16 253:25

284:12,22 285:2,8
   309:20,25 310:9
**attachments**
285:15
**attempted**
261:7
**attend**
113:20
**attended**
113:18 316:3
**attorney**
317:8
**attorneys**
3:5,14 306:14
**Au**
58:10
**auction**
10:24
**audit**
70:11,12 260:18
**audited**
282:2
**auditor**
82:10
**auditors**
81:23 258:19,22
   259:2 260:15,22
**August**
12:23 13:8 82:6
   199:12 210:5,10
   219:4 290:2 291:23
   321:5 322:20
**authorities**
99:18 100:21
**authority**
31:15 32:15 33:8,11
   33:11,15 300:24
   303:16
**authorization**
50:15
**authorize**
45:22 46:19
**authorized**
114:15
**automaker**
134:11

**automatically**
206:8
**automobile**
87:23 134:5 150:11
   152:11 322:10
**automobiles**
209:2 238:3 240:11
   241:10
**Automobili**
1:7 61:12 158:23
   252:14
**automotive**
16:14
**automotives**
211:5
**available**
215:5 292:7
**avenue**
190:21
**avenues**
190:19 191:9
**average**
280:17 281:3
**averaged**
280:23
**averages**
281:7
**avoid**
169:23
**aware**
19:11 25:16 36:8
   45:21,24 46:2,10
   50:9,14 100:11
   106:14 107:12
   128:4 260:7 296:2

---

## B

**B**
30:14 50:6
**back**
10:18,25 15:13 19:20
   23:17 26:7,8 35:4,9
   52:11,13 73:6 87:3
   96:2 108:13,15
   110:18 111:20
   121:7,8,22 123:4,5

131:19 143:6
149:22 154:11
157:4 172:11
174:10 176:2 179:6
199:14 207:24
209:24 239:12
248:11 270:8,11
271:25 281:25
283:25 284:10
289:19,23 290:7
291:11 304:22
317:18
**back-and-forth**
175:20 222:9
**background**
8:12,18 14:22 135:4
**backwards**
290:22
**bad**
24:21 129:19 192:3
   221:21 235:5
   239:24 240:9,18
   243:4 307:23
**balance**
21:21 76:21 122:22
   214:13 239:23
   240:8,16 252:15
**balanced**
239:15
**ballpark**
276:11 293:13
**bank**
64:19 65:3 90:18,20
   90:21,23 91:6,9,15
   91:21 92:14,22
   97:12 99:8 106:19
   107:20 110:13
**banking**
195:25
**bankruptcy**
43:13
**banks**
108:3,6,10 278:23
**Barry**
315:24
**base**



172:14 226:8,11,24
281:5,14
**based**
76:3 89:6 92:14
94:16 128:15 182:8
188:2 189:2 196:2
307:24
**basically**
10:15 39:12 83:13
116:14 129:14
143:17 163:10
**basis**
58:6 68:5 70:13 73:7
73:13 168:9 169:22
171:8 173:10
**Bates**
141:12,15 144:11,13
144:17 145:5 206:2
252:10 322:6,7
**Bay**
144:24
**bear**
179:15
**becoming**
273:8
**began**
50:23 304:20
**beginning**
44:10 50:5 228:19
278:10 313:20
**begun**
277:22
**behalf**
34:5 93:2 98:16
109:13,14 177:13
296:24 299:25
300:25
**believe**
55:17 112:2 124:9
128:15 140:12
141:22 143:9,11
144:20 148:24
158:5 169:11 175:4
176:3,8 186:5
187:14,22 194:7
195:21 199:10

205:19 213:22
221:2,16 222:17
223:10,20 246:18
252:23 259:15
260:20 262:20
263:6,21,24 269:15
277:23 278:10
282:4 295:25
300:13 315:8 316:8
316:18
**believed**
176:5
**believes**
139:23 257:2
**benchmarking**
192:20
**beneficial**
11:23 172:13
**benefit**
168:13 293:25
295:13
**Berger**
114:4 130:10,17
145:23 322:4
**Berger's**
130:25
**Berris**
1:4 3:24 5:12 13:4,16
14:13 16:12 25:15
25:21,24 26:11,17
27:3,24 28:5,18,23
29:4 30:11,23 31:9
32:2,15,23 33:7,22
34:13 40:18 45:22
45:25 46:3,7,10,18
46:23 50:15 52:21
56:3,13 85:6 112:8
112:9,11 120:11
125:5,14,19,22
127:25 128:22
135:21 171:15
194:7 254:22 255:3
255:19 256:9,25
257:2 259:4 260:7
261:20 262:5 274:2
275:15,23 299:13

300:14,17,23
302:16,18 303:6,10
303:12,24 305:17
306:2 309:6,13
310:23 314:7,12
315:11 316:9,13,22
**Berris'**
40:15 207:21 251:22
260:5 274:10 276:5
278:15 298:5
300:10 312:6 315:4
316:6 317:5
**best**
20:16 21:12 86:7
94:25 202:6 233:8
262:11 278:2 291:5
299:5,6 313:25
315:23
**bet**
197:6
**better**
20:3 48:4 268:25
286:19 294:18
**BI**
266:18
**big**
289:20
**bill**
232:19 233:2,19
**billion**
193:7 194:16,17
219:23 221:18
287:25 288:19
289:10
**bills**
232:5 233:8,11,15
**bind**
31:15,21 33:8,12
49:22
**binding**
299:24
**binds**
44:25 45:5
**bit**
23:18 64:3 90:9
96:21 133:22 146:9

154:7 176:14
178:16 181:21
202:13,14 281:24
**blood**
319:14
**board**
25:6,7,11 26:17
27:14,15 28:2,5,11
28:18 29:15,24
30:10 31:17,21,25
32:6,25 33:23 34:6
34:13 35:10,18,21
35:24,25 36:4,6,9
36:12 40:19 45:11
46:11,13,18 50:10
52:16 53:2 175:17
219:20 255:20
302:3 304:10,13
**Boies**
2:10 3:4
**boil**
202:13
**book**
86:21 87:4
**booked**
109:9
**bookkeeper**
58:8,9 261:10
**bookkeeping**
57:21
**books**
36:18,22 37:13,23
38:2,20 45:10 60:11
72:23 80:4 86:8
100:7 101:2 124:21
215:15 216:8
276:24 282:8,11
**borrow**
106:19,22
**borrower**
106:11,13
**borrowing**
106:9
**bottom**
18:4 61:19 63:7 65:7
66:18 142:14 206:4



238:10
**bound**
32:24
**box**
223:7 242:2
**boxes**
288:4
**bracket**
184:13
**brand**
9:7 10:8,22 20:6
271:13,16,21,23
272:5
**brand-wise**
270:15
**branding**
238:7
**brands**
16:18 270:2 279:5,13
**breach**
43:4 255:7
**breached**
255:3,20
**break**
34:19 37:10 51:20,25
88:17 120:18
133:21 209:14,15
209:25 211:20
226:18 265:5
271:11 283:20
**breakouts**
116:25
**briefly**
49:10 122:9 149:22
183:8 251:25
**bring**
240:2,12 241:8
270:10 304:21
**bringing**
256:25
**British**
44:18 45:2 49:17,23
64:11,18 65:15,16
131:12
**broad**
126:6

**broadly**
283:7
**broken**
177:21
**broker**
97:5 297:3,9
**brought**
135:21 136:23
**Bugatti**
269:5,7,10,12 270:2
270:6
**build**
22:2 244:11 295:8
**building**
248:4
**built**
138:24 211:5
**business**
16:15 27:18 29:25
30:6 37:2 54:20,25
55:11,25 56:15
57:17 89:17 93:9,15
93:20 106:16 112:3
113:4,6 116:2,6,14
116:17,19 117:4,8
117:12 126:9 149:4
182:11 213:8 217:4
217:11 224:19
229:17 239:16
240:3,13,15,17
245:6 260:25
261:15 264:3,25
267:13,22 268:7
272:15 273:4,6
279:25 281:18
282:18 283:17
294:11,14 308:17
322:23
**BUSTAMANTE**
3:18 218:11,15,19
284:25
**buttons**
146:21
**buy**
212:12
**buying**

111:23
**BVI**
11:22,25 87:24 88:2
88:20,23 90:14
92:21 93:3,3,10
95:16,20 103:23
110:9 150:3 152:7
153:6,25 156:9,16
158:13,22 159:8
160:9,17 162:17,20
162:23 163:18,24
164:3 165:8,10,12
321:18 322:9

---

**C**

**C**
3:2 31:2
**cabinet**
37:16
**CAD**
48:14,17
**calculate**
186:24 274:20
**calibration**
247:18 249:10
**call**
65:13 98:24 137:18
185:17 265:20
267:14 278:19
315:5,8,15,21
**called**
6:3 11:12,20 36:18
47:13 188:12,15
293:3 315:9,10,19
315:20
**calm**
239:18
**campaign**
271:3
**campaigns**
270:13 271:2
**canceled**
80:21
**candid**
242:23
**capacity**

8:8 62:19 103:21
304:12
**capital**
1:8 38:11 169:23
171:2,9 172:13,21
172:24 173:12
191:10 213:7 277:4
278:15
**Capricorn**
90:11 126:20 127:4
128:6,17 129:12,12
129:14,20,23 132:2
136:17,23 137:8,16
138:4,18,23 139:2
139:11,15,23 140:6
140:20 141:4,21
142:9,22,25 143:6
143:12,21,22,24
147:11 243:8,12
251:4,14
**Capricorn's**
128:16
**car**
111:4,23,25 112:4,10
112:12,16 113:2
127:20 134:2,11,13
137:10,12,19,25
138:2,11,20 225:24
226:17,22,25
228:12 229:13
234:2,7,16 239:25
248:17,25 265:25
267:10,24 268:4
272:25 281:20
294:12 295:9
296:17,19 316:3
**car/EPA**
248:7
**card**
208:25 210:25 211:3
212:11 213:2,14,25
214:16,16 216:11
**careful**
169:13 239:11
**Carmen**
33:21 256:18 263:18



270:13
**carry**
30:5,23 214:12
**cars**
21:11,14 22:2 41:24
  89:14,16,23 135:6
  135:16 137:2
  138:23 212:13
  214:17 219:25
  221:15,23,25
  224:20 227:3
  229:22 234:23
  235:8,25 236:7,14
  244:11 248:5
  249:20 251:10
  265:2,19 266:2
  268:8,23 271:4
  273:16,18 280:18
  281:2 294:3 311:7
**case**
1:5 32:14 50:21
  52:14 53:6,12,14
  83:25 91:25 217:15
  217:17 239:21
  265:6 281:17 324:3
**cash**
60:21 90:17 92:17
  214:14,20 282:15
  290:16 292:21
**categorize**
241:13
**category**
258:11
**caused**
262:5
**caveat**
142:3
**Cayman**
94:19 166:19
**cc'd**
16:12
**ceased**
136:6 278:6
**centralized**
37:6
**cents**

142:18,19
**CEO**
16:5 26:14,20 28:17
  131:3 170:6
**certain**
7:22 32:16 33:8
  54:19 116:23,24
  182:24 183:14
  202:19 211:11
  242:8 246:25
  260:12 278:22
  317:3
**certainly**
268:25
**CERTIFICATE**
319:2
**certifications**
248:7,25
**certify**
319:8,13
**chain**
218:14,18,19 313:11
**challenges**
271:10,22 279:17
**Chan**
110:3,5
**chances**
242:17
**change**
8:16 13:20 17:9 23:7
  151:14 154:25
  155:23 157:17
  237:17 273:17
**changed**
151:24 154:14,18,21
  161:2,6 226:2
  275:14 283:18
**changes**
26:25 155:4 157:17
  161:9 243:9,15
**changing**
275:18
**characterize**
274:13
**charge**
240:23

**charged**
56:9
**chat**
13:7 131:9 236:24
  238:11
**cheap**
294:19
**cheaper**
273:18
**check**
178:10
**checked**
105:20
**chief**
41:23 48:14
**Choi**
1:7,7 3:25 5:12 7:22
  8:2 9:8,16 10:16,23
  11:3 12:3,6,12,14
  12:17 13:4,12,21
  14:13,17 16:2,4,11
  16:12,24 17:10,12
  18:20 19:17,22,22
  20:3,19 23:9 25:14
  28:6 29:4 30:11,22
  31:8 32:2,4 34:3,12
  40:19 41:10,17
  46:23 53:21 56:2,13
  79:14 97:13 98:7,20
  99:6,15,25 100:8,16
  100:19 101:3,8
  102:22 103:20
  104:11,17,23 105:6
  105:11,24 107:2,8
  107:11 108:7
  109:10,13,15,16,19
  109:22 112:7,23
  113:2,5 114:13,18
  119:5 120:9,11
  123:15 124:22
  126:22 158:15,21
  164:17,18 165:19
  167:12 169:8 171:9
  172:10,13,25 176:8
  177:13 178:6,8,11
  178:13,24 179:5,13

179:21 187:2
  203:19 204:5 205:5
  207:23 208:9,22
  211:6,15 212:7,12
  212:18,23 213:5
  214:3,7,8 215:7,15
  216:9 229:25
  230:10,13 231:4
  236:25 238:12
  240:22 242:22
  243:2,20 272:6,18
  275:25 276:4 277:5
  277:11,18 282:12
  282:17 295:22
  296:2,13,18,25
  297:19 299:8
  300:18 302:9,12
  303:4,15 304:5,9,11
  305:4,15 306:20
  312:2 314:25 315:9
  315:10,20 322:19
**Choi's**
9:16 14:21 19:4 54:2
  96:22 97:21 98:3,14
  99:17,23 104:5
  110:15 113:10
  119:22 168:19,22
  173:11 180:3 187:8
  187:24 214:25
  275:2 297:15
**choice**
71:5
**choose**
46:8
**chronological**
56:23
**chunk**
215:6
**circulated**
288:15,22
**claim**
257:5 263:2
**claiming**
143:5 255:8
**claims**
143:8 254:22 256:25



clarified
68:6
clarify
297:8
class
163:24 215:20
classes
159:14 215:23
clause
29:21
clear
65:11 76:17 83:24
84:22,25 97:18
120:4 151:8 177:22
185:11 225:3 242:5
290:24
clearly
238:16
clients
238:17 316:21
Clooney's
115:10
close
209:16 299:12
closed
206:25 207:2
closely
232:13
closer
269:9 315:10
closest
232:18
coffee
117:3
Cohen
314:16,25
collaborations
279:4,12
colleague
68:10,24 71:11 74:17
colleagues
114:12 264:11
308:21 312:4
collect
240:25 307:19,21
collected

307:11,13
colors
145:2,3
column
291:18
come
33:12 51:20 73:6
74:19,23 90:2 91:20
94:14 162:20
175:16 188:5
239:12 261:4
271:23,25 283:25
comes
90:10 101:13 201:19
227:14 238:13
comfortable
140:11
coming
46:11 60:16,16 71:15
103:24 104:2,7,13
104:18 105:2 138:2
138:3 230:9 231:5
278:25 285:22
commences
45:16
commercial
294:21
commercially
175:6
commission
182:13 324:25
commitments
33:9 132:3 212:6
258:7
common
167:6,8,13 186:25
187:8,24 202:3,20
204:25 205:4
206:10 214:25
215:24 216:4
commonly
170:24
communicate
238:16 243:14
communicated
224:25

communicating
300:14,17 304:10
communication
224:2 242:4
communications
303:23 305:16 309:8
Como
115:11,14
companies
54:12 80:19 107:13
152:5 162:10 164:4
165:2 192:21
270:16 294:20
company
10:7,12,18 11:14,20
11:22 15:24 16:5
19:12 22:24 23:10
24:7 25:25 26:21
27:3,12,13,18,25
28:23 30:2,7 31:16
31:21 32:24 33:8,12
35:21 36:22 37:8,24
38:14,21,23 40:15
40:20,23 43:7 44:17
45:5 50:16 55:7,9
56:7,9,10 60:15
61:5 62:6 67:16,17
67:19 68:3,4,16
69:15 70:2,9 72:10
72:20,22 74:2,14,21
76:11 77:22 78:18
79:13,17 80:3 81:22
82:17 88:14 89:18
89:25 90:13 92:25
93:3,3,14 94:4,7,9
94:12 95:5 98:4,8
99:8,13,20,22,24
100:9,11,14,18,23
101:9 104:6,13
105:5,23 106:4,6,8
106:8,11,18 107:3,7
107:12,19 108:8
109:3,17,20,23
111:3,23 112:15,23
113:11,15,17
118:25 119:8,12,13

120:10,13 122:16
123:16 128:23
132:4 142:24 152:7
154:3,6 156:8,9,12
156:21,23 159:17
159:21 160:3,12,23
160:24 161:2,5,8
162:3,18 163:6,9,10
163:11,12,15,17
164:23 165:4,5,14
165:18 166:13,16
166:19,20,24 169:2
169:21 170:7,15
171:5,6,19,20,25
172:5,6,23 173:2
177:14 178:23
179:4,10 180:24
182:18 183:9,13
184:22 186:22
191:10 201:15
202:3,23 203:2
208:9 211:2,6,15
212:6 213:4 214:12
214:19,21 215:2
216:9 220:24 221:2
221:17 232:14
233:9,14 243:3,17
244:2,10,17 245:2
246:21 251:8
255:21 256:9,11
257:11,21,24 258:4
258:7,19 259:24
260:6,6,10 273:21
274:3,10 275:15,20
275:22 278:16
281:12 282:4,11,16
282:25 287:6 289:9
291:8 293:2 294:7
295:10,16,20
297:16,18 298:5
299:13,25 300:2,11
302:2 303:16,18
306:5 309:7 312:8
316:10,11,14 317:4
company's
37:2 82:9 99:11



106:25 120:5,7
171:13 256:10,14
256:21,24 257:16
258:25 259:11,13
259:14,19 260:14
262:11 275:13
276:24 300:7
**comparable**
188:17 269:9,22
**compare**
193:22,23
**compared**
251:12
**comparing**
268:9
**compensated**
44:9
**compensation**
39:16 44:4,15 45:15
49:15 50:4 77:18
96:16
**competent**
197:15
**competitors**
271:7
**compiling**
225:6
**complaint**
254:14,17 323:6
**complete**
17:22 85:25 132:5
144:19 147:20
218:2 247:17 248:6
**completed**
248:8,17 249:2
**completely**
238:15 294:23
**compliance**
134:12 137:3,20
250:7,10
**complicated**
127:21,23 167:21
201:23
**complied**
134:6
**complies**

133:17
**comply**
135:15 280:8
**comport**
142:20
**comprised**
27:16
**computer**
18:9
**computers**
307:9,10
**concern**
274:21,24
**concerned**
238:18
**concluded**
141:4 198:22 248:19
318:5
**concludes**
187:6 193:5
**conclusion**
185:18 255:11
256:16 261:4
262:16 263:5,20
264:5 304:15
**condition**
213:19 251:17
**conditions**
9:10 202:20 205:8,9
213:15 277:12
**conduct**
194:23 196:18,25
**conducted**
286:21 296:12
**conducting**
168:23 196:10
197:16 286:16
306:25
**conferred**
68:6 71:11
**confidentiality**
87:10
**confirm**
144:21
**confirmed**
142:4 309:25

**confused**
71:14
**confusing**
121:24
**connection**
12:17 19:6 67:13
87:17 134:16,22
135:7 192:12
194:10 196:4
204:16 208:19,21
217:19 220:23
222:3,12 255:6
262:12 263:2,18
264:25 285:23
286:14,22 293:25
308:10
**consent**
28:14 31:17 32:5,25
33:22 34:5
**consider**
192:15 193:18
220:20 274:23
301:6
**considerably**
228:4,11 276:2
**consideration**
158:15,25 159:9
173:15 191:13
**considerations**
173:9
**considered**
272:15
**considering**
196:13 222:10
**consists**
31:25
**consolidate**
69:5
**consolidated**
68:20 69:13,18,23,24
70:12,18 72:13
76:20 80:14,19 81:6
81:14 82:24 83:4,11
84:17 85:10,19,24
88:4,8 95:2 96:2
108:13 122:15

123:8 150:2,9,17
151:10,19 152:6,9
152:21 153:4
156:14 157:24
162:10,11 211:13
211:21 212:5
258:23 264:19
321:17 322:8,10
**consolidation**
156:18
**constitute**
56:14
**constitutes**
312:5
**construction**
21:21
**consult**
136:14 264:11
**Consultancy**
96:8
**consultant**
135:3 138:3 175:16
**consultants**
312:21,23
**consulting**
62:4,9 63:20 65:20
66:4 67:3 174:12,18
**Cont'd**
322:2 323:2
**contemplate**
171:21
**contemplated**
171:25
**contemplating**
213:5 243:13
**contemplation**
272:7
**content**
17:8
**context**
217:22 223:6,25
243:7 254:5
**continue**
69:23 147:16 148:18
156:22 239:7,15
240:11 241:4,9



242:4
**continued**
1:15 2:9 198:7
**continuing**
274:20
**contract**
33:21 34:4 44:24
45:8,22 46:2,7
47:24 48:14 49:19
50:7,11,17 51:9
139:9 140:22,25
175:8,13,14,21
176:6,9 228:3,13
241:19 301:19
**contractor**
40:3,11 43:9,14 44:8
44:17 48:11 62:21
231:3 321:9
**contractors**
8:3 39:19 53:9 55:10
125:6,15 148:13
231:9 313:3
**contracts**
32:16 39:19 130:3
174:12 241:18
299:24
**contractual**
33:9
**contributions**
213:7
**control**
192:7
**controlled**
15:25 47:17 65:24
79:14 92:23 101:8
211:14
**controls**
16:3 47:23 102:22
163:12,25
**conversations**
13:3
**conversion**
64:14 201:25 203:3,8
205:20,20,22,24
206:4 211:11
214:24

**conversions**
64:15
**convert**
202:2 205:10,23
208:23 212:10
**converted**
202:20 206:9 213:14
214:15 216:4
**convertible**
166:18
**convey**
235:22
**conveyed**
303:12
**conveying**
235:20
**convicted**
43:9
**convinced**
151:6
**COO**
38:21 53:20 62:5,20
62:25 170:11
**copied**
14:16 126:23 306:20
307:4
**copy**
6:19 7:2 58:18
130:23 321:4
**core**
244:10 245:6
**CORP**
1:8
**corporate**
24:17 68:13 77:12
114:15 115:25
**corporation**
38:13
**correct**
26:18,19 28:7 63:4
80:10 85:16 87:14
89:12 100:17 101:4
103:4 105:3 124:23
128:24 134:15
154:8,16 167:10
171:4 188:11

200:24 204:23
205:6 207:10
215:12 216:14
225:8 227:17
228:20 231:6 258:9
273:23 299:14
308:4
**correction**
288:24
**correctly**
98:13 99:6
**correspondence**
305:17
**costs**
70:5 188:17 198:5
**counsel**
5:16 7:16,21 168:6
170:3,4 255:16
263:11 306:7,21
307:17 314:22,23
314:24
**counterclaim**
32:22 33:7 262:19
**counterclaims**
32:19 254:15,18,25
255:3,17 260:4
261:18 323:6
**countries**
133:24 134:3
**COUNTY**
319:4
**couple**
12:9 26:4 35:7 43:18
121:9 144:8 214:7
221:10 315:9
**course**
9:21 57:16 76:17
149:4 271:24
308:16,25
**court**
1:2 5:18 47:19 71:4
318:8
**cover**
23:16
**covered**
73:8 281:23

**create**
55:20 86:21 272:13
272:22,25 273:17
**created**
10:19 55:18 98:18
148:2 166:25 172:7
287:6
**creates**
204:17
**creating**
214:22 273:15
**creation**
89:10
**credible**
291:6
**credit**
124:14 212:22
**crime**
43:9
**CTA**
127:8
**CTE**
127:14,25 128:6,12
128:18 129:2,15
131:10,13,19,23
132:5,10
**culprit**
237:8
**currency**
61:2 64:14,15,23
80:5 91:12
**current**
98:24 99:3 147:12
148:3,14 165:4
176:22,25 250:13
272:21 312:7
**currently**
272:19
**custodians**
311:5,6
**customer**
225:19,23,24 227:10
227:14,22 229:4,8
229:10,24 240:3,12
241:9,20 268:3,6
**customers**



225:13 226:4
230:10 233:24
234:5,15,22,24
235:7,11,13,23
238:2 239:24 240:9
240:19 241:15
242:24 243:15,24
268:16 311:8,15,16
315:6,11,14 316:5
316:12,20
**cut**
54:4
**Cygler**
310:6

_____

**D**

**D**
1:1 2:1 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1,22 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1

113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1

251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1
**damages**
143:16,18 207:20
261:19,22 262:11
263:2,13,15,18
264:2,6
**dance**
97:5,21
**Danny**
3:23 5:4
**darker**
237:12
**data**
75:15
**database**
59:12
**date**
5:7 7:4 12:24 14:6
17:20 23:21 40:5
47:5 52:19 57:9
58:16 59:4,9 65:17
81:8 95:17 102:5

111:11 115:4
121:15 126:16
130:12 133:4
141:13 144:12
146:5 148:6 150:5
150:13 156:23
157:18 159:6
181:10,16 186:9
189:20 195:9,20
200:11 203:13,20
210:7 217:6 218:9
231:20,23 236:22
245:13 252:5
254:19 275:8
284:16,20 298:21
309:18,23 311:23
313:17 324:4
**dated**
12:22 13:7 14:4
17:18 18:12 48:20
133:2 134:17 210:5
210:9 236:21
245:12,15 290:4
321:5,6,7 322:5,20
322:24 323:4
**dates**
65:12 157:21 236:14
**daughter's**
97:21
**DAVID**
3:10
**David's**
105:21
**day**
116:14 136:11
235:15 318:22
319:18 324:24
**days**
86:19 251:22
**de**
1:7 6:13 7:12 8:4 9:7
9:15 10:7,22 12:8
12:16,19 13:20,23
14:20 15:15 16:21
17:9 18:3,18 19:6
19:10 20:19 22:16



23:4,8 24:7,18
25:12 26:24 28:25
29:5 30:24 32:14,23
33:20 34:5 35:17
36:3 37:13,22 39:17
39:25 40:7 41:2,21
44:25 45:11,21 47:3
47:13 48:5,9,12
49:22 50:9,22 51:3
52:14 53:2,7,18
54:11,24 55:24
57:17,23 60:7 61:11
62:9,11,15,20,23
63:2,3 66:15,24
67:10,13 69:4,12,14
74:11 75:9,17 76:5
76:16,25 77:6 79:7
83:14 85:5 86:6,20
86:23 87:3,12,16,23
88:3,12 89:8,9 91:5
91:10 93:10,14 95:4
96:17 97:3,11 103:3
103:15 105:16
108:13 117:19
123:9 125:4,13,21
126:8 127:19,24
128:3,11,17,25
129:19,25 130:10
130:18 131:2,18,25
132:4 134:20
135:22,24,25 136:7
138:4,7 139:14,16
139:23 140:18
141:4,21 142:2,8
143:5,9,11,12,19
144:23 145:10,24
146:11,24 147:15
148:2,10,12 149:3,7
150:10 151:11,20
151:23 152:10
153:16 156:8
157:16,23 158:22
160:12,12,18,21
161:15,15,16 162:7
164:18,19 168:2,21
174:13,18 180:8

182:10,13,17 183:3
186:2 187:14,18,21
188:22 189:7 190:3
190:11,15,20 191:3
191:14,20,21,24
192:6,13 193:6,13
193:25 194:2,4,9,15
194:19,21,22
195:19 196:4,9,11
196:14,22 197:14
198:2,7,12 199:10
199:15,18,20,23
202:17 203:18
204:4,17,17,22
206:12,14 207:5,16
209:2 210:14
212:12 213:12,17
217:9 218:23
219:20,24 220:7,22
221:4,8,14,16 222:2
222:25 223:11,21
224:3,5,10,15 225:5
225:12,17 228:24
229:3,6,7,15,23
230:19 231:8,15,16
231:22 232:20,23
232:24 233:23,25
234:5,6,13,20 235:3
235:22 236:4,7,12
236:14 238:3
239:22,24 240:7,10
240:15,23 241:7
242:21 246:12
248:4 250:23 251:7
251:17 252:14
254:7 255:8,19
260:21 261:7,19
262:6 263:17,25
264:17,25 265:17
265:19 266:6,12
267:13,21 268:9,11
269:24 270:7,14
271:11 272:11
273:4,25 274:14,19
275:4 277:3,7,10,16
278:5,14 279:3,9,11

279:16 280:12,18
281:12 283:8
285:13,17 286:3,13
287:2,13,14,19,25
288:16,17 290:25
292:9,14,25 293:20
294:2,2,9 295:6,8
295:21 296:17
297:18,24,25 298:7
298:12,12 299:22
300:15,20,25 301:6
301:17,24 302:3
303:3,13,19,21
304:3,6,8,13,21
305:14 306:4 307:9
308:3,14,22 309:8
310:16,18 311:13
312:13,14,16,20
314:19 315:5,8,13
315:23 316:3,12,15
316:19 321:11
322:4,10,19

**deadline**
85:17 140:5
**deal**
208:16,22 223:13
280:12 297:3
**dealer**
265:21 309:9
**dealers**
236:6,13 311:5,9,10
311:14
**dealership**
265:25
**dealerships**
265:18,21 266:13,15
**dealing**
292:4
**Dear**
127:3 312:4
**death**
43:15
**debate**
310:2
**debit**
109:18 124:10,13

**debited**
110:15
**debt**
190:23 208:18,24
**December**
57:8,12 110:9 150:4
150:18 151:12,21
152:8 153:13
158:20 176:16,18
321:13 322:9
**decide**
88:12 89:25 202:2
**decided**
200:21 272:12
273:21 277:15
**decision**
128:12 131:18
**decisions**
37:7 52:16
**deed**
210:4,11 212:16
213:23 322:20
**deemed**
56:9
**deems**
229:18
**defendant**
10:7 68:2,9,16 69:15
72:9,19 74:2,21
76:11 77:22 78:18
106:12 156:8
**Defendants**
1:9 3:14
**defined**
231:24 250:14
**defining**
161:15
**definitely**
115:7 138:14 291:22
**definition**
201:19
**definitive**
272:24 273:3
**Delaware**
24:13,24
**deleted**



305:11 306:17
**deliver**
129:24 132:3 139:7
  140:3 221:14 234:7
  239:25 240:10
  275:5
**delivered**
139:11 140:13
  143:25 219:25
  221:25 226:17
  249:21
**delivering**
223:2 229:22
**delivery**
140:23 228:5,11
  234:23 235:25
  236:13 242:25
  248:23 249:2
  274:11 275:9
  294:22
**denomination**
61:7
**departed**
27:3,25 128:23 274:2
  275:15 309:6
  316:22
**departing**
299:13
**departure**
40:15 52:20 260:5
  274:10 276:5,14
  278:16 298:5
  309:10 315:5,7
  316:6
**depend**
227:21
**depending**
64:21 122:23 250:18
  271:8
**depends**
61:5 69:25 90:17
  117:11 227:25
**deponent**
5:14 324:5,22
**deposit**
22:3,4 225:19,23

226:7 242:7 265:14
  268:6 297:3
**deposition**
1:15 2:9 5:9 7:11 8:5
  8:7,11,25 20:3 54:3
  67:22 71:8 73:2
  79:4 96:23,25 98:14
  110:7 113:10
  145:19 180:4 230:8
  311:11 318:5
  319:10,11 324:4
**depositions**
86:19 129:18
**deposits**
229:4,8,10,16,24
  234:8,24 235:8,23
  240:3,12,25 241:9
  241:15 243:4,21
  268:3
**describe**
7:17 165:21 268:11
**described**
162:8 262:13
**describes**
159:18
**description**
83:6 204:8 321:3
  322:3 323:3
**design**
41:3 45:6 48:17
  51:10 63:9,24 64:9
  93:19 270:10
**designate**
27:14
**designated**
6:13 28:13
**designer**
41:23 48:14
**designs**
41:24
**despite**
241:19 243:4
**detail**
197:19 257:9
**details**
258:17

**determination**
260:24
**determine**
148:3 161:14 261:13
**determines**
90:13
**develop**
140:6 148:18 280:2
**developed**
147:2 295:22
**developing**
89:13 126:3,5 139:17
**development**
89:16,22 118:12,20
  125:3,7,16 131:24
  139:4 146:13
  147:17 148:15
  149:12 198:5,7
  224:20 242:14
  247:18,22 273:25
  295:14
**developmental**
146:25 293:25
**developments**
146:12
**devices**
306:20
**Diana**
1:16 2:9 5:15 6:2,8
  96:8 122:5 299:21
  313:25 318:19
  319:9 320:3
**difference**
56:12
**different**
37:18 39:11 68:3
  72:24 80:19 84:21
  85:7 91:12 125:2
  128:18 133:23
  135:15 152:4 153:2
  155:21 183:18
  184:2 188:9,20
  200:22 205:15
  209:11,11 230:17
  269:3 270:5 271:5
  294:24 295:10

298:25
**differentiate**
230:12 269:25
  270:15
**differently**
161:12
**difficult**
155:8
**digital**
39:3
**diligence**
195:17 196:5,7,11,19
  196:25 197:17
  277:22 286:14,17
  286:21 289:20
**dilute**
214:25
**dinner**
118:7
**dinners**
118:4
**direct**
16:8 42:6 63:2 99:7
  290:11 303:23
**directed**
109:22
**directing**
109:16 302:10
**direction**
128:19 272:12
  300:18,21 302:11
  302:11,13,16
**directly**
51:12 97:4,12 98:4
  99:13 104:18 105:2
  109:17 262:5
  297:16
**director**
28:12,13,19 30:15
  31:3,14 34:9 109:9
  178:2,7,12 299:23
  304:13
**director's**
110:14
**directors**
28:24 29:5,15 40:23



120:15 303:17
**disagree**
136:4 189:8
**disagreements**
243:18
**disbursement**
124:22
**disconnect**
97:19 98:11
**discount**
199:3
**discovery**
307:14
**discuss**
7:13 9:25 74:5
**discussed**
68:24 74:17 122:14
160:19 216:12
220:22 232:12
241:17 264:15
280:9 317:5
**discussing**
87:11 102:8 180:3
303:5 316:6
**discussion**
13:13 73:10 76:13
105:21
**discussions**
7:16 117:9,13 118:8
118:19,23 222:15
287:12 316:4
**dismissed**
316:16
**dispute**
142:25 143:3 306:3
**disseminate**
311:15
**dissolution**
43:14
**distinction**
135:12
**distinguish**
268:19
**distributed**
312:16,18
**DISTRICT**

1:2,3
**diversification**
295:3
**divulge**
168:5
**document**
4:8 7:7,10,20 12:22
17:22 23:24 24:13
24:23 25:23 26:25
40:8 57:15,25 81:5
81:11,17 83:23
98:12,17 101:19,20
101:22 102:4,8,12
102:18 122:3
141:11,19,23 145:8
146:18 147:5,9,13
147:23,25 148:12
148:21,25 149:2,7,9
150:7 157:19
184:22 186:2,6
189:15 194:9
197:21 200:6 210:2
210:9 216:23 217:2
217:8,18 222:2,14
222:24 223:24
224:10 225:7
245:11 246:17
252:2,3,22 253:15
253:23 254:3
255:12 256:4
287:23 288:15,21
304:23 308:15
309:16 321:5,17,19
322:6,22 323:4,5,10
**documentation**
37:6 260:8 263:12
**documented**
101:10
**documents**
7:23 12:10 38:3
56:18 59:15 96:20
121:10 158:2
167:24 232:9
236:20 260:13
263:7 264:8 286:25
306:5 307:19,21

322:24
**doing**
23:3 41:22 54:10
113:6 129:15
136:15 156:13,18
168:13 169:19
171:7 209:8,9
243:13 246:20
249:9 272:7 292:5
304:11
**dollar**
61:8 80:2 230:9
**dollars**
61:4,13,15 64:20,21
78:14,15 79:20,21
80:9,9 91:11 108:21
207:13 227:11
280:20 288:19
293:17
**double**
53:15 237:8
**doubt**
157:21
**draft**
174:20,24 175:7,14
184:16 185:4,17,18
219:7 282:23 290:4
291:22 301:14
314:4
**drafted**
277:25
**drafting**
175:2,13,24
**drafts**
175:25
**Dragon**
65:8,23 66:10,19
67:8,11
**drawings**
48:17
**Dream**
78:8,21 79:13,24
102:18,21 103:2,9
103:16,25
**drinking**
117:2

**drive**
112:5,6 249:22
**driven**
134:2,14
**drivers**
270:11
**drove**
112:8
**DT**
6:18 12:21 13:3,14
14:3 17:16 18:2
35:6 45:20 46:25
57:5,11 61:9 81:4
82:13,17 84:13,20
95:14,25 102:2
111:8,13,21 114:19
121:11,17,20 122:9
123:3 126:13 130:8
132:18 141:10
144:5,11 145:6
149:25 150:8,16,25
151:10,14,18 152:6
152:9,15,18,19
153:2,11,12,14,20
154:5,6,10,10,25
155:24,24 156:2,2,4
156:7 157:5,8,13
158:13,22 159:6,8,8
160:8,17 162:17,20
162:21,23 163:3,5
163:18,24 165:8,9
165:10,12,13 167:8
176:13 181:6,12,18
181:19,19 195:6,11
195:14 203:16
204:3 208:8 210:3
211:22 216:25
236:19 245:10,15
252:2 254:13
264:16,21 284:13
284:17 298:18
309:15 311:20
322:7
**DT's**
7:2 12:22 14:4 17:17
23:19 40:2 47:2



57:6 58:14 59:2,7
81:5 95:15 102:3
111:9 115:2 121:13
126:14 130:9 133:2
141:11 144:10
150:2,9 167:25
181:7,13 189:18
195:7 200:9 203:11
203:17 210:4 217:2
236:20 245:11
252:3 254:16
284:14,18 298:19
309:16,21 311:21
313:15 321:3 322:3
323:3
**DT165322**
141:17
**DT165332**
141:12 322:6
**due**
90:2 91:20 195:16
196:5,7,11,19,25
197:16 226:13,16
227:19 228:14,17
231:20,23,23 232:5
232:22 233:20
253:5,9,12,18 254:5
277:22 286:13,16
286:20 289:20
312:8
**duly**
6:3 319:10
**duties**
41:20 44:3 255:4,7
255:20

———————————
E
———————————
**E**
3:2,2 121:2,2
**earlier**
14:8 42:19 102:8
108:24,25 122:14
123:13 131:23
132:12 152:19
153:11 154:13
202:22 204:15

208:8 211:10
241:18 265:15
291:12 311:11
**early**
55:22 109:4 157:2
306:19 309:3
**earn**
100:9
**earned**
100:15,19
**earning**
103:9
**earthshattering**
8:20
**easier**
157:11 227:7,8
**East**
267:7,11
**economy**
277:14
**ECU**
249:10
**Edith**
110:3,5
**educate**
7:18
**education**
232:17
**effective**
24:8 27:23 42:13
50:7
**effectuate**
30:5
**efficient**
169:5
**efforts**
278:14 292:23
306:15
**either**
22:21 43:4 90:14
116:23 120:15
261:6,9 317:24
**elected**
277:18
**electric**
294:15,18

**electronic**
306:16
**email**
14:3,4,12,16 16:9
17:8,18 18:12,17
20:14,18 23:7 71:12
73:11 126:13,14,19
126:25 128:8 130:9
130:14 131:7
132:18 133:2
134:17 145:13,15
146:6 218:6,10
220:12 223:6
235:15 284:12,14
284:18 285:12
309:12 311:21,25
312:4,15,17 313:10
313:11,15,19 314:4
314:22 321:6,7,23
322:4,5 323:7,8,12
323:13
**emails**
224:9
**emissions**
247:17 249:12 250:3
250:6,10,13
**employ**
270:14
**employed**
270:20
**employee**
62:20,22 63:3 232:22
313:6
**employees**
8:3 39:18 53:9 55:9
77:19 232:20
312:19 316:19
**employing**
269:24
**employment**
300:10 303:13
**ended**
150:18 163:3
**engaged**
191:14 196:6 278:18
286:13

**engagement**
45:12 136:9 190:12
**engine**
246:6 249:9
**engineers**
48:18
**engines**
249:12
**enjoy**
30:16
**enlisted**
19:17
**ensure**
56:8 133:17 209:5
229:11 242:9
306:15
**enter**
34:3 279:11 299:24
**entered**
40:3,11 41:2 47:24
67:2 86:24 166:4
178:24 321:10
**entering**
32:16 33:20 50:16
213:19 279:17
**enterprise**
287:24 288:9,18
**entire**
71:19 102:12 118:24
**entirely**
72:24
**entities**
9:9,17 11:4 12:6 68:8
68:15 69:6 70:4
74:15 75:16 76:24
77:6 83:14,17 88:3
88:13 90:3,5,15,19
90:21,23 94:10 97:4
101:6,8 102:22
104:5 152:22
160:21 161:16
164:5,20 167:8
177:13 211:14
215:16 230:2
282:17
**entitled**



81:6,13 217:3
321:17 322:22
**entity**
11:10,12,24,25 15:16
24:14 45:16 46:5
47:13,16,23,24 48:6
63:11 65:24 69:10
74:22 77:3,10 80:8
83:20 84:11 86:20
88:20,23 89:2 91:3
91:5 92:7,21,23
93:11,16,18,21,25
94:2 95:16,20
101:17 103:23,23
110:10 127:15
153:17 204:17
223:20 299:23
321:18
**entity's**
92:11
**entries**
58:15 59:3,8 102:25
121:14 124:4
321:14,15,16,22
**entry**
78:5,6 95:15 123:19
178:16 321:18
**enumerated**
75:25
**EPA**
248:25 249:4,7
**equals**
20:23 22:3,4,5
**equities**
74:13
**equity**
165:18,22,23 183:6
183:19 186:15,25
187:7,16,23 190:23
199:4
**era**
270:9,11
**ERRATA**
324:2
**escrow**
229:4,7

**especially**
186:5 223:6 253:14
**ESQ**
3:8,9,10,17,18
**essentially**
24:12 49:12 123:21
134:9 160:11
170:13,16 177:10
208:25 246:16
257:9 290:16
302:16
**establish**
303:11
**established**
27:11 76:19,23
**estate**
97:5 119:16,20,24
297:11
**estimate**
262:11 267:2 276:3
276:11 278:9
**estimated**
185:20 275:8
**et**
5:12
**Euro**
91:17 92:3 143:20
227:10 253:9
**Europe**
266:24 267:5
**European**
16:17 65:14
**Euros**
11:5,8,9 92:2 142:13
142:17 226:25
227:3 280:21
**evaluate**
148:13
**evaluation**
188:23
**Evan**
310:6
**event**
205:24 206:5
**events**
116:18 206:7 271:5

316:2
**eventually**
86:23 173:2,24
198:22 215:4
**everybody**
309:12
**evolved**
273:5
**exact**
4:7 164:12 231:20
**exactly**
10:9 25:3 38:6,15
55:16,16,16 70:20
101:14 117:20
147:5 163:21
233:10 288:11
289:15 307:15
**EXAMINATION**
320:2
**examined**
6:4
**example**
32:13 101:17 102:25
118:2 133:20
165:14 273:13
294:22
**examples**
190:22
**exceeded**
32:15
**Excel**
59:16 145:11,12
252:9
**excerpt**
141:14 142:6 218:4
252:24
**excess**
262:7
**exchange**
14:3 92:6 175:25
219:21 220:9 221:6
221:9
**exchanged**
287:2
**excluding**
76:14

**exclusive**
153:5 266:16 268:22
273:16 294:11
**excuse**
111:20 131:6 250:9
**execute**
137:18 138:5
**executed**
25:24 27:2,22 173:25
228:3
**executing**
139:16 215:13
**execution**
52:20 138:9
**executives**
171:22 172:2
**exercise**
30:16
**exhaust**
127:16,20 128:2,13
128:19 132:5
**exhibit**
6:17 7:2 12:22 14:4
17:17 23:19 40:2
41:6 44:2 47:2 57:6
58:14 59:2,7 81:5
95:15 102:3 111:7,9
115:2 121:13
126:14 130:9 133:2
141:11 144:10
150:2,9 181:7,13
189:18 195:7 200:9
203:11,17 210:4
217:2 236:20
245:11 252:3
254:16 284:14,18
298:19 309:16,21
311:21 313:15
321:4,5,6,7,8,9,11
321:12,14,15,16,17
321:18,19,20,21,22
321:23 322:4,5,6,7
322:8,10,12,13,15
322:16,17,18,19,20
322:22,24 323:4,5,6
323:7,8,9,10,11,12



323:13
**exhibits**
4:5 318:7 321:2
322:2 323:2
**exist**
165:23 174:6 182:18
**existed**
159:15
**existing**
153:7
**exists**
165:22
**expect**
76:4 242:16
**expectation**
233:13,14
**expectations**
242:9,11,25
**expected**
144:2 274:9
**expecting**
251:13
**Expedia.com**
258:16
**expense**
53:6,7,17 54:14,18
54:21 56:6,15 90:10
91:8 92:12,20 93:4
97:22 98:6 99:15
124:14 261:15
297:15
**expenses**
53:5 55:2,11,22 56:2
56:8 67:24,25 70:5
70:16 72:9,12 73:17
73:24 74:2,12 77:22
80:13,23 88:14
89:21 90:2 91:19,20
92:13 97:2,13,16,17
256:20 257:8,10,15
257:20 258:3,12,20
259:3 260:8,15,23
260:25 262:3,14
**expensive**
273:16
**experience**

129:19
**expert**
138:3
**EXPIRES**
324:25
**explain**
79:22 167:25 202:5,6
**exploring**
190:20 191:4,11
**extended**
46:4 120:13
**extent**
54:19 60:13 67:10
88:7 103:11 119:23
123:7 126:7 172:20
217:25 233:11
253:14 259:5
260:18 282:14
283:8 304:9 306:7
**external**
258:19
**extreme**
294:13
**extremely**
234:14,21

### F

**F**
121:2
**face**
210:25
**faced**
271:11 279:16
**fact**
32:22 68:6 83:3
112:9,15 128:25
138:18 159:13
169:8 191:14
208:17,22 231:7
241:7 242:20 244:8
259:3 271:23
286:24 301:16
316:14
**factors**
279:24
**failed**

129:23 130:2 132:3
138:19 139:7 140:3
141:5
**fair**
16:6 20:9 39:4 45:7
48:3 51:15 67:9
70:3 104:9 135:11
149:20 154:22
162:24 167:17
168:17 173:23
174:21,23 180:22
182:20 186:7 189:5
189:11 196:8
202:10 205:18
208:6 209:7 219:5
220:13 221:17
230:23,24 238:8
239:4 242:12 244:8
254:2 258:21
261:17 263:8
267:12,21 280:6
281:21,22 286:4
289:11 297:13,21
298:6,9 301:8,10
**fairness**
142:5
**faith**
234:6,12
**familiar**
7:6 12:11 15:15,19
23:23 40:8 47:9
81:10 135:8 195:11
195:12 200:13
205:12 286:6
**family**
114:13 145:2 218:2
284:24
**fan**
144:23
**far**
36:8 89:16 129:11
138:23 139:4
185:15 242:12
251:9 275:2 277:16
**farmland**
115:23

**farther**
269:8
**fashion**
240:2
**faster**
132:8
**features**
245:21
**February**
140:24
**fee**
62:4,9,16 63:20,20
65:21 66:4 67:5
96:8
**feel**
233:19 234:11
**fell**
231:8,11
**fellow**
304:10
**felt**
269:12 277:11
**Fernicola**
1:24 2:12 5:19 319:6
319:22
**Ferrari**
268:13,20,22,24
269:10,12 270:2,5
271:16
**fewer**
268:23
**fiduciary**
255:4,7,20
**file**
289:3
**filed**
143:17 251:23
**files**
38:25 39:3 307:11
308:6,10
**filing**
37:16
**fill**
55:15
**filled**
207:4



**filling**
225:5
**final**
301:19
**finalized**
85:12,15,20 155:24
  184:18
**finally**
127:7
**finances**
170:14 232:13
**financial**
15:22 60:14 68:20
  69:5,7,13 70:7,10
  70:18,25 72:13
  74:10 75:10 76:6
  80:14 81:7,14 82:16
  82:25 83:4,11 84:17
  85:10,20,25 88:4,8
  95:2 108:14 122:15
  123:8 149:23 150:3
  150:10,17 151:11
  151:19 152:7,10
  156:6 157:24,25
  162:11 189:25
  190:2,7,10,11,15
  195:16,24 196:5,7
  196:10,19 211:13
  212:5 243:25
  251:17 258:24
  262:6 264:19
  274:14,16 275:3,13
  275:18,25 278:19
  282:2 283:2 285:16
  293:8 321:17 322:8
  322:10
**financially**
143:12 188:8 273:9
  273:11
**financing**
108:5,9 191:4 192:13
  194:11
**find**
108:9 110:20
**fine**
72:20 131:6 145:16

201:6 247:25
  255:16,25 304:18
**finish**
77:15
**firm**
15:22 182:7
**firms**
278:19
**first**
6:17 9:5 13:11 16:8
  24:9 48:19 51:5
  55:22 78:5 96:4
  102:25 140:12
  152:3 157:7 166:25
  168:15 182:25
  201:8,13,18 204:9
  205:8 206:24 214:8
  226:7 227:10
  228:16 247:6
  254:13,17 272:5
  277:3 286:5,7 323:6
**fit**
229:18
**five**
63:6 65:6 110:23,24
**five-minute**
51:20
**fixed**
228:22
**fleets**
294:21
**Flexner**
2:10 3:4
**flip**
104:21 197:22
  217:14 246:7
**flipping**
146:11,18
**flow**
290:16 292:21
**focus**
313:12
**folks**
232:23 246:4 311:7
**followed**
226:8 306:11

**following**
199:2 301:14
**follows**
6:4 122:6
**forced**
205:22,23
**Ford**
22:3,19 267:17
**forecast**
290:10
**forecasts**
290:5,16 291:5,16,25
  292:7,10,14,20
**foreign**
92:6
**forget**
268:10
**forgot**
174:9
**form**
11:17 12:7,18 19:7
  19:13 20:7 22:17
  24:19 29:17 31:23
  32:8,18 33:2,14
  34:8,15 37:9,15
  38:24 42:4 43:17
  45:4,13,23 46:21
  49:8,25 50:12,18,25
  52:17 53:10 54:9,15
  54:24 55:3,6,8,12
  55:13,14,18,20 60:2
  60:19 62:12 69:8
  70:8 78:25 80:17
  82:19 83:16 84:19
  85:22 87:6,13 90:4
  90:25 91:23 92:15
  93:12,17,22 94:5,21
  97:7,14,24 98:9
  99:19 100:5,22
  101:11 104:14
  106:2,7 107:9,16,24
  109:6,21 112:13,18
  112:25 114:17
  116:7,12 117:10,15
  118:13 119:3,18
  125:9,25 128:14,20

129:3,21 132:13
  134:7 135:18,23
  136:8,19 137:6,21
  138:12,21 139:18
  139:25 140:21
  141:7 142:10 143:7
  143:13 146:15
  147:3 148:23
  149:13 150:20
  152:2,24 153:8
  154:19 155:3,25
  156:25 159:16,22
  160:2,14,22 161:7
  161:24 162:4,12
  163:4,14 164:2,7,11
  164:21 165:22,24
  165:25 166:14
  167:2,14 168:4,14
  168:25 169:10,17
  169:25 170:9,20
  171:3,11,23 172:16
  173:14 174:2,22
  175:9 176:7 177:15
  179:2 180:5 181:3
  182:2,15 183:11
  185:23 186:4,19
  187:3,10,17,25
  188:25 189:9 190:6
  191:6 192:2,8,14
  193:9,16 194:13,18
  196:15,20 197:18
  198:9,13 199:13
  200:2,23 201:17
  202:9,15,17 204:19
  205:2,11 206:16,21
  207:17,25 209:3
  211:17 212:15,25
  213:9,21 215:19
  216:5 220:10
  221:11,19 222:5,16
  223:5 224:7 229:19
  230:3 231:10,18
  232:2,7,21 234:10
  234:18,25 235:10
  236:2,16 240:4
  241:11 243:5 244:3



244:19 245:3
248:20 251:11,19
253:13,22 254:8
255:10 256:15
257:13,23 258:13
259:17 260:11,17
261:2,16 262:15
263:4,19 264:4
265:3 267:9,18
268:14 269:6,14,20
270:3,17,25 271:14
273:10 274:4,15,22
275:17 276:7,12,21
277:9,20 278:7,17
279:6,14,20 280:14
280:24 281:15
282:5,19 283:5,13
285:25 287:7,15
288:2,8,20 289:14
290:8,19 291:9
292:11 293:4,15
294:8 295:24 296:5
297:7,20 298:8,14
300:12,19 301:3,9
302:5,19 303:7,25
304:14 305:20
306:18 307:12,20
308:12,18,23 309:4
311:3 312:25 314:8
314:21 315:17
316:7,17,24
**formal**
37:5 46:17,22 53:17
53:22 54:7,14,18
67:3 103:14 116:3
116:17,19 312:5
**formally**
35:20 116:15,21
**format**
59:16 100:19 252:8
305:7
**forth**
23:17 42:24 44:3
49:6 82:17 174:10
176:2 197:25
319:10

**forward**
148:18 173:12
**forwarded**
314:14,24,25
**forwarding**
299:17 302:17
**foundation**
254:9 290:9 302:20
303:8 304:2 305:21
**four**
226:5 241:3 253:8
285:9
**fourth**
61:18
**frame**
303:5,9 305:16
**Frank**
313:21
**fraudulently**
261:24 262:2
**friend**
19:4 119:22
**front**
73:11 252:10
**FTAG**
166:5,7,12,22 167:3
195:21,23 196:3,10
196:12,18 199:17
200:20 201:3
203:18,22 204:4,16
205:9,21 206:12,15
206:19 208:16,21
213:16,18 214:4,23
215:5,18 217:19
218:24 219:13
220:23 221:4 222:4
222:9,19 223:2,2,10
223:12,15,18 224:3
224:6,12,22 230:11
277:2 278:13 279:2
322:19
**FTAG's**
201:14 206:8 220:23
220:25 224:4,5
**full**
6:6 247:17 284:23

**fully**
207:3
**fully-sold**
220:3
**function**
127:21 212:9
**fund**
219:9,14 222:19
223:3,8,11,15,18,21
240:3,12 268:4,7
**fund-raising**
206:5 278:21
**funding**
9:10 282:17
**fundraising**
190:17,19 292:23
**fundraisings**
214:11
**funds**
15:4,7 119:11 230:18
278:13
**further**
178:16 206:18
240:21 254:4
311:15 317:21
319:13
**furtherance**
89:22
**future**
206:5 208:25 211:4
212:12,22 214:11
214:17 221:6
239:12

---

## G

**G30**
111:17
**gain**
168:3,12
**gains**
169:23 171:2,10
172:14,21,24
173:12
**game**
214:9
**GBP**

64:10
**GCA**
181:8,14,24 182:4
183:13 186:11
322:12,13
**gears**
254:11 264:9 297:22
**Gemini**
22:5,22 23:3
**general**
42:17 57:6,11,20
58:5 59:11,23 60:7
61:3 65:12 80:12
82:15 84:8,10 85:4
87:22 88:19,22,25
89:5 92:11 95:19
97:10,23 101:16
121:12,13 122:10
138:16 140:11
147:4 207:18
235:18 240:17
259:21 268:7
277:13 306:22
308:14 321:12,22
**generally**
29:18 154:4,18 155:6
227:18,23 257:19
259:14
**generated**
59:17 106:17
**Genesis**
1:7 191:22,25 192:7
277:8,17 278:6
285:23 286:14,16
286:21 287:3,5,8,11
287:13 288:22,23
298:16
**George**
115:10
**German**
131:3
**Germany**
17:3 154:2 156:10
**getting**
96:19 209:16 294:2
307:22


MAGNA
LEGAL SERVICES

**gift**
208:25 210:25 211:3
  212:11 213:2,14,24
  214:16,16 216:11
**Gilbey-Dunning**
114:9
**girlfriend**
114:3
**gist**
43:20 257:4
**give**
26:6 56:21 58:17
  60:23 79:6 86:5
  110:20 121:21
  140:10 150:6 176:4
  184:8 187:19
  197:12 217:21
  273:13 276:10
  283:19
**given**
45:21 107:22 137:14
  137:16 140:6
  319:12
**giving**
291:5 302:10,11,13
  302:15
**glad**
13:17 127:7
**Global**
81:18
**GM**
267:17
**go**
7:15 9:6 22:9 23:17
  26:7,7 29:7 35:7,9
  36:13 42:8 52:2
  65:5 67:6 68:19
  71:4,20,22 83:3,22
  101:19 106:18
  108:13,15,16
  110:18 123:4
  128:18 131:19
  137:10 143:18
  149:22 153:9
  154:11 157:4,8
  172:11 176:15

177:17 179:6 184:4
186:9 187:19
198:15 199:14
203:25 215:9
241:23 248:11
253:8 265:14
272:11 280:10
290:13 304:22,25
306:9 310:25 311:4
**goal**
168:22 229:22
**goes**
21:17,25 28:8 42:17
  44:13 123:5 156:9
  215:10 237:25
  245:6 248:2 300:3
  313:21
**going**
6:18 10:2,17 16:7
  17:4,15 23:16 29:10
  46:24 56:17,19,22
  56:25 57:2 58:11
  64:20 67:6,11 71:3
  72:18 73:25 80:24
  81:3 83:12,22 92:17
  95:13 96:2 98:4
  108:18 110:18
  111:6,20 121:21
  124:25 132:17,21
  134:14 137:10,19
  140:8 141:10 144:6
  144:8 148:17
  149:24 152:16
  155:17,18 169:8,11
  173:12 174:10
  175:15,16 180:15
  181:11 189:13,14
  195:2 200:3 203:9
  216:10,20 217:24
  221:23 227:5
  229:12 230:12
  233:20 238:17
  245:9 254:12
  257:18,19 264:9
  270:8 273:13
  274:21,23 280:12

281:16,25 283:21
284:11 289:19
290:22 291:11
295:6 298:10
306:13 309:14
**good**
6:10,11 8:23 51:21
  51:22 60:3 72:25
  175:11 209:13
**governed**
140:23
**government**
10:25
**governs**
24:23 47:25 202:25
  203:6
**Great**
44:18 45:2 49:17
  131:12
**Green**
144:23
**Greenwich**
111:14 266:10
**group**
70:11,12,19 93:14
  94:13 118:9,24
  189:19,22,24 190:2
  190:4 192:11 193:4
  194:6 195:24 312:8
  312:12,13 322:15
**grouping**
253:4
**guarantee**
107:19,23 108:9
  207:24
**guarantees**
107:14
**guess**
11:6 94:25 106:9
  154:4 189:11
  202:25 231:24
  245:19 262:18
  283:7
**guests**
117:8,13,21
**guilty**

53:15
**Gumpert**
16:19
**guys**
114:22 141:16
  145:17 151:15

---

**H**

**h-o-m-o-l-o-g-a-t-i-...**
133:10
**H.K**
165:13
**Hamilton**
114:8 237:19,21,22
  310:20
**hand**
129:11 132:20
  319:18
**handles**
225:18
**hangover**
78:6
**HANNAH**
3:17
**happen**
248:18
**happened**
99:10 108:4
**happening**
291:7
**happens**
205:24 228:10
**happy**
71:18 73:9,14 74:18
**hard**
279:25
**harm**
264:2
**harmed**
143:12
**head**
155:7 174:9 237:22
  237:24
**header**
245:21
**heading**



18:16
health
274:14,16
hear
13:17 77:21
heard
257:25
held
5:10 10:24 28:19
   187:2 238:21 248:6
   249:3
Helix
293:3 295:13
Helix's
294:14
help
8:4 19:18 108:9
   128:13 190:16
   197:4 278:20 295:8
helped
125:14
helpful
65:4 145:20 152:13
helping
20:10 236:6
helps
135:5
hereunto
319:17
Heritage
19:19 20:6 21:11
   180:14,16,17,20
   183:23 208:13
   211:24 272:7
Hi
131:8 313:21
hide
240:18
high
7:17 140:2 255:18
   256:6 269:8
higher
169:22 172:14,15
   268:24 280:20
hills
115:21,22

HIN
1:7
hired
86:20 125:23 258:19
   258:22
historical
290:21 291:18
historically
10:21
history
8:13 10:18
HKD
91:17
hold
35:17 53:2 229:3
holder
161:21
holding
69:25 93:13 94:4,6,9
   94:11,12 95:5
   156:21,23 160:24
   161:2,5,8 163:6,9
   163:11,11,15,17
   164:23 171:18
Holdings
1:7 150:11 152:11
   158:23 322:10
holds
91:10 93:18 112:10
   165:12
home
119:6,9,25 120:6,8
homes
120:11
homologate
138:2,11
homologating
138:20
homologation
133:6,13,14,15 134:9
   134:22 135:8,10
   136:18,22 137:9
   138:25 139:6
   248:12,13,18
   249:13 279:23
   280:8

honest
236:6,12 242:6
Hong
15:23,24 20:22 39:2
   61:3 64:20 69:9
   72:22 74:22 77:10
   78:14,15 79:19,21
   80:3,4,8,9 83:19
   84:11 89:2 90:15
   91:3,4,9,10,16
   92:14,23,25 93:5,21
   93:25 108:21
   110:13 154:2
   156:10 182:9
   219:21 220:8 221:6
   221:9 266:20
   307:24 308:4,7
honored
234:11
hope
175:10 268:25 275:9
   295:5
hopefully
293:23
hoping
281:16 294:6
hotels
258:15
Hudson
2:11 3:6 5:10 297:3,9
Hugo
114:2 145:24
hundreds
286:24
husband
65:24
husband's
67:15
HWA
147:12,15
hypercars
294:11
hypothetical
32:10 90:9 108:2
―――――― I ――――――

Ideal
11:12,16,21 101:18
   103:19 104:2,7,13
   105:11 158:14
   180:10 210:15
   253:5
identification
7:4 12:24 14:6 17:19
   23:21 40:5 47:4
   57:9 58:16 59:4,9
   81:8 95:17 102:5
   111:10 115:3
   121:15 126:16
   130:11 133:4
   141:13 144:12
   150:5,13 181:10,16
   189:20 195:8
   200:10 203:12,19
   210:6 217:5 236:22
   245:13 252:4
   254:19 271:13
   284:15,19 298:21
   309:17,22 311:22
   313:16
identified
259:25
identify
261:8
IDIADA
138:17 147:15
IEs
208:12 211:24
ignore
121:25
illustrative
192:25 273:13
immediate
312:6
immediately
43:7
impact
251:16
implication
172:25
implications
169:16 171:21 172:9



172:12
**implied**
199:4
**imply**
253:17
**importable**
135:17
**important**
157:25 234:14,21
    235:4,19,22 236:5
    243:23,25 244:4
**importation**
135:6
**imposed**
133:18 134:4 213:16
    213:18
**impossibility**
295:11
**impossible**
79:10 230:5
**inaccurate**
187:22
**inactive**
271:20
**inappropriate**
257:12
**include**
43:3 76:18 83:12
    153:6 312:22
**included**
21:3 82:22
**includes**
212:17 314:6
**including**
9:9 46:18 74:12 76:7
    83:19 117:18
    147:14 260:22
    267:7 268:7
**income**
70:16 99:17,23,25
    100:3 188:16
**incoming**
230:18 231:2 233:15
**incomplete**
253:15,23 261:6,11
**incorporated**

153:17,21 158:24
    171:18
**incorrect**
158:5
**incorrectly**
139:15,19
**increase**
170:25 171:8 173:10
    213:7 281:19
**increases**
215:4
**incurred**
257:10,15,21 262:12
    275:22
**independent**
40:2,10 48:11 62:21
    125:6,15 127:14
    135:3 180:25 296:3
    321:9
**Index**
81:6,13 320:2 321:2
    321:17 322:2 323:2
**indicate**
4:7
**indirect**
164:22
**indirectly**
163:19 167:15
**individual**
12:12 31:14 47:17
    134:21 192:10
    314:15
**individuals**
27:16 28:10 119:12
    315:16,18 317:4
**industry**
192:21 294:25
**inform**
315:6
**informal**
117:5 118:4,8 308:20
**informally**
116:15,21
**information**
59:14 60:15 80:15
    82:12,16 84:16 86:2

88:9 183:14 186:21
    196:24 197:11,25
    198:5 235:4,5
    243:24 261:5,8,13
    291:10 295:7
    306:16 307:5,8
    308:25 314:20
**infrastructure**
267:16
**initial**
13:22 140:5
**initially**
27:15 106:5 225:18
**initiated**
141:8
**input**
59:14 176:4
**insisting**
305:5
**installment**
227:19
**installments**
226:5
**instance**
109:16
**instruct**
71:3 304:7
**instructed**
306:8
**instructing**
302:3
**instruction**
307:16
**instructions**
137:15,17,23 306:12
**instrument**
166:10
**insufficient**
261:12
**intangible**
178:23 211:25
**Integration**
246:13
**intended**
283:11
**intends**

275:4
**intense**
197:13
**intention**
169:4 220:7,20 221:8
    295:12
**intentionally**
240:19
**interacting**
196:4
**intercompany**
80:20
**interest**
100:10,15,19,24,25
    103:17 105:14,25
    106:6,21,24 107:21
    123:14,17,20,23,24
    124:4,8,12,13,16
    159:20 160:11,21
    162:3 166:12,15
    177:3,11 178:11
    179:12,15 187:7,16
    187:23 287:19
**interested**
117:23 319:15
**interests**
162:9 256:11,12,13
    256:14
**interfacing**
194:5
**internal**
116:9 292:21
**Internet**
114:20
**interpret**
254:5
**interpreting**
300:9
**interrogatories**
262:21 317:2
**interrogatory**
262:25
**interrupt**
10:2
**intertwined**
232:13



**invest**
94:15 201:3 295:21
**invested**
202:16 223:11,21
**investing**
166:17
**investment**
166:10 196:13,18
199:17,19 200:21
201:14 203:8
206:24 220:24
221:2 222:10 224:5
277:2 278:23,25
293:2,6,21,23,24
294:6 295:9,13,16
**investments**
217:20
**investor**
17:10 23:9 94:14
223:22 291:24
**investors**
12:4,15 13:22 72:15
191:2 213:16
223:12,19 224:4,14
224:25 244:2,18,25
278:23
**investors'**
219:10 223:3,9
224:22
**invited**
117:20
**invoice**
64:23 90:13 111:9,13
231:20,23 321:20
**invoiced**
231:15
**invoices**
92:2 231:9,17
**involved**
50:4 60:22 119:12,25
142:24 143:3
173:21 183:9
191:11 208:12
218:23 222:8
295:19
**involvement**

22:15 186:17
**involving**
270:13
**IP**
282:15
**IPO**
206:6
**Islands**
94:19 158:25 159:7
166:19
**issuance**
210:24
**issue**
72:24 88:7 250:3
**issued**
154:5,6 165:9 211:14
215:16
**issues**
139:6 146:20,25
165:4 170:23 172:4
172:8 238:7 279:23
280:9,11
**Italian**
10:25
**Italy**
113:11
**item**
93:4 122:23
**items**
122:22
**iteration**
148:25 287:23

_____

**J**

**Jacob**
47:18 48:7 114:6
**Jake**
114:8 237:16,19,21
237:22 239:17
310:20
**Jake's**
238:13
**January**
57:7,12 96:12 176:18
321:12
**Jayson**

130:20 131:8
**job**
1:25 54:10 139:3
**Jodlowski**
47:18 48:7,10 114:6
**Jodlowski's**
47:25
**John**
3:8 51:19
**Jorda**
33:21 256:18 257:3
263:18 270:13
**Jorda's**
207:21
**journal**
57:7,11,20 58:5,12
58:14 59:2,7,11,23
60:7 61:3 65:12
80:7,12 82:15 84:10
87:22 88:19,22,25
89:5 92:12,24 95:15
95:19 98:22 110:12
122:10 321:12,14
321:15,16,18
**Jowyn**
41:10,16,21 43:23
44:25 45:16 46:4,10
50:22 51:6,12 63:12
108:20 109:8,12,24
174:25 175:23
293:3
**Joyce**
58:10 261:10
**Jubilant**
65:8,23 66:10,19
67:8,11
**July**
66:17 67:5 103:5
130:10,14 131:18
182:14,23 187:9
188:23 278:11
322:4
**June**
65:7 245:12,15
247:10 250:25
251:8,18 292:15,17

323:4
**jurisdiction**
137:12

_____

**K**

**keep**
36:22 37:22 98:18
121:25 149:11
216:19
**keeping**
39:6
**keeps**
82:17 100:14
**kept**
37:6,14 58:5 72:22
146:11 149:3 212:4
306:23
**key**
273:24
**Kim**
18:19,24 19:2,5,11
19:17 20:10,20
21:17
**kind**
149:17 159:25 179:6
181:20 189:17
253:3
**Kingdom**
93:16
**Kingsway**
15:16,21
**knobs**
146:21
**know**
8:23 15:17 21:10
22:22 23:14,14
38:12 46:9 47:22
51:7,14,14 54:12
55:23 56:23 63:17
68:25 73:18 79:9
80:20 81:20 98:18
101:20 105:19
106:20 110:5 115:5
116:11,16 124:3
132:11,22,23 133:6
135:8 137:22 139:8



140:10 141:25
145:18 146:10
147:5,22 149:3,6
151:23 154:20
165:9 170:18
172:21 174:11
179:5 183:13,25
184:17 185:15,17
185:25 186:2 188:4
194:8,9 195:13
197:24 201:22
205:14 215:9 219:7
221:22,24 222:3
225:4 227:2 230:15
231:13 232:10
234:4,5 235:7 237:7
237:18 246:17
248:15 253:24
254:22 255:15
258:16 270:8
271:18 272:25
273:14,15 277:13
280:16 286:24
289:19 292:4 296:6
296:19,20 297:8,11
306:16 307:10
**know-how**
183:2,20,22 184:25
185:19
**knowledge**
12:8,19 26:3 108:11
135:24 171:24
178:10 202:7
258:25 277:10
279:9 300:21
301:18 315:24
**known**
6:14 15:16 236:14
271:15,24
**knows**
233:8 263:6
**Kong**
15:23,24 20:22 39:2
61:4 64:20 69:10
72:22 74:22 77:10
78:14,15 79:19,21

80:3,4,8,9 83:19
84:11 89:2 90:15
91:3,4,9,10,16
92:14,23,25 93:5,21
93:25 108:21
110:13 154:2
156:10 182:9
219:21 220:8 221:6
221:9 266:20
307:24 308:4,7

---

## L

**LA**
17:2
**labeled**
62:8 192:24
**lack**
294:18
**laid**
264:7
**Lake**
115:11,14
**Lance**
134:21,25 135:2
**laptops**
307:10
**large**
160:13 226:3 235:8
**largely**
275:2 281:8
**larger**
281:12
**last-mile**
294:21
**late**
231:17,19 232:19
241:22
**latest**
228:18
**launch**
125:7,16 221:15
**launched**
220:2
**launching**
126:4,6
**lawsuit**

207:21,22 251:22
306:6
**lawsuits**
143:17
**lawyer**
135:4 168:16 174:19
175:5
**lawyers**
7:25 277:24
**lay**
181:19
**lays**
29:14
**learn**
270:24
**ledger**
101:16 121:14
321:22
**ledgers**
121:12
**leeway**
79:6
**left**
25:24 28:23 224:22
259:22 309:13
**legal**
5:5,6 168:9 249:22
255:11 256:16
262:16 263:5,20
264:5 304:15
**legally**
135:16
**lender**
99:7
**length**
42:5
**lessons**
97:5,22
**let's**
27:6 29:21 44:6
51:18 60:23,25 65:5
71:22 84:7 87:21
90:8,10 92:2 94:23
102:17 108:12
137:18 151:7
175:23 181:18

209:15 254:11
270:19 283:20,25
**letter**
200:9,16 202:24,25
305:7 310:10
322:17
**letters**
203:6
**letting**
270:22,23
**level**
7:17 140:2 156:14,15
156:19,20 255:18
256:7 259:21
**Ley**
126:15,19 321:23
**liabilities**
74:13 76:8 176:23
177:2 215:15
**liability**
24:14 27:13 169:23
171:10 173:12
214:12 231:2
**licenses**
196:2
**light**
111:17
**limit**
75:12 173:11 273:8
**limited**
11:13,21 15:11 24:13
27:13 68:11 71:8
81:18 87:24 158:14
158:23 180:11
181:9,15,25 182:5
252:15 322:12,14
**limiting**
75:23 76:13
**line**
19:19 198:18 253:17
324:6
**lines**
236:9
**list**
8:25 74:8 98:14
113:22 147:18



149:17 190:22
219:19 220:8 221:5
221:9 226:19
258:11
**listed**
88:3 92:21 157:13
161:16 260:4
262:22 263:22
285:9
**listen**
73:15
**listing**
193:20
**lists**
25:7 83:13,17 282:2
290:15
**literal**
55:14
**literally**
174:6 223:15
**litigation**
217:9 304:20 306:4
308:11
**little**
10:11 64:3 90:9
146:9 154:7 176:13
178:15 181:21
195:5 202:12,13
287:25 288:5,18
**live**
146:4
**LLC**
1:7 24:24 52:13
61:12 95:4 150:11
152:11 153:16,20
156:8,12,15,19,20
156:22 162:22
164:3 171:17
299:22 300:9
322:11
**LLP**
2:10 3:4
**loan**
79:23 99:5 103:14,17
103:18 106:5
109:23 110:15

177:25 178:5,12
212:21 229:24
231:4
**loaned**
79:16
**loaner**
78:7
**loans**
100:8 101:5,7,9
107:15 123:14
213:6 214:20 282:8
282:10,14
**local**
134:12
**located**
60:17 266:9
**locations**
316:5
**logo**
245:22
**LOI**
277:21
**long**
68:11 75:22 125:10
132:14 156:22
197:9 211:18 218:7
271:17 304:17
**longer**
73:10 160:24 241:14
316:9,13
**longest**
231:21 233:19
**look**
16:7 26:4 27:9 41:25
47:7 50:6 61:17
67:21 68:19 71:2
73:18 77:14 84:7
87:21 95:2 96:4
98:21 108:18
110:11 115:6
142:12 154:11
161:20 175:11
178:15 183:24
184:13,21 186:8
192:19 200:25
205:25 210:21

213:23 223:7
238:10 240:21
247:3 253:3 261:22
275:24 283:16
290:21 294:12
301:11 310:5
**looked**
44:24 49:13 84:13
88:18 152:19
174:11 208:7
211:22 220:19
222:19 282:22
289:20
**looking**
24:5 40:7 59:16 61:6
82:13 96:19 102:17
114:21 122:8,9
141:19 146:17
150:16 151:18
158:8 165:6 176:13
176:22 179:7
184:19 204:3 232:8
285:6 287:21
291:25
**looks**
9:2 64:6 124:5
145:10 152:18
186:14 198:4 218:5
299:17 310:10
**lose**
92:5
**loss**
122:24 262:6 282:3
**losses**
275:23
**lost**
143:10 306:17
**lot**
144:7 152:18 153:11
157:11 197:7
211:19 243:9
268:21,23
**lots**
205:14 287:4
**Lou**
299:2

**Louwman**
266:16
**lower**
106:6
**Lui**
1:7,7 285:12 297:23
298:6,13,15 299:2,3
299:4,8 300:8,13,16
300:24 301:5,6,12
302:9,18 303:4,12
303:19,22 304:4,6,7
**lunch**
121:9
**luxury**
271:12 294:10

**M**

**M-1**
111:14
**Magna**
5:5
**main**
219:20 271:10
294:10 301:15
**maintain**
36:4 38:22 60:11
64:18 69:12 70:24
86:7 90:20 91:5
158:2
**maintained**
55:7,8 57:16 59:12
**maintaining**
38:19 57:24 59:22
60:6 93:10
**maintains**
70:10 80:4 308:3
**Majcher**
1:1,16 2:1,10 3:1 4:1
5:1,15 6:1,2,8,10
7:1,6 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1



35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1,5
123:1 124:1 125:1
126:1,15 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1

188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1,20,24 318:1
318:19 319:1,9
320:1,3 321:1,23

322:1 323:1 324:1
**major**
37:7 198:6
**majority**
89:20
**Maker**
78:8,21 79:13,24
  102:18,21 103:2,9
  103:16,25
**making**
32:14 50:23 89:4
  95:9 104:5,11 109:3
  137:25 196:13,17
  235:23 244:18
  293:21,22
**man**
107:8,11 249:25
**manage**
27:17 29:25
**managed**
16:13 27:12
**management**
27:9 195:25 217:3,10
  242:22 322:22
**manager**
30:17 31:4
**manager's**
27:12
**managers**
25:7,11 26:18 27:15
  27:17 28:18 31:9
**managing**
240:17
**manner**
4:6 260:2 302:4
**mansion**
115:10
**manufacturers**
134:5 231:15
**March**
78:8 103:2 133:3
  134:17 141:2
  236:21,24 252:18
  322:5,24
**mark**
6:18 14:2 17:15

39:24 56:17,19,22
56:25 58:11 80:24
81:3 95:13 101:22
111:7 121:10,19
122:2 126:11 130:4
130:7 132:17
149:24 150:8 203:9
236:18 245:9
254:12 298:10
309:14
**Mark's**
305:6
**marked**
7:3 12:23 14:5 17:19
  18:2 23:20 40:4
  47:4 57:8 58:15
  59:3,8 81:7 95:16
  102:4 111:10
  114:19 115:3
  121:14,23 126:15
  130:11 133:3
  141:12 144:11
  150:4,12 181:9,15
  189:19 195:8
  200:10 203:12,19
  210:3,6 217:5
  236:21 245:12
  252:4 254:18
  284:15,19 298:20
  309:17,22 311:22
  313:16
**market**
138:13 185:19
  188:13 243:14
  247:19 249:3,14,17
  249:21 268:12,15
  271:12 277:12,14
  294:12,24
**marketing**
118:25 237:23,25
  238:6
**markets**
277:13
**marking**
12:20 57:5 101:25
  126:12 144:5 181:5



195:4 200:8 216:22
252:2 311:19
**marriage**
319:14
**Marshall**
158:24 159:7
**material**
36:24 43:4 244:16,24
**materials**
87:4,8
**math**
20:24 227:7
**matter**
5:11 85:4 90:16
97:10 235:19
319:16
**Mazda**
295:23 296:4,11
**mean**
11:18 15:3 19:22
37:16 38:2,5 48:15
55:13 64:7 67:7
68:19 69:15 72:6
73:15 74:7 77:11
91:25 94:13 99:21
104:10 115:9
116:13 117:17,25
124:3 126:5 136:14
136:21 137:22,23
138:23 145:3
148:21 157:20
166:10 172:17
173:16 177:23
178:9 184:12,19
188:7 189:6 191:8
202:7 207:4 220:11
222:6 228:21,23
230:16 231:11
232:8 233:3 235:11
235:14 240:18
244:8 248:3 253:16
253:19 254:4 256:2
260:3 262:22
275:24 280:25
289:3 296:9,16
306:19,23 316:25

**meaning**
60:16 231:13 254:6
267:15 294:2
**means**
22:13 30:10 72:17
110:12 132:22,23
133:7 191:3,7
201:13 206:5 252:8
**meant**
38:11 112:6 202:8
268:3
**media**
271:3
**meet**
141:5 242:10,13
**meeting**
45:11 46:13
**meetings**
35:10,14,18,21,23,25
36:9,12 52:16 53:3
116:2,22 117:6
**member**
27:11 28:14 255:21
303:16 304:11,13
**members**
28:2,5 29:16 34:14
40:19 302:4
**memory**
51:8 75:15 140:8
185:10 209:9 256:2
**mention**
251:21
**mentioned**
119:20 127:10
131:11 208:3
212:19 251:2
311:10 317:3
**Mercedes**
111:17
**message**
301:12 302:7,8
305:10
**messages**
54:6 298:20,24 299:7
323:9
**met**

16:13 278:22
**Michael**
12:12,14 13:13,21
14:17,21 16:2,4,12
17:2,10 18:19 19:4
19:24 20:19 23:9
**middle**
253:4 267:7,11 288:5
288:6,7 313:20
**milestones**
273:24 274:5
**Miller**
112:20 266:6 310:6
**million**
11:6 21:20 45:2
49:23 78:13 103:3,6
143:20,23 177:7
178:19 179:23
185:21 187:9 199:5
199:6,21 201:10,15
206:13 207:7,12,16
208:17,24 210:23
211:2 212:11
213:13,24 214:5
215:14 216:7
226:21,25 227:3,6
227:12 276:17,20
280:19 281:8,9
282:4
**million-dollar**
228:22
**mind**
48:9
**minimum**
42:13
**minutes**
35:25 36:5,7 52:15
**mirror**
146:21
**mirrored**
307:4
**misconduct**
312:9 316:16,23
**misconducts**
317:5
**misheard**

151:5
**mislead**
240:20
**misled**
239:13
**misrepresenting**
71:17
**misstated**
302:24
**Misstates**
288:21
**misused**
256:11
**mixed**
79:9
**mobility**
294:25
**model**
264:25 267:13,22
272:22 273:4,6
294:14
**modeling**
283:10
**models**
188:9 220:3
**modern**
270:9
**moment**
29:9 47:7 91:2,7
143:4 221:12,21,22
226:24
**money**
11:2 60:16,16 64:19
79:16 91:10 93:5
98:7,14,15,19,19,23
101:13 103:24
104:17 106:9,19,22
109:12 110:12
120:2 143:6 199:24
202:16 206:12
219:10 221:23
223:4,9,12,22
224:22 229:21
230:12 231:5
244:12 256:20
257:16 258:6



259:10,12,22,24
262:13 276:2,4
282:11
**monies**
177:14
**month**
63:20 65:17 136:12
**monthly**
67:5
**months**
226:13 227:24
228:14,18,25 232:3
232:6 241:3
**Moore**
81:18
**Moritz**
126:15,19 127:3
321:23
**morning**
6:10,11
**motor**
110:25 111:4
**Motorcars**
266:6 310:7
**Motors**
112:21 266:19
**move**
51:18 124:25 161:9
**moved**
161:6 259:10,25
**movie**
249:24 250:4
**moving**
51:24 256:20 259:12
**MSPC**
81:20 82:2
**MULLIN**
3:13
**multi-currency**
91:13
**multiple**
129:24 147:14
155:14 206:17
**multiples**
193:23
**mutual**

106:3
**MYOB**
59:18,19

―――――― **N** ――――――
**N**
3:2 121:2,2,2
**N.A**
1:7
**name**
5:4 4:6 19:25 59:19
94:3 104:17 114:10
115:17 188:18
289:3 298:25 324:3
**named**
12:12 47:17 134:21
314:15
**names**
113:23 317:3
**narrow**
173:5
**nations**
135:15 137:5 279:18
**nations'**
137:3
**native**
252:7
**naturally**
175:18 212:18
**nature**
83:7
**near**
119:6 221:6
**nearby**
266:9
**necessarily**
4:7 68:14 169:3
241:23 265:20
**necessary**
30:3 136:25 138:10
292:12 303:22
**need**
13:14 34:12 51:14
85:20 136:13
147:19 209:5
235:14 239:10,14

239:17 240:2 242:9
266:22 280:10
303:19 308:13
**needed**
131:12 224:13
**needs**
198:6 242:5 244:11
244:24
**negatives**
53:16
**negotiate**
105:24
**negotiated**
176:10
**negotiating**
175:21
**negotiation**
219:2
**negotiations**
39:23 218:23 222:4
**Netherlands**
266:17
**Network**
81:18
**never**
46:13 67:18 76:12
120:13 136:5
138:24,24 139:3
140:15 143:24
301:5,6
**new**
1:3,17,17 2:11,11,13
3:7,7,16,16 5:10,11
8:20 82:5,5 94:13
112:24 113:3,6
120:9 172:4 243:12
250:15 319:3,4,8
**newcomer**
271:25
**newer**
220:3
**news**
239:24 240:10,19
243:4
**newsletter**
309:21 310:14,15,19

310:25 323:11
**NGCG**
20:23
**Nguyen**
41:3 45:6 51:10 63:9
63:24 64:9
**NHTSA**
133:19
**night**
116:15
**nine**
227:23
**no-option**
226:20
**nominated**
211:7
**nominates**
212:14,24
**nonexistent**
261:6
**nonscientific**
152:17
**normal**
167:5
**normally**
64:22
**Norman**
1:7 3:25 14:13 16:11
16:24 17:12 19:22
19:24 20:3 25:14
29:4 30:22 31:8
34:3,12 41:10,17
53:21 104:23 131:9
158:15,21 179:13
179:21 301:13,16
**North**
95:4
**nostalgic**
270:11
**Notary**
2:13 6:4 319:7
324:25
**note**
4:4 64:22 110:22,24
123:21 124:2,15
177:16 179:7,9,9



180:11,19,20 289:7
**noted**
5:16 121:3 288:24
**notes**
123:15 124:18
178:17 179:4,11,15
179:25 208:9,11
211:12,22,23
212:19 213:6
247:13
**notice**
6:19,20 7:3 43:8
73:23 75:23 83:5
306:2 312:5 321:4
**noticed**
71:9
**notified**
315:19
**noting**
248:14
**number**
9:6 54:5 56:18 59:6
83:17 97:2 101:18
125:22 138:19
141:15 142:18
145:5 146:19
164:12 167:23
173:9 174:12,13
191:15,18 194:24
215:5 227:6 231:9
231:14 266:22
276:9 301:20
**numbered**
7:11
**numbers**
13:15 21:22 61:14
75:15 82:22 142:5
193:21,21 209:6
285:16

---

**O**

**O**
121:2,2,2
**OBD**
247:18,22
**object**

11:17 12:7,18 19:7
19:13 20:7 22:17
24:19 37:9,15 38:24
42:4 43:17 45:4
46:21 49:8,25 50:12
50:18,25 52:17
53:10 54:9,15 55:3
55:12 60:2,19 62:12
69:8 78:24 84:19
90:4,25 91:23 92:15
93:12,17,22 94:5,21
97:7,14,24 98:9
99:19 100:5,22
101:11 104:14
106:2,7 107:9,16,24
109:6,21 112:13
116:7,12 117:10,15
118:13 119:3,18
125:9 129:3,21
132:13 134:7
135:18,23 136:8,19
137:6,21 138:12,21
139:18,25 140:21
141:7 142:10 143:7
143:13 146:15
147:3 148:23
149:13 150:20
152:24 153:8
154:19 155:3
156:25 159:16,22
160:2,14 161:7,24
162:4 163:4,14
164:7,11,21 165:24
167:2 168:14
169:10,17,25 170:9
170:20 171:3,11,23
172:16 173:14
174:2,22 175:9
176:7 177:15 179:2
180:5 181:3 182:2
182:15 183:11
185:23 186:4,19
187:3,10,17,25
188:25 189:9 190:6
191:6 192:2,8
193:16 194:13,18

196:15,20 198:9,13
199:13 200:2,23
201:17 202:9,15
204:19 205:2,11
206:16,21 207:17
209:3 211:17
212:15,25 213:9,21
215:19 216:5
217:25 220:10
221:11,19 222:5,16
223:5 224:7 229:19
230:3 231:18 232:2
232:7,21,25 234:10
234:18,25 235:10
236:2,16 240:4
241:11 244:3 245:3
248:20 251:11,19
253:13,22 254:8
255:10 256:15
257:13,23 258:13
259:17 260:11,17
261:2,16 262:15
263:4,19 264:4
265:3 267:9,18
268:14 269:6,14,20
270:3,17,25 271:14
273:10 274:4,15,22
275:17 276:7,12,21
277:9,20 278:7,17
279:6,14,20 280:14
280:24 281:15
282:5,19 283:5,13
285:25 287:7,15
288:2,8,20 289:14
290:8,19 291:9
292:11 293:4,15
294:8 295:24 296:5
297:7,20 298:8,14
300:12,19 301:3,9
302:5,19 303:7,25
304:14 305:20
306:18 307:12,20
308:12,18,23 309:4
311:3 312:25 314:8
314:21 315:17
316:7,17,24

**objected**
68:5,23 71:10
**objection**
14:23 22:20 29:17
31:23 32:8,18 33:2
33:14 34:8,15 45:13
45:23,25 60:4 68:7
70:8,23 73:12 80:17
82:19 83:16 85:22
87:6,13 112:18,25
114:17 118:17
119:14 125:18,25
128:14,20 145:21
152:2 155:25
160:22 162:12
164:2 166:14
167:14 168:4,25
192:14 193:9
197:18 207:25
231:10 236:8
240:14 243:5
244:19 255:22
303:14
**objections**
9:22 39:22 50:19
68:11 75:7,12,19,22
**obligated**
214:19
**obligation**
214:14 254:6 297:18
**obligations**
129:24 141:5 216:8
229:25
**observe**
54:5
**obtain**
192:12 238:2 243:4
277:4 295:6
**obviously**
39:2 62:15 140:15
153:13 224:16
235:12 255:15
**occur**
25:20 198:6
**occurred**
25:21 116:2,18



MAGNA
LEGAL SERVICES

140:15 157:18
259:16,20
**occurring**
117:7 194:11
**occurs**
206:8
**October**
50:24 108:19 109:4
218:11,18,20
**offense**
43:10
**offer**
108:7 120:10,14
136:6
**offered**
137:8
**Offhand**
293:9
**office**
39:2 308:3
**officers**
39:18
**Offices**
2:10
**official**
297:23 300:11
**offset**
211:4
**oh**
47:21 93:24 194:21
288:23
**okay**
10:4,10 16:10 27:8
29:8,12 42:9 68:12
70:20 71:13 72:4
76:2 80:11 84:6
93:8 99:21 102:14
110:16 116:23
122:25 145:5 157:6
160:15 161:18
163:17 165:3
167:17 174:7
181:22 193:25
202:4 205:21 224:8
224:12 237:11,13
252:16 265:23

273:19 280:25
288:12 289:17,25
290:14 299:5
302:21,23 305:24
316:25
**omit**
235:4
**omniscient**
51:16
**once**
9:20 56:20 214:15
221:25 271:24
**ones**
104:25 163:25
282:23 289:24
**ongoing**
88:14 149:11 260:19
275:3
**oOo**
318:9
**open**
242:5
**operated**
24:14
**operating**
23:19 24:6 94:2
279:18 321:8
**Operation**
217:4,11 322:22
**operations**
83:8 171:16 224:16
**opinion**
17:9 187:19 194:20
**opposed**
138:8 282:15
**opt**
277:18
**option**
205:21 278:6
**options**
226:12,12 228:8,17
228:23 281:13,19
**order**
31:20 56:23 134:2
**ordinary**
57:16 149:4 308:16

308:25
**organization**
83:7 154:9
**organizational**
155:23
**organize**
283:21
**organized**
39:6
**orient**
246:10 247:9
**oriented**
197:19
**original**
10:6,23 64:23 295:12
305:6
**originally**
93:13 314:23
**Ortega**
3:23 5:4
**outcome**
319:15
**outside**
107:18 115:17
223:19 244:18
277:4 278:13,25
283:3 317:4
**outsource**
267:22
**outstanding**
109:18 124:17
164:13 179:11,14
210:19 212:6,17
213:6 215:14 216:8
297:17
**overall**
99:25 100:3 159:20
160:20 250:19
281:19
**overarching**
94:9,11
**overlap**
39:13 73:19
**oversight**
57:24 58:2 153:25
**overstate**

173:7
**Overview**
184:23
**owed**
66:11 98:7,20 101:2
109:19 212:6,18
229:25 253:19
254:7
**owes**
93:5 143:6 179:5
**owned**
156:11 165:18 171:8
**owner**
11:15,24 149:6
161:14 164:19,23
167:12 301:17
**owners**
202:22
**ownership**
159:19,20 160:11,20
162:9 215:2 264:18
288:25 289:4,13
**owns**
163:15,17,19 164:25

———————

**P**

**P**
3:2,2 118:14
**p.m**
34:25 120:20,22,23
121:3,6 209:18,20
209:21,23 284:4,6,7
284:9 317:12,14,15
317:17 318:3,6
**P72**
89:10 118:15,16
125:3,8,17 126:4,6
127:16,21 131:24
133:23 139:17,24
146:4,13,25 149:12
185:6,20 220:4
221:15,16 225:23
226:20 227:15
234:23 235:6
243:23 246:2 270:8
272:13 273:14,22



294:3,10 295:14
**P72's**
148:15
**P72/P900**
219:25
**P72s**
225:10 243:2 266:21
274:11 275:5
**P790**
118:12
**P900**
89:10 118:20 221:15
**Pachmar**
253:9,12,18,20 254:6
254:7
**Packers**
144:24
**PAG**
111:14
**Pagani**
269:18,19,21 270:2
271:16
**page**
13:11 24:9 25:6 26:8
26:9 27:6 35:8 41:6
42:8 48:19,23 61:18
63:5,22 65:5 66:17
78:3 81:24,25 83:4
86:10 96:4 104:22
108:18,19 110:22
111:21 123:12
157:8 176:15 184:3
184:21 185:16
187:6 192:23,24
198:15,17,19
210:18 219:6 237:5
239:7 241:25 247:3
252:10,13 255:2
290:12,13 299:16
310:21 313:12,20
313:21 320:3 321:3
322:3 323:3 324:6
**pages**
41:7 102:13
**paid**
49:16 66:3 89:21

90:14 91:21 92:13
92:22 97:3 113:14
123:14,18 143:22
207:4 258:6 282:11
**pamphlet**
310:11
**Pantera**
19:19 20:11 180:16
180:17 183:23
185:9 208:13
211:24
**paper**
6:22 55:14 307:10
308:6,10
**papering**
176:11
**paragraph**
160:15 165:7 167:20
200:25 201:5
255:24 261:23
**paragraphs**
205:15
**parent**
165:5
**parentheses**
185:2
**parked**
112:20
**part**
8:19 16:8 29:13
32:21 33:17,19,24
35:23 43:22 82:20
87:7,9 117:18 139:8
145:8,13 148:2
171:20 172:3
173:20 201:14
204:7 206:19 208:7
208:16 212:10,20
226:3 238:10
248:13 249:10
261:18 267:21
281:18 282:9 287:5
287:11
**participate**
285:21
**participated**

12:5,15 125:19 149:8
225:5
**participating**
117:24 283:8
**particular**
123:25 137:12
167:20 192:10
**parties**
147:14 174:13 177:3
178:17 319:14
**partners**
265:22 266:18
267:23 309:9
312:23 316:13,21
**partnership**
266:18
**partnerships**
279:4,12
**parts**
213:24
**party**
34:4 43:4 75:17
76:25 77:3,7 175:14
231:25
**passed**
249:12
**pause**
57:2
**pay**
21:21 44:17,25 45:5
49:22 92:3 97:12
98:5 99:8,13 106:21
109:17 119:8 120:6
120:6,8 170:21
171:2 207:20
214:20 225:24
242:7
**payable**
179:12
**paying**
109:23 112:12
230:25 231:8,17,19
239:14 240:20
**payment**
61:18,24 62:3,10,13
62:14 63:6,14,18,23

65:8 66:19,23 67:10
78:4,8,12 86:15
93:2 96:7,15 97:16
99:13 101:3 104:6
104:11 108:20,25
109:7 110:2,8
206:15 226:10,15
227:19 228:8
231:25 241:17,21
297:5,10,12 300:3
**payments**
50:23 51:5,10,12
64:8 66:11 67:8,16
87:16 88:13 90:3,6
97:6,11,21 98:3
100:2,3,24,25
104:24 109:4
124:22 141:20
142:8,22 206:17,19
211:4 214:17
228:16 231:4
233:24 296:22,23
**people**
116:24 117:18
151:17 212:13
243:19 285:13
292:5 295:19
312:20 313:5 316:9
**percent**
100:9 103:10 105:13
105:25 106:21,23
163:16,18,19
164:19,22,25
167:12 173:3
177:11 179:16
183:19 186:15
199:4 226:8,9,11,16
267:3,4
**percentage**
215:9
**percentage-wise**
266:25
**perform**
130:2 196:7
**performance**
74:10 76:6



**performances**
75:10
**performed**
66:7 67:12
**period**
20:14 23:5 38:17,18
52:25 94:22 132:15
182:23 190:9,19
191:5,17 218:22
250:25 270:18
298:11
**periods**
136:15
**permit**
112:23 205:9
**Perry**
130:20
**Perry's**
131:5
**person**
38:8 135:9 188:8
233:8 237:25
**personal**
8:8,12 54:21 56:2,15
73:2 79:4 97:13,16
97:17,22 98:6 99:14
99:23 103:20
104:17 107:14,19
108:8 119:22
168:19 256:13,19
256:21 297:15
**personally**
104:11 105:5,12
197:5 233:16
307:18,21
**perspective**
9:15 106:16 168:11
172:14 192:25
193:24 197:14
286:10
**phasing**
250:16
**phone**
307:3 315:21
**photograph**
18:9

**phrase**
48:5
**phrased**
286:18
**physical**
38:25 137:18
**physically**
315:15
**pick**
132:8 265:25
**pictures**
310:12
**piece**
55:14
**piercing**
77:12
**place**
8:21 37:6 53:8,18,23
54:8,13 66:10
104:16 110:21
114:16 115:6,7,14
115:15 129:15
134:13 153:23
234:7 243:10
308:16
**placing**
234:6 235:7
**Plaintiff**
1:5
**Plaintiff's**
111:7
**Plaintiff(s)**
3:5
**plan**
173:24 174:3 221:13
272:21 281:18
283:17
**planned**
250:15,19
**planning**
168:19,23 169:4,6
173:20
**plans**
272:24
**play**
48:10

**Plaza**
3:15
**please**
6:6 24:2 37:11 47:7
76:9 86:12 217:14
244:20
**plow**
283:23
**plus**
219:25 226:12 228:8
228:17,23
**point**
19:10,14 81:2 106:25
111:3 119:5 123:2
128:5,11 129:5
131:17 134:20
136:5,17 151:15
165:17 213:4
215:22 228:22
244:8 255:23 259:8
259:9 280:17
283:18 287:17
**pointing**
102:7
**points**
301:15
**policies**
308:15,20
**policy**
53:6,8,18,19,22,23
54:7,14,18 56:4,6
**pool**
231:5
**pooled**
230:19
**poor**
139:2
**popped**
174:9
**portion**
213:25 214:2
**pose**
250:17
**posed**
217:19
**position**

37:22 38:16 118:25
229:20 268:15
275:14,18 300:11
**positioning**
268:12
**possess**
229:6
**possession**
112:16
**possibilities**
220:19,22
**possibility**
106:22
**possible**
106:18 190:21
206:22 230:12
283:11
**pot**
230:14,14,15
**potential**
171:9 172:7 173:11
191:2,15 193:21
214:11 217:20
224:4 239:23 240:9
243:25 244:18,25
278:23 287:13
292:23 306:3
311:16
**potentially**
120:14 220:2 294:20
**pounds**
44:18 45:2,9 49:17
49:23 64:11,19
131:12
**powers**
30:3,17,22
**powertrain**
246:2,5,13
**practical**
90:16
**practice**
36:4 97:11
**pre-money**
201:9
**precise**
102:16 266:22



**preferred**
166:18,22,23 167:4
  190:23 202:2,17
  204:9,10,18,22,24
  205:10 206:9 214:3
  214:22,24 215:17
  215:20,24 216:3,10
**preliminarily**
194:5
**preliminary**
193:5,10,14 194:16
**preorder**
265:8,10
**preorders**
280:18
**preparation**
186:18,20
**prepare**
7:12 8:5 222:14
**prepared**
68:14 76:5,10 81:18
  85:9 181:8,14,24
  183:12 186:11
  189:19 200:20
  217:18 290:6
  291:11,12 310:16
  310:18 322:12,13
  322:15
**preparing**
183:10 193:14
**present**
3:22 117:8,14 223:23
  263:2
**presentation**
116:6,8 192:17
**presentations**
116:9
**presented**
70:19 172:4 233:12
  233:15
**preservation**
308:15
**preserve**
306:5 308:24
**preserved**
39:7

**preserves**
307:4
**pressuring**
243:3,20
**pretransaction**
289:8
**pretty**
127:23 175:11
**previously**
132:7
**price**
226:8,11,19,22,24
  227:12 280:17
  281:3,3,5,9,14
**priced**
227:13 268:24
**prices**
226:12 238:19
**Primarily**
38:9 190:16
**primary**
94:2
**principal**
89:9,17 107:3,13
  179:23
**principally**
39:5 174:25 196:3
**prior**
40:14 43:8 46:3 49:3
  94:3 167:3 196:17
  204:21 208:20
  209:25 226:13
  228:11,14,18,25
  248:5 260:5 301:18
**privilege**
75:14
**probably**
232:18 252:8 283:17
**proceed**
273:21 277:8
**proceeds**
207:20
**process**
30:15 85:15 90:12
  241:3 242:3 265:15
  277:17,19 286:21

287:5,12 307:2,14
**produce**
75:8 275:6 294:15
**produced**
18:2 58:12 85:5
  105:16 141:25
  145:9 156:4 184:10
  217:9 225:11
  234:17 252:7 254:3
  294:3
**producing**
236:15 268:8
**product**
269:2 270:4,22,24
  273:25 274:5
**production**
225:18 226:14
  228:15,19,25
  229:12 234:8 235:6
  241:10 242:15,25
  243:22 244:9,15,23
  247:15 248:16
  251:10 267:23
  268:4
**professional**
2:12 14:22 135:14
  181:8,14,25 182:4,6
  197:16 319:7
  322:12,13
**professionals**
187:20
**profit**
122:23 281:13
**profitability**
281:11,20
**profitable**
238:20
**Proforma**
252:15 289:4
**program**
228:2 247:6,12
  250:18
**project**
131:14 132:7 147:17
  183:23 295:22
  296:3,24

**projection/planning**
292:22
**projections**
74:11 75:11 76:7
  283:2,9,17
**promissory**
123:15,21 124:2,15
  124:18 178:17
  179:4,11,14,25
  208:8,11 211:11,23
  212:19 213:6
**promote**
265:18
**proper**
71:6
**properly**
98:23 138:19
**proposed**
106:5 286:15
**prototype**
140:13
**prototypes**
139:8,12 140:7,24
  143:25 180:2,7,9
  198:8
**provide**
99:24 107:21 108:8
  120:11 175:13
  194:20
**provided**
30:18 31:13 177:14
  206:12 215:18
  223:25 228:24
  261:5 263:11 287:2
**providers**
231:14 232:6
**providing**
135:14 183:13
  186:21 190:15
  244:22
**provision**
34:2 36:21 43:5
  207:24
**provisions**
42:20 44:23 49:5,13
  49:21 87:10 300:9



301:21
**prudent**
54:16
**public**
2:13 6:4 10:24 319:7
324:25
**publicly-traded**
15:24
**pull**
289:22
**purchase**
111:16 119:13,25
120:14 226:5 238:3
277:23
**purchased**
13:23 17:11 111:4
119:6 120:9 225:13
272:6 311:7
**purchaser**
225:20
**purchases**
212:23 214:18
**purchasing**
287:18
**purely**
294:6 295:9
**purpose**
57:19 63:17 89:9,17
93:9,15,21 112:3
149:10 169:3,7
182:21 183:15
186:3,24 190:14
195:19 229:17
230:22 292:19
293:21,22
**purposes**
6:22 30:6 31:4,10
57:22 85:18,19
99:12,16 100:3
103:25 113:4
168:20,23 169:19
171:6 182:11
214:23 292:22
**pursuing**
257:3 278:6,12
**pursuit**

256:17
**put**
34:17 53:8,23 54:7
67:20 83:25 84:3
87:20 95:12 106:15
127:7 129:17
132:16 144:4 147:9
147:13 149:21
157:3 167:18 189:3
193:23 194:25
195:3 201:22
202:22 213:3
227:15 230:16
234:24 243:6 245:8
256:8,9,14 258:23
264:13 267:20
272:16 275:25
276:4 287:10
304:19
**puts**
227:10
**putting**
54:13

---
**Q**
---

**Q&A**
222:13
**qualified**
143:15 187:18
194:20 199:15
200:4
**qualifying**
206:6
**quality**
268:25
**question**
15:18 24:21 32:10
37:19 48:5 53:11
55:5 58:7 60:14
68:21 72:7 73:15
74:3 77:21 79:18
84:8 85:8 88:16
103:13 125:10
143:14 146:9
152:17 155:18,21
161:11 173:5,8

174:8 189:12 192:4
213:11 219:7,8
223:8 224:21 230:4
233:6 237:18 269:4
269:18 273:12
274:18 288:13
291:12 305:23
**questions**
15:11 35:7 72:19,21
77:16 144:9 150:15
217:19 224:13,15
224:19 254:24
283:22 307:23
317:21,24
**quick**
209:14 283:20
**quickly**
146:18 157:15
289:23
**quite**
197:13 205:12 269:2
269:9,22 306:19
**quotation**
246:18
**quotations**
4:5
**quote**
4:7
**quoted**
238:19
**quotes**
238:25 239:3

---
**R**
---

**R**
3:2 121:2
**R&D**
198:6
**R27**
47:3,13,16 48:6
49:16,22 321:11
**Rain**
249:25
**raise**
191:4 278:14
**raising**

191:10 194:10
**range**
198:23 199:5 233:21
**rate**
105:25 106:6,24
107:21 199:3
**read**
4:6 29:9,10 71:12,18
74:18 75:2 83:12
126:25 141:15
160:7 189:13 201:4
218:7 224:9,12
253:16 289:6 324:6
**reading**
162:14 205:16
223:24 224:8
**Reads**
324:6
**real**
97:4 119:16,19,24
270:21 297:11
**realistic**
234:22 235:24
236:13 242:24
244:15,23
**reality**
240:24
**realize**
157:9
**really**
78:5 162:13 173:5
205:16 269:8
313:12
**reask**
288:13
**reason**
117:23 157:21 158:4
183:17 187:21
196:9 277:7 324:6
**reasonable**
194:17 283:4
**recall**
8:9,14 20:5 55:21
97:6,8 98:12 99:6
208:14 212:2
222:13 231:22



232:4 233:19 274:8
292:14,19 293:10
**recalling**
233:18
**receive**
64:18 66:11 225:24
241:15
**received**
87:8
**receiving**
32:24 234:2
**Recess**
34:24 52:7 120:22
209:20 284:6
317:14
**recitation**
75:14
**recollection**
13:21 20:15,16 21:13
26:25 51:4 109:3
148:11 278:3
315:14 316:20
**recommend**
125:14
**recommendation**
128:16
**recommendations**
125:23
**recommended**
127:25 171:15
306:21
**reconcile**
64:15
**record**
4:6 5:3,17 6:7 9:20
11:7 34:23 35:4
46:15 52:3,6,11
60:10 71:21,23 72:3
72:5 74:18 75:2,3
76:20 83:13,24
92:25 93:4,4 100:2
120:2,21 121:7
145:18 149:11
151:7 167:19
195:22 201:23
209:19,24 218:7

238:25 272:4 284:5
284:10 302:25
317:13,18 318:4
319:11
**recorded**
35:24 98:23 99:16
101:2,15 104:2
177:12 275:21
**records**
35:24 36:14,18,23
37:14,23 38:2,4,20
38:23 45:10 46:23
60:12 64:16 70:25
72:23 86:8 92:12
100:7 124:21
276:24 293:9
306:22
**recurring**
62:16
**red**
75:21
**redeemable**
166:18
**reduce**
171:9
**reduced**
107:21
**reengage**
147:11
**refer**
201:9 255:17 312:12
**reference**
19:21 81:2 113:10
129:6 249:4,6
252:11 310:22
**referenced**
270:16
**referred**
28:11 160:6
**referring**
30:11,21 52:13 76:16
152:4 160:4,8 178:7
200:7 210:2 257:22
267:6 273:7 296:7
317:7
**refers**

146:19 167:20
183:23 248:22
**reflect**
36:23 45:11 52:15
100:7 124:7 141:20
142:7 148:17
157:16
**reflected**
4:5 37:7 61:8 82:14
156:5 162:10 174:5
187:24 211:12,23
264:19 276:23
287:22
**reflects**
103:16 110:8 111:22
124:20 148:12
156:15 176:17
**refresh**
109:2
**regarding**
75:9 76:5
**regardless**
92:7,8,11 104:4
**Regards**
22:2 313:25
**register**
165:15
**Registered**
2:12 319:6
**regular**
58:6
**regularly**
35:19 36:4
**regulations**
134:4,13 137:4
**regulatory**
279:17 280:11
**reimbursed**
262:3 297:16
**reimbursement**
54:25 257:11,14
**reiterate**
154:17
**relate**
67:23 180:2,6,13
211:16

**related**
9:8 11:4 14:24 15:2,3
15:6 39:20 69:6
73:16,17 74:14
77:17,21 83:14
99:23 118:11,20
124:4 126:8 169:7
177:3 178:11,12,17
185:2 224:19
285:16 296:23
319:13
**relates**
79:5 178:22 179:3,20
254:21
**relating**
60:15 87:4 185:19
208:8 211:23 216:9
235:5 295:22 296:4
300:9 305:16 309:9
**relation**
220:25
**relationship**
140:19 315:12
**relative**
99:17 268:12
**relaunch**
19:18
**relevant**
9:24 100:21 306:6
**relocate**
169:8 171:16
**relocates**
172:24
**relocation**
172:3,6 173:10 174:4
**reluctance**
238:13
**reluctant**
237:16
**remain**
74:5
**remaining**
215:7 226:16
**remains**
281:17
**remember**



51:17 115:16,22
157:20 282:22
**remove**
303:17
**renamed**
16:20
**rendered**
44:9
**reorganization**
155:12 157:12
168:24
**reorganizational**
157:17
**reorganized**
154:7
**repaid**
103:11
**repay**
109:23 214:14
229:24 230:13
231:3
**repayable**
179:17
**repayment**
79:24 99:9 109:9
296:25 297:17
**repeat**
125:11 240:5 244:20
**repetitive**
88:6
**rephrase**
139:20 148:9
**reply**
219:14 222:19
223:16 301:14
**report**
99:21 100:18 181:7
181:13 184:9 185:9
186:10 188:3 189:3
189:4,8,18 193:19
195:7,15,20 199:16
200:20 289:20
290:6 322:12,13,15
322:16
**reported**
1:23 100:8

**reporter**
2:12 5:18 6:5 47:20
318:8 319:7
**reporting**
85:18 99:16 100:4
238:11 280:4
**reports**
36:14 181:24 182:14
282:21
**repository**
37:12
**represent**
159:19 160:10 162:2
302:15
**representations**
244:17
**representative**
68:13 298:7,15
**represented**
77:24
**representing**
73:16
**represents**
262:25
**request**
106:6
**requested**
247:14
**required**
196:24 197:11
208:23 247:16
**requirements**
249:13,18
**requires**
137:12
**requisite**
31:16
**resignation**
305:7
**resigned**
25:22
**resolve**
70:23
**resources**
256:12
**respect**

41:21 45:20 50:22
55:25 56:14 61:6
75:24 123:23
142:17 215:14
225:10 247:12
257:7 259:12 264:2
293:11 297:24
303:13 307:7
**respectively**
179:18
**responded**
68:10
**responds**
13:16
**response**
75:6,21 76:3 224:10
262:25
**responses**
217:3,10 225:6
262:21 317:2,8
322:22
**responsibilities**
238:4
**responsibility**
136:24 170:14
**responsible**
147:22 175:2 194:5
238:5 246:2
**rest**
22:9 163:20 164:25
242:22 267:5
**restart**
132:10
**restarts**
131:13
**restomod**
20:8,11 21:13 272:22
**restoration**
296:10,24
**restricted**
87:11
**restrictions**
135:16 207:11,15,19
**Restromod**
272:9,10
**restructure**

169:20
**restructuring**
167:19 169:20 171:7
171:14
**resulted**
278:25
**resumed**
122:6
**ret**
272:8
**retain**
190:4
**retained**
195:18 318:7
**retreat**
113:11 114:16
115:13,25 116:5,18
**return**
234:2 293:23 294:7
295:15
**returning**
132:4
**returns**
167:22 219:10 223:3
223:9 224:21
**revenue**
74:12 106:17 198:2
275:21
**revenues**
80:22
**review**
258:19 259:2 260:15
260:23
**reviewed**
7:20,22
**reviewing**
49:10 157:15
**revision**
36:17
**revived**
271:20
**rid**
128:12,25 136:2
**right**
6:15 10:5,20 16:2
18:5 19:22 24:10,14



24:24 26:2,21 27:4
28:6,19 29:5,16,25
30:12,24 31:10,22
32:2,7,17 33:13,23
34:7,14 38:15 39:15
40:12,16,20,23 41:3
42:21 43:5,11,20,23
45:3,17 47:14 48:21
48:25 49:17,24 50:5
52:5 53:18,24 54:8
54:14,21 56:4,15
59:16 60:18 61:4
62:6 63:12,15 64:21
65:18,21,25 66:4,7
66:12,19,24 67:13
70:7,11,14 71:19
77:10 79:9,23 80:16
81:19,22 82:18,25
83:8,15 84:11,18,20
84:25 85:2 86:3,21
86:25 87:5,12,18,24
88:4,10,20,23 89:2
89:6,11,23 92:14
95:7 96:13,17,23
98:8 100:12,16
102:12,19,22 103:3
103:7 104:8 105:14
106:13 107:4,8,15
107:23 110:10
111:4,25 112:12
113:7,12,15 114:22
115:12 118:5,12,21
119:2,6,6,13,17
120:6 122:16,18
125:24 126:23
127:17,21 128:9,13
128:19,23 129:2,15
129:20,25 130:5,15
130:18,23 131:20
131:24 132:5,12
133:10,12,24 134:6
134:18,23 135:22
136:3,18 138:20
140:16 143:2
146:13,22 147:2
148:15,19 149:5,15

149:18 150:19,22
151:12,21 152:19
152:23 153:11
155:8 157:13 158:2
158:6 159:10,21,25
160:6,13 161:3,6,23
162:3,11 163:3,7,13
163:25 164:16,20
164:23 165:11,19
166:5 167:9,13
168:7 169:16 170:6
170:15,19 171:2,22
172:5 173:19
174:15 175:8,19
177:22 178:13,25
180:18 181:2,25
183:3,6 184:6,14
185:10 186:15
187:2,9 188:6,10,13
188:16,19 191:12
191:17,22 196:14
196:19 198:2,8,12
198:23 199:21
200:17,22 201:16
203:25 204:5,11,18
204:25 205:5 207:9
207:13 208:9 209:6
209:18 212:7,14,24
213:8,24 214:18
215:2,11,18,25
216:4,13 219:8
221:12 222:20
223:19 225:11,20
228:5,12,19 232:14
232:20 234:2,9,17
235:9,13 236:15
237:9,12,23 238:3
241:16 244:2,6,12
245:2,6,22 248:12
248:19 250:5 251:4
251:18 255:4,16
260:10 261:20
264:20 265:8,11
266:3,7,10 268:5
269:13 272:2,13,22
276:24 282:12

283:12 286:18,22
287:3,6,14,19
288:19 290:3,7,22
291:2,8 294:22
299:11 300:18
301:2 307:25 308:7
310:7,13,16 312:24
314:7,12 315:2
318:3

**rights**
12:16 30:3,17,22
93:19 282:16

**risk**
107:22 250:17
274:19,20

**risks**
244:10 247:4 248:16

**Roadster**
220:4 221:16

**Robertino**
126:22

**Rockefeller**
3:15

**role**
48:10 130:25 131:5
193:13 297:23

**roll**
122:20

**rolled**
70:6,17 72:12 80:15
80:18 82:15 84:16
86:2 88:9 95:24,25
123:10 152:22

**rolls**
122:14

**romantically**
257:3

**roughly**
142:20 143:23
266:22 267:3
273:20

**Roush**
22:4,15 130:21
245:22,24,25
246:19,22,24
247:13 248:14

249:9

**ROYTBLAT**
3:9

**RPR**
1:24 319:22

**rules**
133:18 135:9

**run**
239:16

**running**
99:3

**RX7**
295:23 296:4,11,23

**Ryan**
1:4 3:24 5:12 14:13
25:15 30:23 31:9
34:13 50:15 305:5
312:5

---

**S**

**S**
3:2 38:11 121:2,2,2

**SA**
22:9,13

**Sadeleer**
145:24

**safety**
133:18 134:4

**salary**
62:17

**sale**
206:6 281:20

**sales**
198:2 226:2 228:2
237:23,24 241:18
248:6,18,22 265:7,8
265:8,9,10,11
277:23

**Sammy**
297:23 299:17

**SAMUEL**
1:7

**sat**
25:11

**satisfied**
210:24



**Save**
317:22
**saving**
6:22
**saying**
10:17 32:12 33:18,20
    51:11 119:24
    133:12 160:25
    223:17 225:4
    235:17,18 239:8
    248:21,24 249:16
    249:19 261:12
    291:15 307:3
**says**
13:12,12 18:18 20:19
    25:6 27:10 29:14,21
    29:23 30:14 31:2,12
    31:20 35:13 36:14
    36:21 42:10 62:4
    64:9,9 82:8 83:10
    96:8 102:18 104:22
    115:10 123:20
    127:2 131:7 146:2
    158:11,19 159:5
    162:21 177:25
    179:9,21 184:22,25
    193:10 198:25
    199:21 208:4,4
    210:18,22 219:8,13
    219:18 222:19
    223:15 240:22
    241:20 246:12
    247:4,6 250:9,12
    252:14 253:8
    261:23 288:9 289:3
    289:6 291:18
    298:24 299:20
    305:4 312:3 313:21
    313:25
**schedule**
23:15 140:4 205:25
    234:23 241:21
**scheduled**
35:20 36:10,12
**schedules**
241:18

**Schiller**
2:10 3:4
**screen**
18:9
**Screenshot**
17:17 321:7
**search**
308:9
**second**
26:6 56:21 57:2
    60:24 61:17 78:4
    86:5 110:20 121:21
    174:7 177:2 184:8
    204:10 206:15,25
    207:3 242:16 250:6
    258:10 259:7
    264:10 283:19
    299:16 302:22
    317:10
**second-to-last**
26:9
**secretary**
37:21 38:10,14
**section**
28:8 35:9,11 204:7
**securing**
243:11
**see**
9:12 13:5,9,18 14:10
    14:14,18 16:22 17:6
    18:4,6,10,14,21
    20:18,25 21:4,23
    22:7,10 25:8 26:11
    26:15 27:19 28:15
    29:13,20 30:8,19
    31:6,18 35:15 36:15
    36:19 37:3 41:9,11
    41:13,18 42:15,25
    44:6,11,20 49:7
    57:13 61:22 63:5
    64:4,7 65:6,9 72:7
    78:3,7,10 79:23,25
    80:6 81:15,24 82:3
    83:5 86:13,16 87:15
    88:22 95:21 96:10
    97:19 98:22 102:18

102:24 108:22
109:7,8,25 110:16
110:16 111:13,18
111:21 115:9
117:22 122:11
124:12 126:18
127:12 131:7,15
132:21 142:13,15
145:12 146:19
147:21 155:20
158:9,17 159:3
161:20 167:23
176:20,25 177:4,8
178:3,20 179:21
180:10 185:22
186:12 193:2,8,10
197:24 198:21
199:7 201:7,11
206:23 210:12,16
211:8 217:12
219:11,13,16 220:5
222:18 223:17
237:2,6 238:22
239:19 241:5
242:18 245:16
246:14 247:20
248:9 250:21
252:19 253:5,10
259:9 262:8 269:21
283:15 285:19
288:25 289:4
290:18 299:9,17
300:5 301:20,22
302:7 304:25 305:8
305:12 310:21
312:10 313:13,23
314:17
**seeing**
115:22 286:7
**seeking**
261:19 263:13,17,25
    264:7
**seen**
46:7 88:25 89:5
    112:14 122:17
    249:24 281:17

    286:10
**segregated**
230:21
**select**
125:5,14
**selection**
125:20
**self-interests**
256:10
**sell**
170:25 236:7 265:2
    265:18
**selling**
89:14 134:11 238:25
    239:2
**selling'**
238:15
**sells**
173:2
**send**
127:9
**sending**
127:5 302:18
**sense**
138:17 224:6 280:22
    294:4
**sent**
218:12 302:9 309:11
    311:25 314:23
**separate**
72:23 201:2
**September**
1:18 2:5 5:7 14:5,9
    17:18 18:13 24:9
    25:10 27:23,24
    28:22 128:8 158:8
    158:10,12 272:20
    292:15 319:12,18
    321:6,7
**series**
7:10 104:23 142:13
    298:23 309:7 314:6
**serve**
27:17
**served**
9:22 62:24 82:9



service
63:19 181:8,14
231:14 232:6
322:12,14
services
5:6 15:22 44:9,16
48:2 181:25 182:5
189:25 278:19
set
13:25 17:14 23:12
39:9 42:24 45:19
49:6 50:20 69:6
70:6,18 82:17 123:8
124:24 141:9
180:23 216:15
225:9 229:10
251:24 283:21
289:18 292:24
305:24 311:18
319:10,17
sets
24:17 44:3 197:25
setting
7:24,25 232:16
270:12 279:23
settle
129:10 214:20
settled
131:13
settlement
86:24 87:7,9,17
127:5,11 129:7,8
210:5,11,19 212:16
213:23 215:13
322:20
seven
36:13
shaded
242:2
share
159:25 165:15
314:19
shared
146:3 244:25 308:21
shareholder
11:18 107:3 162:22

165:16 304:12
shareholders
107:14 192:9 289:16
shares
158:13,22 159:8,12
159:14,19 160:3,5,8
160:8,10,17,19
161:6,9,21 162:2,7
162:17 163:2,16,18
163:23,24 164:5,6,8
164:9,10,13 165:5,9
165:12 166:18,22
166:24 167:4,5,6,7
167:8,13 169:21
170:24 171:8
172:15 173:11
186:25 187:8,24
190:24 202:2,3,18
202:19,21 204:9,10
204:18,22,24
205:10 206:9,10
214:3,22,24 215:5,6
215:17,21,23,24,24
216:3,4,11
sharing
305:15
sheet
76:21 122:22 214:13
252:15 324:2
SHEPPARD
3:13
shift
254:11 264:9
Shifting
297:22
short
51:25
short-circuit
96:20
shortly
251:3
show
12:9 46:15,24 47:19
51:13 108:25
116:10 123:22,22
141:10 181:12

189:14 195:2 200:5
271:9 284:11 293:9
313:9
showed
98:13
showing
17:25 289:16 298:17
shown
46:3 116:16 186:3
201:20 272:3
shows
26:22 120:2 123:24
165:15 237:10
271:5,6,7 316:3
side
146:21 156:11
181:20,20
sign
61:8 175:15
signature
81:25 324:22
signed
38:3 41:9,14,16 82:5
85:13 130:3 175:18
219:4 277:21
significantly
275:14,19
signing
305:6
signs
26:12
similar
49:3 215:16 222:3,6
297:2
Similarly
236:4
SIMONS
3:10 71:16,22 74:23
76:12 77:5
simple
48:16 133:16
simpler
146:10 152:16
simply
16:20 139:21 173:8
256:8

Singapore
196:2
single
70:6,17 299:23
sit
51:4 74:7 91:19 92:8
92:10 94:8 139:10
167:11 206:11
233:18 272:20
274:8,21
sitdown
116:4,22
sitting
10:12 90:17 117:2
276:8
situation
108:2,4
six
63:23 86:13 139:7
140:23 226:13
228:14,18,25 253:4
skin
214:9
skip
8:18 23:13
Skolnick
315:25
slash
17:5
slide
116:10
slides
285:13
slideshow
116:16
slight
295:2
slightly
184:2
slow
239:10
small
294:17
social
271:2
software



59:18,20 60:8,10,18
64:13
**sold**
133:23 137:4 211:5
227:3 249:20
266:22 281:2,2,8
**sole**
29:24 301:17
**solely**
211:3
**solicit**
72:14 243:21
**SOPHIE**
3:9
**sophisticated**
175:6 188:8
**sorry**
24:20 26:7 33:3 42:5
42:7 47:21 53:11
62:14 79:15 84:3
88:15,21 89:14
93:24 94:6 106:10
108:17 118:16
125:10 131:6
137:15 140:24
144:25 148:5 151:4
158:10 189:16,23
203:5 206:2 240:5
244:20 249:5
259:18 280:3,5
288:24 296:16
304:16,22 307:22
309:2 315:18
**sort**
7:18 29:20 55:6 58:4
58:4 59:22 60:14
62:25 70:5 108:8,12
109:18 116:17,25
118:3 124:20 134:3
135:13 146:20
148:3 154:6 181:20
182:11 192:17
198:4 207:23
212:22 222:8,13
224:2 225:5,22
230:21 232:4,16

242:2 248:19 251:2
257:4,21 258:5
259:21 263:12
264:7,18 267:16,22
268:12 269:23,24
270:12 272:7
276:10 278:13
279:18,24 280:11
280:16 281:23
282:16 293:12
295:7 296:3 306:17
307:4,9,18 308:9
313:6,7
**sought**
180:25 257:11,14
**sound**
221:21
**sounds**
203:24
**source**
33:11,15
**sources**
9:10
**SOUTHERN**
1:3
**SPAC**
191:11,15,25 277:8
277:14,17 278:6,12
285:24 286:15,22
287:11,18,18
303:20 305:18
**SPACs**
191:19,21
**speak**
16:3 46:6 107:10,25
108:2 138:5 141:23
176:12 214:9
221:20 239:17
270:22 272:4 287:8
295:3 300:22
306:24
**speaking**
154:4 194:3 300:22
304:6
**speaks**
255:12 270:4

**Special**
35:14
**specific**
50:14 116:24 136:20
162:15 164:6
230:22 270:14
279:18 306:15
**specifically**
36:9 50:10 68:23
69:9 72:8 92:16
160:16 183:22
309:11
**specifications**
44:4
**spectrum**
294:13
**speculate**
140:9
**spell**
47:20 132:21
**spelled**
133:9
**spend**
144:7 169:11 229:17
229:21
**spending**
169:14
**spent**
143:20
**spoke**
123:17 191:18,21
**spoken**
7:21,21 176:8
**spot**
42:7
**spouses**
117:25
**spreadsheet**
59:13 127:10 144:10
144:19 145:25
146:3 252:9 322:7
**spring**
140:14
**SPS**
241:2 266:19
**ss**

319:3
**staff**
242:23
**stake**
183:6
**standard**
37:13 225:22 226:19
**standards**
133:18 250:14,15
**stands**
272:19,23
**Stanley**
314:16
**stapled**
189:17 195:5 216:23
**start**
29:21 44:7 60:23,25
181:18 228:15
247:15
**started**
147:11 156:18
190:12 226:21
**starting**
272:21
**starts**
104:22 218:20 250:4
253:5 313:19
**startup**
106:16 107:13
**state**
2:13 6:6 145:17
301:16 319:3,8
**stated**
75:7 99:7 159:13
**statement**
80:25 82:23 156:6
297:21
**statements**
68:20 69:5,7,13,19
69:23,24 70:7,10,18
72:14 80:14,16 81:7
81:14 82:25 83:5,11
84:18 85:10,20,25
88:4,8,10 95:3 96:2
108:14 122:15
123:8 149:23 150:3



150:10,17 151:11
151:19 152:4,7,10
152:22 156:14
157:25 162:11
211:13 212:5
258:24 264:20
282:2 314:11
321:17 322:8,10
**states**
1:2 48:13 169:12,15
169:24 171:10
173:13 174:5 266:5
266:24
**stationery**
245:18,19
**status**
148:3,14 149:11,16
**stay**
35:6 72:5
**stayed**
154:9
**STENOGRAPHE...**
4:4
**stenographic**
5:17
**step**
15:13 155:11
**Stephan**
114:4 130:10,17
145:23 322:4
**steps**
7:18 148:17 155:14
304:21 306:4
**stick**
8:22
**sticker**
122:2
**sticking**
108:12 152:14
**stock**
204:25 205:4 214:25
**stop**
238:15 246:24
**stopped**
129:4,22 132:11,14
147:10

**strategic**
279:4,11
**strategies**
269:23 270:14
**strategy**
270:21
**streamline**
23:18
**street**
134:3
**strike**
37:17 52:23 58:3
59:25 85:6 92:9
101:6 116:4 128:7
137:15 143:10
152:15 183:16
194:3 208:18,20
217:15 235:20
236:10 239:22
240:8,16 246:9
250:24 263:16
274:6
**stringent**
249:18
**structure**
24:17 69:20 154:14
154:18 155:11,23
156:4 168:12,13
169:7 264:18
267:15
**structured**
166:8,9 168:3
**struggled**
241:8
**stuff**
307:7
**style**
65:14
**subaccount**
92:3
**subject**
9:21 18:16 20:19
39:22 49:5 50:2
56:3 142:3 177:23
178:10 205:16
232:8 246:12

**submit**
55:10 80:13 260:9
**submitted**
55:23 258:3 259:4,6
260:7,12,16
**submitting**
54:25
**subscribe**
214:3
**Subscribed**
318:21 324:23
**subscription**
201:19 219:3
**subsequent**
131:22 278:15
279:10
**subsequently**
135:25 154:14
**subsidiaries**
68:18 76:14,18 153:7
163:12,20
**subsidiary**
131:4
**substantial**
233:24 248:16 282:7
286:13,20
**substantially**
251:16
**substantiated**
257:17
**successful**
273:9,11 295:17
**sued**
77:9
**suffer**
262:6
**sufficient**
241:8
**sufficiently**
137:2 139:4
**suggested**
54:6 219:14
**suggesting**
185:3
**suggestions**
53:21

**suggests**
192:18
**suit**
75:18 77:2,4,8
**sum**
255:14
**summary**
140:10
**Sung-Fung**
1:7 5:12
**Sunwah**
15:16,21
**supplied**
283:2,10 290:25
317:8
**supplier**
147:12 243:12
245:25
**suppliers**
125:6,15 126:8,10
**supply**
100:20 197:10
**supplying**
196:23 291:4
**support**
275:3
**sure**
21:16 55:4 57:3 58:5
79:4 84:22 95:9
101:24 113:24
118:10 125:12,12
134:10 137:2,19
145:9 147:7 151:7
161:10,19 169:2
173:6 176:23
177:20 186:22
189:10 201:6
213:10 218:3 240:6
244:21 247:23
249:11 262:17
270:20 282:9
314:13
**suspension**
312:6
**swear**
5:19



**Switching**
53:5
**Switzerland**
266:19
**sworn**
6:3 318:21 319:10
324:23
**system**
127:20 128:19
146:20 246:3,5
**systems**
127:16

---

**T**

**T**
121:2
**tab**
99:3
**tabbed**
58:18
**table**
289:2,4,13,16
**tag**
227:12
**take**
6:21 29:9 33:5 34:19
47:7 51:19 58:20
66:15 86:6 91:9
113:14 115:13,15
118:3,7 120:17
121:22 129:13
157:23 166:12,15
196:22 209:14,15
225:19 229:16,20
239:14 241:23
243:12 256:23
271:4 273:14
283:20 286:9 306:5
308:6
**taken**
34:24 52:7 120:22
209:20 284:6
317:14
**takes**
240:24 241:14
**talk**

8:2 101:23 116:24
117:4 181:21
**talked**
113:9 123:13 265:15
272:17 279:22
297:5
**talking**
10:20 62:19 74:20
92:16 101:12,21
102:9 116:14,20
143:16 160:16
165:8 177:12
183:25 190:25
211:10 280:21
**talks**
162:16,19 185:6
**target**
219:19 289:9
**tasked**
39:6
**tasks**
139:16
**tax**
85:18 99:17 100:21
167:22 168:3,8,8,11
168:12,15,19,23
169:4,5,6,15 171:2
171:21 172:4,7,21
172:25
**taxes**
100:4 112:12 170:19
**Team**
11:13,21 101:18
103:19 104:2,7,13
105:11 158:14
180:11 210:15
253:5
**Teams**
11:16
**technical**
146:12,20 234:15
312:22 313:6
316:12,21
**technically**
10:5 137:17 182:16
**technological**

183:19,21 295:7
**technology**
183:2,22
**tell**
24:2,4 51:14 147:7
164:15 177:22
205:7 223:11 224:3
235:12 276:8 285:7
302:6
**telling**
209:5 239:23 240:9
309:12
**ten**
42:14
**tension**
242:21
**term**
20:4,5 42:3,5,11,13
48:24 49:4 94:12
244:16,24 294:19
**terminate**
140:19
**terminated**
42:18,24 50:3 140:22
140:25 141:3 243:8
251:3
**terminating**
305:17
**termination**
44:23 49:5,12,21
141:8 303:6,9
**terms**
7:24 9:9 42:2,23
48:16 49:15 59:13
61:2 62:18 75:13
101:5,7 103:17
133:16 138:7
175:12,21 176:9
207:18 214:4
225:25 228:14
242:14 244:16
251:10 266:21
271:12 281:11
288:17 301:19
303:11 306:25
**test**

15:8 51:8 256:2
**testified**
6:4 26:23 122:6
154:13 204:14
**testify**
68:15 75:9 76:5,10
**testimony**
17:9 23:8 75:13,24
98:3 120:5,7 258:18
319:12
**testing**
248:5
**tests**
248:25 249:12
**text**
54:5 145:24 237:12
239:7 298:19,23
299:7,18 301:11
302:7,17 323:9
**texts**
237:8
**thank**
58:21 65:4 84:15
110:16 127:4
272:10 317:19,25
**then-current**
277:12 312:19
**theory**
10:12
**thicker**
289:24
**thing**
29:11 71:19 157:7
288:6,6,7
**things**
26:5 29:15 74:5
96:21 106:15
139:15,22 141:6
147:19 148:14
149:14 214:7 238:9
238:14 243:6
258:15 272:15
**think**
8:6 14:24 15:2,5
19:16,20 21:8,11
22:18,21 23:6 33:6



33:17 51:2 53:25
55:19 62:16 64:7
73:6,12 77:16 84:24
97:19 98:10 99:2
101:20 102:11
112:7 117:16,22
118:2 119:4 125:19
138:22 143:14
147:5,7,21 151:4
153:19 154:13
170:2 183:21
184:20 185:10
187:12 190:12
192:15 193:17,20
195:13,14 199:9,24
200:6,19 203:24
204:8,14 207:19
208:2 209:4,10
212:16 218:25
220:18 230:7
241:14 243:6
248:21,22 251:2
255:15,19 256:7
258:22 260:4 261:3
263:21 264:6,12,16
268:21 270:4,21
271:18 272:17
276:17,18,20
281:23 283:15
291:13,20 293:8,13
301:24 303:3
305:14,22 310:2
313:2,2 316:25
**thinking**
33:3 280:7 305:5
**thinks**
238:14 256:9
**third**
34:4 66:18 174:13
226:10 228:7
231:24 250:9 259:8
259:9
**third-party**
231:3,14
**Thomas**
1:24 2:12 319:6,22

**thought**
51:24 74:19 173:16
257:25
**thousands**
286:25
**three**
75:25 109:25 179:3
212:19 213:24
228:16 232:3,5
**three-month**
233:21
**tied**
73:22,24
**time**
5:8 9:19 10:2 11:11
19:14,20 20:14 23:4
23:15 27:21 28:4
29:3 33:5 34:21
35:2 38:17,18 40:18
43:8 51:22 52:4,9
52:25 53:20,20 62:6
62:17 64:2 66:9,10
67:2 73:2 79:4
94:22 98:20 99:9
120:19 121:3,5
129:5,13 136:2
137:7 144:7 146:25
148:22,22 149:5,5
153:19 156:3
159:15,24 160:19
161:3,3 166:21,25
169:12,14 180:24
180:24 182:19,23
187:12,14 189:12
190:8,9,18 191:5,16
194:12 197:12
203:8 209:14,17,22
218:8,22 219:24
228:2 233:2 243:9
246:25 250:25
251:8,18 256:23
260:19 270:18
271:17 274:2,9
277:3 282:8 283:4,6
283:18 284:3,8
286:7 291:10,21

292:13 298:4,11
299:12,12 300:13
300:15,25 303:20
304:23 306:22
310:3 315:4 317:11
317:16 318:2
**timeline**
140:4 235:24 243:23
244:9,16,24 247:10
274:9
**timelines**
242:15
**timely**
239:25
**times**
52:18 107:13 118:8
136:15
**timing**
247:7,13,14,16
250:19
**tired**
307:22
**title**
26:14 28:19 112:10
263:7 285:8
**titled**
210:10 217:3,10
322:22
**to-be**
48:17
**to-do**
149:17
**today**
5:14,18 51:4 91:20
92:8,10 94:8,17
100:23 139:10
167:11 206:11
220:12 262:10
272:20,23 274:14
274:21 275:16
276:14 311:11
**today's**
5:7 8:5
**told**
128:17 306:14
307:17 316:8,12,20

**Tom**
5:19 18:19,24 19:2,5
19:11 20:10,20
21:17
**Tomaso**
1:7 6:13 7:12 8:4 9:7
10:7,22 12:16 13:23
15:15 16:21 18:3,18
19:6,10 20:19 22:16
23:4 24:7,18 25:12
28:25 29:5 30:24
32:14,23 33:20 34:5
35:17 37:13,22
39:17,25 40:7 41:2
41:21 44:25 45:11
45:21 47:3,13 48:5
48:12 49:22 50:9,22
52:14 53:2,7,18
54:11,24 55:24
57:17,23 60:7 61:11
62:9,11,15,20,23
63:2,3 66:15,24
67:10,13 69:4,12,14
75:17 76:16,25 77:6
79:7 83:14 85:5
86:6,20,23 87:3,12
87:16,23 88:3,12
89:8,9 91:5 93:10
93:14 95:4 96:17
97:3 103:3,15
105:16 108:13
117:19 123:9 125:4
125:13,21 126:8
127:19,24 128:3,11
128:17,25 129:19
129:25 130:10,18
131:2,18,25 132:4
134:20 135:22,25
136:7 138:4,7
139:16,23 140:18
141:4,21 142:2,8
143:5,9,11,12,19
144:23 145:10
146:11,24 147:15
148:2,12 149:3,7
150:10 151:11,20



151:23 152:10
153:16 156:8
157:16,23 158:22
160:12,12,18
161:15,15,16 162:7
164:18,19 174:13
174:18 180:8
182:10,13,17 183:3
186:2 187:14,18,21
189:7 190:3,15,20
191:3,14,20,21
192:6,13 193:6,13
193:25 194:2,4,9,15
194:19,21,22
195:19 196:4,9,14
196:22 198:2,7,12
199:10,15,18,20,23
202:17 203:18
204:4,17,17,22
206:12,14 207:5,16
209:2 210:14
212:12 217:9
218:23 219:20,24
220:22 221:4,14,16
222:2,25 223:11,21
224:3,5,15 225:5,12
225:17 228:24
229:3,6,7,15,23
230:19 231:8,15,16
231:22 232:20,23
232:24 233:23,25
234:6,13,20 235:3
235:22 236:4,12,14
238:3 239:22 240:7
240:15,23 241:7
242:21 246:12
248:4 250:23 251:7
252:14 254:7 255:8
255:19 260:21
261:7,19 262:6
263:17,25 265:17
265:19 266:6,12
268:9,11 269:24
270:7,14 271:11
272:11 274:19
275:4 277:3,7,16

278:5,14 279:3,11
279:16 280:12,18
281:12 283:8
285:13,17 286:3,13
287:2,13,14,19,25
288:16,17 290:25
292:9,14,25 294:2,2
294:9 295:6,8,21
297:18,24,25 298:7
298:12,12 299:22
300:15,20,25 301:6
301:17,24 303:3,13
303:19,21 304:3,6,8
304:13,21 305:14
306:4 308:3,14,22
309:8 310:16,18
312:13,20 314:19
315:5,8 316:3,12,15
316:19 321:11
322:4,10,19
**Tomaso's**
9:15 12:8,19 13:20
14:20 17:9 23:8
26:24 36:3 48:9
51:3 74:11 75:9
76:6 91:10 97:11
135:24 139:14
148:10 160:21
168:2,21 188:22
190:11 191:24
196:11 197:14
213:12,17 220:7
221:8 224:10 234:5
236:7 239:24
240:10 251:17
264:17,25 267:13
267:21 273:4,25
274:14 277:10
279:9 293:20
296:17 302:3 307:9
311:13 312:14,16
315:13,23
**top**
14:10 16:8 63:23
102:17 108:19
237:6 242:2

**topic**
12:10 23:13 39:11,14
67:23 71:7 73:17
74:16 75:4,23 79:5
116:25 117:11
125:2,2 221:3
**topics**
7:11,19 9:2,23 14:25
23:16 39:12 53:5
71:8 73:8,19,21
74:8 147:19 254:21
**total**
98:19 124:17 207:6
**totally**
293:11
**totals**
142:14
**touch**
170:2
**touched**
230:7 268:2 306:23
**track**
37:23 98:18 100:15
146:12 272:3
**tracked**
146:24 163:2
**tracks**
60:20
**trade**
206:6
**trademarks**
93:19
**tranche**
201:8,18 203:7 204:9
204:10 205:8
206:25,25 207:3
**tranches**
206:24
**Trans**
22:5,22 23:3
**transaction**
9:11 153:22 166:5,7
166:23 191:12
197:20 204:16
213:20 214:23
277:15 305:19

**transactions**
36:24 60:11,21 80:21
82:14 191:16
**transfer**
124:7 160:17 262:13
**transference**
162:17
**transferred**
119:11 120:3 128:6
158:13,21 159:7
165:10
**transfers**
262:4
**translated**
204:25
**transmissions**
22:25
**travel**
113:5 258:14
**travels**
317:22
**treated**
104:19 216:10
**treats**
104:6
**tried**
23:18 261:3
**tries**
238:2 239:22 240:8
**triggered**
44:24
**triggering**
49:20
**truck**
111:17
**true**
70:9 240:7 319:11
**truthful**
234:14,22 235:20
**try**
17:4 56:22 220:8
265:18 299:6
**trying**
19:18 33:18 141:23
153:3 155:7,19,20
161:13 185:11



192:12 193:22,23
240:16 259:9
267:13 268:18
270:10 271:11
274:17 280:8
**Tunick**
134:21,25 135:2,13
135:20 136:2,6,10
138:15
**turn**
8:25 13:11 24:16
25:5 27:6 39:10
41:5 43:25 44:2
48:19 63:22 66:17
110:22 164:24
184:3 185:16 187:5
192:22 210:18
237:4 239:6 252:13
299:16
**turned**
180:8
**turning**
39:11 63:5 78:3
86:10 123:12 219:6
241:25
**turns**
48:17
**twice**
237:10
**two**
16:17 27:16 41:7
89:16 102:13,25
103:18 120:15
152:3 179:10
183:18 193:20
201:2 206:24
208:12 211:24
215:23 219:22
220:9,11 232:3,5
238:14 243:7 273:2
288:4
**two-**
233:20
**two-minute**
34:19
**Two-page**

102:3 321:19
**type**
127:20 272:25 297:4
297:14
**types**
257:20 263:13,15
**typically**
162:5,6 169:4 226:13
291:24 292:5

---
**U**
---

**U.K**
11:13 154:2 156:12
**U.S**
20:21 61:13,15 64:20
80:2 89:5 96:8
133:19 135:6,19
138:13 159:8
162:21 163:3,5
165:11 169:9,15
171:16,17 210:23
227:11,13,16
228:23 247:19
249:2,13,17,21
267:4 277:13 281:9
293:17
**U.S.D**
79:25
**Uber**
258:15
**Uh-huh**
274:25
**ultimate**
11:23 161:14 162:3
165:18 303:15
306:3
**ultimately**
11:5 72:12 79:14
82:15 129:19 138:3
140:19 160:20
162:25 163:3,5
167:15 180:7 187:5
198:11,14 199:19
200:21 201:25
224:24 229:21
234:7,16 272:16

278:24 296:18,20
314:15
**ultra**
271:12
**unauthorized**
262:4,14
**uncomfortable**
277:11
**underlying**
169:22 194:23
283:16
**underneath**
163:13
**understand**
6:12 7:9 16:4 19:3
51:15 71:25 72:16
73:21 75:5 77:9
88:15 93:6 98:2
119:21 135:3
138:10 153:3
161:10 166:2 171:5
175:7 176:24
182:22 189:10
192:6 213:10 227:9
233:5,6 274:17
289:12 296:8
298:13 306:10
**understanding**
14:21 18:23 21:6
22:12 23:2 74:20,24
76:15 78:20 79:11
142:21 162:14
168:2,8,22 170:18
171:14 174:17
191:25 196:12
213:13,18 235:24
259:15,20 263:10
293:19,20 294:5
296:17 300:8
305:23 311:14
312:15,17
**understands**
48:6 107:20 213:4
214:21
**understood**
55:4 80:11 169:3

191:20 295:4
**undo**
258:8
**undocumented**
256:19 257:8
**UNICORN**
1:8
**uniform**
56:7
**unilaterally**
32:5
**United**
1:2 93:16 169:12,15
169:24 171:10
173:13 174:5 266:5
266:24
**unnamed**
68:8 75:16
**unreasonable**
106:24
**unsecured**
179:15
**unsigned**
184:9 186:6 189:4
**unsupported**
256:19
**unwind**
257:22,24
**update**
235:15 262:18 292:9
**updated**
58:6 148:22 149:4
292:2
**updating**
149:8 292:14
**urban**
294:15
**USD**
91:17
**use**
60:7,9 66:10 94:12
128:18 172:8
207:12,16 212:12
227:5 266:12
294:20
**uses**



Page 45

245:19
**utilize**
112:24 174:19
265:17 303:19
**utilized**
266:6 290:6
**utilizing**
304:3

**V**

**valuation**
181:23 182:7,14
185:8 187:13,15,23
192:11,16,18,20
193:5,11,14,19,21
194:16 197:2,17
198:12,22 199:11
200:16,22 201:8,10
201:18 202:24,25
203:6,7 219:22
221:17 282:21
283:9 285:22
287:24 288:17
289:5,9 292:6
**valuations**
180:25 182:22
183:10,12 201:2
287:6 292:5
**value**
172:15 182:24
185:19 186:25
187:7 188:5 192:25
199:5 201:25
221:24 287:14,24
288:10,18
**valued**
199:20
**valuers**
283:3
**values**
203:2
**valuing**
183:5,17 188:9,21
195:19 201:15
**various**
70:5 90:3 94:10 97:3

100:8 101:6 119:12
125:5 137:3 142:7
160:21 203:3
257:10 258:15
259:3 285:12
311:10 316:2
**vast**
89:20
**vehicle**
21:8,9 110:25 111:4
133:17 147:20
247:17
**vehicles**
19:19 250:20 275:10
294:15,17
**veil**
77:12
**vendor**
306:21
**venture**
16:14
**Ventures**
11:13,21 101:18
105:11 158:14
180:11 210:15
**verified**
119:19
**verifying**
177:23
**Verona**
115:18
**versus**
5:12 54:20 55:25
**video**
5:9
**videographer**
3:23 5:2,5 34:21 35:2
52:4,9 72:2 120:19
121:5 209:17,22
284:3,8 317:11,16
318:2
**VIDEOTAPED**
1:15 2:9
**view**
104:3 106:25 139:14
188:22 194:15

229:15 256:24
282:25
**viewed**
104:12 258:4 271:25
282:16
**views**
257:12 282:11
**villa**
113:11
**village**
115:17
**vineyards**
115:23
**violation**
32:6 34:7,10
**Voting**
35:10
**vs**
1:6

**W**

**Waft**
86:15,19,25 87:11,17
**wait**
251:12
**walk**
265:24
**walked**
97:2
**walking**
97:8
**want**
7:15 8:16 9:18 10:4
23:13 26:4 32:9
46:8 57:3 58:17
71:20 73:4,9 83:23
113:22 132:23
145:17 149:22
154:20 157:4 172:7
173:5,6 176:14,14
176:23 177:19
183:24 198:16
201:22 203:25
217:15 221:21
227:15 246:8
264:13 282:9

291:25 292:3,6
313:12
**wanted**
106:20 169:13
196:18 251:9
254:23 265:2
**wants**
237:15
**warranted**
98:6
**wasn't**
295:5 306:17
**water**
115:19
**way**
48:4 56:24 65:15,16
77:14 94:25 102:25
155:15 177:22
188:3 213:3 225:17
229:11 230:17
261:13 265:13
267:20 269:13
273:5 287:10
289:23 319:15
**ways**
183:18 188:20
298:25
**we'll**
6:21 9:24 15:10 71:4
72:7 96:20 130:7
144:16 181:20
185:17 283:23
**we're**
10:20 34:23 35:4
39:14 45:24 59:15
68:25 72:2 76:15
80:8,9 120:21 121:7
121:8 124:16
143:16 165:6 184:7
209:19,24 221:23
251:14 264:6
268:21,24 275:11
280:21 281:16
284:5,10 292:15
317:13 318:4
**we've**


MAGNA
LEGAL SERVICES

67:2 76:19 79:3
82:9 88:25 89:4
122:17 143:22
174:11 177:11
216:12 257:8
262:21 264:12
280:9 297:5
**wealthy**
107:8,10,11
**week**
17:3
**weeks**
243:7
**weird**
10:11 189:17
**weirdly**
195:6 216:24
**WENG**
1:7
**went**
8:12 13:14 65:2 97:4
98:23 109:12
114:22 146:13
153:25 197:20
231:22 259:23
**weren't**
266:2
**WHEREOF**
319:17
**whichever**
99:8 138:2 164:24
**wholly-owned**
205:5
**wife**
114:5,7 119:22
**WIGGER**
3:17 6:21 9:18 11:17
12:7,18 14:23 15:5
15:10 17:21 19:7,13
20:7 22:17,20 24:19
29:17 31:23 32:8,18
33:2,14 34:8,15,20
37:9,15 38:24 39:21
42:4 43:17 45:4,13
45:23 46:21 49:8,25
50:12,18,25 51:19

51:23 52:17 53:10
54:9,15 55:3,12
60:2,19 62:12 67:22
67:25 68:22 69:8
70:8,22 71:6,18,24
72:4,16 73:14,20
74:16,25 76:22 77:7
77:20 78:17,24
80:17 82:19 83:16
84:19 85:22 87:6,13
90:4,25 91:23 92:15
93:12,17,22 94:5,21
97:7,14,24 98:9
99:19 100:5,22
101:11 102:11,14
104:14 105:20
106:2,7 107:9,16,24
109:6,21 112:13,18
112:25 114:17
116:7,12 117:10,15
118:13,17 119:3,14
119:18 121:16
125:9,18,25 128:14
128:20 129:3,21
132:13 134:7
135:18,23 136:8,19
137:6,21 138:12,21
139:18,25 140:21
141:7 142:10 143:7
143:13 144:15,18
145:14,22 146:7,15
147:3 148:7,23
149:13 150:20,25
151:4 152:2,24
153:8 154:19 155:3
155:10,25 156:25
159:16,22 160:2,14
160:22 161:7,24
162:4,12 163:4,14
164:2,7,11,21
165:24 166:14
167:2,14 168:4,14
168:25 169:10,17
169:25 170:9,20
171:3,11,23 172:16
173:14 174:2,22

175:9 176:7 177:15
179:2 180:5 181:3
182:2,15 183:11
184:5 185:23 186:4
186:19 187:3,10,17
187:25 188:25
189:9 190:6 191:6
192:2,8,14 193:9,16
194:13,18 196:15
196:20 197:18
198:9,13 199:13
200:2,23 201:17
202:9,15 204:19
205:2,11 206:16,21
207:17,25 209:3
211:17 212:15,25
213:9,21 215:19
216:5 217:24 218:5
218:13,17 220:10
220:16 221:11,19
222:5,16 223:5
224:7 229:19 230:3
231:10,18 232:2,7
232:21,25 234:10
234:18,25 235:10
236:2,8,16 238:24
240:4,14 241:11
243:5 244:3,19
245:3 248:20
251:11,19 252:21
253:13,22 254:8
255:10,22 256:3,15
257:13,23 258:13
259:17 260:11,17
261:2,16 262:15
263:4,19 264:4
265:3 267:9,18
268:14 269:6,14,20
270:3,17,25 271:14
273:10 274:4,15,22
275:17 276:7,12,21
277:9,20 278:7,17
279:6,14,20 280:14
280:24 281:15
282:5,19 283:5,13
284:23 285:3,7,25

287:7,15 288:2,8,20
289:14 290:8,19
291:9 292:11 293:4
293:15 294:8
295:24 296:5 297:7
297:20 298:8,14
300:12,19 301:3,9
302:5,19 303:7,14
303:25 304:14
305:20 306:18
307:12,20 308:12
308:18,23 309:2,19
311:3 312:25 314:8
314:21 315:17
316:7,17,24 317:23
**Wild**
126:23 240:25
**wire**
21:19 262:4
**wired**
20:21
**Wisconsin**
145:3
**wish**
303:17
**wishes**
99:9
**withdraw**
24:22 189:13 277:15
302:23 304:18
**witness**
5:20 6:3,14 7:13 75:8
76:4 84:23 232:11
319:9,12,17 320:3
**Wong**
41:10,16,21 43:23
44:25 45:16 46:4,10
50:22 51:6,12
108:20,25 109:8,12
109:24 174:25
175:23 176:4,10
293:3
**Wong's**
295:16,18
**word**
46:8 132:21 133:12



MAGNA
LEGAL SERVICES

**work**
13:14 20:11 23:4
  30:24 48:18 62:11
  62:14,25 66:6,15,24
  67:12,17,18 96:16
  125:24 128:2,5,13
  129:10,15 131:19
  132:5,9,11 134:10
  134:22 136:18,22
  136:25 137:9,10,18
  139:24 148:12
  170:19 174:14
  188:4 189:2 197:7,9
  197:17 231:16
  246:19 248:19
  251:4 285:23
  298:13
**worked**
21:14 125:5 132:7
  246:21 277:24
  296:14
**working**
127:15 129:4,22
  131:23 135:9
  136:11 138:14
  147:10,16 183:10
  221:5 232:23 238:6
  243:11 246:24
  260:20 275:5
  303:20 312:20
  313:3
**works**
22:24 127:3 172:21
  265:13
**world**
133:24 266:13
  270:24
**worldwide**
138:16
**worry**
144:6
**worth**
199:24
**wouldn't**
157:22 220:20
  243:16,19 265:20

**wrap**
283:24
**write**
21:18 237:14 242:2
**writes**
16:12,25 20:20
  301:12
**writing**
310:13
**written**
28:14 53:7,19,23
  54:7,14,18,24 55:8
  67:4 103:14 105:8
  256:4 263:12
  308:19
**wrong**
139:23 150:23
  172:18 258:3,4
**wrote**
180:14

---
**X**
---

**x**
1:3,9

---
**Y**
---

**Yang**
110:3,5
**Yard**
297:9
**Yards**
2:11 3:6 5:10 297:3
**year**
16:16 44:19 45:9
  49:17 65:18 123:9
  124:6 132:12 150:3
  150:18,23 151:12
  151:20 153:15
  227:24 273:2 282:3
  322:9
**years**
42:14 45:3 48:25
  49:24 84:21 219:22
  220:9,11 221:10
  225:25 226:22
  271:19

**yesterday**
8:8,21 230:8
**York**
1:3,17,17 2:11,11,13
  3:7,7,16,16 5:10,11
  82:5,6 112:24 113:3
  113:6 120:9 319:3,4
  319:8

---
**Z**
---

**Zach**
3:8 6:9,17 7:5 12:20
  13:2 14:2,7 15:2,8
  15:12 17:15,23,24
  23:22 34:18 35:5
  37:17,20 39:24 40:6
  43:19 46:24 47:6,19
  51:22 52:2,12 56:17
  57:10 58:11,23 59:5
  59:10,25 60:3,5
  67:24 68:17 69:3,11
  71:2,20 72:11 73:4
  73:18 74:7 77:11
  78:2,19 80:24 81:9
  84:24 85:3 95:13,18
  101:25 102:6,13,15
  105:22 111:6,12
  119:15 120:17
  121:8,18 122:7
  126:12,17 130:7,13
  132:17,19 133:5
  141:14,18 144:5,13
  144:16,20,22
  145:16 146:5,8,16
  148:5,8 149:24
  150:6,14,22 151:3,6
  151:9 155:13 168:7
  168:10 170:10
  181:5,11,17 184:7
  189:16,21 192:3,5
  195:4,10 200:8,12
  202:10,11 203:9,14
  203:21,23 204:20
  209:13,25 210:8
  216:22 217:7 218:3
  218:9,21 220:13,17

233:4 236:18,23
  239:2,5 245:9,14
  251:25 252:6,23
  253:2 254:12,20
  255:13,25 256:5
  263:8,9 265:4 274:6
  274:7 282:6 283:19
  284:11,17,21 285:5
  285:11,18 288:3,23
  298:17,22 302:22
  303:2 309:14,24
  310:4 311:19,24
  313:18 317:10,19
  320:4

---
**0**
---

---
**1**
---

**1**
6:18 7:2,11 44:10
  45:17 50:5,8 57:7
  57:12 75:13 176:18
  179:9 180:19 193:6
  226:21 227:6,12
  238:14 281:8
  287:25 289:10
  321:4,12
**1,050,000**
11:6
**1.05**
11:6
**1.0B**
193:11
**1.1**
21:20 205:25
**1.2**
281:9
**1.3**
281:9
**1.5**
193:7 194:17 219:23
  221:18
**1.5B**
193:11
**1.6**
226:25 227:3



**1/2**
44:25
**1:2023cv04305**
1:5
**10**
39:14 42:8 44:2 45:3
   48:25 49:24 58:23
   59:2 66:17 84:7
   87:20 100:9 103:10
   105:13,25 106:23
   177:11 179:16
   276:17 321:15
**10-year**
43:22 45:8 49:4
**10,000**
158:16 159:2,9
**10:22**
34:22,24
**10:25**
34:25 35:3
**10:45**
52:5,7
**10:56**
52:8,10
**100**
163:16,18,19 164:19
   164:22,25 167:12
   173:3 183:19
   186:15 199:21
   215:9
**100,000**
22:3 293:16
**10001**
3:7
**10112**
3:16
**102**
321:19
**11**
39:14 59:6,7 87:21
   95:6,10,12 123:13
   133:3 134:17
   321:16 322:5
**11.12**
199:4
**111**

321:20
**114**
321:21
**12**
81:4,5 82:17 84:14
   84:15,20 95:25
   108:13,16 110:19
   111:21 123:3
   152:19 154:10,25
   157:5,8,13 176:13
   208:8 211:22 247:3
   264:16,21 321:5,17
**12:05**
120:20,22
**12:44**
120:23 121:3,6
**1200212**
1:25
**121**
321:22
**126**
321:23
**13**
17:18 18:13 95:14,14
   95:15 108:15
   245:12,15 321:7,18
   323:4
**130**
322:4
**132**
322:5
**14**
78:8 102:2,3 247:3
   290:2 321:6,19
**140**
81:25
**141**
322:6
**144**
322:7
**15**
14:5,9 106:21 111:7
   111:8,9,13 267:4
   321:6,20
**15-minute**
209:15

**15.6**
78:13
**150**
322:8,10
**150,000**
293:16
**159753**
144:11 145:6 322:7
**16**
114:19 115:2 185:16
   187:6 321:21
**17**
65:7 110:22 111:20
   111:21 121:11,13
   121:18 122:9
   236:21,24 321:7,22
   322:24
**175**
201:10,15
**18**
1:18 2:5 5:7 108:19
   121:20,22,23,25,25
   122:3 126:13,14
   130:5,6 184:21
   185:16 187:6
   192:23 319:12
   321:23
**181**
322:12,13
**189**
322:15
**19**
130:8,9 322:4
**19,730,968**
142:18
**195**
322:16
**195,000**
111:22
**1960s**
270:9
**19th**
319:18
_____
            **2**
**2**

9:6 12:21,22 13:3
   42:11 44:25 61:21
   75:14 180:20
   210:18 238:18
   321:5
**2(d)**
42:24 49:6
**2,000**
273:17
**2.5**
49:23
**2/12**
41:16
**2:15**
209:18,20
**2:39**
209:21,23
**20**
132:18 133:2 143:20
   143:23 178:19
   214:5 215:14
   271:19 276:19
   322:5
**200**
322:17
**2013**
220:15
**2014**
10:25
**2015**
10:25 14:5,9 321:6
**2017**
12:23 13:8 17:18
   18:13 19:16 20:14
   22:16 321:5,7
**2019**
271:20
**2020**
24:9 25:10 27:24
   28:22 36:10 94:23
   122:21 123:9 150:4
   150:11,18 151:12
   151:24 152:8,11
   153:18 158:8,12,20
   182:14,23 187:9
   188:23 252:18



282:3,22 322:9,11
**2021**
  50:24 82:10 96:13
  103:2,5 108:19
  109:5 110:9 111:17
  123:5 150:12
  151:21,25 152:12
  153:13,15 176:18
  176:19 190:13,18
  191:5,16 281:25
  282:3 322:11
**2022**
  36:11 40:4,12,14
  44:10 45:17 48:20
  50:5,8 57:7,8,12,12
  61:21 63:24 65:7
  78:9 94:24 95:3
  128:9 133:3 134:17
  138:6 140:14
  176:17 177:6
  179:22 190:18
  191:5,16 231:8
  260:6 264:17,24
  265:6 269:13
  270:19 273:5
  275:16 278:11
  279:5,7,10,19
  280:13 285:12
  288:16 290:7,22
  291:13,16,18
  297:22 299:8
  321:10,12,13 322:5
**2023**
  82:6 85:11,24 88:7
  130:11,15 131:18
  141:2 146:7 148:7
  148:11 157:2
  199:12 210:5,10
  218:12,18,20
  220:17 236:21,25
  245:12,15 246:20
  247:10 250:25
  251:8,18 290:3
  291:23 322:4,21,24
  323:4
**2024**

1:18 2:5 5:8 272:20
  275:11 292:17
  318:22 319:12,18
  324:24
**2025**
  275:12
**2026**
  250:15
**2027**
  250:16
**2028**
  179:17
**2029**
  179:17
**203**
  322:18,19
**2032**
  250:16
**2044**
  305:2
**21**
  141:10,11 322:6
**210**
  322:20
**217**
  322:22
**22**
  144:5,10 322:7
**221**
  255:24
**225**
  261:23
**226**
  313:12
**23**
  7:11 146:7 148:7
  149:25 150:2,16,25
  151:3,10 152:6,15
  153:2,11,14,20
  154:5 155:24 156:2
  156:4,7 220:16
  321:8 322:8
**236**
  322:24
**24**
  150:8,9 151:2,18

152:9,18 153:12
  154:6,10 155:24
  156:2 322:10
**245**
  323:4
**25**
  181:6,7,18,19 183:4
  184:5,7 206:13
  207:8 226:8,9,11,16
  322:12
**25,000**
  66:21
**250**
  227:10
**250,000**
  44:18 45:9 49:16
  227:15,20 228:8
**252**
  323:5
**254**
  323:6
**26**
  48:20 63:15 181:12
  181:13,19 183:5
  186:9 288:16
  322:13
**260,000**
  21:19
**27**
  189:18 218:11,18
  322:15
**27,070.83**
  63:15
**28**
  195:6,7,11,14 289:25
  322:16
**284**
  323:7,8
**29**
  66:17 86:10,11 200:8
  200:9 216:16
  322:17
**298**
  323:9
**2M**
  79:25

---
**3**
---
**3**
  14:3,4 24:9 25:10
  27:6,24 28:22 42:8
  44:6 75:15 103:3,6
  184:21 200:25
  289:7 321:6
**3(b)**
  44:7
**3:54**
  284:4,6
**30**
  3:15 203:10,11 207:6
  207:9,12,16 209:4
  216:16 322:18
**30(b)(6)**
  6:14,19 7:3 71:7,7
  73:3,22 232:11
  321:4
**30,000**
  61:25 96:9
**309**
  323:10,11
**31**
  12:23 13:8 57:8,12
  150:4,18 151:12,21
  152:8 158:20
  176:16,18 187:9
  188:23 203:16,17
  203:21,25 204:3
  210:5 216:16 282:4
  321:5,13 322:9,19
  322:20
**311**
  323:12
**313**
  323:13
**31st**
  210:10 252:17
**32**
  210:3,4 216:17
  322:20
**32,000**
  131:12
**33**



216:25 217:2
322:22
**34**
236:18,19,20 322:24
**344**
185:21
**35**
208:17,24 210:23
211:2 212:11
213:13,24 216:7
245:10,11,15 323:4
**36**
252:2,3 323:5
**37**
254:13,16 323:6
**38**
284:13,14 285:6
323:7
**39**
284:17,18 285:15,19
287:21 323:8

————————————
**4**
————————————
**4**
17:16,17 18:2 35:9
63:24 78:3 176:15
179:7,9 321:7
**4.1(b)**
210:21
**4:05**
284:2
**4:09**
284:7,9
**4:41**
317:12,14
**4:42**
317:15,17 318:3,6
**40**
298:18,19 321:9
323:9
**40,000**
20:22
**400**
187:9
**400,000**
262:7

**41**
309:15,16 310:5
323:10
**42**
309:15,19,21 310:10
323:11
**43**
198:17 290:13,14
311:19,20,21
323:12
**44**
313:9,15 323:13
**47**
142:18 321:11

————————————
**5**
————————————
**5**
23:19 35:6,8 63:5
125:2 204:8 207:7,9
218:20 321:8
**5.1**
27:9
**5.1(1)**
27:10
**5.13**
29:7
**5.4**
204:12,13
**5:18**
299:19
**50**
267:3
**543,000**
108:21
**55**
2:11 3:6 5:10
**57**
321:12
**58**
321:14,15
**59**
321:16

————————————
**6**
————————————
**6**
35:9,11 39:25 40:2,7

45:20 75:4 96:12
285:11 320:4 321:4
321:9
**6.2**
35:13
**60,000**
22:6
**61**
237:5
**63**
241:25
**680**
199:5
**692**
206:2

————————————
**7**
————————————
**7**
46:25 47:2 108:18,19
321:11
**7.3**
36:17 177:7
**7.4**
179:23
**70s**
270:9
**72**
225:15 255:2 273:16
281:2
**7355**
304:25
**75,000**
22:4
**750**
199:6
**750,000**
228:23 234:8
**79,669**
64:25

————————————
**8**
————————————
**8**
57:5,6,11 60:25 61:7
61:9 65:5 67:20
83:4 110:9 157:8
321:12

**80,000**
64:3
**800,000**
20:21
**81**
321:17
**83**
201:4
**840,000**
20:23
**85TR**
21:3,7

————————————
**9**
————————————
**9**
23:13 44:2 58:12,14
58:22,22 67:21 68:3
82:13 83:25 84:3
158:8,10,12 321:14
**9:00**
2:6
**9:55**
5:8
**95**
321:18
**95,000**
253:9
**962**
206:2


MAGNA
LEGAL SERVICES