# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
RYAN BERRIS,
          Plaintiff,
                          Case No.:
     -against-            1:23-cv-04305(AS)
SUNG-FUNG CHOI (a/k/a NORMAN CHOI),
DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC,
HIN WENG LUI (a/k/a SAMUEL LUI),
GENESIS UNICORN CAPITAL CORP.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - x


            DEPOSITION TAKEN VIA ZOOM

            September 19, 2024

               8:04 a.m.

          Videotaped deposition of SAMUEL
     LUI, held at the above-mentioned time,
     before, LESLIE FAGIN, a Court Reporter
     and Notary Public in the State of New
     York.


                    - - -


     MAGNA LEGAL SERVICES - (866) 624-6221
                www.MagnaLS.com



Page 2

```
 1
 2   APPEARANCES:
 3
     BOIES SCHILLER & FLEXNER LLP
 4   Attorneys for Plaintiff
             55 Hudson Yards
 5           New York, New York 10001
     BY:     SOPHIE ROYTBLAT, ESQUIRE
 6           JOHN ZACH, ESQUIRE
             DAVID SIMONS, ESQUIRE
 7
 8   SHEPPARD MULLIN RICHTER & HAMPTON LLP
     Attorneys for Defendants
 9           2099 Pennsylvania Avenue, NW
             Suite 100
10           Washington, D.C. 20006-6801
     BY:     ALEXANDRA BUSTAMANTE, ESQUIRE
11           HANNAH WIGGER, ESQUIRE
12
     ALSO PRESENT:
13
     DIANA MAJCHER
14
     RYAN BERRIS
15
     NORMAN CHOI
16
     JACOB USCINOWICZ, Videographer
17     Magna Legal Services
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2          THE VIDEOGRAPHER:  Good morning.
 3     We are now on the record.
 4          This begins videotape No. 1 in the
 5     deposition of 30(b)(6) Samuel Lui,
 6     Genesis, in the matter of Ryan Berris v.
 7     Sung-Fung Choi, et al.
 8          Today is Thursday September 19,
 9     2024 and the time is now approximately
10     8:04 a.m. Eastern time.
11          This deposition is being taken at
12     Zoom virtual location.
13          The videographer is Jacob
14     Uscinowicz of Magna Legal Services and
15     the court reporter is Leslie Fagin of
16     Magna Legal Services.
17          Will counsel and all parties
18     present state their appearances and who
19     they represent?
20          MR. SIMONS:  My name is David
21     Simons, Boies Schiller Flexner,
22     representing plaintiff, Ryan Berris,
23     joined on the Zoom by my colleagues John
24     Zach, Sophie Roytblat, as well as Mr.
25     Berris.
```



Page 4

```
 1
 2          MS. WIGGER:  This is Hannah Wigger
 3      for Sheppard Mullin representing Genesis
 4      and Sam Lui.  I'm joined by my
 5      colleagues, Alexandra Busamante and
 6      party representatives Norman Choi and
 7      Diana Majcher.
 8          THE REPORTER:  I need to make
 9      statement on the record, because I'm not
10      with the witness.
11          The attorneys participating in this
12      deposition acknowledge that I am not
13      physically in the deposition room, and
14      that I will be reporting this deposition
15      remotely.
16          They further acknowledge that in
17      lieu of an oath administered in person,
18      I will administer the oath remotely.
19          The parties and their counsel
20      further agree that the witness may be in
21      a state where I am not a notary and
22      stipulate to the witness being sworn in
23      by an out-of-state notary.
24          If any party has an objection to
25      this manner of proceeding, please state
```



Page 5

```
 1                     S. Lui
 2      so now.
 3            (No objection.)
 4  S A M U E L    L U I,   called as a witness,
 5      having been duly sworn by a Notary
 6      Public, was examined and testified as
 7      follows:
 8  EXAMINATION BY
 9  MR. SIMONS:
10      Q.   Good evening.  Is it pronounced
11  Lui?
12      A.   Yeah, Lui.
13      Q.   Good evening, Mr. Lui.  I know it's
14  morning for those of us on the east coast,
15  but I believe it's 11:05 p.m. where you are.
16      A.   Yes.
17      Q.   Are you in Singapore right now?
18      A.   I'm in Hong Kong.
19      Q.   Hong Kong, okay.
20            As we discussed with your counsel,
21  we understand it's nighttime there.  We will
22  not make you stay up all night.  We will do
23  our best to get you done by hopefully 11:30
24  p.m. your time.  I know that seems late, but,
25  of course, if you start flagging and you feel
```



```
 1                    S. Lui
 2  like you just can't continue anymore, that's
 3  fine, we understand, and we can just pick it
 4  up tomorrow and make accommodations to make
 5  sure we get everything done.
 6            Does that sound okay?
 7       A.   Yeah, okay.
 8       Q.   Understanding this is a virtual
 9  deposition and there is nobody else in the
10  room with you, do you have a phone with you
11  right now, like on your person?
12       A.   It's on my desk.
13       Q.   Would you mind just picking it up
14  and turning it off for the duration of the
15  deposition, at least while we are on camera?
16       A.   Okay.
17       Q.   I appreciate that.
18       A.   Okay.  Just give me a second.
19       Q.   Yes.  Thank you.
20            Do you have access to any kind of
21  messaging application or device that's open
22  on your computer right now?
23       A.   I can turn it off.  Do you want me
24  to turn it off?
25       Q.   If you wouldn't mind just turning
```



Page 7

```
 1                    S. Lui
 2   it off.  Thank you.  Just to make sure you
 3   are not distracted during this deposition and
 4   to make sure there is no one bothering you
 5   with any type of communication.
 6               MS. WIGGER:  To make sure you don't
 7          have anything in front of you or on your
 8          screen.
 9          Q.   I don't know if you have a Smart
10   watch.  Nothing in front of you, nothing on
11   the screen.  All right.
12               Have you ever been deposed before,
13   Mr. Lui?
14          A.   No, first time.
15          Q.   Lucky you.  I'm sure your lawyers
16   gave you some sort of guidance on how to
17   handle the deposition, but we will cover some
18   ground rules to make it go as smoothly as
19   possible for everyone.
20               I think one first ground rule is
21   just that we try not to speak over each
22   other.  That applies to me, that applies to
23   you, that applies to me and your counsel, Ms.
24   Wigger.  Usually the witness is better at
25   this than the counsel are, but I will ask you
```



```
 1                  S. Lui
 2   some questions.
 3            It's usually best if you sort of
 4   pause a second before answering to allow your
 5   counsel to object if they have any
 6   objections.
 7            Generally, the way it works is
 8   those objections are just sort of put on the
 9   record.  You still have to answer the
10   question that I've asked you unless your
11   attorney specifically instructs you not to
12   answer the question.
13            Does that make sense?
14   A.    Yes.
15   Q.    I think we might show you some
16   documents which we will call exhibits.  We
17   will mark them, Genesis 1, 2, 3, et cetera.
18   The way it's going to work in this setting is
19   my colleague, Ms. Roytblat will pull it up on
20   the screen using the typical share screen, it
21   will pop up on your screen just like you see
22   it in a normal sort of Zoom share and we will
23   go through that document.
24            I think if you need her to direct
25   you to a certain portion, we will work
```



Page 9

```
 1                    S. Lui
 2   through that and it's the nature of a virtual
 3   deposition.
 4              Does that sound okay?
 5       A.   Yes.
 6       Q.   Mindful of the fact that it's kind
 7   of late where you are, we are going to try to
 8   keep breaks to a minimum.  I think the way it
 9   works, if you need a bathroom break or grab
10   water or tea or whatever, we will go off the
11   record and basically everyone should just
12   mute their microphones and their cameras
13   during the break and when we pick back up,
14   you can put your camera back on and put your
15   microphone back on.
16              Does that make sense?
17       A.   Yes.
18       Q.   So let's get into it a little bit.
19              As we noted at the beginning, you
20   are going to be testifying for now in your
21   capacity as the corporate representative of
22   Genesis Unicorn Capital Corp. so we will make
23   very clear when we start asking you questions
24   in your capacity as Samuel Lui.  I know it's
25   a bit odd because you, Samuel Lui, are the
```



Page 10

                        S. Lui

1

2    person here today testifying, so I will ask

3    questions phrased towards Genesis Unicorn.

4    It sounds a little weird, but what I'm asking

5    about is all the knowledge that Genesis

6    Unicorn has based on your preparation for the

7    deposition today.

8           Does that make sense?

9    A.    Yes.

10    Q.    What did you do today to prepare

11    for your deposition, just to be clear, what

12    did you do today to prepare to testify on

13    behalf of Genesis Unicorn Capital?

14           MS. WIGGER:  Object to form.  I

15           assume what did you do generally, not

16           literally just today.

17    Q.    What did you do to testify for the

18    deposition today?

19    A.    I did refresh my memory.  I did go

20    back and look at some of the messages with

21    Ryan, Norman, you know, some of the emails

22    and I had two calls with my counsel last

23    week.

24    Q.    I don't want to know anything about

25    that, but you had two calls with your counsel



```
 1                    S. Lui
 2  and just when were those calls with your
 3  counsel, what day?
 4       A.   You said you didn't want to hear
 5  about that.
 6       Q.   Sorry, to be clear, I don't want to
 7  hear about the substance.  We can talk about
 8  when you met with them, for how long you met
 9  with them, but nothing about the substance of
10  the conversations that you had with them.
11            Does that distinction --
12            MS. WIGGER:  Sam, just don't tell
13       them anything we talked about, but you
14       can tell him the day if you remember.
15       A.   Yeah.  Okay.  The last one was on
16  Sunday, last Sunday, and then there was one
17  call, I can't remember when it was, I think
18  Thursday or Wednesday, I can't remember the
19  exact date.  So those were the two calls I
20  had with my counsel.
21       Q.   Was anyone on those calls besides
22  your counsel?
23       A.   No.
24       Q.   You mentioned that you looked back
25  at some emails, I think you said, or some
```



```
 1                    S. Lui
 2   messages with Ryan.
 3            Were you referring to Ryan Berris?
 4       A.   Yes.
 5            MS. WIGGER:  Object to form.
 6       Q.   You said you looked back at some
 7   messages and some emails with Norman.
 8            Were you referring to Norman Choi?
 9            MS. WIGGER:  Object to form.
10       A.   Yes.
11       Q.   Did you do anything else to prepare
12   for your deposition on behalf of Genesis
13   Unicorn besides looking at some documents
14   with Ryan and Norman and speaking to your
15   counsel?
16            MS. WIGGER:  Object to form.
17       A.   Well, I did look at some of the
18   Genesis public documents as well because it's
19   up on the SEC website, so I did refresh my
20   memory, I went back to look at some documents
21   and the dates to make sure I have the exact
22   dates to certain events.
23       Q.   So it's fair to say you looked back
24   at some of the publicly available SEC filings
25   for Genesis, right?
```



Page 13

```
 1                    S. Lui
 2      A.    Yes.
 3      Q.    Did you speak to anyone else who
 4  either currently or in the past is associated
 5  with Genesis Unicorn to prepare for your
 6  deposition today?
 7      A.    No.
 8            MS. WIGGER:  Object to form.
 9      Q.    The answer was no?
10      A.    Yes, the answer was no.
11      Q.    I just want to cover your
12  background briefly.
13            Can you describe your educational
14  history, really starting just with university
15  or any higher education?
16      A.    Okay.  1998, I graduate with
17  bachelor of accountancy from university in
18  Singapore which is Nanyang Technological
19  University, N-A-N-Y-A-N-G, Technological
20  University, that was '98.
21            My first jobs were in financial
22  audit which I did for four years and then
23  after that, I moved to investment banking in
24  Singapore and in Hong Kong and I have been
25  doing investment banking, capital market work
```



Page 14

                         S. Lui
1
2    since then, so I've been in this industry for
3    21 years.
4                MR. SIMONS:  I have marked as a
5          document as the first exhibit here.
6          Sophie, if you can share tab 1.  We will
7          mark this as Genesis Exhibit 1.
8                (Genesis Exhibit 1, copy of Samuel
9          Lui's LinkedIn profile, marked for
10         identification.)
11               MR. SIMONS:  Give Sophie a second.
12         It should come up on the screen.
13               MS. WIGGER:  If you want to see the
14         whole document, they can probably send
15         it to you and you can scroll through the
16         entire thing.
17         Q.    Let's start on the first page and
18    we will scroll through it.
19               MS. WIGGER:  For the record, can
20         you scroll through so I can see the
21         whole document you are putting in front
22         of the witness?
23         Q.    Let's go back to the first page.
24               Mr. Lui, does this appear a copy of
25    your LinkedIn profile?



Page 15

```
 1                    S. Lui
 2       A.    It looks like it, yes.
 3       Q.    And how frequently do you update
 4   your LinkedIn profile?
 5       A.    The last time was I think two years
 6   ago.
 7       Q.    Let's scroll down to the bottom
 8   just to sort of confirm some of the
 9   information on here.
10             You testified earlier about your
11   educational history that is reflected here
12   where it says Nanyang Technological
13   University, correct?
14       A.    Yeah.
15       Q.    Then if we scroll up a little bit,
16   is your first job out of university working
17   at a firm called Arthur Andersen?
18       A.    Yes.
19       Q.    You worked there from August 1998
20   until January 2002, is that correct?
21       A.    Yes.
22       Q.    Why did you leave Arthur Andersen
23   at that point?
24             MS. WIGGER:  Object to form.
25       Q.    You can answer.
```



Page 16

```
 1                    S. Lui
 2        A.   I'm not sure what's the relevance.
 3   I left for a better paying job.
 4        Q.   I understand.  We are just covering
 5   your background.
 6             I sort of meant, what were the
 7   circumstances under which you left.  If you
 8   left for a better paying job, that's totally
 9   fine.  We will cover this so we understand
10   the background of the witness testifying
11   today.
12             That better paying job was at EY or
13   Ernst & Young?
14        A.   Yes.
15        Q.   And it says here you worked there
16   from May 2002 until April 2003, is that
17   correct?
18        A.   Yes.
19        Q.   Then if you scroll up a little bit
20   more, was your next job at HSBC?
21        A.   Yes.
22        Q.   And you worked there from
23   approximately May 2003 until June 2004, is
24   that correct?
25        A.   Yes.
```



                        S. Lui
1
2       Q.    Then was your next job at Societe
3   Generale or how ever you pronounce it?  Soc
4   Gen, most people call it, right?
5       A.    Yes.
6       Q.    You worked there from approximately
7   July 2004 until August 2005, is that correct?
8       A.    Yes.
9       Q.    If we scroll up a little bit more,
10  your next job was at ABN AMRO Bank NV, is
11  that right?
12      A.    Yes.
13      Q.    You were there from August 2005
14  until April 2007, is that correct?
15      A.    Yes.
16      Q.    Then you worked, it says at Merrill
17  Lynch next, is that right?
18      A.    Yes.
19      Q.    You worked there from May 2007
20  until May 2009, is that correct?
21      A.    Yes.
22      Q.    Keep scrolling up.
23            Was your next job at Feres,
24  F-E-R-E-S, Limited?
25      A.    Yes.



Page 18

```
 1                   S. Lui
 2       Q.    And you were the chief financial
 3  officer there?
 4       A.    Yes.
 5       Q.    What kind of work does Feres do?
 6       A.    It's in the mining industry.
 7       Q.    You worked there from July 2009
 8  until May 2011, is that right?
 9       A.    Yes.
10       Q.    If you go up to the next entry, you
11  worked next at -- actually, let me pause for
12  a second.  It looks like there is maybe a
13  break between May 2011 and October 2013.
14  Maybe if we scroll up, I'm not sure if there
15  is something else that fills in there.
16            What did you do after you left
17  Feres, but before you joined ELL
18  Environmental Holding?
19            MS. WIGGER:  Object to form.
20       A.    I took a two years break.
21       Q.    That sounds great.
22            Did you do some traveling during
23  that break?
24       A.    Yeah, I spent a lot of time in
25  Indonesia.
```



Page 19

                        S. Lui

 1
 2     Q.    After that two-year break, you
 3   resumed employment at ELL Environmental
 4   Holdings Limited, is that right?
 5     A.    Yes.
 6     Q.    That was based in Hong Kong?
 7     A.    Yes.
 8     Q.    Was that a publicly-traded company
 9   in Hong Kong?
10     A.    Yes, they hire me as the CFO to
11   take them public.
12     Q.    You worked there from October 2013
13   to June 2015, is that accurate?
14     A.    Yes.
15     Q.    Above that, it says you were a
16   member of a board of the directors of a
17   company called MEC Coal, is that right?
18     A.    Yes.
19     Q.    Was that full-time employment or
20   you just served on the board?
21     A.    I just served on the board.
22     Q.    Scroll up.  It says you also worked
23   at Singapore Kitchen Equipment Limited as an
24   independent nonexecutive director, is that
25   correct?



```
 1                    S. Lui
 2        A.    Yes.
 3        Q.    That was for a period from May 2018
 4   to September 2021?
 5        A.    Yeah.
 6        Q.    Again, once again, that was you
 7   serving on the board instead of as a
 8   full-time employee, is that right?
 9        A.    Correct.
10        Q.    Then above that, it says you worked
11   at Rockstead Capital Group from December 2011
12   until December 2021, is that right?
13        A.    Yes.
14        Q.    So were you working there partly
15   during the period where you said you had your
16   break of employment?
17        A.    Yes.
18        Q.    Was this like a part-time
19   consultancy?
20        A.    I'm just a board director.
21        Q.    You were a director of Rockstead
22   Capital Group?
23        A.    Yeah.
24        Q.    Then above there, it says that you
25   were also a member of the board of directors
```



```
 1                    S. Lui
 2   of EFT Solutions Holding Limited.
 3            Do you see that?
 4        A.    Yes.
 5        Q.    That was also -- or is still a
 6   publicly-traded company in Hong Kong?
 7        A.    Yes.
 8        Q.    That was from December 2016 until
 9   present day.
10            Are you still serving on that
11   board?
12        A.    Yes.
13        Q.    If we scroll up, it says you were
14   the founder and managing director of an
15   entity called LV Capital, is that right?
16        A.    Yes.
17        Q.    What is LV Capital?
18        A.    So it's my own firm mainly to do
19   some of my own private investments and to
20   help clients on fundraising, clients,
21   meaning, private companies to raise funds, to
22   help them when necessary.  If they have plans
23   to go public, I will help them with the IPO
24   plans as well.
25        Q.    When you say you do your own
```



                         S. Lui
1
2    private investments, do you mean you invest
3    in other entities using your own capital?
4         A.   Yes.
5              MS. WIGGER:  Object to form.
6              Sam, try to give a little pause in
7         case I need to say something before you
8         answer.
9         Q.   I will second that.  It's an
10   unnatural dynamic.  You want to just answer
11   the question as I asked it, it's totally
12   natural, but it's usually best just to take a
13   deep breath, wait to see if Ms. Wigger has an
14   objection.  If not, just go ahead with your
15   answer.
16             You mentioned that LV Capital also
17   consulted other clients to assist them in
18   raising funds, is that right?
19        A.   Yes.
20        Q.   What exactly does that entail?
21             MS. WIGGER:  Object to form.
22        A.   I'm not sure how to explain that
23   because if there are companies that need to
24   raise capital, like could be a series A,
25   series B and then they need access to



Page 23

                              S. Lui
1
2       investors.  I have my own pool of investors
3       that I work with all the time, so depending
4       on, you know, the status of the company, the
5       state of law, the amount of funds they
6       require, I then do a matching and match both
7       companies together, and if it's a deal, then
8       it's a deal.
9               So I will match make companies
10      together, so companies who need capital and
11      investors who have money to invest into
12      private companies, so I'm trying to match
13      both sides to see if we can get a deal done
14      on the fundraising.
15          Q.    You mentioned in your answer that
16      there is a pool of investors that you work
17      with regularly, is that right?
18          A.    Yeah.
19          Q.    What did you mean by that?
20          A.    So they could be, say, family
21      offices in Hong Kong and Singapore.  They may
22      have a portion of their portfolio that they
23      are looking to invest into, say, private
24      investments, so I will speak to these
25      investors to see if they have interest in the



Page 24

```
 1                    S. Lui
 2   company that I'm trying to help to raise
 3   funds.
 4        Q.   Besides the family offices in
 5   Singapore, are there any individuals that you
 6   consider are this pool of investors that you
 7   work with regularly?
 8             MS. WIGGER:  Object to form.
 9        A.   Yes.
10        Q.   Who are those individuals?
11        A.   It's impossible for me to list all
12   the names.
13        Q.   Can you list any of the names?
14        A.   Yeah, I can, but I don't see the
15   relevance, I'm sorry.
16        Q.   It's not up to you, I'm afraid, Mr.
17   Lui, to determine what is or is not relevant.
18             For the purposes of this
19   deposition, if you know the answer to the
20   question, you are supposed to answer the
21   question.
22        A.   In Singapore, there is Philip Wong,
23   there is Philip Ton, there is Steven Ling,
24   there is Jack Wong.
25             In Malaysia, there is Fran Ling,
```



Page 25

```
 1                    S. Lui
 2  there is Wara Ling, so those are some of the
 3  people that I will talk to.
 4       Q.   Are there any individual investors
 5  that you have relationships with who are
 6  based in Hong Kong?
 7            MS. WIGGER:  Object to form.
 8       A.   Not regular, no.
 9       Q.   Going back to Genesis Exhibit 1 --
10  just to finish off on LV Capital, you
11  currently still are affiliated with LV
12  Capital?
13       A.   Yes.
14       Q.   Is that a yes?
15       A.   Yes.
16       Q.   What kind of entity or corporate
17  entity is LV Capital?
18            MS. WIGGER:  Object to form.
19       A.   It's a limited company.
20       Q.   Limited company, is it incorporated
21  or registered in Singapore?
22       A.   In Hong Kong.
23       Q.   Then the last or most recent entry
24  on your experience is Genesis Unicorn Capital
25  Corp., director, president and CFO from
```



Page 26

```
 1                    S. Lui
 2  October 2021 to present, is that accurate?
 3      A.   So I don't know when this was
 4  printed --
 5      Q.   Right.  And sorry, I don't mean to
 6  interrupt.  We understand that there might be
 7  -- I know it says to present, so if you want
 8  to clarify.  When did you stop having those
 9  roles with Genesis Unicorn Capital Corp.?
10           MS. WIGGER:  Object to form.
11           You have to let him finish his
12       answers without interrupting.
13           MR. SIMONS:  Fair enough.  I was
14       trying to be helpful, but I understand.
15           MS. WIGGER:  I got it.
16      A.   So I was there from October 2021 to
17  August 2023.
18      Q.   Since August of 2023, where have
19  you been employed?
20      A.   I still have my own LV Capital and
21  since September 2023, I have had one contract
22  with De Tomaso Automobili Holdings Limited.
23      Q.   What is your role or title at De
24  Tomaso?
25      A.   The contract I signed says CFO.
```



S. Lui

1

2          Q.    The contract you signed says that

3     you are the chief financial officer?

4          A.    Yes.

5          Q.    Are you, in fact, the chief

6     financial officer of De Tomaso?

7          A.    I see myself more as an advisor

8     because I do not -- I don't take on day to

9     day responsibilities in managing the

10    business.

11         Q.    So is that a no, you do not

12    consider yourself to be the chief financial

13    advisor of De Tomaso?

14              MS. WIGGER:  Object to form, asked

15         and answered.

16         A.    The contract says CFO, but I don't

17    do what is typically, you know, what I would

18    typically do if I was a CFO role.

19         Q.    So what are your job duties at De

20    Tomaso?

21         A.    My job so far is to do fundraising.

22         Q.    What does that entail?

23         A.    Raising funds for De Tomaso private

24    investments specifically.

25         Q.    How do you raise funds for De



Page 28

1                    S. Lui

2    Tomaso?

3            MS. WIGGER:  Object to form.

4        A.    Would you repeat that?

5        Q.    Have you, in fact, raised any funds

6    for De Tomaso?

7        A.    Yes, I did.

8        Q.    When did you raise those funds?

9        A.    I think -- I can't remember the

10   exact date, but I think starting from August

11   or September, that was when the first tranche

12   of the funds was raised, so in total, we

13   raised about 25 million U.S. so far.

14       Q.    Who did you raise those funds from?

15       A.    FTAG Asset Management.

16       Q.    What is FTAG Asset Management?

17       A.    They are a licensed asset

18   management fund based in Singapore and they

19   are licensed in Labuan, L-A-B-U-A-N,

20   Malaysia.

21       Q.    You mentioned that you did this

22   fundraising in or around August or September

23   of 2023, is that correct?

24       A.    Yeah.

25       Q.    I believe you testified that you



Page 29

                              S. Lui
 1
 2    began your contract with De Tomaso in October
 3    of 2023, is that correct?
 4        A.    I can't remember exact date,
 5    September or October, I think it was
 6    September.
 7        Q.    When you were doing this work for
 8    De Tomaso raising capital from FTAG, did you
 9    have a written agreement with De Tomaso at
10    that point?
11            MS. WIGGER:  Object to form.
12            You can go ahead and answer, Sam.
13        A.    No.
14        Q.    Did you have any type of unwritten
15    or informal agreement with De Tomaso relating
16    to the work that you were doing to raise
17    capital?
18            MS. WIGGER:  Object to form.
19        A.    No.
20        Q.    So why were you raising capital for
21    De Tomaso if you didn't have any type of
22    agreement with them to do so?
23            MS. WIGGER:  Object to form.
24        A.    There was a fee that LV Capital was
25    entitled to.



Page 30

                    S. Lui
 1
 2      Q.    When you say -- sorry, go ahead.
 3      A.    There was a success fee that LV
 4   Capital was entitled to in the event of a
 5   successful raising.
 6      Q.    When you say, there was a success
 7   fee that LV Capital was entitled to, do you
 8   mean was entitled to if you raised funding
 9   specifically for De Tomaso?
10      A.    Yes.
11      Q.    Is there a document that
12   memorialized this agreement?
13      A.    Yes.
14      Q.    Who entered into that agreement on
15   behalf of De Tomaso?
16      A.    I can't recall.  I think it must
17   have been Norman.
18      Q.    By Norman, you mean Norman Choi?
19      A.    Yes.
20      Q.    And do you recall when LV Capital
21   entered into this agreement?
22      A.    I cannot recall offhand.
23      Q.    You entered into this agreement on
24   behalf of LV Capital, right?
25      A.    Yeah.



Page 31

                        S. Lui
1
2       Q.   We can put that document down.   I
3  want to show you what we will mark as Genesis
4  2.
5            MR. SIMONS:  Sophie, that's tab 2.
6            (Genesis Exhibit 2, notice of a
7        rule 30(b)(6) deposition of Genesis
8        Unicorn Capital Corp., marked for
9        identification.)
10      Q.   I think per Ms. Wigger, scroll down
11 so we can see the whole document.
12           MS. WIGGER:  Did you send an
13       updated notice?
14           MR. SIMONS:  No, I don't think we
15       did.  I think we just agreed over email.
16      Q.   If you can go back to the first
17 page please.
18           Mr. Lui, have you seen this
19 document before?
20      A.   Yes.
21      Q.   And without getting into specifics
22 of conversations with counsel, when did you
23 -- do you recall when you first saw this
24 document?
25      A.   I can't remember.



Page 32

1                     S. Lui

2        Q.    That's fine.  I will represent to

3    you that this is what we call a notice of a

4    rule 30(b)(6) deposition of Genesis Unicorn

5    Capital Corp.

6              You see that's what is written on

7    there, right?

8        A.    Yes.

9        Q.    It was mentioned at the beginning

10   the nature of that is that Genesis Unicorn

11   Capital Corp. is putting forth a

12   representative to testify on its behalf.  Is

13   that your understanding?

14       A.    Yes.

15       Q.    You understand that you, in fact,

16   are the lucky person that gets to testify on

17   behalf of Genesis Unicorn Capital Corp.,

18   right?

19       A.    Yes.

20       Q.    You can disagree with me about

21   whether you are lucky or not, I understand

22   that, but you are the person that is

23   testifying on behalf of Genesis, yes?

24       A.    Yes.

25       Q.    So when I'm going to be asking you



Page 33

                              S. Lui

 1    questions pretty much from here on out, I am

 2    going to be asking you those questions and

 3    expecting you to answer in your capacity as a

 4    corporate representative of Genesis Unicorn

 5    Capital.  Does that make sense?

 6        A.    Yes.

 7        Q.    Is there any reason why you cannot

 8    testify completely and accurately in that

 9    capacity today?

10        A.    I'm not aware of any reasons.

11        Q.    Are you -- I think we established

12    in the previous testimony, but you left

13    employment with Genesis Unicorn Capital Corp.

14    in or around August of 2023, is that correct?

15        A.    Yes, but left employment is not the

16    correct word.  Genesis, we never had any

17    employees, I was an officer, but none of us

18    were paid salaries so, you know, so to answer

19    the question, we all left Genesis because

20    August 2023, our budget was completed, we

21    call it de-SPAC, the de-SPAC was completed

22    with a Singapore company, Environmental

23    Solutions Asia Private Limited.

24            The merger deal was done in August

25



                        S. Lui

1

2    2023 and Genesis was -- cease to exist on

3    that date, so all of us, you know, as a

4    result of the merger, we were not appointed

5    by the entity, merged entity Chok Fun is ESGL

6    Holdings Limited.

7              Stock hold is also ESGL, so most of

8    us except one director, Ernest Fong, we all

9    left, we are no longer officers or directors

10   on the ESGL block except Mr. Ernest Fong who

11   continued to sit on the board.

12             So from Genesis, he was a board

13   director and then he moved over to ESGL as a

14   board director as well.

15        Q.   Did you speak to Mr. Fong in

16   preparation for your testimony today?

17        A.   No.

18        Q.   Leaving aside any discussions with

19   counsel, who at Genesis Unicorn Capital Corp.

20   asked you to testify on their behalf today?

21             MS. WIGGER:   Object to form.

22             To be clear, Genesis doesn't exist

23        anymore.

24        Q.   You can answer.

25        A.   Yeah, so I was the main -- I was



Page 35

                              S. Lui
 1
 2    the main person driving the Genesis business,
 3    so the best person to answer any of the
 4    questions would be myself.
 5            I did all the -- most of -- all of
 6    the work from the listing side to talking to
 7    various potential merger targets, to the
 8    lawyers, to the advisors.  I'm the only
 9    person who knows everything that goes on in
10    Genesis so I can't think of anyone else that
11    would be suitable to be here representing
12    Genesis other than myself.
13        Q.    That makes sense to me, Mr. Lui.
14            The question I asked was slightly
15    different, but maybe related question.
16            Who from Genesis Unicorn Capital
17    Corp. or its successor in interest designated
18    you to testify today?
19            MS. WIGGER:  Object to form.
20        Again, this is not a notice to ESGL, so
21        you can ask about the company that used
22        to exist in 2023.
23            You can answer if you can, Mr. Lui.
24        A.    Again, I'm the most suitable person
25    to represent, you know, if I wanted to,



Page 36

                        S. Lui
1
2    maybe, I don't know, someone else could be in
3    this position now, but I can assure you, you
4    wouldn't be getting the full answers.
5         Q.    Fair enough.  We definitely want
6    the full answers.  Let me try the question a
7    slightly different way.
8              Was there anyone associated with
9    Genesis Unicorn Capital Corp. involved in the
10   decision to designate you as the corporate
11   representative today other than you, Samuel
12   Lui?
13             MS. WIGGER:  Object to form.
14             You can answer if you can.
15        A.    Yeah.  So I don't understand that
16   question because as of August 2023, Genesis
17   Unicorn ceased to exist.  This document for
18   deposition came out in August 2024, one year
19   later, so, and as I mentioned, I'm the only
20   person that knows everything from the IPO to
21   looking for targets, due diligence, closing
22   the de-SPAC, you know, so if there was any
23   questions that if you want a full, complete
24   answer, I would be the only person that would
25   be able to do that from Genesis.



                          S. Lui

1

2      Q.    Understood.  Let me try to maybe

3  sort of distill this into a more concrete

4  question.

5           You are sitting here today, Mr.

6  Lui, as the Genesis 30(b)(6) corporate

7  representative, right?

8      A.    Yes.

9      Q.    Besides your attorneys, who, if

10 anyone, was involved in the discussions

11 whereby they said you, Samuel Lui, are going

12 to be the person to appear for this

13 deposition?

14          MS. WIGGER:  Object to form, asked

15      and answered.

16     A.    I have nothing to add to that.

17     Q.    Was there anyone besides your

18 attorneys involved in those discussions?

19          MS. WIGGER:  Object to form, asked

20      and answered.

21     Q.    It hasn't been asked.  It certainly

22 hasn't been answered.

23          MS. WIGGER:  He is answering the

24      question as best as he can.  You are

25      just not listening to the answer.



Page 38

                         S. Lui
 1
 2            MR. SIMONS:  Can we keep our
 3       objections to form?
 4       Q.   Mr. Lui, was there anyone besides
 5  your counsel involved in the discussions
 6  about who would testify on behalf of Genesis
 7  Unicorn Capital Corp.?
 8            MS. WIGGER:  Object to form, asked
 9       and answered.
10       Q.   You can answer.
11       A.   No, I think my counsel answer on my
12  behalf.
13       Q.   She is not allowed --
14            MS. WIGGER:  Unfortunately, you
15       have to answer no matter how many times
16       he asks you, so go ahead and answer
17       again.
18       A.   I already answered.  You can ask
19  anyone on my team who will be best position
20  to answer all these questions, who knows
21  Genesis the best, it's me.
22       Q.   I'm not questioning that you know
23  Genesis the best and I think it's great that
24  you are here to testify and I appreciate that
25  you are the main person doing all the work



Page 39

1                         S. Lui

2    for Genesis.

3              The question that I'm trying to get

4    an answer to is, was there anybody besides

5    you and your attorneys who was involved in

6    the discussions that led you to be testifying

7    here today on behalf of Genesis?  And there

8    may be there wasn't anyone, I don't know.  I

9    just need to know the answer.

10        A.    No, no one.

11        Q.    Did you ever have any discussions

12   with Mr. Norman Choi about the decision to

13   have you testify as Genesis's corporate

14   representative?

15        A.    No.

16        Q.    Did you ever have any discussions

17   with Diana Majcher about the decision to have

18   to testify about Genesis's corporate

19   representative?

20        A.    No.

21        Q.    Did you ever have discussions with

22   anyone associated with De Tomaso about the

23   decision to have you testify as Genesis'

24   corporate representative?

25              MS. WIGGER:  Object to form.



Page 40

1                    S. Lui

2        A.    No.

3        Q.    I just want to go through the

4   topics here, so let me scroll down a bit.

5             This is Exhibit A.  We will go

6   through the topics.

7             Do you see these deposition topics

8   listed here on the screen?  And I think that

9   is, in fact, of the totality of the

10  deposition topics, so if you want to take a

11  minute and read through those and just let me

12  know when you are done.

13       A.    Please, go ahead.

14       Q.    So what did you do to prepare to

15  testify regarding these specific topics?

16            MS. WIGGER:  Object to form, asked

17       and answered.

18       A.    I already answered the question I

19  believe.

20       Q.    Your answer was that you looked at

21  some emails and text messages with Mr. Berris

22  and Mr. Choi, right?

23            MS. WIGGER:  Object to form,

24       misstates earlier testimony.

25            Answer one more time please, Sam.



Page 41

                              S. Lui
1
2       A.    Yes.
3       Q.    And I believe you said you looked
4    at some public SEC filings associated with
5    Genesis?
6       A.    Yes.
7       Q.    Did you review any other documents?
8       A.    I looked at my computer to see what
9    other documents that were potentially
10   relevant.
11      Q.    When you say you looked at your
12   computer to see what other documents were
13   potentially relevant, what were the other
14   documents you looked at?
15            MS. WIGGER:  Object to form.
16      A.    So, for example, we have a deal
17   tracker so we track all the different
18   companies that we are looking at, that we
19   were potentially interested to acquire or to
20   merge with, so I'm just going through all
21   those names just to refresh my memory.
22      Q.    Mr. Lui, who, if anyone, is paying
23   the legal fees associated with the
24   representation of Genesis Unicorn Capital
25   Corp., if you know?



Page 42

1                        S. Lui

2              MS. WIGGER:  Object to form.

3         A.    I've been paying out of my own

4    pocket.

5         Q.    You, Samuel Lui, are personally

6    paying the legal fees for the representation

7    of Genesis Unicorn Capital Corp.?

8         A.    Yes.

9              MS. WIGGER:  Object to form.

10        Q.    Is anybody reimbursing you for your

11   payment of those legal fees?

12        A.    No.

13        Q.    Have you ever asked anybody to

14   reimburse you for your payment of those legal

15   fees?

16        A.    No.

17        Q.    Do you have any expectation that

18   you will be reimbursed for the payment of

19   those legal fees?

20              MS. WIGGER:  Object to form.

21        A.    No.

22        Q.    I want to start getting into

23   Genesis' understanding of some of the issues

24   raised in this deposition notice.

25              Just a little bit of background.



Page 43

```
 1                    S. Lui
 2  Is Genesis aware -- I know it's a bit weird
 3  because I will be asking is Genesis aware of
 4  things involving you, you are supposed to
 5  answer both as to anything you know
 6  personally in your role with Genesis Unicorn
 7  or anything that you learned from others at
 8  Genesis Unicorn in preparation for this
 9  deposition.
10           So with that preface, is Genesis
11  aware whether Samuel Lui owned stock in
12  Genesis or its successor entity?
13           MS. WIGGER:  Object to form.
14       A.   Can you clarify your question?  I
15  don't understand when you mean Genesis
16  Unicorn.
17           Let me put it this way, Genesis
18  Unicorn was a listed entity, right, so the
19  shares that I own, because I was the sole
20  member of the -- we call it sponsor of the
21  SPAC, of the sole member of the sponsor of
22  the SPAC and my shares are more than 5
23  percent of the listed company, so all the
24  shares that I own is actually publicly
25  disclosed from day one.
```



Page 44

                          S. Lui
 1
 2              So to answer your question, it's
 3    not just Genesis Unicorn.  I think you can go
 4    into SEC website.  The whole world can see
 5    how many shares I own of Genesis Unicorn and
 6    subsequently of the successor ESGL Holdings
 7    Limited as well.
 8         Q.   What was your, meaning Sam Lui's,
 9    shareholdership in Genesis Unicorn?
10         A.   I can't remember the exact amount,
11    but I believe it was 2 plus million shares, I
12    can't remember the exact amount.
13         Q.   Do you still hold those shares?
14              MS. WIGGER:  Object to form.
15         A.   I still hold a majority of those
16    shares, yes.
17         Q.   And what is the approximate value
18    of your equity ownership interest in Genesis
19    Unicorn or its successor today?
20              MS. WIGGER:  Object to form.
21         A.   I need a calculator.  Can I use my
22    phone?
23         Q.   Sure -- let's not do that actually.
24              Do you still currently own roughly
25    2 million shares?  We can do some back of the



Page 45

```
 1                    S. Lui
 2   envelope math together maybe.
 3        A.    No, specifically I own I think 1.7.
 4   It's publicly disclosed.  I can't remember
 5   the exact number.
 6        Q.    Your understanding is you currently
 7   own about 1.7 million shares in ESGL, is that
 8   right?
 9        A.    Yes.
10        Q.    So if I were to represent to you,
11   you can check this later, I think yesterday,
12   the share price of ESGL was about $1.90, does
13   that sound about right to you, U.S. dollars?
14        A.    I think it close.
15        Q.    If we were to calculate your equity
16   ownership, it would be 1.7 million times
17   $1.90, right?
18             MS. WIGGER:  Object to form.
19        A.    Yes.
20        Q.    You mentioned at one point that you
21   owned I believe 2 million or a little bit
22   over 2 million shares, is that right?
23        A.    Yes.
24        Q.    Is it fair to say that you sold
25   some of those shares at some point?
```



Page 46

                        S. Lui
 1
 2        A.    No.   I didn't sell any of the
 3   shares.   In fact -- so the difference of
 4   about, I can't remember, maybe half a million
 5   shares or thereabouts.  I gave it to my other
 6   board members as in officers and board
 7   members.
 8              So the way that I compensated the
 9   rest of my directors and officers was not
10   through salaries, we gave up shares as their
11   compensation.
12              This is all publicly disclosed, the
13   breakdown, how much, it's all publicly
14   disclosed.
15        Q.    So did you say that you gave up
16   shares, is that what you said?
17        A.    Yes.
18        Q.    What do you mean by that?
19        A.    So I can't remember, I would say,
20   let's say it's 2.2 million shares, I can't
21   remember the exact amount, and then I took
22   500,000 shares out of my shares and then
23   distribute those shares to my board of
24   directors and fellow officers.
25        Q.    Why did you do that?



Page 47

1                      S. Lui

2        A.    It's a very common practice in the

3    SPAC world, we don't pay salaries, we

4    compensate the directors and officers through

5    shares.

6        Q.    Have you made any profit from your

7    investment in Genesis Unicorn Capital Corp.?

8              MS. WIGGER:  Object to form.

9        A.    I have not sold my shares, so the

10   answer is no.

11       Q.    How much money did you personally

12   invest in Genesis Unicorn?

13             MS. WIGGER:  Object to form.

14       A.    Again, I don't have the exact

15   number, but I invested north of 7 million

16   U.S. into Genesis.

17       Q.    Was that all your personal funds?

18       A.    Yes.

19       Q.    What was the source of those funds?

20             MS. WIGGER:  Object to form.

21       A.    My employment income, my business

22   profits, my profits from property

23   investments, from investments into shares of

24   publicly listed shares.

25       Q.    Did any of that 7 million in funds



Page 48

1                     S. Lui
2    come from money that was lent or provided to
3    you from anybody else?
4              MS. WIGGER:  Object to form.
5         A.    Can you be more specific?
6         Q.    Sure.  Seven million dollars, at
7    least to me, is a lot of money.  I know there
8    are plenty of ways to make $7 million.  You
9    said you have employment income, business
10   profits and that was some of the source of
11   the $7 million.
12              I'm just trying to figure out if
13   there was sort of anybody else that helped
14   contribute to that pot of capital either by
15   lending you money or providing you additional
16   money, pooling their money with you?
17              MS. WIGGER:  Object to form, asked
18        and answered.
19              I think he listed where he got his
20        money.
21        A.    Yeah.  So my sources of where, I
22   got mainly from my employment income, my
23   business profits and, you know, sometimes
24   it's from clients where we have arrangements
25   for advanced fees as well, meaning, I take



Page 49

                         S. Lui

 1
 2   deposit for fees that are due to me when the
 3   deal is not closed yet, but I will take an
 4   advance first so that I will commit to a
 5   specific project.  It's kind of like an
 6   upfront payment, but, yeah, so but I can't
 7   recall the exact sources, but, you know, in
 8   between, sometimes I made loans, private
 9   loans that I may undertake to kind of move my
10   cash around, you know, so, yeah.
11            So I agree with you, 7 million is a
12   lot of money so I can't remember the exact
13   breakdown of when it happened, but there
14   could have been short-term loans that I took
15   to cover the cash payment required to go into
16   Genesis Unicorn.
17       Q.   And who would have been the other
18   party on the other side of those short-term
19   loans?
20            MS. WIGGER:  Object to form.  He
21        didn't say there were any.  He said
22        there might have been.
23            Which deposition topic does this
24        relate to the 30(b)(6)?
25            MR. SIMONS:  The equity ownership



Page 50

```
 1                    S. Lui
 2      of Genesis Unicorn.
 3           MS. WIGGER:  No, the equity
 4      ownership would be number of shares, not
 5      who hypothetically might have given a
 6      short-term loan if there was one.
 7           Why don't we stick to 30(b)(6)
 8      topics today?
 9           MR. SIMONS:  We absolutely are and,
10      once, again I appreciate if you limit
11      your objections to form or if you are
12      going to instruct him to answer, that's
13      fine.
14           MS. WIGGER:  My appropriate
15      objection right now is what 30(b)(6)
16      topic are you talking about right now?
17           MR. SIMONS:  I identified the
18      topic.
19           MS. WIGGER:  That doesn't relate to
20      equity interest.
21      Q.   Mr. Lui, you can answer the
22 question.  Let me know if you need me to
23 repeat it.
24      A.   I believe I already answered the
25 question, so unless you have something more
```



Page 51

```
 1                    S. Lui
 2  specific to ask.
 3      Q.    The specific question was who -- to
 4  the extent you said you may have used
 5  short-term loans to finance your equity
 6  ownership interest in Genesis Unicorn
 7  Capital, who would have provided you those
 8  short-term loans?
 9          MS. WIGGER:  Object to form and
10      foundation.  There has been no testimony
11      as to what short-term loans.
12      A.    I can't recall offhand right now.
13      Q.    Would it have been a bank, an
14  individual?
15          MS. WIGGER:  Object to form, calls
16      for speculation, lack of foundation.
17      A.    I can't recall.
18      Q.    Sitting here today, you don't have
19  any recollection of the potential individuals
20  or entities that may have loaned you money to
21  invest in Genesis Unicorn?
22          MS. WIGGER:  Object to form, asked
23      and answered.
24      A.    No, I can't recall.
25      Q.    Mr. Lui, when was Genesis Unicorn
```



Page 52

```
 1                    S. Lui
 2  Capital formed?
 3       A.   So I did not form Genesis Unicorn.
 4  It was formed by someone else, by Juan
 5  Fernandez, but from memory, I think it was
 6  formed in February 2021, but I could be
 7  wrong.
 8       Q.   That's fine.  It's not a memory
 9  test.
10            Actually, I can pull up a document
11  that might help refresh your recollection.
12            MR. SIMONS:  Sophie, I think this
13            is tab 3.  I don't know if you want us
14            to scroll through all 207 pages.
15            MS. WIGGER:  Can you give an
16            indication what this is and a Bates
17            number?
18            MR. SIMONS:  I'm not sure there is
19            a Bates number.  It's a publicly
20            available document, a Form S-1 appears
21            to have been filed with the Securities
22            and Exchange Commission, registration
23            statement for Genesis Unicorn Capital
24            Corp. and appears to be dated July 1,
25            2021.
```



MAGNA
LEGAL SERVICES

Page 53

                    S. Lui
1
2          MS. WIGGER:  That's fine.  Without
3      a Bates number, seeing this for the
4      first time and all I see is page 1, we
5      will take your representation, but,
6      yeah.
7          MR. SIMONS:  Let's mark this as
8      Genesis 3.
9          (Genesis Exhibit 3, Form S-1 filed
10      with the Securities and Exchange
11      Commission, registration statement for
12      Genesis Unicorn Capital Corp. dated July
13      1, 2021, marked for identification.)
14      Q.    Does this look familiar, Mr. Lui?
15      A.    Yes.
16      Q.    Does this refresh your recollection
17  about when Genesis Unicorn Capital Corp. was
18  first formed?
19      A.    Again, I did not form Genesis
20  Unicorn, it was formed by someone else.  I
21  believe it was Juan Fernandez, but this is a
22  public document.
23          From memory, I think Genesis was
24  formed in February 2021.  You can scroll
25  down.  That information is there.



Page 54

1                          S. Lui

2        Q.    I understand that you were not

3    involved in the initial formation of Genesis

4    Unicorn, but you are aware that your

5    obligation today was to educate yourself and

6    prepare to testify generally about the

7    formation structure and ownership of Genesis

8    Unicorn, right?

9        A.    Sure.   If you want me to advance

10   now, I can open up my --

11       Q.    No, no, that's fine.   Like I said,

12   it's not a memory test.

13            I'm just trying to establish what

14   is your knowledge and what you did to prepare

15   to testify for this topic?

16            MS. WIGGER:   I think the witness

17       asked to scroll down to answer the

18       question.   Can we do that?

19            MR. SIMONS:   Where do you want to

20       scroll to?

21       A.    I believe it was formed in

22   February.   Just control F, February.

23            MR. SIMONS:   Let's see if we can

24       do.   That, maybe it's easier with the

25       virtual setting than otherwise.   The



Page 55

                        S. Lui

1

2       record may or may not reflect that we

3       are doing a control F search for

4       February in the PDF document that has

5       been marked as Genesis 3.

6       Q.    According to Adobe Acrobat, there

7  are no matches.  The document, it's very

8  lengthy.  We will not waste anyone's time

9  going through all of it.

10            I do want to go to one part on, I

11  think the third page.  If you can scroll down

12  there.

13            If you see in the first paragraph,

14  right, it says -- again, the first paragraph

15  under the sort of prospectus heading.

16  Genesis Unicorn Capital Corp. is a newly

17  organized blank check company formed under

18  the laws of the State of Delaware.

19            Do you see that?

20      A.    Yes.

21      Q.    What is a blank check company?

22      A.    It means you list the company

23  without any business at time of listing and

24  you have a time, in this case for Genesis, we

25  have 12 months to look for companies to



Page 56

                         S. Lui
1
2    acquire, so in the initial stages, when you
3    are listed with just money and no business,
4    that's what, in our industry, you call a
5    blank check company.
6         Q.    Is another term for blank check
7    company a special purpose acquisition
8    company?
9         A.    Yes, SPAC.
10        Q.    If we use the term SPAC, you will
11   understand that that's what we are referring
12   to, right?
13        A.    Yes.
14        Q.    So it's fair to say that Genesis
15   Unicorn Capital was a SPAC?
16        A.    Yes.
17        Q.    So if you go to the second sentence
18   in that same paragraph, it says, We have not
19   selected any specific business combination
20   target and we have not, nor has anyone on our
21   behalf, initiated any substantive discussions
22   directly or indirectly with any business
23   combination target.
24             Do you see that?
25        A.    Yes.



Page 57

1                      S. Lui

2      Q.    To Genesis' knowledge, was that

3  statement accurate at the time that this was

4  filed in July of 2021?

5            MS. WIGGER:  Object to form.

6      A.    Specific to your question, July 1,

7  2021, I was not involved with Genesis at all

8  so I wouldn't be able to answer that, but I'm

9  pretty sure the answer will be yes as well.

10     Q.    Did you do anything in your

11 capacity as a 30(b)(6) witness to educate

12 yourself about anything relating to the

13 formation, structure and ownership of Genesis

14 Unicorn prior to the time you became involved

15 with Genesis Unicorn?

16           MS. WIGGER:  Object to form.

17     A.    Yes, I did, I reviewed the public

18 documents, yes.

19     Q.    Did you review this document?

20           MS. WIGGER:  Object to form.

21     A.    Yes.

22     Q.    In the next sentence, it says,

23 While we may pursue an initial business

24 combination target in any business, industry

25 or geography.  We intend to focus our search



Page 58

1                   S. Lui

2   on the intersection of the healthcare and

3   technology industries, specifically within

4   the biotechnology and pharmaceutical sectors.

5           Do you see that?

6       A.   Yes.

7       Q.   And to Genesis' understanding, was

8   this statement accurate at the time it was

9   filed with the SEC?

10      A.   I can't answer that question when

11  this was filed because I wasn't involved, but

12  from my understanding, my discussions with

13  Juan Fernandez who was a board director

14  eventually with our SPAC when we got listed,

15  there were no discussions at all with any

16  targets.

17      Q.   Has Genesis ever had a compliance

18  program?

19          MS. WIGGER:  Object to form.

20      A.   What do you mean by compliance

21  program?

22      Q.   As you understand from your

23  background in finance, sort of the compliance

24  function to advise corporate entities or

25  their employees on compliance with applicable



Page 59

```
 1                    S. Lui
 2   laws and regulations.
 3             MS. WIGGER:  Object to form.
 4        A.   I don't understand your question.
 5        Q.   Was there anybody that was offering
 6   training to anyone at Genesis, providing
 7   guidance to anyone at Genesis regarding
 8   Genesis' ability to comply with applicable
 9   securities laws?
10             MS. WIGGER:  Object to form.
11        A.   If you look at the background and
12   experience of all of our directors and
13   officers, every single one of us has
14   experience dealing with listed companies and
15   public companies in general, so, no, we did
16   not have any external compliance training.
17        Q.   It's fair to say what you are
18   saying is that you felt or Genesis felt that
19   based on its employees past experience
20   working on publicly listed companies, that
21   Genesis had a general understanding of how to
22   comply with applicable securities laws and
23   regulations?
24             MS. WIGGER:  Object to form.
25        A.   Yes, you could say that, yes.
```



Page 60

                         S. Lui

 1

 2      Q.    Let me -- if you scroll up to the

 3   top of the page -- the first page.

 4           Do you see there is an address

 5   listed there, 281 Witherspoon Street in

 6   Princeton, New Jersey?

 7           Do you see that, Mr. Lui?

 8      A.    Yes.

 9      Q.    What was that business address?

10           MS. WIGGER:   Object to form.

11      A.    That was the business address for

12   one of our directors.

13      Q.    Did Genesis actually operate any

14   business from that address?

15      A.    No, because during that time, it

16   was kind of like during Covid as well and we

17   were all over the world, our directors and

18   officers, we were, you know, Juan Fernandez

19   is in Spain, Grainne Oie, Grainne,

20   G-R-A-I-N-N-E, Oie, O-I-E, Niel, N-I-E-L,

21   were the advisors; Hank Wu, and then Robert

22   Chang, they were all based in the U.S.

23           Myself, Onus (phonetic), Teck Yong,

24   the other board director, Teck Yong, the rest

25   of us were based in Asia, so all our meetings


MAGNA
LEGAL SERVICES

Page 61

 1                    S. Lui
 2   were online via Zoom.
 3       Q.   So you never had any in-person
 4   meetings at that address in Princeton, New
 5   Jersey?
 6       A.   No, I've been there before, but,
 7   no, our meetings were always online.
 8       Q.   So you are very familiar with this
 9   wonderful Zoom setting we are all in today
10   and the awkwardness of the time lags and the
11   audio and the everything.  That's helpful.
12            I understood that you testified
13   that at the time that this S-1 was filed in
14   July 1, 2021, you, Samuel Lui, were not yet
15   involved in Genesis.
16            When did you first become involved
17   with Genesis?
18       A.   So I took it over officially in, I
19   think it was end of October 2021.
20       Q.   When you say you took it over
21   officially end of October 2021, what do you
22   mean by that?
23       A.   Meaning, I paid the previous
24   shareholder a sum of money to take over the
25   SPAC and plus, whatever expenses that had to



Page 62

                    S. Lui
1
2   be paid to get it listed, I took on that.
3       Q.    What was that sum of money that you
4   paid to the previous shareholder?
5       A.    I can't remember.  I think it was
6   about a million.
7       Q.    Roughly $4 million U.S. dollars?
8       A.    A million, 1 million.
9       Q.    One million U.S. dollars?
10      A.    Yeah.
11      Q.    What was the source of those funds?
12            MS. WIGGER:  Object to form.  This
13      is not a 30(b)(6) topic.
14      A.    I believe I already answered your
15  question, David.  I think you asked it twice
16  or three times or more than that.
17      Q.    So --
18      A.    So that million is part of the
19  seven, right.
20      Q.    I wasn't clear on that, so with
21  that clarification, we're good.
22            If you take this document down and
23  we will mark the next one as Genesis 4, tab
24  4.
25            (Genesis Exhibit 4, Form S-1 filed



Page 63

```
 1                    S. Lui
 2        with the U.S. Securities and Exchange
 3        Commission on November 24, 2021, marked
 4        for identification.)
 5        Q.   I will represent to you, again,
 6   this is a publicly filed document.
 7             At the top, it says, as filed with
 8   the U.S. Securities and Exchange Commission
 9   on November 24, 2021.
10             Do you see that?
11             MS. WIGGER:  Is this one produced
12        or no?
13             MR. SIMONS:  It may well have been
14        produced.  In the interest of making
15        sure that we had a complete and legible
16        copy, we used the one we were able to
17        download from the SEC.
18             MS. WIGGER:  We can only see the
19        first page and I don't know if we've see
20        it before.  We will take your
21        representation.
22        Q.   You see it says this is as filed
23   with the SEC on November 24, 2021?
24        A.   Yes.
25        Q.   It says it's a Form S-1, right?
```



Page 64

                    S. Lui

1

2        A.    Yes.

3        Q.    It says it's a Form S-1 for Genesis

4  Unicorn Capital Corp., right?

5        A.    Yes.

6        Q.    Is this one of the publicly

7  available filings for Genesis Unicorn Capital

8  Corp. that you reviewed in preparation for

9  your testimony today?

10        A.    Yes.

11        Q.    And you were involved in Genesis

12  Unicorn Capital Corp. prior to the filing of

13  this document, right?

14        A.    Yes.

15        Q.    And what was your role at Genesis

16  Unicorn at that time?

17        A.    Specific to this document, David?

18        Q.    No, just generally.

19        A.    I'm a board director, I am

20  president and CFO of Genesis Unicorn.

21        Q.    So when you, as you said, took over

22  Genesis Unicorn in October of 2021, at that

23  point, you had the role of president,

24  correct?

25        A.    Yes.



```
 1                   S. Lui
 2        Q.   Chief financial officer, correct?
 3        A.   Yes.
 4        Q.   And director, correct?
 5        A.   Yes.
 6        Q.   Who at Genesis Unicorn Capital
 7   appointed you to those roles?
 8             MS. WIGGER:  Object to form.
 9        A.   Myself, I'm the sole member of the
10   sponsor, so at this stage, I'm paying for all
11   the expenses to have this company listed.
12        Q.   So at this stage, is it fair to say
13   you were the only person that has put money
14   into the SPAC to have it listed?
15        A.   Yes.
16        Q.   If we go down to the seventh page,
17   where it says, Our sponsor, it says, Our
18   sponsor has made an initial investment of
19   $25,000 in exchange for 2,156,250 shares of
20   our class B common stock.
21             Do you see that?
22        A.   Yes.
23        Q.   Who is the sponsor referred to
24   there?
25        A.   That is me, I'm the sponsor.
```



Page 66

1                          S. Lui

2        Q.    Is that an accurate statement?

3        A.    You are saying legally, legally,

4    it's an entity called Genesis Unicorn Capital

5    LLC and I'm the sole member of Genesis

6    Unicorn Capital LLC.

7        Q.    Genesis Unicorn Capital LLC, you

8    were the sole member of that and that was the

9    sponsor of this SPAC?

10        A.    Yes.

11        Q.    Please scroll down a little bit

12    more.  You see there is a section labeled Our

13    Management Team and Advisors Background and

14    Experience.

15              Do you see that?

16        A.    Yes.

17        Q.    The second individual listed there

18    at the bottom is you, Samuel Lui.  It says,

19    our president, chief financial officer and

20    director.

21              Do you see that?

22        A.    Yes.

23        Q.    And as we established, that was

24    accurate at the time this was filed with the

25    SEC, right?



Page 67

1                    S. Lui

2      A.    Yes.

3      Q.    If we scroll back up a bit to page

4  3 I think.  If you go to the second sentence

5  of the first full paragraph, it says, We have

6  not selected any specific business

7  combination target and we have not, nor has

8  anyone on our behalf, initiated any

9  substantive discussions directly or

10  indirectly with any business combination

11  target.

12          Do you see that?

13      A.    Yes.

14      Q.    Would Genesis say that that was an

15  accurate statement at the time that this was

16  filed?

17      A.    Yes.

18      Q.    If we just go to the very last

19  page.  It appears that this was signed by

20  you, Samuel Lui.

21          Do you see that?

22      A.    Yes.

23      Q.    Did you, in fact, sign this

24  document?

25      A.    Yes.



Page 68

```
 1                    S. Lui
 2      Q.    You can put that aside.
 3            MR. SIMONS:  Sophie, if we can pull
 4      up what we will mark as Genesis 5, tab
 5      5.
 6            (Genesis Exhibit 5, Form 10-Q
 7      publicly filed with the Securities and
 8      Exchange Commission on behalf of Genesis
 9      Capital Corp., marked for
10      identification.)
11      Q.    And I will represent to you that
12 this is a Form 10-Q publicly filed with the
13 Securities and Exchange Commission on behalf
14 of Genesis Capital Corp.
15            Do you see that?  It says it's for
16 the quarterly period ended March 31, 2022.
17            Do you see that?
18            MS. WIGGER:  Was this one produced?
19            MR. SIMONS:  Again, it may be
20      somewhere in the production, but the
21      version that we are using, I believe we
22      pulled from publicly available sources
23      just to have the most legible version
24      possible.
25            MS. WIGGER:  How many pages are in
```



Page 69

                    S. Lui

1

2       this document?  I see one, but it looks

3       like there are more.

4             MR. SIMONS:  There are more pages.

5             MS. WIGGER:  I just want to ask if

6       it is complete?

7             MR. SIMONS:  It is a complete

8       document.

9       Q.   Mr Lui, do you see your signature

10   there?  If go to the bottom of the document,

11   I believe it's page 24.

12      A.   Yes.

13      Q.   If you go back to page 17, if you

14   can try to blow it up a little bit, I think

15   we want to go in the overview section.

16           I believe this has the exact same

17   language we read before, but I will read it

18   again.  We have not selected any business

19   combination target and we have not, nor has

20   anyone on our behalf initiated any

21   substantive discussions, either directly or

22   indirectly, with any business combination

23   target.

24           Do you see that see that language,

25   Mr. Lui?



Page 70

```
 1                    S. Lui
 2        A.   Yes.
 3        Q.   Does Genesis believe this was an
 4   accurate statement at the time this was filed
 5   with the SEC in March of 2022?
 6        A.   Yes.
 7        Q.   You can put that aside.
 8             MR. SIMONS:  We are going to pull
 9        up what we will mark as Genesis 6.
10             (Genesis Exhibit 6, Form 10-Q filed
11        with the Securities and Exchange
12        Commission for the quarterly period
13        ended in June 30, 2022, marked for
14        identification.)
15        Q.   This, I will represent to you, is
16   another publicly filed document, a Form 10-Q
17   filed with the Securities and Exchange
18   Commission.  It says it's for the quarterly
19   period ended in June 30, 2022.
20             Once again, I will represent that
21   this is the publicly available version.
22   There may be a version similar to this in
23   some format in the various document
24   productions, but for purposes of readability,
25   we are using this version?
```



Page 71

                        S. Lui
1
2            MR. SIMONS:  And, Sophie, if you
3        want to scroll through to the bottom.
4            MS. WIGGER:  Again, since there is
5        no Bates, we will take your
6        representation that it's complete and it
7        is what you say it is.
8            MR. SIMONS:  Yes.
9        Q.   We get to the last page.  Mr. Lui,
10   is that yet again your signature on August 11
11   of 2022?
12       A.   Yes.
13       Q.   If we go to page 16, overview
14   section, it says, We have not selected any
15   business combination target and we have not,
16   nor has anyone on our behalf initiated any
17   substantive discussions, directly or
18   indirectly, with any business combination
19   target.
20            Do you see that language?
21       A.   Yes.
22       Q.   Does Genesis believe that was an
23   accurate statement at the time that this was
24   filed with the Securities and Exchange
25   Commission?



Page 72

1                    S. Lui

2        A.    Yes.

3        Q.    How did you, Samuel Lui, first

4    become involved with Genesis Unicorn?

5        A.    I was introduced to Sergio

6    Camarero, C-A-M-A-R-E-R-O, of ARC Group,

7    A-R-C, Group.  I was introduced to him in

8    July of 2021 when I was made aware that one

9    of the SPACs that they were trying to list or

10   helping to list, which is Genesis Unicorn,

11   the original sponsor wanted out as in he

12   didn't want to fund the SPAC anymore, he

13   wanted to move out.

14            So ARC Group was the advisor to the

15   original Genesis team so they were looking

16   for new people to take over Genesis Unicorn.

17       Q.    When did you first have discussions

18   with people that were looking for someone to

19   take over Genesis Unicorn?

20       A.    I think I answered that question.

21   Right, so Sergio told me that Genesis was

22   available for someone to take over sometime

23   in July.  I spent the next few months looking

24   through the documents, you know, we had to

25   agree on a price for me to take it over, so



Page 73

                        S. Lui

1

2    it took a few months and we only agreed a

3    deal in, I believe it was October 27th or

4    thereabouts, late October 2021 where I

5    officially paid up and I became the sole

6    member of the sponsor.

7        Q.    Did you have discussions during

8    this period with anyone associated with

9    Genesis besides Mr. Fernandez?

10            MS. WIGGER:  Object to form.

11       A.    Can you be specific?  Discussions

12   regarding what?

13       Q.    Regarding the idea that you would

14   take over the SPAC.

15       A.    I was talking to my various

16   partners, team members, because if I was to

17   take it over, I would have to -- I didn't

18   know anyone on the original Genesis team, so

19   they all foreign to me so if I were to take

20   it over, I would have put my own trusted

21   partners on the team to help me, so I did

22   have discussions, yes.

23       Q.    Did you have discussions with

24   anyone not associated with Genesis Unicorn

25   about the possibility of you taking over the



Page 74

```
 1                    S. Lui
 2  SPAC?
 3            MS. WIGGER:  Object to form.
 4       A.   Can you be more specific when you
 5  say not associated with Genesis?
 6       Q.   Sure.
 7       A.   Then or potentially, they could
 8  have been involved, but, you know, they chose
 9  not to.
10            Could you be a bit more specific,
11  sorry?
12       Q.   I will ask maybe a more direct
13  question.
14            Did you have discussions with
15  anyone associated with De Tomaso during the
16  period where you were considering whether to
17  take over the Genesis Unicorn SPAC?
18            MS. WIGGER:  Object to form.
19       A.   I would say the answer is yes, I
20  did.  I did tell Norman that I was
21  potentially looking at taking over this SPAC
22  so we did have discussions, yes.
23       Q.   The Norman you are referring to
24  there is Norman Choi?
25       A.   Norman Choi, yes.
```



Page 75

1                           S. Lui

2        Q.    Did you have discussions with

3    anyone else associated with De Tomaso about

4    the possibility of you taking over this SPAC?

5             MS. WIGGER:   Object to form.

6        A.    No.

7        Q.    When did you first have a

8    discussion with Norman Choi about the

9    possibility of you taking over the Genesis

10   Unicorn SPAC?

11       A.    I can't recall, but it must have

12   been anywhere between July to October 2021.

13   I don't have the exact dates.

14       Q.    That's fine.

15             Were those discussions in person,

16   over the phone, via email?

17             MS. WIGGER:   Object to form.

18       A.    I can't recall.  It could have been

19   all of the above.

20       Q.    How did you first meet Norman Choi?

21       A.    I think I first met Norman, I think

22   it was April or May of 2021, I can't remember

23   the exact date.  I was introduced through

24   mutual friend, Gabriel, G-A-B-R-I-E-L, Fong,

25   F-O-N-G.



Page 76

```
 1                     S. Lui
 2      Q.    So you were introduced through a
 3 mutual friend, Gabriel Fong?
 4      A.    Yes.
 5      Q.    Was that introduction in person or
 6 like through email or phone call?
 7      A.    I can't remember the exact first
 8 time, but we did meet in person, Gabriel and
 9 I did meet Norman in person more than once, I
10 think two or three times.
11      Q.    Do you recall if that was during
12 the period you were referring to of roughly
13 July to October of 2021?
14           MS. WIGGER:  Object to form.
15      A.    No.
16      Q.    Your answer was no?
17      A.    Your question is confusing, David.
18 You are asking about when I first met Norman.
19 I first met Norman in April or May 2021.
20      Q.    That's when you first met him in
21 person?
22      A.    Yes.
23      Q.    So you met him in person prior to
24 having those discussions with Mr. Choi about
25 the possibility of you taking over the
```



1                    S. Lui
2    Genesis Unicorn SPAC?
3             MS. WIGGER:  Object to form.
4        A.    Yes.
5        Q.    What do you recall about those
6    discussions that you had with Mr. Choi about
7    the possibility of you taking over the
8    Genesis Unicorn SPAC?
9             MS. WIGGER:  Object to form.
10       A.    I just informed him that I could be
11   taking over a SPAC, that's all.
12       Q.    Why did you inform him of that?
13            MS. WIGGER:  Object to form.
14       A.    I don't see why not.
15       Q.    Did --
16       A.    So to be specific, okay.
17       Q.    The more specific, I'm trying to
18   get -- sorry.
19       A.    So Norman did express an interest
20   potentially exploring raising funds to
21   listing via a SPAC, so because at that time
22   during that 2021, maybe starting in 2020,
23   2021, the SPAC market was fairly active, was
24   very liquid.
25            So, you know, I believe SPAC was



Page 78

                         S. Lui

1

2   something that Norman was interested in so

3   when I decided or when I was exploring or

4   thinking about SPAC myself, I just mention it

5   to Norman.

6        Q.   You said you believe that a SPAC

7   was something that Mr. Choi was interested

8   in.

9            How did you come to have that

10  understanding?

11           MS. WIGGER:   Object to form.

12       A.   We had discussions about some of

13  the SPAC deals that was done during that time

14  and they were done at fairly high valuations

15  and the deals were closed with quite a lot of

16  funds, new money in place, you know, so and a

17  lot -- for example, there were quite a few

18  pre-revenue, electric vehicle companies that

19  were listed via SPACs during that period at

20  really high valuations.

21           And like so, for example, from

22  memory, I believe one of the larger deals

23  that was done was Lucid, L-U-C-I-D, Motor.  I

24  think that was done at almost 12 billion

25  valuation and I believe at the time, they



Page 79

                         S. Lui

1

2    were pre-revenue, so they didn't sell any

3    cars at the time.

4              So it was a similar situation to De

5    Tomaso, but that's why when those deals were

6    happening, we were just discussing in general

7    that it's something that Norman could

8    potentially look at and he was interested,

9    you know, so we didn't, you know -- I will

10   stop there.

11        Q.   That's all very helpful.

12             So during these conversations, did

13   Mr. Choi say to you sort of generally, like I

14   see the SPAC market is really hot, I run this

15   company, De Tomaso, I think it might be a

16   good opportunity for me to have De Tomaso be

17   acquired through a SPAC?

18             MS. WIGGER:   Object to form.

19        A.   Well, I don't know if he use those

20   exact words, but he did express an interest

21   in exploring listing via SPACs and so what I

22   did was in November, I introduce ARC Group to

23   Norman.   Ryan was involved as well, to De

24   Tomaso, because ARC Group, at the time, I

25   think they were the top financial advisor for



Page 80

                      S. Lui
1
2   SPAC listings in the U.S., I think they were
3   doing probably, I don't know, maybe half of
4   all the -- they had a lot of clients they
5   were listing, SPAC listings.  They were the
6   financial advisor.
7           So under their clientele, they had
8   easily, at that time, meaning, November 2021
9   they probably had more than 10 SPAC companies
10  listed and they were looking for deals to
11  acquire, so I introduce Sergio of ARC Group
12  to Norman and Ryan with the objective of
13  running what we call a beauty parade.  That
14  means introducing De Tomaso as a potential
15  merger target to the various SPACs that were
16  already listed.
17      Q.   Mr. Lui, you mentioned you were
18  introduced to Norman Choi through a mutual
19  friend named Gabriel Fong.
20           Is he any relation to Ernest Fong?
21      A.   Yes, they are brothers.
22      Q.   Who is Ernest Fong or what is his
23  relationship to Genesis Unicorn Capital?
24           MS. WIGGER:  Object to form.
25      A.   Sorry, who --



Page 81

1                        S. Lui

2        Q.    Ernest Fong, what role, if any, did

3    he have with Genesis?

4              MS. WIGGER:  Object to form.

5        A.    Ernest Fong is the board director

6    of Genesis Unicorn.

7        Q.    So you were introduced to Mr. Choi

8    through the brother of the board director of

9    Genesis Unicorn?

10       A.    Yes.

11       Q.    What role, if any, did Mr. Ernest

12   Fong play in the selection of potential

13   acquisition targets for Genesis?

14             MS. WIGGER:  Object to form.

15       A.    For all our targets, we need the

16   board to approve, so Ernest was one of the

17   board of directors, so we needed the approval

18   of all the board directors for any deals that

19   we sign off on, including the approval from

20   Ernest.

21       Q.    Earlier in your testimony, you said

22   that you were really the main person, I

23   believe was your testimony, running the

24   Genesis SPAC.

25             So is it fair to say that you were



Page 82

                        S. Lui
 1
 2    also the main person involved in the process
 3    of looking for potential acquisition targets
 4    for Genesis?
 5            MS. WIGGER:  Object to form.
 6        A.    No.  Specific to your question,
 7    looking for targets, all of us did, so I
 8    wasn't the only one looking for targets.
 9            So we have other board members or
10    officers, they introduce, you know, potential
11    deals to the team, you know, so it's not just
12    me.
13            Sometimes we have cold calls as
14    well, we have people calling in, we have
15    lawyers or our financial advisors introducing
16    us to their clients, right, who could be
17    potential targets as well.
18            So specific to your question,
19    looking for targets is not just me alone.
20        Q.    I understand.  It may not have just
21    been you, but in your capacity as the main
22    person running the SPAC, were you the
23    primarily person who oversaw the process by
24    which you were investigating potential
25    acquisition targets?



Page 83

1                         S. Lui

2              MS. WIGGER:  Object to form, asked

3         and answered.

4         A.    Yes, I was.

5         Q.    You alluded earlier to the member

6    of Genesis Unicorn Capital or sponsor being

7    Genesis Unicorn Capital LLC, is that right?

8         A.    Yes, and I am the sole member, yes.

9         Q.    It's your testimony that you were

10   the sole member of Genesis Unicorn Capital

11   LLC?

12        A.    Yes.

13        Q.    Was there ever any other member

14   associated with Genesis?

15        A.    No.  Well the member before me, but

16   he sold his share to me.

17        Q.    Who was the member before you?

18        A.    Juan Fernandez.

19        Q.    Do you know what a person or entity

20   named, I'm just going to spell it, N-G-A,

21   first word, L-O-K, second word, Y-U-E-N.

22        A.    Okay, yes.  That was -- okay, yes,

23   okay, at that time when I was listing, I was

24   the sole member, so whatever was written in

25   the prospectus was accurate, but after



Page 84

                        S. Lui
1
2    listing for tax purposes, I have a friend --
3    after the SPAC was listed and for tax
4    purposes, I introduce another member into the
5    LLC entity, but she was holding very little
6    shares.  I'm the main member of the LLC.
7         Q.   So let me see if I understand what
8    you are saying.
9              At the time of the prospectus, your
10   testimony is you were the sole member of
11   Genesis Unicorn Capital LLC?
12        A.   Yes.
13        Q.   But subsequent to that, there did
14   become another investor or member of Genesis
15   Unicorn Capital LLC?
16        A.   Yes.
17        Q.   And you are saying that was a
18   friend of yours?
19        A.   Yeah.  And the reason why I had to
20   bring in another shareholder and another
21   member was for tax purposes.
22        Q.   What tax purposes?
23             MS. WIGGER:  Object to form.  This
24        is not a 30(b)(6) topic.  Let's just
25        stick to 30(b)(6) topics today since you



Page 85

```
 1                    S. Lui
 2        said you are splitting it, okay?
 3             MR. SIMONS:  The topic is the
 4        formation structure and ownership of
 5        Genesis Unicorn.
 6             MS. WIGGER:  You are asking him
 7        what tax purposes he had in his personal
 8        transaction.  That has nothing to do
 9        with the formation or ownership of
10        Genesis.
11        Q.   We are going to try to get you out
12   of here at a reasonable hour if your counsel
13   is able to limit her objections and not have
14   speaking objections and just limit her
15   objections to form, we will be in a better
16   position to get you out of here.
17             Unfortunately, if these objections
18   continue, we will have to keep the deposition
19   open and it might actually drag into next
20   week.
21             We will do everything we can --
22             MS. WIGGER:  I will make objections
23        as I see appropriate.  We've been going
24        almost two hours.  Can we take a short
25        break?
```



Page 86

```
 1                    S. Lui
 2          MR. SIMONS:  Sure.  We've been
 3      going 90 minutes.  Let's take a short
 4      break.
 5          THE VIDEOGRAPHER:  The time is now
 6      approximately 9:37 a.m.  We are now
 7      going off the record.
 8          (Recess.)
 9          THE VIDEOGRAPHER:  The time is now
10      approximately 9:46 a.m.  We are now
11      going back on the record.
12      Q.   Welcome back, Mr. Lui.
13          When we left off, this is my bad, I
14  forgot to give you this ground rule before we
15  began.  I think there was actually a question
16  pending and one thing I ask going forward in
17  the future is that we are happy to take a
18  break at any time, but we do just want to
19  make sure that we get an answer to any
20  question that I ask you before we take a
21  break.
22          Does that sound fair going forward?
23      A.   Yeah.
24      Q.   So I believe the question pending
25  was that I was asking you, what did you mean
```



Page 87

```
 1                    S. Lui
 2   when you said that for tax purposes, you
 3   brought in another investor or member of the
 4   Genesis Unicorn Capital LLC?
 5            MS. WIGGER:  Object to form.
 6            You can answer in your personal
 7       capacity.
 8       A.   Yeah.  So to be clear, this
 9   question is for Genesis or for me?
10            MS. WIGGER:  You can answer in your
11       personal capacity.
12       A.   This clearly has nothing to do with
13   Genesis Unicorn.  It has nothing to do with
14   Genesis Unicorn.  The question is on the
15   Genesis Unicorn LLC level which is the
16   sponsor for Genesis Unicorn.
17            I believe I've answered the
18   question, David.  A new member was introduced
19   for tax purposes for U.S. tax purposes.
20       Q.   So I understand your answer and I
21   understand that your counsel is trying to say
22   that you should only be answering this
23   question in your personal capacity and you
24   seem to be trying to sort of adopt that
25   instruction.
```



Page 88

```
 1                    S. Lui
 2            I don't think it's necessarily
 3   appropriate to draw a distinction between the
 4   sponsor of Genesis Unicorn Capital Corp.
 5   which is, obviously, associated with Genesis
 6   Unicorn Capital Corp. and anything else.
 7            But I'm just trying to understand,
 8   what was the specific tax purpose by which an
 9   additional member was brought into Genesis
10   Unicorn Capital LLC?  What was Genesis
11   Unicorn Capital LLC trying to accomplish?
12            MS. WIGGER:  You can answer in your
13        personal capacity, but not for the
14        company.
15        A.   So I was advised by the tax advisor
16   that there are exemptions when there is
17   another --
18            MS. WIGGER:  Hold on.  If the tax
19        advisor is a lawyer, don't say what they
20        told you.
21        Q.   I don't want to hear anything that
22   came from legal counsel.
23            Was this a legal counsel or an
24   accountant?
25        A.   It's a tax advisors.  I'm not sure
```



Page 89

```
 1                    S. Lui
 2  whether they are lawyers or not.
 3       Q.   If you are not sure, then let's
 4  stay out of it.
 5       A.   So I stick to my original answer
 6  which is a new member was introduced for tax
 7  purposes.
 8       Q.   What was the name of that new
 9  member?
10       A.   You mentioned the name earlier,
11  David, it's Ms. Nga, N-G-A, Ms. N-G-A, that's
12  her name.
13       Q.   Where does she reside?
14       A.   Hong Kong.
15       Q.   What was her monetary contribution
16  to Genesis Unicorn Capital LLC?
17            MS. WIGGER:  Again, you can answer
18       in your personal capacity, but not for
19       the company.
20       A.   I can't recall.
21       Q.   I'm happy to rephrase the question.
22            Does Genesis Unicorn Capital have
23  an understanding of the monetary contribution
24  that the second member made into Genesis
25  Unicorn Capital LLC?
```



Page 90

1                    S. Lui

2          MS. WIGGER:  You cannot answer for

3      the company on this, but you can answer

4      personally.

5          MR. SIMONS:  That's not an

6      appropriate instruction.

7          MS. WIGGER:  It is.  You are

8      constrained by your 30(b)(6) topics and

9      our objections which you didn't respond

10     to.  Personally -- to keep this moving,

11     personally, you can answer.

12     A.    Your question is was Genesis

13 Unicorn aware?

14     Q.    Yes.  Was Genesis Unicorn aware of

15 the amount of money that this Ms. Nga

16 contributed to Genesis Unicorn Capital LLC?

17     A.    I would say the answer is no

18 because we were already listed then.

19 Whatever was invested into Genesis, it's all

20 publicly stated in the S-1, it's all publicly

21 disclosed.

22          So the introduction of Ms. Nga as

23 another member of the LLC happened post

24 listing, so you know, so it's -- so I don't

25 see why -- there is no obligation post



Page 91

                    S. Lui
1
2    listing for my LLC to inform Genesis Unicorn
3    of any changes at my LLC level.
4         Q.   I understand the testimony.
5             Did Genesis have any corporate
6    policies regarding communication with
7    potential target companies?
8             MS. WIGGER:  Object to form.
9         A.   Yes, our policies is actually not
10   to have any communications until there is a
11   disclosable transaction.
12        Q.   Was that a policy that was written
13   somewhere down or written down somewhere, I
14   should say?
15        A.   It's capital market 101, we don't
16   make any disclosures until there is a binding
17   agreement signed and we are guided by our
18   company counsel as well on any disclosures
19   that need to be made.  So if at any stage,
20   you know, our counsel say that you have to
21   disclose this, we would have done so
22   accordingly.
23        Q.   I think I'm asking a slightly
24   different question.  You were talking about
25   whether there were disclosures regarding the



Page 92

                              S. Lui
1
2    communications between Genesis and potential
3    target companies.
4              What I'm asking you about is, just
5    generally speaking, when individuals from
6    Genesis were sort of prospecting or mining
7    for potential target companies, did Genesis
8    have a policy regarding the way in which you
9    were supposed to carry out those types of
10   communications?
11             MS. WIGGER:  Object to form.
12        A.   I don't understand your question,
13   sorry, David.  Specifically that there is no
14   communication policy, there is no written
15   communication policy, yes.
16        Q.   So there is no written
17   communication policy for Genesis, yes?
18             MS. WIGGER:  Object to form.
19        A.   Yes.
20        Q.   Was Genesis' expectation that any
21   communication between Genesis and potential
22   target companies would occur via official
23   corporate email addresses?
24             MS. WIGGER:  Object to form.
25        A.   Generally, yes.



Page 93

                                S. Lui

1

2        Q.    What do you mean by generally, yes?

3        A.    If it's matters related to Genesis

4   Unicorn, then you would -- it should be via

5   Genesis Unicorn email.

6        Q.    Would there be any occasion where

7   Genesis would expect there to be

8   communications related to Genesis that are

9   not conducted over Genesis Unicorn email?

10            MS. WIGGER:   Object to form.

11        A.    I don't understand your question.

12   Could you ask specific questions, David?

13   It's a bit tough for me to answer.

14        Q.    You said generally, yes, and we are

15   at a bit of disadvantage because with the

16   virtual setting, I don't have live

17   transcripts in front of me to get your exact

18   words, but generally, what you said was that,

19   yes, the general expectation would be that

20   communication between Genesis and potential

21   target companies would occur via corporate

22   email.

23            What I'm trying to understand is

24   when would there be potential exceptions to

25   that general understanding?



Page 94

                        S. Lui

1

2           MS. WIGGER:  Object to form.

3      A.    I still stick to my original

4    answer, David, generally, communications with

5    target will have to be through Genesis

6    Unicorn emails.

7      Q.    Is Genesis Unicorn aware of any

8    communications between -- I know this is a

9    weird way to phrase it, but between you, Mr.

10   Lui, and Mr. Norman Choi regarding the

11   advisory firm that De Tomaso would retain to

12   advise them on a potential SPAC transaction?

13          MS. WIGGER:  Object to form.

14     A.    Your question is, does Genesis

15   Unicorn know of ARC Group acting as financial

16   advisor to De Tomaso?

17     Q.    It's a slightly different version

18   of that question.

19          Is Genesis Unicorn aware of

20   communications between you and Mr. Norman

21   Choi regarding the fact that De Tomaso might

22   retain ARC Group?

23          MS. WIGGER:  Object to form.

24     A.    When I introduce ARC Group to De

25   Tomaso, Genesis wasn't listed at that point,



Page 95

```
1                    S. Lui
2   so theoretically, Genesis Unicorn didn't
3   really exist, so to speak, as an operating
4   entity when ARC Group was appointed which I
5   believe was end of November 2021.
6        Q.   When you say that Genesis Unicorn
7   wasn't listed yet, what do you mean by that?
8        A.   That the listing only happened in
9   February 14th, I believe, 2022.  So Genesis
10  Unicorn was only officially listed on NASDAQ
11  on February 14th or 15th, 2022.
12       Q.   Is Genesis Unicorn aware of any
13  communications between you and Mr. Norman
14  Choi in or around November 2021 where Mr.
15  Choi shared financial information regarding
16  De Tomaso with you?
17            MS. WIGGER:  Object to form and
18       foundation.
19       A.   I don't see the relevance of that
20  question, David.
21            Even if Norman shared financial
22  information, it was the personal capacity, so
23  Genesis Unicorn was not listed yet at that
24  point in time.
25       Q.   I appreciate -- I appreciate that
```



Page 96

1                    S. Lui
2    you might not understand the relevance, but I
3    think as your counsel told you earlier, you
4    are still supposed to answer the question as
5    asked, so I'm just going to repeat the
6    question.
7              Was Genesis Unicorn aware of any
8    communications between you and Norman Choi in
9    November 2021 where Mr. Choi shared financial
10   information regarding De Tomaso with you?
11             MS. WIGGER:  Object to form and
12        foundation.
13        A.   No, no, the answer is no.  I have
14   no obligation to share any personal
15   discussions with Genesis Unicorn.
16        Q.   Did you have an obligation to share
17   discussions with Genesis Unicorn regarding
18   the identification of a potential target?
19             MS. WIGGER:  Object to form and
20        foundation.
21        A.   I mean, could you ask your question
22   properly?  It sounds like a leading question
23   to me.  What's your --
24        Q.   It sounds like --
25             MS. WIGGER:  Hold on.  Let me see



```
 1                    S. Lui
 2      if I can help.
 3           Sam, try to listen to the exact
 4      question David is asking and just answer
 5      it directly.  I know depositions are
 6      strange and you have not done this
 7      before.  But just try to listen to the
 8      questions he is asking you and try to
 9      answer.
10           MR. SIMONS:  I appreciate that.  I
11      know for someone who has never been in a
12      deposition, it's a very foreign exercise
13      and I appreciate Ms. Wigger's guidance
14      to you on that.
15      Q.   So I believe the question that I
16 was asking you was whether -- now, it's a
17 little bit out of my head.
18           Essentially, what I was trying to
19 ask was, would Genesis Unicorn expect to be
20 made aware of any communications between
21 anyone associated with Genesis Unicorn and a
22 potential target of Genesis Unicorn?
23           MS. WIGGER:  Object to form.
24      A.   I need you to tell me exactly when
25 is the timeline you are referring to.
```



Page 98

1                    S. Lui

2          So, to me, there is an obligation

3    before listing and after listing, so your

4    question is in relation the Genesis Unicorn

5    before it was listed or after it was listed?

6          Q.   Let's cover both.  So -- and when

7    you say -- your testimony is that it was

8    listed in February of 2022?

9          A.   Yes.

10         Q.   And is it your testimony on behalf

11   of Genesis Unicorn that prior to February '22

12   -- prior to February of 2022, there was no

13   obligation for individuals associated with

14   Genesis Unicorn to inform Genesis Unicorn

15   regarding communications they may have had

16   with potential targets for Genesis Unicorn?

17         MS. WIGGER:  Object to form, legal

18        conclusions.

19         A.   I don't know the answer, David.  I

20   don't know whether there is an obligation to

21   inform Genesis Unicorn, but the fact is, none

22   of us had any discussions about merger,

23   potential mergers with Genesis Unicorn before

24   February 2022, before the IPO of Genesis

25   Unicorn.



Page 99

                        S. Lui

1

2      Q.    When I say obligation, I was using

3   it, I believe, again, I'm at a disadvantage

4   because we don't have a live transcript, I

5   believe that was the word or something

6   similar to it that you used when you said, I

7   didn't think that I or Genesis -- there was

8   no obligation prior to listing to provide

9   information to Genesis Unicorn about

10  communications regarding a potential SPAC, so

11  I meant obligation in that sense that you

12  used it.

13           Do you have a revised answer to

14  that question?

15      A.    Sorry, could you ask, obligation on

16  behalf, as in, are you asking about the

17  members of Genesis Unicorn, as in the

18  officers and directors of Genesis Unicorn?

19      Q.    Yes.  Let me try another way.

20           Would Genesis Unicorn have expected

21  that it be informed about communications

22  between, say, yourself and a potential target

23  of Genesis Unicorn prior to February of 2022?

24           MS. WIGGER:  Object to form.

25      A.    Okay, if, let's say I had



Page 100

                        S. Lui
1
2   discussions, yes, then I would have, you
3   know, so-called obligation to inform Genesis
4   Unicorn, yes.
5       Q.   Your testimony, as I recall, is
6   that you had no such discussions prior to
7   February of 2022, is that correct?
8           MS. WIGGER:  Object to form.
9       A.   Yes.
10      Q.   Is Genesis Unicorn aware whether
11  you, Mr. Lui, was an unannounced attendee at
12  the introductory meeting between ARC and De
13  Tomaso in November 2021 to discuss a
14  potential SPAC transaction?
15          MS. WIGGER:  Object to form,
16      foundation.
17      A.   I don't know if the rest of my
18  colleagues on Genesis were aware, but I did
19  not inform them to that.
20      Q.   Why did you not inform them?
21          MS. WIGGER:  Object to form.
22      A.   I didn't see the need to inform
23  them because our SPAC was not listed at that
24  point.  We didn't have any discussions
25  between De Tomaso and Genesis Unicorn about



Page 101

```
 1                    S. Lui
 2    merger between both parties.
 3              In fact, it was opposite.  I
 4    introduce an advisor to De Tomaso so that
 5    they could do a beauty parade so that they
 6    could look at other SPACs, right, not Genesis
 7    Unicorn.
 8         Q.    Is Genesis Unicorn aware of whether
 9    you, Mr. Lui, instructed Mr. Norman Choi to
10    hide your attendance at that introductory
11    meeting between ARC and De Tomaso in November
12    of 2021?
13              MS. WIGGER:  Object to form and
14         foundation.
15         A.    No, I don't know.  The answer is no
16    and I don't see the relevance, it has nothing
17    to do with Genesis Unicorn.
18         Q.    Who at Genesis Unicorn was involved
19    in the selection of De Tomaso as a potential
20    acquisition target for Genesis Unicorn?
21              MS. WIGGER:  Object to form.
22         A.    Everyone.  Like I said earlier, we
23    need the management team and the board to
24    sign off on any deals that we do, so all of
25    our board of directors would have to sign off
```



Page 102

```
 1                       S. Lui
 2  on any deal that we sign.
 3       Q.    Who at Genesis Unicorn was the
 4  first person to mention De Tomaso as a
 5  possible acquisition target for Genesis?
 6            MS. WIGGER:  Object to form.
 7       A.    So ARC Group was the one who
 8  introduce De Tomaso to us as a potential
 9  merger target.
10       Q.    When you say ARC Group was the
11  person who introduced De Tomaso to us, who at
12  ARC Group introduced De Tomaso to you?
13       A.    I think it's Joe, so Joe Camarero.
14       Q.    You, Mr. Lui, were the person who
15  introduced ARC Group to De Tomaso, correct?
16       A.    Yes.
17       Q.    Isn't it fair to say that you were,
18  in fact, the person who was first involved in
19  the selection of De Tomaso as a potential
20  acquisition target for Genesis?
21            MS. WIGGER:  Object to form.
22       A.    No.
23       Q.    At the time that -- does Genesis
24  have an understanding of whether at the time
25  Mr. Lui introduced ARC Group to De Tomaso,
```



Page 103

```
 1                    S. Lui
 2   Mr. Lui had already determined that De Tomaso
 3   was a potential acquisition target for
 4   Genesis?
 5           MS. WIGGER:  Object to form and
 6       foundation.
 7       A.    No.
 8       Q.    When was the earliest date that
 9   Genesis Unicorn began considering De Tomaso
10   as a potential acquisition target?
11       A.    Could you quantify or qualify what
12   you mean by considering?
13       Q.    When is the first time that the
14   name De Tomaso was ever made aware to anyone
15   at Genesis Unicorn as being a potential
16   acquisition target?
17       A.    When ARC Group did introduction,
18   which I believe was end of February, I can't
19   remember the exact date, end of February
20   2022.  ARC Group introduced De Tomaso to us,
21   including Ryan, Ryan Berris and we signed a
22   nonbinding LOI which is letter of intent in
23   early April of 2022, so I would say it was
24   probably early April 2022 that we seriously
25   looked at De Tomaso as a potential merger
```



Page 104

1                     S. Lui

2    target.

3         Q.    Was Genesis aware that Mr. Lui

4    started assisting De Tomaso in its

5    preparation for a potential SPAC acquisition

6    prior to that date?

7              MS. WIGGER:   Object to form,

8         foundation.

9         A.    No, I did tell them my history with

10   Norman and then I did tell them that I

11   introduce ARC Group to Norman and at that

12   point in time, I think ARC Group had already

13   introduced a handful, I don't know the exact

14   number of SPACs to Norman, you know, nothing

15   was done yet, so they are aware, my board was

16   aware of my previous relationship and

17   discussions with Norman.

18        Q.    When did you tell your board about

19   your previous relationship and discussions

20   with Norman Choi?

21        A.    Well, it must have been like March

22   or April, during that period when we were

23   considering whether to do a nonbinding LOI,

24   letter of intent, with De Tomaso.

25        Q.    What did you tell the Genesis board



Page 105

                        S. Lui

1

2   about your earlier discussions with Norman

3   Choi?

4           MS. WIGGER:  Object to form.

5       A.   I think I answered that question

6   already.

7       Q.   What did you tell the board about

8   your earlier discussions with Norman Choi?

9   What did you say you had discussed?  You said

10  I spoke to Norman Choi and we talked about

11  what?

12          MS. WIGGER:  Object to form.

13      A.   I explain to them my previous

14  discussions or interactions with Norman Choi.

15  My understanding of the business from Norman

16  regarding the business and the fact that I

17  introduced ARC Group to De Tomaso to run the

18  beauty parade.

19          So there is no certainty to a deal

20  happening with us because ARC Group is the

21  financial advisor.  He did whatever advice

22  Norman to choose the best SPAC partner to go

23  with and it may or may not be Genesis

24  Unicorn.

25      Q.   Was Genesis Unicorn aware in March



Page 106

```
 1                    S. Lui
 2  or April 2022 that you had received
 3  confidential De Tomaso financial information
 4  going back to as early as November of 2021?
 5            MS. WIGGER:  Object to form and
 6        foundation.
 7        A.   I don't know how to answer that
 8  question, David, it's too broad.
 9            We signed an NDA with De Tomaso, a
10  nondisclosure agreement, for Leslie, you
11  know, so we do have access to the information
12  that they provided, whatever Genesis Unicorn
13  had.
14            So the question you are asking me
15  is asking to me as a person, am I right, and
16  not Genesis Unicorn?
17        Q.   I'm asking if Genesis Unicorn as an
18  entity -- the information generally that is
19  known by an entity, is of course, it's a
20  fiction, there is no such person that's in a
21  corporate form of Genesis Unicorn, but was
22  there anyone at Genesis Unicorn who was aware
23  that you had access to confidential financial
24  information from De Tomaso as early as
25  November 2021?
```



```
 1                      S. Lui
 2           MS. WIGGER:  Object to form and
 3      foundation.
 4      A.    Generally, I would say yes, they
 5   are aware because I made known to the board
 6   that I have been involved, I've been trying
 7   to help Norman or specifically, De Tomaso, to
 8   look at potential fundraising, right.
 9           So as part of the process, I did
10   sign confidentiality agreements.  I did have
11   access to De Tomaso's information beforehand.
12      Q.    When did you first sign a
13   confidentiality agreement?
14      A.    I can't remember, I can't remember.
15   Sometime in 2021.
16      Q.    Do you have a copy, does Genesis
17   Unicorn have a copy of that in its files?
18      A.    I can't remember.  It should be a
19   copy somewhere.
20           MR. SIMONS:  I don't believe we
21      have ever seen a document produced from
22      2021 indicating that Genesis was allowed
23      to have access to confidential financial
24      information, so we request that be
25      produced.
```



```
 1                    S. Lui
 2          MS. WIGGER:  Object to form,
 3      misstates testimony.  We can handle it
 4      offline.
 5          MR. SIMONS:  I'm saying to counsel,
 6      it's not a question for you, Mr. Lui.
 7          MS. WIGGER:  Don't say anything,
 8      Sam, just answer his questions.  I will
 9      deal with this later.
10      Q.   You mentioned that you told the
11  board that you were assisting Mr. Norman Choi
12  with helping De Tomaso potentially enter into
13  a SPAC deal, is that correct?
14          MS. WIGGER:  Object to form.
15      A.   That's not what I said, David.
16      Q.   But what did you say?  Again, I'm
17  at a disadvantage because I don't have the
18  exact wording.  I'm trying as best I can to
19  summarize what you said so I can understand.
20      A.   The board is aware that I introduce
21  ARC Group to De Tomaso to run the beauty
22  parade to look at potential SPACs.
23      Q.   Was the board of Genesis Unicorn
24  aware that you, Samuel Lui, were advising De
25  Tomaso regarding its financial projections in
```



Page 109

                         S. Lui
1
2    or around the end of 2021?
3            MS. WIGGER:  Object to form and
4        foundation.
5        A.    I wasn't advising De Tomaso,
6    quote-unquote advising.  I have no mandate
7    with De Tomaso.  I was just trying to fix
8    some of the errors in the financial model,
9    the financial forecast model.  That's the
10   only thing I did.
11       Q.    Does Genesis have an understanding
12   of why you, Mr. Lui, that you were in no
13   official capacity trying to help De Tomaso
14   fix certain any errors in its financial
15   model?
16           MS. WIGGER:  Object to form,
17       foundation and misstates testimony.
18       A.    Sorry, I don't understand your
19   question.  Can you be a bit more specific?
20       Q.    I'm trying to understand, if you
21   didn't have any sort of role with De Tomaso
22   and if you were not, it sounds like doing
23   this necessarily at the request of Genesis,
24   why were you advising De Tomaso on a SPAC
25   process at this point?



Page 110

```
 1                    S. Lui
 2            MS. WIGGER:  Object to form.
 3       A.   I mean, I wanted to help Norman as
 4   a friend.
 5       Q.   That had nothing to do with the
 6   possibility that De Tomaso would be a
 7   potential acquisition target for Genesis?
 8            MS. WIGGER:  Object to form.
 9       A.   No.
10       Q.   When you were working with or
11   having these discussions with Norman Choi in
12   the fall of 2021, at that time, you were the
13   president, CFO and director of Genesis,
14   right?
15       A.   Yes.
16       Q.   Did that generally give you
17   authority to pretty much do whatever you
18   wanted on behalf of Genesis?
19            MS. WIGGER:  Object to form.
20       A.   No.
21       Q.   Did it give you the authority to
22   provide informal advice to De Tomaso during
23   this period?
24            MS. WIGGER:  Object to form.
25       A.   I mean, my answer to that would be,
```



Page 111

```
 1                      S. Lui
 2  why not?  It's one of the few projects that I
 3  work on, you know, it's not like I work for
 4  Microsoft and I can't work for IBM.  It was a
 5  side project.  The SPAC was a side project
 6  that I was working on.
 7       Q.   So you were the president, CFO and
 8  director of a SPAC that was looking for a
 9  potential acquisition target and at the same
10  time, your side project was working with a
11  company that was looking to be acquired by a
12  SPAC, is that right?
13            MS. WIGGER:  Object to form and
14       foundation, misstates testimony.
15       A.   No, before the SPAC is listed, we
16  are not supposed to look for any targets, so
17  there was nothing to do, except my only focus
18  then was to get the SPAC listed.
19            We had no discussions with any
20  targets about potential mergers with Genesis
21  Unicorn before it was listed.
22       Q.   Did Genesis ever solicit any type
23  of funding from Norman Choi?
24            MS. WIGGER:  Object to form.
25       A.   No.
```



Page 112

1                      S. Lui

2        Q.    Did Genesis ever solicit any type

3    of funding from anyone associated with Norman

4    Choi?

5               MS. WIGGER:  Object to form.

6        A.    I think that's a question you have

7    to ask Norman, but as far as I am aware, no.

8        Q.    I'm just asking through Genesis'

9    knowledge, is Genesis aware of whether it

10   solicited any type of funding from anyone

11   Norman Choi introduced to Genesis?

12              MS. WIGGER:  Object to form.

13       A.    There could have been one or two

14   introductions from Norman's friends, but as

15   far as I'm aware, there was no investments

16   ever done.

17       Q.    When did those discussions with

18   Norman's friends about potential investment

19   in Genesis occur?

20              MS. WIGGER:  Object to form,

21       misstates testimony.

22       A.    I cannot remember, but probably

23   late 2021.

24       Q.    Do you recall or is it Genesis'

25   understanding or recall who those individuals



Page 113

```
 1                    S. Lui
 2  were?
 3       A.   There was a Michael Choi that I --
 4  that was potentially interested, but -- was
 5  one of Norman's friends, but he didn't invest
 6  eventually.
 7       Q.   You said he did not invest
 8  eventually?
 9       A.   Yes, he did not invest eventually
10  as far as I am aware.
11       Q.   Do you recall any other
12  individuals?
13            MS. WIGGER:  Object to form.
14       A.   There was a Peter guy, I can't
15  remember his last name.  We had a meal in
16  Hong Kong, one of the hotels.  We had a chat,
17  but that was it, he wasn't interested at all.
18  Pete, I can't remember his last name.
19       Q.   You said that the discussions, in
20  your view, about a potential SPAC transaction
21  involving De Tomaso only began in February of
22  2022, is that your testimony?
23            MS. WIGGER:  Object to form.
24       A.   As far as Genesis is concerned,
25  yes.
```



Page 114

```
 1                    S. Lui
 2     Q.   Was that -- are you using that
 3  February date to signify the introduction
 4  from ARC to Genesis and De Tomaso?
 5          MS. WIGGER:  Object to form.
 6     A.   Yes.
 7     Q.   Let's pull up another document.  I
 8  think this is Genesis 7.
 9          (Genesis Exhibit 7, email exchange,
10      marked for identification.)
11     Q.   We have up on the screen a document
12  being marked as Genesis 7.  It was produced
13  from Genesis with a Bates number ending in
14  848.
15          MS. WIGGER:  Can we see the whole
16      thing?
17          Sam, if you need to read the thread
18      or any part of it, just let them know
19      and they will show you.
20     Q.   Do you recall this email exchange,
21  Mr. Lui?
22          MS. WIGGER:  Do you need to read
23      it, Sam?
24     A.   Can you scroll down?  Can you start
25  from the bottom?
```



Page 115

```
 1                      S. Lui
 2      Q.    Let's start with the first email,
 3  read that and let me know when you are ready.
 4      A.    Okay.
 5      Q.    Do you recall this email?
 6      A.    Yes.
 7      Q.    Is this what you were referring to
 8  when you said this was the introduction from
 9  ARC to -- between Genesis and De Tomaso?
10          MS. WIGGER:  Object to form.
11      A.    Yes.
12      Q.    To Genesis' understanding, was this
13  the first time that you, Samuel Lui, had been
14  introduced to Norman Choi?
15          MS. WIGGER:  Object to form.
16      A.    No, I told you, they are aware that
17  I know Norman from a year ago, they are aware
18  I introduce ARC Group to De Tomaso, so this
19  is not the first time that I was introduced
20  to Norman Choi.
21          That was your question, right?
22      Q.    Right, because that's because as
23  you said, you know Mr. Choi going back to
24  sometime in 2021, right?
25      A.    Yes.
```



Page 116

1                    S. Lui

2        Q.    In fact, you have been

3    corresponding with Mr. Choi fairly regularly

4    starting at some point in 2021, correct?

5              MS. WIGGER:  Object to form.

6        A.    Yes.

7        Q.    And you had been talking to him,

8    again, fairly regularly about De Tomaso's

9    interest in entering into a potential SPAC

10   transaction, right?

11             MS. WIGGER:  Object to form.

12       A.    Yes.

13       Q.    At some point, Genesis began

14   conducting due diligence into De Tomaso,

15   right?

16       A.    Yes, after this introduction.

17       Q.    After this introduction, so

18   sometime after the 25th of February 2022?

19       A.    Yes.

20       Q.    Do you recall roughly when?

21       A.    No, but you can scroll up.

22             I think when we signed the NDA and

23   then we were given access to the data room.

24       Q.    I'm happy to scroll, but I honestly

25   don't recall offhand what's...



Page 117

```
 1                    S. Lui
 2               There is an NDA and let me ask
 3    about this portion of the email.
 4               MS. WIGGER:  Why don't you read the
 5          full email to the extent you are going
 6          to ask about it.
 7               Let's let the witness review, is my
 8          point since he doesn't have it in front
 9          of him.
10          A.   I'm good now.  Please go ahead,
11    David.
12          Q.   Of course.  In this email, you
13    write, Nice to meet you here.  Please kindly
14    propose one or two time slots for the planned
15    introduction meeting.  I'm also attaching our
16    standard NDA for your comments and/or
17    execution.
18               Do you see that?
19          A.   Yes.
20          Q.   Was that the first time that you
21    had executed or that you had discussed
22    entering into an NDA with De Tomaso?
23               MS. WIGGER:  Object to form.
24          A.   Yes, on behalf Genesis Unicorn,
25    yes.
```



Page 118

```
 1                    S. Lui
 2            MR. SIMONS:  You can scroll up to
 3        the rest of the email.  I don't think
 4        there is anything else I want to ask you
 5        about this.  I just want to see, so if
 6        you can keep scrolling.  Scroll to the
 7        very top.
 8            I think we can put this aside.
 9        Q.   Do you recall roughly when -- you
10    said there was an NDA signed, and it was
11    after that that the due diligence process
12    began?
13        A.   Yeah, the high level due diligence,
14    yes.  We were given access to the data room
15    by Ryan, Ryan Berris.
16        Q.   And who from Genesis Unicorn was
17    involved in the due diligence process?
18        A.   The management team, you saw the
19    names there.  So there was Oie, our CEO,
20    there was Niel Stockson (phonetic), our chief
21    scientific officer and then was Juan
22    Fernandez, our COO, chief operating officer
23    and myself.
24        Q.   Who from De Tomaso was involved in
25    the due diligence process?
```



Page 119

```
 1                    S. Lui
 2        A.    It was mainly Norman Choi and Ryan
 3   Berris.
 4        Q.    Was Diana Majcher involved at all?
 5              MS. WIGGER:  Object to form.
 6        A.    Yes, she was part of the team, but
 7   from memory, we dealt mainly with -- I would
 8   say most of the stuff we dealt mainly with
 9   Ryan Berris.
10        Q.    Were there outside auditors that
11   were involved?
12              MS. WIGGER:  Object to form.
13        A.    I believe De Tomaso had an auditor
14   at that time, yeah, that was doing, we call
15   it PCAOB audit.
16        Q.    Do you recall who that was?
17        A.    I think it was SPC.
18        Q.    Was Genesis working with any
19   third-party financial advisors to conduct the
20   due diligence process?
21        A.    For De Tomaso deal, we engage
22   Benchmark Group as our financial advisor.
23        Q.    Do you recall any involvement from
24   ARC in the due diligence process?
25              MS. WIGGER:  Object to form.
```



1                    S. Lui

2      A.    ARC Group was the financial advisor

3  to De Tomaso so most of the questions, we

4  actually directed to ARC Group, so ARC Group

5  was like the intermediary.

6            Who ARC Group dealt with at De

7  Tomaso, I am not sure, but it's probably

8  Ryan, Ryan Berris.

9      Q.    Was Altas Capital involved in the

10  due diligence process at any point?

11      A.    Yeah, so Altas Capital was engaged

12  by us to help us with our financial due

13  diligence.

14      Q.    And what did Altas Capital do to

15  help you with your financial due diligence?

16      A.    I mean, they did what typical for

17  financial due diligence, so they went

18  through, for example, all the contracts that

19  were signed by De Tomaso, for example the

20  sales agreement that De Tomaso had even with

21  the dealers or with direct customers.

22            So they went through every single

23  contract.  They also went through all the

24  payments that were received or deposits that

25  were received by the customers or the



Page 121

1                         S. Lui
2     dealers, so you know, they help us look at
3     the financial statement, review all the
4     numbers, the payables, liabilities.
5         Q.   So is it fair to say that Altas'
6     mandate for Genesis was to, as you say,
7     basically investigate all the finances
8     relating to De Tomaso and to essentially sort
9     of confirm the accuracy of the finances and
10    to sort of draw or give you an opinion about
11    the overall sort of financial status of the
12    company?
13              MS. WIGGER:   Object to form.
14        A.   Yes.
15        Q.   And that would include verifying
16    the company's financial projections?
17              MS. WIGGER:   Object to form.
18        A.   They did help us review the
19    financials as well, yeah, including the
20    forecasts, yes, that was part of their job as
21    well.
22        Q.   And they were taking instruction
23    from you, not from De Tomaso, right?
24              MS. WIGGER:   Object to form.
25        A.   Yes, because they were engaged by



Page 122

1                    S. Lui

2    us.

3        Q.    And because the goal was to have an

4    independent party that would evaluate De

5    Tomaso's financial records, right?

6            MS. WIGGER:  Object to form.

7        A.    Yes.

8        Q.    And as part of that exercise, did

9    Altas Capital ever render an opinion about

10   the enterprise valuation of De Tomaso?

11           MS. WIGGER:  Object to form.

12       A.    No, that's not part of their job

13   scope.

14       Q.    Is Genesis Unicorn aware of whether

15   Altas Capital has ever rendered an opinion

16   about the equity valuation of De Tomaso?

17           MS. WIGGER:  Object to form.

18       A.    No, as far as Genesis Unicorn is

19   concerned, no, Altas never gave a valuation

20   report.

21       Q.    As part of the due diligence

22   process, did Genesis learn the identity of De

23   Tomaso's senior leadership?

24           MS. WIGGER:  Object to form.

25       A.    Your question is, did Genesis know



Page 123

1                         S. Lui
2    the senior management of De Tomaso?
3         Q.    Yes.
4         A.    Yeah, absolutely, yes, management,
5    you know, the key business -- one of the key
6    things on our due diligence list was to
7    diligence the management, to make sure that
8    they have the right expertise, experience to
9    run and manage the company, so yes, yes.
10        Q.    Who did Genesis understand to be
11   the key management of De Tomaso at that time?
12             MS. WIGGER:   Object to form.
13        A.    Well, we were only given access to
14   two people at that time, it's Norman Choi and
15   Ryan Berris.   Those are the only two
16   management at the company.
17        Q.    What did Genesis understand Mr.
18   Choi's role to be at the company?
19        A.    Mr. Choi is the sole shareholder,
20   the founder.   And he is the key brains behind
21   the business.   He was the one who funded all
22   the business.   That's what our financial
23   diligence showed anyway, you know, so Norman
24   Choi is the key person behind De Tomaso.
25        Q.    What did Genesis understand to be



Page 124

```
 1                    S. Lui
 2  Mr. Berris' role at De Tomaso?
 3        A.    So our interaction with Ryan, Mr.
 4  Berris was fairly limited, it was only during
 5  the period and, like I said, we were only
 6  given access to these two people.
 7              We knew there were other people on
 8  the management team, but we didn't have
 9  access to them at that point when we were
10  doing our due diligence.  So our impression
11  was that Ryan Berris is probably like the No.
12  2 of De Tomaso because most of the questions,
13  detailed questions that we asked, most of the
14  answers came through Ryan Berris.
15              So as far as we are aware, the
16  forecast, the investor presentation were all
17  done by Ryan Berris.
18        Q.    Did Genesis have an understanding
19  of what Mr. Berris' job title was at De
20  Tomaso?
21        A.    To be honest, we had a vague idea,
22  because one of the things that was
23  outstanding in our due diligence list was
24  there was no employment contract signed, no
25  one at the time, there was no employment
```



Page 125

```
 1                 S. Lui
 2   contracts.
 3          So everyone you mention, including
 4   Ryan Berris, Diana, you know, everyone was --
 5   we were told that they were all on consulting
 6   agreements and, in fact, we weren't even
 7   provided copies of the so-called consulting
 8   agreements.  We did ask for it, but we were
 9   never provided.
10          So going back to your question,
11   David, you know, we actually had no real idea
12   what the job scope was for each of the
13   management team.  We had a rough idea.  Diana
14   was -- she was in charge of the finances, you
15   know, Ryan, we were told was the CEO and
16   Norman is the brains, the funder, the boss
17   behind the business.
18      Q.   You mentioned that Genesis'
19   understanding was that Diana was in charge of
20   the company's finances.
21          Did Genesis have an understanding
22   that she was, in fact, the primary person
23   that was managing the day to day of De
24   Tomaso's finances?
25          MS. WIGGER:  Object to form.
```



Page 126

```
 1                    S. Lui
 2       A.    That was our understanding because
 3  every time we asked for historical
 4  financials, Ryan would say, oh, he will have
 5  to get it from Diana.
 6       Q.    Did Genesis have an understanding
 7  of whether Diana Majcher was involved in the
 8  financial projections that were provided to
 9  Genesis?
10            MR. WIGGER:   Object to form.
11       A.    No, I don't think Diana was ever
12  involved on the forecasts.  The forecasts
13  was -- my understanding is that the forecasts
14  was done by Ryan himself.  He created the
15  model.  He was responsible for the forecasts
16  as well as the investor presentation.
17            In fact, he is proud of the
18  investor presentation that he did, so as far
19  as we are aware, Ryan was in charge of the
20  forecast model as well as the investor
21  presentation.
22       Q.    Did Genesis ever correspond
23  directly with Ms. Majcher?
24       A.    I think she was copied on some of
25  the emails, but not all, but we did
```



Page 127

                    S. Lui
1
2   communicate, yes.  That's for sure, but I
3   can't remember exactly like the number of
4   emails or whatever.  I believe she is part of
5   the De Tomaso team, so she is on the emails
6   that are between Genesis and De Tomaso.
7        Q.   So when you testified earlier that
8   Genesis was only provided access to Mr. Choi
9   and Mr. Berris, is it fair to say that they
10  were also provided access to Ms. Majcher?
11       A.   Via email, yes, but, like, for
12  example, I don't recall we at least spoke on
13  the phone, for example, directly with Diana.
14  She could have been on some of the calls, but
15  most of the time, it was Ryan or Norman doing
16  the talking.
17       Q.   As part of the diligence process,
18  did Genesis learn that De Tomaso had a
19  practice of entering into unwritten contracts
20  with its employees or contractors?
21            MS. WIGGER:  Object to form, and
22       foundation, legal conclusions.
23       A.   The short answer is no, if it's
24  unwritten and we weren't given access, we
25  wouldn't be aware that there was any



Page 128

                        S. Lui
1
2    unwritten contracts, David.  If there was any
3    unwritten contracts, we would not have been
4    given access to them.
5         Q.    The question is a little bit
6    different.  Did Genesis have an understanding
7    that De Tomaso did, in fact, enter into oral
8    agreements with some of its employees or
9    contractors?
10             MS. WIGGER:  Object to form,
11        foundation, and legal conclusion.
12        A.    No, I'm not aware of oral
13    contracts.
14             I know where you are going, David.
15    I will probably just add to it --
16             MS. WIGGER:  Just answer the
17        question, Sam.  Just answer the
18        questions that are asked.
19        A.    I am not aware of any oral
20    agreements.
21        Q.    You mentioned that during the
22    diligence process, you never saw any signed
23    contracts for individuals associated with De
24    Tomaso, is that right?
25        A.    The consulting agreements, so for


MAGNA
LEGAL SERVICES

Page 129

                          S. Lui
1
2   example, I know, like Ryan, Ryan Berris,
3   right, as well as Diana, they were on
4   consulting contracts with De Tomaso, so they
5   weren't full-time, they weren't quite
6   full-time or at least there wasn't an
7   employment agreement between De Tomaso and
8   Ryan Berris, for example.
9               So, yeah, and they told us that
10  everyone is on consulting contracts.  We
11  asked for a copy of those contracts.  We were
12  never given a copy of those.
13              In fact, this was one of the key
14  diligence points that our advisor Benchmark
15  Group kept hopping on because you cannot
16  possibly have a listed company without any
17  employees.
18              So one of the things that we make
19  clear, you know, you have to have an
20  employment contract signed, right, so how
21  much is the salary, right, what's the
22  benefits, the stock, how much stock options.
23  Those has to be clearly stated in an
24  employment contract if you are going to get
25  listed.



Page 130

                         S. Lui
1
2        Q.    As part of the due diligence
3   process, Genesis learned that Mr. Berris did
4   not have a written employment agreement with
5   De Tomaso, right?
6        A.    No.
7              MS. WIGGER:   Object to form.
8        A.    Not that we are aware of.
9        Q.    As part of the due diligence
10  process, did Genesis look into the
11  compensation arrangements for De Tomaso's
12  senior leadership?
13             MS. WIGGER:   Object to form.
14       A.    We did ask about it, so, for
15  example, we asked for a copy of the
16  consulting agreements, but we were never
17  provided any of those, so we could see in the
18  financials, that's a line item for, you know,
19  consulting fees, right.  While you couldn't
20  see the breakdown, who was getting what, how
21  much, so that was something that was
22  outstanding as part of our due diligence.
23       Q.    Who did you ask for copies of these
24  consulting contracts?
25       A.    The entire team, our lawyers, our



Page 131

                        S. Lui

1

2   advisors.  We put it in writing so we have a

3   list of documents that we request from our

4   target company, so it's specific to De

5   Tomaso.

6            One of the outstanding items was

7   copy of employment contracts and,

8   subsequently, when we were told there were no

9   employment contracts, we asked for copies of

10  the consulting agreements.

11       Q.   Do you recall when you made -- when

12  Genesis made that request?

13       A.   I can't recall, but it's in the

14  emails, the lawyers, there is a list of

15  documents that we request, so probably when

16  we did the diligence, probably March or April

17  2021.

18       Q.   Did anyone from Genesis ever ask

19  Mr. Choi what the terms of Mr. Berris'

20  employment agreement with De Tomaso was or

21  were?

22            MS. WIGGER:  Object to form and

23       foundation, misstates testimony.

24       A.   We did not ask specifically Mr.

25  Choi what Mr. Berris' contract, no.  We asked



Page 132

```
 1                    S. Lui
 2   for everyone's contract, not just for one
 3   person, but we weren't provided any
 4   agreements.  We were never aware, like, how
 5   much Ryan was getting, how much Diana was
 6   getting, we had no idea.
 7        Q.   Did you ask Mr. Choi how much De
 8   Tomaso had agreed to compensate Mr. Berris?
 9             MS. WIGGER:  Object to form,
10        foundation.
11        A.   No, we did not.
12        Q.   Did you ask Mr. Choi how much De
13   Tomaso was compensating him?
14             MS. WIGGER:  Object to form,
15        foundation.
16        A.   No, we didn't ask specifically just
17   for Ryan.  We asked for everyone involved in
18   De Tomaso.
19        Q.   Did you get information about how
20   much De Tomaso's senior leadership was being
21   compensated?
22             MS. WIGGER:  Object to form.
23        A.   No, they never gave us the
24   breakdown.
25        Q.   Did Genesis ever ask De Tomaso why
```



Page 133

1                    S. Lui
2    they never provided that information?
3        A.    We didn't ask why, but we did ask
4    for the information, yeah.
5        Q.    Did Genesis find it odd that De
6    Tomaso did not provide signed contracts
7    memorializing the employment agreements for
8    people that were doing work for De Tomaso?
9             MS. WIGGER:  Object to form.
10       A.    Sure, of course, but we didn't do a
11   deal eventually with De Tomaso.  We chose to
12   walk away, we moved to another target
13   eventually, right, as you are aware, you
14   know.
15            So, yeah, I mean, if we really
16   wanted to do the deal, we would have pressed
17   on because it's the key item for us.  You
18   can't list a company where you have no
19   employees, you don't know how much to pay
20   your staff.  If you have 100 million company,
21   you know, you can't possibly be paying your
22   CEO, I don't know, 10, 20 million, right, so,
23   for example, right, so, you know, it was a
24   key diligence item for us, so, yeah, we chose
25   to walk away so we didn't push on this issue.



Page 134

```
 1                    S. Lui
 2      Q.   When you say that we chose to walk
 3  away, what do you mean by that, meaning -- I
 4  will leave it at that?
 5      A.   Meaning, okay, specifically we
 6  didn't carry on with the due diligence.  The
 7  letter of intent that we signed in April
 8  lapsed after 60 days, so it was terminated so
 9  that's what we mean by walk away.
10      Q.   Was there any discussion with De
11  Tomaso about renewing that letter of intent
12  or continuing discussions about entering into
13  a SPAC transaction?
14           MS. WIGGER:  Object to form.
15      A.   No, I would say no, we did have
16  some, like -- we did have a draft merger
17  agreement drafted by the lawyers going into
18  even early June, which is kind of around the
19  time when the merger ended, but no, we never
20  progressed into discussion where -- we never
21  progressed to the stage where we had a
22  discussion about extending the LOI.
23      Q.   How far into the due diligence
24  process did Genesis get?
25           MS. WIGGER:  Object to form.
```



Page 135

                    S. Lui

1

2    A.    So we had the financial due

3    diligence done fairly substantially.  The

4    legal due diligence was still ongoing because

5    we were struggling with some of the contracts

6    or the nonexistence of contracts I would say.

7              So, for example, like I said, there

8    wasn't any employment contracts, so that was

9    a huge gap.  There wasn't any production

10   agreement signed with anyone.  At that point,

11   it was supposed to be Capricorn Group, so our

12   bankers was saying it's tough, it's a tough

13   deal to do when you have no employees, you

14   have no production agreement.

15             There is no certainty they can

16   deliver a car to their customers, right, so

17   the due diligence was I would say pretty

18   early stage, but financial due diligence were

19   pretty comfortable, except for employment

20   costs because we had no idea what was the

21   breakdown.

22   Q.    As part of the due diligence

23   process, you mentioned the name entity named

24   Capricorn.

25             Was Genesis aware that Mr. Choi had



Page 136

```
 1                    S. Lui
 2  authorized significant payments to Capricorn
 3  without, as you mentioned, a signed contract?
 4        MS. WIGGER:  Object to form and
 5     foundation.
 6        A.   You are testing my memory, David.
 7  I can't recall how much was paid to Capricorn
 8  at that time when we did the financial due
 9  diligence, but from memory, there was a draft
10  development agreement with Capricorn Group
11  and we were told that it was near a final
12  draft that would have been signed fairly
13  soon, yeah, you know, and we did fly to
14  Germany to look at the Capricorn Group as
15  part of the due diligence.  Your client, Mr.
16  Berris, was there as well.
17        So we have no reason to suspect
18  that, you know, that -- you know, to suspect
19  that Capricorn wouldn't be able to deliver at
20  that time, right, any of the things that they
21  were supposed to deliver after getting
22  payments from De Tomaso.
23        Q.   And during the due diligence
24  process, what did Mr. Choi tell Genesis about
25  Capricorn?
```



Page 137

                        S. Lui
1
2            MS. WIGGER:  Object to form.
3        A.    That Capricorn was the partner that
4    they chose, that De Tomaso chose to do the
5    development and the production of P72 -- De
6    Tomaso P72, the car, yeah.
7        Q.    What, if anything, did Mr. Choi
8    tell Genesis about Capricorn's qualifications
9    to do the production of the P72 car?
10            MS. WIGGER:  Object to form and
11            foundation.
12        A.    Can you repeat the question.
13        Q.    Sure.  Did Mr. Choi tell Genesis
14    anything about Capricorn's background or
15    experience in auto manufacturing and why he
16    thought it would be a good technical partner
17    to use to handle the production of the P72s?
18            MS. WIGGER:  Same objection.
19        A.    Well, I mean, okay, when I say De
20    Tomaso, I'm referring to Norman Choi and Ryan
21    Berris, so both of them represented that
22    Capricorn Group is capable of producing the
23    P72 cars.  That's the short answer, David.
24        Q.    Does Genesis recall any specific
25    conversations where Mr. Choi made that



Page 138

```
 1                    S. Lui
 2   representation that Capricorn was capable of
 3   producing the P72 cars?
 4             MS. WIGGER:  Object to form.
 5        A.   I mean, I cannot remember whether
 6   it was Mr. Choi alone specifically, but I'm
 7   very sure Ryan say that exact thing as well
 8   to us.  It's Ryan and Norman.
 9        Q.   During the due diligence process,
10   was Genesis aware that De Tomaso had entered
11   into contracts with an entity named Wyn
12   Design for a minimum 10-year term that
13   committed De Tomaso to pay Wyn Design 2-1/2
14   million Great British pounds over that
15   period?
16             MS. WIGGER:  Object to form and
17        foundation.
18             You are referring to documents that
19        are not in front of him.
20        A.   I cannot recall, David.
21        Q.   Do you recall Mr. Choi ever telling
22   you during this due diligence process, I'm
23   about to sign a deal committing the company
24   to pay 2-1/2 million pounds over the next 10
25   years?
```



Page 139

```
 1                    S. Lui
 2           MS. WIGGER:  Object to form and
 3      foundation.
 4      A.   I would say there was some
 5 conversation, but specifically the form of
 6 the contract, whether it was signed or not, I
 7 am not aware because we weren't given a copy
 8 of that agreement.  If it was signed, I don't
 9 know if it was signed.
10      Q.   From Genesis' perspective, if a
11 contract was signed with those terms in April
12 2022, would that have been material
13 information that Genesis would have wanted to
14 know during its due diligence process?
15           MS. WIGGER:  Object to form and
16      foundation, calls for speculation.
17      A.   If it was signed -- I'm sorry, it's
18 getting late.  Materiality, if the 10-year
19 contract -- we would have looked at the
20 materiality of that contract so, for example,
21 if the revenue is 100 million a year and this
22 particular contract, right, if it's, like,
23 for 20 million a year, right, they are taking
24 a huge part of our costs, then, obviously,
25 yes, the answer is yes, we would have looked
```



Page 140

1                    S. Lui
2   at it because 20 million over 10 years is 200
3   million.
4        Q.    During the diligence process, was
5   Genesis aware that De Tomaso entered into a
6   contract in April of 2022 with an entity
7   associated with someone named Jakub Jodlowski
8   who had also committed De Tomaso over a
9   minimum 10-year period to pay Mr. Jodlowski
10  an additional 2-1/2 million pounds over those
11  10 years?
12           MS. WIGGER:  Object to form and
13        foundation.  Again, there is no
14        document.
15       A.    My understanding is that Jakub and
16  Wyn, which is Jowyn, they work together,
17  yeah, so, yes, we were made aware of
18  potentially there might be such a contract
19  signed, but again, we never saw any such
20  contract as part of our due diligence.
21       Q.    How was Genesis made aware of the
22  potential of these deals between -- with
23  Jowyn and Jakub Jodlowski?
24           MS. WIGGER:  Object to form.
25       A.    I think Norman mentioned it to us



Page 141

```
 1                    S. Lui
 2  verbally, but as far as we were concerned, we
 3  were not provided any copies of those
 4  contracts, it was ever signed.
 5      Q.   Is Genesis aware of whether Mr.
 6  Berris ever authorized De Tomaso to enter
 7  into those contracts?
 8           MS. WIGGER:  Object to form.
 9      A.   You are referring to Jowyn's and
10  Jakub's contracts?
11      Q.   Correct.
12           MS. WIGGER:  Object to form and
13      foundation.
14      A.   No.
15      Q.   Would it have been material
16  information from Genesis' perspective if Mr.
17  Choi had authorized the company to pay 5
18  million pounds to these two individuals
19  without the authorization of Mr. Berris?
20           MS. WIGGER:  Object to form and
21      foundation.
22      A.   So you are saying we doubt the
23  authorization of Mr. Berris?
24      Q.   Correct.
25      A.   No, I mean, I don't see why Mr.
```



Page 142

                    S. Lui

1

2    Berris' approval is required because as far

3    as we are concerned, Norman Choi is the boss

4    of the company.  We dealt with Norman as the

5    principal, Ryan was just an employee, so...

6        Q.    During the diligence process, did

7    Genesis ever review De Tomaso's LLC operating

8    agreement?

9        A.    Could you repeat that, LLC

10   agreement?

11       Q.    Did Genesis ever review the

12   operating agreement for the De Tomaso

13   Automobili Holding NA LLC?

14       A.    I'm not aware that there is such an

15   agreement, David.

16       Q.    So that was never provided to

17   Genesis, to Genesis' knowledge, during the

18   due diligence process?

19            MS. WIGGER:  Object to form.

20       A.    I wasn't aware that there is an

21   operating agreement of De Tomaso LLC, no.

22       Q.    So Genesis' understanding was that

23   Mr. Choi could bind the company to contracts

24   without anyone else's authorization?

25            MS. WIGGER:  Object to form,



Page 143

                    S. Lui

1        foundation, legal conclusion.

2               You can answer if you know.

3        A.    I'm not a lawyer so I will have to

4    -- we weren't aware of -- we didn't look at

5    the M&A or whatever you call it in the U.S.,

6    we weren't sure exactly who's approval is

7    required to bind the contract, but as far as

8    we are aware, Norman Choi is the sole

9    shareholder, the sole owner of the business,

10   so I would imagine his signature alone,

11   approval is probably all that is required.

12       Q.    During the diligence process, what

13   did Genesis to do inform itself about Mr.

14   Choi's background?

15              MS. WIGGER:   Object to form.

16       A.    To be honest, we didn't progress to

17   that stage because, you know, quite early on

18   after we signed the LOI, we found out about

19   the unauthorized contract that Ryan signed

20   with Carmen Jordá.  That took us by surprise.

21              So we -- once we were aware of that

22   contract, we basically took our foot off the

23   pedal, so we stopped, we more or less stopped

24   the heavy lifting due diligence because it



Page 144

```
 1                    S. Lui
 2   was the last nail in the coffin as far as we
 3   were concerned about working with De Tomaso.
 4        Q.   When you say that there was an
 5   unauthorized contract with Carmen Jordá, what
 6   was Genesis' understanding of why that
 7   contract was unauthorized?
 8             MS. WIGGER:  Object to form.
 9        A.   We were made aware by Norman that
10   he received a lawyer's letter from Carmen
11   Jordá's lawyer asking for unpaid fees or
12   salaries or whatnot and Ryan and Diana had no
13   idea that there was even such a contract ever
14   signed.  So that was very concerning for us
15   as a potential investor in De Tomaso, when
16   your left hand doesn't know what your right
17   hand is doing, so that was a huge red flag
18   for us when that happened.
19        Q.   To that point, would it similarly
20   have been very concerning for Genesis to
21   learn that Mr. Choi had authorized
22   significant contracts worth 5 million pounds
23   without Mr. Berris being aware?
24             MS. WIGGER:  Object to form, asked
25        and answered.
```



Page 145

                        S. Lui

1

2       A.    I don't think I am in a position to

3   answer that question, David, but for the sake

4   of going through this, I would say, again, I

5   don't see why Ryan's approval is required

6   when he is just an employee or consultant,

7   right -- not an employee, he is just a

8   consultant, he wasn't even an employee of the

9   company.

10          Norman is the sole shareholder of

11  the business, so I don't see why Ryan's

12  approval is required for any major decisions

13  at all.

14      Q.    Genesis was aware, as you said,

15  that Mr. Berris was the CEO of De Tomaso,

16  correct?

17      A.    That's what we were told, yes.

18      Q.    Was Genesis aware that Mr. Berris

19  was one of two board members of De Tomaso?

20      A.    Yes, we were aware, I think just

21  for the LLC entity, yes.

22      Q.    Is it Genesis' understanding that

23  Mr. Choi had the ability to enter into any

24  contract and do anything he wanted with the

25  company, regardless of whether he had



Page 146

```
 1                    S. Lui
 2   authority from the board?
 3           MS. WIGGER:  Object to form,
 4       foundation, legal conclusions.
 5       A.   So I cannot answer to the question
 6   because we were never given all the detail.
 7   We call it M&A in our part of the world of
 8   the LLC entity, but, you know, but I will
 9   say, logically speaking, if there is only one
10   shareholder, Norman should be able to make
11   decisions on his own without having to
12   consult or get approval from one of his
13   staff.
14       Q.   If there is a corporate document
15   that says that's not the case, then you would
16   say he wouldn't be able to do that, right?
17           MS. WIGGER:  Object to form,
18       foundation.
19       A.   Well, if it's a document that show
20   that, for example, you are required two board
21   directors to sign and it's specific to that
22   entity, so in this case, if there is an LLC
23   document, right, that says that, you know, I
24   don't know, like, for material contracts,
25   right, it requires both directors to sign,
```



 1                    S. Lui
 2    then, yes, I would say yes, it's clearly
 3    stated.
 4        Q.    In that case, it would have also
 5    been a serious red flag to Genesis if Mr.
 6    Choi had in violation of the LLC agreement
 7    authorized those types of contracts without
 8    the vote of both board members, right?
 9            MS. WIGGER:  Object to form,
10        foundation, legal conclusion.
11        A.    You use the word serious violation.
12    I think again it depends, from our
13    perspective as investor when we look at the
14    materiality of that contract you are
15    referring to, if it's a thousand dollar
16    contract, right, to pay a fee every month to
17    come to clean office.  That's 12 grand a
18    year.  It's not material, right, so we would
19    have let it pass.
20        Q.    You mentioned earlier that you had
21    some concern that the right hand was not
22    talking to the left hand with respect to Ms.
23    Jordá, right?
24        A.    Yes.
25        Q.    Would you have also had that



Page 148

```
 1                    S. Lui
 2   concern if Mr. Choi was entering into
 3   contracts without the CEO and other board
 4   member of De Tomaso being aware?
 5            MS. WIGGER:  Object to form, calls
 6        for speculation.
 7        A.    There's many ways to answer that
 8   question, David, because you use the word
 9   CEO, like I said, we didn't see any documents
10   that show that Ryan was the CEO, right.  He
11   said he is the CEO, everyone said Ryan is the
12   CEO, but we never saw any documents, right.
13            And, again, as far as we are
14   concerned, we were dealing with Norman as the
15   only shareholder and the logical conclusion
16   is that, you know, Norman can decide on
17   anything.  It's his company, it's all his
18   money inside the company.
19        Q.    So your understanding from your
20   background working in financial services and
21   you said you also worked with companies that
22   have become publicly listed companies is that
23   the sole shareholder of a company has
24   unfettered authority to do anything they want
25   with respect to that company?
```



Page 149

S. Lui

1

2          MS. WIGGER:  Object to form,
3      foundation, legal conclusions, misstates
4      testimony.
5          A.    That's not what I said, David,
6  that's not what I said.
7          Q.    Going back to the original line of
8  questioning, you said you didn't get too far
9  into looking into the background of Mr. Choi,
10 correct?
11         A.    Uh-huh.
12         Q.    You have to say yes or no.
13         A.    Yes.
14         Q.    I know it's getting late.  We will
15 try to wrap this up so you can get to bed.
16              Did you or did Genesis have an
17 understanding of Mr. Choi's approximate net
18 worth?
19              MS. WIGGER:  Object to form.
20         A.    We made a guess because before De
21 Tomaso, we know that Norman sold Apollo
22 Automobili to a Hong Kong listed company,
23 860, that's the stock code, for I think $150
24 million, so we assumed that was a starting
25 point.  How much was cash, how much was



Page 150

```
 1                    S. Lui
 2  shares is -- we didn't ask Norman when you
 3  sold those shares, how much cash did you get,
 4  but we took that as a benchmark, right, of
 5  his own personal wealth which is at least
 6  $150 million U.S. dollars.
 7      Q.   Did you have an understanding of
 8  Mr. Choi's assets beyond his stake in Apollo
 9  Future Mobility Group?
10           MS. WIGGER:  Object to form.
11      A.   So when I knew Norman, I knew he
12  had an apartment in Hong Kong, you know,
13  worth, I don't know, the price fluctuates, I
14  would say at least 7 or 8 million U.S. and
15  then he has another apartment in Hudson Yards
16  that's probably around the same price that he
17  paid for it, probably higher, I can't
18  remember.
19           So those were stuff that he told me
20  that I am aware.
21      Q.   So based on the information that
22  Genesis had about Mr. Choi's assets, what was
23  Genesis' best estimate of Mr. Choi's net
24  worth?
25           MS. WIGGER:  Object to form.
```



Page 151

 1                    S. Lui
 2      A.    I would state north of 150 million
 3  U.S.
 4      Q.    Was Genesis aware of whether Mr.
 5  Choi also had access to money from his
 6  family?
 7            MS. WIGGER:  Object to form.
 8      A.    No, we never discussed that, no.
 9      Q.    You mentioned Apollo Future
10  Mobility Group.
11            During the due diligence process,
12  did Genesis ever speak to anyone at Apollo
13  Future Mobility Group?
14      A.    No.
15      Q.    During the diligence process, did
16  Genesis ever speak to any of the individuals
17  or entities identified as De Tomaso's
18  customers for the P72?
19            MR. WIGGER:  Object to form.
20      A.    Your question is were we aware who
21  were their customers, is that your question?
22      Q.    Let's start with that question,
23  were you aware of who the customers were for
24  the P72?
25      A.    No.  In fact, no -- the short



Page 152

```
 1                    S. Lui
 2  answer is no.
 3            We -- the model and the detail room
 4  that Ryan was in charge of, a lot of the
 5  information was, what was the word they use,
 6  I don't know -- you couldn't see the names.
 7  It was like sensored.  It was blot out.
 8            In fact, one of the diligence items
 9  we specifically asked for was the full list
10  of customers, who they sold to exactly, we
11  were never provided with that list.  There
12  were some names that were mentioned who, like
13  a famous football in Europe, a famous car
14  collector in South America, so there were a
15  few names that we knew, but we never had
16  access to the full customer list before.
17       Q.   During the diligence process, was
18  Genesis aware that the entity that purported
19  to have signed the most sale and purchase
20  agreements for P72s was something called
21  Pachmar?
22            MS. WIGGER:  Object to form and
23       foundation.
24       A.   No, no.  We are not aware.  The
25  largest customer, as far as we were aware, is
```



```
 1                    S. Lui
 2    Miller Motors, is the largest customer,
 3    quote-unquote, which is De Tomaso's dealer
 4    based out in Greenwich, Connecticut.
 5              MR. SIMONS:  Why don't we maybe
 6         take a short break and then I think we
 7         should be able to wrap up in the next 15
 8         minutes hopefully.
 9              MS. WIGGER:  Sounds good.
10              THE VIDEOGRAPHER:  The time is
11         approximately 11:08 a.m.  We are now
12         going off the record.
13              (Recess.)
14              THE VIDEOGRAPHER:  The time is now
15         approximately 11:15 a.m.  We are now
16         going back on the record.
17         Q.   Mr. Lui, earlier you testified that
18    in Genesis' view, Genesis got pretty far
19    along in the financial due diligence process
20    of De Tomaso, is that accurate?
21         A.   Yes.
22         Q.   That was based on work done by
23    independent advisors, right?
24              MS. WIGGER:  Object to form.
25         A.   Yes.
```



Page 154

```
 1                      S. Lui
 2        Q.    And based on the work analyzing De
 3   Tomaso's financials, Genesis arrived at an
 4   understanding of what an approximate
 5   valuation of De Tomaso would be, correct?
 6             MS. WIGGER:  Object to form.
 7        A.    We had a range in mind, yes.  I
 8   mean, we have our own views on the valuation,
 9   but we had a range in mind.
10        Q.    What was that range?
11             MS. WIGGER:  Object to form.
12        A.    During that time, you know, it
13   could have been anywhere between 500 to a
14   billion probably at that time, just based on
15   where the market was.  It was very bullish.
16   So we were making comparisons to other
17   transactions that was done through a SPAC.
18   So it could have been 500 to a billion
19   potentially, that was probably the high end
20   of it.
21        Q.    As of May 2022, Genesis thought or
22   was prepared to move forward with a SPAC that
23   valued De Tomaso at somewhere between 500
24   million and $1 billion?
25             MS. WIGGER:  Object to form.
```



Page 155

```
 1                    S. Lui
 2        A.    That was the range we had in mind.
 3        Q.    In April and May of 2022, as you
 4   said, Genesis was undertaking a due diligence
 5   process looking into De Tomaso, right?
 6        A.    Yes.
 7        Q.    There was a signed letter of
 8   intent?
 9        A.    Yes.
10        Q.    And so you were negotiating -- are
11   you familiar with the term arm's length?
12        A.    Yes.
13        Q.    You were negotiating at arm's
14   length with De Tomaso regarding a potential
15   acquisition, right?
16             MS. WIGGER:  Object to form.
17        A.    Yes.
18        Q.    So during this time, all of your
19   interactions with De Tomaso, you were acting
20   on behalf of Genesis as part of that arm's
21   length relationship, right?
22             MS. WIGGER:  Object to form.
23        A.    Yes.
24        Q.    That included the conversations
25   that you had with De Tomaso regarding the
```



Page 156

```
 1                    S. Lui
 2   termination of Mr. Berris, right?
 3           MS. WIGGER:  Object to form.
 4      A.   I didn't hear that question.  Can
 5   you repeat it, David?
 6      Q.   That included the conversations you
 7   had with De Tomaso regarding Mr. Berris'
 8   termination?
 9           MS. WIGGER:  Object to form and
10           foundation.
11      A.   Yes, it happened during that
12   period, yes.
13      Q.   That was the period that you were
14   working exclusively on behalf of Genesis'
15   interests, right?
16           MS. WIGGER:  Object to form.
17      A.   Yes.
18      Q.   Was anyone else at Genesis aware
19   that you were involved in the -- in sending
20   Mr. Berris a letter asking him to resign as
21   CEO of De Tomaso?
22           MS. WIGGER:  Object to form and
23           foundation.
24      A.   The email was sent from my personal
25   email address, yeah.  So was any of my
```



```
 1                    S. Lui
 2  colleagues aware, I can't recall, but the
 3  email was sent in my personal capacity.
 4      Q.   But at the time, as you said, you
 5  were the president and CEO of Genesis, right?
 6      A.   Yes.
 7      Q.   Genesis' officers and directors
 8  have a fiduciary duty to the company and its
 9  stockholders, right?
10           MS. WIGGER:  Object to form, legal
11           conclusion.
12      A.   Yes.
13      Q.   As part of your understanding of
14  that duty, Genesis would be obligated or the
15  officers and directors would be obligated to
16  inform the company of any adverse information
17  that they learned about a potential target,
18  right?
19           MS. WIGGER:  Object to form, legal
20           conclusions.
21           Now you can answer.
22      A.   Yes.
23      Q.   During Genesis' due diligence
24  process into De Tomaso, did Genesis learn of
25  any alleged misconduct from Norman Choi?
```



Page 158

```
 1                    S. Lui
 2           MS. WIGGER:  Object to form.
 3      A.    No.
 4      Q.    As you said, you did not get
 5 particularly far in advance in investigating
 6 Mr. Choi's background, is that right?
 7           MS. WIGGER:  Object to form.
 8      A.    No.  You asked that question.  I
 9 think you used the word unauthorized
10 transaction.
11      Q.    Yes.
12      A.    We were not aware there was any
13 unauthorized transaction by Mr. Choi.
14      Q.    As part of the diligence process,
15 did Genesis speak to any of Mr. Choi's past
16 business associates?
17           MS. WIGGER:  Object to form,
18      foundation.
19      A.    No, we didn't progress to that
20 stage, no.
21      Q.    As part of the diligence process in
22 De Tomaso, did Genesis investigate whether
23 Mr. Choi had any undisclosed interests in
24 various companies?
25           MS. WIGGER:  Object to form and
```



Page 159

```
 1                 S. Lui
 2       foundation.
 3       A.    No, we did not do that, no.
 4             MR. SIMONS:  I think that's all I
 5       have.  Thank you, Mr. Lui, for your time
 6       on behalf of Genesis.
 7             For tomorrow, we have a little
 8       concern in terms of getting lunch and
 9       then getting across town midtown, that
10       1:00 is not going to cut it to start for
11       Ryan, so is it possible to agree to move
12       that to 2:00, seeing how the second
13       deposition tomorrow is going?
14             MS. WIGGER:  That might push it
15       later.  Are you fine with pushing it
16       later?
17             MR. SIMONS:  We understand, midtown
18       traffic, UN Assembly traffic started to
19       get underway so I think it could get us
20       a while to get there.
21             MR. WERNER:  We will have to give
22       it some thought.  We can go off the
23       record.
24             MS. WIGGER:  Before we go off,
25       30(b)(6) you are done with now.
```



Page 160

```
 1                     S. Lui
 2          MR. SIMONS:  Correct.
 3          MS. WIGGER:  Tomorrow, we are doing
 4     the personal deposition.
 5          MR. SIMONS:  Correct.
 6          MS. WIGGER:  We have no questions
 7     on the 30(b)(6) so thank you, Sam, for
 8     your time.
 9          And, Sam, with that, you are
10     excused, yes?
11          MR. SIMONS:  Yes, please.  Go to
12     bed.
13          THE VIDEOGRAPHER:  The time is now
14     approximately 11:22 a.m.  We are now
15     going off the record.
16          (Time noted:  11:22 a.m.)
17
18
19
20
21
22
23
24
25
```



Page 161

```
 1
 2                    - - -
 3                 I N D E X
 4                    - - -
 5
 6  SAMUEL LUI                           PAGE
 7      By Mr. Simons                    5
 8
 9                    - - -
10              E X H I B I T
11                    - - -
12  GENESIS EXHIBIT                      PAGE
13  Exhibit 1 Copy of Samuel Lui's      14
14      LinkedIn profile
15  Exhibit 2 Notice of a rule 30(b)(6) 31
16      deposition of Genesis Unicorn
17      Capital Corp.
18  Exhibit 3 Form S-1 filed with the   53
19      Securities and Exchange
20      Commission, registration
21      statement for Genesis Unicorn
22      Capital Corp. dated July 1, 2021
23  Exhibit 4 Form S-1 filed with the   62
24      U.S. Securities and Exchange
25      Commission on November 24, 2021
```



Page 162

```
 1

 2                     - - -

 3               E  X  H  I  B  I  T

 4                     - - -

 5  GENESIS EXHIBIT                      PAGE

 6  Exhibit 5 Form 10-Q publicly filed    68

 7       with the Securities and Exchange

 8       Commission on behalf of Genesis

 9       Capital Corp.

10  Exhibit 6 Form 10-Q filed with the     70

11       Securities and Exchange

12       Commission for the quarterly

13       period ended in June 30, 2022

14  Exhibit 7 Email exchange              114

15

16

17

18

19

20

21

22

23

24

25
```



Page 163

```
 1
 2                        - - -
 3            DEPOSITION SUPPORT INDEX
 4                        - - -
 5  Request for Production of Documents
    Page  Line        Page  Line    Page   Line
 6  None
 7                        - - -
 8  Stipulations
    Page  Line        Page  Line    Page   Line
 9  None
                          - - -
10
    Questions Marked
11  Page  Line        Page  Line    Page   Line
    None
12                        - - -
13  To Be Filled In
    Page  Line        Page  Line    Page   Line
14  None
                          - - -
15
16
17
18
19
20
21
22
23
24
25
```



Page 164

```
 1
 2                    CERTIFICATE
 3
            I HEREBY CERTIFY that the witness,
 4  SAMUEL LUI, was duly sworn by me and that the
    deposition is a true record of the testimony
 5  given by the witness.
 6      _____ Leslie Fagin _____
        Leslie Fagin,
 7      Registered Professional Reporter
        Dated: September 19, 2024
 8
 9
10
            (The foregoing certification of
11  this transcript does not apply to any
    reproduction of the same by any means, unless
12  under the direct control and/or supervision
    of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



MAGNA
LEGAL SERVICES

Page 165

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3            I,                        , do hereby
    certify that I have read the foregoing pages,
 4  and that the same is a correct transcription
    of the answers given by me to the questions
 5  therein propounded, except for the
    corrections or changes in form or substance,
 6  if any, noted in the attached Errata Sheet.
 7
 8
    SAMUEL LUI                      DATE
 9
10
    Subscribed and sworn
11  to before me this
            day of                  , 2024.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



Page 166

1

2                              - - - - - -

                              E  R  R  A  T  A

3                              - - - - - -

    PAGE   LINE   CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



## A

**A-R-C**
72:7
**a.m**
1:15 3:10 86:6,10
153:11,15 160:14
160:16
**a/k/a**
1:8,9
**ability**
59:8 145:23
**able**
36:25 57:8 63:16
85:13 136:19
146:10,16 153:7
**ABN**
17:10
**above-mentioned**
1:17
**absolutely**
50:9 123:4
**access**
6:20 22:25 106:11,23
107:11,23 116:23
118:14 123:13
124:6,9 127:8,10,24
128:4 151:5 152:16
**accommodations**
6:4
**accomplish**
88:11
**accountancy**
13:17
**accountant**
88:24
**accuracy**
121:9
**accurate**
19:13 26:2 57:3 58:8
66:2,24 67:15 70:4
71:23 83:25 153:20
**accurately**
33:9
**acknowledge**
4:12,16

**ACKNOWLEDG...**
165:2
**acquire**
41:19 56:2 80:11
**acquired**
79:17 111:11
**acquisition**
56:7 81:13 82:3,25
101:20 102:5,20
103:3,10,16 104:5
110:7 111:9 155:15
**Acrobat**
55:6
**acting**
94:15 155:19
**active**
77:23
**add**
37:16 128:15
**additional**
48:15 88:9 140:10
**address**
60:4,9,11,14 61:4
156:25
**addresses**
92:23
**administer**
4:18
**administered**
4:17
**Adobe**
55:6
**adopt**
87:24
**advance**
49:4 54:9 158:5
**advanced**
48:25
**adverse**
157:16
**advice**
105:21 110:22
**advise**
58:24 94:12
**advised**
88:15

**advising**
108:24 109:5,6,24
**advisor**
27:7,13 72:14 79:25
80:6 88:15,19 94:16
101:4 105:21
119:22 120:2
129:14
**advisors**
35:8 60:21 66:13
82:15 88:25 119:19
131:2 153:23
**advisory**
94:11
**affiliated**
25:11
**afraid**
24:16
**against-**
1:7
**ago**
15:6 115:17
**agree**
4:20 49:11 72:25
159:11
**agreed**
31:15 73:2 132:8
**agreement**
29:9,15,22 30:12,14
30:21,23 91:17
106:10 107:13
120:20 129:7 130:4
131:20 134:17
135:10,14 136:10
139:8 142:8,10,12
142:15,21 147:6
**agreements**
107:10 125:6,8 128:8
128:20,25 130:16
131:10 132:4 133:7
152:20
**ahead**
22:14 29:12 30:2
38:16 40:13 117:10
**al**
3:7

**Alexandra**
2:10 4:5
**alleged**
157:25
**allow**
8:4
**allowed**
38:13 107:22
**alluded**
83:5
**Altas**
120:9,11,14 122:9,15
122:19
**Altas'**
121:5
**America**
152:14
**amount**
23:5 44:10,12 46:21
90:15
**AMRO**
17:10
**analyzing**
154:2
**and/or**
117:16 164:12
**Andersen**
15:17,22
**answer**
8:9,12 13:9,10 15:25
22:8,10,15 23:15
24:19,20 29:12 33:4
33:19 34:24 35:3,23
36:14,24 37:25
38:10,11,15,16,20
39:4,9 40:20,25
43:5 44:2 47:10
50:12,21 54:17 57:8
57:9 58:10 74:19
76:16 86:19 87:6,10
87:20 88:12 89:5,17
90:2,3,11,17 93:13
94:4 96:4,13 97:4,9
98:19 99:13 101:15
106:7 108:8 110:25
127:23 128:16,17



137:23 139:25
143:3 145:3 146:5
148:7 152:2 157:21
**answered**
27:15 37:15,20,22
38:9,18 40:17,18
48:18 50:24 51:23
62:14 72:20 83:3
87:17 105:5 144:25
**answering**
8:4 37:23 87:22
**answers**
26:12 36:4,6 124:14
165:4
**anybody**
39:4 42:10,13 48:3
48:13 59:5
**anymore**
6:2 34:23 72:12
**anyone's**
55:8
**anyway**
123:23
**apartment**
150:12,15
**Apollo**
149:21 150:8 151:9
151:12
**appear**
14:24 37:12
**appearances**
2:2 3:18
**appears**
52:20,24 67:19
**applicable**
58:25 59:8,22
**application**
6:21
**applies**
7:22,22,23
**apply**
164:11
**appointed**
34:4 65:7 95:4
**appreciate**
6:17 38:24 50:10

95:25,25 97:10,13
**appropriate**
50:14 85:23 88:3
90:6
**approval**
81:17,19 142:2 143:7
143:12 145:5,12
146:12
**approve**
81:16
**approximate**
44:17 149:17 154:4
**approximately**
3:9 16:23 17:6 86:6
86:10 153:11,15
160:14
**April**
16:16 17:14 75:22
76:19 103:23,24
104:22 106:2
131:16 134:7
139:11 140:6 155:3
**ARC**
72:6,14 79:22,24
80:11 94:15,22,24
95:4 100:12 101:11
102:7,10,12,15,25
103:17,20 104:11
104:12 105:17,20
108:21 114:4 115:9
115:18 119:24
120:2,4,4,6
**arm's**
155:11,13,20
**arrangements**
48:24 130:11
**arrived**
154:3
**Arthur**
15:17,22
**Asia**
33:24 60:25
**aside**
34:18 68:2 70:7
118:8
**asked**

8:10 22:11 27:14
34:20 35:14 37:14
37:19,21 38:8 40:16
42:13 48:17 51:22
54:17 62:15 83:2
96:5 124:13 126:3
128:18 129:11
130:15 131:9,25
132:17 144:24
152:9 158:8
**asking**
9:23 10:4 32:25 33:3
43:3 76:18 85:6
86:25 91:23 92:4
97:4,8,16 99:16
106:14,15,17 112:8
144:11 156:20
**asks**
38:16
**Assembly**
159:18
**asset**
28:15,16,17
**assets**
150:8,22
**assist**
22:17
**assisting**
104:4 108:11
**associated**
13:4 36:8 39:22 41:4
41:23 73:8,24 74:5
74:15 75:3 83:14
88:5 97:21 98:13
112:3 128:23 140:7
**associates**
158:16
**assume**
10:15
**assumed**
149:24
**assure**
36:3
**attached**
165:6
**attaching**

117:15
**attendance**
101:10
**attendee**
100:11
**attorney**
8:11
**attorneys**
2:4,8 4:11 37:9,18
39:5
**audio**
61:11
**audit**
13:22 119:15
**auditor**
119:13
**auditors**
119:10
**August**
15:19 17:7,13 26:17
26:18 28:10,22
33:15,21,25 36:16
36:18 71:10
**authority**
110:17,21 146:2
148:24
**authorization**
141:19,23 142:24
**authorized**
136:2 141:6,17
144:21 147:7
**auto**
137:15
**Automobili**
1:8 26:22 142:13
149:22
**available**
12:24 52:20 64:7
68:22 70:21 72:22
**Avenue**
2:9
**aware**
33:11 43:2,3,11 54:4
72:8 90:13,14 94:7
94:19 95:12 96:7
97:20 100:10,18



101:8 103:14 104:3
104:15,16 105:25
106:22 107:5
108:20,24 112:7,9
112:15 113:10
115:16,17 122:14
124:15 126:19
127:25 128:12,19
130:8 132:4 133:13
135:25 138:10
139:7 140:5,17,21
141:5 142:14,20
143:5,9,22 144:9,23
145:14,18,20 148:4
150:20 151:4,20,23
152:18,24,25
156:18 157:2
158:12

**awkwardness**
61:10

---

**B**

**B**
22:25 65:20 161:10
162:3

**bachelor**
13:17

**back**
9:13,14,15 10:20
11:24 12:6,20,23
14:23 25:9 31:16
44:25 67:3 69:13
86:11,12 106:4
115:23 125:10
149:7 153:16

**background**
13:12 16:5,10 42:25
58:23 59:11 66:13
137:14 143:15
148:20 149:9 158:6

**bad**
86:13

**bank**
17:10 51:13

**bankers**
135:12

**banking**
13:23,25

**based**
10:6 19:6 25:6 28:18
59:19 60:22,25
150:21 153:4,22
154:2,14

**basically**
9:11 121:7 143:23

**Bates**
52:16,19 53:3 71:5
114:13

**bathroom**
9:9

**beauty**
80:13 101:5 105:18
108:21

**bed**
149:15 160:12

**began**
29:2 86:15 103:9
113:21 116:13
118:12

**beginning**
9:19 32:9

**begins**
3:4

**behalf**
10:13 12:12 30:15,24
32:12,17,23 34:20
38:6,12 39:7 56:21
67:8 68:8,13 69:20
71:16 98:10 99:16
110:18 117:24
155:20 156:14
159:6 162:8

**believe**
5:15 28:25 40:19
41:3 44:11 45:21
50:24 53:21 54:21
62:14 68:21 69:11
69:16 70:3 71:22
73:3 77:25 78:6,22
78:25 81:23 86:24
87:17 95:5,9 97:15
99:3,5 103:18

**banking**
107:20 119:13
127:4

**benchmark**
119:22 129:14 150:4

**benefits**
129:22

**Berris**
1:5 2:14 3:6,22,25
12:3 40:21 103:21
118:15 119:3,9
120:8 123:15 124:4
124:11,14,17 125:4
127:9 129:2,8 130:3
132:8 136:16
137:21 141:6,19,23
144:23 145:15,18
156:2,20

**Berris'**
124:2,19 131:19,25
142:2 156:7

**best**
5:23 8:3 22:12 35:3
37:24 38:19,21,23
105:22 108:18
150:23

**better**
7:24 16:3,8,12 85:15

**beyond**
150:8

**billion**
78:24 154:14,18,24

**bind**
142:23 143:8

**binding**
91:16

**biotechnology**
58:4

**bit**
9:18,25 15:15 16:19
17:9 40:4 42:25
43:2 45:21 66:11
67:3 69:14 74:10
93:13,15 97:17
109:19 128:5

**blank**
55:17,21 56:5,6

**block**
34:10

**blot**
152:7

**blow**
69:14

**board**
19:16,20,21 20:7,20
20:25 21:11 34:11
34:12,14 46:6,6,23
58:13 60:24 64:19
81:5,8,16,17,18
82:9 101:23,25
104:15,18,25 105:7
107:5 108:11,20,23
145:19 146:2,20
147:8 148:3

**Boies**
2:3 3:21

**boss**
125:16 142:3

**bothering**
7:4

**bottom**
15:7 66:18 69:10
71:3 114:25

**brains**
123:20 125:16

**break**
9:9,13 18:13,20,23
19:2 20:16 85:25
86:4,18,21 153:6

**breakdown**
46:13 49:13 130:20
132:24 135:21

**breaks**
9:8

**breath**
22:13

**briefly**
13:12

**bring**
84:20

**British**
138:14

**broad**



106:8
**brother**
81:8
**brothers**
80:21
**brought**
87:3 88:9
**budget**
33:21
**bullish**
154:15
**Busamante**
4:5
**business**
27:10 35:2 47:21
  48:9,23 55:23 56:3
  56:19,22 57:23,24
  60:9,11,14 67:6,10
  69:18,22 71:15,18
  105:15,16 123:5,21
  123:22 125:17
  143:10 145:11
  158:16
**BUSTAMANTE**
2:10

**C**

**C-A-M-A-R-E-R-O**
72:6
**calculate**
45:15
**calculator**
44:21
**call**
8:16 11:17 17:4 32:3
  33:22 43:20 56:4
  76:6 80:13 119:14
  143:6 146:7
**called**
5:4 15:17 19:17
  21:15 66:4 152:20
**calling**
82:14
**calls**
10:22,25 11:2,19,21
  51:15 82:13 127:14

139:16 148:5
**Camarero**
72:6 102:13
**camera**
6:15 9:14
**cameras**
9:12
**capable**
137:22 138:2
**capacity**
9:21,24 33:4,10
  57:11 82:21 87:7,11
  87:23 88:13 89:18
  95:22 109:13 157:3
**capital**
1:9 9:22 10:13 13:25
  20:11,22 21:15,17
  22:3,16,24 23:10
  25:10,12,17,24 26:9
  26:20 29:8,17,20,24
  30:4,7,20,24 31:8
  32:5,11,17 33:6,14
  34:19 35:16 36:9
  38:7 41:24 42:7
  47:7 48:14 51:7
  52:2,23 53:12,17
  55:16 56:15 64:4,7
  64:12 65:6 66:4,6,7
  68:9,14 80:23 83:6
  83:7,10 84:11,15
  87:4 88:4,6,10,11
  89:16,22,25 90:16
  91:15 120:9,11,14
  122:9,15 161:17,22
  162:9
**Capricorn**
135:11,24 136:2,7,10
  136:14,19,25 137:3
  137:22 138:2
**Capricorn's**
137:8,14
**car**
135:16 137:6,9
  152:13
**Carmen**
143:21 144:5,10

**carry**
92:9 134:6
**cars**
79:3 137:23 138:3
**case**
1:6 22:7 55:24
  146:15,22 147:4
**cash**
49:10,15 149:25
  150:3
**cease**
34:2
**ceased**
36:17
**CEO**
118:19 125:15
  133:22 145:15
  148:3,9,10,11,12
  156:21 157:5
**certain**
8:25 12:22 109:14
**certainly**
37:21
**certainty**
105:19 135:15
**CERTIFICATE**
164:2
**certification**
164:10
**certify**
164:3 165:3
**certifying**
164:12
**cetera**
8:17
**CFO**
19:10 25:25 26:25
  27:16,18 64:20
  110:13 111:7
**Chang**
60:22
**CHANGE**
166:3
**changes**
91:3 165:5
**charge**

125:14,19 126:19
  152:4
**chat**
113:16
**check**
45:11 55:17,21 56:5
  56:6
**chief**
18:2 27:3,5,12 65:2
  66:19 118:20,22
**Choi**
1:8,8 2:15 3:7 4:6
  12:8 30:18 39:12
  40:22 74:24,25 75:8
  75:20 76:24 77:6
  78:7 79:13 80:18
  81:7 94:10,21 95:14
  95:15 96:8,9 101:9
  104:20 105:3,8,10
  105:14 108:11
  110:11 111:23
  112:4,11 113:3
  115:14,20,23 116:3
  119:2 123:14,19,24
  127:8 131:19,25
  132:7,12 135:25
  136:24 137:7,13,20
  137:25 138:6,21
  141:17 142:3,23
  143:9 144:21
  145:23 147:6 148:2
  149:9 151:5 157:25
  158:13,23
**Choi's**
123:18 143:15
  149:17 150:8,22,23
  158:6,15
**Chok**
34:5
**choose**
105:22
**chose**
74:8 133:11,24 134:2
  137:4,4
**circumstances**
16:7



**clarification**
62:21
**clarify**
26:8 43:14
**class**
65:20
**clean**
147:17
**clear**
9:23 10:11 11:6
  34:22 62:20 87:8
  129:19
**clearly**
87:12 129:23 147:2
**client**
136:15
**clientele**
80:7
**clients**
21:20,20 22:17 48:24
  80:4 82:16
**close**
45:14
**closed**
49:3 78:15
**closing**
36:21
**Coal**
19:17
**coast**
5:14
**code**
149:23
**coffin**
144:2
**cold**
82:13
**colleague**
8:19
**colleagues**
3:23 4:5 100:18
  157:2
**collector**
152:14
**combination**
56:19,23 57:24 67:7

67:10 69:19,22
71:15,18
**come**
14:12 48:2 78:9
  147:17
**comfortable**
135:19
**comments**
117:16
**commission**
52:22 53:11 63:3,8
  68:8,13 70:12,18
  71:25 161:20,25
  162:8,12 165:12
**commit**
49:4
**committed**
138:13 140:8
**committing**
138:23
**common**
47:2 65:20
**communicate**
127:2
**communication**
7:5 91:6 92:14,15,17
  92:21 93:20
**communications**
91:10 92:2,10 93:8
  94:4,8,20 95:13
  96:8 97:20 98:15
  99:10,21
**companies**
21:21 22:23 23:7,9
  23:10,12 41:18
  55:25 59:14,15,20
  78:18 80:9 91:7
  92:3,7,22 93:21
  148:21,22 158:24
**company**
19:8,17 21:6 23:4
  24:2 25:19,20 33:23
  35:21 43:23 55:17
  55:21,22 56:5,7,8
  65:11 79:15 88:14
  89:19 90:3 91:18

111:11 121:12
123:9,16,18 129:16
131:4 133:18,20
138:23 141:17
142:4,23 145:9,25
148:17,18,23,25
149:22 157:8,16
**company's**
121:16 125:20
**comparisons**
154:16
**compensate**
47:4 132:8
**compensated**
46:8 132:21
**compensating**
132:13
**compensation**
46:11 130:11
**complete**
36:23 63:15 69:6,7
  71:6
**completed**
33:21,22
**completely**
33:9
**compliance**
58:17,20,23,25 59:16
**comply**
59:8,22
**computer**
6:22 41:8,12
**concern**
147:21 148:2 159:8
**concerned**
113:24 122:19 141:2
  142:3 144:3 148:14
**concerning**
144:14,20
**conclusion**
128:11 143:2 147:10
  148:15 157:11
**conclusions**
98:18 127:22 146:4
  149:3 157:20
**concrete**

37:3
**conduct**
119:19
**conducted**
93:9
**conducting**
116:14
**confidential**
106:3,23 107:23
**confidentiality**
107:10,13
**confirm**
15:8 121:9
**confusing**
76:17
**Connecticut**
153:4
**consider**
24:6 27:12
**considering**
74:16 103:9,12
  104:23
**constrained**
90:8
**consult**
146:12
**consultancy**
20:19
**consultant**
145:6,8
**consulted**
22:17
**consulting**
125:5,7 128:25 129:4
  129:10 130:16,19
  130:24 131:10
**continue**
6:2 85:18
**continued**
34:11
**continuing**
134:12
**contract**
26:21,25 27:2,16
  29:2 120:23 124:24
  129:20,24 131:25



132:2 136:3 139:6
139:11,19,20,22
140:6,18,20 143:8
143:20,23 144:5,7
144:13 145:24
147:14,16
**contractors**
127:20 128:9
**contracts**
120:18 125:2 127:19
128:2,3,13,23 129:4
129:10,11 130:24
131:7,9 133:6 135:5
135:6,8 138:11
141:4,7,10 142:23
144:22 146:24
147:7 148:3
**contribute**
48:14
**contributed**
90:16
**contribution**
89:15,23
**control**
54:22 55:3 164:12
**conversation**
139:5
**conversations**
11:10 31:22 79:12
137:25 155:24
156:6
**COO**
118:22
**copied**
126:24
**copies**
125:7 130:23 131:9
141:3
**copy**
14:8,24 63:16 107:16
107:17,19 129:11
129:12 130:15
131:7 139:7 161:13
**Corp**
1:9 9:22 25:25 26:9
31:8 32:5,11,17

33:14 34:19 35:17
36:9 38:7 41:25
42:7 47:7 52:24
53:12,17 55:16 64:4
64:8,12 68:9,14
88:4,6 161:17,22
162:9
**corporate**
9:21 25:16 33:5
36:10 37:6 39:13,18
39:24 58:24 91:5
92:23 93:21 106:21
146:14
**correct**
15:13,20 16:17,24
17:7,14,20 19:25
20:9 28:23 29:3
33:15,17 64:24 65:2
65:4 100:7 102:15
108:13 116:4
141:11,24 145:16
149:10 154:5 160:2
160:5 165:4
**corrections**
165:5
**correspond**
126:22
**corresponding**
116:3
**costs**
135:20 139:24
**counsel**
3:17 4:19 5:20 7:23
7:25 8:5 10:22,25
11:3,20,22 12:15
31:22 34:19 38:5,11
85:12 87:21 88:22
88:23 91:18,20 96:3
108:5
**course**
5:25 106:19 117:12
133:10
**court**
1:2,18 3:15
**cover**
7:17 13:11 16:9

49:15 98:6
**covering**
16:4
**Covid**
60:16
**created**
126:14
**currently**
13:4 25:11 44:24
45:6
**customer**
152:16,25 153:2
**customers**
120:21,25 135:16
151:18,21,23
152:10
**cut**
159:10

---

**D**

**D**
161:3
**D.C**
2:10
**data**
116:23 118:14
**date**
11:19 28:10 29:4
34:3 75:23 103:8,19
104:6 114:3 165:8
**dated**
52:24 53:12 161:22
164:7
**dates**
12:21,22 75:13
**David**
2:6 3:20 62:15 64:17
76:17 87:18 89:11
92:13 93:12 94:4
95:20 97:4 98:19
106:8 108:15
117:11 125:11
128:2,14 136:6
137:23 138:20
142:15 145:3 148:8
149:5 156:5

**day**
11:3,14 21:9 27:8,9
43:25 125:23,23
165:11
**days**
134:8
**De**
1:8 26:22,23 27:6,13
27:19,23,25 28:6
29:2,8,9,15,21 30:9
30:15 39:22 74:15
75:3 79:4,15,16,23
80:14 94:11,16,21
94:24 95:16 96:10
100:12,25 101:4,11
101:19 102:4,8,11
102:12,15,19,25
103:2,9,14,20,25
104:4,24 105:17
106:3,9,24 107:7,11
108:12,21,24 109:5
109:7,13,21,24
110:6,22 113:21
114:4 115:9,18
116:8,14 117:22
118:24 119:13,21
120:3,6,19,20 121:8
121:23 122:4,10,16
122:22 123:2,11,24
124:2,12,19 125:23
127:5,6,18 128:7,23
129:4,7 130:5,11
131:4,20 132:7,12
132:18,20,25 133:5
133:8,11 134:10
136:22 137:4,5,19
138:10,13 140:5,8
141:6 142:7,12,21
144:3,15 145:15,19
148:4 149:20
151:17 153:3,20
154:2,5,23 155:5,14
155:19,25 156:7,21
157:24 158:22
**de-SPAC**
33:22,22 36:22



**deal**
23:7,8,13 33:25
  41:16 49:3 73:3
  102:2 105:19 108:9
  108:13 119:21
  133:11,16 135:13
  138:23
**dealer**
153:3
**dealers**
120:21 121:2
**dealing**
59:14 148:14
**deals**
78:13,15,22 79:5
  80:10 81:18 82:11
  101:24 140:22
**dealt**
119:7,8 120:6 142:4
**December**
20:11,12 21:8
**decide**
148:16
**decided**
78:3
**decision**
36:10 39:12,17,23
**decisions**
145:12 146:11
**deep**
22:13
**Defendants**
1:10 2:8
**definitely**
36:5
**Delaware**
55:18
**deliver**
135:16 136:19,21
**depending**
23:3
**depends**
147:12
**DEPONENT**
165:2
**deposed**

7:12
**deposit**
49:2
**deposition**
1:13,17 3:5,11 4:12
  4:13,14 6:9,15 7:3
  7:17 9:3 10:7,11,18
  12:12 13:6 24:19
  31:7 32:4 36:18
  37:13 40:7,10 42:24
  43:9 49:23 85:18
  97:12 159:13 160:4
  161:16 163:3 164:4
**depositions**
97:5
**deposits**
120:24
**describe**
13:13
**Design**
138:12,13
**designate**
36:10
**designated**
35:17
**desk**
6:12
**detail**
146:6 152:3
**detailed**
124:13
**determine**
24:17
**determined**
103:2
**development**
136:10 137:5
**device**
6:21
**Diana**
2:13 4:7 39:17 119:4
  125:4,13,19 126:5,7
  126:11 127:13
  129:3 132:5 144:12
**difference**
46:3

**different**
35:15 36:7 41:17
  91:24 94:17 128:6
**diligence**
36:21 116:14 118:11
  118:13,17,25
  119:20,24 120:10
  120:13,15,17
  122:21 123:6,7,23
  124:10,23 127:17
  128:22 129:14
  130:2,9,22 131:16
  133:24 134:6,23
  135:3,4,17,18,22
  136:9,15,23 138:9
  138:22 139:14
  140:4,20 142:6,18
  143:13,25 151:11
  151:15 152:8,17
  153:19 155:4
  157:23 158:14,21
**direct**
8:24 74:12 120:21
  164:12
**directed**
120:4
**directly**
56:22 67:9 69:21
  71:17 97:5 126:23
  127:13
**director**
19:24 20:20,21 21:14
  25:25 34:8,13,14
  58:13 60:24 64:19
  65:4 66:20 81:5,8
  110:13 111:8
**directors**
19:16 20:25 34:9
  46:9,24 47:4 59:12
  60:12,17 81:17,18
  99:18 101:25
  146:21,25 157:7,15
**disadvantage**
93:15 99:3 108:17
**disagree**
32:20

**disclosable**
91:11
**disclose**
91:21
**disclosed**
43:25 45:4 46:12,14
  90:21
**disclosures**
91:16,18,25
**discuss**
100:13
**discussed**
5:20 105:9 117:21
  151:8
**discussing**
79:6
**discussion**
75:8 134:10,20,22
**discussions**
34:18 37:10,18 38:5
  39:6,11,16,21 56:21
  58:12,15 67:9 69:21
  71:17 72:17 73:7,11
  73:22,23 74:14,22
  75:2,15 76:24 77:6
  78:12 96:15,17
  98:22 100:2,6,24
  104:17,19 105:2,8
  105:14 110:11
  111:19 112:17
  113:19 134:12
**distill**
37:3
**distinction**
11:11 88:3
**distracted**
7:3
**distribute**
46:23
**DISTRICT**
1:2,3
**document**
8:23 14:5,14,21
  30:11 31:2,11,19,24
  36:17 52:10,20
  53:22 55:4,7 57:19



62:22 63:6 64:13,17
67:24 69:2,8,10
70:16,23 107:21
114:7,11 140:14
146:14,19,23
**documents**
8:16 12:13,18,20
41:7,9,12,14 57:18
72:24 131:3,15
138:18 148:9,12
163:5
**doing**
13:25 29:7,16 38:25
55:3 80:3 109:22
119:14 124:10
127:15 133:8
144:17 160:3
**dollar**
147:15
**dollars**
45:13 48:6 62:7,9
150:6
**doubt**
141:22
**download**
63:17
**draft**
134:16 136:9,12
**drafted**
134:17
**drag**
85:19
**draw**
88:3 121:10
**driving**
35:2
**due**
36:21 49:2 116:14
118:11,13,17,25
119:20,24 120:10
120:12,15,17
122:21 123:6
124:10,23 130:2,9
130:22 134:6,23
135:2,4,17,18,22
136:8,15,23 138:9

138:22 139:14
140:20 142:18
143:25 151:11
153:19 155:4
157:23
**duly**
5:5 164:4
**duration**
6:14
**duties**
27:19
**duty**
157:8,14
**dynamic**
22:10

---

**E**

**E**
5:4 161:3,10 162:3
166:2
**earlier**
15:10 40:24 81:21
83:5 89:10 96:3
101:22 105:2,8
127:7 147:20
153:17
**earliest**
103:8
**early**
103:23,24 106:4,24
134:18 135:18
143:18
**easier**
54:24
**easily**
80:8
**east**
5:14
**Eastern**
3:10
**educate**
54:5 57:11
**education**
13:15
**educational**
13:13 15:11

**EFT**
21:2
**either**
13:4 48:14 69:21
**electric**
78:18
**ELL**
18:17 19:3
**else's**
142:24
**email**
31:15 75:16 76:6
92:23 93:5,9,22
114:9,20 115:2,5
117:3,5,12 118:3
127:11 156:24,25
157:3 162:14
**emails**
10:21 11:25 12:7
40:21 94:6 126:25
127:4,5 131:14
**employed**
26:19
**employee**
20:8 142:5 145:6,7,8
**employees**
33:18 58:25 59:19
127:20 128:8
129:17 133:19
135:13
**employment**
19:3,19 20:16 33:14
33:16 47:21 48:9,22
124:24,25 129:7,20
129:24 130:4 131:7
131:9,20 133:7
135:8,19
**ended**
68:16 70:13,19
134:19 162:13
**engage**
119:21
**engaged**
120:11 121:25
**entail**
22:20 27:22

**enter**
108:12 128:7 141:6
145:23
**entered**
30:14,21,23 138:10
140:5
**entering**
116:9 117:22 127:19
134:12 148:2
**enterprise**
122:10
**entire**
14:16 130:25
**entities**
22:3 51:20 58:24
151:17
**entitled**
29:25 30:4,7,8
**entity**
21:15 25:16,17 34:5
34:5 43:12,18 66:4
83:19 84:5 95:4
106:18,19 135:23
138:11 140:6
145:21 146:8,22
152:18
**entry**
18:10 25:23
**envelope**
45:2
**Environmental**
18:18 19:3 33:23
**Equipment**
19:23
**equity**
44:18 45:15 49:25
50:3,20 51:5 122:16
**Ernest**
34:8,10 80:20,22
81:2,5,11,16,20
**Ernst**
16:13
**Errata**
165:6
**errors**
109:8,14



**ESGL**
34:5,7,10,13 35:20
44:6 45:7,12
**ESQUIRE**
2:5,6,6,10,11
**essentially**
97:18 121:8
**establish**
54:13
**established**
33:12 66:23
**estimate**
150:23
**et**
3:7 8:17
**Europe**
152:13
**evaluate**
122:4
**evening**
5:10,13
**event**
30:4
**events**
12:22
**eventually**
58:14 113:6,8,9
133:11,13
**everyone's**
132:2
**exact**
11:19 12:21 28:10
29:4 44:10,12 45:5
46:21 47:14 49:7,12
69:16 75:13,23 76:7
79:20 93:17 97:3
103:19 104:13
108:18 138:7
**exactly**
22:20 97:24 127:3
143:7 152:10
**EXAMINATION**
5:8
**examined**
5:6
**example**

41:16 78:17,21
120:18,19 127:12
127:13 129:2,8
130:15 133:23
135:7 139:20
146:20
**exceptions**
93:24
**exchange**
52:22 53:10 63:2,8
65:19 68:8,13 70:11
70:17 71:24 114:9
114:20 161:19,24
162:7,11,14
**exclusively**
156:14
**excused**
160:10
**executed**
117:21
**execution**
117:17
**exemptions**
88:16
**exercise**
97:12 122:8
**exhibit**
14:5,7,8 25:9 31:6
40:5 53:9 62:25
68:6 70:10 114:9
161:12,13,15,18,23
162:5,6,10,14
**exhibits**
8:16
**exist**
34:2,22 35:22 36:17
95:3
**expect**
93:7 97:19
**expectation**
42:17 92:20 93:19
**expected**
99:20
**expecting**
33:4
**expenses**

61:25 65:11
**experience**
25:24 59:12,14,19
66:14 123:8 137:15
**expertise**
123:8
**expires**
165:12
**explain**
22:22 105:13
**exploring**
77:20 78:3 79:21
**express**
77:19 79:20
**extending**
134:22
**extent**
51:4 117:5
**external**
59:16
**EY**
16:12

_____

F

**F**
54:22 55:3
**F-E-R-E-S**
17:24
**F-O-N-G**
75:25
**fact**
9:6 27:5 28:5 32:15
40:9 46:3 67:23
94:21 98:21 101:3
102:18 105:16
116:2 125:6,22
126:17 128:7
129:13 151:25
152:8
**Fagin**
1:18 3:15 164:6
**fair**
12:23 26:13 36:5
45:24 56:14 59:17
65:12 81:25 86:22
102:17 121:5 127:9

**fairly**
77:23 78:14 116:3,8
124:4 135:3 136:12
**fall**
110:12
**familiar**
53:14 61:8 155:11
**family**
23:20 24:4 151:6
**famous**
152:13,13
**far**
27:21 28:13 112:7,15
113:10,24 122:18
124:15 126:18
134:23 141:2 142:2
143:8 144:2 148:13
149:8 152:25
153:18 158:5
**February**
52:6 53:24 54:22,22
55:4 95:9,11 98:8
98:11,12,24 99:23
100:7 103:18,19
113:21 114:3
116:18
**fee**
29:24 30:3,7 147:16
**feel**
5:25
**fees**
41:23 42:6,11,15,19
48:25 49:2 130:19
144:11
**fellow**
46:24
**felt**
59:18,18
**Feres**
17:23 18:5,17
**Fernandez**
52:5 53:21 58:13
60:18 73:9 83:18
118:22
**fiction**
106:20



**fiduciary**
157:8
**figure**
48:12
**filed**
52:21 53:9 57:4 58:9
58:11 61:13 62:25
63:6,7,22 66:24
67:16 68:7,12 70:4
70:10,16,17 71:24
161:18,23 162:6,10
**files**
107:17
**filing**
64:12
**filings**
12:24 41:4 64:7
**Filled**
163:13
**fills**
18:15
**final**
136:11
**finance**
51:5 58:23
**finances**
121:7,9 125:14,20,24
**financial**
13:21 18:2 27:3,6,12
65:2 66:19 79:25
80:6 82:15 94:15
95:15,21 96:9
105:21 106:3,23
107:23 108:25
109:8,9,14 119:19
119:22 120:2,12,15
120:17 121:3,11,16
122:5 123:22 126:8
135:2,18 136:8
148:20 153:19
**financials**
121:19 126:4 130:18
154:3
**find**
133:5
**fine**

6:3 16:9 32:2 50:13
52:8 53:2 54:11
75:14 159:15
**finish**
25:10 26:11
**firm**
15:17 21:18 94:11
**first**
7:14,20 13:21 14:5
14:17,23 15:16
28:11 31:16,23 49:4
53:4,18 55:13,14
60:3 61:16 63:19
67:5 72:3,17 75:7
75:20,21 76:7,18,19
76:20 83:21 102:4
102:18 103:13
107:12 115:2,13,19
117:20
**fix**
109:7,14
**flag**
144:17 147:5
**flagging**
5:25
**Flexner**
2:3 3:21
**fluctuates**
150:13
**fly**
136:13
**focus**
57:25 111:17
**follows**
5:7
**Fong**
34:8,10,15 75:24
76:3 80:19,20,22
81:2,5,12
**foot**
143:23
**football**
152:13
**forecast**
109:9 124:16 126:20
**forecasts**

121:20 126:12,12,13
126:15
**foregoing**
164:10 165:3
**foreign**
73:19 97:12
**forgot**
86:14
**form**
10:14 12:5,9,16 13:8
15:24 18:19 22:5,21
24:8 25:7,18 26:10
27:14 28:3 29:11,18
29:23 34:21 35:19
36:13 37:14,19 38:3
38:8 39:25 40:16,23
41:15 42:2,9,20
43:13 44:14,20
45:18 47:8,13,20
48:4,17 49:20 50:11
51:9,15,22 52:3,20
53:9,19 57:5,16,20
58:19 59:3,10,24
60:10 62:12,25
63:25 64:3 65:8
68:6,12 70:10,16
73:10 74:3,18 75:5
75:17 76:14 77:3,9
77:13 78:11 79:18
80:24 81:4,14 82:5
83:2 84:23 85:15
87:5 91:8 92:11,18
92:24 93:10 94:2,13
94:23 95:17 96:11
96:19 97:23 98:17
99:24 100:8,15,21
101:13,21 102:6,21
103:5 104:7 105:4
105:12 106:5,21
107:2 108:2,14
109:3,16 110:2,8,19
110:24 111:13,24
112:5,12,20 113:13
113:23 114:5
115:10,15 116:5,11
117:23 119:5,12,25

121:13,17,24 122:6
122:11,17,24
123:12 125:25
126:10 127:21
128:10 130:7,13
131:22 132:9,14,22
133:9 134:14,25
136:4 137:2,10
138:4,16 139:2,5,15
140:12,24 141:8,12
141:20 142:19,25
143:16 144:8,24
146:3,17 147:9
148:5 149:2,19
150:10,25 151:7,19
152:22 153:24
154:6,11,25 155:16
155:22 156:3,9,16
156:22 157:10,19
158:2,7,17,25
161:18,23 162:6,10
165:5
**format**
70:23
**formation**
54:3,7 57:13 85:4,9
**formed**
52:2,4,6 53:18,20,24
54:21 55:17
**forth**
32:11
**forward**
86:16,22 154:22
**found**
143:19
**foundation**
51:10,16 95:18 96:12
96:20 100:16
101:14 103:6 104:8
106:6 107:3 109:4
109:17 111:14
127:22 128:11
131:23 132:10,15
136:5 137:11
138:17 139:3,16
140:13 141:13,21



143:2 146:4,18
147:10 149:3
152:23 156:10,23
158:18 159:2
**founder**
21:14 123:20
**four**
13:22
**Fran**
24:25
**frequently**
15:3
**friend**
75:24 76:3 80:19
84:2,18 110:4
**friends**
112:14,18 113:5
**front**
7:7,10 14:21 93:17
117:8 138:19
**FTAG**
28:15,16 29:8
**full**
36:4,6,23 67:5 117:5
152:9,16
**full-time**
19:19 20:8 129:5,6
**Fun**
34:5
**function**
58:24
**fund**
28:18 72:12
**funded**
123:21
**funder**
125:16
**funding**
30:8 111:23 112:3,10
**fundraising**
21:20 23:14 27:21
28:22 107:8
**funds**
21:21 22:18 23:5
24:3 27:23,25 28:5
28:8,12,14 47:17,19

47:25 62:11 77:20
78:16
**further**
4:16,20
**future**
86:17 150:9 151:9,13

---

## G

**G-A-B-R-I-E-L**
75:24
**G-R-A-I-N-N-E**
60:20
**Gabriel**
75:24 76:3,8 80:19
**gap**
135:9
**Gen**
17:4
**general**
59:15,21 79:6 93:19
93:25
**Generale**
17:3
**generally**
8:7 10:15 54:6 64:18
79:13 92:5,25 93:2
93:14,18 94:4
106:18 107:4
110:16
**Genesis**
1:9 3:6 4:3 8:17 9:22
10:3,5,13 12:12,18
12:25 13:5 14:7,8
25:9,24 26:9 31:3,6
31:7 32:4,10,17,23
33:5,14,17,20 34:2
34:12,19,22 35:2,10
35:12,16 36:9,16,25
37:6 38:6,21,23
39:2,7 41:5,24 42:7
43:2,3,6,8,10,12,15
43:17 44:3,5,9,18
47:7,12,16 49:16
50:2 51:6,21,25
52:3,23 53:8,9,12
53:17,19,23 54:3,7

55:5,16,24 56:14
57:7,13,15 58:17
59:6,7,18,21 60:13
61:15,17 62:23,25
64:3,7,11,15,20,22
65:6 66:4,5,7 67:14
68:4,6,8,14 70:3,9
70:10 71:22 72:4,10
72:15,16,19,21 73:9
73:18,24 74:5,17
75:9 77:2,8 80:23
81:3,6,9,13,24 82:4
83:6,7,10,14 84:11
84:14 85:5,10 87:4
87:9,13,14,15,16
88:4,5,9,10 89:16
89:22,24 90:12,14
90:16,19 91:2,5
92:2,6,7,17,21 93:3
93:5,7,8,9,20 94:5,7
94:14,19,25 95:2,6
95:9,12,23 96:7,15
96:17 97:19,21,22
98:4,11,14,14,16,21
98:23,24 99:7,9,17
99:18,20,23 100:3
100:10,18,25 101:6
101:8,17,18,20
102:3,5,20,23 103:4
103:9,15 104:3,25
105:23,25 106:12
106:16,17,21,22
107:16,22 108:23
109:11,23 110:7,13
110:18 111:20,22
112:2,9,11,19
113:24 114:4,8,9,12
114:13 115:9
116:13 117:24
118:16 119:18
121:6 122:14,18,22
122:25 123:10,17
123:25 124:18
125:21 126:6,9,22
127:6,8,18 128:6
130:3,10 131:12,18

132:25 133:5
134:24 135:25
136:24 137:8,13,24
138:10 139:13
140:5,21 141:5
142:7,11,17 143:14
144:20 145:14,18
147:5 149:16
150:22 151:4,12,16
152:18 153:18
154:3,21 155:4,20
156:18 157:5,14,24
158:15,22 159:6
161:12,16,21 162:5
162:8
**Genesis'**
39:23 42:23 57:2
58:7 59:8 92:20
112:8,24 115:12
125:18 139:10
141:16 142:17,22
144:6 145:22
150:23 153:18
156:14 157:7,23
**Genesis's**
39:13,18
**geography**
57:25
**Germany**
136:14
**getting**
31:21 36:4 42:22
130:20 132:5,6
136:21 139:18
149:14 159:8,9
**give**
6:18 14:11 22:6
52:15 86:14 110:16
110:21 121:10
159:21
**given**
50:5 116:23 118:14
123:13 124:6
127:24 128:4
129:12 139:7 146:6
164:5 165:4



go
7:18 8:23 9:10 10:19
  14:23 18:10 21:23
  22:14 29:12 30:2
  31:16 38:16 40:3,5
  40:13 44:3 49:15
  55:10 56:17 65:16
  67:4,18 69:10,13,15
  71:13 105:22
  117:10 159:22,24
  160:11
goal
  122:3
goes
  35:9
going
  8:18 9:7,20 25:9
  32:25 33:3 37:11
  41:20 50:12 55:9
  70:8 83:20 85:11,23
  86:3,7,11,16,22
  96:5 106:4 115:23
  117:5 125:10
  128:14 129:24
  134:17 145:4 149:7
  153:12,16 159:10
  159:13 160:15
good
  3:2 5:10,13 62:21
  79:16 117:10
  137:16 153:9
grab
  9:9
graduate
  13:16
Grainne
  60:19,19
grand
  147:17
great
  18:21 38:23 138:14
Greenwich
  153:4
ground
  7:18,20 86:14
Group

20:11,22 72:6,7,14
  79:22,24 80:11
  94:15,22,24 95:4
  102:7,10,12,15,25
  103:17,20 104:11
  104:12 105:17,20
  108:21 115:18
  119:22 120:2,4,4,6
  129:15 135:11
  136:10,14 137:22
  150:9 151:10,13
guess
  149:20
guidance
  7:16 59:7 97:13
guided
  91:17
guy
  113:14

_____

**H**

H
  161:10 162:3
half
  46:4 80:3
HAMPTON
  2:8
hand
  144:16,17 147:21,22
handful
  104:13
handle
  7:17 108:3 137:17
Hank
  60:21
Hannah
  2:11 4:2
happened
  49:13 90:23 95:8
  144:18 156:11
happening
  79:6 105:20
happy
  86:17 89:21 116:24
head
  97:17

heading
  55:15
healthcare
  58:2
hear
  11:4,7 88:21 156:4
heavy
  143:25
held
  1:17
help
  21:20,22,23 24:2
  52:11 73:21 97:2
  107:7 109:13 110:3
  120:12,15 121:2,18
helped
  48:13
helpful
  26:14 61:11 79:11
helping
  72:10 108:12
hide
  101:10
high
  78:14,20 118:13
  154:19
higher
  13:15 150:17
HIN
  1:9
hire
  19:10
historical
  126:3
history
  13:14 15:11 104:9
hold
  34:7 44:13,15 88:18
  96:25
holding
  18:18 21:2 84:5
  142:13
Holdings
  1:8 19:4 26:22 34:6
  44:6
honest

124:21 143:17
honestly
  116:24
Hong
  5:18,19 13:24 19:6,9
  21:6 23:21 25:6,22
  89:14 113:16
  149:22 150:12
hopefully
  5:23 153:8
hopping
  129:15
hot
  79:14
hotels
  113:16
hour
  85:12
hours
  85:24
HSBC
  16:20
Hudson
  2:4 150:15
huge
  135:9 139:24 144:17
hypothetically
  50:5

_____

**I**

IBM
  111:4
idea
  73:13 124:21 125:11
  125:13 132:6
  135:20 144:13
identification
  14:10 31:9 53:13
  63:4 68:10 70:14
  96:18 114:10
identified
  50:17 151:17
identity
  122:22
imagine
  143:11



**impossible**
24:11
**impression**
124:10
**in-person**
61:3
**include**
121:15
**included**
155:24 156:6
**including**
81:19 103:21 121:19
125:3
**income**
47:21 48:9,22
**incorporated**
25:20
**independent**
19:24 122:4 153:23
**INDEX**
163:3
**indicating**
107:22
**indication**
52:16
**indirectly**
56:22 67:10 69:22
71:18
**individual**
25:4 51:14 66:17
**individuals**
24:5,10 51:19 92:5
98:13 112:25
113:12 128:23
141:18 151:16
**Indonesia**
18:25
**industries**
58:3
**industry**
14:2 18:6 56:4 57:24
**inform**
77:12 91:2 98:14,21
100:3,19,20,22
143:14 157:16
**informal**

29:15 110:22
**information**
15:9 53:25 95:15,22
96:10 99:9 106:3,11
106:18,24 107:11
107:24 132:19
133:2,4 139:13
141:16 150:21
152:5 157:16
**informed**
77:10 99:21
**initial**
54:3 56:2 57:23
65:18
**initiated**
56:21 67:8 69:20
71:16
**inside**
148:18
**instruct**
50:12
**instructed**
101:9
**instruction**
87:25 90:6 121:22
**instructs**
8:11
**intend**
57:25
**intent**
103:22 104:24 134:7
134:11 155:8
**interaction**
124:3
**interactions**
105:14 155:19
**interest**
23:25 35:17 44:18
50:20 51:6 63:14
77:19 79:20 116:9
**interested**
41:19 78:2,7 79:8
113:4,17
**interests**
156:15 158:23
**intermediary**

120:5
**interrupt**
26:6
**interrupting**
26:12
**intersection**
58:2
**introduce**
79:22 80:11 82:10
84:4 94:24 101:4
102:8 104:11
108:20 115:18
**introduced**
72:5,7 75:23 76:2
80:18 81:7 87:18
89:6 102:11,12,15
102:25 103:20
104:13 105:17
112:11 115:14,19
**introducing**
80:14 82:15
**introduction**
76:5 90:22 103:17
114:3 115:8 116:16
116:17 117:15
**introductions**
112:14
**introductory**
100:12 101:10
**invest**
22:2 23:11,23 47:12
51:21 113:5,7,9
**invested**
47:15 90:19
**investigate**
121:7 158:22
**investigating**
82:24 158:5
**investment**
13:23,25 47:7 65:18
112:18
**investments**
21:19 22:2 23:24
27:24 47:23,23
112:15
**investor**

84:14 87:3 124:16
126:16,18,20
144:15 147:13
**investors**
23:2,2,11,16,25 24:6
25:4
**involved**
36:9 37:10,18 38:5
39:5 54:3 57:7,14
58:11 61:15,16
64:11 72:4 74:8
79:23 82:2 101:18
102:18 107:6
118:17,24 119:4,11
120:9 126:7,12
132:17 156:19
**involvement**
119:23
**involving**
43:4 113:21
**IPO**
21:23 36:20 98:24
**issue**
133:25
**issues**
42:23
**item**
130:18 133:17,24
**items**
131:6 152:8

**J**

**Jack**
24:24
**Jacob**
2:16 3:13
**Jakub**
140:7,15,23
**Jakub's**
141:10
**January**
15:20
**Jersey**
60:6 61:5
**job**
15:16 16:3,8,12,20



17:2,10,23 27:19,21
121:20 122:12
124:19 125:12
**jobs**
13:21
**Jodlowski**
140:7,9,23
**Joe**
102:13,13
**John**
2:6 3:23
**joined**
3:23 4:4 18:17
**Jord**
143:21 144:5 147:23
**Jordá's**
144:11
**Jowyn**
140:16,23
**Jowyn's**
141:9
**Juan**
52:4 53:21 58:13
60:18 83:18 118:21
**July**
17:7 18:7 52:24
53:12 57:4,6 61:14
72:8,23 75:12 76:13
161:22
**June**
16:23 19:13 70:13,19
134:18 162:13

———————— K ————————

**keep**
9:8 17:22 38:2 85:18
90:10 118:6
**kept**
129:15
**key**
123:5,5,11,20,24
129:13 133:17,24
**kind**
6:20 9:6 18:5 25:16
49:5,9 60:16 134:18
**kindly**

117:13
**Kitchen**
19:23
**knew**
124:7 150:11,11
152:15
**know**
5:13,24 7:9 9:24
10:21,24 23:4 24:19
26:3,7 27:17 33:19
34:3 35:25 36:2,22
38:22 39:8,9 40:12
41:25 43:2,5 48:7
48:23 49:7,10 50:22
52:13 60:18 63:19
72:24 73:18 74:8
77:25 78:16 79:9,9
79:19 80:3 82:10,11
83:19 90:24 91:20
94:8,15 97:5,11
98:19,20 100:3,17
101:15 104:13,14
106:7,11 111:3
114:18 115:3,17,23
121:2 122:25 123:5
123:23 125:4,11,15
128:14 129:2,19
130:18 133:14,19
133:21,22,23
136:13,18,18 139:9
139:14 143:3,18
144:16 146:8,23,24
148:16 149:14,21
150:12,13 152:6
154:12
**knowledge**
10:5 54:14 57:2
112:9 142:17
**known**
106:19 107:5
**knows**
35:9 36:20 38:20
**Kong**
5:18,19 13:24 19:6,9
21:6 23:21 25:6,22
89:14 113:16

149:22 150:12

———————— L ————————

**L**
5:4,4
**L-A-B-U-A-N**
28:19
**L-O-K**
83:21
**L-U-C-I-D**
78:23
**labeled**
66:12
**Labuan**
28:19
**lack**
51:16
**lags**
61:10
**language**
69:17,24 71:20
**lapsed**
134:8
**larger**
78:22
**largest**
152:25 153:2
**late**
5:24 9:7 73:4 112:23
139:18 149:14
**law**
23:5
**laws**
55:18 59:2,9,22
**lawyer**
88:19 143:4 144:11
**lawyer's**
144:10
**lawyers**
7:15 35:8 82:15 89:2
130:25 131:14
134:17
**leadership**
122:23 130:12
132:20
**leading**

96:22
**learn**
122:22 127:18
144:21 157:24
**learned**
43:7 130:3 157:17
**leave**
15:22 134:4
**Leaving**
34:18
**led**
39:6
**left**
16:3,7,8 18:16 33:13
33:16,20 34:9 86:13
144:16 147:22
**legal**
1:24 2:17 3:14,16
41:23 42:6,11,14,19
88:22,23 98:17
127:22 128:11
135:4 143:2 146:4
147:10 149:3
157:10,19
**legally**
66:3,3
**legible**
63:15 68:23
**lending**
48:15
**length**
155:11,14,21
**lengthy**
55:8
**lent**
48:2
**Leslie**
1:18 3:15 106:10
164:6
**let's**
9:18 14:17,23 15:7
44:23 46:20 53:7
54:23 84:24 86:3
89:3 98:6 99:25
114:7 115:2 117:7
151:22



letter
103:22 104:24 134:7
  134:11 144:10
  155:7 156:20
level
87:15 91:3 118:13
liabilities
121:4
licensed
28:17,19
lieu
4:17
lifting
143:25
limit
50:10 85:13,14
limited
17:24 19:4,23 21:2
  25:19,20 26:22
  33:24 34:6 44:7
  124:4
line
130:18 149:7 163:5,5
  163:5,8,8,8,11,11
  163:11,13,13,13
  166:3
Ling
24:23,25 25:2
LinkedIn
14:9,25 15:4 161:14
liquid
77:24
list
24:11,13 55:22 72:9
  72:10 123:6 124:23
  131:3,14 133:18
  152:9,11,16
listed
40:8 43:18,23 47:24
  48:19 56:3 58:14
  59:14,20 60:5 62:2
  65:11,14 66:17
  78:19 80:10,16 84:3
  90:18 94:25 95:7,10
  95:23 98:5,5,8
  100:23 111:15,18

111:21 129:16,25
  148:22 149:22
listen
97:3,7
listening
37:25
listing
35:6 55:23 77:21
  79:21 80:5 83:23
  84:2 90:24 91:2
  95:8 98:3,3 99:8
listings
80:2,5
literally
10:16
little
9:18 10:4 15:15
  16:19 17:9 22:6
  42:25 45:21 66:11
  69:14 84:5 97:17
  128:5 159:7
live
93:16 99:4
LLC
1:8 66:5,6,7 83:7,11
  84:5,6,11,15 87:4
  87:15 88:10,11
  89:16,25 90:16,23
  91:2,3 142:7,9,13
  142:21 145:21
  146:8,22 147:6
LLP
2:3,8
loan
50:6
loaned
51:20
loans
49:8,9,14,19 51:5,8
  51:11
location
3:12
logical
148:15
logically
146:9

LOI
103:22 104:23
  134:22 143:19
long
11:8
longer
34:9
look
10:20 12:17,20 53:14
  55:25 59:11 79:8
  101:6 107:8 108:22
  111:16 121:2
  130:10 136:14
  143:5 147:13
looked
11:24 12:6,23 40:20
  41:3,8,11,14 103:25
  139:19,25
looking
12:13 23:23 36:21
  41:18 72:15,18,23
  74:21 80:10 82:3,7
  82:8,19 111:8,11
  149:9 155:5
looks
15:2 18:12 69:2
lot
18:24 48:7 49:12
  78:15,17 80:4 152:4
Lucid
78:23
lucky
7:15 32:16,21
Lui
1:9,9,17 3:5 4:4 5:1
  5:11,12,13 6:1 7:1
  7:13 8:1 9:1,24,25
  10:1 11:1 12:1 13:1
  14:1,24 15:1 16:1
  17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1
  24:17 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1,18 32:1 33:1
  34:1 35:1,13,23
  36:1,12 37:1,6,11

38:1,4 39:1 40:1
  41:1,22 42:1,5 43:1
  43:11 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1,21 51:1,25
  52:1 53:1,14 54:1
  55:1 56:1 57:1 58:1
  59:1 60:1,7 61:1,14
  62:1 63:1 64:1 65:1
  66:1,18 67:1,20
  68:1 69:1,9,25 70:1
  71:1,9 72:1,3 73:1
  74:1 75:1 76:1 77:1
  78:1 79:1 80:1,17
  81:1 82:1 83:1 84:1
  85:1 86:1,12 87:1
  88:1 89:1 90:1 91:1
  92:1 93:1 94:1,10
  95:1 96:1 97:1 98:1
  99:1 100:1,11 101:1
  101:9 102:1,14,25
  103:1,2 104:1,3
  105:1 106:1 107:1
  108:1,6,24 109:1,12
  110:1 111:1 112:1
  113:1 114:1,21
  115:1,13 116:1
  117:1 118:1 119:1
  120:1 121:1 122:1
  123:1 124:1 125:1
  126:1 127:1 128:1
  129:1 130:1 131:1
  132:1 133:1 134:1
  135:1 136:1 137:1
  138:1 139:1 140:1
  141:1 142:1 143:1
  144:1 145:1 146:1
  147:1 148:1 149:1
  150:1 151:1 152:1
  153:1,17 154:1
  155:1 156:1 157:1
  158:1 159:1,5 160:1
  161:6 164:4 165:8
Lui's
14:9 44:8 161:13
lunch



159:8
**LV**
21:15,17 22:16 25:10
  25:11,17 26:20
  29:24 30:3,7,20,24
**Lynch**
17:17

---

**M**

**M**
5:4
**M&A**
143:6 146:7
**Magna**
1:24 2:17 3:14,16
**main**
34:25 35:2 38:25
  81:22 82:2,21 84:6
**Majcher**
2:13 4:7 39:17 119:4
  126:7,23 127:10
**major**
145:12
**majority**
44:15
**making**
63:14 154:16
**Malaysia**
24:25 28:20
**manage**
123:9
**management**
28:15,16,18 66:13
  101:23 118:18
  123:2,4,7,11,16
  124:8 125:13
**managing**
21:14 27:9 125:23
**mandate**
109:6 121:6
**manner**
4:25
**manufacturing**
137:15
**March**
68:16 70:5 104:21

105:25 131:16
**mark**
8:17 14:7 31:3 53:7
  62:23 68:4 70:9
**marked**
14:4,9 31:8 53:13
  55:5 63:3 68:9
  70:13 114:10,12
  163:10
**market**
13:25 77:23 79:14
  91:15 154:15
**match**
23:6,9,12
**matches**
55:7
**matching**
23:6
**material**
139:12 141:15
  146:24 147:18
**materiality**
139:18,20 147:14
**math**
45:2
**matter**
3:6 38:15
**matters**
93:3
**meal**
113:15
**mean**
22:2 23:19 26:5 30:8
  30:18 43:15 46:18
  58:20 61:22 86:25
  93:2 95:7 96:21
  103:12 110:3,25
  120:16 133:15
  134:3,9 137:19
  138:5 141:25 154:8
**meaning**
21:21 44:8 48:25
  61:23 80:8 134:3,5
**means**
55:22 80:14 164:11
**meant**

16:6 99:11
**MEC**
19:17
**meet**
75:20 76:8,9 117:13
**meeting**
100:12 101:11
  117:15
**meetings**
60:25 61:4,7
**member**
19:16 20:25 43:20,21
  65:9 66:5,8 73:6
  83:5,8,10,13,15,17
  83:24 84:4,6,10,14
  84:21 87:3,18 88:9
  89:6,9,24 90:23
  148:4
**members**
46:6,7 73:16 82:9
  99:17 145:19 147:8
**memorialized**
30:12
**memorializing**
133:7
**memory**
10:19 12:20 41:21
  52:5,8 53:23 54:12
  78:22 119:7 136:6,9
**mention**
78:4 102:4 125:3
**mentioned**
11:24 22:16 23:15
  28:21 32:9 36:19
  45:20 80:17 89:10
  108:10 125:18
  128:21 135:23
  136:3 140:25
  147:20 151:9
  152:12
**merge**
41:20
**merged**
34:5
**merger**
33:25 34:4 35:7

80:15 98:22 101:2
  102:9 103:25
  134:16,19
**mergers**
98:23 111:20
**Merrill**
17:16
**messages**
10:20 12:2,7 40:21
**messaging**
6:21
**met**
11:8,8 75:21 76:18
  76:19,20,23
**Michael**
113:3
**microphone**
9:15
**microphones**
9:12
**Microsoft**
111:4
**midtown**
159:9,17
**Miller**
153:2
**million**
28:13 44:11,25 45:7
  45:16,21,22 46:4,20
  47:15,25 48:6,8,11
  49:11 62:6,7,8,8,9
  62:18 133:20,22
  138:14,24 139:21
  139:23 140:2,3,10
  141:18 144:22
  149:24 150:6,14
  151:2 154:24
**mind**
6:13,25 154:7,9
  155:2
**Mindful**
9:6
**minimum**
9:8 138:12 140:9
**mining**
18:6 92:6



minute
40:11
minutes
86:3 153:8
misconduct
157:25
misstates
40:24 108:3 109:17
 111:14 112:21
 131:23 149:3
Mobility
150:9 151:10,13
model
109:8,9,15 126:15,20
 152:3
monetary
89:15,23
money
23:11 47:11 48:2,7
 48:15,16,16,20
 49:12 51:20 56:3
 61:24 62:3 65:13
 78:16 90:15 148:18
 151:5
month
147:16
months
55:25 72:23 73:2
morning
3:2 5:14
Motor
78:23
Motors
153:2
move
49:9 72:13 154:22
 159:11
moved
13:23 34:13 133:12
moving
90:10
Mullin
2:8 4:3
mute
9:12
mutual

75:24 76:3 80:18

—————————————
N
—————————————
N
161:3
N-A-N-Y-A-N-G
13:19
N-G-A
83:20 89:11,11
N-I-E-L
60:20
N.A
1:8
nail
144:2
name
3:20 89:8,10,12
 103:14 113:15,18
 135:23
named
80:19 83:20 135:23
 138:11 140:7
names
24:12,13 41:21
 118:19 152:6,12,15
Nanyang
13:18 15:12
NASDAQ
95:10
natural
22:12
nature
9:2 32:10
NDA
106:9 116:22 117:2
 117:16,22 118:10
near
136:11
necessarily
88:2 109:23
necessary
21:22
need
4:8 8:24 9:9 22:7,23
 22:25 23:10 39:9
 44:21 50:22 81:15

91:19 97:24 100:22
 101:23 114:17,22
needed
81:17
negotiating
155:10,13
net
149:17 150:23
never
33:17 61:3 97:11
 122:19 125:9
 128:22 129:12
 130:16 132:4,23
 133:2 134:19,20
 140:19 142:16
 146:6 148:12 151:8
 152:11,15
new
1:3,18 2:5,5 60:6
 61:4 72:16 78:16
 87:18 89:6,8
newly
55:16
Nga
89:11 90:15,22
Nice
117:13
Niel
60:20 118:20
night
5:22
nighttime
5:21
nonbinding
103:22 104:23
nondisclosure
106:10
nonexecutive
19:24
nonexistence
135:6
normal
8:22
Norman
1:8 2:15 4:6 10:21
 12:7,8,14 30:17,18

30:18 39:12 74:20
 74:23,24,25 75:8,20
 75:21 76:9,18,19
 77:19 78:2,5 79:7
 79:23 80:12,18
 94:10,20 95:13,21
 96:8 101:9 104:10
 104:11,14,17,20
 105:2,8,10,14,15,22
 107:7 108:11 110:3
 110:11 111:23
 112:3,7,11 115:14
 115:17,20 119:2
 123:14,23 125:16
 127:15 137:20
 138:8 140:25 142:3
 142:4 143:9 144:9
 145:10 146:10
 148:14,16 149:21
 150:2,11 157:25
Norman's
112:14,18 113:5
north
47:15 151:2
notary
1:18 4:21,23 5:5
 165:14
noted
9:19 160:16 165:6
notice
31:6,13 32:3 35:20
 42:24 161:15
November
63:3,9,23 79:22 80:8
 95:5,14 96:9 100:13
 101:11 106:4,25
 161:25
number
45:5 47:15 50:4
 52:17,19 53:3
 104:14 114:13
 127:3
numbers
121:4
NV
17:10



**NW**
2:9

**O**

**O-I-E**
60:20
**oath**
4:17,18
**object**
8:5 10:14 12:5,9,16
13:8 15:24 18:19
22:5,21 24:8 25:7
25:18 26:10 27:14
28:3 29:11,18,23
34:21 35:19 36:13
37:14,19 38:8 39:25
40:16,23 41:15 42:2
42:9,20 43:13 44:14
44:20 45:18 47:8,13
47:20 48:4,17 49:20
51:9,15,22 57:5,16
57:20 58:19 59:3,10
59:24 60:10 62:12
65:8 73:10 74:3,18
75:5,17 76:14 77:3
77:9,13 78:11 79:18
80:24 81:4,14 82:5
83:2 84:23 87:5
91:8 92:11,18,24
93:10 94:2,13,23
95:17 96:11,19
97:23 98:17 99:24
100:8,15,21 101:13
101:21 102:6,21
103:5 104:7 105:4
105:12 106:5 107:2
108:2,14 109:3,16
110:2,8,19,24
111:13,24 112:5,12
112:20 113:13,23
114:5 115:10,15
116:5,11 117:23
119:5,12,25 121:13
121:17,24 122:6,11
122:17,24 123:12
125:25 126:10

127:21 128:10
130:7,13 131:22
132:9,14,22 133:9
134:14,25 136:4
137:2,10 138:4,16
139:2,15 140:12,24
141:8,12,20 142:19
142:25 143:16
144:8,24 146:3,17
147:9 148:5 149:2
149:19 150:10,25
151:7,19 152:22
153:24 154:6,11,25
155:16,22 156:3,9
156:16,22 157:10
157:19 158:2,7,17
158:25
**objection**
4:24 5:3 22:14 50:15
137:18
**objections**
8:6,8 38:3 50:11
85:13,14,15,17,22
90:9
**objective**
80:12
**obligated**
157:14,15
**obligation**
54:5 90:25 96:14,16
98:2,13,20 99:2,8
99:11,15 100:3
**obviously**
88:5 139:24
**occasion**
93:6
**occur**
92:22 93:21 112:19
**October**
18:13 19:12 26:2,16
29:2,5 61:19,21
64:22 73:3,4 75:12
76:13
**odd**
9:25 133:5
**offering**

59:5
**offhand**
30:22 51:12 116:25
**office**
147:17
**officer**
18:3 27:3,6 33:18
65:2 66:19 118:21
118:22
**officers**
34:9 46:6,9,24 47:4
59:13 60:18 82:10
99:18 157:7,15
**offices**
23:21 24:4
**official**
92:22 109:13
**officially**
61:18,21 73:5 95:10
**offline**
108:4
**oh**
126:4
**Oie**
60:19,20 118:19
**okay**
5:19 6:6,7,16,18 9:4
11:15 13:16 77:16
83:22,22,23 85:2
99:25 115:4 134:5
137:19
**once**
20:6 50:10 70:20
76:9 143:22
**ongoing**
135:4
**online**
61:2,7
**Onus**
60:23
**open**
6:21 54:10 85:19
**operate**
60:13
**operating**
95:3 118:22 142:7,12

142:21
**opinion**
121:10 122:9,15
**opportunity**
79:16
**opposite**
101:3
**options**
129:22
**oral**
128:7,12,19
**organized**
55:17
**original**
72:11,15 73:18 89:5
94:3 149:7
**out-of-state**
4:23
**outside**
119:10
**outstanding**
124:23 130:22 131:6
**overall**
121:11
**oversaw**
82:23
**overview**
69:15 71:13
**owned**
43:11 45:21
**owner**
143:10
**ownership**
44:18 45:16 49:25
50:4 51:6 54:7
57:13 85:4,9

**P**

**p.m**
5:15,24
**P72**
137:5,6,9,23 138:3
151:18,24
**P72s**
137:17 152:20
**Pachmar**



152:21
**page**
14:17,23 31:17 53:4
55:11 60:3,3 63:19
65:16 67:3,19 69:11
69:13 71:9,13 161:6
161:12 162:5 163:5
163:5,5,8,8,8,11,11
163:11,13,13,13
166:3
**pages**
52:14 68:25 69:4
165:3
**paid**
33:19 61:23 62:2,4
73:5 136:7 150:17
**parade**
80:13 101:5 105:18
108:22
**paragraph**
55:13,14 56:18 67:5
**part**
55:10 62:18 107:9
114:18 119:6
121:20 122:8,12,21
127:4,17 130:2,9,22
135:22 136:15
139:24 140:20
146:7 155:20
157:13 158:14,21
**part-time**
20:18
**participating**
4:11
**particular**
139:22
**particularly**
158:5
**parties**
3:17 4:19 101:2
**partly**
20:14
**partner**
105:22 137:3,16
**partners**
73:16,21

**party**
4:6,24 49:18 122:4
**pass**
147:19
**pause**
8:4 18:11 22:6
**pay**
47:3 133:19 138:13
138:24 140:9
141:17 147:16
**payables**
121:4
**paying**
16:3,8,12 41:22 42:3
42:6 65:10 133:21
**payment**
42:11,14,18 49:6,15
**payments**
120:24 136:2,22
**PCAOB**
119:15
**PDF**
55:4
**pedal**
143:24
**pending**
86:16,24
**Pennsylvania**
2:9
**people**
17:4 25:3 72:16,18
82:14 123:14 124:6
124:7 133:8
**percent**
43:23
**period**
20:3,15 68:16 70:12
70:19 73:8 74:16
76:12 78:19 104:22
110:23 124:5
138:15 140:9
156:12,13 162:13
**person**
4:17 6:11 10:2 32:16
32:22 35:2,3,9,24
36:20,24 37:12

38:25 65:13 75:15
76:5,8,9,21,23
81:22 82:2,22,23
83:19 102:4,11,14
102:18 106:15,20
123:24 125:22
132:3
**personal**
47:17 85:7 87:6,11
87:23 88:13 89:18
95:22 96:14 150:5
156:24 157:3 160:4
**personally**
42:5 43:6 47:11 90:4
90:10,11
**perspective**
139:10 141:16
147:13
**Pete**
113:18
**Peter**
113:14
**pharmaceutical**
58:4
**Philip**
24:22,23
**phone**
6:10 44:22 75:16
76:6 127:13
**phonetic**
60:23 118:20
**phrase**
94:9
**phrased**
10:3
**physically**
4:13
**pick**
6:3 9:13
**picking**
6:13
**place**
78:16
**plaintiff**
1:6 2:4 3:22
**planned**

117:14
**plans**
21:22,24
**play**
81:12
**please**
4:25 31:17 40:13,25
66:11 117:10,13
160:11
**plenty**
48:8
**plus**
44:11 61:25
**pocket**
42:4
**point**
15:23 29:10 45:20,25
64:23 94:25 95:24
100:24 104:12
109:25 116:4,13
117:8 120:10 124:9
135:10 144:19
149:25
**points**
129:14
**policies**
91:6,9
**policy**
91:12 92:8,14,15,17
**pool**
23:2,16 24:6
**pooling**
48:16
**pop**
8:21
**portfolio**
23:22
**portion**
8:25 23:22 117:3
**position**
36:3 38:19 85:16
145:2
**possibility**
73:25 75:4,9 76:25
77:7 110:6
**possible**



7:19 68:24 102:5
159:11
**possibly**
129:16 133:21
**post**
90:23,25
**pot**
48:14
**potential**
35:7 51:19 80:14
81:12 82:3,10,17,24
91:7 92:2,7,21
93:20,24 94:12
96:18 97:22 98:16
98:23 99:10,22
100:14 101:19
102:8,19 103:3,10
103:15,25 104:5
107:8 108:22 110:7
111:9,20 112:18
113:20 116:9
140:22 144:15
155:14 157:17
**potentially**
41:9,13,19 74:7,21
77:20 79:8 108:12
113:4 140:18
154:19
**pounds**
138:14,24 140:10
141:18 144:22
**practice**
47:2 127:19
**pre-revenue**
78:18 79:2
**preface**
43:10
**preparation**
10:6 34:16 43:8 64:8
104:5
**prepare**
10:10,12 12:11 13:5
40:14 54:6,14
**prepared**
154:22
**present**

2:12 3:18 21:9 26:2,7
**presentation**
124:16 126:16,18,21
**president**
25:25 64:20,23 66:19
110:13 111:7 157:5
**pressed**
133:16
**pretty**
33:2 57:9 110:17
135:17,19 153:18
**previous**
33:13 61:23 62:4
104:16,19 105:13
**price**
45:12 72:25 150:13
150:16
**primarily**
82:23
**primary**
125:22
**Princeton**
60:6 61:4
**principal**
142:5
**printed**
26:4
**prior**
57:14 64:12 76:23
98:11,12 99:8,23
100:6 104:6
**private**
21:19,21 22:2 23:12
23:23 27:23 33:24
49:8
**probably**
14:14 80:3,9 103:24
112:22 120:7
124:11 128:15
131:15,16 143:12
150:16,17 154:14
154:19
**proceeding**
4:25
**process**
82:2,23 107:9 109:25

118:11,17,25
119:20,24 120:10
122:22 127:17
128:22 130:3,10
134:24 135:23
136:24 138:9,22
139:14 140:4 142:6
142:18 143:13
151:11,15 152:17
153:19 155:5
157:24 158:14,21
**produced**
63:11,14 68:18
107:21,25 114:12
**producing**
137:22 138:3
**production**
68:20 135:9,14 137:5
137:9,17 163:5
**productions**
70:24
**Professional**
164:7
**profile**
14:9,25 15:4 161:14
**profit**
47:6
**profits**
47:22,22 48:10,23
**program**
58:18,21
**progress**
143:17 158:19
**progressed**
134:20,21
**project**
49:5 111:5,5,10
**projections**
108:25 121:16 126:8
**projects**
111:2
**pronounce**
17:3
**pronounced**
5:10
**properly**

96:22
**property**
47:22
**propose**
117:14
**propounded**
165:5
**prospecting**
92:6
**prospectus**
55:15 83:25 84:9
**proud**
126:17
**provide**
99:8 110:22 133:6
**provided**
48:2 51:7 106:12
125:7,9 126:8 127:8
127:10 130:17
132:3 133:2 141:3
142:16 152:11
**providing**
48:15 59:6
**public**
1:18 5:6 12:18 19:11
21:23 41:4 53:22
57:17 59:15 165:14
**publicly**
12:24 43:24 45:4
46:12,13 47:24
52:19 59:20 63:6
64:6 68:7,12,22
70:16,21 90:20,20
148:22 162:6
**publicly-traded**
19:8 21:6
**pull**
8:19 52:10 68:3 70:8
114:7
**pulled**
68:22
**purchase**
152:19
**purported**
152:18
**purpose**



56:7 88:8
**purposes**
24:18 70:24 84:2,4
84:21,22 85:7 87:2
87:19,19 89:7
**pursue**
57:23
**push**
133:25 159:14
**pushing**
159:15
**put**
8:8 9:14,14 31:2
43:17 65:13 68:2
70:7 73:20 118:8
131:2
**putting**
14:21 32:11

―――――――――
**Q**
―――――――――
**qualifications**
137:8
**qualify**
103:11
**quantify**
103:11
**quarterly**
68:16 70:12,18
162:12
**question**
8:10,12 22:11 24:20
24:21 33:20 35:14
35:15 36:6,16 37:4
37:24 39:3 40:18
43:14 44:2 50:22,25
51:3 54:18 57:6
58:10 59:4 62:15
72:20 74:13 76:17
82:6,18 86:15,20,24
87:9,14,18,23 89:21
90:12 91:24 92:12
93:11 94:14,18
95:20 96:4,6,21,22
97:4,15 98:4 99:14
105:5 106:8,14
108:6 109:19 112:6

115:21 122:25
125:10 128:5,17
137:12 145:3 146:5
148:8 151:20,21,22
156:4 158:8
**questioning**
38:22 149:8
**questions**
8:2 9:23 10:3 33:2,3
35:4 36:23 38:20
93:12 97:8 108:8
120:3 124:12,13
128:18 160:6
163:10 165:4
**quite**
78:15,17 129:5
143:18
**quote-unquote**
109:6 153:3

―――――――――
**R**
―――――――――
**R**
166:2,2
**raise**
21:21 22:24 24:2
27:25 28:8,14 29:16
**raised**
28:5,12,13 30:8
42:24
**raising**
22:18 27:23 29:8,20
30:5 77:20
**range**
154:7,9,10 155:2
**read**
40:11 69:17,17
114:17,22 115:3
117:4 165:3
**readability**
70:24
**ready**
115:3
**real**
125:11
**really**
13:14 78:20 79:14

81:22 95:3 133:15
**reason**
33:8 84:19 136:17
**reasonable**
85:12
**reasons**
33:11
**recall**
30:16,20,22 31:23
49:7 51:12,17,24
75:11,18 76:11 77:5
89:20 100:5 112:24
112:25 113:11
114:20 115:5
116:20,25 118:9
119:16,23 127:12
131:11,13 136:7
137:24 138:20,21
157:2
**received**
106:2 120:24,25
144:10
**Recess**
86:8 153:13
**recollection**
51:19 52:11 53:16
**record**
3:3 4:9 8:9 9:11
14:19 55:2 86:7,11
153:12,16 159:23
160:15 164:4
**records**
122:5
**red**
144:17 147:5
**referred**
65:23
**referring**
12:3,8 56:11 74:23
76:12 97:25 115:7
137:20 138:18
141:9 147:15
**reflect**
55:2
**reflected**
15:11

**refresh**
10:19 12:19 41:21
52:11 53:16
**regarding**
40:15 59:7 73:12,13
91:6,25 92:8 94:10
94:21 95:15 96:10
96:17 98:15 99:10
105:16 108:25
155:14,25 156:7
**regardless**
145:25
**registered**
25:21 164:7
**registration**
52:22 53:11 161:20
**regular**
25:8
**regularly**
23:17 24:7 116:3,8
**regulations**
59:2,23
**reimburse**
42:14
**reimbursed**
42:18
**reimbursing**
42:10
**relate**
49:24 50:19
**related**
35:15 93:3,8
**relating**
29:15 57:12 121:8
**relation**
80:20 98:4
**relationship**
80:23 104:16,19
155:21
**relationships**
25:5
**relevance**
16:2 24:15 95:19
96:2 101:16
**relevant**
24:17 41:10,13



**remember**
11:14,17,18 28:9
    29:4 31:25 44:10,12
    45:4 46:4,19,21
    49:12 62:5 75:22
    76:7 103:19 107:14
    107:14,18 112:22
    113:15,18 127:3
    138:5 150:18
**remotely**
4:15,18
**render**
122:9
**rendered**
122:15
**renewing**
134:11
**repeat**
28:4 50:23 96:5
    137:12 142:9 156:5
**rephrase**
89:21
**report**
122:20
**reporter**
1:18 3:15 4:8 164:7
    164:12
**reporting**
4:14
**represent**
3:19 32:2 35:25
    45:10 63:5 68:11
    70:15,20
**representation**
41:24 42:6 53:5
    63:21 71:6 138:2
**representative**
9:21 32:12 33:5
    36:11 37:7 39:14,19
    39:24
**representatives**
4:6
**represented**
137:21
**representing**
3:22 4:3 35:11

**reproduction**
164:11
**request**
107:24 109:23 131:3
    131:12,15 163:5
**require**
23:6
**required**
49:15 142:2 143:8,12
    145:5,12 146:20
**requires**
146:25
**reside**
89:13
**resign**
156:20
**respect**
147:22 148:25
**respond**
90:9
**responsibilities**
27:9
**responsible**
126:15
**rest**
46:9 60:24 100:17
    118:3
**result**
34:4
**resumed**
19:3
**retain**
94:11,22
**revenue**
139:21
**review**
41:7 57:19 117:7
    121:3,18 142:7,11
**reviewed**
57:17 64:8
**revised**
99:13
**RICHTER**
2:8
**right**
5:17 6:11,22 7:11

12:25 17:4,11,17
    18:8 19:4,17 20:8
    20:12 21:15 22:18
    23:17 26:5 30:24
    32:7,18 37:7 40:22
    43:18 45:8,13,17,22
    50:15,16 51:12 54:8
    55:14 56:12 62:19
    63:25 64:4,13 66:25
    72:21 82:16 83:7
    101:6 106:15 107:8
    110:14 111:12
    115:21,22,24
    116:10,15 121:23
    122:5 123:8 128:24
    129:3,20,21 130:3
    130:19 133:13,22
    133:23 135:16
    136:20 139:22,23
    144:16 145:7
    146:16,23,25 147:8
    147:16,18,21,23
    148:10,12 150:4
    153:23 155:5,15,21
    156:2,15 157:5,9,18
    158:6
**Robert**
60:21
**Rockstead**
20:11,21
**role**
26:23 27:18 43:6
    64:15,23 81:2,11
    109:21 123:18
    124:2
**roles**
26:9 65:7
**room**
4:13 6:10 116:23
    118:14 152:3
**rough**
125:13
**roughly**
44:24 62:7 76:12
    116:20 118:9
**Roytblat**

2:5 3:24 8:19
**rule**
7:20 31:7 32:4 86:14
    161:15
**rules**
7:18
**run**
79:14 105:17 108:21
    123:9
**running**
80:13 81:23 82:22
**Ryan**
1:5 2:14 3:6,22 10:21
    12:2,3,14 79:23
    80:12 103:21,21
    118:15,15 119:2,9
    120:8,8 123:15
    124:3,11,14,17
    125:4,15 126:4,14
    126:19 127:15
    129:2,2,8 132:5,17
    137:20 138:7,8
    142:5 143:20
    144:12 148:10,11
    152:4 159:11
**Ryan's**
145:5,11

———————

**S**

**S**
5:1,4 6:1 7:1 8:1 9:1
    10:1 11:1 12:1 13:1
    14:1 15:1 16:1 17:1
    18:1 19:1 20:1 21:1
    22:1 23:1 24:1 25:1
    26:1 27:1 28:1 29:1
    30:1 31:1 32:1 33:1
    34:1 35:1 36:1 37:1
    38:1 39:1 40:1 41:1
    42:1 43:1 44:1 45:1
    46:1 47:1 48:1 49:1
    50:1 51:1 52:1 53:1
    54:1 55:1 56:1 57:1
    58:1 59:1 60:1 61:1
    62:1 63:1 64:1 65:1
    66:1 67:1 68:1 69:1



70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
**S-1**
52:20 53:9 61:13
62:25 63:25 64:3
90:20 161:18,23
**sake**
145:3
**salaries**
33:19 46:10 47:3
144:12
**salary**
129:21
**sale**
152:19
**sales**
120:20
**Sam**
4:4 11:12 22:6 29:12
40:25 44:8 97:3

108:8 114:17,23
128:17 160:7,9
**Samuel**
1:9,17 3:5 9:24,25
14:8 36:11 37:11
42:5 43:11 61:14
66:18 67:20 72:3
108:24 115:13
161:6,13 164:4
165:8
**saw**
31:23 118:18 128:22
140:19 148:12
**saying**
59:18 66:3 84:8,17
108:5 135:12
141:22
**says**
15:12 16:15 17:16
19:15,22 20:10,24
21:13 26:7,25 27:2
27:16 55:14 56:18
57:22 63:7,22,25
64:3 65:17,17 66:18
67:5 68:15 70:18
71:14 146:15,23
**Schiller**
2:3 3:21
**scientific**
118:21
**scope**
122:13 125:12
**screen**
7:8,11 8:20,20,21
14:12 40:8 114:11
**scroll**
14:15,18,20 15:7,15
16:19 17:9 18:14
19:22 21:13 31:10
40:4 52:14 53:24
54:17,20 55:11 60:2
66:11 67:3 71:3
114:24 116:21,24
118:2,6
**scrolling**
17:22 118:6

**search**
55:3 57:25
**SEC**
12:19,24 41:4 44:4
58:9 63:17,23 66:25
70:5
**second**
6:18 8:4 14:11 18:12
22:9 56:17 66:17
67:4 83:21 89:24
159:12
**section**
66:12 69:15 71:14
**sectors**
58:4
**securities**
52:21 53:10 59:9,22
63:2,8 68:7,13
70:11,17 71:24
161:19,24 162:7,11
**see**
8:21 14:13,20 21:3
22:13 23:13,25
24:14 27:7 31:11
32:6 40:7 41:8,12
44:4 53:4 54:23
55:13,19 56:24 58:5
60:4,7 63:10,18,19
63:22 65:21 66:12
66:15,21 67:12,21
68:15,17 69:2,9,24
69:24 71:20 77:14
79:14 84:7 85:23
90:25 95:19 96:25
100:22 101:16
114:15 117:18
118:5 130:17,20
141:25 145:5,11
148:9 152:6
**seeing**
53:3 159:12
**seen**
31:18 107:21
**selected**
56:19 67:6 69:18
71:14

**selection**
81:12 101:19 102:19
**sell**
46:2 79:2
**send**
14:14 31:12
**sending**
156:19
**senior**
122:23 123:2 130:12
132:20
**sense**
8:13 9:16 10:8 33:6
35:13 99:11
**sensored**
152:7
**sent**
156:24 157:3
**sentence**
56:17 57:22 67:4
**September**
1:14 3:8 20:4 26:21
28:11,22 29:5,6
164:7
**Sergio**
72:5,21 80:11
**series**
22:24,25
**serious**
147:5,11
**seriously**
103:24
**served**
19:20,21
**services**
1:24 2:17 3:14,16
148:20
**serving**
20:7 21:10
**setting**
8:18 54:25 61:9
93:16
**seven**
48:6 62:19
**seventh**
65:16



**share**
8:20,22 14:6 45:12
83:16 96:14,16
**shared**
95:15,21 96:9
**shareholder**
61:24 62:4 84:20
123:19 143:10
145:10 146:10
148:15,23
**shareholdership**
44:9
**shares**
43:19,22,24 44:5,11
44:13,16,25 45:7,22
45:25 46:3,5,10,16
46:20,22,22,23 47:5
47:9,23,24 50:4
65:19 84:6 150:2,3
**Sheet**
165:6
**Sheppard**
2:8 4:3
**short**
85:24 86:3 127:23
137:23 151:25
153:6
**short-term**
49:14,18 50:6 51:5,8
51:11
**show**
8:15 31:3 114:19
146:19 148:10
**showed**
123:23
**side**
35:6 49:18 111:5,5
111:10
**sides**
23:13
**sign**
67:23 81:19 101:24
101:25 102:2
107:10,12 138:23
146:21,25
**signature**

69:9 71:10 143:11
**signed**
26:25 27:2 67:19
91:17 103:21 106:9
116:22 118:10
120:19 124:24
128:22 129:20
133:6 134:7 135:10
136:3,12 139:6,8,9
139:11,17 140:19
141:4 143:19,20
144:14 152:19
155:7
**significant**
136:2 144:22
**signify**
114:3
**similar**
70:22 79:4 99:6
**similarly**
144:19
**Simons**
2:6 3:20,21 5:9 14:4
14:11 26:13 31:5,14
38:2 49:25 50:9,17
52:12,18 53:7 54:19
54:23 63:13 68:3,19
69:4,7 70:8 71:2,8
85:3 86:2 90:5
97:10 107:20 108:5
118:2 153:5 159:4
159:17 160:2,5,11
161:7
**Singapore**
5:17 13:18,24 19:23
23:21 24:5,22 25:21
28:18 33:23
**single**
59:13 120:22
**sit**
34:11
**sitting**
37:5 51:18
**situation**
79:4
**slightly**

35:14 36:7 91:23
94:17
**slots**
117:14
**Smart**
7:9
**smoothly**
7:18
**so-called**
100:3 125:7
**Soc**
17:3
**Societe**
17:2
**sold**
45:24 47:9 83:16
149:21 150:3
152:10
**sole**
43:19,21 65:9 66:5,8
73:5 83:8,10,24
84:10 123:19 143:9
143:10 145:10
148:23
**solicit**
111:22 112:2
**solicited**
112:10
**Solutions**
21:2 33:24
**soon**
136:13
**Sophie**
2:5 3:24 14:6,11 31:5
52:12 68:3 71:2
**sorry**
11:6 24:15 26:5 30:2
74:11 77:18 80:25
92:13 99:15 109:18
139:17
**sort**
7:16 8:3,8,22 15:8
16:6 37:3 48:13
55:15 58:23 79:13
87:24 92:6 109:21
121:8,10,11

**sound**
6:6 9:4 45:13 86:22
**sounds**
10:4 18:21 96:22,24
109:22 153:9
**source**
47:19 48:10 62:11
**sources**
48:21 49:7 68:22
**South**
152:14
**SOUTHERN**
1:3
**SPAC**
43:21,22 47:3 56:9
56:10,15 58:14
61:25 65:14 66:9
72:12 73:14 74:2,17
74:21 75:4,10 77:2
77:8,11,21,23,25
78:4,6,13 79:14,17
80:2,5,9 81:24
82:22 84:3 94:12
99:10 100:14,23
104:5 105:22
108:13 109:24
111:5,8,12,15,18
113:20 116:9
134:13 154:17,22
**SPACs**
72:9 78:19 79:21
80:15 101:6 104:14
108:22
**Spain**
60:19
**SPC**
119:17
**speak**
7:21 13:3 23:24
34:15 95:3 151:12
151:16 158:15
**speaking**
12:14 85:14 92:5
146:9
**special**
56:7



**specific**
40:15 48:5 49:5 51:2
  51:3 56:19 57:6
  64:17 67:6 73:11
  74:4,10 77:16,17
  82:6,18 88:8 93:12
  109:19 131:4
  137:24 146:21
**specifically**
8:11 27:24 30:9 45:3
  58:3 92:13 107:7
  131:24 132:16
  134:5 138:6 139:5
  152:9
**specifics**
31:21
**speculation**
51:16 139:16 148:6
**spell**
83:20
**spent**
18:24 72:23
**splitting**
85:2
**spoke**
105:10 127:12
**sponsor**
43:20,21 65:10,17,18
  65:23,25 66:9 72:11
  73:6 83:6 87:16
  88:4
**staff**
133:20 146:13
**stage**
65:10,12 91:19
  134:21 135:18
  143:18 158:20
**stages**
56:2
**stake**
150:8
**standard**
117:16
**start**
5:25 9:23 14:17
  42:22 114:24 115:2

151:22 159:10
**started**
104:4 159:18
**starting**
13:14 28:10 77:22
  116:4 149:24
**state**
1:18 3:18 4:21,25
  23:5 55:18 151:2
**stated**
90:20 129:23 147:3
**statement**
4:9 52:23 53:11 57:3
  58:8 66:2 67:15
  70:4 71:23 121:3
  161:21
**STATES**
1:2
**status**
23:4 121:11
**stay**
5:22 89:4
**Steven**
24:23
**stick**
50:7 84:25 89:5 94:3
**stipulate**
4:22
**Stipulations**
163:8
**stock**
34:7 43:11 65:20
  129:22,22 149:23
**stockholders**
157:9
**Stockson**
118:20
**stop**
26:8 79:10
**stopped**
143:24,24
**strange**
97:6
**Street**
60:5
**structure**

54:7 57:13 85:4
**struggling**
135:5
**stuff**
119:8 150:19
**Subscribed**
165:10
**subsequent**
84:13
**subsequently**
44:6 131:8
**substance**
11:7,9 165:5
**substantially**
135:3
**substantive**
56:21 67:9 69:21
  71:17
**success**
30:3,6
**successful**
30:5
**successor**
35:17 43:12 44:6,19
**suitable**
35:11,24
**Suite**
2:9
**sum**
61:24 62:3
**summarize**
108:19
**Sunday**
11:16,16
**Sung-Fung**
1:8 3:7
**supervision**
164:12
**SUPPORT**
163:3
**supposed**
24:20 43:4 92:9 96:4
  111:16 135:11
  136:21
**sure**
6:5 7:2,4,6,15 12:21

16:2 18:14 22:22
  44:23 48:6 52:18
  54:9 57:9 63:15
  74:6 86:2,19 88:25
  89:3 120:7 123:7
  127:2 133:10
  137:13 138:7 143:7
**surprise**
143:21
**suspect**
136:17,18
**sworn**
4:22 5:5 164:4
  165:10

---

**T**

**T**
161:10 162:3 166:2
**tab**
14:6 31:5 52:13
  62:23 68:4
**take**
19:11 22:12 27:8
  40:10 48:25 49:3
  53:5 61:24 62:22
  63:20 71:5 72:16,19
  72:22,25 73:14,17
  73:19 74:17 85:24
  86:3,17,20 153:6
**taken**
1:13 3:11
**talk**
11:7 25:3
**talked**
11:13 105:10
**talking**
35:6 50:16 73:15
  91:24 116:7 127:16
  147:22
**target**
56:20,23 57:24 67:7
  67:11 69:19,23
  71:15,19 80:15 91:7
  92:3,7,22 93:21
  94:5 96:18 97:22
  99:22 101:20 102:5



102:9,20 103:3,10
103:16 104:2 110:7
111:9 131:4 133:12
157:17
**targets**
35:7 36:21 58:16
81:13,15 82:3,7,8
82:17,19,25 98:16
111:16,20
**tax**
84:2,3,21,22 85:7
87:2,19,19 88:8,15
88:18,25 89:6
**tea**
9:10
**team**
38:19 66:13 72:15
73:16,18,21 82:11
101:23 118:18
119:6 124:8 125:13
127:5 130:25
**technical**
137:16
**Technological**
13:18,19 15:12
**technology**
58:3
**Teck**
60:23,24
**tell**
11:12,14 74:20 97:24
104:9,10,18,25
105:7 136:24 137:8
137:13
**telling**
138:21
**term**
56:6,10 138:12
155:11
**terminated**
134:8
**termination**
156:2,8
**terms**
131:19 139:11 159:8
**test**

52:9 54:12
**testified**
5:6 15:10 28:25
61:12 127:7 153:17
**testify**
10:12,17 32:12,16
33:9 34:20 35:18
38:6,24 39:13,18,23
40:15 54:6,15
**testifying**
9:20 10:2 16:10
32:23 39:6
**testimony**
33:13 34:16 40:24
51:10 64:9 81:21,23
83:9 84:10 91:4
98:7,10 100:5 108:3
109:17 111:14
112:21 113:22
131:23 149:4 164:4
**testing**
136:6
**text**
40:21
**thank**
6:19 7:2 159:5 160:7
**theoretically**
95:2
**thereabouts**
46:5 73:4
**thing**
14:16 86:16 109:10
114:16 138:7
**things**
43:4 123:6 124:22
129:18 136:20
**think**
7:20 8:15,24 9:8
11:17,25 15:5 28:9
28:10 29:5 30:16
31:10,14,15 33:12
35:10 38:11,23 40:8
44:3 45:3,11,14
48:19 52:5,12 53:23
54:16 55:11 61:19
62:5,15 67:4 69:14

72:20 75:21,21
76:10 78:24 79:15
79:25 80:2 86:15
88:2 91:23 96:3
99:7 102:13 104:12
105:5 112:6 114:8
116:22 118:3,8
119:17 126:11,24
140:25 145:2,20
147:12 149:23
153:6 158:9 159:4
159:19
**thinking**
78:4
**third**
55:11
**third-party**
119:19
**thought**
137:16 154:21
159:22
**thousand**
147:15
**thread**
114:17
**three**
62:16 76:10
**Thursday**
3:8 11:18
**time**
1:17 3:9,10 5:24 7:14
15:5 18:24 23:3
40:25 53:4 55:8,23
55:24 57:3,14 58:8
60:15 61:10,13
64:16 66:24 67:15
70:4 71:23 76:8
77:21 78:13,25 79:3
79:24 80:8 83:23
84:9 86:5,9,18
95:24 102:23,24
103:13 104:12
110:12 111:10
115:13,19 117:14
117:20 119:14
123:11,14 124:25

126:3 127:15
134:19 136:8,20
153:10,14 154:12
154:14 155:18
157:4 159:5 160:8
160:13,16
**timeline**
97:25
**times**
38:15 45:16 62:16
76:10
**title**
26:23 124:19
**today**
3:8 10:2,7,10,12,16
10:18 13:6 16:11
33:10 34:16,20
35:18 36:11 37:5
39:7 44:19 50:8
51:18 54:5 61:9
64:9 84:25
**told**
72:21 88:20 96:3
108:10 115:16
125:5,15 129:9
131:8 136:11
145:17 150:19
**Tomaso**
1:8 26:22,24 27:6,13
27:20,23 28:2,6
29:2,8,9,15,21 30:9
30:15 39:22 74:15
75:3 79:5,15,16,24
80:14 94:11,16,21
94:25 95:16 96:10
100:13,25 101:4,11
101:19 102:4,8,11
102:12,15,19,25
103:2,9,14,20,25
104:4,24 105:17
106:3,9,24 107:7
108:12,21,25 109:5
109:7,13,21,24
110:6,22 113:21
114:4 115:9,18
116:14 117:22



118:24 119:13,21
120:3,7,19,20 121:8
121:23 122:10,16
123:2,11,24 124:2
124:12,20 127:5,6
127:18 128:7,24
129:4,7 130:5 131:5
131:20 132:8,13,18
132:25 133:6,8,11
134:11 136:22
137:4,6,20 138:10
138:13 140:5,8
141:6 142:12,21
144:3,15 145:15,19
148:4 149:21
153:20 154:5,23
155:5,14,19,25
156:7,21 157:24
158:22

**Tomaso's**
107:11 116:8 122:5
122:23 125:24
130:11 132:20
142:7 151:17 153:3
154:3

**tomorrow**
6:4 159:7,13 160:3

**Ton**
24:23

**top**
60:3 63:7 79:25
118:7

**topic**
49:23 50:16,18 54:15
62:13 84:24 85:3

**topics**
40:4,6,7,10,15 50:8
84:25 90:8

**total**
28:12

**totality**
40:9

**totally**
16:8 22:11

**tough**
93:13 135:12,12

**town**
159:9

**track**
41:17

**tracker**
41:17

**traffic**
159:18,18

**training**
59:6,16

**tranche**
28:11

**transaction**
85:8 91:11 94:12
100:14 113:20
116:10 134:13
158:10,13

**transactions**
154:17

**transcript**
99:4 164:11

**transcription**
165:4

**transcripts**
93:17

**traveling**
18:22

**true**
164:4

**trusted**
73:20

**try**
7:21 9:7 22:6 36:6
37:2 69:14 85:11
97:3,7,8 99:19
149:15

**trying**
23:12 24:2 26:14
39:3 48:12 54:13
72:9 77:17 87:21,24
88:7,11 93:23 97:18
107:6 108:18 109:7
109:13,20

**turn**
6:23,24

**turning**

6:14,25

**twice**
62:15

**two**
10:22,25 11:19 15:5
18:20 76:10 85:24
112:13 117:14
123:14,15 124:6
141:18 145:19
146:20

**two-year**
19:2

**type**
7:5 29:14,21 111:22
112:2,10

**types**
92:9 147:7

**typical**
8:20 120:16

**typically**
27:17,18

---

**U**

**U**
5:4,4

**U.S**
28:13 45:13 47:16
60:22 62:7,9 63:2,8
80:2 87:19 143:6
150:6,14 151:3
161:24

**Uh-huh**
149:11

**UN**
159:18

**unannounced**
100:11

**unauthorized**
143:20 144:5,7 158:9
158:13

**understand**
5:21 6:3 16:4,9 26:6
26:14 32:15,21
36:15 43:15 54:2
56:11 58:22 59:4
82:20 84:7 87:20,21

88:7 91:4 92:12
93:11,23 96:2
108:19 109:18,20
123:10,17,25
159:17

**understanding**
6:8 32:13 42:23 45:6
58:7,12 59:21 78:10
89:23 93:25 102:24
105:15 109:11
112:25 115:12
124:18 125:19,21
126:2,6,13 128:6
140:15 142:22
144:6 145:22
148:19 149:17
150:7 154:4 157:13

**understood**
37:2 61:12

**undertake**
49:9

**undertaking**
155:4

**underway**
159:19

**undisclosed**
158:23

**unfettered**
148:24

**Unfortunately**
38:14 85:17

**Unicorn**
1:9 9:22 10:3,6,13
12:13 13:5 25:24
26:9 31:8 32:4,10
32:17 33:5,14 34:19
35:16 36:9,17 38:7
41:24 42:7 43:6,8
43:16,18 44:3,5,9
44:19 47:7,12 49:16
50:2 51:6,21,25
52:3,23 53:12,17,20
54:4,8 55:16 56:15
57:14,15 64:4,7,12
64:16,20,22 65:6
66:4,6,7 72:4,10,16



72:19 73:24 74:17
75:10 77:2,8 80:23
81:6,9 83:6,7,10
84:11,15 85:5 87:4
87:13,14,15,16 88:4
88:6,10,11 89:16,22
89:25 90:13,14,16
91:2 93:4,5,9 94:6,7
94:15,19 95:2,6,10
95:12,23 96:7,15,17
97:19,21,22 98:4,11
98:14,14,16,21,23
98:25 99:9,17,18,20
99:23 100:4,10,25
101:7,8,17,18,20
102:3 103:9,15
105:24,25 106:12
106:16,17,21,22
107:17 108:23
111:21 117:24
118:16 122:14,18
161:16,21
**UNITED**
1:2
**university**
13:14,17,19,20 15:13
15:16
**unnatural**
22:10
**unpaid**
144:11
**unwritten**
29:14 127:19,24
128:2,3
**update**
15:3
**updated**
31:13
**upfront**
49:6
**Uscinowicz**
2:16 3:14
**use**
44:21 56:10 79:19
137:17 147:11
148:8 152:5

**usually**
7:24 8:3 22:12

---
**V**
---
**v**
3:6
**vague**
124:21
**valuation**
78:25 122:10,16,19
154:5,8
**valuations**
78:14,20
**value**
44:17
**valued**
154:23
**various**
35:7 70:23 73:15
80:15 158:24
**vehicle**
78:18
**verbally**
141:2
**verifying**
121:15
**version**
68:21,23 70:21,22,25
94:17
**videographer**
2:16 3:2,13 86:5,9
153:10,14 160:13
**videotape**
3:4
**Videotaped**
1:17
**view**
113:20 153:18
**views**
154:8
**violation**
147:6,11
**virtual**
3:12 6:8 9:2 54:25
93:16
**vote**

147:8

---
**W**
---
**wait**
22:13
**walk**
133:12,25 134:2,9
**want**
6:23 10:24 11:4,6
13:11 14:13 22:10
26:7 31:3 36:5,23
40:3,10 42:22 52:13
54:9,19 55:10 69:5
69:15 71:3 72:12
86:18 88:21 118:4,5
148:24
**wanted**
35:25 72:11,13 110:3
110:18 133:16
139:13 145:24
**Wara**
25:2
**Washington**
2:10
**wasn't**
39:8 58:11 62:20
82:8 94:25 95:7
109:5 113:17 129:6
135:8,9 142:20
145:8
**waste**
55:8
**watch**
7:10
**water**
9:10
**way**
8:7,18 9:8 36:7 43:17
46:8 92:8 94:9
99:19
**ways**
48:8 148:7
**we're**
62:21
**we've**
63:19 85:23 86:2

**wealth**
150:5
**website**
12:19 44:4
**Wednesday**
11:18
**week**
10:23 85:20
**weird**
10:4 43:2 94:9
**Welcome**
86:12
**WENG**
1:9
**went**
12:20 120:17,22,23
**weren't**
125:6 127:24 129:5,5
132:3 139:7 143:5,7
**WERNER**
159:21
**whatnot**
144:12
**Wigger**
2:11 4:2,2 7:6,24
10:14 11:12 12:5,9
12:16 13:8 14:13,19
15:24 18:19 22:5,13
22:21 24:8 25:7,18
26:10,15 27:14 28:3
29:11,18,23 31:10
31:12 34:21 35:19
36:13 37:14,19,23
38:8,14 39:25 40:16
40:23 41:15 42:2,9
42:20 43:13 44:14
44:20 45:18 47:8,13
47:20 48:4,17 49:20
50:3,14,19 51:9,15
51:22 52:15 53:2
54:16 57:5,16,20
58:19 59:3,10,24
60:10 62:12 63:11
63:18 65:8 68:18,25
69:5 71:4 73:10
74:3,18 75:5,17



76:14 77:3,9,13
78:11 79:18 80:24
81:4,14 82:5 83:2
84:23 85:6,22 87:5
87:10 88:12,18
89:17 90:2,7 91:8
92:11,18,24 93:10
94:2,13,23 95:17
96:11,19,25 97:23
98:17 99:24 100:8
100:15,21 101:13
101:21 102:6,21
103:5 104:7 105:4
105:12 106:5 107:2
108:2,7,14 109:3,16
110:2,8,19,24
111:13,24 112:5,12
112:20 113:13,23
114:5,15,22 115:10
115:15 116:5,11
117:4,23 119:5,12
119:25 121:13,17
121:24 122:6,11,17
122:24 123:12
125:25 126:10
127:21 128:10,16
130:7,13 131:22
132:9,14,22 133:9
134:14,25 136:4
137:2,10,18 138:4
138:16 139:2,15
140:12,24 141:8,12
141:20 142:19,25
143:16 144:8,24
146:3,17 147:9
148:5 149:2,19
150:10,25 151:7,19
152:22 153:9,24
154:6,11,25 155:16
155:22 156:3,9,16
156:22 157:10,19
158:2,7,17,25
159:14,24 160:3,6
**Wigger's**
97:13
**Witherspoon**

60:5
**witness**
4:10,20,22 5:4 7:24
  14:22 16:10 54:16
  57:11 117:7 164:3,5
**wonderful**
61:9
**Wong**
24:22,24
**word**
33:17 83:21,21 99:5
  147:11 148:8 152:5
  158:9
**wording**
108:18
**words**
79:20 93:18
**work**
8:18,25 13:25 18:5
  23:3,16 24:7 29:7
  29:16 35:6 38:25
  111:3,3,4 133:8
  140:16 153:22
  154:2
**worked**
15:19 16:15,22 17:6
  17:16,19 18:7,11
  19:12,22 20:10
  148:21
**working**
15:16 20:14 59:20
  110:10 111:6,10
  119:18 144:3
  148:20 156:14
**works**
8:7 9:9
**world**
44:4 47:3 60:17
  146:7
**worth**
144:22 149:18
  150:13,24
**wouldn't**
6:25 36:4 57:8
  127:25 136:19
  146:16

**wrap**
149:15 153:7
**write**
117:13
**writing**
131:2
**written**
29:9 32:6 83:24
  91:12,13 92:14,16
  130:4
**wrong**
52:7
**Wu**
60:21
**www.MagnaLS.com**
1:24
**Wyn**
138:11,13 140:16

---
**X**
---

**x**
1:4,11 161:3,10
  162:3

---
**Y**
---

**Y-U-E-N**
83:21
**Yards**
2:4 150:15
**yeah**
5:12 6:7 11:15 15:14
  18:24 20:5,23 23:18
  24:14 28:24 30:25
  34:25 36:15 48:21
  49:6,10 53:6 62:10
  84:19 86:23 87:8
  118:13 119:14
  120:11 121:19
  123:4 129:9 133:4
  133:15,24 136:13
  137:6 140:17
  156:25
**year**
36:18 115:17 139:21
  139:23 147:18
**years**

13:22 14:3 15:5
  18:20 138:25 140:2
  140:11
**yesterday**
45:11
**Yong**
60:23,24
**York**
1:3,19 2:5,5
**Young**
16:13

---
**Z**
---

**Zach**
2:6 3:24
**Zoom**
1:13 3:12,23 8:22
  61:2,9

---
**0**
---

---
**1**
---

**1**
3:4 8:17 14:6,7,8
  25:9 52:24 53:4,13
  57:6 61:14 62:8
  154:24 161:13,22
**1.7**
45:3,7,16
**1.90**
45:12,17
**1:00**
159:10
**1:23-cv-04305(AS)**
1:7
**10**
80:9 133:22 138:24
  140:2,11
**10-Q**
68:6,12 70:10,16
  162:6,10
**10-year**
138:12 139:18 140:9
**100**
2:9 133:20 139:21
**10001**



2:5
**101**
91:15
**11**
71:10
**11:05**
5:15
**11:08**
153:11
**11:15**
153:15
**11:22**
160:14,16
**11:30**
5:23
**114**
162:14
**12**
55:25 78:24 147:17
**14**
161:13
**14th**
95:9,11
**15**
153:7
**150**
149:23 150:6 151:2
**15th**
95:11
**16**
71:13
**17**
69:13
**19**
1:14 3:8 164:7
**1998**
13:16 15:19

---

**2**

**2**
8:17 31:4,5,6 44:11
44:25 45:21,22
124:12 161:15
**2-1/2**
138:13,24 140:10
**2,156,250**

65:19
**2.2**
46:20
**2:00**
159:12
**20**
133:22 139:23 140:2
**200**
140:2
**20006-6801**
2:10
**2002**
15:20 16:16
**2003**
16:16,23
**2004**
16:23 17:7
**2005**
17:7,13
**2007**
17:14,19
**2009**
17:20 18:7
**2011**
18:8,13 20:11
**2013**
18:13 19:12
**2015**
19:13
**2016**
21:8
**2018**
20:3
**2020**
77:22
**2021**
20:4,12 26:2,16 52:6
52:25 53:13,24 57:4
57:7 61:14,19,21
63:3,9,23 64:22
72:8 73:4 75:12,22
76:13,19 77:22,23
80:8 95:5,14 96:9
100:13 101:12
106:4,25 107:15,22
109:2 110:12

112:23 115:24
116:4 131:17
161:22,25
**2022**
68:16 70:5,13,19
71:11 95:9,11 98:8
98:12,24 99:23
100:7 103:20,23,24
106:2 113:22
116:18 139:12
140:6 154:21 155:3
162:13
**2023**
26:17,18,21 28:23
29:3 33:15,21 34:2
35:22 36:16
**2024**
1:14 3:9 36:18 164:7
165:11
**207**
52:14
**2099**
2:9
**21**
14:3
**22**
98:11
**24**
63:3,9,23 69:11
161:25
**25**
28:13
**25,000**
65:19
**25th**
116:18
**27th**
73:3
**281**
60:5

---

**3**

**3**
8:17 52:13 53:8,9
55:5 67:4 161:18
**30**

70:13,19 162:13
**30(b)(6)**
3:5 31:7 32:4 37:6
49:24 50:7,15 57:11
62:13 84:24,25 90:8
159:25 160:7
161:15
**31**
68:16 161:15

---

**4**

**4**
62:7,23,24,25 161:23

---

**5**

**5**
43:22 68:4,5,6
141:17 144:22
161:7 162:6
**500**
154:13,18,23
**500,000**
46:22
**53**
161:18
**55**
2:4

---

**6**

**6**
70:9,10 162:10
**60**
134:8
**62**
161:23
**624-6221**
1:24
**68**
162:6

---

**7**

**7**
47:15,25 48:8,11
49:11 114:8,9,12
150:14 162:14
**70**



162:10

---

**8**

**8**
150:14
**8:04**
1:15 3:10
**848**
114:14
**860**
149:23
**866**
1:24

---

**9**

**9:37**
86:6
**9:46**
86:10
**90**
86:3
**98**
13:20

