# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
RYAN BERRIS,

         Plaintiff,

                     Case No.:

   -against-           1:23-cv-04305(AS)
SUNG-FUNG CHOI (a/k/a NORMAN CHOI),
DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC,
HIN WENG LUI (a/k/a SAMUEL LUI),
GENESIS UNICORN CAPITAL CORP.,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - x


        Videotaped deposition of EVAN
   CYGLER, taken pursuant to notice, was
   held at the law offices of BOIES
   SCHILLER & FLEXNER LLP, 55 Hudson Yards,
   New York, New York, commencing September
   24, 2024, 10:08 a.m., on the above date,
   before Leslie Fagin, a Court Reporter
   and Notary Public in the State of New
   York.
                - - -



Page 2

```
 1
 2    APPEARANCES:
 3
      BOIES SCHILLER & FLEXNER LLP
 4    Attorneys for Plaintiff
                55 Hudson Yards
 5              New York, New York 10001
      BY:       KELLY WALDO, ESQUIRE
 6              DAVID SIMONS, ESQUIRE
 7
 8    SHEPPARD MULLIN RICHTER & HAMPTON LLP
      Attorneys for Defendants
 9              2099 Pennsylvania Avenue, NW
                Suite 100
10              Washington, D.C. 20006-6801
      BY:       PAUL WERNER, ESQUIRE
11              ALEXANDRA BUSTAMANTE, ESQUIRE
                HANNAH WIGGER, ESQUIRE
12
13    GILBRIDE TUSA LAST & SPELLANE LLC
      Attorneys for Witness
14              30 Brewster Lane
                Bellport, New York 11713
15    BY:       ERIC SELTZER, ESQUIRE
16
17    ALSO PRESENT:
18
      RYAN BERRIS
19
      DANIEL IRVINE, Videographer
20      Magna Legal Services
21
22
23
24
25
```



Page 3

```
 1
 2          THE VIDEOGRAPHER:  Good morning.
 3     We are now on the record.
 4          This begins videotape No. 1 in the
 5     deposition of Evan Cygler in the matter
 6     of Berris v. Sung-Fung Choi, et al.
 7          Today is September 24, 2024 and the
 8     time is 10:08 a.m.
 9          This deposition is being taken at
10     55 Hudson Yards, New York, New York at
11     the request of Boies Schiller Flexner
12     LLP.
13          The videographer is Daniel Irvine
14     of Magna Legal Services and the court
15     reporter is Leslie Fagin of Magna Legal
16     Services.
17          Will counsel and all parties
18     present state their appearances and who
19     they represent?
20          MS. WALDO:  Kelly Waldo, Boies
21     Schiller Flexner for the plaintiff.
22          MR. SIMONS:  David Simons, Boies
23     Schiller Flexner for the plaintiff and
24     plaintiff, Ryan Berris, is present with
25     us.
```



Page 4

```
 1              E. Cygler
 2         MR. SELTZER:  Eric Seltzer,
 3    Gilbride Tusa Last Spellane for the
 4    witness.
 5         MS. WIGGER:  Hannah Wigger from
 6    Sheppard Mullin for defendants.  I'm
 7    joined by my co-counsel Alexandra
 8    Bustamante and Paul Werner.
 9 E V A N   C Y G L E R,  called as a
10    witness, having been duly sworn by a
11    Notary Public, was examined and testified
12    as follows:
13 EXAMINATION BY
14 MS. WALDO:
15    Q.   Thanks for being here, everyone,
16 and thanks for coming in, Mr. Cygler.
17         Could you start by stating your
18 full name for the record?
19    A.   Evan Matthew Cygler.
20    Q.   Where do you live?
21    A.   I live in New York City.
22    Q.   Have you ever been deposed before?
23    A.   I have not.
24    Q.   I will go over just some ground
25 rules before we get started.  So our court
```



Page 5

1                    E. Cygler
2    reporter is taking down everything we say so
3    make sure that you give full verbal responses
4    to my questions, yes or no or correct.  No
5    shaking heads or nodding please.
6              Try to speak as slowly and clearly
7    as you can and we should both try to avoid
8    talking over each other to the extent we can,
9    and if you ever feel like you need a break
10   for any reason, we can hit pause, just let me
11   know.
12        A.    Thank you.
13        Q.    So what did you do to prepare for
14   today's deposition?
15        A.    In preparation, Eric -- for today,
16   I had a cup of coffee and woke up and did
17   some work, nothing beyond that.
18        Q.    Did you speak with your lawyers
19   before?
20        A.    Not today, no.
21        Q.    In the months preceding this?
22        A.    Yes.
23        Q.    On how many occasions did you speak
24   with your lawyers?
25        A.    We spoke twice.



1                     E. Cygler

2        Q.    In your preparations, did you speak

3    with anyone other than your lawyers?

4        A.    No, I did not.

5        Q.    Did you review any documents in

6    preparation for this deposition?

7        A.    No, I did not.

8        Q.    And you are represented by your own

9    counsel here today?

10       A.    Correct.

11       Q.    Are you paying your own legal costs

12   in connection with your counsel?

13       A.    Personally, no.

14       Q.    Is De Tomaso paying for your legal

15   costs?

16       A.    No.

17       Q.    Is some other party?

18       A.    Miller Motorcars, I work for a

19   representative for De Tomaso so Miller

20   Motorcars.

21       Q.    Is there any reason or condition

22   that would limit your ability to testify

23   truthfully and accurately today?

24       A.    No.

25       Q.    Where did you attend college?



1                    E. Cygler

2         A.    I attended college, I went to

3    school at University of Arizona.

4         Q.    What was your degree in?

5         A.    Communications business.

6         Q.    Where did you work after you

7    graduated?

8         A.    Miller Motorcars.  I've been with

9    them since.

10         Q.    How many years have you been with

11    them total?

12         A.    In full-time employment, something

13    like 13 years.

14         Q.    What is your current position with

15    Miller Motorcars?

16         A.    Director of special projects.

17         Q.    Have you previously held other

18    positions there?

19         A.    I was previously director of

20    marketing, for around seven years.

21         Q.    Could you please just explain the

22    basics of what your position at Miller

23    Motorcars entails?

24              MS. WIGGER:  Object to form.

25              Sometimes I will have an objection, but



Page 8

                    E. Cygler
1
2       you can go ahead and answer after I give
3       my objection.  Just try to pause one
4       second before you answer so she can get
5       it.
6       A.    My role is sales, sales for various
7  brands.
8       Q.    Sales for brands?
9       A.    Sales for various brands that we
10  look at, that I look after at the company.
11      Q.    How did you come to be acquainted
12  with Ryan Berris?
13      A.    I think I was acquainted with Ryan,
14  we had some -- it's a bit vague in how I
15  remember how it came together, but I remember
16  a communication or reach out about the,
17  firstly the Apollo project, and then the
18  Apollo project then led to the De Tomaso
19  project.
20      Q.    Do you recall approximately when
21  was that?
22      A.    We started in 2018 or so, I would
23  have to cross check that.  The car that was
24  shown to the world, De Tomaso, was in 2019 so
25  it was either 2018 or 2017.



```
 1                    E. Cygler
 2        Q.    In addition to your business
 3   dealings with Mr. Berris, were you also
 4   personal friends with him?
 5        A.    Outside of business, I would say
 6   no.
 7        Q.    What was your general impression of
 8   Mr. Berris?
 9        A.    Serious, focused, hardworking.
10        Q.    Anything else?
11        A.    Car enthusiast, into fitness, just
12   like general basics.
13        Q.    How did you come to be acquainted
14   with Norman Choi?
15             MS. WIGGER:  Object to form.
16             MR. SELTZER:  You can answer.
17        A.    I met Norman through Ryan.
18        Q.    Approximately when was that?
19        A.    That was 2017 or 2018.  It's one of
20   these two years.  It was a visit to our
21   offices in Greenwich.
22        Q.    Have you known Mr. Berris longer
23   than you've known Mr. Choi?
24        A.    I would say perhaps over time, we
25   probably met in passing.  I don't know
```



1                    E. Cygler

2    specifically the time of when, but we, to be

3    fair really, didn't cross paths very

4    frequently.

5         Q.    Were you personal friends with Mr.

6    Choi?

7         A.    Prior to meeting?

8         Q.    At any point.

9         A.    Personal friends, same situation,

10   it's a business acquaintance.

11        Q.    What was your general impression of

12   Mr. Choi?

13              MS. WIGGER:    Object to form.

14        A.    Soft spoken, also focused, also

15   kind of healthy in a sense, passionate about

16   cars, successful in his past business

17   experience, entrepreneurial.  That's probably

18   as much as I can naturally just say.

19        Q.    What was your impression of how

20   effective Mr. Choi was as an executive of De

21   Tomaso?

22              MS. WIGGER:    Object to form.

23        A.    Can you repeat the question?

24        Q.    What was your impression of how

25   effective Mr. Choi was as an executive of De



                         E. Cygler

1                        E. Cygler

2    Tomaso?

3         A.   I would say had given an ability to

4    have a focus of what he was willing to

5    accomplish or wishing to accomplish.  Already

6    had previous track record through developing

7    his first product, also known as the Apollo

8    IE, so when we met, this was already like a

9    product that was already actively being shown

10   and displayed so that's where I gained

11   credibility that he had already coming to

12   with this first brand, first product, his

13   first acquisition of this brand, Apollo

14   Automobili or Automobili, however it's

15   described and had already good explanation of

16   past understandings of experience with the

17   manufacturing process, his kind of wishes,

18   desires, past ownership of specific cars.  He

19   seemed to be knowledgeable about cars.

20        Q.   During the course of your business

21   relationship with Mr. Choi, has Mr. Choi ever

22   asked you to do anything that you felt might

23   be unethical?

24             MS. WIGGER:  Object to form.

25        A.   I would say no, nothing would come



Page 12

1                     E. Cygler
2    to mind.
3        Q.    Anything that you felt might be
4    illegal?
5              MS. WIGGER:  Object to form.
6        A.    No.
7        Q.    Could you tell me a bit about your
8    business relationship with the Apollo brand
9    and how that got started?
10             MS. WIGGER:  Object to form.
11       A.    I started via Apollo, we came into
12   some kind of, I don't think it was an
13   official agreement, but some kind of verbal
14   official agreement that we would be looking
15   after sales for North America.
16             And the brand, as I had mentioned
17   before, was already selling cars, it had
18   already been previously engineering, building
19   and delivering these cars so we were like a
20   bit of a late start as I like to think.
21             It was 10 cars to be made for the
22   world.  It's a very small number.  We had
23   participated or I had participated in
24   marketing activities, either seeing the
25   product in Geneva, Switzerland or I can't



Page 13

1                    E. Cygler
2    remember specifically, another show or event,
3    but we had seen the car or I had seen the car
4    and that was one relation.
5              We did have the ability to sell a
6    few of these examples -- can you repeat that
7    last question?
8        Q.    Sure.   What was the nature of your
9    business relationship with the Apollo brand?
10       A.    So it was sales and to be service,
11   maintenance.
12       Q.    What was Mr. Berris' role at
13   Apollo?
14       A.    Overseeing and working alongside
15   Norman on the sales side, so sales liaison, a
16   request for renderings, going over a sales
17   pitch presentation.
18       Q.    Did you regularly interact with Mr.
19   Berris while he was at Apollo?
20       A.    I did.
21       Q.    How often would you communicate
22   with him?
23       A.    It could be a couple of times a
24   week, it could have been sporadically, it
25   depended on the nature of the interest of the



Page 14

                    E. Cygler
1
2    product at the time.
3        Q.    What was your impression of how
4    effective Mr. Berris was in his position at
5    Apollo?
6            MS. WIGGER:  Object to form.
7        A.    I had an understanding of the
8    product, the performance statistics, the
9    materials used, the overall product.  I had a
10   detailed kind of understanding of what the IE
11   product was.
12       Q.    Did you find him to be
13   professional?
14       A.    Yes, he was professional.  There
15   were some things that were mysterious to me,
16   like the car was being sold as a U.S.
17   home-built constructed product that customers
18   would be able to purchase the car and then
19   find some creative way to, like, road
20   legalize it, which in the end, turned out to
21   be a complete false -- completely false.
22            So we had sold cars with some kind
23   of understanding that customers would
24   purchase the car and be able to, like, road
25   register it in their respected home state and



                          E. Cygler
1
2    in the end, that turned out to be false and
3    complicated and resulted in cancellation of
4    business within our business because of the
5    specific situation, meaning, refunding money
6    to a customer for being told this promise.
7                From my understanding, this was
8    also -- this was also common in multiple
9    instances, so the cars were originally being
10   sold as race cars and then road cars, but
11   they're really race cars.
12       Q.   This incident that you just
13   described, is this something you attributed
14   to Ryan specifically?
15       A.   Yes.
16       Q.   Why is that?
17       A.   He had experience with the
18   home-built process of importation of some
19   kind of unique understanding of how the law
20   worked with a home built.  It's like some
21   kind of special car that could be assembled
22   in the United States or some kind of -- I
23   don't know what you call it, some kind of
24   alternative method to having an ability to
25   road register a vehicle.



Page 16

                        E. Cygler
1
2           So typically, cars are crash
3   tested, tested for emissions, but there is a
4   special exemption called home built and that
5   means the car has to be like some kind of
6   replica or the car is built in the United
7   States from, like, a small pieces to eventual
8   full vehicle.
9           So that was cancelled after we
10  learned that -- we spoke with legal on it, we
11  spoke with people who specialize in this
12  specific industry and that it was not
13  happening, stay away.
14      Q.   Could you say more about why you
15  attributed that to Ryan as opposed to your
16  legal counsel?
17          MS. WIGGER:  Object to form.
18      A.   It was something that I had worked
19  -- we had spent time to promise to someone,
20  we accepted someone's money on the fact of
21  delivering a product on this specific home
22  built product.
23          It was honestly very frustrating,
24  put me in a bad position with my customer,
25  put me in a bad position with the



```
 1                    E. Cygler
 2  manufacturer because the car was built and
 3  then after the car was built, we had applied
 4  to import this car and nothing panned out.
 5       Q.   Were you working with Mr. Berris to
 6  import Apollo IEs in the U.S.?
 7       A.   Correct.
 8       Q.   When was that?
 9       A.   I don't remember the specific year.
10       Q.   During the time, he was at Apollo?
11       A.   Correct.  Yeah, he asked me to open
12  up a New York State LLC.  I presented my
13  Social Security number, my driver's license,
14  I think I still have an active New York State
15  LLC that was set up for personal use to aid
16  the company.
17       Q.   Could you describe the nature of
18  your business relationship with De Tomaso?
19            MS. WIGGER:  Object to form.
20       A.   My business -- in what capacity?
21       Q.   What role?
22       A.   My role was sales.
23       Q.   Sales.  What was Miller Motorcars'
24  relationship with De Tomaso?
25            MS. WIGGER:  Object to form.
```



                        E. Cygler
 1
 2        A.    My arrangement with De Tomaso was
 3   sales for North America, for the United
 4   States specifically.
 5        Q.    Was that relationship memorialized
 6   in a contract?
 7        A.    We did have some form of agreement
 8   in principle in regards to our understanding
 9   of representing De Tomaso.
10        Q.    Do you recall if that was an oral
11   or a written contract?
12        A.    Written.
13        Q.    What was your understanding of the
14   basics of what that contract said?
15             MS. WIGGER:  Object to form.
16        A.    That we would be -- the
17   understanding was there was a commitment of
18   sales for the P72, the first model for sales
19   for the United States and service.
20        Q.    Would you get paid a commission for
21   the sale of De Tomaso vehicles?
22        A.    I would get paid an individual
23   commission for each sale, correct.
24        Q.    What was the amount of that
25   commission?



Page 19

                         E. Cygler

1

2       A.    Nothing, we have never been paid

3    anything, so if and when that happens, then I

4    can be compensated.

5       Q.    What was the agreement?

6       A.    I think I get 10 percent of profits

7    per each unit.

8       Q.    How would you assist in marketing

9    or displaying the De Tomaso vehicles?

10           MS. WIGGER:  Object to form.

11      A.    I would assist marketing through

12   various events, car shows, traveling to

13   display the car at an event in California, to

14   an event in Florida, so various car shows,

15   events.

16      Q.    Did you keep track of customer

17   deposits for the P72s?

18      A.    Yes, we did.

19      Q.    Did you frequently interact with

20   Mr. Berris while he was at De Tomaso?

21           MS. WIGGER:  Object to form.

22      A.    Yes, I did.

23      Q.    Did you find him to be professional

24   in that role?

25      A.    Yeah, he was professional, yes.



Page 20

                        E. Cygler

1

2        Q.    Did you attend any events or trips
3    with Mr. Berris while he was at Apollo or De
4    Tomaso?
5        A.    Yes.
6        Q.    Could you please describe them?
7        A.    I need a moment to think about
8    these trips.  We attended a trip in
9    California, northern California, to display a
10   car at some kind of small gathering at a
11   private space.  That's an example.
12             We had attended a long weekend in
13   Scottsdale, Arizona with Apollo.  I had
14   attended a trip with Ryan in 2019 at the
15   Goodwill Festival Speed in July.  That's
16   probably all naturally that comes top mind.
17             Sorry, I'm still booting up.
18       Q.    At these events that you just
19   mentioned, would Mr. Berris act as the De
20   Tomaso spokesperson or representative?
21       A.    At these events, yes, he would be
22   the spokesperson and if Norman was around as
23   well, he would be also representing.
24       Q.    How would you say that Mr. Berris
25   performed in that sales-type role?



Page 21

                          E. Cygler
1
2                MS. WIGGER:  Object to form.
3        A.    I would say professional, felt, you
4    know, in process of speaking in like a nice
5    kind of slow manner, somewhat scripted -- can
6    you repeat the question?
7        Q.    At these events that you attended,
8    would Mr. Berris act as the De Tomaso
9    spokesperson or representative?
10       A.    Yes.
11       Q.    So was it your understanding that
12   Mr. Berris was the person in De Tomaso who
13   was in charge of the sales process?
14               MS. WIGGER:  Object to form.
15       A.    In the sales process, it was Ryan
16   and it was Norman, yes.
17       Q.    Do you and Mr. Berris share many
18   acquaintances or business connections?
19               MS. WIGGER:  Object to form.
20       A.    I would say we know some of the
21   same people.
22       Q.    Roughly how many business
23   acquaintances would you say you share with
24   Mr. Berris?
25               MS. WIGGER:  Object to form.



Page 22

1                    E. Cygler

2         A.    Not many.  I would say very few.

3         Q.    So these events you went to

4    together, you wouldn't have mutual

5    connections?

6         A.    You say a common connection, like,

7    I knew him previously and we knew each other

8    from, like, separate occasions?  Can you

9    clarify that?

10        Q.    Sure.  Business acquaintances who

11   know each other, who speak to each other?

12        A.    On occasion, yeah, there would be a

13   few clients that were overlapped, a lot of

14   the clients.

15             When you say an acquaintance, I

16   will give you an example.  Miller Motorcars,

17   who then meets Ryan and we are now both

18   acquainted, so that's now an acquaintance.

19        Q.    Yes.

20        A.    So an introduction then becomes an

21   acquaintance, got it.

22        Q.    Do you have an estimate of how

23   many?

24             MS. WIGGER:  Object to form.

25        A.    I don't have a formal amount.



Page 23

                        E. Cygler
1
2      Q.    Would you say that in the luxury
3  automotive industry, a person's reputation is
4  particularly important?
5          MS. WIGGER:  Object to form.
6      A.    It's an interesting question.  It
7  feels like some kind of setup, but I think
8  any reputation is important, sure, yes.
9      Q.    How did you learn that Mr. Berris
10  was no longer working with De Tomaso?
11     A.    I was informed.  It's a bit vague.
12  I don't remember a specific conversation or
13  phone call, but I remember speaking to Norman
14  about it.  Nothing really more than that.
15  This was a few years ago already.  I don't
16  know how long it's been.
17     Q.    Do you recall what was told to you
18  by Norman?
19     A.    That he had left the company and I
20  vaguely remember a few things happening at
21  the time, you know, like things that were
22  promised to be done that weren't being done.
23          Eventually, like, some kind of -- I
24  will describe it as, like, a snowballing
25  effect of certain things that were supposed



Page 24

                         E. Cygler
1
2    to be accomplished that weren't being
3    accomplished and, therefore, Ryan was let go,
4    like homologation reasons or just time.  I
5    think it really just felt like there was so
6    much time passing and then issues with
7    suppliers.
8             And then it felt like there was
9    also this Carmen Jordá situation I remember
10   being, like, a problem.
11        Q.   Did Mr. Choi tell you that Mr.
12   Berris was let go for poor performance
13   issues?
14             MS. WIGGER:  Object to form.
15        A.   One day, I will know what that
16   means, but why he was let go, I just kind of
17   explained it to you.  It was like a multitude
18   of things such as unmet deadlines, things
19   that were being done from my understanding,
20   from what I was told, hiring of this person
21   named Carmen Jordá and he was in, like, some
22   kind of situation where he had a financial
23   obligation to pay her like a spokesperson.
24   This was one element I vaguely remember.
25             If I remember, at some point, I



Page 25

1                     E. Cygler
2    don't think it had anything to do with
3    anything, there was an issue with a supplier
4    called Capricorn and I don't think Norman
5    even at that time knew what was going to be
6    happening, but it's all like a little bit
7    unclear in my mind at this point.
8              Did I answer your question?
9         Q.   You did.
10             To clarify all those issues that
11   you just mentioned, those were things that
12   Norman told you on the phone call?
13             MS. WIGGER:  Object to form.
14        A.   Vaguely, I remember these, like,
15   being topics that were in my mind.
16        Q.   What was your reaction to that
17   news?
18             MS. WIGGER:  Object to form.
19        A.   My reaction, I think my reaction
20   was I think disappointment, disappointment
21   because we were promised something, we were
22   promised a delivery of a vehicle in July of
23   -- even earlier 2019.  I was promised a car
24   from De Tomaso in 18 months, so I would say
25   certainly frustration of unnecessary drama,



Page 26

```
 1                 E. Cygler
 2  poor organization.  I would say some kind of
 3  feeling of confusion of this, like,
 4  mysterious situation, like, what did this man
 5  just do for the past few years?  How are we
 6  still not making a stronger leap forward to
 7  build the product?
 8     Q.   How did others at Miller Motorcars
 9  react to the news?
10          MS. WIGGER:  Object to form.
11     A.   I don't recall.  I don't remember
12  or even want to allude to, like some kind of
13  feeling.  I don't remember.  This was years
14  ago.
15     Q.   How did others in your mutual
16  acquaintances network react to this news?
17          MS. WIGGER:  Object to form.
18     A.   A level of surprise because Ryan
19  was the -- was working on the project for as
20  long as I had been communicating with
21  customers on De Tomaso, so it was kind of
22  like an abrupt departure, people were
23  surprised because the company was, in
24  reality, very small.
25          So there was very few contacts.  It
```



Page 27

1                    E. Cygler

2    was Norman, Ryan, a car designer, this guy,

3    Jakub, and this lady, Diane, so it was a

4    small organization.  Ryan was like the

5    liaison to them in relation to a conversation

6    or through the brand.

7        Q.  Do you recall any names of people

8    who had these types of reactions?

9            MS. WIGGER:  Object to form.

10       A.  I think some depositors.  We had

11   one client, Stanley Cohen, he had passed

12   away, he was surprised.

13           We had a client that I had spoken

14   to, I can't remember his name.  He lives in

15   northern California.  We met him at a car

16   show.  I can get back to you on that.

17           Actually, I can't rattle off these

18   names off the top of my head, but there were

19   people who were surprised.  I think one

20   naturally would be surprised to say, like,

21   okay, wow, this person no longer works there.

22           I think just considering it was if

23   we started on a project in 2019, and I don't

24   know when Ryan had departed, but it could

25   have been some period of time, so people were



Page 28

```
 1                    E. Cygler
 2  -- some people were naturally surprised.
 3       Q.   Do you recall ever receiving any
 4  written communications about Mr. Berris'
 5  departure from De Tomaso?
 6            MS. WIGGER:  Object to form.
 7       A.   I don't recall, but I would have to
 8  check back on emails.  There was never an
 9  official letter.
10            MS. WALDO:  I'm going to be showing
11       you a document we will be marking this
12       as Cygler Exhibit 1.
13       Q.   I will give you a moment to read
14  it.
15            MS. WIGGER:  Is this the complete
16       Bates family range?
17            MS. WALDO:  This is just a
18       single-page document.
19            MS. WIGGER:  We object to the
20       extent this is incomplete.
21            MR. SELTZER:  What was the
22       question?
23            MS. WALDO:  I'm letting him read it
24       first.
25       A.   Do you want me to read it?
```



Page 29

                    E. Cygler
1
2        MS. WIGGER:  I have a question.
3    This is a confidential document and
4    given there is no parent email, I don't
5    know if this witness was actually on it.
6        Is this something this witness was
7    copied on?
8        MS. WALDO:  I don't believe he was
9    copied on it.
10       MS. WIGGER:  Has the witness signed
11   the confidentiality order?
12       MS. WALDO:  We can have him sign
13   it.
14       MR. SIMONS:  The court has not
15   actually technically entered the
16   protective order.
17       MS. WIGGER:  I think both parties
18   agreed to operate under it.
19       MR. SIMONS:  Absolutely.  We can
20   have him read it and sign it on a break,
21   but we don't technically have a
22   confidentially agreement we are
23   operating under.
24       MR. SELTZER:  How many pages is
25   this confidentiality agreement?



Page 30

1                    E. Cygler

2          MS. WALDO:  We can break now if you

3     like.

4          MS. WIGGER:  I don't think we

5     should be showing him confidential

6     documents he is not on.

7          MR. SIMONS:  It's under the

8     protective order.  You can show a

9     potential deponent or witness any

10    document whatsoever, as long as they --

11         MR. WERNER:  He hasn't done that.

12         MR. SIMONS:  We are not in

13    disagreement.  We can set this aside for

14    now and have him review it at the next

15    break.  It's a pretty short document.

16         MS. WALDO:  Actually, we should

17    break now.

18         THE VIDEOGRAPHER:  The time is

19    10:40 a.m. and we are going off the

20    record.

21         (Recess.)

22         THE VIDEOGRAPHER:  The time is

23    10:54 a.m. and we are back on the

24    record.

25         MS. WALDO:  Just noting for the



Page 31

                    E. Cygler

1                    E. Cygler
2      record that Exhibit 1 has been
3      withdrawn.
4          Q.   Mr. Cygler, earlier you were
5   discussing the Apollo vehicles and the issues
6   you encountered with completing the
7   home-built exception.
8              Could you tell me when that process
9   began?
10             MS. WIGGER:  Object to form.
11         A.   I don't remember, like, the
12  specific year, so I am not doing a good job
13  in keeping my years on schedule here, but it
14  was -- I don't know if it was in '21 or -- I
15  don't remember when I sold the car, but I
16  vaguely -- I clearly remember it was a
17  home-built sales process.  That was the
18  reason why the customer engaged in the
19  specific sale in the first place.
20         Q.   Is it true that process began
21  shortly before Mr. Berris left De Tomaso?
22             MS. WIGGER:  Object to form.
23         A.   It happened before he left, way
24  before he had left.  It was in the middle of
25  my time between knowing Ryan to his



Page 32

```
 1                    E. Cygler
 2  departure.
 3      Q.    In your phone call with Mr. Choi
 4  when you were informed about Mr. Berris'
 5  departure, did Mr. Choi ever say anything
 6  about Mr. Berris misappropriating company
 7  funds?
 8           MS. WIGGER:  Object to form.
 9      A.    I do recall that he -- that this
10  employee or Ryan had engaged in a contract to
11  have Carmen Jordá as a -- some kind of
12  spokesperson.  I think that was in, clearly
13  in some kind of capacity, that there was a
14  financial agreement paid.
15           He mentioned like there was a
16  contract signed and either money was
17  exchanged, potentially, I don't know if
18  actually money she was ever paid, but I
19  remember that a contract was signed, but it
20  was something he wasn't aware of until
21  after -- eventually he found out.  He wasn't
22  aware or it wasn't brought to his
23  awareness -- this is from my understanding,
24  that a contract was signed between De Tomaso
25  and Carmen Jordá.  Norman was kind of like
```



Page 33

```
 1                    E. Cygler
 2  surprised that it happened.  He was also,
 3  like, unaware of it.  That's how it was
 4  presented to me.
 5      Q.   Mr. Choi characterized this
 6  contractual issue with Ms. Jordá as a
 7  misappropriation of funds?
 8           MS. WIGGER:  Object to form,
 9      mischaracterizes testimony.
10           Go ahead.
11      A.   It was brought like a surprise,
12  like it was just not something I would have
13  agreed upon.
14           And I also I don't remember clearly
15  what the number was, but it was a lot of
16  money, like an excessive amount of money to
17  hire a spokesperson.
18           I didn't know who she was until I
19  was -- it was brought to my attention of who
20  Carmen Jordá was until I had started working
21  on the De Tomaso brand.
22      Q.   Did you ever meet Ms. Jordá?
23      A.   I don't recall.
24      Q.   I'm going to be showing you some
25  documents now that are emails.
```



Page 34

                              E. Cygler

1
2          MS. WALDO:  This will be marked as
3     Cygler Exhibit 2.
4          (Cygler Exhibit 2, email from Evan
5     Cygler to David Collins, marked for
6     identification.)
7          MS. WIGGER:  Object to the extent
8     this document is also not complete.
9     Q.   Do you recognize this document?
10    A.   It was a couple of years ago.  I
11    obviously wrote it because it's from me.
12    Q.   It was an email from you to who?
13    A.   To a David Collins, who is a
14    depositor of ours.
15    Q.   What did Mr. Collins purchase?
16    A.   He had purchased an order for a
17    P72.  He was previously a customer of Miller
18    Motorcars and prospect for other products.
19          We brought him into De Tomaso,
20    after the fact, after like engaging with him
21    on brands like Aston Martin.
22    Q.   Do you recall why this email was
23    sent to Mr. Collins?
24          MS. WIGGER:  Object to form.
25    A.   We would have sent updates to



Page 35

```
 1                    E. Cygler
 2    customers.  I see it says open letter, open
 3    letter was, from what my recollection is, is
 4    we would send these kind of updates on the
 5    production.  I don't remember what this open
 6    letter was.
 7         Q.   I will be giving that to you.
 8         A.   I'm sure.
 9         Q.   I'm giving you another document we
10    will be marking this as Exhibit 3.
11              (Cygler Exhibit 3, email and
12         attachment, marked for identification.)
13              MS. WIGGER:  These Bates numbers
14         don't seem to match up.  You said this
15         was the attachment to this email.  Are
16         you sure?
17              MS. WALDO:  Yes.
18              MS. WIGGER:  I'm confused, it says
19         only one attachment, but this ends at DT
20         454 and this picks up at 469.
21              MS. WALDO:  I'm sure this is the
22         attachment.
23         Q.   Feel free to take your time with
24    that, but there is one specific portion I
25    would like to draw your attention to when
```



Page 36

```
 1                    E. Cygler
 2   you're ready.
 3        A.    Sure.
 4        Q.    So on the final page of this
 5   document ending in Bates 474.
 6             MR. SELTZER:  When she says Bates,
 7        she is referring to the numbers at the
 8        bottom of the page.  The last three
 9        digits.
10        A.    Cool.  It's been so long.  Okay.
11        Q.    I'm going to read aloud a portion
12   of this.  It says, Team departures, Ryan
13   Berris.  De Tomaso would like to take the
14   opportunity to thank Ryan Berris for his hard
15   work and commitment to the brand over the
16   formative years of our revival.  It is with
17   great regret we inform you of Mr. Berris'
18   departure from his position due to personal
19   circumstances.
20             MS. WIGGER:  Object to form.  As
21        long as you are reading, you should read
22        the last sentence too.
23        Q.    We wish Ryan all the best in his
24   future endeavors.
25             What did you make of the
```



Page 37

                        E. Cygler

1
2    explanation provided in this document?
3              MS. WIGGER:  Object to form.
4         A.   It's one of those kind of gentle,
5    he's moved on kind of notes.  This feels kind
6    of nice.  Doesn't feel really negative.  It
7    feels kind of like a positive goodbye and
8    kind of what it says.
9              I can't really read into it any
10   deeper than what it says, but for whatever
11   it's written, that's what it is.
12        Q.   Did the recipient of this email,
13   Mr. Collins, have any reaction to this news?
14             MS. WIGGER:  Object to form and
15        foundation.
16        A.   I don't think I -- David Collins, I
17   don't want to say think, but I don't think
18   there was even a conversation or even cared.
19   It's kind of like, I want my car and you are
20   my guy and, okay, and let's move on.  That's
21   how David is.  As the specific buyer, he is
22   very cut and dry, not really into the drama.
23        Q.   Do you recall sending copies of
24   this document to other individuals?
25        A.   I would have sent this per my job



Page 38

```
 1                    E. Cygler
 2   description or responsibilities, I would have
 3   sent this to our depositors.
 4        Q.   Do you recall anyone else
 5   expressing reactions to Ryan's departure?
 6             MS. WIGGER:  Object to form.
 7        A.   I do not recall.
 8        Q.   We can move on from that.
 9             Do you recall the Le Mans Classic
10   event that occurred in France in June and
11   July of 2022?
12        A.   I do.
13        Q.   Could you tell me a bit about that
14   event, what happens there?
15             MS. WIGGER:  Object to form.
16        A.   The Le Mans Classic was a multiday
17   event taking place in Le Mans, France, racing
18   happening day and night.  Clients were
19   brought in to participate in an experience,
20   overnight stay in this hotel, French Chateau
21   and people were shuttled to and from the
22   racetrack and there was, like, opportunities
23   to go out in the De Tomaso prototype and some
24   kind of vintage car each day, I recall.
25        Q.   Did you attend that event?
```



Page 39

```
 1                    E. Cygler
 2        A.    I did, yes.
 3        Q.    Did others affiliated with De
 4  Tomaso attend that event?
 5        A.    That's correct, yes.
 6        Q.    Do you recall who those people
 7  were?
 8        A.    Norman, there was Jakub, the
 9  designer, there was, I believe there was
10  Jowyn, the other designer.  I don't remember
11  if Ryan was still at the company by then to
12  be honest with you.  That's what I've been
13  trying to think in my own mind, was he even
14  there.  This was also what felt like a long
15  time ago.
16             Who else was there?  We had this
17  agency supporting us there.  We had a
18  supplier there or the vendor, Robertino Wild
19  of Capricorn was there.  We had a decent
20  amount of our customers there.
21             Yeah, that's -- and I believe --
22  this gentleman, Hugo, he was there as well,
23  the test driver.
24        Q.    Did Mr. Berris help to plan this
25  event?
```



Page 40

E. Cygler

1    A.    We were solicited on the event to
2    make a financial contribution and he did help
3    in my understanding, in planning the event.
4    Q.    Did you communicate with Mr. Berris
5    about planning this event?
6    A.    Yes, I did.
7    Q.    Do you recall if this event
8    occurred in the timeframe after Mr. Berris'
9    departure?
10    MS. WIGGER:    Object to form.
11    A.    As I mentioned before, I tried
12    thinking about whether Ryan was there or not,
13    so that question just confirmed to me that he
14    wasn't.
15
16    I would say I remember the event
17    being very lavish and very, like, very nice,
18    which we had made a financial contribution to
19    it because we were asked to and thought it
20    would be something special for the customers,
21    but I remember it being like a little bit
22    hard to get people to confirm to come just
23    due to, like, time, expense, and then we went
24    to Germany after this experience.
25    Q.    Do you recall anyone discussing Mr.



Page 41

1                    E. Cygler
2    Berris at that event?
3        A.    I do not recall that.
4        Q.    You mentioned Stanley Cohen earlier
5    in your testimony.
6            Could you tell me a bit more about
7    who he is and how you know him?
8            MS. WIGGER:  Object to form.
9        A.    Sure.  Stanley lived in Avon,
10   Connecticut, he is a long-term customer,
11   probably the longest term customer of Miller
12   Motorcars.  He just passed six months ago or
13   whatever it was.  A lawyer, a bit of a firm
14   guy, a bit of a character.  Someone who had
15   been working with, or I should say, as a
16   customer to Miller Motorcars probably since,
17   like, literally day one.
18           He was like a top Ferrari client of
19   our store.  I had sold him a Pagani.  We had
20   sold him some McLarens.  He was the kind of
21   the client who was also kind of like someone
22   you can have a personal, like warm
23   relationship with in the sense of questions
24   about you or anything of that sort.
25       Q.    Would you say Mr. Cohen was



Page 42

```
 1                    E. Cygler
 2   influential in this community?
 3              MS. WIGGER:  Object to form.
 4        A.   He was a charitable person.  He was
 5   well-known in the Hartford area for Ferrari
 6   Club as being like a Ferrari fanatic.
 7              People knew Stanley.  He was
 8   definitely well-known or well-liked among
 9   many.
10        Q.   Did Mr. Cohen order any Apollo
11   vehicles?
12        A.   Say that again.
13        Q.   Did Mr. Cohen order any Apollo
14   vehicles?
15        A.   Yes, he did, he was a depositor.
16        Q.   How about De Tomaso vehicles?
17        A.   He was a De Tomaso P72 depositor.
18        Q.   How often would you communicate
19   with Mr. Cohen?
20        A.   On this specific project on De
21   Tomaso or just in general?
22        Q.   In general.
23        A.   Could be every few weeks, it could
24   be every couple of months.  Whether I would
25   communicate to all emails.  This is a man
```



Page 43

```
 1                    E. Cygler
 2   who, in life, he cc's you on every email,
 3   like, so, but he was becoming, year after
 4   year, becoming very impatient on the project,
 5   constantly like, what is happening, you know,
 6   kind of getting scared, what is happening, is
 7   my money safe?
 8            Even being vocal to our ownership,
 9   like what's going on here?  Am I going to see
10   this car before I die kind of situation.  I
11   think that's kind of the gist of it.
12       Q.   Did Mr. Cohen know Mr. Berris?
13            MS. WIGGER:  Object to form.
14       A.   Yeah, throughout my time at De
15   Tomaso, they had a relationship.  Ryan had
16   made me aware they had known each other or he
17   had known Stanley for many years leading up
18   to De Tomaso.
19       Q.   Prior to Mr. Berris' departure from
20   De Tomaso, would you say Mr. Berris had a
21   good relationship with Mr. Cohen?
22            MS. WIGGER:  Object to form.
23       A.   After to?
24       Q.   Prior to.
25       A.   I think it was very healthy.  He
```



Page 44

```
 1                      E. Cygler
 2   had a good relationship with pretty much
 3   everyone.
 4        Q.   Was that relationship altered after
 5   Mr. Berris' departure?
 6             MS. WIGGER:  Object to form, calls
 7        for speculation.
 8        A.   I think after the departure, the
 9   communication probably stopped.  If he wasn't
10   officially through the company, whether they
11   had dealings or communications after the
12   fact, I am not aware of that.
13        Q.   I'm going to be showing you an
14   email we will be marking this as an exhibit.
15             MS. WALDO:  We are on Cygler 4.
16             (Cygler Exhibit 4, email from
17        Stanley Cohen to Norman Choi and others,
18        marked for identification.)
19        Q.   You are welcome to read as much of
20   it as you want, but I will be drawing your
21   attention to specific portions.
22        A.   You can just tell me what page you
23   want me to look at and I will dive right in.
24        Q.   Do you recognize this document?
25        A.   This document?  I don't think I'm
```



Page 45

1                    E. Cygler
2  on any of this.  I guess I am, yeah.
3      Q.   It looks like this is an email from
4  Stanley Cohen to Norman Choi and there are a
5  few people cc'd and you are one of the people
6  cc'd.
7      A.   Yeah, like I mentioned before, he
8  would put me on so many emails.  Obviously,
9  I'm on this.  I do -- I don't know if I read
10 everything.  It sounds like everything was
11 kind of under control as far as all these
12 other people, but I'm on it.
13     Q.   Can you tell me who these other
14 people are who are cc'd on this email?
15     A.   Colby Paul is Stanley's grandson;
16 Max Silverman is Stanley's grandson, and that
17 should be about it.
18     Q.   The date on this document is
19 approximately a week after Mr. Berris'
20 departure from De Tomaso, is that correct?
21          MS. WIGGER:  Object to form and
22     foundation.
23     A.   I don't recall the dates of his
24 departure.
25     Q.   If you could please flip to the



Page 46

1                    E. Cygler
2    page ending in Bates 305.
3         A.   Okay.
4         Q.   I'm going to read some portions to
5    you aloud.  Stanley Cohen says, Ryan, How are
6    you doing, to start off his email.  He says
7    some other things and then Norman Choi
8    responds, Dear Stanley, Thank you for the
9    email.  Would it be all right if I give you a
10   call in 30 minutes, Norman, and Norman
11   attaches some photos of the car.
12              And then we have a response from
13   Norman again, Dear Stanley, It was very nice
14   talking to you on the phone and we are
15   extremely grateful for your continuous
16   support with the De Tomaso P72 program and
17   the email continues.
18              And then we have the response from
19   Stanley Cohen, Dear Norman, Thank you for
20   your telephone call, your email and the
21   beautiful photos.  I am deeply honored to
22   receive your call.
23              Do you recall if you participated
24   in this phone call?
25        A.   No, I did not.



Page 47

1                    E. Cygler

2       Q.    Did you ever learn what happened

3   during this phone call?

4            MS. WIGGER:  Object to form.

5       A.    I was not privy to that phone call.

6       Q.    Do you know why Mr. Cohen cc'd you

7   on this email chain?

8            MS. WIGGER:  Object to form.

9       A.    Like I said, I mean, one, I'm

10  involved in the brand; two, Stanley Cohen

11  would cc you on everything.  If there was an

12  article about -- just like a funny article,

13  he would just put you on it and like 20 other

14  people, so eventually I got to a point where

15  I didn't really even want to see all these

16  emails, but was I on all these emails or that

17  was -- like -- I know I'm on the first page,

18  but is this like one long chain.

19      Q.    It's a long email chain?

20      A.    It's a long email chain.  I don't

21  recall looking through all this, this is like

22  a lot.

23      Q.    That's fine.  I will be showing you

24  another document.  This one is shorter.

25           MS. WALDO:  This one is Exhibit 5.



Page 48

```
 1                    E. Cygler
 2            (Cygler Exhibit 5, email sent from
 3       Stanley Cohen to others, marked for
 4       identification.)
 5       Q.   Do you recognize this document?
 6       A.   I do not, but I'm on it and that's
 7  very Stanley.
 8       Q.   It looks like it's an email sent
 9  from Stanley Cohen to a few individuals,
10  including Norman Choi and yourself.
11            Could you tell me who are the other
12  people on this email?
13       A.   Richard Koppelman is the president
14  of Miller Motorcars; Bailey is the general
15  manager of Miller Motorcars; Norman Choi and
16  myself on there as well and sharing this PR
17  newswire article.
18       Q.   What does Mr. Cohen say in this
19  email?
20            MS. WIGGER:  Object to form.  We
21       can stipulate the document says what it
22       says.
23       A.   With a schmuck like Ryan, there is
24  no doubt that Norman will prevail.
25            I don't know if you know what
```



Page 49

1                        E. Cygler

2    schmuck means.  It's a Yiddish word,

3    whatever.  Anyways, it's what it says.

4        Q.    Do you know what Mr. Cohen meant by

5    that?

6              MS. WIGGER:  Object to form,

7        speculation.

8        A.    How do I say this, what is a

9    schmuck?

10             MR. SELTZER:  I'm not allowed to

11       help you.

12       A.    It's a Yiddish word.  It's not a

13   nice thing.

14       Q.    Would Mr. Cohen say things like

15   this about Mr. Berris to you on other

16   occasions?

17             MS. WIGGER:  Object to form.

18       A.    Not that I recall.

19       Q.    Do you recall Mr. Cohen criticizing

20   Mr. Berris to other individuals?

21             MS. WIGGER:  Object to form.

22       A.    He didn't have, amongst his friend

23   group, didn't really -- you have this guy,

24   Stanley Cohen, up in the Hartford area.

25   There is like a contingency of people who are



Page 50

                        E. Cygler
1
2   in this, like, family-oriented group of
3   people who are depositors.  He was the only
4   one in that whole, like, area getting one.
5            To share that with others, it was
6   -- keep in mind, the guy was a lawyer, he was
7   kind of confidential about his personal
8   business and things like this.  Probably keep
9   most of these kinds of communications to
10  people like us and/or himself and not
11  something he would let go running around
12  speaking about the brand.
13           Even up until his death, he was an
14  active depositor, he still believed in the
15  project, but that's the basis of it.
16      Q.   So you are not sure if he was
17  widely circulating these kind of things?
18      A.   No, I don't think he would have any
19  motive to do that.  He wasn't upset in the
20  sense of I'm cancelling my order, he
21  continued the process.
22      Q.   I'm going to be showing you another
23  document.
24           MS. WALDO:  This will be Cygler
25      Exhibit 6.



Page 51

                    E. Cygler

1                   E. Cygler
2                   (Cygler Exhibit 6, email chain,
3          marked for identification.)
4          Q.    This one is a bit longer, but it's
5     just the first two pages I will be asking you
6     about.
7          A.    What's the question?
8          Q.    Do you know who the people cc'd on
9     this email are?  Big Head Dennis is the email
10    address.
11         A.    Yeah.  My first point to myself was
12    I actually don't know who Big Head Dennis is
13    or knew who Dennis Lui was or Lui, I don't
14    recall that.  He had, like, randomly put me
15    on an email to this guy and I don't recall
16    responding to it because I saw nothing to --
17    I saw no reason to respond because I didn't
18    know who he was or even wanted to get
19    involved.
20         Q.    I will read you a few select
21    portions of it.
22         A.    Where I am?
23         Q.    Starting on Bates 816.
24               So Dennis writes on October 3,
25    2023, I presume you were introduced to this



Page 52

                        E. Cygler

1                    E. Cygler
2    through Ryan Berris.  You are aware of the
3    lawsuit, he then gives a link.  We have a
4    response from Stanley Cohen who says, among
5    other things, The Berris lawsuit is a pack of
6    lies and being defended strenuously by De
7    Tomaso.  Berris pulled the same shit at his
8    prior similar employment.  Berris screwed up
9    and lost a great opportunity and is seeking
10   vengeance against De Tomaso?
11           Dennis then replies, Berris had a
12   falling out with Glickenhaus, fascinating.
13   And Stanley Cohen then responds, Glickenhaus
14   fired Berris.  Lawsuit between Berris and De
15   Tomaso will disclose that Berris is in the
16   wrong.
17           Do you know who the Glickenhaus is
18   that he is referring to?
19           MS. WIGGER:  Object to form.
20      A.   Jim Glickenhaus is a car builder or
21   I should say, a gentleman who is -- he is a
22   car collector and then started his own car
23   company.
24      Q.   Do you know anything about the
25   relationship between Glickenhaus and Mr.



Page 53

```
 1                    E. Cygler
 2   Berris?
 3             MS. WIGGER:  Object to form.
 4        A.    I do recall that Ryan was working
 5   for him at one point.
 6        Q.    Do you ever recall hearing anything
 7   about a falling out between the two of them?
 8             MS. WIGGER:  Object to form.
 9        A.    That, I was not aware of.
10        Q.    Do you recall Mr. Cohen circulating
11   these types of links or articles to other
12   people in your circle of acquaintances?
13             MS. WIGGER:  Object to form and
14        foundation.
15        A.    It's unclear.  As I mentioned, this
16   guy would -- sometimes he would cc you on
17   emails and, like, bladder out, certain
18   things, but it's a bit vague.
19             The man wrote a lot of emails.  You
20   already presented a few to me.  I see on the
21   last page, he had sent out an email on page
22   51818.  If this is still all in the same
23   chain, I don't know if these people are on
24   it.  This is a new email.  This is the final
25   page.
```



Page 54

1                    E. Cygler

2      Q.   Do you know any of those people?

3           MS. WIGGER:  Object to form.

4      A.    I know Richard; I know Joe Capasso;

5  I know Michael Bozzuto; Peter Lombardo;

6  vaguely Amy Paulo, I think that's Stanley's

7  daughter, I think Stanley's daughter, I know

8  them, never met them; Lou Luciani; not Shayna

9  Luciani; Roger Beit, yes.

10           He is talking to them about his

11  bladder not working, but I don't think he is

12  saying anything bad about De Tomaso.

13           He is just talking about it would

14  be nice to receive ongoing information and

15  pictures on the progress of my P72, but I

16  don't see anything other than in the circle

17  of conversation between Big Head Dennis and

18  Stanley.

19      Q.   Fair enough.  Thank you.  We can

20  move on from that one.  Unless you would like

21  to say anything more about it.

22      A.    This is communication between Big

23  Head Dennis and Stanley.

24           MS. WIGGER:  Object to form.  There

25           is no actual question pending.



Page 55

                        E. Cygler
1
2       A.    The question was -- there is no one
3    on here in De Tomaso.
4           Is there -- there is someone --
5    Norman Choi is on the last page.  I have no
6    motive or anything here.  I don't see anyone
7    from the company on the email.
8       Q.    We can move on from that one.
9       A.    I don't know how you guys even got
10   that.
11      Q.    As part of your work with Miller
12   Motorcars, were you aware of the identities
13   of the customers who were ordering vehicles
14   such as the P72?
15           MS. WIGGER:  Object to form.
16      A.    Can you repeat the question?
17      Q.    As part of your work at Miller
18   Motorcars, were you aware of the identities
19   of the customers who were ordering vehicles
20   like the P72?
21           MS. WIGGER:  Same objection.
22      A.    Yes.
23      Q.    Was it important to know customer
24   identities?
25           MS. WIGGER:  Object to form.



Page 56

1                        E. Cygler

2          A.    It was important to know who I was

3     doing business with, yes.

4          Q.    Why?

5                MS. WIGGER:  Object to form.

6          A.    One, I wanted to know who I'm doing

7     business with; two, it's important to know

8     who you are selling your product to; three,

9     when you do business with someone, you want

10    to know like who they are and what they do

11    and hopefully have an understanding if

12    they're good people.

13         Q.    How did you keep records of

14    customers?

15         A.    We kept records of customers

16    through a document that identified deposits,

17    emails, digital records to, you know,

18    probably mostly emails and Excel file to

19    record deposit 1, 2, 3, 4 and the allocation

20    slots that we had and maybe I had a prospect

21    list probably.

22         Q.    Did you ever research or

23    investigate the identities of customers who

24    placed orders?

25         A.    Yeah, if I didn't know who that



Page 57

1                E. Cygler

2  person was, I would probably Google them or

3  if I knew who the customer was because they

4  were previous customers, I would have brought

5  them into De Tomaso as depositors.  If it was

6  a new person I never heard of, I would

7  probably do some kind of general check

8  online.

9      Q.   For example, if an LLC or a

10  corporation placed an order for a P72, would

11  you investigate who was the owner of that

12  organization?

13          MS. WIGGER:  Object to form and

14      foundation.

15      A.   The actual LLC, typically, we could

16  -- until the final kind of bill out of the

17  sale, we would ask for articles of

18  organization or members of the LLC.  We never

19  really got to the final point for specific --

20  but I would probably be looking at the

21  overall pictures, the name of the person who

22  I'm dealing with.  I don't recall doing

23  business with a lot of LLCs.

24      Q.   Have you ever heard of an entity

25  called Pachmar?



Page 58

```
 1                    E. Cygler
 2        A.    No.
 3        Q.    So you wouldn't recall if Pachmar
 4   placed any orders for vehicles?
 5              MS. WIGGER:  Object to form.
 6        A.    Can you spell it?
 7        Q.    P-A-C-H-M-A-R?
 8        A.    I don't recall.
 9        Q.    You don't recall Norman Choi ever
10   speaking to you about Pachmar?
11              MS. WIGGER:  Object to form, asked
12        and answered.
13        A.    It's not coming to me.
14        Q.    Do you recall in 2020 how many P72s
15   were allocated to Miller Motorcars?
16        A.    The initial number that we were
17   given was 36 cars.
18        Q.    Did that number subsequently
19   change?
20        A.    The number has pretty much always
21   stayed the same, there was conversations of
22   us getting more cars.  There was some
23   conversation of some cars getting removed if
24   they weren't fulfilled, it's a bit vague,
25   whether any of it actually happened is a bit
```


MAGNA
LEGAL SERVICES

Page 59

                    E. Cygler
1
2   unclear.
3       Q.    Do you recall anything about the
4   allocation increasing to 48 vehicles in 2022?
5           MS. WIGGER:  Object to form.
6       A.    Forty-eight is the number.  No, I
7   do not.
8       Q.    In your general conversations with
9   De Tomaso about the vehicle allocations, what
10  would have been the reason for a higher
11  allocation of vehicles?
12          MS. WIGGER:  Object to form.
13      A.    If we were to get a higher
14  allocation, it was based on demand.
15      Q.    Were customers required to make
16  deposits when ordering a P72?
17      A.    Yes.
18      Q.    Who held those deposits?
19      A.    Those deposits were sent to Miller
20  Motorcars and then the funds were then sent
21  to De Tomaso.
22      Q.    Were there any specific
23  restrictions on how customer deposits could
24  be stored or used?
25          MS. WIGGER:  Object to form.



Page 60

```
 1                    E. Cygler
 2       A.   Could you clarify that question a
 3  little deeper.
 4       Q.   Sure.  Were there set custodians
 5  for the deposits, set procedures for
 6  safeguarding the deposits?
 7            MS. WIGGER:  Object to form.
 8       A.   Funds were sent to Miller
 9  Motorcars.  They were held with us until a
10  certain point and then I was asked by Ryan to
11  send them to a bank account that was De
12  Tomaso's bank account, but those cars were
13  earmarked per, like, a list.
14       Q.   Are you aware if Mr. Choi ever took
15  customer deposits from Miller Motorcars and
16  then used them to repay himself for loans he
17  issued to De Tomaso?
18            MS. WIGGER:  Object to form,
19       foundation, speculation.
20            You can answer if you know.
21            THE WITNESS:  Eric.
22            MR. SELTZER:  Could you repeat the
23       question please?
24       Q.   Are you aware if Mr. Choi ever took
25  customer deposits Miller Motorcars and then
```



Page 61

1                      E. Cygler
2    used him to repay himself for loans issue
3    today De Tomaso?
4              MS. WIGGER:  Same objections.
5         A.   I am not aware of that.
6         Q.   That's fine.
7              To your knowledge, is De Tomaso a
8    financially stable company?
9              MS. WIGGER:  Object to form and
10             foundation.
11             MR. SELTZER:  Objection.
12        A.   From my understanding, it is.
13        Q.   What, if anything, did Mr. Choi
14   communicate to you about De Tomaso's
15   financial status?
16             MS. WIGGER:  Object to form.
17        A.   That the company was self-funded
18   and all bills were, like, up to par, that's
19   what we were told.
20        Q.   Are you aware that prior to
21   delivering a new vehicle to a customer, there
22   are certain preproduction regulatory
23   standards that new vehicles must meet?
24             MS. WIGGER:  Object to form and
25             foundation.



Page 62

                        E. Cygler

1

2       A.    That a car has to have a regulatory

3    standard?

4       Q.    Yeah.   For example, EPA emission

5    standards.

6       A.    Yes, absolutely, yes.

7       Q.    Are you aware that under such

8    regulations, new vehicles have to undergo a

9    certain amount of testing in order to be

10   emission compliant, for example?

11           MS. WIGGER:   Object to form,

12        foundation, legal conclusions.

13      Q.    Are you aware that this testing can

14   sometimes take many months?

15           MS. WIGGER:   Object to form and

16        foundation.

17      A.    Yes.

18      Q.    Is it your understanding that De

19   Tomaso is conducting or will be conducting

20   such required emission testing on the P72?

21           MS. WIGGER:   Object to form.

22      A.    Yes.

23      Q.    How did you come to believe that?

24      A.    We were informed that Roush was, by

25   contract, in charge of doing emissions



Page 63

                    E. Cygler
 1
 2   testing, but the car's been characterized
 3   under the law of show and display through
 4   NHTSA and part of the process is emissions
 5   testing.  It's a standard protocol for a show
 6   display vehicle.
 7        Q.    You stated that Roush was in charge
 8   of this.  Who informed you of this?
 9        A.    Norman.
10        Q.    So Norman represented to you that
11   everything was okay with the emissions
12   testing process?
13             MS. WIGGER:  Object to form,
14        mischaracterizes testimony.
15        A.    It was my understanding that Norman
16   had Roush in charge of the responsibility of
17   emissions testing.  That's their
18   responsibility.
19        Q.    Are you aware that De Tomaso
20   purchased a corporate vehicle from Miller
21   Motorcars, specifically a Mercedes G Wagon?
22             MS. WIGGER:  Object to form and
23        foundation.
24        A.    A Mercedes G Wagon was purchased
25   but I don't believe through Miller Motorcars.



Page 64

```
 1                    E. Cygler
 2   It was purchased through a separate company.
 3        Q.    Did Miller ever store that vehicle
 4   for De Tomaso?
 5             MS. WIGGER:  Object to form.
 6        A.    Yes.
 7        Q.    Do you know who was the primary
 8   driver of that vehicle?
 9             MS. WIGGER:  Object to form.
10        A.    Norman.
11        Q.    Did you ever see Mr. Berris driving
12   that vehicle?
13        A.    Not that I recall.
14        Q.    Are you aware that title to that
15   vehicle is in Mr. Berris' name?
16             MS. WIGGER:  Object to form and
17        foundation.
18        A.    I have not seen the title before.
19   We didn't officially sell the car to them.
20        Q.    Are you aware that Mr. Berris is
21   receiving all the tax bills associated with
22   that car?
23             MS. WIGGER:  Object to form and
24        foundation.
25        A.    I'm not aware.  We were also
```



Page 65

                    E. Cygler
1
2    storing Mr. Berris' car after his departure
3    from the company, for many months as well,
4    that was unpaid.
5        Q.    You mentioned earlier Capricorn
6    Group?
7        A.    Yes.
8        Q.    Could you state again your
9    familiarity with that company?
10            MS. WIGGER:  Object to form.
11        A.    Capricorn, we were told was going
12    to be the new appointed company to
13    manufacture the De Tomaso P72.
14        Q.    Did Norman Choi ever speak to you
15    about how De Tomaso came to work with
16    Capricorn?
17        A.    How the relationship came about, I
18    don't recall, I was not informed.
19        Q.    Do you remember Norman Choi
20    speaking about Capricorn generally?
21        A.    Yes.
22        Q.    Did he seem enthusiastic about
23    working with Capricorn?
24            MS. WIGGER:  Object to form.
25        A.    There was enthusiasm.



Page 66

                        E. Cygler

1

2       Q.    Was it your impression it was Mr.

3   Choi's idea to work with Capricorn?

4            MS. WIGGER:  Object to form.

5       A.    That, I don't recall.

6       Q.    What was your impression of the

7   quality of work being performed by Capricorn?

8            MS. WIGGER:  Object to form and

9       foundation.

10       A.    There wasn't really much work from

11   what I recall.  The only thing I had seen

12   naturally was some kind of resin model of a

13   race car on display at the factory, but as

14   far as, like, a substantial car, anything of

15   that sort, I have never actually physically

16   seen anything.

17       Q.    Did it seem like Mr. Choi had a

18   change of opinion about Capricorn?

19            MS. WIGGER:  Object to form and

20       foundation.

21       A.    Change of opinion due to no

22   progress.  After there was no progress, then

23   Norman had stopped doing business with

24   Capricorn and that's when -- yeah, things

25   probably got complicated.



Page 67

```
 1                    E. Cygler
 2        Q.   I would like to ask you a bit more
 3   about the dealership agreement between De
 4   Tomaso and Miller Motorcars.
 5             Under that agreement, was Miller
 6   Motorcars the exclusive dealer for De Tomaso
 7   vehicles in North America?
 8             MS. WIGGER:  Object to form.
 9        A.   We did come to a principle
10   agreement that we would be the exclusive
11   dealer.  Since the cars were not legally
12   allowed to be sold to Canada and Mexico, we
13   were always just -- still our understanding,
14   it's a U.S. only because that's where the law
15   applies for for the vehicle.
16        Q.   Under that agreement, would De
17   Tomaso be permitted to sell P72s directly to
18   customers in North America without using
19   Miller Motorcars?
20             MS. WIGGER:  Object to form.
21        A.   For the show and display program,
22   it has to be a direct sale.
23        Q.   A direct sale via Miller Motorcars.
24             MS. WIGGER:  Object to form.
25        A.   It has to be a direct sale between
```



Page 68

```
 1                    E. Cygler
 2   De Tomaso and the customer.  And then Miller
 3   Motorcars receives a commission for
 4   management or assisting.
 5           It's the same concept like Aston
 6   Martin, they have a car being made called the
 7   Valkyrie.
 8           So the paperwork is done between
 9   manufacturer and customer and then dealership
10   receives commission after delivery.
11      Q.   So based on your understanding,
12   would it violate that contract if De Tomaso
13   were to by pass Miller Motorcars entirely and
14   transact with the customer directly?
15           MS. WIGGER:  Object to form, legal
16       conclusions.
17      A.   That is the agreement.  The
18   agreement was -- I don't think that breaks
19   the rule.
20           At the time of delivery, cars will
21   be on invoice between De Tomaso, Germany to
22   John Smith, New York, New York.  If there are
23   separate dealings happening outside, would
24   that violate the agreement?  It would be a
25   get star or formal agreement.
```



Page 69

                         E. Cygler
1
2       Q.    To your knowledge, has there ever
3    been a dispute about this provision of the
4    agreement between De Tomaso and Miller
5    Motorcars?
6            MS. WIGGER:  Object to form.
7       A.    Not that I recall.  It's been
8    pretty cordial.
9            MS. WALDO:  That is everything I
10        have for you.
11           THE WITNESS:  Okay.
12           MS. WIGGER:  I have a couple of
13        questions.  If we take 10 minutes.  I
14        will have fewer questions, so why don't
15        we -- let's take 15, let's come back at
16        noon and I think I will be able to wrap
17        this up pretty quickly.
18           THE VIDEOGRAPHER:  It's 11:43 a.m.
19        and we are going off the record.
20           (Recess.)
21           THE VIDEOGRAPHER:  The time is
22        12:03 p.m.  We are back on the record.
23   EXAMINATION BY
24   MS. WIGGER:
25        Q.    Do you say your name Cygler or



Page 70

```
 1                    E. Cygler
 2  Cygler?
 3       A.   Cygler.
 4       Q.   Well, good morning again, Mr.
 5  Cygler, and thank you for coming here today.
 6  I just have a few questions for you today and
 7  I will ask you about a couple of documents.
 8            I know that these events took place
 9  a long time ago, so I don't want you to
10  speculate.  If you don't know the answer to
11  one of my questions, just tell me and that is
12  a perfectly sufficient answer.
13            Can you tell me when the last time
14  you spoke to Ryan Berris was?
15       A.   I don't really have any
16  recollection.  Based on the documents that I
17  saw today, it seemed to be in 2022.
18       Q.   So safe to say it's been a year or
19  more?
20       A.   Correct.
21       Q.   You mentioned working for Apollo
22  earlier.
23            Do you remember that?
24       A.   Yes.
25       Q.   When you were working for Apollo,
```



Page 71

1                     E. Cygler
2    your main contact was Ryan, right?
3         A.    Correct.
4         Q.    As opposed to Norman, right?
5         A.    Correct.
6         Q.    Then you also said that there was a
7    time when you worked for De Tomaso as well,
8    right?
9         A.    Correct.
10        Q.    And at De Tomaso, your main contact
11   was also Ryan, correct?
12        A.    Correct.
13        Q.    You did have some conversations
14   with Norman though, right?
15        A.    Correct.
16        Q.    Earlier my colleague asked what you
17   your impression of Ryan was.
18              Do you remember that?
19        A.    Yes.
20        Q.    One of the words you used to
21   describe him was mysterious, right?
22              MS. WALDO:  Object to form.
23        A.    Yes.
24        Q.    You found Ryan shady, right?
25              MS. WALDO:  Object to form.



Page 72

                        E. Cygler
1
2      A.   I used the word mysterious because
3  there were a lot of things I didn't really
4  understand or really couldn't really get to
5  know him, but there were some things that I
6  was -- being that he left the room, now I
7  could speak a little more openly.
8            There were things -- I was asked to
9  open up, like, private LLCs under my own
10 name, on the side of our business, to find
11 some legal way to do things like register a
12 vehicle for Apollo in that sense.
13     Q.   You found those things shady?
14           MS. WALDO:  Object to form.
15     A.   I did not find them to be above
16 board.
17     Q.   Did you think that Ryan was always
18 telling you the truth?
19           MS. WALDO:  Object to form.
20     A.   No, I did not.
21     Q.   So there were times when you
22 thought Ryan wasn't being open and honest
23 with you, right?
24           MS. WALDO:  Object to form.
25     A.   Yeah, no.  I do note that he --



Page 73

1                    E. Cygler

2  things I was being told, I did not truthfully

3  believe were always correct.

4      Q.   Why do you say that?

5      A.   I will give you a couple of

6  examples.  We were expected to go to the

7  White House and there was this campaign that

8  Ryan had formed, it was called like the

9  Automotive Renaissance.

10          There was even like posters he had

11  made of all these artists like showing people

12  in America working and the concept was to

13  bring American manufacturing back to America

14  on like a high level which sounded a bit --

15  it sounded very patriotic and interesting and

16  we were actually supposed to go to the White

17  House and we kept getting rebooked.

18          He was, like, Evan, this is going

19  to be the week we are going to go to the

20  White House, like we are going to go to

21  Washington.  I was like, this is crazy, this

22  is pretty out there, but like, I have to be

23  respectful, like this is what he is telling

24  us we are about to do and we are going to

25  meet, I guess the president, you know, to,



Page 74

```
 1                    E. Cygler
 2    like, talk to him about building this project
 3    in Detroit.
 4            It sounded like there were some
 5    kind of grants or something to be produced to
 6    build the De Tomaso P72 in America.  The P72
 7    which is the model of De Tomaso in America,
 8    so, you know, that was kind of like a fair
 9    example.
10        Q.   I want to talk actually a little
11    bit more about that Automotive Renaissance
12    and White House dealing, let's say.
13            So there came a time when De Tomaso
14    was going to move its production from Europe
15    to the United States, right?
16        A.   Europe to the United States,
17    correct.  That's where Roush -- Roush was
18    going to be the manufacturing arm.  We even
19    went there, correct.
20        Q.   You did not support that move,
21    right?
22            MS. WALDO:  Object to form.
23        A.   We were happy to hear it was being
24    built where it's being built and then we were
25    told it was being built in America and then
```



Page 75

                              E. Cygler
1
2    it went from America to being built in
3    Germany and then from Germany back to the
4    same person we went to initially from the
5    very beginning, so we went from here, there,
6    there, there, there.
7         Q.   And then back into the same spot,
8    right?
9         A.   Correct.  I will be there hopefully
10   to see some progress next month.
11        Q.   So it would be safe to say that
12   Miller Motorcars was concerned about moving
13   the production to the United States, right?
14             MS. WALDO:  Object to form.
15        A.   I don't want to say that we were
16   concerned.  I don't think that was -- we were
17   following, at that point, the guidance of the
18   manufacturer to what they believed was most
19   effective for the future of the product.
20             At this point, I don't think we
21   really had much say.  It was just like this
22   is what is happening and follow along.
23        Q.   Now, your bosses at Miller
24   Motorcars are two men named Richard and
25   Bailey, right?



Page 76

```
 1                    E. Cygler
 2        A.    Correct.
 3        Q.    Did they both voice concerns about
 4   moving the production to the United States?
 5        A.    Not that I recall.
 6        Q.    Were you concerned that bringing
 7   production to the United States would devalue
 8   the brand?
 9             MS. WALDO:  Object to form.
10        A.    We did have conversations initially
11   when we sat down to talk about the product,
12   that it's actually very rare to see like a
13   high luxury American car manufacturer build
14   cars in the United States.
15             Typically, it hasn't really
16   happened at this high level, mainly because
17   of like the cache, like it's American.  If
18   it's like Italian or French or if it's
19   German, it sounds more like more like high
20   touch, high luxury.  So there was this idea
21   to bring it to America, build it at Roush.
22             We went there, it wasn't very -- it
23   wasn't something very fancy.  They're an
24   engineering firm.  It was okay, it was okay.
25             I mean, I can't judge whether Roush
```



Page 77

1                    E. Cygler

2  is qualified or not qualified, but we had the

3  understanding that this could be like not

4  what we initially signed up for, but then to

5  enhance the connotation that, like, it's a

6  great product, eventually this campaign would

7  come out, the AARP or whatever it was,

8  something of this context.

9       Q.   That was a campaign that Ryan was

10  driving, right?

11       A.   Correct.  There was even a livery

12  on one of the P72s for it.  There was a

13  four-poster set that was being printed that

14  we had rolled up in poster tubes and gifted

15  to customers.

16            I guess we were being told by Ryan

17  that there was basically some lobbying

18  happening.  Whether that was true or not, I

19  don't know.

20       Q.   Those posters were created by Ryan

21  as well, right?

22       A.   Correct, yeah.  He had worked with

23  like a digital design artist to create this

24  imagery and graphics of, like, people in

25  overalls, like, working over, like, metalwork



Page 78

```
 1                    E. Cygler
 2  and it was, like, artisans, American
 3  artisans.
 4      Q.   You said earlier that De Tomaso
 5  ended up having to move its production back
 6  to Europe?
 7      A.   It was moved to Capricorn.
 8      Q.   And then that left Miller Motor
 9  Cars in the position of explaining to
10  customers why production was moving from
11  Europe to the United States and back to
12  Europe, right?
13           MS. WALDO:  Object to form.
14      A.   Yes.  We were selling the customers
15  on the new updated plan that this was
16  actually done for the better because, from my
17  understanding, Ryan said they weren't able to
18  -- Roush was not giving or delivering or had
19  the experience of, like, really building what
20  they were looking for, meaning, like, they
21  don't know how to do carbon fiber work.
22           They weren't really able to deliver
23  on all the high quality production level
24  skill set that they were needing or wanted.
25  So that's where we departed to Capricorn and
```



Page 79

```
 1                E. Cygler
 2  the rest goes on from there.
 3      Q.   And, again, that was Ryan
 4  communicating to you about Roush, right?
 5           MS. WALDO:  Object to form.
 6      A.   Correct.
 7      Q.   Now, as part of this Automotive
 8  Renaissance campaign, Ryan also told you that
 9  you would be visiting the White House, like
10  you mentioned earlier, right?
11      A.   Correct.
12      Q.   He told you he was going to set up
13  a meeting at the White House, right?
14           MS. WALDO:  Object to form.
15      A.   Correct.  We were going there for,
16  like, a day trip to Washington.
17      Q.   To display the P72?
18      A.   Correct.  We were supposed to have
19  our trucks ready.  We were supposed to take
20  the cars there, yeah.
21      Q.   He would tell you this was
22  happening and then cancel and then tell you
23  it was happening again and then cancel,
24  right?
25           MS. WALDO:  Object to form.
```



Page 80

                    E. Cygler

1

2        A.    Apparently there were some

3   scheduling issues and, you know, if something

4   happened in the world, it was like, it's off

5   for now, but it's going to happen.

6        Q.    You found that to be frustrating,

7   didn't you?

8              MS. WALDO:   Objection.

9        A.    I found that to be -- I found it to

10  be -- I will use a better word.   It sounded

11  like BS to be honest with you.

12              Am I allowed to say something else?

13  I think it's worth noting.   There was a press

14  event that was supposed to take place in New

15  York City.   They rented out Cipriani Downtown

16  on Wall Street which is a really beautiful

17  venue and they did a press event on the night

18  of Yom Kippur.   I'm Jewish, Yom Kippur is the

19  holiest holiday of the year.   It was, like,

20  so bizarre.   I was, like, can we not do it on

21  Yom Kippur?

22              Well, that's the only date that the

23  venue was available and apparently they got

24  like a great deal on it, so they put this car

25  in Cipriani Downtown, they lit it up with all



Page 81

1                    E. Cygler

2   these De Tomaso logos.  I don't really

3   honestly know if anyone actually physically

4   went, but it was a very bizarre and

5   frustrating situation.

6            I felt; one, very disrespected;

7   two, I've been working on this project for a

8   few years.  You are going to do something in

9   our own city, can we do it on any other day?

10  No, it has to be this day, this it is the day

11  we are doing it.

12           I think we had to hire trucks and

13  all this stuff.  It's such a last-minute

14  moment of time to deliver these kind of like

15  demands and it happened multiple times.

16           Every time a car had to be moved,

17  they had to fly someone in to move it from

18  this parking spot to this, like, truck.  We

19  have prototypes that get shipped in that are

20  worth many millions more and it was just

21  like, it was -- it had to be like 10:00 a.m.,

22  a very specific moment of time.

23           It became kind of strange, to be

24  honest with you, and definitely frustrating

25  where there were heavy demands put in place.



Page 82

                        E. Cygler

1
2          And I even told Bailey multiple
3    times, something doesn't feel right here.  He
4    is, like, getting underneath my fingernails
5    here.  I think this is, like, kind of
6    unnecessary, you know, and then time kind of
7    just kept rolling on with all these little
8    things.
9          Eventually, I was just really
10   frustrated.  I don't feel like I'm getting
11   any truth here, you know.
12        Q.   He was Ryan, right?
13        A.   Yes, Ryan.
14        Q.   So Ryan was the one planning the
15   Cipriani event, right?
16        A.   Correct.  It was his organization,
17   it was his doing.
18        Q.   He held himself out as of CEO of De
19   Tomaso, right?
20             MS. WALDO:  Object to form.
21        A.   Him being like the marketing guy,
22   the events guy.  It was his doing to, like,
23   do that and Norman entrusted him to do those
24   things.
25        Q.   The problem of doing things like



Page 83

                    E. Cygler
1
2    saying you are going to go to the White House
3    and cancelling or the Cipriani event you just
4    described, it hurts the credibility of the
5    company too, right?
6              MS. WALDO:  Object to form.
7         A.   I would say it certainly raised
8    some red flags about what was really
9    happening.  It didn't really feel by any
10   means, normal.  It was definitely a lot of,
11   like, question marks, like, why are we doing
12   this shoot and why were all these, like, you
13   know, Carmen Jordá, I never really met her,
14   but there was this massive campaign.
15             The car was supposed to be
16   called -- there was a name for it, like, Lucy
17   Belle or something that Norman had -- excuse
18   me, that Ryan had put together this campaign
19   about this, like, reliving this name of the
20   car.  It was Alejandro De Tomaso's daughter I
21   believe.
22             There was a lot of explicit types
23   of themes put together to display this kind
24   of magical, like, woman coming back from the
25   dead and I think it was Carmen Jordá and she



Page 84

                    E. Cygler
1    is, like, an attractive woman.  I never heard
2    of her, but she was apparently or based on
3    what I read on her Instagram, she was, like,
4    a Formula One test driver and that's -- it
5    was, like, another question mark, like, who
6    is this person?  It sounded like it was very
7    explicit, like this is our ambassador and I
8    don't know, if felt like a bit strange.
9    Q.    Did you understand Ryan to be
10   coordinating the whole Carmen Jordá
11   situation?
12   MS. WALDO:  Object to form.
13   A.    From my understanding, it was his
14   thing.  He was in charge of, like, selecting
15   personalities like that or I think even from
16   my understanding, I don't know if it was him
17   who even hired Hugo.  It was his job to put
18   these things together.
19   Q.    We got to talking about the White
20   House and the Automotive Renaissance campaign
21   by talking about untruthful statements.
22   Were there any other untruthful
23   statements from Ryan that you remember?
24   A.    Whether they were truthful or not



E. Cygler

1
2    truthful, the selling facts of, like, the
3    manual gearbox, like we are going to own all
4    of -- what do they call it, RP or something,
5    like, your designs, we are doing everything,
6    we are going to own everything.
7            The designers of the gearbox or the
8    former designers of the '05, '06 of the Ford
9    GT from 2005 to 2006, so, I mean, when you
10   hear these kind of things, you are, like,
11   this is kind of amazing.  These guys built
12   one of the best gearboxes ever.
13           So I didn't really know.  You just
14   have to believe it, you know, at some point
15   and that's what we told people.  We told them
16   things based on engineering.  I didn't really
17   get a lot of photos for a lot of things.
18   Everything was just, like, so, like...
19           I would tell Bailey, who I work
20   with, he is our general manager, I'm hearing
21   all these things, but like, I'm not seeing
22   any pictures, hey, can you send a picture, we
23   are your partners, we are here with you, you
24   know, we are on your team.  We don't want to
25   discuss it.  We are not ready to share it.



Page 86

```
 1                    E. Cygler
 2           The mantra from Ryan was, like, we
 3    only talk when we are ready to speak and
 4    things are, like, very in place.  It almost
 5    felt like we were being withheld from, like,
 6    certain processes or kind of things where we
 7    stood on the project.
 8       Q.   Those communications, again, were
 9    coming from Ryan, right?
10           MS. WALDO:  Object to form.
11       A.   Correct.  Ryan was our lead, mostly
12    Ryan was mostly talking in a lot of
13    situations.  Norman kind of somewhat being
14    the more silent figure.  You can tell that
15    Ryan wanted to talk.
16       Q.   You felt like Ryan was telling you
17    things that were maybe too incredible to
18    actually be true or fantastical?
19       A.   Yeah --
20           MS. WALDO:  Object to form.
21       A.   Whether it's true or not, I don't
22    know whether it's factual or not, but we were
23    told that Ryan was a partner in the business,
24    that he had a vested ownership in De Tomaso.
25    I don't know if that's true or not, whether
```



MAGNA
LEGAL SERVICES

Page 87

1                          E. Cygler

2    he had sweat equity.  He had invested

3    personal money into the business, that's what

4    it sounded like.

5                I don't know if I will know that

6    ever or not, but that's maybe private

7    business between the two parties.

8         Q.    That's something Ryan told you?

9         A.    Correct.

10               MS. WALDO:  Object to form.

11        A.    Yeah, he would refer to Norman as

12   my partner, we are partners, not being I work

13   for Norman, but he is my partner which I

14   think gave him some kind of stately kind of,

15   you know, kind of confidence to people, that

16   he wasn't just an employee, he was an owner.

17        Q.    Did Ryan bring any P72 clients to

18   you or Miller Motorcars?

19        A.    The majority of the customers that

20   all came to the program were leads that came

21   in through our website, came through De

22   Tomaso's.

23               I did get leads through their

24   website.  They would be fielded, like here

25   is, like, these automated names, so those



Page 88

                        E. Cygler
1
2    were sent by Ryan.
3              So, like, a person would reach out
4    to De Tomaso, I'm interested in a car.  I
5    would get an email with the leads.  I would
6    then field them, talk to them, sell them.
7              And then a lot of them were current
8    Miller Motorcars customers that were, I
9    should say, were entrusted.  I'm a customer
10   of Miller Motorcars, if you think this is the
11   right project for me to buy -- there were
12   entrusted customers of Miller Motorcars that
13   did sales with us because they trusted us.
14             They said if Miller Motorcars is
15   involved, I'm comfortable doing the deal with
16   you guys, because people were sending the
17   money to Miller Motor Cars and I think people
18   were -- that's always the biggest question is
19   where is the money going?  It's going to
20   Miller Motorcars, it's not going to some
21   company they never heard of.  So people were
22   buying into Miller Motorcars for protection
23   and credibility.
24             There is a customer that is worth
25   mentioning is Stanley Cohen.  He had been a



Page 89

                         E. Cygler

1

2    Miller Motorcars customer since 1976 and I

3    think being that Miller was involved and one

4    of our best customers, he decided to be a

5    customer, a depositor.

6              Did he have a relationship with

7    Ryan previously?  It sounded like it.

8    Whether how long this relationship really

9    went, I don't know, but I was always, like --

10   Ryan would always say, we've known each other

11   for years, we've known each other for years

12   at this point.  He would also say we are very

13   dear friends.

14        Q.   You didn't find that to be

15   credible?

16             MS. WALDO:  Object to form.

17        A.   No, I did not.  I did find that

18   always to be uncomforting.  He would say this

19   person, we are very dear friends.  I mean,

20   these are, like -- it didn't seem natural

21   because everyone was a dear friend.  I only

22   have a couple of dear friends.

23        Q.   So Stanley Cohen, though, was your

24   client from your perspective, right?

25        A.   Yes, he was a Miller Motorcars



Page 90

```
 1                    E. Cygler
 2  customer.
 3       Q.    Do you know, other than just hits
 4  on the website, do you know of any customer
 5  that Ryan brought to Miller Motor Cars?
 6       A.    From -- there was a customer, I
 7  don't know if it was specifically Ryan or if
 8  it was Norman or Ryan, but there was a client
 9  Barry Skolnick, S-K-O-L-N-I-C-K, out of
10  Miami.  He was already an Apollo customer of
11  their's and he was then a De Tomaso
12  depositor.
13       Q.    Anyone else other than him?
14       A.    There is a Mike Yin, I don't know
15  what his real name is, Mike Yin on the west
16  coast was brought in to be a depositor.  The
17  guy is not even allowed in America.
18            There is a guy, Carlos Peralta out
19  of Mexico.  They were -- he was also a
20  previous Apollo customer that was a referral
21  as well.
22       Q.    I asked you earlier if you thought
23  that Ryan was selling you things that were
24  too incredible or fantastical to be true.  I
25  don't think the transcript actually caught
```



Page 91

```
 1                    E. Cygler
 2  your answer.
 3           Your answer to that was yes, right?
 4           MS. WALDO:  Object to form.
 5      A.   Can you repeat that question?
 6      Q.   Did you feel Ryan was often selling
 7  you things that were too incredible or
 8  fantastical to be true?
 9           MS. WALDO:  Object to form.
10      A.   It sounded very magical.  There are
11  reasons Miller Motorcars as a company said
12  yes to representing De Tomaso, because of all
13  these things we saw and heard, you hear what
14  you want to hear and that makes you feel
15  good.
16           I would say Richard and/or Bailey
17  who were in those first initial meetings felt
18  very intrigued by everything we were hearing.
19           A lot of the comments came from
20  Norman, like, we really like the way this
21  guy, Norman, portrays himself and the way he
22  speaks and certain ways of kind of giving us
23  a good understanding that there could be some
24  business to be done between us.
25      Q.   So take, like, the White House, for
```



Page 92

1                    E. Cygler

2  example.

3            Did you feel like that was just too

4  fantastical to actually be true?

5            MS. WALDO:  Object to form.

6       A.   I mean, the idea of going to the

7  White House is pretty cool.  It's like the

8  highest level of government in the United

9  States.  The idea of going on a little trip

10  to go to the White House does sound pretty

11  wild, I guess.  You really would never know

12  unless it happened and it sounded bizarre.

13            We are a car dealership and we are

14  a car company.  The idea of like a car, small

15  boutique American car company going to the

16  White House is not a very normal situation.

17            I think, like the idea of, like,

18  Elon Musk going to the White House is, like,

19  you get an invite if you are a pretty big

20  deal, so it sounded a little bit strange to

21  be honest with you.

22       Q.   Of course, it never happened,

23  right?

24            MS. WALDO:  Object to form.

25       A.   No, it did not happen.



Page 93

                        E. Cygler

1

2      Q.    Because you were helping to solicit

3   the P72 clients, you were communicating with

4   the clients about the P72s and their

5   progress, right?

6      A.    Yes.

7      Q.    So what would happen usually is

8   Ryan would draft you an email about the

9   progress that you could forward on to

10  clients, right?

11          MS. WALDO:  Object to form.

12     A.    Correct.

13     Q.    So I do want to look at a document.

14          MS. WIGGER:  This will be Cygler 7.

15          (Cygler Exhibit 7, text thread

16          between Evan Cygler and Ryan Berris in

17          January of 2022, marked for

18          identification.)

19     Q.    This is a short text thread.  Feel

20  free to look through it and just let me know

21  when you are ready.

22          I will be only be asking about the

23  first page, but read as far as you want.

24     A.    Okay.

25     Q.    Are you ready?



Page 94

```
 1                    E. Cygler
 2        A.    I'm ready.
 3        Q.    This is a text thread between you
 4   and Ryan, right?
 5        A.    Yes.
 6        Q.    In January of 2022?
 7        A.    Correct.
 8        Q.    And you are kind of talking about
 9   some updates you are going to give on the
10   P72, right?
11        A.    Correct.
12        Q.    So Ryan tells you he will prepare
13   an update related to the engine, right?
14        A.    Correct.
15        Q.    He says he will keep it short and
16   sweet, right?
17        A.    Correct.
18        Q.    He says less is more, right?
19        A.    Correct.
20        Q.    So when you gave these updates to
21   clients, you were relying on Ryan to be
22   accurate, right?
23             MS. WALDO:  Object to form.
24        A.    Of course.
25        Q.    And understanding, of course, you
```



Page 95

                     E. Cygler
1    may not tell customers every minutia of the
2
3    production, right?
4         A.    Yes.
5              MS. WALDO:   Object to form.
6         Q.    I want to look at another email.
7    So, again, take some time to review, but I'm
8    just going to ask you generally about this
9    email.
10             (Cygler Exhibit 8, email from Ryan
11        Berris to Evan Cygler in August of 2020,
12        marked for identification.)
13        Q.    Good?
14        A.    Just finishing.  Give me a moment.
15        Q.    No rush.
16        A.    Completed.
17        Q.    This is an email from Ryan to you,
18   right?
19        A.    Correct.
20        Q.    In August of 2020, right?
21             You have to say yes verbally for
22   the court reporter.
23        A.    Yes.
24        Q.    Thank you.  It's another P72
25   program update, right?



Page 96

1                    E. Cygler
2        A.    Correct.
3        Q.    This was a message that was meant
4   to go out to P72 customers, right?
5        A.    Correct.
6        Q.    So Ryan is telling you that the
7   development is progressing positively and
8   remains on schedule, right?
9        A.    Correct.
10        Q.    And Norman Choi is not copied on
11   this email, right?
12        A.    Correct.
13        Q.    Was it common, if you remember, for
14   Ryan to not copy Norman on update emails like
15   this?
16        A.    He would keep me away from Norman
17   in a variety of times.
18        Q.    What do you mean by that?
19        A.    Conversations, he would just talk
20   with me, I'm your guy, I'm the liaison.  It
21   definitely felt like there was definitely a
22   layer that I had to -- sometimes it was just
23   between myself and Ryan.
24        Q.    So did Ryan tell you that he was
25   the point person as opposed to Norman?



Page 97

```
 1                E. Cygler
 2           MS. WALDO:  Object to form.
 3      A.   I mean, he was leading this
 4  program.  If felt like sometimes we would
 5  really only be dealing with Ryan in many
 6  circumstances, so we were really entrusting
 7  our relationship with Ryan on these things.
 8      Q.   About how often did Ryan send you
 9  these update emails?
10      A.   Not often.
11      Q.   Was it upon request or just would
12  he send them to you every now and then?
13      A.   You would have to really ask -- it
14  wasn't -- they weren't on time, there wasn't
15  really a consistent time of when they would
16  come, meaning, like they would send every day
17  or every other month.  Sometimes it would
18  take five months, four months, so it would be
19  sporadically.
20           There was something in here that
21  said we only talk when we hear -- we only
22  speak when we have, like, very strong
23  development, like, we keep things very kind
24  of quiet.  Although we've been very quiet, it
25  has been by design and that was always Ryan's
```



Page 98

1                    E. Cygler
2  kind of statement, we do this by design, less
3  is more.
4      Q.   When you received these emails from
5  Ryan, would you read through them before
6  sending them to customers?
7      A.   Yeah, I would read my emails.
8      Q.   To your knowledge, was information
9  contained in these updates true?
10     A.   I hope to believe they were.
11     Q.   So you didn't -- let me try that
12  again.
13          You did not knowingly send out
14  false statements to customers, right?
15          MS. WALDO:  Object to form.
16     A.    I would hope I was not sending out
17  false statements.  If I was, I would not be
18  doing my job.
19     Q.   You were relying on Ryan to tell
20  you the complete truth, right?
21          MS. WALDO:  Object to form.
22     A.    One hundred percent.  It is Ryan's
23  responsibility, he is the manufacturer, it is
24  his job to report to us with factual and
25  truthful information.



Page 99

```
 1                    E. Cygler
 2      Q.    Again, you did send out these
 3   program updates to clients, right?
 4      A.    Always.  We were very explicit
 5   about the process, making sure that each
 6   customers communicated -- imagine you had
 7   $250,000 of your money, you would want
 8   updates, so it's my job to deliver this
 9   information.
10           MS. WIGGER:  I want to look at one
11       more of these.
12           This will be Cygler 9.
13           (Cygler Exhibit 9, email from Ryan
14       Berris to Evan Cygler in January of
15       2022, marked for identification.)
16      A.    Okay.
17      Q.    This is another email from Ryan to
18   you, right?
19      A.    Correct.
20      Q.    This one in January of 2022, right?
21      A.    Correct.
22      Q.    Again, Norman is not copied on this
23   email, right?
24      A.    He is not.
25      Q.    But it's another update about the
```



Page 100

                    E. Cygler
 1
 2   P72, this time, the Power Train program,
 3   right?
 4        A.    Correct.
 5        Q.    Ryan gives you this high level
 6   update, right?
 7        A.    Correct.
 8        Q.    That update would reference or does
 9   reference both Roush and Capricorn?
10        A.    Correct.
11        Q.    As well as the homologation
12   certification team that they're working with?
13        A.    Okay.
14        Q.    The bullet one up from the end.
15        A.    That is correct.
16        Q.    So, again, you were trusting that
17   the information Ryan was sending you was
18   accurate, right?
19             MS. WALDO:  Object to form, asked
20        and answered.
21        A.    Correct.
22        Q.    You can set that document aside.
23             You mentioned the Le Mans Classic
24   earlier.
25             Do you remember that?



Page 101

```
 1                    E. Cygler
 2        A.    I do.
 3        Q.    I'm sorry for my complete lack of
 4   an accent on that.
 5        A.    Le Mans Classic.
 6        Q.    I have an associate that is French
 7   and she would be cringing so hard.
 8              That's something you were working
 9   with De Tomaso on, right?
10        A.    Correct.
11        Q.    De Tomaso, through you, invited
12   some P72 customers to that event, right?
13        A.    Correct.
14        Q.    As far as you are aware, Ryan was
15   the one planning it, right?
16        A.    Correct.
17        Q.    He was the one in charge of
18   creating the invitation as well, right?
19        A.    Correct.
20        Q.    I think I heard you say earlier
21   that it was hard to get people to confirm
22   they were coming.
23              Do you remember that testimony?
24        A.    Yes.
25        Q.    It was hard to get them to confirm
```



Page 102

1                    E. Cygler
2    they were coming because the invitations were
3    way late, right?
4            MS. WALDO:  Object to form,
5        mischaracterization.
6        A.    I do remember that we sent them,
7    like it almost felt like a month before or --
8    it took a while for them, from my
9    understanding, to assemble all the expenses
10   and put this together so it was a serious
11   activation.
12       Q.    And the invitations went out late,
13   right?
14       A.    Correct.
15           MS. WALDO:  Objection.
16       Q.    That made it difficult, of course,
17   to get people to commit to flying to Europe
18   for an event, right?
19           MS. WALDO:  Objection.
20       A.    Correct.
21       Q.    Did you feel that Ryan's
22   preparation for the event was pretty
23   disorganized?
24           MS. WALDO:  Object to form.
25       A.    I can't comment on that.



Page 103

                    E. Cygler

1

2       Q.    I want to talk a little bit about

3    the time when Ryan left De Tomaso.  I think

4    you spoke about that earlier.

5            So if I heard you correctly

6    earlier, you said that Norman gave you a call

7    to tell you that Ryan was leaving, right?

8       A.    Correct.

9       Q.    Sitting here today, do you remember

10   the exact statements that Norman told you?

11      A.    I think it kind of came down to the

12   fact of the things that he was challenged by

13   were, for example, the Carmen Jordá

14   situation, that Ryan had set up an agreement

15   without his knowing or without his awareness,

16   that Ryan had initiated a contract with

17   Carmen Jordá, don't quote me on this, but I

18   think it was for like a couple hundred

19   thousand dollars and that was, like,

20   something that didn't settle well with

21   Norman.

22           He was, like, I wasn't aware of it

23   and it doesn't settle well with me to have

24   someone, like, do these things without my

25   permission or my approval.



```
 1                    E. Cygler
 2        Q.    You said, don't quote me on this,
 3   that's because you don't remember the exact
 4   words that Norman used, right?
 5              MS. WALDO:  Object to form.
 6        A.    That's correct.
 7        Q.    Because it's been years, right?
 8        A.    Correct.
 9        Q.    Did Norman specifically say, I
10   fired Ryan because of the Carmen Jordá
11   contract?
12              MS. WALDO:  Object to form.
13        A.    No, that was one element.  I think
14   there was a multitude of things.  As I used
15   words earlier, snowballing, there were a
16   multitude of things.
17        Q.    So as I understood your testimony
18   earlier, you said that Norman called you to
19   tell you that Ryan was let go and there were
20   also all these other issues swirling around,
21   right?
22              MS. WALDO:  Object to form.
23        A.    Correct.
24        Q.    Norman didn't specifically say, I'm
25   firing Ryan for incompetence, right?
```



Page 105

1                    E. Cygler
2          MS. WALDO:  Object to form.
3          A.    No.  As I mentioned, there was a
4    multitude of things happening, various --
5    that was one element.
6          Q.    He didn't specifically say, I'm
7    firing Ryan for misappropriating funds,
8    right?
9          MS. WALDO:  Object to form.
10         A.    No.
11         Q.    In fact, Norman didn't say anything
12   specifically negative about Ryan to you at
13   all, right?
14         A.    Can you repeat the question?
15         Q.    Norman did not say anything
16   specifically negative about Ryan to you at
17   all, right?
18         MS. WALDO:  Objection to form.
19         A.    Negatively, I don't know what a
20   good example is.  I think there was a lot of
21   disappointment.
22              Norman is a nice guy, but one could
23   say he is a bit naive, so he got led on to --
24   he was entrusting this person, you know, I
25   don't know much internally between what was



Page 106

                        E. Cygler
1
2   actually being said or promised or between
3   the two of them.
4       Q.    That's fair.  Fair to say, though,
5   Norman didn't say Ryan is a schmuck, right?
6       A.    No, he did not say that.
7             MS. WALDO:  Objection to form.
8       Q.    You never heard Norman say anything
9   like that about Ryan to other people, right?
10            MS. WALDO:  Objection.
11      A.    Norman's style would be -- he
12  didn't really -- the guy does not curse, he
13  never raised his voice, he was never someone
14  who is typically slandering, that's not his
15  style.
16            He is a very soft spoken and quite
17  person in that context, but I do remember,
18  like, Norman being frustrated.
19      Q.    Sure.  But Norman didn't say things
20  like, you know, Ryan is a schmuck or Ryan is
21  incompetent to other people, like customers,
22  right?
23            MS. WALDO:  Objection, asked and
24      answered.
25      A.    Not that I recall.



Page 107

1                      E. Cygler

2        Q.   Do you remember Exhibit 3?

3             Do you still have that in front of

4    you?

5             THE WITNESS:  Thank you, Eric.

6        A.   These are the pictures.

7        Q.   The one with the pictures.  This is

8    the open letter.

9        A.   This was at a place -- these

10   pictures look like they're apparently from

11   Spain, yes, Isabelle, that was the project,

12   Isabelle.

13       Q.   This is the open letter that went

14   to the P72 customers at the end of May 2022,

15   right?

16       A.   I just want to look at the date.

17       Q.   The date is on C 2.

18       A.   May 27, 2022.

19       Q.   So end of May, right?

20       A.   Correct.

21       Q.   If you look at the back page, we

22   read earlier the statement about Ryan Berris

23   that ends with -- well, it says, We regret to

24   inform you of Mr. Berris' departure from his

25   position due to personal circumstances.  We



Page 108

                        E. Cygler

1                       E. Cygler

2    wish Ryan all the best in his future

3    endeavors.

4               That's more Norman's style, right?

5               MS. WALDO:  Object to form.

6        A.    Yeah, it's the polite way of saying

7    goodbye.  We do this all the time in the

8    world.

9        Q.    It doesn't say anything negative,

10   right?

11              MS. WALDO:  Objection to form.

12       A.    No, it doesn't.

13       Q.    You recall also looking at some

14   emails from a man named Stanley Cohen

15   earlier?

16       A.    Correct.

17       Q.    And Stanley had some colorful

18   things to say, right?

19       A.    He did.  We saw that.

20       Q.    Those are Stanley's comments, not

21   Norman's, right?

22              MS. WALDO:  Object to form.

23       A.    Correct.

24              MS. WIGGER:  Thank you for your

25         time today.  Those are my questions.



Page 109

1                      E. Cygler

2              THE VIDEOGRAPHER:  The time is

3         12:45.  We are going off the record.

4              (Time noted:  12:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 110

1

2                       - - -

3                  I N D E X

4                       - - -

5

6   EVAN CYGLER                               PAGE

7        By Ms. Waldo                         4

8        By Ms. Wigger                        69

9

10                      - - -

11                 E X H I B I T

12                      - - -

13  CYGLER EXHIBIT                            PAGE

14  Exhibit 2 Email from Evan Cygler to       32

15       David Collins

16  Exhibit 3 Email and attachment            35

17  Exhibit 4 Email from Stanley Cohen        44

18       to Norman Choi and others

19  Exhibit 5 Email sent from Stanley         48

20       Cohen to others

21  Exhibit 6 Email chain                     51

22  Exhibit 7 Text thread between Evan        93

23       Cygler and Ryan Berris in

24       January of 2022

25



Page 111

1
2                              - - -
3                      E  X  H  I  B  I  T
4                              - - -
5    CYGLER EXHIBIT                              PAGE
6    Exhibit 8 Email from Ryan Berris to      95
7         Evan Cygler in August of 2020
8    Exhibit 9 Email from Ryan Berris to      99
9         Evan Cygler in January of 2022
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 112

```
 1
 2                        - - -
 3            DEPOSITION SUPPORT INDEX
 4                        - - -
 5   Request for Production of Documents
     Page  Line        Page  Line    Page  Line
 6   None
 7                        - - -
 8   Stipulations
     Page  Line        Page  Line    Page  Line
 9   None
                         - - -
10
     Questions Marked
11   Page  Line        Page  Line    Page  Line
     None
12                        - - -
13   To Be Filled In
     Page  Line        Page  Line    Page  Line
14   None
                         - - -
15
16
17
18
19
20
21
22
23
24
25
```



Page 113

```
 1
 2                      CERTIFICATE
 3
           I HEREBY CERTIFY that the witness,
 4  EVAN CYGLER, was duly sworn by me and that
    the deposition is a true record of the
 5  testimony given by the witness.
 6         Leslie Fagin
           _____
           Leslie Fagin,
 7         Registered Professional Reporter
           Dated: September 24, 2024
 8
 9
10
           (The foregoing certification of
11  this transcript does not apply to any
    reproduction of the same by any means, unless
12  under the direct control and/or supervision
    of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



MAGNA
LEGAL SERVICES

Page 114

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3         I,                        , do hereby
    certify that I have read the foregoing pages,
 4  and that the same is a correct transcription
    of the answers given by me to the questions
 5  therein propounded, except for the
    corrections or changes in form or substance,
 6  if any, noted in the attached Errata Sheet.
 7
 8
    EVAN CYGLER                    DATE
 9
10
    Subscribed and sworn
11  to before me this
            day of                   , 2024.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



Page 115

1

2                    - - - - - -

              E  R  R  A  T  A

3                    - - - - - -

   PAGE   LINE   CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



## A

**a.m**
1:16 3:8 30:19,23
69:18 81:21
**a/k/a**
1:8,9
**AARP**
77:7
**ability**
6:22 11:3 13:5 15:24
**able**
14:18,24 69:16 78:17
78:22
**abrupt**
26:22
**absolutely**
29:19 62:6
**accent**
101:4
**accepted**
16:20
**accomplish**
11:5,5
**accomplished**
24:2,3
**account**
60:11,12
**accurate**
94:22 100:18
**accurately**
6:23
**ACKNOWLEDG...**
114:2
**acquaintance**
10:10 22:15,18,21
**acquaintances**
21:18,23 22:10 26:16
53:12
**acquainted**
8:11,13 9:13 22:18
**acquisition**
11:13
**act**
20:19 21:8
**activation**

102:11
**active**
17:14 50:14
**actively**
11:9
**activities**
12:24
**actual**
54:25 57:15
**addition**
9:2
**address**
51:10
**affiliated**
39:3
**against-**
1:7
**agency**
39:17
**ago**
23:15 26:14 34:10
39:15 41:12 70:9
**agreed**
29:18 33:13
**agreement**
12:13,14 18:7 19:5
29:22,25 32:14 67:3
67:5,10,16 68:17,18
68:24,25 69:4
103:14
**ahead**
8:2 33:10
**aid**
17:15
**al**
3:6
**Alejandro**
83:20
**Alexandra**
2:11 4:7
**allocated**
58:15
**allocation**
56:19 59:4,11,14
**allocations**
59:9

**allowed**
49:10 67:12 80:12
90:17
**allude**
26:12
**alongside**
13:14
**aloud**
36:11 46:5
**altered**
44:4
**alternative**
15:24
**amazing**
85:11
**ambassador**
84:8
**America**
12:15 18:3 67:7,18
73:12,13 74:6,7,25
75:2 76:21 90:17
**American**
73:13 76:13,17 78:2
92:15
**amount**
18:24 22:25 33:16
39:20 62:9
**Amy**
54:6
**and/or**
50:10 91:16 113:12
**answer**
8:2,4 9:16 25:8 60:20
70:10,12 91:2,3
**answered**
58:12 100:20 106:24
**answers**
114:4
**Anyways**
49:3
**Apollo**
8:17,18 11:7,13 12:8
12:11 13:9,13,19
14:5 17:6,10 20:3
20:13 31:5 42:10,13
70:21,25 72:12

90:10,20
**apparently**
80:2,23 84:3 107:10
**appearances**
2:2 3:18
**applied**
17:3
**applies**
67:15
**apply**
113:11
**appointed**
65:12
**approval**
103:25
**approximately**
8:20 9:18 45:19
**area**
42:5 49:24 50:4
**Arizona**
7:3 20:13
**arm**
74:18
**arrangement**
18:2
**article**
47:12,12 48:17
**articles**
53:11 57:17
**artisans**
78:2,3
**artist**
77:23
**artists**
73:11
**aside**
30:13 100:22
**asked**
11:22 17:11 40:19
58:11 60:10 71:16
72:8 90:22 100:19
106:23
**asking**
51:5 93:22
**assemble**
102:9



**assembled**
15:21
**assist**
19:8,11
**assisting**
68:4
**associate**
101:6
**associated**
64:21
**Aston**
34:21 68:5
**attached**
114:6
**attaches**
46:11
**attachment**
35:12,15,19,22
110:16
**attend**
6:25 20:2 38:25 39:4
**attended**
7:2 20:8,12,14 21:7
**attention**
33:19 35:25 44:21
**Attorneys**
2:4,8,13
**attractive**
84:2
**attributed**
15:13 16:15
**August**
95:11,20 111:7
**automated**
87:25
**Automobili**
1:8 11:14,14
**automotive**
23:3 73:9 74:11 79:7
84:21
**available**
80:23
**Avenue**
2:9
**avoid**
5:7

**Avon**
41:9
**aware**
32:20,22 43:16 44:12
52:2 53:9 55:12,18
60:14,24 61:5,20
62:7,13 63:19 64:14
64:20,25 101:14
103:22
**awareness**
32:23 103:15

———————
**B**

**B**
110:11 111:3
**back**
27:16 28:8 30:23
69:15,22 73:13 75:3
75:7 78:5,11 83:24
107:21
**bad**
16:24,25 54:12
**Bailey**
48:14 75:25 82:2
85:19 91:16
**bank**
60:11,12
**Barry**
90:9
**based**
59:14 68:11 70:16
84:3 85:16
**basically**
77:17
**basics**
7:22 9:12 18:14
**basis**
50:15
**Bates**
28:16 35:13 36:5,6
46:2 51:23
**beautiful**
46:21 80:16
**becoming**
43:3,4
**began**

31:9,20
**beginning**
75:5
**begins**
3:4
**Beit**
54:9
**believe**
29:8 39:9,21 62:23
63:25 73:3 83:21
85:14 98:10
**believed**
50:14 75:18
**Belle**
83:17
**Bellport**
2:14
**Berris**
1:5 2:18 3:6,24 8:12
9:3,8,22 13:19 14:4
17:5 19:20 20:3,19
20:24 21:8,12,17,24
23:9 24:12 31:21
32:6 36:13,14 39:24
40:5 41:2 43:12,20
49:15,20 52:2,5,7,8
52:11,14,14,15 53:2
64:11,20 70:14
93:16 95:11 99:14
107:22 110:23
111:6,8
**Berris'**
13:12 28:4 32:4
36:17 40:9 43:19
44:5 45:19 64:15
65:2 107:24
**best**
36:23 85:12 89:4
108:2
**better**
78:16 80:10
**beyond**
5:17
**big**
51:9,12 54:17,22
92:19

**biggest**
88:18
**bill**
57:16
**bills**
61:18 64:21
**bit**
8:14 12:7,20 23:11
25:6 38:13 40:21
41:6,13,14 51:4
53:18 58:24,25 67:2
73:14 74:11 84:9
92:20 103:2 105:23
**bizarre**
80:20 81:4 92:12
**bladder**
53:17 54:11
**board**
72:16
**Boies**
1:15 2:3 3:11,20,22
**booting**
20:17
**bosses**
75:23
**bottom**
36:8
**boutique**
92:15
**Bozzuto**
54:5
**brand**
11:12,13 12:8,16
13:9 27:6 33:21
36:15 47:10 50:12
76:8
**brands**
8:7,8,9 34:21
**break**
5:9 29:20 30:2,15,17
**breaks**
68:18
**Brewster**
2:14
**bring**
73:13 76:21 87:17



**bringing**
76:6
**brought**
32:22 33:11,19 34:19
38:19 57:4 90:5,16
**BS**
80:11
**build**
26:7 74:6 76:13,21
**builder**
52:20
**building**
12:18 74:2 78:19
**built**
15:20 16:4,6,22 17:2
17:3 74:24,24,25
75:2 85:11
**bullet**
100:14
**business**
7:5 9:2,5 10:10,16
11:20 12:8 13:9
15:4,4 17:18,20
21:18,22 22:10 50:8
56:3,7,9 57:23
66:23 72:10 86:23
87:3,7 91:24
**Bustamante**
2:11 4:8
**buy**
88:11
**buyer**
37:21
**buying**
88:22

---
**C**
---

**C**
4:9 107:17
**cache**
76:17
**California**
19:13 20:9,9 27:15
**call**
15:23 23:13 25:12
32:3 46:10,20,22,24

47:3,5 85:4 103:6
**called**
4:9 16:4 25:4 57:25
68:6 73:8 83:16
104:18
**calls**
44:6
**campaign**
73:7 77:6,9 79:8
83:14,18 84:21
**Canada**
67:12
**cancel**
79:22,23
**cancellation**
15:3
**cancelled**
16:9
**cancelling**
50:20 83:3
**capacity**
17:20 32:13
**Capasso**
54:4
**CAPITAL**
1:9
**Capricorn**
25:4 39:19 65:5,11
65:16,20,23 66:3,7
66:18,24 78:7,25
100:9
**car**
8:23 9:11 13:3,3
14:16,18,24 15:21
16:5,6 17:2,3,4
19:12,13,14 20:10
25:23 27:2,15 31:15
37:19 38:24 43:10
46:11 52:20,22,22
62:2 64:19,22 65:2
66:13,14 68:6 76:13
80:24 81:16 83:15
83:20 88:4 92:13,14
92:14,15
**car's**
63:2

**carbon**
78:21
**cared**
37:18
**Carlos**
90:18
**Carmen**
24:9,21 32:11,25
33:20 83:13,25
84:11 103:13,17
104:10
**cars**
10:16 11:18,19 12:17
12:19,21 14:22 15:9
15:10,10,11 16:2
58:17,22,23 60:12
67:11 68:20 76:14
78:9 79:20 88:17
90:5
**Case**
1:6
**caught**
90:25
**cc**
47:11 53:16
**cc'd**
45:5,6,14 47:6 51:8
**cc's**
43:2
**CEO**
82:18
**certain**
23:25 53:17 60:10
61:22 62:9 86:6
91:22
**certainly**
25:25 83:7
**CERTIFICATE**
113:2
**certification**
100:12 113:10
**certify**
113:3 114:3
**certifying**
113:12
**chain**

47:7,18,19,20 51:2
53:23 110:21
**challenged**
103:12
**change**
58:19 66:18,21 115:3
**changes**
114:5
**character**
41:14
**characterized**
33:5 63:2
**charge**
21:13 62:25 63:7,16
84:15 101:17
**charitable**
42:4
**Chateau**
38:20
**check**
8:23 28:8 57:7
**Choi**
1:8,8 3:6 9:14,23
10:6,12,20,25 11:21
11:21 24:11 32:3,5
33:5 44:17 45:4
46:7 48:10,15 55:5
58:9 60:14,24 61:13
65:14,19 66:17
96:10 110:18
**Choi's**
66:3
**Cipriani**
80:15,25 82:15 83:3
**circle**
53:12 54:16
**circulating**
50:17 53:10
**circumstances**
36:19 97:6 107:25
**city**
4:21 80:15 81:9
**clarify**
22:9 25:10 60:2
**Classic**
38:9,16 100:23 101:5



**clearly**
5:6 31:16 32:12
    33:14
**client**
27:11,13 41:18,21
    89:24 90:8
**clients**
22:13,14 38:18 87:17
    93:3,4,10 94:21
    99:3
**Club**
42:6
**co-counsel**
4:7
**coast**
90:16
**coffee**
5:16
**Cohen**
27:11 41:4,25 42:10
    42:13,19 43:12,21
    44:17 45:4 46:5,19
    47:6,10 48:3,9,18
    49:4,14,19,24 52:4
    52:13 53:10 88:25
    89:23 108:14
    110:17,20
**Colby**
45:15
**colleague**
71:16
**collector**
52:22
**college**
6:25 7:2
**Collins**
34:5,13,15,23 37:13
    37:16 110:15
**colorful**
108:17
**come**
8:11 9:13 11:25
    40:22 62:23 67:9
    69:15 77:7 97:16
**comes**
20:16

**comfortable**
88:15
**coming**
4:16 11:11 58:13
    70:5 83:24 86:9
    101:22 102:2
**commencing**
1:16
**comment**
102:25
**comments**
91:19 108:20
**commission**
18:20,23,25 68:3,10
    114:12
**commit**
102:17
**commitment**
18:17 36:15
**common**
15:8 22:6 96:13
**communicate**
13:21 40:5 42:18,25
    61:14
**communicated**
99:6
**communicating**
26:20 79:4 93:3
**communication**
8:16 44:9 54:22
**communications**
7:5 28:4 44:11 50:9
    86:8
**community**
42:2
**company**
8:10 17:16 23:19
    26:23 32:6 39:11
    44:10 52:23 55:7
    61:8,17 64:2 65:3,9
    65:12 83:5 88:21
    91:11 92:14,15
**compensated**
19:4
**complete**
14:21 28:15 34:8

98:20 101:3
**Completed**
95:16
**completely**
14:21
**completing**
31:6
**compliant**
62:10
**complicated**
15:3 66:25
**concept**
68:5 73:12
**concerned**
75:12,16 76:6
**concerns**
76:3
**conclusions**
62:12 68:16
**condition**
6:21
**conducting**
62:19,19
**confidence**
87:15
**confidential**
29:3 30:5 50:7
**confidentiality**
29:11,25
**confidentially**
29:22
**confirm**
40:22 101:21,25
**confirmed**
40:14
**confused**
35:18
**confusion**
26:3
**Connecticut**
41:10
**connection**
6:12 22:6
**connections**
21:18 22:5
**connotation**

77:5
**considering**
27:22
**consistent**
97:15
**constantly**
43:5
**constructed**
14:17
**contact**
71:2,10
**contacts**
26:25
**contained**
98:9
**context**
77:8 106:17
**contingency**
49:25
**continued**
50:21
**continues**
46:17
**continuous**
46:15
**contract**
18:6,11,14 32:10,16
    32:19,24 62:25
    68:12 103:16
    104:11
**contractual**
33:6
**contribution**
40:3,18
**control**
45:11 113:12
**conversation**
23:12 27:5 37:18
    54:17 58:23
**conversations**
58:21 59:8 71:13
    76:10 96:19
**cool**
36:10 92:7
**coordinating**
84:11



**copied**
29:7,9 96:10 99:22
**copies**
37:23
**copy**
96:14
**cordial**
69:8
**CORP**
1:9
**corporate**
63:20
**corporation**
57:10
**correct**
5:4 6:10 17:7,11
  18:23 39:5 45:20
  70:20 71:3,5,9,11
  71:12,15 73:3 74:17
  74:19 75:9 76:2
  77:11,22 79:6,11,15
  79:18 82:16 86:11
  87:9 93:12 94:7,11
  94:14,17,19 95:19
  96:2,5,9,12 99:19
  99:21 100:4,7,10,15
  100:21 101:10,13
  101:16,19 102:14
  102:20 103:8 104:6
  104:8,23 107:20
  108:16,23 114:4
**corrections**
114:5
**correctly**
103:5
**costs**
6:11,15
**counsel**
3:17 6:9,12 16:16
**couple**
13:23 34:10 42:24
  69:12 70:7 73:5
  89:22 103:18
**course**
11:20 92:22 94:24,25
  102:16

**court**
1:2,17 3:14 4:25
  29:14 95:22
**crash**
16:2
**crazy**
73:21
**create**
77:23
**created**
77:20
**creating**
101:18
**creative**
14:19
**credibility**
11:11 83:4 88:23
**credible**
89:15
**cringing**
101:7
**criticizing**
49:19
**cross**
8:23 10:3
**cup**
5:16
**current**
7:14 88:7
**curse**
106:12
**custodians**
60:4
**customer**
15:6 16:24 19:16
  31:18 34:17 41:10
  41:11,16 55:23 57:3
  59:23 60:15,25
  61:21 68:2,9,14
  88:9,24 89:2,5 90:2
  90:4,6,10,20
**customers**
14:17,23 26:21 35:2
  39:20 40:20 55:13
  55:19 56:14,15,23
  57:4 59:15 67:18

77:15 78:10,14
87:19 88:8,12 89:4
95:2 96:4 98:6,14
99:6 101:12 106:21
107:14
**cut**
37:22
**Cygler**
1:14 3:5 4:1,16,19
  5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1,12
  29:1 30:1 31:1,4
  32:1 33:1 34:1,3,4,5
  35:1,11 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1,15
  44:16 45:1 46:1
  47:1 48:1,2 49:1
  50:1,24 51:1,2 52:1
  53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1
  69:1,25 70:1,2,3,5
  71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1
  91:1 92:1 93:1,14
  93:15,16 94:1 95:1
  95:10,11 96:1 97:1
  98:1 99:1,12,13,14
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:6,13,14
  110:23 111:5,7,9
  113:4 114:8

────────── **D** ──────────
**D**

110:3
**D.C**
2:10
**Daniel**
2:19 3:13
**date**
1:16 45:18 80:22
  107:16,17 114:8
**Dated**
113:7
**dates**
45:23
**daughter**
54:7,7 83:20
**David**
2:6 3:22 34:5,13
  37:16,21 110:15
**day**
24:15 38:18,24 41:17
  79:16 81:9,10,10
  97:16 114:11
**De**
1:8 6:14,19 8:18,24
  10:20,25 17:18,24
  18:2,9,21 19:9,20
  20:3,19 21:8,12
  23:10 25:24 26:21
  28:5 31:21 32:24
  33:21 34:19 36:13
  38:23 39:3 42:16,17
  42:20 43:14,18,20
  45:20 46:16 52:6,10
  52:14 54:12 55:3
  57:5 59:9,21 60:11
  60:17 61:3,7,14
  62:18 63:19 64:4
  65:13,15 67:3,6,16
  68:2,12,21 69:4
  71:7,10 74:6,7,13
  78:4 81:2 82:18
  83:20 86:24 87:21
  88:4 90:11 91:12
  101:9,11 103:3
**dead**
83:25
**deadlines**



24:18
**deal**
80:24 88:15 92:20
**dealer**
67:6,11
**dealership**
67:3 68:9 92:13
**dealing**
57:22 74:12 97:5
**dealings**
9:3 44:11 68:23
**dear**
46:8,13,19 89:13,19
89:21,22
**death**
50:13
**decent**
39:19
**decided**
89:4
**deeper**
37:10 60:3
**deeply**
46:21
**defendants**
1:10 2:8 4:6
**defended**
52:6
**definitely**
42:8 81:24 83:10
96:21,21
**degree**
7:4
**deliver**
78:22 81:14 99:8
**delivering**
12:19 16:21 61:21
78:18
**delivery**
25:22 68:10,20
**demand**
59:14
**demands**
81:15,25
**Dennis**
51:9,12,13,24 52:11

54:17,23
**departed**
27:24 78:25
**departure**
26:22 28:5 32:2,5
36:18 38:5 40:10
43:19 44:5,8 45:20
45:24 65:2 107:24
**departures**
36:12
**depended**
13:25
**deponent**
30:9 114:2
**deposed**
4:22
**deposit**
56:19
**deposition**
1:14 3:5,9 5:14 6:6
112:3 113:4
**depositor**
34:14 42:15,17 50:14
89:5 90:12,16
**depositors**
27:10 38:3 50:3 57:5
**deposits**
19:17 56:16 59:16,18
59:19,23 60:5,6,15
60:25
**describe**
17:17 20:6 23:24
71:21
**described**
11:15 15:13 83:4
**description**
38:2
**design**
77:23 97:25 98:2
**designer**
27:2 39:9,10
**designers**
85:7,8
**designs**
85:5
**desires**

11:18
**detailed**
14:10
**Detroit**
74:3
**devalue**
76:7
**developing**
11:6
**development**
96:7 97:23
**Diane**
27:3
**die**
43:10
**difficult**
102:16
**digital**
56:17 77:23
**digits**
36:9
**direct**
67:22,23,25 113:12
**directly**
67:17 68:14
**director**
7:16,19
**disagreement**
30:13
**disappointment**
25:20,20 105:21
**disclose**
52:15
**discuss**
85:25
**discussing**
31:5 40:25
**disorganized**
102:23
**display**
19:13 20:9 63:3,6
66:13 67:21 79:17
83:23
**displayed**
11:10
**displaying**

19:9
**dispute**
69:3
**disrespected**
81:6
**DISTRICT**
1:2,3
**dive**
44:23
**document**
28:11,18 29:3 30:10
30:15 34:8,9 35:9
36:5 37:2,24 44:24
44:25 45:18 47:24
48:5,21 50:23 56:16
93:13 100:22
**documents**
6:5 30:6 33:25 70:7
70:16 112:5
**doing**
31:12 46:6 56:3,6
57:22 62:25 66:23
81:11 82:17,22,25
83:11 85:5 88:15
98:18
**dollars**
103:19
**doubt**
48:24
**Downtown**
80:15,25
**draft**
93:8
**drama**
25:25 37:22
**draw**
35:25
**drawing**
44:20
**driver**
39:23 64:8 84:5
**driver's**
17:13
**driving**
64:11 77:10
**dry**



37:22
**DT**
35:19
**due**
36:18 40:23 66:21
  107:25
**duly**
4:10 113:4

——————————————
E
——————————————
**E**
4:1,9,9 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1
  76:1 77:1 78:1 79:1
  80:1 81:1 82:1 83:1
  84:1 85:1 86:1 87:1
  88:1 89:1 90:1 91:1
  92:1 93:1 94:1 95:1
  96:1 97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:3,11
  111:3 115:2
**earlier**
25:23 31:4 41:4 65:5
  70:22 71:16 78:4
  79:10 90:22 100:24
  101:20 103:4,6
  104:15,18 107:22

108:15
**earmarked**
60:13
**effect**
23:25
**effective**
10:20,25 14:4 75:19
**either**
8:25 12:24 32:16
**element**
24:24 104:13 105:5
**Elon**
92:18
**email**
29:4 34:4,12,22
  35:11,15 37:12 43:2
  44:14,16 45:3,14
  46:6,9,17,20 47:7
  47:19,20 48:2,8,12
  48:19 51:2,9,9,15
  53:21,24 55:7 88:5
  93:8 95:6,9,10,17
  96:11 99:13,17,23
  110:14,16,17,19,21
  111:6,8
**emails**
28:8 33:25 42:25
  45:8 47:16,16 53:17
  53:19 56:17,18
  96:14 97:9 98:4,7
  108:14
**emission**
62:4,10,20
**emissions**
16:3 62:25 63:4,11
  63:17
**employee**
32:10 87:16
**employment**
7:12 52:8
**encountered**
31:6
**endeavors**
36:24 108:3
**ended**
78:5

ends
35:19 107:23
**engaged**
31:18 32:10
**engaging**
34:20
**engine**
94:13
**engineering**
12:18 76:24 85:16
**enhance**
77:5
**entails**
7:23
**entered**
29:15
**enthusiasm**
65:25
**enthusiast**
9:11
**enthusiastic**
65:22
**entirely**
68:13
**entity**
57:24
**entrepreneurial**
10:17
**entrusted**
82:23 88:9,12
**entrusting**
97:6 105:24
**EPA**
62:4
**equity**
87:2
**Eric**
2:15 4:2 5:15 60:21
  107:5
**Errata**
114:6
**ESQUIRE**
2:5,6,10,11,11,15
**estimate**
22:22
**et**

3:6
**Europe**
74:14,16 78:6,11,12
  102:17
**Evan**
1:14 3:5 4:19 34:4
  73:18 93:16 95:11
  99:14 110:6,14,22
  111:7,9 113:4 114:8
**event**
13:2 19:13,14 38:10
  38:14,17,25 39:4,25
  40:2,4,6,8,16 41:2
  80:14,17 82:15 83:3
  101:12 102:18,22
**events**
19:12,15 20:2,18,21
  21:7 22:3 70:8
  82:22
**eventual**
16:7
**eventually**
23:23 32:21 47:14
  77:6 82:9
**exact**
103:10 104:3
**EXAMINATION**
4:13 69:23
**examined**
4:11
**example**
20:11 22:16 57:9
  62:4,10 74:9 92:2
  103:13 105:20
**examples**
13:6 73:6
**Excel**
56:18
**exception**
31:7
**excessive**
33:16
**exchanged**
32:17
**exclusive**
67:6,10



**excuse**
83:17
**executive**
10:20,25
**exemption**
16:4
**exhibit**
28:12 31:2 34:3,4
  35:10,11 44:14,16
  47:25 48:2 50:25
  51:2 93:15 95:10
  99:13 107:2 110:13
  110:14,16,17,19,21
  110:22 111:5,6,8
**expected**
73:6
**expense**
40:23
**expenses**
102:9
**experience**
10:17 11:16 15:17
  38:19 40:24 78:19
**expires**
114:12
**explain**
7:21
**explained**
24:17
**explaining**
78:9
**explanation**
11:15 37:2
**explicit**
83:22 84:8 99:4
**expressing**
38:5
**extent**
5:8 28:20 34:7
**extremely**
46:15

——————————

**F**

**fact**
16:20 34:20 44:12
  103:12 105:11

**factory**
66:13
**facts**
85:2
**factual**
86:22 98:24
**Fagin**
1:17 3:15 113:6
**fair**
10:3 54:19 74:8
  106:4,4
**falling**
52:12 53:7
**false**
14:21,21 15:2 98:14
  98:17
**familiarity**
65:9
**family**
28:16
**family-oriented**
50:2
**fanatic**
42:6
**fancy**
76:23
**fantastical**
86:18 90:24 91:8
  92:4
**far**
45:11 66:14 93:23
  101:14
**fascinating**
52:12
**feel**
5:9 35:23 37:6 82:3
  82:10 83:9 91:6,14
  92:3 93:19 102:21
**feeling**
26:3,13
**feels**
23:7 37:5,7
**felt**
11:22 12:3 21:3 24:5
  24:8 39:14 81:6
  84:9 86:5,16 91:17

96:21 97:4 102:7
**Ferrari**
41:18 42:5,6
**Festival**
20:15
**fewer**
69:14
**fiber**
78:21
**field**
88:6
**fielded**
87:24
**figure**
86:14
**file**
56:18
**Filled**
112:13
**final**
36:4 53:24 57:16,19
**financial**
24:22 32:14 40:3,18
  61:15
**financially**
61:8
**find**
14:12,19 19:23 72:10
  72:15 89:14,17
**fine**
47:23 61:6
**fingernails**
82:4
**finishing**
95:14
**fired**
52:14 104:10
**firing**
104:25 105:7
**firm**
41:13 76:24
**first**
11:7,12,12,13 18:18
  28:24 31:19 47:17
  51:5,11 91:17 93:23
**firstly**

8:17
**fitness**
9:11
**five**
97:18
**flags**
83:8
**Flexner**
1:15 2:3 3:11,21,23
**flip**
45:25
**Florida**
19:14
**fly**
81:17
**flying**
102:17
**focus**
11:4
**focused**
9:9 10:14
**follow**
75:22
**following**
75:17
**follows**
4:12
**Ford**
85:8
**foregoing**
113:10 114:3
**form**
7:24 9:15 10:13,22
  11:24 12:5,10 14:6
  16:17 17:19,25 18:7
  18:15 19:10,21 21:2
  21:14,19,25 22:24
  23:5 24:14 25:13,18
  26:10,17 27:9 28:6
  31:10,22 32:8 33:8
  34:24 36:20 37:3,14
  38:6,15 40:11 41:8
  42:3 43:13,22 44:6
  45:21 47:4,8 48:20
  49:6,17,21 52:19
  53:3,8,13 54:3,24



55:15,25 56:5 57:13
58:5,11 59:5,12,25
60:7,18 61:9,16,24
62:11,15,21 63:13
63:22 64:5,9,16,23
65:10,24 66:4,8,19
67:8,20,24 68:15
69:6 71:22,25 72:14
72:19,24 74:22
75:14 76:9 78:13
79:5,14,25 82:20
83:6 84:13 86:10,20
87:10 89:16 91:4,9
92:5,24 93:11 94:23
95:5 97:2 98:15,21
100:19 102:4,24
104:5,12,22 105:2,9
105:18 106:7 108:5
108:11,22 114:5
**formal**
22:25 68:25
**formative**
36:16
**formed**
73:8
**former**
85:8
**Formula**
84:5
**Forty-eight**
59:6
**forward**
26:6 93:9
**found**
32:21 71:24 72:13
80:6,9,9
**foundation**
37:15 45:22 53:14
57:14 60:19 61:10
61:25 62:12,16
63:23 64:17,24 66:9
66:20
**four**
97:18
**four-poster**
77:13

**France**
38:10,17
**free**
35:23 93:20
**French**
38:20 76:18 101:6
**frequently**
10:4 19:19
**friend**
49:22 89:21
**friends**
9:4 10:5,9 89:13,19
89:22
**front**
107:3
**frustrated**
82:10 106:18
**frustrating**
16:23 80:6 81:5,24
**frustration**
25:25
**fulfilled**
58:24
**full**
4:18 5:3 16:8
**full-time**
7:12
**funds**
32:7 33:7 59:20 60:8
105:7
**funny**
47:12
**future**
36:24 75:19 108:2

_____
**G**
**G**
4:9 63:21,24
**gained**
11:10
**gathering**
20:10
**gearbox**
85:3,7
**gearboxes**
85:12

**general**
9:7,12 10:11 42:21
42:22 48:14 57:7
59:8 85:20
**generally**
65:20 95:8
**GENESIS**
1:9
**Geneva**
12:25
**gentle**
37:4
**gentleman**
39:22 52:21
**German**
76:19
**Germany**
40:24 68:21 75:3,3
**getting**
43:6 50:4 58:22,23
73:17 82:4,10
**gifted**
77:14
**Gilbride**
2:13 4:3
**gist**
43:11
**give**
5:3 8:2 22:16 28:13
46:9 73:5 94:9
95:14
**given**
11:3 29:4 58:17
113:5 114:4
**gives**
52:3 100:5
**giving**
35:7,9 78:18 91:22
**Glickenhaus**
52:12,13,17,20,25
**go**
4:24 8:2 24:3,12,16
33:10 38:23 50:11
73:6,16,19,20 83:2
92:10 96:4 104:19
**goes**

79:2
**going**
13:16 25:5 28:10
30:19 33:24 36:11
43:9,9 44:13 46:4
50:22 65:11 69:19
73:18,19,20,24
74:14,18 79:12,15
80:5 81:8 83:2 85:3
85:6 88:19,19,20
92:6,9,15,18 94:9
95:8 109:3
**good**
3:2 11:15 31:12
43:21 44:2 56:12
70:4 91:15,23 95:13
105:20
**goodbye**
37:7 108:7
**Goodwill**
20:15
**Google**
57:2
**government**
92:8
**graduated**
7:7
**grandson**
45:15,16
**grants**
74:5
**graphics**
77:24
**grateful**
46:15
**great**
36:17 52:9 77:6
80:24
**Greenwich**
9:21
**ground**
4:24
**group**
49:23 50:2 65:6
**GT**
85:9



guess
45:2 73:25 77:16
92:11
guidance
75:17
guy
27:2 37:20 41:14
49:23 50:6 51:15
53:16 82:21,22
90:17,18 91:21
96:20 105:22
106:12
guys
55:9 85:11 88:16

**H**

H
110:11 111:3
HAMPTON
2:8
Hannah
2:11 4:5
happen
80:5 92:25 93:7
happened
31:23 33:2 47:2
58:25 76:16 80:4
81:15 92:12,22
happening
16:13 23:20 25:6
38:18 43:5,6 68:23
75:22 77:18 79:22
79:23 83:9 105:4
happens
19:3 38:14
happy
74:23
hard
36:14 40:22 101:7,21
101:25
hardworking
9:9
Hartford
42:5 49:24
head
27:18 51:9,12 54:17

54:23
heads
5:5
healthy
10:15 43:25
hear
74:23 85:10 91:13,14
97:21
heard
57:6,24 84:2 88:21
91:13 101:20 103:5
106:8
hearing
53:6 85:20 91:18
heavy
81:25
held
1:15 7:17 59:18 60:9
82:18
help
39:24 40:3 49:11
helping
93:2
hey
85:22
high
73:14 76:13,16,19,20
78:23 100:5
higher
59:10,13
highest
92:8
HIN
1:9
hire
33:17 81:12
hired
84:18
hiring
24:20
hit
5:10
hits
90:3
HOLDINGS
1:8

holiday
80:19
holiest
80:19
home
14:25 15:20 16:4,21
home-built
14:17 15:18 31:7,17
homologation
24:4 100:11
honest
39:12 72:22 80:11
81:24 92:21
honestly
16:23 81:3
honored
46:21
hope
98:10,16
hopefully
56:11 75:9
hotel
38:20
House
73:7,17,20 74:12
79:9,13 83:2 84:21
91:25 92:7,10,16,18
Hudson
1:15 2:4 3:10
Hugo
39:22 84:18
hundred
98:22 103:18
hurts
83:4

**I**

idea
66:3 76:20 92:6,9,14
92:17
identification
34:6 35:12 44:18
48:4 51:3 93:18
95:12 99:15
identified
56:16

identities
55:12,18,24 56:23
IEs
17:6
illegal
12:4
imagery
77:24
imagine
99:6
impatient
43:4
import
17:4,6
important
23:4,8 55:23 56:2,7
importation
15:18
impression
9:7 10:11,19,24 14:3
66:2,6 71:17
incident
15:12
including
48:10
incompetence
104:25
incompetent
106:21
incomplete
28:20
increasing
59:4
incredible
86:17 90:24 91:7
INDEX
112:3
individual
18:22
individuals
37:24 48:9 49:20
industry
16:12 23:3
influential
42:2
inform



36:17 107:24
**information**
54:14 98:8,25 99:9
100:17
**informed**
23:11 32:4 62:24
63:8 65:18
**initial**
58:16 91:17
**initially**
75:4 76:10 77:4
**initiated**
103:16
**Instagram**
84:4
**instances**
15:9
**interact**
13:18 19:19
**interest**
13:25
**interested**
88:4
**interesting**
23:6 73:15
**internally**
105:25
**intrigued**
91:18
**introduced**
51:25
**introduction**
22:20
**invested**
87:2
**investigate**
56:23 57:11
**invitation**
101:18
**invitations**
102:2,12
**invite**
92:19
**invited**
101:11
**invoice**

68:21
**involved**
47:10 51:19 88:15
89:3
**Irvine**
2:19 3:13
**Isabelle**
107:11,12
**issue**
25:3 33:6 61:2
**issued**
60:17
**issues**
24:6,13 25:10 31:5
80:3 104:20
**Italian**
76:18

—————————
**J**
—————————
**Jakub**
27:3 39:8
**January**
93:17 94:6 99:14,20
110:24 111:9
**Jewish**
80:18
**Jim**
52:20
**job**
31:12 37:25 84:18
98:18,24 99:8
**Joe**
54:4
**John**
68:22
**joined**
4:7
**Jordá**
24:9,21 32:11,25
33:6,20,22 83:13,25
84:11 103:13,17
104:10
**Jowyn**
39:10
**judge**
76:25

**July**
20:15 25:22 38:11
**June**
38:10

—————————
**K**
—————————
**keep**
19:16 50:6,8 56:13
94:15 96:16 97:23
**keeping**
31:13
**Kelly**
2:5 3:20
**kept**
56:15 73:17 82:7
**kind**
10:15 11:17 12:12,13
14:10,22 15:19,21
15:22,23 16:5 20:10
21:5 23:7,23 24:16
24:22 26:2,12,21
32:11,13,25 35:4
37:4,5,5,7,8,19
38:24 41:20,21 43:6
43:10,11 45:11 50:7
50:17 57:7,16 66:12
74:5,8 81:14,23
82:5,6 83:23 85:10
85:11 86:6,13 87:14
87:14,15 91:22 94:8
97:23 98:2 103:11
**kinds**
50:9
**Kippur**
80:18,18,21
**knew**
22:7,7 25:5 42:7
51:13 57:3
**know**
5:11 9:25 15:23 21:4
21:20 22:11 23:16
23:21 24:15 27:24
29:5 31:14 32:17
33:18 41:7 43:5,12
45:9 47:6,17 48:25
48:25 49:4 51:8,12

51:18 52:17,24
53:23 54:2,4,4,5,7
55:9,23 56:2,6,7,10
56:17,25 60:20 64:7
70:8,10 72:5 73:25
74:8 77:19 78:21
80:3 81:3 82:6,11
83:13 84:9,17 85:13
85:14,24 86:22,25
87:5,5,15 89:9 90:3
90:4,7,14 92:11
93:20 105:19,24,25
106:20
**knowing**
31:25 103:15
**knowingly**
98:13
**knowledge**
61:7 69:2 98:8
**knowledgeable**
11:19
**known**
9:22,23 11:7 43:16
43:17 89:10,11
**Koppelman**
48:13

—————————
**L**
—————————
**L**
4:9
**lack**
101:3
**lady**
27:3
**Lane**
2:14
**last-minute**
81:13
**late**
12:20 102:3,12
**lavish**
40:17
**law**
1:15 15:19 63:3
67:14
**lawsuit**



52:3,5,14
**lawyer**
41:13 50:6
**lawyers**
5:18,24 6:3
**layer**
96:22
**Le**
38:9,16,17 100:23
101:5
**lead**
86:11
**leading**
43:17 97:3
**leads**
87:20,23 88:5
**leap**
26:6
**learn**
23:9 47:2
**learned**
16:10
**leaving**
103:7
**led**
8:18 105:23
**left**
23:19 31:21,23,24
72:6 78:8 103:3
**legal**
1:24 2:20 3:14,15
6:11,14 16:10,16
62:12 68:15 72:11
**legalize**
14:20
**legally**
67:11
**Leslie**
1:17 3:15 113:6
**let's**
37:20 69:15,15 74:12
**letter**
28:9 35:2,3,6 107:8
107:13
**letting**
28:23

**level**
26:18 73:14 76:16
78:23 92:8 100:5
**liaison**
13:15 27:5 96:20
**license**
17:13
**lies**
52:6
**life**
43:2
**limit**
6:22
**Line**
112:5,5,5,8,8,8,11,11
112:11,13,13,13
115:3
**link**
52:3
**links**
53:11
**list**
56:21 60:13
**lit**
80:25
**literally**
41:17
**little**
25:6 40:21 60:3 72:7
74:10 82:7 92:9,20
103:2
**live**
4:20,21
**lived**
41:9
**livery**
77:11
**lives**
27:14
**LLC**
1:8 2:13 17:12,15
57:9,15,18
**LLCs**
57:23 72:9
**LLP**
1:15 2:3,8 3:12

**loans**
60:16 61:2
**lobbying**
77:17
**logos**
81:2
**Lombardo**
54:5
**long**
20:12 23:16 26:20
30:10 36:10,21
39:14 47:18,19,20
70:9 89:8
**long-term**
41:10
**longer**
9:22 23:10 27:21
51:4
**longest**
41:11
**look**
8:10,10 44:23 93:13
93:20 95:6 99:10
107:10,16,21
**looking**
12:14 47:21 57:20
78:20 108:13
**looks**
45:3 48:8
**lost**
52:9
**lot**
22:13 33:15 47:22
53:19 57:23 72:3
83:10,22 85:17,17
86:12 88:7 91:19
105:20
**Lou**
54:8
**Luciani**
54:8,9
**Lucy**
83:16
**Lui**
1:9,9 51:13,13
**luxury**
54:5

23:2 76:13,20

---

**M**

---

**magical**
83:24 91:10
**Magna**
1:24 2:20 3:14,15
**main**
71:2,10
**maintenance**
13:11
**majority**
87:19
**making**
26:6 99:5
**man**
26:4 42:25 53:19
108:14
**management**
68:4
**manager**
48:15 85:20
**manner**
21:5
**Mans**
38:9,16,17 100:23
101:5
**mantra**
86:2
**manual**
85:3
**manufacture**
65:13
**manufacturer**
17:2 68:9 75:18
76:13 98:23
**manufacturing**
11:17 73:13 74:18
**mark**
84:6
**marked**
34:2,5 35:12 44:18
48:3 51:3 93:17
95:12 99:15 112:10
**marketing**
7:20 12:24 19:8,11



82:21
**marking**
28:11 35:10 44:14
**marks**
83:11
**Martin**
34:21 68:6
**massive**
83:14
**match**
35:14
**materials**
14:9
**matter**
3:5
**Matthew**
4:19
**Max**
45:16
**McLarens**
41:20
**mean**
47:9 76:25 85:9
  89:19 92:6 96:18
  97:3
**meaning**
15:5 78:20 97:16
**means**
16:5 24:16 49:2
  83:10 113:11
**meant**
49:4 96:3
**meet**
33:22 61:23 73:25
**meeting**
10:7 79:13
**meetings**
91:17
**meets**
22:17
**members**
57:18
**memorialized**
18:5
**men**
75:24

**mentioned**
12:16 20:19 25:11
  32:15 40:12 41:4
  45:7 53:15 65:5
  70:21 79:10 100:23
  105:3
**mentioning**
88:25
**Mercedes**
63:21,24
**message**
96:3
**met**
9:17,25 11:8 27:15
  54:8 83:13
**metalwork**
77:25
**method**
15:24
**Mexico**
67:12 90:19
**Miami**
90:10
**Michael**
54:5
**middle**
31:24
**Mike**
90:14,15
**Miller**
6:18,19 7:8,15,22
  17:23 22:16 26:8
  34:17 41:11,16
  48:14,15 55:11,17
  58:15 59:19 60:8,15
  60:25 63:20,25 64:3
  67:4,5,19,23 68:2
  68:13 69:4 75:12,23
  78:8 87:18 88:8,10
  88:12,14,17,20,22
  89:2,3,25 90:5
  91:11
**millions**
81:20
**mind**
12:2 20:16 25:7,15

39:13 50:6
**minutes**
46:10 69:13
**minutia**
95:2
**misappropriating**
32:6 105:7
**misappropriation**
33:7
**mischaracterization**
102:5
**mischaracterizes**
33:9 63:14
**model**
18:18 66:12 74:7
**moment**
20:7 28:13 81:14,22
  95:14
**money**
15:5 16:20 32:16,18
  33:16,16 43:7 87:3
  88:17,19 99:7
**month**
75:10 97:17 102:7
**months**
5:21 25:24 41:12
  42:24 62:14 65:3
  97:18,18
**morning**
3:2 70:4
**motive**
50:19 55:6
**Motor**
78:8 88:17 90:5
**Motorcars**
6:18,20 7:8,15,23
  22:16 26:8 34:18
  41:12,16 48:14,15
  55:12,18 58:15
  59:20 60:9,15,25
  63:21,25 67:4,6,19
  67:23 68:3,13 69:5
  75:12,24 87:18 88:8
  88:10,12,14,20,22
  89:2,25 91:11
**Motorcars'**

17:23
**move**
37:20 38:8 54:20
  55:8 74:14,20 78:5
  81:17
**moved**
37:5 78:7 81:16
**moving**
75:12 76:4 78:10
**Mullin**
2:8 4:6
**multiday**
38:16
**multiple**
15:8 81:15 82:2
**multitude**
24:17 104:14,16
  105:4
**Musk**
92:18
**mutual**
22:4 26:15
**mysterious**
14:15 26:4 71:21
  72:2

---
**N**

**N**
4:9 110:3
**N.A**
1:8
**naive**
105:23
**name**
4:18 27:14 57:21
  64:15 69:25 72:10
  83:16,19 90:15
**named**
24:21 75:24 108:14
**names**
27:7,18 87:25
**natural**
89:20
**naturally**
10:18 20:16 27:20
  28:2 66:12



**nature**
13:8,25 17:17
**need**
5:9 20:7
**needing**
78:24
**negative**
37:6 105:12,16 108:9
**Negatively**
105:19
**network**
26:16
**never**
19:2 28:8 54:8 57:6
    57:18 66:15 83:13
    84:2 88:21 92:11,22
    106:8,13,13
**new**
1:3,16,16,17 2:5,5,14
    3:10,10 4:21 17:12
    17:14 53:24 57:6
    61:21,23 62:8 65:12
    68:22,22 78:15
    80:14
**news**
25:17 26:9,16 37:13
**newswire**
48:17
**NHTSA**
63:4
**nice**
21:4 37:6 40:17
    46:13 49:13 54:14
    105:22
**night**
38:18 80:17
**nodding**
5:5
**noon**
69:16
**normal**
83:10 92:16
**Norman**
1:8 9:14,17 13:15
    20:22 21:16 23:13
    23:18 25:4,12 27:2

32:25 39:8 44:17
45:4 46:7,10,10,13
46:19 48:10,15,24
55:5 58:9 63:9,10
63:15 64:10 65:14
65:19 66:23 71:4,14
82:23 83:17 86:13
87:11,13 90:8 91:20
91:21 96:10,14,16
96:25 99:22 103:6
103:10,21 104:4,9
104:18,24 105:11
105:15,22 106:5,8
106:18,19 110:18
**Norman's**
106:11 108:4,21
**North**
12:15 18:3 67:7,18
**northern**
20:9 27:15
**Notary**
1:17 4:11 114:14
**note**
72:25
**noted**
109:4 114:6
**notes**
37:5
**notice**
1:14
**noting**
30:25 80:13
**number**
12:22 17:13 33:15
    58:16,18,20 59:6
**numbers**
35:13 36:7
**NW**
2:9

_____
**O**
**object**
7:24 9:15 10:13,22
    11:24 12:5,10 14:6
    16:17 17:19,25
    18:15 19:10,21 21:2

21:14,19,25 22:24
23:5 24:14 25:13,18
26:10,17 27:9 28:6
28:19 31:10,22 32:8
33:8 34:7,24 36:20
37:3,14 38:6,15
40:11 41:8 42:3
43:13,22 44:6 45:21
47:4,8 48:20 49:6
49:17,21 52:19 53:3
53:8,13 54:3,24
55:15,25 56:5 57:13
58:5,11 59:5,12,25
60:7,18 61:9,16,24
62:11,15,21 63:13
63:22 64:5,9,16,23
65:10,24 66:4,8,19
67:8,20,24 68:15
69:6 71:22,25 72:14
72:19,24 74:22
75:14 76:9 78:13
79:5,14,25 82:20
83:6 84:13 86:10,20
87:10 89:16 91:4,9
92:5,24 93:11 94:23
95:5 97:2 98:15,21
100:19 102:4,24
104:5,12,22 105:2,9
108:5,22
**objection**
7:25 8:3 55:21 61:11
    80:8 102:15,19
    105:18 106:7,10,23
    108:11
**objections**
61:4
**obligation**
24:23
**obviously**
34:11 45:8
**occasion**
22:12
**occasions**
5:23 22:8 49:16
**occurred**
38:10 40:9

**October**
51:24
**offices**
1:15 9:21
**official**
12:13,14 28:9
**officially**
44:10 64:19
**okay**
27:21 36:10 37:20
    46:3 63:11 69:11
    76:24,24 93:24
    99:16 100:13
**ongoing**
54:14
**online**
57:8
**open**
17:11 35:2,2,5 72:9
    72:22 107:8,13
**openly**
72:7
**operate**
29:18
**operating**
29:23
**opinion**
66:18,21
**opportunities**
38:22
**opportunity**
36:14 52:9
**opposed**
16:15 71:4 96:25
**oral**
18:10
**order**
29:11,16 30:8 34:16
    42:10,13 50:20
    57:10 62:9
**ordering**
55:13,19 59:16
**orders**
56:24 58:4
**organization**
26:2 27:4 57:12,18



82:16
**originally**
15:9
**outside**
9:5 68:23
**overall**
14:9 57:21
**overalls**
77:25
**overlapped**
22:13
**overnight**
38:20
**Overseeing**
13:14
**owner**
57:11 87:16
**ownership**
11:18 43:8 86:24

**P**

**P-A-C-H-M-A-R**
58:7
**p.m**
69:22 109:4
**P72**
18:18 34:17 42:17
46:16 54:15 55:14
55:20 57:10 59:16
62:20 65:13 74:6,6
79:17 87:17 93:3
94:10 95:24 96:4
100:2 101:12
107:14
**P72s**
19:17 58:14 67:17
77:12 93:4
**Pachmar**
57:25 58:3,10
**pack**
52:5
**Pagani**
41:19
**page**
36:4,8 44:22 46:2
47:17 53:21,21,25

55:5 93:23 107:21
110:6,13 111:5
112:5,5,5,8,8,8,11
112:11,11,13,13,13
115:3
**pages**
29:24 51:5 114:3
**paid**
18:20,22 19:2 32:14
32:18
**panned**
17:4
**paperwork**
68:8
**par**
61:18
**parent**
29:4
**parking**
81:18
**part**
55:11,17 63:4 79:7
**participate**
38:19
**participated**
12:23,23 46:23
**particularly**
23:4
**parties**
3:17 29:17 87:7
**partner**
86:23 87:12,13
**partners**
85:23 87:12
**party**
6:17
**pass**
68:13
**passed**
27:11 41:12
**passing**
9:25 24:6
**passionate**
10:15
**paths**
10:3

**patriotic**
73:15
**Paul**
2:10 4:8 45:15
**Paulo**
54:6
**pause**
5:10 8:3
**pay**
24:23
**paying**
6:11,14
**pending**
54:25
**Pennsylvania**
2:9
**people**
16:11 21:21 26:22
27:7,19,25 28:2
38:21 39:6 40:22
42:7 45:5,5,12,14
47:14 48:12 49:25
50:3,10 51:8 53:12
53:23 54:2 56:12
73:11 77:24 85:15
87:15 88:16,17,21
101:21 102:17
106:9,21
**Peralta**
90:18
**percent**
19:6 98:22
**perfectly**
70:12
**performance**
14:8 24:12
**performed**
20:25 66:7
**period**
27:25
**permission**
103:25
**permitted**
67:17
**person**
21:12 24:20 27:21

42:4 57:2,6,21 75:4
84:7 88:3 89:19
96:25 105:24
106:17
**person's**
23:3
**personal**
9:4 10:5,9 17:15
36:18 41:22 50:7
87:3 107:25
**personalities**
84:16
**Personally**
6:13
**perspective**
89:24
**Peter**
54:5
**phone**
23:13 25:12 32:3
46:14,24 47:3,5
**photos**
46:11,21 85:17
**physically**
66:15 81:3
**picks**
35:20
**picture**
85:22
**pictures**
54:15 57:21 85:22
107:6,7,10
**pieces**
16:7
**pitch**
13:17
**place**
31:19 38:17 70:8
80:14 81:25 86:4
107:9
**placed**
56:24 57:10 58:4
**plaintiff**
1:6 2:4 3:21,23,24
**plan**
39:24 78:15



planning
40:4,6 82:14 101:15
please
5:5 7:21 20:6 45:25
60:23
point
10:8 24:25 25:7
47:14 51:11 53:5
57:19 60:10 75:17
75:20 85:14 89:12
96:25
polite
108:6
poor
24:12 26:2
portion
35:24 36:11
portions
44:21 46:4 51:21
portrays
91:21
position
7:14,22 14:4 16:24
16:25 36:18 78:9
107:25
positions
7:18
positive
37:7
positively
96:7
poster
77:14
posters
73:10 77:20
potential
30:9
potentially
32:17
Power
100:2
PR
48:16
preceding
5:21
preparation

5:15 6:6 102:22
preparations
6:2
prepare
5:13 94:12
preproduction
61:22
present
2:17 3:18,24
presentation
13:17
presented
17:12 33:4 53:20
president
48:13 73:25
press
80:13,17
presume
51:25
pretty
30:15 44:2 58:20
69:8,17 73:22 92:7
92:10,19 102:22
prevail
48:24
previous
11:6 57:4 90:20
previously
7:17,19 12:18 22:7
34:17 89:7
primary
64:7
principle
18:8 67:9
printed
77:13
prior
10:7 43:19,24 52:8
61:20
private
20:11 72:9 87:6
privy
47:5
probably
9:25 10:17 20:16
41:11,16 44:9 50:8

56:18,21 57:2,7,20
66:25
problem
24:10 82:25
procedures
60:5
process
11:17 15:18 21:4,13
21:15 31:8,17,20
50:21 63:4,12 99:5
processes
86:6
produced
74:5
product
11:7,9,12 12:25 14:2
14:8,9,11,17 16:21
16:22 26:7 56:8
75:19 76:11 77:6
production
35:5 74:14 75:13
76:4,7 78:5,10,23
95:3 112:5
products
34:18
professional
14:13,14 19:23,25
21:3 113:7
profits
19:6
program
46:16 67:21 87:20
95:25 97:4 99:3
100:2
progress
54:15 66:22,22 75:10
93:5,9
progressing
96:7
project
8:17,18,19 26:19
27:23 42:20 43:4
50:15 74:2 81:7
86:7 88:11 107:11
projects
7:16

promise
15:6 16:19
promised
23:22 25:21,22,23
106:2
propounded
114:5
prospect
34:18 56:20
protection
88:22
protective
29:16 30:8
protocol
63:5
prototype
38:23
prototypes
81:19
provided
37:2
provision
69:3
Public
1:17 4:11 114:14
pulled
52:7
purchase
14:18,24 34:15
purchased
34:16 63:20,24 64:2
pursuant
1:14
put
16:24,25 45:8 47:13
51:14 80:24 81:25
83:18,23 84:18
102:10

_____
**Q**
_____
qualified
77:2,2
quality
66:7 78:23
question
10:23 13:7 21:6 23:6



25:8 28:22 29:2
40:14 51:7 54:25
55:2,16 60:2,23
83:11 84:6 88:18
91:5 105:14
**questions**
5:4 41:23 69:13,14
70:6,11 108:25
112:10 114:4
**quickly**
69:17
**quiet**
97:24,24
**quite**
106:16
**quote**
103:17 104:2

**R**

**R**
4:9 115:2,2
**race**
15:10,11 66:13
**racetrack**
38:22
**racing**
38:17
**raised**
83:7 106:13
**randomly**
51:14
**range**
28:16
**rare**
76:12
**rattle**
27:17
**reach**
8:16 88:3
**react**
26:9,16
**reaction**
25:16,19,19 37:13
**reactions**
27:8 38:5
**read**

28:13,23,25 29:20
36:11,21 37:9 44:19
45:9 46:4 51:20
84:4 93:23 98:5,7
107:22 114:3
**reading**
36:21
**ready**
36:2 79:19 85:25
86:3 93:21,25 94:2
**real**
90:15
**reality**
26:24
**really**
10:3 15:11 23:14
24:5 37:6,9,22
47:15 49:23 57:19
66:10 70:15 72:3,4
72:4 75:21 76:15
78:19,22 80:16 81:2
82:9 83:8,9,13
85:13,16 89:8 91:20
92:11 97:5,6,13,15
106:12
**reason**
5:10 6:21 31:18
51:17 59:10
**reasons**
24:4 91:11
**rebooked**
73:17
**recall**
8:20 18:10 23:17
26:11 27:7 28:3,7
32:9 33:23 34:22
37:23 38:4,7,9,24
39:6 40:8,25 41:3
45:23 46:23 47:21
49:18,19 51:14,15
53:4,6,10 57:22
58:3,8,9,14 59:3
64:13 65:18 66:5,11
69:7 76:5 106:25
108:13
**receive**

46:22 54:14
**received**
98:4
**receives**
68:3,10
**receiving**
28:3 64:21
**Recess**
30:21 69:20
**recipient**
37:12
**recognize**
34:9 44:24 48:5
**recollection**
35:3 70:16
**record**
3:3 4:18 11:6 30:20
30:24 31:2 56:19
69:19,22 109:3
113:4
**records**
56:13,15,17
**red**
83:8
**refer**
87:11
**reference**
100:8,9
**referral**
90:20
**referring**
36:7 52:18
**refunding**
15:5
**regards**
18:8
**register**
14:25 15:25 72:11
**Registered**
113:7
**regret**
36:17 107:23
**regularly**
13:18
**regulations**
62:8

**regulatory**
61:22 62:2
**related**
94:13
**relation**
13:4 27:5
**relationship**
11:21 12:8 13:9
17:18,24 18:5 41:23
43:15,21 44:2,4
52:25 65:17 89:6,8
97:7
**reliving**
83:19
**relying**
94:21 98:19
**remains**
96:8
**remember**
8:15,15 13:2 17:9
23:12,13,20 24:9,24
24:25 25:14 26:11
26:13 27:14 31:11
31:15,16 32:19
33:14 35:5 39:10
40:16,21 65:19
70:23 71:18 84:24
96:13 100:25
101:23 102:6 103:9
104:3 106:17 107:2
**removed**
58:23
**Renaissance**
73:9 74:11 79:8
84:21
**renderings**
13:16
**rented**
80:15
**repay**
60:16 61:2
**repeat**
10:23 13:6 21:6
55:16 60:22 91:5
105:14
**replica**



16:6
**replies**
52:11
**report**
98:24
**reporter**
1:17 3:15 5:2 95:22
113:7,12
**represent**
3:19
**representative**
6:19 20:20 21:9
**represented**
6:8 63:10
**representing**
18:9 20:23 91:12
**reproduction**
113:11
**reputation**
23:3,8
**request**
3:11 13:16 97:11
112:5
**required**
59:15 62:20
**research**
56:22
**resin**
66:12
**respected**
14:25
**respectful**
73:23
**respond**
51:17
**responding**
51:16
**responds**
46:8 52:13
**response**
46:12,18 52:4
**responses**
5:3
**responsibilities**
38:2
**responsibility**

63:16,18 98:23
**rest**
79:2
**restrictions**
59:23
**resulted**
15:3
**review**
6:5 30:14 95:7
**revival**
36:16
**Richard**
48:13 54:4 75:24
91:16
**RICHTER**
2:8
**right**
44:23 46:9 71:2,4,8
71:14,21,24 72:23
74:15,21 75:8,13,25
77:10,21 78:12 79:4
79:10,13,24 82:3,12
82:15,19 83:5 86:9
88:11 89:24 91:3
92:23 93:5,10 94:4
94:10,13,16,18,22
95:3,18,20,25 96:4
96:8,11 98:14,20
99:3,18,20,23 100:3
100:6,18 101:9,12
101:15,18 102:3,13
102:18 103:7 104:4
104:7,21,25 105:8
105:13,17 106:5,9
106:22 107:15,19
108:4,10,18,21
**road**
14:19,24 15:10,25
**Robertino**
39:18
**Roger**
54:9
**role**
8:6 13:12 17:21,22
19:24 20:25
**rolled**

77:14
**rolling**
82:7
**room**
72:6
**Roughly**
21:22
**Roush**
62:24 63:7,16 74:17
74:17 76:21,25
78:18 79:4 100:9
**RP**
85:4
**rule**
68:19
**rules**
4:25
**running**
50:11
**rush**
95:15
**Ryan**
1:5 2:18 3:24 8:12,13
9:17 15:14 16:15
20:14 21:15 22:17
24:3 26:18 27:2,4
27:24 31:25 32:10
36:12,14,23 39:11
40:13 43:15 46:5
48:23 52:2 53:4
60:10 70:14 71:2,11
71:17,24 72:17,22
73:8 77:9,16,20
78:17 79:3,8 82:12
82:13,14 83:18
84:10,24 86:2,9,11
86:12,15,16,23 87:8
87:17 88:2 89:7,10
90:5,7,8,23 91:6
93:8,16 94:4,12,21
95:10,17 96:6,14,23
96:24 97:5,7,8 98:5
98:19 99:13,17
100:5,17 101:14
103:3,7,14,16
104:10,19,25 105:7

105:12,16 106:5,9
106:20,20 107:22
108:2 110:23 111:6
111:8
**Ryan's**
38:5 97:25 98:22
102:21

---

**S**

**S-K-O-L-N-I-C-K**
90:9
**safe**
43:7 70:18 75:11
**safeguarding**
60:6
**sale**
18:21,23 31:19 57:17
67:22,23,25
**sales**
8:6,6,8,9 12:15 13:10
13:15,15,16 17:22
17:23 18:3,18,18
21:13,15 31:17
88:13
**sales-type**
20:25
**SAMUEL**
1:9
**sat**
76:11
**saw**
51:16,17 70:17 91:13
108:19
**saying**
54:12 83:2 108:6
**says**
35:2,18 36:6,12 37:8
37:10 46:5,6 48:21
48:22 49:3 52:4
94:15,18 107:23
**scared**
43:6
**schedule**
31:13 96:8
**scheduling**
80:3



**Schiller**
1:15 2:3 3:11,21,23
**schmuck**
48:23 49:2,9 106:5
  106:20
**school**
7:3
**Scottsdale**
20:13
**screwed**
52:8
**scripted**
21:5
**second**
8:4
**Security**
17:13
**see**
35:2 43:9 47:15
  53:20 54:16 55:6
  64:11 75:10 76:12
**seeing**
12:24 85:21
**seeking**
52:9
**seen**
13:3,3 64:18 66:11
  66:16
**select**
51:20
**selecting**
84:15
**self-funded**
61:17
**sell**
13:5 64:19 67:17
  88:6
**selling**
12:17 56:8 78:14
  85:2 90:23 91:6
**Seltzer**
2:15 4:2,2 9:16 28:21
  29:24 36:6 49:10
  60:22 61:11
**send**
35:4 60:11 85:22

97:8,12,16 98:13
  99:2
**sending**
37:23 88:16 98:6,16
  100:17
**sense**
10:15 41:23 50:20
  72:12
**sent**
34:23,25 37:25 38:3
  48:2,8 53:21 59:19
  59:20 60:8 88:2
  102:6 110:19
**sentence**
36:22
**separate**
22:8 64:2 68:23
**September**
1:16 3:7 113:7
**serious**
9:9 102:10
**service**
13:10 18:19
**Services**
1:24 2:20 3:14,16
**set**
17:15 30:13 60:4,5
  77:13 78:24 79:12
  100:22 103:14
**settle**
103:20,23
**setup**
23:7
**seven**
7:20
**shady**
71:24 72:13
**shaking**
5:5
**share**
21:17,23 50:5 85:25
**sharing**
48:16
**Shayna**
54:8
**Sheet**

114:6
**Sheppard**
2:8 4:6
**shipped**
81:19
**shit**
52:7
**shoot**
83:12
**short**
30:15 93:19 94:15
**shorter**
47:24
**shortly**
31:21
**show**
13:2 27:16 30:8 63:3
  63:5 67:21
**showing**
28:10 30:5 33:24
  44:13 47:23 50:22
  73:11
**shown**
8:24 11:9
**shows**
19:12,14
**shuttled**
38:21
**side**
13:15 72:10
**sign**
29:12,20
**signed**
29:10 32:16,19,24
  77:4
**silent**
86:14
**Silverman**
45:16
**similar**
52:8
**Simons**
2:6 3:22,22 29:14,19
  30:7,12
**single-page**
28:18

**Sitting**
103:9
**situation**
10:9 15:5 24:9,22
  26:4 43:10 81:5
  84:12 92:16 103:14
**situations**
86:13
**six**
41:12
**skill**
78:24
**Skolnick**
90:9
**slandering**
106:14
**slots**
56:20
**slow**
21:5
**slowly**
5:6
**small**
12:22 16:7 20:10
  26:24 27:4 92:14
**Smith**
68:22
**snowballing**
23:24 104:15
**Social**
17:13
**soft**
10:14 106:16
**sold**
14:16,22 15:10 31:15
  41:19,20 67:12
**solicit**
93:2
**solicited**
40:2
**someone's**
16:20
**somewhat**
21:5 86:13
**sorry**
20:17 101:3



sort
41:24 66:15
sound
92:10
sounded
73:14,15 74:4 80:10
84:7 87:4 89:7
91:10 92:12,20
sounds
45:10 76:19
SOUTHERN
1:3
space
20:11
Spain
107:11
speak
5:6,18,23 6:2 22:11
65:14 72:7 86:3
97:22
speaking
21:4 23:13 50:12
58:10 65:20
speaks
91:22
special
7:16 15:21 16:4
40:20
specialize
16:11
specific
11:18 15:5 16:12,21
17:9 23:12 31:12,19
35:24 37:21 42:20
44:21 57:19 59:22
81:22
specifically
10:2 13:2 15:14 18:4
63:21 90:7 104:9,24
105:6,12,16
speculate
70:10
speculation
44:7 49:7 60:19
Speed
20:15

spell
58:6
Spellane
2:13 4:3
spent
16:19
spoke
5:25 16:10,11 70:14
103:4
spoken
10:14 27:13 106:16
spokesperson
20:20,22 21:9 24:23
32:12 33:17
sporadically
13:24 97:19
spot
75:7 81:18
stable
61:8
standard
62:3 63:5
standards
61:23 62:5
Stanley
27:11 41:4,9 42:7
43:17 44:17 45:4
46:5,8,13,19 47:10
48:3,7,9 49:24 52:4
52:13 54:18,23
88:25 89:23 108:14
108:17 110:17,19
Stanley's
45:15,16 54:6,7
108:20
star
68:25
start
4:17 12:20 46:6
started
4:25 8:22 12:9,11
27:23 33:20 52:22
Starting
51:23
state
1:17 3:18 14:25

17:12,14 65:8
stated
63:7
stately
87:14
statement
98:2 107:22
statements
84:22,24 98:14,17
103:10
States
1:2 15:22 16:7 18:4
18:19 74:15,16
75:13 76:4,7,14
78:11 92:9
stating
4:17
statistics
14:8
status
61:15
stay
16:13 38:20
stayed
58:21
stipulate
48:21
Stipulations
112:8
stood
86:7
stopped
44:9 66:23
store
41:19 64:3
stored
59:24
storing
65:2
strange
81:23 84:9 92:20
Street
80:16
strenuously
52:6
strong

97:22
stronger
26:6
stuff
81:13
style
106:11,15 108:4
Subscribed
114:10
subsequently
58:18
substance
114:5
substantial
66:14
successful
10:16
sufficient
70:12
Suite
2:9
Sung-Fung
1:8 3:6
supervision
113:12
supplier
25:3 39:18
suppliers
24:7
support
46:16 74:20 112:3
supporting
39:17
supposed
23:25 73:16 79:18,19
80:14 83:15
sure
5:3 13:8 22:10 23:8
35:8,16,21 36:3
41:9 50:16 60:4
99:5 106:19
surprise
26:18 33:11
surprised
26:23 27:12,19,20
28:2 33:2



sweat
87:2
sweet
94:16
swirling
104:20
Switzerland
12:25
sworn
4:10 113:4 114:10

---

**T**

T
110:11 111:3 115:2
take
35:23 36:13 62:14
69:13,15 79:19
80:14 91:25 95:7
97:18
taken
1:14 3:9
talk
74:2,10 76:11 86:3
86:15 88:6 96:19
97:21 103:2
talking
5:8 46:14 54:10,13
84:20,22 86:12 94:8
tax
64:21
team
36:12 85:24 100:12
technically
29:15,21
telephone
46:20
tell
12:7 24:11 31:8
38:13 41:6 44:22
45:13 48:11 70:11
70:13 79:21,22
85:19 86:14 95:2
96:24 98:19 103:7
104:19
telling
72:18 73:23 86:16

96:6
tells
94:12
term
41:11
test
39:23 84:5
tested
16:3,3
testified
4:11
testify
6:22
testimony
33:9 41:5 63:14
101:23 104:17
113:5
testing
62:9,13,20 63:2,5,12
63:17
text
93:15,19 94:3 110:22
thank
5:12 36:14 46:8,19
54:19 70:5 95:24
107:5 108:24
thanks
4:15,16
their's
90:11
themes
83:23
thing
49:13 66:11 84:15
things
14:15 23:20,21,25
24:18,18 25:11 46:7
49:14 50:8,17 52:5
53:18 66:24 72:3,5
72:8,11,13 73:2
82:8,24,25 84:19
85:10,16,17,21 86:4
86:6,17 90:23 91:7
91:13 97:7,23
103:12,24 104:14
104:16 105:4

106:19 108:18
think
8:13 12:12,20 17:14
19:6 20:7 23:7 24:5
25:2,4,19,20 27:10
27:19,22 29:17 30:4
32:12 37:16,17,17
39:13 43:11,25 44:8
44:25 50:18 54:6,7
54:11 68:18 69:16
72:17 75:16,20
80:13 81:12 82:5
83:25 84:16 87:14
88:10,17 89:3 90:25
92:17 101:20 103:3
103:11,18 104:13
105:20
thinking
40:13
thought
40:19 72:22 90:22
thousand
103:19
thread
93:15,19 94:3 110:22
three
36:8 56:8
time
3:8 9:24 10:2 14:2
16:19 17:10 23:21
24:4,6 25:5 27:25
30:18,22 31:25
35:23 39:15 40:23
43:14 68:20 69:21
70:9,13 71:7 74:13
81:14,16,22 82:6
95:7 97:14,15 100:2
103:3 108:7,25
109:2,4
timeframe
40:9
times
13:23 72:21 81:15
82:3 96:17
title
64:14,18

today
3:7 5:15,20 6:9,23
61:3 70:5,6,17
103:9 108:25
today's
5:14
told
15:6 23:17 24:20
25:12 61:19 65:11
73:2 74:25 77:16
79:8,12 82:2 85:15
85:15 86:23 87:8
103:10
Tomaso
1:8 6:14,19 8:18,24
10:21 11:2 17:18,24
18:2,9,21 19:9,20
20:4,20 21:8,12
23:10 25:24 26:21
28:5 31:21 32:24
33:21 34:19 36:13
38:23 39:4 42:16,17
42:21 43:15,18,20
45:20 46:16 52:7,10
52:15 54:12 55:3
57:5 59:9,21 60:17
61:3,7 62:19 63:19
64:4 65:13,15 67:4
67:6,17 68:2,12,21
69:4 71:7,10 74:6,7
74:13 78:4 81:2
82:19 86:24 88:4
90:11 91:12 101:9
101:11 103:3
Tomaso's
60:12 61:14 83:20
87:22
top
20:16 27:18 41:18
topics
25:15
total
7:11
touch
76:20
track



11:6 19:16
**Train**
100:2
**transact**
68:14
**transcript**
90:25 113:11
**transcription**
114:4
**traveling**
19:12
**tried**
40:12
**trip**
20:8,14 79:16 92:9
**trips**
20:2,8
**truck**
81:18
**trucks**
79:19 81:12
**true**
31:20 77:18 86:18,21
  86:25 90:24 91:8
  92:4 98:9 113:4
**trusted**
88:13
**trusting**
100:16
**truth**
72:18 82:11 98:20
**truthful**
84:25 85:2 98:25
**truthfully**
6:23 73:2
**try**
5:6,7 8:3 98:11
**trying**
39:13
**tubes**
77:14
**turned**
14:20 15:2
**Tusa**
2:13 4:3
**twice**

5:25
**two**
9:20 47:10 51:5 53:7
  56:7 75:24 81:7
  87:7 106:3
**types**
27:8 53:11 83:22
**typically**
16:2 57:15 76:15
  106:14

---
**U**
---

**U.S**
14:16 17:6 67:14
**unaware**
33:3
**unclear**
25:7 53:15 59:2
**uncomforting**
89:18
**undergo**
62:8
**underneath**
82:4
**understand**
72:4 84:10
**understanding**
14:7,10,23 15:7,19
  18:8,13,17 21:11
  24:19 32:23 40:4
  56:11 61:12 62:18
  63:15 67:13 68:11
  77:3 78:17 84:14,17
  91:23 94:25 102:9
**understandings**
11:16
**understood**
104:17
**unethical**
11:23
**UNICORN**
1:9
**unique**
15:19
**unit**
19:7

**United**
1:2 15:22 16:6 18:3
  18:19 74:15,16
  75:13 76:4,7,14
  78:11 92:8
**University**
7:3
**unmet**
24:18
**unnecessary**
25:25 82:6
**unpaid**
65:4
**untruthful**
84:22,23
**update**
94:13 95:25 96:14
  97:9 99:25 100:6,8
**updated**
78:15
**updates**
34:25 35:4 94:9,20
  98:9 99:3,8
**upset**
50:19
**use**
17:15 80:10
**usually**
93:7

---
**V**
---

**v**
3:6 4:9
**vague**
8:14 23:11 53:18
  58:24
**vaguely**
23:20 24:24 25:14
  31:16 54:6
**Valkyrie**
68:7
**variety**
96:17
**various**
8:6,9 19:12,14 105:4
**vehicle**

15:25 16:8 25:22
  59:9 61:21 63:6,20
  64:3,8,12,15 67:15
  72:12
**vehicles**
18:21 19:9 31:5
  42:11,14,16 55:13
  55:19 58:4 59:4,11
  61:23 62:8 67:7
**vendor**
39:18
**vengeance**
52:10
**venue**
80:17,23
**verbal**
5:3 12:13
**verbally**
95:21
**vested**
86:24
**videographer**
2:19 3:2,13 30:18,22
  69:18,21 109:2
**videotape**
3:4
**Videotaped**
1:14
**vintage**
38:24
**violate**
68:12,24
**visit**
9:20
**visiting**
79:9
**vocal**
43:8
**voice**
76:3 106:13

---
**W**
---

**Wagon**
63:21,24
**Waldo**
2:5 3:20,20 4:14



28:10,17,23 29:8,12
30:2,16,25 34:2
35:17,21 44:15
47:25 50:24 69:9
71:22,25 72:14,19
72:24 74:22 75:14
76:9 78:13 79:5,14
79:25 80:8 82:20
83:6 84:13 86:10,20
87:10 89:16 91:4,9
92:5,24 93:11 94:23
95:5 97:2 98:15,21
100:19 102:4,15,19
102:24 104:5,12,22
105:2,9,18 106:7,10
106:23 108:5,11,22
110:7

**Wall**
80:16

**want**
26:12 28:25 37:17,19
44:20,23 47:15 56:9
70:9 74:10 75:15
85:24 91:14 93:13
93:23 95:6 99:7,10
103:2 107:16

**wanted**
51:18 56:6 78:24
86:15

**warm**
41:22

**Washington**
2:10 73:21 79:16

**wasn't**
32:20,21,22 40:15
44:9 50:19 66:10
72:22 76:22,23
87:16 97:14,14
103:22

**way**
14:19 31:23 72:11
91:20,21 102:3
108:6

**ways**
91:22

**we've**

89:10,11 97:24

**website**
87:21,24 90:4

**week**
13:24 45:19 73:19

**weekend**
20:12

**weeks**
42:23

**welcome**
44:19

**well-known**
42:5,8

**well-liked**
42:8

**WENG**
1:9

**went**
7:2 22:3 40:23 74:19
75:2,4,5 76:22 81:4
89:9 102:12 107:13

**weren't**
23:22 24:2 58:24
78:17,22 97:14

**Werner**
2:10 4:8 30:11

**west**
90:15

**whatsoever**
30:10

**White**
73:7,16,20 74:12
79:9,13 83:2 84:20
91:25 92:7,10,16,18

**widely**
50:17

**Wigger**
2:11 4:5,5 7:24 9:15
10:13,22 11:24 12:5
12:10 14:6 16:17
17:19,25 18:15
19:10,21 21:2,14,19
21:25 22:24 23:5
24:14 25:13,18
26:10,17 27:9 28:6
28:15,19 29:2,10,17

30:4 31:10,22 32:8
33:8 34:7,24 35:13
35:18 36:20 37:3,14
38:6,15 40:11 41:8
42:3 43:13,22 44:6
45:21 47:4,8 48:20
49:6,17,21 52:19
53:3,8,13 54:3,24
55:15,21,25 56:5
57:13 58:5,11 59:5
59:12,25 60:7,18
61:4,9,16,24 62:11
62:15,21 63:13,22
64:5,9,16,23 65:10
65:24 66:4,8,19
67:8,20,24 68:15
69:6,12,24 93:14
99:10 108:24 110:8

**wild**
39:18 92:11

**willing**
11:4

**wish**
36:23 108:2

**wishes**
11:17

**wishing**
11:5

**withdrawn**
31:3

**withheld**
86:5

**witness**
2:13 4:4,10 29:5,6,10
30:9 60:21 69:11
107:5 113:3,5

**woke**
5:16

**woman**
83:24 84:2

**word**
49:2,12 72:2 80:10

**words**
71:20 104:4,15

**work**
5:17 6:18 7:6 36:15

55:11,17 65:15 66:3
66:7,10 78:21 85:19
87:12

**worked**
15:20 16:18 71:7
77:22

**working**
13:14 17:5 23:10
26:19 33:20 41:15
53:4 54:11 65:23
70:21,25 73:12
77:25 81:7 100:12
101:8

**works**
27:21

**world**
8:24 12:22 80:4
108:8

**worth**
80:13 81:20 88:24

**wouldn't**
22:4 58:3

**wow**
27:21

**wrap**
69:16

**writes**
51:24

**written**
18:11,12 28:4 37:11

**wrong**
52:16

**wrote**
34:11 53:19

**www.MagnaLS.com**
1:25

___

**X**

**x**
1:4,11 110:3,11
111:3

___

**Y**

**Y**
4:9

**Yards**



  1:15 2:4 3:10
**yeah**
  17:11 19:25 22:12
    39:21 43:14 45:2,7
    51:11 56:25 62:4
    66:24 72:25 77:22
    79:20 86:19 87:11
    98:7 108:6
**year**
  17:9 31:12 43:3,4
    70:18 80:19
**years**
  7:10,13,20 9:20
    23:15 26:5,13 31:13
    34:10 36:16 43:17
    81:8 89:11,11 104:7
**Yiddish**
  49:2,12
**Yin**
  90:14,15
**Yom**
  80:18,18,21
**York**
  1:3,16,16,18 2:5,5,14
    3:10,10 4:21 17:12
    17:14 68:22,22
    80:15

_____
Z
_____

_____
0
_____
**05**
  85:8
**06**
  85:8

_____
1
_____
**1**
  3:4 28:12 31:2 56:19
**1:23-cv-04305(AS)**
  1:7
**10**
  12:21 19:6 69:13
**10:00**
  81:21
**10:08**

  1:16 3:8
**10:40**
  30:19
**10:54**
  30:23
**100**
  2:9
**10001**
  2:5
**11:43**
  69:18
**11713**
  2:14
**12:03**
  69:22
**12:45**
  109:3,4
**13**
  7:13
**15**
  69:15
**18**
  25:24
**1976**
  89:2

_____
2
_____
**2**
  34:3,4 56:19 107:17
    110:14
**20**
  47:13
**20006-6801**
  2:10
**2005**
  85:9
**2006**
  85:9
**2017**
  8:25 9:19
**2018**
  8:22,25 9:19
**2019**
  8:24 20:14 25:23
    27:23
**2020**

  58:14 95:11,20 111:7
**2022**
  38:11 59:4 70:17
    93:17 94:6 99:15,20
    107:14,18 110:24
    111:9
**2023**
  51:25
**2024**
  1:16 3:7 113:7
    114:11
**2099**
  2:9
**21**
  31:14
**24**
  1:16 3:7 113:7
**250,000**
  99:7
**27**
  107:18

_____
3
_____
**3**
  35:10,11 51:24 56:19
    107:2 110:16
**30**
  2:14 46:10
**305**
  46:2
**32**
  110:14
**35**
  110:16
**36**
  58:17

_____
4
_____
**4**
  44:15,16 56:19 110:7
    110:17
**44**
  110:17
**454**
  35:20
**469**

  35:20
**474**
  36:5
**48**
  59:4 110:19

_____
5
_____
**5**
  47:25 48:2 110:19
**51**
  110:21
**51818**
  53:22
**55**
  1:15 2:4 3:10

_____
6
_____
**6**
  50:25 51:2 110:21
**624-6221**
  1:24
**69**
  110:8

_____
7
_____
**7**
  93:14,15 110:22

_____
8
_____
**8**
  95:10 111:6
**816**
  51:23
**866**
  1:24

_____
9
_____
**9**
  99:12,13 111:8
**93**
  110:22
**95**
  111:6
**99**
  111:8

