# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
RYAN BERRIS,
          Plaintiff,
                          Case No.:
     -against-            1:23-cv-04305(AS)
SUNG-FUNG CHOI (a/k/a NORMAN CHOI),
DE TOMASO AUTOMOBILI HOLDINGS N.A. LLC,
HIN WENG LUI (a/k/a SAMUEL LUI),
GENESIS UNICORN CAPITAL CORP.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - x


            DEPOSITION TAKEN VIA ZOOM

            September 20, 2024

                8:02 a.m.

        Videotaped deposition of SAMUEL
    LUI, held at the above-mentioned time,
    before, LESLIE FAGIN, a Court Reporter
    and Notary Public in the State of New
    York.



                    - - -



    MAGNA LEGAL SERVICES - (866) 624-6221
                www.MagnaLS.com



Page 2

```
 1
 2   APPEARANCES:
 3
     BOIES SCHILLER & FLEXNER LLP
 4   Attorneys for Plaintiff
             55 Hudson Yards
 5           New York, New York 10001
     BY:     SOPHIE ROYTBLAT, ESQUIRE
 6           JOHN ZACH, ESQUIRE
             DAVID SIMONS, ESQUIRE
 7
 8   SHEPPARD MULLIN RICHTER & HAMPTON LLP
     Attorneys for Defendants
 9           2099 Pennsylvania Avenue, NW
             Suite 100
10           Washington, D.C. 20006-6801
     BY:     ALEXANDRA BUSTAMANTE, ESQUIRE
11           HANNAH WIGGER, ESQUIRE
12
     ALSO PRESENT:
13
     DIANA MAJCHER
14
     RYAN BERRIS
15
     NORMAN CHOI
16
     BOB BEHRENS, Videographer
17     Magna Legal Services
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2              THE VIDEOGRAPHER:  Good morning.
 3       We are now on the record.
 4              Today's date is Friday, September
 5       20, 2024 and the time is now
 6       approximately 8:02 a.m.
 7              This begins the videotaped
 8       deposition of Samuel Lui in the matter
 9       of Ryan Berris versus Sung-Fung Choi, et
10       al.
11              Will counsel please identify
12       yourselves for the record?
13              MR. ZACH:  Good morning.  John Zach
14       on behalf of plaintiffs.  Also on the
15       video are David Simons, Sophie Roytblat
16       is not on the video, but she is sitting
17       adjacent to me and Mr. Berris the client
18       is also in the room with me.
19              MS. WIGGER:  Good morning.  My name
20       is Hannah Wigger from Sheppard Mullin.
21       I'm joined by my co-counsel, Alexander
22       Bustamante, and party representatives,
23       Diana Majcher and Norman Choi.
24              THE REPORTER:  I need to make
25       statement on the record, because I'm not
```



Page 4

```
 1                    S. Lui
 2       with the witness.
 3            The attorneys participating in this
 4       deposition acknowledge that I am not
 5       physically in the deposition room, and
 6       that I will be reporting this deposition
 7       remotely.
 8            They further acknowledge that in
 9       lieu of an oath administered in person,
10       I will administer the oath remotely.
11            The parties and their counsel
12       further agree that the witness may be in
13       a state where I am not a notary and
14       stipulate to the witness being sworn in
15       by an out-of-state notary.
16            If any party has an objection to
17       this manner of proceeding, please state
18       so now.
19            (No objection.)
20  S A M U E L   L U I,   called as a witness,
21       having been duly sworn by a Notary
22       Public, was examined and testified as
23       follows:
24  EXAMINATION BY
25  MR. ZACH:
```



Page 5

```
 1                    S. Lui
 2        Q.    Good evening, Mr. Lui.  My name is
 3   John Zach.
 4              We have never before, have we?
 5        A.    No.
 6        Q.    Yesterday you appeared in your
 7   capacity as a representative of Genesis
 8   Unicorn and you gave your personal
 9   background.
10              Do you recall that testimony
11   yesterday?
12        A.    Yes.
13        Q.    Is there anything about your
14   personal background yesterday that you want
15   to change?
16        A.    No.
17        Q.    Okay.  I'm just asking, that way, I
18   don't have to go over it again.
19        A.    Yes.
20        Q.    So I would like to begin -- some
21   preliminaries.  As with yesterday, if you
22   ever want to take a break, just let me know.
23   I may have to finish a question or two, but
24   we can take a break at your convenience.
25        A.    Okay.
```



Page 6

1                    S. Lui

2        Q.    And as with yesterday, you

3    shouldn't have any electronic devices on or

4    texting, texting appliances or what have you.

5    Okay?

6        A.    Yes.

7        Q.    So just to confirm, you don't have

8    any, other than the computer or whatever it

9    is you are appearing on, you don't have any

10   other electronic device in front of you?

11       A.    No.

12       Q.    So I would like to begin by marking

13   Lui 1 which is a series of chats between you

14   and Norman Choi.  Okay, I will bring that up.

15            (Lui Exhibit 1, series of chats

16            between Samuel Lui and Norman Choi,

17            marked for identification.)

18       Q.    So we can scroll -- we are going to

19   be coming back to this document.

20            MR. ZACH:  But, Sophie, if we can

21            scroll down so he can just see it and

22            Hannah can see it.

23            MS. WIGGER:  It's very long.  When

24            we get to the section they are talking

25            about, Sam, if you need more context,



```
 1                    S. Lui
 2        they can scroll up or down for you.
 3        Q.   Exactly.  We will be going back to
 4   it, but we are marking this now because we
 5   are going to start with it.  We will go to
 6   Bates 277 on this.
 7             At, it looks like 2244.  It's a
 8   little hard on these.
 9             MR. ZACH:  Can you scroll down a
10        little bit more, Sophie?
11        Q.   So you see, sir, on 8/25/21, you
12   forward an SEC link to Mr. Choi?
13             Do you see that?
14        A.   Yes.
15        Q.   You say:  Et's have a chat when you
16   are available.
17             Do you see that?
18        A.   Yes.
19        Q.   Then Mr. -- he says, Thanks.
20   Samuel.  Apparently my friend's company, Day
21   Cook (phonetic), is also going to SPAC.
22             Do you see that?
23        A.   Yes.
24        Q.   Does this refresh your recollection
25   that in or about August of 2021, you were
```



Page 8

```
 1                    S. Lui
 2    considering working on a SPAC?
 3         A.   Yes.
 4         Q.   I would like to look at the -- take
 5    that down and we will look at what is now Lui
 6    2.
 7              (Lui Exhibit 2, SEC Form S-1,
 8         marked for identification.)
 9         Q.   This is the SEC Form S-1.
10              MS. WIGGER:  Does this have a Bates
11         stamp or no?
12              MR. ZACH:  No, this is off the SEC
13         website.
14              MS. WIGGER:  If these do have a
15         Bates stamp, can you put it on the
16         record, otherwise, we will assume they
17         weren't produced.
18              MR. ZACH:  That's fine.
19         Q.   Mr. Lui, this is -- you are
20    familiar with how the SEC works, right?
21         A.   Yes.
22              MS. WIGGER:  Object to form.
23         Q.   You can file, a company makes
24    filings with the SEC that are publicly
25    available on a service called Edgar, right?
```



Page 9

```
 1                    S. Lui
 2        A.   Yes.
 3        Q.   And I take it you have some
 4   experience looking at Edgar and using Edgar?
 5             MS. WIGGER:   Object to form.
 6        A.   Yes.
 7        Q.   So looking at this document, do you
 8   see that it's filed as of July 1, 2021?
 9        A.   Yes.
10        Q.   What, sir, do you know what a Form
11   S-1 is?
12        A.   Yes, I do.
13        Q.   What is it?
14        A.   It's like a prospectus.
15        Q.   You would agree with me that the
16   way -- strike that.
17             A prospectus is a document filed
18   with the Securities and Exchange Commission
19   that is used to begin an IPO, right?
20        A.   Yes.
21        Q.   And the way it works is that if you
22   want to file a prospectus, you file an
23   initial sort of draft prospectus with the SEC
24   so it can review it, is that right?
25        A.   Yes.
```



Page 10

```
 1                     S. Lui
 2        Q.    So to your understanding, is this
 3   the sort of initial prospectus filed in
 4   connection with Genesis Unicorn?
 5              MS. WIGGER:  Object to form.
 6        A.    Yes.
 7        Q.    So let's go to the second page and
 8   you can stop there.
 9              You see sort of to the bottom, Mr.
10   Lui, there is a calculation of registration
11   fee?
12        A.    Is that footnote 1 you are
13   referring to?
14        Q.    No.  There is like a chart, a table
15   that has shares and like five columns.
16        A.    Yeah.
17        Q.    The second to last column says
18   proposed maximum aggregate offering price.
19              Do you see that?
20        A.    Yes.
21        Q.    There, it's $115 million.
22              Is that, at least to your
23   understanding, is that with respect to the
24   initial S-1 filed for Genesis Unicorn, they
25   were looking to raise about $115 million?
```



Page 11

1                      S. Lui
2        A.    Yes, that's what it says on this
3    portion of the document.
4        Q.    As you sit here, do you recall, I
5    know -- strike that.
6              At this point in July of 2021, did
7    you have any connection with Genesis Unicorn?
8              MS. WIGGER:   Object to form.
9        A.    No.
10       Q.    When did you first meet the folks
11   that were associated with Genesis Unicorn?
12             MS. WIGGER:   Object to form.
13       A.    I'm going to repeat what I said
14   yesterday.  I was introduced to Genesis
15   Unicorn -- I was introduced to the financial
16   advisor of Genesis Unicorn, ARC Group, I
17   believe, was July 2021, so that was the first
18   date.
19       Q.    If we scroll down to the next page,
20   do you see we were talking earlier about
21   filing sort of a preliminary prospectus for
22   the SEC to review?
23             Do you see at the top of this page,
24   how there is sort of a notice that says, The
25   information in this preliminary prospectus is



Page 12

```
 1                    S. Lui
 2   not complete and may be changed, you may not
 3   sell the security until the registration
 4   statement filed with the SEC is effective.
 5            Do you see that?
 6       A.   Yes.
 7       Q.   You are aware that this sort of
 8   banner or disclaimer is utilized until the
 9   SEC sort of authorizes the filing of the
10   final prospectus, right?
11            MS. WIGGER:  Object to form.
12       A.   Yes.
13       Q.   Then if you look at the first
14   paragraph below where it says Genesis Unicorn
15   Capital, there is, it describes a little bit
16   about Genesis Capital and you will see maybe
17   on the third line, a sentence that says, We
18   have not selected any specific business
19   combination target and have not, nor has
20   anyone on our behalf, initiated any
21   substantive discussions, directly or
22   indirectly, with any business combination
23   target.
24            Do you see that?
25       A.   Yes.
```



Page 13

1                       S. Lui

2       Q.   So you understand, sir, that at

3  least in connection with the SPAC, the SPAC

4  itself is not permitted by law to select a

5  target prior to issuing its shares, right?

6       A.   Yes.

7            MS. WIGGER:   Object to form.

8       A.   Yes.

9       Q.   You would agree with me, that's a

10  basic concept of how SPACs work, right?

11            MS. WIGGER:   Same objection.

12       A.   Yes.

13       Q.   And you understand that it's

14  actually illegal to select a target prior to

15  issuing the shares, right?

16       A.   Did you say legal or illegal?

17       Q.   Illegal.   It's wrong to do it.

18       A.   Yes, I agree.

19       Q.   And I take it you understand that

20  making filings with the SEC is a serious

21  matter, right, sir?

22            MS. WIGGER:   Sorry, I just froze

23        and cut out and missed the last three

24        questions.

25            MR. ZACH:   Do you want to have them



Page 14

```
 1                    S. Lui
 2      read back?
 3           MS. WIGGER:  I didn't get my
 4      objections on, so, yes, I do.
 5           Can you please read them back?
 6           (Record read.)
 7           MS. WIGGER:  To the extent these
 8      are legal conclusions, but with that,
 9      you can go on, sorry.  I will keep my
10      video off until my internet stabilizes.
11      Q.   The last question on this page, Mr.
12 Lui, is -- the last sentence of that
13 paragraph we were looking at states, While we
14 may pursue an initial business combination
15 target in any business industry or geography,
16 we intend to focus our search on the
17 intersection of the healthcare and technology
18 industries, specifically within the
19 biotechnology and pharmaceutical sectors.
20           Do you see that?
21      A.   Yes.
22      Q.   So at least according to this
23 document, the Genesis Unicorn was going to
24 focus its efforts to identify a target as of
25 July 2021 in the healthcare and technology
```



Page 15

```
 1                    S. Lui
 2   industries.
 3            You would agree with that?
 4        A.    Yes.
 5        Q.    Turning to -- you can take that one
 6   down.
 7            Was it your understanding, sir,
 8   that Genesis Unicorn entity was trying to be
 9   a publicly listed entity on the NASDAQ?
10            MS. WIGGER:  Object to form.
11        A.    Yes, I believe that was the
12   intention.
13        Q.    And that the NASDAQ is a stock
14   exchange located in the United States, right?
15        A.    Yes.
16        Q.    And it's one of several exchanges
17   that are located in the U.S., right?
18        A.    Yes.
19        Q.    Now, let's go back to your Lui 1.
20   I'm going to try to do this.  Mr. Lui, I'm
21   trying to go sort of chronologically so we
22   can move forward in time.  I will try not to
23   jump around out of temporal, like jump around
24   out of time.
25            So turning to 280.  We've got, if
```



Page 16

                    S. Lui
1
2    you look at 10/21 at 1650, Mr. Choi texts
3    you, Last remaining items of the SPAC going
4    well?  You respond, Yes, I'm going to sign
5    off on the documents to take over the SPAC by
6    tomorrow.
7              Do you see that?
8         A.   Yes.
9         Q.   So you would agree with me that
10   here, you and Mr. -- you and Norman Choi are
11   having a text exchange relating to your
12   intention to take over the Genesis Unicorn
13   SPAC, right?
14        A.   Yes.
15        Q.   I think you had previously
16   testified that it was through ARC that you
17   came to know about Genesis Unicorn, right?
18        A.   Yes.
19        Q.   So then if you look at, go down a
20   little bit further, at 10/22 at 1641 you say,
21   I am working ARC Capital of my current SPAC
22   who is the same advisor on this digital world
23   acquisition SPAC, and then Mr. Choi says, You
24   picked the right partner.
25              Do you see that?



Page 17

```
 1                    S. Lui
 2       A.    Yes.
 3       Q.    How was it that you learned -- how
 4   were you introduced to the folks at ARC?
 5            MS. WIGGER:  Object to form.
 6       A.    I was introduced -- now, they are
 7   called ARC Group, back then, they were called
 8   ARC Capital through Mr. Heng Teck Yong, Mr.
 9   Heng, H-E-N-G, T-E-C-K, Y-O-N-G.  That was in
10   July 2021.
11       Q.    Why was it at this time that you
12   were -- strike that.
13            What was your relationship with
14   Norman Choi at this point in October 2021?
15            MS. WIGGER:  Object to form.
16       A.    We were new acquaintances.  I only
17   knew Norman a few months back, I think it was
18   in April or May 2021 so we were very recent
19   acquaintances.
20       Q.    And for what reason were you
21   advising Norman Choi that you were taking
22   over the SPAC in October of 2021?
23            MS. WIGGER:  Object to form.
24       A.    Norman worked in the same
25   investment bank as me previously which was
```



Page 18

                              S. Lui
1
2    Merrill Lynch in Hong Kong so we are both
3    interested in the capital markets in general
4    so we talk a lot in general about capital
5    markets and at that time, I think Norman
6    express early interest in raising funds via
7    listing through a SPAC.
8         Q.    And did you recall when Mr. Choi
9    sort of expressed that interest to you about
10   raising capital through a SPAC?
11             MS. WIGGER:   Object to form.
12        A.    No, I can't remember exactly.
13        Q.    So let's go to the next document
14   which I believe is going to be Lui 3.
15             (Lui Exhibit 3, two-page document
16             bearing the ARC logo, marked for
17             identification.)
18             MR. ZACH:   Let's scroll down so
19             everyone can see it.
20        Q.    This is a two-page document that's
21   really -- the last page only has the ARC logo
22   on it.
23             If you look below, let's start at
24   the lower email, you see on October 28, 2021,
25   Sergio Camarero emails you and an individual



Page 19

                        S. Lui

1

2    named Hapan Nga Hannah (phonetic).

3            Who was Sergio Camarero?

4        A.    Sergio is the contact that I was

5    introduced to at ARC Group.

6        Q.    Would it be fair to say he was sort

7    of like the liaison at ARC Group that you

8    would speak to when you needed something from

9    them?

10       A.    Generally, yes.

11       Q.    If you notice, your email here is

12   at LV Cap Limited.

13            Do you see that?

14       A.    Yes.

15       Q.    Is that where you were working at

16   the time?

17       A.    Yes, that's my company.

18       Q.    That's a company that you own?

19       A.    Yes.

20       Q.    What is the -- what sort of

21   business is LV Cap Limited?

22       A.    We do private investments.  I help

23   companies as well to do fundraisings and

24   also, if needed, I help them in their listing

25   plans as an IPO.



Page 20

1                    S. Lui

2       Q.    How many employees are there at LV

3   Cap Limited?

4       A.    It depends which time you are

5   talking about.  At any point in time,

6   probably a handful.

7       Q.    Around this time period in October

8   2021, how many people did you have?

9       A.    I can't recall.

10       Q.    Did you have office space?

11       A.    Yeah, I have an office space.

12       Q.    The folks that work for you would

13   report to that office space?

14       A.    At that point in time, probably not

15   because it was Covid.

16       Q.    Where were the offices of LV

17   Capital located?

18       A.    In Hong Kong.

19       Q.    You see going back to the email,

20   Hi, Samuel, As discussed, please find

21   attached De Tomaso engagement letter.

22            Do you see that?

23       A.    Yes.

24       Q.    It says, I send you Word version in

25   case you want to make any modification.  We



```
 1                    S. Lui
 2   have three SPACs recently listed that would
 3   like to start talking to them and I -- and
 4   one more will get listed in one to two weeks'
 5   time.
 6            Do you see that?
 7       A.   Yes.
 8       Q.   So this is Mr. Camarero sending you
 9   an engagement letter for De Tomaso to work
10   with ARC, right?
11            MS. WIGGER:  Object to form.
12       A.   Yes.
13       Q.   So you introduced De Tomaso to ARC,
14   right?
15       A.   Yes.
16       Q.   Then if you scroll up, you respond,
17   Sergio, I have sent calendar invite with Zoom
18   link to both yourself and Ian for next Monday
19   at 7:00 p.m.  Also, as discussed in We Chat,
20   Norman wants you to sign an NDA prior to the
21   meeting.  I will forward the NDA to you once
22   I received it from Norman.
23            Do you see that?
24       A.   Yes.
25       Q.   The Norman you are referring to
```



Page 22

```
 1                    S. Lui
 2  there is Norman Choi, right?
 3       A.   Yes.
 4       Q.   So you are sort of helping cement
 5  the engagement letter in relationship between
 6  ARC and De Tomaso here right?
 7            MS. WIGGER:  Object to form.
 8       A.   Yes.
 9            MR. ZACH:  You can put that aside.
10       Q.   So going back, you will see we are
11  going to keep going back to these chats.
12  Going back to the chats, we are going to go
13  to Bates 281.
14            If you look at around the 14:56 on
15  October 28, 2021, you write, sometimes it
16  gets a little glitchy, and Mr. Lui, if you
17  can't read something, let me know because
18  sometimes it's a little bit small.  You see
19  at 10/28, 14:36, Norman writes, Perhaps prior
20  to the call, we should have an NDA and we can
21  dig in to show them the presentation probably
22  more effectively when we all speak.  You
23  respond, Sure.  I will get ARC to sign NDA,
24  no problem.  Please send me the NDA template.
25            Do you see that?
```



Page 23

```
1                    S. Lui
2      A.   Yes.
3      Q.   So you would agree that this is
4  sort of the communications between you and
5  Mr. Choi related to the prior email that we
6  saw when you are asking -- when you are
7  telling ARC that De Tomaso would like an NDA,
8  right?
9      A.   Yes.
10      Q.   And when there is a reference to we
11  begin to show him the presentation, that's a
12  presentation about sort of the De Tomaso
13  business, right?
14           MS. WIGGER:  Object to form.
15      A.   Yes, I believe so.
16      Q.   The point here is you are trying to
17  have ARC learn more about De Tomaso, right?
18           MS. WIGGER:  Object to form.
19      A.   Yes, that's part of the objective,
20  but the main objective, as you saw, I believe
21  in Lui 3, the previous email, where you can
22  see that ARC has three SPAC IPOs to be listed
23  and one that was coming up so there was at
24  least four SPACs that ARC Group could
25  introduce to De Tomaso which goes back to.
```



Page 24

```
 1                    S. Lui
 2            I said it in yesterday's session.
 3    I will repeat it again, Norman expressed
 4    interest in listing De Tomaso via a SPAC so
 5    the purpose of introducing ARC Group to De
 6    Tomaso is to introduce them to as many SPACs
 7    as possible to run beauty parade so De Tomaso
 8    will have options to potentially choose the
 9    best SPAC that they can merge with.
10        Q.    I think what you previously
11    testified to as well at this point, you knew
12    that from Mr. Choi that he was looking to see
13    if he could sell De Tomaso in a SPAC, right?
14        A.    Yes.
15        Q.    So just briefly going down this
16    chat a little ways to 11/2.  It says, you say
17    at 14:43, Gentle reminder to introduce me to
18    your bookkeeper so that I can obtain a copy
19    of the financial statements for 2019 and 2020
20    after which I can obtain a more finalized
21    audit fee quote from Moore International.
22            Then you say, If you are using
23    email, please use my personal email,
24    hinweng@gmail.com.
25            Do you see that?
```



Page 25

1                    S. Lui
2        A.    Yes.
3        Q.    The first question is, is
4    hinweng@gmail.com an email that you use?
5        A.    Yes.
6        Q.    Here you are asking Norman Choi for
7    the financial statements for De Tomaso from
8    2019 and 2020, right?
9        A.    Yes.
10       Q.    What is Moore International?
11       A.    Moore International is an audit
12   firm.
13       Q.    What to your recollection was the
14   purpose of trying to get a quote from Moore
15   International?
16             MS. WIGGER:   Object to form.
17       A.    So Moore International can do an
18   audit based on PCAOB basis which is the
19   public company, I can't remember the full
20   name.  I think it's public company auditing
21   oversight board so for companies that want to
22   list in the U.S., same NASDAQ or NYSE, their
23   financial statements must be audited on a
24   PCAOB basis.
25       Q.    So I take it the idea was De Tomaso



Page 26

1                    S. Lui

2     needed to have someone like Moore

3     International who could provide such an audit

4     in anticipation of a potential transaction

5     with a SPAC, right?

6          A.   Correct.

7          Q.   If you go down to 11/3/21 at 20:24,

8     you can see that Mr. Choi writes, Next

9     question is if we are able to price it at $1

10    billion and only in the market to raise 50

11    million, would the SPAC investors still be

12    interested?  And then you respond, 3 percent

13    on the entire deal value so if your valuation

14    is say 800 million, then it is 3 percent on

15    800 million.

16              Do you see that?

17         A.   Yes.

18         Q.   You would agree with me here that

19    you are providing Mr. Choi with sort of your

20    views on how to potentially value a De Tomaso

21    SPAC transaction, right?

22              MS. WIGGER:  Object to form.

23         A.   No, that's not what this message is

24    about.

25         Q.   What's it about?



Page 27

                         S. Lui
1
2       A.   The 3 percent is the fee, success
3  fee -- 3 percent is the success fee as per
4  ARC Group's engagement letter with De Tomaso.
5       Q.   So ARC charges a percentage of the
6  total valuation for its fee?
7       A.   Yes.
8       Q.   How many SPACs had you worked on
9  prior to fall of 2021?
10      A.   Exactly zero.
11      Q.   So this is your first experience
12 with a SPAC transaction, right?
13      A.   Correct.
14           MR. ZACH:  Let's take that down and
15      what are we on now.
16           I'm going to show you what I will
17      mark as Lui 4.
18           (Lui Exhibit 4, U.S. IPO De Tomaso
19      Automobili screenshot, marked for
20      identification.)
21      Q.   Which is a screenshot of a November
22 8 -- I will scroll down a bit.
23           Do you know who Fiona Wu is?
24      A.   Yes, she is the -- I believe at
25 that time, a manager with Moore



Page 28

```
 1                  S. Lui
 2    International.
 3       Q.    You see this is U.S. IPO De Tomaso
 4    Automobili?
 5       A.    Yes.
 6       Q.    So I take it here that, you can
 7    look at the email, but I think she is
 8    referencing sort of an engagement letter with
 9    De Tomaso, right?
10            MS. WIGGER:  Object to form.
11            Can you scroll through the whole
12       document quickly?
13            MR. ZACH:  Sure.
14       Q.    It's a screenshot.
15       A.    Yes.
16       Q.    And this is sort of similar to the
17    text that we just saw between you and Mr.
18    Choi about helping him in connection to bring
19    in auditors that can do the audit that you
20    had previously discussed, right?
21            MS. WIGGER:  Object to form.
22       A.    Yes.
23            MR. ZACH:  We can take that down.
24       Q.    I would like to go back to the
25    chats now and if we can go to 285.  At the
```



Page 29

                         S. Lui
 1
 2   top of the page, do you see at 15:23, the
 3   second line down, let's start there.  You
 4   write, FYI, for the call with ARC in about
 5   two hours, I will log in as iPad and then you
 6   say if anyone asks, just say iPad is you as
 7   well.
 8             Do you see that?
 9        A.   Yes.
10        Q.   So you would agree with me, sir,
11   this is in reference to a call that Norman
12   Choi was about to have with ARC Group
13   relating to the potential SPAC transaction,
14   right?
15        A.   Yes.
16             MS. WIGGER:  Object to form.
17        Q.   What you are telling him here is
18   that you want to listen in on the meeting,
19   right?
20        A.   Yes.
21        Q.   You are instructing him if anyone
22   asks -- strike that.
23             In listening to the meeting, you
24   don't want to actually identify that you are
25   in the meeting, right?



Page 30

```
 1                    S. Lui
 2       A.   Yes.
 3       Q.   You are trying to sort of secretly
 4   listen in, right?
 5            MS. WIGGER:  Object to form.
 6       A.   Yes, if you put it that way, yes.
 7       Q.   You tell him, if anyone asks, just
 8   say iPad is you as well, right?
 9       A.   Yes.
10       Q.   So you are asking Mr. Choi to
11   misrepresent who was actually on the iPad to
12   the folks at ARC, right?
13            MS. WIGGER:  Object to form.
14       A.   I asked him to say what I type
15   exactly, so if it's misrepresentation to you,
16   then, yes.
17       Q.   Well, let's talk about what you are
18   asking him to do.  You are going to be
19   listening to this meeting on an iPad, right?
20       A.   Yes.
21       Q.   And you are saying to him, if
22   anyone says, hey, who is that on the iPad, to
23   say it's just him, Norman Choi, right?
24       A.   Yes.
25       Q.   So how do you define the word
```



```
 1                    S. Lui
 2  misrepresent?
 3            MS. WIGGER:  Object to form,
 4        argumentative.
 5        A.    I have no idea.  Maybe you can
 6  explain.
 7        Q.    Do you think -- do you use the word
 8  misrepresent in your everyday life?
 9            MS. WIGGER:  Object to form.
10        A.    Sorry, is that a question for me?
11        Q.    You've used the word misrepresent
12  before, haven't you?
13            MS. WIGGER:  Object to form.
14        Q.    Have you, sir?
15        A.    I can't recall.
16        Q.    So I will ask one more time.  You
17  would agree with me, sir, that here, you are
18  telling Mr. Choi to misrepresent who was
19  actually on the iPad if anyone asks, right?
20            MS. WIGGER:  Object to form, asked
21        and answered.
22        A.    I believe I've answered that
23  question, John.
24            MR. ZACH:  Let's take that down and
25        let's move on to --
```



Page 32

```
 1                    S. Lui
 2      Q.    Let me ask that question
 3  differently.  Maybe there was some confusion
 4  about the word misrepresent.  I will use a
 5  different word.
 6            You would agree with me, sir, that
 7  you were telling Mr. Choi to lie about who is
 8  actually on the iPad, right?
 9            MS. WIGGER:  Object to form.
10      Q.    Yes or no, sir?
11      A.    You could say that.
12            MR. ZACH:  We can take that down.
13      Q.    Now, I would like to show you what
14  is Lui 5 I believe.
15            (Lui Exhibit 5, November 14, 2021
16       email, marked for identification.)
17            MR. ZACH:  Quickly scroll through
18       the document so Hannah can see what it
19       is.
20            MS. WIGGER:   Thank you.
21      Q.    Going to --
22            MR. ZACH:  Scroll down a bit,
23       Sophie.
24      Q.    Mr. Lui, you can see this is an
25  email from the 14th of November 2021 and it's
```



Page 33

```
 1                    S. Lui
 2    from your Gmail account, right?
 3         A.   Yes.
 4         Q.   And you're emailing Mr. Choi, but
 5    you are emailing him at his Gmail account,
 6    right?
 7         A.   Yes, I can see that.
 8         Q.   You understood at the time that Mr.
 9    Choi had a De Tomaso email address, right?
10         A.   Yes.
11         Q.   Instead of emailing him at the De
12    Tomaso email address, you decided to email
13    him at his Gmail address, right?
14         A.   Yes.
15         Q.   As part of this email, you are
16    asking for financial information relating to
17    De Tomaso, right?
18         A.   Sorry, are you asking in relation
19    to this email.
20         Q.   Yes.  So you can take your time.
21    The first thing you say, One latest dilution
22    table with the following assumptions changed
23    from the previous version.
24              I will ask a different question.
25              What are you taking about here in
```



Page 34

```
 1                    S. Lui
 2   this email?
 3        A.   We are just running a hypothetical
 4   scenario that if there was a SPAC that was
 5   listed, if, you know, if there was a one deal
 6   in variation, this would be the outcome.
 7        Q.   You are talking about sort of the
 8   SPAC market and how that might play in
 9   connection with De Tomaso's SPAC, right?
10             MS. WIGGER:  Object to form.
11        A.   Yes, in general.
12             MR. ZACH:  We can take that one
13        down.
14        Q.   Going back to the chat, we are
15   going to go to page 285 and I want to sort of
16   take you down to November 17, 2021.
17             Do you see that?
18             And you go, at 10:11, you forward
19   again another sort of SEC link and then you
20   write, This was the last public filing before
21   we took it over.  We are targeting to refile
22   by this week with details of the new
23   management team and board members.
24             Do you see that?
25        A.   Yes.
```



Page 35

```
 1                    S. Lui
 2        Q.    And what you are saying there, sir,
 3    is that by this time, you are going to come
 4    in and take over Genesis Unicorn, that SPAC,
 5    right, sir?
 6        A.    Yes.
 7        Q.    And you will be doing that in the
 8    coming week or so and that you are going to
 9    bring in with you a new management team and
10    board members, right?
11        A.    Yes.
12        Q.    So what management team and board
13    members did you bring in to Genesis Unicorn?
14        A.    So the new management team
15    consisted of Dr. Olukotun, Dr. Adeoye,
16    A-D-E-O-Y-E, Olukotun, I believe it's
17    O-L-U-K-O-T-U-N.  So Adeoye was the CEO of
18    the SPAC; myself is the president and CFO;
19    Juan Fernandez was the COO; there was a Dr.
20    Niel Sarksen, Niel, N-I-E-L, Sarksen,
21    S-A-R-K-S-E-N, was the chief scientific
22    officer and then the new board consisted of
23    Grainne Coen, Grainne is G-R-A-I-N-N-E, Coen,
24    C-O-E-N, she is the co-chairman; and then we
25    have a Mr. Ernest Fong as the co-chairman; we
```



Page 36

                        S. Lui
1
2    have two other independent directors, Mr.
3    Heng, H-E-N-G, P-E-C-K, Y-O-N-G, Heng Peck
4    Yong; and then the last board director was
5    Mr. Daniel Cheng, C-H-E-N-G.
6        Q.   How did you, at a high level, where
7    did you know those folks from?
8        A.   They were mostly my existing
9    acquaintances.
10        Q.   Are these acquaintances of yours
11   from Hong Kong or somewhere else?
12        A.   Both, from Hong Kong and overseas,
13   overseas as in outside of Hong Kong.
14        Q.   Got it.
15           MR. ZACH:  Let go to -- are we on
16        6?
17           (Lui Exhibit 6, email with an
18        attachment, marked for identification.)
19        Q.   I'm going to mark this next one as
20   Lui 6.  This is still in the same period, but
21   I think it's a few days earlier.  We can
22   scroll down.
23           This is the attachment, so this is
24   an email with an attachment, and don't worry,
25   we are not going to -- I know those numbers



Page 37

                              S. Lui
1
2    are really small.  We are not going to look
3    at this.
4                Do you see here that on November
5    15, 2021, you're emailing Mr. Choi, this
6    time, at his De Tomaso address and Mr.
7    Berris.
8                Do you see that?
9        A.   Yes.
10       Q.   You say, you are asking for Project
11   Hyper financing forecast.
12               Do you see that?
13       A.   Yes.
14       Q.   Project Hyper is a code name given
15   to De Tomaso for purposes of a potential
16   public offering?
17       A.   I believe so.  It was a project
18   code by the company.
19       Q.   You write, Gents, This is the
20   financial forecast that I last worked on
21   which I just made two amendments today; A,
22   changing the SPAC size from 75 to 100 million
23   and; B, increasing the valuation to 1
24   billion.
25               Do you see that?



```
 1                    S. Lui
 2        A.   Yes.
 3        Q.   I'm not going to make you look at
 4   the -- if you can, you are welcome to, the
 5   forecast is attached there.
 6             Do you see that?
 7        A.   Yes.
 8        Q.   So this is, it's a document that
 9   you worked on, right?
10             MS. WIGGER:  Object to form.
11        A.   That's a document that was created
12   originally by Mr. Berris.  I mainly added a
13   summary sheet which is this sheet that you
14   are looking at and which is a sheet to run
15   different scenarios.
16        Q.   Exactly -- sorry, go ahead.
17             So the purpose of this document is
18   essentially to run through, do some modeling
19   on a potential SPAC for De Tomaso, right?
20        A.   It may not be necessary just apply
21   to SPAC, but I believe at that point in time,
22   the purpose of this financial forecast is
23   because, you know, they needed -- we call it
24   bankable, bankable forecast that they can
25   show to potential SPAC companies, investors,
```



1                      S. Lui

2    so that's why, you know, I will kind of help

3    out in a personal capacity to ensure that the

4    forecasts had sufficient flexibility to run

5    different scenarios, different valuation

6    numbers, so that the investor could kind of

7    run different numbers and different outcome

8    and see if they are comfortable with, you,

9    know what was being shown to them at that

10   time.

11        Q.   Got it.  But you helped sort of

12   with these numbers -- strike that.

13             You provided some input into the

14   numbers and assumptions to assist with that,

15   right?

16        A.   No, that's not accurate.

17             MS. WIGGER:  Object to form.

18        A.   So specifically I will repeat, I

19   never gave input to any assumptions, so I

20   will state this very clearly, I have no

21   business, I have no knowledge of De Tomaso.

22   I have never been involved in running the

23   business, I have never met anyone in the

24   company except for Norman Choi at this point

25   in time.  I have zero idea how the business



Page 40

```
 1                    S. Lui
 2   is run, how it was found and funded.
 3            So at this stage, I'm just taking
 4   the numbers from this forecast which I
 5   understand was the person in charge is Mr.
 6   Berris, your client.  I took the base model,
 7   there were some errors in the model, some
 8   really basic modeling errors like, you know,
 9   for example, I want to be very careful, so my
10   answer will be longer.
11            So, for example, in the net present
12   value, discounting net present value, so we
13   shop for NPV.  There was a few sheets where
14   in the model, you have a series of forecasts,
15   cash flows which what we do is we will
16   discount the future cash flows to come to a
17   present value.
18            In the model when I was first
19   given, which I believe Mr. Berris was in
20   charge, you know, there was a fundamental
21   mistake made, for example, that in year zero,
22   we call it year zero, terminology which is
23   the current year, you do not discount the
24   cash flows for the current year, okay.
25            So that's NPV calculation 101,
```



Page 41

                    S. Lui
1
2   right, you know, when I first got the model,
3   the current year numbers which we call it
4   year zero was discounted.
5           So it's basic errors like this and
6   there were many errors in the model so what I
7   did was just to correct the formula, that's
8   No. 1.
9           No. 2 is I added this summary
10  sheet.  Just able to run different scenarios.
11  There was never a time where I provided any
12  input to any of the assumptions.
13      Q.   So maybe to make it more simpler.
14  You were making sure the model was more
15  correct rather than the actual numbers?
16      A.   Yes, thank you, John, I agree.
17      Q.   So let's look at -- let's go back
18  to the chats, 288.  Just very briefly, if we
19  go down to 18:03.  You see, you say, Meeting
20  is on, confirmed by Sergio.  This is the
21  correct link.  Then Norman says, You managed
22  to lock -- to look, I think it says to lock,
23  and listen in, and you say, Yes, I did, as
24  iPad.
25           Do you see that?



Page 42

1                    S. Lui

2        A.    Yes.

3        Q.    So you, in fact, did listen in to

4    the ARC meeting, right?

5              MS. WIGGER:  Object to form.

6        A.    Yes.

7        Q.    You did so using the, as we talked

8    about earlier, using iPad as sort of what's

9    shown on the screen?

10       A.    Yes.

11             MR. ZACH:  So I would like to mark

12             the next document as Lui, I think 7 we

13             are at.

14             (Lui Exhibit 7, SEC registration

15             statement, marked for identification.)

16       Q.    This is another SEC registration

17    statement that's taken offer of Edgar.

18             I'm just looking at this document.

19    Do you see, as filed with the SEC on November

20    24, 2023.

21             Do you see that?

22       A.    Yes.

23       Q.    We can go to two pages over.

24    Again, you see it has that banner that says

25    preliminary prospectus, subject to the



Page 43

```
 1                   S. Lui
 2  completion dated November 24, 2021?
 3        A.   Yes.
 4        Q.   And, again, it has sort of -- the
 5  first paragraph, I won't go over it again,
 6  has similar disclosures to the one we looked
 7  at earlier, right?
 8             MS. WIGGER:  Object to form.
 9        Q.   We can go over it.  Here again, it
10  says, We have not selected any specific
11  business combination target and nor has
12  anyone on our behalf initiated any
13  substantive discussions, directly or
14  indirectly, with any business combination
15  target.
16             Do you see that?
17        A.   Yes.
18        Q.   Again, it's actually slightly
19  different in terms of the target.  It says,
20  While we may pursue an initial business
21  combination target in any business industry
22  or geographic location other than the
23  People's Republic of China, Hong Kong and
24  Macau, we intend to focus our search on the
25  intersection of healthcare and technology
```



Page 44

1                    S. Lui
2    industries, specifically within the
3    biotechnology and pharmaceutical sectors.
4            Do you see that?
5        A.    Yes.
6        Q.    So it's basically the same areas we
7    looked at before you became involved,
8    healthcare and technology industries, right?
9        A.    Yes.
10       Q.    But this time, it comes with sort
11   of this carveout of not wanting to have it be
12   in the PRC, Hong Kong or Macau.
13           Whose decision was it to sort of
14   add that carveout?  Was that something you
15   put in there?
16           MS. WIGGER:  Object to form.
17       A.    It was SEC, Securities Exchange
18   Commission.
19       Q.    Now, we can go to page, what would
20   be 7, page 7, it would be page 8 of the PDF.
21   So we are on page 7 of 220 and then 8 of 220.
22           This lists the management and now
23   you are on it.  It says Samuel Lui, our
24   president, chief financial officer and
25   director.



Page 45

1                    S. Lui

2          Do you see that?

3     A.    Yes.

4     Q.    At this point, you've sort of come

5  in and taken over Genesis Unicorn, right?

6     A.    Yes.

7     Q.    What did you have -- as part of the

8  transaction where you took it over, how much

9  did you have to pay the former owners of

10  Genesis Unicorn?

11     A.    I can't remember the exact amount,

12  but I believe it was about a million or

13  thereabouts.

14     Q.    A million did you say?

15     A.    Yeah.

16     Q.    U.S. dollars or Hong Kong dollars?

17     A.    U.S. dollars.

18     Q.    Where did you raise the million

19  dollars from?

20     A.    My own funds.

21          MS. WIGGER:  Object to form.

22          Go ahead.

23     Q.    So you paid basically, to say it

24  colloquially -- you sort of paid that out of

25  your own pocket?



Page 46

```
 1                    S. Lui
 2      A.    Yes.
 3      Q.    That was your personal funds?
 4      A.    Yes.
 5      Q.    If you had to estimate at this
 6 time, what was your net worth in this time
 7 period?
 8           MS. WIGGER:  Object to form.
 9      A.    I don't know, 20 million.
10      Q.    I couldn't hear you, say again.
11      A.    Twenty million U.S. dollars.
12      Q.    Who did you pay the million dollars
13 -- who was sort -- would were the prior
14 principals at Genesis Unicorn that you paid
15 the money to?
16      A.    Juan Fernandez.
17           MR. ZACH:  We can take that down.
18      Q.    Going back to the chats, at 294, do
19 you see -- I want to focus your attention on
20 12, December 7, 2021.  In your texting
21 with -- it's in the middle now -- you are
22 texting with Mr. Choi saying -- you say,
23 Waiting for SEC comments to our November 26th
24 filing.
25           Do you see that?
```



Page 47

1                    S. Lui

2       A.   Yes.

3       Q.   That's referring to the filing that

4   we just looked at, right?

5       A.   Yes, I believe so, yes.

6       Q.   And that was sort of the first

7   amended registration statement that was

8   submitted to the SEC and it included sort of

9   bringing you out as the current CFO and

10  director and whatever is listed in that

11  document, right?

12      A.   Yes.

13      Q.   Then you tell Mr. Choi, But I am

14  expecting them to respond by this week.

15           Do you see that?

16      A.   Yes.

17      Q.   What you are referring to there is

18  that the SEC provides comments to preliminary

19  prospectuses and you are awaiting the SEC

20  comments, right?

21      A.   Yes.

22           MR. ZACH:  We can take that down.

23           Now, I would like to mark --

24      Q.   At this time, what lawyers were you

25  using?  I don't want to hear the substance,



Page 48

```
 1                    S. Lui
 2   but what lawyers were you using in connection
 3   with getting Genesis Unicorn publicly listed?
 4         A.    You mean the name of our lawyer?
 5         Q.    Yeah, just the firm or to the best
 6   of your recollection.
 7         A.    I can't remember.  I'm so sorry, I
 8   didn't select the lawyer, but if you go to
 9   the prospectus, I think on the cover page.
10         Q.    I guess what I'm asking, you didn't
11   bring in your own lawyers, you were just
12   using whoever had already started, is that
13   fair?
14         A.    Yes.
15         Q.    That's actually a good point.  It
16   says here, I can't pronounce this, it says,
17   Becker & Poliakoff and...
18         A.    Yes, that's the one.
19         Q.    Those lawyers had been selected by
20   the predecessor owners of Genesis Unicorn and
21   you just kept with them?
22         A.    Yeah.
23         Q.    But I take it without going into
24   the substance of your communications, you
25   started communicating with them regularly
```



Page 49

```
 1                     S. Lui
 2   about sort of moving the SPAC process along?
 3            MS. WIGGER:  Object to form.
 4       A.    I don't understand the question,
 5   John.
 6       Q.    You are right.  It was a bad
 7   question.  Let me break it down.
 8            So as part of making these SEC
 9   filings, you had to interact with your
10   lawyers, right, because they do the filings,
11   right?
12       A.    Sure.  Yes.
13       Q.    Without going into any of the
14   specifics of the communications, you had sort
15   of regular updates and contact with those
16   lawyers throughout the SPAC process, right?
17            MS. WIGGER:  Object to form.
18       A.    Yes.
19       Q.    You have to talk to yours lawyers
20   to make sure the documents are right and
21   being filed, right?
22       A.    Yes.
23            MR. ZACH:  So let's look really
24       briefly at Lui 8.
25            (Lui Exhibit 8, email dated January
```



Page 50

                    S. Lui
1           10, 2022 from Samuel Lui to MW at
2           Meridian Risk, marked for
3           identification.)
4           identification.)
5      Q.    Which is an email dated January 10,
6   2022.  This is an email from you to MW at
7   Meridian Risk.
8           Do you see that?
9      A.    Yes, okay.
10     Q.    So the first question is now, if
11  you look at your email, now you have a
12  Genesis Unicorn email address, right?
13     A.    Yes.
14     Q.    So as of at least January 10, 2022,
15  you had a Genesis Unicorn email address that
16  you could use, right?
17     A.    Yes.
18     Q.    Again, at this point, we haven't
19  been talking about this, but to make sure we
20  are at the same spot at this point, Genesis
21  Unicorn is looking toward finalizing its
22  prospectus with the SEC so they can issue
23  shares on the NASDAQ, right?
24     A.    Yes.
25          MS. WIGGER:  Object to form.



Page 51

                        S. Lui

1

2      Q.    You see you also cc Carlos Lopez?

3      A.    Yes.

4      Q.    Was Mr. Lopez -- it says his email

5  is from ARC Group.

6            What was his role in connection

7  with Genesis Unicorn?

8      A.    So ARC Group was the original

9  advisor to Genesis Unicorn and they remained

10  the advisor of Genesis Unicorn when I took it

11  over, I believe October 2021.

12            So they were giving -- I think they

13  introduce one or two insurance brokers to me

14  to source for quotes for the D&O insurance,

15  directors and officers liability insurance.

16      Q.    That would be for D&O insurance for

17  Genesis Unicorn?

18      A.    Yes.

19      Q.    Then you can see that you say --

20  there is another Edgar, sort of cut and paste

21  of the note from the Edgar website.

22            Do you see that?

23      A.    Yes.

24      Q.    Right below that, you say, We have

25  cleared comments from the SEC and are looking



Page 52

```
 1                    S. Lui
 2    to proceed quickly, and then as you just
 3    said, require assistance with D&O insurance.
 4            Do you see that?
 5       A.   Yes.
 6       Q.   So at this point, you were getting
 7    pretty far along with the SEC in terms of
 8    finalizing the prospectus, right?
 9            MS. WIGGER:  Object to form.
10       A.   Yes.
11            MR. ZACH:  We can take this down.
12       Can we take like a five-minute break?
13            THE VIDEOGRAPHER:  This ends media
14       unit No. 1 in the deposition of Samuel
15       Lui.  The time is 9:05 a.m.  We are
16       going off the record.
17            (Recess.)
18            THE VIDEOGRAPHER:  This begins
19       media unit No. 2 in the deposition of
20       Samuel Lui.  The time is 9:10 a.m.  We
21       are back on the record.
22       Q.   Mr. Lui, I want to go back to the
23    chats again.  Let's go to Bates 299.
24            So you see where it says, Mr. Choi
25    writes on 1/13, the very top of the screen,
```



Page 53

                              S. Lui

1

2    One of the founder's key shareholders of

3    Cosworth (phonetic) has passed away, perhaps

4    an opportunity.  You write, Another option

5    for you to consider, and then Mr. Choi says,

6    Money wired.  Then you say you are checking

7    your HSBC account.

8              What is your recollection was --

9    how much money was wired to you by Mr. Choi

10   here?

11        A.   I can't recall.

12        Q.   Do you recall the purpose of Mr.

13   Choi wiring you money in January of 2022?

14             MS. WIGGER:  Object to form.

15        A.   I can't recall specific to this

16   date to this message.

17        Q.   Do you recall, do you recall what

18   your business relation -- what other

19   relationship did you have with Mr. Choi at

20   this time other than what we've been looking

21   at in terms of giving -- discussing a

22   potential IPO or SPAC for his company?

23             MS. WIGGER:  Object to form.

24        A.   I really can't recall.  It could

25   have been.  I could have paid something on



Page 54

```
 1                    S. Lui
 2  his behalf and then he wired something back
 3  to me, I really can't recall.
 4       Q.   Do you still have your bank records
 5  for the HSBC account from this time period?
 6            MS. WIGGER:  Object to form.
 7       A.   Yes, the answer is yes.
 8       Q.   So we just ask your counsel, you
 9  can confer with your counsel later, if we can
10  sort of figure out whatever record reflects
11  what this transaction was.
12            MS. WIGGER:  We can take it up
13       later.
14            MR. ZACH:  We can take it up later.
15       I'm just making a note of it.
16       Q.   While we are here, let's go to --
17  let's go one down.  So you see here, sir, we
18  are on page 300.
19            Do you see that?
20       A.   Uh-huh.
21       Q.   You see in the middle of the page,
22  on January 19, 2022, you text Mr. Choi,
23  Remember to go for the full press.
24            Do you see that?
25       A.   Yes, I can see it.
```



Page 55

```
 1                    S. Lui
 2      Q.    Why don't you tell us when your
 3  next text to Mr. Choi is?
 4            MS. WIGGER:  Object to form.
 5      A.    On here?
 6      Q.    What is the date of the next text
 7  after that one?
 8      A.    April 9th.
 9      Q.    We've been looking at your texts.
10  You guys have been texting on a nearly daily
11  basis before January 19, 2022.
12            Do you see that?
13            MS. WIGGER:  Object to form.
14      A.    Yes.
15      Q.    What happened to the texts between
16  January 19th and April 9th?
17            MS. WIGGER:  Object to form.
18      A.    I can't recall.
19      Q.    You can't recall?
20      A.    Yeah.
21      Q.    Isn't it a fact, sir, that you
22  deleted those texts?
23            MS. WIGGER:  Object to form and
24      foundation.
25      A.    No.
```



Page 56

                         S. Lui

1

2       Q.   Is it your sworn testimony here

3   before the jury that you didn't delete the

4   texts between January 19, 2022 and April 9,

5   2022, sir?

6            MS. WIGGER:  Object to form.

7       A.   So I don't delete my texts, but I

8   do recall I changed my phone during that

9   period so it could have been, you know,

10  through the process of switching over to the

11  new phone, some information or data, you

12  know, were missing, so it could have.

13      Q.   We will come back to it.

14           MR. ZACH:  We can take that down.

15           I would like to show you what we

16      will mark as Lui 9.

17           (Lui Exhibit 9, email dated

18      February 10, 2022 from

19      tackisfat@gmail.com to Mr. Choi at his

20      Gmail address, marked for

21      identification.)

22      Q.   You see this is an email dated

23  February 10, 2022, right?

24      A.   Yes.

25      Q.   And it's from an email tackfat --



                          S. Lui
1
2    the email is tackisfat@gmail.com to Mr. Choi
3    at his Gmail address, right?
4         A.    Yes.
5         Q.    It says forecast?
6         A.    Yes.
7         Q.    Is the email address
8    tackisfat@gmail.com you?
9         A.    Yes.
10        Q.    This is another email address that
11   you use, right, sir?
12        A.    Yes.
13        Q.    What is does tackfat refer to?
14             MS. WIGGER:  Object to form.
15        A.    I don't know, it's my nickname when
16   I was young because I was fat.
17        Q.    Now, very quickly, we will look at
18   -- one second.
19             You say here, Let me know once you
20   are ready to update the forecast.  Thanks.
21             Do you see that?
22        A.    Yes.
23        Q.    What forecast are you referring to
24   there, sir?
25        A.    I can't recall, but it probably was



Page 58

```
 1                    S. Lui
 2   in relation to De Tomaso.
 3        Q.    Then we can look really quickly at
 4   Lui 10.
 5             (Lui Exhibit 10, email from Mr. Lui
 6        to Mr. Choi with attached Project Hyper
 7        financial forecast, marked for
 8        identification.)
 9        Q.    This is, again, from you to Mr.
10   Choi saying this is the latest version and
11   you see the attachment is Project Hyper
12   financial forecast.
13             Do you see that?
14        A.    Yes.
15        Q.    I think we talked earlier that
16   Project Hyper was a code name for the
17   potential offering of De Tomaso, right?
18        A.    Yes.
19        Q.    So here, you and Mr. Choi are
20   exchanging financial forecasts for De Tomaso
21   using your Gmail addresses, right?
22             MS. WIGGER:  Object to form.
23        A.    Yes.
24        Q.    And to be clear, as we saw earlier,
25   you had a Genesis Unicorn email address
```



Page 59

                        S. Lui
1
2   available to you, right?
3        A.   Yes.
4        Q.   And as we know, Mr. Berris had --
5   excuse me, Mr. Choi had a De Tomaso email
6   address available to him, right?
7        A.   Yes.
8        Q.   This is also during the time period
9   where there are, at least as produced by you,
10  there are no text exchanges between the two
11  of you, right?
12            MS. WIGGER:  Object to form.
13       A.   No, I did not say that.
14       Q.   What I'm saying, as we looked
15  earlier, there was, between January and
16  April, there were no text messages between
17  you guys, right?  We just looked at the
18  document.
19            MS. WIGGER:  Object to form.
20       A.   The document has missing, probably
21  has missing messages, I'm not sure, but, you
22  know, I have no idea why.  Like I said, it
23  could have been when I switched over my
24  phone.  In fact, you know, when I was
25  switching over, you know, I forgot the email



Page 60

                        S. Lui
1
2    password to the hinweng@gmail as well, so you
3    might -- so I'm speculating here, if you ask
4    me why I'm using --
5              MS. WIGGER:  Let's not speculate.
6         Let's just answer the questions and not
7         speculate.
8         A.   Okay.
9         Q.   My point, we just looked at a
10   document that didn't have any texts in
11   February 2022 between you and Mr. Choi,
12   right?
13             MS. WIGGER:  Object to form.
14        A.   Again, I'm not sure.  When I
15   download my messages now as of today, that's
16   what I see.
17        Q.   I'm just saying, in terms of time,
18   we just looked at your chats, Lui 1, and
19   there were no chats between -- in the
20   February 2022 time period.  That's all I'm
21   asking.  You agree with that, right, sir?
22             MS. WIGGER:  Object to form.
23        A.   Yes, as per the document.
24        Q.   This document is from February
25   2022, right, sir?



Page 61

```
 1                    S. Lui
 2         A.    Yes.
 3         Q.    Here you are using
 4    tackisfact@gmail.com to email De Tomaso
 5    forecasts back to Mr. Choi, right, sir?
 6         A.    Yes.
 7              MS. WIGGER:   Object to form.
 8         Q.    You are emailing them to Mr. Choi
 9    at his Gmail and not at his De Tomaso
10    address, right, sir?
11         A.    Yes.
12              MR. ZACH:   We can take this one
13         down.
14         Q.    Was your texting between Mr. Choi
15    and yourself on WhatsApp?
16              MS. WIGGER:   Object to form.
17         A.    Sorry, could you be more specific
18    on the question?
19         Q.    Sir, what texting service did you
20    use to communicate with Mr. Choi during this
21    time period?
22              MS. WIGGER:   Object to form.
23         A.    I mean, historically, it's been
24    only through WhatsApp.
25         Q.    WhatsApp is a service where the
```



Page 62

                          S. Lui
1
2    chats are stored on the cloud and not hard on
3    the phone, right?
4              MS. WIGGER:  Object to form.
5         A.    I have no idea what's the answer to
6    that question.
7         Q.    Do you have an iPad?
8         A.    I don't have an iPad, no.
9         Q.    Did you used to have an iPad?
10        A.    No -- it's not my iPad, it's my
11   daughter's iPad.
12        Q.    You would agree with me, sir, that
13   you understand that if you had an iPad and a
14   telephone, you could access your WhatsApp on
15   either device, it comes simultaneously to
16   both, right?
17             MS. WIGGER:  Object to form.
18        A.    No, I don't know, I'm not sure.
19        Q.    You would agree with me, sir, that
20   -- we will move on.
21             Now, I would like to show you --
22   this one was actually -- actually has -- I'm
23   going to go to the registration statement,
24   the prospectus.
25             MS. WIGGER:  I'm not sure we can



Page 63

                          S. Lui
 1
 2        see this document.
 3              MR. ZACH:  We can blow it up.  We
 4        will call this Lui 11.
 5              (Lui Exhibit 11, filed registration
 6        statement for Genesis Unicorn, marked
 7        for identification.)
 8        Q.    This is the filed registration
 9    statement for Genesis Unicorn, right, sir?
10        A.    Yes, looks like it, yes.
11        Q.    And if we go down to the bottom of
12    this page, do you see that?
13              MR. ZACH:  A little bit more
14        please, Sophie.
15        Q.    We can see that the date of the
16    prospectus is April 14, 2022.
17              Do you see that?
18        A.    Yes.
19        Q.    So to your recollection, this is
20    when the prospectus was and registration
21    statement was accepted by the SEC, right?
22        A.    Yes.
23        Q.    That means that at this point,
24    Genesis Unicorn was able to trade on the
25    NASDAQ, right, to issue its shares, right?



Page 64

```
 1                    S. Lui
 2            MS. WIGGER:  Object to form.
 3       A.   Yes.
 4       Q.   To your recollection that on April
 5  14th or a few days after where Genesis
 6  Unicorn became a publicly listed company in
 7  the United States, right?
 8            MS. WIGGER:  Object to form.
 9       A.   Yes.
10       Q.   That means that people could buy
11  shares of Genesis Unicorn on the NASDAQ,
12  right?
13       A.   Yes.
14       Q.   Let's go to page 641.  We are no
15  longer talking about a preliminary
16  prospectus, this is the actual filed one,
17  right, sir?
18       A.   Yes.
19       Q.   You see -- let's be clear about
20  this.  You agree that everything in a
21  prospectus needs to be truthful, right?
22       A.   Yes.
23            MS. WIGGER:  Object to form.
24       Q.   You would agree, sir, that one of
25  the reasons it needs to be truthful is that
```



Page 65

                         S. Lui
1
2    because investors rely upon the prospectus to
3    decide whether or not they want to trade in
4    Genesis Unicorn, right?
5              MS. WIGGER:  Object to form.
6         A.    Yes.
7         Q.    And that it would be -- let's look
8    at overview.  It says, Explains that we are a
9    newly organized blank check company
10   incorporated in February 2021.
11             Do you see that?
12        A.    Yes.
13        Q.    I won't read the rest of that
14   paragraph, but going to the paragraph --
15   let's keep with this one.  The next sentence
16   says, We have not selected any specific
17   business combination target and we have not,
18   nor has anyone on our behalf engaged in any
19   substantive discussions, directly or
20   indirectly, with any business combination
21   target with respect to an initial business
22   combination with us.
23             Do you see that?
24        A.    Yes.
25        Q.    As you sit here today, are you



Page 66

                              S. Lui
1
2    telling the jury that is a truthful statement
3    as of February 14, 2022?
4         A.   Yes.
5              MS. WIGGER:  Object to form.
6         A.   I said yes.
7         Q.   You actually had to sign the
8    registration statement and the prospectus in
9    connection with your role as Genesis right?
10        A.   Yes.
11        Q.   That's required by law right, sir?
12             MS. WIGGER:  Object to form.
13        A.   Yes.
14        Q.   Because of your senior position
15   within the company, right?
16        A.   Yes.
17        Q.   So you would agree with me that
18   ultimately, the responsibility for being
19   truthful in these statements rested with you
20   as the person running the company, right,
21   sir?
22             MS. WIGGER:  Object to form.
23        A.   Yes.
24             MR. ZACH:  We can put that aside.
25        Q.   Now, let's look at an email -- that



Page 67

                      S. Lui

1    was February 14th, right, sir, that

2    registration statement was from February

3    14th?

4         A.   Yes, February 14th, the

5    registration statement, yes.

6         Q.   Now I want to look at Lui 12.

7              (Lui Exhibit 12, documents bearing

8         Bates stamp No. Genesis 848 through

9         Genesis 852, marked for identification.)

10             MS. WIGGER:  I cannot see that

11        well.  Can you blow it up please?

12        Q.   This is a document.  It's got

13   Genesis 848 through 852.  I want to go down

14   to page 851.

15             Do you see, sir, this email is

16   dated February 25, 2022, right?

17        A.   Yes.

18        Q.   This is from Sergio Camarero,

19   right?

20        A.   Yes.

21        Q.   As you testified earlier, Mr.

22   Camarero was your principal contact at the

23   ARC Group, right?

24        A.   Yes.



Page 68

1                        S. Lui

2        Q.   And as we've shown earlier, you

3   actually helped introduce ARC Group to Norman

4   Choi, right?

5        A.   Yes.

6        Q.   And you had been providing

7   information about De Tomaso to ARC Group in

8   connection with a potential public offering

9   right, sir?

10            MS. WIGGER:  Object to form.

11       A.   No, I don't think that's an

12  accurate statement, John.

13       Q.   But you would agree with me, sir,

14  you had been facilitating communications and

15  the exchange of financial information between

16  ARC Group and De Tomaso over the few months

17  prior to this, right?

18            MS. WIGGER:  Object to form.

19       A.   I facilitated the appointment of

20  ARC Group in early November I believe, right,

21  2021.  I attended one or two of the calls,

22  but I dropped out subsequently so I was never

23  involved in the process.

24       Q.   So talking about those calls, were

25  you referring back to the iPad call we just



Page 69

```
 1                    S. Lui
 2   talked about?
 3         A.   Yes.
 4         Q.   That was between you, ARC Group and
 5   Mr. Choi, right, sir?
 6              MS. WIGGER:  Object to form.
 7         A.   Sorry, is there a question?
 8         Q.   I'm saying, on that iPad call where
 9   you were hiding your identity, that was
10   between -- that involved ARC Group and Mr.
11   Choi, right, sir?
12              MS. WIGGER:  Object to form.
13         A.   Yes, I just want to make sure the
14   process was going smoothly, that ARC Group
15   was doing their job properly.
16         Q.   Now, sir, you see the subject of
17   this email from Mr. Camarero is SPAC target
18   intro DT.
19              Do you see that?
20         A.   Yes.
21         Q.   Then Mr. Camarero writes, Dear
22   Samuel and Norman, I hope this email finds
23   you well.
24              Do you see that, sir?
25         A.   Yes.
```



Page 70

1                         S. Lui

2        Q.    Then he says, As discussed

3    individually with both of you, let me make a

4    short intro.

5              Do you see that, sir?

6        A.    Yes.

7        Q.    Intro means introduction, it's

8    shorthand for introduction, right?

9        A.    Yes.

10       Q.    Then he says, Norman, Samuel, Oye,

11   Juan, are the management team of Genesis --

12   sorry, Norman, Samuel, Oye and Juan are the

13   management team of Genesis Unicorn

14   acquisition group.

15             Do you see that?

16       A.    Yes.

17       Q.    Then he says, Samuel and Norman and

18   Ryan are the management team of De Tomaso a

19   legendary car brand with a very exclusive

20   product and approach.

21             Do you see that, sir?

22       A.    Yes.

23       Q.    So what he is doing is he is

24   pretending to introduce you Genesis Unicorn

25   to De Tomaso, right, sir, that's what he is



Page 71

                         S. Lui
1
2    doing?
3              MS. WIGGER:  Object to form.
4         A.    You can say what you want.  I
5    object to the phrase you use, pretending.
6              This is a formal introduction to De
7    Tomaso's advisor to the Genesis Unicorn team,
8    you know, so I don't agree with the word you
9    use, pretending.
10        Q.    You all knew each other well at
11   this point, right?
12             MS. WIGGER:  Object to form.
13        A.    We knew each other less than a
14   year.  I wouldn't say we knew well, but, you
15   know.
16        Q.    Sir, you had actually helped
17   facilitate the engagement agreement between
18   ARC and De Tomaso, right, sir?
19             MS. WIGGER:  Object to form.
20        A.    Yes, I did.
21        Q.    You are still sticking by that
22   answer, sir?
23             MS. WIGGER:  Object to form.
24        A.    My answer is yes, I did that.
25        Q.    Let go down the email.  Let's focus



Page 72

                        S. Lui
1
2   on the third line before he signs, BR.  Mr.
3   Camarero writes, quote, Please let me know
4   when you are available so we can arrange a
5   call to introduce each other.
6           Do you see that, sir?
7       A.   Yes.
8       Q.   You would agree with me that there
9   was no need to introduce you guys at this
10  point, right?
11          MS. WIGGER:  Object to form.
12      A.   No.  As I say, right, the
13  introduction -- exactly why Sergio is writing
14  this way is not for me to answer.  You should
15  ask Sergio himself.
16          As far as I am concerned, the
17  introduction is not between me and Norman
18  because, obviously, by this time, Sergio, me
19  and Norman, we are all known to each other so
20  it is also ridiculous from Sergio's
21  perspective to say he is introducing me to
22  Norman when that is clearly not factual, so
23  this email is really to introduce De Tomaso
24  to Genesis Unicorn, not persons, right.
25          If it's a personal email, you know,



Page 73

                        S. Lui
1
2   I believe Sergio would send to my personal
3   email or WhatsApp or other communication
4   channels, but this is written to my whole
5   team, Genesis Unicorn.
6       Q.   Let's scroll up to the top of this
7   email where we can look at the email
8   addresses.
9            You see Mr. Camarero is emailing
10  you at your Genesis Unicorn email address,
11  right, sir?
12      A.   Yes.
13      Q.   Prior to this, we saw that you were
14  using your tackfat email address in
15  communications with Mr. Choi, right, sir?
16      A.   Yes.
17           MS. WIGGER:   Object to form.
18      A.   Yes.
19      Q.   You can see this email is to Mr.
20  Choi at his De Tomaso email address.
21           Do you see that?
22      A.   Yes.
23      Q.   He is not emailing Mr. Choi at the
24  Gmail address that you and Mr. Choi were
25  communicating about the De Tomaso previously,



Page 74

                        S. Lui
1
2    right, sir?
3              MS. WIGGER:  Object to form.
4        A.   Yes, which is exactly my point.
5    It's introduction between De Tomaso company
6    and Genesis Unicorn company.
7        Q.   Sir, isn't it a fact that this
8    email is meant to make it appear that this is
9    the first time that De Tomaso and you and
10   Genesis Unicorn were having substantive
11   conversations about participating in the SPAC
12   deal?
13             MS. WIGGER:  Object to form.
14       A.   No.
15       Q.   So you are telling the jury that
16   this is not trying to paper over the fact
17   that you, over the prior few months, had
18   already been working with De Tomaso to
19   participate in a Genesis Unicorn SPAC?
20             MS. WIGGER:  Object to form,
21        foundation, asked and answered.  There
22        is no jury here.
23             MR. ZACH:  There will be.
24       A.   I have already answered the
25   question, John.



Page 75

```
 1                    S. Lui
 2            MR. ZACH:  Let's put that document
 3       aside.
 4       Q.    Now, after that introduction, you
 5  continued to make -- you continued to have
 6  discussions with Mr. Choi about De Tomaso,
 7  right?
 8            MS. WIGGER:  Object to form.
 9       A.    Could you be specific?
10       Q.    That's fair.  So after the email
11  from -- that we just looked at that we will
12  call it the introduction email, Genesis
13  Unicorn and De Tomaso had discussions
14  relating to participating in a SPAC
15  transaction together, right?
16            MS. WIGGER:  Object to form.
17       A.    Yes.
18       Q.    So going forward from February 25,
19  2022, you admit that De Tomaso and Genesis
20  Unicorn were discussing a SPAC transaction,
21  right?
22            MS. WIGGER:  Object to form.
23       A.    We were in discussions for a
24  potential SPAC transaction, yes.
25       Q.    Those discussions included the
```



Page 76

```
 1                    S. Lui
 2   exchange of various types of financial
 3   information relating to De Tomaso, right?
 4            MS. WIGGER:  Object to form.
 5       A.   Yes.
 6       Q.   Let me show you, I'm going to -- an
 7   email from -- excuse me, from March 11, 2022.
 8            (Lui Exhibit 13, March 11, 2022
 9       email from tackisfat@gmail to Diana
10       Majcher and Norman Choi, marked for
11       identification.)
12            MR. ZACH:  We will mark this.  What
13       are we up to, Lui 13?
14       Q.   Do you see, sir, this is a March
15   11, 2022 email from your tack is fat Gmail
16   account to Diana Majcher and Norman Choi.
17            Do you see that?
18       A.   Yes.
19       Q.   The subject is forecast?
20       A.   Yes.
21       Q.   Again, was Project Hyper financial
22   forecast.
23            Do you see that?
24       A.   Yes.
25       Q.   Just to orient everyone, Project
```



Page 77

```
 1                    S. Lui
 2   Hyper is the code name for the De Tomaso
 3   potential SPAC transaction?
 4             MS. WIGGER:  Object to form.
 5        A.   Sorry, was that a question?
 6        Q.   I'm saying, you agree with me,
 7   right?
 8        A.   Yes.
 9        Q.   And here, you are emailing Mr. Choi
10   at his Gmail address, right, sir?
11        A.   Yes.
12        Q.   And you are emailing Ms. Majcher at
13   her Gmail address, right, sir?
14        A.   Yes.
15        Q.   Then you say, quote, I don't have
16   Ryan's personal email so I didn't cc him into
17   this email.
18             Do you see that?
19        A.   Yes.
20        Q.   Then you discuss revised model as
21   per our discussion a few hours ago, a to do
22   list.
23             Do you see that?
24        A.   Yes.
25        Q.   Then you give a to do list to
```



Page 78

```
 1                    S. Lui
 2   Norman and to Ryan, right?
 3        A.   Yes.
 4             MR. ZACH:  We can take that email
 5        aside.
 6             I will show you Lui 14 which is an
 7        email from March 22nd.
 8             (Lui Exhibit 14, March 22nd email
 9        from hinweng@gmail.com to Mr. Choi,
10        marked for identification.)
11             MR. ZACH:  Scroll down so Hannah
12        can see it.
13        Q.   You can see that this is from
14   hinweng@gmail.com?
15        A.   Yes.
16        Q.   We discussed, this is another one
17   of your Gmail addresses, right?
18        A.   Yes.
19        Q.   You are emails to Mr. Choi at his
20   Gmail address, right, sir?
21        A.   Yes.
22        Q.   And just take a moment and scan the
23   email and then I will ask you a couple of
24   quick questions.
25        A.   I'm good.  Go ahead.
```



Page 79

                              S. Lui
1
2        Q.    So this email relates to you
3   providing advice to Mr. Choi about how to
4   bolster some of -- to bolster De Tomaso's
5   position in the market place for a potential
6   SPAC, right?
7              MS. WIGGER:    Object to form.
8        A.    The word I would use is suggestion
9   instead of advice.
10             As you can see on the last
11  paragraph, I say, my humble suggestion is the
12  following.
13       Q.    Your humble suggestion is to hire
14  or plan to hire at least two to three more
15  senior executives who have a long track
16  record in the automotive industry, ideally in
17  the high end market segment like Ferrari,
18  Pagani, et cetera, to fill key posts like
19  COO, CTO, chief designer, et cetera, right?
20             Do you see that?
21       A.    Yes.
22       Q.    That was one of your humble
23  suggestions?
24       A.    Yes.
25       Q.    Then you say, For yourself and



Page 80

                          S. Lui
1
2   Ryan, to emphasize your experience and track
3   record with Apollo which is a very recent and
4   direct experience and credential.
5            Do you see that?
6        A.   Yes.
7            MR. ZACH:  You can put that aside.
8            I would like to mark as Lui 15, an
9        email dated March 28, 2022.
10           (Lui Exhibit 15, email dated March
11       28, 2022, marked for identification.)
12           MR. ZACH:  Can we scroll down so my
13       colleague can sort of see what it is.
14       Q.   Starting with the first -- that's
15   the wrong email, sorry.  Sorry, Mr. Lui, just
16   give me a second.
17           I'm being told I can't read that
18   was the right email.  Let's go down a little
19   bit.  Start at the top.
20           Mr. Lui, you see here, you are
21   using your LV Cap Limited email, right?
22       A.   Yes.
23       Q.   And you are emailing an individual
24   named Mark Adesso and others at saul.com.
25           Do you see that?



Page 81

```
 1                    S. Lui
 2        A.    Yes.
 3        Q.    What is Saul?
 4        A.    Saul Ewing.  I think they are a law
 5   firm based out of D.C., Washington, D.C.
 6   They have offices all over.
 7              MS. WIGGER:  Objection.  If this is
 8        a law firm, then this is likely
 9        privileged.  I can't see the entire
10        document.
11              Can you scroll down please?
12              Is this just between Mr. Lui and
13        his law firm?
14              MR. ZACH:  I don't know what Saul
15        is.
16              MS. WIGGER:  He just said it is a
17        law firm, so it sounds like it's a
18        communication between him and his
19        lawyers, in which case, it's privileged
20        and so we are going to claw it back.  I
21        don't have the whole document in front
22        of me so I'm at a disadvantage on the
23        Zoom screen but keep going down please.
24              I want to see the parties actually
25        copied on the email so if you can scroll
```



Page 82

                              S. Lui
1
2         to the next party.  These looks like all
3         lawyers if Saul is a law firm.
4         Q.   Without asking about the document,
5    why are you using your LV Cap Limited email
6    here?
7              MS. WIGGER:  That is asking about
8         the document and, again, subject to me
9         checking further, this is privileged and
10        we are clawing it back so can we please
11        take it off the screen?
12             MR. ZACH:  Hold on one second.  I'm
13        going to go on mute one second.  I just
14        want to see something.
15             Hannah, we will step out of the
16        room.  I don't know if this is actually
17        privileged, but I do think you should
18        have a moment to speak with your client
19        about it.
20             What I point out is that he is
21        emailing from LV Capital Limited,
22        emailing to someone at Genesis Unicorn
23        and there is Saul and someone named Mark
24        Chan at Taylor Wessing on this.  I think
25        Mark Chan is a lawyer actually, but I



Page 83

                        S. Lui
1
2       think it probably makes sense for you to
3       talk to Mr. Lui to figure out who these
4       people are and in what capacity they are
5       talking so you can figure out if there
6       is privileged.
7            Just because lawyers are copied
8       doesn't make it privilege, but we will
9       not listen in and you guys can talk.
10           MS. WIGGER:  Can we just go off the
11      record.  I will call Mr. Lui and will
12      you please email me the document?
13           MR. ZACH:  Sophie will email you
14      the document right now.
15           THE VIDEOGRAPHER:  This ends media
16      unit No. 2 in the deposition of Samuel
17      Lui.  The time is 9:47 a.m.  We are
18      going off the record.
19           (Recess.)
20           THE VIDEOGRAPHER:  This begins
21      media unit No. 3 in the deposition
22      Samuel Lui.  The time is 9:54 a.m.  We
23      are back on the record.
24           MS. WIGGER:  The document we are
25      discussing is privileged, so Genesis is



Page 84

                    S. Lui

1

2      clawing it back, Mr. Lui is clawing it

3      back, defendants are clawing it back.

4          MR. ZACH:  We reserve rights, but

5      for purposes of the deposition, we are

6      comfortable with my colleague's

7      representations and we will no longer

8      discuss the document.

9      Q.  I know it's getting late, Mr. Lui,

10 so we will keep going ahead.

11          I want to sort of shift back in

12 time very briefly.  I want to bring up -- I

13 think, if I understand your testimony here

14 today, you said that in terms of financial --

15 receiving financial information relating to

16 De Tomaso, that it was Mr. Berris that was

17 principally responsible for doing that and

18 working with you, is that right?

19     A.   Okay, let me be clear.  When I

20 interacted with Mr. Berris, he provided me

21 with -- he was the key person that provided

22 me either as a person, that means pre Genesis

23 Unicorn days and post Genesis Unicorn days.

24          He was the key contact into all the

25 information from De Tomaso, right, which



Page 85

1                    S. Lui

2    included a data room.  Mr. Berris was in

3    charge of that which included an investor

4    presentation which Ryan -- Mr. Berris, Ryan

5    said many times it's his baby, he is really

6    proud of that document as well as the

7    financial forecasts.

8            So those were the three key items

9    that Mr. Berris provided to me, yeah.  So I

10   have never seen any -- the financials, my

11   understanding was maintained by Diana.  So to

12   answer your question, yeah.

13       Q.    Just to break that down.  Prior to

14   you -- let just say, let's use February 2022

15   as the demarcation line.

16           Before February 2022, in terms of

17   financial and accounting information relating

18   to De Tomaso, did you -- is it your testimony

19   that you were receiving that from Mr. Berris?

20   I just want the record to be clear.

21       A.    The financial forecasts was from

22   Mr. Berris, okay, and included in the

23   financial forecasts, I believe in the later

24   versions, the historical numbers were added

25   and I believe the historical numbers came



Page 86

```
 1                    S. Lui
 2  from Diana.
 3       Q.   Going forward in time from March
 4  2022, when you made reference to the data
 5  room and other things, you are saying that
 6  was Mr. Berris as well, is your testimony?
 7       A.   The data room was all Mr. Berris,
 8  yeah.
 9       Q.   Let me show you, I just want to
10  show you an email dated November 3, 2021.
11  What time is it there?  Are you at 12 hours?
12       A.   Twelve hours, yeah.
13            MR. ZACH:  Lui 15 is I think what
14       Hannah clawed back, so this would be Lui
15       16.
16            (Lui Exhibit 16 email from Ms.
17       Majcher to Mr. Lui at hinweng@gmail.com,
18       marked for identification.)
19       Q.   I would like to scroll down to the
20  first email.
21            Do you see this is dated November
22  2021 and it says De Tomaso financials.
23            Do you see that?
24       A.   Yes.
25       Q.   It's from Ms. Majcher to you at
```



Page 87

1                    S. Lui

2    your hinweng@gmail?

3         A.   Yes.

4         Q.   I think further what you are

5    saying, she writes, Dear Samuel, I hope this

6    email finds you well.  Norman has asked me to

7    get in touch with you to further discuss

8    financial and accounting matters for De

9    Tomaso.

10             Do you see that?

11        A.   Yes.

12        Q.   As can you appreciate, we have a

13   lot of data so it would be helpful if I could

14   understand what you need in order to prepare

15   the appropriate documents for you.

16             Do you see that?

17        A.   Yes.

18        Q.   Then she offers for you to contact

19   her via email or call or WhatsApp.

20             Do you see that?

21        A.   Yes.

22        Q.   If you go up, you respond, Diana,

23   Thanks for reaching out.  I am based in Hong

24   Kong as well so perhaps it might be easier to

25   have a chat.



Page 88

                        S. Lui
1
2          Do you see that?
3     A.    Yes.
4     Q.    So you would agree that in November
5  of 2021, you were receiving financial and
6  accounting information from Ms. Majcher?
7          MS. WIGGER:  Object to form.
8     A.    It seems like it, but I really
9  can't recall.  I need to check my emails
10 again, but as far as I remember, the
11 financial -- because Diana was in charge of
12 the financial statements, historical
13 financials, so that's why Norman directed me
14 to Diana.
15    Q.    But you are not disputing that you
16 received this email from Ms. Majcher, right?
17    A.    No, no, I'm not.
18    Q.    Do you have any reason to think
19 that -- strike that.
20          MR. ZACH:  We can put that down.
21          That was Lui 16, so now we are going to
22          go to Lui 17 which is a Genesis,
23          internal Genesis document.
24          (Lui Exhibit 17, internal Genesis
25          document, marked for identification.)



Page 89

                              S. Lui
1
2        Q.    We are going back now to March of
3    2022, okay.  This is --
4             MR. ZACH:  Can we scroll up so Mr.
5        Lui can see the date?
6        Q.    This is a memo dated March 21, 2022
7    on sort of Genesis Unicorn Capital.  There is
8    a logo on the top.
9             Do you see that, sir?
10       A.    Yes.
11       Q.    Is this a document that was
12   prepared in the ordinary course of business
13   at Genesis?
14       A.    Yeah.  We do this for every target
15   company that we look at.
16       Q.    So you can see on this document,
17   just the header says, this is an initial
18   review of the potential investment
19   opportunity into De Tomaso Automobili
20   Holdings and it goes on to say it's a luxury
21   sports car brand and that the target is
22   planning to raise $50 million, right?
23       A.    Yes.
24       Q.    So this document sort of reflects
25   Genesis Unicorn's internal analysis of De



Page 90

                        S. Lui
1
2   Tomaso, right, for purposes of potentially
3   doing a SPAC?
4         A.    Yes.
5               MS. WIGGER:  Object to form.
6         A.    Yes.
7         Q.    At this point, you had
8   substantially exchanged financial information
9   between Genesis Unicorn and De Tomaso, right?
10              MS. WIGGER:  Object to form.
11        A.    Yes.
12        Q.    You had analyzed -- looking at this
13  document, you had analyzed De Tomaso's
14  business plan and future prospects?
15              MS. WIGGER:  Object to form.
16        A.    Yes, we did analyze their business
17  plan and forecasts.
18        Q.    If you go down to page 2, at the
19  very bottom of this page, you see under D
20  status of PCAOB audit?
21        A.    Yes.
22        Q.    We had previously testified about
23  what the PCAOB does.
24              Do you recall that testimony?
25        A.    Yes.



Page 91

```
 1                      S. Lui
 2        Q.    And I think you previously
 3   testified that you had assisted De Tomaso in
 4   hiring Moore so that they could conduct an
 5   audit for purposes of some -- for raising
 6   capital for De Tomaso?
 7        A.    Well, to be clear, I did an
 8   introduction.  It was De Tomaso's decision
 9   whether to appoint Moore or to appoint some
10   other audit firm for the audit.
11        Q.    To be clear, at this point, you
12   made an introduction of De Tomaso to Moore,
13   right?
14        A.    Yes, I did that, yes.
15        Q.    And you had also introduced De
16   Tomaso to ARC, right?
17        A.    Yes.
18        Q.    And here, if you look at the
19   document, it says, The PCAOB audited
20   financials should be completed and available
21   by the end of the month.  Auditor is MSPC CPA
22   part of Moore Global which is one of the
23   largest accounting firms in the world.
24              Do you see that, sir?
25        A.    Yes.
```



Page 92

                         S. Lui
1
2       Q.    That was the audit firm you had
3    introduced De Tomaso to, correct?
4       A.    Yes.
5            MR. ZACH:  Put that document down.
6        What was that, Lui -- let's bring up Lui
7        18.
8            (Lui Exhibit 18, Form 10-Q for
9        Genesis Unicorn Capital, marked for
10       identification.)
11      Q.    You see this is a Form 10-Q for
12   Genesis Unicorn Capital, right?
13      A.    Uh-huh.  Yes.
14      Q.    What's your understanding of what a
15   10-Q is?
16      A.    It's a quarterly report.
17      Q.    If you scroll down.  Looking at the
18   date of this -- scroll up maybe.  It says
19   this is from March 31, 2022, right?
20      A.    Yes.
21      Q.    Let's -- I want to scroll down to
22   page 16.
23            MR. ZACH:  Can we blow it up?
24      Q.    If you look at, there is an
25   overview here as part of your 10-Q.



Page 93

```
 1                    S. Lui
 2           Do you see that?
 3      A.    Uh-huh.   Yes.
 4      Q.    It says, We have not selected any
 5 business combination target and we have not,
 6 nor has anyone on our behalf initiated any
 7 substantive discussions, directly or
 8 indirectly, with any business combination
 9 target.
10           Do you see that?
11      A.    Yes.
12      Q.    You would agree with me that at
13 this point, you had, directly and indirectly,
14 had substantive discussions with De Tomaso,
15 right, sir?
16           MS. WIGGER:   Object to form.
17      A.    At this point, we actually had
18 discussion with a lot of companies, not just
19 De Tomaso.
20      Q.    That wasn't my question, sir.
21           My question to you was, you would
22 agree with me that as of the time that you
23 filed this 10-Q, that you had had substantive
24 discussions, both directly and indirectly,
25 with De Tomaso, right?
```



Page 94

                    S. Lui

1
2              MS. WIGGER:  Object to form.
3        A.    You are referring to which
4    timeline?  During this timeline specific to
5    this document?
6        Q.    Sir, this was filed on March 31,
7    2022, right?
8        A.    Yes, correct.
9        Q.    So for the period ending March 31,
10   2022.
11       A.    My answer is yes.
12       Q.    So I'm going to ask it again so I
13   have the answer, okay?  I will put the
14   question to you --
15       A.    I just want to point out, right,
16   this is a standard wording for all SPACs.
17   You will see this on all SPACs.  I believe
18   the key word is substantive discussions.
19            As of the date of this document, we
20   have not signed a binding agreement so, you
21   know, that's why you will see this as a
22   standard statement for all SPACs until you
23   have signed a binding agreement.
24       Q.    My question again to you, sir, is
25   that you would agree with me that as of March



Page 95

                        S. Lui
1
2    31, 2022, Genesis Unicorn, Genesis Unicorn
3    had had substantive discussions, both
4    directly and indirectly, with De Tomaso?
5            MS. WIGGER:  Object to form.
6        A.   I object to the word substantive
7    discussions.
8        Q.   So you disagree, you don't believe
9    as of March 31, 2022, you had had substantive
10   discussions with De Tomaso?
11       A.   So this is the second time I will
12   repeat myself.  The key word is substantive
13   discussions and as far as we were concerned,
14   substantive discussions, meaning, you know we
15   have -- which is a binding merger agreement
16   or we calling it a business combination
17   agreement, a BCA, so at this stage, we
18   weren't even close to signing or even a draft
19   of any BCA, business combination agreement.
20       Q.   I want to understand.  You use the
21   word substantive in your everyday life,
22   right, sir?
23           MS. WIGGER:  Object to form.
24       Q.   Right, sir?
25       A.   Let's do general question.  John, I



Page 96

                        S. Lui
 1
 2    don't know.  I can't remember.
 3        Q.    You don't remember if you use the
 4    word substantive in your everyday life?
 5            MS. WIGGER:  Object to form.
 6        A.    As far as we were concerned, in our
 7    world, in the SPAC world, substantive
 8    discussions as advised by our lawyers --
 9        Q.    Don't go into --
10            MS. WIGGER:  Don't state what your
11            lawyers told you please, Sam.
12        Q.    I will ask the question again.  You
13    can answer yes or no.  Your answer, it's your
14    testimony, but I need a clear answer to this
15    question.  Is it your -- isn't it the case --
16    strike that.
17            Isn't it the case, sir, that as of
18    March 31, 2022, Genesis Unicorn had had
19    substantive discussions both directly and
20    indirectly with De Tomaso?
21            MS. WIGGER:  Object to form, asked
22            and answered.
23        Q.    Yes or no, sir?
24        A.    No.
25            MR. ZACH:  You can take that



Page 97

                        S. Lui
 1
 2      document down.
 3              I would now like to bring up 19
 4      which is -- one second -- sorry, April
 5      3, 2022.
 6              (Lui Exhibit 19, email dated April
 7      3, 2022, marked for identification.)
 8      Q.   Very briefly this is moving on a
 9   few days past March 2022.  This is an email
10   dated April 3, 2022.
11              Do you see that?
12      A.   Yes.
13      Q.   And here, you are using your
14   tackisfat@gmail, right?
15      A.   Yes.
16      Q.   You are not utilizing your Genesis
17   Unicorn email address, right, sir?
18      A.   Yes.
19      Q.   You are emailing Mr. Choi at his
20   Gmail address, sir?
21      A.   Yes.
22      Q.   Yes, this pertains to the De Tomaso
23   Automobili financial forecasts, right, sir?
24      A.   Yes.
25      Q.   So it's your testimony that this



Page 98

```
 1                    S. Lui
 2   wouldn't be part of substantive
 3   communications with De Tomaso?
 4            MS. WIGGER:  Object to form.
 5       A.   Yes.
 6            MR. ZACH:  Now, let's bring up a
 7       document dated April 7, 2022.
 8            We will mark this as Lui 20.
 9            (Lui Exhibit 20, document dated
10       April 7, 2022, marked for
11       identification.)
12       Q.   Do you recognize this document,
13   sir?
14       A.   You need to scroll down.
15       Q.   Sure.  Is that your signature, sir?
16       A.   Yes.
17       Q.   That's Mr. Choi's signature below?
18            MS. WIGGER:  Object to form.
19       A.   Sorry, was that a question for me?
20       Q.   Yes.  You would agree that Mr. Choi
21   also signed this document?
22            MS. WIGGER:  Object to form.
23       A.   Yeah, if it's the same document I
24   signed, yes.
25       Q.   Then we can scroll up back to the
```



Page 99

```
 1                    S. Lui
 2  top.
 3           Do you recognize this is a
 4  nonbinding letter of intent between Genesis
 5  Unicorn and De Tomaso?
 6        A.   Yes.
 7        Q.   And that this document, if you turn
 8  to Exhibit A -- sorry, so if you look at sort
 9  of the header here, it says, the first
10  paragraph, the last sentence says, The
11  proposed transaction between investor and the
12  company is intended to be on substantially
13  the terms and conditions as set forth in
14  Exhibit A.
15           Do you see that?
16        A.   Yes.
17        Q.   And if we turn to Exhibit A, you
18  see it's got the transaction consideration
19  which sort of lays out the total
20  consideration for the proposed transaction?
21           MS. WIGGER:   Object to form.
22        A.   Yes.
23        Q.   And if you keep going, scrolling
24  down to the next page, it discusses what the
25  initial board of directors of the surviving
```



Page 100

1                          S. Lui
2    company would be, right?
3          A.    Yes.
4          Q.    And by surviving company, that's
5    after the de-SPAC, you would have a -- De
6    Tomaso would be publicly traded, right, using
7    the Genesis Unicorn SPAC structure, right?
8               MS. WIGGER:    Object to form.
9          A.    Yes.
10         Q.    This says that surviving company
11   will have five directors consisting of three
12   directors designated to the closing by the
13   company and two directors designated by the
14   investor, right?
15         A.    Yes.
16         Q.    So that's sort of apportioning who
17   gets to pick the board of directors for De
18   Tomaso once it's public, some go to De Tomaso
19   and some are appointed by Genesis Unicorn,
20   right, sir?
21              MS. WIGGER:    Object to form.
22         A.    Yes.
23         Q.    If we go to the next page, it lists
24   sort of what the closing conditions would be
25   for the transaction, right?



Page 101

1                   S. Lui
2          MS. WIGGER:  Object to form.
3      A.   Yes.
4      Q.   So you would agree with me that
5  this is a substantive discussion between De
6  Tomaso and Genesis Unicorn relating to a SPAC
7  transaction?
8          MS. WIGGER:  Object to form, legal
9      conclusions.
10     A.   I mean, like I said, first of all,
11  this document is dated April 7, 2022 and, you
12  know, substantial discussions for us means,
13  you know, we are probably close to a BCA,
14  business combination agreement.
15     Q.   I think we talked about this
16  earlier.
17          What is the purpose -- strike that.
18          Would you agree with me that one of
19  the purposes of filing a 10-Q is to advise
20  investors in the market about important
21  issues relating to Genesis Unicorn?
22          MS. WIGGER:  Object to form.
23     A.   Yeah, yes.
24     Q.   And, again, you understood when you
25  were signing and authorizing the issuance of



Page 102

```
 1                         S. Lui
 2    a 10-Q that one of its purposes was to be
 3    read by ordinary folks who were considering
 4    purchasing Genesis Unicorn stock, right?
 5              MS. WIGGER:  Object to form.
 6         A.   Yes.
 7         Q.   So you understood that it was
 8    important that the language in the 10-Q be
 9    written in everyday English that investors
10    can understand, right, sir?
11              MS. WIGGER:  Object to form.
12         A.   Generally, yes, yeah, but I have to
13    say, lawyers like to write things in a
14    complicated way, but generally, yes.
15         Q.   And would you agree that words
16    typically in those 10-Qs and other public
17    filings by Genesis Unicorn were intended to
18    be clear and understandable to the average
19    investor?
20              MS. WIGGER:  Object to form.
21         A.   Generally, yes.
22         Q.   So, again, I would like to ask you,
23    is it still your testimony that prior to
24    March 31, 2022, De Tomaso -- excuse me,
25    Genesis Unicorn was not having substantive
```



Page 103

                              S. Lui
1
2    discussions with De Tomaso?
3              MS. WIGGER:  Object to form, asked
4         and answered, legal conclusions.
5         A.   Yes.
6         Q.   Now, we've moved past March 31st.
7    Right, now, we are in April.
8              Would you agree with me at least
9    that this letter of intent constitutes a
10   substantive discussion between De Tomaso and
11   Genesis Unicorn?
12             MS. WIGGER:  Same objection.
13        A.   No, John.  I answered previously
14   the rationale, so I don't have to repeat
15   myself again, John.
16             MR. ZACH:  All right.  Let's take
17        that down.
18             Let's look at what is going to be
19        marked as Lui 21.  It's an email dated
20        April 24th.
21             (Lui Exhibit 21, email dated April
22        24, 2022, marked for identification.)
23        Q.   Do you see here, as of 4 -- this is
24   an email 4/24/22, right, sir?
25        A.   Yes.



Page 104

```
 1                    S. Lui
 2      Q.    And here you are sending an email
 3  using your Genesis Unicorn email address,
 4  right?
 5      A.    Yes.
 6      Q.    And you are emailing individuals at
 7  UBS, right?
 8      A.    Yes.
 9      Q.    And UBS is an international
10  investment bank, right, sir?
11      A.    Yes.
12      Q.    And at this time, is it fair to say
13  that in connection with your work with De
14  Tomaso, you were looking to identify
15  individuals that could help provide what's
16  called pipe financing, right?
17            MS. WIGGER:  Object to form.
18      A.    Yes, I believe so, from the best of
19  my memory, yes.
20      Q.    And would you tell me sort of what
21  your understanding of what a pipe is?
22      A.    It's a private placement.
23      Q.    In connect with the SPAC
24  transaction, what function would a pipe
25  serve?
```



Page 105

                         S. Lui

1

2            MS. WIGGER:  Object to form.

3       A.    Additional financing to be raised.

4       Q.    It's additional capital to help

5   with the SPAC and de-SPAC process, right?

6       A.    Yes.

7       Q.    And essentially, people that invest

8   in the pipe, they receive shares of the

9   company as well, right?

10      A.    Yes.

11      Q.    As part of your work on the De

12  Tomaso and Genesis Unicorn SPAC, you went out

13  and were trying to solicit investors to

14  invest in the pipe, right?

15           MS. WIGGER:  Object to form.

16      A.    Yes.

17      Q.    And one of the places that you went

18  to look are at sort of prominent New York

19  investment banks, right, and other financial

20  institutions, right?

21           MS. WIGGER:  Object to form.

22      A.    Yes.

23      Q.    When you were communicating

24  directly with some of these financial

25  institutions, you were utilizing your Genesis



Page 106

```
 1                    S. Lui
 2   Unicorn email, right?
 3              MS. WIGGER:  Object to form.
 4        A.   Yes.
 5        Q.   If you look at this email here, it
 6   says, Vincenzo, FYI, I sent an email to -- I
 7   think it's Arnold on April 15th and he never
 8   replied to me.  Anyway, we have been talking
 9   to other banks in New York City and those
10   that we have spoken to have been very
11   impressed with what Norman and Ryan have
12   achieved to date.
13              Do you see that?
14        A.   Yes.
15        Q.   What investment banks do you recall
16   speaking to about De Tomaso in this time
17   period?
18        A.   Our advisor for this deal was
19   Benchmark Group.  I believe we spoke to E.F.
20   Hutton as well.
21        Q.   And in speaking to those banks,
22   were you reporting truthfully that they had
23   been impressed with what Norman and Ryan had
24   achieved to date?
25              MS. WIGGER:  Object to form.
```



Page 107

                          S. Lui
1
2      A.    That's what I write on the email,
3  yes.
4      Q.    Do you have any reason not to stand
5  by your email?
6          MS. WIGGER:  Object to form.
7      A.    Yes, after the fact, yes.
8      Q.    At the time that you wrote this
9  email, was it a truthful email?
10         MS. WIGGER:  Object to form.
11     A.    Yes.  As in the banks were
12  impressed by what Norman and Ryan had
13  achieved?
14     Q.    Yes.  When you wrote it, that's
15  what you meant, right?
16     A.    Yes.
17     Q.    But you never secured any pipe
18  financing?
19     A.    No, we weren't even close.  In
20  fact, we couldn't raise any money for De
21  Tomaso.
22     Q.    So now we are in the April 24th
23  time period.  I want to now shift back to the
24  chats.
25         MR. ZACH:  So if we can go back to



Page 108

                              S. Lui
1
2        Lui 1 and go to 306 if we can.
3        Q.    Sir, at this time, let's be really
4   clear.  In the April and May '22 time period,
5   what was your time at Genesis Unicorn during
6   that time period?
7        A.    I answered that already, president
8   and CFO and board director.
9        Q.    You would agree with me that in the
10  March, April May 2022 time period, as
11  president, CFO and board member, you were in
12  charge of Genesis Unicorn Capital, right?
13            MS. WIGGER:  Object to form.
14       A.    I mean, I wouldn't use the word in
15  charge.  We were an entity, we make decisions
16  as a board, you know.
17       Q.    Was there anyone that you directly
18  reported to at Genesis Unicorn Capital that
19  was an officer or director during that time
20  period or were you at the highest sort of
21  part of the organizational pyramid?
22       A.    Well, we report to the board, John,
23  we report to the board.
24       Q.    Setting aside the board, in terms
25  of management and executives, was there any



Page 109

                              S. Lui
1
2   executive at the company at a higher rank
3   than you at this time?
4        A.    Yeah, absolutely, the CEO.
5        Q.    Who was the CEO?
6        A.    No change from what I said earlier,
7   John.
8        Q.    At this time period, between March
9   an May of 2022, you were working at Genesis
10  Unicorn to -- strike that.
11             You would agree with me, sir, that
12  during this time period of March to May 2022,
13  you had no officer or director role at De
14  Tomaso, right?
15       A.    Yes, correct.
16       Q.    In fact, you were leading the
17  Genesis Unicorn side of the proposed SPAC
18  transaction at this time period, right?
19       A.    Yes.
20       Q.    So you were operating at arm's
21  length between -- sorry, Genesis -- strike
22  that.
23             Genesis Unicorn and De Tomaso were
24  operating at arm's length during the process
25  of negotiating a potential SPAC, right?



1                      S. Lui

2          A.    Yes.

3          Q.    So you had no authority to hire or

4    fire employees at De Tomaso during that time

5    period, right?

6          A.    Yes.

7          Q.    In fact, you worked for a

8    completely separate company during this time

9    period, right?

10          A.    Yes.

11          Q.    Let's look at 306 of the chats.

12    You see here at 10:59 on the 30th, Mr. Choi

13    writes -- at 1:21 on 4/30, you say, At your

14    lobby now, to Mr. Choi.

15                Do you see that?

16          A.    Yes.

17          Q.    You were in New York City during

18    this time period, right?

19          A.    Yes, as part of our Genesis Unicorn

20    due diligence on De Tomaso.

21          Q.    So you are there in New York on

22    behalf of Genesis Unicorn performing due

23    diligence in connection with De Tomaso,

24    right?

25          A.    Yes.



Page 111

1                    S. Lui
2        Q.    You say, Mr. Choi then writes to
3    you at 10:59, Did you end up meeting/talking
4    to Ryan?
5              Do you see that?
6        A.    Yes.
7        Q.    And he is referring to Ryan Berris,
8    right?
9        A.    Yes.
10       Q.    You answer, Yes, I did.  Free to
11   chat, right?
12       A.    Yes.
13       Q.    And then you invite him to a Zoom
14   meeting, right?
15       A.    Yes.
16       Q.    So during this time period, you and
17   Mr. Choi are both in New York City, right,
18   you see earlier that you went to his lobby?
19       A.    Yes.
20       Q.    Mr. Choi lives in Hudson Yards,
21   right?
22             MS. WIGGER:  Object to form.
23       A.    Yes.
24       Q.    I can show you out the window if
25   you want.



Page 112

                          S. Lui

1

2          So the next day, later, at 12:00,

3    you go after the meeting, after the Zoom

4    meeting, you write, Tomorrow, 9:30 chat with

5    Mark Chan.

6          Do you see that?

7     A.   Yes.

8     Q.   Mark Chan is a lawyer that you used

9    in the past, right?

10    A.   We used Mark Chan -- can I say

11   this, Mark Chan is with Taylor Wessing and

12   Taylor Wessing was advising us on the -- as

13   to Genesis Unicorn on the potential

14   acquisition of De Tomaso.

15    Q.   So from the Genesis Unicorn

16   perspective, Mark Chan was a lawyer that was

17   advising Genesis Unicorn?

18    A.   Yes.

19    Q.   Then if you look down at 5/1 at

20   9:53, you say to Mr. Choi, Free to chat?  I

21   just spoke to Mark Chan.

22          Do you see that?

23    A.   Yes.

24    Q.   So you are wanting to speak to Mr.

25   Choi to tell him what your attorney, Mark



Page 113

```
 1                    S. Lui
 2    Chan, had told you, right?
 3            MS. WIGGER:  Object to form.
 4        A.    I can't recall, John.
 5        Q.    Let's go to the next -- hold on.
 6    We will come back to this.  I'm trying to
 7    skip some of this for you, Mr. Lui.
 8        A.    John, can we take a five-minute
 9    break?
10        Q.    Whatever you need, just let me
11    know.  I was trying to get you done in like
12    the next, maybe an hour or so, but I'm trying
13    to get you done, okay?
14        A.    Okay.
15        Q.    How long do you want?
16        A.    Five minutes.
17            MR. ZACH:  Can we go off the
18        record.
19            THE VIDEOGRAPHER:  This ends media
20        unit No. 3 in the deposition of Samuel
21        Lui.  The time is 10:31 a.m.  We are
22        going off the record.
23            (Recess.)
24            THE VIDEOGRAPHER:  Starting media
25        unit No. 4 in the deposition of Samuel
```



Page 114

```
 1                    S. Lui
 2       Lui.  The time is 10:40 a.m.  We are
 3       back on the record.
 4       Q.   I'm going to bring up another
 5  email.  This is from March -- excuse me, May
 6  1, 2022.
 7            (Lui Exhibit 22, May 1, 2022 email
 8       chain, marked for identification.)
 9       Q.   Looking at Lui 22, you see the top
10  email is you using your tack is fat email
11  account emailing Mr. Choi at his Gmail
12  account?
13       A.   Yes.
14       Q.   So, again, you guys had the option
15  to use your Genesis Unicorn email or your De
16  Tomaso email, but you are not doing that,
17  right?
18            MS. WIGGER:  Object to form.
19       A.   Yes.
20       Q.   You see what's happened directly
21  below that is Mr. Choi has forwarded you an
22  email from Sergio Camarero, right?
23       A.   I can see the email, yeah, but I'm
24  not sure of the contents.
25       Q.   So we are going to go down to it.
```



Page 115

```
 1                    S. Lui
 2           You see there is an email from
 3   Sunday, May 1st from Mr. Camarero, right?
 4      A.   Yes.
 5      Q.   And Mr. Camarero is the individual
 6   from ARC that is handling for De Tomaso the
 7   SPAC negotiations, right?
 8      A.   Yes.
 9           MS. WIGGER:   Form.
10      Q.   So you can see here, you don't have
11   to read the whole thing, but we are going to
12   go to the bottom part, but you can see that
13   they are talking about -- if you go back to
14   the second page, it says, With all that said,
15   I suggest the following, and then Mr.
16   Camarero puts out option A and option B.
17   Option A is ARC will receive a cash
18   consideration of 5.5 million at closing and
19   the scheduled fee agreed before $175,000 U.S.
20   dollar at the moment of the signature of the
21   BCA.
22           Do you see that?
23      A.   Yes.
24      Q.   And BCA is a term that means
25   business combination agreement?
```



Page 116

                    S. Lui
1
2            MS. WIGGER:  Object to form.
3       A.    Yes.
4       Q.    It's kind of some people would
5  refer to as a BCA as a merger agreement too,
6  right, it's kind of the same thing?
7            MS. WIGGER:  Object to form.
8       A.    Yes, the binding merger agreement.
9       Q.    And option B says, ARC lays out a
10 different fee structure for itself, right?
11      A.    Yes.
12      Q.    Again, ARC is representing De
13 Tomaso in this, right?
14      A.    Yes.
15      Q.    So then if we go back up, all the
16 way to the top, you respond to Mr. Choi, What
17 is your preference?  I think option B is a
18 good compromise between cash and stock,
19 right?
20      A.    Yes.
21      Q.    So you are providing advice to Mr.
22 Choi about how to structure De Tomaso's fee
23 arrangement with ARC, correct?
24           MS. WIGGER:  Object to form.
25      A.    I'm just giving my opinion.  I



Page 117

```
 1                    S. Lui
 2  wouldn't say it's advice.
 3       Q.   What distinction do you make
 4  between giving your opinion and giving your
 5  advice?
 6            MS. WIGGER:  Object to form.
 7       A.   Do we need to do this, John?  This
 8  is my opinion, right, I said I think option
 9  B, that's the word I use.
10            If I was to give advice, I would
11  say my advice is to go for option B.  To me,
12  that's the distinction between giving my
13  opinion and giving my advice.
14            MR. ZACH:  I want to bring up
15       another email.  This will be Lui 23.
16            (Lui Exhibit 23, email dated April
17       27, 2022, marked for identification.)
18       Q.   A few days earlier, same thing
19  here, you can see an email dated April 27,
20  2022, right?
21       A.   Yes.
22       Q.   And Mr. Choi is again forwarded you
23  an email from Mr. Camarero at ARC?
24       A.   Yes.
25       Q.   And you respond to ARC's proposal,
```



Page 118

```
 1                    S. Lui
 2  I have nothing else to add.  All good, right?
 3       A.   Yes.
 4       Q.   Is this you just giving your
 5  opinion again?
 6       A.   Yes.
 7            MS. WIGGER:  Object to form.
 8       Q.   Going back to the chats.  I want to
 9  go to page 307.  So we are scrolling down to
10  -- let's go back up to refresh your
11  recollection.
12            You see earlier on the 1st, you had
13  made a reference to having a chat with Mark
14  Chan, your lawyer, right?
15       A.   Yes.
16       Q.   If we go down to the next page, at
17  5:18.
18            MR. ZACH:  Can you scroll up a
19       little bit please?
20       Q.   You see there is a big chunk of
21  text.  I want to start with the first one at
22  5:18.  You write, According to Diana, under
23  the articles for De Tomaso LLC entity, no
24  single director can enter into binding
25  agreements on behalf of the company.
```



Page 119

```
 1                    S. Lui
 2           Do you see that?
 3      A.    Yes.
 4      Q.    And Diana there is you are
 5  referring to Diana Majcher?
 6      A.    Yes.
 7      Q.    And you say, Having said the
 8  company made a payment of 83,000 Euro to
 9  Carmen in Q-4 of 2021 before, so that act
10  alone may imply there is a contract between
11  both parties whether written or not.
12           Do you see that?
13      A.    Yes.
14      Q.    This is -- what you are doing here
15  is you are forwarding Mark Chan's advice he
16  had given to you when you spoke to him,
17  right?
18           MS. WIGGER:  Object to form.
19      A.    I can't recall.  It could be my
20  opinion, John.
21           Can you scroll up?  I just want to
22  read --
23      Q.    Sure.  Where do you want to go?
24  Just say what you want.
25      A.    Let me just read.
```



Page 120

                        S. Lui
1
2        Q.     Take your time.
3        A.     So the one at the first 5:18 text,
4  that was my opinion.  That's me telling --
5  the first sentence is what I'm -- and the
6  second sentence is my opinion.
7        Q.     The first sentence is, sorry, there
8  are -- they are both at 5:18.  You are saying
9  the first big chunk of text that is like six
10 lines long?
11       A.     Stop there.  The first sentence of
12 the paragraph you are highlighting now,
13 according to Diana, that first sentence.
14       Q.     Yes.
15       A.     That's what I understood from Diana
16 the articles of De Tomaso LLC.
17       Q.     I'm trying to make sure.  What you
18 are writing there is what?
19       A.     In summary, John, the first 5:18
20 message is from me to Mark.
21       Q.     So are you sort of cutting and
22 pasting something you had emailed to Mark and
23 now passing it along to Norman?
24       A.     No, no, this -- yeah, this is what
25 I texted Mark, so the two messages at 5:18, I



Page 121

                        S. Lui
1
2   texted to Mark earlier and I just forwarded
3   whatever I texted to Mark to Norman at 5:18.
4        Q.   Okay.  That makes sense.  If we
5   look at the second -- if we go to the second
6   chunk of text, you write, Norman would like
7   you to draft a reply with the following and
8   main points.
9            Do you see that?
10       A.   Yes.
11       Q.   I think, if I understand what you
12  are testifying is the you here would be Mark
13  Chan, the lawyer, right?
14       A.   Yes.  I was literally -- what I
15  said here, Norman needs a lawyer to draw up a
16  letter to Ryan Berris, you know, and Norman's
17  instructions was in this letter.  He wants to
18  see point A, point B, point C, so I was just
19  listing up the items that Norman wanted to
20  see in this letter.
21       Q.   Your understanding was that this
22  was a letter that Mr. Chan would be drafting
23  that was to go from Norman or De Tomaso to
24  Mr. Berris, right?
25       A.   Yes.



Page 122

1                    S. Lui

2        Q.    Of the main points, the first one

3    is, State the fact that Norman is the sole

4    owner of De Tomaso and that he had no prior

5    knowledge of the final terms of the contract

6    with Carmen and Ryan and Ryan had signed the

7    said contract without Norman's approval.

8             Do you see that?

9        A.    Yes.

10        Q.    So one of the things that -- Mr.

11    Choi had told you what these points were

12    before you passed them along to Mr. Chan,

13    right?

14        A.    Yes.

15        Q.    So this first point is that first,

16    that Norman is the sole owner of De Tomaso,

17    right?

18        A.    Yes.

19        Q.    And then that he had no knowledge

20    of the final terms of the Jordá agreement,

21    right?

22        A.    Yeah, so to be clear, Carmen refers

23    to Carmen Jordá and Ryan obviously refers to

24    Ryan Berris.

25        Q.    Then if you go down to four, like



Page 123

```
 1                    S. Lui
 2   the little iv, it's maybe three lines from
 3   the bottom.
 4        A.    Uh-huh.
 5        Q.    You wrote, All communication under
 6   this contract will be directly with Norman
 7   only at Norman's Gmail address, right?
 8        A.    Yes.
 9        Q.    Then if you look directly below
10   that, you write, This is what I sent to Mark,
11   FYI, right?
12        A.    Yes.
13        Q.    And Mr. Choi says, Thank you.
14        A.    Yes.
15        Q.    So sort of like wrapping this all
16   up, you are sort of helping Mr. Choi
17   communicate with Mr. Chan about a legal
18   letter that De Tomaso was going to send to
19   Mr. Berris, right?
20              MS. WIGGER:  Object to form.
21        A.    Well, I facilitated a discussion,
22   yes.
23        Q.    Then if you scroll down just a
24   little bit.  So after -- later on, you can
25   see Mr. Choi texts you at 5:23.  You say,
```



Page 124

                        S. Lui
1
2   Good morning -- sorry, I gave you the wrong
3   time.  He texts at the 21:12 time stamp, Good
4   morning.  Mark replied, question mark.
5            Do you see that?
6        A.   Yes.
7        Q.   Then you say a little bit below
8   that, Good morning.  Mark replied with a
9   draft already.  I'm going through with him
10  this morning and thereafter, we will send out
11  the draft to you.
12           Do you see that?
13       A.   Yes.
14       Q.   The draft you are discussing is a
15  letter that will be sent to Mr. Berris,
16  right?
17       A.   Yes.
18       Q.   So you and Mark Chan are writing a
19  letter that will be sent on behalf of De
20  Tomaso to Mr. Berris, right?
21           MS. WIGGER:  Object to form.
22       A.   I never wrote the letter, John.
23       Q.   I'm sorry, continue.
24       A.   Mark Chan drafted the letter, not
25  me.



Page 125

                        S. Lui

1

2       Q.    And you say, I am going through

3   with him this morning.

4             Do you see that?

5       A.    Yes.

6       Q.    By going through with him, it means

7   you are going through the draft that Mr. Chan

8   had written, right?

9             MS. WIGGER:  Object to form.

10      A.    So when I say going through the

11  draft, I wanted to ensure that the points

12  that Norman wanted in the letter were all in

13  it.

14      Q.    To be clear, at this point, you

15  held no position as an officer, director,

16  employee of De Tomaso, right?

17      A.    Yes.

18      Q.    At this time, you were the

19  president, CFO and board member of Genesis

20  Unicorn, right?

21      A.    Yes.

22      Q.    And you were actually using Mr.

23  Chan, who has been Genesis Unicorn's letter

24  to help -- to draft this letter to Mr.

25  Berris, right?



Page 126

```
 1                    S. Lui
 2        A.   I just did the introduction, John,
 3   that's all I did.
 4        Q.   In addition to making the
 5   introduction, you received a draft letter
 6   that was written on behalf of De Tomaso,
 7   right?
 8             MS. WIGGER:  Object to form.
 9        A.   Yes, I was -- Norman wanted a
10   lawyer to draft a letter.  I introduced
11   Norman to a lawyer.  I ensured the draft
12   points that Norman wanted was in the final
13   draft before it was sent out to Norman.
14             MR. ZACH:  We can take that down.
15        Q.   I would like to show you -- what
16   are we on -- I'm going to show you what is
17   Lui 24.
18             (Lui Exhibit 24, May 3, 2022 email
19        from Mr. Lui to Mr. Berris, marked for
20        identification.)
21        Q.   Lui 24.  I will scroll through this
22   so you can see it, but let me just orient
23   you, then we will let you scroll through it,
24   okay?
25             You can see here that this is an
```



Page 127

                      S. Lui
1
2    email that you are sending from your tack is
3    fat Gmail account to Mr. Berris on May 3,
4    2022, right?
5         A.   Yes, yes.
6         Q.   You can see like at the caption for
7    the email, it says there are two attachments,
8    right?
9         A.   Yes.
10        Q.   And -- one second.  We will slowly
11   scroll down so you can see the attachments
12   and then we will come back.
13        A.   It's okay.  You can stop there.
14        Q.   You write to Mr. Berris,
15   Resignation as director.  Get it signed by
16   tonight and emailed to me and/or directly to
17   Norman.
18             Do you see that?
19        A.   Yes.
20        Q.   What you are doing is you are
21   instructing Mr. Berris, board member of De
22   Tomaso, to sign the letter of resignation,
23   right?
24             MS. WIGGER:  Object to form.
25        A.   No, it's not instruction, John.  I



```
 1                    S. Lui
 2   have no role at De Tomaso, you know, and you
 3   are asking questions out of context, you
 4   know, but no, it's not an instruction.
 5               There is a whole series of events
 6   that happened before this and in and around
 7   leading to this email so it's not an
 8   instruction at all.  I had long conversations
 9   with Ryan, you know, so, you know, I object
10   to the word that you use instruction.
11       Q.   Well, you wrote, quote, get it
12   signed by tonight, right?
13       A.   That's what I wrote, yes.
14       Q.   And your testimony is you don't
15   think that, get it signed by tonight, is an
16   instruction?
17       A.   No, it's not.  I don't control
18   Ryan, he is, you know, he is a grown man.  He
19   claims to be a very senior executive in the
20   automotive industry.  I'm just an outsider,
21   you know, so if -- he can make his own
22   choice.
23               Yeah, so if he want to sign it, he
24   can choose to sign it which I believe he did
25   it eventually, right, so... but to me, it's
```



Page 129

```
 1                    S. Lui
 2   not an instruction and he has no reason to
 3   take instructions from me anyway.
 4            I just happen to be New York City
 5   and I can assure you, if I wasn't in New York
 6   City, you would not be seeing these emails
 7   from me at all.
 8        Q.   To be clear, I think we were
 9   looking previously, you were in New York City
10   because you were working to secure pipe
11   financing for the SPAC transaction, correct?
12            MS. WIGGER:  Object to form.
13        A.   Not just pipe financing.  We were
14   looking as to whether we, as in Genesis
15   Unicorn, will be going to a binding merger
16   agreement with De Tomaso, so the pipe
17   financing is just one part of it.
18        Q.   And the same question with respect
19   to the second part of the sentence and email
20   to me or directly to Norman.
21            Your testimony is, I take it,
22   again, that you don't view that as an
23   instruction to Mr. Berris?
24            MS. WIGGER:  Object to form.
25        A.   No, it's not an instruction.
```



Page 130

                          S. Lui
1
2        Q.    Let's scroll down to the page
3   ending 954.
4              Is this the letter Mark Chan wrote
5   and that you reviewed?
6        A.    Sorry, you are referring to the
7   messages that I sent, that I forwarded to
8   Norman on -- the 51 time stamp, the earlier
9   one?
10       Q.    The prior day, on the 2nd.
11       A.    No.   This is not -- you can clearly
12  see the contents of this letter and what I
13  wrote in the message is completely different.
14       Q.    Who drafted this letter then?
15       A.    It's not me.   I have no idea.
16  Probably Mark Chan, but this is a question
17  you have to ask De Tomaso who drafted this
18  document.   It is not me, I did not draft this
19  document.
20       Q.    So as we saw in the prior chat, you
21  reviewed the letter that Mr. Chan sent over
22  after you sent him Norman's request, right?
23             MS. WIGGER:   Object to form.
24       A.    Yeah, I believe that was the first
25  letter that Norman sent Ryan, yeah, so this



Page 131

                              S. Lui
1
2    letter looking at now, is a completely
3    different letter.
4        Q.    So your testimony is that this is
5    not the letter that you reviewed that Mr.
6    Chan sent over?
7        A.    Yeah, correct, no.
8        Q.    Then briefly, we don't have to go
9    through it, but the second attachment is
10   what's titled a deed of novation, right?
11       A.    Yes.
12       Q.    And at sort of a high level, the
13   idea of the deed of novation was to have Mr.
14   Berris take financial responsibility for the
15   contracts that Carmen Jordá had entered into
16   with De Tomaso, right?
17            MS. WIGGER:  Object to form.
18       A.    I don't have -- I can read the full
19   contents of this email, but from memory, yes,
20   that was the gist of it which is, by the way,
21   was what Ryan promised me that he would do,
22   not just me.  He promised Norman and myself,
23   when I was talking to him, as in my
24   discussions with Ryan, he promised that he
25   would take full responsibility for the



Page 132

```
 1                      S. Lui
 2  contract that he signed with Carmen Jordá.
 3      Q.   As part of the conversations you
 4  were having with Mr. Berris around this time,
 5  isn't it a fact that you told Mr. Berris that
 6  Norman was going to report him to the SEC for
 7  certain actions he had taken at De Tomaso?
 8           MS. WIGGER:  Object to form.
 9      A.   Well, first of all, we never -- was
10  it Norman who said that?
11      Q.   Let me ask the question again.
12           Isn't it a fact, sir, that in your
13  conversations with Ryan Berris during this
14  time period, you told Mr. Berris that Norman
15  was planning to report Ryan to the SEC for
16  certain actions he had taken in his role at
17  De Tomaso?
18           MS. WIGGER:  Object to form.
19      A.   No, not that I am aware of, no.
20      Q.   So your testimony is that you never
21  told Mr. Berris that Norman was threatening
22  to go to the SEC against Mr. Berris?
23      A.   Yes, correct.
24      Q.   Is it your testimony that Mr. Choi
25  never brought up reporting to the SEC any
```



Page 133

```
 1                    S. Lui
 2   conduct by Mr. Berris?
 3             MS. WIGGER:  Object to form.
 4        A.   I can't answer that question, John.
 5   You are asking me what Norman has said.  I
 6   only spend limited time with him, but as far
 7   as I am aware or at least based on my
 8   discussions and conversations with Norman,
 9   going to SEC and, you know, complaining or,
10   you know, harassing about Ryan's misconduct
11   or whatever was never discussed with me
12   before.
13        Q.   I'm only asking about what you saw
14   or heard.  You can only testify as to your
15   own knowledge.
16             So as I take it your testimony is
17   that you do not recall Mr. Choi ever making
18   such a statement to you?
19             MS. WIGGER:  Object to form.
20        A.   Let me put it this way, John.  I'm
21   pretty certain Norman never mentioned this to
22   me before.
23        Q.   Now -- one second.
24             Sir, during this time period in
25   May, isn't it a fact that Mr. Berris told you
```



Page 134

                        S. Lui
1
2    that he owned 10 percent of De Tomaso?
3              MS. WIGGER:  Object to form.
4         A.   Yes, that's true, he did mention to
5    me verbally probably more than once, but I
6    think twice verbally, yes.
7         Q.   Do you recall where Mr. Berris told
8    you that he had a 10 percent ownership stake
9    in De Tomaso?
10             MS. WIGGER:  Object to form.
11        A.   I can't remember, but I'm pretty
12   sure on April 30th or after.  So April 30th
13   was when Norman told me about the
14   unauthorized contract with Carmen Jordá and
15   at that point in time, you know, the both of
16   them refused -- I'm sorry, Norman refused to
17   meet or discuss with Ryan, right.
18             So I think Ryan or Mr. Berris was
19   trying to have a discussion to explain his
20   position to Mr. Choi regarding Carmen Jordá's
21   contract and I believe Norman ignored him,
22   you know, so I was kind of like the
23   in-between guy, I happened to be at the scene
24   of the crime, so to speak, and you know, I
25   was just passing messages between the both of



Page 135

```
 1                    S. Lui
 2   them.
 3             So during that time, you know, it
 4   could have been at one of the cafes that was
 5   -- usually I meet Ryan near his hotel.  He
 6   was staying at Intercontinental,
 7   Intercontinental Barclay New York, midtown
 8   area, near Bryant Park, so usually we will
 9   meet kind of around Bryant Park.
10             So I believe he told me during one
11   of those sessions, I believe I spoke to him
12   separately three or four times during that
13   period.  So I'm pretty sure one of them was
14   during those sessions that I met with Ryan
15   individually.
16        Q.   During this time period when you
17   were interacting with Ryan, was it fair to
18   say you guys had an amicable relationship?
19        A.   Absolutely, yes.
20        Q.   In fact, you were pretty friendly
21   with one another, right?
22        A.   Yes, absolutely, yes.
23        Q.   You were very friendly to Ryan,
24   right?
25             MS. WIGGER:  Object to form.
```



Page 136

```
 1                    S. Lui
 2      A.    Yes.
 3      Q.    And Ryan was very friendly back to
 4 you?
 5            MS. WIGGER:  Object to form.
 6      A.    Yes.
 7      Q.    Let's go back to the chats.  We are
 8 going to look at -- I would like to go to
 9 308.
10            MR. ZACH:  I'm going to go off very
11       briefly.  I have to find a quick
12       document.  I have it now.  We can pick
13       up 308.
14      Q.    We are going to go down to the
15 bottom of the page which is near 5322 and you
16 see at 22:09, Mr. Choi says, two above that,
17 at 7:15, you write to Mr. Choi, I'm at your
18 lobby.
19            Do you see that?
20      A.    Yes.
21      Q.    So you were, in addition to meeting
22 with Mr. Berris at times in New York, you
23 were also meeting with Mr. Choi, right?
24      A.    Yeah.  Like I said, I was the
25 messenger boy, passing messages between the
```



Page 137

```
 1                    S. Lui
 2   both.
 3       Q.   Then a couple of lines down, Mr.
 4   Choi says, Are you meeting Ryan?  If so,
 5   please ask him to sign the two agreements,
 6   resignation and novation, right?
 7       A.   Yes.
 8       Q.   This is what you are saying, your
 9   testimony is you were sort of being treated
10   as sort of an intermediary between the two of
11   them, right?
12       A.   Yes, exactly.
13       Q.   So going down to the next page, at
14   5:30 on 5/4, you say at 5:30 -- and I know
15   these are hard to read and I know it's late
16   so I appreciate your patience, Mr. Lui.
17            You write, I just finished with
18   Ryan.  Let me know if you are free to chat,
19   and you say, I am at your lobby, right?
20       A.   Yes.
21       Q.   He says, Coming, same thing.
22            Then if you go down a little bit
23   lower, maybe 15 hours later or so, Mr. Choi
24   writes to you saying, Thinking of insisting
25   on Ryan signing Mark's original resignation
```



Page 138

```
 1                    S. Lui
 2   letter format.
 3            Do you see that?
 4       A.   Yes.
 5       Q.   Do you take -- did you understand
 6   Mr. Choi to be referring to the previous
 7   version of the letter that -- in the earlier
 8   chats?
 9            MS. WIGGER:  Object to form.
10       A.   I really can't answer that
11   question, John.  All I know is that Norman's
12   request, I forwarded those two documents to
13   Ryan with the content of the email that
14   Norman wanted, so I sent the email and I
15   don't believe I was involved in the back and
16   forth between Ryan and Norman thereafter.
17            So I cannot answer your question
18   whether -- was it original version or which
19   version it was.  I won't be able to answer
20   that, John.
21       Q.   Just let me go back.  I don't want
22   to go all the way.  Let's go back to 307.
23   This will be very quick.
24       A.   Okay.
25       Q.   So remember you testified earlier,
```



Page 139

                        S. Lui
1
2    this is the two big paragraphs of text?
3        A.    Yes.
4        Q.    Remember we looked at this and the
5    second one was sort of what the letter was
6    supposed to be, that Mr. Chan was supposed to
7    write, right?
8        A.    Yes.
9        Q.    When we looked at the attachment to
10   the email, you said this was different,
11   right?
12       A.    Yes.
13       Q.    So when we go forward to 309, when
14   Mr. Choi says at 20:44, Thinking of insisting
15   on Ryan signing Mark's original resignation
16   letter format.  Does that refresh your
17   recollection that he is talking about the
18   earlier text that we just looked at?
19            MS. WIGGER:  Object to form.
20       A.    It could have been the email that I
21   sent from tack is fat Gmail account to Ryan,
22   so I suspect, from recollection, I think
23   Norman must have been referring to the
24   original version that Mark drafted.
25       Q.    And sort of briefly --



Page 140

                          S. Lui
1
2           MR. ZACH:  We can set this document
3      aside.
4      Q.   I'm going to show you another
5  email.  It's dated 5/4/2022.
6           MR. ZACH:  What are we at, Sophie?
7      This will be Lui 25.
8           (Lui Exhibit 25, 5/4/2022 email
9      from Mr. Berris to Mr. Lui, marked for
10     identification.)
11     Q.   Do you see this is Mr. Berris
12  emailing you from his De Tomaso account to
13  your Gmail account and on 5/4/2022 at 2:14 in
14  the morning?
15          Do you see that?
16     A.   Yes.
17     Q.   And you can tell from the email
18  that there is an attachment, right?
19     A.   Yes.
20     Q.   This is responding to that email we
21  looked at earlier, Get it signed by tonight
22  and email it to me, right?
23     A.   Yes.
24     Q.   If we go -- there is an attachment,
25  right, and that's where Mr. Berris -- you can



Page 141

                              S. Lui
1
2    see that the letter has been modified from
3    the prior attachment, right?
4         A.    Yes, I can see it now on this, yes.
5         Q.    You can see Mr. Berris signed the
6    letter, right?
7         A.    Yes.
8         Q.    And Mr. Berris then sort of
9    forwarded that back to you, right?
10        A.    Yes.
11              MR. ZACH:    We can put that aside.
12        Q.    Let's go back to Lui 1, page 311.
13              I won't go through all of these,
14   but I will point out a few.
15              Can you see at the top, you say, I
16   am moving to the Courtyard right next to your
17   place?
18              Do you see that?
19        A.    Yes.
20        Q.    That's a hotel that's near Hudson
21   Yards where Norman lived, right?
22        A.    Yes.
23        Q.    Then that's on the 5th and on the
24   6th at 12:15 you say, Free to chat if you are
25   still awake.  Good morning.  I'm still



Page 142

                        S. Lui
1
2    waiting for Ryan to return my call.  He said
3    he would do so this morning.
4              Do you see that?
5        A.   Yes.
6        Q.   Then if you go down to 5/7 which is
7    another day later, it says, Ryan just called.
8    I'm keeping him for lunch now.  Keep you
9    posted.
10             Do you see that?
11       A.   Yes.
12       Q.   So I mean, then on the 8th, the
13   very bottom, you say, Let me know if you want
14   to chat, re:  Ryan and my coffee with him at
15   5:00 p.m. or we can chat tomorrow too.
16             Do you see that?
17       A.   Yes.
18       Q.   These are in furtherance of what
19   you described as being the sort of the go
20   between between Mr. Choi and Mr. Berris,
21   right?
22             MS. WIGGER:  Object to form.
23       A.   Yes.
24       Q.   Okay.  You can put the chats away.
25             MR. ZACH:  I'm going to mark very



Page 143

                        S. Lui
 1
 2      briefly -- what are we at now, Lui 26,
 3      which is a very large document, but I'm
 4      only going to have you look at the first
 5      page.
 6              (Lui Exhibit 26, document titled
 7      Business Combination Agreement, Genesis
 8      Unicorn Capital Corp., De Tomaso dated
 9      May 16, 2022, marked for
10      identification.)
11      Q.    You see that this is a document.
12  You can scroll through it, but I can -- you
13  see it's titled Business Combination
14  Agreement, Genesis Unicorn Capital Corp., De
15  Tomaso.
16              Do you see that?
17      A.    Yes.
18      Q.    And it's dated May 16, 2022?
19      A.    Yes.
20      Q.    And you would agree, this is sort
21  of the draft of the BCA, the business
22  combination agreement that would sort of
23  consummate the deal between De Tomaso and
24  Genesis Unicorn, right?
25              MS. WIGGER:  Object to form.



Page 144

```
 1                    S. Lui
 2        A.    Yes.
 3        Q.    And do you recall reviewing this
 4   contract or versions of it during the May '22
 5   time period?
 6        A.    Yes.
 7             MR. ZACH:  You can set that aside.
 8             I would like to mark Lui 27 which
 9        is a presentation called Summary of
10        Contracts.
11             (Lui Exhibit 27, presentation
12        called Summary of Contracts, marked for
13        identification.)
14             MS. WIGGER:  Do you have the cover
15        email?
16             MR. ZACH:  I don't think I have the
17        cover email for it.
18        Q.    If we can scroll through this a
19   little bit.
20             You would agree with me that this
21   is sort of a due diligence type document?
22        A.    Yes.  Specifically, this is the
23   legal due diligence report.  It's work in
24   progress that we were doing as part of our
25   due diligence into the potential merger with
```



Page 145

                        S. Lui

 1                        S. Lui
 2  De Tomaso.
 3           MS. WIGGER:  It seems to be from a
 4      law firm.  Is there a cover email where
 5      they sent it to De Tomaso?  It says,
 6      Taylor Wessing, it says it's legal due
 7      diligence.
 8      A.   I'm pretty sure this document was
 9  just sent to us, John, as in just Genesis
10  Unicorn.
11      Q.   I don't have the cover email.  You
12  guys -- let me ask some questions without
13  flipping to the email.
14           As part of the due diligence
15  process, you would exchange information back
16  and forth between De Tomaso and Genesis?
17      A.   Generally, yes, but I'm pretty sure
18  this document was not shared with De Tomaso
19  because it's our internal Genesis Unicorn
20  report.
21      Q.   It says what it says.
22           You recognize this and you know
23  it's a due diligence document, right?
24      A.   Yes.
25           MR. ZACH:  Okay.  We don't have to



Page 146

                         S. Lui
1
2      go into it.
3             We can put it aside and Hannah and
4      I can work out what the status is later.
5             Ms. WIGGER:  I lost you there for a
6      second.  We can look at it later.
7             MR. ZACH:  It says what it says.
8      Q.    Now, I would like to show you
9  another document -- I'm going to show you
10  another quick chat.  That may be our last
11  visit to the chat.  Let's go to 319.
12            If you go kind of --
13            MR. ZACH:  Sophie, can we please go
14      down to the bottom half?
15      Q.    You see on June 16th -- at some
16  point, you knew that Mr. Berris left the
17  company in May, right?
18      A.    Yes, based on his resignation, yes.
19      Q.    Now, that -- as of May, you were
20  fully apprised of various issues relating to
21  De Tomaso, including the issues concerning
22  Carmen Jordá, right?
23      A.    Yes.
24            MS. WIGGER:  Object to form.
25      Q.    So now we are -- you knew that



Page 147

                         S. Lui
1
2    going back to April and May of 2022, right?
3              MS. WIGGER:  Object to form.
4        A.    Sorry, could you repeat your
5    question again?
6        Q.    Sorry.  You knew about the issues
7    Mr. Choi had concerning the Carmen Jordá
8    contracts beginning in or about April of
9    2022?
10             MS. WIGGER:  Object to form.
11       A.    Specifically for me, I believe it's
12   around April 2022.
13       Q.    So now we are in this chat.  We are
14   in mid June of 2022, right?
15       A.    Yes.
16       Q.    So looking at this text, at 9:42 on
17   June 16th, you write, Thanks, Norman.  Your
18   assistance -- sorry, go back to 9:37.
19             So at 9:37, Mr. Choi writes to you,
20   We will continue to push through the SPAC
21   process.  Doesn't matter what amount we end
22   up raising.  We get it done.
23             Do you see that?
24       A.    Yes.
25       Q.    Then you respond, Thanks, Norman.



Page 148

```
 1                    S. Lui
 2   Your assistance really means a lot to me.
 3   Let's work together and bring DT to the next
 4   level.  The de-SPAC is just the beginning of
 5   an exciting journey and I hope to contribute
 6   to this journey of yours.
 7            Do you see that?
 8        A.   Yes.
 9        Q.   When you refer to the de-SPAC, you
10   are referring to when the merger is like
11   finally consummated, right?
12        A.   Yes.
13        Q.   So at this point, you are
14   anticipating that there will be sort of a
15   consummated SPAC between De Tomaso and
16   Genesis Unicorn, right?
17            MS. WIGGER:  Object to form.
18        A.   No, that's not what I meant, John.
19        Q.   When it says, the de-SPAC is just
20   the beginning, what de-SPAC are you referring
21   to?
22        A.   So a couple of points.  De-SPAC is
23   what you said in your earlier question which
24   I agree.  De-SPAC means completing the
25   binding merger agreement, so that's one.
```



Page 149

```
 1                      S. Lui
 2             Second point is at this stage,
 3   while looking at 16th of June, the nonbinding
 4   LOI that was signed between Genesis Unicorn
 5   and De Tomaso had already expired and we did
 6   not sign any extension to that LOI, so at
 7   this point in time, the LOI has already been
 8   terminated.
 9        Q.   At this time, you are also drafting
10   a business combination agreement, right?
11             MS. WIGGER:  Object to form.
12        A.   It was -- let me say my piece.
13             It was after, I believe, it could
14   have been the first draft.  The lawyers
15   worked on it.  It could have been in early
16   May, so we were just reviewing a draft that
17   the lawyers did, you know, in the middle of
18   our due diligence, so within the 60 day
19   effective period of the LOI.
20        Q.   In this text, when you say, let's
21   work together and bring DT to the next level,
22   you are referring to De Tomaso going public
23   via the SPAC, right?
24             MS. WIGGER:  Object to form.
25        A.   You have to remember that ARC Group
```



Page 150

                        S. Lui
1                       S. Lui
2    was still the financial advisor to De Tomaso.
3    ARC Group still had many clients that they
4    helped to list, SPACs that they helped to
5    list for NASDAQ.
6             So at that point in time, as far as
7    we were concerned, if we really wanted to
8    continue working on the deal, the first thing
9    we would have done was to extend the LOI
10   which we did not.
11        Q.   You are saying that at this point,
12   it's your testimony that as of June 16, 2022,
13   that Genesis Unicorn no longer anticipated
14   going forward with the De Tomaso SPAC?
15             MS. WIGGER:   Object to form.
16        A.   Yes, correct.
17             MR. ZACH:   Let's put that aside.
18             I would like to mark -- what are we
19        up to now?  This will be Lui 28.
20             (Lui Exhibit 28, Genesis Unicorn
21        internal document titled Weekly Meetings
22        and Notes, marked for identification.)
23        Q.   This is another Genesis Unicorn
24   internal document, right, sir?
25        A.   Yes.



Page 151

                        S. Lui

1

2    Q.    And it's titled Weekly Meetings and

3    Notes, right?

4    A.    Yeah.

5    Q.    This is a regular report that's

6    made internally by Genesis talking about

7    various internal business updates, right?

8    A.    Yes.

9    Q.    I would like to go down to 3.  You

10   see it says here, the status of De Tomaso

11   automobile deal.

12            Do you see that?

13   A.    Yes.

14   Q.    And it says -- it says, We have --

15   go back to the top, the June 22nd, I got you.

16            You would agree that June 22nd is

17   later in time than June 16th?

18   A.    Yes.

19   Q.    Here you say, We have agreed with

20   Norman to proceed to BCA without a pipe.

21   Target deadline is four weeks from now for

22   BCA announcement followed two or three weeks

23   for filing a proxy.

24            Do you see that?

25   A.    Yes.



Page 152

1                    S. Lui

2        Q.    So here, on June 22nd, in an

3    internal Genesis weekly update, it states

4    that Genesis Unicorn is intending to proceed

5    to the BCA without a pipe, right, sir?

6        A.    Yes, that's what it says, yes.

7        Q.    BCA is the business combination

8    agreement, right, sir?

9        A.    Yes.

10       Q.    Another term for that, I think you

11   just used, was merger agreement, right, sir?

12       A.    Yes.

13       Q.    So you would agree with me that

14   your previous testimony relating to that June

15   16th text is incorrect, right, sir?

16             MS. WIGGER:  Object to form.

17       A.    No, I stick to my previous

18   testimony, John.

19       Q.    And then it says, Target deadline

20   of four weeks from now, i.e., the end of the

21   third week of July for BCA announcement.

22             Do you see that?

23       A.    Yes.

24       Q.    That would be an announcement in

25   which the BCA was finalized between De Tomaso



Page 153

```
 1                    S. Lui
 2  and Genesis Unicorn, right?
 3            MS. WIGGER:  Object to form.
 4       A.   Which never happened at all, John.
 5       Q.   But I'm asking as of June 22nd,
 6  when this document was written, the target
 7  deadline was only four weeks away for
 8  completing the merger agreement, right, sir?
 9            MS. WIGGER:  Object to form.
10       A.   John, I need to stop you there
11  because this is a document that we update on
12  a weekly basis.  I need to check the
13  historical versions of this document because
14  usually what we do is, like, for the week
15  before, we will write something, right, on
16  it, you know, and depending whether we --
17  because typically, we don't -- how do I put
18  it?
19            What I'm trying to say, this
20  document could have been a legacy document,
21  so meaning this particular statement where we
22  say we have agreed with Norman to proceed to
23  BCA without a pipe, this could have been in
24  the previous week's meeting notes.  It's just
25  that, you know, we did not update it, you
```



Page 154

                         S. Lui

1
2    know, to say that okay, we are not going to
3    pursue for this particular week.  So I would
4    say I reserve my comment on this document,
5    but, you know, I will probably need to go
6    back and check on the different versions of
7    the various weeks to answer that.
8         Q.   You said a lot there.  I want to
9    make sure I understand it.
10             So your testimony is that it's your
11   understanding that this document is
12   potentially stale, meaning that it just
13   hadn't been properly updated from prior
14   versions, right?
15             MS. WIGGER:  Object to form.
16        A.   Yes, correct.
17        Q.   Because at this time, it's your
18   testimony that as of June 22nd, Genesis was
19   to longer committed to pursuing the BCA?
20        A.   For me personally, okay, you are
21   asking me questions in pieces, so if you take
22   a step back, the various issues that we
23   discovered up to say June 16th, there were a
24   lot of so-called, we call them deal killers.
25             Our bankers, which is Benchmark



```
 1                      S. Lui
 2   Group, they couldn't raise any placement
 3   money at all, for various reasons.  Mainly
 4   because De Tomaso is pre revenue, meaning
 5   they have zero revenues, they have zero
 6   employees, they don't have production
 7   agreement signed, they don't have a
 8   development agreement signed with any
 9   manufacturer, you know.
10            And then the last straw, so to
11   speak, for us is when we found out about the
12   potential lawsuits through Carmen Jordá and
13   through Ryan Berris, you know, so we were
14   facing a lot of issues and, you know, there
15   were a lot of documents that were still
16   outstanding in our due diligence.
17            Like I said, we didn't see any
18   employment agreements, okay.  As far as we
19   were concerned, De Tomaso had zero employees,
20   right, so we could not list the company with
21   zero employees.  So I'm just listing there as
22   examples of issues that we face, that we
23   couldn't close the deal, right.
24            So in my mind, by, you know, that's
25   why we allow the LOI to lapse.  We know we
```



Page 156

1                    S. Lui
2   not extending the LOI, you know, so
3   theoretically, even by this time, this
4   document June 22nd or the messages you
5   referred to on June 16th, if we really wanted
6   to close this deal, the first thing we would
7   have done is to extend the LOI which we did
8   not.  I will stop there.
9        Q.   So to summarize, your testimony is
10  that with respect to this June 22nd weekly
11  meetings and notes, that it does not reflect
12  your -- does match your recollection that at
13  this time, you were basically stopping going
14  forward with the merger?
15       A.   No, I mean, the reality is we did
16  not extend the LOI so it expired, if I'm not
17  wrong, it's June 6th, so by this time, you
18  know, the deal was already, quote-unquote,
19  the LOI that we had was eliminated.
20            So the reality is, we were already
21  giving up on this deal by that time, right,
22  so the rest is, you know, you saw the
23  messages to me and Norman, it's just, maybe
24  it's an Asian thing, we -- I tried to be
25  courteous, you know, so, but you know, so,



Page 157

```
 1                    S. Lui
 2   but when I reply, I will reply positively.
 3            So all I'm trying to say is, look
 4   at what we do, not what we say.  My messages
 5   may say okay, let's do this, I'm being
 6   positive, encouraging, but, in reality, as
 7   far as Genesis was concerned, we were moving
 8   on to other deals and the fact as well, we
 9   did not sign any binding agreement with De
10   Tomaso eventually.
11       Q.   I take it from what you just said
12   that it was Genesis Unicorn's decision to
13   stop the transaction and that it was not De
14   Tomaso that stopped it?
15            MS. WIGGER:  Object to form.
16       A.   Yeah.  We -- well, I think that's
17   selective, but as far as we were concerned
18   our board, we were aware of the legal issues
19   with Carmen Jordá, we had discussions with
20   our advisors.  So that was a deal killer for
21   us.
22       Q.   Meaning, you had no intention of
23   going forward after those deal killers came
24   to light?
25       A.   Absolutely, yeah.
```



Page 158

```
 1                    S. Lui
 2      Q.   Just to be clear though, sir, this
 3  is an internal document created by Genesis
 4  Unicorn, right?
 5      A.   Yes.
 6      Q.   This isn't a document that is
 7  shared with De Tomaso, this is for your
 8  internal use only, right?
 9      A.   Yes.
10      Q.   I take it that you want to be
11  accurate in keeping your weekly meetings and
12  notes as a record of what Genesis Unicorn is
13  actually doing, right?
14      A.   Yes.
15           MS. WIGGER:  Object to form.
16      A.   Yes.
17           MR. ZACH:  You can set that aside.
18           MS. WIGGER:  Just for planning, we
19      are getting pretty close to midnight
20      Sam's time.
21           MR. ZACH:  I'm pretty close.
22           I would like to mark now what is
23      Lui 29.
24           (Lui Exhibit 29, June 27, 2022
25      weekly meetings and notes, marked for
```



Page 159

```
 1                    S. Lui
 2        identification.)
 3        Q.    This is a similar weekly meetings
 4   and notes, right, sir?
 5        A.    Yes.
 6        Q.    And this is from the next week,
 7   June 27, 2022, right, sir?
 8        A.    Yes.
 9        Q.    You are an attendee of the meeting,
10   right, it has your name there?
11        A.    Yes.
12        Q.    Let's go down to 3.  See, again,
13   here, we have the status of De Tomaso
14   Automobili deal, right?
15        A.    Yes.
16        Q.    You know this one has been updated
17   because there is new language there, right,
18   sir?
19        A.    Yeah.
20        Q.    What it says in your own internal
21   documents is, Norman is having second
22   thoughts about doing a de-SPAC now.  He is
23   concerned that the market may not agree with
24   the valuation, share price tanks and affects
25   DT's reputation negatively.
```



Page 160

1                        S. Lui

2          Do you see that?

3     A.    Yes.

4     Q.    What you are saying, what Genesis

5     Unicorn is saying here is that it is Mr. Choi

6     who is having second thoughts about doing the

7     de-SPAC, right?

8          MS. WIGGER:  Object to form.

9     A.    Yes.

10    Q.    If you look below, again, you

11    reiterate, As per previous week, which is the

12    week before, we have agreed with Norman to

13    proceed to a BCA without a pipe.

14          Do you see that, sir?

15    A.    Yes.

16    Q.    Then you say, Target deadline is

17    four weeks from now, IE, the third week of

18    July.

19          Do you see that, sir?

20    A.    Yes.

21    Q.    Right, sir?

22    A.    Yes.

23    Q.    So, again, it was -- and it says,

24    Again, for BCA announcement followed by the

25    two to three weeks for filing of a proxy.



Page 161

```
 1                    S. Lui
 2          Do you see that, sir?
 3     A.   Yes.
 4     Q.   This was an internal document,
 5 right, sir?
 6     A.   Yes.
 7          MR. ZACH:  Why don't we take -- I'm
 8     going to go off for like two minutes and
 9     I will come right back, so, hopefully,
10     we can get you done with this.
11          THE VIDEOGRAPHER:  This ends media
12     unit No. 4 in the deposition of Samuel
13     Lui.  The time is 11:39 a.m.  We are
14     going off the record.
15          (Recess.)
16          THE VIDEOGRAPHER:  This is media
17     unit No. 5 in the deposition of Samuel
18     Lui.  The time is 11:42 a.m.  We are
19     back on the record.
20     Q.   Has Mr. Norman Choi ever been an
21 investor, either directly or indirectly, in
22 Genesis Unicorn Capital?
23     A.   No, not that I am aware of.
24     Q.   I would like to show you one last
25 document.  This is --
```



MAGNA
LEGAL SERVICES

Page 162

```
 1                  S. Lui
 2           MR. ZACH:  What are we marking it
 3      as?  This is Lui 30.
 4           (Lui Exhibit 30, text chat group
 5      between Mr. Lui, Mr. Choi and Ms.
 6      Majcher dated October 14, 2023, marked
 7      for identification.)
 8      Q.   Do you see, sir, this is a text
 9  chat group between yourself, Mr. Choi and Ms.
10  Majcher?
11           Do you see that?
12      A.   Yes.
13      Q.   Do you see it's dated October 14,
14  2023?
15      A.   Yes.
16      Q.   I would like to take you to page
17  738.
18           Do you see at 6:22:24, you write, I
19  want to get someone back this website and
20  give him pain.
21           Do you see that?
22      A.   Yes.
23      Q.   And you are referring to Mr.
24  Berris, right?
25           MS. WIGGER:  Can you scroll up?
```



Page 163

                        S. Lui
1
2           MR. ZACH:  Sure.
3           MS. WIGGER:  Sam, if you need to go
4       up higher, that's fine, too.
5       Q.   If you go to the bottom of page
6   136, you see it says ww.ryanberris.com?
7       A.   Yes.
8       Q.   Does that refresh your recollection
9   that the website you are talking to is Mr.
10  Berris?
11      A.   Yeah, I think so, yeah.
12           Go ahead, your question is?
13      Q.   Let's go down to 739.  You see you
14  go on to say, I found this and he has a cock
15  sucker website on himself.
16           Do you see that, sir?
17      A.   Yeah, I don't think that was
18  written by me.
19      Q.   It says from Samuel Lui.
20           Do you see that, sir?
21      A.   Yeah, but, that was a message that
22  I forwarded to them.
23      Q.   So your testimony is you didn't
24  write this?
25      A.   No, I don't recall writing this.  I



Page 164

```
 1                    S. Lui
 2   believe it was written by an investor,
 3   subsequently an investor in De Tomaso, so he
 4   found the website and he forwarded those
 5   messages to me and I forward these messages
 6   into the chat group with Diana and Norman.
 7        Q.   Let's go down to the bottom of 739.
 8             Do you see here you write, The
 9   website just says investor/entrepreneur, but
10   nothing else.  Sounds like him exactly, only
11   words, but nothing else, full of shit.
12             Do you see that?
13        A.   Yes, yes.
14        Q.   That's something you wrote, right,
15   sir?
16        A.   No, no.  People would know me.  I
17   never write words like that.  I can assure
18   you, this was not written by me.
19             If you want, I can, you know,
20   through Hannah, I can show you whatever -- I
21   can show you that the messages were not from
22   me.  I just forwarded those messages that
23   someone else found.  I thought it was funny
24   so I forward it to Norman and Diana.
25        Q.   The next one below says, Yes, we
```



Page 165

                          S. Lui

1
2    can hack it out.  Some dick picture of him
3    sucking it.  I'm thinking about it.  Laughing
4    out loud.
5              Do you see that?
6         A.   Yes.
7         Q.   Same testimony, you are saying you
8    didn't write that?
9         A.   Yes.
10        Q.   Let's go to the next page.
11             You then write the word hack.
12             Do you see that?
13        A.   Yes.
14        Q.   If you keep going down, you write
15   in the chat, I have lawyers.
16             Do you see that?
17        A.   Yes.
18        Q.   And then you go down some more and
19   you say --
20        A.   John, it says I have lawyers.  You
21   use the word that I write.  I didn't write
22   this, okay.  So all these messages you are
23   showing on the screen now was not written by
24   me.  I forward those messages.
25             MR. ZACH:  Well, with that, I know



Page 166

                    S. Lui
1
2        it's late there, Mr. Lui.  I appreciate
3        your time.  We have no further
4        questions.
5             MS. WIGGER:  Thank you.  I have no
6        questions, Mr. Lui.
7             I know it's midnight so you can go.
8             There is one thing I want to put on
9        the record about Exhibit 27.  I looked
10       at the parent email, but you can go.
11            So I'm referring to Genesis, the
12       Bates number is 2417 at the end.  I
13       think it was Exhibit 27, I might have
14       that wrong and the parent email to that
15       thread is -- starts on Genesis 2413 and
16       I think it's just Genesis board members
17       and their lawyers so that and the
18       attachments, there are two actually, are
19       privileged and we are clawing them back.
20            MR. ZACH:  We should probably keep
21       a running list of some of these so we
22       don't lose track.
23            MS. WIGGER:  I just wanted it on
24       the record so there wasn't confusion
25       later, but we can chat later.  We will



Page 167

 1

 2        follow-up later.

 3             MR. ZACH:  Have a good morning,

 4        everyone.

 5             THE VIDEOGRAPHER:  This ends the

 6        deposition of Samuel Lui.  The time is

 7        11:48 a.m.  We are going off the record.

 8             (Time noted:  11:48 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 168

1

2                  - - -

3              I N D E X

4                  - - -

5

6   SAMUEL LUI                         PAGE

7      By Mr. Zach                     4

8

9                  - - -

10            E X H I B I T

11                 - - -

12  LUI EXHIBIT                        PAGE

13  Exhibit 1 Series of chats between   6

14      Samuel Lui and Norman Choi

15  Exhibit 2 SEC Form S-1             8

16  Exhibit 3 Two-page document bearing  18

17      the ARC logo

18  Exhibit 4 U.S. IPO De Tomaso       27

19      Automobili Screenshot

20  Exhibit 5 November 14, 2021 email   32

21  Exhibit 6 Email with an attachment  36

22  Exhibit 7 SEC registration statement  42

23  Exhibit 8 Email dated January 10,   49

24      2022 from Samuel Lui to MW at

25      Meridian Risk



Page 169

```
 1
 2                    - - -
 3                E X H I B I T
 4                    - - -
 5  LUI EXHIBIT                        PAGE
 6  Exhibit 9 Email dated February 10,    56
 7      2022 from tackisfat@gmail.com
 8      to Mr. Choi at his Gmail address
 9  Exhibit 10 Email from Mr. Lui to      58
10      Mr. Choi with attached Project
11      Hyper financial forecast
12  Exhibit 11 Filed registration        63
13      statement for Genesis Unicorn
14  Exhibit 12 Documents bearing Bates    67
15      Stamp No. Genesis 848 through
16      Genesis 852
17  Exhibit 13 March 11, 2022 email       76
18      from tackisfat@gmail to Diana
19      Majcher and Norman Choi
20  Exhibit 14 March 22nd email from      78
21      hinweng@gmail.com to Mr. Choi
22  Exhibit 15 Email dated March 28,      80
23      2022
24  Exhibit 16 Email from Ms. Majcher     86
25      to Mr. Lui at hinweng@gmail.com
```



Page 170

1

2                    - - -

3                E X H I B I T

4                    - - -

5   LUI EXHIBIT                              PAGE

6   Exhibit 17 Internal Genesis document    88

7   Exhibit 18 Form 10-Q for Genesis        92

8       Unicorn Capital

9   Exhibit 19 Email dated April 3, 2022    97

10  Exhibit 20 Document dated April 7,      98

11      2022

12  Exhibit 21 Email dated April 24,        103

13      2022

14  Exhibit 22 May 1, 2022 email chain      114

15  Exhibit 23 Email dated April 27,        117

16      2022

17  Exhibit 24 May 3, 2022 email from       126

18      Mr. Lui to Mr. Berris

19  Exhibit 25 5/4/2022 email from Mr.      140

20      Berris to Mr. Lui

21  Exhibit 26 Document titled Business     143

22      Combination Agreement, Genesis

23      Unicorn Capital Corp., De Tomaso

24      dated May 16, 2022

25



Page 171

1
2                        - - -
3                  E X H I B I T
4                        - - -

5    LUI EXHIBIT                              PAGE
6    Exhibit 27 Presentation called          144
7          Summary of Contracts
8    Exhibit 28 Genesis Unicorn internal     150
9          document titled Weekly Meetings
10         and Notes
11   Exhibit 29 June 27, 2022 weekly         158
12         meetings and notes
13   Exhibit 30 Text chat group between      161
14         Mr. Lui, Mr. Choi and Ms.
15         Majcher dated October 14, 2023
16
17
18
19
20
21
22
23
24
25



Page 172

1
2                        - - -
3            DEPOSITION SUPPORT INDEX
4                        - - -
5   Request for Production of Documents
    Page  Line         Page  Line    Page  Line
6   None
7                        - - -
8   Stipulations
    Page  Line         Page  Line    Page  Line
9   None
                        - - -
10
    Questions Marked
11  Page  Line         Page  Line    Page  Line
    None
12                       - - -
13  To Be Filled In
    Page  Line         Page  Line    Page  Line
14  None
                        - - -
15
16
17
18
19
20
21
22
23
24
25



Page 173

1

2                          CERTIFICATE

3

              I HEREBY CERTIFY that the witness,
4    SAMUEL LUI, was duly sworn by me and that the
     deposition is a true record of the testimony
5    given by the witness.

6         _____ *Leslie Fagin* __
          Leslie Fagin,
7         Registered Professional Reporter
          Dated: September 20, 2024

8

9

10

              (The foregoing certification of
11   this transcript does not apply to any
     reproduction of the same by any means, unless
12   under the direct control and/or supervision
     of the certifying reporter.)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 174

1
2            ACKNOWLEDGMENT OF DEPONENT
3            I,                        , do hereby
    certify that I have read the foregoing pages,
4   and that the same is a correct transcription
    of the answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or substance,
6   if any, noted in the attached Errata Sheet.
7

8
    SAMUEL LUI                    DATE
9

10
    Subscribed and sworn
11  to before me this
            day of                  , 2024.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25



```
 1
 2                    - - - - - -

                     E  R  R  A  T  A
 3                    - - - - - -

     PAGE   LINE   CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



## A

**A-D-E-O-Y-E**
35:16
**a.m**
1:15 3:6 52:15,20
83:17,22 113:21
114:2 161:13,18
167:7,8
**a/k/a**
1:8,9
**able**
26:9 41:10 63:24
138:19
**above-mentioned**
1:17
**absolutely**
109:4 135:19,22
157:25
**accepted**
63:21
**access**
62:14
**account**
33:2,5 53:7 54:5
76:16 114:11,12
127:3 139:21
140:12,13
**accounting**
85:17 87:8 88:6
91:23
**accurate**
39:16 68:12 158:11
**achieved**
106:12,24 107:13
**acknowledge**
4:4,8
**ACKNOWLEDG...**
174:2
**acquaintances**
17:16,19 36:9,10
**acquisition**
16:23 70:14 112:14
**act**
119:9
**actions**

132:7,16
**actual**
41:15 64:16
**add**
44:14 118:2
**added**
38:12 41:9 85:24
**addition**
126:4 136:21
**additional**
105:3,4
**address**
33:9,12,13 37:6
50:12,15 56:20 57:3
57:7,10 58:25 59:6
61:10 73:10,14,20
73:24 77:10,13
78:20 97:17,20
104:3 123:7 169:8
**addresses**
58:21 73:8 78:17
**Adeoye**
35:15,17
**Adesso**
80:24
**adjacent**
3:17
**administer**
4:10
**administered**
4:9
**admit**
75:19
**advice**
79:3,9 116:21 117:2
117:5,10,11,13
119:15
**advise**
101:19
**advised**
96:8
**advising**
17:21 112:12,17
**advisor**
11:16 16:22 51:9,10
71:7 106:18 150:2

**advisors**
157:20
**against-**
1:7
**aggregate**
10:18
**ago**
77:21
**agree**
4:12 9:15 13:9,18
15:3 16:9 23:3
26:18 29:10 31:17
32:6 41:16 60:21
62:12,19 64:20,24
66:17 68:13 71:8
72:8 77:6 88:4
93:12,22 94:25
98:20 101:4,18
102:15 103:8 108:9
109:11 143:20
144:20 148:24
151:16 152:13
159:23
**agreed**
115:19 151:19
153:22 160:12
**agreement**
71:17 94:20,23 95:15
95:17,19 101:14
115:25 116:5,8
122:20 129:16
143:7,14,22 148:25
149:10 152:8,11
153:8 155:7,8 157:9
170:22
**agreements**
118:25 137:5 155:18
**ahead**
38:16 45:22 78:25
84:10 163:12
**al**
3:10
**Alexander**
3:21
**ALEXANDRA**
2:10

**allow**
155:25
**amended**
47:7
**amendments**
37:21
**amicable**
135:18
**amount**
45:11 147:21
**analysis**
89:25
**analyze**
90:16
**analyzed**
90:12,13
**and/or**
127:16 173:12
**announcement**
151:22 152:21,24
160:24
**answer**
40:10 54:7 60:6 62:5
71:22,24 72:14
85:12 94:11,13
96:13,13,14 111:10
133:4 138:10,17,19
154:7
**answered**
31:21,22 74:21,24
96:22 103:4,13
108:7
**answers**
174:4
**anticipated**
150:13
**anticipating**
148:14
**anticipation**
26:4
**anyway**
106:8 129:3
**Apollo**
80:3
**Apparently**
7:20



MAGNA
LEGAL SERVICES

appear
74:8
**APPEARANCES**
2:2
appeared
5:6
appearing
6:9
appliances
6:4
apply
38:20 173:11
appoint
91:9,9
appointed
100:19
appointment
68:19
apportioning
100:16
appreciate
87:12 137:16 166:2
apprised
146:20
approach
70:20
appropriate
87:15
approval
122:7
approximately
3:6
**April**
17:18 55:8,16 56:4
  59:16 63:16 64:4
  97:4,6,10 98:7,10
  101:11 103:7,20,21
  106:7 107:22 108:4
  108:10 117:16,19
  134:12,12 147:2,8
  147:12 170:9,10,12
  170:15
**ARC**
11:16 16:16,21 17:4
  17:7,8 18:16,21
  19:5,7 21:10,13

22:6,23 23:7,17,22
  23:24 24:5 27:4,5
  29:4,12 30:12 42:4
  51:5,8 67:24 68:3,7
  68:16,20 69:4,10,14
  71:18 91:16 115:6
  115:17 116:9,12,23
  117:23 149:25
  150:3 168:17
**ARC's**
117:25
**area**
135:8
**areas**
44:6
**argumentative**
31:4
**arm's**
109:20,24
**Arnold**
106:7
**arrange**
72:4
**arrangement**
116:23
**articles**
118:23 120:16
**Asian**
156:24
**aside**
22:9 66:24 75:3 78:5
  80:7 108:24 140:3
  141:11 144:7 146:3
  150:17 158:17
**asked**
30:14 31:20 74:21
  87:6 96:21 103:3
**asking**
5:17 23:6 25:6 30:10
  30:18 33:16,18
  37:10 48:10 60:21
  82:4,7 128:3 133:5
  133:13 153:5
  154:21
**asks**
29:6,22 30:7 31:19

assist
39:14
assistance
52:3 147:18 148:2
assisted
91:3
associated
11:11
assume
8:16
assumptions
33:22 39:14,19 41:12
assure
129:5 164:17
attached
20:21 38:5 58:6
  169:10 174:6
attachment
36:18,23,24 58:11
  131:9 139:9 140:18
  140:24 141:3
  168:21
attachments
127:7,11 166:18
attended
68:21
attendee
159:9
attention
46:19
attorney
112:25
attorneys
2:4,8 4:3
audit
24:21 25:11,18 26:3
  28:19 90:20 91:5,10
  91:10 92:2
audited
25:23 91:19
auditing
25:20
**Auditor**
91:21
auditors
28:19

**August**
7:25
authority
110:3
authorizes
12:9
authorizing
101:25
automobile
151:11
**Automobili**
1:8 27:19 28:4 89:19
  97:23 159:14
  168:19
automotive
79:16 128:20
available
7:16 8:25 59:2,6 72:4
  91:20
**Avenue**
2:9
average
102:18
awaiting
47:19
awake
141:25
aware
12:7 132:19 133:7
  157:18 161:23

---

**B**

**B**
37:23 115:16 116:9
  116:17 117:9,11
  121:18 168:10
  169:3 170:3 171:3
baby
85:5
back
6:19 7:3 14:2,5 15:19
  17:7,17 20:19 22:10
  22:11,12 23:25
  28:24 34:14 41:17
  46:18 52:21,22 54:2
  56:13 61:5 68:25



81:20 82:10 83:23
84:2,3,3,11 86:14
89:2 98:25 107:23
107:25 113:6 114:3
115:13 116:15
118:8,10 127:12
136:3,7 138:15,21
138:22 141:9,12
145:15 147:2,18
151:15 154:6,22
161:9,19 162:19
166:19
**background**
5:9,14
**bad**
49:6
**bank**
17:25 54:4 104:10
**bankable**
38:24,24
**bankers**
154:25
**banks**
105:19 106:9,15,21
107:11
**banner**
12:8 42:24
**Barclay**
135:7
**base**
40:6
**based**
25:18 81:5 87:23
133:7 146:18
**basic**
13:10 40:8 41:5
**basically**
44:6 45:23 156:13
**basis**
25:18,24 55:11
153:12
**Bates**
7:6 8:10,15 22:13
52:23 67:9 166:12
169:14
**BCA**

95:17,19 101:13
115:21,24 116:5
143:21 151:20,22
152:5,7,21,25
153:23 154:19
160:13,24
**bearing**
18:16 67:8 168:16
169:14
**beauty**
24:7
**Becker**
48:17
**beginning**
147:8 148:4,20
**begins**
3:7 52:18 83:20
**behalf**
3:14 12:20 43:12
54:2 65:18 93:6
110:22 118:25
124:19 126:6
**BEHRENS**
2:16
**believe**
11:17 15:11 18:14
23:15,20 27:24
31:22 32:14 35:16
37:17 38:21 40:19
45:12 47:5 51:11
68:20 73:2 85:23,25
94:17 95:8 104:18
106:19 128:24
130:24 134:21
135:10,11 138:15
147:11 149:13
164:2
**Benchmark**
106:19 154:25
**Berris**
1:5 2:14 3:9,17 37:7
38:12 40:6,19 59:4
84:16,20 85:2,4,9
85:19,22 86:6,7
111:7 121:16,24
122:24 123:19

124:15,20 125:25
126:19 127:3,14,21
129:23 131:14
132:4,5,13,14,21,22
133:2,25 134:7,18
136:22 140:9,11,25
141:5,8 142:20
146:16 155:13
162:24 163:10
170:18,20
**best**
24:9 48:5 104:18
**big**
118:20 120:9 139:2
**billion**
26:10 37:24
**binding**
94:20,23 95:15 116:8
118:24 129:15
148:25 157:9
**biotechnology**
14:19 44:3
**bit**
7:10 12:15 16:20
22:18 27:22 32:22
63:13 80:19 118:19
123:24 124:7
137:22 144:19
**blank**
65:9
**blow**
63:3 67:12 92:23
**board**
25:21 34:23 35:10,12
35:22 36:4 99:25
100:17 108:8,11,16
108:22,23,24
125:19 127:21
157:18 166:16
**BOB**
2:16
**BOIES**
2:3
**bolster**
79:4,4
**bookkeeper**

24:18
**bottom**
10:9 63:11 90:19
115:12 123:3
136:15 142:13
146:14 163:5 164:7
**boy**
136:25
**BR**
72:2
**brand**
70:19 89:21
**break**
5:22,24 49:7 52:12
85:13 113:9
**briefly**
24:15 41:18 49:24
84:12 97:8 131:8
136:11 139:25
143:2
**bring**
6:14 28:18 35:9,13
48:11 84:12 92:6
97:3 98:6 114:4
117:14 148:3
149:21
**bringing**
47:9
**brokers**
51:13
**brought**
132:25
**Bryant**
135:8,9
**business**
12:18,22 14:14,15
19:21 23:13 39:21
39:23,25 43:11,14
43:20,21 53:18
65:17,20,21 89:12
90:14,16 93:5,8
95:16,19 101:14
115:25 143:7,13,21
149:10 151:7 152:7
170:21
**Bustamante**



2:10 3:22
**buy**
64:10

---
**C**
---
**C**
121:18
**C-H-E-N-G**
36:5
**C-O-E-N**
35:24
**cafes**
135:4
**calculation**
10:10 40:25
**calendar**
21:17
**call**
22:20 29:4,11 38:23
  40:22 41:3 63:4
  68:25 69:8 72:5
  75:12 83:11 87:19
  142:2 154:24
**called**
4:20 8:25 17:7,7
  104:16 142:7 144:9
  144:12 171:6
**calling**
95:16
**calls**
68:21,24
**Camarero**
18:25 19:3 21:8
  67:19,23 69:17,21
  72:3 73:9 114:22
  115:3,5,16 117:23
**Cap**
19:12,21 20:3 80:21
  82:5
**capacity**
5:7 39:3 83:4
**capital**
1:9 12:15,16 16:21
  17:8 18:3,4,10
  20:17 82:21 89:7
  91:6 92:9,12 105:4

108:12,18 143:8,14
  161:22 170:8,23
**caption**
127:6
**car**
70:19 89:21
**careful**
40:9
**Carlos**
51:2
**Carmen**
119:9 122:6,22,23
  131:15 132:2
  134:14,20 146:22
  147:7 155:12
  157:19
**carveout**
44:11,14
**case**
1:6 20:25 81:19
  96:15,17
**cash**
40:15,16,24 115:17
  116:18
**cc**
51:2 77:16
**cement**
22:4
**CEO**
35:17 109:4,5
**certain**
132:7,16 133:21
**CERTIFICATE**
173:2
**certification**
173:10
**certify**
173:3 174:3
**certifying**
173:12
**cetera**
79:18,19
**CFO**
35:18 47:9 108:8,11
  125:19
**chain**

114:8 170:14
**Chan**
82:24,25 112:5,8,10
  112:11,16,21 113:2
  118:14 121:13,22
  122:12 123:17
  124:18,24 125:7,23
  130:4,16,21 131:6
  139:6
**Chan's**
119:15
**change**
5:15 109:6 175:3
**changed**
12:2 33:22 56:8
**changes**
174:5
**changing**
37:22
**channels**
73:4
**charge**
40:5,20 85:3 88:11
  108:12,15
**charges**
27:5
**chart**
10:14
**chat**
7:15 21:19 24:16
  34:14 87:25 111:11
  112:4,20 118:13
  130:20 137:18
  141:24 142:14,15
  146:10,11 147:13
  162:4,9 164:6
  165:15 166:25
  171:13
**chats**
6:13,15 22:11,12
  28:25 41:18 46:18
  52:23 60:18,19 62:2
  107:24 110:11
  118:8 136:7 138:8
  142:24 168:13
**check**

65:9 88:9 153:12
  154:6
**checking**
53:6 82:9
**Cheng**
36:5
**chief**
35:21 44:24 79:19
**China**
43:23
**Choi**
1:8,8 2:15 3:9,23
  6:14,16 7:12 16:2
  16:10,23 17:14,21
  18:8 22:2 23:5
  24:12 25:6 26:8,19
  28:18 29:12 30:10
  30:23 31:18 32:7
  33:4,9 37:5 39:24
  46:22 47:13 52:24
  53:5,9,13,19 54:22
  55:3 56:19 57:2
  58:6,10,19 59:5
  60:11 61:5,8,14,20
  68:4 69:5,11 73:15
  73:20,23,24 75:6
  76:10,16 77:9 78:9
  78:19 79:3 97:19
  98:20 110:12,14
  111:2,17,20 112:20
  112:25 114:11,21
  116:16,22 117:22
  122:11 123:13,16
  123:25 132:24
  133:17 134:20
  136:16,17,23 137:4
  137:23 138:6
  139:14 142:20
  147:7,19 160:5
  161:20 162:5,9
  168:14 169:8,10,19
  169:21 171:14
**Choi's**
98:17
**choice**
128:22



**choose**
24:8 128:24
**chronologically**
15:21
**chunk**
118:20 120:9 121:6
**City**
106:9 110:17 111:17
  129:4,6,9
**claims**
128:19
**claw**
81:20
**clawed**
86:14
**clawing**
82:10 84:2,2,3
  166:19
**clear**
58:24 64:19 84:19
  85:20 91:7,11 96:14
  102:18 108:4
  122:22 125:14
  129:8 158:2
**cleared**
51:25
**clearly**
39:20 72:22 130:11
**client**
3:17 40:6 82:18
**clients**
150:3
**close**
95:18 101:13 107:19
  155:23 156:6
  158:19,21
**closing**
100:12,24 115:18
**cloud**
62:2
**co-chairman**
35:24,25
**co-counsel**
3:21
**cock**
163:14

**code**
37:14,18 58:16 77:2
**Coen**
35:23,23
**coffee**
142:14
**colleague**
80:13
**colleague's**
84:6
**colloquially**
45:24
**column**
10:17
**columns**
10:15
**combination**
12:19,22 14:14 43:11
  43:14,21 65:17,20
  65:22 93:5,8 95:16
  95:19 101:14
  115:25 143:7,13,22
  149:10 152:7
  170:22
**come**
35:3 40:16 45:4
  56:13 113:6 127:12
  161:9
**comes**
44:10 62:15
**comfortable**
39:8 84:6
**coming**
6:19 23:23 35:8
  137:21
**comment**
154:4
**comments**
46:23 47:18,20 51:25
**commission**
9:18 44:18 174:12
**committed**
154:19
**communicate**
61:20 123:17
**communicating**

48:25 73:25 105:23
**communication**
73:3 81:18 123:5
**communications**
23:4 48:24 49:14
  68:14 73:15 98:3
**companies**
19:23 25:21 38:25
  93:18
**company**
7:20 8:23 19:17,18
  25:19,20 37:18
  39:24 53:22 64:6
  65:9 66:15,20 74:5
  74:6 89:15 99:12
  100:2,4,10,13 105:9
  109:2 110:8 118:25
  119:8 146:17
  155:20
**complaining**
133:9
**complete**
12:2
**completed**
91:20
**completely**
110:8 130:13 131:2
**completing**
148:24 153:8
**completion**
43:2
**complicated**
102:14
**compromise**
116:18
**computer**
6:8
**concept**
13:10
**concerned**
72:16 95:13 96:6
  150:7 155:19 157:7
  157:17 159:23
**concerning**
146:21 147:7
**conclusions**

14:8 101:9 103:4
**conditions**
99:13 100:24
**conduct**
91:4 133:2
**confer**
54:9
**confirm**
6:7
**confirmed**
41:20
**confusion**
32:3 166:24
**connect**
104:23
**connection**
10:4 11:7 13:3 28:18
  34:9 48:2 51:6 66:9
  68:8 104:13 110:23
**consider**
53:5
**consideration**
99:18,20 115:18
**considering**
8:2 102:3
**consisted**
35:15,22
**consisting**
100:11
**constitutes**
103:9
**consummate**
143:23
**consummated**
148:11,15
**contact**
19:4 49:15 67:23
  84:24 87:18
**content**
138:13
**contents**
114:24 130:12
  131:19
**context**
6:25 128:3
**continue**


MAGNA
LEGAL SERVICES

124:23 147:20
150:8
**continued**
75:5,5
**contract**
119:10 122:5,7 123:6
132:2 134:14,21
144:4
**contracts**
131:15 144:10,12
147:8 171:7
**contribute**
148:5
**control**
128:17 173:12
**convenience**
5:24
**conversations**
74:11 128:8 132:3,13
133:8
**COO**
35:19 79:19
**Cook**
7:21
**copied**
81:25 83:7
**copy**
24:18
**Corp**
1:9 143:8,14 170:23
**correct**
26:6 27:13 41:7,15
41:21 92:3 94:8
109:15 116:23
129:11 131:7
132:23 150:16
154:16 174:4
**corrections**
174:5
**Cosworth**
53:3
**counsel**
3:11 4:11 54:8,9
**couple**
78:23 137:3 148:22
**course**

89:12
**Court**
1:2,18
**courteous**
156:25
**Courtyard**
141:16
**cover**
48:9 144:14,17 145:4
145:11
**Covid**
20:15
**CPA**
91:21
**created**
38:11 158:3
**credential**
80:4
**crime**
134:24
**CTO**
79:19
**current**
16:21 40:23,24 41:3
47:9
**cut**
13:23 51:20
**cutting**
120:21

––––––––––––––––––
**D**

**D**
90:19 168:3
**D&O**
51:14,16 52:3
**D.C**
2:10 81:5,5
**daily**
55:10
**Daniel**
36:5
**data**
56:11 85:2 86:4,7
87:13
**date**
3:4 11:18 53:16 55:6

63:15 89:5 92:18
94:19 106:12,24
174:8
**dated**
43:2 49:25 50:5
56:17,22 67:17 80:9
80:10 86:10,21 89:6
97:6,10 98:7,9
101:11 103:19,21
117:16,19 140:5
143:8,18 162:6,13
168:23 169:6,22
170:9,10,12,15,24
171:15 173:7
**daughter's**
62:11
**David**
2:6 3:15
**day**
7:20 112:2 130:10
142:7 149:18
174:11
**days**
36:21 64:5 84:23,23
97:9 117:18
**De**
1:8 20:21 21:9,13
22:6 23:7,12,17,25
24:4,5,7,13 25:7,25
26:20 27:4,18 28:3
28:9 33:9,11,17
34:9 37:6,15 38:19
39:21 58:2,17,20
59:5 61:4,9 68:7,16
70:18,25 71:6,18
72:23 73:20,25 74:5
74:9,18 75:6,13,19
76:3 77:2 79:4
84:16,25 85:18
86:22 87:8 89:19,25
90:9,13 91:3,6,8,12
91:15 92:3 93:14,19
93:25 95:4,10 96:20
97:22 98:3 99:5
100:5,17,18 101:5
102:24 103:2,10

104:13 105:11
106:16 107:20
109:13,23 110:4,20
110:23 112:14
114:15 115:6
116:12,22 118:23
120:16 121:23
122:4,16 123:18
124:19 125:16
126:6 127:21 128:2
129:16 130:17
131:16 132:7,17
134:2,9 140:12
143:8,14,23 145:2,5
145:16,18 146:21
148:15 149:5,22
150:2,14 151:10
152:25 155:4,19
157:9,13 158:7
159:13 164:3
168:18 170:23
**de-SPAC**
100:5 105:5 148:4,9
148:19,20,22,24
159:22 160:7
**deadline**
151:21 152:19 153:7
160:16
**deal**
26:13 34:5 74:12
106:18 143:23
150:8 151:11
154:24 155:23
156:6,18,21 157:20
157:23 159:14
**deals**
157:8
**Dear**
69:21 87:5
**December**
46:20
**decide**
65:3
**decided**
33:12
**decision**



**decisions**
108:15
**deed**
131:10,13
**defendants**
1:10 2:8 84:3
**define**
30:25
**delete**
56:3,7
**deleted**
55:22
**demarcation**
85:15
**depending**
153:16
**depends**
20:4
**DEPONENT**
174:2
**deposition**
1:13,17 3:8 4:4,5,6
    52:14,19 83:16,21
    84:5 113:20,25
    161:12,17 167:6
    172:3 173:4
**described**
142:19
**describes**
12:15
**designated**
100:12,13
**designer**
79:19
**details**
34:22
**development**
155:8
**device**
6:10 62:15
**devices**
6:3
**Diana**
2:13 3:23 76:9,16
    85:11 86:2 87:22
    88:11,14 118:22

119:4,5 120:13,15
164:6,24 169:18
**dick**
165:2
**different**
32:5 33:24 38:15
    39:5,5,7,7 41:10
    43:19 116:10
    130:13 131:3
    139:10 154:6
**differently**
32:3
**dig**
22:21
**digital**
16:22
**diligence**
110:20,23 144:21,23
    144:25 145:7,14,23
    149:18 155:16
**dilution**
33:21
**direct**
80:4 173:12
**directed**
88:13
**directly**
12:21 43:13 65:19
    93:7,13,24 95:4
    96:19 105:24
    108:17 114:20
    123:6,9 127:16
    129:20 161:21
**director**
36:4 44:25 47:10
    108:8,19 109:13
    118:24 125:15
    127:15
**directors**
36:2 51:15 99:25
    100:11,12,13,17
**disadvantage**
81:22
**disagree**
95:8
**disclaimer**

12:8
**disclosures**
43:6
**discount**
40:16,23
**discounted**
41:4
**discounting**
40:12
**discovered**
154:23
**discuss**
77:20 84:8 87:7
    134:17
**discussed**
20:20 21:19 28:20
    70:2 78:16 133:11
**discusses**
99:24
**discussing**
53:21 75:20 83:25
    124:14
**discussion**
77:21 93:18 101:5
    103:10 123:21
    134:19
**discussions**
12:21 43:13 65:19
    75:6,13,23,25 93:7
    93:14,24 94:18 95:3
    95:7,10,13,14 96:8
    96:19 101:12 103:2
    131:24 133:8
    157:19
**disputing**
88:15
**distinction**
117:3,12
**DISTRICT**
1:2,3
**document**
6:19 9:7,17 11:3
    14:23 18:13,15,20
    28:12 32:18 38:8,11
    38:17 42:12,18
    47:11 59:18,20

60:10,23,24 63:2
67:13 75:2 81:10,21
82:4,8 83:12,14,24
84:8 85:6 88:23,25
89:11,16,24 90:13
91:19 92:5 94:5,19
97:2 98:7,9,12,21
98:23 99:7 101:11
130:18,19 136:12
140:2 143:3,6,11
144:21 145:8,18,23
146:9 150:21,24
153:6,11,13,20,20
154:4,11 156:4
158:3,6 161:4,25
168:16 170:6,10,21
171:9
**documents**
16:5 49:20 67:8
87:15 138:12
155:15 159:21
169:14 172:5
**doing**
35:7 69:15 70:23
71:2 84:17 90:3
114:16 119:14
127:20 144:24
158:13 159:22
160:6
**dollar**
115:20
**dollars**
45:16,16,17,19 46:11
46:12
**download**
60:15
**Dr**
35:15,15,19
**draft**
9:23 95:18 121:7
124:9,11,14 125:7
125:11,24 126:5,10
126:11,13 130:18
143:21 149:14,16
**drafted**
124:24 130:14,17



139:24
**drafting**
121:22 149:9
**draw**
121:15
**dropped**
68:22
**DT**
69:18 148:3 149:21
**DT's**
159:25
**due**
110:20,22 144:21,23
144:25 145:6,14,23
149:18 155:16
**duly**
4:21 173:4

**E**

**E**
4:20 168:3,10 169:3
170:3 171:3 175:2
**E.F**
106:19
**earlier**
11:20 36:21 42:8
43:7 58:15,24 59:15
67:22 68:2 101:16
109:6 111:18
117:18 118:12
121:2 130:8 138:7
138:25 139:18
140:21 148:23
**early**
18:6 68:20 149:15
**easier**
87:24
**Edgar**
8:25 9:4,4 42:17
51:20,21
**effective**
12:4 149:19
**effectively**
22:22
**efforts**
14:24

**either**
62:15 84:22 161:21
**electronic**
6:3,10
**eliminated**
156:19
**email**
18:24 19:11 20:19
23:5,21 24:23,23
25:4 28:7 32:16,25
33:9,12,12,15,19
34:2 36:17,24 49:25
50:5,6,11,12,15
51:4 56:17,22,25
57:2,7,10 58:5,25
59:5,25 61:4 66:25
67:16 69:17,22
71:25 72:23,25 73:3
73:7,7,10,14,19,20
74:8 75:10,12 76:7
76:9,15 77:16,17
78:4,7,8,23 79:2
80:9,10,15,18,21
81:25 82:5 83:12,13
86:10,16,20 87:6,19
88:16 97:6,9,17
103:19,21,24 104:2
104:3 106:2,5,6
107:2,5,9,9 114:5,7
114:10,10,15,16,22
114:23 115:2
117:15,16,19,23
126:18 127:2,7
128:7 129:19
131:19 138:13,14
139:10,20 140:5,8
140:17,20,22
144:15,17 145:4,11
145:13 166:10,14
168:20,21,23 169:6
169:9,17,20,22,24
170:9,12,14,15,17
170:19
**emailed**
120:22 127:16
**emailing**

33:4,5,11 37:5 61:8
73:9,23 77:9,12
80:23 82:21,22
97:19 104:6 114:11
140:12
**emails**
18:25 78:19 88:9
129:6
**emphasize**
80:2
**employee**
125:16
**employees**
20:2 110:4 155:6,19
155:21
**employment**
155:18
**encouraging**
157:6
**ends**
52:13 83:15 113:19
161:11 167:5
**engaged**
65:18
**engagement**
20:21 21:9 22:5 27:4
28:8 71:17
**English**
102:9
**ensure**
39:3 125:11
**ensured**
126:11
**enter**
118:24
**entered**
131:15
**entire**
26:13 81:9
**entity**
15:8,9 108:15 118:23
**Ernest**
35:25
**Errata**
174:6
**errors**

40:7,8 41:5,6
**ESQUIRE**
2:5,6,6,10,11
**essentially**
38:18 105:7
**estimate**
46:5
**et**
3:9 79:18,19
**Et's**
7:15
**Euro**
119:8
**evening**
5:2
**events**
128:5
**eventually**
128:25 157:10
**everyday**
31:8 95:21 96:4
102:9
**Ewing**
81:4
**exact**
45:11
**exactly**
7:3 18:12 27:10
30:15 38:16 72:13
74:4 137:12 164:10
**EXAMINATION**
4:24
**examined**
4:22
**example**
40:9,11,21
**examples**
155:22
**exchange**
9:18 15:14 16:11
44:17 68:15 76:2
145:15
**exchanged**
90:8
**exchanges**
15:16 59:10



**exchanging**
58:20
**exciting**
148:5
**exclusive**
70:19
**excuse**
59:5 76:7 102:24
114:5
**executive**
109:2 128:19
**executives**
79:15 108:25
**Exhibit**
6:15 8:7 18:15 27:18
32:15 36:17 42:14
49:25 56:17 58:5
63:5 67:8 76:8 78:8
80:10 86:16 88:24
92:8 97:6 98:9 99:8
99:14,17 103:21
114:7 117:16
126:18 140:8 143:6
144:11 150:20
158:24 162:4 166:9
166:13 168:12,13
168:15,16,18,20,21
168:22,23 169:5,6,9
169:12,14,17,20,22
169:24 170:5,6,7,9
170:10,12,14,15,17
170:19,21 171:5,6,8
171:11,13
**existing**
36:8
**expecting**
47:14
**experience**
9:4 27:11 80:2,4
**expired**
149:5 156:16
**expires**
174:12
**explain**
31:6 134:19
**Explains**

65:8
**express**
18:6
**expressed**
18:9 24:3
**extend**
150:9 156:7,16
**extending**
156:2
**extension**
149:6
**extent**
14:7

---

**F**

---

**face**
155:22
**facilitate**
71:17
**facilitated**
68:19 123:21
**facilitating**
68:14
**facing**
155:14
**fact**
42:3 55:21 59:24
74:7,16 107:7,20
109:16 110:7 122:3
132:5,12 133:25
135:20 157:8
**factual**
72:22
**Fagin**
1:18 173:6
**fair**
19:6 48:13 75:10
104:12 135:17
**fall**
27:9
**familiar**
8:20
**far**
52:7 72:16 88:10
95:13 96:6 133:6
150:6 155:18 157:7

157:17
**fat**
57:16 76:15 114:10
127:3 139:21
**February**
56:18,23 60:11,20,24
65:10 66:3 67:2,3,5
67:17 75:18 85:14
85:16 169:6
**fee**
10:11 24:21 27:2,3,3
27:6 115:19 116:10
116:22
**Fernandez**
35:19 46:16
**Ferrari**
79:17
**figure**
54:10 83:3,5
**file**
8:23 9:22,22
**filed**
9:8,17 10:3,24 12:4
42:19 49:21 63:5,8
64:16 93:23 94:6
169:12
**filing**
11:21 12:9 34:20
46:24 47:3 101:19
151:23 160:25
**filings**
8:24 13:20 49:9,10
102:17
**fill**
79:18
**Filled**
172:13
**final**
12:10 122:5,20
126:12
**finalized**
24:20 152:25
**finalizing**
50:21 52:8
**finally**
148:11

**financial**
11:15 24:19 25:7,23
33:16 37:20 38:22
44:24 58:7,12,20
68:15 76:2,21 84:14
84:15 85:7,17,21,23
87:8 88:5,11,12
90:8 97:23 105:19
105:24 131:14
150:2 169:11
**financials**
85:10 86:22 88:13
91:20
**financing**
37:11 104:16 105:3
107:18 129:11,13
129:17
**find**
20:20 136:11
**finds**
69:22 87:6
**fine**
8:18 163:4
**finish**
5:23
**finished**
137:17
**Fiona**
27:23
**fire**
110:4
**firm**
25:12 48:5 81:5,8,13
81:17 82:3 91:10
92:2 145:4
**firms**
91:23
**first**
11:10,17 12:13 25:3
27:11 33:21 40:18
41:2 43:5 47:6
50:10 74:9 80:14
86:20 99:9 101:10
118:21 120:3,5,7,9
120:11,13,19 122:2
122:15,15 130:24



132:9 143:4 149:14
150:8 156:6
**five**
10:15 100:11 113:16
**five-minute**
52:12 113:8
**flexibility**
39:4
**FLEXNER**
2:3
**flipping**
145:13
**flows**
40:15,16,24
**focus**
14:16,24 43:24 46:19
71:25
**folks**
11:10 17:4 20:12
30:12 36:7 102:3
**follow-up**
167:2
**followed**
151:22 160:24
**following**
33:22 79:12 115:15
121:7
**follows**
4:23
**Fong**
35:25
**footnote**
10:12
**forecast**
37:11,20 38:5,22,24
40:4 57:5,20,23
58:7,12 76:19,22
169:11
**forecasts**
39:4 40:14 58:20
61:5 85:7,21,23
90:17 97:23
**foregoing**
173:10 174:3
**forgot**
59:25

**form**
8:7,9,22 9:5,10 10:5
11:8,12 12:11 13:7
15:10 17:5,15,23
18:11 21:11 22:7
23:14,18 25:16
26:22 28:10,21
29:16 30:5,13 31:3
31:9,13,20 32:9
34:10 38:10 39:17
42:5 43:8 44:16
45:21 46:8 49:3,17
50:25 52:9 53:14,23
54:6 55:4,13,17,23
56:6 57:14 58:22
59:12,19 60:13,22
61:7,16,22 62:4,17
64:2,8,23 65:5 66:5
66:12,22 68:10,18
69:6,12 71:3,12,19
71:23 72:11 73:17
74:3,13,20 75:8,16
75:22 76:4 77:4
79:7 88:7 90:5,10
90:15 92:8,11 93:16
94:2 95:5,23 96:5
96:21 98:4,18,22
99:21 100:8,21
101:2,8,22 102:5,11
102:20 103:3
104:17 105:2,15,21
106:3,25 107:6,10
108:13 111:22
113:3 114:18 115:9
116:2,7,24 117:6
118:7 119:18
123:20 124:21
125:9 126:8 127:24
129:12,24 130:23
131:17 132:8,18
133:3,19 134:3,10
135:25 136:5 138:9
139:19 142:22
143:25 146:24
147:3,10 148:17
149:11,24 150:15

152:16 153:3,9
154:15 157:15
158:15 160:8
168:15 170:7 174:5
**formal**
71:6
**format**
138:2 139:16
**former**
45:9
**formula**
41:7
**forth**
99:13 138:16 145:16
**forward**
7:12 15:22 21:21
34:18 75:18 86:3
139:13 150:14
156:14 157:23
164:5,24 165:24
**forwarded**
114:21 117:22 121:2
130:7 138:12 141:9
163:22 164:4,22
**forwarding**
119:15
**found**
40:2 155:11 163:14
164:4,23
**foundation**
55:24 74:21
**founder's**
53:2
**four**
23:24 122:25 135:12
151:21 152:20
153:7 160:17
**free**
111:10 112:20
137:18 141:24
**Friday**
3:4
**friend's**
7:20
**friendly**
135:20,23 136:3

**front**
6:10 81:21
**froze**
13:22
**full**
25:19 54:23 131:18
131:25 164:11
**fully**
146:20
**function**
104:24
**fundamental**
40:20
**funded**
40:2
**fundraisings**
19:23
**funds**
18:6 45:20 46:3
**funny**
164:23
**further**
4:8,12 16:20 82:9
87:4,7 166:3
**furtherance**
142:18
**future**
40:16 90:14
**FYI**
29:4 106:6 123:11

---
**G**
**G-R-A-I-N-N-E**
35:23
**general**
18:3,4 34:11 95:25
**generally**
19:10 102:12,14,21
145:17
**Genesis**
1:9 5:7 10:4,24 11:7
11:11,14,16 12:14
12:16 14:23 15:8
16:12,17 35:4,13
45:5,10 46:14 48:3
48:20 50:12,15,20



51:7,9,10,17 58:25
63:6,9,24 64:5,11
65:4 66:9 67:9,10
67:14 70:11,13,24
71:7 72:24 73:5,10
74:6,10,19 75:12,19
82:22 83:25 84:22
84:23 88:22,23,24
89:7,13,25 90:9
92:9,12 95:2,2
96:18 97:16 99:4
100:7,19 101:6,21
102:4,17,25 103:11
104:3 105:12,25
108:5,12,18 109:9
109:17,21,23
110:19,22 112:13
112:15,17 114:15
125:19,23 129:14
143:7,14,24 145:9
145:16,19 148:16
149:4 150:13,20,23
151:6 152:3,4 153:2
154:18 157:7,12
158:3,12 160:4
161:22 166:11,15
166:16 169:13,15
169:16 170:6,7,22
171:8
**Gentle**
24:17
**Gents**
37:19
**geographic**
43:22
**geography**
14:15
**getting**
48:3 52:6 84:9
158:19
**gist**
131:20
**give**
77:25 80:16 117:10
162:20
**given**

37:14 40:19 119:16
173:5 174:4
**giving**
51:12 53:21 116:25
117:4,4,12,13 118:4
156:21
**glitchy**
22:16
**Global**
91:22
**Gmail**
33:2,5,13 56:20 57:3
58:21 61:9 73:24
76:15 77:10,13
78:17,20 97:20
114:11 123:7 127:3
139:21 140:13
169:8
**go**
5:18 7:5 10:7 14:9
15:19,21 16:19
18:13 22:12 26:7
28:24,25 34:15,18
36:15 38:16 41:17
41:19 42:23 43:5,9
44:19 45:22 48:8
52:22,23 54:16,17
54:23 62:23 63:11
64:14 67:14 71:25
78:25 80:18 82:13
83:10 87:22 88:22
90:18 96:9 100:18
100:23 107:25
108:2 112:3 113:5
113:17 114:25
115:12,13 116:15
117:11 118:9,10,16
119:23 121:5,23
122:25 131:8
132:22 136:7,8,10
136:14 137:22
138:21,22,22
139:13 140:24
141:12,13 142:6,19
146:2,11,12,13
147:18 151:9,15

154:5 159:12 161:8
163:3,5,12,13,14
164:7 165:10,18
166:7,10
**goes**
23:25 89:20
**going**
6:18 7:3,5,21 11:13
14:23 15:20 16:3,4
18:14 20:19 22:10
22:11,11,12,12
24:15 27:16 30:18
32:21 34:14,15 35:3
35:8 36:19,25 37:2
38:3 46:18 48:23
49:13 52:16 62:23
65:14 69:14 75:18
76:6 81:20,23 82:13
83:18 84:10 86:3
88:21 89:2 94:12
99:23 103:18
113:22 114:4,25
115:11 118:8
123:18 124:9 125:2
125:6,7,10 126:16
129:15 132:6 133:9
136:8,10,14 137:13
140:4 142:25 143:4
146:9 147:2 149:22
150:14 154:2
156:13 157:23
161:8,14 165:14
167:7
**good**
3:2,13,19 5:2 48:15
78:25 116:18 118:2
124:2,3,8 141:25
167:3
**Grainne**
35:23,23
**group**
11:16 17:7 19:5,7
23:24 24:5 29:12
51:5,8 67:24 68:3,7
68:16,20 69:4,10,14
70:14 106:19

149:25 150:3 155:2
162:4,9 164:6
171:13
**Group's**
27:4
**grown**
128:18
**guess**
48:10
**guy**
134:23
**guys**
55:10 59:17 72:9
83:9 114:14 135:18
145:12

---

**H**

**H**
168:10 169:3 170:3
171:3
**H-E-N-G**
17:9 36:3
**hack**
165:2,11
**half**
146:14
**HAMPTON**
2:8
**handful**
20:6
**handling**
115:6
**Hannah**
2:11 3:20 6:22 19:2
32:18 78:11 82:15
86:14 146:3 164:20
**Hapan**
19:2
**happen**
129:4
**happened**
55:15 114:20 128:6
134:23 153:4
**harassing**
133:10
**hard**



7:8 62:2 137:15
**header**
89:17 99:9
**healthcare**
14:17,25 43:25 44:8
**hear**
46:10 47:25
**heard**
133:14
**held**
1:17 125:15
**help**
19:22,24 39:2 104:15
    105:4 125:24
**helped**
39:11 68:3 71:16
    150:4,4
**helpful**
87:13
**helping**
22:4 28:18 123:16
**Heng**
17:8,9 36:3,3
**hey**
30:22
**Hi**
20:20
**hiding**
69:9
**high**
36:6 79:17 131:12
**higher**
109:2 163:4
**highest**
108:20
**highlighting**
120:12
**HIN**
1:9
**hinweng@gmail**
60:2 87:2
**hinweng@gmail.co...**
24:24 25:4 78:9,14
    86:17 169:21,25
**hire**
79:13,14 110:3

**hiring**
91:4
**historical**
85:24,25 88:12
    153:13
**historically**
61:23
**hold**
82:12 113:5
**Holdings**
1:8 89:20
**Hong**
18:2 20:18 36:11,12
    36:13 43:23 44:12
    45:16 87:23
**hope**
69:22 87:5 148:5
**hopefully**
161:9
**hotel**
135:5 141:20
**hour**
113:12
**hours**
29:5 77:21 86:11,12
    137:23
**HSBC**
53:7 54:5
**Hudson**
2:4 111:20 141:20
**humble**
79:11,13,22
**Hutton**
106:20
**Hyper**
37:11,14 58:6,11,16
    76:21 77:2 169:11
**hypothetical**
34:3

---

**I**

**i.e**
152:20
**Ian**
21:18
**idea**

25:25 31:5 39:25
    59:22 62:5 130:15
    131:13
**ideally**
79:16
**identification**
6:17 8:8 18:17 27:20
    32:16 36:18 42:15
    50:4 56:21 58:8
    63:7 67:10 76:11
    78:10 80:11 86:18
    88:25 92:10 97:7
    98:11 103:22 114:8
    117:17 126:20
    140:10 143:10
    144:13 150:22
    159:2 162:7
**identify**
3:11 14:24 29:24
    104:14
**identity**
69:9
**ignored**
134:21
**illegal**
13:14,16,17
**imply**
119:10
**important**
101:20 102:8
**impressed**
106:11,23 107:12
**in-between**
134:23
**included**
47:8 75:25 85:2,3,22
**including**
146:21
**incorporated**
65:10
**incorrect**
152:15
**increasing**
37:23
**independent**
36:2

**INDEX**
172:3
**indirectly**
12:22 43:14 65:20
    93:8,13,24 95:4
    96:20 161:21
**individual**
18:25 80:23 115:5
**individually**
70:3 135:15
**individuals**
104:6,15
**industries**
14:18 15:2 44:2,8
**industry**
14:15 43:21 79:16
    128:20
**information**
11:25 33:16 56:11
    68:7,15 76:3 84:15
    84:25 85:17 88:6
    90:8 145:15
**initial**
9:23 10:3,24 14:14
    43:20 65:21 89:17
    99:25
**initiated**
12:20 43:12 93:6
**input**
39:13,19 41:12
**insisting**
137:24 139:14
**institutions**
105:20,25
**instructing**
29:21 127:21
**instruction**
127:25 128:4,8,10,16
    129:2,23,25
**instructions**
121:17 129:3
**insurance**
51:13,14,15,16 52:3
**intend**
14:16 43:24
**intended**



**intending**
152:4
**intent**
99:4 103:9
**intention**
15:12 16:12 157:22
**interact**
49:9
**interacted**
84:20
**interacting**
135:17
**Intercontinental**
135:6,7
**interest**
18:6,9 24:4
**interested**
18:3 26:12
**intermediary**
137:10
**internal**
88:23,24 89:25
    145:19 150:21,24
    151:7 152:3 158:3,8
    159:20 161:4 170:6
    171:8
**internally**
151:6
**international**
24:21 25:10,11,15,17
    26:3 28:2 104:9
**internet**
14:10
**intersection**
14:17 43:25
**intro**
69:18 70:4,7
**introduce**
23:25 24:6,17 51:13
    68:3 70:24 72:5,9
    72:23
**introduced**
11:14,15 17:4,6 19:5
    21:13 91:15 92:3
    126:10

99:12 102:17
**introducing**
24:5 72:21
**introduction**
70:7,8 71:6 72:13,17
    74:5 75:4,12 91:8
    91:12 126:2,5
**invest**
105:7,14
**investment**
17:25 89:18 104:10
    105:19 106:15
**investments**
19:22
**investor**
39:6 85:3 99:11
    100:14 102:19
    161:21 164:2,3
**investor/entrepren...**
164:9
**investors**
26:11 38:25 65:2
    101:20 102:9
    105:13
**invite**
21:17 111:13
**involved**
39:22 44:7 68:23
    69:10 138:15
**iPad**
29:5,6 30:8,11,19,22
    31:19 32:8 41:24
    42:8 62:7,8,9,10,11
    62:13 68:25 69:8
**IPO**
9:19 19:25 27:18
    28:3 53:22 168:18
**IPOs**
23:22
**issuance**
101:25
**issue**
50:22 63:25
**issues**
101:21 146:20,21
    147:6 154:22
    155:14,22 157:18

**issuing**
13:5,15
**items**
16:3 85:8 121:19
**iv**
123:2

---
**J**
---

**January**
49:25 50:5,14 53:13
    54:22 55:11,16 56:4
    59:15 168:23
**job**
69:15
**John**
2:6 3:13 5:3 31:23
    41:16 49:5 68:12
    74:25 95:25 103:13
    103:15 108:22
    109:7 113:4,8 117:7
    119:20 120:19
    124:22 126:2
    127:25 133:4,20
    138:11,20 145:9
    148:18 152:18
    153:4,10 165:20
**joined**
3:21
**Jord**
122:20,23 131:15
    132:2 134:14
    146:22 147:7
    155:12 157:19
**Jordá's**
134:20
**journey**
148:5,6
**Juan**
35:19 46:16 70:11,12
**July**
9:8 11:6,17 14:25
    17:10 152:21
    160:18
**jump**
15:23,23
**June**

146:15 147:14,17
    149:3 150:12
    151:15,16,17 152:2
    152:14 153:5
    154:18,23 156:4,5
    156:10,17 158:24
    159:7 171:11
**jury**
56:3 66:2 74:15,22

---
**K**
---

**keep**
14:9 22:11 65:15
    81:23 84:10 99:23
    142:8 165:14
    166:20
**keeping**
142:8 158:11
**kept**
48:21
**key**
53:2 79:18 84:21,24
    85:8 94:18 95:12
**killer**
157:20
**killers**
154:24 157:23
**kind**
39:2,6 116:4,6
    134:22 135:9
    146:12
**knew**
17:17 24:11 71:10,13
    71:14 146:16,25
    147:6
**know**
5:22 9:10 11:5 16:17
    22:17 27:23 34:5
    36:7,25 38:23 39:2
    39:9 40:8,20 41:2
    46:9 56:9,12 57:15
    57:19 59:4,22,24,25
    62:18 71:8,15 72:3
    72:25 81:14 82:16
    84:9 94:21 95:14
    96:2 101:12,13



108:16 113:11
121:16 128:2,4,9,9
128:18,21 133:9,10
134:15,22,24 135:3
137:14,15,18
138:11 142:13
145:22 149:17
153:16,25 154:2,5
155:9,13,14,24,25
156:2,18,22,25,25
159:16 164:16,19
165:25 166:7
**knowledge**
39:21 122:5,19
133:15
**known**
72:19
**Kong**
18:2 20:18 36:11,12
36:13 43:23 44:12
45:16 87:24

————————
**L**

**L**
4:20,20
**language**
102:8 159:17
**lapse**
155:25
**large**
143:3
**largest**
91:23
**late**
84:9 137:15 166:2
**latest**
33:21 58:10
**Laughing**
165:3
**law**
13:4 66:11 81:4,8,13
81:17 82:3 145:4
**lawsuits**
155:12
**lawyer**
48:4,8 82:25 112:8

112:16 118:14
121:13,15 126:10
126:11
**lawyers**
47:24 48:2,11,19
49:10,16,19 81:19
82:3 83:7 96:8,11
102:13 149:14,17
165:15,20 166:17
**lays**
99:19 116:9
**leading**
109:16 128:7
**learn**
23:17
**learned**
17:3
**left**
146:16
**legacy**
153:20
**legal**
1:24 2:17 13:16 14:8
101:8 103:4 123:17
144:23 145:6
157:18
**legendary**
70:19
**length**
109:21,24
**Leslie**
1:18 173:6
**let's**
10:7 15:19 18:13,18
18:23 27:14 29:3
30:17 31:24,25
41:17,17 49:23
52:23 54:16,17 60:5
60:6 64:14,19 65:7
65:15 66:25 71:25
73:6 75:2 80:18
85:14 92:6,21 95:25
98:6 103:16,18
108:3 110:11 113:5
118:10 130:2 136:7
138:22 141:12

146:11 148:3
149:20 150:17
157:5 159:12
163:13 164:7
165:10
**letter**
20:21 21:9 22:5 27:4
28:8 99:4 103:9
121:16,17,20,22
123:18 124:15,19
124:22,24 125:12
125:23,24 126:5,10
127:22 130:4,12,14
130:21,25 131:2,3,5
138:2,7 139:5,16
141:2,6
**level**
36:6 131:12 148:4
149:21
**liability**
51:15
**liaison**
19:7
**lie**
32:7
**lieu**
4:9
**life**
31:8 95:21 96:4
**light**
157:24
**limited**
19:12,21 20:3 80:21
82:5,21 133:6
**line**
12:17 29:3 72:2
85:15 172:5,5,5,8,8
172:8,11,11,11,13
172:13,13 175:3
**lines**
120:10 123:2 137:3
**link**
7:12 21:18 34:19
41:21
**list**
25:22 77:22,25 150:4

150:5 155:20
166:21
**listed**
15:9 21:2,4 23:22
34:5 47:10 48:3
64:6
**listen**
29:18 30:4 41:23
42:3 83:9
**listening**
29:23 30:19
**listing**
18:7 19:24 24:4
121:19 155:21
**lists**
44:22 100:23
**literally**
121:14
**little**
7:8,10 12:15 16:20
22:16,18 24:16
63:13 80:18 118:19
123:2,24 124:7
137:22 144:19
**lived**
141:21
**lives**
111:20
**LLC**
1:8 118:23 120:16
**LLP**
2:3,8
**lobby**
110:14 111:18
136:18 137:19
**located**
15:14,17 20:17
**location**
43:22
**lock**
41:22,22
**log**
29:5
**logo**
18:16,21 89:8 168:17
**LOI**



149:4,6,7,19 150:9
155:25 156:2,7,16
156:19
**long**
6:23 79:15 113:15
120:10 128:8
**longer**
40:10 64:15 84:7
150:13 154:19
**look**
8:4,5 12:13 16:2,19
18:23 22:14 28:7
37:2 38:3 41:17,22
49:23 50:11 57:17
58:3 65:7 66:25
67:7 73:7 89:15
91:18 92:24 99:8
103:18 105:18
106:5 110:11
112:19 121:5 123:9
136:8 143:4 146:6
157:3 160:10
**looked**
43:6 44:7 47:4 59:14
59:17 60:9,18 75:11
139:4,9,18 140:21
166:9
**looking**
9:4,7 10:25 14:13
24:12 38:14 42:18
50:21 51:25 53:20
55:9 90:12 92:17
104:14 114:9 129:9
129:14 131:2
147:16 149:3
**looks**
7:7 63:10 82:2
**Lopez**
51:2,4
**lose**
166:22
**lost**
146:5
**lot**
18:4 87:13 93:18
148:2 154:8,24

155:14,15
**loud**
165:4
**lower**
18:24 137:23
**Lui**
1:9,9,17 3:8 4:1 5:1,2
6:1,13,15,16 7:1 8:1
8:5,7,19 9:1 10:1,10
11:1 12:1 13:1 14:1
14:12 15:1,19,20
16:1 17:1 18:1,14
18:15 19:1 20:1
21:1 22:1,16 23:1
23:21 24:1 25:1
26:1 27:1,17,18
28:1 29:1 30:1 31:1
32:1,14,15,24 33:1
34:1 35:1 36:1,17
36:20 37:1 38:1
39:1 40:1 41:1 42:1
42:12,14 43:1 44:1
44:23 45:1 46:1
47:1 48:1 49:1,24
49:25 50:1,2 51:1
52:1,15,20,22 53:1
54:1 55:1 56:1,16
56:17 57:1 58:1,4,5
58:5 59:1 60:1,18
61:1 62:1 63:1,4,5
64:1 65:1 66:1 67:1
67:7,8 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1,8,13
77:1 78:1,6,8 79:1
80:1,8,10,15,20
81:1,12 82:1 83:1,3
83:11,17,22 84:1,2
84:9 85:1 86:1,13
86:14,16,17 87:1
88:1,21,22,24 89:1
89:5 90:1 91:1 92:1
92:6,6,8 93:1 94:1
95:1 96:1 97:1,6
98:1,8,9 99:1 100:1
101:1 102:1 103:1

103:19,21 104:1
105:1 106:1 107:1
108:1,2 109:1 110:1
111:1 112:1 113:1,7
113:21 114:1,2,7,9
115:1 116:1 117:1
117:15,16 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1,17,18
126:19,21 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1,16 138:1
139:1 140:1,7,8,9
141:1,12 142:1
143:1,2,6 144:1,8
144:11 145:1 146:1
147:1 148:1 149:1
150:1,19,20 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1,23,24 159:1
160:1 161:1,13,18
162:1,3,4,5 163:1
163:19 164:1 165:1
166:1,2,6 167:6
168:6,12,14,24
169:5,9,25 170:5,18
170:20 171:5,14
173:4 174:8
**lunch**
142:8
**luxury**
89:20
**LV**
19:12,21 20:2,16
80:21 82:5,21
**Lynch**
18:2

---

**M**

**M**
4:20
**Macau**

43:24 44:12
**Magna**
1:24 2:17
**main**
23:20 121:8 122:2
**maintained**
85:11
**Majcher**
2:13 3:23 76:10,16
77:12 86:17,25 88:6
88:16 119:5 162:6
162:10 169:19,24
171:15
**making**
13:20 41:14 49:8
54:15 126:4 133:17
**man**
128:18
**managed**
41:21
**management**
34:23 35:9,12,14
44:22 70:11,13,18
108:25
**manager**
27:25
**manner**
4:17
**manufacturer**
155:9
**March**
76:7,8,14 78:7,8 80:9
80:10 86:3 89:2,6
92:19 94:6,9,25
95:9 96:18 97:9
102:24 103:6
108:10 109:8,12
114:5 169:17,20,22
**mark**
27:17 36:19 42:11
47:23 56:16 76:12
80:8,24 82:23,25
98:8 112:5,8,10,11
112:16,21,25
118:13 119:15
120:20,22,25 121:2



121:3,12 123:10
124:4,4,8,18,24
130:4,16 139:24
142:25 144:8
150:18 158:22
**Mark's**
137:25 139:15
**marked**
6:17 8:8 18:16 27:19
32:16 36:18 42:15
50:3 56:20 58:7
63:6 67:10 76:10
78:10 80:11 86:18
88:25 92:9 97:7
98:10 103:19,22
114:8 117:17
126:19 140:9 143:9
144:12 150:22
158:25 162:6
172:10
**market**
26:10 34:8 79:5,17
101:20 159:23
**markets**
18:3,5
**marking**
6:12 7:4 162:2
**match**
156:12
**matter**
3:8 13:21 147:21
**matters**
87:8
**maximum**
10:18
**mean**
48:4 61:23 101:10
108:14 142:12
156:15
**meaning**
95:14 153:21 154:12
155:4 157:22
**means**
63:23 64:10 70:7
84:22 101:12
115:24 125:6 148:2

148:24 173:11
**meant**
74:8 107:15 148:18
**media**
52:13,19 83:15,21
113:19,24 161:11
161:16
**meet**
11:10 134:17 135:5,9
**meeting**
21:21 29:18,23,25
30:19 41:19 42:4
111:14 112:3,4
136:21,23 137:4
153:24 159:9
**meeting/talking**
111:3
**meetings**
150:21 151:2 156:11
158:11,25 159:3
171:9,12
**member**
108:11 125:19
127:21
**members**
34:23 35:10,13
166:16
**memo**
89:6
**memory**
104:19 131:19
**mention**
134:4
**mentioned**
133:21
**merge**
24:9
**merger**
95:15 116:5,8 129:15
144:25 148:10,25
152:11 153:8
156:14
**Meridian**
50:3,7 168:25
**Merrill**
18:2

**message**
26:23 53:16 120:20
130:13 163:21
**messages**
59:16,21 60:15
120:25 130:7
134:25 136:25
156:4,23 157:4
164:5,5,21,22
165:22,24
**messenger**
136:25
**met**
39:23 135:14
**mid**
147:14
**middle**
46:21 54:21 149:17
**midnight**
158:19 166:7
**midtown**
135:7
**million**
10:21,25 26:11,14,15
37:22 45:12,14,18
46:9,11,12 89:22
115:18
**mind**
155:24
**minutes**
113:16 161:8
**misconduct**
133:10
**misrepresent**
30:11 31:2,8,11,18
32:4
**misrepresentation**
30:15
**missed**
13:23
**missing**
56:12 59:20,21
**mistake**
40:21
**model**
40:6,7,14,18 41:2,6

41:14 77:20
**modeling**
38:18 40:8
**modification**
20:25
**modified**
141:2
**moment**
78:22 82:18 115:20
**Monday**
21:18
**money**
46:15 53:6,9,13
107:20 155:3
**month**
91:21
**months**
17:17 68:16 74:17
**Moore**
24:21 25:10,11,14,17
26:2 27:25 91:4,9
91:12,22
**morning**
3:2,13,19 124:2,4,8
124:10 125:3
140:14 141:25
142:3 167:3
**move**
15:22 31:25 62:20
**moved**
103:6
**moving**
49:2 97:8 141:16
157:7
**MSPC**
91:21
**Mullin**
2:8 3:20
**mute**
82:13
**MW**
50:2,6 168:24

---

**N**

**N**
168:3



**N-I-E-L**
35:20
**N.A**
1:8
**name**
3:19 5:2 25:20 37:14
  48:4 58:16 77:2
  159:10
**named**
19:2 80:24 82:23
**NASDAQ**
15:9,13 25:22 50:23
  63:25 64:11 150:5
**NDA**
21:20,21 22:20,23,24
  23:7
**near**
135:5,8 136:15
  141:20
**nearly**
55:10
**necessary**
38:20
**need**
3:24 6:25 72:9 87:14
  88:9 96:14 98:14
  113:10 117:7
  153:10,12 154:5
  163:3
**needed**
19:8,24 26:2 38:23
**needs**
64:21,25 121:15
**negatively**
159:25
**negotiating**
109:25
**negotiations**
115:7
**net**
40:11,12 46:6
**never**
5:4 39:19,22,23
  41:11 68:22 85:10
  106:7 107:17
  124:22 132:9,20,25

133:11,21 153:4
  164:17
**new**
1:3,18 2:5,5 17:16
  34:22 35:9,14,22
  56:11 105:18 106:9
  110:17,21 111:17
  129:4,5,9 135:7
  136:22 159:17
**newly**
65:9
**Nga**
19:2
**nickname**
57:15
**Niel**
35:20,20
**nonbinding**
99:4 149:3
**Norman**
1:8 2:15 3:23 6:14,16
  16:10 17:14,17,21
  17:24 18:5 21:20,22
  21:25 22:2,19 24:3
  25:6 29:11 30:23
  39:24 41:21 68:3
  69:22 70:10,12,17
  72:17,19,22 76:10
  76:16 78:2 87:6
  88:13 106:11,23
  107:12 120:23
  121:3,6,15,19,23
  122:3,16 123:6
  125:12 126:9,11,12
  126:13 127:17
  129:20 130:8,25
  131:22 132:6,10,14
  132:21 133:5,8,21
  134:13,16,21
  138:14,16 139:23
  141:21 147:17,25
  151:20 153:22
  156:23 159:21
  160:12 161:20
  164:6,24 168:14
  169:19

**Norman's**
121:16 122:7 123:7
  130:22 138:11
**notary**
1:18 4:13,15,21
  174:14
**note**
51:21 54:15
**noted**
167:8 174:6
**notes**
150:22 151:3 153:24
  156:11 158:12,25
  159:4 171:10,12
**notice**
11:24 19:11
**novation**
131:10,13 137:6
**November**
27:21 32:15,25 34:16
  37:4 42:19 43:2
  46:23 68:20 86:10
  86:21 88:4 168:20
**NPV**
40:13,25
**number**
166:12
**numbers**
36:25 39:6,7,12,14
  40:4 41:3,15 85:24
  85:25
**NW**
2:9
**NYSE**
25:22

-----

**O**

**O-L-U-K-O-T-U-N**
35:17
**oath**
4:9,10
**object**
8:22 9:5 10:5 11:8,12
  12:11 13:7 15:10
  17:5,15,23 18:11
  21:11 22:7 23:14,18

25:16 26:22 28:10
28:21 29:16 30:5,13
31:3,9,13,20 32:9
34:10 38:10 39:17
42:5 43:8 44:16
45:21 46:8 49:3,17
50:25 52:9 53:14,23
54:6 55:4,13,17,23
56:6 57:14 58:22
59:12,19 60:13,22
61:7,16,22 62:4,17
64:2,8,23 65:5 66:5
66:12,22 68:10,18
69:6,12 71:3,5,12
71:19,23 72:11
73:17 74:3,13,20
75:8,16,22 76:4
77:4 79:7 88:7 90:5
90:10,15 93:16 94:2
95:5,6,23 96:5,21
98:4,18,22 99:21
100:8,21 101:2,8,22
102:5,11,20 103:3
104:17 105:2,15,21
106:3,25 107:6,10
108:13 111:22
113:3 114:18 116:2
116:7,24 117:6
118:7 119:18
123:20 124:21
125:9 126:8 127:24
128:9 129:12,24
130:23 131:17
132:8,18 133:3,19
134:3,10 135:25
136:5 138:9 139:19
142:22 143:25
146:24 147:3,10
148:17 149:11,24
150:15 152:16
153:3,9 154:15
157:15 158:15
160:8
**objection**
4:16,19 13:11 81:7
  103:12



objections
14:4
objective
23:19,20
obtain
24:18,20
obviously
72:18 122:23
October
17:14,22 18:24 20:7
22:15 51:11 162:6
162:13 171:15
offer
42:17
offering
10:18 37:16 58:17
68:8
offers
87:18
office
20:10,11,13
officer
35:22 44:24 108:19
109:13 125:15
officers
51:15
offices
20:16 81:6
okay
5:17,25 6:5,14 40:24
50:9 60:8 84:19
85:22 89:3 94:13
113:13,14 121:4
126:24 127:13
138:24 142:24
145:25 154:2,20
155:18 157:5
165:22
Olukotun
35:15,16
once
21:21 57:19 100:18
134:5
operating
109:20,24
opinion

116:25 117:4,8,13
118:5 119:20 120:4
120:6
opportunity
53:4 89:19
option
53:4 114:14 115:16
115:16,17 116:9,17
117:8,11
options
24:8
order
87:14
ordinary
89:12 102:3
organizational
108:21
organized
65:9
orient
76:25 126:22
original
51:8 137:25 138:18
139:15,24
originally
38:12
out-of-state
4:15
outcome
34:6 39:7
outside
36:13
outsider
128:20
outstanding
155:16
overseas
36:12,13
oversight
25:21
overview
65:8 92:25
owned
134:2
owner
122:4,16

owners
45:9 48:20
ownership
134:8
Oye
70:10,12

---

**P**

P-E-C-K
36:3
p.m
21:19 142:15
Pagani
79:18
page
10:7 11:19,23 14:11
18:21 29:2 34:15
44:19,20,20,21 48:9
54:18,21 63:12
64:14 67:15 90:18
90:19 92:22 99:24
100:23 115:14
118:9,16 130:2
136:15 137:13
141:12 143:5
162:16 163:5
165:10 168:6,12
169:5 170:5 171:5
172:5,5,5,8,8,8,11
172:11,11,13,13,13
175:3
pages
42:23 174:3
paid
45:23,24 46:14 53:25
pain
162:20
paper
74:16
parade
24:7
paragraph
12:14 14:13 43:5
65:14,14 79:11
99:10 120:12
paragraphs

139:2
parent
166:10,14
Park
135:8,9
part
23:19 33:15 45:7
49:8 91:22 92:25
98:2 105:11 108:21
110:19 115:12
129:17,19 132:3
144:24 145:14
participate
74:19
participating
4:3 74:11 75:14
particular
153:21 154:3
parties
4:11 81:24 119:11
partner
16:24
party
3:22 4:16 82:2
passed
53:3 122:12
passing
120:23 134:25
136:25
password
60:2
paste
51:20
pasting
120:22
patience
137:16
pay
45:9 46:12
payment
119:8
PCAOB
25:18,24 90:20,23
91:19
PDF
44:20



Peck
36:3
Pennsylvania
2:9
people
20:8 64:10 83:4
    105:7 116:4 164:16
People's
43:23
percent
26:12,14 27:2,3
    134:2,8
percentage
27:5
performing
110:22
period
20:7 36:20 46:7 54:5
    56:9 59:8 60:20
    61:21 94:9 106:17
    107:23 108:4,6,10
    108:20 109:8,12,18
    110:5,9,18 111:16
    132:14 133:24
    135:13,16 144:5
    149:19
permitted
13:4
person
4:9 40:5 66:20 84:21
    84:22
personal
5:8,14 24:23 39:3
    46:3 72:25 73:2
    77:16
personally
154:20
persons
72:24
perspective
72:21 112:16
pertains
97:22
pharmaceutical
14:19 44:3
phone

56:8,11 59:24 62:3
phonetic
7:21 19:2 53:3
phrase
71:5
physically
4:5
pick
100:17 136:12
picked
16:24
picture
165:2
piece
149:12
pieces
154:21
pipe
104:16,21,24 105:8
    105:14 107:17
    129:10,13,16
    151:20 152:5
    153:23 160:13
place
79:5 141:17
placement
104:22 155:2
places
105:17
Plaintiff
1:6 2:4
plaintiffs
3:14
plan
79:14 90:14,17
planning
89:22 132:15 158:18
plans
19:25
play
34:8
please
3:11 4:17 14:5 20:20
    22:24 24:23 63:14
    67:12 72:3 81:11,23
    82:10 83:12 96:11

118:19 137:5
    146:13
pocket
45:25
point
11:6 17:14 20:5,14
    23:16 24:11 38:21
    39:24 45:4 48:15
    50:18,20 52:6 60:9
    63:23 71:11 72:10
    74:4 82:20 90:7
    91:11 93:13,17
    94:15 121:18,18,18
    122:15 125:14
    134:15 141:14
    146:16 148:13
    149:2,7 150:6,11
points
121:8 122:2,11
    125:11 126:12
    148:22
Poliakoff
48:17
portion
11:3
position
66:14 79:5 125:15
    134:20
positive
157:6
positively
157:2
possible
24:7
post
84:23
posted
142:9
posts
79:18
potential
26:4 29:13 37:15
    38:19,25 53:22
    58:17 68:8 75:24
    77:3 79:5 89:18
    109:25 112:13

144:25 155:12
potentially
24:8 26:20 90:2
    154:12
PRC
44:12
pre
84:22 155:4
predecessor
48:20
preference
116:17
preliminaries
5:21
preliminary
11:21,25 42:25 47:18
    64:15
prepare
87:14
prepared
89:12
present
2:12 40:11,12,17
presentation
22:21 23:11,12 85:4
    144:9,11 171:6
president
35:18 44:24 108:7,11
    125:19
press
54:23
pretending
70:24 71:5,9
pretty
52:7 133:21 134:11
    135:13,20 145:8,17
    158:19,21
previous
23:21 33:23 138:6
    152:14,17 153:24
    160:11
previously
16:15 17:25 24:10
    28:20 73:25 90:22
    91:2 103:13 129:9
price



10:18 26:9 159:24
**principal**
67:23
**principally**
84:17
**principals**
46:14
**prior**
13:5,14 21:20 22:19
23:5 27:9 46:13
68:17 73:13 74:17
85:13 102:23 122:4
130:10,20 141:3
154:13
**private**
19:22 104:22
**privilege**
83:8
**privileged**
81:9,19 82:9,17 83:6
83:25 166:19
**probably**
20:6,14 22:21 57:25
59:20 83:2 101:13
130:16 134:5 154:5
166:20
**problem**
22:24
**proceed**
52:2 151:20 152:4
153:22 160:13
**proceeding**
4:17
**process**
49:2,16 56:10 68:23
69:14 105:5 109:24
145:15 147:21
**produced**
8:17 59:9
**product**
70:20
**production**
155:6 172:5
**Professional**
173:7
**progress**

144:24
**project**
37:10,14,17 58:6,11
58:16 76:21,25
169:10
**prominent**
105:18
**promised**
131:21,22,24
**pronounce**
48:16
**properly**
69:15 154:13
**proposal**
117:25
**proposed**
10:18 99:11,20
109:17
**propounded**
174:5
**prospects**
90:14
**prospectus**
9:14,17,22,23 10:3
11:21,25 12:10
42:25 48:9 50:22
52:8 62:24 63:16,20
64:16,21 65:2 66:8
**prospectuses**
47:19
**proud**
85:6
**provide**
26:3 104:15
**provided**
39:13 41:11 84:20,21
85:9
**provides**
47:18
**providing**
26:19 68:6 79:3
116:21
**proxy**
151:23 160:25
**public**
1:18 4:22 25:19,20

34:20 37:16 68:8
100:18 102:16
149:22 174:14
**publicly**
8:24 15:9 48:3 64:6
100:6
**purchasing**
102:4
**purpose**
24:5 25:14 38:17,22
53:12 101:17
**purposes**
37:15 84:5 90:2 91:5
101:19 102:2
**pursue**
14:14 43:20 154:3
**pursuing**
154:19
**push**
147:20
**put**
8:15 22:9 30:6 44:15
66:24 75:2 80:7
88:20 92:5 94:13
133:20 141:11
142:24 146:3
150:17 153:17
166:8
**puts**
115:16
**pyramid**
108:21

---

**Q**

**Q-4**
119:9
**quarterly**
92:16
**question**
5:23 14:11 25:3 26:9
31:10,23 32:2 33:24
49:4,7 50:10 61:18
62:6 69:7 74:25
77:5 85:12 93:20,21
94:14,24 95:25
96:12,15 98:19

124:4 129:18
130:16 132:11
133:4 138:11,17
147:5 148:23
163:12
**questions**
13:24 60:6 78:24
128:3 145:12
154:21 166:4,6
172:10 174:4
**quick**
78:24 136:11 138:23
146:10
**quickly**
28:12 32:17 52:2
57:17 58:3
**quote**
24:21 25:14 72:3
77:15 128:11
**quote-unquote**
156:18
**quotes**
51:14

---

**R**

**R**
175:2,2
**raise**
10:25 26:10 45:18
89:22 107:20 155:2
**raised**
105:3
**raising**
18:6,10 91:5 147:22
**rank**
109:2
**rationale**
103:14
**reaching**
87:23
**read**
14:2,5,6 22:17 65:13
80:17 102:3 115:11
119:22,25 131:18
137:15 174:3
**ready**



**57:**20
**reality**
156:15,20 157:6
**really**
18:21 37:2 40:8
49:23 53:24 54:3
58:3 72:23 85:5
88:8 108:3 138:10
148:2 150:7 156:5
**reason**
17:20 88:18 107:4
129:2
**reasons**
64:25 155:3
**recall**
5:10 11:4 18:8 20:9
31:15 53:11,12,15
53:17,17,24 54:3
55:18,19 56:8 57:25
88:9 90:24 106:15
113:4 119:19
133:17 134:7 144:3
163:25
**receive**
105:8 115:17
**received**
21:22 88:16 126:5
**receiving**
84:15 85:19 88:5
**Recess**
52:17 83:19 113:23
161:15
**recognize**
98:12 99:3 145:22
**recollection**
7:24 25:13 48:6 53:8
63:19 64:4 118:11
139:17,22 156:12
163:8
**record**
3:3,12,25 8:16 14:6
52:16,21 54:10
79:16 80:3 83:11,18
83:23 85:20 113:18
113:22 114:3
158:12 161:14,19

166:9,24 167:7
173:4
**records**
54:4
**refer**
57:13 116:5 148:9
**reference**
23:10 29:11 86:4
118:13
**referencing**
28:8
**referred**
156:5
**referring**
10:13 21:25 47:3,17
57:23 68:25 94:3
111:7 119:5 130:6
138:6 139:23
148:10,20 149:22
162:23 166:11
**refers**
122:22,23
**refile**
34:21
**reflect**
156:11
**reflects**
54:10 89:24
**refresh**
7:24 118:10 139:16
163:8
**refused**
134:16,16
**regarding**
134:20
**Registered**
173:7
**registration**
10:10 12:3 42:14,16
47:7 62:23 63:5,8
63:20 66:8 67:3,6
168:22 169:12
**regular**
49:15 151:5
**regularly**
48:25

**reiterate**
160:11
**related**
23:5
**relates**
79:2
**relating**
16:11 29:13 33:16
75:14 76:3 84:15
85:17 101:6,21
146:20 152:14
**relation**
33:18 53:18 58:2
**relationship**
17:13 22:5 53:19
135:18
**rely**
65:2
**remained**
51:9
**remaining**
16:3
**remember**
18:12 25:19 45:11
48:7 54:23 88:10
96:2,3 134:11
138:25 139:4
149:25
**reminder**
24:17
**remotely**
4:7,10
**repeat**
11:13 24:3 39:18
95:12 103:14 147:4
**replied**
106:8 124:4,8
**reply**
121:7 157:2,2
**report**
20:13 92:16 108:22
108:23 132:6,15
144:23 145:20
151:5
**reported**
108:18

**reporter**
1:18 3:24 173:7,12
**reporting**
4:6 106:22 132:25
**representations**
84:7
**representative**
5:7
**representatives**
3:22
**representing**
116:12
**reproduction**
173:11
**Republic**
43:23
**reputation**
159:25
**request**
130:22 138:12 172:5
**require**
52:3
**required**
66:11
**reserve**
84:4 154:4
**resignation**
127:15,22 137:6,25
139:15 146:18
**respect**
10:23 65:21 129:18
156:10
**respond**
16:4 21:16 22:23
26:12 47:14 87:22
116:16 117:25
147:25
**responding**
140:20
**responsibility**
66:18 131:14,25
**responsible**
84:17
**rest**
65:13 156:22
**rested**



66:19
**return**
142:2
**revenue**
155:4
**revenues**
155:5
**review**
9:24 11:22 89:18
**reviewed**
130:5,21 131:5
**reviewing**
144:3 149:16
**revised**
77:20
**RICHTER**
2:8
**ridiculous**
72:20
**right**
8:20,25 9:19,24
  12:10 13:5,10,15,21
  15:14,17 16:13,17
  16:24 21:10,14 22:2
  22:6 23:8,13,17
  24:13 25:8 26:5,21
  27:12 28:9,20 29:14
  29:19,25 30:4,8,12
  30:19,23 31:19 32:8
  33:2,6,9,13,17 34:9
  35:5,10 38:9,19
  39:15 41:2 42:4
  43:7 44:8 45:5 47:4
  47:11,20 49:6,10,11
  49:16,20,21 50:12
  50:16,23 51:24 52:8
  56:23 57:3,11 58:17
  58:21 59:2,6,11,17
  60:12,21,25 61:5,10
  62:3,16 63:9,21,25
  63:25 64:7,12,17,21
  65:4 66:9,11,15,20
  67:2,17,20,24 68:4
  68:9,17,20 69:5,11
  70:8,25 71:11,18
  72:10,12,24 73:11

73:15 74:2 75:7,15
75:21 76:3 77:7,10
77:13 78:2,17,20
79:6,19 80:18,21
83:14 84:18,25
88:16 89:22 90:2,9
91:13,16 92:12,19
93:15,25 94:7,15
95:22,24 97:14,17
97:23 100:2,6,7,14
100:20,25 102:4,10
103:7,16,24 104:4,7
104:10,16 105:5,9
105:14,19,20 106:2
107:15 108:12
109:14,18,25 110:5
110:9,18,24 111:8
111:11,14,17,21
112:9 113:2 114:17
114:22 115:3,7
116:6,10,13,19
117:8,20 118:2,14
119:17 121:13,24
122:13,17,21 123:7
123:11,19 124:16
124:20 125:8,16,20
125:25 126:7 127:4
127:8,23 128:12,25
130:22 131:10,16
134:17 135:21,24
136:23 137:6,11,19
139:7,11 140:18,22
140:25 141:3,6,9,16
141:21 142:21
143:24 145:23
146:17,22 147:2,14
148:11,16 149:10
149:23 150:24
151:3,7 152:5,8,11
152:15 153:2,8,15
154:14 155:20,23
156:21 158:4,8,13
159:4,7,10,14,17
160:7,21 161:5,9
162:24 164:14
**rights**

84:4
**Risk**
50:3,7 168:25
**role**
51:6 66:9 109:13
  128:2 132:16
**room**
3:18 4:5 82:16 85:2
  86:5,7
**Roytblat**
2:5 3:15
**run**
24:7 38:14,18 39:4,7
  40:2 41:10
**running**
34:3 39:22 66:20
  166:21
**Ryan**
1:5 2:14 3:9 70:18
  78:2 80:2 85:4,4
  106:11,23 107:12
  111:4,7 121:16
  122:6,6,23,24 128:9
  128:18 130:25
  131:21,24 132:13
  132:15 134:17,18
  135:5,14,17,23
  136:3 137:4,18,25
  138:13,16 139:15
  139:21 142:2,7,14
  155:13
**Ryan's**
77:16 133:10

_____
S
_____

**S**
4:1,20 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1

45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1
**S-1**
8:7,9 9:11 10:24
  168:15
**S-A-R-K-S-E-N**
35:21
**Sam**
6:25 96:11 163:3
**Sam's**
158:20



**Samuel**
1:9,17 3:8 6:16 7:20
20:20 44:23 50:2
52:14,20 69:22
70:10,12,17 83:16
83:22 87:5 113:20
113:25 161:12,17
163:19 167:6 168:6
168:14,24 173:4
174:8
**Sarksen**
35:20,20
**Saul**
81:3,4,14 82:3,23
**saul.com**
80:24
**saw**
23:6,20 28:17 58:24
73:13 130:20
133:13 156:22
**saying**
30:21 35:2 46:22
58:10 59:14 60:17
69:8 77:6 86:5 87:5
120:8 137:8,24
150:11 160:4,5
165:7
**says**
7:19 10:17 11:2,24
12:14,17 16:23
20:24 24:16 30:22
41:21,22 42:24
43:10,19 44:23
48:16,16 51:4 52:24
53:5 57:5 65:8,16
70:2,10,17 86:22
89:17 91:19 92:18
93:4 99:9,10 100:10
106:6 115:14 116:9
123:13 127:7
136:16 137:4,21
139:14 142:7 145:5
145:6,21,21 146:7,7
148:19 151:10,14
151:14 152:6,19
159:20 160:23

163:6,19 164:9,25
165:20
**scan**
78:22
**scenario**
34:4
**scenarios**
38:15 39:5 41:10
**scene**
134:23
**scheduled**
115:19
**SCHILLER**
2:3
**scientific**
35:21
**screen**
42:9 52:25 81:23
82:11 165:23
**screenshot**
27:19,21 28:14
168:19
**scroll**
6:18,21 7:2,9 11:19
18:18 21:16 27:22
28:11 32:17,22
36:22 73:6 78:11
80:12 81:11,25
86:19 89:4 92:17,18
92:21 98:14,25
118:18 119:21
123:23 126:21,23
127:11 130:2
143:12 144:18
162:25
**scrolling**
99:23 118:9
**search**
14:16 43:24
**SEC**
7:12 8:7,9,12,20,24
9:23 11:22 12:4,9
13:20 34:19 42:14
42:16,19 44:17
46:23 47:8,18,19
49:8 50:22 51:25

52:7 63:21 132:6,15
132:22,25 133:9
168:15,22
**second**
10:7,17 29:3 57:18
80:16 82:12,13
95:11 97:4 115:14
120:6 121:5,5
127:10 129:19
131:9 133:23 139:5
146:6 149:2 159:21
160:6
**secretly**
30:3
**section**
6:24
**sectors**
14:19 44:3
**secure**
129:10
**secured**
107:17
**Securities**
9:18 44:17
**security**
12:3
**see**
6:21,22 7:11,13,17
7:22 9:8 10:9,19
11:20,23 12:5,16,24
14:20 16:7,25 18:19
18:24 19:13 20:19
20:22 21:6,23 22:10
22:18,25 23:22
24:12,25 26:8,16
28:3 29:2,8 32:18
32:24 33:7 34:17,24
37:4,8,12,25 38:6
39:8 41:19,25 42:19
42:21,24 43:16 44:4
45:2 46:19,25 47:15
50:8 51:2,19,22
52:4,24 54:17,19,21
54:24,25 55:12
56:22 57:21 58:11
58:13 60:16 63:2,12

63:15,17 64:19
65:11,23 67:11,16
69:16,19,24 70:5,15
70:21 72:6 73:9,19
73:21 76:14,17,23
77:18,23 78:12,13
79:10,20 80:5,13,20
80:25 81:9,24 82:14
86:21,23 87:10,16
87:20 88:2 89:5,9
89:16 90:19 91:24
92:11 93:2,10 94:17
94:21 97:11 99:15
99:18 103:23
106:13 110:12,15
111:5,18 112:6,22
114:9,20,23 115:2
115:10,12,22
117:19 118:12,20
119:2,12 121:9,18
121:20 122:8
123:25 124:5,12
125:4 126:22,25
127:6,11,18 130:12
136:16,19 138:3
140:11,15 141:2,4,5
141:15,18 142:4,10
142:16 143:11,13
143:16 146:15
147:23 148:7
151:10,12,24
152:22 155:17
159:12 160:2,14,19
161:2 162:8,11,13
162:18,21 163:6,13
163:16,20 164:8,12
165:5,12,16
**seeing**
129:6
**seen**
85:10
**segment**
79:17
**select**
13:4,14 48:8
**selected**



12:18 43:10 48:19
65:16 93:4
**selective**
157:17
**sell**
12:3 24:13
**send**
20:24 22:24 73:2
123:18 124:10
**sending**
21:8 104:2 127:2
**senior**
66:14 79:15 128:19
**sense**
83:2 121:4
**sent**
21:17 106:6 123:10
124:15,19 126:13
130:7,21,22,25
131:6 138:14
139:21 145:5,9
**sentence**
12:17 14:12 65:15
99:10 120:5,6,7,11
120:13 129:19
**separate**
110:8
**separately**
135:12
**September**
1:14 3:4 173:7
**Sergio**
18:25 19:3,4 21:17
41:20 67:19 72:13
72:15,18 73:2
114:22
**Sergio's**
72:20
**series**
6:13,15 40:14 128:5
168:13
**serious**
13:20
**serve**
104:25
**service**

8:25 61:19,25
**Services**
1:24 2:17
**session**
24:2
**sessions**
135:11,14
**set**
99:13 140:2 144:7
158:17
**Setting**
108:24
**share**
159:24
**shared**
145:18 158:7
**shareholders**
53:2
**shares**
10:15 13:5,15 50:23
63:25 64:11 105:8
**sheet**
38:13,13,14 41:10
174:6
**sheets**
40:13
**Sheppard**
2:8 3:20
**shift**
84:11 107:23
**shit**
164:11
**shop**
40:13
**short**
70:4
**shorthand**
70:8
**show**
22:21 23:11 27:16
32:13 38:25 56:15
62:21 76:6 78:6
86:9,10 111:24
126:15,16 140:4
146:8,9 161:24
164:20,21

**showing**
165:23
**shown**
39:9 42:9 68:2
**side**
109:17
**sign**
16:4 21:20 22:23
66:7 127:22 128:23
128:24 137:5 149:6
157:9
**signature**
98:15,17 115:20
**signed**
94:20,23 98:21,24
122:6 127:15
128:12,15 132:2
140:21 141:5 149:4
155:7,8
**signing**
95:18 101:25 137:25
139:15
**signs**
72:2
**similar**
28:16 43:6 159:3
**Simons**
2:6 3:15
**simpler**
41:13
**simultaneously**
62:15
**single**
118:24
**sir**
7:11 9:10 13:2,21
15:7 29:10 31:14,17
32:6,10 35:2,5
54:17 55:21 56:5
57:11,24 60:21,25
61:5,10,19 62:12,19
63:9 64:17,24 66:11
66:21 67:2,16 68:9
68:13 69:5,11,16,24
70:5,21,25 71:16,18
71:22 72:6 73:11,15

74:2,7 76:14 77:10
77:13 78:20 89:9
91:24 93:15,20 94:6
94:24 95:22,24
96:17,23 97:17,20
97:23 98:13,15
100:20 102:10
103:24 104:10
108:3 109:11
132:12 133:24
150:24 152:5,8,11
152:15 153:8 158:2
159:4,7,18 160:14
160:19,21 161:2,5
162:8 163:16,20
164:15
**sit**
11:4 65:25
**sitting**
3:16
**six**
120:9
**size**
37:22
**skip**
113:7
**slightly**
43:18
**slowly**
127:10
**small**
22:18 37:2
**smoothly**
69:14
**so-called**
154:24
**sole**
122:3,16
**solicit**
105:13
**Sophie**
2:5 3:15 6:20 7:10
32:23 63:14 83:13
140:6 146:13
**sorry**
13:22 14:9 31:10



33:18 38:16 48:7
61:17 69:7 70:12
77:5 80:15,15 97:4
98:19 99:8 109:21
120:7 124:2,23
130:6 134:16 147:4
147:6,18
**sort**
9:23 10:3,9 11:21,24
12:7,9 15:21 18:9
19:6,20 22:4 23:4
23:12 26:19 28:8,16
30:3 34:7,15,19
39:11 42:8 43:4
44:10,13 45:4,24
46:13 47:6,8 49:2
49:14 51:20 54:10
80:13 84:11 89:7,24
99:8,19 100:16,24
104:20 105:18
108:20 120:21
123:15,16 131:12
137:9,10 139:5,25
141:8 142:19
143:20,22 144:21
148:14
**sounds**
81:17 164:10
**source**
51:14
**SOUTHERN**
1:3
**SPAC**
7:21 8:2 13:3,3 16:3
16:5,13,21,23 17:22
18:7,10 23:22 24:4
24:9,13 26:5,11,21
27:12 29:13 34:4,8
34:9 35:4,18 37:22
38:19,21,25 49:2,16
53:22 69:17 74:11
74:19 75:14,20,24
77:3 79:6 90:3 96:7
100:7 101:6 104:23
105:5,12 109:17,25
115:7 129:11

147:20 148:15
149:23 150:14
**space**
20:10,11,13
**SPACs**
13:10 21:2 23:24
24:6 27:8 94:16,17
94:22 150:4
**speak**
19:8 22:22 82:18
112:24 134:24
155:11
**speaking**
106:16,21
**specific**
12:18 43:10 53:15
61:17 65:16 75:9
94:4
**specifically**
14:18 39:18 44:2
144:22 147:11
**specifics**
49:14
**speculate**
60:5,7
**speculating**
60:3
**spend**
133:6
**spoke**
106:19 112:21
119:16 135:11
**spoken**
106:10
**sports**
89:21
**spot**
50:20
**stabilizes**
14:10
**stage**
40:3 95:17 149:2
**stake**
134:8
**stale**
154:12

**stamp**
8:11,15 67:9 124:3
130:8 169:15
**stand**
107:4
**standard**
94:16,22
**start**
7:5 18:23 21:3 29:3
80:19 118:21
**started**
48:12,25
**Starting**
80:14 113:24
**starts**
166:15
**state**
1:18 4:13,17 39:20
96:10 122:3
**statement**
3:25 12:4 42:15,17
47:7 62:23 63:6,9
63:21 66:2,8 67:3,6
68:12 94:22 133:18
153:21 168:22
169:13
**statements**
24:19 25:7,23 66:19
88:12
**states**
1:2 14:13 15:14 64:7
152:3
**status**
90:20 146:4 151:10
159:13
**staying**
135:6
**step**
82:15 154:22
**stick**
152:17
**sticking**
71:21
**stipulate**
4:14
**Stipulations**

172:8
**stock**
15:13 102:4 116:18
**stop**
10:8 120:11 127:13
153:10 156:8
157:13
**stopped**
157:14
**stopping**
156:13
**stored**
62:2
**straw**
155:10
**strike**
9:16 11:5 17:12
29:22 39:12 88:19
96:16 101:17
109:10,21
**structure**
100:7 116:10,22
**subject**
42:25 69:16 76:19
82:8
**submitted**
47:8
**Subscribed**
174:10
**subsequently**
68:22 164:3
**substance**
47:25 48:24 174:5
**substantial**
101:12
**substantially**
90:8 99:12
**substantive**
12:21 43:13 65:19
74:10 93:7,14,23
94:18 95:3,6,9,12
95:14,21 96:4,7,19
98:2 101:5 102:25
103:10
**success**
27:2,3



sucker
163:15
sucking
165:3
sufficient
39:4
suggest
115:15
suggestion
79:8,11,13
suggestions
79:23
Suite
2:9
summarize
156:9
summary
38:13 41:9 120:19
144:9,12 171:7
Sunday
115:3
Sung-Fung
1:8 3:9
supervision
173:12
SUPPORT
172:3
supposed
139:6,6
sure
22:23 28:13 41:14
49:12,20 50:19
59:21 60:14 62:18
62:25 69:13 98:15
114:24 119:23
120:17 134:12
135:13 145:8,17
154:9 163:2
surviving
99:25 100:4,10
suspect
139:22
switched
59:23
switching
56:10 59:25

sworn
4:14,21 56:2 173:4
174:10

— T —

T
168:10 169:3 170:3
171:3 175:2
T-E-C-K
17:9
table
10:14 33:22
tack
76:15 114:10 127:2
139:21
tackfat
56:25 57:13 73:14
tackisfact@gmail.c...
61:4
tackisfat@gmail
76:9 97:14 169:18
tackisfat@gmail.c...
56:19 57:2,8 169:7
take
5:22,24 8:4 9:3 13:19
15:5 16:5,12 25:25
27:14 28:6,23 31:24
32:12 33:20 34:12
34:16 35:4 46:17
47:22 48:23 52:11
52:12 54:12,14
56:14 61:12 78:4,22
82:11 96:25 103:16
113:8 120:2 126:14
129:3,21 131:14,25
133:16 138:5
154:21 157:11
158:10 161:7
162:16
taken
1:13 42:17 45:5
132:7,16
talk
18:4 30:17 49:19
83:3,9
talked

42:7 58:15 69:2
101:15
talking
6:24 11:20 20:5 21:3
34:7 50:19 64:15
68:24 83:5 106:8
115:13 131:23
139:17 151:6 163:9
tanks
159:24
target
12:19,23 13:5,14
14:15,24 43:11,15
43:19,21 65:17,21
69:17 89:14,21 93:5
93:9 151:21 152:19
153:6 160:16
targeting
34:21
Taylor
82:24 112:11,12
145:6
team
34:23 35:9,12,14
70:11,13,18 71:7
73:5
technology
14:17,25 43:25 44:8
Teck
17:8
telephone
62:14
tell
30:7 47:13 55:2
104:20 112:25
140:17
telling
23:7 29:17 31:18
32:7 66:2 74:15
120:4
template
22:24
temporal
15:23
term
115:24 152:10

terminated
149:8
terminology
40:22
terms
43:19 52:7 53:21
60:17 84:14 85:16
99:13 108:24 122:5
122:20
testified
4:22 16:16 24:11
67:22 90:22 91:3
138:25
testify
133:14
testifying
121:12
testimony
5:10 56:2 84:13
85:18 86:6 90:24
96:14 97:25 102:23
128:14 129:21
131:4 132:20,24
133:16 137:9
150:12 152:14,18
154:10,18 156:9
163:23 165:7 173:4
text
16:11 28:17 54:22
55:3,6 59:10,16
118:21 120:3,9
121:6 139:2,18
147:16 149:20
152:15 162:4,8
171:13
texted
120:25 121:2,3
texting
6:4,4 46:20,22 55:10
61:14,19
texts
16:2 55:9,15,22 56:4
56:7 60:10 123:25
124:3
thank
32:20 41:16 123:13



166:5

**Thanks**
7:19 57:20 87:23
147:17,25

**theoretically**
156:3

**thereabouts**
45:13

**thing**
33:21 115:11 116:6
117:18 137:21
150:8 156:6,24
166:8

**things**
86:5 102:13 122:10

**think**
16:15 17:17 18:5
24:10 25:20 28:7
31:7 36:21 41:22
42:12 48:9 51:12
58:15 68:11 81:4
82:17,24 83:2 84:13
86:13 87:4 88:18
91:2 101:15 106:7
116:17 117:8
121:11 128:15
129:8 134:6,18
139:22 144:16
152:10 157:16
163:11,17 166:13
166:16

**thinking**
137:24 139:14 165:3

**third**
12:17 72:2 152:21
160:17

**thought**
164:23

**thoughts**
159:22 160:6

**thread**
166:15

**threatening**
132:21

**three**
13:23 21:2 23:22

79:14 85:8 100:11
123:2 135:12
151:22 160:25

**time**
1:17 3:5 15:22,24
17:11 18:5 19:16
20:4,5,7,14 21:5
27:25 31:16 33:8,20
35:3 37:6 38:21
39:10,25 41:11
44:10 46:6,6 47:24
52:15,20 53:20 54:5
59:8 60:17,20 61:21
72:18 74:9 83:17,22
84:12 86:3,11 93:22
95:11 104:12
106:16 107:8,23
108:3,4,5,6,10,19
109:3,8,12,18 110:4
110:8,18 111:16
113:21 114:2 120:2
124:3,3 125:18
130:8 132:4,14
133:6,24 134:15
135:3,16 144:5
149:7,9 150:6
151:17 154:17
156:3,13,17,21
158:20 161:13,18
166:3 167:6,8

**timeline**
94:4,4

**times**
85:5 135:12 136:22

**titled**
131:10 143:6,13
150:21 151:2
170:21 171:9

**today**
37:21 60:15 65:25
84:14

**Today's**
3:4

**told**
80:17 96:11 113:2
122:11 132:5,14,21

133:25 134:7,13
135:10

**Tomaso**
1:8 20:21 21:9,13
22:6 23:7,12,17,25
24:4,6,7,13 25:7,25
26:20 27:4,18 28:3
28:9 33:9,12,17
37:6,15 38:19 39:21
58:2,17,20 59:5
61:4,9 68:7,16
70:18,25 71:18
72:23 73:20,25 74:5
74:9,18 75:6,13,19
76:3 77:2 84:16,25
85:18 86:22 87:9
89:19 90:2,9 91:3,6
91:12,16 92:3 93:14
93:19,25 95:4,10
96:20 97:22 98:3
99:5 100:6,18,18
101:6 102:24 103:2
103:10 104:14
105:12 106:16
107:21 109:14,23
110:4,20,23 112:14
114:16 115:6
116:13 118:23
120:16 121:23
122:4,16 123:18
124:20 125:16
126:6 127:22 128:2
129:16 130:17
131:16 132:7,17
134:2,9 140:12
143:8,15,23 145:2,5
145:16,18 146:21
148:15 149:5,22
150:2,14 151:10
152:25 155:4,19
157:10,14 158:7
159:13 164:3
168:18 170:23

**Tomaso's**
34:9 71:7 79:4 90:13
91:8 116:22

**tomorrow**
16:6 112:4 142:15

**tonight**
127:16 128:12,15
140:21

**top**
11:23 29:2 52:25
73:6 80:19 89:8
99:2 114:9 116:16
141:15 151:15

**total**
27:6 99:19

**touch**
87:7

**track**
79:15 80:2 166:22

**trade**
63:24 65:3

**traded**
100:6

**transaction**
26:4,21 27:12 29:13
45:8 54:11 75:15,20
75:24 77:3 99:11,18
99:20 100:25 101:7
104:24 109:18
129:11 157:13

**transcript**
173:11

**transcription**
174:4

**treated**
137:9

**tried**
156:24

**true**
134:4 173:4

**truthful**
64:21,25 66:2,19
107:9

**truthfully**
106:22

**try**
15:20,22

**trying**
15:8,21 23:16 25:14



30:3 74:16 105:13
113:6,11,12 120:17
134:19 153:19
157:3
**turn**
99:7,17
**turning**
15:5,25
**Twelve**
86:12
**Twenty**
46:11
**twice**
134:6
**two**
5:23 21:4 29:5 36:2
37:21 42:23 51:13
59:10 68:21 79:14
100:13 120:25
127:7 136:16 137:5
137:10 138:12
139:2 151:22
160:25 161:8
166:18
**two-page**
18:15,20 168:16
**type**
30:14 144:21
**types**
76:2
**typically**
102:16 153:17

———————— U ————————

**U**
4:20,20
**U.S**
15:17 25:22 27:18
28:3 45:16,17 46:11
115:19 168:18
**UBS**
104:7,9
**Uh-huh**
54:20 92:13 93:3
123:4
**ultimately**

66:18
**unauthorized**
134:14
**understand**
13:2,13,19 40:5 49:4
62:13 84:13 87:14
95:20 102:10
121:11 138:5 154:9
**understandable**
102:18
**understanding**
10:2,23 15:7 85:11
92:14 104:21
121:21 154:11
**understood**
33:8 101:14 102:7
120:15
**Unicorn**
1:9 5:8 10:4,24 11:7
11:11,15,16 12:14
14:23 15:8 16:12,17
35:4,13 45:5,10
46:14 48:3,20 50:12
50:15,21 51:7,9,10
51:17 58:25 63:6,9
63:24 64:6,11 65:4
70:13,24 71:7 72:24
73:5,10 74:6,10,19
75:13,20 82:22
84:23,23 89:7 90:9
92:9,12 95:2,2
96:18 97:17 99:5
100:7,19 101:6,21
102:4,17,25 103:11
104:3 105:12 106:2
108:5,12,18 109:10
109:17,23 110:19
110:22 112:13,15
112:17 114:15
125:20 129:15
143:8,14,24 145:10
145:19 148:16
149:4 150:13,20,23
152:4 153:2 158:4
158:12 160:5
161:22 169:13

170:8,23 171:8
**Unicorn's**
89:25 125:23 157:12
**unit**
52:14,19 83:16,21
113:20,25 161:12
161:17
**United**
1:2 15:14 64:7
**update**
57:20 152:3 153:11
153:25
**updated**
154:13 159:16
**updates**
49:15 151:7
**use**
24:23 25:4 31:7 32:4
50:16 57:11 61:20
71:5,9 79:8 85:14
95:20 96:3 108:14
114:15 117:9
128:10 158:8
165:21
**usually**
135:5,8 153:14
**utilized**
12:8
**utilizing**
97:16 105:25

———————— V ————————

**valuation**
26:13 27:6 37:23
39:5 159:24
**value**
26:13,20 40:12,12,17
**variation**
34:6
**various**
76:2 146:20 151:7
154:7,22 155:3
**verbally**
134:5,6
**version**
20:24 33:23 58:10

138:7,18,19 139:24
**versions**
85:24 144:4 153:13
154:6,14
**versus**
3:9
**video**
3:15,16 14:10
**Videographer**
2:16 3:2 52:13,18
83:15,20 113:19,24
161:11,16 167:5
**videotaped**
1:17 3:7
**view**
129:22
**views**
26:20
**Vincenzo**
106:6
**visit**
146:11

———————— W ————————

**waiting**
46:23 142:2
**want**
5:14,22 9:22 13:25
20:25 25:21 29:18
29:24 34:15 40:9
46:19 47:25 52:22
65:3 67:7,14 69:13
71:4 81:24 82:14
84:11,12 85:20 86:9
92:21 94:15 95:20
107:23 111:25
113:15 117:14
118:8,21 119:21,23
119:24 128:23
138:21 142:13
154:8 158:10
162:19 164:19
166:8
**wanted**
121:19 125:11,12
126:9,12 138:14



150:7 156:5 166:23
**wanting**
44:11 112:24
**wants**
21:20 121:17
**Washington**
2:10 81:5
**wasn't**
93:20 129:5 166:24
**way**
5:17 9:16,21 30:6
72:14 102:14
116:16 131:20
133:20 138:22
**ways**
24:16
**we've**
15:25 53:20 55:9
68:2 103:6
**website**
8:13 51:21 162:19
163:9,15 164:4,9
**week**
34:22 35:8 47:14
152:21 153:14
154:3 159:6 160:11
160:12,17
**week's**
153:24
**weekly**
150:21 151:2 152:3
153:12 156:10
158:11,25 159:3
171:9,11
**weeks**
151:21,22 152:20
153:7 154:7 160:17
160:25
**weeks'**
21:4
**welcome**
38:4
**WENG**
1:9
**went**
105:12,17 111:18

**weren't**
8:17 95:18 107:19
**Wessing**
82:24 112:11,12
145:6
**WhatsApp**
61:15,24,25 62:14
73:3 87:19
**Wigger**
2:11 3:19,20 6:23
8:10,14,22 9:5 10:5
11:8,12 12:11 13:7
13:11,22 14:3,7
15:10 17:5,15,23
18:11 21:11 22:7
23:14,18 25:16
26:22 28:10,21
29:16 30:5,13 31:3
31:9,13,20 32:9,20
34:10 38:10 39:17
42:5 43:8 44:16
45:21 46:8 49:3,17
50:25 52:9 53:14,23
54:6,12 55:4,13,17
55:23 56:6 57:14
58:22 59:12,19 60:5
60:13,22 61:7,16,22
62:4,17,25 64:2,8
64:23 65:5 66:5,12
66:22 67:11 68:10
68:18 69:6,12 71:3
71:12,19,23 72:11
73:17 74:3,13,20
75:8,16,22 76:4
77:4 79:7 81:7,16
82:7 83:10,24 88:7
90:5,10,15 93:16
94:2 95:5,23 96:5
96:10,21 98:4,18,22
99:21 100:8,21
101:2,8,22 102:5,11
102:20 103:3,12
104:17 105:2,15,21
106:3,25 107:6,10
108:13 111:22
113:3 114:18 115:9

116:2,7,24 117:6
118:7 119:18
123:20 124:21
125:9 126:8 127:24
129:12,24 130:23
131:17 132:8,18
133:3,19 134:3,10
135:25 136:5 138:9
139:19 142:22
143:25 144:14
145:3 146:5,24
147:3,10 148:17
149:11,24 150:15
152:16 153:3,9
154:15 157:15
158:15,18 160:8
162:25 163:3 166:5
166:23
**window**
111:24
**wired**
53:6,9 54:2
**wiring**
53:13
**witness**
4:2,12,14,20 173:3,5
**word**
20:24 30:25 31:7,11
32:4,5 71:8 79:8
94:18 95:6,12,21
96:4 108:14 117:9
128:10 165:11,21
**wording**
94:16
**words**
102:15 164:11,17
**work**
13:10 20:12 21:9
104:13 105:11
144:23 146:4 148:3
149:21
**worked**
17:24 27:8 37:20
38:9 110:7 149:15
**working**
8:2 16:21 19:15

74:18 84:18 109:9
129:10 150:8
**works**
8:20 9:21
**world**
16:22 91:23 96:7,7
**worry**
36:24
**worth**
46:6
**wouldn't**
71:14 98:2 108:14
117:2
**wrapping**
123:15
**write**
22:15 29:4 34:20
37:19 53:4 102:13
107:2 112:4 118:22
121:6 123:10
127:14 136:17
137:17 139:7
147:17 153:15
162:18 163:24
164:8,17 165:8,11
165:14,21,21
**writes**
22:19 26:8 52:25
69:21 72:3 87:5
110:13 111:2
137:24 147:19
**writing**
72:13 120:18 124:18
163:25
**written**
73:4 102:9 119:11
125:8 126:6 153:6
163:18 164:2,18
165:23
**wrong**
13:17 80:15 124:2
156:17 166:14
**wrote**
107:8,14 123:5
124:22 128:11,13
130:4,13 164:14



**Wu**
27:23
**ww.ryanberris.com**
163:6
**www.MagnaLS.com**
1:24

---
**X**
---
**x**
1:4,11 168:3,10
169:3 170:3 171:3

---
**Y**
---
**Y-O-N-G**
17:9 36:3
**Yards**
2:4 111:20 141:21
**yeah**
10:16 20:11 45:15
48:5,22 55:20 85:9
85:12 86:8,12 89:14
98:23 101:23
102:12 109:4
114:23 120:24
122:22 128:23
130:24,25 131:7
136:24 151:4
157:16,25 159:19
163:11,11,17,21
**year**
40:21,22,23,24 41:3
41:4 71:14
**yesterday**
5:6,11,14,21 6:2
11:14
**yesterday's**
24:2
**Yong**
17:8 36:4
**York**
1:3,19 2:5,5 105:18
106:9 110:17,21
111:17 129:4,5,9
135:7 136:22
**young**
57:16

---
**Z**
---
**Zach**
2:6 3:13,13 4:25 5:3
6:20 7:9 8:12,18
13:25 18:18 22:9
27:14 28:13,23
31:24 32:12,17,22
34:12 36:15 42:11
46:17 47:22 49:23
52:11 54:14 56:14
61:12 63:3,13 66:24
74:23 75:2 76:12
78:4,11 80:7,12
81:14 82:12 83:13
84:4 86:13 88:20
89:4 92:5,23 96:25
98:6 103:16 107:25
113:17 117:14
118:18 126:14
136:10 140:2,6
141:11 142:25
144:7,16 145:25
146:7,13 150:17
158:17,21 161:7
162:2 163:2 165:25
166:20 167:3 168:7
**zero**
27:10 39:25 40:21,22
41:4 155:5,5,19,21
**Zoom**
1:13 21:17 81:23
111:13 112:3

---
**0**
---
---
**1**
---
**1**
6:13,15 9:8 10:12
15:19 26:9 37:23
41:8 52:14 60:18
108:2 114:6,7
141:12 168:13
170:14
**1/13**
52:25
**1:21**

110:13
**1:23-cv-04305(AS)**
1:7
**10**
50:2,5,14 56:18,23
58:4,5 134:2,8
168:23 169:6,9
**10-Q**
92:8,11,15,25 93:23
101:19 102:2,8
170:7
**10-Qs**
102:16
**10/21**
16:2
**10/22**
16:20
**10/28**
22:19
**10:11**
34:18
**10:31**
113:21
**10:40**
114:2
**10:59**
110:12 111:3
**100**
2:9 37:22
**10001**
2:5
**101**
40:25
**103**
170:12
**11**
63:4,5 76:7,8,15
169:12,17
**11/2**
24:16
**11/3/21**
26:7
**11:39**
161:13
**11:42**
161:18

**11:48**
167:7,8
**114**
170:14
**115**
10:21,25
**117**
170:15
**12**
46:20 67:7,8 86:11
169:14
**12:00**
112:2
**12:15**
141:24
**126**
170:17
**13**
76:8,13 169:17
**136**
163:6
**14**
32:15 63:16 66:3
78:6,8 162:6,13
168:20 169:20
171:15
**14:36**
22:19
**14:43**
24:17
**14:56**
22:14
**140**
170:19
**143**
170:21
**144**
171:6
**14th**
32:25 64:5 67:2,4,5
**15**
37:5 80:8,10 86:13
137:23 169:22
**15:23**
29:2
**150**



171:8
**158**
171:11
**15th**
106:7
**16**
86:15,16 88:21 92:22
143:9,18 150:12
169:24 170:24
**161**
171:13
**1641**
16:20
**1650**
16:2
**16th**
146:15 147:17 149:3
151:17 152:15
154:23 156:5
**17**
34:18 88:22,24 170:6
**175,000**
115:19
**18**
92:7,8 168:16 170:7
**18:03**
41:19
**19**
54:22 55:11 56:4
97:3,6 170:9
**19th**
55:16
**1st**
115:3 118:12

--- **2** ---

**2**
8:6,7 41:9 52:19
83:16 90:18 168:15
**2:14**
140:13
**20**
1:14 3:5 46:9 98:8,9
170:10 173:7
**20:24**
26:7

**20:44**
139:14
**20006-6801**
2:10
**2019**
24:19 25:8
**2020**
24:19 25:8
**2021**
7:25 9:8 11:6,17
14:25 17:10,14,18
17:22 18:24 20:8
22:15 27:9 32:15,25
34:16 37:5 43:2
46:20 51:11 65:10
68:21 86:10,22 88:5
119:9 168:20
**2022**
50:2,6,14 53:13
54:22 55:11 56:4,5
56:18,23 60:11,20
60:25 63:16 66:3
67:17 75:19 76:7,8
76:15 80:9,11 85:14
85:16 86:4 89:3,6
92:19 94:7,10 95:2
95:9 96:18 97:5,7,9
97:10 98:7,10
101:11 102:24
103:22 108:10
109:9,12 114:6,7
117:17,20 126:18
127:4 143:9,18
147:2,9,12,14
150:12 158:24
159:7 168:24 169:7
169:17,23 170:9,11
170:13,14,16,17,24
171:11
**2023**
42:20 162:6,14
171:15
**2024**
1:14 3:5 173:7
174:11
**2099**

2:9
**21**
89:6 103:19,21
170:12
**21:12**
124:3
**22**
108:4 114:7,9 144:4
170:14
**22:09**
136:16
**220**
44:21,21
**2244**
7:7
**22nd**
78:7,8 151:15,16
152:2 153:5 154:18
156:4,10 169:20
**23**
117:15,16 170:15
**24**
42:20 43:2 103:22
126:17,18,21
170:12,17
**2413**
166:15
**2417**
166:12
**24th**
103:20 107:22
**25**
67:17 75:18 140:7,8
170:19
**26**
143:2,6 170:21
**26th**
46:23
**27**
117:17,19 144:8,11
158:24 159:7 166:9
166:13 168:18
170:15 171:6,11
**277**
7:6
**28**

18:24 22:15 80:9,11
150:19,20 169:22
171:8
**280**
15:25
**281**
22:13
**285**
28:25 34:15
**288**
41:18
**29**
158:23,24 171:11
**294**
46:18
**299**
52:23
**2nd**
130:10

--- **3** ---

**3**
18:14,15 23:21 26:12
26:14 27:2,3 83:21
86:10 97:5,7,10
113:20 126:18
127:3 151:9 159:12
168:16 170:9,17
**30**
162:3,4 171:13
**300**
54:18
**306**
108:2 110:11
**307**
118:9 138:22
**308**
136:9,13
**309**
139:13
**30th**
110:12 134:12,12
**31**
92:19 94:6,9 95:2,9
96:18 102:24
**311**



141:12
**319**
146:11
**31st**
103:6
**32**
168:20
**36**
168:21

_____ **4** _____
**4**
27:17,18 103:23
    113:25 161:12
    168:7,18
**4/24/22**
103:24
**4/30**
110:13
**42**
168:22
**49**
168:23

_____ **5** _____
**5**
32:14,15 161:17
    168:20
**5.5**
115:18
**5/1**
112:19
**5/4**
137:14
**5/4/2022**
140:5,8,13 170:19
**5/7**
142:6
**5:00**
142:15
**5:18**
118:17,22 120:3,8,19
    120:25 121:3
**5:23**
123:25
**5:30**

137:14,14
**50**
26:10 89:22
**51**
130:8
**5322**
136:15
**55**
2:4
**56**
169:6
**58**
169:9
**5th**
141:23

_____ **6** _____
**6**
36:16,17,20 168:13
    168:21
**6:22:24**
162:18
**60**
149:18
**624-6221**
1:24
**63**
169:12
**641**
64:14
**67**
169:14
**6th**
141:24 156:17

_____ **7** _____
**7**
42:12,14 44:20,20,21
    46:20 98:7,10
    101:11 168:22
    170:10
**7:00**
21:19
**7:15**
136:17
**738**

162:17
**739**
163:13 164:7
**75**
37:22
**76**
169:17
**78**
169:20

_____ **8** _____
**8**
27:22 44:20,21 49:24
    49:25 168:15,23
**8/25/21**
7:11
**8:02**
1:15 3:6
**80**
169:22
**800**
26:14,15
**83,000**
119:8
**848**
67:9,14 169:15
**851**
67:15
**852**
67:10,14 169:16
**86**
169:24
**866**
1:24
**88**
170:6
**8th**
142:12

_____ **9** _____
**9**
56:4,16,17 169:6
**9:05**
52:15
**9:10**
52:20

**9:30**
112:4
**9:37**
147:18,19
**9:42**
147:16
**9:47**
83:17
**9:53**
112:20
**9:54**
83:22
**92**
170:7
**954**
130:3
**97**
170:9
**98**
170:10
**9th**
55:8,16

