# EXHIBIT 8

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF NEW YORK

3     **********************************************************

4     RYAN BERRIS,                    )

5               Plaintiff,            )

6                                     )

7     -vs-                            )  Case No. 1:23-cv-04305

8                                     )  (AS)

9     SUNG-FUNG CHOI (A/K/A NORMAN    )

10    CHOI), DE TOMASO AUTOMOBILI     )

11    HOLDINGS, N.A. LLC, HIN WENG    )

12    LUI (A/K/A SAMUEL LUI),         )

13    GENESIS UNICORN CAPITAL CORP.,) )

14              Defendants.           )

15    **********************************************************

16

17         ZOOM VIDEOTAPED DEPOSITION OF JOHN IMPERIALE

18                    9:59 AM to 2:27 PM

19                    October 22, 2024

20                    REMOTE DEPOSITION

21

22

23    Job No. PA 6970488

24         REPORTED BY:  Lisa Reinicke, Court Reporter

25                    Warren Brey, Videographer

Page 2

1    APPEARANCES OF COUNSEL:

2      For the Plaintiff:

3         Sophie Roytblat, Esquire
          Boies Schiller Flexner, LLP

4         1401 New York Avenue, NW
          Washington, DC  20002

5         202-237-2727
          Sroytblat@bsfllp.com

6

7      For the Defendants Sung-Fung Choi (a/k/a Norman Choi),
       De Tomaso Automobili Holdings, N.A., LLC., Hin Weng Lui

8      (a/k/a Samuel Lui), and Genesis Unicorn Capital Corp.:

9         Hannah Wigger, Esquire
          Alexandra Bustamante, Esquire

10        2099 Pennsylvania Avenue, NW
          Washington, DC  20006

11        (202) 747-1931
          Hwigger@sheppardmullin.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    JOHN IMPERIALE:

Examination by Ms. Wigger.......................... 5

3    Examination by Ms. Roytblat...................... 162

Examination by Ms. Wigger........................ 163

4

5

6

                    E X H I B I T S

7

1 Notice of Deposition............................ 8

8    2 Expert Report.................................. 34

3 Publication 535................................ 52

9    4 Ryan Berris's Declaration...................... 77

5 Consulting Agreement.......................... 111

10   6 Publication 463.............................. 129

7 Email from Diana Majcher to Ryan Berris......... 143

11   8 May 19th of 2022 Email......................... 147

9 Document Produced in Native Format.............. 161

12   10 Excel Spreadsheet............................ 161

11 Excel Spreadsheet............................ 158

13   12 Excel Spreadsheet............................ 158

14

15

16

17                     * * * * *

18

19

20

21

22

23

24

25

Page 4

1    (9:59 AM, October 23, 2024)

2              THE VIDEOGRAPHER:  Good morning.

3              We're going on the record at 9:59 AM EST on

4    October 22nd, 2024.

5              This is media unit 1 of the video recorded

6    deposition of John Imperiale, taken by counsel for the

7    defendant in the matter of Ryan Berris vs. Norman Choi,

8    et al., filed in the United States District Court,

9    Southern District of New York, case number 1:23-cv-04305.

10             This deposition is being held as a Zoom video

11   conference with participants in various locations.

12             My name is a Warren Brey, representing

13   Veritext Legal Solutions.  I'm the videographer.

14             The court reporter is Lisa Reinicke from the

15   firm of Veritext Legal Solutions.

16             Counsel, please introduce yourselves for the

17   record.

18             MS. WIGGER:  Good morning.  My name is Hannah

19   Wigger.  I represent defendants.

20             MS. ROYTBLAT:  Good morning.  Sophie Roytblat

21   on behalf of plaintiff, Ryan Berris.

22             THE VIDEOGRAPHER:  And, court reporter, please

23   swear in the witness.

24             (Witness sworn.)

25             And you may proceed.

1          MS. WIGGER:  Thank you very much.

2                    JOHN IMPERIALE

3          was sworn and testified as follows:

4                    EXAMINATION

5     BY WIGGER:

6          Q     Good morning, John.

7                Could you please state your full name for the

8     record?

9          A     Good morning.

10               My name is John, J-o-h-n, Imperiale,

11    I-m-p-e-r-i-a-l-e.

12         Q     Okay.  And where do you live?

13         A     I reside in Port Washington, New York.

14         Q     What's the address for that?

15         A     99 Madison Street, Port Washington, New York,

16    11050.

17         Q     Thank you.

18               Have you been deposed before?

19         A     I have not.

20         Q     Oh, first time.

21               All right.  So before we start, I just want to

22    establish some basic ground rules for the deposition

23    today.  I am here to ask some questions.  And if I ask a

24    question that you don't understand just tell me you don't

25    understand it.  Okay?

```
                                                    Page 6
 1        A     Okay.

 2        Q     If I don't hear anything I'm going to assume

 3   you understood my question.  Fair?

 4        A     Fair.

 5        Q     We have a court reporter here today who will

 6   be transcribing this proceeding.  And because of that,

 7   your responses need to be clear and verbal.  So please

 8   don't shake your head or nod your head or say uh-huh if

 9   you can help it.  Okay?

10        A     Okay.

11        Q     And she will also tell us to slow down if we

12   need to slow down.

13              MS. WIGGER:  And I may need to slow down.  So,

14   Lisa, please don't be shy.

15   BY MS. WIGGER:

16        Q     It's also important that you try to remember

17   to let me finish my questions before you begin your

18   answer so that we're not talking over each other.  And

19   I'll try to do the same for you.  Okay?

20        A     Okay.

21        Q     All right.  Your counsel may object, and those

22   objections are for the record.  You can answer the

23   question unless your counsel specifically tells you not

24   to.  Okay?

25        A     Okay.
```

```
 1        Q     I usually take breaks every hour or

 2   hour-and-a-half or so.  If you need a different break

 3   from the questioning, just let me know.  I'm just going

 4   to ask that you answer the question that's pending before

 5   you take a break.  Okay?

 6        A     Okay.

 7        Q     All right.  And you understand you're

 8   testifying under oath, right?

 9        A     I do.

10        Q     Is there any reason you cannot testify

11   truthfully and accurately today?

12        A     No.

13        Q     Are you on any medications that would impede

14   your ability to focus and answer my questions?

15        A     No.

16        Q     Have you ever been convicted of a crime?

17        A     No.

18        Q     Have you ever been the subject of an

19   investigation by a regulatory or government agency?

20        A     No.

21        Q     Have you ever been sanctioned or penalized by

22   any court, regulatory body, or administrative agency?

23              I didn't catch that.  What was that?

24        A     No.

25        Q     Okay.  Your audio is cutting out just a little
```

Page 8

1  bit.  But I heard no.

2           All right.  We're going to test our

3  technology.  So I'm going to introduce Exhibit 1, which

4  is going to be your notice of deposition.  Since we're

5  virtual today, there's a little bit of a lag when I do

6  these things.  So you're going to need to be patient with

7  me.

8           So give me one second while this loads.  It

9  does take a second.

10           Okay.  So if you click refresh on the folder

11  you're looking at with marked exhibits, you should see

12  Exhibit 1.  Go ahead and do that.  And let me know if you

13  see Exhibit 1.

14           (Exhibit 1 marked for identification.)

15           MS. ROYTBLAT:  I'm just passing the witness

16  the laptop with the Veritext platform on it.

17      A    Yep, I see it.  Should I open it?

18  BY MS. WIGGER:

19      Q    Please open it.

20           All right.  You should see a notice of

21  deposition that's three pages long with Exhibit 1 in the

22  bottom right-hand corner.

23           Do you see that?

24      A    It's just taking a minute to load.

25      Q    Yep.

1      A      Got it.  Okay.

2      Q      You see it?

3      A      Yeah, I do.

4      Q      Okay.  So as I show you exhibits today,

5  they're going to appear in that same manner.  If for some

6  reason it doesn't work I can screen share.  But this

7  allows you to scroll through the document so you can see

8  any portion of it that you need to.  Okay?

9      A      Okay.

10     Q      It's just a little bit easier.

11            Do you have any documents with you today?

12     A      I do.  I have a binder with my expert report

13  and the supporting -- the citations, the documents I

14  cited.

15     Q      Okay.  Anything else?

16     A      No.

17     Q      And that report was the one that you submitted

18  on September 30th?

19     A      That's right.

20     Q      And the citations were submitted that same day

21  as well?

22     A      Yeah, and then there was also an errata after

23  that.

24     Q      Okay.  Do you have your errata with you as

25  well?

```
 1          A       I do not.

 2          Q       Okay.  And then do you have any documents

 3     produced with that errata with you?

 4          A       I have all the documents that I relied upon

 5     for my report.

 6          Q       Okay.  And just to make sure that we're on the

 7     same page, those are the documents originally submitted

 8     with your report, right?

 9          A       They are -- no, I believe they are the

10     documents that were cited in -- that were in the errata

11     report.

12          Q       Okay.  So you have the Bates stamped versions

13     in front of you is what you're saying?

14          A       Yes.

15          Q       Okay.  And you do not have the ones without a

16     Bates stamp in front of you?

17          A       I believe that's correct.

18          Q       Okay.  Have you testified as an expert witness

19     before?

20          A       I've testified in an arbitration.

21          Q       As an expert witness?

22          A       Yes.

23          Q       Okay.  What arbitration was that?

24          A       It was an arbitration involving Marto Capital.

25     It's in my CV in appendix A.
```

Page 11

```
 1        Q     Did you --

 2        A     Go, et al. --

 3        Q     Oh, go ahead.

 4        A     I was saying it's Go, et al. vs. Marto

 5   Capital, LLC.

 6        Q     Were you retained as a testifying expert or an

 7   internal consultant?

 8        A     As a testifying exert.

 9        Q     Were you retained via an engagement letter?

10        A     Yes.

11        Q     Were you compensated hourly?

12        A     Yes.

13        Q     Did you represent the plaintiff or defendant?

14        A     I represented the -- the -- the defendant.

15        Q     Okay.  So Marto Capital?

16        A     That's right.

17        Q     And what was the topic of your opinion in that

18   case?

19        A     It was a business valuation report.

20        Q     Were you able to render a business valuation

21   in that case?

22        A     I was.

23        Q     What was the scope of the valuation?  Like how

24   much, generally?

25        A     I don't -- I can't say.  I don't recall.
```

Page 12

1       Q      Do you recall if it was hundreds of thousands

2    versus millions?

3       A      I recall that it was in the millions.

4       Q      Okay.  Millions or 10 millions?

5       A      I can't say.  I don't remember.

6       Q      When was that arbitration?

7       A      It would have been, I think, 2021.

8       Q      Was any part of your report in that case

9    excluded?

10      A      No.

11      Q      Okay.  And I understand you did not have your

12   deposition taken in that case?

13      A      That's right.

14      Q      Did you testify at the actual arbitration?

15      A      Yes.

16      Q      Is that the only case in which you have

17   testified as an expert witness?

18      A      It is.

19      Q      Is that the only case in which you've

20   submitted an expert report?

21      A      Yes.

22      Q      Okay.  So I take it that no court or judicial

23   body has ever rejected your opinions; is that accurate?

24      A      That's correct.

25      Q      What did you do to prepare for today's

1    deposition?

2         A    I reviewed my expert report, reviewed the

3    supporting documents.  I had meetings with counsel.

4         Q    Did you have any meetings with Ryan Berris,

5    the plaintiff?

6         A    Not in preparation of this deposition.

7         Q    Did you separately?

8         A    I did speak to him for about half an hour.

9         Q    And when was that?

10        A    It was -- I don't recall the exact date.  But

11   it was at some point before I produced my report on

12   September 30th.

13        Q    What was the purpose of that meeting?

14        A    It was to ask him some questions about the

15   kind of factual basis, the nature of his business travel.

16   And to go over and discuss some of the supporting

17   documents.

18        Q    What did you ask him regarding the factual

19   basis for his business travel?

20        A    I don't recall specific questions.  But I

21   wanted to understand the business purpose for some of the

22   travel.

23        Q    Did he answer your questions?

24        A    He did.

25        Q    What did you ask him about the nature of the

Page 14

1    business travel?

2         A     I don't recall specifically.

3         Q     Do you recall anything they told you

4    specifically?

5         A     Not specifically.

6         Q     Did you rely on his statements in coming to

7    the conclusions in your report?

8         A     Not -- not his statements.  His declaration I

9    relied upon.  And I think, you know, contextually it was,

10   you know, what was in the declaration was similar to what

11   he was telling me verbally.

12        Q     What do you mean similar?

13        A     I think that the conversations covered some of

14   the documents that were provided, the nature of the

15   business travel, business purpose, which was sort of the

16   nature that was covered in his declaration.

17        Q     Did he tell you anything during your

18   conversation that was not reflected in his declaration?

19        A     Again, I can't recall specifically what we

20   spoke about.  We spoke about half an hour.

21        Q     Okay.  So suffice it so say, though, if he

22   did, you didn't rely on it in forming your opinions,

23   correct?

24        A     I'm sorry, can you say that again?

25        Q     If he told you something different from what

1    was in his declaration during your meeting, you didn't

2    rely on it in forming your opinions?

3         A    No, I wouldn't agree with that.  If he told me

4    something that was different than what was in his

5    declaration that would have been a red flag for me to

6    follow up.

7         Q    I understand.  That's not my quite my

8    question.  I'm just trying to make sure I understand

9    everything you relied on in forming your opinions.  And

10   you're telling me you don't really remember what

11   Mr. Berris told you.

12             So as far as Mr. Berris's statements, the

13   statements you were relying on are those reflected in his

14   declaration, right?

15        A    Yes.  That's correct.

16        Q    Okay.  Now, you told me you that had

17   conversations with counsel and with Berris.

18             Did you have conversations with anyone else

19   prior to filing your report related to this case?

20        A    No.  No.

21        Q    Okay.  You said that you met with counsel for

22   Mr. Berris.  When did you meet with them or speak with

23   them?

24        A    Are you asking me just for the deposition prep

25   or are you asking me over the course of the entire

1    engagement?

2          Q    Over the course of the engagement.

3          A    When did I speak with them?  I -- I spoke with

4    them -- I don't recall specific dates, but I spoke with

5    them a number of times throughout September.

6          Q    Let me ask you this:  When did Boies Schiller

7    engage you for this litigation?

8          A    It was early September.

9          Q    Okay.  So a couple weeks before you submitted

10   your report, right?

11         A    Right.

12         Q    Who contacted you from Boies Schiller?

13         A    I believe an associate reached out to my firm.

14   And it was the request was routed to me.  And I think I

15   spoke with John Zach as well as an associate, Isaac.  I

16   don't recall his last name offhand.

17         Q    Has Boies Schiller engaged you before?

18         A    Engaged me, no.

19         Q    Have you worked on a case in which Boies

20   Schiller was counsel before?

21         A    I believe that I have.

22         Q    What case was that?

23         A    I don't recall specifically.  Just say in

24   general I know that Boies Schiller is -- you know, I

25   think -- I'm sure I've done work with them before.  I

1    don't remember the specific case.

2         Q    Okay.  So you think you've done work with

3    Boies Schiller before.  But you have no recollection of

4    the case beyond that?

5         A    I don't recall the specific name of the case.

6         Q    What was the nature of the case?

7         A    I believe it was a forensic accounting

8    investigation.

9         Q    And what was the nature of your work on that

10   case?

11        A    Reviewing expenses, reviewing supporting

12   documentation to determine the business nature or the

13   purpose of the expense.

14        Q    Was an expert report submitted in that case?

15        A    Well, you asked me if this -- this was not

16   something that I was hired as an expert.  This is

17   something that I was consulting on.  You know, or I

18   was -- you know, I was not the actual testifying expert.

19   It was just a case that I was assisting on.  Somebody

20   else was the testifying expert.

21        Q    Okay.  So on the case in which you worked with

22   Boies Schiller there was a testifying expert and you were

23   assisting the testifying expert, right?

24        A    That's correct.

25        Q    And the nature of your assisting was to review

1    expenses and supporting documents, right?

2        A    That's correct.

3        Q    And then presumably the testifying expert

4    submitted an expert report, correct?

5        A    I don't think a report has been submitted yet.

6        Q    Okay.  So this is a current case ongoing?

7        A    It is.  It sort of kind of had gone dormant

8    for a while.

9        Q    I see.

10            When did you -- when, like roughly, did you do

11   work on that case?

12       A    I'd say about a year ago.

13       Q    And was that also with John Zach?

14       A    Not to my knowledge.  I don't think he's

15   involved in this one.

16       Q    Which attorneys at Boies Schiller were you

17   working with?

18       A    I don't recall.  I don't actually -- I don't

19   think I have spoken with the attorneys themselves.

20       Q    Okay.  So you don't know the attorney's names?

21       A    Right.

22       Q    Is it the New York office for Boies Schiller?

23       A    I'd have to refer back.

24       Q    I'm sorry, you cut out for a second.  What was

25   that?

Page 19

```
 1        A       I don't know what office the attorneys are

 2    from.

 3        Q       Okay.  So no opinion has been rendered in that

 4    case yet, if I understand correctly?

 5        A       That's right.

 6        Q       Okay.  Going back to your conversations in

 7    preparing your report, we talked about Mr. Berris.  Did

 8    you speak to anyone else who used to or does work at

 9    de Tomaso?

10        A       No.

11        Q       Did you speak to Hugo de Sadeleer?

12        A       No.

13        Q       Do you know who that is?

14        A       I understand just from reviewing the complaint

15    and some of the depositions that he is -- you know,

16    whether it's a contractor or a consultant, he works with

17    Mr. Berris.  Or used to work with Mr. Berris.

18        Q       And did you speak with the Carmen Jorda?

19        A       No.

20        Q       Do you know who that is?

21        A       Again, just through reading the complaint I'm

22    familiar that she was involved in the Meet Isabelle

23    Campaign.

24        Q       Was there anyone that you wanted to speak to

25    with whom you were not able to speak?
```

1      A      No.

2      Q      Did you review -- I think you answered this.

3             Did you review documents in preparation for

4      your deposition specifically, beyond your report, any

5      exhibits to your report?

6      A      When you said exhibits, you mean the

7      footnotes?

8      Q      I mean the materials relied on.

9      A      There was -- there was nothing in addition to

10     the materials that I relied on.  Well, I guess maybe I'll

11     just amend my answer.  There is the expense reports that

12     Mr. Sadeleer prepared on behalf of Mr. Berris that were

13     submitted to de Tomaso.  I reviewed those.

14     Q      All right.  Those aren't listed in your

15     report, are they?

16     A      They're not.

17     Q      Did you review them before or after submitting

18     your report?

19     A      Before.

20     Q      Why aren't they listed in your report?

21     A      Because they don't form the basis of my

22     opinion.  They were really just the starting point of my

23     analysis.  They were one of the first documents that I

24     reviewed.  But they don't go to the foundation of my

25     opinion.

Page 21

1       Q       Did you consider them in forming any of your

2   conclusions?

3       A       I don't know how you would define the term

4   consider them.  I -- it was something that I reviewed.

5   But they -- it does not -- it was not the -- it does not

6   form the basis of my opinion.  It was the supporting

7   document cited in my report that are the basis of my

8   opinion.

9       Q       Which expense reports did you review?

10      A       There was an expense report.  I don't have the

11  Bates stamp in front of me, but it was an expense report

12  from approximately December of 2020 through August of

13  2021.

14      Q       Is that the only one?

15      A       Subsequently there was another expense report

16  that was prepared from August 2021 through, I believe,

17  the end of the year, December 2021.

18      Q       Was that all?

19      A       Yes.

20      Q       Okay.  So you reviewed two expense reports?

21      A       That's right.

22      Q       Are there any other documents not listed in

23  your report that you reviewed prior to submitting your

24  report?

25      A       No.

Page 22

1       Q       Any other documents, other than those listed

2   in your report, that you reviewed in preparation for your

3   deposition?

4       A       No.

5       Q       All right.  On what topics are you purporting

6   to be an expert?

7       A       On the fact that the business expenses listed

8   in my expert report are reasonable, valid business

9   expenses in accordance with the guidelines issued by the

10  IRS and FASB.

11              That's spelled F-A-S-B.

12      Q       All right.  You were not an expert in the

13  luxury automotive industry, right?

14      A       I am not.

15      Q       You're not an expert in reviving historic car

16  brands, right?

17      A       Can you say that again?

18      Q       You are not an expert in reviving historic car

19  brands, right?

20      A       No, I'm a forensic accountant.

21      Q       Have you ever worked with a luxury automotive

22  company before?

23      A       Professionally?

24      Q       Yes.

25      A       No.

1          Q      Have you ever done any sort of accounting

2     analysis for a luxury automotive company before?

3          A      I've done forensic accounting for luxury

4     brands.  Not in the automobile phase.

5          Q      So the answer is, no, you have not done an

6     accounting analysis for a luxury automotive company

7     before, right?

8          A      That's right.

9          Q      In other words, you've never done an

10    accounting analysis for a company like de Tomaso, right?

11         A      No, I wouldn't agree with that.  I've dealt

12    with many companies where I've done forensic accounting.

13    Again, whether it's, you know, manufacturing companies,

14    consumer product companies, high end luxury brands, I do

15    have a lot of experience in that.

16         Q      I'm not asking about whether you've done

17    forensic accounting before.  I'm asking about whether

18    you've done it for a company in the same position as

19    de Tomaso, a luxury automobile company that is reviving a

20    brand.  You've never done that before, right?

21         A      I've never done a forensic accounting for a

22    luxury automobile startup company that is reviving a

23    brand, that is correct.

24         Q      Okay.  Now, you said that you've done them for

25    high -- for luxury companies of some sort, right?

1      A      That's right.

2      Q      Which ones?

3      A      It is an ongoing case, highly sensitive SEC

4    regulations I can't disclose.  But it is a very high end,

5    very well known luxury brand that there is a very

6    confidential investigation on.

7      Q      Okay.  I'm not going to ask you the name of

8    it, but suffice it to say it is better established than

9    de Tomaso, right?

10     A      Not necessarily.  It is having some financial

11   hardships.

12     Q      I'm not asking about financial hardships.  I'm

13   asking about market recognition.

14            Let me ask you this:  Does it have products

15   that's actually delivered to customers?

16     A      Yes.

17     Q      Okay.  Has it been around more than a decade?

18            MS. ROYTBLAT:  Object to form.  To the extent

19   it's a confidential investigation and a confidential

20   case, then I think this is bordering on maybe too much

21   detail.

22   BY MS. WIGGER:

23     Q      Answer my question, please.  Has it been

24   around more than a decade?

25     A      I believe it has.

Page 25

1          Q     All right.  What other luxury companies?

2          A     I have to give some thought to that.  Sitting

3     here right now I can't think of anything.

4          Q     Any other automotive companies?

5          A     No.

6          Q     Setting aside just forensic analyses -- well,

7     yeah.  Setting aside just a forensic analysis of

8     accounts, have you done any other sort of professional

9     work for a luxury automotive company?

10         A     No.

11         Q     Do you know what types of events would be

12    common in a luxury automotive industry?

13         A     Really that goes outside of the scope of my

14    report.  I was not covering events.  I was covering

15    business travel.

16         Q     That's fine.  I still need an answer to my

17    question.

18               Do you know what types of events would be

19    common in a luxury automotive industry?

20         A     And can you clarify what you mean by events?

21    Are you speaking about client entertainment events?

22         Q     Yeah, do you know what type of client

23    entertainment events would be common in the luxury

24    automotive industry?

25         A     No.

1      Q      Do you know what types of client pitches would

2    be common in a luxury automotive industry?

3      A      I don't.

4      Q      Do you know what types of conferences or other

5    meetings would be common in a luxury automotive industry?

6      A      I mean, are you speaking in general?  Are you

7    asking me do I know that it is common to meet with

8    customers?  Or are you asking specific meetings, specific

9    events?

10      Q      I'm asking about -- I'm asking do you know

11    what types of conferences or other industry meetings

12    would be common in the luxury automotive industry?

13      A      I don't have independent knowledge.

14      Q      Do you know who de Tomaso's peer companies

15    are?

16      A      I would assume they would be other high end

17    automotive companies.

18      Q      Like what?

19      A      I don't want to speculate offhand.

20      Q      Okay.  That's fine.  If you don't know that's

21    fine.

22            So it's fair to say that you don't know

23    offhand who de Tomaso's peers would be, right?

24      A      That's right.  That would be -- that would be

25    totally out of the scope of my work.

1          Q       That's fine.  That's a fine answer.  I'm just

2    trying to make sure I understand the full scope of your

3    report.

4                  All right.  Let me just round this out.  So

5    you graduated from Villanova with a BS in business

6    administration, right?

7          A       It was a BBA.  But, yeah, in accounting and

8    finance.

9          Q       Okay.  When was that roughly?

10         A       Graduated in 2004.

11         Q       Okay.  And then you have a masters of business

12   administration from Fordham; is that right?

13         A       That's right.  Yep.

14         Q       And when was that?

15         A       2010.

16         Q       Okay.  After you graduated from Villanova,

17   were you employed?

18         A       I was.

19         Q       Where?

20         A       I worked at a national public accounting firm

21   called Smart & Associates.

22         Q       What was your title?

23         A       I was an associate.  And then I believe it was

24   bumped up to experienced associate in my second year.

25         Q       Experienced associate.

Page 28

```
 1        A      It makes you feel good, yeah.

 2        Q      Yeah.  What was --

 3        A      It came with a higher bell rate.

 4        Q      I should just start calling my associates

 5   that.

 6               What were your responsibilities just at a high

 7   level?

 8        A      So I was responsible for performing financial

 9   statement audits of small and midsized corporations.  I

10   also was involved in preparing personal and corporate

11   income taxes.

12        Q      When you say small to midsized corporations,

13   give me an idea of what that means.

14        A      You know, I can't speak to specifics.  It was

15   a while ago.  But, I mean, these could be startups,

16   re-revenue companies to maybe companies that had under

17   a hundred million in revenue.

18        Q      How long were you at Smart & Associates?

19        A      For over two years.  Two to three years.

20        Q      Two years, you said?

21        A      Over two years.  Two to three years.

22        Q      Okay.  Got it.

23               What was your next job?

24        A      Then I left Smart & Associates and I went to

25   business school.  So Fordham.
```

Page 29

1      Q     Okay.  After you graduated from Fordham, what

2   was your next job?

3      A     Well, so during Fordham I had an internship at

4   Rinehart Capital.  And that was an investment banking

5   firm.  That would have been my next job.

6      Q     All right.  And when did you start at Rinehart

7   Capital?

8      A     That would have been at some point in -- I'm

9   going to give you rough dates.  But at some point in 2009

10  through probably early 2010.

11     Q     Okay.  And what was your title at Rinehart?

12     A     I was an associate intern in their investment

13  banking practice.

14     Q     The entire time you were there?

15     A     Yes.

16     Q     What were your responsibilities at a high

17  level?

18     A     That of a typical investment banking

19  associate.  So that would be building what we call

20  financial statement models.  Essentially it's a way to

21  valuate a business doing industry research, company

22  research, putting all that into marketing materials for

23  companies that my firm was engaged on selling or, you

24  know, providing, you know, advisory services in the

25  investment banking space.

Page 30

1       Q       After you left Rinehart Capital, where did you

2    go?

3       A       So it was the predecessor to Kroll.  It was a

4    firm called Duff & Phelps, which then later rebranded,

5    renamed itself as Kroll.

6       Q       What was your title when you started at Duff &

7    Phelps/Kroll?

8       A       A senior associate.

9       Q       What were your responsibilities?

10      A       So I was in, what they called at the time, the

11   disputes and investigations practice.  I was sort of a

12   generalist.  Again, as a CPA, in my background I worked

13   on a lot of the same things; forensic accounting, asset

14   tracing, fraud investigations, financial reporting issues

15   over the proper application of generally accepted

16   accounting principles.  I also worked on some business

17   valuation matters as well as lost profits and

18   quantification of economic damages.

19      Q       Were these for startups and pre-revenue

20   companies?

21      A       Some of them were.  Some of them were for

22   larger and more established.

23      Q       You said earlier that you did some personal

24   tax work at Smart & Associates; is that right?

25      A       Yes.

Page 31

```
 1        Q     Okay.  Were any of those for officers or
 2    directors of a company?
 3        A     I mean, you're going back --
 4        Q     I know.
 5        A     -- roughly 20 years.  I really -- sitting here
 6    I can't say one way or the other.
 7        Q     Okay.  Coming back to Duff & Phelps or Kroll,
 8    did you have a role after senior associate?
 9        A     I did.  The next role I was promoted to was
10    vice president.
11        Q     Vice president of what?  Sorry.
12        A     Sorry.  Vice president in the same disputes
13    and investigations practice.
14        Q     Sorry.  I couldn't tell if you had cut out
15    there.
16              And did your responsibilities change when you
17    were vice president?
18        A     So once I became vice president, my -- the
19    scope of the work that I did became more narrowly focused
20    to forensic accounting, fraud, asset tracing, you know,
21    financial reporting matters.  More focused and away from
22    being more of a generalist.  And I also took on more
23    responsibility on my matters, managing staff, mentoring
24    staff, or client contact.
25        Q     When did that change occur?  When did you
```

Page 32

1   become vice president?

2       A    I believe I was a senior associate for three

3   years.  So I joined the firm in August of 2010.  So I

4   would say approximately around 2013.

5       Q    Okay.  Did you have a role after vice

6   president?

7       A    Yes.  Then I became a director.  And then in

8   terms of the practice group, we renamed the practice

9   group.  So it was not disputes under investigations.  It

10  was renamed to expert services.

11      Q    When did you become a director?

12      A    Again, rough dates, but I think I was a vice

13  president for about four years.  And so that would have

14  been, I guess probably puts you around 2017, 2018, I

15  think.  Give or take a year or two.

16      Q    What were your responsibilities as director?

17      A    Similar responsibilities.  Performing fraud

18  investigations, forensic accounting, asset tracing,

19  financial reporting matters, and taking on an even larger

20  role on my matters, being more responsible for the

21  day-to-day client contact.

22      Q    Were you also dealing with larger companies or

23  were you still dealing with startups and pre-revenue

24  companies?

25      A    The types of companies didn't change.  And

Page 33

1   even just from the outset it wasn't only that I was

2   working on startups and pre-revenue.  I was working on

3   all different types of companies.

4          Q      Got it.

5                 So you've always worked with startups and

6   pre-revenue companies among others, among other

7   companies?

8          A      Among other companies, yes.

9          Q      Okay.  Did you have a role after director?

10         A      Yes, in my current role.  So I'm now a senior

11  director in the expert services practice.

12         Q      When did you become senior director?

13         A      It was a few years after I made director.  I

14  am going to estimate.  It was maybe around 2021, give or

15  take a year.

16         Q      Did your role change at all?

17         A      Same types of projects that I was working on.

18  Again, even more responsibility.

19         Q      Okay.  All right.  We're going to take a look

20  at your report.  I'm going to mark it in Veritext.  If

21  you want to use the version in front of you, that is

22  fine.

23         A      Okay.

24         Q      But do at least look at Exhibit 2, which you

25  should be able to see now if you refresh your page.

Page 34

1              (Exhibit 2 marked for identification.)

2       A      Yeah, it's loading.

3              Got it.

4       Q      All right.  You see Exhibit 2 is your expert

5   report, right?

6       A      Yep.

7       Q      Signed and submitted on September 30th, 2024,

8   right?

9       A      Yes.

10      Q      Were you the one who drafted your report?

11  Sorry, did you hear my question?

12      A      I did.  You didn't hear my answer?  I said I

13  was.

14      Q      Oh, sorry.  This audio is really cutting out.

15             Did you draft the entire report?

16      A      Yes.

17      Q      Okay.  Including your list of documents

18  considered?

19      A      Yes.

20      Q      Did you do your own citations?

21      A      I did.

22      Q      Okay.  And did you actually review each

23  document in the list of documents considered?

24      A      I did.

25      Q      Okay.  I have a couple questions about this

Page 35

1    and then we're going to get into some specifics.

2              In your report you cite to the December 18th,

3    2024 deposition of Diana Majcher, right?

4         A    Yes.

5         Q    Did you read the whole thing?

6         A    I did.

7         Q    Is that the only deposition that you read?

8         A    Yes.

9         Q    Why is that the only deposition that you read?

10        A    She is the corporate representative of

11   de Tomaso, and so I thought it was relevant to hear what

12   de Tomaso said, how they answered questions.

13        Q    Did you read her personal deposition?

14        A    I read the deposition that she submitted on

15   September 19th, 2023.  That is the only one that I

16   reviewed of hers.

17        Q    September 18th or 19th?  Just to be clear.

18        A    Oh, I'm sorry, 18th.

19        Q    Did you read the deposition of Ryan Berris?

20        A    No.

21        Q    Why?

22        A    Because I didn't think it was relevant for my

23   opinions.  They were dealing with the expenses.

24        Q    Do you know if he discusses expenses in his

25   deposition?

1        A      I don't know that for a fact.

2        Q      If he had, would that have been relevant for

3    you to know?

4        A      I think that I had all the documents necessary

5    for my opinion.  I had the supporting documents that I

6    requested, invoices, receipts, emails, chat messages.  I

7    had the declaration where he factually testified to the

8    nature and dates of his business travel.

9        Q      That's not what I'm asking you.  I'm asking

10   you whether if he had discussed expenses in his

11   deposition that would have been relevant to your report

12   about his expenses?

13       A      I think only to the extent that anything he

14   testified to in his deposition would run counter to what

15   I had in my report.

16       Q      Okay.  And you don't know if anything that he

17   testified to in his deposition runs counter to your

18   report, right?

19       A      That's right.

20       Q      All right.  In your list of documents

21   considered you list a whole bunch of documents without

22   Bates stamps, right?

23       A      Yes.

24       Q      Okay.  And is it your understanding that those

25   were not produced in this litigation?

1      A      When I was writing my report, before I

2    submitted my report, I was given documents by counsel.  I

3    reviewed those documents.  And, you know, it didn't come

4    up one way or the other whether those documents were

5    produced.  After the fact I now know that all of the

6    documents were produced that I relied upon in my report.

7      Q      Right.  And the documents that don't have

8    Bates stamps were produced after your report, right?

9      A      I'm not aware of the internal mechanics of how

10   documents were produced.

11     Q      Okay.  Did it concern you at all, though, that

12   you were being given documents without Bates stamps to

13   rely on?

14     A      I really had no role in terms of, you know,

15   looking at documents, whether they were Bates stamped or

16   produced.  I requested documents.  I reviewed them, and

17   it didn't come up one way or the other.

18     Q      Let me ask you this:  You said you were handed

19   documents to review for your support.  Does your list of

20   documents considered include all the documents that you

21   were, quote, unquote, handed?

22     A      I think I may have received -- well, let

23   me -- I had access to the full relativity database.  So

24   to the extent of documents that I had in my possession,

25   they would be all, you know, over 10,000 or so documents.

1              My documents considered list does not include
2      every document that was -- that I had access to in the
3      relativity.  It's the documents that formed the basis of
4      my opinion.
5              Q     How did you identify those documents?
6              A     Which documents?
7              Q     How did you identify the documents cited in
8      your report if you had access to the entire relativity
9      database?
10             A     So the starting point was the expense report
11     that Mr. de Sadeleer prepared of behalf of Mr. Berris and
12     submitted to the company.  I then went through the travel
13     related expenses on that expense report.  And I requested
14     supporting documentation to substantiate the business
15     purpose and the nature of those expenses.
16             And so a variety of supporting documents were
17     provided to me; being receipts, invoices, emails, chat
18     messages.  And those are the documents that form the
19     basis of my opinion and what's listed in my documents
20     considered list.
21             Q     Okay.  So you took the expense report,
22     identified expenses.  Sent that identification to counsel
23     and asked for support.  And then received documents
24     supporting the expense?
25             A     Right.  I identified expenses from that

1    expense report.  I asked for the supporting documentation

2    for those expenses -- the expenses related to business

3    travel.  And received the documents and information

4    responsive to my request.

5        Q    Were there any expenses for which you asked

6    for documentation where you didn't receive any?

7        A    There are some expenses listed on that expense

8    report that you will notice do not appear in my report.

9        Q    And are those expenses for which you did not

10   receive requested documentation?

11       A    So it's an interesting question.  There are

12   certain expenses that I did not feel that I had

13   sufficient documentation to substantiate the business

14   purpose of the expense by the time I issued my report.

15   And so for those expenses I did not include them in my

16   report.

17       Q    Okay.  So if I take the expense report dated

18   December 2020 through August 2021, and I compare the

19   travel expenses in that report to the travel expenses

20   listed in your report, any difference between the two

21   would be travel expenses for which you did not feel there

22   was sufficient documentation?

23       A    I would just qualify that and say I didn't

24   have sufficient documentation to meet my standards to

25   say, to establish one way or the other, whether there was

1    a business purpose by the time that I issued my report.

2         Q    Yeah, that's what I'm asking you, your

3    opinions in your expert report.

4              So if there is a difference between the

5    expense report submitted by Mr. Berris and the expenses

6    listed in your report, within the scope of your report as

7    it goes to travel expenses, the difference is because you

8    excluded those expenses because you didn't have

9    sufficient documentation for them, right?

10        A    That's right.  I wanted to take a conservative

11   approach in preparing my report.  So I felt that I didn't

12   have sufficient documentation to establish the business

13   purpose, I did not -- and by the time that I issued my

14   report, if I didn't have sufficient documentation by the

15   time I issued my report, I did not include it in my

16   report.

17        Q    Did you only include expenses in your report

18   that Berris included on one of those expense reports?

19        A    No.  I believe there are a few additional

20   expenses that were not on his expense report that I later

21   on got support for and included in my report.

22        Q    And how did you even identify those if they

23   weren't listed on an expense report?

24        A    Because as part of my work, I requested from

25   counsel essentially a narrative of all of the business

Page 41

1    travel that Mr. Berris took as, you know, in his role as

2    CEO of the company.  And through that interim process and

3    me requesting supporting documentation and asking

4    follow-up questions, there were additional expenses that

5    came to light.

6         Q    Okay.  So actually to make your report, you

7    started not only with an expense report but also with a

8    narrative of business expenses, right?

9         A    That's correct.

10        Q    Okay.  Why isn't that narrative of business

11   expenses listed on your documents considered?

12        A    It's the -- on my docs considered is the

13   declaration that Mr. Berris submitted along with mine on

14   September 30th.  And that is really the facts of his

15   business travel that he laid out that I relied upon.

16        Q    Oh, so the narrative of business travel is

17   Mr. Berris's declaration?

18        A    No, they're not the same documents.

19        Q    I'm sorry, maybe I misunderstood what you just

20   said.  I thought you said that the narrative of business

21   travel was his declaration.  Is that not what you said?

22        A    I -- they are two separate documents.  The

23   contents of the narrative were essentially the -- on a

24   factual basis the travel dates, where he stayed, if he

25   took a flight, what the flight was, the business purpose

Page 42

1    of his travel.  That was a separate document than his

2    declaration.  But the contact -- I guess the content of

3    the two documents are similar.

4        Q     But not the same?

5        A     Not verbatim, no.

6        Q     Okay.  So, I, as you know, am entitled to see

7    all the documents you relied on in forming your opinion.

8    So just to be totally clear, this narrative of business

9    expenses you used to come up with expenses in your report

10   is not listed on your documents considered, right?

11       A     That's right.

12       Q     And it's not -- hasn't been given to me in any

13   form, right?

14             MS. ROYTBLAT:  Object to form.

15       A     I don't know what's been provided.

16             MS. WIGGER:  Okay.  Well, Sophie, let me ask

17   you.  Do I have that document?

18             MS. ROYTBLAT:  I don't believe that document

19   has been produced.  But that's, you know, the expert

20   report product that --

21             MS. WIGGER:  That's expert work product?

22   BY MS. WIGGER:

23       Q     I'm sorry, did you make that document,

24   Mr. Imperiale?

25       A     No.

1          Q      Right.  Counsel gave it to you and you used

2     that to decide which expenses you were going to put in

3     your report, right?  Right?

4          A      You're asking me?  Sorry.

5          Q      Yes, I'm asking you.

6          A      Yes, counsel gave me that document.

7          Q      And then you used that document to add

8     additional expenses to your report, right?

9          A      That document identified additional travel.  I

10    asked for supporting documentation and follow-up

11    questions regarding that supporting travel.  And I found

12    additional expenses that weren't listed on the expense

13    report.

14         Q      So I think that means yes, right?

15                MS. ROYTBLAT:  Object to form.

16    BY MS. WIGGER:

17         Q      Did you answer?  I'm sorry.

18         A      No, I'm sorry.

19                Can you rephrase your question?

20         Q      Yes.

21                So I think the answer to my question is, yes,

22    you used the document counsel gave you to add expenses to

23    your report, right?

24         A      It was one document that I referenced.

25         Q      Okay.  One document you relied on to identify

Page 44

1    expenses that were not otherwise identified in an expense

2    report, right?

3         A    Right.

4         Q    Yeah, in other words, absent that document you

5    wouldn't have had any idea about these extra expenses,

6    right?

7         A    I mean, I don't know that that's true.  I was

8    getting supporting invoices and receipts and emails.  So

9    there may have been other ways to identify it.

10        Q    Do you know there was another way or are you

11   just guessing maybe there might have been?

12             MS. ROYTBLAT:  Object to form.

13        A    No, I would say that the narratives were

14   certainly helpful in identifying expenses.

15   BY MS. WIGGER:

16        Q    Helpful or necessary?

17             MS. ROYTBLAT:  Object to form.

18        A    The narratives were how I identified the other

19   expenses.

20   BY MS. WIGGER:

21        Q    Right.

22             Now, let me ask you this:  You understand that

23   the expenses reports, that also weren't listed in your

24   report, were submitted to de Tomaso, right?

25        A    It's my understanding that that's the case

Page 45

1    based on conversation with counsel.

2              Q      Right.

3                     So if there are expenses that you put in your

4    report that weren't in those expense reports that means

5    that they probably weren't submitted to de Tomaso, right?

6              A      I have no knowledge.

7              Q      Right.

8                     You have no evidence that those expenses were

9    submitted to de Tomaso, right?

10             A      I wouldn't agree with that.  It's been based

11   on conversations with counsel.  I understand that these

12   expense reports were -- the expenses on these expense

13   reports were submitted to de Tomaso.  And that Mr. Berris

14   received reimbursement for those expenses.

15             Q      Yeah, no.  Again, listen to my question.

16                    I'm not asking you about the expenses on the

17   expenses report.  I'm asking you about the expenses not

18   on the expense report that you identified in your report

19   based on your narrative from counsel.  You have no

20   evidence de Tomaso knew about those at all, right?

21             A      I can't speak to what de Tomaso knew.

22             Q      I'm asking you if you have evidence that

23   de Tomaso knew.  You don't, right?

24             A      I don't have evidence one way or the other.

25             Q      Right.

1            And of course if expenses aren't actually

2     submitted to a company, they can't be valid business

3     expenses, right?

4        A     No, I would not agree with that.

5        Q     All right.  So you think that there are valid

6     business expenses if they're just never submitted to a

7     company?

8        A     Well, I don't know that I agree with your

9     foundation.  I don't know one way or the other that they

10    were submitted to the company or not.

11       Q     I am not asking you that.  Again, please try

12    to listen to my questions.

13            I'm asking you about business expenses.  You

14    cannot have a valid expense that is never submitted,

15    right?

16            MS. ROYTBLAT:  Object to form.

17       A     It depends on what the company's expense

18    policy says.  There's no reason why I would agree with

19    that.

20    BY MS. WIGGER:

21       Q     Okay.  So you think that Berris could incur

22    valid business expenses that he never ever showed to

23    de Tomaso and yet is entitled to be paid for?  That's

24    your opinion?

25       A     I'm not opining on what he's eligible to be

Page 47

1    paid for or whether he submitted it for expenses.  I'm

2    saying that if he, in his role as CEO of the company, was

3    meeting with clients and incurred business expenses for a

4    hotel and airfare in furtherance of his job duties, that

5    that in fact would be a valid business expense under the

6    guidelines issued by the IRS and FASB.

7         Q    Let me try this.

8         A    That's my opinion.

9         Q    In order to have a valid claim of that

10   business expense -- in other words, in order to be

11   validly paid for that business expense, he would be

12   required to actually submit it to the company, right?

13             MS. ROYTBLAT:  Object to form.

14        A    I don't know what the company's expense policy

15   is.  I don't know what --

16   BY MS. WIGGER:

17        Q    I am not asking you --

18        A    I don't know their --

19        Q    Hold on.

20        A    I don't know the process.

21             THE REPORTER:  I need you guys to slow down a

22   little bit.

23             MS. WIGGER:  I'm sorry.

24   BY MS. WIGGER:

25        Q    I'm not asking you about the company's expense

Page 48

```
 1    policy.  I'm asking you about your opinion as an expert

 2    witness.  And I don't think this is a difficult question.

 3    If you don't submit a business expense, you're not

 4    entitled to be paid for it, right?

 5              MS. ROYTBLAT:  Object to form.

 6        A    I'm not opining --

 7    BY MS. WIGGER:

 8        Q    Yes or no.

 9        A    -- I'm not opining on the process.  You're

10    asking me to opine on the process.  I'm saying that as

11    the CEO of the company he incurred business expenses.

12        Q    Okay.  So you're refusing --

13        A    I evaluated -- no, I'm not refusing.

14              I evaluated the business expenses that he

15    incurred as CEO of the company.  And my opinion is that,

16    based on the guidance of FASB and the IRS, that these

17    were reasonable business expenses.

18        Q    So you're refusing to answer my question as to

19    whether you would have to submit an expense in order to

20    be validly paid for it?

21        A    That depends on the process set forth by the

22    company in their expense report.  I'm not opining one way

23    or the other --

24        Q    Let me ask you this --

25        A    -- as to whether -- uh-huh.
```

Page 49

1              MS. ROYTBLAT:  Hannah, could you just let the

2       witness finish, please?

3       BY MS. WIGGER:

4          Q     Yeah, sorry.  I thought you were done.  Please

5       go ahead.

6          A     I'm just saying I'm not opining one way or the

7       other in terms of process, the timing when he would have

8       had to submit the expense.  I am just saying that he

9       incurred expenses for travel expenses in furtherance of

10      his job duties as CEO.  And that those expenses, under

11      the guidance issued by FASB and the IRS, are valid

12      business expenses.

13         Q     All right.  So your opinion is that de Tomaso

14      doesn't have a business expense policy, right?

15         A     It's based on the deposition testimony of

16      Ms. Majcher.  She was asked multiple times, you know, in

17      her capacity as the corporate representative of

18      de Tomaso, she was asked does de Tomaso have an expense

19      policy.  And she answered no.

20         Q     Okay.  So your opinion is that de Tomaso

21      doesn't have an expense policy, right?

22         A     That's a foundation of my report, yes.

23         Q     Right.  And so then instead of applying an

24      expense policy, you applied the FASB and IRS standards,

25      right?

1        A      That's right.

2        Q      Okay.  Now, you would, of course, agree with

3   me that the IRS does have standards related to when you

4   submit expenses and the support you need when you submit

5   them, right?

6        A      They -- they talk about, you know, submitting

7   expenses on a reasonable basis.  But it really gets to

8   what is the -- those are very general standards.  It gets

9   to what is the policy specific to the company.  And the

10  company did not have a policy.

11       Q      Okay.  Because the company didn't have a

12  policy you applied the IRS standards, right?

13       A      I applied the IRS standards in the sense that

14  I was looking at what the IRS considers to been an

15  allowable business expense.

16       Q      Oh, so you didn't apply all the IRS standards.

17  You only applied some of the IRS standards; is that what

18  you're telling me?

19              MS. ROYTBLAT:  Object to form.

20       A      No.  No, that's not what I'm telling you.  I'm

21  telling that I relied on the IRS standards because the

22  company did not in fact have a business expense policy in

23  terms of what would be an allowable business expense.  So

24  I had to fall back on the IRS and FASB standards in order

25  to establish some sort of general framework.

Page 51

1    BY MS. WIGGER:

2          Q      Right.  That's all I'm asking.

3                 You applied the IRS standards to the facts of

4    this case, right?

5          A      Right.

6          Q      Right.

7                 Now, the second half of my question is, of

8    course, in applying the IRS standards to the facts of

9    this case, you applied all the IRS standards.  You didn't

10   just pick and choose standards you were going to apply,

11   right?

12         A      That's true.

13                MS. ROYTBLAT:  Object to form.

14   BY MS. WIGGER:

15         Q      What was your answer?

16         A      Yes, that's right.  I applied the IRS

17   standards to the facts in this case.

18         Q      You're aware, of course, that the IRS has

19   standards related to what a reasonable period of time in

20   which to submit an expense is, right?

21         A      I under -- they have best practices, yes.

22         Q      Oh, so now they're best practices and not

23   standards?

24                MS. ROYTBLAT:  Object to form.

25         A      I don't believe sitting here, unless you can

Page 52

1    put something in front of me, that there is a specific

2    time period that says that they have to submit an expense

3    by a certain date.  I think they use terms like this --

4    you know, this is what you should do or reasonable

5    periods of time.  But they do not say that if you don't

6    submit an expense report within a specific amount of days

7    then it is disallowed as an expense.  I do not think that

8    that is in the policy.

9    BY MS. WIGGER:

10        Q     Okay.

11        A     Unless you can point it to me.

12        Q     But you agree that they do set forth a

13   reasonable period of time in which to submit an expense,

14   right?

15        A     Can you put something in front of me?

16        Q     Yeah, sure.  Let's introduce Exhibit 3.

17              Go ahead and open Exhibit 3.  Tell me once you

18   have it open.  Are you with me?

19              (Exhibit 3 marked for identification.)

20        A     It's loading.  Just bear with me.

21              I have the standard in front of me too if you

22   just want to point me to the page.

23        Q     Let's make sure we're looking at the same

24   page.  I don't know what you have in front of you.

25              Is it open?

Page 53

1      A      Just opened, yep.

2      Q      Okay.  This is publication 535, business

3    expenses for use in preparing 2021 returns, right?

4      A      Yep.

5      Q      This is one of the IRS standards you cite in

6    your report, right?

7      A      That's right.

8      Q      This is the framework you say you applied to

9    the facts of this case, right?

10     A      That's right.

11     Q      All right.  Turn to page 45, 44 or 45.

12            Are you with me on page 45?

13     A      Just one second.  I want to have it up on the

14   computer as well.

15            Okay.

16     Q      All right.  I'm looking at a reasonable period

17   of time on page 45.  Do you see that?  Left-hand column,

18   top of the page.  Second bolded line.

19     A      Yep.

20     Q      You with me?

21     A      I am.

22     Q      All right.  Question one, the IRS does give

23   guidelines related to what a reasonable period of time

24   would be for submitting an expense report, right?

25     A      Let me just take a look at this a little bit

Page 54

1    closer.  So this is under what is called an accountable

2    plan as opposed to a non-accountable plan.

3              So I think the first question that I would

4    have is was de Tomaso's expense policy an accountable

5    plan or a non-accountable plan.  And until we know that

6    answer, I don't even know if this reasonable period of

7    time standard applies.

8         Q    Okay.  Ms. --

9         A    Yeah.

10        Q    Okay.  I understand that your opinion is that

11   de Tomaso didn't have an expense policy.  In your report

12   you say as a result of that, I applied other standards.

13   I'm trying to ask you about the standards you applied.

14   Okay.

15             So my question is:  You would agree with me,

16   consistent with these standards, that employees need to

17   submit expenses within a reasonable period of time,

18   right, under the IRS standards?

19             I'm not asking you for a specific date now.

20   I'm just saying do you agree with me, yes or no, that

21   employees need to submit expenses within a reasonable

22   period of time?

23             MS. ROYTBLAT:  Object to form.

24        A    And I'm telling you I don't even know if this

25   standard applies.

1    BY MS. WIGGER:

2         Q      Okay.

3         A      This applies to something --

4                MS. ROYTBLAT:  Hey, Hannah, please let the

5    witness finish.

6         A      This applies to something that's -- that's

7    referred to as an accountable plan.  So I think -- you

8    know, just the premise needs to be set.  Does this even

9    apply to the situation.  You're questioning whether --

10   why didn't I apply the standard.  I don't even know if

11   this is an applicable standard.  Right.

12               And then it says -- in goes -- just in terms

13   of the section that you were -- that you're referring to,

14   a reasonable period of time depends on the facts and

15   circumstances.  So what are the facts and circumstances?

16   It says generally.  I don't see -- I mean, this thing, it

17   goes on to say, you know, general guidelines.  But this

18   is not a specific standard.  This is very vague to me.

19               So, no, I didn't apply this standard.  And I

20   wouldn't apply it to my report.

21   BY MS. WIGGER:

22        Q      Are we done?

23        A      Yep.

24        Q      Okay.  My question:  Do employees need to

25   submit expenses within a reasonable period of time in

Page 56

1    your opinion?

2           A     It depends on the expense policy.

3           Q     As a standard in the industry, do employees

4    need to submit expenses in a reasonable period of time?

5                 MS. ROYTBLAT:  Object to form.

6           A     I don't know.  It depends on the specific

7    company.

8    BY MS. WIGGER:

9           Q     Okay.  So --

10          A     I'm reading here that if this is an

11   accountable plan that there is generally a time period.

12   But I don't see any specifics.

13          Q     Please set aside this document.

14          A     Okay.

15          Q     I'll note the document.

16                Is it your testimony that employees only have

17   to submit expenses within a reasonable period of time if

18   their expense policy says they have to?

19          A     I think you need to follow the expense policy.

20          Q     Not my question.

21          A     If the -- go ahead.

22          Q     No, go ahead.

23          A     Please clarify your question then.

24          Q     Is it your testimony that employees only have

25   to submit expenses within a reasonable period of time if

1    their expense policy says that?

2        A    I think that it is up to the company in terms

3    of what their practices are for submitting the time

4    period for submitting expenses.  I really can't speak to

5    what a hypothetical company in general would impose on

6    their employees.

7              I mean, I know at Kroll we have certain time

8    restraints.  I'm sure other companies have different time

9    restraints.  I don't know what de Tomaso would have had.

10   And this, you know, guidance from the -- from the IRS

11   that you put in front of me, I'm not even sure applies to

12   this standard.  But it seems very general.

13       Q    Okay.  So beyond what is written in an expense

14   policy, you have no opinion on whether there is any

15   industry standard of whether employees need to submit

16   expenses in a reasonable period of time?

17             MS. ROYTBLAT:  Object to form.

18       A    I think it is company specific.  And if the

19   company wants their employees to submit their expenses

20   within a certain period of day -- a certain amount of

21   time then they should have a policy that sets forth that

22   requirement.

23   BY MS. WIGGER:

24       Q    And beyond that --

25       A    I'm not aware of --

Page 58

1      Q      Oh, I thought you were done.  Sorry, keep

2    going.

3      A      No, go ahead.

4             Beyond that I am not aware of a specific, you

5    know, industry policy that sets forth a specific number

6    of days, for example, that an employee has to file their

7    expense report.

8      Q      Is there an industry standard that an employee

9    must submit expenses within a reasonable period of time?

10            MS. ROYTBLAT:  Object to form.

11     A      Well, noting that the one that's in front of

12   me, that you put in front me, but I'm not sure applies to

13   this situation.

14   BY MS. WIGGER:

15     Q      Okay.  We've put that document aside.  Okay.

16   We've put the --

17     A      So other than that --

18     Q      We put the IRS report aside and your report

19   aside.

20            So listen to my question without that in front

21   of you.  Okay.  Is there an industry standard that an

22   employee must submit an expense report within a

23   reasonable period of time?

24     A      An industry standard --

25     Q      Yes or no.

1      A      An industry standard, sitting here right now I

2   can't think of any.

3      Q      Okay.  So your testimony is that there is no

4   industry standard that an employee must submit an expense

5   report in a reasonable period of time?

6           MS. ROYTBLAT:  Object to form, asked and

7   answered.

8      A      There's nothing that I can think of right now

9   that would establish an industry standard that a person

10  would have to submit an expense report within a specific

11  number of days.

12  BY MS. WIGGER:

13     Q      Not my question.  Please listen to my

14  question.  I'm not asking you for a specific number of

15  days.

16     A      Uh-huh.

17     Q      I am asking about a reasonable period of time.

18  And I just want to make sure this testimony is clear.

19  Okay.  So I'm going to re-ask my question.

20           Your testimony is that there is no industry

21  standard that an employee must submit an expense report

22  in a reasonable period of time?

23           MS. ROYTBLAT:  Object to form.

24     A      And you are saying put aside the

25  publication 535?

1    BY MS. WIGGER:

2        Q    Well, if that's the industry standard, then

3    please.  I'm just asking you -- you're an expert.  I am

4    asking you as a purported expert about industry standards

5    related to the themes mentioned in your report.

6        A    I would say that the publication 535 applies a

7    general guidance that is applicable in certain

8    circumstances if you have something called an accountable

9    plan.

10       Q    What is the difference between general

11   guidance and an industry standard?

12       A    Well, I'm just reading it.  A reasonable

13   period of time depends on the facts and circumstances.

14   So that doesn't sound to me to be a standard.  That seems

15   to -- a standard would be something that is more set in

16   stone.  A reasonable period of time depends on the facts

17   and circumstances.

18       Q    Mr. Imperiale, I don't know how to be clear

19   about this.  Please turn the computer around or somehow

20   make it so you can't see that document.  Okay?

21            I'm not asking you to read me the document.

22   Okay.  I am asking you, as an expert with knowledge of

23   this field, not to read me the standard cited in your

24   report, but to tell me based on your expertise whether it

25   is industry standard for a person to submit an expense

Page 61

```
 1    report in a reasonable period of time, yes or no?
 2                MS. ROYTBLAT:  Object to form.
 3         A     I am not aware of an industry standard that
 4    says that.  But if you want to put one in front of me,
 5    I'm happy to take a look.
 6    BY MS. WIGGER:
 7         Q     Okay.  So your testimony is that absent an
 8    expense policy, a person could submit expenses whenever
 9    they wanted?
10                MS. ROYTBLAT:  Object to form.
11         A     It really is up to the specific company.
12    BY MS. WIGGER:
13         Q     So that's a --
14         A     I can't speak for what -- right.  I can't
15    speak for what de Tomaso requires of their employees and
16    contractors.
17                So, yes, if you don't have a specific expense
18    policy that sets forth the amount of time until you have
19    to submit an expense report then there's nothing --
20    there's no foundation.  I can't impose my own standard on
21    what de Tomaso -- what de Tomaso wanted.  If de Tomaso
22    wanted their expense reports to be submitted within,
23    let's say, 30 days then that's why they should have had
24    an expense policy setting that forth.
25                But, you know, we're sitting here now going
```

Page 62

```
 1   back in time and saying, you know, whether or not, you
 2   know, Mr. Berris should have submitted his expenses
 3   faster.
 4             And, again, that's why you have an expense
 5   policy.
 6        Q    Okay.  So your opinion is that because
 7   de Tomaso did not have an expense policy setting forth a
 8   number of days in which expenses had to be submitted, it
 9   was okay to submit them whenever?
10             MS. ROYTBLAT:  Object to form.
11        A    Really outside of the scope of my opinion.  I
12   would also note that.
13             My opinion does not relate to how many days he
14   had to submit his expenses.  I don't know what de Tomaso
15   wanted.  They didn't have a policy and it's not an issue
16   I cover in my report.
17   BY MS. WIGGER:
18        Q    Okay.  So you're not going to answer the
19   question?
20             MS. ROYTBLAT:  Object to form.
21        A    I don't have an opinion -- I don't have an
22   opinion one way or the other.  I don't know.  I can't
23   impose what I think personally on what de Tomaso wanted
24   at the time back in 2021.  I don't know.
25             I don't have any relevant standards either
```

Page 63

1    that I know of, sitting here, that I think would apply.

2    BY MS. WIGGER:

3        Q       We've got that.

4                All right.  I want to talk to you about how

5    you identified the scope of your report.

6                MS. ROYTBLAT:  Hannah, could we take a break

7    maybe?  It's been about over an hour now.

8                MS. WIGGER:  Yeah, let me finish this little

9    section, if that's okay, and then we can.

10               MS. ROYTBLAT:  Okay.  Sounds good.

11   BY MS. WIGGER:

12       Q       All right.  I want to talk to you about how

13   you identified the scope of your report.

14               So you state your opinion as limited to travel

15   expenses incurred from December 2020 through August 2021,

16   right?

17       A       Yep.

18       Q       You title that the relevant time period,

19   right?

20       A       That's right.

21       Q       How did you identify the relevant time period?

22       A       It's based on conversation with counsel.  I

23   understand that those -- that time period was the time

24   period that Mr. Berris submitted expenses to de Tomaso

25   and was reimbursed for those expenses on his expense

1  report.

2       Q     So just to be clear, all the expenses you

3  identify in your report, you agree that he was reimbursed

4  for those expenses, right?

5       A     It's based on conversations with counsel.

6  That's my understanding.

7       Q     So your opinion is not that he should be paid

8  X-amount of money, right?

9       A     That's -- that's not what my opinion covers.

10  My opinion covers whether they were legitimate valid

11  business expenses in accordance with the IRS and FASB

12  standards.

13       Q     That's fine.  Just try to answer my question

14  so we can move this along.  Okay?  Part of what I'm

15  trying to do is understand the scope of your opinion.

16           And so just to be clear, your opinion is not

17  that he should be paid $49,884.29, right?

18       A     That's right.  I'm just saying that he

19  incurred that amount in business expenses.

20       Q     Okay.  And your opinion is limited to travel

21  expenses, right?

22       A     That's right.

23       Q     But you know that Berris submitted other type

24  of expense as well, right?

25       A     I do.

Page 65

1      Q      But you have no opinion regarding any
2   non-travel related expenses, right?
3      A      That's right.  That's out of the scope of my
4   report.
5      Q      Okay.  So you have no opinion related to
6   entertainment expenses, right?
7      A      Out of the scope of my report.
8      Q      Or meal or grocery expenses, right?
9      A      That's correct.
10     Q      Or other corporate expenses, right?
11     A      Correct.  That's out of the scope.
12     Q      All right.  Just a couple more.  Then we'll
13  take a break.
14            In your report you state -- this is
15  paragraph 7, footnote 2, if you want to look at it.
16            You state:  I understand from counsel that
17  Mr. Berris incurred other expenses in the course of his
18  work for the company during and after this period, and
19  that such expenses were not reimbursed by the company.
20            Do you see that?
21     A      I do.
22     Q      Okay.  You didn't analyze those expenses,
23  right?
24     A      That's right.
25     Q      So you have no opinion related to those

Page 66

1    expenses if they exist, right?

2         A    I have no opinion one way or the other about

3    expenses that are not listed in my report.

4         Q    All right.  Look at footnote 10.

5              You state:  Further, I understand, based on my

6    review of the documents and through discussions with

7    counsel, that certain entertainment expenses were

8    incurred for networking with prospective clients and

9    business partners, right?

10        A    Yes.

11        Q    Now, you don't identify those specific

12   expenses, right?

13        A    Right.

14        Q    And you don't have any opinion related to

15   them, right?

16        A    No.

17        Q    Just to make sure the double negative works

18   out.

19        A    Oh, sorry.

20        Q    It's correct that you don't have the opinion,

21   right?

22        A    That's correct.  I don't have an opinion.

23             MS. WIGGER:  All right.  This is a good time

24   for a break.  Let's do 10 minutes and come back at 11:25,

25   if that works for everyone.

Page 67

1              MS. ROYTBLAT:  Yep, that works.

2              MS. WIGGER:  Thanks.

3              THE VIDEOGRAPHER:  We're now off the record at

4    11:14 AM.

5              (Recess taken from 11:14 AM to 11:24 AM.)

6              THE VIDEOGRAPHER:  We're now back on the

7    record at 11:24 AM.

8              You may proceed.

9    BY MS. WIGGER:

10        Q    All right, Mr. Imperiale, I'm looking at

11   paragraph 8 of your report if you would like to reference

12   that.

13             In paragraph 8 you say:  Based on my analysis,

14   I have determined that Mr. Berris incurred at least

15   $49,884.29 in travel related business expenses during the

16   relevant time period.

17             Do you see that?

18        A    I do.

19        Q    Okay.  So that is your only opinion in this

20   case, right?

21             MS. ROYTBLAT:  Object to form.

22        A    I believe my opinion is that these were valid

23   business expenses in accordance with the IRS and FASB

24   guidelines.

25   BY MS. WIGGER:

1        Q     All right.  So your opinion is that those

2    expenses were validly incurred, right?

3        A     That they were valid business expenses in

4    accordance with the IRS and FASB guidelines.

5        Q     Yes, that they were validly incurred.  But you

6    don't have an opinion about whether, for example, they

7    were validly submitted to de Tomaso, right?

8              MS. ROYTBLAT:  Object to form.

9        A     My understanding to the last question is that

10   the expense report that was prepared by Mr. de Sadeleer

11   on behalf of Mr. Berris was submitted to the company.

12   And that Mr. Berris was reimbursed for those expenses.

13   BY MS. WIGGER:

14       Q     Okay.  Not my question.

15             My questions is:  Is it within the scope of

16   your report, is it your opinion that these expenses were

17   validly submitted to de Tomaso?

18             MS. ROYTBLAT:  Object to form.

19       A     It's outside the scope of my report.

20   BY MS. WIGGER:

21       Q     Okay.  That's fine.

22             So you don't have an opinion about whether

23   these expenses were validly submitted, right?

24       A     Right.  That's not covered in my report.

25       Q     Right.  That's fine.  I'm just making sure I

Page 69

1   understand the scope of your report.

2              And you don't have an opinion about whether

3   these expenses were validly paid, right?

4       A    I'm not sure what you mean validly paid.  What

5   does that mean?

6       Q    You don't have an opinion about whether these

7   expenses were properly paid to Berris, right?

8              MS. ROYTBLAT:  Object to form.

9       A    Again, I'm not sure what you mean by properly

10  paid.  My understanding, based on conversations I had

11  with counsel, is that these expenses were submitted and

12  that he was reimbursed for those expenses.

13  BY MS. WIGGER:

14      Q    Okay.

15      A    I don't understand when you say properly paid

16  or validly paid.

17      Q    Okay.  You say it is your understanding, based

18  on conversations with counsel, that these expenses were

19  paid, right?

20      A    Yes.

21      Q    Okay.  But you don't actually know that.  As

22  in you, John Imperiale, did not actually go look into

23  that, right?

24              MS. ROYTBLAT:  Object to form.

25      A    It was represented to me that they were paid.

1  But I didn't look at his like personal bank account.

2  BY MS. WIGGER:

3      Q    Right.

4            It is not part of your report to see if he was

5  or was not paid for any given expense, right?

6      A    In terms of actually verifying that the money

7  was deposited in his account, that's right.  I did not

8  verify that.  It's not part of my report.  It's just been

9  represented to me that he was reimbursed.

10     Q    That's fine.  I'm just asking about your

11 personal knowledge and the scope of your report.

12           Okay.  So it's outside the scope of your

13 report to determine whether he was specifically paid for

14 any given expense, right?

15     A    Right.  It's just that it was represented to

16 me that he was reimbursed.

17     Q    I got --

18           MS. ROYTBLAT:  Hannah, let the witness finish.

19     A    If you're asking me did I do a specific

20 investigation into his bank accounts to verify and do

21 like a cash tracing analysis to make sure that he was

22 paid for those expenses and it hit his bank account in a

23 timely -- I didn't do that.  Right.  I'm just relying on

24 what I -- you know, conversations I had with counsel.

25 They told me that those expenses were reimbursed.

1    BY MS. WIGGER:

2        Q    Okay.  Setting aside what counsel told you, it

3    is not your opinion that any given expense was paid or

4    not paid, right?  That is outside the scope of your

5    report?

6        A    Right.  My opinion relies on just what was

7    represented to me by counsel.  But I did not perform any

8    additional analysis to verify that he was paid.

9        Q    All right.  It is also beyond the scope of

10   your report, if I understand this correctly, to say

11   whether or not he was validly paid for any expense,

12   right?

13            MS. ROYTBLAT:  Object -- object to form.

14       A    I don't know what that term means.  I'm not

15   familiar with the term validly paid.

16   BY MS. WIGGER:

17       Q    Okay.  So to be paid for a business expense

18   the expense would have to be a business expense, right?

19       A    It would have to be business expense, yeah.

20       Q    Then it would have to be submitted to the

21   company, right?

22       A    I am not sure I agree with that.  My opinion

23   is based on whether he incurred business expenses in

24   accordance with the guidelines.  I don't go into when or

25   how or the mechanics of how he should have gone about

Page 72

1    submitting them, the timeframe.  That is out of the scope

2    of my report.

3         Q    I think that was all I was asking.

4         A    Okay.

5         Q    So, I mean, again, in order to be paid for an

6    expense the company would have to see the expense, right?

7         A    They would have to be aware of the expense.

8         Q    Okay.  That's all I'm asking.

9              So it would have to be a business expense that

10   you actually submitted to the company, right?

11        A    In order to be reimbursed by the company for

12   an expense, the company would have to be aware that the

13   expense, you know, existed.

14        Q    Okay.  And it's just beyond the scope of your

15   report to go into whether any of the expenses were even

16   submitted to de Tomaso, right?

17        A    No.  It was represented to me by counsel that

18   the expenses were submitted to de Tomaso.

19        Q    Okay.  And that is within the scope of your

20   report?

21             MS. ROYTBLAT:  Object to form.

22        A    I say in my report that I -- it goes to the

23   relevant time period because it's my understanding from

24   counsel -- I mean, let me just -- I'll read to you what I

25   said.

Page 73

1    BY MS. WIGGER:

2         Q    No, that's okay.  I don't need you to read me

3    your report.  Thank you.  Okay.  I think we're probably

4    on the same page here.

5              You've said it was represented to me by

6    counsel that the expenses were submitted to de Tomaso.

7    For that statement you're relying solely on the

8    statements of Berris's counsel, right?

9         A    That's right.

10        Q    Okay.  That's all.

11             Now, this number that you have, this

12   $49,884.29, to get that number you added the numbers on

13   the receipts that Berris gave you, right?

14        A    Yeah, I believe that's correct.

15        Q    Okay.  So you did some math, right?

16        A    I verified that the expenses existed.  So I

17   looked at the receipts to verify the amounts, yes.

18        Q    Okay.  Did you verify that every expense

19   existed for the expenses in your report?

20        A    Yes.

21        Q    Okay.  Now, you would agree with me, and I'm

22   not talking about a specific receipt here, I'm asking

23   about your knowledge in the industry.  Okay.  You would

24   agree with me that not every flight or hotel is a

25   business expense, right?

Page 74

1        A      Are you referring to could there be vacations

2    and you take a flight for that?  Sure, you can take a

3    vacation.

4        Q      Exactly.

5               So a flight for a personal trip would not be a

6    business expense, right?

7        A      That's right.

8        Q      So to determine that the receipts were

9    business expenses, you relied on the representations of

10   the plaintiff, Ryan Berris, right?

11       A      Not entirely.  I received supporting

12   documentation.  In addition to the declaration that

13   Mr. Berris submitted, I received chat messages and emails

14   that further supported what Mr. Berris said in his

15   declaration.  It wasn't simply just taking the facts that

16   were in his declaration and applying it to my report.

17   That was just -- that was just one of many of the

18   supporting documentations that I looked at to

19   substantiate the business purpose of the expense.

20       Q      We're going to talk about those in greater

21   detail in a moment.  But you would agree that not

22   every -- not everything listed in Mr. Berris' declaration

23   had additional supporting evidence, right?

24               MS. ROYTBLAT:  Object to form.

25       A      Can you point me to something specific?

Page 75

1    BY MS. WIGGER:

2         Q    Sure.  We'll go through it in a second.

3              I believe you said earlier that there were

4    expenses that Berris gave you that you did not include in

5    your report, right?

6         A    Like I said, if there were expenses listed on

7    the expense report that I did not get sufficient

8    supporting documentation for me to substantiate that it

9    was a business expense in accordance with the IRS and

10   FASB guidelines by the time that I issued my report on

11   September 30th.

12        Q    When you say in accordance with the IRS and

13   FASB guidelines, what do you mean?

14        A    So, you know, typically when you're doing an

15   exercise like this and you're reviewing business

16   expenses, the first source you go to is the company's own

17   expense policy.  In this case here, you know, the absence

18   of an expense policy means that you then have to go to,

19   you know, other industry sources to establish some sort

20   of framework in order to evaluate the expenses and

21   determine whether they're allowable business expenses.

22              So that's why I went to the IRS and FASB

23   guidelines to provide some sort of general industry

24   framework to evaluate the expenses.  And my conclusion is

25   that based on the expenses that I reviewed, the

Page 76

1    supporting documentation, and based on the guidance

2    provided by the IRS and FASB, that the expenses listed in

3    my report are valid business expenses.

4         Q    Which part of the IRS guidelines that you

5    cited did you apply to this case?

6         A    Sure.

7              So the IRS standard on the 535 is page 3.  And

8    then specifically to the travel, the travel expenses, if

9    you go to IRS publication 463, go to page 3 through about

10   5.

11        Q    Are you done?

12        A    Yes.

13        Q    Okay.  So you applied page 3 of the

14   publication 535 and pages 3 through 5 of publication 463;

15   is that accurate?

16        A    I believe that's accurate.  Sitting here right

17   now, I believe so.

18        Q    Did you apply the rest of the document?

19        A    Well, I reviewed the rest of the document.

20   But I didn't use it to form my opinion.

21        Q    So is that a no --

22        A    But I'm familiar with -- well, I think, you

23   know, I'm familiar with both of these IRS standards.  I

24   reviewed them again.  I think that they go into a lot of

25   areas that are not really relevant or applicable here.

1    I'm just looking at what is relevant for the business

2    expenses, specifically the travel expenses.  So relevant

3    for my opinion is the pages I mentioned.

4         Q    How did you decide which portions were

5    relevant for your opinion?

6         A    Well, I think if you -- if you continue to go

7    through the standards.  So, for example, if we're at 535,

8    and just flipping through, you know, I just -- I opened

9    to page 35 just randomly.  And it talks about pollution

10   control facilities, geological and geophysical costs,

11   mineral property, depletion, you know, et cetera, natural

12   gas wells.

13            A lot of the standard here is not relevant to

14   the facts and issues in this case.  So I just -- as

15   somebody who is a CPA, and I'm a forensic accountant, and

16   I review business expenses, expense reports, financial

17   statements, I have a familiarity with these standards.

18   And I felt that this was the relevant piece.

19        Q    I'm introducing Ryan Berris's declaration as

20   Exhibit 4.  You should be able to see it if you refresh.

21   Let me know when that's open in front of you.

22            (Exhibit 4 marked for identification.)

23        A    Okay.

24        Q    Is it open in front of you?

25        A    It is.

Page 78

```
 1        Q       This is the declaration of Ryan Berris, right?

 2        A       It is.

 3        Q       Signed on September 30, right?

 4        A       Yep.

 5        Q       The same day your report was due, right?

 6        A       That's right.

 7        Q       Did you see the signed version of this before

 8   you submitted your report?

 9        A       Yes.

10        Q       When did you receive it?

11        A       So I received essentially a draft of this

12   declaration a few days -- I don't recall specifically,

13   but a few days before I submitted my report.  And then I

14   saw the final version the day I submitted my report.  But

15   earlier in the day just to verify that nothing changed.

16        Q       Did anything change?

17        A       No.

18        Q       So were there any changes between any draft

19   that you saw and the final copy?

20        A       Not drafts that I saw.

21        Q       All right.  You copy and pasted large portions

22   of this declaration into your report, right?

23                MS. ROYTBLAT:  Object to form.

24        A       No, I didn't copy -- what do you -- I mean,

25   from the factual dates, the dates are what the dates are.
```

1    BY MS. WIGGER:

2         Q    So your testimony is you did not copy and

3    paste large sections of this into your report?

4              MS. ROYTBLAT:  Object to form.

5         A    Well, I'm not sure what you mean by copy and

6    paste.  So, for example, you know -- I mean, can you

7    point me to an example?

8    BY MS. WIGGER:

9         Q    I'm trying to ask a very simple yes or no

10   question.  Did you copy and paste this into your report

11   or not?

12             MS. ROYTBLAT:  Object to form.

13        A    No.  But I relied on the facts, the dates.  So

14   there may be similar content because it's literally from

15   this date to this date I traveled to this city.  So to

16   the extent that there may be some reiteration, there may

17   be.  But it wasn't as if I did a, you know, control C,

18   control P and put it into my report.

19   BY MS. WIGGER:

20        Q    All right.  Let's take a look.  Let's look at

21   paragraph 1 of Berris's declaration.  It says:  On or

22   about December 24th, 2020, I had a meeting with Stanley,

23   Cohen, the de Tomaso customer, in West Hartford,

24   Connecticut, right?

25        A    Yep.  Yes.

Page 80

```
 1        Q      Let's look at paragraph 21 of your report.
 2               You say:  On December 24th, 2020, Mr. Berris
 3    had a meeting with Stanley Cohen, a de Tomaso client, in
 4    West Hartford Connecticut, right?
 5        A      Yes.
 6        Q      Okay.  So that's basically the same, right?
 7               MS. ROYTBLAT:  Object to form.
 8        A      I mean, again, to the extent that it has the
 9    same date and the same location, geographically that he
10    met, and it says Mr. Cohen, yeah, it has the same
11    content.
12    BY MS. WIGGER:
13        Q      All right.  You have no personal knowledge of
14    where Mr. Cohen lives, right?
15        A      Where Mr. Cohen lives?
16        Q      Yeah.
17        A      No.
18        Q      Right.  So you're taking Berris's word that he
19    lives in West Hartford, Connecticut, right?
20        A      No, I'm not.  I'm saying that he had a meeting
21    with Stanley Cohen in West Hartford, Connecticut.
22        Q      Right.
23        A      You're asking me do I know where he lives.  I
24    don't know where he lives.
25        Q      Okay.  You're taking his word that he met with
```

1   Stanley Cohen in West Hartford, Connecticut, right?

2        A    Just bear with me one second.  I want to look

3   something up.

4             So I also was looking at the chat message

5   between Mr. Berris and Mr. Cohen.  And there's a chat

6   message that says, you know, we can -- from Stanley

7   Cohen, we can meet whenever you wish.  Please give me a

8   day, time, and place.  Very exciting.  Thanks.

9             Mr. Berris follows up and says:  My schedule

10  is quite full through Wednesday.  I can meet on Thursday

11  around midday.  If not, then Saturday.

12            Mr. Cohen says:  Thursday is good at noon.

13  Where?

14            Mr. Berris says:  Wherever you prefer.

15            And Mr. Cohen says:  Thursday, 12/24/2020,

16  noon, my office, 80 South Main Street, second floor.  Is

17  that okay?

18            And Mr. Berris says:  Perfect.  See you.

19            So it wasn't just the declaration I relied

20  upon.  It was also chat messages.  In certain other

21  circumstances it was emails.

22        Q    Are you done?

23        A    Yeah.

24        Q    Cool.

25            Going back to my question, you're relying on

Page 82

1    Berris, Berris's declaration, for the proposition that

2    they met in West Hartford, Connecticut, right?

3                    MS. ROYTBLAT:  Object to form.

4        A    It is one source that I am relying upon in

5    addition to verifying that the meeting took place on the

6    date he said based on that chat message.

7    BY MS. WIGGER:

8        Q    What other source says that they met in

9    West Hartford, Connecticut?

10       A    Just the declaration.

11       Q    Okay.  So you're relying on Mr. Berris's

12   declaration for the proposition they met in

13   West Hartford, Connecticut, right?

14       A    Yes.

15       Q    And that's important because the expense that

16   you're talking about is a hotel in West Hartford,

17   Connecticut, right?

18       A    Yes.

19       Q    So if they didn't meet in West Hartford,

20   Connecticut, the hotel in West Hartford, Connecticut

21   would not be a business expense related to that meeting,

22   right?

23       A    I mean, it would depend on where the meeting

24   took place.  You know, yes, I am relying on the

25   declaration.  So to the extent that the declaration is

Page 83

1    wrong, I do have a chat message that said that a meeting

2    took place.  But if the meeting did not take place

3    anywhere near West Hartford, Connecticut I would -- I

4    would have to re-review that expense.

5            I do know that he stated West Hartford,

6    Connecticut.  And the amount of the expense was $148.

7        Q    None of that was my question.

8            My question was just that you're relying on

9    Berris's declaration for the proposition that this

10   meeting -- this business expense took place in

11   West Hartford, Connecticut, right?

12       A    Yes.

13       Q    Okay.  Let's look at the fourth photograph of

14   Berris's declaration.  It says:  From about May 23rd,

15   2021 to about June 2nd, 2021, I and Mr. de Sadeleer

16   traveled to Detroit, Michigan to attend meetings with

17   de Tomaso's powertrain technical partner, Roush

18   Industries, and to conduct filming with Tangent Vector as

19   part of the Meet Isabelle Campaign.

20           Do you see that?

21       A    Yes.

22       Q    Okay.  Let's go to paragraph 24 of your

23   report.  You say:  From May 23rd, 2021 to June 2nd, 2021,

24   Mr. Berris and Mr. Sadeleer traveled to Detroit, Michigan

25   to attend meetings with de Tomaso's powertrain technical

Page 84

1   partner, Roush Industries, and to conduct filming with

2   Tangent Vector as part of the Meet Isabelle Campaign,

3   right?

4        A    Yes.

5        Q    Other than changing the names or pronouns,

6   those sentences are the same, right?

7        A    Yes.

8        Q    You don't have any independent knowledge that

9   Roush Industries is de Tomaso's powertrain technical

10  partner, right?

11       A    I've seen emails.  I believe they're cited.

12  But I have seen emails that they were a partner or a

13  vendor.

14       Q    Not my question.

15            My question was whether you have any

16  independent knowledge that Roush Industries was

17  de Tomaso's powertrain technical partner, specifically.

18            MS. ROYTBLAT:  Object to form.

19       A    Specifically I don't have my own independent

20  knowledge.  I'm relying on the declaration.

21  BY MS. WIGGER:

22       Q    Right.

23            What is the Meet Isabelle Campaign, to your

24  knowledge?

25       A    My understanding, that it involved a photo

Page 85

1    shoot.  It involved Ms. Jorda.  I don't have much more

2    independent understanding of the Meet Isabelle Campaign

3    beyond that.

4         Q    Again, you're relying on Mr. Berris's

5    declaration for the proposition that that was related to

6    de Tomaso's business, right?

7              MS. ROYTBLAT:  Object to form.

8         A    The Meet Isabelle Campaign was related to

9    de Tomaso's business?

10   BY MS. WIGGER:

11        Q    Yes.

12        A    Is that what you're asking me?  One moment.

13   Let me just look at the support for that.

14              So I have an email from Ryan Berris to Matthew

15   Hepburn at Roush dated May 16th, 2021.  And it

16   essentially provides an agenda of the activities, the

17   plan to visit and meet with Roush Industries.

18              That email then goes on to talk about filming.

19   So that email supports the declaration that they were out

20   there for those dates to meet Roush Industries.

21        Q    I'm sorry, what email relates to the Meet

22   Isabelle Campaign that you just referenced?  What's the

23   Bates number of that email?  What document are you

24   looking at right now?

25        A    I believe it is DT0000036027.

Page 86

1      Q     And your testimony is that is cited in support

2   of paragraph 24 of your report?

3      A     I'm sorry, I'm looking at the wrong paragraph.

4   I'm sorry, I misspoke.  That is not the Bates number.  It

5   is -- I don't have the Bates number on this particular

6   document.  But it is one of the Bates numbers in

7   footnote 23.

8      Q     Okay.  And your testimony is that one of the

9   documents in footnote 23 discusses the Meet Isabelle

10  Campaign?

11     A     It discusses or it's an agenda of the meeting

12  that Mr. Berris was having with Roush Industries on the

13  same dates.  So it kind of further supports what is in

14  the declaration.

15     Q     That is not my question.  My question, let me

16  just read it back to you, is that you're relying on

17  Mr. Berris's declaration for the proposition that the

18  Meet Isabelle Campaign was related to de Tomaso's

19  business, right?

20     A     I would agree with that.

21     Q     I'm just trying to understand the

22  support -- sorry, go ahead.

23     A     I don't have any other independent knowledge

24  of the Meet Isabelle Campaign.

25     Q     Which is totally fine.  I'm just trying to

Page 87

1    make sure I understand this.

2              So any expenses related to the Meet Isabelle

3    Campaign, you're relying on the predicate of Mr. Berris

4    telling you that that was a business expense, right?

5              MS. ROYTBLAT:  Object to form.

6        A    Right.  I am relying on the assumption that

7    the Meet Isabelle Campaign was in furtherance of

8    de Tomaso -- was a de Tomaso business event.

9    BY MS. WIGGER:

10       Q    Let's look at paragraph 5 of Berris's

11   declaration.  It says:  From about June 2nd, 2021 to

12   about June 7th, 2021, I and Mr. de Sadeleer stayed at the

13   Hyatt Regency, Greenwich Hotel in Greenwich, Connecticut

14   to attend meetings with de Tomaso dealer, Miller

15   Motorcars and to prepare for an upcoming trip to

16   California.

17             Do you see that?

18       A    I do.

19       Q    All right.  Let's look at paragraph 26 of your

20   report.  You say:  From June 2nd, 2021 to June 7, 2021,

21   Mr. Berris and Mr. de Sadeleer stayed at the Hyatt

22   Regency Greenwich Hotel in Greenwich, Connecticut in

23   order to attend meetings with Miller Motorcars and

24   prepare for an upcoming trip to California, right?

25       A    Yep.

Page 88

1      Q     Okay.  Again, that's lifted from the Berris's

2   declaration, right?

3              MS. ROYTBLAT:  Object to form.

4      A     Again, these are dates of travel, who he

5   traveled with, where he stayed, the city that he stayed

6   in, and the agenda.  So, yes, the facts are the same.

7   BY MS. WIGGER:

8      Q     The sentences are the same, right?

9      A     I mean, not verbatim.  But, again, the content

10   is very similar because you're dealing with dates,

11   locations, and an agenda.

12      Q     Your only support for that statement is the

13   declaration of Ryan Berris, right?

14              MS. ROYTBLAT:  Object to form.

15      A     Yes.

16   BY MS. WIGGER:

17      Q     So you have no verification for the

18   proposition that Mr. Berris and Mr. de Sadeleer were

19   attending meetings with Miller Motorcars, right?

20              MS. ROYTBLAT:  Object to form.

21      A     Bear with me one second.

22              Yeah, that is right.  I relied on the Berris

23   declaration to confirm that that meeting specifically

24   took place.

25   BY MS. WIGGER:

1      Q     And you have no verification for the

2   proposition that Mr. Berris and Mr. de Sadeleer were

3   preparing for an upcoming trip to California, right?

4            MS. ROYTBLAT:  Object to form.

5      A     That's right.  I -- I don't have any

6   independent knowledge of what they were doing.

7   BY MS. WIGGER:

8      Q     Right.

9            And your determination that expenses related

10  to that trip are business expenses is contingent on those

11  statements, right?

12           MS. ROYTBLAT:  Object to form.

13     A     In this instance, yes, it is -- it relies upon

14  the Berris declaration.

15  BY MS. WIGGER:

16     Q     Look at paragraph 6 of Mr. Berris's

17  declaration.

18     A     Okay.

19     Q     It's quite long.  There's a paragraph and then

20  parts A through P.  So I'm not going to bore you with

21  reading on to the record.

22           But do you see what I'm looking at?

23     A     Yes.

24     Q     All right.  This is a breakdown of a trip that

25  Mr. Berris allegedly took, right?

Page 90

1       A       It is.

2       Q       This is not the type of detail he provided for

3   other trips referenced in his declaration, right?

4       A       Well, I mean, I think for his other trips he

5   provided what the business purpose was for the trip.

6   This trip happened to be over a month long, so there is

7   more detail in terms of the agenda and the things he

8   accomplished.

9       Q       All right.  You reiterate his schedule in a

10  table in your report, right?

11      A       Yes.

12      Q       All right.  And, again, you're relying solely

13  on Mr. Berris's declaration for the veracity of many of

14  these statements, right?

15              MS. ROYTBLAT:  Object to form.

16      A       I am relying in part on the statement.  But,

17  again, for many of these I have supporting chat messages

18  and emails and other things to substantiate what

19  Mr. Berris said in his declaration.

20  BY MS. WIGGER:

21      Q       Very well.  Let's go through it.

22              So the expenses are from June 8th, 2021 to

23  July 10th, 2021.  So for almost a month, right?  A little

24  over a month, actually, right?  Right?

25      A       Yes.  I'm sorry, I answered yes.

1      Q      Okay.  Sorry.  Didn't catch that.

2             And the expenses that you tie to this trip

3   include flights, right?

4      A      Yep.

5      Q      And hotels, right?

6      A      That's right.

7      Q      For the entire month of June going into July,

8   right?

9      A      Essentially.

10     Q      To be fair, from June 8th going into July,

11  right?

12     A      Right.

13     Q      All right.  And then to determine those are

14  business expenses you've broken them in this table by

15  day, right?

16     A      Right.

17     Q      All right.  Let's take the first one.

18  June 8th, 2021, Mr. Berris and Mr. de Sadeleer attend

19  meetings with Roush Industries.

20             Do you see that?

21     A      I do.

22     Q      Your only support for that statement is the

23  declaration of Ryan Berris, right?

24             MS. ROYTBLAT:  Object to form.

25     A      Yes.

Page 92

1    BY MS. WIGGER:

2        Q    You have no other support for the proposition

3    that Mr. Berris and Mr. Sadeleer, or de Sadeleer, were

4    attending meetings with Roush Industries on June 8th,

5    2021, right?

6        A    That's correct.

7        Q    All right.  June 9 through 10, 2021,

8    Mr. Berris and Mr. de Sadeleer prepared the P72 prototype

9    for an upcoming marketing event at the Hypercar

10   Invitational.

11            Do you see that?

12       A    I do.

13       Q    Your only support is a statement -- or the

14   declaration of Ryan Berris, right?

15            MS. ROYTBLAT:  Object to form.

16       A    That is the only thing that I cite to in

17   footnote 31, so yes.

18   BY MS. WIGGER:

19       Q    Okay.  So you have no other support for the

20   proposition that Mr. Berris and Mr. de Sadeleer were

21   preparing the P72 prototypes on those days, right?

22       A    That's right.

23       Q    In other words, for both June 8 and then

24   June 9 through 10, the justification that would support a

25   business expense just comes from the statement of

Page 93

1   Ryan Berris, right?

2            MS. ROYTBLAT:  Object to form.

3       A     It comes from the declaration of Ryan Berris.

4   He signed it under penalty of perjury.  So, yes, to

5   answer your question, that's where the support for that

6   came from.

7   BY MS. WIGGER:

8       Q     Okay.  So for those two expenses your opinion

9   really is, assuming Mr. Berris is correct and accurate,

10  that these are business expenses, right?

11           MS. ROYTBLAT:  Object to form.

12      A     Right.  I am assuming that what he said is

13  correct and that there was in -- it is in fact why he was

14  traveling to California on those dates.  Then the

15  expenses that he incurred, flights and hotels, would,

16  under the FASB and IRS guidelines, be valid business

17  expenses.

18  BY MS. WIGGER:

19      Q     June 15 through 17, 2021, Mr. Berris and

20  Mr. de Sadeleer worked with Roush Industries to change

21  the gearbox on the P72 prototype.

22           Your only support is the declaration of

23  Ryan Berris, right?

24           MS. ROYTBLAT:  Object to form.

25      A     For that one, yes.

1    BY MS. WIGGER:

2         Q    Okay.  So you have no other evidence that that

3    statement is true, correct?

4              MS. ROYTBLAT:  Object to form.

5              MS. WIGGER:  What is wrong with the form of

6    that question?  I want to make sure these are accurate.

7              MS. ROYTBLAT:  Evidence is vague.

8              MS. WIGGER:  Okay.

9              MS. ROYTBLAT:  Objection on vagueness grounds.

10   BY MS. WIGGER:

11        Q    Mr. Imperiale, do you know what I mean by

12   evidence?

13        A    If you could please expand on that.

14        Q    Sure.

15        A    It's --

16        Q    I mean any -- oh, go ahead.

17        A    No, I'm sorry.  I have a general understanding

18   of -- of -- you're referring to these supporting

19   documents?

20        Q    Yeah, supporting documents or anything else in

21   the world that would support the statement.  So when I

22   say do you have evidence, I mean anything.  Do you

23   understand that?

24        A    I do.

25        Q    Perfect, okay.  Let's go back to my question

1    then.

2              You have no evidence, other than Mr. Berris's

3    declaration, that the statements in that June 15 to 17

4    paragraph are true, right?

5         A    Not in that one.  That's correct.  It's just

6    the declaration.

7         Q    Okay.  Do you know how long it would take to

8    change a gearbox?

9         A    I don't have knowledge of it.

10        Q    Do you have any reason to believe it would

11   take three days?

12             MS. ROYTBLAT:  Object to form.

13        A    I have -- I can't say one way or the other.

14   BY MS. WIGGER:

15        Q    Okay.  That's the only activity listed for

16   those three days covering purported business expenses,

17   right?

18        A    Well, again, I would also note that the entry

19   before is the attendance at the Hypercar Invitational

20   event.  And so that at least establishes that he was out

21   there in California.  And for that one, footnote 32, I do

22   have a lot of support in addition to just relying on the

23   declaration.

24        Q    Okay.  I'm not just asking about footnote 32.

25   So let's go back to my question.

1      A      Well, I think it -- I'll just say it.  I

2   think -- I think it places him in California for a

3   business purpose.  And it's an entry where I'm not just

4   relying on the declaration.  So, you know, if you're --

5   you know, I don't think that there's anything in the FASB

6   or IRS standards that say that he needs to spend a full

7   eight-hour working day doing a particular task.  But I

8   think it is, you know, fair to say that he was -- you

9   know, he was already out there for this Hypercar

10  Invitational event.  That then the next day he performed

11  a task and it didn't take the full eight hours, that's

12  not really something that I found relevant.

13     Q      Okay.  One, you have no idea how long it took

14  them to change the gearbox, right?

15     A      I don't.  I don't have any idea.

16     Q      Two, is it your statement that if he's out in

17  California from June 8 to July 10 and on some days does

18  some business related things that the entire thing is

19  automatically a business trip?

20            MS. ROYTBLAT:  Object to form.

21     A      It would -- it would really depend on how many

22  days he wasn't working.  I mean, there is -- in the

23  IRS 535 they do discuss if you're taking a business trip,

24  they do discuss that issue.  And it would take me a

25  moment to get to it.  But essentially there's nothing

1    that says that you need to work the entire time on a

2    business trip.  As long as the principal reason for

3    taking the trip was business related then it is

4    allowable.

5    BY MS. WIGGER:

6        Q    Okay.  Well, here you, I guess include for

7    lack of a better word, expenses related to June 8 to

8    July 10 in your report.

9             So how many of these days had to actually be

10   business work for this to be a business trip?

11       A    I don't think the standard specifically notes

12   the day.  Although they do note that if the beginning or

13   end of the trip was for a vacation then that piece of it

14   would be disallowed.

15            I think really the intent of the standard gets

16   to -- and, again, if you give me a minute, I can go to it

17   if you want to read it verbatim.  But it does not require

18   somebody on a business trip to be working a full business

19   day if the intent of the trip was business related.

20            But, you're right, so I did rely on some of

21   the entries at the beginning of the trip from the

22   declaration of Mr. Berris.

23       Q    Look at the next one, June 18, 2021.

24   Mr. Berris and Mr. de Sadeleer picked up Carmen Jorda

25   from LAX airport and brought her to her hotel.

Page 98

1          Do you see that?

2      A    I do.

3      Q    You're solely relying on Berris's declaration

4  for that proposition?

5      A    I -- I mean, sitting here right now, I don't

6  know how else I would verify that statement.

7          But the answer is, yes, I relied on the

8  declaration for that statement.

9      Q    Look at June 24 through 25, 2021.  Mr. Berris

10  and Ms. Jorda drove the P72 to Tesla headquarters in

11  Palo Alto, California and the Tesla factory in Fremont,

12  California.

13          Do you see that?

14      A    I do.

15      Q    That's another one where you just rely solely

16  on the declaration of Ryan Berris, right?

17      A    Yes.  But then the next one I have some

18  additional support where he was out there meeting with

19  SpaceX.

20      Q    I'm not asking about June 26 or 28.  I'm

21  asking you about June 24 through 25.

22      A    So just in -- sorry, just in a vacuum then the

23  answer is no.  I don't have additional support for that

24  specific entry.

25          But, again, I think you have to look at all of

Page 99

1   these business expenses for this particular trip

2   together, I have additional support, not just the

3   declaration, that places him in California, in Palo Alto.

4            For some specific days specifically -- I mean,

5   you know, if you're picking up Carmen Jorda, I don't know

6   what other support would even be relevant to confirm that

7   he picked up Carmen Jorda on that particular day.  So to

8   some degree it's relying on the declaration.  To others

9   it's also looking at the other supporting documentation,

10  the emails, the chat messages, to substantiate what he

11  said in the declaration.

12       Q     Are you done?

13       A     I am.

14       Q     Cool.

15            Coming back to my question.  For June 24

16  through 25, the activities for two days that you list as

17  business expenses, the only support that you list is the

18  declaration of Ryan Berris, right?

19       A     Yes.  For that -- for that specific entry it's

20  just the declaration.  But, again, I think you have to

21  look at it more wholistically.  I mean, for the very next

22  entry I have additional support.

23       Q     I'm not asking about June 26 through 28.

24  Please try to focus on my questions.

25       A     I understand.  I just think it's -- I think

Page 100

1    it's relevant.

2        Q    Okay.  Let's just read it.  For June 26 to 28,

3    2021 you say:  Mr. Berris and Mr. de Sadeleer visited

4    SpaceX and the Tesla Design Center in Hawthorne,

5    California, right?

6        A    Correct.

7        Q    Okay.  Those are different days than the days

8    when Mr. Berris and Ms. Jorda purportedly drove to P72 to

9    the Tesla headquarters, right?

10       A    Yes.

11       Q    They're different cities, Hawthorne,

12   California versus Palo Alto, California, right?

13       A    Yep.

14       Q    Okay.  And there are different people

15   involved, right?

16       A    Yes.

17       Q    Berris and de Sadeleer versus Berris and

18   Jorda, right?

19       A    That's right.

20       Q    Okay.  So, again, let's focus on June 24

21   through 25.  And all I'm asking is do you have any other

22   evidence where this justification that Mr. Berris and

23   Ms. Jorda drove the P72 to Tesla headquarters in

24   Palo Alto and the Tesla factory in Fremont?

25       A    Just the declaration.

Page 101

1      Q      Okay.  Let's go to July 9 and 10.

2             July 9, Mr. Berris and Mr. de Sadeleer

3      returned the P72 prototype to JP Logistics in preparation

4      for the car to be stored in their facility, right?

5      A      Yes.

6      Q      And then there's a return to New York, right?

7      A      Correct.

8      Q      And your support is the declaration of

9      Ryan Berris, right?

10     A      Right.  Well, I think for the flight, I do

11     have the receipt for the flight.

12     Q      Okay.  So for the activities on July 9th,

13     returning the P72, you're just relying on Berris's

14     statements, right?

15     A      Yes.

16     Q      Now, for the rest of these expenses, your

17     primary citation is to the declaration of Ryan Berris,

18     right?

19     A      Well, when you say primary, I mean, that is

20     one thing that I cite.  And then I also cite to other

21     documents.  And typically they're the chat messages, the

22     chat logs, or emails.

23     Q      Do you have -- do you see for most of these

24     where your second citation is to Berris 000280869?

25     A      Yes.

Page 102

1      Q     Do you have that document in front of you?

2      A     Not the entirety.  It's a very lengthy chat

3  log.

4      Q     Right.  Because it's 3,581 pages long, right?

5      A     Yes.

6      Q     And you don't provide any citation to which

7  entry is in there or which pages supposedly support

8  your -- or these statements, right?

9      A     I didn't handle the document production, how

10  it was produced.

11      Q     I'm not asking about how it was produced.  I'm

12  asking about how it was cited.  You told me earlier you

13  did your own citations, right?

14      A     Yes.

15      Q     So did you read the entirety, the 3,581 page

16  chat?

17      A     No.  No, I looked at the relevant sections of

18  the chat.

19      Q     How?

20      A     I was pointed to the sections that supported

21  the agenda items on here by counsel.

22      Q     Okay.  So counsel told you which sections of

23  this document to look at is what you're telling me?

24      A     Yes.

25      Q     Did you read anything counsel didn't point you

Page 103

1    to?

2          A     No.

3          Q     And sitting here today you can't tell me where

4    that is in the document because it's 3500 pages long,

5    right?

6          A     Well, actually I could.  Because I would just

7    look at the chat log that is around the date that

8    this -- that the, you know, event in question happened.

9    And I would be able to find it.

10         Q     Let's go to paragraph 8 of Berris's

11   declaration.  It says:  On or about July 17 and 18, 2021,

12   I attended business meetings related to de Tomaso in

13   Greenwich, Connecticut.

14               Do you see that?

15         A     Yes.

16         Q     Okay.  And then in your report you say:  From

17   July 17 to July 18, 2021, Mr. Berris attended meetings in

18   Greenwich, Connecticut, right?

19         A     Which paragraph are we at?  I lost my place.

20         Q     33.  33 in your report.

21         A     Okay.  I'm there.

22         Q     You with me?

23         A     Yeah.

24         Q     Your only support for that statement is the

25   declaration of Ryan Berris, right?

1  A  That's right.

2  Q  So you have no other evidence he was actually

3 attending meetings, right?

4  A  I don't.  For this one it was just the

5 declaration.

6  Q  Or that those meetings were related to

7 de Tomaso, right?

8     MS. ROYTBLAT:  Object to form.

9  A  It would just be the declaration.

10 BY MS. WIGGER:

11  Q  Do you know where Berris's family lives?

12  A  I don't.

13  Q  Would it surprise you to know it's

14 Connecticut?

15     MS. ROYTBLAT:  Object to form.

16  A  I'm not -- I don't know anything about his

17 family.

18 BY MS. WIGGER:

19  Q  All right.  So for support that the expenses

20 identified in paragraph 33 of your report are actually

21 business expenses, you're relying solely on Berris's

22 statements, right?

23  A  For paragraph 33, yes, that is -- that is all

24 I'm citing.

25  Q  Paragraph 9 of Berris's declaration.

Page 105

1              From about July 19, 2021 to about August 8,

2    2021, I and Mr. de Sadeleer visited New York City to work

3    in person with Mr. Choi at his request to participate in

4    de Tomaso meetings and to attend other business and

5    networking events.

6              Do you see that?

7        A    I do.

8        Q    All right.  You transfer that into your

9    report, right?

10             MS. ROYTBLAT:  Object to form.

11       A    Paragraph 34 references July 19 through

12   July 25th, Mr. Berris and Mr. de Sadeleer stayed at

13   Citizen M, New York Times Square Hotel in New York City

14   to work in person with Mr. Choi at his request and to

15   attend company business meetings.

16   BY MS. WIGGER:

17       Q    Your only support for that is the statement of

18   Mr. Berris, right?

19       A    That is correct.

20       Q    All right.  Do you know --

21       A    Well, actually, can I just retract that?

22   My -- the declaration of Berris supports that he went and

23   stayed in New York to work with Mr. Choi at his request

24   and to attend business meetings.  I do have other support

25   that substantiates the hotel expense in question.

Page 106

1          Q       That's fair.  I actually just want to focus on

2    that part.

3                  So for the proposition that Choi asked Berris

4    to come to New York and work with him, you're relying

5    just on Berris's declaration, right?

6          A       Yes.

7          Q       And for the proposition that he was attending

8    company business meetings, you're relying solely on his

9    declaration, right?

10         A       That's right.

11         Q       Where did Mr. Berris live?

12         A       I don't know where he resides.

13         Q       Did you ask where he resided during the time

14   period of your expense report?

15                 MS. ROYTBLAT:  Object to form.

16         A       I was told that he stays at the office in

17   Glastonbury, Connecticut.

18   BY MS. WIGGER:

19         Q       You were told that he lives at the office in

20   Connecticut?

21         A       I was told that he doesn't maintain his own

22   permanent residence.  He stays at the office in

23   Connecticut.  He stays -- I think he mentioned once that

24   he stayed with family and friends.

25         Q       Knowing Mr. Berris's primary residence is

1    actually relevant to your analysis, right?

2        A    It depends.  How so?

3        Q    Well, okay.  If you live in New York City and

4    you attend a meeting in New York City a block from your

5    home, it would not be appropriate to bill a hotel night

6    for that meeting, right?

7        A    I mean, look, if it is a block from your home,

8    you know, that would be -- that would be something.  But

9    I think it would go back to whether or not the company

10   has an expense policy that says whether or not you could

11   stay in a hotel, you know, if you live or reside a

12   certain amount of distance from wherever the meeting is

13   taking place.

14            I think there is -- there is -- you know,

15   there is kind of room in a company expense policy where

16   if you reside -- you know, depending on where you resided

17   and depending on what time the meeting started and if you

18   were working together with other colleagues, that

19   depending on the policy's expense policy at the time it

20   may be justifiable to stay in the city to work together

21   with colleagues.

22       Q    You'd first need to know where Berris lived to

23   even begin to analyze that, right?

24            MS. ROYTBLAT:  Object to form.

25       A    So, again, my understanding -- and actually

Page 108

1    I'll tie it back to the IRS standards 535.  It discuss --

2    or, sorry, I think -- actually I believe it was the other

3    one, 563.

4              It discusses your tax home for business

5    travel.  And it says that your tax home is -- you know,

6    when you don't maintain a permanent residence is your

7    principal place of business.  So that would put him in

8    Glastonbury, Connecticut.  And so to the extent that he

9    had a business meeting in New York City, which I

10   understand is quite a ways, several hours away from

11   Glastonbury, Connecticut, again, you would have to look

12   at the company specific expense policy.

13             But, sure, I think your question was, was it

14   unreasonable to stay overnight in the city if he worked

15   or resided in Glastonbury, Connecticut.  I wouldn't agree

16   with that.

17   BY MS. WIGGER:

18       Q    That was so not my question.  But you know

19   what?  Forget it.

20             You'd agree with me that the IRS reports

21   actually do talk about travel expenses, right?

22       A    Yes.

23       Q    Yeah, we'll get to those later.

24             But just so I understand, your understanding

25   is that Ryan Berris lived in Glastonbury, Connecticut at

Page 109

1    the company's corporate headquarters?

2            MS. ROYTBLAT:  Object to form.

3        A    I really don't have a firm understanding of

4    where he maintained his private residence.  My

5    understanding is that he did spend some time at the

6    company headquarters in Glastonbury, Connecticut.  That's

7    pretty much the extent of it.  I don't know anything

8    further.  I don't know where his family lives.

9    BY MS. WIGGER:

10       Q    All right.  Let's look at paragraph 10 of

11   Berris's declaration.  It says from about August 9, 2021

12   to about August 17, 2021, I and Mr. de Sadeleer and

13   Mr. Choi traveled to California to meet with various P72

14   clients and potential investors.

15           Do you see that?

16       A    I do.

17       Q    Okay.  And then in your report you say:  From

18   August 9 to August 17, 2021, Mr. Berris, Mr. Choi, and

19   Mr. de Sadeleer traveled to California to meet with

20   various P72 clients and potential investors, right?

21       A    Yes.

22       Q    Your only support is the declaration of

23   Ryan Berris, right?

24       A    Let me just -- bear with me for a second.

25           I believe there was another document that was

Page 110

1    cited in that footnote.

2         Q    Looking at paragraph 36 of your report,

3    footnote 76.

4         A    Okay.  You're right.  For that one that is the

5    only document cited, the declaration.

6         Q    Right.

7              So you have no other evidence showing which

8    various P72 clients were potential investors Berris was

9    supposedly meeting with, right?

10        A    No, I don't have that information.

11             MS. WIGGER:  All right.  We're going to break

12   here for lunch.  Let's just come back at 1, so

13   40 minutes.

14             THE VIDEOGRAPHER:  We're now off the record at

15   12:20 PM.

16             (Recess taken from 12:20 PM to 1:01 PM.)

17             THE VIDEOGRAPHER:  We're now back on the

18   record at 1:01 PM.

19             You may proceed.

20             MS. WIGGER:  Thank you.

21   BY MS. WIGGER:

22        Q    Okay.  Mr. Imperiale, I believe you said a few

23   times that it's your opinion that de Tomaso did not have

24   a written expense policy, right?

25        A    It's based on the testimony from the de Tomaso

1    corporate representative.

2         Q    Okay.  So that's a yes to my question?

3         A    Yes.

4         Q    Okay.  Have you reviewed Berris's consulting

5    agreement with Apollo?

6         A    Can you put it in front of me?

7         Q    Yes, I can.

8         A    I'll let you know.

9         Q    Bear with me as I open this.  Okay.  Exhibit 5

10   will be the consulting agreement, which is DT100.

11            (Exhibit 5 marked for identification.)

12        A    Bear with me.  It's loading.

13            Got it.  Okay.

14        Q    So have you seen this document before?

15        A    I have.

16        Q    I'm sorry, what was that?

17        A    Yes, I have.  I have.

18        Q    Okay.  Was this listed on your materials

19   considered?

20        A    I think this was an exhibit in the declaration

21   of Diana Majcher.  So I guess by way of that it would be

22   listed.

23        Q    Okay.  If we look at page 3, paragraph 2B,

24   there's a paragraph that says expenses, right?

25        A    On page 3?

Page 112

1       Q      Page 3, paragraph 2B.

2       A      Yes.

3       Q      Are you with me?

4       A      I am.

5       Q      Do you see the paragraph titled Expenses?

6       A      I am, yes.

7       Q      All right.  This says:  The consultant shall

8    see approval from the company prior to incurring any

9    expenses more than $500.

10             Do you see that?

11      A      I do.

12      Q      Okay.  And you understand the consultant to be

13   Ryan Berris, right?

14      A      Aprivy.  Yes, Ryan Berris's LLC.

15      Q      All right.  So Ryan Berris acting through

16   Aprivy, his LLC, right?

17      A      Yes.

18      Q      Okay.  This would be an example of a policy

19   related to expenses, right?

20      A      Can I just review the top of it?

21             So the company here is defined by -- is

22   defined as Apollo Automobile Limited, not de Tomaso.

23      Q      Are you done?

24      A      Yes.

25      Q      Okay.  So going back to my question.  This is

Page 113

1    a policy related to expenses, right?

2              MS. ROYTBLAT:  Object to form.

3        A      Yeah, it is the policy regarding expenses

4    between Aprivy and Apollo.

5    BY MS. WIGGER:

6        Q      Okay.  Now, do you know, yes or no is fine,

7    but do you know if Berris was doing work for both Apollo

8    and Aprivy during the same period of time?

9        A      No, I'm not aware.

10       Q      Okay.  Do you know if he was submitting

11   expenses related to work for Apollo?

12       A      I'm not aware either way.

13       Q      Okay.  Are you aware this consulting agreement

14   actually references de Tomaso?

15       A      I believe it does.  But if you could direct

16   me.

17       Q      Yeah, it's in Exhibit A, I believe.

18              1E, it references -- it says:  The services

19   will be performed for both Apollo and de Tomaso.

20              Do you see that?

21       A      Yes.

22       Q      Okay.  So you don't know if the expenses you

23   analyzed were related to Apollo or de Tomaso, do you?

24       A      Well, my understanding is that the expense

25   report was submitted to de Tomaso.

Page 114

1    Q    Do you know if expenses, Berris's expenses,
2    were submitted separately to Apollo and de Tomaso?
3    A    No, I don't know that to be the case.
4    Q    Okay.  Are you assuming that they were
5    submitted separately to Apollo and de Tomaso?
6    A    No, I'm not making any assumption.  I'm just
7    saying that the expense report, it's my understanding
8    based on conversation with counsel, is it was submitted
9    to de Tomaso.
10    Q    Okay.  So you don't know if those expenses
11    related to de Tomaso or Apollo, right?
12        MS. ROYTBLAT:  Object to form.
13    A    Again, based on conversations with counsel,
14    they are expenses incurred for his work through -- at
15    de Tomaso.
16    BY MS. WIGGER:
17    Q    Okay.  So you're assuming, based on your
18    conversations with counsel, that the expenses related to
19    de Tomaso, right?
20    A    Yes.
21    Q    Okay.  And your opinions are based on the
22    assumption that the expenses were related to de Tomaso,
23    right?
24    A    Yes, I would say that.
25    Q    Okay.  You did not look into, then, whether

Page 115

1    Berris sought approval from a company prior to incurring

2    any expense for more than $500, right?

3                    MS. ROYTBLAT:  Object to form.

4        A     You know, again, the premise is that this

5    policy applies to de Tomaso.  And based on conversation

6    with counsel, my understanding is that this -- this

7    policy relates to his work at Apollo, not de Tomaso.

8                    And I also have direct testimony from the

9    company's representative that there is no expense

10   report -- I'm sorry, that there is no expense policy.

11   BY MS. WIGGER:

12       Q     Are you done?

13       A     Yes.

14       Q     You did not look into whether Berris sought

15   approval from a company prior to incurring expenses of

16   more than $500, right?

17       A     That's right.

18       Q     Now, is it your understanding that Ms. Majcher

19   did not testify regarding this paragraph?

20                    MS. ROYTBLAT:  Object to form.

21       A     Yeah, can you please be more specific?

22   BY MS. WIGGER:

23       Q     Yeah, you said that you have direct testimony

24   that there's no expense policy.  And I'm asking you if

25   you're aware of testimony from Ms. Majcher related to

Page 116

1   this paragraph?

2        A    No, the only testimony that I'm aware of is

3   when she was asked as the corporate representative of

4   de Tomaso, there was no formal expense policy in place at

5   de Tomaso, right?

6             And she said yes.

7        Q    And of course she did testify that there were

8   informal expectations, right?

9        A    No, I'm not aware of that.

10       Q    Okay.  Let me just take a note.  We may come

11  back to that.

12            On that note, did you look at how anyone else

13  at de Tomaso submitted expense reports?

14       A    No.

15            MS. ROYTBLAT:  Object to form.

16  BY MS. WIGGER:

17       Q    Okay.  So you didn't look to see if there was

18  a practice in the company of how expense reports were to

19  be submitted, right?

20       A    That's right.

21       Q    Now, you would agree Ms. Majcher did testify

22  that there was a standard form on which expense reports

23  were to be submitted, right?

24            MS. ROYTBLAT:  Object to form.

25       A    If you can put that testimony in front of me.

Page 117

1    I don't recall sitting here.

2    BY MS. WIGGER:

3        Q    I'm asking if you're aware of it or not?

4             MS. ROYTBLAT:  Object to form.

5        A    I reviewed her testimony.  I just -- I don't

6    recall the specifics at this point regarding that area.

7    BY MS. WIGGER:

8        Q    Okay.  I want to turn back to your report,

9    around paragraph 13.  And this is just the opinion we

10   were just talking about.

11            You say:  De Tomaso failed to establish a

12   specific framework for how individuals employed by or

13   otherwise working for the company could determine whether

14   an expense was reimbursable by the company, right?

15       A    Yes.

16       Q    Okay.  And I just want to be totally clear on

17   this.  Your opinion is not that because de Tomaso did not

18   have a written expense policy that Berris could submit

19   any and every expense that he wanted to for

20   reimbursement, right?

21            MS. ROYTBLAT:  Object to form.

22       A    That's right.  I evaluated based on the

23   standards and guidelines set forth by the IRS and FASB.

24   BY MS. WIGGER:

25       Q    Right.  Now, you would agree with me that

Page 118

1    Berris was not just an employee of de Tomaso, right?

2         A     I mean, I can't speak to what his -- you know,

3    the actual corporate formality was.

4         Q     You'd agree with me he was a CEO, right?

5         A     Yes.

6         Q     An officer of the company, right?

7         A     I assume so.  He was the CEO.

8         Q     A director of a company?

9               MS. ROYTBLAT:  Object to form.

10        A     I recall seeing in the yellow see agreement

11   for de Tomaso that he was listed, I believe, subject to

12   checking, a director.

13   BY MS. WIGGER:

14        Q     Which means he owed the company fiduciary

15   duties, right?

16              MS. ROYTBLAT:  Object to form.

17        A     I really -- I can't speak to the specifics.

18   BY MS. WIGGER:

19        Q     You don't know if an officer, director owes

20   fiduciary duties to a company?

21              MS. ROYTBLAT:  Object to form.

22        A     I would be -- I would be making the

23   assumption.

24   BY MS. WIGGER:

25        Q     I'm sorry, didn't you tell me that you've been

Page 119

1   working for 24 years in accounting?

2        A    I could make an inference if you would put in

3   front of me the document.

4        Q    What document?  I'm asking you if an officer,

5   director of a company owes fiduciary duties to the

6   company based on your knowledge?

7             MS. ROYTBLAT:  Object to form.

8        A    I think that's a general understanding of a

9   director.

10  BY MS. WIGGER:

11       Q    Right.  You know that from your experience

12  working with officers and directors of companies, right?

13            MS. ROYTBLAT:  Objection.

14       A    Right.

15  BY MS. WIGGER:

16       Q    Sorry, what was that answer?  Yeah, sorry,

17  you're cutting out a little bit.

18       A    Yes.  Yes, I understand that to be the case

19  generally --

20       Q    Okay, great.

21       A    -- a director owes fiduciary duties.

22       Q    Right.

23            Now, de Tomaso was a relatively new company,

24  right?

25            MS. ROYTBLAT:  Objection.

Page 120

1        A      Well, I understand that it was around for a

2    while and then it was revived.

3    BY MS. WIGGER:

4        Q      Okay.  So I guess that's fair.

5               De Tomaso was -- its revival was relatively

6    new, as in the past like five years, right?

7        A      I believe that to be the case.

8        Q      Okay.  So de Tomaso is akin to the startup

9    pre-revenue companies that we talked about earlier in

10   your deposition, right?

11              MS. ROYTBLAT:  Objection.

12   BY MS. WIGGER:

13       Q      What was that?

14       A      I haven't looked at the financial statements

15   of the company to know whether they were pre-revenue or

16   not.

17       Q      Do you know if de Tomaso was operating at a

18   loss?

19       A      I don't know that.

20              MS. ROYTBLAT:  Objection.

21   BY MS. WIGGER:

22       Q      Was that relevant at all to your expense

23   analysis?

24              MS. ROYTBLAT:  Object to form.

25       A      No, it was --

Page 121

```
 1              MS. WIGGER:  I'm sorry, what's wrong with the
 2     form of that question?
 3              MS. ROYTBLAT:  You didn't specify what was
 4     relevant to his analysis.
 5     BY MS. WIGGER:
 6         Q    Did you understand what I meant by that
 7     question, Mr. Imperiale?
 8         A    You're asking me if the amount of revenues
 9     that the company earns is relevant to the expense policy?
10         Q    Yes.
11         A    I have no way of saying one way or the other
12     whether the amount of revenues the company earns is
13     relevant.  So I wouldn't agree one way or the other with
14     that statement.
15         Q    Do you know how de Tomaso was covering its
16     expenses?
17         A    No.
18         Q    Okay.  Would it surprise you to know it was
19     solely funded by Norman Choi's personal money?
20              MS. ROYTBLAT:  Objection.
21         A    Again, I have -- I have no basis of knowing
22     that.
23     BY MS. WIGGER:
24         Q    Okay.  So whether or not it was appropriate to
25     submit expenses is not at all formed by the fact that the
```

Page 122

1   company was bringing in zero dollars; is that your

2   testimony?

3            MS. ROYTBLAT:  Objection.

4        A     Yeah, according to the IRS and FASB standards,

5   it does not look at the amount of revenue the company is

6   bringing in terms of what would be considered a business

7   expense.

8   BY MS. WIGGER:

9        Q     Even for --

10       A     And the --

11       Q     Sorry, go ahead.

12       A     Go ahead.  No.

13       Q     No, go ahead.  Finish.

14       A     I was saying and especially also in light of

15   the fact that the company didn't have its own written

16   expense policy.  I think if the company wanted to set

17   some sort of standards because they were, as you say, a

18   pre-revenue company then they should have done that.

19       Q     And is it your testimony that that is true

20   also for executives?

21            MS. ROYTBLAT:  Objection.

22       A     My understanding is that that is companywide

23   that Ms. Majcher testified that the company did not have

24   an expense policy.

25   BY MS. WIGGER:

Page 123

1       Q      Yeah, okay.  We got the company doesn't have

2    an expense policy.  Thank you.

3              What I'm asking you is, is it true under the

4    IRS and FASB standards that the financial situation that

5    whether or not it's appropriate to submit expenses as

6    business expenses is not dependent of the financial

7    situation of the company even for officers, directors?

8       A      There's nothing that I'm aware of, sitting

9    here right now, that would say that the financial -- when

10   you say the financial situation of the company, are you

11   referring to its revenue?  If that's the case then, no,

12   I'm not aware of anything sitting here right now in the

13   IRS standards that would say you have to look at the

14   company's revenue to determine whether or not certain

15   business expenses are allowable.

16      Q      Even for officers, directors?

17      A      I'm not aware of anywhere where it says that.

18      Q      All right.  Now, you don't need the IRS or

19   FASB standards to know that not every expense you incur

20   as a person should be submitted for reimbursement to a

21   company, right?

22             MS. ROYTBLAT:  Object to form.

23      A      Can you -- can you just expand on that

24   question?  I'm not sure I understand.

25   BY MS. WIGGER:

Page 124

1    Q    Yeah.

2         Not every expense you incur on your credit

3    card should be submitted to a company as a business

4    expense, right?

5    A    Well, to the extent it's personal, no, I would

6    not submit a personal expense as a business expense.  Is

7    that what you're asking?

8    Q    For -- it is.

9         For example, rent on your primary residence

10   would not be a business expense, right?

11   A    It really depends on the company's situation.

12   If the company may have a -- I'm being serious.  There

13   may be circumstances -- and I know for a fact at Kroll.

14   For example we have company apartments where we allow our

15   company executives, when they're coming in for an

16   extended period of time, where they can stay.  And -- and

17   they don't pay the company rent.  We cover that for them.

18        So it really is on a company-by-company basis

19   what types of expenses are allowable.

20   Q    Are you done?

21   A    Yes.

22   Q    All right.  You would agree with me that an

23   ordinary expense is one that is common and accepted in

24   the industry, right?

25   A    Yes.

1      Q      All right.  And a necessary expense is one

2    that is helpful or appropriate for your trade of

3    business, right?

4      A      Yes.

5      Q      Is it your testimony that rent on a primary

6    residence is an ordinary expense in a luxury car

7    industry?

8      A      Yeah, it's not something that I looked at in

9    this case.  So it would really depend on the specific

10   facts of the circumstances.  I would have no know why

11   rent was being expensed in this hypothetical.  I would

12   have a lot more questions and I would need to review

13   further supporting documents and information.

14     Q      So you can't answer that question?

15     A      Well, because there are circumstances where I

16   know that a company could cover rent for a corporate

17   apartment.  It is something that does happen at Kroll.

18   So I can't say one way or the other, make a generalized

19   statement of what would be allowable or not.  It may be

20   allowable.  It depends on the company.

21     Q      How about haircuts?  Your personal haircut is

22   not an appropriate business expense, right?

23     A      Again, it depends on why you're getting your

24   haircut.  If you are -- you know, I could see a

25   circumstance where if you're appearing on television or

Page 126

1   at an event, it certainly could be.  If you are -- you

2   know, I don't know, going -- attending a photo shoot.  It

3   really depends on why you're getting the haircut.

4           I would have a lot of questions, a lot of

5   follow-up questions that I would need to know the

6   business purpose.  There would have to be a linkage

7   between the expense and the business purpose.

8       Q    Is it your testimony that getting a haircut is

9   an ordinary expense in the luxury car industry?

10      A    It really depends on why the person got a

11  haircut.  I don't know.  And this is a hypothetical

12  expense, and I really don't know.  I can't testify one

13  way or the other.

14      Q    How about your medicine from CVS, is that a

15  business expense?

16      A    I would need to understand what the linkage is

17  between the medicine that you bought from CVS and the

18  business purpose of the expense.

19      Q    Can you imagine any business purpose now?

20      A    It would be -- you know, it would be -- I

21  think that's more of an ambiguous one.  But, you know, in

22  the hypothetical I would still need to ask questions of

23  the person who incurred the expense of why they felt that

24  that was a legitimate business expense.

25      Q    It would not be appropriate to submit an

Page 127

1    expense for every single meal that you eat, right?

2              MS. ROYTBLAT:  Object to form.

3        A    Again, it depends if there is a business

4    purpose for the meal.  If you are having a meal with a

5    potential client or customer or if you're traveling there

6    could be instances where it is allowable.  And it

7    certainly is allowable under the IRS standards to deduct

8    business meals.  You'd have to be more specific.  If

9    there is a business purpose for the meal then the

10   standards say you can deduct it.

11             If it's purely a personal meal then -- and

12   there's no clear linkage to a business purpose then it

13   would not be deductible.

14   BY MS. WIGGER:

15       Q    Personal meals with your friends are not

16   business expenses, right?

17       A    Again, I would have to understand, you know,

18   is this a -- you know, truly a personal dinner with

19   friends or is this a dinner with friends where, you know,

20   it was kind of also a business meeting.  I would have to

21   understand the business purpose for the dinner to get an

22   understanding, a better understanding.  And I would also

23   want to see supporting documentation.  I'd want to see --

24   I'd want to know who attended the dinner.  And if it was

25   business associates what did they speak about.

Page 128

1          Q      You expect that in writing, right?

2          A      Well, I expect it to be communicated somehow,

3     whether it's in writing or verbally.

4          Q      All right.  Let's talk about that reporting.

5     You'd agree with me that under the IRS standards you must

6     keep records that support each element of an expense,

7     right?

8                 MS. ROYTBLAT:  Object to form.

9          A      I believe for tax deductibility issues,

10    because really these IRS standards go towards, you know,

11    what the IRS allows for in tax deductions and what you

12    would need to produce to the IRS if you were under audit,

13    that you would need supporting documentation for your

14    expenses that you're deducting.

15    BY MS. WIGGER:

16         Q      Okay.  Mr. Imperiale, these are the standards

17    you applied in your analysis of this case, right?

18         A      Uh-huh.  Yes.

19         Q      All right.  So under the standards that you

20    applied in your analysis of this case, you need to have

21    support for each element of an expense, right?

22         A      I would say that's generally true.  You would

23    need to have, you know, support to substantiate your

24    bigger ticket items.  I'm not sure, sitting here right

25    now, if there's a materiality threshold.

1      Q      Okay.  You would agree that when you submit an

2  expense you should keep proof that you need in some sort

3  of account book, diary, log, statement of expense, trip

4  sheet, or similar record, right?

5      A      Can you point to me to the page that you're

6  referencing from?

7      Q      Of course.

8             I've just introduced Exhibit 6, which is

9  publication 463.  Please open that.  Let me know when it

10  loads for you.

11             (Exhibit 6 marked for identification.)

12      A      It's still loading.

13             Okay.

14      Q      All right.  This is publication 463 from the

15  IRS, right?

16      A      Yes.

17      Q      This is one of the sources you relied on in

18  making your opinions in this case, right?

19      A      That's right.

20      Q      All right.  I think you've said many times now

21  that this is how you analyzed the expenses that you

22  analyzed in your report, right?

23      A      That's right.

24      Q      Okay.  Let's go to page 24.  We're looking at

25  section 5 called recordkeeping.

Page 130

1                    Do you see that?

2          A       I do.

3          Q       Okay.  So under the standards that you applied

4    in this case, if you want to submit an expense you must

5    be able to prove the elements of the expense, right?

6          A       I would just preface this -- one second --

7    with I am applying the general principles in this

8    guidance in order to establish what types of expenses are

9    considered business expenses versus non business or

10   personal.  The entirety of these statements really get

11   to, you know, the tax deductibility and what kind of

12   support you need to provide to the IRS should it be

13   questioned, and sort of best practices.

14                 I'm not testifying to the entirety of this

15   standard.  I'm really just using the content in this

16   standard to essentially create a generalized framework

17   for how to analyze business expenses given that the

18   company didn't have its own policy.

19                 So to the extent that you're going to get

20   into -- you know, before we even get into this question,

21   that you're going to get into the specifics, I just want

22   to set that as a baseline.

23         Q       Okay.  So you've told me several times, I

24   wrote it down to make sure I got it right, that you're an

25   expert on -- the business expenses are reasonable, valid

Page 131

1    business expenses in accordance with the IRS and FASB

2    guidelines, right?

3         A    Yes.

4         Q    We're looking at the IRS guidelines, right?

5         A    Yes.

6         Q    Okay.  So are you telling me that these don't

7    really apply to this case or do they?

8         A    I'm saying that the entirety of this standard

9    really gets to how a company, you know, should, you know,

10   look at expenses from a tax deductibility issue from an

11   IRS standpoint.  I'm telling you that I looked at this

12   standard because I felt that the content was helpful in

13   order to delineate between what types of expenses are

14   considered business expenses versus non business or

15   personal.

16        Q    Okay.  You looked at these because of industry

17   standards, right?

18        A    Yes.

19        Q    And they set forth how expenses should be

20   treated by a company, right?

21        A    It sets forth what the IRS considers to be

22   business versus personal.

23        Q    Yeah, which you felt was relevant to this

24   case, right?

25        A    That's right.

1          Q     All right.  You don't cite any other standard

2     or industry guidance that you rely on for your opinions,

3     right?

4          A     Well, there's the FASB and the two IRS

5     standards.

6          Q     Right.

7                Okay.  So this is what we're working with.  So

8     I'm going to ask you about this.  And right now I want to

9     focus you on this recordkeeping section, right?

10         A     Yes.

11         Q     You would agree under this IRS -- these IRS

12    standards you need to be able to prove or substantiate

13    elements of your expenses, right?

14               MS. ROYTBLAT:  And, John, if you need a second

15    to read the standards --

16         A     Yeah, if you just wouldn't mind giving me a

17    second.

18    BY MS. WIGGER:

19         Q     Of course.

20         A     Okay.

21         Q     Is it a controversial statement to say you

22    need to be able to prove or substantiate elements of your

23    expenses?

24               MS. ROYTBLAT:  Object to form.

25         A     Yeah, it says -- it says here that you have

1    to -- you know, if -- I guess you have to provide, you

2    know, I guess if asked, support for expenses to the IRS.

3    BY MS. WIGGER:

4        Q    But you agree you should be able to provide

5    support of all of your business expenses, right?

6            MS. ROYTBLAT:  Object to form.

7        A    The standard here says that if you deduct

8    travel gift or transportation expenses that you should

9    have support to provide to the IRS.

10   BY MS. WIGGER:

11       Q    John, I'm asking you, you, John Imperiale,

12   agree that you should be able to back up your business

13   expenses, right?

14       A    I think that's a best practice.

15       Q    Right.  That's what you did in this -- in your

16   report.  You looked for support, right?

17       A    Right.

18       Q    Right, because that is the best practice, like

19   you just said, right?

20       A    It is -- yeah, it is a best practice to

21   maintain records of your expenses.

22       Q    Right.

23            And those records should be timely kept,

24   right?

25            MS. ROYTBLAT:  Object to form.

Page 134

1      A      I am just reading the standard.  It says if

2   you keep timely and accurate records you will have

3   support to show the IRS.

4   BY MS. WIGGER:

5      Q      Okay.  You, John Imperiale, agree you should

6   keep timely records of business expenses, right?

7      A      I think that's a general best practice that

8   you keep timely business records.

9      Q      Okay.  The IRS agrees.  On paragraph -- on

10  page 25, bottom of the first column, under the heading

11  timely records, it says you should record the elements of

12  an expense or of a business use at or near the time of

13  the expense or use and support it with sufficient

14  documentary evidence, right?

15     A      You're at the bottom of 25?

16     Q      Yes.

17     A      The bottom of page 25 talks about separating

18  and combining expenses.

19     Q      Bottom of page 25, the first column.  Bottom

20  of the first column, timely kept records.

21            Are you with me?  First column at the bottom.

22     A      Oh, I'm sorry.

23     Q      All right.  We together?

24     A      Yes.

25     Q      All right.  Timely kept records.  You should

Page 135

1  record the elements of an expense or of a business use at

2  or near the time of an expense or use and support it with

3  sufficient documentary evidence, right?

4      A    That's what it says.

5      Q    All right.  And like you just said earlier, if

6  your business expense is a meal you should include the

7  name and location of the restaurant, the number of people

8  served, and the date of -- and amount of the expense at a

9  minimum, right?

10          MS. ROYTBLAT:  Object to form.

11      A    Are you reading from this page 25?

12  BY MS. WIGGER:

13      Q    Yes, it's listed on page 25.  So under

14  adequate evidence, first column.  The middle, adequate

15  evidence.  Almost the dead middle of the column.

16      A    Got it.

17      Q    Are you with me?

18      A    A restaurant receipt is enough to prove an

19  expense for a business meal if it has all of the

20  following information; name, number, date.

21          Yes, that's what it says.

22      Q    Okay.  And you agree with that statement,

23  right?

24      A    I would say that that is what -- you know, the

25  support that the IRS requires or --

Page 136

1    Q    Yes, I know that you're agreeing that the

2  words say that.  I'm separately asking you, it is you,

3  John Imperiale's opinion, that when you expense a meal

4  you should have this information, right?

5    A    I would say that's a best practice.

6    Q    You would expect a CEO to know these rules,

7  right?

8    A    No, not necessarily.  I wouldn't have any

9  expectation.

10    Q    Okay.  So you would not --

11    A    It's I -- well, it's IRS tax policy.  I mean,

12  I don't know of Mr. Berris to be a CPA.  So I wouldn't --

13  I wouldn't have an expectation one way or the other for

14  him to be familiar with IRS policy.

15    Q    So you would not expect a CEO to know the

16  standards you cited in your expert report as industry

17  standards?

18    A    I couldn't offer an opinion on that whether

19  it's one way or the other.

20    Q    What if that CEO was deducting business

21  expenses on their personal taxes?  Then would you expect

22  them to know this?

23    A    Again, it's really outside of the scope of

24  what I'm aware of.  I can't testify to that.

25    Q    I mean, answer anyway.  If a CEO was

1    deducting expenses on their personal taxes, would you

2    expect them to know the IRS standards?

3         A     Well, I mean, do we know if he even prepared

4    his own tax return or if he had some third-party

5    accountant prepare the tax return?

6         Q     I mean, either way you're on the hook for your

7    taxes, right?  You would have to give the receipts to an

8    accountant to fill in.

9         A     Well, yes and no.  I mean, I think to the

10    extent that you are relying on it, the expertise of a

11    CPA, for them to prepare your taxes, you may not, you

12    know, page 25 of IRS publication 463.  So I really can't

13    say one way or the other what he knew or what he should

14    have known as the CEO.

15         Q     All right.  So in all your years of working

16    with companies and with executives you don't think a CEO

17    would understand the recordkeeping principles, for

18    example, in the IRS standards?

19         A     I really can't say one way or the other

20    whether Mr. Berris knew.

21         Q     I'm not asking about Mr. Berris.  I'm asking

22    you generally, actually.  I'm kind of rewriting my

23    questions and your answers.

24              So I'm not asking you what Berris knew or

25    didn't know.  I know you don't know that.  I'm saying in

1    your experience working with companies, doing your

2    forensic audits and all your fraud investigations,

3    working with CEOs, all that experience, would you expect

4    executives of a company to have a basic understanding of

5    these principles if they're -- if they're discounting

6    business expenses on their personal taxes?

7              MS. ROYTBLAT:  Object to form.

8         A    I would say -- I would say certain executives.

9    I think certainly if you are the CFO of a company you

10   would be expected to know tax policy.  I think if you

11   were, you know, general counsel in the legal office you

12   would be expected to know tax policy.

13             But the CEO in particular is not necessarily

14   somebody who may have, you know, the acumen or the

15   educational background or the work experience background

16   specifically to be familiar with IRS tax guidelines.  So

17   I can't say one way or the other.

18   BY MS. WIGGER:

19        Q    All right.  So anyone but Mr. Berris might

20   know is what I'm gathering.

21             MS. ROYTBLAT:  Object to form.

22        A    That's -- that's not what I'm saying.

23   BY MS. WIGGER:

24        Q    Okay.  Let's talk a little more about travel

25   expenses.  You can stick with the document in front of

Page 139

1    you.

2         A    All right.

3         Q    You would agree with me that travel expenses

4    are the ordinary and necessary expenses of traveling away

5    from home for your business?

6         A    For business purposes, yes.

7         Q    Okay.  And you're traveling away from home if

8    your duties require you to be outside of the general area

9    of your home, right?

10             MS. ROYTBLAT:  Object to form.

11        A    I just want to take a moment to review page 3

12   again.

13             It says you are traveling away from home if

14   your duties require you to be away from the general area

15   of your tax home substantially longer than ordinary day's

16   work and you need to sleep or rest to meet the demands of

17   your work while traveling away from home.

18             Then when we look at the heading under tax

19   home, it says generally your tax home is your regular

20   place of business or post of duty regardless of where you

21   maintain your home.

22             So that is the definition from the IRS

23   standard.  And, again, this gets to what would be

24   allowable to be tax deducted for a company's tax returns.

25             I also just want to make sure separately, the

Page 140

1    expense policy of the company would really tell you what

2    is allowed one way or the other regarding business

3    travel.

4    BY MS. WIGGER:

5        Q    Are you done?

6        A    Yes.

7        Q    Okay.  So I'm not asking you to read me IRS

8    standards.  I can do that.  I'm trying to get your

9    opinion on things.  So it's not really helpful for you to

10   respond to my questions by just reading paragraphs.  I

11   put this in front of you to help you.  But I'm asking

12   about your opinion as a court expert in this industry.

13            So, again, you told me earlier these are the

14   travel expense standards you applied in this case, right?

15       A    That's right.

16       Q    Okay.  So you keep caveating these by saying

17   they're IRS tax deductible standards.  But they're the

18   standards you applied in forming your opinions, right?

19       A    Right.  I had to establish a general

20   framework.

21       Q    And you picked these IRS tax deductible

22   standards as your general framework, right?

23       A    Yes.  Yes, that's right.

24       Q    Okay.  Are you telling me now those don't

25   apply to this case?

Page 141

1          A       No, I'm not.

2          Q       Okay.  So -- okay.  So these are the standards

3     you're applying to de Tomaso's expenses, right?

4          A       That's right.

5          Q       Okay.  So to determine -- you, as part of your

6     report, you analyzed certain of Mr. Berris's travel

7     expenses, right?

8          A       That's right.

9          Q       In determining whether something was a travel

10    expense, you relied on these standards, right?

11         A       Yes.

12         Q       Including the definitions set forth in these

13    standards, right?

14         A       Yes.

15         Q       Okay.  So Mr. Berris was traveling away from

16    home, according to your analysis, if his duties required

17    him to be out of the general area of his tax home for

18    substantially longer than an ordinary day's work where he

19    was stopping or resting on the way to do so, right?

20         A       Yes.

21         Q       Okay.  And his tax home is his regular place

22    of business or post of duty, right?

23         A       Right.

24         Q       And you told me that was Glastonbury,

25    Connecticut based on your analysis?

Page 142

1        A     Yes.

2        Q     Okay.  Because, of course, you had to know the

3   tax home to know if he was traveling away from the tax

4   home, right?

5        A     Correct.

6        Q     Okay.  Now, when Mr. Berris traveled away from

7   his tax home he was to keep records of his expense so

8   that he could submit them as business expenses, right?

9        A     I think we established that that would be a

10  best practice.

11       Q     Right.  That's a best practice set forth in

12  the standards you applied to this case, right?

13       A     Right.

14       Q     Okay.  All right.  We've covered this earlier.

15  But the expenses that you analyzed were for the months

16  December 2020 through August 2021, right?

17       A     Yes.

18       Q     Do you know how much Mr. Berris received from

19  de Tomaso in expense reimbursements between August 2021

20  and December 2021?

21       A     No.

22       Q     Okay.  Would it surprise you to know it was

23  over $700,000?

24             MS. ROYTBLAT:  Object to form.

25       A     I wouldn't know one way or the other.

Page 143

```
 1    BY MS. WIGGER:
 2         Q     Okay.  I'm going to show you a document.  Bear
 3    with us.  Nope.  Okay.  Well, that got introduced without
 4    an exhibit stamp accidentally.
 5               But Berris 91077 is going to be Exhibit 7.
 6               (Exhibit 7 marked for identification.)
 7         A     One moment while it loads.  Okay.
 8         Q     I don't know if we can add a stamp on the back
 9    end.  But if so, that would be helpful because I meant to
10    put a stamp on that.
11               All right.  Do you see that document in front
12    of you?
13         A     I do.
14         Q     Okay.  Have you seen this document before?
15         A     No.
16         Q     Okay.  Take a chance to read it and tell me
17    when you're done.
18         A     Okay.
19         Q     Have you read it?
20         A     Yes.
21         Q     All right.  This is an email from Diana
22    Majcher to Ryan Berris on March 24th, '22, right?
23         A     Yes.
24         Q     Okay.  And after reviewing it, have you seen
25    this email, whether this thread or another, before?
```

Page 144

1        A      No, this is the first time I've seen this.

2        Q      Okay.  So this is an email from Diana

3    requesting justification or support for certain expenses,

4    right?

5        A      Yes.

6        Q      And we've said earlier you're aware that

7    Aprivy is Berris's personal LLC, right?

8        A      Right.

9        Q      Okay.  And this references an audit, right?

10       A      It does.

11       Q      In the bottom paragraph that begins with

12   "based on," it says:  Based on the above, the auditors

13   are inclined to view the amounts paid to Aprivy and the

14   transactions in the Bank of America account that cannot

15   be substantiated/verified as money spent on Aprivy/your

16   behalf unless proper documentation can be provided.

17              Do you see that?

18       A      I do.

19       Q      Okay.  And then there's directly paid to

20   Aprivy.  And there's an amount of $157,521.92?

21       A      I see that.

22       Q      And then there's expenses incurred.  And

23   there's a total of $469,465.02, right?

24       A      Yep, right.

25       Q      Okay.  Now, I understand that your report

1    covers about $49,000 of travel expenses, right?

2         A     Right.

3         Q     And as you saw in the expense reports that

4    there are far more expenses reported, right?

5         A     Right.

6         Q     Were you asked at any time to analyze the rest

7    of the $469,000 of expenses?

8         A     No.

9         Q     Why did you focus just on travel expenses and

10   not on any other expense in the expense reports?

11        A     Because they happened to be the larger ticket

12   items.  I didn't focus on the smaller items, like meals

13   and smaller items like that.

14        Q     Okay.  So you cover 49,000 out of 469,000 of

15   expenses.  And that's all, right?

16        A     That was the scope of my report, yes.

17        Q     Were you ever asked to look into the expenses

18   directly paid to Aprivy totaling, at least according to

19   this email, 157,000?

20        A     No.

21        Q     Did you ever see any emails or reports from

22   the auditors that were looking over de Tomaso's accounts?

23        A     No, I didn't.

24        Q     Is this something you would have wanted to see

25   in the scope -- in your report?

Page 146

1          A       I don't think it would have had any effect on

2     the scope of my report.  What I really wanted to see was,

3     number one, what was the business purpose of each of the

4     trips that I looked at.  And then supporting

5     documentation in terms of receipts, invoices, chats,

6     emails to substantiate the expense.  Anything else would

7     have been kind of unnecessary.

8          Q       So that's what was being requested in this

9     audit, right?

10         A       In terms of -- let me take a look at this.

11                 MS. ROYTBLAT:  Object to form.

12         A       Because this is the first time I'm looking at

13    this document.

14    BY MS. WIGGER:

15         Q       Take your time.

16         A       So in bullet point 2, note the proper

17    supporting documents means actual receipts, invoices,

18    emails, and correspondence.

19                 So, yeah, those were the types of supporting

20    documents that I requested and reviewed for the expenses

21    in my analysis.

22         Q       But you, nevertheless, didn't see anything

23    from this audit?

24         A       No, I'm not aware of this audit.  I haven't

25    seen anything from it.

Page 147

1        Q    All right.  You can set that aside.

2             Let me show you another exhibit.  All right.

3    You should be able to see Exhibit 8.

4             (Exhibit 8 marked for identification.)

5        A    Bear with me while it loads.  Oh, I may have

6    gotten a little error.  Oh, actually, no.  I can't see

7    the first page.  I don't know if there's anything on the

8    first page.  All I see is the second page.  It just says

9    please let me know if you have any questions.  Best

10   regards, Diana.

11       Q    Yeah, there's definitely a first page.  Try

12   refreshing it again.

13       A    Oh, there it is.  Yep.

14            Okay.  Can I take a moment to review it?

15       Q    So I'm going to ask you if you've seen this

16   and let you review it.  But this email has an attachment

17   that is 784 documents long.  So I just put the cover

18   email in here.  But go ahead and take a look at it and

19   let me know if you've seen this before.

20       A    Okay.  I've reviewed.

21       Q    Have you seen this document before?

22       A    I have not.

23       Q    Have you seen the attachment, the 784

24   documents together before?

25       A    I don't think so.  It -- I'm not sure what

Page 148

1    that would look like.

2        Q    Yeah, I'm not asking -- I mean, obviously

3    that's a lot of documents.  You wouldn't know if you've

4    seen a particular one.  But you haven't received any

5    other cover email with an attachment called 2021

6    de Tomaso RB expense documents that has about

7    700 documents in it?

8              MS. ROYTBLAT:  Object to form.

9        A    That does not -- it doesn't look familiar to

10   me.  I've never seen this email.

11   BY MS. WIGGER:

12       Q    Okay.  So this is an email from Ryan to Diana

13   on May 19th of 2022, right?

14       A    Yes.

15       Q    And he says:  Following our discussion

16   regarding this matter, I have spent time reviewing,

17   preparing missing receipts and revising Excel documents.

18   Kindly find attached to this email the corresponding

19   expense reports, receipts, and other relevant

20   documentation.

21            Do you see that?

22       A    I do.

23       Q    Okay.  So you, as far as you know, were never

24   provided this list of expense reports, receipts, and

25   other relevant documentation?

Page 149

1          A      I would say to the extent that any of those

2     files relate to the receipts for the travel expenses in

3     my report, I probably may have seen them.  But I don't

4     know what the receipts in the files are to say one way or

5     the other.

6          Q      And maybe I kind of answered this question at

7     the beginning.  But just to make sure I understand this

8     correctly, the process for getting the receipts and

9     documentation for expenses were that you identified

10    expenses, either in the expense report or in the

11    narrative, and then asked counsel to provide you with the

12    backup related to those expenses.  Is that an accurate

13    understanding?

14         A      Right.  The supporting doc -- go ahead.

15         Q      I was just going to say as opposed to you

16    sorting through a collection of documents trying to match

17    them up yourself?

18         A      That's right.  The request was made to

19    counsel.  Counsel provided me the response of documents

20    per my request.

21                And I would just add to the extent that I felt

22    that what was provided was not sufficient to substantiate

23    the expense, you know, in accordance with the IRS

24    policies, those expenses I would not have included in my

25    report.

Page 150

1          Q     Okay.  I'm introducing another document.  This
2     is going to be in two parts.  The first one is just a
3     blank sheet that says document produced in data format,
4     but has a Bates number.  And then I'm going to introduce
5     an Excel.  So bear with me for a second.
6                So I just introduced one, which I also forgot
7     to put an exhibit sticker on.  I'm doing really poorly
8     with that today.  And then the native is coming.
9                All right.  If you could open that native
10    Excel when you have a second.  Well, when it loads.  I
11    guess you have as many seconds as we want right now.
12         A     It's loading.
13         Q     Just let me know when it's open in front of
14    you.
15         A     It's still loading.
16         Q     Still loading?
17         A     It is.  It's still spinning.
18         Q     Try refreshing it.  If it won't open, I can
19    screen share.  It's just easier for you to look through
20    it if you have your own.
21         A     Oh, yeah, that did it.
22         Q     All right.  Cool.
23                Okay.  So this is Berris's expense report from
24    December 19, 2020 through August 15, 2021, right?
25         A     Yes.

Page 151

1          Q       Okay.  So I'm looking at the recap tab, by the

2    way.  I don't know if it opened to the first tab.  But go

3    to recap tab.

4          A       Oh, just to pause you.  So it opened as like a

5    PDF.  So there's no tabs to tab through on this document.

6          Q       Okay.  That's --

7          A       Maybe I can try opening it again.

8          Q       Do you want me to screen share so you can just

9    look at this Excel with me?

10         A       Yeah, let's try that.

11         Q       All right.  If this doesn't work we can find

12   some other.

13                 All right.  Do you see an Excel?  Hold on.

14   There we go.

15         A       If you can make it bigger.  But yes.

16         Q       That's probably about as big as -- oh, better?

17         A       Yeah.

18         Q       Okay.  So this is the expense report from

19   December 19, 2020 through August 15, 2021, right?

20         A       Yep.

21         Q       And you told me earlier this is one of the

22   documents that you did review in identifying expenses for

23   your report, right?

24         A       That's right.

25         Q       Okay.  So this report lists, if you just look

Page 152

1   at the travel things, about 8,000, a little over, in

2   travel and transportation, right?

3        A      Right.

4        Q      A little over 2,000 in gas, right?

5        A      Yep.

6        Q      And a little over 45,000 in hotels, right?

7        A      Yes.

8        Q      And then 10,000 in flights, correct?

9        A      Correct.

10       Q      Okay.  Now, those numbers are different than

11   the ones that you have in your report, right?

12       A      That's right.

13       Q      All right.  So I think in your report you have

14   that Berris incurred a little over 37 in hotel expenses,

15   right?

16       A      That's right.

17       Q      And a little over 12,000 in airfare, right?

18       A      Yep, that's right.

19       Q      Okay.  So less in hotels and a little more in

20   flights, right?

21       A      Right.

22       Q      All right.  Did you reconcile the numbers in

23   your report with the actual expense reports?

24       A      Did I reconcile the numbers?  Can you be more

25   specific?

Page 153

1      Q      Yes.

2             So the numbers in these expense reports, we've

3      just established, are different than the numbers in your

4      report.

5      A      That is correct.

6      Q      Do you know why?

7      A      I do.  So for the hotels, the reason why I

8      came in a little below the 45 on the expense report,

9      that's going to be primarily because there are certain

10     hotel expenses that are listed on this report that we're

11     looking at that I could not get sufficient documentation

12     to substantiate the business purpose for that expense.

13            The flights, I came in at a little bit more

14     because even though this expense report says it goes

15     through August 15th, 2021, it seems that the expenses

16     included in this report only go up to the end of

17     July 2021 or thereabouts.  So there was some expenses,

18     specifically flights, and I believe also maybe some hotel

19     expenses that were left off of this report.  But I later

20     picked up when I went through the narratives that we

21     discussed earlier.

22     Q      All right.  And as I think you said earlier,

23     your understanding is that this report was submitted to

24     de Tomaso for payment of these expenses, right?

25     A      Yes.

Page 154

1        Q     And as far as you know those expenses were

2    paid, right?

3        A     Based on discussions with counsel.

4        Q     Based on counsel statements, these expenses

5    were paid as far as you know, right?

6        A     Yes.

7        Q     All right.  I want to look at the hotels tab

8    here.  This is very small.

9              And I want to look at June and July.

10             MS. ROYTBLAT:  Would you mind -- would you

11    mind zooming in just a little more?

12             MS. WIGGER:  Is that better?

13             MS. ROYTBLAT:  I think so.

14             THE WITNESS:  A little bit.

15             MS. WIGGER:  This is why Exhibit Share is much

16    better.  But is that better?  I can just keep scrolling

17    down, I guess.

18             THE WITNESS:  Yeah, that's fine.

19             MS. WIGGER:  That did something to it.  That

20    took away -- there we go.  For some reason that took away

21    the headings.  But, all right, can you guys see that?

22        A     Yes.

23    BY MS. WIGGER:

24        Q     All right.  Berris has hotel expenses for most

25    days in June on this sheet, right?

Page 155

1          A       Yes.

2          Q       Okay.  And also most days in July, right?

3          A       Yeah, that's what it seems like on the

4     spreadsheet.

5          Q       Okay.  Now, this expense report does not list

6     the business reason that he would have needed any of

7     these hotels, right?

8          A       Right.  It's not listed on the expense report.

9          Q       So someone reviewing would have had no way to

10    evaluate whether these were legitimate business expenses,

11    right?

12         A       For my purposes, if I was reviewing just that

13    expense report, I would need to -- and in fact I did go

14    back and get more supporting information to substantiate

15    the business purpose.

16         Q       Right.  Because you were applying industry

17    standards, right?

18         A       Yes, as a forensic accountant.  In order to

19    issue an expert opinion that these were business

20    expenses, I would need to seek more than just an Excel

21    spreadsheet.

22         Q       All right.  I'm going to the flights tab.

23         A       Okay.

24         Q       And I'm just going to try to make it bigger.

25    And it weirdly changed the formatting.

Page 156

1          MS. WIGGER:  Is that big enough for you guys?

2     A    Yes.

3  BY MS. WIGGER:

4     Q    Okay.  So, again, the expense report does not

5  list the business reason that he would have needed any of

6  these flights, right?

7     A    That's right.

8     Q    So someone reviewing would had no way to

9  evaluate whether these were legitimate business expenses

10 just based on this report, right?

11    A    They would have needed to ask follow-up

12 questions like I did.

13    Q    All right.  Now I'm going to the food tab.

14    A    Okay.

15    Q    This is really small.  I'm kind of zooming in

16 on July as best I can.  Can you more or less see that?

17    A    Yeah.

18    Q    Okay.  Again, there are meal expenses for

19 almost every day in July, right?

20    A    Yes.

21    Q    Okay.  And they're for things like

22 Whole Foods, right?

23    A    Yep.

24    Q    Okay.  Starbucks, Pressed Juicery, right?

25    A    I see -- I see those.

1        Q      And there's nothing in this expense report

2   here which someone reviewing would be able to evaluate

3   whether these were legitimate expenses, right?

4        A      No, not just based on that expense report

5   would tell you.

6        Q      Okay.  I want to go back to the flights tab.

7   And grab your report as well.  I want to look at

8   paragraph 36 of your report.  Let me know when you have

9   that in front of you.

10       A      Okay.

11       Q      Okay.  So on paragraph 36 of your report you

12  say:  Mr. Berris purchased a flight for himself and

13  Mr. Choi to fly from New York JFK to Los Angeles, LAX, on

14  August 9, 2021 for a total cost of $988.80, right?

15       A      Yes.

16       Q      And the footnote there, the 77, is to a

17  document without a Bates stamp, right?

18       A      Right.

19       Q      Okay.  Now, the flight in August of 2021

20  would, in theory, fall under this expense report, right?

21       A      That's right.

22       Q      Okay.  That flight is not listed in this

23  expense report, right?

24       A      It is not.

25       Q      Okay.  And like you said earlier, in fact

Page 158

1   nothing in August is, right?

2       A     Right.

3       Q     Okay.  So we're going to look at the next

4   expense report.  Bear with me as I get that in front of

5   us.  Sorry, this takes a second.

6             So same deal.  This is going to be a two-part

7   exhibit with a cover page with a Bates stamp followed by

8   the native Excel.  I'm currently introducing Exhibit 11,

9   which is a blank page with a Bates stamp.

10            (Exhibit 11 marked for identification.)

11            MS. ROYTBLAT:  Would you mind reading off

12  those Bates?

13            MS. WIGGER:  Yes, give me one second.

14            And now I'm introducing the Excel coming in as

15  Exhibit 12.

16            (Exhibit 12 marked for identification.)

17      A     It's loading.

18  BY MS. WIGGER:

19      Q     And the Bates is on Exhibit 11.  It looks like

20  it is DT 35961.  Okay.  And I'm going to do the same

21  thing and screen share this.

22            Has it loaded in Exhibit Share?

23      A     No, it hasn't.  Same thing.

24      Q     Okay.  I do want to make sure it actually

25  loads in Exhibit Share at some point.  But this is

Page 159

1    DT 35961.

2            Can you see the document I've shared on my

3    screen?

4        A    Yes.

5        Q    Okay.  So this is the next expense report

6    sequentially from August 15, 2021 through December 31,

7    2021, right?

8        A    Yep.

9        Q    This is the second expense report that you

10   told me you looked at earlier, right?

11       A    Yes, that's right.

12       Q    Okay.  And I just want to go to the flights

13   tab.  This is where we see those flights from August show

14   up, right?

15       A    Yep.  Yes.

16       Q    Okay.  But we still don't have an August 9th

17   flight for $988.80, right?

18       A    That's right.  It seems like the beginning of

19   August got cut off from the last expense report.  And

20   this expense report picked up on August 15th.  So it's

21   missing --

22       Q    It didn't get -- get cut off.  It wasn't

23   included as far as we can tell from these documents,

24   right?

25       A    That's fair.  That's what I meant to say.

Page 160

1    Right.  So we're missing about a two-week period in early

2    August.

3         Q    Okay.  So there are expenses in your report

4    that were not even submitted to de Tomaso, right?

5              MS. ROYTBLAT:  Object to form.

6         A    I don't know one way or the other how

7    Mr. Berris went about submitting those expenses.  I can't

8    say.

9    BY MS. WIGGER:

10        Q    Based on the expense reports you analyzed,

11   there are expenses in your report that were not submitted

12   to de Tomaso, right?

13             MS. ROYTBLAT:  Object to form.

14        A    I would just rephrase and say that there are

15   expenses in my report that don't show up in either of the

16   two expense reports that you've put in front of me.

17   BY MS. WIGGER:

18        Q    Including this flight for $988.80, right?

19        A    Right.

20        Q    Okay.  Now, you just said including the two

21   expense reports you put in front of me.  Were there other

22   expense reports that you reviewed?

23        A    Does this go up to December of 2021?

24        Q    It does.

25        A    Then I think these are the only two that I've

1   looked at.

2           MS. WIGGER:  Okay.  All right.  Let's go ahead

3   and take a 10-minute break and come back at 2:20, please.

4           THE WITNESS:  Okay.  And maybe I'll just

5   follow up with, Hannah.  So the document did load.  But,

6   again, it's loading sort of like as a PDF style.  So like

7   I can scroll down and it's got a lot of pages.  But I

8   can't see the tabs.  So something is up with the Excel.

9           MS. WIGGER:  All right.  Well, you saw the

10  Excel when I screen shared, right?

11          THE WITNESS:  Yes.

12          MS. ROYTBLAT:  I also think there might be an

13  issue with the exhibit numbering where one of the Excels

14  is Exhibit 10 and then the second one is 12.

15          MS. WIGGER:  Right.  So the blank pages that

16  had the Bates numbers on them loaded as separate

17  exhibits.  So the first Excel is Exhibits 9 and 10.  The

18  second is 11 and 12.  And Exhibits 9 and 11 have their

19  Bates numbers.

20          (Exhibits 9 and 10 marked for identification.)

21          MS. ROYTBLAT:  Got it.  Sorry.

22          MS. WIGGER:  Yeah, there's a point where they

23  do them together.  I just don't know what it is.

24          Okay.  Let's come back in 10 minutes.  Thank

25  you.

Page 162

1                THE VIDEOGRAPHER:  We're now off the record at

2       2:07 PM.

3                (Recess taken from 2:07 PM to 2:21 PM.)

4                THE VIDEOGRAPHER:  We're now back on the

5       record at 2:21 PM.

6                You may proceed.

7                MS. WIGGER:  Thank you, Mr. Imperiale.  I

8       don't have any further questions.

9                MS. ROYTBLAT:  All right.  I just have one

10      question on redirect.

11                          EXAMINATION

12      BY MS. ROYTBLAT:

13         Q    Mr. Imperiale, you recall opposing counsel

14      asking you about Mr. Berris's September 30th, 2024

15      declaration?

16         A    I do.

17         Q    Why did you rely on that declaration in

18      preparing your report?

19         A    So let's refer to footnote 1 of my expert

20      report.  And I say in the second sentence:  It's any

21      understanding that the factual foundation predicates for

22      the facts set forth in my report will be laid by fact

23      witnesses at trial and through other evidentiary

24      materials.

25                And so I wanted to get an understanding of

Page 163

1  what Mr. Berris would testify to on a factual basis, if

2  asked, as to the travel dates and the business purpose of

3  his travel.  It is not the declaration itself that formed

4  the basis of my opinion.  It is one document that I

5  relied upon in conjunction with many other pieces of

6  supporting documentation and receipts and invoices for

7  the underlying expenses.

8            MS. ROYTBLAT:  Nothing further from me.

9            MS. WIGGER:  Okay.  I have a recross.

10                      EXAMINATION

11  BY MS. WIGGER:

12       Q    Did you practice that question with

13  Ms. Roytblat at a break?

14       A    I did not practice that question.  It was, you

15  know, something that we discussed at lunch.

16       Q    I see.  So you discussed your testimony on

17  redirect at lunch?

18       A    It was an issue that came up at lunch.

19       Q    I see.

20       A    Of something that I felt that I did not get a

21  chance to answer fully in my examination.

22            MS. WIGGER:  Well, as you know, Sophie, that's

23  improper.  But we'll set that aside for now.

24  BY MS. WIGGER:

25       Q    Mr. Berris's declaration was necessary to your

Page 164

1    report, right?

2         A    It was one of the documents that I relied upon

3    to understand the business purpose of -- of his travel.

4         Q    And for many of the business expenses we

5    talked about earlier, it was the only thing you relied on

6    to understand the business purpose of the expense, right?

7              MS. ROYTBLAT:  Object to form.

8         A    Understand the business purpose of the

9    expense, yes.  I had other documents to substantiate the

10   expense itself.  But, yes, there were certain expenses

11   that I relied upon the declaration to understand what

12   Mr. Berris would testify to as to the business -- the

13   business purpose of that trip.

14   BY MS. WIGGER:

15        Q    Right.

16             And you needed that to form your opinions,

17   right?

18        A    I did.  That was one piece of the evidence

19   that I needed.  Like I said in footnote 1, you know, the

20   factual foundation of the certain items in my report, I'm

21   going to rely on, you know, fact witnesses and other

22   evidentiary materials at trial.  So I wanted to know what

23   Mr. Berris would testify to if asked on that issue at

24   trial.

25             MS. WIGGER:  All right.  I have no further

Page 165

1    questions for you.

2              But I want to stay on the record.

3              So there are several things about this that

4    concern me.  One, you coached a witness at a break.

5    That's pretty improper under New York rules.  As you

6    know, once a witness is under oath you don't get to talk

7    to them about their testimony and prep redirect

8    questions.  So that's an issue that we're going to deal

9    with.

10             Number two, you didn't produce a lot of the

11   documents or cite many of the documents that he relied

12   upon in forming his report.  In particular, I want the

13   list of expenses that he referenced he testified or

14   relied on that counsel gave him.

15             I'll follow up in an email on these points.

16   But that needs to be produced to us immediately.  And

17   we're holding this deposition open until we receive that

18   document and can evaluate it.

19             MS. ROYTBLAT:  Sounds good.  You can follow up

20   in an email.

21             As to your first point, I did not coach the

22   witness at a break.  We discussed the questions that came

23   up as to the declaration.  But that was not coaching.

24             And as to your second point, Hannah, you guys

25   had all of the documents that were cited in

Page 166

1    Mr. Imperiale's report when the report was served on U.S.

2    counsel.  And then all of the expense reports that were

3    relied on were provided to you in the electronic binder

4    that we sent last night.

5              MS. WIGGER:  Right.  So my concern is the

6    documents that weren't cited in his report, weren't

7    provided at all, including the document he relied on

8    given him by counsel.

9              And just to be clear, the documents you gave

10   us last night at midnight, that didn't include any new

11   documents, did it?

12             MS. ROYTBLAT:  No.

13             MS. WIGGER:  Right.  Okay.  So, again, my

14   specific ask in particular, and I would like to have it

15   today, is the document he testified he relied on for

16   business expenses to identify expenses beyond the expense

17   reports.

18             MS. ROYTBLAT:  Sure.  If you put your request

19   in an email, we're -- we're happy to address that.

20             MS. WIGGER:  Well, I'm telling you that right

21   now, like as counsel, I need that document today.

22             MS. ROYTBLAT:  Yes.  Okay.  Well --

23             MS. WIGGER:  Okay.

24             MS. ROYTBLAT:  -- you put your request in

25   writing in an email, then I will confer with my team, and

1    then we will respond to your request.  I don't think that

2    the deposition is the appropriate forum for that.

3              MS. WIGGER:  Okay, Sophie, I will go to your

4    partners and tell them as well if you can't do it.  But,

5    yes, I'm telling you I want it.

6              MS. ROYTBLAT:  Okay.

7              MS. WIGGER:  All right.

8              Can I have a -- from the court reporter -- we

9    can go off the record.

10             THE VIDEOGRAPHER:  This now ends today's

11   deposition of John Imperiale.  We're off the record at

12   2:26 PM.

13             MS. WIGGER:  Can I get a rough as soon as

14   possible for this deposition?  Would the next 24 hours be

15   possible?

16             THE REPORTER:  Yes, I'll make sure you have

17   it.

18             MS. ROYTBLAT:  And I'll take a rough as well.

19   I don't know if we have a running order, but I would like

20   the rough.

21             MS. WIGGER:  Would a rush on this be possible?

22             THE REPORTER:  Yes.  When would you like it?

23             MS. WIGGER:  Is five business days possible?

24             THE REPORTER:  Sure.  Not a problem.

25             (Off the record at 2:27 PM.)

Page 168

1          COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2              I, Lisa Rene Reinicke, a Notary Public in and

3     for the Commonwealth of Virginia at large, and whose

4     commission expires October 31st, 2028, do certify that

5     the aforementioned appeared before me, was sworn by me,

6     and was thereupon examined by counsel, and that the

7     foregoing is a true, correct, and full transcript of the

8     testimony adduced.

9              I further certify that I am neither related to

10    nor associated with any counsel or party to this

11    proceeding nor otherwise interested in the event thereof.

12             Given under my hand and notarial seal at

13    Charlottesville, Virginia, this 4th day of November 2024.

14

15

16

17    _____

18              Lisa Reinicke

19    Notary Public Registration No. 7863327

20       Commonwealth of Virginia at Large

21

22

23

24

25

**[& - 25]**                                                                                    Page 1

**&**

**&**  27:21 28:18
  28:24 30:4,6
  30:24 31:7

**0**

**000280869**
  101:24
**04305**  1:7 4:9

**1**

**1**  3:7 4:5 8:3,12
  8:13,14,21
  79:21 110:12
  162:19 164:19
**10**  3:12 12:4
  66:4,24 92:7
  92:24 96:17
  97:8 101:1
  109:10 161:3
  161:14,17,20
  161:24
**10,000**  37:25
  152:8
**10th**  90:23
**11**  3:12 158:8
  158:10,19
  161:18,18
**11050**  5:16
**111**  3:9
**11:14**  67:4,5
**11:24**  67:5,7
**11:25**  66:24
**12**  3:13 158:15
  158:16 161:14
  161:18

**12,000**  152:17
**12/24/2020**
  81:15
**129**  3:10
**12:20**  110:15
  110:16
**13**  117:9
**1401**  2:4
**143**  3:10
**147**  3:11
**148**  83:6
**15**  93:19 95:3
  150:24 151:19
  159:6
**157,000**  145:19
**157,521.92**
  144:20
**158**  3:12,13
**15th**  153:15
  159:20
**161**  3:11,12
**162**  3:3
**163**  3:3
**16th**  85:15
**17**  93:19 95:3
  103:11,17
  109:12,18
**18**  97:23
  103:11,17
**18th**  35:2,17,18
**19**  105:1,11
  150:24 151:19
**19th**  3:11 35:15
  35:17 148:13

**1:01**  110:16,18
**1:23**  1:7 4:9
**1e**  113:18

**2**

**2**  3:8 33:24
  34:1,4 65:15
  146:16
**2,000**  152:4
**20**  31:5
**20002**  2:4
**20006**  2:10
**2004**  27:10
**2009**  29:9
**2010**  27:15
  29:10 32:3
**2013**  32:4
**2017**  32:14
**2018**  32:14
**202**  2:11
**202-237-2727**
  2:5
**2020**  21:12
  39:18 63:15
  79:22 80:2
  142:16 150:24
  151:19
**2021**  12:7
  21:13,16,17
  33:14 39:18
  53:3 62:24
  63:15 83:15,15
  83:23,23 85:15
  87:11,12,20,20
  90:22,23 91:18
  92:5,7 93:19

97:23 98:9
  100:3 103:11
  103:17 105:1,2
  109:11,12,18
  142:16,19,20
  148:5 150:24
  151:19 153:15
  153:17 157:14
  157:19 159:6,7
  160:23
**2022**  3:11
  148:13
**2023**  35:15
**2024**  1:19 4:1,4
  34:7 35:3
  162:14 168:13
**2028**  168:4
**2099**  2:10
**21**  80:1
**22**  1:19 143:22
**22nd**  4:4
**23**  4:1 86:7,9
**23rd**  83:14,23
**24**  83:22 86:2
  98:9,21 99:15
  100:20 119:1
  129:24 167:14
**24th**  79:22 80:2
  143:22
**25**  98:9,21
  99:16 100:21
  134:10,15,17
  134:19 135:11
  135:13 137:12

**[25th - account]**                                    Page 2

**25th** 105:12
**26** 87:19 98:20
99:23 100:2
**28** 98:20 99:23
100:2
**28947** 168:16
**2:07** 162:2,3
**2:20** 161:3
**2:21** 162:3,5
**2:26** 167:12
**2:27** 1:18
167:25
**2b** 111:23
112:1
**2nd** 83:15,23
87:11,20

**3**

**3** 3:8 52:16,17
52:19 76:7,9
76:13,14
111:23,25
112:1 139:11
**3,581** 102:4,15
**30** 61:23 78:3
**30th** 9:18 13:12
34:7 41:14
75:11 162:14
**31** 92:17 159:6
**31st** 168:4
**32** 95:21,24
**33** 103:20,20
104:20,23
**34** 3:8 105:11
**35** 77:9

**3500** 103:4
**35961** 158:20
159:1
**36** 110:2 157:8
157:11
**37** 152:14

**4**

**4** 3:9 77:20,22
**40** 110:13
**44** 53:11
**45** 53:11,11,12
53:17 153:8
**45,000** 152:6
**463** 3:10 76:9
76:14 129:9,14
137:12
**469,000** 145:7
145:14
**469,465.02**
144:23
**49,000** 145:1,14
**49,884.29** 64:17
67:15 73:12
**4th** 168:13

**5**

**5** 3:2,9 76:10
76:14 87:10
111:9,11
129:25
**500** 112:9
115:2,16
**52** 3:8
**535** 3:8 53:2
59:25 60:6

76:7,14 77:7
96:23 108:1
**563** 108:3

**6**

**6** 3:10 89:16
129:8,11
**6970488** 1:23

**7**

**7** 3:10 65:15
87:20 143:5,6
**700** 148:7
**700,000** 142:23
**747-1931** 2:11
**76** 110:3
**77** 3:9 157:16
**784** 147:17,23
**7863327** 168:19
**7th** 87:12

**8**

**8** 3:7,11 67:11
67:13 92:23
96:17 97:7
103:10 105:1
147:3,4
**8,000** 152:1
**80** 81:16
**8th** 90:22 91:10
91:18 92:4

**9**

**9** 3:11 92:7,24
101:1,2 104:25
109:11,18
157:14 161:17
161:18,20

**91077** 143:5
**988.80** 157:14
159:17 160:18
**99** 5:15
**9:59** 1:18 4:1,3
**9th** 101:12
159:16

**a**

**ability** 7:14
**able** 11:20
19:25 33:25
77:20 103:9
130:5 132:12
132:22 133:4
133:12 147:3
157:2
**above** 144:12
**absence** 75:17
**absent** 44:4
61:7
**accepted** 30:15
124:23
**access** 37:23
38:2,8
**accidentally**
143:4
**accomplished**
90:8
**accordance**
22:9 64:11
67:23 68:4
71:24 75:9,12
131:1 149:23
**account** 70:1,7
70:22 129:3

144:14
**accountable**
  54:1,2,4,5 55:7
  56:11 60:8
**accountant**
  22:20 77:15
  137:5,8 155:18
**accounting**
  17:7 23:1,3,6
  23:10,12,17,21
  27:7,20 30:13
  30:16 31:20
  32:18 119:1
**accounts**  25:8
  70:20 145:22
**accurate**  12:23
  76:15,16 93:9
  94:6 134:2
  149:12
**accurately**  7:11
**acting**  112:15
**activities**  85:16
  99:16 101:12
**activity**  95:15
**actual**  12:14
  17:18 118:3
  146:17 152:23
**actually**  18:18
  24:15 34:22
  41:6 46:1
  47:12 69:21,22
  70:6 72:10
  90:24 97:9
  103:6 104:2,20
  105:21 106:1

107:1,25 108:2
  108:21 113:14
  137:22 147:6
  158:24
**acumen**  138:14
**add**  43:7,22
  143:8 149:21
**added**  73:12
**addition**  20:9
  74:12 82:5
  95:22
**additional**
  40:19 41:4
  43:8,9,12 71:8
  74:23 98:18,23
  99:2,22
**address**  5:14
  166:19
**adduced**  168:8
**adequate**
  135:14,14
**administration**
  27:6,12
**administrative**
  7:22
**advisory**  29:24
**aforemention...**
  168:5
**agency**  7:19,22
**agenda**  85:16
  86:11 88:6,11
  90:7 102:21
**ago**  18:12
  28:15

**agree**  15:3
  23:11 45:10
  46:4,8,18 50:2
  52:12 54:15,20
  64:3 71:22
  73:21,24 74:21
  86:20 108:15
  108:20 116:21
  117:25 118:4
  121:13 124:22
  128:5 129:1
  132:11 133:4
  133:12 134:5
  135:22 139:3
**agreeing**  136:1
**agreement**  3:9
  111:5,10
  113:13 118:10
**agrees**  134:9
**ahead**  8:12
  11:3 49:5
  52:17 56:21,22
  58:3 86:22
  94:16 122:11
  122:12,13
  147:18 149:14
  161:2
**airfare**  47:4
  152:17
**airport**  97:25
**akin**  120:8
**al**  4:8 11:2,4
**alexandra**  2:9
**allegedly**  89:25

**allow**  124:14
**allowable**
  50:15,23 75:21
  97:4 123:15
  124:19 125:19
  125:20 127:6,7
  139:24
**allowed**  140:2
**allows**  9:7
  128:11
**alto**  98:11 99:3
  100:12,24
**ambiguous**
  126:21
**amend**  20:11
**america**  144:14
**amount**  52:6
  57:20 61:18
  64:8,19 83:6
  107:12 121:8
  121:12 122:5
  135:8 144:20
**amounts**  73:17
  144:13
**analyses**  25:6
**analysis**  20:23
  23:2,6,10 25:7
  67:13 70:21
  71:8 107:1
  120:23 121:4
  128:17,20
  141:16,25
  146:21
**analyze**  65:22
  107:23 130:17

145:6
**analyzed**
  113:23 129:21
  129:22 141:6
  142:15 160:10
**angeles**  157:13
**answer**  6:18,22
  7:4,14 13:23
  20:11 23:5
  24:23 25:16
  27:1 34:12
  43:17,21 48:18
  51:15 54:6
  62:18 64:13
  93:5 98:7,23
  119:16 125:14
  136:25 163:21
**answered**  20:2
  35:12 49:19
  59:7 90:25
  149:6
**answers**  137:23
**anyway**  136:25
**apartment**
  125:17
**apartments**
  124:14
**apollo**  111:5
  112:22 113:4,7
  113:11,19,23
  114:2,5,11
  115:7
**appear**  9:5 39:8
**appearances**
  2:1

**appeared**  168:5
**appearing**
  125:25
**appendix**  10:25
**applicable**
  55:11 60:7
  76:25
**application**
  30:15
**applied**  49:24
  50:12,13,17
  51:3,9,16 53:8
  54:12,13 76:13
  128:17,20
  130:3 140:14
  140:18 142:12
**applies**  54:7,25
  55:3,6 57:11
  58:12 60:6
  115:5
**apply**  50:16
  51:10 55:9,10
  55:19,20 63:1
  76:5,18 131:7
  140:25
**applying**  49:23
  51:8 74:16
  130:7 141:3
  155:16
**approach**
  40:11
**appropriate**
  107:5 121:24
  123:5 125:2,22
  126:25 167:2

**approval**  112:8
  115:1,15
**approximately**
  21:12 32:4
**aprivy**  112:14
  112:16 113:4,8
  144:7,13,15,20
  145:18
**arbitration**
  10:20,23,24
  12:6,14
**area**  117:6
  139:8,14
  141:17
**areas**  76:25
**aside**  25:6,7
  56:13 58:15,18
  58:19 59:24
  71:2 147:1
  163:23
**asked**  17:15
  38:23 39:1,5
  43:10 49:16,18
  59:6 106:3
  116:3 133:2
  145:6,17
  149:11 163:2
  164:23
**asking**  15:24,25
  23:16,17 24:12
  24:13 26:7,8
  26:10,10 36:9
  36:9 40:2 41:3
  43:4,5 45:16
  45:17,22 46:11

46:13 47:17,25
  48:1,10 51:2
  54:19 59:14,17
  60:3,4,21,22
  70:10,19 72:3
  72:8 73:22
  80:23 85:12
  95:24 98:20,21
  99:23 100:21
  102:11,12
  115:24 117:3
  119:4 121:8
  123:3 124:7
  133:11 136:2
  137:21,21,24
  140:7,11 148:2
  162:14
**asset**  30:13
  31:20 32:18
**assisting**  17:19
  17:23,25
**associate**  16:13
  16:15 27:23,24
  27:25 29:12,19
  30:8 31:8 32:2
**associated**
  168:10
**associates**
  27:21 28:4,18
  28:24 30:24
  127:25
**assume**  6:2
  26:16 118:7
**assuming**  93:9
  93:12 114:4,17

| assumption | august 21:12 | **b** | 154:3,4 156:10 |
|---|---|---|---|
| 87:6 114:6,22 | 21:16 32:3 | **b** 3:6 22:11 | 157:4 160:10 |
| 118:23 | 39:18 63:15 | back 18:23 | baseline 130:22 |
| attached | 105:1 109:11 | 19:6 31:3,7 | basic 5:22 |
| 148:18 | 109:12,18,18 | 50:24 62:1,24 | 138:4 |
| attachment | 142:16,19 | 66:24 67:6 | basically 80:6 |
| 147:16,23 | 150:24 151:19 | 81:25 86:16 | basis 13:15,19 |
| 148:5 | 153:15 157:14 | 94:25 95:25 | 20:21 21:6,7 |
| attend 83:16,25 | 157:19 158:1 | 99:15 107:9 | 38:3,19 41:24 |
| 87:14,23 91:18 | 159:6,13,16,19 | 108:1 110:12 | 50:7 121:21 |
| 105:4,15,24 | 159:20 160:2 | 110:17 112:25 | 124:18 163:1,4 |
| 107:4 | automatically | 116:11 117:8 | bates 10:12,16 |
| attendance | 96:19 | 133:12 143:8 | 21:11 36:22 |
| 95:19 | automobile | 155:14 157:6 | 37:8,12,15 |
| attended | 23:4,19,22 | 161:3,24 162:4 | 85:23 86:4,5,6 |
| 103:12,17 | 112:22 | background | 150:4 157:17 |
| 127:24 | automobili | 30:12 138:15 | 158:7,9,12,19 |
| attending | 1:10 2:7 | 138:15 | 161:16,19 |
| 88:19 92:4 | automotive | backup 149:12 | bba 27:7 |
| 104:3 106:7 | 22:13,21 23:2 | bank 70:1,20 | bear 52:20 81:2 |
| 126:2 | 23:6 25:4,9,12 | 70:22 144:14 | 88:21 109:24 |
| attorney's | 25:19,24 26:2 | banking 29:4 | 111:9,12 143:2 |
| 18:20 | 26:5,12,17 | 29:13,18,25 | 147:5 150:5 |
| attorneys 18:16 | avenue 2:4,10 | based 45:1,10 | 158:4 |
| 18:19 19:1 | aware 37:9 | 45:19 48:16 | beginning |
| audio 7:25 | 51:18 57:25 | 49:15 60:24 | 97:12,21 149:7 |
| 34:14 | 58:4 61:3 72:7 | 63:22 64:5 | 159:18 |
| audit 128:12 | 72:12 113:9,12 | 66:5 67:13 | begins 144:11 |
| 144:9 146:9,23 | 113:13 115:25 | 69:10,17 71:23 | behalf 4:21 |
| 146:24 | 116:2,9 117:3 | 75:25 76:1 | 20:12 38:11 |
| auditors | 123:8,12,17 | 82:6 110:25 | 68:11 144:16 |
| 144:12 145:22 | 136:24 144:6 | 114:8,13,17,21 | believe 10:9,17 |
| audits 28:9 | 146:24 | 115:5 117:22 | 16:13,21 17:7 |
| 138:2 | | 119:6 141:25 | 21:16 24:25 |
| | | 144:12,12 | 27:23 32:2 |

40:19 42:18
51:25 67:22
73:14 75:3
76:16,17 84:11
85:25 95:10
108:2 109:25
110:22 113:15
113:17 118:11
120:7 128:9
153:18
**bell** 28:3
**berris** 1:4 3:10
4:7,21 13:4
15:11,17,22
19:7,17,17
20:12 35:19
38:11 40:5,18
41:1,13 45:13
46:21 62:2
63:24 64:23
65:17 67:14
68:11,12 69:7
73:13 74:10,13
74:14,22 75:4
78:1 80:2 81:5
81:9,14,18
82:1 83:24
85:14 86:12
87:3,21 88:13
88:18,22 89:2
89:14,25 90:19
91:18,23 92:3
92:8,14,20
93:1,3,9,19,23
97:22,24 98:9

98:16 99:18
100:3,8,17,17
100:22 101:2,9
101:17,24
103:17,25
105:12,18,22
106:3,11
107:22 108:25
109:18,23
110:8 112:13
112:15 113:7
115:1,14
117:18 118:1
136:12 137:20
137:21,24
138:19 141:15
142:6,18 143:5
143:22 152:14
154:24 157:12
160:7 163:1
164:12,23
**berris's** 3:9
15:12 41:17
73:8 77:19
79:21 80:18
82:1,11 83:9
83:14 85:4
86:17 87:10
88:1 89:16
90:13 95:2
98:3 101:13
103:10 104:11
104:21,25
106:5,25
109:11 111:4

112:14 114:1
141:6 144:7
150:23 162:14
163:25
**best** 51:21,22
130:13 133:14
133:18,20
134:7 136:5
142:10,11
147:9 156:16
**better** 24:8
97:7 127:22
151:16 154:12
154:16,16
**beyond** 17:4
20:4 57:13,24
58:4 71:9
72:14 85:3
166:16
**big** 151:16
156:1
**bigger** 128:24
151:15 155:24
**bill** 107:5
**binder** 9:12
166:3
**bit** 8:1,5 9:10
47:22 53:25
119:17 153:13
154:14
**blank** 150:3
158:9 161:15
**block** 107:4,7
**body** 7:22
12:23

**boies** 2:3 16:6
16:12,17,19,24
17:3,22 18:16
18:22
**bolded** 53:18
**book** 129:3
**bordering**
24:20
**bore** 89:20
**bottom** 8:22
134:10,15,17
134:19,19,21
144:11
**bought** 126:17
**brand** 23:20,23
24:5
**brands** 22:16
22:19 23:4,14
**break** 7:2,5
63:6 65:13
66:24 110:11
161:3 163:13
165:4,22
**breakdown**
89:24
**breaks** 7:1
**brey** 1:24 4:12
**bringing** 122:1
122:6
**broken** 91:14
**brought** 97:25
**bs** 27:5
**bsfllp.com** 2:5
**building** 29:19

**bullet**  146:16
**bumped**  27:24
**bunch**  36:21
**business**  11:19
  11:20 13:15,19
  13:21 14:1,15
  14:15 17:12
  22:7,8 25:15
  27:5,11 28:25
  29:21 30:16
  36:8 38:14
  39:2,13 40:1
  40:12,25 41:8
  41:10,15,16,20
  41:25 42:8
  46:2,6,13,22
  47:3,5,10,11
  48:3,11,14,17
  49:12,14 50:15
  50:22,23 53:2
  64:11,19 66:9
  67:15,23 68:3
  71:17,18,19,23
  72:9 73:25
  74:6,9,19 75:9
  75:15,21 76:3
  77:1,16 82:21
  83:10 85:6,9
  86:19 87:4,8
  89:10 90:5
  91:14 92:25
  93:10,16 95:16
  96:3,18,19,23
  97:2,3,10,10,18
  97:18,19 99:1

  99:17 103:12
  104:21 105:4
  105:15,24
  106:8 108:4,7
  108:9 122:6
  123:6,15 124:3
  124:6,10 125:3
  125:22 126:6,7
  126:15,18,19
  126:24 127:3,8
  127:9,12,16,20
  127:21,25
  130:9,9,17,25
  131:1,14,14,22
  133:5,12 134:6
  134:8,12 135:1
  135:6,19
  136:20 138:6
  139:5,6,20
  140:2 141:22
  142:8 146:3
  153:12 155:6
  155:10,15,19
  156:5,9 163:2
  164:3,4,6,8,12
  164:13 166:16
  167:23
**bustamante**  2:9

**c**

**c**  79:17
**california**
  87:16,24 89:3
  93:14 95:21
  96:2,17 98:11
  98:12 99:3

  100:5,12,12
  109:13,19
**call**  29:19
**called**  27:21
  30:4,10 54:1
  60:8 129:25
  148:5
**calling**  28:4
**campaign**
  19:23 83:19
  84:2,23 85:2,8
  85:22 86:10,18
  86:24 87:3,7
**capacity**  49:17
**capital**  1:13 2:8
  10:24 11:5,15
  29:4,7 30:1
**car**  22:15,18
  101:4 125:6
  126:9
**card**  124:3
**carmen**  19:18
  97:24 99:5,7
**case**  1:7 4:9
  11:18,21 12:8
  12:12,16,19
  15:19 16:19,22
  17:1,4,5,6,10
  17:14,19,21
  18:6,11 19:4
  24:3,20 44:25
  51:4,9,17 53:9
  67:20 75:17
  76:5 77:14
  114:3 119:18

  120:7 123:11
  125:9 128:17
  128:20 129:18
  130:4 131:7,24
  140:14,25
  142:12
**cash**  70:21
**catch**  7:23 91:1
**caveating**
  140:16
**center**  100:4
**ceo**  41:2 47:2
  48:11,15 49:10
  118:4,7 136:6
  136:15,20,25
  137:14,16
  138:13
**ceos**  138:3
**certain**  39:12
  52:3 57:7,20
  57:20 60:7
  66:7 81:20
  107:12 123:14
  138:8 141:6
  144:3 153:9
  164:10,20
**certainly**  44:14
  126:1 127:7
  138:9
**certify**  168:4,9
**cetera**  77:11
**cfo**  138:9
**chance**  143:16
  163:21

change 31:16
31:25 32:25
33:16 78:16
93:20 95:8
96:14
changed 78:15
155:25
changes 78:18
changing 84:5
charlottesville
168:13
chat 36:6 38:17
74:13 81:4,5
81:20 82:6
83:1 90:17
99:10 101:21
101:22 102:2
102:16,18
103:7
chats 146:5
checking
118:12
choi 1:9,10 2:7
2:7 4:7 105:3
105:14,23
106:3 109:13
109:18 157:13
choi's 121:19
choose 51:10
circumstance
125:25
circumstances
55:15,15 60:8
60:13,17 81:21
124:13 125:10

125:15
citation 101:17
101:24 102:6
citations 9:13
9:20 34:20
102:13
cite 35:2 53:5
92:16 101:20
101:20 132:1
165:11
cited 9:14
10:10 21:7
38:7 60:23
76:5 84:11
86:1 102:12
110:1,5 136:16
165:25 166:6
cities 100:11
citing 104:24
citizen 105:13
city 79:15 88:5
105:2,13 107:3
107:4,20 108:9
108:14
claim 47:9
clarify 25:20
56:23
clear 6:7 35:17
42:8 59:18
60:18 64:2,16
117:16 127:12
166:9
click 8:10
client 25:21,22
26:1 31:24

32:21 80:3
127:5
clients 47:3
66:8 109:14,20
110:8
closer 54:1
coach 165:21
coached 165:4
coaching
165:23
cohen 79:23
80:3,10,14,15
80:21 81:1,5,7
81:12,15
colleagues
107:18,21
collection
149:16
column 53:17
134:10,19,20
134:21 135:14
135:15
combining
134:18
come 37:3,17
42:9 66:24
106:4 110:12
116:10 161:3
161:24
comes 92:25
93:3
coming 14:6
31:7 99:15
124:15 150:8
158:14

commission
168:4
common 25:12
25:19,23 26:2
26:5,7,12
124:23
commonwealth
168:1,3,20
communicated
128:2
companies
23:12,13,14,25
25:1,4 26:14
26:17 28:16,16
29:23 30:20
32:22,24,25
33:3,6,7,8 57:8
119:12 120:9
137:16 138:1
company 22:22
23:2,6,10,18,19
23:22 25:9
29:21 31:2
38:12 41:2
46:2,7,10 47:2
47:12 48:11,15
48:22 50:9,10
50:11,22 56:7
57:2,5,18,19
61:11 65:18,19
68:11 71:21
72:6,10,11,12
105:15 106:8
107:9,15
108:12 109:6

112:8,21 115:1
115:15 116:18
117:13,14
118:6,8,14,20
119:5,6,23
120:15 121:9
121:12 122:1,5
122:15,16,18
122:23 123:1,7
123:10,21
124:3,12,14,15
124:17,18,18
125:16,20
130:18 131:9
131:20 138:4,9
140:1
**company's**
46:17 47:14,25
75:16 109:1
115:9 123:14
124:11 139:24
**companywide**
122:22
**compare** 39:18
**compensated**
11:11
**complaint**
19:14,21
**computer**
53:14 60:19
**concern** 37:11
165:4 166:5
**conclusion**
75:24

**conclusions**
14:7 21:2
**conduct** 83:18
84:1
**confer** 166:25
**conference**
4:11
**conferences**
26:4,11
**confidential**
24:6,19,19
**confirm** 88:23
99:6
**conjunction**
163:5
**connecticut**
79:24 80:4,19
80:21 81:1
82:2,9,13,17,20
82:20 83:3,6
83:11 87:13,22
103:13,18
104:14 106:17
106:20,23
108:8,11,15,25
109:6 141:25
**conservative**
40:10
**consider** 21:1,4
**considered**
34:18,23 36:21
37:20 38:1,20
41:11,12 42:10
111:19 122:6
130:9 131:14

**considers** 50:14
131:21
**consistent**
54:16
**consultant** 11:7
19:16 112:7,12
**consulting** 3:9
17:17 111:4,10
113:13
**consumer**
23:14
**contact** 31:24
32:21 42:2
**contacted**
16:12
**content** 42:2
79:14 80:11
88:9 130:15
131:12
**contents** 41:23
**contextually**
14:9
**contingent**
89:10
**continue** 77:6
**contractor**
19:16
**contractors**
61:16
**control** 77:10
79:17,18
**controversial**
132:21
**conversation**
14:18 45:1

63:22 114:8
115:5
**conversations**
14:13 15:17,18
19:6 45:11
64:5 69:10,18
70:24 114:13
114:18
**convicted** 7:16
**cool** 81:24
99:14 150:22
**copy** 78:19,21
78:24 79:2,5
79:10
**corner** 8:22
**corp** 1:13 2:8
**corporate**
28:10 35:10
49:17 65:10
109:1 111:1
116:3 118:3
125:16
**corporations**
28:9,12
**correct** 10:17
12:24 14:23
15:15 17:24
18:2,4 23:23
41:9 65:9,11
66:20,22 73:14
92:6 93:9,13
94:3 95:5
100:6 101:7
105:19 142:5
152:8,9 153:5

168:7

**correctly** 19:4
71:10 149:8

**corresponden...**
146:18

**corresponding**
148:18

**cost** 157:14

**costs** 77:10

**counsel** 2:1 4:6
4:16 6:21,23
13:3 15:17,21
16:20 37:2
38:22 40:25
43:1,6,22 45:1
45:11,19 63:22
64:5 65:16
66:7 69:11,18
70:24 71:2,7
72:17,24 73:6
73:8 102:21,22
102:25 114:8
114:13,18
115:6 138:11
149:11,19,19
154:3,4 162:13
165:14 166:2,8
166:21 168:6
168:10

**counter** 36:14
36:17

**couple** 16:9
34:25 65:12

**course** 15:25
16:2 46:1 50:2

51:8,18 65:17
116:7 129:7
132:19 142:2

**court** 1:1,24
4:8,14,22 6:5
7:22 12:22
140:12 167:8

**cover** 62:16
124:17 125:16
145:14 147:17
148:5 158:7

**covered** 14:13
14:16 68:24
142:14

**covering** 25:14
25:14 95:16
121:15

**covers** 64:9,10
145:1

**cpa** 30:12
77:15 136:12
137:11

**create** 130:16

**credit** 124:2

**crime** 7:16

**current** 18:6
33:10

**currently** 158:8

**customer** 79:23
127:5

**customers**
24:15 26:8

**cut** 18:24 31:14
159:19,22

**cutting** 7:25
34:14 119:17

**cv** 1:7 4:9 10:25

**cvs** 126:14,17

**d**

**d** 3:1

**damages** 30:18

**data** 150:3

**database** 37:23
38:9

**date** 13:10 52:3
54:19 79:15,15
80:9 82:6
103:7 135:8,20

**dated** 39:17
85:15

**dates** 16:4 29:9
32:12 36:8
41:24 78:25,25
78:25 79:13
85:20 86:13
88:4,10 93:14
163:2

**day** 9:20 32:21
32:21 57:20
78:5,14,15
81:8 91:15
96:7,10 97:12
97:19 99:7
156:19 168:13

**day's** 139:15
141:18

**days** 52:6 58:6
59:11,15 61:23
62:8,13 78:12

78:13 92:21
95:11,16 96:17
96:22 97:9
99:4,16 100:7
100:7 154:25
155:2 167:23

**dc** 2:4,10

**de** 1:10 2:7
19:9,11 20:13
23:10,19 24:9
26:14,23 35:11
35:12 38:11
44:24 45:5,9
45:13,20,21,23
46:23 49:13,18
49:18,20 54:4
54:11 57:9
61:15,21,21,21
62:7,14,23
63:24 68:7,10
68:17 72:16,18
73:6 79:23
80:3 83:15,17
83:25 84:9,17
85:6,9 86:18
87:8,8,12,14,21
88:18 89:2
91:18 92:3,8
92:20 93:20
97:24 100:3,17
101:2 103:12
104:7 105:2,4
105:12 109:12
109:19 110:23
110:25 112:22

113:14,19,23
113:25 114:2,5
114:9,11,15,19
114:22 115:5,7
116:4,5,13
117:11,17
118:1,11
119:23 120:5,8
120:17 121:15
141:3 142:19
145:22 148:6
153:24 160:4
160:12
**dead** 135:15
**deal** 158:6
165:8
**dealer** 87:14
**dealing** 32:22
32:23 35:23
88:10
**dealt** 23:11
**decade** 24:17
24:24
**december**
21:12,17 35:2
39:18 63:15
79:22 80:2
142:16,20
150:24 151:19
159:6 160:23
**decide** 43:2
77:4
**declaration** 3:9
14:8,10,16,18
15:1,5,14 36:7

41:13,17,21
42:2 74:12,15
74:16,22 77:19
78:1,12,22
79:21 81:19
82:1,10,12,25
82:25 83:9,14
84:20 85:5,19
86:14,17 87:11
88:2,13,23
89:14,17 90:3
90:13,19 91:23
92:14 93:3,22
95:3,6,23 96:4
97:22 98:3,8
98:16 99:3,8
99:11,18,20
100:25 101:8
101:17 103:11
103:25 104:5,9
104:25 105:22
106:5,9 109:11
109:22 110:5
111:20 162:15
162:17 163:3
163:25 164:11
165:23
**deduct** 127:7
127:10 133:7
**deducted**
139:24
**deductibility**
128:9 130:11
131:10

**deductible**
127:13 140:17
140:21
**deducting**
128:14 136:20
137:1
**deductions**
128:11
**defendant** 4:7
11:13,14
**defendants**
1:14 2:7 4:19
**define** 21:3
**defined** 112:21
112:22
**definitely**
147:11
**definition**
139:22
**definitions**
141:12
**degree** 99:8
**delineate**
131:13
**delivered** 24:15
**demands**
139:16
**depend** 82:23
96:21 125:9
**dependent**
123:6
**depending**
107:16,17,19
**depends** 46:17
48:21 55:14

56:2,6 60:13
60:16 107:2
124:11 125:20
125:23 126:3
126:10 127:3
**depletion** 77:11
**deposed** 5:18
**deposited** 70:7
**deposition** 1:17
1:20 3:7 4:6,10
5:22 8:4,21
12:12 13:1,6
15:24 20:4
22:3 35:3,7,9
35:13,14,19,25
36:11,14,17
49:15 120:10
165:17 167:2
167:11,14
**depositions**
19:15
**design** 100:4
**detail** 24:21
74:21 90:2,7
**determination**
89:9
**determine**
17:12 70:13
74:8 75:21
91:13 117:13
123:14 141:5
**determined**
67:14
**determining**
141:9

**detroit** 83:16
83:24
**diana** 3:10 35:3
111:21 143:21
144:2 147:10
148:12
**diary** 129:3
**difference**
39:20 40:4,7
60:10
**different** 7:2
14:25 15:4
33:3 57:8
100:7,11,14
152:10 153:3
**difficult** 48:2
**dinner** 127:18
127:19,21,24
**direct** 113:15
115:8,23
**directly** 144:19
145:18
**director** 32:7
32:11,16 33:9
33:11,12,13
118:8,12,19
119:5,9,21
**directors** 31:2
119:12 123:7
123:16
**disallowed** 52:7
97:14
**disclose** 24:4
**discounting**
138:5

**discuss** 13:16
96:23,24 108:1
**discussed** 36:10
153:21 163:15
163:16 165:22
**discusses** 35:24
86:9,11 108:4
**discussion**
148:15
**discussions**
66:6 154:3
**disputes** 30:11
31:12 32:9
**distance** 107:12
**district** 1:1,2
4:8,9
**doc** 149:14
**docs** 41:12
**document** 3:11
9:7 21:7 34:23
38:2 42:1,17
42:18,23 43:6
43:7,9,22,24,25
44:4 56:13,15
58:15 60:20,21
76:18,19 85:23
86:6 102:1,9
102:23 103:4
109:25 110:5
111:14 119:3,4
138:25 143:2
143:11,14
146:13 147:21
150:1,3 151:5
157:17 159:2

161:5 163:4
165:18 166:7
166:15,21
**documentary**
134:14 135:3
**documentation**
17:12 38:14
39:1,6,10,13,22
39:24 40:9,12
40:14 41:3
43:10 74:12
75:8 76:1 99:9
127:23 128:13
144:16 146:5
148:20,25
149:9 153:11
163:6
**documentatio...**
74:18
**documents**
9:11,13 10:2,4
10:7,10 13:3
13:17 14:14
18:1 20:3,23
21:22 22:1
34:17,23 36:4
36:5,20,21
37:2,3,4,6,7,10
37:12,15,16,19
37:20,20,24,25
38:1,3,5,6,7,16
38:18,19,23
39:3 41:11,18
41:22 42:3,7
42:10 66:6

86:9 94:19,20
101:21 125:13
146:17,20
147:17,24
148:3,6,7,17
149:16,19
151:22 159:23
164:2,9 165:11
165:11,25
166:6,9,11
**doing** 29:21
75:14 89:6
96:7 113:7
138:1 150:7
**dollars** 122:1
**dormant** 18:7
**double** 66:17
**draft** 34:15
78:11,18
**drafted** 34:10
**drafts** 78:20
**drove** 98:10
100:8,23
**dt** 158:20 159:1
**dt0000036027**
85:25
**dt100** 111:10
**due** 78:5
**duff** 30:4,6
31:7
**duties** 47:4
49:10 118:15
118:20 119:5
119:21 139:8
139:14 141:16

**[duty - examination]**                                         Page 13

**duty**  139:20
  141:22

**e**

**e**  3:1,6 5:11,11
**earlier**  30:23
  75:3 78:15
  102:12 120:9
  135:5 140:13
  142:14 144:6
  151:21 153:21
  153:22 157:25
  159:10 164:5
**early**  16:8
  29:10 160:1
**earns**  121:9,12
**easier**  9:10
  150:19
**eat**  127:1
**economic**  30:18
**educational**
  138:15
**effect**  146:1
**eight**  96:7,11
**either**  62:25
  113:12 137:6
  149:10 160:15
**electronic**
  166:3
**element**  128:6
  128:21
**elements**  130:5
  132:13,22
  134:11 135:1
**eligible**  46:25

**email**  3:10,11
  85:14,18,19,21
  85:23 143:21
  143:25 144:2
  145:19 147:16
  147:18 148:5
  148:10,12,18
  165:15,20
  166:19,25
**emails**  36:6
  38:17 44:8
  74:13 81:21
  84:11,12 90:18
  99:10 101:22
  145:21 146:6
  146:18
**employed**
  27:17 117:12
**employee**  58:6
  58:8,22 59:4
  59:21 118:1
**employees**
  54:16,21 55:24
  56:3,16,24
  57:6,15,19
  61:15
**ends**  167:10
**engage**  16:7
**engaged**  16:17
  16:18 29:23
**engagement**
  11:9 16:1,2
**entertainment**
  25:21,23 65:6
  66:7

**entire**  15:25
  29:14 34:15
  38:8 91:7
  96:18 97:1
**entirely**  74:11
**entirety**  102:2
  102:15 130:10
  130:14 131:8
**entitled**  42:6
  46:23 48:4
**entries**  97:21
**entry**  95:18
  96:3 98:24
  99:19,22 102:7
**errata**  9:22,24
  10:3,10
**error**  147:6
**especially**
  122:14
**esquire**  2:3,9,9
**essentially**
  29:20 40:25
  41:23 78:11
  85:16 91:9
  96:25 130:16
**est**  4:3
**establish**  5:22
  39:25 40:12
  50:25 59:9
  75:19 117:11
  130:8 140:19
**established**
  24:8 30:22
  142:9 153:3

**establishes**
  95:20
**estimate**  33:14
**et**  4:8 11:2,4
  77:11
**evaluate**  75:20
  75:24 155:10
  156:9 157:2
  165:18
**evaluated**
  48:13,14
  117:22
**event**  87:8 92:9
  95:20 96:10
  103:8 126:1
  168:11
**events**  25:11,14
  25:18,20,21,23
  26:9 105:5
**evidence**  45:8
  45:20,22,24
  74:23 94:2,7
  94:12,22 95:2
  100:22 104:2
  110:7 134:14
  135:3,14,15
  164:18
**evidentiary**
  162:23 164:22
**exact**  13:10
**exactly**  74:4
**examination**
  3:2,3,3 5:4
  162:11 163:10
  163:21

| | | | |
|---|---|---|---|
| **examined** | 161:13,14 | 53:24 54:4,11 | 134:13 135:1,2 |
| 168:6 | **exhibits** 8:11 | 56:2,18,19 | 135:6,8,19 |
| **example** 58:6 | 9:4 20:5,6 | 57:1,13 58:7 | 136:3 140:1,14 |
| 68:6 77:7 79:6 | 161:17,17,18 | 58:22 59:4,10 | 141:10 142:7 |
| 79:7 112:18 | 161:20 | 59:21 60:25 | 142:19 145:3 |
| 124:9,14 | **exist** 66:1 | 61:8,17,19,22 | 145:10,10 |
| 137:18 | **existed** 72:13 | 61:24 62:4,7 | 146:6 148:6,19 |
| **excel** 3:12,12 | 73:16,19 | 63:25 64:24 | 148:24 149:10 |
| 3:13 148:17 | **expand** 94:13 | 68:10 70:5,14 | 149:23 150:23 |
| 150:5,10 151:9 | 123:23 | 71:3,11,17,18 | 151:18 152:23 |
| 151:13 155:20 | **expect** 128:1,2 | 71:18,19 72:6 | 153:2,8,12,14 |
| 158:8,14 161:8 | 136:6,15,21 | 72:6,7,9,12,13 | 155:5,8,13 |
| 161:10,17 | 137:2 138:3 | 73:18,25 74:6 | 156:4 157:1,4 |
| **excels** 161:13 | **expectation** | 74:19 75:7,9 | 157:20,23 |
| **exciting** 81:8 | 136:9,13 | 75:17,18 77:16 | 158:4 159:5,9 |
| **excluded** 12:9 | **expectations** | 82:15,21 83:4 | 159:19,20 |
| 40:8 | 116:8 | 83:6,10 87:4 | 160:10,16,21 |
| **executives** | **expected** | 92:25 105:25 | 160:22 164:6,9 |
| 122:20 124:15 | 138:10,12 | 106:14 107:10 | 164:10 166:2 |
| 137:16 138:4,8 | **expense** 17:13 | 107:15,19 | 166:16 |
| **exercise** 75:15 | 20:11 21:9,10 | 108:12 110:24 | **expensed** |
| **exert** 11:8 | 21:11,15,20 | 113:24 114:7 | 125:11 |
| **exhibit** 8:3,12 | 38:10,13,21,24 | 115:2,9,10,24 | **expenses** 17:11 |
| 8:13,14,21 | 39:1,7,14,17 | 116:4,13,18,22 | 18:1 22:7,9 |
| 33:24 34:1,4 | 40:5,18,20,23 | 117:14,18,19 | 35:23,24 36:10 |
| 52:16,17,19 | 41:7 43:12 | 120:22 121:9 | 36:12 38:13,15 |
| 77:20,22 111:9 | 44:1 45:4,12 | 122:7,16,24 | 38:22,25 39:2 |
| 111:11,20 | 45:12,18 46:14 | 123:2,19 124:2 | 39:2,5,7,9,12 |
| 113:17 129:8 | 46:17 47:5,10 | 124:4,6,6,10,23 | 39:15,19,19,21 |
| 129:11 143:4,5 | 47:11,14,25 | 125:1,6,22 | 40:5,7,8,17,20 |
| 143:6 147:2,3 | 48:3,19,22 | 126:7,9,12,15 | 41:4,8,11 42:9 |
| 147:4 150:7 | 49:8,14,18,21 | 126:18,23,24 | 42:9 43:2,8,12 |
| 154:15 158:7,8 | 49:24 50:15,22 | 127:1 128:6,21 | 43:22 44:1,5 |
| 158:10,15,16 | 50:23 51:20 | 129:2,3 130:4 | 44:14,19,23 |
| 158:19,22,25 | 52:2,6,7,13 | 130:5 134:12 | 45:3,8,12,14,16 |

| | | | |
|---|---|---|---|
| 45:17,17 46:1 | 114:1,1,10,14 | **experienced** | 121:25 122:15 |
| 46:3,6,13,22 | 114:18,22 | 27:24,25 | 124:13 155:13 |
| 47:1,3 48:11 | 115:15 121:16 | **expert** 3:8 9:12 | 157:25 162:22 |
| 48:14,17 49:9 | 121:25 123:5,6 | 10:18,21 11:6 | 164:21 |
| 49:9,10,12 | 123:15 124:19 | 12:17,20 13:2 | **factory** 98:11 |
| 50:4,7 53:3 | 127:16 128:14 | 17:14,16,18,20 | 100:24 |
| 54:17,21 55:25 | 129:21 130:8,9 | 17:22,23 18:3 | **facts** 41:14 |
| 56:4,17,25 | 130:17,25 | 18:4 22:6,8,12 | 51:3,8,17 53:9 |
| 57:4,16,19 | 131:1,10,13,14 | 22:15,18 32:10 | 55:14,15 60:13 |
| 58:9 61:8 62:2 | 131:19 132:13 | 33:11 34:4 | 60:16 74:15 |
| 62:8,14 63:15 | 132:23 133:2,5 | 40:3 42:19,21 | 77:14 79:13 |
| 63:24,25 64:2 | 133:8,13,21 | 48:1 60:3,4,22 | 88:6 125:10 |
| 64:4,11,19,21 | 134:6,18 | 130:25 136:16 | 162:22 |
| 65:2,6,8,10,17 | 136:21 137:1 | 140:12 155:19 | **factual** 13:15 |
| 65:19,22 66:1 | 138:6,25 139:3 | 162:19 | 13:18 41:24 |
| 66:3,7,12 | 139:4 141:3,7 | **expertise** 60:24 | 78:25 162:21 |
| 67:15,23 68:2 | 142:8,15 144:3 | 137:10 | 163:1 164:20 |
| 68:3,12,16,23 | 144:22 145:1,4 | **expires** 168:4 | **factually** 36:7 |
| 69:3,7,11,12,18 | 145:7,9,15,17 | **extended** | **failed** 117:11 |
| 70:22,25 71:23 | 146:20 149:2,9 | 124:16 | **fair** 6:3,4 26:22 |
| 72:15,18 73:6 | 149:10,12,24 | **extent** 24:18 | 91:10 96:8 |
| 73:16,19 74:9 | 151:22 152:14 | 36:13 37:24 | 106:1 120:4 |
| 75:4,6,16,20,21 | 153:10,15,17 | 79:16 80:8 | 159:25 |
| 75:24,25 76:2 | 153:19,24 | 82:25 108:8 | **fall** 50:24 |
| 76:3,8 77:2,2 | 154:1,4,24 | 109:7 124:5 | 157:20 |
| 77:16 87:2 | 155:10,20 | 130:19 137:10 | **familiar** 19:22 |
| 89:9,10 90:22 | 156:9,18 157:3 | 149:1,21 | 71:15 76:22,23 |
| 91:2,14 93:8 | 160:3,7,11,15 | **extra** 44:5 | 136:14 138:16 |
| 93:10,15,17 | 163:7 164:4,10 | **f** | 148:9 |
| 95:16 97:7 | 165:13 166:16 | | **familiarity** |
| 99:1,17 101:16 | 166:16 | **f** 22:11 | 77:17 |
| 104:19,21 | **experience** | **facilities** 77:10 | **family** 104:11 |
| 108:21 111:24 | 23:15 119:11 | **facility** 101:4 | 104:17 106:24 |
| 112:5,9,19 | 138:1,3,15 | **fact** 22:7 36:1 | 109:8 |
| 113:1,3,11,22 | | 37:5 47:5 | |
| | | 50:22 93:13 | |

**far** 15:12 145:4
  148:23 154:1,5
  159:23
**fasb** 22:10 47:6
  48:16 49:11,24
  50:24 64:11
  67:23 68:4
  75:10,13,22
  76:2 93:16
  96:5 117:23
  122:4 123:4,19
  131:1 132:4
**faster** 62:3
**feel** 28:1 39:12
  39:21
**felt** 40:11 77:18
  126:23 131:12
  131:23 149:21
  163:20
**fiduciary**
  118:14,20
  119:5,21
**field** 60:23
**file** 58:6
**filed** 4:8
**files** 149:2,4
**filing** 15:19
**fill** 137:8
**filming** 83:18
  84:1 85:18
**final** 78:14,19
**finance** 27:8
**financial** 24:10
  24:12 28:8
  29:20 30:14

31:21 32:19
  77:16 120:14
  123:4,6,9,10
**find** 103:9
  148:18 151:11
**fine** 25:16
  26:20,21 27:1
  27:1 33:22
  64:13 68:21,25
  70:10 86:25
  113:6 154:18
**finish** 6:17 49:2
  55:5 63:8
  70:18 122:13
**firm** 4:15 16:13
  27:20 29:5,23
  30:4 32:3
  109:3
**first** 5:20 20:23
  54:3 75:16
  91:17 107:22
  134:10,19,20
  134:21 135:14
  144:1 146:12
  147:7,8,11
  150:2 151:2
  161:17 165:21
**five** 120:6
  167:23
**flag** 15:5
**flexner** 2:3
**flight** 41:25,25
  73:24 74:2,5
  101:10,11
  157:12,19,22

159:17 160:18
**flights** 91:3
  93:15 152:8,20
  153:13,18
  155:22 156:6
  157:6 159:12
  159:13
**flipping** 77:8
**floor** 81:16
**fly** 157:13
**focus** 7:14
  99:24 100:20
  106:1 132:9
  145:9,12
**focused** 31:19
  31:21
**folder** 8:10
**follow** 15:6
  41:4 43:10
  56:19 126:5
  156:11 161:5
  165:15,19
**followed** 158:7
**following**
  135:20 148:15
**follows** 5:3
  81:9
**food** 156:13
**foods** 156:22
**footnote** 65:15
  66:4 86:7,9
  92:17 95:21,24
  110:1,3 157:16
  162:19 164:19

**footnotes** 20:7
**fordham** 27:12
  28:25 29:1,3
**foregoing**
  168:7
**forensic** 17:7
  22:20 23:3,12
  23:17,21 25:6
  25:7 30:13
  31:20 32:18
  77:15 138:2
  155:18
**forget** 108:19
**forgot** 150:6
**form** 20:21
  21:6 24:18
  38:18 42:13,14
  43:15 44:12,17
  46:16 47:13
  48:5 50:19
  51:13,24 54:23
  56:5 57:17
  58:10 59:6,23
  61:2,10 62:10
  62:20 67:21
  68:8,18 69:8
  69:24 71:13
  72:21 74:24
  76:20 78:23
  79:4,12 80:7
  82:3 84:18
  85:7 87:5 88:3
  88:14,20 89:4
  89:12 90:15
  91:24 92:15

93:2,11,24
94:4,5 95:12
96:20 104:8,15
105:10 106:15
107:24 109:2
113:2 114:12
115:3,20
116:15,22,24
117:4,21 118:9
118:16,21
119:7 120:24
121:2 123:22
127:2 128:8
132:24 133:6
133:25 135:10
138:7,21
139:10 142:24
146:11 148:8
160:5,13 164:7
164:16
**formal** 116:4
**formality** 118:3
**format** 3:11
150:3
**formatting**
155:25
**formed** 38:3
121:25 163:3
**forming** 14:22
15:2,9 21:1
42:7 140:18
165:12
**forth** 48:21
52:12 57:21
58:5 61:18,24

62:7 117:23
131:19,21
141:12 142:11
162:22
**forum** 167:2
**found** 43:11
96:12
**foundation**
20:24 46:9
49:22 61:20
162:21 164:20
**four** 32:13
**fourth** 83:13
**framework**
50:25 53:8
75:20,24
117:12 130:16
140:20,22
**fraud** 30:14
31:20 32:17
138:2
**fremont** 98:11
100:24
**friends** 106:24
127:15,19,19
**front** 10:13,16
21:11 33:21
52:1,15,21,24
57:11 58:11,12
58:20 61:4
77:21,24 102:1
111:6 116:25
119:3 138:25
140:11 143:11
150:13 157:9

158:4 160:16
160:21
**full** 5:7 27:2
37:23 81:10
96:6,11 97:18
168:7
**fully** 163:21
**funded** 121:19
**fung** 1:9 2:7
**further** 66:5
74:14 86:13
109:8 125:13
162:8 163:8
164:25 168:9
**furtherance**
47:4 49:9 87:7

**g**

**gas** 77:12 152:4
**gathering**
138:20
**gearbox** 93:21
95:8 96:14
**general** 16:24
26:6 50:8,25
55:17 57:5,12
60:7,10 75:23
94:17 119:8
130:7 134:7
138:11 139:8
139:14 140:19
140:22 141:17
**generalist**
30:12 31:22
**generalized**
125:18 130:16

**generally** 11:24
30:15 55:16
56:11 119:19
128:22 137:22
139:19
**genesis** 1:13 2:8
**geographically**
80:9
**geological**
77:10
**geophysical**
77:10
**getting** 44:8
125:23 126:3,8
149:8
**gift** 133:8
**give** 8:8 25:2
28:13 29:9
32:15 33:14
53:22 81:7
97:16 137:7
158:13
**given** 37:2,12
42:12 70:5,14
71:3 130:17
166:8 168:12
**giving** 132:16
**glastonbury**
106:17 108:8
108:11,15,25
109:6 141:24
**go** 8:12 11:2,3
11:4 13:16
20:24 30:2
49:5 52:17

**[go - historic]**

56:21,22 58:3
69:22 71:24
72:15 75:2,16
75:18 76:9,9
76:24 77:6
83:22 86:22
90:21 94:16,25
95:25 97:16
101:1 103:10
107:9 122:11
122:12,13
128:10 129:24
147:18 149:14
151:2,14
153:16 154:20
155:13 157:6
159:12 160:23
161:2 167:3,9
**goes** 25:13 40:7
55:12,17 72:22
85:18 153:14
**going** 4:3 6:2
7:3 8:2,3,4,6
9:5 19:6 24:7
29:9 31:3
33:14,19,20
35:1 43:2
51:10 58:2
59:19 61:25
62:18 74:20
81:25 89:20
91:7,10 110:11
112:25 126:2
130:19,21
132:8 143:2,5

147:15 149:15
150:2,4 153:9
155:22,24
156:13 158:3,6
158:20 164:21
165:8
**good** 4:2,18,20
5:6,9 28:1
63:10 66:23
81:12 165:19
**gotten** 147:6
**government**
7:19
**grab** 157:7
**graduated** 27:5
27:10,16 29:1
**great** 119:20
**greater** 74:20
**greenwich**
87:13,13,22,22
103:13,18
**grocery** 65:8
**ground** 5:22
**grounds** 94:9
**group** 32:8,9
**guess** 20:10
32:14 42:2
97:6 111:21
120:4 133:1,2
150:11 154:17
**guessing** 44:11
**guidance** 48:16
49:11 57:10
60:7,11 76:1
130:8 132:2

**guidelines** 22:9
47:6 53:23
55:17 67:24
68:4 71:24
75:10,13,23
76:4 93:16
117:23 131:2,4
138:16
**guys** 47:21
154:21 156:1
165:24

**h**

**h** 3:6 5:10
**haircut** 125:21
125:24 126:3,8
126:11
**haircuts** 125:21
**half** 7:2 13:8
14:20 51:7
**hand** 8:22
53:17 168:12
**handed** 37:18
37:21
**handle** 102:9
**hannah** 2:9
4:18 49:1 55:4
63:6 70:18
161:5 165:24
**happen** 125:17
**happened** 90:6
103:8 145:11
**happy** 61:5
166:19
**hardships**
24:11,12

**hartford** 79:23
80:4,19,21
81:1 82:2,9,13
82:16,19,20
83:3,5,11
**hawthorne**
100:4,11
**head** 6:8,8
**heading** 134:10
139:18
**headings**
154:21
**headquarters**
98:10 100:9,23
109:1,6
**hear** 6:2 34:11
34:12 35:11
**heard** 8:1
**held** 4:10
**help** 6:9 140:11
**helpful** 44:14
44:16 125:2
131:12 140:9
143:9
**hepburn** 85:15
**hey** 55:4
**high** 23:14,25
24:4 26:16
28:6 29:16
**higher** 28:3
**highly** 24:3
**hin** 1:11 2:7
**hired** 17:16
**historic** 22:15
22:18

**hit** 70:22
**hold** 47:19
  151:13
**holding** 165:17
**holdings** 1:11
  2:7
**home** 107:5,7
  108:4,5 139:5
  139:7,9,13,15
  139:17,19,19
  139:21 141:16
  141:17,21
  142:3,4,7
**hook** 137:6
**hotel** 47:4
  73:24 82:16,20
  87:13,22 97:25
  105:13,25
  107:5,11
  152:14 153:10
  153:18 154:24
**hotels** 91:5
  93:15 152:6,19
  153:7 154:7
  155:7
**hour** 7:1,2 13:8
  14:20 63:7
  96:7
**hourly** 11:11
**hours** 96:11
  108:10 167:14
**hugo** 19:11
**huh** 6:8 48:25
  59:16 128:18

**hundred** 28:17
**hundreds** 12:1
**hwigger** 2:11
**hyatt** 87:13,21
**hypercar** 92:9
  95:19 96:9
**hypothetical**
  57:5 125:11
  126:11,22

**i**

**idea** 28:13 44:5
  96:13,15
**identification**
  8:14 34:1
  38:22 52:19
  77:22 111:11
  129:11 143:6
  147:4 158:10
  158:16 161:20
**identified**
  38:22,25 43:9
  44:1,18 45:18
  63:5,13 104:20
  149:9
**identify** 38:5,7
  40:22 43:25
  44:9 63:21
  64:3 66:11
  166:16
**identifying**
  44:14 151:22
**imagine** 126:19
**immediately**
  165:16

**impede** 7:13
**imperiale** 1:17
  3:2 4:6 5:2,10
  42:24 60:18
  67:10 69:22
  94:11 110:22
  121:7 128:16
  133:11 134:5
  162:7,13
  167:11
**imperiale's**
  136:3 166:1
**important** 6:16
  82:15
**impose** 57:5
  61:20 62:23
**improper**
  163:23 165:5
**inclined** 144:13
**include** 37:20
  38:1 39:15
  40:15,17 75:4
  91:3 97:6
  135:6 166:10
**included** 40:18
  40:21 149:24
  153:16 159:23
**including** 34:17
  141:12 160:18
  160:20 166:7
**income** 28:11
**incur** 46:21
  123:19 124:2
**incurred** 47:3
  48:11,15 49:9

63:15 64:19
  65:17 66:8
  67:14 68:2,5
  71:23 93:15
  114:14 126:23
  144:22 152:14
**incurring**
  112:8 115:1,15
**independent**
  26:13 84:8,16
  84:19 85:2
  86:23 89:6
**individuals**
  117:12
**industries**
  83:18 84:1,9
  84:16 85:17,20
  86:12 91:19
  92:4 93:20
**industry** 22:13
  25:12,19,24
  26:2,5,11,12
  29:21 56:3
  57:15 58:5,8
  58:21,24 59:1
  59:4,9,20 60:2
  60:4,11,25
  61:3 73:23
  75:19,23
  124:24 125:7
  126:9 131:16
  132:2 136:16
  140:12 155:16
**inference** 119:2

**informal**  116:8
**information**
  39:3 110:10
  125:13 135:20
  136:4 155:14
**instance**  89:13
**instances**  127:6
**intent**  97:15,19
**interested**
  168:11
**interesting**
  39:11
**interim**  41:2
**intern**  29:12
**internal**  11:7
  37:9
**internship**  29:3
**introduce**  4:16
  8:3 52:16
  150:4
**introduced**
  129:8 143:3
  150:6
**introducing**
  77:19 150:1
  158:8,14
**investigation**
  7:19 17:8 24:6
  24:19 70:20
**investigations**
  30:11,14 31:13
  32:9,18 138:2
**investment**
  29:4,12,18,25

**investors**
  109:14,20
  110:8
**invitational**
  92:10 95:19
  96:10
**invoices**  36:6
  38:17 44:8
  146:5,17 163:6
**involved**  18:15
  19:22 28:10
  84:25 85:1
  100:15
**involving**  10:24
**irs**  22:10 47:6
  48:16 49:11,24
  50:3,12,13,14
  50:16,17,21,24
  51:3,8,9,16,18
  53:5,22 54:18
  57:10 58:18
  64:11 67:23
  68:4 75:9,12
  75:22 76:2,4,7
  76:9,23 93:16
  96:6,23 108:1
  108:20 117:23
  122:4 123:4,13
  123:18 127:7
  128:5,10,11,12
  129:15 130:12
  131:1,4,11,21
  132:4,11,11
  133:2,9 134:3
  134:9 135:25

  136:11,14
  137:2,12,18
  138:16 139:22
  140:7,17,21
  149:23
**isaac**  16:15
**isabelle**  19:22
  83:19 84:2,23
  85:2,8,22 86:9
  86:18,24 87:2
  87:7
**issue**  62:15
  96:24 131:10
  155:19 161:13
  163:18 164:23
  165:8
**issued**  22:9
  39:14 40:1,13
  40:15 47:6
  49:11 75:10
**issues**  30:14
  77:14 128:9
**items**  102:21
  128:24 145:12
  145:12,13
  164:20

**j**

**j**  5:10
**jfk**  157:13
**job**  1:23 28:23
  29:2,5 47:4
  49:10
**john**  1:17 3:2
  4:6 5:2,6,10
  16:15 18:13

  69:22 132:14
  133:11,11
  134:5 136:3
  167:11
**joined**  32:3
**jorda**  19:18
  85:1 97:24
  98:10 99:5,7
  100:8,18,23
**jp**  101:3
**judicial**  12:22
**juicery**  156:24
**july**  90:23 91:7
  91:10 96:17
  97:8 101:1,2
  101:12 103:11
  103:17,17
  105:1,11,12
  153:17 154:9
  155:2 156:16
  156:19
**june**  83:15,23
  87:11,12,20,20
  90:22 91:7,10
  91:18 92:4,7
  92:23,24 93:19
  95:3 96:17
  97:7,23 98:9
  98:20,21 99:15
  99:23 100:2,20
  154:9,25
**justifiable**
  107:20
**justification**
  92:24 100:22

**[justification - linkage]**                                    Page 21

| 144:3 | 52:4,24 54:5,6 | 128:23 129:9 | 124:13 125:17 |

**k**

**k**  1:9,12 2:7,8
**keep**  58:1 128:6
 129:2 134:2,6
 134:8 140:16
 142:7 154:16
**kept**  133:23
 134:20,25
**kind**  13:15 18:7
 86:13 107:15
 127:20 130:11
 137:22 146:7
 149:6 156:15
**kindly**  148:18
**knew**  45:20,21
 45:23 137:13
 137:20,24
**know**  7:3 8:12
 14:9,10 16:24
 16:24 17:17,18
 18:20 19:1,13
 19:15,20 21:3
 23:13 25:11,18
 25:22 26:1,4,7
 26:10,14,20,22
 28:14 29:24,24
 31:4,20 35:24
 36:1,3,16 37:3
 37:5,14,25
 41:1 42:6,15
 42:19 44:7,10
 46:8,9 47:14
 47:15,18,20
 49:16 50:6

54:24 55:8,10
55:17 56:6
57:7,9,10 58:5
60:18 61:25
62:1,2,14,22,24
63:1 64:23
69:21 70:24
71:14 72:13
75:14,17,19
76:23 77:8,11
77:21 79:6,17
80:23,24 81:6
82:24 83:5
94:11 95:7
96:4,5,8,9 98:6
99:5,5 103:8
104:11,13,16
105:20 106:12
107:8,11,14,16
107:22 108:5
108:18 109:7,8
111:8 113:6,7
113:10,22
114:1,3,10
115:4 118:2,19
119:11 120:15
120:17,19
121:15,18
123:19 124:13
125:10,16,24
126:2,2,5,11,12
126:20,21
127:17,18,19
127:24 128:10

130:11,20
131:9,9 133:1
133:2 135:24
136:1,6,12,15
136:22 137:2,3
137:12,25,25
137:25 138:10
138:11,12,14
138:20 142:2,3
142:18,22,25
143:8 147:7,9
147:19 148:3
148:23 149:4
149:23 150:13
151:2 153:6
154:1,5 157:8
160:6 161:23
163:15,22
164:19,21,22
165:6 167:19
**knowing**
 106:25 121:21
**knowledge**
 18:14 26:13
 45:6 60:22
 70:11 73:23
 80:13 84:8,16
 84:20,24 86:23
 89:6 95:9
 119:6
**known**  24:5
 137:14
**kroll**  30:3,5,7
 31:7 57:7

**l**

**l**  5:11
**lack**  97:7
**lag**  8:5
**laid**  41:15
 162:22
**laptop**  8:16
**large**  78:21
 79:3 168:1,3
 168:20
**larger**  30:22
 32:19,22
 145:11
**lax**  97:25
 157:13
**left**  28:24 30:1
 53:17 153:19
**legal**  4:13,15
 138:11
**legitimate**
 64:10 126:24
 155:10 156:9
 157:3
**lengthy**  102:2
**letter**  11:9
**level**  28:7 29:17
**lifted**  88:1
**light**  41:5
 122:14
**limited**  63:14
 64:20 112:22
**line**  53:18
**linkage**  126:6
 126:16 127:12

**[lisa - made]**                                                    Page 22

lisa   1:24 4:14
  6:14 168:2,18
list   34:17,23
  36:20,21 37:19
  38:1,20 99:16
  99:17 148:24
  155:5 156:5
  165:13
listed   20:14,20
  21:22 22:1,7
  38:19 39:7,20
  40:6,23 41:11
  42:10 43:12
  44:23 66:3
  74:22 75:6
  76:2 95:15
  111:18,22
  118:11 135:13
  153:10 155:8
  157:22
listen   45:15
  46:12 58:20
  59:13
lists   151:25
literally   79:14
litigation   16:7
  36:25
little   7:25 8:5
  9:10 47:22
  53:25 63:8
  90:23 119:17
  138:24 147:6
  152:1,4,6,14,17
  152:19 153:8
  153:13 154:11

154:14
live   5:12
  106:11 107:3
  107:11
lived   107:22
  108:25
lives   80:14,15
  80:19,23,24
  104:11 106:19
  109:8
llc   1:11 2:7
  11:5 112:14,16
  144:7
llp   2:3
load   8:24 161:5
loaded   158:22
  161:16
loading   34:2
  52:20 111:12
  129:12 150:12
  150:15,16
  158:17 161:6
loads   8:8
  129:10 143:7
  147:5 150:10
  158:25
location   80:9
  135:7
locations   4:11
  88:11
log   102:3 103:7
  129:3
logistics   101:3
logs   101:22

long   8:21 28:18
  89:19 90:6
  95:7 96:13
  97:2 102:4
  103:4 147:17
longer   139:15
  141:18
look   33:19,24
  53:25 61:5
  65:15 66:4
  69:22 70:1
  79:20,20 80:1
  81:2 83:13
  85:13 87:10,19
  89:16 97:23
  98:9,25 99:21
  102:23 103:7
  107:7 108:11
  109:10 111:23
  114:25 115:14
  116:12,17
  122:5 123:13
  131:10 139:18
  145:17 146:10
  147:18 148:1,9
  150:19 151:9
  151:25 154:7,9
  157:7 158:3
looked   73:17
  74:18 102:17
  120:14 125:8
  131:11,16
  133:16 146:4
  159:10 161:1

looking   8:11
  37:15 50:14
  52:23 53:16
  67:10 77:1
  81:4 85:24
  86:3 89:22
  99:9 110:2
  129:24 131:4
  145:22 146:12
  151:1 153:11
looks   158:19
los   157:13
loss   120:18
lost   30:17
  103:19
lot   23:15 30:13
  76:24 77:13
  95:22 125:12
  126:4,4 148:3
  161:7 165:10
lui   1:12,12 2:7
  2:8
lunch   110:12
  163:15,17,18
luxury   22:13
  22:21 23:2,3,6
  23:14,19,22,25
  24:5 25:1,9,12
  25:19,23 26:2
  26:5,12 125:6
  126:9

**m**

m   5:11 105:13
made   33:13
  149:18

madison 5:15
main 81:16
maintain
106:21 108:6
133:21 139:21
maintained
109:4
majcher 3:10
35:3 49:16
111:21 115:18
115:25 116:21
122:23 143:22
make 10:6 15:8
27:2 41:6
42:23 52:23
59:18 60:20
66:17 70:21
87:1 94:6
119:2 125:18
130:24 139:25
149:7 151:15
155:24 158:24
167:16
makes 28:1
making 68:25
114:6 118:22
129:18
managing
31:23
manner 9:5
manufacturing
23:13
march 143:22
mark 33:20

marked 8:11
8:14 34:1
52:19 77:22
111:11 129:11
143:6 147:4
158:10,16
161:20
market 24:13
marketing
29:22 92:9
marto 10:24
11:4,15
masters 27:11
match 149:16
materiality
128:25
materials 20:8
20:10 29:22
111:18 162:24
164:22
math 73:15
matter 4:7
148:16
matters 30:17
31:21,23 32:19
32:20
matthew 85:14
meal 65:8
127:1,4,4,9,11
135:6,19 136:3
156:18
meals 127:8,15
145:12
mean 14:12
20:6,8 25:20

26:6 28:15
31:3 44:7
55:16 57:7
69:4,5,9 72:5
72:24 75:13
78:24 79:5,6
80:8 82:23
88:9 90:4
94:11,16,22
96:22 98:5
99:4,21 101:19
107:7 118:2
136:11,25
137:3,6,9
148:2
means 28:13
43:14 45:4
71:14 75:18
118:14 146:17
meant 121:6
143:9 159:25
mechanics 37:9
71:25
media 4:5
medications
7:13
medicine
126:14,17
meet 15:22
19:22 26:7
39:24 81:7,10
82:19 83:19
84:2,23 85:2,8
85:17,20,21
86:9,18,24

87:2,7 109:13
109:19 139:16
meeting 13:13
15:1 47:3
79:22 80:3,20
82:5,21,23
83:1,2,10
86:11 88:23
98:18 107:4,6
107:12,17
108:9 110:9
127:20
meetings 13:3,4
26:5,8,11
83:16,25 87:14
87:23 88:19
91:19 92:4
103:12,17
104:3,6 105:4
105:15,24
106:8
mentioned 60:5
77:3 106:23
mentoring
31:23
message 81:4,6
82:6 83:1
messages 36:6
38:18 74:13
81:20 90:17
99:10 101:21
met 15:21
80:10,25 82:2
82:8,12

**michigan** 83:16
83:24
**midday** 81:11
**middle** 135:14
135:15
**midnight**
166:10
**midsized** 28:9
28:12
**miller** 87:14,23
88:19
**million** 28:17
**millions** 12:2,3
12:4,4
**mind** 132:16
154:10,11
158:11
**mine** 41:13
**mineral** 77:11
**minimum**
135:9
**minute** 8:24
97:16 161:3
**minutes** 66:24
110:13 161:24
**missing** 148:17
159:21 160:1
**misspoke** 86:4
**misunderstood**
41:19
**models** 29:20
**moment** 74:21
85:12 96:25
139:11 143:7
147:14

**money** 64:8
70:6 121:19
144:15
**month** 90:6,23
90:24 91:7
**months** 142:15
**morning** 4:2,18
4:20 5:6,9
**motorcars**
87:15,23 88:19
**move** 64:14
**multiple** 49:16

**n**

**n** 3:1 5:10
**n.a.** 1:11 2:7
**name** 4:12,18
5:7,10 16:16
17:5 24:7
135:7,20
**names** 18:20
84:5
**narrative** 40:25
41:8,10,16,20
41:23 42:8
45:19 149:11
**narratives**
44:13,18
153:20
**narrowly** 31:19
**national** 27:20
**native** 3:11
150:8,9 158:8
**natural** 77:11
**nature** 13:15
13:25 14:14,16

17:6,9,12,25
36:8 38:15
**near** 83:3
134:12 135:2
**necessarily**
24:10 136:8
138:13
**necessary** 36:4
44:16 125:1
139:4 163:25
**need** 6:7,12,13
7:2 8:6 9:8
25:16 47:21
50:4 54:16,21
55:24 56:4,19
57:15 73:2
97:1 107:22
123:18 125:12
126:5,16,22
128:12,13,20
128:23 129:2
130:12 132:12
132:14,22
139:16 155:13
155:20 166:21
**needed** 155:6
156:5,11
164:16,19
**needs** 55:8 96:6
165:16
**negative** 66:17
**neither** 168:9
**networking**
66:8 105:5

**never** 23:9,20
23:21 46:6,14
46:22 148:10
148:23
**nevertheless**
146:22
**new** 1:2 2:4 4:9
5:13,15 18:22
101:6 105:2,13
105:13,23
106:4 107:3,4
108:9 119:23
120:6 157:13
165:5 166:10
**night** 107:5
166:4,10
**nod** 6:8
**non** 54:2,5 65:2
130:9 131:14
**noon** 81:12,16
**nope** 143:3
**norman** 1:9 2:7
4:7 121:19
**notarial** 168:12
**notary** 168:2
168:19
**note** 56:15
62:12 95:18
97:12 116:10
116:12 146:16
**notes** 97:11
**notice** 3:7 8:4
8:20 39:8
**noting** 58:11

| | | | |
|---|---|---|---|
| **november** | 87:5 88:3,14 | **offer** 136:18 | 31:1,7 32:5 |
| 168:13 | 88:20 89:4,12 | **offhand** 16:16 | 33:9,19,23 |
| **number** 4:9 | 90:15 91:24 | 26:19,23 | 34:17,22,25 |
| 16:5 58:5 | 92:15 93:2,11 | **office** 18:22 | 36:16,24 37:11 |
| 59:11,14 62:8 | 93:24 94:4 | 19:1 81:16 | 38:21 39:17 |
| 73:11,12 85:23 | 95:12 96:20 | 106:16,19,22 | 41:6,10 42:6 |
| 86:4,5 135:7 | 104:8,15 | 138:11 | 42:16 43:25 |
| 135:20 146:3 | 105:10 106:15 | **officer** 118:6,19 | 46:21 48:12 |
| 150:4 165:10 | 107:24 109:2 | 119:4 | 49:20 50:2,11 |
| **numbering** | 113:2 114:12 | **officers** 31:1 | 52:10 53:2,15 |
| 161:13 | 115:3,20 | 119:12 123:7 | 54:8,10,14 |
| **numbers** 73:12 | 116:15,24 | 123:16 | 55:2,24 56:9 |
| 86:6 152:10,22 | 117:4,21 118:9 | **oh** 5:20 11:3 | 56:14 57:13 |
| 152:24 153:2,3 | 118:16,21 | 34:14 35:18 | 58:15,15,21 |
| 161:16,19 | 119:7 120:24 | 41:16 50:16 | 59:3,19 60:20 |
| **nw** 2:4,10 | 123:22 127:2 | 51:22 58:1 | 60:22 61:7 |
| **o** | 128:8 132:24 | 66:19 94:16 | 62:6,9,18 63:9 |
| | 133:6,25 | 134:22 147:5,6 | 63:10 64:14,20 |
| **o** 5:10 | 135:10 138:7 | 147:13 150:21 | 65:5,22 67:19 |
| **oath** 7:8 165:6 | 138:21 139:10 | 151:4,16 | 68:14,21 69:14 |
| **object** 6:21 | 142:24 146:11 | **okay** 5:12,25 | 69:17,21 70:12 |
| 24:18 42:14 | 148:8 160:5,13 | 6:1,9,10,19,20 | 71:2,17 72:4,8 |
| 43:15 44:12,17 | 164:7 | 6:24,25 7:5,6 | 72:14,19 73:2 |
| 46:16 47:13 | **objection** 94:9 | 7:25 8:10 9:1,4 | 73:3,10,15,18 |
| 48:5 50:19 | 119:13,25 | 9:8,9,15,24 | 73:21,23 76:13 |
| 51:13,24 54:23 | 120:11,20 | 10:2,6,12,15,18 | 77:23 80:6,25 |
| 56:5 57:17 | 121:20 122:3 | 10:23 11:15 | 81:17 82:11 |
| 58:10 59:6,23 | 122:21 | 12:4,11,22 | 83:13,22 86:8 |
| 61:2,10 62:10 | **objections** 6:22 | 14:21 15:16,21 | 88:1 89:18 |
| 62:20 67:21 | **obviously** | 16:9 17:2,21 | 91:1 92:19 |
| 68:8,18 69:8 | 148:2 | 18:6,20 19:3,6 | 93:8 94:2,8,25 |
| 69:24 71:13,13 | **occur** 31:25 | 21:20 23:24 | 95:7,15,24 |
| 72:21 74:24 | **october** 1:19 | 24:7,17 26:20 | 96:13 97:6 |
| 78:23 79:4,12 | 4:1,4 168:4 | 27:9,11,16 | 100:2,7,14,20 |
| 80:7 82:3 | | 28:22 29:1,11 | 101:1,12 |
| 84:18 85:7 | | | |

102:22 103:16
103:21 107:3
109:17 110:4
110:22 111:2,4
111:9,13,18,23
112:12,18,25
113:6,10,13,22
114:4,10,17,21
114:25 116:10
116:17 117:8
117:16 119:20
120:4,8 121:18
121:24 123:1
128:16 129:1
129:13,24
130:3,23 131:6
131:16 132:7
132:20 134:5,9
135:22 136:10
138:24 139:7
140:7,16,24
141:2,2,5,15,21
142:2,6,14,22
143:2,3,7,14,16
143:18,24
144:2,9,19,25
145:14 147:14
147:20 148:12
148:23 150:1
150:23 151:1,6
151:18,25
152:10,19
155:2,5,23
156:4,14,18,21
156:24 157:6

157:10,11,19
157:22,25
158:3,20,24
159:5,12,16
160:3,20 161:2
161:4,24 163:9
166:13,22,23
167:3,6
**once** 31:18
52:17 106:23
165:6
**ones** 10:15 24:2
152:11
**ongoing** 18:6
24:3
**open** 8:17,19
52:17,18,25
77:21,24 111:9
129:9 150:9,13
150:18 165:17
**opened** 53:1
77:8 151:2,4
**opening** 151:7
**operating**
120:17
**opine** 48:10
**opining** 46:25
48:6,9,22 49:6
**opinion** 11:17
19:3 20:22,25
21:6,8 36:5
38:4,19 42:7
46:24 47:8
48:1,15 49:13
49:20 54:10

56:1 57:14
62:6,11,13,21
62:22 63:14
64:7,9,10,15,16
64:20 65:1,5
65:25 66:2,14
66:20,22 67:19
67:22 68:1,6
68:16,22 69:2
69:6 71:3,6,22
76:20 77:3,5
93:8 110:23
117:9,17 136:3
136:18 140:9
140:12 155:19
163:4
**opinions** 12:23
14:22 15:2,9
35:23 40:3
114:21 129:18
132:2 140:18
164:16
**opposed** 54:2
149:15
**opposing**
162:13
**order** 47:9,10
48:19 50:24
72:5,11 75:20
87:23 130:8
131:13 155:18
167:19
**ordinary**
124:23 125:6
126:9 139:4,15

141:18
**originally** 10:7
**outset** 33:1
**outside** 25:13
62:11 68:19
70:12 71:4
136:23 139:8
**overnight**
108:14
**owed** 118:14
**owes** 118:19
119:5,21
**own** 34:20
61:20 75:16
84:19 102:13
106:21 122:15
130:18 137:4
150:20

**p**

**p** 5:11 79:18
89:20
**p72** 92:8,21
93:21 98:10
100:8,23 101:3
101:13 109:13
109:20 110:8
**pa** 1:23
**page** 10:7
33:25 52:22,24
53:11,12,17,18
73:4 76:7,9,13
77:9 102:15
111:23,25
112:1 129:5,24
134:10,17,19

135:11,13
137:12 139:11
147:7,8,8,11
158:7,9
**pages** 8:21
76:14 77:3
102:4,7 103:4
161:7,15
**paid** 46:23 47:1
47:11 48:4,20
64:7,17 69:3,4
69:7,10,15,16
69:19,25 70:5
70:13,22 71:3
71:4,8,11,15,17
72:5 144:13,19
145:18 154:2,5
**palo** 98:11 99:3
100:12,24
**paragraph**
65:15 67:11,13
79:21 80:1
83:22 86:2,3
87:10,19 89:16
89:19 95:4
103:10,19
104:20,23,25
105:11 109:10
110:2 111:23
111:24 112:1,5
115:19 116:1
117:9 134:9
144:11 157:8
157:11

**paragraphs**
140:10
**part** 12:8 40:24
64:14 70:4,8
76:4 83:19
84:2 90:16
106:2 141:5
158:6
**participants**
4:11
**participate**
105:3
**particular** 86:5
96:7 99:1,7
138:13 148:4
165:12 166:14
**partner** 83:17
84:1,10,12,17
**partners** 66:9
167:4
**parts** 89:20
150:2
**party** 137:4
168:10
**passing** 8:15
**past** 120:6
**paste** 79:3,6,10
**pasted** 78:21
**patient** 8:6
**pause** 151:4
**pay** 124:17
**payment**
153:24
**pdf** 151:5 161:6

**peer** 26:14
**peers** 26:23
**penalized** 7:21
**penalty** 93:4
**pending** 7:4
**pennsylvania**
2:10
**people** 100:14
135:7
**perfect** 81:18
94:25
**perform** 71:7
**performed**
96:10 113:19
**performing**
28:8 32:17
**period** 51:19
52:2,13 53:16
53:23 54:6,17
54:22 55:14,25
56:4,11,17,25
57:4,16,20
58:9,23 59:5
59:17,22 60:13
60:16 61:1
63:18,21,23,24
65:18 67:16
72:23 106:14
113:8 124:16
160:1
**periods** 52:5
**perjury** 93:4
**permanent**
106:22 108:6

**person** 59:9
60:25 61:8
105:3,14
123:20 126:10
126:23
**personal** 28:10
30:23 35:13
70:1,11 74:5
80:13 121:19
124:5,6 125:21
127:11,15,18
130:10 131:15
131:22 136:21
137:1 138:6
144:7
**personally**
62:23
**phase** 23:4
**phelps** 30:4,7
31:7
**photo** 84:25
126:2
**photograph**
83:13
**pick** 51:10
**picked** 97:24
99:7 140:21
153:20 159:20
**picking** 99:5
**piece** 77:18
97:13 164:18
**pieces** 163:5
**pitches** 26:1
**place** 81:8 82:5
82:24 83:2,2

83:10 88:24
103:19 107:13
108:7 116:4
139:20 141:21
**places**  96:2
99:3
**plaintiff**  1:5 2:2
4:21 11:13
13:5 74:10
**plan**  54:2,2,5,5
55:7 56:11
60:9 85:17
**platform**  8:16
**please**  4:16,22
5:7 6:7,14 8:19
24:23 46:11
49:2,4 55:4
56:13,23 59:13
60:3,19 81:7
94:13 99:24
115:21 129:9
147:9 161:3
**pm**  1:18 110:15
110:16,16,18
162:2,3,3,5
167:12,25
**point**  13:11
20:22 29:8,9
38:10 52:11,22
74:25 79:7
102:25 117:6
129:5 146:16
158:25 161:22
165:21,24

**pointed**  102:20
**points**  165:15
**policies**  149:24
**policy**  46:18
47:14 48:1
49:14,19,21,24
50:9,10,12,22
52:8 54:4,11
56:2,18,19
57:1,14,21
58:5 61:8,18
61:24 62:5,7
62:15 75:17,18
107:10,15,19
108:12 110:24
112:18 113:1,3
115:5,7,10,24
116:4 117:18
121:9 122:16
122:24 123:2
130:18 136:11
136:14 138:10
138:12 140:1
**policy's**  107:19
**pollution**  77:9
**poorly**  150:7
**port**  5:13,15
**portion**  9:8
**portions**  77:4
78:21
**position**  23:18
**possession**
37:24
**possible**  167:14
167:15,21,23

**post**  139:20
141:22
**potential**
109:14,20
110:8 127:5
**powertrain**
83:17,25 84:9
84:17
**practice**  29:13
30:11 31:13
32:8,8 33:11
116:18 133:14
133:18,20
134:7 136:5
142:10,11
163:12,14
**practices**  51:21
51:22 57:3
130:13
**pre**  30:19 32:23
33:2,6 120:9
120:15 122:18
**predecessor**
30:3
**predicate**  87:3
**predicates**
162:21
**preface**  130:6
**prefer**  81:14
**premise**  55:8
115:4
**prep**  15:24
165:7
**preparation**
13:6 20:3 22:2

101:3
**prepare**  12:25
87:15,24 137:5
137:11
**prepared**  20:12
21:16 38:11
68:10 92:8
137:3
**preparing**  19:7
28:10 40:11
53:3 89:3
92:21 148:17
162:18
**president**  31:10
31:11,12,17,18
32:1,6,13
**pressed**  156:24
**presumably**
18:3
**pretty**  109:7
165:5
**primarily**
153:9
**primary**
101:17,19
106:25 124:9
125:5
**principal**  97:2
108:7
**principles**
30:16 130:7
137:17 138:5
**prior**  15:19
21:23 112:8
115:1,15

private  109:4
probably  29:10
  32:14 45:5
  73:3 149:3
  151:16
problem
  167:24
proceed  4:25
  67:8 110:19
  162:6
proceeding  6:6
  168:11
process  41:2
  47:20 48:9,10
  48:21 49:7
  149:8
produce  128:12
  165:10
produced  3:11
  10:3 13:11
  36:25 37:5,6,8
  37:10,16 42:19
  102:10,11
  150:3 165:16
product  23:14
  42:20,21
production
  102:9
products  24:14
professional
  25:8
professionally
  22:23
profits  30:17

projects  33:17
promoted  31:9
pronouns  84:5
proof  129:2
proper  30:15
  144:16 146:16
properly  69:7,9
  69:15
property  77:11
proposition
  82:1,12 83:9
  85:5 86:17
  88:18 89:2
  92:2,20 98:4
  106:3,7
prospective
  66:8
prototype  92:8
  93:21 101:3
prototypes
  92:21
prove  130:5
  132:12,22
  135:18
provide  75:23
  102:6 130:12
  133:1,4,9
  149:11
provided  14:14
  38:17 42:15
  76:2 90:2,5
  144:16 148:24
  149:19,22
  166:3,7

provides  85:16
providing
  29:24
public  27:20
  168:2,19
publication  3:8
  3:10 53:2
  59:25 60:6
  76:9,14,14
  129:9,14
  137:12
purchased
  157:12
purely  127:11
purported  60:4
  95:16
purportedly
  100:8
purporting
  22:5
purpose  13:13
  13:21 14:15
  17:13 38:15
  39:14 40:1,13
  41:25 74:19
  90:5 96:3
  126:6,7,18,19
  127:4,9,12,21
  146:3 153:12
  155:15 163:2
  164:3,6,8,13
purposes  139:6
  155:12
put  43:2 45:3
  52:1,15 57:11

58:12,15,16,18
  59:24 61:4
  79:18 108:7
  111:6 116:25
  119:2 140:11
  143:10 147:17
  150:7 160:16
  160:21 166:18
  166:24
puts  32:14
putting  29:22

**q**

qualify  39:23
quantification
  30:18
question  5:24
  6:3,23 7:4 15:8
  24:23 25:17
  34:11 39:11
  43:19,21 45:15
  48:2,18 51:7
  53:22 54:3,15
  55:24 56:20,23
  58:20 59:13,14
  59:19 62:19
  64:13 68:9,14
  79:10 81:25
  83:7,8 84:14
  84:15 86:15,15
  93:5 94:6,25
  95:25 99:15
  103:8 105:25
  108:13,18
  111:2 112:25
  121:2,7 123:24

125:14 130:20
149:6 162:10
163:12,14
**questioned**
130:13
**questioning** 7:3
55:9
**questions** 5:23
6:17 7:14
13:14,20,23
34:25 35:12
41:4 43:11
46:12 68:15
99:24 125:12
126:4,5,22
137:23 140:10
147:9 156:12
162:8 165:1,8
165:22
**quite** 15:7
81:10 89:19
108:10
**quote** 37:21

**r**

**r** 5:11
**randomly** 77:9
**rate** 28:3
**rb** 148:6
**reached** 16:13
**read** 35:5,7,9
35:13,14,19
60:21,23 72:24
73:2 86:16
97:17 100:2
102:15,25

132:15 140:7
143:16,19
**reading** 19:21
56:10 60:12
89:21 134:1
135:11 140:10
158:11
**really** 15:10
20:22 25:13
31:5 34:14
37:14 41:14
50:7 57:4
61:11 62:11
76:25 93:9
96:12,21 97:15
109:3 118:17
124:11,18
125:9 126:3,10
126:12 128:10
130:10,15
131:7,9 136:23
137:12,19
140:1,9 146:2
150:7 156:15
**reason** 7:10 9:6
46:18 95:10
97:2 153:7
154:20 155:6
156:5
**reasonable**
22:8 48:17
50:7 51:19
52:4,13 53:16
53:23 54:6,17
54:21 55:14,25

56:4,17,25
57:16 58:9,23
59:5,17,22
60:12,16 61:1
130:25
**rebranded** 30:4
**recall** 11:25
12:1,3 13:10
13:20 14:2,3
14:19 16:4,16
16:23 17:5
18:18 78:12
117:1,6 118:10
162:13
**recap** 151:1,3
**receipt** 73:22
101:11 135:18
**receipts** 36:6
38:17 44:8
73:13,17 74:8
137:7 146:5,17
148:17,19,24
149:2,4,8
163:6
**receive** 39:6,10
78:10 165:17
**received** 37:22
38:23 39:3
45:14 74:11,13
78:11 142:18
148:4
**recess** 67:5
110:16 162:3
**recognition**
24:13

**recollection**
17:3
**reconcile**
152:22,24
**record** 4:3,17
5:8 6:22 67:3,7
89:21 110:14
110:18 129:4
134:11 135:1
162:1,5 165:2
167:9,11,25
**recorded** 4:5
**recordkeeping**
129:25 132:9
137:17
**records** 128:6
133:21,23
134:2,6,8,11,20
134:25 142:7
**recross** 163:9
**red** 15:5
**redirect** 162:10
163:17 165:7
**refer** 18:23
162:19
**reference** 67:11
**referenced**
43:24 85:22
90:3 165:13
**references**
105:11 113:14
113:18 144:9
**referencing**
129:6

| | | | |
|---|---|---|---|
| **referred**  55:7 | 69:12 70:9,16 | **relativity**  37:23 | 82:24 83:8 |
| **referring**  55:13 | 70:25 72:11 | 38:3,8 | 84:20 85:4 |
| 74:1 94:18 | **reimbursement** | **relevant**  35:11 | 86:16 87:3,6 |
| 123:11 | 45:14 117:20 | 35:22 36:2,11 | 90:12,16 95:22 |
| **reflected**  14:18 | 123:20 | 62:25 63:18,21 | 96:4 98:3 99:8 |
| 15:13 | **reimburseme...** | 67:16 72:23 | 101:13 104:21 |
| **refresh**  8:10 | 142:19 | 76:25 77:1,2,5 | 106:4,8 137:10 |
| 33:25 77:20 | **reinicke**  1:24 | 77:13,18 96:12 | **remember**  6:16 |
| **refreshing** | 4:14 168:2,18 | 99:6 100:1 | 12:5 15:10 |
| 147:12 150:18 | **reiterate**  90:9 | 102:17 107:1 | 17:1 |
| **refusing**  48:12 | **reiteration** | 120:22 121:4,9 | **remote**  1:20 |
| 48:13,18 | 79:16 | 121:13 131:23 | **renamed**  30:5 |
| **regarding** | **rejected**  12:23 | 148:19,25 | 32:8,10 |
| 13:18 43:11 | **relate**  62:13 | **relied**  10:4 14:9 | **render**  11:20 |
| 65:1 113:3 | 149:2 | 15:9 20:8,10 | **rendered**  19:3 |
| 115:19 117:6 | **related**  15:19 | 37:6 41:15 | **rene**  168:2 |
| 140:2 148:16 | 38:13 39:2 | 42:7 43:25 | **rent**  124:9,17 |
| **regardless** | 50:3 51:19 | 50:21 74:9 | 125:5,11,16 |
| 139:20 | 53:23 60:5 | 79:13 81:19 | **rephrase**  43:19 |
| **regards**  147:10 | 65:2,5,25 | 88:22 98:7 | 160:14 |
| **regency**  87:13 | 66:14 67:15 | 129:17 141:10 | **report**  3:8 9:12 |
| 87:22 | 82:21 85:5,8 | 163:5 164:2,5 | 9:17 10:5,8,11 |
| **registration** | 86:18 87:2 | 164:11 165:11 | 11:19 12:8,20 |
| 168:19 | 89:9 96:18 | 165:14 166:3,7 | 13:2,11 14:7 |
| **regular**  139:19 | 97:3,7,19 | 166:15 | 15:19 16:10 |
| 141:21 | 103:12 104:6 | **relies**  71:6 | 17:14 18:4,5 |
| **regulations** | 112:19 113:1 | 89:13 | 19:7 20:4,5,15 |
| 24:4 | 113:11,23 | **rely**  14:6,22 | 20:18,20 21:7 |
| **regulatory**  7:19 | 114:11,18,22 | 15:2 37:13 | 21:10,11,15,23 |
| 7:22 | 115:25 149:12 | 97:20 98:15 | 21:24 22:2,8 |
| **reimbursable** | 168:9 | 132:2 162:17 | 25:14 27:3 |
| 117:14 | **relates**  85:21 | 164:21 | 33:20 34:5,10 |
| **reimbursed** | 115:7 | **relying**  15:13 | 34:15 35:2 |
| 63:25 64:3 | **relatively** | 70:23 73:7 | 36:11,15,18 |
| 65:19 68:12 | 119:23 120:5 | 81:25 82:4,11 | 37:1,2,6,8 38:8 |

38:10,13,21
39:1,8,8,14,16
39:17,19,20
40:1,3,5,6,6,11
40:14,15,16,17
40:20,21,23
41:6,7 42:9,20
43:3,8,13,23
44:2,24 45:4
45:17,18,18
48:22 49:22
52:6 53:6,24
54:11 55:20
58:7,18,18,22
59:5,10,21
60:5,24 61:1
61:19 62:16
63:5,13 64:1,3
65:4,7,14 66:3
67:11 68:10,16
68:19,24 69:1
70:4,8,11,13
71:5,10 72:2
72:15,20,22
73:3,19 74:16
75:5,7,10 76:3
78:5,8,13,14,22
79:3,10,18
80:1 83:23
86:2 87:20
90:10 97:8
103:16,20
104:20 105:9
106:14 109:17
110:2 113:25

114:7 115:10
117:8 129:22
133:16 136:16
141:6 144:25
145:16,25
146:2 149:3,10
149:25 150:23
151:18,23,25
152:11,13,23
153:4,8,10,14
153:16,19,23
155:5,8,13
156:4,10 157:1
157:4,7,8,11,20
157:23 158:4
159:5,9,19,20
160:3,11,15
162:18,20,22
164:1,20
165:12 166:1,1
166:6
**reported** 1:24
145:4
**reporter** 1:24
4:14,22 6:5
47:21 167:8,16
167:22,24
**reporting**
30:14 31:21
32:19 128:4
**reports** 20:11
21:9,20 40:18
44:23 45:4,12
45:13 61:22
77:16 108:20

116:13,18,22
145:3,10,21
148:19,24
152:23 153:2
160:10,16,21
160:22 166:2
166:17
**represent** 4:19
11:13
**representations**
74:9
**representative**
35:10 49:17
111:1 115:9
116:3
**represented**
11:14 69:25
70:9,15 71:7
72:17 73:5
**representing**
4:12
**request** 16:14
39:4 105:3,14
105:23 149:18
149:20 166:18
166:24 167:1
**requested** 36:6
37:16 38:13
39:10 40:24
146:8,20
**requesting** 41:3
144:3
**require** 97:17
139:8,14

**required** 47:12
141:16
**requirement**
57:22
**requires** 61:15
135:25
**research** 29:21
29:22
**reside** 5:13
107:11,16
**resided** 106:13
107:16 108:15
**residence**
106:22,25
108:6 109:4
124:9 125:6
**resides** 106:12
**respond** 140:10
167:1
**response**
149:19
**responses** 6:7
**responsibilities**
28:6 29:16
30:9 31:16
32:16,17
**responsibility**
31:23 33:18
**responsible**
28:8 32:20
**responsive** 39:4
**rest** 76:18,19
101:16 139:16
145:6

restaurant
135:7,18
resting 141:19
restraints 57:8
57:9
result 54:12
retained 11:6,9
retract 105:21
return 101:6
137:4,5
returned 101:3
returning
101:13
returns 53:3
139:24
revenue 28:16
28:17 30:19
32:23 33:2,6
120:9,15 122:5
122:18 123:11
123:14
revenues 121:8
121:12
review 17:25
20:2,3,17 21:9
34:22 37:19
66:6 77:16
83:4 112:20
125:12 139:11
147:14,16
151:22
reviewed 13:2
13:2 20:13,24
21:4,20,23
22:2 35:16

37:3,16 75:25
76:19,24 111:4
117:5 146:20
147:20 160:22
reviewing
17:11,11 19:14
75:15 143:24
148:16 155:9
155:12 156:8
157:2
revising 148:17
revival 120:5
revived 120:2
reviving 22:15
22:18 23:19,22
rewriting
137:22
right 5:21 6:21
7:7,8 8:2,20,22
9:19 10:8
11:16 12:13
15:14 16:10,11
17:23 18:1,21
19:5 20:14
21:21 22:5,12
22:13,16,19
23:7,8,10,20,25
24:1,9 25:1,3
26:23,24 27:4
27:6,12,13
29:6 30:24
33:19 34:4,5,8
35:3 36:18,19
36:20,22 37:7
37:8 38:25

40:9,10 41:8
42:10,11,13
43:1,3,3,8,14
43:23 44:2,3,6
44:21,24 45:2
45:5,7,9,20,23
45:25 46:3,5
46:15 47:12
48:4 49:13,14
49:21,23,25
50:1,5,12 51:2
51:4,5,6,11,16
51:20 52:14
53:3,6,7,9,10
53:11,16,22,24
54:18 55:11
59:1,8 61:14
63:4,12,16,19
63:20 64:4,8
64:17,18,21,22
64:24 65:2,3,6
65:8,10,12,23
65:24 66:1,4,9
66:12,13,15,21
66:23 67:10,20
68:1,2,7,23,24
68:25 69:3,7
69:19,23 70:3
70:5,7,14,15,23
71:4,6,9,12,18
71:21 72:6,10
72:16 73:8,9
73:13,15,25
74:6,7,10,23
75:5 76:16

78:1,3,5,6,21
78:22 79:20,24
80:4,6,13,14,18
80:19,22 81:1
82:2,13,17,22
83:11 84:3,6
84:10,22 85:6
85:24 86:19
87:4,6,19,24
88:2,8,13,19,22
89:3,5,8,11,24
89:25 90:3,9
90:10,12,14,23
90:24,24 91:3
91:5,6,8,11,12
91:13,15,16,17
91:23 92:5,7
92:14,21,22
93:1,10,12,23
95:4,17 96:14
97:20 98:5,16
99:18 100:5,9
100:12,15,18
100:19 101:4,6
101:9,10,14,18
102:4,4,8,13
103:5,18,25
104:1,3,7,19,22
105:8,9,18,20
106:5,9,10
107:1,6,23
108:21 109:10
109:20,23
110:4,6,9,11,24
111:24 112:7

**[right - roytblat]**                                                    Page 34

| | | | |
|---|---|---|---|
| 112:13,15,16 | 141:13,19,22 | 166:5,13,20 | 70:18 71:13 |
| 112:19 113:1 | 141:23 142:4,8 | 167:7 | 72:21 74:24 |
| 114:11,19,23 | 142:11,12,13 | **rinehart** 29:4,6 | 78:23 79:4,12 |
| 115:2,16,17 | 142:14,16 | 29:11 30:1 | 80:7 82:3 |
| 116:5,8,19,20 | 143:11,21,22 | **role** 31:8,9 32:5 | 84:18 85:7 |
| 116:23 117:14 | 144:4,7,8,9,23 | 32:20 33:9,10 | 87:5 88:3,14 |
| 117:20,22,25 | 144:24 145:1,2 | 33:16 37:14 | 88:20 89:4,12 |
| 118:1,4,6,15 | 145:4,5,15 | 41:1 47:2 | 90:15 91:24 |
| 119:11,12,14 | 146:9 147:1,2 | **room** 107:15 | 92:15 93:2,11 |
| 119:22,24 | 148:13 149:14 | **rough** 29:9 | 93:24 94:4,7,9 |
| 120:6,10 123:9 | 149:18 150:9 | 32:12 167:13 | 95:12 96:20 |
| 123:12,18,21 | 150:11,22,24 | 167:18,20 | 104:8,15 |
| 124:4,10,22,24 | 151:11,13,19 | **roughly** 18:10 | 105:10 106:15 |
| 125:1,3,22 | 151:23,24 | 27:9 31:5 | 107:24 109:2 |
| 127:1,16 128:1 | 152:2,3,4,6,11 | **round** 27:4 | 113:2 114:12 |
| 128:4,7,17,19 | 152:12,13,15 | **roush** 83:17 | 115:3,20 |
| 128:21,24 | 152:16,17,18 | 84:1,9,16 | 116:15,24 |
| 129:4,14,15,18 | 152:20,21,22 | 85:15,17,20 | 117:4,21 118:9 |
| 129:19,20,22 | 153:22,24 | 86:12 91:19 | 118:16,21 |
| 129:23 130:5 | 154:2,5,7,21,24 | 92:4 93:20 | 119:7,13,25 |
| 130:24 131:2,4 | 154:25 155:2,7 | **routed** 16:14 | 120:11,20,24 |
| 131:17,20,24 | 155:8,11,16,17 | **roytblat** 2:3 3:3 | 121:3,20 122:3 |
| 131:25 132:1,3 | 155:22 156:6,7 | 4:20,20 8:15 | 122:21 123:22 |
| 132:6,8,9,13 | 156:10,13,19 | 24:18 42:14,18 | 127:2 128:8 |
| 133:5,13,15,16 | 156:22,24 | 43:15 44:12,17 | 132:14,24 |
| 133:17,18,19 | 157:3,14,17,18 | 46:16 47:13 | 133:6,25 |
| 133:22,24 | 157:20,21,23 | 48:5 49:1 | 135:10 138:7 |
| 134:6,14,23,25 | 158:1,2 159:7 | 50:19 51:13,24 | 138:21 139:10 |
| 135:3,5,9,23 | 159:10,11,14 | 54:23 55:4 | 142:24 146:11 |
| 136:4,7 137:7 | 159:17,18,24 | 56:5 57:17 | 148:8 154:10 |
| 137:15 138:19 | 160:1,4,12,18 | 58:10 59:6,23 | 154:13 158:11 |
| 139:2,9 140:14 | 160:19 161:2,9 | 61:2,10 62:10 | 160:5,13 |
| 140:15,18,19 | 161:10,15 | 62:20 63:6,10 | 161:12,21 |
| 140:22,23 | 162:9 164:1,6 | 67:1,21 68:8 | 162:9,12 163:8 |
| 141:3,4,7,8,10 | 164:15,17,25 | 68:18 69:8,24 | 163:13 164:7 |

165:19 166:12
166:18,22,24
167:6,18
**rules**  5:22
136:6 165:5
**run**  36:14
**running**  167:19
**runs**  36:17
**rush**  167:21
**ryan**  1:4 3:9,10
4:7,21 13:4
35:19 74:10
77:19 78:1
85:14 88:13
91:23 92:14
93:1,3,23
98:16 99:18
101:9,17
103:25 108:25
109:23 112:13
112:14,15
143:22 148:12

**s**

**s**  3:6 22:11
**sadeleer**  19:11
20:12 38:11
68:10 83:15,24
87:12,21 88:18
89:2 91:18
92:3,3,8,20
93:20 97:24
100:3,17 101:2
105:2,12
109:12,19

**samuel**  1:12 2:8
**sanctioned**
7:21
**saturday**  81:11
**saw**  78:14,19
78:20 145:3
161:9
**saying**  10:13
11:4 47:2
48:10 49:6,8
54:20 59:24
62:1 64:18
80:20 114:7
121:11 122:14
131:8 137:25
138:22 140:16
**says**  46:18 52:2
55:12,16 56:18
57:1 61:4
79:21 80:10
81:6,9,12,14,15
81:18 82:8
83:14 87:11
97:1 103:11
107:10 108:5
109:11 111:24
112:7 113:18
123:17 132:25
132:25 133:7
134:1,11 135:4
135:21 139:13
139:19 144:12
147:8 148:15
150:3 153:14

**schedule**  81:9
90:9
**schiller**  2:3
16:6,12,17,20
16:24 17:3,22
18:16,22
**school**  28:25
**scope**  11:23
25:13 26:25
27:2 31:19
40:6 62:11
63:5,13 64:15
65:3,7,11
68:15,19 69:1
70:11,12 71:4
71:9 72:1,14
72:19 136:23
145:16,25
146:2
**screen**  9:6
150:19 151:8
158:21 159:3
161:10
**scroll**  9:7 161:7
**scrolling**
154:16
**seal**  168:12
**sec**  24:3
**second**  8:8,9
18:24 27:24
51:7 53:13,18
75:2 81:2,16
88:21 101:24
109:24 130:6
132:14,17

147:8 150:5,10
158:5,13 159:9
161:14,18
162:20 165:24
**seconds**  150:11
**section**  55:13
63:9 129:25
132:9
**sections**  79:3
102:17,20,22
**see**  8:11,13,17
8:20,23 9:2,7
18:9 33:25
34:4 42:6
53:17 55:16
56:12 60:20
65:20 67:17
70:4 72:6
77:20 78:7
81:18 83:20
87:17 89:22
91:20 92:11
98:1,13 101:23
103:14 105:6
109:15 112:5,8
112:10 113:20
116:17 118:10
125:24 127:23
127:23 130:1
143:11 144:17
144:21 145:21
145:24 146:2
146:22 147:3,6
147:8 148:21
151:13 154:21

156:16,25,25
159:2,13 161:8
163:16,19
**seeing** 118:10
**seek** 155:20
**seems** 57:12
60:14 153:15
155:3 159:18
**seen** 84:11,12
111:14 143:14
143:24 144:1
146:25 147:15
147:19,21,23
148:4,10 149:3
**selling** 29:23
**senior** 30:8
31:8 32:2
33:10,12
**sense** 50:13
**sensitive** 24:3
**sent** 38:22
166:4
**sentence**
162:20
**sentences** 84:6
88:8
**separate** 41:22
42:1 161:16
**separately** 13:7
114:2,5 136:2
139:25
**separating**
134:17
**september** 9:18
13:12 16:5,8

34:7 35:15,17
41:14 75:11
78:3 162:14
**sequentially**
159:6
**serious** 124:12
**served** 135:8
166:1
**services** 29:24
32:10 33:11
113:18
**set** 48:21 52:12
55:8 56:13
60:15 117:23
122:16 130:22
131:19 141:12
142:11 147:1
162:22 163:23
**sets** 57:21 58:5
61:18 131:21
**setting** 25:6,7
61:24 62:7
71:2
**several** 108:10
130:23 165:3
**shake** 6:8
**share** 9:6
150:19 151:8
154:15 158:21
158:22,25
**shared** 159:2
161:10
**sheet** 129:4
150:3 154:25

**sheppardmull...**
2:11
**shoot** 85:1
126:2
**show** 9:4 134:3
143:2 147:2
159:13 160:15
**showed** 46:22
**showing** 110:7
**shy** 6:14
**signature**
168:16
**signed** 34:7
78:3,7 93:4
**similar** 14:10
14:12 32:17
42:3 79:14
88:10 129:4
**simple** 79:9
**simply** 74:15
**single** 127:1
**sitting** 25:2
31:5 51:25
59:1 61:25
63:1 76:16
98:5 103:3
117:1 123:8,12
128:24
**situation** 55:9
58:13 123:4,7
123:10 124:11
**sleep** 139:16
**slow** 6:11,12,13
47:21

**small** 28:9,12
154:8 156:15
**smaller** 145:12
145:13
**smart** 27:21
28:18,24 30:24
**solely** 73:7
90:12 98:3,15
104:21 106:8
121:19
**solutions** 4:13
4:15
**somebody**
17:19 77:15
97:18 138:14
**soon** 167:13
**sophie** 2:3 4:20
42:16 163:22
167:3
**sorry** 14:24
18:24 31:11,12
31:14 34:11,14
35:18 41:19
42:23 43:4,17
43:18 47:23
49:4 58:1
66:19 85:21
86:3,4,22
90:25 91:1
94:17 98:22
108:2 111:16
115:10 118:25
119:16,16
121:1 122:11
134:22 158:5

161:21

**sort**  14:15 18:7
23:1,25 25:8
30:11 50:25
75:19,23
122:17 129:2
130:13 161:6

**sorting**  149:16

**sought**  115:1
115:14

**sound**  60:14

**sounds**  63:10
165:19

**source**  75:16
82:4,8

**sources**  75:19
129:17

**south**  81:16

**southern**  1:2
4:9

**space**  29:25

**spacex**  98:19
100:4

**speak**  13:8
15:22 16:3
19:8,11,18,24
19:25 28:14
45:21 57:4
61:14,15 118:2
118:17 127:25

**speaking**  25:21
26:6

**specific**  13:20
16:4 17:1,5
26:8,8 50:9

52:1,6 54:19
55:18 56:6
57:18 58:4,5
59:10,14 61:11
61:17 66:11
70:19 73:22
74:25 98:24
99:4,19 108:12
115:21 117:12
125:9 127:8
152:25 166:14

**specifically**
6:23 14:2,4,5
14:19 16:23
20:4 70:13
76:8 77:2
78:12 84:17,19
88:23 97:11
99:4 138:16
153:18

**specifics**  28:14
35:1 56:12
117:6 118:17
130:21

**specify**  121:3

**speculate**  26:19

**spelled**  22:11

**spend**  96:6
109:5

**spent**  144:15
148:16

**spinning**
150:17

**spoke**  14:20,20
16:3,4,15

**spoken**  18:19

**spreadsheet**
3:12,12,13
155:4,21

**square**  105:13

**sroytblat**  2:5

**staff**  31:23,24

**stamp**  10:16
21:11 143:4,8
143:10 157:17
158:7,9

**stamped**  10:12
37:15

**stamps**  36:22
37:8,12

**standard**  52:21
54:7,25 55:10
55:11,18,19
56:3 57:12,15
58:8,21,24
59:1,4,9,21
60:2,11,14,15
60:23,25 61:3
61:20 76:7
77:13 97:11,15
116:22 130:15
130:16 131:8
131:12 132:1
133:7 134:1
139:23

**standards**
39:24 49:24
50:3,8,12,13,16
50:17,21,24
51:3,8,9,10,17

51:19,23 53:5
54:12,13,16,18
60:4 62:25
64:12 76:23
77:7,17 96:6
108:1 117:23
122:4,17 123:4
123:13,19
127:7,10 128:5
128:10,16,19
130:3 131:17
132:5,12,15
136:16,17
137:2,18 140:8
140:14,17,18
140:22 141:2
141:10,13
142:12 155:17

**standpoint**
131:11

**stanley**  79:22
80:3,21 81:1,6

**starbucks**
156:24

**start**  5:21 28:4
29:6

**started**  30:6
41:7 107:17

**starting**  20:22
38:10

**startup**  23:22
120:8

**startups**  28:15
30:19 32:23
33:2,5

**state**   5:7 63:14
65:14,16 66:5
**stated**   83:5
**statement**   28:9
29:20 73:7
88:12 90:16
91:22 92:13,25
94:3,21 96:16
98:6,8 103:24
105:17 121:14
125:19 129:3
132:21 135:22
**statements**
14:6,8 15:12
15:13 73:8
77:17 89:11
90:14 95:3
101:14 102:8
104:22 120:14
130:10 154:4
**states**   1:1 4:8
**stay**   107:11,20
108:14 124:16
165:2
**stayed**   41:24
87:12,21 88:5
88:5 105:12,23
106:24
**stays**   106:16,22
106:23
**stick**   138:25
**sticker**   150:7
**stone**   60:16
**stopping**
141:19

**stored**   101:4
**street**   5:15
81:16
**style**   161:6
**subject**   7:18
118:11
**submit**   47:12
48:3,19 49:8
50:4,4 51:20
52:2,6,13
54:17,21 55:25
56:4,17,25
57:15,19 58:9
58:22 59:4,10
59:21 60:25
61:8,19 62:9
62:14 117:18
121:25 123:5
124:6 126:25
129:1 130:4
142:8
**submitted**   9:17
9:20 10:7
12:20 16:9
17:14 18:4,5
20:13 34:7
35:14 37:2
38:12 40:5
41:13 44:24
45:5,9,13 46:2
46:6,10,14
47:1 61:22
62:2,8 63:24
64:23 68:7,11
68:17,23 69:11

71:20 72:10,16
72:18 73:6
74:13 78:8,13
78:14 113:25
114:2,5,8
116:13,19,23
123:20 124:3
153:23 160:4
160:11
**submitting**
20:17 21:23
50:6 53:24
57:3,4 72:1
113:10 160:7
**subsequently**
21:15
**substantially**
139:15 141:18
**substantiate**
38:14 39:13
74:19 75:8
90:18 99:10
128:23 132:12
132:22 146:6
149:22 153:12
155:14 164:9
**substantiated**
144:15
**substantiates**
105:25
**suffice**   14:21
24:8
**sufficient**   39:13
39:22,24 40:9
40:12,14 75:7

134:13 135:3
149:22 153:11
**sung**   1:9 2:7
**support**   37:19
38:23 40:21
50:4 85:13
86:1,22 88:12
91:22 92:2,13
92:19,24 93:5
93:22 94:21
95:22 98:18,23
99:2,6,17,22
101:8 102:7
103:24 104:19
105:17,24
109:22 128:6
128:21,23
130:12 133:2,5
133:9,16 134:3
134:13 135:2
135:25 144:3
**supported**
74:14 102:20
**supporting**
9:13 13:3,16
17:11 18:1
21:6 36:5
38:14,16,24
39:1 41:3
43:10,11 44:8
74:11,18,23
75:8 76:1
90:17 94:18,20
99:9 125:13
127:23 128:13

**[supporting - testimony]** Page 39

146:4,17,19
149:14 155:14
163:6
**supports**  85:19
86:13 105:22
**supposedly**
102:7 110:9
**sure**  10:6 15:8
16:25 27:2
52:16,23 57:8
57:11 58:12
59:18 66:17
68:25 69:4,9
70:21 71:22
74:2 75:2 76:6
79:5 87:1 94:6
94:14 108:13
123:24 128:24
130:24 139:25
147:25 149:7
158:24 166:18
167:16,24
**surprise**  104:13
121:18 142:22
**swear**  4:23
**sworn**  4:24 5:3
168:5

**t**

**t**  3:6
**tab**  151:1,2,3,5
154:7 155:22
156:13 157:6
159:13
**table**  90:10
91:14

**tabs**  151:5
161:8
**take**  7:1,5 8:9
12:22 32:15
33:15,19 39:17
40:10 53:25
61:5 63:6
65:13 74:2,2
79:20 83:2
91:17 95:7,11
96:11,24
116:10 139:11
143:16 146:10
146:15 147:14
147:18 161:3
167:18
**taken**  4:6 12:12
67:5 110:16
162:3
**takes**  158:5
**talk**  50:6 63:4
63:12 74:20
85:18 108:21
128:4 138:24
165:6
**talked**  19:7
120:9 164:5
**talking**  6:18
73:22 82:16
117:10
**talks**  77:9
134:17
**tangent**  83:18
84:2

**task**  96:7,11
**tax**  30:24 108:4
108:5 128:9,11
130:11 131:10
136:11 137:4,5
138:10,12,16
139:15,18,19
139:24,24
140:17,21
141:17,21
142:3,3,7
**taxes**  28:11
136:21 137:1,7
137:11 138:6
**team**  166:25
**technical**  83:17
83:25 84:9,17
**technology**  8:3
**television**
125:25
**tell**  5:24 6:11
14:17 31:14
52:17 60:24
103:3 118:25
140:1 143:16
157:5 159:23
167:4
**telling**  14:11
15:10 50:18,20
50:21 54:24
87:4 102:23
131:6,11
140:24 166:20
167:5

**tells**  6:23
**term**  21:3
71:14,15
**terms**  32:8
37:14 49:7
50:23 52:3
55:12 57:2
70:6 90:7
122:6 146:5,10
**tesla**  98:10,11
100:4,9,23,24
**test**  8:2
**testified**  5:3
10:18,20 12:17
36:7,14,17
122:23 165:13
166:15
**testify**  7:10
12:14 115:19
116:7,21
126:12 136:24
163:1 164:12
164:23
**testifying**  7:8
11:6,8 17:18
17:20,22,23
18:3 130:14
**testimony**
49:15 56:16,24
59:3,18,20
61:7 79:2 86:1
86:8 110:25
115:8,23,25
116:2,25 117:5
122:2,19 125:5

126:8 163:16
165:7 168:8
**thank** 5:1,17
73:3 110:20
123:2 161:24
162:7
**thanks** 67:2
81:8
**themes** 60:5
**theory** 157:20
**thereabouts**
153:17
**thereof** 168:11
**thing** 35:5
55:16 92:16
96:18 101:20
158:21,23
164:5
**things** 8:6
30:13 90:7,18
96:18 140:9
152:1 156:21
165:3
**think** 12:7 14:9
14:13 16:14,25
17:2 18:5,14
18:19 20:2
24:20 25:3
32:12,15 35:22
36:4,13 37:22
43:14,21 46:5
46:21 48:2
52:3,7 54:3
55:7 56:19
57:2,18 59:2,8

62:23 63:1
72:3 73:3
76:22,24 77:6
90:4 96:1,2,2,5
96:8 97:11,15
98:25 99:20,25
99:25 101:10
106:23 107:9
107:14 108:2
108:13 111:20
119:8 122:16
126:21 129:20
133:14 134:7
137:9,16 138:9
138:10 142:9
146:1 147:25
152:13 153:22
154:13 160:25
161:12 167:1
**third** 137:4
**thought** 25:2
35:11 41:20
49:4 58:1
**thousands** 12:1
**thread** 143:25
**three** 8:21
28:19,21 32:2
95:11,16
**threshold**
128:25
**thursday** 81:10
81:12,15
**ticket** 128:24
145:11

**tie** 91:2 108:1
**time** 5:20 29:14
30:10 39:14
40:1,13,15
51:19 52:2,5
52:13 53:17,23
54:7,17,22
55:14,25 56:4
56:11,17,25
57:3,7,8,16,21
58:9,23 59:5
59:17,22 60:13
60:16 61:1,18
62:1,24 63:18
63:21,23,23
66:23 67:16
72:23 75:10
81:8 97:1
106:13 107:17
107:19 109:5
113:8 124:16
134:12 135:2
144:1 145:6
146:12,15
148:16
**timeframe** 72:1
**timely** 70:23
133:23 134:2,6
134:8,11,20,25
**times** 16:5
49:16 105:13
110:23 129:20
130:23
**timing** 49:7

**title** 27:22
29:11 30:6
63:18
**titled** 112:5
**today** 5:23 6:5
7:11 8:5 9:4,11
103:3 150:8
166:15,21
**today's** 12:25
167:10
**together** 99:2
107:18,20
134:23 147:24
161:23
**told** 14:3,25
15:3,11,16
70:25 71:2
102:12,22
106:16,19,21
130:23 140:13
141:24 151:21
159:10
**tomaso** 1:10
2:7 19:9 20:13
23:10,19 24:9
35:11,12 44:24
45:5,9,13,20,21
45:23 46:23
49:13,18,18,20
54:11 57:9
61:15,21,21,21
62:7,14,23
63:24 68:7,17
72:16,18 73:6
79:23 80:3

87:8,8,14
103:12 104:7
105:4 110:23
110:25 112:22
113:14,19,23
113:25 114:2,5
114:9,11,15,19
114:22 115:5,7
116:4,5,13
117:11,17
118:1,11
119:23 120:5,8
120:17 121:15
142:19 148:6
153:24 160:4
160:12
**tomaso's**  26:14
26:23 54:4
83:17,25 84:9
84:17 85:6,9
86:18 141:3
145:22
**took**  31:22
38:21 41:1,25
82:5,24 83:2
83:10 88:24
89:25 96:13
154:20,20
**top**  53:18
112:20
**topic**  11:17
**topics**  22:5
**total**  144:23
157:14

**totaling**  145:18
**totally**  26:25
42:8 86:25
117:16
**towards**  128:10
**tracing**  30:14
31:20 32:18
70:21
**trade**  125:2
**transactions**
144:14
**transcribing**
6:6
**transcript**
168:7
**transfer**  105:8
**transportation**
133:8 152:2
**travel**  13:15,19
13:22 14:1,15
25:15 36:8
38:12 39:3,19
39:19,21 40:7
41:1,15,16,21
41:24 42:1
43:9,11 49:9
63:14 64:20
65:2 67:15
76:8,8 77:2
88:4 108:5,21
133:8 138:24
139:3 140:3,14
141:6,9 145:1
145:9 149:2
152:1,2 163:2

163:3 164:3
**traveled**  79:15
83:16,24 88:5
109:13,19
142:6
**traveling**  93:14
127:5 139:4,7
139:13,17
141:15 142:3
**treated**  131:20
**trial**  162:23
164:22,24
**trip**  74:5 87:15
87:24 89:3,10
89:24 90:5,6
91:2 96:19,23
97:2,3,10,13,18
97:19,21 99:1
129:3 164:13
**trips**  90:3,4
146:4
**true**  44:7 51:12
94:3 95:4
122:19 123:3
128:22 168:7
**truly**  127:18
**truthfully**  7:11
**try**  6:16,19
46:11 47:7
64:13 99:24
147:11 150:18
151:7,10
155:24
**trying**  15:8
27:2 54:13

64:15 79:9
86:21,25 140:8
149:16
**turn**  53:11
60:19 117:8
**two**  21:20
28:19,19,20,21
28:21 32:15
39:20 41:22
42:3 93:8
96:16 99:16
132:4 150:2
158:6 160:1,16
160:20,25
165:10
**type**  25:22
64:23 90:2
**types**  25:11,18
26:1,4,11
32:25 33:3,17
124:19 130:8
131:13 146:19
**typical**  29:18
**typically**  75:14
101:21

**u**

**u.s.**  166:1
**uh**  6:8 48:25
59:16 128:18
**under**  7:8
28:16 32:9
47:5 49:10
51:21 54:1,18
93:4,16 123:3
127:7 128:5,12

128:19 130:3
132:11 134:10
135:13 139:18
157:20 165:5,6
168:12
**underlying**
163:7
**understand**
5:24,25 7:7
12:11 13:21
15:7,8 19:4,14
27:2 44:22
45:11 54:10
63:23 64:15
65:16 66:5
69:1,15 71:10
86:21 87:1
94:23 99:25
108:10,24
112:12 119:18
120:1 121:6
123:24 126:16
127:17,21
137:17 144:25
149:7 164:3,6
164:8,11
**understanding**
36:24 44:25
64:6 68:9
69:10,17 72:23
84:25 85:2
94:17 107:25
108:24 109:3,5
113:24 114:7
115:6,18 119:8

122:22 127:22
127:22 138:4
149:13 153:23
162:21,25
**understood**  6:3
**unicorn**  1:13
2:8
**unit**  4:5
**united**  1:1 4:8
**unnecessary**
146:7
**unquote**  37:21
**unreasonable**
108:14
**upcoming**
87:15,24 89:3
92:9
**use**  33:21 52:3
53:3 76:20
134:12,13
135:1,2
**used**  19:8,17
42:9 43:1,7,22
**using**  130:15
**usually**  7:1

| v |
| --- |

**vacation**  74:3
97:13
**vacations**  74:1
**vacuum**  98:22
**vague**  55:18
94:7
**vagueness**  94:9
**valid**  22:8 46:2
46:5,14,22

47:5,9 49:11
64:10 67:22
68:3 76:3
93:16 130:25
**validly**  47:11
48:20 68:2,5,7
68:17,23 69:3
69:4,16 71:11
71:15
**valuate**  29:21
**valuation**  11:19
11:20,23 30:17
**variety**  38:16
**various**  4:11
109:13,20
110:8
**vector**  83:18
84:2
**vendor**  84:13
**veracity**  90:13
**verbal**  6:7
**verbally**  14:11
128:3
**verbatim**  42:5
88:9 97:17
**verification**
88:17 89:1
**verified**  73:16
144:15
**verify**  70:8,20
71:8 73:17,18
78:15 98:6
**verifying**  70:6
82:5

**veritext**  4:13,15
8:16 33:20
**version**  33:21
78:7,14
**versions**  10:12
**versus**  12:2
100:12,17
130:9 131:14
131:22
**vice**  31:10,11
31:12,17,18
32:1,5,12
**video**  4:5,10
**videographer**
1:24 4:2,13,22
67:3,6 110:14
110:17 162:1,4
167:10
**videotaped**
1:17
**view**  144:13
**villanova**  27:5
27:16
**virginia**  168:1
168:3,13,20
**virtual**  8:5
**visit**  85:17
**visited**  100:3
105:2
**vs**  1:7 4:7 11:4

| w |
| --- |

**want**  5:21
26:19 33:21
52:22 53:13
59:18 61:4

**[want - work]**                                                    Page 43

| | | | |
|---|---|---|---|
| 63:4,12 65:15 | 138:17 140:2 | 47:24 48:7 | 133:3,10 134:4 |
| 81:2 94:6 | 141:19 142:25 | 49:3 51:1,14 | 135:12 138:18 |
| 97:17 106:1 | 149:4 151:2 | 52:9 55:1,21 | 138:23 140:4 |
| 117:8,16 | 155:9 156:8 | 56:8 57:23 | 143:1 146:14 |
| 127:23,23,24 | 160:6 | 58:14 59:12 | 148:11 154:12 |
| 130:4,21 132:8 | **ways**  44:9 | 60:1 61:6,12 | 154:15,19,23 |
| 139:11,25 | 108:10 | 62:17 63:2,8 | 156:1,3 158:13 |
| 150:11 151:8 | **we've**  58:15,16 | 63:11 66:23 | 158:18 160:9 |
| 154:7,9 157:6 | 63:3 142:14 | 67:2,9,25 | 160:17 161:2,9 |
| 157:7 158:24 | 144:6 153:2 | 68:13,20 69:13 | 161:15,22 |
| 159:12 165:2 | **wednesday** | 70:2 71:1,16 | 162:7 163:9,11 |
| 165:12 167:5 | 81:10 | 73:1 75:1 79:1 | 163:22,24 |
| **wanted**  13:21 | **week**  160:1 | 79:8,19 80:12 | 164:14,25 |
| 19:24 40:10 | **weeks**  16:9 | 82:7 84:21 | 166:5,13,20,23 |
| 61:9,21,22 | **weirdly**  155:25 | 85:10 87:9 | 167:3,7,13,21 |
| 62:15,23 | **wells**  77:12 | 88:7,16,25 | 167:23 |
| 117:19 122:16 | **weng**  1:11 2:7 | 89:7,15 90:20 | **wish**  81:7 |
| 145:24 146:2 | **went**  28:24 | 92:1,18 93:7 | **wit**  168:1 |
| 162:25 164:22 | 38:12 75:22 | 93:18 94:1,5,8 | **witness**  4:23,24 |
| **wants**  57:19 | 105:22 153:20 | 94:10 95:14 | 8:15 10:18,21 |
| **warren**  1:24 | 160:7 | 97:5 104:10,18 | 12:17 48:2 |
| 4:12 | **west**  79:23 80:4 | 105:16 106:18 | 49:2 55:5 |
| **washington**  2:4 | 80:19,21 81:1 | 108:17 109:9 | 70:18 154:14 |
| 2:10 5:13,15 | 82:2,9,13,16,19 | 110:11,20,21 | 154:18 161:4 |
| **way**  29:20 31:6 | 82:20 83:3,5 | 113:5 114:16 | 161:11 165:4,6 |
| 37:4,17 39:25 | 83:11 | 115:11,22 | 165:22 |
| 44:10 45:24 | **wholistically** | 116:16 117:2,7 | **witnesses** |
| 46:9 48:22 | 99:21 | 117:24 118:13 | 162:23 164:21 |
| 49:6 62:22 | **wigger**  2:9 3:2 | 118:18,24 | **word**  80:18,25 |
| 66:2 95:13 | 3:3 4:18,19 5:1 | 119:10,15 | 97:7 |
| 111:21 113:12 | 5:5 6:13,15 | 120:3,12,21 | **words**  23:9 |
| 121:11,11,13 | 8:18 24:22 | 121:1,5,23 | 44:4 47:10 |
| 125:18 126:13 | 42:16,21,22 | 122:8,25 | 92:23 136:2 |
| 136:13,19 | 43:16 44:15,20 | 123:25 127:14 | **work**  9:6 16:25 |
| 137:6,13,19 | 46:20 47:16,23 | 128:15 132:18 | 17:2,9 18:11 |

**[work - zooming]**                                    Page 44

| | | |
|---|---|---|
| 19:8,17 25:9 | **wrote**   130:24 | **yellow**   118:10 |
| 26:25 30:24 | **x** | **yep**   8:17,25 |
| 31:19 40:24 | **x**   3:1,6 64:8 | 27:13 34:6 |
| 42:21 65:18 | **y** | 53:1,4,19 |
| 97:1,10 105:2 | **yeah**   9:3,22 | 55:23 63:17 |
| 105:14,23 | 25:7,22 27:7 | 67:1 78:4 |
| 106:4 107:20 | 28:1,2 34:2 | 79:25 87:25 |
| 113:7,11 | 40:2 44:4 | 91:4 100:13 |
| 114:14 115:7 | 45:15 49:4 | 144:24 147:13 |
| 138:15 139:16 | 52:16 54:9 | 151:20 152:5 |
| 139:17 141:18 | 63:8 71:19 | 152:18 156:23 |
| 151:11 | 73:14 80:10,16 | 159:8,15 |
| **worked**   16:19 | 81:23 88:22 | **york**   1:2 2:4 |
| 17:21 22:21 | 94:20 103:23 | 4:9 5:13,15 |
| 27:20 30:12,16 | 108:23 113:3 | 18:22 101:6 |
| 33:5 93:20 | 113:17 115:21 | 105:2,13,13,23 |
| 108:14 | 115:23 119:16 | 106:4 107:3,4 |
| **working**   18:17 | 122:4 123:1 | 108:9 157:13 |
| 33:2,2,17 96:7 | 124:1 125:8 | 165:5 |
| 96:22 97:18 | 131:23 132:16 | **z** |
| 107:18 117:13 | 132:25 133:20 | **zach**   16:15 |
| 119:1,12 132:7 | 146:19 147:11 | 18:13 |
| 137:15 138:1,3 | 148:2 150:21 | **zero**   122:1 |
| **works**   19:16 | 151:10,17 | **zoom**   1:17 4:10 |
| 66:17,25 67:1 | 154:18 155:3 | **zooming** |
| **world**   94:21 | 156:17 161:22 | 154:11 156:15 |
| **writing**   37:1 | **year**   18:12 | |
| 128:1,3 166:25 | 21:17 27:24 | |
| **written**   57:13 | 32:15 33:15 | |
| 110:24 117:18 | **years**   28:19,19 | |
| 122:15 | 28:20,21,21 | |
| **wrong**   83:1 | 31:5 32:3,13 | |
| 86:3 94:5 | 33:13 119:1 | |
| 121:1 | 120:6 137:15 | |

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116


(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.


DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.