# EXHIBIT 9

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    _____

5    RYAN BERRIS,

6                        Plaintiff,

7            v.                    Case No. 1:23-cv-04305(AS)

8    SUNG-FUNG CHOI (a/k/a NORMAN

9    CHOI) DE TOMASO AUTOMOBILI

10   HOLDINGS, N.A., LLC, HIN WENG LUI

11   (a/k/a SAMUEL LUI), GENESIS

12   UNICORN CAPITAL CORP.,

13                        Defendants.

14   _____/

15

16            The Zoom Videoconferenced/Videorecorded

17            Deposition of CHELSEA BERRIS,

18            Taken on Tuesday, September 10, 2024,

19            Commencing at 10:02 a.m. EDT,

20            Before Stenographic Shorthand Reporter

21            Lori Ann Baldwin, CSR-5207, RPR, CRR, BA.

22

23            Veritext Job No. PA 6863921

24

25

Page 2

1    REMOTE APPEARANCES:

2

3    JOHN THOMAS ZACH

4    Boies Schiller Flexner LLP

5    55 Hudson Yards

6    New York, New York 10001

7    212.446.2300

8    jzach@bsfllp.com

9         Appearing on behalf of Plaintiff.

10

11   ALEXANDRA BUSTAMANTE

12   HANNAH WIGGER

13   Sheppard Mullin

14   2099 Pennsylvania Avenue NW

15   Washington, D.C. 20006

16   202.747.1931

17   abustamante@sheppardmullin.com

18   hwigger@sheppardmullin.com

19        Appearing on behalf of Defendants.

20

21   ALSO PRESENT REMOTELY:

22   Mike Gurlides - Videographer

23

24

25

Page 3

TABLE OF CONTENTS

1     

2     

3    WITNESS                                      PAGE

4    CHELSEA BERRIS

5     

6    EXAMINATION

7    BY MS. BUSTAMANTE                            6

8    EXAMINATION

9    BY MR. ZACH:                                 133

10     

11                          EXHIBITS

12     

13    EXHIBIT                                      PAGE

14    (Exhibits attached to transcript.)

15     

16    DEPOSITION EXHIBIT 1                         54

17    DT53801

18    (Chelsea attendance at the BRIDGE)

19    BY MS. BUSTAMANTE

20    DEPOSITION EXHIBIT 2                         76

21    DT2158

22    DEPOSITION EXHIBIT 3                         79

23    BERRIS-000334676

24    DEPOSITION EXHIBIT 4                         82

25    BERRIS-000337348

Page 4

1    DEPOSITION EXHIBIT 5                          84

2    BERRIS-000341830

3    DEPOSITION EXHIBIT 6                          85

4    BERRIS-000221218-222

5    DEPOSITION EXHIBIT 7                          90

6    BERRIS-00221287-289

7    DEPOSITION EXHIBIT 8                          94

8    DT00167491-503

9    DEPOSITION EXHIBIT 9                          99

10   DT0000059424

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1    Via Zoom Videoconference/Video Recording

2    Tuesday, September 10, 2024

3    10:02 a.m. EDT

4

5                    THE VIDEOGRAPHER:  Good morning.  We are

6          going on the record at 10:02 a.m. on Tuesday,

7          September 10th, 2024.  This is media unit 1 in the

8          video recorded deposition of Chelsea Berris being

9          taken by counsel by Defendants in the matter of Berris

10         versus Choi, et al., filed in the United States

11         District Court for the Southern District of New York,

12         case number 1:23-cv-04305.

13                    This deposition is being held remotely

14         via -- via Veritext Virtual.  My name is Mike

15         Gurlides, the legal videographer, and the court

16         reporter is Lori Baldwin, both representing Veritext.

17                    Counsel will now state their appearances

18         and affiliations for the record.  If there are any

19         objections to proceeding, please state them at the

20         time of your appearance beginning with the Noticing

21         Attorney.

22                    MS. BUSTAMANTE:  Good morning.  My name is

23         Alexandra Bustamante.  I am here for the Defendants.

24         And I have Hannah Wigger also for the Defendants.

25                    MR. ZACH:  Morning.  John Zach on behalf of

Page 6

1       the Plaintiff.

2                   (Witness sworn.)

3                        CHELSEA BERRIS,

4       Was thereupon called as a witness herein, and after

5       having first been remotely duly sworn to testify to

6       the truth, the whole truth and nothing but the truth,

7       was examined and testified as follows:

8                        EXAMINATION

9       BY MS. BUSTAMANTE:

10      Q.   Hi, Chelsea.  Just to get this out of the way at the

11           beginning, do you have Exhibit Share open with you at

12           the moment?

13      A.   I do.  Yeah, I do.

14      Q.   Perfect.  And there should be a folder called

15           Marked Exhibits which should be empty at the moment.

16      A.   Yep.  I have that folder up.

17      Q.   Great.  So, throughout the deposition, I'm going to

18           introduce just a couple of exhibits and then when I do

19           introduce them you are going to be able to see them

20           show up in that folder and just click through them and

21           you will be able to, like, see them.  Is that okay?

22      A.   Yep, understood.

23      Q.   Perfect.  Good morning.  Like I said, my name is

24           Alexandra Bustamante.  I'm here for the Defendants.

25                   Can you please state your name for the

Page 7

1        record?

2    A.   Yes.  Chelsea Berris.

3    Q.   Hi Chelsea.  Where do you live?

4    A.   I live in Chicago, Illinois.

5    Q.   And what's your address?

6    A.   311 West Illinois Street.

7    Q.   And how long have you lived at that address?

8    A.   I've lived here for a little over a year, but I've

9         lived in Chicago since 2020.

10   Q.   And where did you live before that?

11   A.   Before that, I lived in New York City for about

12        two-ish years, and then I -- prior to that I lived in

13        Boston, Massachusetts following graduating college.

14   Q.   Did you live with your brother?

15   A.   No, I did not.  Just at home, yeah.

16   Q.   All right.  And Ryan -- Ryan Berris is your brother,

17        right?

18   A.   He is my brother, correct.

19   Q.   Do you know where Ryan currently lives?

20   A.   Yes.  He lives in Hudson Yards in New York City.

21   Q.   Do you know how long he's lived there?

22   A.   I -- I -- I am speculating, I don't know exact -- the

23        exact -- exact time frame so I don't recall the exact

24        date that he moved, but I would have to say it's

25        certainly been, I believe, like over a year.  It

Page 8

1       wasn't in the exact apartment he's in now, but I would

2       say around that time frame.

3   Q.  Perfect.  No need to speculate, so on or around is

4       fine.

5   A.  Yeah.

6   Q.  Have you visited his apartment at Hudson Yards?

7   A.  I have, yes, a few times.

8   Q.  And how would you describe your relationship with

9       Ryan?

10  A.  Very -- very close.  We talk on, you know, a pretty

11      consistent basis, I would say at least weekly, but

12      often, you know, daily or -- or every other day.  So

13      we -- we've always been pretty close.

14  Q.  And when you say that you talk weekly or almost daily,

15      is it on the phone on a call or is it via text?

16  A.  A little bit of both.  You know, sometimes we'll just

17      call to, you know, check in and say hi and then, once

18      in a while, we'll text as well.

19  Q.  Okay.  How -- would you say that Ryan confides in you?

20  A.  To a certain extent.  I would say with certain things,

21      yes.  He also, though, is certainly a -- a private

22      person, I would say, as well.

23  Q.  Does he discuss his general life with you?

24              MR. ZACH:  Object to the form, but you can

25      answer the question.

1    A.    Um --

2    BY MS. BUSTAMANTE:

3    Q.    Let me be a little bit more specific.

4    A.    Yeah, I was going to ask if you could clarify.

5    Q.    Does he discuss his professional pursuits with you?

6    A.    Again, I would -- I would probably say, you know, at

7          times.  There are things that he has shared with me

8          and then there are certainly things that I think he

9          has always been private about.

10   Q.    What do you mean by "private"?

11   A.    I think he's somebody who has kind of kept to himself

12         with certain things.

13   Q.    What do you mean by "certain things," like

14         specifically about his job, about his romantic

15         relationships, about his emotions?  What -- like, what

16         do you think about "certain things" -- what do you

17         mean by "certain things"?

18   A.    I -- I think just really, he just isn't really

19         somebody who I would say just, you know, shares a lot

20         of detail in general about his life.  He, I would say,

21         certainly I would consider me probably the person that

22         he's closest with, but yeah...

23   Q.    What makes you say that he's, you're the person that

24         he's closest with?

25   A.    Just, you know, we've always just had a very close

```
 1        sibling relationship.  And I know that, you know, he

 2        spent the past many, many years obviously dedicating

 3        his life to -- to working on, you know, everything

 4        with De Tomaso, and so I would say at least from what

 5        I was aware he seemed to keep a very small circle from

 6        a social standpoint.

 7   Q.   Okay.  When you say that he spent many, many years

 8        dedicating his life to working for De Tomaso, did you

 9        see that or did he tell you that?

10   A.   I would say a little bit of both.  He certainly

11        traveled often, and so, you know, we were, you know,

12        my parents and I would be aware that he was traveling

13        a lot, so didn't necessarily get to see him very often

14        during that time because of his travels.

15               At times, if he ever were able to be home,

16        he didn't have a home base starting during that time

17        because of his extensive travels, so if he were to be

18        home at any point, he would be home, you know,

19        visiting my parents and I, here and there, not too,

20        too frequently.  And he just, any time he was, he was

21        head down and working the entire time, so ...

22   Q.   So you said that he had traveled a lot.  Did he tell

23        you specifically he was traveling for De Tomaso?

24   A.   Yes.  He would, you know, say traveling for, you know,

25        I don't obviously recall what he told me every single
```

1           time that he traveled, but it was also just, you know,

2           my assumption that he was traveling for De Tomaso

3           because my perception was that really everything that

4           he was doing was, you know, being dedicated to those

5           efforts.

6     Q.    Okay.  So you said that you've been very close to him

7           your whole life, right?

8     A.    Yes.  He is six years older than me, so, you know,

9           certainly, there's a bit of a gap there, but yes, we

10          have always had a close, what I would consider

11          anyways, a close sibling relationship.

12    Q.    Okay.  Prior to working for De Tomaso, did he discuss

13          with you his professional pursuits in, like, "I'm

14          applying for this job" or "I'm looking to speak to

15          this person," things like that, tell you about an

16          interview?

17    A.    No.  I know that he worked for, upon graduating, he

18          worked for my father.  My father has a financial

19          services company, so he worked there for a few years,

20          again, I don't recall exactly how many.  And I know

21          that he worked with the Glickenhaus family on SCG.

22                Again, I don't, I wasn't necessarily privy

23          to a lot of those details, but I know that he worked

24          with them for a while and then he formed his

25          relationship with Norman and was working on Apollo and

                                                          Page 12

 1          De Tomaso.  So as far as his professional pursuits go,

 2          that's what I was aware of.

 3     Q.   Okay.  And we're going to talk about those in just a

 4          second.  I want to get a range of, like, kind of what

 5          he told you about.

 6                    Did he ever tell you about his problems?

 7                    MR. ZACH:  Object to the form, but if you

 8          understand the question, you can answer.

 9     A.   When you say "problems," can you elaborate?  Do you

10          just, like, generally, if he had issues if would he

11          talk to me about them?

12     BY MS. BUSTAMANTE:

13     Q.   Yes.  Generally if he was stressed about anything at

14          all, professionally, otherwise, romantically,

15          personally, would he come to you and tell you?

16     A.   I would say that's one of the things that I would

17          consider him to be, to have been rather private about.

18          I don't, again, maybe there were times that I'm not

19          recalling, but to my rec -- to my recollection, he

20          didn't often come to me and talk to me about, you

21          know, problems that he was having.

22     Q.   All right.  Do you think that at times Ryan may

23          embellish a story for the purpose of making it more

24          interesting?

25                    MR. ZACH:  Object to the form.

Page 13

1    A.    That is, no, to, you know, at least the way that I

2          know my brother, it's not consistent with how I know

3          him to be.

4    BY MS. BUSTAMANTE:

5    Q.    All right.  Did you talk to Ryan about his deposition?

6    A.    No details.  I did, you know, check in with him just

7          to see how he was doing and obviously, he said that he

8          could not share details.  I obviously know that, did

9          not ask for details, but yeah, so...

10   Q.    When did you talk to him?

11   A.    I talked to him Friday, so that would have been the

12         day after his deposition.

13   Q.    Did you talk on the phone or through text?

14   A.    On the phone.

15   Q.    And what did he say on the phone?

16   A.    Just honestly, he was, you know, again, said that he

17         couldn't share details.  The one detail that he did

18         share which he said he was allowed to share was that

19         Norman was present at the deposition.  That's all that

20         he shared, and then he was very excited about, he's a

21         huge Linkin Park fan and there was a new surprise

22         concert that they were having, and they -- they, the

23         band kind of reunited and so I know he was really

24         looking forward to that so the rest of the

25         conversation was kind of taken up by discussing that.

Page 14

```
 1              MR. ZACH:  That's impeachment material for
 2         you, Alexandra.  I don't know what people think about
 3         Linkin Park.
 4    BY MS. BUSTAMANTE:
 5    Q.   Did you talk to any lawyers about his deposition?
 6    A.   About my brother's deposition?
 7    Q.   Yes.
 8    A.   No.
 9    Q.   Did you talk to him about his deposition?
10    A.   The only thing, again, no details, all that we
11         discussed was just, you know, he had suggested this is
12         the first time that I've ever gone through this
13         situation or anything like this.  And so he had
14         suggested just Googling some tips on how depositions
15         generally work.  I did also have a 30-minute
16         discussion with John.  He also just told me, you know,
17         this is how depositions work, told me kind of proper
18         attire and then was just told to, you know, provide
19         truthful responses, so that's all that was discussed
20         in terms of this, today's deposition.
21    Q.   When did you talk to John?
22    A.   A few Fridays ago.
23    Q.   What did John say?
24    A.   He just -- just that what I said to you, just that,
25         you know, I've never been, he knew I had never gone
```

```
 1              through a situation like this before and so he wanted
 2              to just describe how depositions typically work,
 3              describe what appropriate attire was, et cetera, no --
 4              no details were discussed.
 5      Q.      Did you talk about the case?
 6      A.      No real details about the case were discussed.  Just,
 7              yeah, I don't think any actual details were discussed
 8              other than, you know, he said they'll likely ask some
 9              background information, some information about, you
10              know, your relationship with your brother and -- and,
11              you know, have you met Norman, et cetera.  But there
12              was, aside from those basic things, there was no
13              details discussed.
14      Q.      You say "real details."
15      A.      No details, sorry.  I...
16      Q.      What do you consider by, like, "real details"?  When
17              you say you talked about Norman, what did you talk
18              about Norman?
19      A.      We didn't discuss any details about Norman, it just
20              came up that, like, when he was -- throughout the 30
21              minutes that we spoke, he just, you know, kind of
22              asked some simple questions, like background questions
23              that might be asked and then two of those questions
24              were, you know, how do you know Norman and, you know,
25              describe your relationship with your brother.
```

Page 16

1   Q.   You said he went through background questions.  You

2        went through practice questions with John prior to

3        this deposition?

4   A.   Just what's your name -- state your name, where did

5        you go to school, and where do you live.

6   Q.   You said that you discussed your relationship with

7        your brother with John.  What did you tell John about

8        your relationship with your brother?

9   A.   I didn't tell, I just -- I didn't tell him an actual

10       response to it.  It was just more of a, this is the

11       type of question that might be asked.

12  Q.   John told you questions that might be asked?

13  A.   No, outside of the -- the two that I just mentioned,

14       that was it, and again, it was just because I have

15       never gone through, you know, this scenario, and so

16       just wanting to, you know, probably provide some

17       comfort in that I had never been deposed before.

18  Q.   Did you go through any documents with John?

19  A.   No.

20  Q.   Did you go through any documents with your brother?

21  A.   No.

22  Q.   You said that you Googled some tips or that your

23       brother told you to Google some tips.  Did you Google

24       some tips?

25  A.   I just Googled, you know, what questions, you know,

1     are typically asked during a deposition.

2  Q.   What did you find?

3  A.   You know, name, background information, you know,

4     where did you go to school, et cetera.  Again, this is

5     my first time ever going through something like this

6     and so it was more so to familiarize myself with the

7     process.

8  Q.   All right.  You said that you talk pretty frequently

9     with Ryan.  How frequently do you meet with Ryan in

10    person?

11  A.   Not often.  You know, I would say, and again,

12    speculating, but, like, once every few months, so not

13    very often.  Again, because I live in Chicago, I don't

14    often find myself in New York City.

15  Q.   Would you say you see him twice a year, three times a

16    year, four times a year?

17  A.   I would say, and -- and just to clarify, you are

18    talking about, like, right now, not necessarily when

19    he was working?

20  Q.   Well, let's -- let's start with right now.  In the

21    last year, how often have you seen him?

22  A.   Again, you know, make -- taking my best guess, but I

23    would say probably, again, every few months is -- is

24    likely.  So if I had to guess, maybe, you know,

25    five-ish times, maybe a little, you know, less, maybe

1          a little more --

2     Q.   Give or take?

3     A.   -- but give or take.

4     Q.   And when he was working for De Tomaso, how often did

5          you see him?

6     A.   I would say there, again, he was working for them for

7          many, many years.  So it -- it may have changed from

8          year to year depending on his travel schedule.  When

9          he was traveling often, obviously would see him less.

10         At the time when I was living in New York City, you

11         know, I might see him a little bit more because he

12         would find himself in New York here and there.  But I,

13         you know, wouldn't say that it was necessarily

14         frequent, again, just because of his -- his busy

15         travel schedule.

16    Q.   Okay.  Do you have any other siblings apart from Ryan?

17    A.   No.

18    Q.   Has Ryan ever ghosted you?

19    A.   Can you clarify what you mean by "ghosted"?

20    Q.   I mean, like, you try to contact him and he's just not

21         responding back?

22    A.   I -- I would not use the term "ghosted" to describe

23         it.  You know, I would say at times I knew that he was

24         extremely busy and so his response time might not

25         necessarily have been, you know, a -- a fast one.  But

1    he would always eventually, at least from my

2    recollection, he would always eventually, you know,

3    get back to me and let me know, you know, "Sorry, I've

4    been busy, traveling," and so, you know, he would

5    eventually get back to me.  He would -- it would -- he

6    never would just ghost me and completely never

7    respond.

8  Q.  But you never got the impression that he was just

9    avoiding talking to you; it was just because he was

10   busy?

11 A.  That was always my understanding, was that he, you

12   know, had a lot on his plate and so he was just

13   extremely busy and needed to stay focused, and so my,

14   you know, my takeaway was always that, yeah, it wasn't

15   that he was avoiding me personally, but that he was

16   just busy, and, you know, not keeping up with his

17   communications.

18 Q.  When he wasn't keeping up with his communications and

19   would take a long time to respond, what's the maximum

20   time that would go by until you would get a response?

21 A.  I honestly can't recall specific times at this point.

22   That -- it just was so long ago that I -- I can't say

23   that I remember exact amount of days that would go by

24   before, you know, I would hear back.

25 Q.  Has it ever taken a month where you messaged him and

1     he doesn't respond back?

2  A.   Outside of when he actually was missing and my parents

3     and I did not know where he was, no, that -- that was

4     the only time.

5  Q.   Okay.  We're going to talk about that a little bit

6     later.  So you mentioned Ryan worked for your dad.

7     Your father's name is Chris Berris, right?

8  A.   Correct.

9  Q.   Chris is also Ryan's dad?

10  A.   Yes.

11  Q.   All right.  And how would you describe the

12     relationship between your father and Ryan?

13  A.   I think that they have, you know, a pretty good,

14     standard father-son relationship.

15  Q.   What do you mean by "standard"?

16  A.   I think they're -- they have a good relationship.

17  Q.   Do you know that they speak frequently with one

18     another?

19  A.   They speak, you know, I think, now more than ever,

20     they're speaking more frequently, for sure.  I can't

21     say that I -- I know how frequently they speak,

22     though, you know.

23  Q.   Are you aware of any falling out between the two at

24     any point?

25            MR. ZACH:  Object to the form, but if you

```
 1        know, you can answer.
 2   A.   I -- I would say, I don't -- I don't know that there
 3        was ever any specific falling out between them.  I --
 4        I know that they worked together so maybe there, you
 5        know, were tensions there from their working
 6        relationship, but no one, specific, you know, falling
 7        out that I can recall.
 8   BY MS. BUSTAMANTE:
 9   Q.   What tensions do you mean?
10   A.   I am not, you know, aware of -- of specifics, by any
11        means.  I just, you know, know that at times I think
12        that there could have been tensions with the two of
13        them, but details --
14   Q.   When --
15   A.   I'm sorry.  Go ahead.
16   Q.   When specifically?
17   A.   Again, I -- I do not know specifics and don't recall.
18        It would be a very long time ago that he worked for
19        him.
20   Q.   Okay.  So your father owns a company, right?
21   A.   Correct.
22   Q.   And it's called Buell Securities?
23   A.   Correct.
24   Q.   And Ryan worked for that company?
25   A.   Correct.
```

1    Q.    You don't remember exactly how long, but do you think

2          that it was over a year?

3    A.    Yes, I believe it was over a year, but -- but, yeah,

4          I -- I don't know specifics of exactly how long.

5    Q.    Okay.  Do you think definitely over two years or,

6          like, that it's just foggy at that point?

7    A.    I would -- I would say my guess, again, just guessing,

8          that it was, it was certainly more than two years, but

9          again, I don't recall exactly how many years it was.

10   Q.    Did Ryan ever tell you that he was to

11         inherit -- inherit Buell Securities?

12   A.    No.

13   Q.    Did your father ever say anything to that effect?

14   A.    No.

15   Q.    When you said that there were possibly tensions

16         between your father and Ryan, was it because he didn't

17         want to work at Buell Securities anymore?

18   A.    I don't believe that to be the case.  You know, I

19         believe my dad was always aware of where my brother's

20         passions lied, knew that he loved the -- the car

21         industry, and so, you know, as far as I'm aware, I

22         don't believe he ever, "he" being my father, ever

23         thought that, you know, he was going to, you know,

24         leave the company to my brother, as far as I'm aware.

25   Q.    Do you know if Ryan was ever in any financial trouble?

Page 23

```
 1   A.   No.

 2   Q.   Have you ever suspected that he has been in financial

 3        trouble?

 4             MR. ZACH:  Object to the form.

 5   A.   No.

 6   BY MS. BUSTAMANTE:

 7   Q.   Has Ryan ever asked you for money?

 8   A.   No.

 9   Q.   To your knowledge, has Ryan ever asked your parents

10        for money?

11   A.   No.

12   Q.   All right.  From what you've observed, Ryan is very

13        passionate about cars, right?

14   A.   Correct.

15   Q.   Did he ever tell you that he wanted to work for a car

16        company?

17   A.   It was never something that he explicitly stated to

18        me, but just through, you know, his passions, and I

19        think he kind of just took it upon himself to get

20        involved in, in the car scene.

21   Q.   Are you familiar with, I'm going to, like, butcher

22        this, so I apologize, Scuderia Cameron Glickenhaus or

23        SCG?

24   A.   I'm familiar -- familiar with it.  I don't, you know,

25        know a ton of details about -- about it, but I am
```

Page 24

```
 1        familiar with it and know that he, you know, that he
 2        did work there or help them at some point.
 3   Q.   So you say that you are aware that he worked for SCG.
 4        Do you know whether he completely finished his work
 5        with your dad first prior to start working or was it
 6        kind of meshed in between the two positions when he
 7        started?
 8   A.   I'm unaware.
 9   Q.   Do you know around the time when he started working
10        for SCG?
11   A.   I don't recall.
12   Q.   Do you know how he got the job?
13   A.   I do not know details.  I believe he had a
14        relationship or formed a relationship with Jim
15        Glickenhaus, but I do not know any, you know,
16        specifics as to how it had exactly happened.
17   Q.   Is Jim a family friend?
18   A.   No.
19   Q.   Ryan just met him on his own?
20   A.   Yes.
21   Q.   Did Ryan ever tell you about his role at SCG?
22   A.   I don't recall specifics in terms of, you know, what
23        exactly his role was.
24   Q.   Do you recall him telling you about his
25        responsibilities at SCG?
```

1    A.    I do not.

2    Q.    Did Ryan ever tell you that he had an employment

3          contract with SCG?

4    A.    No.

5    Q.    Did he ever tell you how much he was compensated at

6          SCG?

7    A.    No.

8    Q.    Did he tell you he was compensated at all?

9    A.    No.

10   Q.    He -- he didn't tell you he was compensated or he just

11         didn't tell you about his compensation?

12   A.    I was never told anything about -- in regards to his

13         compensation.

14   Q.    Okay.  Are you familiar with De Tomaso?

15   A.    Yes.

16   Q.    That's the company Ryan worked for, right?

17   A.    Yes.

18   Q.    Did Ryan ever tell you how he came to work for Apollo?

19   A.    No, not from what I can recall.  I -- I am aware that

20         he, at least my understanding is that he had developed

21         a relationship with Norman at some point, but I do not

22         know any specifics.

23   Q.    Did he tell you how he came to work with De Tomaso?

24   A.    I believe, again, it was kind of through his

25         relationship with -- with Norman, but again, I'm not

```
 1          aware of all of the specifics.
 2    Q.    Did he tell you how he met Norman?
 3    A.    I do not recall specifics of how they met.
 4    Q.    How did you first hear about De Tomaso?
 5    A.    Again, this was a, quite a long time ago, so
 6          specifics, you know, I -- I don't recall all specifics
 7          but, you know, my brother certainly informed myself
 8          and, you know, my family at some point of his
 9          involvement, but I don't recall, you know, how long
10          ago that was or, you know, exactly what was told.
11    Q.    Okay.  Did Ryan tell you what his title was when he
12          first started working at De Tomaso?
13    A.    I don't recall what his first title was.  I believe
14          that he had a few throughout his time there.  I, so
15          I -- I don't know what his, you know, very first title
16          was.  This could be, you know, incorrect, but I know
17          he was working on a lot of the marketing for them at
18          one point, so...
19    Q.    Does "general manager" sound familiar as his first
20          title?
21    A.    I believe potentially, but again, it was a very long
22          time ago so I don't recall.
23    Q.    You know that at some point he was named CMO and CEO,
24          right?
25    A.    Yes.
```

Page 27

```
 1    Q.    Did it surprise you?

 2    A.    I'm sorry, can you repeat that?

 3    Q.    Did it surprise you that he was named CMO and CEO?

 4    A.    No.

 5    Q.    Why?

 6    A.    Just, you know, as I had mentioned previously, I had,

 7          you know, watched my brother essentially dedicate his

 8          entire, what seemed like his entire life to this

 9          company.  And -- and building it and helping to build

10          the brand, and, you know, as I mentioned, every time

11          that he would be home, he was spending every waking

12          hour working.  So it -- it didn't surprise me at all

13          that, you know, he eventually was, you know, given

14          those titles.  They seemed very well deserved.

15    Q.    Well, when you said that he, you saw him dedicate his

16          life, you had mentioned you had just heard that he

17          traveled a lot, didn't you?

18    A.    I knew that he was always traveling.  Again, you know,

19          it was, my assumption was and what he had, you know,

20          shared is that he was traveling for, you know, the

21          company, and he would, at times, be home, as well, if

22          he, you know, in the beginning, if he ever was home

23          and was always, always working, you know, didn't even

24          sleep very much, was just, you know, constantly on his

25          computer on calls and -- and working.
```

Page 28

1    Q.   Did you think he had skills and experience specific to

2         be CEO and CMO?

3                   MR. ZACH:   Objection to the form,

4         foundation.

5    A.   Yes, you know, just from all of, you know, at this

6         point, the point that he started working for De

7         Tomaso, you know, he had been involved, you know, with

8         SCG, he had been involved with Apollo and so I knew

9         that he had, you know, a lot of connections and

10        experience in the -- in the car industry at that

11        point.

12   BY MS. BUSTAMANTE:

13   Q.   What connections did you know he had?

14   A.   Again, I know, it's -- this was a long time ago so I

15        don't necessarily know specifics or names, but I just

16        know that, you know, through all of his years having

17        those roles that he had, you know, made a lot of

18        relationships and gave a lot of, you know, knowledge

19        and expertise, and so obviously, made -- just making

20        connections while doing that is -- is natural.

21   Q.   Do you know about any specific relationships that he

22        made?

23                   MR. ZACH:   Object to the form.  You can

24        answer it if you understand it.

25   A.   Can you clarify what you mean, like?

 1   BY MS. BUSTAMANTE:

 2   Q.   You said that he was in the car industry a lot and

 3        that he gained a lot of experience by meeting a lot of

 4        people.  Do you know any specific people that he met

 5        that helped him in being CEO of De Tomaso?

 6   A.   I'm not necessarily, you know, aware of specific

 7        individuals.  I think that those are things that he

 8        often, you know, either kept to himself or maybe they

 9        were told to me at some point and I no longer remember

10        the names, but, yeah.

11   Q.   So are you just assuming that he gained experience by

12        working or do you know that he gained experience by

13        working?

14   A.   I'm very, you know, very confident in what my brother

15        had done and achieved in all of the past roles that he

16        had.

17   Q.   Did you see him work?

18                (Reporter clarification at 10:38 a.m.)

19   A.   I saw him put in countless hours, again, anytime that

20        I would be with him at our family's house in

21        Connecticut, he was working on stuff, and I, again,

22        know that he was traveling a ton, there were a few

23        events that I went to that were, you know, extremely

24        impressive, that he essentially was, had put together

25        and was running all by himself, and so...

```
 1   BY MS. BUSTAMANTE:
 2   Q.   Did you know that he was putting them together or did
 3        he tell you that he was putting them together?
 4   A.   I, you know, I -- I believe that he was the one who
 5        was putting it together.
 6   Q.   Why?  Why do you believe that?
 7   A.   Because my brother is, you know, to my knowledge, he
 8        was, you know, wearing many, many hats while working
 9        at De Tomaso, doing the work of what seemed to be, you
10        know, many people and in many different roles.  And
11        so, you know, from, again, this is all my observation,
12        but from what I observed, you know, it seemed that he
13        was -- he was the one responsible for a lot of their
14        success and putting the events that at least I had
15        gone to together.
16   Q.   Did he tell you that he was responsible for their
17        success?
18   A.   Never, you know, it was never stated solely that, you
19        know, that he was the sole person necessarily
20        responsible for their success, but he, of course, you
21        know, shared that he put, you know, his -- his life
22        into his roles.
23   Q.   So you say that you observed him work and you say that
24        you observed him dedicate his life.  I'm just trying
25        to get at what you saw.  Like, did you see him
```

Page 31

 1          personally sell a car?  Did you see him talk to people

 2          and represent De Tomaso and make the connections with

 3          large investors, did you see him run the marketing

 4          campaigns?  That's what I'm trying to get at.  You say

 5          that -- you say that you saw him travel and that you

 6          know that he wasn't around or that he worked really

 7          late nights, but I want to know what work products you

 8          actually saw yourself?

 9                    MR. ZACH:  I object to the form.

10     A.   So, you know, I was not privy to any of the examples

11          that you just mentioned in terms of, you know, deals

12          or anything of that nature, but, you know, at the

13          events, again, that I had gone to, you know, he was

14          the person running the events.  He was, you know, the

15          person that everybody would go to for logistics, for

16          you know, this -- setting everything up, for actually

17          running it, for speaking at the events.  You know,

18          Norman even actually told me at one of the -- at one

19          of the events that I had gone to in New York City,

20          that, you know, it was, all of it, it was happening

21          because of my brother.  So, you know, to my knowledge,

22          it was kind of a known fact that all of the work that

23          my brother was putting into De Tomaso.

24     BY MS. BUSTAMANTE:

25     Q.   Okay.  So you, just so that I understand it, you saw

Page 32

1    him travel a lot, put in a lot of hours and in the
2    events that you attended, people came to him as the
3    point person and that's what made you think that he
4    was responsible for the success of De Tomaso?
5                MR. ZACH:  Objection; asked and answered,
6    and the prior answer speaks for itself, but you can
7    answer the question.
8  A.    I -- I would say that, you know, to distill it down
9        to, you know, how you kind of just phrased it, like,
10       he, I'm extremely confident that I know that my
11       brother was largely responsible for the success of De
12       Tomaso.  You know, he -- he even there were, you know,
13       times that he was working on things, you know, that he
14       would have me test emails, et cetera, and you know,
15       just overall, I saw the -- the blood, sweat, and tears
16       that he put into this so I am, yeah, I am confident of
17       that.
18  BY MS. BUSTAMANTE:
19  Q.    Okay.  But you never saw him sell a car, did you?
20                MR. ZACH:  Object to the form, but go
21       ahead.
22  A.    Actually see it, no.
23  BY MS. BUSTAMANTE:
24  Q.    Did you ever see a contract that he signed for selling
25       the car?

1    A.    No contracts were ever shared with me.

2    Q.    Did you either -- ever see him bring a specific

3          investor to De Tomaso?

4    A.    From what I can recall, again, it's a difficult

5          question for me to answer because I did not -- I was

6          not necessarily familiar with the people who attended

7          the events specific roles.

8    Q.    Did he ever tell you, "Hey, Chelsea, I signed an

9          investor for De Tomaso today"?

10   A.    An investor?  No, that information was never shared

11         with me.

12   Q.    What events did you attend?  You said that you

13         attended events.  Which ones?

14   A.    So, from, again, this is just from what I can recall

15         because these were several years ago, but there was an

16         event that was in New York City when I was living

17         there.  There was an -- another event that took place

18         in The Hamptons.  I believe the event was called The

19         Bridge.  I had attended that one as well.

20                And then there was one other event that I

21         had attended, a smaller event.  This was for, I

22         believe it was for Apollo.  But it was, again, when I

23         was living in New York City, they were showing a car

24         at one of the dealerships, I believe, that was in

25         Greenwich.  It was just my brother that was at that

Page 34

```
 1        event, and -- from what I can recall.  And I took the
 2        train in and traveled just to see him and be a
 3        supportive sister.
 4   Q.   The New York City event, was that the Cipriani event?
 5        And I'm sorry if I'm pronouncing that wrong.
 6                  MR. ZACH:  That's right.  That's right.
 7        Well, actually, that may be, that's how I pronounce
 8        it.  So I bet, we may be, may both be pronouncing it
 9        wrong.
10   BY MS. BUSTAMANTE:
11   Q.   Does "Cipriani" sound familiar as the New York City
12        event that you attended?
13   A.   I don't believe it was that event, no.
14   Q.   Did you attend that event at all?
15   A.   No.
16   Q.   When was the New York City event?
17   A.   You're talking about the event that I attended,
18        correct?
19   Q.   Correct.  The one that you attended.
20   A.   I'm going to have to make an estimation, just because,
21        again, this was -- this was a long time ago.  It's
22        when I was living in New York, so the year -- it would
23        have had to be, if I had to guess I would say probably
24        2019, and the month, I don't recall the month.  I
25        would say maybe in the fall, but that's just a guess.
```

Page 35

1    Q.    Okay.  And the other Apollo event, when was that?

2    A.    Again, I do not recall the specific date of that event

3          but I was also living in New York at the time and so I

4          would say, you know, probably -- either in 2019 or,

5          yeah so, most likely same year if I had to guess.  It

6          could have been end of 2018, but again, these are just

7          my speculations.

8    Q.    Sorry about that.  Was that one also at New York?

9    A.    That one was in, I believe, potentially Greenwich or

10         an area around there in Connecticut.  It was just a,

11         seemed like a small, private event showing a car at a

12         dealership there.

13   Q.    Who was at the event?

14   A.    That event was from, again, I do not recall specifics.

15         In terms of actual workers, it seemed, I recall my

16         brother being there.  There could have been others

17         that were there as well.  I'm sure that those who were

18         working at the dealership may also, you know, have

19         been involved in helping to put it on but I'm not

20         aware of and I, or don't recall any of the actual

21         specific attendees because it was so many years ago.

22   Q.    Okay.  I'm going to go a little bit over those events

23         specifically a little bit later.

24                I want to go back to your brother's

25         responsibilities at De Tomaso.

1                Did he ever express frustrations to you

2         about his work with the company?

3    A.   No.

4    Q.   Did he ever express that he was stressed?

5    A.   Never, that I can recall, never explicitly stated that

6         he was stressed.  I think, I knew that he was very

7         busy, but I don't recall him, you know, ever

8         disclosing, you know, him being stressed.

9    Q.   Did he ever express to you that he was anxious?

10   A.   Not that I can recall.

11   Q.   Did he ever express he was nervous about his duties?

12   A.   No.

13   Q.   Did he ever express that he was scared that he may not

14        fulfill all of his responsibilities?

15   A.   No.

16   Q.   So he never expressed any concerns about his ability

17        to perform his duties at De Tomaso?

18   A.   No.

19   Q.   Did Ryan ever talk to you about his salary at

20        De Tomaso?

21   A.   No.

22   Q.   Is that something that he would normally tell you

23        about?

24   A.   No.

25   Q.   Did Ryan ever convey to you that he had an employment

Page 37

```
 1        agreement with De Tomaso?
 2   A.   No.
 3   Q.   Do you know how much he was supposed to be compensated
 4        at all?
 5   A.   No.
 6   Q.   Do you know whether he was supposed to get comission?
 7   A.   It was -- it's my assumption that, you know, being
 8        responsible for the selling of the cars, that that
 9        would come along with it, but no details were ever
10        provided to me about, you know, commissions or -- or
11        agreements or anything of that nature.
12   Q.   So you assumed that he was going to get one, but he
13        never actually told you that he was getting a
14        commission on selling cars?
15   A.   Not -- not that I can recall.
16   Q.   Do you know whether his compensation -- compensation
17        ever changed?
18   A.   No, I'm not aware.
19   Q.   Did he ever express that he was going to get a raise?
20   A.   No, not that I can recall.
21   Q.   Did he ever express to you that he was going to get
22        equity at De Tomaso?
23   A.   I don't recall.
24   Q.   Or did he ever express that he owned part of De Tomaso
25        or he was going to own, he would -- would own some
```

Page 38

```
 1        part of De Tomaso at some point?
 2   A.   Not that I can recall.  It was my understanding that
 3        him and Norman were, you know, both, obviously, the --
 4        the key, sole people in De Tomaso, but that's really
 5        all that I was aware of.  I was not aware of anything
 6        in regards to agreements or contracts.
 7   Q.   I mean, you would agree with me that getting equity in
 8        the company is pretty exciting news, right?
 9                  MR. ZACH:  Objection; form.
10                  THE WITNESS:  Am I -- am I supposed to
11        answer?
12                  MR. ZACH:  You can answer all the
13        questions.
14                  THE WITNESS:  Sorry.
15                  MR. ZACH:  I didn't expect you not to
16        answer.  If you understand, you can answer all the
17        questions.
18   A.   Yes, I -- I agree that that would be exciting and it's
19        just, not, again, these conversations may have
20        happened so long ago, it's not something that I ever
21        remember discussing.
22   BY MS. BUSTAMANTE:
23   Q.   So you don't ever remember Ryan ever coming to you and
24        saying, "I have equity in this company I've dedicated
25        my life to"?
```

Page 39

```
 1              MR. ZACH:  Objection; asked and answered.
 2   A.   I don't recall if that was explicitly stated.  Again,
 3        he was a -- a private person in terms of these
 4        matters, but it was, yeah, not that I can recall.
 5   Q.   Okay.  So you just don't recall at all, right?
 6   A.   No.
 7   Q.   Did he ever tell you --
 8              MR. ZACH:  I don't mean to interrupt, but
 9        just -- I think there was a double negative there.
10              (Reporter clarification at 10:54 a.m.)
11              (The record was read by the reporter at
12              10:54 a.m.)
13              MR. ZACH:  You have no recollection of
14        that, Ms. Berris?
15              THE WITNESS:  Oh, correct, correct, sorry.
16   BY MS. BUSTAMANTE:
17   Q.   To be clear, you don't recall Ryan ever telling you he
18        had equity in De Tomaso?
19   A.   Correct.  Sorry.
20   Q.   Sorry.  No, you're fine.  It's confusing with the
21        "rights" and "corrects" at the end of the sentence.
22              MR. ZACH:  This is a problem that lawyers
23        always have.  We do this all the time.
24   BY MS. BUSTAMANTE:
25   Q.   Did Ryan ever tell you that De Tomaso was going to
```

1    give him a Porsche?

2  A.   Not that I can recall.

3  Q.   Did he tell you that he was giving up working with his

4       dad to pursue working for De Tomaso?

5  A.   The only reason I -- I'm hesitating is just because

6       I'm trying to recall.  You know, I don't know, it was

7       my assumption that he essentially had stopped most of

8       his, if not all of his duties working for my father to

9       focus full time on De Tomaso because I don't, you

10      know, work there, I'm not sure if, you know, if that's

11      the case or when exactly that happened, but it's my

12      understanding that he, yes, had given up working for

13      my father to focus full time on De Tomaso.

14 Q.   Okay.  So you said -- you said you had met Norman

15      Choi, right?

16 A.   I had met Norman.

17 Q.   And when did you meet Norman?

18 A.   I can't recall the first time.  Again, this would have

19      been several, several years ago.  I probably, it, most

20      likely, again, just making an estimation, was when I

21      was living in New York City.

22 Q.   Okay.  Norman is the owner of De Tomaso, right?

23              MR. ZACH:  Objection; form.

24 BY MS. BUSTAMANTE:

25 Q.   To your knowledge, Norman is the owner of De Tomaso?

Page 41

1                    MR. ZACH:  Objection to form.  Go ahead.

2    A.    Correct.  Yes.

3    BY MS. BUSTAMANTE:

4    Q.    Did you ever see Norman and Ryan interact?

5    A.    Yes.

6    Q.    How would you characterize Ryan and Norman's

7          interactions?

8    A.    They seemed to have a good relationship, from what I

9          observed.

10   Q.    What makes you say that?

11   A.    I never noticed any, you know, tension between them.

12         Again, I had only met Norman a handful of times, but

13         in the times that I had spent with them, they did not

14         seem to have any tension.  My brother was close and

15         had spent a lot of time with Norman's wife and

16         daughter as well.  There were a few times that we all

17         were together as a group in the city and just never --

18         never experienced any issues, from what I could

19         observe.

20   Q.    Did Ryan ever express his personal opinions or

21         feelings about Norman?

22                    MR. ZACH:  Objection to the form, but to

23         the extent you know, you can answer that, as it was

24         told to you.

25   A.    And -- and just to clarify, do you mean at any point

Page 42

```
 1        during their relationship?
 2   BY MS. BUSTAMANTE:
 3   Q.   Yes.  At any point, did Ryan ever speak to you about
 4        how he felt about Norman or his opinion about Norman?
 5   A.   No.  In the -- in the very beginning, you know, I know
 6        that he was, from what I can recall, you know, excited
 7        to be working with him in the beginning.  It, again,
 8        seemed like they had a good relationship at first, but
 9        other than that, no.  And in the last several years,
10        no.  Nothing was disclosed to me.
11   Q.   Did Ryan ever tell you that Norman was untruthful?
12   A.   No, not that I can recall.
13   Q.   Did Ryan ever tell you that Norman was untrustworthy?
14   A.   Not that I can recall.
15   Q.   Do you know Diana Majcher?  Majcher?
16   A.   No.
17   Q.   Do you know who Hugo de Sadeleer is?
18   A.   Yes.
19   Q.   Who is he -- who is he?
20   A.   He works for De Tomaso, was my brother's -- somebody
21        that my brother was very close with while he worked
22        there.  I don't know what his specific, you know,
23        title was for the company.  I know he, I believe, had,
24        like, a driving role for them, but outside of that, I
25        don't know what his specific role was.
```

```
 1   Q.   Did you ever meet Hugo?

 2   A.   Yes.  I believe, I know I met him -- I know I met him

 3        at the Bridge event in the Hamptons.  I can't recall

 4        if I had met him any other time outside of that, but I

 5        don't believe so.  I think, from my recollection, that

 6        was the one time I had met him.

 7   Q.   Did you ever see Ryan and Hugo interact?

 8   A.   Just at that event.

 9   Q.   How would you characterize Ryan's and Hugo's

10        interactions?

11   A.   They seemed to have a good relationship, from what I

12        observed.

13   Q.   What made you think that?

14   A.   Just no tensions.  You know, everybody seemed to be in

15        good spirits.

16   Q.   Did they seem to be friends outside of work?

17   A.   Not something that I would be aware of.

18   Q.   Okay.  Did Ryan ever express his personal opinions or

19        feelings about Hugo to you?

20   A.   I knew that he thought very highly of Hugo.  He only

21        had good things to say about him, and I knew that he

22        had helped my brother or was helping my brother out a

23        lot.  It seemed like he was kind of, like, his

24        right-hand man from what I could observe.  But I knew,

25        again, not remembering, you know, any specific words,
```

Page 44

1      I knew that he really thought very, very highly of

2      him.

3  Q.  You don't recall exactly what he would say about him?

4  A.  No, no specific words, no, I don't recall that.

5      Again, that would have been a while ago.  But just,

6      again, knew that he thought very highly of him and

7      knew that he enjoyed working with him and was happy

8      that he was a part of a team, but...

9  Q.  Are you familiar with Carmen Jordá?

10 A.  Yes.

11 Q.  Okay.  Who is she?

12 A.  She is a race car driver.  They had brought her on as

13     part of the team as well, I believe, around the same

14     time of the event that I had gone to in the Hamptons.

15 Q.  You say "they had brought her as part of the team."

16     Who do you mean by "they"?

17 A.  You know, I -- I again, not having worked there, you

18     know, it was my assumption that it was, you know, my

19     brother and Norman.

20 Q.  Do you know that Norman brought her?

21 A.  No.

22 Q.  Did Ryan tell you that he brought her, and by "he," I

23     mean did Ryan tell you that Ryan brought Carmen to

24     De Tomaso?

25 A.  Yes.  I knew that he had, I knew that she, I guess,

Page 45

```
 1         yes, but I would say that I don't, I don't know
 2         specifics in terms of, you know, the steps that were
 3         taken to get her to be a part of the team.  But I knew
 4         that my brother was involved in bringing her on the
 5         team.
 6    Q.   Did you ever meet Carmen?
 7    A.   I met her, I believe, just one time, again, at that
 8         same event in the Hamptons.  I think that was the only
 9         time.
10    Q.   What was your first impression of Carmen?
11    A.   I thought that she seemed nice.
12    Q.   What makes you think that?
13    A.   Again, we, you know, she was very cordial, was very
14         nice, gave off a good first impression, we, all had
15         spent, you know, the day together kind of walking
16         around the cars at the event, and just, again, was a
17         good day, everyone seemed in good spirits.
18    Q.   Have you personally seen any of the work that Carmen
19         has done for De Tomaso?
20    A.   I had seen, I believe, a video that their team had
21         been working on and maybe some photos, but from what I
22         can recall, that's all I recall seeing.
23    Q.   How would you describe the relationship between Ryan
24         and Carmen?
25    A.   They seemed to have a good -- a good relationship.
```

Page 46

```
 1   Q.   Did you ever get the impression that Ryan was
 2        romantically interested in Carmen?
 3   A.   I would have to speculate.  It's not something that
 4        was, that I recall that was ever explicitly stated to
 5        me.
 6   Q.   No, but did you get the impression that he was
 7        attracted to her, not that he told you about it?
 8                  MR. ZACH:  Object to the form.
 9   A.   I would say there were times where, you know, maybe,
10        to use your words, maybe I -- I, you know, or I would
11        say I think that I knew how much he admired her.  You
12        know, my brother has been a car lover, a car fanatic
13        his entire life, and Carmen is a beautiful girl who is
14        a professional race car driver, so I think it would be
15        not surprising if he did, but it was never anything
16        that was explicitly stated to me, so I would be, you
17        know, making an assumption.
18   BY MS. BUSTAMANTE:
19   Q.   Did you ever get the impression that Carmen was
20        romantically interested in Ryan?
21                  MR. ZACH:  Object to the form.
22   A.   No, you know, their relationship seemed to me always
23        to be professional, and also, I had, you know, I'm
24        speaking from this one, you know, one day that I had
25        met her.
```

1    BY MS. BUSTAMANTE:

2    Q.    Did Ryan ever tell you that he was attracted to her?

3    A.    Not that I can recall.

4    Q.    Did Ryan ever tell you that he was in love with her?

5    A.    No.

6    Q.    Would it surprise you to know that Carmen sent Ryan a

7          photo of her in a bathtub?

8                        MR. ZACH:   Objection.

9    A.    Yes.   Yes.

10   BY MS. BUSTAMANTE:

11   Q.    Would it surprise you that Ryan referred to Carmen in

12         texts to his co-workers as "potentially mi amore"?

13                       MR. ZACH:   Objection.

14   A.    Again, you know, I think she is a very beautiful woman

15         and I know that he admired her very much.   I know that

16         he was excited about her being brought on to the team

17         and how well she fit with the story, but, you know, I

18         can't speak to how he was, you know, feeling.

19   BY MS. BUSTAMANTE:

20   Q.    But would it surprise you that he referred to her as

21         "potentially mi amore" to his coworkers?

22                       MR. ZACH:   Objection.

23   A.    I -- I, you know, if that, I don't know really how to

24         respond to that.

25   BY MS. BUSTAMANTE:

Page 48

```
 1   Q.   Well, are you surprised to know that or not?
 2              MR. ZACH:  Objection, at this point, you
 3        know, you are asking her about a text message without
 4        showing it to her without it's context and you're just
 5        taking a phrase of it, so answer if you can, but I'm
 6        just making my record that I don't -- that there are
 7        multiple issues -- (crosstalk).
 8              (Reporter clarification at 11:09 a.m.)
 9   BY MS. BUSTAMANTE:
10   Q.   I'm just asking whether you're surprised, if you knew
11        that that was a text that he sent, would you be
12        surprised to it?
13              MR. ZACH:  Objection.
14   A.   I would say, you know, for him to be, it doesn't
15        surprise me that he would, you know, potentially be
16        interested in somebody like Carmen would be my
17        response to that.
18   BY MS. BUSTAMANTE:
19   Q.   Would it surprise you that he spent $20,000 of his
20        personal money on a Chanel suit for Carmen?
21              MR. ZACH:  Objection.
22   A.   No.
23   BY MS. BUSTAMANTE:
24   Q.   Why?
25   A.   If it was something that, you know, had to do with
```

Page 49

```
1         the, you know, the good of the company as well, I
2         would say it wouldn't surprise me, but yeah, that's...
3    Q.   Well, I'm not ask -- I'm not telling you that he spent
4         money for the company.  Would it surprise you that
5         he's spending, of his personal money, $20,000, on a
6         clothing item for a girl?
7                   MR. ZACH:  Objection.
8    A.   I mean, it's, you know, a lot of money, but it's his
9         personal money so -- like, am I surprised?  Yes, I
10        think it's a lot of money to spend on something, but
11        it's not my decision to make.
12   BY MS. BUSTAMANTE:
13   Q.   Well, you say that you're very close to him, right?
14   A.   Yes.
15   Q.   You said that you think he's -- that you're the
16        closest person to him, right?
17   A.   My assumption is that I am one of the people that he's
18        likely the closest to.  But again, he's also a private
19        person, as I mentioned.
20   Q.   So as a person that grew up with him and as -- as the
21        closest person to him, you would know whether he's
22        romantically interested in someone, wouldn't you?
23                  MR. ZACH:  Objection.
24   A.   Maybe.  You know, I -- I also did not, again, spend a
25        ton of time with him, but again, it wouldn't surprise
```

```
 1        me if he had a romantic interest in somebody like
 2        Carmen.
 3   BY MS. BUSTAMANTE:
 4   Q.   Did you think he liked her romantically, yes or no?
 5               MR. ZACH:  Objection.  Answer the question
 6        if you can, you can answer however you want.
 7   BY MS. BUSTAMANTE:
 8   Q.   I'm not asking you whether he did actually or not, I'm
 9        asking did you think that he romantically was
10        interested in her or not?
11               MR. ZACH:  Objection; relevance, form.
12   A.   There were times where I thought that he may have been
13        interested in Carmen.  However, again, just want to
14        state that as far as, you know, I'm aware, their
15        relationship was always kept, you know, business
16        and -- and everything was professional, from what I
17        observed and, and from what I was aware.
18   BY MS. BUSTAMANTE:
19   Q.   So that's a yes, you did think that at some point Ryan
20        was romantically interested in Carmen?
21               MR. ZACH:  Objection.  The prior answer
22        speaks for itself.
23   A.   If I -- I mean, I feel like I -- I answered that
24        already.
25   BY MS. BUSTAMANTE:
```

Page 51

1   Q.   Yes?  So is it a yes or a no?

2                MR. ZACH:  Objection.  You know -- can we

3        read back what the pending question is?

4                (The record was read by the reporter at

5                11:14 a.m.)

6                MR. ZACH:  Once again, objection to the

7        form.  Answer if you know.

8   A.   I can't say for certain.  There were times when I

9        thought maybe he could have been interested, but not

10       involved.

11               MS. BUSTAMANTE:  All right.  We've been

12       going at it for a little bit over an hour so how about

13       we take a little bit of a break.  Ten minutes sounds

14       okay?

15               THE WITNESS:  Sure.  Whatever.  I'm okay to

16       keep going or we can take a break if -- if you all

17       want to take a break.

18               MS. BUSTAMANTE:  Yes, let's take a break,

19       let's come back at 11:25.

20               THE VIDEOGRAPHER:  All right.  Off the

21       record at 11:14 a.m.

22               (Off the record at 11:14 a.m.)

23               (Back on the record at 11:28 a.m.)

24               THE VIDEOGRAPHER:  All right.  We're back

25       on the record as 11:28 a.m.  This marks the beginning

Page 52

1           of media unit 2.

2     BY MS. BUSTAMANTE:

3     Q.   All right, Chelsea.  So you mentioned that you

4           attended several De Tomaso events, right?

5     A.   Just two, I believe.

6     Q.   And one for Apollo?

7     A.   Yes.  Correct.

8     Q.   So essentially three car events with Ryan you

9           attended?

10    A.   Yes.  Correct.

11    Q.   All right.  So now is the time that we start looking

12          at Exhibit Share.  I'm going to introduce an exhibit.

13          All right.  Should be loading and show up in your

14          folder.  Let me know when it does.

15    A.   Okay.  Maybe I need to refresh.

16                    THE VIDEOGRAPHER:  Yes, when you refresh --

17                    THE WITNESS:  Okay.

18                    THE VIDEOGRAPHER:  Okay.

19    A.   I see it.

20    BY MS. BUSTAMANTE:

21    Q.   All right.  Do you recognize this photo?

22    A.   It's the first time I'm actually seeing it, but it is

23          from the event that I -- that I referenced that we

24          went to in the Hamptons where I had met Carmen and

25          Hugo.

Page 53

1           MR. ZACH:  Can I ask this question?  I
2       don't see it on my -- I don't see it on my screen.
3       That could be because I'm doing something wrong.
4           MS. BUSTAMANTE:  Do you have access to
5       Exhibit Share, John?
6           MR. ZACH:  Um...
7           MS. BUSTAMANTE:  I should have given them
8       your email, but I don't know...
9           MR. ZACH:  Sure.  Hold on.  Hold on.  Hold
10      on.  It could just be that I'm missing something.  I
11      mean, sorry, guys.  Give me one second.
12          MS. BUSTAMANTE:  Okay.  If you don't, I can
13      always --
14          MR. ZACH:  No, no, I bet I -- hold on one
15      second.  So I've got to open it up on another computer
16      basically, right?
17          MS. BUSTAMANTE:  It's just in another tab.
18          THE REPORTER:  Yeah, and if -- and I can
19      always send you a link it you don't have it.
20          MR. ZACH:  Do you mind sending a link?
21          THE REPORTER:  Do you mind -- Mike, can
22      you -- is it okay, Ms. Bustamante, if we go off the
23      record one second?
24          MS. BUSTAMANTE:  Sure.  Absolutely.
25          THE REPORTER:  Thank you.

Page 54

```
 1                    THE VIDEOGRAPHER:  Going off the record at
 2         11:30 a.m.
 3                    (Off the record at 11:30 a.m.)
 4                    (Back on the record at 11:34 a.m.)
 5                    THE VIDEOGRAPHER:  We're back on the record
 6         at 11:34 a.m.  This marks the beginning of media
 7         unit 3.
 8                    MARKED FOR IDENTIFICATION:
 9                    DEPOSITION EXHIBIT 1
10                    DT53801
11                    (Chelsea attendance at the BRIDGE)
12    BY MS. BUSTAMANTE:
13    Q.   All right, Chelsea, I introduced Exhibit 1 to your
14         deposition.  Do you recognize this photo?
15    A.   I've never, it's my first time seeing the photo, but I
16         do remember the event.
17    Q.   And the person on the left, that's you, right?
18    A.   Yes.
19    Q.   Why did you attend this event?
20    A.   Just to be a supportive sister.  I was in New York
21         that weekend for a wedding and so I knew that they had
22         this event going on and so my brother just asked if I
23         would attend in support of their team and so I just
24         went along.
25    Q.   Okay.  And just to clarify, this is the Bridge event
```

```
 1          in the Hamptons that you had mentioned before, right?
 2   A.    Yes.
 3   Q.    And this event was in 2001 (sic)?
 4   A.    Yes.
 5   Q.    September 18th, to be exact?
 6   A.    Yes.
 7   Q.    And the center of the photo, that's Norman?
 8   A.    Yes.
 9   Q.    And on the right, that's Carmen?
10   A.    Right.
11   Q.    And that's the first time that you had met Carmen,
12          right?
13   A.    Yes.
14   Q.    You mentioned she was nice?
15   A.    Yep.  She seemed -- seemed nice to me.
16   Q.    What do you mean by "nice"?
17   A.    Just she seemed friendly, no, you know, didn't sense
18          any rudeness, any, you know, tension or anything like
19          that.  I wouldn't say we had an extensive amount of
20          dialogue, but from, you know, the dialogue that we
21          had, all seemed good.
22   Q.    What did you talk about, do you remember?
23   A.    I do not recall.
24   Q.    Did Ryan attend the event, too?
25   A.    Yes.
```

Page 56

```
 1   Q.   You mentioned that you were already in New York at the
 2        time?
 3   A.   Yes.
 4   Q.   Did you drive to the event?
 5   A.   I met up with my brother, Norman, and Carmen, and I --
 6        I think it might have just been us from what I can
 7        remember, there might have been one other person in
 8        the car, I can't recall, obviously it was a few years
 9        ago, but I think we actually all drove up to the event
10        together.
11   Q.   So you drove from New York City to Bridgehampton?
12   A.   Correct.  Norman drove.
13   Q.   Where did you spend the night when you attended the
14        event?
15   A.   We spent the night at a hotel in the city.  I had a
16        flight out the next morning.  I don't recall what the
17        hotel was, but it was some hotel in New York.
18   Q.   Who booked the hotel for you?
19   A.   My brother.
20   Q.   Did he pay for it?
21   A.   Yes.
22   Q.   Did Ryan ever tell you that he submitted your hotel
23        room for reimbursement to De Tomaso?
24   A.   No.
25   Q.   Did he tell you that De Tomaso was paying for your
```

Page 57

1       room?

2   A.  No.

3   Q.  Was it under your understanding that De Tomaso was

4       paying for the room?

5   A.  I wasn't sure.  We didn't discuss who was covering the

6       room.  It could have been him, his personal expenses,

7       I wasn't aware or made aware of who was covering the

8       room.

9   Q.  Did you offer to reimburse him for your room?

10  A.  I don't recall.

11  Q.  Do you remember how much it was?

12  A.  No.

13  Q.  Do you remember the name of the hotel?

14  A.  No.

15  Q.  In the previous events that you attended, did you also

16      stay at hotels?

17  A.  No.  This was the only event.  The others, I already

18      lived in the city and so they didn't require any stay.

19  Q.  Have you traveled with your brother before?

20              MR. ZACH:  Objection; time frame maybe.

21  A.  Yeah, and to confirm, like work-related travel or,

22      like personally travel?

23  BY MS. BUSTAMANTE:

24  Q.  Personally, when you traveled with your brother -- I

25      mean, have you traveled with your brother in your

1           adult life?

2    A.    From what I can recall, we've taken, you know, family

3          trips, summer trips with our family to our summer

4          spots, Maine, et cetera, but I don't recall taking a

5          individual trip with my brother.

6    Q.    When you did go on these family trips, did you book

7          your own hotel?

8    A.    No.

9    Q.    Who booked your hotel?

10   A.    My hotel was always booked by my parents.  At times, I

11         would sometimes stay with them but, yeah, I never

12         personally booked the hotel room.

13   Q.    When you accepted to attend the invitation to the

14         Bridge to support your brother, did you do it under

15         the understanding that he was going to cover all of

16         your expenses when you attended?

17   A.    I don't recall, and I don't -- I didn't really think

18         about, or at least right now, you know, too many

19         expenses being incurred because I was already going to

20         be in New York for the wedding so there was no travel

21         expenses or anything involved, but I don't recall that

22         being a part of our discussion.

23   Q.    Did Ryan ever give you -- did Ryan give you a free

24         ticket to the event?

25   A.    Yes.

1  Q.  Do you know how much the tickets were?

2  A.  I do not.

3  Q.  Did you spend any of your personal money at the event?

4  A.  I did not.

5  Q.  Did Ryan cover for everything?

6  A.  There -- I personally didn't make any purchases there,

7      or no purchases were made on my behalf that I can

8      recall.

9  Q.  Did you eat?

10 A.  Lunch, yes, lunch was the -- the only other, we did --

11     we went out to lunch and we went out to dinner as well

12     with Norman, Hugo, and the rest of the team also.

13 Q.  And who paid for that?

14 A.  I did not pay for any of the -- I didn't pay for the

15     lunch or the dinner.  I don't know who paid for the

16     dinner.  For the lunch, I believe my brother paid for

17     it.

18 Q.  Was it your understanding that De Tomaso was paying

19     for it?

20 A.  I really can't say.  I'm not sure, you know, if it was

21     my brother's personal expenses or if it was De Tomaso

22     covering.

23 Q.  And the other two events that you attended, did you

24     spend any of your personal money?

25 A.  No.  There were no purchases involved that I can

1       recall at all at those events.

2   Q.  You didn't go out for drinks?

3   A.  No.

4   Q.  Did you go to dinner with your brother after the

5       event?

6   A.  No.  For the event, the other New York City De Tomaso

7       event, I recall him, I believe, staying late to, I

8       think just help with pick-up, et cetera.  This is

9       just, again, from what I can recall, this was several

10      years ago.  I went from work and went back to my

11      apartment after work.  The other event, which was for

12      Apollo, I just took a train from New York City right

13      outside the city to go to the event and then came back

14      afterwards.

15  Q.  Did you pay for the train?

16  A.  I paid for the train, correct.

17  Q.  You said that from time to time you would meet with

18      Ryan if, for example, you had coincided by being in

19      the same city, right?

20  A.  Yes.

21  Q.  When you did meet, what would you do, would you meet

22      for coffee, would you go out to dinner, would you have

23      breakfast, would you meet for five minutes?  Like, can

24      you describe the encounters, please?

25  A.  I was working in New York City at the time and

1          periodically, if there was overlap, we might meet up

2          after I got out of work, get dinner, and go back to my

3          apartment, catch up, watch TV, and that was pretty --

4          would pretty much be it.

5     Q.   When you did go to dinner, who paid for dinner?

6     A.   I believe my brother.  But, again, I don't really

7          recall.  It was a very long time ago, but...

8     Q.   Did you ever offer to split it?

9     A.   I could have.  Again, I really don't recall.  It was a

10         very long time ago.

11    Q.   Was it your understanding that the dinner was a

12         business expense?

13    A.   No.

14              MR. ZACH:  Objection to form.

15    A.   No, that wasn't my understanding.

16    BY MS. BUSTAMANTE:

17    Q.   Your understanding was that he was just buying you

18         lunch or dinner out of his own money?

19    A.   Likely, yes, just, you know, as -- as an older

20         brother.

21    Q.   Did you ever get invited to any more De Tomaso events

22         and just couldn't go?

23    A.   I do remember being invited to the, I believe what was

24         the Cipriani event, and I did not attend.  I think, at

25         least from what I can recall, that's the only one that

Page 62

```
 1       I can remember.  There may -- may have been others,
 2       but from, you know, my memory -- what my memory serves
 3       me, that was the only one that sticks out.
 4  Q.   Do you remember why you couldn't make it?
 5  A.   I believe it was just my own work responsibilities.
 6  Q.   Did you know that Carmen sued Ryan and De Tomaso?
 7  A.   I was made aware of that at one point, yes.
 8  Q.   Did Ryan talk to you about that lawsuit at all?
 9  A.   No details.  I just recall him informing me of that at
10       one point.
11  Q.   What did he tell you?
12  A.   From what I can, again, from what I can recall, I was
13       aware that she was suing them, and I want to say it
14       may have been due to compensation, not -- not being
15       compensated.  Again, I don't know the details though,
16       I may be misspeaking, but that's what I can recall.
17  Q.   When you say "suing them," who do you mean?
18  A.   I don't know the exact parties that were involved.  It
19       could have just been De Tomaso, as a company, I don't
20       know, you know, I don't really know how all the
21       legalities work with -- with lawsuits, if, you know,
22       my brother and Norman both were individually involved
23       in that, but I -- I really, you know, don't know
24       specifics.
25  Q.   Did he ever tell you that he was a named defendant in
```

```
 1        this lawsuit, "him" being Ryan?
 2   A.   Potentially.  But again, you know, from potentially,
 3        from, I don't remember, you know, all the details.  He
 4        didn't -- he didn't share much.
 5   Q.   Did he ever tell you about any steps he took to
 6        resolve that litigation?
 7   A.   No, not that I can recall.
 8   Q.   What did he tell you about that litigation?
 9   A.   All I know of that specific litigation is that I
10        believe Carmen was suing, and I believe that my
11        brother is no longer involved.  But I don't know any
12        other details.
13   Q.   How do you know he's no longer involved?
14   A.   I was informed of that.
15   Q.   Who told you that?
16   A.   My brother.
17   Q.   When?
18   A.   I don't recall.
19   Q.   What did he tell you?
20   A.   Just that -- that, you know, could not discuss
21        details, but that he was no longer involved.
22   Q.   What did you understand by "no longer involved"?
23   A.   My assumption was that he was no longer being sued, I
24        guess.  But again, I don't have a ton of experience in
25        lawsuits or legal matters, so that -- that's just my
```

```
 1        understanding.
 2   Q.   You were never employed by De Tomaso, right?
 3   A.   Correct.  I was not.
 4   Q.   Have you ever been paid by De Tomaso?
 5   A.   No.
 6   Q.   Have you ever been paid by a company called Apollo?
 7   A.   No.
 8   Q.   Have you ever been paid by a company called Aprivy?
 9   A.   No.
10              (Reporter clarification at 11:50 a.m.)
11              MS. BUSTAMANTE:  Aprivy, that's
12        A-P-R-I-V-Y.
13   BY MS. BUSTAMANTE:
14   Q.   Are you aware that Aprivy is Ryan's LLC?
15   A.   Yes, I'm aware of the -- aware of the company name.
16   Q.   When did you become aware of Aprivy?
17   A.   Probably, again, I would have to speculate, I don't
18        recall specific dates.  If I had to guess, I would
19        say, you know, maybe two years ago, a year-and-a-half
20        ago.  I don't know.  Again, I have to speculate,
21        but...
22   Q.   Did Ryan ever offer you a position at De Tomaso?
23   A.   He didn't offer me a position.  It was discussed that,
24        you know, he had hoped to bring me on as part of the
25        team in some capacity at some point.  Details weren't
```

Page 65

```
 1          ever discussed in terms of, like, what my particular
 2          role would be, it was just discussed that it was his
 3          hope at some point.
 4    Q.    When did he tell you that?
 5    A.    It had been kind of a ongoing, something that we would
 6          discuss kind of ongoing and -- for, you know, a few
 7          years, so several years ago.
 8    Q.    Did he tell you in text?
 9    A.    I truly do not recall.  It was a -- a very long time
10          ago, and it was never really a formal thing and never
11          something that materialized.
12    Q.    Did he tell you as soon as he started working at
13          De Tomaso?
14    A.    Not that I recall, but that was a very long time ago,
15          so...
16    Q.    Let's gauge it by where you were living at.
17                So when did he first mention that he wanted
18          to bring you to De Tomaso, when you were living in New
19          York or when you were living in Chicago?
20    A.    Probably when I was living in New York.
21    Q.    So around 2019?
22    A.    I don't want to, you know, guess dates.  It could have
23          been the year before, it could have been 2019, so
24          maybe around that general time frame, but...
25    Q.    So he discussed hopes to bring you as what?
```

```
 1   A.   No specifics were really discussed in terms of what my
 2        actual role would be.  I had, you know, my own job
 3        and, you know, it was just kind of something that we
 4        had discussed.  Something that, you know, he was going
 5        to need to and I don't know to the extent that they
 6        did discuss it, but discuss it with Norman.  I know it
 7        was, you know, not just a decision that he was going
 8        to, I believe, just make on his own, but --
 9   Q.   Did he tell you that?  Did he tell you he had to
10        discuss it with Norman first?
11   A.   I believe, you know, there were times where he said
12        that he and Norman were going to be talking about it,
13        so that's probably the better terminology to use, but
14        yeah, no specifics in terms of what the exact --
15   Q.   Did he say "I want you to bring you to De Tomaso" or
16        did he say "Norman and I want to bring you into De
17        Tomaso"?
18                    MR. ZACH:  Objection to form.  You can
19        answer.
20   A.   I don't recall.  Most likely it would have been, you
21        know, his -- him wanting to.  But it, you know, not
22        something that I remember details of.
23   BY MS. BUSTAMANTE:
24   Q.   Well, when you met Norman in person, did you mention
25        to him, "Hey, I want to work with De Tomaso"?
```

1    A.    I did not.  You know, it, again, I didn't want to be

2          pushy.  I had my own job, my own career that I was

3          very focused on.  It was not something that I, you

4          know, I knew that they had a lot on their plate as it

5          was, so I certainly was not pushing the matter by any

6          means.

7    Q.    In the times that you did meet Norman in person, did

8          you ever discuss your potential position at De Tomaso

9          with him?

10   A.    Not that I recall.

11   Q.    So the only person that you discussed your potential

12         position at De Tomaso was with your brother?

13   A.    I believe so.

14   Q.    Chelsea, do you have experience in the car industry?

15   A.    No.  I do not.

16   Q.    Have you ever worked with luxury -- luxury cars?

17   A.    I do have experience producing custom advertising

18         campaigns, for BMW actually, from my most recent

19         position.  That was one of our key clients that we

20         produced advertising campaigns for.

21   Q.    When did you work on that?

22   A.    We worked on those, I would say, annually,

23         consecutively, from 2018 through probably 2023 or

24         2022.

25   Q.    Did Ryan know about that?

Page 68

```
 1   A.   I believe he did.  You know, I can't say that I recall
 2        I shared specifics of, you know, I often shared
 3        specifics about the campaigns that I worked on with my
 4        brother and my family, so yes, he knew about that,
 5        most likely.
 6   Q.   Did Ryan ever imply that he could get someone else a
 7        job at De Tomaso?
 8              MR. ZACH:  Objection to form.
 9   A.   I don't believe so, but just so I can make sure I'm
10        understanding what you're asking, can you clarify what
11        you mean by that?
12   BY MS. BUSTAMANTE:
13   Q.   Like, did he ever say or imply that he could have your
14        dad work at De Tomaso or a family friend or --
15   A.   No.  No, not that I'm aware of.
16   Q.   Okay.  You never signed a non-disclosure agreement
17        with De Tomaso, right?
18   A.   No.
19   Q.   You would agree with me that from time to time Ryan
20        asked you to help him with work for De Tomaso?
21   A.   Yes.  I helped him with a few things.
22   Q.   Why?
23   A.   I just knew that he was very busy, had his hands full.
24        Seemed to -- you know, these were just often
25        proofreading, checking to make sure links worked and,
```

Page 69

```
 1          you know, a test email.  You know, oftentimes, it's
 2          just helpful to just have a second set of eyes to take
 3          a look.  I think he just valued my opinion.  And at
 4          the end of the day I just was trying to be a good
 5          sister to help him when he asked because I knew how
 6          busy he was.
 7     Q.   Do you think he was in over his head with the amount
 8          of work that he had?
 9               MR. ZACH:  Object to the form.
10     A.   I can't really answer that question because I'm not,
11          you know, he was the one doing the work, I wasn't
12          there with him.  I would say it always seemed that he
13          was very busy, but never once did I think that he was,
14          you know, in over his head.  He always seemed like he
15          had things under control when it came to his work
16          responsibilities and always, has always seemed
17          extremely competent in terms of the roles that he's
18          held in the car industry.
19     BY MS. BUSTAMANTE:
20     Q.   You would read over press releases for him, wouldn't
21          you?
22     A.   There were, and again, I'm speculating here, but maybe
23          two, not, not too many, but there were a few from time
24          to time that he would send to me.  Again, his ask was
25          always just essentially to proofread it.
```

Page 70

```
 1   Q.   You helped with some editing?

 2   A.   Yep.

 3   Q.   And during his work at SCG, did Ryan ever ask you to

 4        read over press releases?

 5   A.   I don't recall.  Not that I recall, but I don't

 6        recall.  That the would have been a very long time

 7        ago.

 8   Q.   Outside of De Tomaso, did you ever help Ryan edit his

 9        work product at other positions?

10   A.   Not that I recall.

11   Q.   Do you recall helping him while he was at Buell

12        Securities?

13   A.   No.

14   Q.   Would you say that you have more marketing experience

15        than Ryan?

16             MR. ZACH:  Object to the form.

17   A.   I would -- I would not say that.  I think that we have

18        different marketing experience, but he certainly has

19        more hands-on on experience and particularly in the

20        luxury car space.

21   BY MS. BUSTAMANTE:

22   Q.   What makes you think that he has marketing experience

23        in the luxury car space?

24   A.   Just because of the work that he had done with

25        De Tomaso and with Apollo as well.  I know that he did
```

Page 71

```
 1        a lot of work for their social media, you know, email
 2        campaigns, I know that he had helped a lot with their
 3        marketing efforts, so...
 4   Q.   Did he tell you that?
 5   A.   Yes.
 6   Q.   You didn't see it yourself?
 7   A.   I would see, you know, the work come to fruition.  You
 8        know, I would see the work on social media, you know,
 9        posters that might get produced, so I would see final
10        products of things, but, yeah...
11   Q.   But he never came up to you and showed you, "Hi, this
12        is the poster I'm working on for marketing."  You
13        would just see the final product?
14   A.   There -- there were likely times where I would, you
15        know, see certain, like, works in progress, but again,
16        we were not with one another very often, so -- so no,
17        it was not always that I was seeing, you know, things
18        that were being worked on.
19   Q.   What marketing experience do you have?
20   A.   So I graduated from the University of Connecticut from
21        the School of Business with a degree in marketing.
22             I, coming out of college, I worked for a
23        year at Mediahub as an assistant media planner.
24             I then went to JP Morgan and worked in
25        finance for about a year-and-a-half.
```

Page 72

```
 1                      I then went to John Hancock Investments,
 2          worked in marketing there for two years.
 3                      And then I went to Fox Sports, which was
 4          later acquired, the division that I worked for, by a
 5          larger sports marketing agency called Playfly Sports,
 6          and I led a -- a marketing team there for almost six
 7          years.
 8     Q.   And what do you do now?
 9     A.   So I actually, I'm currently actively searching for my
10          next opportunity.  After -- as I mentioned, after
11          almost staying with my most recent employer for almost
12          six years, I made the difficult decision to
13          voluntarily leave this summer to just provide myself
14          with the appropriate time to search for a new job and
15          network.
16                      I had been in a difficult position there,
17          not having the resources that I needed for quite some
18          time and working 12-hour days and pretty much every
19          weekend and so I knew that I wasn't going to have the
20          time that I needed to find a -- you know, my next
21          opportunity if I stayed, so that's what I'm currently
22          doing.
23     Q.   Do you have any marketing experience that would
24          qualify you to revise documents for the chief
25          marketing officer of a luxury car company?
```

Page 73

1          MR. ZACH:  Object to the form.  You can

2       answer.

3   A.   I do, you know, I -- I would say that the work that I

4       was doing to help my brother review things was truly

5       just, you know, just that, reviewing, writing,

6       offering what I always said was my opinion, you know,

7       as a second set of eyes taking a look at something.

8       You know, always said, you know, this is by no means

9       advice that you need to accept, but again, just

10      helpful to have a second set of eyes read through

11      something at times.

12          I did a lot of -- a lot of copywriting and

13      a lot of editing and proofing in a lot of my past

14      jobs, so...

15  BY MS. BUSTAMANTE:

16  Q.   So I understand that you helped your brother by

17      reviewing and writing and offering your opinion.  But

18      what marketing experience do you have that qualifies

19      you to advise a CMO?

20  A.   I did not, so I wasn't, the work that I was being

21      asked to help him with, and again, only very few

22      instances, it was not work that would be, you know,

23      advising a CMO, nor did I think that if I were brought

24      on to the team it were going to be in a role where I

25      would be advising my brother.  I certainly knew that

Page 74

```
 1        he was calling the shots and I just wanted to be a
 2        helpful and supportive sister and, you know, would
 3        have been happy to take on a role that would have
 4        been, you know, more of a helper while I learned kind
 5        of the ropes of the industry, but again, I was focused
 6        on, you know, my specific career at the time, so...
 7   Q.   If you were brought on to the team, what role did you
 8        think that you would be brought on to?
 9                  MR. ZACH:  Objection.
10   A.   Again, it was not discussed specifically what the
11        exact role would be.  That's something that was
12        unknown.
13                  As I mentioned, I think something that just
14        excited me was kind of learning a new industry, so I
15        certainly didn't expect to be coming on and advising,
16        you know, anybody on anything.  I think I would have
17        been coming on and learning the industry while helping
18        in really any capacity that I could to be helpful.
19   BY MS. BUSTAMANTE:
20   Q.   But again, you've never specifically worked in the car
21        industry, right, other than the marketing for BMW, I
22        think you said?
23   A.   Never worked in the car agency on the client side, but
24        the positions that I've held have been on the agency
25        side, so again, my experience has been in producing
```

Page 75

```
 1        custom advertising campaigns for, yes, BMW.
 2                  We actually also produced a customer
 3        advertising campaign for Vroom as well, which is
 4        another car company, but yes, it would be, I
 5        certainly, it would have been something new for me
 6        from, you know, the experience of being on the client
 7        side in the auto world.
 8   Q.   Have you ever worked as a CMO of a company?
 9   A.   No.
10   Q.   Is it your understanding that Ryan asked you for help
11        with his work at De Tomaso because of your previous
12        experience in marketing?
13   A.   It -- it could have been.  It could have been he just
14        valued my opinion.  You know, I've always been a
15        strong writer.  His, the specific reasons why he was,
16        you know, seeking it out were -- were not specifically
17        stated, but, yes, I'm sure my experience had played a
18        role.
19   Q.   We're going to look at another exhibit.  Give me a
20        second for it to load.
21   A.   Is it the same -- oh.
22   Q.   So I just introduced Exhibit 2.  If you refresh
23        your --
24   A.   Yep, I see it.
25                  MARKED FOR IDENTIFICATION:
```

Page 76

```
 1                    DEPOSITION EXHIBIT 2

 2                    DT2158

 3                    12:08 p.m.

 4    BY MS. BUSTAMANTE:

 5    Q.   So this is an email from Ryan to you on August 8th,

 6         2021, right?

 7    A.   Yep.

 8    Q.   And Ryan is sending you excerpts from an upcoming

 9         De Tomaso book?

10    A.   Yep.

11    Q.   If you look at the subject line in the attachments,

12         you see that the information was confidential, right?

13    A.   Yep.

14    Q.   Why did Ryan send this to you?

15                    MR. ZACH:   Objection; form.

16    A.   This was shared with me, again, his hope was to

17         eventually onboard me in some capacity to help out,

18         you know, with the company, so this, he was sharing to

19         kind of give me some additional context on the De

20         Tomaso brand and story and how it all started just to

21         kind of get more familiar with it.

22    BY MS. BUSTAMANTE:

23    Q.   Do you think he was trying to convince you to work for

24         De Tomaso?

25    A.   No, I never took him sending me these things as him
```

Page 77

```
 1        trying to convince me.  I think he was just excited
 2        and wanted to share the story that he loved so much
 3        with me.
 4   Q.   The file was password protected, right?
 5   A.   Yep.
 6   Q.   And the password is "Carmen"?
 7   A.   Yes.
 8   Q.   Did you think it was odd that Ryan made the password
 9        "Carmen"?
10             MR. ZACH:  Objection to form.
11   A.   Not really.  I think that she, at least for what, you
12        know, if my memory is correct, this was around the --
13        the time that she was onboarded onto the team,
14        something that I knew that he was really excited
15        about, the De Tomaso story, you know, from what I can
16        remember, it, you know, the beginning of it has a lot
17        to do with both the man and his wife as well who, her
18        name was Isabelle, and you know, Carmen was kind of
19        embodying Isabelle in some of the marketing work that
20        they were doing.  And so I think it just kind of, I
21        viewed it as just a connection in that sense.
22   BY MS. BUSTAMANTE:
23   Q.   Did you open the files Ryan sent you?
24   A.   Yes.
25   Q.   Did you save the files on your personal computer?
```

1  A.    No.

2  Q.    How did you view them?

3  A.    Again, this is a very, very long time ago so I don't

4        recall specifically.  Most likely, it was on my

5        computer.  Could have been on my phone, but I don't

6        recall the exact method.

7  Q.    Did you give Ryan feedback on the book?

8  A.    I'm sorry, you cut out at the end.

9  Q.    Did you give Ryan feedback on the book?

10 A.    No.  No.  I had no involvement in this.

11 Q.    Did you share the files with anyone?

12 A.    No.

13 Q.    Did you share them with your parents?

14 A.    No.

15 Q.    With your friends?

16 A.    No.

17 Q.    Did you talk about the files with anyone?

18 A.    No.  Not that I can recall.

19 Q.    That's not the only De Tomaso document that Ryan sent

20       you, huh?  Right?

21 A.    He had sent me others.

22 Q.    All right.  I introduced Exhibit 3 to your deposition.

23       Do you see it?

24 A.    I see it, yep.

25              MARKED FOR IDENTIFICATION:

Page 79

```
 1                    DEPOSITION EXHIBIT 3
 2                    BERRIS-000334676
 3                    12:12 p.m.
 4   BY MS. BUSTAMANTE:
 5   Q.   This is an email from Ryan to you in October 2021,
 6        right?
 7   A.   Correct.
 8   Q.   And the subject line says "CONFIDENTIAL | Version 1."
 9        Right?
10   A.   Yep.
11   Q.   And the body of the email references
12        "CONFIDENTIAL | Version 2"?
13   A.   Yep.  I see that.
14   Q.   And these files were also password protected?
15   A.   I see that.
16   Q.   Do you think it's okay for you to look at this
17        information?
18                    MR. ZACH:  Objection.
19   A.   I, again, always just viewed any of these as being a
20        supportive sister, one who he hoped would be a part of
21        the team officially at some point.  Always knew that
22        when something was sent to me that was confidential,
23        it meant that I couldn't share it with anybody else,
24        which I never did.  It was always just either take a
25        look, or, you know, maybe provide, you know, what I
```

1        thought, but that was really it.

2    BY MS. BUSTAMANTE:

3    Q.   Did you ask him if it was okay for you to look at this

4        information even though it was confidential?

5    A.   I don't recall.  I don't recall.

6    Q.   Did Ryan ever say anything about the confidential

7        information he was giving you?

8    A.   I don't recall specifically.  Any time that he would

9        share something with me, and again, it wasn't too

10       often, you know, he would, of course, stress the

11       importance of not sharing it, but I think he felt

12       comfortable sharing it with his, with me as his

13       sister.

14    Q.   When he was working at SCG, did he share confidential

15       information from SCG to you?

16    A.   Not that I can recall, no.

17    Q.   Did you open the files Ryan sent you?

18    A.   Yes, I would have opened them at the time.

19    Q.   Do you recall what they were?

20    A.   I don't recall.  This is quite a long time ago.

21    Q.   It appears like they are in a Dropbox, right?

22    A.   Yep.

23    Q.   Did you just have access to those two files or did you

24       have access to other things in the Dropbox?

25    A.   No, it would have been just the two, just what was

1           shared with me.

2      Q.   Do you recall that it was specifically just those two

3           files?

4      A.   I just know from how he would share things.  He -- he

5           was a very careful person and so he would not have,

6           you know, shared an entire probably folder of

7           confidential items with me, just the items that he was

8           asking me to take a look at, but specifics of this, I

9           don't -- I don't recall and I don't know what the

10          files were.

11     Q.   Did you give Ryan feedback on these files?

12     A.   I don't recall.  I don't even recall what these were

13          linking to.

14     Q.   Did you save them on your personal computer?

15     A.   No.

16     Q.   How do you remember that?

17     A.   I just -- it's not something that I would have done.

18     Q.   Did you share the files with anyone?

19     A.   No.

20     Q.   Not your parents?

21     A.   No.

22     Q.   Or your friends?

23     A.   No.

24     Q.   Did you discuss them with anyone?

25     A.   No, not that I can recall.

Page 82

```
 1    Q.   All right.  I'm introducing Exhibit 4 to your

 2         deposition.

 3                     MARKED FOR IDENTIFICATION:

 4                     DEPOSITION EXHIBIT 4

 5                     BERRIS-000337348

 6                     12:16 p.m.

 7    BY MS. BUSTAMANTE:

 8    Q.   Can you see it?

 9    A.   Yes, I can see it now.

10    Q.   And this is an email from Ryan to you, right?

11    A.   Correct.

12    Q.   And the email is sent from Ryan's personal work email?

13    A.   Correct.

14    Q.   To your personal email?

15    A.   Correct.

16    Q.   And the subject line of the email is "Confidential for

17         your eyes only," correct?

18    A.   Correct.

19    Q.   And he sent it on November 28, 2021?

20    A.   Correct.

21    Q.   And in the email Ryan sent you De Tomaso exclusive

22         Dropbox links?

23    A.   Correct.

24    Q.   Did you open the files Ryan sent you?

25    A.   Yes, I'm sure that I did.
```

1    Q.    Do you recall what they were?

2    A.    I don't recall.  This was, again, a very long time ago

3          so I don't recall specifics of what they, of what the

4          video was showing, but it looks like it was final

5          versions of a teaser in a -- from a video.

6    Q.    Did you have access to other documents through that

7          Dropbox?

8    A.    Most likely, no.  Not something that he would have

9          done.

10   Q.    But you don't remember exactly whether you did or not?

11   A.    Anytime that he shared anything with me that was

12         marked confidential, which, as you can see, he put in

13         the subject line always as well, it would just be

14         linking to the one item that he was referencing.

15   Q.    What did you do with these files?

16   A.    Just opened them and -- and watched them.

17   Q.    Did you give Ryan feedback?

18   A.    No, these are also, these appear to be final versions

19         so I wouldn't have given him any feedback.  These he

20         likely just shared with me just out of excitement to

21         show me final products that were, that he was excited

22         about.

23   Q.    Were you ever compensated for reviewing any of the

24         items that I just showed you?

25   A.    No.  Nor did I expect to be.

Page 84

1    Q.    Why did you not expect to be compensated?

2    A.    Because I was not, you know, officially an employee of

3          the company and I was just, you know, happy to look at

4          these again.  As a supportive sister I was really

5          proud of all of the work that he was doing and I just

6          was excited to see anything that he was working on.

7    Q.    After viewing all of these, did you expect to become a

8          part of the company eventually?

9    A.    I had no, you know, expectation that needed to happen.

10         I thought there was a likelihood that at some point,

11         didn't know what time frame, but whenever it was right

12         for the De Tomaso team, if they were, you know, all in

13         agreement, that I would become part of it, but again,

14         it was not something that I felt needed to happen.

15   Q.    I'm going to introduce another exhibit.  This is going

16         to be Exhibit 5 to your deposition.  You should be

17         able to see it now.

18   A.    Yes, I see it now.

19               MARKED FOR IDENTIFICATION:

20               DEPOSITION EXHIBIT 5

21               BERRIS-000341830

22               12:20 p.m.

23   BY MS. BUSTAMANTE:

24   Q.    And this is another email from Ryan to you, right?

25   A.    Yep.

Page 85

1    Q.    And it's dated February of 2022?

2    A.    Correct.

3    Q.    And the subject line is "For your eyes only"?

4    A.    Yep.

5    Q.    So again, that's just more confidential De Tomaso

6          information that your brother is sending you?

7    A.    Yes, but, you know, again, just sharing it with his

8          sister, I think just out of, again, excitement and

9          wanting to share it.

10   Q.    And again, you weren't working at De Tomaso at the

11         time?

12   A.    I was not working for them, no.

13   Q.    And you didn't sign a non-disclosure agreement?

14   A.    No.

15   Q.    What did you do with this?  It seems like a video?

16   A.    Just clicked on it, watched it.  I don't, you know,

17         recall what exactly it is just by looking at the link,

18         but yes, this appears to be a video.

19   Q.    I'm introducing Exhibit 6 to your deposition.

20                   MARKED FOR IDENTIFICATION:

21                   DEPOSITION EXHIBIT 6

22                   BERRIS-000221218-222

23                   12:22 p.m.

24   BY MS. BUSTAMANTE:

25   Q.    It's loading.

Page 86

1   A.   Yep, I see it now.

2   Q.   And if we look at the first email on the thread, which

3        would be the one on the bottom, that one is dated

4        September -- I mean Saturday, September 8, 2022 (sic),

5        right?

6   A.   Um...

7   Q.   I mean 2020, I'm sorry.

8   A.   Hang on.  I'm supposed to be looking at the -- scroll

9        to the bottom, you said?

10  Q.   Well, if you look, it's at the bottom of the first

11       page -- and because of the way the email --

12  A.   Oh, yeah, I see.  I see.

13  Q.   That's the first email that's sent by Ryan, right?

14  A.   Correct.

15  Q.   And the subject line is "DT open letter draft"?

16  A.   Yeah.

17  Q.   And in the email, he attached a letter for you to

18       edit?

19  A.   Yep.

20  Q.   And then you responded back a couple of hours after

21       with your suggestions, right?

22  A.   Correct.

23  Q.   And in the email you state you highlighted all of the

24       changes you made in yellow -- yellow?

25  A.   Yep.

1    Q.    And you left any notes for Ryan in red, correct?

2    A.    Yep.

3    Q.    So if we scroll down to the actual attachment, those

4          are the redlines that you provided Ryan, right?

5    A.    Correct.

6    Q.    And if you look at the top of the document, it states

7          "Draft for internal use only," right?

8    A.    Correct.

9    Q.    And this is a letter regarding the De Tomaso P72

10          Program update?

11   A.    Correct.

12   Q.    At the time you weren't working at De Tomaso?

13   A.    No.

14   Q.    Are you familiar with the De Tomaso P72 Program?

15   A.    I was certainly more familiar with it at the time.

16          This is, again, years ago, so it's not something that

17          I would remember all the details of now, but again,

18          the -- the updates that I suggested, and I noted here

19          that they were purely my suggestion, were more of a

20          proofing kind of proofreading.

21   Q.    Were -- were you familiar enough with the program to

22          provide updates yourself?

23   A.    I, you know, was familiar with it, sure, and felt

24          comfortable doing so, but again, if you, you know, any

25          copywriter would have been able to do this work

Page 88

```
 1          without even being familiar with what the actual
 2          program was because these are kind of copy suggestions
 3          that I was suggesting might be -- might help make the
 4          piece a little bit better, but I, again, by no means
 5          expected them to be used.
 6     Q.   Well, if you look at the redlines, in the second
 7          paragraph you write, "In those instances we did seek
 8          out the best partners in the world who are most suited
 9          for the job to help us accomplish our goal."
10               Did you know who the partners were?
11     A.   Sorry, I'm reading this.
12               I mean, I didn't, I likely didn't know
13          specifics.  Again, this is a very long time ago, this
14          is several years ago, however, I understood what they
15          meant by, you know, "partners."  And again, my
16          suggestions to this were in no way related to the
17          content of the piece.  I was simply just providing,
18          you know, grammatical adjustments that I felt like
19          might help the piece read a little bit more smoothly,
20          which sometimes I think it's helpful to have somebody
21          who maybe isn't as close to the content itself to even
22          do that job, just to make sure it reads smoothly to
23          everybody who is receiving it.
24     Q.   Did Ryan tell you who this writing was intended for?
25     A.   I'm sure he did.  I don't recall the specifics of our
```

Page 89

```
 1          discussion related to this as this was many years ago
 2          at this point.
 3   Q.    Did you ever tell Norman that Ryan was asking you to
 4          do work for De Tomaso?
 5   A.    No.
 6   Q.    In the instances that you met with Norman, did you
 7          tell him that you had proofread things for De Tomaso?
 8   A.    No.
 9   Q.    Did you tell him that you had been seeing confidential
10          videos for De Tomaso?
11   A.    No.
12   Q.    At the time of this letter, Ryan was the CMO for De
13          Tomaso, right?
14   A.    I don't recall what his exact title was at the time
15          that he shared this with me.
16   Q.    Were you ever compensated in any way for the work that
17          you did in this letter?
18   A.    No.
19   Q.    This one was not the only time that Ryan sent you work
20          to revise, right?
21               MR. ZACH:  Object to the form, but answer
22          if you can.
23   A.    I likely helped out with a couple other items.
24   BY MS. BUSTAMANTE:
25   Q.    I introduced Exhibit 7 to your deposition.
```

```
                                               Page 90
 1   A.    Okay.  I have it open.

 2                  MARKED FOR IDENTIFICATION:

 3                  DEPOSITION EXHIBIT 7

 4                  BERRIS-00221287-289

 5                  12:29 p.m.

 6   BY MS. BUSTAMANTE:

 7   Q.    Looking at the first email on the thread, so you are

 8         going to have to scroll to the second page with the

 9         numbers on the bottom, 1288.

10   A.    Yes.

11   Q.    This is an email from Ryan to you on August 5th, 2020,

12         right?

13   A.    Correct.

14   Q.    And if we go up to the first page again to see the

15         subject line that's "Email for review," right?

16   A.    Correct.

17   Q.    Just scrolling back again down, Ryan asks you to

18         review the draft email within the next hour, right?

19   A.    Correct.

20   Q.    Were you usually on call to revise documents for

21         De Tomaso on such short notice?

22   A.    No, I would say this was -- this would not have been a

23         frequent occurrence where it was asked for something

24         to be done so quickly.

25   Q.    And if we look at the message that you were editing,
```

1         it looks like it's another email regarding the P72

2         program updates, right?

3    A.   Correct.

4    Q.   And your changes are in red?

5    A.   Correct.

6    Q.   So looking at some of your changes in red, you write,

7         "The only meaningful delays we have experienced as a

8         result of COVID 19 are to our marketing events and

9         development prototypes."  Right?

10   A.   Sorry, I'm just trying to find where you are.

11   Q.   It's on the first paragraph, the first page, and it's

12        in red, and you highlight "development prototypes."

13   A.   Right.  So this would have been again, similarly,

14        like, just he developed all the content, none of that

15        I would have changed because he was close to that.

16             I would have taken a look at it, maybe made

17        some grammatical tweaks that I thought might make it,

18        from my perspective, read a little bit more smoothly.

19             And anything that I here appeared to have,

20        like, maybe updated, if I updated a sentence and the

21        wording in it a little bit, I just changed it to red.

22             So, like, the content for what's in red

23        would have been, you know, from him, but I just maybe

24        made some grammatical tweaks to it that I wanted to

25        make him aware of in case he wanted to keep them.

Page 92

1    Q.    But you didn't actually know what was going on with
2          the program, you were just tweaking the letter?
3    A.    And keeping the content and everything, you know,
4          intent-wise that it was saying exactly intact from
5          what he had initially provided to me.  I was just
6          making changes to grammar that wouldn't have changed
7          the structure or the message that he was trying to get
8          across.
9    Q.    That's because you weren't qualified to actually know
10         what the program was or what it was doing, right?
11                    MR. ZACH:  Objection to form.
12   Q.    You know, I wouldn't say that I wasn't qualified to
13         know.  I think that I just, I -- I wasn't as close to
14         the information, but, you know, if he informed me and,
15         you know, shared the information with me, obviously, I
16         wasn't, him being so close to everything, I was not
17         changing any of that actual information.  So the role
18         that was being asked of me, anytime that he asked me
19         to assist, was never anything that related to, you
20         know, the content of something or the intent of
21         something.  It was always just, "Can you maybe give
22         this, you know, a second peek just to make sure it
23         sounds okay," and so it was, again, just kind of a
24         copywriting read through?
25   BY MS. BUSTAMANTE:

1   Q.   Well, you weren't changing the substance because you

2        just didn't know about the substance?

3                    MR. ZACH:  Objection.

4   A.   Right.  But that also was never be the ask.  The ask

5        would never have been to change the substance.  He was

6        the subject matter expert.  The ask was just if you

7        could take a second look at this, you know, I would

8        appreciate it.

9   BY MS. BUSTAMANTE:

10  Q.   And you weren't compensated for reviewing this letter?

11  A.   I was not compensated, but again, I by no means

12       expected to be.  I was just trying to be helpful.

13  Q.   Did he send you any other De Tomaso documents during

14       the time that he was working at De Tomaso?

15  A.   It was truly such a long time ago, I do not recall.

16  Q.   Do you have any De Tomaso documents yourself?

17  A.   Not that I recall.

18  Q.   At this point in time you don't have any drafts for

19       De Tomaso saved in your computer or printouts in your

20       house?

21  A.   No, not that I recall.

22  Q.   Have you checked?

23  A.   I have not checked in quite some time.

24  Q.   Were you ever officially offered a marketing position

25       at De Tomaso?

1   A.   I was not.

2   Q.   Were you ever offered an official position at

3        De Tomaso that was not in marketing?

4   A.   I was not.

5   Q.   I'm introducing Exhibit 8 to your deposition.

6   A.   Yep, I see it.

7                    MARKED FOR IDENTIFICATION:

8                    DEPOSITION EXHIBIT 8

9                    DT00167491-503

10                   12:35 p.m.

11  BY MS. BUSTAMANTE:

12  Q.   This is an email from, in the very bottom you can see

13       it says "media@detomaso-automobili.com," right?

14  A.   I'm sorry, can you say what you just said?  For some

15       reason, I didn't hear it.

16  Q.   Sorry.  The email is from media@detomaso-automobili,"

17       I'm sorry for butchering that.

18  A.   Yeah -- oh, at the bottom.  I see.  Yes.  Correct.

19  Q.   The original email.  And it's sent to you?

20  A.   Sent to me, yes.

21  Q.   And then you respond, "This looks so awesome."  Right?

22  A.   Yep.

23  Q.   And then Ryan responds, correct?

24  A.   Correct.

25  Q.   So it was your understanding that the original email

Page 95

1          was sent by Ryan?

2     A.   Correct.  It looks like a test email, but I can't,

3          obviously, see the content.

4     Q.   And if we scroll down, the email printed funny, but

5          you can kind of see the content, around page 7, 6 and

6          7?

7     A.   Yep.

8     Q.   496 and 497, right?

9     A.   Yep.

10    Q.   And it looks like it's just a De Tomaso press release,

11         right?

12    A.   Correct.  Correct.

13    Q.   Okay.  So now, go up to your response.  You say, "I

14         can't wait to be a part of this exciting world soon."

15         Right?

16    A.   Yep.

17    Q.   And then you say, "and get to spend more time with

18         you."

19    A.   Yeah.

20    Q.   What did you mean by "can't wait to be a part of this

21         exciting world soon"?

22    A.   At the time, it -- it certainly would have meant that

23         I was excited to hopefully get to be a part of the

24         De Tomaso team.

25                   Again, this was something that we, was

1     always kind of discussed on an ongoing basis, but

2     obviously never material -- materialized, so, there,

3     you know, we may have discussed it kind of recently at

4     this point.  I can't recall, obviously, this was

5     several years ago.  But likely that's what I was

6     talking about and then obviously, you know, he was so

7     busy traveling so much that I was excited that I would

8     be able to get to spend more time with him.

9  Q.  Did Ryan ever tell you how much your compensation

10     would have been had you joined De Tomaso?

11 A.  Not that I can recall.

12 Q.  When you say spent more time with him --

13 A.  Mm-hmm.

14 Q.  -- do you mean by working with him?

15 A.  Yeah.

16 Q.  Did Ryan ever express what your responsibilities would

17     have been if you ever joined De Tomaso?

18 A.  Not specifically that I can recall.  It would have

19     been something that we would have, we likely just,

20     like, didn't get to that point where things got that

21     specific and formal.

22 Q.  You say "can't wait to be a part of this exciting

23     world."  Did you expect it to be soon?

24 A.  I don't recall, but it looks from the -- from what I

25     wrote that, yeah, I had hoped that it would, from

1      whatever our conversations had been around the time of

2      this email that my hope was that it would be happening

3      soon.

4   Q.  Is that because he had implied that it could be soon?

5   A.  I don't recall what our -- what my guess is yes, to

6      some extent, but it was never, you know, a formal

7      offer was obviously never made.  There were steps that

8      still needed to take place as far as what I was aware.

9   Q.  And by "formal offer," you mean, like, a written

10      employment contract, right?

11  A.  Correct.  Never -- yeah, written or verbal, never had

12      either.

13  Q.  Did Ryan ever ask you to perform any other work for

14      De Tomaso?

15  A.  Just to confirm, you mean outside of, like, the duties

16      that you've seen here or, it's -- it's hard for me,

17      really anything that I had ever done was -- was just

18      kind of proofing, like what you've seen -- what you've

19      shown here.  There --

20  Q.  Yeah.  Outside of like a, the reading of the

21      emails and --

22  A.  Yeah --

23  Q.  -- the -- (overspeak) --

24  A.  -- not -- not that I can recall.  Usually just this,

25      maybe testing links on an email or something to that

Page 98

```
 1        extent, but from what I can recall, no, I never did
 2        anything else for them, no.
 3   Q.   Did you ever have access to De Tomaso's social media
 4        account?
 5   A.   No.
 6   Q.   Did you ever prepare posts for them?
 7   A.   No.  I never prepared posts.  I, there maybe was one
 8        or two times when he would show me two photos that he
 9        was deciding between and asked which I liked better,
10        but again, final decision always was -- came down to
11        him and I never had any actual direct involvement with
12        the posts.
13                  MR. ZACH:  Hey!
14                  THE WITNESS:  The dog?
15                  MR. ZACH:  Oh, sorry.  I thought I was
16        muted.  I'm sorry.
17                  MS. BUSTAMANTE:  I was like "I haven't said
18        anything."
19                  MR. ZACH:  So the record is clear, that was
20        not directed at Ms. Bustamante.  I'm sorry, guys, I
21        apologize.
22                  MS. BUSTAMANTE:  You're okay.  I just have
23        a few more exhibits.
24   BY MS. BUSTAMANTE:
25   Q.   Chelsea, we talked a little bit about how when you met
```

Page 99

```
 1        with Ryan he would sometimes cover, like, expenses for
 2        you, right?  Like dinner?
 3   A.   Would be, it was very infrequent, I would say, but a
 4        handful of times, yes.  We would go to a small little
 5        dinner place by my apartment.
 6   Q.   Okay.  And again, did he ever tell you that he was
 7        going to submit the purchase for reimbursement?
 8   A.   No.
 9   Q.   Did he ever say, "Oh, don't worry about it, it's on
10        the business card"?
11   A.   Not that I recall.  But again, that would have been
12        like 2018 or 2019, from what I can recall, so, I -- I
13        do not remember any of those discussions.
14   Q.   I'm introducing Exhibit 9 to your deposition.  Let me
15        know when you see it.
16   A.   Yes.  I see it.
17                  MARKED FOR IDENTIFICATION:
18                  DEPOSITION EXHIBIT 9
19                  DT0000059424
20                  12:43 p.m.
21   BY MS. BUSTAMANTE:
22   Q.   And from the top of the email, that one is an email
23        from Hugo to you.  Right?
24   A.   Correct.
25   Q.   And in the bottom, you can see that it's a forward,
```

Page 100

```
 1        like, he forwarded the message originally from Ryan to
 2        him, right?
 3   A.   Yeah.
 4   Q.   And the email he sent to you is from June 6th, 2022,
 5        right?
 6   A.   Mm-hmm.  Correct.
 7   Q.   If you look at the subject line, it says "Expenses for
 8        August - December '21."
 9   A.   Yep.
10   Q.   Meaning, it's for the year 2021?
11   A.   Correct.
12   Q.   And if we look at the attachments, it says, "2021
13        Expenses - Ryan DT for Hugo," and it's a zip folder?
14   A.   Yep.
15   Q.   And then it says Priceline and Expedia receipts
16        August to December '21, and it's also a zip folder?
17   A.   I'm not seeing the zip folders.  I might be looking at
18        this in the wrong way.
19   Q.   The zip folders are very, very large.  I'm just
20        showing you the email.
21   A.   Oh, okay.  But the attachments, that's the title of
22        them, right?
23   Q.   Yep.
24   A.   Okay.
25   Q.   The attachments are referring to personal expenses --
```

Page 101

1          expenses from 2021 from Ryan to De Tomaso, right?

2    A.    Correct.  I do have, I mean, am I able to provide

3          context as to, like, why this email was sent to me?

4    Q.    Yeah.  Why did Hugo forward you that email?

5    A.    This actually was during the time where my parents and

6          I didn't know where my brother was and we couldn't

7          find him, we weren't able to contact him, and so we

8          obviously were extremely concerned.

9                 And Hugo and I, Hugo had been kind enough

10         to try and do what he could to help figure out where

11         he might be and what was going on.  And so one of the

12         things that we had asked is if he could, if he ever

13         had, you know, helped with any expenses or had

14         anything that might have had my brother's, like,

15         credit card information on there, if he could share it

16         with me so that I could provide it to my parents so

17         they could give it to the police so they could try to

18         find him.

19   Q.    So this email, you have contacted Hugo and requested

20         the expenses from him?

21   A.    Mm-hmm.

22   Q.    And this is after Ryan had already resigned from

23         De Tomaso, right?

24   A.    Yes, I would have assumed that to be the case.

25   Q.    Well, did Ryan tell you that he resigned from

Page 102

1        De Tomaso?

2    A.   No.  No.

3    Q.   How do you know he resigned from De Tomaso?

4             MR. ZACH:  Object to the form just in terms

5        of "resigned," but you can answer.

6    A.   Yeah, I was going to say I don't know if I'm

7        comfortable with the terminology, but he -- when we

8        were unable to contact him for a while, we obviously

9        were very concerned, my dad had one day received a

10       letter at his office in Connecticut stating something

11       to the effect that Ryan was no longer with the

12       company, I never saw the letter.  I didn't obviously

13       receive the letter, so I don't know the specifics of

14       what it said.

15            But my dad called me immediately and

16       obviously that made us extremely worried because we

17       already couldn't contact him and didn't know where he

18       was and he wasn't responding to us and messages

19       weren't getting delivered.

20            And so when we found out that he was no

21       longer with the company we just had no idea what was

22       going on and we knew how devastated he probably was

23       and so that's how I first found out.

24    BY MS. BUSTAMANTE:

25    Q.   Okay.  When was this?

Page 103

```
 1   A.   I do not -- I hate to speculate because I don't

 2        remember specific dates, but it would have been

 3        shortly before this was forwarded to me from -- from

 4        Hugo.  I don't know how shortly, it could have been,

 5        you know, it could have been a week, it could have

 6        been two weeks, I don't know specifics, but it was

 7        prior to Hugo sending me this.

 8   Q.   So I just want to clarify because we were talking

 9        about the terminology.  Did Ryan ever tell you that he

10        resigned from the De Tomaso board?

11   A.   No.

12   Q.   Did he tell you that he was going to go offline?

13   A.   No.

14   Q.   Did he tell you that he was going to turn off his

15        phone?

16   A.   No.

17   Q.   Ryan disappeared on or about May of 2022, right?

18   A.   It was at some point in May, towards the end of May, I

19        believe.

20   Q.   Did he tell you that he was scared for his safety?

21   A.   No, we did not know what was going on.

22   Q.   Did he ever tell you that you should be scared for

23        your safety?

24   A.   No.

25   Q.   Did he ever tell you --
```

```
                                              Page 104
 1   A.   Just wait, I'm sorry, can I ask you a question?
 2   Q.   Yeah.
 3   A.   Do you mean prior to him disappearing or ever?
 4   Q.   I mean prior to him disappearing or during the time
 5        that he was --
 6   A.   -- missing?
 7   Q.   -- missing, yes.
 8   A.   No, had no contact with him and he never mentioned
 9        anything about it prior.
10   Q.   Okay.  Did he ever tell you or your family that they
11        should be concerned for their safety?
12   A.   And again, this was prior, correct?
13   Q.   Yes.
14   A.   No.
15   Q.   What would you think if the reason he disappeared was
16        because he was scared for his safety and that of his
17        family?
18   A.   To confirm, did -- are you saying do I think that now
19        or at the time did I think that?
20   Q.   I mean, what -- what would you think if that is the
21        reason why?
22             MR. ZACH:  Object to the form.  And it
23        sounds like you are asking any time, so...
24   A.   Sorry, I just want to make sure that I answer you
25        correctly.  You are saying -- can you just restate it
```

1        one more time?

2    BY MS. BUSTAMANTE:

3    Q.    Yeah.

4    A.    Thank you.

5    Q.    So if he was scared for your safety or that of your

6          parents, is that something that he would have told you

7          at the time that he was scared for his safety or that

8          of your parents?

9    A.    It sounds like he was, you know, just afraid to do so,

10         from what I understand now.

11               At the time, there was no way of reaching

12         him, no way of contacting him.  Messages weren't

13         getting delivered.  Emails weren't being responded to.

14         I left voicemails.  Like, we all were doing whatever

15         we could to find him.

16               We had no understanding of why he, you

17         know, wasn't responding or why we couldn't get into

18         contact with him.

19               And so at the time, yeah, we -- we had

20         absolutely no idea what was going on.

21               We later were informed of the reason why he

22         did that and that it was because he was afraid for his

23         safety, but, which obviously is, you know,

24         heartbreaking to hear, but we did not, we were not

25         made aware of anything prior or during.

Page 106

```
 1   Q.   I understand that he didn't tell you at the moment and
 2        I understand that later you found out --
 3   A.   Mm-hmm.
 4   Q.   -- but my question is, would you expect him to tell
 5        you at the moment that he thinks you are in danger to
 6        warn you of the danger?
 7                  MR. ZACH:  Object to the form and
 8        foundation.
 9   A.   I would say -- I don't, you know, I don't know, I
10        don't really know what the -- the right way someone is
11        supposed to act when they are afraid for their own
12        life.
13                  I think his priority was his safety and
14        likely not wanting to get my family or, you know, or
15        myself, so him not wanting to get his family involved
16        in any way.
17                  You know, there were certainly times where,
18        during the period where he was missing, where, you
19        know, we were beside ourselves; and then, you know,
20        there were days I was so mad, because it was, like,
21        you know, "why can't you just reach out and let us
22        know if you're okay, like, all we want to know is if,
23        you know, you're okay."  But we had no idea of what
24        was going on.
25                  I think for anybody who goes through a
```

```
 1        traumatic experience like that it's natural to feel
 2        emotions like that.
 3                   But when we ultimately, you know, found
 4        him, and he made us aware of why he did what he did,
 5        we felt like he did what he did to protect everybody
 6        involved because I think if you inform, you know, if
 7        you inform any, if you inform your family member and
 8        tell them your, you know, "your life is in danger," he
 9        might have thought we would have taken action and that
10        isn't what he obviously wanted.  So he did what he
11        felt he had to do to keep himself safe at the time.
12   BY MS. BUSTAMANTE:
13   Q.   I understand that we don't know how someone is going
14        to react to a very stressful situation, but my
15        question is, if you were physically in danger, would
16        you expect Ryan to tell you if he knew that?
17                   MR. ZACH:  Objection.
18   BY MS. BUSTAMANTE:
19   Q.   In order to protect yourself?
20   A.   I don't know if, you know, I think he viewed himself
21        as being in danger and I don't think at the time he
22        viewed, you know, maybe me specifically as being in
23        danger, having had no idea of anything that was going
24        on, so I can't really, I would say if he -- if he felt
25        that that was the case, then I guess yes, but also, I
```

```
1        think he's a very smart person and I think that he --
2        he felt that he was doing, I trust that he felt like
3        he was doing what he had to do at the time to keep
4        himself safe and I didn't, you know, I didn't
5        personally know that I myself was, you know, at risk
6        during that time.
7   Q.   So is that a yes?
8                    MR. ZACH:  Objection.
9   A.   I don't -- you know, I don't really know how to answer
10       that question.
11  BY MS. BUSTAMANTE:
12  Q.   So my question was, if Ryan thought you were in
13       danger, would you expect him to warn you that you were
14       in danger, not what he did, not what he explained
15       after, would you expect him to warn you to protect
16       yourself?
17                   MR. ZACH:  Objection to the form and asked
18       and answered.
19                   MS. BUSTAMANTE:  I have -- she hasn't
20       answered my question.  I've asked it maybe three
21       times, I've asked it maybe several times, I haven't
22       gotten an answer.
23                   MR. ZACH:  The record is what it is.  I'm
24       not instructing her not to answer; I'm not her lawyer.
25       I'm just making my record.
```

Page 109

```
 1   A.   It's just -- I'm sorry that I haven't, you know,
 2        provided a direct answer, it's just hard because, you
 3        know, situations like this aren't always black and
 4        white, and in the situation that he was in, if I
 5        myself, if he thought I or my parents were in danger
 6        then I think that he was taking the steps that he --
 7        by not informing us of anything, then he might, maybe
 8        that was his way of protecting us, so that is the way
 9        that I view the situation.
10                  To -- if I had to provide a yes or no
11        answer to what you asked, yes, I would think that if
12        my life was in direct danger, that somebody would tell
13        me, but again, I think I just have, you know, viewed
14        it as him doing what he felt he needed to do to keep
15        himself and his family safe.
16   BY MS. BUSTAMANTE:
17   Q.   Did he ever say that he was scared?
18                  MR. ZACH:  Objection to form.
19   A.   Just to clarify, you mean after he had been found and
20        we had been in contact with him?
21   BY MS. BUSTAMANTE:
22   Q.   Yes.
23   A.   He did, you know, I don't know if those were his exact
24        words, but he did state that he, you know, he felt
25        unsafe, yes.
```

```
                                              Page 110
 1   Q.   Okay.  Did he say that he was scared for him or for

 2        you?

 3                  MR. ZACH:  Object to the form.  You can

 4        answer.

 5   A.   He stated that he, you know, was scared for himself

 6        and that he didn't want, at the time when he was

 7        first, when he first came home, he didn't want anybody

 8        to know that he was home because of safety reasons.

 9   BY MS. BUSTAMANTE:

10   Q.   When did he tell you that?

11   A.   I truly do not recall the date of when he finally came

12        home.  I would have to speculate, if -- if that's

13        okay.

14   Q.   On or around the end of June, July, August?

15   A.   It was, if I had to guess, I would say likely, I

16        don't -- I don't know if it was the end of June or if

17        it was July, but, and I don't know certainly, like,

18        the date that any of those discussions happened.

19   Q.   What did he tell you?

20   A.   All that was specifically told to, at least to me was

21        that Norman, things with him and Norman, you know,

22        that Norman was essentially trying to, you know, not

23        do right by him, and that he felt that his life was --

24        he felt that he was unsafe.  He didn't share any other

25        details with me until, like, really the lawsuit came
```

1          out and everything went public.  That's kind of the
2          only time that I learned of the details.
3     Q.   Did he tell you in person or in writing?
4     A.   When he had come home, I went home to -- to see him
5          and to be with my parents so we could all be together.
6     Q.   So when he came back, he told you that he felt unsafe,
7          but he didn't tell you why?
8     A.   I don't -- I mean, the details of the discussions are
9          hard to obviously recall everything, but -- but yes,
10         all I had kind of known and what I could recall is --
11         is that, you know, obviously something had happened
12         and that they were, you know, essentially trying to
13         screw him over and that he -- he didn't feel safe and
14         it was important that, you know, people didn't know
15         that he was home at the time for safety reasons and,
16         again, that's all that I knew at the time.
17    Q.   Okay.  So help me understand.  He disappeared on or
18         around May and he didn't come back to you until on or
19         around July.  So he's been gone for at least a
20         month-and-a-half, and he comes back and he tells you
21         he's unsafe and this is a pretty traumatic experience
22         in your life, because he's your only brother and he's
23         been missing for a month-and-a-half and you don't
24         remember what he said that he was unsafe about?
25                   MR. ZACH:  Object to the form.

1  A.   He felt like his, obviously, was -- felt like his --

2       like his, he had been threatened, but I, he -- he

3       didn't share details, or at least I can't remember

4       details of the conversation.  I don't think that he

5       wanted to share any details of what had, you know,

6       specifically happened with he and Norman in the

7       company.

8  BY MS. BUSTAMANTE:

9  Q.   He told you he was threatened?

10 A.   And you know, he may have shared this information

11      with, you know, my parents, but, like, I'm just

12      telling you what discussions that I had.

13 Q.   And in the discussions that he had with you, did he

14      tell you he was threatened?

15 A.   I -- I believe so, yes, I don't recall if that came

16      directly from him or if it was from him to, you know,

17      my parents to me, but yes, that was discussed.

18 Q.   Did he tell you who threatened him?

19 A.   I believe Norman.

20 Q.   Did he show you the threats?

21 A.   No.  I never saw anything.

22 Q.   What were the threats?

23 A.   I don't know specifics.

24 Q.   So all you knew was that he felt unsafe from something

25      and that he was vaguely threatened by Norman?

Page 113

 1              MR. ZACH:  Objection; misstates prior
 2         testimony.
 3              MS. BUSTAMANTE:  She can clarify it.
 4    A.   Can you repeat your statement one more time?
 5    BY MS. BUSTAMANTE:
 6    Q.   So what you knew was that he disappeared for a
 7         month-and-a-half because he felt vaguely unsafe about
 8         something and was threatened by Norman over something?
 9              MR. ZACH:  Same objection.
10    A.   I -- I know that they were, you know, trying to push
11         him out of the company.
12    BY MS. BUSTAMANTE:
13    Q.   Who was trying to push him out of the company?
14    A.   This is all my understanding in and of itself it's all
15         Norman is what I'm, you know, was told.  And that his
16         life was -- was threatened.  That's what I know.  And
17         that's what I --
18    Q.   Norman threatened his life?
19    A.   That's what my understanding of the situation was,
20         that he didn't feel unsafe, and that's -- that's my,
21         yes, that's how I took the conversation's intent.
22    Q.   After he filed the Complaint, did he tell you anything
23         else about those threats?
24    A.   No.
25    Q.   Did he tell you anything about why it is that he felt

Page 114

```
 1        unsafe?
 2   A.   What I told you is what I know.
 3   Q.   During the time that he disappeared, do you know where
 4        he was?  Obviously not at the moment, but after the
 5        fact?
 6   A.   It's my understanding that I believe he was kind of
 7        just staying in various different hotels.  I don't
 8        think he was staying in any one specific place.  But I
 9        don't know all of the places that he was.
10   Q.   Did he tell you that he stayed at a De Tomaso Airbnb
11        in Lake Como?
12                  (Reporter clarification at 1:04 p.m.)
13   A.   So that is the last place that I had communication
14        with him before he went missing.  He had FaceTimed me,
15        I don't remember what the -- the date was, but it
16        was -- it was in May, and, you know, once that was
17        over, I don't know if he had spoken to my parents that
18        day or not as well, but after that call, I knew that
19        he was in Lake Como.
20                  After that call, I didn't hear from him
21        again until we were able to find him and that's when,
22        you know, we were obviously doing everything we could
23        to figure out what happened and where he was.
24   BY MS. BUSTAMANTE:
25   Q.   So he FaceTimed you while he was in Italy, right?
```

Page 115

1    A.    Yes.

2    Q.    And did at any point in that conversation, he tell you

3          that he felt threatened?

4    A.    Not during that discussion.  I could tell during our

5          FaceTime that he, some -- some, like he seemed -- he

6          seemed a little somber, a little bit different in

7          terms of his demeanor and he had mentioned something

8          about, like, an argue -- something like a disagreement

9          with Norman, but it wasn't something that I had taken

10         as serious by any means, but at the time he was still

11         there with, you know, my understanding was, the other

12         folks from the De Tomaso team.  I'm not sure who all

13         was there.  I still kind of assumed everything was

14         fine.  And then, you know, we obviously weren't able

15         to reach him after that and then my dad received that

16         letter shortly thereafter.

17   Q.    Okay.  I want to break that up a little bit.  You said

18         he FaceTimed.  Was the camera on or off?

19   A.    It was on.

20   Q.    Could you see where he was, was he at the airport or

21         was he at the Airbnb already?

22   A.    I think he was -- I think he was at the Airbnb.

23   Q.    Was he alone or was he with other people?

24   A.    Well, he was alone when he was talking to me, but it's

25         my understanding that other people from the, you know,

```
 1          he was in Lake Como with other people from the De
 2          Tomaso team.
 3    Q.    And he didn't specifically tell you that someone
 4          threatened him at that point, he seemed --
 5    A.    At that point, no.
 6    Q.    Okay.  What specifically did you talk about?
 7    A.    I do not recall.  It was, yeah, I -- I don't recall
 8          specifics.  It wasn't a super long conversation, but
 9          it was years ago at this point.  So...
10    Q.    You said that he had mentioned a disagreement with
11          Norman.  That was during that call or was that before
12          that call?
13    A.    No, that was -- I -- that was on that call.  It was
14          the only time, I believe, from what I can recall, that
15          I had heard him ever mention anything about, like, a
16          disagreement with them and so that's why I kind,
17          that's why I remember it, because it kind of surprised
18          me.
19    Q.    Okay.  Do you know what the Enigma Network is?
20    A.    No.
21    Q.    Has Ryan ever mentioned it to you?
22    A.    No.
23    Q.    Are there any -- are there any other times in Ryan's
24          adult life in which he has disappeared like this
25          before?
```

```
 1   A.   Never.

 2   Q.   Are there any other times where you tried to get in

 3        touch with him and he just wouldn't respond at all?

 4   A.   I know you asked this earlier in the call as well.  I

 5        believe, like, never to the extent of -- of when we

 6        were unable to find him for, you know, several weeks,

 7        months.  There might have been a couple days that went

 8        by where he didn't respond because he was busy, but he

 9        would always get back to me, you know, after, you

10        know, however, you know, a couple days or whatever, I

11        don't obviously want to speculate on timing, but

12        and -- and just let me know that he was busy and he

13        would, you know, call the next day to catch up or

14        whatever it may be, so never to the extent of when he

15        went missing.

16             And, you know, messages, like, weren't even

17        getting, you know, delivered, like, if you send a text

18        to someone, it would say delivered, so, like, that was

19        also concerning, we couldn't even get anything to, you

20        know, go through, so...

21   Q.   So, my understanding is that your family filed a

22        police report for a missing person at this time,

23        right?

24   A.   So we did contact, my parents reached out to the local

25        police in our hometown to inform them of, like, what
```

Page 118

1      was going on, and I don't know if -- I don't believe a

2      formal missing person's report was actually filed,

3      because, and again, I'm not, I wasn't the one doing it

4      so, like, I'm, you know, I don't want to be

5      misspeaking, but we -- we didn't want to -- things to

6      get public that, you know, we didn't know where he

7      was, and you know, all we knew is we couldn't find him

8      and he had dedicated his entire life for however many

9      years it was to this company, we knew that, and my dad

10     gets this letter that's saying that he's no longer

11     with the company and we had no idea what was going on,

12     so we obviously had no idea what to expect and we

13     were, you know, extremely emotional and didn't know

14     what was going on and we wanted to find him but we

15     didn't want to embarrass him and make anything overly

16     public that would, if he saw it, prevent him from, you

17     know, coming home.

18              And so I don't know if, like, maybe one was

19     filed, but it was not one that went public or maybe it

20     wasn't officially filed, and they were just, we had

21     them helping us look for him.  But they did help us to

22     actually locate him and they were the first people to

23     reach out to my parents and let them know that they

24     had found him.

25  Q.  So I asked you if there were any other times where you

Page 119

1          tried to get in touch with Ryan and he wouldn't
2          respond at all and then you said never to this extent?
3     A.   Mm-hmm.
4     Q.   To what extent?  Just that you understood he was busy
5          with work?  Did you ever get...
6     A.   I mean, this was, this was weeks, you know, months
7          potentially.  Again, I don't want to speculate on
8          exact dates, but that were -- we had no idea where he
9          was, we couldn't get in contact with him via phone,
10         email, any -- text, voicemails, responding to nothing;
11         phone going right to voicemail, texts not being
12         delivered, emails not being responded to.
13                   And then to know that, you know, Hugo also
14         didn't know where he was.  That also was extremely
15         concerning.  Then to receive that letter.  You know,
16         all of this combined is, obviously would send anybody
17         into a panic.
18    Q.   So I'm talking about the other times when he would go
19         by without talking, did it ever occur to you that he
20         was missing or just --
21    A.   No, never.
22    Q.   This was the only time that you were concerned for his
23         safety?
24    A.   Yes.
25    Q.   Is it common for Ryan to take time to himself when

Page 120

```
 1        he's having a hard time?
 2   A.   Kind of, do you just mean to kind of like -- like shut
 3        off, or -- can you kind of clarify?
 4   Q.   Yeah.  Shut off or isolate or just keep by himself
 5        when he's having a hard time.
 6   A.   Yeah, I would say, as I mentioned earlier, he can be
 7        private and keep to himself at times.  Because he
 8        traveled so much, I would say it was not common for us
 9        to always know, like, is he having a hard time right
10        now or is he having -- not having a hard time right
11        now, because we weren't with him all the time.  So I
12        guess that distinction is kind of hard to make, but he
13        does, he is somebody who certainly, you know, keeps to
14        himself.
15   Q.   After Ryan did resurface, did he tell you that he
16        thought anyone might come after him?
17   A.   I don't know that I recall him using those specific
18        words to me.  I just knew that he felt unsafe, but I
19        don't recall those, him stating that specifically to
20        me, no.
21   Q.   Do you recall or do you know whether he stated that to
22        someone else?
23   A.   That somebody would come -- come after him
24        specifically?
25   Q.   Yes.
```

Page 121

1    A.    I'm not sure.

2    Q.    Did he tell anything to your parents that they related

3          to you?

4    A.    I know that they -- that they also were aware that he

5          had felt like his life was threatened, but again,

6          that's -- that's what I know.  I don't know details

7          of, you know, what exact threats were made or, you

8          know, who exactly said them and at what time.  I don't

9          know those details.

10   Q.    So you don't know exactly who threatened his life, if

11         anyone?

12   A.    I'm -- I have always been under the impression that it

13         was Norman who did so, but...

14   Q.    Why did you think it was Norman?

15   A.    Because I knew that they, that they had had, a

16         disagreement, things weren't going well with them, so,

17         yeah, that's who, yeah, that -- that has been my -- my

18         assumption.

19   Q.    But you just assumed Norman threatened him.  Ryan

20         didn't tell you that?

21   A.    No, he, I do believe that he, you know, had stated,

22         again, this is years ago at this point, but that --

23         that Norman had threatened him, and again, as I've

24         stated, that's what I know, details of the threat are

25         not something that were related to me.

1   Q.   Okay.  This is important, so I just want to know

2        exactly what you know.

3                   You understood that Norman threatened

4        Ryan's life because Ryan told you so?

5   A.   It was either stated to me or that might have been

6        stated to my parents and then relayed to me, but I do

7        believe that was stated, yes.

8   Q.   So either because he told you directly or he told your

9        parents, but it was because Ryan told you that Norman

10       threatened his life?

11                  (Reporter clarification at 1:16 p.m.)

12  A.   Yes.

13  BY MS. BUSTAMANTE:

14  Q.   Do you know a person named Samuel Lui?

15  A.   I do not.

16  Q.   Have you ever heard the name Sam Lui?

17  A.   No.

18  Q.   Okay.  Did Ryan ever tell you that Sam threatened him?

19  A.   No.

20                  MR. ZACH:  Objection.

21  BY MS. BUSTAMANTE:

22  Q.   Did Ryan ever tell you that Sam was drafting messages

23       for him?

24                  MR. ZACH:  Objection; she testified that

25       she doesn't know who this person is.

Page 123

```
 1   A.    Yeah, I don't know any -- anything about Sam.

 2                 MS. BUSTAMANTE:  Okay.  The videographer

 3         needs a little minute.  Can we take a ten minute break

 4         and we can regroup?  Just the file size is too big.

 5                 THE WITNESS:  Okay.

 6                 MR. ZACH:  I won't hold you to it, but how

 7         long do you --

 8                 THE VIDEOGRAPHER:  Would you like to go off

 9         the record?

10                 MR. ZACH:  Okay.

11                 THE VIDEOGRAPHER:  Off the record at 1:17

12         p.m.

13                 (Off the record at 1:17 p.m.)

14                 (Back on the record at 1:30 p.m.)

15                 THE VIDEOGRAPHER:  All right.  We're back

16         on the record at 1:30 p.m.  This marks the beginning

17         of media unit 4.

18   BY MS. BUSTAMANTE:

19   Q.    Chelsea, Ryan is a pretty big and strong guy, right?

20                 MR. ZACH:  Objection to form.

21   A.    You said a pretty big and strong guy?

22   BY MS. BUSTAMANTE:

23   Q.    Yeah.  I wanted to clarify, like, strong -- not me,

24         just saying he's big.

25                 MR. ZACH:  Objection; form.
```

Page 124

1   A.   He's in good shape.

2   BY MS. BUSTAMANTE:

3   Q.   He works out a lot?

4   A.   He does.  He's, I would say, I guess your -- your

5        average male height.

6   Q.   Your average is a lot taller than mine is.  Wow.

7             He's pretty fit, right?

8   A.   He's fit, yep.

9   Q.   And you said you've met Norman, right?

10  A.   Yes.

11  Q.   Norman, comparably, is very small next to Ryan, right?

12             MR. ZACH:  Objection.

13  A.   Yes.

14  BY MS. BUSTAMANTE:

15  Q.   When you found out that Ryan said that Norman

16       threatened his life, did you find it odd that Ryan was

17       scared?

18             MR. ZACH:  Objection.  But go ahead.

19  A.   No.

20  BY MS. BUSTAMANTE:

21  Q.   Did you think that Ryan was genuinely scared for his

22       safety?

23  A.   I did.  I don't think that he would have disappeared

24       in the way that he did if he was not genuinely afraid.

25  Q.   Did you think that Ryan was reasonable in thinking

Page 125

```
 1        that Norman had physically threatened him?
 2                  MR. ZACH:  Objection to form.
 3   A.   I was never, you know, made aware of the details of
 4        how the threat was made or what, so, you know, so I'm
 5        not sure.  I didn't think of it in terms of just
 6        physicality.
 7   BY MS. BUSTAMANTE:
 8   Q.   Well, if it wasn't a physical threat, then what was
 9        your understanding of how Norman was threatening Ryan?
10                  MR. ZACH:  Objection; asked and --
11   A.   I don't --
12                  MR. ZACH:  Go ahead.
13   A.   Again, I, you know, details -- these specifics were
14        never made, you know, verbally stated to me and so I
15        really just don't want to speculate, but yes, I'm
16        agreeing with you that in terms of their physical
17        size, yes, my brother is a taller, more muscular
18        person.
19   BY MS. BUSTAMANTE:
20   Q.   Did you know that Ryan moved next door to Norman?
21   A.   I was aware that --
22                  MR. ZACH:  Objection to form, but you can
23        answer.  Go ahead, I'm sorry.
24   A.   I'm aware that he also lives in -- in Hudson Yards.
25   BY MS. BUSTAMANTE:
```

Page 126

```
 1   Q.   Are you aware that the building in which your brother
 2        lives is exactly next to Norman's?
 3   A.   Yes.  I don't know which specific building it is, I
 4        know that there are a few, but I knew that he lived in
 5        one of them.
 6   Q.   Did you find it odd that Ryan purposely moved next
 7        door to the person who he says threatened his life?
 8                  MR. ZACH:  Objection.
 9   A.   No.  He -- he has always said that he has felt safe
10        there, and so I just trust that he, you know, knows
11        what's best for him and what he feels comfortable
12        with.
13   BY MS. BUSTAMANTE:
14   Q.   So I understand that he says he feels safe there, but
15        he disappeared for a month-and-a-half because someone
16        threatened his life and then he proceeded to move
17        right next door to that person, did you not find that
18        odd?
19                  MR. ZACH:  Objection.
20   A.   No, at the end of the day it's, you know, not my
21        decision to make.  There's, you know, things are
22        public now.  There's security in the building, so I
23        think he feels comfortable, obviously, with the
24        decision that he made.
25   BY MS. BUSTAMANTE:
```

1    Q.    So you didn't find it odd that he moved next to them?

2                    MR. ZACH:  Objection; asked and answered.

3                    MS. BUSTAMANTE:  Well, if he's telling me

4          what he feels right now, I'm asking her what she felt

5          when she found out that he moved next to the

6          Defendant.

7    A.    I, there, you know, I did certainly ask at one point,

8          like, if he, you know, if he felt like that was the

9          right decision and he did.  And he felt confident in

10         it and, yeah, so again, not -- not my decision to

11         make, so...

12   BY MS. BUSTAMANTE:

13   Q.    Did he tell you why he felt confident in that

14         decision?

15   A.    No.

16   Q.    During the time that Ryan was employed at De Tomaso,

17         did he ever tell you about any wrongdoing by anyone at

18         De Tomaso?

19   A.    No.

20   Q.    How about after he resigned or after he was

21         terminated?  Did he tell you about any wrongdoings by

22         anyone involved at De Tomaso?

23   A.    All that I know is what, you know, I publicly read in

24         the lawsuit and the articles that were posted, and

25         that's -- that's pretty much it.  He didn't share

Page 128

1       specifics with me.

2  Q.   So the only wrongdoings that you know about are those

3       alleged in the Complaint and anything that is posted

4       in the De Tomaso article, correct?

5  A.   Yeah.

6  Q.   Did Ryan tell you that after he resigned from the

7       board of De Tomaso that he started investigating De

8       Tomaso?

9  A.   No.

10 Q.   Did he tell you that he thought that people had been

11      involved in any wrongdoings?

12           MR. ZACH:  Objection.  I think it was asked

13      and answered, but go ahead.

14 A.   No, again, I just know, you know, what I read in -- in

15      the articles.

16 BY MS. BUSTAMANTE:

17 Q.   Did he tell you about any China connections that

18      De Tomaso had?

19 A.   No, not that I'm aware of.

20 Q.   Do you know what Ryan is up to now?

21           MR. ZACH:  Objection to form.

22 A.   You know, like, he has just been, and just to confirm,

23      are you asking professionally or personally?

24 BY MS. BUSTAMANTE:

25 Q.   Everything.

Page 129

```
 1              MR. ZACH:  Objection to form.
 2    A.   You know, I know...
 3    BY MS. BUSTAMANTE:
 4    Q.   Do you -- do you know what Ryan is working on
 5         professionally at the moment?
 6    A.   I do not.  I know that he has been focusing on, you
 7         know, the -- the lawsuit and what's going on right now
 8         and I've not been made aware of anything that he's
 9         working on professionally, no.
10    Q.   Do you know what Ryan does in his free time other than
11         Linkin Park concerts?
12    A.   He is very into health and wellness and fitness so he
13         spends a lot of time exercising, working out, going
14         for walks, runs, et cetera, does a lot of reading, but
15         yeah, definitely spends a lot of time at Whole Foods
16         and keeps to just, you know, a lot of, I'd say he
17         doesn't have a very big social circle at the moment in
18         terms of, you know, city life.
19    Q.   Do you know whether Ryan has a job?
20    A.   I'm sorry, can you say that one more time?  I don't
21         know why my Zoom crapped out.
22    Q.   Do you know whether Ryan has a job?
23    A.   I don't believe he does, to my knowledge.
24    Q.   Do you know whether he has any sort of income?
25    A.   To my knowledge, no.
```

1   Q.   How is he paying his rent?

2   A.   Again, not information that I'm aware of, you know,

3        I've never been close to his finances, but I know that

4        he, you know, has, again, worked for my father in the

5        past, invests, has made money, you know, at different

6        phases in his life, but he keeps those matters

7        private, however.

8   Q.   So your understanding is that he's living off of his

9        investments right now?

10  A.   I do not -- I do not know.  I don't want to speculate

11       but I'm unaware of, you know, his current status of

12       income.

13  Q.   Do you know whether your parents are helping him

14       financially?

15  A.   I'm not aware.

16  Q.   Are your parents financially -- helping you

17       financially at the moment?

18            MR. ZACH:  Objection to relevance, but you

19       can -- you can answer.

20  A.   I am paying, while I'm in this kind of, you know,

21       period where I'm not, I'm searching, actively

22       searching for another job, I am still paying for my

23       own expenses.  There have been things that my father

24       has helped me with here and there because I've had,

25       you know, the usual, a million wedding trips, et

Page 131

1          cetera, to pay for this summer, but -- but yeah, so I
2          have received some help from my father.
3     BY MS. BUSTAMANTE:
4     Q.    Okay.  So it wouldn't be abnormal if Ryan is also
5          getting help from his father?
6                    MR. ZACH:  Objection.
7     A.    I -- I don't, again, just speculating, I don't believe
8          that he is, but I'm just, you know, that's just my
9          speculation.
10    BY MS. BUSTAMANTE:
11    Q.    Okay.  Do you know if he's ever considered going back
12         to work for your dad?
13    A.    Not to my knowledge.
14    Q.    Why not?
15                   MR. ZACH:  Objection.
16                   MS. BUSTAMANTE:  If she knows.
17    A.    I just, you know, he loves the car world so much.  I
18         know he's always wanted to have a career in the car
19         industry, and so, you know, it's just, I think that's
20         always been his goal.  So I, at least as far as I'm
21         aware, he has not expressed any interest in working
22         for my father.
23    BY MS. BUSTAMANTE:
24    Q.    Do you think your dad would take him back into the
25         company if he were to want to come back?

1   A.   I do.

2                MR. ZACH:  Object --

3   BY MS. BUSTAMANTE:

4   Q.   Okay.  Has Ryan ever mentioned going back to school?

5   A.   No.

6   Q.   Has he mentioned job opportunities with any other car

7        companies?

8   A.   No.

9   Q.   Has he told you that he has been looking for jobs, but

10       has been unable to find one?

11  A.   No.

12  Q.   You're not aware of any interviews he's had?

13  A.   No.

14  Q.   Any active job applications?

15  A.   No.

16  Q.   Has he ever told you that he has not been able to get

17       a job in the car industry because his reputation has

18       been harmed by De Tomaso?

19  A.   No.

20  Q.   As far as you know, has Ryan ever been diagnosed with

21       any mental health issues?

22  A.   No.

23                MR. ZACH:  Objection.  Actually, I'm going

24       to instruct you not to answer that question.

25  BY MS. BUSTAMANTE:

Page 133

1   Q.   Any reason we cannot rely on your testimony today,
2        Chelsea?
3   A.   No.
4   Q.   Did you understand all of my questions?
5   A.   I did.
6   Q.   Are you under any medication that could have impacted
7        your ability to tell the truth today?
8   A.   No.
9   Q.   Okay.
10              MS. BUSTAMANTE:  All right.  I have no
11        further questions.  I don't know if you have any,
12        John.
13              MR. ZACH:  I have two minutes.
14                        EXAMINATION
15   BY MR. ZACH:
16   Q.   Good afternoon, Ms.Berris.  I think you previously
17        testified that you and I met for about 30 minutes.  Do
18        you recall that?
19   A.   I do.
20   Q.   Where did that meeting take place?
21   A.   In the Hudson Yards office.
22   Q.   And how close is that to Mr. Berris's apartment?
23   A.   Extremely close.  I feel like a five minute walk.
24   Q.   And you've appeared here today without counsel, right?
25   A.   Correct.

Page 134

1   Q.   So you have not hired an attorney or prepared for this
2        deposition with outside counsel, right?
3                  MS. BUSTAMANTE:  Objection, form.
4   BY MR. ZACH:
5   Q.   That's fair.
6                  You have not -- you have not hired your own
7        attorney and prepared with that attorney for this
8        deposition?
9   A.   I did not.
10  Q.   And in meeting with me, you didn't review any of the
11       documents that you saw today, right?
12  A.   No.
13  Q.   So this was of would be the first time that you saw
14       those documents since they happened sort of in real
15       time?
16  A.   Correct.
17  Q.   And your college degree was in marketing, right?
18  A.   Correct.
19  Q.   And your subsequent career has been in marketing,
20       right?
21  A.   Correct.
22  Q.   And the various communications, the confidential
23       communications that you were shown by Ms. Bustamante,
24       would you characterize those as marketing-type
25       activity?

1          MS. BUSTAMANTE:  Objection; form.

2    A.    Would I characterize them as marketing activity?

3    BY MR. ZACH:

4    Q.    Yeah.

5    A.    Yeah.  Press releases, you know, things of that

6          nature, yeah, so all marketing related.

7    Q.    And those are the sorts of items that you would deal

8          with and have dealt with in the ordinary course of

9          your career in marketing, right?

10          MS. BUSTAMANTE:  Objection; form.

11   A.    Yes.

12   BY MR. ZACH:

13   Q.    And after you received those, you never shared them

14         with anyone else, right?

15   A.    No.

16   Q.    You viewed them as being confidential as between you

17         and your brother, right?

18   A.    Yes.

19   Q.    And as I think you've testified a number of times, you

20         and your brother are very close, right?

21   A.    Yes.

22   Q.    And so your testimony is that you kept that

23         information confidential, when he receives it, and

24         going forward in time, right?

25   A.    Yes.

Page 136

1    Q.    And you provided your comments to your brother for

2          free, right?

3    A.    Yes.

4    Q.    And as I understand your testimony, you did that sort

5          of out of the, you know, the sibling relationship in

6          which you guys are close, right?

7                      MS. BUSTAMANTE:  Objection; form.

8    A.    Yes.

9    BY MR. ZACH:

10   Q.    And maybe to put it more simply, you were just helping

11         your brother out, right?

12   A.    Yes.  Correct.

13                     MR. ZACH:  No further questions.

14                     MS. BUSTAMANTE:  We have no further

15         questions.

16                     THE VIDEOGRAPHER:  All right.  This

17         concludes today's deposition.  The time is 1:46 p.m.

18         We are now off the record.

19                        (The Zoom Videoconferenced/Video Recorded

20             deposition was concluded at 1:47 p.m. EDT

21             Signature of the witness was not requested by

22             counsel for the respective parties hereto.)

23

24

25

Page 137

1                         CERTIFICATE

2

3   STATE OF MICHIGAN

4   COUNTY OF OAKLAND

5                   LORI ANN BALDWIN, a Notary Public in and

6            for the above county and state, do hereby certify that

7            this remote deposition was taken before me, via Zoom

8            Videoconference, at the time and place hereinbefore

9            set forth; that the witness was by me first duly

10           remotely sworn, via Zoom Videoconference, to testify

11           to the truth; that this is a true, full and correct

12           transcript of my stenographic notes so taken to the

13           best of my skill and ability; and that I am not

14           related, nor of counsel to either party, nor

15           interested in the event of this cause.

16

17

18

19                        *Lori Baldwin*

20

21           Lori Ann Baldwin, CSR-5207, RPR, CRR

22           Notary Public

23           Oakland County, Michigan

24           My commission expires:  December 21, 2025

25

**[000221218-222 - able]**                                Page 1

| 0 |
| --- |

**000221218-2...**
  4:4 85:22
**000334676**   3:23
  79:2
**000337348**   3:25
  82:5
**000341830**   4:2
  84:21
**00221287-289**
  4:6 90:4
**04305**   1:7 5:12

| 1 |
| --- |

**1**   3:16 5:7 54:9
  54:13 79:8
**10**   1:18 5:2
**10001**   2:6
**10:02**   1:19 5:3
  5:6
**10:38**   29:18
**10:54**   39:10,12
**10th**   5:7
**11:09**   48:8
**11:14**   51:5,21
  51:22
**11:25**   51:19
**11:28**   51:23,25
**11:30**   54:2,3
**11:34**   54:4,6
**11:50**   64:10
**12**   72:18
**1288**   90:9
**12:08**   76:3
**12:12**   79:3

**12:16**   82:6
**12:20**   84:22
**12:22**   85:23
**12:29**   90:5
**12:35**   94:10
**12:43**   99:20
**133**   3:9
**18th**   55:5
**19**   91:8
**1:04**   114:12
**1:16**   122:11
**1:23**   1:7 5:12
**1:30**   123:14,16
**1:46**   136:17
**1:47**   136:20

| 2 |
| --- |

**2**   3:20 52:1
  75:22 76:1
  79:12
**20,000**   48:19
  49:5
**20006**   2:15
**2001**   55:3
**2018**   35:6
  67:23 99:12
**2019**   34:24
  35:4 65:21,23
  99:12
**202.747.1931**
  2:16
**2020**   7:9 86:7
  90:11
**2021**   76:6 79:5
  82:19 100:10
  100:12 101:1

**2022**   67:24
  85:1 86:4
  100:4 103:17
**2023**   67:23
**2024**   1:18 5:2,7
**2025**   137:24
**2099**   2:14
**21**   100:8,16
  137:24
**212.446.2300**
  2:7
**26737**   137:20
**28**   82:19

| 3 |
| --- |

**3**   3:22 54:7
  78:22 79:1
**30**   14:15 15:20
  133:17
**311**   7:6

| 4 |
| --- |

**4**   3:24 82:1,4
  123:17
**496**   95:8
**497**   95:8

| 5 |
| --- |

**5**   4:1 84:16,20
**5207**   1:21
  137:21
**54**   3:16
**55**   2:5
**5th**   90:11

| 6 |
| --- |

**6**   3:7 4:3 85:19
  85:21 95:5
**6863921**   1:23
**6th**   100:4

| 7 |
| --- |

**7**   4:5 89:25
  90:3 95:5,6
**76**   3:20
**79**   3:22

| 8 |
| --- |

**8**   4:7 86:4 94:5
  94:8
**82**   3:24
**84**   4:1
**85**   4:3
**8th**   76:5

| 9 |
| --- |

**9**   4:9 99:14,18
**90**   4:5
**94**   4:7
**99**   4:9

| a |
| --- |

**a.m.**   1:19 5:3,6
  29:18 39:10,12
  48:8 51:5,21
  51:22,23,25
  54:2,3,4,6
  64:10
**ability**   36:16
  133:7 137:13
**able**   6:19,21
  10:15 84:17

87:25 96:8
101:2,7 114:21
115:14 132:16
**abnormal**
131:4
**above** 137:6
**absolutely**
53:24 105:20
**abustamante**
2:17
**accept** 73:9
**accepted** 58:13
**access** 53:4
80:23,24 83:6
98:3
**accomplish**
88:9
**account** 98:4
**achieved** 29:15
**acquired** 72:4
**act** 106:11
**action** 107:9
**active** 132:14
**actively** 72:9
130:21
**activity** 134:25
135:2
**actual** 15:7
16:9 35:15,20
66:2 87:3 88:1
92:17 98:11
**actually** 20:2
31:8,16,18
32:22 34:7
37:13 50:8

52:22 56:9
67:18 72:9
75:2 92:1,9
101:5 118:2,22
132:23
**additional**
76:19
**address** 7:5,7
**adjustments**
88:18
**admired** 46:11
47:15
**adult** 58:1
116:24
**advertising**
67:17,20 75:1
75:3
**advice** 73:9
**advise** 73:19
**advising** 73:23
73:25 74:15
**affiliations**
5:18
**afraid** 105:9,22
106:11 124:24
**afternoon**
133:16
**agency** 72:5
74:23,24
**ago** 14:22
19:22 21:18
26:5,10,22
28:14 33:15
34:21 35:21
38:20 40:19

44:5 56:9
60:10 61:7,10
64:19,20 65:7
65:10,14 70:7
78:3 80:20
83:2 87:16
88:13,14 89:1
93:15 96:5
116:9 121:22
**agree** 38:7,18
68:19
**agreeing**
125:16
**agreement** 37:1
68:16 84:13
85:13
**agreements**
37:11 38:6
**ahead** 21:15
32:21 41:1
124:18 125:12
125:23 128:13
**airbnb** 114:10
115:21,22
**airport** 115:20
**al** 5:10
**alexandra** 2:11
5:23 6:24 14:2
**alleged** 128:3
**allowed** 13:18
**amore** 47:12,21
**amount** 19:23
55:19 69:7
**ann** 1:21 137:5
137:21

**annually** 67:22
**answer** 8:25
12:8 21:1
28:24 32:6,7
33:5 38:11,12
38:16,16 41:23
48:5 50:5,6,21
51:7 66:19
69:10 73:2
89:21 102:5
104:24 108:9
108:22,24
109:2,11 110:4
125:23 130:19
132:24
**answered** 32:5
39:1 50:23
108:18,20
127:2 128:13
**anxious** 36:9
**anybody** 74:16
79:23 106:25
110:7 119:16
**anymore** 22:17
**anytime** 29:19
83:11 92:18
**anyways** 11:11
**apart** 18:16
**apartment** 8:1
8:6 60:11 61:3
99:5 133:22
**apollo** 11:25
25:18 28:8
33:22 35:1
52:6 60:12

64:6 70:25

**apologize** 23:22
98:21

**appear** 83:18

**appearance**
5:20

**appearances**
2:1 5:17

**appeared** 91:19
133:24

**appearing** 2:9
2:19

**appears** 80:21
85:18

**applications**
132:14

**applying** 11:14

**appreciate** 93:8

**appropriate**
15:3 72:14

**aprivy** 64:8,11
64:14,16

**area** 35:10

**argue** 115:8

**article** 128:4

**articles** 127:24
128:15

**aside** 15:12

**asked** 15:22,23
16:11,12 17:1
23:7,9 32:5
39:1 54:22
68:20 69:5
73:21 75:10
90:23 92:18,18

98:9 101:12
108:17,20,21
109:11 117:4
118:25 125:10
127:2 128:12

**asking** 48:3,10
50:8,9 68:10
81:8 89:3
104:23 127:4
128:23

**asks** 90:17

**assist** 92:19

**assistant** 71:23

**assumed** 37:12
101:24 115:13
121:19

**assuming** 29:11

**assumption**
11:2 27:19
37:7 40:7
44:18 46:17
49:17 63:23
121:18

**attached** 3:14
86:17

**attachment**
87:3

**attachments**
76:11 100:12
100:21,25

**attend** 33:12
34:14 54:19,23
55:24 58:13
61:24

**attendance**
3:18 54:11

**attended** 32:2
33:6,13,19,21
34:12,17,19
52:4,9 56:13
57:15 58:16
59:23

**attendees** 35:21

**attire** 14:18
15:3

**attorney** 5:21
134:1,7,7

**attracted** 46:7
47:2

**august** 76:5
90:11 100:8,16
110:14

**auto** 75:7

**automobili** 1:9
94:16

**automobili.c...**
94:13

**avenue** 2:14

**average** 124:5
124:6

**avoiding** 19:9
19:15

**aware** 10:5,12
12:2 20:23
21:10 22:19,21
22:24 24:3
25:19 26:1
29:6 35:20
37:18 38:5,5

43:17 50:14,17
57:7,7 62:7,13
64:14,15,15,16
68:15 91:25
97:8 105:25
107:4 121:4
125:3,21,24
126:1 128:19
129:8 130:2,15
131:21 132:12

**awesome** 94:21

**b**

**ba** 1:21

**back** 18:21
19:3,5,24 20:1
35:24 51:3,19
51:23,24 54:4
54:5 60:10,13
61:2 86:20
90:17 111:6,18
111:20 117:9
123:14,15
131:11,24,25
132:4

**background**
15:9,22 16:1
17:3

**baldwin** 1:21
5:16 137:5,21

**band** 13:23

**base** 10:16

**basic** 15:12

**basically** 53:16

**basis** 8:11 96:1

**bathtub** 47:7
**beautiful** 46:13
47:14
**beginning** 5:20
6:11 27:22
42:5,7 51:25
54:6 77:16
123:16
**behalf** 2:9,19
5:25 59:7
**believe** 7:25
22:3,18,19,22
24:13 25:24
26:13,21 30:4
30:6 33:18,22
33:24 34:13
35:9 42:23
43:2,5 44:13
45:7,20 52:5
59:16 60:7
61:6,23 62:5
63:10,10 66:8
66:11 67:13
68:1,9 103:19
112:15,19
114:6 116:14
117:5 118:1
121:21 122:7
129:23 131:7
**berris** 1:5,17
3:4,23,25 4:2,4
4:6 5:8,9 6:3
7:2,16 20:7
39:14 79:2
82:5 84:21

85:22 90:4
**berris's** 133:22
**best** 17:22 88:8
126:11 137:13
**bet** 34:8 53:14
**better** 66:13
88:4 98:9
**big** 123:4,19,21
123:24 129:17
**bit** 8:16 9:3
10:10 11:9
18:11 20:5
35:22,23 51:12
51:13 88:4,19
91:18,21 98:25
115:6,17
**black** 109:3
**blood** 32:15
**bmw** 67:18
74:21 75:1
**board** 103:10
128:7
**body** 79:11
**boies** 2:4
**book** 58:6 76:9
78:7,9
**booked** 56:18
58:9,10,12
**boston** 7:13
**bottom** 86:3,9
86:10 90:9
94:12,18 99:25
**brand** 27:10
76:20

**break** 51:13,16
51:17,18
115:17 123:3
**breakfast**
60:23
**bridge** 3:18
33:19 43:3
54:11,25 58:14
**bridgehampton**
56:11
**bring** 33:2
64:24 65:18,25
66:15,16
**bringing** 45:4
**brother** 7:14,16
7:18 13:2
15:10,25 16:7
16:8,20,23
22:24 26:7
27:7 29:14
30:7 31:21,23
32:11 33:25
35:16 41:14
42:21 43:22,22
44:19 45:4
46:12 54:22
56:5,19 57:19
57:24,25 58:5
58:14 59:16
60:4 61:6,20
62:22 63:11,16
67:12 68:4
73:4,16,25
85:6 101:6
111:22 125:17

126:1 135:17
135:20 136:1
136:11
**brother's** 14:6
22:19 35:24
42:20 59:21
101:14
**brought** 44:12
44:15,20,22,23
47:16 73:23
74:7,8
**bsfllp.com** 2:8
**buell** 21:22
22:11,17 70:11
**build** 27:9
**building** 27:9
126:1,3,22
**business** 50:15
61:12 71:21
99:10
**bustamante**
2:11 3:7,19
5:22,23 6:9,24
9:2 12:12 13:4
14:4 21:8 23:6
28:12 29:1
30:1 31:24
32:18,23 34:10
38:22 39:16,24
40:24 41:3
42:2 46:18
47:1,10,19,25
48:9,18,23
49:12 50:3,7
50:18,25 51:11

51:18 52:2,20
53:4,7,12,17,22
53:24 54:12
57:23 61:16
64:11,13 66:23
68:12 69:19
70:21 73:15
74:19 76:4,22
77:22 79:4
80:2 82:7
84:23 85:24
89:24 90:6
92:25 93:9
94:11 98:17,20
98:22,24 99:21
102:24 105:2
107:12,18
108:11,19
109:16,21
110:9 112:8
113:3,5,12
114:24 122:13
122:21 123:2
123:18,22
124:2,14,20
125:7,19,25
126:13,25
127:3,12
128:16,24
129:3 131:3,10
131:16,23
132:3,25
133:10 134:3
134:23 135:1
135:10 136:7

136:14
**busy** 18:14,24
19:4,10,13,16
36:7 68:23
69:6,13 96:7
117:8,12 119:4
**butcher** 23:21
**butchering**
94:17
**buying** 61:17

**c**

**call** 8:15,17
90:20 114:18
114:20 116:11
116:12,13
117:4,13
**called** 6:4,14
21:22 33:18
64:6,8 72:5
102:15
**calling** 74:1
**calls** 27:25
**camera** 115:18
**cameron** 23:22
**campaign** 75:3
**campaigns**
31:4 67:18,20
68:3 71:2 75:1
**capacity** 64:25
74:18 76:17
**capital** 1:12
**car** 22:20 23:15
23:20 28:10
29:2 31:1
32:19,25 33:23

35:11 44:12
46:12,12,14
52:8 56:8
67:14 69:18
70:20,23 72:25
74:20,23 75:4
131:17,18
132:6,17
**card** 99:10
101:15
**career** 67:2
74:6 131:18
134:19 135:9
**careful** 81:5
**carmen** 44:9,23
45:6,10,18,24
46:2,13,19
47:6,11 48:16
48:20 50:2,13
50:20 52:24
55:9,11 56:5
62:6 63:10
77:6,9,18
**cars** 23:13 37:8
37:14 45:16
67:16
**case** 1:7 5:12
15:5,6 22:18
40:11 91:25
101:24 107:25
**catch** 61:3
117:13
**cause** 137:15
**center** 55:7

**ceo** 26:23 27:3
28:2 29:5
**certain** 8:20,20
9:12,13,16,17
51:8 71:15
**certainly** 7:25
8:21 9:8,21
10:10 11:9
22:8 26:7 67:5
70:18 73:25
74:15 75:5
87:15 95:22
106:17 110:17
120:13 127:7
**certificate**
137:1
**certify** 137:6
**cetera** 15:3,11
17:4 32:14
58:4 60:8
129:14 131:1
**chanel** 48:20
**change** 93:5
**changed** 18:7
37:17 91:15,21
92:6
**changes** 86:24
91:4,6 92:6
**changing** 92:17
93:1
**characterize**
41:6 43:9
134:24 135:2
**check** 8:17 13:6

checked  93:22
93:23
checking  68:25
chelsea  1:17
3:4,18 5:8 6:3
6:10 7:2,3 33:8
52:3 54:11,13
67:14 98:25
123:19 133:2
chicago  7:4,9
17:13 65:19
chief  72:24
china  128:17
choi  1:8,9 5:10
40:15
chris  20:7,9
cipriani  34:4
34:11 61:24
circle  10:5
129:17
city  7:11,20
17:14 18:10
31:19 33:16,23
34:4,11,16
40:21 41:17
56:11,15 57:18
60:6,12,13,19
60:25 129:18
clarification
29:18 39:10
48:8 64:10
114:12 122:11
clarify  9:4
17:17 18:19
28:25 41:25

54:25 68:10
103:8 109:19
113:3 120:3
123:23
clear  39:17
98:19
click  6:20
clicked  85:16
client  74:23
75:6
clients  67:19
close  8:10,13
9:25 11:6,10
11:11 41:14
42:21 49:13
88:21 91:15
92:13,16 130:3
133:22,23
135:20 136:6
closest  9:22,24
49:16,18,21
clothing  49:6
cmo  26:23 27:3
28:2 73:19,23
75:8 89:12
coffee  60:22
coincided
60:18
college  7:13
71:22 134:17
combined
119:16
come  12:15,20
37:9 51:19
71:7 111:4,18

120:16,23,23
131:25
comes  111:20
comfort  16:17
comfortable
80:12 87:24
102:7 126:11
126:23
coming  38:23
71:22 74:15,17
118:17
comission  37:6
commencing
1:19
comments
136:1
commission
37:14 137:24
commissions
37:10
common
119:25 120:8
communication
114:13
communicati...
19:17,18
134:22,23
como  114:11,19
116:1
companies
132:7
company  11:19
21:20,24 22:24
23:16 25:16
27:9,21 36:2

38:8,24 42:23
49:1,4 62:19
64:6,8,15
72:25 75:4,8
76:18 84:3,8
102:12,21
112:7 113:11
113:13 118:9
118:11 131:25
comparably
124:11
compensated
25:5,8,10 37:3
62:15 83:23
84:1 89:16
93:10,11
compensation
25:11,13 37:16
37:16 62:14
96:9
competent
69:17
complaint
113:22 128:3
completely
19:6 24:4
computer
27:25 53:15
77:25 78:5
81:14 93:19
concerned
101:8 102:9
104:11 119:22
concerning
117:19 119:15

concerns 36:16
concert 13:22
concerts
  129:11
concluded
  136:20
concludes
  136:17
confident 29:14
  32:10,16 127:9
  127:13
confidential
  76:12 79:8,12
  79:22 80:4,6
  80:14 81:7
  82:16 83:12
  85:5 89:9
  134:22 135:16
  135:23
confides 8:19
confirm 57:21
  97:15 104:18
  128:22
confusing
  39:20
connecticut
  29:21 35:10
  71:20 102:10
connection
  77:21
connections
  28:9,13,20
  31:2 128:17
consecutively
  67:23

consider 9:21
  11:10 12:17
  15:16
considered
  131:11
consistent 8:11
  13:2
constantly
  27:24
contact 18:20
  101:7 102:8,17
  104:8 105:18
  109:20 117:24
  119:9
contacted
  101:19
contacting
  105:12
content 88:17
  88:21 91:14,22
  92:3,20 95:3,5
contents 3:1
context 48:4
  76:19 101:3
contract 25:3
  32:24 97:10
contracts 33:1
  38:6
control 69:15
conversation
  13:25 112:4
  115:2 116:8
conversation's
  113:21

conversations
  38:19 97:1
convey 36:25
convince 76:23
  77:1
copy 88:2
copywriter
  87:25
copywriting
  73:12 92:24
cordial 45:13
corp 1:12
correct 7:18
  20:8 21:21,23
  21:25 23:14
  34:18,19 39:15
  39:15,19 41:2
  52:7,10 56:12
  60:16 64:3
  77:12 79:7
  82:11,13,15,17
  82:18,20,23
  85:2 86:14,22
  87:1,5,8,11
  90:13,16,19
  91:3,5 94:18
  94:23,24 95:2
  95:12,12 97:11
  99:24 100:6,11
  101:2 104:12
  128:4 133:25
  134:16,18,21
  136:12 137:11
correctly
  104:25

corrects 39:21
counsel 5:9,17
  133:24 134:2
  136:22 137:14
countless 29:19
county 137:4,6
  137:23
couple 6:18
  86:20 89:23
  117:7,10
course 30:20
  80:10 135:8
court 1:1 5:11
  5:15
cover 58:15
  59:5 99:1
covering 57:5,7
  59:22
covid 91:8
coworkers
  47:21
crapped 129:21
credit 101:15
crosstalk 48:7
crr 1:21 137:21
csr 1:21 137:21
current 130:11
currently 7:19
  72:9,21
custom 67:17
  75:1
customer 75:2
cut 78:8
cv 1:7 5:12

| d | | | |
|---|---|---|---|
| **d.c.** 2:15 | 33:3,9 35:25 | **dealership** | **demeanor** |
| **dad** 20:6,9 | 36:17,20 37:1 | 35:12,18 | 115:7 |
| 22:19 24:5 | 37:22,24 38:1 | **dealerships** | **depending** 18:8 |
| 40:4 68:14 | 38:4 39:18,25 | 33:24 | **deposed** 16:17 |
| 102:9,15 | 40:4,9,13,22,25 | **deals** 31:11 | **deposition** 1:17 |
| 115:15 118:9 | 42:17,20 44:24 | **dealt** 135:8 | 3:16,20,22,24 |
| 131:12,24 | 45:19 52:4 | **december** | 4:1,3,5,7,9 5:8 |
| **daily** 8:12,14 | 56:23,25 57:3 | 100:8,16 | 5:13 6:17 13:5 |
| **danger** 106:5,6 | 59:18,21 60:6 | 137:24 | 13:12,19 14:5 |
| 107:8,15,21,23 | 61:21 62:6,19 | **deciding** 98:9 | 14:6,9,20 16:3 |
| 108:13,14 | 64:2,4,22 | **decision** 49:11 | 17:1 54:9,14 |
| 109:5,12 | 65:13,18 66:15 | 66:7 72:12 | 76:1 78:22 |
| **date** 7:24 35:2 | 66:16,25 67:8 | 98:10 126:21 | 79:1 82:2,4 |
| 110:11,18 | 67:12 68:7,14 | 126:24 127:9 | 84:16,20 85:19 |
| 114:15 | 68:17,20 70:8 | 127:10,14 | 85:21 89:25 |
| **dated** 85:1 86:3 | 70:25 75:11 | **dedicate** 27:7 | 90:3 94:5,8 |
| **dates** 64:18 | 76:9,19,24 | 27:15 30:24 | 99:14,18 134:2 |
| 65:22 103:2 | 77:15 78:19 | **dedicated** 11:4 | 134:8 136:17 |
| 119:8 | 82:21 84:12 | 38:24 118:8 | 136:20 137:7 |
| **daughter** 41:16 | 85:5,10 87:9 | **dedicating** 10:2 | **depositions** |
| **day** 8:12 13:12 | 87:12,14 89:4 | 10:8 | 14:14,17 15:2 |
| 45:15,17 46:24 | 89:7,10,12 | **defendant** | **describe** 8:8 |
| 69:4 102:9 | 90:21 93:13,14 | 62:25 127:6 | 15:2,3,25 |
| 114:18 117:13 | 93:16,19,25 | **defendants** | 18:22 20:11 |
| 126:20 | 94:3 95:10,24 | 1:13 2:19 5:9 | 45:23 60:24 |
| **days** 19:23 | 96:10,17 97:14 | 5:23,24 6:24 | **deserved** 27:14 |
| 72:18 106:20 | 98:3 101:1,23 | **definitely** 22:5 | **detail** 9:20 |
| 117:7,10 | 102:1,3 103:10 | 129:15 | 13:17 |
| **de** 1:9 10:4,8,23 | 114:10 115:12 | **degree** 71:21 | **details** 11:23 |
| 11:2,12 12:1 | 116:1 127:16 | 134:17 | 13:6,8,9,17 |
| 18:4 25:14,23 | 127:18,22 | **delays** 91:7 | 14:10 15:4,6,7 |
| 26:4,12 28:6 | 128:4,7,7,18 | **delivered** | 15:13,14,15,16 |
| 29:5 30:9 31:2 | 132:18 | 102:19 105:13 | 15:19 21:13 |
| 31:23 32:4,11 | **deal** 135:7 | 117:17,18 | 23:25 24:13 |
| | | 119:12 | 37:9 62:9,15 |

63:3,12,21
64:25 66:22
87:17 110:25
111:2,8 112:3
112:4,5 121:6
121:9,24 125:3
125:13
**detomaso**
94:13,16
**devastated**
102:22
**developed**
25:20 91:14
**development**
91:9,12
**diagnosed**
132:20
**dialogue** 55:20
55:20
**diana** 42:15
**different** 30:10
70:18 114:7
115:6 130:5
**difficult** 33:4
72:12,16
**dinner** 59:11
59:15,16 60:4
60:22 61:2,5,5
61:11,18 99:2
99:5
**direct** 98:11
109:2,12
**directed** 98:20
**directly** 112:16
122:8

**disagreement**
115:8 116:10
116:16 121:16
**disappeared**
103:17 104:15
111:17 113:6
114:3 116:24
124:23 126:15
**disappearing**
104:3,4
**disclosed** 42:10
**disclosing** 36:8
**disclosure**
68:16 85:13
**discuss** 8:23
9:5 11:12
15:19 57:5
63:20 65:6
66:6,6,10 67:8
81:24
**discussed** 14:11
14:19 15:4,6,7
15:13 16:6
64:23 65:1,2
65:25 66:1,4
67:11 74:10
96:1,3 112:17
**discussing**
13:25 38:21
**discussion**
14:16 58:22
89:1 115:4
**discussions**
99:13 110:18
111:8 112:12

112:13
**distill** 32:8
**distinction**
120:12
**district** 1:1,2
5:11,11
**division** 72:4
**document**
78:19 87:6
**documents**
16:18,20 72:24
83:6 90:20
93:13,16
134:11,14
**dog** 98:14
**doing** 11:4 13:7
28:20 30:9
53:3 69:11
72:22 73:4
77:20 84:5
87:24 92:10
105:14 108:2,3
109:14 114:22
118:3
**door** 125:20
126:7,17
**double** 39:9
**draft** 86:15
87:7 90:18
**drafting** 122:22
**drafts** 93:18
**drinks** 60:2
**drive** 56:4
**driver** 44:12
46:14

**driving** 42:24
**dropbox** 80:21
80:24 82:22
83:7
**drove** 56:9,11
56:12
**dt** 86:15 100:13
**dt0000059424**
4:10 99:19
**dt00167491-...**
4:8 94:9
**dt2158** 3:21
76:2
**dt53801** 3:17
54:10
**due** 62:14
**duly** 6:5 137:9
**duties** 36:11,17
40:8 97:15

**e**

**earlier** 117:4
120:6
**eat** 59:9
**edit** 70:8 86:18
**editing** 70:1
73:13 90:25
**edt** 1:19 5:3
136:20
**effect** 22:13
102:11
**efforts** 11:5
71:3
**either** 29:8 33:2
35:4 79:24
97:12 122:5,8

137:14

**elaborate** 12:9

**email** 53:8 69:1
71:1 76:5 79:5
79:11 82:10,12
82:12,14,16,21
84:24 86:2,11
86:13,17,23
90:7,11,15,18
91:1 94:12,16
94:19,25 95:2
95:4 97:2,25
99:22,22 100:4
100:20 101:3,4
101:19 119:10

**emails** 32:14
97:21 105:13
119:12

**embarrass**
118:15

**embellish**
12:23

**embodying**
77:19

**emotional**
118:13

**emotions** 9:15
107:2

**employed** 64:2
127:16

**employee** 84:2

**employer** 72:11

**employment**
25:2 36:25
97:10

**empty** 6:15

**encounters**
60:24

**enigma** 116:19

**enjoyed** 44:7

**entire** 10:21
27:8,8 46:13
81:6 118:8

**equity** 37:22
38:7,24 39:18

**essentially** 27:7
29:24 40:7
52:8 69:25
110:22 111:12

**estimation**
34:20 40:20

**et** 5:10 15:3,11
17:4 32:14
58:4 60:8
129:14 130:25

**event** 33:16,17
33:18,20,21
34:1,4,4,12,13
34:14,16,17
35:1,2,11,13,14
43:3,8 44:14
45:8,16 52:23
54:16,19,22,25
55:3,24 56:4,9
56:14 57:17
58:24 59:3
60:5,6,7,11,13
61:24 137:15

**events** 29:23
30:14 31:13,14

31:17,19 32:2
33:7,12,13
35:22 52:4,8
57:15 59:23
60:1 61:21
91:8

**eventually** 19:1
19:2,5 27:13
76:17 84:8

**everybody**
31:15 43:14
88:23 107:5

**exact** 7:22,23
7:23,23 8:1
19:23 55:5
62:18 66:14
74:11 78:6
89:14 109:23
119:8 121:7

**exactly** 11:20
22:1,4,9 24:16
24:23 26:10
40:11 44:3
83:10 85:17
92:4 121:8,10
122:2 126:2

**examination**
3:6,8 6:8
133:14

**examined** 6:7

**example** 60:18

**examples** 31:10

**excerpts** 76:8

**excited** 13:20
42:6 47:16

74:14 77:1,14
83:21 84:6
95:23 96:7

**excitement**
83:20 85:8

**exciting** 38:8
38:18 95:14,21
96:22

**exclusive** 82:21

**exercising**
129:13

**exhibit** 3:13,16
3:20,22,24 4:1
4:3,5,7,9 6:11
52:12,12 53:5
54:9,13 75:19
75:22 76:1
78:22 79:1
82:1,4 84:15
84:16,20 85:19
85:21 89:25
90:3 94:5,8
99:14,18

**exhibits** 3:11
3:14 6:15,18
98:23

**expect** 38:15
74:15 83:25
84:1,7 96:23
106:4 107:16
108:13,15
118:12

**expectation**
84:9

**expected**  88:5
  93:12
**expedia**  100:15
**expense**  61:12
**expenses**  57:6
  58:16,19,21
  59:21 99:1
  100:7,13,25
  101:1,13,20
  130:23
**experience**  28:1
  28:10 29:3,11
  29:12 63:24
  67:14,17 70:14
  70:18,19,22
  71:19 72:23
  73:18 74:25
  75:6,12,17
  107:1 111:21
**experienced**
  41:18 91:7
**expert**  93:6
**expertise**  28:19
**expires**  137:24
**explained**
  108:14
**explicitly**  23:17
  36:5 39:2 46:4
  46:16
**express**  36:1,4
  36:9,11,13
  37:19,21,24
  41:20 43:18
  96:16

**expressed**
  36:16 131:21
**extensive**  10:17
  55:19
**extent**  8:20
  41:23 66:5
  97:6 98:1
  117:5,14 119:2
  119:4
**extremely**
  18:24 19:13
  29:23 32:10
  69:17 101:8
  102:16 118:13
  119:14 133:23
**eyes**  69:2 73:7
  73:10 82:17
  85:3

**f**

**facetime**  115:5
**facetimed**
  114:14,25
  115:18
**fact**  31:22
  114:5
**fair**  134:5
**fall**  34:25
**falling**  20:23
  21:3,6
**familiar**  23:21
  23:24,24 24:1
  25:14 26:19
  33:6 34:11
  44:9 76:21
  87:14,15,21,23

  88:1
**familiarize**
  17:6
**family**  11:21
  24:17 26:8
  58:2,3,6 68:4
  68:14 104:10
  104:17 106:14
  106:15 107:7
  109:15 117:21
**family's**  29:20
**fan**  13:21
**fanatic**  46:12
**far**  12:1 22:21
  22:24 50:14
  97:8 131:20
  132:20
**fast**  18:25
**father**  11:18,18
  20:12,14 21:20
  22:13,16,22
  40:8,13 130:4
  130:23 131:2,5
  131:22
**father's**  20:7
**february**  85:1
**feedback**  78:7
  78:9 81:11
  83:17,19
**feel**  50:23 107:1
  111:13 113:20
  133:23
**feeling**  47:18
**feelings**  41:21
  43:19

**feels**  126:11,14
  126:23 127:4
**felt**  42:4 80:11
  84:14 87:23
  88:18 107:5,11
  107:24 108:2,2
  109:14,24
  110:23,24
  111:6 112:1,1
  112:24 113:7
  113:25 115:3
  120:18 121:5
  126:9 127:4,8
  127:9,13
**figure**  101:10
  114:23
**file**  77:4 123:4
**filed**  5:10
  113:22 117:21
  118:2,19,20
**files**  77:23,25
  78:11,17 79:14
  80:17,23 81:3
  81:10,11,18
  82:24 83:15
**final**  71:9,13
  83:4,18,21
  98:10
**finally**  110:11
**finance**  71:25
**finances**  130:3
**financial**  11:18
  22:25 23:2
**financially**
  130:14,16,17

**find**   17:2,14
  18:12 72:20
  91:10 101:7,18
  105:15 114:21
  117:6 118:7,14
  124:16 126:6
  126:17 127:1
  132:10
**fine**   8:4 39:20
  115:14
**finished**   24:4
**first**   6:5 14:12
  17:5 24:5 26:4
  26:12,13,15,19
  40:18 42:8
  45:10,14 52:22
  54:15 55:11
  65:17 66:10
  86:2,10,13
  90:7,14 91:11
  91:11 102:23
  110:7,7 118:22
  134:13 137:9
**fit**   47:17 124:7
  124:8
**fitness**   129:12
**five**   17:25
  60:23 133:23
**flexner**   2:4
**flight**   56:16
**focus**   40:9,13
**focused**   19:13
  67:3 74:5
**focusing**   129:6

**foggy**   22:6
**folder**   6:14,16
  6:20 52:14
  81:6 100:13,16
**folders**   100:17
  100:19
**folks**   115:12
**following**   7:13
**follows**   6:7
**foods**   129:15
**form**   8:24 12:7
  12:25 20:25
  23:4 28:3,23
  31:9 32:20
  38:9 40:23
  41:1,22 46:8
  46:21 50:11
  51:7 61:14
  66:18 68:8
  69:9 70:16
  73:1 76:15
  77:10 89:21
  92:11 102:4
  104:22 106:7
  108:17 109:18
  110:3 111:25
  123:20,25
  125:2,22
  128:21 129:1
  134:3 135:1,10
  136:7
**formal**   65:10
  96:21 97:6,9
  118:2

**formed**   11:24
  24:14
**forth**   137:9
**forward**   13:24
  99:25 101:4
  135:24
**forwarded**
  100:1 103:3
**found**   102:20
  102:23 106:2
  107:3 109:19
  118:24 124:15
  127:5
**foundation**
  28:4 106:8
**four**   17:16
**fox**   72:3
**frame**   7:23 8:2
  57:20 65:24
  84:11
**free**   58:23
  129:10 136:2
**frequent**   18:14
  90:23
**frequently**
  10:20 17:8,9
  20:17,20,21
**friday**   13:11
**fridays**   14:22
**friend**   24:17
  68:14
**friendly**   55:17
**friends**   43:16
  78:15 81:22

**fruition**   71:7
**frustrations**
  36:1
**fulfill**   36:14
**full**   40:9,13
  68:23 137:11
**fung**   1:8
**funny**   95:4
**further**   133:11
  136:13,14

**g**

**gained**   29:3,11
  29:12
**gap**   11:9
**gauge**   65:16
**general**   8:23
  9:20 26:19
  65:24
**generally**   12:10
  12:13 14:15
**genesis**   1:11
**genuinely**
  124:21,24
**getting**   37:13
  38:7 102:19
  105:13 117:17
  131:5
**ghost**   19:6
**ghosted**   18:18
  18:19,22
**girl**   46:13 49:6
**give**   18:2,3 40:1
  53:11 58:23,23
  75:19 76:19
  78:7,9 81:11

83:17 92:21
101:17
**given**   27:13
40:12 53:7
83:19
**giving**   40:3
80:7
**glickenhaus**
11:21 23:22
24:15
**go**   12:1 16:5,18
16:20 17:4
19:20,23 21:15
31:15 32:20
35:22,24 41:1
53:22 58:6
60:2,4,13,22
61:2,5,22
90:14 95:13
99:4 103:12
117:20 119:18
123:8 124:18
125:12,23
128:13
**goal**   88:9
131:20
**goes**   106:25
**going**   5:6 6:17
6:19 9:4 12:3
17:5 20:5
22:23 23:21
34:20 35:22
37:12,19,21,25
39:25 51:12,16
52:12 54:1,22

58:15,19 66:4
66:7,12 72:19
73:24 75:19
84:15,15 90:8
92:1 99:7
101:11 102:6
102:22 103:12
103:14,21
105:20 106:24
107:13,23
118:1,11,14
119:11 121:16
129:7,13
131:11 132:4
132:23 135:24
**good**   5:5,22
6:23 20:13,16
41:8 42:8
43:11,15,21
45:14,17,17,25
45:25 49:1
55:21 69:4
124:1 133:16
**google**   16:23,23
**googled**   16:22
16:25
**googling**   14:14
**gotten**   108:22
**graduated**
71:20
**graduating**
7:13 11:17
**grammar**   92:6
**grammatical**
88:18 91:17,24

**great**   6:17
**greenwich**
33:25 35:9
**grew**   49:20
**group**   41:17
**guess**   17:22,24
22:7 34:23,25
35:5 44:25
63:24 64:18
65:22 97:5
107:25 110:15
120:12 124:4
**guessing**   22:7
**gurlides**   2:22
5:15
**guy**   123:19,21
**guys**   53:11
98:20 136:6

**h**

**half**   64:19
71:25 111:20
111:23 113:7
126:15
**hamptons**
33:18 43:3
44:14 45:8
52:24 55:1
**hancock**   72:1
**hand**   43:24
**handful**   41:12
99:4
**hands**   68:23
70:19
**hang**   86:8

**hannah**   2:12
5:24
**happen**   84:9,14
**happened**
24:16 38:20
40:11 110:18
111:11 112:6
114:23 134:14
**happening**
31:20 97:2
**happy**   44:7
74:3 84:3
**hard**   97:16
109:2 111:9
120:1,5,9,10,12
**harmed**   132:18
**hate**   103:1
**hats**   30:8
**head**   10:21
69:7,14
**health**   129:12
132:21
**hear**   19:24 26:4
94:15 105:24
114:20
**heard**   27:16
116:15 122:16
**heartbreaking**
105:24
**height**   124:5
**held**   5:13 69:18
74:24
**help**   24:2 60:8
68:20 69:5
70:8 73:4,21

75:10 76:17
88:3,9,19
101:10 111:17
118:21 131:2,5
**helped**  29:5
43:22 68:21
70:1 71:2
73:16 89:23
101:13 130:24
**helper**  74:4
**helpful**  69:2
73:10 74:2,18
88:20 93:12
**helping**  27:9
35:19 43:22
70:11 74:17
118:21 130:13
130:16 136:10
**hereinbefore**
137:8
**hereto**  136:22
**hesitating**  40:5
**hey**  33:8 66:25
98:13
**hi**  6:10 7:3 8:17
71:11
**highlight**  91:12
**highlighted**
86:23
**highly**  43:20
44:1,6
**hin**  1:10
**hired**  134:1,6
**hmm**  96:13
100:6 101:21

106:3 119:3
**hold**  53:9,9,9
53:14 123:6
**holdings**  1:10
**home**  7:15
10:15,16,18,18
27:11,21,22
110:7,8,12
111:4,4,15
118:17
**hometown**
117:25
**honestly**  13:16
19:21
**hope**  65:3
76:16 97:2
**hoped**  64:24
79:20 96:25
**hopefully**  95:23
**hopes**  65:25
**hotel**  56:15,17
56:17,18,22
57:13 58:7,9
58:10,12
**hotels**  57:16
114:7
**hour**  27:12
51:12 72:18
90:18
**hours**  29:19
32:1 86:20
**house**  29:20
93:20
**hudson**  2:5
7:20 8:6

125:24 133:21
**huge**  13:21
**hugo**  42:17
43:1,7,19,20
52:25 59:12
99:23 100:13
101:4,9,9,19
103:4,7 119:13
**hugo's**  43:9
**huh**  78:20
**hwigger**  2:18

**i**

**idea**  102:21
105:20 106:23
107:23 118:11
118:12 119:8
**identification**
54:8 75:25
78:25 82:3
84:19 85:20
90:2 94:7
99:17
**illinois**  7:4,6
**immediately**
102:15
**impacted**  133:6
**impeachment**
14:1
**implied**  97:4
**imply**  68:6,13
**importance**
80:11
**important**
111:14 122:1

**impression**
19:8 45:10,14
46:1,6,19
121:12
**impressive**
29:24
**income**  129:24
130:12
**incorrect**  26:16
**incurred**  58:19
**individual**  58:5
**individually**
62:22
**individuals**
29:7
**industry**  22:21
28:10 29:2
67:14 69:18
74:5,14,17,21
131:19 132:17
**inform**  107:6,7
107:7 117:25
**information**
15:9,9 17:3
33:10 76:12
79:17 80:4,7
80:15 85:6
92:14,15,17
101:15 112:10
130:2 135:23
**informed**  26:7
63:14 92:14
105:21
**informing**  62:9
109:7

**infrequent** 99:3
**inherit** 22:11
  22:11
**initially** 92:5
**instances** 73:22
  88:7 89:6
**instruct** 132:24
**instructing**
  108:24
**intact** 92:4
**intended** 88:24
**intent** 92:4,20
  113:21
**interact** 41:4
  43:7
**interactions**
  41:7 43:10
**interest** 50:1
  131:21
**interested** 46:2
  46:20 48:16
  49:22 50:10,13
  50:20 51:9
  137:15
**interesting**
  12:24
**internal** 87:7
**interrupt** 39:8
**interview** 11:16
**interviews**
  132:12
**introduce** 6:18
  6:19 52:12
  84:15

**introduced**
  54:13 75:22
  78:22 89:25
**introducing**
  82:1 85:19
  94:5 99:14
**investigating**
  128:7
**investments**
  72:1 130:9
**investor** 33:3,9
  33:10
**investors** 31:3
**invests** 130:5
**invitation**
  58:13
**invited** 61:21
  61:23
**involved** 23:20
  28:7,8 35:19
  45:4 51:10
  58:21 59:25
  62:18,22 63:11
  63:13,21,22
  106:15 107:6
  127:22 128:11
**involvement**
  26:9 78:10
  98:11
**isabelle** 77:18
  77:19
**ish** 7:12 17:25
**isolate** 120:4
**issues** 12:10
  41:18 48:7

  132:21
**italy** 114:25
**item** 49:6 83:14
**items** 81:7,7
  83:24 89:23
  135:7

**j**

**jim** 24:14,17
**job** 1:23 9:14
  11:14 24:12
  66:2 67:2 68:7
  72:14 88:9,22
  129:19,22
  130:22 132:6
  132:14,17
**jobs** 73:14
  132:9
**john** 2:3 5:25
  14:16,21,23
  16:2,7,7,12,18
  53:5 72:1
  133:12
**joined** 96:10,17
**jordá** 44:9
**jp** 71:24
**july** 110:14,17
  111:19
**june** 100:4
  110:14,16
**jzach** 2:8

**k**

**k** 1:8,11
**keep** 10:5 51:16
  91:25 107:11

  108:3 109:14
  120:4,7
**keeping** 19:16
  19:18 92:3
**keeps** 120:13
  129:16 130:6
**kept** 9:11 29:8
  50:15 135:22
**key** 38:4 67:19
**kind** 9:11 12:4
  13:23,25 14:17
  15:21 23:19
  24:6 25:24
  31:22 32:9
  43:23 45:15
  65:5,6 66:3
  74:4,14 76:19
  76:21 77:18,20
  87:20 88:2
  92:23 95:5
  96:1,3 97:18
  101:9 111:1,10
  114:6 115:13
  116:16,17
  120:2,3,12
  130:20
**knew** 14:25
  18:23 22:20
  27:18 28:8
  36:6 43:20,21
  43:24 44:1,6,7
  44:25,25 45:3
  46:11 48:10
  54:21 67:4
  68:4,23 69:5

| | | | |
|---|---|---|---|
| 72:19 73:25 | 26:9,10,15,15 | 53:8 55:17,18 | 106:9,9,10,14 |
| 77:14 79:21 | 26:16,16,23 | 55:20 58:2,18 | 106:17,19,19 |
| 102:22 107:16 | 27:6,7,10,13,13 | 59:1,15,20 | 106:21,22,22 |
| 111:16 112:24 | 27:18,19,20,22 | 61:19 62:2,6 | 106:23 107:3,6 |
| 113:6 114:18 | 27:23,24 28:5 | 62:15,18,20,20 | 107:8,13,20,20 |
| 118:7,9 120:18 | 28:5,7,7,9,13 | 62:20,21,23,23 | 107:22 108:4,5 |
| 121:15 126:4 | 28:14,15,16,16 | 63:2,3,9,11,13 | 108:5,9,9 |
| **know**   7:19,21 | 28:17,18,21 | 63:20 64:19,20 | 109:1,3,13,23 |
| 7:22 8:10,12 | 29:4,6,8,12,14 | 64:24 65:6,22 | 109:23,24 |
| 8:16,17 9:6,19 | 29:22,23 30:2 | 66:2,3,4,5,6,7 | 110:5,8,16,17 |
| 9:25 10:1,1,3 | 30:4,7,8,10,11 | 66:11,21,21 | 110:21,22 |
| 10:11,11,18,24 | 30:12,18,19,21 | 67:1,4,25 68:1 | 111:11,12,14 |
| 10:24 11:1,4,8 | 30:21 31:6,7 | 68:2,24 69:1,1 | 111:14 112:5 |
| 11:17,20,23 | 31:10,11,12,13 | 69:11,14 70:25 | 112:10,11,16 |
| 12:21 13:1,2,2 | 31:14,16,17,20 | 71:1,2,7,8,8,15 | 112:23 113:10 |
| 13:6,8,16,23 | 31:21 32:8,9 | 71:17 72:20 | 113:10,15,16 |
| 14:2,11,16,18 | 32:10,12,12,13 | 73:3,5,6,8,8,22 | 114:2,3,9,16,17 |
| 14:25 15:8,10 | 32:14 35:4,18 | 74:2,4,6,16 | 114:22 115:11 |
| 15:11,21,24,24 | 36:7,8 37:3,6,7 | 75:6,14,16 | 115:14,25 |
| 15:24 16:15,16 | 37:10,16 38:3 | 76:18 77:12,15 | 116:19 117:4,6 |
| 16:25,25 17:3 | 40:6,6,10,10 | 77:16,18 79:25 | 117:9,10,10,12 |
| 17:3,11,22,24 | 41:11,23 42:5 | 79:25 80:10 | 117:13,16,17 |
| 17:25 18:11,13 | 42:5,6,15,17,22 | 81:4,6,9 84:2,3 | 117:20 118:1,4 |
| 18:23,25 19:2 | 42:22,23,25 | 84:9,11,12 | 118:6,6,7,13,13 |
| 19:3,3,4,12,14 | 43:2,2,14,25 | 85:7,16 87:23 | 118:17,18,23 |
| 19:16,24 20:3 | 44:17,18,18,20 | 87:24 88:10,12 | 119:6,13,13,14 |
| 20:13,17,19,21 | 45:1,2,13,15 | 88:15,18 91:23 | 119:15 120:9 |
| 20:22 21:1,2,4 | 46:9,10,12,17 | 92:1,3,9,12,13 | 120:13,17,21 |
| 21:5,6,10,11,11 | 46:22,23,24 | 92:14,15,20,22 | 121:4,6,6,7,8,9 |
| 21:17 22:4,18 | 47:6,14,15,15 | 93:2,7 96:3,6 | 121:10,21,24 |
| 22:21,23,23,25 | 47:17,18,23,23 | 97:6 99:15 | 122:1,2,14,25 |
| 23:18,24,25 | 48:1,3,14,15,25 | 101:6,13 102:3 | 123:1 125:3,4 |
| 24:1,1,4,9,12 | 49:1,8,21,24 | 102:6,13,17 | 125:13,14,20 |
| 24:13,15,15,22 | 50:14,15 51:2 | 103:4,5,6,21 | 126:3,4,10,20 |
| 25:22 26:6,7,8 | 51:7 52:14 | 105:9,17,23 | 126:21 127:7,8 |

**[know - longer]**

127:23,23
128:2,14,14,20
128:22 129:2,2
129:4,6,7,10,16
129:18,19,21
129:22,24
130:2,3,4,5,10
130:11,13,20
130:25 131:8
131:11,17,18
131:19 132:20
133:11 135:5
136:5
**knowledge**
  23:9 28:18
  30:7 31:21
  40:25 129:23
  129:25 131:13
**known**  31:22
  111:10
**knows**  126:10
  131:16

**l**

**lake**  114:11,19
  116:1
**large**  31:3
  100:19
**largely**  32:11
**larger**  72:5
**late**  31:7 60:7
**lawsuit**  62:8
  63:1 110:25
  127:24 129:7
**lawsuits**  62:21
  63:25

**lawyer**  108:24
**lawyers**  14:5
  39:22
**learned**  74:4
  111:2
**learning**  74:14
  74:17
**leave**  22:24
  72:13
**led**  72:6
**left**  54:17 87:1
  105:14
**legal**  5:15
  63:25
**legalities**  62:21
**letter**  86:15,17
  87:9 89:12,17
  92:2 93:10
  102:10,12,13
  115:16 118:10
  119:15
**lied**  22:20
**life**  8:23 9:20
  10:3,8 11:7
  27:8,16 30:21
  30:24 38:25
  46:13 58:1
  106:12 107:8
  109:12 110:23
  111:22 113:16
  113:18 116:24
  118:8 121:5,10
  122:4,10
  124:16 126:7
  126:16 129:18

130:6
**liked**  50:4 98:9
**likelihood**
  84:10
**likely**  15:8
  17:24 35:5
  40:20 49:18
  61:19 66:20
  68:5 71:14
  78:4 83:8,20
  88:12 89:23
  96:5,19 106:14
  110:15
**line**  76:11 79:8
  82:16 83:13
  85:3 86:15
  90:15 100:7
**link**  53:19,20
  85:17
**linkin**  13:21
  14:3 129:11
**linking**  81:13
  83:14
**links**  68:25
  82:22 97:25
**litigation**  63:6
  63:8,9
**little**  7:8 8:16
  9:3 10:10
  17:25 18:1,11
  20:5 35:22,23
  51:12,13 88:4
  88:19 91:18,21
  98:25 99:4
  115:6,6,17

123:3
**live**  7:3,4,10,14
  16:5 17:13
**lived**  7:7,8,9,11
  7:12,21 57:18
  126:4
**lives**  7:19,20
  125:24 126:2
**living**  18:10
  33:16,23 34:22
  35:3 40:21
  65:16,18,19,20
  130:8
**llc**  1:10 64:14
**llp**  2:4
**load**  75:20
**loading**  52:13
  85:25
**local**  117:24
**locate**  118:22
**logistics**  31:15
**long**  7:7,21
  19:19,22 21:18
  22:1,4 26:5,9
  26:21 28:14
  34:21 38:20
  61:7,10 65:9
  65:14 70:6
  78:3 80:20
  83:2 88:13
  93:15 116:8
  123:7
**longer**  29:9
  63:11,13,21,22
  63:23 102:11

**[longer - meant]** Page 18

102:21 118:10
**look** 69:3 73:7
75:19 76:11
79:16,25 80:3
81:8 84:3 86:2
86:10 87:6
88:6 90:25
91:16 93:7
100:7,12
118:21
**looking** 11:14
13:24 52:11
85:17 86:8
90:7 91:6
100:17 132:9
**looks** 83:4 91:1
94:21 95:2,10
96:24
**lori** 1:21 5:16
137:5,21
**lot** 9:19 10:13
10:22 11:23
19:12 26:17
27:17 28:9,17
28:18 29:2,3,3
30:13 32:1,1
41:15 43:23
49:8,10 67:4
71:1,2 73:12
73:12,13,13
77:16 124:3,6
129:13,14,15
129:16
**love** 47:4

**loved** 22:20
77:2
**lover** 46:12
**loves** 131:17
**lui** 1:10,11
122:14,16
**lunch** 59:10,10
59:11,15,16
61:18
**luxury** 67:16
67:16 70:20,23
72:25

**m**

**mad** 106:20
**made** 28:17,19
28:22 32:3
43:13 57:7
59:7 62:7
72:12 77:8
86:24 91:16,24
97:7 102:16
105:25 107:4
121:7 125:3,4
125:14 126:24
129:8 130:5
**maine** 58:4
**majcher** 42:15
42:15
**make** 17:22
31:2 34:20
49:11 59:6
62:4 66:8 68:9
68:25 88:3,22
91:17,25 92:22
104:24 118:15

120:12 126:21
127:11
**makes** 9:23
41:10 45:12
70:22
**making** 12:23
28:19 40:20
46:17 48:6
92:6 108:25
**male** 124:5
**man** 43:24
77:17
**manager** 26:19
**marked** 6:15
54:8 75:25
78:25 82:3
83:12 84:19
85:20 90:2
94:7 99:17
**marketing**
26:17 31:3
70:14,18,22
71:3,12,19,21
72:2,5,6,23,25
73:18 74:21
75:12 77:19
91:8 93:24
94:3 134:17,19
134:24 135:2,6
135:9
**marks** 51:25
54:6 123:16
**massachusetts**
7:13

**material** 14:1
96:2
**materialized**
65:11 96:2
**matter** 5:9 67:5
93:6
**matters** 39:4
63:25 130:6
**maximum**
19:19
**mean** 9:10,13
9:17 18:19,20
20:15 21:9
28:25 38:7
39:8 41:25
44:16,23 49:8
50:23 53:11
55:16 57:25
62:17 68:11
86:4,7 88:12
95:20 96:14
97:9,15 101:2
104:3,4,20
109:19 111:8
119:6 120:2
**meaning**
100:10
**meaningful**
91:7
**means** 21:11
67:6 73:8 88:4
93:11 115:10
**meant** 79:23
88:15 95:22

**media** 5:7 52:1
  54:6 71:1,8,23
  94:13,16 98:3
  123:17
**mediahub**
  71:23
**medication**
  133:6
**meet** 17:9
  40:17 43:1
  45:6 60:17,21
  60:21,23 61:1
  67:7
**meeting** 29:3
  133:20 134:10
**member** 107:7
**memory** 62:2,2
  77:12
**mental** 132:21
**mention** 65:17
  66:24 116:15
**mentioned**
  16:13 20:6
  27:6,10,16
  31:11 49:19
  52:3 55:1,14
  56:1 72:10
  74:13 104:8
  115:7 116:10
  116:21 120:6
  132:4,6
**meshed** 24:6
**message** 48:3
  90:25 92:7
  100:1

**messaged**
  19:25
**messages**
  102:18 105:12
  117:16 122:22
**met** 15:11
  24:19 26:2,3
  29:4 40:14,16
  41:12 43:2,2,4
  43:6 45:7
  46:25 52:24
  55:11 56:5
  66:24 89:6
  98:25 124:9
  133:17
**method** 78:6
**mi** 47:12,21
**michigan** 137:3
  137:23
**mike** 2:22 5:14
  53:21
**million** 130:25
**mind** 53:20,21
**mine** 124:6
**minute** 14:15
  123:3,3 133:23
**minutes** 15:21
  51:13 60:23
  133:13,17
**missing** 20:2
  53:10 104:6,7
  106:18 111:23
  114:14 117:15
  117:22 118:2
  119:20

**misspeaking**
  62:16 118:5
**misstates** 113:1
**mm** 96:13
  100:6 101:21
  106:3 119:3
**moment** 6:12
  6:15 106:1,5
  114:4 129:5,17
  130:17
**money** 23:7,10
  48:20 49:4,5,8
  49:9,10 59:3
  59:24 61:18
  130:5
**month** 19:25
  34:24,24
  111:20,23
  113:7 126:15
**months** 17:12
  17:23 117:7
  119:6
**morgan** 71:24
**morning** 5:5,22
  5:25 6:23
  56:16
**move** 126:16
**moved** 7:24
  125:20 126:6
  127:1,5
**ms.berris.**
  133:16
**mullin** 2:13
**multiple** 48:7

**muscular**
  125:17
**muted** 98:16

**n**

**n.a.** 1:10
**name** 5:14,22
  6:23,25 16:4,4
  17:3 20:7
  57:13 64:15
  77:18 122:16
**named** 26:23
  27:3 62:25
  122:14
**names** 28:15
  29:10
**natural** 28:20
  107:1
**nature** 31:12
  37:11 135:6
**necessarily**
  10:13 11:22
  17:18 18:13,25
  28:15 29:6
  30:19 33:6
**need** 8:3 52:15
  66:5 73:9
**needed** 19:13
  72:17,20 84:9
  84:14 97:8
  109:14
**needs** 123:3
**negative** 39:9
**nervous** 36:11
**network** 72:15
  116:19

**never** 14:25,25
16:15,17 19:6
19:6,8 23:17
25:12 30:18,18
32:19 33:10
36:5,5,16
37:13 41:11,17
41:18 46:15
54:15 58:11
64:2 65:10,10
68:16 69:13
71:11 74:20,23
76:25 79:24
92:19 93:4,5
96:2 97:6,7,11
97:11 98:1,7
98:11 102:12
104:8 112:21
117:1,5,14
119:2,21 125:3
125:14 130:3
135:13
**new** 1:2 2:6,6
5:11 7:11,20
13:21 17:14
18:10,12 31:19
33:16,23 34:4
34:11,16,22
35:3,8 40:21
54:20 56:1,11
56:17 58:20
60:6,12,25
65:18,20 72:14
74:14 75:5

**news** 38:8
**nice** 45:11,14
55:14,15,16
**night** 56:13,15
**nights** 31:7
**non** 68:16
85:13
**normally** 36:22
**norman** 1:8
11:25 13:19
15:11,17,18,19
15:24 25:21,25
26:2 31:18
38:3 40:14,16
40:17,22,25
41:4,12,21
42:4,4,11,13
44:19,20 55:7
56:5,12 59:12
62:22 66:6,10
66:12,16,24
67:7 89:3,6
110:21,21,22
112:6,19,25
113:8,15,18
115:9 116:11
121:13,14,19
121:23 122:3,9
124:9,11,15
125:1,9,20
**norman's** 41:6
41:15 126:2
**notary** 137:5
137:22

**noted** 87:18
**notes** 87:1
137:12
**notice** 90:21
**noticed** 41:11
**noticing** 5:20
**november**
82:19
**number** 5:12
135:19
**numbers** 90:9
**nw** 2:14

**o**

**oakland** 137:4
137:23
**object** 8:24
12:7,25 20:25
23:4 28:23
31:9 32:20
46:8,21 69:9
70:16 73:1
89:21 102:4
104:22 106:7
110:3 111:25
132:2
**objection** 28:3
32:5 38:9 39:1
40:23 41:1,22
47:8,13,22
48:2,13,21
49:7,23 50:5
50:11,21 51:2
51:6 57:20
61:14 66:18
68:8 74:9

**76:15 77:10**
79:18 92:11
93:3 107:17
108:8,17
109:18 113:1,9
122:20,24
123:20,25
124:12,18
125:2,10,22
126:8,19 127:2
128:12,21
129:1 130:18
131:6,15
132:23 134:3
135:1,10 136:7
**objections** 5:19
**observation**
30:11
**observe** 41:19
43:24
**observed** 23:12
30:12,23,24
41:9 43:12
50:17
**obviously** 10:2
10:25 13:7,8
18:9 28:19
38:3 56:8
92:15 95:3
96:2,4,6 97:7
101:8 102:8,12
102:16 105:23
107:10 111:9
111:11 112:1
114:4,22

115:14 117:11
118:12 119:16
126:23
**occur**  119:19
**occurrence**
90:23
**october**  79:5
**odd**  77:8
124:16 126:6
126:18 127:1
**offer**  57:9 61:8
64:22,23 97:7
97:9
**offered**  93:24
94:2
**offering**  73:6
73:17
**office**  102:10
133:21
**officer**  72:25
**official**  94:2
**officially**  79:21
84:2 93:24
118:20
**offline**  103:12
**oftentimes**  69:1
**oh**  39:15 75:21
86:12 94:18
98:15 99:9
100:21
**okay**  6:21 8:19
10:7 11:6,12
12:3 18:16
20:5 21:20
22:5 25:14

26:11 31:25
32:19 35:1,22
39:5 40:14,22
43:18 44:11
51:14,15 52:15
52:17,18 53:12
53:22 54:25
68:16 79:16
80:3 90:1
92:23 95:13
98:22 99:6
100:21,24
102:25 104:10
106:22,23
110:1,13
111:17 115:17
116:6,19 122:1
122:18 123:2,5
123:10 131:4
131:11 132:4
133:9
**older**  11:8
61:19
**onboard**  76:17
**onboarded**
77:13
**once**  8:17 17:12
51:6 69:13
114:16
**ones**  33:13
**ongoing**  65:5,6
96:1
**open**  6:11
53:15 77:23
80:17 82:24

86:15 90:1
**opened**  80:18
83:16
**opinion**  42:4
69:3 73:6,17
75:14
**opinions**  41:20
43:18
**opportunities**
132:6
**opportunity**
72:10,21
**order**  107:19
**ordinary**  135:8
**original**  94:19
94:25
**originally**
100:1
**outside**  16:13
20:2 42:24
43:4,16 60:13
70:8 97:15,20
134:2
**overall**  32:15
**overlap**  61:1
**overly**  118:15
**overspeak**
97:23
**own**  24:19
37:25,25 58:7
61:18 62:5
66:2,8 67:2,2
106:11 130:23
134:6

**owned**  37:24
**owner**  40:22,25
**owns**  21:20

**p**

**p**  64:12
**p.m.**  76:3 79:3
82:6 84:22
85:23 90:5
94:10 99:20
114:12 122:11
123:12,13,14
123:16 136:17
136:20
**p72**  87:9,14
91:1
**pa**  1:23
**page**  3:3,13
86:11 90:8,14
91:11 95:5
**paid**  59:13,15
59:16 60:16
61:5 64:4,6,8
**panic**  119:17
**paragraph**
88:7 91:11
**parents**  10:12
10:19 20:2
23:9 58:10
78:13 81:20
101:5,16 105:6
105:8 109:5
111:5 112:11
112:17 114:17
117:24 118:23
121:2 122:6,9

130:13,16
**park** 13:21
  14:3 129:11
**part** 37:24 38:1
  44:8,13,15
  45:3 58:22
  64:24 79:20
  84:8,13 95:14
  95:20,23 96:22
**particular** 65:1
**particularly**
  70:19
**parties** 62:18
  136:22
**partners** 88:8
  88:10,15
**party** 137:14
**passionate**
  23:13
**passions** 22:20
  23:18
**password** 77:4
  77:6,8 79:14
**past** 10:2 29:15
  73:13 130:5
**pay** 56:20
  59:14,14 60:15
  131:1
**paying** 56:25
  57:4 59:18
  130:1,20,22
**peek** 92:22
**pending** 51:3
**pennsylvania**
  2:14

**people** 14:2
  29:4,4 30:10
  31:1 32:2 33:6
  38:4 49:17
  111:14 115:23
  115:25 116:1
  118:22 128:10
**perception**
  11:3
**perfect** 6:14,23
  8:3
**perform** 36:17
  97:13
**period** 106:18
  130:21
**periodically**
  61:1
**person** 8:22
  9:21,23 11:15
  17:10 30:19
  31:14,15 32:3
  39:3 49:16,19
  49:20,21 54:17
  56:7 66:24
  67:7,11 81:5
  108:1 111:3
  117:22 122:14
  122:25 125:18
  126:7,17
**person's** 118:2
**personal** 41:20
  43:18 48:20
  49:5,9 57:6
  59:3,21,24
  77:25 81:14

82:12,14
  100:25
**personally**
  12:15 19:15
  31:1 45:18
  57:22,24 58:12
  59:6 108:5
  128:23
**perspective**
  91:18
**phases** 130:6
**phone** 8:15
  13:13,14,15
  78:5 103:15
  119:9,11
**photo** 47:7
  52:21 54:14,15
  55:7
**photos** 45:21
  98:8
**phrase** 48:5
**phrased** 32:9
**physical** 125:8
  125:16
**physicality**
  125:6
**physically**
  107:15 125:1
**pick** 60:8
**piece** 88:4,17
  88:19
**place** 33:17
  97:8 99:5
  114:8,13
  133:20 137:8

**places** 114:9
**plaintiff** 1:6 2:9
  6:1
**planner** 71:23
**plate** 19:12
  67:4
**played** 75:17
**playfly** 72:5
**please** 5:19
  6:25 60:24
**point** 10:18
  19:21 20:24
  22:6 24:2
  25:21 26:8,18
  26:23 28:6,6
  28:11 29:9
  32:3 38:1
  41:25 42:3
  48:2 50:19
  62:7,10 64:25
  65:3 79:21
  84:10 89:2
  93:18 96:4,20
  103:18 115:2
  116:4,5,9
  121:22 127:7
**police** 101:17
  117:22,25
**porsche** 40:1
**position** 64:22
  64:23 67:8,12
  67:19 72:16
  93:24 94:2
**positions** 24:6
  70:9 74:24

possibly 22:15
posted 127:24
  128:3
poster 71:12
posters 71:9
posts 98:6,7,12
potential 67:8
  67:11
potentially
  26:21 35:9
  47:12,21 48:15
  63:2,2 119:7
practice 16:2
prepare 98:6
prepared 98:7
  134:1,7
present 2:21
  13:19
press 69:20
  70:4 95:10
  135:5
pretty 8:10,13
  17:8 20:13
  38:8 61:3,4
  72:18 111:21
  123:19,21
  124:7 127:25
prevent 118:16
previous 57:15
  75:11
previously 27:6
  133:16
priceline
  100:15

printed 95:4
printouts 93:19
prior 7:12
  11:12 16:2
  24:5 32:6
  50:21 103:7
  104:3,4,9,12
  105:25 113:1
priority 106:13
private 8:21
  9:9,10 12:17
  35:11 39:3
  49:18 120:7
  130:7
privy 11:22
  31:10
probably 9:6
  9:21 16:16
  17:23 34:23
  35:4 40:19
  64:17 65:20
  66:13 67:23
  81:6 102:22
problem 39:22
problems 12:6
  12:9,21
proceeded
  126:16
proceeding
  5:19
process 17:7
produced
  67:20 71:9
  75:2

producing
  67:17 74:25
product 70:9
  71:13
products 31:7
  71:10 83:21
professional
  9:5 11:13 12:1
  46:14,23 50:16
professionally
  12:14 128:23
  129:5,9
program 87:10
  87:14,21 88:2
  91:2 92:2,10
progress 71:15
pronounce
  34:7
pronouncing
  34:5,8
proofing 73:13
  87:20 97:18
proofread
  69:25 89:7
proofreading
  68:25 87:20
proper 14:17
protect 107:5
  107:19 108:15
protected 77:4
  79:14
protecting
  109:8
prototypes
  91:9,12

proud 84:5
provide 14:18
  16:16 72:13
  79:25 87:22
  101:2,16
  109:10
provided 37:10
  87:4 92:5
  109:2 136:1
providing
  88:17
public 111:1
  118:6,16,19
  126:22 137:5
  137:22
publicly 127:23
purchase 99:7
purchases 59:6
  59:7,25
purely 87:19
purpose 12:23
purposely
  126:6
pursue 40:4
pursuits 9:5
  11:13 12:1
push 113:10,13
pushing 67:5
pushy 67:2
put 29:19,24
  30:21 32:1,16
  35:19 83:12
  136:10
putting 30:2,3
  30:5,14 31:23

| q | | | |
|---|---|---|---|
| **qualified**  92:9 92:12 | **react**  107:14 | 19:21 21:7,17 | 116:7,7,14 |
| **qualifies**  73:18 | **read**  39:11 51:3 51:4 69:20 70:4 73:10 88:19 91:18 92:24 127:23 128:14 | 22:9 24:11,22 24:24 25:19 26:3,6,9,13,22 33:4,14 34:1 34:24 35:2,14 35:15,20 36:5 36:7,10 37:15 37:20,23 38:2 39:2,4,5,17 40:2,6,18 42:6 42:12,14 43:3 44:3,4 45:22 45:22 46:4 47:3 55:23 56:8,16 57:10 58:2,4,17,21 59:8 60:1,7,9 61:7,9,25 62:9 62:12,16 63:7 63:18 64:18 65:9,14 66:20 67:10 68:1 70:5,5,6,10,11 78:4,6,18 80:5 80:5,8,16,19,20 81:2,9,12,12,25 83:1,2,3 85:17 88:25 89:14 93:15,17,21 96:4,11,18,24 97:5,24 98:1 99:11,12 110:11 111:9 111:10 112:15 | 120:17,19,21 133:18 |
| **qualify**  72:24 | | | **recalling**  12:19 |
| **question**  8:25 12:8 16:11 32:7 33:5 50:5 51:3 53:1 69:10 104:1 106:4 107:15 108:10,12,20 132:24 | | | **receipts**  100:15 |
| | | | **receive**  102:13 119:15 |
| | **reading**  88:11 97:20 129:14 | | **received**  102:9 115:15 131:2 135:13 |
| | **reads**  88:22 | | **receives**  135:23 |
| | **real**  15:6,14,16 134:14 | | **receiving**  88:23 |
| **questions**  15:22 15:22,23 16:1 16:2,12,25 38:13,17 133:4 133:11 136:13 136:15 | **really**  9:18,18 11:3 13:23 31:6 38:4 44:1 47:23 58:17 59:20 61:6,9 62:20,23 65:10 66:1 69:10 74:18 77:11,14 80:1 84:4 97:17 106:10 107:24 108:9 110:25 125:15 | | **recent**  67:18 72:11 |
| | | | **recently**  96:3 |
| | | | **recognize** 52:21 54:14 |
| **quickly**  90:24 | | | **recollection** 12:19 19:2 39:13 43:5 |
| **quite**  26:5 72:17 80:20 93:23 | | | **record**  5:6,18 7:1 39:11 48:6 51:4,21,22,23 51:25 53:23 54:1,3,4,5 98:19 108:23 108:25 123:9 123:11,13,14 123:16 136:18 |
| r | | | |
| **r**  64:12 | **reason**  40:5 94:15 104:15 104:21 105:21 133:1 | | |
| **race**  44:12 46:14 | | | |
| **raise**  37:19 | **reasonable** 124:25 | | **recorded**  5:8 136:19 |
| **range**  12:4 | | | **recording**  5:1 |
| **rather**  12:17 | **reasons**  75:15 110:8 111:15 | | **red**  87:1 91:4,6 91:12,21,22 |
| **reach**  106:21 115:15 118:23 | **rec**  12:19 | | |
| **reached**  117:24 | **recall**  7:23 10:25 11:20 | | |
| **reaching** 105:11 | | | |

**[redlines - right]**                                    Page 25

**redlines** 87:4
88:6
**referenced**
52:23
**references**
79:11
**referencing**
83:14
**referred** 47:11
47:20
**referring**
100:25
**refresh** 52:15
52:16 75:22
**regarding** 87:9
91:1
**regards** 25:12
38:6
**regroup** 123:4
**reimburse** 57:9
**reimbursement**
56:23 99:7
**related** 57:21
88:16 89:1
92:19 121:2,25
135:6 137:14
**relationship**
8:8 10:1 11:11
11:25 15:10,25
16:6,8 20:12
20:14,16 21:6
24:14,14 25:21
25:25 41:8
42:1,8 43:11
45:23,25 46:22

50:15 136:5
**relationships**
9:15 28:18,21
**relayed** 122:6
**release** 95:10
**releases** 69:20
70:4 135:5
**relevance**
50:11 130:18
**rely** 133:1
**remember**
19:23 22:1
29:9 38:21,23
54:16 55:22
56:7 57:11,13
61:23 62:1,4
63:3 66:22
77:16 81:16
83:10 87:17
99:13 103:2
111:24 112:3
114:15 116:17
**remembering**
43:25
**remote** 2:1
137:7
**remotely** 2:21
5:13 6:5
137:10
**rent** 130:1
**repeat** 27:2
113:4
**report** 117:22
118:2

**reporter** 1:20
5:16 29:18
39:10,11 48:8
51:4 53:18,21
53:25 64:10
114:12 122:11
**represent** 31:2
**representing**
5:16
**reputation**
132:17
**requested**
101:19 136:21
**require** 57:18
**resigned**
101:22,25
102:3,5 103:10
127:20 128:6
**resolve** 63:6
**resources**
72:17
**respective**
136:22
**respond** 19:7
19:19 20:1
47:24 94:21
117:3,8 119:2
**responded**
86:20 105:13
119:12
**responding**
18:21 102:18
105:17 119:10
**responds** 94:23

**response** 16:10
18:24 19:20
48:17 95:13
**responses**
14:19
**responsibilities**
24:25 35:25
36:14 62:5
69:16 96:16
**responsible**
30:13,16,20
32:4,11 37:8
**rest** 13:24
59:12
**restate** 104:25
**result** 91:8
**resurface**
120:15
**reunited** 13:23
**review** 73:4
90:15,18
134:10
**reviewing** 73:5
73:17 83:23
93:10
**revise** 72:24
89:20 90:20
**right** 7:16,17
11:7 12:22
13:5 17:8,18
17:20 20:7,11
21:20 23:12,13
25:16 26:24
34:6,6 38:8
39:5 40:15,22

| | | | |
|---|---|---|---|
| 43:24 49:13,16 | **rights** 39:21 | 26:11 36:19,25 | 124:15,16,21 |
| 51:11,20,24 | **risk** 108:5 | 38:23 39:17,25 | 124:25 125:9 |
| 52:3,4,11,13,21 | **role** 24:21,23 | 41:4,6,20 42:3 | 125:20 126:6 |
| 53:16 54:13,17 | 42:24,25 65:2 | 42:11,13 43:7 | 127:16 128:6 |
| 55:1,9,10,12 | 66:2 73:24 | 43:18 44:22,23 | 128:20 129:4 |
| 58:18 60:12,19 | 74:3,7,11 | 44:23 45:23 | 129:10,19,22 |
| 64:2 68:17 | 75:18 92:17 | 46:1,20 47:2,4 | 131:4 132:4,20 |
| 74:21 76:6,12 | **roles** 28:17 | 47:6,11 50:19 | **ryan's** 20:9 |
| 77:4 78:20,22 | 29:15 30:10,22 | 52:8 55:24 | 43:9 64:14 |
| 79:6,9 80:21 | 33:7 69:17 | 56:22 58:23,23 | 82:12 116:23 |
| 82:1,10 84:11 | **romantic** 9:14 | 59:5 60:18 | 122:4 |
| 84:24 86:5,13 | 50:1 | 62:6,8 63:1 | |
| 86:21 87:4,7 | **romantically** | 64:22 67:25 | **s** |
| 89:13,20 90:12 | 12:14 46:2,20 | 68:6,19 70:3,8 | **sadeleer** 42:17 |
| 90:15,18 91:2 | 49:22 50:4,9 | 70:15 75:10 | **safe** 107:11 |
| 91:9,13 92:10 | 50:20 | 76:5,8,14 77:8 | 108:4 109:15 |
| 93:4 94:13,21 | **room** 56:23 | 77:23 78:7,9 | 111:13 126:9 |
| 95:8,11,15 | 57:1,4,6,8,9 | 78:19 79:5 | 126:14 |
| 97:10 99:2,23 | 58:12 | 80:6,17 81:11 | **safety** 103:20 |
| 100:2,5,22 | **ropes** 74:5 | 82:10,21,24 | 103:23 104:11 |
| 101:1,23 | **rpr** 1:21 137:21 | 83:17 84:24 | 104:16 105:5,7 |
| 103:17 106:10 | **rudeness** 55:18 | 86:13 87:1,4 | 105:23 106:13 |
| 110:23 114:25 | **run** 31:3 | 88:24 89:3,12 | 110:8 111:15 |
| 117:23 119:11 | **running** 29:25 | 89:19 90:11,17 | 119:23 124:22 |
| 120:9,10 | 31:14,17 | 94:23 95:1 | **salary** 36:19 |
| 123:15,19 | **runs** 129:14 | 96:9,16 97:13 | **sam** 122:16,18 |
| 124:7,9,11 | **ryan** 1:5 7:16 | 99:1 100:1,13 | 122:22 123:1 |
| 126:17 127:4,9 | 7:16,19 8:9,19 | 101:1,22,25 | **samuel** 1:11 |
| 129:7 130:9 | 12:22 13:5 | 102:11 103:9 | 122:14 |
| 133:10,24 | 17:9,9 18:16 | 103:17 107:16 | **saturday** 86:4 |
| 134:2,11,17,20 | 18:18 20:6,12 | 108:12 116:21 | **save** 77:25 |
| 135:9,14,17,20 | 21:24 22:10,16 | 119:1,25 | 81:14 |
| 135:24 136:2,6 | 22:25 23:7,9 | 120:15 121:19 | **saved** 93:19 |
| 136:11,16 | 23:12 24:19,21 | 122:4,9,18,22 | **saw** 27:15 |
| | 25:2,16,18 | 123:19 124:11 | 29:19 30:25 |
| | | | 31:5,8,25 |

32:15,19
102:12 112:21
118:16 134:11
134:13
**saying** 38:24
92:4 104:18,25
118:10 123:24
**says** 79:8 94:13
100:7,12,15
126:7,14
**scared** 36:13
103:20,22
104:16 105:5,7
109:17 110:1,5
124:17,21
**scenario** 16:15
**scene** 23:20
**scg** 11:21 23:23
24:3,10,21,25
25:3,6 28:8
70:3 80:14,15
**schedule** 18:8
18:15
**schiller** 2:4
**school** 16:5
17:4 71:21
132:4
**screen** 53:2
**screw** 111:13
**scroll** 86:8 87:3
90:8 95:4
**scrolling** 90:17
**scuderia** 23:22
**search** 72:14

**searching** 72:9
130:21,22
**second** 12:4
53:11,15,23
69:2 73:7,10
75:20 88:6
90:8 92:22
93:7
**securities** 21:22
22:11,17 70:12
**security** 126:22
**see** 6:19,21
10:9,13 13:7
17:15 18:5,9
18:11 29:17
30:25 31:1,3
32:22,24 33:2
34:2 41:4 43:7
52:19 53:2,2
71:6,7,8,9,13
71:15 75:24
76:12 78:23,24
79:13,15 82:8
82:9 83:12
84:6,17,18
86:1,12,12
90:14 94:6,12
94:18 95:3,5
99:15,16,25
111:4 115:20
**seeing** 45:22
52:22 54:15
71:17 89:9
100:17

**seek** 88:7
**seeking** 75:16
**seem** 41:14
43:16
**seemed** 10:5
27:8,14 30:9
30:12 35:11,15
41:8 42:8
43:11,14,23
45:11,17,25
46:22 55:15,15
55:17,21 68:24
69:12,14,16
115:5,6 116:4
**seems** 85:15
**seen** 17:21
45:18,20 97:16
97:18
**sell** 31:1 32:19
**selling** 32:24
37:8,14
**send** 53:19
69:24 76:14
93:13 117:17
119:16
**sending** 53:20
76:8,25 85:6
103:7
**sense** 55:17
77:21
**sent** 47:6 48:11
77:23 78:19,21
79:22 80:17
82:12,19,21,24
86:13 89:19

94:19,20 95:1
100:4 101:3
**sentence** 39:21
91:20
**september** 1:18
5:2,7 55:5 86:4
86:4
**serious** 115:10
**serves** 62:2
**services** 11:19
**set** 69:2 73:7,10
137:9
**setting** 31:16
**several** 33:15
40:19,19 42:9
52:4 60:9 65:7
88:14 96:5
108:21 117:6
**shape** 124:1
**share** 6:11 13:8
13:17,18,18
52:12 53:5
63:4 77:2
78:11,13 79:23
80:9,14 81:4
81:18 85:9
101:15 110:24
112:3,5 127:25
**shared** 9:7
13:20 27:20
30:21 33:1,10
68:2,2 76:16
81:1,6 83:11
83:20 89:15
92:15 112:10

135:13

**shares** 9:19

**sharing** 76:18
80:11,12 85:7

**sheppard** 2:13

**sheppardmull...**
2:17,18

**short** 90:21

**shorthand** 1:20

**shortly** 103:3,4
115:16

**shots** 74:1

**show** 6:20
52:13 83:21
98:8 112:20

**showed** 71:11
83:24

**showing** 33:23
35:11 48:4
83:4 100:20

**shown** 97:19
134:23

**shut** 120:2,4

**sibling** 10:1
11:11 136:5

**siblings** 18:16

**sic** 55:3 86:4

**side** 74:23,25
75:7

**sign** 85:13

**signature**
136:21 137:20

**signed** 32:24
33:8 68:16

**similarly** 91:13

**simple** 15:22

**simply** 88:17
136:10

**single** 10:25

**sister** 34:3
54:20 69:5
74:2 79:20
80:13 84:4
85:8

**situation** 14:13
15:1 107:14
109:4,9 113:19

**situations**
109:3

**six** 11:8 72:6,12

**size** 123:4
125:17

**skill** 137:13

**skills** 28:1

**sleep** 27:24

**small** 10:5
35:11 99:4
124:11

**smaller** 33:21

**smart** 108:1

**smoothly** 88:19
88:22 91:18

**social** 10:6 71:1
71:8 98:3
129:17

**sole** 30:19 38:4

**solely** 30:18

**somber** 115:6

**somebody** 9:11
9:19 42:20
48:16 50:1
88:20 109:12
120:13,23

**son** 20:14

**soon** 65:12
95:14,21 96:23
97:3,4

**sorry** 15:15
19:3 21:15
27:2 34:5 35:8
38:14 39:15,19
39:20 53:11
78:8 86:7
88:11 91:10
94:14,16,17
98:15,16,20
104:1,24 109:1
125:23 129:20

**sort** 129:24
134:14 136:4

**sorts** 135:7

**sound** 26:19
34:11

**sounds** 51:13
92:23 104:23
105:9

**southern** 1:2
5:11

**space** 70:20,23

**speak** 11:14
20:17,19,21
42:3 47:18

**speaking** 20:20
31:17 46:24

**speaks** 32:6
50:22

**specific** 9:3
19:21 21:3,6
28:1,21 29:4,6
33:2,7 35:2,21
42:22,25 43:25
44:4 63:9
64:18 74:6
75:15 96:21
103:2 114:8
120:17 126:3

**specifically**
9:14 10:23
21:16 35:23
74:10,20 75:16
78:4 80:8 81:2
96:18 107:22
110:20 112:6
116:3,6 120:19
120:24

**specifics** 21:10
21:17 22:4
24:16,22 25:22
26:1,3,6,6
28:15 35:14
45:2 62:24
66:1,14 68:2,3
81:8 83:3
88:13,25
102:13 103:6
112:23 116:8
125:13 128:1

speculate 8:3
  46:3 64:17,20
  103:1 110:12
  117:11 119:7
  125:15 130:10
speculating
  7:22 17:12
  69:22 131:7
speculation
  131:9
speculations
  35:7
spend 49:10,24
  56:13 59:3,24
  95:17 96:8
spending 27:11
  49:5
spends 129:13
  129:15
spent 10:2,7
  41:13,15 45:15
  48:19 49:3
  56:15 96:12
spirits 43:15
  45:17
split 61:8
spoke 15:21
spoken 114:17
sports 72:3,5,5
spots 58:4
standard 20:14
  20:15
standpoint
  10:6

start 17:20
  24:5 52:11
started 24:7,9
  26:12 28:6
  65:12 76:20
  128:7
starting 10:16
state 5:17,19
  6:25 16:4
  50:14 86:23
  109:24 137:3,6
stated 23:17
  30:18 36:5
  39:2 46:4,16
  75:17 110:5
  120:21 121:21
  121:24 122:5,6
  122:7 125:14
statement
  113:4
states 1:1 5:10
  87:6
stating 102:10
  120:19
status 130:11
stay 19:13
  57:16,18 58:11
stayed 72:21
  114:10
staying 60:7
  72:11 114:7,8
stenographic
  1:20 137:12
steps 45:2 63:5
  97:7 109:6

sticks 62:3
stopped 40:7
story 12:23
  47:17 76:20
  77:2,15
street 7:6
stress 80:10
stressed 12:13
  36:4,6,8
stressful
  107:14
strong 75:15
  123:19,21,23
structure 92:7
stuff 29:21
subject 76:11
  79:8 82:16
  83:13 85:3
  86:15 90:15
  93:6 100:7
submit 99:7
submitted
  56:22
subsequent
  134:19
substance 93:1
  93:2,5
success 30:14
  30:17,20 32:4
  32:11
sued 62:6 63:23
suggested
  14:11,14 87:18
suggesting 88:3

suggestion
  87:19
suggestions
  86:21 88:2,16
suing 62:13,17
  63:10
suit 48:20
suited 88:8
summer 58:3,3
  72:13 131:1
sung 1:8
super 116:8
support 54:23
  58:14
supportive
  34:3 54:20
  74:2 79:20
  84:4
supposed 37:3
  37:6 38:10
  86:8 106:11
sure 20:20
  35:17 40:10
  51:15 53:9,24
  57:5 59:20
  68:9,25 75:17
  82:25 87:23
  88:22,25 92:22
  104:24 115:12
  121:1 125:5
surprise 13:21
  27:1,3,12 47:6
  47:11,20 48:15
  48:19 49:2,4
  49:25

**surprised** 48:1
48:10,12 49:9
116:17
**surprising**
46:15
**suspected** 23:2
**sweat** 32:15
**sworn** 6:2,5
137:10

**t**

**tab** 53:17
**table** 3:1
**take** 18:2,3
19:19 51:13,16
51:17,18 69:2
74:3 79:24
81:8 93:7 97:8
119:25 123:3
131:24 133:20
**takeaway**
19:14
**taken** 1:18 5:9
13:25 19:25
45:3 58:2
91:16 107:9
115:9 137:7,12
**talk** 8:10,14
12:3,11,20
13:5,10,13
14:5,9,21 15:5
15:17 17:8
20:5 31:1
36:19 55:22
62:8 78:17
116:6

**talked** 13:11
15:17 98:25
**talking** 17:18
19:9 34:17
66:12 96:6
103:8 115:24
119:18,19
**taller** 124:6
125:17
**team** 44:8,13
44:15 45:3,5
45:20 47:16
54:23 59:12
64:25 72:6
73:24 74:7
77:13 79:21
84:12 95:24
115:12 116:2
**tears** 32:15
**teaser** 83:5
**tell** 10:9,22
11:15 12:6,15
16:7,9,9 22:10
23:15 24:21
25:2,5,8,10,11
25:18,23 26:2
26:11 30:3,16
33:8 36:22
39:7,25 40:3
42:11,13 44:22
44:23 47:2,4
56:22,25 62:11
62:25 63:5,8
63:19 65:4,8
65:12 66:9,9

71:4 88:24
89:3,7,9 96:9
99:6 101:25
103:9,12,14,20
103:22,25
104:10 106:1,4
107:8,16
109:12 110:10
110:19 111:3,7
112:14,18
113:22,25
114:10 115:2,4
116:3 120:15
121:2,20
122:18,22
127:13,17,21
128:6,10,17
133:7
**telling** 24:24
39:17 49:3
112:12 127:3
**tells** 111:20
**ten** 51:13 123:3
**tension** 41:11
41:14 55:18
**tensions** 21:5,9
21:12 22:15
43:14
**term** 18:22
**terminated**
127:21
**terminology**
66:13 102:7
103:9

**terms** 14:20
24:22 31:11
35:15 39:3
45:2 65:1 66:1
66:14 69:17
102:4 115:7
125:5,16
129:18
**test** 32:14 69:1
95:2
**testified** 6:7
122:24 133:17
135:19
**testify** 6:5
137:10
**testimony**
113:2 133:1
135:22 136:4
**testing** 97:25
**text** 8:15,18
13:13 48:3,11
65:8 117:17
119:10
**texts** 47:12
119:11
**thank** 53:25
105:4
**thing** 14:10
65:10
**things** 8:20 9:7
9:8,12,13,16,17
11:15 12:16
15:12 29:7
32:13 43:21
68:21 69:15

71:10,17 73:4
76:25 80:24
81:4 89:7
96:20 101:12
110:21 118:5
121:16 126:21
130:23 135:5
**think** 9:8,11,16
9:18 12:22
14:2 15:7
20:13,16,19
21:11 22:1,5
23:19 28:1
29:7 32:3 36:6
39:9 43:5,13
45:8,12 46:11
46:14 47:14
49:10,15 50:4
50:9,19 56:6,9
58:17 60:8
61:24 69:3,7
69:13 70:17,22
73:23 74:8,13
74:16,22 76:23
77:1,8,11,20
79:16 80:11
85:8 88:20
92:13 104:15
104:18,19,20
106:13,25
107:6,20,21
108:1,1 109:6
109:11,13
112:4 114:8
115:22,22

121:14 124:21
124:23,25
125:5 126:23
128:12 131:19
131:24 133:16
135:19
**thinking**
124:25
**thinks** 106:5
**thomas** 2:3
**thought** 22:23
43:20 44:1,6
45:11 50:12
51:9 80:1
84:10 91:17
98:15 107:9
108:12 109:5
120:16 128:10
**thread** 86:2
90:7
**threat** 121:24
125:4,8
**threatened**
112:2,9,14,18
112:25 113:8
113:16,18
115:3 116:4
121:5,10,19,23
122:3,10,18
124:16 125:1
126:7,16
**threatening**
125:9
**threats** 112:20
112:22 113:23

121:7
**three** 17:15
52:8 108:20
**ticket** 58:24
**tickets** 59:1
**time** 5:20 7:23
8:2 10:14,16
10:20,21 11:1
14:12 17:5
18:10,24 19:19
19:20 20:4
21:18 24:9
26:5,14,22
27:10 28:14
34:21 35:3
39:23 40:9,13
40:18 41:15
43:4,6 44:14
45:7,9 49:25
52:11,22 54:15
55:11 56:2
57:20 60:17,17
60:25 61:7,10
65:9,14,24
68:19,19 69:23
69:24 70:6
72:14,18,20
74:6 77:13
78:3 80:8,18
80:20 83:2
84:11 85:11
87:12,15 88:13
89:12,14,19
93:14,15,18,23
95:17,22 96:8

96:12 97:1
101:5 104:4,19
104:23 105:1,7
105:11,19
107:11,21
108:3,6 110:6
111:2,15,16
113:4 114:3
115:10 116:14
117:22 119:22
119:25 120:1,5
120:9,10,11
121:8 127:16
129:10,13,15
129:20 134:13
134:15 135:24
136:17 137:8
**times** 8:7 9:7
10:15 12:18,22
17:15,16,25
18:23 19:21
21:11 27:21
32:13 41:12,13
41:16 46:9
50:12 51:8
58:10 66:11
67:7 71:14
73:11 98:8
99:4 106:17
108:21,21
116:23 117:2
118:25 119:18
120:7 135:19
**timing** 117:11

tips 14:14
  16:22,23,24
title 26:11,13
  26:15,20 42:23
  89:14 100:21
titles 27:14
today 33:9
  133:1,7,24
  134:11
today's 14:20
  136:17
together 21:4
  29:24 30:2,3,5
  30:15 41:17
  45:15 56:10
  111:5
told 10:25 12:5
  14:16,17,18
  16:12,23 25:12
  26:10 29:9
  31:18 37:13
  63:15 105:6
  110:20 111:6
  112:9 113:15
  114:2 122:4,8
  122:8,9 132:9
  132:16
tomaso 1:9
  10:4,8,23 11:2
  11:12 12:1
  18:4 25:14,23
  26:4,12 28:7
  29:5 30:9 31:2
  31:23 32:4,12

33:3,9 35:25
36:17,20 37:1
37:22,24 38:1
38:4 39:18,25
40:4,9,13,22,25
42:20 44:24
45:19 52:4
56:23,25 57:3
59:18,21 60:6
61:21 62:6,19
64:2,4,22
65:13,18 66:15
66:17,25 67:8
67:12 68:7,14
68:17,20 70:8
70:25 75:11
76:9,20,24
77:15 78:19
82:21 84:12
85:5,10 87:9
87:12,14 89:4
89:7,10,13
90:21 93:13,14
93:16,19,25
94:3 95:10,24
96:10,17 97:14
101:1,23 102:1
102:3 103:10
114:10 115:12
116:2 127:16
127:18,22
128:4,7,8,18
132:18
tomaso's 98:3

ton 23:25 29:22
  49:25 63:24
took 23:19
  33:17 34:1
  60:12 63:5
  76:25 113:21
top 87:6 99:22
touch 117:3
  119:1
towards 103:18
train 34:2
  60:12,15,16
transcript 3:14
  137:12
traumatic
  107:1 111:21
travel 18:8,15
  31:5 32:1
  57:21,22 58:20
traveled 10:11
  10:22 11:1
  27:17 34:2
  57:19,24,25
  120:8
traveling 10:12
  10:23,24 11:2
  18:9 19:4
  27:18,20 29:22
  96:7
travels 10:14
  10:17
tried 117:2
  119:1
trip 58:5

trips 58:3,3,6
  130:25
trouble 22:25
  23:3
true 137:11
truly 65:9 73:4
  93:15 110:11
trust 108:2
  126:10
truth 6:6,6,6
  133:7 137:11
truthful 14:19
try 18:20
  101:10,17
trying 30:24
  31:4 40:6 69:4
  76:23 77:1
  91:10 92:7
  93:12 110:22
  111:12 113:10
  113:13
tuesday 1:18
  5:2,6
turn 103:14
tv 61:3
tweaking 92:2
tweaks 91:17
  91:24
twice 17:15
two 7:12 15:23
  16:13 20:23
  21:12 22:5,8
  24:6 52:5
  59:23 64:19
  69:23 72:2

80:23,25 81:2
98:8,8 103:6
133:13
**type**  16:11
134:24
**typically**  15:2
17:1

**u**

**ultimately**
107:3
**um**  9:1 53:6
86:6
**unable**  102:8
117:6 132:10
**unaware**  24:8
130:11
**under**  57:3
58:14 69:15
121:12 133:6
**understand**
12:8 28:24
31:25 38:16
63:22 73:16
105:10 106:1,2
107:13 111:17
126:14 133:4
136:4
**understanding**
19:11 25:20
38:2 40:12
57:3 58:15
59:18 61:11,15
61:17 64:1
68:10 75:10
94:25 105:16

113:14,19
114:6 115:11
115:25 117:21
125:9 130:8
**understood**
6:22 88:14
119:4 122:3
**unicorn**  1:12
**unit**  5:7 52:1
54:7 123:17
**united**  1:1 5:10
**university**
71:20
**unknown**  74:12
**unsafe**  109:25
110:24 111:6
111:21,24
112:24 113:7
113:20 114:1
120:18
**untrustworthy**
42:13
**untruthful**
42:11
**upcoming**  76:8
**update**  87:10
**updated**  91:20
91:20
**updates**  87:18
87:22 91:2
**use**  18:22 46:10
66:13 87:7
**used**  88:5
**using**  120:17

**usual**  130:25
**usually**  90:20
97:24

**v**

**v**  1:7 64:12
**vaguely**  112:25
113:7
**valued**  69:3
75:14
**various**  114:7
134:22
**verbal**  97:11
**verbally**  125:14
**veritext**  1:23
5:14,16
**version**  79:8,12
**versions**  83:5
83:18
**versus**  5:10
**video**  5:1,8
45:20 83:4,5
85:15,18
136:19
**videoconfere...**
5:1 137:8,10
**videoconfere...**
1:16 136:19
**videographer**
2:22 5:5,15
51:20,24 52:16
52:18 54:1,5
123:2,8,11,15
136:16
**videorecorded**
1:16

**videos**  89:10
**view**  78:2 109:9
**viewed**  77:21
79:19 107:20
107:22 109:13
135:16
**viewing**  84:7
**virtual**  5:14
**visited**  8:6
**visiting**  10:19
**voicemail**
119:11
**voicemails**
105:14 119:10
**voluntarily**
72:13
**vroom**  75:3

**w**

**wait**  95:14,20
96:22 104:1
**waking**  27:11
**walk**  133:23
**walking**  45:15
**walks**  129:14
**want**  12:4
22:17 31:7
35:24 50:6,13
51:17 62:13
65:22 66:15,16
66:25 67:1
103:8 104:24
106:22 110:6,7
115:17 117:11
118:4,5,15
119:7 122:1

125:15 130:10
131:25
**wanted**  15:1
23:15 65:17
74:1 77:2
91:24,25
107:10 112:5
118:14 123:23
131:18
**wanting**  16:16
66:21 85:9
106:14,15
**warn**  106:6
108:13,15
**washington**
2:15
**watch**  61:3
**watched**  27:7
83:16 85:16
**way**  6:10 13:1
86:11 88:16
89:16 100:18
105:11,12
106:10,16
109:8,8 124:24
**we've**  8:13 9:25
51:11 58:2
**wearing**  30:8
**wedding**  54:21
58:20 130:25
**week**  103:5
**weekend**  54:21
72:19
**weekly**  8:11,14

**weeks**  103:6
117:6 119:6
**wellness**  129:12
**weng**  1:10
**went**  16:1,2
29:23 52:24
54:24 59:11,11
60:10,10 71:24
72:1,3 111:1,4
114:14 117:7
117:15 118:19
**west**  7:6
**white**  109:4
**wife**  41:15
77:17
**wigger**  2:12
5:24
**wise**  92:4
**witness**  3:3 6:2
6:4 38:10,14
39:15 51:15
52:17 98:14
123:5 136:21
137:9
**woman**  47:14
**wording**  91:21
**words**  43:25
44:4 46:10
109:24 120:18
**work**  14:15,17
15:2 22:17
23:15 24:2,4
25:18,23 29:17
30:9,23 31:7
31:22 36:2

40:10 43:16
45:18 57:21
60:10,11 61:2
62:5,21 66:25
67:21 68:14,20
69:8,11,15
70:3,9,24 71:1
71:7,8 73:3,20
73:22 75:11
76:23 77:19
82:12 84:5
87:25 89:4,16
89:19 97:13
119:5 131:12
**worked**  11:17
11:18,19,21,23
20:6 21:4,18
21:24 24:3
25:16 31:6
42:21 44:17
67:16,22 68:3
68:25 71:18,22
71:24 72:2,4
74:20,23 75:8
130:4
**workers**  35:15
47:12
**working**  10:3,8
10:21 11:12,25
17:19 18:4,6
21:5 24:5,9
26:12,17 27:12
27:23,25 28:6
29:12,13,21
30:8 32:13

35:18 40:3,4,8
40:12 42:7
44:7 45:21
60:25 65:12
71:12 72:18
80:14 84:6
85:10,12 87:12
93:14 96:14
129:4,9,13
131:21
**works**  42:20
71:15 124:3
**world**  75:7
88:8 95:14,21
96:23 131:17
**worried**  102:16
**worry**  99:9
**wow**  124:6
**write**  88:7 91:6
**writer**  75:15
**writing**  73:5,17
88:24 111:3
**written**  97:9,11
**wrong**  34:5,9
53:3 100:18
**wrongdoing**
127:17
**wrongdoings**
127:21 128:2
128:11
**wrote**  96:25

| y |
|---|

**y**  64:12
**yards**  2:5 7:20
8:6 125:24

133:21
**yeah**  6:13 7:15
8:5 9:4,22 13:9
15:7 19:14
22:3 29:10
32:16 35:5
39:4 49:2
53:18 57:21
58:11 66:14
71:10 86:12,16
94:18 95:19
96:15,25 97:11
97:20,22 100:3
101:4 102:6
104:2 105:3,19
116:7 120:4,6
121:17,17
123:1,23
127:10 128:5
129:15 131:1
135:4,5,6
**year**  7:8,25
17:15,16,16,21
18:8,8 22:2,3
34:22 35:5
64:19 65:23
71:23,25
100:10
**years**  7:12 10:2
10:7 11:8,19
18:7 22:5,8,9
28:16 33:15
35:21 40:19
42:9 56:8
60:10 64:19

65:7,7 72:2,7
72:12 87:16
88:14 89:1
96:5 116:9
118:9 121:22
**yellow**  86:24,24
**yep**  6:16,22
55:15 70:2
75:24 76:7,10
76:13 77:5
78:24 79:10,13
80:22 84:25
85:4 86:1,19
86:25 87:2
94:6,22 95:7,9
95:16 100:9,14
100:23 124:8
**york**  1:2 2:6,6
5:11 7:11,20
17:14 18:10,12
31:19 33:16,23
34:4,11,16,22
35:3,8 40:21
54:20 56:1,11
56:17 58:20
60:6,12,25
65:19,20

**z**

**zach**  2:3 3:9
5:25,25 8:24
12:7,25 14:1
20:25 23:4
28:3,23 31:9
32:5,20 34:6
38:9,12,15

39:1,8,13,22
40:23 41:1,22
46:8,21 47:8
47:13,22 48:2
48:13,21 49:7
49:23 50:5,11
50:21 51:2,6
53:1,6,9,14,20
57:20 61:14
66:18 68:8
69:9 70:16
73:1 74:9
76:15 77:10
79:18 89:21
92:11 93:3
98:13,15,19
102:4 104:22
106:7 107:17
108:8,17,23
109:18 110:3
111:25 113:1,9
122:20,24
123:6,10,20,25
124:12,18
125:2,10,12,22
126:8,19 127:2
128:12,21
129:1 130:18
131:6,15 132:2
132:23 133:13
133:15 134:4
135:3,12 136:9
136:13
**zip**  100:13,16
100:17,19

**zoom**  1:16 5:1
129:21 136:19
137:7,10

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.