# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:23-cv-04305(AS)

- - - - - - - - - - - - - - - - - - - - - - - - - x

RYAN BERRIS,

     Plaintiff,


   - against -


SUNG-FUNG CHOI (a/k/a NORMAN CHOI), DE TOMASO

AUTOMOBILI HOLDINGS N.A. LLC, HIN WENG LUI

(a/k/a SAMUEL LUI), GENESIS UNICORN CAPITAL

CORP.,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x


 VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF

     NED S. BARNES


    October 30, 2024

   MAGNA LEGAL SERVICES

    (866) 624-6221

    www.MagnaLS.com

Page 2

1           VIDEOTAPED ZOOM VIDEOCONFERENCE ORAL

2    DEPOSITION OF NED S. BARNES, pursuant to Notice,

3    commencing October 30, 2024, at 9:59 o'clock a.m.,

4    on the above date, before Catherine M. Donahue, a

5    Certified Court Reporter and Notary Public in the

6    State of New Jersey.

7

8    Magna Job No. 1227724

9

10

11

12

13

14

15                MAGNA LEGAL SERVICES

16                  (866) 624-6221

                   www.MagnaLS.com

17

18

19

20

21

22

23

24

25



Page 3

```
 1   A P P E A R A N C E S:
 2   (All parties present via Zoom Remote)
 3
 4   BOIES SCHILLER & FLEXNER LLP
 5   BY:   JOHN T. ZACH, ESQ.
 6         SOPHIE ROYTBLAT, ESQ.
 7   55 Hudson Yards
 8   New York, New York 10001
 9   (212) 446-2300
10   jzach@bsfllp.com
11   sroytblat@bsfllp.com
12   Attorneys for Plaintiff
13
14   SHEPPARD MULLIN RICHTER & HAMPTON LLP
15   BY:  ALEXANDRA BUSTAMANTE, ESQ.
16        HANNAH WIGGER, ESQ.
17   2099 Pennsylvania Avenue, NW, Suite 100
18   Washington, D.C. 20006-6801
19   (202) 747-1900
20   abustamante@sheppardmullin.com
21   hwigger@sheppardmullin.com
22   Attorneys for Defendants
23
24
25
```



Page 4

1    A P P E A R A N C E S: (Cont'd)

2    (All parties present via Zoom Remote)

3

4    ALSO PRESENT:

5            Ryan Berris

6            Chris Russo, Magna Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 5

```
 1                       I N D E X

 2

 3   Witness:                                  Page

 4   NED S. BARNES

 5    Examination by Mr. Zach................... 9

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18   October 30, 2024

19

20

21

22

23

24

25
```



Page 6

1                       E X H I B I T S

2    Exhibit Name        Description                    Page No.

3

4    1                   Document                          16

5    2                   Document entitled De Tomaso's     55
                         Second Amended Disclosures

6

     3                   Answer to the First Amended       59
7                        Complaint

8    4                   Document bearing Bates stamp      135
                         DT00092013

9

     5                   Document bearing Bates stamp      137
10                       DT00092014

11   6                   Document bearing Bates stamp      139
                         DT0000009310

12

     7                   Document bearing Bates stamp      142
13                       DT000094981

14   8                   Document bearing Bates stamp      143
                         DT0000071709

15

     9                   Expert report of Adam S.          158
16                       Rabinowitz

17   10                  Document bearing Bates stamp      204
                         DT0000000249 through
18                       DT0000000253

19

20

21          (Exhibits attached with transcript.)

22

23

24

25



```
 1              DEPOSITION SUPPORT INDEX

 2

 3         Instruction To Witness Not To Answer

 4                   PAGE       LINE

 5                    None Marked

 6

 7         Request for Production of Documents

 8                   PAGE       LINE

 9                    None Marked

10

11                   Marked Text

12                   PAGE       LINE

13                    None Marked

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 8

```
 1              THE VIDEOGRAPHER:  We are now on
 2         the record.
 3              This begins videotape number 1 in
 4         the deposition of Ned S. Barnes, in the
 5         matter of Ryan Berris versus Sung-Fung
 6         Choi, et al.
 7              Today is Wednesday, October 30,
 8         2024, and the time is now 9:59 a.m.
 9              This deposition is being taken
10         virtually at the request of Boies
11         Schiller Flexner LLP.  The videographer
12         is Chris Russo of Magna Legal Services
13         and the court reporter is Catherine
14         Donahue of Magna Legal Services.
15              Will counsel and all parties
16         present state their appearances and whom
17         they represent.
18              MR. ZACH:  So starting with the
19         noticing party, I'm John Zach.  I'm
20         joined by Sophie Roytblat.  We're
21         attorneys for Ryan Berris.
22              Mr. Berris is actually -- I'm in
23         a conference room.  He's sitting in the
24         conference room with me.  And we
25         represent the plaintiff.
```



Page 9

1          MS. BUSTAMANTE:  Hello.

2          Alexandra Bustamante for the

3      defendants, and I'm joined by my

4      colleague Hannah Wigger.

5          THE VIDEOGRAPHER:  Will the court

6      reporter please swear in the witness.

7              (The witness is sworn by the

8      court reporter.)

9  N E D   S.   B A R N E S,  called as a witness by

10      (Plaintiff), having been first duly sworn

11      by Catherine M. Donahue, a Notary Public

12      within and for the State of New Jersey, was

13      examined and testified as follows:

14  EXAMINATION BY MR. ZACH:

15      Q.   Thank you.

16           Good morning, Mr. Barnes.

17      A.   Good morning, Mr. Zach.

18      Q.   I take it that you have prepared a

19  rebuttal expert report in connection with this

20  matter; is that fair?

21      A.   That is correct.

22      Q.   And when were you first retained by

23  the defendants, I guess, to, I guess -- let me

24  rephrase.  Strike that.

25           I'm sorry.  I can't talk this



Page 10

1   morning.

2              When were you first contacted by the

3   defendants in connection with this case?

4        A.    I don't have a recollection of the

5   specific date.  I would have to go back and

6   check my and check my records.

7              But I would, I would estimate that

8   it was sometime in the, in the spring or maybe

9   the very early part of the summer of this year

10  but probably the spring.

11       Q.    That's fine.

12             And had you done work with Sheppard

13  Mullin in the past?  Have you done other cases

14  with them?

15       A.    Yes, Sheppard Mullin has retained me

16  in several other cases in the past.

17       Q.    Okay.

18             I mean, it is not a memory test, but

19  just approximately how many times, would you

20  say?

21       A.    I would say approximately five.

22       Q.    Okay.

23       A.    Maybe seven.

24       Q.    And when was the most recent one of

25  those cases?



Page 11

```
 1          A.   Well, I don't know when I was
 2   retained in the most recent case, but I
 3   submitted an expert report in a case in which I
 4   was retained -- I guess retained by Sheppard
 5   Mullin's client but through Sheppard Mullin
 6   probably in -- I issued the report, I believe,
 7   over the summer.
 8          Q.   So the summer of 2024?
 9          A.   Yes.
10          Q.   Okay.
11               Just going through your professional
12   background, you're a CPA, correct?
13          A.   Yes, sir.
14          Q.   And do you, in terms of -- besides
15   the CPA, do you have any other professional
16   designations?
17          A.   So I'm a certified fraud examiner.
18   I do quite a bit of forensic accounting as part
19   of my professional practice.
20               I don't know that I would
21   characterize it as a professional certification,
22   but I have, I have a designation through the
23   AICPA related to forensic services and
24   litigation support services.
25          Q.   Do you -- are you -- do you have a
```



Page 12

1    certification -- do you have any credentials

2    specific to business valuation?

3           A.    I don't have any, I don't have any

4    specific designation or certification other than

5    my CPA related to business valuation, no.

6           Q.    Okay.

7                 Are you familiar with something

8    called a Certified Valuation Analyst?

9           A.    Yes.

10          Q.    Okay.

11                And I take it you don't have that

12   credential?

13          A.    If that's the one that NACVA,

14   N-A-C-V-A, bestows, I actually used to have that

15   designation.  I no longer have it.

16                And I may, I may be misrecalling the

17   acronyms, but I am aware.  There's a handful of

18   them out there.  I'm generally familiar with all

19   of them and I presently don't have any of them.

20          Q.    Got it.

21                In terms of your practice -- well,

22   strike that.

23                Outside of testifying in court

24   proceedings, arbitrations and the like, do you

25   have, do you have -- is there another part of



Page 13

1   your practice that you currently have?

2          A.    Well, if I understand that question

3   correctly, I, I don't delineate or apportion out

4   kind of my professional practice.

5                You know, again, as I stated before,

6   I do a fair amount of forensic accounting,

7   valuation-related work and other types of

8   financial consulting work.

9                Some of that -- a significant

10  portion of that generally is related to dispute

11  resolution.  So it would be involved in some

12  type of proceeding, whether it be through a

13  court or an arbitration of some sort.

14               But oftentimes I'm retained in a

15  matter that doesn't involve or does not

16  contemplate litigation.  And that could include

17  and has included some of my valuation work, some

18  of my forensic work, some of my royalty auditing

19  and the like.

20         Q.    Okay.

21               Again, I'm just asking for

22  approximations, so you don't have to be

23  scientific about it.

24               How much of your work would you say

25  is non-dispute oriented, meaning it isn't being



Page 14

1    retained for a contemplated or active dispute?

2            A.   Well, that's difficult to even

3    estimate and approximate or approximate because

4    that's going to vary over, you know, over time

5    from -- certainly from year to year and

6    potentially even from quarter to quarter or

7    month to month.

8                  I would say that, that currently, as

9    I sit here today, roughly all of my professional

10   engagements are in some way related to either

11   actual or contemplated litigation.

12                 But I've had, I've had periods in my

13   career where I've had very large

14   nonlitigation-related matters that where the

15   answer would be almost vice versa.

16                 So, I can -- I would need to look at

17   it for a period of time before I could really

18   even approximate that.

19           Q.   Fair enough.

20                 Would you say that at least the

21   majority of your work is in some way connected

22   to a dispute over the last -- let's just call it

23   three years?

24           A.   That's probably fair.  That's

25   probably fair.



Page 15

```
 1          Q.   Do you have your report?  Do you
 2   have a copy of your report?
 3          A.   I actually -- I was going to ask you
 4   if this is acceptable.  I have another screen
 5   here --
 6          Q.   Totally fine.
 7          A.   -- and I have a copy of it pulled
 8   up.  So I'm happy to close that screen.
 9          Q.   No, no, no, I want you to do that.
10          A.   Yes, so in that case, yes, I have an
11   electronic copy that's clean.  I have not noted
12   it in any way or put notations on it.
13               But I do not have a physical copy
14   sitting in front of me.
15          Q.   Okay.
16               You have access to it.  So I don't
17   have to show you everything.  You and I can just
18   talk.  I've got a copy.  You've got a copy and
19   we can just sort of go to it.
20          A.   Certainly.
21          Q.   Okay.
22               MR. ZACH:  So I'm going to mark
23          your report as -- how are we doing this?
24          For the other experts, did we just make
25          it like Barnes 1?
```



Page 16

```
 1                   MS. BUSTAMANTE:  I think that
 2          works.
 3                   MR. ZACH:  Okay.
 4                   MS. BUSTAMANTE:  We've been doing
 5          the last names for every witness
 6          usually.
 7                   MR. ZACH:  Okay.
 8                   So I'm going to mark as
 9          Barnes 1 -- we'll just call your report
10          as Barnes 1, which -- and I'm not going
11          to bring it up on the screen because I
12          have it here, but just to make it easy.
13                       (Document was marked as
14              Barnes Exhibit 1 for identification,
15              as of this date.)
16   BY MR. ZACH:
17          Q.   Can you turn to -- I just want to
18   sort of go through your CV a little bit at the
19   outset.
20          A.   Okay.
21          Q.   So I think it is Exhibit 1, which is
22   your, which is your CV.  And it sort of sets
23   forth your professional -- high level of your
24   professional background.
25                   So I take it you graduated with a
```



Page 17

1    degree in accounting in 1991; is that fair?

2         A.    That's correct.

3         Q.    Okay.

4               And then, after, after you

5    graduated, you went to work for Friedman &

6    Fuller; is that right?

7         A.    Correct.

8         Q.    Just generally, what kind of work

9    did you do at Friedman & Fuller?

10        A.    Friedman & Fuller was a CPA firm.

11   So I was a, I was a -- I started as a staff

12   accountant doing -- primarily on the audit side

13   of the business.

14              They service mainly, you know, small

15   to mid-size companies in the mid Atlantic,

16   mid-Atlantic area or in the greater Washington,

17   D.C. area, to be more specific.

18              And I, I was on the audit side and I

19   progressed through, through the ranks to -- I

20   think when I left, I was an audit manager for

21   the firm.

22        Q.    And what sort of clients generally

23   were you performing audits on?

24        A.    They were -- it was a pretty diverse

25   group.  The firm had somewhat of a specialty in



Page 18

1    wholesale distribution and also a fairly, a

2    fairly robust portfolio of automobile

3    dealerships.

4          Q.    Okay.

5                And in terms of auditing, was it --

6    and I apologize.  I'm not an accountant.

7                Was it -- were you doing sort of tax

8    work or were you preparing financial statements

9    or all of the above?

10         A.    So, I was not primarily on the tax

11   side.  I did, I did, I did do a fair amount of

12   tax work during what we called the tax busy

13   season, as everybody in the firm did.

14               My role was primarily on the audit

15   side and not to, you know -- just to try to

16   simplify, auditors, external auditors do not

17   prepare financial statements.  The financial

18   statements are always prepared by the company.

19   They're the responsibility of management.

20               It is the responsibility of the

21   external auditors to perform a financial

22   statement auditor -- audit, I'm sorry, or in

23   some cases a lower level of assurance called a

24   review or a compilation.

25               And I was responsible, primarily



Page 19

1    responsible for doing all of those things, as
2    well as other ancillary services that the client
3    might require, such as audits for their employee
4    stock option plans, inventory valuation services
5    and the like.
6            Q.    And after you -- I take it you're
7    based in the D.C. area?
8            A.    Yes, I have been generally.  I live
9    in Virginia.  I'm in Virginia today.
10            But my, my office -- my offices, to
11    the extent I have had them over the course of my
12    career, have either been in Virginia, Maryland
13    or D.C.
14            Q.    My son goes to school in D.C.  It is
15    a great city.  It is too humid.
16            You then went on to, it looks like,
17    a place called Capital Accounting; is that
18    right?
19            A.    Yes.
20            Q.    Like what was Capital Accounting?
21            A.    So Capital Accounting was actually a
22    wholly-owned subsidiary of a law firm that's no
23    longer in existence.  It used to be called
24    Howrey & Simon.  And then it went to Howrey.
25            Howrey had an internal group of



Page 20

1  consulting practices that generally provided --
2  I think I would describe it as their primary
3  function was to support Howrey lawyers with
4  respect to their own cases.
5          Howrey was a big litigation firm.
6  But, in addition, ex -- professionals within
7  what we call the capital group -- because there
8  was a capital economics and a capital
9  environmental as well.  Professionals within
10  those groups would, would also practice outside
11  of Howrey's umbrella.
12          Q.   Okay.
13          And were you doing basically work
14  that was kind of in line with what you were
15  doing at Friedman?
16          A.   No, it was not, it was not in the
17  practice of public accounting.  It was more in
18  the consulting, consulting services.
19          And that's, that's really how I got
20  into the litigation support business and
21  providing expert testimony.
22          Q.   Okay.
23          So that's sort of when you, when you
24  developed that part of your practice, that would
25  have started your time at Capital Accounting?



Page 21

1          A.    Not exactly, because the reason I
2    went to Capital Accounting was a partner at
3    Friedman & Fuller who began to expand his
4    practice into more nontraditional services, such
5    as valuation and litigation support, he
6    recruited me into his practice and I began doing
7    some, some work with him towards the end of my
8    tenure at Friedman & Fuller.
9              And then, when he moved on to become
10   the president of Capital Accounting, he
11   recruited me to Capital Accounting.
12         Q.    And then, from there you went to
13   LECG LLC.
14              What was that?
15         A.    So LECG is the acronym stands for --
16   used to stand for Law and Economics Consulting
17   Group, and that was a collection of economic
18   professionals, accounting professionals and
19   finance professionals that generally provided
20   consulting services to, to companies, to law
21   firms, to government agencies on, on any variety
22   of issues.
23              And a fair amount of that was,
24   again, in a dispute resolution context, but a
25   lot of it was also outside of dispute



Page 22

1  resolution.

2          Q.    Okay.

3                And you made it to -- your final

4  position there was as a director?

5          A.    Correct.

6          Q.    When did you -- and I'm not -- you

7  can approximate.

8                When did you first -- when was your

9  first sort of retention, as you can remember, as

10  potentially a testifying expert in a dispute?

11         A.    Do you mind if I look at my CV?

12         Q.    Yes, yes, yes, totally fine.

13         A.    So there was one -- so my, my CV,

14  although this is not really required under the

15  federal rules, I don't -- I'm not very

16  disciplined at, at cleaning this up.

17               But my CV goes back to -- August of

18  2005 is the first engagement where I actually

19  provided expert testimony at trial that's,

20  that's reflected on my CV.

21               I was retained in one or two other

22  matters to act as an expert that did not end up

23  resulting in -- I think I was deposed but did

24  not end up going to trial.

25               One of -- at least one of those



Page 23

1  happened while I was at Capital Accounting.  I
2  don't, I don't recall if both of them were.  But
3  one of them predates -- one of them at least
4  goes back to whenever I -- before I left Capital
5  Accounting, which would have been 2002 or prior.
6        Q.    Okay.
7              And then when you were at LECG, did
8  you work as sort of a testifying expert?  Is
9  that where that part of your practice started to
10  grow?
11       A.    It certainly grew throughout that.
12 I mean, I would say that during the early years
13 of my time at LECG, I was probably, maybe --
14 best guess would be roughly split between what I
15 would call my own professional engagements where
16 I was acting as a potential testifier or I was
17 at least a principal on the matter, whether it
18 was litigation or not.
19             And then, the other half would be
20 matters or engagements where I was providing
21 support to someone else in the firm.
22       Q.    Got it.
23             I probably should have asked this.
24 Did you ever work for us, Boies Schiller?  Did
25 Boies Schiller ever retain you?



Page 24

```
 1          A.   I don't think I have been retained
 2   in the capacity as you described it as the
 3   principal or the main potential testifier or the
 4   principal, even if it is a nonlitigation.
 5               But I have worked on matters with
 6   other professionals where Boies Schiller was
 7   the, was the firm that retained us.
 8          Q.   Got you.
 9               What kind of matters were those?
10          A.   I don't recall.  It was some time
11   ago and I just don't recall.  I'm sorry.
12          Q.   That's all right.
13               Again, I'm just trying to get a
14   sense of your background.  So -- and then you
15   moved on to Berkeley Research Group where it
16   looks like you were there until last year; is
17   that right?
18          A.   That's true.  I mean, I remain in
19   some, in some loose affiliation.  I remain
20   affiliated with BRG in some capacity, and I'm
21   happy to expand on that.
22               But I'm currently not an employee or
23   exclusive to BRG.  But, yes, I was, I was an
24   employee of BRG through June 30th of last year.
25          Q.   Okay.
```



Page 25

1            And you still -- I mean, I don't
2    need the nitty-gritty, but what is, what is sort
3    of the remaining relationship, sort of, at a
4    very high level?
5            A.   So I, I decided for a variety of
6    reasons to have a discussion with the firm
7    management to move to an independent contractor
8    status.
9            As part of the agreement that I had
10   with them, they generally get a right of first
11   refusal on anything that I generate.
12           And if they choose, for conflict or
13   business reasons or whatever, if they choose --
14   if they don't want to provide, you know,
15   staffing support, back office support and the
16   like, I'm free to pursue it outside.  I just
17   don't -- I can't, I can't utilize BRG resources
18   on those matters.
19           Q.   I see.
20           So, you know, like for people --
21   maybe someone that's supporting you with doing
22   the research or having access to whatever their
23   infrastructure is, that's, that's sort -- if
24   they accept, they accept the assignment and want
25   to do it under that umbrella, that's sort of



1    what you get from them?

2         A.    Yes.  And so, this case is a good

3    example of that.  All of my support staff, my

4    professional staff, my IT support, you know, the

5    access to computer servers and research services

6    and all that stuff on this matter goes through

7    BRG.

8         Q.    And so, Sterling Forensics, is that

9    your, is that sort of your, your company?

10         A.    Yes, that's my, that's my personal

11    LLC that I handle.  All my work goes through

12    Sterling Forensics LLC now.

13              But it is just where I get my back

14    office support is either BRG or I find alternate

15    sources for that.

16         Q.    Okay.

17              And so for Sterling Forensics, is

18    that just you or do you have folks working for

19    you?

20         A.    I don't have any employees.  I don't

21    have any employees that, that directly support

22    me.  I use, I use independent contractors when,

23    when necessary.

24         Q.    Okay.

25         A.    But not on this case.  Because this



1    case is for BRG.

2              Q.    Do you know Bruce Dubinsky?

3              A.    I do.

4              Q.    He's from Maryland.  I was just

5    curious.  It seems like -- you two seem like you

6    might know each other.

7              A.    I think he offered me a job once.

8    He's a good guy.  I like Bruce.

9              Q.    Bruce is a good guy.

10             A.    Bruce is a good guy.

11             Q.    Okay.

12                   So in terms of this -- so just going

13   to your assignment on this case, did you have

14   folks assisting you with it?

15             A.    I did.

16             Q.    Okay.

17                   Who were those folks?

18             A.    So, I have a case manager.  Her name

19   is Drew Lehman.  She was -- she generally is my

20   case manager on most of my significant matters.

21                   I have another senior manager who is

22   very close to a case manager named Sydney

23   Fallone, who is -- who I rely on quite a bit.

24                   And then, I have a number of what I

25   would call more -- not to say this in a



Page 28

1    pejorative fashion, a more junior staff;

2    researchers, analysts, consultants who generally

3    work at the direction of either Drew or Sydney.

4           They don't -- they generally take

5    their assignments and purview directly from Drew

6    or Sydney.  But, I don't, I don't know their

7    names right now.  I mean, I could go look it up.

8           Q.    It's okay.  It's okay.

9           In terms of like the drafting of the

10   report, did anybody -- did you have anyone that

11   was assisting you with the drafting?

12          A.    Well, in terms of the actual putting

13   the words on paper or putting the words into a

14   Microsoft word file, that's all me.  I don't --

15   no one -- I mean, there are people who read it

16   and give me comments or may suggest that I've

17   made typos or, you know, footnote edits and that

18   sort of type of stuff.

19          But, no, I write, I write all my own

20   reports.  And occasionally I will ask, I will

21   ask someone to draft a, you know, a paragraph or

22   something outside of the report that I can look

23   at and then make my own.

24          I don't recall that happening in

25   this case, but that's part of my practice.  But



Page 29

1    everything that -- all the writing that goes

2    into the report is my own.

3           Q.    And just as an estimate, how much

4    time -- do you bill by the hour?

5           A.    I do.

6           Q.    Okay.

7                 As of, you know, today, before, you

8    know, having talked to me, about how much time

9    have you billed on this matter?

10          A.    So are you referring specifically to

11   the work that went into preparing this report or

12   just total?

13          Q.    Why don't we do both.

14                So let's just start with this

15   report.  About how much time did you bill on the

16   report?

17          A.    If I had to -- if I had to guess, I

18   would probably say between maybe 60 and 80

19   hours.

20          Q.    And then it sounds like -- and then

21   for the entire engagement relating to this case,

22   how much time do you think you billed to the, to

23   the matter?

24          A.    For me, for me it wouldn't be

25   significantly more than that.



Page 30

```
 1                    And when I, when I gave you my last
 2      answer, that included my -- the time I spent
 3      reviewing Mr. -- and I want to get his name
 4      right.  I'm not trying to be disrespectful.  Is
 5      it Rabinowitz?
 6           Q.   Yes, that's how I say it.
 7           A.   Okay.
 8           Q.   But I could be wrong too.  So we can
 9      agree on that.
10           A.   So, you know, I'm including in the
11      time estimate that I gave you, I'm including the
12      time that I spent reviewing Mr. Rabinowitz'
13      report.
14                    For me, in addition to that -- so
15      prior to receiving Mr. Rabinowitz' report, I
16      personally did not have a significant amount of
17      hours.  That could be different for my staff.
18           Q.   Okay.
19                    That was going to be my follow-up
20      question.
21                    In terms of the staff or the support
22      that BRG is offering, do you have a sense of how
23      much time has been billed by them?
24                    MS. BUSTAMANTE:  Object to form.
25           A.   I don't, I don't, primarily because
```



Page 31

1    I believe the majority of that work, just

2    because of the timing here, necessarily had to

3    occur this month and I haven't seen any

4    information related to what the bill is for --

5    that's going to go out in November.

6              Again, there was -- there have been

7    bills prior from my staff primarily reviewing

8    documents and other things that might have

9    occurred prior to Mr. Rabinowitz' report being

10   issued.  I don't have, I don't have a good feel

11   for how much that is.  I would have to go back

12   and check the invoices.

13   BY MR. ZACH:

14        Q.   No, fair enough.  It was a pretty

15   quick turnaround time.

16              When you were retained in the

17   spring, what was your understanding of sort

18   of -- what assignment was given to you?

19        A.   Well, my assignment -- I wasn't

20   really given an assignment when I was retained.

21   I was basically told that -- I was basically

22   asked if I would be available to potentially

23   provide expert services and potentially expert

24   reports and testimony in this case.

25              I don't -- I mean, there might have



Page 32

1    been some discussion clearly that, that there

2    would likely be a claim for damages that someone

3    from -- retained on behalf of Mr. Berris might,

4    might issue and that I would -- and that I would

5    be asked to respond to that.

6              There might have been some

7    discussion early on about whether or not there

8    was a claim for damages that Mr. Choi or the

9    other defendants in this matter might be

10   asserting against Mr. Berris.

11             Ultimately, my understanding is that

12   I was not asked to, to present any such analysis

13   or opinion.

14        Q.   Okay.

15             So you, in terms of a claim and

16   analysis for damages being asserted by Mr. Choi,

17   you did not prepare a report for that?

18        A.   I did not.

19        Q.   Okay.

20             So your, your sort of assignment has

21   been to sort of rebut and you know, to review

22   and rebut Mr. Rabinowitz' report?

23             MS. BUSTAMANTE:  Objection.

24             THE WITNESS:  Sorry.  Sorry, Ali.

25        A.   Certainly that's the case today.



Page 33

1    Again, I can't -- I believe my recollection is

2    there was some discussion at some point that

3    there might be a claim for damages that, that

4    Mr. Choi might want or other defendants might

5    want to assert.

6              I don't -- again, nothing was ever

7    done in that, in that vein.  But that's all I

8    remember.

9    BY MR. ZACH:

10         Q.   Okay.

11              Let's go -- let me -- I'm skipping

12   around a bit.  I want to go back to -- we'll get

13   back to sort of the prepping of the report, but

14   I just wanted to go through some of your, your

15   testimony, like, you know, your prior testimony

16   in your CV.

17              You've got from like pages 3 of 5 --

18         A.   Yes, sir.

19         Q.   -- that lists, that lists, you know,

20   your matters going back to 2005.

21              Did you -- how many times -- again,

22   I'm just asking you to estimate.  How many times

23   do you think you testified at a trial?

24         A.   Are you including -- would you

25   include an arbitration in that, in that question



Page 34

1   or are you asking me just in federal or state
2   court?
3          Q.   No, I'm a real lawyer.  So
4   arbitration doesn't count.  So let's just do --
5   let's just do the court.
6          A.   Well, the last arbitration I
7   testified in for Boies Schiller --
8          Q.   I know.  I know.
9          A.   -- so, you know, I mean, I count it.
10         Q.   No, we do, too.  Don't tell my
11  colleagues I said that.
12              But let's just take it with trials.
13  How many trials do you think you have testified
14  at?
15         A.   Roughly, I'm going to say 20.  I
16  would say at least, comfortably at least 15.  I
17  would say it is closer to 20.  It could even be
18  25.
19         Q.   Well, you were doing the Panini
20  stuff, right?
21         A.   I testified in the arbitration in
22  connection with Panini and NFLPA.
23         Q.   Okay.
24              That's kind of a cool case.
25              So of those, of those trials that



Page 35

1  we're talking about, were most of them jury

2  trials or was a fair number of them bench

3  trials?

4        A.   I would say most were jury trials.

5  There have been a handful of bench trials that I

6  can recall.

7        Q.   And in terms of your overall

8  practice, is it predominantly civil or have you

9  done any work in a criminal context?

10        A.   I have never offered expert

11  testimony in a criminal case.

12        Q.   Okay.

13             And in terms of like, you know --

14  let's just, I guess, put a time frame -- let's

15  say the last 10 years, have you been

16  predominantly on one side of the view or the

17  other, meaning like has more of it been for

18  plaintiffs or more of it been for defendants?

19        A.   If I had to guess, sitting here

20  today without going through my CV, I would say

21  it is fairly evenly split.

22        Q.   Now moving to arbitrations, how many

23  times have you sort of testified sort of at an

24  arbitration hearing?

25        A.   I would say at least five.  Maybe as



Page 36

```
 1   many as ten.
 2          Q.    Okay.
 3          A.    It would all be reflected on the CV
 4   you have.
 5          Q.    Exactly.
 6                I'm not, I'm not asking -- I'm just
 7   trying to get a sense of it.  I'm not asking for
 8   a memory test.
 9          A.    Comfortably five.
10          Q.    Okay.
11                And then, you know, this is going to
12   be a large number, I assume.  Like ballpark, how
13   many times do you think you have been deposed?
14          A.    I would say comfortably 30.  I don't
15   think it's significantly greater than that, but
16   comfortably 30.  There's actually been cases
17   where I testified where I wasn't deposed, where
18   I have testified at trial or arbitration where
19   there was no deposition.
20                So there's not always a one-for-one.
21   There are certainly cases where I was deposed
22   where I did not testify at a trial or a hearing
23   because maybe one didn't occur.
24                But I would say comfortably 30.  It
25   could be as many as 40.
```



1          Q.    And in connection with your serving

2    as an expert, has your testimony ever been

3    limited or excluded in part or whole by, by a

4    court?

5          A.    No.

6          Q.    You testified in the Epic case?

7          A.    I testified in two Epic cases.  Epic

8    v. Google and Epic v. Apple.

9          Q.    What party were you an expert for?

10         A.    I was retained by counsel for Epic

11   Games.

12         Q.    Okay.

13               Was that Cravath?

14         A.    Yes, it was.

15         Q.    All right.

16               Who put you on the stand?

17         A.    The lawyer that actually put me on

18   the stand was Brett Byers.  I worked also

19   closely with Yonatan Evan and Gary Bornstein.

20         Q.    Gary is a good guy.

21         A.    Great guy.

22         Q.    Great guy.

23               Okay.

24               So turning to sort of -- turning to

25   how you prepared this report, I just want to



Page 38

1  spend a little time going over how you -- the

2  mechanics of how you kind of got up to speed on

3  this case.

4           So I'll start with asking -- so when

5  you, when you were retained, did -- what was

6  first provided to you by counsel for the

7  defendants?

8       A.   Well, as best as I can recall, my

9  staff, you know, at the direction of Drew, would

10  have been primarily responsible for the initial

11  review of materials.

12          But I recall we received a fair

13  amount of materials related to financial

14  documents and financial planning documents that

15  had, that had been prepared in connection with,

16  you know, you know De Tomaso's efforts to at

17  various times, you know, raise funds or whatnot.

18          And I believe we received what I

19  would generally describe as speaking documents;

20  you know, e-mails and the like that related to,

21  you know, Mr. Berris' tenure at De Tomaso.

22      Q.   Okay.

23          And just, I guess, just turning to

24  sort of your -- on your -- in your report going

25  to Exhibit 2, you've got your sort of materials,



Page 39

1    you know, sort of the standard materials

2    considered disclosure.

3            A.    Yes.

4            Q.    And so, it looks like -- I guess

5    does this reflect, the materials considered --

6    does this reflect all of the materials that were

7    provided to you by counsel?

8                    MS. BUSTAMANTE:    Object to form.

9            A.    I cannot -- I suspect not, but I

10   don't know because I can't -- I don't have the,

11   I don't have a way to inventory that.  This is

12   all the materials that I relied on in connection

13   with providing this report or, you know,

14   considered in preparing this report.

15                    If there were other documents that

16   were provided that either -- that my staff

17   deemed were not necessarily pertinent or that,

18   or that didn't relate to any of the issues that

19   were associated with this report, I can't, I

20   can't foreclose that.  I don't know, I don't

21   know whether that occurred or not.

22   BY MR. ZACH:

23           Q.    Okay.

24                    So I guess rephrasing it, would it

25   be fair to say that there could have -- there



Page 40

1  potentially could have been more materials

2  provided to your staff or you by counsel related

3  to this case that aren't listed on Exhibit 2?

4           MS. BUSTAMANTE:  Object to form.

5       A.    That is, that is certainly possible.

6  Because I would not -- but this is a complete

7  list of what I considered.

8  BY MR. ZACH:

9       Q.    Understood.

10          Just to sort of break that down.  So

11 initially materials are provided to people that

12 -- we'll just call them, your staff, the people

13 that are assisting you; is that fair?

14      A.    Correct.

15      Q.    And then, that staff reviews them,

16 sort of organizes them, and then filters up to

17 you those that they think are worth you looking

18 at?

19      A.    Well, that's not -- that's not

20 necessarily inaccurate, but it is also not

21 complete because, again, with respect to my --

22 my understanding, my belief is that we might --

23 we may -- we, meaning BRG and my team, may have

24 received some number of materials prior to

25 getting Mr. Rabinowitz' report.



Page 41

```
 1                    It wasn't until we got his report
 2      and we understood what he was doing that I was
 3      able to determine what information I needed.
 4                    And the information that I needed
 5      largely -- not entirely, but largely is
 6      encapsulated in the last item on this list,
 7      which is his report and all of the exhibits,
 8      attachments and his list of materials.
 9                    So, that pretty much -- I mean, I
10      don't think -- I mean, there's certainly some
11      things that I did with respect to public
12      research and so forth.
13                    But Mr. Rabinowitz' report and
14      everything that goes along with that was
15      certainly the lion's share of the information
16      that I deemed to be relevant for me to consider.
17           Q.    Got it.
18                    And by that you're saying -- there's
19      a bunch of exhibits to his report.  It is a big
20      thick thing when you have it.
21                    So as an initial matter, that was
22      what you reviewed; is that fair?
23           A.    From the, from the time when I got
24      his report, yes.  I can't foreclose what I'm,
25      what I'm -- what limited amount of effort I may
```



Page 42

1    have put into prior to that.

2            But once I got his report, I was

3    almost exclusively focused within the four

4    corners of his report except for the fact that I

5    do include in there all, all of the information

6    that he cites to and that he says he considered.

7            So I didn't necessarily review every

8    document.  He has a very long list of documents

9    that he says he considered.

10            I can't, I can't arbitrate whether

11    or not he actually considered all those

12    documents or not, but I did not certainly review

13    all of them.  But they were made available for

14    my consideration.

15            And to the extent I determined that

16    I, that I thought I should review them, I did.

17        Q.    Fair.

18            And in terms of, you know, if you --

19    did you have access to -- and I don't know how

20    the folks on the other side organize your

21    documents, but usually, you know, it is in a

22    database.

23            Did you have access to sort of the

24    discovery database in this case so you could

25    review materials if you had wanted to?



Page 43

```
 1        A.   I suspect the answer to that is yes,
 2   but I don't know for a fact.
 3             Well, let me, let me clarify.  Me
 4   personally, no.  I don't, I don't use
 5   Relativity.  I don't use any of the other, you
 6   know, software programs, Concordance or anything
 7   where people can get -- actually log into a
 8   discovery database like the one you're speaking
 9   of, I think.  I think you and I are on the same
10   page there.
11             I expect that it is likely that my
12   team did, but I don't know, I don't know that
13   for a fact.
14        Q.   Was it your understanding that if
15   you did want -- let's say you wanted to ask,
16   request additional information from counsel,
17   that that would be provided to you?
18        A.   Oh, certainly.  And I believe that
19   occurred.  I absolutely believe that there were,
20   you know, there were communications that I had
21   with my staff and I said can someone please
22   reach out to the people at Sheppard Mullin,
23   Hannah or Ali, and request -- see if they can --
24   if any, if any documents like this are
25   available.
```



Page 44

```
 1                 And again, I don't have any examples
 2     to give you right now.  I know, I know for a
 3     fact that did occur, that process did occur.
 4          Q.    Okay.
 5                 So, big picture, if you wanted
 6     something from let's call it the case record,
 7     you could have requested that if you wanted to?
 8          A.    Absolutely.  And we did.
 9          Q.    In terms of -- when you say
10     materials considered, I just want to know like
11     what is your understanding of the definition of
12     considered.
13                 Like what, what standard are you
14     applying, you know, in your own head to --
15          A.    If it went into my thought process
16     with respect to whether or not it was
17     potentially relevant for the analysis or
18     opinions that I was offering.
19                 So, I mean, again, again, there's --
20     I could consider something and not rely on it,
21     but I still considered it.
22          Q.    Got it.
23                 So, I think I understand.  So that
24     like, you know, hypothetically, you have a stack
25     of documents.  We can all sort of scan documents
```



Page 45

1    and flip through.

2              You wouldn't, you wouldn't treat

3    just flipping through the documents as being

4    considered; is that fair?

5              MS. BUSTAMANTE:  Object to form.

6        A.   That's -- I would agree with your

7    characterization that flipping through a stack

8    of documents would not necessarily equate to

9    considering it.

10             I would need to actually digest what

11   the document is and digest the relevance of it

12   and make a determination as to, okay, is this

13   something I want to consider in connection with

14   the issues that are relevant for my role in the

15   case.

16             And then from there, further make a

17   determination if it is something that actually

18   rises to the level of, okay, I'm going to rely

19   on this document.

20   BY MR. ZACH:

21       Q.    Exactly.

22             So rely -- would it be fair to say

23   that rely would mean that it is something that

24   you're including in your report and that

25   contributes to your overall opinions?



Page 46

1          A.    Well, I would probably even simplify
2    it further and say that rely is going to be
3    something that I actually cited to in my report.
4              So I actually, I actually put it in
5    a footnote or I discuss it in the narrative.
6    Something, something to that effect.
7          Q.    Okay.
8              But considered could be something
9    that you reviewed substantively but didn't
10   ultimately put in a footnote in your report?
11         A.    That's possible yes.
12              MS. BUSTAMANTE:  Object to form.
13   BY MR. ZACH:
14         Q.    And if you -- were there documents
15   that you reviewed for their substance but --
16   strike that.
17              If you reviewed a document for its
18   substance but did not cite it in your report,
19   would that document be included in your
20   materials considered?
21         A.    It would certainly, it would
22   certainly be my intention to do so.
23         Q.    Okay.
24              But there may be documents that you
25   reviewed substantively, did not cite in your



Page 47

1  report, but that are also not listed in the

2  materials considered?

3            MS. BUSTAMANTE:  Object to form.

4       A.   If that occurred, it is an oversight

5  on my, on my part or my staff's part.  It was

6  not -- and when I say my staff, the buck stops

7  with me.  If that occurred, it was an oversight

8  because that's not -- that was not the

9  intention.

10 BY MR. ZACH:

11      Q.   Okay.

12           So, so for what's -- absent some

13 oversight, the items listed in the materials

14 considered are essentially the materials that

15 you substantively reviewed regardless of whether

16 or not you cited them in your report?

17      A.   That's correct.  Again, that's my

18 intention.

19      Q.   And throughout this process, you had

20 the ability to request at your discretion

21 additional materials to review from counsel?

22      A.   Yes, that is, that is correct.  And

23 that did occur.

24      Q.   Okay.

25           And just -- you know again, not a



Page 48

1   memory test, but how many times do you think

2   that type of request was made to counsel?

3                 MS. BUSTAMANTE:  Object to form.

4        A.   Well, my, my case manager Drew, and

5   Sydney as well, they would have had -- they

6   would have had the authority to, to interact

7   directly with counsel and make any such

8   requests.  And I can't, I can't even estimate

9   how many times that might have occurred.

10                In terms of an instruction or a

11  direction coming directly from me, it is --

12  again, it is tough for me -- it is tough for me

13  to even put an estimate on it.

14                But I would say there were at least

15  ten times where I would send an e-mail or make a

16  phone call on a conference call and say let's go

17  back to counsel and see if there are any

18  documents related to this or do we have any, any

19  more information related to this issue.

20  BY MR. ZACH:

21       Q.   Got it.

22                And did you interview -- outside of

23  what's listed here, did you interview any

24  witnesses or do any sort of independent --

25  strike that.



Page 49

```
 1               Basically, did you interview anybody
 2  in connection with this?
 3               MS. BUSTAMANTE:  Object to form.
 4       A.   I had a telephone -- I had a
 5  telephone conference relatively early on, well
 6  before, well before Mr. Rabinowitz' report was
 7  issued, with Ms. -- I'm probably going to say
 8  her name too -- Majcher.
 9  BY MR. ZACH:
10       Q.   Yes, Majcher, I think.
11       A.   Majcher.
12            I don't recall -- it is possible
13  that Mr. Choi was on that call as well, but I
14  don't have a specific recollection.
15       Q.   And from a high level, what was the
16  substance of that conversation?
17       A.   It was a while -- it was several
18  months ago.  My best recollection is that we
19  were -- is that the conversation was focused on
20  the, the efforts by De Tomaso to raise capital
21  or generate investment in the company and some
22  of the, some of the materials that had been
23  prepared by various parties in connection with
24  those efforts.
25       Q.   Okay.
```



Page 50

```
 1                      And did you -- do you recall if you
 2    made a record of that conversation?
 3             A.    Like in terms of notes?
 4             Q.    Notes or whatever, yes.
 5             A.    No, I'm virtually certain I did not
 6    make any notes.
 7             Q.    Okay.
 8                   So still sticking with Exhibit 2,
 9    the materials considered, do you see there's --
10    you know, under legal, it looks like you
11    considered our Amended Complaint and their
12    Answer to the First Amended Complaint; is that
13    right?
14                   Is that fair?
15             A.    That's correct.
16             Q.    Okay.
17                   And in terms of depositions, the
18    only deposition that you considered was
19    Ms. Majcher in sort of her 30(b)(6) capacity?
20                   And to be fair, sir -- I'll strike
21    that.
22                   And Ms. Bustamante can correct me if
23    I'm saying this wrong.  So it is clear, she was
24    deposed twice.  She was deposed once in her
25    personal capacity and then another day she was
```



Page 51

```
 1   done as a 30(b)(6).  And the only one listed
 2   here is the 30(b)(6).
 3             My question is just, you didn't
 4   review her other testimony?
 5       A.   Yes, that's a good -- that's
 6   actually a good point.  I think I did have
 7   occasion to review her other deposition.
 8             I don't recall if there was anything
 9   in that deposition that I would characterize as
10   something I considered.  I guess for
11   completeness, I could have put that on here just
12   out of an abundance of caution.
13             And if you want to make an addendum
14   or a note -- but I did review, I did review -- I
15   do recall reviewing at least parts of that
16   deposition, and I actually believe I reviewed
17   but I did not -- I don't believe I have
18   considered for purposes of my report here
19   because I didn't find anything particularly
20   relevant for purposes of my report.
21             I did review the deposition of
22   Mr. Berris in the case.  But again, my
23   recollection is that there wasn't anything that
24   I took out of that deposition transcript to say,
25   well, let me, let me consider this.
```



Page 52

```
 1                   And I know that's kind of a
 2    blurry -- blurred line there.  But I don't know
 3    how else to go about answering the question.
 4         Q.    That's helpful.
 5                   So when you say -- when you say --
 6    let's just take Ms. Majcher's other deposition.
 7                   It would be fair to say you read it
 8    basically?
 9                   MS. BUSTAMANTE:  Object to form.
10         A.    I read parts of it.  I don't believe
11    I read it in its entirety.  I think that there
12    might have been information that I was directed
13    to that I was -- that was provided to me, and I
14    looked through it.
15                   And I can't recall as I sit here
16    today whether I took anything away from that
17    that I would characterize as considered.
18                   But if I were writing this Exhibit 2
19    again, just based on our conversation now, I
20    would probably include that deposition on this
21    list.  And I'm happy to do an addendum if you
22    would like.
23    BY MR. ZACH:
24         Q.    You don't need to do an addendum.
25    That's fine.
```



Page 53

```
 1          A.    Okay.
 2          Q.    And was it sort of the same type of
 3   process for Mr. Berris' deposition?
 4          A.    It would have been.
 5                But for Mr. Berris, I'm fairly
 6   confident that I didn't -- I basically reached a
 7   conclusion that the subject matter that was
 8   discussed in Mr. Berris' deposition was not
 9   really pertinent to the work that I was doing
10   with respect to responding to Mr. Rabinowitz'
11   report.
12          Q.    Okay.
13          A.    I could be mistaken, but I don't --
14   I feel less -- I'm less concerned about -- for,
15   for completeness purposes, excluding Mr. Berris'
16   deposition.
17          Q.    Fair enough.
18                Look, I always find these terms
19   considered, relied, they can be -- it is not
20   math.
21          A.    They're vague.
22          Q.    Yes.  Yes.
23                Okay.
24                But other than the two Majcher
25   depositions and Mr. Berris' deposition, did you
```



Page 54

```
 1   review in any way any of the other depositions
 2   in this matter?
 3              MS. BUSTAMANTE:  Object to form.
 4        A.   Not that I recall.
 5   BY MR. ZACH:
 6        Q.   Okay.
 7              And so, I guess to be specific, you
 8   didn't, you didn't read Mr. Choi's deposition?
 9        A.   I didn't have any recollection of
10   seeing any part of Mr. Choi's deposition, no.
11        Q.   Okay.
12              All right.
13              Okay.
14              MR. ZACH:  So we can move on from
15          Exhibit 2.
16              MS. BUSTAMANTE:  John, if you are
17          at a good stopping point, would you mind
18          taking a five-minute break?
19              MR. ZACH:  That's fine.  I just
20          want to get some more coffee.  Can we
21          make it like ten?
22              Is that all right?
23              MS. BUSTAMANTE:  Yes, let's do
24          that.
25              THE WITNESS:  Yes.
```



Page 55

```
 1                    MR. ZACH:  All right.

 2                    I'll see you guys, at let's come

 3           back as say like a little after 11:00.

 4                    MS. BUSTAMANTE:  Okay.

 5                    THE VIDEOGRAPHER:  Off the record

 6              10:51 a.m.

 7                       (Whereupon, at 10:51 o'clock

 8                 a.m., a recess was taken until 11:01

 9                 o'clock a.m.)

10                    THE VIDEOGRAPHER:  On the record

11              11:01 a.m.

12   BY MR. ZACH:

13        Q.   So, Mr. Barnes, I just want to talk

14   about some of the things I want to make sure

15   that you're not opining on.

16                    MR. ZACH:  So I'm going to mark

17              as Barnes 2, a document that's titled

18              De Tomaso's Second Amended Disclosures,

19              which is a document that was filed in

20              this case.

21                       (Document entitled De

22                 Tomaso's Second Amended Disclosures

23                 was marked as Barnes Exhibit 2 for

24                 identification, as of this date.)

25        A.   Okay.
```



Page 56

```
 1   BY MR. ZACH:
 2          Q.    You can review this.  It is sort of
 3   a standard disclosure document.  I'm just going
 4   to take two minutes to make sure that I
 5   understand that you're familiar with it.
 6                So if we go down to the -- well, I
 7   guess the pages are not numbered, but there is a
 8   section called Damages, right here.
 9                So, I can sort of just represent to
10   you, Mr. Barnes, that as part of federal
11   litigation, the parties are made to sort of give
12   disclosures that essentially serve to the other
13   side about various aspects of the case.
14          A.    Okay.
15          Q.    Does that make sense to you?
16          A.    Yes, I understand that.
17          Q.    Okay.
18                And one of those things is that you
19   have to disclose, you know, information under
20   Rule 26 relating to your damages.
21          A.    Okay.
22          Q.    And if you look at the first bullet
23   point here -- and this is, this is the
24   defendants' disclosure.
25                It says, it says one of the things
```



Page 57

1    they're seeking as damages is breaches of the

2    duties and care and loyalty to the company

3    resulting in a loss in company value to be

4    determined at trial, including through expert

5    testimony.

6              Do you see that?

7    A.    Yes.

8    Q.    I just want to be clear, you're not

9    offering any affirmative opinion about the loss

10   in company value on behalf of defendants?

11   A.    As a result of what's listed here,

12   that's, that's correct.  I'm not, I'm not

13   offering any -- I'm not offering any opinion

14   that I would say is, is related to that bullet

15   point.

16   Q.    I can maybe make it sort of simpler.

17             You know, the defendants in this

18   case have a couple of counterclaims.

19             Do you understand what a

20   counterclaim is?

21   A.    I do.

22   Q.    Okay.

23             And you would agree with me that a

24   counterclaim is what it says.  It is an

25   affirmative claim against the plaintiff seeking



Page 58

1    that the defendant themselves would prove up and

2    seek damages.

3                 Is that a fair rough estimate of it?

4                    MS. BUSTAMANTE:  Object to form.

5                    MR. ZACH:  Let me rephrase that.

6            That was a terrible question.

7    BY MR. ZACH:

8            Q.    You understand that a counterclaim

9    is an instrument in which a defendant can seek

10   affirmative damages from the plaintiff?

11                   MS. BUSTAMANTE:  Object to form.

12           A.    Well, again, I'm not a lawyer,

13   obviously, but I think that damages are one

14   thing that they can seek through, through -- in

15   a counterclaim.

16                I think there's other avenues --

17   there's other things that may be available to a

18   defendant when asserting a counterclaim.  They

19   might be seeking an injunction.  They might be

20   seeking a declaratory judgment.  They might be

21   seeking a variety of things.

22                But certainly one of the things that

23   they could be seeking through a counterclaim

24   would be damages.

25



Page 59

```
 1   BY MR. ZACH:

 2          Q.    Exactly.   Exactly.

 3                And you're not, you're not offering

 4   any affirmative opinion asking, you know -- in

 5   connection with any of the defendants'

 6   counterclaims; is that fair?

 7          A.    That's correct.

 8          Q.    Okay.

 9                So we can take that down.

10                MR. ZACH:   And just to sort of

11           close the loop on this, let's bring

12           up -- let's mark as Barnes 3, the Answer

13           to the First Amended Complaint.

14                     (Answer to the First Amended

15              Complaint was marked as Barnes

16              Exhibit 3 for identification, as of

17              this date.)

18   BY MR. ZACH:

19          Q.    This is one of the documents under

20   your documents considered list, right, sir?

21          A.    It is.

22          Q.    Give me one second to get to the

23   right paragraph.   If we turn to page 101 --

24   actually, let's go to 99 so I can orient,

25   Mr. Barnes.
```



Page 60

1            So, sir, looking at page 99 of the

2   Answer, do you see it says Count I, Breach of

3   Fiduciary Duty of Loyalty (Delaware Law)?

4       A.   I do see that.

5       Q.   Okay.

6            And this is the first counterclaim

7   that's be brought against our client in

8   connection with this litigation.

9            Do you understand that?

10           MS. BUSTAMANTE:   Object to form.

11      A.   I mean, it is labeled Count I.   I

12  would assume that it is the first.

13  BY MR. ZACH:

14      Q.   You know, I won't go over all of it.

15  But if we go to page 101, do you see at

16  paragraph 224, it says De Tomaso has suffered

17  serious monetary harm as a result of Berris'

18  multiple breaches of his fiduciary duty of

19  loyalty?

20           Do you see that?

21      A.   I see that.

22      Q.   And then, the next paragraph says

23  between his fraudulently reimbursed expenses

24  and unauthorized wire transfers, Berris has

25  directly caused De Tomaso to suffer financial



Page 61

1    loss in excess of $400,000.

2                 Do you see that?

3         A.    I see that.

4         Q.    You're offering no opinion relating

5    to those specific expenses and wire transfers,

6    right?

7         A.    That has, that has not been the

8    subject of any analysis I have conducted.  I'm

9    not offering any expert opinion related to that.

10        Q.    And with respect to paragraph 226,

11   that reads Berris' breaches of his duty of

12   loyalty and self-interested conduct have

13   directly caused the company to underperform

14   relative to its own financial projections and as

15   compared to similarly-situated luxury automobile

16   companies and have caused the company to suffer

17   a loss of hundreds of millions of dollars in

18   enterprise value.

19                Do you see that?

20        A.    I do.

21        Q.    And you're not offering any

22   affirmative opinion as to the loss -- the

23   alleged loss of enterprise value in connection

24   with this counterclaim, right?

25        A.    Well, I'm not, I'm not offering



Page 62

1    it -- any opinion, any opinion along the lines

2    of what you described related specifically --

3    specifically related to this particular

4    paragraph.

5              It is possible that my testimony, if

6    offered -- if I'm called to testify at trial,

7    may, may relate to a claim that's presented by

8    De Tomaso related to this paragraph because I've

9    obviously analyzed and evaluated the financial

10   performance of the company as set forth in my

11   report and the failure or inability of De Tomaso

12   to actually meet in any way -- in any meaningful

13   way its, its numerous, numerous projections that

14   were prepared by various individuals or

15   entities.

16        Q.   Well, let me ask you slightly

17   different.

18             So you have, you have been an expert

19   in many civil cases; is that fair?

20        A.   I think that's fair.  I mean, we

21   have gone over the numbers.  I mean, if we can

22   agree that that --

23        Q.   Yes, yes.  I was just laying the

24   foundation.

25             You would agree that you have



Page 63

 1    experience with the mechanics of civil

 2    litigation to a certain extent, right?

 3                    MS. BUSTAMANTE:  Object to form.

 4        A.    I am generally familiar with the

 5    process, yes.

 6    BY MR. ZACH:

 7        Q.    And you understand that when a

 8    plaintiff brings a claim, they have to prove

 9    that claim and introduce evidence relating to

10    damages relating to that claim.

11                    You generally understand that?

12                    MS. BUSTAMANTE:  Object to form.

13        A.    I generally understand that.

14    BY MR. ZACH:

15        Q.    And so, and do you understand -- is

16    it your understanding that like in connection

17    with the claims that Mr. Berris is bringing that

18    Mr. Rabinowitz was offered as an affirmative

19    expert in connection with damages relating to

20    Mr. Berris' claims?

21                    MS. BUSTAMANTE:  Object to form.

22        A.    I don't have any reason to disagree

23    with that.  I think that's probably accurate.

24    BY MR. ZACH:

25        Q.    And so, a counterclaim is sort of



Page 64

1    the flip side of that, which is the defendant

2    basically becomes a plaintiff and brings a claim

3    against the defendant for its own independent

4    reasons.

5                    Do you, do you generally understand

6    that?

7                    MS. BUSTAMANTE:  Object to form.

8        A.    I don't know, I don't know about the

9    term independent in that question because I'm

10   not sure.

11                   As I understand this dispute,

12   there's an inner relationship between some of

13   the, some of the facts -- some of the underlying

14   facts that would go into both what, what

15   Mr. Berris is alleging as well as what De Tomaso

16   or the other defendants are alleging.

17                   So I think that some of the relevant

18   underlying facts might pertain to both sides'

19   claims.  So I don't know that I -- I just don't

20   know how you meant to use the word independent

21   in that context.

22   BY MR. ZACH:

23       Q.    Fair enough.

24                   Maybe to make it more narrowly

25   tailored -- so you see in paragraph 226, the



Page 65

1    counterclaim alleges that Mr. Berris caused the

2    company to suffer loss of hundreds of millions

3    of dollars in enterprise value.

4              Do you see that?

5         A.   I see that.

6         Q.   You have not conducted your own

7    independent analysis to establish the amount of

8    loss of hundreds of millions of dollars, right?

9              MS. BUSTAMANTE:  Object to form.

10        A.   I'm not offering any opinion with

11   respect to any specific amount that De Tomaso

12   may have lost in connection with the allegations

13   against Mr. Berris.  That's correct.

14   BY MR. ZACH:

15        Q.   Got you.

16             And you actually in your report --

17   and you're not offering any sort of opinion

18   about the specific amount of enterprise value

19   that may have been lost in connection with this

20   counterclaim, right?

21        A.   That is also correct.  My -- I mean,

22   just -- I'm not trying to shortcut your

23   examination, but my, my opinions are all set

24   forth in my report.

25        Q.   Exactly.  Exactly.  Exactly.



Page 66

```
 1                   So, I mean, your report is sort of

 2     cabined by responding to Mr. Rabinowitz, right?

 3                   MS. BUSTAMANTE:  Object to form.

 4          A.    I don't know that I really

 5     understand that question.

 6     BY MR. ZACH:

 7          Q.    Sure.

 8                   You have an understanding that, you

 9     know, in litigation there's often an initial

10     exchange of expert reports by the parties,

11     right?

12                   MS. BUSTAMANTE:  Object to form.

13          A.    I understand.

14     BY MR. ZACH:

15          Q.    And one, one sort of common type in

16     financial litigation is a damages expert, right?

17                   MS. BUSTAMANTE:  Object to form.

18          A.    That's, that's -- I am aware of

19     that.  I'm aware that expert reports are often

20     exchanged in litigation.

21     BY MR. ZACH:

22          Q.    And so, in this case, Mr. -- you

23     know Mr. Berris has retained Mr. Rabinowitz to

24     serve as a damages expert in connection with

25     this case, right?
```



Page 67

```
 1          A.    That's my understanding.

 2                MS. BUSTAMANTE:  Object to form.

 3   BY MR. ZACH:

 4          Q.    Right.

 5                And in the initial round -- in the

 6   initial exchange of expert reports, you did not

 7   file an affirmative report raising issues --

 8   raising any issues, right?

 9          A.    I did not file an affirmative -- I

10   did not file an affirmative report.

11          Q.    Okay.

12          A.    I only filed one report.  It was the

13   report I filed on whatever day, I guess

14   the 18th.

15          Q.    Exactly.

16                And so -- and that report is styled

17   the Rebuttal Expert Report of Ned S. Barnes,

18   right?

19          A.    I believe that's correct.

20          Q.    And in that, you essentially review

21   and make -- sort of criticize Mr. Rabinowitz'

22   own work, right?

23                MS. BUSTAMANTE:  Object to form.

24          A.    Well, I believe my report speaks for

25   itself.  I think that I'm setting forth my
```



Page 68

1  opinions and the bases and foundation for those,

2  for those opinions.

3            I'm not going to characterize it in

4  any other way other than how it is set forth in

5  my report.

6  BY MR. ZACH:

7            Q.    Fair enough.

8            And then you would agree that that

9  report does not contain any affirmative damages

10  number that represents any loss allegedly

11  incurred by De Tomaso in connection with conduct

12  by Mr. Berris?

13            MS. BUSTAMANTE:    Object to form.

14            A.    I have not offered any affirmative

15  damages number.    That is correct.

16  BY MR. ZACH:

17            Q.    All right.

18            And so, really quickly here, if you

19  look at paragraph 227, as part of this

20  counterclaim, it says De Tomaso has suffered

21  serious reputational harm as a direct result of

22  Berris' misrepresentations of his position and

23  false promises.

24            You're offering no opinion about the

25  economic value of any reputational harm suffered



Page 69

1    by De Tomaso, right?

2              MS. BUSTAMANTE:  Object to form.

3         A.   I have not been asked to or offered

4    any expert opinion on De Tomaso's alleged

5    damages with respect to reputational harm.

6    BY MR. ZACH:

7         Q.   And then, going to 228, it says

8    De Tomaso has lost numerous business

9    opportunities as a result of the company's

10   diminished goodwill.

11             Is it fair to say that you have

12   offered no sort of expert opinion or calculation

13   of what the economic value of the alleged lost

14   business opportunities are in your report?

15        A.   I have not offered any affirmative

16   opinion as to the alleged damages that De Tomaso

17   has asserted against Mr. Berris with respect to

18   diminished goodwill.

19        Q.   Okay.

20             Perfect.

21             Let's just move to Count II.  This

22   is the second counterclaim which is for breach

23   of fiduciary duty of care.

24             I'm basically going to ask similar

25   questions as I'm sure you have anticipated.



Page 70

1                    Let's go down to 235.  It says

2    De Tomaso has suffered serious monetary harm as

3    a result of Berris' multiple breaches of

4    fiduciary duty of care.

5                    Do you see that?

6         A.    Yes.

7         Q.    And then on 236, it says Berris'

8    reckless, devil-may-care attitude directly

9    caused the company to underperform relative to

10   its own financial projections and as compared to

11   similarly situated luxury automobile companies,

12   and has caused the company to suffer a loss of

13   hundreds of millions of dollars in enterprise

14   value.

15                   We kind of went over this.

16                   But you have not done your own

17   analysis of any alleged loss relating to

18   enterprise value in connection with this

19   counterclaim, right?

20                   MS. BUSTAMANTE:  Object to form.

21        A.    So as I stated earlier with respect

22   to Count I, it is correct that I have not

23   offered any specific calculation of alleged

24   damages related to lost enterprise value.

25                   But I just want to clarify that the



Page 71

1    testimony -- the opinions that I have offered
2    and the testimony that I may offer at trial is
3    not necessarily disconnected or -- from, from an
4    allegation along those lines.
5              So, again, I'm not -- I'm not going
6    to be called -- I'm not going to be asked a
7    question, or at least I won't provide an answer
8    if someone, you or anyone else asks me what's
9    the amount.
10             But if someone asks me, did they --
11   how did, how did De Tomaso perform relative to
12   its projections or projections that were
13   prepared either by it or on behalf of De Tomaso,
14   I have provided that analysis and I have offered
15   opinions on that and I will answer those
16   questions.
17   BY MR. ZACH:
18        Q.   No, that's fair.
19             And I, I understand and accept what
20   you're saying.  There's factual overlap because
21   you're talking about projection -- you know,
22   projections are relevant to a damages analysis;
23   is that fair?
24        A.   Yes.
25        Q.   But just to get sort of the precise



Page 72

1    answer, which is you are not offering any

2    affirmative specific damages number to be

3    presented to the jury that represents the amount

4    of damages defendants allege occurred in

5    connection with their counterclaims?

6                    MS. BUSTAMANTE:  Object to form.

7        A.    That is correct.

8    BY MR. ZACH:

9        Q.    Okay.

10                    MR. ZACH:  We can take this down.

11    BY MR. ZACH:

12        Q.    Okay.

13                    So, now, let's go to your report.

14    You have your report.  Do you also have

15    Mr. Rabinowitz' report available on like your

16    screen or whatever?

17        A.    I don't right now, but I could very

18    easily pull it up if you don't want to put it up

19    on the screen.

20        Q.    Yes, I leave it to you.

21        A.    It is easier for me to look at if I

22    pull it up on my screen rather than have you do

23    it.

24        Q.    Yes, that's great.

25        A.    Let me do that.



Page 73

1        Q.   So let's just -- turning back to

2   your report, I think we can start with

3   paragraph 5.

4            So turning to paragraph 5 of

5   Barnes 1, in this paragraph you outline at a

6   high level what you were asked to do and what

7   your opinions are; is that fair?

8        A.   This is a summary paragraph,

9   obviously.  It makes reference to and requires

10  the remainder of the report for context and

11  expansion.

12           But, yes, I would say generally

13  speaking that is correct.

14       Q.   And it says, you know, sort of in

15  terms of what you were asked to do, it says "I

16  was asked to review the conclusions of value

17  presented in the Rabinowitz report and to offer

18  my own objective, independent opinions as to the

19  accuracy, reasonableness and reliability of the

20  conclusions of value presented by

21  Mr. Rabinowitz."

22           Do you see that?

23       A.   Yes, you read that extraordinarily.

24       Q.   And does that fairly represent what

25  you were asked to do after you got the



Page 74

1    Rabinowitz report?

2           A.    That, that is, that is fair.

3           Q.    And I think we talked earlier that

4    there might have been potential work you could

5    have done on the case before you received the

6    report.

7                 But in terms of what you have

8    actually sort of submitted at the end of the

9    day, that was the assignment you were given?

10                 MS. BUSTAMANTE:  Object to form.

11          A.    That was the general -- generally

12   speaking, that was the assignment with respect

13   to Mr. Rabinowitz, yes.

14   BY MR. ZACH:

15          Q.    Okay.

16                 And you -- sort of the first -- is

17   it -- the first sort of broad, broad opinion --

18   and I'll stipulate now that I understand that

19   everything is sort of subject to the whole

20   report.  I'm not trying to piecemeal anything.

21   So I agree that you have to read the report as a

22   whole.

23                 But just as a, as a broad matter, is

24   it fair to say that your first opinion is -- and

25   conclusion as to the value of De Tomaso



Page 75

1    presented in the Rabinowitz report amounts to

2    speculation and guesswork and do not reasonably

3    reflect any actual estimate as to the equity

4    value of De Tomaso as of the date set forth in

5    Mr. Rabinowitz' report?

6          A.    Well, that is certainly a summary

7    level opinion that I'm presenting, and it is the

8    first one that I present in this summary

9    paragraph.

10                So if you want to call it first, I

11   guess I wouldn't disagree with that.  But it is

12   certainly there.  You read it accurately.

13         Q.    I'm just trying to break out the

14   different, the different opinions.

15                So, you can change that later, but

16   can we just agree to call that your first

17   opinion for now?

18         A.    Well, I guess there's -- I mean, we

19   can call it my first opinion for now.  But

20   everything that I write in that paragraph is

21   very much interrelated.

22                So, you can almost characterize this

23   as just three, three points under one broad

24   opinion.

25                So I'm not, I'm not necessarily



Page 76

1   going to agree that you can, that you can, you
2   know, bifurcate it in the way that you're
3   suggesting.  But I'm happy to discuss it in any
4   way you see fit.
5       Q.   And it kind of follows because the
6   next one is -- the next sentence says "It is
7   also my opinion that the valuation conclusions
8   presented in Rabinowitz' report cannot be
9   reasonably relied upon for any meaningful
10  estimate of Berris' alleged damages in this
11  matter."
12      A.   Right.  And that is true.  That is
13  my opinion, you know.
14          And I would have to go back and
15  actually look if Mr., if Mr. Rabinowitz actually
16  argues that his valuation conclusions amount,
17  amount to his opinion on damages or not.  I
18  don't even recall.
19          The first step is he comes up with
20  the value and the proportional value of what
21  he -- of what Mr. Berris claims he is entitled.
22          And we can stop there.  There's,
23  there's numerous problems with Mr. Rabinowitz'
24  opinion on that.
25          And then, to take that further and



Page 77

1  to suggest that that can be used as a measure of

2  economic damages to Mr. Berris in this case,

3  that is also fatally flawed.

4          Q.   When you say cannot be reasonably

5  relied upon, by who?  I guess when you say

6  can't, by who -- who are you saying cannot rely

7  on this?

8          A.   I would say by anyone.

9          Q.   Okay.

10              And then --

11         A.   As it matters -- procedurally as it

12  matters, it would be the fact finder in the

13  case.

14         Q.   And then your -- sort of the

15  third -- let's call it the third sentence is

16  "Further, it is my opinion that due to

17  De Tomaso's historical financial performance to

18  date and current financial condition, any

19  attempt to estimate the cash equivalent value of

20  a purported ten percent equity interest in

21  De Tomaso is speculative."

22              Do you see that?

23         A.   Yes.

24         Q.   What do you mean?  Like what do you

25  mean by cash equivalent value?



Page 78

1        A.   Well, again, it is my understanding

2   that what Mr. Berris is seeking here through --

3   in part through what Mr. Rabinowitz is offering

4   in his report, is a monetary -- monetary damages

5   presumably of an amount that is consistent with

6   what Mr. Rabinowitz says it has advanced which,

7   for all the reasons discussed, I very much

8   disagree with.

9            And, I mean, I would just refer back

10  to my sentence.  I just don't, I don't, I don't

11  think that's reasonable.  I think that goes

12  beyond speculation to try, to try and suggest

13  that there would be a cash equivalent value.

14            Even if in a hypothetical scenario,

15  even if in a hypothetical scenario there was a

16  10 percent equity interest that was -- that

17  Mr. Berris was entitled to, as he alleges, to

18  suggest that that, that -- that one could

19  quantify that right now or at trial, presumably

20  next year some time, in a cash equivalent

21  manner, I don't think is reasonable and I think

22  it is speculative.

23        Q.   Okay.

24            So by cash equivalent, that term

25  would include sort of a request for monetary



Page 79

1    damages in a trial; is that fair?

2              MS. BUSTAMANTE:  Object to form.

3         A.   I would generally agree with that,

4    as compared to some type of performance -- some

5    type of performance in terms of the grant of

6    equity.

7    BY MR. ZACH:

8         Q.   I don't totally follow.  What do you

9    mean by performance in a grant of equity?  Like,

10   are you talking about specific performance, is

11   that --

12        A.   Well, that, that's --

13        Q.   That was a bad question.

14        A.   That may be getting close to a legal

15   term for me.

16        Q.   Fair enough.  Fair enough.

17        A.   Yes, you know, the alternative or an

18   alternative would be that -- let's just take it

19   away from this case.

20              A party that is -- that feels

21   they're entitled to -- they were, they were

22   supposed to be given equity in a company, a

23   privately held company, they could assert a

24   claim presumably that they should be given the

25   equity in the company.



Page 80

1          Q.   I think I understand.

2               Right, as opposed to --

3          A.   As opposed to the operation of the

4    value of the equity in the company that they

5    come up with at a given time.

6          Q.   All right.

7               So, in other words, you sort of just

8    received the shares themselves and not the cash

9    equivalent.

10              Is what you're saying?

11              MS. BUSTAMANTE:  Object to form.

12         A.   Well, again, I don't want to -- I

13   don't want to jump to the outcome here, but

14   certainly, I, I have been -- I am aware and I

15   have actually been involved in many cases -- or

16   not many.  I have been involved in several cases

17   where there is a claim that a, that a, that a

18   shareholder, a minority shareholder is alleging

19   that they -- or an alleged minority shareholder

20   is claiming that they did not receive the equity

21   they're entitled to and they want the equity.

22   BY MR. ZACH:

23         Q.   I understand.

24         A.   The equity may not have any market

25   value because, you know, in many cases small



Page 81

1  businesses, privately held businesses don't
2  have -- they don't have a marketable value.
3              You can have -- you could, you could
4  own shares in a privately held company that
5  simply can't be transacted for cash.  They have
6  no cash value.
7          Q.    Got it.
8              And your opinion is essentially
9  because for the reasons set forth in your
10  report, you think any attempt to translate a
11  10 percent equity stake into a monetary number,
12  a cash equivalent, would be speculative?
13              MS. BUSTAMANTE:  Object to form.
14         A.    Right now, right now, I certainly --
15  that's certainly my opinion.  That's one of my
16  opinions.
17  BY MR. ZACH:
18         Q.    Okay.
19              So going through, just -- so your
20  first, you know, at the bottom of page 3 and the
21  top of page 4, has a section called No Evidence
22  of Terms and Conditions Related to Issuance or
23  Redemption of Purported Equity Interest.
24              Do you, do you see that?
25         A.    Yes.



Page 82

1          Q.    Do you -- I guess let me ask you

2     this.

3               Do you intend to testify about this

4     section, Section 3, at trial or is this sort of

5     introductory to set the stage?

6               MS. BUSTAMANTE:  Object to form.

7          A.    Everything in my report is -- I

8     mean, obviously I'm not going to get up and

9     give, you know, sua sponte.

10              But if I'm asked questions about my

11    opinions and what I did and the conclusions I

12    reached, I will offer testimony about them.

13    BY MR. ZACH:

14         Q.    Okay.

15              So I just want to under -- I just

16    want to spend a few minutes trying to understand

17    what, making sure I understand what this opinion

18    is.

19              So you start off by saying "As an

20    initial matter, neither Berris nor

21    Mr. Rabinowitz has made reference to or cited

22    any actual written agreement or term sheet

23    setting forth relevant conditions and terms that

24    would govern the issuance of any equity interest

25    in De Tomaso to Berris or the terms and



Page 83

```
 1  conditions associated with any purported
 2  redemption of such an equity interest or terms
 3  associated with Berris' purported rights to
 4  convert such an equity interest into cash."
 5          Do you see that sentence?
 6     A.   Yes.
 7     Q.   Okay.
 8          And so, I take it that based on your
 9  review of -- I'll just say this.
10          Everyone kind of agrees there's --
11  well, I shouldn't say that.
12          There's -- how do you come to the
13  conclusion that there's no written agreement?
14          MS. BUSTAMANTE:  Object to form.
15     A.   I haven't seen one.  I made a
16  request to counsel that if there was one or a
17  draft or any type of document that discussed any
18  type of situation and pursuant to which
19  Mr. Berris would be awarded a grant of an equity
20  interest or any type of even a term sheet that
21  would just set forth at a very preliminary level
22  the general factors that, in my experience, go
23  into such, such an agreement of some type of an
24  employee stock award, and I was told that there
25  is none.
```



1              So that's a representation I did

2    receive from counsel.

3              But I would say that my strongest

4    basis for that is if there were anything, I

5    would expect that Mr. Berris would have given it

6    to you or given it to Mr. Rabinowitz and that

7    Mr. Rabinowitz would have cited it.

8              I would have expected it to be the

9    first document that he cited.

10   BY MR. ZACH:

11        Q.   And I think we have talked earlier,

12   you, you at least looked at briefly Mr. Berris'

13   deposition, right?

14        A.   I do recall, I do recall looking at

15   Mr. Berris' deposition.

16        Q.   And as I recall, you did not look at

17   Mr. Choi's deposition; is that fair?

18        A.   I don't recall doing that, no.

19   That's correct.

20        Q.   And so, as you sit here today, you

21   don't have -- well, strike that.

22              So you did not rely in your report

23   or in this expert report on any deposition

24   testimony from either Mr. Berris or Mr. Choi; is

25   that fair?



Page 85

```
 1                    MS. BUSTAMANTE:  Object to form.
 2          A.    I don't, I don't believe I'm
 3   specifically relying on that testimony, no.
 4                This is -- the general support for
 5   that statement is the absence of information as
 6   opposed to specific information.
 7   BY MR. ZACH:
 8          Q.    And so, you did not -- for instance,
 9   you didn't take any -- strike that.
10                As part of your work on this case,
11   you did not take steps to review the
12   circumstances around any oral agreement between
13   Mr. Berris and Mr. Choi relating to an equity
14   interest in this case?
15                    MS. BUSTAMANTE:  Object to form.
16          A.    I don't -- I'm not -- other than
17   what I reviewed in Mr. Rabinowitz' report and
18   briefly scanning through his deposition
19   transcript, the rough version of his deposition
20   transcript from last week, I'm not aware of
21   anything to investigate.
22                But I would be happy to discuss
23   anything that you want to bring to my attention.
24   BY MR. ZACH:
25          Q.    Well, I'm just saying you're not
```



Page 86

1    offering an opinion on the existence or terms of

2    any oral agreement that may have been entered

3    into by Mr. Choi and Mr. Berris?

4                   MS. BUSTAMANTE:  Object to form.

5           A.    I'm not offering any, any opinion on

6    whether or not there was an oral agreement or

7    what those terms might be, if, if there were.

8                   I don't have any opinions as to

9    that.  That's a question of fact for the fact

10   finder.

11   BY MR. ZACH:

12          Q.    And so, focusing on Section 3, would

13   it be fair to say that the opinion offered just

14   in just this paragraph is premised on your

15   assumption that there was no written agreement?

16                  MS. BUSTAMANTE:  Object to form.

17          A.    I don't know that I would

18   characterize that as an assumption.  I mean, I

19   don't even know if you're, if you're suggesting

20   now during this deposition that there may be a

21   written agreement because --

22   BY MR. ZACH:

23          Q.    I'm not.  I'm not.

24          A.    -- I would certainly like to see it.

25          Q.    I'm not.  I'm not.  I'm not.



Page 87

```
 1          A.    Please, Mr. Zach, let me answer the
 2   question.
 3                Okay.
 4                I'm not -- I don't characterize that
 5   as an assumption.
 6                Okay.
 7                I've reached a conclusion, which I
 8   believe is well grounded for the reasons I have
 9   set forth that there is no written agreement.
10                And as I set forth in this
11   paragraph, that is beyond highly unusual and
12   I'm -- quite frankly, I'm astonished that
13   Mr. Rabinowitz was not willing to concede that
14   point in his deposition and he actually fought
15   that point.
16                Because for him to suggest that it
17   is a coin flip between whether or not you got an
18   oral agreement or a written agreement when a
19   company is going to award stock to an employee,
20   to me -- and again, I'm not trying to not be
21   pejorative here, it is laughable.
22          Q.    So, I'm just trying to understand.
23                All right.
24                So let's -- sticking with your
25   report.  So the next sentence says "In my
```



Page 88

1    experience, it is uncommon for non-controlling

2    shareholders of privately held firms to be

3    granted cash conversion rights at alleged market

4    value upon separation from the company."

5              Do you see that?

6         A.    I see that, and that's actually

7    probably understating it.  But, yes, I see that.

8         Q.    And so, could you -- in terms of --

9    what you're saying here, I can't -- well, what

10   are you trying -- strike that.

11             So I just want to make sure, does

12   this -- hypothetically, does this statement

13   assume -- let's say setting aside this case -- I

14   just want to make sure I understand the

15   substance of it.

16             So let's say Person A has a

17   minority -- minority shares in a privately held

18   company.

19             Are you with me?

20        A.    I'm with you.

21        Q.    And they're not disputing -- let's

22   say that person has, you know -- pick a

23   different number.  Let's say about 20 percent.

24             Is what you are saying here that

25   your, your opinion is that someone that had that



Page 89

1    interest would not typically be able to cash

2    that in when they departed from the company as

3    opposed to simply retaining those shares in the

4    status quo before their departure?

5              MS. BUSTAMANTE:  Object to form.

6         A.   So there's several -- there's

7    several elements to my response to that, and

8    I'll -- let me -- so this is going to be a

9    potentially lengthy answer.

10             So, first, it is my experience, and

11   I believe I have significant experience here,

12   that -- again, it is, it is virtually unheard of

13   that there wouldn't be specific terms that are

14   clear and communicated in a written document

15   that would set forth what would happen under

16   certain scenarios where an employee leaves a

17   company and they either have or were potentially

18   entitled to receive an equity interest.

19             I, just for the sake -- for example,

20   I have an equity interest in BRG, and I know --

21   I know exactly what happens if I discontinue my

22   relationship in its entirety with BRG.  It's,

23   it's unequivocal.

24             Okay.

25             What I can't do is leave BRG and



Page 90

1    make some argument as to what the value of BRG
2    is and say I want my share -- I want cash for my
3    percentage of the company, which I think is
4    worth X number of dollars, and I want you to pay
5    me that in cash.
6              That's not, that's not happening
7    under -- in any way, shape or form.  And that is
8    consistent.
9              I have been a part -- I have been
10   personally a party and I have conducted reviews
11   on many occasions of employee stock option plans
12   of privately held companies, and that is
13   generally almost universally the case.
14             So the idea that there's a
15   non-written oral agreement that would somehow
16   provide for full and unfettered liquidity of a
17   minority interest in a privately held company
18   like De Tomaso which Mr. Choi can't liquidate
19   his shares -- so, it just doesn't, it doesn't
20   make any sense to me.
21   BY MR. ZACH:
22        Q.   Okay.
23             I think -- so, is it your opinion
24   that a written agreement would typically contain
25   terms relating to how, how, how you would



Page 91

1  sell -- liquidate your shares for a minority

2  owner?

3        A.   That is absolutely the case.  It

4  would include terms related to a grant price, a

5  strike price, any type of -- what happens in a

6  liquidation event, anything that happens, you

7  know -- what might, what might be available to a

8  minority shareholder in terms of redemption,

9  what happens to a minority shareholder on

10 separation, what happens on a, on a type of --

11 on an acquisition or a merger.  It sets forth

12 all those terms.

13       Q.   And it is your, it is your

14 opinion -- right.

15            So you're saying that, in your

16 opinion, that would be typical in a written

17 agreement?

18       A.   I think typical understates it.  It

19 is almost -- I would say it is almost universal.

20            Look, I can't, I can't preclude that

21 there's not some agreement out there for the

22 grant of, you know, rights in a company that

23 don't set forth that, but it would -- I've never

24 seen it.  I've never seen it.

25       Q.   But in the absence of a written



Page 92

1  agreement, is it your intention to testify about

2  whether or not an oral agreement would be

3  legally binding between the parties?

4            MS. BUSTAMANTE:  Object to form.

5       A.   That, that is outside the scope of

6  my expertise and it is outside the scope of my

7  report.

8            And that's a legal issue.  That's

9  for the fact finder.  I'm not, I'm not offering

10  any opinion as to the legality of an oral

11  agreement.

12  BY MR. ZACH:

13       Q.   And then, sort of a similar

14  question, do you intend to offer any opinion as

15  to the enforceability of an oral agreement

16  between two parties?

17            MS. BUSTAMANTE:  Object to form.

18       A.   That again, is outside the scope of

19  my expertise.  That's a question of law, and I'm

20  not, I'm not offering any opinion on that issue.

21  BY MR. ZACH:

22       Q.   So what your -- at least this

23  section, what this opinion would relate to is

24  what you would expect to see in a written

25  agreement that grants a minority equity stake to



Page 93

1    someone in a privately held company?

2                MS. BUSTAMANTE:  Object to form.

3        A.   And as we have discussed, all of the

4    ramifications of that and all of the potentially

5    intervening or events that might, that might

6    flow from that.

7                I mean, it is not, you know, with

8    the redemption, liquidity events, that sort of

9    thing.

10   BY MR. ZACH:

11       Q.   So, in this -- just give me one

12   second.  Sorry, Mr. Barnes.

13               Other than, sort of the second

14   sentence where you say -- we just went over

15   where you referred to -- I'll just read it so

16   that the record is clear.

17               That "It is uncommon for

18   non-controlling shareholders of privately held

19   firms to be granted cash conversion rights at

20   alleged market value upon separation from the

21   company."

22               Would you agree with me that your

23   report doesn't set forth specific other terms

24   that you would expect to see in a grant of

25   equity -- a minority grant of equity in a



Page 94

1    privately owned company?

2                    MS. BUSTAMANTE:  Object to form.

3        A.    I don't agree with that because you

4    read the first sentence prior, and that sets

5    forth, you know, at a high level the types of

6    terms that I would expect to see in a, in a, in

7    an agreement for the grant -- for the award of

8    an equity interest in the company.

9                    But that second sentence relates to

10   the issue that is most pertinent here with

11   respect to Mr. Rabinowitz' report in which he

12   is -- he's dealing with -- set aside whether the

13   award -- the grant was ever made -- he's dealing

14   with Mr. Berris' alleged ability to say, okay,

15   so now pay me the cash, a cash value for that

16   based on this purported 10 percent interest.

17                    So I specifically address that

18   particular issue because that's what's, that's

19   what's most pertinent to what Mr. Rabinowitz is

20   offering.

21   BY MR. ZACH:

22        Q.    Okay.

23                    I'll make my question a little bit

24   more narrow.

25                    So going back to the first --



Page 95

1    because that's a fair point by the first

2    sentence.

3               So in the first sentence -- I'm

4    sorry, I have to read it again.  So you start

5    off saying "As an initial matter, neither

6    Mr. Berris nor Mr. Rabinowitz has made reference

7    to or cited any actual agreement or term sheet

8    setting forth relevant conditions and terms that

9    would govern the issuance of any equity interest

10   in De Tomaso to Berris."

11              And I just want to stop there.

12              So stopping there with "conditions

13   and terms that would govern the issuance of any

14   equity interest in De Tomaso to Berris."

15              My question to you is, you would

16   agree with me that your report, other than

17   saying that as a general matter, does not

18   articulate what specific terms and conditions

19   would govern the issuance?

20              MS. BUSTAMANTE:  Object to form.

21        A.    That is true, because again, I don't

22   want to speak for Mr. Rabinowitz, but I believe

23   I saw this in his deposition.

24              I don't think neither Mr. Rabinowitz

25   or I are, are offering an opinion, and neither



Page 96

1    one of us, I don't believe, are qualified to

2    offer an opinion as to whether there was a grant

3    of equity to Mr. Berris by De Tomaso; and if

4    there was, under, under which terms that grant

5    was made.

6              So, from -- for my purposes in

7    responding to Mr. Rabinowitz' report, that issue

8    is -- while it is relevant at a general level

9    and it is very interesting to me, it is not

10   really -- it doesn't really address anything

11   that Mr. Rabinowitz is saying.

12             Because he's dealing with the issue

13   of, okay, let's assume there is this 10 percent

14   grant that was made and now I can -- I'm going

15   to value what that 10 percent interest is worth

16   and then I'm going to say that's what Mr. Berris

17   should be paid today.

18             So, I'm dealing with the, with the

19   redemption or the liquidity aspect of this

20   purported agreement.

21   BY MR. ZACH:

22        Q.   Got it.

23             I mean, I'm just trying to make --

24   so you're not offering an opinion of -- relating

25   to specific terms and conditions that you would



Page 97

1    expect to see in connection with the issuance of

2    an equity interest in De Tomaso to Berris?

3                    You're not sort of like listing off

4    a handful of things, or however many you would

5    expect to see.  It is not in your report?

6                    MS. BUSTAMANTE:  Object to form.

7         A.    That's not something I'm presenting

8    here as part of my expert testimony.  It is

9    not -- there, there could be a wide variety, a

10   wide latitude of the types of terms and the

11   specific provisions.

12                   That's not, that's not really the

13   issue as it relates to what Mr. Rabinowitz has

14   opined.

15   BY MR. ZACH:

16        Q.    That's right.

17                   I'm just trying to understand the

18   scope because it is written broadly and I just

19   want to make sure I understand, you know, what

20   you're intending to say, to say with regard to

21   this paragraph.

22                   And so -- and then a related

23   question.  So picking up, "or the terms or

24   conditions associated with any purported

25   redemption of such an equity interest or terms



Page 98

1    associated with Berris' purported rights to

2    convert such an equity interest into cash."

3                    So, same question.  Other than

4    what's in the next sentence, you're not

5    intending to testify about any other specific

6    terms and conditions relating to that that you

7    would expect to see in an initial grant of

8    equity?

9                    MS. BUSTAMANTE:  Object to form.

10        A.   Well, I don't necessarily agree with

11   that because that's what I address in the

12   sentence that follows, which is that -- again,

13   with the sentence that follows dealing with the

14   ability of a non-controlling shareholder to

15   mandate payment in cash for the redemption of

16   shares upon separation of the company.

17                   Again, in my experience, not just

18   personally but professionally, that, that is

19   highly unusual and I would almost say unheard

20   of.

21   BY MR. ZACH:

22        Q.   I tried to make my question subject

23   to that caveat that you do have the second

24   sentence.  I guess, maybe to make it narrower.

25                   You're not intending to testify



Page 99

1    about specific types of terms and conditions

2    other than what's in the second sentence

3    relating to how a non-controlling shareholder

4    could convert or liquidate their shares in a

5    privately held company?

6                  MS. BUSTAMANTE:  Object to form.

7          A.    I obviously can't -- I don't know

8    what questions you're going to ask me at trial.

9    I don't know what questions Mr. Werner or

10   whoever is going to put me on is going to ask me

11   at trial.

12                So, I can't preclude -- I mean, if I

13   were asked a question as to, you know, can you

14   give us an example of what -- of a term that you

15   might expect to see, I could certainly do that.

16   I could, I could give it to you now.

17                But, you know -- so I don't, I don't

18   know how to -- I don't know how to limit my --

19   how to answer that question without knowing what

20   I'm going to be asked at trial.

21   BY MR. ZACH:

22         Q.    Fair enough.

23                Sir, I could certainly, if I asked

24   you a question, I could open the door.  I get

25   that.  I guess, maybe to make it even more



Page 100

```
 1   narrow.
 2              Your report doesn't set forth any of
 3   those other specific terms and conditions
 4   relating to conversion rights of a minority
 5   shareholder in a privately held company relating
 6   to conversion rights?
 7         A.   Other than to say having the, having
 8   the ability to convert them at any alleged
 9   market value is highly unusual, virtually
10   unheard of.
11         Q.   Got it.
12              Now, in terms of -- you're talking
13   about -- in the second sentence, you know, you
14   say -- we have been talking about converting
15   upon termination to cash, right?
16              Are you aware of any allegation or
17   fact in the record of this case that Mr. Berris
18   demanded upon his termination that his equity
19   interest be paid out to him in cash at that
20   time?
21              MS. BUSTAMANTE:  Object to form.
22         A.   I don't know.  I'm not aware of
23   anything specific to the timing point of your
24   question, but I think that's essentially what
25   Mr. Rabinowitz is being offered for.  That's
```



Page 101

1    what he's, that's what he's presenting in his

2    expert report.

3              Now, I mean, obviously his report is

4    not -- does not coincide with the timing of

5    Mr. Berris' departure.  But that's essentially

6    what Mr. Rabinowitz is -- as I understand it,

7    that's what he's advancing here.

8    BY MR. ZACH:

9         Q.   So you're not offering -- well, you

10   understand that the demands that are being made

11   in this case relate to -- strike that.

12             Let me figure out a better way to

13   say it.

14             You understand that damages as

15   litigated in a court proceeding operate under

16   different legal principles -- strike that.

17             So, you understand that at a trial,

18   there are jury instructions relating to how

19   damages should be calculated.

20             You understand that, right?

21        A.   I am aware --

22             MS. BUSTAMANTE:  Object to form.

23        A.   -- I am aware that there is such a

24   thing as jury instructions.

25



Page 102

1   BY MR. ZACH:

2           Q.    Okay.

3           A.    And I am aware that in jury

4   instructions, there is often a subset of those

5   said jury instructions that relate to damages.

6           Q.    And whatever those, whatever those

7   rules or laws are, you would agree with me that

8   that's for -- that's outside of the scope of

9   your opinion, right?

10                MS. BUSTAMANTE:   Object to form.

11          A.    Well, I'm certainly not providing

12  any expert opinions in my report here or have I

13  ever with respect to what jury -- what jury

14  instructions say.

15                That's, that's -- I know you lawyers

16  argue about that all the time in cases, and it

17  is ultimately the judge that makes the decision

18  as to what the jury is going to be asked to do.

19                So -- but I'm not -- I don't have

20  any -- I don't have any opinion that goes to

21  that.

22  BY MR. ZACH:

23          Q.    And so, when you say it is uncommon

24  for non-controlling shareholders of privately

25  held firms to be granted cash conversion rights



Page 103

1    at alleged market value upon separation from the

2    company, that refers to your understanding of

3    how, how parties typically negotiate their

4    rights between the person that receives the

5    equity and the company on a contractual, on a

6    contractual basis, right?

7                    MS. BUSTAMANTE:  Object to form.

8           A.    I think that's generally fair.

9                    And I would just add to that that,

10   you know, based on, you know, my experience as

11   to how those -- what the -- how the

12   agreements -- what the agreements actually set

13   forth and what they never set forth, at least in

14   my experience.

15   BY MR. ZACH:

16          Q.    And that's in the context of like

17   everyday commercial life where you have seen --

18   you have looked at equity grants in other

19   circumstances?

20          A.    My, my professional experience, and

21   I actually happen to have personal experience in

22   this, in this area.  So, yes.

23          Q.    Okay.

24                   So we can move on from that.

25                   So the second -- going back to --



Page 104

1   going sort of to the next section of your

2   report, which is on page 4 -- and you've got

3   sort of a header, which is the Improper Use of

4   Inaccurate and Unreliable Projections.

5          Do you, do you dispute what

6   Mr. Rabinowitz is employing; that in conducting

7   a valuation, it has to be as of a certain date

8   and you shouldn't be looking at evidence and

9   events that occur after that date in doing the

10  valuation?

11          MS. BUSTAMANTE:  Object to form.

12      A.   I do not dispute or disagree that a

13  general principle of business valuation is to

14  consider information that was known or

15  reasonably knowable at the time of the valuation

16  date.

17          But that is not -- Mr. Rabinowitz

18  has not done that.

19  BY MR. ZACH:

20      Q.   Okay.

21          We can get into that, but you agree

22  with that general principle?

23      A.   Generally, yes.  I mean, there are,

24  there are occasions where information --

25  subsequently generated information, if it, if it



Page 105

1    could be reasonably knowable, could be

2    considered and should be considered to form a

3    more reliable opinion as to, as to valuation at

4    a given date.

5         Q.   So when you say reasonably knowable,

6    do you mean reasonably knowable as of the date

7    of the valuation?

8              MS. BUSTAMANTE:  Object to form.

9         A.   Yes.

10   BY MR. ZACH:

11        Q.   So you're not saying -- right.

12             But that's different from saying

13   some subsequent event after the valuation date

14   occurs and that new information should be

15   backdated into the analysis if it was not

16   reasonably knowable at the time of the analysis?

17             MS. BUSTAMANTE:  Object to form.

18        A.   To the extent, to the extent the

19   information could, could -- was reasonably

20   foreseeable, it should, it should be considered.

21             To the extent it was not reasonably

22   foreseeable at the date as of the valuation

23   date, it generally should not be considered.

24   BY MR. ZACH:

25        Q.   So we'll get into the details in a



Page 106

1    second, but I just want to try to talk at a high

2    level.

3              So you, as part of your report, you

4    cite to a series of projections that occur over

5    a number of years.

6              Do you recall that?

7              MS. BUSTAMANTE:  Object to form.

8         A.    Generally, yes.

9    BY MR. ZACH:

10        Q.    And as I think -- again, it is a

11   high level.  As I understand your point, it is

12   that at the time the two sets of projections --

13   the two different sets of projections utilized

14   by Mr. Rabinowitz were made, there were earlier

15   projections that were so far afield and wrong

16   that they should warn or counsel against relying

17   on the current projections?

18             MS. BUSTAMANTE:  Object to form.

19   BY MR. ZACH:

20        Q.    Is that fair?

21             MS. BUSTAMANTE:  Object to form.

22        A.    I don't agree with that

23   oversimplification and characterization.

24             And again, I would refer back to my

25   report because I think I gave a fairly



1    straightforward and, you know, well-described

2    opinion on what my opinion is and the bases for

3    that.

4                But if you, if you want to -- if you

5    want me to try and summarize it, what

6    Mr. Rabinowitz did was nothing -- no, no

7    independent or objective analysis or

8    investigation into the information that he put

9    into his models.

10               He, he seems like he may be very

11   well versed and proficient in Excel and he

12   understands the mechanics of a discounted cash

13   flow model.  I'm not, I'm not quarreling with

14   that.

15               But simply taking numbers that

16   appear on a piece of paper and offering an

17   opinion based on what's on a piece of paper

18   without conducting any due diligence, no

19   investigation, no independent objective analysis

20   and then reaching a conclusion of value based on

21   that, is not, is not, in my opinion, appropriate

22   expert, expert work.

23               It is not, it is not the type of

24   work that should be, should be done in reaching

25   opinions like this.



Page 108

```
 1              And yes, there is, there is
 2  available information.  Information was
 3  available to him that meets his definition of
 4  information known or knowable at the time of the
 5  valuation date that he did not consider.
 6  BY MR. ZACH:
 7         Q.   We'll get into that in a second.
 8  But let me sort of narrow it a bit.
 9              So you understand that there were
10  two sort of sets of projections that
11  Mr. Rabinowitz relies on.  There's one from, I
12  think May '22, and another set from August 2023.
13              Do you, do you recall that?
14              MS. BUSTAMANTE:  Object to form.
15         A.   I think there -- I think there were
16  generally two.  I think there were actually
17  more, more sets or variations or versions of
18  those, of those sets of forecasts.
19              But, but he relies on two.
20  Generally he relies on two.
21  BY MR. ZACH:
22         Q.   Right.
23              And just so the record is clear,
24  when we say relies on, he basically does DCF
25  analysis on those two sets; is that fair?
```



Page 109

```
 1          A.   He adopts them but without any
 2    independent or objective analysis.
 3          Q.   And so, in terms of, you know, going
 4    back to the as of standard, it is not your
 5    position, is it, sir, that in looking at that
 6    first set, the May '22 projections, that
 7    Mr. Rabinowitz should also have considered the
 8    August 2023 projections a year later in doing
 9    his DCF analysis for the May '22 information?
10               MS. BUSTAMANTE:  Object to form.
11          A.   To the extent that anything that
12    occurred subsequent in any, in any meaningful
13    way to the time that the valuation, that the
14    valuation in May of '22 was, was performed or as
15    of that date, that information would generally
16    not be under the purview of a valuation analysis
17    as of that date.
18               I mean, we have already -- I have
19    already agreed to that.
20    BY MR. ZACH:
21          Q.   Okay.
22               I just want to make sure.
23               And so, to the extent that there
24    are -- all right.
25               Got you there.
```



Page 110

1             So you said, you know -- you said

2    earlier when we were talking that you -- your

3    position is that he did not do any independent

4    and objective analysis of the projections.

5             What, what sorts of things do you

6    think he should have done?

7        A.    Well, look, it is not, it is not my

8    role here to try and suggest what he should or

9    what he could have done to be more in compliance

10   with basic valuation principles.

11            But he certainly could have done a

12   better investigation or any investigation as to

13   the financial performance of the company up to

14   the date that he was, he was preparing his

15   valuations and evaluate whether or not these

16   projections were, were, were reliable or

17   achievable in any, in any meaningful way.

18            How they were -- I believe he

19   testified -- he had difficulty testifying -- and

20   again, I only had his rough transcript for a

21   little bit of time, but I believe he testified,

22   that he didn't -- there was some aspects about

23   certain of these projections that he didn't know

24   who prepared them.  He didn't know what Ryan --

25   what Mr. Berris' involvement was in them.



Page 111

```
 1                  So, there's, there's a lot that was
 2      just left uninvestigated.  And rather -- and he
 3      says this quite clearly in his report.  He says
 4      I've just assumed that these represented
 5      management's best information about the
 6      prospects for the company and that they were
 7      reliable.
 8                  And that's, that's not the type of
 9      assumption that a, that a rigorous business
10      valuation analyst would, would just accept.
11          Q.    When you say -- do you draw a
12      distinction between doing a business valuation
13      contemporaneously in a non-litigation context
14      for a client and trying to assess a historical
15      business valuation that occurred in the past?
16                  MS. BUSTAMANTE:  Object to form.
17          A.    Well, it's -- as a business
18      valuation professional, it's very -- I don't
19      think it occurs very frequently.  And maybe it
20      never occurs where you're actually asked to do
21      a, a valuation.  I'm going to do a valuation
22      today for this company.
23                  It's, it's -- there's generally a
24      lag period.  There generally is -- it is
25      generally being -- you generally have to be
```



Page 112

1    looking backward because you get asked -- that's
2    when we get retained to, to perform business
3    valuations.
4              That's not to say that you couldn't
5    be called in and say, you know, here it is
6    June 30, 2024, and we want you to do a valuation
7    of our company as of today and here is all the
8    information we have as of today and you could,
9    you could attempt to do that.
10             But I guess to answer your question
11   directly, I don't know that I would draw a
12   distinction between those two things.
13   BY MR. ZACH:
14        Q.   So you would agree with me that, for
15   example, there are many privately held
16   companies, say in Silicon Valley, in which
17   potential investors look to take an equity
18   stake?
19             MS. BUSTAMANTE:   Object to form.
20        A.   There are many, many examples of,
21   you know, angel investors or venture capitalist
22   firms that investigate the possibility of
23   providing seed capital to privately held
24   start-ups or companies that they're hoping are
25   going to be successful investments at some point



Page 113

1    down the road.

2    BY MR. ZACH:

3         Q.    And would you agree with me that as

4    part of an investor looking to take an equity

5    interest in a private start-up company, that it

6    is common to conduct a business valuation of

7    that company to help establish the cost of

8    purchasing that equity interest?

9              MS. BUSTAMANTE:    Object to form.

10        A.    That's not really my, my area of

11   expertise.  But I am generally -- it is

12   generally, it is generally known that there are

13   -- again, angel investment firms or venture

14   capitalists that will explore what potentially

15   could happen with this company and is this

16   worth -- is it worth the risk for us to make an

17   investment in this company in the, in the hopes

18   that it is going to be able to achieve some,

19   some outcomes or outcomes within a range that

20   would ultimately make it a -- an investment for

21   us, accepting the possibility that it is not --

22   that's not going to happen and we may lose our

23   investment.

24              And that happens all the time.  I

25   mean, not all the time.  It happens very



Page 114

1    frequently.  There are hits and there are misses

2    and there are generally a lot more misses than

3    there are hits.

4    BY MR. ZACH:

5            Q.    Right.

6                  But I guess my question to you is,

7    you would agree that there are -- it is common

8    for outside investors to conduct DCF type

9    analyses based on projections in trying to

10   understand the value of the company so that they

11   can price their potential investment in that

12   company?

13                 MS. BUSTAMANTE:  Object to form.

14           A.    Well, it is, it is more to

15   understand the potential value of the company.

16   BY MR. ZACH:

17           Q.    Right.

18                 The start-up company, right?

19           A.    Well, in the example you have

20   articulated, yes.

21           Q.    Yes, exactly, in my example.

22                 And that you would also agree that

23   it is routine for outside investors, whether

24   they be angel investors or private equity or

25   whoever, to invest in early-stage companies that



Page 115

1    have not yet generated a profit?

2                    MS. BUSTAMANTE:  Object to form.

3           A.    That is, that is very common.  It's,

4    it's -- it has nothing to do with what

5    Mr. Rabinowitz has done here or what Mr. Berris

6    is seeking here.

7                    Those are completely unrelated.

8    They couldn't be, they couldn't be farther apart

9    on the reality spectrum if, if you tried.

10   BY MR. ZACH:

11          Q.    Sorry, are you done?

12                Have you ever participated in trying

13   to valuate business in connection with a

14   potential equity investment by an outside party

15   for a start-up company that had yet to turn a

16   profit?

17          A.    I have done it personally.  I mean,

18   I have, I have done it personally.

19          Q.    And as part of that, did you utilize

20   projections created by the company to conduct

21   your analysis?

22          A.    Among, among other -- among other

23   sources of information, yes.  Projections are

24   forecasts of what the company hopes to be able

25   to achieve in the future over a certain period



Page 116

```
 1    of time is a relevant consideration in that, in
 2    that context.
 3          Q.    And in those valuations, did you, as
 4    part of your -- as part of your work on that,
 5    did you conduct a DCF analysis?
 6          A.    Most likely.  I don't have a
 7    specific recollection each and every time but
 8    most likely that would have been a component.
 9          Q.    So this is an instance in which you
10    were -- you had the opportunity to conduct your
11    own sort of independent and objective analysis
12    of the projections that were being provided to
13    you by, by the company, right?
14                MS. BUSTAMANTE:  Object to form.
15          A.    When you say this, I didn't follow
16    what you were referring to.
17    BY MR. ZACH:
18          Q.    Sorry.
19                In doing your business valuation,
20    which likely included a DCF analysis, you were
21    able to conduct your own independent and
22    objective analysis of the reliability of the
23    projections that were provided to you in order
24    to conduct the DCF analysis, right?
25          A.    And again, I don't have a specific
```



Page 117

1   recollection of each and every situation, but

2   that's certainly something that I likely would

3   have considered and evaluated, yes.

4          Q.   Okay.

5               So what I want to understand is what

6   steps in that context did you take to gain

7   comfort that those projections that were

8   provided to you were reliable?

9          A.   I don't have a specific

10  recollection, but I could have conducted my own

11  market study, my own investigation, my own --

12  you know, conducted my own analysis of the

13  performance of the company.

14              There could be a variety.  I don't,

15  I don't have a specific recollection of what I

16  have done in another, in another context.

17         Q.   Well, I think you have articulated a

18  standard that says that a valuation professional

19  should conduct an independent and objective

20  analysis of the projections that are being used

21  in the valuation.

22              So my question to you is, what sort

23  of standards do you apply to yourself in the

24  context that we just described to ensure that

25  you meet that requirement that your report says



Page 118

1   exists?

2              MS. BUSTAMANTE:  Object to form.

3       A.   Well, I've set forth very clearly

4   several examples of those in my report.

5              Look at the financial performance of

6   the company.  Is it consistent with reason that

7   the projections make sense?

8              Look at their historical fact

9   pattern of making projections that we now have a

10  natural experiment that we can evaluate.

11             I mean, there are, there are a

12  number of things that can be done, and

13  Mr. Rabinowitz didn't do any of them.  He just

14  put blinders on and said I have this piece of

15  paper.  I have an Excel spreadsheet that has

16  numbers on it.  I'm going to assume that this is

17  what, this is what, this is what the projections

18  are and I'm going to assume these projections

19  are going to be achieved.  And I'm going to do

20  the math.

21             He basically did the math.

22  BY MR. ZACH:

23      Q.   When you, when you are doing this,

24  right -- when you're doing this in a

25  non-litigation context, someone hands you -- a



Page 119

1   company supplies you with its projections.

2             What specific steps do you take to

3   gain comfort that they are independent -- that

4   they do take independently and objectively gain

5   comfort that they're reliable, that you can use

6   them in your valuation?

7             MS. BUSTAMANTE:  Object to form.

8        A.   I can't, I can't describe that in --

9   out of context.  It is going to vary.  It is

10  going to vary depending on what the nature of

11  the company is, you know, how long it has been

12  in existence, what its financial track record

13  is, what business is it in, what industry.

14            There's a whole host of variables

15  that you can't, you can't encapsulate into a set

16  of, of rules.

17            But, the fundamental principle here

18  is Mr. Rabinowitz didn't do anything, and

19  there's evidence to suggest that what he relied

20  on was not reliable.

21  BY MR. ZACH:

22       Q.   Okay.

23            Can you give me -- for example,

24  would you go speak to -- in conducting your own

25  analysis, would you go speak to management in



Page 120

1    the company to determine how they are utilizing

2    the projections they supplied?

3              A.    That's, that's certainly one.

4    That's one analysis that could be, that could be

5    relevant.  Yes, I would not foreclose that.

6              Q.    So that would be at least one

7    example of a step that someone could take to

8    conduct an independent and objective analysis of

9    the reliability of a set of financial

10   projections?

11             A.    Well, it could contribute to

12   reaching that conclusion.  I'm not saying it is

13   going to be outcome determinative.

14                   But it could certainly contribute.

15   It is a relative consideration.

16             Q.    Would you consider whether the

17   projections that were supplied to you had been

18   reviewed by other outside business valuation

19   professionals who came to a view as to their

20   reliability?

21                   MS. BUSTAMANTE:  Object to form.

22             A.    That would, that would depend.

23   BY MR. ZACH:

24             Q.    But would you agree that that could

25   be one step for a valuation expert to conduct



Page 121

1    their own independent and objective analysis as

2    to the reliability of the projections?

3                    MS. BUSTAMANTE:  Object to form.

4        A.    No, because I think that would

5    depend -- that would depend on a number of

6    factors.

7    BY MR. ZACH:

8        Q.    I get that.

9               But it could be that the outside

10   valuation people were morons and it was

11   terrible.  I get that.

12              But as a, as a procedural matter,

13   would you agree with me that looking for

14   evidence of the projections having been

15   evaluated by other independent professionals

16   would be a step that one could take to determine

17   whether it was -- whether it was appropriate to

18   rely on the projections that had been supplied?

19                   MS. BUSTAMANTE:  Object to form.

20       A.    I'm sorry, I'm not going to agree to

21   that out of context.  And I'm not suggesting

22   that one reason would be because they may be

23   morons.  I mean, I'm not going to accuse anyone

24   of being a moron.

25              It could be what was the purpose of



Page 122

1    what they were doing.  What was, what was, what
2    type of rigor did they, did they participate in.
3    What type -- were they, were they essentially
4    just functioning as a calculator, like
5    Mr. Rabinowitz.
6                Okay.
7                So I'm not going to -- I'm not going
8    to agree to that.
9    BY MR. ZACH:
10        Q.    But you would agree that you're
11   offering an opinion that Mr. Rabinowitz
12   conducted -- as you said, he acted as a
13   calculator and conducted no independent and
14   objective analysis to determine whether the
15   projections relied upon in his report were
16   reliable?
17        A.    It is, it is worse than that.  He
18   ignored data that demonstrates that he shouldn't
19   have relied on those projections.
20        Q.    And as part, you know, as part of
21   your opinion, to make that assessment, you would
22   agree with me that you need to be utilizing some
23   commonly accepted standard as to what
24   constitutes an independent and objective
25   analysis for purposes of examining projections



Page 123

1    that were supplied to you, right?

2              MS. BUSTAMANTE:  Object to form.

3         A.   I don't know that you could say

4    there's, there's one set of commonly or common

5    and accepted standards, as you, as you phrase it

6    that way because, again, every situation is

7    going to be different.  Every, every company is

8    going to be different.

9              The availability of information for

10   the company, the availability of information for

11   the market, the availability of information for

12   the industry and the economic conditions --

13   there's, there's a whole host of variables

14   there.

15             So, no, I do not agree that there's

16   going to be one set of common and accepted

17   standards that you can articulate or enumerate

18   in the fashion that you're, that you're trying

19   to suggest and then say, okay, well, if we do

20   these three things, we have satisfied, we have

21   satisfied the common and accepted standards.  I

22   don't agree with that.

23   BY MR. ZACH:

24        Q.   Well, what, what -- you would agree

25   that there has to be some standard or some set



Page 124

1    of principles --

2                 MS. BUSTAMANTE:  Object.

3    BY MR. ZACH:

4         Q.    -- that guide a business valuation

5    expert in assessing -- in conducting an

6    independent and objective analysis of financial

7    projections, right?

8                 MS. BUSTAMANTE:  Object to form.

9         A.    I don't know how that question is

10   any different than what you just asked me.  So

11   I'll, I'll refer back to my previous answer.

12                But, but there are, there are

13   certainly examples.  Again, look at the

14   financial performance of the company.  Look at

15   the historical manner in which the projections

16   were prepared and whether they were met or not

17   met.  Look at the nature of the projections that

18   you are analyzing and what was, what was the

19   purpose that they were prepared for and how were

20   they prepared and what were the assumptions that

21   went into it and how reliable are those

22   assumptions.

23                There's -- I'm not going to agree,

24   again, that those are commonly accepted set of

25   standards or principles, but they're certainly



Page 125

 1   examples of things that could be done.

 2   BY MR. ZACH:

 3        Q.   That's what I'm getting at, sort of

 4   like what, what are some of those examples.

 5             And, you know, you, you seem

 6   disinclined to agree with me that looking at how

 7   other independent third parties have looked at

 8   things could be a way of conducting that

 9   analysis.

10             MS. BUSTAMANTE:  Object to form.

11   BY MR. ZACH:

12        Q.   Do you still, do you still hold that

13   position?

14        A.   I continue to disagree with that as

15   you have characterized it because that, that

16   would depend.  That would depend.

17             You know, you're saying it could be.

18   And so you want me to say, well, if it would

19   depend, then it could be.

20             I'm not going to agree with that

21   because I would want to investigate various

22   aspects of what, what the outside independent --

23   your so-called independent entity that did, that

24   did the analysis.

25             There are things I would want to



Page 126

1    consider and evaluate before I would make a

2    determination as to whether that is a relevant

3    or productive exercise.

4         Q.   And I don't -- I think that's a fair

5    point.

6              My point is -- I'm going to split

7    these two things.  There is a set of things that

8    a valuation expert could do, could explore,

9    versus what is ultimately reliable from what is

10   found that goes into the business valuation.

11             Do you understand the distinction

12   I'm making?

13        A.   Not really.

14        Q.   So, you know, you get a set of

15   projections.  They're laying on your desk.  And

16   you think how am I going to go about checking

17   these out.

18             There's a variety of avenues that

19   you could explore to conduct what you called

20   independent and objective analysis.

21             Do you agree with that?

22             MS. BUSTAMANTE:  Object to form.

23        A.   There are -- depending on the

24   situation, depending on the circumstances, as

25   I've articulated, there are different analyses



Page 127

1    or investigations that one could conduct to

2    assist in reaching a determination as to whether

3    or not the projections are meaningful for the

4    purpose of estimating a valuation of the

5    company.

6    BY MR. ZACH:

7         Q.    Another way of saying this, you

8    would look for evidence of a variety of

9    different things, including the purpose for

10   which the projections were made, how they were

11   going to be used and the like; is that fair?

12        A.    Well, there's a whole --

13        Q.    Many other things, including many

14   other things?

15        A.    There's many things.  There's many

16   things.

17        Q.    One of the things that you have

18   raised is the purpose of -- for which the

19   projections were made.

20              What, what sorts of purposes would

21   you, would you be looking at in conducting your

22   own -- in conducting a business valuation?

23        A.    There are -- again, there are many

24   purposes for conducting a business valuation.

25   There are purposes for actually engaging in a



Page 128

```
 1   transaction.  There are purposes for attempting
 2   to raise, you know, raise seed capital.  There
 3   are purposes for trying to secure bank
 4   financing.
 5              There are purposes for succession
 6   planning and creating employee stock ownership
 7   plans and a whole host of reasons for why a
 8   company might be, might be interested in either
 9   preparing or have prepared projections just for,
10   just for general business planning purposes.
11        Q.   And as I understand it, in
12   conducting an independent and objective
13   analysis, your view is that some of those
14   purposes potentially indicate more reliability
15   for the projections than others; is that fair?
16              MS. BUSTAMANTE:  Object to form.
17        A.   It's certainly possible.  I mean,
18   again, that is certainly possible.  I mean, you
19   can't, you can't reach a conclusion just based
20   on that.
21              But it is certainly something that
22   could factor into an analysis or investigation
23   of the projections, understanding, you know,
24   what they were prepared for.
25
```



Page 129

BY MR. ZACH:

    2       Q.   And so, from your perspective, what are some of the purposes for which the projections were created that suggest to you that they are more reliable than others?

            A.   I don't, I don't have an opinion on that right now.  That's, that's going to be facts, very fact specific.

            Q.   But your testimony here is that you don't believe that Mr. Rabinowitz looked at the purposes for which the projections he relies upon were, were created?

                  MS. BUSTAMANTE:  Object to form.

            A.   I don't -- I'd have to go, go back and look, actually.  I don't, I don't know that I can say that as a matter of fact.

                  I would have to go back and read his report.  I don't believe he did -- he conducted any independent analysis of it.

                  Just understanding what they were, what the purpose of the projections was, is maybe informative at some level, but it is not going to be -- I don't believe it is likely to be outcome determinative.

                  But I would have to go back and look



Page 130

1    at what he says in his report.  I don't recall.

2                    MR. ZACH:  How long have we been

3         going?

4                    MS. BUSTAMANTE:  Do you want to

5         take a lunch break?

6                    MR. ZACH:  Yes, sorry.  We have

7         been going for a while.

8                    You're the witness.  How much,

9         how much time do you want?

10                   THE WITNESS:  I'm, I'm pretty

11        flexible.  I mean, if people want to

12        eat, they can eat.  I'm not, I'm not a

13        big lunch guy.

14                   MR. ZACH:  How about, how about

15        if we come back at 1:10, is that okay

16        with everybody?

17                   MS. BUSTAMANTE:  That's good.

18                   MR. ZACH:  Okay.

19                   THE WITNESS:  Fine by me.

20                   THE VIDEOGRAPHER:  Off the record

21        12:35 p.m.

22                       (Whereupon, at 12:35 o'clock

23            p.m., a lunch recess was taken.)

24

25



Page 131

1          A F T E R N O O N   S E S S I O N

2                    1:14 o'clock p.m.

3               THE VIDEOGRAPHER:  On the record

4          1:14 p.m.

5   BY MR. ZACH:

6          Q.    Okay.

7               We're back from lunch.  Sticking --

8   and I think we left off -- we're still in sort

9   of Section 4 of your report.

10              I want to go through some of the --

11  your report, your report cites to a series of

12  projections that aren't relied on by

13  Mr. Rabinowitz; is that fair?

14         A.    I don't know that for sure.  I

15  don't -- I believe I cite a couple that were not

16  the ones that he uses for his DCF, but I can't

17  preclude the possibility that he didn't rely on

18  them.

19         Q.    Fair enough.  Fair enough.

20              So let's -- I just want to look

21  at -- to make sure we have them all.  So we've

22  got -- we agree that you have identified or you

23  understand what projections Mr. Rabinowitz

24  relied on for the May 2022 valuation and for the

25  August 2023 valuation, right?



Page 132

```
 1              MS. BUSTAMANTE:  Object to form.
 2        A.   Can you state the question again?
 3   BY MR. ZACH:
 4        Q.   Yes.
 5              You reviewed those and you're
 6   familiar with the projections that he relied on?
 7        A.   I did review them.  Yes, I am aware
 8   of them.
 9        Q.   Okay.
10              But in addition -- and you cite
11   those and rely upon them in your report, right?
12              MS. BUSTAMANTE:  Object to form.
13        A.   They are, they are documents that I
14   discuss in my report.
15   BY MR. ZACH:
16        Q.   But in addition to them, your report
17   cites to a number of different valuations that
18   were created at different times.
19              Do you agree with that?
20              MS. BUSTAMANTE:  Object to form.
21        A.   No, I don't agree with that.
22   BY MR. ZACH:
23        Q.   Okay.
24              Well, let's go to -- so you have --
25   still have your report, right?
```



Page 133

1          A.    I do.

2          Q.    So let's go to paragraph 10.

3                And the second sentence of paragraph

4    10, you say "For example, financial projections

5    prepared in July 2018 forecast De Tomaso

6    revenues for 2019, 2020 and 2021," and then you

7    go on to give, give the actual numbers.

8                Do you see that?

9          A.    I do.

10         Q.    So that is, that is a set of

11   projections that you have identified that were

12   prepared years earlier.

13               2018, right?

14         A.    That's my understanding, yes.

15         Q.    Okay.

16               And those, those specific

17   projections are cited to you in footnote 13 of

18   your report, right?

19         A.    That's, that's where I reference the

20   actual documents, yes.

21         Q.    Okay.

22               And I can pull them up if you want,

23   but I just have some general questions around

24   them.

25         A.    Okay.



Page 134

```
 1          Q.   So the first is, do you, do you know
 2   how the projections that you cite in footnote 13
 3   were prepared at De Tomaso?
 4               MS. BUSTAMANTE:  Object to form.
 5          A.   Can you be more specific as to what
 6   you're asking me?
 7   BY MR. ZACH:
 8          Q.   Sure.
 9               Do you know who at De Tomaso
10   prepared the projections that you cite to in
11   footnote 13?
12          A.   I would have to go back.  I don't
13   know as I sit here right now.  I would have to
14   go back and look at them.
15               So I don't know.  I don't know if
16   there is some context around them or not.
17          Q.   Totally fair.  And I can bring them
18   up.
19               MR. ZACH:  So let's mark it.
20          What are we up to?  Four.
21               So let's mark as Barnes 4 the
22          first one that is cited here, which
23          would be DT 9 -- let me just make sure I
24          have the right one.  92013.
25                    (Document bearing Bates
```



Page 135

```
 1               stamp DT00092013 was marked as
 2               Barnes Exhibit 4 for identification,
 3               as of this date.)
 4    BY MR. ZACH:
 5        Q.   He's asking about context.  So
 6    Barnes 4 --
 7               MR. ZACH:  Do you guys know -- we
 8          haven't looked at a document yet.  Do
 9          you guys have, do you have open --
10               MS. BUSTAMANTE:  I don't have it
11          open.
12               MR. ZACH:  We'll just share the
13          screen.  It is a one-page e-mail.
14    BY MR. ZACH:
15        Q.   So just go down to the bottom so you
16    can see the Bates number.
17               Do you see the Bates number is
18    92013?
19        A.   Yes.
20    BY MR. ZACH:
21        Q.   And you would agree with me that
22    that matches with the Bates number in your
23    report, the first Bates number in footnote 4,
24    right?
25        A.   Correct.
```



Page 136

1              MR. ZACH:  Okay.

2              And then scroll up so Mr. Barnes

3         can read the e-mail.

4         A.   Okay.

5    BY MR. ZACH:

6         Q.   So, does this, I guess, refresh your

7    recollection as to who participated in creating

8    the projections that you reference?

9              MS. BUSTAMANTE:  Object to form.

10        A.   This indicates that Ms. Majcher at

11   least was responsible for updating something in

12   the forecast.  She's sending this to Mr. Choi

13   and Mr. Berris.

14             So this e-mail in and of itself

15   doesn't determinatively tell me who prepared

16   them initially, but this clearly indicates -- or

17   this would suggest that Ms. Majcher was updating

18   them.

19   BY MR. ZACH:

20        Q.   Okay.

21             And do you know -- and so, the next

22   document that you cited, it is an e-mail and

23   attachment.  So the attachment is next.

24             I'll just show you the attachment.

25   I'm not going to ask you any, any questions



Page 137

1    about it.  I'll just show it to you so you have

2    the complete set of documents that you sort of

3    cite to in footnote 13.

4                    MR. ZACH:  So we'll mark as

5            Barnes 5, a document that's DT 92014.

6                    (Document bearing Bates

7            stamp DT00092014 was marked as

8            Barnes Exhibit 5 for identification,

9            as of this date.)

10                   MS. BUSTAMANTE:  Just to be

11           clear, this is the attachment to the

12           previous exhibit that you just showed?

13                   MR. ZACH:  Yes.  Yes.

14   BY MR. ZACH:

15           Q.    And I'm not going to ask you any

16   questions about it.  I just wanted you to see it

17   so you could see both documents.

18                   Let me know when you're --

19           A.    Yes, no, I see it.  There's, there's

20   a series of tabs.  And I could be wrong, but I

21   believe it is the P&L tab is the relevant one,

22   but I could, I could be misremembering that.

23           Q.    Fine.  We can click on that.

24                   So my question to you is, do you

25   know for what purpose these projections were



Page 138

1   made?

2        A.   I don't, I don't have any specific

3   knowledge as to, as to why they were made.  I

4   mean, I have -- all I have is the e-mail that we

5   were referring to earlier from Ms. Majcher.

6        Q.   Okay.

7             So in terms of your understanding of

8   the circumstances of how this particular set of

9   projections was created, it is limited to the

10  cover e-mail that we just looked at and whatever

11  the contents of this spreadsheet are?

12       A.   Correct.

13       Q.   And you didn't conduct any

14  additional analysis of -- relating to how these

15  projections were, were utilized?

16             MS. BUSTAMANTE:  Object to form.

17       A.   The only analysis I conducted was to

18  compare it to actual performance.

19             MR. ZACH:  So, we can take that

20       down.

21  BY MR. ZACH:

22       Q.   And so, I'm just trying to walk

23  through your report to give you the context.  It

24  might be easier to follow along.

25             So skipping -- turning to page 6,



Page 139

1    three lines down -- give me one second.

2              You write "Similarly, in August

3    2020, Mr. Berris forwarded to Mr. Choi a set of

4    financial projections for De Tomaso that

5    included forecasted revenues for 2019, 2020,

6    2021," and then you give the numbers.

7              Do you see that?

8         A.    I do.

9         Q.    And then, you have those -- you cite

10   to them in footnote 17 as DT 3310.

11             Do you see that?

12        A.    DT 9310.

13        Q.    Oh, thank you.  Thank you.  Thank

14   you.  Yes, DT 9310.

15             MR. ZACH:  I'll just show you --

16        this will be Barnes 6.  I'll just show

17        you the e-mail.

18                  (Document bearing Bates

19             stamp DT0000009310 was marked as

20             Barnes Exhibit 6 for identification,

21             as of this date.)

22             MR. ZACH:  Scroll down so he can

23        see the Bates.

24        A.    Yes, I recall this.

25



Page 140

1    BY MR. ZACH:

2          Q.    Okay.

3                That's fine.

4                And this is an e-mail dated

5    August 2, 2020, right?

6          A.    That's what I reference.  I don't

7    see the date.

8          Q.    Oh, yes.  Sorry, sorry.

9          A.    Yes, it says August 2nd.

10         Q.    And in this e-mail, Mr. Berris is

11   e-mailing Mr. Choi, right?

12         A.    Yes.

13         Q.    And the subject of the e-mail is old

14   DT forecasts.

15               Do you see that?

16         A.    Yes.

17         Q.    And so, did you have an

18   understanding of who created these forecasts?

19         A.    I don't have a specific recollection

20   as I sit here today.  So I would be speculating

21   right now.

22         Q.    And do you have an understanding of

23   the purpose for which those forecasts were

24   created?

25                    MS. BUSTAMANTE:  Object to form.



Page 141

```
 1          A.    Not as I sit here today.
 2   BY MR. ZACH:
 3          Q.    And would it be fair to say you did
 4   not take sort of independent steps to go
 5   understand -- strike that.
 6                Would it be fair to say that you did
 7   not take steps to further explore the
 8   circumstances under which these forecasts were
 9   created?
10                MS. BUSTAMANTE:  Object to form.
11          A.    No, the only analysis I did was to
12   compare them to actual performance.
13   BY MR. ZACH:
14          Q.    Okay.
15          A.    And to enter future projections,
16   sorry.
17          Q.    And then -- sorry.  Just give me a
18   second.
19                And then, if you look down sort of
20   to the second to last sentence on paragraph 10,
21   it starts "Other projections prepared by
22   De Tomaso in 2018 and 2019 also forecast
23   significant revenues for 2020-2023."
24          A.    I see that.
25          Q.    And then again, sort of similar like
```



Page 142

1    you see footnote 18, that sort of cites to what

2    you're talking about, right?

3         A.   Correct.

4         Q.   So let's just quickly look at both

5    of those.

6              MR. ZACH:   Let's mark as Barnes 7

7         DT 94981.

8                   (Document bearing Bates

9              stamp DT000094981 was marked as

10             Barnes Exhibit 7 for identification,

11             as of this date.)

12   BY MR. ZACH:

13        Q.   We'll put it on the screen for you.

14   There's no cover e-mail cited in this.  So it is

15   just the spreadsheet.  I'm going to ask general

16   questions.

17             Do you know who prepared these

18   forecasts?

19        A.   Not as I sit here today, no.

20        Q.   And do you know what the purpose of

21   those, the creation -- strike that.

22             Do you know for what purpose these

23   forecasts were created?

24        A.   No.

25                  MS. BUSTAMANTE:  Object to form.


MAGNA
LEGAL SERVICES

Page 143

1          A.    Not as I sit here today.

2                    MR. ZACH:  We can take that down.

3                    And then, the last one is -- so

4           it is footnote 18 too.  This one is DT

5           70935.

6                    MS. BUSTAMANTE:  Can you repeat

7           the Bates?

8                    MR. ZACH:  No, I think I got the

9           wrong one.  Sorry, John can't read.  The

10          Bates is DT 71709.

11                   Sorry, Mr. Barnes.  That's the

12          second document referenced in

13          footnote 18, and we're marking that as

14          Barnes 8.

15                        (Document bearing Bates

16              stamp DT0000071709 was marked as

17              Barnes Exhibit 8 for identification,

18              as of this date.)

19     BY MR. ZACH:

20          Q.    Mr. Barnes, very similar questions.

21                    Do you know who created the

22     forecasts that you cite to in footnote 18?

23          A.    Not as I sit here.  I don't recall.

24     Not as I sit here today.

25          Q.    And as you sit here today, do you



Page 144

1    have an understanding of what the purpose was

2    for the creation of these forecasts?

3           A.    No.

4           Q.    Okay.

5                 MR. ZACH:   We can take those

6           down.

7    BY MR. ZACH:

8           Q.    Moving on to paragraph 11 of your

9    report, you state, you state -- the first

10   sentence is that "Further evidence as to the

11   unreliability of the forecasts Mr. Rabinowitz

12   relies on is the fact that even to the present

13   day, De Tomaso has not recorded any revenue,

14   despite the projections relied on by

15   Mr. Rabinowitz indicating forecasted revenues,"

16   and then you give some numbers.

17                Do you see that?

18          A.    Correct.

19          Q.    So are you -- as part of your

20   opinion, is it your view that as of -- there was

21   a date you see in the middle.  Obviously this

22   report was written a while ago, as of

23   September 18, 2024.

24                So, is it your opinion that, you

25   know, that for purposes of conducting an as of



Page 145

1    valuation, as Mr. Rabinowitz did in May 2022 and

2    August 2023, this is evidence that he should

3    have considered?

4            A.    Absolutely.

5            Q.    Okay.

6                  And what's your basis for that?

7            A.    Because, again, the standard is, is

8    known or reasonably foreseeable.  I think

9    there's a fair amount of evidence if he had

10   conducted any independent objective analysis, he

11   might have concluded that it was reasonably

12   foreseeable that there was going to be no

13   revenues through at least the middle to late

14   2024.

15                 This is not, this is not

16   speculation.  This is not something -- this is

17   not a hurricane that happened that wasn't on the

18   radar.  This is not a facility burning down that

19   couldn't be anticipated.

20                 This is quite consistent with the

21   fact pattern we had for the preceding five or

22   six years.

23                 So, I think it was -- I think it was

24   irresponsible of Mr. Rabinowitz to actually

25   ignore the fact that even in the, in the period



Page 146

1    subsequent to his valuation dates, there

2    continued to be, as there had been for years and

3    years -- despite projections that had been

4    prepared by or on behalf of the company, there

5    was zero revenue.

6            Q.    So just to break those out.

7                  Is it your, is it your opinion that

8    as of his first DCF analysis, which was as of

9    May 2022, that the actual stated revenue for the

10   company as of September 18, 2024 should have

11   been included in that valuation from -- as of

12   May 2022?

13                 MS. BUSTAMANTE:  Object to form.

14           A.    I don't know what you mean by

15   included, but I believe that this is

16   information -- at least some, some amount of

17   information concerning the ongoing lack of

18   generating any revenue despite, despite having

19   projections that suggested that was something

20   that was reasonably foreseeable as of the date

21   of both of his valuation dates and that he chose

22   to ignore that.

23   BY MR. ZACH:

24           Q.    So would another way of putting that

25   be that it is your opinion that it was knowable



Page 147

1   as of the dates of both of his valuations that

2   there would be no revenue in September 18, 2024?

3                   MS. BUSTAMANTE:  Object to form.

4          A.   I said reasonably foreseeable.

5   BY MR. ZACH:

6          Q.   So is it your position that under

7   sort of the accepted valuation standards, that

8   in addition to considering things that are known

9   and knowable as of the valuation date, the

10  valuer is also entitled to consider things that

11  would be, in your words, reasonably foreseeable?

12                  MS. BUSTAMANTE:  Object to the

13           form.

14         A.   I don't think I would use the word

15  entitled.  It is incumbent.  It is responsible

16  and it is also consistent with standard

17  valuation practice.

18  BY MR. ZACH:

19         Q.   What is the difference between

20  something being knowable and something being

21  reasonably foreseeable, at least in your mind?

22         A.   Well, reasonably foreseeable is, is

23  there evidence to suggest something that a

24  reasonable person could, could say, okay, yes, I

25  have projections that say this, that say that



Page 148

 1    2024 or 2023 is going to have all this revenue,

 2    but I've got a four or five-year track record

 3    where they projected revenue of many millions of

 4    dollars and each, each quarter and year

 5    subsequent, even despite those projections,

 6    revenue was zero up to the date of the

 7    valuation.

 8            So maybe it is incumbent on me to,

 9    to dig in a little further since I do have the

10    passage of time and evaluate whether or not

11    someone at either or both valuation dates might

12    have concluded that it was reasonably

13    foreseeable that there would be no revenue in

14    the upcoming years potentially until as late as

15    September 2018, which was the date of

16    Ms. Majcher's deposition that I reviewed where

17    she said there was no revenue even as of the

18    date of her deposition.

19        Q.    Mr. Barnes, I think you said 2018.

20    I think you meant 2024, just to be clear.

21        A.    I'm sorry if I misspoke.

22        Q.    Just for the record, I think.

23            Okay.

24            And so, as I understand it, at least

25    in paragraph 11, it is the fact that it was



Page 149

1    reasonably foreseeable at the time of the

2    valuation that there would be no revenue as late

3    as September 2024 that you believe is something

4    that should have been included in his analysis?

5                MS. BUSTAMANTE:  Object to form.

6        A.    Again, you keep using the word

7    included.  I don't know what you mean by that

8    because I'm not suggesting that you just plug in

9    those zeros.

10               Okay.

11               I'm suggesting that it be -- it is

12   taken into account in evaluating whether or not

13   these projections that I have are reliable and

14   should they be the basis, the sole basis for

15   preparing a valuation without conducting any

16   further independent or objective investigation.

17   BY MR. ZACH:

18       Q.    Well, you're saying he should have

19   done it, right?

20       A.    Done what?

21       Q.    That he should have taken this into

22   account.

23       A.    He -- it should have been

24   something that -- he should have considered the

25   fact that there was -- that there continued to



Page 150

1  be no revenue beyond the dates of his purported

2  valuation dates because it was reasonably

3  foreseeable.

4              And that might have -- had he, had

5  he, had he, had he evaluated that, amongst other

6  information that was available to him, he might

7  very well have reached a conclusion that I can't

8  base a DCF valuation on these projections that

9  were prepared at these dates.  They're not

10 reliable.

11             And just because the fact that they

12 were prepared either by or on behalf of the

13 company or potentially by Mr. Berris himself

14 doesn't, doesn't make them reliable.

15       Q.   Let's, let's turn to -- let's take a

16 look now at the May '22 valuation.  Just give me

17 one second.

18             So this would be attachment 14 to

19 the Rabinowitz report.

20             Do you want me -- I can pull it up

21 on the screen, or if you want to just look at

22 your computer -- whichever you prefer.

23       A.   Which attachment?

24       Q.   It is 14.  And we're going to do 18,

25 too, later.  So if you're grabbing them.



Page 151

```
 1              MS. BUSTAMANTE:  Sorry, John, you
 2         said 14 and 18?
 3              MR. ZACH:  Yes.  I can put them
 4         on the screen.  Whatever is easier for
 5         him.
 6         A.   I got them here.  I just have to get
 7    to them.
 8              Okay.
 9              I'm at 14.  Is that the one you want
10    me to be at?
11    BY MR. ZACH:
12         Q.   Fourteen, please.  Thank you.
13         A.   I'm at 14.
14         Q.   So 14 is sort of the -- this
15    outlines how Mr. Rabinowitz conducted his
16    May 2022 valuation, right?
17              MS. BUSTAMANTE:  Object to form.
18         A.   I don't know what you mean by the
19    term outlines but this is, this is --
20    BY MR. ZACH:
21         Q.   His valuation.
22         A.   This is the mechanics of his
23    valuation.  This is what I presume exists in an
24    Excel spreadsheet somewhere.
25         Q.   Exactly.
```



Page 152

1            And you, you understand that

2    these -- that this analysis was conducted on

3    projections that were prepared by the company in

4    April 2022, right?

5        A.   Well, I think there's, there's some

6    question about specifically who prepared them,

7    but -- and I don't -- as I'm sitting here today,

8    I don't have the specific date.

9            But if you're going to represent to

10   me it was April of 2022, then that's fine.

11       Q.   Sure.

12           Why don't we say in or about April

13   2022.

14       A.   Okay.

15       Q.   Did you conduct your own analysis of

16   like who created these numbers?  The projection

17   numbers, excuse me.

18           MS. BUSTAMANTE:  Object to form.

19       A.   I don't, I don't recall.  I mean, I

20   may have, I may have, may have read some

21   testimony in Ms. Majcher's deposition and

22   potentially in Mr. Rabinowitz' deposition, but I

23   don't, I don't recall as I sit here.

24   BY MR. ZACH:

25       Q.   Okay.



Page 153

 1                    Do you have an understanding of the
 2    purpose for which these projections were, were
 3    created?
 4          A.    I don't recall.
 5          Q.    You know, we talked earlier about
 6    the purpose of the projections being, you know,
 7    relevant to their reliability.
 8                    Do you recall that?
 9          A.    We talked about it being -- that
10    being one potential consideration in connection
11    with determining whether or projections may or
12    may not be reliable, yes.
13          Q.    And are you aware that in or about
14    the time frame of April 2022, De Tomaso was
15    looking to go public as part of the SPAC
16    transaction?
17                    MS. BUSTAMANTE:  Object to form.
18          A.    I recall some discussion of that.
19    BY MR. ZACH:
20          Q.    And you would agree -- and as
21    part -- are you aware that in the same time
22    period, that De Tomaso was soliciting potential
23    investors in that SPAC transaction?
24                    MS. BUSTAMANTE:  Object to form.
25          A.    I don't recall that specifically,



Page 154

1    but I recall seeing a discussion about a

2    potential SPAC transaction.

3    BY MR. ZACH:

4            Q.    You would agree with me, sir,

5    wouldn't you, that it is important for a company

6    to provide reliable projections to potential

7    investors who are considering making an

8    investment in the company?

9                 MS. BUSTAMANTE:  Object to form.

10           A.    That, that really depends.  I mean,

11   I think it is always important to, to present

12   what you -- for a company to present what, what

13   they, what they think may be the ability of the

14   company to perform.

15                And that may -- this may very well

16   have been what the company envisioned at the

17   time that they prepared these projections.  It

18   wasn't -- that doesn't make it a reliable

19   projection.

20   BY MR. ZACH:

21           Q.    Are you aware that these specific

22   projections were shared with UBS, the investment

23   bank?

24                MS. BUSTAMANTE:  Object to form.

25           A.    I don't have any specific



Page 155

1    recollection of that.

2    BY MR. ZACH:

3         Q.   Are you aware that these projections

4    were shared with Guggenheim?

5              MS. BUSTAMANTE:  Object to form.

6         A.   Again, I don't have any specific

7    recollection of that.

8    BY MR. ZACH:

9         Q.   Are you aware that these projections

10   were shared with Deutsche Bank?

11             MS. BUSTAMANTE:  Object to form.

12        A.   No, not as I sit here today.

13   BY MR. ZACH:

14        Q.   Okay.

15             Are you aware that these projections

16   were placed in a data room for potential

17   investors to, to examine as part of making a

18   potential investment in De Tomaso?

19             MS. BUSTAMANTE:  Object to form.

20        A.   I don't recall and -- not as I sit

21   here today.

22   BY MR. ZACH:

23        Q.   Are you aware or have you seen any

24   evidence that any, any outside party questioned

25   the authenticity of the projections that were



Page 156

1    placed in the data room?

2                    MS. BUSTAMANTE:  Object to form.

3         A.    What do you mean by authenticity?

4    BY MR. ZACH:

5         Q.    Are you aware of anyone raising

6    concerns about the nature of the projections

7    that had been placed in the data room?

8                    MS. BUSTAMANTE:  Object to form.

9         A.    Again, I don't, I don't really know

10   what you're getting at with respect to nature.

11   If you're -- I don't know what you mean by that.

12   BY MR. ZACH:

13        Q.    Are you aware -- okay.

14              Are you aware -- so you would agree

15   that UBS is a sophisticated financial entity?

16                    MS. BUSTAMANTE:  Object to form.

17        A.    I don't have any reason to believe

18   that they're not.

19   BY MR. ZACH:

20        Q.    And the same goes -- and Deutsche

21   Bank is a sophisticated financial entity?

22        A.    I haven't evaluated that personally,

23   but I have no reason to believe they're not.

24        Q.    And have you, in formulating your

25   opinion, have you come across any evidence in



Page 157

1    this spring 2022 time period that any of the
2    outside investors looking to potentially invest
3    in De Tomaso criticized the projections that had
4    been made available to them?

5                    MS. BUSTAMANTE:  Object to form.
6                    He already testified he doesn't
7              know that these went to investors at
8              all.

9         A.    The only thing I am aware of is that
10    no one did.  No one made an investment.  So
11    that, that -- I mean, I don't know whether that
12    suggests or doesn't suggest that they had
13    questions or issues with respect to their
14    projections or, or that it doesn't.

15                    MR. ZACH:  We can take that down.
16              You can take -- it is not up.  That's
17              fair enough.

18    BY MR. ZACH:

19         Q.    I guess just sticking with this for
20    a second -- let's just try and stay on the
21    valuation.  Let me just pull up --

22                    MR. ZACH:  Have we marked, have
23              we marked the Rabinowitz report?

24                    Let's mark the Rabinowitz report
25              as 9.



Page 158

```
 1                        (Expert report of Adam S.
 2                Rabinowitz was marked as Barnes
 3                Exhibit 9 for identification, as of
 4                this date.)
 5        A.    I have it up on my screen.
 6                MR. ZACH:  Sorry, just give me a
 7         second.
 8  BY MR. ZACH:
 9        Q.    So as part of Mr. Rabinowitz'
10  report, you understand that he -- the first step
11  of his DCF analysis is to look at the
12  projections that you have said are unreliable,
13  right?
14                MS. BUSTAMANTE:  Object to form.
15        A.    Repeat that question, please.
16  BY MR. ZACH:
17        Q.    So the first step in a DCF analysis
18  generally is to use projections to project
19  future cash flows, right?
20        A.    I wouldn't agree with that.
21        Q.    Okay.
22                What would you say the first step
23  is?
24        A.    Well, I think, I think it is going
25  to vary depending on what you're going to do.
```



Page 159

```
 1              But a first step might very well be
 2    to do a financial analysis of the financial
 3    history of the company.
 4         Q.   And that's -- your report focuses on
 5    the unreliability of the projections; is that
 6    fair?
 7              MS. BUSTAMANTE:  Object to form.
 8         A.   My report focuses on that?
 9    BY MR. ZACH:
10         Q.   Yes.
11         A.   I mean, it is an issue.  I mean, my
12    report speaks for itself.  I mean, my report
13    discusses the unreliability, the unreliability
14    of the projections that Mr. Rabinowitz' entire
15    opinions are predicated on.
16    BY MR. ZACH:
17         Q.   Right.
18              But after, after initially
19    calculating cash flows, you would agree with me
20    that Mr. Rabinowitz then applies a discount,
21    right?
22              MS. BUSTAMANTE:  Object to form.
23         A.   If you're referring to the fact that
24    he incorporates -- are you talking about a
25    discount rate?
```



Page 160

```
 1   BY MR. ZACH:
 2         Q.    Yes.
 3         A.    Discount value.  He also does a
 4   marketability discount.
 5               So I don't know what you're
 6   referring to when you use the word discount.
 7         Q.    That's fair enough.
 8               So I'm talking about the first, the
 9   discount rate -- the first discount that's
10   applied.
11               Right?
12         A.    Yes.
13         Q.    And what, what is your understanding
14   of the percentage of that initial discount rate
15   that he applies?
16               What is, what is the number?
17         A.    I don't recall.  I would have to
18   look at his report.
19         Q.    Okay.
20               But as part of your report, you
21   don't propose a different discount rate that
22   should have been -- specific discount rate that
23   should have been applied, right?
24         A.    No, I don't think a discounted cash
25   flow model is appropriate here in any respect.
```



Page 161

1          Q.   So, I mean, again, I'm not -- at a

2    high level, would it be fair to say that your --

3    part of your opinion is that given the

4    unreliability of the projections that De Tomaso

5    had, it was not appropriate to even do a DCF

6    analysis?

7                    MS. BUSTAMANTE:  Object to form.

8          A.   No, that's not correct.  It is not,

9    it is not the unreliability of the projections

10   in and of themselves.

11                   It is the, it is the unduly

12   speculative nature of any forecasts associated

13   with this company's performance into the future

14   at any given date based on their historical

15   performance and other evidence that we have.

16   BY MR. ZACH:

17         Q.   So your -- is it your opinion then

18   that De Tomaso -- any forecast made by De Tomaso

19   was inherently unreliable?

20                   MS. BUSTAMANTE:  Object to form.

21         A.   I can't reach that conclusion.  With

22   respect to any forecast, I would need to, we

23   would need to look at one and I can tell you or

24   I can try and evaluate it.

25                   But, no, they might have done a



Page 162

1    forecast this year that projects revenue at some

2    point in time.  I don't know.

3    BY MR. ZACH:

4         Q.    So as of May 2022, is it your

5    opinion that it was not possible for De Tomaso

6    to create a reliable forecast of its future

7    revenues?

8              MS. BUSTAMANTE:  Object to form.

9         A.    I'm not suggesting that.

10   BY MR. ZACH:

11        Q.    Okay.

12              Why then is -- okay.

13              What would you have done to -- what

14   would you view as an appropriate forecast as of

15   May 2022?

16        A.    I can't, I can't speak to that in

17   the abstract.  I don't know.

18        Q.    And that's not something that you

19   looked at?

20        A.    I looked at their historical

21   performance and how they measured up to

22   forecasts that had been prepared previously and

23   how they performed even beyond the date of those

24   forecasts.

25        Q.    And so, in terms of your report and



Page 163

1    at trial, you are not offering an alternative

2    discount rate with respect to Mr. Rabinowitz'

3    May 2022 valuation?

4          A.    I'm not offering an opinion on

5    discounted rate.

6          Q.    And you also -- in his report -- and

7    I'm at page 16, going into 17.

8                MS. BUSTAMANTE:  Of the

9          Rabinowitz report?

10               MR. ZACH:  Yes, of the Rabinowitz

11         report.

12               Sorry.

13         A.    Okay.

14               What do you want me to look at?

15   BY MR. ZACH:

16         Q.    Do you see there's like a chart

17   there on 17?

18         A.    I didn't go far enough.

19               Okay.

20               Yes, I see this table.

21         Q.    And your expert report doesn't

22   specifically address the use of the table which

23   comes from the AICPA practice aid, right?

24         A.    It does not.

25         Q.    Because your premise essentially



Page 164

1    stops at the projection without sort of -- in

2    your view, there's no need then to address the

3    discount rate or the marketability rate; is that

4    fair?

5            MS. BUSTAMANTE:  Object to form.

6        A.    Well, I don't know that I would

7    characterize it that way.  But if you don't have

8    meaningful projections of revenue or cash flows,

9    then there's, there's nothing to discount beyond

10   that.  So the discount rate becomes, becomes

11   moot.

12   BY MR. ZACH:

13       Q.    Okay.

14            And so, you have no opinion narrowly

15   circumscribed to the discount rate about what an

16   alternative number would be?

17            MS. BUSTAMANTE:  Object to the

18        form.

19       A.    You already asked me that question

20   twice.  I'll refer back to my previous answer.

21   BY MR. ZACH:

22       Q.    And you offer no opinion with

23   respect to the marketability rate that presents

24   an alternative percentage, right?

25       A.    I don't know what a marketability



Page 165

1    rate is.

2        Q.    A marketability discount.

3        A.    I don't have any opinion as to an

4    alternative marketability discount because I

5    don't believe there's any valuation that has

6    been presented that's in any way reliable in the

7    Rabinowitz report from which to then calculate a

8    non-marketable valuation.

9        Q.    Let's turn to attachment 18 now.  So

10   I'm not going to put it up.  This is what he

11   calls the current valuation.

12       A.    Well, I didn't know that he was

13   calling it -- maybe he called it the current

14   valuation in his report.  I don't recall that.

15            But I recall him trying to testify

16   to that at his deposition, which I found

17   surprising that the current valuation, if there

18   is one, is relevant because he didn't do a

19   current valuation.

20       Q.    This is -- you call it the August

21   2023 valuation.

22       A.    Oh, I see where he does label it

23   current valuation.  I didn't notice that before.

24   But, yes, it is the August 2023 valuation.

25            It is not current by any stretch of



Page 166

1    the imagination.

2         Q.    I'm just trying to get you to the

3    attachment.

4              So are you at attachment 18?

5         A.    Yes.

6         Q.    Okay.

7              And I take it as part of preparing

8    your opinion, you reviewed attachment 18?

9         A.    I did.

10        Q.    What is your understanding of where

11   the projections utilized by Mr. Rabinowitz in

12   what you call the August 2023 valuation or where

13   they come from?

14        A.    I don't recall as I sit here today.

15   I would need to go back to his report or my

16   report.  I think I refer to them in there.

17        Q.    Do you have an understanding of who

18   created these, these projections?

19        A.    He says they were included in an

20   e-mail from Ms. Majcher to Lisa Lim, but I don't

21   know that he discusses who prepared them.  He

22   may, he may have.  I just don't recall as I sit

23   here.

24        Q.    And you understand that Mr. Berris

25   was no longer with De Tomaso as of the summer of



Page 167

1    2023, right?

2          A.    That's my understanding, yes.

3          Q.    Do you know in what context --

4    strike that.

5                Do you know for what purpose these

6    projections were used by De Tomaso?

7                MS. BUSTAMANTE:  Object to form.

8          A.    I don't recall specifically how they

9    might have been used, but there might have

10   been -- these might have been prepared in some

11   way in connection with the, with the efforts to

12   solicit an investment from I believe what he

13   refers to as FTAG.

14   BY MR. ZACH:

15         Q.    I think we can call it FTAG.

16               Did you review or are you aware that

17   FTAG hired an independent firm to conduct due

18   diligence on De Tomaso prior to making its

19   investment?

20               MS. BUSTAMANTE:  Object to form.

21         A.    I recall seeing documents related to

22   that, yes.

23   BY MR. ZACH:

24         Q.    Okay.

25               Do you, do you rely on any of those



Page 168

1    documents in part of your report?

2                    MS. BUSTAMANTE:  Object to form.

3         A.    I don't recall specifically relying

4    on them.  I may, I may reference them in my

5    report, but I don't recall specifically relying

6    on them.

7    BY MR. ZACH:

8         Q.    Would you say that you considered

9    the work that was done by the independent due

10   diligence firm that FTAG hired in coming to your

11   opinion?

12        A.    I think they are materials that are

13   in my materials considered list because they are

14   part of the information that was in the, in the

15   Rabinowitz report, which I, I cite all of that.

16        Q.    Are you aware whether or not --

17   well, let me ask you this, do you know the name

18   of the firm that FTAG hired to conduct due

19   diligence on De Tomaso?

20        A.    I don't recall as I sit here.

21        Q.    You reviewed, I think we talked

22   earlier, you reviewed Ms. Majcher's -- both of

23   her depositions, right?

24        A.    I believe so, yes.  I certainly

25   reviewed her 30(b)(6), and I believe I reviewed



Page 169

1    certain aspects of her personal deposition, as

2    well.

3        Q.    Do you recall her testimony relating

4    to the extent of the due diligence that was

5    conducted on De Tomaso through -- by these -- by

6    this outside due diligence firm?

7        A.    I don't.

8        Q.    Okay.

9             Do you recall reading it at all or

10   is it something that you didn't think was

11   relevant?

12       A.    No, I just don't recall right now.

13       Q.    But you don't -- it is not something

14   that -- that portion of her testimony is not

15   something that you relied upon in your report,

16   right?

17            MS. BUSTAMANTE:  Object to form.

18       A.    I don't have a specific recollection

19   of relying on that specific testimony.  I would

20   have to go back and check, but I don't, I don't

21   have any specific recollection of that.

22   BY MR. ZACH:

23       Q.    Do you, do you understand that --

24   hold on one second.

25            Does it refresh your recollection



Page 170

1    that the company name was Altis?

2          A.    That does sound familiar.

3          Q.    Do you recall that Altis determined

4    that the projections that were provided to it

5    were reasonable?

6                MS. BUSTAMANTE:  Object to form.

7          A.    I don't recall seeing that.  But if

8    that was their conclusion, then they were wrong.

9    BY MR. ZACH:

10         Q.    And what's your basis for -- I

11   mean -- well, as you sit here today in this

12   deposition, you just said they're wrong.

13               Tell me, tell me the reasoning that

14   you used to arrive at that conclusion.

15         A.    That they were wrong about them

16   being reliable?

17         Q.    No.

18               As to start with, you just said they

19   were wrong.

20               Do you have an understanding as you

21   sit here, do you have an understanding of what

22   process they used to access the reasonability of

23   the projections?

24               MS. BUSTAMANTE:  Object to form.

25         A.    You mischaracterized what I said.



Page 171

1    You asked me a question that asked me -- of what

2    they did to reach a conclusion that they were

3    reliable.

4              And I said I don't recall that they

5    did reach that conclusion, but if they did reach

6    that conclusion, then they were wrong.

7    BY MR. ZACH:

8         Q.   All right.

9              And my question is how do you know

10   that they were wrong?

11        A.   Because the projections were not

12   reliable and there's sufficient evidence --

13   there's overwhelming evidence to reach that

14   conclusion.

15        Q.   Are you aware that these projections

16   were also shared with FTAG?

17             MS. BUSTAMANTE:  Object to form.

18        A.   I believe so.  I believe that's why

19   FTAG had Altis do the analysis.

20   BY MR. ZACH:

21        Q.   And what is your understanding as to

22   whether or not FTAG actually invested in

23   De Tomaso?

24        A.   FTAG did invest in De Tomaso but not

25   in any way close to what Mr. Berris is



Page 172

1  suggesting his investment would have been.

2        Q.   Have you -- so the fact that --

3  would the fact that an independent due diligence

4  firm like Altis reviewed the projections and

5  found them reasonable, would that constitute

6  something that a valuation, a business valuation

7  expert could reasonably consider?

8             MS. BUSTAMANTE:  Object to form.

9        A.   It may be something that could go

10  into the -- could go into an analysis subject to

11  other independent and objective analyses.

12  BY MR. ZACH:

13        Q.   And what is your understanding of

14  whether or not Mr. Rabinowitz considered the

15  Altis due diligence report?

16        A.   My understanding is he did.

17        Q.   Okay.

18             So when you say that he did not, he

19  took -- made no effort to conduct an independent

20  and objective analysis, you would agree that

21  this was -- that considering that report was at

22  least a step in conducting the analysis as you

23  described it?

24             MS. BUSTAMANTE:  Object to form.

25        A.   I disagree.



Page 173

```
 1   BY MR. ZACH:

 2          Q.    Okay.

 3                So it doesn't count towards an

 4   objective and reasonable analysis, in your

 5   opinion?

 6                MS. BUSTAMANTE:  Object to form.

 7          A.    You have asked several different

 8   questions and then tried to equate them, and I'm

 9   not -- the answer to that question, Mr. Zach, is

10   I disagree.

11   BY MR. ZACH:

12          Q.    Okay.

13                And I guess the same -- just to

14   close the loop, with respect to what you call

15   the August 2023 valuation, you understand that

16   Mr. Rabinowitz applied both a discounted rate

17   and a marketability discount, right?

18                MS. BUSTAMANTE:  Object to form.

19          A.    He, in his DCF valuation, he -- a

20   discount rate is necessary.  And in this case, a

21   marketability discount would be necessary even

22   assuming -- if you assume for a minute that you

23   could do one.  And he does both.

24   BY MR. ZACH:

25          Q.    And in your, in your rebuttal
```



Page 174

1  report, you don't proffer an alternative

2  discount rate with respect to the August 2023

3  valuation, right?

4       A.   Which he calls -- no, I do not offer

5  an alternative to what he calls the current

6  valuation, which is not a current valuation.

7       Q.   Okay.

8            I can use either term.  You sort of

9  disputed current valuation.  I was just trying

10  to use the term that you use.  So I'm happy to

11  use whatever one you want.

12       A.   This was new information to me.

13  Because I know he uses the language in his

14  report.  He says current valuation.

15            But I didn't even understand until

16  he was deposed that he was bringing current

17  valuation as a relevant construct here because a

18  current valuation would take in -- would clearly

19  take into account everything that's happened

20  since August 2023.

21            And he knew, he knew for a fact that

22  when he did his valuation, his second valuation,

23  that there was no revenue all the way up through

24  September of 2024.  And there was no expectation

25  of revenue in 2025.



Page 175

```
 1            Q.   All right.
 2                 So, look at -- so you see
 3    attachment 18.
 4                 You have the cover page?
 5            A.   Yes.
 6            Q.   So that's, that's where, that's
 7    where I was referencing current valuation.
 8                 Do you see that?
 9                 And flip the page and you see it
10    begins -- I think you said the mechanics of his
11    DCF analysis -- this is the start of it on the
12    next page.
13                 Do you see that?
14            A.   Yes.
15            Q.   And you see the valuation date is as
16    August 23, 2023?
17            A.   Yes, I see that.
18                 But what he testified to last week
19    was that the reason he chose that date is
20    because he claims he didn't have any -- or he
21    couldn't put any projections together that were
22    any closer to current time.
23                 So, so I didn't understand what the
24    relevance of the August 2023 time period was
25    until his deposition when he said it was because
```



Page 176

1  that's his best estimate to do a current

2  valuation.

3          Well, it is not.  He could have done

4  a current valuation if he thought -- if he

5  wanted to do one, he could have tried to do a

6  current valuation as of September or October

7  2024, and it would have looked much, much

8  different than this one.

9      Q.   And so, we did the discount rate.

10 But in terms of the -- what do you want me to

11 call it, current valuation or August 2023

12 valuation?  I'm happy to use your term.

13     A.   It doesn't matter to me.  You can

14 call it whatever you want.  That's not a

15 reliable valuation.

16     Q.   Well, I'm just trying to make the

17 record clear.  We have to call it something.  So

18 I'm going to call it the August 2023.

19          So in terms of the August 2023 DCF

20 valuation that Mr. Rabinowitz did, you did not

21 offer an alternative marketability discount

22 rate; is that fair?

23          MS. BUSTAMANTE:  Object to form.

24     A.   That's correct.  I don't believe

25 that it is appropriate to apply marketability



Page 177

1   discount to a valuation that is unreliable.

2   BY MR. ZACH:

3         Q.   Now, let me -- if I can put this

4   away.  Let me ask you this.

5              As part -- you understand -- so that

6   as part of the discount rate -- strike that.

7              Stepping, stepping back, this is a

8   general -- speaking about the DCF, how DCF works

9   generally, you understand, sir, that the

10  discount rate is meant to apply and take into --

11  sorry.

12             You understand the discount rate in

13  a DCF analysis considers the risk that certain

14  projections may be unreliable, right?

15             MS. BUSTAMANTE:  Object to form.

16        A.   I would not characterize that, no.

17  If the projections themselves are unreliable,

18  then I don't think they could be incorporated

19  reasonably into a discounted cash flow analysis.

20             The purpose of a discount rate is to

21  account for two things.  It is to account for

22  the time value of money, which in this case is

23  the much smaller of the two factors, and then it

24  is to count for the fact that any, any time

25  you're making a projection in the future,



Page 179

1    began taking deposits for the cars?

2          A.    I don't have that specific date

3    committed to memory.  I've seen reference to

4    deposit balances.  I know they have deposit

5    balances on their financial statements.

6          Q.    So did you consider when De Tomaso

7    started taking in deposits as being relevant to

8    your, your opinion?

9                MS. BUSTAMANTE:  Object to form.

10          A.    I don't think that fact in and of

11    itself is particularly relevant to my analysis

12    of Mr. Rabinowitz' valuations.

13    BY MR. ZACH:

14          Q.    Was it relevant at all to your

15    assessment of the degree of unreliability that

16    you perceive in the projections that he relied

17    upon?

18                MS. BUSTAMANTE:  Object to form.

19          A.    I don't have a specific recollection

20    of that factoring in as I sit here.

21    BY MR. ZACH:

22          Q.    Do you have an understanding of

23    whether those deposits were refundable or

24    nonrefundable?

25                MS. BUSTAMANTE:  Object to form.



Page 180

```
 1          A.   I don't recall.  I think I've seen
 2    reference to that one way or the other but I
 3    don't recall.
 4    BY MR. ZACH:
 5          Q.   Do you know as of April 2022 the
 6    total amount of nonrefundable deposits that
 7    De Tomaso had received?
 8               MS. BUSTAMANTE:  Object to form.
 9          A.   As of April, is that what you said?
10    BY MR. ZACH:
11          Q.   Yes, April 2022.
12          A.   I mean, I think I know.  I have the
13    financial statements for -- I don't recall as I
14    sit here today.  I think that's reflected in
15    some of the documents, either the financial
16    statements or some of the, some of the materials
17    surrounding some of these things.
18          Q.   Would it be fair to say that the
19    amount of nonrefundable deposits that had been
20    received by De Tomaso as of April -- in or about
21    April 2022, that was not relevant to your
22    conclusions?
23               MS. BUSTAMANTE:  Object to form.
24          A.   You have already asked me that
25    question.  I said I don't recall that that
```



Page 181

1    specific fact factoring into my, my evaluation

2    of Mr. Rabinowitz' valuations.

3    BY MR. ZACH:

4         Q.   So the answer is no?

5         A.   I already answered it twice now.

6         Q.   Did you -- between, between April

7    2022 and August 2023, did you conduct any

8    independent and objective analysis of

9    manufacturing issues that De Tomaso may have

10   incurred?

11             MS. BUSTAMANTE:  Object to form.

12        A.   I did not investigate specifically

13   manufacturing issues.  I investigated the

14   financial performance of the company during that

15   time period and the fact that they continue to

16   have zero revenue.

17   BY MR. ZACH:

18        Q.   So in conducting that analysis, you

19   were comparing only the financial information

20   that was available to you without looking into

21   potential factual causes for delays in producing

22   the cars?

23             MS. BUSTAMANTE:  Object to the

24        form.

25        A.   My analysis was focused on the



Page 182

1    financial performance of the company and

2    whether, whether it indicated that there was

3    reason to place any reliance on projections that

4    the company had prepared around that time.

5    BY MR. ZACH:

6         Q.    Okay.

7               But going forward from in or about

8    April 2022, you did not conduct an independent

9    and objective analysis of the reasons for any

10   delay in the production of the car?

11              MS. BUSTAMANTE:   Object to form.

12         This is outside the scope of his report.

13         A.    Yes, I haven't specifically

14   investigated that.  But even, even as late as of

15   September 2024, we're still at zero revenue.

16   Not a single car has been sold.

17              So the reasons -- whatever the

18   reasons are, they're, they're clearly making it

19   so that the cars are not being produced, not

20   being produced or at least not being delivered

21   and sold in a manner that lines up in any way

22   with the projections that Mr. Rabinowitz relied

23   upon.

24   BY MR. ZACH:

25         Q.    But as you sit here today, you



Page 183

1    cannot articulate what reasons, if any, caused

2    that delay?

3                MS. BUSTAMANTE:  Object to form.

4        Again, it is outside the scope of his

5        report.

6        A.   Yes, that's not something I

7    investigated.

8    BY MR. ZACH:

9        Q.   Okay.

10               All right.

11               Just give me a second.  So let's

12   move to a slightly different topic.  So we can

13   move on to the next section of your report,

14   which is Section V starting on page 7.

15       A.   Okay.

16       Q.   And this part, this part of your

17   report is titled Failure to Analyze or

18   Investigate the Actual Financial Performance of

19   De Tomaso, right?

20       A.   Okay.

21       Q.   And I think some of what we talked

22   about today is overlapping with this.  But in

23   this you introduce a table that shows the net

24   losses that are reflected in De Tomaso's

25   financial statements, right?



Page 184

1          A.    In their financial statements, and

2     then with respect to 2023, I had to rely on a

3     mid year, a mid-year data point because there

4     was no financial statement for 2023.

5          Q.    Okay.

6                And who provided you with that

7     mid-year data point?

8          A.    I believe I got it from one of the

9     documents that Mr. Rabinowitz relied upon.

10         Q.    Okay.

11               Now, in analyzing these losses, did

12    you break down what they were comprised of in

13    terms of the types of expenses that were

14    incurred?

15               MS. BUSTAMANTE:  Object to form.

16         A.    I did not break that down.  I was

17    looking at the net operating losses as reported

18    in the financial statements.

19    BY MR. ZACH:

20         Q.    Okay.

21               And have you -- how many start-up

22    companies have you -- strike that.

23               How many pre-revenue start-up

24    companies have you conducted valuations for?

25    Again, an estimate.



Page 185

1          A.   Well, I have not -- I've not
2    actually conducted a valuation of a pre-revenue
3    start-up company.
4               I have, as I referred to earlier, I
5    have investigated and analyzed the future
6    prospects of a pre-revenue start-up company for
7    the purposes of considering personal investment,
8    and I have also analyzed the prospects for a
9    pre-revenue start-up in connection with a
10   damages analysis related to a breach of contract
11   matter.
12          Q.   Okay.
13          A.   Those are the two that I can recall
14   as I sit here today besides this one.
15          Q.   Okay.
16               In terms of looking at the net loss
17   numbers, did you look -- did you, did you learn
18   how much on an annual basis the company was
19   spending on research and development?
20               MS. BUSTAMANTE:  Object to form.
21          A.   That information is reflected in the
22   financial statements.  I don't, I don't have a
23   recollection specifically as I sit here today
24   what, what that amount is.
25



Page 186

1    BY MR. ZACH:

2          Q.    Is it -- would it be relevant to you

3    whether or not some of the expense was for

4    research and development in conducting your

5    opinion -- in conducting your analysis?

6                    MS. BUSTAMANTE:  Object to form.

7          A.    Well, research and development is an

8    important expense, especially for a pre-revenue

9    start-up company.  So it is certainly, it is

10   certainly relevant.

11   BY MR. ZACH:

12         Q.    Would you agree with me that it is

13   common for a pre-revenue start-up company to

14   spend substantial sums of money on research and

15   development to bring their products to market?

16         A.    I mean, that's, that's going --

17   that's going to be a fact specific -- I can't, I

18   can't analyze that or answer that in the

19   abstract.

20                    In some instances yes, and in some

21   instances probably not.  So it is going to vary.

22         Q.    Would you expect to see substantial

23   research and development expenditures for a

24   pre-revenue start-up company?

25                    MS. BUSTAMANTE:  Object to form.



Page 187

1          A.   I don't know how that's different

2    than the question you just asked.  But I said

3    that would depend.

4    BY MR. ZACH:

5          Q.   But for purposes of your report, you

6    didn't, you didn't break that out or consider it

7    on its own in assessing the total loss amount

8    that you put forth on page 7 of your report?

9              MS. BUSTAMANTE:  Object to form.

10         A.   I clearly haven't broken it out

11   separately.  It is broken out in the financial

12   statements.

13             I'm not sure what you mean by -- I

14   mean, no, I haven't, I haven't done a

15   separate -- I haven't put a separate line item

16   in the chart that shows what the cumulative

17   investment in research and development is.

18   BY MR. ZACH:

19         Q.   Well, would it be fair to say that

20   part of, part of your opinion is that given the

21   size of the cumulative losses incurred by

22   De Tomaso to date, that plays into your opinion

23   that the projections that Mr. Rabinowitz relied

24   upon were not -- should not have been relied

25   upon as such?



Page 188

1                    MS. BUSTAMANTE:   Object to form.

2            A.    Well, it's certainly one -- it is

3    certainly one aspect, among many -- among

4    several others.

5                    I mean, the fact that they received

6    a going concern opinion from their auditors for

7    two consecutive years.  And I'm anticipating if

8    we had 2023 financial statements, if they were

9    audited, they would probably have a going

10   concern opinion for 2023 as well.

11                   The fact that they have a

12   significant -- a very significant working

13   capital deficit right now that is only growing,

14   and the fact that even Ms. Majcher as of, as of,

15   as recently as September has indicated at this

16   point she's not even sure they're going to make

17   any money on these cars at all.

18   BY MR. ZACH:

19           Q.    Would you agree that it is not

20   unusual for pre-revenue start-up companies to

21   have independent audits that reflect a going, a

22   going concern issue?

23                   MS. BUSTAMANTE:   Object to form.

24           A.    Ask me that question again.

25



Page 189

1    BY MR. ZACH:

2         Q.    Sorry.

3               So, you referenced the fact that the

4    auditors flagged what I'll just call a going

5    concern issue, right?

6         A.    Well, the auditors and management

7    itself.  So management recognizes it.

8         Q.    And that's sort of -- for lack of a

9    better term, it is sort of a term of art that

10   accountants use, right?

11        A.    You could call it a term of art.  I

12   mean, a going concern, a going concern opinion

13   or a going concern issue has a specific meaning

14   in, in accounting and auditing parlance.

15              It basically means there's

16   substantial doubt about the company's ability to

17   survive even a year.

18        Q.    So my question to you is that would

19   you agree with me that it is not unusual for

20   accountants to flag a going concern issue for

21   pre-revenue start-up companies?

22              MS. BUSTAMANTE:  Object to form.

23        A.    No, I would not, I would not agree

24   with that.  I don't think you could -- I don't

25   think it is fair to say that it would be -- that



Page 190

1    it is not unusual.

2    BY MR. ZACH:

3         Q.    What do you, what do you base that

4    on?

5         A.    Because there could be -- start-up

6    companies can have -- can be capitalized in many

7    different ways, and there might be -- you could

8    have companies that don't have any -- there's no

9    issue about their ability to survive as a going

10   concern even if they're, if they're not at a

11   revenue stage yet because they're very well

12   capitalized.

13   BY MR. ZACH:

14        Q.    And then part of what a going

15   concern issue that's been flagged tells you is

16   that there is a risk that the business will

17   fail, right?

18             MS. BUSTAMANTE:    Object to form.

19        A.    It, it suggests that there is a

20   significant risk that the, that the company will

21   not be able to remain operational --

22   BY MR. ZACH:

23        Q.    And is it --

24        A.    -- without, without -- sorry, just

25   without additional capital.



Page 191

1    BY MR. ZACH:

2         Q.    And, I mean, there's another way of

3    saying it too, is that the going concern -- part

4    of what a going concerning issue flags too is

5    that investors that elect to put money into the

6    company face a risk that the company will fail,

7    right?

8         A.    They face a higher degree of risk

9    than investing in a company that isn't -- that

10   doesn't have a going concern issue.

11        Q.    And you understand, don't you, that

12   this going concern issue was disclosed to FTAG

13   before they made their investment, right?

14              MS. BUSTAMANTE:    Object to form.

15        A.    I don't have specific recollection

16   of that, but I have no reason to believe that

17   FTAG didn't have access to the 2022 valuation --

18   I mean, 2022 financial statements which set

19   forth that going concern issue.

20   BY MR. ZACH:

21        Q.    And you understand that despite the

22   going concern issue, FTAG nonetheless invested a

23   substantial amount of money in De Tomaso, right?

24              MS. BUSTAMANTE:    Object to form.

25        A.    They made an investment.    That's



Page 192

1   very similar to essentially a debt instrument,
2   at least initially, that would provide for
3   them -- if there was no liquidity event that
4   would allow them to convert to, to common stock,
5   that they would be entitled to get their capital
6   back with a, with a 5 percent rate of return.
7              And that, that was later amended to
8   reflect that they would actually only get their
9   capital back but it would be in the form of a
10  deposit on a car.
11  BY MR. ZACH:
12       Q.   Well, you would agree with me that
13  providing, I think it was $25 million to
14  De Tomaso, FTAG was putting that capital at
15  risk, right?
16              MS. BUSTAMANTE:   Object to form.
17       A.   Well, again, initially they were,
18  they were investing it -- it had a backstop with
19  where, where it was going to provide -- it was
20  going to function as basically a loan.
21              If there was no -- if there was no
22  liquidity event, it was going to function
23  essentially as a loan.
24              And now that has been amended so
25  that it still functions equivalently as a loan.



Page 193

1   It is just that the payback of it is going to be

2   in the form of a deposit for a car, presumably,

3   if a car is ever, is ever produced.

4              But, yes, there is, there is risk.

5   There is risk even with a debt instrument,

6   there's risk.

7   BY MR. ZACH:

8       Q.   I mean, just to be very simple about

9   it, FTAG gave De Tomaso $25 million to utilize,

10  you know, to invest in -- well, let me strike

11  that.

12             FTAG put $25 million into the

13  company, right?

14             MS. BUSTAMANTE:   Object to form.

15      A.   Yes, FTAG, FTAG made a $25 million

16  investment.   Correct.

17  BY MR. ZACH:

18      Q.   And as we have discussed, they did

19  that knowing that there was this going concern

20  issue, right?

21             MS. BUSTAMANTE:   Object to form.

22      A.   Again, I have no reason to believe

23  they didn't -- they weren't provided with the

24  2022 financials.

25



Page 194

1    BY MR. ZACH:

2         Q.    Okay.

3               And so -- fair enough.

4               Now, you said that the agreement was

5    later amended to have them be paid back out

6    under certain conditions through future -- the

7    purchase of future cars as opposed to just

8    getting liquid cash back; is that fair?

9               MS. BUSTAMANTE:  Object to form.

10        A.    That's my understanding of what the

11   amendment includes.

12   BY MR. ZACH:

13        Q.    And you would agree with me that at

14   least in terms of, in terms of going concern

15   risk, having your investment essentially

16   collateralized by future cars is riskier than

17   simply being able to get your cash back?

18               MS. BUSTAMANTE:  Object to form.

19        A.    That's probably a question you would

20   have to ask someone at FTAG.  I don't know

21   that -- I don't know that I would consider

22   either one of those potential scenarios or the

23   likelihood of those potential scenarios more or

24   less riskier than the other.

25



Page 195

1    BY MR. ZACH:

2            Q.    One of your criticisms is that

3    De Tomaso has yet to deliver a car, right?

4                    MS. BUSTAMANTE:   Object to form.

5            A.    I'm not -- I don't think I ever

6    suggested that's a criticism.

7    BY MR. ZACH:

8            Q.    I'm sorry.   One of the -- sorry, one

9    of the -- I'll say this more clearly.

10                   One of the factors that you point to

11   in the unreliability of the projections that

12   Mr. Rabinowitz utilizes is the fact that to

13   date, no car has been delivered, right?

14           A.    I think that is one -- that is one

15   key fact that is, that is important here, yes.

16           Q.    All right.

17                   And you actually point out that even

18   as of today, a car has not yet been delivered,

19   right?

20                   MS. BUSTAMANTE:   Object to form.

21           A.    Well, I don't know that for a fact.

22   I believe that as of at least September 18th

23   when Ms. Majcher was deposed, no car had been

24   delivered.

25                   I don't have reason to believe they



Page 196

1    delivered one in the last month and a half.

2    BY MR. ZACH:

3           Q.    So you would agree with me that in

4    FTAG amending the agreement to go from being

5    able to just demand money back to only being

6    paid in cars, FTAG has incurred an additional

7    hurdle to its recovery in the form of De Tomaso

8    actually having to produce enough cars to

9    compensate FTAG for its investment?

10                 MS. BUSTAMANTE:   Object to form.

11          A.    Again, I don't know whether that's

12   an additional risk or not.   I mean, there

13   certainly is risk associated with their ability

14   to even regain the cash.

15                 So that's a question you would have

16   to ask FTAG or someone from FTAG.

17   BY MR. ZACH:

18          Q.    But as a business valuation expert,

19   you don't perceive any difference in the risk

20   profile of having to be repaid in cash or future

21   payment through cars that have not yet been

22   delivered?

23                 MS. BUSTAMANTE:   Objection.

24          Asked and answered.

25          A.    I think that's going to be subject



Page 197

1    to what the -- to the lender or investors -- how

2    they, how they view their potential for getting

3    their capital back if, if there's no liquidity

4    event.

5                    MR. ZACH:  Okay.

6                    How long have we been going for?

7            We have been going for an hour now.

8            Let's take a quick 10-minute break.

9                    THE WITNESS:  Okay.

10                   THE VIDEOGRAPHER:  Off the record

11           2:36 p.m.

12                       (Whereupon, at 2:36 p.m.

13             o'clock, a recess was taken until

14             2:47 o'clock p.m.)

15                   THE VIDEOGRAPHER:  On the record

16           2:47 p.m.

17   BY MR. ZACH:

18           Q.   Okay.

19                So we can now move on to Section VI

20   of your report, which starts on page 8 --

21           A.   Okay.

22           Q.   -- which the heading is Improper

23   Reliance on Investment by FTAG Asset Management.

24                Is it -- so, is it your opinion that

25   in terms of comparing under the comparable



Page 198

1  company guidelines, that you don't view the FTAG

2  investment as being an appropriate comparable?

3       A.   It is my opinion, and I believe the

4  facts support this, that it is in no way

5  comparable to the nature or the transaction that

6  Mr. Berris is alleging should take place here

7  and what Mr. Rabinowitz purports to advance in

8  support of that transaction.

9       Q.   Now, we have talked a little bit

10  about it, but I want to just make sure we're on

11  the same page with how the FTAG investment was

12  structured.

13            So I guess my question is how do you

14  understand the transaction was structured in

15  terms of FTAG's ability to take its preferred

16  shares and potentially convert those to common

17  shares?

18       A.   My understanding is that the

19  conversion process would occur essentially

20  automatically, I think.

21            I could be wrong about that, but I

22  think essentially would convert automatically

23  upon a, upon what's described as a conversion

24  event which is set forth in the agreement in the

25  terms sheet.



Page 199

```
 1          Q.   Okay.
 2               So it is your understanding that you
 3     actually would have to have a specific
 4     conversion event for that conversion from
 5     preferred into common stock?
 6          A.   Well, again, I'm speaking from
 7     memory here.  We can get the -- the agreement
 8     speaks for itself.
 9          Q.   Okay.
10          A.   But that's, that's my recollection.
11          Q.   And in terms of valuing the amount
12     of common shares that the conversion would
13     yield, do you understand that the parties agreed
14     on an initial valuation of the company for that
15     purpose?
16               MS. BUSTAMANTE:  Object to form.
17          A.   That's not how I would characterize
18     it.  I think that in determining the quantity of
19     shares or the percentage of the ownership that
20     FTAG would have, there was an implied value that
21     was used to make that calculation.
22               But it is important that the --
23     there was no way for those shares to have any
24     liquidity unless there was a liquidation event.
25               So, so it doesn't matter -- if
```



Page 200

1    you're using the implied value just to say,

2    okay, this is going to be a 10 percent or

3    20 percent or 30 percent of the company that

4    we're going to own.

5              But there was specific terms in the

6    agreement as to when those shares -- whatever

7    percentage it was and whatever the quantity of

8    shares would have any liquidity to them.

9    BY MR. ZACH:

10        Q.   Would another -- I mean, typically a

11   DCF analysis, isn't it the case that a

12   marketability discount is meant to address

13   issues of liquidity or lack thereof for shares?

14              MS. BUSTAMANTE:   Object to form.

15        A.   When you're trying to value a

16   business that is not actively traded, the

17   marketability discount is intended to adjust for

18   the fact that there are greater impediments and

19   higher transaction costs associated with

20   converting the ownership interest in a privately

21   held company to cash than there are to convert

22   ownership interests in an actively traded

23   company to cash.

24   BY MR. ZACH:

25        Q.   So, for example, if you owned shares



Page 201

1   in a company that traded on the New York Stock

2   Exchange, there would, there would be -- absent

3   you having a huge chunk of those shares as a

4   percentage of total volume, there really

5   wouldn't be a need for a marketability discount;

6   is that fair?

7        A.   There absolutely is no marketability

8   discount for shares that are traded.  You can

9   convert them to cash basically transaction free

10  now in three days.

11            Sorry.  Just let me finish.

12            If you own shares, whatever

13  percentage -- you could own 99 percent or you

14  could own 10 percent of shares in a privately

15  held company.  There's a lot more impediments to

16  go through.  You basically have to sell the

17  company or find someone to -- where there's an

18  agreement among the shareholders to sell part of

19  the company for anyone to get -- convert that --

20  convert those shares to cash.

21        Q.   And I can put it up, but if you have

22  in front of you attachment 12 to the Rabinowitz

23  report, that has the subscription agreement.

24        A.   I can probably get to it.

25            MS. BUSTAMANTE:  Are you



Page 202

```
 1                introducing that as an exhibit?
 2                     MR. ZACH:  I think I already
 3                introduced the full report.  So I can do
 4                it as a separate one, but we can --
 5                     MS. BUSTAMANTE:  That's fine.
 6           A.   Do you happen to know what page of
 7      his report?  What pdf page is it?
 8      BY MR. ZACH:
 9           Q.   Sorry, no.  428.
10           A.   428?
11           Q.   Yes.
12                Okay.
13           A.   I have the initial.  I believe there
14      was at least one amendment.
15           Q.   Yes, this doesn't include -- there
16      was the amendment that you and I were just
17      talking about for the cars.
18                That's not -- that was subsequent to
19      this.
20           A.   Okay.
21           Q.   So if you turn to page 6, it has
22      Section 9 for Title Conversion Rights.
23           A.   Right.
24           Q.   And there's essentially a formula
25      that is set forth in 9.3.
```



Page 203

1           Do you see that?

2           A.    Yes.

3           Q.    And essentially the formula -- the

4    inputs to the formula are first the amount --

5    the first tranche investment amount or second

6    tranche investment amount that would have been

7    made by FTAG, that would be at the -- I forget

8    math -- there's like the numerator and the

9    denominator.  I think it would be the numerator.

10          A.    Correct.

11          Q.    Okay.

12                And then below that, then the

13   numerator is then divided by the first tranche

14   or the second tranche valuation, plus the

15   same -- plus the first tranche or the second

16   tranche investment amount.

17                Do you see that?

18          A.    Yes.

19          Q.    And that essentially spits out the

20   percentage of common stock that would then be

21   provided to FTAG, right?

22          A.    That would represent the ownership

23   percentage that FTAG would have.

24          Q.    Okay.

25                And do you -- are you aware of what



Page 204

1   the first tranche valuation number is?

2          A.   I don't recall.  I think I remember

3   something in reference to maybe there was a

4   hundred million dollar figure that I might have

5   seen, but I don't remember.

6          Q.   I can show you a document.  It is

7   not a number test.  I'll show you the document.

8                  MR. ZACH:  So, let me mark --

9             what are we up to now?

10                 Barnes 10, a document that starts

11            with Bates No. DT 249.

12                    (Document bearing Bates

13            stamp DT0000000249 through

14            DT0000000253 was marked as Barnes

15            Exhibit 10 for identification, as of

16            this date.)

17  BY MR. ZACH:

18         Q.   We only have to look at the first

19  page.  Did you review this valuation letter as

20  part of formulating your opinion?

21         A.   I did.

22         Q.   And in terms of the valuation

23  amounts we were just talking about, do you see

24  that at 3(a), the first tranche valuation is at

25  $175 million?



Page 205

```
 1          A.    I do see that.
 2          Q.    And then for the second tranche, it
 3    is $250 million?
 4          A.    Right.
 5          Q.    And then (c) has sort of a
 6    conditional valuation, which says in the event
 7    that the closing of the subscription of the
 8    second tranche preferred shares completes by
 9    December 31, 2023, and the investor invests the
10    full amount of $10 million for the subscription
11    of the first tranche preferred shares, the first
12    tranche valuation shall be adjusted downwards to
13    a hundred million dollars.
14          A.    Right.  I see that.
15          Q.    So in connection with -- and you
16    don't dispute any of those numbers, do you?
17                MS. BUSTAMANTE:  Object to form.
18                MR. ZACH:  I withdraw that
19          question.  That is a terrible question.
20    BY MR. ZACH:
21          Q.    What relevance, if any, do you think
22    these numbers would have toward determining the
23    value of De Tomaso as of the date of this
24    valuation letter?
25          A.    Zero.
```



Page 206

1          Q.    And why is that?

2          A.    Because this is simply to assess the

3    percentage of ownership that FTAG is going to

4    have.

5                In this case, it would be, it would

6    be in FTAG's interest to have, to have the

7    valuation -- the implied valuation be as low as

8    possible because that's going to dictate, that's

9    going to dictate that their investment is going

10   to be the highest majority.

11               This is just to say, we're going to

12   assume this number for purposes of calculating

13   how much of the company you will be entitled to

14   when your shares convert.

15               And then if there ever is a

16   liquidation event, you'll be able to liquidate

17   those shares and that percentage of the company

18   at whatever the liquidation price is depending

19   on whether there's an IPO or somebody buys the

20   company or whatever other liquidation event

21   occurs.

22          Q.    Right.

23               So as we were just looking at,

24   because the valuation sort of goes in the

25   denominator, the smaller it is, the larger the



Page 207

1   percentage of shares that would yield for FTAG,

2   right?

3           A.    That's correct.

4           Q.    Okay.

5                 Just give me a second.

6                 Just going back -- still on your

7   screen, going back to the subscription

8   agreement, if you look at -- I just want to look

9   at Section 9.1.

10                It says that any time prior to a

11  conversion event, the investor shall have the

12  right to convert the preferred shares into

13  ordinary shares in the following manner, and

14  then it lists things.

15                So we had been talking earlier about

16  a conversion right, a conversion event, but

17  isn't it the case that FTAG at its discretion

18  could convert its preferred shares into common

19  shares and, according to this agreement, prior

20  to any defined conversion event?

21                MS. BUSTAMANTE:  Object to form.

22          A.    That is, that is, that is correct.

23  And then there's an automatic conversion

24  provision in the next paragraph.  But, yes, that

25  is correct.



Page 208

1                    MR. ZACH:  Okay.

2                    We can take that down.

3    BY MR. ZACH:

4          Q.    So the last part -- give me one

5    second.  I just want to make sure.

6                    The last part of your report --

7    we're making progress here.  So on page 10,

8    Section VII, you title that Improper

9    Consideration of Non-Comparable Companies.

10                    Do you see that?

11         A.    Yes.

12         Q.    And I take it that this is your

13    opinion as it relates to Mr. Rabinowitz'

14    selection of certain comparable companies for

15    purposes of preparing his market valuation of

16    De Tomaso; is that fair?

17                    MS. BUSTAMANTE:  Object to form.

18         A.    Well, there were some words in that

19    question I didn't quite follow.  I don't know

20    what you mean by market valuation.

21    BY MR. ZACH:

22         Q.    Fair enough.

23                    So Mr. -- Mr. Rabinowitz does a

24    number of different -- takes a number of

25    different approaches to doing his valuation.



1            Do you recall that?

2        A.    Correct.  He does, he does an

3   income-based approach based on the discounted

4   cash flow and he does a market-based approach

5   based on the guideline of a comparable company

6   approach.

7        Q.    Exactly.

8            So now we're sort of -- we were

9   talking about sort of all day the income

10   approach.  Now I want to sort of shift over to

11   the market approach.

12            Okay.

13            You, you essentially -- is it your

14   view that none of the companies utilized by

15   Mr. Rabinowitz are appropriate comparables for

16   purposes of conducting the market -- his market

17   approach?

18        A.    Yes, with the possible exception of

19   Fisker, but, yes.

20        Q.    And in sort of reaching that

21   conclusion, did you look at any sort of prior

22   evaluations that the company had conducted or

23   had received in the past?

24        A.    I did see reference to where

25   other -- others had put together attempts to, to



Page 210

1   estimate a hypothetical value for De Tomaso if

2   it could achieve similar price-to-earnings

3   ratios of other car companies.

4         Q.   And in looking at those prior

5   valuations, did you review the companies that

6   those other valuers selected for their analysis?

7              MS. BUSTAMANTE:  Object to form.

8         A.   I certainly saw them.  I don't, I

9   don't recall the extent to which they were

10  similar to or different than what Mr. Rabinowitz

11  did here.

12  BY MR. ZACH:

13        Q.   Did you review a valuation that was

14  conducted by a company called ARC?

15        A.   I believe so.

16        Q.   Okay.

17             And --

18        A.   I believe that was one of the

19  documents that Mr. Rabinowitz relied on.  So I

20  think I reviewed it in that context.

21        Q.   And we talked earlier about that due

22  diligence from Altis.

23             Did you review their, their use of

24  comparables in its valuation and due diligence?

25        A.   Yes, I did.



Page 211

```
 1          Q.   Okay.
 2               And as you sit here, do you know
 3   what the overlap is between companies selected
 4   by Altis and ARC are to those that were utilized
 5   by Mr. Rabinowitz?
 6          A.   I don't.  I don't recall that.
 7          Q.   Would it be relevant to you at all
 8   if there was similarity between the companies
 9   that were selected by Altis and ARC and those
10   used by Mr. Rabinowitz in terms of the
11   appropriateness of using them as, as comps?
12               MS. BUSTAMANTE:  Object to form.
13          A.   No, not, not particularly, no.
14   BY MR. ZACH:
15          Q.   Okay.
16               In your report, you -- one of your,
17   one of your -- one of the points that you
18   make -- and I'm on page 10.
19               The last sentence of the first
20   paragraph is that "All of the remaining 12
21   companies reported significant revenue for the
22   trailing 12 months leading up to Mr. Rabinowitz'
23   valuation dates."
24               And then you say "And 8 of the 12
25   reported significant profits during these same
```



Page 212

1    periods."

2              Do you see that?

3        A.    I do.

4        Q.    And so, is it your view that any

5    company -- strike that.

6              Is it your view that when trying to

7    conduct a market-based valuation of a

8    pre-revenue start-up company, that it would be

9    inappropriate to use as comparable companies

10    those that have actually earned revenue or

11    become profitable?

12              MS. BUSTAMANTE:    Object to form.

13        A.    I'm not going to be categorical

14    about it, but I just don't think there's any

15    basis based on the historical financial

16    performance and current prospects for this

17    company that you can engage in this type of

18    fantasy analysis.

19              I just don't think you can sit there

20    and look at General Motors and Ford and say

21    let's base our valuation of De Tomaso, which has

22    never produced a car, has zero revenue, has

23    missed its forecasts for six years and has, you

24    know, significant negative working capital and

25    is highly, highly leveraged and say we're going



Page 213

1    to use that as a benchmark to place an

2    aspirational value on it.

3              I think there has to be some

4    progress made in the business model, in the

5    plan, in the company.  There has to be a

6    progression towards an actual point where the

7    company can produce revenue and profits.

8    BY MR. ZACH:

9         Q.    And so, one of the comparables that

10    was utilized by Mr. Rabinowitz is for Apollo.

11              Are you familiar with that company?

12        A.    Apollo?  I don't recall as I sit

13    here today.  I would have to look at it.

14        Q.    Okay.

15              Now, just give me one second.  Just

16    give me one second.  I have to grab a document.

17              Now, in your, in your report, you --

18    strike that.

19              Do you understand that

20    Mr. Rabinowitz adjusted the comparable companies

21    that he used to, to make them more, I guess -- I

22    mean, in his, in his opinion, closer to an

23    appropriate, an appropriate comparison?

24              You are aware of that, right?

25        A.    I am aware that he attempted to



Page 214

1    apply certain adjustments.  I don't think that

2    solves his problem.

3            Q.    In your report, you don't

4    specifically identify your own adjustment that

5    would sort of address the concerns you have

6    about these companies not being appropriately

7    comparable?

8                    MS. BUSTAMANTE:  Object to form.

9            A.    No, I don't, I don't think I can --

10   I don't think I can overcome that, the

11   noncomparability issue.  I just don't think this

12   is an appropriate exercise.

13                   I think it is -- I think this is,

14   this is, this is just applying math to, to -- in

15   a nonmeaningful way to try and articulate a

16   value.  I don't think there's any substance

17   here.

18   BY MR. ZACH:

19           Q.    Do you think there are circumstances

20   under which De Tomaso could be, in your view,

21   appropriately valued using the market approach?

22           A.    I don't have any -- I can't think of

23   any way to do that as I sit here today.

24                   I'm not saying, I'm not saying -- if

25   you're, if you're trying to value the company



Page 215

1  for the purpose of potentially soliciting angel

2  investors or some venture capital firm to come

3  in that is in the business of spreading seed

4  money around and trying to wait for something to

5  happen, you may be able to articulate a value.

6           I'm not sure if a market-based

7  valuation would be appropriate.  But if you're

8  trying to perform a valuation to determine the

9  cash value of a 10 percent interest in the

10  company today, I don't think there's any

11  conclusion other than it is zero.

12           There is no cash value.  There is

13  no, no liquidity value to the company today or

14  in April -- or in April of 2022.  There's just

15  not.

16       Q.   So, I mean -- so I want to unpack

17  it.

18           So is it your, is it your, is it

19  your opinion that as we sit here today, there is

20  no articulable value to De Tomaso?

21       A.   Not in cash.  I don't think -- I

22  actually today think Mr. Choi could sell his

23  shares of the company.

24           So, so if, if, if there is an

25  agreement, which I understand De Tomaso



Page 216

1    disputes, but if there is an agreement, then

2    Mr. Berris should have his equity shares in the

3    company.

4              But they don't have, they don't have

5    anywhere close to the cash value that

6    Mr. Rabinowitz is suggesting they have today or

7    as of May of 2022.

8         Q.   Do you think, do you think there may

9    have been value -- was there any point in your

10   mind that De Tomaso had an articulable value

11   through the duration of its existence?

12        A.   Well, I've only -- I mean, I have

13   only seen information going back to 2000 and, I

14   guess, 18 or 19.  So I don't know.

15             But I don't -- no, I don't think so

16   yet.  I think they're still -- maybe there will

17   be in the future.

18        Q.   Okay.

19             Give me -- let me put that aside.

20   Just give me a second.  I just want to look

21   through a couple of things.

22             MR. ZACH:  Let's take a quick

23        five-minute break.  I'm about to wrap

24        up.  I just want to organize.

25             THE WITNESS:  Okay.



Page 217

1              MS. BUSTAMANTE:  So 3:20 or do

2       you just want to do ten?

3              MR. ZACH:  Let's do ten.  Let's

4       come back at 3:25.

5              MS. BUSTAMANTE:  Okay.

6              THE VIDEOGRAPHER:  Off the record

7       at 3:16.

8                   (Whereupon, at 3:16 o'clock

9            p.m., a recess was taken until 3:28

10           o'clock p.m.)

11             THE VIDEOGRAPHER:  On the record

12      3:28 p.m.

13             MR. ZACH:  Thank you for your

14      time, Mr. Barnes.  I have no further

15      questions.

16             THE WITNESS:  Thank you,

17      Mr. Zach.  Have a good day.

18             MR. ZACH:  You too.

19             Do you guys have any questions or

20      are we good?

21             MS. BUSTAMANTE:  No, we don't

22      have any questions.

23             We can go off the record just to

24      talk about the rough delivery and stuff.

25             THE VIDEOGRAPHER:  Off the record



Page 218

1           3:28 p.m.

2                        (Whereupon, at 3:28 o'clock

3                p.m., the deposition was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 219

         1                    INSTRUCTIONS TO WITNESS

         2

         3        Read your deposition over carefully.  It is

         4   your right to read your deposition and make

         5   changes in form or substance.  You should assign a

         6   reason in the appropriate column on the errata

         7   sheet for any change made.

         8        After making any change in the form or

         9   substance, and which have been noted on the

        10   following errata sheet, along with the reason for

        11   any change, sign your name on the errata sheet and

        12   date it.

        13        Then sign your deposition at the end of your

        14   testimony in the space provided.  You are signing

        15   it subject to the changes you have made in the

        16   errata sheet, which will be attached to the

        17   deposition before filing.  You must sign it in

        18   front of a notary public.  Any competent adult may

        19   witness your signature.

        20        Return the original errata sheet to the court

        21   reporter promptly.  Court rules require filing

        22   within 30 days after you receive deposition.

        23

        24

        25



Page 220

1                        ERRATA SHEET

2

3     PAGE      LINE#      CHANGE                    REASON

4     _____     _____      _____          _____

5     _____     _____      _____          _____

6     _____     _____      _____          _____

7     _____     _____      _____          _____

8     _____     _____      _____          _____

9     _____     _____      _____          _____

10    _____     _____      _____          _____

11    _____     _____      _____          _____

12    _____     _____      _____          _____

13    _____     _____      _____          _____

14    _____     _____      _____          _____

15    _____     _____      _____          _____

16    _____     _____      _____          _____

17    _____     _____      _____          _____

18    _____     _____      _____          _____

19    _____     _____      _____          _____

20    _____     _____      _____          _____

21    _____     _____      _____          _____

22    _____     _____      _____          _____

23    _____     _____      _____          _____

24    _____     _____      _____          _____

25



Page 221

1                    SIGNATURE PAGE

2                          OF

3                    NED S. BARNES

4

5        I hereby acknowledge that I have read the

6    foregoing deposition, dated October 30, 2024, and

7    that the same is a true and correct transcription

8    of the answers given by me to the questions

9    propounded, except for the changes, if any, noted

10   on the attached errata sheet.

11

12

     SIGNATURE: _____

13

14   WITNESSED BY: _____

15

     DATE: _____

16

17

18

19

20

21

22

23

24

25



Page 222

1                C E R T I F I C A T E

2    STATE OF NEW JERSEY)

3                     )SS:

4    COUNTY OF MONMOUTH )

5

6        I, CATHERINE M. DONAHUE, a Certified Court

7    Reporter and Notary Public within and for the

8    State of New Jersey, do hereby certify:

9        That the witness whose deposition is

10   hereinbefore set forth was duly sworn by me and

11   that such deposition is a true record of the

12   testimony given by such witness.

13       I further certify that I am not related to

14   any of the parties to this action by blood or

15   marriage, and that I am in no way interested in

16   the outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto set my

18   hand this 4th day of November, 2024.

19

20       ___ *Catherine M. Donahue* ___

         CATHERINE M. DONAHUE, CCR

21       License No. 30X100223700

22

23

24

25



# Magna
## Key Contacts

### Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

### Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

### General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

### Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

### Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

### Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

### National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

### Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

### Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

## A

**ability**
47:20 94:14 98:14
  100:8 154:13
  189:16 190:9
  196:13 198:15
**able**
41:3 89:1 113:18
  115:24 116:21
  190:21 194:17
  196:5 206:16 215:5
**absence**
85:5 91:25
**absent**
47:12 201:2
**absolutely**
43:19 44:8 91:3
  145:4 201:7
**abstract**
162:17 186:19
**abundance**
51:12
**abustamante@she...**
3:20
**accept**
25:24,24 71:19
  111:10
**acceptable**
15:4
**accepted**
122:23 123:5,16,21
  124:24 147:7
**accepting**
113:21
**access**
15:16 25:22 26:5
  42:19,23 170:22
  191:17
**account**
149:12,22 174:19
  177:21,21
**accountant**
17:12 18:6
**accountants**
189:10,20

**accounting**
11:18 13:6 17:1
  19:17,20,21 20:17
  20:25 21:2,10,11,18
  23:1,5 189:14
**accuracy**
73:19
**accurate**
63:23
**accurately**
75:12
**accuse**
121:23
**achievable**
110:17
**achieve**
113:18 115:25 210:2
**achieved**
118:19
**acknowledge**
221:5
**acquisition**
91:11
**acronym**
21:15
**acronyms**
12:17
**act**
22:22
**acted**
122:12
**acting**
23:16
**action**
222:14
**active**
14:1
**actively**
200:16,22
**actual**
14:11 28:12 75:3
  82:22 95:7 133:7,20
  138:18 141:12
  146:9 183:18 213:6
**Adam**
6:15 158:1

**add**
103:9
**addendum**
51:13 52:21,24
**addition**
20:6 30:14 132:10,16
  147:8
**additional**
43:16 47:21 138:14
  190:25 196:6,12
**address**
94:17 96:10 98:11
  163:22 164:2
  200:12 214:5
**adjust**
200:17
**adjusted**
205:12 213:20
**adjustment**
214:4
**adjustments**
214:1
**adopts**
109:1
**adult**
219:18
**advance**
198:7
**advanced**
78:6
**advancing**
101:7
**affiliated**
24:20
**affiliation**
24:19
**affirmative**
57:9,25 58:10 59:4
  61:22 63:18 67:7,9
  67:10 68:9,14 69:15
  72:2
**afield**
106:15
**agencies**
21:21
**ago**

24:11 49:18 144:22
**agree**
30:9 45:6 57:23
  62:22,25 68:8 74:21
  75:16 76:1 79:3
  93:22 94:3 95:16
  98:10 102:7 104:21
  106:22 112:14
  113:3 114:7,22
  120:24 121:13,20
  122:8,10,22 123:15
  123:22,24 124:23
  125:6,20 126:21
  131:22 132:19,21
  135:21 153:20
  154:4 156:14
  158:20 159:19
  172:20 186:12
  188:19 189:19,23
  192:12 194:13
  196:3
**agreed**
109:19 199:13
**agreement**
25:9 82:22 83:13,23
  85:12 86:2,6,15,21
  87:9,18,18 90:15,24
  91:17,21 92:1,2,11
  92:15,25 94:7 95:7
  96:20 194:4 196:4
  198:24 199:7 200:6
  201:18,23 207:8,19
  215:25 216:1
**agreements**
103:12,12
**agrees**
83:10
**AICPA**
11:23 163:23
**aid**
163:23
**al**
8:6
**Alexandra**
3:15 9:2
**Ali**



32:24 43:23
**allegation**
71:4 100:16
**allegations**
65:12
**allege**
72:4
**alleged**
61:23 69:4,13,16
70:17,23 76:10
80:19 88:3 93:20
94:14 100:8 103:1
**allegedly**
68:10
**alleges**
65:1 78:17
**alleging**
64:15,16 80:18 198:6
**allow**
192:4
**alternate**
26:14
**alternative**
79:17,18 163:1
164:16,24 165:4
174:1,5 176:21
**Altis**
170:1,3 171:19 172:4
172:15 210:22
211:4,9
**amended**
6:5,6 50:11,12 55:18
55:22 59:13,14
192:7,24 194:5
**amending**
196:4
**amendment**
194:11 202:14,16
**amount**
13:6 18:11 21:23
30:16 38:13 41:25
65:7,11,18 71:9
72:3 76:16,17 78:5
145:9 146:16 180:6
180:19 185:24
187:7 191:23

199:11 203:4,5,6,16
205:10
**amounts**
75:1 204:23
**analyses**
114:9 126:25 172:11
**analysis**
32:12,16 44:17 61:8
65:7 70:17 71:14,22
105:15,16 107:7,19
108:25 109:2,9,16
110:4 115:21 116:5
116:11,20,22,24
117:12,20 119:25
120:4,8 121:1
122:14,25 124:6
125:9,24 126:20
128:13,22 129:19
138:14,17 141:11
145:10 146:8 149:4
152:2,15 158:11,17
159:2 161:6 171:19
172:10,20,22 173:4
175:11 177:13,19
179:11 181:8,18,25
182:9 185:10 186:5
200:11 210:6
212:18
**analyst**
12:8 111:10
**analysts**
28:2
**analyze**
183:17 186:18
**analyzed**
62:9 185:5,8
**analyzing**
124:18 184:11
**ancillary**
19:2
**angel**
112:21 113:13
114:24 215:1
**annual**
185:18
**answer**

6:6 7:3 14:15 30:2
43:1 50:12 59:12,14
60:2 71:7,15 72:1
87:1 89:9 99:19
112:10 124:11
164:20 173:9 181:4
186:18
**answered**
181:5 196:24
**answering**
52:3
**answers**
221:8
**anticipated**
69:25 145:19 178:8
**anticipating**
188:7
**anybody**
28:10 49:1
**apart**
115:8
**Apollo**
213:10,12
**apologize**
18:6
**appear**
107:16
**appearances**
8:16
**Apple**
37:8
**applied**
160:10,23 173:16
**applies**
159:20 160:15
**apply**
117:23 176:25
177:10 214:1
**applying**
44:14 214:14
**apportion**
13:3
**approach**
209:3,4,6,10,11,17
214:21
**approaches**

208:25
**appropriate**
107:21 121:17
160:25 161:5
162:14 176:25
198:2 209:15
213:23,23 214:12
215:7 219:6
**appropriately**
214:6,21
**appropriateness**
211:11
**approximate**
14:3,3,18 22:7
**approximately**
10:19,21
**approximations**
13:22
**April**
152:4,10,12 153:14
180:5,9,11,20,21
181:6 182:8 215:14
215:14
**arbitrate**
42:10
**arbitration**
13:13 33:25 34:4,6
34:21 35:24 36:18
**arbitrations**
12:24 35:22
**ARC**
210:14 211:4,9
**area**
17:16,17 19:7 103:22
113:10
**argue**
102:16
**argues**
76:16
**argument**
90:1
**arrive**
170:14
**art**
189:9,11
**articulable**



215:20 216:10
**articulate**
95:18 123:17 183:1
214:15 215:5
**articulated**
114:20 117:17
126:25
**aside**
88:13 94:12 216:19
**asked**
23:23 31:22 32:5,12
69:3 71:6 73:6,15
73:16,25 82:10
99:13,20,23 102:18
111:20 112:1
124:10 164:19
171:1,1 173:7
180:24 187:2
196:24
**asking**
13:21 33:22 34:1
36:6,7 38:4 59:4
134:6 135:5
**asks**
71:8,10
**aspect**
96:19 188:3
**aspects**
56:13 110:22 125:22
169:1
**aspirational**
213:2
**assert**
33:5 79:23
**asserted**
32:16 69:17
**asserting**
32:10 58:18
**assess**
111:14 206:2
**assessing**
124:5 187:7
**assessment**
122:21 179:15
**Asset**
197:23

**assign**
219:5
**assignment**
25:24 27:13 31:18,19
31:20 32:20 74:9,12
**assignments**
28:5
**assist**
127:2
**assisting**
27:14 28:11 40:13
**associated**
39:19 83:1,3 97:24
98:1 161:12 196:13
200:19
**assume**
36:12 60:12 88:13
96:13 118:16,18
173:22 206:12
**assumed**
111:4
**assuming**
173:22
**assumption**
86:15,18 87:5 111:9
**assumptions**
124:20,22
**assurance**
18:23
**astonished**
87:12
**Atlantic**
17:15
**attached**
6:21 219:16 221:10
**attachment**
136:23,23,24 137:11
150:18,23 165:9
166:3,4,8 175:3
201:22
**attachments**
41:8
**attempt**
77:19 81:10 112:9
**attempted**
213:25

**attempting**
128:1
**attempts**
209:25
**attention**
85:23
**attitude**
70:8
**attorneys**
3:12,22 8:21
**audit**
17:12,18,20 18:14,22
**audited**
188:9
**auditing**
13:18 18:5 189:14
**auditor**
18:22
**auditors**
18:16,16,21 188:6
189:4,6
**audits**
17:23 19:3 188:21
**August**
22:17 108:12 109:8
131:25 139:2 140:5
140:9 145:2 165:20
165:24 166:12
173:15 174:2,20
175:16,24 176:11
176:18,19 181:7
**authenticity**
155:25 156:3
**authority**
48:6
**automatic**
207:23
**automatically**
198:20,22
**automobile**
18:2 61:15 70:11
**AUTOMOBILI**
1:11
**availability**
123:9,10,11
**available**

31:22 42:13 43:25
58:17 72:15 91:7
108:2,3 150:6 157:4
181:20
**Avenue**
3:17
**avenues**
58:16 126:18
**award**
83:24 87:19 94:7,13
**awarded**
83:19
**aware**
12:17 66:18,19 80:14
85:20 100:16,22
101:21,23 102:3
132:7 153:13,21
154:21 155:3,9,15
155:23 156:5,13,14
157:9 167:16
168:16 171:15
203:25 213:24,25
**a.m**
2:3 8:8 55:6,8,9,11
**a/k/a**
1:10,12

_____
**B**
_____
**B**
6:1 9:9
**back**
10:5 22:17 23:4
25:15 26:13 31:11
33:12,13,20 48:17
55:3 73:1 76:14
78:9 94:25 103:25
106:24 109:4
124:11 129:14,17
129:25 130:15
131:7 134:12,14
164:20 166:15
169:20 177:7 192:6
192:9 194:5,8,17
196:5 197:3 207:6,7
216:13 217:4
**backdated**



105:15
**background**
11:12 16:24 24:14
**backstop**
192:18
**backward**
112:1
**bad**
79:13
**balances**
179:4,5
**ballpark**
36:12
**bank**
128:3 154:23 155:10
156:21
**Barnes**
1:19 2:2 5:4 8:4 9:16
15:25 16:9,10,14
55:13,17,23 56:10
59:12,15,25 67:17
73:5 93:12 134:21
135:2,6 136:2 137:5
137:8 139:16,20
142:6,10 143:11,14
143:17,20 148:19
158:2 204:10,14
217:14 221:3
**base**
150:8 190:3 212:21
**based**
19:7 52:19 83:8
94:16 103:10
107:17,20 114:9
128:19 161:14
209:3,5 212:15
**bases**
68:1 107:2
**basic**
110:10
**basically**
20:13 31:21,21 49:1
52:8 53:6 64:2
69:24 108:24
118:21 189:15
192:20 201:9,16

**basis**
84:4 103:6 145:6
149:14,14 170:10
185:18 212:15
**Bates**
6:8,9,11,12,14,17
134:25 135:16,17
135:22,23 137:6
139:18,23 142:8
143:7,10,15 204:11
204:12
**bearing**
6:8,9,11,12,14,17
134:25 137:6
139:18 142:8
143:15 204:12
**began**
21:3,6 179:1
**begins**
8:3 175:10
**behalf**
32:3 57:10 71:13
146:4 150:12
**belief**
40:22
**believe**
11:6 31:1 33:1 38:18
43:18,19 51:16,17
52:10 67:19,24 85:2
87:8 89:11 95:22
96:1 110:18,21
129:10,18,23
131:15 137:21
146:15 149:3
156:17,23 165:5
167:12 168:24,25
171:18,18 176:24
184:8 191:16
193:22 195:22,25
198:3 202:13
210:15,18
**bench**
35:2,5
**benchmark**
213:1
**Berkeley**

24:15
**Berris**
1:5 4:5 8:5,21,22
32:3,10 38:21 51:22
53:3,5,8,15,25
60:17,24 61:11
63:17,20 64:15 65:1
65:13 66:23 68:12
68:22 69:17 70:3,7
76:10,21 77:2 78:2
78:17 82:20,25 83:3
83:19 84:5,12,15,24
85:13 86:3 94:14
95:6,10,14 96:3,16
97:2 98:1 100:17
101:5 110:25 115:5
136:13 139:3
140:10 150:13
166:24 171:25
198:6 216:2
**best**
23:14 38:8 49:18
111:5 176:1
**bestows**
12:14
**better**
101:12 110:12 189:9
**beyond**
78:12 87:11 150:1
162:23 164:9
**bifurcate**
76:2
**big**
20:5 41:19 44:5
130:13
**bill**
29:4,15 31:4
**billed**
29:9,22 30:23
**bills**
31:7
**binding**
92:3
**bit**
11:18 16:18 27:23
33:12 94:23 108:8

110:21 198:9
**blinders**
118:14
**blood**
222:14
**blurred**
52:2
**blurry**
52:2
**Boies**
3:4 8:10 23:24,25
24:6 34:7
**Bornstein**
37:19
**bottom**
81:20 135:15
**breach**
60:2 69:22 185:10
**breaches**
57:1 60:18 61:11
70:3
**break**
40:10 54:18 75:13
130:5 146:6 184:12
184:16 187:6 197:8
216:23
**Brett**
37:18
**BRG**
24:20,23,24 25:17
26:7,14 27:1 30:22
40:23 89:20,22,25
90:1
**briefly**
84:12 85:18
**bring**
16:11 59:11 85:23
134:17 186:15
**bringing**
63:17 174:16
**brings**
63:8 64:2
**broad**
74:17,17,23 75:23
**broadly**
97:18



**broken**
187:10,11
**brought**
60:7
**Bruce**
27:2,8,9,10
**buck**
47:6
**bullet**
56:22 57:14
**bunch**
41:19
**burning**
145:18
**business**
12:2,5 17:13 20:20
25:13 69:8,14
104:13 111:9,12,15
111:17 112:2 113:6
115:13 116:19
119:13 120:18
124:4 126:10
127:22,24 128:10
172:6 190:16
196:18 200:16
213:4 215:3
**businesses**
81:1,1
**Bustamante**
3:15 9:1,2 16:1,4
30:24 32:23 39:8
40:4 45:5 46:12
47:3 48:3 49:3
50:22 52:9 54:3,16
54:23 55:4 58:4,11
60:10 63:3,12,21
64:7 65:9 66:3,12
66:17 67:2,23 68:13
69:2 70:20 72:6
74:10 79:2 80:11
81:13 82:6 83:14
85:1,15 86:4,16
89:5 92:4,17 93:2
94:2 95:20 97:6
98:9 99:6 100:21
101:22 102:10

103:7 104:11 105:8
105:17 106:7,18,21
108:14 109:10
111:16 112:19
113:9 114:13 115:2
116:14 118:2 119:7
120:21 121:3,19
123:2 124:2,8
125:10 126:22
128:16 129:13
130:4,17 132:1,12
132:20 134:4
135:10 136:9
137:10 138:16
140:25 141:10
142:25 143:6
146:13 147:3,12
149:5 151:1,17
152:18 153:17,24
154:9,24 155:5,11
155:19 156:2,8,16
157:5 158:14 159:7
159:22 161:7,20
162:8 163:8 164:5
164:17 167:7,20
168:2 169:17 170:6
170:24 171:17
172:8,24 173:6,18
176:23 177:15
178:10 179:9,18,25
180:8,23 181:11,23
182:11 183:3
184:15 185:20
186:6,25 187:9
188:1,23 189:22
190:18 191:14,24
192:16 193:14,21
194:9,18 195:4,20
196:10,23 199:16
200:14 201:25
202:5 205:17
207:21 208:17
210:7 211:12
212:12 214:8 217:1
217:5,21
**busy**

18:12
**buys**
206:19
**Byers**
37:18

---

**C**

**c**
3:1 4:1 205:5 222:1,1
**cabined**
66:2
**calculate**
165:7
**calculated**
101:19
**calculating**
159:19 206:12
**calculation**
69:12 70:23 199:21
**calculator**
122:4,13
**call**
14:22 16:9 20:7
23:15 27:25 40:12
44:6 48:16,16 49:13
75:10,16,19 77:15
165:20 166:12
167:15 173:14
176:11,14,17,18
189:4,11
**called**
9:9 12:8 18:12,23
19:17,23 56:8 62:6
71:6 81:21 112:5
126:19 165:13
210:14
**calling**
165:13
**calls**
165:11 174:4,5
**capacity**
24:2,20 50:19,25
**capital**
1:12 19:17,20,21
20:7,8,8,25 21:2,10
21:11 23:1,4 49:20

112:23 128:2
188:13 190:25
192:5,9,14 197:3
212:24 215:2
**capitalist**
112:21
**capitalists**
113:14
**capitalized**
190:6,12
**car**
178:21,22,23 182:10
182:16 192:10
193:2,3 195:3,13,18
195:23 210:3
212:22
**care**
57:2 69:23 70:4
**career**
14:13 19:12
**carefully**
219:3
**cars**
179:1 181:22 182:19
188:17 194:7,16
196:6,8,21 202:17
**case**
1:3 10:3 11:2,3 15:10
26:2,25 27:1,13,18
27:20,22 28:25
29:21 31:24 32:25
34:24 35:11 37:6
38:3 40:3 42:24
44:6 45:15 48:4
51:22 55:20 56:13
57:18 66:22,25 74:5
77:2,13 79:19 85:10
85:14 88:13 90:13
91:3 100:17 101:11
173:20 177:22
200:11 206:5
207:17
**cases**
10:13,16,25 18:23
20:4 36:16,21 37:7
62:19 80:15,16,25



102:16
**cash**
77:19,25 78:13,20,24
80:8 81:5,6,12 83:4
88:3 89:1 90:2,5
93:19 94:15,15 98:2
98:15 100:15,19
102:25 107:12
158:19 159:19
160:24 164:8
177:19 194:8,17
196:14,20 200:21
200:23 201:9,20
209:4 215:9,12,21
216:5
**categorical**
212:13
**Catherine**
2:4 8:13 9:11 222:6
222:20
**caused**
60:25 61:13,16 65:1
70:9,12 183:1
**causes**
181:21
**caution**
51:12
**caveat**
98:23
**CCR**
222:20
**certain**
50:5 63:2 89:16
104:7 110:23
115:25 169:1
177:13 194:6
208:14 214:1
**certainly**
14:5 15:20 23:11
32:25 36:21 40:5
41:10,15 42:12
43:18 46:21,22
58:22 75:6,12 80:14
81:14,15 86:24
99:15,23 102:11
110:11 117:2 120:3

120:14 124:13,25
128:17,18,21
168:24 186:9,10
188:2,3 196:13
210:8
**certification**
11:21 12:1,4
**certified**
2:5 11:17 12:8 222:6
**certify**
222:8,13
**change**
75:15 219:7,8,11
220:3
**changes**
219:5,15 221:9
**characterization**
45:7 106:23
**characterize**
11:21 51:9 52:17
68:3 75:22 86:18
87:4 164:7 177:16
199:17
**characterized**
125:15
**chart**
163:16 187:16
**check**
10:6,6 31:12 169:20
**checking**
126:16
**Choi**
1:10,10 8:6 32:8,16
33:4 49:13 84:24
85:13 86:3 90:18
136:12 139:3
140:11 215:22
**Choi's**
54:8,10 84:17
**choose**
25:12,13
**chose**
146:21 175:19
**Chris**
4:6 8:12
**chunk**

201:3
**circumscribed**
164:15
**circumstances**
85:12 103:19 126:24
138:8 141:8 214:19
**cite**
46:18,25 106:4
131:15 132:10
134:2,10 137:3
139:9 143:22
168:15
**cited**
46:3 47:16 82:21
84:7,9 95:7 133:17
134:22 136:22
142:14
**cites**
42:6 131:11 132:17
142:1
**city**
19:15
**civil**
35:8 62:19 63:1
**claim**
32:2,8,15 33:3 57:25
62:7 63:8,9,10 64:2
79:24 80:17
**claiming**
80:20
**claims**
63:17,20 64:19 76:21
175:20
**clarify**
43:3 70:25
**clean**
15:11
**cleaning**
22:16
**clear**
50:23 57:8 89:14
93:16 108:23
137:11 148:20
176:17
**clearly**
32:1 111:3 118:3

136:16 174:18
182:18 187:10
195:9
**click**
137:23
**client**
11:5 19:2 60:7
111:14
**clients**
17:22
**close**
15:8 27:22 59:11
79:14 171:25
173:14 216:5
**closely**
37:19
**closer**
34:17 175:22 213:22
**closing**
205:7
**coffee**
54:20
**coin**
87:17
**coincide**
101:4
**collateralized**
194:16
**colleague**
9:4
**colleagues**
34:11
**collection**
21:17
**column**
219:6
**come**
55:2 80:5 83:12
130:15 156:25
166:13 215:2 217:4
**comes**
76:19 163:23
**comfort**
117:7 119:3,5
**comfortably**
34:16 36:9,14,16,24



**coming**
48:11 168:10
**commencing**
2:3
**comments**
28:16
**commercial**
103:17
**committed**
179:3
**common**
66:15 113:6 114:7
115:3 123:4,16,21
186:13 192:4
198:16 199:5,12
203:20 207:18
**commonly**
122:23 123:4 124:24
**communicated**
89:14
**communications**
43:20
**companies**
17:15 21:20 61:16
70:11 90:12 112:16
112:24 114:25
184:22,24 188:20
189:21 190:6,8
208:9,14 209:14
210:3,5 211:3,8,21
212:9 213:20 214:6
**company**
18:18 26:9 49:21
57:2,3,10 61:13,16
62:10 65:2 70:9,12
79:22,23,25 80:4
81:4 87:19 88:4,18
89:2,17 90:3,17
91:22 93:1,21 94:1
94:8 98:16 99:5
100:5 103:2,5
110:13 111:6,22
112:7 113:5,7,15,17
114:10,12,15,18
115:15,20,24
116:13 117:13

118:6 119:1,11
120:1 123:7,10
124:14 127:5 128:8
146:4,10 150:13
152:3 154:5,8,12,14
154:16 159:3 170:1
181:14 182:1,4
185:3,6,18 186:9,13
186:24 190:20
191:6,6,9 193:13
198:1 199:14 200:3
200:21,23 201:1,15
201:17,19 206:13
206:17,20 209:5,22
210:14 212:5,8,17
213:5,7,11 214:25
215:10,13,23 216:3
**company's**
69:9 161:13 189:16
**comparable**
197:25 198:2,5
208:14 209:5 212:9
213:20 214:7
**comparables**
209:15 210:24 213:9
**compare**
138:18 141:12
**compared**
61:15 70:10 79:4
**comparing**
181:19 197:25
**comparison**
213:23
**compensate**
196:9
**competent**
219:18
**compilation**
18:24
**Complaint**
6:7 50:11,12 59:13
59:15
**complete**
40:6,21 137:2
**completely**
115:7

**completeness**
51:11 53:15
**completes**
205:8
**compliance**
110:9
**component**
116:8
**comprised**
184:12
**comps**
211:11
**computer**
26:5 150:22
**concede**
87:13
**concern**
188:6,10,22 189:5,12
189:12,13,20
190:10,15 191:3,10
191:12,19,22
193:19 194:14
**concerned**
53:14
**concerning**
146:17 191:4
**concerns**
156:6 214:5
**concluded**
145:11 148:12 218:3
**conclusion**
53:7 74:25 83:13
87:7 107:20 120:12
128:19 150:7
161:21 170:8,14
171:2,5,6,14 209:21
215:11
**conclusions**
73:16,20 76:7,16
82:11 180:22
**Concordance**
43:6
**condition**
77:18
**conditional**
205:6

**conditions**
81:22 82:23 83:1
95:8,12,18 96:25
97:24 98:6 99:1
100:3 123:12 194:6
**conduct**
61:12 68:11 113:6
114:8 115:20 116:5
116:10,21,24
117:19 120:8,25
126:19 127:1
138:13 152:15
167:17 168:18
172:19 181:7 182:8
212:7
**conducted**
61:8 65:6 90:10
117:10,12 122:12
122:13 129:18
138:17 145:10
151:15 152:2 169:5
184:24 185:2
209:22 210:14
**conducting**
104:6 107:18 119:24
124:5 125:8 127:21
127:22,24 128:12
144:25 149:15
172:22 181:18
186:4,5 209:16
**conference**
8:23,24 48:16 49:5
**confident**
53:6
**conflict**
25:12
**connected**
14:21
**connection**
9:19 10:3 34:22 37:1
38:15 39:12 45:13
49:2,23 59:5 60:8
61:23 63:16,19
65:12,19 66:24
68:11 70:18 72:5
97:1 115:13 153:10



167:11 185:9
205:15
**consecutive**
188:7
**consider**
41:16 44:20 45:13
51:25 104:14 108:5
120:16 126:1
147:10 172:7 179:6
187:6 194:21
**consideration**
42:14 116:1 120:15
153:10 208:9
**considered**
39:2,5,14 40:7 42:6,9
42:11 44:10,12,21
45:4 46:8,20 47:2
47:14 50:9,11,18
51:10,18 52:17
53:19 59:20 105:2,2
105:20,23 109:7
117:3 145:3 149:24
168:8,13 172:14
**considering**
45:9 147:8 154:7
172:21 185:7
**considers**
177:13
**consistent**
78:5 90:8 118:6
145:20 147:16
**constitute**
172:5
**constitutes**
122:24
**construct**
174:17
**consultants**
28:2
**consulting**
13:8 20:1,18,18
21:16,20
**contacted**
10:2
**contain**
68:9 90:24

**contemplate**
13:16
**contemplated**
14:1,11
**contemporaneously**
111:13
**contents**
138:11
**context**
21:24 35:9 64:21
73:10 103:16
111:13 116:2 117:6
117:16,24 118:25
119:9 121:21
134:16 135:5
138:23 167:3
210:20
**continue**
125:14 181:15
**continued**
146:2 149:25
**contract**
185:10
**contractor**
25:7
**contractors**
26:22
**contractual**
103:5,6
**contribute**
120:11,14
**contributes**
45:25
**Cont'd**
4:1
**conversation**
49:16,19 50:2 52:19
**conversion**
88:3 93:19 100:4,6
102:25 198:19,23
199:4,4,12 202:22
207:11,16,16,20,23
**convert**
83:4 98:2 99:4 100:8
192:4 198:16,22
200:21 201:9,19,20

206:14 207:12,18
**converting**
100:14 200:20
**cool**
34:24
**copy**
15:2,7,11,13,18,18
**corners**
42:4
**CORP**
1:13
**correct**
9:21 11:12 17:2,7
22:5 40:14 47:17,22
50:15,22 57:12 59:7
65:13,21 67:19
68:15 70:22 72:7
73:13 84:19 135:25
138:12 142:3
144:18 161:8
176:24 193:16
203:10 207:3,22,25
209:2 221:7
**correctly**
13:3
**cost**
113:7
**costs**
200:19
**counsel**
8:15 37:10 38:6 39:7
40:2 43:16 47:21
48:2,7,17 83:16
84:2 106:16
**count**
34:4,9 60:2,11 69:21
70:22 173:3 177:24
**counterclaim**
57:20,24 58:8,15,18
58:23 60:6 61:24
63:25 65:1,20 68:20
69:22 70:19
**counterclaims**
57:18 59:6 72:5
**COUNTY**
222:4

**couple**
57:18 131:15 216:21
**course**
19:11
**court**
1:1 2:5 8:13 9:5,8
12:23 13:13 34:2,5
37:4 101:15 219:20
219:21 222:6
**cover**
138:10 142:14 175:4
**CPA**
11:12,15 12:5 17:10
**Cravath**
37:13
**create**
162:6
**created**
115:20 129:4,12
132:18 138:9
140:18,24 141:9
142:23 143:21
152:16 153:3
166:18
**creating**
128:6 136:7
**creation**
142:21 144:2
**credential**
12:12
**credentials**
12:1
**criminal**
35:9,11
**criticism**
195:6
**criticisms**
195:2
**criticize**
67:21
**criticized**
157:3
**cumulative**
187:16,21
**curious**
27:5



current
77:18 106:17 165:11
  165:13,17,19,23,25
  174:5,6,9,14,16,18
  175:7,22 176:1,4,6
  176:11 212:16
currently
13:1 14:8 24:22
CV
16:18,22 22:11,13,17
  22:20 33:16 35:20
  36:3

___

**D**

D
5:1 9:9
damages
32:2,8,16 33:3 56:8
  56:20 57:1 58:2,10
  58:13,24 63:10,19
  66:16,24 68:9,15
  69:5,16 70:24 71:22
  72:2,4 76:10,17
  77:2 78:4 79:1
  101:14,19 102:5
  185:10
data
122:18 155:16 156:1
  156:7 184:3,7
database
42:22,24 43:8
date
2:4 10:5 16:15 55:24
  59:17 75:4 77:18
  104:7,9,16 105:4,6
  105:13,22,23 108:5
  109:15,17 110:14
  135:3 137:9 139:21
  140:7 142:11
  143:18 144:21
  146:20 147:9 148:6
  148:15,18 152:8
  158:4 161:14
  162:23 175:15,19
  179:2 187:22
  195:13 204:16

205:23 219:12
  221:15
dated
140:4 221:6
dates
146:1,21 147:1
  148:11 150:1,2,9
  211:23
day
50:25 67:13 74:9
  144:13 209:9
  217:17 222:18
days
201:10 219:22
DCF
108:24 109:9 114:8
  116:5,20,24 131:16
  146:8 150:8 158:11
  158:17 161:5
  173:19 175:11
  176:19 177:8,8,13
  200:11
De
1:10 6:5 38:16,21
  49:20 55:18,21
  60:16,25 62:8,11
  64:15 65:11 68:11
  68:20 69:1,4,8,16
  70:2 71:11,13 74:25
  75:4 77:17,21 82:25
  90:18 95:10,14 96:3
  97:2 133:5 134:3,9
  139:4 141:22
  144:13 153:14,22
  155:18 157:3 161:4
  161:18,18 162:5
  166:25 167:6,18
  168:19 169:5
  171:23,24 178:25
  179:6 180:7,20
  181:9 183:19,24
  187:22 191:23
  192:14 193:9 195:3
  196:7 205:23
  208:16 210:1
  212:21 214:20

215:20,25 216:10
dealerships
18:3
dealing
94:12,13 96:12,18
  98:13
debt
192:1 193:5
December
205:9
decided
25:5
decision
102:17
declaratory
58:20
deemed
39:17 41:16
defendant
58:1,9,18 64:1,3
defendants
1:15 3:22 9:3,23 10:3
  32:9 33:4 35:18
  38:7 56:24 57:10,17
  59:5 64:16 72:4
deficit
188:13
defined
207:20
definition
44:11 108:3
degree
17:1 179:15 191:8
Delaware
60:3
delay
182:10 183:2
delays
181:21
delineate
13:3
deliver
195:3
delivered
182:20 195:13,18,24
  196:1,22

delivery
217:24
demand
196:5
demanded
100:18
demands
101:10
demonstrates
122:18
denominator
203:9 206:25
departed
89:2
departure
89:4 101:5
depend
120:22 121:5,5
  125:16,16,19 187:3
depending
119:10 126:23,24
  158:25 206:18
depends
154:10
deposed
22:23 36:13,17,21
  50:24,24 174:16
  195:23
deposit
179:4,4 192:10 193:2
deposition
1:18 2:2 7:1 8:4,9
  36:19 50:18 51:7,9
  51:16,21,24 52:6,20
  53:3,8,16,25 54:8
  54:10 84:13,15,17
  84:23 85:18,19
  86:20 87:14 95:23
  148:16,18 152:21
  152:22 165:16
  169:1 170:12
  175:25 218:3 219:3
  219:4,13,17,22
  221:6 222:9,11
depositions
50:17 53:25 54:1



168:23
**deposits**
179:1,7,23 180:6,19
**describe**
20:2 38:19 119:8
**described**
24:2 62:2 117:24
172:23 198:23
**Description**
6:2
**designation**
11:22 12:4,15
**designations**
11:16
**desk**
126:15
**despite**
144:14 146:3,18,18
148:5 191:21
**details**
105:25
**determination**
45:12,17 126:2 127:2
**determinative**
120:13 129:24
**determinatively**
136:15
**determine**
41:3 120:1 121:16
122:14 215:8
**determined**
42:15 57:4 170:3
**determining**
153:11 199:18
205:22
**Deutsche**
155:10 156:20
**developed**
20:24
**development**
185:19 186:4,7,15,23
187:17
**devil-may-care**
70:8
**dictate**
206:8,9

**difference**
147:19 196:19
**different**
30:17 62:17 75:14,14
88:23 101:16
105:12 106:13
123:7,8 124:10
126:25 127:9
132:17,18 160:21
173:7 176:8 183:12
187:1 190:7 208:24
208:25 210:10
**difficult**
14:2
**difficulty**
110:19
**dig**
148:9
**digest**
45:10,11
**diligence**
107:18 167:18
168:10,19 169:4,6
172:3,15 210:22,24
**diminished**
69:10,18
**direct**
68:21
**directed**
52:12
**direction**
28:3 38:9 48:11
**directly**
26:21 28:5 48:7,11
60:25 61:13 70:8
112:11
**director**
22:4
**disagree**
63:22 75:11 78:8
104:12 125:14
172:25 173:10
**disciplined**
22:16
**disclose**
56:19

**disclosed**
191:12
**disclosure**
39:2 56:3,24
**disclosures**
6:5 55:18,22 56:12
**disconnected**
71:3
**discontinue**
89:21
**discount**
159:20,25 160:3,4,6
160:9,9,14,21,22
163:2 164:3,9,10,15
165:2,4 173:17,20
173:21 174:2 176:9
176:21 177:1,6,10
177:12,20 200:12
200:17 201:5,8
**discounted**
107:12 160:24 163:5
173:16 177:19
209:3
**discovery**
42:24 43:8
**discretion**
47:20 207:17
**discuss**
46:5 76:3 85:22
132:14
**discussed**
53:8 78:7 83:17 93:3
193:18
**discusses**
159:13 166:21
**discussion**
25:6 32:1,7 33:2
153:18 154:1
**disinclined**
125:6
**dispute**
13:10 14:1,22 21:24
21:25 22:10 64:11
104:5,12 205:16
**disputed**
174:9

**disputes**
216:1
**disputing**
88:21
**disrespectful**
30:4
**distinction**
111:12 112:12
126:11
**distribution**
18:1
**DISTRICT**
1:1,2
**diverse**
17:24
**divided**
203:13
**document**
6:4,5,8,9,11,12,14,17
16:13 42:8 45:11,19
46:17,19 55:17,19
55:21 56:3 83:17
84:9 89:14 134:25
135:8 136:22 137:5
137:6 139:18 142:8
143:12,15 204:6,7
204:10,12 213:16
**documents**
7:7 31:8 38:14,14,19
39:15 42:8,12,21
43:24 44:25,25 45:3
45:8 46:14,24 48:18
59:19,20 132:13
133:20 137:2,17
167:21 168:1
180:15 184:9
210:19
**doing**
15:23 16:4 17:12
18:7 19:1 20:13,15
21:6 25:21 34:19
41:2 53:9 84:18
104:9 109:8 111:12
116:19 118:23,24
122:1 208:25
**dollar**



204:4
**dollars**
61:17 65:3,8 70:13
90:4 148:4 178:21
205:13
**Donahue**
2:4 8:14 9:11 222:6
222:20
**door**
99:24
**doubt**
189:16
**downwards**
205:12
**draft**
28:21 83:17
**drafting**
28:9,11
**draw**
111:11 112:11
**Drew**
27:19 28:3,5 38:9
48:4
**DT**
134:23 137:5 139:10
139:12,14 140:14
142:7 143:4,10
204:11
**DT0000000249**
6:17 204:13
**DT0000000253**
6:18 204:14
**DT0000009310**
6:11 139:19
**DT0000071709**
6:14 143:16
**DT000094981**
6:13 142:9
**DT00092013**
6:8 135:1
**DT00092014**
6:10 137:7
**Dubinsky**
27:2
**due**
77:16 107:18 167:17

168:9,18 169:4,6
172:3,15 210:21,24
**duly**
9:10 222:10
**duration**
216:11
**duties**
57:2
**duty**
60:3,18 61:11 69:23
70:4
**D.C**
3:18 17:17 19:7,13
19:14

---
**E**
---
**E**
3:1,1 4:1,1 5:1 6:1
9:9,9 131:1,1 222:1
222:1
**earlier**
70:21 74:3 84:11
106:14 110:2
133:12 138:5 153:5
168:22 185:4
207:15 210:21
**early**
10:9 23:12 32:7 49:5
**early-stage**
114:25
**earned**
212:10
**easier**
72:21 138:24 151:4
**easily**
72:18
**easy**
16:12
**eat**
130:12,12
**economic**
21:17 68:25 69:13
77:2 123:12
**economics**
20:8 21:16
**edits**

28:17
**effect**
46:6
**effort**
41:25 172:19
**efforts**
38:16 49:20,24
167:11
**either**
14:10 19:12 26:14
28:3 39:16 71:13
84:24 89:17 128:8
148:11 150:12
174:8 180:15
194:22
**elect**
191:5
**electronic**
15:11
**elements**
89:7
**employee**
19:3 24:22,24 83:24
87:19 89:16 90:11
128:6
**employees**
26:20,21
**employing**
104:6
**encapsulate**
119:15
**encapsulated**
41:6
**enforceability**
92:15
**engage**
212:17
**engagement**
22:18 29:21
**engagements**
14:10 23:15,20
**engaging**
127:25
**ensure**
117:24
**enter**

141:15
**entered**
86:2
**enterprise**
61:18,23 65:3,18
70:13,18,24
**entire**
29:21 159:14
**entirely**
41:5
**entirety**
52:11 89:22
**entities**
62:15
**entitled**
6:5 55:21 76:21
78:17 79:21 80:21
89:18 147:10,15
192:5 206:13
**entity**
125:23 156:15,21
**enumerate**
123:17
**environmental**
20:9
**envisioned**
154:16
**Epic**
37:6,7,7,8,10
**equate**
45:8 173:8
**equity**
75:3 77:20 78:16
79:6,9,22,25 80:4
80:20,21,24 81:11
81:23 82:24 83:2,4
83:19 85:13 89:18
89:20 92:25 93:25
93:25 94:8 95:9,14
96:3 97:2,25 98:2,8
100:18 103:5,18
112:17 113:4,8
114:24 115:14
216:2
**equivalent**
77:19,25 78:13,20,24



80:9 81:12
**equivalently**
192:25
**errata**
219:6,10,11,16,20
220:1 221:10
**especially**
186:8
**ESQ**
3:5,6,15,16
**essentially**
47:14 56:12 67:20
81:8 100:24 101:5
122:3 163:25 192:1
192:23 194:15
198:19,22 202:24
203:3,19 209:13
**establish**
65:7 113:7
**estimate**
10:7 14:3 29:3 30:11
33:22 48:8,13 58:3
75:3 76:10 77:19
176:1 184:25 210:1
**estimating**
127:4
**et**
8:6
**evaluate**
110:15 118:10 126:1
148:10 161:24
**evaluated**
62:9 117:3 121:15
150:5 156:22
**evaluating**
149:12
**evaluation**
181:1
**evaluations**
209:22
**Evan**
37:19
**evenly**
35:21
**event**
91:6 105:13 192:3,22

197:4 198:24 199:4
199:24 205:6
206:16,20 207:11
207:16,20
**events**
93:5,8 104:9
**everybody**
18:13 130:16
**everyday**
103:17
**evidence**
63:9 81:21 104:8
119:19 121:14
127:8 144:10 145:2
145:9 147:23
155:24 156:25
161:15 171:12,13
**ex**
20:6
**exactly**
21:1 36:5 45:21 59:2
59:2 65:25,25,25
67:15 89:21 114:21
151:25 178:13
209:7
**examination**
5:5 9:14 65:23
**examine**
155:17
**examined**
9:13
**examiner**
11:17
**examining**
122:25
**example**
26:3 89:19 99:14
112:15 114:19,21
119:23 120:7 133:4
200:25
**examples**
44:1 112:20 118:4
124:13 125:1,4
**Excel**
107:11 118:15
151:24

**exception**
209:18
**excess**
61:1
**exchange**
66:10 67:6 201:2
**exchanged**
66:20
**excluded**
37:3
**excluding**
53:15
**exclusive**
24:23
**exclusively**
42:3
**excuse**
152:17
**exercise**
126:3 214:12
**exhibit**
6:2 16:14,21 38:25
40:3 50:8 52:18
54:15 55:23 59:16
135:2 137:8,12
139:20 142:10
143:17 158:3 202:1
204:15
**exhibits**
6:21 41:7,19
**existence**
19:23 86:1 119:12
216:11
**exists**
118:1 151:23
**expand**
21:3 24:21
**expansion**
73:11
**expect**
43:11 84:5 92:24
93:24 94:6 97:1,5
98:7 99:15 186:22
**expectation**
174:24
**expected**

84:8
**expenditures**
186:23
**expense**
186:3,8
**expenses**
60:23 61:5 184:13
**experience**
63:1 83:22 88:1
89:10,11 98:17
103:10,14,20,21
**experiment**
118:10
**expert**
6:15 9:19 11:3 20:21
22:10,19,22 23:8
31:23,23 35:10 37:2
37:9 57:4 61:9
62:18 63:19 66:10
66:16,19,24 67:6,17
69:4,12 84:23 97:8
101:2 102:12
107:22,22 120:25
124:5 126:8 158:1
163:21 172:7
196:18
**expertise**
92:6,19 113:11
**experts**
15:24
**explore**
113:14 126:8,19
141:7
**extent**
19:11 42:15 63:2
105:18,18,21
109:11,23 169:4
210:9
**external**
18:16,21
**extraordinarily**
73:23
**e-mail**
48:15 135:13 136:3
136:14,22 138:4,10
139:17 140:4,10,13



142:14 166:20
**e-mailing**
140:11
**e-mails**
38:20

---

**F**

**F**
131:1 222:1
**face**
191:6,8
**facility**
145:18
**fact**
42:4 43:2,13 44:3
77:12 86:9,9 92:9
100:17 118:8 129:8
129:16 144:12
145:21,25 148:25
149:25 150:11
159:23 172:2,3
174:21 177:24
178:12 179:10
181:1,15 186:17
188:5,11,14 189:3
195:12,15,21
200:18
**factor**
128:22
**factoring**
179:20 181:1
**factors**
83:22 121:6 177:23
195:10
**facts**
64:13,14,18 129:8
198:4
**factual**
71:20 181:21
**fail**
190:17 191:6
**failure**
62:11 183:17
**fair**
9:20 13:6 14:19,24
14:25 17:1 18:11

21:23 31:14 35:2
38:12 39:25 40:13
41:22 42:17 45:4,22
50:14,20 52:7 53:17
58:3 59:6 62:19,20
64:23 68:7 69:11
71:18,23 73:7 74:2
74:24 79:1,16,16
84:17,25 86:13 95:1
99:22 103:8 106:20
108:25 126:4
127:11 128:15
131:13,19,19
134:17 141:3,6
145:9 157:17 159:6
160:7 161:2 164:4
176:22 178:11
180:18 187:19
189:25 194:3,8
201:6 208:16,22
**fairly**
18:1,2 35:21 53:5
73:24 106:25
**Fallone**
27:23
**false**
68:23
**familiar**
12:7,18 56:5 63:4
132:6 170:2 213:11
**fantasy**
212:18
**far**
106:15 163:18
**farther**
115:8
**fashion**
28:1 123:18
**fatally**
77:3
**federal**
22:15 34:1 56:10
**feel**
31:10 53:14
**feels**
79:20

**fiduciary**
60:3,18 69:23 70:4
**figure**
101:12 204:4
**file**
28:14 67:7,9,10
**filed**
55:19 67:12,13
**filing**
219:17,21
**filters**
40:16
**final**
22:3
**finance**
21:19
**financial**
13:8 18:8,17,17,21
38:13,14 60:25
61:14 62:9 66:16
70:10 77:17,18
110:13 118:5
119:12 120:9 124:6
124:14 133:4 139:4
156:15,21 159:2,2
179:5 180:13,15
181:14,19 182:1
183:18,25 184:1,4
184:18 185:22
187:11 188:8
191:18 212:15
**financials**
193:24
**financing**
128:4
**find**
26:14 51:19 53:18
201:17
**finder**
77:12 86:10 92:9
**fine**
10:11 15:6 22:12
52:25 54:19 130:19
137:23 140:3
152:10 202:5
**finish**

201:11
**firm**
17:10,21,25 18:13
19:22 20:5 23:21
24:7 25:6 167:17
168:10,18 169:6
172:4 215:2
**firms**
21:21 88:2 93:19
102:25 112:22
113:13
**first**
6:6 9:10,22 10:2 22:8
22:9,18 25:10 38:6
50:12 56:22 59:13
59:14 60:6,12 74:16
74:17,24 75:8,10,16
75:19 76:19 81:20
84:9 89:10 94:4,25
95:1,3 109:6 134:1
134:22 135:23
144:9 146:8 158:10
158:17,22 159:1
160:8,9 178:25
203:4,5,13,15 204:1
204:18,24 205:11
205:11 211:19
**Fisker**
209:19
**fit**
76:4
**five**
10:21 35:25 36:9
145:21
**five-minute**
54:18 216:23
**five-year**
148:2
**flag**
189:20
**flagged**
189:4 190:15
**flags**
191:4
**flawed**
77:3



**flexible**
130:11
**Flexner**
3:4 8:11
**flip**
45:1 64:1 87:17
  175:9
**flipping**
45:3,7
**flow**
93:6 107:13 160:25
  177:19 209:4
**flows**
158:19 159:19 164:8
**focused**
42:3 49:19 181:25
**focuses**
159:4,8
**focusing**
86:12
**folks**
26:18 27:14,17 42:20
**follow**
79:8 116:15 138:24
  208:19
**following**
207:13 219:10
**follows**
9:13 76:5 98:12,13
**follow-up**
30:19
**footnote**
28:17 46:5,10 133:17
  134:2,11 135:23
  137:3 139:10 142:1
  143:4,13,22
**Ford**
212:20
**forecast**
133:5 136:12 141:22
  161:18,22 162:1,6
  162:14
**forecasted**
139:5 144:15
**forecasts**
108:18 115:24

140:14,18,23 141:8
142:18,23 143:22
144:2,11 161:12
162:22,24 212:23
**foreclose**
39:20 41:24 120:5
**foregoing**
221:6
**forensic**
11:18,23 13:6,18
**Forensics**
26:8,12,17
**foreseeable**
105:20,22 145:8,12
  146:20 147:4,11,21
  147:22 148:13
  149:1 150:3
**forget**
203:7
**form**
30:24 39:8 40:4 45:5
  46:12 47:3 48:3
  49:3 52:9 54:3 58:4
  58:11 60:10 63:3,12
  63:21 64:7 65:9
  66:3,12,17 67:2,23
  68:13 69:2 70:20
  72:6 74:10 79:2
  80:11 81:13 82:6
  83:14 85:1,15 86:4
  86:16 89:5 90:7
  92:4,17 93:2 94:2
  95:20 97:6 98:9
  99:6 100:21 101:22
  102:10 103:7
  104:11 105:2,8,17
  106:7,18,21 108:14
  109:10 111:16
  112:19 113:9
  114:13 115:2
  116:14 118:2 119:7
  120:21 121:3,19
  123:2 124:8 125:10
  126:22 128:16
  129:13 132:1,12,20
  134:4 136:9 138:16

140:25 141:10
142:25 146:13
147:3,13 149:5
151:17 152:18
153:17,24 154:9,24
155:5,11,19 156:2,8
156:16 157:5
158:14 159:7,22
161:7,20 162:8
164:5,18 167:7,20
168:2 169:17 170:6
170:24 171:17
172:8,24 173:6,18
176:23 177:15
178:10 179:9,18,25
180:8,23 181:11,24
182:11 183:3
184:15 185:20
186:6,25 187:9
188:1,23 189:22
190:18 191:14,24
192:9,16 193:2,14
193:21 194:9,18
195:4,20 196:7,10
199:16 200:14
205:17 207:21
208:17 210:7
211:12 212:12
214:8 219:5,8
**formula**
202:24 203:3,4
**formulating**
156:24 204:20
**forth**
16:23 41:12 62:10
  65:24 67:25 68:4
  75:4 81:9 82:23
  83:21 87:9,10 89:15
  91:11,23 93:23 94:5
  95:8 100:2 103:13
  103:13 118:3
  178:14 187:8
  191:19 198:24
  202:25 222:10
**forward**
182:7

**forwarded**
139:3
**fought**
87:14
**found**
126:10 165:16 172:5
**foundation**
62:24 68:1
**four**
42:3 134:20 148:2
**Fourteen**
151:12
**frame**
35:14 153:14
**frankly**
87:12
**fraud**
11:17
**fraudulently**
60:23
**free**
25:16 201:9
**frequently**
111:19 114:1
**Friedman**
17:5,9,10 20:15 21:3
  21:8
**front**
15:14 201:22 219:18
**FTAG**
167:13,15,17 168:10
  168:18 171:16,19
  171:22,24 191:12
  191:17,22 192:14
  193:9,12,15,15
  194:20 196:4,6,9,16
  196:16 197:23
  198:1,11 199:20
  203:7,21,23 206:3
  207:1,17
**FTAG's**
198:15 206:6
**full**
90:16 202:3 205:10
**Fuller**
17:6,9,10 21:3,8



**function**
20:3 192:20,22
**functioning**
122:4
**functions**
192:25
**fundamental**
119:17
**funds**
38:17
**further**
45:16 46:2 76:25
77:16 141:7 144:10
148:9 149:16
217:14 222:13
**future**
115:25 141:15
158:19 161:13
162:6 177:25 178:4
178:7,13 185:5
194:6,7,16 196:20
216:17

---

**G**

**gain**
117:6 119:3,4
**Games**
37:11
**Gary**
37:19,20
**general**
74:11 83:22 85:4
95:17 96:8 104:13
104:22 128:10
133:23 142:15
177:8 212:20
**generally**
12:18 13:10 17:8,22
19:8 20:1 21:19
25:10 27:19 28:2,4
38:19 63:4,11,13
64:5 73:12 74:11
79:3 90:13 103:8
104:23 105:23
106:8 108:16,20
109:15 111:23,24

111:25,25 113:11
113:12,12 114:2
158:18 177:9
**generate**
25:11 49:21
**generated**
104:25 115:1
**generating**
146:18
**GENESIS**
1:12
**getting**
40:25 79:14 125:3
156:10 194:8 197:2
**give**
28:16 44:2 56:11
59:22 82:9 93:11
99:14,16 119:23
133:7,7 138:23
139:1,6 141:17
144:16 150:16
158:6 183:11 207:5
208:4 213:15,16
216:19,20
**given**
31:18,20 74:9 79:22
79:24 80:5 84:5,6
105:4 161:3,14
187:20 221:8
222:12
**go**
10:5 15:19 16:18
28:7 31:5,11 33:11
33:12,14 48:16 52:3
56:6 59:24 60:14,15
64:14 70:1 72:13
76:14 83:22 119:24
119:25 126:16
129:14,14,17,25
131:10 132:24
133:2,7 134:12,14
135:15 141:4
153:15 163:18
166:15 169:20
172:9,10 196:4
201:16 217:23

**goes**
19:14 22:17 23:4
26:6,11 29:1 41:14
78:11 102:20
126:10 156:20
206:24
**going**
11:11 14:4 15:3,22
16:8,10 22:24 27:12
30:19 31:5 33:20
34:15 35:20 36:11
38:1,24 45:18 46:2
49:7 55:16 56:3
68:3 69:7,24 71:5,6
76:1 81:19 82:8
87:19 89:8 94:25
96:14,16 99:8,10,10
99:20 102:18
103:25 104:1 109:3
111:21 112:25
113:18,22 118:16
118:18,19,19 119:9
119:10 120:13
121:20,23 122:7,7
123:7,8,16 124:23
125:20 126:6,16
127:11 129:7,23
130:3,7 136:25
137:15 142:15
145:12 148:1
150:24 152:9
158:24,25 163:7
165:10 176:18
182:7 186:16,17,21
188:6,9,16,21,22
189:4,12,12,13,20
190:9,14 191:3,4,10
191:12,19,22
192:19,20,22 193:1
193:19 194:14
196:25 197:6,7
200:2,4 206:3,8,9,9
206:11 207:6,7
212:13,25 216:13
**good**
9:16,17 26:2 27:8,9

27:10 31:10 37:20
51:5,6 54:17 130:17
217:17,20
**goodwill**
69:10,18
**Google**
37:8
**govern**
82:24 95:9,13,19
**government**
21:21
**grab**
213:16
**grabbing**
150:25
**graduated**
16:25 17:5
**grant**
79:5,9 83:19 91:4,22
93:24,25 94:7,13
96:2,4,14 98:7
**granted**
88:3 93:19 102:25
**grants**
92:25 103:18
**great**
19:15 37:21,22 72:24
**greater**
17:16 36:15 200:18
**grew**
23:11
**grounded**
87:8
**group**
17:25 19:25 20:7
21:17 24:15
**groups**
20:10
**grow**
23:10
**growing**
188:13
**guess**
9:23,23 11:4 23:14
29:17 35:14,19
38:23 39:4,24 51:10



54:7 56:7 67:13
75:11,18 77:5 82:1
98:24 99:25 112:10
114:6 136:6 157:19
173:13 198:13
213:21 216:14
**guesswork**
75:2
**Guggenheim**
155:4
**guide**
124:4
**guideline**
209:5
**guidelines**
198:1
**guy**
27:8,9,10 37:20,21
37:22 130:13
**guys**
55:2 135:7,9 217:19

**H**

**H**
6:1
**half**
23:19 196:1
**HAMPTON**
3:14
**hand**
222:18
**handful**
12:17 35:5 97:4
**handle**
26:11
**hands**
118:25
**Hannah**
3:16 9:4 43:23
**happen**
89:15 103:21 113:15
113:22 202:6 215:5
**happened**
23:1 145:17 174:19
**happening**
28:24 90:6

**happens**
89:21 91:5,6,9,10
113:24,25
**happy**
15:8 24:21 52:21
76:3 85:22 174:10
176:12
**harm**
60:17 68:21,25 69:5
70:2
**head**
44:14
**header**
104:3
**heading**
197:22
**hearing**
35:24 36:22
**held**
79:23 81:1,4 88:2,17
90:12,17 93:1,18
99:5 100:5 102:25
112:15,23 200:21
201:15
**Hello**
9:1
**help**
113:7
**helpful**
52:4
**hereinbefore**
222:10
**hereunto**
222:17
**high**
16:23 25:4 49:15
73:6 94:5 106:1,11
161:2
**higher**
191:8 200:19
**highest**
206:10
**highly**
87:11 98:19 100:9
212:25,25
**HIN**

1:11
**hired**
167:17 168:10,18
**historical**
77:17 111:14 118:8
124:15 161:14
162:20 212:15
**history**
159:3
**hits**
114:1,3
**hold**
125:12 169:24 178:4
178:7
**HOLDINGS**
1:11
**hopes**
113:17 115:24
**hoping**
112:24
**host**
119:14 123:13 128:7
**hour**
29:4 197:7
**hours**
29:19 30:17
**Howrey**
19:24,24,25 20:3,5
**Howrey's**
20:11
**Hudson**
3:7
**huge**
201:3
**humid**
19:15
**hundred**
204:4 205:13
**hundreds**
61:17 65:2,8 70:13
178:20
**hurdle**
196:7
**hurricane**
145:17
**hwigger@sheppar...**

3:21
**hypothetical**
78:14,15 210:1
**hypothetically**
44:24 88:12

**I**

**idea**
90:14
**identification**
16:14 55:24 59:16
135:2 137:8 139:20
142:10 143:17
158:3 204:15
**identified**
131:22 133:11
**identify**
214:4
**ignore**
145:25 146:22
**ignored**
122:18
**II**
69:21
**imagination**
166:1
**impediments**
200:18 201:15
**implied**
199:20 200:1 206:7
**important**
154:5,11 186:8
195:15 199:22
**Improper**
104:3 197:22 208:8
**inability**
62:11
**inaccurate**
40:20 104:4
**inappropriate**
212:9
**include**
13:16 33:25 42:5
52:20 78:25 91:4
202:15
**included**



13:17 30:2 46:19
116:20 139:5
146:11,15 149:4,7
166:19
**includes**
194:11
**including**
30:10,11 33:24 45:24
57:4 127:9,13
**income**
209:9
**income-based**
209:3
**incorporated**
177:18
**incorporates**
159:24
**incumbent**
147:15 148:8
**incurred**
68:11 181:10 184:14
187:21 196:6
**independent**
25:7 26:22 48:24
64:3,9,20 65:7
73:18 107:7,19
109:2 110:3 116:11
116:21 117:19
119:3 120:8 121:1
121:15 122:13,24
124:6 125:7,22,23
126:20 128:12
129:19 141:4
145:10 149:16
167:17 168:9 172:3
172:11,19 181:8
182:8 188:21
**independently**
119:4
**INDEX**
7:1
**indicate**
128:14
**indicated**
182:2 188:15
**indicates**

136:10,16
**indicating**
144:15
**individuals**
62:14
**industry**
119:13 123:12
**information**
31:4 41:3,4,15 42:5
43:16 48:19 52:12
56:19 85:5,6 104:14
104:24,25 105:14
105:19 107:8 108:2
108:2,4 109:9,15
111:5 112:8 115:23
123:9,10,11 146:16
146:17 150:6
168:14 174:12
181:19 185:21
216:13
**informative**
129:22
**infrastructure**
25:23
**inherent**
178:1
**inherently**
161:19
**initial**
38:10 41:21 66:9
67:5,6 82:20 95:5
98:7 160:14 199:14
202:13
**initially**
40:11 136:16 159:18
192:2,17
**injunction**
58:19
**inner**
64:12
**inputs**
203:4
**instance**
85:8 116:9
**instances**
186:20,21

**instruction**
7:3 48:10
**instructions**
101:18,24 102:4,5,14
219:1
**instrument**
58:9 192:1 193:5
**intend**
82:3 92:14
**intended**
200:17
**intending**
97:20 98:5,25
**intention**
46:22 47:9,18 92:1
**interact**
48:6
**interest**
77:20 78:16 81:23
82:24 83:2,4,20
85:14 89:1,18,20
90:17 94:8,16 95:9
95:14 96:15 97:2,25
98:2 100:19 113:5,8
200:20 206:6 215:9
**interested**
128:8 222:15
**interesting**
96:9
**interests**
200:22
**internal**
19:25
**interrelated**
75:21
**intervening**
93:5
**interview**
48:22,23 49:1
**introduce**
63:9 183:23
**introduced**
202:3
**introducing**
202:1
**introductory**

82:5
**inventory**
19:4 39:11
**invest**
114:25 157:2 171:24
193:10
**invested**
171:22 191:22
**investigate**
85:21 112:22 125:21
181:12 183:18
**investigated**
181:13 182:14 183:7
185:5
**investigation**
107:8,19 110:12,12
117:11 128:22
149:16
**investigations**
127:1
**investing**
191:9 192:18
**investment**
49:21 113:13,17,20
113:23 114:11
115:14 154:8,22
155:18 157:10
167:12,19 172:1
185:7 187:17
191:13,25 193:16
194:15 196:9
197:23 198:2,11
203:5,6,16 206:9
**investments**
112:25
**investor**
113:4 205:9 207:11
**investors**
112:17,21 114:8,23
114:24 153:23
154:7 155:17 157:2
157:7 191:5 197:1
215:2
**invests**
205:9
**invoices**



31:12
**involve**
13:15
**involved**
13:11 80:15,16
**involvement**
110:25
**IPO**
206:19
**irresponsible**
145:24
**issuance**
81:22 82:24 95:9,13
95:19 97:1
**issue**
32:4 48:19 92:8,20
94:10,18 96:7,12
97:13 159:11
188:22 189:5,13,20
190:9,15 191:4,10
191:12,19,22
193:20 214:11
**issued**
11:6 31:10 49:7
**issues**
21:22 39:18 45:14
67:7,8 157:13 181:9
181:13 200:13
**item**
41:6 187:15
**items**
47:13

**J**
**Jersey**
2:6 9:12 222:2,8
**job**
2:8 27:7
**John**
3:5 8:19 54:16 143:9
151:1
**joined**
8:20 9:3
**judge**
102:17
**judgment**

58:20
**July**
133:5
**jump**
80:13
**June**
24:24 112:6
**junior**
28:1
**jury**
35:1,4 72:3 101:18
101:24 102:3,5,13
102:13,18
**jzach@bsfllp.com**
3:10

**K**
**keep**
149:6
**key**
195:15
**kind**
13:4 17:8 20:14 24:9
34:24 38:2 52:1
70:15 76:5 83:10
**knew**
174:21,21
**know**
11:1,20 13:5 14:4
17:14 18:15 25:14
25:20 26:4 27:2,6
28:6,17,21 29:7,8
30:10 32:21 33:15
33:19 34:8,8,9
35:13 36:11 38:9,16
38:16,17,20,21 39:1
39:10,13,20,21
42:18,19,21 43:2,6
43:12,12,20 44:2,2
44:10,14,24 47:25
50:10 52:1,2 56:19
57:17 59:4 60:14
64:8,8,19,20 66:4,9
66:23 71:21 73:14
76:2,13 79:17 80:25
81:20 82:9 86:17,19

88:22 89:20,21 91:7
91:22 93:7 94:5
97:19 99:7,9,13,17
99:18,18 100:13,22
102:15 103:10,10
107:1 109:3 110:1
110:23,24 112:5,11
112:21 117:12
119:11 122:20
123:3 124:9 125:5
125:17 126:14
128:2,23 129:15
131:14 134:1,9,13
134:15,15 135:7
136:21 137:18,25
142:17,20,22
143:21 144:25
146:14 149:7
151:18 153:5,6
156:9,11 157:7,11
160:5 162:2,17
164:6,25 165:12
166:21 167:3,5
168:17 171:9
174:13 178:25
179:4 180:5,12
187:1 193:10
194:20,21 195:21
196:11 202:6
208:19 211:2
212:24 216:14
**knowable**
104:15 105:1,5,6,16
108:4 146:25 147:9
147:20
**knowing**
99:19 193:19
**knowledge**
138:3
**known**
104:14 108:4 113:12
145:8 147:8

**L**
**label**
165:22

**labeled**
60:11
**lack**
146:17 189:8 200:13
**lag**
111:24
**language**
174:13
**large**
14:13 36:12
**largely**
41:5,5
**larger**
206:25
**late**
145:13 148:14 149:2
182:14
**latitude**
97:10
**laughable**
87:21
**law**
19:22 21:16,20 60:3
92:19
**laws**
102:7
**lawyer**
34:3 37:17 58:12
**lawyers**
20:3 102:15
**laying**
62:23 126:15
**leading**
211:22
**learn**
185:17
**leave**
72:20 89:25
**leaves**
89:16
**LECG**
21:13,15 23:7,13
**left**
17:20 23:4 111:2
131:8
**legal**



1:22 2:15 8:12,14
50:10 79:14 92:8
101:16
**legality**
92:10
**legally**
92:3
**Lehman**
27:19
**lender**
197:1
**lengthy**
89:9
**letter**
204:19 205:24
**let's**
14:22 29:14 33:11
34:4,5,12 35:14,14
43:15 44:6 48:16
52:6 54:23 55:2
59:11,12,24 69:21
70:1 72:13 73:1
77:15 79:18 87:24
88:13,16,21,23
96:13 131:20
132:24 133:2
134:19,21 142:4,6
150:15,15,15
157:20,24 165:9
183:11 197:8
212:21 216:22
217:3,3
**level**
16:23 18:23 25:4
45:18 49:15 73:6
75:7 83:21 94:5
96:8 106:2,11
129:22 161:2
**leveraged**
212:25
**License**
222:21
**life**
103:17
**likelihood**
194:23

**Lim**
166:20
**limit**
99:18
**limited**
37:3 41:25 138:9
**line**
7:4,8,12 20:14 52:2
187:15 220:3
**lines**
62:1 71:4 139:1
182:21
**lion's**
41:15
**liquid**
194:8
**liquidate**
90:18 91:1 99:4
206:16
**liquidation**
91:6 199:24 206:16
206:18,20
**liquidity**
90:16 93:8 96:19
192:3,22 197:3
199:24 200:8,13
215:13
**Lisa**
166:20
**list**
40:7 41:6,8 42:8
52:21 59:20 168:13
**listed**
40:3 47:1,13 48:23
51:1 57:11
**listing**
97:3
**lists**
33:19,19 207:14
**litigated**
101:15
**litigation**
11:24 13:16 14:11
20:5,20 21:5 23:18
56:11 60:8 63:2
66:9,16,20

**little**
16:18 38:1 55:3
94:23 110:21 148:9
198:9
**live**
19:8
**LLC**
1:11 21:13 26:11,12
**LLP**
3:4,14 8:11
**loan**
192:20,23,25
**log**
43:7
**long**
42:8 119:11 130:2
197:6
**longer**
12:15 19:23 166:25
**look**
14:16 22:11 28:7,22
53:18 56:22 68:19
72:21 76:15 84:16
91:20 110:7 112:17
118:5,8 124:13,14
124:17 127:8
129:15,25 131:20
134:14 141:19
142:4 150:16,21
158:11 160:18
161:23 163:14
175:2 185:17
204:18 207:8,8
209:21 212:20
213:13 216:20
**looked**
52:14 84:12 103:18
125:7 129:10 135:8
138:10 162:19,20
176:7
**looking**
40:17 60:1 84:14
104:8 109:5 112:1
113:4 121:13 125:6
127:21 153:15
157:2 181:20

184:17 185:16
206:23 210:4
**looks**
19:16 24:16 39:4
50:10
**loop**
59:11 173:14
**loose**
24:19
**lose**
113:22
**loss**
57:3,9 61:1,17,22,23
65:2,8 68:10 70:12
70:17 185:16 187:7
**losses**
183:24 184:11,17
187:21
**lost**
65:12,19 69:8,13
70:24
**lot**
21:25 111:1 114:2
201:15
**low**
206:7
**lower**
18:23
**loyalty**
57:2 60:3,19 61:12
**LUI**
1:11,12
**lunch**
130:5,13,23 131:7
**luxury**
61:15 70:11

---
## M

**M**
2:4 9:11 222:6,20
**Magna**
1:22 2:8,15 4:6 8:12
8:14
**main**
24:3
**Majcher**



49:8,10,11 50:19
53:24 136:10,17
138:5 166:20
188:14 195:23
**Majcher's**
52:6 148:16 152:21
168:22
**majority**
14:21 31:1 206:10
**making**
82:17 118:9 126:12
154:7 155:17
167:18 177:25
182:18 208:7 219:8
**management**
18:19 25:7 119:25
189:6,7 197:23
**management's**
111:5
**manager**
17:20 27:18,20,21,22
48:4
**mandate**
98:15
**manner**
78:21 124:15 182:21
207:13
**manufacturing**
181:9,13
**mark**
15:22 16:8 55:16
59:12 134:19,21
137:4 142:6 157:24
204:8
**marked**
7:5,9,11,13 16:13
55:23 59:15 135:1
137:7 139:19 142:9
143:16 157:22,23
158:2 204:14
**market**
80:24 88:3 93:20
100:9 103:1 117:11
123:11 186:15
208:15,20 209:11
209:16,16 214:21

**marketability**
160:4 164:3,23,25
165:2,4 173:17,21
176:21,25 200:12
200:17 201:5,7
**marketable**
81:2
**market-based**
209:4 212:7 215:6
**marking**
143:13
**marriage**
222:15
**Maryland**
19:12 27:4
**matches**
135:22
**materials**
38:11,13,25 39:1,5,6
39:12 40:1,11,24
41:8 42:25 44:10
46:20 47:2,13,14,21
49:22 50:9 168:12
168:13 180:16
**math**
53:20 118:20,21
203:8 214:14
**matter**
8:5 9:20 13:15 23:17
26:6 29:9,23 32:9
41:21 53:7 54:2
74:23 76:11 82:20
95:5,17 121:12
129:16 176:13
185:11 199:25
222:16
**matters**
14:14 22:22 23:20
24:5,9 25:18 27:20
33:20 77:11,12
**mean**
10:18 23:12 24:18
25:1 28:7,15 31:25
34:9 41:9,10 44:19
45:23 60:11 62:20
62:21 65:21 66:1

75:18 77:24,25 78:9
79:9 82:8 86:18
93:7 96:23 99:12
101:3 104:23 105:6
109:18 113:25
115:17 118:11
121:23 128:17,18
130:11 138:4
146:14 149:7
151:18 152:19
154:10 156:3,11
157:11 159:11,11
159:12 161:1
170:11 180:12
186:16 187:13,14
188:5 189:12 191:2
191:18 193:8
196:12 200:10
208:20 213:22
215:16 216:12
**meaning**
13:25 35:17 40:23
189:13
**meaningful**
62:12 76:9 109:12
110:17 127:3 164:8
**means**
189:15
**meant**
64:20 148:20 177:10
200:12
**measure**
77:1
**measured**
162:21
**mechanics**
38:2 63:1 107:12
151:22 175:10
**meet**
62:12 117:25
**meets**
108:3
**memory**
10:18 36:8 48:1
179:3 199:7
**merger**

91:11
**met**
124:16,17
**Microsoft**
28:14
**mid**
17:15 184:3
**middle**
144:21 145:13
**mid-Atlantic**
17:16
**mid-size**
17:15
**mid-year**
184:3,7
**million**
192:13 193:9,12,15
204:4,25 205:3,10
205:13
**millions**
61:17 65:2,8 70:13
148:3 178:20
**mind**
22:11 54:17 147:21
216:10
**minority**
80:18,19 88:17,17
90:17 91:1,8,9
92:25 93:25 100:4
**minute**
173:22
**minutes**
56:4 82:16
**mischaracterized**
170:25
**misrecalling**
12:16
**misremembering**
137:22
**misrepresentations**
68:22
**missed**
212:23
**misses**
114:1,2
**misspoke**



148:21
**mistaken**
53:13
**model**
107:13 160:25 213:4
**models**
107:9
**monetary**
60:17 70:2 78:4,4,25
81:11
**money**
177:22 186:14
188:17 191:5,23
196:5 215:4
**MONMOUTH**
222:4
**month**
14:7,7 31:3 196:1
**months**
49:18 211:22
**moot**
164:11
**morning**
9:16,17 10:1
**moron**
121:24
**morons**
121:10,23
**Motors**
212:20
**move**
25:7 54:14 69:21
103:24 183:12,13
197:19
**moved**
21:9 24:15
**moving**
35:22 144:8
**Mullin**
3:14 10:13,15 11:5
43:22
**Mullin's**
11:5
**multiple**
60:18 70:3

---
**N**
---
**N**
3:1 4:1 5:1 9:9,9
131:1,1,1
**NACVA**
12:13
**name**
6:2 27:18 30:3 49:8
168:17 170:1
219:11
**named**
27:22
**names**
16:5 28:7
**narrative**
46:5
**narrow**
94:24 100:1 108:8
**narrower**
98:24
**narrowly**
64:24 164:14
**natural**
118:10
**nature**
119:10 124:17 156:6
156:10 161:12
198:5
**necessarily**
31:2 39:17 40:20
42:7 45:8 71:3
75:25 98:10 178:15
**necessary**
26:23 173:20,21
**Ned**
1:19 2:2 5:4 8:4
67:17 221:3
**need**
14:16 25:2 45:10
52:24 122:22
161:22,23 164:2
166:15 201:5
**needed**
41:3,4
**negative**

212:24
**negotiate**
103:3
**neither**
82:20 95:5,24,25
**net**
183:23 184:17
185:16
**never**
35:10 91:23,24
103:13 111:20
212:22
**new**
1:2 2:6 3:8,8 9:12
105:14 174:12
201:1 222:2,8
**NFLPA**
34:22
**nitty-gritty**
25:2
**noncomparability**
214:11
**nonlitigation**
24:4
**nonlitigation-related**
14:14
**nonmeaningful**
214:15
**nonrefundable**
179:24 180:6,19
**nontraditional**
21:4
**Non-Comparable**
208:9
**non-controlling**
88:1 93:18 98:14
99:3 102:24
**non-dispute**
13:25
**non-litigation**
111:13 118:25
**non-marketable**
165:8
**non-written**
90:15
**NORMAN**

1:10
**notary**
2:5 9:11 219:18
222:7
**notations**
15:12
**note**
51:14
**noted**
15:11 219:9 221:9
**notes**
50:3,4,6
**notice**
2:2 165:23
**noticing**
8:19
**November**
31:5 222:18
**number**
8:3 27:24 35:2 36:12
40:24 68:10,15 72:2
81:11 88:23 90:4
106:5 118:12 121:5
132:17 135:16,17
135:22,23 160:16
164:16 204:1,7
206:12 208:24,24
**numbered**
56:7
**numbers**
62:21 107:15 118:16
133:7 139:6 144:16
152:16,17 185:17
205:16,22
**numerator**
203:8,9,13
**numerous**
62:13,13 69:8 76:23
**NW**
3:17
**N-A-C-V-A**
12:14
**N.A**
1:11

---
**O**
---



**O**
131:1,1,1
**Object**
30:24 39:8 40:4 45:5
46:12 47:3 48:3
49:3 52:9 54:3 58:4
58:11 60:10 63:3,12
63:21 64:7 65:9
66:3,12,17 67:2,23
68:13 69:2 70:20
72:6 74:10 79:2
80:11 81:13 82:6
83:14 85:1,15 86:4
86:16 89:5 92:4,17
93:2 94:2 95:20
97:6 98:9 99:6
100:21 101:22
102:10 103:7
104:11 105:8,17
106:7,18,21 108:14
109:10 111:16
112:19 113:9
114:13 115:2
116:14 118:2 119:7
120:21 121:3,19
123:2 124:2,8
125:10 126:22
128:16 129:13
132:1,12,20 134:4
136:9 138:16
140:25 141:10
142:25 146:13
147:3,12 149:5
151:17 152:18
153:17,24 154:9,24
155:5,11,19 156:2,8
156:16 157:5
158:14 159:7,22
161:7,20 162:8
164:5,17 167:7,20
168:2 169:17 170:6
170:24 171:17
172:8,24 173:6,18
176:23 177:15
178:10 179:9,18,25
180:8,23 181:11,23

182:11 183:3
184:15 185:20
186:6,25 187:9
188:1,23 189:22
190:18 191:14,24
192:16 193:14,21
194:9,18 195:4,20
196:10 199:16
200:14 205:17
207:21 208:17
210:7 211:12
212:12 214:8
**Objection**
32:23 196:23
**objective**
73:18 107:7,19 109:2
110:4 116:11,22
117:19 120:8 121:1
122:14,24 124:6
126:20 128:12
145:10 149:16
172:11,20 173:4
181:8 182:9
**objectively**
119:4
**obviously**
58:13 62:9 73:9 82:8
99:7 101:3 144:21
**occasion**
51:7
**occasionally**
28:20
**occasions**
90:11 104:24
**occur**
31:3 36:23 44:3,3
47:23 104:9 106:4
198:19
**occurred**
31:9 39:21 43:19
47:4,7 48:9 72:4
109:12 111:15
**occurs**
105:14 111:19,20
206:21
**October**

1:21 2:3 5:18 8:7
176:6 221:6
**offer**
71:2 73:17 82:12
92:14 96:2 164:22
174:4 176:21
**offered**
27:7 35:10 62:6
63:18 68:14 69:3,12
69:15 70:23 71:1,14
86:13 100:25
**offering**
30:22 44:18 57:9,13
57:13 59:3 61:4,9
61:21,25 65:10,17
68:24 72:1 78:3
86:1,5 92:9,20
94:20 95:25 96:24
101:9 107:16
122:11 163:1,4
**office**
19:10 25:15 26:14
**offices**
19:10
**oftentimes**
13:14
**Oh**
43:18 139:13 140:8
165:22
**okay**
10:17,22 11:10 12:6
12:10 13:20 15:15
15:21 16:3,7,20
17:3 18:4 20:12,22
22:2 23:6 24:25
26:16,24 27:11,16
28:8,8 29:6 30:7,18
32:14,19 33:10
34:23 35:12 36:2,10
37:12,23 38:22
39:23 44:4 45:12,18
46:7,23 47:11,24
49:25 50:7,16 53:1
53:12,23 54:6,11,13
55:4,25 56:14,17,21
57:22 59:8 60:5

67:11 69:19 72:9,12
74:15 77:9 78:23
81:18 82:14 83:7
87:3,6 89:24 90:22
94:14,22 96:13
102:2 103:23
104:20 109:21
117:4 119:22 122:6
123:19 130:15,18
131:6 132:9,23
133:15,21,25 136:1
136:4,20 138:6
140:2 141:14 144:4
145:5 147:24
148:23 149:10
151:8 152:14,25
155:14 156:13
158:21 160:19
162:11,12 163:13
163:19 164:13
166:6 167:24 169:8
172:17 173:2,12
174:7 178:5 182:6
183:9,15,20 184:5
184:10,20 185:12
185:15 194:2 197:5
197:9,18,21 199:1,9
200:2 202:12,20
203:11,24 207:4
208:1 209:12
210:16 211:1,15
213:14 216:18,25
217:5
**old**
140:13
**once**
27:7 42:2 50:24
**ones**
131:16
**one-for-one**
36:20
**one-page**
135:13
**ongoing**
146:17
**open**



99:24 135:9,11
**operate**
101:15
**operating**
184:17
**operation**
80:3
**operational**
190:21
**opined**
97:14
**opining**
55:15
**opinion**
32:13 57:9,13 59:4
61:4,9,22 62:1,1
65:10,17 68:24 69:4
69:12,16 74:17,24
75:7,17,19,24 76:7
76:13,17,24 77:16
81:8,15 82:17 86:1
86:5,13 88:25 90:23
91:14,16 92:10,14
92:20,23 95:25 96:2
96:24 102:9,20
105:3 107:2,2,17,21
122:11,21 129:6
144:20,24 146:7,25
156:25 161:3,17
162:5 163:4 164:14
164:22 165:3 166:8
168:11 173:5 179:8
186:5 187:20,22
188:6,10 189:12
197:24 198:3
204:20 208:13
213:22 215:19
**opinions**
44:18 45:25 65:23
68:1,2 71:1,15 73:7
73:18 75:14 81:16
82:11 86:8 102:12
107:25 159:15
**opportunities**
69:9,14
**opportunity**

116:10
**opposed**
80:2,3 85:6 89:3
194:7
**option**
19:4 90:11
**oral**
2:1 85:12 86:2,6
87:18 90:15 92:2,10
92:15
**order**
116:23
**ordinary**
207:13
**organize**
42:20 216:24
**organizes**
40:16
**orient**
59:24
**oriented**
13:25
**original**
219:20
**outcome**
80:13 120:13 129:24
222:16
**outcomes**
113:19,19
**outline**
73:5
**outlines**
151:15,19
**outset**
16:19
**outside**
12:23 20:10 21:25
25:16 28:22 48:22
92:5,6,18 102:8
114:8,23 115:14
120:18 121:9
125:22 155:24
157:2 169:6 182:12
183:4
**overall**
35:7 45:25

**overcome**
214:10
**overlap**
71:20 211:3
**overlapping**
183:22
**oversight**
47:4,7,13
**oversimplification**
106:23
**overwhelming**
171:13
**owned**
94:1 200:25
**owner**
91:2
**ownership**
128:6 199:19 200:20
200:22 203:22
206:3
**o'clock**
2:3 55:7,9 130:22
131:2 197:13,14
217:8,10 218:2

_____
**P**
_____
**P**
3:1,1 4:1,1
**page**
5:3 6:2 7:4,8,12
43:10 59:23 60:1,15
81:20,21 104:2
138:25 163:7 175:4
175:9,12 183:14
187:8 197:20
198:11 202:6,7,21
204:19 208:7
211:18 220:3 221:1
**pages**
33:17 56:7
**paid**
96:17 100:19 194:5
196:6
**Panini**
34:19,22
**paper**

28:13 107:16,17
118:15
**paragraph**
28:21 59:23 60:16,22
61:10 62:4,8 64:25
68:19 73:3,4,5,8
75:9,20 86:14 87:11
97:21 133:2,3
141:20 144:8
148:25 207:24
211:20
**parlance**
189:14
**part**
10:9 11:18 12:25
20:24 23:9 25:9
28:25 37:3 47:5,5
54:10 56:10 68:19
78:3 85:10 90:9
97:8 106:3 113:4
115:19 116:4,4
122:20,20 144:19
153:15,21 155:17
158:9 160:20 161:3
166:7 168:1,14
177:5,6 183:16,16
187:20,20 190:14
191:3 201:18
204:20 208:4,6
**participate**
122:2
**participated**
115:12 136:7
**particular**
62:3 94:18 138:8
**particularly**
51:19 179:11 211:13
**parties**
3:2 4:2 8:15 49:23
56:11 66:10 92:3,16
103:3 125:7 199:13
222:14
**partner**
21:2
**parts**
51:15 52:10



party
8:19 37:9 79:20
90:10 115:14
155:24
passage
148:10
pattern
118:9 145:21
pay
90:4 94:15
payback
193:1
payment
98:15 196:21
pdf
202:7
pejorative
28:1 87:21
Pennsylvania
3:17
people
25:20 28:15 40:11,12
43:7,22 121:10
130:11
perceive
179:16 196:19
percent
77:20 78:16 81:11
88:23 94:16 96:13
96:15 192:6 200:2,3
200:3 201:13,14
215:9
percentage
90:3 160:14 164:24
199:19 200:7 201:4
201:13 203:20,23
206:3,17 207:1
Perfect
69:20
perform
18:21 71:11 112:2
154:14 215:8
performance
62:10 77:17 79:4,5,9
79:10 110:13
117:13 118:5

124:14 138:18
141:12 161:13,15
162:21 181:14
182:1 183:18
212:16
performed
109:14 162:23
performing
17:23
period
14:17 111:24 115:25
145:25 153:22
157:1 175:24
181:15
periods
14:12 212:1
person
88:16,22 103:4
147:24
personal
26:10 50:25 103:21
169:1 185:7
personally
30:16 43:4 90:10
98:18 115:17,18
156:22
perspective
129:2
pertain
64:18
pertinent
39:17 53:9 94:10,19
phone
48:16
phrase
123:5
physical
15:13
pick
88:22
picking
97:23
picture
44:5
piece
107:16,17 118:14

piecemeal
74:20
place
19:17 182:3 198:6
213:1
placed
155:16 156:1,7
plaintiff
1:6 3:12 8:25 9:10
57:25 58:10 63:8
64:2
plaintiffs
35:18
plan
213:5
planning
38:14 128:6,10
plans
19:4 90:11 128:7
play
178:8,12,13
plays
187:22
please
9:6 43:21 87:1
151:12 158:15
plug
149:8
plus
203:14,15
point
33:2 51:6 54:17
56:23 57:15 87:14
87:15 95:1 100:23
106:11 112:25
126:5,6 162:2 184:3
184:7 188:16
195:10,17 213:6
216:9
points
75:23 211:17
portfolio
18:2
portion
13:10 169:14
position

22:4 68:22 109:5
110:3 125:13 147:6
possibility
112:22 113:21
131:17
possible
40:5 46:11 49:12
62:5 128:17,18
162:5 206:8 209:18
potential
23:16 24:3 74:4
112:17 114:11,15
115:14 153:10,22
154:2,6 155:16,18
181:21 194:22,23
197:2
potentially
14:6 22:10 31:22,23
40:1 44:17 89:9,17
93:4 113:14 128:14
148:14 150:13
152:22 157:2
198:16 215:1
practice
11:19 12:21 13:1,4
20:10,17,24 21:4,6
23:9 28:25 35:8
147:17 163:23
practices
20:1
preceding
145:21
precise
71:25
preclude
91:20 99:12 131:17
predates
23:3
predicated
159:15
predominantly
35:8,16
prefer
150:22
preferred
198:15 199:5 205:8



205:11 207:12,18
**preliminary**
83:21
**premise**
163:25
**premised**
86:14
**prepare**
18:17 32:17
**prepared**
9:18 18:18 37:25
38:15 49:23 62:14
71:13 110:24
124:16,19,20 128:9
128:24 133:5,12
134:3,10 136:15
141:21 142:17
146:4 150:9,12
152:3,6 154:17
162:22 166:21
167:10 182:4
**preparing**
18:8 29:11 39:14
110:14 128:9
149:15 166:7
208:15
**prepping**
33:13
**present**
3:2 4:2,4 8:16 32:12
75:8 144:12 154:11
154:12
**presented**
62:7 72:3 73:17,20
75:1 76:8 165:6
**presenting**
75:7 97:7 101:1
**presently**
12:19
**presents**
164:23
**president**
21:10
**presumably**
78:5,19 79:24 193:2
**presume**

151:23
**pretty**
17:24 31:14 41:9
130:10
**previous**
124:11 137:12
164:20
**previously**
162:22
**pre-revenue**
184:23 185:2,6,9
186:8,13,24 188:20
189:21 212:8
**price**
91:4,5 114:11 206:18
**price-to-earnings**
210:2
**primarily**
17:12 18:10,14,25
30:25 31:7 38:10
**primary**
20:2
**principal**
23:17 24:3,4
**principle**
104:13,22 119:17
**principles**
101:16 110:10 124:1
124:25
**prior**
23:5 30:15 31:7,9
33:15 40:24 42:1
94:4 167:18 207:10
207:19 209:21
210:4
**private**
113:5 114:24
**privately**
79:23 81:1,4 88:2,17
90:12,17 93:1,18
94:1 99:5 100:5
102:24 112:15,23
200:20 201:14
**probably**
10:10 11:6 14:24,25
23:13,23 29:18 46:1

49:7 52:20 63:23
88:7 186:21 188:9
194:19 201:24
**problem**
214:2
**problems**
76:23
**procedural**
121:12
**procedurally**
77:11
**proceeding**
13:12 101:15
**proceedings**
12:24
**process**
44:3,15 47:19 53:3
63:5 170:22 198:19
**produce**
196:6 213:7
**produced**
182:19,20 193:3
212:22
**producing**
181:21
**production**
7:7 182:10
**productive**
126:3
**products**
186:15
**professional**
11:11,15,19,21 13:4
14:9 16:23,24 23:15
26:4 103:20 111:18
117:18
**professionally**
98:18
**professionals**
20:6,9 21:18,18,19
24:6 120:19 121:15
**proffer**
174:1
**proficient**
107:11
**profile**

196:20
**profit**
115:1,16
**profitable**
212:11
**profits**
211:25 213:7
**programs**
43:6
**progress**
208:7 213:4
**progressed**
17:19
**progression**
213:6
**project**
158:18
**projected**
148:3 178:18,20
**projection**
71:21 152:16 154:19
164:1 177:25
**projections**
61:14 62:13 70:10
71:12,12,22 104:4
106:4,12,13,15,17
108:10 109:6,8
110:4,16,23 114:9
115:20,23 116:12
116:23 117:7,20
118:7,9,17,18 119:1
120:2,10,17 121:2
121:14,18 122:15
122:19,25 124:7,15
124:17 126:15
127:3,10,19 128:9
128:15,23 129:4,11
129:21 131:12,23
132:6 133:4,11,17
134:2,10 136:8
137:25 138:9,15
139:4 141:15,21
144:14 146:3,19
147:25 148:5
149:13 150:8 152:3
153:2,6,11 154:6,17



154:22 155:3,9,15
155:25 156:6 157:3
157:14 158:12,18
159:5,14 161:4,9
164:8 166:11,18
167:6 170:4,23
171:11,15 172:4
175:21 177:14,17
178:7,12,14,16,17
179:16 182:3,22
187:23 195:11
**projects**
162:1
**promises**
68:23
**promptly**
219:21
**proportional**
76:20
**propose**
160:21
**propounded**
221:9
**prospects**
111:6 185:6,8 212:16
**prove**
58:1 63:8
**provide**
25:14 31:23 71:7
90:16 154:6 192:2
192:19
**provided**
20:1 21:19 22:19
38:6 39:7,16 40:2
40:11 43:17 52:13
71:14 116:12,23
117:8 170:4 184:6
193:23 203:21
219:14
**providing**
20:21 23:20 39:13
102:11 112:23
192:13
**provision**
207:24
**provisions**

97:11
**public**
2:5 9:11 20:17 41:11
153:15 219:18
222:7
**pull**
72:18,22 133:22
150:20 157:21
**pulled**
15:7
**purchase**
194:7
**purchasing**
113:8
**purported**
77:20 81:23 83:1,3
94:16 96:20 97:24
98:1 150:1
**purports**
198:7
**purpose**
121:25 124:19 127:4
127:9,18 129:21
137:25 140:23
142:20,22 144:1
153:2,6 167:5
177:20 199:15
215:1
**purposes**
51:18,20 53:15 96:6
122:25 127:20,24
127:25 128:1,3,5,10
128:14 129:3,11
144:25 185:7 187:5
206:12 208:15
209:16
**pursuant**
2:2 83:18
**pursue**
25:16
**purview**
28:5 109:16
**put**
15:12 35:14 37:16,17
42:1 46:4,10 48:13
51:11 72:18 99:10

107:8 118:14
142:13 151:3
165:10 175:21
177:3 187:8,15
191:5 193:12
201:21 209:25
216:19
**putting**
28:12,13 146:24
192:14
**P&L**
137:21
**p.m**
130:21,23 131:2,4
197:11,12,14,16
217:9,10,12 218:1,3

---
**Q**
---

**qualified**
96:1
**quantify**
78:19
**quantity**
199:18 200:7
**quarreling**
107:13
**quarter**
14:6,6 148:4
**question**
13:2 30:20 33:25
51:3 52:3 58:6 64:9
66:5 71:7 79:13
86:9 87:2 92:14,19
94:23 95:15 97:23
98:3,22 99:13,19,24
100:24 112:10
114:6 117:22 124:9
132:2 137:24 152:6
158:15 164:19
171:1,9 173:9
180:25 187:2
188:24 189:18
194:19 196:15
198:13 205:19,19
208:19
**questioned**

155:24
**questions**
69:25 71:16 82:10
99:8,9 133:23
136:25 137:16
142:16 143:20
157:13 173:8
217:15,19,22 221:8
**quick**
31:15 197:8 216:22
**quickly**
68:18 142:4
**quite**
11:18 27:23 87:12
111:3 145:20
208:19
**quo**
89:4

---
**R**
---

**R**
3:1 4:1 9:9 131:1
222:1
**Rabinowitz**
6:16 30:5,12,15 31:9
32:22 40:25 41:13
49:6 53:10 63:18
66:2,23 67:21 72:15
73:17,21 74:1,13
75:1,5 76:8,15,23
78:3,6 82:21 84:6,7
85:17 87:13 94:11
94:19 95:6,22,24
96:7,11 97:13
100:25 101:6 104:6
104:17 106:14
107:6 108:11 109:7
115:5 118:13
119:18 122:5,11
129:10 131:13,23
144:11,15 145:1,24
150:19 151:15
152:22 157:23,24
158:2,9 159:14,20
163:2,9,10 165:7
166:11 168:15



172:14 173:16
176:20 179:12
181:2 182:22 184:9
187:23 195:12
198:7 201:22
208:13,23 209:15
210:10,19 211:5,10
211:22 213:10,20
216:6
**radar**
145:18
**raise**
38:17 49:20 128:2,2
**raised**
127:18
**raising**
67:7,8 156:5
**ramifications**
93:4
**range**
113:19
**ranks**
17:19
**rate**
159:25 160:9,14,21
160:22 163:2,5
164:3,3,10,15,23
165:1 173:16,20
174:2 176:9,22
177:6,10,12,20
192:6
**ratios**
210:3
**reach**
43:22 128:19 161:21
171:2,5,5,13
**reached**
53:6 82:12 87:7
150:7
**reaching**
107:20,24 120:12
127:2 209:20
**read**
28:15 52:7,10,11
54:8 73:23 74:21
75:12 93:15 94:4

95:4 129:17 136:3
143:9 152:20 219:3
219:4 221:5
**reading**
169:9
**reads**
61:11
**real**
34:3
**reality**
115:9
**really**
14:17 20:19 22:14
31:20 53:9 66:4
68:18 96:10,10
97:12 113:10
126:13 154:10
156:9 201:4
**reason**
21:1 63:22 118:6
121:22 156:17,23
175:19 182:3
191:16 193:22
195:25 219:6,10
220:3
**reasonability**
170:22
**reasonable**
78:11,21 147:24
170:5 172:5 173:4
**reasonableness**
73:19
**reasonably**
75:2 76:9 77:4
104:15 105:1,5,6,16
105:19,21 145:8,11
146:20 147:4,11,21
147:22 148:12
149:1 150:2 172:7
177:19
**reasoning**
170:13
**reasons**
25:6,13 64:4 78:7
81:9 87:8 128:7
182:9,17,18 183:1

**rebut**
32:21,22
**rebuttal**
9:19 67:17 173:25
**recall**
23:2 24:10,11 28:24
35:6 38:8,12 49:12
50:1 51:8,15 52:15
54:4 76:18 84:14,14
84:16,18 106:6
108:13 130:1
139:24 143:23
152:19,23 153:4,8
153:18,25 154:1
155:20 160:17
165:14,15 166:14
166:22 167:8,21
168:3,5,20 169:3,9
169:12 170:3,7
171:4 180:1,3,13,25
185:13 204:2 209:1
210:9 211:6 213:12
**receive**
80:20 84:2 89:18
219:22
**received**
38:12,18 40:24 74:5
80:8 180:7,20 188:5
209:23
**receives**
103:4
**receiving**
30:15
**recess**
55:8 130:23 197:13
217:9
**reckless**
70:8
**recognizes**
189:7
**recollection**
10:4 33:1 49:14,18
51:23 54:9 116:7
117:1,10,15 136:7
140:19 155:1,7
169:18,21,25

179:19 185:23
191:15 199:10
**record**
8:2 44:6 50:2 55:5,10
93:16 100:17
108:23 119:12
130:20 131:3 148:2
148:22 176:17
197:10,15 217:6,11
217:23,25 222:11
**recorded**
144:13
**records**
10:6
**recovery**
196:7
**recruited**
21:6,11
**redemption**
81:23 83:2 91:8 93:8
96:19 97:25 98:15
**refer**
78:9 106:24 124:11
164:20 166:16
**reference**
73:9 82:21 95:6
133:19 136:8 140:6
168:4 179:3 180:2
204:3 209:24
**referenced**
143:12 189:3
**referencing**
175:7
**referred**
93:15 185:4
**referring**
29:10 116:16 138:5
159:23 160:6
**refers**
103:2 167:13
**reflect**
39:5,6 75:3 188:21
192:8
**reflected**
22:20 36:3 180:14
183:24 185:21



**refresh**
136:6 169:25
**refundable**
179:23
**refusal**
25:11
**regain**
196:14
**regard**
97:20
**regardless**
47:15
**reimbursed**
60:23
**relate**
39:18 62:7 92:23
101:11 102:5
**related**
11:23 12:5 13:10
14:10 31:4 38:13,20
40:2 48:18,19 57:14
61:9 62:2,3,8 70:24
81:22 91:4 97:22
167:21 185:10
222:13
**relates**
94:9 97:13 208:13
**relating**
29:21 56:20 61:4
63:9,10,19 70:17
85:13 90:25 96:24
98:6 99:3 100:4,5
101:18 138:14
169:3
**relationship**
25:3 64:12 89:22
**relative**
61:14 70:9 71:11
120:15
**relatively**
49:5
**Relativity**
43:5
**relevance**
45:11 175:24 205:21
**relevant**

41:16 44:17 45:14
51:20 64:17 71:22
82:23 95:8 96:8
116:1 120:5 126:2
137:21 153:7
165:18 169:11
174:17 179:7,11,14
180:21 186:2,10
211:7
**reliability**
73:19 116:22 120:9
120:20 121:2
128:14 153:7
**reliable**
105:3 110:16 111:7
117:8 119:5,20
122:16 124:21
126:9 129:5 149:13
150:10,14 153:12
154:6,18 162:6
165:6 170:16 171:3
171:12 176:15
**reliance**
182:3 197:23
**relied**
39:12 53:19 76:9
77:5 119:19 122:15
122:19 131:12,24
132:6 144:14
169:15 179:16
182:22 184:9
187:23,24 210:19
**relies**
108:11,19,20,24
129:11 144:12
**rely**
27:23 44:20 45:18,22
45:23 46:2 77:6
84:22 121:18
131:17 132:11
167:25 184:2
**relying**
85:3 106:16 168:3,5
169:19
**remain**
24:18,19 190:21

**remainder**
73:10
**remaining**
25:3 211:20
**remember**
22:9 33:8 204:2,5
**Remote**
3:2 4:2
**repaid**
196:20
**repeat**
143:6 158:15
**rephrase**
9:24 58:5
**rephrasing**
39:24
**report**
6:15 9:19 11:3,6 15:1
15:2,23 16:9 28:10
28:22 29:2,11,15,16
30:13,15 31:9 32:17
32:22 33:13 37:25
38:24 39:13,14,19
40:25 41:1,7,13,19
41:24 42:2,4 45:24
46:3,10,18 47:1,16
49:6 51:18,20 53:11
62:11 65:16,24 66:1
67:7,10,12,13,16,17
67:24 68:5,9 69:14
72:13,14,15 73:2,10
73:17 74:1,6,20,21
75:1,5 76:8 78:4
81:10 82:7 84:22,23
85:17 87:25 92:7
93:23 94:11 95:16
96:7 97:5 100:2
101:2,3 102:12
104:2 106:3,25
111:3 117:25 118:4
122:15 129:18
130:1 131:9,11,11
132:11,14,16,25
133:18 135:23
138:23 144:9,22
150:19 157:23,24

158:1,10 159:4,8,12
159:12 160:18,20
162:25 163:6,9,11
163:21 165:7,14
166:15,16 168:1,5
168:15 169:15
172:15,21 174:1,14
182:12 183:5,13,17
187:5,8 197:20
201:23 202:3,7
208:6 211:16
213:17 214:3
**reported**
184:17 211:21,25
**reporter**
2:5 8:13 9:6,8 219:21
222:7
**reports**
28:20 31:24 66:10,19
67:6
**represent**
8:17,25 56:9 73:24
152:9 203:22
**representation**
84:1
**represented**
111:4
**represents**
68:10 72:3
**reputational**
68:21,25 69:5
**request**
7:7 8:10 43:16,23
47:20 48:2 78:25
83:16
**requested**
44:7
**requests**
48:8
**require**
19:3 219:21
**required**
22:14
**requirement**
117:25
**requires**



73:9
**research**
24:15 25:22 26:5
  41:12 185:19 186:4
  186:7,14,23 187:17
**researchers**
28:2
**resolution**
13:11 21:24 22:1
**resources**
25:17
**respect**
20:4 40:21 41:11
  44:16 53:10 61:10
  65:11 69:5,17 70:21
  74:12 94:11 102:13
  156:10 157:13
  160:25 161:22
  163:2 164:23
  173:14 174:2 184:2
**respond**
32:5
**responding**
53:10 66:2 96:7
**response**
89:7
**responsibility**
18:19,20
**responsible**
18:25 19:1 38:10
  136:11 147:15
**result**
57:11 60:17 68:21
  69:9 70:3
**resulting**
22:23 57:3
**retain**
23:25
**retained**
9:22 10:15 11:2,4,4
  13:14 14:1 22:21
  24:1,7 31:16,20
  32:3 37:10 38:5
  66:23 112:2
**retaining**
89:3

**retention**
22:9
**return**
192:6 219:20
**revenue**
144:13 146:5,9,18
  147:2 148:1,3,6,13
  148:17 149:2 150:1
  162:1 164:8 174:23
  174:25 181:16
  182:15 190:11
  211:21 212:10,22
  213:7
**revenues**
133:6 139:5 141:23
  144:15 145:13
  162:7
**review**
18:24 32:21 38:11
  42:7,12,16,25 47:21
  51:4,7,14,14,21
  54:1 56:2 67:20
  73:16 83:9 85:11
  132:7 167:16
  204:19 210:5,13,23
**reviewed**
41:22 46:9,15,17,25
  47:15 51:16 85:17
  120:18 132:5
  148:16 166:8
  168:21,22,25,25
  172:4 210:20
**reviewing**
30:3,12 31:7 51:15
**reviews**
40:15 90:10
**RICHTER**
3:14
**right**
17:6 19:18 24:12,17
  25:10 28:7 30:4
  34:20 37:15 44:2
  50:13 54:12,22 55:1
  56:8 59:20,23 61:6
  61:24 63:2 65:8,20
  66:2,11,16,25 67:4

67:8,18,22 68:17
  69:1 70:19 72:17
  76:12 78:19 80:2,6
  81:14,14 84:13
  87:23 91:14 97:16
  100:15 101:20
  102:9 103:6 105:11
  108:22 109:24
  114:5,17,18 116:13
  116:24 118:24
  123:1 124:7 129:7
  131:25 132:11,25
  133:13,18 134:13
  134:24 135:24
  140:5,11,21 142:2
  149:19 151:16
  152:4 158:13,19
  159:17,21 160:11
  160:23 163:23
  164:24 167:1
  168:23 169:12,16
  171:8 173:17 174:3
  175:1 177:14 178:9
  183:10,19,25
  188:13 189:5,10
  190:17 191:7,13,23
  192:15 193:13,20
  195:3,13,16,19
  202:23 203:21
  205:4,14 206:22
  207:2,12,16 213:24
  219:4
**rights**
83:3 88:3 91:22
  93:19 98:1 100:4,6
  102:25 103:4
  202:22
**rigor**
122:2
**rigorous**
111:9
**rises**
45:18
**risk**
113:16 177:13 178:1
  190:16,20 191:6,8

192:15 193:4,5,6
  194:15 196:12,13
  196:19
**riskier**
194:16,24
**road**
113:1
**robust**
18:2
**role**
18:14 45:14 110:8
**room**
8:23,24 155:16 156:1
  156:7
**rough**
58:3 85:19 110:20
  217:24
**roughly**
14:9 23:14 34:15
**round**
67:5
**routine**
114:23
**royalty**
13:18
**Roytblat**
3:6 8:20
**Rule**
56:20
**rules**
22:15 102:7 119:16
  219:21
**Russo**
4:6 8:12
**Ryan**
1:5 4:5 8:5,21 110:24

--- **S** ---

**S**
1:19 2:2 3:1 4:1 5:4
  6:1,15 8:4 9:9,9
  67:17 131:1,1,1
  158:1 221:3
**sake**
89:19
**SAMUEL**



1:12
**satisfied**
123:20,21
**saw**
95:23 210:8
**saying**
41:18 50:23 71:20
77:6 80:10 82:19
85:25 88:9,24 91:15
95:5,17 96:11
105:11,12 120:12
125:17 127:7
149:18 191:3
214:24,24
**says**
42:6,9 56:25,25
57:24 60:2,16,22
68:20 69:7 70:1,7
73:14,15 76:6 78:6
87:25 111:3,3
117:18,25 130:1
140:9 166:19
174:14 205:6
207:10
**scan**
44:25
**scanning**
85:18
**scenario**
78:14,15
**scenarios**
89:16 194:22,23
**Schiller**
3:4 8:11 23:24,25
24:6 34:7
**school**
19:14
**scientific**
13:23
**scope**
92:5,6,18 97:18
102:8 182:12 183:4
**screen**
15:4,8 16:11 72:16
72:19,22 135:13
142:13 150:21

151:4 158:5 207:7
**scroll**
136:2 139:22
**season**
18:13
**second**
6:5 55:18,22 59:22
69:22 93:12,13 94:9
98:23 99:2 100:13
103:25 106:1 108:7
133:3 139:1 141:18
141:20 143:12
150:17 157:20
158:7 169:24
174:22 183:11
203:5,14,15 205:2,8
207:5 208:5 213:15
213:16 216:20
**section**
56:8 81:21 82:4,4
86:12 92:23 104:1
131:9 183:13,14
197:19 202:22
207:9 208:8
**secure**
128:3
**see**
25:19 43:23 48:17
50:9 55:2 57:6 60:2
60:4,15,20,21 61:2
61:3,19 64:25 65:4
65:5 70:5 73:22
76:4 77:22 81:24
83:5 86:24 88:5,6,7
92:24 93:24 94:6
97:1,5 98:7 99:15
133:8 135:16,17
137:16,17,19 139:7
139:11,23 140:7,15
141:24 142:1
144:17,21 163:16
163:20 165:22
175:2,8,9,13,15,17
186:22 203:1,17
204:23 205:1,14
208:10 209:24

212:2
**seed**
112:23 128:2 215:3
**seeing**
54:10 154:1 167:21
170:7
**seek**
58:2,9,14
**seeking**
57:1,25 58:19,20,21
58:23 78:2 115:6
**seen**
31:3 83:15 91:24,24
103:17 155:23
179:3 180:1 204:5
216:13
**selected**
210:6 211:3,9
**selection**
208:14
**self-interested**
61:12
**sell**
91:1 201:16,18
215:22
**send**
48:15
**sending**
136:12
**senior**
27:21
**sense**
24:14 30:22 36:7
56:15 90:20 118:7
**sentence**
76:6 77:15 78:10
83:5 87:25 93:14
94:4,9 95:2,3 98:4
98:12,13,24 99:2
100:13 133:3
141:20 144:10
211:19
**separate**
187:15,15 202:4
**separately**
187:11

**separation**
88:4 91:10 93:20
98:16 103:1
**September**
144:23 146:10 147:2
148:15 149:3
174:24 176:6
178:23 182:15
188:15 195:22
**series**
106:4 131:11 137:20
**serious**
60:17 68:21 70:2
**serve**
56:12 66:24
**servers**
26:5
**service**
17:14
**services**
1:22 2:15 8:12,14
11:23,24 19:2,4
20:18 21:4,20 26:5
31:23
**serving**
37:1
**set**
62:10 65:23 68:4
75:4 81:9 82:5
83:21 87:9,10 89:15
91:23 93:23 94:12
100:2 103:12,13
108:12 109:6 118:3
119:15 120:9 123:4
123:16,25 124:24
126:7,14 133:10
137:2 138:8 139:3
178:14 191:18
198:24 202:25
222:10,17
**sets**
16:22 91:11 94:4
106:12,13 108:10
108:17,18,25
**setting**
67:25 82:23 88:13



95:8
**seven**
10:23
**shape**
90:7
**share**
41:15 90:2 135:12
**shared**
154:22 155:4,10
171:16
**shareholder**
80:18,18,19 91:8,9
98:14 99:3 100:5
**shareholders**
88:2 93:18 102:24
201:18
**shares**
80:8 81:4 88:17 89:3
90:19 91:1 98:16
99:4 198:16,17
199:12,19,23 200:6
200:8,13,25 201:3,8
201:12,14,20 205:8
205:11 206:14,17
207:1,12,13,18,19
215:23 216:2
**sheet**
82:22 83:20 95:7
198:25 219:7,10,11
219:16,20 220:1
221:10
**Sheppard**
3:14 10:12,15 11:4,5
43:22
**shift**
209:10
**shortcut**
65:22
**show**
15:17 136:24 137:1
139:15,16 204:6,7
**showed**
137:12
**shows**
183:23 187:16
**side**

17:12,18 18:11,15
35:16 42:20 56:13
64:1
**sides**
64:18
**sign**
219:11,13,17
**signature**
219:19 221:1,12
**significant**
13:9 27:20 30:16
89:11 141:23
188:12,12 190:20
211:21,25 212:24
**significantly**
29:25 36:15
**signing**
219:14
**Silicon**
112:16
**similar**
69:24 92:13 141:25
143:20 192:1 210:2
210:10
**similarity**
211:8
**similarly**
70:11 139:2
**similarly-situated**
61:15
**Simon**
19:24
**simple**
193:8
**simpler**
57:16
**simplify**
18:16 46:1
**simply**
81:5 89:3 107:15
178:12 194:17
206:2
**single**
178:23 182:16
**sir**
11:13 33:18 50:20

59:20 60:1 99:23
109:5 154:4 177:9
**sit**
14:9 52:15 84:20
134:13 140:20
141:1 142:19 143:1
143:23,24,25
152:23 155:12,20
166:14,22 168:20
170:11,21 179:20
180:14 182:25
185:14,23 211:2
212:19 213:12
214:23 215:19
**sitting**
8:23 15:14 35:19
152:7
**situated**
70:11
**situation**
83:18 117:1 123:6
126:24
**six**
145:22 212:23
**size**
187:21
**skipping**
33:11 138:25
**slightly**
62:16 183:12
**small**
17:14 80:25
**smaller**
177:23 206:25
**software**
43:6
**sold**
178:22 182:16,21
**sole**
149:14
**solicit**
167:12
**soliciting**
153:22 215:1
**solves**
214:2

**somebody**
206:19
**somewhat**
17:25
**son**
19:14
**Sophie**
3:6 8:20
**sophisticated**
156:15,21
**sorry**
9:25 18:22 24:11
32:24,24 93:12 95:4
115:11 116:18
121:20 130:6 140:8
140:8 141:16,17
143:9,11 148:21
151:1 158:6 163:12
177:11 189:2
190:24 195:8,8
201:11 202:9
**sort**
13:13 15:19 16:18,22
17:22 18:7 20:23
22:9 23:8 25:2,3,23
25:25 26:9 28:18
31:17 32:20,21
33:13 35:23,23
37:24 38:24,25 39:1
40:10,16 42:23
44:25 48:24 50:19
53:2 56:2,9,11
57:16 59:10 63:25
65:17 66:1,15 67:21
69:12 71:25 73:14
74:8,16,17,19 77:14
78:25 80:7 82:4
92:13 93:8,13 97:3
104:1,3 108:8,10
116:11 117:22
125:3 131:8 137:2
141:4,19,25 142:1
147:7 151:14 164:1
174:8 189:8,9 205:5
206:24 209:8,9,10
209:20,21 214:5



sorts
110:5 127:20
sound
170:2
sounds
29:20
sources
26:15 115:23
SOUTHERN
1:2
so-called
125:23
SPAC
153:15,23 154:2
space
219:14
speak
95:22 119:24,25
162:16
speaking
38:19 43:8 73:13
74:12 177:8 199:6
speaks
67:24 159:12 199:8
specialty
17:25
specific
10:5 12:2,4 17:17
49:14 54:7 61:5
65:11,18 70:23 72:2
79:10 85:6 89:13
93:23 95:18 96:25
97:11 98:5 99:1
100:3,23 116:7,25
117:9,15 119:2
129:8 133:16 134:5
138:2 140:19 152:8
154:21,25 155:6
160:22 169:18,19
169:21 179:2,19
181:1 186:17
189:13 191:15
199:3 200:5
specifically
29:10 62:2,3 85:3
94:17 152:6 153:25

163:22 167:8 168:3
168:5 181:12
182:13 185:23
214:4
spectrum
115:9
speculating
140:20
speculation
75:2 78:12 145:16
speculative
77:21 78:22 81:12
161:12
speed
38:2
spend
38:1 82:16 186:14
spending
185:19
spent
30:2,12
spits
203:19
split
23:14 35:21 126:6
sponte
82:9
spreading
215:3
spreadsheet
118:15 138:11
142:15 151:24
spring
10:8,10 31:17 157:1
sroytblat@bsfllp.c...
3:11
SS
222:3
stack
44:24 45:7
staff
17:11 26:3,4 28:1
30:17,21 31:7 38:9
39:16 40:2,12,15
43:21 47:6
staffing

25:15
staff's
47:5
stage
82:5 190:11
stake
81:11 92:25 112:18
stamp
6:8,9,11,12,14,17
135:1 137:7 139:19
142:9 143:16
204:13
stand
21:16 37:16,18
standard
39:1 44:13 56:3
109:4 117:18
122:23 123:25
145:7 147:16
standards
117:23 123:5,17,21
124:25 147:7
stands
21:15
start
29:14 38:4 73:2
82:19 95:4 170:18
175:11
started
17:11 20:25 23:9
179:7
starting
8:18 183:14
starts
141:21 197:20
204:10
start-up
113:5 114:18 115:15
184:21,23 185:3,6,9
186:9,13,24 188:20
189:21 190:5 212:8
start-ups
112:24
state
2:6 8:16 9:12 34:1
132:2 144:9,9 222:2

222:8
stated
13:5 70:21 146:9
statement
18:22 85:5 88:12
184:4
statements
18:8,17,18 179:5
180:13,16 183:25
184:1,18 185:22
187:12 188:8
191:18
STATES
1:1
status
25:8 89:4
stay
157:20
step
76:19 120:7,25
121:16 158:10,17
158:22 159:1
172:22
stepping
177:7,7
steps
85:11 117:6 119:2
141:4,7
Sterling
26:8,12,17
sticking
50:8 87:24 131:7
157:19
stipulate
74:18
stock
19:4 83:24 87:19
90:11 128:6 192:4
199:5 201:1 203:20
stop
76:22 95:11
stopping
54:17 95:12
stops
47:6 164:1
straightforward



107:1
**stretch**
165:25
**strike**
9:24 12:22 46:16
  48:25 50:20 84:21
  85:9 88:10 91:5
  101:11,16 141:5
  142:21 167:4 177:6
  184:22 193:10
  212:5 213:18
**strongest**
84:3
**structured**
198:12,14
**study**
117:11
**stuff**
26:6 28:18 34:20
  217:24
**styled**
67:16
**sua**
82:9
**subject**
53:7 61:8 74:19
  98:22 140:13
  172:10 196:25
  219:15
**submitted**
11:3 74:8
**subscription**
201:23 205:7,10
  207:7
**subsequent**
105:13 109:12 146:1
  148:5 202:18
**subsequently**
104:25
**subset**
102:4
**subsidiary**
19:22
**substance**
46:15,18 49:16 88:15
  214:16 219:5,9

**substantial**
186:14,22 189:16
  191:23
**substantively**
46:9,25 47:15
**successful**
112:25
**succession**
128:5
**suffer**
60:25 61:16 65:2
  70:12
**suffered**
60:16 68:20,25 70:2
**sufficient**
171:12
**suggest**
28:16 77:1 78:12,18
  87:16 110:8 119:19
  123:19 129:4
  136:17 147:23
  157:12
**suggested**
146:19 195:6
**suggesting**
76:3 86:19 121:21
  149:8,11 162:9
  172:1 216:6
**suggests**
157:12 190:19
**Suite**
3:17
**summarize**
107:5
**summary**
73:8 75:6,8
**summer**
10:9 11:7,8 166:25
**sums**
186:14
**Sung-Fung**
1:10 8:5
**supplied**
120:2,17 121:18
  123:1
**supplies**

119:1
**support**
7:1 11:24 20:3,20
  21:5 23:21 25:15,15
  26:3,4,14,21 30:21
  85:4 198:4,8
**supporting**
25:21
**supposed**
79:22
**sure**
55:14 56:4 64:10
  66:7 69:25 82:17
  88:11,14 97:19
  109:22 131:14,21
  134:8,23 152:11
  187:13 188:16
  198:10 208:5 215:6
**surprising**
165:17
**surrounding**
180:17
**survive**
189:17 190:9
**suspect**
39:9 43:1
**swear**
9:6
**sworn**
9:7,10 222:10
**Sydney**
27:22 28:3,6 48:5

—————————————
**T**
—————————————
**T**
3:5 6:1 131:1 222:1,1
**tab**
137:21
**table**
163:20,22 183:23
**tabs**
137:20
**tailored**
64:25
**take**
9:18 12:11 16:25

19:6 28:4 34:12
  52:6 56:4 59:9
  72:10 76:25 79:18
  83:8 85:9,11 112:17
  113:4 117:6 119:2,4
  120:7 121:16 130:5
  138:19 141:4,7
  143:2 144:5 150:15
  157:15,16 166:7
  174:18,19 177:10
  197:8 198:6,15
  208:2,12 216:22
**taken**
8:9 55:8 130:23
  149:12,21 197:13
  217:9
**takes**
208:24
**talk**
9:25 15:18 55:13
  106:1 217:24
**talked**
29:8 74:3 84:11
  153:5,9 168:21
  183:21 198:9
  210:21
**talking**
35:1 71:21 79:10
  100:12,14 110:2
  142:2 159:24 160:8
  202:17 204:23
  207:15 209:9
**tax**
18:7,10,12,12
**team**
40:23 43:12
**telephone**
49:4,5
**tell**
34:10 136:15 161:23
  170:13,13
**tells**
190:15
**ten**
36:1 48:15 54:21
  77:20 217:2,3



tenure
21:8 38:21
term
64:9 78:24 79:15
82:22 83:20 95:7
99:14 151:19 174:8
174:10 176:12
189:9,9,11
termination
100:15,18
terms
11:14 12:21 18:5
27:12 28:9,12 30:21
32:15 35:7,13 42:18
44:9 48:10 50:3,17
53:18 73:15 74:7
79:5 81:22 82:23,25
83:2 86:1,7 88:8
89:13 90:25 91:4,8
91:12 93:23 94:6
95:8,13,18 96:4,25
97:10,23,25 98:6
99:1 100:3,12 109:3
138:7 162:25
176:10,19 184:13
185:16 194:14,14
197:25 198:15,25
199:11 200:5
204:22 211:10
terrible
58:6 121:11 205:19
test
10:18 36:8 48:1
204:7
testified
9:13 33:23 34:7,13
34:21 35:23 36:17
36:18 37:6,7 110:19
110:21 157:6
175:18
testifier
23:16 24:3
testify
36:22 62:6 82:3 92:1
98:5,25 165:15
testifying

12:23 22:10 23:8
110:19
testimony
20:21 22:19 31:24
33:15,15 35:11 37:2
51:4 57:5 62:5 71:1
71:2 82:12 84:24
85:3 97:8 129:9
152:21 169:3,14,19
219:14 222:12
Text
7:11
thank
9:15 139:13,13,13
151:12 217:13,16
thereof
200:13
thick
41:20
thing
41:20 58:14 93:9
101:24 157:9
things
19:1 31:8 41:11
55:14 56:18,25
58:17,21,22 97:4
110:5 112:12
118:12 123:20
125:1,8,25 126:7,7
127:9,13,14,15,16
127:17 147:8,10
177:21 178:6
180:17 207:14
216:21
think
16:1,21 17:20 20:2
22:23 24:1 27:7
29:22 33:23 34:13
36:13,15 40:17
41:10 43:9,9 44:23
48:1 49:10 51:6
52:11 58:13,16
62:20 63:23 64:17
67:25 73:2 74:3
78:11,11,21,21 80:1
81:10 84:11 90:3,23

91:18 95:24 100:24
103:8 106:10,25
108:12,15,15,16
110:6 111:19
117:17 121:4 126:4
126:16 131:8 143:8
145:8,23,23 147:14
148:19,20,22 152:5
154:11,13 158:24
158:24 160:24
166:16 167:15
168:12,21 169:10
175:10 177:18
179:10 180:1,12,14
183:21 189:24,25
192:13 195:5,14
196:25 198:20,22
199:18 202:2 203:9
204:2 205:21
210:20 212:14,19
213:3 214:1,9,10,11
214:13,13,16,19,22
215:10,21,22 216:8
216:8,15,16
third
77:15,15 125:7
thought
42:16 44:15 176:4
three
14:23 75:23,23
123:20 139:1
201:10
time
8:8 14:4,17 20:25
23:13 24:10 29:4,8
29:15,22 30:2,11,12
30:23 31:15 35:14
38:1 41:23 78:20
80:5 100:20 102:16
104:15 105:16
106:12 108:4
109:13 110:21
113:24,25 116:1,7
130:9 148:10 149:1
153:14,21 154:17
157:1 162:2 175:22

175:24 177:22,24
178:8 181:15 182:4
207:10 217:14
times
10:19 33:21,22 35:23
36:13 38:17 48:1,9
48:15 132:18
timing
31:2 100:23 101:4
title
202:22 208:8
titled
55:17 183:17
today
8:7 14:9 19:9 29:7
32:25 35:20 52:16
84:20 96:17 111:22
112:7,8 140:20
141:1 142:19 143:1
143:24,25 152:7
155:12,21 166:14
170:11 180:14
182:25 183:22
185:14,23 195:18
213:13 214:23
215:10,13,19,22
216:6
told
31:21 83:24
Tomaso
1:10 38:21 49:20
60:16,25 62:8,11
64:15 65:11 68:11
68:20 69:1,8,16
70:2 71:11,13 74:25
75:4 77:21 82:25
90:18 95:10,14 96:3
97:2 133:5 134:3,9
139:4 141:22
144:13 153:14,22
155:18 157:3 161:4
161:18,18 162:5
166:25 167:6,18
168:19 169:5
171:23,24 178:25
179:6 180:7,20



181:9 183:19
187:22 191:23
192:14 193:9 195:3
196:7 205:23
208:16 210:1
212:21 214:20
215:20,25 216:10
**Tomaso's**
6:5 38:16 55:18,22
69:4 77:17 183:24
**top**
81:21
**topic**
183:12
**total**
29:12 180:6 187:7
201:4
**totally**
15:6 22:12 79:8
134:17
**tough**
48:12,12
**track**
119:12 148:2
**traded**
200:16,22 201:1,8
**trailing**
211:22
**tranche**
203:5,6,13,14,15,16
204:1,24 205:2,8,11
205:12
**transacted**
81:5
**transaction**
128:1 153:16,23
154:2 198:5,8,14
200:19 201:9
**transcript**
6:21 51:24 85:19,20
110:20
**transcription**
221:7
**transfers**
60:24 61:5
**translate**

81:10
**treat**
45:2
**trial**
22:19,24 33:23 36:18
36:22 57:4 62:6
71:2 78:19 79:1
82:4 99:8,11,20
101:17 163:1
**trials**
34:12,13,25 35:2,3,4
35:5
**tried**
98:22 115:9 173:8
176:5
**true**
24:18 76:12 95:21
221:7 222:11
**try**
18:15 78:12,12 106:1
107:5 110:8 157:20
161:24 214:15
**trying**
24:13 30:4 36:7
65:22 74:20 75:13
82:16 87:20,22
88:10 96:23 97:17
111:14 114:9
115:12 123:18
128:3 138:22
165:15 166:2 174:9
176:16 200:15
212:6 214:25 215:4
215:8
**turn**
16:17 59:23 115:15
150:15 165:9
202:21
**turnaround**
31:15
**turning**
37:24,24 38:23 73:1
73:4 138:25
**twice**
50:24 164:20 181:5
**two**

22:21 27:5 37:7
53:24 56:4 92:16
106:12,13 108:10
108:16,19,20,25
112:12 126:7
177:21,23 185:13
188:7
**type**
13:12 28:18 48:2
53:2 66:15 79:4,5
83:17,18,20,23 91:5
91:10 107:23 111:8
114:8 122:2,3
212:17
**types**
13:7 94:5 97:10 99:1
184:13
**typical**
91:16,18
**typically**
89:1 90:24 103:3
200:10
**typos**
28:17

---
**U**
---

**UBS**
154:22 156:15
**ultimately**
32:11 46:10 102:17
113:20 126:9
**umbrella**
20:11 25:25
**unauthorized**
60:24
**uncertainty**
178:1,3
**uncommon**
88:1 93:17 102:23
**underlying**
64:13,18
**underperform**
61:13 70:9
**understand**
13:2 44:23 56:5,16
57:19 58:8 60:9

63:7,11,13,15 64:5
64:11 66:5,13 71:19
74:18 80:1,23 82:16
82:17 87:22 88:14
97:17,19 101:6,10
101:14,17,20
106:11 108:9
114:10,15 117:5
126:11 128:11
131:23 141:5
148:24 152:1
158:10 166:24
169:23 173:15
174:15 175:23
177:5,9,12 191:11
191:21 198:14
199:13 213:19
215:25
**understanding**
31:17 32:11 40:22
43:14 44:11 63:16
66:8 67:1 78:1
103:2 128:23
129:20 133:14
138:7 140:18,22
144:1 153:1 160:13
166:10,17 167:2
170:20,21 171:21
172:13,16 179:22
194:10 198:18
199:2
**understands**
107:12
**understates**
91:18
**understating**
88:7
**understood**
40:9 41:2
**unduly**
161:11
**unequivocal**
89:23
**unfettered**
90:16
**unheard**



89:12 98:19 100:10
**UNICORN**
1:12
**uninvestigated**
111:2
**UNITED**
1:1
**universal**
91:19
**universally**
90:13
**unpack**
215:16
**unrelated**
115:7
**unreliability**
144:11 159:5,13,13
  161:4,9 179:15
  195:11
**unreliable**
104:4 158:12 161:19
  177:1,14,17 178:16
  178:17
**unusual**
87:11 98:19 100:9
  188:20 189:19
  190:1
**upcoming**
148:14
**updating**
136:11,17
**use**
26:22,22 43:4,5
  64:20 104:3 119:5
  147:14 158:18
  160:6 163:22 174:8
  174:10,10,11
  176:12 189:10
  210:23 212:9 213:1
**uses**
131:16 174:13
**usually**
16:6 42:21
**utilize**
25:17 115:19 193:9
**utilized**

106:13 138:15
  166:11 209:14
  211:4 213:10
**utilizes**
195:12
**utilizing**
120:1 122:22

——————
**V**
——————

**v**
37:8,8 183:14
**vague**
53:21
**Valley**
112:16
**valuate**
115:13
**valuation**
12:2,5,8 13:17 19:4
  21:5 76:7,16 104:7
  104:10,13,15 105:3
  105:7,13,22 108:5
  109:13,14,16
  110:10 111:10,12
  111:15,18,21,21
  112:6 113:6 116:19
  117:18,21 119:6
  120:18,25 121:10
  124:4 126:8,10
  127:4,22,24 131:24
  131:25 145:1 146:1
  146:11,21 147:7,9
  147:17 148:7,11
  149:2,15 150:2,8,16
  151:16,21,23
  157:21 163:3 165:5
  165:8,11,14,17,19
  165:21,23,24
  166:12 172:6,6
  173:15,19 174:3,6,6
  174:9,14,17,18,22
  174:22 175:7,15
  176:2,4,6,11,12,15
  176:20 177:1 185:2
  191:17 196:18
  199:14 203:14

204:1,19,22,24
  205:6,12,24 206:7,7
  206:24 208:15,20
  208:25 210:13,24
  211:23 212:7,21
  215:7,8
**valuations**
110:15 112:3 116:3
  132:17 147:1
  179:12 181:2
  184:24 210:5
**valuation-related**
13:7
**value**
57:3,10 61:18,23
  65:3,18 68:25 69:13
  70:14,18,24 73:16
  73:20 74:25 75:4
  76:20,20 77:19,25
  78:13 80:4,25 81:2
  81:6 88:4 90:1
  93:20 94:15 96:15
  100:9 103:1 107:20
  114:10,15 160:3
  177:22 199:20
  200:1,15 205:23
  210:1 213:2 214:16
  214:25 215:5,9,12
  215:13,20 216:5,9
  216:10
**valued**
214:21
**valuer**
147:10
**valuers**
210:6
**valuing**
199:11
**variables**
119:14 123:13
**variations**
108:17
**variety**
21:21 25:5 58:21
  97:9 117:14 126:18
  127:8

**various**
38:17 49:23 56:13
  62:14 125:21
**vary**
14:4 119:9,10 158:25
  186:21
**vein**
33:7
**venture**
112:21 113:13 215:2
**versa**
14:15
**versed**
107:11
**version**
85:19
**versions**
108:17
**versus**
8:5 126:9
**VI**
197:19
**vice**
14:15
**VIDEOCONFER...**
1:18 2:1
**videographer**
4:6 8:1,11 9:5 55:5
  55:10 130:20 131:3
  197:10,15 217:6,11
  217:25
**videotape**
8:3
**VIDEOTAPED**
1:18 2:1
**view**
35:16 120:19 128:13
  144:20 162:14
  164:2 197:2 198:1
  209:14 212:4,6
  214:20
**VII**
208:8
**Virginia**
19:9,9,12
**virtually**



8:10 50:5 89:12
100:9
**volume**
201:4

---
**W**
---

**wait**
215:4
**walk**
138:22
**want**
15:9 16:17 25:14,24
30:3 33:4,5,12
37:25 43:15 44:10
45:13 51:13 54:20
55:13,14 57:8 70:25
72:18 75:10 80:12
80:13,21 82:15,16
85:23 88:11,14 90:2
90:2,4 95:11,22
97:19 106:1 107:4,5
109:22 112:6 117:5
125:18,21,25 130:4
130:9,11 131:10,20
133:22 150:20,21
151:9 163:14
174:11 176:10,14
198:10 207:8 208:5
209:10 215:16
216:20,24 217:2
**wanted**
33:14 42:25 43:15
44:5,7 137:16 176:5
**warn**
106:16
**Washington**
3:18 17:16
**wasn't**
31:19 36:17 41:1
51:23 145:17
154:18
**way**
14:10,21 15:12 39:11
54:1 62:12,13 68:4
76:2,4 90:7 101:12
109:13 110:17

123:6 125:8 127:7
146:24 164:7 165:6
167:11 171:25
174:23 180:2
182:21 191:2 198:4
199:23 214:15,23
222:15
**ways**
190:7
**Wednesday**
8:7
**week**
85:20 175:18
**well-described**
107:1
**WENG**
1:11
**went**
17:5 19:16,24 21:2
21:12 29:11 44:15
70:15 93:14 124:21
157:7
**weren't**
193:23
**Werner**
99:9
**we'll**
16:9 33:12 40:12
105:25 108:7
135:12 137:4
142:13
**we're**
8:20 35:1 131:7,8
143:13 150:24
182:15 198:10
200:4 206:11 208:7
209:8 212:25
**we've**
16:4 131:21
**whatnot**
38:17
**WHEREOF**
222:17
**whichever**
150:22
**wholesale**

18:1
**wholly-owned**
19:22
**wide**
97:9,10
**Wigger**
3:16 9:4
**willing**
87:13
**wire**
60:24 61:5
**withdraw**
205:18
**witness**
5:3 7:3 9:6,7,9 16:5
32:24 54:25 130:8
130:10,19 197:9
216:25 217:16
219:1,19 222:9,12
222:17
**WITNESSED**
221:14
**witnesses**
48:24
**word**
28:14 64:20 147:14
149:6 160:6
**words**
28:13,13 80:7 147:11
208:18
**work**
10:12 13:7,8,17,18
13:24 14:21 17:5,8
18:8,12 20:13 21:7
23:8,24 26:11 28:3
29:11 31:1 35:9
53:9 67:22 74:4
85:10 107:22,24
116:4 168:9
**worked**
24:5 37:18
**working**
26:18 188:12 212:24
**works**
16:2 177:8
**worse**

122:17
**worth**
40:17 90:4 96:15
113:16,16
**wouldn't**
29:24 45:2,2 75:11
89:13 154:5 158:20
201:5
**wrap**
216:23
**write**
28:19,19 75:20 139:2
**writing**
29:1 52:18
**written**
82:22 83:13 86:15,21
87:9,18 89:14 90:24
91:16,25 92:24
97:18 144:22
**wrong**
30:8 50:23 106:15
137:20 143:9 170:8
170:12,15,19 171:6
171:10 198:21
**www.MagnaLS.com**
1:24 2:16

---
**X**
---

**x**
1:4,16 5:1 6:1 90:4

---
**Y**
---

**Yards**
3:7
**year**
10:9 14:5,5 24:16,24
78:20 109:8 148:4
162:1 184:3 189:17
**years**
14:23 23:12 35:15
106:5 133:12
145:22 146:2,3
148:14 188:7
212:23
**yield**
199:13 207:1



**Yonatan**
37:19
**York**
1:2 3:8,8 201:1

---
**Z**
---

**Zach**
3:5 5:5 8:18,19 9:14
  9:17 15:22 16:3,7
  16:16 31:13 33:9
  39:22 40:8 45:20
  46:13 47:10 48:20
  49:9 52:23 54:5,14
  54:19 55:1,12,16
  56:1 58:5,7 59:1,10
  59:18 60:13 63:6,14
  63:24 64:22 65:14
  66:6,14,21 67:3
  68:6,16 69:6 71:17
  72:8,10,11 74:14
  79:7 80:22 81:17
  82:13 84:10 85:7,24
  86:11,22 87:1 90:21
  92:12,21 93:10
  94:21 96:21 97:15
  98:21 99:21 101:8
  102:1,22 103:15
  104:19 105:10,24
  106:9,19 108:6,21
  109:20 112:13
  113:2 114:4,16
  115:10 116:17
  118:22 119:21
  120:23 121:7 122:9
  123:23 124:3 125:2
  125:11 127:6 129:1
  130:2,6,14,18 131:5
  132:3,15,22 134:7
  134:19 135:4,7,12
  135:14,20 136:1,5
  136:19 137:4,13,14
  138:19,21 139:15
  139:22 140:1 141:2
  141:13 142:6,12
  143:2,8,19 144:5,7
  146:23 147:5,18

149:17 151:3,11,20
152:24 153:19
154:3,20 155:2,8,13
155:22 156:4,12,19
157:15,18,22 158:6
158:8,16 159:9,16
160:1 161:16 162:3
162:10 163:10,15
164:12,21 167:14
167:23 168:7
169:22 170:9 171:7
171:20 172:12
173:1,9,11,24 177:2
178:2,24 179:13,21
180:4,10 181:3,17
182:5,24 183:8
184:19 186:1,11
187:4,18 188:18
189:1 190:2,13,22
191:1,20 192:11
193:7,17 194:1,12
195:1,7 196:2,17
197:5,17 200:9,24
202:2,8 204:8,17
205:18,20 208:1,3
208:21 210:12
211:14 213:8
214:18 216:22
217:3,13,17,18
**zero**
146:5 148:6 178:21
181:16 182:15
205:25 212:22
215:11
**zeros**
149:9
**Zoom**
1:18 2:1 3:2 4:2

---
**$**
---

**$10**
205:10
**$175**
204:25
**$25**
192:13 193:9,12,15

**$250**
205:3
**$400,000**
61:1

---
**1**
---

**1**
6:4 8:3 15:25 16:9,10
  16:14,21 73:5
**1:10**
130:15
**1:14**
131:2,4
**1:23-cv-04305(AS)**
1:3
**10**
6:17 35:15 78:16
  81:11 94:16 96:13
  96:15 133:2,4
  141:20 178:18
  200:2 201:14
  204:10,15 208:7
  211:18 215:9
**10-minute**
197:8
**10:51**
55:6,7
**100**
3:17
**10001**
3:8
**101**
59:23 60:15
**11**
144:8 148:25
**11:00**
55:3
**11:01**
55:8,11
**12**
178:19 201:22
  211:20,22,24
**12:35**
130:21,22
**1227724**
2:8

**13**
133:17 134:2,11
  137:3
**135**
6:8
**137**
6:9
**139**
6:11
**14**
150:18,24 151:2,9,13
  151:14
**142**
6:12
**143**
6:14
**15**
34:16
**158**
6:15
**16**
6:4 163:7
**17**
139:10 163:7,17
**18**
142:1 143:4,13,22
  144:23 146:10
  147:2 150:24 151:2
  165:9 166:4,8 175:3
  216:14
**18th**
67:14 195:22
**19**
216:14
**1991**
17:1

---
**2**
---

**2**
6:5 38:25 40:3 50:8
  52:18 54:15 55:17
  55:23 140:5
**2nd**
140:9
**2:36**
197:11,12



**2:47**
197:14,16
**20**
34:15,17 88:23 200:3
**2000**
216:13
**20006-6801**
3:18
**2002**
23:5
**2005**
22:18 33:20
**2018**
133:5,13 141:22
148:15,19
**2019**
133:6 139:5 141:22
**202**
3:19
**2020**
133:6 139:3,5 140:5
**2020-2023**
141:23
**2021**
133:6 139:6
**2022**
131:24 145:1 146:9
146:12 151:16
152:4,10,13 153:14
157:1 162:4,15
163:3 180:5,11,21
181:7 182:8 191:17
191:18 193:24
215:14 216:7
**2023**
108:12 109:8 131:25
145:2 148:1 165:21
165:24 166:12
167:1 173:15 174:2
174:20 175:16,24
176:11,18,19 181:7
184:2,4 188:8,10
205:9
**2024**
1:21 2:3 5:18 8:8
11:8 112:6 144:23

145:14 146:10
147:2 148:1,20
149:3 174:24 176:7
178:23 182:15
221:6 222:18
**2025**
174:25
**204**
6:17
**2099**
3:17
**212**
3:9
**22**
108:12 109:6,9,14
150:16
**224**
60:16
**226**
61:10 64:25
**227**
68:19
**228**
69:7
**23**
175:16
**235**
70:1
**236**
70:7
**249**
204:11
**25**
34:18
**26**
56:20

_____

_____ 3 _____

**3**
6:6 33:17 59:12,16
81:20 82:4 86:12
**3(a)**
204:24
**3:16**
217:7,8
**3:20**

217:1
**3:25**
217:4
**3:28**
217:9,12 218:1,2
**30**
1:21 2:3 5:18 8:7
36:14,16,24 112:6
200:3 219:22 221:6
**30th**
24:24
**30X100223700**
222:21
**30(b)(6)**
50:19 51:1,2 168:25
**31**
205:9
**3310**
139:10

_____ 4 _____

**4**
6:8 81:21 104:2
131:9 134:21 135:2
135:6,23
**4th**
222:18
**40**
36:25
**428**
202:9,10
**446-2300**
3:9

_____ 5 _____

**5**
6:9 33:17 73:3,4
137:5,8 192:6
**55**
3:7 6:5
**59**
6:6

_____ 6 _____

**6**
6:11 138:25 139:16

139:20 202:21
**60**
29:18
**624-6221**
1:23 2:16

_____ 7 _____

**7**
6:12 142:6,10 183:14
187:8
**70935**
143:5
**71709**
143:10
**747-1900**
3:19

_____ 8 _____

**8**
6:14 143:14,17
178:19 197:20
211:24
**80**
29:18
**866**
1:23 2:16

_____ 9 _____

**9**
5:5 6:15 134:23
157:25 158:3
202:22
**9.1**
207:9
**9.3**
202:25
**9:59**
2:3 8:8
**92013**
134:24 135:18
**92014**
137:5
**9310**
139:12,14
**94981**
142:7



**99**
59:24 60:1 201:13

