**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RYAN BERRIS,

       *Plaintiff*,

v.

SUNG-FUNG CHOI (A/K/A NORMAN
CHOI), DE TOMASO AUTOMOBILI
HOLDING N.A. LLC, HIN WENG LUI
(A/K/A SAMUEL LUI), GENESIS
UNICORN CAPITAL CORP.,

*Defendants*.

Case No. 1:23-cv-04305 (AS)

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**STATEMENT OF ADDITIONAL MATERIAL FACTS**

## RESPONSES TO PLAINTIFF'S STATEMENT OF
## ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56.1(b) of the Local Rules of the United States District Court for the

Southern District of New York, Defendants De Tomaso Automobili Holdings N.A. LLC ("De

Tomaso"), Sung-Fung Choi ("Choi"), Hin Weng Lui ("Lui") and Genesis Unicorn Capital

Corp.'s ("Genesis") respectfully submit this response to Plaintiff Ryan Berris' ("Berris'") Rule

56.1 Statement of Additional Material Facts (ECF No. 165).

Defendants have restated in this Response the headings as they appear in Plaintiff's

Statement of Additional Material Facts.  To the extent the headings purport to assert any factual

allegations or legal conclusions, Defendants deny them in their entirety.

## I.    THE PARTIES

1.    Defendant De Tomaso Automobili Holdings N.A. LLC ("De Tomaso") is a privately

held limited liability company incorporated in Delaware.  December 6, 2024, Declaration of John T.

Zach In Opposition to Defendants' Motions for Summary Judgment, Exhibit ("Ex.") 20,

DT0000000073 (LLC Agreement).

**Response**:  Defendants dispute this statement insofar as the cited exhibits do not support it.

Local Rule 56.1(c)–(d).

2.    De Tomaso is an automobile company which designs, manufactures, and sells

high-end specialized vehicles—such as the P72 and P900 vehicles.  Ex. 4, De Tomaso 30(b)(6) Tr.

89:8-19.

**Response**:  Undisputed.

3.    Defendant Norman Choi ("Choi") is a citizen of Hong Kong and the current owner

of De Tomaso. Ex. 72, CHOI00000110; Ex. 4, De Tomaso 30(b)(6) Tr. 167:11-17.

**Response**:  Undisputed.

-1-

4.      Plaintiff Ryan Berris ("Berris") is a resident of New York. Berris formerly served as De Tomaso's Chief Executive Officer ("CEO") and Chief Marketing Officer ("CMO"). Ex. 1, Berris Tr. 97:22–98:14.

**Response**: Undisputed.

5.      De Tomaso's principal place of business is in Connecticut. [ECF No. 54, Decl. of D. Majcher].

**Response**:  Defendants dispute this statement because it calls for a legal conclusion that is not properly supported by testimony by a lay witness, and which the Court should disregard. *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).  Additionally, Ms. Majcher states in her cited declaration that "most of [De Tomaso's] business operations [are] based out of Hong Kong."  ECF No. 54, Decl. of D. Majcher; *see also* ECF No. 49, Decl. of R. Berris (detailing De Tomaso's business and connections in New York).

6.      Choi spent much of 2022 living in and working from New York, including long stretches in May and June 2022. Ex. 162, CHOI00000160; Ex. 133133, BERRIS-000092815; Ex. 134134, BERRIS-000093063; Ex. 3, Choi Tr. 122:13-123:24; Ex. 7, Lui Tr. 110:11-111:23, 136:21-137:1.

**Response**:  Disputed.  Choi is a citizen and resident of Hong Kong.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 4:21–22; De Tomaso Ex. 30, ECF No. 145-8, CHOI00000155.  The cited evidence only demonstrates Choi spent a total of 132 days in New York in 2022 and visited for no longer than 17 days in May or June 2022.  Berris Ex. 162, ECF No. 173-37, at CHOI00000160–163.  The rest of the cited documents do not support the statement.  Local Rule 56.1(c)–(d).

7.      When Choi did not necessitate Berris's presence in New York and Berris was not otherwise traveling on company business, Berris performed his duties at De Tomaso's Connecticut offices.  Ex. 1, Berris Tr. 576:24-577:23.

**Response**:  Disputed. Berris' citations do not support his statement, including the notion that "Choi . . . necessitate[d]" Berris to work from New York or that Berris primarily or usually worked from Connecticut.  Rather, Berris testified he worked both from New York, including "hotel rooms" and in Connecticut.  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 576:24–577:23.  Moreover, under his consultancy agreement, Berris worked under a "work from home" arrangement, thus De Tomaso has no way of knowing where Berris was performing his duties from while working remotely.  De Tomaso Ex. 1, ECF No. 156-1, at DT0000000110 § 2.  Berris did not report to De Tomaso where he was, did not communicate whether he was working or traveling for personal reasons, and would oftentimes turn his phone off completely for days at a time without communicating with the De Tomaso team.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 429:4–10.  Finally, Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances, LLC,* 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

8.      While working for De Tomaso, Berris worked almost exclusively from his parents' home in Brooklyn, Connecticut, hotels in West Hartford and Greenwich, Connecticut, and De Tomaso's Connecticut headquarters. Ex. 1, Berris Tr. 368:23-369:2, 576:24-578:12.

**Response**: Disputed. Berris' citations do not support his statement. Rather, Berris testified he spent most of his time traveling, and spent significant time working in New York. *See, e.g.*, ECF No. 49, Decl. of R. Berris; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 368:23–369:6. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

9.  Choi also frequently traveled to Connecticut for De Tomaso-related work. Ex. 73, DT0000002158 (July 19, 2019 calendar invitation to Berris, Choi and Bailey Vanneck for meeting with Miller Motorcars in Greenwich, CT); Ex. 163, BERRIS-000078609 (July 11, 2021 hotel reservation for Choi in West Hartford, CT); Ex. 74, BERRIS-000330280 (July 28, 2021 calendar invitation to Berris, Choi and other for "Miller Motorcars / De Tomaso Meeting" in Greenwich, CT);Ex. 75, DT0000048837 at -853-55 (August 18, 2021 WhatsApp chat between Berris and Choi discussing travel and meeting in West Hartford, CT); Ex. 76, BERRIS- 000092241 (April 14, 2022 calendar invitation to Berris, Choi and Bailey Vanneck for meeting at Miller Motorcars in Greenwich, CT).

**Response**: Disputed. Defendants do not know what Berris means by the term "frequently" and therefore contest this statement. This statement is also disputed insofar as the cited documents only demonstrate that Choi was scheduled to be in Connecticut for a total of five different dates and meeting with one single entity, Miller Motors, and Berris Exhibit 76 has not been filed on the court docket. Further, the vast majority of De Tomaso-related work was conducted in New York and Choi

never visited De Tomaso's Connecticut office.  ECF No. 49 ¶¶ 2–4 & 6; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 577:7–15.

10.        Diana Majcher ("Majcher") helps to manage De Tomaso's financial and accounting records, among other duties. Ex. 4, De Tomaso 30(b)(6) Tr. 37:21-38:21, 170:11-16.

**Response**:  This statement is disputed insofar as it mischaracterizes Majcher's testimony about her role at De Tomaso.  Majcher is De Tomaso's Chief Operating Officer and is the person primarily responsible for keeping De Tomaso's books and records, including accounting records. De Tomaso Ex. 6, ECF No. 143-3, Tr. at 37:21–38:21 & 170:11–16.

11.        Defendant Samuel Lui ("Lui") is a citizen of Singapore and Choi's personal friend and business associate. Ex. 5, Genesis 30(b)(6) Tr. 109:20-11:4; Ex. 164, DT0000052700 at -751.

**Response**:  This statement is undisputed except insofar as it implies a preexisting relationship between Choi and Lui.  Choi and Lui first met in the spring of 2021.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 17:16–19.

12.        In or around the spring of 2021, Choi met Lui and began to discuss various financial opportunities. Ex. 3, Choi Tr. 314:19-317:7.

**Response**:  It is undisputed that Choi met Lui in or around the spring of 2021.  This statement is disputed insofar as the statement implies that they immediately began discussing various financial opportunities related to De Tomaso, because the cited documents do not support this statement.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 314:19–317:7; Local Rule 56.1(c)–(d). The earliest that Choi and Lui began to discuss financial opportunities was on August 25, 2021. De Tomaso Ex. 7, ECF No. 143-4, at 318:7–319:11; Berris Ex. 12, ECF No. 168-12, at BERRIS-000035822.

13.       Lui owns a firm called LV Capital Limited, which assists clients on issues related to fund raising and initiating IPOs. Ex. 5, Genesis 30(b)(6) Tr. 21:13–24.

     **Response**:  Undisputed.

14.       While Lui has worked with De Tomaso since 2021, he did not hold a formal position with De Tomaso until September 2023, when he was hired to be De Tomaso's Chief Financial Officer ("CFO"). Ex. 5, Genesis 30(b)(6) Tr. 26:23-25 ("Q. What is your role or title at De Tomaso? A. The contract I signed says CFO."), 109:11-111:6; Ex. 44, DT00159355 (September 14, 2023, message from Mr. Lui to Mr. Choi and others: "I have agreed to terms of employment to join De Tomaso officially as vice-president and CFO").

     **Response**:  It is undisputed that Lui has been employed by De Tomaso since September 2023 as an "Advisor of the Company," not the Chief Financial Officer.  De Tomaso Ex. 86, at DT00177645 § 1.1.  Lui testified that "he does not do what is typically required of a "CFO role," and that "his job duties at De Tomaso" "so far is to do fundraising."  De Tomaso Ex. 8, ECF No. 143-5, Tr. at 27:5–21.  It is disputed that Lui has worked with De Tomaso since 2021.  Lui worked with Genesis Unicorn Capital Corp from October 2021 to August 2023 and only started working with De Tomaso in September 2023.  De Tomaso Ex. 8, ECF No. 143-5, Tr. at 26:5–22; De Tomaso Ex. 9, ECF No. 143-6, Tr. at 17:16–19; Berris Ex. 44, ECF No. 172-27, at DT00159355.

15.       Defendant Genesis Unicorn Capital ("Genesis") was a Special Purpose Acquisition Company ("SPAC"), which was incorporated in Delaware and maintained its principal offices in New Jersey. Genesis has since merged with ESGL Holdings Limited, which is a Cayman Islands company with its principal place of business in Singapore. Ex. 5, Genesis 30(b)(6) Tr. 33:25-34:6, 56:14–16; Ex. 4, De Tomaso 30(b)(6) Tr. 191:20–23; Ex. 164, DT0000052700 at -702, -726.

**Response**: It is undisputed that Genesis was a SPAC incorporated in Delaware and that it has since merged with ESGL Holdings Limited, a Cayman Islands company. A company's principle place of business is a legal conclusion the Court should disregard. *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015). Further, Defendants dispute New Jersey was Genesis's principal place of business. Lui testified Genesis operated no business out of its New Jersey office and that they never had any in-person meetings in New Jersey. De Tomaso Ex. 8, ECF No. 143-5, Tr. at 60:4–61:7.

16.    In October 2021, Lui was the "sole member" of the LLC that sponsored Genesis as a SPAC and the "only person that has put money into the SPAC to have it listed." Ex. 5, Genesis 30(b)(6) Tr. 64:21-66:10.

**Response**: Undisputed.

17.    From October 2021 until August 2023, Lui served as the Director, President, and Chief Financial Officer for Genesis. Ex. 5, Genesis 30(b)(6) Tr. 25:23-26:17.

**Response**: Undisputed.

## II.    CHOI SOLICITS BERRIS'S INVOLVEMENT IN HIS NEW PROJECTS

18.    Prior to meeting Choi, Berris held positions in the luxury auto industry. Berris first worked for Scuderia Cameron Glickenhaus ("SCG"), an American auto company that manufactures high-performances racing cars. Ex. 1, Berris Tr. 39:5-40:23, 48:3-9.

**Response**: This statement is undisputed except insofar as the statement attempts to insinuate Berris had more than one role in the luxury auto industry. Berris only held one position in the luxury auto industry prior to working with De Tomaso which was as a marketing consultant with SCG. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 42:2–43:17, 44:10–20, 76:19–25, 78:2–8 & 97:22–98:14.

19.    Berris was a key contributor and strategic advisor for SCG, where he helped in development, sales, and marketing the brand. He also helped introduce the SCG brand to an

extensive network of bespoke auto enthusiasts and collectors, and was directly responsible for multiple vehicles sales. Ex. 1, Berris Tr. 39:16–20, 44:25-45:13, 48:3–49:11.

**Response**: Disputed. There is no evidence Berris was a major contributor for SCG or that he introduced the brand to an extensive network of people. During his years at SCG, Berris only sold two vehicles. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 39:16–20, 48:3–49:11 & 64:8–13. Berris had no experience in the luxury auto industry prior to working at SCG. *Id.* at 42:2–43:17, 44:10–20, 76:19–25, 78:2–8 & 97:22–98:14. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

20.    Choi first met Berris in 2014 or 2015, after Choi reached out to Berris saying that he was an admirer of SCG. Ex. 1, Berris Tr. 63:25–64:4; Ex. 3, Choi Tr. 25:5-7; Ex. 77, BERRIS-000055898.

**Response**: It is undisputed that Choi first met Berris in 2015. It is disputed that their meeting occurred after "Choi reached out to Berris saying that he was an admirer of SCG," which is not supported by the cited exhibit. Choi first met Berris after Berris' team individually reached out to Choi in February 2015 inviting him to a track in Spain. De Tomaso Ex. 74, at BERRIS-000046111.

21.    Choi informed Berris that he had acquired two luxury automotive brands, Apollo and De Tomaso, but was unsure how to develop and advance the brands. Ex. 78, BERRIS-000055957 (September 5, 2015 email from Choi to Berris stating that Choi recently "managed to

venture into the automotive business" and acquired the Apollo and De Tomaso brands). Choi was exploring how to revamp the De Tomaso brand. Choi initially explored creating replicas of classic De Tomaso designs, but did not end up actually producing any of those vehicles for sale. Ex. 3, Choi Tr. 52:10-55:10.

**Response**: It is undisputed that Choi informed Berris he had acquired Apollo and De Tomaso after Berris reached out to Choi in an email. Berris Ex. 78, ECF No. 169-28, at BERRIS-000055957. It is disputed that Choi ever expressed uncertainty about "how to develop and advance the brands" or "did not end up actually producing any of those vehicles for sale." The cited documents do not support those statements. Local Rule 56.1(c)–(d).

22.    Choi's background was in finance, and these brand acquisitions were his first foray into the automotive industry. Ex. 78, BERRIS-000055957; Ex. 3, Choi Tr. 19:8-23.

**Response**: Disputed. The underlying citations do not support Berris' statements. Local Rule 56.1(c)–(d).

23.    Prior to purchasing these brands, Choi had mostly spent his professional life "investing [his] family's money." Ex. 3, Choi Tr. 6:4-19:14. Choi's family is exceedingly wealthy, and his father has significant commodity businesses throughout Asia (primarily plantations and coal mines in Indonesia). *Id.* (Choi's father was a "prominent businessperson in Hong Kong," who "owned numerous businesses" throughout Asia).

**Response**: It is undisputed that Choi previously "invested [his] family's money." De Tomaso Ex. 7, ECF No. 143-4, Tr. at 6:4–19:14. Otherwise, this statement is disputed because the record citations do not support it. Local Rule 56.1(c)–(d).

24.    In January 2018, Berris entered into a consulting services agreement with Apollo that memorialized Berris's role and compensation. Ex. 80, DT0000000100 (the "Consultancy Agreement").

**Response**: Undisputed.

25.    Berris entered into the Consultancy Agreement via his personal company, Aprivy LLC, of which he is the sole owner and shareholder. Ex. 1, Berris Tr. 110:22-23, 275:5-10, 588:3-5. De Tomaso was not a party to the Agreement. Ex. 80, DT0000000100. In fact, the Consultancy Agreement contains an express anti-delegation and anti-assignment clause. *Id.* § 11. While the Agreement does mention Berris' work on De Tomaso vehicles, De Tomaso was not a party to this contract. *Id.* § A1(e) (stating that Berris' services "shall be performed for both 'Apollo' and 'De Tomaso' branded vehicles and any future brands that the Company may launch over the duration of this Agreement"). The Agreement also states that "for future [vehicle] models, Apollo or De Tomaso, [Berris] and the Company will in good faith come to terms on a mutually agreeable compensation on those products at the time that they are defined and planned for production." *Id.* § A3(c)(iii). This is consistent with Berris' deposition testimony, wherein he stated that "at the time of this agreement, the reason that there's a mention of De Tomaso is because at this time Norman was the owner of Apollo/De Tomaso," but that at that time "it was not possible to come to a mutually agreeable financial terms for De Tomaso, which is why it mentioned we would discuss those in good faith at a later date." Ex. 1, Berris Tr. 275:24-276:11.

**Response**:  It is undisputed that "Berris entered into the Consultancy Agreement via his personal company, Aprivy LLC, of which he is the sole owner and shareholder."  Defendants do not dispute that De Tomaso was not a signatory to the contract, but do dispute any implication that it was not a third-party beneficiary of the contract.  Defendants do not dispute that the quoted language

appears in the cited document.  The document speaks for itself, and Defendants dispute any attempt

by Berris to characterize the plain language of the document.  Defendants dispute that "it was not

possible to come to a mutually agreeable financial terms for De Tomaso, which is why it mentioned

we would discuss those in good faith at a later date."  The Consultancy Agreement, drafted by Berris

himself, always meant to include the scope of services for both, Apollo and De Tomaso.  De Tomaso

Ex. 7, ECF No. 143-4, Tr. at 40:20–41:13; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 279:7–19; De

Tomaso Ex. 1, ECF No. 156-1, at DT000000110 §1(e).  Berris' self-serving testimony is further

disputed because it is unsupported by anything other than Berris' self-serving statements, which do

not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*,

LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement,

without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary

judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d

Cir. 2009).

26.    The Consultancy Agreement set forth the terms of Berris' employment at Apollo

Ex. 80, DT0000000100. Under the Consultancy Agreement, in exchange for his services, Berris was

to be paid $200,000 per year in compensation, plus a performance fee calculated based on a

percentage of sales. Ex. 80, DT0000000100 at -110-111.

**Response**:  Disputed.  This statement is a legal conclusion that is not properly supported by

testimony by a lay witness, and which the Court should disregard.  *See Congregations Rabbinical*

*Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).  De

Tomaso does not dispute that the Consultancy Agreement was intended to cover services "for both

'Apollo' and 'De Tomaso' branded vehicles," and that Berris was to be paid $200,00 a year, plus a

commission based on sales as set forth in the Consultancy Agreement. De Tomaso Ex. 1, ECF No. 156-1, at DT000000110 §1(e); De Tomaso Ex. 4, ECF No. 143-2, Tr. at 279:7–19.

27.    While working as a consultant for Apollo, in 2018, Berris took the lead on creating the De Tomaso P72, which would become the central component of the De Tomaso brand's revival. Ex. 1, Berris Tr. 106:15-107:21.

**Response**: Disputed. Berris did not take "the lead on creating the De Tomaso P72," and the cited testimony does not support – or reference – Berris "creating" the P72. Rather it discusses his marketing role at De Tomaso. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

28.    A feature piece in the Robb Report lifestyle magazine described how Berris worked alongside Choi to build the Apollo brand. Ex. 82, BERRIS-000269202 (Berris noted, "I've been involved with the Apollo program since the inception of the IE, as Norman has been my friend for many years. I had been working with Scuderia Cameron Glickenhaus (SCG) when Norman and I started talking about resurrecting the Apollo nameplate").

**Response**: Disputed. The document referenced in this statement is inadmissible hearsay evidence. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"). Further, the document speaks for itself, and Defendants dispute any attempt by Berris to characterize the plain language of the document.

29.     In May 2019, WE Solutions Limited ("WE Solutions")—a Hong Kong publicly

traded company—announced it was going to purchase an interest in Apollo. Ex. 83, BERRIS-

000164502. WE Solutions ultimately purchased the entire company for approximately $153 million;

the deal closed in March 2020 and Choi sold his entire stake in Apollo. Ex. 1, Berris Tr. 281:15-17;

Ex. 3, Choi Tr. 56:10-12.

**Response**: This statement is disputed because this document is inadmissible hearsay

evidence. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir.

2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment"). Moreover, WE Solutions did not purchase 100% of Apollo. Berris Ex. 83,

ECF No. 169-32, at BERRIS-000164502. We Solutions only purchased 86.06% of Apollo from

Choi. *Id*.

30.     WE Solutions then rebranded itself as Apollo Future Mobility Group ("AFMG").

Ex. 3, Choi Tr. 276:20-277:3. At Choi's request, Berris continued to work for Apollo—after its sale

to AFMG—and oversaw the management of Apollo's existing clients. Ex. 1, Berris Tr. 284:20-

285:18. He also continued to manage Apollo's marketing and corporate events, assist with the

closing and delivery of Apollo vehicles and participate in Apollo's corporate planning. Ex. 135,

DT00130052 at-072-73 (Choi writing to Majcher that "Ryan will continue to help out" with Apollo);

Ex. 1, Berris Tr. 283:23-285:22.

**Response**: It is undisputed that WE Solutions rebranded itself as Apollo Future Mobility

Group ("AFMG"). The remainder of this statement is disputed because Berris' citations do not

support it. Berris equivocated on this role at Apollo, repeatedly testifying when pressed that he

"would need to check [his] records" to confirm any work he actually did. De Tomaso Ex. 4, ECF

No. 143-2, Tr. at 284:10–285:22. Moreover, Berris' self-serving testimony is further disputed

because it is unsupported by anything other than Berris' self-serving statements, which do not create

a genuine issue of fact on summary judgment . *See Fed. Trade Comm'n v. RCG Advances*, LLC,

695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without

direct or circumstantial evidence. . . , is insufficient to defeat a motion for summary judgment.")

(emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

31.     For that work, Berris continued to receive compensation under the Apollo

agreement from the now AFMG-owned Apollo until the Consultancy Agreement was terminated in

May 2022. Ex. 1, Berris Tr. 281:18-282:12; Ex. 120, DT0000036166.

**Response**:  Disputed.  The cited documents do not support this statement.  Local Rule

56.1(c)–(d).  As Berris testified, he continued to receive compensation through Aprivy for his work

for both Apollo *and* De Tomaso.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 281:18–282:12; De

Tomaso Ex. 1, ECF No. 156-1, at DT000000110 §1(e); De Tomaso Exs. 12 & 13, ECF Nos. 144-1

& 156-13, at RFA Nos. 33–34.  Berris' self-serving testimony is further disputed because it is

unsupported by anything other than Berris' self-serving statements, which do not create a genuine

issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances, LLC*, 695 F. Supp.

3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or

circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis

added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

32.     De Tomaso was expressly excluded from the sale of Apollo and Choi continued to

own it. AFMG, however, retained a call option to purchase shares in De Tomaso, which was

structured as a right of first refusal to purchase shares in De Tomaso. Ex. 165, BERRIS- 000241279.

AFMG ultimately did not exercise that option and Choi bought back the option in March 2021. Ex.

3, Choi Tr. 277:4-11; Ex. 128, DT00164138 at -148-50.

**Response**:  Disputed.  There is no record evidence, including that to which Berris cites, to support the statement that "De Tomaso was expressly excluded from the sale of Apollo and Choi continued to own it."  Local Rule 56.1(c)–(d).  Defendants do not dispute that AFMG had an option to purchase a percentage in De Tomaso, yet it was never exercised, and Choi purchased the option back from AFMG.  De Tomaso Ex. 7, ECF No. 143-7, Tr. at 277:4–23.

33.    Berris's business development, management, and branding contributions contributed to the successful buyout of Apollo. Berris received no additional compensation or bonus from the buyout—rather, he requested that Choi use the proceeds from the sale to fund De Tomaso's operations (a promise which Choi did not carry out). Ex. 3, Choi Tr. 292:16-20; Ex. 1, Berris Tr. 313:8-12.

**Response:**  Disputed.  There is no record evidence cited to support the statement that "Berris's business development, management, and branding contributions contributed to the successful buyout of Apollo."  Additionally, the cited testimony does not support the statement that Berris was entitled to any type of compensation from the buyout, much less that he requested how to use the proceeds of the sale.  Choi was the sole owner of the stake in Apollo that was sold to WE Solutions; therefore, Berris was never entitled to nor was there any reason for Berris to receive compensation from the Apollo buy out.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 28:4–9.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

34.     During their years working together at Apollo (and later, at De Tomaso), Berris and Choi developed a close personal friendship, spending many hours together as they traveled the world to promote the new brands and grew close with each other's families.  *See* Ex. 1, Berris Tr. 305:10-13, 374:14-15 (Berris testified "Norman was my best friend, he was my brother, my honestly family"); Ex. 84, BERRIS-000022405 (Choi messaged "great day brother. And good rest tonight" and Berris responded, "love you bro"); Ex. 85, BERRIS-000014158 (Berris messaged "I love you bro and am doing everything I can to make things happen" and Choi responded, "Now I want to cry. Let's give each other a BIG hug."); Ex. 86, BERRIS- 000004427 (Berris messaged that De Tomaso was "like family" and Choi responded "feeling is mutual"); Ex. 87, BERRIS-000045779 (Berris exchanged texts with Choi's young daughter, who referred to Berris as "Uncle Blueberry").

**Response**:  Defendants do not know what Berris means by "close personal friendship" or "close with each other's families," and therefore dispute those statements.  It is undisputed that Berris and Choi were, at one time, friends.

### III.     BERRIS BEGINS WORKING FOR DE TOMASO AT CHOI'S REQUEST

35.     After the Apollo sale, Berris and Choi finalized an agreement for Berris to continue working at De Tomaso, now a stand-alone company, as its CEO and Chief Marketing Officer. Berris joined De Tomaso as an at-will employee and negotiated a compensation package with Choi for his work. Ex. 1, Berris Tr. 620:24-621:9.

**Response**:  Disputed.  Berris and Choi finalized an agreement for Berris to perform work for De Tomaso on January 27, 2018, when they signed the Consultancy Agreement between Apollo and Aprivy LLC.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 274:11–275:21; De Tomaso Ex. 1, ECF No. 156-1, at DT000000110 §1(e).  The Consultancy Agreement, drafted by Berris himself, expressly includes services for both Apollo and De Tomaso.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 40:20–41:13; De Tomaso Ex. 1, ECF No. 156-1, at DT000000110 §1(e).  The Consultancy Agreement was

-16-

terminated in May 2022, after Berris resigned from the Board of De Tomaso.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 276:12–277:2; De Tomaso Ex. 25, ECF 140-12, at BERRIS-000055464–65. Defendants further dispute "Berris joined De Tomaso as an at-will employee and negotiated a compensation package with Choi for his work."  Berris' citation does not reference or support any negotiations or compensation package.  Nor does it show Berris was an at-will employee,  which only asserted when prompted with a leading question from his own lawyer.  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 620:24–621:9.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).  When he wasn't being coached, Berris testified his purported agreement was to last for "more than a year." De Tomaso Ex. 4, ECF No. 143-2, Tr. at 307:17–25.

36.    Berris often covered De Tomaso business expenses (such as travel to auto shows or client meetings) with his own funds, understanding that they would eventually be reimbursed by De Tomaso.

**Response**:  Disputed.  Berris provides no citations to record evidence to support this statement.  Fed. R. Civ. P. 56(c).  Rather, the evidence shows Berris submitted hundreds of thousands of dollars in expense reimbursements to De Tomaso without explaining the business purpose of any of them, and which he was never able to explain or justify.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 330:15–363:5 & 465:5–24; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 590:2–591:23 & 597:17–598:4.

37.      Berris's unreimbursed expenses totaled "in excess of $500,000." Ex. 1, Berris Tr. 219:6-20; 333:20-334:7.

**Response**:  Disputed.  Berris received payment for every invoice he issued to either De Tomaso or Apollo.  De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 33–35. Berris submitted over $442,034.69 in unsubstantiated business expenses.  De Tomaso, Ex. 20, ECF No. 145-4, at BERRIS-000091077–79.  He testified he "d[idn't] know" how anyone would determine from what he submitted the business purpose of any expense and "c[ouldn't] recall" how he supposedly justified his expenses.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 330:15–363:5 & 465:5–24; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 590:2–591:23 & 597:17–598:4.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

38.      Berris's responsibilities with De Tomaso included business strategizing and planning, coordinating with technical partners to ensure manufacturing was on track, creating contracts and agreements with technical partners, recruiting and overseeing the work of new employees, supervising corporate contracts and vendor relationships.

**Response**:  Disputed.  Berris provides no citations to record evidence to support this statement.  Fed. R. Civ. P. 56(c).

-18-

39.    It also included working with car dealers to process and vet P72 buyers, and marketing and publicizing the brand (which often involved traveling to international automobile events). Ex. 1, Berris Tr. 106:18-24-108:4; Ex. 2, Majcher Tr. 114:16-116:17.

**Response**: Undisputed.

40.    Berris also led the development of De Tomaso's P72 vehicle. Ex. 19, DT0000049319 at -331-332 (Choi wrote to Berris, "And to be fair You originated / discovered the P70…To help both of us achieving 'our' vision").

**Response**: Disputed. The cited document does not support the statement. Fed. R. Civ. P. 56(c).

41.    In the March through June 2020 time frame, Choi offered Berris a 10% equity stake in De Tomaso, which Berris accepted. Ex. 1, Berris Tr. 291:22-292:6; 292:11-16. Berris recalled that he was in Connecticut—likely the De Tomaso offices—when Choi extended the offer of equity to him. Ex. 1, Berris Tr. 292:17-23. The accepted offer was effective immediately. Ex. 1, Berris Tr. 292:3-6.

**Response**: Disputed. Choi never offered 10% equity of De Tomaso to Berris and never promised Berris a specific percentage of equity in any company that Choi owns. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13 & 391:14–392:3. At most, De Tomaso contemplated various methods by which employees could receive equity as part of its corporate restructuring. *See, e.g.*, De Tomaso Ex. 77, at BERRIS-000071280; De Tomaso Ex. 83, at BERRIS-000073916–921. But those discussions were abandoned, and De Tomaso completed its restructuring without assigning any equity to any employee, including Berris. De Tomaso Ex. 72, at DT0000059720. Indeed, Berris freely admits there is "no written agreement" entitling him "to any equity interest." De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 1, 2 & 7; De Tomaso Ex. 4, ECF

-19-

No. 143-2, Tr. at 314:22–315:21 & 316:3–20.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

42.     At the time Choi offered Berris a 10% equity stake, De Tomaso was a closely- held company. Ex. 136, BERRIS-000325040; Ex. 4, De Tomaso 30(b)(6) Tr. 166:21-167:10.

**Response**:  It is undisputed that De Tomaso is a closely-held company.  It is disputed that Choi offered Berris a 10% equity stake.  Choi never conferred equity in De Tomaso on Berris and never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7 & 391:14–392:3.  Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At most, De Tomaso contemplated various methods by which employees could receive equity as part of its corporate restructuring.  *See, e.g.*, De Tomaso Ex. 77, at BERRIS-000071280; De Tomaso Ex. 83, at BERRIS-000073916–921.  But those discussions were abandoned, and De Tomaso completed its restructuring without assigning any equity to any employee, including Berris.  De Tomaso Ex. 72, at DT0000059720.  Indeed, Berris freely admits there is "no written agreement" entitling him "to any equity interest."  De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 1, 2 & 7; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 314:22–315:21 & 316:3–20. This statement is disputed because Exhibit 136 contains inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

43.     Choi offered Berris this equity stake to reward Berris's hard work for De Tomaso; to incentivize Berris to stay at De Tomaso; and to get him to take on an even large role at the company (CEO). Ex. 1, Berris Tr. 98:9-23, 311:13-312:4; Ex. 88, DT0000004556 at -557 (press release from October 2019 showing that Berris' title was "General Manager and CMO"); Ex. 137, DT00113837 at -838 (press release from October 2020 showing that Berris' title was "CEO/CMO").

**Response**: Disputed.  The cited documents do not support this statement.  Local Rule 56.1(c)–(d).  It is further disputed that Choi offered Berris a 10% equity stake.  Choi never conferred De Tomaso equity upon Berris and never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7 & 391:14–392:3.  Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At most, De Tomaso contemplated various methods by which employees could receive equity as part of its corporate restructuring.  *See, e.g.*, De Tomaso Ex. 77, at BERRIS-000071280; De Tomaso Ex. 83, at BERRIS-000073916–921.  But those discussions were abandoned, and De Tomaso completed its restructuring without assigning any equity to any employee, including Berris.  De Tomaso Ex. 72, at DT0000059720.  Indeed, Berris freely admits there is "no written agreement" entitling him "to any equity interest."  De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 1, 2 & 7; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 314:22–315:21 & 316:3–20.  And Berris' responsibilities at De Tomaso did not change after he received the title of CEO.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 109:14–21.

44.     During this time, Berris had contemplated leaving De Tomaso, because his father suggested Berris take over the family investing business. Ex. 1, Berris Tr. 37:22-38:4, 311:13- 312:4.

**Response**: Disputed.  Berris' citations do not support the statement that Berris' "father suggested Berris take over the family investing business," nor were Berris' other family members –

including his sister – aware of any such offer.  De Tomaso Ex. 10, ECF No. 156-10, Tr. at 22:10–24.

Berris' self-serving testimony is further disputed because it is unsupported by anything other than

Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.

*See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A]

*nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is

insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom

Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

45.     By immediately accepting Choi's offer of an equity stake, Berris forewent the

potential business relationship with his father, which strained his family relationships. Ex. 1, Berris

Tr. 37:9-38:8.

**Response**:  Disputed.  As noted above, Choi never conferred equity upon Berris in De

Tomaso and never promised Berris a specific percentage of equity in any company that Choi owns.

De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7 & 391:14–392:3.  Choi never set aside 10 percent

equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  Berris and his father have a

good relationship, and the pair have never had any falling out between them.  De Tomaso Ex. 10,

ECF No. 156-10, Tr. at 20:11–21:7.  Berris's father "was always aware of where [Berris'] passions

lied, knew that [Berris] loved the car industry" and never thought he would leave his company to

Berris.  *Id.* at 22:10–24.  Berris' self-serving testimony is further disputed because it is unsupported

by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on

summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382

(S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial

evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also

Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

46.     After Berris accepted Choi's 10% equity stake offer, Berris and Choi consulted with De Tomaso's attorneys about the tax implications of the equity grant. Ex. 1, Berris Tr. 293:3–294:16.

**Response**: It is disputed that Choi offered Berris a 10% equity stake, or that Berris accepted it. Choi never conferred equity in De Tomaso on Berris and never promised Berris a specific percentage of equity in any company that Choi owns. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13 & 391:14–392:3. Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris. *Id.* at 301:10–18. And while De Tomaso consulted lawyers regarding various methods by which employees could receive equity as part of its corporate restructuring, those discussions were abandoned, and De Tomaso completed its restructuring without assigning any equity to any employee, including Berris. *See, e.g.*, De Tomaso Ex. 77, at BERRIS-000071280; De Tomaso Ex. 83, at BERRIS-000073916–921; De Tomaso Ex. 72, at DT0000059720. Indeed, Berris freely admits there is "no written agreement" entitling him "to any equity interest." De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 1, 2 & 7; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 314:22–315:21 & 316:3–20. Finally, Defendants dispute this statement because Berris' self-serving testimony is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

47.     Berris and Choi agreed that the equity stake was to be a 10% stake in De Tomaso, in the form of "sweat equity," with no "performance clauses or conditions" or other "restrictions."

Ex. 1, Berris Tr. 298:19-300:25, 323:3-16, 621:17-25.  While Berris could have taken possession of his shares at any time, Choi agreed to hold them in good faith until such time that Berris had enough liquidity to cover his tax liability. Ex. 1, Berris Tr. 300:15-25.

**Response**:  Disputed.  Choi never conferred equity upon Berris in De Tomaso and never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13 & 391:14–392:3. Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  Indeed, Berris freely admits there is "no written agreement" entitling him "to any equity interest."  De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 1, 2 & 7; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 314:22–315:21 & 316:3–20.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

48.     Berris does not recall any specific agreement relating to a partnership structure for De Tomaso. Ex. 1, Berris Tr. 298:8-299:13, 323:23-325:11.

**Response**:  Disputed.  Berris alleged in his amended complaint his supposed equity and compensation agreement was part of an agreement between Choi and Berris to "partner," and that "Choi assured Berris that he would be a partner in the company and have a 10% ownership stake." Am. Cmplt. ¶¶ 2, 4, 59 & 67.  Berris testified his discussions around his "oral agreement" for equity in De Tomaso included "discussions of a partnership structure."  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 323:23–324:22.  Berris referred to his oral agreement as a partnership agreement with Choi.

*Id.* at 324:7–22. Berris further testified that his agreement with Choi was a partnership, meant to last "indefinitely," that is, "more than a year," and that "Mr. Choi and I were partners." *Id.* at 307:17-25 & 420:8-13. Berris referred to himself as a "partner in the business" and repeatedly stated he and Choi were partners. *Id.* at 160:19–22, 208:14–22, 210:18–20, 220:6–10, 307:21–23 & 311:13–14, 323:19–22. And Berris discussed a partnership agreement with De Tomaso's lawyers, including discussed creating a "partnership" where "[a]s a partner, Ryan [would] no longer" be "treated as an 'employee.' " De Tomaso Ex. 77, at BERRIS-000071280; *see* De Tomaso Ex. 83, at BERRIS-000073916–921. Time sheets from those lawyers refer to the alleged oral contract as a "partnership." Berris Ex. 15, ECF No. 168-15, at BERRIS-0000074573. Berris's own counsel even referred to the alleged oral contract as a "partnership." De Tomaso Ex. 7, ECF No. 143-4, Tr. at 293:23–295:25. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

49.     The corporate structure of De Tomaso is a limited liability company, not a partnership. Ex. 20, DT0000000073 (stating that De Tomaso is a "limited liability company").

**Response**: Undisputed.

50.     After coming to ground on the equity stake, Berris and Choi entered into separate, subsequent discussions relating to other components of his compensation, including salary. Ex. 1, Berris Tr. 291:21-292:6. Specifically, Berris negotiated a salary of $400,000 per year to be paid by De Tomaso. Ex. 1, Berris Tr. 318:6-10. Other than submitting an invoice for a single- month's

payment of $33,333 in March 2022, Berris did not draw his salary during his time with De Tomaso. Ex. 1, Berris Tr. 312:24-313:16, 317:3-6; Ex. 153, DT0000075484 (March 4, 2022 email from Berris to Majcher, transmitting "Invoice no. 13025"). Notably, after receiving the invoice, Choi wrote to Majcher: "Should be $400K a year so that works out to be 33,333". Ex. 116, DT00133566 at -608-610 (referencing invoice no. 13025).

**Response**: Disputed. Defendants do not know what Berris means by "other components of his compensation" and contests there were unspecified "other components." As noted above, Defendants further contest Berris "c[ame] to ground on the equity stake." Defendants further dispute Berris negotiated a salary of $400,000 per year. As Mr. Choi testified, he did not promise Berris a new, increased, second salary and he paid Berris' single invoice as a favor simply because he thought Berris needed cash. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 86:12–87:5. Rather, as Berris admits, he was compensated for his services performed under the Consulting Services Agreement through payments made to Aprivy. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 280:6–11. Berris received more than half a million dollars in payment through Aprivy pursuant to the Consulting Services Agreement *even after Apollo was sold in March of 2020*. *Id.* at 282:6–11; De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 31 & 34–35. After March of 2020, Aprivy likewise received more than $360,000 from De Tomaso. De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 32–33; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 282:16–21. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is

insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

51.    Berris also negotiated with Choi a 2% commission on the sale of De Tomaso automobiles. Ex. 1, Berris Tr. 288:18-289:5. Berris never invoiced De Tomaso for commissions on the sales he made and was not paid them. Ex. 1, Berris Tr. 322:4-15.

**Response**: It is undisputed that Berris neither invoiced nor received any commission related to a De Tomaso vehicle.  Defendants dispute that Berris had an agreement with Choi for a 2% commission on De Tomaso sales.  There is no written agreement entitling Berris to a specific commission on any De Tomaso vehicle.  De Tomaso Ex. 1, ECF No. 156-1, at DT0000000100, Ex. A § 3(c)(iii); De Tomaso Ex. 4, ECF No. 143-2, Tr. at 316:16–20.  Nor is there any written agreement entitling Berris to a "2 percent commission *on all sales*," unrestricted by time or product, that Berris asserts lasted "indefinitely."   Am. Cmplt. ¶ 136; *see also id.* ¶¶ 59, 68 & 151; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 288:19–289:5; 307:17–25 & 409:18–411:14.  And Choi testified he "never agreed that De Tomaso would pay Mr. Berris a 2 percent commission for De Tomaso automobiles, including the P72s that were sold."  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 311:13–312:2.  Nor would Berris be entitled to any commission anyway, because De Tomaso had not completed the sale of any vehicles by the time Berris left.  Berris Ex. 92, ECF No. 172-49 at DT0000034130 § 3.1 (setting forth a staggered, as of yet uncompleted payment schedule for the cars).  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . ,

is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

52.     While at De Tomaso, Berris was responsible for over $100 million in De Tomaso sales agreements, which he personally executed (on behalf of De Tomaso). Ex. 89, DT0000050169 (De Tomaso spreadsheet showing all purchasers of P72s and amount of deposits paid); *see, e.g.*, Ex. 90, BERRIS-000253929; Ex. 91, DT0000080756; Ex. 92, DT0000034128 (examples of some of the many P72 purchase agreements executed by Berris); Ex. 93, DT0000030261 (email between Berris and De Tomaso customer Barry Skolnick, showing Berris closing the deal for a P900 sale to Skolnick).

**Response**: Disputed. The cited documents do not support the statements, except to show Berris' signature appeared on a few sales agreements. Local Rule 56.1(c)–(d). A spreadsheet of customers does not mean Berris was "personally responsible" for the sale agreements. For example, Evan Cygler testified "[t]he majority of the customers that all came to the program were leads that came in through our website" – not Ryan Berris – and that others were "current Miller Motorcars customers" that trusted Miller Motorcars. De Tomaso Ex. 11, ECF No. 143-7, Tr. at 87:19–90:2.

53.     Berris and Choi also agreed that Berris would receive a Porsche GT3 and a specification order for the vehicle was submitted in 2022. Ex. 1, Berris Tr. 305:20-306:20. But, as there was a waiting list, the vehicle was not delivered to Berris prior to his termination from De Tomaso. Ex. 1, Berris Tr. 306:21-307:6.

**Response**: Disputed. There is no written agreement entitling Berris to a new Porsche 911 GT3. De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA No. 7; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 316:9–13. Berris never received a Porsche GT3 from De Tomaso, nor did he ever raise that issue with De Tomaso. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 305:22–306:2 & 307:3–

13. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

54.     Choi also agreed to provide Berris with a P72 chassis bearing the number 60. Ex. 1, Berris Tr. 289:6-13. An internal De Tomaso document titled "De Tomaso P72 / Global Chassis Allocations," notes that a chassis 60 has been assigned to "RB," and is described as an "Internal" allocation. Ex. 167, DT00168682. Other units listed in that document have names or initials that reflect to whom they were assigned, including the number 72 with the initials "NC" by it. *Id.*

**Response**: Disputed. The Chassis Allocation document Berris now asserts entitled him to a P72 was *drafted by Berris*– in other words, he assigned a P72 to himself. De Tomaso Ex. 5, ECF No. 156-5, Tr. at 575:6–576:2; De Tomaso Ex. 7, ECF 143-4, Tr. at 95:2–96:5 & 97:14–98:22. Choi never orally or in writing promised chassis No. 60 to Berris. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 94:19–23 & 98:20–22. Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

55.      Choi testified that NC referred to him, but claimed to not know who RB referred to. Ex. 3, Choi Tr. 97:2-9. Choi speculated that RB might refer to "Richard Branson," but later admitted Branson never purchased a P72. Ex. 3, Choi Tr. 97:20-98:7.

**Response**: It is undisputed that Choi testified he "had no idea who inputted" a specific entry in Berris' Chassis Allocation excel file and "[did not] want to speculate."  Choi stated that RB could refer to "Richard Branson" as an example that RB could stand for someone other than "Ryan Berris."  Choi stated he did not know what RB stood for since the entry was "not input by [him]," and that he "never orally promised chassis No. 60 to Ryan Berris."  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 97:17–98:22.

56.      Berris felt comfortable entering into these oral agreements with Choi because he "trusted him." Ex. 1, Berris Tr. 229:5-13, 295:21-296:13, 305:5-13.

**Response**:  Disputed.  Choi did not enter into any oral agreements with Berris.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 83:3–13, 98:20–22, 284:2–7, 291:14–292:13, 311:13–312:2 & 391:14–392:3.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

57.      Moreover, it was not unusual for Choi to enter into oral agreements over matters of importance in his business dealings. Although Choi testified that having a written agreement is "essential," Ex. 3, Choi Tr. 76:2-3, Majcher did not have a written employment contract with De Tomaso prior to Berris's departure from the company in May 2022. Ex. 2, Majcher Tr. 46:25-47:17.

**Response**:  Disputed.  The first statement is unsupported by any record evidence.  Further, Choi did not routinely enter into oral agreements.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 83:3–13, 98:20–22, 284:2–7, 291:14–292:13, 311:13–312:2 & 391:14–392:3; Berris Ex. 2, ECF No. 168-2, Tr. at 47:18–25.  This statement is further disputed because it mischaracterizes Majcher's testimony.  Berris Ex. 2, ECF No. 168-2, Tr. at 43:10–22 & 47:18–25.  Majcher testified that she did not have a written or oral agreement with De Tomaso, but rather understood the work she did for De Tomaso would be compensated under her Apollo contract (just like Berris).  *Id.* at 47:18–48:8.

58.     Despite being dated June 2022, Majcher's consultancy agreement with De Tomaso was executed in July 2023, after Berris filed this litigation. Ex. 138, DT0016477 at- 777-778; Ex. 2, Majcher Tr. 59:8-62:20. In 2022—months before Majcher's consultancy agreement was executed in July 2023—Majcher and Choi orally agreed on the same terms later memorialized in the 2023 agreement. Ex. 2, Majcher Tr. 62:7-63:11. Majcher started receiving her annual salary of $300,000 in 2022. Ex. 2, Majcher Tr. 62:21-63:7.

**Response**:  Disputed.  This statement mischaracterizes the cited testimony.  Majcher's consultancy arrangement with De Tomaso started in 2022.  Berris Ex. 2, ECF 168-2, Tr. at 62:7–16.  Prior to formalizing the consultancy arrangement with De Tomaso, Majcher and Choi discussed the terms of the arrangement in 2022.  *Id.* at 63:3–11.  De Tomaso started to pay Majcher per the terms of her separate consultancy agreement with the company in 2022 and continues to pay Majcher per the terms of the agreement.  *Id.*  Majcher has a fully executed independent contractor agreement with De Tomaso dated July 2022 and signed by both Majcher and Choi.  De Tomaso Ex. 75, at DT00177644.

## IV.    CHOI'S GRANT OF THE EQUITY STAKE IS REFLECTED IN OTHER WRITTEN EVIDENCE

59.    In the fall of 2020, Choi and Majcher referenced the equity grant promised to Berris in connection with valuation work for the call option that AFMG retained and was considering exercising. In a text exchange, Majcher told Choi that he needs to "let them know about Ryan's ownership % though." Ex. 35, DT00099775 at -781. Majcher testified that the text meant that "if AFMG is going to exercise its option, they need to be aware about the percentage of equity that Ryan owns in the company." Ex. 2, Majcher Tr. 351:24-352:5.

**Response**: Disputed.  This statement mischaracterizes the cited testimony.  At different times Choi considered giving equity to different employees under different circumstances, and discussed those thoughts with his counsel and Majcher.  Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4, Tr. at 291:14–292:23 & 394:3–25.  Any equity arrangement between De Tomaso and its employees was subject to the final agreement and the advice of De Tomaso's counsel.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 291:14–292:23 & 394:3–25; De Tomaso Ex. 76, at BERRIS-000064746.  De Tomaso Ex. 76, at BERRIS-000064748 (discussing the possibility of an "equity incentive plan."); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815 (discussing different methods of transferring assets).  Neither the amount of equity to be transferred nor the method of transferring equity to employees was ever decided or agreed upon.  Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815 (stating "its unclear what the relative percentages will be.").  And ultimately De Tomaso did not create any employee incentive plan or give equity to any employee.  De Tomaso Ex. 72, DT0000059720 (final corporate organizational structure); De Tomaso Ex. 83, at BERRIS-000073916 & 919 (email thread dated March 15, 2021 where Ryan states, "Will revisit" and "Both of these Marshall Island entities will be 100% owned by Norman in his personal capacity.").  At no point in time did Choi give De Tomaso equity to any of De

Tomaso's employees or anyone else.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:23, 391:14–392:3 & 394:3–25; De Tomaso Ex. 72, DT0000059720 (final corporate organizational structure).

60.    In December 2020, Choi and Berris were working to establish a banking relationship with JP Morgan for De Tomaso. As part of the due diligence process, JP Morgan was informed in December 2020 that "the ultimate beneficial owners [of De Tomaso] are Norman and yourself [Ryan], not an open ended investor pool." Ex. 94, BERRIS-000071091.

**Response**:  Disputed.  These statements are not supported by any record citations (nor does the filed version of Exhibit 94 contain a BATES number).  The conversation referenced here is inadmissible hearsay.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").  Further, it appears to be a statement by someone named Freda Ho summarizing what Berris told her – in other words, not a statement by Choi or De Tomaso, but a statement by Berris.  The document further makes clear the company was in the process of restructuring to "treat all of the entities as . . . partnership for US tax purposes."  But those discussions were abandoned, and De Tomaso completed its restructuring without assigning any equity to any employee, including Berris.  De Tomaso Ex. 72, at DT0000059720.

61.    Choi likewise referenced Berris's equity interest in communications with De Tomaso's legal counsel. On December 31, 2020, Choi forwarded to Berris an exchange with De Tomaso's attorney, in which Choi stated: "Morning, one question regarding the % I promised to give Ryan. At the end, what's the best way /structure to proceed with Ryan not having to deal with all the capital gain / gift / income tax issues?" Berris responded, "Well noted and appreciated bud." Ex. 95, BERRIS-0000030379.

**Response**:  Disputed.  The first statement is not supported by any record citations.

Defendants further dispute that the cited evidence shows that Choi actually gifted or otherwise gave

Berris an equity interest in De Tomaso.  Choi never conferred equity upon Berris in De Tomaso and

never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso

Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25.  Choi never set

aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At different

times Choi considered ideas for giving equity to different employees and discussed this with his

counsel and Majcher.  Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4,

Tr. at 291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.

Indeed, this message thread continues on to say, "the structure will be a partnership for tax purposes

until SPAC."  Berris Ex. 95, ECF No. 169-44, at BERRIS-0000030380.  But ultimately De Tomaso

De Tomaso did not create any employee incentive plan or give equity to any employee.  De Tomaso

Ex. 72, DT0000059720 (final corporate organizational structure); Berris Ex. 168, ECF No. 171-16,

at BERRIS-000064815.

     62.       On January 5, 2021, Choi again forwarded Berris a copy of a message Choi sent to

the attorneys stating: "Pls let me know once you speak to Jamie, FYI, I will proceed with the fund

raise and want to make sure Ryan's interest is well taken care prior to the completion of the raise,

many thanks."  Choi then wrote to Berris "[h]ave a wonderful day ahead Mr. Berris Kick some

butts," and Berris responded, "Noted and appreciated." Ex. 96, BERRIS-000030582 at - 584-585.

     **Response**:  Defendants do not dispute this statement quotes a select portion of the

referenced document.  Defendants dispute this document shows anything but abandoned negotiations

for interest through a partnership agreement.  Choi never conferred equity upon Berris in De Tomaso

and never promised Berris a specific percentage of equity in any company that Choi owns.  De

Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25.  Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At different times Choi considered ideas for giving equity to different employees and discussed this with his counsel and Majcher.  Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4, Tr. at 291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.  Indeed, this message thread continues on to say, "the structure will be a partnership for tax purposes until SPAC."  Berris Ex. 96, ECF No. 169-45, at BERRIS-000030584.  But ultimately De Tomaso De Tomaso did not create any employee incentive plan or give equity to any employee.  De Tomaso did not create any employee incentive plan or give equity to any employee. De Tomaso did not create any employee incentive plan or give equity to any employee.  De Tomaso Ex. 72, DT0000059720 (final corporate organizational structure); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.

63.    The time sheets from those attorneys reflect time billed on January 5, 2021 for "[r]eviewing partnership tax issues for assigning interest to Ryan" and on January 6, 2021 for "[c]orresponding with Norman regarding structuring Ryan's share." Ex. 15, BERRIS- 0000074570.

**Response**:  Defendants do not dispute this statement quotes a select portion of the referenced document.  Defendants dispute this document shows anything but abandoned negotiations for interest through a partnership agreement.  Choi never conferred equity upon Berris in De Tomaso and never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25.  Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At different times Choi considered ideas for giving equity to different employees and discussed this with his counsel and Majcher.  Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF

No. 143-4, Tr. at 291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815. But ultimately De Tomaso De Tomaso did not create any employee incentive plan or give equity to any employee. De Tomaso Ex. 72, DT0000059720 (final corporate organizational structure); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.

64.      On January 17, 2021, Choi forwarded to Berris another message in which Choi asked the attorneys "can you help me set up 2 more Marshall Island entities. Entity # 1 is simply crafting out 10% holding out of 100%" Ex. 97, BERRIS-000030742 at -744. Choi further explained that "AFMG which hold an option worth of HK$20m will convert into equity at a valuation of US$180m. Ideally, I would like to close this initial round by end of Jan, 2021." *Id.*

**Response**: Defendants do not dispute this statement quotes a select portion of the referenced document. Defendants dispute this statement to the extent Berris implies these entities were actually created, or that Choi awarded Berris an equity interest in De Tomaso. Choi never conferred equity upon Berris in De Tomaso and never promised Berris a specific percentage of equity in any company that Choi owns. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25. Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris. *Id.* at 301:10–18. At different times Choi considered ideas for giving equity to different employees and discussed this with his counsel and Majcher. Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4, Tr. at 291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815. But ultimately De Tomaso did not create any employee stock ownership program or give equity to any employee, including through a partnership arrangement, or restructure the company in the way set forth above. De Tomaso Ex. 72, DT0000059720 (final corporate organizational structure); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.

65.      Then, on January 20, 2021, the attorneys sent an email to Choi and Berris that referenced structuring De Tomaso's equity. In that email, the attorneys noted that "Norman has asked us to establish two additional Marshall Islands entities (i) entity #1 to hold 10% of the LLC, and (ii) entity #2 for Norman's friend." Ex. 98, BERRIS-000073910 at -912. Later in the email, Choi interpolated comments noting that "Entitiy [sic] #1 (10%) is essentially myself, the intention was to set aside a portion of the 100% holding as I plan to give it away as a donation in the future." *Id.* at -913. The document further states that "Norman is not selling his existing shares other than transferring the 10%." *Id.*

**Response**: Defendants do not dispute this statement quotes a select portion of the referenced document.  However, the statements by the lawyers are inadmissible hearsay.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").  Defendants further dispute this statement to the extent Berris implies these entities were actually created, or that Choi gave Berris an equity interest in De Tomaso.  Choi never conferred equity upon Berris in De Tomaso and never promised Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25.  Choi never set aside 10 percent equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At different times Choi considered ideas for giving equity to different employees and discussed this with his counsel and Majcher.  Berris Ex. 2, ECF No. 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4 at 291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.  But ultimately De Tomaso did not create any employee stock ownership program or give equity to any employee, including through a partnership agreement, or restructure

the company in the way set forth above.  De Tomaso Ex. 72, DT0000059720 (final corporate

organizational structure); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.

66.     That same day, Choi texted Berris: "BTW, once u read it [the email], the 10% is

for the Big Guy. Let me know if you have any question, otherwise, will proceed along with this

course." Ex. 139, DT0000040939 at -945-46.

**Response**:  Defendants do not dispute this statement quotes a select portion of the referenced

document.  Defendants dispute this statement to the extent Berris implies Choi gave Berris an equity

interest in De Tomaso.  Choi never conferred equity upon Berris in De Tomaso and never promised

Berris a specific percentage of equity in any company that Choi owns.  De Tomaso Ex. 7, ECF No.

143-4, Tr. at 284:2–7, 291:14–292:13, 391:14–392:3 & 394:3–25.  Choi never set aside 10 percent

equity in De Tomaso (or any other entity) for Berris.  *Id.* at 301:10–18.  At different times Choi

considered ideas for giving equity to different employees and discussed this with his counsel and

Majcher.  Berris Ex. 2, ECF 168-2, Tr. at 242:2–12; De Tomaso Ex. 7, ECF No. 143-4, Tr. at

291:14–292:23 & 394:3–25; Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815.  But

ultimately De Tomaso did not create any employee stock ownership program or give equity to any

employee, including through a partnership structure.  De Tomaso Ex. 72, DT0000059720 (final

corporate organizational structure); Berris Ex. 168, ECF No. 171-16, at BERRIS-000064815; De

Tomaso Ex. 79, at BERRIS-000071279 (counsel discussing potential partnership structures).

## V.     DE TOMASO HIRES RACING DRIVER CARMEN JORDA FOR A MARKETING CAMPAIGN

67.     In early 2021, Berris began discussions with Carmen Jorda about adding her to the

De Tomaso team to assist with advertising campaigns and publicity. Ex. 1, Berris Tr. 131:16- 132:4.

**Response**:  Undisputed.

68.     Jorda is female racecar driver who previously raced for Formula One (and who, as recently reported, has been signed up by the actor Tom Cruise as a consultant). Ex. 3, Choi Tr. 223:12-224:14; Ex. 1, Berris Tr. 130:12-23; Ex. 131, "Who is Carmen Jorda, the driver signed by Tom Cruise?" (Oct. 31, 2024) https://en.as.com/entertainment/who-is-carmen-jorda-the- driver-signed-by-tom-cruise-n/ (Jorda is "one of only 11 women to join an F1 driver lineup"); Ex. 132, "Tom Cruise shows off his piloting skills on helicopter ride with F1 driver Carmen Jorda" (Nov. 6, 2024), https://www.hola.com/us/celebrities/20241106728546/tom-cruise- helicopter-f1-carmen-jorda/ ("As one of the few women to create space for herself in F1, a male-dominated sport, Jorda's voice is one that's valued and is likely why Cruise reached out to her. She also has some experience working in films and entertainment, being an ambassador for the film 'Fast & Furious 9,' released in 2021.").

**Response**:  It is undisputed that Jorda is a female racecar driver who previously raced for Formula 1.  Defendants dispute the other statements regarding her recent ventures because the cited Exhibits 131 & 132 contain inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

69.     Later in 2021, De Tomaso hired Jorda as an independent contractor to work on an ad campaign and to perform various services, including "general business activities and product development, testing, racing and content creation concerning the Company's products and creative assets." Ex. 3, Choi Tr. 220:21-231:1; Ex. 99, DT0000052170.

**Response**:  It is undisputed that De Tomaso hired Jorda to work on the Meet Isabelle ad campaign.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 227:5–10.  Defendants dispute this statement insofar as the cited language is from a draft contract that was countersigned by Berris, without

Choi's consent, and never sent to anyone at De Tomaso.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 226:15–17; De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA No. 12.  Choi understood Jorda would be working on the Meet Isabelle campaign as an actress or model, and that the work Jorda did for De Tomaso "was a one-time campaign fee."  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 227:5–10 & 228:11–14.  Jorda had an initial contract with De Tomaso executed on or around May or June 2021 which only governed Jorda's services in a photoshoot.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 170:4–17.

70.    Choi knew about, authorized, and encouraged the hiring of Jorda. Ex. 13, BERRIS-000039034 (Choi asking "Can you remind me what's Carmen's rate again?" and Berris responding "€250/yr Full-time Exclusive"); Ex. 100, DT0000045727 at -732 (Berris discussing meeting with a De Tomaso client, Choi responds "He will love Isabelle + You + Carmen + Rousch"); Ex. 101, BERRIS-000033950 at -962 (Berris stating that he "sent first payment for Carmen" and Choi responding that he "will reimburse u"); Ex. 102, DT0000046548 (Choi asking if they are "almost done shooting" the marketing campaign with Carmen, Berris responding "still shooting," Choi responds "hope she enjoys the experience and love the [P72]"); Ex. 103, BERRIS-000034369 at -372 (Choi stating "pls thank Carmen and looking forward to working together in the future").

**Response**:  Defendants dispute Choi approved a broad long term employment agreement between Jorda and De Tomaso.  Berris unilaterally executed a long-term employment agreement with Jorda on January 22, 2022.  De Tomaso Ex. 60, ECF No. 146-24, at DT0000052170; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 197:24–198:6.  Berris did not send any written contract regarding Jorda to Choi for approval, and Choi did not sign off on the January 2022 employment contract with Jorda.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 226:15–17; De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA No. 12.  Defendants further dispute this statement because Berris

mischaracterizes Exhibits 100, 101 (the filed version of which does not contain a BATES number), and 102 by implying the quoted language supports the statement that Choi encouraged the "hiring" of Jorda long-term. Choi understood Jorda would be working on the Meet Isabelle campaign as an actress or model, and that the work Jorda did for De Tomaso "was a one-time campaign fee." De Tomaso Ex. 7, ECF No. 143-4, Tr. at 227:5–10 & 228:11–14. Jorda had an initial contract with De Tomaso executed on or around May or June 2021 which only governed Jorda's services in a photoshoot. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 170:4–17. The cited Exhibits 100–103 relate to Jorda's limited work as part of the Meet Isabelle campaign.

71.     De Tomaso had a copy of Jorda's final agreement in their files and Choi referenced having her prior agreements as well. Ex. 99, DT0000052170; Ex. 140, DT00106908 at -914-915 (On January 15, 2022, Choi wrote to Majcher, regarding Ms. Jorda: "She has a contract with DT, somewhere in the Dropbox.").

**Response**: Disputed. The cited documents do not support Berris' statement. Berris Exhibit 140 references Jorda's initial contract with De Tomaso executed on or around May or June 2021 which only governed Jorda's services for the Meet Isabelle campaign. Berris Ex. 140, ECF No. 173-20, at DT00106914–915; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 170:4–17. Berris executed a long-term employment agreement with Jorda on January 22, 2022, and cited Berris Exhibit 140 is a conversation between Berris and Choi dated January 14, 2022, 8 days prior to the secret signing by Berris of Jorda's long term contract. De Tomaso Ex. 60, ECF No. 146-24, at DT0000052170; De Tomaso Ex. 4, ECF No. 143-2, Tr. at 197:24–198:6 & 226:15–17; De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA No. 12; Berris Ex. 140, ECF No. 173-20. Berris did not send any written contract regarding Jorda to Choi for approval, and Choi did not sign off on the January 22, 2022 employment contract with Jorda. De Tomaso Ex. 60, ECF No. 146-24, at DT0000052170; De

Tomaso Ex. 4, ECF No. 143-2, Tr. at 197:24–198:6 & 226:15–17; De Tomaso Exs. 12 & 13, ECF

Nos. 144-1 & 156-13, at RFA No. 12; Berris Ex. 140, ECF No. 173-20.

72.     Jorda participated in several successful advertising campaigns for De Tomaso,

including the "Meet Isabelle" campaign, and generated positive publicity for the company's brand.

Ex. 104, BERRIS-000201075; Ex. 106, BERRIS-000201157 (photos of Jorda from the Meet Isabelle

marketing campaign); Ex. 105, BERRIS-000143901 (spreadsheet titled "Carmen & Ryan – Internal

Activities Planning" which shows the various marketing campaigns, sponsorships, and publicity

projects that Berris and Jorda were collaborating on for De Tomaso).

**Response**: Defendants do not know what Berris means by the terms "successful" and

"positive" and therefore disputes this statement.  Jorda is a controversial figure in the racing world

who stated that female race car drivers are physically inferior to male race car drivers, and received a

lot of criticism for the statements.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 131:3–15, 151:5–15 &

152:3–18; *Carmen Jorda issues statement over controversial comments*, ESPN,

https://www.espn.com/f1/story/_/id/22685057/carmen-jorda-issues-statement-controversial-

comments (last visited Dec. 18, 2024).  Defendants dispute the statement because publicity done by

Jorda generated nothing in terms of client sales for De Tomaso.  De Tomaso Ex. 7, ECF No. 143-3,

Tr. at 239:13–240:14.  Defendants further dispute the statement except insofar as the statement

implies Jorda participated in more than one advertisement campaign for De Tomaso.  Jorda only

participated in the Meet Isabelle campaign on behalf of De Tomaso.  De Tomaso Ex. 7, ECF No.

143-4, Tr. at 225:4–19.

73.     Multiple De Tomaso clients reached out to Berris to express their appreciation for

the quality of the campaign. Ex. 107, BERRIS-000036391 (text message from a De Tomaso client

about the Meet Isabelle campaign, stating "Hello Ryan, Love it! The story, the history, the romance .

. . Well done, good Sir!"); Ex. 108, BERRIS-000199631 (text message from a De Tomaso client about the Meet Isabelle campaign, stating that client "loved it" and that "you and your team have created something truly special").

    **Response**:  Defendants dispute this statement because cited Exhibits 107 & 108 contain inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

    74.      Despite feigning to not know who Jorda was at his deposition ("Q: Who is Carmen Jorda? A: Ryan knows best. Q: I'm asking you, who is Carmen Jorda? A: A female from Spain."), Choi ultimately acknowledged that he "didn't dislike" the ad campaigns that Jorda was featured in. Ex. 3, Choi Tr. 223:16-20; 226:8-19.

    **Response**:  It is undisputed that Choi stated he "didn't dislike" the Meet Isabelle campaign. The remaining statements are disputed because Berris is mischaracterizing Choi's deposition testimony.  Choi did not ever claim "to not know who Jorda was."  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 223:16–20.

    75.      Among other things, Jorda made introductions to potential clients, wore De Tomaso branded gear to racing events, hosted promotional events for De Tomaso (including at Cipriani in New York) and generated media publicity for De Tomaso (including a lengthy story in major British newspaper that had photos of the P72 with the former head of Formula 1 and former Spice Girl Geri Halliwell). Ex. 3, Choi Tr. 228:11-230:25; 235:19-239:21.

    **Response**: Disputed. The cited evidence does not support the statements.  Jorda did not introduce De Tomaso to clients, did not host promotional events, and the publicity done by Jorda

generated nothing in terms of client sales for De Tomaso.  De Tomaso Ex. 7, ECF No. 143-3, Tr. at 239:13–240:14 & 243:6–15.

76.      On multiple occasions, Berris advanced Jorda's salary out of his own pocket. Ex. 101, BERRIS-000033950 (Berris stating that he "sent first payment for Carmen" and Choi responding that he "will reimburse u"). He also purchased, at his own expense, clothing for Jorda to wear to photo shoots for De Tomaso. Ex. 1, Berris Tr. 204:14-25.

**Response**:  Defendants do not know what Berris means by "on multiple occasions" and therefore disputes this statement.  Defendants do not dispute one text message says Berris "sent first payment for Carmen" and Choi responded "will reimburse u."  De Tomaso further does not dispute Berris bought Jorda a $20,000 Chanel suit and did not directly seek reimbursement for it because he "d[idn't] think Mr. Choi and I would see eye to eye on it."  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 206:11–209:6.

77.      Berris' relationship with Jorda was friendly, but not romantic, in nature. Ex. 1, Berris Tr. 132:5-17; 138:11-139:2.

**Response**:  Disputed.  Berris was romantically interested in Jorda.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 139:3–8 & 139:19–143:14; De Tomaso Ex. 81, at BERRIS-000026488; De Tomaso Ex. 10, ECF No. 156-10, Tr. at 50:8–51:10; De Tomaso Ex. 19, ECF No. 145-3, at BERRIS-000202770.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

## VI.  CHOI INSISTS ON HIRING CAPRICORN TO COMPLETE DEVELOPMENT OF P72

78.      In or about early 2022, Choi engaged a technical partner—Capricorn—to complete development of the P72 and produce six prototypes. Ex. 3, Choi Tr. 249:13-19; Ex. 2, Majcher Tr. 162:18-163:2.

**Response**:  Undisputed.

79.      Before a written agreement with Capricorn was in place, Choi paid €1,000,000 to Capricorn. Ex. 2, Majcher Tr. 162:13-164:24; Ex. 109, DT00132395 at -410.

**Response**:  Undisputed.

80.      Berris expressed to Choi his concerns that De Tomaso was expanding Capricorn's role beyond its areas of core expertise and advised Choi to limit Capricorn's role. Ex. 3, Choi Tr. 252:21-254:13; Ex. 110, DT0000075576; Ex. 141, DT00133763 at -769.

**Response**:  Disputed.  The cited documents do not support the statement that Berris "expressed to Choi his concerns that De Tomaso was expanding Capricorn's role beyond its areas of core expertise."  Local Rule 56.1(c)–(d).  Exhibit 110 is an email from Berris that references the scope of Capricorn's contract in terms of open items.  The cited deposition testimony is just an attorney reading this document.  Exhibit 141 is a text thread between Choi and Majcher that speculates regarding Berris' thoughts on Capricorn, but says nothing about Capricorn's "areas of core expertise."

81.      Berris was not the only person at De Tomaso who was concerned with Capricorn's incompetence. Majcher also expressed to Choi her concerns about Capricorn's ability to develop the expected prototypes. Ex. 2, Majcher Tr. 420:6-421:18.

**Response**:  Disputed.  Defendants do not know what Berris means by "Capricorn's incompetence," and the cited testimony does not support that statement.  Local Rule 56.1(c)–(d).

-45-

What this testimony actually says is that Ms. Majcher had "concerns at some point in time" regarding Capricorn's ability to deliver the "prototypes," and does not know if anyone else shared those concerns. Berris Ex. 2, ECF No. 168-2, Tr. at 420:6–20.

82.     Another De Tomaso employee, Jowyn Wong, was similarly critical of Capricorn. Wong wrote to Choi that those at Capricorn "really have no idea whats going on and are always avoiding calls and emails" and "they have no direction / director and there is zero flow over at capricorns team" and "DT cannot afford this level of rubbish work." Mr. Wong further warned Mr. Choi, "Even Ryan think[s] it smells funny." Ex. 142, DT00109256 at -264-269; Ex. 3, Choi Tr. 264:6-265:18.

**Response**:  Defendants do not dispute the selectively quoted language appears in the cited documents.  Defendants dispute Berris' characterization of the communications, which is unsupported by the cited documents.

83.     Later, Majcher and Wong continued to express their concerns, with Wong writing: "Neil reviewed the agreement and he just thought Norman went crazy." Majcher responded: "He couldn't believe we kept paying them without having seen or received anything." Ex. 143, DT00134279 at 372-376; Ex. 2, Majcher Tr. 423:19-424:12. Wong then wrote: "there is no scope of work for what will be delivered after 300K. Just small details like these puts enormous risk and liability to DT and I can imagine every proposal is the same," to which Majcher replied: "Your imagination is correct." Majcher then wrote: "They can't define their own scope of work in an agreement where we are going to pay then 10 million euros"! Majcher was referring here to Capricorn. Ex. 143, DT00134279 at -388-390; Ex. 2, Majcher Tr. 429:19-430:12.

**Response**:  Defendants do not dispute the selectively quoted language appears in the cited documents.  Defendants dispute Berris' characterization of the communications, which is unsupported by the cited documents.

84.    Choi then began to silo-off Berris from status updates and notifications of delays from Capricorn, despite Berris's explicit requests. Ex. 1, Berris Tr. 514:17-515:4, 515:16-25, 519:15-23.

**Response**:  Disputed.  There is no evidence – beyond Berris' plainly insufficient, self-serving testimony – that Choi "began to silo-off Berris" from status updates and notifications of delays from Capricorn, including the alleged communications Berris "discovered" later.  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

85.    Ultimately, Capricorn "failed to delivery according to the timeline" and never delivered a single P72 prototype for De Tomaso. Ex. 3, Choi Tr. 251:3-5, Ex. 2, Majcher Tr. 421:9-11; Ex. 4, De Tomaso 30(b)(6) Tr. 139:2-140:17, 143:24-144:3. As part of that, Capricorn also failed to properly implement "homlogation," which means "ensur[ing] that the vehicle with [U.S.] safety standards and rules." Ex. 4, De Tomaso 30(b)(6) Tr. 133:6-20, 138:18-139:6.

**Response**:  Defendants do not dispute Capricorn failed to deliver P72 prototypes.  Defendants dispute Capricorn failed to properly implement homologation in that Ms. Majcher testified, "I don't think we even got that far with Capricorn.  I mean the cars were never built, so we

never even got to homologation." De Tomaso Ex. 6, ECF No. 143-3, Tr. 133:6–20 & 138:18–139:9. Capricorn's job was to develop six prototypes for De Tomaso, "not to advice De Tomaso what [a] particular jurisdiction requires." De Tomaso Ex. 6, ECF No. 143-3, Tr. at 137:7–13 & 139:2–9. Capricorn was never the entity to make decisions on homologation, rather it was to execute the instructions given to it by De Tomaso or its advisors. *Id.* at 137:16–138:5.

86.     In total, De Tomaso paid Capricorn approximately €22,000,000 without receiving a single P72. Capricorn also remains in possession of certain De Tomaso assets. Ex. 3, Choi Tr. 250:17-251:2; 251:6-10; Ex. 4, De Tomaso Tr. 141:10-142:19, 143:19-23; Ex. 15, DT00165322.

**Response**: Disputed because the first sentence is not supported by record evidence. Local Rule 56.1(c)–(d). Defendants further dispute the statement because Berris mischaracterizes the cited testimony. Choi testified De Tomaso paid Capricorn $22,000,000 U.S. dollars, not Euros. This statement is further disputed as the exhibit number cited for DT00165322 is incorrect and does not support the statement. *See* Berris Ex. 14, ECF No. 172-2. This statement is further disputed because cited Exhibit 15 contains inadmissible hearsay evidence. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"). It is undisputed that Capricorn remains in possession of certain De Tomaso assets.

87.     The delays caused by Capricorn substantially and adversely impacted De Tomaso's financial condition. Ex. 4, De Tomaso 30(b)(6) Tr. 250:23-251:20.

**Response**: Defendants do not dispute De Tomaso has paid Capricorn roughly $22 million. Defendants otherwise dispute this statement because it is unsupported by the cited evidence.

88.    In March 2023, De Tomaso ultimately terminated its relationship with Capricorn for Capricorn's failure to meet its obligations. Ex. 4, De Tomaso 30(b)(6) Tr. 129:18-130:3, 132:2-15, 140:18-141:8; Ex. 1, Berris Tr. 510:25-511:5.

**Response**:  Undisputed.

89.    De Tomaso is presently pursuing legal action against Capricorn "[f]or nondeliverables." Ex. 3, Choi Tr. 250:13:16; Ex. 4, De Tomaso 30(b)(6) Tr. 142:24-143:18.

**Response**:  Undisputed.

90.    Choi's mismanagement of the Capricorn engagement was not an isolated incident. In the fall of 2020, Wong and Majcher had identified it as problem, with Wong writing "That's what I don't like, to be honest. We have left a trail of just bad relationships with suppliers. It's really not acceptable." Majcher then replied: "For the costs of production, etc, no homework has been done at all….There is one thing in common with all the suppliers…and that's Norman." Ex. 144, DT00128930 at -026-027.

**Response**:  Disputed.  There is no evidence Choi "mismanage[d] . . . the Capricorn engagement," and Berris cites to none.  Local Rule 56.1(c)–(d).  Nor do the quoted statements show the situation with any other supplier was similar in any specific way to any circumstance related to Capricorn, or relate in any way to any of Berris' claims.  Rather, it is clear Berris is simply attempting to malign and harass Choi.

## VII.    BERRIS'S EXPENSES AT DE TOMASO

91.    De Tomaso never had a written expense policy in place. Ex. 4, De Tomaso 30(b)(6) Tr. 53:17-19; Ex. 2, Majcher Tr. 258:2-4.

**Response**:  Disputed only insofar as Berris agreed to "seek approval . . . prior to incurring any expense more than $500 (USD)."  De Tomaso Ex. 1, ECF No. 156-1, at DT0000000102§ 2(b); De Tomaso Ex. 4, ECF No. 143-2, Tr. at 277:13–24.

92.     On multiple occasions, Majcher—who purported to be the COO of De Tomaso—told Choi that the company should institute a formal written policy. Ex. 4, De Tomaso 30(b)(6) Tr. 53:20-25. For example, On April 22, 2022, Mr. Choi wrote to Ms. Majcher: "We need to have a corporate policy giving everyone a guideline." Ex. 145, DT00160972 at -975. De Tomaso admitted that it would have been prudent to have instituted such a policy because, among other things, it would have "alleviate[d] ambiguity as to what's a business versus personal expense." Ex. 4, De Tomaso 30(b)(6) Tr. 54:17–22.

**Response**: Defendants do not dispute the quoted language appears in the cited documents, except that Ms. Majcher testified that she "might have" suggested De Tomaso implement a formal written policy.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 53:20–25.

93.     After Berris was terminated, the company reviewed some of Berris's expenses but could not reach the conclusion based on the information provided whether they were personal or business. Ex. 4, De Tomaso 30(b)(6) Tr. 260:5-261:17.

**Response**:  Undisputed.  Berris submitted over $442,034.69 in unsubstantiated business expenses.  De Tomaso, Ex. 20, ECF No. 145-4, BERRIS-000091077–79.  Majcher repeatedly reached out to Berris requesting him to justify his expenses, which included things like haircuts, Whole Foods, and CVS charges and provided Berris with the exact breakdown and sums ($736,986.94, broken down into expenses Berris directly transferred to Aprivy, expenses, and other amounts) that De Tomaso was challenging.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 350:15–351:7 & 352:1–21; De Tomaso Ex. 20, ECF No. 145-4, BERRIS-000091077–79; De Tomaso Ex. 41, ECF No. 146-7, at DT0000036164; De Tomaso Ex. 47, ECF No. 146-13, at DT0000035961; De Tomaso Ex. 49, ECF No. 146-15, at DT0000076100;  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 581:19–23 & 600:20–601:10.  Berris admitted he "d[idn't] know" how anyone would determine from what he

submitted the business purpose of any expense and "c[ouldn't] recall" how he supposedly justified

his expenses.  De Tomaso Ex. 4, ECF No. 143-2, Tr. 330:15–363:5 & 465:5–24; De Tomaso Ex. 5,

ECF No. 156-5, Tr. at 590:2– 591:23 & 597:17-598:4.

94.       On May 16, 2022, Mr. Berris emailed Ms. Majcher:

> Thank you for your updates and hardwork.  Below is a long note that we can
> go into further detail on during our next call (as soon as you are available and
> hopefully within the next 12 hours) as I am here to assist/complete the process
> with you. As we discussed on our call last evening, for years I have done
> everything I can to bring value to the company.  I have dedicated my life,
> personally and professionally, to Norman and have remained by his side
> through thick-and-thin.  I have nothing to hide and want to assist in any way I
> can to help you complete this process, but the language in the documents you
> have provided to me does not make me comfortable, as you concurred and
> understood during our discussion. To my knowledge, there has never been any
> formal internal protocols and procedures clearly communicated and explained
> to me regarding this process, and others processes in general, and if there
> were/are I am more than happy to adhere 100% going forward.  For the past
> years, I'm sure you know that there have been times whereby I've been able to
> keep track and issue monthly invoices in a timely manner and
> othertimes/periods when the invoices may constitute a period of months due to
> extreme workloads on my plate.  Perhaps it is a fault of my own (as I need to
> learn to delegate work better), but I literally have been doing the work of
> multiple people for years (24/7/365) and quite honestly at many times do not
> even have time to eat, sleep, see my family, let alone efficiently keep track of
> all my expenses. I've done this out of my undying loyalty and respect for
> Norman, knowing the great sacrifices he has made for many years and trying
> to reduce the burden on his shoulders as much as I possibly can, given my
> limited resources.  I've sacrificed my health, my life and everything I hold
> dear, for Norman.  There are many expenses that I have incurred on my side
> that I have never proposed nor sought reimbursement for as I am from the
> bottom of my heart, wholeheartedly dedicated to Norman, the team and the
> company.  Although I've been working for De Tomaso for many years, I only
> accepted my first paycheck this February, at the kind request of Norman, and
> have yet to invoice for subsequent months.  In our lives people come and go,
> but it is those who are willing to stand with us in the rain when others walk
> away, taking our umbrellas, that we must cherish and hold dear. Norman is
> my life, De Tomaso is my life, and I do not know what I can do further to
> prove myself.  We are a family and when mistakes or understandings happen
> in families we should have frank conversations, learn and rectify, but also
> show and practice love and forgiveness when tough periods arise.

Ex. 146, DT0000050334.

**Response:** Defendants do not dispute the quoted language appears in the cited document.

95.     Majcher does not recall whether she responded to this email or ever spoke to Mr. Berris after May 13, 2022. Ex. 2, Majcher Tr. 355:9-20.

**Response**: Undisputed.

96.     On May 20, 2022, Mr. Berris emailed Ms. Majcher:

> I hope this message finds you well. Following our discussions regarding this matter, I have spent time reviewing, preparing missing receipts and revising excel documents. Kindly find attached to this email the corresponding expense reports, receipts and other relevant documentation. As I am not an accounting expert, please let me know if there are any outstanding invoices that need to be issued in order to match the expense reports. As always, I remain on standby to provide any further clarification and/or assistance to help satisfy the requirements.

Ex. 40, DT00135304.

**Response:** Defendants do not dispute the quoted language appears in the cited document.

97.     Attached to this May 20, 2020 email was a zip file of documents labeled "RB Expense Documents." *Id.* Majcher cannot remember whether she ever responded to this email or reviewed the contents of the zip file. Ex. 2, Majcher Tr. 267:25-268:22; 270:13-19.

**Response**: Undisputed.

98.     At his deposition, Berris explained the business purpose for each expense which he was asked about. Ex. 1, Berris Tr. 582:6-585:13.

**Response**: Disputed. Berris submitted over $442,034.69 in unsubstantiated business expenses. De Tomaso, Ex. 20, ECF No. 145-4, BERRIS-000091077–79. Berris' inability to justify or substantiate his expenses required the parties to return for a second day of deposition. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 359:15–363:5. Even then, Berris admitted he "d[idn't] know" how anyone would determine from what he submitted the business purpose of any expense and

"c[ouldn't] recall" how he supposedly justified his expenses.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 330:15–363:5 & 465:5–24; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 590:2–591:23 & 597:17–598:4.

99.    Under the De Tomaso LLC agreement, both Berris and Choi (as directors) needed to consent to enter into a binding agreement with a third-party. Ex. 4, De Tomaso 30(b)(6) Tr. 33:25-34:16.

**Response**:  Defendants dispute this statement because it calls for a legal conclusion that is not properly supported by testimony by a lay witness, and which the Court should disregard.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).

100.    Choi entered into 10-year contracts binding De Tomaso to pay 2.5 million GBP to each of Jowyn Wong and Jacob Jodlowski without Berris's approval. Ex. 4, De Tomaso 30(b)(6) Tr. 40:7-53:17-19.

**Response**:  Disputed.  The statement mischaracterizes the cited testimony.  Majcher testified that De Tomaso was "not aware of any objection by Mr. Berris" to Wong's contract and that he "was aware of Mr. Jowyn Wong coming on board."  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 45:20–25 & 46:2–11.

**VIII.   CHOI PURSUED A SPAC TRANSACTION WITH GENESIS AND LUI**

101.    In March 2021, Choi began exploring how to sell De Tomaso, including via a SPAC transaction. Ex. 147, DT00130585 at -585; Ex. 2, Majcher Tr. 156:16-157:25 ("In sum, we have three routes; one, engage banker/sponsor the traditional way, matchmaking process; two, start a new SPAC; three, acquire an existing SPAC.").

**Response**:  Defendants do not contest the quoted language appears in the cited document, and that Choi considered a SPAC transaction around March 2021 in order to raise funds for – not "sell" – De Tomaso.  Berris Ex. 2, ECF No. 168-2, Tr. at 172:4–13.

102.    A SPAC, also known as a "blank check company," refers to a company that is specifically created (and publicly listed) in order to identify and acquire an existing business (which then permits the existing business to go public while avoiding the traditional IPO process)—basically, the SPAC will be created, listed on the exchange, and funded by investors, and will then have a set amount of time in which it can seek out and select another existing company to acquire. Ex. 7, Lui Tr. at 55:21-56:9.

**Response**:  Defendants dispute this statement because it states legal conclusions that are not properly supported by testimony by a lay witness, and which the Court should disregard.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).

103.    Choi understood that it was illegal for a SPAC to have already selected its target before the SPAC goes public. Ex. 3, Choi Tr. 323:7-11; Ex. 129, DT00130496 at -503-508; Ex. 2, Majcher Tr.145:10-146:7 ("Technically speaking, you are not supposed to have already identified an acquisition target when you form the SPAC because it is supposed to be a blind pool that you are raising for the IPO.").

**Response**:  Defendants dispute this statement because it states legal conclusions that are not properly supported by testimony by a lay witness, and which the Court should disregard.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).  Choi testified he "do[es]n't know what's legal or illegal" in the SPAC context. De Tomaso Ex. 7, ECF No. 143-4, Tr. at 353:15–20.

-54-

104.     Indeed, the SEC previously charged SPACs for exactly this type of conduct—
creating a SPAC with a target company pre-selected. *See* "SEC Charges Digital World SPAC for
Material Misrepresentations to Investors" (July 20, 2023) https://www.sec.gov/newsroom/press-
releases/2023-135 (SEC finding that company "violated the antifraud provisions of the federal
securities laws" by "failing to disclose that it had formulated a plan to acquire and was pursuing the
acquisition of" the target company prior to the SPAC's going public).

**Response**:  Defendants dispute this statement because this document contains inadmissible
hearsay evidence,  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264
(2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a
motion for summary judgment"), and calls for legal conclusions that are not properly supported by
this hearsay evidence.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138
F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015)

105.     Choi met Lui in April or May of 2021. Ex. 7, Lui Tr. 17:11-19. Despite Lui never
having worked on a SPAC transaction before, he and Choi soon began discussing how to sell De
Tomaso through a SPAC transaction. Ex. 7, Lui Tr. 27:8-10.

**Response**:  It is undisputed that Choi met Lui in the spring of 2021.  Defendants dispute that
Choi and Lui discussed selling De Tomaso through a SPAC transaction.  The cited evidence does
not support the statement.  Rather, in November 2021, Lui introduced Choi to ARC Group, a "top
financial advisor for SPAC listings in the" United States.  De Tomaso Ex. 8, ECF No. 143-5, Tr. at
79:19–80:6.  De Tomaso engaged ARC Group for the primary purpose of raising capital for De
Tomaso through different fundraising methods including, equity, debts, preferred shares, and SPAC
transactions.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 190:3–191:13.

106.     Lui also understood that SPACs are not permitted to pre-select their targets.  Ex. 7, Lui Tr.13:2-18.

**Response**:  Defendants dispute this statement because it states legal conclusions that are not properly supported by testimony by a lay witness, and which the Court should disregard.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015).

107.     On July 1, 2021, Genesis filed a Form S-1 Registration Statement with the SEC, which included its preliminary prospectus for the SEC's review. The Form S-1 stated that Genesis had yet to identify a target company and that it was looking to explore the "intersection of the healthcare and technology industries, specifically within the biotechnology and pharmaceutical sectors." The Form S-1 further stated that Genesis was looking to raise $115M. Ex. 7, Lui Dep. Ex. 2 (Form S-1 for Genesis Unicorn Capital Corp. dated July 1, 2021).

**Response**:  Defendants dispute this statement because this document contains inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

108.     Later that month, Lui was introduced to Genesis, through Genesis's financial advisor ARC Capital ("ARC"). Ex. 7, Lui Tr. 11:10-18. Lui then initiated an effort to purchase and take control of Genesis, keeping Choi abreast of his efforts. Ex. 12, BERRIS-000035815 at - 822 (Choi texted Berris a link to the Genesis Registration Statement and notes "Samuel's latest SPAC.").

**Response**:  Defendants do not dispute that Lui was introduced to Genesis through ARC Capital.  Defendants dispute the rest of this statement because the cited evidence does not support Berris' statement.  Local Rule 56.1(c)–(d).

109.    Lui and Choi proceeded to orchestrate a scheme in which Lui would take control of Genesis so that Genesis could purchase De Tomaso. Lui introduced Choi to investment bankers at ARC to assist with preparing De Tomaso for a sale to the SPAC. Ex. 48, GEN0000000274 at -280-81 (Lui tells Choi that he is "working ARC Capital of my current SPAC" and that he can introduce Choi to them).

**Response**: Defendants dispute that Lui and Choi "orchestrated a scheme in which Lui would take control of Genesis" to then purchase De Tomaso.  Berris offers no citation for this statement, and the record evidence does not support it.  Nor did Genesis plan to acquire De Tomaso.  Rather, Lui introduced De Tomaso to ARC Group "to introduce them to as many SPACs as possible . . . so De Tomaso will have options to potentially choose the best SPAC that they can merge with."  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 24:2–9.   Thus, between November 2021 and March 2022, De Tomaso met with multiple SPACs to discuss a potential transaction with De Tomaso, including Genesis, Pono Capital Corp., Fintech Ecosystem Development Corp., and Stonebridge Acquisition Corporation.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 191:14–23; De Tomaso Ex. 78, DT0000026311–15; De Tomaso Ex. 79, DT0000026333–34; De Tomaso Ex. 80, at DT0000029426. In other words, Genesis was not the only company with which De Tomaso explored the possibility of a SPAC merger, and De Tomaso received more than one letter of intent for a despac merger.  De Tomaso Exs. 12 & 13, ECF Nos. 144-1 & 156-13, at RFA Nos. 65 & 66.

110.    Lui then brokered an NDA between De Tomaso and ARC so that ARC could learn more about De Tomaso to facilitate the SPAC transaction. Ex. 48, GEN0000000274 at - 281.

**Response**: Disputed as the cited document does not support the statement.  Local Rule 56.1(c)–(d).

111.     Lui then connected Choi with Moore International, an audit firm, so that De Tomaso could prepare audited financial statements prepared in anticipation of the SPAC transaction. Ex. 48, GEN0000000274 at -281; Ex. 7, Lui Tr. 25:25-26:6. In doing so, Lui asked Choi to be introduced to De Tomaso's "bookkeeper" so that he could obtain De Tomaso's financial statements and expressly asked Choi to send him that information at Lui's personal Gmail address. Ex. 7, Lui Tr. 24:15-25:5.

**Response**:  Defendants do not dispute that Lui requested a copy of De Tomaso's financial statements to his personal email address and offered to obtain an audit fee quote from Moore International.  De Tomaso disputes the remainder of this statement because the cited evidence does not state the Lui actually connected De Tomaso to Moore International, sent Moore International De Tomaso's records, or obtained an audit fee quote.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 24:15–26:6.

112.     Choi then connected Lui with Majcher on November 3, 2021. Ex. 148, GEN0000000003 (Diana to Samuel's gmail: "Norman has asked me to get in touch with you to further discuss financial and accounting matters for De Tomaso.") Choi asked Majcher to assist with the financial aspects of the due diligence process, forecast and valuation related matters, and certain legal and structuring issues. Majcher provided the requested assistance. Ex. 109, DT00132395 at -402-403; Ex. 2, Majcher Ta2r. 158:7-160:13.

**Response**:  Defendants do not dispute that Ms. Majcher sent Mr. Lui an email that included the quoted language, or that Ms. Majcher testified she assisted with unspecified financial aspects of the due diligence process, forecast and valuation related matters, and certain legal and structuring issues.  Berris Ex. 2, ECF No. 168-2, Tr. at 158:7–160:12.

113.    After arranging the introduction to ARC, Lui and Choi arranged for Lui to surreptitiously listen in on the ARC Zoom call from an unnamed iPad. They agreed that if anyone from ARC asks who is on the iPad, Choi will lie and say it is just another one of his devices. Ex. 7, Lui Tr. 28:24-29:9; 32:5-11; Ex. 48, GEN0000000274 at -285. They both proceeded to work out how to adjust De Tomaso's financial analyses to line up with the Genesis SPAC.

Response:  Defendants do not dispute Choi and Lui planned for Lui to anonymously join a zoom call.  Defendants dispute the remainder of the statements in this paragraph.  There is no evidence Choi and Lui worked on "how to adjust De Tomaso's financial analyses to line with the Genesis SPAC," nor does Berris cite to any.  As Lui explained, he was not "involved in running the business" and did not know "how it was found[ed] and funded."  Instead, he added a summary sheet to the forecasts and fixed some of the modeling errors Berris made when he created the forecasts. De Tomaso Ex. 8, ECF No. 143-5, Tr. at 109:5–10; De Tomaso Ex. 9, ECF No. 143-6, Tr. at 38:8–41:16 & 84:14–86:8; De Tomaso Ex. 37, ECF No. 146-3, GEN0000000056–57.

114.    For example, on November 14, 2021, Lui emailed Choi—both of them using personal Gmail accounts instead of their work email addresses—an adjusted dilution analysis for De Tomaso. In that email, Lui explained that he adjusted the analysis "to be consistent with the expected terms of our SPAC." Ex. 24, DT0000026256.

Response:  Defendants do not dispute that the quoted language appears in the cited document.  Defendants do dispute that Lui created this document – Berris did – or provided substantive input.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 37:19–39:19.  As he explained, he is not "involved in running the business" and did not know "how it was found[ed] and funded."  Instead, he added a summary sheet to the forecasts and fixed some of the modeling errors Berris made when he created the forecasts and would have allowed De Tomaso or its investors to run different

valuation scenarios. De Tomaso Ex. 8, ECF No. 143-5, Tr. at 109:5–10; De Tomaso Ex. 9, ECF No. 143-6, Tr. at 38:8–41:16 & 84:14–86:8; De Tomaso Ex. 37, ECF No. 146-3, GEN0000000056–57. Further, Choi immediately forwarded the document to Ms. Majcher and Mr. Berris at their De Tomaso email addresses.

115.    A few days later, Lui advised Choi that Genesis expected to refile its Form S-1 in a week to reflect the change in ownership of Genesis to Lui. Choi asked: "who will be the new management?," to which Lui responded that all but one of the new management will likely resign and "the rest of the board and mgt team will be filled with your own people." Ex. 48, GEN0000000274 at -285.

**Response**: Disputed.  This statement mischaracterizes the cited evidence.  In the cited text thread, Lui is explaining how a SPAC transaction works and what would happen to the board "after de-SPAC is completed."  Berris Ex. 48, ECF No. 172-31, at GEN0000000285.

116.    On November 24, 2021, Genesis filed with the SEC an amended Form S-1 Registration Statement, which reflected that Lui and others had taken over the SPAC and that Genesis was now targeting a $86 million raise. Ex. 7, Lui Dep. Ex. 7 (Amendment to Form S-1 dated November 24, 2021) at 2, 138.

**Response**:  Defendants dispute this statement because this document contains inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

117.    By this time, Lui was asking Choi about becoming the CFO of De Tomaso. Ex. 109, DT00132395 at -411-412; Ex. 2, Majcher Tr. 165:15-167:8.

**Response:**  Undisputed.

118.    Lui also solicited an investment from Choi for Genesis. On November 14, 2021, Choi wrote to Majcher that Lui had a SPAC "about to get listed" and that Lui "asked if I was interested to be one of the funders, total 4 million risk capital." Choi then wrote to Majcher: "With that, DD valuation and timing would be much easier to control…. His SPAC is proposed to raise 75-M…. I asked him to prepare another set of dilution table, assuming I or friends take up one forth of the risk capital." Majcher replied: "And use the SPAC for DT," to which Mr. Choi responded, "Yes." Ex. 34, DT00132501 at -501-502; Ex. 2, Majcher Tr. 168:21-172:4.

**Response**:  Defendants do not dispute that the quoted language appears in the cited document.  However, Choi is not, and never had been, an investor in Genesis, and Genesis never acquired any stake in De Tomaso. De Tomaso Ex. 9, ECF No. 143-6, Tr. at 161:20–23; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 500:4–7.

119.    On January 14, 2021—one day after Choi messaged Lui "Money wired," and Lui replied that "the funds have yet to reach my HSBC account. Will continue checking again tomorrow,"—Lui received a $1 million USD deposit into his HSBC account. Ex. 48, GEN0000000274 at -299; Ex. 154, GEN0000009366 at -369.

**Response**:  Undisputed that the quoted language appears in the cited documents.

120.    Throughout December 2021 and January 2022, Choi and Lui continued to communicate by text about the status of the Genesis SPAC IPO as Genesis worked through SEC comments so that an IPO could proceed. However, their ongoing text chain has no texts between January 19, 2022 and April 9, 2022. Ex. 48, GEN0000000274 at -300.

**Response**: Defendants do not dispute that Choi and Lui continued to communicate by text through December 2021 and January 2022, and that there were no texts between January 19, 2022

and April 9, 2022.  Defendants dispute the remainder of the statements in this paragraph because they are unsupported by the cited evidence.  Local Rule 56.1(c)–(d).

121.    In his deposition, Lui testified that he did not delete those texts and believes he simply changed his phone during that time period. Ex. 7, Lui Tr. 55:21-56:12. Whatsapp conversations between Lui and Berris produced by Genesis from Lui's same phone show there are multiple texts from Lui during that same period demonstrating that he had not in fact switched phones. Ex. 156, GEN0000000267 at -267.

**Response**: Disputed.  As an initial matter, Ex. 156 is a Bank of America statement and does not support the cited statement.  Further, Lui explicitly testified that he did not delete his text messages and that he switched physical phones at the time as the possible explanation for any  lost data (assuming there was any), not that he switched phone numbers.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 55:21–56:12.

122.    Moreover, on February 10, 2022, Choi texted Majcher and instructed her to "delete all emails you have with Samuel." Being extra cautious, he added: "As well as the previous message. His SPAC is ready." Ex. 2, Majcher Tr. 17:6-9, 21:11-23:13; Ex. 166, DT00133161 at -161-162.

**Response**:  Undisputed except for Berris's editorializing, which is not supported by the cited evidence.  Majcher confirmed at her deposition that she had not deleted any messages or emails with Lui.  Berris Ex. 2, ECF No. 168-2, Tr. at 16:23–17:15.

123.    Prior to these exchanges, Majcher had previously expressed concerns to a colleague about Choi's business practices noting that she "had strong talks with Norman at one point saying [she's] not doing this anymore, saying the lying part," to which Norman responded, "other brands to it." Ex. 144, at DT00128968. She went on to write that "I know a lot, but I don't know enough and I don't know what kind of exposure I actually have" and "[i]f Norman one day just

decides, fuck it, I'm getting the hell out, then I will be very difficult for me to try to say I didn't know about all this." *Id.* at -970, -983.

      **Response**: Disputed. The statement mischaracterizes the cited evidence. The statement "had strong talks with Norman at one point saying I am not doing this anymore" is a message sent *to* Majcher from Jowyn Wong, not sent *by* Ms. Majcher. Majcher never wrote or said the quoted language. Berris Ex. 144, ECF No. 173-24, at DT00128968. Mr. Wong was not involved in the SPAC process. The statement is inflammatory and meant to harass and thus is improper and should be stricken. Fed. R. Civ. P. 11(b)(3).

      124.    At his deposition, when confronted with the text message above, Choi claimed that he could not recall whether or not he was instructing Majcher to delete her emails with Lui. Ex. 3, Choi Tr. 346:1-22, 353:5-353:20.

      **Response**: Undisputed.

      125.    He also testified that he does not regularly delete his own text messages and that he did not recall whether he deleted texts between himself and Majcher relating to De Tomaso business. Ex. 3, Choi Tr. 346:14-22.

      **Response**: Undisputed.

      126.    The first text exchange between Choi and Lui that De Tomaso produced was from April 26, 2022. Ex. 81, DT00157543. Genesis produced text messages between the two beginning on June 25, 2021 that continues on for 30 single-spaced pages until the April 26 text. Ex. 48, GEN0000000274.

      **Response**: Undisputed.

127.    Exhibits 129 and 130 are text messages produced separately from Choi's and Majcher's phone from a single day. The highlighted portions of texts from Majcher's phone are texts that do not appear on Choi's phone over the same time period.

**Response**:  Undisputed.

128.    Lui and Choi continued to email about the Genesis and De Tomaso SPAC transaction using their personal email addresses (indeed, Lui switched to a second Gmail address called tackisfat@gmail.com). Those emails included Lui asking when Choi would be ready to update the De Tomaso forecast, Ex. 111, GEN0000000168; Lui sending Choi updated financial forecasts for De Tomaso, Ex. 112, GEN0000000169; and Lui providing advice on how to bolster De Tomaso's management team to make them more attractive in the de-SPAC process, Ex. 113, DT00113906.

**Response**: Undisputed.

129.    On February 14, 2022, the final prospectus for the Genesis SPAC IPO was approved by the SEC and the stock began to trade on the NASDAQ. Ex. 115, GEN0000000638. On the first page, the prospectus stated that Genesis is seeking to raise $75 million and that it has not yet identified a target company. *Id.* at -638.

**Response**:  Defendants dispute this statement because it is premised on hearsay evidence. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

130.    On February 25, 2022, a managing partner at ARC sent an email to Lui, Choi and others—all at their work email addresses—titled "SPAC target intro DT". Ex. 48, GEN0000000848 at -851. In the email, he wrote "let me make a short intro. Normal [sic], Samuel, Oye and Juan are

the management team of Genesis Unicorn Acquisition Corp. a 86.25M USD SPAC recently listed in NASDAQ. Samuel, Norman and Ryan are the management team of DE TOMASO a legendary car brand with a very exclusive product and approach." *Id.* He continued, "Please let me know when you are available so we can arrange a call to introduce each other." *Id.*

      **Response**: Defendants do not dispute that the quoted language appears in the cited document.

      131.     On April 7, 2022, Genesis and De Tomaso entered into a non-binding letter of intent to merge with one another. Ex. 28, DT0000052148. The text string between Choi and Lui—which had no messages starting on January 9, 2022—picked back up on April 9, 2022. That was two days after the agreement was signed. Ex. 48, GEN0000000274 at -300.

      **Response**: Defendants do not dispute that they entered a nonbinding letter of intent that lapsed on June 6, 2022. De Tomaso Ex. 9, ECF No. 143-6, Tr. at 148:22–149:8 & 150:11–16; De Tomaso Ex. 59, at DT0000052150, ¶ 5. Defendants further do not dispute that Exhibit 48 does not contain messages between January 9, 2022, and April 9, 2022.

      132.     On September 14, 2023, Lui sent a message to Choi, Majcher and others stating: "I have agreed to terms of employment to join De Tomaso officially as vice-president and CFO." Ex. 44, DT000159355.

      **Response**: Defendants do not dispute that the quoted language appears in the cited document.

## IX.    BERRIS'S TERMINATION FROM DE TOMASO

      133.     On March 3, 2022, Majcher wrote to Choi: "No way Ryan can handle all of this on his own. He needs a lot of help. I'm happy to help with whatever he is willing to part with. Maybe what makes most sense for now is the SPAC-related stuff." Choi replied: "Yes, SPAC- related only." Ex. 116, DT00133566, at -609-610; Ex. 2, Majcher Tr. 343:16-24.

**Response**:  It is undisputed that the quoted language appears in the cited document.

134.     Around this time, Berris raised concerns to Choi with the situation at De Tomaso. For one, Berris learned from Choi that Lui was going to take over the Genesis SPAC prior to the announcement of his new role, and that Lui had joined confidential calls between De Tomaso and its advisors prior to that announcement. Ex. 1, Berris Tr. 498:16-499:18. Choi also told Berris that he was an investor in the Genesis SPAC itself at the time that it was seeking to acquire De Tomaso. Ex. 1, Berris Tr. 498:7-12. Also in connection with the SPAC, De Tomaso was producing altered financial statements with forecasts and production timelines that could not be met. Ex. 1, Berris Tr. 513:14-24. Berris brought these concerns to Choi's attention starting in late February or early March 2022 and continuing through his departure from De Tomaso in May 2022. Ex. 1, Berris Tr. 514:9-21.

**Response**:  Disputed.  Defendants do not know what Berris means by "concerns" or "situation at De Tomaso" and therefore disputes this statement.  Defendants dispute the remaining statements in this paragraph, which are unsupported by the record.  Berris testified he found it "odd" that Norman "forwarded [him] a message" regarding Lui creating a SPAC and joining a call "anonymously coming in as iPad."  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 498:16–499:18.  He did not testify he discussed those "concerns" with Choi, and there is no evidence he did.  *Id.*  Defendants further dispute Choi told Berris he was an investor in the Genesis SPAC, or that Choi was in fact an investor in the Genesis SPAC – he is not, and Berris testified he has no factual basis for that allegation.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 161:20–23; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 499:24–500:7.  Defendants dispute De Tomaso "was producing altered financial statements with forecasts and production timelines that could not be met."  During the SPAC process, De Tomaso's financial forecasts and investor presentations were all created by Berris, and there is no

evidence any specific financial statement with any specific altered statements was produced to any specific person.  De Tomaso Ex. 8, ECF No. 143-5, Tr. at 124:15–17 & 126:6–21; Berris' Amended Complaint, ECF No. 80 ¶ 72; De Tomaso Ex. 70, DT0000082625.  Lui never revised or provided substantive input regarding the numbers and assumptions in De Tomaso's financial forecasts and investor presentations. As he explained, he is not "involved in running the business" and did not know "how it was found[ed] and funded." Instead, he added a summary sheet to the forecasts and fixed some of the modeling errors Berris made when he created the forecasts.  De Tomaso Ex. 8, ECF No. 143-5, Tr. at 109:5–10; De Tomaso Ex. 9, ECF No. 143-6, Tr. at 38:8–41:16 & 84:14–86:8; De Tomaso Ex. 37, ECF No. 146-3, GEN0000000056–57.  Nor is there any evidence – and Berris' citations do not support – that "in connection with the SPAC" De Tomaso was producing "production timelines that could not be met."  Defendants further dispute Berris raised any of these issues with Choi.  When asked which statements regarding the SPAC he discussed with anyone at De Tomaso, Berris testified "I believe I communicated with [Choi] about concerns with Capricorn." De Tomaso Ex. 5, ECF No. 156-5, Tr. at 513:14-514:25.  That's it.

Defendants further dispute this statement because Berris' self-serving testimony is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

135.    Berris also complained to Choi that Choi was making false statements to clients about the development milestones and production timelines for the P72. Ex. 1, Berris Tr. 511:13-18; 522:18-523. Berris learned that Choi made changes to the specifications for the P72 that made them

illegal to drive on public roads in the United States, due to not meeting safety regulations. Ex. 1, Berris Tr. 507:13-508:6. These changes—related to braking, emissions, and traction control requirements—were made when Choi brought in Capricorn to oversee the development of the vehicles. Ex. 1, Berris Tr. 507:13-508:6. There were also changes made to the emissions and exhaust system. Ex. 1, Berris Tr. 508:19-23. The changes made the P72 non- compliant for road use in the U.S. Ex. 1, Berris Tr. 509:15-510:1. Starting in March 2022, Berris lodged his objections to these changes with Choi but Choi did not correct the problems (as of the time that Berris left De Tomaso). Ex. 1, Berris Tr. 510:8-24.

    **Response**: Disputed.  There is no evidence Choi made false statements to clients about "development milestones" and "production timelines," and the cited deposition testimony does not support either that contention, or that Berris raised those specific issues with Choi.  Local Rule 56.1(c)–(d).  Rather, Berris testified *he* communicated status updates and timelines to dealer partners, and "d[oesn't] know" if or how those partners communicated with their clients.  De Tomaso Ex. 5, ECF 156-5, Tr. at 515:16–521:25.  Indeed, Evan Cygler, who represented Miller Motorcars, testified Berris, not Choi, communicated with him, and that Berris actively tried to cut Choi out of those discussions.  De Tomaso Ex. 11, ECF No. 143-7, Tr. at 96:3–97:10.  Moreover, Berris testified the issues he references "occurred when Capricorn came on board," De Tomaso Ex. 5, ECF No. 156-5, Tr. at 507:19–21, but as Ms. Majcher explained, "I don't think we even got that far with Capricorn.  I mean the cars were never built, so we never even got to homologation."  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 133:6–20 & 138:18–139:9.  And Capricorn's job was to develop six prototypes for De Tomaso, "not to advice De Tomaso what [a] particular jurisdiction requires."  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 137:7–13 & 139:2–9. Capricorn was never the entity to make decisions on homologation, rather it was to execute the instructions given to it by De

Tomaso or its advisors. *Id.* at 137:16–138:16. Berris also admits that to the extent concerns existed regarding Capricorn, they had already been raised by Roush – De Tomaso's engine supplier – and they were addressed shortly after they were raised when De Tomaso parted ways with Capricorn. De Tomaso Ex. 5, ECF 156-5, Tr. at 508:3–6 & 510:14–511:5.

Defendants further dispute this statement because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

136.    On March 22, 2022, Majcher and Choi discussed removing Berris as a director of De Tomaso and potentially firing him. In connection with that discussion, Majcher noted that Berris is a shareholder in the company, but that he had a minority interest and could not outvote Choi. Ex. 2, Majcher Tr. 251:2-12; Ex. 39, DT00134071 at -082-086. Choi then stated "he's not a shareholder yet." *Id.* at -086.

**Response**:  Defendants do not dispute Berris was not a shareholder of De Tomaso in March 2022, could not outvote Choi, and that Berris' performance had deteriorated to the point that Choi and Majcher discussed separating from him in March 2022.  Berris Ex. 2, ECF No. 168-2, Tr. at 251:2–12; Berris Ex. 39, ECF No. 172-22, at DT00134082–086.

137.    Majcher and Choi concocted a scheme to tell Berris that De Tomaso's auditors had raised concerns about his expenses, which was not true. Ex. 2, Majcher Tr. 257:15-25. In fact, the auditors "didn't raise any questions," about Berris's expenses. Ex. 39, DT00134071 at - 077-079; Ex. 2, Majcher Tr. 245:12-246:9. But Majcher informed Choi that she "told the auditor I need to

hold off on the audit because of this issue … and they are willing to play ball with us." Ex. 41, DT00157092 at -097.

**Response**:  Disputed.  Berris submitted over $442,034.69 in unsubstantiated business expenses.  De Tomaso, Ex. 20, ECF No. 145-4, BERRIS-000091077–79.  He testified he "d[idn't] know" how anyone would determine from what he submitted the business purpose of any expense and "c[ouldn't] recall" how he supposedly justified his expenses.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 330:15–363:5 & 465:5–24; De Tomaso Ex. 5, ECF No. 156-5, Tr. at 590:2–591:23 & 597:17–598:4.  As a result, Majcher repeatedly reached out to Berris requesting him to justify his expenses, which included things like haircuts, Whole Foods, and CVS charges – challenges that were not "concocted," but rather, well documented by De Tomaso, and provided Berris with the exact breakdown and sums ($736,986.94, broken down into expenses Berris directly transferred to Aprivy, expenses, and other amounts) De Tomaso was challenging.  De Tomaso Ex. 4, ECF No. 143-2, Tr. at 350:15–351:7 & 352:1–21; De Tomaso Ex. 20, ECF No. 145-4, BERRIS-000091077–79; De Tomaso Ex. 41, ECF No. 146-7, at DT0000036164; De Tomaso Ex. 47, ECF No. 146-13, DT0000035961; De Tomaso Ex. 49, ECF No. 146-15, at DT0000076100;  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 581:19–23 & 600:20–601:10.

138.    Eventually, Choi stopped speaking with Berris. Ex. 1, Berris Tr. 525:9-18; Ex. 2, Majcher Tr. 304:11-305:7.

**Response**:  It is undisputed that there was a period of time in April/May 2022 in which Berris and Choi were not communicating.

139.    In late April and carrying into May 2022, Choi and Lui worked together to force Berris out of De Tomaso. At this time, Lui was the president, CFO and board director of Genesis

who had no position at, or authority to act on behalf of, De Tomaso. In fact, he was leading the

Genesis side of the proposed De Tomaso SPAC transaction. Ex. 7, Lui Tr. 108:3-8; 109:8-110:10.

**Response**: Disputed. Berris' citations do not support his statements. Local Rule 56.1(c)–

(d). There is no evidence "Choi and Lui worked together to force Berris out of De Tomaso," and

Berris offers no citation for this sweeping assertion. Rather, Berris voluntarily resigned as De

Tomaso's manager, Board member, and Director on May 3, 2022. De Tomaso Ex. 4, ECF No. 143-

2, Tr. at 234:11–13 & 366:13–367:19; De Tomaso Ex. 51, ECF No. 146-16, at DT00110062. Berris

acknowledged his failures at De Tomaso, messaging Choi, "I love you," that "things could have

been handled better in retrospect," and admitting to his "mistakes in the past." De Tomaso Ex. 62,

ECF No. 141-1, at DT00157731–32; De Tomaso Ex. 52, ECF No. 140-39, DT00157941. It is

undisputed that Lui was president, CFO, and board director of Genesis in late April and May 2022.

140.    On or around April 27, 2022, Lui told Berris that if Berris did not follow his

instructions, Choi and De Tomaso would report Berris to the SEC. Ex. 1, Berris Tr. 225:5–23,

228:12–17, 248:20–24.

**Response**: Disputed. Lui never told Berris that he or Choi were planning to report Berris to

the SEC for any action. De Tomaso Ex. 9, ECF No. 143-6, Tr. at 132:12–133:22. Rather, Lui

communicated with Berris between April 27, 2022, and May 19, 2022, attempting to dispel any

miscommunications between Choi and Berris. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 259:2–23.

During that time, Berris and Lui exchanged friendly and casual messages. *Id.* at 248:11–249:18 &

253:24–254:10; De Tomaso Ex. 51, ECF No. 146-16, at DT00110062; De Tomaso Ex. 22, ECF No.

140-9, at DT000158882–83. Berris' self-serving testimony is further disputed because it is

unsupported by anything other than Berris' self-serving statements, which do not create a genuine

issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp.

3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

141.    In addition, Lui worked directly with counsel for Genesis to prepare a termination letter for De Tomaso. As part of that process, Choi requested the lawyer make a series of points to Berris, the first being that "Norman is the sole owner of De Tomaso". Ex. 48, GEN0000000274 at -307; Ex. 7, Lui Tr. 118:8-123:22.

**Response**: Disputed.  Lui testified he did not "work directly" with counsel on behalf of De Tomaso.  Rather, Lui "facilitated a discussion" between Mark Chan and Choi for the drafting of the letter for De Tomaso.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 121:11–124:25.  He then sent Mr. Chan a series of points drafted by Choi related to Berris' resignation from De Tomaso's board – not his termination.  *Id.*

142.    In this same time period, Berris told Lui on more than one occasion that he had a 10% ownership stake in De Tomaso. Ex. 7, Lui Tr. 133:23-134:17.

**Response**: Defendants do not know what "in this same time period" means, and therefore disputes this statement.  Defendants do not dispute that Lui testified Berris asserted "twice" in May of 2022 that he had an equity interest in De Tomaso.  De Tomaso Ex. 9, ECF No. 143-6, Tr. at 133:23–134:6.  Lui testified he was "not aware of oral contracts" and that as far as he was aware after conducting diligence on De Tomaso, "Norman Choi is the sole shareholder, the sole owner of the business."  De Tomaso Ex. 8, ECF No. 143-5, Tr. at 128:5–13 & 142:6–143:12.

143.    Messages between Majcher and Choi corroborate this. Ex. 43, DT00157742 ("Btw, [Berris] told Samuel he owns 10% of DT.").

**Response**: Defendants do not dispute that the quoted language appears in the cited document. The complete text message by Choi states: "[i]n the past, we did discuss about him having an equity stake but nothing came out of the discussions." Berris Ex. 43, ECF No. 172-26, at DT00157742. As noted above, Defendants dispute both that Berris had equity in De Tomaso and that Lui knew the basis or validity of Berris' statements in May of 2022.

144.    On May 3, 2022, Lui sent Berris an email attaching a resignation letter that falsely claimed Berris had "no claim" against De Tomaso "in respect of fees, remuneration, benefits or compensation" and instructed him to sign it immediately. Ex. 117, DT0000034953 (email from Lui's personal email address to Berris, stating "Resignation as Director – get it signed by tonight and email to me"); Ex. 119, DT0000034954 (email attachment, draft letter of resignation that Lui asked Berris to sign); Ex. 7, Lui Tr. 57:1-4 (Lui confirming that "tackisfat@gmail.com" is his personal email address).

**Response**: Defendants do not dispute that the quoted language appears in the cited document. Defendants dispute that Berris has any claim against the company, which is not supported by the record citations and is a legal conclusion in any event. *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015)

145.    Berris deleted the language relating to having "no claim" and signed a revised version in which he resigned from the board. Ex. 118, DT00110062.

**Response**: Undisputed.

146.    Thereafter, on May 19, 2022, Berris received a letter from De Tomaso terminating him as CEO of De Tomaso. Ex. 120, DT0000036166. The De Tomaso termination notice made no reference to Apollo or the Consultancy Agreement. *Id.*

-73-

**Response**:  Undisputed.  Berris admits that the Consultancy Agreement with Apollo terminated after he received the termination notice on May 19, 2022.  De Tomaso Ex. 4, ECF 143-2, Tr. at 276:12–277:4.

147.    On May 31, 2022, Apollo sent a separate termination email titled "Notice of Terminate Consulting Agreement" and, per the notice provisions in the Consultancy Agreement, was emailed to Berris's Aprivy email address. Ex. 121, DT0000050451; Ex. 80, DT0000000100 § 14.

**Response**: Undisputed.

## X.    WAFT BOOK – CATCH AND KILL

148.    De Tomaso commissioned a two-part book (from a publishing company named Waft) that was supposed to track the history and development of the De Tomaso brand.  Ex. 2, Majcher Tr. 355:21-356:9. The first part of the book was published and De Tomaso provided copies of that book to its clients and customers. Ex. 2, Majcher Tr. 356:10-25. The second part of the book was supposed to focus on the modern history of the De Tomaso brand, including the development of the P72. Ex. 2, Majcher Tr. 355:22-357:23.

**Response**: Undisputed.

149.    After reviewing drafts of the second book, De Tomaso had it decommissioned, meaning De Tomaso did not want the book to be published.  Ex. 2, Majcher Tr. 359:18-360:4.

**Response**:  This statement is undisputed except insofar as it states this decision was made "after reviewing drafts of the second book."  Majcher testified she did not read the book and only explained it was her understanding the company decided not to move forward with the project. Berris Ex. 2, ECF No. 168-2, Tr. at 360:15–22.

150.    De Tomaso did not want the second book published because it did not think the book would put the company "in a favorable light." Ex. 2, Majcher Tr. 360:5-14. Specifically, an

internal De Tomaso document shows notes and analysis on the second book, including that "Book 2 is structured in a way which paints Ryan in an overly positive light." Ex. 149, DT0000061290.

**Response**:  It is undisputed that Majcher stated her understanding was that De Tomaso "did not think the book would put the company in a favorable light and didn't represent the company." Berris Ex. 2, ECF No. 168-2, Tr. at 360:5–14.  Defendants dispute that De Tomaso believed Book 2 painted "Ryan in an overly positive light" and that that was the reason for not publishing the book. Majcher testified she did not read the book, and there is no evidence that the cited document was an "internal De Tomaso document" that set forth the position of the company.  *Id.* at 360:15–22.  The cited document does not show an author, and there is no evidence of who wrote this document or when it was created.

151.     Choi made the decision to decommission the second book.  Ex. 2, Majcher Tr. 360:23-25.

**Response**:  Undisputed.

152.     On October 10, 2023, which is after Berris filed this lawsuit, Majcher wrote to the authors of the second Waft book attaching a copy of a settlement agreement signed by Choi and witnessed by Majcher. Ex. 122, DT00138703; Ex. 2, Majcher Tr. 362:6-364:23.

**Response**:  Undisputed.

153.     Under the settlement agreement, De Tomaso agreed to pay Waft €100,000 to not publish the book, to return to De Tomaso all copies of any materials they had relating to the book, and to delete any copies of files they had left. Ex. 123, DT00138704; Ex. 2, Majcher Tr. 363:3-364:18.

**Response**:  Defendants do not dispute the stated terms summarize some of the terms in their settlement agreement with Waft.

## XI.    CHOI'S DEFAMATION OF BERRIS

154.    After Berris was terminated, De Tomaso hired someone to conduct physical surveillance of Berris, to perform a background investigation into him, and to provide a report to De Tomaso. Ex. 2, Majcher Tr. 32:11-35:8.  Majcher discussed with her husband, Bill Majcher, potentially hiring someone to hack into Mr. Berris's personal emails to see what he was up to. Ex. 2, Majcher Tr. 292:8-293:3.

**Response**:  Disputed.  The statement mischaracterizes Majcher's testimony.  Majcher testified De Tomaso hired an investigator to help "locate Berris," as he had disappeared following his resignation from De Tomaso.  Berris Ex. 2, ECF No. 168-2, Tr. at 34:13–18.  She only "vaguely remember[s] having some report," but could not recall any further details.  *Id.* at 35:3–8.  Ms. Majcher similarly testified she "may have" had certain discussions with her husband.  *Id.* at 292:8–293:3.

155.    Bill Majcher was a former Canadian law enforcement officer who worked on undercover investigations into drug cartels and was recently arrested and criminally charged in Canada for assisting the People's Republic of China to identify and intimidate an individual outside the scope of Canadian law. Ex. 2, Majcher Tr. 321:10-322:5; 334:19-335:335:16]; Ex. 150, DT00130583.

**Response**:  Disputed.  The statement and cited evidence are not relevant to the issues in this case.  The statement is inflammatory and meant to harass and thus is improper and should be stricken. Fed. R. Civ. P. 11(b)(3); *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

156.    Following Berris's termination from De Tomaso, Choi began to spread false and defamatory statements about him to De Tomaso customers, partners, and others in the luxury

automotive industry. Ex. 1, Berris Tr. 542:1-544 (Berris was "told from numerous parties that Mr.

Choi had approached them and was tarnishing my name" and "was telling them that all of the delays

. . . [were] my fault").

   **Response**: Disputed.  Choi has not made defamatory statements against Berris, which is a

legal assertion properly disregarded by the Court in any event.  De Tomaso Ex. 7, ECF No. 143-4,

Tr. at 372:5–7; *see Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F.

Supp. 3d 352, 393–96 (S.D.N.Y. 2015).  Berris has not identified the specific words of any

defamatory statement he believes Choi made regarding him or his departure from De Tomaso.  De

Tomaso Ex. 5, ECF No. 156-5, Tr. at 543:14–570:19.  Berris has not identified the exact timing (the

day) in which Choi purportedly made any defamatory statements regarding him or his departure

from De Tomaso.  *Id.*  Berris has not identified any defamatory statements Choi made to people in

New York.  *Id.*  Berris' self-serving testimony is further disputed because it is unsupported by

anything other than Berris' self-serving statements, which do not create a genuine issue of fact on

summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382

(S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial

evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also*

*Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

   157.    After terminating Berris, Choi told Evan Cygler, who lives in New York City, that

Berris was "let go" from De Tomaso because of a "multitude of things such as unmet deadlines,"

and "things that were promised to be done that weren't being done." These included "homologation

reasons," too much "time passing" and "issues with suppliers," including with Capricorn. Norman

also cited hiring Jorda as another reason. Ex. 6, Cygler Tr. 4:20-21; 23:9- 25:7.

**Response**:  Disputed.  This statement misstates cited testimony.  Cygler testified that Choi had informed him that Berris "left the company" and that he personally remembered "a few things happening at the time."  De Tomaso Ex. 11, ECF No. 143-7, Tr. at 23:19–22.  Cygler is not aware of Choi making negative comments about Berris to customers or other third parties.  *Id.* at 106:4–25. Indeed, De Tomaso issued an open letter prepared by De Tomaso to Miller Motor Cars as well as De Tomaso's other custodians and dealers announcing Berris' departure from De Tomaso and stating De Tomaso "wish[ed] Ryan all the best in his future endeavors."  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 364:2–365:18; De Tomaso Ex. 6, ECF No. 143-3, Tr. at 310:5–311:12; De Tomaso Ex. 11, ECF No. 143-7, Tr. at 107:2–108:12; De Tomaso Ex. 73 at DT0000050474.

158.    On May 16, 2022, Choi sent an email to De Tomaso's employees and consultants providing "formal notice of Ryan Berris's immediate suspension from all current activities in the Company and the Group due to misconduct." Ex. 124, DT00110331; Ex. 151, DT00110390 (Choi email and memo stating that "this email constitutes a formal notice of Ryan Berris immediate suspension of all current activities in the company due to misconduct"); Ex. 125, DT00110322 (Choi informing Majcher about the content of the planned email and stating (on May 14, 2022) that he would "email it out on Monday"); Ex. 126, DT00110340 (Choi stating that he "need[s] more time to write the internal memo of all [of Berris'] various misconducts," and informing Majcher that he will "send out the memo today"). Choi was in New York during April and May 2022 and living at his apartment in Hudson Yards. Ex. 161, GEN0000000274 at -303 (April 16, 2022 text message between Choi and Lui where they agree to meet at Choi's Hudson Yards apartment).

**Response**:  Defendants do not dispute that the quoted language appears in the cited documents.  Defendants do dispute that Choi was in New York for all of "April and May 2022 and

living at his apartment in Hudson Yards" because the cited record evidence does not support that statement. Local Rule 56.1(c)–(d).

159.    Similarly, Choi, Majcher and a De Tomaso attorney exchanged emails on May 17, 2022 relating to their efforts to terminate Berris that stated they believed "he may be defrauding the company." Ex. 127, DT00111229. On June 24, 2022, Choi forwarded the entirety of that correspondence to Stanley Cohen (who was a De Tomaso customer, an insider in the luxury auto industry, and Berris's long-time friend). Ex. 159, DT00177630; Ex. 1, Berris Tr. 566:8-11; Ex. 6, Cygler Tr. 41:4-44:12; Ex. 127, DT00111229. The email chain stated: "Dear Stanley, Below is a general background for your information. I will send a separate email containing alleged agreement with Carmen Jorda." Ex. 127, DT00111229. Cohen replied to Choi stating that "after reading your email . . . it appears that Ryan has decided to take advantage of Norman," and that "I am very disappointed in Ryan. I would never have suspected that he would be the Bernie Madoff of New England." *Id.*

**Response**:  Defendants do not dispute the quoted language appears in the cited documents. Defendants dispute Berris' comments on the documents, including those characterizing Stanley Cohen and Berris' relationship with Cohen, because they are not supported by the cited evidence. Defendants further dispute this statement because cited Exhibit 127 contains inadmissible hearsay evidence.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

160.    In the months following Berris' termination, Choi attended several auto industry events on behalf of De Tomaso (including an event at the Villa d'Esta in Italy, and at the Nurburgring in Germany). At these events, Choi falsely stated to numerous individuals that Berris

had been fired for incompetence, had mismanaged the company, and that Berris was responsible for the delay in production of the P72. Ex. 1, Berris Tr. 542:1-544.

**Response**:  Disputed.  The statement that Choi attended several auto industry events and made false statement to "numerous" unspecified individuals is unsupported by record evidence. This statement is further disputed because Choi has not made false statements regarding Berris.  De Tomaso Ex. 7, ECF No. 143-4, Tr. at 372:5–7.  Indeed, Berris has not identified the specific words of any false statement he believes Choi made regarding him or his departure from De Tomaso, including at these "auto industry events."  De Tomaso Ex. 5, ECF No. 156-5, Tr. at 543:14–570:19. Berris has not identified the exact timing (the day) in which Choi purportedly made any false statements regarding him or his departure from De Tomaso.  *Id.*  Nor has Berris identified any false statements Choi made to people in New York.  *Id.*  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

161.    Specifically, in "the third week of May 2022," at the Villa d'Esta event, Choi told Jim Glickenhaus (a mutual friend and important figure in the luxury auto industry) that Berris held "all the blame" for the production delays of the P72, that "all of the delays and decisions with Capricorn" were Berris' fault, and that "everything that was wrong with the P72 program and delays were all as a result of" Berris' mistakes. Ex. 1, Berris Tr. 542:1-550:13, 558:6-11. Choi also "approached [Glickenhaus] on subsequent occasions in the months of" "June and July of 2022" to continue making similar defamatory statements about Ryan's job performance. *Id.* 547:13-18.

**Response**:  Disputed.  The quoted statements misstate the cited testimony, in which Berris

recites what he says Jim Glickenhaus said Norman Choi told Jim Glickenhaus.  That is both

inadmissible hearsay and insufficient evidence on summary judgment.  *See Presbyterian Church of*

*Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).  Berris' self-serving testimony is

further disputed because it is unsupported by anything other than Berris' self-serving statements,

which do not create a genuine issue of fact on summary judgment.  *Fed. Trade Comm'n v. RCG*

*Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023).  As noted in response to paragraph 160,

Choi did not make false, defamatory statements regarding Berris.

162.    Similarly, sometime between May 2022 and October 2022, Choi told Gerald Ng

(another individual involved in the luxury auto industry) that Berris was "personally" to blame for

all "supposed issues with the P72 development and delays." Ex. 1, Berris Tr. 545:4-20.

**Response**:  Disputed.  Again, the quoted statements misstate the cited testimony, in which

Berris recites what he says Gerald Ng said Norman Choi told Gerald Ng.  That is both inadmissible

hearsay and insufficient evidence on summary judgment.  *See Presbyterian Church of Sudan v.*

*Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).  Berris' self-serving testimony is further

disputed because it is unsupported by anything other than Berris' self-serving statements, which do

not create a genuine issue of fact on summary judgment.  *Fed. Trade Comm'n v. RCG Advances*,

LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023); *see* De Tomaso Ex. 5, ECF No. 156-5, Tr. at

545:4–20.  As noted in response to paragraph 160, Choi did not make false, defamatory statements

regarding Berris.

163.    Sometime between May 2022 and October 2022, Choi made similar statements

(about Berris being to blame for the P72 production delays and issues with Capricorn) to several

other individuals in the luxury auto industry, including: Florian Kamelger, Andreas Baenzinger, Stanley Cohen, and Bart Lennartz.  Ex.01, Berris Tr. 549:13-550:13.

**Response**:  Disputed.  Defendants do not know what specific time, statements, or persons Berris intends to encompass in this statement and therefore dispute it.  With respect to Kamelger, Baenzinger, Cohen, and Lennartz, Berris is just vaguely repeating what he says they said Choi said, which is both inadmissible hearsay and insufficient evidence on summary judgment.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023); *see* De Tomaso Ex. 5, ECF No. 156-5, Tr. at 549:13–550:13.  As noted in response to paragraph 160, Choi did not make false, defamatory statements regarding Berris.

164.    During this same time period, Choi also told Barry Skolnick (another individual involved in the luxury auto industry) that Berris had "conducted unauthorized activity" while employed at De Tomaso and had "misappropriated company funds." Ex. 1, Berris Tr. 552:6- 553:15.

**Response**:  Disputed.  Defendants do not know what "during the same time period" means, and therefore disputes this statement.  Regardless, Berris is again repeating what a third party said Choi said to them, which is both inadmissible hearsay and insufficient evidence on summary judgment.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).  Berris' self-serving testimony is further disputed because it is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023);

De Tomaso Ex. 5, ECF No. 156-5, Tr. at 552:6–553:15.  As noted in response to paragraph 160, Choi did not make false, defamatory statements regarding Berris.

165.    The luxury automotive industry is a small, exclusive, and tight-knit community—one in which a person's reputation is particularly important in their business dealings. Ex. 1, Berris Tr. 557:4-20.

**Response**: Disputed.  Berris' self-serving testimony is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment. *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

166.    Choi's false statements about Berris "destroyed [his] reputation amongst clients, partners, [and] the insular world" of the luxury auto industry. Choi's false statements were "utterly devastating" to Berris' reputation and future employment prospects in the industry. In fact, at least one potential employer (SCG) told Berris that they wouldn't hire him because of Choi's statements. Ex. 1, Berris Tr. 557:4-558:24.

**Response**:  Disputed.  There is no evidence Choi made false statements about Berris, as noted above, including in response to paragraph 160.  Nor is there any actual evidence – including expert evidence – that any statement Choi made was "devastating" to Berris' reputation.  Berris' self-serving testimony is unsupported by anything other than Berris' self-serving statements, which do not create a genuine issue of fact on summary judgment.  *See Fed. Trade Comm'n v. RCG Advances*, LLC, 695 F. Supp. 3d 368, 382 (S.D.N.Y. 2023) ("[A] *nonmoving* party's self-serving statement, without direct or circumstantial evidence . . . , is insufficient to defeat a motion for

summary judgment.") (emphasis added); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654,

656 (2d Cir. 2009). Further, the statements of Berris' unidentified "potential employer" are

inadmissible hearsay otherwise unsupported by the record. *See Presbyterian Church of Sudan v.*

*Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009). Berris testified that since his departure

from De Tomaso, he has not sought any form of employment, including but not limited to any in the

automotive industry, and has not made any form of inquiries for employment or sent out any

resumes to pursue employment. De Tomaso Ex. 4, ECF No. 143-2, Tr. at 55:12–56:8.

## XII.    FACTS RELATING TO PIERCING DE TOMASO'S CORPORATE VEIL

167.    De Tomaso maintained only a single bank account for all of its various

subsidiaries. Ex. 4, De Tomaso 30(b)(6) Tr. 90:19-91:7. Expenses for all subsidiaries are paid out of

the bank account and noted on the ledger for each subsidiary. *Id.* at 92:7-93:8.

**Response**: Disputed. De Tomaso's German subsidiary has its own bank account, De

Tomaso's Hong Kong subsidiary had two bank accounts, and De Tomaso Automobili Holdings NA

LLC also (previously) had its own bank account. De Tomaso Ex. 5, ECF No. 156-5, Tr. at 526:4–

22; De Tomaso Ex. 16, ECF No. 144-2, at BERRIS-000083295; De Tomaso Ex. 85, at

DT0000080120 (General Journal De Tomaso, North America LLC); *id.* at DT0000080119 (General

Journal De Tomaso Automobili Limited (Hong Kong)); *id.* at DT0000080121 (General Journal De

Tomaso Automobili Limited (BVI)).

168.    The company routinely directly pays for Choi's personal expenses out of its bank

account. *See, e.g.*, Ex. 152, DT00176285 (De Tomaso ledger spreadsheet, showing numerous loan

payments and repayments for Choi's personal purposes—including a payment to his daughter's

dance studio, and multiple payments expressly labeled "loan repayment" for Choi); Ex. 3, Choi Tr.

122:6-126:23 (Choi admitting that this spreadsheet shows him making loans/payments, *using De*

*Tomaso funds,* to his personal real estate broker, his daughter's dance school, and his wife). The

company does not record those payments or the interest Choi earns on his loans for tax purposes. Ex. 4, De Tomaso 30(b)(6) Tr. 99:11-101:4. The company does not have loan agreements with all of the various Choi controlled entities that bring money into the company or which is paid out to them by the company. It treats those entity payments as all related to a single Choi entity, Ideal Team Ventures. *Id.* at 103:13-104:9. De Tomaso pools all of its money so that those funds—including customer deposits—can be paid to contractors or to Choi. *Id.* at 229:10-231:6.

**Response**:  Disputed.  The statements are argumentative and unsupported by the cited evidence.  De Tomaso does not know – and there is no citation for – what "various Choi controlled entities" Berris is referencing.  De Tomaso has two loan agreements with Choi, and does not treat "all entities" as the same entity.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 103:14–21.  De Tomaso does not pay Choi's "personal expenses" – it makes loan repayments to Choi in accordance with the terms of the loan agreements.  Per De Tomaso's loan agreements with Choi, "the lender can direct the company to pay whichever bank account it wishes at the time of repayment."  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 99:5–9.  De Tomaso keeps a live document keeping track of "the total amount of money that is owed to Choi at any one time" and any time money goes out "its properly recorded."  *Id.* at 98:17–23;  De Tomaso Ex. 82, DT00177194.   Thus, the sums Choi had paid on his behalf were small repayments of the tens of millions of dollars of loans he has personally made to De Tomaso under written loan agreements, and were recorded as such on De Tomaso's books.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 99:5–105:21.  Further, as Ms. Majcher testified, the company "keeps track of the interest that's earned by Mr. Choi," but has not repaid it yet.  *Id.* at 100:7–24.

169.    A July 5, 2021 email exchange between Choi and Majcher reflects all this intermingling. At one point, Majcher wrote to Choi: "The option was repurchased by DT, using around $11m of cash that came from Sino Vision (part of the $3m), the rest were u taking up

amounts originally due to u from Apollo, those can be credited to ur account." Ex. 128, DT00164138 at -148-150.

**Response**:  Disputed.  The cited text (not email) thread does not show that De Tomaso funds were intermingled.  As noted in De Tomaso's response to paragraph 168, they were not.  In fact, the exchange cited shows that De Tomaso had a formal accounting process and that its funds and transactions were properly accounted for.  Berris Ex. 128, ECF No. 173-13, at DT00164148–150. De Tomaso keeps track of "the total amount of money that is owed to Choi at any one time" and any time money goes out "is properly recorded."  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 98:17–23.

170.    The LLC agreement Section 6 required annual board meetings. DT did not have any formally scheduled board meetings, otherwise regularly have board meetings, or keep board minutes. No board meetings were scheduled between 2020 and the end of 2022. Ex. 4, De Tomaso 30(b)(6) Tr. 53:9-36:12.

**Response**:  Defendants do not dispute De Tomaso did not have formal board meetings scheduled between 2020 and 2022, but disputes the remainder of this statement, which is not supported by the record citations and is a legal conclusion in any event.  *See Congregations Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 393–96 (S.D.N.Y. 2015)

171.    Choi also routinely used personal email to conduct De Tomaso's business and to delete books and records of the company that were relevant to its business. Ex. 109, DT00132395 at -402-403; supra ¶¶ 114, 128.

**Response**:  It is undisputed that Choi received some business communications to his personal email account.  Defendants dispute Choi deleted "books and records of the company that were relevant to his business."  There is no evidence Choi deleted "books" or "records," nor are such terms further defined by Berris.  Indeed, Majcher is De Tomaso's Chief Operating Officer and is the

person primarily responsible for keeping De Tomaso's books and records, including accounting records.  De Tomaso Ex. 6, ECF No. 143-3, Tr. at 37:21–38:21 & 170:11–16.

172.    Indeed, the Defendants own expert noted that De Tomaso received "going concern" opinions from their auditors for 2021 and 2022 (and likely for 2023) and that, even after receiving funds from an outside investor, it had capital deficit. Ex. 10, Barnes Tr. 187:19- 188:17.

**Response**:  Disputed.  This statement relies on hearsay and mischaracterizes the deposition testimony from Mr. Barnes.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

173.    On October 29, 2020, Majcher wrote Jowyn Wong: "He [Norman] came from the stock trading world and he can't shake the mindset of getting something for nothing and always just trying to play the market." Ex. 11, DT00129042 at -084. Later in the message exchange, Majcher wrote: "Can't build a business like that," and Wong replied: "Yes, you are very right. Norman approaches business like stocks." Majcher then wrote: "All just becomes a big Ponzi scheme" and that she "wants nothing to do with that." Ex. 11, DT00129042 at -85.

**Response**:  Disputed.  This statement is irrelevant to the claims at issue in this case and its only purpose is to harass Choi.  Indeed, it is from October 2020, taken out of context, and relies on hearsay.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

Date: December 23, 2024                    By,

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

_____

Paul Werner (Lead Counsel) (NYSB:6104798)
Imad Matini (NYSB: 5302419)
Hannah Wigger (admitted *pro hac vice*)
Alexandra Bustamante (admitted *pro hac vice*)
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 747–1931
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
hwigger@sheppardmullin.com
abustamante@sheppardmullin.com

Bradley M. Rank
30 Rockefeller Plaza, 39th Floor
New York, New York 10112
(212) 653–8712
brank@sheppardmullin.com

*Counsel for Defendants*