UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RYAN BERRIS,

                              Plaintiff,

                  -against-

SUNG-FUNG CHOI, also known as Norman
Choi; DE TOMASO AUTOMOBILI
HOLDINGS N.A. LLC; HIN WENG LUI, also
known as Samuel Lui; GENESIS UNICORN
CAPITAL CORP.,

                              Defendants.

---

23-cv-4305 (AS)


OPINION AND ORDER

---

ARUN SUBRAMANIAN, United States District Judge:

   De Tomaso Automobili Holdings N.A. LLC ("De Tomaso") creates, develops, and sells luxury
automobiles. Dkt. 166 ¶ 2. Norman Choi is its current owner. Dkt. 179-1 ¶ 3. Ryan Berris is its
former Chief Executive Officer and Chief Marketing Officer. Dkt. 166 ¶ 12. Choi says that Berris
resigned from De Tomaso in disgrace after squandering the company's resources. Berris says that
he was forced out after he raised concerns that Choi was engaging in fraud.

   According to Berris, Choi decided to take De Tomaso public through a merger with defendant
Genesis Unicorn Capital Corp., a Special Purpose Acquisition Company ("SPAC"). Berris alleges
that defendant Samuel Lui, Genesis's Chief Financial Officer, conspired with Choi to preselect De
Tomaso as Genesis's target, and that Berris was forced to resign after he complained to Choi that
De Tomaso was engaging in fraud by making false statements to SPAC investors. Berris sues Choi
and De Tomaso for, *inter alia*, breach of contract and wrongful discharge. He also seeks to hold
Genesis and Lui liable for aiding and abetting and conspiring to cause his wrongful discharge.
Defendants move for summary judgment. For the following reasons, Choi and De Tomaso's
motion is GRANTED IN PART and DENIED IN PART. Lui and Genesis's motion is GRANTED.

## BACKGROUND

### I.    The Consulting Services Agreement

   Norman Choi and Ryan Berris met in 2015, when Berris was working as a marketing consultant
for a different luxury automotive company. Dkt. 166 ¶¶ 13–15. "Choi informed Berris that he had
acquired two luxury automotive brands, Apollo and De Tomaso." Dkt. 179-1 ¶ 21. In January
2018, Berris signed on to work as an independent contractor with Apollo under a Consulting
Services Agreement between Berris's LLC—Aprivy—and Apollo. Dkt. 166 ¶¶ 21–22; *see also*
Dkt. 156-1 at 4. The agreement provided that Aprivy's services "w[ould] be performed for both

'Apollo' and 'De Tomaso' branded vehicles and any future brands that the Company [(Apollo)] may launch over the duration of th[e] agreement." Dkt. 156-1 at 12. Berris's compensation was a base fee of $200,000 per year, plus a "performance fee that [wa]s predicated as a percentage of sales." *Id.* at 12–13. The agreement set a specific performance fee for certain models and provided that "[f]or future models, Apollo or De Tomaso, [Aprivy] and [Apollo] will in good faith come to terms on a mutually agreeable compensation on those products at the time that they are defined and planned for production." *Id.* at 13.

In March 2020, Choi sold his stake in Apollo to WE Solutions, which then rebranded itself to Apollo Future Mobility Group (AFMG). Dkt. 166 ¶ 32; *see also* Dkt. 169-32; Dkt. 179-1 ¶¶ 29–30. AFMG had an option to purchase shares in De Tomaso, which it didn't exercise, and Choi later purchased the option back. Dkt. 168-3 at 277. Berris continued to receive payments from AFMG through Aprivy pursuant to the Consulting Services Agreement. Dkt. 166 ¶¶ 33–34. He also received payments from De Tomaso through Aprivy. *Id.* ¶ 35. The parties agree that the Consulting Services Agreement "remained in effect until it was terminated on May 19, 2022." *Id.* ¶ 36.

## II.    The Alleged Oral Employment Agreement

The parties dispute whether Berris and De Tomaso entered into a separate agreement following the Apollo sale. Defendants say that the money De Tomaso paid Berris through Aprivy represented his salary for work at De Tomaso. Berris says that "sometime between March and June of 2020" Choi offered, and Berris accepted, an employment contract with De Tomaso, Dkt. 168-1 at 290–92, under which Berris would receive "(1) an annual salary of $400,000; (2) a 2 percent commission on all sales of De Tomaso; (3) a Porsche GT3 and Chassis 60 for the P72; and (4) a ten percent equity stake in De Tomaso." Dkt. 166 ¶ 48. Berris concedes that this purported employment contract was never reduced to writing.

Berris points to multiple communications that he says reflect his equity stake, including an email Choi forwarded to Berris in which Choi asked De Tomaso's attorney "one question regarding the % [he] promised to give to [Berris]. At the end, what's the best way/ structure to proceed with [Berris] not having to deal with all the capital gain/ gift/ income tax issues?" Dkt. 169-44. Choi also forwarded Berris a copy of a message he sent to the attorney saying "Pls let me know once you speak to Jamie, FYI, I will proceed with the fund raise and want to make sure [Berris's] interest is well taken care of prior to the completion of the raise." Dkt. 169-45. As for his agreement to a $400,000 salary, Berris points to a text exchange between Choi and De Tomaso's COO, Diana Majcher, in which Majcher sent Choi an invoice from Berris, and Choi responded "[s]hould be 400k per year so that works out to be 33,333." Dkt. 173-1 at 46. And for the cars he was purportedly promised, Berris points to an internal De Tomaso document titled "De Tomaso P72 / Global Chassis Allocations," which noted that a P72 was reserved for "RB." Dkt. 173-40 at 3.

### III.    The Carmen Jorda Contract

On September 3, 2020, Berris signed an LLC Agreement with De Tomaso, which named Berris and Choi as managers, board members, and directors. Dkt. 166 ¶¶ 40, 42–43. The LLC Agreement provides that no individual director "shall have the authority to act for or bind the Company without the requisite consent of the Board." *Id.* ¶ 44.

In 2021, Berris began discussions with Carmen Jorda, a professional race-car driver who previously raced for Formula One, "about adding her to the De Tomaso team to assist with advertising campaigns and publicity." Dkt. 179-1 ¶¶ 67–68. Later that year, De Tomaso hired Jorda as an independent contractor to work on an ad campaign, "Meet Isabelle." *Id.* ¶ 69. It is undisputed that Choi knew that Jorda was hired for this campaign. *Id.*; *see also* Dkt. 168-3 at 227–28. In August 2021, Berris began negotiating a broader, long-term employment contract between De Tomaso and Jorda. Dkt. 166 ¶¶ 118, 120–22. De Tomaso's lawyers were not involved in the negotiations. *Id.* ¶¶ 122, 128. Berris signed the agreement on De Tomaso's behalf in September 2021. *Id.* ¶ 123. Berris says that he and Jorda had a "verbal understanding that [Jorda] would have the ability to revisit the topics" in the contract. *Id.* ¶ 125 (alteration in original). The parties later revised the terms, and Berris signed the final version on January 22, 2022. *Id.* ¶¶ 129, 131, 133, 135. Berris says that he did this with Choi's knowledge and approval, citing a communication shortly before the final contract was signed in which Choi asked Berris to "remind [him] what's [Jorda's] rate again?," to which Berris responded "€250/yr Full-time Exclusive." Dkt. 168-13 at 9. Choi says that Berris acted unilaterally in hiring Jorda, and that he only knew that she was hired for the Meet Isabelle campaign. *See* Dkt. 179-1 ¶ 70.

Things quickly soured with Jorda after De Tomaso refused to pay her invoices. On March 29, 2022, Jorda told Berris that she had not been compensated for the last three months. Dkt. 166 ¶ 139. In May, she told Berris that De Tomaso was in breach of contract. *Id.* ¶ 140. Berris emailed Majcher and Choi, asking for Jorda's payment to be deducted from his personal compensation. *Id.* ¶ 141. In December 2023, Jorda sued De Tomaso, Choi, and Berris in federal court. *Id.* ¶ 143. After Jorda submitted a sworn declaration from Berris to support her opposition to defendants' motion to dismiss, she voluntarily dismissed Berris from the case, which remains ongoing. *Id.* ¶¶ 146–47; s*ee Jorda v. De Tomaso Automobili Holdings N.A. LLC*, 23 Civ. 9809 (S.D.N.Y.).

### IV.    The De-SPAC Deal

Meanwhile, in March 2021, Choi began exploring the possibility of raising capital for De Tomaso through a SPAC transaction. Dkt. 179-1 ¶ 101. Later that spring, Choi met defendant Samuel Lui, who would come to lead a SPAC called Genesis Unicorn Capital. *Id.* ¶ 105.

Genesis was "a newly organized blank check company formed under the laws of the State of Delaware for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses." Dkt. 171-28 at 4. Genesis stated in an initial SEC filing that it "ha[d] not selected any specific business combination target" nor "initiated any substantive discussions, directly or indirectly, with any business combination target." *Id.*

Lui was introduced to Genesis through ARC Capital, a financial advisor for SPAC listings. Dkt. 179-1 ¶ 108; Dkt. 166 ¶ 177. In October 2021, Lui became the Director, President, and Chief Financial Officer of Genesis. Dkt. 166 ¶ 9. Lui then introduced Choi to ARC in November 2021. Dkt. 167 ¶ 20.

Berris says that the primary reason why De Tomaso engaged ARC was to "facilitate and paper-over a pre-arranged SPAC deal between De Tomaso and Genesis," Dkt. 166 ¶ 178, which is a problem because "[a] SPAC cannot identify a target company to acquire until the SPAC's own initial public offering has been completed." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 134 n.2 (S.D.N.Y. 2023). In support, he points to evidence that "Lui and Choi arranged for Lui to surreptitiously listen in on the ARC Zoom call from an unnamed iPad." *See* Dkt. 179-1 ¶ 113; *see also* Dkt. 168-7 at 28–30. He also points to a text thread between Choi and Majcher, in which Choi told Majcher that "Samuel . . . has a SPAC about to get listed early Dec" and "[h]e asked if [Choi] was interested to be one of the Funders (total 4m risk capital)." Dkt. 172-17 at 2. "With that," said Choi, "DD, valuation and timing would be much easier to control." *Id.* at 3. Majcher responded, "And use this SPAC for DT?," to which Choi responded "Yes." *Id.* at 3–4. Using personal email addresses, Lui also emailed Choi a dilution table that was amended "to be consistent with the expected terms of our SPAC." Dkt. 172-7. And shortly before Genesis refiled its Form S-1 to reflect Lui's role, Choi asked Lui "[w]ho will be in the new management?" and Lui responded "after de-spac is completed, all of the SPAC's management and board directors will resign . . . . [T]he rest of the board and mgt team will be filled with your own people." Dkt. 172-31 at 13. Around this time, Lui was asking Choi about becoming the CFO of De Tomaso. Dkt. 179-1 ¶ 117.

Choi and Lui continued to communicate by text until January 2022, but there are no texts between them from January to April 2022. *Id.* ¶ 120. In February, Choi instructed Majcher to "delete all emails you have with [Lui] . . . [a]s well as the previous message. His SPAC is ready." *Id.* ¶ 122. In February 2022, ARC sent an email titled "SPAC target intro D" introducing Lui and Choi (and their respective teams). *Id.* ¶ 130. Two days after Genesis and De Tomaso entered into a nonbinding letter of intent on April 7, 2022, Choi and Lui's text message thread picked back up. *Id.* ¶ 131.[1]

Berris "found it odd" that Choi and Lui were discussing Genesis as Lui's SPAC before Lui was listed on the public filings and that Lui "was joining confidential discussions" between ARC and De Tomaso. Dkt. 168-1 at 498–99. Berris says that he raised concerns to Choi about "altered financial statements with forecasts and production timelines that could not be met." *Id.* at 513–14.

---

[1] The nonbinding letter of intent lapsed on June 6, 2022. Dkt. 166 ¶ 198. On March 31, 2025, Berris moved for leave to supplement the summary-judgment record with additional facts drawn from SEC documents showing that "De Tomaso and Genesis [a]re in [e]ffect [m]erging." Dkt. 183 at 2. The Court denies this request because whether De Tomaso and Genesis merged has no effect on its ruling.

## V.   Berris's Termination

Tensions between Berris and Choi ratcheted up in the spring of 2022. That March, Majcher emailed Berris asking for additional documentation to support certain business expenditures after "De Tomaso's auditors had found expense reimbursement transfers to Aprivy and transactions in the De Tomaso Bank of America account that did not have supporting documentation." Dkt. 166 ¶ 90. Berris says that this was a fabricated request that came from Choi, not from the auditors. *See id.*; Dkt. 168-2 at 255–56. On April 8, 2022, Choi emailed Berris, chiding him for holding onto an employee's notice of resignation for weeks before showing it to Choi, which Choi said was what Berris had done with Jorda's contract. Dkt. 166 ¶ 200.

By late April, Berris and Choi's relationship had deteriorated such that they were no longer speaking. Dkt. 179-1 ¶ 138. Berris emailed and called Choi, telling him "I haven't been able to sleep in days," "I love you and I'm sorry," and "things could have been handled better in retrospect." Dkt. 167 ¶ 128. Lui, who was in New York City to investigate financing for the de-SPAC deal, ended up passing messages between the two. *Id.* ¶¶ 127, 129.

On May 3, 2022, Lui sent Berris a proposed resignation letter, which was drafted by a lawyer and reviewed by both Choi and Lui. *Id.* ¶ 131. Berris resigned as De Tomaso's manager, board member, and director that day. *Id.* ¶ 133. The next day, he messaged Choi stating that he had "made mistakes in the past," including as to Jorda, and that he "understood he needed 'to do a better job at communicating more freely and openly and "ping-ponging" things back and forth' with Choi." Dkt. 166 ¶ 204. On May 19, 2022, Berris received a letter from De Tomaso's lawyers terminating him as CEO "effective the date referenced in [Berris's] resignation letter." *Id.* ¶ 205.

A year later, Berris sued Choi, De Tomaso, Lui, and Genesis. *See* Dkt. 1. Against Choi and De Tomaso, he brings claims for breach of contract, promissory estoppel, unjust enrichment, quantum meruit, and wrongful discharge. *See* Dkt. 80 ¶¶ 135–41, 149–72.[2] Against Lui and Genesis, he brings a claim for aiding and abetting and conspiring to cause his wrongful discharge. *Id.* ¶¶ 173–91. He also sues Choi for defamation. *Id.* ¶¶ 192–97. De Tomaso counterclaims for unjust enrichment and breach of the fiduciary duties of loyalty and care. Dkt. 95 ¶¶ 218–49. Defendants move for summary judgment on all counts.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden

---

[2] Berris's implied-covenant claim, which was included in the complaint as a "typographical error," was dismissed. *See Berris v. Choi*, 2024 WL 4635251, at *1 (S.D.N.Y. Oct. 30, 2024).

of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## DISCUSSION

I. **Summary judgment is denied on the contract claim against De Tomaso but granted as to Choi.**

Choi and De Tomaso move for summary judgment on Berris's breach-of-contract claim, arguing that the purported contract between Berris and De Tomaso is unenforceable based on the statute of frauds and because it is merely an "agreement to agree." Choi also argues that the contract claim fails against him because he was not a signatory to the agreement. The Court agrees that Berris's contract claim cannot proceed against Choi because Berris points to no evidence to justify piercing the corporate veil.

### A. The statute-of-frauds defense is waived, and in any event, does not bar Berris's contract claim.

Choi and De Tomaso argue that Berris's breach-of-contract claim is barred by the statute of frauds. Berris responds that defendants waived this defense by failing to raise it in their answer. The Court agrees with Berris.

Federal Rule of Civil Procedure 8(c)(1) requires that "[i]n respon[se] to a pleading, a party must affirmatively state any . . . affirmative defense, including . . . statute of frauds." "Failure to plead an affirmative defense in the answer results in 'the waiver of that defense and its exclusion from the case.'" *U.S. ex rel. Mar. Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1253 (2d Cir. 1989) (citation omitted); *see also Toussie v. County of Suffolk*, 806 F. Supp. 2d 558, 591 (E.D.N.Y. 2011) (rejecting statute-of-frauds defense at summary judgment because "[d]efendants waived any statute of frauds defense when they failed to assert it in their Amended Answer").

Defendants say that "Berris never alleged the existence of an *oral promise* in his Amended Complaint, and thus never put Defendants on notice of a need to raise a Statute of Frauds defense in their Answer." Dkt. 179 at 6. But in the amended complaint, Berris alleged that his agreement with De Tomaso "was formalized over a series of phone calls with Choi as Berris took on leadership of De Tomaso." Dkt. 80 ¶ 68. According to the complaint, during these phone calls "Berris was promised a 10% equity stake in De Tomaso," "a salary of $400,00 a year," and a "2% commission on vehicle sales." *Id.* Berris based his claim for breach of contract on this oral agreement. *See id.* ¶¶ 135–41. So defendants were on notice that Berris alleged an oral agreement and were obligated to raise any statute-of-frauds defense in their answer.

Even if the defense were not waived, it would fail. Choi and De Tomaso argue that the statute of frauds bars Berris's contract claim for two reasons: first, because the contract was incapable of completion within one year, and second, because it created a "partnership interest." Dkt. 138 at 12.

As to the first argument, New York law provides that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, . . . if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime." N.Y. Gen. Obl. L. § 5-701(a)(1). In other words, oral agreements that "are impossible of completion within [one year] by their own terms" are "void if unwritten." *D&N Boening, Inc. v. Kirsch Beverages, Inc.*, 472 N.E.2d 992, 994–95 (N.Y. 1984).

Choi and De Tomaso argue that Berris testified that his "oral contract" contains an indefinite commission on all De Tomaso sales even after his termination, rendering his contract incapable of being completed within one year. It's true that a contract entitling the employee to post-termination commissions must be reduced to writing to be enforceable. *See Levine v. Zadro Prods., Inc.*, 2003 WL 21344550, at *2 (S.D.N.Y. June 9, 2003) ("[T]he Statute of Frauds . . . bars the enforcement of an agreement for ongoing post-termination commissions."). But Choi and De Tomaso misrepresent Berris's testimony. In response to the question, "how long was [the employment agreement that was on the table] supposed to last?", Berris responded, "[i]ndefinitely." Dkt. 168-1 at 307. Berris later clarified that he meant "there was no specific time period" to his employment agreement, "[a]nd it was the hope for [him]self and Mr. Choi that [they] would work together forever," but "[i]n the event [they] decided to part ways, then [they] had the ability to do so." *Id.* at 620. As Berris explains, all this means is that he understood that his employment contract would last for an indefinite period, until one party or the other decided to end it, and that he would receive commissions for sales made during the period he was employed. Dkt. 164 at 22–23. He has not ever claimed (nor did he testify) that his contract with De Tomaso entitled him to post-termination commissions, so Choi and De Tomaso's argument on this ground fails. *Cf. Levine*, 2003 WL 21344550, at *1 ("Plaintiffs assert that the parties' agreement called for the payment of commissions beyond termination . . . .").[3]

As to the second argument, New York law provides that an unwritten agreement is unenforceable if it "[i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of . . . a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest." N.Y. Gen. Obl. L. § 5-701(a)(10). Choi and De Tomaso take this provision to mean that an agreement creating a "partnership interest" isn't enforceable unless it's in writing. But that's not what the statute says. It doesn't require that any contract for an "interest" in a business be reduced to writing to be enforceable; instead, it requires a writing for any contract "to pay compensation *for services rendered in negotiating* . . . the purchase . . . of . . . [a] business . . . or an interest therein." N.Y. Gen. Obl. L. § 5-701(a)(10) (emphasis added); *see also Chardan Cap. Mkts., LLC v. N.W. Biotherapeutics, Inc.*, 2018 WL 3733948, at *4 (S.D.N.Y. Aug. 6, 2018) ("Under any reasonable

---

[3] At oral argument, the parties agreed that no sales were made during Berris's employment, and no commissions are due. *See* Oral Arg. Tr. at 52:10–53:5.

reading of section 5-701(a)(10), a purported oral contract *to negotiate the creation of [a partnership] interest* would be governed by section 5-701(a)(10) even though the limited partner could not, consistent with its limited partner status, control the business." (emphasis added)); *JF Cap. Advisors, LLC v. Lightstone Grp., LLC*, 37 N.E.3d 725, 729 (N.Y. 2015) ("General Obligations Law § 5–701(a)(10) interdicts oral agreements to pay compensation for services rendered with respect to the *negotiation* of the purchase of real estate or of a business opportunity or business."). Indeed, New York law is clear that "[a]n oral agreement to form a partnership for an indefinite period creates a partnership at will and is not barred by the Statute of Frauds." *Prince v. O'Brien*, 650 N.Y.S.2d 157, 158 (1st Dep't 1996); *see also Belluomo v. Tiger Schulmann's Mixed Martial Arts*, 2015 WL 5794356, at *7 (E.D.N.Y. Sept. 30, 2015) (rejecting argument that an oral partnership agreement violates New York's statute of frauds); *Massey v. Byrne*, 977 N.Y.S.2d 242, 243 (1st Dep't 2013) ("Plaintiff is correct that the statute of frauds does not apply to partnerships or joint ventures created at will."). So even setting aside the parties' factual dispute about whether Berris is claiming a partnership interest in the business, Choi and De Tomaso's argument on this ground fails.

### B. There is a triable issue of fact about the parties' intent to create a binding contract.

Next, Choi and De Tomaso argue that the contract is an unenforceable "agreement to agree." Dkt. 138 at 14. They argue that the purported contract was, at most, a preliminary discussion about Berris's compensation that the parties never intended to be binding.

"The key" in determining whether an agreement is an enforceable contract is "the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548–59 (2d Cir. 1998). "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (alteration in original) (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)). To determine "whether the parties intended to be bound in the absence of a document executed by both sides," courts consider "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.*

Choi and De Tomaso focus on the third and fourth factors, arguing that there is no evidence that the parties agreed on "any of the obvious and customary terms of . . . an agreement" for equity, and "equity stakes worth millions are 'precisely the type of agreement that is typically reduced to writing.'" *See* Dkt. 138 at 14–15 (quoting *Fetet v. Altice USA, Inc.*, 2021 WL 2941917, at *8 (S.D.N.Y. July 12, 2021)); *see also* Dkt. 179 at 7 ("[T]here is no evidence the parties agreed on any essential terms of [Berris's] supposed agreement."). They point to ongoing communications between De Tomaso and its lawyers about a corporate restructuring, which (in their view) culminated with a March 15, 2021, email in which Berris agreed to "revisit" the potential transfer of equity later. *See* Dkt. 182-11 at 2.

Having reviewed the evidence, the Court is left with more questions than answers about whether the parties agreed to the grant of 10% equity. It is undisputed that there are various communications in the record about a purported grant of equity to Berris, and the March 15 email is not the smoking gun that defendants insist it is: in the email exchange, Choi forwarded an email from De Tomaso's lawyers about the company's restructuring, asking Berris to "pls have a look," to which Berris responded, "[w]ill revisit. Thanks for forwarding." *Id.* A juror could conclude that this just reflects that Berris agreed to revisit the email, not the grant of equity.

As for defendants' argument that this is the type of agreement that is typically reduced to writing, that may be true, but there is evidence in the record that De Tomaso regularly entered into oral agreements that one would expect to be reduced to writing. *Cf. Fetet*, 2021 WL 2941917, at *8 ("Tellingly, the parties' other agreements, such as the Amended Bonus Plan, the Settlement Agreement, and the Operating Agreement, were reduced to complex writings."). For example, Majcher testified that she began working and was paid under a consultancy arrangement in 2022, for which a contract was not executed until 2023. *See* Dkt. 168-2 at 61–63. And De Tomaso also paid one of its technical partners €1,000,000 "[b]efore a written agreement . . . was in place." Dkt. 179-1 ¶ 79.

At bottom, "[w]hether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir. 1993). "[S]ummary judgment [is] an improper procedural vehicle for determining the parties' intent not to be bound in the absence of written agreements—even in cases where evidence strongly suggests the contrary." *Id.* Accordingly, even though Berris's claim "depends entirely upon the existence of an oral agreement, and [his] evidence . . . consists" largely of "[his] own, uncorroborated testimony," summary judgment is unwarranted. *Yurman v. Printex Packaging Corp.*, 2008 WL 11417672, at *7 (E.D.N.Y. Sept. 22, 2008).

### C. Summary judgment is granted on Berris's alter-ego claims against Choi.

Choi moves for summary judgment on the contract and alternative equitable claims on the ground that he wasn't a party to the purported contract between Berris and De Tomaso, and "a non-signatory to a contract cannot be named as a defendant . . . unless it has thereafter assumed or been assigned the contract." *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991). Berris argues that Choi is liable on an alter-ego theory, under which "a court may impose personal liability on a corporation's owner when . . . the corporation 'is in fact a mere instrumentality or alter ego of its owner.'" *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 518 (S.D.N.Y. 2017) (quoting *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011)).

To prevail under this theory, "a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *5 (Del. Ch. Sept. 19,

1989)).[4] In evaluating whether the owner mingled operations with the entity, factors to consider include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." *Id.* at 177 (quoting *Harco*, 1989 WL 110537, at \*4). "No single factor can justify a decision to disregard the corporate entity, but some combination of them is required, and an *overall element of injustice or unfairness must always be present, as well.*" *Id.* (cleaned up).

Although Berris points to some evidence that Choi and De Tomaso intermingled operations, he does not address the "injustice or unfairness" requirement at all. *See* Dkt. 164 at 42–44. He just says that Choi is liable because De Tomaso breached its contract and Choi and De Tomaso operated as one. But "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil." *Caplan v. Dollinger*, 2025 WL 1808530, at \*8 (S.D.N.Y. June 30, 2025) (citation omitted) (applying New York law). Because Berris does not identify any shred of evidence that Choi used the corporate form "to engage in conduct that was 'inequitable,'" *NetJets*, 537 F.3d at 177 (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989)), Choi is entitled to summary judgment on Berris's alter-ego claims.

## II.    Summary judgment is denied on the alternative equitable claims as to De Tomaso.

As an alternative to his contract claim, Berris pled promissory estoppel, unjust enrichment, and quantum meruit. *See* Dkt. 80 ¶¶ 150, 156, 164. De Tomaso moves for summary judgment on Berris's equitable claims, arguing that they are barred for the same reasons as the contract claim: the statute of frauds. But as discussed above, defendants' statute-of-frauds arguments lack merit, so this argument fails.

De Tomaso also argues that it is entitled to summary judgment on Berris's equitable claims because "the parties had an existing agreement—the Consulting Services Agreement—under which Berris was compensated and De Tomaso performed." Dkt. 138 at 16. It argues that the existence of this agreement "is fatal to [Berris's] [equitable] claims . . . because none of those claims is available where a 'valid and enforceable written contract governing a particular subject matter' already exists." *Id.* (citations omitted).

But there's a genuine dispute about whether the Consulting Services Agreement covers the subject matter at issue: Berris's employment as CEO of De Tomaso. The Consulting Services

---

[4] To the extent that the parties dispute whether New York or Delaware veil-piercing law applies, Choi is correct that Delaware law applies because "under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (cleaned up). But this choice also doesn't matter because "New York and Delaware veil-piercing law do not materially differ." *LaCourte v. JP Morgan Chase & Co.*, 2013 WL 4830935, at \*6 n.2 (S.D.N.Y. Sept. 4, 2013).

Agreement was between Apollo Automobil Limited and Aprivy LLC (of which Berris is the sole member). Dkt. 166 ¶¶ 21–22; *see also* Dkt. 156-1 at 14. Under the agreement, Berris agreed to provide services to Apollo and Apollo's businesses as an independent contractor, which included services for "Apollo" and "De Tomaso" branded vehicles. Dkt. 156-1 at 2, 12. Given that De Tomaso was not affiliated with Apollo after Apollo's sale in March 2021, it's not clear from the face of the Consulting Services Agreement that the agreement governs Berris's services as an officer of De Tomaso.

Rule 8(d) of the Federal Rules of Civil Procedure permits a plaintiff to assert alternative claims, and "[i]t is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation." *Polanco v. City of New York*, 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018). Barring any substantive reason to grant summary judgment on these claims, Berris is entitled to put these alternative theories to the jury. *See id.* ("[Plaintiff] could properly argue alternative claims to the jury." (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996))).

### III.    Summary judgment is granted on the wrongful-discharge claim.

Berris alleges that he was wrongfully terminated in violation of Connecticut law. As a threshold matter, the parties dispute whether Connecticut or New York law applies to Berris's wrongful-discharge claim. Because New York law does not recognize a tort of wrongful discharge, Berris's claim can't proceed unless Connecticut law governs. *See Barcellos v. Robbins*, 858 N.Y.S.2d 658, 660 (2d Dep't 2008) ("New York does not recognize a cause of action for the tort of abusive or wrongful discharge of an at-will employee."). The Court need not resolve this choice-of-law dispute, however, because even if Connecticut law governs, De Tomaso and Choi are entitled to summary judgment on the wrongful-discharge claim.

Connecticut law "permit[s] a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." *Sheet v. Teddy's Frosted Foods, Inc.*, 427 A.2d 385, 386 (Conn. 1980). Berris argues that he was "terminated in violation of established public policy on two independent grounds." Dkt. 164 at 38. First, he says that his "termination was timed so that De Tomaso could avoid paying him the compensation to which he was entitled." *Id.* Second, he says that he was "terminated in violation of the public policy articulated by Connecticut General Statutes § 33-13[3]6." *Id.* at 39. But there is no evidence in the summary-judgment record from which a reasonable juror could draw these connections. *See Celotex Corp.*, 477 U.S. at 322–23 (holding that nonmoving party must point to some evidence supporting the essential elements of its position if it will bear the burden on the issue at trial).

On compensation, Berris points to no evidence that he was terminated "solely to avoid vesting of certain rights to compensation." *Nofs v. Gemini Network, Inc.*, 2003 WL 462975, at *7 (Conn. Super. Ct. Feb. 4, 2003). He doesn't say, for example, that he complained to Choi about his compensation at any point, or that he was terminated shortly before certain rights were about to vest. *See* Dkt. 166 ¶¶ 57–58 (Berris conceding that he never complained to De Tomaso that he hadn't received a Porsche GT3 or ten percent equity grant); *id.* ¶ 65 (Berris stating that "[t]here

was never to be any vesting period for Berris's equity"). The only evidence he points to in support of this wrongful-discharge theory is the same evidence he points to for his contract claim. In other words, Berris says he's entitled to certain compensation for his work at De Tomaso. *See* Dkt. 179-1 ¶¶ 41, 50–55. But he doesn't point to any evidence from which a reasonable juror might conclude that he was fired by De Tomaso so that it could avoid paying him that compensation.

Nor is there sufficient evidence to support Berris's theory that he was fired for reporting fraud. Section 33-1336 protects employees of publicly held corporations who are discharged for reporting fraud. The policy "expressed" in this statute "supports a cause of action for wrongful discharge in violation of public policy in the case of an employee of a privately held corporation who . . . reports fraud only internally." *Chenarides v. Bestfoods Baking*, 2005 WL 1088983, at *5 (Conn. Super. Ct. Mar. 30, 2005). In *Chenarides*, for example, the court held that the plaintiff had a valid claim for wrongful termination where he "claim[ed] that he uncovered fraud and reported it to his superiors." *Id.* However, the contours of the "public policy" exception to the at-will employment doctrine, and how it applies in the context of internal reports of fraud, have not been clarified by the Connecticut Supreme Court. *Cf. TyMetrix, Inc. v. Syzmonik*, 2007 WL 352033, at *2 (Conn. Super. Ct. Jan. 19, 2007) (observing that "the Connecticut Supreme Court has repeatedly underscored the narrowness of the [public policy] exception and the Court's continued 'adherence . . . to the general rule allowing unfettered termination of an at-will relationship'" (quoting *Thibodeau v. Design Grp. One Architects, LLC*, 802 A.2d 731, 737 (Conn. 2002))).

In any event, here Berris has produced insufficient evidence that he uncovered fraud during his time at De Tomaso and reported it to Choi. Although Berris now alleges that Choi and Lui agreed to illegally paper over a prearranged de-SPAC deal, there is no evidence that Berris communicated this concern to Choi during his employment at De Tomaso. Berris testified that he "found it odd that [Choi]" knew that Lui would take over Genesis before it was publicly announced in SEC filings and that Lui "was joining confidential discussions" between De Tomaso and ARC. Dkt. 168-1 at 498–99. But he doesn't say that he raised those concerns to Choi.

The only evidence that Berris complained about anything is his own, vague testimony that he raised certain unrelated issues to Choi at unspecified times in spring 2022. Berris testified in his deposition that Choi began making "material changes to the specifications of De Tomaso vehicles" when a new technical partner, Capricorn, came on board to develop the P72. *Id.* at 507. Berris saw in reports that another technical partner responsible for the "braking and traction control system" "w[as] not capable of producing a system that was road legal," so he "raised this concern to . . . Choi," but it "went unaddressed." *Id.* at 507–08; *see also id.* at 510 (Berris stating that he "object[ed] to those changes" to Choi in writing). Berris then discussed his allegation that Choi had made false statements to potential SPAC investors and customers. When asked what false statements "were made to the SPAC," Berris said "there were altered financial statements with forecasts and production timelines that could not be met," and "[t]here was vehicle noncompliance because of the change of key technical partners, again, corresponding to the braking and traction control systems as well as emissions." *Id.* at 513. When asked whether he discussed those statements with anyone at De Tomaso, Berris testified that he "did with Mr. Choi." *Id.* at 514. And

when asked whether he did so in writing, Berris said that he "believe[d] [he] communicated with [Choi] about concerns with Capricorn and asking for status updates both verbally and in writing." *Id.* If Berris did communicate his concerns in writing, he testified, "it would have occurred some time in the spring of 2022." *Id.* at 515. (There is no evidence in the summary-judgment record that Berris ever complained about any of this in writing.) As for false statements made to customers, Berris testified that he and Choi made false statements to clients about "the timing for delivery and the availability of the final development prototypes for the P72" because Berris "could only relay to the clients what . . . Choi was relaying to [him] because [he] was not getting status updates from Capricorn, even though [he] was trying via email[ and] via text on numerous occasions." *Id.* Berris "raised concerns" about these false statements to Choi and "vent[ed] [his] frustrations" to others. *Id.* at 522–23. Some of these communications purportedly took place over WhatsApp, but none of these communications is in the summary-judgment record. *Id.* at 524.

Berris's testimony isn't enough to create a triable issue of fact on whether he was fired for reporting fraud. *See FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387 (S.D.N.Y. 2023) ("[A] non-moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." (alteration in original) (citation omitted)). To start, the record doesn't show that Berris was reporting fraud by raising these concerns with Choi. Berris was concerned that Choi was hiring technical partners that were ill-equipped to create cars that were compliant with relevant regulations. But an employee doesn't report fraud every time they raise a concern about an employer's plans or a subcontractor's abilities. Moreover, Berris testified that *he* made statements to customers in spring 2022 that turned out not to be true because he was "siloed off" from updates from Capricorn. Dkt. 168-1 at 515–20. It's not clear from Berris's testimony when he became aware that the statements were untrue, nor does he explain whether or when he raised that specific concern to Choi. The gist of Berris's testimony on this point is that he and Choi told customers that certain cars could be ready by a certain date, which didn't happen. But a company doesn't engage in fraud every time it overpromises on deliverables. *See TyMetrix*, 2007 WL 352033, at *1, *4 (no claim even where former employee communicated to company his "reasonable belief" that misrepresentations might expose company and its customers to violations of the law, including Sarbanes-Oxley, and even where a senior executive told the employee he would lose his job unless he participated in the "dishonest, unethical, and likely illegal actions being promulgated").

In sum, although Berris styled himself as a whistleblower on Choi and Lui's fraudulent SPAC, there is no evidence of this in the record, nor is there any evidence that Berris reported any other type of fraud. Instead, Berris's testimony reflects that he was upset that Choi was mismanaging a technical partner, overpromising on deliverables, and keeping Berris out of the loop.[5] This isn't enough to clear the summary-judgment hurdle, especially in light of the record of written communications among Berris, Choi, and Lui, which is devoid of any whistleblowing or concerns

---

[5] There is no dispute that Capricorn overpromised and underdelivered on its contract with De Tomaso. De Tomaso "ultimately terminated its relationship with Capricorn for Capricorn's failure to meet its obligations" and "is presently pursuing legal action against Capricorn." Dkt. 179-1 ¶¶ 88–89.

about fraud. Indeed, around the time of Berris's resignation from the board and termination as CEO, Berris simply expressed regret for the deterioration of the parties' relationship. *See, e.g.*, Dkt. 166 ¶¶ 203–04; Dkt. 167 ¶ 128. Lacking evidence that he uncovered and reported fraud, and that he was terminated on that basis, no juror could conclude that Berris was fired in violation of "important public policy." *See TyMetrix*, 2007 WL 352033, at *5. Accordingly, summary judgment is granted in Choi and De Tomaso's favor on the wrongful-discharge claim.

**IV.    Summary judgment is granted on the aiding-and-abetting and conspiracy claim.**

Genesis and Lui move for summary judgment on Berris's claim that they aided and abetted and conspired to cause Berris's wrongful discharge. Because Berris has failed to create a triable issue as to whether he was fired in violation of public policy, Genesis and Lui cannot be held liable for aiding and abetting or conspiring to cause Berris's wrongful discharge. Accordingly, summary judgment is granted on Berris's claim against Genesis and Lui.

**V.    Summary judgment is denied on the defamation claim.**

Defendants argue that the Court lacks personal jurisdiction over Berris's defamation claim against Choi because Choi doesn't live in New York and "Berris has not produced any evidence of any defamatory statements made by Choi in New York to anyone in New York." Dkt. 138 at 20–22. In fact, Choi argues, Berris hasn't produced any evidence of any defamatory statements at all.

The Court begins with the jurisdictional question. *See In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267 (2d Cir. 2001). *But see SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring) ("I believe that *Steel Co.* [*v. Citizens for a Better Environment*, 523 U.S. 83 (1998)] is not controlling in cases of personal jurisdiction."). "CPLR 302 outlines acts that can form the basis for obtaining personal jurisdiction over non-domiciliaries." *SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n*, 963 N.E.2d 1226, 1228 (N.Y. 2012). Under New York law, "defamation claims . . . . may proceed against non-domiciliaries who transact business within the state and thereby satisfy the requirements of CPLR 302(a)(1)." *Id.* "In order to demonstrate that an individual is transacting business within the meaning of CPLR 302(a)(1), 'there must have been some "purposeful activities" within the State that would justify bringing the nondomiciliary defendant before the New York courts.'" *Id.* (quoting *McGowan v. Smith*, 419 N.E.2d 321, 322 (N.Y. 1981)). "Moreover, there must be 'some articulable nexus between the business transacted and the cause of action sued upon.'" *Id.* at 1228–29 (quoting *McGowan*, 419 N.E.2d at 323).

Here, Choi clearly transacted business in New York. Although his family "principally reside[s] in . . . Hong Kong," he comes to New York, where he owns a condominium, whenever business requires it. Dkt. 168-3 at 123, 357–58. As defendants argued vigorously when it came to Berris's wrongful-discharge claim, Berris and Choi "worked and conducted company operations very frequently from New York." *See* Dkt. 138 at 18 ("New York has more contacts with both parties, and a greater concern with the issues in this litigation."). Choi's allegedly defamatory statements

concerned Berris's work, which took place at least in part in New York with Choi. Choi may even have been in New York on May 16, 2022, when he sent one of the emails at issue. *See* 179-1 ¶ 158; Dkt. 173-37 (showing that Choi arrived in New York on April 19, 2022, and left the country via Miami on May 17, 2022). And another statement was made to a person who lives in New York. Dkt. 168-6 at 4. That's enough to create an articulable nexus between Choi's business in New York and Berris's defamation claim.

As for the statements themselves, "[w]hen challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made." *Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir. 2001) (quoting *Snyder v. Sony Music Ent., Inc.*, 684 N.Y.S.2d 235, 238 (1st Dep't 1999)). Berris argues that Choi made a variety of defamatory statements to "De Tomaso employees, consultants, customers, partners, and others in the luxury automotive industry," which destroyed Berris's reputation. Dkt. 164 at 14. For the most part, Berris doesn't introduce any evidence beyond his own testimony to prove that Choi said anything to anyone. *See* Dkt. 179-1 ¶¶ 156, 160–64. He just says that he was "told from numerous parties that . . . Choi had approached them and was tarnishing [his] name." Dkt. 168-1 at 542. This is hearsay that cannot be used to prove up Choi's allegedly defamatory statements. *See Albert*, 239 F.3d at 266–67; *see also Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 851 (9th Cir. 1990) (holding that summary judgment on defamation claim was proper where plaintiff's only evidence that statements were in fact made was plaintiff's own assertion "that the manager who succeeded him . . . told customers that [plaintiff] had been fired for doing something illegal").

But there is sufficient non-hearsay evidence that Choi discussed Berris's conduct with associates on three occasions. First, Berris points to the testimony of Evan Cygler, a business associate who lives in New York, Dkt. 168-6 at 4, 7–8, who testified that he "was informed" by Choi that Berris was no longer working with De Tomaso. *Id.* at 23. Second, Berris cites an email Choi sent to De Tomaso's employees and consultants providing "formal notice of Ryan Berris's immediate suspension from all current activities in the Company and the Group due to misconduct." Dkt. 179-1 ¶ 158; *see also* Dkt. 173-9; Dkt. 173-30. Third, Berris points to an email that Choi forwarded to a De Tomaso customer, in which Majcher stated that "we have reasons to believe that [Berris] may be defrauding the company." Dkt. 179-1 ¶ 159; *see also Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 298 (S.D.N.Y. 2005) ("A defamatory statement is uttered not merely by the person from whose e-mail account it is sent, but by anyone who participates in its publication . . . ."). Majcher's original email described Berris as the "[t]arget" of De Tomaso's investigation and provided certain "investigative suggestions." Dkt. 173-12 at 4. Majcher explained that although Berris had "produced some good work[,] . . . over the past 6 months or so [they had] been noticing irregularities in his behaviour," including "entering into contracts on behalf of the company without the approval of [Choi]," "making unauthorized hires in an attempt to sideline other current employees," and "exhibiting obsessive qualities over [Choi]." *Id.* After Majcher forwarded the discussion to Choi, Choi forwarded it to Stanley Cohen,

a customer of De Tomaso, who responded that he was "very disappointed in [Berris]" and "never would have suspected that [Berris] would be the Bernie Madoff of New England." *Id.* at 2.

Choi's statements to Cygler can't support Berris's defamation claim given how vague Cygler is about what Choi actually said. Cygler's memory of how he learned that Berris was no longer working with De Tomaso was, in his own words, "a bit vague." Dkt. 168-6 at 23. He recalled that Choi told him Berris "had left the company," and "vaguely remember[ed] a few things happening at the time, . . . like things that were promised to be done that weren't being done," and "[e]ventually . . . some kind of . . . snowballing effect of certain things that were supposed to be accomplished that weren't being accomplished and, therefore, [Berris] was let go, like homologation reasons or just time." *Id.* at 23–24. In Cygler's words, "it really just felt like there was so much time passing and then issues with suppliers[, a]nd then it felt like there was also this Carmen Jorda situation [he] remember[ed] being . . . a problem." *Id.* Cygler was then asked whether Choi told him that Berris "was let go for poor performance," to which Cygler responded

> One day, I will know what that means, but why he was let go, I just kind of explained it to you. It was like a multitude of things such as unmet deadlines, things that were being done from my understanding, from what I was told, hiring of this person named Carmen Jorda, and he was in, like, some kind of situation where he had a financial obligation to pay her like a spokesperson. This was one element I vaguely remember. If I remember, at some point, I don't think it had anything to do with anything, there was an issue with a supplier called Capricorn and I don't think [Choi] even at that time knew what was going to be happening, but it's all like a little bit unclear in my mind at this point.

*Id.* at 24–25. Berris's counsel then asked whether "all those issues . . . were things that [Choi] told [him] on the phone call," to which Cygler responded that he "[v]aguely" remembered these "being topics that were in my mind." *Id.* at 25.

"On a motion for summary judgment, the court's role is to determine whether a statement is 'reasonably susceptible to the defamatory meaning imputed to it.'" *Stern v. Cosby*, 645 F. Supp. 2d 258, 272 (S.D.N.Y. 2009). The Court can't reach that conclusion here. All Cygler's testimony demonstrates is that following Berris's termination, he and Choi discussed Berris's performance at the company. Cygler's vague awareness of several "topics" related to Choi's performance cannot support a defamation claim.

But the statements in the emails can. Choi argues that the emails contain "exactly the kinds of 'indefinite, ambiguous' statements of opinion that will not support a defamation claim." Dkt. 179 at 14 (quoting *Mirage Entertainment, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 37 (S.D.N.Y. 2018)). The court disagrees.

"New York courts employ a three-part test in determining whether a statement is of fact or opinion: '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being

16

read or heard is likely to be opinion, not fact.'" *Mirage*, 326 F. Supp. 3d at 37 (quoting *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993)). Applying that test here, Choi's statements are statements of fact, not opinion. Fired for "misconduct" has a precise meaning that is easily understood, can be proven untrue (if, for example, Berris proves that he did nothing wrong), and the surrounding circumstances—an employer explaining why an employee is terminated—would not signal to the listener that the speaker was expressing a statement of opinion. Similarly, "we have reasons to believe that [Berris] may be defrauding the company" has a precise meaning, can be proven untrue by showing that Choi had no reason to believe Berris was defrauding the company, and the surrounding circumstances—an employer stating to outside counsel that they have reason to believe that a former employee was engaged in fraud—would signal fact, not opinion.

Choi also argues that Berris's defamation claim fails because Berris has failed to "point to any evidence of harm flowing from any defamatory statement." Dkt. 179 at 14. Berris points to his own testimony that Choi's statements "destroyed [his] reputation amongst clients, partner[s]" and others in the "insular world" of the luxury auto industry. Dkt. 179-1 ¶ 166. He also says that one potential employer told him that they wouldn't hire him because of Choi's statements. *Id.* But as Choi points out, this is inadmissible hearsay, which the Court can't rely on at summary judgment.

Nonetheless, "New York recognizes certain statements as defamatory per se, meaning they are actionable without 'pleading and proof of special damages.'" *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (quoting *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985)). Although "[t]he line between statements that are defamatory per se and those that require proof of special damages remains fuzzy," *id.*, "it is well settled that a 'writing which *tends* to disparage a person in the way of his office profession or trade' is libelous *per se*." *Davis*, 754 F.2d at 82 (quoting *Nichols v. Item Pubs.*, 132 N.E.2d 860, 862 (N.Y. 1956)); *see also Four Star Stage Lighting, Inc. v. Merrick*, 392 N.Y.S.2d 297, 298 (1st Dep't 1977) ("[W]ords are libelous if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof."). Choi's statements plainly "imput[ed] to [Berris] . . . misconduct" in his work, which means that the statements, if all the other elements of the claim are established, would be per se defamatory. "If a statement is defamatory per se, injury is assumed," and "[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages." *Celle*, 209 F.3d at 179 (quoting *Van-Go Transp. Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y. 1997)). So although Berris's evidence of injury is thin, this lack of evidence isn't fatal to his defamation claim.

A reader might wonder how Berris's defamation claim can survive while his wrongful-discharge claim fails. Although Berris did not point to any evidence that he uncovered and reported fraud during his time at De Tomaso, his testimony does suggest that his relationship with Choi deteriorated as he continued to raise concerns about suppliers, manufacturing, and the sharing of information. In other words, there is evidence that Berris became a thorn in Choi's side. Berris also points to evidence suggesting that Choi ginned up concerns about Berris's performance based

on his personal frustrations with Berris. For example, after Choi told Majcher that he wanted to "remove [Berris's] directorship" based on "irregularities," Majcher "remind[ed]" Choi that "maybe [his] agitation towards [Berris] recently stemmed from [Choi] not having enough sleep so every little thing becomes a trigger point." Dkt. 172-22 at 5–7. Majcher stated that Berris "has his flaws," but "he's not a cheat." *Id.* at 7. Although De Tomaso's auditors didn't raise any questions about Berris's expenses, Choi told Majcher he wanted to "conduct a forensic investigation" into Berris's invoices and receipts because Berris's expenses had "exploded." *See id.* at 8, 10, 49. After Berris was fired, Majcher and Choi hired someone to conduct physical surveillance of Berris. *See* Dkt. 168-2 at 32–33. And Majcher testified that she and her husband discussed finding someone to hack into Berris's emails. *Id.* at 292. A jury could determine from this evidence that Choi manufactured his concerns about Berris's misconduct and fraud to fire Berris based on personal animus, particularly given that, as discussed below, there is a genuine dispute about whether Berris's expenses were business expenses, and about whether Choi was in the know about the Jorda contract that Berris entered into on De Tomaso's behalf.

Accordingly, summary judgment is denied on Berris's defamation claim.

## VI. Summary judgment is denied on De Tomaso's counterclaims.

De Tomaso moves for summary judgment on its counterclaims against Berris for breach of his fiduciary duties of care and loyalty, as well as for unjust enrichment. *See* Dkt. 95 ¶¶ 218–49. It argues that "[t]here is no genuine dispute that Berris breached his duties of loyalty and care to De Tomaso by demanding and taking hundreds of thousands of dollars of unjustified expense reimbursements from the company" and through his "dealings with Jorda." Dkt. 138 at 23–24.

### A. Defendants' motion to exclude Imperiale's testimony is denied.

Before reaching the merits of defendants' counterclaims, the Court addresses their motion to exclude expert testimony purporting to show that Berris's travel expenses were reasonable. *See* Dkt. 127. De Tomaso did not have a written, formal expense policy in place when Berris incurred these expenses. Dkt. 179-1 ¶ 91. Berris proposes to offer the expert testimony of John Imperiale, a certified public accountant who currently serves as a Senior Director in the Expert Services practice at a financial and risk advisory firm, Dkt. 129-2 ¶ 5, to give the jury "additional context and guidance regarding what may constitute proper business expenses," Dkt. 162 at 7.

Under Federal Rule of Evidence 702, expert witness testimony is permitted

if the proponent demonstrates . . . that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The district court plays the role of gatekeeper, determining whether the expert's testimony is reliable and relevant." *Faison-Williams v. United States*, 2025 WL 974831, at *3 (2d

Cir. Apr. 1, 2025). Defendants argue that the Court should exclude Imperiale's opinions because he merely "regurgitates" what Berris has told him, and because his opinions are not based on reliable principles or methods. Dkt. 128 at 5–6 (citation omitted).

The Court disagrees. As to Imperiale's methods, because De Tomaso did not have an expense policy in place, Imperiale uses "professional accounting and taxation guidelines issued by the Financial Accounting Standards Board ('FASB') and the U.S. Internal Revenue Service ('IRS') in order to provide a general framework for what are generally and customarily accepted as valid business expenses." Dkt. 129-2 ¶ 13. Under these guidelines, Imperiale opines that "the principal analysis of whether a particular expense is considered to be a 'business expense' turns on if it is 'common and accepted in your industry' and 'helpful and appropriate for your trade or business,'" as well as whether "the expense was incurred in 'carrying out other activities that constitute the entity's ongoing major or central operations.'" *Id.* ¶ 18. He then applies that framework to the facts of this case using "various sources of information including, but not limited to, pleadings in this case, deposition transcripts, documents produced by the parties in this matter, and publicly available documents," on the understanding "that the factual foundation and predicates for the facts set forth in [his] report will be laid by fact witnesses at trial and through other evidentiary materials." *Id.* at 1 n.1. Imperiale concludes based on this evidence that Berris "incurred at least $49,884.29 in travel-related business expenses" between December 2020 and August 2021. *Id.* ¶¶ 7–8.

Although the IRS and FASB guidelines do not directly control the issues in this case, absent a written expense policy, the jury has no benchmark against which to measure the reasonableness of Berris's expenses. The Court agrees with Berris that insight into what constitutes a business expense under tax and accounting standards may assist the jury in drawing the line between business and personal expenses in this context, which in turn will assist the jury in determining whether Berris breached his fiduciary duty to De Tomaso by reimbursing certain expenses.

As for defendants' argument that Imperiale is merely bolstering Berris's testimony, although he relies in part on Berris's factual statements, Imperiale does not merely "regurgitate[] what a party has told him," *see Arista Records, LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009), but rather analyzes whether Berris's expenditures are reasonably considered business expenses if Berris's factual assertions are taken as true. Moreover, the Court will put in place appropriate guardrails at trial to ensure that Imperiale isn't simply acting as a mouthpiece for otherwise inadmissible evidence and isn't vouching for Berris's credibility. Imperiale should make clear that he was asked to assume the truth of the stated reasons for the various expenses, and that he is not testifying as to the veracity of those reasons.

### B. There are genuine issues of material fact as to whether Berris's expenses were reasonable business expenses and whether Choi approved the Jorda contract.

"Decisions by interested fiduciaries to reimburse their own expenses or provide themselves with other corporate benefits are . . . subject to entire fairness review" under Delaware law, *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *16 (Del. Ch. May 27, 2015), which applies

here given that De Tomaso is a Delaware LLC, *Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980) ("New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation."). Although a fiduciary carries the burden of accounting for their expenses, *see Cancan*, 2015 WL 3400789, at *16, this is true only when "a plaintiff has made a *prima facie* showing based on *substantial* evidence that the expenditures in question are self-interested transactions." *Avande, Inc. v. Evans*, 2019 WL 3800168, at *12 (Del. Ch. Aug. 13, 2019).

De Tomaso argues that Berris has failed to carry his burden of accounting for his expenses and asks the Court to hold that Berris's expenditures were unfair as a matter of law. Berris fails to address the entire-fairness standard or how it maps onto the facts here. Nonetheless, "[t]his is . . . one of those frequent situations where it is desirable to inquire into and develop more thoroughly the facts at trial." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 31 (Del. Ch. 2014). At the time Berris made his expenditures, De Tomaso had no written expense policy in place. Dkt. 179-1 ¶ 91. Berris points to testimony suggesting that De Tomaso's auditors had no problem with his expenditures, but Choi decided to press him about them anyway. *See* Dkt. 168-2 at 245–46. Berris emailed Majcher a zip file containing "expense reports, receipts, credit card statements and excel sheets." Dkt. 166 ¶ 92. He also wrote to Majcher explaining there were times when he was unable to "efficiently keep track of all [his] expenses" but offering to provide "further explanation" if necessary. Dkt. 173-26. Majcher couldn't recall "whether she ever responded to this email or reviewed the contents of the zip file." Dkt. 179-1 ¶ 97. During his deposition, Berris explained how he conceived of personal versus business expenses and explained the business purpose of several of the specific expenses he was asked about. *See* Dkt. 168-1 at 578–85. For example, Berris testified that he understood he was entitled to a "per diem," which accounted for his grocery-store expenditures. *Id.* at 581. He also expensed shirts that were embroidered with the company logo for himself and Choi. *See id.* at 580. For certain other expenditures, like restaurant meals, Berris offers corroborating evidence to suggest that these meals were business meetings. *See, e.g.*, Dkt. 166 ¶ 100. Under these circumstances, even assuming that De Tomaso has made its *prima facie* showing that the expenditures are self-interested, the Court can't say that Berris has failed as a matter of law to carry his burden of justifying them.

As for the Jorda contract, there's a genuine dispute about whether Berris acted unilaterally in his dealings with Jorda. Berris says that Choi knew about his dealing with Jorda, *see* Dkt. 168-1 at 226, and he points to evidence that he and Choi discussed her annual salary. Dkt. 168-13 at 9. Accordingly, De Tomaso isn't entitled to summary judgment on its counterclaims against Berris.

## CONCLUSION

For these reasons, Choi and De Tomaso's motion for summary judgment is GRANTED IN PART and DENIED IN PART, Genesis and Lui's motion is GRANTED, and defendants' motion to preclude Imperiale's testimony is DENIED.

The Clerk of Court is directed to terminate Dkts. 127, 130, and 137.

SO ORDERED.

Dated: September 4, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge